## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
## CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

**1. SEE NOTICE ON REVERSE**　　　**2. PLEASE TYPE OR PRINT**　　　**3. STAPLE ALL ADDITIONAL PAGES**

| Case Caption: | District Court or Agency: | Judge: |
|---|---|---|
| Sarah Palin v. The New York Times Company and James Bennet | S.D.N.Y. | Hon. Jed S. Rakoff |

| | Date the Order or Judgment Appealed from was Entered on the Docket: | District Court Docket No.: |
|---|---|---|
| | 2/14/22; 2/15/22; 3/1/22 | 17-cv-4853-JSR |

| | Date the Notice of Appeal was Filed: | Is this a Cross Appeal? |
|---|---|---|
| | 3/17/22 | ☐ Yes　✓ No |

| Attorney(s) for Appellant(s):<br>✓ Plaintiff<br>☐ Defendant | Counsel's Name:<br>Shane B. Vogt | Address:<br>100 N. Tampa St.<br>Suite 1900<br>Tampa, FL 33602 | Telephone No.:<br>(813) 834-9191 | Fax No.:<br>(813) 443-2193 | E-mail:<br>svogt@<br>tcb-law.com |
|---|---|---|---|---|---|
| Attorney(s) for Appellee(s):<br>☐ Plaintiff<br>✓ Defendant | Counsel's Name:<br>See attached sheet for attorneys for Appellees | Address: | Telephone No.: | Fax No.: | E-mail: |

| Has Transcript Been Prepared?<br>Yes. | Approx. Number of Transcript Pages:<br>1370 | Number of Exhibits Appended to Transcript:<br>136 | Has this matter been before this Circuit previously? ✓ Yes ☐ No<br>If Yes, provide the following:<br>Case Name: Sarah Palin v. The New York Times Co.<br>2d Cir. Docket No.: 17-3801　　Reporter Citation: (i.e., F.3d or Fed. App.)<br>　　　　　　　　　　　　　940 F.3d 804 |
|---|---|---|---|

**ADDENDUM "A":** COUNSEL MUST ATTACH TO THIS FORM: (1) A BRIEF, BUT NOT PERFUNCTORY, DESCRIPTION OF THE NATURE OF THE ACTION; (2) THE RESULT BELOW; (3) A COPY OF THE NOTICE OF APPEAL AND A CURRENT COPY OF THE LOWER COURT DOCKET SHEET; AND (4) A COPY OF ALL RELEVANT OPINIONS/ORDERS FORMING THE BASIS FOR THIS APPEAL, INCLUDING TRANSCRIPTS OF ORDERS ISSUED FROM THE BENCH OR IN CHAMBERS.

**ADDENDUM "B":** COUNSEL MUST ATTACH TO THIS FORM A LIST OF THE ISSUES PROPOSED TO BE RAISED ON APPEAL, AS WELL AS THE APPLICABLE APPELLATE STANDARD OF REVIEW FOR EACH PROPOSED ISSUE.

### PART A: JURISDICTION

| 1. Federal Jurisdiction | | 2. Appellate Jurisdiction | |
|---|---|---|---|
| ☐ U.S. a party | ✓ Diversity | ✓ Final Decision | ☐ Order Certified by District Judge (i.e., Fed. R. Civ. P. 54(b)) |
| ☐ Federal question (U.S. not a party) | ☐ Other (specify): _____ | ☐ Interlocutory Decision Appealable As of Right | ☐ Other (specify): _____ |

**IMPORTANT. COMPLETE AND SIGN REVERSE SIDE OF THIS FORM.**

FORM C (Rev. October 2016)

| PART B:  DISTRICT COURT DISPOSITION  (Check as many as apply) |
|---|

| 1. Stage of Proceedings | 2. Type of Judgment/Order Appealed | 3. Relief |
|---|---|---|
| ☐ Pre-trial<br>☐ During trial<br>☑ After trial | ☐ Default judgment<br>☐ Dismissal/FRCP 12(b)(1)<br>lack of subject matter juris.<br>☐ Dismissal/FRCP 12(b)(6)<br>failure to state a claim<br>☐ Dismissal/28 U.S.C. § 1915(e)(2) ☑<br>frivolous complaint<br>☐ Dismissal/28 U.S.C. § 1915(e)(2) ☑<br>other dismissal<br><br>☐ Dismissal/other jurisdiction<br>☐ Dismissal/merit<br>☐ Judgment / Decision of the Court<br>☐ Summary judgment<br>☐ Declaratory judgment<br>☑ Jury verdict<br>☐ Judgment NOV<br>☑ Directed verdict<br>☑ Other (specify): | ☑ Damages:  ☑ Injunctions:<br>☐ Sought: $ _____  ☐ Preliminary<br>☐ Granted: $ _____  ☑ Permanent<br>☑ Denied: $ _____  ☑ Denied<br><br>Relief sought: Compensatory, special, punitive damages; injunction; costs. |

| PART C:  NATURE OF SUIT  (Check as many as apply) |
|---|

| 1. Federal Statutes | | | 2. Torts | 3. Contracts | 4. Prisoner Petitions |
|---|---|---|---|---|---|
| ☐ Antitrust<br>☐ Bankruptcy<br>☐ Banks/Banking<br>☐ Civil Rights<br>☐ Commerce<br>☐ Energy<br>☐ Commodities<br>☐ Other (specify): | ☐ Communications<br>☐ Consumer Protection<br>☐ Copyright ☐ Patent<br>☐ Trademark<br>☐ Election<br>☐ Soc. Security<br>☐ Environmental | ☐ Freedom of Information Act<br>☐ Immigration<br>☐ Labor<br>☐ OSHA<br>☐ Securities<br>☐ Tax | ☐ Admiralty/<br>Maritime<br>☑ Assault /<br>Defamation<br>☐ FELA<br>☐ Products Liability<br>☐ Other (Specify): | ☐ Admiralty/<br>Maritime<br>☐ Arbitration<br>☐ Commercial<br>☐ Employment<br>☐ Insurance<br>☐ Negotiable<br>Instruments<br>☐ Other Specify | ☐ Civil Rights<br>☐ Habeas Corpus<br>☐ Mandamus<br>☐ Parole<br>☐ Vacate Sentence<br>☐ Other |

| 5. Other | 6. General | 7. Will appeal raise constitutional issue(s)? |
|---|---|---|
| ☐ Hague Int'l Child Custody Conv.<br>☐ Forfeiture/Penalty<br>☐ Real Property<br>☐ Treaty (specify): _____<br>☐ Other (specify): _____ | ☐ Arbitration<br>☐ Attorney Disqualification<br>☐ Class Action<br>☐ Counsel Fees<br>☐ Shareholder Derivative<br>☐ Transfer | ☑ Yes    ☐ No<br><br>Will appeal raise a matter of first impression?<br><br>☑ Yes    ☐ No |

---

1. Is any matter relative to this appeal still pending below?  ☐ Yes, specify: _____  ☑ No

2. To your knowledge, is there any case presently pending or about to be brought before this Court or another court or administrative agency which:

   (A)   Arises from substantially the same case or controversy as this appeal?   ☑ Yes   ☐ No

   (B)   Involves an issue that is substantially similar or related to an issue in this appeal?   ☑ Yes   ☐ No

If yes, state whether ☐ "A," or ☐ "B," or ☐ both are applicable, and provide in the spaces below the following information on the *other* action(s):

| Case Name:<br>In re Sarah Palin | Docket No.<br>22-629 | Citation: | Court or Agency:<br>Second Circuit Court of Appeal |
|---|---|---|---|
| Name of Appellant: Sarah Palin | | | |

| Date: June 16, 2022 | Signature of Counsel of Record: |
|---|---|

## NOTICE TO COUNSEL

**Once you have filed your Notice of Appeal with the District Court or the Tax Court, you have only 14 days in which to complete the following important steps:**

1. Complete this Civil Appeal Pre-Argument Statement (Form C); serve it upon all parties, and file it with the Clerk of the Second Circuit in accordance with LR 25.1.

2. File the Court of Appeals Transcript Information/Civil Appeal Form (Form D) with the Clerk of the Second Circuit in accordance with LR 25.1.

3. Pay the $505 docketing fee to the United States District Court or the $500 docketing fee to the United States Tax Court unless you are authorized to prosecute the appeal without payment.

   **PLEASE NOTE: IF YOU DO NOT COMPLY WITH THESE REQUIREMENTS WITHIN 14 DAYS, YOUR APPEAL WILL BE DISMISSED.** *SEE* **LOCAL RULE 12.1.**

**FORM C**  (Rev. December 2016)

## ATTACHMENT TO FORM C

### I.    Attorneys for Appellant-Plaintiff

Shane B. Vogt [Lead Counsel]
Kenneth G. Turkel
Turkel Cuva Barrios, PA
100 North Tampa Street, Suite 1900
Tampa, FL 33602
Tel: (813) 834-9191
Fax: (813) 443-2193
svogt@tcb-law.com
kturkel@tcb-law.com

### II.    Attorneys for Appellee-Defendant

Jay Ward Brown
David L. Axelrod
Jacquelyn N. Schell
Thomas B. Sullivan
BALLARD SPAHR LLP
1909 K Street, NW - 12th Floor
Washington, DC 20006
Tel: (202) 508-1136
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

## ADDENDUM A TO FORM C

### I.    Brief Description of the Nature of the Action

This is a libel action by Petitioner, Sarah Palin, against The New York Times Company (the "Times") and its former Opinion Section Editor, James Bennet ("Bennet") based on the June 14, 2017 editorial "*America's Lethal Politics*" (the "Editorial").  *See Palin v. The New York Times Company*, 940 F.3d 804, 808-809 (2d Cir. 2019).  The central issue throughout this case has been the "actual malice" requirement under *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964).

### II.    Proceedings and Result Below.

#### 1.    The Dismissal and First Appeal

At the pleadings stage, after *sua sponte* setting an evidentiary hearing to assess the plausibility of Petitioner's actual malice allegations, the District Court dismissed Appellant's Complaint with prejudice and denied her motion for leave to amend.  *Palin*, 940 F.3d at 809-815.  On August 6, 2019, this Court vacated the dismissal and rejection of Petitioner's proposed amended complaint, identified several fact and evidentiary issues pertinent to this appeal, and remanded the case "for proceedings consistent with this opinion."  *Id.* at 808, 813.

#### 2.    The Summary Judgment Rulings

On August 28, 2020, after the parties filed motions for summary judgment focused on the actual malice issue,[1] the District Court ruled that Appellant had to establish actual malice ***both*** as to defamatory meaning and falsity but denied summary judgment.  In reaching its decision, the District Court disregarded specific evidence this Court identified as relevant to actual malice in its Mandate (*Palin*, 940 F.3d at 814-815), but nevertheless found that "Bennet came up with an angle for the Editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results [of] the Williamson research that he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth."

#### 3.    The Application of New York's Amended Anti-SLAPP Statute

On November 25, 2020, Appellees moved to modify the District Court's August 28, 2020 summary judgment ruling by holding that New York's recently-amended[2] Anti-SLAPP Law (N.Y. Civil Rights Law § 76-a) applied retroactively to this case and required Appellant to prove actual malice by clear and convincing evidence under state law.  On December 29, 2020, the District Court granted Appellees' motion.

---

[1] Appellant moved for a partial summary judgment determining that proof of actual malice should no longer be required.  Appellees moved for summary judgment based primarily on the argument that Appellant could not establish actual malice.

[2] N.Y. Civil Rights Law § 76-a was amended on November 10, 2020.

## 4.    The Trial

After numerous delays associated with COVID, the jury trial in this action was held on February 3-15, 2022.  The District Court conducted a very brief *voir dire* on February 3, 2022, during which the venire's potential biases and exposure to extensive media coverage about the case were not meaningfully explored.  During trial, the District Court excluded significant evidence of actual malice as irrelevant and overly prejudicial, including evidence associated with Bennet's brother and articles about the Loughner shooting while Bennet was Editor of *The Atlantic* which this Court specifically identified as relevant in the Mandate (*Palin*, 940 F.3d at 814-815).  The exclusion of the articles written around the time of the Loughner shooting was based on the erroneous proposition that they could not be admitted unless Bennet admitted reading and remembering them when he rewrote the Editorial.  Despite the exclusion of this evidence, Petitioner introduced legally sufficient proof of actual malice at trial to meet her clear and convincing burden.  Moreover, Bennet testified at trial that, "*I didn't think then and don't think now that the map caused Jared Loughner to act…*"

Defendants moved for judgment as a matter of law under Rule 50 (the "Rule 50 Motion") based on several elements of Petitioner's claim (of and concerning, actual malice, and falsity) but the District Court focused on the same issue used to dismiss this case in 2017: actual malice as to falsity.  On the afternoon of February 14, 2022, while the jury was still deliberating, the District Court orally announced its decision to grant judgment as a matter of law based on actual malice as to falsity.  In reaching this decision, the District Court accepted Bennet's testimony as true, drew inferences in favor of Appellees, disregarded research Bennet read before publication of the Editorial, and explained away other circumstantial evidence of actual malice.  The ruling garnered immediate news coverage and "push notifications" revealing the substance of the District Court's Rule 50 dismissal in their headlines.

On the morning of February 15, 2022, the jury submitted a question about actual malice as to falsity that asked whether it was appropriate to infer actual malice from testimony given by Bennet if it was in response to a question his own lawyer asked.  Over Appellant's objection, the District Court responded to this question by instructing the jury that "an answer given by Mr. Bennet and a reasonable inference drawn therefrom is not sufficient in itself to carry the plaintiff's burden…"  This erroneous instruction told jurors to disregard legally sufficient evidence of actual malice.

After their exposure to push notifications about the District Court's Rule 50 decision and the above-referenced improper jury instruction, the jury soon reached a verdict for Defendants.  Prior to and after the verdict, none of the jurors volunteered any information about their exposure to media coverage or "push notifications" and they were released.

## 5.    The *Ex Parte* Jury Interview and District Court's Statement to the Press

On the afternoon of February 15, 2022, the District Court judicial law clerk conducted an exit interview, and several jurors volunteered their exposure to push notifications about the Rule 50 decision.  The District Court did not immediately advise the parties about this development.

Rather, on February 16, 2022, at 12:13 p.m., Petitioner's counsel learned about jurors' exposure to push notifications from a reporter requesting comment on an article posted online at 11:34 a.m. that quoted the District Court: "'I'm disappointed that the jurors even got these messages, if they did,' Rakoff said in an interview Wednesday, referring to the news notifications received by jurors. 'I continue to think it was the right way to handle things.'" The District Court first informed counsel about this issue at 12:26 p.m., emailing a 2-page order that would be "docketed shortly.

### 6.     Petitioner's Post-Trial Motions

As directed by the District Court, Appellant's counsel coordinated a call with the District Court for February 23, 2022 and submitted a letter to the court on February 22, 2022, outlining the post-trial relief Appellant would be seeking. On the February 23rd call, the District Court instructed Petitioner to file an "omnibus" post-trial motion. The District Court also indicated that due to the "fracas" surrounding the trial it would be "expediting" a written order on the February 14th oral Rule 50 decision.

### 7.     The Rule 50 "Opinion"

On March 1, 2022 the District Court issued its 68-page Opinion (the "Rule 50 Opinion") defending its Rule 50 decision and preemptively rebutting issues identified in Appellant's February 22nd letter that would be fully addressed in her Omnibus Post-Trial Motion. Among other things, the Rule 50 Opinion sought to justify the "unusual" timing of the Rule 50 decision (during deliberations) based on a waiver and to validate the verdict by describing the "model jury" as "adamant that [push notifications] had not affected their determination of the verdict in the slightest," but then deemed the verdict "legally irrelevant…even if one indulges the implausible hypothesis that the jury would have returned a verdict for Palin absent news alerts."

Substantively, the Rule 50 Opinion is based on a slanted, incomplete version of the facts established at trial, draws inferences against Appellant, adopts Bennet's testimony as true, disregards critical evidence favorable to Appellant, discredits Appellant's evidence, and impermissibly substitutes the District Court's judgment concerning the weight of the evidence for the jury's.

### 8.     The Denial of Appellant's Post-Trial Motions

In her Omnibus Post-Trial Motion, Appellant sought disqualification of the District Judge under 28 U.S.C. § 455 and relief, vacatur, reconsideration, and/or rehearing of the verdict, Rule 50 decision, and Final Judgment and a new trial under Rules 59 and 60. On May 31, 2022, the District Court entered its Opinion and Order denying all of Appellant's requested relief.

**III.    Copy of Notice of Appeal and Current Lower Court Docket Sheet**

See attached.

**IV.    Copy of All Relevant Opinions/Orders Forming the Basis for This Appeal, Including Transcripts of Orders Issued from the Bench or in Chambers**

See attached.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH PALIN, an individual,<br><br>                Plaintiff,<br><br>– against –<br><br>THE NEW YORK TIMES COMPANY,<br>A New York corporation<br><br>                Defendants. | No. 17 Civ. 4853<br><br>Hon. Jed S. Rakoff<br><br>ECF Case |

## **NOTICE OF APPEAL**

NOTICE IS HEREBY GIVEN that Sarah Palin, Plaintiff in this case, hereby appeals to the United States Court of Appeals for the Second Circuit from the Final Judgment entered in this action on February 15, 2022 [Doc. 171] ("Final Judgment"), inclusive (without limitation) of: the Court's February 14, 2022 oral [Tr. Trans. at 1295-1306] and March 1, 2022 written [Doc. 196] rulings granting judgment as a matter of law under *Fed. R. Civ. P.* 50; the February 15, 2022 Jury Verdict [Doc. 173]; the December 29, 2020 Memorandum Order [Doc. 125] (applying N.Y. Civil Rights Law § 76-a, as amended on November 10, 2020, to this action); and any and all interlocutory judgments, decrees, decisions, rulings, verdicts, and opinions that merged into and became part of the Final Judgment, that are related to the Final Judgment, and upon which the Final Judgment is based.

**<u>Notice of Pending Motions Under Rule 4(a) *Fed. R. App. P.*</u>**

On February 28, 2022, pursuant to Local Civil Rule 6.1 and Rule 2 of the Court's Individual Rules of Practice, Plaintiff filed her Notice of Omnibus Post-Trial Motions [Doc. 195], including (among others) motions for: reconsideration under Local Civil Rule 6.3 and to alter or amend the Final Judgment under Rule 59; for new trial under Rule 59; and for relief under Rule 60.  Pursuant to Rule 4(a), *Fed. R. App. P.*, the time to file this Notice of Appeal runs from the entry of the order disposing of the last remaining of these motions.  However, because Plaintiff's deadline for filing her memorandum of law in support of the Omnibus Post-Trial Motions is not until March 22, 2022 [*see* March 4, 2022 Minute Entry], Plaintiff is filing this Notice of Appeal within thirty days of the Final Judgment to ensure preservation of all her appellate rights.

*/s/ Shane B. Vogt*
Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 834-9191
Fax: (813) 443-2193

and

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY 10017
Tel:  (212) 907-7300
Fax:  (212) 754-0330

*Counsel for Petitioner/Plaintiff*
*Sarah Palin*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Notice of Appeal was filed electronically on the 17th day of March, 2022.  Notice of this filing will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt.  Parties and their counsel may access this filing through the Court's system.

*/s/ Shane B. Vogt*
Attorney for Plaintiff Sarah Palin

CLOSED,APPEAL,ECF

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:17–cv–04853–JSR

Palin v. The New York Times Company
Assigned to: Judge Jed S. Rakoff
Demand: $75,000
Cause: 28:1332lb Diversity–Libel, Assault, Slander

Date Filed: 06/27/2017
Date Terminated: 02/15/2022
Jury Demand: Both
Nature of Suit: 320 Assault Libel &
Slander
Jurisdiction: Diversity

| Date Filed | # | Docket Text |
|---|---|---|
| 06/27/2017 | 1 | COMPLAINT against The New York Times Company. (Filing Fee $ 400.00, Receipt Number 0208–13834937)Document filed by Sarah Palin. (Attachments: # 1 Exhibit 01, # 2 Exhibit 02, # 3 Exhibit 03, # 4 Exhibit 04, # 5 Exhibit 05, # 6 Exhibit 06, # 7 Exhibit 07, # 8 Exhibit 08, # 9 Exhibit 09, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16)(Ricardo, Shawn) (Entered: 06/27/2017) |
| 06/27/2017 | 2 | CIVIL COVER SHEET filed. (Ricardo, Shawn) (Entered: 06/27/2017) |
| 06/27/2017 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to The New York Times Company, re: 1 Complaint,. Document filed by Sarah Palin. (Ricardo, Shawn) (Entered: 06/27/2017) |
| 06/27/2017 | 4 | **FILING ERROR – DEFICIENT DOCKET ENTRY –** MOTION for Kenneth George Turkel to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208–13835535. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sarah Palin. (Attachments: # 1 Affidavit of K. Turkel, # 2 Exhibit 01, # 3 Text of Proposed Order)(Ricardo, Shawn) Modified on 6/28/2017 (wb). (Entered: 06/27/2017) |
| 06/27/2017 | 5 | **FILING ERROR – DEFICIENT DOCKET ENTRY –** MOTION for Shane Brady Vogt to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208–13835551. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sarah Palin. (Attachments: # 1 Affidavit S. Vogt, # 2 Exhibit 01, # 3 Text of Proposed Order)(Ricardo, Shawn) Modified on 6/28/2017 (wb). (Entered: 06/27/2017) |
| 06/28/2017 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE–FILE Document No. 5 MOTION for Shane Brady Vogt to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208–13835551. Motion and supporting papers to be reviewed by Clerk's Office staff., 4 MOTION for Kenneth George Turkel to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208–13835535. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of Florida; Please put the Title on Order for Pro hac Vice;. Re–file the motion as a Motion to Appear Pro Hac Vice – attach the correct signed PDF – select the correct named filer/filers – attach valid Certificates of Good Standing issued within the past 30 days – attach Proposed Order.. (wb)** (Entered: 06/28/2017) |
| 06/28/2017 | 6 | ELECTRONIC SUMMONS ISSUED as to The New York Times Company. (rch) (Entered: 06/28/2017) |
| 06/28/2017 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above–entitled action is assigned to Judge Jed S. Rakoff. Please download and review the Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (rch) (Entered: 06/28/2017) |

| 06/28/2017 | | Magistrate Judge Debra C. Freeman is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: http://nysd.uscourts.gov/forms.php. (rch) (Entered: 06/28/2017) |
|---|---|---|
| 06/28/2017 | | Case Designated ECF. (rch) (Entered: 06/28/2017) |
| 06/28/2017 | 7 | NOTICE OF COURT CONFERENCE: Initial Conference set for 7/7/2017 at 11:00 AM in Courtroom 14B, 500 Pearl Street, New York, NY 10007 before Judge Jed S. Rakoff, as further set forth in this order. (Signed by Judge Jed S. Rakoff on 6/28/2017) (jwh) (Entered: 06/28/2017) |
| 06/29/2017 | 8 | NOTICE OF APPEARANCE by Shawn Preston Ricardo on behalf of Sarah Palin. (Ricardo, Shawn) (Entered: 06/29/2017) |
| 06/29/2017 | 9 | **FILING ERROR – DEFICIENT DOCKET ENTRY** – MOTION for Kenneth G. Turkel to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sarah Palin. (Attachments: # 1 Affidavit of K. Turkel, # 2 Exhibit 01, # 3 Text of Proposed Order)(Ricardo, Shawn) Modified on 6/30/2017 (wb). (Entered: 06/29/2017) |
| 06/29/2017 | 10 | **FILING ERROR – DEFICIENT DOCKET ENTRY** – MOTION for Shane B. Vogt to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sarah Palin. (Attachments: # 1 Affidavit S. Vogt, # 2 Exhibit 01, # 3 Text of Proposed Order)(Ricardo, Shawn) Modified on 6/30/2017 (wb). (Entered: 06/29/2017) |
| 06/30/2017 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE–FILE Document No. 10 MOTION for Shane B. Vogt to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff., 9 MOTION for Kenneth G. Turkel to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of Florida;. Re–file the motion as a Motion to Appear Pro Hac Vice – attach the correct signed PDF – select the correct named filer/filers – attach valid Certificates of Good Standing issued within the past 30 days – attach Proposed Order.. (wb)** (Entered: 06/30/2017) |
| 06/30/2017 | 11 | MOTION for Kenneth G. Turkel to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sarah Palin. (Attachments: # 1 Affidavit K. Turkel, # 2 Exhibit 01, # 3 Text of Proposed Order)(Ricardo, Shawn) (Entered: 06/30/2017) |
| 06/30/2017 | 12 | MOTION for Shane B. Vogt to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sarah Palin. (Attachments: # 1 Affidavit S. Vogt, # 2 Exhibit 01, # 3 Text of Proposed Order)(Ricardo, Shawn) (Entered: 06/30/2017) |
| 06/30/2017 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 11 MOTION for Kenneth G. Turkel to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ma)** (Entered: 06/30/2017) |
| 06/30/2017 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 12 MOTION for Shane B. Vogt to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ma)** (Entered: 06/30/2017) |
| 07/05/2017 | 13 | ORDER FOR PRO HAC VICE granting 12 Motion for Shane B. Vogt to Appear Pro Hac Vice. (Signed by Judge Jed S. Rakoff on 6/30/2017) (mro) (Entered: 07/05/2017) |
| 07/05/2017 | 14 | ORDER granting 11 Motion for Kenneth G. Turkel to Appear Pro Hac Vice. (Signed by Judge Jed S. Rakoff on 6/30/2017) (mro) (Entered: 07/05/2017) |
| 07/05/2017 | 15 | SUMMONS RETURNED EXECUTED Summons and Complaint, served. The New York Times Company served on 6/29/2017, answer due 7/20/2017. Service was accepted by Ellen Herb, Executive Assistant. Document filed by Sarah Palin. (Ricardo, |

| | | |
|---|---|---|
| | | Shawn) (Entered: 07/05/2017) |
| 07/06/2017 | 16 | NOTICE OF APPEARANCE by Kenneth G. Turkel on behalf of Sarah Palin. (Turkel, Kenneth) (Entered: 07/06/2017) |
| 07/06/2017 | 17 | NOTICE OF APPEARANCE by Shane B. Vogt on behalf of Sarah Palin. (Vogt, Shane) (Entered: 07/06/2017) |
| 07/06/2017 | 18 | NOTICE OF APPEARANCE by David A.. Schulz on behalf of The New York Times Company. (Schulz, David) (Entered: 07/06/2017) |
| 07/06/2017 | 19 | NOTICE OF APPEARANCE by Jay Ward Brown on behalf of The New York Times Company. (Brown, Jay) (Entered: 07/06/2017) |
| 07/06/2017 | 20 | MOTION for Lee Levine to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208–13865200. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by The New York Times Company. (Attachments: # 1 Affidavit of Lee Levine in Support of Motion, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Text of Proposed Order)(Levine, Lee) (Entered: 07/06/2017) |
| 07/06/2017 | 21 | MOTION for Thomas S. Leatherbury to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208–13865604. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by The New York Times Company. (Attachments: # 1 Exhibit 1 – Affidavit in Support, # 2 Exhibit 2 – Certificate of Good Standing, # 3 Exhibit 3 – Proposed Order)(Leatherbury, Thomas) (Entered: 07/06/2017) |
| 07/06/2017 | 22 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate Grupo Financiero Inbursa, S.A.B. de C.V. for The New York Times Company. Document filed by The New York Times Company.(Brown, Jay) (Entered: 07/06/2017) |
| 07/07/2017 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 20 MOTION for Lee Levine to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208–13865200. Motion and supporting papers to be reviewed by Clerk's Office staff., 21 MOTION for Thomas S. Leatherbury to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208–13865604. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 07/07/2017) |
| 07/07/2017 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Initial Pretrial Conference held on 7/7/2017. A trial date is set for December 11, 2017. (Kotowski, Linda) (Entered: 08/08/2017) |
| 07/10/2017 | 23 | CIVIL CASE MANAGEMENT PLAN: The case is to be tried to a jury. Motion to Dismiss moving papers: 7/14; Answering: 7/21; Reply: 7/26. Oral Argument set for 7/31/2017 at 04:00 PM before Judge Jed S. Rakoff. Amended Pleadings due by 8/9/2017. Joinder of Parties due by 8/9/2017. Post–discovery summary judgment motions 10/5/2017. Responses due by 10/19/2017. Replies due by 10/26/2017. All depositions (including any expert depositions, see item 3 above) must be completed by 9/28/2017. All discovery is to be completed by 9/28/2017. A final pre–trial conference as well as oral argument on any post–discovery summary judgment motions, shall be held on 11/2/2017 at 04:00 PM before Judge Jed S. Rakoff. This Court requires that this case shall be ready for trial on 12/7/2017. (Signed by Judge Jed S. Rakoff on 7/7/2017) (mro) (Entered: 07/10/2017) |
| 07/14/2017 | 24 | MOTION to Dismiss . Document filed by The New York Times Company.(Brown, Jay) (Entered: 07/14/2017) |
| 07/14/2017 | 25 | MEMORANDUM OF LAW in Support re: 24 MOTION to Dismiss . . Document filed by The New York Times Company. (Brown, Jay) (Entered: 07/14/2017) |
| 07/14/2017 | 26 | DECLARATION of Jay Ward Brown in Support re: 24 MOTION to Dismiss .. Document filed by The New York Times Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Brown, Jay) (Entered: 07/14/2017) |

| | | |
|---|---|---|
| 07/17/2017 | 27 | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting 20 Motion for Lee Levine to Appear Pro Hac Vice. IT IS HEREBY ORDERED that Applicant is admitted to practice pro hac vice in the above captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys. (Signed by Judge Jed S. Rakoff on 7/15/17) (yv) (Entered: 07/17/2017) |
| 07/17/2017 | 28 | ORDER FOR ADMISSION PRO HAC VICE granting 21 Motion for Thomas S. Leatherbury to Appear Pro Hac Vice. IT IS HEREBY ORDERED that Thomas S. Leatherbury is admitted to practice pro hac vice in the above–captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys. (Signed by Judge Jed S. Rakoff on 7/15/17) (yv) (Entered: 07/17/2017) |
| 07/21/2017 | 29 | MEMORANDUM OF LAW in Opposition re: 24 MOTION to Dismiss . . Document filed by Sarah Palin. (Vogt, Shane) (Entered: 07/21/2017) |
| 07/21/2017 | 30 | DECLARATION of Shane B. Vogt in Opposition re: 24 MOTION to Dismiss .. Document filed by Sarah Palin. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Vogt, Shane) (Entered: 07/21/2017) |
| 07/26/2017 | 31 | REPLY MEMORANDUM OF LAW in Support re: 24 MOTION to Dismiss . . Document filed by The New York Times Company. (Brown, Jay) (Entered: 07/26/2017) |
| 07/26/2017 | 32 | DECLARATION of Jay Ward Brown in Support re: 24 MOTION to Dismiss .. Document filed by The New York Times Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Brown, Jay) (Entered: 07/26/2017) |
| 07/26/2017 | 33 | TRANSCRIPT of Proceedings re: CONFERENCE held on 7/7/2017 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Raquel Robles, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/16/2017. Redacted Transcript Deadline set for 8/28/2017. Release of Transcript Restriction set for 10/24/2017.(McGuirk, Kelly) (Entered: 07/26/2017) |
| 07/26/2017 | 34 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 7/7/17 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 07/26/2017) |
| 07/31/2017 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Oral Argument held on 7/31/2017 re: 24 MOTION to Dismiss . filed by The New York Times Company. (Kotowski, Linda) (Entered: 08/01/2017) |
| 08/10/2017 | 35 | ORDER re: 24 MOTION to Dismiss . filed by The New York Times Company. To help inform the Court of what inferences are reasonable or unreasonable in this context, the Court, pursuant to Rule 43(c), will convene an evidentiary hearing on Wednesday, August 16 at 2:00 PM EST. At the hearing, defense counsel must produce the author(s) of the editorial, who (or each of whom, if there is more than one author) will be examined under oath by defense counsel for no more than thirty (30) minutes, to be followed by cross–examination of plaintiff's counsel of no more than forty–five (45) minutes, to be followed by no more than fifteen (15) minutes of redirect by defense counsel. The Court also may question each such witness. SO ORDERED., (Evidentiary Hearing set for 8/16/2017 at 02:00 PM before Judge Jed S. Rakoff.) (Signed by Judge Jed S. Rakoff on 8/10/17) (yv) (Entered: 08/10/2017) |
| 08/10/2017 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 8/10/2017. (Kotowski, Linda) (Entered: 08/16/2017) |
| 08/14/2017 | 36 | **FILING ERROR – DEFICIENT DOCKET ENTRY** – MOTION for Michael D. Sullivan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number |

| | | |
|---|---|---|
| | | 0208–14010060. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by The New York Times Company.(Sullivan, Michael) Modified on 8/14/2017 (ma). (Entered: 08/14/2017) |
| 08/14/2017 | 37 | **FILING ERROR – DEFICIENT DOCKET ENTRY –** DECLARATION of Michael D. Sullivan in Support re: 36 MOTION for Michael D. Sullivan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208–14010060. **Motion and supporting papers to be reviewed by Clerk's Office staff..** Document filed by The New York Times Company. (Attachments: # 1 Exhibit 1 – certificate of good standing, # 2 Text of Proposed Order)(Sullivan, Michael) Modified on 8/14/2017 (ma). (Entered: 08/14/2017) |
| 08/14/2017 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE–FILE Document No. 36 MOTION for Michael D. Sullivan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208–14010060. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): ALL THE DOCUMENTS MUST BE FILED TOGETHER. THE DOCUMENTS SHOULD BE IN THE FOLLOWING ORDR: 1) MOTION THEN THE DECLARATION/AFFIDAVIT, CERTIFCATE OF GOOD STANDING FROM THE SUPREME COURT AND THE PROPOSED ORDER MUST ALL BE ATTACHED;. Re–file the motion as a Motion to Appear Pro Hac Vice – attach the correct signed PDF – select the correct named filer/filers – attach valid Certificates of Good Standing within the past 30 days – attach Proposed Order.. (ma)** (Entered: 08/14/2017) |
| 08/14/2017 | 38 | MOTION for Michael D. Sullivan to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by The New York Times Company. (Attachments: # 1 Declaration of Michael D. Sullivan in Support, # 2 Exhibit 1 – certificate of good standing, # 3 Text of Proposed Order)(Sullivan, Michael) (Entered: 08/14/2017) |
| 08/14/2017 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 38 MOTION for Michael D. Sullivan to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ma)** (Entered: 08/14/2017) |
| 08/16/2017 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Evidentiary Hearing held on 8/16/2017. (Kotowski, Linda) (Entered: 08/23/2017) |
| 08/21/2017 | 39 | MEMO ENDORSED ORDER granting 38 Motion for Michael D. Sullivan to Appear Pro Hac Vice. ENDORSEMENT: IT IS HEREBY ORDERED that Applicant is admitted to practice pro hac vice in the above captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys. (Signed by Judge Jed S. Rakoff on 8/18/17) (yv) Modified on 9/20/2017 (yv). (Entered: 08/21/2017) |
| 08/21/2017 | 40 | MEMORANDUM OF LAW in Opposition re: 24 MOTION to Dismiss . *on Context, Inferences and Plausibility*. Document filed by Sarah Palin. (Vogt, Shane) (Entered: 08/21/2017) |
| 08/21/2017 | 41 | DECLARATION of Shane B. Vogt in Opposition re: 24 MOTION to Dismiss .. Document filed by Sarah Palin. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34)(Vogt, Shane) (Entered: 08/21/2017) |
| 08/21/2017 | 42 | SUPPLEMENTAL MEMORANDUM OF LAW in Support re: 24 MOTION to Dismiss . . Document filed by The New York Times Company. (Brown, Jay) (Entered: 08/21/2017) |
| 08/22/2017 | 43 | RESPONSE to Motion re: 24 MOTION to Dismiss . *(Response to 42 Defendant's Supplemental Memorandum)*. Document filed by Sarah Palin. (Vogt, Shane) (Entered: |

| | | 08/22/2017) |
|---|---|---|
| 08/22/2017 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 8/22/2017. (Kotowski, Linda) (Entered: 08/28/2017) |
| 08/23/2017 | 44 | REPLY to Response to Motion re: 24 MOTION to Dismiss . *Reply to Plaintiff's Response, Dkt. No. 43*. Document filed by The New York Times Company. (Brown, Jay) (Entered: 08/23/2017) |
| 08/29/2017 | 45 | OPINION AND ORDER re: 24 MOTION to Dismiss . filed by The New York Times Company. The Court grants defendant's motion to dismiss. Because, moreover, this Court has canvassed in the discussion above all the various additions that plaintiff has even remotely suggested it would include in an amended complaint, the dismissal is "with prejudice," that is, final. Clerk to enter judgment. SO ORDERED. (Signed by Judge Jed S. Rakoff on 8/29/17) (yv) (Main Document 45 replaced on 8/30/2017) (mt). (Entered: 08/29/2017) |
| 08/29/2017 | | Transmission to Judgments and Orders Clerk. Transmitted re: 45 Memorandum & Opinion, to the Judgments and Orders Clerk. (yv) (Entered: 08/29/2017) |
| 08/30/2017 | 46 | CLERK'S JUDGMENT: That for the reasons stated in the Court's Opinion and Order dated August 29, 2017, defendant's motion to dismiss is granted with prejudice. (Signed by Clerk of Court Ruby Krajick on 08/30/2017) (Attachments: # 1 Notice of Right to Appeal, # 2 Notice of Right to Appeal)(dt) (Entered: 08/30/2017) |
| 08/30/2017 | | Terminate Transcript Deadlines (dt) (Entered: 08/30/2017) |
| 08/30/2017 | 47 | TRANSCRIPT of Proceedings re: ARGUMENT held on 7/31/2017 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Andrew Walker, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/20/2017. Redacted Transcript Deadline set for 10/2/2017. Release of Transcript Restriction set for 11/28/2017.(McGuirk, Kelly) (Entered: 08/30/2017) |
| 08/30/2017 | 48 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a ARGUMENT proceeding held on 7/31/17 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 08/30/2017) |
| 08/30/2017 | 49 | TRANSCRIPT of Proceedings re: HEARING held on 8/16/2017 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Vincent Bologna, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/20/2017. Redacted Transcript Deadline set for 10/2/2017. Release of Transcript Restriction set for 11/28/2017.(McGuirk, Kelly) (Entered: 08/30/2017) |
| 08/30/2017 | 50 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a HEARING proceeding held on 8/16/17 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 08/30/2017) |
| 09/11/2017 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 9/11/2017. (Kotowski, Linda) (Entered: 09/12/2017) |
| 09/25/2017 | 51 | MOTION for Reconsideration re; 45 Memorandum & Opinion,, 46 Clerk's Judgment, . Document filed by Sarah Palin.(Vogt, Shane) (Entered: 09/25/2017) |
| 09/25/2017 | 52 | MEMORANDUM OF LAW in Support re: 51 MOTION for Reconsideration re; 45 Memorandum & Opinion,, 46 Clerk's Judgment, . . Document filed by Sarah Palin. (Vogt, Shane) (Entered: 09/25/2017) |

| 09/25/2017 | 53 | DECLARATION of Shane B. Vogt in Support re: 51 MOTION for Reconsideration re; 45 Memorandum & Opinion,, 46 Clerk's Judgment, .. Document filed by Sarah Palin. (Attachments: # 1 Exhibit 1 to Exhibit A (Proposed Amended Complaint), # 2 Exhibit 2 to Exhibit A (Proposed Amended Complaint), # 3 Exhibit 3 to Exhibit A (Proposed Amended Complaint), # 4 Exhibit 4 to Exhibit A (Proposed Amended Complaint), # 5 Exhibit 5 to Exhibit A (Proposed Amended Complaint), # 6 Exhibit 6 to Exhibit A (Proposed Amended Complaint), # 7 Exhibit 7 to Exhibit A (Proposed Amended Complaint), # 8 Exhibit 8 to Exhibit A (Proposed Amended Complaint), # 9 Exhibit 9 to Exhibit A (Proposed Amended Complaint), # 10 Exhibit 10 to Exhibit A (Proposed Amended Complaint), # 11 Exhibit 11 to Exhibit A (Proposed Amended Complaint), # 12 Exhibit 12 to Exhibit A (Proposed Amended Complaint), # 13 Exhibit 13 to Exhibit A (Proposed Amended Complaint), # 14 Exhibit 14 to Exhibit A (Proposed Amended Complaint), # 15 Exhibit 15 to Exhibit A (Proposed Amended Complaint), # 16 Exhibit 16 to Exhibit A (Proposed Amended Complaint), # 17 Exhibit 17 to Exhibit A (Proposed Amended Complaint), # 18 Exhibit 18 to Exhibit A (Proposed Amended Complaint), # 19 Exhibit 19 to Exhibit A (Proposed Amended Complaint), # 20 Exhibit 20 to Exhibit A (Proposed Amended Complaint), # 21 Exhibit 21 to Exhibit A (Proposed Amended Complaint), # 22 Exhibit 22 to Exhibit A (Proposed Amended Complaint), # 23 Exhibit 23 to Exhibit A (Proposed Amended Complaint), # 24 Exhibit 24 to Exhibit A (Proposed Amended Complaint), # 25 Exhibit 25 to Exhibit A (Proposed Amended Complaint), # 26 Exhibit 26 to Exhibit A (Proposed Amended Complaint), # 27 Exhibit 27 to Exhibit A (Proposed Amended Complaint), # 28 Exhibit 28 to Exhibit A (Proposed Amended Complaint), # 29 Exhibit 29 to Exhibit A (Proposed Amended Complaint))(Vogt, Shane) (Entered: 09/25/2017) |
| 09/25/2017 | 54 | DECLARATION of Shane B. Vogt in Support re: 51 MOTION for Reconsideration re; 45 Memorandum & Opinion,, 46 Clerk's Judgment, .. Document filed by Sarah Palin. (Attachments: # 1 Exhibit A to Declaration)(Vogt, Shane) (Entered: 09/25/2017) |
| 10/03/2017 | 55 | NOTICE OF CHANGE OF ADDRESS by David A.. Schulz on behalf of The New York Times Company. New Address: Ballard Spahr LLP, 919 Third Avenue, 37th Floor, New York, NY, USA 10022–3915, 212–850–6103. (Schulz, David) (Entered: 10/03/2017) |
| 10/03/2017 | 56 | NOTICE OF CHANGE OF ADDRESS by Jay Ward Brown on behalf of The New York Times Company. New Address: Ballard Spahr LLP, 1909 K Street, NW, 12th Floor, Washington, DC, USA 20006–1157, 202–508–1136. (Brown, Jay) (Entered: 10/03/2017) |
| 10/03/2017 | 57 | NOTICE OF CHANGE OF ADDRESS by Lee Levine on behalf of The New York Times Company. New Address: Ballard Spahr LLP, 1909 K Street, NW, 12th Floor, Washington, DC, USA 20006–1157, 202–508–1110. (Levine, Lee) (Entered: 10/03/2017) |
| 10/03/2017 | 58 | NOTICE OF CHANGE OF ADDRESS by Michael D. Sullivan on behalf of The New York Times Company. New Address: Ballard Spahr LLP, 1909 K Street, NW, 12th Floor, Washington, DC, USA 20006–1157, 202–508–1116. (Sullivan, Michael) (Entered: 10/03/2017) |
| 10/09/2017 | 59 | MEMORANDUM OF LAW in Opposition re: 51 MOTION for Reconsideration re; 45 Memorandum & Opinion,, 46 Clerk's Judgment, . . Document filed by The New York Times Company. (Brown, Jay) (Entered: 10/09/2017) |
| 10/16/2017 | 60 | REPLY MEMORANDUM OF LAW in Support re: 51 MOTION for Reconsideration re; 45 Memorandum & Opinion,, 46 Clerk's Judgment, . . Document filed by Sarah Palin. (Vogt, Shane) (Entered: 10/16/2017) |
| 10/23/2017 | 61 | MEMORANDUM ORDER denying 51 Motion for Reconsideration re 45 Memorandum & Opinion. For the foregoing reasons, plaintiff's motion for reconsideration is hereby denied. The Clerk of the Court is directed to close the case. So Ordered., (Signed by Judge Jed S. Rakoff on 10/23/17) (yv) (Entered: 10/23/2017) |
| 10/23/2017 | | Terminate Transcript Deadlines (yv) (Entered: 12/05/2017) |
| 11/21/2017 | 62 | NOTICE OF APPEAL from 46 Clerk's Judgment, 61 Order on Motion for Reconsideration,. Document filed by Sarah Palin. Filing fee $ 505.00, receipt number 0208–14390616. Form C and Form D are due within 14 days to the Court of Appeals, |

| | | |
|---|---|---|
| | | Second Circuit. (Vogt, Shane) (Entered: 11/21/2017) |
| 11/21/2017 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 62 Notice of Appeal. (tp) (Entered: 11/21/2017) |
| 11/21/2017 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 62 Notice of Appeal, filed by Sarah Palin were transmitted to the U.S. Court of Appeals. (tp) (Entered: 11/21/2017) |
| 01/22/2018 | 63 | NOTICE OF CHANGE OF ADDRESS by David A. Schulz on behalf of The New York Times Company. New Address: Ballard Spahr LLP, 1675 Broadway, 19th Floor, New York, NY, US 10019–5820, 212–850–6103. (Schulz, David) (Entered: 01/22/2018) |
| 08/06/2019 | 64 | OPINION of USCA (Certified) as to 62 Notice of Appeal, filed by Sarah Palin USCA Case Number 17–3801–cv. This case is ultimately about the First Amendment, but the subject matter implicated in this appeal is far less dramatic: rules of procedure and pleading standards. Sarah Palin appeals the dismissal of her defamation complaint against The New York Times ("the Times") for failure to state a claim. The district court (Rakoff, J.), uncertain as to whether Palin's complaint plausibly alleged all of the required elements of her defamation claim, held an evidentiary hearing to test the sufficiency of Palins pleadings. Following the hearing, and without converting the proceeding to one for summary judgment, the district court relied on evidence adduced at that hearing to dismiss Palins complaint under Federal Rule of Civil Procedure 12(b)(6). We find that the district court erred in relying on facts outside the pleadings to dismiss the complaint. We further conclude that Palin's Proposed Amended Complaint plausibly states a claim for defamation and may proceed to full discovery. We therefore VACATE and REMAND for proceedings consistent with this opinion.. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 8/6/2019. (nd) (Entered: 08/06/2019) |
| 08/06/2019 | | Transmission of USCA Opinion to the District Judge re: 64 USCA Opinion. (nd) (Entered: 08/06/2019) |
| 10/15/2019 | 65 | AMENDED OPINION OF USCA as to 62 Notice of Appeal, filed by Sarah Palin. USCA Case Number 17–3801–cv. This case is ultimately about the First Amendment, but the subject matter implicated in this appeal is far less dramatic: rules of procedure and pleading standards. Sarah Palin appeals the dismissal of her defamation complaint against The New York Times ("the Times") for failure to state a claim. The district court (Rakoff, J.), uncertain as to whether Palin's complaint plausibly alleged all of the required elements of her defamation claim, held an evidentiary hearing to test the sufficiency of Palin's pleadings. Following the hearing, and without converting the proceeding to one for summary judgment, the district court relied on evidence adduced at that hearing to dismiss Palin's complaint under Federal Rule of Civil Procedure 12(b)(6). We find that the district court erred in relying on facts outside the pleadings to dismiss the complaint. We further conclude that Palin's Proposed Amended Complaint plausibly states a claim for defamation and may proceed to full discovery. We therefore VACATE and REMAND for proceedings consistent with this opinion. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 10/15/2019. (nd) (Entered: 10/15/2019) |
| 12/10/2019 | 66 | MANDATE of USCA (Certified Copy) as to 62 Notice of Appeal, filed by Sarah Palin. USCA Case Number 17–3801. IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is VACATED and the case is REMANDED to the district court for further proceedings consistent with this Court's opinion. This judgment is nunc pro tunc to October 15, 2019, the date the Amended Opinion was filed. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 12/09/2019. (Attachments: # 1 Opinion, # 2 Amended Opinion, # 3 Judgment)(nd) (Entered: 12/10/2019) |
| 12/10/2019 | | Transmission of USCA Mandate to the District Judge re: 66 USCA Mandate,,. (nd) (Entered: 12/10/2019) |
| 12/11/2019 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. Scheduling Conference set for 12/16/2019 at 11:00 AM before Judge Jed S. Rakoff. (Kotowski, Linda) (Entered: 12/11/2019) |

| | | |
|---|---|---|
| 12/12/2019 | 67 | ORDER: The Court will hold a scheduling conference in this case on Monday, December 16, 2019 at 11:00 AM in Courtroom 14B at 500 Pearl St., New York, NY. (Scheduling Conference set for 12/16/2019 at 11:00 AM in Courtroom 14B, 500 Pearl Street, New York, NY 10007 before Judge Jed S. Rakoff.) (Signed by Judge Jed S. Rakoff on 12/11/2019) (jwh) (Entered: 12/12/2019) |
| 12/13/2019 | 68 | NOTICE OF APPEARANCE by Thomas Byrne Sullivan on behalf of The New York Times Company. (Sullivan, Thomas) (Entered: 12/13/2019) |
| 12/16/2019 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Scheduling Conference held on 12/16/2019, ( Final Pretrial Conference set for 5/26/2020 at 11:00 AM before Judge Jed S. Rakoff., Jury Trial set for 6/22/2020 at 09:30 AM before Judge Jed S. Rakoff.). (Kotowski, Linda) (Entered: 12/16/2019) |
| 12/16/2019 | 69 | CIVIL CASE MANAGEMENT PLAN: Trial – 6/22/20. The case is to be tried to a jury. Amended Pleadings due by 1/7/2020. Motions due by 4/27/2020. Responses due by 5/11/2020 Replies due by 5/18/2020. Deposition due by 4/6/2020. Discovery due by 4/13/2020. Oral Argument set for 5/26/2020 at 11:00 AM before Judge Jed S. Rakoff. Final Pretrial Conference set for 5/26/2020 at 11:00 AM before Judge Jed S. Rakoff. (Signed by Judge Jed S. Rakoff on 12/16/2019) (jwh) (Entered: 12/16/2019) |
| 12/30/2019 | 70 | FIRST AMENDED COMPLAINT amending 1 Complaint, against The New York Times Company, James Bennet with JURY DEMAND.Document filed by Sarah Palin. Related document: 1 Complaint,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29)(Ricardo, Shawn) (Entered: 12/30/2019) |
| 12/30/2019 | 71 | REQUEST FOR ISSUANCE OF SUMMONS as to James Bennet, re: 70 Amended Complaint,,. Document filed by Sarah Palin. (Ricardo, Shawn) (Entered: 12/30/2019) |
| 01/02/2020 | 72 | ELECTRONIC SUMMONS ISSUED as to James Bennet. (pc) (Entered: 01/02/2020) |
| 01/02/2020 | 73 | NOTICE OF APPEARANCE by Jay Ward Brown on behalf of James Bennet. (Brown, Jay) (Entered: 01/02/2020) |
| 01/02/2020 | 74 | NOTICE OF APPEARANCE by Thomas Byrne Sullivan on behalf of James Bennet. (Sullivan, Thomas) (Entered: 01/02/2020) |
| 01/02/2020 | 75 | ANSWER to 70 Amended Complaint,, with JURY DEMAND. Document filed by James Bennet, The New York Times Company.(Brown, Jay) (Entered: 01/02/2020) |
| 01/02/2020 | 76 | MOTION for Judgment on the Pleadings *to dismiss plaintiff's claim for disgorgement damages*. Document filed by James Bennet, The New York Times Company. Responses due by 1/10/2020(Brown, Jay) (Entered: 01/02/2020) |
| 01/02/2020 | 77 | MEMORANDUM OF LAW in Support re: 76 MOTION for Judgment on the Pleadings *to dismiss plaintiff's claim for disgorgement damages*. . Document filed by James Bennet, The New York Times Company. (Brown, Jay) (Entered: 01/02/2020) |
| 01/03/2020 | 78 | MOTION to Withdraw *as Co−Counsel*. Document filed by The New York Times Company. (Attachments: # 1 Text of Proposed Order)(Leatherbury, Thomas) (Entered: 01/03/2020) |
| 01/03/2020 | 79 | DECLARATION of Thomas S. Leatherbury in Support re: 78 MOTION to Withdraw *as Co−Counsel*.. Document filed by The New York Times Company. (Leatherbury, Thomas) (Entered: 01/03/2020) |
| 01/10/2020 | 80 | MEMORANDUM OF LAW in Opposition re: 76 MOTION for Judgment on the Pleadings *to dismiss plaintiff's claim for disgorgement damages*. . Document filed by Sarah Palin. (Vogt, Shane) (Entered: 01/10/2020) |
| 01/13/2020 | 81 | ORDER GRANTING LEAVE TO WITHDRAW AS COUNSEL granting 78 Motion to Withdraw: IT IS HEREBY ORDERED that the noticed request to withdraw Thomas S. Leatherbury and Vinson & Elkins LLP as co−counsel for The New York Times Company is granted, and the appearances of Mr. Leatherbury and Vinson & |

| | | |
|---|---|---|
| | | Elkins LLP are withdrawn as of the date of this Order. (Attorney Thomas S. Leatherbury terminated.) (Signed by Judge Jed S. Rakoff on 1/10/2020) (jwh) Modified on 1/13/2020 (jwh). (Entered: 01/13/2020) |
| 01/16/2020 | 82 | REPLY MEMORANDUM OF LAW in Support re: 76 MOTION for Judgment on the Pleadings *to dismiss plaintiff's claim for disgorgement damages*. . Document filed by James Bennet, The New York Times Company. (Brown, Jay) (Entered: 01/16/2020) |
| 01/21/2020 | 83 | MEMORANDUM ORDER granting 76 Motion for Judgment on the Pleadings: For these reasons, the Court grants the defendants' motion for partial judgment on the pleadings dismissing Palin's claim for disgorgement damages. The Clerk is directed to close the entry bearing the docket number 76. (Signed by Judge Jed S. Rakoff on 1/19/2020) (jwh) (Entered: 01/21/2020) |
| 01/24/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 1/24/2020. (Kotowski, Linda) (Entered: 01/30/2020) |
| 01/27/2020 | 84 | PROTECTIVE ORDER regarding procedures to be followed that shall govern the handling of confidential material. (Signed by Judge Jed S. Rakoff on 1/24/2020) (jwh) (Entered: 01/27/2020) |
| 01/30/2020 | 85 | MOTION for David L. Axelrod to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–18640467. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by James Bennet, The New York Times Company. (Attachments: # 1 Affidavit of D. Axelrod, # 2 Exhibit 1, # 3 Text of Proposed Order)(Axelrod, David) (Entered: 01/30/2020) |
| 02/03/2020 | 86 | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting 85 Motion for David L. Axelrod to Appear Pro Hac Vice. (Signed by Judge Jed S. Rakoff on 1/31/2020) (jwh) (Entered: 02/03/2020) |
| 02/20/2020 | 87 | NOTICE OF APPEARANCE by Jacquelyn Nicole Schell on behalf of James Bennet, The New York Times Company..(Schell, Jacquelyn) (Entered: 02/20/2020) |
| 02/27/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 2/27/2020. (Kotowski, Linda) (Entered: 02/27/2020) |
| 03/11/2020 | 88 | TRANSCRIPT of Proceedings re: CONFERENCE held on 12/16/2019 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Sonya Ketter Moore, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/1/2020. Redacted Transcript Deadline set for 4/13/2020. Release of Transcript Restriction set for 6/9/2020..(McGuirk, Kelly) (Entered: 03/11/2020) |
| 03/11/2020 | 89 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 12/16/19 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 03/11/2020) |
| 03/17/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 3/17/2020. (tro) Modified on 3/18/2020 (tro). (Entered: 03/18/2020) |
| 03/17/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Interim Pretrial Conference held on 3/17/2020. (tro) (Entered: 03/19/2020) |
| 03/18/2020 | 90 | AMENDED CIVIL CASE MANAGEMENT PLAN: Ready for Trial by 8/24/2020. Amended pleadings may be filed without leave of Court until 1/7/20. Deposition due by 5/29/2020. Discovery due by 6/5/2020. Motions due by 6/19/2020. Responses due by 7/10/2020. Replies due by 7/17/2020. Oral Argument set for 7/27/2020 at 02:00 PM before Judge Jed S. Rakoff. Final Pretrial Conference set for 7/27/2020 at 02:00 PM before Judge Jed S. Rakoff. The Court will decide any summary judgment motions by no later than 8/10/20. The trial of any remaining claims will commence on 8/24/20 at 9:00 am. Jury Trial set for 8/24/2020 at 09:00 AM before Judge Jed S. Rakoff. (Signed by Judge Jed S. Rakoff on 3/18/2020) (jwh) (Entered: 03/18/2020) |

| | | |
|---|---|---|
| 03/19/2020 | | MEMORANDUM TO THE DOCKET CLERK: The final pre–trial conference and the trial dates previously set for May 26, 2020 and June 22, 2020, respectively, have been adjourned to July 27, 2020 at 2:00 p.m. and August 24, 2020 at 9:00 a.m.(kgo) (Entered: 03/19/2020) |
| 03/19/2020 | | Set/Reset Hearings: Final Pretrial Conference set for 7/27/2020 at 02:00 PM before Judge Jed S. Rakoff. Jury Trial set for 8/24/2020 at 09:00 AM before Judge Jed S. Rakoff. (kgo) (Entered: 03/19/2020) |
| 03/19/2020 | 91 | NOTICE OF APPEARANCE by Michael McGee Munoz on behalf of Sarah Palin..(Munoz, Michael) (Entered: 03/19/2020) |
| 03/20/2020 | 92 | NOTICE of Substitution of Attorney. Old Attorney: S. Preston Ricardo, New Attorney: Michael M. Munoz, Address: Golenbock Eiseman Assor Bell & Peskoe LLP, 711 Third Avenue, 17th Floor, New York, NY, United States 10017, 212–907–7300. Document filed by Sarah Palin..(Ricardo, Shawn) (Entered: 03/20/2020) |
| 03/23/2020 | 93 | MEMO ENDORSEMENT on re: 92 Notice of Substitution of Attorney, filed by Sarah Palin. ENDORSEMENT: SO ORDERED. (Attorney Shawn Preston Ricardo terminated.) (Signed by Judge Jed S. Rakoff on 3/23/2020) (jwh) (Entered: 03/23/2020) |
| 06/12/2020 | 94 | MOTION for Summary Judgment . Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 06/12/2020) |
| 06/12/2020 | 95 | MOTION for Partial Summary Judgment . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 06/12/2020) |
| 06/19/2020 | 96 | MEMORANDUM OF LAW in Support re: 94 MOTION for Summary Judgment . . Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 06/19/2020) |
| 06/19/2020 | 97 | RULE 56.1 STATEMENT. Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 06/19/2020) |
| 06/19/2020 | 98 | DECLARATION of James Bennet in Support re: 94 MOTION for Summary Judgment .. Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 06/19/2020) |
| 06/19/2020 | 99 | DECLARATION of Thomas B. Sullivan in Support re: 94 MOTION for Summary Judgment .. Document filed by James Bennet, The New York Times Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60 Exhibit 60, # 61 Exhibit 61).(Brown, Jay) (Entered: 06/19/2020) |
| 06/19/2020 | 100 | MEMORANDUM OF LAW in Support re: 95 MOTION for Partial Summary Judgment . . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 06/19/2020) |
| 06/19/2020 | 101 | RULE 56.1 STATEMENT. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 06/19/2020) |
| 06/19/2020 | 102 | DECLARATION of Shane B. Vogt in Support re: 95 MOTION for Partial Summary Judgment .. Document filed by Sarah Palin. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # |

| | | |
|---|---|---|
| | | 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB).(Vogt, Shane) (Entered: 06/19/2020) |
| 07/08/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 7/8/2020. (Kotowski, Linda) (Entered: 07/10/2020) |
| 07/09/2020 | 103 | **FILING ERROR – WRONG EVENT TYPE SELECTED FROM MENU –** CONSENT MOTION to Amend/Correct 99 Declaration in Support of Motion,,,,, . Document filed by James Bennet, The New York Times Company. (Attachments: # 1 Exhibit Corrected Exhibit 4, # 2 Exhibit Corrected Exhibit 5).(Sullivan, Thomas) Modified on 7/27/2020 (lb). (Entered: 07/09/2020) |
| 07/10/2020 | 104 | MEMORANDUM OF LAW in Opposition re: 95 MOTION for Partial Summary Judgment . . Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 07/10/2020) |
| 07/10/2020 | 105 | DECLARATION of Jacquelyn N. Schell in Opposition re: 95 MOTION for Partial Summary Judgment .. Document filed by James Bennet, The New York Times Company. (Attachments: # 1 Exhibit 62, # 2 Exhibit 63, # 3 Exhibit 64, # 4 Exhibit 65, # 5 Exhibit 66).(Brown, Jay) (Entered: 07/10/2020) |
| 07/10/2020 | 106 | COUNTER STATEMENT TO 101 Rule 56.1 Statement. Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 07/10/2020) |
| 07/10/2020 | 107 | MEMORANDUM OF LAW in Opposition re: 94 MOTION for Summary Judgment . . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 07/10/2020) |
| 07/10/2020 | 108 | COUNTER STATEMENT TO 97 Rule 56.1 Statement. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 07/10/2020) |
| 07/11/2020 | 109 | DECLARATION of Shane B. Vogt in Opposition re: 94 MOTION for Summary Judgment .. Document filed by Sarah Palin. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60 Exhibit 60, # 61 Exhibit 61, # 62 Exhibit 62, # 63 Exhibit 63, # 64 Exhibit 64, # 65 Exhibit 65, # 66 Exhibit 66, # 67 Exhibit 67, # 68 Exhibit 68, # 69 Exhibit 69, # 70 Exhibit 70 (Part 1), # 71 Exhibit 70 (Part 2), # 72 Exhibit 70 (Part 3), # 73 Exhibit 70 (Part 4), # 74 Exhibit 71, # 75 Exhibit 72, # 76 Exhibit 73, # 77 Exhibit 74, # 78 Exhibit 75, # 79 Exhibit 76, # 80 Exhibit 77, # 81 Exhibit 78, # 82 Exhibit 79, # 83 Exhibit 80, # 84 Exhibit 81, # 85 Exhibit 82, # 86 Exhibit 83, # 87 Exhibit 84, # 88 Exhibit 85, # 89 Exhibit 86, # 90 Exhibit 87, # 91 Exhibit 88, # 92 Exhibit 89, # 93 Exhibit 90, # 94 Exhibit 91, # 95 Exhibit 92, # 96 Exhibit 93, # 97 Exhibit 94, # 98 Exhibit 95, # 99 Exhibit 96, # 100 Exhibit 97, # 101 Exhibit 98, # 102 Exhibit 99, # 103 Exhibit 100, # 104 Exhibit 101, # 105 Exhibit 102, # 106 Exhibit 103, # 107 Exhibit 104, # 108 Exhibit 105, # 109 Exhibit 106, # 110 Exhibit 107, # 111 Exhibit 108, # 112 Exhibit 109, # 113 Exhibit 110, # 114 Exhibit 111, # 115 Exhibit 112, # 116 Exhibit 113, # 117 Exhibit 114, # 118 Exhibit 115, # 119 Exhibit 116, # 120 Exhibit 117, # 121 Exhibit 118, # 122 Exhibit 119, # 123 Exhibit 120, # 124 Exhibit 121, # 125 Exhibit 122, # 126 Exhibit 123, # 127 Exhibit 124, # 128 Exhibit 125, # 129 Exhibit 126, # 130 Exhibit 127, # 131 Exhibit 128, # 132 Exhibit 129, # 133 Exhibit 130, # 134 Exhibit 131, # 135 Exhibit 132, # 136 Exhibit 133, # 137 Exhibit 134, # 138 Exhibit 135, # 139 Exhibit 136, # 140 Exhibit 137, # 141 Exhibit 138, # 142 Exhibit 139, # 143 Exhibit 140, # 144 Exhibit 141, # 145 Exhibit 142, # 146 Exhibit 143, # 147 Exhibit 144, # 148 Exhibit 145, # 149 Exhibit 146, # 150 Exhibit 147, # 151 Exhibit 148, # 152 Exhibit 149, # 153 Exhibit 150, # 154 Exhibit 151, # 155 Exhibit 152, # 156 Exhibit 153, # 157 Exhibit 154, # 158 Exhibit 155, # 159 Exhibit 156, # 160 Exhibit 157, # 161 Exhibit 158, # 162 Exhibit 159, # 163 Exhibit 160, # 164 Exhibit 161, # 165 Exhibit 162, # 166 Exhibit 163, # 167 |

| | | |
|---|---|---|
| | | Exhibit 164, # <u>168</u> Exhibit 165, # <u>169</u> Exhibit 166, # <u>170</u> Exhibit 167, # <u>171</u> Exhibit 168, # <u>172</u> Exhibit 169, # <u>173</u> Exhibit 170, # <u>174</u> Exhibit 171, # <u>175</u> Exhibit 172, # <u>176</u> Exhibit 173, # <u>177</u> Exhibit 174, # <u>178</u> Exhibit 175, # <u>179</u> Exhibit 176, # <u>180</u> Exhibit 177, # <u>181</u> Exhibit 178, # <u>182</u> Exhibit 179, # <u>183</u> Exhibit 180, # <u>184</u> Exhibit 181, # <u>185</u> Exhibit 182, # <u>186</u> Exhibit 183, # <u>187</u> Exhibit 184, # <u>188</u> Exhibit 185, # <u>189</u> Exhibit 186, # <u>190</u> Exhibit 187, # <u>191</u> Exhibit 188, # <u>192</u> Exhibit 189, # <u>193</u> Exhibit 190, # <u>194</u> Exhibit 191, # <u>195</u> Exhibit 192, # <u>196</u> Exhibit 193, # <u>197</u> Exhibit 194, # <u>198</u> Exhibit 195, # <u>199</u> Exhibit 196, # <u>200</u> Exhibit 197, # <u>201</u> Exhibit 198, # <u>202</u> Exhibit 199, # <u>203</u> Exhibit 200, # <u>204</u> Exhibit 201, # <u>205</u> Exhibit 202, # <u>206</u> Exhibit 203, # <u>207</u> Exhibit 204, # <u>208</u> Exhibit 205, # <u>209</u> Exhibit 206, # <u>210</u> Exhibit 207, # <u>211</u> Exhibit 208, # <u>212</u> Exhibit 209, # <u>213</u> Exhibit 210, # <u>214</u> Exhibit 211).(Vogt, Shane) (Entered: 07/11/2020) |
| 07/11/2020 | <u>110</u> | NOTICE of Plaintiff's Statement Regarding Filing of Declaration of Shane Vogt [Doc. 109] re: <u>109</u> Declaration in Opposition to Motion,,,,,,,,,,,,,,,,,,,. Document filed by Sarah Palin. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4).(Vogt, Shane) (Entered: 07/11/2020) |
| 07/15/2020 | <u>111</u> | **FILING ERROR – WRONG EVENT TYPE SELECTED FROM MENU –** MOTION for Reconsideration re; <u>83</u> Order on Motion for Judgment on the Pleadings, . Document filed by Sarah Palin..(Vogt, Shane) Modified on 7/28/2020 (lb). (Entered: 07/15/2020) |
| 07/16/2020 | | NOTICE of Hearing:The Pretrial Conference set for 7/27/2020 at 02:00 PM before Judge Jed S. Rakoff shall proceed telephonically. Dial in information: USA toll free – 888–363–4735; International, caller paid – 215–446–3657; Access code – 1086415..(Kotowski, Linda) (Entered: 07/16/2020) |
| 07/17/2020 | <u>112</u> | REPLY MEMORANDUM OF LAW in Opposition re: <u>94</u> MOTION for Summary Judgment . . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 07/17/2020) |
| 07/17/2020 | <u>113</u> | REPLY MEMORANDUM OF LAW in Support re: <u>94</u> MOTION for Summary Judgment . . Document filed by The New York Times Company..(Brown, Jay) (Entered: 07/17/2020) |
| 07/17/2020 | <u>114</u> | RULE 56.1 STATEMENT. Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 07/17/2020) |
| 07/20/2020 | <u>115</u> | MEMORANDUM OF LAW in Opposition re: <u>111</u> MOTION for Reconsideration re; <u>83</u> Order on Motion for Judgment on the Pleadings, . . Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 07/20/2020) |
| 07/22/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 7/22/2020, ( Jury Trial set for 2/1/2021 at 09:30 AM before Judge Jed S. Rakoff.). (Kotowski, Linda) (Entered: 07/22/2020) |
| 07/27/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephonic Oral Argument held on 7/27/2020 re: <u>95</u> MOTION for Partial Summary Judgment . filed by Sarah Palin, <u>94</u> MOTION for Summary Judgment . filed by The New York Times Company, James Bennet. (Kotowski, Linda) (Entered: 07/30/2020) |
| 07/28/2020 | | **\*\*\*NOTICE TO ATTORNEY TO RE–FILE DOCUMENT – EVENT TYPE ERROR. Notice to Attorney Shane B. Vogt to RE–FILE Document <u>111</u> MOTION for Reconsideration re; <u>83</u> Order on Motion for Judgment on the Pleadings, .. Use the event type Memorandum of Law in Support (non–motion) found under the event list Other Answers. (lb)** (Entered: 07/28/2020) |
| 07/28/2020 | <u>116</u> | MEMORANDUM OF LAW in Support re: <u>83</u> Order on Motion for Judgment on the Pleadings, *of Reconsideration and/or Alteration or Amendment of January 21, 2020 Memorandum Order*. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 07/28/2020) |
| 08/28/2020 | <u>117</u> | OPINION AND ORDER re: <u>95</u> MOTION for Partial Summary Judgment . filed by Sarah Palin, <u>94</u> MOTION for Summary Judgment . filed by The New York Times Company, James Bennet. For the above–discussed reasons, plaintiff's motion for partial summary judgment is denied and defendants' motion for summary judgment is also denied. The Clerk of the Court is directed to close docket entries 94 and 95. The trial of this case, pandemic permitting, will commence on February 1, 2020 at 9:30 |

| | | |
|---|---|---|
| | | a.m. SO ORDERED. (Signed by Judge Jed S. Rakoff on 8/28/2020) (kv) (Entered: 08/28/2020) |
| 08/28/2020 | 118 | ORDER: The Court hereby corrects the following error in the Opinion and Order signed today, August 28, 2020, Dkt. No. 117, in the above–captioned matter: On page 35, line 5, the word "2020" is deleted and replaced with "2021." (Signed by Judge Jed S. Rakoff on 8/28/2020) (rro) (Entered: 08/28/2020 |
| 11/23/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 11/23/2020. (Kotowski, Linda) (Entered: 12/04/2020) |
| 11/25/2020 | 119 | MOTION for Reconsideration re; 117 Memorandum & Opinion,, . Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 11/25/2020) |
| 11/30/2020 | 120 | MEMORANDUM OF LAW in Support re: 119 MOTION for Reconsideration re; 117 Memorandum & Opinion,, . . Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 11/30/2020) |
| 11/30/2020 | 121 | MOTION for Lee. J. Levine to Withdraw as Attorney . Document filed by James Bennet, The New York Times Company..(Levine, Lee) (Entered: 11/30/2020) |
| 12/04/2020 | 122 | MEMO ENDORSEMENT granting 121 Motion to Withdraw as Attorney. ENDORSEMENT: SO ORDERED. (Attorney Lee Levine terminated.) (Signed by Judge Jed S. Rakoff on 12/4/2020) (rro) (Entered: 12/04/2020) |
| 12/07/2020 | 123 | RESPONSE to Motion re: 119 MOTION for Reconsideration re; 117 Memorandum & Opinion,, . . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 12/07/2020) |
| 12/09/2020 | 124 | REPLY MEMORANDUM OF LAW in Support re: 119 MOTION for Reconsideration re; 117 Memorandum & Opinion,, . . Document filed by The New York Times Company..(Brown, Jay) (Entered: 12/09/2020) |
| 12/17/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. Jury Trial set for 6/21/2021 at 09:30 AM before Judge Jed S. Rakoff, pending further order of the Court. (Kotowski, Linda) (Entered: 12/17/2020) |
| 12/29/2020 | 125 | MEMORANDUM ORDER granting 119 Motion for Reconsideration: For the foregoing reasons, defendants' motion is granted. The Court holds that N.Y. Civil Rights Law § 76–a, as amended on November 10, 2020, applies to this action and requires plaintiff, as a matter of state law, to prove by clear and convincing evidence what she had already been tasked with establishing under the federal Constitution: that defendants made the allegedly defamatory statements in the Editorial "with knowledge of [their] falsity or with reckless disregard of whether [they were] false" –– that is, with actual malice. See § 76–a(2). The Clerk of the Court is directed to close the entry at docket number 119. (Signed by Judge Jed S. Rakoff on 12/29/2020) (jwh) (Entered: 12/29/2020) |
| 01/12/2021 | 126 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 125 Order on Motion for Reconsideration. (sjo) (Entered: 01/12/2021) |
| 06/18/2021 | | NOTICE: The trial is adjourned pending further of the Court..(Kotowski, Linda) (Entered: 06/18/2021) |
| 06/22/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 6/22/2021. (Kotowski, Linda) (Entered: 06/22/2021) |
| 07/19/2021 | 127 | MOTION for Michael D. Sullivan to Withdraw as Attorney . Document filed by James Bennet, The New York Times Company..(Sullivan, Michael) (Entered: 07/19/2021) |
| 07/22/2021 | 128 | MEMO ENDORSEMENT granting 127 Motion to Withdraw as Attorney. ENDORSEMENT: SO ORDERED. Attorney Michael D. Sullivan terminated. (Signed by Judge Jed S. Rakoff on 7/20/2021) (kv) (Entered: 07/22/2021) |
| 07/28/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 7/28/2021, ( Jury Trial set for 9/20/2021 at 09:30 AM before Judge Jed S. Rakoff.). (Kotowski, Linda) (Entered: 07/29/2021) |
| 08/12/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: In the above–captioned case, a telephone conference was held August 12, 2021 without transcription or |

| | | |
|---|---|---|
| | | recording. Counsel for Plaintiff and Defendant were present. Developments with the COVID–19 pandemic necessitate the postponement of the jury trial. Accordingly, trial will now commence January 24, 2022. ( Jury Selection set for 1/24/2022 at 09:30AM before Judge Jed S. Rakoff.). (Kotowski, Linda) (Entered: 08/12/2021) |
| 12/20/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 12/20/2021. (Kotowski, Linda) (Entered: 12/20/2021) |
| 01/07/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 1/7/2022.. The Court denied Plaintiffs motion to adjourn the trial but granted Plaintiffs motion to adjust the sitting times on certain trial days. (Kotowski, Linda) (Entered: 01/07/2022) |
| 01/10/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. A telphonic Pretrial Conference set for 1/11/2022 at 02:30 PM before Judge Jed S. Rakoff. The public may access this proceeding by dialing :USA toll free 888–363–4735, international caller paid 215–446–3657, Access code 1086415 (Kotowski, Linda) (Entered: 01/10/2022) |
| 01/10/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. Telephone Conference set for 1/11/2022 at 02:30 PM before Judge Jed S. Rakoff. The public may access this proceeding by dialing :USA toll free 888–363–4735, international caller paid 215–446–3657, Access code 1086415 (Kotowski, Linda) (Entered: 01/10/2022) |
| 01/10/2022 | <u>129</u> | MOTION in Limine . Document filed by Sarah Palin. (Attachments: # <u>1</u> Exhibit A).(Vogt, Shane) (Entered: 01/10/2022) |
| 01/10/2022 | <u>130</u> | MEMORANDUM OF LAW in Support re: 129 MOTION in Limine . . Document filed by Sarah Palin. (Attachments: # <u>1</u> Exhibit A).(Vogt, Shane) (Entered: 01/10/2022) |
| 01/11/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 1/11/2022. (Kotowski, Linda) (Entered: 01/13/2022) |
| 01/14/2022 | <u>131</u> | **FILING ERROR – DEFICIENT DOCKET ENTRY** – MOTION in Limine *For A Ruling That The Challenged Statements Are Not Defamatory Per Se*. Document filed by James Bennet, The New York Times Company. (Attachments: # <u>1</u> Memorandum in Support).(Axelrod, David) Modified on 1/31/2022 (kj). (Entered: 01/14/2022) |
| 01/14/2022 | <u>132</u> | MOTION in Limine *To Exclude The Testimony of Craig Kronenberger*. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | <u>133</u> | MEMORANDUM OF LAW in Support re: 132 MOTION in Limine *To Exclude The Testimony of Craig Kronenberger*. . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | <u>134</u> | DECLARATION of David L. Axelrod in Support re: 132 MOTION in Limine *To Exclude The Testimony of Craig Kronenberger*.. Document filed by James Bennet, The New York Times Company. (Attachments: # <u>1</u> Ex. 1, # <u>2</u> Ex. 2, # <u>3</u> Ex. 3, # <u>4</u> Ex. 4, # <u>5</u> Ex. 5, # <u>6</u> Ex. 6, # <u>7</u> Ex. 7, # <u>8</u> Ex. 8, # <u>9</u> Ex. 9, # <u>10</u> Ex. 10, # <u>11</u> Ex. 11, # <u>12</u> Ex. 12, # <u>13</u> Ex. 13, # <u>14</u> Ex. 14, # <u>15</u> Ex. 15, # <u>16</u> Ex. 16, # <u>17</u> Ex. 17, # <u>18</u> Ex. 18).(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. Jury Selection set for 1/24/2022 at 09:00AM before Judge Jed S. Rakoff. The public may listen by using the connection information:Toll–Free USA : 877–810–9415International Caller Paid: 636–651–3185Access Code: 4086346 (Kotowski, Linda) (Entered: 01/14/2022) |
| 01/14/2022 | <u>135</u> | MOTION in Limine *to Exclude Evidence Regarding Articles and Posts Published by Atlantic Media, an Article James Bennet Was Sent, and Senator Michael Bennet*. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | <u>136</u> | MEMORANDUM OF LAW in Support re: 135 MOTION in Limine *to Exclude Evidence Regarding Articles and Posts Published by Atlantic Media, an Article James Bennet Was Sent, and Senator Michael Bennet*. . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/14/2022) |

| | | |
|---|---|---|
| 01/14/2022 | 137 | MOTION in Limine *to Exclude Evidence of James Bennet's Departure from The Times, Unrelated Controversies During His Tenure as Opinion Editor, and the Elimination of the Public Editor Position*. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | 138 | MEMORANDUM OF LAW in Support re: 137 MOTION in Limine *to Exclude Evidence of James Bennet's Departure from The Times, Unrelated Controversies During His Tenure as Opinion Editor, and the Elimination of the Public Editor Position*. . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | 139 | DECLARATION of Thomas B. Sullivan in Support re: 137 MOTION in Limine *to Exclude Evidence of James Bennet's Departure from The Times, Unrelated Controversies During His Tenure as Opinion Editor, and the Elimination of the Public Editor Position*., 135 MOTION in Limine *to Exclude Evidence Regarding Articles and Posts Published by Atlantic Media, an Article James Bennet Was Sent, and Senator Michael Bennet*.. Document filed by James Bennet, The New York Times Company. (Attachments: # 1 Ex. A, # 2 Ex. B, # 3 Ex. C, # 4 Ex. D, # 5 Ex. E, # 6 Ex. F, # 7 Ex. G, # 8 Ex. H, # 9 Ex. I, # 10 Ex. J, # 11 Ex. K, # 12 Ex. L, # 13 Ex. M (intentionally omitted), # 14 Ex. N, # 15 Ex. O, # 16 Ex. P, # 17 Ex. Q, # 18 Ex. R, # 19 Ex. S, # 20 Ex. T, # 21 Ex. U, # 22 Ex. V, # 23 Ex. W, # 24 Ex. X, # 25 Ex. Y, # 26 Ex. Z, # 27 Ex. AA, # 28 Ex. AB, # 29 Ex. AC, # 30 Ex. AD, # 31 Ex. AE, # 32 Ex. AF, # 33 Ex. AG, # 34 Ex. AH, # 35 Ex. AI, # 36 Ex. AJ, # 37 Ex. AK, # 38 Ex. AL, # 39 Ex. AM, # 40 Ex. AN, # 41 Ex. AO, # 42 Ex. AP – Part 1 of 2, # 43 Ex. AP – Part 2 of 2, # 44 Ex. AQ, # 45 Ex. AR, # 46 Ex. AS, # 47 Ex. AT, # 48 Ex. AU, # 49 Ex. AV).(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | | **\*\*\*NOTICE TO ATTORNEY TO RE–FILE DOCUMENT – DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney David Axelrod to RE–FILE Document 131 MOTION in Limine *For A Ruling That The Challenged Statements Are Not Defamatory Per Se*.. ERROR(S): Supporting Documents are filed separately, each receiving their own document #. (Supporting Documents are found under the Event Type – Replies, Opposition and Supporting Documents; Rule 56.1 Statement is found under Other Answers). (kj)** (Entered: 01/31/2022) |
| 01/17/2022 | 140 | MOTION in Limine *Regarding Case Management Techniques*. Document filed by James Bennet, The New York Times Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Axelrod, David) (Entered: 01/17/2022) |
| 01/17/2022 | 141 | MEMORANDUM OF LAW in Support re: 140 MOTION in Limine *Regarding Case Management Techniques*. . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/17/2022) |
| 01/17/2022 | 142 | **FILING ERROR – DEFICIENT DOCKET ENTRY –** MEMORANDUM OF LAW in Opposition re: 131 MOTION in Limine *For A Ruling That The Challenged Statements Are Not Defamatory Per Se*. . Document filed by Sarah Palin..(Vogt, Shane) Modified on 1/31/2022 (kj). (Entered: 01/17/2022) |
| 01/17/2022 | 143 | MEMORANDUM OF LAW in Opposition re: 140 MOTION in Limine *Regarding Case Management Techniques*. . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/17/2022) |
| 01/17/2022 | 144 | RESPONSE in Opposition to Motion re: 129 MOTION in Limine . . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/17/2022) |
| 01/17/2022 | 145 | MEMORANDUM OF LAW in Opposition re: 137 MOTION in Limine *to Exclude Evidence of James Bennet's Departure from The Times, Unrelated Controversies During His Tenure as Opinion Editor, and the Elimination of the Public Editor Position*. . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/17/2022) |
| 01/17/2022 | 146 | PROPOSED JURY INSTRUCTIONS. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/17/2022) |
| 01/17/2022 | 147 | MEMORANDUM OF LAW in Opposition re: 135 MOTION in Limine *to Exclude Evidence Regarding Articles and Posts Published by Atlantic Media, an Article James Bennet Was Sent, and Senator Michael Bennet*. . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/17/2022) |

| 01/17/2022 | 148 | PROPOSED PRE–TRIAL ORDER. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/17/2022) |
|---|---|---|
| 01/17/2022 | 149 | MEMORANDUM OF LAW in Opposition re: 132 MOTION in Limine *To Exclude The Testimony of Craig Kronenberger*. . Document filed by Sarah Palin. (Attachments: # 1 Exhibit A).(Vogt, Shane) (Entered: 01/17/2022) |
| 01/17/2022 | 150 | DECLARATION of Craig Kronenberger in Opposition re: 132 MOTION in Limine *To Exclude The Testimony of Craig Kronenberger*.. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/17/2022) |
| 01/17/2022 | 151 | PROPOSED JURY INSTRUCTIONS. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/17/2022) |
| 01/17/2022 | | ***NOTICE TO ATTORNEY TO RE–FILE DOCUMENT – DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Shane Vogt to RE–FILE Document 142 Memorandum of Law in Opposition to Motion,. ERROR(S): Supporting and or Opposing document(s) was linked to a deficient filing. (kj) (Entered: 01/31/2022) |
| 01/18/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial in this matter will commence before Judge Rakoff on 1/24/22. Throughout the trial, the public may listen to the proceedings using the following public access line: 877–810–9415; Access Code: 4086346. (Kotowski, Linda) (Entered: 01/18/2022) |
| 01/19/2022 | 152 | PROPOSED VOIR DIRE QUESTIONS. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/19/2022) |
| 01/19/2022 | 153 | PROPOSED JURY INSTRUCTIONS. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/19/2022) |
| 01/20/2022 | 154 | PROPOSED VOIR DIRE QUESTIONS. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/20/2022) |
| 01/20/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. Jury Selection set for 1/24/2022 before Judge Jed S. Rakoff. Throughout the trial, the public may listen to the proceedings using the following public access line: USA Toll free: 844–721–7237, International Caller paid: 409–207–6951,Access Code: 7920433This is a change in connection information. (Kotowski, Linda) (Entered: 01/20/2022) |
| 01/21/2022 | 155 | PROPOSED JURY INSTRUCTIONS. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/21/2022) |
| 01/22/2022 | 156 | NOTICE OF APPEARANCE by Shawn Preston Ricardo on behalf of Sarah Palin..(Ricardo, Shawn) (Entered: 01/22/2022) |
| 01/22/2022 | 157 | JOINT PRETRIAL CONSENT ORDER: Pursuant to Rule 4 of the Court's Individual Rules of Practice, Plaintiff Sarah Palin and Defendants The New York Times Company ("The Times") and James Bennet respectfully submit this proposed joint pretrial order for the jury trial scheduled to commence on January 24, 2022, as further set forth in this Order. Estimates Length of Trial: Five (5) days. (Signed by Judge Jed S. Rakoff on 1/22/2022) (mml) (Entered: 01/24/2022) |
| 01/23/2022 | 158 | ORDER: The Court has just learned that, based on a new safety protocol that will be implemented imminently, no one may unmask in the courtroom –– even in the HEPA–filter–outfitted witness and attorney boxes –– unless they have tested negative for COVID–19 using an approved molecular diagnostic test. (Antigen tests are not approved.) If a person will be removing his or her mask on successive days, the person may test on an every–other–day schedule; otherwise, the speaker must test negative on the day of his or her appearance. If a speaker has had a confirmed case of COVID–19 (verified by either a doctor'snote or a viral test result) within the prior ninety days, he or she will be exempted from these testing requirements. Confirmation of negative test results (or of a prior case of COVID–19) must be provided to the Court through its staff, as further set forth in this Order. (Signed by Judge Jed S. Rakoff on 1/23/2022) (mml) (Entered: 01/24/2022) |
| 01/24/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 1/23/2022 regarding the Plaintiffs positive test for COVID–19, without transcription or recording. (Kotowski, Linda) (Entered: 01/24/2022) |

| | | |
|---|---|---|
| 01/24/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Hearing Out of Jury Presence held on 1/24/2022, Minute entry for proceedings held before Judge Jed S. Rakoff: Hearing held on 1/24/22. Present for the plaintiff: Kenneth Turkel, Michael Munoz & Shane Vogt, present for the defendant: David Schulz, Jay Brown, David Axelrod, Thomas Sullivan for the defendant, and a court reporter. Due to Plaintiffs positive tests for COVID–19, the trial is adjourned to 2/3/22. The Court ruled on the parties motions in limine, setting forth its reasoning on the record. The Court denied Defendants motion 159 for a ruling that the challenged statements are not defamatory per se, without prejudice to Defendants raising the issue again at the charging conference. The Court granted Defendants motion 132 to exclude the testimony of Plaintiffs damages expert. The Court granted in part and denied in part Defendants motion 137 , granting the prong of the motion seeking to exclude evidence about James Bennets departure from the New York Times but denying the rest of the motion without prejudice to reraising the objections if the evidence is offered. The Court denied Defendants motion 135 without prejudice to reraising the objections if the evidence is offered, except that the Court granted the aspect of Defendants motion seeking exclusion of articles concerning the Plaintiffs child. The Court denied Defendants motion 140 regarding case management issues, but the Court will read the jury a preliminary instruction immediately after opening statements are finished. The Court heard argument on and finalized the text of that preliminary instruction. Plaintiffs motion 129 is denied as moot, but each partys counsel shall identify for opposing counsel any objected–to, proposed exhibits they intend to reference during their opening statements. The Court will rule on any remaining objections to such exhibits before the start of trial. The parties shall file a joint, final, and binding list of witnesses in likely order of appearance on 2/1/22. Throughout the trial, the public may listen to the proceedings using the following public access line: USA Toll free: 844–721–7237, International Caller paid: 409–207–6951,Access Code: 7920433. Pursuant to Federal law, the public is strictly prohibited from recording any part of these proceedings. ( Bench Trial set for 2/3/2022 at 09:00 AM before Judge Jed S. Rakoff.) (Kotowski, Linda) (Entered: 02/01/2022) |
| 01/31/2022 | 159 | MOTION in Limine *For A Ruling That The Challenged Statements Are Not Defamatory Per Se*. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/31/2022) |
| 01/31/2022 | 160 | MEMORANDUM OF LAW in Support re: 159 MOTION in Limine *For A Ruling That The Challenged Statements Are Not Defamatory Per Se*. . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/31/2022) |
| 01/31/2022 | 161 | MEMORANDUM OF LAW in Opposition re: 159 MOTION in Limine *For A Ruling That The Challenged Statements Are Not Defamatory Per Se*. . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/31/2022) |
| 02/01/2022 | 162 | WITNESS LIST. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 02/01/2022) |
| 02/03/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial begun on 2/3/2022. (Kotowski, Linda) (Entered: 02/04/2022) |
| 02/04/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/4/2022. (Court Reporter Kristen Carranante) (Kotowski, Linda) (Entered: 02/04/2022) |
| 02/07/2022 | 163 | ORDER re: 162 Witness List filed by Sarah Palin. Docket entry 162, a revised witness list submitted after adjournment of the trial to February 3, 2022, was erroneously filed in a manner that prevented public access. The witness list has now been ordered unsealed. SO ORDERED. (Signed by Judge Jed S. Rakoff on 2/7/2022) (kv) (Entered: 02/07/2022) |
| 02/07/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/7/2022. (Kotowski, Linda) (Entered: 02/08/2022) |
| 02/08/2022 | 164 | TRIAL MEMORANDUM. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 02/08/2022) |
| 02/08/2022 | 165 | TRIAL MEMORANDUM. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 02/08/2022) |

| 02/08/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/8/2022. (Kotowski, Linda) (Entered: 02/08/2022) |
|---|---|---|
| 02/09/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/9/2022. (Kotowski, Linda) (Entered: 02/11/2022) |
| 02/10/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/10/2022. Both sides rest. Defendant's Motion to Dismiss denied. (Kotowski, Linda) Modified on 2/11/2022 (Kotowski, Linda). (Entered: 02/11/2022) |
| 02/11/2022 | [166](#) | TRANSCRIPT of Proceedings re: CONFERENCE held on 1/24/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Kelly Surina, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/4/2022. Redacted Transcript Deadline set for 3/14/2022. Release of Transcript Restriction set for 5/12/2022..(Moya, Goretti) (Entered: 02/11/2022) |
| 02/11/2022 | [167](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 1/24/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/11/2022) |
| 02/11/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/11/2022. (Kotowski, Linda) (Entered: 02/16/2022) |
| 02/14/2022 | [168](#) | TRANSCRIPT of Proceedings re: CONFERENCE held on 1/11/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Steven Greenblum, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/7/2022. Redacted Transcript Deadline set for 3/17/2022. Release of Transcript Restriction set for 5/16/2022..(Moya, Goretti) (Entered: 02/14/2022) |
| 02/14/2022 | [169](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 1/11/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/14/2022) |
| 02/14/2022 | [170](#) | THE COURT'S INSTRUCTIONS OF LAW TO THE JURY: Ct. Ex. 1..(kv) (Entered: 02/14/2022) |
| 02/14/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/14/2022. The Court grants the defendants' Rule 50 Motion. Charge by the Court. At 3:40pm, after Marshal is sworn, the jury retires to deliberate. (Kotowski, Linda) (Entered: 02/16/2022) |
| 02/15/2022 | [171](#) | FINAL JUDGMENT: In view of the jury having returned a verdict of not–liable, and independently, for the reasons stated by the Court previously in granting Defendants' Rule 50 motion, final judgment is hereby entered dismissing the complaint with prejudice. ADJUDGED AND DECREED. (Signed by Judge Jed S. Rakoff on 2/15/2022) (kv) (Entered: 02/15/2022) |
| 02/15/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial completed on 2/15/2022. (Kotowski, Linda) (Entered: 02/16/2022) |
| 02/16/2022 | [172](#) | ORDER: It is the Court's uniform practice after a verdict has been rendered in a jury trial to have the Court's law clerk inquire of the jury as to whether there were any problems understanding the Court's instructions of law, so that improvements can be made in future cases. Late yesterday, in the course of such an inquiry in this case –– in which the jury confirmed that they had fully understood the instructions and had no suggestions regarding jury instructions for future cases –– several jurors volunteered |

| | | to the law clerk that, prior to the rendering of the jury verdict in this case, they had learned of the fact of this Court's Rule 50 determination on Monday to dismiss the case on legal grounds. These jurors reported that although they had been assiduously adhering to the Court's instruction to avoid media coverage of the trial, they had involuntarily received "push notifications" on their smartphones that contained the bottom–line of the ruling. The jurors repeatedly assured the Court's law clerk that these notifications had not affected them in any way or played any role whatever in their deliberations. The Court also notes that when it proposed to the parties, during oral argument on Monday morning, to render its Rule 50 decision later that day but to permit the jury to continue deliberating so that the Court of Appeals would have the benefit of both the Court's legal determination and the jury's verdict, no party objected to this plan. Nor did any party object when the Court reconvened later that day, outside the presence of the jury, and the Court indicated that it was prepared to issue a Rule 50 decision at that time. Indeed, no party objected to this procedure at any time whatever. Nevertheless, in an excess of caution, the Court hereby brings the foregoing facts to the parties' attention. If any party feels there is any relief they seek based on the above, counsel should promptly initiate a joint phone conference with the Court to discuss whether any further proceedings are appropriate. SO ORDERED. (Signed by Judge Jed S. Rakoff on 2/16/2022) (kv) (Entered: 02/16/2022) |
| 02/16/2022 | 173 | VERDICT FORM..(kv) (Entered: 02/16/2022) |
| 02/16/2022 | 174 | ORDER: The Clerk is directed to docket the attached documents, to supplement the record in this case. Exhibit A is an instruction sent by email to members of the jury on Saturday, February 12, 2022 admonishing them again to avoid any media coverage of the trial. Exhibit B is correspondence between the Court and counsel for the parties regarding case law germane to Defendants' Rule 50 motion for judgment as a matter of law. SO ORDERED. (Signed by Judge Jed S. Rakoff on 2/16/2022) (kv) (Entered: 02/16/2022) |
| 02/17/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. Telephone Conference set for 2/23/2022 at 04:00 PM before Judge Jed S. Rakoff. The public may access this proceeding on the following line:USA toll free 888–363–4735, international caller paid 215–446–3657, Access code 1086415 (Kotowski, Linda) (Entered: 02/17/2022) |
| 02/21/2022 | 175 | TRANSCRIPT of Proceedings re: TRIAL held on 2/3/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 176 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/3/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 177 | TRANSCRIPT of Proceedings re: TRIAL held on 2/4/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 178 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/4/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |

| 02/21/2022 | 179 | TRANSCRIPT of Proceedings re: TRIAL held on 2/7/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
|---|---|---|
| 02/21/2022 | 180 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/7/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 181 | TRANSCRIPT of Proceedings re: TRIAL held on 2/8/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 182 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/8/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 183 | TRANSCRIPT of Proceedings re: TRIAL held on 2/9/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 184 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/9/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 185 | TRANSCRIPT of Proceedings re: TRIAL held on 2/10/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 186 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/10/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 187 | TRANSCRIPT of Proceedings re: TRIAL held on 2/11/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court |

| | | |
|---|---|---|
| | | Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 188 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/11/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 189 | TRANSCRIPT of Proceedings re: TRIAL held on 2/14/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 190 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/14/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 191 | TRANSCRIPT of Proceedings re: TRIAL held on 2/15/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 192 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/15/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/23/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 2/23/2022 with court reporter Khris Sellin. Plaintiff's post trial motions not to exceed 50 pages, all motions in a single submission. Defendants' response not to exceed 50 pages, replies are limited to 15 pages. (Kotowski, Linda) (Entered: 02/23/2022) |
| 02/25/2022 | 193 | TRANSCRIPT of Proceedings re: CONFERENCE held on 2/23/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/18/2022. Redacted Transcript Deadline set for 3/28/2022. Release of Transcript Restriction set for 5/26/2022..(Moya, Goretti) (Entered: 02/25/2022) |
| 02/25/2022 | 194 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 2/23/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/25/2022) |

| | | |
|---|---|---|
| 02/28/2022 | <u>195</u> | MOTION to Disqualify Judge *retroactive to August 28,2020, and setting aside/vacating rulings and orders made by the Court during that time*., MOTION approval to interview members of jury concerning their receipt of push notifications during trial ., MOTION for Reconsideration , *Reargument and/or Rehearing of Court's decision under Rule 50*., MOTION to Set Aside Verdict *and Final Judgment and granting Plaintiff a new trial*. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 02/28/2022) |
| 03/01/2022 | <u>196</u> | OPINION: At trial, plaintiff Sarah Palin wholly failed to prove her case even to the minimum standard required by law. Accordingly, defendants the New York Times Company (the "Times") and James Bennet moved to dismiss the case prior to the start of jury deliberations. After hearing extensive argument, the Court granted the motion shortly after the jury had begun its deliberations. This Opinion sets forth the reasons for that decision, as well as the reasons for how the Court then dealt with the deliberating jury. (as further set forth herein). For all the reasons set forth above, the Court entered final judgment as a matter of law in favor of The New York Times Co. and James Bennet, because no reasonable jury could find that Sarah Palin proved that the defendants published "America's Lethal Politics" with actual malice. SO ORDERED. (Signed by Judge Jed S. Rakoff on 3/1/2022) (kv) (Entered: 03/01/2022) |
| 03/04/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 3/4/2022 without transcription or recording. Counsel for Plaintiff and Defendant were present. The Court granted defendants unopposed motion for extensions of time to brief post–trial motions, which shall now proceed on the following schedule: plaintiffs omnibus motion due 3/22/22, defendants opposition due 4/12/22, plaintiffs reply due 4/19/22. The Court also granted defendants unopposed motion for leave not to file an initial notice of taxable costs, as required by Local Rule 54.1, and instead to file any notice of taxable costs by no later than 30 days after the Court issues its decision on the post–trial motions. (Kotowski, Linda) (Entered: 03/04/2022) |
| 03/17/2022 | <u>197</u> | NOTICE OF APPEAL from <u>125</u> Order on Motion for Reconsideration,,, <u>171</u> Judgment, <u>196</u> Memorandum & Opinion,,,. Document filed by Sarah Palin. Filing fee $ 505.00, receipt number ANYSDC–25876553. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Vogt, Shane) (Entered: 03/17/2022) |
| 03/17/2022 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: <u>197</u> Notice of Appeal,..(nd) (Entered: 03/17/2022) |
| 03/17/2022 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for <u>197</u> Notice of Appeal, filed by Sarah Palin were transmitted to the U.S. Court of Appeals..(nd) (Entered: 03/17/2022) |
| 03/22/2022 | <u>198</u> | MEMORANDUM OF LAW in Support re: <u>195</u> MOTION to Disqualify Judge *retroactive to August 28,2020, and setting aside/vacating rulings and orders made by the Court during that time*. MOTION approval to interview members of jury concerning their receipt of push notifications during trial . MOTION for Reconsideration , *Reargument and/or Rehearing of Court's decision under Rule 50*. MOTION to Set Aside Verdict *and Final Judgment and granting Plaintiff a new trial*. . Document filed by Sarah Palin. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6 (Part 1 of 2), # <u>7</u> Exhibit 6 (Part 2 of 2)).(Vogt, Shane) (Entered: 03/22/2022) |
| 03/25/2022 | <u>199</u> | INITIAL NOTICE OF STAY OF APPEAL re: <u>197</u> Notice of Appeal,. A notice of appeal was filed in this case on 03/17/2022. Since at least one motion cited in F.R.A.P. 4(a)(4) has been filed in the district court, this appeal is stayed pending resolution of the motion(s). USCA Case No. 22–558..(nd) (Entered: 03/25/2022) |
| 03/29/2022 | <u>200</u> | ORDER of USCA (Certified Copy) USCA Case Number 22–629. Petitioner Sarah Palin has filed a petition for a writ of mandamus. Petitioner has also filed a post–trial motion in the district court which may impact this petition. Upon consideration thereof, IT IS HEREBY ORDERED that this petition is held in abeyance pending the district court's resolution of Petitioners post–trial motion. Petitioner is directed to inform this Court in writing of the status of the motion in 30–day intervals, beginning 30 days from the date of this order. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 03/29/2022..(nd) (Entered: 03/29/2022) |

| 04/12/2022 | 201 | MEMORANDUM OF LAW in Opposition re: 195 MOTION to Disqualify Judge *retroactive to August 28,2020, and setting aside/vacating rulings and orders made by the Court during that time*. MOTION approval to interview members of jury concerning their receipt of push notifications during trial . MOTION for Reconsideration *, Reargument and/or Rehearing of Court's decision under Rule 50*. MOTION to Set Aside Verdict *and Final Judgment and granting Plaintiff a new trial*. . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 04/12/2022) |
|---|---|---|
| 04/19/2022 | 202 | REPLY to Response to Motion re: 195 MOTION to Disqualify Judge *retroactive to August 28,2020, and setting aside/vacating rulings and orders made by the Court during that time*. MOTION approval to interview members of jury concerning their receipt of push notifications during trial . MOTION for Reconsideration *, Reargument and/or Rehearing of Court's decision under Rule 50*. MOTION to Set Aside Verdict *and Final Judgment and granting Plaintiff a new trial*. . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 04/19/2022) |
| 05/31/2022 | 203 | OPINION AND ORDER re: 195 MOTION to Disqualify Judge *retroactive to August 28,2020, and setting aside/vacating rulings and orders made by the Court during that time*. MOTION approval to interview members of jury concerning their receipt of push notifications during trial . MOTION for Reconsideration *, Reargument and/or Rehearing of Court's decision under Rule 50*. MOTION to Set Aside Verdict *and Final Judgment and granting Plaintiff a new trial*. filed by Sarah Palin. The meritless accusations of impropriety in Palin's motion cannot substitute for what her trial presentation lacked: proof of actual malice. This requires, under both Supreme Court precedent and New York State statutory law, clear and convincing evidence that Bennet and the Times published "America's Lethal Politics" knowing that it was false or in reckless disregard of its falsity. See New York Times v. Sullivan, 376 U.S. 254, 280 (1964). And, as the Supreme Court has likewise held, this high standard cannot be satisfied simply by a negative inference drawn from discrediting Bennet's denials. See Anderson, 477 U.S. at 256. Here, Palin still cannot identify any affirmative evidence to support the essential element of actual malice. This absence is not a consequence of trial procedures, judicial bias, or adverse evidentiary rulings. It is, in the Court's view, a reflection of the facts of the case. To be sure, as the Court itself recognized even it is initial statement of its Rule 50 decision, the evidence showed that Bennet and the Times's Editorial Board made mistakes as they rushed to meet a print deadline, and that their editorial processes failed to catch those mistakes before publication. See Tr. 1303–1304. But in a defamation case brought by a public figure like Sarah Palin, a mistake is not enough to win if it was not motivated by actual malice. And the striking thing about the trial here was that Palin, for all her earlier assertions, could not in the end introduce even a speck of such evidence. Palin's motion is hereby denied in its entirety. SO ORDERED. (Signed by Judge Jed S. Rakoff on 5/31/2022) (kv) (Entered: 05/31/2022) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
SARAH PALIN,                               :
                                           :
                                           :    17-cv-4853 (JSR)
            Plaintiff,                      :
                                           :    OPINION AND ORDER
            -v-                             :
                                           :
THE NEW YORK TIMES COMPANY and JAMES       :
BENNET,                                    :
                                           :
            Defendants.                    :
------------------------------------------x

JED S. RAKOFF, U.S.D.J.

        Familiarity with the prior proceedings in this action is

here assumed. As relevant here, on December 30, 2019, plaintiff

Sarah Palin filed an amended complaint against defendants the

New York Times Company (the "Times") and James Bennet, alleging

that they had defamed her in an editorial (the "Editorial")

published on June 14, 2017. Dkt. 70. After the completion of

discovery, both sides filed motions for summary judgment that

are now ripe for decision.

        Both motions relate to the proposition that a public figure

cannot recover for defamation unless the defamatory statement

was made with "actual malice." See New York Times Co. v.

Sullivan, 376 U.S. 254, 280 (1964). Specifically, plaintiff

moves for partial summary judgment on the basis of her assertion

that the requirement is no longer good law or at least does not

apply to this case. Dkt. No. 95; Plaintiff's Memorandum of Law

1

in Support of Plaintiff's Motion for Partial Summary Judgment
("Pl. Mem."), Dkt No. 100; Plaintiff's Reply Memorandum of Law
in Opposition [sic] to Plaintiff's Motion for Partial Summary
Judgment ("Pl. Reply"), Dkt. No. 112. Defendants oppose.
Defendants' Memorandum of Law in Opposition to Plaintiff's
Motion for Partial Summary Judgment ("Defs' Opp."), Dkt. No. 104
Conversely, defendants, maintaining that the actual malice
standard fully applies here, seek summary judgment on the ground
that no reasonable jury could find, based on the evidence of
record, that the allegedly defamatory statements were published
with actual malice. Dkt. No. 94; Defendants' Memorandum of Law
in Support of their Motion for Summary Judgment ("Defs' Mem."),
Dkt. No. 96; Defendants' Reply Memorandum of Law in Support of
their Motion for Summary Judgment ("Defs' Reply"), Dkt. No. 113.
Plaintiff opposes. Plaintiff's Memorandum of Law in Opposition
to Defendants' Motion for Summary Judgment ("Pl. Opp."), Dkt.
No. 107.

    I.    <u>Factual Background</u>[1]

---

[1]    On a motion for summary judgment, the Court construes all
facts in the light most favorable to the non-moving party.
Ordinarily, when faced with cross-motions for summary judgment,
a district court would "evaluate each party's motion on its own
merits, taking care in each instance to draw all reasonable
inferences against the party whose motion is under
consideration." <u>Schwabenbauer v. Bd. of Educ. of Olean</u>, 667 F.2d
305, 314 (2d Cir. 1981). Here, however, plaintiff's motion for
partial summary judgment presents a pure question of law and
does not depend on the evidence in this case. Therefore, the

Plaintiff Sarah Palin is the former governor of Alaska and a former vice-presidential candidate. See Defendants' Statement of Undisputed Material Facts, Dkt. No. 97, ¶ 1; Plaintiff's Response to Defendants' Local Rule 56.1 State of Material Facts & Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment ("Pl. SUMF"), Dkt. No. 108, ¶ 1.[2] Defendant The New York Times Company (the "Times"), a New York corporation, is a global media organization that publishes The New York Times daily newspaper. First Amended Complaint ("FAC"), Dkt. No. 70, ¶ 6. Defendant James Bennet was at all times relevant to this lawsuit the editor overseeing opinion journalism at the Times, including masthead editorials by the Times Editorial Board. Pl. SUMF ¶ 3.

On June 14, 2017, defendant The Times published the Editorial, authored (in the segments here relevant) by defendant Bennet, which identified a "familiar pattern" of politically motivated violence and criticized members of Congress for supporting permissive gun regulations. Pl. SUMF ¶ 348. The Editorial identified two instances of mass shootings "fuel[ed]" by politics: (1) James Hodgkinson's June 14, 2017 armed attack

---

following facts are either undisputed or, where disputed, taken most favorably to plaintiff.

[2]     Where a fact is undisputed, the Court cites to plaintiff's Rule 56.1 statement.

on members of Congress at a baseball field in Virginia, which seriously wounded U.S. Congressperson Steve Scalise; and (2) Jared Lee Loughner's January 8, 2011 armed attack in Arizona, which seriously wounded U.S. Congressperson Gabby Giffords.[3] Declaration of Thomas B. Sullivan ("Sullivan Decl."), Dkt. No. 99, Ex. 40.

Describing Loughner's 2011 attack, the Editorial stated: "[T]he link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs."[4] Id. The Editorial contrasted the Loughner attack with that day's Hodgkinson shooting, where there was "no sign of incitement as direct as in the Giffords attack." Id. The Editorial did, however, include a hyperlink to an ABC News Article titled Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate, published

---

[3]    Although not relevant to the issues here presented, it certainly should not be forgotten that Loughner's shooting also resulted in the death of six people, including U.S. District Judge John Roll.

[4]    The Palin committee's circular is hereinafter referred to as the "Map." Although plaintiff purports to dispute that the marks on the circular were crosshairs, see Pl. SUMF ¶ 7, even the most causal interpretation of the circular definitively rebuts plaintiff's suggestion, and there is no evidence of record to the contrary. And, in any event, even plaintiff does not suggest that the defendants acted with actual malice in describing the marks as crosshairs.

4

the day after Loughner's 2011 attack, which stated that "[n]o connection has been made between [the Map] and the Arizona shooting." Pl. SUMF ¶¶ 37, 40.

The Editorial was the product of discussions that occurred over the course of June 14, 2017. Soon after the Hodgkinson attack, evidence emerged that Hodgkinson was a supporter of Senator Bernie Sanders and an opponent of President Donald Trump. Id. ¶ 20. In an email thread between Editorial Board members discussing whether and how to cover the shooting, Bennet suggested writing about "the rhetoric of demonization and whether it incites people to this kind of violence." Sullivan Decl. Ex. 11. In particular, Bennet said that "if there's evidence [surrounding the Hodgkinson shooting] of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting) we should deal with that." Id.

Another member of the Board, Elizabeth Williamson, then researched the Hodgkinson and Loughner shootings and wrote the first draft of the Editorial. Pl. SUMF ¶ 35. Her draft referred to the fact that there had been some debate in the media in the wake of the Loughner shooting regarding whether there existed a connection between the shooting and the Map. See Sullivan Decl. Ex. 24. But Williamson's draft did not affirmatively state that such a connection had been established. See id. The draft also

included the hyperlink to the above-mentioned ABC news article.
Id. As relevant here, Williamson's draft read:

> Just as in 2011, when Jared Lee Loughner opened fire
> in a supermarket parking lot, grievously wounding
> Representative Gabby Giffords and killing six people,
> including a nine year-old girl, Mr. Hodgkinson's rage
> was nurtured in a vile political climate. Then, it was
> the pro-gun right being criticized: in the weeks
> before the shooting[,] Sarah Palin's political action
> committee circulated a map of targeted electoral
> districts that put Ms. Giffords and 19 other Democrats
> under stylized crosshairs.

Bennet received the draft around 5:00 p.m. Pl. SUMF ¶ 335.
After reading the draft, Bennet, who was ultimately responsible
for the content of such editorials, decided it needed
substantial revision and began rewriting it himself. Id. ¶ 51.
Around 7:30 p.m., Bennet sent a revised draft back to
Williamson, asking her to "[p]lease take a look." Id. ¶ 66.
Without further relevant changes, the Editorial, as revised by
Bennet, was published around 9:00 p.m. Id. ¶ 73.

Around 10:00 p.m., Ross Douthat, a Times opinion writer,
reached out to Bennet via email to express concern over the
Editorial. Sullivan Decl. Ex. 21. Douthat explained that there
was "no evidence that Jared Lee Loughner was incited by Sarah
Palin or anyone else, given his extreme mental illness and lack
of any tangible connection to that crosshair map." Id. A few
minutes later, Bennet responded that his "understanding [is]
that in the Giffords case there was a gun sight superimposed

over her district; so far in this case we don't know of any
direct threat against any of the congressman on the field.
That's not to say that any of it is ok, obviously, or that the
violence in either case was caused by the poltical [sic]
rhetoric. But the incitement in this case seems, so far, to be
less specific." Id.

That night, Bennet reached back out to Williamson to see
whether she was available to start investigating Douthat's
concerns. Pl. SUMF ¶ 99. Early the next morning, Bennet emailed
a larger group of people, instructing them to "get to the bottom
of this as quickly as possible." Id. ¶ 101.

Less than a day after the Editorial's publication, after
having found no evidence of the "link" to which it referred, the
Times revised and corrected the Editorial. The Times published
the first revised online version at 11:15 a.m. on June 15, 2017.
Id. ¶ 106. In it, the Times deleted the phrases "the link to
political incitement was clear" and "[t]hough there's no sign of
incitement as direct as in the Giffords attack" and added the
sentence "But no connection to that crime was ever established."
Id. In addition, the Times published a series of corrections,
which ultimately clarified that no link between political
rhetoric and the 2011 shooting of Representative Gabby Giffords
was ever established. Id. ¶ 109.

Despite these prompt corrections, plaintiff chose to sue
the Times, and filed her initial complaint less than two weeks
later. Dkt. No. 1. After an evidentiary hearing convened with
the consent of both parties,[5] this Court dismissed plaintiff's
complaint in its entirety, holding that she had failed to
plausibly allege that the Editorial was published with actual
malice, as required by the First Amendment. Dkt. No. 45. The
Second Circuit reversed, holding, inter alia, that plaintiff's
proposed (though not yet filed) amended complaint had
sufficiently alleged actual malice. Palin v. New York Times Co.,
940 F.3d 804, 813 (2d Cir. 2019). Soon thereafter, on December

---

[5] The hearing was something of an innovation, designed to
allow a court to better assess the "plausibility" standard that
the Supreme Court requires district courts to apply on a motion
to dismiss a complaint, see Ashcroft v. Iqbal, 556 U.S. 662
(2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), by
providing the court with enough context to make that
determination. After all, how can a judge assess whether a claim
is "plausible" if it involves conduct that occurred in a setting
with which the judge is totally unfamiliar? But even though the
hearing was consented to by all parties, the Second Circuit held
that such a hearing is not countenanced by the Federal Rules of
Civil Procedure. Palin v. New York Times Co., 940 F.3d 804, 807
(2d Cir. 2019). Of course, the judge-made "plausibility"
standard is not mentioned in the Federal Rule of Civil Procedure
either. And in the roughly analogous setting of class
certification, the Second Circuit, having at one time insisted
that a district court could not look beyond the complaint in
determining whether to certify a class, see Caridad v. Metro-
North Commuter, R.R., 191 F.3d 283, 292-93 (2d Cir. 1999), later
reversed its position because it recognized that a court may
often have to look at matters beyond the complaint to fulfill
its gatekeeping role, see In re Initial Public Offerings
Securities Litigation, 471 F.3d 24, 41-42 (2d Cir. 2006)

30, 2019, plaintiff filed the amended complaint, naming Bennet
as a co-defendant. Dkt. No. 70. After full discovery, the
parties filed, briefed, and argued their cross-motions for
summary judgment.

    II.   General Legal Standards[6]

    Under Rule 56(a) of the Federal Rules of Civil Procedure, a
"court shall grant summary judgment if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." In reviewing
the record, "the court must draw all reasonable inferences in
favor of the nonmoving party, and it may not make credibility
determinations or weigh the evidence." Reeves v. Sanderson
Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). "In moving for
summary judgment against a party who will bear the ultimate
burden of proof at trial, the movant's burden will be satisfied
if he can point to an absence of evidence to support an
essential element of the nonmoving party's claim." Goenaga v.
March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.
1995). Although the party opposing summary judgment may not
"rely on mere conclusory allegations nor speculation," D'Amico
v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), if "there

_____

[6]    Unless otherwise indicated, in quoting cases all internal
quotation marks, alterations, emphases, footnotes, and citations
are omitted.

is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper," Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

"Under New York law,[7] a plaintiff must establish five elements to recover in libel: 1) a written defamatory statement of fact concerning the plaintiff; 2) publication to a third party; 3) fault (either negligence or actual malice depending on the status of the libeled party); 4) falsity of the defamatory statement; and 5) special damages or per se actionability (defamatory on its face)." Celle v. Filipino Reporter Enterps. Inc., 209 F.3d 163, 173 (2d Cir. 2000). Furthermore, as discussed at length below, under here applicable federal law binding on the states, a public figure claiming defamation or libel must establish that the statements at issue were published with actual malice — that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." Palin, 940 F.3d at 809 (quoting New York Times, 376 U.S. at 280). Further still, a court ruling on a motion for summary

---

[7]     This Court and the Second Circuit have already held that New York law (along with certain federal constitutional requirements) governs plaintiff's claim. See Palin v. New York Times Co., 264 F. Supp. 3d 527, 533 n.4, rev'd on other grounds by Palin, 940 F.3d 804.

judgment on actual malice "must be guided by the New York Times 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists — that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." Anderson v. Liberty Lobby, 477 U.S. 242, 257 (1986).

    III. Plaintiff's Motion for Partial Summary Judgment

    Plaintiff's motion for partial summary judgment presents a pure question of law: whether plaintiff is required to prove that the allegedly libelous statements at issue in this case were published with "actual malice." Pl. Mem. at 1. There is no dispute that plaintiff is a public figure and must therefore, under seemingly well-settled law, prove that the statements were published with actual malice. See Palin, 940 F.3d at 809-10; see generally New York Times Co. v. Sullivan, 376 U.S. 254 (1964). What plaintiff is really asking, then, is for this Court either to "overrule" New York Times v. Sullivan or else to distinguish that case on the facts and refuse to apply the actual malice rule here. Pl. Mem. at 8, 13. To the extent those are, in fact, different requests, the Court declines them both.

    While plaintiff acknowledges that the actual malice rule of New York Times and its progeny is well-established, see, e.g., id. at 6, she fundamentally misunderstands the doctrine of stare decisis that makes that rule binding on this Court. Plaintiff

alludes to the "factors considered in deciding whether to overrule precedent" and notes in particular that "constitutional questions are less susceptible to stare decisis." Id. at 10 (citing Janus v. American Fed'n of State, County, and Mun. Emps. Council 31, 138 S. Ct. 2444 (2018); Kimble v. Marvel Entm't, LLC, 576 U.S. 446, 456 (2015)). But those factors, and those cases, pertain to horizontal stare decisis, whereby a court determines whether its own prior precedent remain binding on that court. See Dodge v. Cty. of Orange, 282 F. Supp. 2d 41, 79 (S.D.N.Y. 2003). By contrast, what lies before this Court is vertical stare decisis, whereby a higher court ruling binds a lower court. Id. "[V]ertical stare decisis is absolute, as it must be in a hierarchical system with 'one supreme Court.'" Ramos v. Louisiana, 140 S.Ct. 1390, 1416 n.5 (2020) (Kavanaugh, J., concurring in part) (quoting U.S. Const., art. III, § 1). In other words, this Court has "a constitutional obligation" to follow the Supreme Court's precedent "unless and until it is overruled by [the Supreme Court]." Id.

Perhaps recognizing that this Court is not free to disregard controlling precedent even if it were so inclined (which in this case it distinctly is not), plaintiff offers what she calls an alternative argument: that "the actual malice rule arose from distinguishable facts and should not be applied" here. Pl. Mem. at 13. More precisely, plaintiff's argument is

that the actual malice rule, which was first articulated more
than half a century ago in the days before the Internet and
social media, has run its course and should no longer govern our
contemporary media landscape. Binding precedent does not,
however, come with an expiration date. To the extent plaintiff
believes the actual malice requirement ought to be abolished,
she could make that argument to the appropriate court – the
Supreme Court. Until then, public figures, like plaintiff, must
establish actual malice before collecting damages for
defamation. Plaintiff's motion for partial summary is therefore
denied.[8]

IV.   Defendants' Motion for Summary Judgment

Given the denial of plaintiff's motion, the remaining
question presented by defendants' motion is whether, with the
benefit of discovery, plaintiff has adduced sufficient evidence
to prove actual malice (taking the evidence most favorably to
plaintiff). That is to say, defendants move for summary judgment
on the ground that no reasonable jury could find that the
statements at issue in this case were published with actual

---

[8]    Defendants also argue that plaintiff cannot challenge the
actual malice rule because it has been cemented as law of the
case and that, in any event, plaintiff must establish actual
malice as a matter of state law. Defs' Opp. at 6. Because the
Court rejects plaintiff's motion on stare decisis grounds, the
Court does not reach these other arguments.

malice. In this respect, defendants make two arguments. First, they argue that plaintiff cannot prove that Bennett was aware that the statements carried a defamatory meaning – that is, that Bennet did not have actual malice with respect to the statements' <u>meaning</u>. Second, they argue that, even assuming Bennett was aware that the statements carried a defamatory meaning, plaintiff cannot prove that Bennet was aware that the statements were false – that is, that Bennet did not have actual malice with respect to the statement's <u>falsity</u>.[9] The Court addresses each argument in turn.

      A. <u>Actual Malice – Meaning</u>

---

[9]    In response, plaintiff makes the threshold argument that the Second Circuit has already decided the issue of actual malice in this case in its earlier opinion when it explained that, even if this Court had converted the 12(b)(6) motion into a summary judgment motion after the Court's evidentiary hearing, it "would still have to vacate because [this Court's] opinion relied on credibility determinations [regarding Bennet's testimony] not permissible at any stage before trial." 940 F.3d at 812. Plaintiff concludes that under the law-of-the-case doctrine, therefore, defendants' motion must be denied. But the Second Circuit's discussion of how it would have ruled had the motion been converted to summary judgment is pure dicta and does not constitute law of the case. <u>See</u> <u>Schwabenbauer v. Bd. of Educ.</u>, 777 F.2d 837, 841-42 (2d Cir. 1985). Moreover, even if the Second Circuit's dicta were construed as law of the case, additional evidence, which was not before the Second Circuit, has arisen in the course of discovery. Therefore, even if the Second Circuit held that Bennet's testimony alone could not support a grant of summary judgment, it has not – and indeed, could not have — ruled on whether this additional evidence justifies summary judgment.

Defendants first argue that plaintiff cannot prove that at the time Bennet wrote the allegedly defamatory portion of the Editorial, he knew that, or was reckless with respect to whether, readers would understand his words in the defamatory sense — that is, that the Map had "directly caused Loughner to shoot his victims." Defs' Mem. at 1. More generally, defendants suggest that a person who believes and intends to say one thing is not guilty of actual malice "merely because he or she chooses the wrong language to say or because those who hear the statement reasonably believe it to mean something different." Id. at 15 (quoting Hon. Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 5:5.1[B] (5th ed, 2017)). In response, plaintiff contests this facet of the actual malice rule and asks the Court not to impose what she calls "an additional actual malice element" to her claim. Pl. Opp. at 9. Accordingly, the Court must first decide whether to adopt defendants' version of the actual malice rule before determining whether the record supports defendants' first ground for granting summary judgment in favor of defendants.

      1. Whether plaintiff **must** prove actual malice with respect to meaning

The legal question presented here is whether the First Amendment requires that plaintiff prove that Bennet "was aware of, or recklessly blinded himself to, the defamatory import of

his words." See Marc Franklin & Daniel Bussel, The Plaintiff's Burden in Defamation: Awareness and Falsity, 25 Wm. & Mary L. Rev. 825, 834 (1984). There is no controlling precedent squarely on point.[10]

In the early years of the actual malice standard, Justice Byron White, writing only for himself in a concurring opinion, suggested that Sullivan should not be "extended to preclude liability for injury to reputation caused by employing words of double meaning, one of which is libelous, whenever the publisher claims in good faith to have intended the innocent meaning." Greenbelt Co-Op. Pub. Ass'n v. Bresler, 398 U.S. 6, 22 (1970) (White, J., concurring in the judgment). He explained that the

---

[10] Defendants cite to Bose Corp v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 n.30 (1984), for the proposition that the actual malice standard "requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." Seizing on "realized," defendants argue that it "necessarily follows that the actual malice standard is not met where a defendant was unaware of the defamatory meaning his or her words conveyed." Defs' Mem. at 15. But defendants misread Bose. That case did not involve "the employment of an ambiguous word; it involved a report of an ambiguous event, specifically how plaintiff's stereo speakers sounded to listeners present. . . . As such, Bose simply stands for the unremarkable proposition that the First Amendment protects an author from liability when adoption of language chosen was one of a number of possible rational interpretations of an ambiguous event because this represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the New York Times rule applies." Sprague v. American Bar Ass'n, No. Civ.A 01-382, 2003 WL 22110574 (E.D. Penn July 21, 2003).

actual malice rule was rooted in a recognition of the challenge
of ascertaining truth. Id. at 22-23. But he saw "no reason why
the members of a skilled calling should not be held to the
standard of their craft and assume the risk of being
misunderstood — if they are — by the ordinary reader of their
publications." Id.

In more recent years, however, lower courts have disavowed
Justice White's reasoning and have expressly adopted this
awareness requirement. The Ninth Circuit, for example, has held
that "constitutional malice does not flow from a finding that an
'intelligent speaker' failed to describe the words he used as
the finder of fact did." Newton v. Nat'l Broad. Co., 930 F.2d
662, 681 (9th Cir. 1990) (explaining that defendants should not
be liable "for what was not intended to be said" lest we
"eviscerate[] the First Amendment protections established by New
York Times"); see also Dodds v. American Broad. Co., 145 F.3d
1053, 1064 (9th Cir. 1998) (requiring plaintiff to "show that a
jury could reasonably find by clear and convincing evidence that
[defendant] intended to convey the defamatory impression").

Ultimately, this issue comes down to the values underlying
Sullivan. And, on this point, the Court agrees with the
California Supreme Court, which has explained that failure to
impose an awareness requirement "would create precisely the
chilling effect on speech which the New York Times rule was

designed to avoid." Good Government Group of Seal Beach, Inc. v. Sup. Court, 22 Cal.3d 672, 684 (1978); see also Saenz v. Playboy Enterprises, Inc., 841 F.2d 1309, 1318 (7th Cir. 1988) ("[R]equiring a publisher to guarantee the truth of all the inferences a reader might reasonably draw from a publication would undermine the uninhibited, open discussion of matters of public concern.").

Plaintiff argues that those cases, and the awareness rule, are limited to claims of libel or defamation by implication — that is, cases "where the defamatory meaning of ambiguous and innocuous statement has to be inferred or implied to establish a claim" – and are therefore inapposite. Pl. Opp. at 10. Where, as here, the allegedly libelous statements are "explicit and facially defamatory" and where there is "substantial evidence" showing what the speaker meant and intended to say, plaintiff suggests, the awareness rule should not apply. The Court disagrees. "The purpose of the awareness element is to ensure that liability is not imposed upon a defendant who acted without fault. This must hold true regardless of whether the defendant's statement is directly or indirectly libelous." Masson v. New Yorker Magazine, Inc., 832 F. Supp. 1350, 1361-63 (N.D. Cal. 1993), aff'd on other grounds, 85 F.3d 1394 (9th Cir. 1996).

Plaintiff also invokes the law of the case doctrine. She suggests that the defendants already made the argument for, and

18

the Second Circuit already rejected, the awareness requirement. See Pl. Opp. at 6-9. But while plaintiff is correct that the Times has raised this issue before, see, e.g., Defendant's Supplemental Memorandum of Law in Further Support of Its Motion to Dismiss the Complaint, Dkt. No. 42, at 7, neither this Court (previously) nor the Second Circuit has squarely addressed, much less resolved, whether plaintiff must establish actual malice with respect to meaning as well as falsity. For the above-discussed reasons, the Court now holds that she must.

> 2. Whether plaintiff **can** prove actual malice with respect to meaning

Whether plaintiff can make that showing, however, is a different question. Where a plaintiff's defamation case depends on a statement that is capable of multiple meanings — one defamatory, the other innocuous — the plaintiff must prove that the defendant acted with actual malice not only with respect to the statement's falsity but also to its meaning. Indeed, as the Seventh Circuit has explained, "[e]vidence of defamatory meaning and recklessness regarding potential falsity does not alone establish the defendant's intent." Saenz, 841 F.2d at 1318. Instead, the plaintiff must show that the defendant "either deliberately cast its statements in an equivocal fashion in the hope of insinuating a false import to the reader or that it knew and acted with reckless disregard of whether its words would be

19

interpreted by the average reader as a false statement." See
Solano v. Playgirl, Inc., 292 F.3d 1078, 1084 (9th Cir. 2002).

Of course, because actual malice "is a matter of the
defendant's subjective mental state, revolves around facts
usually within the defendant's knowledge and control, and rarely
is admitted," Dalbec v. Gentleman's Companion, Inc., 828 F.2d
921, 927 (2d Cir. 1987), a defendant cannot "automatically
insure a favorable verdict by testifying that he published with
a belief that the statements were true." St. Amant v. Thompson,
390 U.S. 727, 732 (1968). Here, to be sure, Bennet has sworn
multiple times that he "did not intend to imply a direct causal
link between [the Map] and Loughner's horrific acts."
Declaration of James Bennet ("Bennet Decl."), Dkt. No. 98, ¶ 8.
He also avers that "it did not occur to [him] that readers would
understand the phrase 'the link to political incitement was
clear' as suggesting that Loughner himself was directly inspired
or motivated by the [Map] to engage in the shooting, and [he]
did not intend for readers to draw such an inference." Id.
Instead, he claims that he "intended to advance the idea that
overheated political rhetoric can create a climate inducive to
violent acts, and [he] mentioned the [Map] as an example of the
kind of 'political incitement' that contributes to this
atmosphere." Id.

20

However, as the Second Circuit has already made clear in this very case, the Court cannot automatically credit this testimony at the summary judgment stage. See Palin, 940 F.3d at 812; see also Sprague, 2003 WL 22110574, at *6 ("The defendant author and his editors contend that they did not anticipate that the readers would perceive the [allegedly defamatory] term . . . in its negative capacity. This is testimonial evidence that the jury will be permitted to weigh as it deems warranted.")

Defendants, however, argue that Bennet's allegedly innocent intent is independently corroborated by Bennet's contemporaneous email exchange with Douthat. Specifically, in his email responding to Douthat's concerns, Bennet explained that his "understanding was that in the Giffords case there was a gun sight superimposed over her district; so far in [the Scalise] case we don't know of any direct threat against any of the congressmen on the field. That's not to say any of it is ok, obviously, or that the violence in either case was caused by the poltical [sic] rhetoric. But the incitement in [the Giffords] case seems, so far, to be less specific [than in the Scalise case]." Sullivan Decl. Ex. 21. This email suggests that Bennet did not intend for his words to convey the idea that the Map directly caused Loughner's shooting, which is the heart of what plaintiff says was libelous.

But in the end plaintiff meets her burden of adducing evidence that, taken in the light most favorable to plaintiff, could enable a rational jury to conclude that Bennet either knew, or was reckless not to know, that his words would carry the defamatory meaning. Indeed, at least four items of evidence warrant this conclusion.

First, there is the language of the Editorial's statements themselves, such as, e.g., the reference to the Map as being a "direct" form of "incitement" to Loughner's shooting. As defense counsel conceded at oral argument, in determining actual malice, the finder of fact is "entitled to consider the wording of the alleged defamatory statement." Transcript of Oral Argument, July 27, 2020 ("Tr.") at 10:20-11:1; see also id. at 12:9-12 ("I agree that the language of the publication is part of the mix" in determining actual malice). Here, Bennet's contention that, notwithstanding the words he used, he did not mean to suggest a direct link between the Map and the shooting, may be "so inherently improbable that only a reckless man would have" chosen the words he chose to convey the meaning he (allegedly) sought to convey.[11] Dalbec, 828 F.2d at 927; cf. id. ("[T]he

_____

[11]    To be sure, it is not the case, as plaintiff suggests, that the clarity of a statement renders irrelevant the speaker's awareness of its meaning. Instead, the clarity of a statement can serve as evidence – here, powerful evidence — for inferring the speaker's awareness of its meaning.

plain language of the . . . statement strongly supports the inference that it was made with knowledge of its falsity.")

Second, Bennet has himself admitted that he was aware that the term "incitement" could mean a call to violence. Indeed, at his deposition, Bennet conceded that the term "incitement" means "different things to different people" and that "some people could interpret [the term] as a call to violence." See Sullivan Decl. Ex. 2 (Bennet Dep.) at 112-14. Bennet's general awareness of the fact that "incitement" could be construed as a call to violence is further evidence in favor of actual malice. See Sprague, 2003 WL 22110574, at *5 (knowledge "that the average reader of the journal would be familiar with both" the defamatory and nondefamatory meanings of the word at issue counts in favor of finding actual malice).

Third, Bennet's decision to substantially revise Williamson's earlier draft, which did not include the allegedly defamatory language and meaning, is, a jury could find, yet more evidence of actual malice. To be sure, Bennet testified that he made these changes because he worried that phrases like "incendiary" or "inflammatory rhetoric" had been "drained of [their] power because [they are] used so often" and that he was searching for "a very strong word to write about the political climate," and so chose "political incitement." Defs' Mem. at 18 (quoting Pl. SUMF ¶¶ 56, 58-59). But, as discussed above, the

23

credibility of that testimony is for the jury to assess, not for this Court to credit at the summary judgment phase. It is virtually undeniable that Bennet's edits changed the meaning of Williamson's draft, an alteration that a reasonable jury might conclude was intentional. Cf. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 521 (1991) ("[T]he progression from typewritten notes, to manuscript, then to galleys provides further evidence of intentional alteration.").

Fourth, the nature of the corrections issued by the Times in the aftermath of the Editorial stand as further circumstantial evidence that Bennet was aware that the Editorial carried the defamatory meaning. As discussed above, upon receiving Douthat's email expressing concern over the Editorial, Bennet reached out to Williamson and other members of the team and asked them to "get to the bottom of this as quickly as possible." Pl. SUMF ¶ 101. The team then looked into whether there existed a direct link between the Map and the Loughner shooting; and when it concluded that no such link had been established, the Times issued a correction which read, in part: "An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established." Id. ¶¶ 104-107.

The fact that Bennet and the Times were so quick to print a correction is, on the one hand, evidence that a jury might find corroborative of a lack of actual malice, as discussed later. But, on the other hand, a reasonable jury could conclude that Bennet's reaction and the Times' correction may also be probative of a prior intent to assert the existence of such a direct link, for why else the need to correct? Indeed, the correction itself concedes that Bennet's initial draft incorrectly stated that there existed such a link. If, as Bennet now contends, it was all simply a misunderstanding, the result of a poor choice of words, it is reasonable to conclude that the ultimate correction would have reflected as much and simply clarified the Editorial's intended meaning.[12]

Ultimately, while much of plaintiff's evidence is circumstantial, as is often the case when actual malice is at issue, and while there is arguably contrary evidence as well,[13]

---

[12]    See Tr. at 38:14-18 (quoting Shane B. Vogt, Esq.) ("[I]f the true facts are as defendants say they are and this was really just a syntax error and Mr. Bennet's explanation for this was, oh, that's not what I meant, that's not what I meant there's no need to do that research. It's pointless to do that research. He shouldn't have been asking for anyone to do that research. He should have just said, oh, that's not what I meant, and affixed an editor's note.").

[13]    For example, defendants point to evidence that Bennet had previously used the term "incitement" in the broader, rhetorical sense of the phrase, in an earlier article for the Times discussing a meeting of a joint Israeli-Palestinian "committee on 'prevention of incitement,'" which focused on "messages in

the Court finds that, taking the evidence in the light most favorable to plaintiff, she has sufficiently pointed to enough triable issues of fact that would enable a jury to find by clear and convincing evidence that Bennet knew, or was reckless not to know, that his words would convey the meaning in the minds of the readers that plaintiff asserts was libelous, to wit, that she bore a direct responsibility for inciting the Loughner shooting.

### B. Actual Malice – Falsity

It is not enough, however, for plaintiff to show that Bennet meant to say what plaintiff claims was libelous; in addition, to establish actual malice, plaintiff must show that defendants published the libelous statement "with knowledge that it was false or with reckless disregard of whether it was false or not." Sullivan, 376 U.S. at 279. "Mere negligence does not suffice." Masson, 501 U.S. at 510. Instead, "[a] finding of malice must be based on clear and convincing evidence that the defendant in fact entertained serious doubts as to the truth of his publication, or, in the alternative, knew of its falsity." Dalbec, 828 F.2d at 927.

---

the schools and news media encouraging violence." Sullivan Decl. Ex. 28. While such prior use of the term in the non-defamatory sense weighs against a finding of actual malice, the weighing of evidence here is for the jury, not the Court.

26

While mere failure to conduct an investigation before
publishing cannot itself establish actual malice, nonetheless,
"where there are obvious reasons to doubt the veracity" of the
information, that can give rise to an inference of actual
malice. Harte-Hanks Communications, Inc. v. Connaughton, 491
U.S. 657, 688 (1989). Thus, as the Ninth Circuit explained,
"where [a] publisher undertakes to investigate the accuracy of a
story and learns facts casting doubt on the information
contained therein, it may not ignore those doubts, even though
it had no duty to conduct the investigation in the first place."
Masson v. New York Magazine, Inc., 960 F.2d 896, 901 (9th Cir.
1992). That is why, as the Supreme Court has explained, "the
purposeful avoidance of the truth is in a different category"
from mere failure to investigate. Harte-Hanks, 491 U.S. at 692.

As the Second Circuit explained in this very case,
plaintiff's "overarching theory of actual malice is that Bennet
had a 'pre-determined' argument he wanted to make in the
editorial," his commitment to which "led him to publish a
statement about Palin that he either knew to be false, or at
least was reckless as to whether it was false." Palin, 940 F.3d
at 813. In support of that theory, the Second Circuit found
three allegations in the amended complaint that "paint[ed] a
plausible picture of this actual-malice scenario." Id. Now that
discovery is over (and the standard is no longer mere

plausibility), it turns out that two of these three allegations find no support in the actual evidence. However, there is enough support for the third allegation to preclude a grant of summary judgment.

The Court begins by reviewing the two refuted allegations before turning to the evidence supporting the third.

### 1. Bennet's Background

The Second Circuit held that "Bennet's background as an editor and political advocate provided sufficient evidence" to infer actual malice. Id. In particular, the court focused on the fact that Bennet was the editor-in-chief of The Atlantic from 2006-2016 and that during that time the magazine published several articles confirming there was no link between the Map and the Loughner shooting. Id. A plausible inference, the court explained, is that "one who had risen to editor-in-chief at The Atlantic knew their content and thus that there was no connection between Palin and the Loughner shooting." Id. at 814.

The undisputed record now shows, however, that Bennet was not responsible for editing any of those articles; instead, they were published by sister publications over which Bennet had no editorial control. Defs' Mem. at 22; see also Deposition of Andrew Sullivan, Dkt. No. 99-41, at 93. Indeed, Andrew Sullivan, who ran one of the blogs on which many of these articles were

published, testified that Bennet had no role whatsoever in the preparation of those posts. Id.

In response, plaintiff points out that the posts "appeared on The Atlantic's website," see, e.g., Pl. SUMF ¶ 118, and that Bennet conceded that he "consumed" the Atlantic's website in 2011 and admitted that he "must have read" some of these articles, see Pl. Opp. at 18. But, as defendants persuasively reply, plaintiff cites to no evidence, beyond the mere fact that the two sites shared a URL, that Bennet had editorial control over those articles, so at most he simply read the posts. Having once read an article many years before the drafting of the Editorial is hardly enough to create an inference of knowledge of the Editorial's falsity.[14]

The Second Circuit further speculated on the basis of the amended complaint's allegations that "Bennet in particular was more likely than the average editor-in-chief to know the truth about the Loughner shooting because he had reason to be personally hostile toward Palin." Palin, 940 F.3d at 814. But the Second Circuit also made clear that these speculations were only "relevant to the credibility of Bennet's testimony that he

---

[14]    For the same reason, plaintiff's evidence that Bennet was sent soon after the Loughner shooting an article refuting the causal link between the shooting and the Map is likewise insufficient to support a finding of actual malice. See Pl. SUMF ¶ 267.

was unaware of facts published on his watch relating to the Loughner shooting." Id. As just discussed, there is no evidence to suggest that those facts were actually published on his watch. And standing alone, as the Second Circuit itself recognized, political opposition "does not constitute actual malice." Id.

### 2. The Retraction

While a defendant's willingness (as here) to quickly acknowledge and correct its error ordinarily weighs against a finding of actual malice, see e.g., Zerangue v. TSP Newspapers, Inc., 814 F.2d 1066, 1071 (5th Cir. 1987), the Second Circuit once again theorized that it was "plausible that the correction was issued after a calculus that standing by the editorial was not worth the cost of the public backlash." Palin, 940 F.3d at 815. But, as defendants point out, plaintiff does not cite to any evidence in the record that corroborates this theory of the retraction/correction so far as defendants' knowledge of falsity is concerned, and the Court's own review of the record discloses no evidence warranting this speculation.

### 3. The Drafting and Publication Process

Ultimately, then, we are left with how Bennet handled the Williamson draft and the attached hyperlink, which the Second Circuit held could show that Bennet "willfully disregarded the truth." Palin, 940 F.3d at 815. Plaintiff argues that,

30

construing the evidence in the light most favorable to her, a jury could conclude that (1) Bennet instructed Williamson to research whether there was a link between the Map and the shooting; (2) Bennet conceded, and Williamson confirmed, that her draft embodied the results of that research and did not turn up evidence of a causal link between the Map and the shooting; (3) the hyperlinked article attached to Williamson's draft recognized as much; and (4) therefore, Bennet "knew there was no link but rewrote the draft anyway to say a link existed — consistent with the narrative he already decided to portray." Pl. Opp. at 18.

As a threshold matter, defendants insist there is "no evidence to support these assertions." Defs' Reply at 8. Specifically, defendants contend that Bennet did not instruct Williamson to research whether there was a link between the map and the shooting; rather, according to defendants, Bennet only "asked for research to determine if the Times' own Editorial Board had previously written anything connecting the Loughner Shooting to incitement . . . because he wanted to ensure the new editorial was in sync with any prior Board position. Id. at 8-9.

However, taking the evidence in the light most favorable to plaintiff, Williamson acknowledges in her deposition that Bennet specifically asked her to "look for pieces related to the Giffords shooting and whether there was such a connection."

Sullivan Decl. Ex. 3 (Williamson Dep.) at 142; see also id.
("[Bennet] asked me to research that particular shooting, and I
did."). Defendants suggest that plaintiff is taking these
statements out of context, weaving "two strands of testimony
into a fiction." Defs' Reply at 9. But, again, at the summary
judgment phase, the Court finds that Williamson's deposition
testimony could allow a juror to conclude that, at some point
during the drafting process, Bennet specifically instructed
Williamson to research whether there existed a link between the
Map and the shooting and learned that there was no material
support for such a link.

Beyond this, Williamson's inclusion in her first draft of
the hyperlink to the contemporaneous ABC news article that
flatly stated there was no such connection would have given
Bennet, if he had accessed the article, "obvious reasons to
doubt the veracity" of the alleged connection. Harte-Hanks, 491
U.S. at 688. If so, Bennet's failure to investigate could
support an inference that he purposefully avoided the truth. Id.
at 692. To be sure, Bennet maintains that he never clicked on
the hyperlink. See Bennet Dep. at 261. But under all the
circumstances, a jury might discredit this testimony.
Nonetheless, even if it were true, it could be evidence of
reckless disregard. After receiving Williamson's draft, a
reasonable jury might conclude, Bennet had obvious reasons to

32

doubt whether there existed a link between the Map and the Loughner shooting. At that point, Bennet's failure to further investigate or at least just click on the link to the only article Williamson had presented could support the inference that he was purposefully avoiding the truth.

There are other pieces of evidence from the drafting process that further support such a theory. First, as the editors were discussing whether to cover the Hodgkinson shooting, it was Bennet's idea to focus the editorial on "the rhetoric of demonization and whether it incites people to this kind of violence." Sullivan Decl. Ex. 11. Then, during the research phase, Bennet asked a researcher to determine whether the Board had previously written "anything connecting to the Giffords shooting to some kind of incitement." Pl. SUMF ¶ 324. After the researcher sent Bennet an article (written not by the Board but by a columnist at the Times), Bennet replied "Good for us." Id. ¶ 326. While Bennet has testified that he does not recall what he meant by that response, a reasonable jury could infer from this response that Bennet felt free to advance his narrative because the Editorial Board had not written on the subject.

In addition, researchers sent to Bennet other articles that disclaimed the idea that Loughner had been motivated by violent rhetoric. Notably, Bennet was sent an earlier editorial entitled

"As We Mourn," published in January 2011, which quoted President Barack Obama saying Loughner's shooting cannot be blamed on "a simple lack of civility." Declaration of Shane B. Vogt, Dkt. No. 102, Ex. 30 at 19. Like the hyperlink, Bennet testified that he did not read this article, even after specifically asking for the researcher to dig up articles of this sort. Pl. SUMF ¶¶ 324-330. But, as with the hyperlink, a jury could infer from this a purposeful avoidance of the truth.

Once again, there is considerable evidence that defendants mount to support the notion that Bennet simply drew the innocent inference that a political circular showing crosshairs over a Congressperson's district might well invite an increased climate of violence with respect to her. But, taken in the light most favorable to plaintiff, the evidence shows Bennet came up with an angle for the Editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results the Williamson research that he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth

Accordingly, the Court concludes that there is sufficient evidence to allow a rational finder of fact to find actual malice by clear and convincing evidence. Anderson, 477 U.S. at 254.

C. Conclusion

For the above-discussed reasons, plaintiff's motion for partial summary judgment is denied and defendants' motion for summary judgment is also denied.[15] The Clerk of the Court is directed to close docket entries 94 and 95. The trial of this case, pandemic permitting, will commence on February 1, 2020 at 9:30 a.m.

SO ORDERED.

_____

[15]    Also before the Court is plaintiff's motion for reconsideration of the Court's decision to dismiss her claim for disgorgement damages. Dkt. No. 111. In that motion, plaintiff asks the Court to reconsider its earlier decision because, she argues, the Supreme Court's decision in Liu v. SEC, 140 S.Ct. 1936 (2020), decided on June 22, 2020, constituted "a change in controlling law" and gave rise to "a need to correct a clear legal error or prevent manifest injustice." Plaintiff's Memorandum of Law in Support Reconsideration And/Or Alteration or Amendment, Dkt. No. 111, at 4.

The Court denies plaintiff's motion as untimely. Under Local Rule 6.3, a motion for reconsideration of a court order must be served within 14 days after entry of the order determining the original motion. While there might be some fuzziness regarding when the fourteen-day clock starts and stops, plaintiff's motion is untimely under even the most generous interpretation of Rule 6.3. The Court's order on the original motion was entered on January 21, 2020. Dkt. No. 83. Plaintiff did not move for reconsideration until July 15, 2020 — more than five months later. Thus, a strict application of Rule 6.3 would warrant denying plaintiff's motion as grossly untimely. Moreover, even if the fourteen-day clock were deemed to have restarted on the date the Supreme Court announced its decision in Liu and if the clock were deemed to have stopped on the date plaintiff sought leave from this Court to file the motion, she would still have missed the deadline. Plaintiff sought leave to file this motion on July 8, 2020 — sixteen days after the Supreme Court decided Liu on June 22, 2020.

Dated:    New York, NY
         August 28, 2020

                                              JED S. RAKOFF, U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- x

SARAH PALIN,                          :
                                      :      17-cv-4853 (JSR)
          Plaintiff,                  :
                                      :
          -v-                         :      MEMORANDUM ORDER
                                      :
THE NEW YORK TIMES COMPANY and        :
JAMES BENNET,                         :
                                      :
          Defendants.                 :
----------------------------------- x

JED S. RAKOFF, U.S.D.J.

On June 27, 2017, plaintiff Sarah Palin brought a single defamation claim against The New York Times Company ("The Times") arising from The Times' editorial of June 14, 2017 titled America's Lethal Politics regarding gun control (the "Editorial"). Dkt. No. 1. The now-operative complaint, filed on December 30, 2019, also named James Bennet, the author of the relevant segments of the Editorial. Dkt. No. 70.

Although plaintiff does not dispute that she is a "public figure," in a previously-filed motion for partial summary judgment, she argued that she is not required to prove actual malice, and prove it by clear and convincing evidence, on the ground that the federal constitutional rule imposing that burden in the case of public figures either is no longer good law or does not apply to this case. Dkt. No. 100. Defendants argued, among

other things, that the federal constitutional rule governed the case and that, in any event, New York law independently imposed an actual malice requirement. Dkt. No. 104. In an Opinion and Order dated August 28, 2020 (the "Opinion"), Dkt. No. 117, the Court held that the federal Constitution, under well-settled and binding precedent, imposed the actual malice requirement, id at 12-13 (citing New York Times Co. v. Sullivan, 376 U.S. 254 (1964)), and declined to reach the question whether New York law independently imposed that burden, id. at 13 n.8. The case is now set for trial, pandemic permitting, on June 21, 2021.

Now before the Court is defendants' motion, pursuant to Federal Rule of Civil Procedure 54(b), for an order modifying the Opinion to reflect the fact that on November 10, 2020, New York amended its "anti-strategic litigation against public participation" ("anti-SLAPP") law to expressly require that public figures prove actual malice by clear and convincing evidence. Dkt. No. 120. Plaintiff opposes. Dkt. No. 123. For the reasons set forth below, the motion is granted.

Federal Rule of Civil Procedure 54(b) provides, in relevant part, that an interlocutory order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Of course, past decisions should not be revisited "without good reason." Official Comm. of

-2-

the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003). But "an intervening change of controlling law" is just such a reason. Id.

Here, there has been just such an intervening change of law. It is true that New York's anti-SLAPP law has long had an actual malice requirement, providing that:

> [i]n an action involving public petition and participation, damages may only be recovered if the plaintiff, in addition to all other necessary elements, shall have established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue.

See N.Y. Civil Rights Law § 76-a(2). The prior version of the law, however, defined "an action involving public petition and participation" narrowly to include only claims "brought by a public applicant or permittee, and [that are] materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission." See Intl. Shoppes v. At the Airport, 131 A.D.3d 926, 928 (2d Dep't 2015).[1] As a result, the actual malice requirement was effectively limited to cases initiated by persons or business entities that were

---

[1] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

-3-

involved in controversies over a public application or permit. <u>See</u> <u>Chandok v. Klessig</u>, 632 F.3d 803, 819 (2d Cir. 2011) ("Uniformly, the New York courts have found that the persons properly alleged to be public applicants within the meaning of the anti-SLAPP statute were persons whose proposed actions required government permission.").

On November 10, 2020, New York amended its anti-SLAPP law. <u>See</u> A.B. 5991-A. Among other things, the amendments substantially broadened the reach of the actual malice rule. As amended, the law defines an "action involving public petition and participation" to include a claim based upon:

    (1)   any communication in a place open to the public or a public forum in connection with an issue of public interest; or

    (2)   any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

N.Y. Civil Rights Law § 76-a(1)(a). The law further directs that the term "public interest" is to "be construed broadly, and shall mean any subject other than a purely private matter." <u>Id.</u> § 76-a(1)(d). Also, although less directly relevant here, the amendments create an affirmative cause of action for certain

defendants to recover attorneys' fees and other damages from plaintiffs in specified circumstances. <u>Id.</u> § 70-a.[2]

Defendants now ask the Court to rule that § 76-a, as amended on November 10, 2020, applies retroactively to this action and thus requires that plaintiff prove actual malice by clear and convincing evidence as a matter of New York law, separate and apart from the requirements of the federal Constitution. Def. Mem. at 4. They contend that "a ruling now on the applicability of state law will inform the drafting of jury instructions at trial, simplify future proceedings including on appeal, and give effect to constitutional avoidance . . . ." <u>Id.</u> at 5.

Plaintiff responds that defendants have not established extraordinary circumstances warranting reconsideration. Plaintiff's Response to Defendants [sic] Memorandum of Law in Support of Motion for Reconsideration ("Pl. Mem."), Dkt. No. 123, at 1. Plaintiff argues that the Court has already decided that the actual malice standard applies to this case, and that the source of the actual malice rule does not matter for the purposes of the upcoming trial. <u>Id.</u> at 1-2. And, plaintiff contends, if she loses at trial and renews her challenge to the federal actual malice

---

[2]    Defendants do not ask the Court to apply § 70-a in this action, nor do they contend that the provision would even apply in federal court. <u>See</u> Defendants' Memorandum of Law in Support of Motion for Reconsideration ("Def. Mem."), Dkt. No. 120, at 4 n.4.

rule on appeal, defendants will have preserved their argument that New York independently imposes the requirement. Id. at 2. Therefore, according to plaintiff, nothing will be simplified by granting reconsideration; indeed, doing so "would amount to an advisory opinion." Id. at 1-2.

The Court sees no reason why it should delay resolution of this plainly relevant issue. If, as defendants contend, § 76-a applies retroactively to this action, that will undoubtedly simplify proceedings on appeal; by contrast, if, as plaintiff insists, the statute does not have retroactive effect, then we are exactly where we began and, to prevail at trial, plaintiff will still have to prove actual malice as a matter of federal constitutional law. Either way, there is nothing to be gained from delay. In light of the intervening change of law, the Court now turns to the merits of defendants' motion.

It is undisputed that § 76-a requires public figures, like plaintiff, to prove actual malice by clear and convincing evidence. It is also undisputed (albeit by virtue of neither party having raised the issue) that a federal court sitting in diversity must apply § 76-a because it is a substantive, rather than a procedural, provision. See Adelson v. Harris, 774 F.3d 803, 809 (2d Cir. 2014) (affirming the district court's application of certain substantive provisions of Nevada's anti-SLAPP law); see also La Liberte v.

-6-

_Reid_, 966 F.3d 79, 86 n.3 (2d Cir. 2020) (distinguishing between the applicability in federal court of substantive and procedural elements of state anti-SLAPP laws). The only question here is whether § 76-a should be given retroactive effect to this action, which was filed before the amendments took effect but has not yet gone to trial.

Under New York law, statutory amendments are generally "presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated." _Matter of Gleason (Michael Vee, Ltd.)_, 96 N.Y.2d 117, 122 (2001). So-called "remedial legislation," however, "should be given retroactive effect in order to effectuate its beneficial purpose." _Id._ "Remedial statutes are those designed to correct imperfections in prior law, by generally giving relief to the aggrieved party." _Nelson v. HSBC Bank USA_, 87 A.D.3d 995, 998 (2d Dep't 2011). "Other factors in the retroactivity analysis include whether the Legislature has made a specific pronouncement about retroactive effect or conveyed a sense of urgency; whether the statute was designed to rewrite an unintended judicial interpretation; and whether the enactment itself reaffirms a legislative judgment about what the law in question should be." _Gleason_, 96 N.Y.2d at 122.

-7-

It is clear that § 76-a is a remedial statute that should be given retroactive effect. The Legislature conveyed a sense of urgency by directing that the amendment was to "take effect immediately." See A.B. 5991-A § 4; see, e.g., Gleason, 96 N.Y.2d at 122. Moreover, the legislative history demonstrates that the amendments to § 76-a were intended to correct the narrow scope of New York's prior anti-SLAPP law. As State Senator Brad Hoylman, the Senate sponsor of the amendments, explained: the prior anti-SLAPP law had been "strictly limited to cases initiated by persons or business entities that are embroiled in controversies over a public application or permit, usually in a real estate development situation." Sponsor Mem. of Sen. Hoylman (July 22, 2020), https://www.nysenate.gov/legislation/bills/2019/s52. "By revising the definition of an 'action involving public petition and participation,' this amendment to Section 76-a will better advance the purposes that the Legislature originally identified in enacting New York's anti-SLAPP law" -- namely, "to provide the utmost protection for the free exercise or speech, petition, and association rights, particularly where such rights are exercised in a public forum with respect to issues of public concern." Id. "These factors together persuade [the Court] that the remedial purpose of the amendment should be effectuated through retroactive application." Gleason, 96 N.Y.2d at 123.

Plaintiff offers three reasons not to give § 76-a retroactive effect, but none is persuasive. First, plaintiff argues that while "the changes made to Section 70-a appear to be 'remedial' in nature, . . . the changes to Section 76-a are not." Pl. Mem. at 2. For example, plaintiff points out that § 70-a states that it applies to "any person who commenced or continued such action," (emphasis added), whereas § 76-a "contains no such temporal expression." Id. at 4. That § 70-a might also be intended to have retroactive effect, however, does not undermine the clear evidence that the Legislature intended § 76-a to have retroactive effect. Nor is it any surprise that the Legislature did not expressly state that § 76-a would apply to any plaintiff who "continued" such an action; after all, any public figure would have already had to prove actual malice under the federal Constitution.[3]

Next, plaintiff argues that Matter of Regina Metro. Co., LLC v New York State Div. of Hous. & Community Renewal, 35 N.Y.3d 332 (2020), a recent New York Court of Appeals decision, creates a presumption against retroactivity, where, as here, the amendment would "impact substantive rights." Pl. Mem. at 3 (quoting Regina,

---

[3]    As the preceding analysis makes clear, the famously "intricate relationship between First Amendment and state libel law," Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 176 (2d Cir. 2000), is especially pronounced where, as here, a state opts to conform aspects of its state law to the First Amendment.

-9-

35 N.Y.3d at 370). For at least two reasons, however, this argument is unpersuasive. The first is that Regina created no such rule. Instead, the Regina court simply restated well-established New York law: that legislation is typically presumed to apply prospectively but that the presumption could be overcome with "a clear expression of . . . legislative purpose." 35 N.Y.3d at 369 (quoting Gleason, 96 N.Y.2d at 36). Nothing in Regina suggests that it is overturning the general rule that remedial legislation, like § 76-a, is presumed to have retroactive effect.[4] Second, even assuming arguendo that Regina did articulate such a rule, § 76-a will not have any meaningful impact on plaintiff's "substantive rights." As already discussed, any public figure seeking to recover damages for defamation would already have had to prove actual malice as a matter of federal law separate and apart from the requirements of New York law.[5]

---

[4]    Indeed, Regina itself recognized that certain portions of the Housing Stability and Tenant Protection Act of 2019 were intended by the Legislature to have retroactive effect, although, as discussed below, it ultimately refused to effectuate that legislative intent on due process grounds. See 35 N.Y.3d at 387.

[5]    To be sure, states are free to subject to the actual malice rule plaintiffs who might otherwise fall outside the reach of the First Amendment. See, e.g., Nelson Auto Center, Inc. v. Multimedia Holdings Corporation, 951 F.3d 952, 957 (8th Cir. 2020) ("Minnesota is free to categorize corporations as public figures that must prove actual malice even if federal law does not."). Because plaintiff is clearly a public figure under well-established

Finally, plaintiff, again relying on <u>Regina</u>, suggests that applying § 76-a retroactively would "raise a bevy of constitutional concerns," including due process concerns. Pl. Mem. at 4-5. Specifically, plaintiff contends that "the retroactive application of Section 76-a would impose a significant element of proof (actual malice by clear and convincing evidence) upon Plaintiff on a claim based on conduct occurring over three years ago." <u>Id.</u> at 5. Plaintiff is correct, of course, that retroactive legislation could, in certain cases, implicate due process concerns. This, however, is not such a case. As <u>Regina</u> itself recognizes, "due process requires a persuasive reason for the potentially harsh impacts of retroactivity." <u>Regina</u>, 35 N.Y.3d at 375. Here, however, plaintiff fails to identify any "harsh impact" of retroactively applying § 76-a to the instant case.

<u>Regina</u> itself helps prove the point. There, the Court of Appeals held that the retroactive application of certain provisions of the Housing Stability and Tenant Protection Act of 2019 would violate the Due Process Clause. 35 N.Y.3d at 388. Relevant to the court's holding was the fact that the retroactive application of the law would effectively penalize landlords for

_____

federal law, the Court need not and does not address whether § 76-a subjects to New York's actual malice rule a broader collection of plaintiffs than does the First Amendment.

-11-

having disposed of tenant records years earlier, even though doing so at the time was perfectly legal. Id. at 379-80. By contrast, and by virtue of the First Amendment, plaintiff was never entitled to recover monetary damages absent a showing of actual malice.

Put differently, here, unlike the plaintiffs in Regina, plaintiff has not demonstrated any reasonable reliance interest. To the extent plaintiff invokes such a reliance interest, her claim would seem to be that, in first bringing this lawsuit in 2017, she relied on the prospect that the Supreme Court would overturn New York Times Co. v. Sullivan and allow her to recover damages without a showing of actual malice. While courts might, in some contexts, credit the "objectively reasonable reliance on binding appellate precedent," cf. Davis v. United States, 564 U.S. 229, 231 (2011), there is no case law or principle of constitutional adjudication that would credit a litigant's wishful reliance on the prospect that binding appellate precedent will one day be overturned. If anything, the retroactive application of § 76-a will protect the reliance interests of defendants, who published the Editorial in a media landscape long-governed by the actual malice rule, against possible changes of constitutional law at the federal level.

For the foregoing reasons, defendants' motion is granted. The Court holds that N.Y. Civil Rights Law § 76-a, as amended on November 10, 2020, applies to this action and requires plaintiff,

-12-

as a matter of state law, to prove by clear and convincing evidence
what she had already been tasked with establishing under the
federal Constitution: that defendants made the allegedly
defamatory statements in the Editorial "with knowledge of [their]
falsity or with reckless disregard of whether [they were] false"
-- that is, with actual malice. See § 76-a(2).

The Clerk of the Court is directed to close the entry at
docket number 119.

SO ORDERED.

Dated:    New York, NY
          December 29, 2020

                                   United States District Judge

-13-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------
SARAH PALIN,

           Plaintiffs,                    17-cv-4853 (JSR)

      -v-                                  FINAL JUDGMENT

THE NEW YORK TIMES COMPANY
and JAMES BENNET,

           Defendants.
------------------------------
```

JED S. RAKOFF, U.S.D.J.:

In view of the jury having returned a verdict of not-liable, and independently, for the reasons stated by the Court previously in granting Defendants' Rule 50 motion, final judgment is hereby entered dismissing the complaint with prejudice.

ADJUDGED AND DECREED.

New York, NY
February 15, 2022

JED S. RAKOFF, U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------
| SARAH PALIN,                |
|                             |
|          Plaintiff,         |          17-cv-4853 (JSR)
|                             |
|      -v-                    |          ORDER
|                             |
| THE NEW YORK TIMES COMPANY  |
| and JAMES BENNET,           |
|                             |
|          Defendants.        |
-----------------------------
```

JED S. RAKOFF, U.S.D.J.:

It is the Court's uniform practice after a verdict has been
rendered in a jury trial to have the Court's law clerk inquire of the
jury as to whether there were any problems understanding the Court's
instructions of law, so that improvements can be made in future cases.
Late yesterday, in the course of such an inquiry in this case -- in
which the jury confirmed that they had fully understood the
instructions and had no suggestions regarding jury instructions for
future cases -- several jurors volunteered to the law clerk that,
prior to the rendering of the jury verdict in this case, they had
learned of the fact of this Court's Rule 50 determination on Monday
to dismiss the case on legal grounds. These jurors reported that
although they had been assiduously adhering to the Court's instruction
to avoid media coverage of the trial, they had involuntarily received
"push notifications" on their smartphones that contained the bottom-
line of the ruling. The jurors repeatedly assured the Court's law

clerk that these notifications had not affected them in any way or played any role whatever in their deliberations.

The Court also notes that when it proposed to the parties, during oral argument on Monday morning, to render its Rule 50 decision later that day but to permit the jury to continue deliberating so that the Court of Appeals would have the benefit of both the Court's legal determination and the jury's verdict, no party objected to this plan. Nor did any party object when the Court reconvened later that day, outside the presence of the jury, and the Court indicated that it was prepared to issue a Rule 50 decision at that time. Indeed, no party objected to this procedure at any time whatever.

Nevertheless, in an excess of caution, the Court hereby brings the foregoing facts to the parties' attention. If any party feels there is any relief they seek based on the above, counsel should promptly initiate a joint phone conference with the Court to discuss whether any further proceedings are appropriate.

SO ORDERED.

New York, NY
February 16, 2022

JED S. RAKOFF, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SARAH PALIN,

     Plaintiff,

     -v-

THE NEW YORK TIMES COMPANY and
JAMES BENNET;

     Defendants.

17-cv-4853 (JSR)

VERDICT FORM

As to the plaintiff's libel claim, we the jury find the defendants

   ☐  Liable

   ☒  Not-liable

If you find the defendants liable, indicate in the box below how much you award in compensatory or nominal damages. If you find the defendants not-liable, leave this box blank.

   $ _____

Dated: 2/15/22

_____
Foreperson

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------
SARAH PALIN,

            Plaintiff,                    17-cv-4853 (JSR)

     -v-                                  OPINION

THE NEW YORK TIMES COMPANY
and JAMES BENNET,

            Defendants.
--------------------------------
```

JED S. RAKOFF, U.S.D.J.:

At trial, plaintiff Sarah Palin wholly failed to prove her case even to the minimum standard required by law. Accordingly, defendants the New York Times Company (the "Times") and James Bennet moved to dismiss the case prior to the start of jury deliberations. After hearing extensive argument, the Court granted the motion shortly after the jury had begun its deliberations. This Opinion sets forth the reasons for that decision, as well as the reasons for how the Court then dealt with the deliberating jury.

By way of background, on June 14, 2017, defendant Times published an editorial, approved and materially revised by co-defendant Bennet, entitled "America's Lethal Politics" (the "Editorial"). The Editorial was prompted by the shooting earlier that day of Republican members of Congress, including Representative Steve Scalise. However, several sentences in the Editorial could be read to suggest that an earlier mass shooting -- an attack that occurred in Tucson, Arizona in 2011, grievously wounding Congresswoman Gabrielle Giffords and killing

several others -- was prompted by a graphic advertisement circulated some months earlier by a political action committee ("SarahPAC") associated with Palin. The graphic (the "crosshairs map") featured a map of the United States with stylized rifle crosshairs superimposed over congressional districts that SarahPAC had targeted for replacing incumbent Democratic members of Congress with Republican candidates in the 2010 midterm elections. Giffords' district was one of 20 featured on the map.

Prior to publication of the Editorial, Bennet, the top editor on the Times' Editorial Board, had added language asserting a "clear" and "direct" link between the 2011 shooting and the "political incitement" generated by the crosshairs map. Although the original author of the Editorial, several other editors, and a fact checker read the draft after Bennet's revision and before publication, none flagged the new language as inaccurate. Nonetheless, journalists and other readers began criticizing the "clear" and "direct" allegation immediately after the Times published the Editorial online. The Times ultimately issued two corrections (the first approximately 14 hours after the editorial was published online) stating that no such link had been established.

Shortly thereafter, Palin commenced this lawsuit, asserting that she had been libeled by Bennet and the Times in violation of New York defamation law.[1] After extensive delays occasioned by an intervening

---

[1] The parties subsequently agreed that Bennet and The New York Times Co. should be considered as a single unit for the purpose of

appeal and constraints arising from the COVID-19 pandemic, the Court

held a seven-day jury trial starting on February 3, 2022. Following

the close of evidence, but before the start of jury deliberations,

defendants moved under Fed. R. Civ. P. 50(a) for judgment as a matter

of law. Rule 50(a) provides, in general, that:

> If a party has been fully heard on an issue during a jury trial
> and the court finds that a reasonable jury would not have a
> legally sufficient evidentiary basis to find for the party on
> that issue, the court may:
>
> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against
>     the party on a claim or defense that, under the
>     controlling law, can be maintained or defeated only
>     with a favorable finding on that issue.

Fed. R. Civ. P. 50(a). The rule further provides that such a motion

may be "made at any time before the case is submitted to the jury."

Id. While Rule 50(a) does not expressly require a court to grant or

deny the motion before jury deliberations begin, it clearly

contemplates that a court will rule expeditiously.[2]

Because this was a serious and case-dispositive motion, the Court

did not rule precipitously. Rather, the Court reserved judgment, first

so that it could hear the lawyers' closing arguments and then, even

after the jury had begun its deliberations late on Friday afternoon,

so that the Court could receive further written and oral submissions

---

assessing liability. See ECF 170 ("Jury Instructions") at 12.
Accordingly, hereinafter, the Court uses "the Times" to refer to both
defendants collectively, except where it is necessary to refer to
Bennet or The New York Times Co. individually.

[2] If the motion is denied, however, it can be renewed after the
jury renders its verdict, pursuant to Fed. R. Civ. P. 50(b).

from counsel. Ultimately, however, by the early afternoon of Monday, February 14, 2022, the Court had reached the firm conclusion that it would have to grant the motion for judgment as a matter of law and so informed the parties.

At that point, the Court could have simply entered final judgment in defendants' favor and dismissed the jury. Instead, however, the Court, while announcing its decision, explained that it would allow the jury to continue its deliberations, so that, if the Court of Appeals were to disagree with the Court's determination to dismiss the case as a matter of law, the appellate court would not have to send the case back for trial, since it would have the benefit of the jury's verdict. Moreover, as a technical matter, the Court could then issue its Rule 50 judgment, post-verdict, pursuant to Rule 50(b). While this approach was a bit unusual, neither side objected to it in the slightest.

Regardless of these procedural niceties, however, the Court never seriously considered hiding from the parties the firm determination it had reached to dismiss the case as a matter of law. This, as the Court noted at the time, would have been grossly unfair to both sides, who would have been left with the impression that the case was going to be determined by the jury's verdict when it was not. Tr. 1298-1299.[3]

Therefore, on the afternoon of February 14, 2022, the Court announced its conclusion that Palin had failed to prove, by the

---

[3] "Tr. __" citations refer to pages in the trial transcript.

necessary clear and convincing evidence, that Bennet and The New York Times Co. had published the allegedly libelous statements with the state of mind known as "actual malice." Specifically, after reviewing all evidence adduced at trial in the light most favorable to Palin and drawing all reasonable inferences in her favor, the Court concluded that no reasonable jury could find by clear and convincing evidence that Bennet or The New York Times Co. knew at the time of publication that the allegedly libelous statements were false or that Bennet thought that the challenged statements were probably false but recklessly proceeded to publish them anyway. The Court further indicated that it would likely issue a written opinion detailing the reasons for these conclusions. Tr. 1307. Hence, this Opinion.

After the Court announced its determination to enter final judgment for the defendants as a matter of law, the Court, as noted, still allowed the jury to continued deliberating for the aforementioned reasons, stating that it would not formally enter the order dismissing the case until after the jury had rendered its verdict. Tr 1305-1306. As also noted, no party objected in the slightest to the Court's plan. Indeed, the parties were given four opportunities to object to the procedure -- when the Court made the initial proposal, Tr. 1256; when the Court indicated it was about to issue its ruling on the motion, Tr. 1295-1297; after that ruling was delivered, Tr. 1306-1307; and when the verdict was returned -- and never did so.

The only issue that was raised -- and then only by counsel for defendants -- was whether it was necessary to further inoculate the

jury against the risk that it might learn of the Court's intended ruling through media reports. When the Court asked counsel what they recommended in this regard, plaintiff's counsel was of the view that the Court should do nothing and "leave things as is." Tr. 1307. But the Court was persuaded by defendants' counsel to again admonish the jury that "If you see anything in the media about this case, just turn away." Tr. 1308. Even though defendants' counsel had raised the possibility (presciently, as it turns out) that some jurors might receive "push notifications" of the Court's Rule 50 determination, Tr. 1307, neither side asked for any other relief than the aforementioned instruction, which was then given to the jury, and accordingly the Court had no occasion to consider any further steps. Tr. 1307.

The next afternoon, the jury returned a verdict of "Not Liable." In the Court's view, the verdict further validated the Court's legal conclusion that no reasonable juror could find by clear and convincing evidence that Bennet or the Times had acted with actual malice. However, this verdict was without immediate legal effect because the Final Judgment entered that day in favor of the Times relied independently on the Court's decision to grant the Rule 50 motion and dismiss the case as a matter of law. ECF 171.

After the jury had been excused, the Court's law clerk discovered, during a routine inquiry, that a few jurors had inadvertently received "push notifications" (alerts automatically generated by news apps installed on their smartphones) containing the bottom-line of the Court's intended Rule 50 determination. See ECF 172. Although these

jurors were adamant that this knowledge had not affected their determination of the verdict in the slightest, the Court promptly notified the parties of this information. See id.

As detailed toward the end of this Opinion, the Court is of the firm view that a few jurors' pre-verdict awareness of news about the Court's intended Rule 50 decision did not nullify the jury's verdict in any respect. But the more fundamental point is that any effect the push notifications may have had is legally irrelevant. The Court had already determined to dismiss Palin's libel claim as a matter of law pursuant to defendants' Rule 50 motion, and the Final Judgment reflected that determination. Even if one indulges the implausible hypothesis that the jury would have returned a verdict for Palin absent the news alerts, the operative final judgment would still have been the same: dismissal of Palin's claim as a matter of law.

The Court now elaborates the reasons for that decision.

## I.   Factual Background

As explained further in § III.B, infra, the Court on a Rule 50 motion must view all evidence in the record in the light most favorable to the non-moving party, here Palin, and must draw all reasonable inferences to her benefit. The recitation of relevant facts below therefore reflects these presumptions.

### A. The Allegedly Libelous Statements

On June 14, 2017, defendant The New York Times Co. published the Editorial entitled "America's Lethal Politics" in response to the shooting that morning of Representative Steven Scalise and several

other Republican members of Congress who had been holding a practice session in suburban Virginia for a charity baseball game. The Editorial identified the attack as part of a "sickeningly familiar pattern [that was] emerging" of members of Congress being targeted by people committing mass shootings. PX-1 at 1.[4] The Editorial's thesis was that this political violence emerged from the "readily available guns and ammunition" in the United States and from "deranged" people whose "derangement had found its fuel in politics" by virtue of the increasingly violent rhetoric used in American political discourse. Id. The "pattern" identified by the Editorial identified only one prior data point: the January 8, 2011 incident in which Jared Lee Loughner opened fire in a Tucson, AZ supermarket parking lot during a "Congress on Your Corner" event hosted by Representative Gabby Giffords, killing six people (including U.S. District Judge John Roll and a nine-year-old girl) and grievously wounding the Congresswoman.

In comparing the two shootings, the Editorial, in language that was added by defendant Bennet to an earlier draft, stated that there was a "clear" and "direct" "link" between Loughner's shooting and the "political incitement" arising from a graphic distributed in March 2010 by the political action committee ("PAC") associated with plaintiff Sarah Palin, who previously served as the Governor of Alaska

---

[4] PX-__ citations refer to plaintiff's exhibits received into evidence at trial, and DX-__ citations refer to defendants' exhibits received into evidence at trial. Unless otherwise specified, all internal quotation marks, omissions, elisions, alterations, citations, and emphases are omitted from all sources cited herein.

and as the 2008 Republican candidate for Vice President. Specifically,

plaintiff alleges that she was libeled by the following two paragraphs:

> In 2011, when Jared Lee Loughner opened fire in a supermarket
> parking lot, grievously wounding Representative Gabby Giffords
> and killing six people, including a 9-year-old girl, the link to
> political incitement was clear. Before the shooting, Sarah
> Palin's political action committee circulated a map of targeted
> electoral districts that put Ms. Giffords and 19 other Democrats
> under stylized crosshairs.
>
> Conservatives and right-wing media were quick on Wednesday to
> demand forceful condemnation of hate speech and crimes by anti-
> Trump liberals. They're right. Though there's no sign of
> incitement as direct as in the Giffords attack, liberals should
> of course hold themselves to the same standard of decency that
> they ask for the right.

PX-4. These paragraphs (the "Challenged Statements") were the fifth

and sixth paragraphs in the twelve-paragraph Editorial. Id. "America's

Lethal Politics" was published online on The New York Times website

at approximately 9:45 p.m. on June 14, 2017, PX-1, and appeared as the

first of three editorials in the June 15, 2017 print newspaper, PX-4.

Neither Palin, nor SarahPAC, nor the map of targeted congressional

districts was referenced elsewhere in the Editorial or in the headline.

See id.

Palin alleges that these two paragraphs contain two defamatory

statements. The first paragraph, Palin argues, asserts that her PAC's

circulation of the so-called crosshairs map was "clear" incitement of

Loughner's shooting of Representative Giffords and others. See ECF

Jury Instructions at 14. The second paragraph, Palin argues, asserts

that the circulation of the crosshairs map served as "direct"

"incitement" of the "attack," or, in other words, that the map caused Loughner to act. See id.

Palin contends that both of these paragraphs contain unsupported or unsupportable factual errors concerning the purported causative role of Palin's PAC's "crosshairs map." Although the crosshairs map was widely blamed for inciting Loughner's violence against Giffords in the days following that shooting, it was subsequently determined that Loughner suffered from mental illness and no link between Loughner's attack and the crosshairs map was ever established. DX-111 at 3-4. Rather, it was determined that Loughner acted because of his own personal demons and mental illness. Accordingly, Palin alleges, it was defamatory for the Editorial to assert that the crosshairs map was either a "clear" or "direct" incitement to Loughner's shooting.[5]

## B. The Original Drafting of the Editorial

On the morning of June 14, 2017, James Hodgkinson opened fire on a group of Republican congressmen, who were practicing in suburban Virginia for an upcoming charity baseball game, wounding four persons, including Representative Scalise. See Tr. 107; PX-4; DX-12. The idea of writing an editorial on the shooting was first raised in a brief

---

[5] Although not central to Palin's case, it may also be noted that the Challenged Statements describe the map as having "put Ms. Giffords and 19 other Democrats under stylized cross hairs," PX-4, thereby suggesting that the crosshairs appeared over images or words signifying the politicians themselves. However, the map in fact placed the stylized crosshairs over these 20 Democrats' congressional districts on a map of the United States, which was positioned above a list of the politicians' names. See DX-61.

10

email sent at 10:46 a.m. by Elizabeth Williamson, a member of the Times' Editorial Board based in Washington, who covered national politics. DX-9; Tr. 78-79. The email went to Bennet and two other editors on the Editorial Board, Robert Semple and Nicholas Fox. DX-9. A few minutes later, in an email titled "POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump," Williamson circulated a set of links to Facebook, LinkedIn, and Twitter profiles that her research suggested belonged to the suspected shooter. DX-13. At 11:49 a.m., after then-President Donald J. Trump had delivered a statement on the shooting, Semple responded by email approving Williamson's proposal to begin drafting an editorial on the shooting, suggesting that the piece focus on gun control. DX-14. Then, at 12:04 p.m. another editor, Linda Cohn, replied to Semple's email, noting that Hodgkinson had gone to high school in her hometown and writing that it was "hard to picture any anti-trump sentiment there." DX-16. Cohn also commented that she was "thinking back to what a giant story [G]abby Gifford[s] shooting was. Amazing that shooting congressmen doesn't seem so shocking now." Id. The record reflects that this was the first time a member of the Editorial Board linked the Virginia and Arizona shootings. Semple, who was a long-tenured member of the Editorial Board, reaffirmed his earlier approval, writing "OK we should definitely shoot for a piece, not huge, but a piece." Id.

Bennet's first contribution to the discussion came in a 12:41 p.m. reply to Williamson's email containing Hodgkinson's suspected social media profiles and copying Semple, Fox, and Cohn. DX-17.

Suggesting an additional argument for the Editorial to make, Bennet wrote:

> Hey Elizabeth -- As Bob has said there's most likely a gun control point to be made here. The other question is whether there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence. Hard for me to imagine that Bernie himself is guilty of anything like that. But if there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting) we should deal with that.

Id. Williamson then agreed to begin writing a draft, noting that she had spoken to Semple. DX-18.

As the assigned writer, Williamson had primary responsibility for research, which included both factual reporting and research on opinions previously expressed by the Editorial Board to maintain consistency with those earlier positions. Tr. 88-89. Williamson testified that on June 14, 2017, she "was researching the political rhetoric that was circulating in our discourse in the run-up to the 2011 shooting in Arizona," not "the shooting itself" or "the state of mind of the gunman." Tr. 174.

To assist Williamson in her research, Semple directed the Board's editorial assistant, Phoebe Lett, to search through prior editorials and send Williamson "four basic gun control pieces (dealing mainly with the plenitude of weapons and porous controls) that also happen to mention Gabrielle Giffords." See DX-21; DX-19.[6] Williamson replied

---

[6] At trial, the four editorials hyperlinked in Lett's email were never shown to any witness, their content was never discussed before the jury, and they were never offered into evidence as part of any witness's testimony. The Court accordingly sustained an objection to

to Lett at 1:40 p.m. asking "is there one that references hate type speech against [Democrats] in the runup to [Giffords'] shooting? James referenced that." DX-22. Lett forwarded this request to Bennet, asking if he "happen[ed] to know which one she is talking about." DX-25. Bennet responded: "No -- I was just wondering if there was such a piece; that is, did we ever write anything connecting ... the Giffords shooting to some kind of incitement?" Id. After searching further, Lett responded "No, but Frank Rich did," providing a link to a January 15, 2011 Op-Ed column entitled "No One Listened to Gabrielle Giffords," DX-24. DX-25. Bennet replied 14 minutes later: "Good for us. Can you let Elizabeth know?" DX-25. Lett then relayed Rich's column to Williamson. DX-23. Viewing the evidence in the light most favorable to Palin, the Court presumes that Bennet read and understood this column by Frank Rich before the Editorial was published.

Rich's column, written one week after the Loughner shooting, discussed that attack and other acts of apparent political violence,

---

plaintiff's counsel motion to admit pre-marked exhibits containing these four editorials when they were offered outside the presence of the jury immediately before closing statements were delivered. See Tr. 1060.

When asked if he had read these four editorials, Bennet testified that he did not recall reading any of them. Tr. 705. And Palin neither adduced any evidence from which the Court could infer that Bennet read these four editorials nor argued in summation that Bennet's knowledge at the time of publication was informed by these four editorials.

Therefore, the content of these four editorials is not in the record and, as a matter of law, none of the four is properly considered as a source for Bennet's pre-publication knowledge. This is so, even though the Court must view the evidence most favorably to Palin and draw all reasonable inferences in her favor.

arguing about they arose from a combination of violent political rhetoric, inadequate gun control, and an ineffective mental health safety net. See DX 24. Rich wrote that it was not yet known whether Loughner had seen the crosshairs map and that then-President Obama had "said, correctly ... that 'a simple lack of civility' didn't cause the Tucson tragedy" or the other incidents he had discussed, such as an earlier act of vandalism at Giffords' office. Id. at 1-2. However, Frank argued that these acts of violence were "inform[ed]" by "an antigovernment radicalism as rabid on the right now as it was on the left in the late 1960s." Id. at 2-3. Rich continued:

> That Loughner was likely insane, with no coherent ideological agenda, does not mean that a climate of antigovernment hysteria has no effect on him or other crazed loners out there. Nor does Loughner's insanity mitigate the surge in unhinged political zealots acting out over the last two years. That's why so many on both the finger-pointing left and the hyper-defensive right automatically assumed he must be another of them.

Id. at 3.

At 2:52 p.m., following Bennet's request, Lett forwarded to Bennet the four editorials that she had previously sent to Williamson. DX-26; DX-27. Lett then kept searching through past editorials and found two more relevant articles, which she emailed to Bennet at 3:01 p.m. and Bennet forwarded to Williamson two minutes later with the note "We dug a little further. Take a look at these two." PX-128. A few minutes later, Bennet separately forwarded the two additional editorials published in the days following the Loughner attack to a group including Semple, Williamson, Fox, and Cohn, writing "FYI -- these two are more relevant precedent for tonight's piece." PX-136. Semple

replied, "just right. The Obama 'as we mourn' in particular." <u>Id.</u>
Bennet testified that although he does not recall reading these two
editorials, he concluded based on his review of this email traffic
that he "must have read them, because [he] knew something about their
content." Tr. 608. Viewing the evidence in the light most favorable
to Palin, the Court presumes that Bennet read and understood these two
editorials prior to publication.

The first of these two editorials, entitled "Bloodshed and
Invective in Arizona," was published January 9, 2011, the day after
the Arizona shooting. PX-134. It describes the Editorial Board's
position on the relationships among gun control, violent political
rhetoric, and mental illness and how these forces increase the risk
of political violence and assassination attempts:

> Jared Loughner, the man accused of shooting Ms. Giffords, killing
> a federal judge and five other people, and wounding 13 others,
> appears to be mentally ill. His paranoid Internet ravings about
> government mind control place him well beyond usual ideological
> categories.
>
> But he is very much a part of a widespread squall of fear, anger
> and intolerance that has produced violent threats against scores
> of politicians and infected the political mainstream with violent
> imagery. With easy and legal access to semiautomatic weapons like
> the one used in the parking lot, those already teetering on the
> edge of sanity can turn a threat into a nightmare.

<u>Id.</u> at 1. "Bloodshed and Invective in Arizona" continues:

> It is facile and mistaken to attribute this particular madman's
> act directly to Republicans or Tea Party members. But it is
> legitimate to hold Republicans and particularly their most
> virulent supporters in the media responsible for the gale of
> anger that has produced the vast majority of these threats,
> setting the nation on edge. Many on the right have exploited the
> arguments of division, reaping political power by demonizing
> immigrants, or welfare recipients, or bureaucrats. They seem to

have persuaded many Americans that the government is not just misguided, but the enemy of the people.

Id. at 2.

The second of these editorials, entitled "As We Mourn," was published on January 12, 2011. PX-135. It addressed then-President Barack H. Obama's speech at a memorial service in Tucson for the victims of the Loughner attack:

> This horrific event, he said, should be a turning point for everyone -- "not because a simple lack of civility caused this tragedy -- it did not -- but rather because only a more civil and honest public discourse can help us face up to our challenges as a nation."

Id. at 1-2.[7] "As We Mourn" does not include any conclusive statement regarding the Arizona gunman's motivations or political convictions, if any.

Bennet testified that on June 14, 2017, he relied on the research Lett conducted on his behalf, and that he never conducted his own factual research in connection with the Editorial. Tr. 610.

## C. Bennet's Revisions

At 4:44 p.m., Williamson uploaded her draft of the Editorial to "Backfield," a section of the Times' content management system that

---

[7] "As We Mourn" continues:

The president's words were an important contrast to the ugliness that continues to swirl in some parts of the country. The accusation by Sarah Palin that "journalists and pundits" had committed a "blood libel" when they raised questions about overheated rhetoric was especially disturbing, given the grave meaning of that phrase in the history of the Jewish people.

PX-135.

stores drafts during the editorial process. Tr. 136-137. Williamson also notified Bennet, Semple, Fox, and Frank Clines (a member of the Editorial Board who covered gun policy). PX-143. After that point, Williamson made no further edits to the piece, Tr. 138, and Palin has not accused her of any actual malice.

The portion of Williamson's 4:44 p.m. draft that served as a precursor to the Challenged Statements reads as follows:

> That in 10 minutes a single gunman could wreak such carnage in a bedroom community a short drive from the Capitol is horrifying, but no longer surprising. Not all the details are known yet, but a sickeningly familiar pattern is emerging: a deranged individual with a gun-perhaps multiple guns-and scores of rounds of ammunition uses politics as a pretense for a murderous shooting spree. Mr. Hodgkinson was a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump, who among many anti-Trump messages posted "Time to Destroy Trump & Co." on social media in March.

> Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured in a vile political climate. Then, it was the pro-gun right being criticized: in the weeks before the shooting Sarah Palin's political action committee <u>circulated</u> a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

PX-141.

The underlined word "circulated" in the latter paragraph of Williamson's draft was hyperlinked to an ABC News article that is dated January 9, 2011, the day after the Arizona shooting, and is entitled "Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate." DX-10; Tr. 144. The article discusses the debate in the wake of the shooting about whether Palin's distribution of the crosshairs map "may have fueled the gunman's rage," though it notes in the tenth

paragraph that "[n]o connection has been made between this graphic and the Arizona shooting." DX-10 at 1-2. Bennet testified that he neither clicked on the "circulated" link in Williamson's draft nor read the ABC News article before the Editorial was published. Tr. 609-610.

After Williamson circulated her draft, Cohn, one of the Editorial Board editors, reviewed the piece. While reading, she made notes on her reactions to the draft, for instance asking whether the referenced to Hodgkinson as "deranged" reflected "signs of mental illness" or was used "just in the sense that anyone who commits [a] mass shooting is deranged." PX140E at 1. Cohn re-saved the draft at 5:03 p.m. Tr. 526; PX-140E at 2. Then, after she had finished her read-through, Cohn went to Bennet's office and told him that she "was just a little confused about ... what we wanted out of this piece, where it was going.... [She] felt he needed to take a look and weigh in." Tr. 520. Bennet recalls that Cohn "did not think it was a great draft." Tr. 636. Bennet agreed to take a look. Tr. 522; 636-637. Cohn testified that it was her decision to take Williamson's draft and pass it off to Bennet, and Bennet testified that he had never told either Williamson or Cohn that he wanted to edit the draft. Tr. 566, 715.

At approximately 5:03 p.m., after speaking with Cohn, Bennet opened and read through Williamson's draft. Tr. 637; DX-30 at 235. He testified that his impression of Williamson's draft was that it "read like a news story, rather than an opinion piece," and Bennet "felt like it wasn't capturing the shock of the attack and kind of the horror of what had happened." Tr. 716. Although his initial intent was to

provide Williamson guidance on rewriting the Editorial, Bennet soon decided to do the revisions himself:

> I initially started drafting a note to Elizabeth at the top of the editorial, trying to provide some instruction on how I thought the piece should be rewritten. And at that point I realized how late in the day it was getting, and I was concerned about getting the piece done in time. So I couldn't tell you exactly what time this was, but I began just editing the piece myself.

Tr. 637. With respect to the time pressure, Bennet testified that the deadline to submit editorials for print publication the following day was approximately 8:00 p.m. Tr. 640.

Bennet testified that in reading Williamson's draft, he interpreted the paragraphs about the Arizona shooting as "the specific example that Elizabeth returned with of incitement or incendiary rhetoric, and I just trusted that it was ... an example of that based on her characterization." Tr. 719. Bennet further testified that he thought the relationship Williamson had posited between the crosshairs map and Loughner's "made sense" because he suspected that "when politicians get shot, ... it has something to do with politics," and "that an atmosphere of highly charged political rhetoric makes such ... terrifying events more likely." Tr. 719-720.

There are words and phrases in the language about which Palin complains that appeared in Williamson's original draft, such as "a sickeningly familiar pattern is emerging" and "Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs." See DX-136 at 2. But Bennet added the key language that Palin argues

19

conveys the allegedly defamatory meaning -- the assertion that Palin's
actions "clear[ly]" and "direct[ly]" caused Loughner to commit a mass
shooting. Id.

A redline of the Editorial, comparing Bennet's revision to
Williamson's first draft, was accepted into evidence, and it succinctly
illustrates Bennet's specific contributions to the two paragraphs
containing the Challenged Statements:

> ~~Just as in~~ Was this attack evidence of how vicious American
> politics has become? Probably. In 2011, when Jared Lee Loughner
> opened fire in a supermarket parking lot, grievously wounding
> Representative Gabby Giffords and killing six people, including
> a ~~nine~~ 9-year-old girl, ~~Mr. Hodgkinson's rage was nurtured in a
> vile political climate. Then, it was the pro-gun right being
> criticized: in the weeks before~~ the link to political incitement
> was clear. Before the shooting, Sarah Palin's political action
> committee circulated a map of targeted electoral districts that
> put Ms. Giffords and 19 other Democrats under stylized ~~crosshairs.~~
>
> ~~In the aftermath of Wednesday's shooting, the political right and
> left and both sides in the gun debate dove into their respective
> foxholes~~ cross hairs.
>
> Conservatives and right-wing media ~~demanded that~~were quick on
> Wednesday to demand forceful condemnation of hate speech and
> crimes by anti-Trump liberals ~~get.~~ They're right. Though there's
> no sign of incitement as direct as in the Giffords attack,
> liberals should of course hold themselves to the same standard
> of decency that they ask of the right.

Id.[8] Bennet testified that as he worked on the Editorial, he did not
know whether or not Loughner had seen the crosshairs map, nor did he
research that question. Tr. 720. As Bennet explained:

> I was functioning as the editor, not the reporter on the piece,
> so I wouldn't normally do the reporting in a situation like this,
> particularly when we were on a tight deadline. But also˘... I

---

[8] As in a standard redline, plain text represents material from
Williamson's initial draft, underlined text represents additions by
Bennet, and ~~strikethroughs~~ represent deletions by Bennet.

didn't think then and don't think now that the map caused Jared
Loughner to act. I didn't think we were saying that, and
therefore ... [it] didn't enter my mind to research that
question.... My goal was to make it, you know, a clearer argument
and ... [a] more compelling description of what happened that
day, a more vivid description of what happened that day.

Tr. 721.

### D. **Further Editing**

Bennet saved his draft in Backfield at 7:21 p.m. DX-30 at 178.

He then emailed Williamson, alerting her that he had finished revising

her draft:

I really reworked this one. I hope you can see what I was trying
to do. Please take a look. Thank you for the hard work today and
I'm sorry to do such a heavy edit.

PX-163. Bennet testified that his request to "[p]lease take a look"

was indicating to Williamson that she should review the piece for fact

checking. Tr. 638. As Bennet explained at trial:

[T]his is why we send playbacks to writers, because they are the
ones who reported the story. They are the ones who are in
possession of the facts. And it is important for them to review
pieces to make sure that edits haven't introduced errors.

Tr. 639. Williamson testified that, after receiving this email, she

"glanced at" the Editorial and replied to Bennet, writing, among other

things, that the draft "Looks great." Tr. 274; DX-38. She suggested

no edits to Bennet's draft. Id.

Cohn re-claimed the pen around 7:23 p.m. and began editing

Bennet's draft of the Editorial. Tr. 571. She continued working on the

piece, making changes for clarity and accuracy until approximately

7:57 p.m. Tr. 571-573; DX-30 at 136. During that time, Fox and Lepping

were reviewing the piece as well, though they had to relay their

changes to Cohn, since only one person was able to edit the Backfield version at a time. Tr. 572; 575-576; PX-155. Cohn testified that she reviewed the Challenged Statements and did not perceive there to be any problem with the language in those paragraphs. Tr. 574-575. Nor did she approach Bennet to discuss those paragraphs. Tr. 575.

Then, at 7:58 p.m., just after storing the latest version of the Editorial reflecting Bennet's revisions, Cohn emailed a "playback," or a static copy of the latest draft, to Williamson for her review.[9] Tr. 576-577. Cohn explained that she sent the playback to Williamson because, although Cohn "assumed that James Bennet had sent one since at that point he was really editing the piece, [she] was playing it safe since [she] had been the original editor on the piece." Tr. 577. The reason Cohn wanted to be sure Williamson received a playback was so Williamson "could make sure that everything in there was correct and that ... the changes seemed fair to her, that ... there was nothing that she wanted to object to either in terms of facts or tone." Id. Cohn did not receive any further edits or comments from Williamson. Tr. 577-578.

Shortly after Bennet filed his draft of the Editorial to Backfield, Eileen Lepping, the Editorial Board's principal fact checker, also began her process of fact checking and editing. Tr. 395.

---

[9] Cohn described the practice of sending a writer a "playback with changes" as "send[ing] a copy to the writer so ... the changes would show up ... so they could go back and look and get back to [the editors] if there were any issues or problems with it." Tr. 577.

Lepping testified that she fact checked the draft Editorial line-by-line. Tr. 416, 421-422. However, she continued editing the piece as Cohn and Bennet also edited and revised it. Tr. 400-401. While fact checking the Editorial, Lepping clicked through the "circulated" hyperlink to the ABC News article, and "scan[ed] it for the facts that [she] was looking for at the moment," meaning specific details such as times, dates, that it was Palin's PAC that had circulated the map, and the number of congressional districts identified. Tr. 399, 422-423. One correction Lepping made around 7:34 p.m. was to edit words indicating the relative timing of the crosshairs map's publication (March 23, 2010, see DX-62; DX-63) and the Arizona shooting (January 8, 2011) from "in the weeks before the shooting" to "in the months before."[10] See PX-153; Tr. 399-403. Lepping testified that she did look at the crosshairs map itself, though she missed the inaccuracy regarding the location of the stylized crosshairs, an error which had already appeared in Williamson's 4:44 p.m. draft. Tr. 406-407. Lepping further testified that she does not recall fact checking the phrase "the link to political incitement was clear" in the first paragraph. Tr. 405. Nor did she fact check the phrase "Though there's no sign of incitement as direct as the as in the Giffords attack" in the second paragraph. Tr. 407. At that point, with the 8:00 print deadline

---

[10] This text was changed yet again, sometime after Lepping completed her edit at approximately 7:56 p.m. that night: the published version reads "Before the shooting." Tr. 404-406. Lepping testified that she did not know who made that further edit. Tr. 406.

nearing, Lepping testified that she "was doing more of a quick check of names and dates and things like that." Tr. 426. However, Lepping said she was able to confirm all of the facts she did check, and no one instructed her not to check any aspect of the piece. Tr. 426-427. At the end of her edit, Lepping sent a playback to Semple, who had a practice of reading the final versions of editorials before they ran and reaching out if he had any concerns; but Semple did not raise any concerns to Lepping about "America's Lethal Politics." Tr. 428-429.

After Cohn and Lepping's review, the copy editors assigned to the editorials page that night -- Bruce Levine and Joe Rakowski -- also edited the piece. Tr. 578. Additional fact checking occurred at this step, with Levine correcting the number of victims hit by Hodgkinson's bullets from five to four, since the fifth victim was determined to have been hit by shrapnel. See PX-178. Levine made this edit by comparing the draft Editorial to the article on the Virginia shooting prepared by the news department for the following day's paper. Tr. 579. Still, no fix was made to the Challenged Statements.

### E. Publication

The Times published "America's Lethal Politics" on its website at approximately 9:45 p.m. on June 14, 2017.[11] Tr. 640-641. The Times' Twitter accounts posted two tweets promoting the Editorial on the

---

[11] The online version of the Editorial received 150,257 page views before the first correction was posted, and 133,572 page views (after it was corrected) for the remainder of the first week after publication. DX-500 ¶ 13; DX-128.

evening of June 14, 2017. PX-3; DX-500 ¶¶ 16-20. "America's Lethal Politics" was the lead article on the editorial page in the June 15, 2017 print edition of The New York Times.[12] PX-4. And the Editorial was featured on the Times' website homepage through June 15, 2017, although it no longer appeared on the homepage as of 3:00 p.m. June 15, 2017. DX-126; DX-127; DX-500 at 1.

### F. Corrections

At 10:35 p.m., less than one hour after the Editorial was published online, Bennet received an email from Ross Douthat, a conservative columnist for the Times' Opinion section who covers national politics, among other topics. Tr. 820. Douthat's email was a response to an email from Bennet complimenting Douthat's latest column. PX-174 at 2. In his email, Douthat criticized the factual basis for the Challenged Statements:

> I feel I would be remiss if I didn't express my bafflement at the editorial that we just ran on today's shootings and political violence. There was not, and continues to be so far as I can tell, no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else, given his extreme mental illness and lack of any tangible connection to that crosshair map, the Tea Party or other right-wing cause. Whereas the shooter today, as our editorial concedes, seems to have had a clear partisan, anti-Trump purpose. That doesn't mean that liberals or "The Resistance" were in any way responsible for this horror; I don't buy those kind of arguments at all, in either case. But our editorial seems to essentially reverse the fact pattern as I understand it, making it sound like *Loughner* had the clearer connection to partisan rhetoric, when to the best of my knowledge he had none. I don't understand that claim at all, and I don't understand why we're making it.

---

[12] 610,531 copies of the June 15, 2017 print edition of The New York Times, which included the Editorial, were printed. DX-500 ¶ 8.

<u>Id.</u> at 1. Bennet responded at 11:09 p.m.:

> Thanks, and I'll look into this tomorrow. But my understanding was that in the Giffords case there was a gun sight superimposed over her district; so far in this case we don't know of any direct threat against any of the congressmen on the field. That's not to say any of it is ok, obviously, or that the violence in either case was caused by the pol[i]tical rhetoric. But the incitement in this case seems, so far, to be less specific.

<u>Id.</u> Bennet testified that when he read Douthat's email he "took away from [it that Douthat] was reading the editorial to say that Loughner was incited by Sarah Palin or somebody else, and that is not the message we intended to send." Tr. 645.

In addition to replying to Douthat by email, Bennet testified that he "checked Twitter, because this ... obviously rang a big alarm for me and, yes, I saw other media people at that point tweeting that we had gotten it wrong," making similar points to Douthat's. <u>Id.</u> at 645-646. Shortly thereafter, Bennet sent a text message to Williamson: "Are you up? The right is coming after us over the Giffords comparison. Do we have it right?" DX-46. Williamson, however, had gone to sleep and did not respond until the morning. <u>Id.</u> Bennet testified that he spent time reading the criticism of the Editorial that was appearing online and tried to sleep but was unable to get much rest, because he was "so upset and confused."[13] Tr. 747-748.

---

[13] Plaintiff's counsel asked Bennet if Douthat's email prompted Bennet to make any effort to take the Editorial offline while the Times was investigating its accuracy. Bennet said he made no such effort because at the time, "<u>The New York Times</u> ... had a rule against so-called unpublishing stories; that if you published a story, you couldn't then just pull it down." Tr. 648. Bennet also noted that the Editorial was irrevocably set to run in the June 15, 2017 print edition. Tr. 649. Plaintiff's counsel adduced no evidence suggesting

At 5:08 a.m. on June 15, 2017 Bennet emailed Williamson and Lepping with the subject line "Giffords:"

> Hey guys -- We're taking a lot of criticism for saying that the attack on Giffords was in any way connected to incitement. The claim is that this was fully investigated and debunked in the months after the attack, and the shooter was found to have acted only because of his personal demons. I don't know what the truth is here but we may have relied too heavily on our early editorials and other early coverage of that attack. If so, I'm very sorry for my own failure on this yesterday. In any case I'd like to get to the bottom of this as quickly as possible this morning and correct the piece if needed. Can you two please put your heads together on this first thing this morning? Please skip the morning meeting if necessary. JB

PX-191. Later that morning, Williamson and Bennet spoke by phone; Williamson described Bennet's demeanor on the call as reflecting that he was "clearly crestfallen that this had happened." Tr. 183; see PX-190. Williamson ("EB") and Bennet ("JB") also exchanged text messages about the apparent error:

> EB: Hey I'm sorry James. I should have read those [para]grafs more closely and asked more questions. That's on me. Will get a [correction] drafted soonest. E.

> JB: No worries. I feel lousy about this one -- I just moved too fast. I'm sorry.

> JB: Now what I need from you/Eileen soonest is a rock-solid version of what we should say -- that an investigation showed NO link to incitement, or NO DIRECT link or NO CLEAR link. I don't want to soften if it we don't need to -- if there was no link we should say so.

> EW: On it. We'll do the right thing

DX-46; PX-188; Tr. 182-183.

---

that Bennet could have taken the Editorial down at that time or that he lacked awareness of this "unpublishing" policy at the time, so there is no inference that can reasonably be drawn from Bennet's decision not to pursue this.

Williamson and Lepping began researching the issue shortly thereafter to determine if a correction was required, skipping the Editorial Board's morning meeting as directed. Tr. 172. Williamson described the <u>Times'</u> corrections policy as "if we were alerted of an error, the policy would be to as swiftly as possible ascertain the correct facts and write the correction and post it."[14] Tr. 206-207. At 7:18 a.m., Williamson emailed her Editorial Board colleague, Jesse Wegman, who had noted criticism of the Editorial on Twitter the night before, asking "What in your view would be the most reliable assessment of the politics link (or not) in the Loughner case? Am thinking court records/assessment of his state of mind." Williamson's focus was correcting the description of the map itself; the bulk of the research and the correction drafting was done in New York. Tr. 173, 185. That morning, Lepping was responsible for researching whether a link had ever been established between the crosshairs map and Loughner's attack. Tr. 410. Lepping testified that she found a police report online

---

[14] The applicable "Corrections" policy from <u>The New York Times'</u> "Guidelines on Integrity" states in full:

> Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small. The paper regrets every error, but it applauds the integrity of a writer who volunteers a correction of his or her own published story. Whatever the origin, though, any complaint should be relayed to a responsible supervising editor and investigated quickly. If a correction is warranted, fairness demands that it be published immediately. In case of reasonable doubt or disagreement about the facts, we can acknowledge that a statement was "imprecise" or "incomplete" even if we are not sure it was wrong.

PX-18; <u>see also</u> Tr. 299-300.

indicating that the shooting "wasn't politically connected."[15] <u>Id.</u> Cohn, working under direction from Bennet and Wegman, drafted the corrections. Tr. 552-553. The first correction, positioned below the online version of the Editorial, was published at approximately 11:15 a.m. on June 15, 2017, Tr. 659, and it read as follows:

> An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.

PX-5 at 3. At the same time, the two paragraphs containing the Challenged Statements was revised to read as follows:

> Was this attack evidence of how vicious American politics has become? Probably. In 2011, Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl. At the time, we and others were sharply critical of the heated political rhetoric on the right. Before the shooting, Sarah Palin's political action committee circulated a map that showed the targeted electoral districts of Ms. Giffords and 19 other Democrats under stylized cross hairs. But in that case no connection to the shooting was ever established.
>
> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Liberals should of course be held to the same standard of decency that they ask of the right.

---

[15] Lepping's testimony about the investigative conclusions she read in the police report was offered for, among other things, the truth of the matters asserted in the report. Plaintiff's counsel never offered the police report, which they had pre-marked as an exhibit and included in the pre-trial exhibit list, <u>see</u> ECF 157 at 55. As such, Lepping's testimony regarding what the report concluded about Loughner's mental state was objectionable hearsay to the extent it was offered for its truth. But since no objection was interposed by defendants, the testimony was received in evidence for all purposes.

Id. at 2.[16] The Times' Opinion Section and its main Twitter accounts also tweeted out the correction. PX-7. The evidence showed that Bennet was involved in drafting the Twitter posts, and that he edited the proposed language to add the apology that "[w]e're sorry about [the error]" and thanked readers for "call[ing] us on the mistake." DX-53 at 1; Tr. 1033.[17]

---

[16] The record contains an email from Wegman to Williamson sent at 12:44 p.m. on June 15, 2017 discussing the correction to the text of the Editorial. In it, Wegman writes, "I made the case that talking about Palin and Giffords in the same [para]graf at all risked seeming like we were still trying to sneak the link in, but James pointed out that in order to write the next [para]graph, we had to put it in there to explain." PX-204 at 1. Plaintiff's counsel, however, elicited no testimony providing context for this statement, and plaintiff's counsel did not rely on any inferences from this document during summation or in argument on the Rule 50 motion.

[17] There was considerable debate at trial about whether the Times has a policy against offering apologies in connection with corrections. See, e.g., Tr. 675, 1036. Plaintiff's counsel raised this issue in connection with the assertion that Palin never received an apology from the Times or Bennet. The Court need not, and does not, resolve the factual issues regarding any apology policy at the Times or whether Palin received an apology, neither of which is materially relevant to the matter at hand. However, it is undisputed that on June 15, 2017, Bennet received a request for comment from CNN's senior media reporter regarding the Editorial's inaccuracy, and that Bennet provided draft comments to the vice president of the New York Times Co. for communications for her to relay back to the CNN reporter. See DX-60. The reporter had asked, inter alia, whether the Times would "be issuing an apology to Sarah Palin for wrongly linking her to the shooting of Giffords." Id. at 2. Bennet's response to this question was "I'm not aware that Sarah Palin has asked for an apology, but yes, I, James Bennet, do apologize to her for this mistake." Id. However, Bennet's statement of apology was not ultimately relayed to CNN, and so it was never published. See PX-236.

Later, the Times issued a second correction to replace the first, addressing the remaining error regarding the description of the map. That second correction read:

> An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.

PX-6. This second correction also ran at the bottom of the editorial page in the June 16, 2017 print edition of the newspaper. PX-10.

## II. **Procedural Background**

### A. **Prior Proceedings**

Palin initiated this lawsuit by filing a one-count complaint on June 27, 2017. ECF 1. Defendants moved to dismiss the complaint on July 14, 2017. ECF 24. The Court subsequently determined that it was a "close question" whether the complaint had pled sufficient allegations of actual malice. ECF 35. Therefore, without objection from the parties, the Court held a brief evidentiary hearing on August 16, 2017, at which the Court ascertained who were the authors of the Editorial and other basic facts that provided context for assessing the plausibility of the inferences upon which the complaint relied to state a libel claim. See ECF 35 at 2. The Court then determined that Palin had not plausibly pled actual malice and dismissed the complaint. Id. Palin appealed that order and the Second Circuit reversed, holding

that the plausibility hearing contravened Fed. R. Civ. P. 12(d). <u>See</u>
<u>Palin v. New York Times Co.</u>, 940, F.3d 804, 812-813 (2d Cir. 2019).

Following remand, Palin filed the operative, first amended
complaint on December 30, 2019. ECF 70. The Court subsequently granted
defendants' motion for partial judgment on the pleadings, dismissing
Palin's claim for disgorgement of advertising revenues specifically
associated with the Editorial. ECF 83. On June 12, 2020, the parties
filed cross-motions for summary judgment. ECF 94, 95. The Court denied
these motions on August 28, 2020 and set the case for trial February
1, 2021. ECF 117.

Defendants subsequently filed a motion for reconsideration on the
basis of an intervening change in substantive law: New York State's
November 10, 2020 amendment of its libel statute to expressly require
a public figure such as Palin to prove actual malice by clear and
convincing evidence. ECF 119. On December 29, 2020, the Court granted
defendants' motion for reconsideration and held that the amendment to
New York's so-called "Anti-SLAPP Statute,"[18] N.Y. Civil Rights L. § 76-
a(2), applies to this action. Consequently, Palin's burden to prove
actual malice as to falsity by clear and convincing evidence is not
only required by the First Amendment to the United States Constitution
but also by New York State statutory law. ECF 125.

---

[18] "Anti-SLAPP" refers to statutes enacted to prevent libel claims
from operating as Strategic Lawsuits Against Public Participation
("SLAPP suits") that would otherwise create a risk of litigation
tending to wrongly inhibit public discourse.

**B. The Trial and Rule 50 Motion**

Unfortunately, the COVID-19 pandemic's cycles of intensification and abatement resulted in several epidemiological "surges" at times set for trial, requiring repeated adjournments to comply with the pandemic protocols of the Southern District of New York. After these delays, trial was set to commence on January 24, 2022. But on the eve of trial, Palin contracted COVID-19 and so was barred by the pandemic protocols from entering the courthouse. See Minute Entries 1/24/2022. Finally, on February 3, 2022, a jury was empaneled, and the trial commenced.

Following the close of evidence on Thursday, February 10, 2022, defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50(a) on four issues, each of which was necessary for Palin to prove the essential elements of their liability on her single claim of libel.[19] See Tr. 1053. These included the two aspects of the "actual malice" element, actual malice as to falsity and actual malice as to defamatory meaning, as well as the "of and concerning" and falsity elements. Tr. 1054-1055. Oral argument proceeded in at least five sessions outside the presence of the jury over three days, and counsel

---

[19] The Court notes that the Times made the Rule 50 motion at the earliest available time. The Times did not call any witnesses of its own or otherwise present an affirmative case after Palin rested. This follows from the Court's individual rules of practice, which provide that each witness may only be called once but can be examined at that time by both sides on any issue.

made written submissions of relevant caselaw citations over the intervening weekend, <u>see</u> ECF 174 at 5-9.

Meanwhile, while the Court continued to reserve judgment on the Rule 50 motion, the jury began deliberations on the afternoon of Friday, February 11, 2022. That evening, following relevant argument and a close review of caselaw cited by counsel, the Court denied the prong of defendants' Rule 50 motion directed at the "of and concerning" element of Palin's libel claim. Tr. 1228.

Argument then turned to the portion of the actual malice element concerning whether Bennet knew or recklessly disregarded the Challenged Statements' falsity prior to publication. <u>Id</u>. The Court was initially skeptical of defendants' position, on the basis that the jury might make adverse determinations as to Bennet's credibility and draw adverse inferences about his pre-publication state of mind therefrom. <u>See, e.g.</u>, Tr. 1232. However, defense counsel drew the Court's attention to a Second Circuit libel case, <u>Contemp. Mission, Inc. v. New York Times Co.</u>, which holds, in sum, that in light of the clear and convincing evidence standard, a plaintiff must adduce some affirmative, "concrete evidence from which a reasonable juror could return a verdict in h[er] favor" to establish a jury question on actual malice, and that it is "[i]t is not enough for the plaintiff merely to assert that the jury might, and legally could, disbelieve the defendant's denial of legal malice." 842 F.2d 612, 621-622 (2d Cir. 1988); <u>see</u> Tr. 1235-1241. Over the weekend, the Court studied the

relevant caselaw, including the numerous citations provided by counsel.

During argument regarding defendants' pending Rule 50 motion on the morning of Monday, February 14, 2022, the Court indicated that it was leaning toward agreement with defendants' position on the issue of actual malice as to falsity, but that, to make sure, it would hear further argument on the issue. The Court further advised the parties that if the Court determined that defendants' Rule 50 motion was meritorious, it would still let the jury reach a verdict so that the case might not need to be retried if the Court's judgment as a matter of law were reversed on appeal.[20] As previously noted, neither party objected in the slightest to this proposal either at that time, during either of the two following sessions of oral argument, or even later that afternoon when the Court indicated it was about to announce its decision on the actual malice prong of the Rule 50 motion. See Tr. 1256-1295.

Later that afternoon, the Court reconvened outside the presence of the jury. First, the Court denied the prong of defendants' motion concerning the falsity element. Specifically, it held that there was

---

[20] See Tr. 1256 ("So I think it comes down to a single issue. By the way, were I to grant the motion -- and I haven't decided yet, but were I to grant the motion, I would still let the jury continue to reach a verdict so that the Court of Appeals, if they disagree with my determination, would still have the jury's verdict before them and we wouldn't have to retry the case. But I don't mean to suggest by that that I've made a decision. I just wanted to flag what would be the result if I did grant the motion.").

sufficient evidence, including unobjected-to testimony from Lepping about her research for the corrections (see n. 15, supra) from which a reasonable jury could conclude that Palin had carried her burden to establish the Challenged Statements' falsity by clear and convincing evidence. See Tr. 1295-1297. Then, after discussing the requirements of Rule 50, the Court explained its determination that no reasonable jury could find that Palin had carried her burden to prove by clear and convincing evidence that Bennet had known or recklessly disregarded the Challenged Statements' falsity prior to publication. Tr. 1299-1305. The Court further stated that it would permit the jury to continue its deliberations, and it would formally enter its Rule 50 judgment as a matter of law after the jury returned its verdict. Tr. 1298, 1305. There were no objections.[21]

At the end of the day and after announcing its ruling on the Rule 50 motion, the Court reconvened counsel and asked whether either side sought a further instruction about avoiding media coverage of the

---

[21] Plaintiff's counsel has since suggested that the Court recognized an objection to this procedure when it stated, after delivering the substance of its Rule 50 decision, that "needless to say, the plaintiff is deemed to have objected to my decision, and that is preserved for appeal as well." Tr. 1306. But plaintiff's interpretation grossly misconstrues the record. The full context of the quoted remark reflects that it concerned only the legal substance of the Court's Rule 50 decision, which plaintiff's counsel had addressed at length, and that the Court was merely recognizing plaintiff counsel's presumed reassertion of those prior objections to the substance of the Court's Rule 50 decision. Because neither party had ever objected to the Court's proposal not to discharge the jury after delivering its Rule 50 decision, there was no prior objection to the procedural aspect of the Court's action that the Court could have recognized as reasserted.

trial or whether "we should just leave things as is." Tr. 1307. Plaintiff's counsel declined to ask for any instruction, stating "We leave things as is." Id. However, defense counsel requested an instruction, raising the risk posed by "push notifications that get sent out to people's phones." Id. The Court ultimately recalled the jury and again admonished the jurors not to look at anything regarding the trial, not to speak with anyone about the trial, and "if you see anything in the media about this case, just turn away."[22] Tr. 1308.

The following afternoon, the jury delivered a verdict of not-liable, which was confirmed in a poll of each individual juror. See ECF 173; Tr. 1324-1325. The Court then informed the jury about its ruling on the Rule 50 motion and discharged the jury. Tr. 1326-1327. The Court entered final judgment later on February 15, 2022. ECF 171.

After the jury was excused, the Court directed its law clerk to speak with the jury about any problems it might have had with the Court's instructions of law or any suggestions they might have for improvements. This has been the Court's routine practice for over 25 years and more than 300 jury trials, and it has led to material improvements. For example, as suggested by a jury several years ago, the Court now always provides the jury with a "short-form" version of its instructions of law at or near the very start of the trial, as it

---

[22] The jury was instructed to turn away from media coverage repeatedly throughout the trial, including when it was empaneled, Tr. 71; after an incident in which a member of the public cheered Palin and denigrated The Times while jurors were waiting for the elevator, Tr. 500, 512; and by email over a weekend recess, ECF 174.

did in this very case. However, in the course of their post-verdict discussion in the instant case, a few of the jurors volunteered to the law clerk that they had previously become aware of the bottom line of the Court's February 14 ruling, because, notwithstanding that they had assiduously adhered to the Court's instruction to avoid media coverage of the trial, they had received "push notifications" on their smartphones containing a few words to the effect that the Court intended to dismiss the case. ECF 172. Although the same jurors made a point of affirmatively expressing to the law clerk that their limited knowledge had not affected their deliberations in the slightest, the Court, upon learning of this conversation, promptly disclosed it, in writing, to the parties and the public. Id.

## III. **Legal Framework**

As explained, the Court entered Final Judgment for defendants as a consequence of their Rule 50 motion for judgment as a matter of law. ECF 171. Specifically, the Court granted the Rule 50 motion with respect to Palin's failure to adduce evidence from which any rational jury could find by clear and convincing evidence either that Bennet and the Times published the Editorial knowing that it contained a false statement of fact about Palin or that Bennet and the Times published in reckless disregard of the Editorial's truth or falsity. Therefore, the Court sets forth in this section the legal frameworks governing the substantive and procedural aspects underlying its judgment.

## A. **Elements of Liability for Libel of a Public Figure**

A claim of libel arises from the publication of a false defamatory statement made in writing or print. To establish liability for such a claim under here-applicable New York law, Palin, who is a "public figure," was required to prove four essential elements concerning any allegedly libelous statement:[23]

(1) It was a statement of fact that the ordinary reader of the publication would understand, when taken in the context in which it appears, to convey a defamatory meaning, <u>Mahoney v. Adirondack Pub. Co.</u>, 71 N.Y.2d 31, 38 (1987);

(2) An ordinary reader would reasonably understand the statement to be "of and concerning" the plaintiff personally, rather than referring to another person or entity, <u>Three Amigos SJL Rest., Inc. v. CBS News Inc.</u>, 28 N.Y.3d 82, 86 (2016);

(3) The statement was materially false, <u>Rinaldi v. Holt, Rinehart & Winston, Inc.</u>, 42 N.Y.2d 369, 380 (1977); and

(4) At the time of publication, the Times (and Bennet, in particular) had the state of mind known as "actual malice," <u>Harte-Hanks Commc'ns, Inc. v. Connaughton</u>, 491 U.S. 657, 666 (1989).

While a plaintiff may prove the first two elements by a preponderance of the credible evidence, the elements of falsity and actual malice must be proven by clear and convincing evidence. <u>See Rinaldi</u>, 42 N.Y.2d at 379. Also, the parties agreed, based on the record and the scope of <u>respondeat superior</u> liability under New York law, to treat Bennet and The New York Times Co. as a single unit with any finding of liability or non-liability applying equally to both defendants. Tr.

---

[23] Although a fifth element, publication, is also an essential element of a libel claim, defendants here conceded that the challenged statements were published, so this was never in dispute. <u>See</u> Tr. 466.

462-464 (charge conference); Jury Instructions at 12 (corporate liability). As for damages, since the Challenged Statements, as construed by Palin, were defamatory per se, damages were presumed, and proof of special damages was not required as an element of liability.[24]

The First Amendment's guarantees of freedom of speech and of the press prohibit imposition of liability for libel of a public figure unless the plaintiff proves that the defendants acted with "actual malice." Sullivan, 376 U.S. at 279-280; see also Harte-Hanks Commc'ns, 491 U.S. at 666 (confirming that the Sullivan rule applies to public figures).[25] It is undisputed that Palin is a public figure for the purposes of this lawsuit. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974) (defining public figures as those who "have thrust themselves to the forefront of particular public controversies in

---

[24] During argument concerning the jury charge, the Court denied defendants' motion in limine that sought a ruling that the Challenged Statements were not defamatory per se. See ECF 159; Tr. 682. Under New York law, "[a]ny written or printed article is libelous or actionable without alleging special damages if it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." Rinaldi, 42 N.Y.2d at 379. The assertion that Palin's actions played a "clear" or "direct" role in causing Loughner to commit a mass shooting undoubtedly falls within this definition of a libelous per se statement. See Tr. 896-897 (describing death threats Palin and her children received after the accusation was first made in 2011).

[25] Palin has consistently maintained that New York Times v. Sullivan either is no longer good law or does not apply to this case, and thus that the First Amendment does not require her to prove that Defendants published with actual malice. The Court has repeatedly rejected these contentions, which are fully preserved for appellate review. See, e.g., ECF 117 at 11-13.

order to influence the resolution of the issues involved" and thereby "invite attention and comment"). Therefore, to prevail, Palin must prove by clear and convincing evidence that Bennet and the <u>Times</u> published the Editorial "with knowledge that it was false or with reckless disregard of whether it was false or not." <u>Sullivan</u>, 376 U.S. at 280.[26]

New York State's "Anti-SLAPP" statute independently requires a plaintiff in Palin's position to prove actual malice, i.e., to have "established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false." Civil Rights L. § 76-a(2). The Court has already held that the current version of this

---

[26] A central plank of the defense was Bennet's assertion that he did not intend the Editorial to convey that the crosshairs map directly caused Loughner to commit the Arizona shooting. This issue largely turns on Bennet's intent in using the word "incitement." On summary judgment, the Court accepted defendants' argument that Bennet could not have actual malice as to the Editorial's purported falsity unless he was also aware that readers would interpret his words to convey the allegedly false meaning. <u>See</u> ECF 117 at 13-15. Accordingly, the Court held that Palin was required to prove two necessary aspects of actual malice by clear and convincing evidence: actual malice as to falsity and actual malice as to defamatory meaning. <u>See</u> <u>id</u>. at 18-19. To prove actual malice as to defamatory meaning, Palin was required to show that Bennet either intended to convey the alleged defamatory meaning or that he was aware that ordinary readers would probably understand his words to convey the allegedly defamatory meaning and he published anyway. <u>See</u> Jury Instructions at 20.

Although defendants' Rule 50 motion contended that Palin had failed to prove by clear and convincing evidence the aspect of actual malice concerning defamatory meaning, the Court did not address this prong of defendants' motion during oral argument. <u>See</u> Tr. 1263. It therefore forms no part of the Court's reasoning as set forth below and is deemed denied as moot.

41

statute, amended November 10, 2020, applies retroactively to this action. See ECF 125. Therefore, the Court's entry of judgment as a matter of law for Palin's failure to prove actual malice rests independently on both federal law, via the First Amendment, and on New York State statutory law, via Civil Rights L. § 76-a(2).

As explained above, the Court denied Defendants' Rule 50 motion with respect to all elements except actual malice, and then only granted the motion with respect to the aspect of actual malice concerning Bennet's knowledge or reckless disregard of the Challenged Statements' falsity. It was also clear from argument that Palin was not seriously contending that Bennet published the Editorial with actual knowledge that the Challenged Statements were false; rather, Palin argued that she established actual malice by virtue of reckless disregard.

The cornerstone of the reckless disregard standard for actual malice is that the plaintiff must prove by clear and convincing evidence, that the "defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968). And, as the New York Court of Appeals has explained, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action." Liberman v. Gelstein, 80 N.Y.2d 429, 438 (1992). Liability is therefore barred unless Palin adduced clear and convincing evidence supporting the conclusion that, at a minimum, "a false publication was made with a

high degree of awareness of probable falsity." <u>Id.</u> Proof of negligence does not suffice to establish actual malice: "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." <u>Id.</u>

Nor, without clear and convincing proof that the defendant harbored serious doubts about the truth of the allegedly libelous statement, would it be enough to "show[] ... highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." <u>Harte-Hanks Commc'ns</u>, 491 U.S. at 666. The failure to investigate a fact or confirm an assertion before publication does not establish reckless disregard -- "even if a prudent person would have investigated before publishing the statement" -- unless the evidence proves that "defendants' 'inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity' of the published statement." <u>Sweeney v. Prisoners' Legal Servs. of New York</u>, Inc., 84 N.Y.2d 786, 793 (1995) (quoting <u>Harte-Hanks Commc'ns</u>, 491 U.S. at 692).

**B. <u>Legal Standard -- Rule 50</u>**

As already noted, the standard for granting a motion under Fed. R. Civ. P. 50 for judgment as a matter of law requires a court to consider all the evidence in the record and draw all reasonable inferences in favor of the non-movant, here Palin. Furthermore, the Court may neither make determinations as to the credibility of

witnesses or other evidence nor weigh conflicting evidence, as any such analysis of the evidence is the jury's exclusive province.

Independently, however, in reviewing the evidentiary record of actual malice, "the judge must view the evidence presented through the prism of the substantive evidentiary burden," i.e., clear and convincing evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Anderson was a libel case, and it addressed the legal issue before this Court: the appropriate standard to apply to a defendant publisher's motion for summary judgment on the actual malice element of a libel claim brought by a public figure, which it described as identical to the standard applied to motions made under Fed. R. Civ. P. 50. Id. at 245-246, 250. The Anderson Court held that to determine whether a jury question exists as to the actual malice element, a judge must account for the clear-and-convincing standard of proof and determine. Id. at 255. Therefore, "there is no genuine issue" of material fact, and so the defendants' motion must be granted, "if the evidence presented [by the plaintiff] is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." Id. at 254.

Anderson also rejected the proposition that a jury question as to actual malice exists where the defendant's "state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue." 477 U.S. at 256. The Court thus held that a plaintiff cannot reach the jury on her libel claim "without offering any concrete evidence from which a reasonable juror could return a verdict in [her]

44

favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of a conspiracy or of legal malice." Id. A libel plaintiff has a "burden of producing ... evidence that would support a jury verdict." Id. "[D]iscredited testimony" of the libel defendant on its own "does not constitute clear and convincing evidence of actual malice." Bose Corp., 466 U.S. at 512. Therefore, as a matter of law, a libel "plaintiff must present affirmative evidence" supporting the inference that the defendant published with knowledge or reckless disregard of the statement's falsity to reach a jury on the question of actual malice, even though such "evidence is likely to be within the possession of the defendant." Anderson, 477 U.S. at 257. As the Second Circuit has repeatedly explained, this means that a libel plaintiff bears the burden that "[s]ome [affirmative] facts must be asserted to support the claim that the state of mind existed." Contemp. Mission, 842 F.2d at 622.

IV.  **Bennet's State of Mind**

The essential question is whether the record reflects any evidence that could give rise to the conclusion that Bennet knew or consciously disregarded that the Challenged Statements were false at the time the Editorial was published on June 14, 2017. In making this assessment, the Court, construing Palin's claim most favorably to her, assumes, as Palin alleges, that Bennet either intended his edits to Williamson's draft to convey that the crosshairs map played a causal role in spurring Loughner to commit the Arizona shooting or at least that Bennet recklessly disregarded that defamatory meaning. Therefore, the

specific inquiry is whether there is any basis from which a reasonable jury could find by clear and convincing evidence that Bennet knew or strongly suspected, before publication, that no link had been established between the crosshairs map and the Loughner shooting. As explained below, the Court concludes that the record contains no such evidence.

Palin has pointed to two categories of evidence that she argues foreclose judgment as a matter of law on actual malice: the research gathered for the Editorial and Bennet's prior awareness of Loughner's motivations. The Court deals with each in turn and then discusses other evidence in the trial record that is probative of Bennet's pre-publication state of mind.

**A. The Research**

Viewed in the light most favorable to Palin, the Court assumes that Bennet read and understood three prior New York Times opinion pieces that Lett found and circulated on June 14, 2017: Frank Rich's "No One Listened to Gabrielle Giffords," DX-24, and the two editorials published in January 2011: "Bloodshed and Invective in Arizona," PX-134, and "As We Mourn," PX-135. But even on the assumption that Bennet read and understood these three articles in their entirety, none presents any definitive facts about the Arizona shooting that would have put Bennet on notice (or led him to strongly suspect) that no link had been established between the crosshairs map and Loughner's attack.

Rich's column, "No One Listened to Gabrielle Giffords" was written one week after the Arizona shooting and presented no actual evidence about Loughner's mental state at the time he committed the Tucson attack. DX-24. Rich opened by endorsing President Obama's statement that "no one can know what is in a killer's mind" but nonetheless argued that while a "simple lack of civility didn't cause the Tucson tragedy," the political violence committed by Loughner and others emerged from a context filled with violent, antigovernment political rhetoric from the radical right. Id. at 2-3. Rich contended, therefore, that the fact "[t]hat Loughner was likely insane, with no coherent ideological agenda, does not mean that a climate of antigovernment hysteria has no effect on him or other crazed loners out there." Id. at 3. Assuming that Bennet knew the contents of this column when he revised the Editorial, the Court concludes that "No One Listened to Gabrielle Giffords" provides no facts about Loughner or argument about the attack that contradict the facts asserted in the Challenged Statements. Therefore, the Frank Rich column provides no basis for finding that Bennet knew or suspected that his revision introduced false statements of fact into the Editorial.

The Times' editorial published the day after the Arizona shooting, entitled "Bloodshed and Invective in Arizona," also provides no facts or argument that contradict the Challenged Statements. This editorial describes Loughner as "appear[ing] to be mentally ill" and notes that "[h]is paranoid Internet ravings about government mind control place him well beyond usual ideological categories." PX-134 at 1. But the

piece nonetheless argues that violent, antigovernment rhetoric creates a context in which people like Loughner are more likely to commit violent acts.[27] At trial, Bennet described this as "the same point" he was trying to make in "America's Lethal Politics." Tr. 712. The core of the argument presented in "Bloodshed and Invective in Arizona" is also consistent with the argument made in "America's Lethal Politics" that violent political rhetoric can make political violence more likely to occur, even if the perpetrators are deranged:

> It is facile and mistaken to attribute this particular madman's act directly to Republicans or Tea Party members. But it is legitimate to hold Republicans and particularly their most virulent supporters in the media responsible for the gale of anger that has produced the vast majority of these threats, setting the nation on edge. Many on the right have exploited the arguments of division, reaping political power by demonizing immigrants, or welfare recipients, or bureaucrats. They seem to have persuaded many Americans that the government is not just misguided, but the enemy of the people.

PX-134 at 2. Bennet described this passage as "[t]o me, ... the same point" as the one he was trying to make in "America's Lethal Politics." Tr. 713. Granted, a tension emerges when one reads both "Bloodshed and Invective in Arizona" and "America's Lethal Politics" in the light most favorable to Palin's claim: the earlier piece says it is "facile and mistaken to attribute this particular madman's act directly to"

---

[27] See PX-134 at 1 ("But [Loughner] is very much a part of a widespread squall of fear, anger and intolerance that has produced violent threats against scores of politicians and infected the political mainstream with violent imagery. With easy and legal access to semiautomatic weapons like the one used in the parking lot, those already teetering on the edge of sanity can turn a threat into a nightmare.")

specific politicians, but the Editorial can be read as doing just that when it asserts that "the link to political incitement was clear," in the context of a discussion of the crosshairs map. But this tension emerges from the arguments made by these two pieces, not contradictions in their presentations of the relevant facts. Of course, "[u]nder the First Amendment there is no such thing as a false idea," so statements of opinion are not actionable in libel. Gertz, 418 U.S. at 340. "Bloodshed and Invective in Arizona" therefore provides no basis for concluding that Bennet knew or suspected that the Challenged Statements contained materially false statements of fact.

The third piece of research Palin emphasizes is the editorial "As We Mourn," which was published four days after the attack and praises then-President Obama's speech at a memorial service for the Tucson victims. PX-135. Palin focuses on its praise of Obama's statement that the Arizona attack should be a turning point "not because a simple lack of civility caused this tragedy -- it did not -- but rather because only a more civil and honest public discourse can help us face up to our challenges as a nation." Id. at 1-2. But neither this line nor any other portion of "As We Mourn" presents any facts that contradict the facts asserted in the Challenged Statements. Accordingly, Bennet's having read "As We Mourn" does not support the conclusion that he knew or recklessly disregarded that it was false to assert that Loughner was "incited" by the crosshairs map.

The Court also rejects Palin's argument that the presence in Williamson's draft (and the final Editorial) of the hyperlink on the

word "circulated" to the ABC News article weighs in favor of finding that Bennet published with actual malice. To be sure, had Bennet read the ABC News article -- which states in the tenth paragraph that "[n]o connection has been made between this graphic and the Arizona shooting," DX-10 at 1-2 -- it would be relevant to establishing that Bennet had reason to doubt that the "link to political incitement was clear" with respect to the Arizona shooting.[28] But Bennet testified that he neither clicked on the "circulated" link in Williamson's draft nor read the ABC News article before the Editorial was published. Tr. 609-610. And Palin has adduced no affirmative evidence to undermine Bennet's testimony on this point. Therefore, even viewing the record in the light most favorable to Palin and drawing all reasonable inferences in her favor, the Court concludes that the contents of the ABC News article did not inform Bennet's pre-publication state of mind.

Indeed, Palin effectively conceded as much by adopting the alternate position during oral argument on the Rule 50 motion that it

---

[28] Even if, assuming arguendo, Bennet had read the ABC News article, it is not at all clear that it would establish that Bennet knew that there was no connection between the cross hairs map and Loughner's attack. The ABC News article was written only one day after the shooting, and its thrust is that people were drawing a link between the shooting and the cross hairs map in the immediate aftermath of the attack. See DX-10. A reasonable reader in Bennet's position would not necessarily understand the hedge contained in the tenth paragraph -- that within one day of the attack, no firm connection had yet been made been made between Loughner and the map -- as conclusive evidence that no such connection was later established by investigators. Of course, this point is academic, since the record reflects that Bennet never read the ABC News article before publication.

was highly unreasonable for Bennet not to have clicked the hyperlink when revising. See, e.g., Tr. 1274. But this contention fails to establish actual malice for two reasons. First, as a legal matter, assuming arguendo that Bennet was negligent -- or even grossly negligent -- in not clicking the link, that would do nothing to establish that Bennet had the subjective awareness of (probable) falsity that is the sine qua non of actual malice. See Harte-Hanks Commc'ns, 491 U.S. at 666. And second, as a factual matter, it is not at all clear that Bennet's failure to click on the link was even negligent: the hyperlink was keyed to the word "circulated," thereby implying factual support for the well-known proposition that Palin's PAC had circulated the crosshairs map prior to the Arizona shooting.[29] Palin established no reason why Bennet was negligent not to validate this proposition, which is distinct from the allegedly libelous assertion and was not subject to question at any time. Accordingly, Bennet's failure to click the ABC News link does not support the conclusion that he published with actual malice.

In sum, drawing all reasonable inferences in Palin's favor regarding Bennet's pre-publication reading, none of the research materials in the record supports the conclusion that Bennet had reason

---

[29] The full sentence in Williamson's draft read: "Then, it was the pro-gun right being criticized: in the weeks before the shooting Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs." PX-141.

to know, or even to suspect, that his revisions had introduced false statements of fact to the Challenged Statements.[30]

Accordingly, the Court concludes that none of the evidence related to the Editorial Board's pre-publication research process supports the conclusion that the Times published the Editorial with knowledge or reckless disregard as to the Challenged Statements' falsity.

**B. Bennet's Recollection**

In addition to research conducted for the Editorial on June 14, 2017, Bennet theoretically could have had prior knowledge regarding the relationship -- or lack thereof -- between the crosshairs map and the Arizona shooting. But the record belies this possibility. Bennet testified that he was not aware of the details of the Loughner case and that he did not recall the controversies surrounding the crosshairs map before the Editorial was written. Palin offered no admissible evidence that would undermine Bennet's testimony on this point. Nor are Bennet's contemporaneous communications inconsistent with his testimony. Accordingly, the Court concludes that Palin has not proved that Bennet had any prior recollection of the Arizona shooting from which a rational jury could infer that he published with actual malice.

Bennet testified that he did not recall seeing the crosshairs map or any press coverage about it when the map was originally released

---

[30] Nor was there any other research that could have informed Bennet's state of mind on June 14, 2017, because he testified that he relied on Lett's research and did no independent research himself. Tr. 610, 621.

in 2010. Tr. 607. Nor does Bennet recall seeing any posts on Twitter that Palin made in connection with the map. Id. Indeed, Bennet testified that at the time he revised the Editorial, he did not have a mental image of the map and "was relying on [Williamson's] description of it in the piece."[31] Id.; see also Tr. 705.

Bennet also denied having any recollection of specific articles he read in 2011 or thereafter about the Arizona shooting that discussed Loughner's mental state at the time of his attack.[32] Tr. 620. Bennet

---

[31] Palin had sought to offer evidence regarding James Bennet's brother, Michael Bennet, who has served during all times relevant to this case as the Democratic Senator representing Colorado. Palin had argued both that James Bennet's relationship to his brother could establish bias and that it would have made James Bennet more likely to have been aware of the cross hairs map at the time it was published. See, e.g., Tr. 501-502; ECF 147. However, the Court ultimately sustained the Times' objections, articulated on the record and in a motion in limine, see ECF 136, and excluded this evidence both on grounds of relevance, since plaintiff's counsel had laid no foundation adequate to support either asserted theory of relevance, and on Rule 403 grounds. Tr. 502-503.

Palin adduced no affirmative evidence that Bennet or others on the Times' Editorial Board were biased, fairly or unfairly, against Palin. Even had Palin been able to elicit such evidence, whether arising from James Bennet's relationship with his brother or from any other source, that would not have established actual malice. See, e.g., Harte-Hanks Commc'ns, 491 U.S. at 666; Buckley v. Littell, 539 F.2d 882, 889 (2d Cir. 1976). ("Repeatedly the Court has said that ill will toward the plaintiff or bad motive, indeed, hatred, spite or desire to injure, are not the kind of 'malice' that the New York Times Co. v. Sullivan test comprehends.").

[32] Palin had sought to offer several articles written by the commentator Andrew Sullivan who published a blog called The Daily Dish that was associated with website of The Atlantic magazine at the time of the Arizona shooting, when Bennet was the editor of The Atlantic. The Daily Dish articles concerned the investigation into Loughner's attack and the allegation made in its immediate aftermath, but ultimately discredited, that the cross hairs map played a role in causing Loughner to commit the mass shooting. Plaintiff's counsel

did, however, have the general recollection of learning from media reports that Bennet "was deranged." Tr. 621. But Bennet testified that he was unaware on June 14, 2017 "whether or not Jared Loughner had seen the crosshairs map," because, he explained "I hadn't reported that myself and I don't think I read any reporting on that. So I didn't know." Tr. 720. Still, he testified that he had "remember[ed] that there had been a debate ... after the shooting ... about exactly this issue, about, you know, inciting rhetoric, but my memory of that was vague." Tr. 702-703. He did not think to look into this issue, Bennet explained, because he "was functioning as the editor, not the reporter on the piece, so [he] wouldn't normally do the reporting in a situation like this, particularly when ... on a tight deadline." Tr. 721.

Bennet continued:

> I didn't think then and don't think now that the map caused Jared Loughner to act. I didn't think we were saying that, and therefore I wouldn't have -- the question wouldn't have entered my mind, didn't enter my mind to research that question.

---

intended to offer these articles to show that Bennet knew that the allegations of a link between Loughner and the map had been discredited. However, plaintiff's counsel was unable to offer an adequate foundation for these articles' admission. The record reflects that Bennet had no editorial responsibility over The Daily Dish, and plaintiff's counsel never elicited any testimony or proffered any other evidence that Bennet had in fact read the articles in question. Accordingly, the Court excluded the articles under Fed. R. Evid. 401 and 402, subject to reconsideration. Tr. 503-511. Specifically, the Court provided plaintiff's counsel the opportunity to conduct voir dire of Bennet outside the presence of the jury to lay additional foundation for the articles' admission. Tr. 508. However, plaintiff's counsel never availed themselves of this opportunity.

Tr. 721. Palin might argue that the first sentence of this comment indicates that Bennet did not believe that what he was writing was true. But the Court concludes that is not a reasonable reading of Bennet's answer and that such a reading would be inconsistent with Bennet's testimony overall. The answer as a whole explains that Bennet's intention was to convey a message that was consistent with his understanding of the Arizona shooting. As Bennet explained a few answers earlier, "when politicians get shot, I suspect it has something to do with politics, and I think that an atmosphere of highly charged political rhetoric makes such, you now, terrifying events more likely." Tr. 720. Accordingly, Bennet's statement that he "didn't think then ... that the map caused Jared Loughner to act" cannot reasonably be read to mean that he thought the map did not contribute at all to the Tucson attack. Rather, the answer must be read to explain that because Bennet did not intend to convey that the crosshairs map directly caused Loughner to act, he therefore did not consider the need to research the veracity of that assertion. In any event, the statement does not suggest that Bennet knew or suspected that there existed any official or widely accepted conclusion that no link whatsoever existed between Loughner's attack and the map. Therefore, it cannot be reasonably inferred from this answer that Bennet published the Editorial with actual malice.

The evidence reflects that Bennet did not introduce the crosshairs map to the draft Editorial, nor did he direct Williamson or anyone else at the Times to refer to Palin in the Editorial. See Tr. 720.

True, Bennet brought up the Giffords shooting in his 12:41 p.m. email, which stated:

> Hey Elizabeth -- As Bob has said there's most likely a gun control point to be made here. The other question is whether there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence. Hard for me to imagine that Bernie himself is guilty of anything like that. But if there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting) we should deal with that.

DX-17. Bennet explained that Loughner's shooting of Representative Giffords was "the obvious precedent" for the "violence against politicians" in the Virginia shooting, Tr. 635, and that his "assumption is that when a politician gets shot, that politics probably had something to do with it," Tr. 704; see also Tr. 720. Bennet also reasonably explained the editorial guidance in his 12:41 email as a proposal for Williamson to research, rather than a directive for her to implement:

> I think "whether" is an important word in this sentence. You know, I've got it there twice. I'm -- I'm putting this to my colleagues as -- I'm raising it as a point to be considered as something we might include, you know, the other question is whether there's a point to be made about this. And then I say the point -- in my mind, the point is whether it incites people to this kind of violence. I didn't write that it incites people to this kind of violence. And I think that's a significant difference. My intention was to raise a question, to make an argument that this was this danger but not to assert it as a matter of fact. Because like the easy availability of guns, you know, I don't have -- I can't prove -- I can't prove that this kind of rhetoric actually, you know, does lead to this sort of violence.

Tr. 700-701. Bennet further testified that when he reviewed Williamson's full draft just after 5:00 p.m., he understood the

reference to the crosshairs map to be "the specific example that [Williamson] returned with of incitement or incendiary rhetoric, and I just trusted that it was ... an example of that based on her characterization." Tr. 719. While Bennet then inaccurately strengthened Williamson's language in a manner that led to the factual error, none of Bennet's editorial direction from earlier in the day supports the proposition that Bennet knew or suspected that Loughner's actions were wholly unrelated to the crosshairs map.

If anything, the record as a whole reflects that Bennet had a general, albeit inaccurate, recollection (or, perhaps, assumption) that the Arizona shooting was preceded by "inciting" political rhetoric and that he incorrectly understood Williamson's reference to the crosshairs map as confirmation of that connection. If that account does reflect Bennet's thought process, then it undermines, rather than strengthens, any inference that he knew or suspected that his revision introduced falsity to the Editorial.

In sum, Palin adduced no evidence suggesting that Bennet (and therefore the Times) was aware, at the time "America's Lethal Politics" was published, that the hypothesized link between her crosshairs map and Loughner's attack had been widely rejected.

## C. **Other Evidence**

As discussed above, Palin failed to offer any affirmative evidence supporting the inference that Bennet knew or suspected that his revisions introduced falsity to the Editorial. This alone suffices for the Court to conclude that Palin failed to adduce evidence sufficient

for a reasonable jury to find by clear and convincing evidence that Bennet published with actual malice. A public figure cannot rely solely on the chance that the jury declines to credit the defendant's testimony denying that he had the necessary state of mind. See Anderson, 477 U.S. at 256; Contemp. Mission, 842 F.2d at 621-622; see also § III.B, supra. Nonetheless, the record reflects a wealth of other evidence that is incompatible with the inference that Bennet knew or suspected that his revision introduced falsity to the Editorial, even if that evidence is viewed in the light most favorable to Palin.

First, the context of Bennet's revision in the Times' editing and fact-checking processes belies the inference that he intentionally or recklessly published false information. Far from Palin's allegation that Bennet intentionally defamed her by forcing the Editorial Board to write a piece in accordance with his diktats because he purportedly held a political grudge against her or her positions, the evidence shows that Bennet did not seek out the opportunity to revise Williamson's draft. The uncontroverted testimony is that Cohn brought the draft Editorial to Bennet's attention because she thought that the draft's argument was unclear; Bennet did not direct Cohn, Williamson, or anyone else to involve him in the editing process for "America's Lethal Politics." See Tr. 520, 636. After Bennet completed his revision at 7:21 p.m., DX-30 at 178, he immediately emailed Williamson, asking her to "[p]lease take a look." PX-163. Bennet testified that his request to "[p]lease take a look" was intended to convey to Williamson

that she should review the piece for fact-checking issues. Tr. 638. This request is incompatible with the inference that Bennet published with actual malice.

Since Bennet was acting as the editor, and since he had not conducted any of the reporting himself, sending a "playback" of the Editorial to the primary author, Williamson, was consistent with Times practices, as they were consistently explained at trial. See Tr. 639, 577. Bennet also submitted his draft to the other editors who were responsible for ensuring the quality, clarity, and accuracy of Editorial Board publications. Accordingly, after Bennet completed his revision, the draft was reviewed, edited, and (in some cases) corrected by Williamson (fact checking), Cohn (editing), Lepping (fact checking), Semple (editing), and Levine and Rakowski (copy editing). See supra § I.D. The thoroughness of these checks was obviously limited by the fact that the print deadline was less than an hour after Bennet saved his draft to Backfield. But the record reflects that this time pressure is routine in the daily newspaper business and not at all suggestive of actual malice.

The Court therefore concludes that, even taking every inference in Palin's favor, Bennet's compliance with these normal pre-publication procedures is consistent with the behavior of a high-ranking editor who is somewhat removed from the reporting details underlying the piece and so was relying on the established processes to ensure that his revisions did not introduce errors. Those processes may have failed in this case; but, nonetheless, Bennet's submission

of the Editorial to several layers of pre-publication review is inconsistent with his intentional or reckless publication of false information.

Second, Bennet's post-publication[33] email exchange with New York Times columnist Ross Douthat about the criticism of the Editorial emerging on Twitter is inconsistent with Bennet having already known or suspected that his revisions introduced falsity. After Douthat explained that the Editorial had the facts of the Loughner case wrong, Bennet responded by stating, in part, that his "understanding was that in the Giffords case there was a gun sight superimposed over her district; so far in this case we don't know of any direct threat against any of the congressmen on the field.... That's not to say ... that the violence in [this] case was caused by the pol[i]tical rhetoric."[34] PX-174. Bennet's response does not specifically insist that he was correct to assert that "the link to political incitement was clear," but he does not state or imply that he believes the

---

[33] See Stern v. Cosby, 645 F.Supp.2d 258, 280 n.14 (S.D.N.Y. 2009) (holding that post-publication statements may be considered as evidence of the defendant's pre-publication state of mind) (Chin, J.).

[34] This email's accurate description of the crosshairs map contrasts with the inaccurate description of the map in the published Editorial and, when viewed in the light most favorable to Palin, could support the inference that Bennet knew that the description of the map Williamson had drafted was false. But Palin does not contend that the inaccuracy in the map's description was a defamatory falsehood; Palin instead complains about the asserted link between her PAC's map and Loughner's attack. Accordingly, no reasonable jury could find that this discrepancy establishes that Bennet published with actual malice as to the falsity of the allegedly defamatory aspects of the Challenged Statements.

Editorial to make a false assertion of fact. Bennet writes instead
that the "specific" link between the crosshairs map and Representative
Giffords does not mean that the map "caused" Loughner's violence, a
message he testified he did not "intend[] to send." Tr. 645.

After checking Twitter to read some of the criticism of the
Editorial, Bennet sent a text message to Williamson asking, about "the
Giffords comparison." DX-46. Bennet asked Williamson, "Do we have it
right?" Id. Even viewing this message and the associated testimony in
the light most favorable to Palin, it suggests that at 11:38 p.m. on
June 14, 2017, Bennet did not know whether the "link" asserted in the
Editorial between the Arizona attack and "political incitement" was
accurate. The late-night message, which Bennet said he sent "[b]ecause
[he] was really worried," Tr. 747, is inconsistent with Bennet having
already known or suspected that the asserted link was false.

Bennet's emails and text messages sent the next morning are also
inconsistent with him having already known or suspected that the
Challenged Statements were false. At 5:08 a.m. -- an "unusual[ly]"
early time for Bennet to be emailing, Tr. 282 -- Bennet told Williamson
and Lepping, in part:

> I don't know what the truth is here but we may have relied too
> heavily on our early editorials and other early coverage of that
> attack. If so, I'm very sorry for my own failure on this
> yesterday. In any case I'd like to get to the bottom of this as
> quickly as possible this morning and correct the piece if needed.
> Can you two please put your heads together on this first thing
> this morning? Please skip the morning meeting if necessary.

PX-191. There are several aspects of this message that undermine the
inference that Bennet had already known or suspected falsity.

First, Bennet states "I don't know what the truth is here." This was an unusual admission: Lepping testified that she had never heard these words from an editor before. Tr. 440. While it may have been negligent for the Times to publish an article that could be read as making a serious accusation without checking if the accusation was true, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action."[35] Liberman, 80 N.Y.2d 438.

The second significant aspect about the email is that Bennet instructed Williamson and Lepping to "get to the bottom of [the factual question] as quickly as possible ... and correct the piece if needed." PX-191. Later that morning, in a text message to Williamson, Bennet reiterated that he "need[ed] ... a rock-solid version" of the correction, which he did not "want to soften if ... we don't need to -- if there was no link we should say so." DX-46 at 2. The Court concludes that these directives are irreconcilable with the suggestion that Bennet purposefully or recklessly published false information. Had he known or suspected the information was false before publication,

---

[35] The Court asked during oral argument for the parties to identify any caselaw that concerned whether the standard for reckless disregard is affected where the allegedly libelous statement had levied serious charges, criminal or otherwise, against the plaintiff. Tr. 1260-1262, 1277. There was extensive argument on this point, and the Court was ultimately persuaded that none of the cases identified by plaintiff's counsel stood for any such proposition that would reduce her burden of proof on actual malice. See generally Tr. 1264-1281.

he likely would have been defensive, avoided issuing a correction to the Editorial, or tried to minimize the correction's confession of error.

The third significant aspect of Bennet's email is his expression of regret for the mistake, which he describes as his "own failure." Bennet's apologetic tone was repeated elsewhere on June 15, 2017. Williamson testified that Bennet was "crestfallen" about the error, Tr. 183, and Bennet's text messages later that morning also reflect that he "fe[lt] lousy about" the error and that he was "sorry." DX-46 at 2. When working on the Twitter posts that would disseminate the first correction, Bennet edited the language proposed by another New York Times staff member to add an apology for the error and thank readers for "call[ing] us on the mistake." DX-53 at 1; Tr. 1033. Bennet also drafted a statement in response to questions from a CNN media reporter in which he stated that "I, James Bennet, do apologize to [Sarah Palin] for this mistake." DX-60 at 2. However, a member of the New York Times Co. public relations staff did not pass along this statement to CNN, so it was never published. PX-236. But for the purpose of assessing Bennet's state of mind, it is not relevant whether the apology ultimately reached Palin. What matters is that, as Bennet testified, "I tried [to apologize] that day. I did -- I thought I had apologized to her. I went home that night thinking I had made a personal apology to the Governor." Tr. 675. The Court concludes that even applying the Rule 50 presumptions, Bennet's private and (intended to be) public expressions of apology, all made before the prospect of

litigation had arisen, are inconsistent with his having intentionally or recklessly introduced the factual error to the Editorial.

Accordingly, the Court's review of the remaining evidence in the record that is relevant to Bennet's pre-publication state of mind weighs heavily and uniformly against finding that he knew or recklessly disregarded that his revisions introduced false statements of fact into the Editorial.

## V.   Conclusion

For the reasons set forth above, the Court finds that Palin adduced no affirmative evidence that Bennet knew that the Challenged Statements were false or recklessly disregarded their probable falsity. The Court is therefore bound to conclude that no reasonable jury could find that Bennet, and therefore The New York Times Co., published "America's Lethal Politics" with actual malice. Clear and convincing proof of knowledge or reckless disregard for falsity is an essential element of a public figure's libel claim. It is required both by Sullivan's construction of the First Amendment and, independently, by N.Y. Civil Rights L. § 76-a(2). Palin thus failed, as a matter of both state and federal law, to carry the heavy burden necessary to prove her libel claim. So the Court was obliged to grant Defendants' Rule 50 motion and dismiss the action with prejudice.

Although the Final Judgment ultimately rests on the Court's dismissal of the action under Rule 50, that legal conclusion is reinforced by the jury's verdict that defendants are not-liable. The Court continues to have great confidence in the integrity of the jury's

verdict, notwithstanding that a few jurors became aware, involuntarily, of the bare fact that the Court intended to dismiss the case as a matter of law. In a case attracting a high degree of public attention, it is inevitable that at least some jurors will encounter information outside the Court's control, even if they are completely conscientious. Here, of course, it was the timing of the Court's announcement of its Rule 50 determination that increased the risk that some jurors would encounter some snippets of the Court's legal conclusion, and that is unfortunate.[36] But the jurors who saw the media coverage say they did as instructed: they turned away from the reports and set the information aside for the remainder of the deliberation. The jurors, both those who reported awareness of the Rule 50 decision and the others, insisted to the Court's law clerk that the information played no role whatsoever in their deliberations and did not affect the outcome. While some outsiders, totally unfamiliar with the exceptional jury in this case,[37] have been quick to assume otherwise,

---

[36] The Court is frank to confess that it was not familiar with the term "push notification" when it was raised by counsel for the Times and did not fully appreciate the potential for jurors to be involuntarily informed about the Court's intended ruling through their smartphones. But it must also be remembered that when defense counsel referred to the term "push notifications," Tr. 1307, the Court responded by doing what defendants' counsel requested, i.e., reminding the jurors of their duty to disregard anything they heard about the case in the media. Defendants' counsel sought no further relief (such as a direction to the jurors to turn off any automated alerts for the duration of the trial) and plaintiff's counsel did not seek any such step or indeed any instruction to the jury whatsoever.

[37] As the Court remarked on several occasions during the trial itself, the jury in this case was a model jury, carefully watching the witnesses, taking copious notes, and in general, showing that they

the Court knows of no reason why the highly conscientious citizens who served as jurors in this case would be so firm that they were unaffected by this information unless it were true. The Court is thus left with the definite conviction that the information did not remotely affect the ultimate verdict.

It also bears repeating that the Final Judgment entered for defendants does not legally depend on the verdict. The verdict could only acquire legal significance if the Court's Rule 50 decision were overturned on appeal and the Court of Appeals then decided to give effect to the verdict rather than remand for retrial.

It remains only to add that the Court's decision to enter judgment as a matter of law also reflected its duty to ensure that public figure libel actions with constitutionally inadequate evidence do not erroneously result in the imposition of liability that might chill protected speech. In libel cases that concern public figures and matters of public concern, the court "must make an independent examination of the whole record so as to assure [itself] that the judgment does not constitute a forbidden intrusion on the field of free expression." Sullivan, 376 U.S. at 285. That principle is no less true in cases where the alleged libel was provably false but neither intentionally nor recklessly so. As the Supreme Court later elaborated:

> [J]udges ... must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation

_____

intended to decide the case based solely on the evidence. See, e.g., Tr. 689, 878, & 1324.

66

> case is of the convincing clarity required to strip the utterance
> of First Amendment protection is not merely a question for the
> trier of fact. Judges, as expositors of the Constitution, must
> independently decide whether the evidence in the record is
> sufficient to cross the constitutional threshold that bars the
> entry of any judgment that is not supported by clear and
> convincing proof of "actual malice."

Bose Corp., 466 U.S. at 510-511; see also Harte-Hanks Commc'ns, 491

U.S. at 697 (reading Bose as requiring "trial judge[s]" to "make their

own 'independent' assessment of the facts allegedly establishing

actual malice") (Scalia, J., concurring). This independent duty to

review the whole record is particularly important where the jury is

tasked primarily with "distinguishing actual malice from mere

negligence," because this is an area in which "jurors have considerable

trouble." Tavoulareas v. Piro, 817 F.2d 762, 807 (D.C. Cir. 1987)

(R.B. Ginsburg, J., concurring). And, as this case demonstrates, the

stakes of the distinction between negligent error and reckless

disregard are significant: the preservation of the "area of breathing

space" that "[o]ur profound national commitment to the free exchange

of ideas, as enshrined in the First Amendment, demands that the law

of libel carve out ... so that protected speech is not discouraged."

Harte-Hanks Commc'ns, 491 U.S. at 686.

For all the reasons set forth above, the Court entered final

judgment as a matter of law in favor of The New York Times Co. and

James Bennet, because no reasonable jury could find that Sarah Palin

proved that the defendants published "America's Lethal Politics" with

actual malice.

SO ORDERED.

New York, NY
March 1, 2022

_____
JED S. RAKOFF, U.S.D.J.

M231PAL1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SARAH PALIN, an individual,

4                  Plaintiff,

5              v.                          17 CV 4853 (JSR)

6   THE NEW YORK TIMES COMPANY, *et
    al.*,

7
                   Defendants.
8
    ------------------------------x          Trial
9
                                             New York, N.Y.
10
                                             February 3, 2022
11                                           9:00 a.m.

12  Before:

13                       HON. JED S. RAKOFF,

14                                           District Judge

15
                           APPEARANCES
16
    TURKEL CUVA BARRIOS, P.A.
17       Attorneys for Plaintiff
    BY:  SHANE B. VOGT
18       KENNETH G. TURKEL

19

20  BALLARD SPAHR, LLP
         Attorneys for Defendants
    BY:  DAVID L. AXELROD
21       JACQUELYN N. SCHELL
         THOMAS BYRNE SULLIVAN
22       JAY WARD BROWN

23

24  Also Present:

25  Dana Green, Senior Counsel, The New York Times Company

M231PAL1

1          (In open court)

2          MR. VOGT:  Could I address one issue with the Court

3   very quickly.

4          THE COURT:  Yes.

5          MR. VOGT:  Our local counsel here doesn't have a seat.

6   We wanted to make sure with the Court it was okay for him to be

7   excused, or should he stay here with us.

8          THE COURT:  Yes, as far as I'm concerned, he can be

9   anywhere you like.  The rules regarding the pandemic are not

10  set by me, but the world's leading expert is my courtroom

11  deputy here, so anything she agrees to is fine with me.

12         MR. VOGT:  I just meant as a matter of practice,

13  because we're admitted *pro hac*, your Honor, if --

14         THE COURT:  I'm sorry, but what is it you want right

15  now?

16         MR. VOGT:  Our local counsel, because we're admitted,

17  is here today --

18         THE COURT:  Yeah.

19         MR. VOGT:  -- if necessary, but if he's not needed, if

20  the Court is okay with us proceeding here without him.

21         THE COURT:  Oh.  Whichever you prefer.

22         MR. VOGT:  Okay.  Thank you, your Honor.

23         THE COURT:  Okay.  Okay.  So the only thing I have to

24  report is that Eileen Lepping, who is one of the Times'

25  witnesses, or I guess maybe both parties' witnesses, anyway,

M231PAL1

1    when she went through security, reported that she had tested

2    positive, so they of course kicked her out, but suggested she

3    go get a PCR test to make sure whether it really was positive.

4    So hopefully she'll be negative.  If not, worst case, in a

5    civil case, particularly with a witness who's not a central

6    witness, we can take it by video, but hopefully that won't be

7    necessary.

8         I want to thank both sides for the updated list of

9    witnesses and witness order.  I do want to advise counsel for

10   both sides that there must always be ready to go the next

11   witness.  I do not ever want to be in a situation where we end

12   one witness and some lawyer says, gee, oh, Judge, I thought it

13   would take an hour later; our witness is somewhere else but

14   will be here shortly.  That's not acceptable.  It's not fair to

15   the jury to just have them sit there and twiddling their

16   thumbs.  So always make sure that the next witness in line is

17   ready to go while a witness is on the stand.

18        Okay.  I think the only issue that we had for this

19   morning until the jury is ready, the jury panel is ready, is

20   any exhibits that either side is going to propose to use in

21   their opening statements.

22        MR. AXELROD:  Yes.  Thank you, your Honor.

23        So last night, Mr. Vogt sent me over a list of about

24   30 exhibits that he intended or may use for opening.  About 16

25   of those we objected to, and so we are in fact worried that

M231PAL1

1    there are so many objectionable exhibits that might infect the

2    jury, and we wanted to talk about that before openings.

3              THE COURT:  So can someone share that list with me.

4              MR. VOGT:  Your Honor, I have actually copies of the

5    exhibits.

6              THE COURT:  All right.  That would be great.  Hand

7    them up.

8              MR. VOGT:  I just need to separate them out.

9              THE COURT:  Excuse me?

10             MR. VOGT:  I just need to separate them out because

11   there are multiple copies.  I was working on the hotel printer.

12             MR. AXELROD:  Your Honor, if I may approach, I have a

13   list, while Mr. Vogt is doing that.

14             THE COURT:  Both sides were supposed to provide me

15   with a box of all the exhibits.  I got them from the defense,

16   but I didn't get them from plaintiff's counsel, which sort of

17   ruined my weekend.  I had to watch television and the playoffs

18   instead of the exhibits from the plaintiff's, and that

19   certainly was a downer, but I survived somehow.

20             So anyway, I have the list.  So going down the list,

21   I'll read off the numbers, and when defense counsel objects,

22   tell me when.

23             4, 5, 6, 7, 17.

24             MR. AXELROD:  Yes, your Honor.  This is where the

25   objections start.

M231PAL1

1    THE COURT:  Okay.  So let me take a look at 17.

2    Incidentally, I remind both counsel that opening

3  statements are strictly limited to 30 minutes, not 31.  So if

4  you were planning to introduce or show the jury 30 exhibits, I

5  guess they're not going to hear much in the way of rhetoric.

6    Okay.  So 17 is a *New York Times* article entitled

7  "Ethical journalism," and it's a modest, what, 30 pages or so.

8  What portion of this are you planning to use on your opening?

9    MR. VOGT:  Do we need to stand, your Honor?

10    THE COURT:  Excuse me?

11    MR. VOGT:  Do we need to stand or --

12    THE COURT:  No, no.

13    MR. VOGT:  We're just using a couple of excerpts out

14  of that.  Those are actually the standards and guidelines that

15  govern the editorial format.

16    THE COURT:  Which portions are you planning to use?

17    MR. VOGT:  Your Honor, we are going to use the section

18  on fact checking.

19    THE COURT:  Well, point me to the page, or Bates

20  stamp.

21    MR. VOGT:  I got these out of order.

22    Page 2 of 36, where it talks about --

23    THE COURT:  Yes.  So which paragraphs there do you

24  want to --

25    MR. VOGT:  Oh, the bottom, the scope of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M231PAL1

1    guidelines, just pointing out that the guidelines actually

2    advise the editorial department as well as editors.

3              THE COURT:  Okay.  What else?

4              MR. VOGT:  And then the "Duty to Our Readers" section,

5    starts on the bottom of page 4 but then it goes on to page --

6    the next page.

7              THE COURT:  I'm sorry.  It starts at the bottom of

8    page 4, and what portion of that are you going to read?

9              MR. VOGT:  And it's actually -- that section goes on

10   to the next page, the top of 5.

11             THE COURT:  I see.  What portion are you going to

12   read?

13             MR. VOGT:  Where, "We tell our readers the complete

14   unvarnished truth as best we can learn it."

15             THE COURT:  Okay.  And what else, if anything?

16             MR. VOGT:  And I believe that is it.

17             THE COURT:  Okay.  So what's the objection?

18             MR. AXELROD:  Well, the objection is, your Honor, this

19   exhibit -- and there are a couple others -- suggests that

20   plaintiff's going to try to make a case that defendants didn't

21   follow their own guidelines, which of course is irrelevant

22   because this is not a negligence case, so I don't know what

23   the --

24             THE COURT:  I'm not sure it's irrelevant.  You are, of

25   course, right it's not a negligence case, but if there is a

M231PAL1

1    deviation from the paper's own standards, why isn't that

2    arguably some evidence -- not sufficient by itself but some

3    evidence -- of hostility?

4              MR. AXELROD:  Well, I think, your Honor, I think it's

5    a stretch to argue that some deviation from a guideline

6    suggests that the times or Mr. Bennet published something

7    false, and what we're doing here is conflating negligence with

8    recklessness, which of course are very different principles.

9              THE COURT:  No, I don't think so.  The objection is

10   overruled.  You may use that on your opening statement.

11             What's next?  That was 17.  18.

12             MR. AXELROD:  Yes, your Honor.  The same objection.  I

13   don't know what they're going to use from this document.

14             THE COURT:  Yes, I need to know that to rule

15   because -- and of course the jury will be told before opening

16   statements that nothing that counsel says is evidence and this

17   is simply to give the jury a heads up of what they hope or

18   expect to prove, not necessarily what they will prove.  But

19   let's see.  So, 18.

20             MR. VOGT:  I have that one here, your Honor.  I didn't

21   pass that one up.  I apologize.

22             THE COURT:  Okay.  Okay.  What portion of that are you

23   planning to read?

24             MR. VOGT:  We have call-outs from the first page where

25   it says, "Our greatest strength is the authority and

M231PAL1

1   reputation --"

2                   THE COURT:  I'm sorry.  I don't mind you sitting, but

3   you have to speak into the microphone.

4                   MR. VOGT:  Yes, sir.  On the first page, the sentence,

5   "Our greatest strength is the authority and reputation of *The*

6   *Times*."  And then beneath that, "*The Times* --"

7                   THE COURT:  What's the relevance of that?

8                   MR. VOGT:  The authority and reputation of *The Times*

9   is directly relevant to the issue of damages.  It's one of the

10  factors courts consider in determining how much harm was done

11  by the publication.

12                  THE COURT:  The harm to *The Times*?

13                  MR. VOGT:  No.  The harm to the plaintiff.

14                  THE COURT:  Yes.  Well, what does this have to do with

15  the harm to the plaintiff?

16                  MR. VOGT:  Well, when it says the greatest strength is

17  the authority and reputation of *The Times* --

18                  THE COURT:  Yeah.

19                  MR. VOGT:  -- the fact that *The Times* has authority in

20  the public and it's recognized.

21                  THE COURT:  Oh, no.  The objection is sustained.

22                  MR. VOGT:  And then beneath that, your Honor, it

23  discusses how "*The Times* and its staff maintain the highest

24  possible standards to ensure that we do nothing that might

25  erode readers' --"

M231PAL1

| | |
|---|---|
| 1 | THE COURT:  Well, that I might allow on the same basis |
| 2 | I allowed the last, although it sounds a little cumulative to |
| 3 | what you just said you were going to put in under 17, but I |
| 4 | will allow it.  But I will repeat for the third and final time, |
| 5 | both sides are given 30 minutes for opening, not 31. |
| 6 | Understood? |
| 7 | MR. VOGT:  Yes, your Honor. |
| 8 | THE COURT:  All right.  Very good. |
| 9 | What's next?  Let's see.  25. |
| 10 | MR. AXELROD:  Yes, your Honor.  We have an objection |
| 11 | to that one as well. |
| 12 | THE COURT:  Okay.  Let me see if I have that. |
| 13 | MR. VOGT:  Your Honor, and we can take this one out -- |
| 14 | THE COURT:  Okay.  Great. |
| 15 | MR. VOGT:  -- to short-circuit that. |
| 16 | THE COURT:  Okay.  Excellent. |
| 17 | 32? |
| 18 | MR. AXELROD:  Same objection as to the previous, 25. |
| 19 | MR. VOGT:  And we can do without that one as well. |
| 20 | THE COURT:  Okay.  33? |
| 21 | MR. AXELROD:  Same objection, your Honor. |
| 22 | MR. VOGT:  We'll do without that one as well, your |
| 23 | Honor. |
| 24 | THE COURT:  Great.  47? |
| 25 | MR. AXELROD:  Yes, objection to 47 and 50.  These are |

M231PAL1

1    two *Atlantic* articles that were covered by our motion *in*
2    *limine*.  And it's not just this.  I suspect that plaintiff's
3    counsel is going to talk about *The Atlantic* and what *The*
4    *Atlantic* reporting was, and for all the reasons in our motion
5    *in limine*, we think that should be kept out of this trial, and
6    based on your summary judgment opinion as well, your Honor.
7                THE COURT:  Well, all I'm dealing with right this
8    second -- and we'll get in a minute to what, if anything, is
9    permitted to be said orally on opening statements -- but even
10   if I were to allow something about *The Atlantic*, I think given
11   the fact that it is at least, at best, open to reasonable
12   dispute whether this would ever come into evidence, I think 47
13   and 50 should not be referred to on the opening statement.
14               All right.  63?
15               MR. AXELROD:  No objection, your Honor.
16               THE COURT:  93?
17               MR. AXELROD:  Yes, your Honor.  93, 96, 97 are all
18   kind of I guess exhibits related to the *New York Times*'
19   marketing campaign.  I can't imagine what the relevance is, but
20   that's the objection.
21               THE COURT:  Well, let me hear from plaintiff's
22   counsel.
23               MR. VOGT:  And your Honor, these are exhibits that
24   have to deal with the truth advertising campaign that was
25   launched shortly before -- as I said, shortly before -- I think

M231PAL1

1    it launched in February of 2017 and this article was then in

2    June of 2017.  And that marketing campaign had posters,

3    billboards, things around town, where *The Times* was professing

4    itself publicly as a purveyor of the truth and talking about

5    how important the truth was and giving the impression to the

6    public, at least, the readers, that what they were reading in

7    the pages of *The Times* is the absolute truth is verified by

8    these.

9                    THE COURT:  So?

10                   MR. VOGT:  And so again, your Honor --

11                   THE COURT:  It's one thing, as in the earlier exhibits

12   that I allowed you to make reference to, to point out that the

13   verification and other ethical rules in *The Times* bind all

14   employees, because at least one potential issue in this case is

15   the difference between the editorial people and the newspeople,

16   but I don't see that *The Times* professes to be telling the

17   truth or even stresses that it's telling the truth, which I

18   suspect may be true of other publications as well.  I haven't

19   yet seen the newspaper or other media that says:  We want you

20   to know we're telling a bunch of lies.  So I'm really not sure

21   what the relevance of this is.  So the objection is sustained.

22                   Okay.  So we're up to 115.

23                   MR. AXELROD:  Your Honor, no objection to 115, 119,

24   135, 142, 160.

25                   THE COURT:  Okay.

M231PAL1

1          MR. AXELROD:  Sorry.  There is an objection to 160.

2          THE COURT:  What's the objection?  In what you just

3     handed up, you didn't indicate an objection to 160, but that's

4     all right.  I won't consider that a waiver.  What's your

5     objection?

6          MR. AXELROD:  The objection, your Honor, this is

7     written by Ross Douthat.  Mr. Douthat is I guess voicing his

8     opinion about what the word "incitement" means.  He, of course,

9     had no role in writing the editorial, and this was written

10    before the editorial was published.  So besides Mr. Douthat

11    having an opinion about the definition of "incitement," which I

12    don't know why that's necessarily relevant, I can't see what

13    the relevance of this would be, especially in an opening

14    statement.

15         THE COURT:  Let me hear from plaintiff's counsel.

16         MR. VOGT:  Your Honor, with respect to the incitement

17    issue, of course one of the main issues in the case is going to

18    be whether how -- whether and how reasonable readers understood

19    the term "incitement," and if there is another person,

20    particularly Mr. Douthat, who had exchanges with Mr. Bennet

21    after this editorial was published, his understanding with

22    respect to the term "incitement" --

23         THE COURT:  Yes, I agree.  It may or may not come into

24    evidence, but I think it's at least sufficiently in the

25    ballpark that I will allow it to be referred to in opening

M231PAL1

1     statement.

2               MR. AXELROD:  Okay.  Your Honor, 165 is another

3     objection to a *New York Times* style and usage document, similar

4     to the earlier objection.

5               THE COURT:  Yes.  What is it in 165, which I'm not

6     sure I have, that plaintiff's counsel is -- let me ask my law

7     clerk to help me out here.

8               We don't have 165.  May I have it?

9               MR. VOGT:  I believe that -- it should just be two

10    pages.  The cover page, it says Manual of Style and Usage on

11    it, and I just included one page of the exhibit.

12              MR. AXELROD:  I've got a seven-page document.

13              THE COURT:  For some reason what was handed up doesn't

14    include it, so do you have another copy?  Does someone have

15    another copy?

16              If you don't have another copy, read me what you're

17    proposing to quote from it.

18              MR. VOGT:  The only thing, your Honor, what we were

19    going to use from that is a call-out of -- there's a definition

20    of "eponymous," which is the namesake of the "of and

21    concerning" issue related to the plaintiff, and the Style and

22    Usage Manual is an instruction manual on how certain terms are

23    supposed to be used.

24              THE COURT:  That's the kind of minutiae that I don't

25    think you should be getting into on opening statements in any

M231PAL1

1    event, so the objection is sustained.

2              171, any objection?

3              MR. AXELROD:  No, your Honor.

4              THE COURT:  174, any objection?

5              MR. AXELROD:  No, your Honor.

6              THE COURT:  175?

7              MR. AXELROD:  Yes, your Honor.

8              THE COURT:  Okay.

9              MR. VOGT:  And we're not going to use that one, your

10   Honor.

11             THE COURT:  Okay.  They're not going to use it.

12             179?

13             MR. AXELROD:  Yes, your Honor.

14             THE COURT:  Okay.  This I do have.

15             What's the relevance of 179?

16             MR. VOGT:  Your Honor, 179, this is an excerpt of a

17   group of reader emails that show how readers actually reacted

18   and responded to The *New York Times* about the editorial itself,

19   which is relevant evidence to show reasonable understanding of

20   the "of and concerning" issue as well as the defamatory issue,

21   as well as it being a statement of fact.

22             THE COURT:  Well, are you saying this goes to damages,

23   or what?

24             MR. VOGT:  No, your Honor.  It goes to whether the

25   article or the editorial was reasonably understood by *Times*

M231PAL1

1    readers, who actually read it, to be of or concerning the

2    plaintiff, whether they read it as being defamatory, and

3    whether they read it as being factual in nature.

4              THE COURT:  You say that's a subjective test or an

5    objective test?

6              MR. VOGT:  It's both, your Honor, and I actually have

7    a case that talks about where one question is the effect of the

8    alleged libel on its readers, the question is one of state of

9    mind of the readers, and that can be proved by secondhand proof

10   of the declaration of the readers.

11             THE COURT:  Let me hear from defense counsel.

12             MR. AXELROD:  Your Honor, what plaintiff's counsel is

13   trying to do is to substitute the jury's findings here by

14   substituting in the opinion of people who are probably not your

15   average reader but people who write to newspapers.  And this

16   goes to the next exhibit, too, who are not your average reader,

17   who are giving their opinion about what the column meant --

18   sorry -- what the editorial meant.  It doesn't make much sense.

19   We can't cross-examine the people about --

20             THE COURT:  First of all, this is purportedly from

21   someone named Scott Armstrong.  Is that the Scott Armstrong or

22   someone else?  I'm asking plaintiff's counsel.

23             MR. VOGT:  I don't know, your Honor.  These were

24   just -- these were emails that were produced by *The New York*

25   *Times* to us.  Reader reaction.

M231PAL1

1          MR. AXELROD:  That's the problem, your Honor.  We

2     don't know who these people are.  We don't know if they are who

3     they actually purport to be; we don't know if these are friends

4     of Governor Palin's who are upset about the editorial.

5          THE COURT:  It starts out, "This is to inform you that

6     in the next several days I will be ending my subscription to

7     *The New York Times*."  So if you thought it was an interloper,

8     you could easily have checked out whether that was true or not

9     and see whether that person had a subscription to *The New York*

10     *Times*.

11          MR. AXELROD:  Well, that's fine, your Honor, but I

12     still don't understand what Scott Armstrong's opinion, being a

13     one-off person, what his opinion about this editorial, what

14     that has to do with the jury's finding about how your average

15     reasonable reader would interpret this.  I mean, I don't know

16     what makes Scott Armstrong's opinion more important than anyone

17     else's or more important than the jury's, whose job is to suss

18     out what the facts are here.

19          THE COURT:  That sounds nice, but how does the

20     plaintiff prove how the reader saw the editorial?  According to

21     at least what plaintiff's counsel is just telling me, it's both

22     an objective and subjective test and you can show anecdotally,

23     in effect, here's how a bunch of readers reacted.

24          MR. AXELROD:  Your Honor, if the shoe was on the other

25     foot and I found a bunch of -- a hundred witnesses who came in

M231PAL1

1    and said they read the editorial a completely different way, I

2    have a hard time believing you would find that acceptable

3    evidence.  I don't understand what the difference is here.

4          But I think to answer your Honor's question, if

5    Ms. Palin had had readers come up or friends come up to her and

6    tell her how they viewed it or -- in fact, Mr. Vogt's going to

7    introduce testimony from Mr. Douthat, who's going to talk about

8    how he understood it, so I think that all that evidence is

9    going to come in, but I think in this form, from a person who

10   cannot be cross-examined about their opinions, we don't know if

11   Mr. Scott Armstrong truly exists.  We don't know anything about

12   him.  I don't know why we'd elevate his opinion over the

13   witnesses that we actually have who are going to testify in

14   this case and are subject to cross-examination.

15         THE COURT:  When were you informed by plaintiff's

16   counsel that he was going to use this particular exhibit on his

17   opening statement?

18         MR. AXELROD:  Last night at about 6:00.

19         THE COURT:  Okay.  I'm going to exclude it, because I

20   think that it would be relevant to the Court's ruling.  I may

21   have to deal with this as an exhibit in this case.  We're just

22   dealing with opening statements now.  But I would need to know

23   more about Mr. Armstrong, etc., etc., and *The Times* I think is

24   in a position to find that out, but not between 6:00 last night

25   and this morning.  So it will be excluded without prejudice to

M231PAL1

1   possibly being introduced at trial.

2          MR. AXELROD:  Thank you, your Honor.

3          And the next exhibit has the same objection.  It's a

4   selection of comments that looks like cherry-picked comments to

5   the editorial that plaintiff I guess wants to show the jury to

6   make the same --

7          THE COURT:  I'm sorry.  This is?

8          MR. AXELROD:  181.

9          MR. VOGT:  And we'll hold off on that exhibit, your

10  Honor.

11         THE COURT:  Okay.  Very good.

12         All right.  So we're up to what, 191?  There was no

13  objection?

14         MR. AXELROD:  No.

15         THE COURT:  204, no objection.

16         So the last two are 236 and 255.

17         MR. AXELROD:  Yes.

18         THE COURT:  All right.  Let me see if I have 236.

19         I have 255.

20         MR. VOGT:  And your Honor, we'll take out 255.

21         THE COURT:  Okay.  236.

22         MR. VOGT:  We'll take out 255.

23         THE COURT:  Oh, 255.  Okay.  So we're down to 236?

24         I don't see that one up here.  So I need to see that.

25  I really need to impress upon plaintiff's counsel that I need

M231PAL1

1    to have, as I already requested previously, a hard copy of all

2    your exhibits, so --

3                MR. VOGT:  Your Honor, they're -- as you know, I had

4    the wedding.  I had stuff shipped up here.  I have them all in

5    folders, but I haven't had a chance to pull them out in the

6    hotel yet.

7                THE COURT:  So what kind of lawyer are you that you

8    weren't doing billable hours during the wedding?  I mean,

9    that's just unheard of.

10               That's fine.  But let's make sure I get it by tonight,

11   let's say, okay?

12               MR. VOGT:  Yes, your Honor.

13               THE COURT:  Very good.

14               Okay.  So let me ask defense counsel, what's 236?

15               MR. AXELROD:  236, your Honor, you know, I don't know

16   why plaintiff's counsel wants to use this, but there are

17   portions of this which are hearsay within hearsay, and I'm

18   guessing that plaintiff's counsel wants to use it to assert for

19   the truth of the matter.  If you look at the back of the

20   document --

21               THE COURT:  I don't have the document.

22               MR. AXELROD:  Oh, I'm sorry.  Here, I'll give you my

23   copy.

24               THE COURT:  Okay.

25               MR. AXELROD:  I'll go off memory.

M231PAL1

1          Look at pages 2 to 3, which are another reporter

2    emailing *The Times* and then quoting what another media entity

3    has written about the editorial.  And I suspect that that's why

4    plaintiff wants to use this.  I think there are other parts of

5    the document that are fine and not objectionable.

6          MR. VOGT:  And that's not the part I'm going to use,

7    your Honor.  The only part of that we wanted to use was a

8    statement by Mr. Bennet that's in it, that they stand by the

9    piece.

10          THE COURT:  I'm sorry.  Where is that?  Because none

11    of this comes from him, right?  So there's the hearsay problem.

12          MR. VOGT:  Right.  And the other parts of it aren't

13    the issue, your Honor.  There is a component of that where

14    Mr. Bennet says --

15          THE COURT:  Well, this is an email from Danielle

16    Rhoades Ha, H-A, vice president of communications of *The Times*,

17    so it is in that sense an exception to the hearsay rule as a

18    statement of a party adversary.  And it's addressed to Oliver

19    Darcy, who is senior media reporter at CNN.  "Hi, Oliver.  The

20    following response is attributable to James Bennet, editorial

21    page editor, *New York Times*, on your most recent email.  A

22    clarification should be posted soon:

23          "'On your second question you write, thank you for

24    calling that to our attention.  We've fixed it.  Yes, criticism

25    on Twitter alerted us to the error.  While it's always

M231PAL1

1    agonizing to get something wrong, we appreciate it when our

2    readers call us out like this.  We made an error in fact in the

3    editorial, and we've corrected it, but that error doesn't

4    undercut or weaken the argument of the piece.'"

5         All of that purporting to be a quote from Mr. Bennet.

6    Now I don't see the hearsay objection.

7         MR. AXELROD:  Your Honor, there is no hearsay

8    objection to that piece.  My hearsay objection is to the end of

9    the email, pages 2 to 3.

10        THE COURT:  I see.  Okay.  So the portion I just read

11   is all you're going to --

12        MR. VOGT:  Yes, your Honor.

13        THE COURT:  So that I'll allow.

14        MR. AXELROD:  Thank you.

15        THE COURT:  Okay.

16        MR. AXELROD:  And then, your Honor, the only other

17   outstanding item is, I'm intending to use Defense Exhibit 74 in

18   my closing -- sorry -- my opening.  It will be one of the four

19   exhibits I use.  Plaintiff's counsel has objected to Defense

20   Exhibit 74.

21        THE COURT:  Okay.  Let me get that out.

22        So aside from the fact that at least the copy you've

23   given me includes a lot of irrelevant items on the right-hand

24   side of articles that a reader may want to take a look at, such

25   as "How to empty your bowels every morning" -- I'm sure the

M231PAL1

1    jury would be thrilled to see that -- but what's the relevance

2    of the portion that you do want to introduce?

3             MR. AXELROD:  So, your Honor, we actually want to use

4    the text of the quote-unquote article that was posted to

5    Ms. Palin's website on I believe it was June 15th.  As you'll

6    see in that article, it makes reference to the allegation that

7    the Loughner shooting in 2011 in Arizona was connected to

8    Ms. Palin and her political action committee.  Of course she

9    says in this case that just that mere allegation has caused her

10   emotional and reputational harm.  The fact that she posted

11   those same allegations to her website prior to the time of the

12   editorial of course is relevant to her state of mind.

13            THE COURT:  Okay.  So this is on Ms. Palin's website,

14   and it's going to be hard to read the date, but it looks like

15   it's -- I assume you're going to blow it up in your --

16            MR. AXELROD:  We are, your Honor.  June 15th, I

17   believe it is.

18            THE COURT:  Yes, June 15th.  So it's before the

19   editorial.

20            MR. AXELROD:  Correct.

21            MR. VOGT:  After.  The editorial was published online

22   on June 14th.

23            THE COURT:  Oh, okay.  Well, let's see.  It's really

24   hard to read, and my ophthalmologist swears I have 20/20 vision

25   once I put on my glasses.

M231PAL1

1          MR. AXELROD:  Your Honor, my paralegal Gianni can put

2     it up on your screen, and we can blow it up any place you want.

3          THE COURT:  Yes, that would be fine.

4          Okay.  I see.  There it is, but it -- yeah, you need

5     to make it -- all right.

6          "On Wednesday, it was revealed that the shooter who

7     opened fire on 25 Congressional Republicans during an

8     Alexandria softball practice volunteered on Senator Bernie

9     Sanders' presidential campaign in 2016.  Washington Free Vegan

10    pointed out the irony of the situation, noting that Sanders

11    fundraised off of false reports that Governor Sarah Palin was

12    to blame for the tragic shooting that injured Representative

13    Gabrielle Giffords in 2011.  Check it out."

14         And then there are two quotes, and then it concludes,

15    "Numerous media outlets blamed Palin for the shooting because a

16    map distributed by her PAC had identified Giffords' district as

17    a target pickup for Republicans.  Nevertheless there was never

18    any evidence found that the shooter was motivated by the

19    governor."

20         Okay.  So what's the relevance?

21         MR. AXELROD:  Your Honor, the fact that Governor Palin

22    put the allegation on her website at the time of the Virginia

23    shooting in 2017 shows that, you know, she was putting -- she

24    was herself publishing the allegations that she was connected

25    to the 2011 shooting and connecting it to the 2017 shooting.

M231PAL1

1    In this case, Governor Palin and her lawyers are going to argue

2    that the 2017 shooting had nothing to do with 2011 and why

3    would they introduce Governor Palin's name into the editorial

4    unless they were trying to hurt her.

5              THE COURT:  This is, at least the one I just read, is

6    she's responding to allegations of that sort.

7              MR. AXELROD:  No, your Honor.  This --

8              THE COURT:  And your adversary says this occurred

9    after *The Times* editorial.

10             MR. AXELROD:  Well, the date may be after *The Times* --

11   *The Times* editorial was published in the paper on June 15th.

12   This does not --

13             THE COURT:  But wasn't it online on the 14th?

14             MR. AXELROD:  It was, but this does not mention the

15   editorial in *The Times*.  There was a later post to Governor

16   Palin's website that does mention the editorial and responds to

17   it, but this one does not mention it at all, so arguably it

18   does not respond to that fact.

19             THE COURT:  No.  I think this is something you may

20   well want to cross-examine Ms. Palin about, but based on the

21   current state of uncertainty, I'm not going to allow it.  So

22   the objection is sustained.

23             MR. AXELROD:  Thank you, your Honor.

24             THE COURT:  All right.  So let me find out from my

25   courtroom deputy what the prediction is.

M231PAL1

1          (Discussion off the record)

2          THE COURT:  So unless anyone else has anything, why

3  don't we take a break for 20 minutes, and we'll reconvene

4  initially here at 10:00.

5          MR. TURKEL:  Judge, I have one question with respect

6  to voir dire.

7          THE COURT:  Yes.

8          MR. TURKEL:  We scoured orders, procedures, etc.  Do

9  you allow -- are you going to allow back-striking?

10          THE COURT:  Do I allow who?

11          MR. TURKEL:  Back-striking.

12          THE COURT:  I don't know what that is.

13          MR. TURKEL:  A panel gets accepted, each side gets a

14  final say to go back and let's say --

15          THE COURT:  I don't know what you're talking about,

16  but let me explain, as I have before --

17          MR. TURKEL:  Right.

18          THE COURT:  -- how I choose juries, which is the way

19  they were chosen in this court for at least 50 years, although

20  now judges use different methods, but I use the old method.

21  That was good enough for Learned Hand and it's good enough for

22  me.

23          So we have, in this case, 82 jurors.  They are in

24  seats numbered 1 through 82.  Because of COVID, some will be in

25  a separate room with video.  So the first 30 or so will be in

M231PAL1

1    the room that you and I and the rest will be, and the others

2    will be in an adjoining room.  We're choosing nine jurors.  I

3    question 1 through 9 on questions for cause.  Maybe one or two

4    of those are excused for cause.  If they are, then No. 10 takes

5    the place of whoever was the first excused, etc.  At that

6    point, after I finish my questioning, each side gets three

7    challenges.  And we do it in rounds.  So in round 1, you will

8    have the first challenge, they will have the second challenge,

9    then we then excuse those two, we replace them with the next in

10   order; we then go to challenge round No. 2.  Same story.  And

11   then after all the challenges are exhausted, we have our jury.

12   So I'm not familiar with your lingo, but is there something

13   different that you had in mind?

14        MR. TURKEL:  It would be -- I've heard it referred to

15   back-striking.  It may be referred as other things.  But if we

16   go around round 1, right, plaintiff says they accept 1 through

17   9, defense doesn't use a challenge either.  Can plaintiff go

18   back then, back-strike --

19        THE COURT:  Okay.  Now I understand.  I've never heard

20   that term before, but here, now I understand your question.  So

21   if in a given round one side waives its challenge, it loses

22   that challenge, but it doesn't lose subsequent challenges.  If

23   in a given round both sides waive their challenges, then we

24   have the jury.  So you cannot go back and recapture a lost

25   challenge, in effect, if that was what your question was.

M231PAL1

1          THE DEPUTY CLERK:  If you don't use it, you lose it.

2          THE COURT:  Obviously my courtroom deputy speaks your

3     language.  Okay?

4          MR. TURKEL:  No, I've got it.  So if both sides lock

5     down with the first nine, don't use the peremptory, that

6     peremptory is gone; you only have two left.

7          THE COURT:  Both sides waive -- I'll repeat again.  If

8     one side waives in a round, they lose that challenge, but we go

9     to the next round.

10          MR. TURKEL:  Right.

11          THE COURT:  If both sides waive in a given round,

12     that's it.  That's the jury.

13          MR. TURKEL:  Got it.  Understood.

14          THE COURT:  Good.

15          MR. TURKEL:  Thank you.

16          THE COURT:  All right.  Anything else?

17          MR. AXELROD:  No, your Honor.  Thank you.

18          THE COURT:  See you at 10:00.

19          THE DEPUTY CLERK:  All rise.

20          (Recess)

21          (In open court)

22          THE COURT:  Please be seated.

23          THE DEPUTY CLERK:  20 minutes.

24          THE COURT:  All right.  So I think one other thing

25     that we needed to cover, although I excluded those documents

M231PAL1

1    relating to *The Atlantic*, the question was what was going to be

2    said about *The Atlantic*.  My recollection of my ruling on the

3    motion *in limine* is that I excluded the article or articles

4    relating to Trig but nothing else saying that it was a question

5    we would have to decide as it came in at trial and reminding

6    counsel to flag it before they asked questions and so forth.

7    Now that doesn't preclude plaintiff's counsel from mentioning

8    something on opening, but what did you have in mind?

9               MR. VOGT:  It's just a general reference, your Honor,

10   with respect to that topic, that we're going to have -- some of

11   the evidence we're going to present to the jury is *Times*' own

12   reporting as well as the reporting of other publications, such

13   as the ones that Mr. Bennet was working for.

14              THE COURT:  Yes.

15              MR. VOGT:  It will be general.

16              THE COURT:  If it turns out that it doesn't come into

17   evidence, of course your adversary, on summation, can say, you

18   know, they said they would produce X and they didn't produce X

19   and so forth.  But regarding opening statements, it is not

20   required that the Court make a definitive ruling on matters

21   that the Court has already indicated are going to be affected

22   by how things come in at trial.  So you can say that much.

23              MR. VOGT:  Thank you, your Honor.

24              THE COURT:  Yes.

25              I'm sorry.  Defense counsel wanted to say something.

M231PAL1

1          MR. AXELROD:  Your Honor, I'll put my objection on the

2     record.  I mean, I think there's a hearsay problem and a

3     relevance problem.  The hearsay problem, of course, is that

4     *Atlantic* publications about the 2011 shooting, I suspect

5     plaintiff will use to assert the truth of the matter asserted.

6     *The Atlantic* was not a party opponent so nothing in there can

7     come in --

8          THE COURT:  No, I think his argument has always

9     been -- correct me if I'm wrong -- that because Mr. Bennet, as

10    the former honcho at the *Atlantic*, could be expected to read

11    everything in *The Atlantic*, he knew about that article before

12    he contributed his portion to the editorial.

13         MR. AXELROD:  I was making my way there, your Honor.

14    Of course that's the main thrust of the argument, but as your

15    Honor found in the summary judgment opinion, the articles that

16    Mr. Vogt wants to use to show to the witness and I guess to

17    talk about to the jury are not technically *Atlantic* articles,

18    and they weren't under Mr. Bennet's purview, so it will create

19    the sense for the jury that Mr. Bennet had something to do with

20    those articles when in reality that is actually not the case.

21         THE COURT:  Well, that's the potential prejudice,

22    which I think maybe can be handled through appropriate

23    limitations on the questioning.  But remind me whether

24    Mr. Bennet was ever asked, either in the hearing in my court or

25    in the discovery, whether he had read those articles.  My

M231PAL1

1    recollection was I think he said he believed he had, although

2    he didn't have a specific recollection.

3              MR. AXELROD:  No.  So Mr. Vogt took Mr. Bennet through

4    a number of the articles, and he said:  Do you remember reading

5    this?  No.  Do you remember reading this?  No.  And then

6    Mr. Vogt said:  Is it possible you read this?  He goes:  Sure,

7    it's possible.  So I mean, I don't really think suggesting it's

8    possible that you read something is enough of a logical

9    connection to let Mr. Vogt and let the jury hear the argument

10   that of course --

11             THE COURT:  Well, forgive me.  I'm sorry.  I didn't

12   mean to interrupt.

13             MR. AXELROD:  That's fine.

14             THE COURT:  Remind me where these articles appeared.

15             MR. AXELROD:  So there's a couple different segments.

16   A lot of them appeared in a blog that a man named Andrew

17   Sullivan ran, which was kind of *Atlantic*-adjacent.  It was a

18   blog that was posted and connected to *The Atlantic* website, but

19   Mr. Bennet had nothing to do with it.  There were also articles

20   posted by *The Atlantic Wire*, which was also part of *The*

21   *Atlantic*, but Mr. Bennet had no -- did not edit those pieces

22   and had nothing to do with them.  And then there's another

23   piece that Mr. Vogt was going to use today which is actually a

24   piece by the *National Journal*, which falls under *The Atlantic*

25   kind of corporate rubric, and it was posted to *The Atlantic*

M231PAL1

1  website, but again, Mr. Bennet had nothing to do with editing

2  the *National Journal* articles.  So everything Mr. -- the

3  plaintiff intends to use, there's really no connection that

4  would, you know, firmly suggest that Mr. Bennet had read those

5  articles in his professional position.

6       THE COURT:  I want to hear from plaintiff's counsel,

7  but just to pursue this first with defense counsel, doesn't

8  plaintiff still have the argument that if Mr. Bennet had

9  checked what was out there in the media, so to speak, before

10 adding what turned out to be the allegedly defamatory language,

11 that he would have picked up these kind of pieces?  What about

12 that argument?

13      MR. AXELROD:  Well, your Honor, I think, A, it's

14 farfetched, A, to suggest that Mr. Bennet, A, should have gone

15 back and checked *Atlantic* articles specifically because he had

16 worked there previously; but also, when you get to the

17 instructions, you're going to instruct the jury the jury's

18 supposed to consider Mr. Bennet's subjective knowledge, not his

19 objective knowledge.  The jury's not asked --

20      THE COURT:  No, no, no.  But in assessing his

21 knowledge, they can assess willful disregard.  If he purposely

22 blinded himself to what was out there, that they can consider.

23      MR. AXELROD:  Well, sure, your Honor.  And maybe it's

24 a hypothetical that's not present here, where Mr. Bennet had

25 some inkling that there was something else out there and maybe

M231PAL1

1    someone suggested, why don't we go back and look at *Atlantic*

2    articles to see if there's something there and Mr. Bennet said

3    no, let's not do that; in that hypothetical, yeah, I would

4    agree with you.  But the facts don't suggest any kind of

5    willful blindness in this case.  Just that there's stuff out

6    there that he didn't look at I don't think is relevant here.

7              THE COURT:  Yes.  Let me hear from plaintiff's counsel

8    exactly what you propose to say about the article in your

9    opening.

10             MR. VOGT:  Twofold, your Honor.  Number one is that we

11   believe it's circumstantial evidence that Mr. Bennet had

12   knowledge of the reporting that was going on at the *Atlantic*

13   and on its website, not that he edited them; that's not really

14   the issue.  It's whether or not --

15             THE COURT:  But at first I thought that was a strong

16   argument because as the former editor and chief and so forth,

17   he would, but now I'm being told this is really not part of the

18   main *Atlantic*, the thing that he was in charge of, the thing

19   that he had been focused on; it was some subsidiary that had a

20   connection to *The Atlantic*.  And so what evidence do you have

21   to suggest that he actually read it?

22             MR. VOGT:  We actually did ask him in his deposition

23   with respect to several of these, whether it's possible that he

24   read them, and he acknowledged that it was.

25             THE COURT:  Well, my understanding of the deposition,

M231PAL1

1    from what defense counsel just told me, he said:  I have no

2    recollection of reading it; I have no recollection of reading

3    this, that, or the other; yes, it's possible I read it.  Is

4    that correct?

5              MR. VOGT:  Yes.

6              THE COURT:  That's I think a fairly thin reed.

7              What was the second thing you were going to say about

8    it?

9              MR. VOGT:  Well, if I could just go back to the first

10   one for just a moment.

11             THE COURT:  Yeah.

12             MR. VOGT:  That goes to a credibility issue, your

13   Honor.  This was a very significant event at the time,

14   something that would have stood out in his mind, he did

15   acknowledge at one point in his testimony.  So to us, it seems

16   a little bit farfetched that he wouldn't have remembered this

17   being reported on by his own publication at the time.

18             Which ties into the second issue, which you brought

19   up, which is, you know, Mr. Bennet knows that at the time of

20   the Loughner shooting, he was in charge of *The Atlantic*.  He's

21   going to have a pretty good idea that *The Atlantic* would have

22   reported on that at the time.  He's acknowledged that it's

23   possible that he read some of these pieces.  And so we do think

24   that that ties in as well to the fact that he purposefully

25   avoided the truth with respect to a publication, your Honor,

M271PAL1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SARAH PALIN, an individual,

4                   Plaintiff,

5            v.                          17 CV 4853 (JSR)

6   THE NEW YORK TIMES COMPANY, *et
    al.*,
7
                    Defendants.
8
    ------------------------------x           Trial
9
                                              New York, N.Y.
10
                                              February 7, 2022
11                                            9:30 a.m.

12  Before:

13                     HON. JED S. RAKOFF,

14                                            District Judge

15
                           APPEARANCES
16
    TURKEL CUVA BARRIOS, P.A.
17        Attorneys for Plaintiff
    BY:   SHANE B. VOGT
18        KENNETH G. TURKEL

19
    BALLARD SPAHR, LLP
20        Attorneys for Defendants
    BY:   DAVID L. AXELROD
21        JACQUELYN N. SCHELL
          THOMAS BYRNE SULLIVAN
22        JAY WARD BROWN

23

24  Also Present:

25  Dana Green, Senior Counsel, The New York Times Company


                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

M271PAL3                          Lepping - Direct

1    related to the shooting; is that right?

2                MS. SCHELL:  Objection.

3    A.   It's possible.

4    Q.   And with respect to any of the information that you recall

5    reading at or around the time of the Loughner shooting, is it

6    correct to say that you do not recall reading any articles that

7    established any link between the map circulated by Sarah

8    Palin's political action committee and the shooting itself?

9    A.   Not that I recall.

10   Q.   And do you recall specifically any pieces that you may have

11   worked on that related to the Loughner shooting?

12   A.   None that I can recall.

13   Q.   Who's the public editor at the *New York Times*?

14               MS. SCHELL:  Objection, relevance.

15               THE COURT:  Sustained.

16               MR. VOGT:  I need to ask some questions about it to

17   demonstrate the relevancy.

18               THE COURT:  Put another question.

19   BY MR. VOGT:

20   Q.   Was there anyone at *The New York Times* whose job it was to

21   point out things that the paper was doing wrong?

22               THE COURT:  The paper was -- I'm sorry -- doing wrong?

23               MR. VOGT:  Yes, your Honor.

24               THE COURT:  I'm not sure what that means, but if the

25   witness understands it, and since there's no objection to this

M271PAL3                          Lepping - Direct

 1  hopelessly vague question, I will allow it.

 2          MS. SCHELL:  Your Honor, I would object to that

 3  hopelessly vague question.

 4          THE COURT:  Sustained.  Thank you.

 5          MS. SCHELL:  Thank you, your Honor.

 6  BY MR. VOGT:

 7  Q.  Was there anyone at *The New York Times* that would publish

 8  stories within the opinion pages that would deal with subject

 9  matters such as the need to do a better job of fact-checking

10  pieces?

11          MS. SCHELL:  Objection, relevance.

12          THE COURT:  Well, before I reach relevance, sustained

13  as to form.

14  Q.  Let me ask you this:  Do you recall at any point in time

15  anyone within *The New York Times* publishing any pieces that

16  dealt with the issue of whether errors were made in reporting

17  in connection with the Loughner shooting?

18          MS. SCHELL:  Objection.  Vague and relevance.

19          THE COURT:  So just so I'm clear what you're trying to

20  get at, you mean other than the various corrections?

21          MR. VOGT:  I'm talking about the 2011 time period,

22  your Honor.

23          THE COURT:  You're talking about the 2011 period.

24          MR. VOGT:  Yes.

25          THE COURT:  And so the question is whether anyone

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M271PAL3                          Lepping - Direct

1    published any pieces in that period that dealt with errors that

2    had appeared in the paper?

3              MR. VOGT:  Errors --

4              THE COURT:  So you need to first establish, if you're

5    going to get there at all, what the underlying article is in

6    2011 that you're referring to.

7              MR. VOGT:  Well, the witness should have a copy of it.

8    Can I show it to the witness?

9              THE COURT:  Well, counsel, put a question.  I just

10   indicated to you how you could get this question fixed, despite

11   all your efforts, and that is, if you think there was a need

12   for some correction at the time, which is apparently what your

13   question seems to refer to, you first have to refer the witness

14   to the article that needed, in your view, correcting.

15             MR. VOGT:  If I can cite for the Court, it wasn't a

16   specific article; it was multiple.

17             THE COURT:  Okay.  Then the objection is sustained.

18             MS. SCHELL:  Thank you, your Honor.

19   BY MR. VOGT:

20   Q.  Do you recall the June 14, 2017, shooting involving Steve

21   Scalise?

22   A.  Yes.

23   Q.  And do you recall how you learned about that shooting?

24   A.  I think it was *The New York Times* breaking news.

25   Q.  And on that date were you working in New York?

M282Pal1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SARAH PALIN, an individual,

                    Plaintiff,

          v.                          17 CV 4853 (JSR)

THE NEW YORK TIMES COMPANY, *et
al*,

                    Defendants.

------------------------------x          Trial

                                         New York, N.Y.

                                         February 8, 2022
                                         9:05 a.m.

Before:

                    HON. JED S. RAKOFF,

                                         District Judge

                         APPEARANCES

TURKEL CUVA BARRIOS, P.A.
     Attorneys for Plaintiff
BY:  SHANE B. VOGT
     KENNETH G. TURKEL


BALLARD SPAHR, LLP
     Attorneys for Defendants
BY:  DAVID L. AXELROD
     JACQUELYN N. SCHELL
     THOMAS BYRNE SULLIVAN
     JAY WARD BROWN


Also Present:

Dana Green, Senior Counsel, The New York Times Company

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

M282Pal1

1         (Trial resumed; jury not present)

2         THE COURT:  All right.  So, I see the draft

3    instruction from defense counsel, but remind me again exactly

4    what occurred.

5         MR. AXELROD:  So, in the hallway yesterday, after

6    court, right after the jury had been dismissed, I witnessed

7    someone — I don't know who they were, they were a member of the

8    public — approach the plaintiff herself while the jurors were

9    in the process of entering the elevator, and I heard him say

10   something like, "I hope you win.  I hate *The Times*."

11        THE COURT:  Okay.  So I may give some curative

12   instruction substantively along the lines of what you

13   suggested, but I think it is too long and really out of

14   proportion to that event, so what I will probably say is, "You

15   may overhear people making comments in the hallway or something

16   like that; don't pay any attention to it; I remind you that you

17   have got to decide this case solely and wholly on the evidence

18   that you hear here in court and put everything else out of your

19   mind," or words to that effect.

20        MR. AXELROD:  Thank you.

21        THE COURT:  However, to avoid any such incidents in

22   the future, or at least minimize the chance of it happening, I

23   have arranged that my courtroom deputy will take the jury to

24   the elevators, and only after they are in the elevators will

25   she then come back to the courtroom, and then the parties can

M282Pal1

1    leave at that time.  So you will need to stay here just a

2    couple of minutes extra just to avoid that situation.

3            Okay.  Now, there are some other matters you wanted to

4    take up, someone wanted to take up?

5            MR. VOGT:  Yes, your Honor.

6            THE COURT:  I thought the main matter we should

7    discuss today, such a beautiful day, there is a touch of spring

8    in the air, so I think the really hard decision is whether we

9    should suspend court altogether and go to Central Park and hang

10   out or continue with the trial, but my law clerk says that his

11   parents are coming to watch the trial today, so that overcomes

12   the temptation.

13           Anyway, go ahead.

14           MR. VOGT:  So, your Honor, there are just a couple of

15   topics, areas, and some potential exhibits we want to get into

16   so we don't have a sidebar during Mr. Bennet's testimony.

17           THE COURT:  Yeah.

18           MR. VOGT:  So the first area that I wanted to get

19   into, very limited, on a very limited basis of questioning, the

20   fact that Mr. Bennet's brother Michael is a U.S. Senator, ran

21   for president in 2020; and then also bring out Mr. Bennet

22   testified that he campaigned with his brother the last two

23   weeks of his 2010 Senate campaign, which would have been the

24   same time period when the map was out, and ask -- and two

25   people on the map endorsed Mr. Bennet; and just ask him

M282Pal1

1    questions about whether that stood out in his head, things of

2    that nature.

3              THE COURT:  Well, I am a little bit skeptical that

4    this has any probative value, but let me hear from defense

5    counsel.

6              MR. AXELROD:  Your Honor, I'm more than skeptical.

7    The fact that Michael Bennet is James Bennet's brother by

8    itself shows nothing, which the law in fact says.  And I assume

9    Mr. Vogt wants to ask the questions so that he can then argue

10   to the jury that Mr. Bennet, of course, must have had some

11   hostility because his brother was a Democratic U.S. Senator,

12   which I don't think is a natural, logical --

13             THE COURT:  Yes.  I think it would be different if his

14   brother had made some comment about the brochure that was

15   distributed by the Sarah Palin PAC or whatever, but there is

16   nothing in the evidence along those lines.

17             MR. AXELROD:  No, there is not.

18             And the idea, of course, if Mr. Bennet went and

19   campaigned, that would have been in October of 2010.

20   Mr. Bennet himself wasn't identified in the crosshairs map; and

21   the idea that two people who are identified in the crosshairs

22   map endorsed Michael Bennet and that somehow James Bennet knew

23   about it and somehow that was his motive, it's so attenuated

24   that I fail to see any relevant value.

25             THE COURT:  I'm inclined to agree on both 402 grounds

M282Pal1

1    and 403 grounds, so that will be precluded.

2             So there was something else counsel wanted to raise.

3             MR. VOGT:  Yes, your Honor, and then there are a few

4    exhibits that we wanted to get into, and this somewhat ties

5    into the Sullivan issue that we were discussing yesterday.

6             THE COURT:  Yes.

7             MR. VOGT:  So we have testimony in the 2011 time

8    period Mr. Bennet was regularly reading *The Atlantic*, *The New*

9    *York Times*, *Washington Post*, *Wall Street Journal*, *Politico*, and

10   *The Drudge Report*; and that he was reading all of those

11   publications to, number one, keep abreast of the news; but

12   then, number two, he also looked at them because he was the

13   editor of *The Atlantic* and was --

14            THE COURT:  So where we left off in this interesting

15   discussion yesterday was what evidence is there that he read

16   *The Daily Dish*?

17            MR. VOGT:  And I didn't openly -- I will say to the

18   Court, I did not ask that particular question at his

19   deposition.  The one thing is I know we mentioned specifically

20   the list that I had shown him of *Atlantic* articles, and your

21   Honor asked yesterday whether any *Daily Dish* pieces were on

22   there, and in fact there is one.

23            THE COURT:  The others are *Atlantic* articles?

24            MR. VOGT:  Some of them are *Atlantic* articles, but

25   some of them are other blog articles as well.

M282Pal1

1          THE COURT:  Tell me what *The Atlantic* articles are.

2          MR. VOGT:  So *The Atlantic* -- well, I want to use

3     three things.  I wanted to use the list and three things.  I

4     don't think these three are *Atlantic* articles.

5          THE COURT:  I see.  *Atlantic* articles I think you

6     would have a stronger position, and that's why I allowed, over

7     objection, your colleague to put the questions yesterday about

8     did Mr. Bennet have a good memory for articles from *The*

9     *Atlantic* or words to that effect.  I can't remember the exact

10    question.  But you were allowed to ask a couple of questions

11    along those lines.

12         But there is a reason the jury could infer that he

13    would read everything or most everything in *The Atlantic*.  I

14    don't see how one can infer that just because he is an avid

15    reader, he read any particular article in some other

16    publication that he has no recollection of.

17         MR. VOGT:  Just to follow up, so when I showed

18    Mr. Bennet this list at his deposition, he said, I must have

19    read at least some of the pieces on that list, and so --

20         THE COURT:  And did you follow up to specify which

21    ones?

22         MR. VOGT:  I did ask him whether he recalled reading

23    one of the ones on the list that I wanted to --

24         THE COURT:  What did he say?

25         MR. VOGT:  He said:  I don't recall reading that

M282Pal1

1      one --

2                  THE COURT:  Oh.

3                  MR. VOGT:  -- which I think is a credibility issue.

4                  THE COURT:  No, no, no.  You know, I don't want to

5      have the debate I had with your --

6                  MR. VOGT:  Understand.

7                  THE COURT:  -- able colleague, but credibility is, of

8      course, an issue in the case, and therefore evidence related to

9      credibility may be relevant.  But the fact that credibility is

10     an issue doesn't mean that something that you have no

11     foundation to offer, or insufficient foundation to offer, comes

12     in.  It still has to meet the standards of 401 and 402.  That

13     is, forgive me, Evidence 101.

14                 MR. VOGT:  I understand, your Honor.  And I wasn't

15     trying to reargue the point.  I was just making sure that we

16     get these out there and that they are identified and that your

17     Honor --

18                 THE COURT:  Well, so --

19                 MR. VOGT:  And there is one more.

20                 THE COURT:  Yes.

21                 MR. VOGT:  There is an article, it is from *The Wire*.

22     It is "Ten Days that Define 2011."  Now, this one, Mr. Bennet

23     does have testimony specifically where it is said that it is

24     possible that he read this one.  Possible.

25                 THE COURT:  Okay.  What does that article say?

M282Pal1

1          MR. VOGT:  This is also the one that is referenced in

2     the Second Circuit opinion that "Loughner is currently

3     incarcerated and undergoing psychiatric treatment . . . .  In a

4     meta media sense, the bad thing to come out of this already

5     terrible story was a round of blame hurling, with people

6     rushing to point at Sarah Palin's infamous target map or

7     Loughner's left seeming (but not really) anti-Bush sentiments.

8     In truth, Loughner is clinically insane and this was not really

9     about politics at all.  That many, including us" --

10         THE COURT:  I'm sorry, this is by whom?

11         MR. VOGT:  This is *The Wire*, which was a partner of

12    the *Atlantic* that published --

13         THE COURT:  I'm saying who wrote the article?

14         MR. VOGT:  Richard Lawson.

15         THE COURT:  And he does give the basis for saying that

16    Mr. Loughner was clinically insane, etc., etc.

17         MR. VOGT:  He doesn't, because it's a "Ten Days that

18    Defined 2011" piece.  It's sort of a summary of what the big

19    stories were.  But regardless of the basis, our point on this

20    one is if it is possible Mr. Bennet read it, this would provide

21    him notice at least that what he was --

22         THE COURT:  To make this relevant, you have to have a

23    foundation for the following: first, that he read it; second,

24    that, at the relevant time of his adding his sentences to the

25    draft editorial, he remembered it and chose to purposely

M282Pal1

| | |
|---|---|
| 1 | disregard it; and that, in some cases, but not in this one, |
| 2 | there would be the further question whether there is any reason |
| 3 | to believe he read it at all, but you seem to have evidence on |
| 4 | that third point with respect to *The Wire*. |
| 5 | So how does it establish the first two points? |
| 6 | MR. VOGT:  Well, your Honor, I don't necessarily agree |
| 7 | that we need to establish the first two points.  I mean, if he |
| 8 | denies that he read it or if that's all he has to do to have |
| 9 | evidence excluded, then we would never get anything in.  I mean |
| 10 | he has denied -- |
| 11 | THE COURT:  No; but, last I remember, the party |
| 12 | offering evidence has the burden to show that it is relevant. |
| 13 | So the burden is on you, not on him, because you are the one |
| 14 | who is offering it and you have to show that it's relevant. |
| 15 | And the -- the theory that both you and your able colleague |
| 16 | seem to be advancing is if there is anything in the world that |
| 17 | appeared that's helpful to your case, and Mr. Bennet denies he |
| 18 | ever saw it, that that makes it admissible.  That's ridiculous, |
| 19 | frankly.  You have to have some basis for showing that he |
| 20 | likely read it and that he had a motive to -- and remembered |
| 21 | it, and he had a motive to disregard it. |
| 22 | Now, in the memory I allowed you, yesterday, to put in |
| 23 | some evidence that might support that.  What's the evidence |
| 24 | that he disregarded? |
| 25 | MR. VOGT:  At this point there is not any.  He just |

M282Pal1

1    says he doesn't recall reading it.  I don't --

2              THE COURT:  I thought you said this was the one that

3    he said he did read.

4              MR. VOGT:  It was possible that he read.

5              THE COURT:  I see.

6              Did you put to him in his deposition any questions

7    about:  Did you have an understanding of Mr. Loughner's mental

8    state or anything like that?

9              MR. VOGT:  I don't believe that I did that

10   specifically, your Honor.

11             THE COURT:  All right.  Well, I will tell you what.  I

12   am not -- based on the current showing, I'm not going to allow

13   it.  But at a break during his testimony, because I assume it's

14   going to go on for some time, I will allow you to put some

15   foundational questions to him outside the presence of the jury

16   on this; and if you can establish more than you have so far, I

17   will reconsider.

18             MR. VOGT:  Or I could -- the one thing I am thinking,

19   your Honor, is perhaps I could ask him some foundational

20   questions, not specifically referencing these documents, when I

21   have him up first --

22             THE COURT:  Well --

23             MR. VOGT:  -- prior to redirect --

24             THE COURT:  -- that may be -- I mean, I will have to

25   hear the question, obviously --

M282Pal1

1          MR. VOGT:  Right.

2          THE COURT:  -- but theoretically that might be another

3     way to handle it.

4          MR. VOGT:  Okay.

5          THE COURT:  Yes.

6          MR. AXELROD:  So, your Honor, the idea that -- I will

7     just raise this in the record now.  The idea that Mr. Bennet

8     read this piece in *The Wire* is almost as tenuous as *The Daily*

9     *Dish* for this reason.  *The Wire*, like *The Daily Dish*, was kind

10    of a separate entity.  Mr. Bennet did not have any day-to-day

11    editing, reviewing, whatever, to do with *The Wire*.  And this is

12    very meta.  Gabriel Snyder, who was the editor of *The Daily*

13    *Wire* or of *The Atlantic Wire* actually published a piece this

14    weekend after seeing argument about this last week, and he

15    writes that *The Wire* was an opinion aggregator, largely

16    summarizing various columns written on news events and issues.

17    He then goes on to say, "I can, as the person who was in charge

18    of reading, reviewing, and editing *The Wire* content, say that

19    it is not certain at all that Bennet was aware of what we

20    published."

21          THE COURT:  So I'm glad you mention that, because you

22    want me to take consideration or the record to reflect an

23    out-of-court hearsay statement made well after the case has

24    gone to trial by someone who has a motive to state what you

25    just stated, counsel.

M282Pal1

1          MR. AXELROD:  Not quite.  I raise it only because this

2     seems like this is the proper forum to raise questions of

3     evidence, you know, under the rules of evidence, and suggest

4     that if this were to become an issue in this case, such that

5     the document was potentially posed to Mr. Bennet, I don't know

6     if I wouldn't come back and ask the Court to allow me to call

7     Mr. Snyder as a witness so he could state, not in hearsay

8     manner, but to this Court exactly what he said in this piece.

9          THE COURT:  Even what he says sounds not like -- it

10    sounds like an opinion and he could only be called as a

11    percipient witness.

12         MR. AXELROD:  Actually, he says, "There was no one

13    else — no fact-checkers, no copyeditors, no top editors —

14    reading our posts before they went up."

15         THE COURT:  So what?

16         MR. AXELROD:  So that is to say that Mr. Bennet had

17    nothing to do with the posts on *The Atlantic Wire*.

18         THE COURT:  But that's not the question.  The question

19    is whether he read it --

20         MR. AXELROD:  Correct, which Mr. Bennet --

21         THE COURT:  -- which this gentleman can't possibly

22    opine on.

23         MR. AXELROD:  Without a doubt.  But Mr. Bennet already

24    testified at his deposition that he doesn't remember reading

25    it.

M282Pal1

1          THE COURT:  I have already ruled in your favor.

2          MR. AXELROD:  Okay.

3          THE COURT:  And notwithstanding the arguments you are

4     now making, I still rule in your favor.

5          MR. AXELROD:  All right.  Thank you.  I will sit down

6     now.

7          THE COURT:  All right.  How are we doing?

8          THE DEPUTY CLERK:  All jurors are present.

9          THE COURT:  All jurors are present.  Okay.  So let's

10    get the witness back on the stand and we can get going.

11          (Witness present)

12          THE COURT:  Good morning.  Please be seated.  You can

13    take off your mask, and the Court reminds you that you are

14    still under oath.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

M2E1PALF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

SARAH PALIN, an individual,

                    Plaintiff,

          v.                              17 CV 4853 (JSR)

THE NEW YORK TIMES COMPANY, *et al.*,

                    Defendants.

------------------------------x          Trial

                                         New York, N.Y.

                                         February 14, 2022
                                         9:44 a.m.

Before:

                    HON. JED S. RAKOFF,

                                         District Judge


                         APPEARANCES

TURKEL CUVA BARRIOS, P.A.
     Attorneys for Plaintiff
BY:  SHANE B. VOGT
     KENNETH G. TURKEL


BALLARD SPAHR, LLP
     Attorneys for Defendants
BY:  DAVID L. AXELROD
     JACQUELYN N. SCHELL
     THOMAS BYRNE SULLIVAN
     JAY WARD BROWN


Also Present:

Dana Green, Senior Counsel, The New York Times Company

M2E1PALF

1    present on this floor at least one lawyer from each side who

2    can respond to any and all questions from the jury, as well as

3    the parties have to be present as well.

4         But the exception is from 1 to 2, and I will apprise

5    the jury through my courtroom deputy that I am excusing

6    everyone for lunch from 1 to 2, so everyone can go and have

7    lunch.  So the bottom line is, I will see you at 2:30 unless we

8    get a note from the jury before then, at which time I will give

9    you a ruling on the Rule 50 motion.

10         MR. VOGT:  Your Honor, I did just want to correct, it

11    was Ms. Lepping.  I misspoke, and I was corrected.  I just want

12    to make sure the Court was aware of it so I wasn't misleading

13    your Honor.

14         THE COURT:  Okay.  Thank you.

15         (Recess pending verdict, 12:06 p.m.)

16         (In open court; jury not present; 2:54 p.m.)

17         THE COURT:  Please be seated.

18         So our jury is hard at work.  Before I turn to the

19    main matter, with respect to the argument that was being made

20    by defense counsel that there was no proof of falsity, I don't

21    agree with that.  I think it is a jury question, but I'll

22    mention in that regard two things:

23         First, the first correction, which appeared on the

24    website *The Times NYT Opinion* on June 15th, states, "We got an

25    important fact wrong, incorrectly linking political incitement

M2E1PALF

1    and the 2011 shooting of Giffords.  No link was ever

2    established."  I think that comes very close to saying that the

3    original statement was untrue.

4                But in addition, I went back and looked at

5    Ms. Lepping's testimony, at page 410, beginning at line 9:

6                "Q.  And did you at any point in time conduct any

7    factual research to determine whether or not a link was

8    established between political incitement and the 2011 shooting

9    of Gabrielle Giffords and the other individuals in Arizona?"

10               "A.  Did I ever, meaning which date?"

11               "Q.  Yes, and I'll clarify.  Do you recall that on

12   June 15th of 2017, you conducted factual research concerning

13   whether or not a link was established between political

14   incitement and the 2011 shooting of Gabrielle Giffords?"

15               "A.  I did, yes."

16               "Q.  And what did that research determine?"

17               "A.  I think the best thing I could find was something

18   in a police report that said it wasn't politically connected."

19               "Q.  And when you say 'it,' you're saying the Loughner

20   shooting was not politically connected; is that correct?"

21               "A.  I think so, to the best of my recollection."

22               Now there were no objections to any of those

23   questions, so all of that evidence was admitted, including the

24   substance of the police report, which otherwise, of course,

25   could have been objected on hearsay grounds, best evidence

M2E1PALF

1    grounds, form grounds, and numerous other grounds, but since

2    none of those objections were made, it was received for all

3    purposes.  And while I'm still bemused that plaintiff's counsel

4    didn't put in the police report which they had marked as an

5    exhibit, here's the essence of it right in the testimony in

6    evidence.  So I think a reasonable jury could, even from just

7    the two items I've mentioned, infer that the editorial was not

8    true, at least the portions of the editorial that are being

9    challenged.

10           Now, though, we come to the more important point, and

11   because I know there are some people in the courtroom who are

12   not lawyers—fortunately—I thought I might make clear just what

13   it is that I've been spending so much time with counsel on

14   beginning last week even before we excused the jury and now

15   continuing through to today, which is a motion under Rule 50 of

16   the Federal Rules of Civil Procedure.  Rule 50(a) says:

17           "If a party has been fully heard on an issue during a

18   jury trial and the Court finds that a reasonable jury would not

19   have a legally sufficient evidentiary basis to find for the

20   party on that issue, the Court may resolve the issue against

21   the party and grant a motion for judgment as a matter of law

22   against the party."

23           Then the rule continues:

24           "A motion for judgment as a matter of law may be made

25   at any time before the case is submitted to the jury," and it

M2E1PALF

1    was in fact so made here.

2            And then just to complete the picture, there's

3    Rule 50(b):

4            "If the court does not grant a motion for judgment as

5    a matter of law made under Rule 50(a), the Court is to consider

6    to have submitted the action to the jury subject to the court's

7    later deciding the legal questions raised by the motion."

8            So I certainly considered the possibility that I

9    should wait until after the jury had rendered its verdict in

10   this case before deciding this motion, but the more I thought

11   about it over the weekend, the more I thought that was unfair

12   to both sides.  We've had very full argument on this, I know

13   where I'm coming out, and I ought to therefore apprise the

14   parties of that.  On the other hand, this is the kind of case

15   that inevitably will go up on appeal, and the Court of Appeals

16   I think would greatly benefit from knowing how the jury

17   decided.  So for example, if I were to dismiss the case as a

18   matter of law for failure to prove an essential element and the

19   jury were to decide to the contrary, then on appeal, the Court

20   of Appeals wouldn't have to send it back for a new trial; they

21   could reinstate the verdict.  And there are other possibilities

22   as well.  So I'm going to give you my decision now, which is

23   essentially, therefore, a 50(a) decision, but I will enter it

24   formally after the jury returns its verdict so it will be in

25   that sense a 50(b) decision.  But I wanted to lay that all out

M2E1PALF

1    and also make clear to the people who are not lawyers that the

2    question before the Court now is whether, taking everything

3    most favorably to the plaintiff, the plaintiff has still failed

4    to prove an essential element of the claim and therefore the

5    claim should be dismissed, which is different from what the

6    jury has to decide.  They can decide that issue in part if they

7    wish but they can also decide just that they think one side has

8    the better case or the other.  It's a different kind of

9    standard.  They are not bound to take things most favorably to

10   one side or the other.

11            So with that long-winded explanation, I think that

12   there is one essential element that plaintiff has not carried

13   its burden with respect to, which is the portion of actual

14   malice relating to belief in falsity or reckless disregard for

15   falsity.  And I want to make clear that although I am required

16   to take everything most favorably to the plaintiff and I have

17   endeavored to do so, this is a very high standard.  This is

18   part of what *New York Times v. Sullivan* is all about.  And of

19   course that's a controversial case, as we all know, but that

20   case sets a very high burden for plaintiffs where the plaintiff

21   is a public figure, like Ms. Palin; the theory being that the

22   Constitution favors a very robust debate involving especially

23   people in power and that the whole point of the First Amendment

24   as applied in that context would be undercut if the standard

25   for libel and defamation were not as high as the Supreme Court

M2E1PALF

1    decreed.  It's a controversial point.  The argument can be made
2    that this opens the door to false accusations being made
3    against public figures, and certainly we all know that that has
4    happened, but the Supreme Court made the balance and set a very
5    high standard.  And I don't think that standard has been
6    realized by plaintiff with respect to at least one aspect of
7    the actual malice requirement.

8         Specifically, I don't think she has adduced sufficient
9    evidence, taken even most favorably to her, that a reasonable
10   juror could conclude that Mr. Bennet either knew that the
11   challenged statements were false or that he thought that there
12   was a high probability they were false and he recklessly
13   disregarded that high probability.

14        As I explained earlier, and really a very important
15   part of what my decision turns on, is the Supreme Court's
16   holding in *Anderson v. Liberty Lobby* that "The judge must view
17   the evidence presented through the prism of the substantive
18   evidentiary burden"—namely, clear and convincing evidence.  And
19   as I also mentioned, this has been adopted, as it must be, of
20   course, as a Supreme Court holding, but further clarified by
21   the Second Circuit in *Contemporary Mission, Inc. v. New York*
22   *Times Company*, 842 F.2d 612, a 1988 decision of the Second
23   Circuit, that places the burden very much on the plaintiff in
24   these situations to come forward with strong, affirmative
25   evidence that before publishing, the author either had actual

M2E1PALF

knowledge that the challenged statements were false or at least

a conscious recognition that they were probably -- some

decisions say highly probably -- false and that he purposely,

consciously chose to disregard that, and that that has been

established by clear and convincing evidence—that is to say, by

a high probability.  So it's a very high standard.

I also think it's worth repeating here what I

instructed the jury, and that is that -- and this embodies both

the federal law and the New York law, which is also applicable

here, and the two laws are really identical when it comes to

this aspect of actual malice.  But I instructed the jury --

this was as part of my Instruction No. 13:

"The first aspect of 'actual malice' you must decide

is whether, at the time the editorial was published,

Mr. Bennet, and therefore The New York Times, (i) knew that

either or both of the allegedly defamatory statements he had

drafted were in fact false; or that, at a minimum, (ii) he

consciously chose to 'recklessly disregard' the high

probability that they were false."

And the instruction continues:

"In considering Mr. Bennet's state of mind, you should

consider all the evidence, including relevant inferences to be

drawn therefrom.  But also keep in mind that the plaintiff must

prove what was in Mr. Bennet's mind by clear and convincing

evidence.  For example, with respect to 'reckless disregard,'

M2E1PALF

1    it is not enough just to show that Mr. Bennet did not know, one

2    way or the other, whether the challenged statement you are

3    considering was true or false.  Nor is it enough to prove that

4    he was merely negligent regarding that statement's truth or

5    falsity.  For instance, a failure to sufficiently investigate

6    or to research a particular point does not establish actual

7    malice, unless the plaintiff has demonstrated that such

8    inaction was a conscious, deliberate attempt to avoid

9    confirming the statement's probable falsity.  Even

10   irresponsible reporting or a demonstrated failure to follow

11   professional, journalistic standards does not, on its own,

12   establish actual malice, unless the plaintiff has proved that

13   there was a high probability that Mr. Bennet actually doubted

14   the truth of the challenged statement you are considering and

15   nevertheless consciously chose to disregard the high

16   probability that the statement was false."

17          So as that illustrates, the standard is very high, and

18   the same standard applies here except that, as mentioned, I

19   have to take everything most favorably to the plaintiff in

20   terms of construing the evidence.

21          So I think it is common ground that the plaintiff here

22   is not relying on actual affirmative proof that Mr. Bennet knew

23   that his statements were false but rather on reckless

24   disregard, and plaintiff has not identified any prepublication

25   email in which Mr. Bennet suggests in any respect the probable

M2E1PALF

1    falsity of the suggestion that the crosshairs map helped cause

2    Loughner to mount his violent attack.  Indeed, as mentioned

3    this morning, in PX 119, Bennet's prepublication email

4    proposing the framing for the editorial shows his preexisting

5    belief that violent right-wing rhetoric incited Loughner's

6    attempted assassination of Representative Giffords, and

7    although he doesn't mention there the map or Sarah Palin, it

8    shows what his belief was, and it really has not been

9    contradicted that he had any different belief at the time.

10        Plaintiff relies on several pieces of research

11   circulated by the editorial team that plaintiff says made

12   Mr. Bennet aware that it had been determined that Mr. Loughner

13   was not inspired to act by the crosshairs map.  It's by no

14   means clear that Mr. Bennet read these articles, and we know

15   that he specifically denies reading at least one of them, but

16   in any event, as I pointed out again this morning, all these

17   columns—Plaintiff's Exhibits 133, 134, 135—give opinions on

18   both sides of that issue and hardly suggest that there is the

19   kind of much more definitive showing as there is in the police

20   report or in the ABC investigation contradicting his good-faith

21   belief.

22        It is true that the argument could be made that he

23   should have looked at the hyperlinked ABC News article under

24   the word "circulated" that accompanied Ms. Williamson's draft.

25   That is in Plaintiff's Exhibit 142.  But negligence, as

M2E1PALF

1    previously mentioned, would not be enough to sustain

2    plaintiff's burden.  In any event, aside from the fact that

3    it's uncontradicted that Mr. Bennet did not open the link, it's

4    perfectly plausible that he would have no reason to open the

5    link since it was linked to the question of circulation, which

6    was really never in doubt—circulation, that is to say, of the

7    crosshairs map.

8         The allegation that he published with actual malice is

9    also undermined, in the Court's view, by the actions he took

10   after finishing his revisions of Ms. Williamson's draft.  For

11   while it's undisputed that an article's author has primary

12   responsibility for fact-checking and accuracy, Mr. Bennet,

13   after revising the editorial, emailed Ms. Williamson, alerting

14   her that he had completed a "heavy edit" and asking her to

15   "please take a look."  This is Plaintiff's Exhibit 163.

16   Mr. Bennet testified that by asking Ms. Williamson to take a

17   look, he meant for her to fact-check the revision, and of

18   course no revision came back from Ms. Williamson or anyone else

19   regarding the issues that are here the subject of the claim of

20   defamation.

21        It is true, of course, that after the editorial was

22   first published, Ross Douthat, on the evening of June 14th,

23   questioned whether the information was all correct, and

24   Mr. Bennet responded by immediately saying, well, this was his

25   understanding but he would pursue it further, and he pursued it

M2E1PALF

1    further to the corrections that were shortly issued.

2                Now I'm not altogether happy with having to make this

3    decision on behalf of the defendant.  As I indicated earlier, I

4    am troubled by the fact that the erroneous edits made by

5    Mr. Bennet reasonably could be read by many readers as an

6    accusation that Ms. Palin's PAC's distribution of the

7    crosshairs map was clearly and directly linked to the Loughner

8    shooting and concomitant murders, and as I mentioned this

9    morning, I'm hardly surprised, therefore, that Ms. Palin

10   brought this lawsuit, for even though *The Times* corrected,

11   perhaps not perfectly in any event, the accusation in fairly

12   quick time, it means that Ms. Palin was subjected to an

13   ultimately unsupported and very serious allegation that

14   Mr. Bennet chose to revisit seven years or so after the

15   underlying events.  So I don't mean to be misunderstood.  I

16   think this is an example of very unfortunate editorializing on

17   the part of *The Times*.  But having said that, that's not the

18   issue before this Court.  My job is to apply the law.  The law

19   here sets a very high standard for actual malice.  And in this

20   case, the Court finds that that standard has not been met.

21   Accordingly, I will ultimately issue an order pursuant to

22   Rule 50 dismissing the complaint, but I will only do so after

23   the jury has returned its verdict.  And they of course will not

24   know about my decision, and therefore, we will have both the

25   benefit of my decision on the law and their decision on the

M2E1PALF

1  facts, if you would, on the different standard that they apply,

2  and therefore the Court of Appeals will have the benefit of

3  both determinations before it when it views the inevitable

4  appeal.

5          So needless to say, the plaintiff is deemed to have

6  objected to my decision, and that is preserved for appeal as

7  well.

8          Anything else that either counsel wanted to raise on

9  this subject?

10          MR. VOGT:  No, your Honor.

11          MR. AXELROD:  No, your Honor.

12          THE COURT:  All right.  So I'm going to go deal with

13  another matter that I have at 3:30 in a different courtroom,

14  but of course we should ask the jury whether they want to stay

15  past 3:30 today.  So let's do that before that.  I'll stay here

16  until we find out the answer to that.

17          THE DEPUTY CLERK:  Okay.

18          (Pause)

19          MR. AXELROD:  Your Honor, while we're waiting, would

20  you want to make the submissions that the parties submitted

21  over the weekend part of the record?

22          THE COURT:  Sure, if you want.  That's fine with me.

23  The case citations, you're talking about?  Sure.  I'll have my

24  law clerk make sure those are docketed.

25          MR. AXELROD:  Thank you.

**ADDENDUM B TO FORM C**
**Proposed Issues for Appeal and Standard of Appellate Review**

As set forth in her Amended Notice of Appeal, Appellant-Plaintiff Sarah Palin proposes to raise in this appeal the question of the correctness the Final Judgment entered in this action on February 15, 2022 [Doc. 171] ("Final Judgment"), and any and all orders and rulings antecedent and ancillary thereto, including (without limitation) the following: the February 14, 2022 oral and March 1, 2022 written [Doc. 196] rulings granting judgment as a matter of law under *Fed. R. Civ. P.* 50; the February 15, 2022 Jury Verdict [Doc. 173]; the August 28, 2020 Order and Opinion [Doc. 117] (on summary judgment); the December 29, 2020 Memorandum Order [Doc. 125] (applying N.Y. Civil Rights Law § 76-a, as amended on November 10, 2020, to this action); the May 31, 2022 Order and Opinion [Doc. 203] (denying post-trial motions and motion for disqualification). This appeal is inclusive of any and all interlocutory judgments, decrees, decisions, rulings, verdicts, and opinions that merged into and became part of the Final Judgment, that are related to the Final Judgment, and upon which the Final Judgment is based.

In support of her appeal, Appellant proposes to raise the following sub-issues:

1. Whether the District Court erred in in its August 28, 2020 decision [Doc. 117] denying Appellant's motion for partial summary judgment seeking a determination that the actual malice rule established in *Times v. Sullivan* should no longer be applied. This issue is subject to a *de novo* review.

2. Whether the District Court erred in its December 29, 2020 ruling [Doc. 125] that N.Y. Civil Rights Law § 76-a, as amended on November 10, 2020, applies retroactively to this action and therefore requiring Appellant to prove actual malice by clear and convincing evidence under New York state law. This issue is subject to a *de novo* review.

3. Whether the District Court erred in its August 28, 2020 ruling [Doc. 117] and at trial by requiring Appellant to establish actual malice as to defamatory meaning (in addition to actual malice as to falsity). This issue is subject to a *de novo* review.

4. Whether the District Court erred during jury selection by conducting a voir dire that failed to adequately address juror's backgrounds, potential biases, and exposure to media coverage. This issue is subject to an abuse of discretion review.

5. Whether the District Court erred by failing to follow this Court's decision in *Palin v. The New York Times Company*, 940 F.3d 804, 808-809 (2d Cir. 2019) and/or the controlling precedent and legal principles discussed therein when it excluded significant evidence of actual malice at trial, including evidence associated with Bennet's brother and articles about the Loughner shooting published while Bennet was Editor of *The Atlantic*. This issue is subject to a mixed *de novo*/abuse of discretion review.

6. Whether the District Court erred by failing to follow this Court's decision in *Palin v. The New York Times Company*, 940 F.3d 804, 808-809 (2d Cir. 2019) and/or the controlling precedent and legal principles discussed therein when it granted judgment as a matter of law under Rule 50 [Doc. 196]. This issue is subject to a *de novo* review.

7.    Whether the District Court erred in reaching its decision to grant judgment as a matter of law under Rule 50 [Doc. 196] by accepting Bennet's testimony as true, drawing inferences in favor of Appellees, disregarding research Bennet read before publication of the Editorial, explaining away other circumstantial evidence of actual malice. disregarding critical evidence favorable to Appellant, discrediting Appellant's evidence, and impermissibly substituting its judgment concerning the weight of the evidence for the jury's.  This issue is subject to a *de novo* review.

8.    Whether the District Court erred by announcing its Rule 50 decision during jury deliberations, which resulted in jurors being exposed to push notifications that disclosed the substance of the Rule 50 dismissal during their deliberations.  This issue is subject to a *de novo* review.

9.    Whether the District Court erred by improperly instructing the jury, in response to its July 15, 2022 question during deliberations, that "an answer given by Mr. Bennet and a reasonable inference drawn therefrom is not sufficient in itself to carry the plaintiff's burden…" to prove actual malice.  This issue is subject to a *de novo* review.

10.    Whether the District Court erred by denying Appellants' motion for disqualification [Doc. 203].  This issue is subject to an abuse of discretion review.

11.    Whether the District Court erred in denying [Doc. 203] Appellant's Omnibus Post-Trial Motions seeking vacatur, relief from, rehearing, and/or reconsideration of the verdict and Final Judgment and for a new trail based on jurors' exposure to push notifications disclosing the Rule 50 decision during deliberations.  This issue is subject to an abuse of discretion review.

12.    Whether the District Court erred in denying [Doc. 203] Appellant's Omnibus Post-Trial Motions seeking vacatur, relief from, rehearing, and/or reconsideration of the verdict and Final Judgment and for a new trail based on the District Court's improper jury instruction that "an answer given by Mr. Bennet and a reasonable inference drawn therefrom is not sufficient in itself to carry the plaintiff's burden…" to prove actual malice in response to the jury's February 15, 2022 question.  This issue is subject to an abuse of discretion review

13.    Whether the District Court erred in denying [Doc. 203] Appellant's Omnibus Post-Trial Motions seeking vacatur, relief from, rehearing, and/or reconsideration of the Rule 50 oral and written [Doc. 196] decisions and Final Judgment and for a new trial based on the District Court's failure to follow this Court's decision in *Palin v. The New York Times Company*, 940 F.3d 804, 808-809 (2d Cir. 2019) and/or the controlling precedent and legal principles discussed therein when it excluded significant evidence of actual malice at trial and/or granted judgment as a matter of law under Rule 50 [Doc. 203] by accepting Bennet's testimony as true, drawing inferences in favor of Appellees, disregarding research Bennet read before publication of the Editorial, explaining away other circumstantial evidence of actual malice. disregarding critical evidence favorable to Appellant, discrediting Appellant's evidence, and impermissibly substituting its judgment concerning the weight of the evidence for the jury's.  This issue is subject to an abuse of discretion review.