```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------x
SARAH PALIN,                              :
                                          :
                                          :    17-cv-4853 (JSR)
         Plaintiff,                       :
                                          :    OPINION AND ORDER
         -v-                              :
                                          :
THE NEW YORK TIMES COMPANY and JAMES      :
BENNET,                                   :
                                          :
         Defendants.                      :
-----------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Familiarity with the prior proceedings in this action is here assumed. As relevant here, on December 30, 2019, plaintiff Sarah Palin filed an amended complaint against defendants the New York Times Company (the "Times") and James Bennet, alleging that they had defamed her in an editorial (the "Editorial") published on June 14, 2017. Dkt. 70. After the completion of discovery, both sides filed motions for summary judgment that are now ripe for decision.

Both motions relate to the proposition that a public figure cannot recover for defamation unless the defamatory statement was made with "actual malice." See New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964). Specifically, plaintiff moves for partial summary judgment on the basis of her assertion that the requirement is no longer good law or at least does not apply to this case. Dkt. No. 95; Plaintiff's Memorandum of Law

1

in Support of Plaintiff's Motion for Partial Summary Judgment
("Pl. Mem."), Dkt No. 100; Plaintiff's Reply Memorandum of Law
in Opposition [sic] to Plaintiff's Motion for Partial Summary
Judgment ("Pl. Reply"), Dkt. No. 112. Defendants oppose.
Defendants' Memorandum of Law in Opposition to Plaintiff's
Motion for Partial Summary Judgment ("Defs' Opp."), Dkt. No. 104

Conversely, defendants, maintaining that the actual malice
standard fully applies here, seek summary judgment on the ground
that no reasonable jury could find, based on the evidence of
record, that the allegedly defamatory statements were published
with actual malice. Dkt. No. 94; Defendants' Memorandum of Law
in Support of their Motion for Summary Judgment ("Defs' Mem."),
Dkt. No. 96; Defendants' Reply Memorandum of Law in Support of
their Motion for Summary Judgment ("Defs' Reply"), Dkt. No. 113.
Plaintiff opposes. Plaintiff's Memorandum of Law in Opposition
to Defendants' Motion for Summary Judgment ("Pl. Opp."), Dkt.
No. 107.

I.    Factual Background[1]

---

[1]    On a motion for summary judgment, the Court construes all
facts in the light most favorable to the non-moving party.
Ordinarily, when faced with cross-motions for summary judgment,
a district court would "evaluate each party's motion on its own
merits, taking care in each instance to draw all reasonable
inferences against the party whose motion is under
consideration." Schwabenbauer v. Bd. of Educ. of Olean, 667 F.2d
305, 314 (2d Cir. 1981). Here, however, plaintiff's motion for
partial summary judgment presents a pure question of law and
does not depend on the evidence in this case. Therefore, the

Plaintiff Sarah Palin is the former governor of Alaska and a former vice-presidential candidate. See Defendants' Statement of Undisputed Material Facts, Dkt. No. 97, ¶ 1; Plaintiff's Response to Defendants' Local Rule 56.1 State of Material Facts & Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment ("Pl. SUMF"), Dkt. No. 108, ¶ 1.[2] Defendant The New York Times Company (the "Times"), a New York corporation, is a global media organization that publishes The New York Times daily newspaper. First Amended Complaint ("FAC"), Dkt. No. 70, ¶ 6. Defendant James Bennet was at all times relevant to this lawsuit the editor overseeing opinion journalism at the Times, including masthead editorials by the Times Editorial Board. Pl. SUMF ¶ 3.

On June 14, 2017, defendant The Times published the Editorial, authored (in the segments here relevant) by defendant Bennet, which identified a "familiar pattern" of politically motivated violence and criticized members of Congress for supporting permissive gun regulations. Pl. SUMF ¶ 348. The Editorial identified two instances of mass shootings "fuel[ed]" by politics: (1) James Hodgkinson's June 14, 2017 armed attack

---

following facts are either undisputed or, where disputed, taken most favorably to plaintiff.

[2]    Where a fact is undisputed, the Court cites to plaintiff's Rule 56.1 statement.

on members of Congress at a baseball field in Virginia, which seriously wounded U.S. Congressperson Steve Scalise; and (2) Jared Lee Loughner's January 8, 2011 armed attack in Arizona, which seriously wounded U.S. Congressperson Gabby Giffords.[3] Declaration of Thomas B. Sullivan ("Sullivan Decl."), Dkt. No. 99, Ex. 40.

Describing Loughner's 2011 attack, the Editorial stated: "[T]he link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs."[4] Id. The Editorial contrasted the Loughner attack with that day's Hodgkinson shooting, where there was "no sign of incitement as direct as in the Giffords attack." Id. The Editorial did, however, include a hyperlink to an ABC News Article titled Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate, published

---

[3]     Although not relevant to the issues here presented, it certainly should not be forgotten that Loughner's shooting also resulted in the death of six people, including U.S. District Judge John Roll.

[4]     The Palin committee's circular is hereinafter referred to as the "Map." Although plaintiff purports to dispute that the marks on the circular were crosshairs, see Pl. SUMF ¶ 7, even the most causal interpretation of the circular definitively rebuts plaintiff's suggestion, and there is no evidence of record to the contrary. And, in any event, even plaintiff does not suggest that the defendants acted with actual malice in describing the marks as crosshairs.

the day after Loughner's 2011 attack, which stated that "[n]o connection has been made between [the Map] and the Arizona shooting." Pl. SUMF ¶¶ 37, 40.

The Editorial was the product of discussions that occurred over the course of June 14, 2017. Soon after the Hodgkinson attack, evidence emerged that Hodgkinson was a supporter of Senator Bernie Sanders and an opponent of President Donald Trump. Id. ¶ 20. In an email thread between Editorial Board members discussing whether and how to cover the shooting, Bennet suggested writing about "the rhetoric of demonization and whether it incites people to this kind of violence." Sullivan Decl. Ex. 11. In particular, Bennet said that "if there's evidence [surrounding the Hodgkinson shooting] of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting) we should deal with that." Id.

Another member of the Board, Elizabeth Williamson, then researched the Hodgkinson and Loughner shootings and wrote the first draft of the Editorial. Pl. SUMF ¶ 35. Her draft referred to the fact that there had been some debate in the media in the wake of the Loughner shooting regarding whether there existed a connection between the shooting and the Map. See Sullivan Decl. Ex. 24. But Williamson's draft did not affirmatively state that such a connection had been established. See id. The draft also

5

included the hyperlink to the above-mentioned ABC news article.
Id. As relevant here, Williamson's draft read:

> Just as in 2011, when Jared Lee Loughner opened fire
> in a supermarket parking lot, grievously wounding
> Representative Gabby Giffords and killing six people,
> including a nine year-old girl, Mr. Hodgkinson's rage
> was nurtured in a vile political climate. Then, it was
> the pro-gun right being criticized: in the weeks
> before the shooting[,] Sarah Palin's political action
> committee circulated a map of targeted electoral
> districts that put Ms. Giffords and 19 other Democrats
> under stylized crosshairs.

Bennet received the draft around 5:00 p.m. Pl. SUMF ¶ 335.
After reading the draft, Bennet, who was ultimately responsible
for the content of such editorials, decided it needed
substantial revision and began rewriting it himself. Id. ¶ 51.
Around 7:30 p.m., Bennet sent a revised draft back to
Williamson, asking her to "[p]lease take a look." Id. ¶ 66.
Without further relevant changes, the Editorial, as revised by
Bennet, was published around 9:00 p.m. Id. ¶ 73.

Around 10:00 p.m., Ross Douthat, a Times opinion writer,
reached out to Bennet via email to express concern over the
Editorial. Sullivan Decl. Ex. 21. Douthat explained that there
was "no evidence that Jared Lee Loughner was incited by Sarah
Palin or anyone else, given his extreme mental illness and lack
of any tangible connection to that crosshair map." Id. A few
minutes later, Bennet responded that his "understanding [is]
that in the Giffords case there was a gun sight superimposed

over her district; so far in this case we don't know of any direct threat against any of the congressman on the field. That's not to say that any of it is ok, obviously, or that the violence in either case was caused by the poltical [sic] rhetoric. But the incitement in this case seems, so far, to be less specific." Id.

That night, Bennet reached back out to Williamson to see whether she was available to start investigating Douthat's concerns. Pl. SUMF ¶ 99. Early the next morning, Bennet emailed a larger group of people, instructing them to "get to the bottom of this as quickly as possible." Id. ¶ 101.

Less than a day after the Editorial's publication, after having found no evidence of the "link" to which it referred, the Times revised and corrected the Editorial. The Times published the first revised online version at 11:15 a.m. on June 15, 2017. Id. ¶ 106. In it, the Times deleted the phrases "the link to political incitement was clear" and "[t]hough there's no sign of incitement as direct as in the Giffords attack" and added the sentence "But no connection to that crime was ever established." Id. In addition, the Times published a series of corrections, which ultimately clarified that no link between political rhetoric and the 2011 shooting of Representative Gabby Giffords was ever established. Id. ¶ 109.

Despite these prompt corrections, plaintiff chose to sue the Times, and filed her initial complaint less than two weeks later. Dkt. No. 1. After an evidentiary hearing convened with the consent of both parties,[5] this Court dismissed plaintiff's complaint in its entirety, holding that she had failed to plausibly allege that the Editorial was published with actual malice, as required by the First Amendment. Dkt. No. 45. The Second Circuit reversed, holding, inter alia, that plaintiff's proposed (though not yet filed) amended complaint had sufficiently alleged actual malice. Palin v. New York Times Co., 940 F.3d 804, 813 (2d Cir. 2019). Soon thereafter, on December

_____

[5]     The hearing was something of an innovation, designed to allow a court to better assess the "plausibility" standard that the Supreme Court requires district courts to apply on a motion to dismiss a complaint, see Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), by providing the court with enough context to make that determination. After all, how can a judge assess whether a claim is "plausible" if it involves conduct that occurred in a setting with which the judge is totally unfamiliar? But even though the hearing was consented to by all parties, the Second Circuit held that such a hearing is not countenanced by the Federal Rules of Civil Procedure. Palin v. New York Times Co., 940 F.3d 804, 807 (2d Cir. 2019). Of course, the judge-made "plausibility" standard is not mentioned in the Federal Rule of Civil Procedure either. And in the roughly analogous setting of class certification, the Second Circuit, having at one time insisted that a district court could not look beyond the complaint in determining whether to certify a class, see Caridad v. Metro-North Commuter, R.R., 191 F.3d 283, 292-93 (2d Cir. 1999), later reversed its position because it recognized that a court may often have to look at matters beyond the complaint to fulfill its gatekeeping role, see In re Initial Public Offerings Securities Litigation, 471 F.3d 24, 41-42 (2d Cir. 2006)

30, 2019, plaintiff filed the amended complaint, naming Bennet as a co-defendant. Dkt. No. 70. After full discovery, the parties filed, briefed, and argued their cross-motions for summary judgment.

## II.  General Legal Standards[6]

Under Rule 56(a) of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In reviewing the record, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Although the party opposing summary judgment may not "rely on mere conclusory allegations nor speculation," D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), if "there

---

[6]    Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper," Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

"Under New York law,[7] a plaintiff must establish five elements to recover in libel: 1) a written defamatory statement of fact concerning the plaintiff; 2) publication to a third party; 3) fault (either negligence or actual malice depending on the status of the libeled party); 4) falsity of the defamatory statement; and 5) special damages or per se actionability (defamatory on its face)." Celle v. Filipino Reporter Enterps. Inc., 209 F.3d 163, 173 (2d Cir. 2000). Furthermore, as discussed at length below, under here applicable federal law binding on the states, a public figure claiming defamation or libel must establish that the statements at issue were published with actual malice — that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." Palin, 940 F.3d at 809 (quoting New York Times, 376 U.S. at 280). Further still, a court ruling on a motion for summary

---

[7]     This Court and the Second Circuit have already held that New York law (along with certain federal constitutional requirements) governs plaintiff's claim. See Palin v. New York Times Co., 264 F. Supp. 3d 527, 533 n.4, rev'd on other grounds by Palin, 940 F.3d 804.

judgment on actual malice "must be guided by the New York Times 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists — that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." Anderson v. Liberty Lobby, 477 U.S. 242, 257 (1986).

III. Plaintiff's Motion for Partial Summary Judgment

Plaintiff's motion for partial summary judgment presents a pure question of law: whether plaintiff is required to prove that the allegedly libelous statements at issue in this case were published with "actual malice." Pl. Mem. at 1. There is no dispute that plaintiff is a public figure and must therefore, under seemingly well-settled law, prove that the statements were published with actual malice. See Palin, 940 F.3d at 809-10; see generally New York Times Co. v. Sullivan, 376 U.S. 254 (1964). What plaintiff is really asking, then, is for this Court either to "overrule" New York Times v. Sullivan or else to distinguish that case on the facts and refuse to apply the actual malice rule here. Pl. Mem. at 8, 13. To the extent those are, in fact, different requests, the Court declines them both.

While plaintiff acknowledges that the actual malice rule of New York Times and its progeny is well-established, see, e.g., id. at 6, she fundamentally misunderstands the doctrine of stare decisis that makes that rule binding on this Court. Plaintiff

alludes to the "factors considered in deciding whether to overrule precedent" and notes in particular that "constitutional questions are less susceptible to stare decisis." Id. at 10 (citing Janus v. American Fed'n of State, County, and Mun. Emps. Council 31, 138 S. Ct. 2444 (2018); Kimble v. Marvel Entm't, LLC, 576 U.S. 446, 456 (2015)). But those factors, and those cases, pertain to horizontal stare decisis, whereby a court determines whether its own prior precedent remain binding on that court. See Dodge v. Cty. of Orange, 282 F. Supp. 2d 41, 79 (S.D.N.Y. 2003). By contrast, what lies before this Court is vertical stare decisis, whereby a higher court ruling binds a lower court. Id. "[V]ertical stare decisis is absolute, as it must be in a hierarchical system with 'one supreme Court.'" Ramos v. Louisiana, 140 S.Ct. 1390, 1416 n.5 (2020) (Kavanaugh, J., concurring in part) (quoting U.S. Const., art. III, § 1). In other words, this Court has "a constitutional obligation" to follow the Supreme Court's precedent "unless and until it is overruled by [the Supreme Court]." Id.

Perhaps recognizing that this Court is not free to disregard controlling precedent even if it were so inclined (which in this case it distinctly is not), plaintiff offers what she calls an alternative argument: that "the actual malice rule arose from distinguishable facts and should not be applied" here. Pl. Mem. at 13. More precisely, plaintiff's argument is

that the actual malice rule, which was first articulated more than half a century ago in the days before the Internet and social media, has run its course and should no longer govern our contemporary media landscape. Binding precedent does not, however, come with an expiration date. To the extent plaintiff believes the actual malice requirement ought to be abolished, she could make that argument to the appropriate court – the Supreme Court. Until then, public figures, like plaintiff, must establish actual malice before collecting damages for defamation. Plaintiff's motion for partial summary is therefore denied.[8]

   IV.  Defendants' Motion for Summary Judgment

   Given the denial of plaintiff's motion, the remaining question presented by defendants' motion is whether, with the benefit of discovery, plaintiff has adduced sufficient evidence to prove actual malice (taking the evidence most favorably to plaintiff). That is to say, defendants move for summary judgment on the ground that no reasonable jury could find that the statements at issue in this case were published with actual

---

[8]   Defendants also argue that plaintiff cannot challenge the actual malice rule because it has been cemented as law of the case and that, in any event, plaintiff must establish actual malice as a matter of state law. Defs' Opp. at 6. Because the Court rejects plaintiff's motion on stare decisis grounds, the Court does not reach these other arguments.

malice. In this respect, defendants make two arguments. First, they argue that plaintiff cannot prove that Bennett was aware that the statements carried a defamatory meaning – that is, that Bennet did not have actual malice with respect to the statements' <u>meaning</u>. Second, they argue that, even assuming Bennett was aware that the statements carried a defamatory meaning, plaintiff cannot prove that Bennet was aware that the statements were false – that is, that Bennet did not have actual malice with respect to the statement's <u>falsity</u>.[9] The Court addresses each argument in turn.

### A. <u>Actual Malice – Meaning</u>

---

[9] In response, plaintiff makes the threshold argument that the Second Circuit has already decided the issue of actual malice in this case in its earlier opinion when it explained that, even if this Court had converted the 12(b)(6) motion into a summary judgment motion after the Court's evidentiary hearing, it "would still have to vacate because [this Court's] opinion relied on credibility determinations [regarding Bennet's testimony] not permissible at any stage before trial." 940 F.3d at 812. Plaintiff concludes that under the law-of-the-case doctrine, therefore, defendants' motion must be denied. But the Second Circuit's discussion of how it would have ruled had the motion been converted to summary judgment is pure dicta and does not constitute law of the case. <u>See</u> <u>Schwabenbauer v. Bd. of Educ.</u>, 777 F.2d 837, 841–42 (2d Cir. 1985). Moreover, even if the Second Circuit's dicta were construed as law of the case, additional evidence, which was not before the Second Circuit, has arisen in the course of discovery. Therefore, even if the Second Circuit held that Bennet's testimony alone could not support a grant of summary judgment, it has not – and indeed, could not have — ruled on whether this additional evidence justifies summary judgment.

Defendants first argue that plaintiff cannot prove that at the time Bennet wrote the allegedly defamatory portion of the Editorial, he knew that, or was reckless with respect to whether, readers would understand his words in the defamatory sense — that is, that the Map had "directly caused Loughner to shoot his victims." Defs' Mem. at 1. More generally, defendants suggest that a person who believes and intends to say one thing is not guilty of actual malice "merely because he or she chooses the wrong language to say or because those who hear the statement reasonably believe it to mean something different." Id. at 15 (quoting Hon. Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 5:5.1[B] (5th ed, 2017)). In response, plaintiff contests this facet of the actual malice rule and asks the Court not to impose what she calls "an additional actual malice element" to her claim. Pl. Opp. at 9. Accordingly, the Court must first decide whether to adopt defendants' version of the actual malice rule before determining whether the record supports defendants' first ground for granting summary judgment in favor of defendants.

### 1. Whether plaintiff **must** prove actual malice with respect to meaning

The legal question presented here is whether the First Amendment requires that plaintiff prove that Bennet "was aware of, or recklessly blinded himself to, the defamatory import of

his words." See Marc Franklin & Daniel Bussel, The Plaintiff's Burden in Defamation: Awareness and Falsity, 25 Wm. & Mary L. Rev. 825, 834 (1984). There is no controlling precedent squarely on point.[10]

In the early years of the actual malice standard, Justice Byron White, writing only for himself in a concurring opinion, suggested that Sullivan should not be "extended to preclude liability for injury to reputation caused by employing words of double meaning, one of which is libelous, whenever the publisher claims in good faith to have intended the innocent meaning." Greenbelt Co-Op. Pub. Ass'n v. Bresler, 398 U.S. 6, 22 (1970) (White, J., concurring in the judgment). He explained that the

---

[10]  Defendants cite to Bose Corp v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 n.30 (1984), for the proposition that the actual malice standard "requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." Seizing on "realized," defendants argue that it "necessarily follows that the actual malice standard is not met where a defendant was unaware of the defamatory meaning his or her words conveyed." Defs' Mem. at 15. But defendants misread Bose. That case did not involve "the employment of an ambiguous word; it involved a report of an ambiguous event, specifically how plaintiff's stereo speakers sounded to listeners present. . . . As such, Bose simply stands for the unremarkable proposition that the First Amendment protects an author from liability when adoption of language chosen was one of a number of possible rational interpretations of an ambiguous event because this represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the New York Times rule applies." Sprague v. American Bar Ass'n, No. Civ.A 01-382, 2003 WL 22110574 (E.D. Penn July 21, 2003).

actual malice rule was rooted in a recognition of the challenge of ascertaining truth. Id. at 22-23. But he saw "no reason why the members of a skilled calling should not be held to the standard of their craft and assume the risk of being misunderstood — if they are — by the ordinary reader of their publications." Id.

In more recent years, however, lower courts have disavowed Justice White's reasoning and have expressly adopted this awareness requirement. The Ninth Circuit, for example, has held that "constitutional malice does not flow from a finding that an 'intelligent speaker' failed to describe the words he used as the finder of fact did." Newton v. Nat'l Broad. Co., 930 F.2d 662, 681 (9th Cir. 1990) (explaining that defendants should not be liable "for what was not intended to be said" lest we "eviscerate[] the First Amendment protections established by New York Times"); see also Dodds v. American Broad. Co., 145 F.3d 1053, 1064 (9th Cir. 1998) (requiring plaintiff to "show that a jury could reasonably find by clear and convincing evidence that [defendant] intended to convey the defamatory impression").

Ultimately, this issue comes down to the values underlying Sullivan. And, on this point, the Court agrees with the California Supreme Court, which has explained that failure to impose an awareness requirement "would create precisely the chilling effect on speech which the New York Times rule was

designed to avoid." Good Government Group of Seal Beach, Inc. v.
Sup. Court, 22 Cal.3d 672, 684 (1978); see also Saenz v. Playboy
Enterprises, Inc., 841 F.2d 1309, 1318 (7th Cir. 1988)
("[R]equiring a publisher to guarantee the truth of all the
inferences a reader might reasonably draw from a publication
would undermine the uninhibited, open discussion of matters of
public concern.").

Plaintiff argues that those cases, and the awareness rule,
are limited to claims of libel or defamation by implication —
that is, cases "where the defamatory meaning of ambiguous and
innocuous statement has to be inferred or implied to establish a
claim" – and are therefore inapposite. Pl. Opp. at 10. Where, as
here, the allegedly libelous statements are "explicit and
facially defamatory" and where there is "substantial evidence"
showing what the speaker meant and intended to say, plaintiff
suggests, the awareness rule should not apply. The Court
disagrees. "The purpose of the awareness element is to ensure
that liability is not imposed upon a defendant who acted without
fault. This must hold true regardless of whether the defendant's
statement is directly or indirectly libelous." Masson v. New
Yorker Magazine, Inc., 832 F. Supp. 1350, 1361-63 (N.D. Cal.
1993), aff'd on other grounds, 85 F.3d 1394 (9th Cir. 1996).

Plaintiff also invokes the law of the case doctrine. She
suggests that the defendants already made the argument for, and

the Second Circuit already rejected, the awareness requirement.
See Pl. Opp. at 6-9. But while plaintiff is correct that the
Times has raised this issue before, see, e.g., Defendant's
Supplemental Memorandum of Law in Further Support of Its Motion
to Dismiss the Complaint, Dkt. No. 42, at 7, neither this Court
(previously) nor the Second Circuit has squarely addressed, much
less resolved, whether plaintiff must establish actual malice
with respect to meaning as well as falsity. For the above-
discussed reasons, the Court now holds that she must.

2. Whether plaintiff **can** prove actual malice with
respect to meaning

Whether plaintiff can make that showing, however, is a
different question. Where a plaintiff's defamation case depends
on a statement that is capable of multiple meanings — one
defamatory, the other innocuous — the plaintiff must prove that
the defendant acted with actual malice not only with respect to
the statement's falsity but also to its meaning. Indeed, as the
Seventh Circuit has explained, "[e]vidence of defamatory meaning
and recklessness regarding potential falsity does not alone
establish the defendant's intent." Saenz, 841 F.2d at 1318.
Instead, the plaintiff must show that the defendant "either
deliberately cast its statements in an equivocal fashion in the
hope of insinuating a false import to the reader or that it knew
and acted with reckless disregard of whether its words would be

interpreted by the average reader as a false statement." See
Solano v. Playgirl, Inc., 292 F.3d 1078, 1084 (9th Cir. 2002).

Of course, because actual malice "is a matter of the
defendant's subjective mental state, revolves around facts
usually within the defendant's knowledge and control, and rarely
is admitted," Dalbec v. Gentleman's Companion, Inc., 828 F.2d
921, 927 (2d Cir. 1987), a defendant cannot "automatically
insure a favorable verdict by testifying that he published with
a belief that the statements were true." St. Amant v. Thompson,
390 U.S. 727, 732 (1968). Here, to be sure, Bennet has sworn
multiple times that he "did not intend to imply a direct causal
link between [the Map] and Loughner's horrific acts."
Declaration of James Bennet ("Bennet Decl."), Dkt. No. 98, ¶ 8.
He also avers that "it did not occur to [him] that readers would
understand the phrase 'the link to political incitement was
clear' as suggesting that Loughner himself was directly inspired
or motivated by the [Map] to engage in the shooting, and [he]
did not intend for readers to draw such an inference." Id.
Instead, he claims that he "intended to advance the idea that
overheated political rhetoric can create a climate inducive to
violent acts, and [he] mentioned the [Map] as an example of the
kind of 'political incitement' that contributes to this
atmosphere." Id.

However, as the Second Circuit has already made clear in this very case, the Court cannot automatically credit this testimony at the summary judgment stage. See Palin, 940 F.3d at 812; see also Sprague, 2003 WL 22110574, at *6 ("The defendant author and his editors contend that they did not anticipate that the readers would perceive the [allegedly defamatory] term . . . in its negative capacity. This is testimonial evidence that the jury will be permitted to weigh as it deems warranted.")

Defendants, however, argue that Bennet's allegedly innocent intent is independently corroborated by Bennet's contemporaneous email exchange with Douthat. Specifically, in his email responding to Douthat's concerns, Bennet explained that his "understanding was that in the Giffords case there was a gun sight superimposed over her district; so far in [the Scalise] case we don't know of any direct threat against any of the congressmen on the field. That's not to say any of it is ok, obviously, or that the violence in either case was caused by the poltical [sic] rhetoric. But the incitement in [the Giffords] case seems, so far, to be less specific [than in the Scalise case]." Sullivan Decl. Ex. 21. This email suggests that Bennet did not intend for his words to convey the idea that the Map directly caused Loughner's shooting, which is the heart of what plaintiff says was libelous.

But in the end plaintiff meets her burden of adducing evidence that, taken in the light most favorable to plaintiff, could enable a rational jury to conclude that Bennet either knew, or was reckless not to know, that his words would carry the defamatory meaning. Indeed, at least four items of evidence warrant this conclusion.

First, there is the language of the Editorial's statements themselves, such as, e.g., the reference to the Map as being a "direct" form of "incitement" to Loughner's shooting. As defense counsel conceded at oral argument, in determining actual malice, the finder of fact is "entitled to consider the wording of the alleged defamatory statement." Transcript of Oral Argument, July 27, 2020 ("Tr.") at 10:20-11:1; see also id. at 12:9-12 ("I agree that the language of the publication is part of the mix" in determining actual malice). Here, Bennet's contention that, notwithstanding the words he used, he did not mean to suggest a direct link between the Map and the shooting, may be "so inherently improbable that only a reckless man would have" chosen the words he chose to convey the meaning he (allegedly) sought to convey.[11] Dalbec, 828 F.2d at 927; cf. id. ("[T]he

_____

[11]    To be sure, it is not the case, as plaintiff suggests, that the clarity of a statement renders irrelevant the speaker's awareness of its meaning. Instead, the clarity of a statement can serve as evidence – here, powerful evidence — for inferring the speaker's awareness of its meaning.

plain language of the . . . statement strongly supports the inference that it was made with knowledge of its falsity.")

Second, Bennet has himself admitted that he was aware that the term "incitement" could mean a call to violence. Indeed, at his deposition, Bennet conceded that the term "incitement" means "different things to different people" and that "some people could interpret [the term] as a call to violence." See Sullivan Decl. Ex. 2 (Bennet Dep.) at 112-14. Bennet's general awareness of the fact that "incitement" could be construed as a call to violence is further evidence in favor of actual malice. See Sprague, 2003 WL 22110574, at *5 (knowledge "that the average reader of the journal would be familiar with both" the defamatory and nondefamatory meanings of the word at issue counts in favor of finding actual malice).

Third, Bennet's decision to substantially revise Williamson's earlier draft, which did not include the allegedly defamatory language and meaning, is, a jury could find, yet more evidence of actual malice. To be sure, Bennet testified that he made these changes because he worried that phrases like "incendiary" or "inflammatory rhetoric" had been "drained of [their] power because [they are] used so often" and that he was searching for "a very strong word to write about the political climate," and so chose "political incitement." Defs' Mem. at 18 (quoting Pl. SUMF ¶¶ 56, 58-59). But, as discussed above, the

credibility of that testimony is for the jury to assess, not for this Court to credit at the summary judgment phase. It is virtually undeniable that Bennet's edits changed the meaning of Williamson's draft, an alteration that a reasonable jury might conclude was intentional. Cf. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 521 (1991) ("[T]he progression from typewritten notes, to manuscript, then to galleys provides further evidence of intentional alteration.").

Fourth, the nature of the corrections issued by the Times in the aftermath of the Editorial stand as further circumstantial evidence that Bennet was aware that the Editorial carried the defamatory meaning. As discussed above, upon receiving Douthat's email expressing concern over the Editorial, Bennet reached out to Williamson and other members of the team and asked them to "get to the bottom of this as quickly as possible." Pl. SUMF ¶ 101. The team then looked into whether there existed a direct link between the Map and the Loughner shooting; and when it concluded that no such link had been established, the Times issued a correction which read, in part: "An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established." Id. ¶¶ 104-107.

The fact that Bennet and the Times were so quick to print a correction is, on the one hand, evidence that a jury might find corroborative of a lack of actual malice, as discussed later. But, on the other hand, a reasonable jury could conclude that Bennet's reaction and the Times' correction may also be probative of a prior intent to assert the existence of such a direct link, for why else the need to correct? Indeed, the correction itself concedes that Bennet's initial draft incorrectly stated that there existed such a link. If, as Bennet now contends, it was all simply a misunderstanding, the result of a poor choice of words, it is reasonable to conclude that the ultimate correction would have reflected as much and simply clarified the Editorial's intended meaning.[12]

Ultimately, while much of plaintiff's evidence is circumstantial, as is often the case when actual malice is at issue, and while there is arguably contrary evidence as well,[13]

_____

[12]    See Tr. at 38:14-18 (quoting Shane B. Vogt, Esq.) ("[I]f the true facts are as defendants say they are and this was really just a syntax error and Mr. Bennet's explanation for this was, oh, what's not what I meant, that's not what I meant there's no need to do that research. It's pointless to do that research. He shouldn't have been asking for anyone to do that research. He should have just said, oh, that's not what I meant, and affixed an editor's note.").

[13]    For example, defendants point to evidence that Bennet had previously used the term "incitement" in the broader, rhetorical sense of the phrase, in an earlier article for the Times discussing a meeting of a joint Israeli-Palestinian "committee on 'prevention of incitement,'" which focused on "messages in

the Court finds that, taking the evidence in the light most favorable to plaintiff, she has sufficiently pointed to enough triable issues of fact that would enable a jury to find by clear and convincing evidence that Bennet knew, or was reckless not to know, that his words would convey the meaning in the minds of the readers that plaintiff asserts was libelous, to wit, that she bore a direct responsibility for inciting the Loughner shooting.

### B.   Actual Malice – Falsity

It is not enough, however, for plaintiff to show that Bennet meant to say what plaintiff claims was libelous; in addition, to establish actual malice, plaintiff must show that defendants published the libelous statement "with knowledge that it was false or with reckless disregard of whether it was false or not." Sullivan, 376 U.S. at 279. "Mere negligence does not suffice." Masson, 501 U.S. at 510. Instead, "[a] finding of malice must be based on clear and convincing evidence that the defendant in fact entertained serious doubts as to the truth of his publication, or, in the alternative, knew of its falsity." Dalbec, 828 F.2d at 927.

---

the schools and news media encouraging violence." Sullivan Decl. Ex. 28. While such prior use of the term in the non-defamatory sense weighs against a finding of actual malice, the weighing of evidence here is for the jury, not the Court.

While mere failure to conduct an investigation before publishing cannot itself establish actual malice, nonetheless, "where there are obvious reasons to doubt the veracity" of the information, that can give rise to an inference of actual malice. Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 688 (1989). Thus, as the Ninth Circuit explained, "where [a] publisher undertakes to investigate the accuracy of a story and learns facts casting doubt on the information contained therein, it may not ignore those doubts, even though it had no duty to conduct the investigation in the first place." Masson v. New York Magazine, Inc., 960 F.2d 896, 901 (9th Cir. 1992). That is why, as the Supreme Court has explained, "the purposeful avoidance of the truth is in a different category" from mere failure to investigate. Harte-Hanks, 491 U.S. at 692.

As the Second Circuit explained in this very case, plaintiff's "overarching theory of actual malice is that Bennet had a 'pre-determined' argument he wanted to make in the editorial," his commitment to which "led him to publish a statement about Palin that he either knew to be false, or at least was reckless as to whether it was false." Palin, 940 F.3d at 813. In support of that theory, the Second Circuit found three allegations in the amended complaint that "paint[ed] a plausible picture of this actual-malice scenario." Id. Now that discovery is over (and the standard is no longer mere

27

plausibility), it turns out that two of these three allegations find no support in the actual evidence. However, there is enough support for the third allegation to preclude a grant of summary judgment.

The Court begins by reviewing the two refuted allegations before turning to the evidence supporting the third.

### 1. Bennet's Background

The Second Circuit held that "Bennet's background as an editor and political advocate provided sufficient evidence" to infer actual malice. Id. In particular, the court focused on the fact that Bennet was the editor-in-chief of The Atlantic from 2006-2016 and that during that time the magazine published several articles confirming there was no link between the Map and the Loughner shooting. Id. A plausible inference, the court explained, is that "one who had risen to editor-in-chief at The Atlantic knew their content and thus that there was no connection between Palin and the Loughner shooting." Id. at 814.

The undisputed record now shows, however, that Bennet was not responsible for editing any of those articles; instead, they were published by sister publications over which Bennet had no editorial control. Defs' Mem. at 22; see also Deposition of Andrew Sullivan, Dkt. No. 99-41, at 93. Indeed, Andrew Sullivan, who ran one of the blogs on which many of these articles were

published, testified that Bennet had no role whatsoever in the preparation of those posts. Id.

In response, plaintiff points out that the posts "appeared on The Atlantic's website," see, e.g., Pl. SUMF ¶ 118, and that Bennet conceded that he "consumed" the Atlantic's website in 2011 and admitted that he "must have read" some of these articles, see Pl. Opp. at 18. But, as defendants persuasively reply, plaintiff cites to no evidence, beyond the mere fact that the two sites shared a URL, that Bennet had editorial control over those articles, so at most he simply read the posts. Having once read an article many years before the drafting of the Editorial is hardly enough to create an inference of knowledge of the Editorial's falsity.[14]

The Second Circuit further speculated on the basis of the amended complaint's allegations that "Bennet in particular was more likely than the average editor-in-chief to know the truth about the Loughner shooting because he had reason to be personally hostile toward Palin." Palin, 940 F.3d at 814. But the Second Circuit also made clear that these speculations were only "relevant to the credibility of Bennet's testimony that he

_____

[14]  For the same reason, plaintiff's evidence that Bennet was sent soon after the Loughner shooting an article refuting the causal link between the shooting and the Map is likewise insufficient to support a finding of actual malice. See Pl. SUMF ¶ 267.

was unaware of facts published on his watch relating to the
Loughner shooting." Id. As just discussed, there is no evidence
to suggest that those facts were actually published on his
watch. And standing alone, as the Second Circuit itself
recognized, political opposition "does not constitute actual
malice." Id.

### 2. The Retraction

While a defendant's willingness (as here) to quickly
acknowledge and correct its error ordinarily weighs against a
finding of actual malice, see e.g., Zerangue v. TSP Newspapers,
Inc., 814 F.2d 1066, 1071 (5th Cir. 1987), the Second Circuit
once again theorized that it was "plausible that the correction
was issued after a calculus that standing by the editorial was
not worth the cost of the public backlash." Palin, 940 F.3d at
815. But, as defendants point out, plaintiff does not cite to
any evidence in the record that corroborates this theory of the
retraction/correction so far as defendants' knowledge of falsity
is concerned, and the Court's own review of the record discloses
no evidence warranting this speculation.

### 3. The Drafting and Publication Process

Ultimately, then, we are left with how Bennet handled the
Williamson draft and the attached hyperlink, which the Second
Circuit held could show that Bennet "willfully disregarded the
truth." Palin, 940 F.3d at 815. Plaintiff argues that,

construing the evidence in the light most favorable to her, a
jury could conclude that (1) Bennet instructed Williamson to
research whether there was a link between the Map and the
shooting; (2) Bennet conceded, and Williamson confirmed, that
her draft embodied the results of that research and did not turn
up evidence of a causal link between the Map and the shooting;
(3) the hyperlinked article attached to Williamson's draft
recognized as much; and (4) therefore, Bennet "knew there was no
link but rewrote the draft anyway to say a link existed —
consistent with the narrative he already decided to portray."
Pl. Opp. at 18.

As a threshold matter, defendants insist there is "no
evidence to support these assertions." Defs' Reply at 8.
Specifically, defendants contend that Bennet did not instruct
Williamson to research whether there was a link between the map
and the shooting; rather, according to defendants, Bennet only
"asked for research to determine if the Times' own Editorial
Board had previously written anything connecting the Loughner
Shooting to incitement . . . because he wanted to ensure the new
editorial was in sync with any prior Board position. Id. at 8-9.

However, taking the evidence in the light most favorable to
plaintiff, Williamson acknowledges in her deposition that Bennet
specifically asked her to "look for pieces related to the
Giffords shooting and whether there was such a connection."

Sullivan Decl. Ex. 3 (Williamson Dep.) at 142; see also id.
("[Bennet] asked me to research that particular shooting, and I
did."). Defendants suggest that plaintiff is taking these
statements out of context, weaving "two strands of testimony
into a fiction." Defs' Reply at 9. But, again, at the summary
judgment phase, the Court finds that Williamson's deposition
testimony could allow a juror to conclude that, at some point
during the drafting process, Bennet specifically instructed
Williamson to research whether there existed a link between the
Map and the shooting and learned that there was no material
support for such a link.

Beyond this, Williamson's inclusion in her first draft of
the hyperlink to the contemporaneous ABC news article that
flatly stated there was no such connection would have given
Bennet, if he had accessed the article, "obvious reasons to
doubt the veracity" of the alleged connection. Harte-Hanks, 491
U.S. at 688. If so, Bennet's failure to investigate could
support an inference that he purposefully avoided the truth. Id.
at 692. To be sure, Bennet maintains that he never clicked on
the hyperlink. See Bennet Dep. at 261. But under all the
circumstances, a jury might discredit this testimony.
Nonetheless, even if it were true, it could be evidence of
reckless disregard. After receiving Williamson's draft, a
reasonable jury might conclude, Bennet had obvious reasons to

doubt whether there existed a link between the Map and the Loughner shooting. At that point, Bennet's failure to further investigate or at least just click on the link to the only article Williamson had presented could support the inference that he was purposefully avoiding the truth.

There are other pieces of evidence from the drafting process that further support such a theory. First, as the editors were discussing whether to cover the Hodgkinson shooting, it was Bennet's idea to focus the editorial on "the rhetoric of demonization and whether it incites people to this kind of violence." Sullivan Decl. Ex. 11. Then, during the research phase, Bennet asked a researcher to determine whether the Board had previously written "anything connecting to the Giffords shooting to some kind of incitement." Pl. SUMF ¶ 324. After the researcher sent Bennet an article (written not by the Board but by a columnist at the Times), Bennet replied "Good for us." Id. ¶ 326. While Bennet has testified that he does not recall what he meant by that response, a reasonable jury could infer from this response that Bennet felt free to advance his narrative because the Editorial Board had not written on the subject.

In addition, researchers sent to Bennet other articles that disclaimed the idea that Loughner had been motivated by violent rhetoric. Notably, Bennet was sent an earlier editorial entitled

33

"As We Mourn," published in January 2011, which quoted President Barack Obama saying Loughner's shooting cannot be blamed on "a simple lack of civility." Declaration of Shane B. Vogt, Dkt. No. 102, Ex. 30 at 19. Like the hyperlink, Bennet testified that he did not read this article, even after specifically asking for the researcher to dig up articles of this sort. Pl. SUMF ¶¶ 324-330. But, as with the hyperlink, a jury could infer from this a purposeful avoidance of the truth.

Once again, there is considerable evidence that defendants mount to support the notion that Bennet simply drew the innocent inference that a political circular showing crosshairs over a Congressperson's district might well invite an increased climate of violence with respect to her. But, taken in the light most favorable to plaintiff, the evidence shows Bennet came up with an angle for the Editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results the Williamson research that he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth

Accordingly, the Court concludes that there is sufficient evidence to allow a rational finder of fact to find actual malice by clear and convincing evidence. Anderson, 477 U.S. at 254.

> C. Conclusion

34

For the above-discussed reasons, plaintiff's motion for partial summary judgment is denied and defendants' motion for summary judgment is also denied.[15] The Clerk of the Court is directed to close docket entries 94 and 95. The trial of this case, pandemic permitting, will commence on February 1, 2020 at 9:30 a.m.

SO ORDERED.

_____

[15] Also before the Court is plaintiff's motion for reconsideration of the Court's decision to dismiss her claim for disgorgement damages. Dkt. No. 111. In that motion, plaintiff asks the Court to reconsider its earlier decision because, she argues, the Supreme Court's decision in Liu v. SEC, 140 S.Ct. 1936 (2020), decided on June 22, 2020, constituted "a change in controlling law" and gave rise to "a need to correct a clear legal error or prevent manifest injustice." Plaintiff's Memorandum of Law in Support Reconsideration And/Or Alteration or Amendment, Dkt. No. 111, at 4.

The Court denies plaintiff's motion as untimely. Under Local Rule 6.3, a motion for reconsideration of a court order must be served within 14 days after entry of the order determining the original motion. While there might be some fuzziness regarding when the fourteen-day clock starts and stops, plaintiff's motion is untimely under even the most generous interpretation of Rule 6.3. The Court's order on the original motion was entered on January 21, 2020. Dkt. No. 83. Plaintiff did not move for reconsideration until July 15, 2020 — more than five months later. Thus, a strict application of Rule 6.3 would warrant denying plaintiff's motion as grossly untimely. Moreover, even if the fourteen-day clock were deemed to have restarted on the date the Supreme Court announced its decision in Liu and if the clock were deemed to have stopped on the date plaintiff sought leave from this Court to file the motion, she would still have missed the deadline. Plaintiff sought leave to file this motion on July 8, 2020 — sixteen days after the Supreme Court decided Liu on June 22, 2020.

Dated:     New York, NY
           August 28, 2020

                                          JED S. RAKOFF, U.S.D.J.