# No. 22-558

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

SARAH PALIN, an individual

*Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY, a New York
corporation, and JAMES BENNET, an individual

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Southern District of New York
(Case No. 1:17-cv-04853-JSR, Hon. Jed S. Rakoff)**

**BRIEF OF APPELLANT**

Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: 813- 834-9191
Fax: 813-443-2193

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY 10017
Tel: 212-907-7300 Fax: 212-754-0330

*Counsel for Plaintiff-Appellant Sarah Palin*

## **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................. iv

JURISDICTIONAL STATEMENT ......................................... 1

STATEMENT OF THE ISSUES ........................................... 2

STATEMENT OF THE CASE ............................................. 3

    A.    Local Rule 28.1(b) Summary .............................. 3

    B.    The First Erroneous Adjudication and Resulting Mandate ................ 4

    C.    The Summary Judgment Rulings ......................... 6

    D.    The Errors Committed Before, During & After Trial ........................ 7

        1.    The Errors Preceding Trial ......................... 7

        2.    The Insufficient *Voir Dire* ........................ 8

        3.    The Erroneous & Prejudicial Exclusion of Evidence in Contravention of the Mandate ................ 10

        4.    The Evidence Admitted at Trial Was Sufficient to Establish Actual Malice ........................ 11

    E.    The District Judge Erroneously Granted Judgment as a Matter of Law Under Rule 50 ............................. 13

    F.    The Erroneous Instruction Responding to the Jury's Actual Malice Question ............................. 20

    G.    The Verdict ......................................... 22

    H.    The Final Judgment and Post-Trial Developments ........................ 23

    I.    The Rule 50 "Opinion" ................................ 25

SUMMARY OF ARGUMENT ............................................................. 28

STANDARD OF REVIEW ................................................................. 29

ARGUMENT ........................................................................................ 30

    A.    The District Court Erred by Requiring Appellant to Prove Actual Malice ........................................................................................ 30

    B.    The District Court's Prejudicial and Erroneous Rulings at Trial Require Reversal ..................................................................... 36

        1.    The Insufficient *Voir Dire* ...................................... 36

        2.    The Erroneous and Prejudicial Exclusion of Evidence at Trial ........................................................................... 37

        3.    The Erroneous Judgment as a Matter of Law under Rule 50 ............................................................................. 39

        4.    The Erroneous Instruction Responding to the Jury's Question About Evidence of Actual Malice .......................... 52

    C.    The Erroneous Refusal to Disqualify ................................. 53

CONCLUSION ..................................................................................... 58

CERTIFICATE OF COMPLIANCE ................................................... 60

CERTIFICATE OF SERVICE ............................................................ 61

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Civil Liberties Union v. Reno*,
    929 F.Supp. 824 (E.D. Pa. 1996) ........................................................ 33

*Arilo v. Lively*,
    474 F.3d 46 (2d Cir. 2007) ................................................................ 38

*Ashley v. City of New York*,
    992 F.3d 128 (2d Cir. 2021) .............................................................. 29

*Bibbins v. Dalsheim*,
    21 F.3d 13 (2d Cir. 1994) ................................................................. 26

*Caperton v. A.T. Massey Coal Co.*,
    556 U.S. 868 (2009) ......................................................................... 53

*Celle v. Filipino Reporter Enterprises, Inc.*,
    209 F.3d 163 (2d Cir. 2000) .............................................................. 31

*Cheney v. U.S. Dist. Court for Dist. Of Columbia*,
    542 U.S. 367 (2004) ......................................................................... 29

*Crescent Publ'g Group, Inc. v. Playboy Enterprises, Inc.*,
    246 F.3d 142 (2d Cir. 2001) .............................................................. 29

*Curtis Pub. Co. v. Butts*,
    388 U.S. 130 (1967) ............................................................ 33, 34, 35

*Davidson v. Riley*,
    44 F.3d 1118 (2d Cir. 1995) .............................................................. 28

*Davis v. Rodriguez*,
    364 F.3d 431 (2d Cir. 2004) .............................................................. 29

*Delaware v. Van Arsdall*,
   475 U.S. 673 (1986) ........................................................................ 28

*Delima v. Trinidad Corp.*,
   302 F.2d 585 (2d Cir. 1962) ........................................................... 53

*Dobbs v. Jackson Women's Health Organization*,
   142 S. Ct. 2228 (2002) ................................................................... 31

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ........................................................... 30, 33, 35

*Giano v. Sullivan*,
   709 F.Supp. 1209 (S.D.N.Y. 1989) ................................................ 28

*Girden v. Sandals Intern.*,
   262 F.3d 195 (2d Cir. 2001) ..................................................... 29, 53

*Gottwald v. Sebert*,
   203 A.D.3d, 488, 165 N.Y.S.3d 38 (1st Dept. 2022) ..................... 35

*Harte-Hanks Communications, Inc. v. Connaughton*,
   491 U.S. 657 (1989) ....................................................................... 46

*Herbert v. Lando*,
   441 U.S. 153 (1979) ....................................................................... 32

*Holzapfel v. Town of Newburgh*,
   145 F.3d 516 (2d Cir. 1998) ..................................................... 29, 53

*Hopson v. Riverbay Corp.*,
   190 F.R.D. 114 (S.D.N.Y. 1999) .................................................... 7

*Hustler Magazine, Inc. v. Falwell*,
   485 U.S. 46 (1988) ......................................................................... 32

*In re Boston's Children First*,
   244 F.3d 164 (1st Cir. 2001) .......................................................... 56

*In re IBM Corp.*,
  45 F.3d 641 (2d Cir. 1995) ................................................................. 56

*In re The City of New York*,
  607 F.3d 923 (2d Cir. 2010) ............................................................... 29

*Innomed Labs, LLC v. ALZA Corp.*,
  368 F.3d 148 (2d Cir. 2004) ......................................................... 30, 53

*Johnstone v. Kelly*,
  808 F.2d 214 (2d Cir. 1986) ............................................................... 28

*Kaytor v. Electric Boat Corp.*,
  609 F.3d 537 (2d Cir. 2010) ........................................................ 15, 30

*Kurland & Associates, P.C. v. Glassdoor, Inc.*,
  205 A.D.3d 545, 166 N.Y.S.3d 847 (1st Dept. 2022) ........................ 35

*Lamborn v. Dittmer*,
  726 F.Supp. 510 (S.D.N.Y. 1989) ...................................................... 55

*Lee v. McCue*,
  2007 WL 2230100 (S.D.N.Y. Jul. 25, 2007) ..................................... 15

*Ligon v. City of New York*,
  736 F.3d 118 (2d Cir. 2013) ........................................................ 56, 57

*Liljeberg v. Health Services Acquisition Corp.*,
  486 U.S. 847 (1988) ........................................................................... 57

*Liteky v. U.S.*,
  510 U.S. 540 (1994) ........................................................................... 54

*Loeb v. New Times Communications Corp.*,
  497 F.Supp. 85 (S.D.N.Y. 1980) ....................................................... 52

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991) ........................................................................... 16

*Matthew Bender & Co. v. West Publ'g Co.*,
  240 F.3d 116 (2d Cir.2001) ........................................................... 29

*McKee v. Cosby*,
  139 S.Ct. 675 (2019) .................................................................... 33

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990) ........................................................ 30, 31, 32, 34

*Mohawk Indust., Inc. v. Carpenter*,
  558 U.S. 100 (2009) ...................................................................... 29

*NAACP v. Button*,
  371 U.S. 415 (1963) ................................................................ 33, 34

*New York Times v. Sullivan*,
  376 U.S. 254 (1964) ................................................................ 33, 34

*Owen v. Thermatool Corp.*,
  155 F.3d 137 (2d Cir. 1998) .................................................... 29, 53

*Palin v. New York Times Co.*,
  940 F.3d 804 (2d Cir. 2019) ................................................. *passim*

*Raedle v. Credit Agricole Indosuez*,
  670 F.3d 411 (2d Cir. 2012) .......................................................... 7

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133 (2000) ................................................. 15, 27, 30, 40

*Regina Metropolitan Co., LLC v. New York State Division
of Housing and Community Renewal*,
  35 N.Y.3d 332 (2020) .................................................................. 35

*Restivo v. Hessmann*,
  846 F.3d 547 (2d Cir. 2017) ......................................... 29, 30, 38, 53

*Rippo v. Baker*,
  137 S.Ct. 905 (2017) .................................................................... 54

*Robbins v. 315 West 103 Enterprises LLC*,
204 A.D.3d 551, 162 N.Y.S.3d 823 (1st Dept. 2022) ........................................ 35

*Rosenblatt v. Baer*,
383 U.S. 75 (1966) ............................................................... 30, 31, 32

*Shade v. Hous. Auth. of New Haven*,
251 F.3d 307 (2d Cir. 2001) ......................................................... 53

*Sharkey v. J.P. Mogan Chase & Co.*,
251 F.Supp.3d 626 (S.D.N.Y. 2017) .................................................. 54

*Sharon v. Time, Inc.*,
599 F.Supp. 538 (S.D.N.Y. 1984) ................................................ 16, 42

*Soto v. Gaudett*,
862 F.3d 148 (2d Cir. 2017) .......................................................... 5

*Stumpf v. Long Island R.R. Co.*,
761 F.3d 192 (2d Cir. 2014) .......................................................... 7

*Time, Inc. v. Hill*,
385 U.S. 374 (1967) ................................................................. 34

*Tumey v. Ohio*,
273 U.S. 510 (1927) ................................................................. 28

*U.S. v. Amico*,
486 F.3d 764 (2d Cir. 2007) .................................................... 55, 57

*U.S. v. Cooley*,
1 F.3d 985 (10th Cir. 1993) .......................................................... 56

*U.S. v. Diaz*,
797 F.2d 99 (2d Cir. 1986) .......................................................... 54

*U.S. v. Ferguson*,
550 F.Supp. 1256 (S.D.N.Y. 1982) .................................................. 55

*U.S. v. Kahaner*,
    204 F.Supp. 921 (S.D.N.Y. 1962) ....................................................... 37

*U.S. v. Kozeny*,
    667 F.3d 122 (2d Cir. 2011) ................................................... 7, 29, 53

*U.S. v. Lawes*,
    292 F.3d 123 (2d Cir. 2002) ................................................. 29, 36, 37

*U.S. v. Lovaglia*,
    954 F.2d 811 (2d Cir. 1992) ............................................................. 54

*U.S. v. Marin*,
    662 F.Supp.2d 155 (D.D.C. 2009) .................................................... 55

*U.S. v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .............................................. 53, 56, 57

*U.S. v. Pepin*,
    514 F.3d 193 (2d Cir. 2008) ............................................................. 29

*U.S. v. Tsarnaev*,
    142 S. Ct. 1024 (2022) ......................................................... 29, 36, 37

*U.S. v. Yousef*,
    327 F.3d 56 (2d Cir. 2003) ............................................................... 54

*Village of Freeport v. Barrella*,
    814 F.3d 594 (2d Cir. 2016) ................................................. 30, 37, 38

*Westmoreland v. CBS, Inc.*,
    596 F.Supp. 1170 (S.D.N.Y. 1984) ................................................... 16

*Withrow v. Larkin*,
    421 U.S. 35 (1975) .......................................................................... 54

*Yimouyannis v. Consumer Union of the U.S., Inc.*,
    619 F.2d 932 (2d Cir. 1980) ............................................................. 52

*Young v. Gannett Satellite Info. Network, Inc.*,
    734 F.3d 544 (6th Cir. 2013) ........................................................ 42, 46

*Zuckerbrot v. Lande*,
    75 Misc.3d, 269, 167 N.Y.S.3d 313 (1st Dept. 2022) ....................................... 35


**OTHER AUTHORITIES**

28 U.S.C. § 455(a) ...................................................................... 54, 55

28 U.S.C. § 1291 ............................................................................ 1

28 U.S.C. § 1332 ............................................................................ 1

N.Y. Civil Rights Law § 76-a ........................................................ 2, 4, 35

*Fed. R. Civ. P. 50* ..................................................................... 4, 58

*Fed. R. Civ. P. 47(a)* ...................................................................... 37

*Fed. R. Evid. 606(b)* ...................................................................... 26

1 Law of Defamation § 1:21 (2d ed.) ......................................................... 31

94 Calif. L. Rev. ........................................................................... 34

Mary-Rose Papandrea,
    *The Story of New York Times Co. v. Sullivan* (2012) ....................................... 32

## **JURISDICTIONAL STATEMENT**

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1332 because there was (and is) complete diversity of citizenship between Plaintiff-Appellant and Defendants-Appellees and the amount in controversy exceeds $75,000, exclusive of interest and costs.  On March 17, 2022, Appellant timely filed her Notice of Appeal [JA2238-40] from the District Court's February 15, 2022 Final Judgment [JA1961], which she amended on June 17, 2022 [JA2523-25] to include the District Court's May 31, 2022 Opinion and Order [JA2492-2521] denying Appellant's post-trial [JA2241-2416].  Accordingly, this Court has jurisdiction to hear this appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the District Court erred by requiring Appellant to prove actual malice as to falsity and defamatory meaning based on the First Amendment and under N.Y. Civil Rights L. § 76-a(2).

2.     Whether the District Court erred by granting judgment as a matter of under Rule 50 based on actual malice and announcing its decision during jury deliberations.

3.     Whether the District Court erred by conducting a legally insufficient *voir dire*, excluding crucial evidence of actual malice contrary to controlling law and this Court's decision in *Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) (the "Mandate") [JA01-14], and/or erroneously instructing the jury on the issue of actual malice.

4.     Whether the District Court erred in denying Appellant's Motion to Disqualify before ruling on Appellant's post-trial motions.

## STATEMENT OF THE CASE

### A.    Local Rule 28.1(b) Summary

This case involves the erroneous adjudication of Appellant, Sarah Palin's, libel claim against *The New York Times Company* (the "*Times*") and the former Editor of its Opinion Section, James Bennet ("Bennet"), arising out of their June 14, 2017 editorial, "*America's Lethal Politics*" (the "Editorial"). *Palin*, 940 F.3d at 808-809.  The Editorial falsely asserts that Appellant "incited" Jared Loughner to "open fire in a supermarket parking lot, grievously wounding Representative Gabby Gifford and killing six people, including a 9-year-old girl," and that Appellant's "political incitement" of Loughner's crimes was clear and directly linked to the "Giffords attack."  [JA1749-81].

This lawsuit was originally filed on June 27, 2017.  The District Judge's *first* premature adjudication of this case based on actual malice occurred at the pleadings stage and was correctly reversed.  *Palin,* 940 F.3d at 809-817.  Appellant's claim was tried before a jury in February 2022.  At trial, the District Court again granted judgment as a matter of law based on actual malice, announcing this ruling during the jury's deliberations but also allowing the jury to reach a verdict.  [JA1201-12]  The jury returned a verdict for Appellees, following which the District Court entered a Final Judgment based on its Rule 50 decision and the verdict.  [JA46-47]

After trial, Appellant timely moved for post-trial relief under Rules 59 and 60 and sought disqualification of the District Judge. [JA2241-2416] Appellant also filed a Petition for Writ of Mandamus [Case No. 22-629], which this Court denied "without prejudice to the issues presented the petition being addressed" in this appeal. [Case No. 22-629 Doc. 37] On May 31, 2022, the District Judge denied all of Appellant's post-trial motions. [JA2492-2521]

United States District Court Judge Jed S. Rakoff presided over this case and rendered decision being appealed, including: (1) the February 14, 2022 oral [JA1201-12 at 1295-1306] and March 1, 2022 written [JA1963-2030] judgment as a matter of law under *Fed. R. Civ. P.* 50; (2) the February 15, 2022 Verdict [JA47]; (3) the February 15, 2022 Final Judgment [JA46]; (4) the August 28, 2020 Opinion and Order (on summary judgment) [JA1331-1366]; (5) the December 29, 2020 Memorandum Order [JA1906-18] (retroactively applying N.Y. Civil Rights Law § 76-a); and (6) the May 31, 2022 Opinion and Order [JA2492-2521].(denying Appellant's motion to disqualify and all of her post-trial motions).

## B.  The First Erroneous Adjudication and Resulting Mandate

At the pleadings stage, the District Judge *sua sponte* set an evidentiary hearing to address the plausibility of Appellant's allegations that the Editorial was published with actual malice. *Palin*, 940 at 809. This "unusual procedural turn" revealed Bennet as the author of the libelous passages of the Editorial. *Id*.

Despite the hearing's represented purpose,[1] the District Judge used Bennet's testimony and other documentary evidence adduced at the hearing to dismiss Appellant's complaint with prejudice. *Id*. at 809. In doing so, the District Judge weighed evidence, assessed Bennet's credibility, and drew inferences in favor of the *Times*. *Id.* at 810-815.

This Court vacated the dismissal and refusal to grant leave to amend. *Id.* at 808, 813. Because the *Times* tried to "salvage" the dismissal by arguing that its Rule 12(b)(6) should be converted to a motion for summary judgment, the Mandate also concludes that:

> Even if the plaintiff had been given notice and the court had explicitly converted the motion to one for summary judgment, we would still have to vacate because the district court's opinion ***relied on credibility determinations not permissible at any stage before trial***.

*Id.* at 812, n.25 (emphasis added) (citing *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017)). The Mandate further provides that: "The jury may ultimately agree with the district court's conclusion that Mr. Bennet was credible—***but it is the jury that must decide***." *Id*. at 815 (emphasis added).

The Mandate also directed based on well-established law that: (1) the District Judge cannot accept Bennet's testimony as true (*Id.* at 812 and n. 25) ; (2) inferences

---

[1] At the evidentiary hearing, the District Judge assured the parties that he was not making "any determinations about the credibility of Mr. Bennet." [JA2117-2118 at 73:25-74:3]

from Bennet's background as an editor and political advocate and the drafting and editing process must be drawn in Appellant's favor, specifically including those to be drawn from articles about the Loughner shooting published on *The Atlantic's* website while Bennet was its Editor-In-Chief and facts associated with Bennet's brother and the Bennet's politics and opposition to Petitioner and her views (*Id*. at 814-815); (3) Bennet's testimony that he did not read an ABC News article[2] hyperlinked in the Editorial must not be accepted as true (*Id*.); and (4) an honest mistake was not the only reasonable inference to be drawn from the facts. *Id*.

## C. The Summary Judgment Rulings

After the conclusion of discovery, Appellees moved for summary judgment on the issue of actual malice [JA1393-1423][3], arguing that Appellant was required to demonstrate actual malice **both** as to defamatory meaning and falsity [JA1411-1422]  On August 28, 2020, the District Judge ruled that Appellant had to establish actual malice **both** as to defamatory meaning[4] and falsity [JA1343-1347] but denied

---

[2] *See* "*Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate*" ("stated[ing], contrary to the claim in the published editorial, that '[n]o connection' was made between the SarahPAC map and Loughner"). *Palin*, 940 F.3d at 815.

[3] Petitioner moved for partial summary judgment arguing that proof of actual malice should not be required. [JA1424-50]  The District Judge rejected that argument. [JA1341-1343]

[4] This decision is indicative of the Judge's continued acceptance of Bennet's claim of an "honest mistake (*Palin*, 940 F.3d at 813) and was erroneously based on non-binding defamation by implication cases ("where a defamation case depends on a statement that is capable of multiple meanings…[plaintiff] must prove that the

summary judgment based on issues of fact. [JA1351-1356] However, the District Judge refused to carry out the Mandate by disregarding *The Atlantic's* Loughner shooting articles[5] and evidence concerning Bennet's background and brother.[6] [JA1357-1360]

### D. The Errors Committed Before, During & After Trial

The District Judge's refusal to carry out the Mandate persisted through and after the February 3-15, 2022 jury trial of this case, culminating in the violation of Petitioner's fundamental right to a fair trial, a tainted jury verdict, and erroneous judgment as a matter of law. The trial and events immediately thereafter demonstrate numerous errors sufficient to warrant reversal and a new trial.[7]

### 1. The Errors Preceding Trial

---

defendant acted with actual malice not only with respect to the statement's falsity but also as to its meaning") [JA1348-1349].

[5] The Judge disregarded *The Atlantic* articles based on Bennet's lack of "editorial control" (ignoring whether Bennet **read** them). [JA1358-1359] Several of these articles were authored by blogs "integrated" into the "umbrella" of *The Atlantic's* website. [JA1268 at ¶ 114; JA1270 at ¶ 128; JA1271 at ¶ 134; JA1301-1303 at ¶¶ 264-265; JA1307-1312 at ¶¶ 269-284] Bennet did not have day-to-day editorial control over their content, but regularly read *The Atlantic's* website and these blogs in 2011 as a reader and to keep his eye on them as its Editor. [JA1309 at ¶ 272; JA1309-1311 at ¶¶ 272-273, 278

[6] The Judge dispensed with Bennet's background as this Court's "speculat[ion]" about Bennet's connection to the shooting and compartmentalized the relevance of Bennet's brother to whether Bennet edited *The Atlantic* articles. [JA1359-1360]

[7] *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012); *Stumpf v. Long Island R.R. Co.*, 761 F.3d 192, 203 (2d Cir. 2014); *U.S. v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011); *Hopson v. Riverbay Corp.*, 190 F.R.D. 114 (S.D.N.Y. 1999) (totality of circumstances should be considered for new trial inquiry).

The Judge originally set this case for trial during the week of Appellant's counsel's daughter's wedding[8] (in Tampa) and later denied a request to continue the trial based on the Omicron variant and fears COVID exposure would cause counsel to miss the wedding.[9] The District Judge's refusal to briefly delay the trial of a case (already delayed several times at no fault of Appellant or her counsel) was prejudicial and gave a tactical advantage to Appellees.

After Appellant tested positive for COVID the day before trial was set to commence [JA1903], her counsel appeared in court while she took a second court ordered COVID test.[10]  [JA49-50 at 2:21-3:3] At the beginning of that proceeding, the Judge disclosed Petitioner's positive COVID test and gratuitously stated *"[s]he is, of course, unvaccinated"* [JA49 at 2:21-25], which predictably generated negative media coverage in this high-profile case.[11]

### 2.    The Insufficient *Voir Dire*

The District Judge started jury selection by telling the venire that whether they had "heard of one side or the other… [or]… will have perhaps views…is an

---

[8] This and other major scheduling conflicts were disclosed before the trial was set [JA1900-1902].

[9] The Judge denied this continuance, instead agreeing to recess the trial a day earlier so Petitioner's counsel could *drive* to Florida to for his daughter's wedding if he contracted COVID.  [JA33 (1/7/22 Minute Entry); JA 51-54 at 4:11-7:2]

[10] If this test was negative, the Judge planned to proceed with the trial.

[11] Conversely, when a key *Times*' witness tested positive for COVID during trial, the District Judge made no comment about her vaccination status.  [JA86-87 at 2:23-3:7]

irrelevancy." [JA2147 at 3:19-22] During the short *voir dire*, the District Judge never meaningfully explored potential biases [JA2148 at 4:20-23; JA2153 at 9:6-11; JA2165-2167 at 21:7-23:14] and at points even tried to persuade two potential jurors who disclosed biases against Appellant[12] that they could be impartial [JA2153-2152].

Petitioner's counsel inquired about asking the parties' proposed *voir dire* questions[13] [JA2159 at 15:8-9] and expressed concern over not exploring preconceived biases [JA169 at 25:19-24], but the District Judge confirmed "I have chosen not to ask those questions" [JA2159 at 15:10-12] and admonished Appellant's counsel for objecting ("You have made your record. You have made it twice. I don't want a third time"). [JA2168-2169 at 24:25-25:4]. The District Judge also commented: "Just for the record, so to speak, my philosophy of picking a jury is, of course, to make sure that we get the fairest jury possible, but also that we don't artificially exclude anyone of intelligence, and many of the questions [submitted prior to trial] that were suggested in this case seemed to me inevitably to have the effect, I'm sure this was not the intent, but have the effect of dumbing down the jury,

---

[12] This person stated, "I don't like Sarah Palin. I think she is a cruel person. I don't like her, and I don't think I would be fair to her listening to what she has to say." [J2153 at 9:19-21]

[13] Before trial, Petitioner submitted proposed voir dire questions that included asking about (among other things) the venire's sources for news and whether they subscribed to any news websites or apps. [JA1934-1936]

and I have seen that repeatedly in the 300 juries I have selected over the years, and

I'm not going to let that happen." [JA2171 at 27:1-8] Based on Appellee' counsel's

prior objection [PA2166-2168], this comment clearly was directed at Petitioner's

counsel.[14]

### 3. The Erroneous & Prejudicial Exclusion of Evidence in Contravention of the Mandate

At trial, the District Judge systematically excluded critical evidence of actual

malice, including evidence associated with Bennet's brother, the Loughner shooting

articles posted on *The Atlantic's* website, the "*How the Media Botched the Arizona*

*Shooting*" article sent to Bennet, *Times*' articles and the article Bennet received at

*The Atlantic* discussing how the media erroneously blamed Appellant for the

Loughner attack,[15] and other circumstantial evidence of actual malice, which the

Mandate identified as relevant and creating fact issues (*Palin*, 940 F.3d at 813-815).

[JA584-584-594] The District Court's rationale for the exclusion of this evidence

was that it was as irrelevant and overly prejudicial and that Bennet had to admit

---

[14] Petitioner's proposed *voir dire* questions about the venire's sources for news [JA1934-1936] were not designed to exclude "educated" jurors but figure out whether they subscribed to the Times (and might be biased) or other news media through which they were or could be exposed to extra-judicial information about the case. Petitioner's counsel later confirmed: "I don't care what level of education they have. I would be happy to know they don't have preconceived biases against my client. That's it." [JA2173 at 29:8-11]

[15] The District Judge excluded all evidence related to the Public Editor, who wrote the "*Time, the Enemy*" piece [JA1668-1671] published in the *Times* Opinion Section. [JA475-477 at 392:13-394:17; JA1668-1673 ("*Time, the Enemy*")]

reading and remembering an article before it could be admitted [JA589-590 at 506:22-507:4]:

> THE COURT: To make this relevant, you have to have a foundation for the following: first, that he read it; second, that, at the relevant time of his adding his sentences to the draft editorial, he remembered it and chose to purposely disregard it; and that, in some cases, but not in this one, there would be the further question whether there is any reason to believe he read it at all, but you seem to have evidence on the third point with respect to *The Wire*.

## 4. The Evidence Admitted at Trial Was Sufficient to Establish Actual Malice

Despite the District Judge's erroneous exclusion of the aforementioned evidence, Petitioner introduced sufficient evidence of actual malice at trial to meet her burden of proof. In addition to evidence confirming the facts discussed in the Mandate,[16] the evidence at trial established:

---

[16] Bennet "consumed" and was "regularly reading" *The Atlantic's* website in 2011, and "must have read" some of the articles about the Loughner shooting posted on the site, including those written by *The Atlantic's* "sister" blogs, several of which established there was no link between the map and Loughner. [JA700-705, 710] Bennet also regularly read the Times in 2011, which also published articles about the Loughner shooting, some of which also established the absence of any link between the map and Loughner. [JA710] A well-known consensus was reached amongst the publications Bennet was regularly reading in 2011 that Loughner's shooting was not connected in any way to the map circulated by Petitioner's PAC. [JA910-912] Bennet testified that the Loughner shooting was a "very big story" and that political rhetoric and gun control were both important issues for him—he even hosted a gun control forum at which Gabby Giffords spoke. [JA704; PA710] Williamson did not say that there was any clear or direct link between the map and Loughner's shooting in her draft because she knew there was no such link. [JA262-

11

- During the research and drafting process, Bennet was actively involved in reviewing Times' editorials and Op-Eds about the Loughner shooting, several of which contained information refuting any direct or clear link between the Palin Map and incitement of Loughner's attack. [JA694-695 at 610:9-611:16; JA718-719 at 634:9-635:3; JA1707-1716 (PL Tr. Ex. 134-136)]

- Bennet admitted reading "*Bloodshed and Invective in Arizona*" and "*As We Mourn*" and sent an e-mail stating that these two pieces were "more relevant" precedent to his predetermined narrative. [JA718-719 at 634:9-635:3; JA1715]

- The operative passages about the map and Loughner shooting in Williamson's draft were her "effort to deal with the issue Mr. Bennet had raised earlier in the day about wanting to address the rhetoric of demonization." [JA223-224 at 142:15-24 and 143:7-12]

- Bennet was "keen" and "super keen" to take on the Editorial. [JA1846 (PL Tr. Ex. 163); JA237-238 at 156:20-157:24; JA1847 (PL Tr. Ex. 186); JA241 at 160:9-21]

- Bennet pressed forward with his incitement narrative even though there was no evidence to support the "pattern" upon which the Editorial was based. [JA686 at 602:6-23; JA687-688 at 603:1-604:11]

- Bennet agreed that Williamson's draft already "communicate[d] to readers that overheated political rhetoric can create a climate that is capable of nurturing rage." [JA684 at 600:1-22]

- As the individual responsible for re-writing Williamson's draft, Bennet was responsible for fact-checking the portions of the Editorial he re-wrote. [JA178 at 92:9-13]

- Douthat, who on the evening of June 14, 2017, within an hour of the Editorial being published online, Times Op-Ed Columnist Ross Douthat emailed Bennet and told him the statements in the

---

263 at 181:10-182:2] Williamson's draft embodied the results of the research Bennet asked her to conduct. [JA684-685 at 600:23-601:25]

Editorial about Petitioner were false, wrote about and followed the Loughner shooting closely and knew the press jumped to conclusions about a political connection and that subsequent reporting revealed that extreme mental illness was the only cause and that Loughner had left-wing political associations. [JA1715-1717-1724 (PL Tr. Ex. 171-174; JA910-912 at 824:24-825:17, 826:2-6]

- Bennet's 5:08 a.m. email on June 15, 2017, instructed Williamson and Lepping to research whether a link between incitement and Loughner's shooting existed" and admits "I don't know what the truth is here." [JA 1723 (PL Tr. Ex. 191) (emphasis added)]

- The Times' policies and procedures[PA 1851-1893 (PL Tr. Ex. 17-18)], including those governing corrections [PA1889-1890], specifically addressed the type of correction to be issued when a mistake in meaning had been made. [JA871 at 786:8-24; JA872 at 787:4-9]

- Mr. Bennet testified at trial that, "*I didn't think then and don't think now that the map caused Jared Loughner to act*…" [JA806 at 721:5-6]

- The Times' first correction (online) in the body of the Editorial essentially says the same thing Williamson said in her draft - which Bennet rewrote and added the language "the link to political incitement was clear." [JA878 at 793:1-23]

**E.    The District Judge Erroneously Granted Judgment as a Matter of Law Under Rule 50**

On February 10, 2022, Defendants moved for judgment as a matter of law under Rule 50 (the "Rule 50 Motion"). [JA962]  After jury instructions and closing arguments, the jury advised the Court that they wanted to deliberate until 5:00-6:00 p.m. [JA1104, 1108]  While the jury began to deliberate, the District Judge heard

13

arguments on the Rule 50 Motion and zeroed in on the same issue used to dismiss the case in 2017: actual malice as to falsity. [JA1105-1107, 1132-1154] [17]

At one point during the February 11, 2022 argument, Defendants' counsel correctly conceded that granting judgment as a matter of law would be improper where "the key witness made a statement suggesting in its wording that he doubted or disbelieved the truth of the statement." [JA1137-1138] This concession is should have been dispositive because Bennet testified at trial that: "*I didn't think then and don't think now that the map caused Jared Loughner to act*…" [JA806 at 721:5-6][18]

However, the District Judge's attention was confined to "the possibility of the so-called adverse inference" and the clear and convincing burden of proof. [JA1138 at 1232:6-21, JA1140-1142 at 1234:16-1236:20, JA1146-1147 at 1240:5-1241:13]

---

[17] The District Judge characterized the "of and concerning" issue as a "slam dunk" for Petitioner [JA1132 at 1226:12-17], and later easily dispensed the falsity issue based on the first correction ("we got an important fact wrong, incorrectly linking political incitement and the 2011 shooting of Giffords. No link was ever established.") and Ms. Lepping's testimony that she found a police report that said the Loughner shooting was not politically connected [JA1202-1203 at 1296:4-1297:9]

[18] This specific testimony was highlighted by his own counsel during closing arguments [JA1083] which, as set forth above, the District Court wanted to hear to evaluate the Rule 50 Motion [JA1107]. For purposes of the Rule 50 Motion, the District Judge "assume[d] as Palin alleges, that Bennet either intended his edits to Williamson's draft to convey that the crosshairs map played a causal role in spurring Loughner to commit the Arizona shooting or at least that Bennet recklessly disregarded the defamatory meaning." [JA2250-2251]

14

The court seemed surprised by this very standard but cited it when he denied summary judgment. [JA1146-1147 at 1240:5-1241:13; PA1339, 1362[19]]

After learning the jury was continuing deliberations on Monday, February 14, 2022 [JA1154-1155 at 1248:22-1249:12], the District Judge indicated he would continue to consider the Rule 50 arguments over the weekend and invited the parties to email any additional authorities they wanted the Court to consider [JA1155], which they did. [JA1565-1569]

Among other things, the case law provided by Petitioner confirmed the same standard governs summary judgment and judgment as a matter of law.[20] On the morning of February 14, 2022, the argument resumed and the District Judge confirmed he had not reached a decision. [JA1162 at 1256:4-12] If the District Court was inclined to grant the Rule 50 Motion but wanted the jury to reach a verdict for purposes of an appeal, the most logical course of action would be to defer ruling on the Rule 50 Motion until after the verdict, as permitted under Rule 50(b).

---

[19] In the summary judgment order, the District Judge states: "Accordingly, the Court concludes that there is sufficient evidence to allow a rational finder of fact to find actual malice by clear and convincing evidence. Anderson, 477 U.S at 254." [JA1364]

[20] See JA 1563 (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-153 (2000); *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545-546 (2d Cir. 2010); *Lee v. McCue*, 2007 WL 2230100, *3 (S.D.N.Y. Jul. 25, 2007)).

The argument was interrupted by the jury's request for the transcript of Ross Douthat's[21] testimony. [JA1168 at 1262:6-12] Once the Rule 50 argument continued, Petitioner's counsel directed the District Judge's attention to *Sharon v. Time, Inc.*, 599 F.Supp. 538, 582 (S.D.N.Y. 1984) for the proposition that materially altering language in a draft of a publication can establish actual malice.[22] [JA1170-1172] Then, the jury requested to see the transcript of Mr. Bennet's testimony. [JA1190]

Appellant's counsel continued by directing the Court's attention to *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520-522 (1991) [JA1565], and the requirement that all justifiable inferences, credibility determinations, and the weight of the evidence be considered in favor of the non-moving party.[23] [JA1356-1357]

---

[21] Mr. Douthat was a key witness at trial because he worked for Mr. Bennet as an op-ed columnist for the Times (and at *The Atlantic*) and emailed Mr. Bennet the night the Editorial was published to confirm that it was false. [JA910-916, 1717-1720] Mr. Douthat also confirmed in his testimony that his reading of the Editorial was the "most natural reading." [JA921, 930 at 835:4-14, 844:4-13)] The jury's continued deliberations and request for the testimony of this key witness reasonably signaled that Petitioner's case had merit.

[22] *Sharon* states "[a]lthough a reporter may have sufficient evidence of his charge to foreclose any material issue of constitutional malice for its publication, he may nonetheless make himself liable if he knowingly or recklessly misstates that evidence to make it seem more convincing or condemnatory than it is." 599 F.Supp. at 582 (quoting *Westmoreland v. CBS, Inc.*, 596 F.Supp. 1170, 1174 (S.D.N.Y. 1984).

[23] On summary judgment, the court found, "It is virtually undeniable that Bennet's edits changed the meaning of Williamson's draft, an alteration that a reasonable jury might conclude was intentional. Cf. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 521 (1991)."

16

Appellant's counsel also highlighted the significance of the language Bennet used and how it changed the meaning of the draft. [JA1178-1180 at 1272:22-1274:20; JA1181-1183 at 1275:17-1277:12; JA1148-1149 at 1242:15-1243:9; JA1152-1154 at 1246:21-1248:19]

After the Rule 50 Motion argument concluded on the morning of February 14, 2022,[24] the Court recessed for lunch and reconvened nearly three hours later. [JA1201 at 1295:4-16 ("I will see you at 2:30, unless we get a note from the jury before then, at which time I will give you a ruling on the Rule 50 motion.")] Upon returning at 2:54 p.m. without a verdict, the District Judge immediately began announcing his Rule 50 decision granting judgment as a matter of law based on actual malice as to falsity [JA1201-1212;1300:8-1301:6] The court found that there was no "prepublication email in which Mr. Bennet suggests in any respect probable falsity" and that Bennet's "prepublication email suggesting the framing for the editorial" [JA1694 (PL Tr. Ex. 119)] only "shows his preexisting belief that violent right-wing rhetoric incited Loughner's attempted assassination…" [JA1208-1209 at 1302:21-1303:9] The Judge disregarded the research Bennet read during the drafting process as "giv[ing] opinions on both sides" [JA1209 at 1303:10-21] and explained away the ABC News article hyperlink as only evidence of "negligence,"

---

[24] The argument on the morning of February 14, 2022 lasted from 10:35 a.m. to 12:06 p.m. but was interrupted several times. [JA1169-1201]

also crediting Bennet's testimony that he did not open or read it. [JA1209-1210 at 1303:22-1304:7] The District Judge further credited Bennet's testimony by concluding that his actions after rewriting Williamson's draft "undermined" a finding of actual malice [JA1210 at 1304:8-20] and accepted Bennet's claim that by emailing Williamson at 7:21 p.m. to "please take a look" Bennet "meant for her to fact-check the revision." [*Id*.] Finally, the District Judge characterized Bennet's email exchange with Ross Douthat on the night the Editorial was published as Douthat "questioning whether the information [in the Editorial] was all correct" and Bennet responding, "this was his understanding but he would pursue it further." [JA1210 at 1304:21-25]

Although "troubled by the fact that the erroneous edits made by Mr. Bennet could be read by many readers as an accusation that Ms. Palin's PAC's distribution of the crosshairs map was clearly and directly linked to the Loughner shooting and concomitant murders," the District Judge considered this "an example of very unfortunate editorializing on the part of The Times." [JA1211 at 1305:2-20]

The District Judge completed his announcement of the Rule 50 decision without interruption, specifically mentioning "non-lawyers" [JA1203 at 1299:1-2; JA1205 at 1297:10-16] and stated, "I will ultimately issue an order pursuant to Rule 50 dismissing the complaint, but I will only do so after the jury returned its verdict." [JA1211 at 1305:19-23] The District Judge also commented, "[a]nd they [the jurors]

18

of course will not know about my decision…" [JA1211 at 1305:23-24], acknowledged the "inevitable appeal," and stated: ***"So, needless to say, the plaintiff is deemed to have objected to my decision, and that is preserved for appeal as well."*** [JA1212 at 1306:5-7]  At that point, ***ALL*** of Appellant's objections to the ruling were preserved.  The Rule 50 decision was the subject of immediate news coverage and "push notifications" while the jury was still deliberating [JA2267-69, 2288, 2294, 2297-2317], many of which revealed the District Judge's decision to dismiss the case in their headlines.

**F.     The Erroneous Instruction Responding to the Jury's Actual Malice Question**

On the morning of February 15, 2022, the jury submitted a question about actual malice as to falsity, which quoted the jury instructions on actual malice and the clear and convincing burden of proof [JA1579, 1944, 1955-56]:



The District Judge's immediate reaction was to provide an instruction that misstated the law and dissuaded a finding of actual malice by telling the jury that "an inference from a statement by Mr. Bennet is not itself sufficient to carry the clear and convincing burden…" [JA1217 at 1311:18-23] Appellees' counsel urged the

Court to give this improper instruction [JA1224 at 1318:1-7], but Appellant's counsel objected and pointed out that the proposed language contradicted Jury Instructions No. 5 [circumstantial evidence] [JA1944] and No. 13 [actual malice] [JA1955-56; JA1227-1228 at 1321:21-1322:3]

Nevertheless, the District Judge persisted, explaining why he believed the jury should be instructed about his rationale for granting the Rule 50 Motion:

> THE COURT: The gloss that wasn't given to them was the particular burden that the case law in defamation subsequent to New York Times v. Sullivan and comparable New York law places on a plaintiff to establish clear and convincing evidence of actual malice through something other than the mere statements of the defendant, which would otherwise be sufficient in a more average case…."

[JA1228 at 1322:4-11][25]   Consequently, the District Judge gave the jury the following erroneous instruction:

---

[25] The District Judge clearly fixated on the "negative inference" issue. However, the jury question could have been about a direct inference to be drawn from Mr. Bennet's testimony or perhaps even used the word "inference" to describe a conclusion the jury was trying to draw from direct evidence in the form of Mr. Bennet's testimony.

> Response to Jury Note of
> 2/15/2022 at 10:21 a.m.
>
> To the jury,
>
> Thank you for your latest note.
>
> In response to your first inquiry, you are free to draw any reasonable inference you choose to draw from any answer received in evidence, regardless of which side posed the question to which the answer was given.
>
> In response to your second inquiry, an answer given by Mr. Bennet and a reasonable inference drawn therefrom is not sufficient in itself to carry the plaintiff's burden of showing by clear and convincing evidence that there was a high probability that Mr. Bennet actually doubted the truth of a challenged statement prior to publication, but it can contribute to the other evidence brought forth by the plaintiff.
>
> Judge Rakoff

[JA1229 at 1323)]  This contradicted the instructions the jury already received, erroneously advised them to disregard legally sufficient evidence of actual malice and told jurors to find in favor of Appellees on actual malice.

### G.    The Verdict

After their exposure to push notifications and the improper jury instruction, the jury predictably reached a verdict for Appellees [JA1229; JA47].  After the verdict, the District Judge discussed the media coverage of the case with the jurors ("I'm glad that you were free of all that coverage since you were instructed, and it's clear to me you followed, not to pay any attention to that and to disregard it and turn away from it")  [JA1231 at 1325:15-21] and recommended to the jurors that they not talk to the media about the case, noting that juror deliberations were "clothed with

the knowledge that this was all secret" and "it would be very unfair to your fellow jurors to now start talking about it with members of the press." [JA1232 (Trial Tr. at 1326:1-8)]

The District Judge also informed the jurors about his Rule 50 Motion decision ("I have concluded as a matter of law that the defendants are not liable too. So we've reached the same bottom line…You decided the facts; I decided the law. As it turns out, they both were in agreement in this case."). [JA1232-1233 at 1326:25-1327:2] At that point, none of the jurors volunteered their exposure to media coverage or "push notifications" during the trial or their deliberations, and they were released. [JA1233 at 1327]

### H.    The Final Judgment and Post-Trial Developments

At 4:53 p.m. on February 15, 2022, the District Court docketed the Final Judgment, [JA2239, JA46], which states "[i]n view of the jury having returned a verdict of not-liable, and independently, for the reasons stated by the Court previously in granting Defendants' Rule 50 motion, final judgment is hereby entered dismissing the complaint with prejudice." [JA44]

Unbeknownst to the parties, on the afternoon of July 15, 2022, the District Judge's judicial law clerk conducted an exit interview of the jurors. [JA1559-1560] During the exit interview, several jurors notified the judicial law clerk that they were exposed to push notifications about the District Judge's Rule 50 decision. [JA1559-

23

1560[26]]   Some jurors likely received push notifications throughout the trial, including headlines disparaging Petitioner and her trial testimony.  [JA2338-2358]

On February 16, 2022, at approximately 12:13 p.m., Petitioner's counsel received an e-mail [JA2360] from a *Bloomberg* journalist requesting comment on the article "*Palin Jurors Knew Judge Dismissed N.Y. Times Case Before Verdict*," which was posted online that morning at 11:34 a.m.  [JA2362]  This article quoted the District Judge, who spoke to the *Bloomberg* reporter and was quoted as follows:

> "I'm disappointed that the jurors even got these messages, if they did," Rakoff said in an interview Wednesday, referring to the news notifications received by jurors.  **"I continue to think it was the right way to handle things."**
>
> The judge said he spoke to his clerk today **after being informed of the issue by Bloomberg**, and was told that "at most three" jurors reported knowing about his ruling before delivering their verdict **and said it didn't affect their deliberations**.

[JA2362 (emphasis added)]

At 12:26 p.m., the judicial law clerk emailed counsel a copy of a brief (2-page) order addressing the situation that would be "docketed shortly."  [JA2364-2366]  The District Judge's timeline of the events on February 16, 2022 (quoted below) appears inconsistent with the timeline established by and in the *Bloomberg*

---

[26] It is unclear whether the judicial law clerk immediately notified anyone else about the jurors disclosure on the afternoon or evening of February 15, 2022, but reasonable to assume that this is the type of information that would have been immediately conveyed.

article [JA1593 at 3:3-20]  The *Bloomberg* article was published at 11:34 a.m. [JA1582] and states the District Judge "spoke to his clerk **after** being informed of this issue by *Bloomberg*."  The District Judge indicated  "my order, which appeared -- that was sent to counsel as well -- I think approximately **five minutes after his story came out**" [JA1593 at 3:18-20 (emphasis added)], but the *Bloomberg* story came out at 11:34 a.m. and the order was not sent to counsel until 12:26 p.m. (**52 minutes** later) [JA2362-2364-66].

Regardless, the District Judge spoke to the press about the jurors' exposure to push notifications before informing counsel about this development and defended his decision to announce the Rule 50 ruling during deliberations to the reporter.

## I.    The Rule 50 "Opinion"

On March 1, 2022, the District Court issued its 68-page "Opinion" (the "Rule 50 Opinion") [JA1963-2030] defending the Rule 50 decision, which goes far beyond "elaborating" on the substance of the oral ruling and seeks to validate the "unusual" timing of the Rule 50 decision based on a waiver (*i.e.,* "neither side objected to it in the slightest") [JA1965-68, 1995-2000, 2026-2027], which contradicts the court's statement: "So, needless to say, the plaintiff is deemed to have objected to my decision, and that is preserved for appeal as well."  [JA1212 at 1306:5-7][27]  The

---

[27] The Court suggests Plaintiff had four opportunities to object to the procedure. [JA1968]  Two of these were *after* the decision was announced [JA1212-13 at 1306-1307]; one was *during* the ruling [JA1201-1203 at 1295-1297] (apparently

Court's unconditional preservation was not limited to "prior" objections or the "legal substance" of the court's ruling. [JA at n. 21]

The Rule 50 Opinion commends the "model jury" [JA2027-2028] and describes jurors as "adamant that [push notifications] had not affected their determination of the verdict in the slightest" [JA1968-69, 1999-2000, 2026-27], but there is no way to test this assertion because Rule 606(b), *Fed. R. Evid.*, prohibits the disclosure of "the effect of anything on [a] juror's or another juror's vote." *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994). Ultimately, the Rule 50 Opinion deems the verdict "legally irrelevant" "even if one indulges the implausible hypothesis that the jury would have returned a verdict for Palin absent news alerts." [28] [JA1969]

As more fully explained below, the Rule 50 Opinion presents a skewed, incomplete version of the facts, disregards significant evidence of actual malice, draws inferences against Plaintiff, and adopts Bennet's testimony as true. It does

---

suggesting Plaintiff's counsel should have predicted the outcome and stopped the ruling); and the other was supposedly when the Court "made the initial proposal" [JA1968]—but no "proposal" was made (rather, the Court confirmed it had not made a decision "but were I to grant the motion, I would still let the jury continue to reach a verdict") [JA1162 at 1256:4-12].

[28] The appearance of partiality arising from this speculative comment is considerable, and it ignores Rule 606(b) and the "objective test" applied to assess the likelihood that extraneous information "would affect a typical juror." *Bibbins*, 21 F.3d at 17. Learning the presiding judge determined a case has no merit is the type of information that would affect a typical juror.

precisely what the this Court said in the Mandate (*Palin*, 940 F.3d at 813-815) and the Supreme Court said in *Reeves*, 530 U.S. at 152-153, cannot be done: it "disregarded critical evidence favorable to petitioner…failed to draw all reasonable inferences in favor of petitioner…discredited petitioner's evidence… [and]… impermissibly substituted its judgment concerning the weight of the evidence for the jury's."

## **SUMMARY OF ARGUMENT**

The totality of facts and circumstances surrounding the trial and premature adjudication of this case warrant reversal and vacatur of the Verdict, Rule 50 decision, and Final Judgment, and the granting of a new trial. ***First***, Appellant should not have been required to prove actual malice as to falsity or defamatory meaning. ***Second***, the verdict cannot stand because the District Court conducted a legally insufficient *voir dire*, erroneously excluded crucial evidence of actual malice, and improperly instructed the jury in response to its February 15, 2022 question.. ***Third***, the District Court erroneously granted judgment under Rule 50 and announced that decision during jury deliberations. ***Fourth***, the District Judge should have granted the motion to disqualify before ruling on Appellant's post-trial motions. Several of these errors independently require reversal and a new trial, and collectively they demonstrate Appellant was denied a fair trial.[29]

---

[29] *Davidson v. Riley*, 44 F.3d 1118, 1122 (2d Cir. 1995); *Delaware v. Van Arsdall*, 475 U.S. 673, 681-682 (1986); *Tumey v. Ohio*, 273 U.S. 510, 535 (1927); *see also Giano v. Sullivan*, 709 F.Supp. 1209, 1217 (S.D.N.Y. 1989) (*citing Johnstone v. Kelly*, 808 F.2d 214, 218 (2d Cir. 1986)).

## STANDARD OF REVIEW

The standard of review for the District Court's legal conclusions, jury instruction, and Rule 50 decision is *de novo*. *Davis v. Rodriguez*, 364 F.3d 431-432 (2d Cir. 2004); *Ashley v. City of New York*, 992 F.3d 128, 142 (2d Cir. 2021). The standard of review for the District Court's questioning of prospective jurors, decisions to exclude evidence, and disqualification decision is an abuse of discretion. *U.S. v. Tsarnaev*, 142 S. Ct. 1024, 1034 (2022); *U.S. v. Pepin*, 514 F.3d 193, 202 (2d Cir. 2008); *Crescent Publ'g Group, Inc. v. Playboy Enterprises, Inc*., 246 F.3d 142, 146 (2d Cir. 2001) ("While "abuse of discretion" is "one of the most deferential standards of review[,] ... [a] district court necessarily abuses its discretion if its conclusions are based on an erroneous determination of law, or on a clearly erroneous assessment of the evidence." (quoting *Matthew Bender & Co. v. West Publ'g Co*., 240 F.3d 116, 120–21 (2d Cir.2001) (citations and internal quotation marks omitted)); *Cheney v. U.S. Dist. Court for Dist. Of Columbia*, 542 U.S. 367, 380 (2004); *In re The City of New York*, 607 F.3d 923, 939 and 943 (2d Cir. 2010) (*quoting Mohawk Indust., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009)). The District Court's insufficient jury selection[30], improper jury instruction[31], erroneous

---

[30] *See U.S. v. Lawes*, 292 F.3d 123, 129 (2d Cir. 2002).

[31] *See U.S. v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011); *Owen v. Thermatool Corp.*, 155 F.3d 137, 139 (2d Cir. 1998); *Girden v. Sandals Intern.*, 262 F.3d 195, 204-205 (2d Cir. 2001); *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 525 (2d Cir. 1998); *Restivo v. Hessmann*, 846 F.3d 547, 572 (2d Cir. 2017) (erroneous instruction about

29

evidentiary rulings[32], Rule 50 decision[33] (including violations of the Mandate throughout), and legal rulings on actual malice all warrant reversal under these standards.

## **ARGUMENT**

### A.     **The District Court Erred by Requiring Appellant to Prove Actual Malice**

"The right of a man to protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22 (1990) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 86 and 92-93 (1966)); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974). As such, the right to protect one's reputation is a fundamental constitutional right according to the standards recently recognized

---

a "potentially dispositive" issue); *Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 162 (2d Cir. 2004) (errors that are so serious and flagrant that they threaten the integrity of the trial or deprive the jury of legal guidance in making a decision are fundamental error).

[32] *See e.g.*, *Village of Freeport v. Barrella*, 814 F.3d 594, 610-611 (2d Cir. 2016) (new trial appropriate where evidentiary rulings are a clear abuse of discretion and clearly prejudicial to the outcome of the trial); *Restivo*, 846 F.3d at 573 (errors are prejudicial to the outcome of the trial where "the jury's judgment would be swayed in a material fashion by the error")

[33] *See Reeves*, 530 U.S. at 150-153; *Kaytor*, 609 F.3d at 545.

by the Supreme Court in *Dobbs v. Jackson Women's Health Organization,* 142 S.
Ct. 2228, 2246 (2002).

"The protection of reputation has taken on additional gravity since the
development of the Internet. It is now easier to defame another person than at any
time in world history, as the Internet makes everyone a potential mass-media
publisher." *See* 1 Law of Defamation § 1:21 (2d ed.) (Protection of Reputation—
Purposes). "The destruction that defamatory falsehood can bring is, to be sure, often
beyond the capacity of the law to redeem. Yet, imperfect though it is, an action for
damages is the only hope for vindication or redress the law gives to a man whose
reputation has been falsely dishonored." *Milkovich*, 497 U.S. at 22-23 (citing
Rosenblatt, 383 U.S. at 92–93 (concurring opinion)). Defamation actions are the
necessary and indispensable means of checking and balancing the exponentially
increasing power of the Fourth Estate and speech in general. The precedents
established through lawsuits against media companies like serve as guideposts to
society and are the only method of "creating incentives for the press to exercise
considered judgment before publishing material that compromises personal
integrity." *Celle v. Filipino Reporter Enterprises, Inc*., 209 F.3d 163, 171 (2d Cir.

2000) (quoting *Herbert v. Lando*, 441 U.S. 153, 203 (1979) (Marshall, J., dissenting)).

In fact, "important social values [ ] underlie the law of defamation'" and "[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation." *Milkovich*, 497 U.S. at 22 (citing *Rosenblatt*, 383 U.S. at 86). One important reason free speech has limits is because "[f]alse statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988).

Nearly half a century ago, long-before the Internet and social media took hold of American society, the actual malice rule was judicially created in response to government officials using defamation lawsuits against members of the press to try to stifle the voices of Civil Rights leaders.[34]  It was a "policy-driven" means of

---

[34] *See* Mary-Rose Papandrea, *The Story of New York Times Co. v. Sullivan*, Boston College Law School Legal Studies Research Series, May 30, 2012, pp. 2-8.   The 1960's saw, among other things, the 1963 March on Washington,  passage of the Civil Rights Act and "Bloody Sunday" in Selma in 1964, passage of the Voting Rights Act and assassination of Malcolm X in 1965, and the assassination of Martin Luther King Jr. and passage of the Fair Housing Act in 1968.

protecting "breathing space[35]" for speech critical of the government. *McKee v. Cosby*, 139 S.Ct. 675, 676 (2019) (Thomas, C., concurring).

The rule, even if it has a valid textual basis in the First Amendment, is obsolete in the modern speech landscape. "It is no exaggeration to conclude that the Internet has achieved, and continues to achieve, the most participatory marketplace of mass speech that this country—and indeed the world—has yet seen." *See American Civil Liberties Union v. Reno*, 929 F.Supp. 824, 881 (E.D. Pa. 1996), *judgment aff'd*, 521 U.S. 844, 851, 853 (1997) ("Anyone with access to the Internet may take advantage of a wide variety of communication and retrieval methods…[and]…with a computer connected to the Internet can 'publish' information.").

The rule should not be applied in substantially dissimilar circumstances to those present in *New York Times v. Sullivan*, 376 U.S. 254 (1964), *Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967), and *Gertz v. Robert Welch, Inc*., 418 U.S. 323

---

[35] The genesis for the Supreme Court's "breathing space" concerns was *NAACP v. Button*, 371 U.S. 415, 433 (1963), which involved attempts to oppress minority speech. At issue was a Virginia statute that infringed the right of the NAACP and its members and lawyers to associate for the purpose of assisting persons who seek legal redress for infringements of their constitutionally guaranteed and other rights. *Id.* at 428. The Court struck the statute as unconstitutional because it could "easily become a weapon of oppression, however evenhanded its terms appear…[and]…freeze out of existence all such activity on behalf of the civil rights of Negro citizens." *Id.* at 435-436.

(1974).[36]  Continuing to apply the rule not only subverts fundamental constitutional rights and human dignity without justification, but also harms free expression, chills speech, and proliferated false information.

Although the Supreme Court counseled against  a "blind application" of the rule,  *Butts*, 388 U.S. at 148 (citing *Time, Inc. v. Hill*, 385 U.S. 374, 390 (1967)), the press has become virtually impervious to liability for defamation by invoking *Sullivan* even though our society now has unfettered access to the marketplace of ideas and there are virtually no limits on everyone's equal opportunity to participate in the uninhibited, robust, and wide-open debate *Sullivan* and its progeny sought[37] but are no longer necessary to ensure.

Beyond those problems, one of the bedrock assumptions upon which the actual malice rule rests is that society can tolerate defamatory statements because they are "inevitable in free debate,"[38] which necessarily presumes untruths will be

---

[36] 94 Calif. L. Rev. at 847-848 ("By focusing on the Court's conception of the media during the decade between Sullivan and Gertz, a picture of a doctrine inextricably tied to outdated assumptions emerges.")

[37] "The *New York Times-Butts-Gertz* culpability requirements further ensure that debate on public issues remains 'uninhibited, robust, and wide-open." *Milkovich*, 497 U.S. at 20.

[38] Despite the fact that false statements are valueless and devoid of constitutional protection, *Milkovich,* 497 U.S. at 18, some justify them based on *Sullivan*'s premise that "erroneous statement[s] [are] inevitable in free debate, and… must be protected…" *Sullivan*, 376 U.S. at 271-272.  However, reliance on this proposition in the public figure context is misplaced because it arose within the narrow confines of overruling "cases which impose liability for erroneous reports of the political conduct of officials [because they] reflect the obsolete doctrine that the governed

the exception. *Butts*, 388 U.S. at 152 ("We have recognized the inevitability of ***some***

error in the situation presented in free debate." (emphasis added)). However, false

information is rampant and defamatory falsehoods cannot sufficiently be overcome

by the "self-help" discussed in *Gertz*, 418 U.S. at 344. We are worlds away from

the days when a public figure was capable of meaningfully defending herself against

defamation by issuing a press release or holding a press conference.

The actual malice rule should not have been applied under the First

Amendment nor N.Y. Civil Rights L. § 76-a(2). The District Judge's December

29, 2020 [Doc. 125] decision to require Appellant to also prove actual malice

based on the retroactive application of New York's amended Anti-SLAPP statute

was clearly erroneous. *Gottwald v. Sebert*, 203 A.D.3d, 488, 165 N.Y.S.3d 38 (1st

Dept. 2022); *Kurland & Associates, P.C. v. Glassdoor, Inc*., 205 A.D.3d 545, 166

N.Y.S.3d 847, 848 (1st Dept. 2022); *Robbins v. 315 West 103 Enterprises LLC*, 204

A.D.3d 551, 162 N.Y.S.3d 823, 824 (1st Dept. 2022); *Zuckerbrot v. Lande*, 75

Misc.3d, 269, 288, 167 N.Y.S.3d 313, 329 (1st Dept. 2022).

The November 10, 2020 amendments to § 76-a are not "remedial." They

impact "substantive burdens and rights" and thus constitute a "change in substantive

law" triggering the standards enunciated in *Regina Metropolitan Co., LLC v. New*

---

must not criticize their governors." *Id.* Extending this justification to false
statements about public *figures* simply ignores the fact that such *figures* do not in
any sense "govern" the people criticizing them.

*York State Division of Housing and Community Renewal*, 35 N.Y.3d 332 (2020). Specifically, because the changes to Section 76-a, "if applied to past conduct, would impact substantive rights and have retroactive effect, the presumption ***against retroactivity*** is triggered." *Id.* at 370 (emphasis added). Notably, New York's legislature did not include an unequivocal textual expression that the statute was intended to apply to past conduct, nor an express prescription of the statute's temporal reach. *Id.* at 373.

**B.    The District Court's Prejudicial and Erroneous Rulings at Trial Require Reversal**

### 1.  The Insufficient *Voir Dire*

Although district courts have broad discretion in jury selection, an insufficient *voir dire* calls for reversal where: (1) it is so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about potential jurors' general outlook, experience, communication skills, intelligence, lifestyle, etc.; or (2) there is a failure to inquire about, or warn against, a systemic or pervasive bias in the community that would have been cured by asking a question posed by a party. *U.S. v. Lawes*, 292 F.3d 123, 129 (2d Cir. 2002).

The District Court's duty is to "conduct a thorough jury selection process that allows the judge to evaluate whether each prospective juror is 'to be believed when he says he has not formed an opinion about the case.'" *Tsarnev,* 142 S. Ct. at 1034. Although strict rules cannot be imposed on trial courts impeding on their discretion,

there needs to be a sufficient exploration of things like what media sources prospective jurors followed, how much media they consumed, and whether they commented publicly about the facts of the case. *Id.* at 1035-36; *U.S. v. Kahaner*, 204 F.Supp. 921, 924 (S.D.N.Y. 1962) ("naïve not to recognize…that the publicity surrounding the case…underscores the court's duty to question jurors on *voir dire* with painstaking care to assure…an impartial jury and a fair trial.")

Here, the District Court began *voir dire* by telling the venire that whether they had "heard of one side or the other… [or]… will have perhaps views…is an irrelevancy" [JA88 at 3:19-22] and refused to ask any of the parties' proposed *voir dire* questions, which were intended to figure out whether jurors subscribed to the *Times* (and might be biased) or other news websites or apps through which they might have been exposed or could be exposed to extra-judicial information about the case. Questions such as these were necessary and appropriate under Rule 47(a), *Fed. R. Civ. P.*, in a high-profile case involving a major media defendant, polarizing parties and political issues, and extensive press coverage. Overall, the jury selection process was so insufficient it calls for reversal. *Lawes*, 292 F.3d at 129.

## 2. The Erroneous and Prejudicial Exclusion of Evidence at Trial

The District Court's evidentiary rulings also warrant reversal and a new trial because they were a clear abuse of discretion and clearly prejudicial to the outcome of the trial. *Village of Freeport v. Barrella*, 814 F.3d 594, 610-611 (2d Cir. 2016).

An "abuse of discretion" occurs where the court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence or rendered a decision that cannot be located within the range of permissible decisions." *Id*. Errors are prejudicial to the outcome of the trial where "the jury's judgment would be swayed in a material fashion by the error." *Restivo v. Hessemann*, 846 F.3d 547, 573 (2d Cir. 2017) (citing *Arilo v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007)).

Under Rule 401, Appellant only needed to demonstrate the evidence had the tendency to make a fact of consequence more or less probable. [JA469 at 386:13-387:12]  The Mandate already established the relevance of Bennet's brother and Bennet's background.  Appellant also introducing evidence that Bennet regularly read *The Atlantic's* website (including its integrated blogs) and the *Times* at the time of the Loughner shooting [JA700-04 at 616:3-620:16; JA705 621:7-9] and "must have read" some of the articles; considered the Loughner shooting a "big story" [JA704 at 620:17-19]; read articles about the shooting that concerned Loughner's "mental state" [*Id*. at 620:20-25]; confirmed his particular interest in political rhetoric and gun control and moderated a gun control event at which Gabrielle Giffords spoke [JA710 at 626:5-25]; and was personally observed by a co-worker recalling articles from several years ago.  [JA495-96 at 412:22-413:1]  This laid a more than adequate foundation to admit excluded articles.

38

The Court erroneously excluded *The Atlantic* articles based on the conclusion they could not be admitted unless Bennet admitted reading and remembering them when he rewrote the Editorial. [JA589-590 at 506:22-507:4] If this were the standard, a defendant could automatically guarantee exclusion of such evidence simply by claiming not to have read or remembered an article when writing a challenged statement.

Appellant was not required to conclusively establish that Bennet read and remembered each of *The Atlantic* website articles and chose to purposely disregard them at the time of writing the Editorial to admit the relevant, material evidence of actual malice the trial court excluded. *Palin*, 940 F.3d at 813-815. It was sufficient to show that Bennet was regularly reading (indeed, "consuming") *The Atlantic's* website (including its integrated blogs) [JA700-704 at 616:3-620:16; JA705 at 621:7-9] and "must have read" some of the articles about the shooting, thought the Loughner shooting was a "big story" [JA704 at 620:17-19] had a particular interest in political rhetoric and gun control, even moderating a gun control event hosted by *The Atlantic* at which Gabrielle Giffords spoke. [JA710 at 626:5-25] This evidence laid a more than adequate foundation to admit the evidence this Court determined to be relevant in the Mandate. *Palin*, 940 F.3d at 813-814.

**3.    The Erroneous Judgment as a Matter of Law Under Rule 50**

The Rule 50 Opinion must be vacated because it violates the Mandate and "disregarded critical evidence favorable to petitioner…failed to draw all reasonable inferences in favor of petitioner…discredited petitioner's evidence… [and]… impermissibly substituted its judgment concerning the weight of the evidence for the jury's." *Reeves*, 530 U.S. at 152-153.

The District Court's characterization of the "origins" of the Editorial [JA1973-1975] embraces Defendants' version of the facts and fails to account for Bennet's preconceived narrative and position as the head of the Opinion Section. The evidence at trial presented an even stronger case of actual malice than at the summary judgment stage, when the Court concluded: "taken in the light most favorable to plaintiff, the evidence shows Bennet came up with an angle for the Editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results [of] the Williamson research that he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth." [JA1364]

The only inferences drawn from the limited facts cited in the Rule 50 Opinion related to the drafting and editing process are in favor of Defendants,[39] making it

---

[39] The Opinion notes Linda Cohn's role in the Editorial [JA1980], but Cohn only briefly reviewed Williamson's draft and immediately took it to Bennet and told him "you need to look at this" because she was not sure it was what he wanted. [JA603 at 519:23-522:5] This was not a "conversation" about the content, but a "one sentence" exchange. [Id.]

seem as if Bennet was not intimately involved and in control of the content of the Editorial. However, the same facts (and others) demonstrate that Bennet (the "boss" with "ultimate decision-making authority" over the Editorial [JA605 at 521:8-18]) plowed ahead with his preconceived narrative about "incitement" (injected forty minutes after Semple already decided the Editorial was going to be about gun control) [JA1964] even though there was no evidence or "pattern" to support the defamatory statements. [JA687at 603:1-604:11; JA869 784:10-786:22].[40] It is likewise reasonable to conclude that no one who worked for Bennet was going to question or change what he wrote in the Editorial—particularly after he decimated the operative passages of Williamson's draft [Doc. 196 at p. 20 (redline of operative passages)] because they did not say what Bennet conveyed to everyone in his 12:41 p.m. email [JA1694] he wanted the Editorial to say.[41] In fact, Williamson testified Bennet was "super keen" to take on the Editorial [JA238 at 157:4-24; JA1846;

---

[40] At one point, Bennet admitted the argument in the Editorial "fell apart," but quickly tried to backtrack. [JA735 at 651:20-652:22]

[41] Indeed, as the District Court noted in its summary judgment order, "taken in the light most favorable to plaintiff, the evidence shows Bennet came up with an angle for the Editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results [of] the Williamson research that he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth." [JA1364] This explains why no one who reviewed Bennet's rewrite flagged any problems [JA1964] and why Lepping did not fact-check the lines Bennet added about incitement [JA1352-53]

JA1847][42] and Bennet's significant edit to Williamson's draft and insertion of language with a different meaning bolsters the conclusion that Bennet was in control.[43]

The Rule 50 Opinion ignores the "strong" language Bennet used to grab reader's attention [JA689 at 605:11-19][44] and assertion that the "link" to "incitement" was "clear" and "direct," which conveyed there was conclusive proof of the causal connection between the map and Loughner's attack. This is significant given Bennet's admission that Williamson's draft already said what Benet claims he was trying to say [JA877-878 at 792:20-793:23; JA869-71 at 784:1-786:24], meaning there was no reason to change the draft unless Bennet was purposefully editing it to convey something different.[45] Williamson drafted the Editorial consistent with the results of her research (refusing to draw any direct or clear

---

[42] This is another critical area where Bennet's conflicting testimony created a fact issue. Bennet denied Williamson's assertions that he was "keen" and "super keen" to take on the Editorial. [JA875 at 790:14-25]

[43] The alteration of a draft by adding or changing language to create a different meaning is recognized evidence of actual malice. *Sharon*, 599 F.Supp. at 582; *Young*, 734 F.3d at 547-548.

[44] The Court previously found this was "powerful evidence" of actual malice, strongly supportive of the inference that the statements were made "with knowledge of [their] falsity," and implicated Bennet's credibility, which "is for the jury to assess, not for this Court to credit..." [JA1352-1354]

[45] Bennet received a glowing review from A.G. Sulzberger for 2017 (the year the editorial was published), including that his "instinct for stories, framing, and language is impeccable." [JA757 at 673:15-674:4]

connection to incitement) [JA223-224, 262-263 at 142-143, 181-182], and Bennet obliterated it because it did not track his narrative.

The Rule 50 Opinion's description of the research conducted on June 14, 2017 about Bennet's preconceived narrative is also tilted exclusively in favor of Defendants. It disregards Bennet's glaring admission of actual knowledge of falsity ("I didn't think then and don't think now the map caused Jared Loughner to act" [A806 at 721:5-6]), asserting it "must be read" to mean something other than what it plainly says. [JA2014][46] In another attack of Plaintiff's proof at trial, the Rule 50 Opinion faults her for "offer[ing] no admissible evidence that would undermine Bennet's" claimed "recollection" [JA2011] and failing to adduce "affirmative evidence" that Bennet or the Editorial Board were biased,[47] while crediting Bennet's "deni[al] [of] having any recollection of specific articles he read in 2011 or thereafter about the Arizona shooting that discussed Loughner's mental state," and simultaneously citing the exclusion of evidence associated with Bennet's brother and *The Atlantic* articles (in violation of the Mandate) [JA2015 at n. 31-32]. Also, despite acknowledging Bennet's request for prior editorials "connecting…the

---

[46] The explanation conflates defamatory meaning and falsity, but the Court did not grant judgment as a matter of law on defamatory meaning [JA2003 at n.26] and assumes Bennet intended to convey the crosshairs map caused Loughner's attack. [JA2007]

[47] Plaintiff introduced substantial evidence of bias, not the least of which was Semple's discussion of the Republican lawmakers shot by Hodgkinson in prepublication emails and the Editorial Board's liberal bias. [JA915 at 829:11-18]

Giffords shooting to some kind of incitement," the Rule 50 Opinion ignores Bennet's "good for us" response when learning there were none.[48]

The Rule 50 Opinion also takes a decidedly one-sided view of the two editorials ("*Bloodshed and Invective*" and "*As We Mourn*") and op-ed column ("*No One Listened to Gabrielle Giffords*") circulated during the drafting process, suggesting this research Bennet requested, received, and read before writing the defamatory passages does not matter. [JA1975-78, 2011-13[49]] This erroneously disregards several statements within these articles that flatly refute Bennet's preconceived narrative.[50] If one accepts that Bennet read and understood each of these articles, it is impossible to grant judgment as a matter of law on actual malice.[51]

---

[48] On summary judgment, the Court concluded that "a reasonable jury could infer from this ["good for us"] response that Bennet felt free to advance his narrative because the Editorial Board had not written on the subject." [JA1363]

[49] The Opinion tries to avoid the implications of Bennet's admission to reading this research by suggesting the articles did not "include any conclusive statement regarding [Loughner's] motivations or political convictions, if any" [JA1978] and that "none presents any definitive facts about the Arizona shooting" [*Id.*].

[50] For example, "Jared Loughner …appears to be mentally ill. His paranoid Internet ravings about government mind control place him well beyond usual ideological categories" [JA1977]; "This horrific event, [Pres. Obama] said, should be a turning point for everyone – 'not because a simple lack of civility caused this tragedy—it did not…'" [JA1978]; "It is facile and mistaken to attribute this particular madman's act directly to Republicans or Tea Party members." [JA2010]) Bennet testified it was probable he read each of these statements. [JA866-867 781:21-782:5; JA 863-64 778:17-779:13; 779:14-781:1] Bennet also confirmed reading the portion of "As We Mourn" concerning the "accusation by Sarah Palin that journalists and pundits had committed a 'blood libel'." [JA866-68 at 779:14-781:1; JA1978]

[51] On summary judgment, the Court specifically addressed these same articles and described them as "disclaim[ing] the idea that Loughner had been motivated by

The statements and other information in these articles demonstrate Bennet knew his assertion of a **"clear"** and **"direct"** link between the map and incitement was false.

At bare minimum, these same materials establish Bennet's reckless disregard of the truth because they indisputably provide information that called Bennet's preconceived narrative into doubt. As the Court found a summary judgment, "where [a] publisher undertakes to investigate the accuracy of a story and learns facts casting doubt on the information contained therein, it may not ignore those doubts, even though it had no duty to investigate in the first place." [JA1357][52] The Second Circuit acknowledged the same principle in the Mandate. *Palin*, 940 F.3d at 814 (discussing Bennet's failure to "reacquaint[] himself with the articles published in *The Atlantic*.").[53]

_____

violent rhetoric," [JA1363-64] and ultimately concluded that "taken in the light most favorable to plaintiff, the evidence shows Bennet came up with the angle for the editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results [of] the Williamson research he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth." [*Id*.]

[52] The Court also concluded that: "After receiving Williamson's draft, a reasonable jury might conclude, Bennet had obvious reasons to doubt whether there existed a link between the map and the Loughner shooting… [and his] failure to further investigate or at least just click on the link to the only article Williamson had presented could support the inference that he was purposefully avoiding the truth." [JA1995]

[53] Plaintiff cited another case during the Rule 50 argument illustrating this same proposition. *Young v. Gannett Satellite Info. Network, Inc*., 734 F.3d 544, 548 (6th Cir. 2013) (*citing Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989)). In *Young*, the court found recklessness based on a failure to investigate further where initial research "found no definitive statement" to support an accusation, and the failure to conduct additional research indicates a "deliberate

The Rule 50 Opinion also contradicts the Mandate and summary judgment order[54] by discounting the ABC News article hyperlink and "reject[ing] Palin's argument that the presence…of the hyperlink" was circumstantial evidence of actual malice; which also once again erroneously accepts Bennet's testimony that he did not click on the hyperlink or read the ABC News article. [JA1979-1980, 2011-2014] *Palin*, 940 F.3d at 815. The Opinion also argues the ABC News article is not evidence of actual malice "assuming <u>arguendo</u>" Bennet read it [JA2012 at n. 28] based on the proposition (which contradicts the Mandate) that a "reasonable reader in Bennet's position" would not understand the ABC News article to call Bennet's assertion of a causal link between the map and Loughner's attack into doubt."[55] This ignores the statement "no connection has been made between [the map] and the Arizona shooting" and other information on the second page of the ABC News article which refutes any connection (*i.e.,* "an acquaintance of Loughner's, Caitie

---

decision not to acquire knowledge of facts that might confirm the probable falsity" of the accusation." *Young*, 734 F.3d at 548.

[54] *See* JA1362-1363 ("a jury might discredit [Bennet's] testimony" that he did not click on the hyperlink and, "[n]onetheless, even if it were true, it could be evidence of reckless disregard.").

[55] The Opinion suggests it is "not at all clear" Bennet was even "negligent" by failing to click on the hyperlink because it was on the word "circulated." However, Plaintiff introduced evidence that Bennet was responsible for fact-checking the portion so the Editorial he rewrote [JA178 at 92:9-13] and fact-checking requires clicking on hyperlinks ("you open every link") and confirming they support the facts. [JA481 at 398:5-20; JA504-505421:2-422:5]

Parker… described him on Twitter as "more libertarian & definitely socially liberal").

The Court also gave considerable weight to a one-sided view of some of the events occurring after Williamson completed her draft, continuing to credit Bennet's testimony about what transpired and who was responsible for fact-checking the portions of the Editorial Bennet rewrote [JA1980-85, 2020-21], accepting as true Bennet's claim that he functioned solely as an editor, not a reporter [JA1982]. Williamson refuted Bennet's claim, confirming that he was responsible for fact-checking his rewrite. [JA178 at 92:9-13] The Rule 50 Opinion also adopts Defendants' position that "the Times' editing and fact-checking processes [bely] the inference that [Bennet] intentionally or recklessly published false information" [JA2020-21] and gave significant weight to Bennet's claim that he sent his revised version to Williamson to fact-check it. [JA1982-85] However, Williamson flatly contradicted Bennet's testimony, confirming that Bennet's email on the evening of June 14, 2017 did not "specifically ask [her] to fact-check anything in the draft that he changed" [JA238-239 at 157:25-158:3] and that once she submitted her draft of the Editorial her work was done [JA219 at 138:9-12].

The Rule 50 Opinion's view of Bennet's post-publication conduct also improperly draws inferences only in favor of Defendants and accepts Bennet's claim that he made an innocent mistake in its analysis of Bennet's email exchanges with

47

Ross Douthat and Bennet's 5:08 a.m. email to Williamson and Lepping [JA1986-89, 2002-05].[56]

The Court clearly believed Bennet's claim that he was "upset and confused" by Douthat's email. [JA1988] However, after Douthat informed Bennet the Editorial was false, Bennet's real-time reaction was "Thanks, and I'll look into this tomorrow" [JA1717], and he did not immediately call Williamson [JA732 at 648:2-5] or conduct any fact research online [JA732 at 648:2-10]. Instead, Bennet looked at comments about the false accusations in the Editorial on social media [JA733 at 649:10-25; JA880-81 795:23-796:13; 835:1-838:11], which continues to give rise to the reasonable inference that "Bennet could have published the editorial knowing— or recklessly disregarding—the falsity of the claim, and then decided later that the false allegation was not worth defending… a calculus that standing by the editorial was not worth the cost of public backlash."[57] *Palin*, 940 F.3d at 815. This "calculus" began with Douthat's emails to Bennet, including links to social media posts by well-known ***liberal*** media pundits who were taking shots at the false accusations in

---

[56] The Court also noted Bennet's "regret for the mistake," citing an apology in a statement in response to questions from a CNN reporter that "a member of the [Times'] public relations staff did not pass along." Bennet claimed at trial he did not know the apology was not published [JA882 at 797:2-20], but the full email string produced by the Times in discovery contains substantial portions redacted as attorney-client communications, which contradicts Bennet's self-serving claim. [JA2368-2414]

[57] Bennet admitted he did not see anyone interpreting the Editorial consistent with what he claimed to be his intended meaning. [JA734 at 650:1-4]

Bennet's Editorial. [JA921 at 835:1-14; JA928 842:1-7; JA1717-1720] In fact, the public backlash underlying this calculus was so bad that the head of the Times' Reader Center reached out to Bennet on her own initiative about the "Sarah Palin editorial." [JA945-48 at 1021:18-1023:12; JA953 -59 1029:17-22; 1034:9-1035:24]

The Rule 50 Opinion also fails to draw inferences in Plaintiff's favor from Bennet's 5:08 a.m. email to Williamson and Lepping [JA1723]. It only considers this email as evidence that Bennet was upset over his mistake and as inconsistent with actual malice. [JA2023] However, this ignores that Bennet's early morning email refutes the claim that he made a mistake because it does not claim his use of the term "incitement" was being misconstrued. Thus, "a reasonable jury could conclude that Bennet's reaction and the Times' correction may also be probative of a prior intent to assert the existence of such a direct link… If, as Bennet now contends, it was all simply a misunderstanding, the result of a poor choice of words, it is reasonable to conclude that the ultimate correction would have reflected as much and simply clarified the Editorial's intended meaning." [JA1355][58]

---

[58] This inference is further supported by the Times' correction policy, which specifically provides for acknowledging a statement was "imprecise" or "incomplete" in situations involving mistakes in meaning. However, Defendants admitted making a "factual" error, and Bennet testified his post-publication Tweet about the correction (admitting to an error of fact) was posted "to make sure the record was clear with respect to the fact [he] got wrong" and that he "would not, after making an error like this, misrepresent what that error was to the public" because "that would be compounding the error." [JA871 at 786:8-24] Bennet also admitted he "did not tell the public [that he] used the word 'incitement' in an

Bennet's 5:08 a.m. email exchange with Williamson and Lepping also highlights Bennet's "unusual admission" that "I don't know what the truth is here." [JA2024], which the Rule 50 Opinion characterizes as mere "negligence" [JA2022]. However, another reasonable inference is that Bennet's 5:08 a.m. email was an attempt to cover for himself and place blame on those around him (notably, Bennet states in the same email "*we* may have relied too heavily on past editorials and early coverage"—when he was the one who wrote the false statements).[59] The Court made this finding on summary judgment [JA1335[60]].

The Rule 50 Opinion also concludes a lack of actual malice is inferred from the fact that Bennet otherwise "likely would have been defensive, avoided issuing a correction to the Editorial, or tried to minimize the correction's confession of error." [JA2025]  This violates the Mandate, which specifically addresses the alternative inferences arising from the correction.[61]  *Palin*, 940 F.3d at 815.  Moreover, there

---

improper way" and "didn't tell the public that's not what I meant when I used the word "incitement."  [JA872 at 787:4-9]

[59] Bennet also tried shifting blame for his false narrative by claiming it was Williamson's "theory" [JA803-04 at 718:25-719:17] and then a "collective" theory [JA868 at 783:2-24].

[60] "[A] reasonable jury could conclude that Bennet's reaction and the Times' correction may also be probative of a prior intent to assert the existence of such a direct link… If, as Bennet now contends, it was all simply a misunderstanding, the result of a poor choice of words, it is reasonable to conclude that the ultimate correction would have reflected as much and simply clarified the Editorial's intended meaning."

[61] The Rule 50 Opinion ignored Bennet's public affirmation that the error "doesn't undercut or weaken the argument of the piece."  [JA754 at 670:4-12]

was substantial evidence demonstrating the minimalization of the correction's confession of error; including the exclusion of any reference to Plaintiff in the correction while leaving her name in the Editorial—which one Times' Editorial Board member recognized as Bennet "still trying to sneak the link in." [JA1992 (summarizing corrections and edits to body of Editorial); JA673-75 at 589:2-591:9; JA675-76591:10-592:15; JA676-77 592:19-593:9; JA755-56 671:14-672:13][62]

Beyond violating the Mandate, the acceptance of Bennet's credibility throughout the Rule 50 Opinion is particularly troubling given the impeachment evidence at trial. Bennet changed his testimony about reading the June 14, 2017 research. He denied reading the research when he testified under oath at the 2017 plausibility hearing and at his deposition but admitted reading it at trial when faced with the email he wrote forwarding "*Bloodshed and Invective*" and "*As We Mourn*" to Semple and describing them as "more relevant precedent" to the Editorial. [JA718-19 at 634:9-635:3; JA1715-16]  Bennet's credibility also took a significant hit when he tried to claim he did not apologize to Plaintiff because the Times had a policy against apologies [JA759-60 at 675:1-676:2], but the Times' written policies contain no such prohibition [JA1853-1895] and the head of the Reader Center testified there was no such policy.  [JA969 at 1036:19-20]

---

[62] The Rule 50 Opinion discounts this "sneak the link" in email from Jesse Wegman to Williamson as lacking "context" [JA1978], which contravenes the obligation to draw all inferences in favor of Plaintiff.

The Rule 50 Opinion concludes by asserting the judgment as a matter of law reflects the Court's "duty" to ensure that public figure libel actions do not chill free speech. [JA2008] This violates controlling precedent: "It is no longer permissible to take into account the 'chilling effect' a libel suit may have on the exercise of first amendment rights. *Loeb v. New Times Communications Corp*., 497 F.Supp. 85, 94 (S.D.N.Y. 1980) (*citing Yimouyannis v. Consumer Union of the U.S., Inc*., 619 F.2d 932, 940 (2d Cir. 1980)).[63]

### 4. The Erroneous Instruction Responding to the Jury's Question About Evidence of Actual Malice

The District Court's February 15, 2022, instruction, given over Appellant's objection, constitutes fundamental error and requires a new trial because it contradicted the law, told jurors to disregard legally sufficient evidence of actual malice, and effectively told them to find in Defendants' favor. *U.S. v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011). A jury instruction is erroneous if "the instruction misleads the jury as to the proper legal standard, or it does not adequately inform the jury of the law." *Owen v. Thermatool Corp.*, 155 F.3d 137, 139 (2d Cir. 1998). Instructions that effectively instruct the jury to find a certain way or accept certain evidence are erroneous. *Girden v. Sandals Intern.*, 262 F.3d 195, 204-205 (2d Cir. 2001). The timing of an instruction is also important, as instructions given at critical

---

[63] Appellant also cited these cases during the Rule 50 argument.

points of trial are likely to affect a verdict. *Id.* at 205 (citing *Delima v. Trinidad Corp.*, 302 F.2d 585, 587 (2d Cir. 1962); *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 525 (2d Cir. 1998)). A new trial is appropriate where an erroneous instruction is given about a "potentially dispositive" issue. *Restivo*, 846 F.3d at 572. Instructions containing errors that are so serious and flagrant that they threaten the integrity of the trial or deprive the jury of legal guidance in making a decision are fundamental error. *Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 162 (2d Cir. 2004) (citing *Shade v. Hous. Auth. of New Haven*, 251 F.3d 307, 313 (2d Cir. 2001)).

## C.   The Erroneous Refusal to Disqualify

The U.S. Constitution, federal statutory law, and codes of judicial conduct each prescribe recusal standards. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876-77 (2009); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 113-115 (D.C. Cir. 2001). Due process requires recusal "when, objectively speaking, 'the probability of actual bias on the part of the judge… is too high to be constitutionally tolerable.'" *Rippo v. Baker*, 137 S.Ct. 905, 907 (2017) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Under 28 U.S.C. § 455(a), any federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." "The Second Circuit applies this standard by asking whether 'an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal,' or alternatively, whether a 'reasonable

person, knowing all the facts,' would question the judge's impartiality.'" *Sharkey v. J.P. Mogan Chase & Co*., 251 F.Supp.3d 626, 629 (S.D.N.Y. 2017) (citing *U.S. v. Yousef*, 327 F.3d 56, 169 (2d Cir. 2003) (quoting *U.S. v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992))).

The rules governing disqualification are "obviously formulated in general terms and do not offer bright-line guidelines." *Lovaglia*, 954 F.2d at 815. Generally, disqualification is appropriate where a judge expresses a personal bias concerning the outcome of the case at issue. *Id.* (citing *U.S. v. Diaz*, 797 F.2d 99, 100 (2d Cir. 1986). While it is generally accepted that judicial rulings and remarks almost never constitute a valid basis for a bias or partiality motion, they will support recusal where they "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. U.S.,* 510 U.S. 540, 555 (1994).

Section 455(a) "deals exclusively with appearances." *U.S. v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007). "Its purpose is the protection of the public's confidence in the impartiality of the judiciary." *Id.* Under the statute, courts consider "the allegations of bias or impartiality" as well as "the judge's rulings on and conduct regarding them," and ask whether the facts would lead the public reasonably to believe that these problems affected the manner in which the judge presided over the case. *Id.* An appearance of partiality sufficient to warrant recusal can arise from the "cumulative effect of the judge's reactions." *Id*. at 776. Moreover, "[a]lthough a

legal ruling may not itself serve as the basis for a motion to disqualify, a particular judicial ruling 'can be evidence of an extrajudicial bias or prejudice.'" *U.S. v. Marin*, 662 F.Supp.2d 155, 158 (D.D.C. 2009).

Where the question of recusal is a close call, a court should recuse itself. *Amico*, 486 F.3d at 775; *Lamborn v. Dittmer*, 726 F.Supp. 510, 518 (S.D.N.Y. 1989); *U.S. v. Ferguson*, 550 F.Supp. 1256, 1259-60 (S.D.N.Y. 1982).

Here, in light of the history of this case, the decisions discussed above, refusal to follow the Mandate, circumstances surrounding the exit interview of the jurors and District Court's comments to the press *before* informing counsel, and made statements defending the decision to announce the Rule 50 ruling during deliberations and the impact of the push notifications an objective, disinterested observer fully informed of the events described herein would entertain doubts about the District Judge's impartiality.

Independently, comments to the press about pending cases warrant disqualification because they run afoul of Canon 3A(6) of the Code of Conduct for United States Judges (requiring federal judges to "avoid public comment on the merits of [ ] pending or impending" cases). Although rare, situations where judges make public comments to the press about a pending case over which they are presiding almost always result in mandatory disqualification under Section 455. *U.S. v. Microsoft Corp.*, 253 F.3d 34, 112-113 (citing *In re Boston's Children First*,

244 F.3d 164 (1st Cir. 2001); *In re IBM Corp.*, 45 F.3d 641 (2d Cir. 1995); *U.S. v. Cooley*, 1 F.3d 985 (10th Cir. 1993)).  As discussed in *Microsoft Corp.*, 253 F.3d at 115, "Judges who covet publicity, or convey the appearance that they do, lead any reasonable observer to wonder whether their judgments are being influenced by the prospect of favorable coverage in the media."[64]

The Court's comment to the press can also reasonably be construed as an attempt to bolster the Court's rulings.  *In re Boston's Children First*, 244 F.3d at 170 (under some circumstances judge's defense of own orders, prior to resolution of appeal, may create appearance of partiality).  The 68-page "Opinion" solidifies this perception; as does the timing of the comment to the press *before* counsel was informed about the developments with the jury.  Moreover, the Court did not discuss purely procedural matters with the press.  *Microsoft*, 253 F.3d at 112.  Regardless, as stated in *Microsoft*, "[i]t is no excuse that the judge may have intended to 'educate' the public about the case or to 'rebut misconceptions' purportedly caused by the parties."  *Id*.  In fact, "[b]ecause there is no scienter requirement in section 455, the test is not how a judge intended his remarks to be understood, but whether,

---

[64] Indeed, this is why "[j]udges are generally loath to discuss pending proceedings with the media." *Ligon*, 736 F.3d at 126 (citing *In re Boston's Children First*, 244 F.3d at 169).  "In fact, the very rarity of such public statements, and the ease with which they may be avoided, make it more likely that a reasonable person will interpret such statements as evidence of bias.  *In re Boston's Children First*, 244 F.3d at 170.

as a result of the interviews or extra-judicial statements, the appearance of impartiality might reasonably be questioned." *Ligon v. City of New York*, 736 F.3d 118, 126-127 (2d Cir. 2013).

The District Judge should have granted the Motion to Disqualify. Having failed to do so, reversal is appropriate along with other potential means available to address the court's error, including retroactive disqualification and vacatur of rulings, orders, and judgments, which are necessary and appropriate here given the unique circumstances of this case. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988); *Amico*, 486 F.3d at 777; *Microsoft Corp.*, 253 F.3d at 116-117; *Liljeberg*, 486 U.S. at 862-864.

## **CONCLUSION**

For the foregoing reasons, Plaintiff-Appellant respectfully requests that the Court reverse and vacate the District Court's Final Judgment dismissing her defamation claim, the February 14, 2022 oral and March 1, 2022 written rulings granting judgment as a matter of law under *Fed. R. Civ. P.* 50; the February 15, 2022 Verdict, the August 28, 2020 Opinion and Order (denying summary judgment); the December 29, 2020 Memorandum Order, and the May 31, 2022 Opinion and Order.; and grant Appellant a new trial.

Date: September 15, 2022.               Respectfully Submitted,

                                        */s/ Shane B. Vogt*
                                        Kenneth G. Turkel (Co-Lead Counsel)
                                        kturkel@tcb-law.com
                                        Shane B. Vogt (Co-Lead Counsel)
                                        svogt@tcb-law.com
                                        TURKEL CUVA BARRIOS, P.A.
                                        100 North Tampa Street, Suite 1900
                                        Tampa, Florida 33602
                                        Tel:  (813) 834-9191
                                        Fax: (813) 443-2193

            *Attorneys for Plaintiff-Appellant Sarah Palin*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief or other document complies with type-volume limits of Fed. R. App. P. R. 32 and Local Rule 32.1 because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[X]    this brief or other document contains 13,856 words

[ ]    this brief uses monospaced type and contains [state number of] lines

This brief or other document complies with the typeface and type style requirements because:

[X]    this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font; or

[ ]    this brief or other document has been prepared in a monospaced typeface using [identify word processing program] in [identify font size and type style].

_/s/ Shane B. Vogt_

Shane B. Vogt

*Attorney for Plaintiff-Appellant Sarah Palin*

Dated: September 15, 2022.

60

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 15, 2022, the foregoing document was served on all parties or their counsel of record through the CM/ECF system, which will send notification to the following:

David L. Axelrod
axelrodd@ballardspahr.com
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599

Thomas B. Sullivan
sullivant@ballardspahr.com
Jacquelyn N. Schell
schellj@ballardspahr.com
Ballard Spahr LLP
1675 Broadway, 19th Floor
New York, NY  10019

*Counsel for Defendant-Appellee The New York Times Company*

Dated: September 15, 2022.                By:   *Shane B. Vogt*
                                                Shane B. Vogt