# No. 22-558

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

SARAH PALIN, an individual

*Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY, a New York
corporation, and JAMES BENNET, an individual

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Southern District of New York
(Case No. 1:17-cv-04853-JSR, Hon. Jed S. Rakoff)**

## SPECIAL APPENDIX

Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: 813- 834-9191
Fax: 813-443-2193

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY 10017
Tel: 212-907-7300 Fax: 212-754-0330

*Counsel for Plaintiff-Appellant Sarah Palin*

# SPECIAL APPENDIX

# TABLE OF CONTENTS

Page

**Volume I**

DOC 171 - Final Judgment, February 15, 2022 ................................................. SA01

Trial Transcript, Pages 1295-1306 – Oral Rule 50 Motion Decision............... SA02

DOC 196 – Rule 50 Opinion ........................................................................ SA15

DOC 173 – Verdict ...................................................................................... SA83

DOC 172 – Order dated February 26, 2022................................................... SA84

DOC 117 – Summary Judgment Order............................................................ SA86

DOC 125 – Memorandum Order .................................................................... SA122

DOC 203 – Opinion and Order...................................................................... SA135

*Palin v. New York Times Co*., 940 F. 3d 804 (2nd Cir. 2019) ......................... SA165

N.Y. Civil Rights Law§76-a ......................................................................... SA179

i

# SA 0001

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - -
  SARAH PALIN,

             Plaintiffs,                          17-cv-4853 (JSR)

     -v-                                           FINAL JUDGMENT

  THE NEW YORK TIMES COMPANY
  and JAMES BENNET,

             Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - -
```

JED S. RAKOFF, U.S.D.J.:

In view of the jury having returned a verdict of not-liable, and independently, for the reasons stated by the Court previously in granting Defendants' Rule 50 motion, final judgment is hereby entered dismissing the complaint with prejudice.

ADJUDGED AND DECREED.

New York, NY
February 15, 2022

JED S. RAKOFF, U.S.D.J.

M2E1PALF                          **SA 0002**

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    SARAH PALIN, an individual,

4                    Plaintiff,

5              v.                           17 CV 4853 (JSR)

6    THE NEW YORK TIMES COMPANY, *et
     al.*,
7
                    Defendants.
8
     ------------------------------x        Trial
9
                                            New York, N.Y.
10
                                            February 14, 2022
11                                          9:44 a.m.

12   Before:

13                   HON. JED S. RAKOFF,

14                                          District Judge

15
                         APPEARANCES
16
     TURKEL CUVA BARRIOS, P.A.
17        Attorneys for Plaintiff
     BY:  SHANE B. VOGT
18        KENNETH G. TURKEL

19
     BALLARD SPAHR, LLP
20        Attorneys for Defendants
     BY:  DAVID L. AXELROD
21        JACQUELYN N. SCHELL
          THOMAS BYRNE SULLIVAN
22        JAY WARD BROWN

23

24   Also Present:

25   Dana Green, Senior Counsel, The New York Times Company


                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

M2E1PALF                    **SA 0003**

1    present on this floor at least one lawyer from each side who

2    can respond to any and all questions from the jury, as well as

3    the parties have to be present as well.

4          But the exception is from 1 to 2, and I will apprise

5    the jury through my courtroom deputy that I am excusing

6    everyone for lunch from 1 to 2, so everyone can go and have

7    lunch.  So the bottom line is, I will see you at 2:30 unless we

8    get a note from the jury before then, at which time I will give

9    you a ruling on the Rule 50 motion.

10         MR. VOGT:  Your Honor, I did just want to correct, it

11   was Ms. Lepping.  I misspoke, and I was corrected.  I just want

12   to make sure the Court was aware of it so I wasn't misleading

13   your Honor.

14         THE COURT:  Okay.  Thank you.

15         (Recess pending verdict, 12:06 p.m.)

16         (In open court; jury not present; 2:54 p.m.)

17         THE COURT:  Please be seated.

18         So our jury is hard at work.  Before I turn to the

19   main matter, with respect to the argument that was being made

20   by defense counsel that there was no proof of falsity, I don't

21   agree with that.  I think it is a jury question, but I'll

22   mention in that regard two things:

23         First, the first correction, which appeared on the

24   website *The Times NYT Opinion* on June 15th, states, "We got an

25   important fact wrong, incorrectly linking political incitement

## SA 0004

1    and the 2011 shooting of Giffords.  No link was ever

2    established."  I think that comes very close to saying that the

3    original statement was untrue.

4            But in addition, I went back and looked at

5    Ms. Lepping's testimony, at page 410, beginning at line 9:

6            "Q.  And did you at any point in time conduct any

7    factual research to determine whether or not a link was

8    established between political incitement and the 2011 shooting

9    of Gabrielle Giffords and the other individuals in Arizona?"

10           "A.  Did I ever, meaning which date?"

11           "Q.  Yes, and I'll clarify.  Do you recall that on

12   June 15th of 2017, you conducted factual research concerning

13   whether or not a link was established between political

14   incitement and the 2011 shooting of Gabrielle Giffords?"

15           "A.  I did, yes."

16           "Q.  And what did that research determine?"

17           "A.  I think the best thing I could find was something

18   in a police report that said it wasn't politically connected."

19           "Q.  And when you say 'it,' you're saying the Loughner

20   shooting was not politically connected; is that correct?"

21           "A.  I think so, to the best of my recollection."

22           Now there were no objections to any of those

23   questions, so all of that evidence was admitted, including the

24   substance of the police report, which otherwise, of course,

25   could have been objected on hearsay grounds, best evidence

M2E1PALF

# SA 0005

1     grounds, form grounds, and numerous other grounds, but since

2     none of those objections were made, it was received for all

3     purposes.  And while I'm still bemused that plaintiff's counsel

4     didn't put in the police report which they had marked as an

5     exhibit, here's the essence of it right in the testimony in

6     evidence.  So I think a reasonable jury could, even from just

7     the two items I've mentioned, infer that the editorial was not

8     true, at least the portions of the editorial that are being

9     challenged.

10         Now, though, we come to the more important point, and

11     because I know there are some people in the courtroom who are

12     not lawyers—fortunately—I thought I might make clear just what

13     it is that I've been spending so much time with counsel on

14     beginning last week even before we excused the jury and now

15     continuing through to today, which is a motion under Rule 50 of

16     the Federal Rules of Civil Procedure.  Rule 50(a) says:

17         "If a party has been fully heard on an issue during a

18     jury trial and the Court finds that a reasonable jury would not

19     have a legally sufficient evidentiary basis to find for the

20     party on that issue, the Court may resolve the issue against

21     the party and grant a motion for judgment as a matter of law

22     against the party."

23         Then the rule continues:

24         "A motion for judgment as a matter of law may be made

25     at any time before the case is submitted to the jury," and it

# SA 0006

1  was in fact so made here.

2        And then just to complete the picture, there's

3  Rule 50(b):

4        "If the court does not grant a motion for judgment as

5  a matter of law made under Rule 50(a), the Court is to consider

6  to have submitted the action to the jury subject to the court's

7  later deciding the legal questions raised by the motion."

8        So I certainly considered the possibility that I

9  should wait until after the jury had rendered its verdict in

10  this case before deciding this motion, but the more I thought

11  about it over the weekend, the more I thought that was unfair

12  to both sides.  We've had very full argument on this, I know

13  where I'm coming out, and I ought to therefore apprise the

14  parties of that.  On the other hand, this is the kind of case

15  that inevitably will go up on appeal, and the Court of Appeals

16  I think would greatly benefit from knowing how the jury

17  decided.  So for example, if I were to dismiss the case as a

18  matter of law for failure to prove an essential element and the

19  jury were to decide to the contrary, then on appeal, the Court

20  of Appeals wouldn't have to send it back for a new trial; they

21  could reinstate the verdict.  And there are other possibilities

22  as well.  So I'm going to give you my decision now, which is

23  essentially, therefore, a 50(a) decision, but I will enter it

24  formally after the jury returns its verdict so it will be in

25  that sense a 50(b) decision.  But I wanted to lay that all out

M2E1PALF                    **SA 0007**

1    and also make clear to the people who are not lawyers that the

2    question before the Court now is whether, taking everything

3    most favorably to the plaintiff, the plaintiff has still failed

4    to prove an essential element of the claim and therefore the

5    claim should be dismissed, which is different from what the

6    jury has to decide.  They can decide that issue in part if they

7    wish but they can also decide just that they think one side has

8    the better case or the other.  It's a different kind of

9    standard.  They are not bound to take things most favorably to

10   one side or the other.

11         So with that long-winded explanation, I think that

12   there is one essential element that plaintiff has not carried

13   its burden with respect to, which is the portion of actual

14   malice relating to belief in falsity or reckless disregard for

15   falsity.  And I want to make clear that although I am required

16   to take everything most favorably to the plaintiff and I have

17   endeavored to do so, this is a very high standard.  This is

18   part of what *New York Times v. Sullivan* is all about.  And of

19   course that's a controversial case, as we all know, but that

20   case sets a very high burden for plaintiffs where the plaintiff

21   is a public figure, like Ms. Palin; the theory being that the

22   Constitution favors a very robust debate involving especially

23   people in power and that the whole point of the First Amendment

24   as applied in that context would be undercut if the standard

25   for libel and defamation were not as high as the Supreme Court

# SA 0008

1  decreed.  It's a controversial point.  The argument can be made

2  that this opens the door to false accusations being made

3  against public figures, and certainly we all know that that has

4  happened, but the Supreme Court made the balance and set a very

5  high standard.  And I don't think that standard has been

6  realized by plaintiff with respect to at least one aspect of

7  the actual malice requirement.

8         Specifically, I don't think she has adduced sufficient

9  evidence, taken even most favorably to her, that a reasonable

10 juror could conclude that Mr. Bennet either knew that the

11 challenged statements were false or that he thought that there

12 was a high probability they were false and he recklessly

13 disregarded that high probability.

14        As I explained earlier, and really a very important

15 part of what my decision turns on, is the Supreme Court's

16 holding in *Anderson v. Liberty Lobby* that "The judge must view

17 the evidence presented through the prism of the substantive

18 evidentiary burden"—namely, clear and convincing evidence.  And

19 as I also mentioned, this has been adopted, as it must be, of

20 course, as a Supreme Court holding, but further clarified by

21 the Second Circuit in *Contemporary Mission, Inc. v. New York*

22 *Times Company*, 842 F.2d 612, a 1988 decision of the Second

23 Circuit, that places the burden very much on the plaintiff in

24 these situations to come forward with strong, affirmative

25 evidence that before publishing, the author either had actual

M2E1PALF

# SA 0009

1  knowledge that the challenged statements were false or at least

2  a conscious recognition that they were probably -- some

3  decisions say highly probably -- false and that he purposely,

4  consciously chose to disregard that, and that that has been

5  established by clear and convincing evidence—that is to say, by

6  a high probability.  So it's a very high standard.

7        I also think it's worth repeating here what I

8  instructed the jury, and that is that -- and this embodies both

9  the federal law and the New York law, which is also applicable

10 here, and the two laws are really identical when it comes to

11 this aspect of actual malice.  But I instructed the jury --

12 this was as part of my Instruction No. 13:

13       "The first aspect of 'actual malice' you must decide

14 is whether, at the time the editorial was published,

15 Mr. Bennet, and therefore The New York Times, (i) knew that

16 either or both of the allegedly defamatory statements he had

17 drafted were in fact false; or that, at a minimum, (ii) he

18 consciously chose to 'recklessly disregard' the high

19 probability that they were false."

20       And the instruction continues:

21       "In considering Mr. Bennet's state of mind, you should

22 consider all the evidence, including relevant inferences to be

23 drawn therefrom.  But also keep in mind that the plaintiff must

24 prove what was in Mr. Bennet's mind by clear and convincing

25 evidence.  For example, with respect to 'reckless disregard,'

M2E1PALF **SA 0010**

1    it is not enough just to show that Mr. Bennet did not know, one

2    way or the other, whether the challenged statement you are

3    considering was true or false.  Nor is it enough to prove that

4    he was merely negligent regarding that statement's truth or

5    falsity.  For instance, a failure to sufficiently investigate

6    or to research a particular point does not establish actual

7    malice, unless the plaintiff has demonstrated that such

8    inaction was a conscious, deliberate attempt to avoid

9    confirming the statement's probable falsity.  Even

10   irresponsible reporting or a demonstrated failure to follow

11   professional, journalistic standards does not, on its own,

12   establish actual malice, unless the plaintiff has proved that

13   there was a high probability that Mr. Bennet actually doubted

14   the truth of the challenged statement you are considering and

15   nevertheless consciously chose to disregard the high

16   probability that the statement was false."

17          So as that illustrates, the standard is very high, and

18   the same standard applies here except that, as mentioned, I

19   have to take everything most favorably to the plaintiff in

20   terms of construing the evidence.

21          So I think it is common ground that the plaintiff here

22   is not relying on actual affirmative proof that Mr. Bennet knew

23   that his statements were false but rather on reckless

24   disregard, and plaintiff has not identified any prepublication

25   email in which Mr. Bennet suggests in any respect the probable

M2E1PALF                    **SA 0011**

1    falsity of the suggestion that the crosshairs map helped cause

2    Loughner to mount his violent attack.  Indeed, as mentioned

3    this morning, in PX 119, Bennet's prepublication email

4    proposing the framing for the editorial shows his preexisting

5    belief that violent right-wing rhetoric incited Loughner's

6    attempted assassination of Representative Giffords, and

7    although he doesn't mention there the map or Sarah Palin, it

8    shows what his belief was, and it really has not been

9    contradicted that he had any different belief at the time.

10            Plaintiff relies on several pieces of research

11   circulated by the editorial team that plaintiff says made

12   Mr. Bennet aware that it had been determined that Mr. Loughner

13   was not inspired to act by the crosshairs map.  It's by no

14   means clear that Mr. Bennet read these articles, and we know

15   that he specifically denies reading at least one of them, but

16   in any event, as I pointed out again this morning, all these

17   columns—Plaintiff's Exhibits 133, 134, 135—give opinions on

18   both sides of that issue and hardly suggest that there is the

19   kind of much more definitive showing as there is in the police

20   report or in the ABC investigation contradicting his good-faith

21   belief.

22            It is true that the argument could be made that he

23   should have looked at the hyperlinked ABC News article under

24   the word "circulated" that accompanied Ms. Williamson's draft.

25   That is in Plaintiff's Exhibit 142.  But negligence, as

M2E1PALF

# SA 0012

1 previously mentioned, would not be enough to sustain

2 plaintiff's burden.  In any event, aside from the fact that

3 it's uncontradicted that Mr. Bennet did not open the link, it's

4 perfectly plausible that he would have no reason to open the

5 link since it was linked to the question of circulation, which

6 was really never in doubt—circulation, that is to say, of the

7 crosshairs map.

8          The allegation that he published with actual malice is

9 also undermined, in the Court's view, by the actions he took

10 after finishing his revisions of Ms. Williamson's draft.  For

11 while it's undisputed that an article's author has primary

12 responsibility for fact-checking and accuracy, Mr. Bennet,

13 after revising the editorial, emailed Ms. Williamson, alerting

14 her that he had completed a "heavy edit" and asking her to

15 "please take a look."  This is Plaintiff's Exhibit 163.

16 Mr. Bennet testified that by asking Ms. Williamson to take a

17 look, he meant for her to fact-check the revision, and of

18 course no revision came back from Ms. Williamson or anyone else

19 regarding the issues that are here the subject of the claim of

20 defamation.

21          It is true, of course, that after the editorial was

22 first published, Ross Douthat, on the evening of June 14th,

23 questioned whether the information was all correct, and

24 Mr. Bennet responded by immediately saying, well, this was his

25 understanding but he would pursue it further, and he pursued it

M2E1PALF                    **SA 0013**

1    further to the corrections that were shortly issued.

2           Now I'm not altogether happy with having to make this

3    decision on behalf of the defendant.  As I indicated earlier, I

4    am troubled by the fact that the erroneous edits made by

5    Mr. Bennet reasonably could be read by many readers as an

6    accusation that Ms. Palin's PAC's distribution of the

7    crosshairs map was clearly and directly linked to the Loughner

8    shooting and concomitant murders, and as I mentioned this

9    morning, I'm hardly surprised, therefore, that Ms. Palin

10   brought this lawsuit, for even though *The Times* corrected,

11   perhaps not perfectly in any event, the accusation in fairly

12   quick time, it means that Ms. Palin was subjected to an

13   ultimately unsupported and very serious allegation that

14   Mr. Bennet chose to revisit seven years or so after the

15   underlying events.  So I don't mean to be misunderstood.  I

16   think this is an example of very unfortunate editorializing on

17   the part of *The Times*.  But having said that, that's not the

18   issue before this Court.  My job is to apply the law.  The law

19   here sets a very high standard for actual malice.  And in this

20   case, the Court finds that that standard has not been met.

21   Accordingly, I will ultimately issue an order pursuant to

22   Rule 50 dismissing the complaint, but I will only do so after

23   the jury has returned its verdict.  And they of course will not

24   know about my decision, and therefore, we will have both the

25   benefit of my decision on the law and their decision on the

M2E1PALF                        **SA 0014**

1   facts, if you would, on the different standard that they apply,

2   and therefore the Court of Appeals will have the benefit of

3   both determinations before it when it views the inevitable

4   appeal.

5            So needless to say, the plaintiff is deemed to have

6   objected to my decision, and that is preserved for appeal as

7   well.

8            Anything else that either counsel wanted to raise on

9   this subject?

10           MR. VOGT:  No, your Honor.

11           MR. AXELROD:  No, your Honor.

12           THE COURT:  All right.  So I'm going to go deal with

13  another matter that I have at 3:30 in a different courtroom,

14  but of course we should ask the jury whether they want to stay

15  past 3:30 today.  So let's do that before that.  I'll stay here

16  until we find out the answer to that.

17           THE DEPUTY CLERK:  Okay.

18           (Pause)

19           MR. AXELROD:  Your Honor, while we're waiting, would

20  you want to make the submissions that the parties submitted

21  over the weekend part of the record?

22           THE COURT:  Sure, if you want.  That's fine with me.

23  The case citations, you're talking about?  Sure.  I'll have my

24  law clerk make sure those are docketed.

25           MR. AXELROD:  Thank you.

# SA 0015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌──────────────────────────────┐
│ SARAH PALIN,                  │
│                               │
│         Plaintiff,            │        17-cv-4853 (JSR)
│                               │
│     -v-                       │        OPINION
│                               │
│ THE NEW YORK TIMES COMPANY    │
│ and JAMES BENNET,             │
│                               │
│         Defendants.           │
└──────────────────────────────┘
```

JED S. RAKOFF, U.S.D.J.:

At trial, plaintiff Sarah Palin wholly failed to prove her case even to the minimum standard required by law. Accordingly, defendants the New York Times Company (the "Times") and James Bennet moved to dismiss the case prior to the start of jury deliberations. After hearing extensive argument, the Court granted the motion shortly after the jury had begun its deliberations. This Opinion sets forth the reasons for that decision, as well as the reasons for how the Court then dealt with the deliberating jury.

By way of background, on June 14, 2017, defendant Times published an editorial, approved and materially revised by co-defendant Bennet, entitled "America's Lethal Politics" (the "Editorial"). The Editorial was prompted by the shooting earlier that day of Republican members of Congress, including Representative Steve Scalise. However, several sentences in the Editorial could be read to suggest that an earlier mass shooting -- an attack that occurred in Tucson, Arizona in 2011, grievously wounding Congresswoman Gabrielle Giffords and killing

1

several others -- was prompted by a graphic advertisement circulated some months earlier by a political action committee ("SarahPAC") associated with Palin. The graphic (the "crosshairs map") featured a map of the United States with stylized rifle crosshairs superimposed over congressional districts that SarahPAC had targeted for replacing incumbent Democratic members of Congress with Republican candidates in the 2010 midterm elections. Giffords' district was one of 20 featured on the map.

Prior to publication of the Editorial, Bennet, the top editor on the Times' Editorial Board, had added language asserting a "clear" and "direct" link between the 2011 shooting and the "political incitement" generated by the crosshairs map. Although the original author of the Editorial, several other editors, and a fact checker read the draft after Bennet's revision and before publication, none flagged the new language as inaccurate. Nonetheless, journalists and other readers began criticizing the "clear" and "direct" allegation immediately after the Times published the Editorial online. The Times ultimately issued two corrections (the first approximately 14 hours after the editorial was published online) stating that no such link had been established.

Shortly thereafter, Palin commenced this lawsuit, asserting that she had been libeled by Bennet and the Times in violation of New York defamation law.[1] After extensive delays occasioned by an intervening

---

[1] The parties subsequently agreed that Bennet and The New York Times Co. should be considered as a single unit for the purpose of

# SA 0017

appeal and constraints arising from the COVID-19 pandemic, the Court held a seven-day jury trial starting on February 3, 2022. Following the close of evidence, but before the start of jury deliberations, defendants moved under Fed. R. Civ. P. 50(a) for judgment as a matter of law. Rule 50(a) provides, in general, that:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A)  resolve the issue against the party; and
>
> (B)  grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a). The rule further provides that such a motion may be "made at any time before the case is submitted to the jury." Id. While Rule 50(a) does not expressly require a court to grant or deny the motion before jury deliberations begin, it clearly contemplates that a court will rule expeditiously.[2]

Because this was a serious and case-dispositive motion, the Court did not rule precipitously. Rather, the Court reserved judgment, first so that it could hear the lawyers' closing arguments and then, even after the jury had begun its deliberations late on Friday afternoon, so that the Court could receive further written and oral submissions

---

assessing liability. See ECF 170 ("Jury Instructions") at 12. Accordingly, hereinafter, the Court uses "the Times" to refer to both defendants collectively, except where it is necessary to refer to Bennet or The New York Times Co. individually.

[2] If the motion is denied, however, it can be renewed after the jury renders its verdict, pursuant to Fed. R. Civ. P. 50(b).

# SA 0018

from counsel. Ultimately, however, by the early afternoon of Monday, February 14, 2022, the Court had reached the firm conclusion that it would have to grant the motion for judgment as a matter of law and so informed the parties.

At that point, the Court could have simply entered final judgment in defendants' favor and dismissed the jury. Instead, however, the Court, while announcing its decision, explained that it would allow the jury to continue its deliberations, so that, if the Court of Appeals were to disagree with the Court's determination to dismiss the case as a matter of law, the appellate court would not have to send the case back for trial, since it would have the benefit of the jury's verdict. Moreover, as a technical matter, the Court could then issue its Rule 50 judgment, post-verdict, pursuant to Rule 50(b). While this approach was a bit unusual, neither side objected to it in the slightest.

Regardless of these procedural niceties, however, the Court never seriously considered hiding from the parties the firm determination it had reached to dismiss the case as a matter of law. This, as the Court noted at the time, would have been grossly unfair to both sides, who would have been left with the impression that the case was going to be determined by the jury's verdict when it was not. Tr. 1298-1299.[3]

Therefore, on the afternoon of February 14, 2022, the Court announced its conclusion that Palin had failed to prove, by the

---

[3] "Tr. __" citations refer to pages in the trial transcript.

# SA 0019

necessary clear and convincing evidence, that Bennet and The New York Times Co. had published the allegedly libelous statements with the state of mind known as "actual malice." Specifically, after reviewing all evidence adduced at trial in the light most favorable to Palin and drawing all reasonable inferences in her favor, the Court concluded that no reasonable jury could find by clear and convincing evidence that Bennet or The New York Times Co. knew at the time of publication that the allegedly libelous statements were false or that Bennet thought that the challenged statements were probably false but recklessly proceeded to publish them anyway. The Court further indicated that it would likely issue a written opinion detailing the reasons for these conclusions. Tr. 1307. Hence, this Opinion.

After the Court announced its determination to enter final judgment for the defendants as a matter of law, the Court, as noted, still allowed the jury to continued deliberating for the aforementioned reasons, stating that it would not formally enter the order dismissing the case until after the jury had rendered its verdict. Tr 1305-1306. As also noted, no party objected in the slightest to the Court's plan. Indeed, the parties were given four opportunities to object to the procedure -- when the Court made the initial proposal, Tr. 1256; when the Court indicated it was about to issue its ruling on the motion, Tr. 1295-1297; after that ruling was delivered, Tr. 1306-1307; and when the verdict was returned -- and never did so.

The only issue that was raised -- and then only by counsel for defendants -- was whether it was necessary to further inoculate the

# SA 0020

jury against the risk that it might learn of the Court's intended ruling through media reports. When the Court asked counsel what they recommended in this regard, plaintiff's counsel was of the view that the Court should do nothing and "leave things as is." Tr. 1307. But the Court was persuaded by defendants' counsel to again admonish the jury that "If you see anything in the media about this case, just turn away." Tr. 1308. Even though defendants' counsel had raised the possibility (presciently, as it turns out) that some jurors might receive "push notifications" of the Court's Rule 50 determination, Tr. 1307, neither side asked for any other relief than the aforementioned instruction, which was then given to the jury, and accordingly the Court had no occasion to consider any further steps. Tr. 1307.

The next afternoon, the jury returned a verdict of "Not Liable." In the Court's view, the verdict further validated the Court's legal conclusion that no reasonable juror could find by clear and convincing evidence that Bennet or the Times had acted with actual malice. However, this verdict was without immediate legal effect because the Final Judgment entered that day in favor of the Times relied independently on the Court's decision to grant the Rule 50 motion and dismiss the case as a matter of law. ECF 171.

After the jury had been excused, the Court's law clerk discovered, during a routine inquiry, that a few jurors had inadvertently received "push notifications" (alerts automatically generated by news apps installed on their smartphones) containing the bottom-line of the Court's intended Rule 50 determination. See ECF 172. Although these

6

# SA 0021

jurors were adamant that this knowledge had not affected their determination of the verdict in the slightest, the Court promptly notified the parties of this information. See id.

As detailed toward the end of this Opinion, the Court is of the firm view that a few jurors' pre-verdict awareness of news about the Court's intended Rule 50 decision did not nullify the jury's verdict in any respect. But the more fundamental point is that any effect the push notifications may have had is legally irrelevant. The Court had already determined to dismiss Palin's libel claim as a matter of law pursuant to defendants' Rule 50 motion, and the Final Judgment reflected that determination. Even if one indulges the implausible hypothesis that the jury would have returned a verdict for Palin absent the news alerts, the operative final judgment would still have been the same: dismissal of Palin's claim as a matter of law.

The Court now elaborates the reasons for that decision.

## I.   **Factual Background**

As explained further in § III.B, _infra_, the Court on a Rule 50 motion must view all evidence in the record in the light most favorable to the non-moving party, here Palin, and must draw all reasonable inferences to her benefit. The recitation of relevant facts below therefore reflects these presumptions.

### A. **The Allegedly Libelous Statements**

On June 14, 2017, defendant The New York Times Co. published the Editorial entitled "America's Lethal Politics" in response to the shooting that morning of Representative Steven Scalise and several

other Republican members of Congress who had been holding a practice
session in suburban Virginia for a charity baseball game. The Editorial
identified the attack as part of a "sickeningly familiar pattern [that
was] emerging" of members of Congress being targeted by people
committing mass shootings. PX-1 at 1.[4] The Editorial's thesis was that
this political violence emerged from the "readily available guns and
ammunition" in the United States and from "deranged" people whose
"derangement had found its fuel in politics" by virtue of the
increasingly violent rhetoric used in American political discourse.
Id. The "pattern" identified by the Editorial identified only one
prior data point: the January 8, 2011 incident in which Jared Lee
Loughner opened fire in a Tucson, AZ supermarket parking lot during a
"Congress on Your Corner" event hosted by Representative Gabby
Giffords, killing six people (including U.S. District Judge John Roll
and a nine-year-old girl) and grievously wounding the Congresswoman.

In comparing the two shootings, the Editorial, in language that
was added by defendant Bennet to an earlier draft, stated that there
was a "clear" and "direct" "link" between Loughner's shooting and the
"political incitement" arising from a graphic distributed in March
2010 by the political action committee ("PAC") associated with
plaintiff Sarah Palin, who previously served as the Governor of Alaska

---

[4] PX-__ citations refer to plaintiff's exhibits received into
evidence at trial, and DX-__ citations refer to defendants' exhibits
received into evidence at trial. Unless otherwise specified, all
internal quotation marks, omissions, elisions, alterations, citations,
and emphases are omitted from all sources cited herein.

# SA 0023

and as the 2008 Republican candidate for Vice President. Specifically, plaintiff alleges that she was libeled by the following two paragraphs:

> In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.
>
> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask for the right.

PX-4. These paragraphs (the "Challenged Statements") were the fifth and sixth paragraphs in the twelve-paragraph Editorial. Id. "America's Lethal Politics" was published online on The New York Times website at approximately 9:45 p.m. on June 14, 2017, PX-1, and appeared as the first of three editorials in the June 15, 2017 print newspaper, PX-4. Neither Palin, nor SarahPAC, nor the map of targeted congressional districts was referenced elsewhere in the Editorial or in the headline. See id.

Palin alleges that these two paragraphs contain two defamatory statements. The first paragraph, Palin argues, asserts that her PAC's circulation of the so-called crosshairs map was "clear" incitement of Loughner's shooting of Representative Giffords and others. See ECF Jury Instructions at 14. The second paragraph, Palin argues, asserts that the circulation of the crosshairs map served as "direct"

9

# SA 0024

"incitement" of the "attack," or, in other words, that the map caused Loughner to act. See id.

Palin contends that both of these paragraphs contain unsupported or unsupportable factual errors concerning the purported causative role of Palin's PAC's "crosshairs map." Although the crosshairs map was widely blamed for inciting Loughner's violence against Giffords in the days following that shooting, it was subsequently determined that Loughner suffered from mental illness and no link between Loughner's attack and the crosshairs map was ever established. DX-111 at 3-4. Rather, it was determined that Loughner acted because of his own personal demons and mental illness. Accordingly, Palin alleges, it was defamatory for the Editorial to assert that the crosshairs map was either a "clear" or "direct" incitement to Loughner's shooting.[5]

## B. The Original Drafting of the Editorial

On the morning of June 14, 2017, James Hodgkinson opened fire on a group of Republican congressmen, who were practicing in suburban Virginia for an upcoming charity baseball game, wounding four persons, including Representative Scalise. See Tr. 107; PX-4; DX-12. The idea of writing an editorial on the shooting was first raised in a brief

---

[5] Although not central to Palin's case, it may also be noted that the Challenged Statements describe the map as having "put Ms. Giffords and 19 other Democrats under stylized cross hairs," PX-4, thereby suggesting that the crosshairs appeared over images or words signifying the politicians themselves. However, the map in fact placed the stylized crosshairs over these 20 Democrats' congressional districts on a map of the United States, which was positioned above a list of the politicians' names. See DX-61.

# SA 0025

email sent at 10:46 a.m. by Elizabeth Williamson, a member of the
Times' Editorial Board based in Washington, who covered national
politics. DX-9; Tr. 78-79. The email went to Bennet and two other
editors on the Editorial Board, Robert Semple and Nicholas Fox. DX-9.
A few minutes later, in an email titled "POSSIBLE shooter's POSSIBLE
social media pages pro-Bernie, anti-Trump," Williamson circulated a
set of links to Facebook, LinkedIn, and Twitter profiles that her
research suggested belonged to the suspected shooter. DX-13. At 11:49
a.m., after then-President Donald J. Trump had delivered a statement
on the shooting, Semple responded by email approving Williamson's
proposal to begin drafting an editorial on the shooting, suggesting
that the piece focus on gun control. DX-14. Then, at 12:04 p.m. another
editor, Linda Cohn, replied to Semple's email, noting that Hodgkinson
had gone to high school in her hometown and writing that it was "hard
to picture any anti-trump sentiment there." DX-16. Cohn also commented
that she was "thinking back to what a giant story [G]abby Gifford[s]
shooting was. Amazing that shooting congressmen doesn't seem so
shocking now." Id. The record reflects that this was the first time a
member of the Editorial Board linked the Virginia and Arizona
shootings. Semple, who was a long-tenured member of the Editorial
Board, reaffirmed his earlier approval, writing "OK we should
definitely shoot for a piece, not huge, but a piece." Id.

Bennet's first contribution to the discussion came in a 12:41
p.m. reply to Williamson's email containing Hodgkinson's suspected
social media profiles and copying Semple, Fox, and Cohn. DX-17.

# SA 0026

Suggesting an additional argument for the Editorial to make, Bennet wrote:

> Hey Elizabeth -- As Bob has said there's most likely a gun control point to be made here. The other question is whether there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence. Hard for me to imagine that Bernie himself is guilty of anything like that. But if there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting) we should deal with that.

Id. Williamson then agreed to begin writing a draft, noting that she had spoken to Semple. DX-18.

As the assigned writer, Williamson had primary responsibility for research, which included both factual reporting and research on opinions previously expressed by the Editorial Board to maintain consistency with those earlier positions. Tr. 88-89. Williamson testified that on June 14, 2017, she "was researching the political rhetoric that was circulating in our discourse in the run-up to the 2011 shooting in Arizona," not "the shooting itself" or "the state of mind of the gunman." Tr. 174.

To assist Williamson in her research, Semple directed the Board's editorial assistant, Phoebe Lett, to search through prior editorials and send Williamson "four basic gun control pieces (dealing mainly with the plenitude of weapons and porous controls) that also happen to mention Gabrielle Giffords." See DX-21; DX-19.[6] Williamson replied

---

[6] At trial, the four editorials hyperlinked in Lett's email were never shown to any witness, their content was never discussed before the jury, and they were never offered into evidence as part of any witness's testimony. The Court accordingly sustained an objection to

to Lett at 1:40 p.m. asking "is there one that references hate type speech against [Democrats] in the runup to [Giffords'] shooting? James referenced that." DX-22. Lett forwarded this request to Bennet, asking if he "happen[ed] to know which one she is talking about." DX-25. Bennet responded: "No -- I was just wondering if there was such a piece; that is, did we ever write anything connecting ... the Giffords shooting to some kind of incitement?" Id. After searching further, Lett responded "No, but Frank Rich did," providing a link to a January 15, 2011 Op-Ed column entitled "No One Listened to Gabrielle Giffords," DX-24. DX-25. Bennet replied 14 minutes later: "Good for us. Can you let Elizabeth know?" DX-25. Lett then relayed Rich's column to Williamson. DX-23. Viewing the evidence in the light most favorable to Palin, the Court presumes that Bennet read and understood this column by Frank Rich before the Editorial was published.

Rich's column, written one week after the Loughner shooting, discussed that attack and other acts of apparent political violence,

---

plaintiff's counsel motion to admit pre-marked exhibits containing these four editorials when they were offered outside the presence of the jury immediately before closing statements were delivered. See Tr. 1060.

When asked if he had read these four editorials, Bennet testified that he did not recall reading any of them. Tr. 705. And Palin neither adduced any evidence from which the Court could infer that Bennet read these four editorials nor argued in summation that Bennet's knowledge at the time of publication was informed by these four editorials.

Therefore, the content of these four editorials is not in the record and, as a matter of law, none of the four is properly considered as a source for Bennet's pre-publication knowledge. This is so, even though the Court must view the evidence most favorably to Palin and draw all reasonable inferences in her favor.

# SA 0028

arguing about they arose from a combination of violent political rhetoric, inadequate gun control, and an ineffective mental health safety net. See DX 24. Rich wrote that it was not yet known whether Loughner had seen the crosshairs map and that then-President Obama had "said, correctly ... that 'a simple lack of civility' didn't cause the Tucson tragedy" or the other incidents he had discussed, such as an earlier act of vandalism at Giffords' office. Id. at 1-2. However, Frank argued that these acts of violence were "inform[ed]" by "an antigovernment radicalism as rabid on the right now as it was on the left in the late 1960s." Id. at 2-3. Rich continued:

> That Loughner was likely insane, with no coherent ideological agenda, does not mean that a climate of antigovernment hysteria has no effect on him or other crazed loners out there. Nor does Loughner's insanity mitigate the surge in unhinged political zealots acting out over the last two years. That's why so many on both the finger-pointing left and the hyper-defensive right automatically assumed he must be another of them.

Id. at 3.

At 2:52 p.m., following Bennet's request, Lett forwarded to Bennet the four editorials that she had previously sent to Williamson. DX-26; DX-27. Lett then kept searching through past editorials and found two more relevant articles, which she emailed to Bennet at 3:01 p.m. and Bennet forwarded to Williamson two minutes later with the note "We dug a little further. Take a look at these two." PX-128. A few minutes later, Bennet separately forwarded the two additional editorials published in the days following the Loughner attack to a group including Semple, Williamson, Fox, and Cohn, writing "FYI -- these two are more relevant precedent for tonight's piece." PX-136. Semple

# SA 0029

replied, "just right. The Obama 'as we mourn' in particular." <u>Id.</u> Bennet testified that although he does not recall reading these two editorials, he concluded based on his review of this email traffic that he "must have read them, because [he] knew something about their content." Tr. 608. Viewing the evidence in the light most favorable to Palin, the Court presumes that Bennet read and understood these two editorials prior to publication.

The first of these two editorials, entitled "Bloodshed and Invective in Arizona," was published January 9, 2011, the day after the Arizona shooting. PX-134. It describes the Editorial Board's position on the relationships among gun control, violent political rhetoric, and mental illness and how these forces increase the risk of political violence and assassination attempts:

> Jared Loughner, the man accused of shooting Ms. Giffords, killing a federal judge and five other people, and wounding 13 others, appears to be mentally ill. His paranoid Internet ravings about government mind control place him well beyond usual ideological categories.

> But he is very much a part of a widespread squall of fear, anger and intolerance that has produced violent threats against scores of politicians and infected the political mainstream with violent imagery. With easy and legal access to semiautomatic weapons like the one used in the parking lot, those already teetering on the edge of sanity can turn a threat into a nightmare.

<u>Id.</u> at 1. "Bloodshed and Invective in Arizona" continues:

> It is facile and mistaken to attribute this particular madman's act directly to Republicans or Tea Party members. But it is legitimate to hold Republicans and particularly their most virulent supporters in the media responsible for the gale of anger that has produced the vast majority of these threats, setting the nation on edge. Many on the right have exploited the arguments of division, reaping political power by demonizing immigrants, or welfare recipients, or bureaucrats. They seem to

# SA 0030

have persuaded many Americans that the government is not just misguided, but the enemy of the people.

Id. at 2.

The second of these editorials, entitled "As We Mourn," was published on January 12, 2011. PX-135. It addressed then-President Barack H. Obama's speech at a memorial service in Tucson for the victims of the Loughner attack:

> This horrific event, he said, should be a turning point for everyone -- "not because a simple lack of civility caused this tragedy -- it did not -- but rather because only a more civil and honest public discourse can help us face up to our challenges as a nation."

Id. at 1-2.[7] "As We Mourn" does not include any conclusive statement regarding the Arizona gunman's motivations or political convictions, if any.

Bennet testified that on June 14, 2017, he relied on the research Lett conducted on his behalf, and that he never conducted his own factual research in connection with the Editorial. Tr. 610.

## C. **Bennet's Revisions**

At 4:44 p.m., Williamson uploaded her draft of the Editorial to "Backfield," a section of the Times' content management system that

---

[7] "As We Mourn" continues:

The president's words were an important contrast to the ugliness that continues to swirl in some parts of the country. The accusation by Sarah Palin that "journalists and pundits" had committed a "blood libel" when they raised questions about overheated rhetoric was especially disturbing, given the grave meaning of that phrase in the history of the Jewish people.

PX-135.

stores drafts during the editorial process. Tr. 136-137. Williamson also notified Bennet, Semple, Fox, and Frank Clines (a member of the Editorial Board who covered gun policy). PX-143. After that point, Williamson made no further edits to the piece, Tr. 138, and Palin has not accused her of any actual malice.

The portion of Williamson's 4:44 p.m. draft that served as a precursor to the Challenged Statements reads as follows:

> That in 10 minutes a single gunman could wreak such carnage in a bedroom community a short drive from the Capitol is horrifying, but no longer surprising. Not all the details are known yet, but a sickeningly familiar pattern is emerging: a deranged individual with a gun-perhaps multiple guns-and scores of rounds of ammunition uses politics as a pretense for a murderous shooting spree. Mr. Hodgkinson was a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump, who among many anti-Trump messages posted "Time to Destroy Trump & Co." on social media in March.

> Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured in a vile political climate. Then, it was the pro-gun right being criticized: in the weeks before the shooting Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

PX-141.

The underlined word "circulated" in the latter paragraph of Williamson's draft was hyperlinked to an ABC News article that is dated January 9, 2011, the day after the Arizona shooting, and is entitled "Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate." DX-10; Tr. 144. The article discusses the debate in the wake of the shooting about whether Palin's distribution of the crosshairs map "may have fueled the gunman's rage," though it notes in the tenth

paragraph that "[n]o connection has been made between this graphic and the Arizona shooting." DX-10 at 1-2. Bennet testified that he neither clicked on the "circulated" link in Williamson's draft nor read the ABC News article before the Editorial was published. Tr. 609-610.

After Williamson circulated her draft, Cohn, one of the Editorial Board editors, reviewed the piece. While reading, she made notes on her reactions to the draft, for instance asking whether the referenced to Hodgkinson as "deranged" reflected "signs of mental illness" or was used "just in the sense that anyone who commits [a] mass shooting is deranged." PX140E at 1. Cohn re-saved the draft at 5:03 p.m. Tr. 526; PX-140E at 2. Then, after she had finished her read-through, Cohn went to Bennet's office and told him that she "was just a little confused about ... what we wanted out of this piece, where it was going.... [She] felt he needed to take a look and weigh in." Tr. 520. Bennet recalls that Cohn "did not think it was a great draft." Tr. 636. Bennet agreed to take a look. Tr. 522; 636-637. Cohn testified that it was her decision to take Williamson's draft and pass it off to Bennet, and Bennet testified that he had never told either Williamson or Cohn that he wanted to edit the draft. Tr. 566, 715.

At approximately 5:03 p.m., after speaking with Cohn, Bennet opened and read through Williamson's draft. Tr. 637; DX-30 at 235. He testified that his impression of Williamson's draft was that it "read like a news story, rather than an opinion piece," and Bennet "felt like it wasn't capturing the shock of the attack and kind of the horror of what had happened." Tr. 716. Although his initial intent was to

provide Williamson guidance on rewriting the Editorial, Bennet soon decided to do the revisions himself:

> I initially started drafting a note to Elizabeth at the top of the editorial, trying to provide some instruction on how I thought the piece should be rewritten. And at that point I realized how late in the day it was getting, and I was concerned about getting the piece done in time. So I couldn't tell you exactly what time this was, but I began just editing the piece myself.

Tr. 637. With respect to the time pressure, Bennet testified that the deadline to submit editorials for print publication the following day was approximately 8:00 p.m. Tr. 640.

Bennet testified that in reading Williamson's draft, he interpreted the paragraphs about the Arizona shooting as "the specific example that Elizabeth returned with of incitement or incendiary rhetoric, and I just trusted that it was ... an example of that based on her characterization." Tr. 719. Bennet further testified that he thought the relationship Williamson had posited between the crosshairs map and Loughner's "made sense" because he suspected that "when politicians get shot, ... it has something to do with politics," and "that an atmosphere of highly charged political rhetoric makes such ... terrifying events more likely." Tr. 719-720.

There are words and phrases in the language about which Palin complains that appeared in Williamson's original draft, such as "a sickeningly familiar pattern is emerging" and "Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs." See DX-136 at 2. But Bennet added the key language that Palin argues

# SA 0034

conveys the allegedly defamatory meaning -- the assertion that Palin's actions "clear[ly]" and "direct[ly]" caused Loughner to commit a mass shooting. Id.

A redline of the Editorial, comparing Bennet's revision to Williamson's first draft, was accepted into evidence, and it succinctly illustrates Bennet's specific contributions to the two paragraphs containing the Challenged Statements:

> ~~Just as in~~ Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a ~~nine~~ 9-year-old girl, ~~Mr. Hodgkinson's rage was nurtured in a vile political climate. Then, it was the pro-gun right being criticized: in the weeks before~~ the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized ~~crosshairs.~~
>
> ~~In the aftermath of Wednesday's shooting, the political right and left and both sides in the gun debate dove into their respective foxholes~~ cross hairs.
>
> Conservatives and right-wing media ~~demanded that~~were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals ~~get~~. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

Id.[8] Bennet testified that as he worked on the Editorial, he did not know whether or not Loughner had seen the crosshairs map, nor did he research that question. Tr. 720. As Bennet explained:

> I was functioning as the editor, not the reporter on the piece, so I wouldn't normally do the reporting in a situation like this, particularly when we were on a tight deadline. But also˘... I

---

[8] As in a standard redline, plain text represents material from Williamson's initial draft, underlined text represents additions by Bennet, and ~~strikethroughs~~ represent deletions by Bennet.

# SA 0035

didn't think then and don't think now that the map caused Jared Loughner to act. I didn't think we were saying that, and therefore ... [it] didn't enter my mind to research that question.... My goal was to make it, you know, a clearer argument and ... [a] more compelling description of what happened that day, a more vivid description of what happened that day.

Tr. 721.

### D. __Further Editing__

Bennet saved his draft in Backfield at 7:21 p.m. DX-30 at 178.

He then emailed Williamson, alerting her that he had finished revising

her draft:

I really reworked this one. I hope you can see what I was trying to do. Please take a look. Thank you for the hard work today and I'm sorry to do such a heavy edit.

PX-163. Bennet testified that his request to "[p]lease take a look"

was indicating to Williamson that she should review the piece for fact

checking. Tr. 638. As Bennet explained at trial:

[T]his is why we send playbacks to writers, because they are the ones who reported the story. They are the ones who are in possession of the facts. And it is important for them to review pieces to make sure that edits haven't introduced errors.

Tr. 639. Williamson testified that, after receiving this email, she

"glanced at" the Editorial and replied to Bennet, writing, among other

things, that the draft "Looks great." Tr. 274; DX-38. She suggested

no edits to Bennet's draft. Id.

Cohn re-claimed the pen around 7:23 p.m. and began editing

Bennet's draft of the Editorial. Tr. 571. She continued working on the

piece, making changes for clarity and accuracy until approximately

7:57 p.m. Tr. 571-573; DX-30 at 136. During that time, Fox and Lepping

were reviewing the piece as well, though they had to relay their

21

changes to Cohn, since only one person was able to edit the Backfield version at a time. Tr. 572; 575-576; PX-155. Cohn testified that she reviewed the Challenged Statements and did not perceive there to be any problem with the language in those paragraphs. Tr. 574-575. Nor did she approach Bennet to discuss those paragraphs. Tr. 575.

Then, at 7:58 p.m., just after storing the latest version of the Editorial reflecting Bennet's revisions, Cohn emailed a "playback," or a static copy of the latest draft, to Williamson for her review.[9] Tr. 576-577. Cohn explained that she sent the playback to Williamson because, although Cohn "assumed that James Bennet had sent one since at that point he was really editing the piece, [she] was playing it safe since [she] had been the original editor on the piece." Tr. 577. The reason Cohn wanted to be sure Williamson received a playback was so Williamson "could make sure that everything in there was correct and that ... the changes seemed fair to her, that ... there was nothing that she wanted to object to either in terms of facts or tone." Id. Cohn did not receive any further edits or comments from Williamson. Tr. 577-578.

Shortly after Bennet filed his draft of the Editorial to Backfield, Eileen Lepping, the Editorial Board's principal fact checker, also began her process of fact checking and editing. Tr. 395.

---

[9] Cohn described the practice of sending a writer a "playback with changes" as "send[ing] a copy to the writer so ... the changes would show up ... so they could go back and look and get back to [the editors] if there were any issues or problems with it." Tr. 577.

# SA 0037

Lepping testified that she fact checked the draft Editorial line-by-line. Tr. 416, 421-422. However, she continued editing the piece as Cohn and Bennet also edited and revised it. Tr. 400-401. While fact checking the Editorial, Lepping clicked through the "circulated" hyperlink to the ABC News article, and "scan[ed] it for the facts that [she] was looking for at the moment," meaning specific details such as times, dates, that it was Palin's PAC that had circulated the map, and the number of congressional districts identified. Tr. 399, 422-423. One correction Lepping made around 7:34 p.m. was to edit words indicating the relative timing of the crosshairs map's publication (March 23, 2010, <u>see</u> DX-62; DX-63) and the Arizona shooting (January 8, 2011) from "in the weeks before the shooting" to "in the months before."[10] <u>See</u> PX-153; Tr. 399-403. Lepping testified that she did look at the crosshairs map itself, though she missed the inaccuracy regarding the location of the stylized crosshairs, an error which had already appeared in Williamson's 4:44 p.m. draft. Tr. 406-407. Lepping further testified that she does not recall fact checking the phrase "the link to political incitement was clear" in the first paragraph. Tr. 405. Nor did she fact check the phrase "Though there's no sign of incitement as direct as the as in the Giffords attack" in the second paragraph. Tr. 407. At that point, with the 8:00 print deadline

---

[10] This text was changed yet again, sometime after Lepping completed her edit at approximately 7:56 p.m. that night: the published version reads "Before the shooting." Tr. 404-406. Lepping testified that she did not know who made that further edit. Tr. 406.

# SA 0038

nearing, Lepping testified that she "was doing more of a quick check of names and dates and things like that." Tr. 426. However, Lepping said she was able to confirm all of the facts she did check, and no one instructed her not to check any aspect of the piece. Tr. 426-427. At the end of her edit, Lepping sent a playback to Semple, who had a practice of reading the final versions of editorials before they ran and reaching out if he had any concerns; but Semple did not raise any concerns to Lepping about "America's Lethal Politics." Tr. 428-429.

After Cohn and Lepping's review, the copy editors assigned to the editorials page that night -- Bruce Levine and Joe Rakowski -- also edited the piece. Tr. 578. Additional fact checking occurred at this step, with Levine correcting the number of victims hit by Hodgkinson's bullets from five to four, since the fifth victim was determined to have been hit by shrapnel. See PX-178. Levine made this edit by comparing the draft Editorial to the article on the Virginia shooting prepared by the news department for the following day's paper. Tr. 579. Still, no fix was made to the Challenged Statements.

### E. Publication

The Times published "America's Lethal Politics" on its website at approximately 9:45 p.m. on June 14, 2017.[11] Tr. 640-641. The Times' Twitter accounts posted two tweets promoting the Editorial on the

---

[11] The online version of the Editorial received 150,257 page views before the first correction was posted, and 133,572 page views (after it was corrected) for the remainder of the first week after publication. DX-500 ¶ 13; DX-128.

# SA 0039

evening of June 14, 2017. PX-3; DX-500 ¶¶ 16-20. "America's Lethal Politics" was the lead article on the editorial page in the June 15, 2017 print edition of The New York Times.[12] PX-4. And the Editorial was featured on the Times' website homepage through June 15, 2017, although it no longer appeared on the homepage as of 3:00 p.m. June 15, 2017. DX-126; DX-127; DX-500 at 1.

**F. Corrections**

At 10:35 p.m., less than one hour after the Editorial was published online, Bennet received an email from Ross Douthat, a conservative columnist for the Times' Opinion section who covers national politics, among other topics. Tr. 820. Douthat's email was a response to an email from Bennet complimenting Douthat's latest column. PX-174 at 2. In his email, Douthat criticized the factual basis for the Challenged Statements:

> I feel I would be remiss if I didn't express my bafflement at the editorial that we just ran on today's shootings and political violence. There was not, and continues to be so far as I can tell, no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else, given his extreme mental illness and lack of any tangible connection to that crosshair map, the Tea Party or other right-wing cause. Whereas the shooter today, as our editorial concedes, seems to have had a clear partisan, anti-Trump purpose. That doesn't mean that liberals or "The Resistance" were in any way responsible for this horror; I don't buy those kind of arguments at all, in either case. But our editorial seems to essentially reverse the fact pattern as I understand it, making it sound like *Loughner* had the clearer connection to partisan rhetoric, when to the best of my knowledge he had none. I don't understand that claim at all, and I don't understand why we're making it.

---

[12] 610,531 copies of the June 15, 2017 print edition of The New York Times, which included the Editorial, were printed. DX-500 ¶ 8.

# SA 0040

Id. at 1. Bennet responded at 11:09 p.m.:

> Thanks, and I'll look into this tomorrow. But my understanding
> was that in the Giffords case there was a gun sight superimposed
> over her district; so far in this case we don't know of any direct
> threat against any of the congressmen on the field. That's not
> to say any of it is ok, obviously, or that the violence in either
> case was caused by the pol[i]tical rhetoric. But the incitement
> in this case seems, so far, to be less specific.

Id. Bennet testified that when he read Douthat's email he "took away
from [it that Douthat] was reading the editorial to say that Loughner
was incited by Sarah Palin or somebody else, and that is not the
message we intended to send." Tr. 645.

In addition to replying to Douthat by email, Bennet testified
that he "checked Twitter, because this ... obviously rang a big alarm
for me and, yes, I saw other media people at that point tweeting that
we had gotten it wrong," making similar points to Douthat's. Id. at
645-646. Shortly thereafter, Bennet sent a text message to Williamson:
"Are you up? The right is coming after us over the Giffords comparison.
Do we have it right?" DX-46. Williamson, however, had gone to sleep
and did not respond until the morning. Id. Bennet testified that he
spent time reading the criticism of the Editorial that was appearing
online and tried to sleep but was unable to get much rest, because he
was "so upset and confused."[13] Tr. 747-748.

---

[13] Plaintiff's counsel asked Bennet if Douthat's email prompted
Bennet to make any effort to take the Editorial offline while the
Times was investigating its accuracy. Bennet said he made no such
effort because at the time, "The New York Times ... had a rule against
so-called unpublishing stories; that if you published a story, you
couldn't then just pull it down." Tr. 648. Bennet also noted that the
Editorial was irrevocably set to run in the June 15, 2017 print
edition. Tr. 649. Plaintiff's counsel adduced no evidence suggesting

# SA 0041

At 5:08 a.m. on June 15, 2017 Bennet emailed Williamson and Lepping with the subject line "Giffords:"

> Hey guys -- We're taking a lot of criticism for saying that the attack on Giffords was in any way connected to incitement. The claim is that this was fully investigated and debunked in the months after the attack, and the shooter was found to have acted only because of his personal demons. I don't know what the truth is here but we may have relied too heavily on our early editorials and other early coverage of that attack. If so, I'm very sorry for my own failure on this yesterday. In any case I'd like to get to the bottom of this as quickly as possible this morning and correct the piece if needed. Can you two please put your heads together on this first thing this morning? Please skip the morning meeting if necessary. JB

PX-191. Later that morning, Williamson and Bennet spoke by phone; Williamson described Bennet's demeanor on the call as reflecting that he was "clearly crestfallen that this had happened." Tr. 183; see PX-190. Williamson ("EB") and Bennet ("JB") also exchanged text messages about the apparent error:

> EB:   Hey I'm sorry James. I should have read those [para]grafs more closely and asked more questions. That's on me. Will get a [correction] drafted soonest. E.

> JB:   No worries. I feel lousy about this one -- I just moved too fast. I'm sorry.

> JB:   Now what I need from you/Eileen soonest is a rock-solid version of what we should say -- that an investigation showed NO link to incitement, or NO DIRECT link or NO CLEAR link. I don't want to soften if it we don't need to -- if there was no link we should say so.

> EW:   On it. We'll do the right thing

DX-46; PX-188; Tr. 182-183.

---

that Bennet could have taken the Editorial down at that time or that he lacked awareness of this "unpublishing" policy at the time, so there is no inference that can reasonably be drawn from Bennet's decision not to pursue this.

# SA 0042

Williamson and Lepping began researching the issue shortly thereafter to determine if a correction was required, skipping the Editorial Board's morning meeting as directed. Tr. 172. Williamson described the <u>Times'</u> corrections policy as "if we were alerted of an error, the policy would be to as swiftly as possible ascertain the correct facts and write the correction and post it."[14] Tr. 206-207. At 7:18 a.m., Williamson emailed her Editorial Board colleague, Jesse Wegman, who had noted criticism of the Editorial on Twitter the night before, asking "What in your view would be the most reliable assessment of the politics link (or not) in the Loughner case? Am thinking court records/assessment of his state of mind." Williamson's focus was correcting the description of the map itself; the bulk of the research and the correction drafting was done in New York. Tr. 173, 185. That morning, Lepping was responsible for researching whether a link had ever been established between the crosshairs map and Loughner's attack. Tr. 410. Lepping testified that she found a police report online

---

[14] The applicable "Corrections" policy from <u>The New York Times'</u> "Guidelines on Integrity" states in full:

> Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small. The paper regrets every error, but it applauds the integrity of a writer who volunteers a correction of his or her own published story. Whatever the origin, though, any complaint should be relayed to a responsible supervising editor and investigated quickly. If a correction is warranted, fairness demands that it be published immediately. In case of reasonable doubt or disagreement about the facts, we can acknowledge that a statement was "imprecise" or "incomplete" even if we are not sure it was wrong.

PX-18; <u>see also</u> Tr. 299-300.

# SA 0043

indicating that the shooting "wasn't politically connected."[15] <u>Id.</u>

Cohn, working under direction from Bennet and Wegman, drafted the corrections. Tr. 552-553. The first correction, positioned below the online version of the Editorial, was published at approximately 11:15 a.m. on June 15, 2017, Tr. 659, and it read as follows:

> An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.

PX-5 at 3. At the same time, the two paragraphs containing the Challenged Statements was revised to read as follows:

> Was this attack evidence of how vicious American politics has become? Probably. In 2011, Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl. At the time, we and others were sharply critical of the heated political rhetoric on the right. Before the shooting, Sarah Palin's political action committee circulated a map that showed the targeted electoral districts of Ms. Giffords and 19 other Democrats under stylized cross hairs. But in that case no connection to the shooting was ever established.

> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Liberals should of course be held to the same standard of decency that they ask of the right.

---

[15] Lepping's testimony about the investigative conclusions she read in the police report was offered for, among other things, the truth of the matters asserted in the report. Plaintiff's counsel never offered the police report, which they had pre-marked as an exhibit and included in the pre-trial exhibit list, <u>see</u> ECF 157 at 55. As such, Lepping's testimony regarding what the report concluded about Loughner's mental state was objectionable hearsay to the extent it was offered for its truth. But since no objection was interposed by defendants, the testimony was received in evidence for all purposes.

# SA 0044

<u>Id.</u> at 2.[16] The <u>Times'</u> Opinion Section and its main Twitter accounts
also tweeted out the correction. PX-7. The evidence showed that Bennet
was involved in drafting the Twitter posts, and that he edited the
proposed language to add the apology that "[w]e're sorry about [the
error]" and thanked readers for "call[ing] us on the mistake." DX-53
at 1; Tr. 1033.[17]

---

[16] The record contains an email from Wegman to Williamson sent at
12:44 p.m. on June 15, 2017 discussing the correction to the text of
the Editorial. In it, Wegman writes, "I made the case that talking
about Palin and Giffords in the same [para]graf at all risked seeming
like we were still trying to sneak the link in, but James pointed out
that in order to write the next [para]graph, we had to put it in there
to explain." PX-204 at 1. Plaintiff's counsel, however, elicited no
testimony providing context for this statement, and plaintiff's
counsel did not rely on any inferences from this document during
summation or in argument on the Rule 50 motion.

[17] There was considerable debate at trial about whether the Times
has a policy against offering apologies in connection with corrections.
<u>See, e.g.,</u> Tr. 675, 1036. Plaintiff's counsel raised this issue in
connection with the assertion that Palin never received an apology
from the <u>Times</u> or Bennet. The Court need not, and does not, resolve
the factual issues regarding any apology policy at the <u>Times</u> or whether
Palin received an apology, neither of which is materially relevant to
the matter at hand. However, it is undisputed that on June 15, 2017,
Bennet received a request for comment from CNN's senior media reporter
regarding the Editorial's inaccuracy, and that Bennet provided draft
comments to the vice president of the New York Times Co. for
communications for her to relay back to the CNN reporter. <u>See</u> DX-60.
The reporter had asked, <u>inter alia</u>, whether the Times would "be issuing
an apology to Sarah Palin for wrongly linking her to the shooting of
Giffords." <u>Id.</u> at 2. Bennet's response to this question was "I'm not
aware that Sarah Palin has asked for an apology, but yes, I, James
Bennet, do apologize to her for this mistake." <u>Id.</u> However, Bennet's
statement of apology was not ultimately relayed to CNN, and so it was
never published. <u>See</u> PX-236.

# SA 0045

Later, the Times issued a second correction to replace the first, addressing the remaining error regarding the description of the map. That second correction read:

> An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.

PX-6. This second correction also ran at the bottom of the editorial page in the June 16, 2017 print edition of the newspaper. PX-10.

## II. **Procedural Background**

### A. **Prior Proceedings**

Palin initiated this lawsuit by filing a one-count complaint on June 27, 2017. ECF 1. Defendants moved to dismiss the complaint on July 14, 2017. ECF 24. The Court subsequently determined that it was a "close question" whether the complaint had pled sufficient allegations of actual malice. ECF 35. Therefore, without objection from the parties, the Court held a brief evidentiary hearing on August 16, 2017, at which the Court ascertained who were the authors of the Editorial and other basic facts that provided context for assessing the plausibility of the inferences upon which the complaint relied to state a libel claim. See ECF 35 at 2. The Court then determined that Palin had not plausibly pled actual malice and dismissed the complaint. Id. Palin appealed that order and the Second Circuit reversed, holding

# SA 0046

that the plausibility hearing contravened Fed. R. Civ. P. 12(d). See Palin v. New York Times Co., 940, F.3d 804, 812-813 (2d Cir. 2019).

Following remand, Palin filed the operative, first amended complaint on December 30, 2019. ECF 70. The Court subsequently granted defendants' motion for partial judgment on the pleadings, dismissing Palin's claim for disgorgement of advertising revenues specifically associated with the Editorial. ECF 83. On June 12, 2020, the parties filed cross-motions for summary judgment. ECF 94, 95. The Court denied these motions on August 28, 2020 and set the case for trial February 1, 2021. ECF 117.

Defendants subsequently filed a motion for reconsideration on the basis of an intervening change in substantive law: New York State's November 10, 2020 amendment of its libel statute to expressly require a public figure such as Palin to prove actual malice by clear and convincing evidence. ECF 119. On December 29, 2020, the Court granted defendants' motion for reconsideration and held that the amendment to New York's so-called "Anti-SLAPP Statute,"[18] N.Y. Civil Rights L. § 76-a(2), applies to this action. Consequently, Palin's burden to prove actual malice as to falsity by clear and convincing evidence is not only required by the First Amendment to the United States Constitution but also by New York State statutory law. ECF 125.

---

[18] "Anti-SLAPP" refers to statutes enacted to prevent libel claims from operating as Strategic Lawsuits Against Public Participation ("SLAPP suits") that would otherwise create a risk of litigation tending to wrongly inhibit public discourse.

# SA 0047

**B. The Trial and Rule 50 Motion**

Unfortunately, the COVID-19 pandemic's cycles of intensification and abatement resulted in several epidemiological "surges" at times set for trial, requiring repeated adjournments to comply with the pandemic protocols of the Southern District of New York. After these delays, trial was set to commence on January 24, 2022. But on the eve of trial, Palin contracted COVID-19 and so was barred by the pandemic protocols from entering the courthouse. See Minute Entries 1/24/2022. Finally, on February 3, 2022, a jury was empaneled, and the trial commenced.

Following the close of evidence on Thursday, February 10, 2022, defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50(a) on four issues, each of which was necessary for Palin to prove the essential elements of their liability on her single claim of libel.[19] See Tr. 1053. These included the two aspects of the "actual malice" element, actual malice as to falsity and actual malice as to defamatory meaning, as well as the "of and concerning" and falsity elements. Tr. 1054-1055. Oral argument proceeded in at least five sessions outside the presence of the jury over three days, and counsel

---

[19] The Court notes that the Times made the Rule 50 motion at the earliest available time. The Times did not call any witnesses of its own or otherwise present an affirmative case after Palin rested. This follows from the Court's individual rules of practice, which provide that each witness may only be called once but can be examined at that time by both sides on any issue.

made written submissions of relevant caselaw citations over the intervening weekend, <u>see</u> ECF 174 at 5-9.

Meanwhile, while the Court continued to reserve judgment on the Rule 50 motion, the jury began deliberations on the afternoon of Friday, February 11, 2022. That evening, following relevant argument and a close review of caselaw cited by counsel, the Court denied the prong of defendants' Rule 50 motion directed at the "of and concerning" element of Palin's libel claim. Tr. 1228.

Argument then turned to the portion of the actual malice element concerning whether Bennet knew or recklessly disregarded the Challenged Statements' falsity prior to publication. <u>Id</u>. The Court was initially skeptical of defendants' position, on the basis that the jury might make adverse determinations as to Bennet's credibility and draw adverse inferences about his pre-publication state of mind therefrom. <u>See, e.g.</u>, Tr. 1232. However, defense counsel drew the Court's attention to a Second Circuit libel case, <u>Contemp. Mission, Inc. v. New York Times Co.</u>, which holds, in sum, that in light of the clear and convincing evidence standard, a plaintiff must adduce some affirmative, "concrete evidence from which a reasonable juror could return a verdict in h[er] favor" to establish a jury question on actual malice, and that it is "[i]t is not enough for the plaintiff merely to assert that the jury might, and legally could, disbelieve the defendant's denial of legal malice." 842 F.2d 612, 621-622 (2d Cir. 1988); <u>see</u> Tr. 1235-1241. Over the weekend, the Court studied the

relevant caselaw, including the numerous citations provided by counsel.

During argument regarding defendants' pending Rule 50 motion on the morning of Monday, February 14, 2022, the Court indicated that it was leaning toward agreement with defendants' position on the issue of actual malice as to falsity, but that, to make sure, it would hear further argument on the issue. The Court further advised the parties that if the Court determined that defendants' Rule 50 motion was meritorious, it would still let the jury reach a verdict so that the case might not need to be retried if the Court's judgment as a matter of law were reversed on appeal.[20] As previously noted, neither party objected in the slightest to this proposal either at that time, during either of the two following sessions of oral argument, or even later that afternoon when the Court indicated it was about to announce its decision on the actual malice prong of the Rule 50 motion. See Tr. 1256-1295.

Later that afternoon, the Court reconvened outside the presence of the jury. First, the Court denied the prong of defendants' motion concerning the falsity element. Specifically, it held that there was

---

[20] See Tr. 1256 ("So I think it comes down to a single issue. By the way, were I to grant the motion -- and I haven't decided yet, but were I to grant the motion, I would still let the jury continue to reach a verdict so that the Court of Appeals, if they disagree with my determination, would still have the jury's verdict before them and we wouldn't have to retry the case. But I don't mean to suggest by that that I've made a decision. I just wanted to flag what would be the result if I did grant the motion.").

sufficient evidence, including unobjected-to testimony from Lepping
about her research for the corrections (see n. 15, supra) from which
a reasonable jury could conclude that Palin had carried her burden to
establish the Challenged Statements' falsity by clear and convincing
evidence. See Tr. 1295-1297. Then, after discussing the requirements
of Rule 50, the Court explained its determination that no reasonable
jury could find that Palin had carried her burden to prove by clear
and convincing evidence that Bennet had known or recklessly disregarded
the Challenged Statements' falsity prior to publication. Tr. 1299-
1305. The Court further stated that it would permit the jury to
continue its deliberations, and it would formally enter its Rule 50
judgment as a matter of law after the jury returned its verdict. Tr.
1298, 1305. There were no objections.[21]

At the end of the day and after announcing its ruling on the Rule
50 motion, the Court reconvened counsel and asked whether either side
sought a further instruction about avoiding media coverage of the

---

[21] Plaintiff's counsel has since suggested that the Court
recognized an objection to this procedure when it stated, after
delivering the substance of its Rule 50 decision, that "needless to
say, the plaintiff is deemed to have objected to my decision, and that
is preserved for appeal as well." Tr. 1306. But plaintiff's
interpretation grossly misconstrues the record. The full context of
the quoted remark reflects that it concerned only the legal substance
of the Court's Rule 50 decision, which plaintiff's counsel had
addressed at length, and that the Court was merely recognizing
plaintiff counsel's presumed reassertion of those prior objections to
the substance of the Court's Rule 50 decision. Because neither party
had ever objected to the Court's proposal not to discharge the jury
after delivering its Rule 50 decision, there was no prior objection
to the procedural aspect of the Court's action that the Court could
have recognized as reasserted.

# SA 0051

trial or whether "we should just leave things as is." Tr. 1307. Plaintiff's counsel declined to ask for any instruction, stating "We leave things as is." Id. However, defense counsel requested an instruction, raising the risk posed by "push notifications that get sent out to people's phones." Id. The Court ultimately recalled the jury and again admonished the jurors not to look at anything regarding the trial, not to speak with anyone about the trial, and "if you see anything in the media about this case, just turn away."[22] Tr. 1308.

The following afternoon, the jury delivered a verdict of not-liable, which was confirmed in a poll of each individual juror. See ECF 173; Tr. 1324-1325. The Court then informed the jury about its ruling on the Rule 50 motion and discharged the jury. Tr. 1326-1327. The Court entered final judgment later on February 15, 2022. ECF 171.

After the jury was excused, the Court directed its law clerk to speak with the jury about any problems it might have had with the Court's instructions of law or any suggestions they might have for improvements. This has been the Court's routine practice for over 25 years and more than 300 jury trials, and it has led to material improvements. For example, as suggested by a jury several years ago, the Court now always provides the jury with a "short-form" version of its instructions of law at or near the very start of the trial, as it

---

[22] The jury was instructed to turn away from media coverage repeatedly throughout the trial, including when it was empaneled, Tr. 71; after an incident in which a member of the public cheered Palin and denigrated The Times while jurors were waiting for the elevator, Tr. 500, 512; and by email over a weekend recess, ECF 174.

## SA 0052

did in this very case. However, in the course of their post-verdict discussion in the instant case, a few of the jurors volunteered to the law clerk that they had previously become aware of the bottom line of the Court's February 14 ruling, because, notwithstanding that they had assiduously adhered to the Court's instruction to avoid media coverage of the trial, they had received "push notifications" on their smartphones containing a few words to the effect that the Court intended to dismiss the case. ECF 172. Although the same jurors made a point of affirmatively expressing to the law clerk that their limited knowledge had not affected their deliberations in the slightest, the Court, upon learning of this conversation, promptly disclosed it, in writing, to the parties and the public. Id.

### III.   **Legal Framework**

As explained, the Court entered Final Judgment for defendants as a consequence of their Rule 50 motion for judgment as a matter of law. ECF 171. Specifically, the Court granted the Rule 50 motion with respect to Palin's failure to adduce evidence from which any rational jury could find by clear and convincing evidence either that Bennet and the Times published the Editorial knowing that it contained a false statement of fact about Palin or that Bennet and the Times published in reckless disregard of the Editorial's truth or falsity. Therefore, the Court sets forth in this section the legal frameworks governing the substantive and procedural aspects underlying its judgment.

# SA 0053

## A. __Elements of Liability for Libel of a Public Figure__

A claim of libel arises from the publication of a false defamatory statement made in writing or print. To establish liability for such a claim under here-applicable New York law, Palin, who is a "public figure," was required to prove four essential elements concerning any allegedly libelous statement:[23]

> (1) It was a statement of fact that the ordinary reader of the publication would understand, when taken in the context in which it appears, to convey a defamatory meaning, <u>Mahoney v. Adirondack Pub. Co.</u>, 71 N.Y.2d 31, 38 (1987);

> (2) An ordinary reader would reasonably understand the statement to be "of and concerning" the plaintiff personally, rather than referring to another person or entity, <u>Three Amigos SJL Rest., Inc. v. CBS News Inc.</u>, 28 N.Y.3d 82, 86 (2016);

> (3) The statement was materially false, <u>Rinaldi v. Holt, Rinehart & Winston, Inc.</u>, 42 N.Y.2d 369, 380 (1977); and

> (4) At the time of publication, the Times (and Bennet, in particular) had the state of mind known as "actual malice," <u>Harte-Hanks Commc'ns, Inc. v. Connaughton</u>, 491 U.S. 657, 666 (1989).

While a plaintiff may prove the first two elements by a preponderance of the credible evidence, the elements of falsity and actual malice must be proven by clear and convincing evidence. <u>See Rinaldi</u>, 42 N.Y.2d at 379. Also, the parties agreed, based on the record and the scope of <u>respondeat superior</u> liability under New York law, to treat Bennet and The New York Times Co. as a single unit with any finding of liability or non-liability applying equally to both defendants. Tr.

---

[23] Although a fifth element, publication, is also an essential element of a libel claim, defendants here conceded that the challenged statements were published, so this was never in dispute. <u>See</u> Tr. 466.

# SA 0054

462-464 (charge conference); Jury Instructions at 12 (corporate liability). As for damages, since the Challenged Statements, as construed by Palin, were defamatory per se, damages were presumed, and proof of special damages was not required as an element of liability.[24]

The First Amendment's guarantees of freedom of speech and of the press prohibit imposition of liability for libel of a public figure unless the plaintiff proves that the defendants acted with "actual malice." Sullivan, 376 U.S. at 279-280; see also Harte-Hanks Commc'ns, 491 U.S. at 666 (confirming that the Sullivan rule applies to public figures).[25] It is undisputed that Palin is a public figure for the purposes of this lawsuit. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974) (defining public figures as those who "have thrust themselves to the forefront of particular public controversies in

---

[24] During argument concerning the jury charge, the Court denied defendants' motion in limine that sought a ruling that the Challenged Statements were not defamatory per se. See ECF 159; Tr. 682. Under New York law, "[a]ny written or printed article is libelous or actionable without alleging special damages if it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." Rinaldi, 42 N.Y.2d at 379. The assertion that Palin's actions played a "clear" or "direct" role in causing Loughner to commit a mass shooting undoubtedly falls within this definition of a libelous per se statement. See Tr. 896-897 (describing death threats Palin and her children received after the accusation was first made in 2011).

[25] Palin has consistently maintained that New York Times v. Sullivan either is no longer good law or does not apply to this case, and thus that the First Amendment does not require her to prove that Defendants published with actual malice. The Court has repeatedly rejected these contentions, which are fully preserved for appellate review. See, e.g., ECF 117 at 11-13.

**SA 0055**

order to influence the resolution of the issues involved" and thereby "invite attention and comment"). Therefore, to prevail, Palin must prove by clear and convincing evidence that Bennet and the <u>Times</u> published the Editorial "with knowledge that it was false or with reckless disregard of whether it was false or not." <u>Sullivan</u>, 376 U.S. at 280.[26]

New York State's "Anti-SLAPP" statute independently requires a plaintiff in Palin's position to prove actual malice, i.e., to have "established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false." Civil Rights L. § 76-a(2). The Court has already held that the current version of this

---

[26] A central plank of the defense was Bennet's assertion that he did not intend the Editorial to convey that the crosshairs map directly caused Loughner to commit the Arizona shooting. This issue largely turns on Bennet's intent in using the word "incitement." On summary judgment, the Court accepted defendants' argument that Bennet could not have actual malice as to the Editorial's purported falsity unless he was also aware that readers would interpret his words to convey the allegedly false meaning. <u>See</u> ECF 117 at 13-15. Accordingly, the Court held that Palin was required to prove two necessary aspects of actual malice by clear and convincing evidence: actual malice as to falsity and actual malice as to defamatory meaning. <u>See</u> <u>id</u>. at 18-19. To prove actual malice as to defamatory meaning, Palin was required to show that Bennet either intended to convey the alleged defamatory meaning or that he was aware that ordinary readers would probably understand his words to convey the allegedly defamatory meaning and he published anyway. <u>See</u> Jury Instructions at 20.

Although defendants' Rule 50 motion contended that Palin had failed to prove by clear and convincing evidence the aspect of actual malice concerning defamatory meaning, the Court did not address this prong of defendants' motion during oral argument. <u>See</u> Tr. 1263. It therefore forms no part of the Court's reasoning as set forth below and is deemed denied as moot.

# SA 0056

statute, amended November 10, 2020, applies retroactively to this action. <u>See</u> ECF 125. Therefore, the Court's entry of judgment as a matter of law for Palin's failure to prove actual malice rests independently on both federal law, via the First Amendment, and on New York State statutory law, via Civil Rights L. § 76-a(2).

As explained above, the Court denied Defendants' Rule 50 motion with respect to all elements except actual malice, and then only granted the motion with respect to the aspect of actual malice concerning Bennet's knowledge or reckless disregard of the Challenged Statements' falsity. It was also clear from argument that Palin was not seriously contending that Bennet published the Editorial with actual knowledge that the Challenged Statements were false; rather, Palin argued that she established actual malice by virtue of reckless disregard.

The cornerstone of the reckless disregard standard for actual malice is that the plaintiff must prove by clear and convincing evidence, that the "defendant in fact entertained serious doubts as to the truth of his publication." <u>St. Amant v. Thompson</u>, 390 U.S. 727, 731 (1968). And, as the New York Court of Appeals has explained, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action." <u>Liberman v. Gelstein</u>, 80 N.Y.2d 429, 438 (1992). Liability is therefore barred unless Palin adduced clear and convincing evidence supporting the conclusion that, at a minimum, "a false publication was made with a

**SA 0057**

high degree of awareness of probable falsity." <u>Id.</u> Proof of negligence does not suffice to establish actual malice: "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." <u>Id.</u>

Nor, without clear and convincing proof that the defendant harbored serious doubts about the truth of the allegedly libelous statement, would it be enough to "show[] ... highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." <u>Harte-Hanks Commc'ns</u>, 491 U.S. at 666. The failure to investigate a fact or confirm an assertion before publication does not establish reckless disregard -- "even if a prudent person would have investigated before publishing the statement" -- unless the evidence proves that "defendants' 'inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity' of the published statement." <u>Sweeney v. Prisoners' Legal Servs. of New York</u>, Inc., 84 N.Y.2d 786, 793 (1995) (quoting <u>Harte-Hanks Commc'ns</u>, 491 U.S. at 692).

**B. <u>Legal Standard -- Rule 50</u>**

As already noted, the standard for granting a motion under Fed. R. Civ. P. 50 for judgment as a matter of law requires a court to consider all the evidence in the record and draw all reasonable inferences in favor of the non-movant, here Palin. Furthermore, the Court may neither make determinations as to the credibility of

witnesses or other evidence nor weigh conflicting evidence, as any such analysis of the evidence is the jury's exclusive province.

Independently, however, in reviewing the evidentiary record of actual malice, "the judge must view the evidence presented through the prism of the substantive evidentiary burden," i.e., clear and convincing evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Anderson was a libel case, and it addressed the legal issue before this Court: the appropriate standard to apply to a defendant publisher's motion for summary judgment on the actual malice element of a libel claim brought by a public figure, which it described as identical to the standard applied to motions made under Fed. R. Civ. P. 50. Id. at 245-246, 250. The Anderson Court held that to determine whether a jury question exists as to the actual malice element, a judge must account for the clear-and-convincing standard of proof and determine. Id. at 255. Therefore, "there is no genuine issue" of material fact, and so the defendants' motion must be granted, "if the evidence presented [by the plaintiff] is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." Id. at 254.

Anderson also rejected the proposition that a jury question as to actual malice exists where the defendant's "state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue." 477 U.S. at 256. The Court thus held that a plaintiff cannot reach the jury on her libel claim "without offering any concrete evidence from which a reasonable juror could return a verdict in [her]

favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of a conspiracy or of legal malice." Id. A libel plaintiff has a "burden of producing ... evidence that would support a jury verdict." Id. "[D]iscredited testimony" of the libel defendant on its own "does not constitute clear and convincing evidence of actual malice." Bose Corp., 466 U.S. at 512. Therefore, as a matter of law, a libel "plaintiff must present affirmative evidence" supporting the inference that the defendant published with knowledge or reckless disregard of the statement's falsity to reach a jury on the question of actual malice, even though such "evidence is likely to be within the possession of the defendant." Anderson, 477 U.S. at 257. As the Second Circuit has repeatedly explained, this means that a libel plaintiff bears the burden that "[s]ome [affirmative] facts must be asserted to support the claim that the state of mind existed." Contemp. Mission, 842 F.2d at 622.

**IV.  Bennet's State of Mind**

The essential question is whether the record reflects any evidence that could give rise to the conclusion that Bennet knew or consciously disregarded that the Challenged Statements were false at the time the Editorial was published on June 14, 2017. In making this assessment, the Court, construing Palin's claim most favorably to her, assumes, as Palin alleges, that Bennet either intended his edits to Williamson's draft to convey that the crosshairs map played a causal role in spurring Loughner to commit the Arizona shooting or at least that Bennet recklessly disregarded that defamatory meaning. Therefore, the

**SA 0060**

specific inquiry is whether there is any basis from which a reasonable jury could find by clear and convincing evidence that Bennet knew or strongly suspected, before publication, that no link had been established between the crosshairs map and the Loughner shooting. As explained below, the Court concludes that the record contains no such evidence.

Palin has pointed to two categories of evidence that she argues foreclose judgment as a matter of law on actual malice: the research gathered for the Editorial and Bennet's prior awareness of Loughner's motivations. The Court deals with each in turn and then discusses other evidence in the trial record that is probative of Bennet's pre-publication state of mind.

### A. The Research

Viewed in the light most favorable to Palin, the Court assumes that Bennet read and understood three prior New York Times opinion pieces that Lett found and circulated on June 14, 2017: Frank Rich's "No One Listened to Gabrielle Giffords," DX-24, and the two editorials published in January 2011: "Bloodshed and Invective in Arizona," PX-134, and "As We Mourn," PX-135. But even on the assumption that Bennet read and understood these three articles in their entirety, none presents any definitive facts about the Arizona shooting that would have put Bennet on notice (or led him to strongly suspect) that no link had been established between the crosshairs map and Loughner's attack.

Rich's column, "No One Listened to Gabrielle Giffords" was written one week after the Arizona shooting and presented no actual evidence about Loughner's mental state at the time he committed the Tucson attack. DX-24. Rich opened by endorsing President Obama's statement that "no one can know what is in a killer's mind" but nonetheless argued that while a "simple lack of civility didn't cause the Tucson tragedy," the political violence committed by Loughner and others emerged from a context filled with violent, antigovernment political rhetoric from the radical right. Id. at 2-3. Rich contended, therefore, that the fact "[t]hat Loughner was likely insane, with no coherent ideological agenda, does not mean that a climate of antigovernment hysteria has no effect on him or other crazed loners out there." Id. at 3. Assuming that Bennet knew the contents of this column when he revised the Editorial, the Court concludes that "No One Listened to Gabrielle Giffords" provides no facts about Loughner or argument about the attack that contradict the facts asserted in the Challenged Statements. Therefore, the Frank Rich column provides no basis for finding that Bennet knew or suspected that his revision introduced false statements of fact into the Editorial.

The Times' editorial published the day after the Arizona shooting, entitled "Bloodshed and Invective in Arizona," also provides no facts or argument that contradict the Challenged Statements. This editorial describes Loughner as "appear[ing] to be mentally ill" and notes that "[h]is paranoid Internet ravings about government mind control place him well beyond usual ideological categories." PX-134 at 1. But the

**SA 0062**

piece nonetheless argues that violent, antigovernment rhetoric creates a context in which people like Loughner are more likely to commit violent acts.[27] At trial, Bennet described this as "the same point" he was trying to make in "America's Lethal Politics." Tr. 712. The core of the argument presented in "Bloodshed and Invective in Arizona" is also consistent with the argument made in "America's Lethal Politics" that violent political rhetoric can make political violence more likely to occur, even if the perpetrators are deranged:

> It is facile and mistaken to attribute this particular madman's act directly to Republicans or Tea Party members. But it is legitimate to hold Republicans and particularly their most virulent supporters in the media responsible for the gale of anger that has produced the vast majority of these threats, setting the nation on edge. Many on the right have exploited the arguments of division, reaping political power by demonizing immigrants, or welfare recipients, or bureaucrats. They seem to have persuaded many Americans that the government is not just misguided, but the enemy of the people.

PX-134 at 2. Bennet described this passage as "[t]o me, ... the same point" as the one he was trying to make in "America's Lethal Politics." Tr. 713. Granted, a tension emerges when one reads both "Bloodshed and Invective in Arizona" and "America's Lethal Politics" in the light most favorable to Palin's claim: the earlier piece says it is "facile and mistaken to attribute this particular madman's act directly to"

---

[27] See PX-134 at 1 ("But [Loughner] is very much a part of a widespread squall of fear, anger and intolerance that has produced violent threats against scores of politicians and infected the political mainstream with violent imagery. With easy and legal access to semiautomatic weapons like the one used in the parking lot, those already teetering on the edge of sanity can turn a threat into a nightmare.")

# SA 0063

specific politicians, but the Editorial can be read as doing just that when it asserts that "the link to political incitement was clear," in the context of a discussion of the crosshairs map. But this tension emerges from the arguments made by these two pieces, not contradictions in their presentations of the relevant facts. Of course, "[u]nder the First Amendment there is no such thing as a false idea," so statements of opinion are not actionable in libel. Gertz, 418 U.S. at 340. "Bloodshed and Invective in Arizona" therefore provides no basis for concluding that Bennet knew or suspected that the Challenged Statements contained materially false statements of fact.

The third piece of research Palin emphasizes is the editorial "As We Mourn," which was published four days after the attack and praises then-President Obama's speech at a memorial service for the Tucson victims. PX-135. Palin focuses on its praise of Obama's statement that the Arizona attack should be a turning point "not because a simple lack of civility caused this tragedy -- it did not -- but rather because only a more civil and honest public discourse can help us face up to our challenges as a nation." Id. at 1-2. But neither this line nor any other portion of "As We Mourn" presents any facts that contradict the facts asserted in the Challenged Statements. Accordingly, Bennet's having read "As We Mourn" does not support the conclusion that he knew or recklessly disregarded that it was false to assert that Loughner was "incited" by the crosshairs map.

The Court also rejects Palin's argument that the presence in Williamson's draft (and the final Editorial) of the hyperlink on the

word "circulated" to the ABC News article weighs in favor of finding
that Bennet published with actual malice. To be sure, had Bennet read
the ABC News article -- which states in the tenth paragraph that "[n]o
connection has been made between this graphic and the Arizona
shooting," DX-10 at 1-2 -- it would be relevant to establishing that
Bennet had reason to doubt that the "link to political incitement was
clear" with respect to the Arizona shooting.[28] But Bennet testified
that he neither clicked on the "circulated" link in Williamson's draft
nor read the ABC News article before the Editorial was published. Tr.
609-610. And Palin has adduced no affirmative evidence to undermine
Bennet's testimony on this point. Therefore, even viewing the record
in the light most favorable to Palin and drawing all reasonable
inferences in her favor, the Court concludes that the contents of the
ABC News article did not inform Bennet's pre-publication state of
mind.

Indeed, Palin effectively conceded as much by adopting the
alternate position during oral argument on the Rule 50 motion that it

---

[28] Even if, assuming _arguendo_, Bennet had read the ABC News
article, it is not at all clear that it would establish that Bennet
knew that there was no connection between the cross hairs map and
Loughner's attack. The ABC News article was written only one day after
the shooting, and its thrust is that people were drawing a link between
the shooting and the cross hairs map in the immediate aftermath of the
attack. See DX-10. A reasonable reader in Bennet's position would not
necessarily understand the hedge contained in the tenth paragraph --
that within one day of the attack, no firm connection had yet been
made been made between Loughner and the map -- as conclusive evidence
that no such connection was later established by investigators. Of
course, this point is academic, since the record reflects that Bennet
never read the ABC News article before publication.

# SA 0065

was highly unreasonable for Bennet not to have clicked the hyperlink when revising. See, e.g., Tr. 1274. But this contention fails to establish actual malice for two reasons. First, as a legal matter, assuming arguendo that Bennet was negligent -- or even grossly negligent -- in not clicking the link, that would do nothing to establish that Bennet had the subjective awareness of (probable) falsity that is the sine qua non of actual malice. See Harte-Hanks Commc'ns, 491 U.S. at 666. And second, as a factual matter, it is not at all clear that Bennet's failure to click on the link was even negligent: the hyperlink was keyed to the word "circulated," thereby implying factual support for the well-known proposition that Palin's PAC had circulated the crosshairs map prior to the Arizona shooting.[29] Palin established no reason why Bennet was negligent not to validate this proposition, which is distinct from the allegedly libelous assertion and was not subject to question at any time. Accordingly, Bennet's failure to click the ABC News link does not support the conclusion that he published with actual malice.

In sum, drawing all reasonable inferences in Palin's favor regarding Bennet's pre-publication reading, none of the research materials in the record supports the conclusion that Bennet had reason

---

[29] The full sentence in Williamson's draft read: "Then, it was the pro-gun right being criticized: in the weeks before the shooting Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs." PX-141.

# SA 0066

to know, or even to suspect, that his revisions had introduced false statements of fact to the Challenged Statements.[30]

Accordingly, the Court concludes that none of the evidence related to the Editorial Board's pre-publication research process supports the conclusion that the Times published the Editorial with knowledge or reckless disregard as to the Challenged Statements' falsity.

### B. **Bennet's Recollection**

In addition to research conducted for the Editorial on June 14, 2017, Bennet theoretically could have had prior knowledge regarding the relationship -- or lack thereof -- between the crosshairs map and the Arizona shooting. But the record belies this possibility. Bennet testified that he was not aware of the details of the Loughner case and that he did not recall the controversies surrounding the crosshairs map before the Editorial was written. Palin offered no admissible evidence that would undermine Bennet's testimony on this point. Nor are Bennet's contemporaneous communications inconsistent with his testimony. Accordingly, the Court concludes that Palin has not proved that Bennet had any prior recollection of the Arizona shooting from which a rational jury could infer that he published with actual malice.

Bennet testified that he did not recall seeing the crosshairs map or any press coverage about it when the map was originally released

---

[30] Nor was there any other research that could have informed Bennet's state of mind on June 14, 2017, because he testified that he relied on Lett's research and did no independent research himself. Tr. 610, 621.

in 2010. Tr. 607. Nor does Bennet recall seeing any posts on Twitter that Palin made in connection with the map. Id. Indeed, Bennet testified that at the time he revised the Editorial, he did not have a mental image of the map and "was relying on [Williamson's] description of it in the piece."[31] Id.; see also Tr. 705.

Bennet also denied having any recollection of specific articles he read in 2011 or thereafter about the Arizona shooting that discussed Loughner's mental state at the time of his attack.[32] Tr. 620. Bennet

_____

[31] Palin had sought to offer evidence regarding James Bennet's brother, Michael Bennet, who has served during all times relevant to this case as the Democratic Senator representing Colorado. Palin had argued both that James Bennet's relationship to his brother could establish bias and that it would have made James Bennet more likely to have been aware of the cross hairs map at the time it was published. See, e.g., Tr. 501-502; ECF 147. However, the Court ultimately sustained the Times' objections, articulated on the record and in a motion in limine, see ECF 136, and excluded this evidence both on grounds of relevance, since plaintiff's counsel had laid no foundation adequate to support either asserted theory of relevance, and on Rule 403 grounds. Tr. 502-503.

Palin adduced no affirmative evidence that Bennet or others on the Times' Editorial Board were biased, fairly or unfairly, against Palin. Even had Palin been able to elicit such evidence, whether arising from James Bennet's relationship with his brother or from any other source, that would not have established actual malice. See, e.g., Harte-Hanks Commc'ns, 491 U.S. at 666; Buckley v. Littell, 539 F.2d 882, 889 (2d Cir. 1976). ("Repeatedly the Court has said that ill will toward the plaintiff or bad motive, indeed, hatred, spite or desire to injure, are not the kind of 'malice' that the New York Times Co. v. Sullivan test comprehends.").

[32] Palin had sought to offer several articles written by the commentator Andrew Sullivan who published a blog called The Daily Dish that was associated with website of The Atlantic magazine at the time of the Arizona shooting, when Bennet was the editor of The Atlantic. The Daily Dish articles concerned the investigation into Loughner's attack and the allegation made in its immediate aftermath, but ultimately discredited, that the cross hairs map played a role in causing Loughner to commit the mass shooting. Plaintiff's counsel

# SA 0068

did, however, have the general recollection of learning from media reports that Bennet "was deranged." Tr. 621. But Bennet testified that he was unaware on June 14, 2017 "whether or not Jared Loughner had seen the crosshairs map," because, he explained "I hadn't reported that myself and I don't think I read any reporting on that. So I didn't know." Tr. 720. Still, he testified that he had "remember[ed] that there had been a debate ... after the shooting ... about exactly this issue, about, you know, inciting rhetoric, but my memory of that was vague." Tr. 702-703. He did not think to look into this issue, Bennet explained, because he "was functioning as the editor, not the reporter on the piece, so [he] wouldn't normally do the reporting in a situation like this, particularly when ... on a tight deadline." Tr. 721.

Bennet continued:

> I didn't think then and don't think now that the map caused Jared Loughner to act. I didn't think we were saying that, and therefore I wouldn't have -- the question wouldn't have entered my mind, didn't enter my mind to research that question.

---

intended to offer these articles to show that Bennet knew that the allegations of a link between Loughner and the map had been discredited. However, plaintiff's counsel was unable to offer an adequate foundation for these articles' admission. The record reflects that Bennet had no editorial responsibility over The Daily Dish, and plaintiff's counsel never elicited any testimony or proffered any other evidence that Bennet had in fact read the articles in question. Accordingly, the Court excluded the articles under Fed. R. Evid. 401 and 402, subject to reconsideration. Tr. 503-511. Specifically, the Court provided plaintiff's counsel the opportunity to conduct voir dire of Bennet outside the presence of the jury to lay additional foundation for the articles' admission. Tr. 508. However, plaintiff's counsel never availed themselves of this opportunity.

54

# SA 0069

Tr. 721. Palin might argue that the first sentence of this comment indicates that Bennet did not believe that what he was writing was true. But the Court concludes that is not a reasonable reading of Bennet's answer and that such a reading would be inconsistent with Bennet's testimony overall. The answer as a whole explains that Bennet's intention was to convey a message that was consistent with his understanding of the Arizona shooting. As Bennet explained a few answers earlier, "when politicians get shot, I suspect it has something to do with politics, and I think that an atmosphere of highly charged political rhetoric makes such, you now, terrifying events more likely." Tr. 720. Accordingly, Bennet's statement that he "didn't think then ... that the map caused Jared Loughner to act" cannot reasonably be read to mean that he thought the map did not contribute at all to the Tucson attack. Rather, the answer must be read to explain that because Bennet did not intend to convey that the crosshairs map directly caused Loughner to act, he therefore did not consider the need to research the veracity of that assertion. In any event, the statement does not suggest that Bennet knew or suspected that there existed any official or widely accepted conclusion that no link whatsoever existed between Loughner's attack and the map. Therefore, it cannot be reasonably inferred from this answer that Bennet published the Editorial with actual malice.

The evidence reflects that Bennet did not introduce the crosshairs map to the draft Editorial, nor did he direct Williamson or anyone else at the Times to refer to Palin in the Editorial. See Tr. 720.

55

## SA 0070

True, Bennet brought up the Giffords shooting in his 12:41 p.m. email, which stated:

> Hey Elizabeth -- As Bob has said there's most likely a gun control point to be made here. The other question is whether there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence. Hard for me to imagine that Bernie himself is guilty of anything like that. But if there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting) we should deal with that.

DX-17. Bennet explained that Loughner's shooting of Representative Giffords was "the obvious precedent" for the "violence against politicians" in the Virginia shooting, Tr. 635, and that his "assumption is that when a politician gets shot, that politics probably had something to do with it," Tr. 704; <u>see also</u> Tr. 720. Bennet also reasonably explained the editorial guidance in his 12:41 email as a proposal for Williamson to research, rather than a directive for her to implement:

> I think "whether" is an important word in this sentence. You know, I've got it there twice. I'm -- I'm putting this to my colleagues as -- I'm raising it as a point to be considered as something we might include, you know, the other question is whether there's a point to be made about this. And then I say the point -- in my mind, the point is whether it incites people to this kind of violence. I didn't write that it incites people to this kind of violence. And I think that's a significant difference. My intention was to raise a question, to make an argument that this was this danger but not to assert it as a matter of fact. Because like the easy availability of guns, you know, I don't have -- I can't prove -- I can't prove that this kind of rhetoric actually, you know, does lead to this sort of violence.

Tr. 700-701. Bennet further testified that when he reviewed Williamson's full draft just after 5:00 p.m., he understood the

# SA 0071

reference to the crosshairs map to be "the specific example that [Williamson] returned with of incitement or incendiary rhetoric, and I just trusted that it was ... an example of that based on her characterization." Tr. 719. While Bennet then inaccurately strengthened Williamson's language in a manner that led to the factual error, none of Bennet's editorial direction from earlier in the day supports the proposition that Bennet knew or suspected that Loughner's actions were wholly unrelated to the crosshairs map.

If anything, the record as a whole reflects that Bennet had a general, albeit inaccurate, recollection (or, perhaps, assumption) that the Arizona shooting was preceded by "inciting" political rhetoric and that he incorrectly understood Williamson's reference to the crosshairs map as confirmation of that connection. If that account does reflect Bennet's thought process, then it undermines, rather than strengthens, any inference that he knew or suspected that his revision introduced falsity to the Editorial.

In sum, Palin adduced no evidence suggesting that Bennet (and therefore the Times) was aware, at the time "America's Lethal Politics" was published, that the hypothesized link between her crosshairs map and Loughner's attack had been widely rejected.

## C. **Other Evidence**

As discussed above, Palin failed to offer any affirmative evidence supporting the inference that Bennet knew or suspected that his revisions introduced falsity to the Editorial. This alone suffices for the Court to conclude that Palin failed to adduce evidence sufficient

# SA 0072

for a reasonable jury to find by clear and convincing evidence that Bennet published with actual malice. A public figure cannot rely solely on the chance that the jury declines to credit the defendant's testimony denying that he had the necessary state of mind. See Anderson, 477 U.S. at 256; Contemp. Mission, 842 F.2d at 621-622; see also § III.B, supra. Nonetheless, the record reflects a wealth of other evidence that is incompatible with the inference that Bennet knew or suspected that his revision introduced falsity to the Editorial, even if that evidence is viewed in the light most favorable to Palin.

First, the context of Bennet's revision in the Times' editing and fact-checking processes belies the inference that he intentionally or recklessly published false information. Far from Palin's allegation that Bennet intentionally defamed her by forcing the Editorial Board to write a piece in accordance with his diktats because he purportedly held a political grudge against her or her positions, the evidence shows that Bennet did not seek out the opportunity to revise Williamson's draft. The uncontroverted testimony is that Cohn brought the draft Editorial to Bennet's attention because she thought that the draft's argument was unclear; Bennet did not direct Cohn, Williamson, or anyone else to involve him in the editing process for "America's Lethal Politics." See Tr. 520, 636. After Bennet completed his revision at 7:21 p.m., DX-30 at 178, he immediately emailed Williamson, asking her to "[p]lease take a look." PX-163. Bennet testified that his request to "[p]lease take a look" was intended to convey to Williamson

that she should review the piece for fact-checking issues. Tr. 638. This request is incompatible with the inference that Bennet published with actual malice.

Since Bennet was acting as the editor, and since he had not conducted any of the reporting himself, sending a "playback" of the Editorial to the primary author, Williamson, was consistent with Times practices, as they were consistently explained at trial. See Tr. 639, 577. Bennet also submitted his draft to the other editors who were responsible for ensuring the quality, clarity, and accuracy of Editorial Board publications. Accordingly, after Bennet completed his revision, the draft was reviewed, edited, and (in some cases) corrected by Williamson (fact checking), Cohn (editing), Lepping (fact checking), Semple (editing), and Levine and Rakowski (copy editing). See supra § I.D. The thoroughness of these checks was obviously limited by the fact that the print deadline was less than an hour after Bennet saved his draft to Backfield. But the record reflects that this time pressure is routine in the daily newspaper business and not at all suggestive of actual malice.

The Court therefore concludes that, even taking every inference in Palin's favor, Bennet's compliance with these normal pre-publication procedures is consistent with the behavior of a high-ranking editor who is somewhat removed from the reporting details underlying the piece and so was relying on the established processes to ensure that his revisions did not introduce errors. Those processes may have failed in this case; but, nonetheless, Bennet's submission

# SA 0074

of the Editorial to several layers of pre-publication review is inconsistent with his intentional or reckless publication of false information.

Second, Bennet's post-publication[33] email exchange with <u>New York Times</u> columnist Ross Douthat about the criticism of the Editorial emerging on Twitter is inconsistent with Bennet having already known or suspected that his revisions introduced falsity. After Douthat explained that the Editorial had the facts of the Loughner case wrong, Bennet responded by stating, in part, that his "understanding was that in the Giffords case there was a gun sight superimposed over her district; so far in this case we don't know of any direct threat against any of the congressmen on the field.... That's not to say ... that the violence in [this] case was caused by the pol[i]tical rhetoric."[34] PX-174. Bennet's response does not specifically insist that he was correct to assert that "the link to political incitement was clear," but he does not state or imply that he believes the

---

[33] <u>See</u> <u>Stern v. Cosby</u>, 645 F.Supp.2d 258, 280 n.14 (S.D.N.Y. 2009) (holding that post-publication statements may be considered as evidence of the defendant's pre-publication state of mind) (Chin, J.).

[34] This email's accurate description of the crosshairs map contrasts with the inaccurate description of the map in the published Editorial and, when viewed in the light most favorable to Palin, could support the inference that Bennet knew that the description of the map Williamson had drafted was false. But Palin does not contend that the inaccuracy in the map's description was a defamatory falsehood; Palin instead complains about the asserted link between her PAC's map and Loughner's attack. Accordingly, no reasonable jury could find that this discrepancy establishes that Bennet published with actual malice as to the falsity of the allegedly defamatory aspects of the Challenged Statements.

# SA 0075

Editorial to make a false assertion of fact. Bennet writes instead that the "specific" link between the crosshairs map and Representative Giffords does not mean that the map "caused" Loughner's violence, a message he testified he did not "intend[] to send." Tr. 645.

After checking Twitter to read some of the criticism of the Editorial, Bennet sent a text message to Williamson asking, about "the Giffords comparison." DX-46. Bennet asked Williamson, "Do we have it right?" Id. Even viewing this message and the associated testimony in the light most favorable to Palin, it suggests that at 11:38 p.m. on June 14, 2017, Bennet did not know whether the "link" asserted in the Editorial between the Arizona attack and "political incitement" was accurate. The late-night message, which Bennet said he sent "[b]ecause [he] was really worried," Tr. 747, is inconsistent with Bennet having already known or suspected that the asserted link was false.

Bennet's emails and text messages sent the next morning are also inconsistent with him having already known or suspected that the Challenged Statements were false. At 5:08 a.m. -- an "unusual[ly]" early time for Bennet to be emailing, Tr. 282 -- Bennet told Williamson and Lepping, in part:

> I don't know what the truth is here but we may have relied too heavily on our early editorials and other early coverage of that attack. If so, I'm very sorry for my own failure on this yesterday. In any case I'd like to get to the bottom of this as quickly as possible this morning and correct the piece if needed. Can you two please put your heads together on this first thing this morning? Please skip the morning meeting if necessary.

PX-191. There are several aspects of this message that undermine the inference that Bennet had already known or suspected falsity.

# SA 0076

First, Bennet states "I don't know what the truth is here." This was an unusual admission: Lepping testified that she had never heard these words from an editor before. Tr. 440. While it may have been negligent for the Times to publish an article that could be read as making a serious accusation without checking if the accusation was true, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action."[35] <u>Liberman</u>, 80 N.Y.2d 438.

The second significant aspect about the email is that Bennet instructed Williamson and Lepping to "get to the bottom of [the factual question] as quickly as possible ... and correct the piece if needed." PX-191. Later that morning, in a text message to Williamson, Bennet reiterated that he "need[ed] ... a rock-solid version" of the correction, which he did not "want to soften if ... we don't need to -- if there was no link we should say so." DX-46 at 2. The Court concludes that these directives are irreconcilable with the suggestion that Bennet purposefully or recklessly published false information. Had he known or suspected the information was false before publication,

---

[35] The Court asked during oral argument for the parties to identify any caselaw that concerned whether the standard for reckless disregard is affected where the allegedly libelous statement had levied serious charges, criminal or otherwise, against the plaintiff. Tr. 1260-1262, 1277. There was extensive argument on this point, and the Court was ultimately persuaded that none of the cases identified by plaintiff's counsel stood for any such proposition that would reduce her burden of proof on actual malice. <u>See generally</u> Tr. 1264-1281.

he likely would have been defensive, avoided issuing a correction to the Editorial, or tried to minimize the correction's confession of error.

The third significant aspect of Bennet's email is his expression of regret for the mistake, which he describes as his "own failure." Bennet's apologetic tone was repeated elsewhere on June 15, 2017. Williamson testified that Bennet was "crestfallen" about the error, Tr. 183, and Bennet's text messages later that morning also reflect that he "fe[lt] lousy about" the error and that he was "sorry." DX-46 at 2. When working on the Twitter posts that would disseminate the first correction, Bennet edited the language proposed by another New York Times staff member to add an apology for the error and thank readers for "call[ing] us on the mistake." DX-53 at 1; Tr. 1033. Bennet also drafted a statement in response to questions from a CNN media reporter in which he stated that "I, James Bennet, do apologize to [Sarah Palin] for this mistake." DX-60 at 2. However, a member of the New York Times Co. public relations staff did not pass along this statement to CNN, so it was never published. PX-236. But for the purpose of assessing Bennet's state of mind, it is not relevant whether the apology ultimately reached Palin. What matters is that, as Bennet testified, "I tried [to apologize] that day. I did -- I thought I had apologized to her. I went home that night thinking I had made a personal apology to the Governor." Tr. 675. The Court concludes that even applying the Rule 50 presumptions, Bennet's private and (intended to be) public expressions of apology, all made before the prospect of

litigation had arisen, are inconsistent with his having intentionally or recklessly introduced the factual error to the Editorial.

Accordingly, the Court's review of the remaining evidence in the record that is relevant to Bennet's pre-publication state of mind weighs heavily and uniformly against finding that he knew or recklessly disregarded that his revisions introduced false statements of fact into the Editorial.

## V.  Conclusion

For the reasons set forth above, the Court finds that Palin adduced no affirmative evidence that Bennet knew that the Challenged Statements were false or recklessly disregarded their probable falsity. The Court is therefore bound to conclude that no reasonable jury could find that Bennet, and therefore The New York Times Co., published "America's Lethal Politics" with actual malice. Clear and convincing proof of knowledge or reckless disregard for falsity is an essential element of a public figure's libel claim. It is required both by Sullivan's construction of the First Amendment and, independently, by N.Y. Civil Rights L. § 76-a(2). Palin thus failed, as a matter of both state and federal law, to carry the heavy burden necessary to prove her libel claim. So the Court was obliged to grant Defendants' Rule 50 motion and dismiss the action with prejudice.

Although the Final Judgment ultimately rests on the Court's dismissal of the action under Rule 50, that legal conclusion is reinforced by the jury's verdict that defendants are not-liable. The Court continues to have great confidence in the integrity of the jury's

verdict, notwithstanding that a few jurors became aware,
involuntarily, of the bare fact that the Court intended to dismiss the
case as a matter of law. In a case attracting a high degree of public
attention, it is inevitable that at least some jurors will encounter
information outside the Court's control, even if they are completely
conscientious. Here, of course, it was the timing of the Court's
announcement of its Rule 50 determination that increased the risk that
some jurors would encounter some snippets of the Court's legal
conclusion, and that is unfortunate.[36] But the jurors who saw the media
coverage say they did as instructed: they turned away from the reports
and set the information aside for the remainder of the deliberation.
The jurors, both those who reported awareness of the Rule 50 decision
and the others, insisted to the Court's law clerk that the information
played no role whatsoever in their deliberations and did not affect
the outcome. While some outsiders, totally unfamiliar with the
exceptional jury in this case,[37] have been quick to assume otherwise,

---

[36] The Court is frank to confess that it was not familiar with
the term "push notification" when it was raised by counsel for the
Times and did not fully appreciate the potential for jurors to be
involuntarily informed about the Court's intended ruling through their
smartphones. But it must also be remembered that when defense counsel
referred to the term "push notifications," Tr. 1307, the Court
responded by doing what defendants' counsel requested, i.e., reminding
the jurors of their duty to disregard anything they heard about the
case in the media. Defendants' counsel sought no further relief (such
as a direction to the jurors to turn off any automated alerts for the
duration of the trial) and plaintiff's counsel did not seek any such
step or indeed any instruction to the jury whatsoever.

[37] As the Court remarked on several occasions during the trial
itself, the jury in this case was a model jury, carefully watching the
witnesses, taking copious notes, and in general, showing that they

# SA 0080

the Court knows of no reason why the highly conscientious citizens who served as jurors in this case would be so firm that they were unaffected by this information unless it were true. The Court is thus left with the definite conviction that the information did not remotely affect the ultimate verdict.

It also bears repeating that the Final Judgment entered for defendants does not legally depend on the verdict. The verdict could only acquire legal significance if the Court's Rule 50 decision were overturned on appeal and the Court of Appeals then decided to give effect to the verdict rather than remand for retrial.

It remains only to add that the Court's decision to enter judgment as a matter of law also reflected its duty to ensure that public figure libel actions with constitutionally inadequate evidence do not erroneously result in the imposition of liability that might chill protected speech. In libel cases that concern public figures and matters of public concern, the court "must make an independent examination of the whole record so as to assure [itself] that the judgment does not constitute a forbidden intrusion on the field of free expression." Sullivan, 376 U.S. at 285. That principle is no less true in cases where the alleged libel was provably false but neither intentionally nor recklessly so. As the Supreme Court later elaborated:

> [J]udges ... must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation

---

intended to decide the case based solely on the evidence. See, e.g., Tr. 689, 878, & 1324.

# SA 0081

> case is of the convincing clarity required to strip the utterance
> of First Amendment protection is not merely a question for the
> trier of fact. Judges, as expositors of the Constitution, must
> independently decide whether the evidence in the record is
> sufficient to cross the constitutional threshold that bars the
> entry of any judgment that is not supported by clear and
> convincing proof of "actual malice."

Bose Corp., 466 U.S. at 510-511; see also Harte-Hanks Commc'ns, 491 U.S. at 697 (reading Bose as requiring "trial judge[s]" to "make their own 'independent' assessment of the facts allegedly establishing actual malice") (Scalia, J., concurring). This independent duty to review the whole record is particularly important where the jury is tasked primarily with "distinguishing actual malice from mere negligence," because this is an area in which "jurors have considerable trouble." Tavoulareas v. Piro, 817 F.2d 762, 807 (D.C. Cir. 1987) (R.B. Ginsburg, J., concurring). And, as this case demonstrates, the stakes of the distinction between negligent error and reckless disregard are significant: the preservation of the "area of breathing space" that "[o]ur profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out ... so that protected speech is not discouraged." Harte-Hanks Commc'ns, 491 U.S. at 686.

For all the reasons set forth above, the Court entered final judgment as a matter of law in favor of The New York Times Co. and James Bennet, because no reasonable jury could find that Sarah Palin proved that the defendants published "America's Lethal Politics" with actual malice.

**SA 0082**

SO ORDERED.

New York, NY
March 1, 2022

JED S. RAKOFF, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SARAH PALIN,

     Plaintiff,

     -v-

THE NEW YORK TIMES COMPANY and
JAMES BENNET;

     Defendants.

17-cv-4853 (JSR)

## VERDICT FORM

As to the plaintiff's libel claim, we the jury find the defendants

☐ Liable

☒ Not-liable

If you find the defendants liable, indicate in the box below how much you award in compensatory or nominal damages. If you find the defendants not-liable, leave this box blank.

$ _____

Dated: 2/15/22

_____
Foreperson

# SA 0084

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌───────────────────────────────┐
│ SARAH PALIN,                   │
│                                │
│         Plaintiff,             │        17-cv-4853 (JSR)
│                                │
│     -v-                        │        ORDER
│                                │
│ THE NEW YORK TIMES COMPANY     │
│ and JAMES BENNET,              │
│                                │
│         Defendants.            │
└───────────────────────────────┘
```

JED S. RAKOFF, U.S.D.J.:

It is the Court's uniform practice after a verdict has been rendered in a jury trial to have the Court's law clerk inquire of the jury as to whether there were any problems understanding the Court's instructions of law, so that improvements can be made in future cases. Late yesterday, in the course of such an inquiry in this case -- in which the jury confirmed that they had fully understood the instructions and had no suggestions regarding jury instructions for future cases -- several jurors volunteered to the law clerk that, prior to the rendering of the jury verdict in this case, they had learned of the fact of this Court's Rule 50 determination on Monday to dismiss the case on legal grounds. These jurors reported that although they had been assiduously adhering to the Court's instruction to avoid media coverage of the trial, they had involuntarily received "push notifications" on their smartphones that contained the bottom-line of the ruling. The jurors repeatedly assured the Court's law

## SA 0085

clerk that these notifications had not affected them in any way or played any role whatever in their deliberations.

The Court also notes that when it proposed to the parties, during oral argument on Monday morning, to render its Rule 50 decision later that day but to permit the jury to continue deliberating so that the Court of Appeals would have the benefit of both the Court's legal determination and the jury's verdict, no party objected to this plan. Nor did any party object when the Court reconvened later that day, outside the presence of the jury, and the Court indicated that it was prepared to issue a Rule 50 decision at that time. Indeed, no party objected to this procedure at any time whatever.

Nevertheless, in an excess of caution, the Court hereby brings the foregoing facts to the parties' attention. If any party feels there is any relief they seek based on the above, counsel should promptly initiate a joint phone conference with the Court to discuss whether any further proceedings are appropriate.

SO ORDERED.

New York, NY
February 16, 2022

JED S. RAKOFF, U.S.D.J.

# SA 0086

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
SARAH PALIN,                              :
                                          :
                                          :    17-cv-4853 (JSR)
         Plaintiff,                       :
                                          :    OPINION AND ORDER
         -v-                              :
                                          :
THE NEW YORK TIMES COMPANY and JAMES      :
BENNET,                                   :
                                          :
         Defendants.                      :
------------------------------------------x

JED S. RAKOFF, U.S.D.J.

    Familiarity with the prior proceedings in this action is
here assumed. As relevant here, on December 30, 2019, plaintiff
Sarah Palin filed an amended complaint against defendants the
New York Times Company (the "Times") and James Bennet, alleging
that they had defamed her in an editorial (the "Editorial")
published on June 14, 2017. Dkt. 70. After the completion of
discovery, both sides filed motions for summary judgment that
are now ripe for decision.

    Both motions relate to the proposition that a public figure
cannot recover for defamation unless the defamatory statement
was made with "actual malice." See New York Times Co. v.
Sullivan, 376 U.S. 254, 280 (1964). Specifically, plaintiff
moves for partial summary judgment on the basis of her assertion
that the requirement is no longer good law or at least does not
apply to this case. Dkt. No. 95; Plaintiff's Memorandum of Law

1

# SA 0087

in Support of Plaintiff's Motion for Partial Summary Judgment ("Pl. Mem."), Dkt No. 100; Plaintiff's Reply Memorandum of Law in Opposition [sic] to Plaintiff's Motion for Partial Summary Judgment ("Pl. Reply"), Dkt. No. 112. Defendants oppose. Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defs' Opp."), Dkt. No. 104 Conversely, defendants, maintaining that the actual malice standard fully applies here, seek summary judgment on the ground that no reasonable jury could find, based on the evidence of record, that the allegedly defamatory statements were published with actual malice. Dkt. No. 94; Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Defs' Mem."), Dkt. No. 96; Defendants' Reply Memorandum of Law in Support of their Motion for Summary Judgment ("Defs' Reply"), Dkt. No. 113. Plaintiff opposes. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp."), Dkt. No. 107.

I.   Factual Background[1]

---

[1]   On a motion for summary judgment, the Court construes all facts in the light most favorable to the non-moving party. Ordinarily, when faced with cross-motions for summary judgment, a district court would "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Schwabenbauer v. Bd. of Educ. of Olean, 667 F.2d 305, 314 (2d Cir. 1981). Here, however, plaintiff's motion for partial summary judgment presents a pure question of law and does not depend on the evidence in this case. Therefore, the

Plaintiff Sarah Palin is the former governor of Alaska and a former vice-presidential candidate. See Defendants' Statement of Undisputed Material Facts, Dkt. No. 97, ¶ 1; Plaintiff's Response to Defendants' Local Rule 56.1 State of Material Facts & Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment ("Pl. SUMF"), Dkt. No. 108, ¶ 1.[2] Defendant The New York Times Company (the "Times"), a New York corporation, is a global media organization that publishes The New York Times daily newspaper. First Amended Complaint ("FAC"), Dkt. No. 70, ¶ 6. Defendant James Bennet was at all times relevant to this lawsuit the editor overseeing opinion journalism at the Times, including masthead editorials by the Times Editorial Board. Pl. SUMF ¶ 3.

On June 14, 2017, defendant The Times published the Editorial, authored (in the segments here relevant) by defendant Bennet, which identified a "familiar pattern" of politically motivated violence and criticized members of Congress for supporting permissive gun regulations. Pl. SUMF ¶ 348. The Editorial identified two instances of mass shootings "fuel[ed]" by politics: (1) James Hodgkinson's June 14, 2017 armed attack

---

following facts are either undisputed or, where disputed, taken most favorably to plaintiff.

[2]    Where a fact is undisputed, the Court cites to plaintiff's Rule 56.1 statement.

# SA 0089

on members of Congress at a baseball field in Virginia, which seriously wounded U.S. Congressperson Steve Scalise; and (2) Jared Lee Loughner's January 8, 2011 armed attack in Arizona, which seriously wounded U.S. Congressperson Gabby Giffords.[3] Declaration of Thomas B. Sullivan ("Sullivan Decl."), Dkt. No. 99, Ex. 40.

Describing Loughner's 2011 attack, the Editorial stated: "[T]he link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs."[4] Id. The Editorial contrasted the Loughner attack with that day's Hodgkinson shooting, where there was "no sign of incitement as direct as in the Giffords attack." Id. The Editorial did, however, include a hyperlink to an ABC News Article titled Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate, published

---

[3]    Although not relevant to the issues here presented, it certainly should not be forgotten that Loughner's shooting also resulted in the death of six people, including U.S. District Judge John Roll.

[4]    The Palin committee's circular is hereinafter referred to as the "Map." Although plaintiff purports to dispute that the marks on the circular were crosshairs, see Pl. SUMF ¶ 7, even the most causal interpretation of the circular definitively rebuts plaintiff's suggestion, and there is no evidence of record to the contrary. And, in any event, even plaintiff does not suggest that the defendants acted with actual malice in describing the marks as crosshairs.

# SA 0090

the day after Loughner's 2011 attack, which stated that "[n]o connection has been made between [the Map] and the Arizona shooting." Pl. SUMF ¶¶ 37, 40.

The Editorial was the product of discussions that occurred over the course of June 14, 2017. Soon after the Hodgkinson attack, evidence emerged that Hodgkinson was a supporter of Senator Bernie Sanders and an opponent of President Donald Trump. Id. ¶ 20. In an email thread between Editorial Board members discussing whether and how to cover the shooting, Bennet suggested writing about "the rhetoric of demonization and whether it incites people to this kind of violence." Sullivan Decl. Ex. 11. In particular, Bennet said that "if there's evidence [surrounding the Hodgkinson shooting] of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting) we should deal with that." Id.

Another member of the Board, Elizabeth Williamson, then researched the Hodgkinson and Loughner shootings and wrote the first draft of the Editorial. Pl. SUMF ¶ 35. Her draft referred to the fact that there had been some debate in the media in the wake of the Loughner shooting regarding whether there existed a connection between the shooting and the Map. See Sullivan Decl. Ex. 24. But Williamson's draft did not affirmatively state that such a connection had been established. See id. The draft also

## SA 0091

included the hyperlink to the above-mentioned ABC news article.
Id. As relevant here, Williamson's draft read:

> Just as in 2011, when Jared Lee Loughner opened fire
> in a supermarket parking lot, grievously wounding
> Representative Gabby Giffords and killing six people,
> including a nine year-old girl, Mr. Hodgkinson's rage
> was nurtured in a vile political climate. Then, it was
> the pro-gun right being criticized: in the weeks
> before the shooting[,] Sarah Palin's political action
> committee circulated a map of targeted electoral
> districts that put Ms. Giffords and 19 other Democrats
> under stylized crosshairs.

Bennet received the draft around 5:00 p.m. Pl. SUMF ¶ 335.
After reading the draft, Bennet, who was ultimately responsible
for the content of such editorials, decided it needed
substantial revision and began rewriting it himself. Id. ¶ 51.
Around 7:30 p.m., Bennet sent a revised draft back to
Williamson, asking her to "[p]lease take a look." Id. ¶ 66.
Without further relevant changes, the Editorial, as revised by
Bennet, was published around 9:00 p.m. Id. ¶ 73.

Around 10:00 p.m., Ross Douthat, a Times opinion writer,
reached out to Bennet via email to express concern over the
Editorial. Sullivan Decl. Ex. 21. Douthat explained that there
was "no evidence that Jared Lee Loughner was incited by Sarah
Palin or anyone else, given his extreme mental illness and lack
of any tangible connection to that crosshair map." Id. A few
minutes later, Bennet responded that his "understanding [is]
that in the Giffords case there was a gun sight superimposed

# SA 0092

over her district; so far in this case we don't know of any direct threat against any of the congressman on the field. That's not to say that any of it is ok, obviously, or that the violence in either case was caused by the poltical [sic] rhetoric. But the incitement in this case seems, so far, to be less specific." <u>Id.</u>

That night, Bennet reached back out to Williamson to see whether she was available to start investigating Douthat's concerns. Pl. SUMF ¶ 99. Early the next morning, Bennet emailed a larger group of people, instructing them to "get to the bottom of this as quickly as possible." <u>Id.</u> ¶ 101.

Less than a day after the Editorial's publication, after having found no evidence of the "link" to which it referred, the Times revised and corrected the Editorial. The Times published the first revised online version at 11:15 a.m. on June 15, 2017. <u>Id.</u> ¶ 106. In it, the Times deleted the phrases "the link to political incitement was clear" and "[t]hough there's no sign of incitement as direct as in the Giffords attack" and added the sentence "But no connection to that crime was ever established." <u>Id.</u> In addition, the Times published a series of corrections, which ultimately clarified that no link between political rhetoric and the 2011 shooting of Representative Gabby Giffords was ever established. <u>Id.</u> ¶ 109.

# SA 0093

Despite these prompt corrections, plaintiff chose to sue the Times, and filed her initial complaint less than two weeks later. Dkt. No. 1. After an evidentiary hearing convened with the consent of both parties,[5] this Court dismissed plaintiff's complaint in its entirety, holding that she had failed to plausibly allege that the Editorial was published with actual malice, as required by the First Amendment. Dkt. No. 45. The Second Circuit reversed, holding, inter alia, that plaintiff's proposed (though not yet filed) amended complaint had sufficiently alleged actual malice. Palin v. New York Times Co., 940 F.3d 804, 813 (2d Cir. 2019). Soon thereafter, on December

---

[5]     The hearing was something of an innovation, designed to allow a court to better assess the "plausibility" standard that the Supreme Court requires district courts to apply on a motion to dismiss a complaint, see Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), by providing the court with enough context to make that determination. After all, how can a judge assess whether a claim is "plausible" if it involves conduct that occurred in a setting with which the judge is totally unfamiliar? But even though the hearing was consented to by all parties, the Second Circuit held that such a hearing is not countenanced by the Federal Rules of Civil Procedure. Palin v. New York Times Co., 940 F.3d 804, 807 (2d Cir. 2019). Of course, the judge-made "plausibility" standard is not mentioned in the Federal Rule of Civil Procedure either. And in the roughly analogous setting of class certification, the Second Circuit, having at one time insisted that a district court could not look beyond the complaint in determining whether to certify a class, see Caridad v. Metro-North Commuter, R.R., 191 F.3d 283, 292-93 (2d Cir. 1999), later reversed its position because it recognized that a court may often have to look to matters beyond the complaint to fulfill its gatekeeping role, see In re Initial Public Offerings Securities Litigation, 471 F.3d 24, 41-42 (2d Cir. 2006)

30, 2019, plaintiff filed the amended complaint, naming Bennet as a co-defendant. Dkt. No. 70. After full discovery, the parties filed, briefed, and argued their cross-motions for summary judgment.

## II.  General Legal Standards[6]

Under Rule 56(a) of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In reviewing the record, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Although the party opposing summary judgment may not "rely on mere conclusory allegations nor speculation," D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), if "there

---

[6]    Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

# SA 0095

is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper," Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

"Under New York law,[7] a plaintiff must establish five elements to recover in libel: 1) a written defamatory statement of fact concerning the plaintiff; 2) publication to a third party; 3) fault (either negligence or actual malice depending on the status of the libeled party); 4) falsity of the defamatory statement; and 5) special damages or per se actionability (defamatory on its face)." Celle v. Filipino Reporter Enterps. Inc., 209 F.3d 163, 173 (2d Cir. 2000). Furthermore, as discussed at length below, under here applicable federal law binding on the states, a public figure claiming defamation or libel must establish that the statements at issue were published with actual malice — that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." Palin, 940 F.3d at 809 (quoting New York Times, 376 U.S. at 280). Further still, a court ruling on a motion for summary

---

[7]   This Court and the Second Circuit have already held that New York law (along with certain federal constitutional requirements) governs plaintiff's claim. See Palin v. New York Times Co., 264 F. Supp. 3d 527, 533 n.4, rev'd on other grounds by Palin, 940 F.3d 804.

judgment on actual malice "must be guided by the <u>New York Times</u> 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists — that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 257 (1986).

III. <u>Plaintiff's Motion for Partial Summary Judgment</u>

Plaintiff's motion for partial summary judgment presents a pure question of law: whether plaintiff is required to prove that the allegedly libelous statements at issue in this case were published with "actual malice." Pl. Mem. at 1. There is no dispute that plaintiff is a public figure and must therefore, under seemingly well-settled law, prove that the statements were published with actual malice. <u>See</u> <u>Palin</u>, 940 F.3d at 809-10; <u>see generally</u> <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254 (1964). What plaintiff is really asking, then, is for this Court either to "overrule" <u>New York Times v. Sullivan</u> or else to distinguish that case on the facts and refuse to apply the actual malice rule here. Pl. Mem. at 8, 13. To the extent those are, in fact, different requests, the Court declines them both.

While plaintiff acknowledges that the actual malice rule of <u>New York Times</u> and its progeny is well-established, <u>see, e.g.</u>, <u>id</u>. at 6, she fundamentally misunderstands the doctrine of <u>stare decisis</u> that makes that rule binding on this Court. Plaintiff

# SA 0097

alludes to the "factors considered in deciding whether to overrule precedent" and notes in particular that "constitutional questions are less susceptible to stare decisis." Id. at 10 (citing Janus v. American Fed'n of State, County, and Mun. Emps. Council 31, 138 S. Ct. 2444 (2018); Kimble v. Marvel Entm't, LLC, 576 U.S. 446, 456 (2015)). But those factors, and those cases, pertain to horizontal stare decisis, whereby a court determines whether its own prior precedent remain binding on that court. See Dodge v. Cty. of Orange, 282 F. Supp. 2d 41, 79 (S.D.N.Y. 2003). By contrast, what lies before this Court is vertical stare decisis, whereby a higher court ruling binds a lower court. Id. "[V]ertical stare decisis is absolute, as it must be in a hierarchical system with 'one supreme Court.'" Ramos v. Louisiana, 140 S.Ct. 1390, 1416 n.5 (2020) (Kavanaugh, J., concurring in part) (quoting U.S. Const., art. III, § 1). In other words, this Court has "a constitutional obligation" to follow the Supreme Court's precedent "unless and until it is overruled by [the Supreme Court]." Id.

Perhaps recognizing that this Court is not free to disregard controlling precedent even if it were so inclined (which in this case it distinctly is not), plaintiff offers what she calls an alternative argument: that "the actual malice rule arose from distinguishable facts and should not be applied" here. Pl. Mem. at 13. More precisely, plaintiff's argument is

# SA 0098

that the actual malice rule, which was first articulated more than half a century ago in the days before the Internet and social media, has run its course and should no longer govern our contemporary media landscape. Binding precedent does not, however, come with an expiration date. To the extent plaintiff believes the actual malice requirement ought to be abolished, she could make that argument to the appropriate court – the Supreme Court. Until then, public figures, like plaintiff, must establish actual malice before collecting damages for defamation. Plaintiff's motion for partial summary is therefore denied.[8]

IV. <u>Defendants' Motion for Summary Judgment</u>

Given the denial of plaintiff's motion, the remaining question presented by defendants' motion is whether, with the benefit of discovery, plaintiff has adduced sufficient evidence to prove actual malice (taking the evidence most favorably to plaintiff). That is to say, defendants move for summary judgment on the ground that no reasonable jury could find that the statements at issue in this case were published with actual

---

[8] Defendants also argue that plaintiff cannot challenge the actual malice rule because it has been cemented as law of the case and that, in any event, plaintiff must establish actual malice as a matter of state law. Defs' Opp. at 6. Because the Court rejects plaintiff's motion on <u>stare decisis</u> grounds, the Court does not reach these other arguments.

# SA 0099

malice. In this respect, defendants make two arguments. First, they argue that plaintiff cannot prove that Bennett was aware that the statements carried a defamatory meaning — that is, that Bennet did not have actual malice with respect to the statements' <u>meaning</u>. Second, they argue that, even assuming Bennett was aware that the statements carried a defamatory meaning, plaintiff cannot prove that Bennet was aware that the statements were false — that is, that Bennet did not have actual malice with respect to the statement's <u>falsity</u>.[9] The Court addresses each argument in turn.

### A. Actual Malice — Meaning

---

[9]  In response, plaintiff makes the threshold argument that the Second Circuit has already decided the issue of actual malice in this case in its earlier opinion when it explained that, even if this Court had converted the 12(b)(6) motion into a summary judgment motion after the Court's evidentiary hearing, it "would still have to vacate because [this Court's] opinion relied on credibility determinations [regarding Bennet's testimony] not permissible at any stage before trial." 940 F.3d at 812. Plaintiff concludes that under the law-of-the-case doctrine, therefore, defendants' motion must be denied. But the Second Circuit's discussion of how it would have ruled had the motion been converted to summary judgment is pure dicta and does not constitute law of the case. <u>See Schwabenbauer v. Bd. of Educ.</u>, 777 F.2d 837, 841-42 (2d Cir. 1985). Moreover, even if the Second Circuit's dicta were construed as law of the case, additional evidence, which was not before the Second Circuit, has arisen in the course of discovery. Therefore, even if the Second Circuit held that Bennet's testimony alone could not support a grant of summary judgment, it has not — and indeed, could not have — ruled on whether this additional evidence justifies summary judgment.

# SA 0100

Defendants first argue that plaintiff cannot prove that at the time Bennet wrote the allegedly defamatory portion of the Editorial, he knew that, or was reckless with respect to whether, readers would understand his words in the defamatory sense — that is, that the Map had "directly caused Loughner to shoot his victims." Defs' Mem. at 1. More generally, defendants suggest that a person who believes and intends to say one thing is not guilty of actual malice "merely because he or she chooses the wrong language to say or because those who hear the statement reasonably believe it to mean something different." Id. at 15 (quoting Hon. Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 5:5.1[B] (5th ed, 2017)). In response, plaintiff contests this facet of the actual malice rule and asks the Court not to impose what she calls "an additional actual malice element" to her claim. Pl. Opp. at 9. Accordingly, the Court must first decide whether to adopt defendants' version of the actual malice rule before determining whether the record supports defendants' first ground for granting summary judgment in favor of defendants.

        1. Whether plaintiff **must** prove actual malice with respect to meaning

The legal question presented here is whether the First Amendment requires that plaintiff prove that Bennet "was aware of, or recklessly blinded himself to, the defamatory import of

# SA 0101

his words." See Marc Franklin & Daniel Bussel, The Plaintiff's Burden in Defamation: Awareness and Falsity, 25 Wm. & Mary L. Rev. 825, 834 (1984). There is no controlling precedent squarely on point.[10]

In the early years of the actual malice standard, Justice Byron White, writing only for himself in a concurring opinion, suggested that Sullivan should not be "extended to preclude liability for injury to reputation caused by employing words of double meaning, one of which is libelous, whenever the publisher claims in good faith to have intended the innocent meaning." Greenbelt Co-Op. Pub. Ass'n v. Bresler, 398 U.S. 6, 22 (1970) (White, J., concurring in the judgment). He explained that the

---

[10] Defendants cite to Bose Corp v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 n.30 (1984), for the proposition that the actual malice standard "requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." Seizing on "realized," defendants argue that it "necessarily follows that the actual malice standard is not met where a defendant was unaware of the defamatory meaning his or her words conveyed." Defs' Mem. at 15. But defendants misread Bose. That case did not involve "the employment of an ambiguous word; it involved a report of an ambiguous event, specifically how plaintiff's stereo speakers sounded to listeners present. . . . As such, Bose simply stands for the unremarkable proposition that the First Amendment protects an author from liability when adoption of language chosen was one of a number of possible rational interpretations of an ambiguous event because this represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the New York Times rule applies." Sprague v. American Bar Ass'n, No. Civ.A 01-382, 2003 WL 22110574 (E.D. Penn July 21, 2003).

# SA 0102

actual malice rule was rooted in a recognition of the challenge of ascertaining truth. Id. at 22-23. But he saw "no reason why the members of a skilled calling should not be held to the standard of their craft and assume the risk of being misunderstood — if they are — by the ordinary reader of their publications." Id.

In more recent years, however, lower courts have disavowed Justice White's reasoning and have expressly adopted this awareness requirement. The Ninth Circuit, for example, has held that "constitutional malice does not flow from a finding that an 'intelligent speaker' failed to describe the words he used as the finder of fact did." Newton v. Nat'l Broad. Co., 930 F.2d 662, 681 (9th Cir. 1990) (explaining that defendants should not be liable "for what was not intended to be said" lest we "eviscerate[] the First Amendment protections established by New York Times"); see also Dodds v. American Broad. Co., 145 F.3d 1053, 1064 (9th Cir. 1998) (requiring plaintiff to "show that a jury could reasonably find by clear and convincing evidence that [defendant] intended to convey the defamatory impression").

Ultimately, this issue comes down to the values underlying Sullivan. And, on this point, the Court agrees with the California Supreme Court, which has explained that failure to impose an awareness requirement "would create precisely the chilling effect on speech which the New York Times rule was

# SA 0103

designed to avoid." Good Government Group of Seal Beach, Inc. v. Sup. Court, 22 Cal.3d 672, 684 (1978); see also Saenz v. Playboy Enterprises, Inc., 841 F.2d 1309, 1318 (7th Cir. 1988) ("[R]equiring a publisher to guarantee the truth of all the inferences a reader might reasonably draw from a publication would undermine the uninhibited, open discussion of matters of public concern.").

Plaintiff argues that those cases, and the awareness rule, are limited to claims of libel or defamation by implication — that is, cases "where the defamatory meaning of ambiguous and innocuous statement has to be inferred or implied to establish a claim" – and are therefore inapposite. Pl. Opp. at 10. Where, as here, the allegedly libelous statements are "explicit and facially defamatory" and where there is "substantial evidence" showing what the speaker meant and intended to say, plaintiff suggests, the awareness rule should not apply. The Court disagrees. "The purpose of the awareness element is to ensure that liability is not imposed upon a defendant who acted without fault. This must hold true regardless of whether the defendant's statement is directly or indirectly libelous." Masson v. New Yorker Magazine, Inc., 832 F. Supp. 1350, 1361-63 (N.D. Cal. 1993), aff'd on other grounds, 85 F.3d 1394 (9th Cir. 1996).

Plaintiff also invokes the law of the case doctrine. She suggests that the defendants already made the argument for, and

# SA 0104

the Second Circuit already rejected, the awareness requirement. See Pl. Opp. at 6-9. But while plaintiff is correct that the Times has raised this issue before, see, e.g., Defendant's Supplemental Memorandum of Law in Further Support of Its Motion to Dismiss the Complaint, Dkt. No. 42, at 7, neither this Court (previously) nor the Second Circuit has squarely addressed, much less resolved, whether plaintiff must establish actual malice with respect to meaning as well as falsity. For the above-discussed reasons, the Court now holds that she must.

    2. Whether plaintiff **can** prove actual malice with respect to meaning

Whether plaintiff can make that showing, however, is a different question. Where a plaintiff's defamation case depends on a statement that is capable of multiple meanings — one defamatory, the other innocuous — the plaintiff must prove that the defendant acted with actual malice not only with respect to the statement's falsity but also to its meaning. Indeed, as the Seventh Circuit has explained, "[e]vidence of defamatory meaning and recklessness regarding potential falsity does not alone establish the defendant's intent." Saenz, 841 F.2d at 1318. Instead, the plaintiff must show that the defendant "either deliberately cast its statements in an equivocal fashion in the hope of insinuating a false import to the reader or that it knew and acted with reckless disregard of whether its words would be

19

interpreted by the average reader as a false statement." <u>See</u> <u>Solano v. Playgirl, Inc.</u>, 292 F.3d 1078, 1084 (9th Cir. 2002).

Of course, because actual malice "is a matter of the defendant's subjective mental state, revolves around facts usually within the defendant's knowledge and control, and rarely is admitted," <u>Dalbec v. Gentleman's Companion, Inc.</u>, 828 F.2d 921, 927 (2d Cir. 1987), a defendant cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." <u>St. Amant v. Thompson</u>, 390 U.S. 727, 732 (1968). Here, to be sure, Bennet has sworn multiple times that he "did not intend to imply a direct causal link between [the Map] and Loughner's horrific acts." Declaration of James Bennet ("Bennet Decl."), Dkt. No. 98, ¶ 8. He also avers that "it did not occur to [him] that readers would understand the phrase 'the link to political incitement was clear' as suggesting that Loughner himself was directly inspired or motivated by the [Map] to engage in the shooting, and [he] did not intend for readers to draw such an inference." <u>Id.</u> Instead, he claims that he "intended to advance the idea that overheated political rhetoric can create a climate inducive to violent acts, and [he] mentioned the [Map] as an example of the kind of 'political incitement' that contributes to this atmosphere." <u>Id.</u>

# SA 0106

However, as the Second Circuit has already made clear in this very case, the Court cannot automatically credit this testimony at the summary judgment stage. See Palin, 940 F.3d at 812; see also Sprague, 2003 WL 22110574, at *6 ("The defendant author and his editors contend that they did not anticipate that the readers would perceive the [allegedly defamatory] term . . . in its negative capacity. This is testimonial evidence that the jury will be permitted to weigh as it deems warranted.")

Defendants, however, argue that Bennet's allegedly innocent intent is independently corroborated by Bennet's contemporaneous email exchange with Douthat. Specifically, in his email responding to Douthat's concerns, Bennet explained that his "understanding was that in the Giffords case there was a gun sight superimposed over her district; so far in [the Scalise] case we don't know of any direct threat against any of the congressmen on the field. That's not to say any of it is ok, obviously, or that the violence in either case was caused by the poltical [sic] rhetoric. But the incitement in [the Giffords] case seems, so far, to be less specific [than in the Scalise case]." Sullivan Decl. Ex. 21. This email suggests that Bennet did not intend for his words to convey the idea that the Map directly caused Loughner's shooting, which is the heart of what plaintiff says was libelous.

# SA 0107

But in the end plaintiff meets her burden of adducing evidence that, taken in the light most favorable to plaintiff, could enable a rational jury to conclude that Bennet either knew, or was reckless not to know, that his words would carry the defamatory meaning. Indeed, at least four items of evidence warrant this conclusion.

First, there is the language of the Editorial's statements themselves, such as, e.g., the reference to the Map as being a "direct" form of "incitement" to Loughner's shooting. As defense counsel conceded at oral argument, in determining actual malice, the finder of fact is "entitled to consider the wording of the alleged defamatory statement." Transcript of Oral Argument, July 27, 2020 ("Tr.") at 10:20-11:1; see also id. at 12:9-12 ("I agree that the language of the publication is part of the mix" in determining actual malice). Here, Bennet's contention that, notwithstanding the words he used, he did not mean to suggest a direct link between the Map and the shooting, may be "so inherently improbable that only a reckless man would have" chosen the words he chose to convey the meaning he (allegedly) sought to convey.[11] Dalbec, 828 F.2d at 927; cf. id. ("[T]he

---

[11]    To be sure, it is not the case, as plaintiff suggests, that the clarity of a statement renders irrelevant the speaker's awareness of its meaning. Instead, the clarity of a statement can serve as evidence – here, powerful evidence — for inferring the speaker's awareness of its meaning.

# SA 0108

plain language of the . . . statement strongly supports the inference that it was made with knowledge of its falsity.")

Second, Bennet has himself admitted that he was aware that the term "incitement" could mean a call to violence. Indeed, at his deposition, Bennet conceded that the term "incitement" means "different things to different people" and that "some people could interpret [the term] as a call to violence." See Sullivan Decl. Ex. 2 (Bennet Dep.) at 112-14. Bennet's general awareness of the fact that "incitement" could be construed as a call to violence is further evidence in favor of actual malice. See Sprague, 2003 WL 22110574, at *5 (knowledge "that the average reader of the journal would be familiar with both" the defamatory and nondefamatory meanings of the word at issue counts in favor of finding actual malice).

Third, Bennet's decision to substantially revise Williamson's earlier draft, which did not include the allegedly defamatory language and meaning, is, a jury could find, yet more evidence of actual malice. To be sure, Bennet testified that he made these changes because he worried that phrases like "incendiary" or "inflammatory rhetoric" had been "drained of [their] power because [they are] used so often" and that he was searching for "a very strong word to write about the political climate," and so chose "political incitement." Defs' Mem. at 18 (quoting Pl. SUMF ¶¶ 56, 58-59). But, as discussed above, the

23

## SA 0109

credibility of that testimony is for the jury to assess, not for this Court to credit at the summary judgment phase. It is virtually undeniable that Bennet's edits changed the meaning of Williamson's draft, an alteration that a reasonable jury might conclude was intentional. Cf. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 521 (1991) ("[T]he progression from typewritten notes, to manuscript, then to galleys provides further evidence of intentional alteration.").

Fourth, the nature of the corrections issued by the Times in the aftermath of the Editorial stand as further circumstantial evidence that Bennet was aware that the Editorial carried the defamatory meaning. As discussed above, upon receiving Douthat's email expressing concern over the Editorial, Bennet reached out to Williamson and other members of the team and asked them to "get to the bottom of this as quickly as possible." Pl. SUMF ¶ 101. The team then looked into whether there existed a direct link between the Map and the Loughner shooting; and when it concluded that no such link had been established, the Times issued a correction which read, in part: "An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established." Id. ¶¶ 104-107.

# SA 0110

The fact that Bennet and the Times were so quick to print a correction is, on the one hand, evidence that a jury might find corroborative of a lack of actual malice, as discussed later. But, on the other hand, a reasonable jury could conclude that Bennet's reaction and the Times' correction may also be probative of a prior intent to assert the existence of such a direct link, for why else the need to correct? Indeed, the correction itself concedes that Bennet's initial draft incorrectly stated that there existed such a link. If, as Bennet now contends, it was all simply a misunderstanding, the result of a poor choice of words, it is reasonable to conclude that the ultimate correction would have reflected as much and simply clarified the Editorial's intended meaning.[12]

Ultimately, while much of plaintiff's evidence is circumstantial, as is often the case when actual malice is at issue, and while there is arguably contrary evidence as well,[13]

---

[12]    See Tr. at 38:14-18 (quoting Shane B. Vogt, Esq.) ("[I]f the true facts are as defendants say they are and this was really just a syntax error and Mr. Bennet's explanation for this was, oh, that's not what I meant, that's not what I meant there's no need to do that research. It's pointless to do that research. He shouldn't have been asking for anyone to do that research. He should have just said, oh, that's not what I meant, and affixed an editor's note.").

[13]    For example, defendants point to evidence that Bennet had previously used the term "incitement" in the broader, rhetorical sense of the phrase, in an earlier article for the Times discussing a meeting of a joint Israeli-Palestinian "committee on 'prevention of incitement,'" which focused on "messages in

# SA 0111

the Court finds that, taking the evidence in the light most favorable to plaintiff, she has sufficiently pointed to enough triable issues of fact that would enable a jury to find by clear and convincing evidence that Bennet knew, or was reckless not to know, that his words would convey the meaning in the minds of the readers that plaintiff asserts was libelous, to wit, that she bore a direct responsibility for inciting the Loughner shooting.

## B.    Actual Malice – Falsity

It is not enough, however, for plaintiff to show that Bennet meant to say what plaintiff claims was libelous; in addition, to establish actual malice, plaintiff must show that defendants published the libelous statement "with knowledge that it was false or with reckless disregard of whether it was false or not." Sullivan, 376 U.S. at 279. "Mere negligence does not suffice." Masson, 501 U.S. at 510. Instead, "[a] finding of malice must be based on clear and convincing evidence that the defendant in fact entertained serious doubts as to the truth of his publication, or, in the alternative, knew of its falsity." Dalbec, 828 F.2d at 927.

---

the schools and news media encouraging violence." Sullivan Decl. Ex. 28. While such prior use of the term in the non-defamatory sense weighs against a finding of actual malice, the weighing of evidence here is for the jury, not the Court.

# SA 0112

 While mere failure to conduct an investigation before
publishing cannot itself establish actual malice, nonetheless,
"where there are obvious reasons to doubt the veracity" of the
information, that can give rise to an inference of actual
malice. Harte-Hanks Communications, Inc. v. Connaughton, 491
U.S. 657, 688 (1989). Thus, as the Ninth Circuit explained,
"where [a] publisher undertakes to investigate the accuracy of a
story and learns facts casting doubt on the information
contained therein, it may not ignore those doubts, even though
it had no duty to conduct the investigation in the first place."
Masson v. New York Magazine, Inc., 960 F.2d 896, 901 (9th Cir.
1992). That is why, as the Supreme Court has explained, "the
purposeful avoidance of the truth is in a different category"
from mere failure to investigate. Harte-Hanks, 491 U.S. at 692.

 As the Second Circuit explained in this very case,
plaintiff's "overarching theory of actual malice is that Bennet
had a 'pre-determined' argument he wanted to make in the
editorial," his commitment to which "led him to publish a
statement about Palin that he either knew to be false, or at
least was reckless as to whether it was false." Palin, 940 F.3d
at 813. In support of that theory, the Second Circuit found
three allegations in the amended complaint that "paint[ed] a
plausible picture of this actual-malice scenario." Id. Now that
discovery is over (and the standard is no longer mere

# SA 0113

plausibility), it turns out that two of these three allegations find no support in the actual evidence. However, there is enough support for the third allegation to preclude a grant of summary judgment.

The Court begins by reviewing the two refuted allegations before turning to the evidence supporting the third.

### 1. Bennet's Background

The Second Circuit held that "Bennet's background as an editor and political advocate provided sufficient evidence" to infer actual malice. Id. In particular, the court focused on the fact that Bennet was the editor-in-chief of The Atlantic from 2006-2016 and that during that time the magazine published several articles confirming there was no link between the Map and the Loughner shooting. Id. A plausible inference, the court explained, is that "one who had risen to editor-in-chief at The Atlantic knew their content and thus that there was no connection between Palin and the Loughner shooting." Id. at 814.

The undisputed record now shows, however, that Bennet was not responsible for editing any of those articles; instead, they were published by sister publications over which Bennet had no editorial control. Defs' Mem. at 22; see also Deposition of Andrew Sullivan, Dkt. No. 99-41, at 93. Indeed, Andrew Sullivan, who ran one of the blogs on which many of these articles were

published, testified that Bennet had no role whatsoever in the preparation of those posts. Id.

In response, plaintiff points out that the posts "appeared on The Atlantic's website," see, e.g., Pl. SUMF ¶ 118, and that Bennet conceded that he "consumed" the Atlantic's website in 2011 and admitted that he "must have read" some of these articles, see Pl. Opp. at 18. But, as defendants persuasively reply, plaintiff cites to no evidence, beyond the mere fact that the two sites shared a URL, that Bennet had editorial control over those articles, so at most he simply read the posts. Having once read an article many years before the drafting of the Editorial is hardly enough to create an inference of knowledge of the Editorial's falsity.[14]

The Second Circuit further speculated on the basis of the amended complaint's allegations that "Bennet in particular was more likely than the average editor-in-chief to know the truth about the Loughner shooting because he had reason to be personally hostile toward Palin." Palin, 940 F.3d at 814. But the Second Circuit also made clear that these speculations were only "relevant to the credibility of Bennet's testimony that he

_____

[14]    For the same reason, plaintiff's evidence that Bennet was sent soon after the Loughner shooting an article refuting the causal link between the shooting and the Map is likewise insufficient to support a finding of actual malice. See Pl. SUMF ¶ 267.

# SA 0115

was unaware of facts published on his watch relating to the Loughner shooting." Id. As just discussed, there is no evidence to suggest that those facts were actually published on his watch. And standing alone, as the Second Circuit itself recognized, political opposition "does not constitute actual malice." Id.

## 2. The Retraction

While a defendant's willingness (as here) to quickly acknowledge and correct its error ordinarily weighs against a finding of actual malice, see e.g., Zerangue v. TSP Newspapers, Inc., 814 F.2d 1066, 1071 (5th Cir. 1987), the Second Circuit once again theorized that it was "plausible that the correction was issued after a calculus that standing by the editorial was not worth the cost of the public backlash." Palin, 940 F.3d at 815. But, as defendants point out, plaintiff does not cite to any evidence in the record that corroborates this theory of the retraction/correction so far as defendants' knowledge of falsity is concerned, and the Court's own review of the record discloses no evidence warranting this speculation.

## 3. The Drafting and Publication Process

Ultimately, then, we are left with how Bennet handled the Williamson draft and the attached hyperlink, which the Second Circuit held could show that Bennet "willfully disregarded the truth." Palin, 940 F.3d at 815. Plaintiff argues that,

30

construing the evidence in the light most favorable to her, a jury could conclude that (1) Bennet instructed Williamson to research whether there was a link between the Map and the shooting; (2) Bennet conceded, and Williamson confirmed, that her draft embodied the results of that research and did not turn up evidence of a causal link between the Map and the shooting; (3) the hyperlinked article attached to Williamson's draft recognized as much; and (4) therefore, Bennet "knew there was no link but rewrote the draft anyway to say a link existed — consistent with the narrative he already decided to portray." Pl. Opp. at 18.

As a threshold matter, defendants insist there is "no evidence to support these assertions." Defs' Reply at 8. Specifically, defendants contend that Bennet did not instruct Williamson to research whether there was a link between the map and the shooting; rather, according to defendants, Bennet only "asked for research to determine if the Times' own Editorial Board had previously written anything connecting the Loughner Shooting to incitement . . . because he wanted to ensure the new editorial was in sync with any prior Board position. Id. at 8-9.

However, taking the evidence in the light most favorable to plaintiff, Williamson acknowledges in her deposition that Bennet specifically asked her to "look for pieces related to the Giffords shooting and whether there was such a connection."

# SA 0117

Sullivan Decl. Ex. 3 (Williamson Dep.) at 142; see also id.
("[Bennet] asked me to research that particular shooting, and I
did."). Defendants suggest that plaintiff is taking these
statements out of context, weaving "two strands of testimony
into a fiction." Defs' Reply at 9. But, again, at the summary
judgment phase, the Court finds that Williamson's deposition
testimony could allow a juror to conclude that, at some point
during the drafting process, Bennet specifically instructed
Williamson to research whether there existed a link between the
Map and the shooting and learned that there was no material
support for such a link.

Beyond this, Williamson's inclusion in her first draft of
the hyperlink to the contemporaneous ABC news article that
flatly stated there was no such connection would have given
Bennet, if he had accessed the article, "obvious reasons to
doubt the veracity" of the alleged connection. Harte-Hanks, 491
U.S. at 688. If so, Bennet's failure to investigate could
support an inference that he purposefully avoided the truth. Id.
at 692. To be sure, Bennet maintains that he never clicked on
the hyperlink. See Bennet Dep. at 261. But under all the
circumstances, a jury might discredit this testimony.
Nonetheless, even if it were true, it could be evidence of
reckless disregard. After receiving Williamson's draft, a
reasonable jury might conclude, Bennet had obvious reasons to

## SA 0118

doubt whether there existed a link between the Map and the Loughner shooting. At that point, Bennet's failure to further investigate or at least just click on the link to the only article Williamson had presented could support the inference that he was purposefully avoiding the truth.

There are other pieces of evidence from the drafting process that further support such a theory. First, as the editors were discussing whether to cover the Hodgkinson shooting, it was Bennet's idea to focus the editorial on "the rhetoric of demonization and whether it incites people to this kind of violence." Sullivan Decl. Ex. 11. Then, during the research phase, Bennet asked a researcher to determine whether the Board had previously written "anything connecting to the Giffords shooting to some kind of incitement." Pl. SUMF ¶ 324. After the researcher sent Bennet an article (written not by the Board but by a columnist at the Times), Bennet replied "Good for us." Id. ¶ 326. While Bennet has testified that he does not recall what he meant by that response, a reasonable jury could infer from this response that Bennet felt free to advance his narrative because the Editorial Board had not written on the subject.

In addition, researchers sent to Bennet other articles that disclaimed the idea that Loughner had been motivated by violent rhetoric. Notably, Bennet was sent an earlier editorial entitled

33

# SA 0119

"As We Mourn," published in January 2011, which quoted President Barack Obama saying Loughner's shooting cannot be blamed on "a simple lack of civility." Declaration of Shane B. Vogt, Dkt. No. 102, Ex. 30 at 19. Like the hyperlink, Bennet testified that he did not read this article, even after specifically asking for the researcher to dig up articles of this sort. Pl. SUMF ¶¶ 324-330. But, as with the hyperlink, a jury could infer from this a purposeful avoidance of the truth.

Once again, there is considerable evidence that defendants mount to support the notion that Bennet simply drew the innocent inference that a political circular showing crosshairs over a Congressperson's district might well invite an increased climate of violence with respect to her. But, taken in the light most favorable to plaintiff, the evidence shows Bennet came up with an angle for the Editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results the Williamson research that he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth

Accordingly, the Court concludes that there is sufficient evidence to allow a rational finder of fact to find actual malice by clear and convincing evidence. Anderson, 477 U.S. at 254.

C. Conclusion

# SA 0120

For the above-discussed reasons, plaintiff's motion for partial summary judgment is denied and defendants' motion for summary judgment is also denied.[15] The Clerk of the Court is directed to close docket entries 94 and 95. The trial of this case, pandemic permitting, will commence on February 1, 2020 at 9:30 a.m.

SO ORDERED.

---

[15] Also before the Court is plaintiff's motion for reconsideration of the Court's decision to dismiss her claim for disgorgement damages. Dkt. No. 111. In that motion, plaintiff asks the Court to reconsider its earlier decision because, she argues, the Supreme Court's decision in Liu v. SEC, 140 S.Ct. 1936 (2020), decided on June 22, 2020, constituted "a change in controlling law" and gave rise to "a need to correct a clear legal error or prevent manifest injustice." Plaintiff's Memorandum of Law in Support Reconsideration And/Or Alteration or Amendment, Dkt. No. 111, at 4.

The Court denies plaintiff's motion as untimely. Under Local Rule 6.3, a motion for reconsideration of a court order must be served within 14 days after entry of the order determining the original motion. While there might be some fuzziness regarding when the fourteen-day clock starts and stops, plaintiff's motion is untimely under even the most generous interpretation of Rule 6.3. The Court's order on the original motion was entered on January 21, 2020. Dkt. No. 83. Plaintiff did not move for reconsideration until July 15, 2020 — more than five months later. Thus, a strict application of Rule 6.3 would warrant denying plaintiff's motion as grossly untimely. Moreover, even if the fourteen-day clock were deemed to have restarted on the date the Supreme Court announced its decision in Liu and if the clock were deemed to have stopped on the date plaintiff sought leave from this Court to file the motion, she would still have missed the deadline. Plaintiff sought leave to file this motion on July 8, 2020 — sixteen days after the Supreme Court decided Liu on June 22, 2020.

**SA 0121**

Dated:     New York, NY
             August 28, 2020

                                      JED S. RAKOFF, U.S.D.J.

# SA 0122

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
SARAH PALIN,                          :
                                      :     17-cv-4853 (JSR)
        Plaintiff,                    :
                                      :
        -v-                           :     MEMORANDUM ORDER
                                      :
THE NEW YORK TIMES COMPANY and        :
JAMES BENNET,                         :
                                      :
        Defendants.                   :
------------------------------------- x

JED S. RAKOFF, U.S.D.J.

On June 27, 2017, plaintiff Sarah Palin brought a single defamation claim against The New York Times Company ("The Times") arising from The Times' editorial of June 14, 2017 titled America's Lethal Politics regarding gun control (the "Editorial"). Dkt. No. 1. The now-operative complaint, filed on December 30, 2019, also named James Bennet, the author of the relevant segments of the Editorial. Dkt. No. 70.

Although plaintiff does not dispute that she is a "public figure," in a previously-filed motion for partial summary judgment, she argued that she is not required to prove actual malice, and prove it by clear and convincing evidence, on the ground that the federal constitutional rule imposing that burden in the case of public figures either is no longer good law or does not apply to this case. Dkt. No. 100. Defendants argued, among

# SA 0123

other things, that the federal constitutional rule governed the case and that, in any event, New York law independently imposed an actual malice requirement. Dkt. No. 104. In an Opinion and Order dated August 28, 2020 (the "Opinion"), Dkt. No. 117, the Court held that the federal Constitution, under well-settled and binding precedent, imposed the actual malice requirement, id at 12-13 (citing New York Times Co. v. Sullivan, 376 U.S. 254 (1964)), and declined to reach the question whether New York law independently imposed that burden, id. at 13 n.8. The case is now set for trial, pandemic permitting, on June 21, 2021.

Now before the Court is defendants' motion, pursuant to Federal Rule of Civil Procedure 54(b), for an order modifying the Opinion to reflect the fact that on November 10, 2020, New York amended its "anti-strategic litigation against public participation" ("anti-SLAPP") law to expressly require that public figures prove actual malice by clear and convincing evidence. Dkt. No. 120. Plaintiff opposes. Dkt. No. 123. For the reasons set forth below, the motion is granted.

Federal Rule of Civil Procedure 54(b) provides, in relevant part, that an interlocutory order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Of course, past decisions should not be revisited "without good reason." Official Comm. of

-2-

# SA 0124

the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003). But "an intervening change of controlling law" is just such a reason. Id.

Here, there has been just such an intervening change of law. It is true that New York's anti-SLAPP law has long had an actual malice requirement, providing that:

> [i]n an action involving public petition and participation, damages may only be recovered if the plaintiff, in addition to all other necessary elements, shall have established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue.

See N.Y. Civil Rights Law § 76-a(2). The prior version of the law, however, defined "an action involving public petition and participation" narrowly to include only claims "brought by a public applicant or permittee, and [that are] materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission." See Intl. Shoppes v. At the Airport, 131 A.D.3d 926, 928 (2d Dep't 2015).[1] As a result, the actual malice requirement was effectively limited to cases initiated by persons or business entities that were

---

[1] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

# SA 0125

involved in controversies over a public application or permit. See Chandok v. Klessig, 632 F.3d 803, 819 (2d Cir. 2011) ("Uniformly, the New York courts have found that the persons properly alleged to be public applicants within the meaning of the anti-SLAPP statute were persons whose proposed actions required government permission.").

On November 10, 2020, New York amended its anti-SLAPP law. See A.B. 5991-A. Among other things, the amendments substantially broadened the reach of the actual malice rule. As amended, the law defines an "action involving public petition and participation" to include a claim based upon:

> (1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or

> (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

N.Y. Civil Rights Law § 76-a(1)(a). The law further directs that the term "public interest" is to "be construed broadly, and shall mean any subject other than a purely private matter." Id. § 76-a(1)(d). Also, although less directly relevant here, the amendments create an affirmative cause of action for certain

-4-

defendants to recover attorneys' fees and other damages from plaintiffs in specified circumstances. Id. § 70-a.[2]

Defendants now ask the Court to rule that § 76-a, as amended on November 10, 2020, applies retroactively to this action and thus requires that plaintiff prove actual malice by clear and convincing evidence as a matter of New York law, separate and apart from the requirements of the federal Constitution. Def. Mem. at 4. They contend that "a ruling now on the applicability of state law will inform the drafting of jury instructions at trial, simplify future proceedings including on appeal, and give effect to constitutional avoidance . . . ." Id. at 5.

Plaintiff responds that defendants have not established extraordinary circumstances warranting reconsideration. Plaintiff's Response to Defendants [sic] Memorandum of Law in Support of Motion for Reconsideration ("Pl. Mem."), Dkt. No. 123, at 1. Plaintiff argues that the Court has already decided that the actual malice standard applies to this case, and that the source of the actual malice rule does not matter for the purposes of the upcoming trial. Id. at 1-2. And, plaintiff contends, if she loses at trial and renews her challenge to the federal actual malice

---

[2]   Defendants do not ask the Court to apply § 70-a in this action, nor do they contend that the provision would even apply in federal court. See Defendants' Memorandum of Law in Support of Motion for Reconsideration ("Def. Mem."), Dkt. No. 120, at 4 n.4.

# SA 0127

rule on appeal, defendants will have preserved their argument that New York independently imposes the requirement. Id. at 2. Therefore, according to plaintiff, nothing will be simplified by granting reconsideration; indeed, doing so "would amount to an advisory opinion." Id. at 1-2.

The Court sees no reason why it should delay resolution of this plainly relevant issue. If, as defendants contend, § 76-a applies retroactively to this action, that will undoubtedly simplify proceedings on appeal; by contrast, if, as plaintiff insists, the statute does not have retroactive effect, then we are exactly where we began and, to prevail at trial, plaintiff will still have to prove actual malice as a matter of federal constitutional law. Either way, there is nothing to be gained from delay. In light of the intervening change of law, the Court now turns to the merits of defendants' motion.

It is undisputed that § 76-a requires public figures, like plaintiff, to prove actual malice by clear and convincing evidence. It is also undisputed (albeit by virtue of neither party having raised the issue) that a federal court sitting in diversity must apply § 76-a because it is a substantive, rather than a procedural, provision. See Adelson v. Harris, 774 F.3d 803, 809 (2d Cir. 2014) (affirming the district court's application of certain substantive provisions of Nevada's anti-SLAPP law); see also La Liberte v.

-6-

Reid, 966 F.3d 79, 86 n.3 (2d Cir. 2020) (distinguishing between the applicability in federal court of substantive and procedural elements of state anti-SLAPP laws). The only question here is whether § 76-a should be given retroactive effect to this action, which was filed before the amendments took effect but has not yet gone to trial.

Under New York law, statutory amendments are generally "presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated." Matter of Gleason (Michael Vee, Ltd.), 96 N.Y.2d 117, 122 (2001). So-called "remedial legislation," however, "should be given retroactive effect in order to effectuate its beneficial purpose." Id. "Remedial statutes are those designed to correct imperfections in prior law, by generally giving relief to the aggrieved party." Nelson v. HSBC Bank USA, 87 A.D.3d 995, 998 (2d Dep't 2011). "Other factors in the retroactivity analysis include whether the Legislature has made a specific pronouncement about retroactive effect or conveyed a sense of urgency; whether the statute was designed to rewrite an unintended judicial interpretation; and whether the enactment itself reaffirms a legislative judgment about what the law in question should be." Gleason, 96 N.Y.2d at 122.

It is clear that § 76-a is a remedial statute that should be given retroactive effect. The Legislature conveyed a sense of urgency by directing that the amendment was to "take effect immediately." See A.B. 5991-A § 4; see, e.g., Gleason, 96 N.Y.2d at 122. Moreover, the legislative history demonstrates that the amendments to § 76-a were intended to correct the narrow scope of New York's prior anti-SLAPP law. As State Senator Brad Hoylman, the Senate sponsor of the amendments, explained: the prior anti-SLAPP law had been "strictly limited to cases initiated by persons or business entities that are embroiled in controversies over a public application or permit, usually in a real estate development situation." Sponsor Mem. of Sen. Hoylman (July 22, 2020), https://www.nysenate.gov/legislation/bills/2019/s52. "By revising the definition of an 'action involving public petition and participation,' this amendment to Section 76-a will better advance the purposes that the Legislature originally identified in enacting New York's anti-SLAPP law" -- namely, "to provide the utmost protection for the free exercise or speech, petition, and association rights, particularly where such rights are exercised in a public forum with respect to issues of public concern." Id. "These factors together persuade [the Court] that the remedial purpose of the amendment should be effectuated through retroactive application." Gleason, 96 N.Y.2d at 123.

Plaintiff offers three reasons not to give § 76-a retroactive effect, but none is persuasive. First, plaintiff argues that while "the changes made to Section 70-a appear to be 'remedial' in nature, . . . the changes to Section 76-a are not." Pl. Mem. at 2. For example, plaintiff points out that § 70-a states that it applies to "any person who commenced or continued such action," (emphasis added), whereas § 76-a "contains no such temporal expression." Id. at 4. That § 70-a might also be intended to have retroactive effect, however, does not undermine the clear evidence that the Legislature intended § 76-a to have retroactive effect. Nor is it any surprise that the Legislature did not expressly state that § 76-a would apply to any plaintiff who "continued" such an action; after all, any public figure would have already had to prove actual malice under the federal Constitution.[3]

Next, plaintiff argues that Matter of Regina Metro. Co., LLC v New York State Div. of Hous. & Community Renewal, 35 N.Y.3d 332 (2020), a recent New York Court of Appeals decision, creates a presumption against retroactivity, where, as here, the amendment would "impact substantive rights." Pl. Mem. at 3 (quoting Regina,

---

[3]    As the preceding analysis makes clear, the famously "intricate relationship between First Amendment and state libel law," Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 176 (2d Cir. 2000), is especially pronounced where, as here, a state opts to conform aspects of its state law to the First Amendment.

# SA 0131

35 N.Y.3d at 370). For at least two reasons, however, this argument is unpersuasive. The first is that <u>Regina</u> created no such rule. Instead, the <u>Regina</u> court simply restated well-established New York law: that legislation is typically presumed to apply prospectively but that the presumption could be overcome with "a clear expression of . . . legislative purpose." 35 N.Y.3d at 369 (quoting <u>Gleason</u>, 96 N.Y.2d at 36). Nothing in <u>Regina</u> suggests that it is overturning the general rule that remedial legislation, like § 76-a, is presumed to have retroactive effect.[4] Second, even assuming arguendo that <u>Regina</u> did articulate such a rule, § 76-a will not have any meaningful impact on plaintiff's "substantive rights." As already discussed, any public figure seeking to recover damages for defamation would already have had to prove actual malice as a matter of federal law separate and apart from the requirements of New York law.[5]

---

[4]    Indeed, <u>Regina</u> itself recognized that certain portions of the Housing Stability and Tenant Protection Act of 2019 were intended by the Legislature to have retroactive effect, although, as discussed below, it ultimately refused to effectuate that legislative intent on due process grounds. <u>See</u> 35 N.Y.3d at 387.

[5]    To be sure, states are free to subject to the actual malice rule plaintiffs who might otherwise fall outside the reach of the First Amendment. <u>See</u>, <u>e.g.</u>, <u>Nelson Auto Center, Inc. v. Multimedia Holdings Corporation</u>, 951 F.3d 952, 957 (8th Cir. 2020) ("Minnesota is free to categorize corporations as public figures that must prove actual malice even if federal law does not."). Because plaintiff is clearly a public figure under well-established

# SA 0132

Finally, plaintiff, again relying on <u>Regina</u>, suggests that applying § 76-a retroactively would "raise a bevy of constitutional concerns," including due process concerns. Pl. Mem. at 4-5. Specifically, plaintiff contends that "the retroactive application of Section 76-a would impose a significant element of proof (actual malice by clear and convincing evidence) upon Plaintiff on a claim based on conduct occurring over three years ago." <u>Id.</u> at 5. Plaintiff is correct, of course, that retroactive legislation could, in certain cases, implicate due process concerns. This, however, is not such a case. As <u>Regina</u> itself recognizes, "due process requires a persuasive reason for the potentially harsh impacts of retroactivity." <u>Regina</u>, 35 N.Y.3d at 375. Here, however, plaintiff fails to identify any "harsh impact" of retroactively applying § 76-a to the instant case.

<u>Regina</u> itself helps prove the point. There, the Court of Appeals held that the retroactive application of certain provisions of the Housing Stability and Tenant Protection Act of 2019 would violate the Due Process Clause. 35 N.Y.3d at 388. Relevant to the court's holding was the fact that the retroactive application of the law would effectively penalize landlords for

---

federal law, the Court need not and does not address whether § 76-a subjects to New York's actual malice rule a broader collection of plaintiffs than does the First Amendment.

having disposed of tenant records years earlier, even though doing so at the time was perfectly legal. Id. at 379-80. By contrast, and by virtue of the First Amendment, plaintiff was never entitled to recover monetary damages absent a showing of actual malice.

Put differently, here, unlike the plaintiffs in Regina, plaintiff has not demonstrated any reasonable reliance interest. To the extent plaintiff invokes such a reliance interest, her claim would seem to be that, in first bringing this lawsuit in 2017, she relied on the prospect that the Supreme Court would overturn New York Times Co. v. Sullivan and allow her to recover damages without a showing of actual malice. While courts might, in some contexts, credit the "objectively reasonable reliance on binding appellate precedent," cf. Davis v. United States, 564 U.S. 229, 231 (2011), there is no case law or principle of constitutional adjudication that would credit a litigant's wishful reliance on the prospect that binding appellate precedent will one day be overturned. If anything, the retroactive application of § 76-a will protect the reliance interests of defendants, who published the Editorial in a media landscape long-governed by the actual malice rule, against possible changes of constitutional law at the federal level.

For the foregoing reasons, defendants' motion is granted. The Court holds that N.Y. Civil Rights Law § 76-a, as amended on November 10, 2020, applies to this action and requires plaintiff,

# SA 0134

as a matter of state law, to prove by clear and convincing evidence what she had already been tasked with establishing under the federal Constitution: that defendants made the allegedly defamatory statements in the Editorial "with knowledge of [their] falsity or with reckless disregard of whether [they were] false" -- that is, with actual malice. See § 76-a(2).

The Clerk of the Court is directed to close the entry at docket number 119.

SO ORDERED.

Dated:   New York, NY

        December 29, 2020

United States District Judge

-13-

## SA 0135

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| SARAH PALIN, |
|       Plaintiff, |
|   -v- |
| THE NEW YORK TIMES COMPANY and JAMES BENNET, |
|       Defendants. |

17-cv-4853 (JSR)

<u>OPINION AND ORDER</u>

JED S. RAKOFF, U.S.D.J.:

Now before the Court is plaintiff Sarah Palin's post-trial motion. She first seeks the Court's retroactive disqualification, arguing that various aspects of the Court's management of her libel trial suggest bias against her. In the alternative, she seeks either a new trial or reconsideration of the Court's prior ruling that entered final judgment in favor of defendants The New York Times Company and James Bennet based on their motion under Fed. R. Civ. P. 50 for judgment as a matter of law. Because Palin's instant motion is wholly lacking in merit, the Court denies it in full.

Whatever she may have claimed in her complaint and pre-trial submissions, Palin was unable to deliver at trial admissible evidence that remotely supported her claim that she was intentionally or recklessly defamed by the defendants. As the Court clearly explained at some length in its Rule 50 Opinion dated March 1, 2022, ECF 196

# SA 0136

("Opinion" or "Op."),[1] which is re-adopted here by reference, Palin wholly failed to establish several essential elements of her claim. Among other things, in the end she offered <u>no</u> affirmative evidence that Bennet or others who worked on the Editorial that is the subject of her claim knew or suspected before publication that the Challenged Statements, which linked Palin's Crosshairs Map to the Arizona shootings of Representative Gabby Giffords and others, were false. Indeed, none of the sources or research upon which the Editorial Board relied to draft, revise, and publish the July 14, 2017 Editorial expressly denied Bennet's inference that Palin's Crosshairs Map had played a causal role in the Arizona shooting. And when cautionary information was brought to defendants' attention, the <u>Times</u> promptly retracted the Challenged Statements. No reasonable juror could therefore have found by clear and convincing evidence that Bennet and the <u>Times</u> published the Challenged Statements with actual malice.

Throughout Palin's motion, she renews complaints about trial procedures and evidentiary rulings, including some made after the trial was over. The passage of time has not rendered these complaints any less meritless. But it is also worth noting that during the trial itself, her counsel was afforded numerous opportunities to object to the rulings and procedures of which she now complains, to lay

---

[1] All capitalized terms here used refer to the definitions set forth in the Opinion, unless otherwise specified. Also, all internal quotation marks, alterations, omissions, emphases, and citations have been omitted from all cited sources.

additional foundation for evidence she now claims was wrongly excluded, and even, post-trial, to seek relief that would establish a factual basis for much of her current complaints -- but she totally failed to do so.

## I.   **Relevant Background**

The Court has previously set forth in the Opinion the procedural and factual background of this case, familiarity with which is here assumed. In brief summary, this case was tried for seven days before the Court and a jury, beginning February 3, 2022. After the close of evidence, the defendants moved under Fed. R. Civ. P. 50 for judgment as a matter of law. Oral argument proceeded over several days while the jury deliberated. The Court eventually determined on February 14, 2022, that it would grant defendants' Rule 50 motion because Palin had failed to present any affirmative evidence supporting the essential element of actual malice. However, as the Court had previewed, it declined to simply enter final judgment and dismiss the jury at that time. Rather, in accordance with prior suggestions from the Second Circuit, the Court explained that it would allow the jury to continue its deliberations and would enter the Rule 50 judgment post-verdict, pursuant to Rule 50(b), so that, if the Court of Appeals were to disagree with the Court's decision to enter judgment as a matter of law, it would have the option of reinstating the jury's verdict rather than remanding for retrial. Neither side objected to this procedure, either when the Court previewed this procedure before ruling, at the time it delivered its ruling in open court, or at any time thereafter

## SA 0138

before the jury rendered its own verdict and judgment was entered. <u>See</u> Op. 35-36.

Ultimately, the jury returned a verdict for defendants on February 15, 2022, and the Court entered final judgment that afternoon on the basis of the Rule 50 motion and, independently, on the basis of the jury's verdict. ECF 171 (final judgment); ECF 173 (verdict). After the jury was excused, the Court, in accordance with its very longstanding practice, directed its law clerk to speak with the jurors about any suggestions they might have for future improvements. During this discussion, however, several of the jurors volunteered to the law clerk that they had previously become aware of the bottom line of the Court's preliminary statement on February 14 that it would dismiss the case as a matter of law under Rule 50, because, notwithstanding that they had assiduously adhered to the Court's instruction to avoid media coverage of the trial, they had involuntarily received "push notifications" on their smartphones that gave the "bottom line" of the Court's decision. ECF 172. Although the same jurors made a point of affirmatively volunteering to the law clerk that this limited knowledge had not affected their deliberations in the slightest, the Court, upon learning of this conversation, promptly disclosed it, in writing, to the parties and the public, on the morning of February 16, 2022. <u>Id.</u>[2]

---

[2] As the Court had repeatedly informed counsel, the Court was required to leave the courthouse promptly after the close of each trial day to attend to teaching responsibilities at Columbia Law School, and this was true on the day the jury rendered its verdict (February 15, 2022). In the few minutes available between the law clerk's return to chambers after speaking with the jurors and the

# SA 0139

On February 23, 2022, the Court held a telephonic conference with counsel regarding Palin's indication in a letter dated February 22, 2022, that she would seek the following forms of relief through post-trial motion practice: (1) the Court's disqualification, pursuant to 28 U.S.C. § 455, retroactive to August 28, 2020; (2) authorization to interview members of the jury; (3) disclosure of any communications between the Court and the media during trial; (4) reconsideration of the Rule 50 decision; and (5) a new trial and to set aside the verdict, pursuant to Fed. R. Civ. P. 59 and 60. See ECF 194 at 2. The Court granted Palin leave to move for any of these forms of relief, and set a schedule for briefing the instant motion, noting that it intended to publish an Opinion on or before March 1, 2022, amplifying the findings of fact and conclusions of law upon which its Rule 50 judgment depended. Id. at 4.

While the February 23, 2022 conference was in all other respects a scheduling conference, the Court, in response to item 3 on plaintiff's list of proposed motions, affirmed that the Court had not communicated with any member of the media at any time during the trial. See id. at 2-3. The Court also explained that on the morning of February 16, 2022, after final judgment had already been entered and

---

Court's departure for Columbia, the Court directed its law clerk to prepare the one-sentence final judgment, which was docketed later that afternoon. See ECF 171. The following morning, however, after the Court learned the details of its law clerk's post-verdict discussion with the jurors, it immediately began drafting the order disclosing the relevant facts, and that order was emailed to counsel and docketed as soon as possible.

the Court had begun drafting the order alerting the parties and the public what its law clerk had learned from the jurors, the Court received an "urgent" message from a Bloomberg reporter asking about the push notification issue. See id. at 3. As the Court explained, it returned the call and, recognizing that Bloomberg might publish its article online before the Court could docket its order, the Court, after confirming certain details with its law clerk, gave a short statement to the reporter so that, if the reporter's article was published online before the Court issued its own announcement, there would be no misunderstandings. The statement contained substantially the same information as the order, which was docketed and emailed to counsel less than an hour after the story was published. See ECF 198-4 (Bloomberg article).

On February 28, 2022, Palin filed a Notice of Motion indicating that she would move for all forms of relief previously listed other than disclosure of the Court's media contacts. See ECF 195. However, her actual motion, filed March 22, 2022, also dropped her request for jury interviews (item 2 on her original list). See generally ECF 198 ("Mot.").

Finally, on March 25, 2022, Palin filed a petition for a writ of mandamus in the U.S. Court of Appeals for the Second Circuit, asking for this Court to be prohibited from ruling on the post-trial motions, for a new trial, and for reassignment to a new district judge. See In re: Palin, No. 22-629 (2d Cir. Mar. 25, 2022) Doc. 3 at 10. But the Court of Appeals, stating that it would benefit from this Court's

## SA 0141

rulings on Palin's post-trial motion, stayed consideration of the petition until after the instant decision was rendered. See ECF 200.

## II.  **Palin's Post-Trial Motion**

The Court now denies Palin's post-trial motion in full, for the reasons set forth below and, where relevant, for reasons explained in the Opinion issued on March 1, 2022 and incorporated here by reference.

### A. **Disqualification**

Palin first moves for the Court to disqualify itself, retroactive to August 28, 2020. Palin does not allege actual bias. Rather, she contends that "a disinterested observer fully informed of the events ... occurring before, during and after the trial of this action would entertain doubts about the Court's impartiality." Mot. 35.

Under 28 U.S.C. § 455, a federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned," or "[w]here he has a personal bias or prejudice concerning a party." The proponent of a disqualification motion bears the burden of demonstrating the appearance of bias. In re Int'l Bus. Machines Corp., 618 F.2d 923, 931 (2d Cir. 1980) ("In re IBM").

Palin made no pre-trial motion to disqualify this Court, and much of her current motion to disqualify the Court retroactively to months before trial simply reflects her unhappiness with some of the Court's rulings, both at and before trial. But the Second Circuit has repeatedly rejected the suggestion "that adverse rulings by a judge can per se create the appearance of bias under section 455(a)." Id. at 929. See also Liteky v. United States, 510 U.S. 540, 555 (1994)

## SA 0142

("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion.") Rather, "under section 455(a) the bias to be established must be extrajudicial and not based upon in-court rulings." As the Second Circuit has further explained, this rule is an essential bulwark of judicial independence: "A trial judge must be free to make rulings on the merits without the apprehension that if he makes a disproportionate number in favor of one litigant, he may have created the impression of bias. Judicial independence cannot be subservient to a statistical study of the calls he has made during the contest." In re IBM, 618 F.2d at 929.

In support of her extraordinary request for retroactive disqualification, Palin identifies several aspects of the Court's management of the trial process. These include the Court's 2017 decision to grant defendants' motion to dismiss (subsequently reversed on appeal), unspecified aspects of the Court's subsequent summary judgment rulings,[3] the scheduling of the trial, the Court's voir dire

---

[3] Palin's dispute with the Court's prior summary judgment rulings largely centers on the Court's decision that an amendment to New York's anti-SLAPP statute applies to this action. See Mot. 1. Palin notes that "[t]his conclusion was recently called into question" by a First Department case, Gottwald v. Sebert, 2022 WL 709757 (1st Dep't Mar. 10, 2022), but her motion offers no argument for why the Court's conclusion is wrong, let alone how this conclusion (made before the Gottwald decision was entered) demonstrates bias. See Mot. 12 n. 14. Moreover, as defendants point out, Gottwald appears to be an outlier. See Opp. 29 n. 9 ("[T]he overwhelming majority of courts to consider this question have agreed with this Court's reasoning and ruled that the 2020 amendments apply to pending actions." (collecting cases)). Furthermore, a single Appellate Division case would not require the Court to reverse its earlier application of New York law when the New

# SA 0143

procedures and rulings during jury selection, certain evidentiary rulings during the trial, the timing of the Court's announcement of its Rule 50 decision, an answer to a jury note, and the Court's aforementioned decision to briefly respond to a reporter's request for comment after final judgment had been entered. See Mot. 35. It is indisputable that all but the last of these complaints "rest upon trial rulings or conduct," which, as explained above, cannot provide the basis for recusal under section 455. In re IBM, 618 F.2d at 929; see also Spiegel v. Schulmann, 604 F.3d 72, 83 (2d Cir. 2010); United States v. Wedd, 993 F.3d 104, 117-118 (2d Cir. 2021). Therefore, even though the opposition papers of the defendants well argue why each of these rulings was correct, see ECF 201 ("Opp.") at 41-45, the Court need not here wade through the details of these decisions. If Palin believes the Court erred in making them, she can address that on appeal.

Palin's only even arguably legally cognizable complaint concerns the Court's decision to provide a brief post-verdict comment to a Bloomberg reporter's "urgent" request. As detailed above, even that last complaint is without legal merit, let alone any evidence of bias. Palin grounds her argument in a partial (and misleading) quote from Canon 3(A)(6) of the Code of Conduct for United States Judges. In full, however, Canon 3(A)(6) states as follows:

---

York Court of Appeals has yet to weigh in. But, in any event, how any of this demonstrates bias is beyond comprehension.

# SA 0144

> A judge should not make public comment on the merits of a matter pending or impending in any court. A judge should require similar restraint by court personnel subject to the judge's direction and control. The prohibition on public comment on the merits does not extend to public statements made in the course of the judge's official duties, to explanations of court procedures, or to scholarly presentations made for purposes of legal education.

The Court's comment to Bloomberg fully complied with Canon 3(A)(6).[4] The comment did not in any way address "the merits of [the] matter." It was rather an "explanation[] of court procedures," specifically made to prevent the reporter, and, by extension the public, from misunderstanding the procedures permitted by Rule 50. Such comments are expressly permitted by Canon 3(A)(6).

Even apart from the textual permission provided by Canon 3(A)(6), the substance of the Court's comment provides no basis for recusal. None of the recusal cases cited by Palin concerned a statement to the media remotely akin to the Court's very brief comment on the Rule 50 procedure; each involved either multiple public statements or a lengthy televised interview, and each involved judicial comments about the merits of pending cases. See Mot. 35-36; Opp. 46-48.

"Of course, not every media comment made by a judge is necessarily grounds for recusal." Ligon v. City of N.Y., 736 F.3d 118, 126 (2d Cir. 2013). Palin's briefing articulates no reason why "under the

---

[4] The Bloomberg article included the following quote: "'I'm disappointed that the jurors even got these messages, if they did,' Rakoff said in an interview, referring to the news notifications. 'I continue to think it [the announcement of the intended Rule 50 decision while the jury was deliberating] was the right way to handle things.'" ECF 198-4 at 2.

circumstances taken as a whole, [the Court's] impartiality may reasonably be called into question" by an objective, disinterested observer fully informed of the facts, id., either considering just the comment to Bloomberg or Palin's whole list of supposed errors.

Since "the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited." In re Aguinda, 241 F.3d 194, 201 (2d Cir. 2001). It is hard to see how Palin's recusal motion is anything but frivolous, and it is hereby denied.

**B. New Trial**

Palin also seeks a new trial, relying on several supposed errors. Palin cites (1) the voir dire conducted during jury selection, which she argues was inadequate because the Court did not ask her counsel's proposed questions; (2) certain evidentiary rulings, including the Court's decisions to exclude certain articles published on the website of The Atlantic, evidence about Bennet's brother who serves in the U.S. Senate, and evidence about the Times's decision to eliminate the Public Editor position; (3) an allegedly inaccurate response to a jury question; and (4) the timing of the Court's announcement of its decision on the Rule 50 motion. In actuality, none of these was erroneous, let alone a basis for granting Palin a new trial.

Before discussing each of the items, it should be noted that three of Palin's four complaints about the trial -- the voir dire, the response to the jury's note, and the effect of the Rule 50 decision on continuing deliberations -- are irrelevant to the Court's decision

11

# SA 0146

to grant judgment to defendants as a matter of law, which supersedes the jury's verdict. Put another way, the Court's dispositive Rule 50 ruling ultimately rests on Palin's total failure to adduce affirmative evidence of actual malice, the core element of her libel claim, not any aspect of how the jury was selected, instructed, or managed. Nevertheless, the Court will address all four asserted grounds for Palin's motion under Rules 59 and 60 seeking a new trial.

## 1. Jury Selection

The purpose of conducting voir dire of prospective jurors during jury selection is to ensure that a fair and impartial jury is efficiently empaneled. Predictably, counsel seek through their own suggested questions to assemble a jury that they perceive to be most favorable to their client's cause, whether or not that assemblage is fair. See United States v. Lawes, 292 F.3d 123, 128 (2d Cir. 2002). There is nothing inherently wrong with this, but the "federal courts have successfully resisted ... attempts" to allow counsel to use "voir dire as an opportunity for advocacy" by repeatedly affirming that the "questioning of potential jurors on voir dire is ... quintessentially a matter for the discretion of trial courts." Id. see also, e.g., United States v. Kyles, 40 F.3d 519, 524 (2d Cir. 1994) (The law is clear that "a trial judge has broad discretion whether to pose a defendant's requested voir dire questions.").

As relevant here, a party is only entitled to a new trial because her proposed questions were not asked when she can show that either:

# SA 0147

(i) [the] voir dire [was] so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style; (ii) a failure to inquire about, or warn against, a systematic or pervasive bias, including one that may be short-lived but existent at the time of trial, in the community that would have been cured by asking a question posed by a party; or (iii) [the] record viewed in its entirety suggest[s] a substantial possibility that a jury misunderstood its duty to weigh certain evidence fairly that would have been clarified by asking a requested voir dire question.

Lawes, 292 F.3d at 129. Under this standard, Palin identifies no deficiency in the voir dire conducted for this trial.

In its questioning of the panelists, the Court identified the parties, witnesses, and other relevant people, noting that they were likely known to many, and repeatedly asked the prospective jurors whether there was any reason that they could not be fair and impartial if selected. See, e.g., Tr. 3-9, 21. In response, several prospective jurors indicated that they could not, and, after further questioning, the Court dismissed them for cause. The adequacy of this process is demonstrated by the fact that several prospective jurors identified themselves as predisposed against Palin and unable to fairly consider her claim, and they were dully excused by the Court. Palin's motion identifies no retained juror that she asserts should have been struck for cause.

Palin's principal complaint is that the Court did not ask where prospective jurors got their news, a question that was proposed by

# SA 0148

counsel for both sides.[5] See Mot. 10. "[B]ut federal trial judges are not required to ask every question that counsel -- even all counsel -- believes is appropriate." Lawes, 292 F.3d at 128. This case illustrates why: as explained on the record, the Court was concerned with preventing questions about prospective jurors' media habits from leading to the exclusion of educated jurors well equipped to interpret the evidence in this case. Palin's counsel has never meaningfully explained why this question was necessary, or even relevant. Indeed, one of the people ultimately empaneled disclosed that their partner had previously worked at "Fox News Channel," where Palin was a paid contributor. See Voir Dire Tr. 27-28. And considering the subject matter and personalities at issue in this case, the Court was equally concerned about not introducing any political charge to the proceedings. Creating a dynamic in which, for example, readers of the Times and viewers of Fox News were repeatedly struck before the other members of the venire would, in the Court's view, have cast an unacceptably partisan pall over the proceedings.

The Court accordingly reaffirms its confidence, both in the jury selection process that it has developed over more than 300 jury trials

---

[5] The motion suggests that questioning about news sources was required to "figure out whether jurors subscribed to the Times (and might be biased) or other news websites or apps through which they were or could be exposed to extra-judicial information about the case." Mot. 10. This is a red herring. If counsel were concerned at the outset about the jury's exposure to digital media, the appropriate response would have been to request further instructions on that issue. None was requested.

**SA 0149**

and in the fair and impartial jury selected for this trial. The Court also feels obliged to note, as it did repeatedly during trial and in the Rule 50 Opinion, that it was obvious to any observer that the jury actually selected in this case -- highly intelligent, attentive, diligent, and focused -- was a model jury in every respect.

### 2. Evidentiary Rulings

Palin also argues that the Court improperly excluded evidence by granting certain motions in limine filed by the Times. Specifically, Palin disputes the Court's exclusion of (1) certain articles about the Arizona shooting published on a blog hosted on the website of The Atlantic magazine while Bennet served as editor in chief of the magazine, (2) evidence concerning the Times's elimination of the Public Editor position, (3) an article about the media's inaccurate coverage of the Arizona shooting that was emailed to Bennet in 2011, and (4) evidence concerning Bennet's brother, who was elected as a Democrat to serve as U.S. senator from Colorado. Mot. 10-11. She further suggests that these evidentiary rulings somehow violated the Second Circuit's mandate from the motion to dismiss appeal. Neither contention has any merit.

The Court need not rehash the details of each of these four disputes. In accordance with its usual practice, the Court declined to rule on most of defendants' motions in limine before the trial, instead waiting to see how the evidence developed before making its determinations about relevance, foundation, and prejudice. Each of these issues was subject to written briefing and extensive oral

## SA 0150

argument. The record of those arguments already reflects why the Court determined that Palin had failed to establish an adequate foundation to justify admission of this evidence, see Fed. R. Evid. 104(b), particularly in light of the significant Rule 403 concerns about some proffered exhibits.

The Court's Rule 50 Opinion further amplified the Court's rulings on the two most significant rulings, concerning the Atlantic blog posts and the evidence regarding Bennet's brother. See Op. 53-54 nn. 31-32. And even after the Court excluded these disputed categories of evidence, the Court expressly noted that the rulings were subject to reconsideration. For example, despite the absence of an adequate foundation in the deposition excerpts proffered as support by plaintiff's counsel during argument, plaintiff's counsel was expressly offered the opportunity to conduct further voir dire of Bennet outside the presence of the jury to lay additional foundation for the introduction of the challenged evidence. See Tr. 508. But plaintiff's counsel chose not to avail themselves of this opportunity, see, e.g., Op. 53-54 n. 32, and her motion provides no reason to excuse that choice.

Palin also suggests (without supporting argument) that these evidentiary decisions were "in violation of the mandate" that the Second Circuit issued after reversing this Court's order granting defendants' motion to dismiss. Mot. 10. This contention is frivolous. The prior appeal in this case concerned only the allegations set forth in Palin's complaint and the procedures employed by the Court in

# SA 0151

assessing the plausibility of inferences drawn therefrom. See ECF 65. The Second Circuit made no evidentiary rulings (or even suggestions about admissibility), and it expressly disclaimed any view of the merits of Palin's claim. There is no colorable argument that the Second Circuit's prior mandate established any specific requirements for this Court's evidentiary rulings at trial.

For the foregoing reasons, the Court continues to believe the challenged evidentiary rulings were wholly correct. But, in any event, Palin's counsel, having declined the Court's invitation to try to lay the foundation that they had failed to establish during discovery, can hardly complain, let alone argue that these evidentiary rulings justify a new trial.

### 3. Jury Note

Palin disputes the Court's response to a question posed by the jury on the morning of February 15, 2022. The Court and the parties agreed that the jury's note contained two questions about the element of actual malice as to falsity: (i) whether the jury was permitted to draw an inference from Bennet's answer to a question posed by defense counsel and (ii) whether such an inference could contribute to the plaintiff's proof. Palin renews her objection to the Court's response to the second question, which read:

> In response to your second inquiry, an answer given by Mr. Bennet and a reasonable inference drawn therefrom is not sufficient in itself to carry the plaintiff's burden of showing by clear and convincing evidence that there was a high probability that Mr. Bennet actually doubted the truth of a challenged statement prior to publication, but it can contribute to the other evidence brought forth by the plaintiff.

17

Tr. 1323. Specifically, Palin argues that the jury should not have been told that an inference arising from Bennet's testimony was "not sufficient in itself to carry the plaintiff's burden." She concedes that this is a correct statement of the law insofar as it concerns a negative inference drawn from Bennet's testimony. See Op. 44-45; see also Anderson v. Liberty Lobby, 477 U.S. 242, 256 (1986). However, she now contends that the Court's response "ignore[es] that the jury question could have been about a direct inference or conclusion to be drawn from Bennet's testimony, or even an admission of actual knowledge of falsity." Mot. 19 n. 24.

There is nothing to support these contentions. As previously explained in the Opinion, Bennet offered no testimony from which the jury could properly draw a direct inference of actual malice, so the question must necessarily have concerned a negative inference. Nor did plaintiff's counsel -- either at the time of the jury note or in their instant motion -- identify any piece of Bennet's testimony from which the jury could have drawn a sufficient direct inference to justify a different instruction. In light of this trial record, her legal dispute is thus wholly academic.

Further still, plaintiff's counsel effectively waived this argument at trial. During the approximately half-hour colloquy through which the Court's response was crafted, the Court asked counsel for all parties whether they wanted to ask the jury "What question and answer are you referring to?" Tr. 1317. Plaintiff's counsel's definitive position was "we do not need to know the question and answer

they're referring to." Tr. 1319. Considering that the argument over the response to the jury's second question concerned the proper role of a negative inference from the defendant's testimony, if plaintiff's counsel believed there was a piece of Bennet's testimony from which a sufficient direct inference might be drawn, they should have accepted the Court's offer to inquire what piece of testimony the jury was asking about.

In any event, a new trial is "not require[d] ... if the instructions, read as a whole, presented the issues to the jury in a fair and evenhanded manner." Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 153 (2d Cir. 2014). As Palin concedes, the Court's response should be read together with Instructions No. 5 (circumstantial evidence) and No. 13 (actual malice), see ECF 170, which together clearly and accurately state the relevant legal standard. But Palin's further argument -- that the response was inconsistent with those instructions -- is wrong. As the Court explained during argument, the response addresses a specific wrinkle of defamation case law concerning the interaction between negative inferences about actual malice drawn from the defendant's testimony and the clear and convincing evidence standard that applies to the actual malice element. See Tr. 1322. The combination of the response to the jury's note read with Instructions No. 5 and 13 correctly states the law regarding the evidentiary basis from which the jury could find by clear and convincing evidence that defendants had published with actual malice.

### 4. Effect of the Rule 50 Decision

Finally, Palin argues that a new trial is warranted because, after the jury had rendered its verdict, a few of the jurors volunteered to the Court's law clerk that on February 14, 2022, while still deliberating, these few jurors had seen push notifications on their smartphones conveying the bottom line of the Court's intention to grant the Rule 50 motion, that is, to dismiss the case as a matter of law at the end of the case. Palin now suggests, without citing a scintilla of evidence, that the jurors must have "received push notifications throughout the trial, ... including articles with headlines that disparaged Plaintiff and her trial testimony." Mot. 21. But this gross and wholly unsupported speculation aside, there are at least four very strong, independent reasons why Palin cannot get a new trial because a few jurors saw a headline about the Court's legal ruling pop up on their phones.

First, and most obviously, if the Court's ruling dismissing the case as a matter of law under Rule 50 is correct, this entire controversy is an irrelevant side-show.

Second, even if the Court of Appeals were to reverse the Court's Rule 50 ruling and so had to consider whether to give effect to the jury's verdict, Palin has effectively waived the argument that the verdict is "tainted" by dropping the prong of her motion asking for permission to interview members of the jury. As the Court informed the parties in its order of February 15, 2022, the few jurors who volunteered to the Court's law clerk that they had seen push

# SA 0155

notifications of the Court's Rule 50 determination also volunteered, indeed were adamant, that this had not affected their verdict or deliberations in the slightest. <u>See</u> ECF 172. But since this was hearsay, plaintiff could have asked to interview the jurors themselves to get first-hand knowledge, and, indeed, plaintiff's counsel indicated that they intended to seek the Court's permission to interview the jurors so they could do just that. <u>See, e.g.</u>, ECF 195 ¶ 2.

Instead, plaintiff's counsel ultimately abandoned this request. While the plain inference is that they accepted as true what the jurors had told the law clerk, they try to justify their waiver by arguing that "Rule 606(b) prohibits the disclosure of the effect of anything on a juror's or another juror's vote." Mot. 24 (quoting <u>Bibbins v. Dalsheim</u>, 21 F.3d 13, 17 (2d Cir 1994)). This totally misstates the law. Rule 606(b) contains an express exception providing that a "juror may testify about whether ... extraneous prejudicial information was improperly brought to the jury's attention." Fed. R. Evid. 606(b)(2)(A). To be sure, <u>Bibbins</u> reaffirms the longstanding rule that "[e]ven when a juror attests to receiving information outside the record, the juror may not go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations." 21 F.3d at 17. But plaintiff's counsel could have sought interviews to determine precisely how many jurors saw push notifications about the Court's Rule 50 decision, whether any jurors were exposed to other media coverage of the trial, and, most important,

"the degree, if any, to which that information was actually discussed or considered" by the jury, United States v. Calbas, 821 F.2d 887, 896-97 (2d Cir. 1987). These facts might have been relevant to the "objective test" for determining if Palin suffered from any of the prejudice she hypothesizes. Bibbins, 21 F.3d at 17. One can only presume that counsel's preference to argue from innuendo rather than evidence reflects the strategic judgment that juror interviews would likely not have strengthened their hand.

Third, as noted in the Opinion, Palin did not preserve her objection to the Court's Rule 50 procedure.[6] Palin failed to object to the Court's stated intention to announce its Rule 50 decision but not to dismiss the jury, not only when the Court announced its decision but also at any of the earlier sessions of argument when the Court proposed this approach.[7] See Op. 35. And, in her motion, Palin cites no authority holding that the Court acted improperly, either by deciding the Rule 50 motion or by announcing that decision once it had

---

[6] Palin now also contends that she need not have objected to the Court's decision to announce the Rule 50 decision because "[t]his waiver position was rejected in the Mandate" from the prior Second Circuit appeal. Mot. 23. This is totally without basis. Yes, the Second Circuit excused Palin's counsel's failure to object to the Court's unconventional procedure to conduct a brief evidentiary hearing on the motion to dismiss. See ECF 65 at 12 n. 24. But that cannot reasonably be read to excuse counsel from the obligation to preserve any and all other objections during the entire rest of the litigation.

[7] Palin maintains that the Court preserved her procedural objection in a comment made after it announced the Rule 50 decision. See Mot. 23. But she provides no argument for why this is so, and the Opinion already explains why this position is manifestly incorrect. See Op. 36 n. 21.

# SA 0157

decided the issue but declining to then dismiss the jury.[8] Nor did Palin's counsel believe that any further instruction to the jury about avoiding media coverage after the Rule 50 decision was announced, though the Court nevertheless gave such an instruction at defendants' request. See Op. 36-37; Tr. 1307.

Fourth, the available information suggests that the jury did exactly as it was repeatedly instructed to do when it encountered coverage of the trial: turn away and focus on the evidence. "It is not an uncommon occurrence for a notorious trial held in Metropolitan New York to engender extensive publicity." United States v. Gaggi, 811 F.2d 47, 51 (2d Cir. 1987). Indeed, if the mere encountering during trial of media information about otherwise unknown events relevant to the trial were sufficient to taint a jury and require a new trial, our entire jury system would be cast in great jeopardy in any and every case that was the subject of significant media coverage.

Nor does Palin explain why there is a qualitative difference between exposure to media coverage in general and exposure to coverage that reflects the Court's view about legal issues in the case.[9] Jurors

---

[8] Indeed, the Court had employed a similar Rule 50 procedure at least once before, and that case was affirmed by the Second Circuit. See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 282 (2d Cir. 1998).

[9] Indeed, a jury often learns of a judge's view of a case when, for example, a judge appoints an expert witness and expressly informs the jury that it is a court-appointed witness, see Fed. R. Evid. 706(d); **Error! Main Document Only.**when the judge dismisses certain of the plaintiff's claims before the start of (or during) jury deliberations and tells the jury that the claims have been dismissed, see, e.g., Gonzalez v. United States, 1989 WL 124069 at *1 (E.D.N.Y.

# SA 0158

are not shy about furnishing their own opinions, nor easily cowed by contrary authority. Indeed, it was just such interference from judicial authority that led our Founding Fathers to enshrine the right to a jury in our Constitution. A new trial is thus only appropriate "if the juror's ability to perform her duty impartially has been adversely affected ... and [a party] has been substantially prejudiced as a result." United States v. Ganias, 755 F.3d 125, 132 (2d Cir. 2014), rev'd on other grounds on reh'g en banc, 824 F.3d 199 (2d Cir. 2016). In the Opinion, the Court discussed at length why it concluded that in this case the Court was "left with the definite conviction that the information did not remotely affect the ultimate verdict." Op. 66. The Court now reaffirms that conclusion.

In sum, Palin's arguments have established neither error nor prejudice, so they cannot justify granting a new trial. Accordingly, Palin's motion for a new trial is denied.

## C. Reconsideration of the Rule 50 Decision

Finally, Palin moves for reconsideration of the Court's decision to grant defendants' Rule 50 motion for judgment as a matter of law. Palin's motion discusses various pieces of evidence while making three basic arguments.

---

Oct. 6, 1989); or when, as used to be common and is still permitted, the judge marshals the evidence as part of its charge to the jury, see United States v. Mundy, 539 F.3d 154, 156-159 (2d Cir. 2008). **Error! Main Document Only.**Here, by contrast, the jury was expressly instructed that the Court's "rulings were no more than applications of the law" and that the Court had "no opinion as to the verdict you should render in this case." Tr. 1206.

# SA 0159

First, Palin contends that the Court misapplied the Rule 50 standard by disregarding certain evidence, drawing inferences unfavorable to her claim, and "adopt[ing] Bennet's testimony as true." Mot. 24. This is simply untrue. The Opinion already addressed the full evidentiary record, and none of the arguments in Palin's motion undermines the Court's prior conclusions. Palin wrongly contends that the Opinion improperly "credited" Bennet's testimony on issues such as whether he opened the ABC News hyperlink in Williamson's draft, whether he meant his email to Williamson asking her to "please take a look" as a request for her to fact check his draft, and whether it is true that in 2017 he did not recall any reporting about the police investigation of the 2011 Arizona shooting. Mot. 16, 27. But at trial Palin provided no concrete, let alone material, evidence undermining Bennet's testimony on these points, and she identifies no authority supporting the proposition that the Rule 50 standard requires the Court to disbelieve uncontested testimony.

The fundamental shortcoming in her trial presentation remains apparent: nowhere does the motion identify any piece of research actually considered during the drafting process by Bennet or any other member of his team that states a fact about the Arizona shooting that would have falsified the Challenged Statements' inference of a causal link between the Crosshairs Map and Loughner's murderous rampage. Nor does the motion identify any testimony or contemporaneous communication suggesting that any member of the team knew or suspected that the asserted link had been disproven. And since Palin adduced no

25

affirmative evidence on these points, her claim fails as a matter of law. See Anderson, 477 U.S. at 256; Contemp. Mission, Inc. v. New York Times Co., 842 F.2d 612, 621-622 (2d Cir. 1988); Op. 43-45.

Palin's second and third arguments are premised on fundamental misunderstandings about the relationship between a motion for judgment as a matter of law advanced at the close of the evidence and the conclusions drawn at earlier points in this litigation.

Palin's second argument is that the Court violated the Second Circuit's mandate from her appeal of the order grating defendants' motion to dismiss, because the Court's interpretation of certain evidence at trial differed from the Second Circuit's assessment of various allegations made in the complaint. But this argument is illogical. The prior appeal considered only the complaint and drew all plausible inferences in Palin's favor therefrom. That appeal never considered any evidentiary record in this case, nor assessed Palin's claims in any posture other than as a motion to dismiss. It is fundamental that a "district court d[oes] not violate the mandate rule by addressing on remand an issue that was not decided by [the Second Circuit] in the original appeal." Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 762 F.3d 165, 175 (2d Cir. 2014). And the Second Circuit has squarely rejected the contention that its review of a claim on a motion to dismiss constrains the district court's analysis after the record has been developed in discovery (let alone limited to the evidence adduced at trial). Brown v. City of Syracuse, 673 F.3d 141, 148 (2d Cir. 2012); see also id. ("There is no inconsistency

# SA 0161

between our statement of hypothetical circumstances in [the first appeal] about what could be possible based on the allegations in the complaint and the district court's subsequent determination of what [the plaintiff] would in fact be able to prove given the evidence and subsequently clarified state of the law.").

For instance, Palin argues that "the Opinion ... contradicts the Mandate ... by discounting the ABC News article hyperlink and rejecting Palin's argument that the presence of the hyperlink was circumstantial evidence of actual malice." Mot. 29. But what the Opinion actually holds is that the hyperlink to the ABC News article does not establish that Bennet published with actual malice since the uncontradicted testimony at trial was that he never clicked the link or read the article. Op. 49-50.[10] Palin suggests that the Opinion's reasoning was somehow foreclosed by the Second Circuit's holding that the Court erred by crediting Bennet's testimony at the 2017 plausibility hearing rather than drawing the inference most favorable to Palin from the complaint's allegations. ECF 65 at 18. But that was a procedural ruling that turned on pleading standards, not a substantive assessment of the ABC News article or the evidence concerning its use (or lack thereof)

---

[10] The Opinion further notes that even if Bennet had read the ABC News article, "it is not at all clear that it would establish that Bennet knew that there was no connection between the cross hairs map and Loughner's attack," since a "reasonable reader in Bennet's position would not necessarily understand the hedge contained in the tenth paragraph -- that within one day of the attack, no firm connection had yet been made been made between Loughner and the map -- as conclusive evidence that no such connection was later established by investigators." Op. 50 n. 28.

# SA 0162

by Bennet and the _Times_. The Opinion therefore could not have violated the mandate rule, regardless of how it interpreted the evidence on that point. The same error infects the other instances in which Palin's motion invokes the mandate rule.

Finally, Palin suggests that the Rule 50 decision was erroneous because the Opinion's conclusions regarding particular pieces of evidence differed in certain respects from conclusions the Court drew on summary judgment. Palin provides no authority for the proposition that the Court is somehow precluded by its prior denial of summary judgment. Indeed, the Second Circuit has squarely rejected this argument, affirming a district court's grant of a Rule 50 motion for defendants where "at an earlier stage of the case the court had denied a motion by defendants for summary judgment. The denial of summary judgment is an interlocutory decision. All interlocutory orders remain subject to modification or adjustment prior to the entry of a final judgment adjudicating the claims to which they pertain." _Williams v. Cnty. of Westchester_, 171 F.3d 98, 102 (2d Cir. 1999) (citing Fed. R. Civ. P. 54(b)). Furthermore, even leaving aside the interlocutory nature of summary judgment, it is unremarkable that the Court might reach different conclusions, even as to the same piece of evidence, on a Rule 50 motion. The standard remains the same -- the Court must view the record in the light most favorable to the non-movant -- but the object of analysis has changed. On a Rule 50 motion, the Court must assess each document or piece of testimony in the context of the trial record, which differs from the summary judgment record for many

reasons, including evidentiary rulings by the Court, the strategic choices of counsel, and differences between witnesses' trial and deposition testimony.

Since Palin has identified neither legal nor factual errors with the Opinion, her motion for reconsideration of the Court's Rule 50 decision is denied.

**III.  Conclusion**

The meritless accusations of impropriety in Palin's motion cannot substitute for what her trial presentation lacked: proof of actual malice. This requires, under both Supreme Court precedent and New York State statutory law, clear and convincing evidence that Bennet and the Times published "America's Lethal Politics" knowing that it was false or in reckless disregard of its falsity. See New York Times v. Sullivan, 376 U.S. 254, 280 (1964). And, as the Supreme Court has likewise held, this high standard cannot be satisfied simply by a negative inference drawn from discrediting Bennet's denials. See Anderson, 477 U.S. at 256. Here, Palin still cannot identify any affirmative evidence to support the essential element of actual malice. This absence is not a consequence of trial procedures, judicial bias, or adverse evidentiary rulings. It is, in the Court's view, a reflection of the facts of the case. To be sure, as the Court itself recognized even it is initial statement of its Rule 50 decision, the evidence showed that Bennet and the Times's Editorial Board made mistakes as they rushed to meet a print deadline, and that their editorial processes failed to catch those mistakes before publication.

See Tr. 1303-1304. But in a defamation case brought by a public figure like Sarah Palin, a mistake is not enough to win if it was not motivated by actual malice. And the striking thing about the trial here was that Palin, for all her earlier assertions, could not in the end introduce even a speck of such evidence.

Palin's motion is hereby denied in its entirety.

SO ORDERED.

New York, NY
May 31, 2022

JED S. RAKOFF, U.S.D.J.

**804**        **940 FEDERAL REPORTER, 3d SERIES**

implement a federal workers' compensation scheme the respect and deference it is entitled to, the consequences of the opinion will likely be that FECA -- Congress's choice of comprehensive workers' compensation -- will not be given that deference. We do not believe Congress intended such an outcome.

For these reasons, we dissent.



**Sarah PALIN, an individual,
Plaintiff-Appellant,**

**v.**

**The NEW YORK TIMES COMPANY,
Defendant-Appellee.**

**No. 17-3801-cv
August Term, 2018**

United States Court of Appeals,
Second Circuit.

Argued: September 21, 2018

Decided: August 6, 2019

Amended: October 15, 2019

**Background:** Politician brought defamation action under New York law against newspaper publisher, relating to editorial linking the shooting of a congresswoman to the circulation by politician's political action committee (PAC) of a map superimposing a crosshairs target over certain congressional districts. The United States District Court for the Southern District of New York, Jed S. Rakoff, Senior District Judge, 264 F.Supp.3d 527, granted publisher's motion to dismiss for failure to

state a claim, and denied reconsideration, 2017 WL 5514371. Politician appealed.

**Holdings:** The Court of Appeals, Walker, Senior Circuit Judge, held that:

(1) in absence of conversion to a summary judgment motion, district court could not rely on testimony from sua sponte evidentiary hearing concerning First Amendment's actual malice requirement for defamation liability to a public figure;

(2) politician plausibly alleged actual malice;

(3) politician plausibly alleged that challenged statements were "of and concerning" politician; and

(4) politician plausibly alleged that challenged statements in newspaper's editorial were reasonably capable of being proven false.

Vacated and remanded.

Opinion, 933 F.3d 160, superseded

**1. Federal Courts** &#8253;**3587(1), 3667**

The Court of Appeals reviews de novo a district court's grant of a motion to dismiss for failure to state a claim, construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor. Fed. R. Civ. P. 12(b)(6).

**2. Libel and Slander** &#8253;**1**

Under New York law, a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or per se actionability.

(which is true in numerous countries; for example, there are about nineteen posts in Mexico), the opinion would have the United States

operate different schemes and systems for foreign nationals employed in the <u>same</u> country, doing essentially the <u>same</u> job.

PALIN v. NEW YORK TIMES CO.     **805**
Cite as 940 F.3d 804 (2nd Cir. 2019)

**3. Constitutional Law ⟂2163**

Under the First Amendment, a public figure plaintiff must prove that an allegedly libelous statement was made with "actual malice," that is, made with knowledge that it was false or with reckless disregard of whether it was false or not. U.S. Const. Amend. 1.

> See publication Words and Phrases for other judicial constructions and definitions.

**4. Constitutional Law ⟂2163**

When the issue is actual malice in making a defamatory statement, as required under the First Amendment for liability for defamation of a public figure, the critical question is the state of mind of those responsible for the publication. U.S. Const. Amend. 1.

**5. Federal Civil Procedure ⟂673**

To satisfy notice pleading requirements, a complaint must contain enough facts to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 8, 12(b)(6).

**6. Federal Civil Procedure ⟂673**

A claim is plausible, as required for notice pleading requirements for stating a claim, when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 8, 12(b)(6).

**7. Federal Civil Procedure ⟂673**

A well-pleaded complaint, under notice pleading requirements for stating a claim, will include facts that raise a right to relief above the speculative level. Fed. R. Civ. P. 8, 12(b)(6).

**8. Federal Civil Procedure ⟂673**

The plausibility standard, under notice pleading requirements for stating a claim, is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Fed. R. Civ. P. 8, 12(b)(6).

**9. Federal Civil Procedure ⟂1825**

Federal civil procedure rule addressing the taking of testimony at trial has nothing to do with the proceedings at the motion-to-dismiss stage. Fed. R. Civ. P. 12(b, c, d), 43(c).

**10. Federal Civil Procedure ⟂1832, 2533.1**

In absence of conversion to a summary judgment motion, district court, on newspaper publisher's motion to dismiss for failure to state a claim in public figure's defamation action, could not rely on matters outside the pleadings by making inferences and credibility determinations based on testimony of author of allegedly defamatory editorial at evidentiary hearing convened sua sponte by the court, and then using those inferences and credibility determinations to find that the public figure failed to plausibly allege actual malice, as would be required under First Amendment for defamation liability to public figure. U.S. Const. Amend. 1; Fed. R. Civ. P. 12(b)(6), (d).

**11. Federal Civil Procedure ⟂1832, 2533.1**

A matter is deemed integral to the complaint, so that the matter can be considered by the court on a motion to dismiss for failure to state a claim, without converting the motion to a motion for summary judgment, when the complaint relies heavily upon the terms and effect of the matter. Fed. R. Civ. P. 12(b)(6), (d).

**12. Federal Civil Procedure ⟂1832, 2533.1**

Typically, a matter that is integral to the complaint, which can be considered by the court on a motion to dismiss for failure to state a claim, without converting the

motion to a motion for summary judgment, is a contract, agreement, or other document essential to the litigation.  Fed. R. Civ. P. 12(b)(6), (d).

**13. Federal Civil Procedure** ⟷**1832, 2533.1**

Testimony from author of allegedly defamatory newspaper editorial, elicited by district court at court-convened evidentiary hearing concerning First Amendment's actual malice requirement for defamation liability to a public figure, was not integral to plaintiff public figure's defamation complaint, as would allow consideration of matters outside the pleadings without converting newspaper publisher's motion to dismiss for failure to state a claim into a motion for summary judgment; public figure, in drafting her complaint, could not have heavily relied on author's testimony because she had no idea what he would say, and testimony revealed substantive information about author's motivations and the editorial drafting process, which information the public figure could not have known in advance of her pleadings.  U.S. Const. Amend. 1; Fed. R. Civ. P. 12(b)(6), (d).

**14. Federal Civil Procedure** ⟷**1832, 2533.1**

Newspaper publisher's motion to dismiss for failure to state a claim would not be deemed as having been converted to motion for summary judgment, which would have allowed district court to consider matters outside the pleadings in public figure's defamation action; district court, which acted sua sponte to convene an evidentiary hearing concerning First Amendment's actual malice requirement for defamation liability to a public figure, did not purport to have converted the motion, public figure had no prior notice that district court might resolve the motion to dismiss after the hearing and might treat the motion as a summary judgment mo-

tion, and district court had been explicit about treating the hearing only as a test of sufficiency of the pleadings.  U.S. Const. Amend. 1; Fed. R. Civ. P. 12(b)(6), (d).

**15. Libel and Slander** ⟷**51(5)**

Politician plausibly alleged, as required to state a claim, the actual malice of newspaper editorial's author, as required under First Amendment for newspaper publisher's defamation liability to a public figure, as to editorial linking the shooting of a congresswoman to the circulation by politician's political action committee (PAC) of a map superimposing a crosshairs target over certain congressional districts; politician's overarching theory was that author had a predetermined argument that he wanted to make based on author's personal connection to potential shooting of author's brother-Senator and personal bias against politician's pro-gun positions, and politician alleged that author, in his previous position as a magazine's editor-in-chief, reviewed, edited, and approved for publication numerous articles confirming that there was no link between PAC's crosshairs map and congresswoman's shooting.  U.S. Const. Amend. 1.

**16. Federal Civil Procedure** ⟷**1772**

On a motion to dismiss for failure to state a claim, it is not the district court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory; the test is whether the complaint is plausible, not whether it is less plausible than an alternative explanation.  Fed. R. Civ. P. 12(b)(6).

**17. Constitutional Law** ⟷**2163**

"Actual malice," which is required under the First Amendment for defamation liability to a public figure, does not mean maliciousness or ill will.  U.S. Const. Amend. 1.

See publication Words and Phrases for other judicial constructions and definitions.

**18. Libel and Slander ⟺21**

Politician plausibly alleged, as required to state a claim for defamation under New York law, that challenged statements in newspaper's editorial were "of and concerning" politician, as to editorial linking the shooting of a congresswoman to the circulation by politician's political action committee (PAC) of a map superimposing a crosshairs target over certain congressional districts; while the PAC was a creature of federal law that was distinct from the politician, the politician plausibly alleged that a reader would identify her as the subject of the challenged statements.

**19. Libel and Slander ⟺6(1)**

Politician plausibly alleged, as required to state a claim for defamation under New York law, that challenged statements in newspaper's editorial were reasonably capable of being proven false, as to editorial linking the shooting of a congresswoman to the circulation by politician's political action committee (PAC) of a map superimposing a crosshairs target over certain congressional districts; a reasonable reader could view the challenged statements as factual, and the social media backlash that precipitated newspaper's correction further suggested that readers perceived the allegedly false statements as fact-based.

**20. Constitutional Law ⟺1490**

First Amendment protections are essential to provide breathing space for freedom of expression. U.S. Const. Amend. 1.

———————

Appeal from the United States District Court for the Southern District of New York. No. 17-cv-04853 – Jed S. Rakoff, *Judge*.

Elizabeth M. Locke, Clare Locke LLP, Alexandria, VA (Thomas A. Clare, Joseph R. Oliveri, Clare Locke LLP, Alexandria, VA; Kenneth G. Turkel, Shane B. Vogt, Bajo Cuva Cohen Turkel P.A., Tampa, FL; S. Preston Ricardo, Golenbock Eiseman Assor Bell & Peskoe LLP, New York, NY, on the brief), for Plaintiff-Appellant.

Lee Levine, Ballard Spahr LLP, Washington, DC (Jay Ward Brown, Ballard Spahr LLP, Washington, D.C.; David A. Schultz, Ballard Spahr LLP, New York, NY; David E. McCraw, The New York Times, New York, NY, on the brief), for Defendant-Appellee.

Before: WALKER and CHIN, Circuit Judges, and KEENAN.*

JOHN M. WALKER, JR., Circuit Judge:

This case is ultimately about the First Amendment, but the subject matter implicated in this appeal is far less dramatic: rules of procedure and pleading standards. Sarah Palin appeals the dismissal of her defamation complaint against *The New York Times* ("the Times") for failure to state a claim. The district court (Rakoff, *J.*), uncertain as to whether Palin's complaint plausibly alleged all of the required elements of her defamation claim, held an evidentiary hearing to test the sufficiency of Palin's pleadings. Following the hearing, and without converting the proceeding to one for summary judgment, the district court relied on evidence adduced at that hearing to dismiss Palin's complaint under Federal Rule of Civil Procedure 12(b)(6). We find that the district court erred in relying on facts outside the pleadings to dismiss the complaint. We further conclude that Palin's Proposed Amended Complaint

———————

* Judge John F. Keenan, of the United States District Court for the Southern District of     New York, sitting by designation.

plausibly states a claim for defamation and may proceed to full discovery.

We therefore VACATE and REMAND for proceedings consistent with this opinion.

## BACKGROUND

On January 8, 2011, Jared Loughner opened fire at a political rally for Democratic Congresswoman Gabrielle Giffords in Tucson, Arizona ("the Loughner shooting"), killing six people and injuring thirteen others. Representative Giffords was seriously wounded in the attack.

Shortly before the tragic attack, Sarah Palin's political action committee ("SarahPAC") had circulated a map that superimposed the image of a crosshairs target over certain Democratic congressional districts (evoking, in the view of many, images of violence). Giffords' district was among those targeted by the SarahPAC crosshairs map. The image had been publicized during the earlier political controversy surrounding the Affordable Care Act, but in the wake of the Loughner shooting, some speculated that the shooting was connected to the crosshairs map. No evidence ever emerged to establish that link; in fact, the criminal investigation of Loughner indicated that his animosity toward Representative Giffords had arisen before SarahPAC published the map.

Six years later, on June 14, 2017, another political shooting occurred when James Hodgkinson opened fire in Alexandria, Virginia at a practice for a congressional baseball game. He seriously injured four people, including Republican Congressman

Steve Scalise ("the Hodgkinson shooting"). That same evening, the Times, under the Editorial Board's byline, published an editorial entitled "America's Lethal Politics" ("the editorial") in response to the shooting.

The editorial argued that these two political shootings evidenced the "vicious" nature of American politics.[1] Reflecting on the Loughner shooting and the SarahPAC crosshairs map, the editorial claimed that the "link to political incitement was clear," and noted that Palin's political action committee had "circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs," suggesting that the congressmembers themselves had been pictured on the map.[2] In the next paragraph, the editorial referenced the Hodgkinson shooting that had happened that day: "Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right."[3]

The Times faced an immediate backlash for publishing the editorial. Within a day, it had changed the editorial and issued a correction. The Times removed the two phrases suggesting a link between Palin and the Loughner shooting. Added to the editorial was a correction that read: "An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established."[4] The Times also clarified that the SarahPAC map had overlaid crosshairs on Democratic congression-

---

**1.** App'x 37.

**2.** App'x 36–37. The crosshairs were put on a map over the locations of the congressional districts, and the names of the congressmembers in question—including Representative

Giffords—were listed at the bottom of the page.

**3.** App'x 41.

**4.** App'x 22.

al districts, not the representatives themselves.

Twelve days after the editorial was published Palin sued the Times in federal court. She alleged one count of defamation under New York law. Thereafter, the Times moved to dismiss Palin's complaint for failure to state a claim.

After the motion to dismiss had been fully briefed, the case took an unusual procedural turn: the district judge held an evidentiary hearing on the motion to dismiss. The district judge stated that the hearing was to assess the plausibility of the "[o]ne close question" presented by the Times' motion to dismiss: whether Palin had sufficiently pled the actual malice element of her defamation claim.[5]

The district judge ordered the Times to identify the author of the editorial and the Times produced James Bennet, the editorial page editor at the Times and the author of the editorial, to testify at the hearing. Bennet was the hearing's only witness. Bennet explained at the hearing that his reference to Palin in the editorial was intended to make a rhetorical point about the present atmosphere of political anger. He also recounted the editorial's research and publication process and answered inquiries about his prior knowledge of the Loughner shooting six years earlier and any connection to Palin. Bennet testified that he was unaware of any of the earlier articles published by the Times, or by *The Atlantic* (where he had previously been the editor-in-chief), that indicated that no connection between Palin or her political action committee and Loughner had ever been established. In addition to answering questions from the Times' counsel, Bennet responded to questions by Palin's counsel and the district judge. Neither party objected to the district judge's decision to hold the hearing.

On August 29, 2017, the district court, relying on evidence adduced at the hearing, granted the Times' motion to dismiss. The district court determined that any amendment would be futile and dismissed Palin's complaint with prejudice. Later, Palin asked the district court to reconsider its decision that the dismissal was with prejudice and included a Proposed Amended Complaint with her motion. The district court denied the motion for reconsideration and leave to replead. She now appeals.

## DISCUSSION

[1]  We review a district court's grant of a motion to dismiss the complaint on the pleadings de novo and "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."[6]

[2, 3]  Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability.[7] In addition, "a public figure plaintiff must prove that an allegedly libelous statement was made with actual malice, that is, made 'with knowledge that it was false or with reckless disregard of whether it was false or not.' "[8] It is undisputed that Palin, a

---

5.  Order re: Motion to Dismiss, ECF No. 35.

6.  *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (internal quotation marks omitted).

7.  *See Celle v. Filipino Reporter Enterps. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) (citations omitted).

8.  *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173–74 (2d Cir. 2001) (quoting *New*

former governor of Alaska and Republican candidate for Vice President in 2008, is a public figure.

[4]   When actual malice in making a defamatory statement is at issue, the critical question is the state of mind of those responsible for the publication.[9] Because the Times identified Bennet as the author of the editorial, it was his state of mind that was relevant to the actual malice determination. We will first address the district court's use of the hearing in the process of deciding the motion to dismiss and then determine whether Palin's Proposed Amended Complaint plausibly states a claim for defamation.

## I. The Hearing

[5–8]   The pleading standards articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) are well-known: in order to satisfy Federal Rule of Civil Procedure 8, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."[10] A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[11] A well-pleaded complaint will include facts that "raise a right to relief above the speculative level."[12] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully."[13]

On appeal, Palin argues that the district court's reliance on the hearing to decide the motion to dismiss offends the Federal Rules of Civil Procedure. We agree that the hearing runs headlong into the federal rules.

[9, 10]   When presented with the Times' Rule 12(b)(6) motion to dismiss for failure to state a claim, the district court relied on Rule 43(c) to convene the hearing at which Bennet testified. The district court's invocation of Rule 43(c), which addresses taking testimony at trial, was misplaced: that rule has nothing to do with the proceedings at the motion-to-dismiss stage. Following the hearing, the district court granted the Times' motion to dismiss, finding that Palin failed to plausibly allege actual malice. This conclusion rested on inferences drawn from Bennet's testimony at the plausibility hearing.

Rule 12(d) provides: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Rule 12(d), therefore, presents district courts with only two options: (1) "the court may exclude the additional material and decide the motion on the complaint alone" or (2) "it may convert the motion to one for summary judgment under Fed. R. Civ.

---

*York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

**9.**   *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) ("[T]he plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." (citing *New York Times*, 376 U.S. at 287, 84 S.Ct. 710)).

**10.**   *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

**11.**   *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

**12.**   *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

**13.**   *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

PALIN v. NEW YORK TIMES CO.                    **811**
Cite as 940 F.3d 804 (2nd Cir. 2019)

P. 56 and afford all parties the opportunity to present supporting material."[14]

The district judge took neither permissible route under Rule 12(d). The judge both relied on matters outside the pleadings to decide the motion to dismiss and did not convert the motion into one for summary judgment. To the contrary, his aim was explicit: to determine whether Palin's complaint stated a plausible claim for relief under Rule 12(b)(6). The district judge explained that "[b]y requiring district courts to make plausibility determinations based on the pleadings, the Supreme Court has, in effect, made district courts gatekeepers."[15]

In an effort to salvage the propriety of the district court's decision, the Times argues that the district court complied with Rule 12(d) because it did not rely on matters outside the pleadings.[16] The Times argues that Bennet's testimony was not outside the pleadings because it presented material integral to the complaint by merely adding depth to what was apparent from the face of Palin's complaint. But the material that came to light at the hearing did considerably more than elaborate on the allegations in the complaint.

[11–13] A matter is deemed "integral" to the complaint when the complaint "relies heavily upon its terms and effect."[17] Typically, an integral matter is a contract, agreement, or other document essential to the litigation.[18] Hearing testimony elicited by the trial judge after litigation has already begun is not the type of material that ordinarily has the potential to be a matter "integral" to a plaintiff's complaint. Regardless, Palin could not have "relie[d] heavily"[19] on Bennet's testimony when drafting her complaint because she had no idea what Bennet would say. Bennet's testimony revealed substantive information about his motivations and the editorial drafting process—none of which Palin could have known in advance of her pleadings, much less "relie[d] heavily" on.[20]

The Times falls back on the argument that, even if the district court relied on matters outside the pleadings, we may treat the motion *as if* it had been converted to a motion for summary judgment. We have held that the "conversion of a Rule 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form"[21] and that "[t]he

**14.** *Kopec v. Coughlin*, 922 F.2d 152, 154 (2d Cir. 1991) (quoting *Fonte v. Bd. of Managers of Continental Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988)).

**15.** *Palin v. New York Times Co.*, 264 F. Supp. 3d 527, 530 n.1 (S.D.N.Y. 2017) (citing *Iqbal*, 556 U.S. at 662, 129 S.Ct. 1937; *Twombly*, 550 U.S. at 554, 127 S.Ct. 1955) (internal citations omitted).

**16.** *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153–54 (2d Cir. 2002) (holding that extraneous material is not "outside the pleadings" when the material is integral to complaint and relied upon by the plaintiff in framing the complaint).

**17.** *Id.* at 153 (internal quotation marks omitted).

**18.** *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006)

("In most instances . . . the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls . . . ."); *see also Nicoisa v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2d Cir. 2016) (an "order page" and "conditions of use" agreement were integral to the complaint when the complaint contained numerous references to them).

**19.** *Chambers*, 282 F.3d at 153 (internal quotation marks omitted).

**20.** *Id.*

**21.** *In re G & A Books*, 770 F.2d 288, 295 (2d Cir. 1985).

**812**                       **940 FEDERAL REPORTER, 3d SERIES**

essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment."[22]

[14] We decline to treat the Rule 12(b)(6) motion here as having been converted to one for summary judgment. Apart from the fact that the able and highly experienced district judge did not purport to convert the motion, Palin had no prior notice that the district court might resolve the Times' Rule 12(b)(6) motion after the judge's sua sponte hearing, much less that he might treat the motion as one for summary judgment. Indeed, the district court was explicit about treating the motion only as a test of the sufficiency of the pleadings. The Times relies on cases where the plaintiff had adequate notice and the district court simply neglected to properly convert the motion.[23] This is not a situation in which where the plaintiff ought to have seen a summary-judgment decision coming.[24]

Even if the plaintiff had been given notice and the court had explicitly converted the motion to one for summary judgment, we would still have to vacate because the district court's opinion relied on credibility determinations not permissible at any stage before trial.[25] As we will discuss in

the next section, the district court's acceptance of Bennet's testimony as credible was what led it to grant the Times' motion to dismiss.

The Times also argues that Palin was not deprived of a meaningful opportunity to conduct discovery "pertinent to the motion."[26] Presumably, the Times is referring to "discovery" on the spot: Bennet's testimony and some related documents. Even assuming that the hearing afforded Palin all of the discovery to which she was entitled, this fact does not mitigate the errors committed by the district court.

It is clear to us that the district court viewed the hearing as a way to more expeditiously decide whether Palin had a viable way to establish actual malice. But, despite the flexibility that is accorded district courts to streamline proceedings and manage their calendars, district courts are not free to bypass rules of procedure that are carefully calibrated to ensure fair process to both sides. The procedural path followed by the district court conforms to neither of the two options permitted by Rule 12(d). While we are cognizant of the difficult determinations that *Twombly* and *Iqbal* often place on district courts, the district court's gatekeeping procedures

---

**22.** *Id.*; *see also Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 592 (2d Cir. 1993).

**23.** *See G & A Books*, 770 F.2d at 295; *Northville Downs v. Granholm*, 622 F.3d 579, 585–86 (6th Cir. 2010).

**24.** In fact, the hearing transcript reflects the understandable confusion of Palin's counsel. App'x 395–97 (The Court: "Neither side raised any objection to my holding [the evidentiary] hearing . . . Counsel: . . . It wasn't a normal kind of hearing during a 12(b)(6) . . . . And to be honest, Judge, we really wouldn't have tendered an objection because we were trying to get a better understanding of kind of what the inquiry was . . . .").

**25.** *See Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (noting that at the summary judgment stage "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))).

**26.** Fed. R. Civ. P. 12(d); *see United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 n.13 (2d Cir. 2017) (noting the district court's "broad discretion to limit discovery in a prudential and proportionate way" (internal quotation marks omitted)).

must nevertheless comply with the Federal Rules of Civil Procedure.

## II. Palin's Proposed Amended Complaint

Having determined that the district court erred in relying on evidence that came to light in the plausibility hearing when it granted the Times' motion to dismiss, we must ascertain what effect, if any, that error had on the dismissal of Palin's defamation complaint. To do so, we will review Palin's Proposed Amendment Complaint ("the PAC") to determine whether she stated a plausible claim for defamation. Because of the district court's decision to hold the plausibility hearing, this case comes to us in unique form. After the district court dismissed her claim with prejudice, Palin attached a PAC to her motion for reconsideration of the "with prejudice" part of the dismissal. The PAC included certain material added by the hearing and we discern no fault here because Bennet's testimony, reliable or not, was now part of the record. The district court denied the motion for reconsideration, finding that leave to replead would be futile and that the PAC suffered the same "fatal flaws" as the original complaint.[27] Our review of the grant of a motion to dismiss is de novo;[28] therefore we now turn to whether the PAC states a plausible claim for relief. We conclude that it does.

In the Times' view, the district court correctly determined that Palin's original complaint and the PAC both gave rise to only one plausible conclusion: that Bennet made an unintended mistake by including the erroneous facts about Palin. We disagree.

[15] In both the original complaint and the PAC, Palin's overarching theory of actual malice is that Bennet had a "predetermined" argument he wanted to make in the editorial.[29] Bennet's fixation on this set goal, the claim goes, led him to publish a statement about Palin that he either knew to be false, or at least was reckless as to whether it was false. The PAC contains allegations that paint a plausible picture of this actual-malice scenario in three respects: (1) Bennet's background as an editor and political advocate provided sufficient evidence to permit a jury to find that he published the editorial with deliberate or reckless disregard for its truth, (2) the drafting and editorial process also permitted an inference of deliberate or reckless falsification, and (3) the Times' subsequent correction to the editorial did not undermine the plausibility of that inference.

*First*, Palin alleges that, because of the editorial positions Bennet held at *The Atlantic* and *The New York Times*, a jury could plausibly find that Bennet knew before publishing the editorial that it was false to claim that Palin or her political action committee were connected to the Loughner shooting.

The PAC alleges that, from 2006 to 2016, Bennet was the editor-in-chief of *The Atlantic*, where "he was responsible for the content of, reviewed, edited and approved the publication of numerous articles confirming there was no link between Mrs. Palin and Loughner's shooting."[30] The complaint references several articles about the Loughner shooting published by *The Atlantic* during Bennet's tenure, the most notable of which is entitled *"Ten Days That Defined 2011."* The part of that article discussing the Loughner shooting

---

27. Memorandum and Order denying Motion for Reconsideration, ECF No. 61.

28. *Elias,* 872 F.3d at 104.

29. App'x 472.

30. App'x 481.

reads: "... the bad thing to come out of this already terrible story was a round of blame hurling, with people rushing to point at Sarah Palin's infamous target map .... In truth, Loughner is clinically insane and this was not really about politics at all."[31]

At the hearing, Bennet stated that he could not recall reading those articles, and even if he had read them, he did not have them in mind when he published the editorial. The district court, in rejecting Palin's theory as implausible, credited this testimony as truthful when it found that Bennet's failure to read the articles was simply a research failure that did not rise to the level of actual malice.

By crediting Bennet's testimony, the district court rejected a permissible inference from the articles: that one who had risen to editor-in-chief at *The Atlantic* knew their content and thus that there was no connection between Palin and the Loughner shooting. That Palin's complaint sufficiently alleges that Bennet's opportunity to know the journalistic consensus that the connection was lacking gives rise to the inference that he actually did know.

The PAC also includes allegations suggesting that Bennet in particular was more likely than the average editor-in-chief to know the truth about the Loughner shooting because he had reason to be personally hostile toward Palin, her political party, and her pro-gun stance. Bennet's brother, a Democrat, had served as a United States Senator for Colorado since 2009. In 2010, Senator Bennet was endorsed by two

House members whose districts had been targeted by the SarahPAC map. Two days before the Loughner shooting, a man threatened to open fire on Senator Bennet's offices, and thereafter both Bennet brothers became "outspoken advocate[s] for gun control."[32] Also, during the 2016 election, Palin endorsed Senator Bennet's opponent and Representative Giffords endorsed Senator Bennet.

The district court gave no weight to these allegations, finding that political opposition did not rise to the level of actual malice. We agree with the district court that political opposition alone does not constitute actual malice, but we conclude that these allegations could indicate more than sheer political bias—they arguably show that Bennet had a personal connection to a potential shooting that animated his hostility to pro-gun positions at the time of the Loughner shooting in 2011.[33] Palin's allegations are relevant to the credibility of Bennet's testimony that he was unaware of facts published on his watch relating to the Loughner shooting and that he made a mistake when he connected Palin to the that shooting. Palin's allegations present a plausible inference that Bennet's claim of memory loss is untrue.

At a minimum, these allegations give rise to a plausible inference that Bennet was recklessly disregarding the truth when he published the editorial without reacquainting himself with the contrary articles published in *The Atlantic* six years earlier.[34] And that plausible inference of

---

**31.** Richard Lawson, *Ten Days That Defined 2011*, The Atlantic, Dec. 29, 2011.

**32.** App'x 480.

**33.** *Cf. Jankovic v. Int'l Crisis Grp.,* 822 F.3d 576, 590 (D.C. Cir. 2016) ("[A] newspaper's motive in publishing a story ... cannot provide a sufficient basis for finding actual malice." (quoting *Harte-Hanks Commc'ns, Inc. v.*

*Connaughton,* 491 U.S. 657, 665, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989))).

**34.** *See Behar,* 238 F.3d at 173–74 (actual malice satisfied upon a showing the statement was made "with reckless disregard of whether it was false or not" (internal quotation marks omitted)).

## PALIN v. NEW YORK TIMES CO. 815
Cite as 940 F.3d 804 (2nd Cir. 2019)

reckless disregard is strengthened when added to Palin's allegations that Bennet had reason to be personally biased against Palin and pro-gun positions in general. When properly viewed in the plaintiff's favor, a reasonable factfinder could conclude this amounted to more than a mistake due to a research failure.

**Second**, the PAC also alleges that certain aspects of the drafting and publication process of the editorial at *The New York Times* permits an inference of actual malice. Elizabeth Williamson, the editorial writer who drafted the initial version of the editorial, had hyperlinked in her draft an article entitled "*Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate.*" The article stated, contrary to the claim in the published editorial, that "[n]o connection" was made between the Sarah-PAC map and Loughner.[35] The link was also included in the final version of the editorial, a version that Bennet essentially rewrote. The Times argues that the hyperlink shows the absence of malice. But the PAC alleges that, by including a hyperlink that contradicted the argument of his editorial, Bennet "willfully disregarded the truth."[36]

The district court, siding with the Times, concluded that including the hyperlinked article was further evidence of simple mistake. After crediting Bennet's testimony that he did not read the hyperlinked article, the district judge concluded that a mistake was the only plausible explanation. But the inclusion of the hyperlinked article gives rise to more than one plausible inference, and any inference to be drawn from the inclusion of the hyperlinked article was for the jury—not the court.

**35.** App'x 642–43.

**36.** App'x 494.

**37.** *Palin,* 264 F. Supp. 3d at 537 (emphasis added).

**Third**, the district court concluded that the correction swiftly issued by the Times again demonstrated that the only plausible explanation for the erroneous statements was a mistake. Yet, it is also plausible that the correction was issued after a calculus that standing by the editorial was not worth the cost of the public backlash. Bennet could have published the editorial knowing—or recklessly disregarding—the falsity of the claim, and then decided later that the false allegation was not worth defending.

At bottom, it is plain from the record that the district court found Bennet a credible witness, and that the district court's crediting his testimony impermissibly anchored the district court's own negative view of the plausibility of Palin's allegations.

**[16, 17]** The district court at one point stated that Bennet's "behavior is much *more plausibly* consistent with making an unintended mistake and then correcting it than with acting with actual malice."[37] Perhaps so, but it is not the district court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory. The test is whether the complaint is plausible, not whether it is less plausible than an alternative explanation.[38] The jury may ultimately agree with the district court's conclusion that Bennet was credible—but it is the jury that must decide. Therefore, at the pleading stage, we are satisfied that Palin has met her burden to plead facts giving rise to the plausible inference that Bennet published the allegedly defamatory editorial with actual mal-

**38.** *See Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 ("The plausibility standard is not akin to a probability requirement . . . .") (internal quotation marks omitted).

**816**          940 FEDERAL REPORTER, 3d SERIES

ice. We emphasize that actual malice does not mean maliciousness or ill will; it simply means the statement was "made with knowledge that it was false or with reckless disregard of whether it was false or not."[39] Here, given the facts alleged, the assertion that Bennet knew the statement was false, or acted with reckless disregard as to whether the statement was false, is plausible.

The Times also argues that Palin failed to plausibly allege two other elements of a defamation claim: (1) that the editorial is not "of and concerning"[40] Palin and (2) the challenged statements cannot reasonably be understood as assertions of provably false fact. The district court considered and rejected both of these arguments, and we agree.

**[18]** First, Palin has plausibly alleged that the challenged statements are "of and concerning" her.[41] The Times argues that SarahPAC, as a political action committee, is a creature of federal law and entirely distinct from Palin herself. At the pleading stage, however, the bar to satisfy this element is low. As we held in *Elias*, the plaintiff "need only plead sufficient facts to make it plausible—not probable or even reasonably likely—that a reader familiar with [the plaintiff] would identify [the

plaintiff] as the subject of the statements at issue."[42]

Palin's allegations are more than sufficient to plausibly allege that the challenged statements were "of and concerning" her. The editorial refers to Palin specifically—"Sarah Palin's political action committee."[43] The legal designation of a political action committee under federal law notwithstanding, Palin has plausibly pleaded that a reader would identify her as the subject of the statements. The Times' arguments to the contrary are unpersuasive.

**[19]** Second, the Times argues that we can also affirm the district court because the challenged statements are not reasonably capable of being proven false.[44] The Times claims that Loughner's motivations are ultimately unknowable and speculative. This objection also goes nowhere. We agree with the district court that a reasonable reader could view the challenged statements as factual, namely that Palin, through her political action committee, was directly linked to the Loughner shooting. The social media backlash that precipitated the correction further suggests that the Times' readers perceived the false statements as fact-based.

**[20]** We conclude by recognizing that First Amendment protections are essential

---

**39.**   *Behar,* 238 F.3d at 174 (internal quotation marks omitted); *see id.* ("The reckless conduct needed to show actual malice is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing, but by whether there is sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." (internal quotation marks and citation omitted)).

**40.**   *See Elias,* 872 F.3d at 104.

**41.**   *Id.* ("[A] defamation plaintiff must allege that the purportedly defamatory statement

was of and concerning him or her . . . ." (internal quotation marks omitted)).

**42.**   *Id.* at 105 (citing *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937).

**43.**   App'x 37.

**44.**   *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19–20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *see also Celle,* 209 F.3d at 178 (noting that under New York law differentiating opinion from actionable fact involves "a determination of whether the statement is capable of being objectively characterized as true or false" (internal quotation marks omitted)).

to provide "breathing space" for freedom of expression.[45] But, at this stage, our concern is with how district courts evaluate pleadings. Nothing in this opinion should therefore be construed to cast doubt on the First Amendment's crucial constitutional protections. Indeed, this protection is precisely why Palin's evidentiary burden at trial—to show by clear and convincing evidence that Bennet acted with actual malice—is high. At the pleading stage, however, Palin's only obstacle is the plausibility standard of *Twombly* and *Iqbal*. She has cleared that hurdle.

Naturally, we take no position on the merits of Palin's claim.

## CONCLUSION

For the reasons stated above, we VACATE and REMAND the judgment of the district court for further proceedings consistent with this opinion.



**UNITED STATES of America,**
**Appellant,**

**v.**

**Janine Plaza PIERCE, Defendant -**
**Appellee.[1]**

**Docket No. 16-3030-cr**
**August Term 2019**

United States Court of Appeals,
Second Circuit.

Argued: August 21, 2019

Decided: October 10, 2019

**Background:** After jury convicted defendant of conspiracy to possess with intent to distribute, and conspiracy to distribute, four types of narcotics, the United States District Court for the Western District of New York, Frank P. Geraci, Chief Judge, set aside the verdict, for which check marks in verdict sheet had been placed next to "guilty" in eight places, as being inconsistent with jury's findings in verdict sheet's interrogatories concerning weight of narcotics, i.e., eight check marks were placed next to "not proven" with respect to conspiracy to possess with intent to distribute each one of the four types of narcotics and conspiracy to distribute each one of the four types of narcotics, with no check marks for options concerning weights. Government appealed.

**Holdings:** The Court of Appeals, Newman, Senior Circuit Judge, held that inconsistency in verdict warranted judgment of acquittal.

Affirmed.

**1. Criminal Law** ⚖1139

The Court of Appeals reviews a district court's grant of a motion for a judgment of acquittal de novo.

**2. Criminal Law** ⚖1139

Legal issue of whether the inconsistency in the jury's verdicts required a judgment of acquittal would be reviewed de novo.

**3. Criminal Law** ⚖870

Although special interrogatories are generally disfavored in criminal cases, in some situations they are recommended.

**4. Federal Civil Procedure** ⚖2242

In the civil context, where a verdict is rendered inconsistent by the jury's special

---

**45.** *New York Times,* 376 U.S. at 271–72, 84 S.Ct. 710.

**1.** The Clerk is requested to amend the official caption as above.

SA 0179

McKinney's Consolidated Laws of New York Annotated
    Civil Rights Law (Refs & Annos)
        Chapter 6. Of the Consolidated Laws
            Article 7. Miscellaneous Rights and Immunities

McKinney's Civil Rights Law § 76-a

§ 76-a. Actions involving public petition and participation; when actual malice to be proven

Effective: November 10, 2020

Currentness

1. For purposes of this section:

(a) An "action involving public petition and participation" is a claim based upon:

(1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or

(2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

(b) "Claim" includes any lawsuit, cause of action, cross-claim, counterclaim, or other judicial pleading or filing requesting relief.

(c) "Communication" shall mean any statement, claim, allegation in a proceeding, decision, protest, writing, argument, contention or other expression.

(d) "Public interest" shall be construed broadly, and shall mean any subject other than a purely private matter.

2. In an action involving public petition and participation, damages may only be recovered if the plaintiff, in addition to all other necessary elements, shall have established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue.

3. Nothing in this section shall be construed to limit any constitutional, statutory or common law protections of defendants to actions involving public petition and participation.

**Credits**
(Added L.1992, c. 767, § 3, eff. Jan. 1, 1993. Amended L.2020, c. 250, § 2, eff. Nov. 10, 2020.)

SA 0180

Notes of Decisions (57)

McKinney's Civil Rights Law § 76-a, NY CIV RTS § 76-a

Current through L.2021, chapters 1 to 833 and L.2022, chapters 1 to 12. Some statute sections may be more current, see credits for details.

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   2