# No. 22-558

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

SARAH PALIN, an individual

*Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY, a New York
corporation, and JAMES BENNET, an individual

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Southern District of New York
(Case No. 1:17-cv-04853-JSR, Hon. Jed S. Rakoff)**

**JOINT APPENDIX**

**VOLUME I OF XI (Pages JA1 to JA214)**

Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  813- 834-9191
Fax:  813-443-2193

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY  10017
Tel: 212-907-7300  Fax: 212-754-0330

*Counsel for Plaintiff-Appellant Sarah Palin*

**JOINT APPENDIX**

**TABLE OF CONTENTS**

Page

**Volume I of XI**

*Palin v. New York Times Co*., 940 F. 3d 804 (2nd Cir. 2019) ............................JA01

Civil Docket – *Palin v. New York Times Co*., Case No. 1:17-cv-04853-JSR   .........................................................................................JA15

DOC 171 - Final Judgment-*Palin v. New York Times Co*., Case No. 1:17-cv-04853-JSR, February 15, 2022 .........................................................JA46

DOC 173 - Verdict Form- *Palin v. New York Times Co*., Case No. 1:17-cv-04853-JSR, February 15, 2022 .........................................................JA47

Hearing Transcript, January 24, 2022 ...............................................JA48

Trial Transcript, February 3, 2022 – Argument regarding Motions in Limine (pgs 01-36)...............................................................................JA85

Trial Transcript, February 3, 2022 (pgs 036-127) .........................................JA121

**Volume II of XI**

Trial Transcript, February 4, 2022...................................................JA215

**Volume III of XI**

Trial Transcript, February 7, 2022...................................................JA416

**Volume IV of XI**

Trial Transcript, February 8, 2022...................................................JA595

Trial Transcript, February 9, 2022...................................................JA765

i

**Volume V of XI**

Trial Transcript, February 9, 2022 ...................................................JA888

Trial Transcript, February 10, 2022 .................................................JA942

Trial Transcript, February 11, 2022 .................................................JA961

**Volume VI of XI**

Trial Transcript, February 14, 2022 ...............................................JA1158

Trial Transcript, February 15, 2022 ...............................................JA1216

DOC 108 – Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts & Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment ....................................................JA1236

DOC 117 – Opinion and Order regarding Motions for Summary Judgment entered August 28, 2020 .....................................................................JA1331

DOC 45 – Opinion and Order granting Defendants' Motion to Dismiss......JA1367

DOC 96 – Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment.........................................................................JA1393

DOC 100 – Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment ...........................................................JA1424

**Volume VII of XI**

DOC 107 – Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.....................................................................JA1451

DOC 157 - Joint Pretrial Consent Order..........................................JA1479

DOC 172 – Order entered February 16, 2022 ................................JA1559

DOC 174 – Order supplementing record entered February 16, 2022 ..........JA1561

February 22, 2022 Letter from Shane B. Vogt to Honorable Jed S. Rakoff at the request of the Court...........................................................................JA1570

ii

Hearing Transcript dated February 24, 2022 – post trial ...............................JA1591

DOC 136 – Defendants' Memorandum of Law in Support of Their Motion in Limine to Exclude Evidence Regarding Articles and Posts Published by Atlantic Media, An Article James Bennet was Sent, and Senator Michael Bennet ......................JA1595

DOC 138 – Defendants' Memorandum of Law in Support of Their Motion in Limine to Exclude Evidence of James Bennet's Departure from the Times, Unrelated Controversies During his Tenure as Opinion Editor, and the Elimination of the Public Editor Position ...................................................................................JA1610

DOC 147 – Plaintiff's Memorandum of Law in Opposition to Defendants' Motion in Limine to Exclude Evidence Regarding Articles and Posts Published by Atlantic Media, An Article James Bennet was Sent, and Senator Michael Bennet ....JA1623

DOC 145 – Plaintiff's Memorandum of Law in Opposition to Defendant's Motion in Limine to Exclude Evidence of James Bennet's Departure from the Times, Unrelated Controversies During his Tenure as Opinion Editor, and the Elimination of the Public Editor Position ...........................................................................JA1625

Plaintiff Trial Exhibit 032 ...............................................................................JA1668

Plaintiff Trial Exhibits 057-058 .....................................................................JA1674

Plaintiff Trial Exhibit 50 .................................................................................JA1683

Plaintiff Trial Exhibit 119 (entered) ..............................................................JA1694

Plaintiff Trial Exhibit 121 (entered) ..............................................................JA1695

Plaintiff Trial Exhibit 124 (entered) ..............................................................JA1696

Plaintiff Trial Exhibit 125 (entered) ..............................................................JA1697

Plaintiff Trial Exhibit 126 (entered) ..............................................................JA1699

Plaintiff Trial Exhibit 127 (entered) ..............................................................JA1701

iii

Plaintiff Trial Exhibit 128 (entered) ...............................................JA1702

Plaintiff Trial Exhibit 133 (entered) ...............................................JA1704

Plaintiff Trial Exhibit 134 (entered) ...............................................JA1707

Plaintiff Trial Exhibit 135 (entered) ...............................................JA1712

Plaintiff Trial Exhibit 136 (entered) ...............................................JA1715

Plaintiff Trial Exhibits 171-173 (entered) .....................................JA1717

Plaintiff Trial Exhibit 174 (entered) ...............................................JA1721

Plaintiff Trial Exhibit 191 (entered) ...............................................JA1723

Plaintiff Trial Exhibit 021 ...............................................................JA1724

**Volume VIII of XI**

Plaintiff Trial Exhibit 39 .................................................................JA1726

Plaintiff Trial Exhibit 40 .................................................................JA1745

Plaintiff Trial Exhibit 41 .................................................................JA1748

Plaintiff Trial Exhibit 42 .................................................................JA1752

Plaintiff Trial Exhibit 43 .................................................................JA1765

Plaintiff Trial Exhibit 44 .................................................................JA1772

Plaintiff Trial Exhibit 45 .................................................................JA1779

Plaintiff Trial Exhibit 46 .................................................................JA1786

Plaintiff Trial Exhibit 47 .................................................................JA1794

Plaintiff Trial Exhibit 48 .................................................................JA1802

iv

Plaintiff Trial Exhibit 49 ........................................................................JA1809

Plaintiff Trial Exhibit 50 ........................................................................JA1817

Plaintiff Trial Exhibit 73 ........................................................................JA1828

Plaintiff Trial Exhibit 74 ........................................................................JA1832

Plaintiff Trial Exhibit 77 ........................................................................JA1838

Plaintiff Trial Exhibit 78 ........................................................................JA1839

Plaintiff Trial Exhibit 100 ......................................................................JA1843

Plaintiff Trial Exhibit 163 (entered) .......................................................JA1846

Plaintiff Trial Exhibit 186 (entered) .......................................................JA1847

Plaintiff Trial Exhibit 188 ......................................................................JA1848

Plaintiff Trial Exhibit 189 ......................................................................JA1849

Plaintiff Trial Exhibit 190 ......................................................................JA1850

Plaintiff Trial Exhibit 234 ......................................................................JA1851

Plaintiff Trial Exhibit 236 (entered) .......................................................JA1852

Plaintiff Trial Exhibit 17 (entered) .........................................................JA1853

Plaintiff Trial Exhibit 18 (entered) .........................................................PA1889

**Volume IX of XI**

E-Mail from Nicholas Werle dated February 16, 2022 with Order...............JA1896

E-Mail from Bloomberg Reporter dated February 16, 2022 ........................JA1899

E-Mail from Shane Vogt, Esq. to Judge Rakoff dated August 12, 2021
regarding conflicts..........................................................................JA1900

E-Mail from Shane Vogt, Esq. to Nicholas Werle regarding positive
COVID Test ..................................................................................JA1903

DOC 119 - Defendants' Notice of Motion dated November 25, 2020 .......... JA1904

DOC 125 - Memorandum Order by Judge Rakoff dated
December 29, 2020 ...................................................................................... JA1906

DOC 113 – Defendants' Reply Memorandum of Law in Support of
Their Motion for Summary Judgment .......................................................... JA1919

DOC 154 – Plaintiff's Proposed Voir Dire Requests .................................... JA1934

DOC 170 – The Court's Instructions of Law to the Jury .............................. JA1937

DOC 171 – Docketing Entry for Final Judgment ......................................... JA1961

DOC 196 – Opinion dated March 1, 2022 .................................................... JA1963

Hearing Transcript excerpt dated July 31, 2017 .......................................... JA2031

Hearing Transcript dated August 16, 2017 .................................................. JA2064

Trial Transcript dated February 3, 2022 – Voir Dire ................................... JA2145

**<u>Volume X of XI</u>**

Brief For Defendant-Appellee (Excerpt) Case No. 17-3801-cv .................... JA2178

DOC 97 - Defendants' Statement of Undisputed Material Facts ................. JA2187

DOC 104 – Defendants' Memorandum of Law in Opposition to
Plaintiff's Motion for Partial Summary Judgment ....................................... JA2212

DOC 113 – Defendants' Reply Memorandum of Law in Support
Of their Motion for Summary Judgment ...................................................... JA2223

DOC 197 – Plaintiff's Notice of Appeal ...................................................... JA2238

DOC 198 – Plaintiff's Omnibus Memorandum of Law in Support
of Post-Trial Motions ................................................................................... JA2241

DOC 199 – Initial Notice of Stay of Appeal ............................................... JA2416

DOC 200 – Order of U.S. Court of Appeals Order staying petition .............JA2417

**Volume XI of XI**

DOC 201 – Defendant's Opposition to Plaintiff's Post-Trial Motions .........JA2420

DOC 202 – Plaintiff's Reply to Defendants' Opposition to Plaintiff's
Post-Trial Motions ...........................................................................................JA2480

DOC 203 – Opinion and Order denying Post-Trial Motions .......................JA2492

DOC 204 – U.S. Court of Appeals for the Second Circuit (Case No. 22-629)
Order denying Petition for Mandamus entered June 16, 2022 .....................JA2522

DOC  205 – Amended Notice of Appeal filed June 16, 2022 .......................JA2523

DOC 207 – U.S. Court of Appeals for the Second Circuit (Case No. 22-629)
Mandate issued on July 20, 2022 .................................................................JA2526

implement a federal workers' compensation scheme the respect and deference it is entitled to, the consequences of the opinion will likely be that FECA -- Congress's choice of comprehensive workers' compensation -- will not be given that deference. We do not believe Congress intended such an outcome.

For these reasons, we dissent.



**Sarah PALIN, an individual, Plaintiff-Appellant,**

**v.**

**The NEW YORK TIMES COMPANY, Defendant-Appellee.**

**No. 17-3801-cv**

**August Term, 2018**

United States Court of Appeals, Second Circuit.

Argued: September 21, 2018

Decided: August 6, 2019

Amended: October 15, 2019

**Background:** Politician brought defamation action under New York law against newspaper publisher, relating to editorial linking the shooting of a congresswoman to the circulation by politician's political action committee (PAC) of a map superimposing a crosshairs target over certain congressional districts. The United States District Court for the Southern District of New York, Jed S. Rakoff, Senior District Judge, 264 F.Supp.3d 527, granted publisher's motion to dismiss for failure to

state a claim, and denied reconsideration, 2017 WL 5514371. Politician appealed.

**Holdings:** The Court of Appeals, Walker, Senior Circuit Judge, held that:

(1) in absence of conversion to a summary judgment motion, district court could not rely on testimony from sua sponte evidentiary hearing concerning First Amendment's actual malice requirement for defamation liability to a public figure;

(2) politician plausibly alleged actual malice;

(3) politician plausibly alleged that challenged statements were "of and concerning" politician; and

(4) politician plausibly alleged that challenged statements in newspaper's editorial were reasonably capable of being proven false.

Vacated and remanded.

Opinion, 933 F.3d 160, superseded

**1. Federal Courts** ⬅3587(1), 3667

The Court of Appeals reviews de novo a district court's grant of a motion to dismiss for failure to state a claim, construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor. Fed. R. Civ. P. 12(b)(6).

**2. Libel and Slander** ⬅1

Under New York law, a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or per se actionability.

---

(which is true in numerous countries; for example, there are about nineteen posts in Mexico), the opinion would have the United States

operate different schemes and systems for foreign nationals employed in the <u>same</u> country, doing essentially the <u>same</u> job.

# JA2

**3. Constitutional Law** ⊜**2163**

Under the First Amendment, a public figure plaintiff must prove that an allegedly libelous statement was made with "actual malice," that is, made with knowledge that it was false or with reckless disregard of whether it was false or not. U.S. Const. Amend. 1.

> See publication Words and Phrases for other judicial constructions and definitions.

**4. Constitutional Law** ⊜**2163**

When the issue is actual malice in making a defamatory statement, as required under the First Amendment for liability for defamation of a public figure, the critical question is the state of mind of those responsible for the publication. U.S. Const. Amend. 1.

**5. Federal Civil Procedure** ⊜**673**

To satisfy notice pleading requirements, a complaint must contain enough facts to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 8, 12(b)(6).

**6. Federal Civil Procedure** ⊜**673**

A claim is plausible, as required for notice pleading requirements for stating a claim, when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 8, 12(b)(6).

**7. Federal Civil Procedure** ⊜**673**

A well-pleaded complaint, under notice pleading requirements for stating a claim, will include facts that raise a right to relief above the speculative level. Fed. R. Civ. P. 8, 12(b)(6).

**8. Federal Civil Procedure** ⊜**673**

The plausibility standard, under notice pleading requirements for stating a claim, is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Fed. R. Civ. P. 8, 12(b)(6).

**9. Federal Civil Procedure** ⊜**1825**

Federal civil procedure rule addressing the taking of testimony at trial has nothing to do with the proceedings at the motion-to-dismiss stage. Fed. R. Civ. P. 12(b, c, d), 43(c).

**10. Federal Civil Procedure** ⊜**1832, 2533.1**

In absence of conversion to a summary judgment motion, district court, on newspaper publisher's motion to dismiss for failure to state a claim in public figure's defamation action, could not rely on matters outside the pleadings by making inferences and credibility determinations based on testimony of author of allegedly defamatory editorial at evidentiary hearing convened sua sponte by the court, and then using those inferences and credibility determinations to find that the public figure failed to plausibly allege actual malice, as would be required under First Amendment for defamation liability to public figure. U.S. Const. Amend. 1; Fed. R. Civ. P. 12(b)(6), (d).

**11. Federal Civil Procedure** ⊜**1832, 2533.1**

A matter is deemed integral to the complaint, so that the matter can be considered by the court on a motion to dismiss for failure to state a claim, without converting the motion to a motion for summary judgment, when the complaint relies heavily upon the terms and effect of the matter. Fed. R. Civ. P. 12(b)(6), (d).

**12. Federal Civil Procedure** ⊜**1832, 2533.1**

Typically, a matter that is integral to the complaint, which can be considered by the court on a motion to dismiss for failure to state a claim, without converting the

**JA3**

motion to a motion for summary judgment, is a contract, agreement, or other document essential to the litigation. Fed. R. Civ. P. 12(b)(6), (d).

**13. Federal Civil Procedure ⚖1832, 2533.1**

Testimony from author of allegedly defamatory newspaper editorial, elicited by district court at court-convened evidentiary hearing concerning First Amendment's actual malice requirement for defamation liability to a public figure, was not integral to plaintiff public figure's defamation complaint, as would allow consideration of matters outside the pleadings without converting newspaper publisher's motion to dismiss for failure to state a claim into a motion for summary judgment; public figure, in drafting her complaint, could not have heavily relied on author's testimony because she had no idea what he would say, and testimony revealed substantive information about author's motivations and the editorial drafting process, which information the public figure could not have known in advance of her pleadings. U.S. Const. Amend. 1; Fed. R. Civ. P. 12(b)(6), (d).

**14. Federal Civil Procedure ⚖1832, 2533.1**

Newspaper publisher's motion to dismiss for failure to state a claim would not be deemed as having been converted to motion for summary judgment, which would have allowed district court to consider matters outside the pleadings in public figure's defamation action; district court, which acted sua sponte to convene an evidentiary hearing concerning First Amendment's actual malice requirement for defamation liability to a public figure, did not purport to have converted the motion, public figure had no prior notice that district court might resolve the motion to dismiss after the hearing and might treat the motion as a summary judgment mo-

tion, and district court had been explicit about treating the hearing only as a test of sufficiency of the pleadings. U.S. Const. Amend. 1; Fed. R. Civ. P. 12(b)(6), (d).

**15. Libel and Slander ⚖51(5)**

Politician plausibly alleged, as required to state a claim, the actual malice of newspaper editorial's author, as required under First Amendment for newspaper publisher's defamation liability to a public figure, as to editorial linking the shooting of a congresswoman to the circulation by politician's political action committee (PAC) of a map superimposing a crosshairs target over certain congressional districts; politician's overarching theory was that author had a predetermined argument that he wanted to make based on author's personal connection to potential shooting of author's brother-Senator and personal bias against politician's pro-gun positions, and politician alleged that author, in his previous position as a magazine's editor-in-chief, reviewed, edited, and approved for publication numerous articles confirming that there was no link between PAC's crosshairs map and congresswoman's shooting. U.S. Const. Amend. 1.

**16. Federal Civil Procedure ⚖1772**

On a motion to dismiss for failure to state a claim, it is not the district court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory; the test is whether the complaint is plausible, not whether it is less plausible than an alternative explanation. Fed. R. Civ. P. 12(b)(6).

**17. Constitutional Law ⚖2163**

"Actual malice," which is required under the First Amendment for defamation liability to a public figure, does not mean maliciousness or ill will. U.S. Const. Amend. 1.

See publication Words and Phrases for other judicial constructions and definitions.

PALIN v. NEW YORK TIMES CO.                807
Cite as 940 F.3d 804 (2nd Cir. 2019)

**18. Libel and Slander** ⬯21

Politician plausibly alleged, as required to state a claim for defamation under New York law, that challenged statements in newspaper's editorial were "of and concerning" politician, as to editorial linking the shooting of a congresswoman to the circulation by politician's political action committee (PAC) of a map superimposing a crosshairs target over certain congressional districts; while the PAC was a creature of federal law that was distinct from the politician, the politician plausibly alleged that a reader would identify her as the subject of the challenged statements.

**19. Libel and Slander** ⬯6(1)

Politician plausibly alleged, as required to state a claim for defamation under New York law, that challenged statements in newspaper's editorial were reasonably capable of being proven false, as to editorial linking the shooting of a congresswoman to the circulation by politician's political action committee (PAC) of a map superimposing a crosshairs target over certain congressional districts; a reasonable reader could view the challenged statements as factual, and the social media backlash that precipitated newspaper's correction further suggested that readers perceived the allegedly false statements as fact-based.

**20. Constitutional Law** ⬯1490

First Amendment protections are essential to provide breathing space for freedom of expression. U.S. Const. Amend. 1.

———————

Appeal from the United States District Court for the Southern District of New York. No. 17-cv-04853 – Jed S. Rakoff, *Judge.*

Elizabeth M. Locke, Clare Locke LLP, Alexandria, VA (Thomas A. Clare, Joseph R. Oliveri, Clare Locke LLP, Alexandria, VA; Kenneth G. Turkel, Shane B. Vogt, Bajo Cuva Cohen Turkel P.A., Tampa, FL; S. Preston Ricardo, Golenbock Eiseman Assor Bell & Peskoe LLP, New York, NY, on the brief), for Plaintiff-Appellant.

Lee Levine, Ballard Spahr LLP, Washington, DC (Jay Ward Brown, Ballard Spahr LLP, Washington, D.C.; David A. Schultz, Ballard Spahr LLP, New York, NY; David E. McCraw, The New York Times, New York, NY, on the brief), for Defendant-Appellee.

Before: WALKER and CHIN, Circuit Judges, and KEENAN.*

JOHN M. WALKER, JR., Circuit Judge:

This case is ultimately about the First Amendment, but the subject matter implicated in this appeal is far less dramatic: rules of procedure and pleading standards. Sarah Palin appeals the dismissal of her defamation complaint against *The New York Times* ("the Times") for failure to state a claim. The district court (Rakoff, *J.*), uncertain as to whether Palin's complaint plausibly alleged all of the required elements of her defamation claim, held an evidentiary hearing to test the sufficiency of Palin's pleadings. Following the hearing, and without converting the proceeding to one for summary judgment, the district court relied on evidence adduced at that hearing to dismiss Palin's complaint under Federal Rule of Civil Procedure 12(b)(6). We find that the district court erred in relying on facts outside the pleadings to dismiss the complaint. We further conclude that Palin's Proposed Amended Complaint

———————

* Judge John F. Keenan, of the United States District Court for the Southern District of New York, sitting by designation.

**JA5**

plausibly states a claim for defamation and may proceed to full discovery.

We therefore VACATE and REMAND for proceedings consistent with this opinion.

## BACKGROUND

On January 8, 2011, Jared Loughner opened fire at a political rally for Democratic Congresswoman Gabrielle Giffords in Tucson, Arizona ("the Loughner shooting"), killing six people and injuring thirteen others. Representative Giffords was seriously wounded in the attack.

Shortly before the tragic attack, Sarah Palin's political action committee ("SarahPAC") had circulated a map that superimposed the image of a crosshairs target over certain Democratic congressional districts (evoking, in the view of many, images of violence). Giffords' district was among those targeted by the SarahPAC crosshairs map. The image had been publicized during the earlier political controversy surrounding the Affordable Care Act, but in the wake of the Loughner shooting, some speculated that the shooting was connected to the crosshairs map. No evidence ever emerged to establish that link; in fact, the criminal investigation of Loughner indicated that his animosity toward Representative Giffords had arisen before SarahPAC published the map.

Six years later, on June 14, 2017, another political shooting occurred when James Hodgkinson opened fire in Alexandria, Virginia at a practice for a congressional baseball game. He seriously injured four people, including Republican Congressman

Steve Scalise ("the Hodgkinson shooting"). That same evening, the Times, under the Editorial Board's byline, published an editorial entitled "America's Lethal Politics" ("the editorial") in response to the shooting.

The editorial argued that these two political shootings evidenced the "vicious" nature of American politics.[1] Reflecting on the Loughner shooting and the SarahPAC crosshairs map, the editorial claimed that the "link to political incitement was clear," and noted that Palin's political action committee had "circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs," suggesting that the congressmembers themselves had been pictured on the map.[2] In the next paragraph, the editorial referenced the Hodgkinson shooting that had happened that day: "Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right."[3]

The Times faced an immediate backlash for publishing the editorial. Within a day, it had changed the editorial and issued a correction. The Times removed the two phrases suggesting a link between Palin and the Loughner shooting. Added to the editorial was a correction that read: "An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established."[4] The Times also clarified that the SarahPAC map had overlaid crosshairs on Democratic congression-

---

**1.** App'x 37.

**2.** App'x 36–37. The crosshairs were put on a map over the locations of the congressional districts, and the names of the congressmembers in question—including Representative

Giffords—were listed at the bottom of the page.

**3.** App'x 41.

**4.** App'x 22.

al districts, not the representatives themselves.

Twelve days after the editorial was published Palin sued the Times in federal court. She alleged one count of defamation under New York law. Thereafter, the Times moved to dismiss Palin's complaint for failure to state a claim.

After the motion to dismiss had been fully briefed, the case took an unusual procedural turn: the district judge held an evidentiary hearing on the motion to dismiss. The district judge stated that the hearing was to assess the plausibility of the "[o]ne close question" presented by the Times' motion to dismiss: whether Palin had sufficiently pled the actual malice element of her defamation claim.[5]

The district judge ordered the Times to identify the author of the editorial and the Times produced James Bennet, the editorial page editor at the Times and the author of the editorial, to testify at the hearing. Bennet was the hearing's only witness. Bennet explained at the hearing that his reference to Palin in the editorial was intended to make a rhetorical point about the present atmosphere of political anger. He also recounted the editorial's research and publication process and answered inquiries about his prior knowledge of the Loughner shooting six years earlier and any connection to Palin. Bennet testified that he was unaware of any of the earlier articles published by the Times, or by *The Atlantic* (where he had previously been the editor-in-chief), that indicated that no connection between Palin or her political action committee and Loughner had ever been established. In addition to answering questions from the Times' counsel, Bennet responded to questions by Palin's counsel and the district judge. Neither party objected to the district judge's decision to hold the hearing.

On August 29, 2017, the district court, relying on evidence adduced at the hearing, granted the Times' motion to dismiss. The district court determined that any amendment would be futile and dismissed Palin's complaint with prejudice. Later, Palin asked the district court to reconsider its decision that the dismissal was with prejudice and included a Proposed Amended Complaint with her motion. The district court denied the motion for reconsideration and leave to replead. She now appeals.

## DISCUSSION

[1]  We review a district court's grant of a motion to dismiss the complaint on the pleadings de novo and "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."[6]

[2, 3]  Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability.[7] In addition, "a public figure plaintiff must prove that an allegedly libelous statement was made with actual malice, that is, made 'with knowledge that it was false or with reckless disregard of whether it was false or not.' "[8] It is undisputed that Palin, a

---

5.  Order re: Motion to Dismiss, ECF No. 35.

6.  *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (internal quotation marks omitted).

7.  *See Celle v. Filipino Reporter Enterps. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) (citations omitted).

8.  *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173–74 (2d Cir. 2001) (quoting *New*

former governor of Alaska and Republican candidate for Vice President in 2008, is a public figure.

**[4]** When actual malice in making a defamatory statement is at issue, the critical question is the state of mind of those responsible for the publication.[9] Because the Times identified Bennet as the author of the editorial, it was his state of mind that was relevant to the actual malice determination. We will first address the district court's use of the hearing in the process of deciding the motion to dismiss and then determine whether Palin's Proposed Amended Complaint plausibly states a claim for defamation.

**I. The Hearing**

**[5–8]** The pleading standards articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) are well-known: in order to satisfy Federal Rule of Civil Procedure 8, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."[10] A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[11] A well-pleaded complaint will include facts that "raise a right to relief above the speculative level."[12] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully."[13]

On appeal, Palin argues that the district court's reliance on the hearing to decide the motion to dismiss offends the Federal Rules of Civil Procedure. We agree that the hearing runs headlong into the federal rules.

**[9, 10]** When presented with the Times' Rule 12(b)(6) motion to dismiss for failure to state a claim, the district court relied on Rule 43(c) to convene the hearing at which Bennet testified. The district court's invocation of Rule 43(c), which addresses taking testimony at trial, was misplaced: that rule has nothing to do with the proceedings at the motion-to-dismiss stage. Following the hearing, the district court granted the Times' motion to dismiss, finding that Palin failed to plausibly allege actual malice. This conclusion rested on inferences drawn from Bennet's testimony at the plausibility hearing.

Rule 12(d) provides: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Rule 12(d), therefore, presents district courts with only two options: (1) "the court may exclude the additional material and decide the motion on the complaint alone" or (2) "it may convert the motion to one for summary judgment under Fed. R. Civ.

---

*York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

**9.** *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) ("[T]he plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." (citing *New York Times*, 376 U.S. at 287, 84 S.Ct. 710)).

**10.** *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

**11.** *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

**12.** *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

**13.** *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

PALIN v. NEW YORK TIMES CO.                811
Cite as 940 F.3d 804 (2nd Cir. 2019)

P. 56 and afford all parties the opportunity to present supporting material."[14]

The district judge took neither permissible route under Rule 12(d). The judge both relied on matters outside the pleadings to decide the motion to dismiss and did not convert the motion into one for summary judgment. To the contrary, his aim was explicit: to determine whether Palin's complaint stated a plausible claim for relief under Rule 12(b)(6). The district judge explained that "[b]y requiring district courts to make plausibility determinations based on the pleadings, the Supreme Court has, in effect, made district courts gatekeepers."[15]

In an effort to salvage the propriety of the district court's decision, the Times argues that the district court complied with Rule 12(d) because it did not rely on matters outside the pleadings.[16] The Times argues that Bennet's testimony was not outside the pleadings because it presented material integral to the complaint by merely adding depth to what was apparent from the face of Palin's complaint. But the material that came to light at the hearing did considerably more than elaborate on the allegations in the complaint.

[11–13]   A matter is deemed "integral" to the complaint when the complaint "relies heavily upon its terms and effect."[17] Typically, an integral matter is a contract, agreement, or other document essential to the litigation.[18] Hearing testimony elicited by the trial judge after litigation has already begun is not the type of material that ordinarily has the potential to be a matter "integral" to a plaintiff's complaint. Regardless, Palin could not have "relie[d] heavily"[19] on Bennet's testimony when drafting her complaint because she had no idea what Bennet would say. Bennet's testimony revealed substantive information about his motivations and the editorial drafting process—none of which Palin could have known in advance of her pleadings, much less "relie[d] heavily" on.[20]

The Times falls back on the argument that, even if the district court relied on matters outside the pleadings, we may treat the motion *as if* it had been converted to a motion for summary judgment. We have held that the "conversion of a Rule 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form"[21] and that "[t]he

**14.**  *Kopec v. Coughlin*, 922 F.2d 152, 154 (2d Cir. 1991) (quoting *Fonte v. Bd. of Managers of Continental Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988)).

**15.**  *Palin v. New York Times Co.*, 264 F. Supp. 3d 527, 530 n.1 (S.D.N.Y. 2017) (citing *Iqbal*, 556 U.S. at 662, 129 S.Ct. 1937; *Twombly*, 550 U.S. at 554, 127 S.Ct. 1955) (internal citations omitted).

**16.**  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153–54 (2d Cir. 2002) (holding that extraneous material is not ''outside the pleadings'' when the material is integral to complaint and relied upon by the plaintiff in framing the complaint).

**17.**  *Id.* at 153 (internal quotation marks omitted).

**18.**  *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006)

(''In most instances . . . the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls . . . .''); *see also Nicoisa v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2d Cir. 2016) (an ''order page'' and ''conditions of use'' agreement were integral to the complaint when the complaint contained numerous references to them).

**19.**  *Chambers*, 282 F.3d at 153 (internal quotation marks omitted).

**20.**  *Id.*

**21.**  *In re G & A Books*, 770 F.2d 288, 295 (2d Cir. 1985).

**JA9**

essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment."[22]

[14] We decline to treat the Rule 12(b)(6) motion here as having been converted to one for summary judgment. Apart from the fact that the able and highly experienced district judge did not purport to convert the motion, Palin had no prior notice that the district court might resolve the Times' Rule 12(b)(6) motion after the judge's sua sponte hearing, much less that he might treat the motion as one for summary judgment. Indeed, the district court was explicit about treating the motion only as a test of the sufficiency of the pleadings. The Times relies on cases where the plaintiff had adequate notice and the district court simply neglected to properly convert the motion.[23] This is not a situation in which where the plaintiff ought to have seen a summary-judgment decision coming.[24]

Even if the plaintiff had been given notice and the court had explicitly converted the motion to one for summary judgment, we would still have to vacate because the district court's opinion relied on credibility determinations not permissible at any stage before trial.[25] As we will discuss in

the next section, the district court's acceptance of Bennet's testimony as credible was what led it to grant the Times' motion to dismiss.

The Times also argues that Palin was not deprived of a meaningful opportunity to conduct discovery "pertinent to the motion."[26] Presumably, the Times is referring to "discovery" on the spot: Bennet's testimony and some related documents. Even assuming that the hearing afforded Palin all of the discovery to which she was entitled, this fact does not mitigate the errors committed by the district court.

It is clear to us that the district court viewed the hearing as a way to more expeditiously decide whether Palin had a viable way to establish actual malice. But, despite the flexibility that is accorded district courts to streamline proceedings and manage their calendars, district courts are not free to bypass rules of procedure that are carefully calibrated to ensure fair process to both sides. The procedural path followed by the district court conforms to neither of the two options permitted by Rule 12(d). While we are cognizant of the difficult determinations that *Twombly* and *Iqbal* often place on district courts, the district court's gatekeeping procedures

---

**22.** *Id.*; *see also Kennedy v. Empire Blue Cross & Blue Shield,* 989 F.2d 588, 592 (2d Cir. 1993).

**23.** *See G & A Books,* 770 F.2d at 295; *Northville Downs v. Granholm,* 622 F.3d 579, 585–86 (6th Cir. 2010).

**24.** In fact, the hearing transcript reflects the understandable confusion of Palin's counsel. App'x 395–97 (The Court: "Neither side raised any objection to my holding [the evidentiary] hearing . . . Counsel: . . . It wasn't a normal kind of hearing during a 12(b)(6) . . . . And to be honest, Judge, we really wouldn't have tendered an objection because we were trying to get a better understanding of kind of what the inquiry was . . . .").

**25.** *See Soto v. Gaudett,* 862 F.3d 148, 157 (2d Cir. 2017) (noting that at the summary judgment stage "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))).

**26.** Fed. R. Civ. P. 12(d); *see United States ex rel. Chorches v. Am. Med. Response, Inc.,* 865 F.3d 71, 88 n.13 (2d Cir. 2017) (noting the district court's "broad discretion to limit discovery in a prudential and proportionate way" (internal quotation marks omitted)).

must nevertheless comply with the Federal Rules of Civil Procedure.

## II. Palin's Proposed Amended Complaint

Having determined that the district court erred in relying on evidence that came to light in the plausibility hearing when it granted the Times' motion to dismiss, we must ascertain what effect, if any, that error had on the dismissal of Palin's defamation complaint. To do so, we will review Palin's Proposed Amendment Complaint ("the PAC") to determine whether she stated a plausible claim for defamation. Because of the district court's decision to hold the plausibility hearing, this case comes to us in unique form. After the district court dismissed her claim with prejudice, Palin attached a PAC to her motion for reconsideration of the "with prejudice" part of the dismissal. The PAC included certain material added by the hearing and we discern no fault here because Bennet's testimony, reliable or not, was now part of the record. The district court denied the motion for reconsideration, finding that leave to replead would be futile and that the PAC suffered the same "fatal flaws" as the original complaint.[27] Our review of the grant of a motion to dismiss is de novo;[28] therefore we now turn to whether the PAC states a plausible claim for relief. We conclude that it does.

In the Times' view, the district court correctly determined that Palin's original complaint and the PAC both gave rise to only one plausible conclusion: that Bennet made an unintended mistake by including the erroneous facts about Palin. We disagree.

**[15]** In both the original complaint and the PAC, Palin's overarching theory of actual malice is that Bennet had a "predetermined" argument he wanted to make in the editorial.[29] Bennet's fixation on this set goal, the claim goes, led him to publish a statement about Palin that he either knew to be false, or at least was reckless as to whether it was false. The PAC contains allegations that paint a plausible picture of this actual-malice scenario in three respects: (1) Bennet's background as an editor and political advocate provided sufficient evidence to permit a jury to find that he published the editorial with deliberate or reckless disregard for its truth, (2) the drafting and editorial process also permitted an inference of deliberate or reckless falsification, and (3) the Times' subsequent correction to the editorial did not undermine the plausibility of that inference.

*First*, Palin alleges that, because of the editorial positions Bennet held at *The Atlantic* and *The New York Times*, a jury could plausibly find that Bennet knew before publishing the editorial that it was false to claim that Palin or her political action committee were connected to the Loughner shooting.

The PAC alleges that, from 2006 to 2016, Bennet was the editor-in-chief of *The Atlantic*, where "he was responsible for the content of, reviewed, edited and approved the publication of numerous articles confirming there was no link between Mrs. Palin and Loughner's shooting."[30] The complaint references several articles about the Loughner shooting published by *The Atlantic* during Bennet's tenure, the most notable of which is entitled *"Ten Days That Defined 2011."* The part of that article discussing the Loughner shooting

---

**27.** Memorandum and Order denying Motion for Reconsideration, ECF No. 61.

**28.** *Elias,* 872 F.3d at 104.

**29.** App'x 472.

**30.** App'x 481.

reads: "... the bad thing to come out of this already terrible story was a round of blame hurling, with people rushing to point at Sarah Palin's infamous target map .... In truth, Loughner is clinically insane and this was not really about politics at all."[31]

At the hearing, Bennet stated that he could not recall reading those articles, and even if he had read them, he did not have them in mind when he published the editorial. The district court, in rejecting Palin's theory as implausible, credited this testimony as truthful when it found that Bennet's failure to read the articles was simply a research failure that did not rise to the level of actual malice.

By crediting Bennet's testimony, the district court rejected a permissible inference from the articles: that one who had risen to editor-in-chief at *The Atlantic* knew their content and thus that there was no connection between Palin and the Loughner shooting. That Palin's complaint sufficiently alleges that Bennet's opportunity to know the journalistic consensus that the connection was lacking gives rise to the inference that he actually did know.

The PAC also includes allegations suggesting that Bennet in particular was more likely than the average editor-in-chief to know the truth about the Loughner shooting because he had reason to be personally hostile toward Palin, her political party, and her pro-gun stance. Bennet's brother, a Democrat, had served as a United States Senator for Colorado since 2009. In 2010, Senator Bennet was endorsed by two House members whose districts had been targeted by the SarahPAC map. Two days before the Loughner shooting, a man threatened to open fire on Senator Bennet's offices, and thereafter both Bennet brothers became "outspoken advocate[s] for gun control."[32] Also, during the 2016 election, Palin endorsed Senator Bennet's opponent and Representative Giffords endorsed Senator Bennet.

The district court gave no weight to these allegations, finding that political opposition did not rise to the level of actual malice. We agree with the district court that political opposition alone does not constitute actual malice, but we conclude that these allegations could indicate more than sheer political bias—they arguably show that Bennet had a personal connection to a potential shooting that animated his hostility to pro-gun positions at the time of the Loughner shooting in 2011.[33] Palin's allegations are relevant to the credibility of Bennet's testimony that he was unaware of facts published on his watch relating to the Loughner shooting and that he made a mistake when he connected Palin to the that shooting. Palin's allegations present a plausible inference that Bennet's claim of memory loss is untrue.

At a minimum, these allegations give rise to a plausible inference that Bennet was recklessly disregarding the truth when he published the editorial without reacquainting himself with the contrary articles published in *The Atlantic* six years earlier.[34] And that plausible inference of

---

**31.** Richard Lawson, *Ten Days That Defined 2011*, The Atlantic, Dec. 29, 2011.

**32.** App'x 480.

**33.** *Cf. Jankovic v. Int'l Crisis Grp.,* 822 F.3d 576, 590 (D.C. Cir. 2016) ("[A] newspaper's motive in publishing a story ... cannot provide a sufficient basis for finding actual malice." (quoting *Harte-Hanks Commc'ns, Inc. v.*

*Connaughton,* 491 U.S. 657, 665, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989))).

**34.** *See Behar,* 238 F.3d at 173–74 (actual malice satisfied upon a showing the statement was made "with reckless disregard of whether it was false or not" (internal quotation marks omitted)).

reckless disregard is strengthened when added to Palin's allegations that Bennet had reason to be personally biased against Palin and pro-gun positions in general. When properly viewed in the plaintiff's favor, a reasonable factfinder could conclude this amounted to more than a mistake due to a research failure.

*Second*, the PAC also alleges that certain aspects of the drafting and publication process of the editorial at *The New York Times* permits an inference of actual malice. Elizabeth Williamson, the editorial writer who drafted the initial version of the editorial, had hyperlinked in her draft an article entitled "*Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate.*" The article stated, contrary to the claim in the published editorial, that "[n]o connection" was made between the Sarah-PAC map and Loughner.[35] The link was also included in the final version of the editorial, a version that Bennet essentially rewrote. The Times argues that the hyperlink shows the absence of malice. But the PAC alleges that, by including a hyperlink that contradicted the argument of his editorial, Bennet "willfully disregarded the truth."[36]

The district court, siding with the Times, concluded that including the hyperlinked article was further evidence of simple mistake. After crediting Bennet's testimony that he did not read the hyperlinked article, the district judge concluded that a mistake was the only plausible explanation. But the inclusion of the hyperlinked article gives rise to more than one plausible inference, and any inference to be drawn from the inclusion of the hyperlinked article was for the jury—not the court.

*Third*, the district court concluded that the correction swiftly issued by the Times again demonstrated that the only plausible explanation for the erroneous statements was a mistake. Yet, it is also plausible that the correction was issued after a calculus that standing by the editorial was not worth the cost of the public backlash. Bennet could have published the editorial knowing—or recklessly disregarding—the falsity of the claim, and then decided later that the false allegation was not worth defending.

At bottom, it is plain from the record that the district court found Bennet a credible witness, and that the district court's crediting his testimony impermissibly anchored the district court's own negative view of the plausibility of Palin's allegations.

[16, 17] The district court at one point stated that Bennet's "behavior is much *more plausibly* consistent with making an unintended mistake and then correcting it than with acting with actual malice."[37] Perhaps so, but it is not the district court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory. The test is whether the complaint is plausible, not whether it is less plausible than an alternative explanation.[38] The jury may ultimately agree with the district court's conclusion that Bennet was credible—but it is the jury that must decide. Therefore, at the pleading stage, we are satisfied that Palin has met her burden to plead facts giving rise to the plausible inference that Bennet published the allegedly defamatory editorial with actual mal-

---

**35.** App'x 642–43.

**36.** App'x 494.

**37.** *Palin,* 264 F. Supp. 3d at 537 (emphasis added).

**38.** *See Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 ("The plausibility standard is not akin to a probability requirement . . . .") (internal quotation marks omitted).

ice. We emphasize that actual malice does not mean maliciousness or ill will; it simply means the statement was "made with knowledge that it was false or with reckless disregard of whether it was false or not."[39] Here, given the facts alleged, the assertion that Bennet knew the statement was false, or acted with reckless disregard as to whether the statement was false, is plausible.

The Times also argues that Palin failed to plausibly allege two other elements of a defamation claim: (1) that the editorial is not "of and concerning"[40] Palin and (2) the challenged statements cannot reasonably be understood as assertions of provably false fact. The district court considered and rejected both of these arguments, and we agree.

**[18]** First, Palin has plausibly alleged that the challenged statements are "of and concerning" her.[41] The Times argues that SarahPAC, as a political action committee, is a creature of federal law and entirely distinct from Palin herself. At the pleading stage, however, the bar to satisfy this element is low. As we held in *Elias*, the plaintiff "need only plead sufficient facts to make it plausible—not probable or even reasonably likely—that a reader familiar with [the plaintiff] would identify [the

plaintiff] as the subject of the statements at issue."[42]

Palin's allegations are more than sufficient to plausibly allege that the challenged statements were "of and concerning" her. The editorial refers to Palin specifically—"Sarah Palin's political action committee."[43] The legal designation of a political action committee under federal law notwithstanding, Palin has plausibly pleaded that a reader would identify her as the subject of the statements. The Times' arguments to the contrary are unpersuasive.

**[19]** Second, the Times argues that we can also affirm the district court because the challenged statements are not reasonably capable of being proven false.[44] The Times claims that Loughner's motivations are ultimately unknowable and speculative. This objection also goes nowhere. We agree with the district court that a reasonable reader could view the challenged statements as factual, namely that Palin, through her political action committee, was directly linked to the Loughner shooting. The social media backlash that precipitated the correction further suggests that the Times' readers perceived the false statements as fact-based.

**[20]** We conclude by recognizing that First Amendment protections are essential

---

**39.**  *Behar*, 238 F.3d at 174 (internal quotation marks omitted); *see id.* ("The reckless conduct needed to show actual malice is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing, but by whether there is sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." (internal quotation marks and citation omitted)).

**40.**  *See Elias*, 872 F.3d at 104.

**41.**  *Id.* ("[A] defamation plaintiff must allege that the purportedly defamatory statement

was of and concerning him or her . . . ." (internal quotation marks omitted)).

**42.**  *Id.* at 105 (citing *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

**43.**  App'x 37.

**44.**  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *see also Celle*, 209 F.3d at 178 (noting that under New York law differentiating opinion from actionable fact involves "a determination of whether the statement is capable of being objectively characterized as true or false" (internal quotation marks omitted)).

to provide "breathing space" for freedom of expression.[45] But, at this stage, our concern is with how district courts evaluate pleadings. Nothing in this opinion should therefore be construed to cast doubt on the First Amendment's crucial constitutional protections. Indeed, this protection is precisely why Palin's evidentiary burden at trial—to show by clear and convincing evidence that Bennet acted with actual malice—is high. At the pleading stage, however, Palin's only obstacle is the plausibility standard of *Twombly* and *Iqbal*. She has cleared that hurdle.

Naturally, we take no position on the merits of Palin's claim.

### CONCLUSION

For the reasons stated above, we VACATE and REMAND the judgment of the district court for further proceedings consistent with this opinion.



**UNITED STATES of America,
Appellant,**

**v.**

**Janine Plaza PIERCE, Defendant - Appellee.[1]**

**Docket No. 16-3030-cr
August Term 2019**

United States Court of Appeals,
Second Circuit.

Argued: August 21, 2019

Decided: October 10, 2019

**Background:** After jury convicted defendant of conspiracy to possess with intent to distribute, and conspiracy to distribute, four types of narcotics, the United States District Court for the Western District of New York, Frank P. Geraci, Chief Judge, set aside the verdict, for which check marks in verdict sheet had been placed next to "guilty" in eight places, as being inconsistent with jury's findings in verdict sheet's interrogatories concerning weight of narcotics, i.e., eight check marks were placed next to "not proven" with respect to conspiracy to possess with intent to distribute each one of the four types of narcotics and conspiracy to distribute each one of the four types of narcotics, with no check marks for options concerning weights. Government appealed.

**Holdings:** The Court of Appeals, Newman, Senior Circuit Judge, held that inconsistency in verdict warranted judgment of acquittal.

Affirmed.

**1. Criminal Law ⚖1139**

The Court of Appeals reviews a district court's grant of a motion for a judgment of acquittal de novo.

**2. Criminal Law ⚖1139**

Legal issue of whether the inconsistency in the jury's verdicts required a judgment of acquittal would be reviewed de novo.

**3. Criminal Law ⚖870**

Although special interrogatories are generally disfavored in criminal cases, in some situations they are recommended.

**4. Federal Civil Procedure ⚖2242**

In the civil context, where a verdict is rendered inconsistent by the jury's special

---

**45.** *New York Times,* 376 U.S. at 271–72, 84 S.Ct. 710.

**1.** The Clerk is requested to amend the official caption as above.

CLOSED,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:17-cv-04853-JSR

| | |
|---|---|
| Palin v. The New York Times Company | Date Filed: 06/27/2017 |
| Assigned to: Judge Jed S. Rakoff | Date Terminated: 02/15/2022 |
| Demand: $75,000 | Jury Demand: Both |
| Cause: 28:1332lb Diversity-Libel, Assault, Slander | Nature of Suit: 320 Assault Libel & Slander |
| | Jurisdiction: Diversity |

**Plaintiff**

**Sarah Palin**
*an individual*

represented by    **Shawn Preston Ricardo**
Golenbock Eiseman Assor Bell & Peskoe LLP
711 Third Avenue, 17th Floor
New York, NY 10017
212-907-7300
Fax: 212-754-0330
Email: pricardo@golenbock.com
*TERMINATED: 03/23/2020*
*LEAD ATTORNEY*

**Kenneth G. Turkel**
Turkel Cuva Barrios
100 N. Tampa St.
Suite 1900
Tampa, FL 33602
813-834-9191
Email: kturkel@tcb-law.com
*ATTORNEY TO BE NOTICED*

**Michael McGee Munoz**
Golenbock Eiseman Assor Bell & Peskoe LLP
711 Third Avenue, 17th Floor
New York, NY 10017
(212) 907-7345
Fax: (212) 754-0330
Email: mmunoz@golenbock.com
*ATTORNEY TO BE NOTICED*

**Shane B. Vogt**
Turkel Cuva Barrios, P.A.
100 North Tampa Street
Suite 1900
Tampa, FL 33602
813-868-6650

Email: svogt@tcb-law.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The New York Times Company**                    represented by    **David A. Schulz**
*a New York corporation*                                              Ballard Spahr LLP
                                                                     1675 Broadway, 19th Floor
                                                                     New York, NY 10019
                                                                     (212) 850-6103
                                                                     Fax: (212) 223-1942
                                                                     Email: schulzd@ballardspahr.com
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Jay Ward Brown**
                                                                     Ballard Spahr LLP (DC)
                                                                     1909 K Street, NW, 12th Floor
                                                                     Washington, DC 20006
                                                                     202 508 1136
                                                                     Fax: 202 661 2299
                                                                     Email: brownjay@ballardspahr.com
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Michael D. Sullivan**
                                                                     Ballard Spahr LLP (DC)
                                                                     1909 K Street, NW, 12th Floor
                                                                     Washington, DC 20006
                                                                     (202) 508-1116
                                                                     Fax: (202) 661-2299
                                                                     Email: sullivanm@ballardspahr.com
                                                                     *TERMINATED: 07/22/2021*
                                                                     *LEAD ATTORNEY*
                                                                     *PRO HAC VICE*

                                                                     **David L. Axelrod**
                                                                     Ballard Spahr
                                                                     1735 Market St., 51st Floor
                                                                     Philadelphia, PA 19103
                                                                     215-864-8639
                                                                     Fax: 215-665-8999
                                                                     Email: axelrodd@ballardspahr.com
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Jacquelyn Nicole Schell**
                                                                     Ballard Spahr LLP (NYC)
                                                                     1675 Broadway, 19th Floor
                                                                     New York, NY 10019
                                                                     646-346-8048
                                                                     Fax: 212-223-1942
                                                                     Email: schellj@ballardspahr.com

Case 22-558, Document 49, 09/19/2022, 3384713, Page25 of 222

*ATTORNEY TO BE NOTICED*

**Lee Levine**
Ballard Spahr LLP (DC)
1909 K Street, NW, 12th Floor
Washington, DC 20006
(202) 508-1100
Fax: (202) 661-2299
Email: levinel@ballardspahr.com
*TERMINATED: 12/04/2020*

**Thomas S. Leatherbury**
Vinson & Elkins LLP
2001 Ross Avenue
Suite 3700
Dallas, TX 75201
214-220-7792
Fax: 214-999-7792
Email: tleatherbury@velaw.com
*TERMINATED: 01/13/2020*

**Thomas Byrne Sullivan**
Ballard Spahr LLP (NYC)
1675 Broadway, 19th Floor
New York, NY 10019
212-850-6139
Fax: 212-223-1942
Email: sullivant@ballardspahr.com
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **James Bennet**<br>*an individual* | represented by | **Jay Ward Brown**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**David L. Axelrod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacquelyn Nicole Schell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Levine**
(See above for address)
*TERMINATED: 12/04/2020*

**Michael D. Sullivan**
(See above for address)
*TERMINATED: 07/22/2021*

**Thomas Byrne Sullivan**

(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/27/2017 | 1 | COMPLAINT against The New York Times Company. (Filing Fee $ 400.00, Receipt Number 0208-13834937)Document filed by Sarah Palin. (Attachments: # 1 Exhibit 01, # 2 Exhibit 02, # 3 Exhibit 03, # 4 Exhibit 04, # 5 Exhibit 05, # 6 Exhibit 06, # 7 Exhibit 07, # 8 Exhibit 08, # 9 Exhibit 09, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16)(Ricardo, Shawn) (Entered: 06/27/2017) |
| 06/27/2017 | 2 | CIVIL COVER SHEET filed. (Ricardo, Shawn) (Entered: 06/27/2017) |
| 06/27/2017 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to The New York Times Company, re: 1 Complaint,. Document filed by Sarah Palin. (Ricardo, Shawn) (Entered: 06/27/2017) |
| 06/27/2017 | 4 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Kenneth George Turkel to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-13835535. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sarah Palin. (Attachments: # 1 Affidavit of K. Turkel, # 2 Exhibit 01, # 3 Text of Proposed Order)(Ricardo, Shawn) Modified on 6/28/2017 (wb). (Entered: 06/27/2017) |
| 06/27/2017 | 5 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Shane Brady Vogt to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-13835551. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sarah Palin. (Attachments: # 1 Affidavit S. Vogt, # 2 Exhibit 01, # 3 Text of Proposed Order)(Ricardo, Shawn) Modified on 6/28/2017 (wb). (Entered: 06/27/2017) |
| 06/28/2017 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 5 MOTION for Shane Brady Vogt to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-13835551. Motion and supporting papers to be reviewed by Clerk's Office staff., 4 MOTION for Kenneth George Turkel to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-13835535. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of Florida; Please put the Title on Order for Pro hac Vice;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (wb) (Entered: 06/28/2017)** |
| 06/28/2017 | 6 | ELECTRONIC SUMMONS ISSUED as to The New York Times Company. (rch) (Entered: 06/28/2017) |
| 06/28/2017 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Jed S. Rakoff. Please download and review the Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (rch) (Entered: 06/28/2017) |
| 06/28/2017 | | Magistrate Judge Debra C. Freeman is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the |

| | | necessary form at the following link: http://nysd.uscourts.gov/forms.php. (rch) (Entered: 06/28/2017) |
|---|---|---|
| 06/28/2017 | | Case Designated ECF. (rch) (Entered: 06/28/2017) |
| 06/28/2017 | 7 | NOTICE OF COURT CONFERENCE: Initial Conference set for 7/7/2017 at 11:00 AM in Courtroom 14B, 500 Pearl Street, New York, NY 10007 before Judge Jed S. Rakoff, as further set forth in this order. (Signed by Judge Jed S. Rakoff on 6/28/2017) (jwh) (Entered: 06/28/2017) |
| 06/29/2017 | 8 | NOTICE OF APPEARANCE by Shawn Preston Ricardo on behalf of Sarah Palin. (Ricardo, Shawn) (Entered: 06/29/2017) |
| 06/29/2017 | 9 | **FILING ERROR - DEFICIENT DOCKET ENTRY** - MOTION for Kenneth G. Turkel to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sarah Palin. (Attachments: # 1 Affidavit of K. Turkel, # 2 Exhibit 01, # 3 Text of Proposed Order)(Ricardo, Shawn) Modified on 6/30/2017 (wb). (Entered: 06/29/2017) |
| 06/29/2017 | 10 | **FILING ERROR - DEFICIENT DOCKET ENTRY** - MOTION for Shane B. Vogt to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sarah Palin. (Attachments: # 1 Affidavit S. Vogt, # 2 Exhibit 01, # 3 Text of Proposed Order)(Ricardo, Shawn) Modified on 6/30/2017 (wb). (Entered: 06/29/2017) |
| 06/30/2017 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 10 MOTION for Shane B. Vogt to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff., 9 MOTION for Kenneth G. Turkel to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of Florida;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (wb)** (Entered: 06/30/2017) |
| 06/30/2017 | 11 | MOTION for Kenneth G. Turkel to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sarah Palin. (Attachments: # 1 Affidavit K. Turkel, # 2 Exhibit 01, # 3 Text of Proposed Order) (Ricardo, Shawn) (Entered: 06/30/2017) |
| 06/30/2017 | 12 | MOTION for Shane B. Vogt to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sarah Palin. (Attachments: # 1 Affidavit S. Vogt, # 2 Exhibit 01, # 3 Text of Proposed Order)(Ricardo, Shawn) (Entered: 06/30/2017) |
| 06/30/2017 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 11 MOTION for Kenneth G. Turkel to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ma)** (Entered: 06/30/2017) |
| 06/30/2017 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 12 MOTION for Shane B. Vogt to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ma)** (Entered: 06/30/2017) |
| 07/05/2017 | 13 | ORDER FOR PRO HAC VICE granting 12 Motion for Shane B. Vogt to Appear Pro Hac Vice. (Signed by Judge Jed S. Rakoff on 6/30/2017) (mro) (Entered: 07/05/2017) |

Case 22-558, Document 49, 08/10/2022, 3384712, Page28 of 222

**JA20**

| 07/05/2017 | 14 | ORDER granting 11 Motion for Kenneth G. Turkel to Appear Pro Hac Vice. (Signed by Judge Jed S. Rakoff on 6/30/2017) (mro) (Entered: 07/05/2017) |
|---|---|---|
| 07/05/2017 | 15 | SUMMONS RETURNED EXECUTED Summons and Complaint, served. The New York Times Company served on 6/29/2017, answer due 7/20/2017. Service was accepted by Ellen Herb, Executive Assistant. Document filed by Sarah Palin. (Ricardo, Shawn) (Entered: 07/05/2017) |
| 07/06/2017 | 16 | NOTICE OF APPEARANCE by Kenneth G. Turkel on behalf of Sarah Palin. (Turkel, Kenneth) (Entered: 07/06/2017) |
| 07/06/2017 | 17 | NOTICE OF APPEARANCE by Shane B. Vogt on behalf of Sarah Palin. (Vogt, Shane) (Entered: 07/06/2017) |
| 07/06/2017 | 18 | NOTICE OF APPEARANCE by David A.. Schulz on behalf of The New York Times Company. (Schulz, David) (Entered: 07/06/2017) |
| 07/06/2017 | 19 | NOTICE OF APPEARANCE by Jay Ward Brown on behalf of The New York Times Company. (Brown, Jay) (Entered: 07/06/2017) |
| 07/06/2017 | 20 | MOTION for Lee Levine to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-13865200. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by The New York Times Company. (Attachments: # 1 Affidavit of Lee Levine in Support of Motion, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Text of Proposed Order)(Levine, Lee) (Entered: 07/06/2017) |
| 07/06/2017 | 21 | MOTION for Thomas S. Leatherbury to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-13865604. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by The New York Times Company. (Attachments: # 1 Exhibit 1 - Affidavit in Support, # 2 Exhibit 2 - Certificate of Good Standing, # 3 Exhibit 3 - Proposed Order)(Leatherbury, Thomas) (Entered: 07/06/2017) |
| 07/06/2017 | 22 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate Grupo Financiero Inbursa, S.A.B. de C.V. for The New York Times Company. Document filed by The New York Times Company.(Brown, Jay) (Entered: 07/06/2017) |
| 07/07/2017 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 20 MOTION for Lee Levine to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-13865200. Motion and supporting papers to be reviewed by Clerk's Office staff., 21 MOTION for Thomas S. Leatherbury to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-13865604. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 07/07/2017) |
| 07/07/2017 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Initial Pretrial Conference held on 7/7/2017. A trial date is set for December 11, 2017. (Kotowski, Linda) (Entered: 08/08/2017) |
| 07/10/2017 | 23 | CIVIL CASE MANAGEMENT PLAN: The case is to be tried to a jury. Motion to Dismiss moving papers: 7/14; Answering: 7/21; Reply: 7/26. Oral Argument set for 7/31/2017 at 04:00 PM before Judge Jed S. Rakoff. Amended Pleadings due by 8/9/2017. Joinder of Parties due by 8/9/2017. Post-discovery summary judgment motions 10/5/2017. Responses due by 10/19/2017. Replies due by 10/26/2017. All depositions (including any expert depositions, see item 3 above) must be completed by 9/28/2017. All discovery is to be completed by 9/28/2017. A final pre-trial conference as well as oral argument on any post-discovery summary judgment motions, shall be held on 11/2/2017 at 04:00 PM before Judge Jed S. Rakoff. This Court requires that this case shall be ready |

Case 22-558, Document 49, 08/19/2022, 3384713, Page29 of 222

JA21

| | | |
|---|---|---|
| | | for trial on 12/7/2017. (Signed by Judge Jed S. Rakoff on 7/7/2017) (mro) (Entered: 07/10/2017) |
| 07/14/2017 | 24 | MOTION to Dismiss . Document filed by The New York Times Company.(Brown, Jay) (Entered: 07/14/2017) |
| 07/14/2017 | 25 | MEMORANDUM OF LAW in Support re: 24 MOTION to Dismiss . . Document filed by The New York Times Company. (Brown, Jay) (Entered: 07/14/2017) |
| 07/14/2017 | 26 | DECLARATION of Jay Ward Brown in Support re: 24 MOTION to Dismiss .. Document filed by The New York Times Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Brown, Jay) (Entered: 07/14/2017) |
| 07/17/2017 | 27 | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting 20 Motion for Lee Levine to Appear Pro Hac Vice. IT IS HEREBY ORDERED that Applicant is admitted to practice pro hac vice in the above captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys. (Signed by Judge Jed S. Rakoff on 7/15/17) (yv) (Entered: 07/17/2017) |
| 07/17/2017 | 28 | ORDER FOR ADMISSION PRO HAC VICE granting 21 Motion for Thomas S. Leatherbury to Appear Pro Hac Vice. IT IS HEREBY ORDERED that Thomas S. Leatherbury is admitted to practice pro hac vice in the above-captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys. (Signed by Judge Jed S. Rakoff on 7/15/17) (yv) (Entered: 07/17/2017) |
| 07/21/2017 | 29 | MEMORANDUM OF LAW in Opposition re: 24 MOTION to Dismiss . . Document filed by Sarah Palin. (Vogt, Shane) (Entered: 07/21/2017) |
| 07/21/2017 | 30 | DECLARATION of Shane B. Vogt in Opposition re: 24 MOTION to Dismiss .. Document filed by Sarah Palin. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Vogt, Shane) (Entered: 07/21/2017) |
| 07/26/2017 | 31 | REPLY MEMORANDUM OF LAW in Support re: 24 MOTION to Dismiss . . Document filed by The New York Times Company. (Brown, Jay) (Entered: 07/26/2017) |
| 07/26/2017 | 32 | DECLARATION of Jay Ward Brown in Support re: 24 MOTION to Dismiss .. Document filed by The New York Times Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Brown, Jay) (Entered: 07/26/2017) |
| 07/26/2017 | 33 | TRANSCRIPT of Proceedings re: CONFERENCE held on 7/7/2017 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Raquel Robles, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/16/2017. Redacted Transcript Deadline set for 8/28/2017. Release of Transcript Restriction set for 10/24/2017. (McGuirk, Kelly) (Entered: 07/26/2017) |
| 07/26/2017 | 34 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 7/7/17 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 07/26/2017) |

| 07/31/2017 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Oral Argument held on 7/31/2017 re: 24 MOTION to Dismiss . filed by The New York Times Company. (Kotowski, Linda) (Entered: 08/01/2017) |
|---|---|---|
| 08/10/2017 | 35 | ORDER re: 24 MOTION to Dismiss . filed by The New York Times Company. To help inform the Court of what inferences are reasonable or unreasonable in this context, the Court, pursuant to Rule 43(c), will convene an evidentiary hearing on Wednesday, August 16 at 2:00 PM EST. At the hearing, defense counsel must produce the author(s) of the editorial, who (or each of whom, if there is more than one author) will be examined under oath by defense counsel for no more than thirty (30) minutes, to be followed by cross-examination of plaintiff's counsel of no more than forty-five (45) minutes, to be followed by no more than fifteen (15) minutes of redirect by defense counsel. The Court also may question each such witness. SO ORDERED., (Evidentiary Hearing set for 8/16/2017 at 02:00 PM before Judge Jed S. Rakoff.) (Signed by Judge Jed S. Rakoff on 8/10/17) (yv) (Entered: 08/10/2017) |
| 08/10/2017 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 8/10/2017. (Kotowski, Linda) (Entered: 08/16/2017) |
| 08/14/2017 | 36 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Michael D. Sullivan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-14010060. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by The New York Times Company.(Sullivan, Michael) Modified on 8/14/2017 (ma). (Entered: 08/14/2017) |
| 08/14/2017 | 37 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** DECLARATION of Michael D. Sullivan in Support re: 36 MOTION for Michael D. Sullivan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-14010060. **Motion and supporting papers to be reviewed by Clerk's Office staff..** Document filed by The New York Times Company. (Attachments: # 1 Exhibit 1 - certificate of good standing, # 2 Text of Proposed Order)(Sullivan, Michael) Modified on 8/14/2017 (ma). (Entered: 08/14/2017) |
| 08/14/2017 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 36 MOTION for Michael D. Sullivan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-14010060. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): ALL THE DOCUMENTS MUST BE FILED TOGETHER. THE DOCUMENTS SHOULD BE IN THE FOLLOWING ORDR: 1) MOTION THEN THE DECLARATION/AFFIDAVIT, CERTIFCATE OF GOOD STANDING FROM THE SUPREME COURT AND THE PROPOSED ORDER MUST ALL BE ATTACHED.;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (ma)** (Entered: 08/14/2017) |
| 08/14/2017 | 38 | MOTION for Michael D. Sullivan to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by The New York Times Company. (Attachments: # 1 Declaration of Michael D. Sullivan in Support, # 2 Exhibit 1 - certificate of good standing, # 3 Text of Proposed Order)(Sullivan, Michael) (Entered: 08/14/2017) |
| 08/14/2017 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 38 MOTION for Michael D. Sullivan to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ma)** (Entered: 08/14/2017) |
| 08/16/2017 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Evidentiary Hearing held |

| | | on 8/16/2017. (Kotowski, Linda) (Entered: 08/23/2017) |
|---|---|---|
| 08/21/2017 | 39 | MEMO ENDORSED ORDER granting 38 Motion for Michael D. Sullivan to Appear Pro Hac Vice. ENDORSEMENT: IT IS HEREBY ORDERED that Applicant is admitted to practice pro hac vice in the above captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys. (Signed by Judge Jed S. Rakoff on 8/18/17) (yv) Modified on 9/20/2017 (yv). (Entered: 08/21/2017) |
| 08/21/2017 | 40 | MEMORANDUM OF LAW in Opposition re: 24 MOTION to Dismiss . *on Context, Inferences and Plausibility*. Document filed by Sarah Palin. (Vogt, Shane) (Entered: 08/21/2017) |
| 08/21/2017 | 41 | DECLARATION of Shane B. Vogt in Opposition re: 24 MOTION to Dismiss .. Document filed by Sarah Palin. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34)(Vogt, Shane) (Entered: 08/21/2017) |
| 08/21/2017 | 42 | SUPPLEMENTAL MEMORANDUM OF LAW in Support re: 24 MOTION to Dismiss . . Document filed by The New York Times Company. (Brown, Jay) (Entered: 08/21/2017) |
| 08/22/2017 | 43 | RESPONSE to Motion re: 24 MOTION to Dismiss . *(Response to 42 Defendant's Supplemental Memorandum)*. Document filed by Sarah Palin. (Vogt, Shane) (Entered: 08/22/2017) |
| 08/22/2017 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 8/22/2017. (Kotowski, Linda) (Entered: 08/28/2017) |
| 08/23/2017 | 44 | REPLY to Response to Motion re: 24 MOTION to Dismiss . *Reply to Plaintiff's Response, Dkt. No. 43*. Document filed by The New York Times Company. (Brown, Jay) (Entered: 08/23/2017) |
| 08/29/2017 | 45 | OPINION AND ORDER re: 24 MOTION to Dismiss . filed by The New York Times Company. The Court grants defendant's motion to dismiss. Because, moreover, this Court has canvassed in the discussion above all the various additions that plaintiff has even remotely suggested it would include in an amended complaint, the dismissal is "with prejudice," that is, final. Clerk to enter judgment. SO ORDERED. (Signed by Judge Jed S. Rakoff on 8/29/17) (yv) (Main Document 45 replaced on 8/30/2017) (mt). (Entered: 08/29/2017) |
| 08/29/2017 | | Transmission to Judgments and Orders Clerk. Transmitted re: 45 Memorandum & Opinion, to the Judgments and Orders Clerk. (yv) (Entered: 08/29/2017) |
| 08/30/2017 | 46 | CLERK'S JUDGMENT: That for the reasons stated in the Court's Opinion and Order dated August 29, 2017, defendant's motion to dismiss is granted with prejudice. (Signed by Clerk of Court Ruby Krajick on 08/30/2017) (Attachments: # 1 Notice of Right to Appeal, # 2 Notice of Right to Appeal)(dt) (Entered: 08/30/2017) |
| 08/30/2017 | | Terminate Transcript Deadlines (dt) (Entered: 08/30/2017) |
| 08/30/2017 | 47 | TRANSCRIPT of Proceedings re: ARGUMENT held on 7/31/2017 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber |

| | | |
|---|---|---|
| | | before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/20/2017. Redacted Transcript Deadline set for 10/2/2017. Release of Transcript Restriction set for 11/28/2017. (McGuirk, Kelly) (Entered: 08/30/2017) |
| 08/30/2017 | 48 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a ARGUMENT proceeding held on 7/31/17 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 08/30/2017) |
| 08/30/2017 | 49 | TRANSCRIPT of Proceedings re: HEARING held on 8/16/2017 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/20/2017. Redacted Transcript Deadline set for 10/2/2017. Release of Transcript Restriction set for 11/28/2017. (McGuirk, Kelly) (Entered: 08/30/2017) |
| 08/30/2017 | 50 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a HEARING proceeding held on 8/16/17 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 08/30/2017) |
| 09/11/2017 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 9/11/2017. (Kotowski, Linda) (Entered: 09/12/2017) |
| 09/25/2017 | 51 | MOTION for Reconsideration re; 45 Memorandum & Opinion,, 46 Clerk's Judgment, . Document filed by Sarah Palin.(Vogt, Shane) (Entered: 09/25/2017) |
| 09/25/2017 | 52 | MEMORANDUM OF LAW in Support re: 51 MOTION for Reconsideration re;45 Memorandum & Opinion,, 46 Clerk's Judgment, . . Document filed by Sarah Palin. (Vogt, Shane) (Entered: 09/25/2017) |
| 09/25/2017 | 53 | DECLARATION of Shane B. Vogt in Support re: 51 MOTION for Reconsideration re; 45 Memorandum & Opinion,, 46 Clerk's Judgment, .. Document filed by Sarah Palin. (Attachments: # 1 Exhibit 1 to Exhibit A (Proposed Amended Complaint), # 2 Exhibit 2 to Exhibit A (Proposed Amended Complaint), # 3 Exhibit 3 to Exhibit A (Proposed Amended Complaint), # 4 Exhibit 4 to Exhibit A (Proposed Amended Complaint), # 5 Exhibit 5 to Exhibit A (Proposed Amended Complaint), # 6 Exhibit 6 to Exhibit A (Proposed Amended Complaint), # 7 Exhibit 7 to Exhibit A (Proposed Amended Complaint), # 8 Exhibit 8 to Exhibit A (Proposed Amended Complaint), # 9 Exhibit 9 to Exhibit A (Proposed Amended Complaint), # 10 Exhibit 10 to Exhibit A (Proposed Amended Complaint), # 11 Exhibit 11 to Exhibit A (Proposed Amended Complaint), # 12 Exhibit 12 to Exhibit A (Proposed Amended Complaint), # 13 Exhibit 13 to Exhibit A (Proposed Amended Complaint), # 14 Exhibit 14 to Exhibit A (Proposed Amended Complaint), # 15 Exhibit 15 to Exhibit A (Proposed Amended Complaint), # 16 Exhibit 16 to Exhibit A (Proposed Amended Complaint), # 17 Exhibit 17 to Exhibit A (Proposed Amended Complaint), # 18 Exhibit 18 to Exhibit A (Proposed Amended Complaint), # 19 Exhibit 19 to Exhibit A (Proposed Amended Complaint), # 20 Exhibit 20 to Exhibit A (Proposed Amended Complaint), # 21 Exhibit 21 to Exhibit A (Proposed Amended Complaint), # 22 Exhibit 22 to Exhibit A (Proposed Amended Complaint), # 23 Exhibit 23 to Exhibit A (Proposed Amended Complaint), # 24 Exhibit 24 to Exhibit A (Proposed |

| | | Amended Complaint), # 25 Exhibit 25 to Exhibit A (Proposed Amended Complaint), # 26 Exhibit 26 to Exhibit A (Proposed Amended Complaint), # 27 Exhibit 27 to Exhibit A (Proposed Amended Complaint), # 28 Exhibit 28 to Exhibit A (Proposed Amended Complaint), # 29 Exhibit 29 to Exhibit A (Proposed Amended Complaint))(Vogt, Shane) (Entered: 09/25/2017) |
|---|---|---|
| 09/25/2017 | 54 | DECLARATION of Shane B. Vogt in Support re: 51 MOTION for Reconsideration re; 45 Memorandum & Opinion,, 46 Clerk's Judgment, .. Document filed by Sarah Palin. (Attachments: # 1 Exhibit A to Declaration)(Vogt, Shane) (Entered: 09/25/2017) |
| 10/03/2017 | 55 | NOTICE OF CHANGE OF ADDRESS by David A.. Schulz on behalf of The New York Times Company. New Address: Ballard Spahr LLP, 919 Third Avenue, 37th Floor, New York, NY, USA 10022-3915, 212-850-6103. (Schulz, David) (Entered: 10/03/2017) |
| 10/03/2017 | 56 | NOTICE OF CHANGE OF ADDRESS by Jay Ward Brown on behalf of The New York Times Company. New Address: Ballard Spahr LLP, 1909 K Street, NW, 12th Floor, Washington, DC, USA 20006-1157, 202-508-1136. (Brown, Jay) (Entered: 10/03/2017) |
| 10/03/2017 | 57 | NOTICE OF CHANGE OF ADDRESS by Lee Levine on behalf of The New York Times Company. New Address: Ballard Spahr LLP, 1909 K Street, NW, 12th Floor, Washington, DC, USA 20006-1157, 202-508-1110. (Levine, Lee) (Entered: 10/03/2017) |
| 10/03/2017 | 58 | NOTICE OF CHANGE OF ADDRESS by Michael D. Sullivan on behalf of The New York Times Company. New Address: Ballard Spahr LLP, 1909 K Street, NW, 12th Floor, Washington, DC, USA 20006-1157, 202-508-1116. (Sullivan, Michael) (Entered: 10/03/2017) |
| 10/09/2017 | 59 | MEMORANDUM OF LAW in Opposition re: 51 MOTION for Reconsideration re; 45 Memorandum & Opinion,, 46 Clerk's Judgment, . . Document filed by The New York Times Company. (Brown, Jay) (Entered: 10/09/2017) |
| 10/16/2017 | 60 | REPLY MEMORANDUM OF LAW in Support re: 51 MOTION for Reconsideration re; 45 Memorandum & Opinion,, 46 Clerk's Judgment, . . Document filed by Sarah Palin. (Vogt, Shane) (Entered: 10/16/2017) |
| 10/23/2017 | 61 | MEMORANDUM ORDER denying 51 Motion for Reconsideration re 45 Memorandum & Opinion. For the foregoing reasons, plaintiff's motion for reconsideration is hereby denied. The Clerk of the Court is directed to close the case. So Ordered., (Signed by Judge Jed S. Rakoff on 10/23/17) (yv) (Entered: 10/23/2017) |
| 10/23/2017 | | Terminate Transcript Deadlines (yv) (Entered: 12/05/2017) |
| 11/21/2017 | 62 | NOTICE OF APPEAL from 46 Clerk's Judgment, 61 Order on Motion for Reconsideration,. Document filed by Sarah Palin. Filing fee $ 505.00, receipt number 0208-14390616. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Vogt, Shane) (Entered: 11/21/2017) |
| 11/21/2017 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 62 Notice of Appeal. (tp) (Entered: 11/21/2017) |
| 11/21/2017 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 62 Notice of Appeal, filed by Sarah Palin were transmitted to the U.S. Court of Appeals. (tp) (Entered: 11/21/2017) |
| 01/22/2018 | 63 | NOTICE OF CHANGE OF ADDRESS by David A. Schulz on behalf of The New York Times Company. New Address: Ballard Spahr LLP, 1675 Broadway, 19th Floor, New York, NY, US 10019-5820, 212-850-6103. (Schulz, David) (Entered: 01/22/2018) |
| 08/06/2019 | 64 | OPINION of USCA (Certified) as to 62 Notice of Appeal, filed by Sarah Palin USCA |

Case 22-558, Document 49, 09/13/2022, 3384713, Page34 of 222

| | | Case Number 17-3801-cv. This case is ultimately about the First Amendment, but the subject matter implicated in this appeal is far less dramatic: rules of procedure and pleading standards. Sarah Palin appeals the dismissal of her defamation complaint against The New York Times ("the Times") for failure to state a claim. The district court (Rakoff, J.), uncertain as to whether Palin's complaint plausibly alleged all of the required elements of her defamation claim, held an evidentiary hearing to test the sufficiency of Palins pleadings. Following the hearing, and without converting the proceeding to one for summary judgment, the district court relied on evidence adduced at that hearing to dismiss Palins complaint under Federal Rule of Civil Procedure 12(b)(6). We find that the district court erred in relying on facts outside the pleadings to dismiss the complaint. We further conclude that Palin's Proposed Amended Complaint plausibly states a claim for defamation and may proceed to full discovery. We therefore VACATE and REMAND for proceedings consistent with this opinion.. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 8/6/2019. (nd) (Entered: 08/06/2019) |
|---|---|---|
| 08/06/2019 | | Transmission of USCA Opinion to the District Judge re: 64 USCA Opinion. (nd) (Entered: 08/06/2019) |
| 10/15/2019 | 65 | AMENDED OPINION OF USCA as to 62 Notice of Appeal, filed by Sarah Palin. USCA Case Number 17-3801-cv. This case is ultimately about the First Amendment, but the subject matter implicated in this appeal is far less dramatic: rules of procedure and pleading standards. Sarah Palin appeals the dismissal of her defamation complaint against The New York Times ("the Times") for failure to state a claim. The district court (Rakoff, J.), uncertain as to whether Palin's complaint plausibly alleged all of the required elements of her defamation claim, held an evidentiary hearing to test the sufficiency of Palin's pleadings. Following the hearing, and without converting the proceeding to one for summary judgment, the district court relied on evidence adduced at that hearing to dismiss Palin's complaint under Federal Rule of Civil Procedure 12(b)(6). We find that the district court erred in relying on facts outside the pleadings to dismiss the complaint. We further conclude that Palin's Proposed Amended Complaint plausibly states a claim for defamation and may proceed to full discovery. We therefore VACATE and REMAND for proceedings consistent with this opinion. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 10/15/2019. (nd) (Entered: 10/15/2019) |
| 12/10/2019 | 66 | MANDATE of USCA (Certified Copy) as to 62 Notice of Appeal, filed by Sarah Palin. USCA Case Number 17-3801. IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is VACATED and the case is REMANDED to the district court for further proceedings consistent with this Court's opinion. This judgment is nunc pro tunc to October 15, 2019, the date the Amended Opinion was filed. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 12/09/2019. (Attachments: # 1 Opinion, # 2 Amended Opinion, # 3 Judgment)(nd) (Entered: 12/10/2019) |
| 12/10/2019 | | Transmission of USCA Mandate to the District Judge re: 66 USCA Mandate,,. (nd) (Entered: 12/10/2019) |
| 12/11/2019 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. Scheduling Conference set for 12/16/2019 at 11:00 AM before Judge Jed S. Rakoff. (Kotowski, Linda) (Entered: 12/11/2019) |
| 12/12/2019 | 67 | ORDER: The Court will hold a scheduling conference in this case on Monday, December 16, 2019 at 11:00 AM in Courtroom 14B at 500 Pearl St., New York, NY. (Scheduling Conference set for 12/16/2019 at 11:00 AM in Courtroom 14B, 500 Pearl Street, New York, NY 10007 before Judge Jed S. Rakoff.) (Signed by Judge Jed S. Rakoff on 12/11/2019) (jwh) (Entered: 12/12/2019) |
| 12/13/2019 | 68 | NOTICE OF APPEARANCE by Thomas Byrne Sullivan on behalf of The New York |

| | | |
|---|---|---|
| | | Times Company. (Sullivan, Thomas) (Entered: 12/13/2019) |
| 12/16/2019 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Scheduling Conference held on 12/16/2019, ( Final Pretrial Conference set for 5/26/2020 at 11:00 AM before Judge Jed S. Rakoff., Jury Trial set for 6/22/2020 at 09:30 AM before Judge Jed S. Rakoff.). (Kotowski, Linda) (Entered: 12/16/2019) |
| 12/16/2019 | 69 | CIVIL CASE MANAGEMENT PLAN: Trial - 6/22/20. The case is to be tried to a jury. Amended Pleadings due by 1/7/2020. Motions due by 4/27/2020. Responses due by 5/11/2020 Replies due by 5/18/2020. Deposition due by 6/4/2020. Discovery due by 4/13/2020. Oral Argument set for 5/26/2020 at 11:00 AM before Judge Jed S. Rakoff. Final Pretrial Conference set for 5/26/2020 at 11:00 AM before Judge Jed S. Rakoff. (Signed by Judge Jed S. Rakoff on 12/16/2019) (jwh) (Entered: 12/16/2019) |
| 12/30/2019 | 70 | FIRST AMENDED COMPLAINT amending 1 Complaint, against The New York Times Company, James Bennet with JURY DEMAND.Document filed by Sarah Palin. Related document: 1 Complaint,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29)(Ricardo, Shawn) (Entered: 12/30/2019) |
| 12/30/2019 | 71 | REQUEST FOR ISSUANCE OF SUMMONS as to James Bennet, re: 70 Amended Complaint,,. Document filed by Sarah Palin. (Ricardo, Shawn) (Entered: 12/30/2019) |
| 01/02/2020 | 72 | ELECTRONIC SUMMONS ISSUED as to James Bennet. (pc) (Entered: 01/02/2020) |
| 01/02/2020 | 73 | NOTICE OF APPEARANCE by Jay Ward Brown on behalf of James Bennet. (Brown, Jay) (Entered: 01/02/2020) |
| 01/02/2020 | 74 | NOTICE OF APPEARANCE by Thomas Byrne Sullivan on behalf of James Bennet. (Sullivan, Thomas) (Entered: 01/02/2020) |
| 01/02/2020 | 75 | ANSWER to 70 Amended Complaint,, with JURY DEMAND. Document filed by James Bennet, The New York Times Company.(Brown, Jay) (Entered: 01/02/2020) |
| 01/02/2020 | 76 | MOTION for Judgment on the Pleadings *to dismiss plaintiff's claim for disgorgement damages*. Document filed by James Bennet, The New York Times Company. Responses due by 1/10/2020(Brown, Jay) (Entered: 01/02/2020) |
| 01/02/2020 | 77 | MEMORANDUM OF LAW in Support re: 76 MOTION for Judgment on the Pleadings *to dismiss plaintiff's claim for disgorgement damages*. . Document filed by James Bennet, The New York Times Company. (Brown, Jay) (Entered: 01/02/2020) |
| 01/03/2020 | 78 | MOTION to Withdraw *as Co-Counsel*. Document filed by The New York Times Company. (Attachments: # 1 Text of Proposed Order)(Leatherbury, Thomas) (Entered: 01/03/2020) |
| 01/03/2020 | 79 | DECLARATION of Thomas S. Leatherbury in Support re: 78 MOTION to Withdraw *as Co-Counsel*.. Document filed by The New York Times Company. (Leatherbury, Thomas) (Entered: 01/03/2020) |
| 01/10/2020 | 80 | MEMORANDUM OF LAW in Opposition re: 76 MOTION for Judgment on the Pleadings *to dismiss plaintiff's claim for disgorgement damages*. . Document filed by Sarah Palin. (Vogt, Shane) (Entered: 01/10/2020) |
| 01/13/2020 | 81 | ORDER GRANTING LEAVE TO WITHDRAW AS COUNSEL granting 78 Motion to |

| | | Withdraw: IT IS HEREBY ORDERED that the noticed request to withdraw Thomas S. Leatherbury and Vinson & Elkins LLP as co-counsel for The New York Times Company is granted, and the appearances of Mr. Leatherbury and Vinson & Elkins LLP are withdrawn as of the date of this Order. (Attorney Thomas S. Leatherbury terminated.) (Signed by Judge Jed S. Rakoff on 1/10/2020) (jwh) Modified on 1/13/2020 (jwh). (Entered: 01/13/2020) |
|---|---|---|
| 01/16/2020 | 82 | REPLY MEMORANDUM OF LAW in Support re: 76 MOTION for Judgment on the Pleadings *to dismiss plaintiff's claim for disgorgement damages.* . Document filed by James Bennet, The New York Times Company. (Brown, Jay) (Entered: 01/16/2020) |
| 01/21/2020 | 83 | MEMORANDUM ORDER granting 76 Motion for Judgment on the Pleadings: For these reasons, the Court grants the defendants' motion for partial judgment on the pleadings dismissing Palin's claim for disgorgement damages. The Clerk is directed to close the entry bearing the docket number 76. (Signed by Judge Jed S. Rakoff on 1/19/2020) (jwh) (Entered: 01/21/2020) |
| 01/24/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 1/24/2020. (Kotowski, Linda) (Entered: 01/30/2020) |
| 01/27/2020 | 84 | PROTECTIVE ORDER regarding procedures to be followed that shall govern the handling of confidential material. (Signed by Judge Jed S. Rakoff on 1/24/2020) (jwh) (Entered: 01/27/2020) |
| 01/30/2020 | 85 | MOTION for David L. Axelrod to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-18640467. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by James Bennet, The New York Times Company. (Attachments: # 1 Affidavit of D. Axelrod, # 2 Exhibit 1, # 3 Text of Proposed Order) (Axelrod, David) (Entered: 01/30/2020) |
| 02/03/2020 | 86 | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting 85 Motion for David L. Axelrod to Appear Pro Hac Vice. (Signed by Judge Jed S. Rakoff on 1/31/2020) (jwh) (Entered: 02/03/2020) |
| 02/20/2020 | 87 | NOTICE OF APPEARANCE by Jacquelyn Nicole Schell on behalf of James Bennet, The New York Times Company..(Schell, Jacquelyn) (Entered: 02/20/2020) |
| 02/27/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 2/27/2020. (Kotowski, Linda) (Entered: 02/27/2020) |
| 03/11/2020 | 88 | TRANSCRIPT of Proceedings re: CONFERENCE held on 12/16/2019 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Sonya Ketter Moore, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/1/2020. Redacted Transcript Deadline set for 4/13/2020. Release of Transcript Restriction set for 6/9/2020.. (McGuirk, Kelly) (Entered: 03/11/2020) |
| 03/11/2020 | 89 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 12/16/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 03/11/2020) |
| 03/17/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 3/17/2020. (tro) Modified on 3/18/2020 (tro). (Entered: 03/18/2020) |

Case 22-558, Document 49, 08/03/2022, 3364713, Page37 of 222

JA29

| 03/17/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Interim Pretrial Conference held on 3/17/2020. (tro) (Entered: 03/19/2020) |
|---|---|---|
| 03/18/2020 | 90 | AMENDED CIVIL CASE MANAGEMENT PLAN: Ready for Trial by 8/24/2020. Amended pleadings may be filed without leave of Court until 1/7/20. Deposition due by 5/29/2020. Discovery due by 6/5/2020. Motions due by 6/19/2020. Responses due by 7/10/2020. Replies due by 7/17/2020. Oral Argument set for 7/27/2020 at 02:00 PM before Judge Jed S. Rakoff. Final Pretrial Conference set for 7/27/2020 at 02:00 PM before Judge Jed S. Rakoff. The Court will decide any summary judgment motions by no later than 8/10/20. The trial of any remaining claims will commence on 8/24/20 at 9:00 am. Jury Trial set for 8/24/2020 at 09:00 AM before Judge Jed S. Rakoff. (Signed by Judge Jed S. Rakoff on 3/18/2020) (jwh) (Entered: 03/18/2020) |
| 03/19/2020 | | MEMORANDUM TO THE DOCKET CLERK: The final pre-trial conference and the trial dates previously set for May 26, 2020 and June 22, 2020, respectively, have been adjourned to July 27, 2020 at 2:00 p.m. and August 24, 2020 at 9:00 a.m.(kgo) (Entered: 03/19/2020) |
| 03/19/2020 | | Set/Reset Hearings: Final Pretrial Conference set for 7/27/2020 at 02:00 PM before Judge Jed S. Rakoff. Jury Trial set for 8/24/2020 at 09:00 AM before Judge Jed S. Rakoff. (kgo) (Entered: 03/19/2020) |
| 03/19/2020 | 91 | NOTICE OF APPEARANCE by Michael McGee Munoz on behalf of Sarah Palin.. (Munoz, Michael) (Entered: 03/19/2020) |
| 03/20/2020 | 92 | NOTICE of Substitution of Attorney. Old Attorney: S. Preston Ricardo, New Attorney: Michael M. Munoz, Address: Golenbock Eiseman Assor Bell & Peskoe LLP, 711 Third Avenue, 17th Floor, New York, NY, United States 10017, 212-907-7300. Document filed by Sarah Palin..(Ricardo, Shawn) (Entered: 03/20/2020) |
| 03/23/2020 | 93 | MEMO ENDORSEMENT on re: 92 Notice of Substitution of Attorney, filed by Sarah Palin. ENDORSEMENT: SO ORDERED. (Attorney Shawn Preston Ricardo terminated.) (Signed by Judge Jed S. Rakoff on 3/23/2020) (jwh) (Entered: 03/23/2020) |
| 06/12/2020 | 94 | MOTION for Summary Judgment . Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 06/12/2020) |
| 06/12/2020 | 95 | MOTION for Partial Summary Judgment . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 06/12/2020) |
| 06/19/2020 | 96 | MEMORANDUM OF LAW in Support re: 94 MOTION for Summary Judgment . . Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 06/19/2020) |
| 06/19/2020 | 97 | RULE 56.1 STATEMENT. Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 06/19/2020) |
| 06/19/2020 | 98 | DECLARATION of James Bennet in Support re: 94 MOTION for Summary Judgment .. Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 06/19/2020) |
| 06/19/2020 | 99 | DECLARATION of Thomas B. Sullivan in Support re: 94 MOTION for Summary Judgment .. Document filed by James Bennet, The New York Times Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 |

| | | |
|---|---|---|
| | | Exhibit 32, # <u>33</u> Exhibit 33, # <u>34</u> Exhibit 34, # <u>35</u> Exhibit 35, # <u>36</u> Exhibit 36, # <u>37</u> Exhibit 37, # <u>38</u> Exhibit 38, # <u>39</u> Exhibit 39, # <u>40</u> Exhibit 40, # <u>41</u> Exhibit 41, # <u>42</u> Exhibit 42, # <u>43</u> Exhibit 43, # <u>44</u> Exhibit 44, # <u>45</u> Exhibit 45, # <u>46</u> Exhibit 46, # <u>47</u> Exhibit 47, # <u>48</u> Exhibit 48, # <u>49</u> Exhibit 49, # <u>50</u> Exhibit 50, # <u>51</u> Exhibit 51, # <u>52</u> Exhibit 52, # <u>53</u> Exhibit 53, # <u>54</u> Exhibit 54, # <u>55</u> Exhibit 55, # <u>56</u> Exhibit 56, # <u>57</u> Exhibit 57, # <u>58</u> Exhibit 58, # <u>59</u> Exhibit 59, # <u>60</u> Exhibit 60, # <u>61</u> Exhibit 61).(Brown, Jay) (Entered: 06/19/2020) |
| 06/19/2020 | <u>100</u> | MEMORANDUM OF LAW in Support re: <u>95</u> MOTION for Partial Summary Judgment . . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 06/19/2020) |
| 06/19/2020 | <u>101</u> | RULE 56.1 STATEMENT. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 06/19/2020) |
| 06/19/2020 | <u>102</u> | DECLARATION of Shane B. Vogt in Support re: <u>95</u> MOTION for Partial Summary Judgment .. Document filed by Sarah Palin. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit D, # <u>5</u> Exhibit E, # <u>6</u> Exhibit F, # <u>7</u> Exhibit G, # <u>8</u> Exhibit H, # <u>9</u> Exhibit I, # <u>10</u> Exhibit J, # <u>11</u> Exhibit K, # <u>12</u> Exhibit L, # <u>13</u> Exhibit M, # <u>14</u> Exhibit N, # <u>15</u> Exhibit O, # <u>16</u> Exhibit P, # <u>17</u> Exhibit Q, # <u>18</u> Exhibit R, # <u>19</u> Exhibit S, # <u>20</u> Exhibit T, # <u>21</u> Exhibit U, # <u>22</u> Exhibit V, # <u>23</u> Exhibit W, # <u>24</u> Exhibit X, # <u>25</u> Exhibit Y, # <u>26</u> Exhibit Z, # <u>27</u> Exhibit AA, # <u>28</u> Exhibit BB).(Vogt, Shane) (Entered: 06/19/2020) |
| 07/08/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 7/8/2020. (Kotowski, Linda) (Entered: 07/10/2020) |
| 07/09/2020 | <u>103</u> | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** CONSENT MOTION to Amend/Correct <u>99</u> Declaration in Support of Motion,,,,, . Document filed by James Bennet, The New York Times Company. (Attachments: # <u>1</u> Exhibit Corrected Exhibit 4, # <u>2</u> Exhibit Corrected Exhibit 5).(Sullivan, Thomas) Modified on 7/27/2020 (lb). (Entered: 07/09/2020) |
| 07/10/2020 | <u>104</u> | MEMORANDUM OF LAW in Opposition re: <u>95</u> MOTION for Partial Summary Judgment . . Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 07/10/2020) |
| 07/10/2020 | <u>105</u> | DECLARATION of Jacquelyn N. Schell in Opposition re: <u>95</u> MOTION for Partial Summary Judgment .. Document filed by James Bennet, The New York Times Company. (Attachments: # <u>1</u> Exhibit 62, # <u>2</u> Exhibit 63, # <u>3</u> Exhibit 64, # <u>4</u> Exhibit 65, # <u>5</u> Exhibit 66).(Brown, Jay) (Entered: 07/10/2020) |
| 07/10/2020 | <u>106</u> | COUNTER STATEMENT TO <u>101</u> Rule 56.1 Statement. Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 07/10/2020) |
| 07/10/2020 | <u>107</u> | MEMORANDUM OF LAW in Opposition re: <u>94</u> MOTION for Summary Judgment . . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 07/10/2020) |
| 07/10/2020 | <u>108</u> | COUNTER STATEMENT TO <u>97</u> Rule 56.1 Statement. Document filed by Sarah Palin.. (Vogt, Shane) (Entered: 07/10/2020) |
| 07/11/2020 | <u>109</u> | DECLARATION of Shane B. Vogt in Opposition re: <u>94</u> MOTION for Summary Judgment .. Document filed by Sarah Palin. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12, # <u>13</u> Exhibit 13, # <u>14</u> Exhibit 14, # <u>15</u> Exhibit 15, # <u>16</u> Exhibit 16, # <u>17</u> Exhibit 17, # <u>18</u> Exhibit 18, # <u>19</u> Exhibit 19, # <u>20</u> Exhibit 20, # <u>21</u> Exhibit 21, # <u>22</u> Exhibit 22, # <u>23</u> Exhibit 23, # <u>24</u> Exhibit 24, # <u>25</u> Exhibit 25, # <u>26</u> Exhibit 26, # <u>27</u> Exhibit 27, # <u>28</u> Exhibit 28, # <u>29</u> Exhibit 29, # <u>30</u> Exhibit 30, # <u>31</u> Exhibit 31, # <u>32</u> Exhibit 32, # <u>33</u> Exhibit 33, # <u>34</u> Exhibit 34, # <u>35</u> Exhibit 35, # <u>36</u> Exhibit 36, # <u>37</u> Exhibit 37, # <u>38</u> Exhibit 38, # <u>39</u> Exhibit 39, # <u>40</u> |

Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45
Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50
Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55
Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60
Exhibit 60, # 61 Exhibit 61, # 62 Exhibit 62, # 63 Exhibit 63, # 64 Exhibit 64, # 65
Exhibit 65, # 66 Exhibit 66, # 67 Exhibit 67, # 68 Exhibit 68, # 69 Exhibit 69, # 70
Exhibit 70 (Part 1), # 71 Exhibit 70 (Part 2), # 72 Exhibit 70 (Part 3), # 73 Exhibit 70
(Part 4), # 74 Exhibit 71, # 75 Exhibit 72, # 76 Exhibit 73, # 77 Exhibit 74, # 78 Exhibit
75, # 79 Exhibit 76, # 80 Exhibit 77, # 81 Exhibit 78, # 82 Exhibit 79, # 83 Exhibit 80, #
84 Exhibit 81, # 85 Exhibit 82, # 86 Exhibit 83, # 87 Exhibit 84, # 88 Exhibit 85, # 89
Exhibit 86, # 90 Exhibit 87, # 91 Exhibit 88, # 92 Exhibit 89, # 93 Exhibit 90, # 94
Exhibit 91, # 95 Exhibit 92, # 96 Exhibit 93, # 97 Exhibit 94, # 98 Exhibit 95, # 99
Exhibit 96, # 100 Exhibit 97, # 101 Exhibit 98, # 102 Exhibit 99, # 103 Exhibit 100, #
104 Exhibit 101, # 105 Exhibit 102, # 106 Exhibit 103, # 107 Exhibit 104, # 108 Exhibit
105, # 109 Exhibit 106, # 110 Exhibit 107, # 111 Exhibit 108, # 112 Exhibit 109, # 113
Exhibit 110, # 114 Exhibit 111, # 115 Exhibit 112, # 116 Exhibit 113, # 117 Exhibit 114,
# 118 Exhibit 115, # 119 Exhibit 116, # 120 Exhibit 117, # 121 Exhibit 118, # 122 Exhibit
119, # 123 Exhibit 120, # 124 Exhibit 121, # 125 Exhibit 122, # 126 Exhibit 123, # 127
Exhibit 124, # 128 Exhibit 125, # 129 Exhibit 126, # 130 Exhibit 127, # 131 Exhibit 128,
# 132 Exhibit 129, # 133 Exhibit 130, # 134 Exhibit 131, # 135 Exhibit 132, # 136
Exhibit 133, # 137 Exhibit 134, # 138 Exhibit 135, # 139 Exhibit 136, # 140 Exhibit 137,
# 141 Exhibit 138, # 142 Exhibit 139, # 143 Exhibit 140, # 144 Exhibit 141, # 145
Exhibit 142, # 146 Exhibit 143, # 147 Exhibit 144, # 148 Exhibit 145, # 149 Exhibit 146,
# 150 Exhibit 147, # 151 Exhibit 148, # 152 Exhibit 149, # 153 Exhibit 150, # 154
Exhibit 151, # 155 Exhibit 152, # 156 Exhibit 153, # 157 Exhibit 154, # 158 Exhibit 155,
# 159 Exhibit 156, # 160 Exhibit 157, # 161 Exhibit 158, # 162 Exhibit 159, # 163
Exhibit 160, # 164 Exhibit 161, # 165 Exhibit 162, # 166 Exhibit 163, # 167 Exhibit 164,
# 168 Exhibit 165, # 169 Exhibit 166, # 170 Exhibit 167, # 171 Exhibit 168, # 172
Exhibit 169, # 173 Exhibit 170, # 174 Exhibit 171, # 175 Exhibit 172, # 176 Exhibit 173,
# 177 Exhibit 174, # 178 Exhibit 175, # 179 Exhibit 176, # 180 Exhibit 177, # 181
Exhibit 178, # 182 Exhibit 179, # 183 Exhibit 180, # 184 Exhibit 181, # 185 Exhibit 182,
# 186 Exhibit 183, # 187 Exhibit 184, # 188 Exhibit 185, # 189 Exhibit 186, # 190
Exhibit 187, # 191 Exhibit 188, # 192 Exhibit 189, # 193 Exhibit 190, # 194 Exhibit 191,
# 195 Exhibit 192, # 196 Exhibit 193, # 197 Exhibit 194, # 198 Exhibit 195, # 199
Exhibit 196, # 200 Exhibit 197, # 201 Exhibit 198, # 202 Exhibit 199, # 203 Exhibit 200,
# 204 Exhibit 201, # 205 Exhibit 202, # 206 Exhibit 203, # 207 Exhibit 204, # 208
Exhibit 205, # 209 Exhibit 206, # 210 Exhibit 207, # 211 Exhibit 208, # 212 Exhibit 209,
# 213 Exhibit 210, # 214 Exhibit 211).(Vogt, Shane) (Entered: 07/11/2020)

| Date | Doc | Description |
|------|-----|-------------|
| 07/11/2020 | 110 | NOTICE of Plaintiff's Statement Regarding Filing of Declaration of Shane Vogt [Doc. 109] re: 109 Declaration in Opposition to Motion,,,,,,,,,,,,,,,,,,,,. Document filed by Sarah Palin. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4).(Vogt, Shane) (Entered: 07/11/2020) |
| 07/15/2020 | 111 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU** - MOTION for Reconsideration re; 83 Order on Motion for Judgment on the Pleadings, . Document filed by Sarah Palin..(Vogt, Shane) Modified on 7/28/2020 (lb). (Entered: 07/15/2020) |
| 07/16/2020 | | NOTICE of Hearing:The Pretrial Conference set for 7/27/2020 at 02:00 PM before Judge Jed S. Rakoff shall proceed telephonically. Dial in information: USA toll free - 888-363-4735; International, caller paid - 215-446-3657; Access code - 1086415..(Kotowski, Linda) (Entered: 07/16/2020) |
| 07/17/2020 | 112 | REPLY MEMORANDUM OF LAW in Opposition re: 94 MOTION for Summary Judgment . . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 07/17/2020) |

| 07/17/2020 | 113 | REPLY MEMORANDUM OF LAW in Support re: 94 MOTION for Summary Judgment . . Document filed by The New York Times Company..(Brown, Jay) (Entered: 07/17/2020) |
| 07/17/2020 | 114 | RULE 56.1 STATEMENT. Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 07/17/2020) |
| 07/20/2020 | 115 | MEMORANDUM OF LAW in Opposition re: 111 MOTION for Reconsideration re; 83 Order on Motion for Judgment on the Pleadings, . . Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 07/20/2020) |
| 07/22/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 7/22/2020, ( Jury Trial set for 2/1/2021 at 09:30 AM before Judge Jed S. Rakoff.). (Kotowski, Linda) (Entered: 07/22/2020) |
| 07/27/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephonic Oral Argument held on 7/27/2020 re: 95 MOTION for Partial Summary Judgment . filed by Sarah Palin, 94 MOTION for Summary Judgment . filed by The New York Times Company, James Bennet. (Kotowski, Linda) (Entered: 07/30/2020) |
| 07/28/2020 | | **\*\*\*NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Notice to Attorney Shane B. Vogt to RE-FILE Document 111 MOTION for Reconsideration re; 83 Order on Motion for Judgment on the Pleadings, .. Use the event type Memorandum of Law in Support (non-motion) found under the event list Other Answers. (lb)** (Entered: 07/28/2020) |
| 07/28/2020 | 116 | MEMORANDUM OF LAW in Support re: 83 Order on Motion for Judgment on the Pleadings, *of Reconsideration and/or Alteration or Amendment of January 21, 2020 Memorandum Order*. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 07/28/2020) |
| 08/28/2020 | 117 | OPINION AND ORDER re: 95 MOTION for Partial Summary Judgment . filed by Sarah Palin, 94 MOTION for Summary Judgment . filed by The New York Times Company, James Bennet. For the above-discussed reasons, plaintiff's motion for partial summary judgment is denied and defendants' motion for summary judgment is also denied. The Clerk of the Court is directed to close docket entries 94 and 95. The trial of this case, pandemic permitting, will commence on February 1, 2020 at 9:30 a.m. SO ORDERED. (Signed by Judge Jed S. Rakoff on 8/28/2020) (kv) (Entered: 08/28/2020) |
| 08/28/2020 | 118 | ORDER: The Court hereby corrects the following error in the Opinion and Order signed today, August 28, 2020, Dkt. No. 117, in the above-captioned matter: On page 35, line 5, the word "2020" is deleted and replaced with "2021." (Signed by Judge Jed S. Rakoff on 8/28/2020) (rro) (Entered: 08/28/2020) |
| 11/23/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 11/23/2020. (Kotowski, Linda) (Entered: 12/04/2020) |
| 11/25/2020 | 119 | MOTION for Reconsideration re; 117 Memorandum & Opinion,, . Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 11/25/2020) |
| 11/30/2020 | 120 | MEMORANDUM OF LAW in Support re: 119 MOTION for Reconsideration re; 117 Memorandum & Opinion,, . . Document filed by James Bennet, The New York Times Company..(Brown, Jay) (Entered: 11/30/2020) |
| 11/30/2020 | 121 | MOTION for Lee. J. Levine to Withdraw as Attorney . Document filed by James Bennet, The New York Times Company..(Levine, Lee) (Entered: 11/30/2020) |
| 12/04/2020 | 122 | MEMO ENDORSEMENT granting 121 Motion to Withdraw as Attorney. ENDORSEMENT: SO ORDERED. (Attorney Lee Levine terminated.) (Signed by Judge |

Case 22-558, Document 49, 08/19/2022, 3364713, Page41 of 222

JA33

| | | Jed S. Rakoff on 12/4/2020) (ro) (Entered: 12/04/2020) |
|---|---|---|
| 12/07/2020 | 123 | RESPONSE to Motion re: 119 MOTION for Reconsideration re; 117 Memorandum & Opinion,, . . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 12/07/2020) |
| 12/09/2020 | 124 | REPLY MEMORANDUM OF LAW in Support re: 119 MOTION for Reconsideration re; 117 Memorandum & Opinion,, . . Document filed by The New York Times Company.. (Brown, Jay) (Entered: 12/09/2020) |
| 12/17/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. Jury Trial set for 6/21/2021 at 09:30 AM before Judge Jed S. Rakoff, pending further order of the Court. (Kotowski, Linda) (Entered: 12/17/2020) |
| 12/29/2020 | 125 | MEMORANDUM ORDER granting 119 Motion for Reconsideration: For the foregoing reasons, defendants' motion is granted. The Court holds that N.Y. Civil Rights Law § 76-a, as amended on November 10, 2020, applies to this action and requires plaintiff, as a matter of state law, to prove by clear and convincing evidence what she had already been tasked with establishing under the federal Constitution: that defendants made the allegedly defamatory statements in the Editorial "with knowledge of [their] falsity or with reckless disregard of whether [they were] false" -- that is, with actual malice. See § 76-a(2). The Clerk of the Court is directed to close the entry at docket number 119. (Signed by Judge Jed S. Rakoff on 12/29/2020) (jwh) (Entered: 12/29/2020) |
| 01/12/2021 | 126 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 125 Order on Motion for Reconsideration. (sjo) (Entered: 01/12/2021) |
| 06/18/2021 | | NOTICE: The trial is adjourned pending further of the Court..(Kotowski, Linda) (Entered: 06/18/2021) |
| 06/22/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 6/22/2021. (Kotowski, Linda) (Entered: 06/22/2021) |
| 07/19/2021 | 127 | MOTION for Michael D. Sullivan to Withdraw as Attorney . Document filed by James Bennet, The New York Times Company..(Sullivan, Michael) (Entered: 07/19/2021) |
| 07/22/2021 | 128 | MEMO ENDORSEMENT granting 127 Motion to Withdraw as Attorney. ENDORSEMENT: SO ORDERED. Attorney Michael D. Sullivan terminated. (Signed by Judge Jed S. Rakoff on 7/20/2021) (kv) (Entered: 07/22/2021) |
| 07/28/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 7/28/2021, ( Jury Trial set for 9/20/2021 at 09:30 AM before Judge Jed S. Rakoff.). (Kotowski, Linda) (Entered: 07/29/2021) |
| 08/12/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: In the above-captioned case, a telephone conference was held August 12, 2021 without transcription or recording. Counsel for Plaintiff and Defendant were present. Developments with the COVID-19 pandemic necessitate the postponement of the jury trial. Accordingly, trial will now commence January 24, 2022. ( Jury Selection set for 1/24/2022 at 09:30AM before Judge Jed S. Rakoff.). (Kotowski, Linda) (Entered: 08/12/2021) |
| 12/20/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 12/20/2021. (Kotowski, Linda) (Entered: 12/20/2021) |
| 01/07/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 1/7/2022.. The Court denied Plaintiffs motion to adjourn the trial but granted Plaintiffs motion to adjust the sitting times on certain trial days. (Kotowski, Linda) (Entered: 01/07/2022) |
| 01/10/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. A telphonic Pretrial |

Case 22-558, Document 49, 09/13/2022, 3384713, Page42 of 222

JA34

| | | |
|---|---|---|
| | | Conference set for 1/11/2022 at 02:30 PM before Judge Jed S. Rakoff. The public may access this proceeding by dialing :USA toll free 888-363-4735, international caller paid 215-446-3657, Access code 1086415 (Kotowski, Linda) (Entered: 01/10/2022) |
| 01/10/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. Telephone Conference set for 1/11/2022 at 02:30 PM before Judge Jed S. Rakoff. The public may access this proceeding by dialing :USA toll free 888-363-4735, international caller paid 215-446-3657, Access code 1086415 (Kotowski, Linda) (Entered: 01/10/2022) |
| 01/10/2022 | [129](#) | MOTION in Limine . Document filed by Sarah Palin. (Attachments: # [1](#) Exhibit A). (Vogt, Shane) (Entered: 01/10/2022) |
| 01/10/2022 | [130](#) | MEMORANDUM OF LAW in Support re: [129](#) MOTION in Limine . . Document filed by Sarah Palin. (Attachments: # [1](#) Exhibit A).(Vogt, Shane) (Entered: 01/10/2022) |
| 01/11/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 1/11/2022. (Kotowski, Linda) (Entered: 01/13/2022) |
| 01/14/2022 | [131](#) | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION in Limine *For A Ruling That The Challenged Statements Are Not Defamatory Per Se*. Document filed by James Bennet, The New York Times Company. (Attachments: # [1](#) Memorandum in Support).(Axelrod, David) Modified on 1/31/2022 (kj). (Entered: 01/14/2022) |
| 01/14/2022 | [132](#) | MOTION in Limine *To Exclude The Testimony of Craig Kronenberger*. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | [133](#) | MEMORANDUM OF LAW in Support re: [132](#) MOTION in Limine *To Exclude The Testimony of Craig Kronenberger*. . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | [134](#) | DECLARATION of David L. Axelrod in Support re: [132](#) MOTION in Limine *To Exclude The Testimony of Craig Kronenberger*.. Document filed by James Bennet, The New York Times Company. (Attachments: # [1](#) Ex. 1, # [2](#) Ex. 2, # [3](#) Ex. 3, # [4](#) Ex. 4, # [5](#) Ex. 5, # [6](#) Ex. 6, # [7](#) Ex. 7, # [8](#) Ex. 8, # [9](#) Ex. 9, # [10](#) Ex. 10, # [11](#) Ex. 11, # [12](#) Ex. 12, # [13](#) Ex. 13, # [14](#) Ex. 14, # [15](#) Ex. 15, # [16](#) Ex. 16, # [17](#) Ex. 17, # [18](#) Ex. 18).(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. Jury Selection set for 1/24/2022 at 09:00AM before Judge Jed S. Rakoff. The public may listen by using the connection information:Toll-Free USA : 877-810-9415International Caller Paid: 636-651-3185Access Code: 4086346 (Kotowski, Linda) (Entered: 01/14/2022) |
| 01/14/2022 | [135](#) | MOTION in Limine *to Exclude Evidence Regarding Articles and Posts Published by Atlantic Media, an Article James Bennet Was Sent, and Senator Michael Bennet*. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | [136](#) | MEMORANDUM OF LAW in Support re: [135](#) MOTION in Limine *to Exclude Evidence Regarding Articles and Posts Published by Atlantic Media, an Article James Bennet Was Sent, and Senator Michael Bennet*. . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | [137](#) | MOTION in Limine *to Exclude Evidence of James Bennet's Departure from The Times, Unrelated Controversies During His Tenure as Opinion Editor, and the Elimination of the Public Editor Position*. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | [138](#) | MEMORANDUM OF LAW in Support re: [137](#) MOTION in Limine *to Exclude Evidence* |

Case 22-558, Document 49, 09/13/2022, 3384713, Page43 of 222

| | | |
|---|---|---|
| | | *of James Bennet's Departure from The Times, Unrelated Controversies During His Tenure as Opinion Editor, and the Elimination of the Public Editor Position.* . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | 139 | DECLARATION of Thomas B. Sullivan in Support re: 137 MOTION in Limine *to Exclude Evidence of James Bennet's Departure from The Times, Unrelated Controversies During His Tenure as Opinion Editor, and the Elimination of the Public Editor Position.*, 135 MOTION in Limine *to Exclude Evidence Regarding Articles and Posts Published by Atlantic Media, an Article James Bennet Was Sent, and Senator Michael Bennet.*. Document filed by James Bennet, The New York Times Company. (Attachments: # 1 Ex. A, # 2 Ex. B, # 3 Ex. C, # 4 Ex. D, # 5 Ex. E, # 6 Ex. F, # 7 Ex. G, # 8 Ex. H, # 9 Ex. I, # 10 Ex. J, # 11 Ex. K, # 12 Ex. L, # 13 Ex. M (intentionally omitted), # 14 Ex. N, # 15 Ex. O, # 16 Ex. P, # 17 Ex. Q, # 18 Ex. R, # 19 Ex. S, # 20 Ex. T, # 21 Ex. U, # 22 Ex. V, # 23 Ex. W, # 24 Ex. X, # 25 Ex. Y, # 26 Ex. Z, # 27 Ex. AA, # 28 Ex. AB, # 29 Ex. AC, # 30 Ex. AD, # 31 Ex. AE, # 32 Ex. AF, # 33 Ex. AG, # 34 Ex. AH, # 35 Ex. AI, # 36 Ex. AJ, # 37 Ex. AK, # 38 Ex. AL, # 39 Ex. AM, # 40 Ex. AN, # 41 Ex. AO, # 42 Ex. AP - Part 1 of 2, # 43 Ex. AP - Part 2 of 2, # 44 Ex. AQ, # 45 Ex. AR, # 46 Ex. AS, # 47 Ex. AT, # 48 Ex. AU, # 49 Ex. AV).(Axelrod, David) (Entered: 01/14/2022) |
| 01/14/2022 | | **\*\*\*NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney David Axelrod to RE-FILE Document 131 MOTION in Limine *For A Ruling That The Challenged Statements Are Not Defamatory Per Se.*. ERROR(S): Supporting Documents are filed separately, each receiving their own document #. (Supporting Documents are found under the Event Type - Replies, Opposition and Supporting Documents; Rule 56.1 Statement is found under Other Answers). (kj)** (Entered: 01/31/2022) |
| 01/17/2022 | 140 | MOTION in Limine *Regarding Case Management Techniques*. Document filed by James Bennet, The New York Times Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B). (Axelrod, David) (Entered: 01/17/2022) |
| 01/17/2022 | 141 | MEMORANDUM OF LAW in Support re: 140 MOTION in Limine *Regarding Case Management Techniques*. . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/17/2022) |
| 01/17/2022 | 142 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MEMORANDUM OF LAW in Opposition re: 131 MOTION in Limine *For A Ruling That The Challenged Statements Are Not Defamatory Per Se.* . Document filed by Sarah Palin..(Vogt, Shane) Modified on 1/31/2022 (kj). (Entered: 01/17/2022) |
| 01/17/2022 | 143 | MEMORANDUM OF LAW in Opposition re: 140 MOTION in Limine *Regarding Case Management Techniques*. . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/17/2022) |
| 01/17/2022 | 144 | RESPONSE in Opposition to Motion re: 129 MOTION in Limine . . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/17/2022) |
| 01/17/2022 | 145 | MEMORANDUM OF LAW in Opposition re: 137 MOTION in Limine *to Exclude Evidence of James Bennet's Departure from The Times, Unrelated Controversies During His Tenure as Opinion Editor, and the Elimination of the Public Editor Position.* . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/17/2022) |
| 01/17/2022 | 146 | PROPOSED JURY INSTRUCTIONS. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/17/2022) |
| 01/17/2022 | 147 | MEMORANDUM OF LAW in Opposition re: 135 MOTION in Limine *to Exclude Evidence Regarding Articles and Posts Published by Atlantic Media, an Article James* |

| | | *Bennet Was Sent, and Senator Michael Bennet.* . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/17/2022) |
|---|---|---|
| 01/17/2022 | 148 | PROPOSED PRE-TRIAL ORDER. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/17/2022) |
| 01/17/2022 | 149 | MEMORANDUM OF LAW in Opposition re: 132 MOTION in Limine *To Exclude The Testimony of Craig Kronenberger*. . Document filed by Sarah Palin. (Attachments: # 1 Exhibit A).(Vogt, Shane) (Entered: 01/17/2022) |
| 01/17/2022 | 150 | DECLARATION of Craig Kronenberger in Opposition re: 132 MOTION in Limine *To Exclude The Testimony of Craig Kronenberger.*. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/17/2022) |
| 01/17/2022 | 151 | PROPOSED JURY INSTRUCTIONS. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/17/2022) |
| 01/17/2022 | | ***NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Shane Vogt to RE-FILE Document 142 Memorandum of Law in Opposition to Motion,. ERROR(S): Supporting and or Opposing document(s) was linked to a deficient filing. (kj)** (Entered: 01/31/2022) |
| 01/18/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial in this matter will commence before Judge Rakoff on 1/24/22. Throughout the trial, the public may listen to the proceedings using the following public access line: 877-810-9415; Access Code: 4086346. (Kotowski, Linda) (Entered: 01/18/2022) |
| 01/19/2022 | 152 | PROPOSED VOIR DIRE QUESTIONS. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/19/2022) |
| 01/19/2022 | 153 | PROPOSED JURY INSTRUCTIONS. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/19/2022) |
| 01/20/2022 | 154 | PROPOSED VOIR DIRE QUESTIONS. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/20/2022) |
| 01/20/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. Jury Selection set for 1/24/2022 before Judge Jed S. Rakoff. Throughout the trial, the public may listen to the proceedings using the following public access line: USA Toll free: 844-721-7237, International Caller paid: 409-207-6951,Access Code: 7920433This is a change in connection information. (Kotowski, Linda) (Entered: 01/20/2022) |
| 01/21/2022 | 155 | PROPOSED JURY INSTRUCTIONS. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/21/2022) |
| 01/22/2022 | 156 | NOTICE OF APPEARANCE by Shawn Preston Ricardo on behalf of Sarah Palin.. (Ricardo, Shawn) (Entered: 01/22/2022) |
| 01/22/2022 | 157 | JOINT PRETRIAL CONSENT ORDER: Pursuant to Rule 4 of the Court's Individual Rules of Practice, Plaintiff Sarah Palin and Defendants The New York Times Company ("The Times") and James Bennet respectfully submit this proposed joint pretrial order for the jury trial scheduled to commence on January 24, 2022, as further set forth in this Order. Estimates Length of Trial: Five (5) days. (Signed by Judge Jed S. Rakoff on 1/22/2022) (mml) (Entered: 01/24/2022) |
| 01/23/2022 | 158 | ORDER: The Court has just learned that, based on a new safety protocol that will be implemented imminently, no one may unmask in the courtroom -- even in the HEPA-filter-outfitted witness and attorney boxes -- unless they have tested negative for COVID-19 using an approved molecular diagnostic test. (Antigen tests are not approved.) If a |

| | | |
|---|---|---|
| | | person will be removing his or her mask on successive days, the person may test on an every-other-day schedule; otherwise, the speaker must test negative on the day of his or her appearance. If a speaker has had a confirmed case of COVID-19 (verified by either a doctor'snote or a viral test result) within the prior ninety days, he or she will be exempted from these testing requirements. Confirmation of negative test results (or of a prior case of COVID-19) must be provided to the Court through its staff, as further set forth in this Order. (Signed by Judge Jed S. Rakoff on 1/23/2022) (mml) (Entered: 01/24/2022) |
| 01/24/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 1/23/2022 regarding the Plaintiffs positive test for COVID-19, without transcription or recording. (Kotowski, Linda) (Entered: 01/24/2022) |
| 01/24/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Hearing Out of Jury Presence held on 1/24/2022, Minute entry for proceedings held before Judge Jed S. Rakoff: Hearing held on 1/24/22. Present for the plaintiff: Kenneth Turkel, Michael Munoz & Shane Vogt, present for the defendant: David Schulz, Jay Brown, David Axelrod, Thomas Sullivan for the defendant, and a court reporter. Due to Plaintiffs positive tests for COVID-19, the trial is adjourned to 2/3/22. The Court ruled on the parties motions in limine, setting forth its reasoning on the record. The Court denied Defendants motion [159] for a ruling that the challenged statements are not defamatory per se, without prejudice to Defendants raising the issue again at the charging conference. The Court granted Defendants motion [132] to exclude the testimony of Plaintiffs damages expert. The Court granted in part and denied in part Defendants motion [137] , granting the prong of the motion seeking to exclude evidence about James Bennets departure from the New York Times but denying the rest of the motion without prejudice to reraising the objections if the evidence is offered. The Court denied Defendants motion [135] without prejudice to reraising the objections if the evidence is offered, except that the Court granted the aspect of Defendants motion seeking exclusion of articles concerning the Plaintiffs child. The Court denied Defendants motion [140] regarding case management issues, but the Court will read the jury a preliminary instruction immediately after opening statements are finished. The Court heard argument on and finalized the text of that preliminary instruction. Plaintiffs motion [129] is denied as moot, but each partys counsel shall identify for opposing counsel any objected-to, proposed exhibits they intend to reference during their opening statements. The Court will rule on any remaining objections to such exhibits before the start of trial. The parties shall file a joint, final, and binding list of witnesses in likely order of appearance on 2/1/22. Throughout the trial, the public may listen to the proceedings using the following public access line: USA Toll free: 844-721-7237, International Caller paid: 409-207-6951,Access Code: 7920433. Pursuant to Federal law, the public is strictly prohibited from recording any part of these proceedings. ( Bench Trial set for 2/3/2022 at 09:00 AM before Judge Jed S. Rakoff.) (Kotowski, Linda) (Entered: 02/01/2022) |
| 01/31/2022 | 159 | MOTION in Limine *For A Ruling That The Challenged Statements Are Not Defamatory Per Se*. Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/31/2022) |
| 01/31/2022 | 160 | MEMORANDUM OF LAW in Support re: 159 MOTION in Limine *For A Ruling That The Challenged Statements Are Not Defamatory Per Se*. . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 01/31/2022) |
| 01/31/2022 | 161 | MEMORANDUM OF LAW in Opposition re: 159 MOTION in Limine *For A Ruling That The Challenged Statements Are Not Defamatory Per Se*. . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 01/31/2022) |
| 02/01/2022 | 162 | WITNESS LIST. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 02/01/2022) |
| 02/03/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial begun on |

| | | |
|---|---|---|
| | | 2/3/2022. (Kotowski, Linda) (Entered: 02/04/2022) |
| 02/04/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/4/2022. (Court Reporter Kristen Carranante) (Kotowski, Linda) (Entered: 02/04/2022) |
| 02/07/2022 | 163 | ORDER re: 162 Witness List filed by Sarah Palin. Docket entry 162, a revised witness list submitted after adjournment of the trial to February 3, 2022, was erroneously filed in a manner that prevented public access. The witness list has now been ordered unsealed. SO ORDERED. (Signed by Judge Jed S. Rakoff on 2/7/2022) (kv) (Entered: 02/07/2022) |
| 02/07/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/7/2022. (Kotowski, Linda) (Entered: 02/08/2022) |
| 02/08/2022 | 164 | TRIAL MEMORANDUM. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 02/08/2022) |
| 02/08/2022 | 165 | TRIAL MEMORANDUM. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 02/08/2022) |
| 02/08/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/8/2022. (Kotowski, Linda) (Entered: 02/08/2022) |
| 02/09/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/9/2022. (Kotowski, Linda) (Entered: 02/11/2022) |
| 02/10/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/10/2022. Both sides rest. Defendant's Motion to Dismiss denied. (Kotowski, Linda) Modified on 2/11/2022 (Kotowski, Linda). (Entered: 02/11/2022) |
| 02/11/2022 | 166 | TRANSCRIPT of Proceedings re: CONFERENCE held on 1/24/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Kelly Surina, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/4/2022. Redacted Transcript Deadline set for 3/14/2022. Release of Transcript Restriction set for 5/12/2022..(Moya, Goretti) (Entered: 02/11/2022) |
| 02/11/2022 | 167 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 1/24/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/11/2022) |
| 02/11/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/11/2022. (Kotowski, Linda) (Entered: 02/16/2022) |
| 02/14/2022 | 168 | TRANSCRIPT of Proceedings re: CONFERENCE held on 1/11/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Steven Greenblum, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/7/2022. Redacted Transcript Deadline set for 3/17/2022. Release of Transcript Restriction set for 5/16/2022..(Moya, Goretti) (Entered: 02/14/2022) |
| 02/14/2022 | 169 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 1/11/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) |

| | | calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/14/2022) |
|---|---|---|
| 02/14/2022 | [170](#) | THE COURT'S INSTRUCTIONS OF LAW TO THE JURY: Ct. Ex. 1..(kv) (Entered: 02/14/2022) |
| 02/14/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial held on 2/14/2022. The Court grants the defendants' Rule 50 Motion. Charge by the Court. At 3:40pm, after Marshal is sworn, the jury retires to deliberate. (Kotowski, Linda) (Entered: 02/16/2022) |
| 02/15/2022 | [171](#) | FINAL JUDGMENT: In view of the jury having returned a verdict of not-liable, and independently, for the reasons stated by the Court previously in granting Defendants' Rule 50 motion, final judgment is hereby entered dismissing the complaint with prejudice. ADJUDGED AND DECREED. (Signed by Judge Jed S. Rakoff on 2/15/2022) (kv) (Entered: 02/15/2022) |
| 02/15/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial completed on 2/15/2022. (Kotowski, Linda) (Entered: 02/16/2022) |
| 02/16/2022 | [172](#) | ORDER: It is the Court's uniform practice after a verdict has been rendered in a jury trial to have the Court's law clerk inquire of the jury as to whether there were any problems understanding the Court's instructions of law, so that improvements can be made in future cases. Late yesterday, in the course of such an inquiry in this case -- in which the jury confirmed that they had fully understood the instructions and had no suggestions regarding jury instructions for future cases -- several jurors volunteered to the law clerk that, prior to the rendering of the jury verdict in this case, they had learned of the fact of this Court's Rule 50 determination on Monday to dismiss the case on legal grounds. These jurors reported that although they had been assiduously adhering to the Court's instruction to avoid media coverage of the trial, they had involuntarily received "push notifications" on their smartphones that contained the bottom-line of the ruling. The jurors repeatedly assured the Court's law clerk that these notifications had not affected them in any way or played any role whatever in their deliberations. The Court also notes that when it proposed to the parties, during oral argument on Monday morning, to render its Rule 50 decision later that day but to permit the jury to continue deliberating so that the Court of Appeals would have the benefit of both the Court's legal determination and the jury's verdict, no party objected to this plan. Nor did any party object when the Court reconvened later that day, outside the presence of the jury, and the Court indicated that it was prepared to issue a Rule 50 decision at that time. Indeed, no party objected to this procedure at any time whatever. Nevertheless, in an excess of caution, the Court hereby brings the foregoing facts to the parties' attention. If any party feels there is any relief they seek based on the above, counsel should promptly initiate a joint phone conference with the Court to discuss whether any further proceedings are appropriate. SO ORDERED. (Signed by Judge Jed S. Rakoff on 2/16/2022) (kv) (Entered: 02/16/2022) |
| 02/16/2022 | [173](#) | VERDICT FORM..(kv) (Entered: 02/16/2022) |
| 02/16/2022 | [174](#) | ORDER: The Clerk is directed to docket the attached documents, to supplement the record in this case. Exhibit A is an instruction sent by email to members of the jury on Saturday, February 12, 2022 admonishing them again to avoid any media coverage of the trial. Exhibit B is correspondence between the Court and counsel for the parties regarding case law germane to Defendants' Rule 50 motion for judgment as a matter of law. SO ORDERED. (Signed by Judge Jed S. Rakoff on 2/16/2022) (kv) (Entered: 02/16/2022) |
| 02/17/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:. Telephone Conference |

Case 22-558, Document 49, 09/13/2022, 3384713, Page48 of 222
**JA40**

| | | set for 2/23/2022 at 04:00 PM before Judge Jed S. Rakoff. The public may access this proceeding on the following line:USA toll free 888-363-4735, international caller paid 215-446-3657, Access code 1086415 (Kotowski, Linda) (Entered: 02/17/2022) |
|---|---|---|
| 02/21/2022 | 175 | TRANSCRIPT of Proceedings re: TRIAL held on 2/3/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 176 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/3/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 177 | TRANSCRIPT of Proceedings re: TRIAL held on 2/4/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 178 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/4/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 179 | TRANSCRIPT of Proceedings re: TRIAL held on 2/7/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 180 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/7/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 181 | TRANSCRIPT of Proceedings re: TRIAL held on 2/8/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |

Case 22-558, Document 49, 08/03/2022, 3364713, Page49 of 222

JA41

| 02/21/2022 | 182 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/8/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
|---|---|---|
| 02/21/2022 | 183 | TRANSCRIPT of Proceedings re: TRIAL held on 2/9/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 184 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/9/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 185 | TRANSCRIPT of Proceedings re: TRIAL held on 2/10/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 186 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/10/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 187 | TRANSCRIPT of Proceedings re: TRIAL held on 2/11/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 188 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/11/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 189 | TRANSCRIPT of Proceedings re: TRIAL held on 2/14/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for |

| | | |
|---|---|---|
| | | 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 190 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/14/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 191 | TRANSCRIPT of Proceedings re: TRIAL held on 2/15/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/14/2022. Redacted Transcript Deadline set for 3/24/2022. Release of Transcript Restriction set for 5/23/2022..(Moya, Goretti) (Entered: 02/21/2022) |
| 02/21/2022 | 192 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TRIAL proceeding held on 2/15/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/21/2022) |
| 02/23/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 2/23/2022 with court reporter Khris Sellin. Plaintiff's post trial motions not to exceed 50 pages, all motions in a single submission. Defendants' response not to exceed 50 pages, replies are limited to 15 pages. (Kotowski, Linda) (Entered: 02/23/2022) |
| 02/25/2022 | 193 | TRANSCRIPT of Proceedings re: CONFERENCE held on 2/23/2022 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/18/2022. Redacted Transcript Deadline set for 3/28/2022. Release of Transcript Restriction set for 5/26/2022..(Moya, Goretti) (Entered: 02/25/2022) |
| 02/25/2022 | 194 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 2/23/22 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/25/2022) |
| 02/28/2022 | 195 | MOTION to Disqualify Judge *retroactive to August 28,2020, and setting aside/vacating rulings and orders made by the Court during that time.*, MOTION approval to interview members of jury concerning their receipt of push notifications during trial ., MOTION for Reconsideration *, Reargument and/or Rehearing of Court's decision under Rule 50.*, MOTION to Set Aside Verdict *and Final Judgment and granting Plaintiff a new trial*. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 02/28/2022) |
| 03/01/2022 | 196 | OPINION: At trial, plaintiff Sarah Palin wholly failed to prove her case even to the minimum standard required by law. Accordingly, defendants the New York Times Company (the "Times") and James Bennet moved to dismiss the case prior to the start of jury deliberations. After hearing extensive argument, the Court granted the motion shortly |

| | | |
|---|---|---|
| | | after the jury had begun its deliberations. This Opinion sets forth the reasons for that decision, as well as the reasons for how the Court then dealt with the deliberating jury. (as further set forth herein). For all the reasons set forth above, the Court entered final judgment as a matter of law in favor of The New York Times Co. and James Bennet, because no reasonable jury could find that Sarah Palin proved that the defendants published "America's Lethal Politics" with actual malice. SO ORDERED. (Signed by Judge Jed S. Rakoff on 3/1/2022) (kv) (Entered: 03/01/2022) |
| 03/04/2022 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference held on 3/4/2022 without transcription or recording. Counsel for Plaintiff and Defendant were present. The Court granted defendants unopposed motion for extensions of time to brief post-trial motions, which shall now proceed on the following schedule: plaintiffs omnibus motion due 3/22/22, defendants opposition due 4/12/22, plaintiffs reply due 4/19/22. The Court also granted defendants unopposed motion for leave not to file an initial notice of taxable costs, as required by Local Rule 54.1, and instead to file any notice of taxable costs by no later than 30 days after the Court issues its decision on the post-trial motions. (Kotowski, Linda) (Entered: 03/04/2022) |
| 03/17/2022 | 197 | NOTICE OF APPEAL from 125 Order on Motion for Reconsideration,,, 171 Judgment, 196 Memorandum & Opinion,,,,. Document filed by Sarah Palin. Filing fee $ 505.00, receipt number ANYSDC-25876553. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Vogt, Shane) (Entered: 03/17/2022) |
| 03/17/2022 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 197 Notice of Appeal,..(nd) (Entered: 03/17/2022) |
| 03/17/2022 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 197 Notice of Appeal, filed by Sarah Palin were transmitted to the U.S. Court of Appeals..(nd) (Entered: 03/17/2022) |
| 03/22/2022 | 198 | MEMORANDUM OF LAW in Support re: 195 MOTION to Disqualify Judge *retroactive to August 28,2020, and setting aside/vacating rulings and orders made by the Court during that time*. MOTION approval to interview members of jury concerning their receipt of push notifications during trial . MOTION for Reconsideration *, Reargument and/or Rehearing of Court's decision under Rule 50*. MOTION to Set Aside Verdict *and Final Judgment and granting Plaintiff a new trial*. . Document filed by Sarah Palin. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6 (Part 1 of 2), # 7 Exhibit 6 (Part 2 of 2)).(Vogt, Shane) (Entered: 03/22/2022) |
| 03/25/2022 | 199 | INITIAL NOTICE OF STAY OF APPEAL re: 197 Notice of Appeal,. A notice of appeal was filed in this case on 03/17/2022. Since at least one motion cited in F.R.A.P. 4(a)(4) has been filed in the district court, this appeal is stayed pending resolution of the motion(s). USCA Case No. 22-558..(nd) (Entered: 03/25/2022) |
| 03/29/2022 | 200 | ORDER of USCA (Certified Copy) USCA Case Number 22-629. Petitioner Sarah Palin has filed a petition for a writ of mandamus. Petitioner has also filed a post-trial motion in the district court which may impact this petition. Upon consideration thereof, IT IS HEREBY ORDERED that this petition is held in abeyance pending the district court's resolution of Petitioners post-trial motion. Petitioner is directed to inform this Court in writing of the status of the motion in 30-day intervals, beginning 30 days from the date of this order. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 03/29/2022..(nd) (Entered: 03/29/2022) |
| 04/12/2022 | 201 | MEMORANDUM OF LAW in Opposition re: 195 MOTION to Disqualify Judge *retroactive to August 28,2020, and setting aside/vacating rulings and orders made by the Court during that time*. MOTION approval to interview members of jury concerning their receipt of push notifications during trial . MOTION for Reconsideration *, Reargument* |

Case 22-558, Document 49, 09/19/2022, 3384713, Page52 of 222

JA44

| | | |
|---|---|---|
| | | *and/or Rehearing of Court's decision under Rule 50*. MOTION to Set Aside Verdict *and Final Judgment and granting Plaintiff a new trial.* . Document filed by James Bennet, The New York Times Company..(Axelrod, David) (Entered: 04/12/2022) |
| 04/19/2022 | 202 | REPLY to Response to Motion re: 195 MOTION to Disqualify Judge *retroactive to August 28,2020, and setting aside/vacating rulings and orders made by the Court during that time*. MOTION approval to interview members of jury concerning their receipt of push notifications during trial . MOTION for Reconsideration *, Reargument and/or Rehearing of Court's decision under Rule 50*. MOTION to Set Aside Verdict *and Final Judgment and granting Plaintiff a new trial.* . Document filed by Sarah Palin..(Vogt, Shane) (Entered: 04/19/2022) |
| 05/31/2022 | 203 | OPINION AND ORDER re: 195 MOTION to Disqualify Judge *retroactive to August 28,2020, and setting aside/vacating rulings and orders made by the Court during that time*. MOTION approval to interview members of jury concerning their receipt of push notifications during trial . MOTION for Reconsideration *, Reargument and/or Rehearing of Court's decision under Rule 50*. MOTION to Set Aside Verdict *and Final Judgment and granting Plaintiff a new trial*. filed by Sarah Palin. The meritless accusations of impropriety in Palin's motion cannot substitute for what her trial presentation lacked: proof of actual malice. This requires, under both Supreme Court precedent and New York State statutory law, clear and convincing evidence that Bennet and the Times published "America's Lethal Politics" knowing that it was false or in reckless disregard of its falsity. See New York Times v. Sullivan, 376 U.S. 254, 280 (1964). And, as the Supreme Court has likewise held, this high standard cannot be satisfied simply by a negative inference drawn from discrediting Bennet's denials. See Anderson, 477 U.S. at 256. Here, Palin still cannot identify any affirmative evidence to support the essential element of actual malice. This absence is not a consequence of trial procedures, judicial bias, or adverse evidentiary rulings. It is, in the Court's view, a reflection of the facts of the case. To be sure, as the Court itself recognized even it is initial statement of its Rule 50 decision, the evidence showed that Bennet and the Times's Editorial Board made mistakes as they rushed to meet a print deadline, and that their editorial processes failed to catch those mistakes before publication. See Tr. 1303-1304. But in a defamation case brought by a public figure like Sarah Palin, a mistake is not enough to win if it was not motivated by actual malice. And the striking thing about the trial here was that Palin, for all her earlier assertions, could not in the end introduce even a speck of such evidence. Palin's motion is hereby denied in its entirety. SO ORDERED. (Signed by Judge Jed S. Rakoff on 5/31/2022) (kv) (Entered: 05/31/2022) |
| 06/16/2022 | 204 | ORDER of USCA (Certified Copy) USCA Case Number 22-0629. Petitioner Sarah Palin petitions for a writ of mandamus. Upon due consideration, it is hereby ORDERED that the petition is DENIED because mandamus relief is not warranted under the present circumstances. See Cheney v. U.S. Dist. Ct. for D.C., 542 U.S. 367, 38081 (2004). However, denial of the petition is without prejudice to the issues presented in the petition being addressed in Petitioner's pending appeal, which will be assigned to a new panel in the ordinary course. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 06/16/2022..(nd) (Entered: 06/16/2022) |
| 06/16/2022 | 205 | AMENDED NOTICE OF APPEAL re: 197 Notice of Appeal, 117 Memorandum & Opinion,, 125 Order on Motion for Reconsideration,,, 171 Judgment, 203 Memorandum & Opinion,,,,,,,, 196 Memorandum & Opinion,,,. Document filed by Sarah Palin..(Vogt, Shane) (Entered: 06/16/2022) |
| 06/17/2022 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 205 Amended Notice of Appeal. (tp) (Entered: 06/17/2022) |
| 06/17/2022 | | First Supplemental ROA Sent to USCA (Electronic File). Certified Supplemental |

| | | Indexed record on Appeal Electronic Files for [205](#) Amended Notice of Appeal, filed by Sarah Palin were transmitted to the U.S. Court of Appeals. (tp) (Entered: 06/17/2022) |
|---|---|---|
| 06/30/2022 | [206](#) | BILL OF COSTS NOTICE OF TAXATION to recover costs against Sarah Palin. Document filed by The New York Times Company, James Bennet. The Clerk may tax costs 14 days after this filing. Objections to Bill of Costs due by 7/14/2022.(Brown, Jay) (Entered: 06/30/2022) |
| 07/19/2022 | | ***NOTICE TO ATTORNEY REGARDING REJECTION OF BILL OF COSTS NOTICE OF TAXATION FOR NON-COMPLIANCE WITH LOCAL RULE 54.1: Notice to Attorney Jay Brown, document [206](#) Bill of Costs Notice of Taxation was rejected by the Clerk's Office for the following reason: the explanation of monetary amounts is not clear. Please refile the Bill of Costs Notice of Taxation within 30 days of entry of final judgment and provide an explanation for the items filled out on your bill of costs form 'fees for printed or electronically recorded transcripts item, as well as the disbursements of printing, fees for exemplification and the costs of making copies along with the other costs item. (laq)** (Entered: 07/19/2022) |
| 07/20/2022 | [207](#) | MANDATE of USCA (Certified Copy) as to [205](#) Amended Notice of Appeal, filed by Sarah Palin, [197](#) Notice of Appeal, filed by Sarah Palin USCA Case Number 22-0629. Petitioner Sarah Palin petitions for a writ of mandamus. Upon due consideration, it is hereby ORDERED that the petition is DENIED because mandamus relief is not warranted under the present circumstances. See Cheney v. U.S. Dist. Ct. for D.C., 542 U.S. 367, 38081 (2004). However, denial of the petition is without prejudice to the issues presented in the petition being addressed in Petitioners pending appeal, which will be assigned to a new panel in the ordinary course. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Order: 7/20/2022. (tp) (Entered: 07/20/2022) |
| 07/21/2022 | [208](#) | BILL OF COSTS NOTICE OF TAXATION to recover costs against Sarah Palin. Document filed by The New York Times Company, James Bennet. The Clerk may tax costs 14 days after this filing. Objections to Bill of Costs due by 8/4/2022 (Attachments: # [1](#) Exhibit A - Itemization, # [2](#) Exhibit B-1 - Supporting Documentation, part 1, # [3](#) Exhibit B-2 - Supporting Documentation, part 2).(Brown, Jay) (Entered: 07/21/2022) |
| 08/23/2022 | [209](#) | TAXATION OF COSTS as to [208](#) Bill of Costs Notice of Taxation,. Costs are taxed on 2/15/22 in favor of defendant against plaintiff in the amount of $21,799.21.(laq) Modified on 8/24/2022 (laq). (Entered: 08/23/2022) |
| 08/24/2022 | [210](#) | Objection re: [209](#) Taxation of Costs . Document filed by Sarah Palin. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B).(Vogt, Shane) (Entered: 08/24/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/13/2022 09:44:37 | | | |
| **PACER Login:** | LMeriwether | **Client Code:** | 1583-01 |
| **Description:** | Docket Report | **Search Criteria:** | 1:17-cv-04853-JSR |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**JA46**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - -
SARAH PALIN,

            Plaintiffs,                    17-cv-4853 (JSR)

     -v-                                   FINAL JUDGMENT

THE NEW YORK TIMES COMPANY
and JAMES BENNET,

            Defendants.
- - - - - - - - - - - - - - - - - - - -
```

JED S. RAKOFF, U.S.D.J.:

In view of the jury having returned a verdict of not-liable, and independently, for the reasons stated by the Court previously in granting Defendants' Rule 50 motion, final judgment is hereby entered dismissing the complaint with prejudice.

ADJUDGED AND DECREED.

New York, NY
February 15, 2022                              JED S. RAKOFF, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SARAH PALIN,

     Plaintiff,

    -v-

THE NEW YORK TIMES COMPANY and
JAMES BENNET;

     Defendants.

17-cv-4853 (JSR)

## VERDICT FORM

As to the plaintiff's libel claim, we the jury find the defendants

    ☐   Liable

    ☒   Not-liable

If you find the defendants liable, indicate in the box below how much you award in compensatory or nominal damages. If you find the defendants not-liable, leave this box blank.

    $

Dated: 2/15/22

                  Foreperson

**JA48**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

SARAH PALIN,

             Plaintiff,

      v.                  17 CV 4853 (JSR)

THE NEW YORK TIMES,

             Defendant.

------------------------------x

                           New York, N.Y.
                           January 24, 2022
                           9:00 a.m.

Before:

                HON. JED S. RAKOFF,

                           District Judge

                    APPEARANCES

TURKEL CUVA BARRIOS, P.A.
     Attorneys for Plaintiff
BY:  SHANE B. VOGT

BALLARD SPAHR LLP
     Attorneys for Defendants
BY:  DAVID AXELROD JACQUELYN N. SCHELL

1          (Case called)

2          MR. TURKEL:  Your Honor, Ken Turkel and Shane Vogt,

3     for the plaintiff.

4          THE COURT:  Good morning.

5          MR. AXELROD:  David Axelrod.  I'm here with Thomas

6     Sullivan who is the down at the end.  We represent James Bennet

7     and the New York Times.  Mr. Bennet is right next to me and

8     Dana Greene is the representative from The Times.

9          THE COURT:  Good morning.

10          So, I'm sorry for the delay.  Traffic was particularly

11     bad this morning.  Although, on my very first day on the bench

12     over 26 years ago, Judge Brieant, the late Judge Brieant, a

13     great judge, took me aside and he said I'm going to tell you

14     the two most important things about being a judge.  One is, you

15     have to rule in robe by which he meant it's important for the

16     parties to know your decision, whether they agree with it or

17     disagree with it but don't play Hamlet.

18          And the other rule he said was, don't forget they

19     can't start without you.

20          So, I appreciate your patience.

21          We have had the unfortunate news that was received by

22     the Court last evening that Ms. Palin had tested positive for

23     coronavirus.  She is, of course, unvaccinated.  So, I ask

24     counsel to arrange for her to take a more proficient test, so

25     to speak, this morning.

**JA50**

1          Has that been done?

2          MR. TURKEL:  Your Honor, she is scheduled for one at

3     10:15.

4          THE COURT:  There were ones available at 8:15.

5          MR. TURKEL:  By the time I got the links, which I

6     believe was an email at 10:15 p.m., forwarded them and

7     discussed with my client what was happening.  She went on the

8     site.  10:15 was the earliest available appointment.

9          THE COURT:  All right.  We'll see what happens.

10         So, last night I informed counsel that if she

11    continued to test positive, obviously, if she tested negative

12    we hopefully could move forward today.  If she tested positive

13    after that further test, it seemed to me there were three

14    options.  One was to go forward today with a selection of the

15    jury which we could only do with her consent.  Although,

16    there's not the same constitutional right for a party to be

17    present when the jury is selected as there is in criminal

18    cases.  Nevertheless, I think it's appropriate that a party be

19    present if they wish to be at the selection of the jury, or if

20    she was willing to let her able lawyers, who are vaccinated,

21    select the jury with the help of the Court and adversary

22    counsel, then we could start the trial and she could either

23    attend by Zoom or give her own testimony towards the end of the

24    trial.  She will be eligible.  Even if she is positive now and

25    turns to negative she will be eligible to return to the

1    courthouse next Tuesday, or we could have her testify earlier

2    but by Zoom.  Although, I'd want to hear from defense counsel.

3          There's one other option, slight variation.  I said

4    last night to the lawyers that if we postpone the trial we

5    would postpone it for two weeks because of jury selection, but

6    it now turns out that there will be a jury panel available next

7    Thursday, February 3rd.  So we could begin the trial next

8    Thursday.  And again, if Ms. Palin had tested negative, she

9    would be eligible to come back on that day.

10          So, let me hear from plaintiff's counsel.

11          MR. TURKEL:  Your Honor, may it please the Court,

12    judge, given by way of refreshing the Court's recollection

13    perhaps on the background we had on January 7, it applied to

14    move this case slightly so my partner could marry his daughter

15    off this weekend.

16          THE COURT:  Yes.  And I had agreed that we would not

17    sit this Thursday and Friday in order to accommodate his

18    situation which, of course, the marriage of his daughter trumps

19    all other concerns.  I am the first to acknowledge that as at

20    father of three daughters.

21          MR. TURKEL:  Correct.  We had also raised some COVID

22    concerns, but the point really is because of that accommodation

23    we're dealing with two of those days this week for starters.

24          THE COURT:  Right.  Today, tomorrow and Wednesday.

25          MR. TURKEL:  So.  In looking at those options

1    particularly, judge, in understanding that the rules are clear

2    about civil litigant's right to be present and interest of

3    getting our client the best trial possible, the one that we

4    would normally get under normal circumstances and we don't have

5    to deal with some of the peculiarities brought on by this

6    pandemic, we do want our client here for jury selection.  She

7    wants to be here for jury selection.  She wants to testify

8    live.  And in that respect because we're already dealing with a

9    truncated week, judge, it kind of chops things up anyway and I

10   understand where we've picked a jury on Friday, started on

11   Tuesday and so forth, but our preference would be, and I guess

12   we have gone from moving to two weeks to moving to next

13   Thursday, at least for jury selection.  So, that's a slight

14   modification on the option we discussed last night, your Honor.

15            THE COURT:  Yes.

16            MR. TURKEL:  That's assuming she's negative, your

17   Honor.

18            THE COURT:  Yes, of course.

19            MR. TURKEL:  Judge, just so it's clear on the record,

20   she had two positive antigen tests.

21            THE COURT:  Yes.  And I'm not holding my breath that

22   she will be negative this morning but I wanted the test that

23   she took, the normal at-home test that whose reliability is not

24   as high as the test that she will be taking today.

25            MR. TURKEL:  Correct, judge.

1          So, what I come back to is this.  We want to try the

2     case, judge.  We're no strangers to jury trial.  That's what we

3     do.  But the most seamless way to minimize the potential of any

4     other problems whether they be COVID related or just the normal

5     things that occur during a jury trial, our preference would

6     obviously be to get the, whether it's the Thursday or whatever

7     day depending on how this test comes back, start fresh, start

8     clean, have consecutive sequential days.

9          Judge, there's no -- I know and I understand and I was

10    trained to defer to the Court province in moving cases along

11    and I get it particularly when --

12          THE COURT:  It's not just that.  It's that through no

13    fault of anyone's, this case has not gone to trial.  We've all

14    tried to get it to trial months, if not years ago.  But because

15    of the pandemic, criminal cases took precedence in the court

16    and it makes perfect sense.  But given all of that, I hope

17    everyone is anxious to get this trial done.  But your point is

18    that under these circumstances a delay of what I guess would be

19    about ten days now --

20          MR. TURKEL:  Seven to ten business days, judge.

21          Judge, I make this point also.  When we applied

22    originally with one concern being the wedding and the other one

23    being the COVID numbers up here, which I think we've put on the

24    record, it wasn't to move it far.  It was just to give it a

25    little breathing room to sort of try to avoid these things

1    given it wasn't the cleanest, or weekend for his daughter.  We

2    are all trying, it's uncharted territory.  I tried my first

3    jury trial last April.  The only prejudice I've heard from the

4    other side throughout these discussions is they've worked over

5    the holidays.  There is just no real prejudice to anyone.  We

6    were up on appeal for a year and a half to two years.  It's a

7    seven to ten day business day swing and we could have

8    sequential days.  We wouldn't have to chop up jury selection.

9          THE COURT:  Well, of course I was disappointed since I

10   worked on this case over the weekend and didn't get to see any

11   of the playoffs, but my understanding is they were very boring

12   games really.

13         MR. TURKEL:  Judge, I have been at every game except

14   for the four years I spent in Tampa stadium or in the James

15   stadium.  I watched the Bucks game or (inaudible).  But we all

16   work, judge, as I was telling you there's no passive income in

17   the practice of law.  We have been working constantly on this,

18   judge, seven to ten days.  It's --

19         THE COURT:  Well, I understand what your preference

20   is.  Let me hear from defense counsel.

21         MR. AXELROD:  Your Honor, we, unfortunately, missed

22   most of the playoffs ourselves.  We were working all weekend.

23   Quite honestly, my clients want to go to trial.  This thing has

24   been languishing.  The public has the right to know the outcome

25   but we recognize the problem caused by the pandemic and of

1    course, Governor Palin's positive test.  I would hope however

2    if her test does go come back negative we could come back and

3    say let's go forward.

4         THE COURT:  Well, my understanding is she should get

5    the results in 15 minutes after she takes the test.  So, she

6    would have the results by 10:30.

7         MR. TURKEL:  Judge, I'm not familiar with where she's

8    going.  I've been in situations where there's sort of on-site

9    PCRs come back in 30 to 45 minutes.

10         THE CLERK:  About an hour.

11         THE COURT:  Okay.  Now I am being told it may be as

12    much as an hour.

13         Well, I think the thing to do is, there's lots of

14    things we can do in the meantime like the motions in limine and

15    so forth.  So, it's not like we won't be using the time.  It's

16    a shame that we'll have to ask the jury panel to wait a little

17    while but they're usually not ready even for the beginning of

18    jury selection till about 10:30.  So, that won't be that much

19    of an inconvenience for them.  Although, I will tell you in

20    advance, once we do go to trial the convenience of the jury is

21    in my view the single highest important consideration in any

22    scheduling that we work out.

23         So, here is what I think makes sense.  We will wait to

24    hear the result of her test.  If it's negative, we'll go

25    forward with the jury selection and the trial.  If it's

1  positive, we will adjourn the trial to Thursday.  I think it's

2  February 3rd.  And then we'll go every business day without a

3  break until the conclusion of the trial.  And this, of course,

4  assuming that in the interim she tests negative.  So, I think

5  that's makes sense.

6           I didn't mean to cut you off, Mr. Axelrod.

7           MR. AXELROD:  No, your Honor.  Obviously, I will say

8  this out of an abundance of caution.  We think it's very

9  important for the process that Governor Palin testify live.  It

10 sounds like that's the way we're headed.  Of course, I'm not

11 sure that even if she recovers in the next ten days, she'll

12 test negative, given I think if you test positive, given the

13 antibodies in your system --

14          THE COURT:  Well, that is, if that were to be the

15 situation, then we'll have to pick still a later date, and that

16 would be a great misfortune in my view because there were

17 criminal cases, not just my case, but cases selected by the

18 court because we only have courtrooms that are designed for

19 COVID protection.  And so it might be several months in that

20 situation before we could get a trial date again.  These are

21 dates assigned by a committee of the judges.  I don't have any

22 personal control over that.

23          Anyway, we will deal with that when we have to.  Being

24 an American, I'm a perennial optimist.

25          MR. AXELROD:  As am I.  The only thing I would

JA57

1   suggest, I know that the district executive is consulting with

2   an epidemiologist.  If we get to next week and Governor Palin

3   is still testing positive, maybe we can consult with the

4   epidemiologist.

5             THE COURT:  All right.  That's a good point.  We'll

6   deal with it then.  So, let's at least make use of the time

7   between now and when we hear of hers test results.  Her

8   appointment is 10:15.  So, hopefully, worst case, we'll know by

9   11:15.

10            She knows how to reach you?

11            MR. TURKEL:  Yes, your Honor.

12            THE COURT:  Very good.  Okay.  So, let's turn to the

13  motions in limine.

14            So, here are my bottom line rulings and I thank

15  counsel for both sides for their helpful written submissions

16  and I don't think I need oral argument.  I may want to write a

17  written decision given the reasons for my ruling, but let me

18  for today's purposes, simply give the bottom line.

19            Most of the motions are by The New York Times.  Their

20  motion for a ruling that the challenge statements are not

21  libelous, per se, is denied on the basis of the present papers

22  but without prejudice to that issue being raised at the

23  charging conference.  The Second Circuit has described New York

24  Law on that issue as "fuzzy", an interesting legal term of art,

25  I'm sure.  But as I read the cases, while I think The New York

1    Times relied on the wrong legal standard in their papers, I

2    think there is at least certain circumstances where that

3    doctrine still could apply.  So, we'll see how the evidence

4    goes and revisit that at the charging conference.  So, the

5    motion in limine is denied without prejudice.

6          I might mention since we have so much time this

7    morning, that motions in limine are not something set forth in

8    the Federal Rules of Civil Procedure or in any statute.  They

9    are a judicial creation for the convenience of the parties and

10   the Court and therefore, they take account of the fact that

11   while certain issues can be decided before a trial begins, many

12   others will be affected by how the proof actually comes out at

13   a trial and this is one example of that.

14         But I state that more generally because even if I have

15   excluded something in a motion in limine and for example, the

16   other side as they say opens the door to what was otherwise

17   excluded, then, of course, I would revisit the issue.  So,

18   motions in limine don't have the permanence, if you will, that

19   other forms of motions do.

20         The next motion though is one that I think the Court

21   is clear and definitive on which is The New York Times motion

22   to exclude plaintiff's damages expert, that motion is granted.

23         I don't think the expert meets the requirements of

24   Rule 702.  I don't think the expert meets the requirements of

25   Daubert.  I think the expert is, to be frank, an example of

1  someone that the Daubert case had in mind when they advised the

2  Court to take a good look at experts before allowing them to be

3  admitted.  So, that motion is not subject to reconsideration

4  and Ms. Palin's damages expert is excluded.

5          The next motion is The New York Times motion to

6  exclude evidence relating to Mr. Bennet's departure from The

7  New York Times and other controversies during his time at The

8  New York Times with respect to his departure.  That motion is

9  granted.

10          It came well after the events that are the subject of

11  this case.  It didn't relate to Ms. Palin.  And while I won't

12  say that it's totally irrelevant, given the requirement of

13  actual malice, whatever probative value it has it's very

14  substantially outweighed by the prejudice.  So, that part of

15  the motion is granted.

16          With respect to other events, earlier events, I don't

17  think I can make a ruling at this time.  And this again,

18  relates to the nature of motions in limine.  When plaintiff is

19  ready to introduce either by questioning on cross-examination

20  or through exhibit or whatever any of the earlier incidents,

21  you'll flag that for the Court by asking for a side bar and

22  I'll rule then on this, and then at that point I'll have a much

23  more finely tuned evidentiary basis for ruling on that.

24          So, the motion, other than with respect to

25  Mr. Bennet's departure, is denied without prejudice.

1          MR. TURKEL:  Judge, so the record is clear, I think

2    you've made it clear, but with the nature of motions in limine

3    being what they are, when we get to the portion of Mr. Bennet

4    that you granted, presumably, that is also without prejudice.

5    We can proffer, take him up on voir dire and proffer to make

6    the record, right?

7          THE COURT:  As to any of my rulings, if you want to

8    make a record, let me tell you the procedure.

9          So, the jury will sit from 9:45 to 3:45.  However, we

10   will convene each day at nine o'clock -- assuming this stupid

11   judge can get his act together -- and we will sit, perhaps,

12   depending on other things I have, even after 3:45.  So, if you

13   want to make a record on one of my rulings that was adverse to

14   your position, you can do it then.  I don't want to interrupt

15   and have the jury sit here for five minutes while we go into

16   the robing room -- which is where we'll have our side bars

17   because of the pandemic -- and have you do it then.  But can

18   you do it in advance of something I've already ruled on like

19   this one or if it's the morning before you would introduce it,

20   you can make your record then or you can do to afterwards.

21   Either way is fine.  You can make whatever record you want, but

22   not a lengthy making of the record itself while the jury is

23   sitting.

24         MR. TURKEL:  With the parties, like Mr. Bennet, we

25   will have the opportunity, if we had to take him on voir dire

1   and lay some predicate facts as part of the proffer, we'd have

2   that opportunity.  Normally, in the middle of the trial you

3   would dismiss the jury, take him on voir dire, ask him whatever

4   questions the judge has to rule on, you don't want to do that.

5           THE COURT:  You mean ask the witness on voir dire?

6           MR. TURKEL:  Yes.

7           THE COURT:  Yes, we could hold the witness at the end

8   of the day or bring him in early in the morning on the day he

9   or she is going to testify.

10          MR. TURKEL:  Moving a jury in and out is --

11          THE COURT:  So, the point is, yes, you will be able to

12  voir dire for foundational reasons or whatever inappropriate,

13  something on the assumption that you could do all the voir dire

14  that you wanted and it would come on your way --

15          MR. TURKEL:  It would be facts that are before you?

16          THE COURT:  Yeah.

17          MR. TURKEL:  Thank you.

18          THE COURT:  By the way, while I am thinking about it,

19  I may have mentioned this to you in one of our phone

20  conferences but juries really hate side bars and I can well

21  understand that.  They sit there twiddling their thumbs while

22  the lawyers and the judge talk legalese out of their presence.

23  So, here's my practice.

24          When you have an objection to a question, you state

25  "objection" and one or two words.  The one word would be

1  something like "hearsay", "foundation", something like that.

2  Or you can do the rule, "Rule 402", "Rule 403".  I'll obviously

3  understand what you mean.  That's all you say.

4       If the objection is to an exhibit, of course, we look

5  first to the pretrial consent order where you've indicated your

6  objections.  So, I'll know what your objections are just by

7  looking at the pretrial consent order.  So, there, all you need

8  to say is "objection".

9       In those rare cases where you think that it's a more

10  complicated situation, for example, where you think that the

11  door has been opened, so there's something that would otherwise

12  be excludable, now is permissible, then you can ask for a side

13  bar and I will accommodate you.  But the point is to keep side

14  bars to the absolute minimum so we don't distract the jury.

15       Okay.  Let's go back to the motions in limine.

16       The New York Times next motion is to exclude articles

17  from a blog posted on The Atlantic, an article Bennet was sent

18  in 2011 and evidence related to the fact that his brother is a

19  democratic senator from Colorado.

20       I began, with one exception, not going to grant that

21  motion at this time but in denying it's without prejudice.  I

22  think that will turn a lot on how examination and

23  cross-examination of Mr. Bennet goes.  The exception is

24  articles posted by Andrew Sullivan about Ms. Palin's son, Trig.

25  Those will be excluded.  So, the motion is granted as to those

1  articles.

2          MR. AXELROD:  Your Honor, if I may?  Excuse me for

3  interrupting.  The one concern I have about that ruling is if

4  Mr. Bennet's on the stand and cross-examination goes and opens

5  the door just to the fact that his brother being a democratic

6  U.S. senator, I think that plaintiff's counsel can easily slide

7  into that issue and have that out before the jury.

8          THE COURT:  No, no, no.  I thought I made clear

9  before -- and maybe I didn't -- even though I don't encourage

10  side bars, where something is about to be raised and has been

11  the subject one of these motions in limine and then I will take

12  a side bar before it's brought to the attention of the jury.

13  But I think the way to do that now that I think that through a

14  little further, when counsel for either side is about to

15  introduce something that I've not ruled on definitively in the

16  motions in limine, so it's still alive, so to speak, they

17  should alert their adversary, and the adversary can then say

18  whether they want a side bar or not.

19          Next, there was The Times motion partly jointly by the

20  plaintiff that the jurors read the editorial before evidence

21  otherwise began, and to receive the pre-charge before opening

22  statements and for use of a special verdict form.

23          So, first, I don't think the editorial should be

24  introduced before, sort of by the Court before we start the

25  evidence.  I'm sure the very first witness, whoever it is is

1  going to introduce it.  That's the way things normally work in

2  a trial and I don't see any reason to depart from that but

3  clearly, the jury will know all about the editorial because of

4  opening statements.  You're free in opening statements to show

5  a picture of the editorial, refer to the language or whatever.

6           In addition, however -- and we'll get in a moment to

7  my proposed preliminary charge -- I have decided that it would

8  be appropriate to give that preliminary charge right after

9  opening statements.  And that charge pinpoints the language of

10  the editorial and the retraction in the relevant respects.  So,

11  in that sense the motion will be sort of granted.

12           As for a special verdict with the exception of

13  punitive damages, I don't usually give that and I don't see any

14  reason to give it here.  But there will be on punitive damages,

15  assuming they make it to the jury, just a box for them to check

16  on the "we award punitive damages or we don't", and then we'll

17  have a further proceeding with regard to punitive damages

18  because that involves evidence that would otherwise be

19  inadmissible.

20           So, in other words, on the verdict form that the jury

21  gets for the case in chief, unless I've ruled out punitive

22  damages and which I won't decide until the charging conference

23  later, if punitive damages are still alive, then there will be

24  an instruction to the jury about what punitive damages involved

25  and they will check either "yes" or "no".  If they check "yes",

1   then they will, after they've reached their verdict on the case

2   in chief, we'll bring them back for a short proceeding on

3   punitive damages in which the parties could produce evidence on

4   both sides that would not otherwise be admissible but would be

5   admissible on punitive damages since punitive damages involves

6   really a different standard than all other standards.  So,

7   that's my practice on that.

8           Now, with respect to Ms. Palin's motion to preclude

9   reference to numerous exhibits to which there are objections,

10  to preclude reference to them in the selection of the jury in

11  opening statements and before the questions are put, so to

12  speak, or before the Court has had a chance to rule outside the

13  presence of the jury, as I've already told you, there's no

14  danger of any exhibit being shown to the jury during selection

15  because the Court is the only person who questions the jury.

16  That's the federal practice.

17          Second, we can deal now or if you want to wait to see

18  if we're going forward, we can deal with on the morning of the

19  later trial any exhibits anyone wants to mention in opening

20  statements.  But that's as far as it goes.  The rest of the

21  motion is denied without prejudice along the lines I've already

22  indicated.

23          When defense counsel is about to introduce an exhibit

24  that plaintiff's counsel has objected to in more of than

25  trivial ways, you'll alert plaintiff's counsel, here comes like

1    there's a video that has been the subject of some controversy.

2    And then if plaintiff wants a side bar, you will say "Can we

3    have a side bar"?  And I will, I am grateful for those motions

4    in limine because I've now familiarizes myself with any of

5    these exhibits.  It won't be that lengthy but it'll turn on

6    what's happened thus far in the trial and therefore, I can't

7    make the decision at this point.

8            I will, of course, in choosing the jury, inquire to

9    what they have seen in the media about this case.  And if I

10   recall correctly, The New York Post ran a copy of that video

11   which I took the liberty of watching.  I thought it was

12   charming myself but it's --

13           MR. TURKEL:  Judge, I could tell you the ebb and flow

14   of trials being what we are, the idea that, we'll always give

15   them the courtesy if we're going through a piece of evidence

16   that they thought was way outside the parameters of

17   admissibility, whatsoever.  Our opinion on that may change.

18   I'm not so sure under 405 standards there's necessarily a

19   relevant incident of conduct but we could very well not have a

20   problem.

21           THE COURT:  This is your call, not mine.  So, for

22   those of you who hasn't watched it, this was a video of

23   Ms. Palin in a, I guess it's sort of like a quiz show where she

24   was dressed up as a kind of teddy bear and then they had the

25   people on the panel had to guess who she was and when they

1   didn't guess who she was.  But when she took off her, the cover

2   of her head, one of the panelists said "Oh, it's Tina Fey".  I

3   thought that was great.

4           Okay.  Let's see what else.  I think we've covered all

5   the motions in limine.  Is there any motion in limine that I

6   haven't covered.

7           MR. AXELROD:  Your Honor, I think you've covered

8   everything outstanding.

9           THE COURT:  Okay.  Then let's turn to the preliminary

10  charge which you both submitted your proposed versions and then

11  I put together what I thought was appropriate and sent it to

12  you yesterday.

13          So, any objections to that preliminary charge?  As I

14  said, my plan was to give it to the jury right after opening

15  statements before the start.

16          MR. VOGT:  Your Honor, two points.  One is not so much

17  an objection.  I understand what the Court was trying to do in

18  truncating an explanation of the corrections itself.  We'll be

19  addressing in opening the situation I wanted to avoid was

20  telling the jury there were two corrections at different times.

21  And the Court gives an instruction makes it look like there's

22  one maybe making counsel lose credibility in front of the jury.

23          THE COURT:  No.  Did you really want me to give both?

24          MR. VOGT:  Well, both are actually in here because the

25  way we wrote it down was there was a correction at 11:55 and

1    there was a subsequent correction at four o'clock.

2              THE COURT:  I understand.  And they were not

3    identified, but my point is this.  All I'm trying to bring

4    across to the jury is what's obviously a major issue in this

5    case which was The Time's position is, we made a mistake but we

6    quickly corrected it and so there's no actual malice, et

7    cetera.

8              So, I'd be pretty surprised if you want me include all

9    the versions of that.

10             MR. VOGT:  I don't.  I'm just thinking practically if

11   my opening gives the impression that there were two and the

12   judge says there's one.

13             THE COURT:  Okay.  So, you want something along the

14   lines that the times published two corrections, one at such and

15   such a time, the other at later time and here is the later one.

16             MR. VOGT:  It could just be around 11:15a.m.  And four

17   or five p.m. on June 15 The Times published corrections.  The

18   first time in their later paper in their final form read.

19             THE COURT:  Okay.  Any problem with that?

20             MR. BROWN:  No, your Honor, we have no problem with

21   that at all.

22             THE COURT:  All right.  I think something I noticed, I

23   referred to Congressman Steven Scalise, but I think he uses the

24   name "Steve" is his first name, if I'm not mistaken, not

25   "Steven".  So, I will change that back to "Steve".

1          Anything else from plaintiff's counsel?

2          MR. VOGT:  The only other point is in point one of the

3    elements, the Court has the word "personally" in there.

4          THE COURT:  Yes.

5          MR. VOGT:  I just noted that the Pattern Instruction

6    case law don't include "personally" again.  It's just --

7          THE COURT:  No, no, no.  One of the issues in this

8    case is whether the reference to Sarah Palin's Political Action

9    Committee was a reference to Sarah Palin or might reasonably

10   simply have been interpreted as a reference to a committee.

11   So, I think that will stay.

12         MR. VOGT:  Understood, your Honor.  I didn't want to

13   to appear as if there was sort of an additional element.

14         THE COURT:  When we get to the charging, remember, all

15   of this gets, as I say to them repeatedly, is displaced by the

16   final instructions and that's because, of course, when we get

17   to the charging conference you may convince me to exclude that

18   but at least for now I am going to include it.

19         MR. VOGT:  Thank you, your Honor.

20         MR. BROWN:  Your Honor, just two points.  And we'll

21   we've provided red lines to plaintiffs counsel on these two

22   points and I can hand them up to the Court if it's helpful.

23   Would you like me to do that?

24         THE COURT:  Yes, that's helpful.

25         MR. BROWN:  How many copies would the Court like?

 1          THE COURT:  Two.  One for me and one for my law

 2   student who is seated in front of me.

 3          (Pause)

 4          MR. BROWN:  As your Honor will see, the first of those

 5   are the same points that counsel for the plaintiff was just

 6   addressing.  That is the first element, in legalese the other

 7   concerning element.  And, your Honor, in this particular case,

 8   although, we recognize that Pattern Jury Instructions often use

 9   word "referred", precisely for the reasons your Honor raised a

10   moment ago with reference to the use of the word "personally",

11   we urge the Court to adopt the phrase or the term "about"

12   rather than "referred".

13          THE COURT:  I'm sorry.  Where are you?

14          MR. BROWN:  On page two of the document.

15          THE COURT:  I see.

16          MR. BROWN:  Precisely for the reason you raised a

17   moment ago which is that Mrs.~Palin's name, of course, appears

18   in the editorial.  It has an apostrophe "s" and reference

19   "political action committee" and the word "referred" we believe

20   would be confusing to the jury here because --

21          THE COURT:  OK.  I understand.  Let me ask plaintiff's

22   counsel, given that I am going to include "personally" in this,

23   do you care one way or the other?

24          MR. VOGT:  I would just note that the "referred" is

25   what all the case law says.  It's not just the Pattern

 1   Instructions.  They use the word "reference" for "refers to".

 2          THE COURT:  Just so you know, case law, of course,

 3   especially in New York, state case law is binding on me if it's

 4   from a higher court.  Pattern Instructions are not.

 5          MR. VOGT:  That's why I mentioned case law uses that

 6   language as well.

 7          THE COURT:  All right.  Let me think about that one

 8   and I'll give you the final obviously before.

 9          MR. BROWN:  Your Honor, just one more sentence on

10   that.

11          Although, we think the wording that immediately

12   precedes one is fine.  I note that it says that the allegedly

13   libelous statements refer to her.  Well, based on the

14   particular sentences of the editorial that plaintiff alleges

15   are defamatory --

16          THE COURT:  Actually, in some ways your suggestion is

17   favorable to the plaintiff in some ways, as well as to the

18   defense because it referred, looked at very narrowly or did

19   refer to her personally end of story, and that's not the end of

20   the story.  So, maybe we should substitute something like

21   "would reasonably be taken to refer to her", or something like

22   that.

23          Well, let me think about it and I'll give you another

24   version of that later only.

25          MR. BROWN:  Fair enough, your Honor.

1          And then in the paragraph below that, again, we're

2     trying to avoid legal terms of art that can be confusing to a

3     juror and "consciously chose to disregard" we think falls into

4     that category.  The legal standard, as articulated by the

5     courts in plain English for that element of the claim is that

6     the defendants had a high degree of subjective awareness of

7     falsity and defamatory meaning.  And while we don't think all

8     of those words from the standard are necessary in its

9     pre-instruction, we thought it was appropriate to suggest that

10    the Court focus on "awareness of the probability of falsity and

11    defamatory" meaning since "conscious disregard" is one way of

12    proving that ultimate legal principle, and we just wanted to

13    put the legal principle in plain English in the

14    pre-instructions.

15          THE COURT:  Well, let me hear from plaintiff's counsel

16    on that.

17          MR. VOGT:  Your Honor, I think it's an incomplete

18    statement of the law.  The high degree of subjective awareness

19    is actually following the case law or acted in reckless

20    disregard of truth.  This makes it seem like --

21          THE COURT:  Yes.  I take it by this you mean what

22    they're suggesting.

23          MR. VOGT:  Yes, your Honor.

24          THE COURT:  I tend to agree with that.  I'm sure we'll

25    have a discussion at the charging conference about reckless

1 disregard.

2      By the way, there have been many studies by

3 sociologists and law professors that say the juries understand

4 what is meant by "preponderance of the evidence". The juries

5 understand what is meant by "proof beyond a reasonable doubt"

6 but that when you get to in between stuff like "clear and

7 convincing evidence", like "reckless disregard", like "willful

8 blindness" and other things that sort of fall in between,

9 juries have a considerable difficulty understanding those. And

10 that's why, for example, I didn't use in the preliminary

11 instructions the term "clear and convincing" because I think

12 some people without the benefit of further instructions that I

13 will give in my final instructions, some people will think

14 well, that means a pretty high standard and other people will

15 think, no, that's just a little bit more and just given that

16 guidance.

17      The proposal here, everyone's agreed that in the first

18 part of the sentence which reads:

19      "If she proves these elements, Ms. Palin in order to

20 prevail on her claim will then have to prove that there was a

21 high probability either that the defendants knew when they

22 published these statements that the statements were false and

23 defamatory."

24      Both sides agree with that for the purpose of

25 preliminary statement. And then we get to the second clause:

1          "Or that at a minimum the defendants were aware that

2     the statements probably were false and defamatory."

3          That's one way of looking at conscious disregard but I

4     think it's a little off the mark.  "Conscious disregard",

5     "reckless disregard", although they vary a little bit between

6     civil and criminal cases, basically, are about purposely

7     blinding yourself to a fact.  It is true that the inference a

8     jury has to draw from purposely blinding yourself to a fact is

9     that you knew what the facts would show if you didn't blind

10    yourself.  So, it's sometimes called the ostrich charge.  But I

11    think the proposal here from The Times doesn't quite capture

12    that notion of willful blindness.  So, I'm inclined to leave it

13    the way it is for now.

14         So, if we go forward today I will get that to you

15    right after lunch.  If we don't go forward I will get it to you

16    sometime next week.

17         All right.  I think those are the only things that we

18    can properly do before hearing from Ms. Palin.

19         Hold on a minute.

20         (Pause)

21         THE COURT:  Okay.  Is there anything else either

22    counsel wish to raise?

23         MR. TURKEL:  Nothing from the plaintiff at this time,

24    judge.

25         MR. AXELROD:  No, your Honor.

1              THE COURT:  All right.  So, we figured that we should

2    know by 11:15.  So, why don't we take an extended break and

3    we'll reconvene at 11:15 here in the courtroom.

4              (Recess)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Any word?

3          MR. TURKEL:  Yes, Judge.  Judge, my client went to one

4   of the centers that was on the email.  And she should have an

5   appointment.  There were a few people in front of her, and she

6   was confused about a PCR test because they have regular PCR and

7   rapid.  She was emailing me to ask me for guidance while my

8   phone was already being used.

9          By the time we got into the courtroom, she had gone up

10  the street to an urgent care center because we told her we need

11  this done.  The urgent care center did another rapid on her.

12  It's an antigen test, but it's positive.  I told her to go back

13  to one of the centers that was referenced and get in line for a

14  rapid PCR.

15         Judge, she was just confused because they were using

16  PCR/rapid.  They were telling her the PCR was three or four

17  days.  She reached out to ask me.

18         THE COURT:  I think, even though it wasn't what I

19  intended in terms of the more reliable PCR test, since she has

20  apparently tested positive three times, I'm going to assume

21  that she's positive.

22         Now, I have consulted with the powers that be in the

23  court, and they have said that even if she tests -- continues

24  to test positive, she can actually return to the Court on

25  February 3, the day that we had talked about, provided she is

 1    asymptomatic.

 2           If she has symptoms, she will have to come to the

 3    court on February 2, and the doctor whom we've employed

 4    throughout the pandemic will assess whether the symptoms are

 5    such that she should not come.

 6           So I think the chances are reasonably good that we

 7    will start on February 3.

 8           MR. TURKEL:  Because we're traveling, it's easy for us

 9    from Tampa.  We have a number of directs a day.  I don't know

10    if she's going to be still on the eastern seaboard or Alaska.

11    I know you're going to say yes, but I just want to make sure

12    we're communicating.

13           As this progresses, I may just want to organize calls

14    to chambers.  It may be a little hard for us.  If we're going

15    into the 3rd, we're probably going to be up here on the 2nd

16    anyway.  I'll just keep lines open is my point, Judge.

17           THE COURT:  All right.  Obviously, Ms. Palin's health

18    comes first, and the health of the rest of the courthouse is

19    equally important.  But I think under these circumstances, she

20    should assume the likelihood that she might have to be here on

21    February 2, so come in on February 1 or whatever.

22           MR. TURKEL:  That's fair.  Understood.

23           THE COURT:  Now, I also took advantage of the break to

24    reflect on the various objections that have been raised to the

25    preliminary instruction, and you have now received my

 1   resolution of those.

 2          Did everyone get that?

 3          MR. TURKEL:  Yes, your Honor.

 4          THE COURT:  As far as I'm concerned, that's it.  This

 5   will be the preliminary instruction that will be given.  I

 6   heard your arguments.  I made my determination.

 7          Just so you know going forward, because I am old, I

 8   can get away with being cranky.  And I don't -- once I've made

 9   a decision, I don't usually allow further reargument.  Okay?

10          MR. TURKEL:  Understood.

11          THE COURT:  You've all been great.  So I didn't expect

12   otherwise, but I just wanted to let you know going forward.

13          Okay.  So unfortunately, I think that's where we are

14   today.  So I will look forward to seeing you in this courtroom

15   at 9:00 a.m. on February 3, but I'm sure you'll provide me with

16   updates about Ms. Palin's situation.

17          MR. TURKEL:  Yes, your Honor.

18          THE COURT:  Very good.  Anything else?

19          MR. VOGT:  I think originally when we were going to

20   the 3rd, you had another trial, and we were going to do half

21   days.

22          THE COURT:  I'm very proud of the fact, not

23   personally, but of our court.  Our court has remained open

24   throughout the pandemic.  We have had over 100 jury trials

25   during the course of the pandemic.

 1          We have never had a single juror contract COVID-19

 2   because of all the precautions we take.  And the result of that

 3   though is that because we only have four courtrooms, we're

 4   backed up, notwithstanding all those efforts.

 5          So I had another trial that was going to follow

 6   immediately on your trial.  And I thought -- sometimes you

 7   never know how long a trial is going to take or how long a jury

 8   is going to be out.  So I thought if worse came to worse, we

 9   would sit half days on each.  But I think now, given the

10   circumstances, I'll just move the other trial.  And we will go

11   full days starting on February 3.

12          Now, I was a little taken aback that the order of

13   witnesses has changed.

14          MR. VOGT:  Yes, your Honor.  We actually communicated

15   with counsel a few days in advance and let each other know.  I

16   think it was just a little reorder at the beginning.

17          THE COURT:  Okay.  So just be sure to let me know.

18   I'd like to get from you no later than February 2 what you

19   consider to be a pretty definitive list of the order of

20   witnesses.

21          MR. VOGT:  Is it okay to email that?

22          THE COURT:  Yes.  And also in that regard -- I think I

23   mentioned this earlier.  But supposing you're calling as a

24   hostile witness someone identified with The New York Times.

25   You have the choice -- and you can consult with counsel --

**JA80**

1  either you can do your, in effect, cross first.  It's not

2  really cross.  It's your direct testimony with leading

3  questions because it's a hostile witness.

4         But then The Times would not be governed by the scope

5  of that, and they could do what would have been their direct,

6  if they had called the witness first, as well as in response to

7  the -- or, if counsel for both sides agree, you can just have

8  The Times go first with a witness like that and then do cross.

9         It's plaintiff's call ultimately, and either is fine

10  with me.  But I just want to be sure that you know no witness

11  will be called twice.

12         MR. TURKEL:  We were going to I think raise this,

13  Judge, because just recently, I had the experience of calling

14  the other party adverse.  They wouldn't agree on depo

15  designations, and they crossed their own witness for nine hours

16  in my case.  It was something new to me.

17         THE COURT:  If you want to do a cross or if any lawyer

18  wants to do a cross for nine hours, that's fine.  I will excuse

19  the jury of course after the first two.

20         MR. TURKEL:  Judge, I think the issue -- and I don't

21  think it's something necessarily we're asking the Court to rule

22  right today because the law is, to use a word you used earlier

23  today, fuzzy on it.  So the question becomes we call, for

24  instance, Mr. Bennet adverse, will The Times be able to lead

25  him.  That's not a foregone --

**JA81**

```
 1              THE COURT:  I've encountered this situation many

 2    times.  So let me just go over it because here are my rules.

 3              MR. TURKEL:  Okay.  Great.

 4              THE COURT:  Assuming you want to call the witness, you

 5    want to put the witness on first with your -- and the witness

 6    is -- the technical term "hostility" is really unfair.  It's an

 7    adverse witness.

 8              MR. TURKEL:  Yes.

 9              THE COURT:  So you would put all your questions.  The

10    Times would then be able to examine this witness.  And on

11    questions that are on new areas, something they would have

12    brought out if they had gone first, they cannot lead.

13              But on things that are responsive to things you've

14    done, they can, within reason, lead.  So that's my practice.

15              MR. TURKEL:  If they chose to raise new areas of

16    direct, I get sur cross on that?

17              THE COURT:  Let me tell you my practice in that

18    regard.  We go as long as you guys want.  So if you want --

19    you'll get the next go-around, which will be redirect/recross,

20    depending on how you want to look at it, and then they will

21    have an opportunity, and then you will have an opportunity.

22              I never -- if it's a legitimate new question that

23    fairly has now become important, I never stop counsel from

24    going.  And that even includes, although I'm a little more

25    unhappy about that, something that they should have asked
```

1   earlier but forgot to ask it because lawyers have an awful lot

2   to do and don't always cover everything.  So no one will ever

3   be deprived of having another time to question the witness

4   about, even if they've already questioned the witness two or

5   three times.

6           Having said that, if it becomes totally repetitive, I

7   might say something in the presence of the jury like, counsel,

8   haven't we gone over that 500 times already?  Or something else

9   that I'm sure you would deeply appreciate.  Anyway, you will go

10  as often as you need, both sides.

11          MR. TURKEL:  The threshold question is you will allow

12  leading if we take some adverse.

13          THE COURT:  Absolutely.

14          MR. TURKEL:  So that applies uniformly?

15          THE COURT:  That applies uniformly.

16          MR. TURKEL:  Thank you.  I appreciate that.

17          MR. AXELROD:  Judge, the only thing I have is

18  plaintiffs are calling most of their witnesses in their case.

19  Some of our witnesses are traveling.  So it might be useful for

20  us to have another day's notice of what the witness order is

21  going to be.

22          THE COURT:  All right.  That's good.  So instead of

23  February 2, let's do it February 1.

24          MR. AXELROD:  That would be very helpful.

25          THE COURT:  I think that's certainly everything on my

1  list.  Anything else?

2          MR. VOGT:  I don't think we've identified how long for

3  opening statements.

4          THE COURT:  I'm sorry.  So I have a firm, fixed, and

5  final rule on that too.  That's the trouble with being a judge

6  all these years, you get into patterns.

7          Half hour.  Rarely, in my experience, do counsel need

8  that much time.  But if you go 30 minutes, that's fine.  If you

9  go 31, I will cut you off.

10          You are all experienced trial lawyers, so this I'm

11  sure you know already.  But opening statements, the jury hasn't

12  heard any of the evidence yet.  They will have had a two-second

13  summary from me when we're choosing a jury about what the case

14  is about.

15          You can only expect them to remember basic facts and

16  basic principles.  Minutia, that very clever little thing that

17  you're going to get to with your fifth witness, will be lost on

18  them in opening statements.  Summation, fine.  But really what

19  they need in opening statements is an overview of where the two

20  sides basically come out.

21          But, as I say, you're all experienced lawyers.  I'm

22  delighted you are.  So my only official rule is 30 minutes.

23          Anything else?

24          MR. TURKEL:  No, Judge.

25          MR. AXELROD:  No, your Honor.

1           THE COURT:  Very good.  I look forward to seeing you

2    and Ms. Palin on February 3.

3           (Adjourned)

**JA85**

M231PAL1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SARAH PALIN, an individual,

4                    Plaintiff,

5            v.                          17 CV 4853 (JSR)

6   THE NEW YORK TIMES COMPANY, *et
    al.*,
7
                     Defendants.
8
    ------------------------------x         Trial
9
                                            New York, N.Y.
10
                                            February 3, 2022
11                                          9:00 a.m.

12  Before:

13                      HON. JED S. RAKOFF,

14                                          District Judge

15                          APPEARANCES

16  TURKEL CUVA BARRIOS, P.A.
17       Attorneys for Plaintiff
    BY:  SHANE B. VOGT
18       KENNETH G. TURKEL

19
    BALLARD SPAHR, LLP
20       Attorneys for Defendants
    BY:  DAVID L. AXELROD
21       JACQUELYN N. SCHELL
         THOMAS BYRNE SULLIVAN
22       JAY WARD BROWN

23

24  Also Present:

25  Dana Green, Senior Counsel, The New York Times Company

**JA86**

2

M231PAL1

1          (In open court)

2          MR. VOGT:  Could I address one issue with the Court

3     very quickly.

4          THE COURT:  Yes.

5          MR. VOGT:  Our local counsel here doesn't have a seat.

6     We wanted to make sure with the Court it was okay for him to be

7     excused, or should he stay here with us.

8          THE COURT:  Yes, as far as I'm concerned, he can be

9     anywhere you like.  The rules regarding the pandemic are not

10    set by me, but the world's leading expert is my courtroom

11    deputy here, so anything she agrees to is fine with me.

12         MR. VOGT:  I just meant as a matter of practice,

13    because we're admitted *pro hac*, your Honor, if --

14         THE COURT:  I'm sorry, but what is it you want right

15    now?

16         MR. VOGT:  Our local counsel, because we're admitted,

17    is here today --

18         THE COURT:  Yeah.

19         MR. VOGT:  -- if necessary, but if he's not needed, if

20    the Court is okay with us proceeding here without him.

21         THE COURT:  Oh.  Whichever you prefer.

22         MR. VOGT:  Okay.  Thank you, your Honor.

23         THE COURT:  Okay.  Okay.  So the only thing I have to

24    report is that Eileen Lepping, who is one of the Times'

25    witnesses, or I guess maybe both parties' witnesses, anyway,

**JA87**

M231PAL1

1    when she went through security, reported that she had tested

2    positive, so they of course kicked her out, but suggested she

3    go get a PCR test to make sure whether it really was positive.

4    So hopefully she'll be negative.  If not, worst case, in a

5    civil case, particularly with a witness who's not a central

6    witness, we can take it by video, but hopefully that won't be

7    necessary.

8            I want to thank both sides for the updated list of

9    witnesses and witness order.  I do want to advise counsel for

10   both sides that there must always be ready to go the next

11   witness.  I do not ever want to be in a situation where we end

12   one witness and some lawyer says, gee, oh, Judge, I thought it

13   would take an hour later; our witness is somewhere else but

14   will be here shortly.  That's not acceptable.  It's not fair to

15   the jury to just have them sit there and twiddling their

16   thumbs.  So always make sure that the next witness in line is

17   ready to go while a witness is on the stand.

18           Okay.  I think the only issue that we had for this

19   morning until the jury is ready, the jury panel is ready, is

20   any exhibits that either side is going to propose to use in

21   their opening statements.

22           MR. AXELROD:  Yes.  Thank you, your Honor.

23           So last night, Mr. Vogt sent me over a list of about

24   30 exhibits that he intended or may use for opening.  About 16

25   of those we objected to, and so we are in fact worried that

**JA88**

M231PAL1

```
1    there are so many objectionable exhibits that might infect the
2    jury, and we wanted to talk about that before openings.
3            THE COURT:  So can someone share that list with me.
4            MR. VOGT:  Your Honor, I have actually copies of the
5    exhibits.
6            THE COURT:  All right.  That would be great.  Hand
7    them up.
8            MR. VOGT:  I just need to separate them out.
9            THE COURT:  Excuse me?
10           MR. VOGT:  I just need to separate them out because
11   there are multiple copies.  I was working on the hotel printer.
12           MR. AXELROD:  Your Honor, if I may approach, I have a
13   list, while Mr. Vogt is doing that.
14           THE COURT:  Both sides were supposed to provide me
15   with a box of all the exhibits.  I got them from the defense,
16   but I didn't get them from plaintiff's counsel, which sort of
17   ruined my weekend.  I had to watch television and the playoffs
18   instead of the exhibits from the plaintiff's, and that
19   certainly was a downer, but I survived somehow.
20           So anyway, I have the list.  So going down the list,
21   I'll read off the numbers, and when defense counsel objects,
22   tell me when.
23           4, 5, 6, 7, 17.
24           MR. AXELROD:  Yes, your Honor.  This is where the
25   objections start.
```

1          THE COURT:  Okay.  So let me take a look at 17.

2          Incidentally, I remind both counsel that opening

3     statements are strictly limited to 30 minutes, not 31.  So if

4     you were planning to introduce or show the jury 30 exhibits, I

5     guess they're not going to hear much in the way of rhetoric.

6          Okay.  So 17 is a *New York Times* article entitled

7     "Ethical journalism," and it's a modest, what, 30 pages or so.

8     What portion of this are you planning to use on your opening?

9          MR. VOGT:  Do we need to stand, your Honor?

10          THE COURT:  Excuse me?

11          MR. VOGT:  Do we need to stand or --

12          THE COURT:  No, no.

13          MR. VOGT:  We're just using a couple of excerpts out

14     of that.  Those are actually the standards and guidelines that

15     govern the editorial format.

16          THE COURT:  Which portions are you planning to use?

17          MR. VOGT:  Your Honor, we are going to use the section

18     on fact checking.

19          THE COURT:  Well, point me to the page, or Bates

20     stamp.

21          MR. VOGT:  I got these out of order.

22          Page 2 of 36, where it talks about --

23          THE COURT:  Yes.  So which paragraphs there do you

24     want to --

25          MR. VOGT:  Oh, the bottom, the scope of the

1    guidelines, just pointing out that the guidelines actually

2    advise the editorial department as well as editors.

3              THE COURT:  Okay.  What else?

4              MR. VOGT:  And then the "Duty to Our Readers" section,

5    starts on the bottom of page 4 but then it goes on to page --

6    the next page.

7              THE COURT:  I'm sorry.  It starts at the bottom of

8    page 4, and what portion of that are you going to read?

9              MR. VOGT:  And it's actually -- that section goes on

10   to the next page, the top of 5.

11             THE COURT:  I see.  What portion are you going to

12   read?

13             MR. VOGT:  Where, "We tell our readers the complete

14   unvarnished truth as best we can learn it."

15             THE COURT:  Okay.  And what else, if anything?

16             MR. VOGT:  And I believe that is it.

17             THE COURT:  Okay.  So what's the objection?

18             MR. AXELROD:  Well, the objection is, your Honor, this

19   exhibit -- and there are a couple others -- suggests that

20   plaintiff's going to try to make a case that defendants didn't

21   follow their own guidelines, which of course is irrelevant

22   because this is not a negligence case, so I don't know what

23   the --

24             THE COURT:  I'm not sure it's irrelevant.  You are, of

25   course, right it's not a negligence case, but if there is a

1    deviation from the paper's own standards, why isn't that

2    arguably some evidence -- not sufficient by itself but some

3    evidence -- of hostility?

4         MR. AXELROD:  Well, I think, your Honor, I think it's

5    a stretch to argue that some deviation from a guideline

6    suggests that the times or Mr. Bennet published something

7    false, and what we're doing here is conflating negligence with

8    recklessness, which of course are very different principles.

9         THE COURT:  No, I don't think so.  The objection is

10   overruled.  You may use that on your opening statement.

11        What's next?  That was 17.  18.

12        MR. AXELROD:  Yes, your Honor.  The same objection.  I

13   don't know what they're going to use from this document.

14        THE COURT:  Yes, I need to know that to rule

15   because -- and of course the jury will be told before opening

16   statements that nothing that counsel says is evidence and this

17   is simply to give the jury a heads up of what they hope or

18   expect to prove, not necessarily what they will prove.  But

19   let's see.  So, 18.

20        MR. VOGT:  I have that one here, your Honor.  I didn't

21   pass that one up.  I apologize.

22        THE COURT:  Okay.  Okay.  What portion of that are you

23   planning to read?

24        MR. VOGT:  We have call-outs from the first page where

25   it says, "Our greatest strength is the authority and

**JA92**

M231PAL1

1  reputation --"

2         THE COURT:  I'm sorry.  I don't mind you sitting, but

3  you have to speak into the microphone.

4         MR. VOGT:  Yes, sir.  On the first page, the sentence,

5  "Our greatest strength is the authority and reputation of *The*

6  *Times*."  And then beneath that, "*The Times* --"

7         THE COURT:  What's the relevance of that?

8         MR. VOGT:  The authority and reputation of *The Times*

9  is directly relevant to the issue of damages.  It's one of the

10  factors courts consider in determining how much harm was done

11  by the publication.

12         THE COURT:  The harm to *The Times*?

13         MR. VOGT:  No.  The harm to the plaintiff.

14         THE COURT:  Yes.  Well, what does this have to do with

15  the harm to the plaintiff?

16         MR. VOGT:  Well, when it says the greatest strength is

17  the authority and reputation of *The Times* --

18         THE COURT:  Yeah.

19         MR. VOGT:  -- the fact that *The Times* has authority in

20  the public and it's recognized.

21         THE COURT:  Oh, no.  The objection is sustained.

22         MR. VOGT:  And then beneath that, your Honor, it

23  discusses how "*The Times* and its staff maintain the highest

24  possible standards to ensure that we do nothing that might

25  erode readers' --"

**JA93**

M231PAL1

```
1           THE COURT:  Well, that I might allow on the same basis
2   I allowed the last, although it sounds a little cumulative to
3   what you just said you were going to put in under 17, but I
4   will allow it.  But I will repeat for the third and final time,
5   both sides are given 30 minutes for opening, not 31.
6   Understood?
7           MR. VOGT:  Yes, your Honor.
8           THE COURT:  All right.  Very good.
9           What's next?  Let's see.  25.
10          MR. AXELROD:  Yes, your Honor.  We have an objection
11  to that one as well.
12          THE COURT:  Okay.  Let me see if I have that.
13          MR. VOGT:  Your Honor, and we can take this one out --
14          THE COURT:  Okay.  Great.
15          MR. VOGT:  -- to short-circuit that.
16          THE COURT:  Okay.  Excellent.
17          32?
18          MR. AXELROD:  Same objection as to the previous, 25.
19          MR. VOGT:  And we can do without that one as well.
20          THE COURT:  Okay.  33?
21          MR. AXELROD:  Same objection, your Honor.
22          MR. VOGT:  We'll do without that one as well, your
23  Honor.
24          THE COURT:  Great.  47?
25          MR. AXELROD:  Yes, objection to 47 and 50.  These are
```

M231PAL1

1  two *Atlantic* articles that were covered by our motion *in*

2  *limine*.  And it's not just this.  I suspect that plaintiff's

3  counsel is going to talk about *The Atlantic* and what *The*

4  *Atlantic* reporting was, and for all the reasons in our motion

5  *in limine*, we think that should be kept out of this trial, and

6  based on your summary judgment opinion as well, your Honor.

7           THE COURT:  Well, all I'm dealing with right this

8  second -- and we'll get in a minute to what, if anything, is

9  permitted to be said orally on opening statements -- but even

10 if I were to allow something about *The Atlantic*, I think given

11 the fact that it is at least, at best, open to reasonable

12 dispute whether this would ever come into evidence, I think 47

13 and 50 should not be referred to on the opening statement.

14           All right.  63?

15           MR. AXELROD:  No objection, your Honor.

16           THE COURT:  93?

17           MR. AXELROD:  Yes, your Honor.  93, 96, 97 are all

18 kind of I guess exhibits related to the *New York Times*'

19 marketing campaign.  I can't imagine what the relevance is, but

20 that's the objection.

21           THE COURT:  Well, let me hear from plaintiff's

22 counsel.

23           MR. VOGT:  And your Honor, these are exhibits that

24 have to deal with the truth advertising campaign that was

25 launched shortly before -- as I said, shortly before -- I think

M231PAL1

1    it launched in February of 2017 and this article was then in

2    June of 2017.  And that marketing campaign had posters,

3    billboards, things around town, where *The Times* was professing

4    itself publicly as a purveyor of the truth and talking about

5    how important the truth was and giving the impression to the

6    public, at least, the readers, that what they were reading in

7    the pages of *The Times* is the absolute truth is verified by

8    these.

9            THE COURT:  So?

10           MR. VOGT:  And so again, your Honor --

11           THE COURT:  It's one thing, as in the earlier exhibits

12   that I allowed you to make reference to, to point out that the

13   verification and other ethical rules in *The Times* bind all

14   employees, because at least one potential issue in this case is

15   the difference between the editorial people and the newspeople,

16   but I don't see that *The Times* professes to be telling the

17   truth or even stresses that it's telling the truth, which I

18   suspect may be true of other publications as well.  I haven't

19   yet seen the newspaper or other media that says:  We want you

20   to know we're telling a bunch of lies.  So I'm really not sure

21   what the relevance of this is.  So the objection is sustained.

22           Okay.  So we're up to 115.

23           MR. AXELROD:  Your Honor, no objection to 115, 119,

24   135, 142, 160.

25           THE COURT:  Okay.

M231PAL1

1          MR. AXELROD:  Sorry.  There is an objection to 160.

2          THE COURT:  What's the objection?  In what you just

3    handed up, you didn't indicate an objection to 160, but that's

4    all right.  I won't consider that a waiver.  What's your

5    objection?

6          MR. AXELROD:  The objection, your Honor, this is

7    written by Ross Douthat.  Mr. Douthat is I guess voicing his

8    opinion about what the word "incitement" means.  He, of course,

9    had no role in writing the editorial, and this was written

10   before the editorial was published.  So besides Mr. Douthat

11   having an opinion about the definition of "incitement," which I

12   don't know why that's necessarily relevant, I can't see what

13   the relevance of this would be, especially in an opening

14   statement.

15         THE COURT:  Let me hear from plaintiff's counsel.

16         MR. VOGT:  Your Honor, with respect to the incitement

17   issue, of course one of the main issues in the case is going to

18   be whether how -- whether and how reasonable readers understood

19   the term "incitement," and if there is another person,

20   particularly Mr. Douthat, who had exchanges with Mr. Bennet

21   after this editorial was published, his understanding with

22   respect to the term "incitement" --

23         THE COURT:  Yes, I agree.  It may or may not come into

24   evidence, but I think it's at least sufficiently in the

25   ballpark that I will allow it to be referred to in opening

M231PAL1

1    statement.

2            MR. AXELROD:  Okay.  Your Honor, 165 is another

3    objection to a *New York Times* style and usage document, similar

4    to the earlier objection.

5            THE COURT:  Yes.  What is it in 165, which I'm not

6    sure I have, that plaintiff's counsel is -- let me ask my law

7    clerk to help me out here.

8            We don't have 165.  May I have it?

9            MR. VOGT:  I believe that -- it should just be two

10   pages.  The cover page, it says Manual of Style and Usage on

11   it, and I just included one page of the exhibit.

12           MR. AXELROD:  I've got a seven-page document.

13           THE COURT:  For some reason what was handed up doesn't

14   include it, so do you have another copy?  Does someone have

15   another copy?

16           If you don't have another copy, read me what you're

17   proposing to quote from it.

18           MR. VOGT:  The only thing, your Honor, what we were

19   going to use from that is a call-out of -- there's a definition

20   of "eponymous," which is the namesake of the "of and

21   concerning" issue related to the plaintiff, and the Style and

22   Usage Manual is an instruction manual on how certain terms are

23   supposed to be used.

24           THE COURT:  That's the kind of minutiae that I don't

25   think you should be getting into on opening statements in any

**JA98**

M231PAL1

1   event, so the objection is sustained.

2               171, any objection?

3               MR. AXELROD:  No, your Honor.

4               THE COURT:  174, any objection?

5               MR. AXELROD:  No, your Honor.

6               THE COURT:  175?

7               MR. AXELROD:  Yes, your Honor.

8               THE COURT:  Okay.

9               MR. VOGT:  And we're not going to use that one, your

10  Honor.

11              THE COURT:  Okay.  They're not going to use it.

12              179?

13              MR. AXELROD:  Yes, your Honor.

14              THE COURT:  Okay.  This I do have.

15              What's the relevance of 179?

16              MR. VOGT:  Your Honor, 179, this is an excerpt of a

17  group of reader emails that show how readers actually reacted

18  and responded to The *New York Times* about the editorial itself,

19  which is relevant evidence to show reasonable understanding of

20  the "of and concerning" issue as well as the defamatory issue,

21  as well as it being a statement of fact.

22              THE COURT:  Well, are you saying this goes to damages,

23  or what?

24              MR. VOGT:  No, your Honor.  It goes to whether the

25  article or the editorial was reasonably understood by *Times*

M231PAL1

1    readers, who actually read it, to be of or concerning the

2    plaintiff, whether they read it as being defamatory, and

3    whether they read it as being factual in nature.

4              THE COURT:  You say that's a subjective test or an

5    objective test?

6              MR. VOGT:  It's both, your Honor, and I actually have

7    a case that talks about where one question is the effect of the

8    alleged libel on its readers, the question is one of state of

9    mind of the readers, and that can be proved by secondhand proof

10   of the declaration of the readers.

11             THE COURT:  Let me hear from defense counsel.

12             MR. AXELROD:  Your Honor, what plaintiff's counsel is

13   trying to do is to substitute the jury's findings here by

14   substituting in the opinion of people who are probably not your

15   average reader but people who write to newspapers.  And this

16   goes to the next exhibit, too, who are not your average reader,

17   who are giving their opinion about what the column meant --

18   sorry -- what the editorial meant.  It doesn't make much sense.

19   We can't cross-examine the people about --

20             THE COURT:  First of all, this is purportedly from

21   someone named Scott Armstrong.  Is that the Scott Armstrong or

22   someone else?  I'm asking plaintiff's counsel.

23             MR. VOGT:  I don't know, your Honor.  These were

24   just -- these were emails that were produced by *The New York*

25   *Times* to us.  Reader reaction.

**JA100**

M231PAL1

1          MR. AXELROD:  That's the problem, your Honor.  We

2     don't know who these people are.  We don't know if they are who

3     they actually purport to be; we don't know if these are friends

4     of Governor Palin's who are upset about the editorial.

5          THE COURT:  It starts out, "This is to inform you that

6     in the next several days I will be ending my subscription to

7     *The New York Times*."  So if you thought it was an interloper,

8     you could easily have checked out whether that was true or not

9     and see whether that person had a subscription to *The New York*

10    *Times*.

11         MR. AXELROD:  Well, that's fine, your Honor, but I

12    still don't understand what Scott Armstrong's opinion, being a

13    one-off person, what his opinion about this editorial, what

14    that has to do with the jury's finding about how your average

15    reasonable reader would interpret this.  I mean, I don't know

16    what makes Scott Armstrong's opinion more important than anyone

17    else's or more important than the jury's, whose job is to suss

18    out what the facts are here.

19         THE COURT:  That sounds nice, but how does the

20    plaintiff prove how the reader saw the editorial?  According to

21    at least what plaintiff's counsel is just telling me, it's both

22    an objective and subjective test and you can show anecdotally,

23    in effect, here's how a bunch of readers reacted.

24         MR. AXELROD:  Your Honor, if the shoe was on the other

25    foot and I found a bunch of -- a hundred witnesses who came in

**JA101**

1    and said they read the editorial a completely different way, I

2    have a hard time believing you would find that acceptable

3    evidence.  I don't understand what the difference is here.

4         But I think to answer your Honor's question, if

5    Ms. Palin had had readers come up or friends come up to her and

6    tell her how they viewed it or -- in fact, Mr. Vogt's going to

7    introduce testimony from Mr. Douthat, who's going to talk about

8    how he understood it, so I think that all that evidence is

9    going to come in, but I think in this form, from a person who

10   cannot be cross-examined about their opinions, we don't know if

11   Mr. Scott Armstrong truly exists.  We don't know anything about

12   him.  I don't know why we'd elevate his opinion over the

13   witnesses that we actually have who are going to testify in

14   this case and are subject to cross-examination.

15        THE COURT:  When were you informed by plaintiff's

16   counsel that he was going to use this particular exhibit on his

17   opening statement?

18        MR. AXELROD:  Last night at about 6:00.

19        THE COURT:  Okay.  I'm going to exclude it, because I

20   think that it would be relevant to the Court's ruling.  I may

21   have to deal with this as an exhibit in this case.  We're just

22   dealing with opening statements now.  But I would need to know

23   more about Mr. Armstrong, etc., etc., and *The Times* I think is

24   in a position to find that out, but not between 6:00 last night

25   and this morning.  So it will be excluded without prejudice to

**JA102**

M231PAL1

1   possibly being introduced at trial.

2              MR. AXELROD:  Thank you, your Honor.

3              And the next exhibit has the same objection.  It's a

4   selection of comments that looks like cherry-picked comments to

5   the editorial that plaintiff I guess wants to show the jury to

6   make the same --

7              THE COURT:  I'm sorry.  This is?

8              MR. AXELROD:  181.

9              MR. VOGT:  And we'll hold off on that exhibit, your

10  Honor.

11             THE COURT:  Okay.  Very good.

12             All right.  So we're up to what, 191?  There was no

13  objection?

14             MR. AXELROD:  No.

15             THE COURT:  204, no objection.

16             So the last two are 236 and 255.

17             MR. AXELROD:  Yes.

18             THE COURT:  All right.  Let me see if I have 236.

19             I have 255.

20             MR. VOGT:  And your Honor, we'll take out 255.

21             THE COURT:  Okay.  236.

22             MR. VOGT:  We'll take out 255.

23             THE COURT:  Oh, 255.  Okay.  So we're down to 236?

24             I don't see that one up here.  So I need to see that.

25  I really need to impress upon plaintiff's counsel that I need

**JA103**

M231PAL1

1   to have, as I already requested previously, a hard copy of all

2   your exhibits, so --

3           MR. VOGT:  Your Honor, they're -- as you know, I had

4   the wedding.  I had stuff shipped up here.  I have them all in

5   folders, but I haven't had a chance to pull them out in the

6   hotel yet.

7           THE COURT:  So what kind of lawyer are you that you

8   weren't doing billable hours during the wedding?  I mean,

9   that's just unheard of.

10          That's fine.  But let's make sure I get it by tonight,

11  let's say, okay?

12          MR. VOGT:  Yes, your Honor.

13          THE COURT:  Very good.

14          Okay.  So let me ask defense counsel, what's 236?

15          MR. AXELROD:  236, your Honor, you know, I don't know

16  why plaintiff's counsel wants to use this, but there are

17  portions of this which are hearsay within hearsay, and I'm

18  guessing that plaintiff's counsel wants to use it to assert for

19  the truth of the matter.  If you look at the back of the

20  document --

21          THE COURT:  I don't have the document.

22          MR. AXELROD:  Oh, I'm sorry.  Here, I'll give you my

23  copy.

24          THE COURT:  Okay.

25          MR. AXELROD:  I'll go off memory.

1        Look at pages 2 to 3, which are another reporter

2   emailing *The Times* and then quoting what another media entity

3   has written about the editorial. And I suspect that that's why

4   plaintiff wants to use this. I think there are other parts of

5   the document that are fine and not objectionable.

6        MR. VOGT: And that's not the part I'm going to use,

7   your Honor. The only part of that we wanted to use was a

8   statement by Mr. Bennet that's in it, that they stand by the

9   piece.

10        THE COURT: I'm sorry. Where is that? Because none

11   of this comes from him, right? So there's the hearsay problem.

12        MR. VOGT: Right. And the other parts of it aren't

13   the issue, your Honor. There is a component of that where

14   Mr. Bennet says --

15        THE COURT: Well, this is an email from Danielle

16   Rhoades Ha, H-A, vice president of communications of *The Times*,

17   so it is in that sense an exception to the hearsay rule as a

18   statement of a party adversary. And it's addressed to Oliver

19   Darcy, who is senior media reporter at CNN. "Hi, Oliver. The

20   following response is attributable to James Bennet, editorial

21   page editor, *New York Times*, on your most recent email. A

22   clarification should be posted soon:

23        "'On your second question you write, thank you for

24   calling that to our attention. We've fixed it. Yes, criticism

25   on Twitter alerted us to the error. While it's always

1    agonizing to get something wrong, we appreciate it when our

2    readers call us out like this.  We made an error in fact in the

3    editorial, and we've corrected it, but that error doesn't

4    undercut or weaken the argument of the piece.'"

5         All of that purporting to be a quote from Mr. Bennet.

6    Now I don't see the hearsay objection.

7         MR. AXELROD:  Your Honor, there is no hearsay

8    objection to that piece.  My hearsay objection is to the end of

9    the email, pages 2 to 3.

10        THE COURT:  I see.  Okay.  So the portion I just read

11   is all you're going to --

12        MR. VOGT:  Yes, your Honor.

13        THE COURT:  So that I'll allow.

14        MR. AXELROD:  Thank you.

15        THE COURT:  Okay.

16        MR. AXELROD:  And then, your Honor, the only other

17   outstanding item is, I'm intending to use Defense Exhibit 74 in

18   my closing -- sorry -- my opening.  It will be one of the four

19   exhibits I use.  Plaintiff's counsel has objected to Defense

20   Exhibit 74.

21        THE COURT:  Okay.  Let me get that out.

22        So aside from the fact that at least the copy you've

23   given me includes a lot of irrelevant items on the right-hand

24   side of articles that a reader may want to take a look at, such

25   as "How to empty your bowels every morning" -- I'm sure the

1    jury would be thrilled to see that -- but what's the relevance

2    of the portion that you do want to introduce?

3           MR. AXELROD:  So, your Honor, we actually want to use

4    the text of the quote-unquote article that was posted to

5    Ms. Palin's website on I believe it was June 15th.  As you'll

6    see in that article, it makes reference to the allegation that

7    the Loughner shooting in 2011 in Arizona was connected to

8    Ms. Palin and her political action committee.  Of course she

9    says in this case that just that mere allegation has caused her

10   emotional and reputational harm.  The fact that she posted

11   those same allegations to her website prior to the time of the

12   editorial of course is relevant to her state of mind.

13          THE COURT:  Okay.  So this is on Ms. Palin's website,

14   and it's going to be hard to read the date, but it looks like

15   it's -- I assume you're going to blow it up in your --

16          MR. AXELROD:  We are, your Honor.  June 15th, I

17   believe it is.

18          THE COURT:  Yes, June 15th.  So it's before the

19   editorial.

20          MR. AXELROD:  Correct.

21          MR. VOGT:  After.  The editorial was published online

22   on June 14th.

23          THE COURT:  Oh, okay.  Well, let's see.  It's really

24   hard to read, and my ophthalmologist swears I have 20/20 vision

25   once I put on my glasses.

**JA107**

M231PAL1

1        MR. AXELROD:  Your Honor, my paralegal Gianni can put

2    it up on your screen, and we can blow it up any place you want.

3        THE COURT:  Yes, that would be fine.

4        Okay.  I see.  There it is, but it -- yeah, you need

5    to make it -- all right.

6        "On Wednesday, it was revealed that the shooter who

7    opened fire on 25 Congressional Republicans during an

8    Alexandria softball practice volunteered on Senator Bernie

9    Sanders' presidential campaign in 2016.  Washington Free Vegan

10   pointed out the irony of the situation, noting that Sanders

11   fundraised off of false reports that Governor Sarah Palin was

12   to blame for the tragic shooting that injured Representative

13   Gabrielle Giffords in 2011.  Check it out."

14       And then there are two quotes, and then it concludes,

15   "Numerous media outlets blamed Palin for the shooting because a

16   map distributed by her PAC had identified Giffords' district as

17   a target pickup for Republicans.  Nevertheless there was never

18   any evidence found that the shooter was motivated by the

19   governor."

20       Okay.  So what's the relevance?

21       MR. AXELROD:  Your Honor, the fact that Governor Palin

22   put the allegation on her website at the time of the Virginia

23   shooting in 2017 shows that, you know, she was putting -- she

24   was herself publishing the allegations that she was connected

25   to the 2011 shooting and connecting it to the 2017 shooting.

**JA108**

M231PAL1

1    In this case, Governor Palin and her lawyers are going to argue

2    that the 2017 shooting had nothing to do with 2011 and why

3    would they introduce Governor Palin's name into the editorial

4    unless they were trying to hurt her.

5         THE COURT:  This is, at least the one I just read, is

6    she's responding to allegations of that sort.

7         MR. AXELROD:  No, your Honor.  This --

8         THE COURT:  And your adversary says this occurred

9    after *The Times* editorial.

10        MR. AXELROD:  Well, the date may be after *The Times* --

11   *The Times* editorial was published in the paper on June 15th.

12   This does not --

13        THE COURT:  But wasn't it online on the 14th?

14        MR. AXELROD:  It was, but this does not mention the

15   editorial in *The Times*.  There was a later post to Governor

16   Palin's website that does mention the editorial and responds to

17   it, but this one does not mention it at all, so arguably it

18   does not respond to that fact.

19        THE COURT:  No.  I think this is something you may

20   well want to cross-examine Ms. Palin about, but based on the

21   current state of uncertainty, I'm not going to allow it.  So

22   the objection is sustained.

23        MR. AXELROD:  Thank you, your Honor.

24        THE COURT:  All right.  So let me find out from my

25   courtroom deputy what the prediction is.

**JA109**

M231PAL1

```
 1              (Discussion off the record)

 2              THE COURT:  So unless anyone else has anything, why

 3    don't we take a break for 20 minutes, and we'll reconvene

 4    initially here at 10:00.

 5              MR. TURKEL:  Judge, I have one question with respect

 6    to voir dire.

 7              THE COURT:  Yes.

 8              MR. TURKEL:  We scoured orders, procedures, etc.  Do

 9    you allow -- are you going to allow back-striking?

10              THE COURT:  Do I allow who?

11              MR. TURKEL:  Back-striking.

12              THE COURT:  I don't know what that is.

13              MR. TURKEL:  A panel gets accepted, each side gets a

14    final say to go back and let's say --

15              THE COURT:  I don't know what you're talking about,

16    but let me explain, as I have before --

17              MR. TURKEL:  Right.

18              THE COURT:  -- how I choose juries, which is the way

19    they were chosen in this court for at least 50 years, although

20    now judges use different methods, but I use the old method.

21    That was good enough for Learned Hand and it's good enough for

22    me.

23              So we have, in this case, 82 jurors.  They are in

24    seats numbered 1 through 82.  Because of COVID, some will be in

25    a separate room with video.  So the first 30 or so will be in
```

M231PAL1

1    the room that you and I and the rest will be, and the others

2    will be in an adjoining room.  We're choosing nine jurors.  I

3    question 1 through 9 on questions for cause.  Maybe one or two

4    of those are excused for cause.  If they are, then No. 10 takes

5    the place of whoever was the first excused, etc.  At that

6    point, after I finish my questioning, each side gets three

7    challenges.  And we do it in rounds.  So in round 1, you will

8    have the first challenge, they will have the second challenge,

9    then we then excuse those two, we replace them with the next in

10   order; we then go to challenge round No. 2.  Same story.  And

11   then after all the challenges are exhausted, we have our jury.

12   So I'm not familiar with your lingo, but is there something

13   different that you had in mind?

14          MR. TURKEL:  It would be -- I've heard it referred to

15   back-striking.  It may be referred as other things.  But if we

16   go around round 1, right, plaintiff says they accept 1 through

17   9, defense doesn't use a challenge either.  Can plaintiff go

18   back then, back-strike --

19          THE COURT:  Okay.  Now I understand.  I've never heard

20   that term before, but here, now I understand your question.  So

21   if in a given round one side waives its challenge, it loses

22   that challenge, but it doesn't lose subsequent challenges.  If

23   in a given round both sides waive their challenges, then we

24   have the jury.  So you cannot go back and recapture a lost

25   challenge, in effect, if that was what your question was.

JA111

M231PAL1

1            THE DEPUTY CLERK:  If you don't use it, you lose it.

2            THE COURT:  Obviously my courtroom deputy speaks your

3     language.  Okay?

4            MR. TURKEL:  No, I've got it.  So if both sides lock

5     down with the first nine, don't use the peremptory, that

6     peremptory is gone; you only have two left.

7            THE COURT:  Both sides waive -- I'll repeat again.  If

8     one side waives in a round, they lose that challenge, but we go

9     to the next round.

10           MR. TURKEL:  Right.

11           THE COURT:  If both sides waive in a given round,

12    that's it.  That's the jury.

13           MR. TURKEL:  Got it.  Understood.

14           THE COURT:  Good.

15           MR. TURKEL:  Thank you.

16           THE COURT:  All right.  Anything else?

17           MR. AXELROD:  No, your Honor.  Thank you.

18           THE COURT:  See you at 10:00.

19           THE DEPUTY CLERK:  All rise.

20           (Recess)

21           (In open court)

22           THE COURT:  Please be seated.

23           THE DEPUTY CLERK:  20 minutes.

24           THE COURT:  All right.  So I think one other thing

25    that we needed to cover, although I excluded those documents

**JA112**

M231PAL1

1    relating to *The Atlantic*, the question was what was going to be

2    said about *The Atlantic*.  My recollection of my ruling on the

3    motion *in limine* is that I excluded the article or articles

4    relating to Trig but nothing else saying that it was a question

5    we would have to decide as it came in at trial and reminding

6    counsel to flag it before they asked questions and so forth.

7    Now that doesn't preclude plaintiff's counsel from mentioning

8    something on opening, but what did you have in mind?

9              MR. VOGT:  It's just a general reference, your Honor,

10   with respect to that topic, that we're going to have -- some of

11   the evidence we're going to present to the jury is *Times*' own

12   reporting as well as the reporting of other publications, such

13   as the ones that Mr. Bennet was working for.

14             THE COURT:  Yes.

15             MR. VOGT:  It will be general.

16             THE COURT:  If it turns out that it doesn't come into

17   evidence, of course your adversary, on summation, can say, you

18   know, they said they would produce X and they didn't produce X

19   and so forth.  But regarding opening statements, it is not

20   required that the Court make a definitive ruling on matters

21   that the Court has already indicated are going to be affected

22   by how things come in at trial.  So you can say that much.

23             MR. VOGT:  Thank you, your Honor.

24             THE COURT:  Yes.

25             I'm sorry.  Defense counsel wanted to say something.

**JA113**

M231PAL1

1     MR. AXELROD:  Your Honor, I'll put my objection on the

2     record.  I mean, I think there's a hearsay problem and a

3     relevance problem.  The hearsay problem, of course, is that

4     *Atlantic* publications about the 2011 shooting, I suspect

5     plaintiff will use to assert the truth of the matter asserted.

6     *The Atlantic* was not a party opponent so nothing in there can

7     come in --

8         THE COURT:  No, I think his argument has always

9     been -- correct me if I'm wrong -- that because Mr. Bennet, as

10    the former honcho at the *Atlantic*, could be expected to read

11    everything in *The Atlantic*, he knew about that article before

12    he contributed his portion to the editorial.

13        MR. AXELROD:  I was making my way there, your Honor.

14    Of course that's the main thrust of the argument, but as your

15    Honor found in the summary judgment opinion, the articles that

16    Mr. Vogt wants to use to show to the witness and I guess to

17    talk about to the jury are not technically *Atlantic* articles,

18    and they weren't under Mr. Bennet's purview, so it will create

19    the sense for the jury that Mr. Bennet had something to do with

20    those articles when in reality that is actually not the case.

21        THE COURT:  Well, that's the potential prejudice,

22    which I think maybe can be handled through appropriate

23    limitations on the questioning.  But remind me whether

24    Mr. Bennet was ever asked, either in the hearing in my court or

25    in the discovery, whether he had read those articles.  My

**JA114**

M231PAL1

1   recollection was I think he said he believed he had, although

2   he didn't have a specific recollection.

3           MR. AXELROD:  No.  So Mr. Vogt took Mr. Bennet through

4   a number of the articles, and he said:  Do you remember reading

5   this?  No.  Do you remember reading this?  No.  And then

6   Mr. Vogt said:  Is it possible you read this?  He goes:  Sure,

7   it's possible.  So I mean, I don't really think suggesting it's

8   possible that you read something is enough of a logical

9   connection to let Mr. Vogt and let the jury hear the argument

10  that of course --

11          THE COURT:  Well, forgive me.  I'm sorry.  I didn't

12  mean to interrupt.

13          MR. AXELROD:  That's fine.

14          THE COURT:  Remind me where these articles appeared.

15          MR. AXELROD:  So there's a couple different segments.

16  A lot of them appeared in a blog that a man named Andrew

17  Sullivan ran, which was kind of *Atlantic*-adjacent.  It was a

18  blog that was posted and connected to *The Atlantic* website, but

19  Mr. Bennet had nothing to do with it.  There were also articles

20  posted by *The Atlantic Wire*, which was also part of *The*

21  *Atlantic*, but Mr. Bennet had no -- did not edit those pieces

22  and had nothing to do with them.  And then there's another

23  piece that Mr. Vogt was going to use today which is actually a

24  piece by the *National Journal*, which falls under *The Atlantic*

25  kind of corporate rubric, and it was posted to *The Atlantic*

**JA115**

M231PAL1

1  website, but again, Mr. Bennet had nothing to do with editing

2  the *National Journal* articles.  So everything Mr. -- the

3  plaintiff intends to use, there's really no connection that

4  would, you know, firmly suggest that Mr. Bennet had read those

5  articles in his professional position.

6  THE COURT:  I want to hear from plaintiff's counsel,

7  but just to pursue this first with defense counsel, doesn't

8  plaintiff still have the argument that if Mr. Bennet had

9  checked what was out there in the media, so to speak, before

10  adding what turned out to be the allegedly defamatory language,

11  that he would have picked up these kind of pieces?  What about

12  that argument?

13  MR. AXELROD:  Well, your Honor, I think, A, it's

14  farfetched, A, to suggest that Mr. Bennet, A, should have gone

15  back and checked *Atlantic* articles specifically because he had

16  worked there previously; but also, when you get to the

17  instructions, you're going to instruct the jury the jury's

18  supposed to consider Mr. Bennet's subjective knowledge, not his

19  objective knowledge.  The jury's not asked --

20  THE COURT:  No, no, no.  But in assessing his

21  knowledge, they can assess willful disregard.  If he purposely

22  blinded himself to what was out there, that they can consider.

23  MR. AXELROD:  Well, sure, your Honor.  And maybe it's

24  a hypothetical that's not present here, where Mr. Bennet had

25  some inkling that there was something else out there and maybe

M231PAL1

1   someone suggested, why don't we go back and look at *Atlantic*

2   articles to see if there's something there and Mr. Bennet said

3   no, let's not do that; in that hypothetical, yeah, I would

4   agree with you.  But the facts don't suggest any kind of

5   willful blindness in this case.  Just that there's stuff out

6   there that he didn't look at I don't think is relevant here.

7           THE COURT:  Yes.  Let me hear from plaintiff's counsel

8   exactly what you propose to say about the article in your

9   opening.

10          MR. VOGT:  Twofold, your Honor.  Number one is that we

11  believe it's circumstantial evidence that Mr. Bennet had

12  knowledge of the reporting that was going on at the *Atlantic*

13  and on its website, not that he edited them; that's not really

14  the issue.  It's whether or not --

15          THE COURT:  But at first I thought that was a strong

16  argument because as the former editor and chief and so forth,

17  he would, but now I'm being told this is really not part of the

18  main *Atlantic*, the thing that he was in charge of, the thing

19  that he had been focused on; it was some subsidiary that had a

20  connection to *The Atlantic*.  And so what evidence do you have

21  to suggest that he actually read it?

22          MR. VOGT:  We actually did ask him in his deposition

23  with respect to several of these, whether it's possible that he

24  read them, and he acknowledged that it was.

25          THE COURT:  Well, my understanding of the deposition,

**JA117**

M231PAL1

1   from what defense counsel just told me, he said:  I have no

2   recollection of reading it; I have no recollection of reading

3   this, that, or the other; yes, it's possible I read it.  Is

4   that correct?

5            MR. VOGT:  Yes.

6            THE COURT:  That's I think a fairly thin reed.

7            What was the second thing you were going to say about

8   it?

9            MR. VOGT:  Well, if I could just go back to the first

10  one for just a moment.

11           THE COURT:  Yeah.

12           MR. VOGT:  That goes to a credibility issue, your

13  Honor.  This was a very significant event at the time,

14  something that would have stood out in his mind, he did

15  acknowledge at one point in his testimony.  So to us, it seems

16  a little bit farfetched that he wouldn't have remembered this

17  being reported on by his own publication at the time.

18           Which ties into the second issue, which you brought

19  up, which is, you know, Mr. Bennet knows that at the time of

20  the Loughner shooting, he was in charge of *The Atlantic*.  He's

21  going to have a pretty good idea that *The Atlantic* would have

22  reported on that at the time.  He's acknowledged that it's

23  possible that he read some of these pieces.  And so we do think

24  that that ties in as well to the fact that he purposefully

25  avoided the truth with respect to a publication, your Honor,

**JA118**

M231PAL1

1    that he says he regularly consumed *The Atlantic*'s website, and

2    each of these blogs, even though they're technically blogs,

3    were all published through *The Atlantic*'s website.

4              THE COURT:  Well, I'm inclined to think that you can

5    make the argument on opening statement that before adding these

6    allegedly defamatory statements, Mr. Bennet made no effort to

7    check out the prior state of knowledge, but I don't think you

8    can reference the specific articles you're talking about.

9              MR. VOGT:  I didn't plan on that.

10             THE COURT:  All right.

11             MR. AXELROD:  The other issue -- I don't know if you

12   were going to take it up -- is of course the relationship with

13   Mr. Bennet's brother.  Mr. Vogt hasn't suggested he's going to

14   talk about that.  I sure hope he doesn't.  But we'd moved *in*

15   *limine* to exclude that because I think the reed is even thinner

16   for that evidence to come in.

17             THE COURT:  Well, let me find out if you're going

18   to --

19             MR. VOGT:  I'm not.

20             THE COURT:  Okay.  So it's moot.  For now, at least.

21             MR. AXELROD:  Okay.  Thank you.

22             THE COURT:  Okay.  So they said 20 minutes when you

23   called them at 10 after?

24             THE DEPUTY CLERK:  At 10.  So it's 17 past now.

25             THE COURT:  All right.  So the attorneys and the

**JA119**

M231PAL1

1   parties need to go to the back door of the jury room.  And I

2   wonder, Linda, if the best thing is for you to guide them

3   there.

4            THE DEPUTY CLERK:  Very good.

5            THE COURT:  So just follow my courtroom deputy.

6   You'll probably have to stand there for a few minutes till

7   they're absolutely ready, but I'll meet you down there in a few

8   minutes.

9            (Recess)

10           (Jury selection conducted)

11           (In open court)

12           THE COURT:  Please be seated.

13           All right.  I'll ask my law clerk to go check and see

14  if the jury is ready to come in, and then we'll have opening

15  statements.

16           MR. AXELROD:  Your Honor, while we're waiting, I just

17  wanted to make sure, I tested this morning with a PCR rapid

18  test, so my plan would be, when I get inside the glass booth,

19  to take my mask off.

20           THE COURT:  Yes.  The two places where you can take

21  off your mask are when you're in the witness box or in the

22  questioner's box.  And the theory of the witness box is that

23  the jury needs to see the demeanor of the witnesses.  I've

24  never totally understood the theory of the questioner box, but

25  maybe it's because when you ask or counsel for the plaintiff

**JA120**

M231PAL1                          Opening - Mr. Vogt

1    asks questions, all eyes will be riveted upon you, so --

2              MR. AXELROD:  Maybe it's hard enough asking questions

3    for a long time.  It's a comfort thing.

4              THE COURT:  Okay.  They'll be here very shortly.

5              (Jury present)

6              THE COURT:  Please be seated.

7              So ladies and gentlemen, we're about to hear opening

8    statements of counsel.  I want to caution you that nothing that

9    counsel says is evidence.  The evidence in this case will come

10   from the witnesses, from the exhibits, and occasionally there

11   may be something called a stipulation, where the two sides

12   agree on a fact.  Those are the only sources of evidence.

13             So you may ask why we have opening statements.  The

14   answer is that the evidence will come in a little bit at a

15   time — one witness, one exhibit, and so forth — so it may be

16   useful to you to have a kind of overview of what each side

17   expects the proof to show, or fail to show, as the case may be.

18             Because the plaintiff has what we call the burden of

19   proof, they're responsible for proving their case, they go

20   first; and then we'll hear from the defendants.  And each side

21   has a half hour.

22             So we'll hear first from counsel for the plaintiff.

23             MR. VOGT:  Thank you, your Honor.

24             We come into this case with our eyes wide open and

25   keenly aware of the fact that we're fighting an uphill battle

**JA121**

M231PAL1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SARAH PALIN, an individual,

                    Plaintiff,

          v.                          17 CV 4853 (JSR)

THE NEW YORK TIMES COMPANY, *et
al.*,

                    Defendants.

------------------------------x          Trial

                                         New York, N.Y.

                                         February 3, 2022
                                         9:00 a.m.

Before:

                    HON. JED S. RAKOFF,

                                         District Judge

                         APPEARANCES

TURKEL CUVA BARRIOS, P.A.
     Attorneys for Plaintiff
BY:  SHANE B. VOGT
     KENNETH G. TURKEL


BALLARD SPAHR, LLP
     Attorneys for Defendants
BY:  DAVID L. AXELROD
     JACQUELYN N. SCHELL
     THOMAS BYRNE SULLIVAN
     JAY WARD BROWN



Also Present:

Dana Green, Senior Counsel, The New York Times Company


SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   asks questions, all eyes will be riveted upon you, so --

2              MR. AXELROD:  Maybe it's hard enough asking questions

3   for a long time.  It's a comfort thing.

4              THE COURT:  Okay.  They'll be here very shortly.

5              (Jury present)

6              THE COURT:  Please be seated.

7              So ladies and gentlemen, we're about to hear opening

8   statements of counsel.  I want to caution you that nothing that

9   counsel says is evidence.  The evidence in this case will come

10  from the witnesses, from the exhibits, and occasionally there

11  may be something called a stipulation, where the two sides

12  agree on a fact.  Those are the only sources of evidence.

13             So you may ask why we have opening statements.  The

14  answer is that the evidence will come in a little bit at a

15  time — one witness, one exhibit, and so forth — so it may be

16  useful to you to have a kind of overview of what each side

17  expects the proof to show, or fail to show, as the case may be.

18             Because the plaintiff has what we call the burden of

19  proof, they're responsible for proving their case, they go

20  first; and then we'll hear from the defendants.  And each side

21  has a half hour.

22             So we'll hear first from counsel for the plaintiff.

23             MR. VOGT:  Thank you, your Honor.

24             We come into this case with our eyes wide open and

25  keenly aware of the fact that we're fighting an uphill battle

1    in terms of initial reactions of Governor Sarah Palin bringing

2    a libel claim against *The New York Times*.  But as Judge Rakoff

3    made clear a moment ago, when we were all in the other room

4    together, your feelings about Governor Palin or *The New York*

5    *Times* are irrelevant.  You swore an oath that you would calmly

6    and coldly look at the facts and apply the law and decide where

7    the truth is in this case.  And that's all that we're asking

8    for you to do is to give us a fair shot; nothing more, and

9    nothing less.

10            To be clear, we're not here trying to win your votes

11   for Governor Palin or any of her policies.  We're here to prove

12   a libel case to you, and that case involves a very specific

13   false narrative about Governor Palin that is particularly

14   horrific and was debunked back in 2011.

15            So I'm going to start today by going through the

16   actual editorial that we're here about and then give you some

17   highlights about how we're going to prove each one of the

18   elements of our claims.

19            As an initial matter, we're going to prove our claim

20   primarily with the defendants, with their testimony, with their

21   own documents, with their own language, with their own words.

22   For the most part, that's going to establish all of the

23   elements of our claim.  It's not going to depend on Governor

24   Palin to prove falsity or that this was defamatory or anything

25   else.  We're going to focus on what the defendants themselves

M231PAL1                        Opening - Mr. Vogt

1    did and said and their testimony in court and how credible you

2    find that to be.

3           So this all started on June 14th of 2017, and at that

4    point a man who the defendants, in the editorial we're here

5    about, they described him as a Bernie Sanders supporter and

6    campaign volunteer who was virulently opposed to president

7    Trump, opened fire on Republican members of Congress that were

8    practicing for the annual congressional charity baseball game

9    in Virginia.  When that happened, the defendants set out to

10   write about it.  And the way that they described that shooting,

11   the way that they described Mr. Hodgkinson, was that he was a

12   sniper, that what people had experienced was an American form

13   of terror, that he had turned the baseball field basically into

14   a killing field, and people said, "He was hunting us."

15          And so against that backdrop of what people had

16   described as a Liberal shooter going after Republicans, and

17   because of the shooter's political leanings, his social media

18   posts that the defendants found, there was a knee-jerk reaction

19   by some people to blame politics.  And it would have been easy

20   for Governor Palin to do that, because as you're going to hear

21   in a moment, that happened to her before.  But she didn't do

22   that.  In fact, she did quite the opposite.  On the date this

23   happened, she was one of the first people to come out and make

24   a statement to the press telling people not to blame Bernie

25   Sanders, don't blame other politicians, you can't make

**JA125**
M231PAL1                    Opening – Mr. Vogt

1    assumptions about things like this; I know, because this has

2    happened to me.

3            The evidence we're going to present to you is that the

4    defendants were among the people who did the opposite.  They

5    tried to get out in front of this story by advancing a

6    narrative about what they called a "sickening pattern."  And

7    what you'll learn is that that sickening pattern, according to

8    Mr. Bennet and *The Times*, consisted of just two things — the

9    Hodgkinson shooting on June 14th in Virginia; and Jared

10   Loughner's shooting in 2011 in Arizona.  During that shooting,

11   the one on June 14th, as they were discussing the sickening

12   pattern consisting of Mr. Hodgkinson and Governor Palin, the

13   way they described it, the way they leaped into it, was that

14   "although not all the details are known yet about what happened

15   in Virginia, a sickeningly familiar pattern is emerging in the

16   assault.  The sniper, James Hodgkinson, who was killed by

17   Capitol Police, was surely deranged, and his derangement had

18   found its fuel in politics."  Now what you'll learn during the

19   course of this trial, including from Mr. Bennet himself when he

20   testifies, is that that's false.  There was no evidence that

21   Mr. Hodgkinson was politically motivated to commit this

22   shooting.  It was an assumption.  But that accusation was

23   necessary to get to the second point of the pattern, which is

24   the crux of this piece, and it was a narrative that you'll

25   learn over the course of this case that Mr. Bennet was the one

**JA126**

M231PAL1                        Opening - Mr. Vogt

1    who came up with early on and stuck with, regardless of what

2    was presented to him.  Regardless of what research that he had,

3    he had his narrative and he stuck to it.

4            And that's where we get to the defamatory passages,

5    because as the defendants wrote this piece, they asked, "Was

6    this attack evidence of how vicious American politics has

7    become?"  They say, "Probably.  In 2011, when Jared Lee

8    Loughner opened fire in a supermarket parking lot, grievously

9    wounding Representative Gabby Giffords and killing six people,

10   including a 9-year-old girl, the link to political incitement

11   was clear.  Before the shooting, Sarah Palin's political action

12   committee circulated a map of targeted electoral districts that

13   put Ms. Giffords and 19 other Democrats under stylized

14   crosshairs."

15           That's false.  It's false in two ways.  And we're

16   going to prove to you that it's false because the defendants

17   admitted that it was false.  There was no link between

18   incitement and Jared Loughner's shooting; there was no link

19   established between Governor Palin and that shooting; there was

20   no link that demonstrated that Governor Palin was responsible

21   for the deaths of six people, including a 9-year-old girl.

22   It's false.  The map itself didn't put target -- crosshairs

23   over Democrats themselves; it put them over districts.

24           So what you'll see in a moment is that had to be

25   corrected as well, as did the next paragraph, because as

JA127

M231PAL1                        Opening - Mr. Vogt

1   Mr. Bennet wrote, "Conservatives and right-wing media were

2   quick on Wednesday to demand forceful condemnation of hate

3   speech and crimes by anti-Trump liberals."  Though there's no

4   sign of incitement as direct as in the Giffords attack,

5   "Liberals should of course be held to the same standard of

6   decency that they ask of the right."

7          And then Mr. Bennet doubled down.  So to leave no

8   mistake in the minds of readers, incitement was -- which

9   Mr. Bennet will tell you in his own words is a very strong word

10  and done to grab attention, that, among other things, he

11  understood as meaning orders of direct call to action,

12  essentially instructions for people to go and commit violent

13  acts, the basis of which was from conflict in the Middle East,

14  those words, those very strong words, were hammered home to

15  readers by using words like "vicious," "direct link," "a clear

16  link," none of which, at the end of the day, was true.

17         That, ladies and gentlemen, is why we're here.  We're

18  not here to try and convince you that, again, you have to agree

19  with Sarah Palin's policies.  It's not what we're doing.  We're

20  here because the defendants published those statements.

21  They're false, those horrific statements, accusing her of

22  inciting a horrific crime.

23         Now the elements we're going to prove, I'm going to go

24  through each one of those now.  Again, as I said, for the most

25  part we're going to prove our case through the defendants

1    themselves.

2           So one of the first things that we've got to prove is

3    that this editorial refers to Sarah Palin, and we're going to

4    do that in a number of ways.  I think it's already obvious that

5    the language itself in the editorial is fairly significant

6    evidence that this editorial refers to Sarah Palin.  It says

7    her name.  It literally says her name.  It says "Sarah Palin's

8    political action committee."  And what you'll find out, when it

9    references the map of targeted electoral districts, is that

10   that map -- her political action committee is called SarahPAC.

11   And on the literature, like this map, at the bottom of the

12   page, prominently featured is her signature.

13          Among other evidence during this trial, you'll hear

14   from Tim Crawford, who ran her PAC, who will explain to you how

15   she was the PAC.  The PAC was her.  Doesn't get more clear than

16   that.

17          The defendants are going to contend during this case

18   that this article doesn't refer to her.  So even going beyond

19   the language that's used, we're also going to show that this

20   refers to her by virtue of the defendants' own documents.  So

21   what am I talking about there?  I'm talking about internal

22   emails.  Despite the position they may take in court to you

23   about whether this refers to her or not, people like Hanna

24   Ingber, actually in an email to James Bennet, referred to this

25   as the "Sarah Palin editorial."  Think about things like that

**JA129**

M231PAL1                          Opening - Mr. Vogt

1    as you're judging the credibility of the case the defense is

2    going to put on to you here, when they claim that this wasn't

3    about her and yet internally they were calling it the "Sarah

4    Palin editorial."

5          We're going to show you other emails like this one.

6    So what happened, immediately after this was published on the

7    night of the 14th?  An op-ed columnist, Ross Douthat, actually

8    emailed Mr. Bennet to tell him about how false this editorial

9    was.  In those emails, which we'll introduce into evidence and

10   you'll see more of, even during my presentation, but clearly

11   Mr. Douthat, like everyone else who reads this, knows that this

12   is about Sarah Palin.  It references her.  We'll prove our case

13   that way to you as well.

14         We hope to be able to present reaction beyond just the

15   people within *The Times* to you as well, to show you how the

16   public reacted to this and how they reasonably understood that

17   this editorial referred to Sarah Palin, the person.

18         So that's our first element.

19         Our second element that we need to prove is that it's

20   false.  Again, we're going to do that primarily through

21   defendants' own documents, most notably a correction.

22         Now you're going to hear the defendants make the case

23   that, well, this was an honest mistake and this wasn't what

24   Mr. Bennet meant, he didn't mean the word "incitement" to

25   communicate to readers exactly what that term means.

M231PAL1                          Opening - Mr. Vogt

1          They're also going to claim that apparently they don't

2     believe that this is false.  We're going to prove that through

3     their own corrections, where they say that it's false, where

4     they say that they incorrectly depict, said that the map had

5     crosshairs over individual lawmakers themselves rather than on

6     electoral districts.  We're going to show you tweets that they

7     put out that say:  "We got an important fact wrong.  No link

8     was ever established."  You'll learn during the course of the

9     trial that Mr. Bennet was actually the one who authored that

10    particular tweet.

11         Then you're going to see emails that I was mentioning

12    a few minutes ago from Mr. Douthat, who actually tells

13    Mr. Bennet:  "The point is that the map had no link — none at

14    all — to Giffords' actual murder.  There was not and continues

15    to be, so far as I can tell, no evidence that Jared Lee

16    Loughner was incited by Sarah Palin or anyone else."  That's

17    the defendants' own words.

18         You're also going to see significant evidence of

19    falsity from their own research.  In this editorial, on the

20    online version, there's a hyperlink, and that's going to be

21    significant during the course of this case.  Elizabeth

22    Williamson prepared the initial draft of this editorial.

23    Mr. Bennet rewrote it substantially, including the paragraph

24    about Governor Palin.  When he did, that hyperlink was in

25    there.  That hyperlink leads to this ABC article that actually

M231PAL1                    Opening - Mr. Vogt

1    says no connection has been made between this graphic and the

2    Arizona shooting.  That's the defendants' own research, proving

3    that this is false, on the day that they published this.

4         There's other research they did as well.  You're going

5    to see editorials, most notably one that Mr. Bennet himself

6    forwarded within the group that was working on this piece and

7    said, "It's highly relevant to what we're doing," and it was a

8    piece called, "As we mourn."  That piece made reference to a

9    speech by President Obama at the memorial service for the

10   victims of the Loughner shooting, and in it, it notes that

11   Mr. Obama said, "Not because a simple lack of civility caused

12   this tragedy.  It did not."  What he's saying there is that

13   incitement or rhetoric or people like Sarah Palin did not cause

14   the Loughner shooting.  And the defendants knew this.  They had

15   this.  They read this.  Mr. Bennet read this.  That will not be

16   disputed.  But they published what they published about

17   Governor Palin anyway.

18        You're also going to see during the course of this

19   case, potentially, depending how far we get into it, *The New*

20   *York Times*' own reporting.  They have their own stories that

21   noted that there was no link between incitement and Governor

22   Palin and the Loughner shooting.  You'll potentially see

23   reporting of others.  Mr. Bennet, at the time of the Loughner

24   shooting, was working at *The Atlantic*.  We may get into some

25   pieces there.  Because generally what you're going to see is

1    that the media as a whole had reached a consensus that there

2    was no link between incitement or Governor Palin and the Jared

3    Loughner shooting, and they had reached that consensus back in

4    2011, six years before this editorial was published.

5              And we're also going to establish the falsity through

6    the defendants' own statements.  They'll testify in court that

7    this was false.  And it won't be able to be disputed.

8              The next thing we're going to show is that it's

9    defamatory.  The language itself speaks for itself.  In a piece

10   that talks about "lethal politics," "a killing field," "a

11   sickening pattern emerging," they have paragraphs talking about

12   Governor Palin's incitement of a mass murder, including a

13   9-year-old girl, a federal judge, numerous other people.  In

14   the same "As we mourn" piece I mentioned to you a few moments

15   ago, they have a very vivid description of what happened, the

16   fact that the people who were shot and killed in Arizona that

17   in this editorial they blamed Governor Palin for, they were

18   doing their most notable public service.  They were at a

19   "Congress on Your Corner" event for Gabrielle Giffords, and

20   among those murdered were John Roll, a federal judge.  They

21   were listening to him questioning their political

22   representatives.  And Christine Taylor Green, the 9-year-old

23   girl that Mr. Bennet stated that Governor Palin was responsible

24   for inciting the murder of, was a student council president.

25             Now apportioning responsibility for that crime is an

1    important thing.  You don't want to blame the wrong people.

2    Doesn't just do a disservice to her, it does a disservice to

3    the victims.  But what you'll find out is that Mr. Bennet

4    didn't care about the facts enough to take a few minutes to

5    read the ABC article, or the "As we mourn" piece, or anything

6    else that was put in front of him.  The draft he got, you're

7    going to hear from him that that was the embodiment of the

8    research that the people who work for him did, and it did not

9    say that a link had been established, and the reason that it

10   didn't, because you'll hear from Elizabeth Williamson, was

11   because when she researched it, she determined that you

12   couldn't say that.  But Mr. Bennet didn't care.  It was

13   political score-keeping.  That's what this was.

14        When you're talking about establishing the defamatory

15   nature of this, again, Mr. Douthat:  "You're responsible for

16   inciting violence if you actually incite or organize or bless

17   violence."  It's a pretty common definition of the term.  And

18   so when Mr. Bennet and *The New York Times* in this case claim

19   that that word didn't mean what it obviously means, you have to

20   determine whether you think that's credible.  When he says it

21   was an honest mistake, you've got to weigh the facts and the

22   evidence — not just what Mr. Bennet says but all the other

23   evidence that we're going to put forth before you — and ask

24   whether that evidence is consistent with what he's claimed, are

25   his actions consistent with what he's claiming, and what you're

1   going to see, when you approach all of that evidence with an

2   open mind and no biases towards Governor Palin, is that we

3   conclusively established our case.

4        One of the big issues in this case is, well, it's

5   intent.  That means knowledge and recklessness; whether

6   Mr. Bennet and the *Times* actually knew that what they were

7   publishing was defamatory and false or with a high degree of

8   awareness of its falsity and defamatory nature.  Again, the

9   language itself speaks for itself.  "Incitement" is a very

10  clear word, and Mr. Bennet knew what it meant.  He will admit

11  that to you on the stand.  You can't make a mistake with words

12  like "incitement," "clear," and "direct."

13       And what you're going to learn about Mr. Bennet is

14  that he's an Ivy League-educated career journalist, who, before

15  becoming the editor of the opinion section for *The New York*

16  *Times*, spent a decade as the editor in chief of *The Atlantic*.

17  It is literally his job to know the meaning of words, and he's

18  going to get up in front of you and say that he didn't.

19       We're also going to establish knowledge and

20  recklessness.  Again, we talked about the research.  On the day

21  that this piece was written, at the time when Mr. Bennet was

22  writing it, he had other articles in front of him — the

23  hyperlink to ABC; the "As we mourn"; other pieces —

24  indisputably, that show that there was no link.

25       And there's another opinion piece that Mr. Bennet

1    forwarded this day:  "It's facile and mistaken to attribute

2    this man's act directly to Republicans or Tea Party members."

3    And you see things like this because it was a consensus and

4    everybody knew.  He knew.

5            And certainly if you don't believe that he actually

6    knew, there is significant evidence that he was reckless with

7    respect to whether this was true or false and that what he was

8    saying was defamatory.

9            Another way we're going to show you knowledge and

10   recklessness is *The Times'* own standards, which were violated.

11   You're going to hear that Mr. Bennet, when he rewrote this

12   piece, was the primary fact-checker and was responsible for

13   making sure that it was accurate.  *The Times'* guidelines apply

14   to editorials as well as they do to news stories.  That will

15   not be disputed.  When they put facts in an editorial, they

16   have to be true.  And the person who writes them has to check

17   them.  And he didn't.  That won't be disputed.

18           And what we'll argue to you at the end of this case is

19   the reason he didn't check those facts is simple — he didn't

20   care.  He had a narrative from the beginning that he was going

21   to make and say about Governor Palin, and the facts didn't

22   matter.  That's what the evidence here will show.

23           And in fact, you're going to see things -- again,

24   internal documents from the *Times* -- where Mr. Bennet was

25   encouraged to do this, among other things.  His performance

**JA136**

M231PAL1                        Opening - Mr. Vogt

1    review noted that he has an exceptional -- his instincts for

2    language are impeccable.  The man who's going to get up in

3    front of you and claim that he didn't know how readers would

4    interpret this got a review saying that his knowledge of

5    language was impeccable.

6          What really happened here is what you see when it goes

7    on further into the review.  Mr. Bennet was told, by the owner

8    of *The Times*:  "You enjoy much more autonomy and a much higher

9    tolerance for risk.  We give you the blessing to move faster or

10   to make changes that are more disruptive.  I suspect you'll be

11   even more aggressive, play outside your lanes a bit more

12   often."  And that's what he did.

13         And you don't have to take my word for it, or Governor

14   Palin's.  You can take his word for it, because in what perhaps

15   is a textbook definition of recklessness, there's an email from

16   Mr. Bennet at 5:08 a.m. on June 15th.  This is significant for

17   a couple of reasons.  Number one, Mr. Bennet says, "I don't

18   know what the truth is here."  That's recklessness.  That's

19   reckless disregard of the truth.  He published something the

20   day before and didn't know if it was true.

21         Here's the other reason this is really important.  On

22   that morning, what he does is he tells the people that work for

23   him to go research whether there was a link or not.  And the

24   reason why that's significant is that what Mr. Bennet is going

25   to claim to you during this trial is true and that it was just

1   a mistake, that that wasn't what he intended with the language,

2   there was no need to do that research.  The only reason that

3   research is necessary is to determine whether that factual

4   statement is true or false, which you do by issuing a

5   correction.  If it was a mistake in language, Mr. Bennet

6   himself will tell you, and *Times* policies will establish, they

7   do an editor's note, not a correction, explaining that "I made

8   a mistake in my language."  But that's not what they did.

9            THE COURT:  Counsel, just so you're aware, you have

10  two minutes.

11           MR. VOGT:  Thank you, your Honor.

12           We're also going to show you a history of bias within

13  *The Times* towards Republicans and towards Governor Palin

14  herself.  And when we get to the end of this case, we're going

15  to leave damages up to you.  Now the jury instructions which

16  Judge Rakoff is going to explain to you, you're to give what's

17  fair and just under the circumstances, considering things like

18  the nature of the statements that were made, the weight they

19  had with respect to the circulation.  We'll put in evidence *The*

20  *Times*' own documents.  There were roughly 600,000 print edition

21  papers that went out, couple hundred thousand online views,

22  page views of this.

23           But we are going to ask you to award damages to

24  Governor Palin because the corrections here didn't fix this.

25  The corrections didn't name her.  You'll see in the print

1    edition they get changed and don't even include the word

2    "incitement."  But most of all, they didn't apologize.  And

3    perhaps one of the most significant things you're going to

4    learn during this trial is that that's because *The New York*

5    *Times* has a policy against apologizing, because they think they

6    can do whatever they want.  They're *The New York Times*.  And

7    it's the same reason why, at the end of this case, we're going

8    to ask you to determine that Governor Palin is entitled to

9    recover punitive damages, because all the evidence I discussed

10   with you about knowledge and recklessness, Mr. Bennet ignoring

11   the facts, also justify a finding that what they did to

12   Governor Palin was malicious.

13              THE COURT:  Thank you very much, counsel.

14              We'll hear now from defense counsel.

15              MR. AXELROD:  Thank you, your Honor.

16              Rather than spending the next 30 minutes arguing to

17   you about what the evidence is going to mean, I'm going to

18   spend the next 30 minutes talking to you about what the

19   evidence is going to show, and then I'll come back and argue to

20   you what it's going to mean.

21              On June 14, 2017, a gunman attacked a group of

22   congressmen practicing for a baseball game.  The same day, *The*

23   *New York Times* editorial board drafted and published an opinion

24   piece voicing concern about the deadly mix of violent political

25   rhetoric and easy access to firearms in this country.  *The*

1    *Times* had an important message to deliver.  But let's be very

2    clear right off the bat.  *The Times* and Mr. Bennet, sitting

3    right here right next to me, failed to appreciate how some

4    readers would interpret two sentences in the middle of that

5    12-paragraph editorial.

6            Soon after publication, that very night, about an hour

7    later, you're going to see, Mr. Bennet learned that some people

8    thought the editorial suggested that Jared Loughner, the man

9    who shot Congresswoman Gabrielle Giffords and others in 2011,

10   had acted because of a map that Governor Palin's political

11   action committee had published.  You're going to hear that

12   Mr. Bennet had no intention of making that point, or suggesting

13   anything of the sort.  And you're going to hear from him

14   directly.  And you're going to see the emails that he wrote.

15   And you're going to see that he barely slept that night.  And

16   you're going to see that as soon as he realized how some people

17   were understanding the editorial, *The Times* recognized that it

18   had made a mistake and immediately began the correction

19   process.  *The Times* corrected that editorial the very next

20   morning, and you'll see they apologized for the mistake.

21           The evidence you're going to see next week will show

22   that Mr. Bennet and *The Times* did not intend to publish

23   anything false about Governor Palin.  *The Times* and Mr. Bennet

24   certainly didn't intend to harm Governor Palin.  *The Times* and

25   Mr. Bennet took responsibility for the mistake they made.  And

1    you're going to hear, most importantly, at the end of this

2    trial, Mr. Bennet and *The Times* did not act with actual malice,

3    which Judge Rakoff will tell you is what the law requires to

4    prove a claim for defamation against defendants like this.

5            To understand all of that, to understand the editorial

6    and the correction, you need to understand the context.

7            But let me start here.  I briefly introduced myself

8    downstairs to you.  My name is Dave Axelrod.  Along with my

9    colleagues sitting here that you'll hear from at various times

10   through this trial, it's my great privilege to represent

11   Mr. Bennet and *The Times*.  James will be sitting here

12   throughout the trial with us.  You're going to hear Mr. Bennet

13   testify.  You're going to hear from him exactly what he meant.

14   Also with us is Dana Green, who is sitting right back there.

15   Ms. Green is an attorney with *The Times*, and she'll be

16   representing *The Times* throughout the trial.

17           We'll start at the beginning.  This case has its roots

18   in two separate violent attacks on members of Congress — the

19   only two shootings of members of Congress that have happened in

20   decades.  One attack was in Arizona in 2011, and one attack was

21   in Virginia in 2017.  But to talk about 2011, we have to jump

22   back a year, so let's start in 2010.

23           During this trial, you're going to hear that in 2010,

24   SarahPAC, a political action committee associated with Governor

25   Palin, released the crosshairs map, which you're going to hear

JA141

M231PAL1                         Opening - Mr. Axelrod

1    a lot about during this trial.  A political action committee is

2    an entity, like a corporation, that can be set up to raise

3    money.  It contributes money to political candidates.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. AXELROD:  The evidence is going to show that

2   SarahPAC was created to raise money for candidates that shared

3   Governor Palin's values.

4          Gianni, if you could put up DX 621.

5          This is the crosshairs map which you are going to see

6   repeatedly through this trial.  As you can see, the crosshairs

7   map placed symbols that look like little rifle scope crosshairs

8   over the congressional districts of members of Congress who

9   voted in support of Obamacare and who were up for reelection in

10  2010.

11         Now, we are going back more than ten years, but at

12  that time that Congress enacted the Affordable Care Act,

13  Obamacare, there were significant public protests about the

14  law, especially by Republicans and conservatives.

15  Congresswoman Giffords, her name is listed there, and one of

16  those little crosshairs is over her district.

17         As soon as it was published in 2010, the map was

18  criticized for its potential to incite political violence.

19  People at the time were incensed that a political action

20  committee would use gun sights in a political ad like this.

21  During this trial, you are going to see Congresswoman Giffords'

22  own criticism of the map in 2010 before she was violently shot.

23         The PAC did not take the crosshairs map down and

24  SarahPAC continued to use this map to make money -- to raise

25  money.  And after the November 2010 congressional elections,

1    when a number of targeted members of Congress were defeated,

2    Governor Palin publicly praised the success of the bull's-eye

3    map, this map.

4              Eight months after the crosshairs map was published,

5    on January 8, 2011, Congresswoman Giffords was meeting with her

6    constituents in Arizona when Jared Loughner shot and almost

7    killed her.  He did kill others, including a federal judge and

8    a young girl.  And in the wake of that shooting, back in 2011,

9    many connected Governor Palin and the crosshairs map to the

10   Arizona shooting, and they criticized her actions.

11             So now let's fast forward six years.  On June 14,

12   2017, that was another tragic day.  That day another gunman

13   attacked Republican members of Congress practicing for the

14   annual congressional baseball game.  Steve Scalise, among

15   others, was shot.  This was, of course, important news and the

16   media immediately harkened back to the Arizona shooting that

17   had taken place six years earlier.  There is a reason for that.

18   The Arizona shooting and the Virginia shooting are the only

19   recent examples of members of Congress being attacked.

20             That morning, after the Virginia shooting, a

21   department of the *New York Times* called the editorial board

22   decided to write an opinion piece about the shooting.  The

23   editorial board was led by James Bennet, who was hired in May

24   2016 as the editor of the opinion section.

25             The opinion section, unlike the news section, is a

1    small part of *The New York Times* distinct from the news.  The

2    news desk reports about the world as it is.  Opinion -- the

3    editorial board likes to think that it reports about the world

4    as it should be.

5          This case is about the editorial board, which is part

6    of the opinion section.  The role of the editorial board is to

7    provide *Times* readers with an opinion representing the

8    institutional values of *The New York Times*.

9          The evidence will show that, around noon, the

10   editorial board decided to write an opinion piece on the

11   shooting.  A member of the board named Elizabeth Williamson,

12   who was located in Washington, D.C., raised the idea of writing

13   about the Virginia shooting and was tasked with writing a first

14   draft.  From the outset, the board thought the editorial would

15   focus on gun laws and the danger posed by easy access to guns.

16         That morning, information came to light showing that

17   the Virginia shooter was a Bernie Sanders supporter who had

18   posted anti-Trump statements on social media.  The editorial

19   board decided that the editorial should also focus on the

20   danger of violent political rhetoric.

21         You are going to hear that Mr. Bennet and the board

22   were especially conscious about not writing a one-sided piece.

23   The goal was to hold both political parties accountable -- the

24   political left and the political right.  They were both

25   responsible for inflammatory rhetoric and unnecessarily

**JA145**

M232Pal2                              Opening - Mr. Axelrod

1    demonizing their political enemies.

2              You are going to hear that Elizabeth Williamson

3    started researching and writing her draft at approximately noon

4    on the afternoon of June 14.  Ms. Williamson researched

5    information about the Virginia shooting, the Arizona shooting,

6    and received editorials that *The Times* had previously published

7    about gun laws and the Arizona shooting.  Approximately five

8    hours later, Elizabeth Williamson turned in her draft.

9              A woman named Linda Cohn, who was an editor at the

10   board, took the first reading of Ms. Williamson's draft.  And

11   you are going to hear from Ms. Cohn.  She is going to testify.

12   She was unclear about whether the editorial was focused on gun

13   control or the political climate and the lack of civility, and

14   she passed it on to Mr. Bennet for his review.  You are going

15   to hear from Ms. Cohn that it was her decision to pass it on to

16   Mr. Bennet to edit.  Mr. Bennet did not say, Give me that

17   editorial, I want to make some points.  You are going to hear

18   that from Ms. Cohn.

19             That night, James Bennet read the piece and agreed

20   that it needed reworking.  Rather than tasking Williamson with

21   revising the draft, Bennet immediately began editing

22   Williamson's draft so that *The Times* could include the

23   editorial in the next day's paper.  As Bennet drafted, *Times*

24   employees continued fact checking, checking facts in the

25   editorial so that the editorial would be ready before the 8

1     p.m. deadline.

2              Mr. Bennet sought to be blunt about the viciousness of

3     the Virginia attack and American politics.  He wanted to make

4     the important point that violent rhetoric used by both

5     Democrats and Republicans about their political foes raises the

6     temperature and creates an environment where a deranged person

7     might be more likely to do something violent to a political

8     opponent.

9              Well, Mr. Bennet didn't change the focus of the

10    editorial, which you are going to hear from Ms. Williamson.  He

11    changed the language to explain and emphasize his theory about

12    the historic danger of violent political rhetoric combined with

13    easy access to guns.  And you are going to see, unlike how

14    Mr. Vogt explained to you, Mr. Bennet did not add

15    Governor Palin's name to the editorial.  Ms. Williamson had put

16    that in herself.  Mr. Bennet just revised words in the

17    editorial.

18             You are going to hear directly from Mr. Bennet that he

19    wasn't trying to say or even suggest that Loughner shot

20    Congresswoman Giffords because of the crosshairs map, and he

21    did not expect anyone who read the editorial to understand his

22    words that way.  He will explain to you exactly what he meant

23    and why he used the words that he did.

24             He is going to explain to you that what he meant by

25    "direct incitement" was that, in the Arizona shooting, there

1  was the crosshairs map first, which it was a piece of political

2  rhetoric specifically about politicians like Gabrielle

3  Giffords; and then, second, there was a violent attack on one

4  of those specific politicians.  So in that case, you had a

5  piece of rhetoric, and then you had an assassination attempt.

6  But in the Virginia shooting, there had been no specific piece

7  of rhetoric targeting the congressional baseball players, and

8  Mr. Bennet is going to explain to you that that was the point

9  he was trying to make.

10         After Mr. Bennet finished the editorial, it was

11  reviewed by other editorial board members -- Williamson, Linda

12  Cohn, a man named Jesse Wegman and another editor named Nick

13  Fox.  You are going to hear that no one who reviewed the draft

14  or was involved in editing saw any inaccuracy or worrisome

15  suggestion.  They all thought it was fine.  No one saw the way

16  some readers were going to interpret two sentences in that

17  twelve-paragraph editorial.

18         As you have already heard, in the editorial *The Times*

19  discussed both the Virginia shooting that took place earlier

20  that day and the only other violent attack on a member of

21  Congress in recent history.  It was a natural connection to try

22  to explain those two events.  It also made sense to include

23  both shootings because the board didn't want to play partisan

24  politics.  You are going to hear from Mr. Bennet and others,

25  this wasn't a political hit job.  The board wanted to caution

1    both sides of the political spectrum, and Mr. Bennet was very

2    conscious about saying, Democrats, I'm holding you to the same

3    standards you expect of Republicans.

4            Most importantly, when you heard Mr. Vogt explain to

5    you the editorial, you probably thought, hey, this editorial

6    was about Sarah Palin.  And he used certain phrases like -- I

7    wrote them down -- "Governor Palin's incitement of a mass

8    murder," "James Bennet accused her of inciting a horrific

9    crime."  "Governor Palin was responsible for the death of a

10   nine-year-old girl."

11           So let's talk about what the editorial actually says.

12   Gianni, if you could put up DX 3.  This is the twelve-paragraph

13   editorial, and you are going to have a chance to read it.

14           The first two paragraphs talk about the baseball

15   shooting.

16           The third paragraph, which startings out, "An American

17   would once have been horrified," that kind of explains the crux

18   of the piece, of the editorial, rhetoric and guns.

19           The fourth paragraph talks about James Hodgkinson, who

20   is the shooter in the Virginia shooting.

21           When you get down to the fifth paragraph, you will

22   see, in the second to last sentence, there is a reference to

23   Sarah Palin's political action committee.  That is the only

24   time that political action committee is referred to.

25   Ms. Palin's name isn't mentioned in the headline.  It's not

1   mentioned in the paragraph.  In fact, a casual reader looking

2   at this editorial would probably have a pretty good chance of

3   just skipping right past her name.

4            But then if you go on in the editorial to the right

5   side, you are going to see paragraphs, four paragraphs that

6   talk about gun policy.  And then in the last paragraph, to kind

7   of put a fine point on this, that this was not a political hit

8   job, the second to last paragraph says, "President Trump said

9   just the right things after the attack on Wednesday."  The

10  editorial praised what President Trump had said in the wake of

11  the Virginia shooting.

12           So the editorial does not focus -- what the editorial

13  does say is it focuses on the Virginia shooting, it talks about

14  violent political rhetoric, it talks about easy access to guns,

15  and it praises former President Trump for his response to this

16  event.

17           What the editorial doesn't do, it doesn't mention --

18  the headline doesn't mention Palin or her PAC.  The first

19  paragraph doesn't mention Palin or her PAC.  Indeed,

20  Governor Palin's name doesn't appear until the middle of the

21  fifth paragraph of the editorial, and it is only used once to

22  help identify that political action committee that released

23  that map.

24           You will see, importantly, that the editorial did not

25  talk about something that Governor Palin herself did, but

1   discussed the actions of the PAC, which is a completely

2   separate entity.

3           So the original version of this editorial was posted

4   on *The New York Times* website at about 10 p.m. on June 14.  You

5   are going to hear that, shortly after it was posted, Ross

6   Douthat, a columnist, e-mailed Mr. Bennet about the editorial.

7   You are going to hear and see how surprised Mr. Bennet was when

8   Mr. Douthat told him that he interpreted the editorial as

9   saying that the crosshairs map caused Jared Loughner to shoot

10  Congresswoman Giffords.  You are going to see the e-mail

11  between Mr. Bennet and Mr. Douthat that night, before there is

12  any lawsuit, where Mr. Bennet -- this is at 11:00 at night,

13  where Mr. Bennet explains that he never intended to convey that

14  message and expressed his concern to Mr. Douthat.  The evidence

15  is going to show that that very evening, immediately after

16  hearing about Mr. Douthat's concerns, James started the process

17  of determining whether *The Times* needed to issue a correction.

18          You are going to see that the very next day *The Times*

19  did not try to defend the two sentences buried in the middle of

20  that twelve-paragraph piece.  Instead*, The Times* decided to set

21  the record straight, and set the record straight quickly, with

22  a direct correction.  It reacted quickly and issued a

23  correction in little more than 12 hours, just overnight, after

24  the editorial was first posted to the *Times* website.

25          And this wasn't a quiet correction.  Mr. Bennet

1   realized that some readers interpreted his words in a way that

2   he hadn't intended, and he wanted to ensure that the correction

3   was crystal clear.  He is going to tell you he wanted to

4   correct the record.  And he says, "We got an important fact

5   wrong."  *The Times* and Mr. Bennet admitted they made a mistake.

6           And then Mr. Bennet did one other thing.  It's really

7   important.  He ensured that the correction went out through the

8   opinion page's Twitter account so as many people would see the

9   correction as possible.  And then the *Times'* main Twitter

10  account, which has a whole lot of followers, retweeted the

11  message, so anyone who followed *The Times* on Twitter would see

12  the correction.

13          Gianni, if you could put up DX 8, please.

14          So at the bottom of this callout is the correction

15  itself, and then if you look right above that, it says -- this

16  is *The Times'* opinion tweet -- "We're sorry about this, and we

17  appreciate that our readers called us on the mistake.  We've

18  corrected the editorial."  You are going to see during this

19  case that those were James Bennet's words.  *The Times* and

20  Mr. Bennet were so committed to addressing the

21  misinterpretation and correcting the record that, in total, the

22  two sentences at the heart of this case were available to

23  readers on the Internet for a little more than 12 hours.

24  That's why we are here.

25          You can take that down.  Thank you.

M232Pal2                         **JA152**            Opening - Mr. Axelrod

1            The evidence is going to show that the *Times* and James

2      Bennet made a mistake.  The evidence is also going to show that

3      this mistake was in no way intentional.  You are not going to

4      need to speculate or guess what was in Mr. Bennet's mind.  You

5      are going to see the e-mail that James sent to Ross Douthat the

6      night the editorial was published, and Mr. Bennet is going to

7      testify in front of you.  Mr. Bennet is going to explain the

8      opinion he was trying to convey and how badly he felt when he

9      had learned his words were being understood in a way he did not

10     intend.

11           Let me explain what I mean by that.  The evidence will

12     show that James Bennet and *The Times* did not intend to publish

13     anything false about Governor Palin.

14           The evidence is going to show that James Bennet was

15     unaware that his words would be understood as stating that

16     Loughner -- that the map caused Loughner to act.

17           Third, the evidence is going to show that James Bennet

18     didn't know one way or the other whether Loughner had seen the

19     crosshairs map.  He didn't know about this journalistic

20     consensus that Mr. Vogt told you exists.

21           You are also going to hear a lot about Governor Palin

22     during this trial.  You are going to hear that Governor Palin

23     built her brand by using her First Amendment rights to advocate

24     loudly for causes she cares about.  You are going to see that

25     Governor Palin was never one to back down from an argument and

1   not afraid to confront her opponents.  She was elected the

2   Governor of Alaska in 2006, nominated as the Republican vice

3   presidential candidate in 2008, and became, and continues to

4   be, a media sensation.

5          Started in 2009, she wrote numerous popular books with

6   titles like *Going Rogue*.  She was a paid political commentator

7   on Fox News, where she discussed the news of the day.  She

8   hosted various reality TV shows featuring her and her family.

9   She launched her own website TV channel and has a popular

10  Facebook page that she uses to voice her opinions.

11         Lawsuits are about compensating people for injuries,

12  and you are going to hear that on June 14, after Steve Scalise

13  was shot, but before the editorial was even published --

14  Mr. Vogt showed it to you -- Governor Palin sat for an article

15  that discussed the very allegation that she says was so harmful

16  to her.

17         So let me be really clear about that.  Prior to the

18  time *The Times* ever published the editorial that Ms. Palin says

19  is defamatory, she sat for an interview where they talked about

20  the allegation that she was connected to the Loughner shooting.

21         There is no doubt that *The Times* made a regrettable

22  error in the editorial, but during this trial you are going to

23  see no credible evidence that Sarah Palin was actually harmed

24  by the publication of that editorial, which makes good sense.

25  The editorial was corrected in a little less than -- a little

1    more than 12 hours.

2          So you are going to see at this trial that

3    Governor Palin won't call a single witness who will testify

4    that they thought the editorial harmed her.

5          Governor Palin won't call a single witness who will

6    testify that they thought less of her or wouldn't associate

7    with her because of the editorial.

8          Governor Palin won't call a single witness who will

9    testify that Governor Palin's reputation has been harmed as a

10   result of the editorial.

11         Governor Palin isn't claiming that she suffered any

12   economic harm as a result of the editorial.

13         And Governor Palin won't call a single witness who

14   will testify about any emotional harm they observed as a result

15   of the publication of the editorial.  Indeed, Governor Palin is

16   going to tell you, when she takes the stand, that she spent no

17   money to fix her reputation after the editorial came out.  And

18   the reason why is, you are going to see, because her reputation

19   wasn't harmed.  We don't expect Governor Palin to put forth any

20   evidence of the harm she allegedly suffered besides her own

21   testimony.

22         After the Arizona shooting back in 2011, where

23   Governor Palin was criticized for the crosshairs map, after

24   that shooting, Governor Palin continued on as an outspoken

25   media personality, writing books, making paid speeches, and

1   going on TV.

2           And you are going to hear that after the Virginia

3   shooting her professional life didn't change.  She continued to

4   make paid speeches.  You are going to see that she is a

5   spokesperson for a financial product.  She has talked about

6   running for the United States Senate in Alaska.  She has talked

7   about running for other office just a couple of weeks ago.  And

8   she was a star on a popular family television show *The Masked*

9   *Singer*.

10          So let me wrap up by saying this:

11          On June 14 of 2017, *The New York Times* and the

12  editorial board had an important and timely message to its

13  readers about the danger of overheated political rhetoric.

14  Unfortunately, you are going to hear all of the people who were

15  involved.  No one at *The Times* anticipated that some people

16  would view two sentences as suggesting that the crosshairs map

17  caused Jared Loughner to shoot Congresswoman Giffords and

18  others.  And when it became apparent that some people thought

19  it read that way, *The Times* acted really quickly and issued a

20  correction the very next morning.  *The Times* made a mistake,

21  and it acted as quickly as possible to correct that mistake.

22          As you will see, there is no evidence that Mr. Bennet,

23  or any other employee at the *Times*, intended to suggest that

24  Governor Palin caused Jared Loughner to shoot Congresswoman

25  Giffords and others.  There is no evidence that Mr. Bennet or

M232Pal2

1    any other employee at the *Times* believed that readers would

2    understand the editorial that way.  There is no evidence that

3    Mr. Bennet even knew that it would have been -- wouldn't have

4    been incorrect to suggest that Jared Loughner acted because of

5    the crosshairs map.

6              Finally, there is no evidence -- you will see it

7    all -- to suggest that Mr. Bennet or anyone at the *Times*

8    harbored any ill will towards Governor Palin or meant to harm

9    her.  The editorial was not even about her.

10             At the end of the day, the evidence will show that

11   Governor Palin has failed to prove that she was defamed, that

12   *The Times* or Mr. Bennet had actual malice, or that she suffered

13   any damages from publication of the editorial.  And for these

14   reasons, and others, at the end of this trial, I'm going to

15   come back and ask you to return the only verdict that is

16   supported by an objective view of the evidence, and that's a

17   verdict in favor of Mr. Bennet and in favor of the *New York*

18   *Times*.

19             I thank you for your time.

20             THE COURT:  Thank you very much.

21             So ladies and gentlemen in about two minutes I'm going

22   to excuse you for lunch.  When you come back, I'm going to give

23   you some instructions on the law to help frame your

24   consideration, and then we will hear from the first witness.

25             But before we break for lunch, I did want to give you

**JA157**
M232Pal2

1     a few sort of housekeeping rules.

2              First, you should not discuss this case with anyone

3     outside.  Your job is to decide this case for yourself and

4     when -- if you start discussing the case with someone else,

5     they will inevitably have views and opinions that are not based

6     on the evidence of the Court, which they haven't even seen, but

7     are based on their own preconceptions.  So don't discuss the

8     case with anyone.  If you have to tell an employer or spouse,

9     I'm on jury duty and, worst case, it will last two weeks, but

10    that's it.

11             Secondly, if by any chance you see or hear anything in

12    the media, turn away from it.  Don't read it.  Don't listen to

13    it.  Put it out of your mind completely for the same reason.

14    The key to being an American juror is to decide the case on the

15    facts that you hear in the courtroom, not on some report or

16    some view that some other person may express in the media.

17             And one other thing along those lines, don't try to do

18    your own research.  Don't Google any of the people involved or

19    anything like that.  We are going to give you, over the course

20    of the next week or so, every piece of evidence that you will

21    need to decide this case, and we will give you the evidence

22    that is properly admissible, and we will keep out all of the

23    evidence that's not properly admissible.  So you will have the

24    real stuff, if you will, for deciding this case, and that's

25    what we want you to focus on.

**JA158**
M232Pal2

1          I should mention that you also should not discuss the
2     case even among yourselves at this stage.  The reason for that
3     is, as I mentioned earlier, the case is going to come in one
4     witness at a time, one exhibit at a time.  It will be a while
5     until the whole picture is before you, and we don't want you to
6     start drawing conclusions too early, so we want you to keep an
7     open mind.  You will of course have plenty of opportunity to
8     discuss the case among yourselves when it is given to you for
9     your deliberations, but until then, don't discuss the case even
10    among yourselves.

11         And the last rule is really a rule for the witnesses
12    and the lawyers, but I wanted you to be aware of it.  They are
13    all under very strict instructions to have no contact with you
14    whatsoever.  So if you are in an elevator and there is one of
15    the lawyers and he or she doesn't even smile or say hello, it's
16    not because they are being rude.  It's because they know that
17    they can't have any contact with you whatsoever.

18         So, it's 5 minutes to 1, but let's give you until
19    2:00, and we will reconvene.  Remember, we only go to 3:30, so
20    when we reconvene, we will go straight from 2 to 3:30.

21         We are off to a good start.  Have a good lunch, and we
22    will see you at 2:00.

23         THE DEPUTY CLERK:  Jurors, please follow me.

24         (Jury not present)

25         THE COURT:  Okay.  We will see you all at 2:00.

**JA159**

M232Pal2

1          MR. TURKEL:  Before we break, we would like to invoke

2     the rule, so when we get back the rule is in place.

3          THE COURT:  I'm sorry.

4          MR. TURKEL:  We would like to invoke the Rule 615

5     sequestration.

6          THE COURT:  Oh, of witnesses.

7          MR. TURKEL:  Yes, Judge, because we are going to take

8     testimony when we get back.

9          THE COURT:  So no one, other than the parties of

10    course, who is a witness in the case can be in the courtroom

11    except when they are testifying.

12          (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA160**

M232Pal2

1          A F T E R N O O N   S E S S I O N

2                        2:00 p.m.

3          (Jury not present)

4          THE DEPUTY CLERK:  May I bring in the jury?

5          THE COURT:  Please.

6          (Jury present)

7          THE COURT:  Please be seated.

8          Ladies and gentlemen, you should each now have a copy

9    of a preliminary instruction.  We are going to read it

10   together, but then you can take it with you into the jury room

11   and have it for further reference in the following days.

12          Before we begin to hear the evidence, I would like to

13   give you a brief overview of some of the legal issues that will

14   arise in this case.  After you have heard all of the evidence

15   and the parties have made their closing arguments, I will give

16   you detailed instructions of law that will displace these

17   preliminary comments and will govern your deliberations.  But

18   for now, it may be useful to give you a quick overview of some,

19   but not all, of the issues in this case, to help focus your

20   evaluation of the evidence.

21          As you know from the opening statements of counsel,

22   the plaintiff, Sarah Palin, claims she was libeled by certain

23   statements, largely drafted by defendant James Bennet, that

24   appeared in a *New York Times* editorial entitled "America's

25   Lethal Politics" that was published following the June 14, 2017

**JA161**

M232Pal2

1   shooting of Congressman Steve Scalise.  The editorial was

2   published online by codefendant, The New York Times Company, on

3   the evening of June 14, 2017 and appeared in the print

4   newspaper the following day.

5        The portions of the editorial of which the plaintiff

6   complains appeared in two paragraphs that read:

7        "In 2011, when Jared Lee Loughner opened fire in a

8   supermarket parking lot, grievously wounding Representative

9   Gabby Giffords and killing six people, including a

10  nine-year-old girl, the link to political incitement was clear.

11  Before the shooting, Sarah Palin's political action committee

12  circulated a map of targeted electoral districts that put

13  Ms. Giffords and 19 other Democrats under stylized crosshairs.

14       "Conservatives and right-wing media were quick on

15  Wednesday to demand forceful condemnation of hate speech and

16  crimes by anti-Trump liberals.  They're right.  Though there's

17  no sign of incitement as direct as in the Giffords attack,

18  liberals should of course hold themselves to the same standard

19  of decency that they ask for the right."

20       Around 11:15 a.m. and then around 4 p.m. on June 15,

21  2017, *The Times* published two corrections, first online and

22  later in the print newspaper.  In its final form, the

23  correction read:

24       "An editorial on Thursday about the shooting of

25  representative Steve Scalise incorrectly stated that a link

1  existed between political rhetoric and the 2011 shooting of

2  Representative Gabby Giffords.  In fact, no such link was

3  established.  The editorial also incorrectly described a map

4  distributed by a political action committee before that

5  shooting.  It depicted electoral districts, not individual

6  Democratic lawmakers, beneath stylized crosshairs."

7          Against this background, Ms. Palin, in order to

8  prevail on her claim of libel, will need to prove, among other

9  things, that the allegedly libelous statements in the original

10 editorial:

11         1. would reasonably be taken to refer to her

12 personally;

13         2. were false;

14         3. were, in the context of the editorial as a whole,

15 defamatory, meaning that they tended to expose her to ridicule,

16 disgrace, contempt, or public hatred.

17         If she proves these elements, Ms. Palin, in order to

18 prevail on her claim, will then have to prove either that there

19 was a high probability that the defendants knew, when they

20 published these statements, that the statements were false and

21 defamatory, or that, at a minimum, there was a high probability

22 that they suspected the statements were false and defamatory

23 but purposely disregarded that risk.

24         Finally, Ms. Palin will have to prove to what extent

25 she was injured by the allegedly libelous statements.

1          Please be sure to remember that this preliminary

2     instruction is simply a brief overview of some of the issues

3     that will arise in this case.  At the start of your

4     deliberations, I will give you more detailed, final

5     instructions that will replace this overview and will govern

6     your deliberations.

7          Okay.  Please call your first witness.

8          MR. VOGT:  Plaintiff calls Elizabeth Williamson, your

9     Honor.

10     ELIZABETH WILLIAMSON,

11          called as a witness by the plaintiff,

12          having been duly sworn, testified as follows:

13          THE DEPUTY CLERK:  Please be seated.  Take your mask

14     off.

15          THE COURT:  You will want to bring that microphone

16     close to your mouth.  That's good.

17          Go ahead, counsel.

18          MR. VOGT:  Thank you, your Honor.

19     DIRECT EXAMINATION

20     BY MR. VOGT:

21     Q.  Could you please state your name?

22     A.  Elizabeth Williamson.

23     Q.  And where do you work?

24     A.  *The New York Times*.

25     Q.  What is your position with *The New York Times*?

**JA164**

1    A.  I am a reporter.

2    Q.  And how long have you been a reporter for the *New York*

3    *Times*?

4    A.  I have been a reporter since 2018 with the *Times*.

5    Q.  Were you also at one point a feature writer?

6    A.  I am currently.

7    Q.  What's a feature writer?

8    A.  A feature writer is a reporter who writes longer form,

9    usually profiles, analysis pieces about the news, that type of

10   thing.

11   Q.  And where are you based?

12   A.  I'm based in Washington, D.C.

13   Q.  Prior to your position as a reporter as a feature writer

14   were you on *The Times* editorial board?

15   A.  Yes, I was.

16   Q.  What is the editorial board?

17   A.  The editorial board is a group of writers who write the

18   pieces which appear in the opinion page of *The New York Times*

19   with the sort of heading by the editorial board.

20   Q.  And is the editorial board independent of the newsroom?

21   A.  Yes, it is.

22   Q.  Does the editorial board follow the same standards for

23   facts as the newsroom?

24   A.  Yes, it does.

25   Q.  And how long were you on the editorial board?

1  A.  I was on the editorial board from October 2015 until the

2  spring of 2018.

3  Q.  And while you were on the editorial board, did you have any

4  particular area of focus?

5  A.  Yes, I did.

6  Q.  What was your area of focus?

7  A.  I covered national politics.

8  Q.  And then prior to October of 2015, were you working?

9  A.  Before October of 2015, I was at the *Wall Street Journal*.

10  Q.  And how long were you there?

11  A.  I was there -- well, I had two stints at the *Wall Street*

12  *Journal*.  I was a foreign correspondent for them from 1999

13  until 2003, and then from 2008 to 2015 I was a reporter in the

14  Washington bureau.

15  Q.  And have you worked at any other publications?

16  A.  Yes.  I also worked at the *Washington Post*.

17  Q.  And what was your position at the *Washington Post*?

18  A.  I had a number of positions, but I was a reporter.

19  Q.  And you have been a journalist, I believe, full-time since

20  1994, is that right?

21  A.  That's correct.

22  Q.  Are you also an author?

23  A.  Yes, I am.

24  Q.  Do you have a book that's about to be released in March?

25  A.  Yes, I do.

M232Pal2                        Williamson - Direct

1    Q.   What's that book?

2    A.   The book is called *Sandy Hook:  An American Tragedy and the*

3    *Battle for Truth.*

4    Q.   And what's it about?

5    A.   It's about the Sandy Hook families' battle against

6    conspiracy theorists and people who said that their children

7    and loved ones were not killed at the Sandy Hook shooting in

8    2012.

9    Q.   And then I understand that you also appeared in a

10   documentary in 2020, is that right?

11   A.   That's correct.

12   Q.   What was the name of that documentary?

13   A.   That was called -- it was a *Frontline* documentary and it

14   was called *United States of Conspiracy.*

15   Q.   And what was that documentary about?

16   A.   Again, it was about conspiracy theories circulating in

17   society, political conspiracy theories, kind of tracing the

18   evolution of those in our culture.

19   Q.   And is that the same documentary that is known as *After*

20   *Truth: Dissemination of False Information or Fake News*?

21   A.   No.  That's a different documentary.

22   Q.   Did you also appear in that documentary?

23   A.   Yes, I did.

24   Q.   And what was that one about?

25   A.   That was on a similar topic about, you know, our post-truth

M232Pal2                        Williamson - Direct

1   culture and the, again, the circulation of conspiracy theories,

2   particularly political ones.

3   Q.  What is -- when you said post-truth culture, what are you

4   referring to?

5   A.  I'm talking about a culture in which, particularly for

6   political reasons, people choose to disregard established

7   truths or come up with theories to explain things which are

8   counterfactual.

9   Q.  So they say things that aren't true to advance a political

10  narrative, is that right?

11  A.  In some cases, but not all.

12  Q.  In 2008, you were working at the *Wall Street Journal* in the

13  D.C. bureau, is that right?

14  A.  That's correct.

15  Q.  Did you cover the 2008 Republican National Convention?

16  A.  In 2008, yes, I was there.

17  Q.  Were you there when Governor Palin first appeared on the

18  national political scene?

19  A.  Yes, I was.

20  Q.  And you covered her speech at the RNC?

21  A.  Yes, I did.

22  Q.  Did you write a story about it?

23  A.  I don't believe I did, no.

24  Q.  And did you do anything after the Republican National

25  Convention in terms of coverage of Governor Palin?

**JA168**

1    A.  I was with a group of reporters who, after the Republican

2    National Convention, flew to Wasilla with the governor on her

3    plane.

4    Q.  And what did you do there?

5    A.  We were kind of there just to talk to people who knew her,

6    people who were her neighbors or her colleagues.

7    Q.  And do you recall writing any stories about Governor Palin?

8    A.  I believe I wrote some posts for the *Wall Street Journal*'s

9    blog which was called *Wash Wire*, just short pieces, but nothing

10   major.  There was one, right during the convention, right after

11   the convention, that I wrote about her appeal to people, you

12   know, particularly women after she made her speech at the

13   convention.

14   Q.  And what was her appeal to women?

15   A.  Well, I think it was -- the piece was about, you know, how

16   there were different receptions of her.  People were kind of

17   talking about what her speech meant to them and what her

18   position as the vice presidential nominee meant to them.

19   Q.  Were there people that were also critical of her?

20   A.  I think there were some, sure.

21   Q.  And do you recall what any of those criticisms were?

22   A.  I really don't as I sit here.

23   Q.  Have you ever met Governor Palin?

24   A.  No, I have not.

25   Q.  Have you ever interviewed her?

**JA169**

M232Pal2                    Williamson - Direct

1   A.  No, I have not.

2   Q.  How would you describe her as someone who's never met her?

3   A.  She was a vice presidential nominee.  She was a governor of

4   Alaska.

5   Q.  And she was the first female Governor of Alaska, is that

6   right?

7   A.  Correct.

8   Q.  Also the youngest Governor of Alaska?

9   A.  That I was not aware of.

10  Q.  Was she the first woman to be nominated for the vice

11  presidency of the Republican party?

12  A.  Yes.

13  Q.  And ultimately Senator McCain and Governor Palin lost the

14  2008 election, is that right?

15  A.  That's correct.

16  Q.  And at that time did you continue to work at the *Wall*

17  *Street Journal*?

18  A.  Yes, I was.

19  Q.  And were you working at the *Wall Street Journal* in January

20  of 2011?

21  A.  Yes, I was.

22  Q.  Do you recall that on January 8 of that year was when Jared

23  Loughner opened fire at the "Congress on your Corner" event

24  that was hosted by Congressperson Gabrielle Giffords?

25  A.  Yes, I recall it.

**JA170**

M232Pal2                          Williamson - Direct

1   Q.  And do you recall learning that Mr. Loughner shot and

2   killed six people?

3   A.  Yes, I recall that shooting.

4   Q.  Do you recall one of them was a nine-year-old girl?

5   A.  Yes.

6   Q.  Do you recall one of them was a federal judge?

7   A.  Yes.

8   Q.  Do you recall a number of other people being injured?

9   A.  Yes, of course.

10  Q.  And Representative Giffords herself was shot in the head?

11  A.  Correct.

12  Q.  You didn't cover that shooting personally, though, is that

13  right?

14  A.  That's correct.

15  Q.  Because you were in D.C. at the time?

16  A.  That's right.

17  Q.  But you did follow news coverage about it.

18  A.  Yes.

19  Q.  And with respect to that news coverage, do you recall

20  seeing or reading anything at that time that demonstrated

21  evidence of any link between a map circulated by

22  Governor Palin's political action committee and the Loughner

23  shooting?

24  A.  No.  I didn't cover that shooting.  I consumed news of that

25  shooting, as anyone would.

1  Q.  And when you consumed that news, did you see anything in

2  that news coverage that indicated that there was a link

3  established between Mr. Loughner's shooting and Governor Palin

4  or the map circulated by her political action committee?

5  A.  I do not recall that, in 2011, seeing that.

6  Q.  And that's the type of thing that would have stuck out in

7  your mind if it had been established, correct?

8  A.  Not necessarily.

9  Q.  Wasn't the shooting, the Loughner shooting in Arizona, it

10 was a big deal, wasn't it?

11 A.  Yes.

12 Q.  It's the first time that a sitting member of Congress had

13 been shot in quite some time?

14 A.  Correct.

15 Q.  And if there had been a direct link established between

16 incitement and that particular shooting, that would have been

17 big national news coverage, wouldn't it?

18 A.  My consumption of the news at that time was, like most

19 Americans, on the dead and the injured and the event itself.

20 Q.  Did -- what news were you following at that time?

21 A.  The *Washington Post*, because that was my daily newspaper

22 where I live, cable news, maybe some network news.

23 Q.  And did you have a subscription to the *Washington Post*?

24 A.  I did.

25 Q.  At the time you were working at the *Wall Street Journal*,

M232Pal2                    Williamson - Direct

1    though, right?

2    A.  Correct.

3    Q.  Did you also follow news coverage in the *Wall Street*

4    *Journal*?

5    A.  Yes.

6    Q.  And did you follow *The New York Times*?

7    A.  Yes, though less so.

8    Q.  And do you recall reading anything in *The New York Times*

9    that related to the Loughner shooting?

10   A.  I do not.

11   Q.  Do you recall reading anything in the *Washington Post* that

12   addressed the Loughner shooting?

13   A.  Yes.

14   Q.  What do you recall reading in the *Washington Post* about the

15   Loughner shooting?

16   A.  As I sit here today, in 2011, I recall just the major facts

17   of that event.

18   Q.  And did you recall any *Washington Post* stories that dealt

19   with President Obama's speech at the memorial service for the

20   victims of the Loughner shooting?

21   A.  In 2011?

22   Q.  Yes.

23   A.  I don't recall.

24   Q.  Once you joined *The New York Times* editorial board in

25   October of 2015, where were you working out of?

1   A.   I was working out of the Washington bureau of *The New York*

2   *Times*.

3   Q.   And when you joined the editorial board in 2015, did you

4   have to familiarize yourself with any *New York Times* policies

5   and procedures?

6   A.   Yes.

7   Q.   What policies and procedures did you have to familiarize

8   yourself with?

9   A.   That's really a broad question.  Can you please elucidate

10  that a little.

11  Q.   Sure.  Did you –– when you joined the editorial board in

12  October of 2015, do you recall reviewing any written materials

13  that related to the concept of ethical journalism?

14  A.   Yes, of course.

15  Q.   And obviously those were in writing?

16  A.   Yes.

17  Q.   And were there ethical journalism guidelines that applied

18  to the editorial board?

19  A.   Yes.

20  Q.   And did those same guidelines apply to the editorial board

21  in June of 2017?

22  A.   Yes.

23  Q.   And the ethical journalism guidelines for *The New York*

24  *Times*, did those cover the editorial department as well as the

25  news department?

1    A.  Yes.

2    Q.  And do you recall did those guidelines require writers and

3    staff at the *Times* to "tell the complete, unvarnished truth as

4    best as we can learn it"?

5    A.  Are you quoting from the guidelines?

6    Q.  Yes.

7    A.  Yes.

8    Q.  And those policies were something that the editorial board

9    would have been following in June of 2017?

10   A.  Yes.

11   Q.  Now, with respect to the policy that I just mentioned, the

12   best way to learn the unvarnished truth about an historic event

13   is to conduct research, correct?

14   A.  That's correct.

15   Q.  And how would you typically conduct research to learn about

16   a historical event?

17   A.  If I were writing about it as a reporter or as a writer on

18   the editorial board?

19   Q.  Well, is there a distinction?

20   A.  Yes.

21   Q.  What is it?

22   A.  So when you are -- in one sense there is no distinction.

23   You are conducting research.  You are calling people.  You are

24   looking into the contemporaneous reports of the event and

25   trying to determine the facts as they are unfurling, you know,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1     in a breaking news event.

2              With the editorial board, there is an added element,

3     and that is, there is a broader position that the editorial

4     board tends to take if they write about a topic, and so you are

5     looking into what is the stance of the editorial board on that

6     particular event or issue as it arises.

7     Q.  Do you do that within the context of when you are doing

8     research for the editorial board to maintain consistency in

9     positions that the editorial board takes?

10    A.  With consistency with positions that the editorial board

11    has taken in the past, yes.

12    Q.  Now, in terms of conducting fact research, while you were a

13    member of the editorial board, what sources would you typically

14    use to look for facts about an historical event?

15    A.  As it occurs?

16    Q.  Yes.

17    A.  You would look at, again, contemporaneous reports.  You

18    would do some reporting and you would look at, you know, just

19    things as they emerge in the news.

20    Q.  And then if you were looking for facts about an event that

21    had happened in the past, where would you go or what sources

22    would you consult to look for facts about a past event?

23    A.  It would depend on how far in the past you are talking

24    about, but you would look at contemporaneous news reports; you

25    might interview participants and witnesses; you might, if it's

M232Pal2                          Williamson - Direct

1   far in the past, you might do some archival research.

2   Q.  So as an example, in June of 2017, and specifically June 14

3   of 2017, you conducted research at some point on that day

4   concerning the Loughner shooting, correct?

5   A.  I conducted research on the political rhetoric that was

6   circulating in the run-up to the Loughner shooting.

7   Q.  And what sources did you consult when you did that

8   research?

9   A.  I looked at a series of articles that were written at the

10  time prior to the shooting.

11  Q.  And do you recall what those articles were?

12  A.  I think you have those in what was produced for discovery.

13  Q.  But you don't remember them off the top of your head?

14  A.  Well, I couldn't run down the list for you, no.  I'm sorry.

15  Q.  Are you also familiar with *The New York Times* guidelines on

16  integrity?

17  A.  Yes.

18  Q.  What are those?

19  A.  I can't recite them for you.

20  Q.  No, just generally speaking, what are they?

21  A.  That we report truthfully and that we report the facts as

22  we know them and events as they occur.

23  Q.  And do you recall whether or not in the guidelines on

24  integrity there are standards concerning fact-checking?

25  A.  Yes.

1    Q.  And were there fact-checking standards in place in June of

2    2017 that applied to the editorial board?

3    A.  Yes.

4    Q.  And at that time, say, as of June 14 of 2017, were writers

5    their own principal fact-checkers?

6    A.  We are the first line of fact-checking, yes.

7    Q.  And were writers often the only fact-checkers?

8    A.  No.

9    Q.  Who else would be fact-checking?

10   A.  There are fact-checkers in New York who go through the

11   story after it is filed and check the facts therein.

12   Q.  And in terms of the fact-checking policy, that would have

13   applied equally to something that was written in the name of

14   the editorial board in June of 2017, correct?

15   A.  Excuse me, Mr. Vogt.  I'm kind of having a difficult time

16   here.  I wonder if I can move my chair so I can face you more

17   directly.  I am getting kind of a cramp in my neck.

18   Q.  Sure.

19   A.  Sorry.  I think that's a bit better.

20   Q.  It's very odd, the two of us talking inside boxes.

21   A.  No, it's not the shield.  It's more just the position of my

22   head.

23          Okay.  Thank you.  Go ahead.  If you could repeat the

24   question, please.

25   Q.  Sure.  So in June of 2017, the fact-checking policy would

M232Pal2                    Williamson - Direct

1   have applied equally to something that was written in the name

2   of the editorial board, is that right?

3   A.   That's correct.

4   Q.   Now, in situations where someone rewrote a draft of an

5   editorial, would the person who did the rewrite be primarily

6   responsible for fact-checking the portion that they wrote?

7   A.   Could you repeat the question, please?

8   Q.   Sure.

9          In situations where someone rewrites a draft that

10  another member of the board had prepared, would the person who

11  did the rewrite have primary responsibility for fact-checking

12  the portion that they rewrote.

13  A.   Yes.

14  Q.   And when you started on the editorial board in October of

15  2015, who was the editor?

16  A.   Andy Rosenthal.

17  Q.   Do you recall when Mr. Bennet came onboard as the editor?

18  A.   Yes, it was in mid 2016.

19  Q.   And how would you describe Mr. Bennet?

20  A.   He is a very well-known editor and journalist.

21  Q.   What does an editor do?

22  A.   That's a broad question, but an editor typically assigns

23  stories, runs a department or a group of reporters, and helps

24  guide their work.

25  Q.   Would you say that Mr. Bennet has a strong command of the

M232Pal2                    Williamson - Direct

1   English language?

2   A.  Yes, I would.

3   Q.  Now, at some point on the morning of June 14 of 2017, you

4   learned about the shooting that took place in Virginia.  Is

5   that correct?

6   A.  Yes, that's correct.

7   Q.  And do you recall how you learned about that shooting?

8   A.  I think I saw initial news reports maybe online.

9   Q.  And given your location at that time in Washington it would

10  have been your job to cover that story?

11  A.  Yes.

12  Q.  And do you recall reaching out to any of your colleagues on

13  the editorial board on the morning of June 14 of 2017 to

14  inquire about whether or not you were going to write on that

15  shooting?

16  A.  Yes, I did.

17  Q.  And do you recall who you reached out to?

18  A.  Yes.  I would have reached out to Nick Fox, who was one of

19  our assigning editors who I reported to pretty frequently, and

20  to Bob Semple, another editor on the editorial board.

21  Q.  And do you recall at some point in time on the morning of

22  June 14 of 2017 beginning to do some research concerning the

23  shooter in the Virginia shooting?

24  A.  Yes.

25  Q.  Do you remember what you learned?

**JA180**

M232Pal2                    Williamson - Direct

1   A.  Well, initially I learned what I thought was the identity

2   of the shooter, but we couldn't be sure because these were

3   initial reports.

4   Q.  And did you e-mail that to your colleagues?

5   A.  Yes.

6   Q.  And did that include Mr. Bennet?

7   A.  I don't believe it did at that time, no.

8   Q.  And then do you recall on the morning of June 14 of 2017

9   also conducting some research concerning social media pages for

10  the possible shooter?

11  A.  Yes.

12  Q.  And do you recall what you learned when you did that

13  research?

14  A.  I learned the links to what had been reported to be his

15  social media pages.

16  Q.  And do you recall what was on those social media pages?

17  A.  I don't, but I think you have the e-mail that I sent.

18  Q.  Yeah.  Let me show you.  138.

19          MR. VOGT:  May I approach, your Honor?

20          THE COURT:  Yes.  You don't have --

21          MR. VOGT:  I have a copy for you.

22          THE COURT:  You can also just put it up on her screen.

23          MR. VOGT:  I thought we had to give her the hard copy

24  under your procedures.

25          THE COURT:  I'm sorry?

1              MR. VOGT:  I thought that the witness got the original

2    under your procedures.

3              THE COURT:  It doesn't matter to me, but go ahead.

4              MR. VOGT:  Okay.  We can just bring it up on the

5    screen, your Honor.

6              THE COURT:  Yes, without showing it yet to the jury,

7    because it's not yet in evidence, just on the screen to the

8    witness and the Court.

9    BY MR. VOGT:

10   Q.  I have handed you what's been premarked as Plaintiff's

11   Exhibit 138.  Do you recognize this document?

12   A.  Yes, I do.

13   Q.  And is this the e-mail that you were referencing a moment

14   ago about the social media research that you did?

15   A.  Yes, it is.

16   Q.  And in the subject line of this it says "Possible Shooters,

17   Possible Social Media Pages, pro-Bernie, anti-Trump"?

18   A.  Yes.

19   Q.  And is that what you actually saw on these pages?

20   A.  Yes.

21   Q.  And why were you communicating this information to --

22             THE COURT:  I'm sorry.  Did you offer this exhibit?

23             MR. VOGT:  No, I haven't yet, your Honor.

24             THE COURT:  Then how can you possibly be reading from

25   it?

**JA182**

1          MR. VOGT:  Well, I'm asking her to identify it.

2          THE COURT:  You can't read from a document that's not

3     in evidence.

4          MR. VOGT:  I understand.  I would offer Exhibit 138

5     into evidence, your Honor.

6          MR. AXELROD:  No objection, your Honor.

7          THE COURT:  Received.

8          (Plaintiff's Exhibit 138 received in evidence)

9     BY MR. VOGT:

10    Q.  Do you recall what, if anything, you learned off of the

11    social media pages that are linked in this e-mail in Exhibit

12    138?

13    A.  I put that in the subject line.

14    Q.  And then what, if anything, did you do after you sent this

15    e-mail to your colleagues on the editorial board?

16    A.  What did I do after?  Do you mean immediately after?

17    Q.  Yeah, what was your next step with respect to the potential

18    story on the shooting?

19    A.  Well, in -- at this stage, we were trying to identify what

20    had happened and who the shooter was.

21    Q.  And on this particular e-mail, Exhibit 138 that we are

22    looking at, James Bennet is listed on there as well, is that

23    right?

24    A.  Yes, he is.

25         THE COURT:  So, counsel, just so we are clear, going

**JA183**

 1  forward, once an exhibit is in evidence, and this one has been

 2  received, then whoever is controlling your computer should show

 3  it to the jury as well.

 4          MR. VOGT:  Okay.  Thank you, your Honor.  May we

 5  publish that now?

 6          THE COURT:  Yes.

 7          MR. VOGT:  May I approach, your Honor?

 8          THE COURT:  I don't know why you need to approach.

 9          MR. VOGT:  I was giving Mr. Werle a copy.

10          THE COURT:  Well, he can survive by looking at the

11  screen.

12          MR. VOGT:  Okay.  I thought he needed a hard copy for

13  the record.

14  BY MR. VOGT:

15  Q.  Ms. Williamson, do you recognize Exhibit -- Plaintiff's

16  Trial Exhibit 115?

17  A.  Yes.

18  Q.  And is this an accurate depiction of an e-mail string

19  between you and Nick Fox?

20  A.  Yes.

21          MR. VOGT:  And at this point in time, your Honor, I

22  would offer Plaintiff's Exhibit 115 into evidence.

23          MR. AXELROD:  No objection, your Honor.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 115 received in evidence)

1  BY MR. VOGT:

2  Q.  Ms. Williamson, in this particular e-mail string, if you

3  look at the bottom, at 10:46 a.m. there is a line there from

4  you.  Do you see that?

5  A.  Yes.

6  Q.  And that e-mail would have been, your subject line, "Are we

7  writing on the congressional shooting," is that right?

8  A.  Yes, that looks correct.

9  Q.  And at 11:28 a.m., Mr. Robert Semple says, "Can't see it

10 yet, but keep looking.  A nut case who hates Republicans."  Do

11 you see that?

12 A.  Yes.

13 Q.  Do you know what he meant by that?

14 A.  I think he was summarizing what he thought were the facts

15 at that moment on the identity of the gunman.

16 Q.  And when he says "can't see it yet," does he mean he can't

17 see a story yet?

18 A.  That's correct.

19 Q.  So at that point in time at least the fact that Republican

20 Congress members have been shot wasn't a story that the

21 editorial board was interested in writing?

22          MR. AXELROD:  Objection.

23          THE COURT:  Sustained.

24 Q.  And then Mr. Fox says, at 11:31, "I talked to Bob about the

25 politicize of horror angle and he didn't quite see it."  Do you

M232Pal2                        Williamson - Direct

1    know what he was referencing there when he said the "politicize

2    of horror angle"?

3    A.  I honestly can't fully recall, this being five years ago.

4    Q.  And were you having any discussions either in person or

5    over the phone with Mr. Semple about this potential story?

6    A.  Yes.  We had a phone call.

7    Q.  And do you recall what you discussed on that phone call

8    with Mr. Semple about the potential story?

9    A.  Not the specifics as I sit here, but basically it was a

10   further effort to answer that question, will we be writing

11   about the shooting, will we be doing an editorial on the

12   shooting.

13   Q.  Ms. Williamson, you are being shown what's been remarked as

14   Plaintiff's Trial Exhibit 117.  Do you recognize this document?

15   A.  Yes.  Excuse me.  Yes.

16            MR. VOGT:  At this point in time, your Honor, I would

17   move Plaintiff's Trial Exhibit 117 into evidence.

18            MR. AXELROD:  No objection, your Honor.

19            THE COURT:  Received.

20            (Plaintiff's Exhibit 117 received in evidence)

21   BY MR. VOGT:

22   Q.  There is an e-mail from you at 11:33 a.m. where you say,

23   "Okay.  Let's see what Trump says.  He is speaking at 11:30."

24   Do you see that?

25   A.  Yes, I do.

1   Q.  Then you say, "I'm writing the Observer about civility in

2   Washington."  What's the Observer?

3   A.  So the full sentence there is, "I am writing the Observer

4   about civility in Washington (Rubenstein) so maybe a reference

5   in that piece."  So the Observer was something called an

6   editorial observer, which are short columns that we wrote under

7   our own names, as opposed to by the editorial board.

8   Q.  And do you recall with respect to your statement here that

9   you are writing the Observer about civility in Washington?

10  A.  Yes.

11  Q.  Do you remember what the specific subject matter of that

12  piece was?

13  A.  Yes.  So David Rubenstein is a philanthropist in Washington

14  who was making a point of bringing Democrats and Republicans

15  together for events in order to put them in the same room

16  together and have them, you know, relate in social settings to

17  try and lower the temperature of the political rhetoric in

18  Washington and promote greater civility among the members of

19  the two parties.

20  Q.  And did that ever make it into your draft of the editorial

21  that we are here about today?

22  A.  No, it did not.  It was a separate piece.

23  Q.  And then in this e-mail string, at 11:50 a.m., you see

24  there is an e-mail there from Mr. Semple.

25  A.  Yes.

1    Q.  And generally talking about it, he brings up the issue of
2    gun control.  Is that right?
3    A.  Yes.
4    Q.  And he says -- one of the things he says in here is, "It
5    would be interesting to know how many of those Republican
6    athletes are beholden to the NRA and its generally
7    antiregulatory philosophy and whether something like this might
8    pound a little sense into their heads."  Do you see that?
9    A.  Yes, I do.
10   Q.  And there he is referencing the shooting that took place,
11   is that right?
12   A.  The Republican athletes, was -- by "them" he meant the
13   members of Congress who were on the field that day, yes.
14   Q.  That were shot?
15   A.  Correct.  Shot at, yeah.
16   Q.  And so Mr. Semple wanted to focus the potential piece on
17   gun control, is that right?
18   A.  He says, "A broad thought.  It would be interesting to
19   know."  So, yes, these thoughts were around gun policy.
20   Q.  And then at 12:04 p.m. Linda Cohn sends an e-mail talking
21   about how "the nutcase went to my high school."  Do you see
22   that one?
23   A.  Yes, I do.
24   Q.  And who is Linda Cohn?
25   A.  She was an editor on the editorial board at the time.

**JA188**

M232Pal2                    Williamson - Direct

1   Q.  And she brings up the Gifford shooting in this e-mail

2   string, correct?

3   A.  Yes, she does.

4   Q.  But she doesn't say anything about incitement, correct?

5   A.  She says, "I'm thinking back to what a giant story Gabby

6   Giffords' shooting was.  Amazing that shooting congressmen

7   doesn't seem so shocking now."

8   Q.  And then at 12:08 p.m., on the top e-mail in the string,

9   Mr. Semple says, "Okay, we should definitely shoot for a piece,

10  not huge, but a piece."

11  A.  Yes.

12  Q.  Now, do you know at that time what the subject matter of

13  the piece was going to be?

14  A.   In general terms, yes, as Bob mentioned the gun policy

15  debate might be part of it.  But we didn't know all the

16  specifics quite yet.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1    BY MR. VOGT:

2    Q.  Ms. Williamson, you should have on your screen now a copy

3    of an email from Mr. Bennet at 12:41 p.m.  Do you see that?

4    A.  Yes.

5    Q.  And this is approximately 33 minutes after the last email

6    that we just looked at when Mr. Semple said, "Let's shoot for a

7    piece"?

8    A.  Mm-hmm, yes.

9    Q.  Now this particular email that Mr. Bennet sends, the

10   subject line of this is "Possible shooter's possible social

11   media pages pro Bernie/anti-Trump."  Do you see that?

12   A.  Yes.

13   Q.  So Mr. Bennet didn't respond on that same email string that

14   we looked at a moment ago, Exhibit 117, right?

15   A.  He's responding on this email stream, in this moment.

16   That's what this is.

17            MR. VOGT:  And at this point -- I'm sorry, Judge -- I

18   want to introduce Exhibit 119 in evidence.

19            MR. AXELROD:  No objection, your Honor.

20            THE COURT:  Received.

21            (Plaintiff's Exhibit 119 received in evidence)

22            THE COURT:  Although I did have a question.  You said

23   Mr. Rubenstein, who I'm not familiar with, brings Democrats and

24   Republicans together in the same room?

25            THE WITNESS:  Yes, your Honor.

 1              THE COURT:  Does he notify the fire department in

 2     advance?

 3              Go ahead, counsel.

 4              MR. VOGT:  Thank you, your Honor.

 5     BY MR. VOGT:

 6     Q.  In this particular email from Mr. Bennet at 12:41 p.m., he

 7     starts off by saying, "As Bob said, there's most likely a gun

 8     control point to be made here.  The other question is whether

 9     there's a point to be made about the rhetoric of demonization."

10     Do you know what he was referring to when he said "the rhetoric

11     of demonization"?

12     A.  At the moment I received this, I did not.

13     Q.  Did you ask him what he meant?

14     A.  I did not ask him in this email, no.

15     Q.  And did you ask him at any point on June 14th of 2017 what

16     he meant?

17     A.  No, I did not.

18     Q.  And then he continues, "and whether it incites people to

19     this kind of violence."  Do you see that?

20     A.  Yes.

21     Q.  Now was that the first time anyone on the editorial board,

22     in connection with talking about a potential piece about the

23     Virginia shooting, had brought up the word "incitement"?

24     A.  I do not know.  I was in Washington and they were all in

25     New York.

JA191

M231PAL3                    Williamson - Direct

1   Q.  Do you know if it's the first time anyone brought it up in

2   an email?

3   A.  As I sit here, I don't know.

4   Q.  Had you ever brought up the idea of incitement by this

5   point?

6   A.  What is the idea of incitement, Mr. Vogt?  Could you be

7   more specific.

8   Q.  Sure.  Had you mentioned -- in any discussions that you had

9   with any member of the editorial board about a potential story

10  on the Virginia shooting, had you ever said the word

11  "incitement," by this time at 12:41 p.m.?

12  A.  I don't believe so.

13  Q.  Had Mr. Semple ever said the word "incitement" by that

14  time?

15  A.  Again, he was in New York and I'm in Washington.  To me?

16  Q.  Yes.

17  A.  I don't recall.

18  Q.  And did you know what Mr. Bennet meant by this passage

19  where he says "and whether it incites people to this kind of

20  violence"?

21  A.  When I received this email, I did not understand what that

22  meant.

23  Q.  At any point in time on June 14th of 2017 did you ask

24  Mr. Bennet what he meant by that?

25  A.  No.  I was working with the other editors.

M231PAL3                    Williamson - Direct

1    Q.  And then he goes on to say, "It's hard for me to imagine

2    that Bernie himself is guilty of anything like that, but

3    there's evidence of the kind of inciting hate speech on the

4    left that we or at least I have tended to associate with the

5    right, e.g., in the run-up to the Gabby Giffords shooting.  We

6    should deal with that."  Do you see that part?

7    A.  Yes, I do.

8    Q.  And now at this point in time, did you tend to associate

9    any political speech on the right with the shooting of

10   Representative Giffords?

11   A.  I really did not understand the point that was being made

12   in this email, and I then proceeded to try and learn what it

13   was.

14   Q.  I believe you say you didn't understand the point that was

15   trying to be made.  You mean what Mr. Bennet was talking about

16   in terms of what he was considering as a potential part of this

17   story on the shooting?

18   A.  I'm sorry.  Could you rephrase that.

19   Q.  Yeah.  It was a horrible question.

20         So when you say you didn't really understand, when we

21   were just talking about that passage from Mr. Bennet, did you

22   at that point in time call Mr. Bennet to follow up with him?

23   A.  I did not call him, no.

24   Q.  Did you have any email communications with him to inquire

25   about what he meant in this email that we've been looking at,

1    Exhibit 119?

2    A.   What I did was, I proceeded -- this to me was a signal to

3    learn what had actually gone on in the run-up to the shooting,

4    and so I talked with other editors about that to try and

5    discover what was meant here and basically what my assignment

6    would be in this regard.

7    Q.   Now at this point in time, by this 12:41 p.m. email, had

8    you uncovered any evidence that the Scalise shooter,

9    Mr. Hodgkinson, had been motivated by any political rhetoric

10   from the left?

11   A.   At the time of this email?

12   Q.   Yes.

13   A.   As I sit here this many years later, I cannot recall

14   specifically what I knew about Mr. Hodgkinson at that time.

15   Q.   As we sit here today, do you recall whether you ever

16   unearthed any evidence that Mr. Hodgkinson was motivated by

17   rhetoric on the left when he committed the shooting of the

18   Republicans in the baseball field in Virginia?

19   A.   Well, I'm going back to the subject line of this email, and

20   it says, "Possible shooter's possible social media pages pro

21   Bernie/anti-Trump."

22   Q.   And so it's your understanding that those social media

23   pages gave at least some indication that there was some sort of

24   direct link between incitement or political rhetoric and the

25   Hodgkinson shooting?

JA194

1   A.  I don't think in that moment anyone knew that.

2   Q.  And did you ever conduct any research at any point in time

3   from June 14, 2017, up to the present to determine whether or

4   not that direct link existed?

5   A.  Between the Hodgkinson shooting and?

6   Q.  And political rhetoric on the left.

7   A.  What we were writing about was the general atmosphere in

8   the run-up to that shooting, and so yes, I did try to learn

9   what -- what was happening contemporaneously that would inform

10  the piece I was about to write.

11  Q.  And do you recall what you learned in that regard in terms

12  of the political atmosphere leading up to the Hodgkinson

13  shooting?

14  A.  I don't think -- on that day, I don't think there was a lot

15  out there.  This had just happened.

16  Q.  At any point in time did you learn of any political

17  rhetoric on the -- on the left that led up to the Hodgkinson

18  shooting?

19  A.  I think we were more focused on what the gunman had put on

20  his -- had said in the run-up to the shooting and had put on

21  his social media pages, and generally the editorial was about

22  the overheated political rhetoric and the demonization of one's

23  political opponents by members of both parties.

24  Q.  And do you recall, were there any specific threats on

25  Mr. Hodgkinson's social media pages that were directed towards

M231PAL3                    Williamson - Direct

1  any Republicans?

2  A.  I have no way of knowing that as I sit here right now.

3  Q.  If you had discovered any specific threats, would you have

4  included those in your draft --

5          MR. AXELROD:  Objection.

6  Q.  -- editorial?

7          MR. AXELROD:  Objection.

8          THE COURT:  Sustained.

9  Q.  Ms. Williamson, you should have now what's been premarked

10  as Plaintiff's Exhibit 121 up on your screen.  Do you recognize

11  that?

12  A.  Yes, I do.

13          MR. VOGT:  At this point, your Honor, I would move

14  Plaintiff's Exhibit 121 into evidence.

15          MR. AXELROD:  No objection.

16          THE COURT:  Received.

17          (Plaintiff's Exhibit 121 received in evidence)

18  Q.  And this particular email is from Phoebe Lett.  Do you see

19  that at the top?

20  A.  Yes, I do.

21  Q.  And who is Phoebe Lett?

22  A.  She was one of the editors and assistants on the editorial

23  board in New York.

24  Q.  And the subject line of this email is, "Gun control past

25  pieces from Bob."  Do you see that?

1    A.   Yes.

2    Q.   And do you recall why Ms. Lett was sending you these gun

3    control past pieces from Bob?

4    A.   Yes, so that I could learn a little bit more about what the

5    editorial board had said and written about this issue in the

6    past.

7    Q.   And did you in fact review the pieces that are -- that were

8    linked in this email?

9    A.   Yes, I did.

10   Q.   And do you recall whether or not from any of those pieces

11   you learned whether there had been any link established between

12   the map that Governor Palin's political action committee

13   circulated and the Giffords shooting?

14   A.   I would have to reread these pieces.

15   Q.   Now in addition to this, the pieces that are in this

16   email -- well, let me ask you first:  These are all editorials,

17   correct?

18   A.   Yes, it looks like that, although I can only see the links,

19   but they all say "opinion" in the URL.

20   Q.   And did you also conduct your own research independent of

21   being provided editorials on June 14th of 2017?

22   A.   Yes, I did.

23   Q.   Did you conduct your own research concerning the Hodgkinson

24   shooting?

25   A.   I was not researching the Hodgkinson shooting; I was

**JA197**

1   researching the political rhetoric that was circulating in our

2   environment, sort of in society, prior to the shooting.

3   Q.  And do you also recall whether or not, on June 14 of 2017,

4   you conducted your own research concerning the Loughner

5   shooting?

6   A.  Yes, I did.

7   Q.  And what research did you conduct regarding the Loughner

8   shooting?

9   A.  Again, I apologize.  I thought that's what you were asking

10  me for on the Hodgkinson shooting.  So for the Loughner

11  shooting, my answer would be the same, that I was researching

12  not the shooting itself but the political rhetoric that was

13  circulating prior to the event.

14  Q.  On June 14th of 2017, did you conduct research of news

15  reports concerning the Hodgkinson shooting?

16  A.  Yes, I did.

17  Q.  And on June 14th of 2017 did you also conduct research

18  involving news reports related to the Loughner shooting?

19  A.  No.  Again, I was researching what was happening in the

20  run-up to the shooting in our political discourse.

21  Q.  Ms. Williamson, do you recall being deposed in this case?

22  A.  Yes, I do.

23  Q.  Do you recall me taking your deposition?

24  A.  Yes.

25              THE COURT:  When you're going to read from a

M231PAL3                        Williamson - Direct

1    deposition, you need to first give the Court and adversary

2    counsel the page and line and then, if there's any objection,

3    it could be heard; and otherwise you can read it.

4              MR. VOGT:  I was just telling Mr. Axelrod, your Honor.

5              THE COURT:  Okay.  Well, that's not doing me any good.

6              MR. VOGT:  I was just making sure he had the

7    transcript out before we did that.  It's page 213, lines 11 to

8    15.  Or 11 to 16.

9              MR. AXELROD:  Okay.

10             THE COURT:  Any objection?

11             MR. AXELROD:  No objection.

12             THE COURT:  Go ahead.

13   BY MR. VOGT:

14   Q.  Ms. Williamson, do you recall being asked at your

15   deposition in this case:

16             "And on June 14 of 2017, did you also conduct research

17   involving news reports related to the Loughner shooting?"

18             And you asked, "You mean of Gabby Giffords and

19   others?"

20             And I said yes, and your response to that question was

21   yes?

22   A.  Are you able to show me?

23   Q.  Yeah.

24             MR. VOGT:  May I approach, your Honor.

25             THE COURT:  Yes.

1          While you're doing that, let me tell the ladies and

2     gentlemen of the jury what a deposition is.

3          In a civil case, before a case goes trial, each side

4     can take the testimony under oath of witnesses that they think

5     may be relevant to the case.  If a witness testifies here in

6     court and the testimony that he or she gave at the deposition

7     is arguably inconsistent, then it could be read as bearing on

8     the witness's credibility, or so that the witness can explain,

9     or whatever.  However, it's up to you whether you think it's

10    inconsistent or not.  You may conclude in many cases that it's

11    not inconsistent.  It's entirely up to you.

12          And you want to give the witness the page and line

13    number again?

14          MR. VOGT:  Yes, your Honor.  It's page 213, starting

15    at page 11 -- I'm sorry -- line 11, to line 16.

16    A.  Mr. Vogt, I'm just checking.  Page 213?

17    Q.  Yes.

18    A.  Okay.  I'm on there.  And line 11 in the left-hand margin?

19    Q.  Yes.

20    A.  Okay.

21    Q.  And do you recall I asked you at that deposition:

22          "And on June 14 of 2017, did you also conduct research

23    involving news reports related to the Loughner shooting?"

24    A.  Yes.  And the answer to that is:  Yes, I did.

25    Q.  That's how you answered that question at your deposition?

M231PAL3                     Williamson - Direct

```
 1    A.  Yes.
 2    Q.  And at that deposition you took the same oath that you took
 3    before testifying in front of this jury today, correct?
 4    A.  Yes, that's correct.
 5    Q.  Now do you know -- do you recall, with respect to the
 6    Loughner shooting, whether you did any Google searches for
 7    newspaper stories that covered the Loughner shooting at the
 8    time?
 9    A.  Oh, Mr. Vogt, are we still on this?
10    Q.  No, we're not.  I'm sorry.  That's my fault.  You can set
11    that down.
12    A.  Yes, I did do research on these reports related to the
13    Loughner shooting, yes.
14    Q.  Do you recall what any of those news reports were?
15    A.  Excuse me?
16    Q.  Do you recall what any of those news reports were?
17    A.  As I sit here?  No, I do not.
18    Q.  Ms. Williamson, you're being shown now what's been
19    premarked as Plaintiff's Exhibit 139.  Do you recognize this
20    document?
21    A.  Let me just take a look.
22            This is an email from Nick Fox to me.
23            MR. VOGT:  And at this point, your Honor, I would ask
24    to move Plaintiff's Exhibit 139 into evidence.
25            MR. AXELROD:  No objection.
```

**JA201**

M231PAL3                    Williamson - Direct

1          THE COURT:  Received.

2          (Plaintiff's Exhibit 139 received in evidence)

3   Q.  And there's an email at 1:23 p.m. from Nick Fox where he

4   writes, "Donnie Jr. gets right with it," and then he has in

5   quotes, "'Events today are exactly why we took issue with NY

6   elites glorifying the assassination of our president.'"  Do you

7   know what that was a reference to?

8   A.  I honestly don't.  I don't really recall.

9   Q.  Do you recall around the time of the Scalise shooting

10  whether there was some controversy involving *The New York Times*

11  in connection with a production of Shakespeare in the Park that

12  depicted Donald Trump as Julius Caesar?

13  A.  Mr. Vogt, could you repeat that.

14  Q.  Sure.  Do you remember around the time of the Scalise

15  shooting whether there was some controversy involving *The New*

16  *York Times* being a sponsor of Shakespeare in the Park and that

17  that production featured Donald Trump as Julius Caesar?

18  A.  No, I don't.

19  Q.  And do you have any idea whether that is what this

20  reference is to in this Nick Fox email at 1:23 p.m.?

21  A.  No, I don't.

22  Q.  And did you have any follow-up conversations or discussions

23  with Mr. Fox about the contents of this email?

24  A.  About this quote?

25  Q.  Yes.

1   A.  No, I don't recall a conversation about that.

2   Q.  And do you recall whether Mr. Fox ever tried to work this

3   quote into a draft of the editorial?

4   A.  I don't recall anything like that, no.

5   Q.  Ms. Williamson, you're now being shown what's been

6   premarked as Plaintiff's Exhibit 124.  Do you recognize this

7   document?

8   A.  Yes.  This is an email from Phoebe to me.

9           MR. VOGT:  At this point, your Honor, I would ask to

10  move Plaintiff's Exhibit 124 into evidence.

11          MR. AXELROD:  No objection.

12          THE COURT:  Received.

13          (Plaintiff's Exhibit 124 received in evidence)

14  Q.  And Ms. Williamson, you write in this email string at

15  1:40 p.m., "Phoebe, thanks.  Is there one that references

16  hate-type speech against Dems in the run-up to her shooting?

17  James referenced that."  Do you see that?

18  A.  Yes.

19  Q.  And when you say there "in the run-up to her shooting," who

20  are you referring to?

21  A.  That would have been to Gabby Giffords.  This was my effort

22  to try and learn what James meant in those instructions that we

23  spoke about a little bit earlier today.

24  Q.  Okay.  And at 2:21 is when Ms. Lett responds and says, "We

25  never ran an editorial on it.  Frank Rich wrote this piece on

M231PAL3                    Williamson - Direct

1    it but the board never did.  James was just wondering if there

2    had been one, he says."  Now the part that says "this piece,"

3    is that a hyperlink?

4    A.  Yes, it is.

5    Q.  And do you know whether that led to the Frank Rich piece?

6    A.  I believe it did, yes.

7    Q.  And do you recall reading the Frank Rich piece?

8    A.  Yes.

9    Q.  And Ms. Williamson, you should have up in front of you now

10   Plaintiff's Trial Exhibit 133.  Do you recognize this document?

11   A.  Yes, I do.

12            MR. VOGT:  At this point, your Honor, I would ask to

13   move Plaintiff's Exhibit 133 into evidence.

14            MR. AXELROD:  No objection, your Honor.

15            THE COURT:  Received.

16            (Plaintiff's Exhibit 133 received in evidence)

17   Q.  And is it the Frank Rich piece that we were just talking

18   about?

19   A.  Yes, I believe it is.

20   Q.  And there on this opinion page it says op-ed columnist.

21   What's the difference between an op-ed column and an editorial?

22   A.  An editorial is typically, as we did them, by the editorial

23   board, and it represents the views of the paper's ownership and

24   leadership.  And this is a columnist, so these individuals

25   write under their own names, and the pieces that they write

1    reflect their own opinions and analyses of the news.

2    Q.  And did you read through Frank Rich's piece on June 14th of

3    2017?

4    A.  Yes, I believe I did.

5    Q.  And did you incorporate anything from this piece into the

6    draft that you were working on of the editorial?

7    A.  Do you mean a quote?

8    Q.  A quote or any facts that are in it?

9    A.  No.

10   Q.  And Ms. Williamson, you should have up in front of you now

11   what's been premarked as Plaintiff's Exhibit 128.  Do you

12   recognize this email?

13   A.  This is an email from James Bennet to myself.

14          MR. VOGT:  And just at this point, your Honor, I would

15   ask to move Exhibit 128 into evidence.

16          MR. AXELROD:  No objection.

17          THE COURT:  Received.

18          (Plaintiff's Exhibit 128 received in evidence)

19   Q.  And Mr. Bennet says, at 3:03 p.m., "We dug a little

20   further.  Take a look at these two."

21   A.  Yes.

22   Q.  Now do you know, was Mr. Bennet conducting his own

23   research, to your knowledge, of any editorials or news reports

24   on June 14 of 2017?

25   A.  Again, I was in Washington and everyone else was in New

York.  But, "We dug a little further.  Take a look at these

two."  And beneath that is an email coming from Phoebe with the

links, so I don't think this is about James Bennet's research

but rather Phoebe's.

Q.  And did you actually read the two pieces that are linked in

Phoebe Lett's email at 3:01 p.m.?

A.  Yes, I did.

Q.  And you should have up now Plaintiff's Exhibit 134.  Is

this one of the two pieces that's linked in the email that we

were just looking at, Exhibit 128?

A.  To be absolutely certain, I'd have to look at the URL

again, but yes, I believe it is.

Q.  And this is an editorial; is that right?

A.  That's correct.

          MR. VOGT:  I'm not sure, your Honor -- if I didn't, I

would like to move Exhibit 134, Plaintiff's 134 into evidence.

          MR. AXELROD:  No objection.

          THE COURT:  Received.

          (Plaintiff's Exhibit 134 received in evidence)

Q.  And this piece is entitled "Bloodshed and invective in

Arizona"?

A.  Yes.

Q.  And in the second paragraph of this, it says, "Jared

Loughner, the man accused of shooting Ms. Giffords, killing a

federal judge and five other people and wounding 13 others,

1    appears to be mentally ill.  His paranoid internet ravings

2    about government mind control place him well beyond the usual

3    ideological categories."  Do you see that?

4    A.  Yes, I do.

5    Q.  Do you recall reading that particular portion of this

6    editorial about Mr. Loughner on June 14th of 2017?

7    A.  I read this editorial on that date, but as to, you know,

8    specifics, I did -- if I read the editorial, yes, I did read

9    it.

10   Q.  And do you recall -- not, obviously, written exchanges with

11   anyone, but do you recall having any conversations over the

12   phone with anyone about this particular editorial?

13   A.  A phone conversation about this editorial specifically?

14   Q.  Yes.

15   A.  Not that I recall, no.

16   Q.  And then if you turn to the second page of Exhibit 134, the

17   second full paragraph there says --

18              The first sentence of the second full paragraph there

19   says, "It's facile and mistaken to attribute this particular

20   madman's act directly to Republicans or Tea Party members."  Do

21   you see that?

22   A.  Yes.  "It is facile and mistaken to attribute this

23   particular madman's act directly to Republicans or Tea Party

24   members.  But it is legitimate to hold Republicans and

25   particularly their most virulent supporters in the media

1    responsible for the gale of anger that has produced the vast

2    majority of these threats, setting the nation on edge."

3    Q.  And do you have any specific recollection of reading that

4    passage on June 14th of 2017?

5    A.  Specific recollection?

6    Q.  Yes.

7    A.  My recollection is of reading this piece.

8    Q.  And you should have up now Plaintiff's Trial Exhibit 135 up

9    on your screen.

10   A.  Yes.

11   Q.  An editorial entitled "As we mourn"; is that correct?

12   A.  Yes.

13           MR. VOGT:  Your Honor, at this point I'd move

14   Exhibit 135 into evidence.

15           MR. AXELROD:  No objection.

16           THE COURT:  Received.

17           (Plaintiff's Exhibit 135 received in evidence)

18   Q.  And does this appear to be to you the other editorial that

19   was linked in the email from Ms. Lett that we had looked at a

20   little while ago that was Exhibit 128?

21   A.  Yes, I believe it is.

22   Q.  And do you have any recollection of reading this piece on

23   June 14 of 2017?

24   A.  Yes.

25   Q.  And do you recall having discussions with anyone about this

**JA208**

M231PAL3

1    particular piece?

2    A.   Specifically about this piece?

3    Q.   Yes.

4    A.   No.

5    Q.   Now other than the editorials and Frank Rich's piece that

6    we've looked through so far, do you recall specifically any

7    other articles or editorials that you reviewed on June 14 of

8    2017?

9    A.   *New York Times* articles.

10   Q.   Yes.

11   A.   Specifically, no.

12             THE COURT:  Counsel, how much more do you have on your

13   direct?

14             MR. VOGT:  Probably an hour.

15             THE COURT:  Okay.  Then I think maybe this would be a

16   good time to break for the day.

17             So ladies and gentlemen, we're off to a good start.  I

18   do want to ask you to, especially tomorrow morning when the

19   weather is supposed to be a little bit bad, to allow yourself

20   for sure enough time to be in the jury room by 9:30 so that we

21   can start on time and keep things going according to schedule.

22   But meantime, have a terrific evening, and we'll see you

23   tomorrow at 9:30.

24             (Jury not present)

25             THE COURT:  And you may step down.  We'll see you

**JA209**

M231PAL1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SARAH PALIN, an individual,

                    Plaintiff,

          v.                         17 CV 4853 (JSR)

THE NEW YORK TIMES COMPANY, *et
al.*,

                    Defendants.

------------------------------x        Trial

                                       New York, N.Y.

                                       February 3, 2022
                                       9:00 a.m.

Before:

                    HON. JED S. RAKOFF,

                                       District Judge


                         APPEARANCES

TURKEL CUVA BARRIOS, P.A.
     Attorneys for Plaintiff
BY:  SHANE B. VOGT
     KENNETH G. TURKEL


BALLARD SPAHR, LLP
     Attorneys for Defendants
BY:  DAVID L. AXELROD
     JACQUELYN N. SCHELL
     THOMAS BYRNE SULLIVAN
     JAY WARD BROWN



Also Present:

Dana Green, Senior Counsel, The New York Times Company

**JA210**

M231PAL3

1    tomorrow morning.

2              THE WITNESS:  Thank you, your Honor.

3              THE COURT:  Okay.  As soon as the witness is gone, I

4    want to take up a matter with counsel.

5              (Witness not present)

6              THE COURT:  Okay.  So what is the lineup for tomorrow?

7    First of all, there's an hour more on direct.  How long do you

8    think you'll be?  This is not binding, but I want a good-faith

9    estimate.  How long do you think you'll be on cross?

10             MR. AXELROD:  I think two to two and a half hours.

11             THE COURT:  All right.  So this witness will probably

12   take most of the morning.

13             MR. AXELROD:  I would think so.

14             THE COURT:  Who's after that?

15             MR. VOGT:  I think Phoebe Lett and then Ms. Lepping --

16             THE COURT:  I'm sorry?

17             MR. VOGT:  Ms. Lepping would be the second one after

18   Ms. Lett, obviously depending on the COVID situation.

19             THE COURT:  And with respect to those two people, how

20   long on direct?

21             MR. VOGT:  I think those will be relatively short.

22             THE COURT:  Meaning what?

23             MR. VOGT:  An hour; 30 minutes to an hour at the most.

24             THE COURT:  Okay.  All right.  That tells me what I

25   need to know.

1          So anything else we need to discuss before we break

2    for today?

3          MR. VOGT:  I just want to point out to the Court that

4    on Friday, those are the only witnesses we were planning on.  I

5    know you mentioned earlier you want to have a witness ready to

6    go, but I think with counsel, we agreed certain people weren't

7    going to go until after Mr. Bennet and Mr. Bennet was going to

8    be the next witness, and I hadn't planned on starting him on a

9    Friday afternoon, unless the Court wants us to.

10          THE COURT:  No.  My understanding from a note that my

11    clerk passed me was that if we wound up in that situation, you

12    would do the deposition testimony of Mr. Crawford.  Is that --

13          MR. VOGT:  Yes.  We can definitely do that.

14          THE COURT:  So I was planning on reviewing that this

15    weekend, but I'll try to do it sooner than that, at least by

16    lunch tomorrow.  Before the start of lunch you'll have my

17    rulings on that.

18          MR. AXELROD:  Your Honor, one other point.  I think

19    Mr. Vogt indicated that Linda Cohn would be called after

20    Ms. Lett, and we had planned to bring Ms. Cohn to court

21    tomorrow.  I just want to make sure that that's still in the

22    cards.

23          MR. VOGT:  That's still in the cards.  I apologize.  I

24    had forgotten about that.  I don't have my list in front of me.

25          THE COURT:  Anything else?

**JA212**

M231PAL3

1      MR. AXELROD:  Would you like us to provide a list

2 every day of the exhibits that had been admitted the prior day?

3      THE COURT:  No.  Our court reporter does that

4 automatically.  So of course you can keep your own list.  At

5 the close of the case -- and this will probably have to be done

6 before you start your summations -- the parties will need to

7 jointly prepare a thumb drive or equivalent of all the exhibits

8 that have been received in evidence that we can give to the

9 jury when they start their deliberations, because they have

10 screens in the jury room and they'll be able to put it up just

11 as we've now done here in the courtroom, rather than have to,

12 you know, go through a mass of written documents.  So it's all

13 streamlined, but we're going to need -- my law clerk will talk

14 to you then about exactly the format.

15      MR. AXELROD:  Thank you.

16      THE COURT:  Any further word on Ms. Lepping?

17      MR. AXELROD:  I think we are -- I think one of my

18 colleagues -- I think we're in the process of trying to get as

19 quick a PCR test as possible.

20      THE COURT:  Okay.

21      MR. AXELROD:  What's the current status?

22      MS. SCHELL:  I'll ask.

23      THE COURT:  All right.  Just let my law clerk know.

24      MR. AXELROD:  Okay.

25      THE COURT:  All right.  Very good.  We'll see you all

**JA213**

M231PAL3

1    tomorrow.

2                MR. AXELROD:  Thank you.

3                THE DEPUTY CLERK:  All rise.

4                (Adjourned to February 4, 2022, at 9:30 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA214**

```
1                        INDEX OF EXAMINATION

2   Examination of:                              Page

3    ELIZABETH WILLIAMSON

4   Direct By Mr. Vogt . . . . . . . . . . . . . . .77

5                        PLAINTIFF EXHIBITS

6   Exhibit No.                               Received

7    138    . . . . . . . . . . . . . . . . . . . .96

8    115    . . . . . . . . . . . . . . . . . . . .97

9    117    . . . . . . . . . . . . . . . . . . . .99

10   119    . . . . . . . . . . . . . . . . . . . 103

11   121    . . . . . . . . . . . . . . . . . . . 109

12   139    . . . . . . . . . . . . . . . . . . . 115

13   124    . . . . . . . . . . . . . . . . . . . 116

14   133    . . . . . . . . . . . . . . . . . . . 117

15   128    . . . . . . . . . . . . . . . . . . . 118

16   134    . . . . . . . . . . . . . . . . . . . 119

17   135    . . . . . . . . . . . . . . . . . . . 121

18

19

20

21

22

23

24

25
```