# No. 22-558

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

SARAH PALIN, an individual

*Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY, a New York
corporation, and JAMES BENNET, an individual

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Southern District of New York
(Case No. 1:17-cv-04853-JSR, Hon. Jed S. Rakoff)**

**JOINT APPENDIX**

**VOLUME II OF XI (Pages JA215 to JA415)**

Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: 813- 834-9191
Fax: 813-443-2193

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY 10017
Tel: 212-907-7300 Fax: 212-754-0330

*Counsel for Plaintiff-Appellant Sarah Palin*

## JOINT APPENDIX

## TABLE OF CONTENTS

**Volume II of XI**

Trial Transcript, February 4, 2022.................................................................JA215

**JA 0215**

M242Pal1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SARAH PALIN, an individual,

 4                   Plaintiff,

 5            v.                         17 CV 4853 (JSR)

 6   THE NEW YORK TIMES COMPANY, et
     al.,
 7
                     Defendants.
 8
     ------------------------------x    Trial
 9
                                        New York, N.Y.
10
                                        February 4, 2022
11                                      9:25 a.m.

12   Before:

13                     HON. JED S. RAKOFF,

14                                      District Judge

15
                            APPEARANCES
16
     TURKEL CUVA BARRIOS, P.A.
17        Attorneys for Plaintiff
     BY:  SHANE B. VOGT
18        KENNETH G. TURKEL

19
     BALLARD SPAHR, LLP
20        Attorneys for Defendants
     BY:  DAVID L. AXELROD
21        JACQUELYN N. SCHELL
          THOMAS BYRNE SULLIVAN
22        JAY WARD BROWN

23

24   Also Present:

25   Dana Green, Senior Counsel, The New York Times Company
```

 1          (Jury present)

 2          THE COURT:  So good morning, ladies and gentlemen, and

 3   thank you for your promptness.  I know there was some problems

 4   today, but everyone is here and we are ready to continue.

 5          And think of the benefit of being on jury service on a

 6   really lousy day like today, where you would otherwise be

 7   sitting at home, looking out the window, wondering whether it

 8   was going to snow, ice, or what.  Instead, you get to watch and

 9   participate in an interesting trial.

10          So we will continue.

11          Counsel.

12    ELIZABETH WILLIAMSON, resumed.

13   DIRECT EXAMINATION

14   BY MR. VOGT:

15   Q.  Good morning.

16   A.  Good morning.

17   Q.  When we finished up yesterday, we had gone through the

18   research in some of the articles that had gone back and forth.

19   During that time period, were you actually working on a draft

20   of the editorial?

21   A.  Can you refresh me, Mr. Vogt, on the time period that you

22   are referring to.

23   Q.  It would be around the 2 to 3:00 time period of June 14 of

24   2017.

25   A.  Yes, I believe I was starting to draft the article.

1   Q.  And when you would work on a draft, would you do that on

2   like a computer system, a document management system?

3   A.  Yes.

4   Q.  How would that process work?

5   A.  Yes.  At the time I was drafting in what was called Scoop,

6   which was a copy management system on my computer.

7   Q.  And was that Scoop system available to other people within

8   the editorial department?

9   A.  Yes.

10  Q.  So were those people able to go in and access or view what

11  you were working on?

12  A.  Yes, if they were inclined, sure, they could have seen the

13  document in progress.

14  Q.  And when you were in the process of drafting the editorial

15  on Scoop, could someone come in and make changes to it while

16  you had it open?

17  A.  I think they could have.  We no longer have that system,

18  but as I recall, they could have.  That would have been

19  unusual.

20  Q.  And what time do you recall complete something your draft

21  of the editorial?

22  A.  Shortly before 5:00 that day.

23  Q.  And once you did complete your draft, what did you do?

24  A.  I let the editors in New York know that it was in what's

25  called backfield, which is a kind of section of the computer

M242Pal1                    Williamson - Direct

1   editing program where you put finished drafts.
2   Q.  Ms. Williamson, you should have now up in front of you what
3   has been premarked as Plaintiff's Exhibit 143.  Do you
4   recognize this document?
5   A.  Yes, I do.
6            MR. VOGT:  At this point, your Honor, I would move to
7   introduce Plaintiff's Exhibit 143.
8            MR. AXELROD:  No objection.
9            THE COURT:  Received.
10            (Plaintiff's Exhibit 143 received in evidence)
11  BY MR. VOGT:
12  Q.  Ms. Williamson, just to follow up on your testimony a
13  moment ago, the subject line of this e-mail is "shootings in
14  backfield, thanks"?
15  A.  Yes.
16  Q.  And this is at 4:45 p.m., correct?
17  A.  Yes.
18  Q.  So at this point your draft was completed?
19  A.  That's correct.
20  Q.  And in this e-mail you say, "I'm no Frank Clines, but I did
21  my best."
22            Who is Frank Clines?
23  A.  Francis X. Clines was a member of the editorial board.
24  Q.  And did he have any area of expertise?
25  A.  Yes.  Frank covered gun policy on the board.

M242Pal1                     Williamson - Direct

1   Q.  And did Mr. Clines have any involvement in the editorial we

2   are here about?

3   A.  In drafting it?

4   Q.  Yes.

5   A.  No, he didn't.

6   Q.  And then at that point, once you completed your draft of

7   the editorial, what did you do?

8   A.  Can you be more specific, Mr. Vogt?

9   Q.  Did you do any additional work on the editorial on the day

10  of June 14 of 2017, after you submitted your draft?

11  A.  No.  I put it in backfield, and then it went to the

12  editors.

13  Q.  We are showing you what's been premarked as Plaintiff's

14  Exhibit 141.  Do you recognize this document?

15  A.  Can you please scroll down so I can see the bottom?

16  Q.  Yes.

17  A.  Okay.  Yes.

18  Q.  What is this?

19  A.  This looks like my draft.

20          MR. VOGT:  Your Honor, plaintiff would move to

21  introduce Exhibit 141.

22          MR. AXELROD:  No objection, your Honor.

23          THE COURT:  Received.

24          (Plaintiff's Exhibit 141 received in evidence)

25  BY MR. VOGT:

1   Q.  Ms. Williamson, was Plaintiff's Exhibit 141, is this your
2   completed draft of the editorial?
3   A.  Yes, it looks like it.
4   Q.  And do you see on the third paragraph, at the end of that
5   paragraph, highlighted, there is a phrase that says "need to
6   check/update"?
7   A.  Yes.
8   Q.  What is that?
9   A.  That was because this was a breaking story, and so we would
10  need to double check the casualty count.
11  Q.  And was that something common that you would use, a phrase
12  like "need to check/update," to signal to fact-checkers that
13  something needed to be checked by them?
14  A.  Yes.
15  Q.  And was that a common practice within the editorial
16  department to do something like that?
17  A.  I can't speak to how the other writers worked, but I would
18  insert a note like that in the copy to just to flag to the
19  fact-checkers that this was something we would need to check
20  again before publication.  Or if there was something I was
21  uncertain about, I would tend to put a note in the text.
22  Q.  And then the following paragraph, it starts out "that in 10
23  minutes"?
24  A.  Yes.
25  Q.  If we go to the second sentence of that one, it says "not

1   all the details are known yet, but a sickeningly familiar

2   pattern is emerging: a deranged individual with a gun --

3   perhaps multiple guns -- and scores of rounds of ammunition

4   uses politics as a pretense for a murderous shooting spree."

5   Do you see that?

6   A.  Yes.

7   Q.  That sentence refers to Mr. Hodgkinson, correct?

8   A.  That's correct, yeah, and the next sentence it refers to

9   Hodgkinson as a "Bernie Sanders supporter and campaign

10  volunteer virulently opposed to President Trump."

11  Q.  And at the end of that sentence that you just read, the

12  start of it says "who, among many anti-Trump messages, posted

13  'time to destroy Trump & Co.' on social media in March."  Do

14  you see that?

15  A.  Yes.

16  Q.  Did you actually observe that social media post on

17  Mr. Hodgkinson's account?

18  A.  I can't recall if I read the actual -- his actual social

19  media page, but at that time that was part of the information

20  that was at hand.

21  Q.  When you were drafting this editorial, did anybody else

22  insert any of the language in there, is it possible that

23  someone put in "who, among many anti-Trump messages, posted

24  'time to destroy Trump & Company'"?

25  A.  I don't recall anyone doing anything like that.  As we just

1    said, it would have been possible, but I don't think that

2    anyone did.

3    Q.  And in the first part of that I read with you, you have in

4    here, "Scores of rounds of ammunition uses politics as a

5    pretext for a murderous shooting spree."  Do you recall what

6    evidence you had that Mr. Hodgkinson had used politics as

7    pretense for a murderous shooting spree?

8    A.  That sentence refers to the one that follows, that he was a

9    Bernie Sanders supporter and "that, among many anti-Trump

10   messages, posted 'time to destroy Trump & Company' on social

11   media in March."

12   Q.  Did you consider that to be any type of direct form of

13   political rhetoric being connected to Mr. Hodgkinson?

14   A.  I don't really understand the question.  Could you clarify,

15   please?

16   Q.  Right.  Other than what was posted on his social media

17   accounts, do you know of any other political rhetoric that

18   connected Mr. Hodgkinson to the shooting in Virginia?

19   A.  I don't recall anything as I sit here today, but he was not

20   really a known quantity at the time.  He was not a well-known

21   individual.

22   Q.  During the course of the shooting in Virginia,

23   Mr. Hodgkinson was killed by Capitol police, correct?

24   A.  I think, yeah.  Sorry.  As I sit here, I am just trying to

25   remember the end of the story.  Okay.

**JA 0223**

M242Pal1                    Williamson – Direct

1   Q.  So there was no criminal case that took place after the

2   shooting of Mr. Hodgkinson?

3   A.  Not that I am aware of, no.

4   Q.  And no one interviewed him after the shooting to figure out

5   why he engaged in that act?

6   A.  That I could not tell you.

7   Q.  Are you aware of any information coming out after the time

8   that you completed your draft of the editorial on June 14 that

9   verified any of Mr. Hodgkinson's motives in the shooting?

10  A.  I think the information that came out after I completed my

11  draft was pretty much confined to the casualty count.

12  Q.  If you go to the next paragraph after the one we have been

13  look at that starts just as in 2011?

14  A.  Yes.

15  Q.  It goes on to read, "When Jared Lee Loughner opened fire in

16  the supermarket parking lot, grievously wounding Representative

17  Gabby Giffords and killing six people, including a 9-year-old

18  girl, Mr. Hodgkinson's rage was nurtured in a vile political

19  climate."

20          When you say that Mr. Hodgkinson rage was nurtured in

21  a vile political climate, what do you mean?

22  A.  I was talking about the political atmosphere and political

23  rhetoric circulating in the run-up to the shooting and the

24  demonization of political opponents by members of both parties.

25  Q.  Do you recall if there are any particular examples of that

M242Pal1                    Williamson - Direct

1   rhetoric that come to mind that you were thinking of or
2   referring to when you wrote that passage?
3   A.  Well, in the next sentence I write, "Then, it was the
4   pro-gun right being criticized; in the weeks before the
5   shooting, Sarah Palin's political action committee circulated a
6   map of targeted electoral districts."
7   Q.  And those two paragraphs that we just went through, were
8   those your effort to deal with the issue that Mr. Bennet had
9   raised earlier in the day about wanting to address the rhetoric
10  of demonization?
11  A.  Yes, the vile political rhetoric that was circulating in
12  our culture at the time.
13  Q.  The part that you just read, "Then, it was the pro-gun
14  right being criticized; in the weeks before the shooting, Sarah
15  Palin's political action committee circulated a map of targeted
16  electoral districts," do you know whether that map, was it
17  actually circulated in the weeks before the shooting?
18  A.  As I sit here today, I don't know exactly when that map was
19  circulated.  That was more than ten years ago.
20  Q.  And then the word "circulated" in your draft is blue and
21  underlined.  That's a hyperlink.  Is that correct?
22  A.  That's correct.
23  Q.  Do you recall off the top of your head where that hyperlink
24  led to?
25  A.  No, but I think you have that information.

1   Q.  Ms. Williamson, you should have up on your screen

2   Plaintiff's Exhibit 142.  Do you recognize this document?

3   A.  Yes.

4          MR. VOGT:  We move to introduce Plaintiff's Exhibit

5   142, your Honor.

6          MR. AXELROD:  No objection, your Honor.

7          THE COURT:  Received.

8          (Plaintiff's Exhibit 142 received in evidence)

9   BY MR. VOGT:

10  Q.  Ms. Williamson, is Plaintiff's Exhibit 142 the article that

11  is hyperlinked in the word "circulated" in your draft

12  editorial?

13  A.  It's a fragment of it.

14  Q.  And I think you may have up on your screen just the

15  beginning of this.  It's multiple pages.

16  A.  Yes.

17  Q.  Do you recall reading this ABC article on June 14 of 2017?

18  A.  If I put it in as a hyperlink, then I found it and read it.

19  Q.  With respect to your draft in Scoop, if someone had gone in

20  and accessed that draft and clicked on the word "circulated,"

21  would it have taken them to this ABC article?

22  A.  If they looked at my draft and clicked on the hyperlink?

23  Q.  Yes.

24  A.  Yes, it would have.

25  Q.  So, in other words, when Mr. Bennet was editing your draft,

**JA 0226**

M242Pal1                          Williamson – Direct

1    if he had clicked on "circulated" it would have taken him to

2    the ABC article.

3    A.   That's correct.

4    Q.   And if we go to the second page of this ABC article, the

5    very first line at the top says, "No connection has been made

6    between this graphic and the Arizona shooting."  Do you see

7    that?

8    A.   Yes.

9    Q.   Do you recall reading that on June 14 of 2017?

10   A.   Yes, I read that, and then I read the following paragraph.

11   "However, following the initial controversy over the crosshairs

12   last year, Palin issued her now oft repeated rallying cry,

13   "Don't retreat.  Reload."

14   Q.   If you go down a little bit, it says "Sarah Palin in

15   crosshairs of Tucson massacre debate"?

16   A.   Um-hmm.

17   Q.   That reference there is to Sarah Palin, not her political

18   action committee, correct?

19             MR. AXELROD:  Objection to form.  Objection, your

20   Honor.

21             THE COURT:  Sustained.

22   BY MR. VOGT:

23   Q.   Ms. Williamson, in the paragraph beneath that, it says,

24   "Anyone who has seen Sarah Palin's Alaska on the TLC channel."

25   Do you see that one?

1   A.  Yes.

2   Q.  All right.  And that references Governor Palin's deep

3   connection and love of hunting, and it says, "She repeated the

4   'reload' phrase on that show.  Language surrounding gun use and

5   hunting is something she uses often, and often with no

6   political overtones."  Do you recall reading that?

7   A.  Not specifically.  I was writing about the map and not

8   Sarah Palin.  I was writing about her political action

9   committee's map.

10  Q.  If you continue down a couple of paragraphs, it says "this

11  statement received."  Do you see that paragraph that starts

12  there?

13  A.  Yes.

14  Q.  And the second sentence there says, "Many criticized any

15  links being made between the media between the Arizona shooting

16  and Palin, particularly since some accounts from Arizona note

17  that accused gunman Jared Loughner was involved at some point

18  with liberal politics and his MySpace profile listed the

19  *Communist Manifesto* as one of his favorite books."  Do you

20  recall reading that?

21  A.  I read the article.  Not specifically.  So it was in the

22  article which I read.

23  Q.  And one of the things I think you mentioned earlier in your

24  testimony was that, in terms of the overall political rhetoric,

25  I think you said it was on both sides at that time, is that

**JA 0228**

M242Pal1                    Williamson - Direct

1   correct?

2   A.  As I said in the original piece, in the run-up to the 2011

3   shooting, it was the right that was being criticized; just as

4   in the run-up to the 2017 shooting, Mr. Hodgkinson's anti-Trump

5   comments were what he had been circulating.

6   Q.  If you go down --

7   A.  So that's the right and left, just to clarify for you.

8   Q.  So with respect, though, to the Loughner shooting, it's

9   your understanding that there was no heated rhetoric on the

10  left in the run-up to the Loughner shooting?

11  A.  I found the map as kind of an Exhibit A of what was

12  happening in the run-up to the 2011 shooting in Arizona, and I

13  used that political action committee's map as an example of

14  that overheated rhetoric.

15  Q.  And if you continue down on this page we are looking at,

16  there is a paragraph near the bottom that starts with "another

17  statement."

18  A.  Sorry.  You are scrolling.  Okay.

19  Q.  "Another statement being retweeted by conservatives is this

20  one, noting that even President Obama has used the language of

21  armed conflict in politics.  The instigator for the AZ

22  massacre, Obama:  'if they bring a knife to the fight, we bring

23  a gun.'"  Do you see that?

24  A.  Yes, I do.

25  Q.  And you doesn't make reference to that in your draft of the

**JA 0229**

M242Pal1                    Williamson - Direct

1   editorial, did you?

2   A.  No, I did not.

3   Q.  And, Mr. Loughner did bring a gun when he went and shot

4   those people at Representative Giffords's rally, didn't he?

5   A.  Yes, he did.

6   Q.  And you don't recall seeing any information on June 14 of

7   2017 that indicated that there was a direct and clear link

8   between the map circulated by Sarah Palin's political action

9   committee and Loughner's shooting, correct?

10  A.  I'm sorry.  Can you repeat the question, Mr. Vogt.

11  Q.  Sure.  You don't recall seeing any information on June 14

12  of 2017 that indicated there was a direct and clear link

13  between the map circulated by Sarah Palin's political action

14  committee and Loughner's shooting, correct?

15  A.  That was not a target of my research that day.  As I said

16  yesterday, I was researching the political rhetoric that was

17  circulating in the run-up to the shooting in 2011.

18  Q.  I understand it may not have been the target of your

19  research, but you don't recall seeing anything that supported

20  the existence of a direct and clear link between the map and

21  the Loughner shooting, do you?

22             MR. AXELROD:  Objection.

23             THE COURT:  Sustained.

24  BY MR. VOGT:

25  Q.  Ms. Williamson, you should have up in front of you now what

M242Pal1                    Williamson - Direct

1   we have premarked as Plaintiff's Exhibit 140E.  Do you

2   recognize this document?

3   A.   This looks like a fragment of the draft.  I am just judging

4   from the time stamp.

5   Q.   I think we have it zoomed in for you.  If you could zoom it

6   out.

7   A.   Okay.  I see the exhibit number on the bottom.  Okay.

8   Thank you.

9           MR. VOGT:  And if you go to the last page of this

10  exhibit.

11          And your Honor, at this point plaintiff would move to

12  introduce Exhibit 140E.

13          MR. AXELROD:  I'm not sure there is a proper

14  foundation for the admission of this exhibit with this witness.

15          THE COURT:  Do you want to lay a foundation or attempt

16  to lay a foundation?

17          MR. VOGT:  I can, your Honor.

18  BY MR. VOGT:

19  Q.   Ms. Williamson, we had looked a moment ago at a draft that

20  you had completed in Scoop of the editorial.  Do you recall

21  that?

22  A.   Yes.

23  Q.   And that draft that you completed was at approximately 4:44

24  p.m.?

25  A.   Yes.

M242Pal1                    Williamson - Direct

1   Q.   And you put that draft in something known as backfield,

2   correct?

3   A.   Yes, I did.

4   Q.   And on Exhibit 140E, do you see that on there there is your

5   name, then the word "backfield" and then a time stamp of 4:44

6   p.m.?

7   A.   Yes.

8   Q.   To your knowledge is this an accurate representation of the

9   content of Scoop at or around the time you finished your

10  initial draft of the editorial at 4:44 p.m.?

11  A.   From what I can see of it, yes, it is.  What follows that

12  time stamp would be my draft.

13  Q.   Okay.

14          MR. VOGT:  Your Honor, at this point I would move to

15  introduce Exhibit 140E.

16          MR. AXELROD:  So the difficulty here, your Honor, is

17  141, which was previously admitted, captures Ms. Williamson's

18  draft.  The information after Ms. Williamson's draft are edits

19  by Linda Cohn, as indicated in this exhibit, and I don't think

20  the foundation has been laid for the admission of those pieces

21  because I'm not sure Ms. Williamson has ever seen those pieces.

22          THE COURT:  Well, let's find out.

23          When for the first time did you see this exhibit?

24          THE WITNESS:  This -- the 6:32, the one time stamped

25  6:32?

M242Pal1                    JA 0232    Williamson – Direct

```
 1              THE COURT:  So you saw it at the time of the events?
 2              THE WITNESS:  Actually, no.  I submitted my draft at
 3      4:45, and I didn't go in and read --
 4              THE COURT:  And so after you submitted your draft, did
 5      you look at any responses you got or any further information
 6      that was added by others or anything like that?
 7              THE WITNESS:  In the computer system, your Honor?
 8              THE COURT:  Yes.
 9              THE WITNESS:  No, I did not.
10              THE COURT:  Okay.
11              THE WITNESS:  I received e-mails.
12              THE COURT:  Sustained.
13      BY MR. VOGT:
14      Q.  Let's go to those e-mails now, some of those, if we could.
15              Ms. Williamson, you should have up in front of you
16      Plaintiff's Exhibit 147.
17      A.  Yes.
18      Q.  Do you recognize this document?
19      A.  This is an e-mail from me to Nick Fox.
20              MR. VOGT:  At this time, your Honor, I move to
21      introduce Plaintiff's Exhibit 147.
22              MR. AXELROD:  No objection, your Honor.
23              THE COURT:  Received.
24              (Plaintiff's Exhibit 147 received in evidence)
25      BY MR. VOGT:
```

**JA 0233**

M242Pal1                        Williamson - Direct

1   Q.  Ms. Williamson, if you look at the beginning e-mail in this

2   string, it is from Mr. Fox as 5:59 p.m.?

3   A.  Yes.

4   Q.  And he says in there, he begins with, "I know James is

5   editing."  Do you see that?

6   A.  Yes, I do.

7   Q.  And then he's got some language, I think, there that is

8   text from your draft of the editorial with some bolded text

9   added.

10  A.  Yes.

11  Q.  Now, is this the way the text would have looked in Scoop if

12  he were making changes to your draft of the editorial?

13  A.  Well, this is his e-mail, so what he was doing was

14  representing the text.  So he wasn't taking it directly from

15  Scoop, if that's what you mean.

16  Q.  Yeah, that's what I was trying to clarify with this is did

17  he just copy it?

18  A.  Yes, he was showing me some edits that he was suggesting.

19  He was e-mailing me those edits that he was suggesting.

20  Q.  And if you look at the one big paragraph there, the bolded

21  text that he has some of it with all caps, is that the edit

22  that he was suggesting?

23  A.  Yes, it looks like it.

24  Q.  And there is a reference there to a tweet again by Donald

25  Trump, Jr., referring to a production of Julius Caesar in which

1   the murdered tyrant resembles the president.  Do you see that?

2   A.  Yes.

3   Q.  Does that refresh your recollection at all as to whether or

4   not there was anything going on around the time of this

5   editorial that involved this Julius Caesar production?

6   A.  I mean, I am reading it, but I didn't, when you asked me,

7   recall that event, no.

8   Q.  Did you ever ask Mr. Fox what he was referring to with

9   respect to this Julius Caesar reference?

10  A.  I don't recall that I did, no.

11  Q.  Did you -- I know we had looked a moment ago at your draft

12  of the editorial because there was a social media post that

13  Mr. Hodgkinson said about "time to destroy Trump & Co."  Do you

14  recall that?

15  A.  Yes.

16  Q.  Did you make any connection between that post by

17  Mr. Hodgkinson and the fact that there was information out

18  there according to Mr. Fox about a production of Julius Caesar

19  in which the murdered tyrant resembles the president?

20          MR. AXELROD:  Objection.

21          THE COURT:  Well, as stated, sustained.

22  BY MR. VOGT:

23  Q.  In your mind, would a production of Julius Caesar in which

24  the murdered tyrant resembles the president, would that be a

25  form of rhetoric that might be relevant to the Hodgkinson

M242Pal1                    Williamson - Direct

1   shooting?

2              MR. AXELROD:  Objection.

3              THE COURT:  Sustained.  I don't think you are really

4   going to be able to cross the rubicon on this particular line

5   of questioning.

6              MR. VOGT:  I understand, your Honor.

7   BY MR. VOGT:

8   Q.  And if you scroll up on this e-mail --

9   A.  Yes.

10  Q.  -- there is an e-mail from you at 6:16 p.m.

11  A.  Um-hmm.

12  Q.  You say, "All this is fine.  Can you get in and make the

13  changes?  I am driving and will be back on Scoop in half an

14  hour."

15  A.  Yes.

16  Q.  Did you ever go back in Scoop?

17  A.  Not that I recall, no.

18  Q.  You should have up in front of you now Plaintiff's Exhibit

19  148.  Do you recognize this document?

20  A.  Yes.

21              MR. VOGT:  At this point, your Honor, I would move to

22  introduce Plaintiff's Exhibit 148.

23              MR. AXELROD:  No objection, your Honor.

24              THE COURT:  Received.

25              (Plaintiff's Exhibit 148 received in evidence)

**JA 0236**

M242Pal1                    Williamson - Direct

1    BY MR. VOGT:

2    Q.  Ms. Williamson, this is an e-mail to you as well as

3    Mr. Bennet, copied to Mr. Fox and Ms. Cohn at 7:33 from Eileen

4    Lepping.  I don't know if we have talked about her before, but

5    who is Eileen Lepping?

6    A.  Eileen Lepping was a fact-checker --

7    Q.  And --

8    A.  -- based in New York.

9    Q.  I'm sorry.  I didn't mean to cut you off.

10   A.  That's okay.

11   Q.  The subject is "Guns in Virginia," then she's got some

12   information there with links.  Was this the information -- when

13   we first looked at the draft, I brought up that note about

14   "need to check."  Was this Ms. Lepping following up on that

15   note in your draft?

16   A.  It looks like this was a different fact-checking point that

17   she was looking into.

18   Q.  Okay.

19   A.  Yeah.

20   Q.  Do you recall anything in particular about the information

21   that Ms. Lepping was providing in this e-mail in terms of why

22   that information was being provided?

23   A.  Just judging from the contents of this e-mail, where she is

24   saying, "In Virginia, if you are a licensed firearms dealer,

25   you need to provide a background check.  Registration is not

**JA 0237**

M242Pal1                         Williamson - Direct

1   required."  It looks like -- this is an example of what Eileen

2   often did.  She is a thorough fact-checker, and what she did

3   was come up with references that would -- that are part of her

4   process of checking whether this individual used a legal --

5   legally purchased and registered weapon.  That's what it looks

6   like to me.

7   Q.  Okay.  And are you familiar with any of the sources within

8   this e-mail?  In particular, there is a site there for

9   smartgunlaws.org.

10  A.  No.  Personally, I'm not familiar with these sites.

11  Q.  Ms. Williamson, you should have up in front of you now

12  Plaintiff's Exhibit 163.  Do you recognize this document?

13  A.  Yes, I do.

14  Q.  And what is it?

15  A.  This is an e-mail from James Bennet to myself.

16          MR. VOGT:  And, your Honor, at this point we would

17  move to introduce Plaintiff's Exhibit 163.

18          MR. AXELROD:  No objection, your Honor.

19          THE COURT:  Received.

20          (Plaintiff's Exhibit 163 received in evidence)

21  BY MR. VOGT:

22  Q.  Ms. Williamson, if you start at the bottom of this e-mail

23  string at 7:22 p.m., there is an e-mail from Mr. Bennet.  It

24  starts with "I really reworked this one."

25  A.  Yes.

M242Pal1                    **JA 0238**        Williamson - Direct

1   Q.  Mr. Bennet rewrote your editorial, the draft that you had

2   done, correct?

3   A.  That's correct.

4   Q.  And after he sent you this e-mail at 7:22 p.m., you respond

5   at 7:29.  Do you see that?

6   A.  Yes.

7   Q.  And at that point in time were you -- I know in your prior

8   e-mail you mentioned you were in a car.  Were you going home at

9   that time?

10  A.  I don't recall physically where I was when I read this.

11  Q.  And you say in your 7:29 p.m. e-mail, "No worries.  The

12  lede does a much better job of conveying how incredibly awful

13  this was."  What's the lede?

14  A.  The lede is the first paragraph of a piece, of an article.

15  Q.  And then you continue, "which is what I was trying to do as

16  well.  And I could tell from your messages that you were keen

17  to take this on!"

18  A.  Yes.

19  Q.  And when you say that you could tell that Mr. Bennet was

20  keen to take this on, what did you mean?

21  A.  I could tell he was keen to take it on because he had

22  e-mailed me earlier in the day and asked me to look into the

23  political rhetoric that had been circulating.  So he took an

24  interest in the piece.

25  Q.  In this e-mail string you have with Mr. Bennet, he never

**JA 0239**

M242Pal1                    Williamson - Direct

1  asks you specifically to fact-check anything in the draft that

2  he changed, does he?

3  A.  No.

4  Q.  You should have up in front of you now Plaintiff's Exhibit

5  186, and do you recognize this document?

6  A.  Yes, I do.  I always wait for you to blow them up so I

7  don't have to put my glasses on.  Yes.  It is from me to Jesse

8  at the top.

9           MR. VOGT:  And at this point, your Honor I would move

10  to introduce Plaintiff's Exhibit 186.

11           MR. AXELROD:  No objection, your Honor.

12           THE COURT:  Received.

13           (Plaintiff's Exhibit 186 received in evidence)

14  BY MR. VOGT:

15  Q.  Who is Jesse Wegman?

16  A.  He was a colleague on the editorial board.

17  Q.  He was a board member also?

18  A.  Yes, he was.

19  Q.  And did Jesse have any particular area of expertise?

20  A.  Yes.  He covered the courts.

21  Q.  And do you know whether Jesse Wegman covered the Loughner

22  shooting?

23  A.  I don't know.

24  Q.  Do you know whether he covered any of the subsequent court

25  proceedings involving Jared Loughner?

1    A.  I don't know.

2    Q.  He e-mails you at 9:32 and says, "That was a superb

3    piece -- perfectly tuned."  Do you see that string?

4    A.  Yes.

5    Q.  Now, by that time, 9:32, had you gone back through and

6    reviewed the edits that Mr. Bennet had made?

7    A.  I had skimmed what he sent me but not read it in any

8    meaningful way, no.

9    Q.  And when you say you skimmed it, where did you access it?

10   A.  I believe James e-mailed it to me.

11   Q.  He e-mailed you a full copy of the editorial?

12   A.  I think you would have to look at the e-mails, but I

13   believe that's what happened as I sit here.

14   Q.  The one that we had looked at a moment ago, Plaintiff's

15   Exhibit 163, didn't have any attachments, if we can go back to

16   that one.  You would agree there are no attachments on that

17   e-mail, correct?

18   A.  I don't see one on this copy, no.

19   Q.  And there are no links to it either, to the draft --

20   A.  I don't see one on this copy, no.

21   Q.  Is it possible you went into Scoop to skim the editorial

22   after Mr. Bennet completed his revisions?

23   A.  I suppose it would be possible, but I don't recall doing

24   that.

25   Q.  And if that had happened, if Mr. Bennet had actually sent

M242Pal1                    Williamson - Direct

1  you a copy of the draft, you would have sent that to us,

2  correct?  You would have given us a copy of that?

3  A.  I saved and sent everything that had to do with this event,

4  yes.

5  Q.  Oh, but it's possible someone else sent it to you as well,

6  though.  I think Ms. Cohn might have sent you a copy in another

7  e-mail.

8  A.  Yes, she did.

9  Q.  Okay.  So, going back now -- sorry, I got sidetracked there

10 a little bit -- to Exhibit 186.  This is your e-mail string

11 with Mr. Wegman.

12 A.  Um-hmm.

13 Q.  You said, "Thanks, Jesse, but I have to say that was mostly

14 a James production."

15 A.  Yes.

16 Q.  "I supplied the skeleton and the riffs.  The goal was

17 shared to communicate the horror of the morning and the fact

18 that, until the culture changes, we can all expect this."  And

19 you say, "But he was super keen to take it on and he did a

20 great job."  Is that correct?

21 A.  That's correct.  That's what this says.

22 Q.  You should have now up in front of you Plaintiff's Exhibit

23 151?

24 A.  Yes.

25 Q.  Do you recognize this document?

1   A.  This is an e-mail from me to Eileen Lepping.

2            MR. VOGT:  At this point, your Honor, plaintiff would

3   move to introduce Plaintiff's Exhibit 151.

4            MR. AXELROD:  No objection.

5            THE COURT:  Received.

6            (Plaintiff's Exhibit 151 received in evidence)

7   BY MR. VOGT:

8   Q.  Ms. Williamson, at the bottom of this e-mail string it

9   starts with an e-mail from Ms. Lepping at 7:34 p.m. where she

10  says, "we wrote about Palin's crosshairs in March of 2020"?

11  A.  March of 2010.

12  Q.  2010, I'm sorry.  "So perhaps we should say in the months

13  before or leading up to the 2010 election or something?"

14  A.  Yes.

15  Q.  A little while back today I talked about in your draft it

16  said in the weeks before.  Do you recall that?  So this is

17  Ms. Lepping's following up, checking facts in that portion of

18  your draft, is that right?

19  A.  That's correct, yes.  She has found a reference to the map

20  and so she is suggesting a change based on her fact-checking,

21  yes.

22  Q.  And this editorial, at least, that's dated -- that she has

23  hyperlinked here is dated March 27 of 2010, correct?

24  A.  Yes, it looks like it.

25  Q.  So from that we can gather that the map that's referenced

M242Pal1                    Williamson - Direct

1  was out by at least that date, right?

2  A.  That's correct.

3  Q.  And the Loughner shooting occurred in January of 2011?

4  A.  Yes.

5  Q.  That would be approximately nine months between the time

6  that the map was out and the Loughner shooting occurred?

7  A.  March of 2010?  Yeah.

8  Q.  And do you recall Ms. Lepping sending you any other

9  information like this e-mail that we are looking at that had to

10  do with the Loughner shooting other than this one dealing with

11  the time period of the publication of the map?

12  A.  As I sit here, I can't recall.

13  Q.  And eventually the editorial "America's Lethal Politics"

14  was posted on line on the night of June 14 of 2017, correct?

15  A.  Correct.

16  Q.  Did you have any involvement in creating the title for that

17  piece?

18  A.  In my recollection, no.

19  Q.  Do you know who did?

20  A.  I do not.

21  Q.  And were you involved in the actual publication, I mean

22  actually pushing the button that put the editorial on line?

23  A.  No, I was not.

24  Q.  And other than the e-mail that we had looked at a little

25  while ago that you had with Mr. Bennet, do you recall having

M242Pal1                    Williamson - Direct

1  any other conversations with him on the phone, from the time

2  that you finished your draft of the editorial to the time that

3  it was published?

4  A.  On the phone, no, I don't.

5  Q.  Is it also your understanding that the editorial was

6  published in the print edition of *The New York Times* the

7  following day, which would be June 15?

8  A.  Yes, that would be correct.

9  Q.  And do you recall whether or not you looked at the

10  editorial the next day, the print edition?

11  A.  In the print edition, no.

12  Q.  You should have now up on your screen Plaintiff's Trial

13  Exhibit 194.  Do you recognize this document?

14  A.  Yes.

15  Q.  What is it?

16  A.  This is an e-mail chain between Jesse Wegman and myself.

17          MR. VOGT:  Your Honor, at this point plaintiffs move

18  to introduce Plaintiff's Exhibit 194.

19          MR. AXELROD:  No objection.

20          THE COURT:  Received.

21          (Plaintiff's Exhibit 194 received in evidence)

22  BY MR. VOGT:

23  Q.  And if we go through this e-mail string and start on the

24  second page at the bottom, Mr. Wegman e-mails at 10:48 p.m. on

25  June 14 of 2017.  Do you see that one?

M242Pal1                    Williamson - Direct

1   A.  Yes, I do.

2   Q.  He says, "The gun-rights brigade is having a seizure over

3   the Giffords-Loughner-Palin link."

4   A.  Yes.

5   Q.  Do you know what he was talking about?

6   A.  I did not read this at the time it came in.  I had already

7   gone to bed, I think.

8   Q.  If you look up above that, there is an e-mail from you at

9   11:08 p.m.

10  A.  Ah.  Okay.

11  Q.  I think "I went to bed" is on the next page.

12  A.  Oh, all right.  I couldn't recall.  Sorry.

13  Q.  It's okay.

14          So but you responded, "Ha, like doing Israel-Palestine

15  or Armenia-Turkey."

16  A.  Yes.

17  Q.  But going back to that first e-mail, did you have any idea

18  or do you have any recollection of what Mr. Wegman was talking

19  about when he said the "gun-rights brigade is having a seizure

20  over the Gifford-Loughner-Palin link"?

21  A.  In my understanding of it at the time, which is why I

22  referenced the other issues, that any gun policy article tends

23  to generate a lot of opinionating and controversy.

24  Q.  You said gun policy article, but the specific reference

25  that Mr. Wegman makes is to the Giffords-Loughner-Palin link,

1    correct?

2    A.   Yes.

3    Q.   And then if you go up --

4    A.   Sorry, just to add, and in my reference, you can tell I am

5    sort of taking it as a gun policy point that he is making

6    because I say "on gun stuff first thought is 'Where's Frank

7    today,'" meaning Frank Clines who usually handed gun policy.

8    Q.   At 11:11, just above that, Mr. Wegman asked did James add

9    that line about Giffords and Palin?

10   A.   Yes.

11   Q.   Did you know what he was referring to when he said Giffords

12   and Palin?

13   A.   He was referring to the map insofar as I knew because that

14   was what was in my draft.

15   Q.   And then if we go to the bottom of the first page, at 11:15

16   p.m., you respond, "No, I had a version of that in my draft"?

17   A.   Yes.

18   Q.   Is that what you just referenced in your testimony?

19   A.   Yes.

20   Q.   And then I think this goes back to your going to bed

21   comment, but at 7:18 a.m. --

22   A.   Ah, yes.

23   Q.   You say, "Hi.  I went to bed after our exchange but have

24   notes this morning that JB would like to check what the truth

25   is here."  Do you see that?

M242Pal1                    Williamson - Direct

1   A.  Yes.

2   Q.  And JB, obviously, is James Bennet?

3   A.  That's correct.

4   Q.  And then you ask, "What in your view would be the most

5   reliable assessment of the politics link (or not) in the

6   Loughner case?"

7   A.  Yes.

8   Q.  "Am thinking court records/assessment of his state of

9   mind."

10          Do you recall what prompted you to reach out to

11  Mr. Wegman at 7:18 a.m. about checking on what the truth is

12  here and an assessment of the politics link?

13  A.  Yes.  As I say here in the e-mail, "I have notes this

14  morning that JB would like to check what the truth is here."

15  So that's why I was asking.

16  Q.  With respect to those notes you should have up in front of

17  you now Plaintiff's Trial Exhibit 188.  Do you recognize this

18  document?

19  A.  Yes, I do.

20  Q.  And what is it?

21  A.  It is a copy of a text exchange that I had -- text message

22  exchange that I had with James Bennet.

23          MR. VOGT:  And at this point, your Honor, plaintiff

24  would move to introduce Plaintiff's Exhibit 188.

25          MR. AXELROD:  No objection.

1              THE COURT:  Received.

2              (Plaintiff's Exhibit 188 received in evidence)

3    BY MR. VOGT:

4    Q.  Now, do you recall why you were forwarding yourself or

5    e-mailing yourself this text exchange you had with Mr. Bennet?

6    A.  No, I really don't.  I tried to remember why I did -- why I

7    have done that, but I don't know.

8    Q.  And if you look at the sent line on this, it is June 16 of

9    2017?

10   A.  Yes.

11   Q.  At 9:25 a.m.?

12   A.  Uh-huh.

13   Q.  So that's two days after the editorial was published,

14   correct?

15   A.  Yes.

16   Q.  And you don't recall whether anything was happening on June

17   16 that would have prompted you to e-mail this text exchange to

18   yourself?

19   A.  No, I don't think so, because by that time the correction

20   had already run.

21   Q.  And in this text exchange, there is a portion that says,

22   "Now, what I need from you/Eileen soonest is a rock-solid

23   version of what we should say -- that an investigation showed

24   NO link to incitement or no direct link or no clear link.  I

25   don't want to soften it if we don't need to.  If there was no

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   link, we should say so."  Do you see that?

2   A.  Yes.

3   Q.  Now, do you recall having any -- let me ask you this, I.

4   Apologize.  Do you recall when this text exchange occurred

5   originally?

6   A.  You have it, so you would know the exact timing, but it was

7   that morning of the 15th.

8   Q.  You should have up in front of you now what has been

9   premarked as Plaintiff's Exhibit 190.  Do you recognize that

10  document?

11  A.  Yes, I do.

12  Q.  Is that the text exchange that we were just talking about?

13  A.  It is a screenshot of a fragment of it, yes.

14          MR. VOGT:  At this point, your Honor, plaintiff would

15  move to introduce Trial Exhibit 190.

16          MR. AXELROD:  No objection.

17          THE COURT:  Received.

18          (Plaintiff's Exhibit 190 received in evidence)

19  BY MR. VOGT:

20  Q.  And just to sort of button up the timeline that we are

21  talking about, but at the top of Exhibit 190, which is just a

22  screenshot of a text exchange, it starts out at June 15 at 8:26

23  a.m.  Do you see that?

24  A.  Yes.

25  Q.  And then it is cut off at the bottom, but the part of the

**JA 0250**

```
 1   text exchange that you e-mailed yourself is within that bottom

 2   bubble on the right.  Do you see that?

 3   A.  Yes.

 4   Q.  So that exchange originally occurred on the morning of June

 5   15 at 8:26 a.m.?

 6   A.  That's correct.

 7   Q.  And it starts off at 8:26 a.m., you say, "Do you have time

 8   to talk by phone this morning?"  That's you, right?  You texted

 9   that?

10   A.  Yes, that's right.

11   Q.  Do you recall having a phone conversation with Mr. Bennet

12   on the morning of June 15 of 2017?

13   A.  Yes, I do.

14   Q.  Do you recall what you discussed?

15   A.  We discussed needing to get to the bottom of this and

16   discover what was the truthful thing to say, the correct thing

17   to say, and to do a correction, which is what he is saying

18   here.

19   Q.  Let me show you another document, 191.

20          You should have Plaintiff's Exhibit 191 up in front of

21   you now.

22   A.  I don't see the number, but I will take your word for it.

23          (Continued on next page)

24

25
```

1  BY MR. VOGT:

2  A.   Oh, there it is.

3  Q.   We zoomed in --

4  A.   Okay.  Thank you.

5  Q.   -- so you don't have to put your glasses on.

6  A.   Yes.  Thank you.

7  Q.   Do you recognize this email exchange?

8  A.   Yes.

9            MR. VOGT:  At this point, your Honor, plaintiff would

10  move to introduce Exhibit 191.

11            MR. AXELROD:  No objection.

12            THE COURT:  Received.

13            (Plaintiff's Exhibit 191 received in evidence)

14  Q.   Ms. Williamson, this is an email exchange on June 15th of

15  2017 between you, Mr. Bennet, and Eileen Lepping; is that

16  right?

17  A.   Yes.

18  Q.   And do you see it begins on the bottom of the page with an

19  email from Mr. Bennet at 5:08 a.m.?

20  A.   Yes.

21  Q.   And do you recall receiving this email?

22  A.   Yes.

23  Q.   And it says in here, "Hey, guys, we're taking a lot of

24  criticism for saying that the attack on Giffords was in any way

25  connected to incitement.  The claim is that this was fully

1    investigated and debunked in the months after the attack and

2    the shooter was found to have acted only because of his

3    personal demons."

4          Now during your telephone conversation with Mr. Bennet

5    that morning, did he discuss that portion of this email that I

6    just read at all with you?

7    A.  The general topic.  I mean, I don't recall verbatim the

8    conversation five years ago, but yes, this is the subject of

9    that conversation, as you could see from the follow-up text

10   messages.

11   Q.  And did he at any point in time on that call tell you where

12   the source of the claim was that this was fully investigated

13   and debunked in the months after the attack?

14   A.  I'm sorry.  Could you repeat that once more.

15   Q.  Yeah.  Did Mr. Bennet, during your call, ever tell you

16   where the source of the information was for this statement in

17   here that he has that the claim is that this was fully

18   investigated and debunked in the months after the attack?

19   A.  I don't recall if he cited a specific source for that, but

20   this was what he was pointing out as his understanding of the

21   nature of the criticism.

22   Q.  And then it continues, and there's a portion that says, "In

23   any case, I'd like to get to the bottom of this as quickly as

24   possible this morning and correct the piece if needed."  Do you

25   see that?

1   A.   Yes.

2   Q.   So it's your understanding, at least by 5:08 a.m. on

3   June 15th of 2017, that Mr. Bennet had not decided to correct

4   this editorial yet; is that true?

5   A.   It's my understanding that he wanted us to learn as swiftly

6   as possible what the facts were and to correct the piece.

7   Q.   But you'd agree that at least in this email, what he

8   communicates to you is that by saying "correct the piece if

9   needed," a decision to correct had not been formally made yet,

10  by 5:08 a.m., correct?

11  A.   What he's communicating to me is that it was important to

12  get to the bottom of this and to make the appropriate

13  correction.

14  Q.   And then he says, "Can you please put your two -- your

15  heads together on this first thing this morning.  Please skip

16  the morning meeting if necessary."

17  A.   Yes.

18  Q.   Did you skip the morning meeting?

19  A.   Yes, I did.

20  Q.   And did Ms. Lepping skip the morning meeting?

21  A.   She's in New York, but I believe she probably did, but I

22  think she testifies later, so --

23  Q.   And what did you do after receiving this email from

24  Mr. Bennet?

25  A.   I began to do exactly what he asked us to do, to try and

1   get to the bottom of this, with Eileen and myself, and that's

2   what that reference, the email to Jesse Wegman, was about as

3   well.

4   Q.  And did you in fact look into whether the claim had been

5   fully investigated and debunked?

6   A.  I was more focused on -- there was an error in the map,

7   which was a sentence that I wrote, so I went to try and figure

8   out what correction needed to be made on that front, and we did

9   get underway, as you saw from the message that I sent to Jesse,

10  trying to find some objective way to determine what we needed

11  to say here and what the truth of the matter was.

12  Q.  So you mentioned the error with respect to the map.

13  A.  Mm-hmm.

14  Q.  That particular error, the way the piece was written, it

15  said that there, the crosshairs were put over individual

16  lawmakers rather than their districts; is that right?

17  A.  Yes.

18  Q.  And then -- so I think what you were just telling us a

19  moment ago is, your research focused on that issue; is that

20  right?

21  A.  Not necessarily.  I began to -- as you saw from the

22  exchange with Jesse, I began to look into how could we find an

23  objective source for what actually happened in regards to this

24  link.  It was the first time I was researching it, so I was

25  trying to learn, you know, what had actually happened and to

1    try and find an objective source for that information.

2    Q.  And you said it was the first time you were researching it,

3    so you did not research a link on June 14th of 2017?

4    A.  On June 14th -- and I think this is an important

5    distinction.  On June 14th, I was researching the political

6    rhetoric that was circulating in our discourse in the run-up to

7    the 2011 shooting in Arizona.  James asked me, on the morning

8    of the 15th, after it was clear that people had misunderstood

9    the intent of the editorial, that I look into the shooting

10   itself and try and determine what we could say and find an

11   objective and factual source of information that would point to

12   the state of mind of the gunman.

13   Q.  And I think you had mentioned in that context

14   Mr. Wegman's -- your emails with Mr. Wegman earlier.  Do you

15   recall actually going out and looking into court records or

16   mental assessments for Mr. Loughner?

17   A.  No.  It was one idea that I had that perhaps there had been

18   maybe an interview with a psychologist or something like that

19   that would establish that baseline fact.

20   Q.  But you didn't actually do that, like --

21   A.  No.

22   Q.  -- go to those sources.

23   A.  No.

24   Q.  Why not?

25   A.  In New York, they began researching that issue, and they

M241PAL2                    Williamson - Direct

1    found, as I understand, other sources for that information.

2    Q.  And do you know what those sources were?

3    A.  I do not know specifically what the sources were.

4    Q.  Do you know what they concluded based on those sources?

5    A.  Yes, you can read that in the correction.

6    Q.  And that would be that there was no link between the map

7    and the Loughner shooting, correct?

8    A.  That is why the correction was made.  Though it's not the

9    map, actually.  It was the -- the incitement issue, the word

10   "incitement," which is what caused people to misunderstand the

11   intent of the editorial.  So they made a correction to that.

12   Q.  Now we've gone through that email string with Mr. Wegman.

13   There's another portion of that.

14         You should have Plaintiff's Exhibit 204 up in front of

15   you now.  Do you recognize that document?

16   A.  Yes.

17   Q.  And this is an email string between you and Mr. Wegman on

18   June 15th of 2017; is that right?

19   A.  Yes.

20         MR. VOGT:  Your Honor, we would move to introduce

21   Plaintiff's Exhibit 204.

22         MR. AXELROD:  No objection.

23         THE COURT:  Received.

24         (Plaintiff's Exhibit 204 received in evidence)

25   Q.  And if we go to the second page of this exhibit, it starts

M241PAL2                    Williamson - Direct

1   with an email string, at 10:43 a.m --

2   A.   Yes.

3   Q.   -- from you; you see that?

4   A.   Yes.

5   Q.   It says:  "The first use of the word 'incite' was hers."

6   A.   Yes.

7   Q.   And there's a body of text there; do you see that?

8   A.   Yes.

9   Q.   Do you know where that text came from?

10  A.   I believe that that was something that Linda Cohn, an

11  editor in New York, inserted into my draft, and by that text,

12  I'm referring to this little section that has a box -- boxes

13  around it that begins, "In the aftermath of Wednesday's

14  shooting," and ends, "Does this graf imply equivalence?"

15  That's an editor's note.

16  Q.   And so in that portion that you were just -- well, let me

17  clarify.  So this would have been something that came out of

18  Scoop; is that right?

19  A.   Yes.

20  Q.   And you just cut it and pasted it into this email?

21  A.   Yes, it looks like that's what I did, yes.

22  Q.   And then with respect to talking about the use of the word

23  "incite," you say, in that boxed portion -- it's kind of hard

24  to see with the highlighting, but you're talking about what's

25  underlined?

 1   A.  Yes, that's right.  So this sentence:  "Do we know of any
 2   elected officials on the left who have incited violence?"
 3   Q.  And do you know if that question was ever answered?
 4   A.  I think the -- I don't, because I didn't answer this query
 5   myself, but this email was an effort to kind of do a forensic
 6   look at how that word, which was problematic to our readers and
 7   which alerted us to the need to do a correction, kind of a
 8   forensic look at how did that get into the copy.
 9   Q.  And with respect to the look at that word "incitement," you
10   mentioned, how did it make it into the copy, but that word in
11   particular, "incitement," had actually been brought up by
12   Mr. Bennet in his original email about the editorial, hadn't
13   it?
14   A.  Yes.
15   Q.  And then in this note in here that ends with, "Does this
16   graf imply equivalence," do you know what she meant by that?
17             MR. AXELROD:  Objection.
18             THE COURT:  Sustained.
19   Q.  Did you ever have any conversations with Ms. Cohn about
20   this editor's note --
21   A.  No.
22   Q.  -- that's included in your email?
23             If you go up at 10:53 a.m., on this same page, there's
24   an email from Jesse Wegman, where he says, "Yeah, the way you
25   wrote it initially was totally fair."

M241PAL2                    **JA 0259**          Williamson - Direct

1   A.  Yes.

2   Q.  Do you know what he's referring to?

3            MR. AXELROD:  Objection.

4            MR. VOGT:  And I can clarify, your Honor.

5            THE COURT:  All right.

6   Q.  When Mr. Wegman says in here, "Yeah, the way you wrote it

7   initially was totally fair," do you know what the reference to

8   it is?

9   A.  Not as I sit here, no.

10  Q.  Were you having any -- Mr. Wegman was in New York at this

11  time?

12  A.  Yes.

13  Q.  Were you having any telephone conversations with Mr. Wegman

14  on June 15th?

15  A.  We had a phone conversation about finding an objective

16  source for the motivation of the gunman in the Arizona

17  shooting.  I think that's referenced in the -- in these email

18  exchanges.

19  Q.  And if you go to the next page, or the first page of the

20  exhibit.  I apologize.  And if you go to Mr. Wegman's email at

21  12:44 p.m.

22  A.  Yes.

23  Q.  And he says there, "Yeah, I made the case that talking

24  about Palin and Giffords in the same graf at all, we're seeming

25  like we're still trying to sneak the link in, but James pointed

M241PAL2                    Williamson - Direct

1  out that in order to write the next graf, we had to put it in

2  there to explain."  Do you see that?

3  A.  Yes.

4  Q.  There's a reference to "the graf" in there.  Does that mean

5  paragraph?

6  A.  It means paragraph, yes.

7  Q.  And do you have any recollection of having any

8  conversations with Mr. Wegman on June 15th of 2017 about this

9  reference he makes in here "to try to sneak the link in"?

10  A.  I didn't understand what this meant at the time, other than

11  a kind of craftsmanship issue, how to structure the sentence so

12  that it was the most clear, that we wouldn't want to repeat a

13  mistake in the correction itself.

14  Q.  And when you say you didn't understand at the time, but did

15  you ask him about it?  Like, did you ask him to clarify what he

16  meant by "sneak the link in"?

17  A.  I'm looking here at the -- no.  The correction -- it looks

18  like the correction was finished already at that time, judging

19  from my note below this exchange.

20  Q.  And you said "the correction."  There were actually two

21  corrections; is that right?

22  A.  That's correct, yes.

23  Q.  And were you involved at all in the first correction?

24  A.  Initially, as we've just reviewed, trying to find that

25  information and having the conversation with Jesse, but the

1  correction was being crafted in New York and so I lost
2  visibility on the, you know, the sort of blow-by-blow of that
3  being done.
4  Q.  And were you involved at all in the second correction?
5  A.  Insofar as I recognized the error, yes.
6  Q.  And when you say the error, what are you referring to?
7  A.  The error was that the crosshairs symbols were over those
8  legislators' districts, and the sentence was misleading in that
9  it said that -- it implied that they were over the individuals.
10  Q.  Now --
11         THE COURT:  Counsel, how much more do you have on
12  direct?
13         MR. VOGT:  I'm almost done, your Honor.
14  Q.  At some point in time Mr. Bennet specifically asked you to
15  look for pieces that were related to the Giffords shooting and
16  whether there was a connection to political rhetoric; is that
17  right?
18  A.  Can you rephrase the question.  You said at some point in
19  time.  What does that mean?
20  Q.  Sure.  So at some point in time on June 14th of 2017
21  Mr. Bennet specifically asked you to look for pieces related to
22  the Giffords shooting and whether there was a connection to
23  political rhetoric, correct?
24  A.  No, that's not exactly correct.  He asked me to look for
25  examples of political rhetoric in the run-up to the Arizona

1  shooting.  That part's correct.  Not about -- not to research

2  the shooting itself.  That happened the next day.

3  Q.  And based on the research that you conducted on June 14th

4  of 2017, you did not think that you could say that there was a

5  clear and direct link between the map circulated by Sarah

6  Palin's political action committee and the Loughner shooting;

7  is that right?

8           MR. AXELROD:  Objection.

9           THE COURT:  Sustained.

10 Q.  Ms. Williamson, you'd agree with me that in your draft of

11 the editorial that we've gone through, you did not use the word

12 "incitement," correct?

13 A.  I did not use that word, no.

14 Q.  And in your draft of the editorial, you did not state that

15 there was a clear or direct link between the map circulated by

16 Sarah Palin's political action committee and the Loughner

17 shooting, correct?

18 A.  I was speaking about the map as an example of that vile

19 political climate that we were referring to in the editorial.

20 Q.  But you did not make a specific connection between those

21 two things, did you?

22 A.  Between what and what, Mr. Vogt?

23 Q.  Between the map circulated by Sarah Palin's political

24 action committee and the Loughner shooting.

25 A.  No.  I was speaking about the map as an example of the

M241PAL2                    Williamson - Cross

1   rhetoric of demonization and dehumanization that the editorial

2   was about.

3              MR. VOGT:  A moment to confer, your Honor?

4              THE COURT:  Yes.

5              MR. VOGT:  I don't have any further questions at this

6   time, your Honor.

7              THE COURT:  All right.  Cross-examination.

8   CROSS EXAMINATION

9   BY MR. AXELROD:

10  Q.  Good morning, Ms. Williamson.

11  A.  Good morning, Mr. Axelrod.

12             MR. AXELROD:  Mr. DiMezza, if you could put up PX 188

13  which has been admitted into evidence.

14  Q.  And so Ms. Williamson, I've put up for you Plaintiff's

15  Exhibit 188, which Mr. Vogt asked you about a couple moments

16  ago.  Do you see that?

17  A.  Yes, I do.

18  Q.  And if you could, could you just explain for the jury what

19  this represents.

20  A.  Yes.  This is a saved -- a version of the email -- I'm

21  sorry -- the text message exchange that I had with James Bennet

22  that I then included in the email.

23  Q.  At the top, below the kind of email specifics, there's an E

24  and a colon, and it says, "Hey, I'm sorry, James, I should have

25  read those grafs more closely and asked more questions.  That's

**JA 0264** Williamson - Cross

1    on me.  We'll get a cx drafted soon."  What is a cx?

2    A.  A cx is a correction.  That's shorthand for that.

3    Q.  And what are you saying in this sentence where you say, "I

4    should have read those grafs more closely and asked more

5    questions"?

6    A.  I just was -- had gotten off the phone with James, and he

7    was obviously clearly crestfallen that this had happened, and I

8    was just kind of feeling for him and thinking what could I have

9    done so that this mistake didn't get made.

10   Q.  Mr. Bennet then writes, "No worries.  I feel lousy about

11   this one.  I just moved too fast.  I'm sorry."  And then he

12   goes on and he says, "Now what I need from you, Eileen,

13   soonest, is a rock-solid version of what we should say — that

14   an investigation showed no link to incitement, or no direct

15   link, or no clear link?  I don't want to soften it if we don't

16   need to.  If there was no link, we should say so."

17           And you testified a couple of minutes ago that on

18   June 15th Mr. Bennet asked you to research whether there was a

19   connection or not.  Was this what you were referring to?

20   A.  I'm sorry, Mr. Axelrod.  Could you repeat that.

21   Q.  Sure.  I'm sorry.  That was a bad question.

22           I think you testified a couple minutes ago that on

23   June 15th Mr. Bennet asked you to research, for the first time,

24   whether there was a connection between the political action

25   committee's map and the Loughner shooting; is that right?

M241PAL2                    Williamson - Cross

1   A.  That's correct, for the first time on the 15th, yes.

2   Q.  And when he asked you to do that, was it in there, this

3   email, this text exchange, which you are kind of writing down

4   in verbatim format here?

5   A.  That's correct.

6   Q.  You then respond:  "On it.  We'll do the right thing."  Do

7   you see that?

8   A.  Yes.

9   Q.  Could you tell the jury what you meant.

10  A.  Sure.  I was referring to what I had said at the beginning

11  of this exchange — "we'll get a correction drafted soonest."

12  And so doing the right thing was making that correction.

13  Q.  Why was making a correction doing the right thing?

14  A.  Because that is kind of bedrock policy of, if you make an

15  error, you ascertain what the nature of the error was, find the

16  facts, and make a correction that includes those facts.

17  Q.  And so let's go back to the beginning and then we'll come

18  forward in a little bit.

19          If you could just tell the jury where you're from.

20  A.  Oh, sure.  I'm from the Chicago area in Illinois.

21  Q.  And where did you go to college?

22  A.  I went to Marquette University in Milwaukee.

23  Q.  And what did you study at college?

24  A.  Journalism.

25  Q.  When you went to college for journalism, did you want to be

M241PAL2                           Williamson - Cross

1  a journalist?

2  A.  I did, but I had a lot of student loans, and so when I got

3  out of school, a beginning job in journalism was kind of not

4  going to allow me to pay back my loans, so I went into PR for a

5  few years, which paid a bit better.

6  Q.  And at some point after your stint in PR, did you then go

7  to work for a newspaper?

8  A.  I began working as a journalist in -- full time in 1994, so

9  about -- about nine years out of college.

10 Q.  And who were you working for in 1994?

11 A.  I was living in Eastern Europe and I was freelancing for a

12 number of different publications.

13 Q.  And if you could, could you just explain to the jury what

14 freelancing means in that context.

15 A.  Absolutely.  So I was living and working in a different --

16 couple different countries in Eastern Europe, and I was picking

17 up freelance jobs that, you know -- covering the area where I

18 was, so, you know, a hundred dollars for a story for Reuters, a

19 couple hundred dollars for the *Wall Street Journal*.  And I

20 eventually started freelancing more and more for the *Wall*

21 *Street Journal*.

22 Q.  And did there come a time where you ended up going to work

23 for the *Wall Street Journal* in Eastern Europe?

24 A.  Yes, I did.

25 Q.  And when was that?

**JA 0267**
Williamson - Cross

1   A.  That was in 1999.  They put me on staff to -- based in

2   Warsaw, Poland, to be their Warsaw bureau chief.

3   Q.  And what type of events did you cover when you were in

4   Warsaw?

5   A.  It was an interesting time in Eastern Europe because it was

6   not that long after the fall of communism, so it was -- the

7   *Wall Street Journal* and Poland had a pretty dynamic economy, so

8   I was doing a lot of business stories and a lot of stories

9   about the selling off of former state enterprises to private

10  owners, including American investors; also some political

11  stories and things like that; whatever occurred in the region,

12  you know, in Poland and around Poland, that would be of

13  interest to *Wall Street Journal* readers.

14  Q.  Did there come a time where you moved over to the

15  *Washington Post*?

16  A.  Yes.

17  Q.  And when was that?

18  A.  That was in early 2003.

19  Q.  Did you continue on in Europe or did you come back to the

20  United States?

21  A.  Came back to the US.  So ten years spent abroad, and

22  returned to the US in 2003 to take the *Washington Post* job.

23  Q.  And where was that job located?

24  A.  In Washington, DC.

25  Q.  And when you started for the *Washington Post*, what type of

**JA 0268**

M241PAL2                         Williamson - Cross

1  events were you covering as a journalist?

2  A.  I -- when I started?  I was a metro reporter, so when --

3  they had a policy that when, they make new hires, they put you

4  on the metro desk so you can kind of learn the ropes of the

5  paper, so I went out to a bureau in Frederick County, Maryland,

6  and I was based there.

7  Q.  And how long were you covering that local metro beat?

8  A.  Well, I moved around a little bit on the metro desk, but I

9  would say, as I sit here, maybe all in, about a year and a half

10 or so.

11 Q.  And from the metro desk, where did you go at the *Post*?

12 A.  I joined the national desk and then was based in the

13 newsroom in Washington.

14 Q.  And what type of focus did you have, if any, at the

15 national desk?

16 A.  Again, I did a number of things, but I did things like I

17 covered lobbying in Washington; I did a stint covering

18 Congress; I covered campaign finance; and I did a lot of

19 stories on the culture in Washington, different things that

20 were happening, feature stories.

21 Q.  And did there come a time where you left the *Post* and went

22 to the *Wall Street Journal*?

23 A.  Oh, sorry.  I also covered the federal government.  I did

24 that quite a bit, so I didn't want to leave that out.

25 Q.  Yeah.  Sorry for interrupting you.

M241PAL2                    Williamson - Cross

1   A.  No, that's okay.

2   Q.  Did there come a time where you went to the *Wall Street*

3   *Journal*?

4   A.  Yes.  I went back to the *Wall Street Journal* in 2008.

5   Q.  And what was the focus of your work at the *Wall Street*

6   *Journal* in 2008?

7   A.  When I first began, I was doing a lot of work on lobbying

8   and campaign finance, and then I covered the Obama White House

9   for about a year and a half.

10  Q.  So yesterday Mr. Vogt asked you if you'd covered Governor

11  Palin as a politician.  Do you recall that testimony?

12  A.  Yes.

13  Q.  And could you just explain to the jury what, you know --

14  how you covered Governor Palin back in 2008.

15  A.  Sure.  So as part of my job, a number of us went to the

16  Republican Convention in 2008 in Minneapolis, and that was

17  where she was quite a sensation with her speech, when she

18  accepted the vice presidential nomination, so we were -- at

19  that time I don't recall writing anything about that because we

20  had a lot of reporters there, but they had asked me to go -- to

21  get on the plane with her when she made a trip across the

22  country to Wasilla, right after the convention, so I joined

23  that group.

24  Q.  And do you recall the testimony yesterday where I think

25  Mr. Vogt asked you if you'd written anything for the *Post* about

M241PAL2                    Williamson - Cross

1    Governor Palin and I think you said you'd written one piece?

2    A.   For the *Journal*.

3    Q.   Sorry.  For the *Journal*, correct.

4    A.   Mm-hmm.

5              MR. AXELROD:  Mr. DiMezza, if you could pull up

6    Defense Exhibit 112, just for the witness.

7    Q.   And so Ms. Williamson, Defense Exhibit 112 is in front of

8    you.  Do you know what this is?

9              I'm going to make you put on your glasses.  I

10   apologize.

11   A.   Yes, that's quite all right.

12             Yes.  This was the piece that I wrote after Governor

13   Palin's speech.

14             MR. AXELROD:  Your Honor, I'd move for admission of

15   Defense Exhibit 112.

16             MR. VOGT:  No objection.

17             THE COURT:  Received.

18             (Defendant's Exhibit 112 received in evidence)

19             MR. AXELROD:  Your Honor, may I publish it to the

20   jury?

21             THE COURT:  Yes.  And then sometime in the next five

22   minutes, find a time so we can give the jury their midmorning

23   break.

24             MR. AXELROD:  Yes.  Thank you.

25   BY MR. AXELROD:

M241PAL2                    **JA 0271**          Williamson – Cross

1   Q.  Ms. Williamson, do you remember this piece?

2   A.  Now that I'm reading it, I do.  It was a long time ago.

3   Q.  I'm not going to take you through all of it, but, you know,

4   if you could, do you recall it enough to summarize it for the

5   jury?

6   A.  Sure.  This was the -- where I was kind of asked to go out

7   and interview people in and around Minneapolis where the

8   convention was to get their reactions to Governor Palin's

9   speech and what it meant to them that she was a female vice

10  presidential nominee, and so this -- this lede anecdote was

11  from a woman who I interviewed who was reacting to her -- her

12  nomination.

13          MR. AXELROD:  And your Honor, I think this is a good

14  point to break.

15          THE COURT:  All right.  So ladies and gentlemen, we'll

16  take our midmorning break, 15 minutes, and then we'll resume.

17          (Continued on next page)

18

19

20

21

22

23

24

25

```
 1                 (Jury not present)

 2                 THE COURT:  Please be seated.

 3                 Ms. Williamson, you can leave for the next 15 minutes,

 4      but just out of curiosity, where in Chicago are you from?

 5                 THE WITNESS:  Oh, your Honor, I grew up on the south

 6      side, in the south suburbs and on the south side of the city.

 7                 THE COURT:  So my wife is from Hyde Park.  That's why

 8      I asked.

 9                 THE WITNESS:  Oh, yeah, so a little bit to the east

10      and on the lake.  I grew up in the Beverly neighborhood, which

11      is to the south and west of there.

12                 THE COURT:  Well, we'll leave it there, because if I

13      went any further, I would have to comment on my in-laws.

14                 You can leave now.

15                 THE WITNESS:  I can?  Okay.  Thank you, your Honor.

16                 (Witness not present)

17                 THE COURT:  All right.  Let me hand to plaintiff's

18      counsel my rulings on the Crawford deposition, which you should

19      show to defense counsel as well, and make the appropriate

20      changes in the videotape.  Where I have sustained an objection,

21      I have indicated the lines that should be deleted, and where I

22      haven't indicated a deletion, objections in those other

23      respects are obviously overruled.  There are, however, a fair

24      number of objections that were sustained, so you'll need to

25      work to fix the videotape before it's shown to the jury.
```

M241PAL2                    JA 0273        Williamson - Cross

```
 1          I did do one other thing.  Wherever there was an
 2   objection in the middle of what was otherwise perfectly proper
 3   testimony to objection to form of the question, which had to be
 4   made at the time, but I didn't see any reason why the jury
 5   should be bothered with that, so I deleted those two lines each
 6   time that occurs.
 7          All right.  We'll see you in 15 minutes.
 8          MR. VOGT:  Your Honor, just so it's not -- we were
 9   going to delete the part your Honor mentioned earlier today.
10   Obviously I'm not going to include anything that the Court
11   thinks is misleading.
12          THE COURT:  That's your choice, but as I said, it's on
13   page 63 and I did not delete it because there was no objection
14   made, but if you want to delete it, you can.
15          MR. VOGT:  Thank you.
16          THE COURT:  Do you want to hand that up so I can mark
17   that so we'll --
18          MR. VOGT:  Sure.
19          THE COURT:  Okay.  Very good.
20          All right.  See you all in 15 minutes.
21          THE DEPUTY CLERK:  All rise.
22          (Recess)
23          (In open court; jury not present)
24          THE COURT:  While we're waiting for the jury, just let
25   me remind everyone, if I haven't told you already, that after
```

**JA 0274**

M241PAL2                    Williamson - Cross

1   the completion of the jury day on Monday, we'll have a charging

2   conference.  And I'll get you probably on Sunday my draft

3   charge so you'll have a chance to look it over.

4                MR. AXELROD:  Thank you.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (Jury present)

2                THE COURT:  Please be seated.

3                All right.  Counsel?

4                MR. AXELROD:  Thank you.

5    BY MR. AXELROD:

6    Q.  Ms. Williamson, did there come a time when you began

7    working for *The New York Times* editorial board?

8    A.  Yes.

9    Q.  And when was that?

10   A.  October of 2015.

11   Q.  And how did it come to be that you became a member of the

12   editorial board?

13   A.  A colleague on the editorial board reached out to me when I

14   was at the *Wall Street Journal* and asked if I would be

15   interested.

16   Q.  And were you interested?

17   A.  Yes.

18   Q.  Why?

19   A.  I thought it was an interesting challenge.  I hadn't worked

20   on the opinion side before and -- obviously a good opportunity

21   at a great newspaper.

22   Q.  Is there a difference between being an opinion journalist

23   and a news journalist?

24   A.  Yes.

25   Q.  And how is it different?

**JA 0276**

M241PAL2                    Williamson - Cross

1  A.  So an opinion journalist, as the name implies, writes

2  opinion pieces, whereas a reporter on the news side is, you

3  know, trained and instructed to write simply the, you know,

4  who, what, when, where, why, how, exactly what happened.  And

5  on the opinion side, we were always looking for a broader theme

6  to opine on in expressing the views of the leadership of the

7  newspaper.

8  Q.  In terms of doing original reporting, was there a

9  difference being on the news side and being on the opinion

10  side?

11  A.  No.  I liked to report the pieces that I was working on on

12  the opinion side as well.

13  Q.  So on the ed board -- Mr. Vogt got into this with you a

14  little bit, but -- did you kind of have a distinct bucket of

15  responsibilities that you covered for the editorial board?

16  A.  Yes.  Each member of the editorial board had a subject area

17  that we were covering.

18  Q.  And what was your subject matter area?

19  A.  National politics.

20  Q.  And if you could, can you just kind of expand on that a

21  little bit and tell us a little bit about the focus of the

22  pieces you would write.

23  A.  Sure.  So this was the beginning of -- when I joined, it

24  was October of 2015, so the -- it was the presidential campaign

25  year, you know, we were in kind of high swing there, so I was

**JA 0277**

M241PAL2                    Williamson - Cross

1   covering the presidential campaign, maybe some congressional

2   races, and all the events swarming around the primaries in 2016

3   and then the general election.

4   Q.  So I take it you had a role in covering the Republican

5   primary in 2016?

6   A.  Yes.

7   Q.  And what was that role?

8   A.  It was to cover, you know, the races, some of the issues

9   that were surfacing; and I also played a role in inviting all

10  of the candidates to come to New York and sit down with the

11  editorial board and answer questions.

12  Q.  When you say all of the candidates, do you mean all of the

13  candidates from both parties or from a specific party?

14  A.  From both parties.  I was making a big effort to bring

15  everybody in.

16  Q.  Why?

17  A.  Because I thought it was really important.  I mean, it was

18  a very crowded Republican field at that time, and I thought it

19  was really important that we hear from as many of the

20  candidates as possible and hear their views.

21  Q.  Which candidates did you meet with?

22  A.  Hmm.  You're taxing my memory here, but let's see.  Kasich

23  came in, Trump -- let me think back.  God, there were 12 of

24  them.  I would say of the 12-ish Republican candidates, we saw

25  a good number of them; maybe a half or 2/3.

**JA 0278**

M241PAL2                       Williamson - Cross

1  Q.  Did the editorial board in 2015 or 2016 write any pieces

2  about the Republican primary?

3  A.  Yes.

4  Q.  And did you write any pieces?

5  A.  I did.

6       MR. AXELROD:  Your Honor, if I could put up Defense

7  Exhibit 114 just for the witness.

8  Q.  And Ms. Williamson, do you know what Defense Exhibit 114

9  is?

10  A.  Oh, my screen isn't working, but I can see it there.

11  Q.  Well, that's a problem.

12       (Discussion off the record)

13       MR. AXELROD:  Your Honor, we have binders for the

14  witness we can bring up.

15       THE COURT:  All right.

16       MR. AXELROD:  May I approach, your Honor.

17       THE COURT:  Yes.

18  Q.  All right.  So now if you could go to 114 in one of the

19  binders.  And just let me know when you're there, since I can't

20  tell.

21  A.  Okay.  So that looks like it's in volume 2.

22       Okay.  Yes, I found it.

23  Q.  Okay.  And do you know what Defense Exhibit 114 is?

24  A.  Yes.  This is an editorial that I wrote.

25       MR. AXELROD:  Your Honor, I'd move for admission of

M241PAL2                         Williamson - Cross

1    Defense Exhibit 114.

2            MR. VOGT:  Your Honor, we would object just based on

3    402 and 802.

4            THE COURT:  Well, the objection on 802 is overruled,

5    but what about 402?

6            MR. AXELROD:  Well, your Honor, I think this is

7    relevant as to issues of bias that were raised by plaintiff's

8    in the opening statement.

9            THE COURT:  I'm trying to recall whether it embraced

10   this particular witness, but since there's the institutional

11   defendant as well as the individual, I will allow it.

12           MR. AXELROD:  Thank you.

13           THE COURT:  Overruled.

14           (Defendant's Exhibit 114 received in evidence)

15           MR. VOGT:  And may I publish it to the jury?

16           THE COURT:  Yes.

17           MR. AXELROD:  We're not going to spend very long on

18   this at all.

19   BY MR. AXELROD:

20   Q.  But Ms. Williamson, while that's coming up for the jury, do

21   you remember this piece?

22   A.  Yes, I do.

23   Q.  And I'm not going to go through it paragraph by paragraph,

24   but do you recall it enough such that you could summarize it

25   for the jury?

**JA 0280**

M241PAL2                    Williamson - Cross

1  A.   Yes.  This was an endorsement of John Kasich because he was

2  seen as someone who was less politically polarizing than the

3  rest of the field in 2016 on the Republican side, so for those

4  who were inclined to vote Republican, this was an endorsement

5  for their consideration.

6  Q.   And this was an endorsement by the editorial board?

7  A.   Correct.

8  Q.   And I think you said this, but you wrote this piece?

9  A.   Yes, I did.

10  Q.   And Mr. Vogt asked you about this yesterday, but there's no

11  byline.  Would you explain to the jury what a byline is.

12  A.   Sure.  It's just my name at the top of a story, "By

13  Elizabeth Williamson."

14  Q.   Why is there no byline?

15  A.   Because this is the view of the editorial board, so I was

16  the author of it, but it was something that was arrived at

17  through a group process and a discussion and agreement by the

18  editorial board.

19          MR. VOGT:  All right.  So you can take that down,

20  Mr. DiMezza.  Thank you.

21  Q.   Just talking about basics, Ms. Williamson, if someone picks

22  up *The New York Times* newspaper and looked to see where the

23  editorials were, where would they find them?

24  A.   They would find them kind of in the center of the A

25  section, the first section of the paper.

JA 0281

M241PAL2                    Williamson - Cross

1   Q.  And they were also online?

2   A.  Yes, they were.  And are.

3   Q.  Okay.  How was the editorial board structured in terms of

4   the people who made up the editorial board?

5   A.  Meaning the backgrounds of the --

6   Q.  Actually, the responsibilities, back in 2017.

7   A.  So our responsibility as an editorial board was to reflect

8   views of the ownership and the leadership of the newspaper, to

9   write opinion pieces, typically off the news, that would

10  reflect their views on broad topics of the day.

11  Q.  And back in June of 2017 how was the editorial board

12  structured?

13  A.  Well, we had our editor, which at the time was James

14  Bennet; and then the rest of us, you're grouped by subject

15  matter expertise or, you know, beats, as we call them, and then

16  there was a kind of phalanx of editors and fact-checkers.

17  Q.  Who were the fact-checkers?

18  A.  Phoebe did a lot of fact-checking -- Phoebe Lett, and

19  Eileen Lepping, but the editors also did some fact-checking as

20  well.

21  Q.  And who were -- we'll talk about some of them later, but

22  who were the phalanx of editors that you just referenced?

23  A.  That would be Nick Fox; Bob Semple, who we've seen, you

24  know, appear in the emails; Eileen; Phoebe; Linda Cohn.

25          MR. AXELROD:  Your Honor, maybe we can take a break

 1   and let the courtroom technician in to see if he can fix the

 2   monitor?

 3              THE COURT:  Sure.

 4              (Pause)

 5              THE COURT:  If it's going take a long while, we'll

 6   proceed, and you can come back at the break at lunch.  All

 7   right.  We'll just use the paper volumes.  Please.  You can

 8   come back at 1:00, please.  Thank you.

 9   BY MR. AXELROD:

10   Q.  All right, Ms. Williamson, we're going old school, and I

11   apologize, but I just have to give you a little bit of time to

12   get to the exhibits.

13   A.  I'm ready.

14   Q.  Thank you.  Back in June of 2017 --

15   A.  Oh, excuse me.  Let me just pull my chair in.

16   Q.  I'm sorry.

17              THE COURT:  You can take off your mask.

18              THE WITNESS:  Oh, yes, right.  Okay.

19              THE COURT:  Go ahead.

20              THE WITNESS:  Thank you.

21              MR. AXELROD:  Thank you.

22   BY MR. AXELROD:

23   Q.  Back in June of 2017, how many different editorials were

24   being published by the editorial board on a daily basis?

25   A.  On a daily basis?  It was three, by the editorial board,

1   yes.

2   Q.  And how many different pieces would you say that you worked

3   on a week on average?

4   A.  It really varied.  2015, 2016 was a pretty busy time

5   because of the campaigns, so sometimes it would be one a day,

6   sometimes it would be maybe three a week, in that neighborhood.

7   Q.  Okay.  How were editorials assigned to different members of

8   the editorial board?

9   A.  It would be -- so we'd have a morning meeting and we'd just

10  kind of go around the horn and people would, you know, report

11  from their subject area what's happening, what they'd like to

12  comment on, and then we'd have a discussion.

13  Q.  And did you attend these meetings in person or by phone?

14  A.  Usually I attended by phone because I was in Washington,

15  and these meetings took place in New York.

16  Q.  Now were there different types of editorials that were

17  being drafted in June of 2017?

18  A.  Can you be a little clearer, please?

19  Q.  That's a bad question.  Let me just lead you a little bit.

20  "America's Lethal Politics," you'd agree, looks like a response

21  to kind of the news of the day; do you agree with that?

22              MR. VOGT:  Objection.

23              THE COURT:  Well, as phrased, sustained.

24              MR. AXELROD:  I'll try to rephrase.

25  Q.  Ms. Williamson, were there editorials that were more

**JA 0284**

M241PAL2                    Williamson - Cross

1   focused on current events?

2   A.   Yes.  Sometimes we had a broad editorial that we had in the

3   works for a while that was on a certain subject that was of

4   interest, and then other times we, quote, wrote off the news,

5   meaning we wrote based on breaking news.

6   Q.   And how would you characterize the editorial "America's

7   Lethal Politics"?

8   A.   Based on breaking news.

9   Q.   Generally, when you were writing editorials in response to

10  breaking news, like "America's Lethal Politics," what was the

11  turnaround in terms of drafting a piece and having it

12  published?

13  A.   Very much as if we were reporting on the event itself --

14  excuse me -- as the news side would, so it was -- it was based

15  on -- you had to do it -- excuse me -- you had to do it that

16  day, the day of the event.

17  Q.   And why is that?

18  A.   Because being a daily newspaper, if you wrote about it a

19  day later, it would be irrelevant.

20  Q.   Why don't you take a sip of water.

21  A.   Thank you.

22  Q.   Let's talk generally about the process.  After you were

23  assigned a piece, a given piece, can you just walk us through

24  the drafting process.

25  A.   Sure.  On a breaking event or --

1    Q.   Sure.   Let's talk about a breaking event.

2    A.   Okay.   So obviously we'd get, you know, news of the event,

3    whatever it would be, and then begin to, you know, gather

4    facts, you know, the basics, what was happening, you know,

5    when, get as many details as we can, and then consult with, you

6    know, the editors, or if it happened, you know, that we could

7    do it during a board meeting with the full board to say, what

8    are the broad points that we'd like to make around this event,

9    'cause we're not just reporting the event, we're kind of coming

10   up with themes and ways to opine, what does this signify in

11   society, what does it, you know -- what are some of the broad

12   themes that we've looked at in the past and the stances that

13   we've taken in the past that could be reflected in the

14   editorial that we would write off of that event.

15   Q.   And Mr. Vogt asked you I think yesterday about

16   fact-checking.   As you were drafting a piece, would you also

17   fact-check that piece?

18   A.   Yes.

19   Q.   And if you can just explain to the jury, what does it mean

20   to fact-check?

21   A.   My own work?

22   Q.   Yeah, your own work.

23   A.   So as I go through, just like any of you would when you're

24   writing something, you're kind of systematically going back and

25   saying, did I spell that person's name right, where was that

**JA 0286**

M241PAL2                    Williamson - Cross

1  individual from, I'd better spell the name of their town right;
2  you know, if you're dealing with numbers, you're
3  double-checking numbers, you're looking for statistics, and
4  you're making sure those are correct.  Just kind of, you know,
5  checking yourself as you go to make sure that you don't insert
6  an error into what you're writing.
7  Q.  And I think you referenced before that there were
8  fact-checkers connected to the editorial board?
9  A.  Yes.
10  Q.  What was their responsibility?
11  A.  So they came along after your piece was filed, after the
12  draft was submitted in, as we said a little earlier, Backfield
13  and Scoop, and they kind of looked behind you just to, you
14  know -- since it's obviously human to make an error, just to
15  check, check your math, as I put it, you know, just to make
16  sure that you have all those things correct, as like another
17  second or third or fourth pair of eyes.
18  Q.  Now we saw -- Mr. Vogt showed you some exhibits, which
19  we'll go through in a second, but kind of in the general
20  process, what would happen after you finished an initial draft
21  of an editorial?
22  A.  After I finished the draft, I would put it in Backfield, in
23  that special section of the computer editing program, and then
24  alert the editors, and then they would begin to go through and
25  edit the piece.

JA 0287

M241PAL2                    Williamson - Cross

1  Q.  And after they edited the piece, what would happen next?
2  A.  Well, they would come back to me with any questions they
3  had or, you know, anything else that they wanted, it needs a
4  little more of this or can you check that or we need another
5  example, that type of thing, maybe -- not always -- and then
6  eventually, you know, after it was fact checked, it would be
7  posted online.
8  Q.  And generally, for a "breaking news" type editorial, how
9  long was that entire process from when you began working on a
10  piece to the time it gets posted online?
11 A.  It would really depend on the time of day that the event
12 occurred, but it could be pretty swift, so that, you know, you
13 could get it in by the end of that day, it would be posted
14 online, and it would go into the next day's paper.
15 Q.  And now focusing on the drafting of "America's Lethal
16 Politics," that editorial, how would you compare that to the
17 general time -- the general drafting of the publication time
18 for your normal or average breaking news event?
19 A.  It was truncated.  We had to do it very swiftly.
20 Q.  Mr. Vogt asked you about the corrections or correction
21 policy yesterday.  Do you recall that testimony?
22 A.  Yes.
23 Q.  Did The Times have a correction policy?
24 A.  Yes.  I mean, I would be paraphrasing here, but it was
25 to -- if an error arose, if we were alerted of an error, the

M241PAL2                    **JA 0288**
                            Williamson - Cross

1   policy would be to as swiftly as possible ascertain the correct
2   facts and write the correction and post it.
3   Q.  And for "America's Lethal Politics," how fast did *The Times*
4   move, relative to other situations, to issue the correction in
5   that story, in that case?
6   A.  I think it was within about -- let's see, doing the math
7   here -- 12 hours or so.
8   Q.  And is that fast?
9   A.  It's fast, given the nature of what we were correcting.  We
10  had to get to, you know -- we had to find what was the baseline
11  truth here and make sure that it was as fulsome a correction as
12  possible.  If you're correcting a name spelling, you can
13  obviously do that pretty swiftly, but this was more
14  comprehensive than that.
15  Q.  So now I want to take you to June 14th of 2017.  When did
16  you first learn about the Virginia shooting where Congressman
17  Steve Scalise was shot?
18  A.  When news of the event kind of ran over the wires, so to
19  speak, you know, when it first began surfacing online.
20  Q.  Do you recall where you were when you first heard that
21  news?
22  A.  Yes.  I was working from home that day.
23  Q.  In Washington?
24  A.  Yes.
25  Q.  Now when you heard that news, at some point did you think

**JA 0289**

M241PAL2                    Williamson - Cross

1   that that would be a good topic for an editorial?

2   A.  Yes.  I wanted to -- I thought that, you know, as the facts

3   were emerging, that this might be a significant event.

4   Q.  Why?

5   A.  Because it was the shooting of members of Congress, and

6   other than the Giffords case, it had been decades -- maybe

7   five, six decades -- since a member of Congress had been shot.

8   Q.  What did you do to raise this, the potential editorial idea

9   with the board?

10  A.  I sent an email with a subject line similar to what we

11  looked at yesterday -- again, paraphrasing -- Are we writing on

12  this today?  Meaning all of us as an editorial board.

13              MR. AXELROD:  And Mr. DiMezza --

14  Q.  Ms. Williamson, if you could go to Tab 9, Defense

15  Exhibit 9.

16              MR. AXELROD:  And Mr. DiMezza, if you could put up

17  Defense Exhibit 9 for the rest of us.

18  Q.  And Ms. Williamson, just let me know when you're there.

19  A.  Okay.  I have it.

20  Q.  What is Defense Exhibit 9?

21  A.  It's an email from me to the editors in New York with the

22  subject line, "Are we writing on the congressional shooting?"

23              MR. AXELROD:  Your Honor, I'd move for admission of

24  Defense Exhibit 9.

25              MR. VOGT:  No objection.

M241PAL2                          Williamson - Cross

```
 1              THE COURT:  Received.

 2              (Defendant's Exhibit 9 received in evidence)

 3              MR. AXELROD:  May I publish?

 4              THE COURT:  Yes.

 5              MR. AXELROD:  I'm just going to wait for it to come up

 6   on the screen for the jury, which should be any second.

 7              Great.

 8   BY MR. AXELROD:

 9   Q.  Ms. Williamson, why did you send this email to Robert

10   Semple, James Bennet, and Nicholas Fox?

11   A.  Because I was gauging the editors' interest in getting a

12   piece on the shooting.

13   Q.  And who is Robert Semple?

14   A.  Bob Semple was an editor on the editorial board.

15   Q.  Do you know how long he had worked on the editorial board?

16   A.  Long time.  I don't know specifically.

17   Q.  Years, decades?  Any -- any idea?

18   A.  Definitely years; perhaps decades.

19   Q.  And we know James Bennet.  And just, again, who is Nicholas

20   Fox?

21   A.  Nick Fox was another editor on the editorial board.

22              MR. AXELROD:  Okay.  And if you could now take that

23   down, Mr. DiMezza.

24   Q.  And Ms. Williamson, if you could go to DX 11, which is not

25   yet in evidence.
```

M241PAL2                    **JA 0291**
                            Williamson - Cross

1              MR. AXELROD:  Mr. DiMezza, if you could pull up DX 11

2    for us.

3    Q.  Are you there?

4    A.  Oh, I'm sorry.  I have it, yes.

5    Q.  Great.  Thank you.  And what is Defense Exhibit 11?

6    A.  This is a note from me to Nick Fox.

7    Q.  Okay.  And if you'll look --

8              MR. AXELROD:  Well, first, your Honor --

9    A.  Oh, I'm sorry.  Excuse me.  It's from Nick Fox to me.

10             MR. AXELROD:  Your Honor, we would move for admission

11   of Defense Exhibit 11.

12             MR. VOGT:  No objection.

13             THE COURT:  Received.

14             (Defendant's Exhibit 11 received in evidence)

15             MR. AXELROD:  And may I publish?

16             THE COURT:  Yes.

17             MR. AXELROD:  Coming up right now.  Okay.

18   BY MR. AXELROD:

19   Q.  So Ms. Williamson, you see the subject is "Re: Are we

20   writing on the congressional shooting?"  Do you see that?

21   A.  Yes.

22   Q.  And it's now -- you wrote that at 10:46, and Mr. Semple

23   responds at 11:28, "Can't see it yet, but keep looking.  A

24   nutcase who hates Republicans."  What did you understand by

25   "keep looking" to mean?

1          MR. VOGT:  Objection.

2          THE COURT:  Overruled.

3  Q.  You can answer.

4  A.  He was saying keep looking for a theme, whether there would

5  be, as I explained, you know, a theme that would be worthy of

6  an editorial.

7  Q.  And then moving up the email chain, at 11:31, Mr. Fox

8  responds, "I talked to Bob about the politicize of horror angle

9  and he didn't quite see it."

10         And I think it was your testimony either yesterday or

11  today that you didn't understand what "politicize of horror"

12  meant?

13  A.  As I sit here, I don't recall what that meant, no.

14  Q.  Mr. Fox then said, "Would you like to sketch out something

15  so he could get a better picture of what you'd want to say."

16  Do you see that?

17  A.  Yes.

18  Q.  Did you start to sketch out anything?

19  A.  In my recollection, no, not at that moment.

20  Q.  Did you do anything with respect to either researching or

21  drafting the editorial after receiving this email from Mr. Fox?

22  A.  I was continuing to just monitor what was happening in the

23  aftermath of the shooting, and I think we began shortly

24  thereafter a series of conversations about what we might say.

25         MR. AXELROD:  You can put that down.

M241PAL2                Williamson - Cross

1   Q.  And Ms. Williamson, if you'd go to DX 12.

2            MR. AXELROD:  And Mr. DiMezza, if you'd put up Defense

3   Exhibit 12 for the judge and for the lawyers.

4   A.  I have it.

5   Q.  And Ms. Williamson, what is Defense Exhibit 12?

6   A.  Judging by the reporters mentioned here, this is a breaking

7   news alert or a news story about the identity of the gunman on

8   the 14th -- sorry -- on June 14, 2017.

9   Q.  And this is an email from you?

10  A.  Yes, it is.

11           MR. AXELROD:  Your Honor, we would move to admit

12  Defense Exhibit 12.

13           MR. VOGT:  No objection.

14           THE COURT:  Received.

15           (Defendant's Exhibit 12 received in evidence)

16           MR. AXELROD:  And may I publish?

17           THE COURT:  Yes.

18           MR. AXELROD:  And it's coming up right now.  Thank

19  you.

20  BY MR. AXELROD:

21  Q.  So Ms. Williamson, if you would, could you just explain

22  what this email is for the jury.

23  A.  Oh, yes.  It's a -- a news alert from *Washington Post* about

24  the identity of the shooter that day.

25  Q.  And it says -- the subject line is "Possible shooter ID"?

**JA 0294**

M241PAL2                    Williamson - Cross

1   A.  Yes.

2   Q.  And if you go down below the headline, it says, "The

3   shooter at the G.O.P. congressional baseball practice this

4   morning is James T. Hodgkinson of Belleville, Illinois,

5   according to law enforcement officials."  Do you see that?

6   A.  Yes.

7   Q.  Why did you send this email to Mr. Bennet and Mr. Semple

8   and Mr. Fox?

9   A.  Because I was continuing to track the event, and this was

10  the latest that we knew.

11          MR. AXELROD:  You could take that down.

12  Q.  And if you would go to Tab DX 13, which is the same

13  document that was admitted yesterday as PX 138.

14  A.  I have it.

15          MR. AXELROD:  And your Honor, I don't know if you want

16  me to admit this different version, but it's the exact same

17  document as PX 138 that came in yesterday.

18          THE COURT:  It's up to you.  Usually I don't think we

19  need to admit something twice, but if you want to, you can.

20          MR. AXELROD:  Okay.  Well, I'll move to admit it.  I

21  don't have a binder of plaintiff's exhibits.  It's just easier

22  this way.

23          THE COURT:  All right.  Fine.

24          Any objection?

25          MR. VOGT:  No, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              THE COURT:  Received.

2              (Defendant's Exhibit 13 received in evidence)

3              MR. AXELROD:  And can you publish.  Thank you.

4    BY MR. AXELROD:

5    Q.  And this was something that Mr. Vogt showed you yesterday,

6    but you wrote the subject, "Possible shooter's possible social

7    media pages pro Bernie, anti-Trump."  Why did you use those two

8    possible "possibles"?

9    A.  Because this was still early after the event and I was

10   trying to be careful, because sometimes -- and it's happened in

11   the past -- shooters get misidentified in the first -- the

12   initial reports, and so I wanted to, you know, just flag that

13   so that, you know, that this was an early ID and just to be

14   careful about putting it out or anything.

15   Q.  Why were you researching, it looks like the shooter's

16   social media link?

17   A.  As I said to Mr. Vogt, I don't know where I found these

18   links, but the links were indicative of his, you know, maybe

19   motivation or certainly who he was.

20   Q.  And why did you send these links, again, on to Mr. Bennet,

21   Mr. Semple, and Mr. Fox?

22   A.  Because, again, I was tracking events as they were

23   occurring, and this was the latest thing to move online about,

24   you know, the status of who -- who this was and what had

25   happened.

M241PAL2                    Williamson - Cross

1   Q.  And so this is at 10:53 on the morning of the 14th?

2   A.  Yes, looks like it.

3   Q.  And so if you could take that down and now flip to DX 14,

4   Tab 14.

5           MR. AXELROD:  And Mr. DiMezza, if you can put up

6   Defense Exhibit 14.

7   Q.  And Ms. Williamson, do you have it in front of you?

8   A.  Oh, yes, I do.

9   Q.  Okay.  And what is Defense Exhibit 14?

10  A.  This is an email from Nick Fox to myself.

11          MR. AXELROD:  And your Honor, we'd move for admission

12  of Defense Exhibit 14.

13          MR. VOGT:  No objection.

14          THE COURT:  Received.

15          (Defendant's Exhibit 14 received in evidence)

16          MR. AXELROD:  And may I publish?

17          THE COURT:  Yes.

18          MR. AXELROD:  So we looked at a little bit of this

19  previously.  If you could actually grab the entire thing,

20  Mr. DiMezza.  Yeah, that's great.

21  BY MR. AXELROD:

22  Q.  And now I'm focusing -- we saw the 11:28 email from

23  Mr. Semple, where he says "keep looking."  And now at 11:33

24  above, it looks like you email, "Okay, let's see what Trump

25  says.  He's speaking at 11:30.  I'm writing the Observer about

M241PAL2                    Williamson - Cross

1    civility in Washington, Rubenstein.  There may be a reference

2    in that piece."

3    A.  Yes.

4    Q.  What were you -- why were you saying, "Let's see what Trump

5    says, he is speaking at 11:30"?

6    A.  Again, we wanted to see, you know, if the president had

7    some further information about what had happened or who the

8    gunman was, what law enforcement might know.

9    Q.  And after that, Mr. Vogt talked to you about -- yesterday

10   about this Observer piece about civility.

11   A.  Yes.

12   Q.  I'm going to put that up for you.  DX 97.  You'll have to

13   move in your binder a little bit.

14   A.  Okay.

15        MR. AXELROD:  And Mr. DiMezza, could you put it up.

16   Thank you.

17   A.  It's in a second volume, so it will take me a bit.

18   Q.  Sorry about that.  And then we're going to go back to 14,

19   so I'm going to make you work a little bit.

20   A.  That's okay.

21        I have it.

22   Q.  And what is Defense Exhibit 97?

23   A.  This is an editorial Observer that was referenced in that

24   email about political civility in Washington.

25   Q.  And this was the Observer piece that you wrote?

JA 0298

M241PAL2                    Williamson - Cross

1   A.  Yes.

2             MR. AXELROD:  Your Honor, I'd move for admission of

3   DX 97.

4             MR. VOGT:  No objection.

5             THE COURT:  Received.

6             (Defendant's Exhibit 97 received in evidence)

7             MR. AXELROD:  And may I publish.

8             THE COURT:  Yes.

9   BY MR. AXELROD:

10  Q.  And we're not going to go through this whole Observer

11  piece, but if you could, what was the focus of this piece for

12  the jury?

13  A.  It was a profile of David Rubenstein, who, as I said

14  yesterday, is a philanthropist in Washington who made it kind

15  of a personal mission to bring together lawmakers or

16  politicians from both parties in the same room for different,

17  you know, educational or social events, just to, you know, kind

18  of have them be -- get to know each other on the theory that

19  it's a lot harder to demonize and dehumanize someone if you've

20  met them and spent some time with them.

21  Q.  Now had you decided to write this piece?

22  A.  Yes.

23  Q.  And who at The Times had signed off on you writing this

24  piece?

25  A.  Well, this would have been James and the editors on the

1    editorial board.

2    Q.  Was the issue of political civility one that was important

3    to you?

4    A.  Yes, it really was.

5    Q.  Why?

6    A.  Because it seemed to be eroding and, you know, it was

7    leading to a lot of, you know, hateful characterizations of

8    people in the political sphere and a lot of lack of progress,

9    and so I just really admired this mission because I just

10   thought, you know, there have been a lot of people who have

11   lamented the fact that members of Congress used to live all in

12   Washington, they often don't anymore, they sort of stay and

13   then they go back, so they don't have as much time to kind of

14   interact with each other, and the sense that he had, and which

15   I shared, was that comity, that sense of, you know, just being

16   humans together with a common purpose in Congress had eroded.

17   Q.  All right.  And now, I'm sorry, I'm going to go back to

18   DX 14, which is in evidence.  So we can put it back up for the

19   jury, but you're going to have to grab the other binder,

20   Ms. Williamson.

21   A.  Oh, that's okay.

22             Okay.  I have it.

23   Q.  Great.  So I'm moving a little bit up on the chain here.

24   So this is after your email at 11:30.

25   A.  Oh, excuse me, Mr. Axelrod.  Is this 14, the links to the

JA 0300

M241PAL2                    Williamson - Cross

1  Facebook page and the shooter's possible -- shooter's possible

2  social media pages?

3  Q.  No.  It should be the subject, "Fwd: Are we writing on the

4  congressional shooting?"

5  A.  Okay.  Can you tell me the citation again, please.

6  Q.  Sure.  DX 14.

7  A.  Okay.  DX 14.  Okay.  I'm sorry.

8          Okay.  Ready.

9  Q.  Thank you.

10         So now I'm taking you up the email chain a little bit,

11  and we're now looking at the email from Bob Semple at

12  11:49 a.m.  Do you see that?

13 A.  11:59?

14 Q.  11:49.  Go down a little bit.

15 A.  Oh, yes, I have it.

16 Q.  And Mr. Semple writes, "Ok -- meanwhile, a broad

17  thought...we have written a ton (mainly Frank) on gun control."

18  Who's Frank?

19 A.  Francis X. Clines, a member of the editorial board at the

20  time.

21 Q.  "We did a huge series on it a few years ago...while this is

22  almost certainly a lone nut, it would be interesting to know

23  how many of those Republican athletes are beholden to the NRA

24  and its generally anti-regulatory philosophy, and whether

25  something like this might pound a little sense into their

1    heads...whether the guy bought the rifle at a gun show or

2    inherited from his grandmother, it's still a gun, of which

3    there enough for practically every man woman and child in this

4    country...

5              "I put the thing on the DEW for now, as an alternate

6    #3..."

7              And so I'm really focused on that last piece, where he

8    says, "I put the thing on the DEW for now as an alternate #3."

9    How did -- what did you understand that to mean?

10   A.   So the DEW was our schedule.  That was just the weird, you

11   know, nickname for it.  And an alternate #3 means -- on each

12   editorial, on each opinion page, we had one main editorial and

13   two smaller ones, and so the main one was called #1, the two

14   smaller ones were 2 and 3.  So when he was saying it's an

15   alternate #3, he was saying we might use it as one of those

16   smaller editorials, but we might not.  We might keep it in

17   reserve.

18              (Continued on next page)

19

20

21

22

23

24

25

M242Pal3                    **JA 0302**
                            Williamson - Cross

1  Q.  So at this time is it fair to say that no decision had been
2  made yet about whether there was going to be an editorial
3  published on the shooting on that day?
4  A.  Yes, that's correct.
5  Q.  Now, if you go up a little bit on the chain to the 11:59
6  e-mail, I think this is Mr. Semple responding to himself.  He
7  says, "Second (or third) message, the more I think about the
8  gun control angle, the better I like it."
9          And then Mr. Fox, I think, just forwards it to you at
10 12:08, so about 18 minutes later, and says, "What do you
11 think?"
12         Do you see that?
13 A.  Yes.
14 Q.  What did you think?
15 A.  I thought that what they were wanting was a gun policy
16 piece, you know, something reflecting the editorial board's
17 stance on gun violence.
18 Q.  And let's take this down.  If you could go to tab 15, which
19 just the next tab in your binder.
20         And Mr. DiMezza, if you could put up DX 15 for the
21 judge and for the parties.
22         And Ms. Williamson, I am really just focused on the
23 top of the exhibit.  You see this continues from the prior
24 exhibit.  Do you know what this is?
25 A.  Yes.  This is my e-mail back in response.

M242Pal3                    Williamson - Cross

1              MR. AXELROD:  Your Honor, we would move for admission

2       of DX 15.

3              MR. VOGT:  No objection.

4              THE COURT:  Received.

5              (Defendant's Exhibit 15 received in evidence)

6              MR. AXELROD:  May I publish?

7              THE COURT:  Yes.

8       BY MR. AXELROD:

9       Q.  So this looks like it's a continuation of the prior

10      exhibit.  And Ms. Williamson, at 12:18, you write, "Is Frank

11      around?  Guns are his thing."  What did you mean by that?

12      A.  It meant that guns are his subject-matter realm.  They are

13      what he typically wrote about.

14      Q.  And did you think that because of the back and forth that

15      this editorial would be assigned to you to write?

16      A.  Well, I think in that moment I was kind of hoping that

17      Frank would do it if it were going to be on gun policy.

18      Q.  Do you know if Frank was around that day?

19      A.  I don't.  He, he -- no, I wasn't aware that he was around.

20      Q.  Now, if you could go to tab 16, which is Defense Exhibit

21      16, which was admitted yesterday as Plaintiff's Exhibit 117.

22      A.  Yes, I have it.

23      Q.  And you saw this yesterday or today, I can't -- I think it

24      was yesterday.

25      A.  Yeah.

1              MR. AXELROD:  Your Honor, I would move for admission

2    of Defense Exhibit 16.

3              MR. VOGT:  No objection.

4              THE COURT:  Received.

5              (Defendant's Exhibit 16 received in evidence)

6              MR. AXELROD:  And could we publish, please.

7              THE COURT:  Yes.

8    BY MR. AXELROD:

9    Q.  If you could just blow up the top half, yeah, a little bit

10   farther, Mr. DiMezza.  That's great.

11             You see Mr. Semple's e-mail at 11:50, Ms. Williamson,

12   and at 12:04 Linda Cohn writes an e-mail.

13             Who is Linda Cohn?

14   A.  She is an editor on the editorial board.

15   Q.  Where she located?

16   A.  In New York.  Everyone here, except for me, was in

17   New York.

18   Q.  And she writes, "The nutcase went to my high school in

19   Belleville, once labeled the most racist town in America by *60*

20   *Minutes*.  That was ages ago, of course, but hard to picture any

21   anti-Trump sentiment there.  I'm on train and don't know what

22   Trump said, but I'm thinking back to what a giant story Gabby

23   Gifford's shooting was.  Amazing that shooting congressmen

24   doesn't seem so shocking now."

25             Prior to Ms. Cohn raising the Gabby Giffords context

**JA 0305**

M242Pal3                        Williamson - Cross

1   or angle or whatever, had you thought about that shooting?

2   A.  No.

3   Q.  Mr. Semple then writes, at 12:08, "We should definitely

4   shoot for a piece, not huge, but a piece."  And then he makes a

5   comment about Jimmy Connors.  I'm not going to ask you about

6   Jimmy Connors.

7          But what did you understand Mr. Semple to be saying

8   when he said, "We should definitely shoot for a piece, not

9   huge, but a piece"?

10  A.  That was definitely the green light to go ahead on the

11  editorial.

12  Q.  And why did you take it that way?

13  A.  He said "we should definitely shoot for a piece, not huge,

14  but a piece," meaning write it probably as one of those number

15  2 or number 3 editorials.

16  Q.  Okay.  So this is at 12:08.  And if you can take that down

17  and go to tab 17, which is Defense Exhibit 17, which was

18  admitted yesterday as Plaintiff's Exhibit 119.

19  A.  I have it.

20  Q.  And do you know what it is, Ms. Williamson?

21  A.  It's an e-mail from James to me with the other editors

22  cc'ed.

23          MR. AXELROD:  Your Honor, I move for admission of 17.

24          MR. VOGT:  No objection.

25          THE COURT:  Received.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA 0306**
M242Pal3                    Williamson - Cross

1          (Defendant's Exhibit 17 received in evidence)

2          MR. AXELROD:  And may I publish?

3          THE COURT:  Yes.

4          MR. AXELROD:  Thank you.

5   BY MR. AXELROD:

6   Q.  So Mr. Vogt showed this to you yesterday, but at 12:41

7   Mr. Bennet writes to you and cc's Mr. Semple, Mr. Fox, and

8   Ms. Cohn, and writes, "Hey Elizabeth, as Bob has said, there's

9   most likely a gun control point to be made here.  The other

10  question is whether there's a point to be made about the

11  rhetoric of demonization and whether it incites people to this

12  kind of violence."

13          I think you testified yesterday that you didn't

14  understand what "rhetoric of demonization" meant.

15  A.  In the moment I wasn't quite sure.

16  Q.  Today you brought up, in your testimony in response to

17  Mr. Vogt, a concept of demonizing your opponent.  Do you recall

18  that testimony?

19  A.  Um-hmm, yes.

20  Q.  Could you explain to the jury again what demonizing your

21  opponent means?

22  A.  Sure.  When one would take usually a politician, but not

23  always, would look at someone who holds the opposing views and,

24  instead of simply disagreeing with them, demonizing them, you

25  know, casting them as something, you know, wrong or evil or bad

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   or less than human, rather than simply disagreeing.

2   Q.  And can you think of any examples of that type of

3   demonizing your opponents?

4   A.  Unfortunately there are many.

5   Q.  Mr. Vogt yesterday asked you about a book that you are

6   writing.  Do you recall that testimony?

7   A.  Yes.

8   Q.  And it was a book about Sandy Hook?

9   A.  Yes.

10  Q.  And in the case of Sandy Hook and in the book you are

11  writing, is there any demonization of opponents or people in

12  that book?

13  A.  Yes.  The book actually traces that kind of occurrence from

14  the time that people who believed wrongly that the Sandy Hook

15  shooting was a pretense to confiscate America's firearms

16  demonized the families of the dead, and it traces how that

17  continued to occur, you know, the demonization of someone who

18  holds the opposite point of view through history, whether it's

19  someone who thinks you should wear a mask during coronavirus or

20  get a vaccine or whether or not you think the 2020 election was

21  stolen, and people who take action based on those false

22  beliefs.

23          THE COURT:  So just so I'm clear --

24          THE WITNESS:  Yes, your Honor.

25          THE COURT:  -- so you do have some understanding of

1    what the rhetoric of demonization means, yes?

2              THE WITNESS:  Yes, your Honor.

3              THE COURT:  And what Mr. Bennet was indicating here

4    was whether there was a point to be made of whether that

5    rhetoric of demonization incites people to this kind of

6    violence, referring to the shooting that had just occurred,

7    yes?

8              THE WITNESS:  Yes.

9              THE COURT:  And what was your understanding of what he

10   meant by "incites"?

11             THE WITNESS:  I think what he was saying -- I wasn't

12   sure what he meant by the word "incite" and my confusion really

13   sprang from when he mentioned the run-up to the Gabby Giffords

14   shooting, because as I read that e-mail, I didn't remember what

15   had happened, you know, in terms of political demonization

16   before that shooting, which was six years prior.

17             THE COURT:  Okay.  Go ahead, counsel.

18   BY MR. AXELROD:

19   Q.  Let me try this question.  Ms. Williamson, if you are just

20   focusing, before you get to the Bernie Sanders and the Gabby

21   Giffords part, so just focusing on the rhetoric of demonization

22   and whether it incites people to this kind of violence, did you

23   have an understanding of the connection of the rhetoric of

24   demonization and whether it incites people?  I think that's

25   pretty similar to the question the Judge asked, but try to get

M242Pal3                    **JA 0309**          Williamson - Cross

1    at it that way.

2    A.   Yes.  My confusion was really about what had happened

3    before the Gabby Giffords shooting.  I just didn't recall off

4    the top of my head specific instances of that rhetoric six

5    years prior.

6    Q.   But are you familiar with the idea that this demonization

7    of opponents can incite people to do something?

8    A.   Absolutely.

9    Q.   Okay.  And do you have any examples that you can discuss

10   with the jury of that?

11   A.   Yeah.  As I just mentioned, the idea that someone would,

12   because they believed that Democrats had stolen the 2020

13   election, that they would riot at the Capitol and breach the

14   Capitol.  So that would be one example.

15        Stalking and confronting the victims of mass shootings

16   based on a belief that, you know, Democrats had plotted or made

17   up this mass shooting as a pretext for stricter gun control

18   measures would be another example.

19        A third would be the gunman who turned up at Comet

20   Pizza in my neighborhood in Washington with a gun because he

21   believed that children were being kept in the basement and

22   trafficked by Democrats.

23   Q.   When you --

24        THE COURT:  Well, forgive me.  I'm sorry.  I'm still

25   not quite clear what, if anything, your understanding was of

M242Pal3                    JA 0310
                        Williamson - Cross

1    what Mr. Bennet meant by the use of the term "incite" in this

2    context.

3                THE WITNESS:  I'm sorry, your Honor.  Could you

4    restate?  I just want to be able to answer you.

5                THE COURT:  The sentence says -- and this is from

6    Mr. Bennet to you, yes?

7                THE WITNESS:  Yes.

8                THE COURT:  So he says, "As Bob has said, there's most

9    likely a gun control point to be made here.  The other question

10   is whether there is a point to be made about the rhetoric of

11   demonization."  And I think we just established that you did

12   have some understanding of what he meant by that, yes?

13               THE WITNESS:  Yes.

14               THE COURT:  "And whether it" -- meaning the rhetoric

15   of demonization -- "incites people to this kind of violence,"

16   "this kind of violence" meaning the shooting of the Congressman

17   that had just occurred, yes.

18               THE WITNESS:  In 2017, yes.

19               THE COURT:  So my simple question is, what was your

20   understanding of what Mr. Bennet meant by the word "incite" in

21   that sentence?

22               THE WITNESS:  I think, you know, that it's hard for me

23   to -- because I wouldn't use that verb, so it looks like maybe

24   inspire or -- you know, as I sit here reading it today,

25   inspire.

M242Pal3                    Williamson – Cross

1              THE COURT:  Well, looking --

2              THE WITNESS:  Or inspires them to contemplate.

3              THE COURT:  I'm looking at something that I have had

4    since I was a college student, and you can see it is sort of

5    falling apart, but it is *Webster's New Collegiate Dictionary*,

6    and it defines "incite" as "to arouse to action, spur, or urge

7    on."

8              Is that the meaning you give to the term?

9              THE WITNESS:  I think the meaning that, you know, as I

10   just came up with was inspires or inspires to contemplate.

11             THE COURT:  It then goes on, "synonyms, incite,

12   instigate, abet, foment, mean to excite to action, incite,

13   stresses, stirring up, and urging on.  Incite also often

14   suggests prompting."

15             Was that, at the time you read this e-mail, your

16   general understanding of what "incite" meant?

17             THE WITNESS:  I think so.  That's close.

18             THE COURT:  I'm sorry?

19             THE WITNESS:  Yes, sir.  That's close.

20             THE COURT:  Okay.  Go ahead, counsel.

21             MR. AXELROD:  Thank you, your Honor.

22   BY MR. AXELROD:

23   Q.  Now, after Mr. Bennet sent this e-mail, did that -- did his

24   e-mail change the scope of the editorial in your mind?  Did it

25   change the focus?

1    A.  Yes.

2    Q.  And how?

3    A.  It made -- it made -- he was referring to a dual focus.

4    Q.  And what were the dual focuses that Mr. Bennet was

5    referring to as you understood it?

6    A.  So what he was saying, it's as he said here, there is most

7    likely a gun control point to be made, so that would be the

8    first; and the second was about the rhetoric of demonization

9    and whether it inspired people to this kind of violence.

10   Q.  And what did you think about those dual messages for this

11   editorial?

12   A.  I thought that sounded interesting.  My -- the source of my

13   confusion was when he said the run-up to the Gabby Giffords

14   shooting, I wanted to check what had happened in advance

15   because I didn't recall what the atmosphere was like in that

16   six years prior event.

17   Q.  In that piece that references -- in the portion that

18   represents the Gabby Giffords shooting, Mr. Bennet also writes

19   "hard for me to imagine that Bernie himself is guilty of

20   anything like that.  But if there's evidence of the kind of

21   inciting hate speech on the left" -- now I'm going to kind of

22   skip and I will come back to that -- "incited hate self speech

23   on the left. . . we should deal with that."

24          How did you understand that?

25   A.  Yeah.  It means we should call it out.

1    Q.   Call out who?

2    A.   Call out anyone on the left who would have been making, you

3    know, issuing or speaking in that way.

4    Q.   Demonizing their opponents?

5    A.   Demonizing their opponents, sorry, yes.

6            THE COURT:  So forgive me.  One last question.

7            THE WITNESS:  Yes, your Honor.

8            THE COURT:  By the way, ladies and gentlemen of the

9    jury, you should understand when I ask questions, it's simply

10   to clarify.  I have no opinion whatsoever about any of the

11   issues in this case.  Fortunately, that's your job and not

12   mine, and I can just sit here like a bump on a log.  But I do

13   want to make sure that everything is clear.

14           He says, after he talks about seeing if there is

15   evidence of inciting hate speech on the left, he says that "we,

16   or I at least" -- meaning Mr. Bennet, yes?

17           THE WITNESS:  Yes.

18           THE COURT:  -- "have tended to associate with the

19   right (e.g., in the run-up to the Gabby Giffords shooting)."

20           What did you understand he meant by that?

21           THE WITNESS:  That was why I said I didn't understand,

22   your Honor, because he was saying if there is evidence of the

23   kind of inciting hate speech on the left, so that was in the

24   shooting that had happened that day, we should call that out.

25   Then he was saying that "we, or I at least, have tended to

M242Pal3                    Williamson - Cross

1  associate with the right in the run-up to the Gabby Giffords

2  shooting."

3        Because I didn't remember what had happened in the

4  run-up to the Gabby Giffords shooting, I wasn't sure, but I

5  just figured he had a recollection that I did not.  And the

6  reason that he was referencing it was because this was, before

7  that day's shooting, the most recent shooting of a member of

8  Congress.

9        THE COURT:  And he seems to be distinguishing,

10  carefully distinguishing between -- at first he says "we" and

11  then he says "or at least I," or "I," meaning so this was his

12  personal view, yes?

13        THE WITNESS:  Yes, his recollection.

14        THE COURT:  All right.

15        THE WITNESS:  That there was something happening in

16  the run-up to the Gabby Giffords shooting.

17        THE COURT:  Very good.  Thank you.

18        MR. AXELROD:  Thank you, your Honor.

19  BY MR. AXELROD:

20  Q.  So if we could take that down now and go to the next one,

21  Defense Exhibit 18, and if you could put that up for the

22  parties and the Judge, Mr. DiMezza.

23  A.  I have it.

24  Q.  Okay.  And just really focusing on the top line e-mail,

25  this is after Mr. Bennet's e-mail to you, what is this

1   document?

2   A.   This is a note from me to James and the other editors in

3   New York.  Excuse me.  I'm just going to grab some water.

4        MR. AXELROD:  Your Honor, I will take that break to

5   move for admission of Defense Exhibit 18.

6        MR. VOGT:  No objection.

7        THE COURT:  Received.

8        (Defendant's Exhibit 18 received in evidence)

9        MR. AXELROD:  And may I publish?

10       THE COURT:  Yes.

11  A.   Ready.  Thank you.

12  Q.   Thank you.

13       So now this is 12:51, and you respond to Mr. Bennet's

14  e-mail, cc'ing all the others, saying, "Okay.  Shall do.  Just

15  spoke with Bob as well.  Thanks, E."

16  A.   Um-hmm.

17  Q.   What are you saying here?

18  A.   I was saying I will undertake to do this piece along the

19  lines that James was recommending.

20  Q.   And you wrote "just spoke to Bob."  Do you recall that

21  conversation with Mr. Semple?

22  A.   Yes, in general terms, not in specifics, but just talking

23  about, again, what would be the goals of the piece.

24  Q.   So it's now approximately 12:51.  It's approximately 1:00,

25  but it's specifically 12:51 in the afternoon.  Did you have any

M242Pal3                    Williamson - Cross

1  concerns over the timing of getting your work done?

2  A.  I was starting to think I had better get going on this

3  because time's a-wasting.

4  Q.  Did you have a deadline that you were shooting for to

5  complete the piece and send it to the editors in New York?

6  A.  In terms of specific timing, no, but generally 4, 5:00 was

7  when we tried to get our pieces in that we are running in the

8  next day's paper.

9  Q.  All right.  So if you could go to the next tab, which is

10 already in evidence, it's Defense Exhibit 19.  It was admitted

11 as Plaintiff's Exhibit 121 yesterday.

12            And just again, Ms. Williamson, what is this document?

13 A.  This is an e-mail from Phoebe Lett to myself with other

14 editors, Bob Semple and Linda Cohn, cc'ed.

15            MR. AXELROD:  We move to admit Defense Exhibit 19.

16            MR. VOGT:  No objection.

17            THE COURT:  Received.

18            (Defendant's Exhibit 19 received in evidence)

19            MR. AXELROD:  And could I publish?

20            THE COURT:  Please.

21 BY MR. AXELROD:

22 Q.  We talked about this a little bit yesterday, but who is

23 Phoebe Lett?

24 A.  Phoebe worked as a fact-checker and a researcher and an

25 assistant to the editorial board in New York.

M242Pal3                    Williamson - Cross

1   Q.  What were these -- generally these four links that Ms Lett

2   sent you?

3   A.  These were links to past editorial -- past editorials done

4   by the editorial board about gun control.

5   Q.  And did you review these editorials?

6   A.  Did I read them?

7   Q.  Yes.

8   A.  Yes, I did.

9   Q.  Why did you read -- or do you know why Ms Lett sent you

10  these four past editorials?

11  A.  Yes, because, as I mentioned earlier, we always, when we

12  wrote, we had to maintain consistency with stances that the

13  editorial board had taken in the past on a given issue; and

14  particularly because I hadn't written a lot about gun policy, I

15  needed to read these to see what our stances were and to be

16  consistent.

17  Q.  And so if you can take that down and go to tab 21 which is

18  defense exhibit 21.

19          And Ms. Williamson, when you are there, what is this

20  exhibit?

21  A.  Let's see.  Oh, sorry.  One second.  This is an e-mail from

22  Bob Semple to myself with James, Nick Fox, Linda Cohn cc'ed.

23          MR. AXELROD:  Your Honor, I move for admission of

24  Defense Exhibit 21.

25          MR. VOGT:  No objection.

1          THE COURT:  Received.

2          (Defendant's Exhibit 21 received in evidence)

3          MR. AXELROD:  And may I publish?

4          THE COURT:  Yes.

5    BY MR. AXELROD:

6    Q.  So this is around the same time as Ms Lett sends you those

7    four links.  It's 12:58 on the 14th, and Mr. Semple writes

8    "Elizabeth, so as not to overwhelm you, I just asked Phoebe to

9    send you four basic gun control pieces dealing with the

10   plenitude of weapons and porous controls that also happen to

11   mention Gabrielle Giffords, including a little piece about her

12   farewell which was partly a rebuke to her colleagues."  Do you

13   see that?

14   A.  Yes, I do.

15   Q.  By the time that Mr. Semple had sent you this e-mail, had

16   you decided one way or the other whether to include a reference

17   to Congresswoman Giffords's shooting in Arizona in your draft?

18   A.  Yes, I would be including that reference because she was

19   the most recent of this very rare occurrence which was a

20   shooting of a member of Congress.

21   Q.  If we could take that down and go to the next tab, tab 22,

22   Defense Exhibit 22.

23          And do you know what this exhibit is, Ms. Williamson?

24   A.  Yes, I have it.  It is a note from me, an e-mail from me to

25   Phoebe Lett.

1              MR. AXELROD:  Your Honor, I move for admission of

2    DX 22.

3              THE COURT:  Admitted.  DX 22 that's been received.

4              (Defendant's Exhibit 22 received in evidence)

5              MR. AXELROD:  And may I publish, your Honor?

6              THE COURT:  Yes.

7    BY MR. AXELROD:

8    Q.  So now it is 1:40 in the afternoon and, Ms. Williamson, you

9    write to Phoebe Lett, "Phoebe, thanks.  Is there one that

10   references hate-type speech against Dems in the run-up of first

11   shooting?"  Do you see that?

12   A.  Yes, I do.

13   Q.  "James referenced that.  Thanks."

14   A.  Yes.

15   Q.  Who were you referring to when you wrote her?

16   A.  Gabby Giffords.  This was my effort to resolve that

17   confusion that we just discussed about the run-up to her

18   shooting.

19   Q.  Do you recall having any conversations with James Bennet

20   that afternoon?

21   A.  By phone you mean?

22   Q.  By phone.

23   A.  No.

24   Q.  The e-mails that we have looked at today and that you

25   discussed with Mr. Vogt yesterday, were these typical

1    communications that you would have when you were constructing

2    and drafting an editorial?

3    A.  Yeah, generally, yes.

4    Q.  We can take that down and go to the next exhibit, which is

5    Defense Exhibit 23, which was yesterday admitted as Plaintiff's

6    Exhibit 124.

7    A.  I have it.

8    Q.  Okay.

9              MR. AXELROD:  And your Honor -- I will do this step by

10   step.

11   Q.  Ms. Williamson, do you know what this exhibit is?

12   A.  This is a note, an e-mail from Phoebe Lett back to me.

13             MR. AXELROD:  Your Honor, I move for admission of

14   Defense Exhibit 23.

15             MR. VOGT:  No objection.

16             THE COURT:  Received.

17             (Defendant's Exhibit 23 received in evidence)

18             MR. AXELROD:  And may I publish?

19             THE COURT:  Yes.

20   BY MR. AXELROD:

21   Q.  So now we are at 2:21 in the afternoon, and Ms Lett writes

22   to you, "We never ran an editorial on it.  Frank Rich wrote

23   this piece on it, but the board never did.  James was just

24   wondering if there had been one, he says."

25             Who is Frank Rich?

M242Pal3                    Williamson - Cross

1   A.  Frank Rich was a columnist at *The Times*.

2   Q.  Was he a member of the editorial board?

3   A.  No, he was not.

4   Q.  Did you overlap at *The Times* with Frank Rich at all?

5   A.  No.

6   Q.  And so I would like to now put up Defense Exhibit 24, which

7   is the Frank Rich piece which was admitted as Plaintiff's

8   Exhibit 133 yesterday.

9   A.  I have it.

10  Q.  And given your normal practice, do you expect that you

11  would have read this piece on June 14?

12  A.  Yes.

13          MR. AXELROD:  Your Honor, I move for Defense Exhibit

14  24, admission of 24.

15          MR. VOGT:  No objection.

16          THE COURT:  Received.

17          (Defendant's Exhibit 24 received in evidence)

18          MR. AXELROD:  And may I publish?

19          THE COURT:  Yes.

20  BY MR. AXELROD:

21  Q.  And, Ms. Williamson -- Mr. DiMezza, if you could blow up

22  the first three paragraphs.

23          And I am really just focused on the last paragraph at

24  this time, where Mr. Rich writes, "If we learn nothing from

25  this tragedy, we are back where we started.  And where we

1   started was with two years of accelerating political violence,

2   actual violence, not to be confused with violent language, that

3   struck fear into many, not the least of whom was Gabrielle

4   Giffords."

5           Do you see that?

6   A.   Yes.

7   Q.   And I mean, do you remember reading this when you were

8   researching kind of the rhetoric in the lead-up to the Arizona

9   shooting?

10  A.   I'm sorry.  Could you repeat the question, Mr. Axelrod.

11  Q.   Yes.  I think it was pretty bad.

12          From your testimony in response to questions from

13  Mr. Vogt, I understand that on June 14, you were researching

14  the rhetoric that occurred before the 2011 Arizona shooting, is

15  that right?

16  A.   Yes, I was.

17  Q.   Do you recall reading this paragraph that I just went over

18  with you?

19  A.   Yes.

20  Q.   And so now let's go down to the final paragraph of the

21  first page and going on to the second page, and if you could

22  blow up the last paragraph of the first page the first two

23  paragraphs of the second page.

24  A.   So you are referring to the paragraph that begins, "Did

25  Loughner see Palin's own most notorious contribution to the

M242Pal3                    Williamson - Cross

1   rancorous tone"?

2   Q.  Yes.

3   A.  Yes.

4   Q.  That paragraph reads, "Did Loughner see Palin's own most

5   notorious contribution to the rancorous tone?  Her March 2010

6   web graphic targeting congressional districts?"  He writes, "We

7   have no idea, nor does it matter, but Giffords did.  Her

8   reaction to it, captured in an interview she did with Chuck

9   Todd of MSNBC, was the most recycled, if least understood,

10  video of last week.  The week of the interview began with the

11  House passing the healthcare bill on Sunday.  Within hours on

12  Monday morning, vandals smashed the front door of Giffords'

13  office in Tucson.  The Palin 'target' map (and the accompanying

14  Twitter *dictum* to reload) went up on Tuesday, just one day

15  after the vandalism timing that was at best tone-deaf and at

16  with worst nastily provocative.  Not just Giffords, but at

17  least three other of the 20 members of Congress on the Palin

18  map were also hit with vandalism or death threats."

19          Then moving on, I'm going to read the next paragraph

20  and move on.  "In her MSNBC interview that Wednesday, Giffords

21  said that 'Palin had put the crosshairs of a gun sight over our

22  district,' adding that 'when people do that, they've got to

23  realize there is consequences to that action.' Chuck Todd then

24  asked Giffords if, in fairness, the campaign rhetoric and war

25  rhetoric have been interchangeable for years.  She responded

M242Pal3                    Williamson - Cross

1   that colleagues who had been in the house 20, 30 years had

2   never seen vitriol this bad.  But Todd moved on and so did the

3   Beltway.  What's the big deal about a little broken glass?  Few

4   want to see what Giffords saw; that the vandalism and death

5   threats were the latest consequence of a tide of ugly

6   insurrectionism that has been rising since the weeks of the

7   2008 campaign and that had threatened to turn violent from the

8   start."

9            So did that discussion in this column kind of inform

10  your research of the rhetoric that led up to the 2011 shooting?

11  A.   Yes.

12  Q.   I want to go to one other piece of this, Mr. DiMezza and

13  Ms. Williamson, if you go to the last paragraph of page 2 that

14  runs on to page 3.

15  A.   "Obama said correctly"?

16  Q.   Yes.

17  A.   Okay.

18  Q.   "Obama said correctly on Wednesday that 'a simple lack of

19  civility didn't cause the Tucson tragedy.'  It didn't cause

20  these other incidents either.  What did inform the earlier

21  violence, including the vandalism at Giffords' office, was an

22  antigovernment radicalism as rabid on the right now as it was

23  on the left in the late 1960s.  That Loughner was likely

24  insane, with no coherent ideological agenda, does not mean that

25  a climate of antigovernment hysteria has no effect on him or

M242Pal3                  Williamson - Cross

1   other crazed loners out there.  Nor does Loughner's insanity

2   mitigate the surge in unhinged political zealots acting out

3   over the last two years.  That's why so many on both the

4   finger-pointing left and the hyper-defensive right

5   automatically assumed he must be another of them."

6           Do you see that?

7   A.  Yes.

8   Q.  Did the ideas in this paragraph inform your draft of the

9   editorial in any way?

10  A.  Yes, they absolutely did.

11  Q.  How so?

12  A.  Because this was exactly what we were trying to

13  demonstrate, that, you know, in the 1960s, you know, going back

14  that far, I mean, this wasn't in the piece, but then liberals

15  who believed that, you know, bankers were demons in some way

16  bombed banks and, you know, this sort of said, spoke to that

17  climate that seemed to be getting worse and raised the question

18  about incendiary political rhetoric causing or inspiring

19  violence.

20  Q.  If we could take that down now and put up Defense Exhibit

21  28, which is tab 28, which was admitted yesterday as

22  Plaintiff's Exhibit 128.

23          Are you there, Ms. Williamson?

24  A.  I am.

25  Q.  What is Defense Exhibit 28?

1   A.  This is an e-mail from James to me.

2          MR. AXELROD:  Your Honor, I move for admission of

3   Defense Exhibit 28.

4          MR. VOGT:  No objection.

5          THE COURT:  Received.

6          (Defendant's Exhibit 28 received in evidence)

7          MR. AXELROD:  And may I publish?

8          THE COURT:  Yes.

9   BY MR. AXELROD:

10  Q.  And so Mr. Vogt showed you this yesterday, Ms. Williamson,

11  but going on this chain, at 3:01, Ms Lett e-mails Mr. Bennet

12  two additional opinion pieces.  Do you see that?

13  A.  Yes.

14  Q.  And then Mr. Bennett forwards them to you with the e-mail

15  message, "We dug a little further.  Take a look at these two."

16  A.  Yes.

17  Q.  And I think you testified yesterday that you read these

18  pieces?

19  A.  Yes, I did.

20  Q.  And keep this in mind for a second because we are going to

21  go to those pieces in a second, but before we do that, I want

22  to show you Plaintiff's Exhibit 136 that was admitted

23  yesterday, but I am going to have to give you a binder before

24  that, so bear with me for one second.

25         MR. AXELROD:  Your Honor, may I approach?

 1          THE COURT:  Yes.  I was going to offer my copy, but

 2    the volumes are much too heavy to lift.

 3          (Pause)

 4    A.   Did you say 136, Mr. Axelrod?

 5    Q.   Yes, Plaintiff's Exhibit 136.

 6          Mr. DiMezza, can you put that up?

 7          Mr. Vogt informs me maybe this wasn't admitted

 8    yesterday, so we will go through that process.

 9          THE COURT:  So are you offering it?

10          MR. AXELROD:  Yes, I'm going to as soon as

11    Ms. Williamson is there.

12          THE COURT:  Given it's a plaintiff's exhibit, I don't

13    even think we need her to identify.  Are you offering it?

14          MR. AXELROD:  I am.

15          MR. VOGT:  No objection.

16          THE COURT:  Received.

17          MR. AXELROD:  Thank you.

18          And may I publish?

19          THE COURT:  Yes.

20          (Defendant's Exhibit 136 received in evidence)

21    BY MR. AXELROD:

22    Q.   So Ms. Williamson, what is Plaintiff's Exhibit 136?

23    A.   This is an e-mail from Bob Semple to, yes, to James, to

24    myself, to Nick, Linda.

25    Q.   So I'm actually going to start below that.  At 3:05,

M242Pal3                    Williamson - Cross

1  Mr. Bennet writes, "FYI, these two are more relevant precedent
2  for tonight's piece.  Elizabeth has them, too."
3           What did that mean to you?
4  A.   That meaned -- sorry, excuse me, that meant that these two
5  links were -- it meant that they were reflective of stances
6  that the editorial board had taken in the past and because they
7  were coming from the editorial board as opposed to coming from
8  a columnist like Frank Rich's piece had, that -- so they would
9  both in terms of their provenance and their content would be
10 very relevant.
11 Q.   Relevant for what you were doing?
12 A.   Yes, that, you know, it reflected the sentiment that we
13 were trying to convey in the piece.
14 Q.   So now if we could put up Defense Exhibit 29, which is
15 another -- again, another exhibit that was the same that was
16 admitted yesterday by plaintiffs, and if you just page down --
17 I'm sorry.  I forgot that you have to shift to another binder.
18 Sorry about that.  If you get a paper cut you can blame the
19 court technician.
20 A.   I've got it.
21 Q.   So page 1 is an editorial called Bloodshed and --
22          THE COURT:  But I think the Doctrine of Judicial
23 Immunity covers the court technician.
24          MR. AXELROD:  I don't know, your Honor, that might be
25 new law.  Okay.

```
1    A.  So far I am not injured.

2    Q.  Let's keep it that way, at least by my questions.

3         So let's start, page 1 is "Bloodshed and Invective in

4    Arizona."  Do you see that?

5    A.  Yes.

6    Q.  And just page through it to make sure you understand what

7    it is.  Page 2 is the second page of that editorial.  And then

8    page 3 is the second editorial "As We Mourn," and page 4 is

9    then the second page of that editorial.  Does that all make

10   sense?

11   A.  Yes, is it does.

12   Q.  And do you know what these exhibits are?

13   A.  Yes.  These are the two links that Phoebe sent that James

14   said were more relevant to what we were writing that day in

15   2017.

16        MR. AXELROD:  Your Honor I move for admission of

17   Defense Exhibit 29.

18        MR. VOGT:  No objection.

19        THE COURT:  Received.

20        (Defendant's Exhibit 29 received in evidence)

21   BY MR. AXELROD:

22   Q.  So this first piece, "Bloodshed and Invective in Arizona,"

23   it is dated January 9, 2011, and I am really focused first on

24   the second paragraph, "Jared Loughner."  Do you see that?

25   A.  Yes.
```

1   Q.  It says, "Jared Loughner, the man accused of shooting

2   Ms. Giffords, killing a federal judge, and five other people,

3   and wounding 13 others, appears to be mentally ill.  His

4   paranoid Internet ravings about government mind control place

5   him well beyond usual ideological categories."  Do you see

6   that?

7   A.  Yes.

8   Q.  If you go to the next paragraph, "But he is very much a

9   part of a widespread squall of fear, anger and intolerance that

10  has produced violent threats against scores of politicians and

11  infected the political mainstream with violent imagery.  With

12  easy and legal access to semiautomatic weapons like the one

13  used in the parking lot those already teetering on the edge of

14  sanity can turn a threat into a nightmare."

15          Do you see that?

16  A.  Yes.

17  Q.  Did the ideas in those two paragraphs inform the work you

18  did on June 14?

19  A.  Yes, particularly that second paragraph that you cited,

20  because those were the twin goals.  It was this widespread

21  squall of fear, anger and intolerance that we were referring

22  to, the violent imagery used to characterize one's political

23  opponents, and then that in combination with access to guns

24  allowed under our current policies were the two quotes that we

25  wanted to make with the editorial.

M242Pal3                    **JA 0331**
                         Williamson - Cross

1  Q.  If you can then go to the next paragraph.  Take those down,

2  Mr. DiMezza.  Thank you.

3          "Last spring, Capitol security officials said threats

4  against members of Congress had tripled over the previous year,

5  almost all from opponents of healthcare reform.  An effigy of

6  Representative Frank Kratovil, Jr., a Maryland Democrat, was

7  hung from a gallows outside his district office.

8  Ms. Giffords' district office door was smashed after the health

9  vote, possibly by a bullet."

10          And did this inform what you were -- your work on June

11  14?

12  A.  Yes.

13  Q.  If you go to the next page I'm going to focus on the second

14  paragraph.  It includes a word that I can't say.  "It is facile

15  and mistaken to attribute this particular madman's acts

16  directly to Republicans or Tea Party members, but it is

17  legitimate to hold Republicans and particularly their most

18  virulent supporters in the media responsible for the gale of

19  anger that has produced the vast majority of these threats

20  setting the nation on edge.  Many on the right have exploited

21  the arguments of the division, reaping political power by

22  demonizing immigrants, or with welfare recipients, or

23  bureaucrats.  They seem to have persuaded many Americans that

24  government is not just misguided, but the enemy of the people."

25          And did you read that paragraph on June 14?

1  A.  Yes.

2  Q.  And did that inform your work?

3  A.  Yes, it did.

4  Q.  Now, if we go to the next editorial of the two that

5  Mr. Bennet said were relevant precedent, I want to focus --

6  yes, Mr. DiMezza.  Can you blow up the second and third

7  paragraphs.

8          "Mr. Obama called on ideological campaigners to stop

9  vilifying their opponents.  The only way to move forward after

10 such a tragedy, he said, is to cast aside point-scoring and

11 pettiness.  He rightly focused primarily on the lives of those

12 who died and the heroism of those who tried to stop the shooter

13 and save the victims.  He urged prayers for the 14 wounded,

14 including representative Gabrielle Giffords, the target of the

15 rampage.  Their stories needed to be told, their lives

16 celebrated and mourned.  It is important that Mr. Obama

17 transcend the debate about whose partisanship has been

18 excessive and whose words have sown the most division and

19 dread.  This page and many others have identified those voices

20 and called on them to stop demonizing their political

21 opponents.  The president's role in Tucson was to comfort and

22 honor, and instill hope."

23          And when you were working on your draft on June 14 of

24 2017, you know, about six and a half years after the shooting

25 in Arizona, was one of the goals you were trying to write about

1   was the idea that politicians should stop demonizing their

2   political opponents?

3   A.  Yes, absolutely.

4   Q.  You can take that down and can you put up Defense Exhibit

5   61 for the parties and the judge.

6           And Ms. Williamson if you can go to tab 61.  Let me

7   know when you are there.

8   A.  Okay.  I have got it.

9   Q.  Do you know what Defense Exhibit 61 is?

10  A.  This is the map that I referenced in the editorial.

11          MR. AXELROD:  Your Honor, I move for admission of

12  Defense Exhibit 61.

13          MR. VOGT:  No objection.

14          THE COURT:  Received.

15          (Defendant's Exhibit 61 received in evidence)

16          MR. AXELROD:  And may I publish?

17          THE COURT:  Yes.

18  BY MR. AXELROD:

19  Q.  Now, on June 14 of 2017, I understand that you did research

20  that you used in writing your draft of the editorial, correct?

21  A.  Yes.

22  Q.  Did you conduct any research into whether or not Jared

23  Loughner had seen Defense Exhibit 61, the crosshairs map?

24  A.  No.

25  Q.  Why not?

**JA 0334**
                              Williamson - Cross

1  A.  Because I was not researching the shooting.  I was

2  researching the political climate in the run-up to the 2011

3  shooting in Arizona.

4  Q.  Did you do any research on June 14 at all into whether

5  Jared Loughner had seen any type of political rhetoric or

6  political incitement?

7  A.  No, I did not.

8  Q.  You can take that down.  Thank you.

9          Ms. Williamson, we are going to go to Defense Exhibit

10  34, which is an exhibit that Mr. Vogt showed you earlier today.

11  Let me know when you are there.

12  A.  Okay.  I have it.

13  Q.  And what is this?

14  A.  This is an e-mail from me to James, Bob Semple, Nick Fox,

15  and Frank Clines.

16          MR. AXELROD:  Your Honor, I move for admission of

17  Defense Exhibit 34.

18          MR. VOGT:  No objection.

19          THE COURT:  Received.

20          (Defendant's Exhibit 34 received in evidence)

21          MR. AXELROD:  And may I publish?

22          THE COURT:  Yes.

23          MR. AXELROD:  Thank you.

24  BY MR. AXELROD:

25  Q.  I know you talked about this before with Mr. Vogt, this was

1   an e-mail you sent at 4:45?

2   A.  Yes.

3   Q.  So pretty close to that 5:00 deadline you were shooting

4   for?

5   A.  Yes.

6   Q.  You wrote "shootings is in backfield," and that was a

7   reference, I guess, to the shared word processing program?

8   A.  Yeah.  The section of our computer editing program.

9   Q.  And you wrote, "I'm no Frank Clines, but I did my best."

10  What did you mean by that?

11  A.  So this was telling them that the piece was done, the draft

12  was in backfield, and that I am not Frank Clines.  And he is

13  cc'd here, because he was covering gun policy.  So I did my

14  best on the gun policy portion of the piece and asking Frank,

15  you know, can you read behind me and make sure I have got my

16  facts right, basically.

17  Q.  Were you being a little self-deprecating?

18  A.  Yeah.  But Frank's pretty good on gun policy.

19  Q.  Now, you talked about this a little bit before earlier

20  today, but was it important for you to finish your draft by

21  5:00 p.m.?

22  A.  Yeah, and as you saw from the e-mails, we didn't have very

23  much time.

24  Q.  And why was it important?

25  A.  Because if we -- if you don't weigh in on the day of a

**JA 0336**

M242Pal3                    Williamson - Cross

1    major event, you are really behind the curve of being a daily

2    newspaper and being current.

3    Q.  Were you pretty comfortable with working on deadline?

4    A.  Yeah.

5    Q.  Now, what did you do after you --

6            THE COURT:  I'm sorry.  I understand what -- that 5:00

7    is important.  Can you tell me why 1:00 is important?  Is 1:00

8    important because that's when we let the jury go to lunch?  So,

9    counsel, maybe this is a good time to take our lunch break.

10           MR. AXELROD:  You really confused me, your Honor.  I

11   wasn't prepared for that one.  This is a good time.

12           THE COURT:  All right.  So we will take our lunch

13   break now and resume at 2:00.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              (Jury not present)
 2              THE COURT:  Please be seated.  Ms. Williamson, you can
 3     step down.  We will see you at 2:00.
 4              THE WITNESS:  Thank you, your Honor.
 5              THE COURT:  Anything counsel needs to raise with the
 6     Court?  Okay.  We will see you all at 2:00.
 7              MR. AXELROD:  Thank you.
 8              (Luncheon recess)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

JA 0338

M241PAL4

<pre>
 1                      AFTERNOON SESSION

 2                          2:05 p.m.

 3          (In open court; jury not present)

 4          THE COURT:  While we're waiting for the jury, let me

 5   just mention, we'll go, of course, with the jury till 3:30.  I

 6   have a bail hearing in this courtroom at 4, so I will need to

 7   have everyone vacate the premises sometime between 3:30 and 4.

 8          (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

**JA 0339**

```
 1              (Jury present)

 2              THE COURT:  Please be seated.

 3              Counsel.

 4              MR. AXELROD:  Thank you, your Honor.

 5              Mr. DiMezza, if you could put up Defense Exhibit 32

 6   for Ms. Williamson.  I think that her monitor is working now.

 7   Crossing fingers.

 8   BY MR. AXELROD:

 9   Q.  And Ms. Williamson, can you see the exhibit?

10   A.  Yes, I can.

11   Q.  Great.  I think this is similar to an exhibit that Mr. Vogt

12   showed you this morning, but if you go to the --

13              MR. AXELROD:  If you could go to the third page,

14   Mr. DiMezza.

15   Q.  Do you see that, Ms. Williamson?

16   A.  Yes.

17   Q.  Do you know what this exhibit is?

18   A.  This, starting in the -- yes, the highlighted part is the

19   beginning of my draft.

20   Q.  Okay.

21              MR. AXELROD:  Your Honor, I'd move to admit Defense

22   Exhibit 32.

23              MR. VOGT:  No objection.

24              THE COURT:  Received.

25              (Defendant's Exhibit 32 received in evidence)
```

M241PAL4

1     MR. AXELROD:  And may I publish.

2     THE COURT:  Yes.

3     MR. AXELROD:  Thank you.

4 BY MR. AXELROD:

5 Q.  And so we'll wait for this to come up for the jury.

6     But what does this signify, the part that's been

7 highlighted, "Elizabeth Williamson, Backfield 6/14/2017,

8 4:44 p.m."?

9 A.  That says that, you know, the draft is finished and it's in

10 that special section of the computer view, copy management

11 system called Backfield.

12 Q.  And can your colleagues on the editorial board now view

13 this?

14 A.  Can they what, Mr. Axelrod?  Sorry.

15 Q.  Sorry.  Can your colleagues on the editorial board view

16 this once it's been filed in Backfield?

17 A.  Yes, they can.

18 Q.  All right.  So now I want to go forward back to the second

19 page, where I think your draft starts.

20     And just to put this in perspective --

21     MR. AXELROD:  If you go forward one page.  Thank you,

22 Mr. DiMezza.  I'm sorry about that.

23 Q.  Do you see "Linda Cohn Backfield at 5:03," and does that

24 indicate that Ms. Cohn saved a draft at that time?

25 A.  I believe it does, yes.

M241PAL4

```
 1   Q.  Okay.  So we'll go to page 2.
 2              And so Mr. Vogt asked you a little bit before about
 3   what the lede, L-E-D-E, of the story is.  I've always wondered
 4   why it's not L-E-A-D, but that's another topic.
 5              What is the lede of this draft?
 6   A.  The lede is the first paragraph, so the opening of the
 7   piece, which is, "Just after 7 a.m. on Wednesday, members of
 8   Congress met in a quiet section of Alexandria, Virginia, to
 9   practice for this week's bipartisan congressional baseball game
10   when James Hodgkinson appeared from behind the dugout, and
11   began firing through the chain link fence."
12   Q.  From a journalistic standpoint, what is the lede paragraph
13   intended to do?
14   A.  It basically tells the reader exactly what -- it's usually
15   the who, what, when, where; it tells them, you know, exactly
16   what happened and what -- what they're about to be reading
17   about.
18   Q.  Does the lede paragraph of your draft involve Sarah Palin
19   or her political action committee in any way?
20   A.  No.
21   Q.  Does it involve Congresswoman Gabrielle Giffords in any
22   way?
23   A.  No.
24              MR. AXELROD:  Could we go to the fourth paragraph,
25   Mr. DiMezza.
```

M241PAL4

1    Q.  And just to follow up on something Mr. Vogt asked you
2    before.  This was your draft that no one else had edited or
3    revised; is that correct?
4    A.  Yes, I believe it is.
5    Q.  So this is the fourth paragraph:  "That in 10 minutes, a
6    single gunman could wreak such carnage in a bedroom community a
7    short drive from the Capitol is horrifying, but no longer
8    surprising.  Not all the details are known yet, but a
9    sickeningly familiar pattern is emerging: a deranged individual
10   with a gun — perhaps multiple guns — and scores of rounds of
11   ammunition uses politics as a pretense for a murderous shooting
12   spree.  Mr. Hodgkinson was a Bernie Sanders supporter and
13   campaign volunteer virulently opposed to president Trump, who
14   among many anti-Trump messages posted 'Time to Destroy Trump &
15   Co.' on social media in March."
16            What did you intend to convey with this paragraph?
17   A.  I was attempting to introduce those twin themes that we
18   talked about — the -- the access to guns; and the overheated
19   political speech that presaged the attack.
20   Q.  And when you use the words "sickeningly familiar pattern is
21   emerging," what were you referencing there?
22   A.  Actually both of those things, but, you know, again, the
23   environment in which this attack occurred was well known to
24   most people, particularly in Washington.
25   Q.  Then in the last sentence, you say, "Mr. Hodgkinson was a

M241PAL4

1  Bernie Sanders supporter and campaign volunteer virulently

2  opposed to President Trump."  Why include the information about

3  Mr. Hodgkinson being a Bernie Sanders supporter?

4  A.  Because in this instance, that rhetoric was coming from

5  someone who had declared themselves to be on the left of the

6  political spectrum.

7  Q.  And was that important -- was that an important detail for

8  you in your draft?

9  A.  Yes, because if you remember, James's original email about

10  what we were to convey in this piece, it was about, you know,

11  if this is coming from the left, we should say that.

12        MR. AXELROD:  You can take that down, Mr. DiMezza.

13  Thank you.  Not the whole editorial.  Thanks.

14        Could we go to the next paragraph.  "Just as in 2011."

15  Q.  Here you write, "Just as in 2011, when Jared Lee Loughner

16  opened fire in a supermarket parking lot, grievously wounding

17  Representative Gabby Giffords, Mr. Hodgkinson's rage was

18  nurtured in a vile political climate."  And what were you

19  intending to say there?

20  A.  Again, I was pointing to the last instance in which we had

21  a shooting of a member of Congress, six years prior, and the

22  same kind of political rhetoric characterized the atmosphere in

23  the run-up to that shooting as well.

24  Q.  What were you trying to accomplish by discussing both the

25  Scalise and the Giffords shooting in this draft editorial?

**JA 0344**

M241PAL4

```
1   A.  I was trying to call out — on behalf of the editorial
2   board, you know, not strictly myself, of course — that we need
3   to take the tone down across the political spectrum and stop
4   demonizing political opponents and stop using violent rhetoric
5   and gun imagery to describe what are basically political
6   disagreements and political opponents.
7   Q.  In the next sentence after the highlighting, you wrote,
8   "Then it was the pro-gun right being criticized: In the weeks
9   before the shooting Sarah Palin's political action committee
10  circulated a map of targeted electoral districts that put
11  Ms. Giffords and 19 other Democrats under stylized crosshairs."
12  Do you see that?
13  A.  Yes.
14  Q.  Who chose to refer to the crosshairs map that we looked at
15  before, Defense Exhibit 61, I believe?
16  A.  I did.
17  Q.  Did anyone on the editorial board instruct you to include a
18  reference to the crosshairs map?
19  A.  No.
20  Q.  At the point that you wrote this draft, did you know
21  whether or not Jared Loughner had seen the crosshairs map?
22  A.  I had no idea.
23  Q.  Through this draft did you mean to suggest that the
24  crosshairs map had somehow caused Loughner to act?
25  A.  No.
```

**JA 0345**

1   Q.  In that sentence that I just read, you include this

2   reference to Sarah Palin's political action committee.  Why did

3   you write about Sarah Palin's political action committee?

4   A.  Because it was the political action committee that produced

5   and circulated the map, and they are, by law, separate from the

6   politician, so it was important factually to distinguish the

7   political action committee from Sarah Palin.

8   Q.  Were you writing about Sarah Palin or the political action

9   committee?

10  A.  I was writing about the political action committee because

11  they were the ones who circulated the map.

12  Q.  Who chose to include the reference to Sarah Palin's

13  political action committee?

14  A.  I did.

15  Q.  Did anyone on the editorial board tell you to refer to

16  Sarah Palin's political action committee?

17  A.  No, they did not.

18  Q.  At the time that you wrote this draft, did you have any

19  positive or negative feelings about Sarah Palin?

20  A.  No.

21  Q.  By including the reference to Sarah Palin's political

22  action committee in this draft, did you intend to harm Sarah

23  Palin in any way?

24  A.  No.

25  Q.  If you see -- look at the screen, that "circulated" --

**JA 0346**

1   Mr. Vogt talked to you about this a little bit -- it looks like
2   it's bolded and underlined, and I think you testified that it
3   was a hyperlink?
4   A.  Yes.
5   Q.  Why did you choose what -- strike that last question.
6           Did you choose to hyperlink to another piece of
7   research or an editorial or something?
8   A.  Yes, I did.
9   Q.  And why did you choose to include the hyperlink?
10  A.  Because that was a link to the map so that when readers,
11  this many years later, read about -- read this sentence, they
12  would know to what I was referring.
13          MR. AXELROD:  And so Mr. DiMezza, if we could take
14  that down and put up DX 10, which Mr. Vogt admitted as a
15  different document, but we'll just go through it again.
16  Q.  Ms. Williamson, do you know what Defense Exhibit 10 is?
17  A.  Yes.  As we talked about earlier, it is the article that I
18  had linked to in the sentence about the map.
19          MR. AXELROD:  Your Honor, I'd move to admit DX 10.
20          MR. VOGT:  No objection.
21          THE COURT:  Received.
22          (Defendant's Exhibit 10 received in evidence)
23          MR. AXELROD:  And if I could publish to the jury.
24          THE COURT:  Yes.
25          MR. AXELROD:  Thank you.

M241PAL4

1  BY MR. AXELROD:

2  Q.  Ms. Williamson, who chose what article to link to?

3  A.  I did.

4  Q.  And why did you choose this article?

5  A.  Because it seemed to comprehensively talk about what

6  emerged in my research as a chief example of the type of

7  rhetoric that circulated prior to the Arizona shooting in 2011.

8  Q.  So Mr. Vogt showed you the second page, but I'm going to

9  spend some time on the first page with you.

10       If you look at the first paragraph, it reads, "In the

11  stunned aftermath of the Tucson massacre, Sarah Palin has found

12  herself in the crosshairs of the ensuing political debate with

13  opponents suggesting she may have fueled the gunman's rage and

14  her supporters saying it is 'grotesque' to blame her and to

15  politicize the tragedy."

16       And then the next sentence, next paragraph goes on --

17       MR. AXELROD:  I think you can just blow up that entire

18  next piece, Mr. DiMezza.  No, grab the second paragraph.

19  Q.  "Crosshairs is a political phrase that emerged from Palin's

20  political action committee SarahPAC that targeted congressional

21  districts for the Tea Party campaign in the last election,

22  including the district of Rep. Gabrielle Giffords."

23       MR. AXELROD:  And then if you can go down and grab the

24  last three paragraphs on the page.

25  Q.  It reads, "Like so much with Palin, the roots are on

1    Facebook.  On her Facebook page last year when she posted the a

2    map of 20 congressional districts targeted by SarahPAC, the

3    headline of the map: It's time to take a stand.

4         "At the time Giffords reacted to the map in an

5    interview on a cable news program.

6         "'When people do that, they've got to realize there

7    are consequences to that action,' Giffords said."

8         Did you want readers of *The Times* to be able to go

9    back and look at this story by ABC News about the 2011

10   political climate?

11   A.  Yes.

12        MR. AXELROD:  So now if you could go back to Defense

13   Exhibit 32, Mr. DiMezza, which is in evidence.

14        Thank you.  And I think that should be up for the

15   jury.  Yeah, that's great.

16        And if you could go to the ninth paragraph, which is

17   on page 3.

18        There you go.

19        You were right.  I messed up.  If you go back to the

20   page before, let's grab the last paragraph first.  Thank you.

21        That's great.

22   BY MR. AXELROD:

23   Q.  So Ms. Williamson, you wrote this:  "President Trump

24   offered a unifying initial response.  'We may have our

25   differences, but we do well in times like these to remember

**JA 0349**

M241PAL4

```
1   that everyone who serves in our nation's capitol is here
2   because, above all, they love our country,' he said.  'We can
3   all agree that we are blessed to be Americans, that our
4   children deserve to grow up in a nation of safety and peace.'"
5           Did you write that?
6   A.  Yes, I did.
7   Q.  Why did you include that in your draft?
8   A.  Because I thought that was a praiseworthy example of trying
9   to bring the two political sides together and to not demonize
10  one's political opponents or add fuel to the rhetorical fire.
11          MR. AXELROD:  And now, Mr. DiMezza, if we can go to
12  the next page, in the next paragraph.
13  Q.  You wrote, "Mr. Trump is right.  Guns are so numerous, and
14  so easy to obtain in America that the risks of being injured or
15  killed with one are higher in America than in any other
16  peaceful nation.  So when Republican legislators tuning up for
17  a ballgame with their Democratic colleagues are targeted by a
18  crazed gunman, what might be the likelier cause: fringe
19  elements on both ends of our political spectrum or 300 million
20  guns in America?  The shooting in Alexandria was one of at
21  least three mass shootings in the United States *on Wednesday*.
22  Before Ms. Giffords' shooting, the last time a member of
23  Congress was gunned down was in 1954, when the number of
24  firearms in the country were a tiny fraction of today's."  And
25  did you write that?
```

M241PAL4

```
1    A.  Yes, I did.

2    Q.  And what were you trying to say?

3    A.  I was trying to point out two things, again, those twin

4    poles, a nation awash in firearms, there has to be -- and the

5    causality there, and then also to point out that the last

6    shooting before, so many decades beforehand, in a country where

7    we had far fewer firearms, so there was -- it was a relative

8    rarity when we had fewer firearms.

9            MR. AXELROD:  You can take that down.  Thank you.

10   Q.  Now, Ms. Williamson, after you submitted your draft in

11   Backfield that we just looked at, did you know who would be

12   editing the piece?

13   A.  No.

14   Q.  But it would be typical in that scenario for someone to be

15   looking at it?

16   A.  Yes.

17           MR. AXELROD:  If we could go to Plaintiff's

18   Exhibit 147, which is in evidence.  Thank you.

19           And your Honor, this is in evidence.  May I publish

20   it?

21           THE COURT:  Yes.

22   Q.  I think Mr. Vogt asked you about this exhibit earlier

23   today.  This was an email from Nick Fox.  Do you recall this?

24   A.  Yes.

25   Q.  Do you understand why Nick Fox was sending you this email?
```

**JA 0351**

M241PAL4

1   A.  He was adding -- it looked like he was adding -- he was

2   editing, he's an editor, so he had undertaken to add some

3   things to the piece.

4   Q.  And would it be normal for one or more people, one or more

5   editors on the editorial board to look at your piece?

6   A.  Absolutely, yes.

7   Q.  Typically how many different sets of eyes at the editorial

8   board are looking at a draft after it's been completed?

9   A.  Counting the fact-checkers?

10  Q.  Sure.

11  A.  Maybe a half dozen.

12  Q.  And speaking of the fact-checkers, after you submitted your

13  draft, do you know whether any additional fact-checking was

14  being done?

15  A.  Oh, yes, I would assume -- yes, it was.

16  Q.  Yeah.  Let's just go back to that.  Mr. Vogt showed you

17  these earlier.

18          MR. AXELROD:  Could we put up DX 35.

19          Sorry.  DX 35.  Thank you, Mr. DiMezza.  I apologize.

20  Q.  And Ms. Williamson, what is this?

21  A.  This is an email from Eileen Lepping, fact-checker, to

22  myself and other editors in New York.

23          MR. AXELROD:  Your Honor, I move to admit DX 35.

24          MR. VOGT:  No objection.

25          THE COURT:  Received.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA 0352**

M241PAL4

| | |
|---|---|
| 1 | (Defendant's Exhibit 35 received in evidence) |
| 2 | MR. AXELROD:  May I publish. |
| 3 | THE COURT:  Yes. |
| 4 | BY MR. AXELROD: |
| 5 | Q.  And I think you answered before under Mr. Vogt's |
| 6 | questioning that this was Ms. Lepping sending details about |
| 7 | different facts or laws she was looking at? |
| 8 | A.  Yeah.  So she was just sending backup to some facts that |
| 9 | she was checking and fixing. |
| 10 | Q.  And she was sending it to you, Mr. Bennet, Mr. Fox, and |
| 11 | Ms. Cohn? |
| 12 | A.  Yes. |
| 13 | Q.  And would it be normal for her to send the fact-checking |
| 14 | that she was doing to the primary author of the piece? |
| 15 | A.  Yes. |
| 16 | MR. AXELROD:  And so if you could take that down, |
| 17 | Mr. DiMezza, and put up DX 36. |
| 18 | Q.  And Ms. Williamson, what is this? |
| 19 | A.  This is another example of Eileen -- well, sorry.  It's an |
| 20 | email from Eileen to me -- or me to Eileen.  Sorry. |
| 21 | Q.  Yeah. |
| 22 | MR. AXELROD:  Your Honor, I move for admission of |
| 23 | DX 36. |
| 24 | MR. VOGT:  No objection. |
| 25 | THE COURT:  Received. |

M241PAL4          **JA 0353**

```
 1                    (Defendant's Exhibit 36 received in evidence)
 2                    MR. AXELROD:  May I publish.
 3                    THE COURT:  Yes.
 4      BY MR. AXELROD:
 5      Q.  You looked at this before with Mr. Vogt.  And yeah, just
 6      briefly, what is this?
 7      A.  This is my response to a suggested change that Eileen, the
 8      fact-checker, wanted to make based on some fact-checking that
 9      she was doing.
10      Q.  I forgot to do something with the previous document, so
11      bear with me for a second.
12                    MR. AXELROD:  Mr. DiMezza, could we go back to 32,
13      please.
14      Q.  So I'm going back to your draft that you filed in
15      Backfield.  And to put you in --
16                    MR. AXELROD:  If you go to the next page and go to the
17      fifth paragraph.
18      Q.  Under questioning from Mr. Vogt, you talked about a second
19      correction.  Do you recall that?
20      A.  Yes.
21      Q.  And I think you said the correction was to the language
22      regarding how the map -- what the map said -- sorry.  Strike
23      that.
24                    I think you said the correction was related to the
25      description of the map?
```

**JA 0354**

1  A.  That's correct.

2  Q.  So it was -- is it the sentence, "Then it was the pro-gun

3  right being criticized: In the weeks before the shooting Sarah

4  Palin's political action committee circulated a map of targeted

5  electoral districts that put Ms. Giffords and 19 other

6  Democrats under stylized crosshairs"?

7  A.  Yes.

8  Q.  So what was the problem with this sentence?

9  A.  So the back half of the sentence was imprecise because the

10  map put Ms. Giffords' district and 19 other Democrats'

11  districts under stylized crosshairs, and if we had had an

12  apostrophe after "Giffords" and "Democrats," it would have been

13  correct.

14  Q.  So it was more like a typo?

15  A.  You could call it that, yeah, but it needed to be

16  corrected.

17  Q.  And this was language that you wrote?

18  A.  Yes.

19          MR. AXELROD:  We can take that down.  Thank you.  And

20  put up DX 38.

21  Q.  And Ms. Williamson, you looked at this before under

22  Mr. Vogt's questioning.  Do you remember this email from

23  Mr. Bennet to you?

24  A.  Yes.

25          MR. AXELROD:  Your Honor, I'd move for admission of

M241PAL4

 1   DX 38.

 2              MR. VOGT:  No objection.

 3              THE COURT:  Received.

 4              (Defendant's Exhibit 38 received in evidence)

 5              MR. AXELROD:  May I publish.

 6              THE COURT:  Yes.

 7              MR. AXELROD:  Thank you.

 8   BY MR. AXELROD:

 9   Q.  So this is now at 7:22 p.m., the bottom email, where

10   Mr. Bennet says to you, "I really reworked this one.  I hope

11   you can see what I was trying to do.  Please take a look.

12   Thank you for the hard work today and I'm sorry to do such a

13   heavy edit."

14              After getting this email, I know that you're not quite

15   sure how you read the revision, but did you read the revision?

16   A.  I glanced at it.  As you can see, I referred to the lede,

17   the first paragraph, so, you know, I basically looked at it,

18   skimmed it, and wrote back about the lede.

19   Q.  In your review of the piece when you read through it, did

20   anything jump off the page at you as being wrong?

21   A.  No.

22   Q.  Did anything jump off the page at you as being unfair?

23   A.  No.

24   Q.  Anything jump off the page at you as being inaccurate?

25   A.  No.

**JA 0356**

M241PAL4

```
1    Q.  When you read Mr. Bennet's draft, did you think that he was
2    trying to make a different point than the one you had been
3    trying to make?
4    A.  No.
5              MR. VOGT:  Objection.
6              THE COURT:  Sustained.
7    Q.  When you read Mr. Bennet's draft, what point did you think
8    he was trying to make?
9              MR. VOGT:  Objection.
10             THE COURT:  Sustained.
11   Q.  When you read Mr. Bennet's draft, did you understand the
12   language that he was using?
13   A.  Like I said, I did not read it thoroughly.  In retrospect,
14   I wish I had, because then maybe we could have caught something
15   before.
16   Q.  When you read Mr. Bennet's draft, did you share any
17   concerns with Mr. Bennet about his revision?
18   A.  No, I did not.
19             MR. AXELROD:  You can take that down, Mr. DiMezza, and
20   put up Defense Exhibit 42.
21   Q.  And Ms. Williamson, what is Defense Exhibit 42?
22   A.  This is an email from Linda Cohn to me.
23             MR. AXELROD:  I'd move for admission of Defense
24   Exhibit 42, your Honor.
25             MR. VOGT:  No objection.
```

**JA 0357**

M241PAL4

```
 1              THE COURT:  Received.
 2              (Defendant's Exhibit 42 received in evidence)
 3              MR. AXELROD:  And may I publish.
 4              THE COURT:  Yes.
 5   BY MR. AXELROD:
 6   Q.  So it looks like, Ms. Williamson, Ms. Cohn emails you at
 7   7:58, the subject is "15thu1 playback attached."  Do you know
 8   what that means?
 9   A.  Yes.  This would have been the -- the final draft of the
10   piece.  A playback is simply they're playing back the story to
11   you so that you can check it.
12   Q.  And Ms. Cohn writes, "Hi.  I don't know whether James sent
13   you a playback with his changes.  Just in case, here's
14   another."
15              And if we go down, you see where it says "Print
16   Headline:  America's Lethal Politics," and "By The Editorial
17   Board"?  Do you see that?
18   A.  Yes.
19   Q.  And do you know whether you read this email from Ms. Cohn
20   when you received it?
21   A.  I glanced at it.
22   Q.  When you read this draft, did you have any concerns about
23   the editorial?
24   A.  No.
25   Q.  And so this was at about 8:00.  And I want to go back to an
```

**JA 0358**

M241PAL4

 1    exhibit that Mr. Vogt asked you about.

 2              MR. AXELROD:  Let's take that down, Mr. DiMezza, and

 3    put up defense Exhibit 123 -- 1-2-3.

 4    Q.  And yeah, Mr. Vogt showed you this before.

 5    A.  Mm-hmm.

 6    Q.  This is an email exchange with Mr. Wegman about the piece.

 7              MR. AXELROD:  Your Honor, I'd move for admission of

 8    DX 123.

 9              MR. VOGT:  No objection.

10              THE COURT:  Received.

11              (Defendant's Exhibit 123 received in evidence)

12              MR. AXELROD:  May I publish.

13              THE COURT:  Yes.

14    BY MR. AXELROD:

15    Q.  So looking at this email, I'm really looking at the top,

16    where you say, "Thanks Jesse but I have to say that was mostly

17    a James production.  I supplied the skeleton and he the riffs.

18    The goal was shared to communicate the horror of the morning

19    and the fact that until the culture changes we can all expect

20    this."  What did you mean by that?

21    A.  So on "the horror of the morning," that was something I

22    noticed in the lede.  The thing that I commented to James about

23    is that I thought he did a better job when he said in the lede,

24    you know, that -- one of the members of Congress saying, "He

25    was hunting us," that I thought that very well communicated

**JA 0359**

1    what an awful thing that must have been for those members of

2    Congress.  And then "until the culture changes we can all

3    expect this," and by that, I meant the political culture.

4    Q.  So you wrote that email at 11:05; is that right?

5    A.  That's correct.

6    Q.  I know what the answer is, but I'm going to ask you anyway.

7    And do you remember what time you went to bed on June 14th of

8    2017?

9    A.  I think it would have been right after that.

10   Q.  Okay.

11   A.  Yes.

12   Q.  That's a better answer than I thought.

13          Do you remember having any concerns or any worries

14   about the editorial as you went to bed on the night of

15   June 14th?

16   A.  No.  Because I think after one or more exchange, you know,

17   there wasn't anything that I read when I went to bed that

18   suggested there was any problem.

19          MR. AXELROD:  You can take that down and put up

20   Defense Exhibit 46.

21   Q.  Ms. Williamson, do you know what Defense Exhibit 46 is?

22   A.  Yes.  These are screenshots of my text messages back and

23   forth with James.

24   Q.  And so I think Mr. Vogt --

25          MR. AXELROD:  I'm sorry.  Before I do that, your

**JA 0360**

M241PAL4

1   Honor, I'd move to admit Defense Exhibit 46.

2              MR. VOGT:  No objection.

3              THE COURT:  Received.

4              (Defendant's Exhibit 46 received in evidence)

5              MR. AXELROD:  And may I publish.

6              THE COURT:  Yes.

7   BY MR. AXELROD:

8   Q.  So if you look, I think Mr. Vogt showed you the texts on

9   the right side that begin with 8:26 a.m.  Do you see that?

10  A.  Yes.

11  Q.  I want to go back to the left side.  So there's a text from

12  June 11, 2017:  "Great piece -- thank you.  Don't worry about

13  that."  But then there's a text from -- on June 14th at

14  11:38 p.m.  Do you see that?

15  A.  Yes.

16  Q.  It says, "Are you up?  The right is coming after us over

17  the Giffords comparison.  Do we have it right?"

18  A.  Yes.

19  Q.  Had you -- were you awake when that text came in?

20  A.  No, unfortunately.

21  Q.  Prior to receiving this text, did you have any concerns

22  about the editorial?

23  A.  No.

24  Q.  You respond to Mr. Bennet, "Sorry I had gone to bed.  Will

25  read now what they are saying."

1          What did you mean by that?

2  A.  Meaning what James had said was, "The right is coming after

3  us over the Giffords comparison.  Do we have it right?"  And so

4  I figured I would try and read what the criticism is.

5  Q.  The next text is at 8:26 that morning from you to

6  Mr. Bennet where you say, "Do you have time to talk by phone

7  this morning?"  And then Mr. Bennet then responds, "Now is

8  good."  Do you see that?

9  A.  Yes.

10  Q.  And did you have a conversation with Mr. Bennet?

11  A.  Yes, I did.

12  Q.  And what did you talk about?

13  A.  While it's hard for me to remember the specifics five years

14  later, we talked about what went wrong here and how to fix it,

15  how to get to what the facts were and address the criticism

16  that was coming from readers and make a correction, if

17  necessary.

18  Q.  You then write, "Hey, I'm sorry James.  I should have read

19  those grafs more closely and asked more questions.  That's on

20  me.  Will get a cx drafted soonest."  And Mr. Bennet responds,

21  "No worries.  I feel lousy about this one.  I just moved too

22  fast.  I'm sorry."  And then he sends you the email about --

23  with the research instructions.  Do you recall that?

24  A.  Yes, I sure do.

25  Q.  Prior to this, the last text message where Mr. Bennet asked

M241PAL4          **JA 0362**

1    you to research whether there was no link to incitement or no

2    direct link or no clear link, had Mr. Bennet asked you to

3    research whether or not Mr. Loughner acted because of the

4    crosshairs map or any incitement?

5    A.   No.  This on the 15th was the first time he had asked for

6    that.

7          MR. AXELROD:  And so if you could take that down now,

8    Mr. DiMezza, and put up DX 48.

9    Q.   Which I think Mr. Vogt showed you before.

10          What is this exhibit, Ms. Williamson?

11   A.   This is an email from James to myself and Eileen Lepping.

12          MR. AXELROD:  Your Honor, I'd move for admission of

13   DX 48.

14          MR. VOGT:  No objection.

15          THE COURT:  Received.

16          (Defendant's Exhibit 48 received in evidence)

17          MR. AXELROD:  And may I publish.

18          THE COURT:  Yes.

19   BY MR. AXELROD:

20   Q.   So this is Mr. Bennet emailing Eileen and you with the

21   subject "Giffords."  He writes, "Hey guys, we're taking a lot

22   of criticism for saying that the attack on Giffords was in any

23   way connected to incitement.  The claim is that this was fully

24   investigated and debunked in the months after the attack, and

25   the shooter was found to have acted only because of his

1    personal demons.  I don't know what the truth is here but we

2    may have relied too heavily on our early editorials and other

3    early coverage of that attack.  If so, I'm very sorry for my

4    own failure on this yesterday.  In any case I'd like to get to

5    the bottom of this as quickly as possible this morning and

6    correct the piece if needed.  Can you two please put your heads

7    together on this first thing this morning?  Please skip the

8    morning meeting if necessary."

9    A.  Yes.

10   Q.  What did you think when you received this 5:08 a.m. email?

11   A.  Just, ugh, that, you know, it sounded like he -- that

12   readers were pointing out what they thought was an error in the

13   piece, so it meant we really had to scramble the jets and find

14   out what the error was, nail it down, and, as quickly as

15   possible, correct it.

16   Q.  Was it usual or unusual to receive emails from Mr. Bennet

17   at 5:00 in the morning?

18   A.  It was unusual, just like the one at 11:30.

19           MR. AXELROD:  You can take that down and put up

20   Defense Exhibit 50, please.

21   Q.  And this is another email that Mr. Vogt showed you this

22   morning.

23           Do you recall this exchange with Mr. Wegman?

24   A.  Yes, I do.

25           MR. AXELROD:  Your Honor, we move for admission of

**JA 0364**

M241PAL4

1   DX 50.

2              MR. VOGT:  No objection.

3              THE COURT:  Received.

4              (Defendant's Exhibit 50 received in evidence)

5              MR. AXELROD:  And may I publish.

6              THE COURT:  Yes.

7              MR. AXELROD:  Thank you.

8   BY MR. AXELROD:

9   Q.  What I really want to focus on here --

10             MR. AXELROD:  Mr. DiMezza, you can go up, actually.

11  Thank you.

12  Q.  -- is the 7:18 email that you wrote to Mr. Wegman.  "Hi I

13  went to bed."  Do you see that piece?

14  A.  Yes.

15  Q.  You wrote.  "Hi I went to bed after our exchange but have

16  notes this morning that JB would like to check what the truth

17  is here.  What in your view would be the most reliable

18  assessment of the politics link (or not) in the Loughner case?

19  Am thinking court records/assessment of his state of mind.

20  Maybe we can talk by phone when you're up?"  What were you

21  saying here?

22  A.  I was coming from zero because I had not researched the

23  shooting itself, and so this was, you know, trying to figure

24  out what would be the most objective source that we could go to

25  to figure out how the gunman -- if the gunman had been

M241PAL4

1    motivated by this political rhetoric when he took the action he

2    did in 2011.

3    Q.  Was it important for you to learn that information?

4    A.  Yeah, because that was the foundation of any correction

5    that we would make.

6    Q.  Did you agree with the decision by the editorial board to

7    issue the correction?

8    A.  Yes.

9    Q.  Why?

10   A.  Because that's what we do.  When we make an error, we

11   correct it.

12           MR. AXELROD:  And Mr. DiMezza, if you could put up

13   DX 5.

14           And if you could go to the end of the -- of this

15   editorial, so Ms. Williamson can see exactly what it is.

16   There.

17   Q.  Do you know what DX 5 is, Ms. Williamson?

18   A.  Yes.  This is the first correction.

19           MR. AXELROD:  Your Honor, I'd move for admission of

20   DX 5?

21           MR. VOGT:  No objection.

22           THE COURT:  Received.

23           (Defendant's Exhibit 5 received in evidence)

24   Q.  Can you tell the jury what we're looking at.

25   A.  Yes.  This is the first correction on June 15th of 2017 to

1    the editorial.

2    Q.   And did you have any role in drafting this language?

3    A.   I had an initial role in that I was trying to find that

4    objective source of the gunman's state of mind and what might

5    have influenced him, but as the day went on, they were working

6    on the correction in New York and so I lost some visibility.

7    Q.   Did you have any role in revising the editorial?

8    A.   No.

9         MR. AXELROD:  You could take that down, Mr. DiMezza,

10   and put up DX 8.

11   Q.   And Ms. Williamson, do you know what DX 8 is?

12   A.   This is -- this is a tweet from *The New York Times* opinion

13   section, drawing public attention to our correction in the

14   piece.

15        MR. AXELROD:  Your Honor, I'd move for admission of

16   DX 8.

17        MR. VOGT:  No objection.

18        THE COURT:  Received.

19        (Defendant's Exhibit 8 received in evidence)

20   Q.   So I don't want to presume -- well, strike that.

21        Could you explain to the jury what Twitter is.

22   A.   Yes.  Twitter is a social media platform that people who

23   have -- who have an account, like *The New York Times* opinion

24   page, use to publicize -- I mean, the opinion section's use of

25   it was usually to draw attention to our work and to what was

**JA 0367**

M241PAL4

1    happening maybe within the section or things that were coming

2    up or, you know, anything, you know, new editorials, things

3    that had just posted online, things of that nature.

4    Q.  And so you said *The New York Times* opinion section had a

5    Twitter account.  If you look, can you explain to the jury what

6    we're looking at in Defense Exhibit 8.

7    A.  Sure.  So this was a series of tweets meant to draw

8    attention to the fact that we had corrected the editorial, and

9    because some of the criticism sprung up on Twitter, it was seen

10    as a pretty effective use of the platform in drawing attention

11    to the correction itself, because we knew that a lot of the

12    criticism was -- or the editorial was being discussed and the

13    criticism was being discussed on Twitter.

14    Q.  And so if you look at the very top tweet, it says, "We

15    published an editorial last night on the shooting at the GOP

16    men's baseball team practice field in Alexandria."  And then

17    the next tweet says, "We got an important fact wrong.

18    Incorrectly linking political incitement and the 2011 shooting

19    of Giffords.  No link was ever established."

20            And then the third tweet says, "We're sorry about this

21    and we appreciate that our readers called us on the mistake.

22    We've corrected the editorial."  And then it includes a link.

23    Do you see that?

24    A.  Yes.

25            MR. AXELROD:  And I'll ask you to take that down,

1    Mr. DiMezza, and put up DX 59.

2    Q.  And Ms. Williamson, do you know what DX -- Defense

3    Exhibit 59 is?

4    A.  Mr. Axelrod, you're asking me that?  Yes.  Sorry.  I just

5    didn't quite hear you.

6    Q.  I'm sorry.  Let me say that again.  Do you know what

7    Defense Exhibit 59 is?

8    A.  Yes.

9    Q.  What is it?

10   A.  This is a -- what is essentially a public apology for the

11   mistake in the editorial.

12   Q.  And what I'm really focusing on is the very top text, over

13   NYT Opinion.  Do you see that?

14   A.  Yes.

15   Q.  What does that mean?

16   A.  I retweeted it on my own Twitter account, meaning I was

17   amplifying this message by putting it on my own Twitter feed so

18   that more people would read it.

19         MR. AXELROD:  And your Honor, at this time I would

20   move for the admission of DX 59.

21         MR. VOGT:  No objection.

22         THE COURT:  Received.

23         (Defendant's Exhibit 59 received in evidence)

24         MR. AXELROD:  And may I publish.

25         THE COURT:  Yes.

1          MR. AXELROD:  And we'll give it a second.  But while

2     we're doing that, we'll go back to basics again.

3     BY MR. AXELROD:

4     Q.  Could you just explain to the jury what retweeting means.

5     A.  Sure.  It's that I would take this post -- you can see the

6     center thing where it says 498, to the right of it -- and to

7     retweet, you press that, and it basically takes this entire

8     post and puts it on my Twitter account so that anyone who

9     follows me on Twitter can read it as well.  So it's as if I'm

10    also apologizing or I am, you know, amplifying the apology of

11    the section where I work.

12    Q.  Why did you retweet the opinion page's tweet that says:

13    We're sorry about this and we thank -- we're sorry about this

14    and that our readers are calling us on a mistake.  Why did you

15    retweet that?

16    A.  Because I wanted as many people as possible, especially the

17    readers who were disappointed in us, because the editorial got

18    something wrong, to see it and to know that we were owning up

19    to the error because that is, again, what we should be doing.

20    Q.  Ms. Williamson, during your time working at the editorial

21    board, up until June 14th of 2017, did you ever hear anyone at

22    the editorial board express something negative about Sarah

23    Palin?

24    A.  No, not that I can think of, no.

25    Q.  Have you ever heard James Bennet express something negative

1   about Sarah Palin?

2   A.  No.

3   Q.  After publication of the editorial, has anyone ever told

4   you that the editorial caused them to think less of Sarah

5   Palin?

6   A.  No.

7   Q.  When you included the reference to Sarah Palin's political

8   action committee in your draft of the editorial, did you do so

9   to injure Sarah Palin?

10  A.  No.

11          MR. AXELROD:  Your Honor, may I have a minute.

12          THE COURT:  Yes.

13          MR. AXELROD:  Thank you, your Honor.  No further

14  questions.

15          THE COURT:  Redirect.

16  REDIRECT EXAMINATION

17  BY MR. VOGT:

18  Q.  Ms. Williamson, at one point earlier today when you were

19  talking with Mr. Axelrod, you were discussing Defense

20  Exhibit 34.  That was the email where you had completed your

21  draft and said, "I'm no Frank Clines."  Do you recall that?

22  A.  May I read it, please.

23  Q.  We should have it.

24  A.  Thank you.

25          Thank you.

1   Q.  And you say in this email, "I'm no Frank Clines, but I did

2   my best"?

3   A.  Yes.

4   Q.  And is that a true statement, you did your best on this

5   draft of the editorial?

6   A.  Yes.

7   Q.  Do you think you did a good job?

8   A.  I did the best job I could, yes.

9   Q.  And Mr. Clines, his area of expertise was gun control; is

10  that right?

11  A.  Yes.

12  Q.  And your area of expertise is politics?

13  A.  National politics, yes.

14  Q.  And I think you also testified today that civility and

15  rhetoric were important issues to you?

16  A.  Yes.

17  Q.  And so the rhetoric part of this editorial would have been

18  right in your wheelhouse, correct?

19  A.  Political rhetoric?

20  Q.  Yes.

21  A.  Mm-hmm.

22  Q.  And those are the portions of the draft that you just ran

23  through with Mr. Axelrod?

24          THE COURT:  I'm sorry.  The witness needs to answer

25  yes or no, not mm-hmm.

 1              THE WITNESS:  Oh, I'm sorry, your Honor.

 2              THE COURT:  That's all right.

 3              THE WITNESS:  Yes.

 4     BY THE COURT:

 5     Q.  And you also ran through with Mr. Axelrod a couple of the

 6     editorials that went around.  I'd also gone through with you

 7     the "bloodshed and invective" and "As we mourn" pieces; do you

 8     recall that?

 9     A.  Yes.

10     Q.  And I believe that you had testified that with respect to

11     both of those, with some passages that Mr. Axelrod read out,

12     that those passages informed your work on your draft; is that

13     right?

14     A.  That's correct.

15     Q.  And I think there was even one passage or one paragraph in

16     the "bloodshed and invective" piece that you had said that you

17     wrote your draft based on; is that right?

18     A.  I don't recall characterizing it exactly that way, but

19     those editorials definitely informed my work that day.

20     Q.  And do you think you did an effective job in your draft of

21     incorporating the sentiment from those editorials into your

22     draft section discussing the Loughner shooting of Giffords?

23     A.  As I said, I did the best job I could.

24     Q.  And when you did that in your draft, you did not use the

25     word "incitement," correct?

1   A.  That's correct.

2   Q.  And then after you had completed your draft, those sections

3   that you wrote dealing with the issue of political rhetoric are

4   the ones that Mr. Bennet rewrote, correct?

5   A.  Correct.

6   Q.  And when he rewrote them, he injected the word "incitement"

7   into those passages, correct?

8   A.  Yes.  He used the word "incitement," which I did not use.

9   Q.  And I believe that you discussed earlier -- I think you

10  said this a couple times -- that the editorial board would also

11  call out people on the left for the rhetoric that demonized

12  opponents; is that right?

13  A.  That's correct.

14  Q.  Did you do that often?

15          MR. AXELROD:  Objection.

16  A.  You would be asking me to characterize a very long period

17  of time and the work of scores of people in a single

18  department.  I don't think I can do that, Mr. Vogt.

19          THE COURT:  I'm sorry.  Mr. Axelrod, did you have an

20  objection?

21          MR. AXELROD:  I did.

22          THE COURT:  I'm sorry.  I didn't hear it.

23          MR. AXELROD:  That's quite all right.  It was low, but

24  Ms. Williamson caught the reason for the objection — that the

25  question was imprecise.

1           THE COURT:  Well, the objection is nevertheless

2    sustained.

3           MR. AXELROD:  Thank you.

4           MR. VOGT:  See if maybe I can bring up something else

5    that's more specific.  Which is a defense exhibit, so I at this

6    time move it into evidence.

7           MR. AXELROD:  I have no objection, your Honor.

8           THE COURT:  Received.

9           (Defendant's Exhibit 68 received in evidence)

10          MR. VOGT:  Could it be published to the jury.

11          It's okay to publish, your Honor?

12          THE COURT:  Yes, yes.

13   BY MR. VOGT:

14   Q.  Ms. Williamson, have you ever seen --

15          THE COURT:  Counsel, just going forward, to save a

16   little time, whenever I receive an exhibit, you're free to

17   publish it.  You don't have to ask permission.

18          MR. VOGT:  I assumed, but I heard Mr. Axelrod asking

19   and so then I --

20          THE COURT:  Yeah, well, he was being polite and I was

21   being habitual, so --

22          MR. VOGT:  I just didn't want to seem like I was being

23   the jerk.

24          THE COURT:  You're fine.  You're fine.

25   BY MR. VOGT:

| | |
|---|---|
| 1 | Q.  Have you ever seen this article before? |
| 2 | A.  Did you show it to me during my deposition two years ago? |
| 3 | Q.  I may have. |
| 4 | A.  So yes then. |
| 5 | Q.  Do you recall this incident that came up with Kathy Griffin |
| 6 | holding a severed head of president Trump? |
| 7 | A.  Yes. |
| 8 | Q.  Did the editorial board call this out as political rhetoric |
| 9 | that demonized opponents? |
| 10 | A.  As I sit here, I don't know. |
| 11 | Q.  Can you -- it's a little faint, but can you make out the |
| 12 | date on this article? |
| 13 | A.  Yes, 30 May 2017. |
| 14 | Q.  It was two weeks before the James Hodgkinson shooting, |
| 15 | wasn't it? |
| 16 | A.  Yes. |
| 17 | Q.  And you didn't mention this in your editorial about the |
| 18 | Hodgkinson shooting, did you? |
| 19 | A.  No. |
| 20 | Q.  And when you had your discussion with Judge Rakoff about |
| 21 | the rhetoric of demonization and the email from Mr. Bennet |
| 22 | about, you know, how that incites people to violence, I think |
| 23 | you gave a couple of examples.  One of those examples was the |
| 24 | stolen election and then the breach of the Capitol; is that |
| 25 | right? |

M241PAL4                    Williamson - Redirect

1  A.  Yes.

2  Q.  Do you recall, was then-president Trump impeached over that

3  incident?

4  A.  Yes.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M242Pal5                    Williamson - Redirect

1

2    Q.  Do you recall what he was impeached for?

3    A.  The specific cause I would not be comfortable parsing for

4    you here since that's a legal matter.

5    Q.  You don't remember the charges against him?

6    A.  I'm sorry, I cannot give you chapter and verse on the

7    charges against him because I would want to be really specific.

8    Q.  Do you recall --

9                THE COURT:  I'm not sure I understand the relevance of

10   this.

11               MR. VOGT:  Well, I'll move on, your Honor.

12               THE COURT:  All right.

13   BY MR. VOGT:

14   Q.  Let me pull up Plaintiff's 166.

15               Ms. Williamson, you should have up on your screen

16   Plaintiff's Exhibit 166.  Do you recognize this document?

17   A.  If that says 166, yes.  It looks like the front page of *The*

18   *New York Times*.

19   Q.  And do you know what day this is from?

20   A.  January 7, 2021.

21               MR. VOGT:  Your Honor, at this time I would ask to

22   move Plaintiff's Exhibit 166 into evidence.

23               MR. AXELROD:  Objection.  Relevance.

24               THE COURT:  Sustained.

25               MR. VOGT:  Your Honor, I would note that there was no

```
 1    objection on the pretrial consent order.
 2              THE COURT:  Okay.  Let me take a look.  What's the
 3    exhibit number again?
 4              MR. VOGT:  166.
 5              MR. AXELROD:  Your Honor, I do believe that objections
 6    to relevance are not waived.
 7              THE COURT:  That's true.  Good point.  Sustained.
 8    BY MR. VOGT:
 9    Q.  You were asked some questions about using the phrase "Sarah
10    Palin Political Action Committee."  Do you recall that?
11    A.  Yes.
12    Q.  And do you have the name of her political action committee?
13    A.  I believe it is called SarahPAC.
14    Q.  Why didn't you use SarahPAC in your piece instead of Sarah
15    Palin political action committee?
16    A.  Because I think readers would want to know who is Sarah if
17    I just used SarahPAC.
18    Q.  So you used Sarah Palin's full name so that readers would
19    know that you were talking about her, correct?
20    A.  I wasn't talking about her.  I was talking about her
21    political action committee, just to be precise, because that is
22    a legal distinction.
23    Q.  But you chose not to use just SarahPAC in your editorial,
24    correct?
25    A.  I used Sarah Palin Political Action Committee and I used a
```

1  hyperlink to an article about it.

2  Q.  And you were asked some questions about Defense Exhibit 11.

3  I believe this was the one where -- which I think has been

4  admitted into evidence.

5        It wasn't this one, I apologize, but you were asked

6  about Mr. Semple putting the editorial, possible editorial on

7  the DEW.  Do you recall that?

8  A.  Yes.

9  Q.  And I believe that your testimony was that it was a smaller

10  piece that was put up as an alternate for number three.  Is

11  that right?

12  A.  I believe I said an alternate two or three, yes, meaning a

13  smaller editorial.

14  Q.  And?

15  A.  Not the main one.

16  Q.  And just so I will understand, when you are talking about

17  the number one, number two, number three, is that the actual

18  placement on the opinion page?

19  A.  Well, it doesn't really refer to geography as much as it

20  does importance.  So the number one editorial is the big piece

21  for the day, the biggest editorial, the most comprehensive and

22  probably deemed by the editors to be the most important or

23  relevant to the news of the day.  And then there are two

24  additional, smaller editorials that are about two other

25  separate matters.  And it was one of those smaller ones that

**JA 0380**

 1  they were considering this editorial to be.

 2  Q.  And Mr. Axelrod had gone through the corrections and some

 3  questions about those with you.  Do you recall that?

 4  A.  Yes.

 5  Q.  You should have Plaintiff's Exhibit 18 up in front of you.

 6  Do you recognize this exhibit?

 7  A.  Yes.

 8          MR. VOGT:  At this time, your Honor, I would move to

 9  introduce Plaintiff's Exhibit 18 into evidence.

10          MR. AXELROD:  No objection, your Honor.

11          THE COURT:  Received.

12          (Plaintiff's Exhibit 18 received in evidence)

13  BY MR. VOGT:

14  Q.  And Ms. Williamson, I think we might have talked about

15  these earlier, but I didn't introduce them.  These are the

16  guidelines on integrity.  Were these in effect on June 14 of

17  2017?

18  A.  Yes.

19  Q.  And if you turn to page 4 of 7, there is a paragraph up at

20  the top of the page?

21  A.  Yes.

22  Q.  It starts with "because our voice is loud and

23  far-reaching."

24  A.  Yes.

25  Q.  What does that mean?

1   A.   "Because we have a big platform, *The Times* recognizes an

2   ethical responsibility to correct all its factual errors, large

3   and small.  The paper regrets every error, but it applauds the

4   integrity of a writer who volunteers a correction of his or her

5   own published story."

6   Q.   Then it goes on to say that "if a correction is warranted,

7   fairness demands that it be published immediately."  Is that

8   correct?

9   A.   That is correct.

10   Q.   And after that it goes on to say, "In case of reasonable

11   doubt or disagreement about the facts, we can acknowledge that

12   a statement was 'imprecise' or 'incomplete' even if we are not

13   sure it was wrong."  Do you see that?

14   A.   Yes.

15   Q.   Was there ever any sort of a note added to the "America's

16   Lethal Politics" editorial indicating that there was -- any

17   statement in it was imprecise or incomplete?

18   A.   Can you repeat the question, Mr. Vogt.

19   Q.   Yeah, do you know whether or not -- Mr. Axelrod went

20   through the two corrections with you, but do you know if at any

21   point in time there was ever a note that was added to the

22   "America's Lethal Politics" editorial that acknowledged that

23   any statement in it was imprecise or incomplete?

24   A.   We were correcting it by saying it was wrong.  So imprecise

25   or incomplete would imply that the truth was unknowable, and we

M242Pal5                    Williamson - Redirect

1   felt that it could be found and that the correction could be

2   made, a complete one.

3   Q.  Ms. Williamson, do you recognize Plaintiff's Trial Exhibit

4   193?

5   A.  This is from the 15th of June, a note to James from myself,

6   an e-mail.

7              MR. VOGT:  At this time I would move Plaintiff's

8   Exhibit 193 into evidence, your Honor.

9              MR. AXELROD:  No objection.

10              THE COURT:  Received.

11              (Plaintiff's Exhibit 193 received in evidence)

12   BY MR. VOGT:

13   Q.  And if you look in this e-mail, on June 15, at 7:52 a.m.,

14   you see there is an e-mail from Mr. Bennet where he says "FYI"?

15   A.  Yes.

16   Q.  And he forwards you an e-mail string beneath that from

17   between him and Mr. Douthat.  Do you see that?

18   A.  Yes.

19   Q.  And at the very bottom of that page down there, June 14, at

20   10:35 p.m., do you see that entry?

21   A.  Yes.

22   Q.  You were still up at that time, correct?

23   A.  Yes.

24   Q.  And if you go to the next page, just the body of that

25   e-mail.

1    A.   Yes.

2    Q.   Do you see in here Mr. Douthat says to Mr. Bennet, "There

3    was not and continues to be, so far as I can tell, no evidence

4    that Jared Lee Loughner was incited by Sarah Palin or anyone

5    else, given his extreme mental illness and lack of any tangible

6    connection to that crosshairs map"?

7    A.   Yes.

8    Q.   Now, before you went to bed on the night of the 14th, were

9    you aware that Mr. Douthat had made that statement to

10   Mr. Bennet?

11   A.   Before I went to bed on the 14th?

12   Q.   Yes.

13   A.   No.

14   Q.   So Mr. Bennet didn't immediately call you or e-mail you

15   after Mr. Douthat said that to him?

16   A.   No.  I think, as we just read, he told him he would look

17   into this.

18   Q.   Right.  Let's go back to that.  Can you go to the first

19   page, please, Mr. O'Shea.  If you go to the 11:09 e-mail from

20   Mr. Bennet -- it's lower.  No, it's lower.  There you go.  Do

21   you see on June 14 at 2017, there is an e-mail from Mr. Bennet

22   at 11:09 p.m.?  And he says, "Hey, thanks, and I'll look into

23   this tomorrow."  Do you see that?

24   A.   Yes.

25   Q.   Do you know whether Mr. Bennet went to bed after that?

M242Pal5                    Williamson - Redirect

1    A.  You are asking me about e-mails that I didn't even see

2    until the next day that were not directed to me --

3    Q.  Understood.

4    A.  -- and whether or not my boss went to bed.

5    Q.  It's a good point.

6             Do you recall reviewing this e-mail string with

7    Mr. Douthat after Mr. Bennet forwarded -- Bennet forwarded it

8    to you the following morning?

9    A.  No.  I'm not in touch with Mr. Douthat.

10   Q.  By the way, who is Mr. Douthat?

11   A.  He is a columnist for *The Times*.

12   Q.  He works in the opinion department?

13   A.  Yes, he does.

14   Q.  Is he a fairly well-respected colleague?

15   A.  As far as I know, yes, he is.  I don't know him personally.

16   Q.  Does he have any area of expertise to your knowledge?

17   A.  I wouldn't be able to characterize what he writes about as

18   I sit here today, no.

19   Q.  Okay.  Plaintiff's Exhibit 194, and I think one of the

20   things that Mr. Axelrod asked you was whether you had any

21   concerns before you went to bed and you said no.  Is that

22   right?

23   A.  That's correct.

24   Q.  If you go to the second page of Exhibit 194, the first

25   e-mail there from Mr. Wegman at 10:48 p.m., it was obviously

1  before you went to bed, correct?

2  A.  Yes.

3  Q.  And he says, "The gun-rights brigade is having a seizure

4  over the Giffords-Loughner-Palin link there.  Do you see that?

5  A.  Yes.

6  Q.  That didn't give you any concern?

7  A.  He said, "These guys always rage whenever we write about

8  guns," and that, to me, was what he was raising.

9  Q.  But his reference to the Giffords-Loughner-Palin link

10  didn't raise any red flags in your mind at least?

11  A.  No, I didn't know what he meant.  But I took his message to

12  mean the second sentence, "These guys always rage whenever we

13  write about guns," which is why I replied in the way that I

14  did.

15          MR. VOGT:  Your Honor, I would ask to move Plaintiff's

16  Exhibit 10 into evidence.

17          MR. AXELROD:  No objection.

18          THE COURT:  Received.

19          (Plaintiff's Exhibit 10 received in evidence)

20  BY MR. VOGT:

21  Q.  Ms. Williamson, I will show you this first just for

22  context, and I know you can't read a word on it.

23  A.  Even with my glasses.

24  Q.  This is an image of the print edition of *The Times* that

25  they produced to us in this case on June 16 of 2017, and if you

 1   go down to the middle, at the very bottom, Mr. O'Shea, at the

 2   very bottom in the center, right above "Trial Exhibit" should

 3   be the correction.  No, to the left.  Right there.

 4           I know Mr. Axelrod went over with you the corrections

 5   that were attached to the digital edition of the editorial.

 6   Have you ever seen the correction in the print edition?

 7   A.  Physically looking at it in the newspaper?

 8   Q.  Yes.

 9   A.  Not that I can recall.

10   Q.  The way it reads is that "An editorial on Thursday about

11   the shooting of Representative Steve Scalise incorrectly stated

12   that a link existed between political rhetoric and the 2011

13   shooting of Representative Gabby Giffords."  Do you see that?

14   A.  Yes.

15   Q.  Now, the original editorial that would have appeared in the

16   print edition on Thursday, the 15th, would have used the word

17   "incitement," correct?

18   A.  Did it?

19   Q.  It was the original piece.

20   A.  The editorial itself?

21   Q.  Yes.

22   A.  Oh, I'm sorry, yes.

23   Q.  Because when the correction was made, the first correction,

24   the body of the online version was changed and the word

25   "incitement" was changed to "rhetoric," correct?

1   A.  Yes.

2   Q.  Do you recall that?

3   A.  I believe so, yes.

4   Q.  And then it goes on to say, "In fact, no such link was

5   established.  The editorial also incorrectly described a map

6   distributed by a political action committee."  Now, that does

7   obviously does not say Sarah Palin Political Action Committee,

8   does it?

9   A.  No.

10  Q.  It just says "a political action committee"?

11  A.  Correct.

12  Q.  And Sarah Palin's name isn't referenced anywhere in this

13  correction, is that right?

14  A.  That's correct.

15  Q.  And then it goes on it, "It depicted electoral districts,

16  not individual democratic lawmakers, beneath stylized

17  crosshairs."  And that was the correction that you were more

18  involved in, that part of it, correct?

19  A.  That's correct.

20  Q.  And this correction itself doesn't even state the title of

21  the article "America's Lethal Politics," does it?

22  A.  No, it does not.

23  Q.  And then Mr. Axelrod also asked you about Defense Exhibit

24  59, which I believe was your retweet of the first correction or

25  the tweet about the first correction from the editorial

1   department.  Do you recall that?

2   A.  Yes.  Was it just the first correction?  I think it cuts

3   off at the bottom, so I'm not certain.  Okay.  Thank you.

4   Q.  No, it's okay.  I was going to ask you about it.  So there

5   was the second correction came out after this tweet, correct?

6   A.  Yes.

7   Q.  And did you send another tweet of that correction?

8   A.  I don't recall if I did.

9   Q.  Did you tag Sarah Palin in this tweet?

10  A.  No.

11          MR. VOGT:  Can I have a moment, your Honor?

12          THE COURT:  Yes.

13          (Counsel confer)

14          MR. VOGT:  That's all the questions that I have, your

15  Honor.

16          MR. AXELROD:  Very briefly, your Honor.

17          THE COURT:  Go ahead.

18          MR. AXELROD:  Thank you.

19          Mr. DiMezza, if you could put the exhibit that was

20  just up, DX 59, and if you could publish this for the jury as

21  well.

22  RECROSS EXAMINATION

23  BY MR. AXELROD:

24  Q.  Ms. Williamson, I believe Mr. Vogt just asked you about

25  tagging Sarah Palin.  Do you recall that?

**JA 0389**
M242Pal5                    Williamson - Recross

1   A.   Yes.

2   Q.   What is tagging?  How do you tag a person in Twitter?

3   A.   You would add their Twitter handle, so the "at sign" and

4   whatever her e-mail -- or, I'm sorry, whatever her Twitter

5   account name might have been, add her to this to make sure that

6   it went to her.

7   Q.   Why didn't you tag Sarah Palin?

8   A.   Two reasons.

9        One, this editorial was not about Sarah Palin.  There

10  was one sentence about Sarah Palin.

11       But the second, probably most important reason, was

12  this was going to our entire readership, so this tweet and this

13  apology was going to everyone, not just Sarah Palin.

14  Q.   Had you tagged Sarah Palin in this, would people receiving

15  the tweet know that the factual inaccuracy was about Sarah

16  Palin or her political action committee?

17            MR. VOGT:  Objection.

18            THE COURT:  Well, as phrased, yes, but I think there

19  may be a question there that could be asked.

20            MR. AXELROD:  Thank you, your Honor.

21  BY MR. AXELROD:

22  Q.   This tweet -- sorry, this correction doesn't mention

23  Ms. Palin's name, correct?

24  A.   That's correct.

25  Q.   Do you know why that is the case?

```
 1  A.  I --
 2              MR. VOGT:  Objection.
 3              THE COURT:  Overruled.
 4  A.  I would be guessing.
 5  Q.  Okay.  Had you tagged Sarah Palin in this retweeting, what
 6  would that be communicating to people who received your tweet?
 7              THE COURT:  Sustained.
 8              MR. VOGT:  Thank you.
 9              MR. AXELROD:  Okay.  Thank you, your Honor.  I don't
10  know if I can get there.  It will probably come to me tomorrow.
11  Let's move on.
12              If you could pull up DX 46.
13              MR. VOGT:  That was, by far, my best objection of the
14  day.
15              MR. AXELROD:  It was a good one.
16              THE COURT:  All right.
17  BY MR. AXELROD:
18  Q.  So Mr. Vogt was asking you about your communications with
19  Mr. Bennet, do you recall that testimony?  And on this exhibit,
20  DX 46, do you see Mr. Bennet text messages you at 11:38.  Do
21  you see that?
22  A.  Yes.
23  Q.  Now we are going it try to get complicated.  Mr. DiMezza,
24  could you put up DX 48 next to DX 46?  I am testing you here.
25  I apologize.  And if you could blow up that top.
```

**JA 0391**

M242Pal5

1        So you see, Ms. Williamson, that then Mr. Bennet, the

2   very next morning, e-mails you at 5:08 a.m.  We had talked

3   about that, correct?

4   A.  Yes.

5   Q.  Approximately how long had elapsed between this text

6   message at 11:38 p.m. and his e-mail at 5:08 a.m.?

7   A.  It looks like about six hours max, less.

8   Q.  You can take that down.

9        And then finally could you put up DX 68.

10       Do you know who Kathy Griffin is?

11  A.  Yes.

12  Q.  What is her profession?

13  A.  She is a comedian.

14  Q.  Is she a politician?

15  A.  No.

16  Q.  Did "America's Lethal Politics" address things that

17  comedians were saying?

18  A.  No.  It was addressing political rhetoric and two shootings

19  of members of Congress.

20       MR. AXELROD:  Thank you, your Honor.  I have no

21  further questions.

22       THE COURT:  Anything else?

23       MR. VOGT:  No, your Honor.

24       THE COURT:  Thank you very much.  You may step down.

25       (Witness excused)

M242Pal1 **JA 0392**

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SARAH PALIN, an individual,

 4                   Plaintiff,

 5           v.                        17 CV 4853 (JSR)

 6   THE NEW YORK TIMES COMPANY, et
     al.,
 7
                     Defendants.
 8
     ------------------------------x        Trial
 9
                                            New York, N.Y.
10
                                            February 4, 2022
11                                          9:25 a.m.

12   Before:

13                       HON. JED S. RAKOFF,

14                                          District Judge

15
                            APPEARANCES
16
     TURKEL CUVA BARRIOS, P.A.
17        Attorneys for Plaintiff
     BY:  SHANE B. VOGT
18        KENNETH G. TURKEL

19
     BALLARD SPAHR, LLP
20        Attorneys for Defendants
     BY:  DAVID L. AXELROD
21        JACQUELYN N. SCHELL
          THOMAS BYRNE SULLIVAN
22        JAY WARD BROWN

23

24   Also Present:

25   Dana Green, Senior Counsel, The New York Times Company
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M242Pal5

```
 1                 (Court reporter confers)
 2                 THE COURT:  Ladies and gentlemen, I'm sorry to
 3     disappoint you, but we are going to let you go for the weekend.
 4     And in all seriousness, have a very good weekend, and we will
 5     see you at 9:30 on Monday.
 6                 (Jury not present)
 7                 THE COURT:  Please be seated.
 8                 So I am a little concerned that, based on what counsel
 9     had told me repeatedly, which is that they expected the trial,
10     in terms of evidence, to take five days, I, in an excess of
11     caution -- and because we never know how long juries will take
12     to deliberate -- when I swore in the jury, said it would be,
13     worst case, two weeks, so doubling, in effect, what counsel had
14     told me.
15                 I think it is incumbent upon counsel to live up to
16     their word and make sure that the evidence in this case is
17     presented in five business days, worst case maybe six.  And so
18     I just point that out because I think we have been perhaps not
19     moving as quickly as counsel had anticipated.  So just think
20     about that and act accordingly.
21                 Let me give plaintiff's counsel my marked up copy of
22     the deposition of Andrew Sullivan, which I have now ruled on,
23     so you can make the appropriate adjustments.
24                 And remind me what the lineup is for Monday.
25                 MR. VOGT:  It will now be Phoebe Lett and then Linda
```

1    Cohn, and we can probably do Lepping now.  We can probably do

2    Ms. Lepping by video as well on Monday.

3                THE COURT:  That's fine.  Okay.

4                So anything else that counsel needs to raise with the

5    Court?

6                MR. AXELROD:  Your Honor, of course I haven't looked

7    at your rulings on the objections to the Sullivan dep, so I

8    probably shouldn't say anything, but I will just, at the risk

9    of your ire --

10               THE COURT:  My ire?

11               MR. TURKEL:  "Ire," such a great word.

12               THE COURT:  No I'm just a pussycat.

13               MR. AXELROD:  Given that we have objected to every

14   exhibit that I think Mr. Sullivan could testify or did testify

15   about on the grounds that whatever Mr. Sullivan was doing at

16   *The Atlantic* had nothing to do with Mr. Bennet, I would just

17   again raise the argument that I don't know why Mr. Sullivan's

18   testimony as a whole --

19               THE COURT:  I mean, you raise a very good point.

20   Because there were portions of the Sullivan deposition that you

21   had objected to on the face of the deposition, such as the

22   stuff about the Trig articles, and you had already brought that

23   up.  I had already ruled on the motion *in limine*, and so of

24   course I deleted all that.  There was other stuff in the

25   deposition that you had at least flagged in your motions *in*

**JA 0395**

1   *limine* but had not yet been definitively ruled on in the

2   motions *in limine* and then, to my surprise, there was no

3   objection made to the relevant lines in the deposition.  What

4   am I to do?

5          MR. AXELROD:  Well, I think, your Honor, that the

6   reason for that is the fact that we had objected.  We filed a

7   motion *in limine* keeping out all of Andrew Sullivan because on

8   the grounds of that motion that there is no connection to

9   Mr. Bennet.  I think one could fairly read that as an objection

10  to that entire deposition.

11          THE COURT:  Well, I will allow you to do that, but I

12  really find that very strange.  I think what you should have

13  done when you gave me the deposition is say right at the

14  beginning on the thing, on the deposition, marked up deposition

15  that you handed to me, that we object to this deposition in its

16  entirety, but if you rule otherwise, we also have these

17  specific objections, and then I would have known.

18          But I will admit that when I saw certain of the things

19  were not objected to that you had at least flagged in your

20  motion *in limine*, I just attributed it to -- what was the word

21  you gave me earlier today?  Overlooking.  So I will indulge

22  that, so the entirety of the deposition is independently in

23  issue, and we will hear argument on that before it is offered.

24          Nevertheless, we might as well at least get the

25  videotape fixed so that we don't have to waste time if it is

**JA 0396**

M242Pal5

1    admitted.

2              MR. AXELROD:  Good deal.

3              THE COURT:  All right.  Anything else?

4              MR. TURKEL:  Just to perhaps --

5              THE COURT:  Who are you?  I thought you were the

6    potted plant.

7              MR. TURKEL:  Judge, do not ask for what you want,

8    because you are getting a heavy dose from me next week.  It's

9    never a good thing when you are trying to save time.  But we

10   will look to try and streamline.

11             THE COURT:  That was what I was trying to suggest.

12             MR. TURKEL:  I think that generally happens in most

13   trials anyway.

14             THE COURT:  Yes, it does, it does.  Frankly, you could

15   draw your own conclusions and -- but I think the two people who

16   the jury wants to hear from are Mr. Bennet and Ms. Palin and,

17   you know, that doesn't mean there aren't other important

18   people, but they pale in significance.

19             MR. TURKEL:  I will not take it personally.  I think

20   they are dying to hear from me, but I could probably regret

21   saying that.

22             THE COURT:  Very good.  I will say this because I want

23   the record to be clear.  I do think that all counsel in this

24   case have operated at the very highest level of

25   professionalism.  I have been very impressed by your

JA 0397

M242Pal5

1   performance so far.  And so if occasionally I have a little

2   area of concern, it is trivial compared to my admiration for

3   all of you, and you are free to tweet that or even retweet it.

4           MR. TURKEL:  Judge, if I told a judge anywhere else in

5   this nation you said I was a potted plant, they wouldn't

6   believe you said that.

7           THE COURT:  All right.  We will see you all on Monday,

8   9:00, here in the courtroom.

9           (Adjourned to Monday, February 7, 2022, at 9:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 ELIZABETH WILLIAMSON

Direct By Mr. Vogt . . . . . . . . . . . . . 135

Cross By Mr. Axelrod . . . . . . . . . . . . 182

Redirect By Mr. Vogt . . . . . . . . . . . . 289

Recross By Mr. Axelrod . . . . . . . . . . . 307

                  PLAINTIFF EXHIBITS

Exhibit No.                                   Received

  143    . . . . . . . . . . . . . . . . . . 137

  141    . . . . . . . . . . . . . . . . . . 138

  142    . . . . . . . . . . . . . . . . . . 144

  147    . . . . . . . . . . . . . . . . . . 151

  148    . . . . . . . . . . . . . . . . . . 154

  163    . . . . . . . . . . . . . . . . . . 156

  186    . . . . . . . . . . . . . . . . . . 158

  151    . . . . . . . . . . . . . . . . . . 161

  194    . . . . . . . . . . . . . . . . . . 163

  188    . . . . . . . . . . . . . . . . . . 167

  190    . . . . . . . . . . . . . . . . . . 168

  191    . . . . . . . . . . . . . . . . . . 170

  204    . . . . . . . . . . . . . . . . . . 175

  18     . . . . . . . . . . . . . . . . . . 299

  193    . . . . . . . . . . . . . . . . . . 301

  10     . . . . . . . . . . . . . . . . . . 304

JA 0399

```
 1                        DEFENDANT EXHIBITS

 2     Exhibit No.                                    Received

 3      112   . . . . . . . . . . . . . . . . . . 189

 4      114   . . . . . . . . . . . . . . . . . . 198

 5      9   . . . . . . . . . . . . . . . . . . . 209

 6      11   . . . . . . . . . . . . . . . . . . . 210

 7      12   . . . . . . . . . . . . . . . . . . . 212

 8      13   . . . . . . . . . . . . . . . . . . . 214

 9      14   . . . . . . . . . . . . . . . . . . . 215

10      97   . . . . . . . . . . . . . . . . . . . 217

11      15   . . . . . . . . . . . . . . . . . . . 222

12      16   . . . . . . . . . . . . . . . . . . . 223

13      17   . . . . . . . . . . . . . . . . . . . 225

14      18   . . . . . . . . . . . . . . . . . . . 234

15      19   . . . . . . . . . . . . . . . . . . . 235

16      21   . . . . . . . . . . . . . . . . . . . 237

17      22   . . . . . . . . . . . . . . . . . . . 238

18      23   . . . . . . . . . . . . . . . . . . . 239

19      24   . . . . . . . . . . . . . . . . . . . 240

20      28   . . . . . . . . . . . . . . . . . . . 245

21      136   . . . . . . . . . . . . . . . . . . 246

22      29   . . . . . . . . . . . . . . . . . . . 248

23      61   . . . . . . . . . . . . . . . . . . . 252

24      34   . . . . . . . . . . . . . . . . . . . 253

25      32   . . . . . . . . . . . . . . . . . . . 258
```

JA 0400

```
 1                      DEFENDANT EXHIBITS

 2     Exhibit No.                                    Received

 3      10    . . . . . . . . . . . . . . . . . . 265

 4      35    . . . . . . . . . . . . . . . . . . 271

 5      36    . . . . . . . . . . . . . . . . . . 272

 6      38    . . . . . . . . . . . . . . . . . . 274

 7      42    . . . . . . . . . . . . . . . . . . 276

 8      123   . . . . . . . . . . . . . . . . . . 277

 9      46    . . . . . . . . . . . . . . . . . . 279

10      48    . . . . . . . . . . . . . . . . . . 281

11      50    . . . . . . . . . . . . . . . . . . 283

12      5     . . . . . . . . . . . . . . . . . . 284

13      8     . . . . . . . . . . . . . . . . . . 285

14      59    . . . . . . . . . . . . . . . . . . 287

15      68    . . . . . . . . . . . . . . . . . . 293

16

17

18

19

20

21

22

23

24

25
```

**JA 0401**

M271PAL1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SARAH PALIN, an individual,

 4                   Plaintiff,

 5            v.                        17 CV 4853 (JSR)

 6   THE NEW YORK TIMES COMPANY, et
     al.,
 7
                    Defendants.
 8
     ------------------------------x        Trial
 9
                                            New York, N.Y.
10
                                            February 7, 2022
11                                          9:30 a.m.

12   Before:

13                        HON. JED S. RAKOFF,

14                                          District Judge

15
                            APPEARANCES
16
     TURKEL CUVA BARRIOS, P.A.
17        Attorneys for Plaintiff
     BY:  SHANE B. VOGT
18        KENNETH G. TURKEL

19
     BALLARD SPAHR, LLP
20        Attorneys for Defendants
     BY:  DAVID L. AXELROD
21        JACQUELYN N. SCHELL
          THOMAS BYRNE SULLIVAN
22        JAY WARD BROWN

23

24   Also Present:

25   Dana Green, Senior Counsel, The New York Times Company
```

**JA 0402**
M271PAL1

1              (In open court; jury not present)

2              THE COURT:  Please be seated.

3              So one juror is delayed—different from the juror on

4    Friday—but she has contacted us and said she'll be here in 10

5    minutes or less.

6              There was one legal issue when I was working on the

7    draft jury instructions over the weekend that I wanted to find

8    out what counsel's view was.  There are two defendants.  If the

9    jury finds Mr. Bennet liable, then automatically, *The Times* is

10   liable; if the jury finds Mr. Bennet not liable, then

11   theoretically *The Times* still could be liable.  But on the

12   facts of the case so far, I don't see that possibility.  Seems

13   to me that the liability of *The Times*, therefore—both

14   directions—falls or stands with the verdict on Mr. Bennet.  But

15   let me find out if counsel disagrees with that, starting with

16   plaintiff's counsel.

17             MR. VOGT:  Sorry, your Honor.  I'm trying to think

18   about it.  I don't know that the defendants have ever viewed

19   that liability would be joint and that both were responsible

20   for publication.  I'm just asking to check the pretrial order

21   on that.

22             THE COURT:  We can discuss that separately.  Here's

23   the issue, as far as I'm concerned.  Obviously if Mr. Bennet is

24   liable, then *The Times* is liable, by basic operation of

25   *respondeat superior*.  If Mr. Bennet is not liable, then

**JA 0403**

M271PAL1

1   theoretically, *The Times* could still be liable on the theory

2   that a combination of what he did or failed to do and what

3   others did or failed to do would make *The Times* liable.  That's

4   the theory.  But I don't really see it so far on the evidence

5   in this case.  So if there's something I'm missing there, let

6   me know, but otherwise, I think we should simplify things for

7   the jury and just tell them in the instructions that there's

8   just one decision they need to make.

9              MR. AXELROD:  Judge, my colleague Jay Brown is going

10  to handle the jury instruction discussion later, but one point

11  we did want to raise is that we see it that way.  We see it

12  that liability is attached.  Of course Mr. Brown can speak to

13  the issues better, but as we see it, the actual malice goes to

14  primarily James Bennet's subjective mind-set, and I don't know

15  how *The Times* could be liable if the jury wouldn't find that

16  Mr. Bennet --

17             THE COURT:  Well, theoretically it could, if there was

18  evidence that someone else had acted with actual malice or

19  something like that, or that a combination of people had acted

20  with actual malice.  But I haven't heard any evidence to that

21  effect.  But I want to give plaintiffs a chance to be heard on

22  that.

23             MR. AXELROD:  I don't think there will be, but that's

24  our position.  We agree.

25             THE COURT:  Okay.  So if that is the case, I'll revise

M271PAL1

1    the instructions accordingly.

2              But you want to wait until this afternoon to give me

3    your response on that?

4              MR. VOGT:  I would appreciate that, your Honor.

5              THE COURT:  Yes, that's fine.  That's fine.

6              Okay.  So that's the only issue I had.  We'll go

7    check.

8              What's the story -- you may have already told my law

9    clerk -- on the witness who was maybe live or maybe remote?

10             MR. MICHAEL SULLIVAN:  Your Honor, Ms. Lepping is

11   going to testify by Microsoft Teams.

12             THE COURT:  Okay.

13             MR. MICHAEL SULLIVAN:  And we coordinated with the AV

14   staff.

15             THE COURT:  I'm told by my boss that she's already set

16   it up, so there we are.

17             Okay.  Who's the first witness today?

18             MR. TURKEL:  Phoebe Lett, your Honor.

19             THE COURT:  While we're still waiting, there was an

20   outstanding issue on the deposition of Mr. Sullivan and whether

21   it was admissible at all, and you have my rulings on what, if

22   it did come in, would be coming in.  So let me hear from

23   defense counsel and then from plaintiff's counsel as to why it

24   should or should not come in at all.

25             MR. AXELROD:  Yes, your Honor.  Thank you.

M271PAL1

1          As we wrote in our pretrial motion about *The Atlantic*

2    evidence generally, Mr. Sullivan was responsible for

3    publication of a blog, the *Daily Dish*, that was kind of

4    tangentially part of *The Atlantic* umbrella.  Deposition

5    testimony from both Mr. Bennet and Mr. Sullivan established

6    that Mr. Bennet really had -- not really -- he had no

7    day-to-day involvement in Mr. Sullivan's posts.  He didn't edit

8    them; he had no approval of them.  Mr. Sullivan essentially had

9    his own little sphere of product within *The Atlantic* umbrella.

10   So on that basis we'd move to exclude anything posted by

11   Mr. Sullivan under the *Daily Dish* title because if it were

12   admitted, it would -- it could lead the jury to think that

13   Mr. Bennet, because of his role at the Atlantic as the editor

14   in chief, had some role in either editing, approving,

15   publishing those pieces, when in reality, he did not, and

16   there's no evidence at all that Mr. Bennet saw any of those

17   pieces.  In fact, in his deposition --

18          THE COURT:  Well, isn't that the issue?  In other

19   words, regardless of whether he had a role in editing him or so

20   forth, if he saw them, it would have arguably been part of his

21   imputed knowledge at the time he drafted the lines in *The Times*

22   editorial that are the subject of this lawsuit.  So assuming he

23   testifies that he never saw them, let me hear from plaintiff's

24   counsel as to why the jury could nevertheless, if you think

25   they could, infer that he did see them.

M271PAL1

1           MR. TURKEL:  Judge, I think the issue comes down to a

2    simple issue of credibility, creating a fact question.  For

3    instance, Judge -- and I agree with what the Court just said in

4    the sense that the fact that he's the editor of *The Atlantic* at

5    the time, it's incidental.  Judge, if we knew that he had

6    subscriptions to *The Boston Globe* and three or four other major

7    newspapers and asked him whether he had read articles that put

8    him on notice of falsity and he denied it, it wouldn't be any

9    different, Judge.  It's a question of fact, and the fact that

10   he denies it doesn't make it irrelevant.  In fact, that is the

11   issue.  And I believe the fact that he was the editor in chief

12   of it that puts him in a direct line with the entire

13   publication begs the question of whether he read it, not

14   whether he edited it.  He certainly had knowledge of what the

15   publication was doing, but the fact that he denies it under

16   that scenario -- all witnesses could deny something; doesn't

17   make it irrelevant.  That is the question.  It's a question of

18   credibility.

19           THE COURT:  Well, I guess my question is, if your

20   argument is that even though he denies he read it, a jury could

21   find more likely than not that he did read it, what is that

22   based on?  For example, you mentioned that if someone has a

23   subscription to a newspaper, it's reasonable, or at least

24   perhaps raises an issue whether they read the front page or

25   something like that.  Whether they read the legal notices that

1    are printed in most newspapers on, you know, page 30 -- for

2    example, I, through the court, have a subscription to the *New*

3    *York Law Journal*, a very fine publication, but every day it has

4    two pages of legal notices, and I have to confess that I don't

5    think I've ever read those, because they're of no interest.  So

6    the question is:  What would be the argument you could make

7    that it was more likely than not that he did read it, despite

8    his denial?

9              MR. TURKEL:  Judge, I think that inquiry really goes

10   to weight, not admissibility.  I mean, he was the editor in

11   chief --

12             THE COURT:  No, no, no.  I think this is -- forgive

13   me, but -- evidence 101.  If no reasonable juror could find X,

14   then it's an irrelevancy and then the judge has an obligation

15   under Rule 402 to keep it out.  So the question is:  What's the

16   argument that you would make that the jury could find that it

17   was more likely than not that he did read it?

18             MR. TURKEL:  Judge, as the editor of the publication,

19   obviously he had access to what the publication published.

20             THE COURT:  Well, it's, as I understand it -- and if

21   we are talking about *The Atlantic* itself, I think that would be

22   a good argument, but this is apparently a separate little --

23   it's under *The Atlantic* umbrella but was not part of the

24   magazine, it was not under his control, etc., etc.

25             MR. TURKEL:  Judge, going to his deposition -- and I

M271PAL1

```
 1    don't know if you want me to direct you to the page or read

 2    question and answer.  But there was an exhibit placed in front

 3    of Mr. Bennet -- and for counsel's benefit, I'm at pages 122

 4    and 123 of his May 26, 2020, depo.  Judge, I don't know if we

 5    have an extra copy handy.  We may have it right there,

 6    possibly.

 7              THE COURT:  Hang on.  Let me get --

 8              MR. TURKEL:  Do you have it, your Honor?

 9              MR. AXELROD:  We have a copy.  I have a copy if you

10    need it.

11              THE COURT:  Well, just -- wait a minute.  Page what?

12              MR. TURKEL:  Pages 122 and 123.

13              THE COURT:  Whoa, whoa, whoa.  There is no page --

14    we're talking about the deposition of Andrew Sullivan --

15              MR. TURKEL:  No, no.  James Bennet, your Honor.  I'm

16    sorry.

17              THE COURT:  Oh, I'm sorry.  The deposition of

18    Mr. Bennet.  I'm sorry.  My mistake.  Let me get ahold of that.

19              Well, go ahead.  I don't want to waste time on that.

20              MR. TURKEL:  I can do a quick reading of it, your

21    Honor.

22              THE COURT:  Go ahead.

23              MR. TURKEL:  He was handed Exhibit 122, which was a

24    list of search results on The Atlantic for Jared Loughner, and

25    the question from Mr. Vogt at line 11 is:
```

1          "If you could just look through this and let me know

2     whether you recall in the 2011 time period reading any of these

3     particular pieces."

4          The answer, at line 15:  "Okay.  I don't -- I must

5     have read at least several of these pieces, but when I look at

6     them, could I tell you what the content -- do I remember what's

7     inside them beyond the clues I can derive from the headlines?

8     No, I don't.  I couldn't tell you that I remember the content

9     of these, that I remember these headlines or the content of

10    these stories."

11         "Q.  When you say you must have read several, can you

12    identify which ones in particular you're referring to when you

13    made that statement."

14         Answer, at line 2 of page 123:  "No, no.  That's the

15    thing.  I said I must, because I was a regular reader of *The*

16    *Atlantic's* website both because I was interested in it as a

17    reader and because I would try to keep my eye on it for

18    purposes of commenting to our editor about what I liked and

19    what I didn't like.  So I was certainly consuming the site, so

20    there's the reason I said I must have."

21         THE COURT:  Okay.  Okay.  So let me go back to defense

22    counsel.  So that seems to be different from what you indicated

23    a few minutes ago.  I'm not sure whether this is a reference to

24    the *Daily Dish*, but if it is, he's saying he was closely

25    following it.

1          MR. AXELROD:  It's not in reference to the *Daily Dish*,

2     your Honor.

3          THE COURT:  Ah.

4          MR. AXELROD:  So what happened is, plaintiff's counsel

5     I guess essentially did a Google search inside *The Atlantic*

6     website and searched "Loughner" and pulled up a list of

7     articles.  Who knows what those articles said.  As Mr. Bennet

8     said when he looked at the exhibit that was referenced in the

9     deposition, he didn't know what those articles said.  But then

10    plaintiff's counsel said:  Have you read any of these articles

11    that are just listed on this Google search, essentially?  And

12    Mr. Bennet says:  Well, I must have, because I read *The*

13    *Atlantic*.  But that Google search didn't distinguish *Daily Dish*

14    from *Atlantic*, from *National Journal*.  It was just a list of

15    articles, not of content --

16         THE COURT:  Well, did it include the *Daily Dish*?

17         MR. AXELROD:  I don't think so.  We have the exhibit.

18    We can show you.  But I don't think it did.

19         MR. TURKEL:  Judge, *Daily Dish* -- well, Mr. Sullivan

20    was writing for *The Atlantic*.  That is a branded blog he was

21    doing.  We know this is as far as back as '17, when I was

22    crossing him on it when we were first here, and I remember the

23    excuse at that time being something to the effect that he has

24    broad editorial discretion.  But when he's testified under oath

25    that he's a regular reader of *The Atlantic's* website, at that

**JA 0411**

1  point it becomes a simple issue of credibility for the jury to

2  determine whether he's incentivized to pretend he didn't read

3  things or forget things or so forth, Judge.  It's --

4  THE COURT:  Okay.  So let me --

5  MR. TURKEL:  He --

6  THE COURT:  Excuse me.

7  Let me ask defense counsel:  Where he says on page 123

8  of his deposition, "I was a regular reader of *The Atlantic*'s

9  website," is that a reference to the *Daily Dish* or to something

10  else?

11  MR. AXELROD:  That's a reference to *The Atlantic*'s

12  website.  The *Daily Dish* was a separate website.  And let me --

13  THE COURT:  No, no, no, no, no, no.  I just want to

14  get the answers to my questions.

15  So I go back to plaintiff's counsel.  If that's not

16  the *Daily Dish*, how does it help you?

17  MR. TURKEL:  Judge, to be clear, I don't think all of

18  the pieces that we're trying to get in are *Daily Dish* pieces,

19  but beyond that, Judge, I don't know enough right now about the

20  website to know whether the *Daily Dish* is linked.  I think if

21  you asked Mr. Bennet if he read the *Daily Dish*, he would say he

22  was a reader of the *Daily Dish*.

23  THE COURT:  Of course, the person who could have asked

24  him that is you at his deposition, or whoever on your side took

25  the deposition.  Did you ask him that?

1           MR. TURKEL:  Judge, I didn't take the deposition, but

2      I have the vaguest memory of asking that when we were in the

3      hearing back in May of 2017.

4           THE COURT:  Okay.  And what did he say?

5           MR. TURKEL:  I didn't know we were --

6           THE COURT:  You don't remember.  All right.

7           MR. TURKEL:  But Judge, let me pose a hypothetical,

8      and maybe it will help.

9           THE COURT:  Okay.  Let me just find out, is the jury

10     here yet?

11          THE DEPUTY CLERK:  At 9:40 I re-called her and she

12     said she was just turning onto Lafayette Street, so the soonest

13     I would expect her is right this second.

14          THE COURT:  Why don't you check.

15          But go ahead.

16          MR. TURKEL:  Judge, let's say the article or articles

17     that we're discussing, whether Mr. Bennet or any witness read

18     this email, let's say the witness had access to them and just

19     denied reading them.  There's no material difference.  Just the

20     fact that he's an editor in chief and Sullivan is working under

21     the, quote, umbrella --

22          THE COURT:  No.  I don't understand your argument.

23     Maybe I'm missing it.  If someone is shown a publication, an

24     article, and they say:  I never saw that in my life, in my

25     hypothetical --

**JA 0413**

1          MR. TURKEL:  Right.

2          THE COURT:  -- and it's not an article that a

3    reasonable juror could infer they would have seen because, for

4    example, the person testified that he was a regular, avid

5    reader of wherever that article appeared, if there's no

6    foundation like that, then it doesn't come in.  If there is

7    foundation like that, it does come in.  And you can tell me all

8    day about that it's just a credibility question, and I say to

9    you, please refer to the Federal Rules of Evidence.  I know it

10   may have been a while since you've looked at them, but maybe

11   you should look at them now.

12         MR. TURKEL:  Judge, are we analyzing -- if a 402 issue

13   is a materiality issue, I don't see how the fact that he's the

14   editor of a publication who denies reading any and all or some

15   of the tentacles of the publication doesn't create just a

16   simple credibility issue for a jury.  It's not a 403 issue.

17         THE COURT:  Of course it's not a 403 issue.  It's a

18   relevancy issue.  And if I said to you:  "Did you see what

19   appeared yesterday in *Pravda*," and you said to me, "I don't

20   read *Pravda*," which I assume you don't --

21         MR. TURKEL:  No, I don't.

22         THE COURT:  Neither do I.  -- at that point, if I

23   thought you were lying, I would have to show that, oh, you were

24   an avid reader of *Pravda* on a general basis.

25         So the question here is:  What is the evidence that he

**JA 0414**

1    was someone who regularly followed the *Daily Dish*?  By the way,

2    if you're right that there are some articles that are part of

3    *The Atlantic*, that's a different issue.  I agree with you on

4    that.  But I thought we were focusing on articles by

5    Mr. Sullivan that appeared in the *Daily Dish*.  So what you've

6    shown me so far is that he was a regular reader of *The*

7    *Atlantic*'s website, and if that were the *Daily Dish*, you'd be

8    right.  But counsel for the defense says that if we all read

9    the deposition, which I guess we'll have to do, that it's not

10    referring to the *Daily Dish*.

11          MR. TURKEL:  I guess, Judge, where the disconnect may

12    be is the fact that he's the editor in chief gives him a vested

13    interest --

14          THE COURT:  The editor in chief of *The Atlantic*.

15          MR. TURKEL:  *The Atlantic* umbrella, your Honor.  The

16    *Daily Dish* was under that umbrella of --

17          THE COURT:  Was it?  Was he editing the *Daily Dish*?

18          MR. TURKEL:  What he said --

19          THE COURT:  Was he?  I think that's a yes or no

20    question.

21          MR. TURKEL:  He said -- "Andrew Sullivan had broad

22    editorial discretion" I think were his words, way back in '17.

23          THE COURT:  My question to you is:  Was he asked, "Did

24    you edit the *Daily Dish*?"  And if he was asked that, what was

25    his answer?

M271PAL1                    **JA 0415**

```
 1              MR. TURKEL:  The answer would be no, that he -- that
 2    that writer had broad editorial discretion.
 3              THE COURT:  No, no, no, no, no.
 4              THE DEPUTY CLERK:  Whenever you're ready, Judge.
 5              THE COURT:  We are fortunate because this timeless
 6    debate is going to extend in further time because the jury is
 7    here.  And we can take this up later.  It's not a matter of the
 8    first witness, in any event.
 9              THE DEPUTY CLERK:  Should I bring in the jury?
10              THE COURT:  Please.  And let's get the first witness
11    on the stand.
12              (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25
```