# No. 22-558

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

SARAH PALIN, an individual

*Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY, a New York
corporation, and JAMES BENNET, an individual

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Southern District of New York
(Case No. 1:17-cv-04853-JSR, Hon. Jed S. Rakoff)**

**JOINT APPENDIX**

**VOLUME IV OF XI (Pages JA595 to JA887)**

Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: 813- 834-9191
Fax: 813-443-2193

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY 10017
Tel: 212-907-7300  Fax: 212-754-0330

*Counsel for Plaintiff-Appellant Sarah Palin*

## JOINT APPENDIX

## TABLE OF CONTENTS

### Volume IV of XI

Trial Transcript, February 8, 2022.......................................................................JA595

Trial Transcript, February 9, 2022.......................................................................JA765

JA 0595

M282Pal1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SARAH PALIN, an individual,

 4                    Plaintiff,

 5           v.                              17 CV 4853 (JSR)

 6   THE NEW YORK TIMES COMPANY, et
     al,
 7
                      Defendants.
 8
     ------------------------------x        Trial
 9
                                            New York, N.Y.
10
                                            February 8, 2022
11                                          9:05 a.m.

12   Before:

13                        HON. JED S. RAKOFF,

14                                          District Judge

15
                            APPEARANCES
16
     TURKEL CUVA BARRIOS, P.A.
17        Attorneys for Plaintiff
     BY:  SHANE B. VOGT
18        KENNETH G. TURKEL

19
     BALLARD SPAHR, LLP
20        Attorneys for Defendants
     BY:  DAVID L. AXELROD
21        JACQUELYN N. SCHELL
          THOMAS BYRNE SULLIVAN
22        JAY WARD BROWN

23

24   Also Present:

25   Dana Green, Senior Counsel, The New York Times Company
```

**JA 0596**

M282Pal1                          Cohn - Direct

1          (Jury present)

2          THE COURT:  Please be seated.

3          So, good morning, ladies and gentlemen.  I hope you

4     appreciate the fact that counsel and I arranged for a beautiful

5     day for you today.

6          I wanted to remind you that when you are out in the

7     hallway or leaving the courthouse, it's possible that you may

8     hear someone say something about the case, and of course that's

9     not evidence; it is irrelevant; you should totally disregard

10    it.  These things happen.

11         I can't control what some member of the public might

12    say in your presence, but your job, as you well know, is to

13    decide this case solely and wholly on the evidence that you

14    hear in this courtroom and not on some comment that someone may

15    have made in your presence when you were leaving the courtroom

16    or coming into the court or any other time.

17         So I just wanted to remind you about all of that, and

18    we are ready to proceed.

19         MR. TURKEL:  Yes, your Honor.  May it please the

20    Court:

21     LINDA COHN,

22    DIRECT EXAMINATION

23    BY MR. TURKEL:

24    Q.  Good morning, Ms. Cohn.

25    A.  Good morning.

**JA 0597**

M282Pal1                              Cohn - Direct

1   Q.  Just for the benefit of kind of bringing us back to where

2   we were, your role in editing the piece, the "America's Lethal

3   Politics" piece, was that you did an initial edit around 4:30

4   or 5:00, right?

5   A.  Yeah, I believe it was around then.  I mean, I don't know

6   for sure unless I refresh my memory with some e-mails.

7   Q.  In that general frame?

8   A.  Yes.

9   Q.  I'm not trying to pin you to a time.

10  A.  Yes.

11  Q.  And that draft gets turned over to Mr. Bennet for his

12  review, is that right?

13  A.  Yes.  I asked him to take a look at it.

14  Q.  Do you get the document back at that point from Mr. Bennet?

15  A.  At what point?  Not at -- not until later.

16  Q.  After he reviews it.

17  A.  Yes.

18  Q.  So and does it come back just to you or does it come back

19  to you and others to edit it?

20  A.  Well, it's in our system.  Everyone can look at it.  So at

21  that point there would be quite a few people, once he released

22  the copy, so we could see what changes he made.  Several people

23  would be looking at it then.

24  Q.  The way your system, like, the software platform works --

25  first of all, what's it called, the platform the documents sit

1   on so you can access them to edit them?

2   A.  I don't really know anymore.  I think -- we had a Scoop

3   system, but I don't know if that was -- I guess it was -- maybe

4   it was called Scoop.  I can't really remember the name.

5   Q.  What's backfield?  Why don't we tell the jury --

6   A.  Backfield.  So we have different, like, directories.  We

7   called them, I think, baskets back then.  Backfield is where a

8   writer would send their piece when it was ready for review, and

9   that's where the editors would first pick it up and other

10  people.  Everyone really had access to it.  They could all --

11  everyone could read it then.

12  Q.  When you get the document -- so when we talk about you

13  accessing the document, the words I just used were get the

14  document back, but you go on backfield to access a copy of it

15  to edit, right?

16  A.  Correct.

17  Q.  And my understanding is — and correct me if I am wrong — if

18  you are in backfield working on it, someone else can't be

19  working on it at the same time.  Is that true?

20  A.  They can't be making changes.  They can be reading it.

21  Q.  Right.  Right.  So you don't have multiple editors, writers

22  editing a piece at the exact same time, right?

23  A.  No.  At some point, and I'm not sure if it was then because

24  we changed computer systems quite a bit, there was a way you

25  could divide up, so someone else could work on the headline.  I

**JA 0599**

M282Pal1                    Cohn - Direct

1   think that might have been the previous computer system.

2   Q.  Got it.

3   A.  Not the text, for sure.

4   Q.  And so in that respect, do you remember in general terms an

5   approximate time that you were able to go back in and look at

6   the document after Mr. Bennet had looked at your initial edit?

7   A.  It was quite a bit after.

8   Q.  Hours?

9   A.  It was late.  It felt -- it was late.  We were right -- at

10  that point we needed to get the piece into the paper.  But I

11  can't really recall the time.  I was waiting for its return so

12  I could start looking at it.

13  Q.  And at least the scope of your edit, when you get it

14  back -- and I'm going to go through the documents so you can

15  see these times.  But at that point you are going to make sure

16  it fits, I think, or words you have used.  Could you explain

17  what that means, to make sure it fits?

18  A.  Yes.  We are talking about the print page, and so we might

19  have one, two, or three editorials on the page.  So you have

20  just a certain -- you know, there is a column, so the

21  editorials run, say, from here to here.  That's all the space

22  you have.  So somehow, you know, if one piece gets longer, the

23  other has to get shorter.  You have to make it all come

24  together, and sometimes you have to change which pieces are

25  running together, because you can see that there is no way

**JA 0600**

1  these two are going to work together, there will not be room.

2  Q.  So to make sure it fits, you worked on the headline some,

3  right?

4  A.  Yes.

5  Q.  Ultimately, was the headline you suggested used or was

6  another one used?

7  A.  I put in several suggestions.  Another editor also sent in

8  a suggestion, which might have -- we -- I might have read to

9  James; and then James and I had a phone call, I think; we might

10 have also gone back and forth by text; going back and just back

11 and forth, batting around ideas for the headline.

12        I think, when I refreshed my memory by when I saw the

13 piece as it appeared in the computer system at the deposition,

14 there were some headlines on the bottom that seemed to me to

15 be -- I mean, I can't really remember who wrote what, because

16 another editor was also sending me ideas.  But it seemed to me

17 mine were on the bottom, and by the time we came to the

18 headline, I think James and I were going back and forth.  He

19 would always okay a headline, for sure; but if that one is -- I

20 think that might have needed a little more of a hand, but I

21 might have added or suggested a word.  I can't really recall

22 more than that.

23 Q.  All right.  So is it fair to say that you don't recall if

24 the precise headline used, "America's Lethal Politics," was

25 yours?

M282Pal1                    Cohn - Direct

1   A.  I am pretty sure it was not mine.  I know it was not wholly

2   mine.

3   Q.  Got it.

4           You also worked on a blurb, right?

5   A.  Yes.

6   Q.  Could you tell the jury, please, what a blurb is?

7   A.  Well, on the editorial page, so an editorial, you know,

8   might run, like, say, this long.  You want to break up the type

9   visually, so you have sort of a -- some people might call it a

10  pull quote.  It doesn't have to be a quote.  It's just bigger

11  type that sort of breaks up the grayness of the page, and this

12  little phrase just that might work with the headline might

13  bring out some point in the story.  It's a bit like -- it can

14  be like a summary, it can make -- or it can just work off the

15  headline.  There is a lot of room to do different things with

16  the blurb.

17  Q.  And lastly, with respect to gun control rules and

18  regulations, you participated in some minimal fact-checking,

19  right?

20  A.  Yeah.  I recall some discussion with Eileen Lepping, the

21  fact-checker, and I believe Nick Fox, the other editor who was

22  reading the piece, at that time.  And, yeah, I was concerned

23  about the graph, the paragraph, on gun control because, yeah,

24  gun control is -- there are a lot of different rules and

25  regulations.

1   Q.  If we could, Mr. Bucher, pull up Exhibit 148.

2           And before you, Ms. Cohn, is Exhibit 148, Plaintiff's

3   Exhibit 148, which is already in evidence.  Does that document

4   look familiar to you?

5   A.  Yes.

6   Q.  And as is obvious from the top, that's an e-mail from

7   Eileen Lepping, correct?

8   A.  Correct.

9   Q.  And would that e-mail contain at least partial, part of the

10  dialogue you engaged in with respect to the gun law

11  fact-checking aspect of the article?

12  A.  Yes.

13  Q.  And so just to be clear, the fact-checking related to these

14  various regulations and so forth that she was researching while

15  you and the team were continuing to revise the piece, right?

16  A.  Yes.  We -- yes.

17  Q.  You can take that down, Mr. Bucher.

18           I want to go back to something we touched on a tad bit

19  yesterday relating to the conversations throughout the day.

20  There were numerous, we could call them, casual or informal

21  conversations going on throughout the day about the content of

22  the piece, is that right?

23           MR. AXELROD:  Objection.

24  A.  Uhm --

25           THE COURT:  When there is an objection --

JA 0603

1              THE WITNESS:  Sorry.

2              THE COURT:  -- you have to wait.

3              THE WITNESS:  Sorry.

4              THE COURT:  Sustained.

5              MR. TURKEL:  I will rephrase, Judge.  I think I

6    understand the grounds.

7              THE COURT:  Yes.

8    BY MR. TURKEL:

9    Q.  Throughout the day, were you talking to your colleagues on

10   the editorial team about the piece "America's Lethal Politics"?

11   A.  There were a few discussions.  I think I spoke to Bob

12   Semple.  I can't really remember if these things are texts or I

13   was in his office, but at one point he was saying he liked the

14   gun control angle.

15              I think Nick Fox might have stepped into my office at

16   some point and mentioned he had had some kind of conversation

17   with Elizabeth about the piece, Elizabeth Williamson.  But I

18   can't recall what he said.

19   Q.  Do any of the conversations you had that day, on June 14,

20   stand out in a way that you can recall them specifically?

21   A.  No, just what I had said about Bob Semple, that he had said

22   he liked the gun control angle.

23   Q.  Do you recall going to Mr. Bennet's office late

24   afternoon/early evening on June 14, standing in front of his

25   glass door, opening it up, and telling him that you needed to

1    talk to him or "you need to look at this," I think were your

2    words?

3    A.   Yes.

4    Q.   So in that respect, is that conversation -- do you have a

5    recollection of that conversation?

6    A.   I do.  That was a conversation after I read the piece, yes.

7    Q.   So we are already -- when you say "after," what do you

8    mean?

9    A.   I guess I was differentiating between conversations during

10   the day from the previous question to a conversation after I

11   had actually read the draft.

12   Q.   So this was late afternoon/early evening after you had read

13   it?

14   A.   Yes, early evening, yes.

15   Q.   Can you tell the jury what -- could you describe that

16   conversation for the jury, that conversation with Mr. Bennet?

17   A.   I just remember saying, I think I would like you to take a

18   look at this, because I'm -- I was just a little confused about

19   what we were -- what we wanted out of this piece, where it was

20   going.  I just felt unsure about it.  I felt he needed to take

21   a look and weigh in.

22   Q.   And as far as being confused about what you wanted, what

23   was the confusion?

24   A.   I was confused about what we wanted the piece to be, what

25   tone we wanted, what we wanted it to say.  So I don't know how

**JA 0605**

M282Pal1                    Cohn - Direct

1   to describe it more than that.

2   Q.  Does this go back to the issue of whether the piece was

3   about political incitement, gun control, or both?

4   A.  That was -- yeah, I mean, that was part of it.  I was --

5   yes, I was just feeling unsure about where we were headed with

6   this, and I felt I needed James, as the editor, to take a look

7   and weigh in and -- yeah.

8   Q.  Does Mr. Bennet, as the -- his title is editor in chief,

9   right?

10  A.  Editor of the -- I think Bennet was editor of the editorial

11  page, or maybe editor of opinion, but I'm not sure.  It changed

12  over time.

13  Q.  Nonetheless, was he the most superior person on the team?

14  Was he the boss?

15  A.  Yes, yes, absolutely.

16  Q.  Did Mr. Bennet have ultimate decision-making authority on

17  what a piece like "America's Lethal Politics" would be?

18  A.  Yes.

19  Q.  Did you know, based on the conversation you had with

20  Mr. Bennet late afternoon/early evening on June 14, 2017, what

21  he wanted the piece to be?

22  A.  Excuse me.  Could you repeat that?

23  Q.  Sure.  Based on the conversation you just described to the

24  jury, when you finished talking to Mr. Bennet, did you have a

25  clear idea from him what he wanted the piece to be?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M282Pal1                    Cohn - Direct

A.  No.  I'm not sure I would call that a conversation.  I

think I said one sentence and he said he would take a look at

it.  So, no.

Q.  Did he say anything else other than that?

A.  No.

Q.  All right.  If you could pull up 144, I think this is just

for the witness only at this moment, 144.

        Can you see that, Ms. Cohn?

A.  Yes.

Q.  And what is it?

A.  It is an e-mail exchange between me and Nick Fox.

        MR. TURKEL:  Your Honor, at this time we would offer

Plaintiff's Exhibit 144.

        MR. AXELROD:  No objection, your Honor.

        THE COURT:  Received.

        (Plaintiff's Exhibit 144 received in evidence)

        MR. TURKEL:  That can be published.

BY MR. TURKEL:

Q.  The way this e-mail -- if you could just look at this and

maybe explain to the jury what this dialogue is about

essentially, because it seems like it's written in kind of a

rapid back-and-forth between you and Mr. Fox.

A.  We were just planning the day of editing, the rest of the

day of editing, because we were already at 4:00, I see.  And

when we use people's names, we are referring to the piece that

1  they have written, so I think I am referring to a piece -- I am

2  referring to a piece by -- actually I'm sorry, that's Nick

3  saying, Would you like to edit the Carol Giacomo piece and he

4  will take the Elizabeth Williamson piece?

5          And then we are sort of planning on what's going to

6  fit on the page, realizing I think the piece that refers to as

7  Carol there is actually -- it was some kind of longer foreign

8  policy piece.  So I think I see there, let's see, it was going

9  to possibly hold, which could have been for space or some other

10 reason, but I suspect space, and then --

11 Q.  If I can ask you there, what does the word "hold" mean in

12 that context?

13 A.  We weren't going to run it the next day.  We were going to

14 keep it and run it some other time in the future.

15 Q.  All right.  And as -- first of all, at this point when you

16 and Mr. Fox are referring to Elizabeth, that's Elizabeth

17 Williamson, right?

18 A.  Yes.

19 Q.  And at this point she is the writer on the "America's

20 Lethal Politics" piece, is that right?

21 A.  Yes.

22 Q.  And as this ends, I think somewhere in here, let me just

23 find it, early in the thread, at 4:09 p.m., the second entry,

24 you say, "Carol may hold, so I can pick up Elizabeth," right?

25 A.  Right.

**JA 0608**

M282Pal1                    Cohn - Direct

1    Q.  Were there any other editors sharing these pieces for

2    editorial responsibility at that time other than you and

3    Mr. Fox?

4    A.  Bob Semple.

5    Q.  And correct me if I am wrong, but Mr. Fox worked on the

6    "America's Lethal Politics" piece, too, didn't he?

7    A.  He was editing it.  While I had it active, he was reading

8    it on what we would call view or read only, where he couldn't

9    make changes, so he was sending changes to me.

10   Q.  I don't mean it in a bad way, but you all worked together.

11   Even if you took an assignment, that doesn't preclude him from

12   helping you with it, right?

13   A.  Right.  We often all read each other's pieces.

14   Q.  Right.  That was what I was getting at.

15           If we could put up Exhibit 143.

16           Now, this is already in evidence.  It's at 4:45.  You

17   are not copied on this, but I wanted to ask you a question

18   about it for a different reason.  If you look at the subject

19   line there it says "shootings is in backfield."  Do you see

20   that?

21   A.  Yes.

22   Q.  Just for the benefit of the jury, when Ms. Williamson is

23   referring to backfield, what is she referring to at this point?

24   A.  The directory or queue where the editors can pick up the

25   piece and start to edit and put changes in.

 1   Q.  Okay.  If you could pull up just for the witness's benefit

 2   140E, Plaintiff's Exhibit 140E.  All right.  And if you could,

 3   Mr. Bucher, go to the second page of that.

 4          All right.  Do you recognize this document?  Don't

 5   talk about it yet.  I'm just asking if you recognize it,

 6   Ms. Cohn.

 7   A.  Yes.

 8   Q.  All right.  And if you look at what's up there, you will

 9   see your name above a time stamp above the word "backfield"?

10   A.  Yes.

11   Q.  All right.  And is this the backfield directory that we

12   have been discussing with respect to editing and revising

13   documents?

14   A.  Yes.

15          MR. TURKEL:  Judge, at this time we would offer 140E.

16          MR. AXELROD:  No objection.

17   BY MR. TURKEL:

18   Q.  All right.  Go back --

19          THE COURT:  Received.

20          MR. TURKEL:  I'm sorry, Judge.  I didn't mean to cut

21   you off there.

22          (Plaintiff's Exhibit 140E received in evidence)

23          MR. TURKEL:  I'm sorry, Judge.  I didn't mean to cut

24   you off there.

25   BY MR. TURKEL:

1   Q.  Go back to the first page in.

2             If you saw the time stamp -- I don't know if you had a

3   chance to look at that, Ms. Cohn, the time stamp above your

4   name?  We may have to go back to page 2.  I'm sorry.

5   A.  I see it.

6   Q.  Right there, 5:03 p.m.

7   A.  Yes.

8   Q.  Right?

9             Just for the jury's benefit, that time stamp with your

10  name above it, what does that mean as far as backfield is

11  concerned?

12  A.  It means I opened the piece and then stored it at 5:03.  I

13  think it means I opened it.  If I made any change, whether it

14  was adding a space, if I store it, it gets a new time stamp.

15  Q.  I --

16  A.  Sorry.

17  Q.  Got it.  You can take that down and go back to the first

18  page.

19            Throughout this piece, you will see there are little

20  portions where there are bolded words.  Do you see that?

21  A.  Yes.

22  Q.  And does that reflect your changes, additions, revisions?

23  A.  That's not how it looked on the screen, but I believe so.

24  Q.  When you say that's not how it looked on the screen, what

25  do you mean?

1    A.  I think often those things weren't in bold.  They were

2    graphically different.  Like when we would add things,

3    sometimes there would be like an underline; or if you would

4    strike out, it would look a certain way; or if you wanted to

5    make a comment or a little note to yourself or a note to a

6    writer, it would just -- it would come off in like a sort of

7    grayed out kind of -- some different tone on the type; but I

8    don't think it ever appeared bold.

9    Q.  All right.  And if we look at some of the -- certainly,

10   though, in this viewing format, those changes show up as bold,

11   though, right?

12   A.  Correct.

13   Q.  So if we look at these changes, I want to look specifically

14   beyond the one or two where you were just adding a word here,

15   but in the third paragraph down there on the page that's blown

16   up, the bold language says, after the words "but a sickeningly

17   familiar pattern is emerging: a deranged" and then in bold you

18   write "are there signs of mental illness, are just in the sense

19   that anyone who commits mass shooting is deranged?" and you ask

20   that question.

21          Who is that question being posed to when you put it in

22   this draft?

23   A.  You know, a lot of these questions are really just to

24   myself.  It is something I want to think about.  But if the

25   writer picks it up and wants to answer or read it on view and

**JA 0612**

1    send me an answer, that's all fine, too.  Or if another editor

2    reads it, it's -- but often it is just something for me to

3    remember, especially if I am doing the first read, like I want

4    to think about this.

5    Q.  When you are doing this initial edit, do you know at the

6    time you are doing it who the document is going to when you are

7    finished, who you are going to send it to, for lack of a better

8    word?

9    A.  I'm not sure I understand that.

10   Q.  Because I asked it poorly.  Let me try again.

11          At this point in time at 5:00, when you finished this

12   edit, do you return the document to Mr. Bennet's control or

13   Ms. Williamson?

14   A.  It would just depend on the editing process.  I might send

15   a playback, which was just a copy of it, to Elizabeth

16   Williamson.  I might call her.  I might say, Can you pick it up

17   and answer some questions?  I mean, it is kind of an organic

18   process.  There are a lot of different ways to do it.  I would

19   always have either Bob Semple or James Bennet, so either the

20   deputy or acting deputy or the editor would at some point look

21   at the piece, yes.

22   Q.  All right.  If we can go to the next page, there is some

23   additional text.

24          If we go to page two, or page two of this particular

25   excerpt, I should say, in the first full paragraph, once again

1    you ask a question after the sentence, "In the aftermath of

2    Wednesday's shooting, the political right and left and both

3    sides in the gun debate dove into their respective foxholes."

4    And then you ask this question, in bold:  "Do we know of any

5    elected officials on the left who have incited violence?  Or

6    just unaffiliated people online or comedians.  Most are pro-gun

7    control.  Does this graph imply equivalence?"

8            First of all, for the -- for clarity, the word "graph"

9    in this context means paragraph, right?

10   A.  Correct.

11   Q.  Like not a graphic graph, right?

12   A.  Correct.

13   Q.  And why did you ask that question?

14   A.  I remember it was my -- you know, this early read, and I

15   just -- the phrase "respective foxholes" sort of struck me.

16   Often I will ask a question; it might be answered in the next

17   sentence or in the next paragraph.  So "respective foxholes"

18   struck me because there was this idea that, you know, it was

19   like the left and the right, like a certain -- there is a

20   saying -- a certain equivalence.  The word "respective" just

21   has -- it just rings a little bit of that idea.  So I just was

22   wondering is there anything on the left?

23           And the phrase about the comedian is just I was

24   wondering if -- you know, there is a difference between a

25   political figure saying something, obviously, and someone who

1    is in pop culture, a comedian.  And I think this was a

2    reference to the -- it was a reference to the Kathy Griffin

3    incident that I believe predated this by not that much.

4    Q.  And without getting into it in too much detail, you mean

5    the incident in which she was holding a head of at the time

6    President Trump, a bloodied head?

7    A.  Yeah, I think it was a mask with some sort of fake blood on

8    it.

9    Q.  Yeah, I mean, it was meant to look like him.  I don't know

10   what it was, but okay.

11            So going back to the equivalence thing, though, you

12   are asking this question because you believe this paragraph

13   implies an equivalence, that the rhetoric on both sides is

14   essentially the same, and you had a question as to whether that

15   was correct, right?

16   A.  I just thought that the phrase "respective foxholes," that

17   image was a little bit like -- it was more like I want to come

18   back and think about this because the respective foxholes is

19   sort of they go here, they go there, and I just wasn't sure

20   that was really a good phrase to use.  I think when I -- yeah.

21   Q.  Wasn't one of your issues -- I didn't mean to cut you off

22   there.

23   A.  No.

24   Q.  Okay.

25            Wasn't one of your issues the fact that the right, at

M282Pal1                    Cohn - Direct

1   least in your viewpoint at the time, wasn't advocating gun

2   control the same way the left was?

3   A.  Yes.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. TURKEL:

2    Q.   And in that respect, if you have rhetoric on both sides but

3    one side's for the control or more control of guns and one

4    isn't, it shouldn't be equivalent; is that a fair summary of

5    what you were getting at?

6    A.   Well, it would depend on what subject the rhetoric was, but

7    yes, if the rhetoric -- if people are using rhetoric that is

8    very, you know, heated up and maybe starting to use imagery

9    that feels somewhat violent, it would make a difference -- it

10   would make a difference to me, yes.  If that person --

11   especially in terms of this piece, which was very much about

12   the flow of guns through the culture, yes, views on gun control

13   I thought would make -- was something we should look at.

14   Q.   Well, that was -- to follow up on that, you asked the

15   question because this piece was trying to combine these two

16   theories of incendiary political rhetoric and gun control

17   issues, right?

18   A.   Well, those two things were on my mind, yes.

19   Q.   And Ms. Williamson, who wrote the initial draft of this,

20   isn't normally someone who writes as much about gun control,

21   right?

22   A.   Well, she -- we had another writer who was an expert on gun

23   control and mainly covered it, especially in terms of the nitty

24   gritty, but she was a political reporter, seasoned political

25   reporter.  Gun control is a big issue in our politics, so --

M281PAL2                    Conn - Direct

1    Q.  Frank Clines --

2    A.  -- she could write about it for sure.

3    Q.  Right.  I didn't mean to cut you off.  Frank Clines is the

4    resident gun control expert, right?

5    A.  Correct.

6    Q.  Okay.  And if we look at this bold question you asked here,

7    you asked:  "Do we know of any elected officials on the left

8    who have incited violence?"  Do you see that?

9    A.  Yes.

10   Q.  And why was that question just directed to elected

11   officials on the left?

12   A.  Well, I think "elected officials" is just shorthand there

13   for me for political figures.  I mean, you know, when you write

14   a question, you're not -- you're not editing your question, so

15   I think I just meant political figures, which --

16   Q.  Why wasn't it "Do we know of any elected officials on the

17   left or right who have incited violence"?

18   A.  Could you ask that again?

19   Q.  Yes, ma'am.  The way you wrote the question restricts it to

20   elected officials on the left who have incited violence.  My

21   question was:  Why weren't you asking "Do we know of any

22   elected officials on the left or right," why just the left was

23   my question.

24   A.  This is my shorthand, and when I say "incited violence"

25   there, I'm really just talking about, you know, heated

**JA 0618**
M281PAL2                    Cohn - Direct

1   rhetoric, like the demonization of opponents, and we just had

2   this, you know, horrific shooting, and I just -- I just -- I

3   was trying to think of what this idea of respective foxholes --

4   who would -- who would it be on the left, and I could not think

5   of anyone.  The only thing that came to mind that was prominent

6   at that time that was, you know, something happening in our

7   culture was the Kathy Griffin incident, which seemed to me, as

8   a comedian doing something which she was much, much criticized

9   for, was just not -- not really the kind of thing we were

10  talking about at all.

11  Q.  Would it be fair to say you were talking about rhetoric

12  that was ugly enough that it would boil up and foster people to

13  take things into their own hands; is that a fair statement?

14  A.  That's probably not how I would put it, no, no, no.

15  Q.  All right.  Let me -- I'd like to just show you something

16  to probably refresh your memory.

17          MR. TURKEL:  Judge, I really don't want to lay the

18  predicate.  Can I approach the witness with a copy of her depo?

19          MR. AXELROD:  Your Honor, I don't think the witness

20  has said she had any lack of recollection about any point.  I

21  don't know that refreshing is appropriate.

22          THE COURT:  That's true.

23          MR. TURKEL:  All right.  Judge, if I can approach with

24  a copy of the deposition.

25          THE COURT:  I'm sorry?

M281PAL2                        Cohn - Direct

1              MR. TURKEL:  May I approach?  I want to give the

2    witness a copy of her deposition.

3              THE COURT:  Yes.

4              MR. TURKEL:  Okay.  I may have to do this in a moment.

5    Judge, I have a copy for the Court also.

6              THE COURT:  So page and line?

7              MR. TURKEL:  Yes, your Honor.  Page 94.

8              MR. AXELROD:  Your Honor, I'm sorry.  I don't quite

9    understand --

10              THE COURT:  Well, he's clearly now claiming that there

11    is an inconsistency, and so we'll see if there is or not.

12              MR. AXELROD:  Okay.

13              MR. TURKEL:  Lines 9 through 20.  Withdrawn.

14              THE COURT:  Hold on.  Hold on.  I'm sorry.  Yes, 9

15    through 20.

16              MR. TURKEL:  Yes, your Honor.

17              THE COURT:  Any objection?

18              MR. AXELROD:  Yes, your Honor.  If you look at the

19    question that Mr. Turkel posed, it was not asking Ms. Cohn what

20    her definition was.  It was, it -- was a very -- actually very

21    vague question about -- referring to something, and her

22    testimony was, "No, I don't think I'd put it that way."  I

23    don't think it's clear impeachment.

24              MR. TURKEL:  Judge, I asked her what she meant by

25    incited.  I used the exact --

**JA 0620**

M281PAL2                              Cohn - Direct

1              THE COURT:  I'm going to allow it.  Go ahead.  You can

2      read it.

3              MR. TURKEL:  Yes.

4      BY MR. TURKEL:

5      Q.  Ms. Cohn, you recall your deposition, right?

6      A.  Yes.

7      Q.  And at that time you took an oath like you took today, yes?

8      A.  Yes.

9      Q.  My partner Mr. Vogt was asking you questions while you were

10     under oath, correct?

11     A.  Yes.

12     Q.  All right.  In that respect, and if I could direct you to

13     page 94, lines 9 through 20, were you then asked the following

14     question and did you not give the following answer:

15              "Q.  And then you used the word 'incited' in that

16     question.  What did you mean by 'incited'?"

17              Your answer:  "Maybe fostered or said things that

18     might make people who were prone to such things feel that they

19     should take some sort of violent action.  I don't know.  Just

20     sort of the general -- I don't -- I -- I certainly didn't mean

21     someone was giving, like, orders or saying go shoot someone or

22     go commit a violent act, but just that the rhetoric was ugly

23     enough that it would boil up and foster people to take things

24     into their own hands."

25              Is that what you explained under oath at your May 7,

M281PAL2                          Cohn - Direct

1   2020, deposition?

2   A.  Yes.

3   Q.  And going back to where we were before that, the only

4   example you could think of—unless you were going to add to

5   it—with respect to this question was the Kathy Griffin example?

6   A.  Excuse me.  What was the question?

7   Q.  I'll reask it.  Where I started was you asking this

8   question:  "Do we know of any elected officials on the left who

9   have incited violence?"  You remember that question, right?

10  A.  Yes.

11  Q.  And I asked you why you didn't include the right in that

12  question also, right?

13  A.  Yes.

14  Q.  All right.  And did you have any examples in your mind of

15  politicians, elected officials on the right who had incited

16  violence at that point?

17  A.  I don't recall, and I don't recall where this paragraph is

18  in the piece, but --

19  Q.  With respect to the Gabby Giffords/Jared Loughner shooting

20  incident in January 2011, you did not use the word "incite" in

21  the sense that you believed that Sarah Palin's political action

22  committee, the map it had circulated, had incited Jared

23  Loughner to commit that shooting in 2011, did you?

24  A.  I'm sorry.  I just -- can you ask that again, please?

25  Q.  Sure.  Let me ask it this way:  The way you understand the

M281PAL2                         Cohn - Direct

1  word "incite," you don't believe that the Sarah Palin political

2  action committee map incited Jared Loughner to shoot Gabby

3  Giffords in 2011, do you?

4  A.  I -- I think I say in here I never thought of the word

5  "incite" to -- to mean it was giving orders or telling someone

6  to do something.  I was really -- and maybe I failed in my

7  deposition response, but trying to -- more the idea that it

8  was -- incitement is more just, you know, rhetoric you put out

9  there.  It's very different than saying you instigated

10 something.  It's just -- it goes out to a crowd.  It's usually

11 used in terms of rhetoric to a crowd or to the public.  It

12 could be written or spoken.  So I was just thinking of it in a

13 more diffuse, general way.  It was really -- yeah.

14 Q.  All right.  Well, just to sum up this line of questioning,

15 there were no other examples you had in your mind when you

16 wrote those comments, other than -- I mean -- let me ask that.

17 Were there any examples in your mind when you wrote those

18 comments, left or right?

19 A.  I was just saying, I need to know where this paragraph was

20 in relation to the rest of the piece, so I don't know if I was

21 thinking about -- if I'd even -- I don't know where I was.

22 Q.  All right.

23 A.  Right?  Okay.

24 Q.  There is the copy if you want to go back and take a look at

25 it.

**JA 0623**

M281PAL2                    Cohn - Direct

1          MR. TURKEL:  Go back to page 1, Mr. Bucher.  Don't cut

2    out that piece, just show the whole thing.  Go back to page 1.

3    Q.  Does that help?

4          MR. AXELROD:  Perhaps if you go to the second page.

5          MR. TURKEL:  We just did.

6    A.  Yes, I had already read the paragraph that mentioned Sarah

7    Palin.

8    Q.  Right.  And so in that respect are you saying that that was

9    an example that you were thinking of when you wrote those bold

10   comments in the first paragraph on page 2 of this exhibit?

11   A.  It was part of it, but I was really thinking about the

12   whole coarsening of the rhetoric over that period from --

13   from -- from like the Tea Party days on when we were just

14   starting to, you know, demonize people on the other side,

15   everything was getting to be, you know -- we were changing our

16   view of pol -- we, not, you know -- people in general were

17   changing their views of politicians, and too often they were

18   becoming the enemy, someone to be hated, not an opponent to

19   discuss and argue issues with.  So I think I would -- I was

20   thinking more generally.  Yes.

21         MR. TURKEL:  Okay.  If you could, Mr. Bucher, pull up

22   Exhibit, just for the witness, 140C, I believe.

23         Go to Page No. 1, again.  Is that the last page?

24         I'm sorry.  140F.  I have the wrong one.  140F.

25         There we go.  Okay.  And if you could take it over a

**JA 0624**

1  page.  Another one.  Is that the last page on this?

2              All right.  Go back two.  Right there.  Page to the

3  last page of this excerpt, if you could.  There we go.

4              Okay.  And Mike, if you could move it one page

5  forward.  One more.  One more.  There we go.

6  BY MR. TURKEL:

7  Q.  All right.  Do you recognize 140F, Ms. Cohn?  I'm sorry for

8  all that.  I was trying to get to pages where we could see your

9  name on the document.  Do you recognize this?

10 A.  I don't see my name, if that's what you're --

11             MR. TURKEL:  Go back to the end of that particular

12 excerpt where her name shows up.

13             Right there.  Okay.

14 Q.  Do you see your name there at 6/14/2017, 7:17 p.m.?

15 A.  Yes.

16 Q.  Would that mean that's how you accessed the document?

17 A.  Yes.

18             MR. TURKEL:  Judge, at this time we'd offer 140F.

19             MR. AXELROD:  No objection.

20             THE COURT:  Received.

21             (Plaintiff's Exhibit 140F received in evidence)

22             MR. TURKEL:  All right.  Now, Mr. Bucher, if you could

23 do this and take it two pages at a time so we're not scrolling

24 individually.

25             Right there.  Okay.

M281PAL2                    Cohn - Direct

1    BY MR. TURKEL:

2    Q.  I'm going to try to do it so you can look at it more all at

3    once, Ms. Cohn, instead of little excerpts.

4         All right.  Now do you recognize this draft of the

5    editorial piece?

6    A.  I mean, in general, yes, but we -- we save the piece many

7    times after we make a change, so I can't -- can't say I know

8    this exact one, because there might be another version at 7:18,

9    but generally, yes.

10   Q.  All right.  In this version at 7:17, though, by virtue of

11   the fact that you're listed at the end there, we know you

12   looked at this one, right?

13   A.  Yes.

14        MR. TURKEL:  All right.  And if you could forward to

15   the next two pages.

16   Q.  All right.  Can you tell from this draft which changes were

17   yours?  In other words, was all the bold yours in this

18   particular draft or not?

19   A.  I can -- I mean, I can tell by reading it.  I can't -- the

20   bold doesn't indicate anything.  I mean -- oh, I don't see

21   anything -- I -- yeah, it looks mainly like not my changes, but

22   I would have to read through the whole thing to see if any of

23   my changes were there.

24        MR. TURKEL:  Okay.  Could you pull up 140E.

25        MR. AXELROD:  Just so the Court knows, I have no

1    objection to any of these Scoop documents.

2              MR. TURKEL:  We'll offer them as they come up.

3              THE COURT:  All right.

4              MR. TURKEL:  Judge, we'd go ahead and offer 140E.

5              THE COURT:  Received.

6              (Plaintiff's Exhibit 140E received in evidence)

7    BY MR. TURKEL:

8    Q.  And that's the one that was already offered.  That was the

9    one we just looked at.  It's 6:32 when Mr. Bennet looks at the

10   one we just spent quite a bit of time on, 140E.  Do you see

11   that?

12   A.  Yes.

13   Q.  All right.  Do you remember what you were doing at 7:17

14   with that next draft?  It appears to be almost a complete

15   rewrite of the piece.

16   A.  I was picking it up to edit it, read it, whatever.  Yeah.

17             MR. TURKEL:  If you put 140F back up now.

18   Q.  When we see bold like that all the way through, does that

19   mean someone changed it, whether it was you or someone else?

20   A.  Yes.  That -- yes.

21             MR. TURKEL:  All right.  So if you page through

22   slowly, Mr. Bucher, go the next page, and then the next one.

23   Q.  All that bolded language we're seeing between 6:30 and 7:17

24   gets added in, right?

25   A.  I would say in general, yes, but again, I would -- I mean,

M281PAL2                    Cohn - Direct

1    some of that might have existed before.  I'd have to read

2    through it, because often, the way the system worked, like if

3    you would pick up a sentence that was in the original draft and

4    maybe say, I want to move this higher up, when you moved it, it

5    would show up as a change, I believe.  So it's -- it would be

6    hard to know if everything was new, new language.

7              MR. TURKEL:  All right.  Mike, pull back 140E.  And do

8    me a favor; highlight the excerpt at the bottom, "Just as in

9    2011."

10             Go to the next page, if you could.

11   Q.  All right.  We talked about the fact that the Jared

12   Loughner shooting example showed up in the draft that you

13   initially edited, right?

14   A.  Yes.

15   Q.  All right.  You can see how that reads there, right?  It

16   discusses the fact that "Mr. Hodgkinson's rage was nurtured in

17   a vile political climate."  That's referring to the Scalise

18   shooter, right, comparing him to Jared Loughner?

19   A.  Oh, yes.  I mean, it's referring to the Scalise shooter

20   when it gets to Mr. Hodgkinson.

21   Q.  Right.  It discussed the fact that, just like Mr. Loughner,

22   his rage was nurtured in a vile political climate, right?

23   A.  Yes.

24   Q.  All right.  Who was responsible at *The Times* for

25   fact-checking the content of this point, this paragraph?

**JA 0628**

M281PAL2                          Cohn - Direct

1   A.  Well, I mean, fact-checking goes on at several levels.  I

2   mean, it's -- there's a fact-checker, but, you know, it's --

3   writers fact-check, or, you know, reporting is in a way a form

4   of fact-checking.  I mean, you're -- everyone who reads it has,

5   you know -- through the copyeditors, like, has some -- has some

6   role, although yes, there was a fact-checker.

7   Q.  Where does the buck stop?  Who is ultimately responsible

8   for fact-checking the content in a paragraph like the one

9   highlighted before you?

10  A.  I just have to say it's a shared responsibility from the

11  editors and the fact-checker and the copyeditors.

12  Q.  Does the writer of the piece not have ultimate

13  responsibility for the fact-checking on it?

14  A.  No, I -- I would say yeah, you want -- definitely want the

15  writer to be sure of the facts, but the -- it's -- we wouldn't

16  have fact-checkers if they were -- if there wasn't a need for

17  everyone to have -- to be rechecked.

18          MR. TURKEL:  Mr. Bucher, pull up 141 now.  And go one

19  page over, please.

20          All right.  Go back.  I'm sorry.  Can you highlight

21  the last paragraph, starting at the last paragraph of this page

22  into the first paragraph of the next page.

23  Q.  All right.  So by 7:17 on Exhibit 140F, by the time we get

24  to that draft, the language about the Jared Loughner/Gabby

25  Giffords incident now reads, "Was this attack evidence of how

M281PAL2                        Cohn - Direct

1   vicious American politics has become?  Probably.  In 2011, when

2   Jared Lee Loughner opened fire in a supermarket parking lot,

3   grievously wounding Representative Gabby Giffords and killing

4   six people, including a 9-year-old girl, the link to political

5   incitement was clear.  In the weeks before the shooting Sarah

6   Palin's political action committee circulated a map of targeted

7   electoral districts that put Ms. Giffords and 19 other

8   Democrats under stylized crosshairs."

9            All right.  Do you see that?

10  A.  Yes.

11  Q.  All right.  Now the language changed since the 6:30 draft

12  that you handed off to Mr. Bennet, didn't it?

13  A.  Yes.

14  Q.  And now the incident has been described to have a clear

15  link to political incitement, right?

16  A.  It says "the link to political incitement was clear."

17  Q.  You yourself did not believe that the map incited Jared Lee

18  Loughner, do you?

19  A.  I was not thinking -- I did not -- I wasn't thinking that

20  it was, you know -- he was taking orders from a map, but I

21  wasn't really thinking about that.  I was thinking really about

22  just -- to me, the link was this sort of confluence of things

23  going on, that we had a really rising, quickly rising

24  temperature of political rhetoric in the country, a lot more

25  demonization of opponents, political opponents, things had

**JA 0630**

M281PAL2                              Conn - Direct

1    gotten very ugly, and at the same time we have guns flowing

2    through the culture, available to everyone, and then there's

3    this shooting, and I -- Gabby Giffords is shot, several other

4    people killed, and as, you know -- then we find out, yeah, then

5    we are thinking about, you know, there was this map going

6    around with crosshairs, gun sights on it, and Gabby Giffords

7    turns out to be one of the people who was in a targeted

8    district.  So it was really -- I think we were just thinking

9    more generally about how these things sort of boil up and

10   affect the whole culture and then, look, this thing happened

11   with Gabby Giffords.  And I can't tell you whether that was

12   what I thought when I read the first version or the second

13   version, because I do not remember, but I remember having that

14   thought.

15   Q.  When you asked your question, though, in bold on 140E, the

16   draft you edited, you -- not talking "we" but you -- did not

17   think in terms of the fact that the Jared Lee Loughner shooting

18   was a direct and clear incitement by the map, did you?

19             MR. AXELROD:  Objection.  Misstates testimony.

20   Misstates the exhibit.

21             MR. TURKEL:  I'll respond if you want, Judge, but --

22             THE COURT:  Well, I don't think he's asking about -- I

23   think it needs to be rephrased.  But the question was, as I

24   understand it, directed at the witness's state of mind, and

25   that will be permitted, but I think you have to rephrase it.

M281PAL2                          Cohn - Direct

1            MR. TURKEL:  All right.

2       BY MR. TURKEL:

3       Q.  When we look at 140F, the document in front of you,

4       Ms. Cohn, the language "the link to political incitement was

5       clear" had been added from the draft you looked at at 6:30,

6       right?

7       A.  Yes.

8       Q.  So for instance, in 6:30, when you ask -- trying to avoid

9       bringing the entire exhibit up here.

10           At 6:30 in your draft when you ask, in bold print, "Do

11      we know of any elected officials on the left who have incited

12      violence," right, at that point in time when you used the

13      phrase "incited violence," the draft you're looking at doesn't

14      have the phrase "the link to political incitement was clear,"

15      does it?

16      A.  No.

17      Q.  All right.  And at that time when you used the word

18      "incited," in your mind, you weren't -- in your mind, you

19      didn't believe that the Sarah Palin map incited Jared Lee

20      Loughner in a clear or direct way to commit that shooting, did

21      you?

22           MR. AXELROD:  Your Honor, this witness just answered

23      that exact same question, and that's the answer, and I don't

24      know why it's being repeated now.

25           MR. TURKEL:  I'm trying to avoid impeachment if I can

M281PAL2              **JA 0632**              Cohn - Direct

1   here, Judge, so -- I can tie it up.

2              THE COURT:  Well, it's interesting hearing from the

3   two of you, since my direction to you at the beginning of the

4   trial was that all objections should be stated as no more than

5   one or two words and no colloquy should occur between counsel.

6              The objection is sustained.

7              MR. AXELROD:  Apologies, your Honor.

8              MR. TURKEL:  Can I rephrase, Judge?  Sustained in what

9   way?

10             THE COURT:  You can certainly make a stab at it.  The

11  objection was asked and answered, and I sustained the

12  objection.

13  BY MR. TURKEL:

14  Q.  And when you said "incited violence" in your comments on

15  140E, you did not believe that the Sarah Palin political action

16  committee map had incited Jared Loughner to commit that

17  shooting in a direct way, did you?

18             MR. AXELROD:  Objection.  Asked and answered.

19             THE COURT:  Well, I'm going to allow it on the

20  objection raised.  I have considerable question in my mind

21  about whether a different objection—namely, relevance—could

22  have been interposed, but that objection was not interposed.

23  So you may answer the question.

24  A.  May I hear the question again.

25  Q.  Yes.  When you used the words "incited violence" in your

M281PAL2                    Cohn - Direct

1    comments on 140E, you did not believe that the Sarah Palin

2    political action committee map that was circulated had incited

3    Jared Loughner to commit that shooting in a direct way?

4    A.  I was not thinking that when I wrote the note.

5    Q.  As we sit here today -- well, strike that.  I'm going to

6    move on.

7            Ultimately, do you find out that a version of the

8    piece is printed with this language in it about a "link to

9    political incitement [which] was clear"?

10   A.  I'm sorry to ask you again, but can you -- could you repeat

11   that.

12   Q.  Sure.

13           MR. TURKEL:  Mike, take that excerpt down.

14   Q.  When do you find out that there is concern within the

15   editorial team that the article that was ultimately published

16   had factual errors in it?

17   A.  When I arrived at work the next day.

18   Q.  Do you know whether the piece went out on time on the 14th?

19   A.  On time, do you mean -- are you talking about did we meet

20   our print deadline, of 8:00?

21   Q.  Yes.

22   A.  I don't know.

23   Q.  What time did you get to work on the 15th?

24   A.  I don't remember.  I -- the only way I would know is to

25   look at the time of the correction and work backwards, but I

M281PAL2                    Cohn - Direct

1    don't know what time I arrived.

2    Q.  When did you normally get to work?

3    A.  It -- it varied all the time, depending on what day, how

4    late I worked the night before.

5    Q.  When you got to work -- when you got to work, was there

6    already discussion about correcting the piece?

7    A.  Yes.

8    Q.  And who did you discuss that with?

9    A.  I feel like I just heard it from a lot of people that there

10   was a problem.  When I walked in, there was -- people were

11   talking about it, but I know I talked to James immediately.

12   Q.  And for the record, by James, you mean James Bennet?

13   A.  James Bennet.

14   Q.  Yeah.  Anybody else?

15   A.  Well, once I sat down, which was, you know, within seconds

16   of entering, at my desk, there was also -- Jesse Wegman was

17   talking to us at one point.  I don't know if it was a tiny bit

18   later or right away.

19   Q.  And who, for -- who is Jesse Wegmans?

20   A.  Jesse Wegman.

21   Q.  Wegman.  I'm sorry.  No S.

22   A.  Right.  Another editorial board member who covers legal

23   affairs.

24   Q.  And is Jesse Wegman a writer, an editor, both?

25   A.  Writer.

**JA 0635**

1          MR. TURKEL:  If we could pull up 192.

2    Q.  Have you seen that email before?  It's already in evidence.

3    A.  I mean, I didn't see it at the time.  I'm not listed on it.

4    But I've been -- I've glanced at it, yes.

5    Q.  Reading what Mr. Bennet wrote to Ms. Lepping and

6    Ms. Williamson, did you have any discussions with Mr. Bennet

7    independently in which he told you he didn't know what the

8    truth was here?

9    A.  No.

10   Q.  Did you have any discussions with Mr. Bennet in which he

11   discussed with you why he included the language about the Sarah

12   Palin/Jared Loughner connection in subsequent drafts?

13   A.  No.

14   Q.  Do you know whether anybody ever fact-checked that at any

15   point in time?  And by "that," I mean the contentions about the

16   connection between Jared Loughner and the Sarah Palin political

17   action committee map.

18   A.  Well, I do remember there was a discussion of when the map

19   came out.

20   Q.  Go ahead.  I didn't mean to cut you off.  Go ahead.

21   A.  And I think that was from Eileen Lepping.

22   Q.  And was that in the context of the fact that one of the

23   drafts or the article made it sound like it was weeks before

24   when the map actually came out nine months before the shooting?

25   A.  I don't know the exact numbers of the months and weeks, but

M281PAL2                    Cohn - Direct

1    yes, it was about weeks versus months.

2    Q.  Right.  So related to the duration of time between the map

3    versus when the shooting occurred.

4    A.  Yes.

5    Q.  Anything else, though, that you discussed with Ms. Lepping

6    or Mr. Bennet about that particular connection being

7    fact-checked by somebody on the editorial team?

8    A.  I can't recall.

9    Q.  Were you involved at all, Ms. Cohn, in helping with the

10   corrections that were ultimately put out with respect to

11   "America's Lethal Politics"?

12   A.  Yes.

13   Q.  In what capacity were you involved in that?

14   A.  I, as -- I had been a copyeditor, so I actually knew how to

15   pull the file up from the -- where they were kept, the already

16   published files, and how to -- I don't know -- code it, for

17   lack of a better word, but use -- how to actually put the

18   correction into the system and make it appear online.

19   Q.  As far as the content of the corrections, was that coming

20   from you or were you being instructed on that by others within

21   the editorial team?

22   A.  I made some suggestions; I think James was in -- and Jesse

23   Wegman were both -- I remember they were both standing behind

24   me, and, you know, dictating some and then I would weigh in

25   and -- yeah.

**JA 0637**

M281PAL2                          Cohn - Cross

1   Q.  Go ahead.  I didn't mean to cut you off.

2   A.  Go ahead.  I'm sorry.

3   Q.  How many corrections were ultimately made?

4   A.  I recall two.  I mean, I recall going back and changing it

5   to clarify our -- the nature of the map and to correct the

6   description of it.

7   Q.  Did any of the corrections mention Governor Palin by name?

8   A.  I know that first one didn't.  I might have to read them

9   again, but I know we didn't put it in the first one.

10  Q.  And by "it," you mean her name, right?

11  A.  "It" refers to her name, yes.

12          MR. TURKEL:  Judge, can I have a moment?

13          THE COURT:  Yes.

14          MR. TURKEL:  Judge, we have no further questions.

15          THE COURT:  All right.  Thank you very much.  You may

16  step down.

17          MR. AXELROD:  Your Honor, I think I need to examine

18  the witness.

19          THE COURT:  Oh, I'm sorry.  I heard his voice and I

20  thought it was your voice.

21          You're not off the hook yet.

22          Okay.  My apologies.  Go ahead, counsel.

23          MR. AXELROD:  Thank you.

24  CROSS EXAMINATION

25  BY MR. AXELROD:

M281PAL2                    Cohn - Cross

1   Q.  Good morning, Ms. Cohn.

2   A.  Good morning.

3   Q.  I want to pick up right where Mr. Turkel left off for a

4   second.

5       Mr. Turkel just asked you whether Ms. Palin's name was

6   in the correction.  Do you recall that question?

7   A.  Yes.

8   Q.  And you were involved in helping Mr. Bennet and Mr. Wegman

9   come up with the language of the correction?

10  A.  Yes.

11  Q.  Did you consider adding Ms. Palin's name to the correction?

12  A.  Yes, we talked about it.

13  Q.  And what did you talk about?

14  A.  I think James or -- James or Jesse Wegman, when they were

15  dictating, they had her name in it, and I brought up the point

16  that the way it was phrased, it might repeat the error and that

17  there's a style to doing *Times* corrections where you don't want

18  to repeat the error, so you would say, you know, in -- can I

19  give an example, say, of this is --

20  Q.  Sure.

21  A.  I'm just making this up.  I'm not referring to any real

22  correction:  In an article yesterday about the weather, the

23  name -- we referred to a forecaster as Jane Smith.  But what

24  you would want to do is say:  We incorrectly referred to the

25  name of a forecaster.  And then say:  She is Paula Smith.  So

1   it's just a way of not repeating the mistake.

2             So I just suggested that we rephrase it.  And then on

3   top of that, I felt like -- I don't know -- I just said -- we

4   were very concerned about this correction.  I said, should we

5   just be -- maybe it would be more gracious not to really have

6   her name in proximity in the same sentence with this horrific

7   shooting again.  So we were -- it was my attempt to follow

8   *Times* style and make the correction.

9   Q.  And you thought it was more gracious not to add Ms. Palin's

10  name to the correction.

11  A.  Yes, that's what I was thinking at the time.

12  Q.  Going back to the beginning, and then we'll catch up a

13  little bit:  I think you first said you were a copyeditor for a

14  number of years, and if you would, could you just remind the

15  jury, what are a copyeditor's responsibilities?

16  A.  Grammar; *Times* style; tone; logic; spelling; does a piece

17  keep up with the news, has it been overtaken by new news

18  developments; writing a headline that captures the story and

19  hopefully is enticing to readers.

20  Q.  Okay.

21  A.  That's a -- that captures a lot of it.

22  Q.  And then your last two years at *The Times*, you were an

23  editor on the editorial board, correct?

24  A.  Correct.

25  Q.  And what were your responsibilities as an editor on the

M281PAL2                          Cohn - Cross

1    board?

2    A.   It was -- it changed in that -- I mean, I still had some of

3    those same concerns, but I was getting involved earlier in the

4    process, talking with writers as they were beginning pieces,

5    attending board meetings, just getting in at the -- at an

6    earlier level when the piece was just first being put together.

7    Q.   In that editing role, when you were actually editing a

8    draft piece, as you looked at Mr. Bennet's piece after he

9    revised it, or I should say "America's Lethal Politics" after

10   Mr. Bennet revised it, in that editor role, what are you

11   looking for?

12   A.   Well, I mean, at that time I was also balancing a lot of

13   production issues that we had to -- we really had to get it to

14   the copydesk right away, it was late, so I'm looking at -- at,

15   did the sentences flow, did -- especially when there's a lot of

16   changes, did some sort of sentence or -- get copy-pasted and

17   get put in there twice; can I follow the, you know -- is

18   anything confusing; is there an awkward sentence; is it

19   grammatical; is everything spelled right; is everything right.

20   Q.   "Is everything right" is kind of where I want to go.  Do

21   you read a draft piece to make sure it makes sense?

22   A.   Yes.

23   Q.   Do you read a draft piece to make sure it's accurate?

24   A.   Yes.

25   Q.   So turning to the day of June 14th.

**JA 0641**

M281PAL2                         Cohn - Cross

 1              MR. AXELROD:  And Mr. DiMezza, if you could put up
 2     Defense Exhibit 16, which is already in evidence.
 3     Q.  So just to kind of put this in perspective, at the very top
 4     of this email, this is 12:08, when Bob Semple makes the Jimmy
 5     Connors comment to you.  Do you see that?
 6     A.  Yes.
 7     Q.  So it's the middle of the day.
 8              MR. AXELROD:  So now if we can take that down,
 9     Mr. DiMezza.
10     Q.  I want to keep on this document.  And you'll see at 11:50,
11     Mr. Semple emails, talking about whether there's a point to be
12     made about gun control, right?
13     A.  Yes.
14     Q.  And at the very end he says, "I put the thing on the DEW
15     for now as an alternate #3."  What did that mean to you?
16     A.  It meant that we were going to have three editorials
17     appearing on the page, the lede, just sort of the weightiest,
18     most -- not necessarily in topic but the most chunkiest, most
19     important piece, longer usually, a middle piece, and then an
20     alternate 3 would be possibility for the third spot.
21              MR. AXELROD:  You can go back to the body of the
22     document, Mr. DiMezza.
23     Q.  You respond at 12:04, Ms. Cohn -- blow that up for you.
24     You said, "I'm on the train now and don't know what Trump said,
25     but I'm thinking back to what a giant story Gabby Gifford

M281PAL2                        Cohn - Cross

1   shooting was.  Amazing that shooting congressmen doesn't seem

2   so shocking now."

3        Why did you bring up the Gabby Giffords shooting?

4   A.  I mean, I felt it was impossible not to make that parallel.

5   It was the last time that a congressperson had been shot, as

6   far as I -- I don't know if there were any other cases of it,

7   but certainly not at all -- not in modern memory, so --

8   Q.  At the time you wrote this, which is, you know, midday on

9   June 14th, what did you remember about the Giffords shooting,

10  or the Arizona shooting?

11  A.  I just remembered how it was just a moment that shocked the

12  nation, that our increasing gun violence had gotten to the

13  point that a congresswoman would be at a public event, I

14  believe with constituents, and be shot, and that it -- I mean,

15  I remember that it had happened in a time when I felt like it

16  was sort of the beginning of the time where politics were

17  growing increasingly vociferous.

18        MR. AXELROD:  So if you can take that down, and

19  Mr. DiMezza, if you could put up Defense Exhibit 17, please.

20        If you could blow that up.  It's already in evidence.

21  I'm sorry.  I should have said that.

22  Q.  So Ms. Cohn, this is an email from Mr. Bennet at 12:41,

23  which you are cc'd on.  Mr. Bennet, you know, weighs in and

24  says, "As Bob has said, there's most likely a gun control point

25  to be made here.  The other question is whether there's a point

1    to be made about the rhetoric of demonization and whether it

2    incites people to this kind of violence.  Hard for me to

3    imagine that Bernie himself is guilty of anything like that.

4    But if there's evidence of the kind of inciting hate speech on

5    the left that we, or I at least, have tended to associate with

6    the right (e.g., in the run-up to the Gabby Giffords shooting)

7    we should deal with that."

8           Mr. Bennet is essentially weighing in on the scope of

9    the editorial, correct?

10   A.  Yes.

11   Q.  Was this type of email from Mr. Bennet typical or uncommon?

12   A.  Typical.  I mean, it wouldn't happen for absolutely every

13   piece, but very typical.

14   Q.  You see where Mr. Bennet writes, "The other question is

15   whether there's a point to be made about the rhetoric of

16   demonization and whether it incites people to this kind of

17   violence"?

18   A.  Yes.

19   Q.  How did you interpret that?

20   A.  That we should address the kind of ugly rhetoric that was

21   going on at the time and see if it was sort of setting the

22   stage kind of boiling up into the culture in a way that was --

23   particularly in a culture where you have guns flowing freely,

24   whether it was setting us up for, you know, dangers like this,

25   dangers of violence.

M281PAL2                              Cohn - Cross

1   Q.  And Mr. Bennet used the term "incite" in that question.  Do

2   you see that?

3   A.  Yes.

4   Q.  In this email, how did you interpret the use of that word?

5            MR. TURKEL:  Objection, your Honor, relevance.

6            THE COURT:  No.  I think the door has been opened to

7   that from previous questioning.  Overruled.

8   Q.  So let me ask you that again, Ms. Cohn, see if I can get it

9   exactly right.

10           Mr. Bennet used the word "incites" in this email.  Do

11  you see that?

12  A.  Yes.

13  Q.  The rhetoric of demonization and whether it incites.  How

14  did you interpret the word "incites"?

15  A.  Whether it stirs people up.

16  Q.  And then Mr. Bennet talked about "inciting hate speech on

17  the left (e.g. in the run-up to the Gabby Giffords shooting)."

18  Do you see that?

19  A.  Yes.

20  Q.  At the time of this email did you remember the details of

21  that shooting?

22  A.  At that -- I remember sort of just barebones how shocking

23  it was when -- when she was shot, what a big story it was.

24  Q.  Did you remember this kind of -- as you just discussed,

25  this kind of nasty rhetoric leading up to that shooting?

M281PAL2                         JA 0645        Cohn - Cross

```
 1    A.  I knew it was a time where there was a lot of -- a lot of

 2    that kind of rhetoric and demonization in politics, yes.

 3    Q.  What did you think about this concept for the editorial?

 4    A.  Seemed like a valid concept.  And I was interested in the

 5    gun control angle also.  I think it all comes back to the guns.

 6    Q.  So I think you testified under questioning from Mr. Turkel

 7    that you got involved because Mr. Semple said pick it up or

 8    something like that?

 9    A.  Yes.

10    Q.  And Mr. Semple had then left the office?

11    A.  Yes.

12    Q.  And was that typical of how you were assigned to edit draft

13    editorials?

14    A.  Yes.

15    Q.  Now at some point late in the afternoon -- and we're going

16    to get to the documents in a second -- do you recall how you

17    learned that Elizabeth Williamson had completed her draft?

18    A.  No.  I don't recall if I was told or if I just saw it in

19    Backfield.

20              MR. AXELROD:  Okay.  And so now, your Honor, I'm about

21    to get into a couple documents.  Do you want to take a break

22    now or should I start?

23              THE COURT:  Well, you've won me over, counsel.  We'll

24    take a 15-minute break at this time.

25              (Jury not present)
```

**JA 0646**

M281PAL2                    Cohn - Cross

1             THE COURT:  Ms. Cohn, you can step down.  We'll see

2    you in 15 minutes.

3             All right.  Counsel, we'll see you in 15 minutes.

4             (Recess)

5             (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Please be seated.

3          Linda, please bring in the jury.

4          (Jury present)

5          THE COURT:  Please be seated.  Go ahead, counsel.

6          MR. AXELROD:  Thank you.

7    BY MR. AXELROD:

8    Q.  So, Ms. Cohn, I think when we broke, I had asked you

9    whether at some point you knew that Elizabeth Williamson had

10   finished her draft, correct?

11   A.  You might have asked that before the break, but I don't

12   remember.

13   Q.  I was actually getting at my question.  At some point you

14   found out that Ms. Williamson had finished her draft, is that

15   right?

16   A.  Yes.

17   Q.  Thank you.

18          Can we put up, Mr. DiMezza, DX 32, which is already in

19   evidence.

20          So, Ms. Cohn, before I ask you substantively about

21   this, I just want to kind of put it in context for you.  So if

22   you look at the first page, at the bottom, it says, "Linda

23   Cohn, backfield, 5:03 p.m."  Do you see that?

24   A.  Yes.

25   Q.  And I take it from Mr. Turkel's examination of you, that

JA 0648

M282Pal3                          Cohn - Cross

1   means, if it says "Linda Cohn, backfield," you did something to

2   this draft and saved it in some way?

3   A.   Correct.

4   Q.   So now let's go backwards one page and then two pages.

5        You see this says "Elizabeth Williamson, backfield, at

6   4:44 p.m."  Do you see that?

7   A.   Yes.

8   Q.   Okay.  And so I just want to make sure we understand that

9   at 4:44 does it look like Ms. Williamson files her draft in

10  backfield?

11  A.   Yes.

12  Q.   Is that consistent with kind of your rough sense of timing?

13  A.   Yes.

14  Q.   All right.  So if you can now go forward one page,

15  Mr. DiMezza.  Yes.  All right.  And if you could blow up the

16  fifth paragraph, "just as in 2011."  Thanks.

17       So, Ms. Cohn, in this paragraph of Ms. Williamson's

18  draft, it says, "Just as in 2011, when Jared Lee Loughner

19  opened fire in a supermarket parking lot, grievously wounding

20  Gabby Giffords and killing six people, including a 9-year-old

21  girl, Mr. Hodgkinson's rage was nurtured in a vile political

22  climate.  Then, it was the pro-gun right being criticized.  In

23  the weeks before the shooting, Sarah Palin's political action

24  committee circulated a map of targeted electoral districts that

25  put Ms. Giffords and 19 other Democrats under stylized

M282Pal3                    Cohn - Cross

1    crosshairs."

2              Fair to say that language was in Ms. Williamson's

3    draft?

4    A.  Correct.

5    Q.  What did you think about -- from an editorial perspective

6    about including both a discussion of the Hodgkinson shooting in

7    June of 2017 and the Arizona, the Loughner shooting in 2011?

8    A.  Well, that made sense to me because they were both very

9    unusual incidents with parallels in that a member of Congress

10   was shot.

11   Q.  So I think you said on examination from Mr. Turkel that you

12   read the piece?

13   A.  Yes.

14   Q.  And then you went and had a conversation with James Bennet

15   next?

16   A.  Correct.

17   Q.  Do you recall what you told Mr. Bennet when you went to go

18   see him?

19   A.  I remember saying I just wasn't sure about the piece and

20   could he take a look at it.  That is about what I recall, yeah.

21   Q.  And you wanted him to take a look at Elizabeth Williamson's

22   draft, correct?

23   A.  Yes.

24   Q.  Prior to that conversation, at any point during the day,

25   had Mr. Bennet said to you something like, when Elizabeth

M282Pal3                    Cohn - Cross

1    Williamson finishes her draft, I want to see it?

2    A.  No.

3    Q.  So whose decision was it to take Ms. Williamson's draft and

4    pass it off to Mr. Bennet?

5    A.  That was my decision.

6    Q.  So if you could take that down, Mr. DiMezza, and put up

7    DX 33, this is a version of the same document Mr. Turkel showed

8    you, but technically it has not been admitted yet, but let's

9    take a look at it.

10            So just putting this in reference again, there is that

11   "James Bennet at 6:32."  Do you see that?

12   A.  Yes.

13   Q.  And then, Mr. DiMezza, if you just jump backwards.  Yeah.

14            You see "Linda Cohn, 5:03"?

15   A.  Yes.

16   Q.  Do you know what this exhibit is?

17   A.  Well, this is showing the file that -- I mean, this shows

18   that I had stored it at 5:03 and then James Bennet stored it

19   whatever that time was.

20   Q.  Great.

21            MR. AXELROD:  Your Honor, I move for admission of

22   Defense Exhibit 33.

23            MR. TURKEL:  No objection, your Honor.

24            THE COURT:  Received.

25            (Defendant's Exhibit 33 received in evidence)

**JA 0651**

M282Pal3                    Cohn - Cross

1    BY MR. AXELROD:

2    Q.  I'm not going to spend a long time but, Mr. DiMezza, if you

3    could go to the next page, the first page.

4              And so going down to the bottom, Ms. Cohn, the very

5    last paragraph --

6              Yeah, if you could blow up the next two paragraphs,

7    Mr. DiMezza.  Thank you.  Perfect.  Yeah.

8              So there is that paragraph that mentions Mr. Loughner

9    and the crosshairs map.  Do you see that?

10   A.  Yes.

11   Q.  And then in the following paragraph, that's the one where

12   you added, "Do we know of any elected officials on left who

13   have incited violence?"  Do you see that?

14   A.  Yes.

15   Q.  "Or just unaffiliated people online or comedians."

16   A.  Correct.

17   Q.  When you said, "Do we know of any elected officials on the

18   left who have incited violence," what did you mean by the words

19   "incited violence"?

20   A.  Well, that was really just kind of a note to myself,

21   shorthand, so just the kind of rhetoric that was fueling this

22   sort of gun violence in the country, particularly political

23   targets.

24   Q.  Political demonization?

25   A.  Yes.

M282Pal3                    Cohn - Cross

1    Q.  Did you mean -- when you used the word "incited," did you

2    mean to imply causation?

3                MR. TURKEL:  Object, Judge.

4                THE COURT:  Overruled.  You may answer.

5    A.  You know, again, this was really just shorthand.  I was

6    just really trying to quickly make the point in a little note,

7    mainly to myself.  This was not -- I don't think I mailed this

8    question to anyone else, like the writer, but just incendiary

9    rhetoric, yeah.

10   Q.  Then you say "or just unaffiliated people online or

11   comedians," and I think you testified that you had in your head

12   the Kathy Griffin example, is that right?

13   A.  Yes.

14   Q.  So, Mr. DiMezza, if you could put up Defense Exhibit 68,

15   which is in evidence, next to this language.

16               So that, Ms. Cohn, if you see that, that picture, do

17   you see that picture on the right of Kathy Griffin and the

18   mask, the bloody mask?

19   A.  Yes.

20   Q.  That was what was kind of in your head when you were

21   thinking about comedians?

22   A.  Yes.

23   Q.  Now, if you take that down, Mr. DiMezza, thank you.

24               So do you recall what Mr. Bennet said to you after you

25   went to his office?

M282Pal3                    Cohn - Cross

1          THE COURT:  I'm sorry.  Forgive me for interrupting.

2     I just want to go back a step to make sure I understood the

3     witness's prior answer.  So the dictionary defines the verb

4     "incite" as "to arouse to action; spur or urge on."

5          Were you using the term consistent with that?

6          THE WITNESS:  I think I was thinking -- I always think

7     of it more as stir up.  I actually think you can have rhetoric

8     that you would call incitement even if nothing happened

9     afterwards.  So I think that was, I would say, language to stir

10    up or rouse.  Is that?  Yeah.

11         THE COURT:  All right.  Go ahead, counsel.

12         MR. AXELROD:  Thank you, sir.

13    BY MR. AXELROD:

14    Q.  So Mr. Bennet tells you something like he will take a look

15    at the draft, is that right?

16    A.  Yes.

17    Q.  Okay.  How much time passed between the time Mr. Bennet

18    says "I will take a look at the draft" and when you get some

19    type of word that he is done with his draft?

20    A.  I would have to refresh my memory.  I know I was waiting

21    anxiously to get the piece back because we were at that point

22    getting close to deadline, when we needed to get the piece to

23    the copydesk.

24    Q.  What were you doing while you were waiting anxiously, if

25    anything?

1  A.  I can't recall exactly.  I may have been working on the

2  headline at that point.  I'm not sure.

3  Q.  In Scoop, the file that we have been talking about a little

4  today, I think you testified that there is an ability to read

5  behind?  Do you recall that testimony?

6  A.  Oh, yes.  Right.  I would have probably also kept checking

7  to see if I could read the changes that James Bennet was

8  making, but I do recall that he hadn't hit the store button, so

9  I couldn't see.  So, yeah, I could not see the copy until he

10  was completely finished.

11  Q.  All right.  Mr. DiMezza, if you could put up Defense

12  Exhibit 30, which is not yet in evidence, but is another Scoop

13  file.

14            And if you could go, Ms. Cohn, if you could look at

15  page --

16            Mr. DiMezza, this is page 178 of this big file.  We

17  are not going to look at the entire document.

18            Ms. Cohn, do you see where it says "James Bennet,

19  backfield, 7:21 p.m."?

20  A.  Yes.

21  Q.  Do you know what that means?

22  A.  He stored it at 7:21.

23  Q.  And then if we could just jump forward, Mr. DiMezza, three

24  pages to 175.

25            Do you see where that says "Linda Cohn, backfield,

**JA 0655**

M282Pal3                    Cohn - Cross

1    7:23"?

2    A.  Yes.

3    Q.  Do you know what that signifies?

4    A.  That was the first time I was able to get into that file

5    actively so I could make changes, and it means I stored it at

6    7:23, after making some sort of change.

7              MR. AXELROD:  Your Honor, I would move for admission

8    of Defense Exhibit 30.

9              MR. TURKEL:  No objection, your Honor.

10             THE COURT:  Received.

11             (Defendant's Exhibit 30 received in evidence)

12   BY MR. AXELROD:

13   Q.  So I am going to wait for that to come up for the jury, but

14   as you will see, Ms. Cohn, you saved this document at 7:23 p.m.

15   Do you see that?

16   A.  Yes.

17   Q.  And Mr. DiMezza, if you can go four pages forward to 171.

18             And you see, Ms. Cohn, you saved this again at 7:24

19   p.m.?

20   A.  Correct.

21   Q.  And Mr. DiMezza, if we can go three pages forward to 168.

22             So now, Ms. Cohn, you saved it at 7:33 p.m.?

23   A.  Yes.

24   Q.  Mr. DiMezza, if we can go four pages forward to 164.

25             And Ms. Cohn, you see that you saved this again at

**JA 0656**

M282Pal3                           Cohn - Cross

1    7:35 p.m.?

2    A.  Yes.

3    Q.  And if we can go three pages forward to 161.

4         Ms. Cohn, you saved it again at 7:36 p.m.?

5    A.  Yes.

6    Q.  Can we go seven pages forward to 154.

7         You saved it again at 7:37 p.m.?

8    A.  Yes.

9    Q.  And if we can go four pages forward to page 150.

10        You saved it again at 7:38 p.m.?

11   A.  Correct.

12   Q.  And one more, if we can go three pages forward to 147.

13        And you saved it again at 7:48 p.m.?

14   A.  Yes.

15   Q.  All those times, one, two, three, four, five, six, seven,

16   eight times you saved it, what does that represent?

17   A.  Those are times I have made some sort of change.

18   Q.  Change to what?

19   A.  Change to the text or headline, an editing change.  I was

20   making -- rewording things, making corrections.  I was also

21   putting in some corrections because I had the file active.  I

22   think there were other people were sending me changes, like

23   Eileen Lepping, the fact-checker, or Nick Fox, who was also

24   editing the piece behind me, and I was putting those changes

25   in.

1   Q.  You were making changes to Mr. Bennet's draft of the

2   editorial?

3   A.  Correct.

4   Q.  How closely did you read Mr. Bennet's draft?

5   A.  I read it.  I read it carefully enough to make all those

6   changes.

7   Q.  Why did you read it carefully?

8   A.  That was my job.

9   Q.  Sorry.  Were you trying to ensure that the editorial was

10  accurate?

11  A.  Yes.

12  Q.  Were you trying to make sure it made sense?

13  A.  Yes.

14  Q.  Hold on one second.

15          Now, if we can go back to page 175, Mr. DiMezza, of

16  this document, yeah, right here.  And I want you to blow up

17  that last paragraph.

18          So this is from Mr. Bennet's draft, Ms. Cohn.  "Was

19  this attack evidence of how vicious American politics has

20  become?  Probably.  In 2011, when Jared Lee Loughner opened

21  fire in a supermarket parking lot, grievously wounding

22  Representative Gabby Giffords and killing six people, including

23  a 9-year-old girl, the link to political incitement was clear.

24  In the weeks before the shooting Sarah Palin's political action

25  committee circulated a map of targeted electoral districts that

**JA 0658**

M282Pal3                    Cohn - Cross

```
1    put Ms. Giffords and 19 other Democrats under stylized
2    crosshairs."
3              You reviewed this language, is that right?
4    A.  Did you say reviewing this language?
5    Q.  Sorry.  You reviewed that language.
6    A.  Yes.
7    Q.  And did you have any problem with any of that language in
8    that paragraph?
9    A.  Nothing -- I don't remember anything coming to me.
10   Q.  At no point did you go to Mr. Bennet and say this doesn't
11   make sense?
12   A.  I did not.
13   Q.  Moving to the next paragraph, this one reads,
14   "Conservatives and right-wing media were quick on Wednesday to
15   demand forceful condemnation of hate speech and crimes by
16   anti-Trump liberals.  They're right.  Though there's no sign
17   yet of incitement as direct as in the Gifford attack, liberals
18   should of course hold themselves to the same standard of
19   decency that they ask of the right."
20             And did you review this language?
21   A.  Yes.
22   Q.  And did you see any problem with the language used in this
23   paragraph?
24   A.  I don't recall having a question or seeing a problem.
25   Q.  Did you see -- did you think that either of these two
```

1  paragraphs we just looked at were inaccurate?

2  A.  I didn't.  At the time I was reading that, I did not think

3  that, no.

4  Q.  Did you think that either of the two paragraphs we just

5  looked at didn't make sense?

6  A.  No.

7  Q.  Do you recall having any conversations with Mr. Bennet

8  about either of those two paragraphs?

9  A.  We did not discuss them.

10 Q.  Do you recall having a conversation with anyone at *The*

11 *Times* editorial board about those two paragraphs before the

12 editorial was published?

13 A.  No.

14 Q.  Did you have any concern about publishing the editorial

15 with those two paragraphs in it?

16 A.  No.

17 Q.  If you could take that down, Mr. DiMezza, and put up

18 Plaintiff's Exhibit 155.

19          And Ms. Cohn, do you know what this document is?

20 A.  Can you blow it up?  I can't really read that.

21 Q.  Sorry about that.

22 A.  Yes.  That is an e-mail from Nick Fox to me.

23          MR. AXELROD:  Your Honor, I would move for admission

24 of Plaintiff's Exhibit 155.

25          MR. TURKEL:  No objection.

M282Pal3                    Cohn - Cross

1            THE COURT:  Received.

2            (Plaintiff's Exhibit 155 received in evidence)

3   BY MR. AXELROD:

4   Q.  So Nick Fox e-mailed you at 7:35 p.m.  I think you have

5   just testified that when we went through those eight times you

6   saved the document, that you think that Nick was also sending

7   you edits.  Is that right?

8   A.  Correct.

9   Q.  He was reading behind?

10  A.  Yes.

11  Q.  What does this exhibit represent?

12  A.  The changes he found for me to insert.

13  Q.  So Nick Fox was also reading Mr. Bennet's draft of the

14  editorial?

15  A.  Yes.

16  Q.  Did Mr. Fox ever express to you in a conversation or an

17  e-mail or anything that he had any concerns about the

18  editorial?

19  A.  No.

20  Q.  If you could take that down, Mr. DiMezza, and put up DX 42,

21  which is already in evidence, and if you could blow up the top

22  for Ms. Cohn.

23            So this document, which is already in evidence,

24  Ms. Cohn, is an e-mail from you to Elizabeth Williamson at 7:58

25  on the evening of June 14.  Do you see that?

**JA 0661**

M282Pal3                    Cohn - Cross

1    A.  Yes.

2    Q.  And you write, "Hi.  I don't know whether James sent you a

3    playback with his changes.  Just in case, here's another."

4              What's a playback with changes?

5    A.  We would send a copy to the writer so they could -- it

6    would show -- you know, the changes would show up not unlike

7    what we have been looking at here, where they are in bold —

8    they would look a little different — so they could go back and

9    look and get back to us if there were any issues or problems

10   with it.

11   Q.  So why did you send this playback to Ms. Williamson?

12   A.  Well, she was the writer.  I assumed that James Bennet had

13   sent one since at that point he was really editing the piece,

14   and I was playing it safe since I had been the original editor

15   on the piece that I made sure that she had a playback.

16   Q.  But why did you want to make sure Ms. Williamson had a

17   playback?

18   A.  So she could make sure that everything in there was correct

19   and that she was happy or would -- "happy" is probably not the

20   right word, but that, you know, the changes seemed fair to her,

21   that her prose was still -- there was nothing that she wanted

22   to object to either in terms of facts or tone.

23   Q.  After sending that playback to Ms. Williamson at 7:58, did

24   she ever get back to you with any objections or concerns or

25   anything like that?

**JA 0662**

M282Pal3                          Cohn - Cross

1    A.  No.

2    Q.  Mr. DiMezza, if you could put up PX 178 for the witness

3    alone.  And if you could blow that up for Ms. Cohn.  Thank you.

4            Ms. Cohn, what is Plaintiff's Exhibit 178?

5    A.  This is an e-mail in which I am replying to the two

6    copyeditors, Bruce Levine and Joe Rakowski.

7            MR. AXELROD:  Your Honor, I would move for admission

8    of PX 178.

9            MR. TURKEL:  No objection, your Honor.

10           THE COURT:  Received.

11           (Plaintiff's Exhibit 178 received in evidence)

12   BY MR. AXELROD:

13   Q.  So let's start at the bottom of this document, actually

14   right here.  You don't even need to do anything, Mr. DiMezza.

15           Who is Bruce Levine?

16   A.  Bruce Levine was one of two copyeditors working on the

17   editorial page that night.

18   Q.  And who is Joe Rakowski?

19   A.  He was the other copyeditor working on the editorials.

20   Q.  And at 10:33, Mr. Levine e-mails, "The editorial had that

21   in all five victims were hit.  But actually four were hit by

22   bullets; the fifth victim was hit by some shrapnel.  So the

23   editorial was changed after first national edition to four.

24   Our news stories had conflicting numbers because they didn't

25   make the distinction; now they agree."

1          Do you see that?

2   A.  Yes.

3   Q.  Could you interpret what Mr. Levine is saying for us?

4   A.  So this means that after the copyeditors have read our

5   editorial and sent it to print, they are then checking all the

6   stories that the news department had on the shooting to see if

7   there are any discrepancies or any news developments.  And so

8   they are just going through with a fine-tooth comb and they are

9   saying that there was this change made that there was -- that

10  maybe we should differentiate the numbers based on whether it

11  was shrapnel or bullet.  So he is letting me know that they

12  have updated the piece, so now the -- the news article and our

13  piece are in accordance.

14  Q.  All right.  So you can take that down, Mr. DiMezza.  Thank

15  you.

16          The next day, you come to work, right?

17  A.  Yes.

18  Q.  And I think you testified that when you got to work, you

19  understood something about a correction.  Is that right?

20  A.  Yes.

21  Q.  Could you explain that to us?

22  A.  I walked in, and it seemed everyone in the room was talking

23  about the need for this correction and the need to get it done

24  right away.  So I was sort of rushed to my desk to start

25  working on it.  As I said, I was the one who could actually

1  pull -- knew how to pull the copy back from the published copy

2  and make changes.

3  Q.  At some point did you learn why people were talking about a

4  correction?

5  A.  Yes.  I don't remember if it was in the room, in the bigger

6  room on the way to my office, or when I got into my office and

7  I was talking to James Bennet and Jesse Wegman, but, yes.

8  Q.  And did they tell you why there needed to be a correction?

9  A.  Somebody said — and I don't remember whether it was James

10  or someone else — that we said -- we got this wrong.  People

11  are reading this differently, and we have got to get this

12  corrected right away.  This is, you know, urgent.

13  Q.  What did you think when you learned that?

14  A.  I mean, realizing that we -- getting anything wrong as an

15  editor — and this is something copyeditors in particular live

16  with because they see the paper right before it goes to press —

17  it's just one of the worst feelings ever.  I mean, yeah, I --

18  you feel horrible.  You never want to have anything in the

19  paper that you have to correct.  It's like -- leads to many

20  sleepless nights afterwards.

21  Q.  Why did you feel horrible?

22  A.  Because we --

23          MR. TURKEL:  Objection.  Asked and answered, your

24  Honor.

25  A.  I'm sorry.

**JA 0665**

M282Pal3                          Cohn - Cross

1          THE COURT:  Hold on.

2          Overruled.

3    BY MR. AXELROD:

4    Q.  So I think my question, Ms. Cohn, is why did you feel

5    horrible?

6    A.  Because we had gotten something wrong.  And we -- I mean --

7    oh, I should add, I also heard that quite a few people were

8    very upset about it.

9    Q.  Upset with what?

10   A.  Upset about our phrasing of the connection between the map

11   and the shooting.

12   Q.  People were upset with *The Times*.

13   A.  Yes.

14   Q.  Could you tell whether Mr. Wegman or Mr. Bennet were

15   surprised at the fact that people were upset with the wording?

16   A.  I mean, there was a general sense of, oh, no.  So, yeah.

17   Q.  So I think you testified that you worked on the correction

18   with Mr. Bennet and Mr. Wegman, is that right?

19   A.  Yes.

20   Q.  What did you do kind of specifically to work on the

21   correction?

22   A.  I mean, I did some technical things of getting the copy

23   ready and they were dictating a lot to me.  I was typing it in

24   and I was making suggestions about the wording *The Times* might

25   use for a correction.

M282Pal3                    Cohn - Cross

1    Q.  And so if we can pull up DX 5, which is already in evidence

2    and we can go to the very bottom, where the correction is.

3    Yeah, if you can blow up the correction.

4              Ms. Cohn, did you work on this language?

5    A.  Yes.

6    Q.  And as you see, it says here, "An earlier version of this

7    editorial incorrectly stated that a link existed between

8    political incitement and the 2011 shooting of Representative

9    Gabby Giffords.  In fact, no such link was established."

10             Do you see that?

11   A.  Yes.

12   Q.  At the time you worked on the editorial the night before,

13   on the night of June 14, did you know that fact that there was

14   no link established between political incitement and the 2011

15   shooting of Representative Gabby Giffords?

16   A.  No.  I actually wasn't -- well, no.

17   Q.  Were you focused on that concept the night before?

18   A.  No.

19   Q.  Why not?

20   A.  Because I was thinking the link was that -- I think I

21   explained this a bit before, but just that there was this

22   literature going around with crosshairs and, I mean, a lot of

23   what we talked about, the general demonization, the flow of

24   guns.  But then there is this shocking shooting and it turns

25   out Gabby Giffords, who was shot, was -- her district was in

**JA 0667**

M282Pal3                    Conn - Cross

1   this map.  She was one of the members of Congress who was

2   targeted visually in the map.

3   Q.  Prior to publication of the editorial "America's Lethal

4   Politics" on June 14, 2017, had you ever heard any editorial

5   member discuss Ms. Palin in a negative way?

6              MR. TURKEL:  Objection.

7              THE COURT:  Sustained.

8   BY MR. AXELROD:

9   Q.  Prior to --

10             THE COURT:  Sustained.

11  BY MR. AXELROD:

12  Q.  Prior to publication --

13             THE COURT:  I'm sorry.  Go ahead, counsel.

14  BY MR. AXELROD:

15  Q.  Prior to publication of the editorial "America's Lethal

16  Politics" on June 14 of 2017, had you ever heard Mr. Bennet

17  discuss Ms. Palin in a negative manner?

18  A.  No.

19             MR. TURKEL:  Objection.

20             THE COURT:  Overruled.

21  Q.  The answer is no?

22  A.  No.

23  Q.  You edited "America's Lethal Politics" on the night of June

24  14.  Did you intentionally mean to publish a false statement in

25  that editorial?

                              Cohn - Redirect

1   A.  No, I would never do that.

2   Q.  When you were editing the editorial that became "America's

3   Lethal Politics," did you seek to harm Ms. Palin in any way?

4   A.  No.

5             MR. AXELROD:  Your Honor, if I may have one minute?

6             THE COURT:  Yes.

7             (Counsel confer)

8             MR. AXELROD:  Your Honor, I have no further questions.

9             THE COURT:  Redirect?

10            MR. TURKEL:  Yes, your Honor.

11            May I inquire, Judge?

12            THE COURT:  Oh, yes, sure.

13  REDIRECT EXAMINATION

14  BY MR. TURKEL:

15  Q.  Ms. Cohn, you were aware, were you not, that a member of

16  *The Times* editorial board staff was assigned the task of

17  researching prior editorial board or opinion pieces relating to

18  this article?

19  A.  I was aware that a researcher was fact-checking -- well, I

20  don't know.  Are we using different terms for researcher and

21  fact-checker?

22  Q.  We are talking about Phoebe Lett who does both, so maybe

23  the same terms.

24  A.  No.  I was not aware that she was researching it.

25  Q.  Between Mr. Bennet, Ms. Williamson, Mr. Fox, Mr. Semple,

JA 0669

M282Pal3                          Cohn - Redirect

1   nobody told you that she had e-mailed around links to previous

2   pieces written by the board or opinion writers that touched on

3   the two themes of this piece, namely, political rhetoric and

4   gun control?

5   A.   I don't recall anyone mentioning that, and I'm assuming I

6   was not on that e-mail.  Is that -- I don't know.  I'm assuming

7   I was not on that e-mail.

8   Q.   I am just asking you whether you recall that happening

9   regardless of whether you were on an e-mail.

10  A.   Do I recall that she did it or do I recall anyone --

11          THE COURT:  No, do you recall that she did it.

12  Q.   Yes.

13  A.   No, I don't recall that she did it.

14  Q.   When you are editing a piece to be right, as you are -- as

15  Mr. Axelrod was asking, right, do you ever check to see what

16  research has been done when you are reviewing it?

17  A.   Yes, sometimes; often.

18  Q.   Do you --

19  A.   Not --

20  Q.   -- read every research?

21  A.   I read what at the moment I think I need to read and, yeah,

22  you know, it often depends how long I am working on a piece.

23  Q.   All right.  But with respect to this piece, you did not

24  read any previous pieces that were circulating by Phoebe Lett

25  to the editorial team, did you?

1    A.   I didn't read any pieces because Phoebe had circulated

2    them.  I don't know what they were.  And it's conceivable I

3    read them on my own; but no, I did not read anything instigated

4    by Phoebe --

5    Q.   Have you ever -- if you could pull up Plaintiff's Exhibit

6    133.

7               MR. TURKEL:  Judge, I want to confirm very quickly

8    that we offered this.  I am pretty sure we did.

9               MR. AXELROD:  It is in evidence.

10              MR. TURKEL:  That's what I thought.

11   BY MR. TURKEL:

12   Q.   Have you ever read Plaintiff's Exhibit 133, "No One

13   Listened to Gabby Giffords" written by Frank Rich?

14   A.   I don't recall reading that.

15   Q.   Did you read it -- when you say you don't recall, I don't

16   mean just in conjunction with the piece, but ever.

17   A.   Ever.

18   Q.   Were you aware that this, among other links, had been

19   circulated to Ms. Williamson, Mr. Bennet, Mr. Semple, and the

20   rest of the team?

21   A.   No, I don't recall knowing that.

22   Q.   One thing you had said earlier, somewhat at the beginning

23   of your testimony, I believe, related to the corrections that

24   were made.  Do you recall talking about those corrections?

25   A.   I recall talking about corrections, yes.

**JA 0671**

M282Pal3                    Cohn - Redirect

1   Q.  And if we could, let's pull up Plaintiff's Exhibit 1 and

2   maybe blow that up a little because the print is fairly small.

3           Now, this is the print version uncorrected of

4   "America's Lethal Politics."  I assume you read that.

5   A.  Yes.

6   Q.  Mr. Bucher, if you could go to where the two paragraphs

7   about incitement are, right there at the top.

8           Now, when this piece goes to print, we have the

9   language in here that we have gone over a number of times.

10  "Was this attack evidence of how vicious American politics has

11  become?  Probably.  In 2011, when Jared Lee Loughner opened

12  fire in a supermarket parking lot, grievously wounding

13  Representative Gabby Giffords and killing six people, including

14  a 9-year-old girl, the link to political incitement was clear.

15  Before the shooting, Sarah Palin's political action committee

16  circulated a map of targeted electoral districts that put

17  Ms. Giffords and 19 other Democrats under stylized crosshairs."

18  Right?

19  A.  Right.

20  Q.  And one of the things you had just discussed with

21  Mr. Axelrod was your understanding at the time you were editing

22  the piece was that Ms. Giffords' district was one of the

23  districts under crosshairs, right?

24  A.  Yes.

25  Q.  Then we have the second paragraph here.  "Conservatives and

M282Pal3                    Cohn - Redirect

1   right-wing media were quick on Wednesday to demand forceful

2   condemnation of hate speech and crimes by anti-Trump liberals.

3   They're right.  Though there is no sign of incitement as direct

4   as in the Gifford attack, liberals should of course hold

5   themselves to the same standard of decency that they ask of the

6   right."  Okay.  You see that?

7   A.  Yes.

8   Q.  I'm sorry.  You have to --

9   A.  Oh, yes.

10  Q.  Whatever the last version you saw was of this when you

11  edited it, you had no objection to it, right?

12  A.  Correct.

13  Q.  I want to pull up Plaintiff's Exhibit 5 now, please.

14  Again, Mr. Bucher, if you could maybe expand that.  The font is

15  kind of small.  And if you could go to the actual correction.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

M281PAL4                          Cohn - Redirect

1   BY MR. TURKEL:

2   Q.  Now when we were on direct, I think I talked to you a

3   little about the fact that there were more than one corrected

4   versions put out?

5   A.  Yes.

6   Q.  And what I'm showing you in Exhibit 5 is the first one of

7   those corrected versions.  And if we see the correction here,

8   it says, "An earlier version of this editorial incorrectly

9   stated that a link existed between political incitement and the

10  2011 shooting of Representative Gabby Giffords.  In fact, no

11  such link was established."  Correct?

12  A.  Correct.

13  Q.  Now one thing you had said at the beginning of your

14  discussion with Mr. -- or maybe -- no, it was when I asked you

15  earlier.  I asked you, did you include Governor Palin's name in

16  this correction, and your answer was no, you didn't want to put

17  it back in with this horrific shooting incident, or words to

18  that effect.  You remember your answer, right?

19  A.  Yes.

20  Q.  And I believe you said the same thing to Mr. Axelrod when

21  he asked you about it, didn't he?  Or didn't you, I should say?

22  A.  I'm sorry.  Can you ask that again.

23  Q.  Sure.  When you talked about the corrections with me and --

24  A.  Yes.

25  Q.  -- and I asked you about whether *The Times* had put Governor

1   Palin's name in the corrected --

2   A.  Right.

3   Q.  -- versions here --

4   A.  Right.

5   Q.  -- or correction text, and you said no, you remember that,

6   right?

7   A.  Right.

8   Q.  And you explained to both me, and I believe Mr. Axelrod

9   asked you also, that it was not making the same mistake again

10  or putting the name back near this horrific shooting incident,

11  right?

12  A.  Right.

13          MR. TURKEL:  Okay.  Now if you could, Mr. Bucher, go

14  back to the body of this, No. 5.  And there are those same two

15  paragraphs.  If we go right here, the top of that page, and put

16  those up, please.

17  Q.  So this is now what the language looks like in corrected

18  version 1.  And I assume you've read this at some point, have

19  you not?

20  A.  I have at some point, yes.

21  Q.  I mean, you did participate in some respect with the

22  correcting of the article, right?

23  A.  I actually don't recall whether I was changing those

24  sentences or someone else was, but I have looked at this since

25  then.

M281PAL4                          Cohn - Redirect

1   Q.  All right.  And if we look in the middle of the top

2   paragraph, it says, "Before the shooting, Sarah Palin's

3   political action committee circulated a map," right?

4   A.  Yes.

5   Q.  All right.  You left her name in the actual piece, didn't

6   you?

7              MR. AXELROD:  Objection.

8              THE COURT:  Overruled.

9   A.  Yes.

10             MR. TURKEL:  All right.  Now go back to the

11  correction, Mike, if you could.

12  Q.  All right.  In this correction, all it talks about is a

13  link between incitement and the 2011 shooting of Gabby

14  Giffords, right?

15  A.  Right.

16  Q.  All right.  Now if we go -- I want to pull up now, and I

17  want you to see that --

18             MR. TURKEL:  Pull up Plaintiff's No. 6, please.

19             And go to the correction language there and blow that

20  up, please.

21  Q.  Now we have a second correction that's done, right?

22  A.  Yes.

23  Q.  And were you involved in any respect with the drafting of

24  that corrective language?

25  A.  I don't recall whether I -- I typed that in or someone else

M281PAL4                    Cohn - Redirect

1   did, but I remember hearing that we needed to also correct our

2   description of the map.

3   Q.  All right.  So in this correction, "An editorial on

4   Thursday about the shooting of Representative Steve Scalise

5   incorrectly stated that a link existed between political

6   rhetoric and the 2011 shooting of Representative Gabby

7   Giffords."  You see that, right?

8   A.  Yes.

9   Q.  Now you used the word "rhetoric," not "incitement," right?

10  A.  Right.

11  Q.  And then again, the concession:  "In fact, no such link was

12  established."  But after this, it says, "The editorial also

13  incorrectly described a map distributed by a political action

14  committee."  Do you see that?

15  A.  Yes.

16          MR. TURKEL:  All right.  Mr. Bucher, if you could now

17  go back to the body of this one, Plaintiff's 6, the two

18  paragraphs at the top of page 2.

19  Q.  All right.  Now again, in this second circulated corrected

20  version, you've left Governor Palin's name in the body of the

21  text again.  Correct?

22  A.  Well, I don't want to say I left it in, because I don't

23  really recall working on the changing the language in the text

24  of the piece.

25  Q.  I didn't mean you particularly, I meant the collective

1    *Times*.  And I should have been more precise.  I'm sorry.

2    A.  Oh, yes.

3    Q.  But the editorial board staff and whoever was working on

4    the corrections didn't take Governor Palin's name out of the

5    body of the text, did they?

6    A.  No.

7    Q.  But when we go to the correction that I just read, her name

8    actually isn't included in any way, shape, or form, is it?

9    A.  It is not.

10          MR. TURKEL:  If you could pull up 192, please.

11   Q.  And I want to just end my examination with this, Ms. Cohn.

12   This email that we --

13          MR. AXELROD:  Objection, your Honor.  Foundation.

14   Before we get to the question.

15          MR. TURKEL:  May I respond.  I'm reluctant to respond

16   in front of the panel.

17          THE COURT:  I'm concerned, counsel.  For example, you

18   just asked the witness a whole bunch of questions about

19   something that she had nothing to do with, and now it sounds

20   like maybe you want to continue down that wrongful path.

21          MR. TURKEL:  Judge --

22          THE COURT:  Do you want to lay a foundation for her

23   involvement?

24          MR. TURKEL:  I think I laid it when I asked her about

25   this the first time.  But I can do it without this document,

1    okay?  So we can take the document off.

2              THE COURT:  All right.

3              MR. TURKEL:  All right.  May I inquire, Judge?

4              THE COURT:  Yes.

5              MR. TURKEL:  All right.

6    BY MR. TURKEL:

7    Q.  On June 14, 2017, at any point in time during your work as

8    an editor on this piece did Mr. Bennet tell you he did not know

9    what the truth was with respect to the Gabby Giffords/Jared

10   Loughner incident?

11   A.  I don't remember him saying that to me.

12             MR. TURKEL:  Judge, I have no further questions.

13             MR. AXELROD:  I just have one completeness question.

14             THE COURT:  All right.

15             MR. AXELROD:  And Mr. DiMezza, if you could put up

16   PX 5.  Thank you.

17             Your Honor, I don't think it's in evidence, but we'll

18   just admit it now.

19             Your Honor, we'd move for admission of PX 5.

20             MR. TURKEL:  No objection.  I thought it was in,

21   actually.

22             THE COURT:  I think it may have been, but if it's not,

23   we'll receive it now.

24             (Plaintiff's Exhibit 5 received in evidence)

25             MR. AXELROD:  Thank you.

1          And Mr. DiMezza, if you could just go back to

2   paragraphs 5 and 6 that Mr. Turkel just asked Ms. Cohn about.

3   RECROSS EXAMINATION

4   BY MR. AXELROD:

5   Q.  And I know, Ms. Cohn, your testimony was you didn't have

6   any role working on this language, but let's just make sure the

7   jury sees the entire paragraph.

8          The corrective language now in paragraph 5 says, "Was

9   this attack evidence of how vicious American politics has

10  become?  Probably.  In 2011, Jared Lee Loughner opened fire in

11  a supermarket parking lot, grievously wounding Representative

12  Gabby Giffords and killing six people, including a 9-year-old

13  girl.  At the time, we and others were sharply critical of the

14  heated political rhetoric on the right.  Before the shooting,

15  Sarah Palin's political action committee circulated a map that

16  showed the targeted electoral districts of Ms. Giffords and 19

17  other Democrats under stylized crosshairs."  Do you see that?

18  A.  Yes.

19  Q.  And the word "incitement" is no longer there.  Do you see

20  that?

21  A.  Correct.

22  Q.  And then the last sentence ends, "But in that case no

23  connection to the shooting was ever established."  Do you see

24  that?

25  A.  Yes.

M281PAL4          **JA 0680**          Cohn - Recross

1          MR. AXELROD:  I have no further questions, your Honor.

2          THE COURT:  Well, since both counsel have persisted in

3     asking you about things that you were not involved in, why

4     should I be left out.

5          Do you have any idea why the sentence at the time,

6     "Before the shooting, Sarah Palin's political action committee

7     circulated a map that showed the targeted electoral districts

8     of Ms. Giffords and 19 other Democrats under stylized

9     crosshairs," why was that still in the editorial if, as the

10    next sentence indicates, it was irrelevant?

11         THE WITNESS:  What this, in my -- what my feel is or

12    what -- I wasn't part of the --

13         THE COURT:  Apparently.  That's what counsel for both

14    sides were asking, your view, so I'll take your view.

15         THE WITNESS:  Well, I think it's just an example of

16    the kind of rhetoric that was circulating at the time.

17         THE COURT:  Why then was it preceded by the reference

18    to the shooting?

19         THE WITNESS:  That was for timing.

20         THE COURT:  For timing?

21         THE WITNESS:  That was what the political climate was

22    in terms of the sort of language we were using to talk about

23    our opponents, at that time.

24         THE COURT:  All right.

25         MR. AXELROD:  Now, your Honor, since -- if I may --

1          THE COURT:  You want to continue down this road,

2     counsel, be my guest.

3          MR. AXELROD:  I'm going to ask one question, see how

4     it goes.

5          MR. TURKEL:  I have no other questions, Judge.

6          THE COURT:  Go ahead.

7          MR. AXELROD:  Roll the dice.

8     BY MR. AXELROD:

9     Q.  Ms. Cohn, the next paragraph says, "Conservatives and

10    right-wing media were quick on Wednesday to demand forceful

11    condemnation of hate speech and crimes by anti-Trump liberals.

12    They're right.  Liberals should of course be held to the same

13    standard of decency that they ask of the right."  Do you see

14    that?

15    A.  Yes.

16    Q.  And when it's referring to "Liberals should [] be held to

17    the same standard of decency that they ask of the right," does

18    that refer to the prior paragraph and heated political rhetoric

19    from the right in connection with the Giffords shooting?

20    A.  Yes.

21         MR. AXELROD:  No more questions, your Honor.

22         THE COURT:  All right.  Anything else?

23         MR. TURKEL:  Not from me, your Honor.

24         THE COURT:  Thank you so much.  You may step down.

25         Please call your next witness.

**JA 0682**
M281PAL4                          Bennet - Direct

1                    (Witness excused)

2                    MR. VOGT:  James Bennet, your Honor.

3                    THE DEPUTY CLERK:  Please rise and raise your right

4        hand.

5                    (Witness sworn)

6                    THE DEPUTY CLERK:  Please be seated.

7                    State your name and spell it slowly for the record.

8                    THE WITNESS:  My name is James Bennet, and that's

9        spelled B as in boy, E-N-N-E-T.

10        JAMES BENNET,

11             called as a witness by the Plaintiff,

12             having been duly sworn, testified as follows:

13       DIRECT EXAMINATION

14       BY MR. VOGT:

15       Q.  Good afternoon, Mr. Bennet.

16       A.  Good afternoon, Mr. Vogt.

17       Q.  As an editor, would it surprise you that readers would

18       understand the word "incitement" to mean what its dictionary

19       definition is?

20       A.  It wouldn't surprise me.

21       Q.  Now in the "America's Lethal Politics" editorial that we've

22       been talking about --

23                    MR. VOGT:  Can you pull up 1, Plaintiff's 1.

24       Q.  Let me direct your attention to the two paragraphs that

25       we've been talking about.

M281PAL4                          Bennet - Direct

1              And Mr. Bennet, these were the paragraphs that, after

2     you received Ms. Williamson's draft, you effectively rewrote;

3     is that correct?

4     A.   The opinion, yeah.

5     Q.   And you in particular were the person who added into the

6     first one of these paragraphs "the link to political incitement

7     was clear"; is that right?

8     A.   Yes.

9     Q.   And you were the individual who added into the second

10    paragraph the phrase "though there's no sign of incitement as

11    direct in the Giffords attack"; is that correct?

12    A.   Yes.

13    Q.   And if I understand correctly, you contend that when you

14    added this language into the editorial, it was your intent to

15    advance the idea that overheated political rhetoric can create

16    a climate conducive to violent acts; is that right?

17    A.   That's right; words to that effect.

18    Q.   And we can agree that the word "rhetoric" does not appear

19    in either of the two paragraphs that we're looking at, correct?

20    A.   It does not appear there.

21    Q.   Now I also want to take a look at Plaintiff's Exhibit 141,

22    which is Ms. Williamson's draft, and the operative paragraphs

23    of that draft that you effectively rewrote.

24              And you recognize those paragraphs, correct?

25    A.   Yes.

1   Q.  And then that second paragraph, where it says, "Just as in

2   2011, when Jared Lee Loughner opened fire in a supermarket

3   parking lot, grievously wounding Representative Gabby Giffords

4   and killing six people, including a 9-year-old girl,

5   Mr. Hodgkinson's rage was nurtured in a vile political climate.

6   Then, it was the pro-gun right being criticized:  In the weeks

7   before the shooting Sarah Palin's political action committee

8   circulated a map of targeted electoral districts that put

9   Ms. Giffords and 19 other Democrats under stylized crosshairs."

10          Now you would agree with me that that paragraph

11  communicates to readers that overheated political rhetoric can

12  create a climate that is capable of nurturing rage, wouldn't

13  you?

14  A.  I would agree, yes.

15  Q.  And you would also agree with me that Ms. Williamson is an

16  accomplished journalist?

17  A.  Yes.

18  Q.  She's an excellent writer as well, isn't she?

19  A.  Yes.

20  Q.  And her area of expertise at the time, on the editorial

21  board at the time was national politics, correct?

22  A.  Yes.

23  Q.  And you also understood at the time that you received this

24  draft after Ms. Williamson completed it that these paragraphs

25  were the embodiment of the research that she had conducted

1   concerning the Hodgkinson shooting, correct?

2   A.  Well, I can't remember, and I can't see the rest of the

3   editorial.  I don't know if there were other paragraphs that

4   reflected that reporting as well.

5   Q.  That's fair.

6           Would it be fair to say that you were determined to

7   use the word "incitement" in the "America's Lethal Politics"

8   editorial?

9   A.  No.

10          MR. VOGT:  Let's pull up 119.

11  Q.  And you recognize this email, correct, Mr. Bennet?

12  A.  Yes.

13  Q.  And let's go to the portion of this where you say, "But if

14  there's evidence of the kind of inciting hate speech on the

15  left that we, or I at least, have tended to associate with the

16  right (e.g., in the run-up to the Gabby Giffords shooting) we

17  should deal with that."  Do you see that?

18  A.  Yes.

19  Q.  And you ask there if there's evidence, correct?

20  A.  Yes.

21  Q.  And so what this expresses to Ms. Williamson -- and then

22  you copied Mr. Semple, Mr. Fox, and Ms. Cohn -- is that you

23  wanted to deal with the topic of incitement if there was

24  evidence of inciting hate speech on the left, correct?

25  A.  I can't speak to what she took away from this email.

**JA 0686**

1   Q.  I'm not talking about what she took away.  I'm talking

2   about what you said.  These are your words.

3   A.  You said what it expressed to Ms. Williamson.

4          Yeah, I would -- I intended her to look -- I was

5   asking her to look for evidence of such speech.

6   Q.  And if she found that evidence, then you wanted to deal

7   with political incitement, correct?

8   A.  I -- I -- I can see why you're saying that.  I can't -- I

9   can't tell you as I sit here whether we would have dealt with

10  it in the end anyway.  What I was really concerned about was

11  whether the board had written about that issue in the wake of

12  Gabby Giffords's shooting, and if it had, I felt we should deal

13  with it in the wake of this shooting as well.

14  Q.  And just to clarify on what you just said -- you couldn't

15  tell whether you would have dealt with it in the end anyway --

16  you did deal with it in the end.

17  A.  I did, yeah, we did.

18  Q.  And isn't it true, Mr. Bennet, that on June 14th of 2017,

19  you never saw any evidence of inciting hate speech on the left,

20  did you?

21  A.  We did not -- we did not see any.  As Elizabeth wrote, she

22  felt that his -- his -- I can't remember -- his rage had been

23  nurtured in a vile climate.

24          MR. VOGT:  Go back to Plaintiff's 1.  Bottom paragraph

25  on the first page, please, Mr. Bucher.

1  Q.  In this paragraph of the editorial, Mr. Bennet, it

2  references a "sickeningly familiar pattern is emerging in the

3  assault."  Do you see that?

4  A.  Yes.

5  Q.  And if I understand correctly, that pattern consisted of

6  the Hodgkinson shooting and the Loughner shooting; is that

7  right?

8  A.  Those are the two examples introduced here, yes.

9  Q.  With respect to the Hodgkinson shooting, you never found

10  any evidence of hate speech on the left that led up to that

11  shooting; is that right?

12  A.  Well, what we're saying here, sir, is that derangement was

13  nurtured in politics, that there was a connection between the

14  political environment and -- and his behavior, and there we did

15  feel like there was sufficient facts and evidence, meaning not

16  in the legal sense but for purposes of venturing opinion and

17  hypothesis, to make that argument.

18  Q.  So as of June 14th of 2017, are you aware of any specific

19  evidence that there was a direct connection between any

20  rhetoric by any politician on the left and Mr. Hodgkinson's

21  shooting?

22  A.  No, I'm not aware of such evidence.

23  Q.  And with respect to the second example in that pattern --

24        MR. VOGT:  Mr. Bucher, can you pull up Plaintiff's 7.

25  Q.  Now we talked about the second example was the Loughner

1    shooting.  This is a copy of the portion of the tweet that was

2    sent out after the correction was made to the editorial; is

3    that right?

4    A.  Yes.

5    Q.  And it reads, "We got an important fact wrong, incorrectly

6    linking political incitement and the 2011 shooting of Giffords.

7    No link was ever established."  Is that right?

8    A.  Yes.

9    Q.  And so that effectively disproves the second example that

10   you gave in the editorial of a pattern, doesn't it?

11            THE COURT:  Sustained, argumentative.

12   Q.  Mr. Bennet, do you know whether Ms. Williamson's draft

13   editorial was fact-checked?

14   A.  Whether the draft was fact-checked?

15   Q.  Yes.

16   A.  I don't.  I don't know.

17   Q.  The term "political incitement," as it was used in the

18   editorial, if I understand correctly, you had several things in

19   mind when you used that term; is that right?

20   A.  I did.

21   Q.  And I believe the first thing you had in mind was a column

22   by Tom Friedman that was about Donald Trump's Second Amendment

23   people, Hillary Clinton comment; is that right?

24   A.  It was definitely a column by Tom about a speech that

25   president Trump had given in which he -- I can't -- you might

M281PAL4                    Bennet - Direct

1  have the precise quote -- said something about maybe the Second

2  Amendment people could do something about Hillary Clinton.

3  Q.  And Mr. Friedman's column actually drew a connection

4  between that statement by then-candidate Trump and the

5  assassination of Israeli prime minister Rabin; is that right?

6  A.  You mean he implied that Donald Trump's statement led to

7  the assassination of Rabin, or that --

8  Q.  No.  That he just drew a connection between those two

9  things, correct?

10  A.  He -- yeah, I -- yes, that is correct.

11  Q.  And another one of the things that you were thinking about

12  when you used the term "political incitement," if I understand

13  correctly, is that you were looking for a strong word to use to

14  get readers' attention; is that right?

15  A.  Yeah.  I was really concerned that day, or would seem so in

16  the email traffic -- Linda said that something like this didn't

17  seem like such a big deal anymore and, and it seemed like a

18  huge deal that several Republican congressmen had been shot,

19  and I did want to get our readers' attention to that.

20  Q.  And then I believe the third thing that you were thinking

21  about when you were deciding on the term "political incitement"

22  was how the word "incitement" is used by Israelis and

23  Palestinians; is that right?

24  A.  I was thinking about that, yes.

25  Q.  And I believe that with respect to that, that term

**JA 0690**

1   "incitement," that it refers to a range of communications that
2   include among them deliberate orders, invocations, and
3   summonses for people to carry out violent attacks; is that
4   right?
5   A.   I think I gave you a very long list of things that included
6   those in it, yes, Mr. Vogt.
7          Yeah, I said at the time I think that it encompassed a
8   range of communication, including textbooks, that dehumanize
9   the other side in the conflict, posters that encourage, you
10  know, the kind of anger that Linda was describing earlier.
11  It's used on both sides in that conflict to basically describe
12  all sorts of communications that teach people to treat each
13  other as enemies, and in some cases even less than human.
14  Q.   Mr. Bennet, as a journalist, are you trained to consider
15  how readers may interpret the words you use when you're writing
16  a piece?
17  A.   Yes.
18  Q.   And did you endeavor to do that when you were writing the
19  portions of "America's Lethal Politics" that you wrote?
20  A.   I endeavored to do that.
21  Q.   Now if I understand you, in the sense that you used that
22  term in the editorial, you considered the map circulated by
23  Sarah Palin's political action committee to be political
24  incitement; is that right?
25  A.   Yes.

M281PAL4                        Bennet - Direct

1   Q.  Now you don't recall seeing that map when it was released,

2   correct?

3   A.  I don't.  I don't recall.

4   Q.  You don't recall seeing any press coverage of the map when

5   it was initially put out, do you?

6   A.  I don't recall, no.

7   Q.  You don't recall any tweets that were put out by Governor

8   Palin in connection with the map, do you?

9   A.  No.

10  Q.  You don't recall any press coverage or debate about a

11  "Don't retreat, reload" tweet by Sarah Palin around that time,

12  do you?

13  A.  I mean, I recall that term.  I don't know that I recall

14  specifically there was a tweet, but I do recall -- I do recall

15  that expression, but --

16  Q.  In any event, that specific phrase, "Don't retreat,

17  reload," was not something that was in your mind when you were

18  writing the sections of "America's Lethal Politics" that you

19  wrote, correct?

20  A.  That's correct.

21  Q.  And in fact, Mr. Bennet, when you were -- before the

22  editorial that we're here about was published, you didn't have

23  a mental image of the map in your mind, did you?

24  A.  No.  I was relying on Elizabeth's description of it in the

25  piece.

Q.  Now in the course of working on this editorial on June 14th

of 2017, one of the things you asked for was research on

whether there was any evidence of a piece of incitement that

was directed at the ballplayers on the field, correct?

A.  That's correct.

Q.  And the group that was working on this did not find

anything; is that right?

A.  Well, I think I asked it of Elizabeth and she didn't find

anything.

Q.  And then --

A.  At least there wasn't anything in the draft editorial that

I received.

Q.  And you also asked for some research on past editorials; is

that right?

A.  Yes.

Q.  And you don't recall whether you read any of those

editorials, do you?

A.  I had said that to you, Mr. Vogt, in one of our previous

conversations, but in the course of this process, I saw an

email -- I don't remember which one -- in which I said, here's

more relevant precedent or something like that, and forwarded

them on, and that tells me that I must have read them, because

I knew something about their content.  But that's only -- I --

as I said to you at the time, I didn't recall reading it.

Q.  And just --

1   A.  But I must have.

2   Q.  So we're clear, in one of our prior conversations, you're

3   talking about when I was questioning you under oath at a

4   deposition?

5   A.  Yes.  I think so.  Either that or the time Mr. Turkel was

6   questioning me previously before Judge Rakoff, but I think it

7   was in a deposition.

8   Q.  Okay.  You don't recall seeing any research that

9   definitively linked the Giffords shooting to incitement prior

10  to "America's Lethal Politics" being published, do you?

11          MR. AXELROD:  Objection.

12          THE COURT:  Well, as phrased, sustained.

13  Q.  In the draft editorial --

14          MR. VOGT:  Can you pull up 141 again.  141.

15  Q.  And Mr. Bennet, in that paragraph we looked at previously

16  that starts with, "Just as in 2011 --"

17  A.  Yeah, yes.

18  Q.  You see the word "circulated" there is blue and underlined,

19  as a hyperlink; is that right?

20  A.  That's right.

21  Q.  And if I understand correctly, once you started working on

22  Ms. Williamson's draft of the "America's Lethal Politics"

23  editorial, you never clicked on that hyperlink, did you?

24  A.  No, I did not.

25  Q.  And if I understand correctly, you don't have any

M281PAL4                              Bennet - Direct

1  recollection of reading the ABC article that that hyperlink led

2  to?

3  A.  Not before working on the editorial, or not while working

4  on the editorial.

5  Q.  And if I understand correctly, you never conducted your own

6  fact research on June 14, 2017, relating to the "America's

7  Lethal Politics" editorial, correct?

8  A.  That's correct.

9  Q.  And on June 14th of 2017, you never did any search of *New*

10 *York Times* articles or editorials yourself?

11 A.  No.  I -- I asked a colleague to do that.

12 Q.  And who was that colleague?

13 A.  Phoebe Lett.

14 Q.  And did you read any materials that Phoebe Lett sent to

15 you?

16 A.  Well, as I said, I think I must have read those editorials

17 because of that email I subsequently saw.

18 Q.  And do you have any independent recollection of what the

19 content of those editorials was?

20 A.  That they -- independent meaning?  I'm so -- it's so hard,

21 Mr. Vogt, for me to tell now what I knew at the time, what I've

22 learned since, and I'm sorry.  I just -- I kind of mixed that

23 stuff up.  So tell me again what you're asking for.

24 Q.  So do you, as we sit here today -- you mentioned you saw an

25 article that said these are more relevant; is that right?

1   A.  An email from me, yes.

2   Q.  And when did you see that email for the first time?

3   A.  In the course of this process, at some point, since --

4   since whenever I answered a question with this before, so

5   probably since the deposition.

6   Q.  So between the time of your deposition and when you're

7   testifying today is the time period when you would have seen

8   the email that you're talking about?

9   A.  Yes.

10  Q.  And aside from what may have been sparked in your mind

11  based on that email, do you have any independent recollection

12  of actually reading any of the editorials that Phoebe Lett sent

13  to you?

14  A.  No.  But again, I -- we wound up writing an editorial that

15  mapped the ideas in those editorials, and I infer from that

16  that, again, that I -- that I did read them.

17          MR. VOGT:  Can you pull up 171.

18  Q.  Mr. Bennet, do you recognize Exhibit 171?

19  A.  Yes.

20  Q.  And this is an email string on -- that started off between

21  you and Mr. Douthat on the night of June 14th of 2017 and

22  continued on to the morning of the 15th; is that right?

23  A.  Yes.

24  Q.  And who is Ross Douthat?

25  A.  Ross is a columnist for *The New York Times*; opinion

1    columnist.

2    Q.  And had you worked with Mr. Douthat previously prior to

3    working together at *The Times*?

4    A.  Yes.

5    Q.  And where was that at?

6    A.  At *The Atlantic*.

7    Q.  And do you respect Mr. Douthat as a journalist?

8    A.  I do.  I respect him very much.

9    Q.  And Mr. Douthat says in here in his email at 7:34 a.m.,

10   among other things, the second sentence, "You can argue about

11   whether that crosses a line (Democrats had used bulls eyes on a

12   map of Rs who voted against the stimulus)."  Do you see that?

13   A.  I do.

14   Q.  And do you have any idea what he is talking about there?

15   A.  I mean, he's -- he's referring to -- I -- I didn't -- I

16   don't know, but, I mean, I can guess based on what -- are you

17   asking me to tell you based on what he's written here?

18   Q.  I'm just saying, do you have any independent recollection

19   of Democrats using a map with bulls-eyes on Republicans in

20   connection with Republicans who voted against the stimulus?

21   A.  I see.  I'm sorry.  No.  No, I don't.

22   Q.  Did you ask Mr. Douthat what he was referring to?

23   A.  I didn't.

24   Q.  Mr. Bennet, where did you attend high school?

25   A.  In Washington, DC.

1    Q.  What was the name of the school?

2    A.  St. Albans School.

3    Q.  And is that a fairly prestigious college preparatory

4    school?

5    A.  Yes, you could describe it that way.

6    Q.  And did you get good grades?

7    A.  I did.

8    Q.  Where did you attend college?

9    A.  I went to Yale University.

10   Q.  What year did you graduate?

11   A.  1988.

12   Q.  And was your main focus in college academics?

13   A.  Yes.

14   Q.  Did you graduate fairly high in your class?

15   A.  You asked me that question before.  I don't -- they didn't

16   keep track that way, I don't think.

17   Q.  Did you receive any academic awards?

18   A.  I did.

19   Q.  And while you were at Yale, did you do any internships?

20   A.  I did.

21   Q.  Where did you intern?

22   A.  I -- I interned for *The Wilson Quarterly*, I think, in that

23   period; and I at one point also interned in the office of

24   Senator Tom Eagleton.

25   Q.  And who is Senator Eagleton?

1    A.  He was a US senator.

2    Q.  And what did you do?

3          THE COURT:  So when the court reporters, who are

4    fantastic, are taking down testimony, they sometimes just put

5    down the sound to then correct it later to what was the actual

6    word.  So they have you saying:  "I went to jail university."

7    I take it that was not totally your view of Yale.

8          THE WITNESS:  No.

9          THE COURT:  Go ahead, counsel.

10   Q.  And what did you do when you were interning with Senator

11   Tom Eagleton?

12   A.  Oh, I think I opened mail and things of that nature,

13   clerical tasks.

14   Q.  And at some point I believe you said you interned at The

15   New Republic?

16   A.  Yes, that was after college.

17   Q.  Who were some of the people that you worked with there?

18   A.  Michael Kinsley was the editor of *The New Republic* at the

19   time, although he left to do a sabbatical, and Bob Wright

20   became the acting editor; Dorothy Wickenden was briefly the

21   managing editor but then she also went to do a fellowship and

22   James Gibney became the acting managing editor.  They were the

23   two I really reported to.  Mickey Kaus was an editor at the

24   time there.  Leon Wieseltier was the literary editor, and Ann

25   Hulbert, also.  Rick Hertzberg was there.  Andrew Sullivan was

M281PAL4                          Bennet - Direct

1    there at the same time.  You know, Michael Newman, Sarah

2    Mosely, Zach Citron were my fellow interns.  And those are the

3    names that occur to me right now.

4    Q.  And you would have interned there I believe back in 1989;

5    is that right?

6    A.  I -- yes, that's right.  I think '88 to '89, yes.

7    Q.  Roughly 33 years ago.

8    A.  Wow.

9    Q.  And then you started working at *The New York Times* in 1991;

10   is that right?

11   A.  Yes.

12   Q.  And what was your job there?

13   A.  I started as a -- as a probationary reporter on the metro

14   desk.

15   Q.  And then in 1996 did you become a White House correspondent

16   during the Clinton Administration?

17   A.  Yes.  After the re-election.

18   Q.  And then in -- I believe in 2001 you went to Jerusalem for

19   *The Times*; is that right?

20   A.  Yes.

21   Q.  And how long were you in Jerusalem?

22   A.  We lived there -- I was based there for about three years,

23   and then I was back and forth for another year, helping cover

24   the conflict.

25   Q.  And then in -- I believe in 2006 is when you were hired to

M281PAL4                        Bennet - Direct

1    become the editor of *The Atlantic*?

2    A.   Yes.

3    Q.   And in that capacity, I believe you were hired as the

4    editor of what was known as *The Atlantic Magazine* and *The*

5    *Atlantic*'s website; is that right?

6    A.   Yes.

7    Q.   Was *The Atlantic* comprised of several different

8    publications?

9    A.   It -- it -- it -- it was kind of the umbrella for a couple

10   of other publications.  I wouldn't say several.  Atlantic Media

11   had several -- *The Atlantic* was part of a company called

12   Atlantic Media that was owned by the owner of *The Atlantic*,

13   David Bradley, and that did have several publications under --

14   under that name.

15   Q.   In your role as editor at *The Atlantic*, what were your job

16   duties and responsibilities there?

17   A.   I was ultimately responsible for the content of -- of the

18   magazine and -- and the website.  I -- a lot of my focus then

19   was on the digital transition of *The Atlantic*, and I helped, I

20   guess, lead an effort to envision what *The Atlantic* could be

21   online, and part of that involved recruiting and hiring people,

22   and I had responsibilities across the organization.  Ultimately

23   I also had profit and loss responsibility for the business,

24   shared with a colleague of mine.  So I wound up having business

25   as well as editorial responsibilities there.

1  Q.  And you mentioned one of the things that you were doing was

2  the hiring.  One of the people that you brought on there was

3  Andrew Sullivan; is that right?

4  A.  Yes. David Bradley was really the key person recruiting

5  Andrew, but I was -- I was right there with him, in doing that.

6  Q.  And Mr. Sullivan operated a blog that was known as the

7  *Daily Dish*; is that right?

8  A.  Yes.

9  Q.  And he was also hired as a writer for *The Atlantic*

10  *Magazine*?

11  A.  He did write for the magazine as well, yes.

12  Q.  And you considered Mr. Sullivan to be a friend and a

13  colleague for a number of years?

14  A.  Yes.

15  Q.  And what was the *Daily Dish*?

16  A.  The *Daily Dish* was a -- it was a blog.  I mean, if people

17  remember the kind of the blog era on the internet, it was --

18  these were the early days of that period, and blogs were

19  basically reverse chronological publications of often fairly

20  short posts.  In other words, the older posts would get down,

21  would get pushed down as new posts arrived.  And Andrew was a

22  kind of early adopter of publishing on the internet.  I think

23  he started publishing, you know, I don't know, once a month,

24  once a week, and then he gradually, under the name at some

25  point the *Daily Dish*.  The *Daily Dish* was really essentially

**JA 0702**

M281PAL4                         Bennet - Direct

<table>
<tr><td>1</td><td>the voice of Andrew Sullivan.  And then it became a more --</td></tr>
<tr><td>2</td><td>more, as we said in the business at the time, high-velocity</td></tr>
<tr><td>3</td><td>blog, and he hired staff, and at a certain point they were</td></tr>
<tr><td>4</td><td>publishing 50 posts a day or more.</td></tr>
<tr><td>5</td><td>Q.  And you recall Mr. Sullivan would have -- and the *Daily*</td></tr>
<tr><td>6</td><td>*Dish* would have been affiliated with *The Atlantic* during the</td></tr>
<tr><td>7</td><td>2008 presidential campaign; is that right?</td></tr>
<tr><td>8</td><td>A.  Yes.  Wait.  Wait, wait, wait.  I'm sorry.</td></tr>
<tr><td>9</td><td>         Yes, definitely, Mr. Vogt.</td></tr>
<tr><td>10</td><td>Q.  And you recall during that time period that Mr. Sullivan</td></tr>
<tr><td>11</td><td>blogged quite a bit about Governor Palin?</td></tr>
<tr><td>12</td><td>A.  I do remember he blogged about Governor Palin.</td></tr>
<tr><td>13</td><td>Q.  And I don't want to get into any specifics about that</td></tr>
<tr><td>14</td><td>blogging, but generally speaking, he was quite critical of</td></tr>
<tr><td>15</td><td>Governor Palin; is that right?</td></tr>
<tr><td>16</td><td>A.  My memory is that he was critical of that -- of Governor</td></tr>
<tr><td>17</td><td>Palin on the ticket.  He was a big supporter of -- of then</td></tr>
<tr><td>18</td><td>President Obama.</td></tr>
<tr><td>19</td><td>Q.  And if I understand and recall correctly, Mr. Sullivan and</td></tr>
<tr><td>20</td><td>the *Daily Dish* increased *The Atlantic*'s website traffic</td></tr>
<tr><td>21</td><td>substantially; is that right?</td></tr>
<tr><td>22</td><td>         MR. AXELROD:  Objection, your Honor, relevance.</td></tr>
<tr><td>23</td><td>         THE COURT:  Sustained.</td></tr>
<tr><td>24</td><td>Q.  Mr. Bennet, you would have been at *The Atlantic* when the</td></tr>
<tr><td>25</td><td>Loughner shooting occurred in January of 2011, correct?</td></tr>
</table>

1    A.  Yes.

2    Q.  And in that time period, around the time of the Loughner

3    shooting, what publications were you regularly reading?

4    A.  I read a long list of publications at that time, or at

5    least browsed in a long list of publications.  I was reading,

6    obviously, our own publication.  *The Atlantic* was a -- is --

7    it's a very old monthly magazine; actually publishes in print

8    10 times a year and then has a website.  I was reading a number

9    of, you know -- I was reading the *Washington Post* and *The New*

10   *York Times*; Politico was becoming a force during that period; I

11   was checking The Drudge Report pretty regularly.  There were a

12   number of -- again, it was the blog era, and there were various

13   bloggers that I was following.  You know, *The New Yorker* and

14   *The New York Review of Books*.  It makes it sound like I'm

15   reading everything.  I can't claim, unfortunately, that I was,

16   but I was trying to kind of keep up.  It's really important in

17   a job like that to keep an eye on the competition.  *Wired*

18   *Magazine, Vanity Fair*, probably just to know what they were

19   doing, and what they were doing that was better than what we

20   were doing that I could learn from.

21          I've given you a list.  I might be leaving some out of

22   the previous list I gave you, Mr. Vogt.  I'm sorry.  That's

23   what comes to mind.

24   Q.  Were you also following the *Daily Dish* during that time

25   period?

M281PAL4                    JA 0704         Bennet - Direct

1  A.  I was.

2  Q.  How often did you read the *Daily Dish* during the 2011 time

3  period, say January?

4  A.  I can't -- I can't answer that question with any precision.

5  Q.  And do you recall, with any of the publications that you've

6  gone through with me, do you recall any articles or stories

7  written in those publications about the Loughner shooting?

8  A.  Specific articles?

9  Q.  Yes.

10  A.  I can't say I recall a specific article.

11  Q.  Generally speaking, do you recall there being news coverage

12  of the Loughner shooting?

13  A.  Oh, definitely.  Definitely.  I can remember.  I just can't

14  remember the -- I mean, you know, there were certainly blaring

15  headlines when it happened.  I'm just right now drawing a blank

16  on a specific piece.

17  Q.  And would you consider the Loughner shooting to be a big

18  story?

19  A.  Yes.

20  Q.  And do you recall any of the stories that you read during

21  the time period of January 2011 discussing Mr. Loughner's

22  mental state at the time of the shooting?

23  A.  I'm sure some of them did.  I don't recall one way or the

24  other, but that's always a relevant area of inquiry in an

25  incident like this.

Q.  And do you recall anything that any of those articles or

stories might have determined about his mental state?

A.  That he was deranged.

Q.  Do you recall any of them referring to him as insane?

A.  I mean, I don't recall that word specifically.  It seems

quite comparable to deranged to me, so --

Q.  And I think you said that one of the publications you were

regularly reading at the time of the Loughner shooting would

have been *The New York Times*; is that right?

A.  Yes.

Q.  And do you recall, on June 14th of 2017, did you go back

yourself personally and do any research into any news stories

that *The New York Times* had written about the Loughner

shooting?

A.  I'm sorry.  Could you ask me that again, Mr. Vogt.

Q.  Sure.  Do you recall whether, on June 14th of 2017, you

personally ever did any research related to articles that were

written by *The New York Times* about the Loughner shooting back

in January of 2011?

A.  I don't believe that I did.

Q.  And do you recall whether, on June 14th of 2017, you ever

personally did any research concerning editorials or op-eds

that were written by *The New York Times* back in the January

2011 time period concerning the Loughner shooting?

A.  Well, as we discussed, I asked one of our research

**JA 0706**

1   assistants to find such pieces.

2   Q.  And do you know off the --

3   A.  But you're asking me if I typed it into the search engine

4   myself or something?  What answer are you after?

5   Q.  Yes, yes.

6   A.  No, I don't think I did that, no.

7   Q.  When I said personally --

8   A.  I'm sorry.  I get it.  I'm sorry.

9   Q.  Have you ever done that in connection with an editorial

10  that you've been involved in writing, meaning have you ever

11  personally typed in search terms and looked for articles?

12  A.  Yes.

13  Q.  How often do you do that?

14  A.  I can't -- I can't -- I mean, I'm not -- I'm not doing that

15  job anymore, so when I was doing it, I would say I did it

16  pretty frequently, but I couldn't -- I couldn't give you a -- a

17  less vague response than that.

18  Q.  Would it be fair to say that if you wanted to check a fact

19  in a piece that you were working on, you know how to do a

20  search for articles relating to that fact, correct?

21  A.  That's correct.

22  Q.  Mr. Bennet, we'll zoom in on it, but do you recognize

23  Plaintiff's Exhibit 125?

24  A.  Yes, I do.

25  Q.  And this has a reference in it to a Frank Rich piece?

1   A.  Yes, I see that.

2   Q.  All right.  And that would have been an op-ed; is that

3   right?

4   A.  It would have been a column.

5   Q.  A column.  And do you recall whether or not on June 14th of

6   2017 you read this Frank Rich column?

7   A.  I don't recall.

8   Q.  And in a 2:07 email here that you wrote, you say, "No -- I

9   was just wondering if there was such a piece; that is, did we

10  ever write anything connecting to the Giffords shooting to some

11  kind of incitement?"  Do you see that?

12  A.  I do.

13  Q.  And do you know whether or not, aside from this Frank Rich

14  piece, anyone found anything that had been written concerning

15  connecting the Giffords shooting to some kind of incitement?

16  A.  Those two editorials I referred to before were the pieces

17  that Phoebe ultimately did find.

18  Q.  Okay.  I'm going to go through those with you.

19          THE COURT:  Well, keep in mind, counsel, that in about

20  five minutes we're going to break for lunch.

21          MR. VOGT:  I just saw that.  It will be later.

22  Q.  And then in this particular email at the top, after Phoebe

23  Lett sends you the Frank Rich piece at 2:20 a.m., you say,

24  "Good for us.  Can you let Elizabeth know."  Do you recall what

25  you meant by "Good for us"?

**JA 0708**
M281PAL4                    Bennet - Direct

1   A.  No, I don't.  If I was -- I don't.  I'm sorry.

2              MR. VOGT:  Your Honor, I'm kind of at a hard breaking

3   point, if this would be --

4              THE COURT:  Okay.  That's fine.

5              So ladies and gentlemen, we'll take our lunch break

6   now and we'll resume at 2:00.

7              (Jury not present)

8              THE COURT:  Please be seated.

9              Mr. Bennet, you can step down.  We'll see you at 2:00.

10             Anything anyone needs to raise with the Court?

11             MR. AXELROD:  Not from the defense, your Honor.

12             MR. TURKEL:  Nothing for plaintiffs, Judge.

13             THE COURT:  Very good.  We'll see you at 2:00.

14             (Luncheon recess)

15

16

17

18

19

20

21

22

23

24

25

M282Pal5                          Bennet - Direct

1              A F T E R N O O N   S E S S I O N

2                           2:10 p.m.

3         (Jury not present)

4         THE COURT:  I just wanted to mention, before we bring

5    in the jury, I need to leave promptly at 3:30 today because I

6    teach at Columbia Law School.  But you will be sent by e-mail

7    by my law clerk sometime late this afternoon the revised jury

8    instructions as well as a proposed verdict form, and we will

9    have final oral argument on that at 9:00 tomorrow morning.

10        Okay.  Bring in the jury, please.

11        (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M282Pal5                          Bennet - Direct

1              (Jury present)

2              THE COURT:  Please be seated.

3              All right, counsel.

4      BY MR. VOGT:

5      Q.  Mr. Bennet, would you agree that political rhetoric is

6      something that you have grown increasingly concerned about?

7      A.  Yes.

8      Q.  And is political rhetoric a topic you have a particular

9      interest in?

10     A.  Yes.

11     Q.  Is gun control also an issue that's important to you

12     personally?

13     A.  It is; yeah, it is an important issue to me.

14     Q.  And do you recall ever speaking at any events or seminars

15     that dealt with gun control?

16     A.  I moderated -- when I was at *The Atlantic*, we did a lot of

17     events.  As the editor, I would end up moderating a lot of

18     them; and I moderated an event that did deal with gun control

19     and also policing, I think, generally.

20     Q.  And do you recall whether Representative Gifford and her

21     husband spoke at that event on gun control?

22     A.  They did.

23     Q.  Is gun control also an issue that is important to the

24     editorial board?

25     A.  Yes.

M282Pal5                          Bennet - Direct

1   Q.  And does the editorial board write about gun control

2   often?

3   A.  There was a period before my time when I think they did a

4   big series on the subject; and since then, the editorial -- I

5   can't speak to the last, whatever, year and a half, but they

6   tended to -- we tended to write about it in the context of a

7   shooting, which, you know, sadly, meant we were writing about

8   it pretty often, yes.

9   Q.  As an editor, are you familiar with the concept of framing?

10  A.  Of?  Excuse me?

11  Q.  Of framing.

12  A.  Yeah.  Yes, I am.

13  Q.  What's framing?

14  A.  Framing an idea is explaining an idea in a way that can be

15  easily understood.

16  Q.  And as an editor, have you cautioned journalists who have

17  worked for you about framing events in a preconceived

18  narrative?

19  A.  Yes, I have.

20  Q.  And do you recall being interviewed by a publication

21  called *The Writer* back in 2016, shortly before you rejoined *The*

22  *Times*?

23  A.  I do, yes.

24  Q.  And do you recall getting a quote to them that "nobody is

25  100 percent right, so a writer must listen carefully, must

M282Pal5                    Bennet - Direct

1    question everybody's assumptions, including his own"?

2    A.   Yes.  I don't know if I -- I should be clear, I didn't --

3    I remember these things because you have previously reminded me

4    of them.  I don't know if that's something I should say.  But,

5    yes, I do remember that.  Thank you.

6    Q.   Is that an accurate quote?

7    A.   I don't know.  I assume it is.  It sounds like something I

8    would say.

9    Q.   And is that a way that you aspired to practice journalism?

10   A.   Can you read me the quote again?

11   Q.   Sure.

12   A.   I'm sorry.

13   Q.   "Nobody is 100 percent right, so a writer must listen

14   carefully, must question everybody's assumptions, including his

15   own."

16   A.   Yes, that was certainly the way I aspired to practice

17   journalism.

18   Q.   Now, did you --

19           THE COURT:  Of course there is the well-known

20   exception that federal judges are 100 percent right.

21           MR. VOGT:  I have learned that the hard way, your

22   Honor.

23   BY MR. VOGT:

24   Q.   So Mr. Bennet, did you have any particular focus on Sarah

25   Palin after you rejoined *The New York Times* in May of 2016?

M282Pal5                    Bennet - Direct

1   A.  No.

2   Q.  Do you recall in the June of 2016 time period circulating

3   some excerpts from a book from Mark Thompson called *Enough*

4   *Said*?

5   A.  I do remember that.

6   Q.  And do you recall at some point in time actually reviewing

7   certain portions of that book?

8   A.  I did.  I did.  I don't remember how much of it.  I passed

9   it on to another editor to do a more in-depth review, to see if

10  there might be an excerpt that we would run in the opinion

11  pages.

12  Q.  Mr. Bennet, do you recognize Exhibit 84?

13  A.  Yes.

14  Q.  And is Exhibit 84 an accurate depiction of an e-mail that

15  you received on June 15 of 2016?

16  A.  I mean, I don't really remember the original e-mail.  I

17  assume this is.  I can't imagine it would be different.

18          MR. VOGT:  Your Honor, at this point we would move to

19  introduce Exhibit 64 -- I'm sorry, 84.  I may have

20  misidentified it.

21          MR. AXELROD:  And I would object on relevance grounds,

22  your Honor.

23          MR. VOGT:  As to relevance, I just ask the Court to

24  turn to the third page before ruling.

25          THE COURT:  Let me see the third page.

1                So sustained with respect to this witness, although I
2        can conceive it might come in through a later witness.
3                MR. VOGT:  Thank you, your Honor.
4        BY MR. VOGT:
5        Q.  Mr. Bennet, do you recall ordering a book about Sarah Palin
6        in December of 2016?
7        A.  I do.
8        Q.  And do you recall reading that book?
9        A.  I don't.
10       Q.  Do you recall the title of the book?
11       A.  No.  I know the author was Matt Continetti.  I ordered the
12       book because I was interested in Matt Continetti as a writer
13       and wanted to familiarize myself with his work, but I didn't
14       wind up reading it.
15       Q.  And do you recall in the February 2017 time period -- let
16       me ask you first who is Brent Staples?
17       A.  Brent Staples is a member of the editorial board.
18       Q.  And do you recall in the February of 2017 time period
19       Mr. Staples raising an issue with you concerning some anxiety
20       staff at the opinion section had?
21       A.  I have seen a message from him in the context of these
22       proceedings.
23       Q.  And do you recall what the nature of that message was?
24       A.  Yes, it was about -- it was a concern about a forthcoming
25       staff move.  *The New York Times* at the time occupied I don't

1   remember how many, but many floors in the office building that

2   it is in in midtown Manhattan, and the company had decided to

3   compress the staff into a smaller number of floors; and rumors

4   were running around that this was going to happen, and there

5   was concern about it.

6           There was particular concern in Opinion, because the

7   tradition in Opinion going back, you know, to time immemorial

8   was that all the columnists and all the editorial board members

9   had their own offices; and one consequence of this move was

10  going to be that they are all going to lose their offices, so

11  there was particular anxiety about that.

12  Q.  And do you recall in the course of your conversations with

13  Mr. Staples Sarah Palin coming up?

14  A.  I recall, again, in that message — and I can't remember if

15  it was a text or e-mail — that I saw in the course of, you

16  know, all of this, that he did refer to a tweet from

17  Governor Palin about the fact that *The New York Times* was going

18  to make this move, that is, to shrink floors, and I think her

19  observation was that they were -- it was a sign of financial,

20  you know, distress or something.

21  Q.  And did you do anything in response to that information?

22  A.  Do you mean the tweet or the -- or --

23  Q.  The information about Sarah Palin, did you follow up with

24  Mr. Staples at all?

25  A.  No.  I mean, eventually, when the company was able to

**JA 0716**

1  disclose its plans and talk openly, I spent a lot of time, you

2  know, explaining to people that they were going to lose their

3  offices, but definitely nothing regarding Governor Palin.

4  Q.  And do you recall in the May of 2017 time period there

5  being some controversy concerning -- I brought it up on the

6  screen earlier today -- but Kathy Griffin in a photo that was

7  posted involving a severed head of President Trump?

8  A.  I do remember that, yeah.

9  Q.  And did the editorial board ever write about that

10  controversy?

11  A.  No, we did not.

12  Q.  And do you recall there also being some controversy or

13  debate around the time of the "America's Lethal Politics"

14  editorial related to a production of Julius Caesar involving an

15  individual playing the role of Caesar who looked like

16  President Trump?

17  A.  I think that that e-mail exchange you showed between me and

18  Ross Douthat began with me writing him to compliment him on a

19  column he had written about that very subject, and I think

20  that's how I found out about it.  So, yes, I do recall it.

21  Q.  And that would have been, actually, the night of June 14,

22  correct?

23  A.  It would have been.

24  Q.  And do you recall, did *The New York Times*, were they a

25  sponsor of that Shakespeare in the Park performance?

M282Pal5                          Bennet - Direct

1    A.  I, again -- I'm not sure.  I heard in the course of these

2    proceedings that that might be the case.

3    Q.  Let's go back to the actual day of June 14 of 2017.  Do you

4    recall how you first learned that the editorial board was going

5    to be writing a piece that related to the Scalise shooting?

6    A.  Well, I would have been involved in the decision to go

7    ahead with -- well, I -- how did I first learn it?  I remember

8    that Elizabeth first raised the idea of writing about it and,

9    you know, I think we began moving ahead with that pretty

10   quickly at that point.

11   Q.  Mr. Bennet, we looked at this particular e-mail a little

12   bit earlier, and I just wanted to ask you a couple follow ups

13   about this.  But the subject line on this is "possible

14   shooter's possible social media pages pro-Bernie anti-Trump."

15   Do you see that?

16   A.  I do.

17   Q.  Do you recall whether or not you actually looked at the

18   possible shooter's social media pages that are linked in this

19   e-mail?

20   A.  I did not.

21   Q.  And do you remember the substance of any conversations from

22   that day about the shooter's possible social media pages?

23   A.  No.  I know that Elizabeth characterized them in the draft

24   that I got, and that's what I relied on as a description of

25   those pages.

M282Pal5                         Bennet - Direct

1  Q.  And then we had talked about this sentence a little bit
2  earlier.  "The other question is whether there is a point to be
3  made about the rhetoric of demonization and whether it incites
4  people to this kind of violence."  Do you see that?
5  A.  I do.
6  Q.  And in that particular sentence there you use "incites" as
7  a verb, is that right?
8  A.  I do.
9  Q.  136.
10          I believe this has also been already introduced into
11  evidence.  I think this is the e-mail you were referring to
12  earlier in your testimony.  If you look at the 3:05 p.m. entry
13  there, where you have an e-mail where you say "FYI, these two
14  are more relevant precedent for tonight's piece"?
15  A.  Yes, that is the one I was referring to earlier.
16  Q.  And if I understand correctly, the fact that you had said
17  in this e-mail, "These are the two that are more relevant
18  precedent for tonight's piece" makes you believe that you
19  actually read the two pieces that are hyperlinked in this
20  e-mail string?
21  A.  Yes, at least skimmed them; I think so.
22  Q.  And those two pieces the parties have already stipulated
23  are Plaintiff's Exhibit 134 and Plaintiff's Exhibit 135, which
24  are "Bloodshed and Invective" and "As We Mourn."
25          Do you recall reading either one of those pieces on

1    June 14 of 2017?

2    A.  Well, as I said, I think, based on this e-mail, I must have

3    read them.

4    Q.  Do you have any specific recollection of anything in either

5    one of those pieces that stands out in your mind?

6    A.  What I recall is that they -- and, again, what did I know

7    then, what do I know now, but that they dealt with the same

8    ideas.  What I remember from the get-go that day, I was very

9    interested in the question of what the board had written

10   previously related to the question of, you know, violence

11   against politicians.  And the obvious precedent for that was

12   the previous shooting of a Congressperson, because -- and I

13   think Elizabeth referred to this the other day.  It's really

14   important to the editorial board to be consistent about the

15   positions it takes, and if we had complained about incitement,

16   rhetoric, invective then, criticized it, I thought it was very

17   important for us to address that subject again.  If we had

18   dealt with gun safety in that -- in that context on that day, I

19   thought it was important for us to return to that again on --

20   after the Scalise shooting.  The most important thing to me was

21   just concentrating people's minds on how horrific the attack

22   was, but -- but that was kind of a given.  I had assumed we had

23   done that.

24   Q.  And do you recall -- if we can pull up Plaintiff's Exhibit

25   141 again.  Can you go to the next page.

M282Pal5                    Bennet - Direct

1              And Mr. Bennet, you will see here that

2    Ms. Williamson's name, it says "backfield, 6/14/2017, at 4:44

3    p.m.," is that your recollection as to the time period when

4    Ms. Williamson finished her draft?

5    A.  Around then, yeah.  Yes.

6    Q.  And do you recall how you learned --

7    A.  Actually, I'm sorry.  Could I?

8    Q.  Go ahead.

9    A.  I don't think -- I'm not sure I knew she had filed.  My

10   recollection is I first knew we had a draft when Linda flagged

11   it for me.

12   Q.  And when you say flagged it, did Ms. Cohn come to your

13   office?

14   A.  Yes.

15   Q.  And do you recall what she said?

16   A.  I said she was concerned about the state of the piece.

17   Q.  And do you recall what her concerns were?

18   A.  You know, I think she thought it wasn't -- it just wasn't

19   working.

20   Q.  Did she have any concerns on whether or not it was what you

21   wanted?

22   A.  I don't remember her saying that.  But I recall she did not

23   think it was a great draft, which happens.

24   Q.  And do you recall what, if anything, you said in response

25   to those concerns that were expressed by Ms. Cohn?

1   A.  I don't know -- I don't remember what specifically I said,

2   but I told her I would take a look at it effectively.

3   Q.  And after Ms. Cohn left your office, what did you do next?

4   A.  I don't think this was at 4:44, though, was it?

5   Q.  I think Ms. Cohn said earlier it was around 5.  It was

6   after 5:03, based on the draft.

7   A.  Okay.  I picked up the editorial.  As we have discussed

8   previously, it was in backfield, in the *Times* editing system,

9   called Scoop then, and I picked it up and read it.

10  Q.  And do you recall at what point in time you started to

11  rewrite it?

12  A.  Well, I initially started drafting a note to Elizabeth at

13  the top of the editorial, trying to provide some instruction on

14  how I thought the piece should be rewritten.  And at that point

15  I realized how late in the day it was getting, and I was

16  concerned about getting the piece done in time.  So I couldn't

17  tell you exactly what time this was, but I began just editing

18  the piece myself.

19          MR. VOGT:  If we can go to Plaintiff's Exhibit 163,

20  and we would move to introduce 163.  I don't think it's been

21  introduced yet.

22          MR. AXELROD:  I think I introduced this.  I think my

23  version --

24          MR. VOGT:  That's probably why.

25          Your Honor, just so we have the designations right, we

**JA 0722**

M282Pal5                    Bennet - Direct

1    would move at this time to introduce Plaintiff's Exhibit 163.

2              THE COURT:  All right.

3              MR. AXELROD:  No objection.

4              THE COURT:  Received.

5              (Plaintiff's Exhibit 163 received in evidence)

6    BY MR. VOGT:

7    Q.  Mr. Bennet, there is an e-mail from you at 7:22 p.m. to

8    Ms. Williamson.  Do you see that?

9    A.  I do.

10   Q.  And that would have been at or around the time that you

11   finished your rewrite of her draft, is that right?

12   A.  I think so.

13   Q.  And you say in here, "I really reworked this one.  I hope

14   you can see what I was trying to do.  Please take a look.

15   Thank you for the hard work today and I'm sorry to do such a

16   heavy edit."  Is that right?

17   A.  Yes.

18   Q.  You don't include any specific request in this e-mail for

19   Ms. Williamson to fact-check your rewrite, do you?

20   A.  That's what I mean by "please take a look."

21   Q.  That's -- the sentence just there, "please take a look," is

22   what you are indicating to Ms. Williamson as being "fact-check

23   this"?

24   A.  Yeah.  I mean, as Linda said earlier, we, you know,

25   routinely send playbacks to writers.  If I could just -- this

JA 0723

1    is my fault, right?  I wrote those sentences, and I'm not

2    looking to shift the blame to anybody else, so I would just

3    like, for the record, I want to say that.

4             But, yeah, this is why we send playbacks to writers,

5    because they are the ones who reported the story.  They are the

6    ones who are in possession of the facts.  And it is important

7    for them to review pieces to make sure that edits haven't

8    introduced errors.  So, yes, "please take a look" was a request

9    that she read the piece and, as Linda said, she reinforced that

10   by sending a version herself.

11   Q.  And so we can agree, though, that prior to 7:22 p.m., when

12   you indicated to Ms. Williamson that your rewrite was finished,

13   she would have had no idea that you had inserted the word

14   "incite" into her draft, would she?

15   A.  Say that again.

16   Q.  Yeah.  We can agree that prior to 7:22 p.m., when you let

17   Ms. Williamson know that you had completed your rewrite, she

18   would not have had any idea that you had inserted the word

19   "incite" into the draft.

20             MR. AXELROD:  Objection.

21             THE COURT:  Sustained.

22   BY MR. VOGT:

23   Q.  Mr. Bennet, did you have any conversations with

24   Ms. Williamson about the draft of the editorial between 4:44

25   p.m. and 7:22 p.m.?

M282Pal5                    Bennet - Direct

1  A.  I don't believe that I did.

2  Q.  And do you have any knowledge of whether or not

3  Ms. Williamson accessed the editorial that you were working on

4  in Scoop between 4:44 p.m. and 7:22 p.m.?

5  A.  I don't know.

6  Q.  And by 7:22 p.m., did you know where Ms. Williamson was?

7  A.  No.

8  Q.  Did you believe that she was still in the office?

9  A.  Well, I think she testified she was working from home that

10 day.

11 Q.  Did you --

12 A.  But I didn't know where she was.  I mean, I knew she would

13 be in contact and reachable.

14 Q.  I think we have heard testimony that the deadline to submit

15 the editorial for the print publication was at approximately

16 8:00 p.m., is that right?

17 A.  That's what Linda said and I have no -- I can't -- I

18 can't -- I think that's about as late as we could push it.  I

19 think she said you could go to 8:15, but I think that's right,

20 but that's very late to get it to print.

21 Q.  And I believe the parties have stipulated that the online

22 version of the editorial that we looked at, at Plaintiff's

23 Exhibit 1, was posted online at 9:45 p.m.  Is that your

24 understanding?

25 A.  That's right.  I mean, that's, again -- that is my

**JA 0725**

M282Pal5                          Bennet - Direct

1    understanding.  I'm sorry.

2    Q.  Okay.

3    A.  Sorry.

4    Q.  Let me show you Plaintiff's Exhibit No. 2.

5            Just for the witness.

6            And do you recognize Plaintiff's Exhibit No. 2?

7    A.  I do.  I mean, I know what it is.

8            MR. VOGT:  At this point, your Honor, we would move to

9    introduce Plaintiff's Exhibit No. 2.

10           MR. AXELROD:  No objection, your Honor.

11           THE COURT:  Received.

12           (Plaintiff's Exhibit 2 received in evidence)

13           MR. VOGT:  Just to move along, can we agree to 3 and 4

14   also?  I don't think they are in.

15           MR. AXELROD:  Just a minute Judge.

16           Oh, they are fine.

17           MR. VOGT:  Your Honor, at this point, with agreement

18   of counsel, we would move to introduce Plaintiff's Exhibit 3

19   and Plaintiff's Exhibit 4.

20           MR. AXELROD:  I'm sorry.  No objection, your Honor.

21           THE COURT:  Received.

22           (Plaintiff's Exhibits 3 and 4 received in evidence)

23   BY MR. VOGT:

24   Q.  Mr. Bennet just to identify these for the jury, Plaintiff's

25   Exhibit No. 2 is a tweet of the editorial by *The New York Times*

M282Pal5                    Bennet - Direct

1    opinion section, is that right?

2    A.   Yes.

3    Q.   And that's at 9:47 p.m.?

4    A.   Yes.

5    Q.   And then if we go to Plaintiff's Exhibit No. 3, it should

6    be a tweet of the editorial by the main *New York Times* account,

7    is that right?

8    A.   Yes.  Is this a -- yes.

9    Q.   Then Plaintiff's Exhibit 4 is the print edition of the

10   original editorial.  Do you recognize that?

11   A.   I do.

12   Q.   And the print edition would have run on June 15 of 2017,

13   correct?

14   A.   That's correct.

15   Q.   And then do you recall whether the "America's Lethal

16   Politics" editorial was also featured on *The New York Times*

17   website home page?

18   A.   I believe that it was.

19   Q.   If we could pull up Defense 126.  Can you zoom in on that a

20   little bit for the witness just to identify it.

21        Mr. Bennet, do you recognize Defense Exhibit 126?

22   A.   I do.

23        I'm sorry.  I can't help observing in passing that it

24   is just remarkable that by the time the editorial was up, the

25   story had already disappeared from the top of the home page.

JA 0727

M282Pal5                        Bennet - Direct

1  It sort of makes that point about people getting used to this
2  kind of thing.  The news story.  I'm sorry.  I'm just observing
3  the news story isn't there anymore.
4  Q.  Let me introduce it first before you talking about it.
5  A.  I'm sorry.  I'm sorry.  I'm sorry.
6  Q.  You don't want to get yelled at for doing that.
7  A.  Yeah.  I don't want to get yelled at at all.
8           MR. VOGT:  Your Honor, at this time, plaintiff would
9  move to introduce Defense Exhibit 126.
10          MR. AXELROD:  It's our exhibit.  We have no objection.
11          THE COURT:  So without yelling, I receive that
12 exhibit.
13          MR. VOGT:  Thank you, your Honor.
14          (Defendant's Exhibit 126 received in evidence)
15 BY MR. VOGT:
16 Q.  And now, so, we can publish Defense Exhibit 126, so the
17 jury can see what you were commenting on is there doesn't
18 appear to be any news articles on this particular page that
19 related to the Scalise shooting.  Is that right?
20 A.  Certainly what we are seeing is the top half of the home
21 page, so I suppose it is possible that there is one further
22 down, but nothing is visible here.
23 Q.  Well, other than the editorial, which is at the top of the
24 home page, correct?
25 A.  Um-hmm.

**JA 0728**

M282Pal5                          Bennet - Direct

1   Q.  And this would have been on June 15 of 2017?  If you look

2   up underneath the banner.

3   A.  That's right.

4   Q.  I am going to go back to an e-mail you mentioned a moment

5   ago, Plaintiff's Exhibit 171, which I am going to move to

6   introduce, your Honor.  I think it may have been, but the chart

7   didn't show, so I just want to make sure that Plaintiff's

8   Exhibit 171 is admitted into evidence.

9            MR. AXELROD:  I think it is, but no objection anyway.

10           THE COURT:  Received.

11           (Plaintiff's Exhibit 171 received in evidence)

12  BY MR. VOGT:

13  Q.  Mr. Bennet, this is your e-mail string with Mr. Douthat

14  that I think you were talking about a moment ago, the beginning

15  of which, if we go down to the bottom, there should be an

16  e-mail on the second page, 8:31 p.m., I think that you were

17  just referencing with respect to the Julius Caesar kerfuffle.

18  A.  That's right.

19  Q.  Now if you go to the first page, Mr. Douthat responded to

20  that e-mail from you at 10:35 p.m.  Do you see that?

21  A.  Yeah.

22  Q.  And he starts out in the second paragraph there saying, "I

23  would be remiss if I didn't express my bafflement at the

24  editorial that we just ran on today's shootings and political

25  violence."  And then he continues by saying, "There was not,

1  and continues to be so far as I can tell, no evidence that

2  Jared Lee Loughner was incited by Sarah Palin or anyone else."

3  Do you see that?

4  A.  I do.

5  Q.  And when Mr. Douthat said that to you in this e-mail, did

6  you trust that he was accurate in that regard?

7  A.  I trusted that he was interpreting the editorial to be

8  saying something that we didn't intend it to say.  That was my

9  reaction.

10 Q.  And in what way was he interpreting the editorial?

11 A.  He is saying here that -- I mean, what I took away from

12 this was he was reading the editorial to say that Loughner was

13 incited by Sarah Palin or somebody else, and that is not the

14 message we intended to send.

15 Q.  And did you see or hear any comments from other people that

16 interpreted the editorial the same way as Mr. Douthat does in

17 this e-mail?

18 A.  Well, we had an exchange.  I wrote him back.  And then I

19 think -- I can't see the top of this.  At some point I checked

20 Twitter because this, you know, obviously rang a big alarm for

21 me and, yes, I saw other media people at that point tweeting

22 that we had gotten it wrong.

23 Q.  And when you say media people, do you recall who those

24 people were?

25 A.  No.

1    Q.  Were those people, like Mr. Douthat, were they expressing

2    their belief that the editorial was about Sarah Palin?

3    A.  I didn't read them expressing the belief it was about Sarah

4    Palin; but, again, the same idea that, in the course of

5    referring to the Loughner shooting, they said we had gotten it

6    wrong and suggested or said that it was incited or caused by

7    Sarah Palin or her PAC, I guess.  I can't remember exactly what

8    they were saying, but that was the gist of what Ross was saying

9    was being echoed by those tweets that I saw.

10   Q.  And did you ever learn whether the sentiments that you were

11   just discussing with respect to the media's reaction to the

12   editorial, whether readers were also having the same reaction?

13   A.  I can't give you a -- I just can't give you a good sense of

14   that, because I don't have a good sense of that myself.

15   Q.  And Mr. Douthat's e-mail to you on this issue is at 10:35

16   p.m., is that right?

17   A.  Yes, that's right.

18   Q.  Do you recall how long it took you to read this e-mail?

19   A.  No.

20   Q.  Do you recall when you read it?

21   A.  No.  I mean, do you see -- what time did I reply?

22   Q.  That's what I was going to say.  We can scroll up.

23   A.  Oh, okay.  I'm sorry.

24   Q.  You reply I think up here at 11:09 p.m., is that right?

25   A.  Yeah.

1   Q.  Do you know, by 11:09 p.m., had you gone and looked on

2   Twitter, as you were saying a moment ago, to see what was being

3   said about the editorial?

4   A.  I don't know if I did it -- I don't know if I did it before

5   or after I sent that e-mail.  Let me just read it for a second.

6   I'm sorry.

7           No, I don't remember.

8   Q.  I think that you said a moment ago that when you initially

9   read Mr. Douthat's 10:35 e-mail that you were very concerned

10  about the way that he had interpreted the editorial, is that

11  right?

12  A.  Yes.

13  Q.  And so at 11:09 p.m. you start your response to Mr. Douthat

14  by saying, "Hey, thanks.  I will look into this tomorrow.

15  A.  Yes.

16  Q.  Is that right?

17          And in fact did you look into it the next day?

18  A.  You know, actually looking at that now, I think I must have

19  looked at the tweets after that because I do remember I wound

20  up texting Elizabeth that night.  So rather than waiting until

21  the next day, which is, you know, what I assumed I would do,

22  because it was well past our deadline at that point.  So I must

23  have, I must have then looked at the tweets because I

24  changed -- I didn't wait until tomorrow to reach out to her.

25  Q.  I think you said you texted Ms. Williamson, is that right?

**JA 0732**

M282Pal5                          Bennet - Direct

1   A.  I believe so.

2   Q.  You didn't call her?

3   A.  I didn't call her.

4   Q.  Did you call Mr. Douthat?

5   A.  No.

6   Q.  Did you do any kind of factual investigation online

7   concerning whether or not there was a link between Sarah

8   Palin's political action committee's map and the Loughner

9   shooting?

10  A.  I don't believe that I did.

11  Q.  At that point in time, the editorial had been online for

12  approximately, if we are using Mr. Douthat's e-mail at 10:35,

13  50 minutes?

14  A.  That seems about right.

15  Q.  And so when you responded at 11:09 p.m., did you make any

16  effort to take the editorial offline?

17  A.  I did not, no.

18  Q.  And is there anything that would have prohibited you from

19  taking the editorial offline so you could figure out whether

20  what Mr. Douthat was saying was correct?

21  A.  Yes.

22  Q.  What?

23  A.  *The New York Times* — and this may have changed, but — had a

24  rule against so-called unpublishing stories; that if you

25  published a story, you couldn't then just pull it down.  We

1    were also already obviously committed to the print edition of

2    the paper.

3    Q.  So is it fair to say it's possible to take a story down

4    but, pursuant to *The New York Times* policy, you won't take a

5    story down?

6    A.  I don't know the answer to that.

7    Q.  Did you check with anyone to see if you could take it down?

8    A.  No, I didn't.

9    Q.  Plaintiff's Exhibit 191.

10            Mr. Bennet, this is an exhibit that's already been

11   introduced and it starts with an e-mail from you at 5:08 a.m.

12   to Eileen Lepping and Elizabeth Williamson.  Do you see that?

13   A.  I do.

14   Q.  And you say, "Hey, guys, we are taking a lot of criticism

15   for saying that the attack on Giffords was in any way connected

16   to incitement."  Do you see that?

17   A.  I do.

18   Q.  Now, the criticism that you are talking about there, what

19   are you referring to?

20   A.  The criticism I had seen on Twitter.

21   Q.  And the criticism you saw on Twitter that that reference is

22   the editorial saying that the attack on Giffords was connected

23   to incitement, is that right?

24   A.  Well, I'm using the language that I was reading on Twitter,

25   and this was how they were interpreting the editorial.

1   Q.  Do you recall seeing anything on Twitter where anyone was

2   interpreting the editorial consistent with what you say your

3   intent was in writing it?

4   A.  No, I don't recall that.

5   Q.  And you continue by saying, "The claim is that this was

6   fully investigated and debunked in the months after the attack,

7   and the shooter was found to have acted only because of his

8   personal demons.  I don't know what the truth is here, but we

9   may have relied too heavily on our earlier editorials and other

10  early coverage of the attack."

11          Now, is that an accurate statement that, as of 5:08

12  a.m., you did not know what the truth was here?

13  A.  I didn't know what the truth was of what Ross had told me,

14  which is that they had -- that it had been found that there was

15  no connection whatsoever; that it had been proven that there

16  was no connection to incitement; and I didn't know the truth of

17  that.

18  Q.  And then you go on to say, "If so, I'm very sorry for my

19  own failure on this yesterday.  In any case, I would like to

20  get to the bottom of this as quickly as possible this morning

21  and correct the piece if needed."

22          Now, at 5:08 a.m. you had not decided yet whether or

23  not the piece needed to be corrected, is that right?

24  A.  That's right.

25  Q.  But by 5:08 a.m. you knew that the piece had been

1    interpreted by some people as meaning something different than

2    you intended.  Is that right?

3    A.   That's right.

4    Q.   And in this e-mail it's my understanding you were

5    instructing Ms. Lepping and Ms. Williamson to go research

6    whether or not there was actually a link between incitement and

7    the Giffords shooting, correct?

8    A.   Actually I know this is a -- but it matters, I was asking

9    to go research whether there was no link between the Giffords

10   shooting and Loughner.

11   Q.   But the research you were asking them to conduct related to

12   whether or not there was a link.  Is that right?

13   A.   Yes, that's -- yes, that's right.

14   Q.   And we can agree that you didn't say anything in this 5:08

15   a.m. e-mail concerning this error being one and your use of the

16   word incitement and readers interpreting that word to be

17   something other than you intended.  Is that right?

18   A.   I'm not following you.

19   Q.   It was a poor question.  Let me ask it another way.

20           If all this situation was was a misunderstanding as to

21   your use of the term "incitement," there would have been no

22   need for Ms. Lepping and Ms. Williamson to research the

23   existence of the link itself, correct?

24   A.   No.  I'm not sure I'm following you.  I'm sorry.

25   Q.   Why were you at this point trying to prove whether or not

M282Pal5                                   Bennet - Direct

1    there was a link between political incitement and the Giffords

2    shooting if that is not what you intended to convey to readers?

3    A.   Because if -- because if they were interpret -- if in fact

4    there was no link whatsoever, no possibility that there was a

5    question between that shooting and politics, the argument fell

6    apart, you know, the pattern that we suggested wouldn't make as

7    much sense and, I was responding in the terms in which we were

8    being criticized.  I recognize that people were interpreting it

9    that way, and if the editorial was incorrect in that

10   interpretation, that was something we needed to deal with.

11   Q.   I think you said the argument would fall apart if it was

12   established that there was no link between incitement and the

13   shooting, is that right?

14   A.   If it was proven that there was absolutely no connection

15   between politics and what happened that day, I wouldn't say the

16   argument would fall apart.  I withdraw that.  But we shouldn't

17   have adduced like these two -- we described it in the

18   editorial, as he said, I think in Elizabeth's version and mine,

19   as a sickeningly familiar pattern, and it just wouldn't have

20   made sense to assert that that was a pattern if that was the

21   case.  But, no, the argument still was -- I think the overall

22   argument of the piece would still have been valid.

23   Q.   Now, let me show you another e-mail with Mr. Douthat,

24   Plaintiff's Exhibit 174.

25            Just for the witness.

M282Pal5                          Bennet - Direct

1              And Mr. Bennet, do you recall this e-mail?

2   A.  I do.

3              MR. VOGT:  At this point, your Honor, if we haven't

4   already, I would move to admit Plaintiff's Exhibit 174.

5              MR. AXELROD:  No objection.

6              THE COURT:  Received.

7              (Plaintiff's Exhibit 174 received in evidence)

8   BY MR. VOGT:

9   Q.  Mr. Bennet, you respond in the same string with Mr. Douthat

10  at 7:56 a.m.  Do you see that?

11  A.  I do.

12  Q.  And you say, "Okay, thanks.  I'll get to the bottom of this

13  this morning."

14  A.  Yes.

15  Q.  "I do feel lousy about it regardless.  We were trying to

16  make the point that we should, of course, take incitement

17  seriously and instead — I see your point — it reads like

18  partisan scorekeeping" is that right?

19  A.  Yes.

20  Q.  So at this point you at least had come to the realization

21  that the arguments that were made in the piece could be

22  interpreted as partisan scorekeeping?

23  A.  Yes.

24  Q.  Do you recall, after this exchange that took place with

25  Mr. Douthat, did there come a point in time when you started

M282Pal5                          Bennet - Direct

1    working on a correction to the editorial?

2    A.  Yes.

3    Q.  And who did you work on that correction with?

4    A.  I -- you know, we talked about this before, and I don't

5    have -- I -- if Linda says I worked on it with her, I worked on

6    it with her; and if she said I worked on it with Jesse, I

7    worked on it with Jesse.  I don't have a very clear memory of

8    that myself.  But I was, you know -- I had not gotten much

9    sleep and that morning is a bit of a blur for me.

10   Q.  Do you have any independent recollection of who wrote the

11   correction?

12   A.  The process Linda described would have -- it made sense to

13   me.  Do I have an independent recollection of it?  Yeah, I can

14   remember being in her office, yes.

15   Q.  Let me show you what has been premarked as Plaintiff's

16   Exhibit 206.

17             Just for the witness.

18             Mr. Bennet, do you recognize this e-mail?

19   A.  I do.

20             MR. VOGT:  And at this point, your Honor, we would

21   move to admit Plaintiff's Exhibit 206.

22             MR. AXELROD:  No objection.

23             THE COURT:  Received.

24             (Plaintiff's Exhibit 206 received in evidence)

25   BY MR. VOGT:

M282Pal5                         Bennet - Direct

Q.  Mr. Bennet, this is an e-mail at 10:26 a.m. from Hanna

Ingber to you.  Do you see that?

A.  I see it.

Q.  And who is Hanna Ingber?

A.  Well, at the time, she was, I believe, the head of,

certainly worked for, something called The Reader Center, which

was a group of journalists who monitored reader feedback on

stories.  In practice, it really meant monitoring Twitter, I

think, and relayed that feedback to editors around *The Times*

regarding pieces that they published.  And then they would --

you know, if *The Times* was being criticized for something, they

might help develop a response to it or I think they did things

like interviews with journalists and pursued questions that

readers had about *The Times* and things like that.  They were

reader advocates in a sense.

Q.  So when she reaches out to you by e-mail at 10:26 a.m., she

would have done that on her own initiative?  You didn't have

any conversations with her prior to this?

A.  She wasn't doing it on my initiative, if that's what you

mean.

          (Continued on next page)

1  BY MR. VOGT:

2  Q.  Okay.  And she says in here, "I'd be happy to chat about

3  the Sarah Palin editorial."  Do you see that?

4  A.  I do see that.

5  Q.  Do you know what she was talking about?

6  A.  I think she was talking about the editorial that we're

7  discussing.

8  Q.  "America's Lethal Politics"?

9  A.  Yes, that editorial.

10  Q.  Okay.  And she says, after that, "and options for

11  responding to readers if that would be helpful."  Do you know

12  what she meant by that?

13  A.  I -- I'm sure I did.  I mean, it sounds like what I was

14  describing earlier—how do we -- how do we respond on Twitter to

15  this criticism.

16  Q.  And do you recall, by this time, at 10:26 a.m., had you

17  started to get any media inquiries concerning the editorial?

18  A.  I don't know that we had, but it wouldn't surprise me if we

19  had.

20  Q.  On the morning of June 15th of 2017, do you recall getting

21  media inquiries concerning the editorial?

22  A.  I recall getting them in -- let me think.  I recall getting

23  them in the afternoon.  I don't -- I don't -- as I sit here, I

24  don't recall getting them in the morning, but it may well have

25  happened.

M281PAL6                    **JA 0741**
                        Bennet - Direct

1   Q.  Let me show you, just for the witness, Plaintiff's

2   Exhibit 223.

3   A.  Oh.

4   Q.  Do you recognize this email string?

5   A.  I do.

6          MR. VOGT:  At this point, your Honor, plaintiff would

7   move to introduce Plaintiff's Exhibit 223.

8          MR. AXELROD:  Just one second, your Honor.

9          Your Honor, could we have a brief sidebar.

10         THE COURT:  We've managed so far to avoid having to do

11  that.

12         MR. AXELROD:  I know.

13         MR. VOGT:  Can I confer for a moment.

14         THE COURT:  Yes.

15         (Counsel conferring)

16         MR. VOGT:  We got that resolved, your Honor.

17         THE COURT:  Very good.

18         MR. VOGT:  So before this exhibit is admitted to the

19  jury, we're going to remove the second and third pages for

20  hearsay issues and at this point in time, though, just show

21  them the first page.

22         THE COURT:  All right.  So the first page is received,

23  on consent.

24         (Plaintiff's Exhibit 223 (page 1 only) received in

25  evidence)

1              MR. AXELROD:  Thank you.

2     BY MR. VOGT:

3     Q.  And Mr. Bennet, do you see there's an email string that

4     starts at the bottom of this page at 8:20 a.m. from Danielle

5     Rhoades Ha?

6     A.  Yup.  Yes.  I'm sorry.  Yes, I see that.

7              MR. VOGT:  I just realized I walked around the

8     courtroom with my mask off and put it back on in the bubble.

9     A.  And clearly -- in answer to your previous question, clearly

10    we did get media inquiries that morning, obviously.

11    Q.  And who's Danielle Rhoades Ha?

12    A.  She was then, and I think still is, the senior

13    communications person for *The New York Times*, a spokesperson

14    for *The Times*.  And she would deal with media inquiries like

15    this.

16    Q.  And then you respond to her 8:20 a.m. email at 8:26 a.m.

17    and you say, "We're taking a hard look at this now and my guess

18    is we will post a correction before the morning is over."  Do

19    you see that?

20    A.  I do.

21    Q.  And then at 10:44 a.m. you say, "We should have the

22    correction up in a few minutes."

23    A.  Yes.

24    Q.  You see that?

25    A.  I see that.

1    Q.  And then at 10:46 she says, "Thanks.  I'll stand by and

2    send the text when --" it says "pubbed."  That means published,

3    right?

4    A.  Yes.

5    Q.  "-- to Fox and others"?

6    A.  Yes.

7    Q.  "And I've heard from *Business Insider* and *Axios*"?

8    A.  Yes.

9    Q.  And you reference at 10:46 a.m. to her, "And I've heard

10   from Farhi"; is that right?

11   A.  Yeah, mm-hmm.

12   Q.  And who is Farhi?

13   A.  A reporter at the *Washington Post*, and he'd reached out to

14   me directly.

15   Q.  And I believe that the correction, what we call the first

16   correction, was actually published at around 11:00 a.m.; is

17   that right?

18   A.  It -- as I said, I just -- I don't really remember the time

19   sequence.  We were scrambling that morning.  And that sounds

20   about right.

21           MR. VOGT:  And if we could pull up Plaintiff's

22   Exhibit 5.

23           MR. AXELROD:  The parties stipulated that it was

24   published about 11:15.

25           MR. VOGT:  Okay.  Thanks.

**JA 0744**

1              THE WITNESS:  Oh.

2    BY MR. VOGT:

3    Q.  So Plaintiff's Exhibit 5 has been introduced into evidence.

4    And if you go to the second page of Exhibit 5, top paragraph,

5    and this is the corrected text of the editorial itself.  Were

6    you involved in preparing this corrected text in the editorial

7    at all?

8    A.  My guess is that I was, but I don't remember.

9    Q.  And you see one of the things that's been changed in here,

10   it says, "At the time, we and others were sharply critical of

11   the heated political rhetoric on the right."  Do you see that?

12   A.  I do see that.

13   Q.  And it still makes reference to Sarah Palin's political

14   action committee; is that right?

15   A.  Yes, it does.

16   Q.  And it still makes reference to the Loughner shooting,

17   correct?

18   A.  Yes, it does.

19   Q.  And then, but added at the end of that paragraph is a

20   sentence that says, "But in that case no connection to the

21   shooting was ever established."

22   A.  Yes.

23   Q.  And is that an accurate statement?

24   A.  Yes.

25   Q.  And then if we go to the bottom of the article where the

JA 0745

1  actual correction is, on June 15th -- and do you recall whether

2  or not you contributed anything to the language of this

3  correction?

4  A.  I don't recall specifically.  As I said, I -- I was

5  involved in -- in drafting the corrections, so I may have.

6  Q.  And subsequent to this correction being issued were you

7  involved in fashioning a tweet about the correction?

8  A.  Yes.

9  Q.  Let me show you, just for the witness, Plaintiff's Trial

10 Exhibit 207.

11           Mr. Bennet, do you recognize Plaintiff's Exhibit 207?

12 A.  Yeah.  Yes, I do.

13           MR. VOGT:  And your Honor, we would move to introduce

14 Plaintiff's Trial Exhibit 207 into evidence.

15           MR. AXELROD:  No objection.

16           THE COURT:  Received.

17           (Plaintiff's Exhibit 207 received in evidence)

18 Q.  And you see, Mr. Bennet, if we go to the second page of

19 this exhibit, your email string there with Hanna Ingber that I

20 had gone through with you a minute ago about the Sarah Palin

21 editorial?

22 A.  Mm-hmm, yes.

23 Q.  And you see up above that at the top of that page there's

24 three points there?

25 A.  I see them.

M281PAL6                          Bennet - Direct

1    Q.   Numbered points?  And if you go to the bottom of the first

2    page, at 11:12 a.m., Ms. Ingber is explaining that that's a

3    draft of a potential tweet about the correction.  Do you see

4    that?

5    A.   Yes, I see that.

6    Q.   And then if you look at 11:22 a.m., in the middle of

7    page 1, an email from you?

8    A.   Yes.

9    Q.   And included within that email are your edits to those

10   three points that Hanna Ingber proposed; is that right?

11   A.   That's right.

12   Q.   And with respect to Item No. 2, you added in that first

13   part that said, "We got an important fact wrong"; is that

14   right?

15   A.   That's right.

16   Q.   So that was your language.

17   A.   Yes, that was my language.

18              MR. VOGT:  And then if we pull up Plaintiff's Trial

19   Exhibit 9, just for the witness.  Technically it's not

20   introduced yet, but I don't think there's a fight over it.

21              MR. AXELROD:  The difficulty is --

22              MR. VOGT:  The bottom stuff?

23              MR. AXELROD:  Yeah.

24              MR. VOGT:  All right.  We'll hold off on this and do

25   it later.

1  BY MR. VOGT:

2  Q.  Let me show you what was previously marked as Plaintiff's

3  Trial Exhibit 7.

4          MR. VOGT:  And this one has been introduced, right?

5  Q.  And this one's broken up so -- but you see at the bottom

6  it's got, "We're sorry about this and we appreciate --"

7  A.  Yes.

8  Q.  "-- that our readers called us on the mistake"?

9  A.  Yes.

10  Q.  And then at the top, in small print, "We published an

11  editorial last night"?

12  A.  Yes.  I think that was the first tweet in the sequence.

13  Q.  Right.  And then the second tweet is the one I just went

14  through with you that starts off with, "We got an important

15  fact wrong."  Do you see that?

16  A.  Yes, yeah.

17  Q.  And that's the tweet that went out about the first

18  correction; is that right?

19  A.  I believe that that's -- I believe that that's right, yeah.

20  Q.  And do you know whether or not a tweet went out concerning

21  the second correction?

22  A.  I don't know.

23  Q.  Let me show you now exhibit that's been marked Plaintiff's

24  202.  Do you recognize this exhibit?

25  A.  Yes, this is the -- I guess this is the --

M281PAL6                    Bennet - Direct

1   Q.   Don't talk about it yet.

2   A.   What?

3   Q.   This one's not in.

4   A.   Oh, I'm sorry.  Sorry, sorry.

5        MR. VOGT:  Your Honor, at this point we would move to

6   introduce Plaintiff's Exhibit 202 into evidence.

7        MR. AXELROD:  No objection.

8        THE COURT:  Received.

9        (Plaintiff's Exhibit 202 received in evidence)

10       MR. VOGT:  Okay.  Now we can publish it.

11  BY MR. VOGT:

12  Q.   And what were you saying, Mr. Bennet, about this email?

13  A.   This is what you were referring to, the second question

14  clarifying, or correcting, the characterization of the map.

15  Q.   And this is at 12:21 p.m.  Do you see that?

16  A.   Yeah.

17  Q.   Now do you recall, when this correction was made concerning

18  the map itself that involved the crosshairs being over

19  lawmakers as opposed to districts, was that correction made

20  initially by *The Times* without adding a correction to the end

21  of the editorial?

22  A.   I -- I can't remember what the sequence was.  That is, I

23  can't -- I can't remember if we -- I think that that's right,

24  that it was corrected in the text before we had added this

25  correction, which we had planned to add.  Somebody dropped the

1   ball.  And we just had -- and then I was alerted by, I believe

2   it was a media inquiry, that this hadn't been added to the

3   correction as we planned, and we added it at that point, which

4   was later in the afternoon.  We were -- you know, this is a

5   poor excuse, but an explanation -- just really scrambling to

6   try to address this and wound up, you know, addressing it over

7   the course of several hours that day.

8   Q.  And let me show you now Plaintiff's Exhibit 204.

9            MR. VOGT:  Which I think is in.  That one's been

10  introduced.

11           MR. AXELROD:  It has.

12  Q.  And there's a reference here to a conversation between you

13  and Jesse Wegman in which Mr. Wegman indicates in this email

14  that he raised with you the possibility that you were seeming

15  like you were still trying to sneak the link in.  Do you recall

16  that conversation with Mr. Wegman?

17           MR. AXELROD:  Objection.  To this exhibit, with this

18  witness.

19           MR. VOGT:  Your Honor, I can ask it without the

20  exhibit, if it resolves the objection.

21           THE COURT:  All right.

22  Q.  Mr. Bennet, do you have -- do you recall having a

23  conversation with Mr. Wegman on the afternoon of June 15th of

24  2017 regarding the issue of whether leaving Governor Palin's

25  name in the editorial made it seem like you were trying to

1    sneak the link in?

2    A.  No.  I don't remember that.

3    Q.  And do you recall at any point in time on the morning or

4    afternoon of June 15th of 2017 learning about some tweets that

5    Governor Palin had made about the editorial?

6    A.  No.

7    Q.  Mr. Bennet, I'm going to show you now Plaintiff's Trial

8    Exhibit 200.

9              Do you recognize Exhibit 200?

10   A.  I don't recognize it, but I see my name in the message

11   field so I must have received it.

12             MR. VOGT:  Okay.  And at this point, your Honor, we

13   would move to introduce Plaintiff's Exhibit 200 into evidence.

14             MR. AXELROD:  No objection.

15             THE COURT:  Received.

16             (Plaintiff's Exhibit 200 received in evidence)

17   Q.  And Mr. Bennet, on this email string, if you look down at

18   the bottom of it, there are two links there to

19   twitter.com/SarahPalinUSA.  Do you see that?

20   A.  I do.

21   Q.  And do you recall any point in time -- I know you said you

22   didn't recognize seeing the email, but do you recall whether or

23   not you clicked on those links?

24   A.  No.  I'm sorry.  I just -- I don't remember this.  Clearly

25   it came to me, but I have -- I just don't know.

**JA 0751**
M281PAL6                         Bennet - Direct

1   Q.  Let me show you now what's been previously marked as

2   Plaintiff's Trial Exhibit 234, just the witness.

3           Do you recognize this email?

4   A.  Yes.

5           MR. VOGT:  And at this point, your Honor, I would move

6   to introduce Plaintiff's Trial Exhibit 234.

7           MR. AXELROD:  No objection.

8           THE COURT:  Received.

9           (Plaintiff's Exhibit 234 received in evidence)

10  Q.  And I think this is what you were referring to a moment

11  ago, but this is an email from Danielle Rhoades Ha to you at

12  12:09 p.m. where she provides a list of questions from Oliver

13  Darcy, a media reporter at CNN.  Do you see that?

14  A.  Yes.

15  Q.  And then there's a list of questions underneath that?

16  A.  Yeah.  And this is what I was confused about, about your

17  question about the timing of the change, 'cause it sounds -- I

18  read this second line as saying we still hadn't changed it in

19  the editorial.  Do you see that, the first sentence of that?

20  Q.  Yes.  That's what I was going to ask you about.

21  A.  Oh, okay.  Okay.

22  Q.  And do you recall what, if anything, you did after you

23  received this email from Danielle Rhoades Ha?

24  A.  I wrote her back with my answers to the questions.

25  Q.  And do you recall, were all of your answers ultimately

1   communicated to Mr. Darcy at CNN?

2   A.  No.

3           MR. VOGT:  And your Honor, plaintiffs move to admit

4   Plaintiff's Trial Exhibit 236, but only the first page.

5           THE COURT:  That's on agreement with defense counsel?

6           MR. AXELROD:  Oh, I'm sorry, your Honor.  Yes, it is.

7           THE COURT:  All right.  So received.

8           (Plaintiff's Exhibit 236 (page 1 only) received in

9   evidence)

10          MR. VOGT:  Thank you, your Honor.

11  BY MR. VOGT:

12  Q.  And Mr. Bennet, you should have in front of you now

13  Plaintiff's Trial Exhibit 236.

14  A.  I see it.

15  Q.  And if you look at the email at 2:14 p.m. from Oliver

16  Darcy.

17  A.  Ah, okay.

18  Q.  He says there, "I noticed The Times has quietly fixed the

19  language about the Palin map putting Giffords under

20  crosshairs."  Does that clarify the language you were just

21  talking about?

22  A.  Yeah.  This wasn't addressed to me, was it?  How do I know

23  about this one?  But anyway, yes.  I think Danielle wrote to me

24  separately?  But anyway, yes.  So somebody had -- for whatever

25  reason, the correction that I'd approved two hours before

1    hadn't been added -- or whenever it was, 12:30, hadn't been

2    added yet.

3    Q.  But it was subsequently added before another correction was

4    added at the end of the piece; is that right?  Is that what you

5    gather from this statement by Mr. Darcy?

6    A.  That it was subsequently -- I think what you mean is in the

7    body of the editorial, the language was --

8    Q.  Right.

9    A.  -- fixed before the correction was added.  Yes, that's what

10   I gather from this message.

11   Q.  Okay.  And then if you go up to the top portion of this

12   email, at 4:07 p.m., Danielle Rhoades Ha is responding to

13   Mr. Darcy.

14   A.  I see that.

15   Q.  And the subject line is "CNN request for comment"?

16   A.  Yes.

17   Q.  And we had gone through that, an email a minute ago with

18   several questions?

19   A.  Yes.

20   Q.  And then Ms. Rhoades Ha says to Mr. Darcy, "The following

21   response is attributable to James Bennet, editorial page

22   editor, *The New York Times*."

23            "'On your most recent email, a clarification should be

24   posted soon.'"

25            And then she says, "'On your second question, you're

1    right.  Thank you for calling that to our attention, and we've

2    fixed it.'"  And that would be the fix on the map itself?

3    A.  That's right.

4    Q.  And then she goes on to say, "'Yes, criticism on Twitter

5    alerted us to the error.  While it's always agonizing to get

6    something wrong, we appreciate it when our readers call us out

7    like this.  We made an error of fact in the editorial, and

8    we've corrected it.  But that error doesn't undercut or weaken

9    the argument of the piece.'"  Do you see that?

10   A.  Yes.

11   Q.  And that quote is attributed to you, correct?

12   A.  Correct.

13   Q.  And do you know whether or not that quote ultimately was

14   published publicly by CNN?

15   A.  I don't know.

16   Q.  And the second correction we've been talking about is

17   Plaintiff's Exhibit 6, if we can pull that up.

18           MR. VOGT:  I don't think that's been formally

19   introduced, but we would move to introduce it at this time,

20   your Honor.

21           MR. AXELROD:  No objection.

22           THE COURT:  Received.

23           (Plaintiff's Exhibit 6 received in evidence)

24   BY MR. VOGT:

25   Q.  And I believe that Mr. Turkel went through this before with

M281PAL6                    Bennet - Direct

1    Ms. Cohn, but if you go to the bottom of the text --

2              MR. VOGT:  Ah, I'm sorry.  The correction.  I wasn't

3    clear, Michael.  My bad.

4    Q.  Do you see there's a correction that's been changed and it

5    says, "An editorial on Thursday about the shooting of

6    Representative Steve Scalise incorrectly stated that a link

7    existed between political rhetoric and the 2011 shooting of

8    Representative Gabby Giffords"?

9    A.  I see that.

10   Q.  And then it also references now here the correction

11   concerning the map and the districts versus individual

12   lawmakers?

13   A.  That's right.

14   Q.  And then let me show you Plaintiff's Trial Exhibit 10,

15   which should be the print edition of *The Times* from June 16th

16   of 2017.  Do you recognize this document?

17   A.  Yes.

18             MR. VOGT:  And at this point, your Honor, we would

19   move to introduce Plaintiff's Trial Exhibit 10 into evidence.

20             MR. AXELROD:  No objection.

21             THE COURT:  Received.

22             (Plaintiff's Exhibit 10 received in evidence)

23   Q.  And if you go down to the bottom of the page in the middle,

24   the correction should be there.

25   A.  Yes.

**JA 0756**

M281PAL6                     Bennet - Direct

1  Q.  Do you see that?  And we can agree that this correction

2  doesn't make any reference to the title of the editorial,

3  "America's Lethal Politics"; is that right?

4  A.  I agree.

5  Q.  And we can agree that this correction also doesn't contain

6  the word "incitement"?

7  A.  It does not contain that word.

8  Q.  And this correction also doesn't reference Sarah Palin's

9  political action committee, correct?

10 A.  That's correct.

11 Q.  Although it does say "a map distributed by a political

12 action committee."  Do you see that?

13 A.  I do.

14 Q.  And then Mr. Bennet, I wanted to show you Plaintiff's Trial

15 Exhibit 63.

16         MR. VOGT:  Just the witness.

17 Q.  Do you recognize this document?

18 A.  I do.

19         MR. VOGT:  And at this point, your Honor, we would

20 move to introduce Plaintiff's Trial Exhibit 63.

21         MR. AXELROD:  No objection.

22         THE COURT:  Received.

23         (Plaintiff's Exhibit 63 received in evidence)

24 Q.  And what is Plaintiff's Trial Exhibit 63, Mr. Bennet?

25 A.  It is a performance review that I would have gotten at some

**JA 0757**

M281PAL6                                    Bennet - Direct

1    point, maybe six months after this period we're talking about,

2    I think.

3              MR. VOGT:  If you zoom out on it.

4    Q.  Do you see in the upper right-hand corner, it says 2017?

5    A.  Yeah.

6    Q.  So was this your 2017 review?

7    A.  I -- I don't know.  I mean, it -- it begins -- the reason I

8    said six months later is it says "a year and a half since you

9    joined The Times," so the timing would be right, yes, 2017.

10   Q.  So this review would have been given to you in 2018?

11   A.  Most likely.

12   Q.  So this review would have been given to you after

13   "America's Lethal Politics" was published, correct?

14   A.  That's correct.

15   Q.  And if you go to the first bullet point, it says, "A list

16   of areas where you're doing great work is long, but I'll just

17   call out a few."  Do you see that?

18   A.  Yes.

19   Q.  And the first one there is editing.

20   A.  Mm-hmm.

21   Q.  And it says, "Your instinct for stories, framing, and

22   language is impeccable"; is that right?

23   A.  It says that.

24   Q.  And who gave you this review?

25   A.  I believe it was A.G Sulzberger.

**JA 0758**           Bennet - Direct

1   Q.  And who's that?

2   A.  He's now the publisher of *The Times*.  At this time I think

3   he -- I'm not -- I think he might have been the deputy

4   publisher.

5   Q.  And did you all actually have a conversation about this

6   review when it was given to you?

7   A.  We would have done that, yeah.

8   Q.  And at any point in time during the review were there any

9   issues raised concerning the "America's Lethal Politics"

10  editorial?

11  A.  I don't remember.

12  Q.  Did you get any marks against your record for the

13  publication of the "America's Lethal Politics" editorial?

14  A.  Marks against my record?

15  Q.  Any disciplinary action taken against you because of it?

16  A.  No, there was no disciplinary action.

17  Q.  Did you get reprimanded at all by management for the

18  "America's Lethal Politics" editorial?

19  A.  I appeared before the board of directors to say that -- to

20  take responsibility for the mistake and apologize.  I wasn't

21  asked to do that.  There just happened to be a meeting of the

22  board and -- I don't -- I don't know if that qualifies as a

23  reprimand, but it felt like -- it felt like one.

24  Q.  And I think you said you apologized to the board?

25  A.  That's my memory, yeah.

1    Q.  Did you ever apologize to Governor Palin?

2    A.  Mr. Vogt, my hope is that as a consequence of this process,

3    now I have.

4    Q.  As a consequence of this process, you mean the trial?

5    A.  Well, I -- I -- that document you showed a few minutes ago

6    from CNN, I tried that day.  I did -- I thought I had

7    apologized to her.  I went home that night thinking I had made

8    a personal apology to the Governor, and I guess my hope is that

9    that's now reached her, because it's in your hands.

10   Q.  And you're talking about an email that we got during

11   discovery in this case, correct?

12   A.  That's right.

13   Q.  But at the time apparently *The Times* had a policy against

14   apologizing to the subjects of stories; is that right?

15   A.  Yes.

16   Q.  So back in 2017 --

17   A.  No, no.  Excuse me.  I'm sorry.  Let me refine that, if I

18   may.  They had a policy, not -- not apologizing to the subjects

19   of stories, the apology -- they had a policy of not apologizing

20   for corrections.  And the reasoning for that -- and it's a

21   longstanding policy, although one of which I was unaware until

22   after this -- was that if you apologized every time, it becomes

23   meaningless, and the feeling of the standards editors I think

24   was that of course *The Times* regrets its errors; they're

25   correcting them.  That's an extremely painful thing for the

M281PAL6

1    journalists and is expressive of regret.  That is my

2    understanding of the basis for the policy.

3              THE COURT:  All right.  We've reached the end of our

4    day.  So ladies and gentlemen, we will continue tomorrow.

5    We'll see you at 9:30.  Have a very good evening.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA 0761**

M281PAL6

1          (Jury not present)

2          THE COURT:  Please be seated.

3          So the parties and counsel need to remain here until

4   my courtroom deputy comes back, which she will do very promptly

5   after the jury has been excused.  And I'll see you tomorrow at

6   9:00, and we'll go over the revised charges then.

7          (Adjourned to February 9, 2022, at 9:00 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 LINDA COHN

Direct By Mr. Turkel . . . . . . . . . . . . 512

Cross By Mr. Axelrod . . . . . . . . . . . . 553

Redirect By Mr. Turkel . . . . . . . . . . . 584

Recross By Mr. Axelrod . . . . . . . . . . . 595

 JAMES BENNET

Direct By Mr. Vogt . . . . . . . . . . . . . 598

**JA 0763**

PLAINTIFF EXHIBITS

Exhibit No.                                          Received

144   . . . . . . . . . . . . . . . . . . 522

140E    . . . . . . . . . . . . . . . . 525

140F    . . . . . . . . . . . . . . . . 540

140E    . . . . . . . . . . . . . . . . 542

155   . . . . . . . . . . . . . . . . . 576

178   . . . . . . . . . . . . . . . . . 578

5   . . . . . . . . . . . . . . . . . . 594

163   . . . . . . . . . . . . . . . . . 638

2   . . . . . . . . . . . . . . . . . . 641

3 and 4 . . . . . . . . . . . . . . . . 641

171   . . . . . . . . . . . . . . . . . 644

174   . . . . . . . . . . . . . . . . . 653

206   . . . . . . . . . . . . . . . . . 654

223 (page 1 only)  . . . . . . . . . . . 657

207   . . . . . . . . . . . . . . . . . 661

202   . . . . . . . . . . . . . . . . . 664

200   . . . . . . . . . . . . . . . . . 666

234   . . . . . . . . . . . . . . . . . 667

236 (page 1 only)  . . . . . . . . . . . 668

6   . . . . . . . . . . . . . . . . . . 670

10   . . . . . . . . . . . . . . . . . . 671

63   . . . . . . . . . . . . . . . . . . 672

```
                      DEFENDANT EXHIBITS

Exhibit No.                                    Received

33     . . . . . . . . . . . . . . . . . 566

30     . . . . . . . . . . . . . . . . . 571

126    . . . . . . . . . . . . . . . . . 643
```

M291PAL1

# JA 0765

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    SARAH PALIN, an individual,

 4                    Plaintiff,

 5              v.                        17 CV 4853 (JSR)

 6    THE NEW YORK TIMES COMPANY, et
      al.,
 7
                    Defendants.
 8
      ------------------------------x         Trial
 9
                                              New York, N.Y.
10
                                              February 9, 2022
11                                            9:23 a.m.

12    Before:

13                        HON. JED S. RAKOFF,

14                                            District Judge

15
                          APPEARANCES
16
      TURKEL CUVA BARRIOS, P.A.
17         Attorneys for Plaintiff
      BY:  SHANE B. VOGT
18         KENNETH G. TURKEL

19
      BALLARD SPAHR, LLP
20         Attorneys for Defendants
      BY:  DAVID L. AXELROD
21         JACQUELYN N. SCHELL
           THOMAS BYRNE SULLIVAN
22         JAY WARD BROWN

23

24    Also Present:

25    Dana Green, Senior Counsel, The New York Times Company
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA 0766**

M291PAL1

```
1              (In open court; jury not present)
2              THE COURT:  Please be seated.
3          So good morning.  I'm ready to hear any further
4     objections to the revised jury instructions.
5          I should point out, I have not yet decided the
6     punitive damages issue.  I just thought it would be convenient
7     to see one version which we previously had included the
8     punitive damage charge and now a version without it, so that
9     whichever way I decide, we can quickly come up with a final
10    charge.  But that issue is still alive.
11             An issue that I think is not alive is The New York
12    Times claim that this is not a case involving defamation per se
13    and therefore only special damages are available and maybe have
14    not been proved.  I think if the other elements of the claim
15    are established by plaintiff, it is defamation per se.  And
16    I've drafted my charge along those lines.
17             So let me hear first any further objections from
18    plaintiff's counsel.
19             MR. VOGT:  Your Honor, the only thing we have is in
20    instruction 13, on the actual malice instruction.
21             THE COURT:  Yes.  Hold on just one second.
22             Okay.  I'm there.
23             MR. VOGT:  So at the end of the second paragraph, the
24    Court has point (ii) there, serious doubt as to the truth of
25    the statement but chose to recklessly disregard the likelihood
```

**JA 0767**

M291PAL1

 1   that they were probably false.

 2              THE COURT:  Yes.

 3              MR. VOGT:  I think it's duplicative because reckless

 4   disregard is the serious doubt standard.  What we --

 5              THE COURT:  I'm sorry.  And actually, that was a

 6   mistake on my part that I didn't catch.  It should read -- I'll

 7   give the whole paragraph.

 8              Oh, no.  I'm sorry.  Go ahead.  Go ahead.  What is

 9   your problem with that?

10              MR. VOGT:  What we would say is:  He had serious

11   doubts as to the truth of the statements—I think that's the

12   actual standard itself, but—and chose to publish them anyway,

13   period.  Or, alternatively, do the reckless disregard part of

14   it, because I think those two things are synonymous.  And chose

15   to publish them in reckless disregard to the likelihood that

16   they were probably false.

17              THE COURT:  Let me see.

18              All right.  So with one slight change from what you're

19   suggesting, it would now read—and then I'll hear from defense

20   counsel—"(ii) he consciously chose to recklessly disregard the

21   likelihood that they were probably false."  I think it's

22   important to always keep in mind that reckless disregard

23   includes an intentional element.  It's an intentional element

24   to disregard, but it's not the same as gross negligence.  It's

25   a conscious decision.  But with that slight change, I would go

**JA 0768**

1    with what you said.

2            Let me hear from defense counsel.

3            MR. BROWN:  Your Honor, we agreed with plaintiff's

4    initial point in that regard.  Could I just ask the Court to

5    read back (ii) again, the whole thing.

6            THE COURT:  Yes.  I'll read the whole thing.  This is

7    the second paragraph of Instruction No. 13:

8            "The first aspect of actual malice you must decide is

9    whether, at the time the editorial was published, Mr. Bennet

10   and therefore The New York Times Company (i) knew that either

11   or both of the allegedly defamatory statements he had drafted

12   were in fact false, or that, at a minimum, (ii) he consciously

13   chose to recklessly disregard the likelihood that they were

14   probably false."

15           And then of course I explain reckless disregard in

16   much more detail in the following paragraph.

17           MR. BROWN:  Your Honor, we would just suggest adding

18   to the end of it, "and published them anyway," as plaintiff had

19   initially proposed.

20           THE COURT:  Well, I thought the publication issue was

21   one everyone agreed on so there was no need to, you know -- I

22   say in the beginning of the sentence, "At the time the

23   editorial was published," so what more do you need?

24           MR. BROWN:  Simply an effort to avoid juror confusion,

25   your Honor, but I take your Honor's point.

M291PAL1

1           THE COURT:  All right.  Okay.  Anything else from

2      plaintiff?

3           MR. VOGT:  And then, your Honor, it says:  "In

4      considering what was in Mr. Bennet's mind."  And obviously I

5      understand what the Court's trying to do there.  I just think

6      it may be confusing.  If it could be:  "In considering

7      Mr. Bennet's state of mind," because that's consistent with

8      what's in the first paragraph.

9           THE COURT:  Yes.  Why not?

10          MR. VOGT:  And that's -- if the Court's going to make

11     that change --

12          THE COURT:  This is what you asked for, I thought, at

13     an earlier conference, and I put it up much higher than we had

14     originally talked about, just --

15          MR. VOGT:  I'm not objecting to the premise.  I'm just

16     saying the one small portion that says:  "In considering what

17     was in Mr. Bennet's mind --"

18          THE COURT:  What would you suggest?

19          MR. VOGT:  It's just that portion, saying, "In

20     considering Mr. Bennet's state of mind," because that's the

21     terminology the Court uses in the very first paragraph.

22          THE COURT:  I see.  I'm sorry.  I missed your point.

23     "In considering Mr. Bennet's state of mind."  That's fine.

24          Okay.  Anything else?

25          MR. VOGT:  And then on the second page of this

**JA 0770**

1   instruction, the second -- the next to last paragraph --

2              THE COURT:  Yes.

3              MR. VOGT:  -- the second aspect, that very last

4   sentence, where the Court says, "As previously noted, reckless

5   disregard is only satisfied if the plaintiff has proved there

6   was a high probability that Mr. Bennet purposely chose to

7   defame."  I would ask that that be changed to "consciously,"

8   which is the change the Court just made in the prior

9   instruction as well.

10             THE COURT:  Okay.  That's fine.  I will make that

11  change.

12             Anything else?

13             MR. VOGT:  No, your Honor.

14             And just on the punitive damages issue, since the

15  Court hasn't decided that yet, we submitted our memoranda of

16  law --

17             THE COURT:  Yes, that was very helpful, and as I

18  indicated previously, we'll take that up at the close of the

19  evidence.

20             MR. VOGT:  Okay.  And I just want to point out to the

21  Court, there was one thing I overlooked in those that dawned on

22  me, which is that -- you brought this up the other day -- the

23  New York legislature very recently passed the anti-SLAPP

24  statute in New York and did not preclude punitive damages or

25  require the standards that The New York Times has requested

**JA 0771**

M291PAL1

1    when it enacted that statute, and New York Civil Rights Act

2    70-a(1)(c) actually discusses punitives --

3              THE COURT:  Yes.  But only because, through my fault,

4    we were a little late in starting, I'm going to discuss

5    everything about punitive damages, including anything you

6    forgot to put in your papers, at the close of the case.

7              MR. VOGT:  Okay.  I just didn't want to leave it

8    hanging out there when your Honor brought it up.

9              THE COURT:  Now before we hear from defense counsel,

10   let me ask my courtroom deputy, are all the jurors here?

11             THE DEPUTY CLERK:  Yes, they are.

12             THE COURT:  So unless defense counsel only has like

13   one or two changes -- but judging from previous discussions, I

14   thought you might have more -- if you only have one or two,

15   we'll do it right now; if not, we'll do it at the next break.

16             MR. BROWN:  We only have two and a half, your Honor.

17             THE COURT:  All right.  Well, let's do it now.

18             MR. BROWN:  Okay.  Your Honor, with respect to

19   instructions 9 and 10, libel in general and defamatory meaning,

20   we believe that one important point that had been in the

21   Court's first draft of these instructions, but which has been

22   removed entirely here, should be added back in, and that is a

23   reference to what plaintiff alleges the defamatory meaning of

24   the two challenged statements to be.  And I'll first tell you

25   what I think that --

**JA 0772**

M291PAL1

1          THE COURT:  All right.  This is going to be a longer

2     discussion.  But we will get to it at the next break, so --

3          MR. BROWN:  Fair enough.

4          THE COURT:  Very good.  Let's bring in the jury.

5     Let's get the witness on the stand.

6          MR. AXELROD:  Your Honor, I have one point.  I have a

7     physical exhibit which you have not seen.  It's just a physical

8     copy of the newspaper of June 15th.

9          THE COURT:  Okay.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA 0773**

M291PAL1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    SARAH PALIN, an individual,

 4                    Plaintiff,

 5              v.                          17 CV 4853 (JSR)

 6    THE NEW YORK TIMES COMPANY, et
      al.,
 7
                    Defendants.
 8
      ------------------------------x        Trial
 9
                                             New York, N.Y.
10
                                             February 9, 2022
11                                           9:23 a.m.

12    Before:

13                      HON. JED S. RAKOFF,

14                                           District Judge

15
                           APPEARANCES
16
      TURKEL CUVA BARRIOS, P.A.
17         Attorneys for Plaintiff
      BY:  SHANE B. VOGT
18         KENNETH G. TURKEL

19
      BALLARD SPAHR, LLP
20         Attorneys for Defendants
      BY:  DAVID L. AXELROD
21         JACQUELYN N. SCHELL
           THOMAS BYRNE SULLIVAN
22         JAY WARD BROWN

23

24    Also Present:

25    Dana Green, Senior Counsel, The New York Times Company
```

```
 1              (Jury present)

 2              THE COURT:  Please be seated.

 3              So ladies and gentlemen, thank you again for your

 4   promptness.  I really am impressed with this jury.  In fact, I

 5   have, after this trial, another trial.  It will last about four

 6   or five weeks.  You wouldn't mind staying on for that trial,

 7   would you?  Maybe not.

 8              Okay.  Let's continue.

 9              MR. AXELROD:  Your Honor, I think Mr. Vogt has

10   finished, so I'm going to take my turn now.

11              THE COURT:  Ah, okay.

12    JAMES BENNET, resumed.

13   CROSS EXAMINATION

14   BY MR. AXELROD:

15   Q.  So good morning, Mr. Bennet.

16   A.  Good morning, Mr. Axelrod, and everyone.

17   Q.  How old are you?

18   A.  Excuse me?

19   Q.  How old are you?

20   A.  I wasn't expecting that one.  I'm 55.

21   Q.  And that was a trick question.  I apologize.

22   A.  Yeah.  55.

23   Q.  And you're married?

24   A.  I am married.

25   Q.  And you have two kids?
```

**JA 0775** Bennet - Cross

1   A.  Yes, we have two boys.

2   Q.  And you joined -- you rejoined *The New York Times* in May of

3   2016; is that right?

4   A.  That's right.

5   Q.  And when you were -- when you rejoined in May of 2016, what

6   was your title?

7   A.  Editorial page editor.

8   Q.  And what were your responsibilities as editorial page

9   editor?

10  A.  I oversaw the opinion pages of the *New York Times*, or the

11  opinion department, which is separate from the newsroom and

12  much smaller.  The news organization is vast.  And opinion is,

13  at the time -- I'm not sure -- a hundred, hundred twenty

14  people, and we published -- we did opinion journalism in a

15  variety of ways that we've discussed—there were columnists

16  writing columns; there's the editorial board producing the

17  daily editorials; we ran the letters to the editor, another

18  form of opinion and commentary; and then op-eds that were

19  pieces solicited or -- or volunteered from the public at large.

20  And that was -- those were the basic elements of the work when

21  I arrived.

22  Q.  And you were responsible for all of that?

23  A.  I was responsible for all of that.

24  Q.  Every day?

25  A.  Every day.

                                    Bennet - Cross

1   Q.  Now you talked about the editorial board, and I know we've

2   talked about it a lot during this trial, but could you just

3   again explain to the jury what the editorial board is and what

4   its function is.

5   A.  Yeah.  It's really a complicated -- it's not complicated,

6   but it's hard to understand.  It's a -- it's a kind of a

7   newspaper tradition that I'm afraid it's often confusing even

8   to people who work in the media.  And actually, I think you all

9   have heard various descriptions of -- over the course of this,

10  of what exactly the views the editorial board represent.  The

11  editorial board is basically a writers collective.  It's a

12  group of writers, and editors, with varying kinds of expertise,

13  that are meant to come together as a group to debate the issues

14  of the day and decide which merit commentary and then what the

15  position should be.  And you've heard that that position is the

16  position of the institution or the position of the publisher,

17  and this is kind of where the confusion could be, because it

18  could look like the editorial board is also speaking for the

19  newsroom.  It doesn't.  You know, the editorial board is

20  separate, and the opinions it expressed are not opinions that

21  are held, or should in any way be evidenced, by the newsroom

22  itself.  And it's an old tradition in newspapers.  I mean, it

23  goes way, way, way back.  And when it's working well, it's a --

24  it's a -- it's a kind of beautiful thing, because you have

25  these debates and -- and, you know, the more good minds you

1   bring to bear on a problem, ideally, the better result you get.

2   And that really was the purpose of the board.  It fit --

3   Q.  No.  Go ahead.  I was going to follow up on something.

4   A.  Well, just to say a word about what we were trying to do in

5   opinion at the time, when I got there.  *The Times*, when -- when

6   the family that controls the paper now bought the paper in the

7   late 19th century, there was this famous statement from there

8   that everybody knows -- not everybody knows, but famous

9   statement that *The Times* would give the news without fear or

10  favor.  In the same statement, there is words about the

11  ambition of the opinion section, and that was that it was going

12  to provide intelligent discussion from every shade of opinion.

13  And you know, my feeling when I got there, and I was asked to

14  come in to --

15          THE COURT:  Counsel --

16          THE WITNESS:  Okay.

17          THE COURT:  -- sounds to me this is going well

18  beyond --

19          THE WITNESS:  Okay.

20          THE COURT:  -- the scope of the question.

21          THE WITNESS:  I'm sorry.  My apologies.  That's my

22  fault.

23  A.  It's just, the editorial board, anyway -- I'm sorry -- it

24  plays a role in the ecosystem of opinion, ideally, and that's

25  what I was trying to describe.

```
 1  Q.  Thank you, Mr. Bennet.  And in the middle of your answer,
 2  you talked about how it's distinct from the newsroom, so -- or
 3  the news side.  When you were running the editorial board,
 4  would you coordinate what you were publishing in opinion with
 5  the news side in any way?
 6  A.  No, no.
 7  Q.  Did you review any news stories before they were published?
 8  A.  No, I didn't.
 9  Q.  And did the news side review any editorial content before
10  it was published?
11  A.  No.
12  Q.  And then finally, one other distinction that I just want to
13  make clear:  How would you contrast an op-ed to what the
14  editorial board was doing?
15  A.  Op-ed -- op-eds are from outside writers.  They're very
16  separate from the editorial board, and actually, ideally, they
17  present opinion -- that's the origin of the term is that
18  they're -- when the op-ed page was created 50 years ago, that
19  they were supposed to take positions different than the
20  editorial board to present kind of argument about the issues of
21  the day to our readers and to, you know, help keep the board
22  honest in its own opinions.
23  Q.  Now turning to something very tangible, back in 2017 you
24  were kind of at the top of the organizational pyramid in
25  opinion; is that right?
```

1   A.  Yes.

2   Q.  And then break it down for us.  Who was kind of below you

3   that reported up to you?

4   A.  Well, I had two deputies, one of whom oversaw the editorial

5   board, and this is -- we restructured this whole operation over

6   the course of that -- I don't know -- year or two, but -- but

7   at the time there was one who -- who oversaw the board and then

8   the other deputy oversaw the rest of the operation, which was

9   all the op-eds and all the columnists and so forth.

10  Q.  And --

11  A.  And we added -- I should have said we added a video opinion

12  operation and a podcasting/audio operation, and all of these

13  things were changing in the period that we're talking about.

14  Q.  As the editor of the opinion section, did you have a view

15  as to your responsibility as to the content that the section

16  published?

17  A.  I was ultimately responsible for all of it.

18  Q.  Now I want to do something very basic.  I'm going to hand

19  you what's been marked as DX -- sorry.  I'm going to speak in

20  the mic -- as Defense Exhibit 137.

21          MR. AXELROD:  Your Honor, may I approach?

22          THE COURT:  Yes.

23  Q.  And Mr. Bennet, do you know what Defense Exhibit 137 is?

24  A.  It's the edition of *The New York Times* the day after the

25  shooting that we've been discussing.

1   Q.  So that would be the paper from June 15th of 2017?

2   A.  Yeah.  It was a Thursday.

3   Q.  And if you could, could you just hold the front section up

4   to the jury so they can see it.

5          Okay.  So we're going to do something really basic.

6   Where are -- could you show the jury where editorials from the

7   editorial board are published in the paper.

8   A.  Yeah.  On a weekday, they're in the back of the A -- what's

9   called the A section, the first section of the -- of the paper.

10  So -- so here, the last two print pages, are the opinion pages

11  of *The Times*, and the editorials are here on the left, you'll

12  see.  They were described earlier.  There's three of them.

13  That's what was typical at the time.  And this -- sorry.  This

14  is the op-ed page that I was describing, and typically there

15  would be two columnists and two outside contributors who would

16  appear on that page.  And then the letters are here.

17  Q.  And if you could just keep holding that up for a second.

18  How often -- when you were at *The Times* as the editor of the

19  opinion section, how often would the opinion section run a

20  correction?

21  A.  I can't -- I can't give you a precise number.  It would

22  happen, you know -- it happened as seldom as possible.  It

23  didn't -- it wasn't -- it wasn't -- I mean, it's a routine part

24  of the process of journalism, people do make mistakes, and we

25  would correct those, but -- but it didn't -- I don't think we

M291PAL1                        Bennet - Cross

1    had very many.

2    Q.   And where would corrections run?

3    A.   They'd be run in proximity to wherever the piece -- I mean,

4    the news corrections run in the front pages of the paper.

5    That's where there's a space devoted to that every day.

6    Actually, I don't see it here.

7    Q.   But focusing on corrections in opinion, where do

8    corrections in opinion go?

9    A.   Yeah, I'm sorry.  We'd run corrections to the editorials as

10   the same column in editorials and corrections to op-eds and

11   columns on this side.

12   Q.   Okay.  And are corrections treated any differently in the

13   opinion section than they are in the news side?

14   A.   No.

15   Q.   While you were the editor of the opinion section, did you

16   have conversations with opinion section employees about

17   fact-checking?

18   A.   Yes.

19   Q.   Why?

20   A.   It was just a very, very important part of the process to

21   ensure the accuracy of our work.

22   Q.   Now turning to the case we're here about, have you ever met

23   Ms. Palin?

24   A.   No, I haven't.

25   Q.   Have you ever written anything about Ms. Palin besides

**JA 0782**

M291PAL1                            Bennet - Cross

1    mentioning the PAC in the editorial?

2    A.  No.

3    Q.  Now how did you first -- turning back to June 14th of 2017,

4    do you recall how you first heard about the shooting in

5    Virginia where Congressman Scalise was shot?

6    A.  I don't remember how I first heard about it.  I mean, I

7    probably got a news alert about it on my phone would be my

8    guess, but I'm not sure.

9    Q.  Do you recall having any -- what your initial reaction was

10   when you heard that news?

11   A.  Just that it was horrific.  I mean, you know, like

12   everybody else, I was just shocked and horrified at the news.

13   Q.  When it happened, when you found out about the shooting,

14   did you think about it as a potential editorial for *The Times*?

15   A.  I can't remember my thought process that day.  It's been --

16   I'm sure I would have -- yes, I mean, it's the kind of major

17   news event that, you know, traditionally the board would

18   comment on and our readers would expect us to comment upon.

19          MR. AXELROD:  So Mr. DiMezza, if you could put up

20   Defense Exhibit 16, please.  It's already in evidence.

21   Q.  And so this is an email that we've seen before during this

22   trial, Mr. Bennet.  And I'm really focusing at the 11:50 email

23   from Robert Semple.  Do you see that one in the middle that

24   Mr. DiMezza just highlighted?

25   A.  Yes.

M291PAL1                          Bennet - Cross

1   Q.  So Mr. Semple writes here about making a point about guns

2   with a potential editorial.  Do you see that?

3   A.  I do.

4   Q.  What did you think about focusing the editorial on gun

5   regulations?

6   A.  It seemed like a logical point to be made in the course

7   of -- of writing the editorial that day.

8   Q.  Why?

9   A.  Well, as Bob writes here, it's, you know, the -- it's a

10  longstanding focus of the editorial board, which has pressed,

11  you know, for years for what we regard as sensible, you know,

12  gun safety measures, tightening licensing requirements and so

13  forth, and, you know, it's a -- it's, I guess, a theory, a

14  hypothesis of the board, and has been for a long time, that

15  easy access to firearms increases the likelihood of this kind

16  of violence, and the lethality of this kind of violence.

17  Q.  So then if you look at this exhibit, at the very top

18  there's an email from Mr. Semple at 12:08 where he says, "Ok,

19  we should definitely shoot for a piece, not huge, but a piece."

20  And then he makes the comment about Jimmy Connors.  So that's

21  12:08.

22          MR. AXELROD:  Mr. DiMezza, if you could take that down

23  and put up DX 17, which is in evidence.

24          If you could blow that up for Mr. Bennet.  Thank you

25  very much.

1   Q.  So that was 12:08, so we're about 30 minutes,

2   approximately, later, and you write this email to

3   Ms. Williamson, Mr. Semple, Mr. Fox, and Ms. Cohn, and you

4   write, "Hey, Elizabeth -- As Bob has said there's most likely a

5   gun control point to be made here.  The other question is

6   whether there's a point to be made about the rhetoric of

7   demonization and whether it incites people to this kind of

8   violence."  And we'll go through it in total, but why did you

9   write this email?

10  A.  This issue of, you know, increasingly kind of poisonous

11  political environment also had been a preoccupation of the

12  board, and it's something I also just personally worry about a

13  lot, and, you know -- and as I've said, I mean, my expectation

14  was that in the past, in an incident like this, and

15  specifically in the Gabby Giffords shooting, my guess at the

16  time, though I didn't know, was that the board, because this is

17  a point that we would make in a situation like this, would have

18  raised this question then too.

19  Q.  So focusing on the sentence that starts with, "The other

20  question," which is the second sentence.

21  A.  Yeah.

22  Q.  "The other question is whether there's a point to be made

23  about the rhetoric of demonization."  And so I want to stop

24  right there.  How would you describe "the rhetoric of

25  demonization"?  What is that?

1    A.  It is political rhetoric that in -- that -- that increases

2    dramatically kind of the heat of the political debate here,

3    language in which we treat each other as -- as enemies, you

4    know, rather than political opponents; words like "traitor,"

5    "evil," that have become fairly frequently used in our

6    politics, and by the way, in our media as well.  And I -- I

7    think it's the risk of -- I think it's bad for our politics in

8    the first place, makes it harder to get anything done or to

9    compromise, which is a requirement of our system, and -- and I

10   worry that -- that there's a great risk that it can lead to

11   violence particularly, and I think the warning has kind of

12   borne out in the last couple years, when it's combined, you

13   know, with a great deal of misinformation that's now pouring

14   into our system, that's a very, very volatile con --

15   combination, in my opinion.

16   Q.  So that in this sentence, as you said, "The other question

17   is whether there's a point to be made about the rhetoric of

18   demonization," and now focusing on the second half, "and

19   whether it incites people to this kind of violence."  And what

20   did you mean when you wrote "whether it incites people to this

21   kind of violence"?

22   A.  Yeah, I think "whether" is an important word in this

23   sentence.  You know, I've got it there twice.  I'm -- I'm

24   putting this to my colleagues as -- I'm raising it as a point

25   to be considered as something we might include, you know, the

1  other question is whether there's a point to be made about

2  this.  And then I say the point -- in my mind, the point is

3  whether it incites people to this kind of violence.  I didn't

4  write that it incites people to this kind of violence.  And I

5  think that's a significant difference.  My intention was to

6  raise a question, to make an argument that this was this danger

7  but not to assert it as a matter of fact.  Because like the

8  easy availability of guns, you know, I don't have -- I can't

9  prove -- I can't prove that this kind of rhetoric actually, you

10  know, does lead to this sort of violence.

11  Q.  In the next portion, you write, "Hard for me to imagine

12  Bernie himself is guilty of anything like that."  And why did

13  you write that?

14  A.  I must have known by then that this -- the assailant that

15  day had, you know, indicated that he was a passionate supporter

16  of Bernie Sanders.

17  Q.  But why was it hard for you to imagine that Bernie

18  himself -- and I'm kind of using your email -- was guilty of

19  the rhetoric of demonization?

20  A.  It's just not the kind of language that at least I had

21  heard him use or the kind of -- I just hadn't -- hadn't

22  heard -- heard -- I hadn't heard that kind of rhetoric from

23  him.

24  Q.  And then the next sentence:  "But if there's evidence of

25  the kind of inciting hate speech on the left that we, or I at

M291PAL1                          Bennet - Cross

1    least, have tended to associate with the right (e.g., in the

2    run-up to the Gabby Giffords shooting) we should deal with

3    that."  What did you mean by the phrase "the kind of inciting

4    hate speech"?

5    A.  This rhetoric of demonization and even dehumanization that

6    can create this environment that -- in which these kinds of

7    events become more common.

8    Q.  And going back to something Mr. Vogt asked you, when you

9    used the word "incite" -- you used the word "incite" in the

10   first part and "inciting hate speech" on the second -- were you

11   meaning to convey only that incitement as direct orders?

12   A.  No, no.  I mean, I -- I -- I -- you can incite hate, you

13   know, you can incite anger, you can incite passion, you can

14   even incite doubt, yes, you can incite violence, and it is used

15   that way, but there's a reason, when it's used that way, that

16   the word "violence" appears, because you're making it clear

17   that that's what you mean.  "Incite" requires an object as a

18   verb.  You can't just say you incite, you know.

19   Q.  On the morning of -- this is now 12 --

20           THE COURT:  What did you mean by the parenthetical,

21   "e.g., in the run-up to the Gabby Giffords shooting"?

22           THE WITNESS:  I -- again, it's hard for me to say

23   exactly, your Honor, what I was thinking at that moment, but my

24   memory is that I remember that there had been a debate in

25   advance -- or after that shooting about -- about exactly this

M291PAL1                          Bennet - Cross

1    issue, about, you know, inciting rhetoric, but my memory of

2    that was vague.  It's possible, though, I might have read

3    something already that day that -- that made that connection.

4    I don't know.

5                   MR. AXELROD:  Your Honor, may I?

6                   THE COURT:  Go ahead.

7    BY MR. AXELROD:

8    Q.  Going back but following up on his Honor's question, going

9    back to the time when Congresswoman Giffords was shot in

10   January of 2011, I mean, do you recall what the political

11   environment was like in 2010 right before that shooting?

12   A.  Yeah.  It was just becoming more and more heated.  This

13   was, you know, two years into the Obama Administration; the Tea

14   Party movement was -- was going strong, and, you know,

15   partisanship in Washington had become really ratcheted up, and

16   you know, part of that was that, you know, people were, again,

17   starting to treat each other, in my view, you know, really as

18   enemies.

19   Q.  On June 14th, did *The Times*, as far as you know, research

20   whether there was any type of inciting hate speech that

21   preceded or targeted Congressman Scalise?

22   A.  I asked Elizabeth -- I mean, this is -- this isn't that

23   email, but I did ask Elizabeth to see if -- if she could find

24   any such hate speech that linked the victims that day to this

25   atmosphere, you know, to this -- to this rhetoric of

**JA 0789**         Bennet - Cross

1   demonization.

2   Q.  And did anyone at *The Times* find any such rhetoric that

3   targeted those ballplayers or Mr. Scalise, or Congressman

4   Scalise?

5   A.  I don't know if anybody at *The Times* did, but Elizabeth did

6   not.

7   Q.  At about this time, did you have an assumption about

8   whether there was a political connection to Congressman Scalise

9   and the ballplayers being targeted?

10  A.  Yeah, I did.  I mean, you know, my assumption is that when

11  a politician gets shot, that politics probably had something to

12  do with it.  And in this case, you know, a guy takes a rifle,

13  drives a long way, starts shooting a bunch of congressmen on a

14  field, I -- my assumption is that politics is somehow

15  connected.  Remember, we quoted one of the congressmen saying,

16  "He was hunting us."  You know, I mean, he wasn't hunting

17  anything else, you know, he wasn't hunting -- he was going

18  after these guys.  So yes, my assumption -- again, can't prove,

19  couldn't prove it, but for purposes of making an argument, I

20  think it's reasonable to -- to think that.

21              (Continued on next page)

22

23

24

25

M292Pal2                          **JA 0790**        Bennet - Cross

Q.  At the time that you wrote this e-mail, when you wrote the

parenthetical "e.g., and the run-up to the Gabby Giffords

shooting," do you know if you recalled the crosshairs map that

was published in 2010?

A.  I don't think I did.

Q.  If you can take that down, Mr. DiMezza, and put up Defense

Exhibit 21, please, which is already in evidence.  Thank you.

If you could blow that up.

          So here, almost 20 minutes later, after you sent your

e-mail on the 14th, and Mr. Semple is sending this e-mail to

Ms. Williamson, informing her that she had Phoebe send her four

basic gun control pieces that also happened to mention

Gabrielle Giffords, and I think it was your testimony — correct

me if I got it wrong — that you don't recall whether you read

any of those pieces?

A.  I don't.  I should say I don't know what I was doing this

day, but it was unfortunately typical for me to be in meetings

all day long and then to emerge late in the day to -- and it

drove my colleagues a little bit crazy, to then get very

immersed in the editorial process.

Q.  At this time, before Ms. Williamson writes her piece or

finishes writing her piece, did you instruct her to include a

discussion of Ms. Palin's political action committee or its

map?

A.  No.

M292Pal2                     Bennet - Cross

1  Q.  Do you know if anyone at *The Times* instructed

2  Ms. Williamson to discuss the crosshairs map in the draft?

3  A.  I don't know of anybody having done that.

4  Q.  Mr. DiMezza, you can take that down and put up Defense

5  Exhibit 25, which is in evidence.  Thank you.

6          So Mr. Bennet, focusing you on the bottom e-mail, so

7  this is 1:40, where you see Ms. Williamson e-mails Ms. Lett,

8  "Phoebe, thanks.  Is there one that references hate type speech

9  against dems in the run-up to her shooting?  James referenced

10  that."

11          At this time, so early afternoon on the 4th, were you

12  aware of any editorial that talked about hate-type speech in

13  the run-up to the Arizona shooting?

14  A.  I wasn't.  Again my supposition was that there probably was

15  such an editorial, but I hadn't seen it at this point.

16  Q.  And so then moving up the chain, Ms. Lett e-mails you.  She

17  says, "I'm trying to find the piece Elizabeth is referring to

18  here.  Do you happen to know which one she is talking about?"

19          And then at 2:07 you respond, "No, I was just

20  wondering if there was such a piece; that is, did we ever write

21  anything connecting the Gifford shooting to some kind of

22  incitement?"

23          And again, not to belabor this point, but when you

24  used the word "incitement" here, what do you have in your mind?

25  A.  The same atmosphere of incendiary political rhetoric.

**JA 0792**          Bennet - Cross

1  Q.  Now, if we go up, Ms. Lett then writes you and says "No,

2  but Frank Rich did."

3          And then you respond, "Good for us.  Can you let

4  Elizabeth know?"

5          I think it was your testimony yesterday that you don't

6  know what you meant by "good for us"?

7  A.  No.

8  Q.  Do you know why you wanted Ms. Lett to let Elizabeth know

9  that there were no editorials?

10  A.  Because --

11          MR. VOGT:  Objection.

12          THE COURT:  Hold on.

13          Overruled.  You may answer.

14  A.  In a sense, she needed to know that there wasn't a

15  precedent regarding the shooting of the Congressman in terms of

16  an argument made by the editorial board that she needed to be

17  bound by; that is, you know, we didn't need to -- she didn't

18  need to -- again, it's just very important, it's very important

19  to all of us, for us to be consistent across time, and if in

20  fact we hadn't commented at all on the previous shooting, she

21  didn't have to -- she didn't have to know what we said because

22  we didn't say anything.  If we had said something, she would

23  need to know that and factor it into her writing.

24  Q.  So if you can take that down, Mr. DiMezza, and put up

25  Defense Exhibit 26, which is in evidence.  Actually I take it

1   back.  I don't know if this one is in evidence.  If you can put

2   it up for Mr. Bennet and we will be careful and admit it

3   anyway.

4          So, Mr. Bennet, do you know what Defense Exhibit 26

5   is?

6   A.  This is a further exchange by e-mail between me and Phoebe

7   about the editorials.

8          MR. AXELROD:  Your Honor, I would move for the

9   admission of Defense Exhibit 26.

10          MR. VOGT:  No objection.

11          THE COURT:  Received.

12          (Defendant's Exhibit 26 received in evidence)

13   BY MR. AXELROD:

14   Q.  Mr. DiMezza, you could publish that, please.

15          Mr. Bennet, this is a little bit later.  We are now

16   moving later in the afternoon.  So after you write "good for

17   us, can you let Elizabeth know," Ms. Lett responds, "Yes,

18   already did.  Thanks for helping." then you write, "Thanks.

19   Can you send me the pieces you sent Elizabeth"?

20   A.  Oh.  I might have been wrong.  I'm not sure what this was.

21   I don't know if this was -- I'm sorry, Mr. Axelrod.  I'm --

22   I've lost the sequence now.  There were some pieces she had

23   sent earlier in the day.  I don't know if I had received those

24   already, so I don't know if I'm referring here to those pieces

25   or the ones that she subsequently found when she looked a

1    little further.

2    Q.  I will try to --

3    A.  Sorry.

4    Q.  I'm not trying to confuse you.  I will try to put this in

5    context for you.

6    A.  All right.

7    Q.  So this is 2:52:20.  Now, Mr. DiMezza, if you could put up

8    DX 27 for Mr. Bennet alone.

9            And Mr. Bennet do you know what this exhibit is, just

10   telling us very superficially what it is?

11   A.  This is -- this is an e-mail forwarded by Phoebe of an

12   e-mail that she had sent previously to Elizabeth, Bob, and

13   Linda, with the editorials.

14           MR. AXELROD:  Your Honor, I move for admission of

15   Defense Exhibit 27.

16           MR. VOGT:  No objection.

17           THE COURT:  Received.

18           (Defendant's Exhibit 27 received in evidence)

19   BY MR. AXELROD:

20   Q.  Mr. DiMezza, can you please publish that.

21           So this is 19 seconds after you asked Ms. Lett to send

22   you the pieces she sent to Ms. Williamson, so what do you think

23   is going on here?

24   A.  I think -- my memory is that I -- it didn't make sense to

25   me that we hadn't editorialized about the shooting of Gabby

1    Giffords.  It was just it was a major news event, like the

2    shooting of Steve Scalise and the other Congressmen that day.

3    So my memory is that I asked Phoebe to go back and look again,

4    and that's when she found these.

5    Q.  Hold on.  I want to put up this.  I don't want to confuse

6    you.  So this is at 2:52:39?

7    A.  Oh, no.  Oh God.  Sorry, everybody.

8    Q.  Mr. DiMezza, if you could put up DX 28, please, which is in

9    evidence.  All right.

10   A.  Sorry.  Here, yeah.

11   Q.  Don't apologize.  I'm not trying to trick you.

12   A.  No, I know, but I'm just not --

13             THE COURT:  Counsel and witness, questions and

14   answers, please --

15             THE WITNESS:  Yeah, sorry.

16             THE COURT:  -- not interplay.

17             MR. AXELROD:  Yes, your Honor.

18   BY MR. AXELROD:

19   Q.  So this is nine minutes later, Mr. Bennet.  Phoebe Lett had

20   sent you two editorials at 3:01, and you then forward them to

21   Ms. Williamson at 3:03 saying, "We dug a little further.  Take

22   a look at these two."

23   A.  Okay.

24   Q.  Do you remember why you dug a little further?

25   A.  As I said, it just didn't make sense that we hadn't

1  editorialized about this.

2  Q.  And why did you send these to Ms. Williamson?

3  A.  Because they were relevant precedent for what we were going

4  to write that day, and she should factor the ideas in those

5  pieces, she should consider as she was writing the editorial.

6  Q.  And Mr. DiMezza, if you can take that down and put up

7  PX 136 which is in evidence.

8            MR. VOGT:  What was that one, that number?

9            MR. AXELROD:  Sorry, that was Defense Exhibit 28.

10           MR. VOGT:  Thank you.

11  BY MR. AXELROD:

12  Q.  And so now trying to put this in time and focus on your

13  e-mail at 3:05.

14           It is right in the middle, Mr. DiMezza.  Thank you.

15           Mr. Bennet, you wrote, "FYI, these are two more

16  relevant precedent for tonight's piece.  Elizabeth has them,

17  too."  Do you see that?

18  A.  Yes.

19  Q.  Do you know why you wrote "these are more relevant

20  precedent for tonight's pieces"?

21  A.  Because they were about the previous shooting.

22  Q.  So let's put up Defense Exhibit 29, which is in evidence,

23  and are those two pieces.  So this is the first piece,

24  "Bloodshed and Invective in Arizona."  Do you see that?

25  A.  I do.

M292Pal2                    JA 0797
                           Bennet - Cross

1    Q.  I'm not going to go through this whole piece again, which

2    we did with Ms. Williamson, but if you look at the third

3    paragraph, and this is talking about Jared Loughner, it says,

4    "But he is very much a part of a widespread squall of fear,

5    anger and intolerance that has produced violent threats against

6    scores of politicians and infected the political mainstream

7    with violent imagery.  With easy and legal access to

8    semiautomatic weapons like the one used in the parking lot,

9    those already teetering on the edge of sanity can turn a threat

10   into a nightmare."

11             What did you think about this passage?

12   A.  I can't remember what I thought at that moment, but, you

13   know, it tracks with the --

14             MR. VOGT:  Objection.

15             THE COURT:  Sustained.  The rest of the sentence will

16   stand.

17   BY MR. AXELROD:

18   Q.  Looking at the kind of message in this paragraph, how would

19   you compare this to the point that you ended up trying to make

20   in "America's Lethal Politics"?

21   A.  It's the same point.

22   Q.  And Mr. DiMezza, if we can take this down and go to the

23   second paragraph of the second page.

24             And here, in this earlier editorial from 2011, it

25   writes, "It is facile and mistaken to attribute this particular

**JA 0798**                 Bennet - Cross

1    madman's act directly to Republicans or Tea Party members.  But

2    it is legitimate to hold Republicans and particularly their

3    most virulent supporters in the media responsible for the gale

4    of anger that has produced the vast majority of these threats,

5    setting the nation on edge.  Many on the right have exploited

6    the arguments of division, reaping political power by

7    demonizing immigrants, or welfare recipients, or bureaucrats.

8    They seem to have persuaded many Americans that the government

9    is not just misguided, but the enemy of the people."

10            And same question, Mr. Bennet.  How would you compare

11   the point that is be being made in this paragraph to the point

12   you were trying to make in "America's Lethal Politics"?

13   A.  To me, it's the same.  It's the same point.

14   Q.  And what is that point?

15   A.  It is that we should be, you know, I mean, this is

16   obviously clearly directed straight at Republicans, but -- so

17   not "we" being all of us in this case, it's Republicans

18   specifically need to be mindful of the language they are using

19   because it can potentially have terrible consequences.

20   Q.  So you are saying that this editorial in 2011 is focused on

21   delivering a message to Republicans, is that right?

22   A.  That's right.

23   Q.  And when you edited "America's Lethal Politics" on June 14

24   of 2017, were you just focused on Republicans?

25   A.  Well, no.  I mean, it was -- you know, it was Republican

**JA 0799**  Bennet - Cross

1   Congressmen who had been targeted that day and shot, and so we

2   were focused on the question of whether rhetoric on the left,

3   which had become much hotter in the period since -- like --

4   things were worse, things are worse today than they were then

5   or they were worse in 2017.  So we were focused on the question

6   of such rhetoric on the left and the right, but specifically

7   the left that day.

8   Q.  So if you could take that down, Mr. DiMezza.

9           So Elizabeth is now working on her draft.  Did you

10  have any conversations with Elizabeth about her draft before

11  she filed it in backfield?

12  A.  I didn't.

13  Q.  And besides the e-mails that we have seen between you and

14  Ms. Williamson, did you have any other conversations offline in

15  any other way?

16  A.  Do you mean conversations with Elizabeth?

17  Q.  Yes.

18  A.  No.

19  Q.  And besides sending those e-mails, had you given her any

20  other type of instruction about what to write in her draft?

21  A.  No.

22  Q.  So Mr. DiMezza, if you could put up DX 34, which is in

23  evidence.

24          So we saw this before.  This was Ms. Williamson

25  e-mailing you and Mr. Semple, Mr. Fox, and Mr. Clines at 4:45

M292Pal2                              Bennet - Cross

1   p.m., saying the subject is "shootings is in backfield."  What

2   did that mean to you?

3   A.  It indicated that she had finished her draft and put it in

4   the section of the content management system where we would

5   edit pieces, which was called backfield.

6   Q.  So this is at 4:45.  What was the deadline for completing

7   editorials so that they could be included in the next day's

8   paper?

9   A.  I mean, the absolute drop-dead deadline was sometime after

10  8:00, but really we were trying to get our stuff in by 6, 6:30,

11  7.  Although, I have to say, it wasn't -- it wasn't an unusual

12  circumstance to get them in -- get pieces in later than that.

13  And this was one of three pieces we had working that day.

14  Q.  So sometime after this, do you recall Ms. Cohn coming to

15  your office to talk to you about Ms. Williamson's draft?

16  A.  I do.

17  Q.  Now, prior to Ms. Cohn coming to see you about Elizabeth's

18  draft, had you told Ms. Cohn that you wanted to edit

19  Ms. Williamson's draft?

20  A.  No.

21  Q.  Had you told Ms. Cohn that you wanted to look at

22  Ms. Williamson's draft?

23  A.  I had not told her that.

24  Q.  Do you recall what Ms. Cohn said to you when she came to

25  your office to talk about the draft?

M292Pal2                    Bennet - Cross

1  A.  That she -- that she thought it was a very troubled draft
2  and that she was throwing up her hands a little bit about it.
3  I mean, I can't remember, I think I said yesterday, I can't
4  remember the specific words, but she felt like it wasn't
5  accomplishing -- it wasn't -- it wasn't a clear argument.
6  Q.  Did you understand Ms. Cohn's concerns to be about the
7  substance of the piece or the writing of the piece, or both?
8  A.  The writing of the piece.
9  Q.  So after Ms. Cohn came to your office, did you read
10 Ms. Williamson's piece?
11 A.  I did.  And I should back up a step.  Because she didn't
12 say that it wasn't a clear argument.  It was about the writing
13 of the piece, and I am saying that because I remember that was
14 my reaction when I looked at the piece.  As I said, I reacted
15 to the top of her draft which read like a news story, rather
16 than an opinion piece, in that it was kind of who, what, where,
17 when, and why; and all of that was going to be covered, our
18 readers would know that thanks to the news stories before they
19 approach our work; and I felt like it wasn't capturing the
20 shock of the attack and kind of the horror of what had
21 happened.
22 Q.  So I think you testified yesterday that you started writing
23 a note at the top of the draft, and you were going to send it
24 back to Elizabeth, is that right?
25 A.  Yeah.  You know, "send it back" is a little confusing.

**JA 0802**

1    What you would do is put it down and then she would be able to

2    pick it up and work in the same environment.

3    Q.  Why did you start out writing that note?

4    A.  Because I was hoping that she would rewrite the piece.  And

5    as I said, I had a million other things going on that day, and

6    my preference is always to have the writer revise a piece in

7    circumstances like that, just take another run at it.

8    Q.  But you didn't have her rewrite the piece, is that right?

9    A.  I didn't.

10   Q.  And why not?

11   A.  Because it was getting late in the day and I was worried

12   about the approaching deadlines.

13   Q.  So, Mr. DiMezza, if we could take that down and put up

14   Defense Exhibit 32, which is in evidence.

15          And just to put this in context for you, Mr. Bennet,

16   we will go to the last page of this exhibit to show you who

17   filed it.  There you go.  So this is Ms. Williamson's piece

18   filed in backfield at 4:44.  And so now, Mr. DiMezza, if we can

19   go back up to the first page, and if you could highlight --

20   sorry.  Go one page down.  Yeah.  If you could highlight the

21   paragraph that starts "that in ten minutes."

22          Okay.  So this is Ms. Williamson's draft, and she

23   writes, "That in ten minutes a single gunman could wreak such

24   carnage in a bedroom community a short drive from the Capitol

25   is horrifying, but no longer surprising.  Not all the details

1   are known yet, but a sickeningly familiar pattern is emerging:

2   a deranged individual with a gun, perhaps multiple guns," and

3   then it goes on to talk about Bernie Sanders.

4           When Ms. Williamson wrote "sickeningly familiar

5   pattern is emerging," what did you understand that language to

6   mean?

7   A.  That something like this had happened before and there were

8   certain elements that the two events had in common, which she

9   then went on to enumerate, to list.

10  Q.  And when she wrote in the next sentence "a deranged

11  individual with a gun and scores of rounds of ammunition uses

12  politics as a pretense for a murderous shooting spree," what

13  did you understand that language to mean?

14  A.  I understood it to be a reference to this idea that

15  politics -- that the political environment was helping to

16  motivate the violence.  I remember I didn't like the "uses

17  politics as a pretense" language, because I did also think this

18  must be a deranged individual and it suggests a degree of,

19  like, intentionality and consciousness and thinking through,

20  I'm going to pretend it's about politics, you know.  But I

21  understood that to be the idea that she was trying to convey

22  there.

23  Q.  Mr. DiMezza, if you can take that down and blow up the next

24  paragraph.

25          So here in this paragraph that Ms. Williamson wrote

JA 0804

1    she wrote, "Just as in 2011, when Jared Lee Loughner opened

2    fire in a supermarket parking lot, grievously wounding

3    Representative Gabby Giffords and killing six people, including

4    a 9-year-old girl, Mr. Hodgkinson's rage was nurtured in a vile

5    political climate.  Then it was the pro-gun right being

6    criticized.  In the weeks before the shooting, Sarah Palin's

7    political action committee circulated a map of targeted

8    electoral districts that put Ms. Giffords and 19 other

9    Democrats under stylized crosshairs."

10            And what did you understand this paragraph to be

11   saying?

12   A.  That this is referring back to the language in the

13   previous -- in the earlier paragraph that there was a pattern

14   here.  That's what the "just as" indicates.  And that pattern

15   includes in this case the -- what she called the vile political

16   climate, that that contributed to her, at least her theory is

17   that that contributed to the violence that day.

18   Q.  What did you think about using the example in 2011 as part

19   of this pattern?

20   A.  I -- it was the specific example that Elizabeth returned

21   with of incitement or incendiary rhetoric, and I just trusted

22   that it was -- that it was an example of that based on her

23   characterization.

24   Q.  What did you think about this message of speaking about the

25   two congressional shootings and the danger of political

1   rhetoric?

2   A.  I thought it made sense, you know, in my view.  As I said

3   earlier, when politicians get shot, I suspect it has something

4   to do with politics, and I think that an atmosphere of highly

5   charged political rhetoric makes such, you know, terrifying

6   events more likely.

7   Q.  Prior to reading Ms. Williamson's draft, did you know

8   whether she was going to discuss Governor Palin's political

9   action committee?

10  A.  No.

11  Q.  And I think Mr. Vogt asked you this, but you see that

12  "circulated" word?

13  A.  I do.

14  Q.  Did you click on that link?

15  A.  I didn't.

16  Q.  Now, on the night of June 14, as you worked on revising

17  Ms. Williamson's draft, did you know whether or not Jared

18  Loughner had seen the crosshairs map?

19  A.  I didn't, no.

20  Q.  Why not?

21  A.  I hadn't reported that myself and I don't think I read any

22  reporting on that.  So I didn't know.

23  Q.  Did you research it?

24  A.  I didn't research it, no.

25  Q.  Why didn't you research it?

M292Pal2                          Bennet - Cross

A.  I, I -- I didn't -- I was functioning as the editor, not

the reporter on the piece, so I wouldn't normally do the

reporting in a situation like this, particularly when we were

on a tight deadline.  But also I didn't, I didn't think -- I

wouldn't have thought it was -- I didn't think then and don't

think now that the map caused Jared Loughner to act.  I didn't

think we were saying that, and therefore I wouldn't have -- the

question wouldn't have entered my mind, didn't enter my mind to

research that question.

Q.  So when you started editing Ms. Williamson's draft on the

night of June 14, what was your goal?

A.  My goal was to make it, you know, a clearer argument and

specifically more compelling about -- more compelling

description of what happened that day, a more vivid description

of what happened that day.

Q.  When you were revising -- strike that.

         Did you revise Ms. Williamson's draft because you

wanted to blame Ms. Palin or her political action committee for

the Arizona shooting?

A.  No.

         MR. VOGT:  Objection.

Q.  Did you revise Ms. Williamson's draft because you wanted to

make the point that Loughner acted because the crosshairs map?

A.  No, no.

Q.  So, Mr. DiMezza, if you could put up Defense Exhibit 136

1    just for the witness.

2              And your Honor this is a new exhibit that I handed up

3    to your clerk this morning.

4              THE COURT:  Yes.

5    BY MR. AXELROD:

6    Q.  Mr. Bennet, do you know what Defense Exhibit 136 is?

7    A.  It is a presentation of the edit I did of the editorial

8    changes that I made in Elizabeth's draft.

9              MR. AXELROD:  Your Honor, at this time I would move

10   for admission of Defense Exhibit 136.

11             MR. VOGT:  No objection, your Honor.

12             THE COURT:  Received.

13             (Defendant's Exhibit 136 received in evidence)

14   BY MR. AXELROD:

15   Q.  Mr. DiMezza, could you please publish that.

16             Just to take you back 15 seconds, Mr. Bennet, now that

17   the jury has it in front of them, could you explain what this

18   document is?

19   A.  I think what you are seeing struck out in red or what you

20   you are seeing struck out in red is the original draft that

21   Elizabeth filed and then what you are seeing in blue is my

22   editorial changes to that draft.  I think, yeah, some of those

23   changes, like you would see things struck out that I moved, you

24   know, so it's not necessarily material that I added or wrote

25   myself.  I remember this.  I wanted to, for example, I moved

1    up -- I think it was in the bottom of her document, the fact

2    that this was one of two mass shootings in the U.S. that day,

3    and there had been a shooting at a San Francisco UPS facility,

4    I just thought that was such a striking fact that it should be

5    higher in the piece, so I think I probably used a lot of her

6    language when I moved that up.

7    Q.  And so if we can then go to the second page, Mr. DiMezza.

8            How would you describe for the jury the extent of the

9    edits you made to Ms. Williamson's draft?

10   A.  It was a thorough edit.

11   Q.  And did you edit most of the piece, not just those two

12   paragraphs that we have spent time talking about?

13   A.  Oh, yeah.  Yeah.  I edited pretty much the whole piece.

14   Q.  Was this type of edit typical for you for pieces you have

15   been involved in?

16   A.  It wasn't -- it wasn't unusual for me or for other editors

17   on the board.

18   Q.  So as you were working on your edit, were you conscious of

19   the deadline that night?

20   A.  I was very conscious of the deadline.

21   Q.  So Mr. DiMezza, if you can take this down and put up

22   Defense Exhibit 31.  Just for Mr. Bennet thank you.  And go to

23   page 4 so we can put this in time perspective.

24           So, Mr. Bennet, do you see there that it says "James

25   Bennet, backfield, 7:21"?

JA 0809

M292Pal2                          Bennet - Cross

1   A.  Yeah.

2           MR. AXELROD:  Your Honor, I move for admission of

3   Defense Exhibit 31?

4           THE COURT:  Received.

5           (Defendant's Exhibit 31 received in evidence)

6   BY MR. AXELROD:

7   Q.  If you could now go back to page 1, Mr. DiMezza.  Thank

8   you.

9           So, Mr. Bennet, this is your version that you filed at

10  7:21 on the night of June 14, and what is the lede, the

11  L-E-D-E, of this piece?

12  A.  It is -- I think of it as the top of the piece.  Others

13  would say it was the first sentence or the first paragraph.

14  Q.  Okay.  And what were you trying to say with the lede?

15  A.  Just how horrific this was.

16  Q.  Does the lede mention Ms. Palin or Ms. Palin's political

17  action committee?

18  A.  No, no, it doesn't.

19  Q.  Now, if you could take that down and we will go to the

20  fourth paragraph, the fourth paragraph of your draft reads,

21  "Not all the details are known yet, but a sickeningly familiar

22  pattern is emerging in the assault on the Congressmen:  The

23  sniper, James Hodgkinson, who was killed by Capitol Hill

24  police, was surely deranged and his derangement had found its

25  fuel in politics."

JA 0810

1           It looks like you kept in that phraseology

2     "sickeningly familiar pattern," is that right?

3     A.  Yeah, that was Elizabeth's original language.

4     Q.  Why did you do that?

5     A.  I, I, I thought that structure of the piece, how she set

6     that up made sense, and I thought that was a good way to

7     describe it.

8     Q.  You then wrote in the next sentence, "The sniper,

9     Hodgkinson . . . was surely deranged."  Why did you write that?

10    A.  Well, I added the word "surely."  You remember, in

11    Elizabeth's draft it just said that he was deranged, and I

12    don't think we knew that for certain at the time.  So to say

13    that he was deranged would be to kind of assert a matter of

14    fact that we weren't sure of; and the word "surely," this is

15    kind of an opinion thing, is a hedge, in a sense.  It is saying

16    our judgment is that this guy must be deranged.

17    Q.  Did you think he was surely deranged?

18    A.  Yeah.

19    Q.  Why?

20    A.  Because I just don't think a sane person would do what he

21    did.

22    Q.  And then the next sentence says, "His derangement" -- not

23    the next sentence, the next clause "his derangement had found

24    its fuel in politics."  What did you mean by that?

25    A.  Yeah, this is, again, where I changed what Elizabeth had

M292Pal2            **JA 0811**        Bennet - Cross

1  written, which is, that he had used words to the effect that he

2  had used politics as a pretense.  I guess and, again, this is

3  my hypothesis, my view is that, you know, there are crazy

4  people in the world, and they find or attach to things to be

5  crazy about; and it might be the IRS, you know; it might be --

6  you know, it might be, whatever, signals that they are getting

7  from outer space; but they find fuel for that anger.  And to

8  me, to me this meant that this is a crazy person.  He and his

9  derangement are responsible, and he had found, as I say, the

10  fuel.  Again, we are just saying it is a pattern at this point,

11  but it found its fuel in politics, which I believed because,

12  again, he had targeted politicians so deliberately.

13  Q.  If you can go to the next paragraph, Mr. DiMezza.

14         And so here Mr. Bennet, this was -- you edited this

15  paragraph, correct?

16  A.  I did, yeah.

17  Q.  Why did you revise this paragraph?

18  A.  Can you show me -- can I look at Elizabeth's original?

19  Q.  Sure.

20         Mr. DiMezza, if you could do a side-by-side of this

21  exhibit and, give me one second, Defense Exhibit 32.  If you

22  could -- that would be great.  I think, yeah, here you need to

23  go down.  Up.  Nope.  Go up, please.  And it's it "just as in

24  2011."  There you go.  Thank you.

25         So, Mr. Bennet, you are looking at your version of the

**JA 0812**

M292Pal2                    Bennet - Cross

fifth paragraph and Ms. Williamson's original version of the

fifth paragraph.

A.   Right.  So I added the sentence at the beginning because I

wanted to make clear that we were making an argument about the

relationship of politics and this kind of violence.

Q.   How -- I'm sorry.

A.   No.

Q.   How were you making clear that you were making an argument?

A.   Well, again, I had said earlier on, and I guess I had this

in my mind that I wanted to, you know, raise the question of

whether politics does influence -- does, you know, create an

atmosphere today where this kind of violence happens.  So I

actually asked the question "was this attack evidence of how

vicious American politics has become?" and then I answered the

question "probably."  And again, this is a piece of opinion

journalism.  It's not a report on what happened today.  And the

view of the board and my view is that probably, not certainly,

but probably, politics contributes to this kind of violence.

Q.   And so if you go on, just leave this up just like this,

Mr. DiMezza.

         In your piece on the left, you added the language

that the link to political incitement was clear.  Do you see

that?

A.   I do.

Q.   Why did you change that language?

JA 0813

M292Pal2                          Bennet - Cross

1   A.  This is -- this is -- I had asked Elizabeth -- again, we

2   talked about this.  I had asked her or e-mailed her, or

3   whatever, the question about left-wing incitement, you know,

4   some evidence of, and the piece had not come back.  I had that

5   in my mind, you know, that I asked to see if there was such a

6   link, some specific piece of incitement that connected the

7   victims to this larger atmosphere.  She didn't find it.

8        She did find this map that she wrote about.  And what

9   was in my mind was that that map was a link, a connection

10  between the events of that day, between the victims on the

11  field and this larger atmosphere of political incitement.

12  That's what I meant by the link to political incitement.

13  Q.  So let me stop you right there --

14  A.  Yeah.

15  Q.  -- and just make sure we understand this.

16       Ms. Williamson had asked you -- you had asked

17  Ms. Williamson to come back with whether there was any

18  incitement on the left that day?

19  A.  Yeah.

20  Q.  Meaning on June 14 of 2017?

21  A.  Yeah, not that it occurred that day, but at any point in

22  the past or whatever that would, you know, somehow be an

23  example of the kind of thing we were talking about.

24  Q.  In connection with the Virginia shooting, right?

25  A.  Exactly, yeah.

M292Pal2                        Bennet - Cross

Q.   Okay.  And you didn't see any of that in her draft.

A.   No.

Q.   But what was the link that you were referring to between

the Gabby Giffords shooting and incitement?

A.   I was referring here to the -- I was inserting these words

to explain why Elizabeth had cited this map; and in my mind at

the time, and I have regretted this pretty much every day

since, I meant that it was simply a connection to this larger

environment.  I did not mean, I didn't think I was saying -- if

I thought it caused the map -- the violence, I would have used

the word "cause."  You know?  It would have saved me a couple

of words.  "The cause was this map."  I would have probably

reversed it and made it more active.

         But I wouldn't have used this ---I was thinking about

the argument we were making about this larger atmosphere.  I

was very mindful that we didn't have the example that I had

asked to see, which I saw as a weakness in our argument.  I was

worried about that.  And I wound up drawing this distinction

because Elizabeth had returned with this example from the

previous shooting, and I wound up making a distinction that was

not worth making, that there was a link, and I used the word

"link" in that case, and there wasn't in this one.

Q.   Okay.  And just to be really clear, did you mean to say to

readers that Mr. Loughner had acted because of the crosshairs

map?

1    A.  No.  And again, I, you know, I was -- to my mind, and I

2    should have slowed down, you know, but to my mind, when you say

3    somebody is deranged, surely deranged, that -- I feel like you

4    are saying that that person in their derangement is -- I just

5    don't personally believe that, you know, anybody but that

6    person is responsible and their derangement, you know, for an

7    act like this.

8    Q.  At the time you wrote this, were you aware that any readers

9    would interpret this to mean that you were saying that Loughner

10   had acted because of the crosshairs map?

11   A.  No.  No.  And, you know, that is my -- you know, that's on

12   me.  That's my failure.  I didn't.  I didn't.

13   Q.  If we can take that down and go to the next paragraph,

14   please.  Sorry, Mr. DiMezza, that was set up nicely.

15           Can you go to DX 32, which is Mr. Bennet's draft,

16   sorry, DX 31, Mr. Bennet's draft.  Can you go to the next page,

17   please, and blow up the top paragraph.  No.  Sorry, the top

18   paragraph, thanks.

19           This is the next paragraph that follows the one we

20   just discussed, and it says, "Conservative and right-wing media

21   were quick on Wednesday to demand forceful condemnation of hate

22   speech and crimes by anti-Trump liberals.  They're right.

23   Though there's no sign yet of incitement as direct as in the

24   Giffords attack, liberals should of course hold themselves to

25   the same standard of decency that they ask of the right."

1          And did you add the language "there is no sign yet of

2    incitement as direct as in the Giffords attack"?

3    A.   Yeah, I did.

4    Q.   And what did you mean to convey by that language?

5    A.   Again, that I was very mindful that we hadn't -- we were

6    asserting that -- we were asserting that it was right to

7    condemn the left for such incitement, but we didn't have an

8    example of such incitement, so I was acknowledging that by

9    saying there was no direct link between the victims that day

10   and this larger atmosphere.  That's what I was thinking.

11   Q.   There was no map targeting congressional baseball players?

12   A.   There was nothing -- there was nothing like that that we

13   had found yet, I mean, which is why the language says "no sign

14   yet."

15   Q.   But when you said "incitement as direct as in the Giffords

16   attack," were you intending to convey to readers that

17   Mr. Loughner had acted because of the crosshairs map?

18   A.   No, I was not intending that.

19   Q.   Were you aware of the possibility at that point that

20   readers could interpret these words as a suggestion that

21   Loughner acted because of the crosshairs map?

22   A.   No.

23   Q.   You end with this clause, "Liberals should of course hold

24   themselves to the same standard of decency."  What do you say

25   in that?

M292Pal2                     Bennet - Cross

1   A.   That, I mean, there is a fair amount of hypocrisy in our
2   political culture, and I know it can affect us as journalists,
3   too, that it is easier to see when the other side is doing
4   something that you don't like than to see when you are making
5   the same mistake.  So I was saying we should all -- you know,
6   everybody should have the same standards.
7   Q.   Mr. DiMezza, if you could go to the next page.
8   A.   I should say it is true of opinion journalists who are
9   allowed to enter such judgments.  The news journalists aren't
10  supposed to do that kind of thing.
11  Q.   And if you could blow up the very last paragraph.  I'm
12  sorry.  Keep going down.  Yeah.  Actually this isn't so clear.
13  We will come back to that.  Take that down, please.
14       Was the message that you were trying to deliver in
15  your draft of the editorial aimed at any one side of the
16  political spectrum, left or right?
17            MR. VOGT:  Objection.
18            THE COURT:  What's the -- in one word, what's the
19  ground of the objection?
20            MR. VOGT:  Argumentative.
21            THE COURT:  Sustained.
22  BY MR. AXELROD:
23  Q.   Now, yesterday Mr. Vogt asked you about your use of the
24  word "incitement," and I think at some point you mentioned a
25  Tom Friedman column that you had read.  Do you recall that

JA 0818

M292Pal2                          Bennet - Cross

1   testimony?

2   A.  I do.

3   Q.  So at this time I would like, Mr. DiMezza, if you could put

4   up Defense Exhibit 96, just for the witness.

5          Mr. Bennet, do you see what Defense Exhibit 96 is?

6   A.  Yes.

7   Q.  What is that?

8   A.  It's the column by Tom Friedman that I very much had in my

9   mind that day.

10          MR. AXELROD:  Your Honor, I move for admission of

11  Defense Exhibit 96.

12          MR. VOGT:  No objection.

13          THE COURT:  Received.

14          (Defendant's Exhibit 96 received in evidence)

15  BY MR. AXELROD:

16  Q.  And so, Mr. DiMezza, while this is -- wait one second while

17  this is coming up for the jury.

18          Could you blow up the second full paragraph, "his

19  right-wing opponents."

20          So Mr. Friedman wrote in -- and this column is titled

21  "Trump's Wink Wink to 'second Amendment People.'"

22          Just summarizing, do you recall what the "Second

23  Amendment People" is a reference to?

24  A.  It was a speech that I guess then candidate Donald Trump

25  had given in which he -- I don't want to get the quote wrong,

M292Pal2                              Bennet - Cross

1    but he said something to the effect that maybe the Second

2    Amendment people, meaning, you know, people who are

3    passionately in favor of gun rights, could do something about

4    his opponent, Hillary Clinton.

5    Q.   The date of this column is August 9, 2016.  Were you

6    working as the editor of the opinion page at that time?

7    A.   I was.

8    Q.   So now going back to the Tom Friedman column, "His

9    right-wing opponents just kept delegitimizing him as a

10   'traitor' and 'a Nazi' for wanting to make peace with the

11   Palestinians and give back part of the land of Israel.  Of

12   course, all is fair in politics, right?  And they had God on

13   their side, right?  They weren't actually telling anyone to

14   assassinate Rabin.  That would be horrible."

15              Do you see that?

16   A.   I do.

17   Q.   Did this message in here inform the way you were writing

18   "America's Lethal Politics"?

19   A.   Yes, it's the same fear, and I just had a vivid memory of

20   Tom Friedman writing this column.

21              He was actually on vacation when this happened, and he

22   called me to say that he wasn't --

23              MR. VOGT:  Objection.

24   A.   Oh, sorry.

25              THE COURT:  Sustained.

M292Pal2                      Bennet - Cross

1             MR. AXELROD:  Well, your Honor, I don't think this is

2       coming in for the truth of the matter.

3             THE COURT:  I agree with that.  The objection is still

4       sustained.

5             MR. AXELROD:  Okay.

6       BY MR. AXELROD:

7       Q.  Yeah, if you can just tell the jury how this paragraph or

8       this idea informed what you were writing.

9       A.  It is just a very similar idea.  I mean, this is the very

10      language that I referred to earlier, words like "traitor"

11      becoming part of the discourse; and what Tom Friedman had said

12      was that he heard Trump use these words and he made a

13      connection that had not occurred to me, and says he had seen

14      this movie before, essentially.  And similar rhetoric was being

15      used in the run-up to the assassination of Prime Minister

16      Yitzhak Rabin of Israel, and he is issuing a warning here that

17      we have to pay attention to the words that we use because they

18      might have consequences, terrible consequences.

19      Q.  Mr. DiMezza, if you could blow up the last paragraph on

20      page 1.

21            Here, Mr. Friedman wrote, "In September, I wrote a

22      column warning that Donald Trump's language toward immigrants

23      could end up inciting just this kind of violence.  I never in

24      my wildest dreams, though, thought he'd actually — in his usual

25      coy, twisted way — suggest that Hillary Clinton was so intent

M292Pal2                          JA 0821
                                  Bennet - Cross

1   on taking away the Second Amendment right to bear arms that

2   maybe Second Amendment enthusiasts could do something to stop

3   her.  Exactly what?  Oh, Trump left that hanging."

4          But if you look at the first sentence, Mr. Friedman

5   uses the words "Donald Trump's language towards immigrants

6   could end up inciting just this kind of violence."

7          How did you understand Mr. Friedman to be using the

8   word "inciting" there?

9   A.  That his language could have this effect of so heightening

10  the atmosphere of hatred, that it would lead to this kind of

11  violence.  Again, it's not --

12         THE COURT:  So you mean that you read his language as

13  indicating that it would be an indirect cause?

14         THE WITNESS:  Yes, not that -- I certainly never heard

15  the president call for this kind of violence at all, but the

16  effect of his language indirectly could be that it would lead

17  to this kind of violence.

18  BY MR. AXELROD:

19  Q.  If you could go to the next page, Mr. DiMezza.  And blow up

20  the first five paragraphs, and I assure you I am not going to

21  read them all.

22         So the first paragraph reads, "Hillary wants to

23  abolish, essentially abolish the Second Amendment," Trump said

24  at a rally in Wilmington, North Carolina, on Tuesday.  "By the

25  way, and if she gets to pick her judges, nothing you can do,

M292Pal2                          JA 0822          Bennet - Cross

1  folks.  All of those the Second Amendment people, maybe there

2  is, I don't know."

3          Is that the language, Mr. Bennet, that you were

4  referring to with the Second Amendment people quote at the

5  beginning?

6  A.  That's right.

7  Q.  The next paragraph says, "Of course Trump's handlers,

8  recognizing just how incendiary were his words, immediately

9  denied that he was suggesting that gun owners do anything

10 harmful toward Clinton."

11         Then moving to the next paragraph, "But that is not

12 what he said.  What he said was ambiguous — slightly menacing,

13 but with just enough plausible deniability that of course he

14 was not suggesting an assassination.  Again, it's just like the

15 Rabin story."

16         And did you have this in mind when you were writing

17 "America's Lethal Politics"?

18 A.  I did.

19 Q.  And finally I just want to go to the next paragraph.  "As

20 *The Times*'s Isabel Kershner reported from Israel when the film

21 was released, it is unambiguous about the forces it holds

22 responsible, the extremist rabbis and militant settlers who

23 branded Rabin a traitor, the right-wing politicians who rode

24 the wave of toxic incitement against Mr. Rabin as they

25 campaigned against the Oslo accords, and the security services

1  that failed to heed the warnings that the incitement could get

2  out of hand."

3          And so you see "incitement" is used twice in that

4  paragraph.  What is your understanding of how Mr. Friedman was

5  using the word "incitement" there?

6  A.  Well, one of the -- in exactly the same way that I

7  described earlier.  And again, this is actually in the Israeli

8  context which is, you know, part of what was in my mind that

9  day.  But that there was this wave of increasingly vitriolic

10 rhetoric, incitement directed at Rabin because he was trying to

11 make peace, and that that contributed, that helped lead to his

12 assassination.

13 Q.  And had you -- you had worked in Israel?

14 A.  I had.

15 Q.  And you had some familiarity of Israeli politics?

16 A.  I -- yes.

17 Q.  Now, after you finished your draft, Mr. Bennet, did you

18 have any conversations with Eileen Lepping, the fact-checker?

19 A.  I don't remember speaking to her.

20 Q.  Did you ever direct Ms. Lepping to fact-check the language

21 that you had changed in the fifth and sixth paragraphs?

22 A.  I -- no, I didn't.

23 Q.  Why not?

24 A.  I don't remember ever asking Eileen to fact-check a

25 specific thing.  My assumption was that she was fact-checking

1    the whole editorial as she always did.

2    Q.  Did you think you had added any new facts to your version

3    of the draft?

4    A.  No, I didn't.  I thought I was working with the facts that

5    Elizabeth had presented and the ideas, too, which were the

6    product of our, you know, joint communication earlier in that

7    day, that she had presented originally.

8    Q.  Did you intend to make any different points than the points

9    you saw in Elizabeth Williamson's draft?

10   A.  No.

11   Q.  So if you could put up Defense Exhibit 38, which is already

12   in evidence, Mr. DiMezza.

13            And I think Mr. Vogt asked you this yesterday, but at

14   7:22 you e-mailed Ms. Williamson and said, "I really reworked

15   this one.  I hope you can see what I was trying to do.  Please

16   take a look.  Thank you for your hard work and I'm sorry" --

17   "hard work today, and I'm sorry to do such a heavy edit."

18            And what were you saying to Elizabeth?

19   A.  I mean, again, when you do a heavy edit of a writer, you --

20   I was, I was, I was -- first of all, I was just trying not to

21   offend her and warn her that I had done it, so that she knew

22   what to look for, but also that she would take a close look

23   because I had done such a heavy edit.  "I really reworked this

24   one."

25   Q.  When you revised the editorial that would be published as

M292Pal2                          **JA 0825**          Bennet - Cross

```
 1   "America's Lethal Politics," did you have any ill Will towards
 2   Ms. Palin?
 3   A.  No.
 4   Q.  Did you intend to cause Ms. Palin any harm by keeping the
 5   reference in the piece to her political action committee and
 6   the crosshairs map?
 7   A.  No.
 8   Q.  Did you intend to cause Ms. Palin any harm through any of
 9   your edits of the draft?
10   A.  No, I didn't.
11   Q.  And finally, did you intend to assert that Jared Loughner
12   had acted because of the crosshairs map?
13   A.  No, I did not.
14   Q.  So after you complete your draft of "America's Lethal
15   Politics," do you recall what you did?
16   A.  Well, I --
17            THE COURT:  Counsel, I wonder whether this is a good
18   time to take our mid-morning break.
19            MR. AXELROD:  It is.
20            THE COURT:  Very good.  So we will take a 15-minute
21   break at this time.
22            (Continued on next page)
23
24
25
```

**JA 0826**

M292Pal2                            Bennet - Cross

1              (Jury not present)

2              THE COURT:  Mr. Bennet, you can step down.

3              Please be seated.

4              So let me give defense counsel the choice.  We can

5    either spend these 15 minutes hearing your points about the

6    charge, or we can do it at the beginning of the lunch break.

7    We can't do it at the end of the day because I have to go teach

8    at Columbia.

9              MR. AXELROD:  Given that my more learned colleague in

10   the ways of the First Amendment is not in the courtroom, I

11   suggest we do it at the lunch break, your Honor.

12             THE COURT:  All right, so we will do it at the start

13   of the lunch break.

14             MR. VOGT:  Your Honor, I prefer to it now, then.

15             THE COURT:  Well, that's too bad.

16             We will see you in 15 minutes.

17             MR. AXELROD:  Thank you.

18             (Recess)

19

20

21

22

23

24

25

**JA 0827**

M291PAL3                              Bennet - Cross

1           (In open court; jury present)

2           THE COURT:  Please be seated.

3           All right.  Counsel.

4           MR. AXELROD:  Mr. DiMezza, if you could put up

5    Plaintiff's Exhibit 171, which is in evidence.

6    BY MR. AXELROD:

7    Q.  And so Mr. Bennet, this is a document that Mr. Vogt showed

8    you yesterday.  I just want to start at the bottom.

9           MR. AXELROD:  So if you could blow up that bottom

10   piece, Mr. DiMezza.

11   Q.  So this is at 8:31 on June 14th, so about an hour after you

12   finished your draft, and you wrote to Mr. Douthat.  If you

13   could just remind the jury who Mr. Douthat is.

14   A.  He's an opinion columnist at *The New York Times*.

15   Q.  And you write, "What a great and chilling column.  Such a

16   smart way to deal with the Julius Caesar kerruffle.  Congrats."

17   Do you see that?

18   A.  Yeah.

19          MR. AXELROD:  So if you could take that down.  And if

20   you could blow up the next two sections.  Yeah, the next two.

21   Yeah, there you go.

22   Q.  And so about two hours later, Mr. Douthat emails you,

23   "You're very kind."  And then he goes on to say, "On that note,

24   I feel I would be remiss if I didn't express my bafflement at

25   the editorial that we just ran on today's shooting and

1   political violence.  There was not, and continues to be so far

2   as I can tell, no evidence that Jared Lee Loughner was incited

3   by Sarah Palin or anyone else."  And then he goes on after

4   that, and then at the end he says, "I don't normally raise

5   issues with our editorials (I expect to disagree with them,

6   after all!), but I felt I should express my confusion in this

7   case."

8           What did you think when you received this 10:35 email?

9   A.  I -- I was very concerned.  I -- I was -- I was really

10  alarmed that he was reading the editorial to imply that

11  Loughner was, you know, directly -- was incited by Sarah Palin

12  or anyone else, and I was just extremely -- I have a lot of

13  respect for Ross and his judgment, as I said, and it was

14  unusual for me to hear from him about an editorial, as he says.

15  He did -- he says he expects to disagree with them because he's

16  a very -- he's a Conservative columnist.

17  Q.  How did you understand him to be using the word "incited"?

18  A.  He's using it there as that, you know, direct incitement to

19  violence.

20  Q.  And is that the way you intended in your --

21  A.  As I understand it, yeah.

22  Q.  Is that the way that you intended to use it?

23  A.  No, no.

24  Q.  If you go up, you respond about 30 minutes later, "Hey --

25  Thanks, and I'll look into this tomorrow.  But my understanding

1   was that in the Giffords case there was a gun sight

2   superimposed over her district."  What are you referring to

3   there?

4   A.  Gabby Giffords.

5   Q.  And the crosshairs map?

6   A.  And the crosshairs map, yeah.

7   Q.  "So far in this case we don't know of any direct threat

8   against any of the congressmen on the field."  What are you

9   talking about there?

10  A.  That we didn't have a specific piece, again, using the word

11  "incitement," directed at one of the victims.

12  Q.  And that would be in the Virginia shooting.

13  A.  In the Virginia shooting.

14  Q.  You then go on to say, "That's not to say any of it is ok,

15  obviously, or that the violence in either case was caused by

16  the political rhetoric."  What are you saying there?

17  A.  That -- that what I was saying earlier, that I -- I didn't

18  believe and didn't think we were saying that the rhetoric

19  caused the violence.

20  Q.  And this was written at 11:09 on June 14th of 2017?

21  A.  Yes.

22  Q.  You then end by saying, "But the incitement in this case

23  seems, so far, to be less specific."  And what were you saying

24  there?

25  A.  Again, that we didn't -- "specific" may be a better word

M291PAL3                        Bennet - Cross

1   than "direct," actually, but that we didn't have a specific

2   example of incitement connected to the congressman.

3           MR. AXELROD:  Now you can take that down, Mr. DiMezza,

4   and go up to Mr. Douthat's response.

5   Q.  And he says, "The targets were used by Palin, or her

6   group --" sorry.  This is the next morning.  "The targets were

7   used by Palin, or her group, in a map of seats targeted for

8   pickup in the midterms.  You can argue about whether that

9   crosses a line (Democrats had used bullseyes on a map of Rs who

10  voted against the stimulus, and so on down the rabbit hole)."

11  And then he goes on to describe the Giffords shooting, and I'm

12  picking up where it says, "People assumed the link initially --

13  there was a Paul K. column that was particularly vivid in

14  blaming Republicans -- but the investigation debunked it.  I

15  think Loughner was instigated by a nonanswer she'd given him at

16  a town hall about one of his theories of grammar, or his

17  obsession with lucid dreaming, or something."  How did you

18  understand, when you read this response that "people assumed

19  the link initially. . . but the investigation debunked it"?

20  A.  Again, it's -- it's still suggesting that he's reading the

21  piece as saying that -- that Loughner was motivated by -- by

22  this map, and he's going on to say it had been shown that there

23  was absolutely no link whatsoever to politics of any sort.

24  That's how I read what he was saying, in any case.

25  Q.  Were you concerned by these emails from Mr. Douthat?

1   A.  Yeah, I was -- I was really concerned.

2   Q.  What were your concerns?

3   A.  That -- that -- I mean, this is now the next morning, this

4   email, but by then, I had -- I had -- I think we discussed

5   yesterday, I'd looked on Twitter and seen that late that night

6   that other people were making this criticism, and I realized

7   that the editorial was being read in a way we did not intend.

8   Q.  The criticism you read on Twitter, who was it criticizing?

9   A.  What I was seeing was other -- that night, what I remember

10  seeing is other Conservative writers who were, you know,

11  echoing this same interpretation.

12  Q.  But I think you said you saw criticism on Twitter.  Who was

13  the criticism directed at, if you recall?

14  A.  Oh, I'm sorry.  Who was it directed at?  It was directed at

15  us, for making this mistake, and it was quite harsh.

16  Q.  Did you see any criticism directed at Ms. Palin?

17  A.  No, no, I didn't.

18          MR. AXELROD:  So if you could take that down,

19  Mr. DiMezza, and put up DX 46, which is already admitted.

20  Q.  So Mr. Bennet, this is a text chain between you and

21  Ms. Williamson that we looked at with Ms. Williamson.  I'm

22  focused on the one in the middle at 11:38 p.m.  Do you see

23  that?

24  A.  Yes.

25  Q.  And you write to Ms. Williamson, "Are you up?  The right is

M291PAL3                         JA 0832        Bennet - Cross

1  coming after us over the Giffords comparison.  Do we have it

2  right?"

3          Was it typical for you to text Ms. Williamson at

4  11:38 p.m.?

5  A.  No.

6  Q.  Why were you doing this now?

7  A.  Because she was that day's expert on this question and I --

8  I wanted to check with her, you know, to make sure she was

9  quite certain we were in the right --

10 Q.  But why text her --

11 A.  -- the way we'd expressed the idea.

12 Q.  Why text her at 11:38 p.m.?

13 A.  Because I was really worried, and I hoped she'd be up.

14          MR. AXELROD:  You can take that down and put up DX 48,

15 which is already in evidence.

16 Q.  And so Mr. Bennet, this is an email that you sent to Eileen

17 Lepping and Ms. Williamson at 5:08, which is about five and a

18 half hours later.  Do you see that?

19 A.  Yeah.

20 Q.  What were you doing between 11:38 and 5:08 a.m.?

21 A.  I was -- you know, I -- I spent some time looking around

22 and -- and reading this criticism, and I tried to get a little

23 sleep, but I don't think I was really able to sleep.  I was --

24 I was upset and confused, I have to say, because I just was

25 so -- I just was so blindsided by -- by this and -- yeah, and I

1    just -- I couldn't sleep, and at some point that night I

2    composed this message to them and sent it off, you know, first

3    thing.

4    Q.  Was it typical of you to email members of the editorial

5    board at 5:08 in the morning?

6    A.  No.

7    Q.  You write, "We're taking a lot of criticism for saying that

8    the attack on Giffords was in any way connected to incitement.

9    The claim is that this was fully investigated and debunked in

10   the months after the attack and the shooter was found to have

11   acted only because of his personal demons.  I don't know what

12   the truth is here but we may have relied too heavily on our

13   early editorials and other early coverage of that attack."  Why

14   did you write that last sentence, "I don't know what the truth

15   is here"?

16   A.  I -- because I wanted them to start from zero.  You know,

17   in a situation like this, you want them to go back in a

18   nondefensive way, which is why I was careful to say I'm not

19   shifting the blame here, I'm very sorry for my own mistake, but

20   I wanted them to go back, without any assumptions of what the

21   truth is, to -- to figure it out, and I really -- I take

22   exception to the idea that I think I would have been

23   demonstrating -- I didn't say I don't care what the truth is

24   here.  I was trying to find out -- I wanted them to start over

25   and figure it out, and make sure that we -- it hadn't been

1    proven, as I took from Ross's note, that there was no

2    possibility of any connection whatsoever to political rhetoric.

3    Q.  When you revised the editorial the previous night on

4    June 14th, did you know that the claim that Loughner had been

5    incited had been debunked, as Mr. Douthat had written?

6    A.  No.

7    Q.  When you revised the editorial on June 14th, did you know

8    what had driven Jared Loughner to shoot Congresswoman Giffords?

9    A.  No.

10   Q.  Why hadn't your -- why didn't you have anyone do that

11   research?

12   A.  Well, as I said, I -- I -- as I said, he was -- he was

13   deranged.  I mean, he was a lunatic, and he was responsible;

14   his motives were his own, and his own responsibility, and I

15   thought that was clear.

16   Q.  You then write, "If so, I'm very sorry for my own failure

17   on this yesterday."  What did you mean by that?

18   A.  That I was acknowledging that I had made the edits that

19   were causing this confusion.

20   Q.  You then --

21   A.  And again, it's an effort just to get everybody, in a very

22   nondefensive frame of mind, rethinking what we'd done, what

23   we'd written.

24   Q.  You then write, "In any case, I'd like to get to the bottom

25   of this as quickly as possible this morning and correct the

1    piece if needed."  Why did you write "I'd like to get to the

2    bottom of this as quickly as possible"?

3    A.  Because I was -- I mean, it's 5:00 in the morning.  I'm

4    trying to get this corrected, if we need to do it, as quickly

5    as possible, address this as fast as I could -- as we could.

6    Q.  Why were you already thinking about a possible correction?

7    A.  Because of the criticism that we were getting.  You know,

8    it was -- it was -- people were asserting that, you know -- the

9    first obligation of any journalist, whether you're an opinion

10   journalist or news journalist, whether you work at *The New York*

11   *Times* or anywhere else, is to make sure that the record is

12   correct, and clear, and people were saying that we had made

13   this mistake that muddied the record, and that's a really --

14   that's just a terrible thing to do as a journalist.

15   Q.  Was it important for you to get it right?

16   A.  Yeah, yes.

17   Q.  Was it important for you to unmuddy the record?

18   A.  Yeah, yes.

19        MR. AXELROD:  Mr. DiMezza, you can go back to Defense

20   Exhibit 46.

21        And if you could put those side by side, the whole

22   exchange, please.  Thank you.

23   Q.  So looking first at the left side, Ms. Williamson responds

24   to you at 6:15, so this was after your 5:08 email, and she

25   writes, "Sorry, I had gone to bed.  Will read now what they are

M291PAL3                           Bennet - Cross

1  saying."  And she responds again, "Do you have to talk by phone

2  this morning?"  I assume she meant, "Do you have time to talk

3  by phone this morning?"  Did you speak to Ms. Williamson that

4  morning?

5  A.  I did.

6  Q.  And what did you discuss?

7  A.  I just reinforced the need to move quickly and to figure

8  out the issue that's, you know, raised in the email, and I

9  think again, I was making clear to her that it was my

10  responsibility, but that it was now her responsibility to

11  figure this out.

12  Q.  And she responds on the next page --

13  A.  It was -- the problem was my responsibility.

14  Q.  -- "Hey, I'm sorry James.  I should have read those grafs

15  more closely and asked more questions.  That's on me.  Will get

16  a cx drafted soonest."

17         And you respond, "No worries.  I feel lousy about this

18  one.  I just moved too fast.  I'm sorry."  What did you mean by

19  that text?

20  A.  Again, that I had edited the piece on a really tight

21  deadline, and I have to say that's not unusual, you know, we

22  worked on tight deadlines, and the system was built for this,

23  and, you know, that's why I say I felt so blindsided.  You

24  know, I edited the piece, I knew Elizabeth, I thought Elizabeth

25  had read it, I knew Linda had edited it, Nick Fox had edited

1    it, others had read it, it had been fact-checked, it also, I

2    know, had been read by one or two of the most experienced

3    copyeditors at *The New York Times* and nobody had raised this

4    issue, right, so I -- I -- that's why I was up all night.  I

5    just couldn't -- it just -- to me, it was -- I -- I was -- I

6    was shocked.  But I was -- I had made the edits and I wanted

7    her to -- I wanted her to figure out, you know, what the facts

8    were that we would use if we needed to make a correction.

9    Q.  And then you write, "Now what I need from you/Eileen

10   soonest is a rock-solid version of what we should say, that an

11   investigation showed no link to incitement, or no direct link,

12   or no clear link?"  And what were you asking them there?

13   A.  I was responding in the -- I think in the words that I was

14   seeing—that is, the criticisms that were being made, that were

15   being made against us—and I was just asking her to be precise

16   about what we knew about whether there was absolutely no

17   connection to the rhetoric of incitement, or I guess to the

18   map.  I don't mention the map in there, but -- actually, yeah,

19   to -- no connection whatsoever to politics.

20           MR. AXELROD:  Mr. DiMezza, if you can take that down

21   and put up Plaintiff's Exhibit 193, which is already in

22   evidence.

23   Q.  And so if you look at the bottom, Mr. Bennet, this is the

24   email from Mr. Douthat that he had sent you, and then it looks

25   like you forwarded it on at the top to Elizabeth at 7:52 and

1   she told you, "Try to do some forensics this morning.  Happy to

2   talk by phone."  Why did you send Mr. Douthat's email on to

3   Elizabeth Williamson?

4   A.  I wanted her to see how he articulated the criticism of the

5   editorial so their work would be responsive to those specific

6   criticisms.

7        MR. AXELROD:  Can you take that down, please.

8   Q.  At some point on the morning of June 15th, did *The Times*

9   decide to revise the editorial and issue a correction?

10  A.  Yes.

11  Q.  And who made that decision?

12  A.  I did.

13  Q.  And why did you make that decision?

14  A.  For the reason I said earlier, that, you know, we were --

15  there were -- we were being, you know, really, really harshly

16  criticized for muddying the record, and I understood now why

17  people like Ross were reading the editorial as they did, and I

18  thought it was urgent to correct the piece as, you know,

19  forthrightly as possible, to acknowledge our mistake.  This

20  is -- this is basic practice.  It's the right thing to do.  It

21  used to be -- I also believe -- yes, I mean, it's just the

22  right thing to do.  It also, I think, at least used to help

23  your credibility to demonstrate that in a nondefensive way

24  you'd acknowledged when you made a mistake and you apologized

25  for it, and that's a way to show people that you take accuracy

M291PAL3                    Bennet - Cross

1    extremely seriously, and that was really important to me to try

2    to send that message.

3            MR. AXELROD:  Mr. DiMezza, if you could put up Defense

4    Exhibit 52 just for Mr. Bennet.

5            MR. VOGT:  And Mr. Bennet, do you know what -- just

6    very superficially, what Defense Exhibit 52 is?

7    A.  Yes.  This is the exchange between me and Hanna Ingber

8    about how to respond on Twitter about the editorial.

9            MR. AXELROD:  Your Honor, I'd move for admission of

10   DX 52.

11           MR. VOGT:  No objection.

12           THE COURT:  Received.

13           (Defendant's Exhibit 52 received in evidence)

14           MR. AXELROD:  And Mr. DiMezza, could you publish that,

15   please.

16   Q.  And so Ms. Ingber emails you at 10:26, "Happy to chat about

17   the Sarah Palin editorial and options for responding to readers

18   if that would be helpful."  And then you respond, "Hey Hanna --

19   We're about to publish a correction."  Do you see that?

20   A.  Mm-hmm.

21   Q.  So this is at 10:46?

22   A.  Yes.

23   Q.  So this is about 13 hours after the editorial was first

24   published online?

25   A.  I guess so, yeah.

JA 0840

1   Q.  And you write, "Do you think it would make sense to push

2   that our," I assume you mean "out," "through our opinion

3   Twitter feed"?

4   A.  Yes.

5   Q.  Why did you write that?

6   A.  I was asking her advice on whether this -- I wanted to get

7   as much attention as possible to the correction, to get as wide

8   an audience for it as we could, and so I'm asking her advice,

9   if it would make sense to -- to push it out through the Twitter

10  feed, meaning to promote it, you know, with a tweet from the

11  opinion account.

12  Q.  Why did you want, in your words, to get as much attention

13  for the correction as possible?

14  A.  I -- I just wanted to demonstrate that -- that, you know,

15  we were holding ourselves accountable for the mistake and --

16  and clarifying the record.

17          MR. VOGT:  Mr. DiMezza, if you could take that down

18  and put up DX 53, which is not in evidence.  Just for

19  Mr. Bennet.

20  Q.  And Mr. Bennet, what is this document?

21  A.  This is the exchange about the sequence of tweets we wound

22  up sending out.  We didn't wind up doing just one; we wound up

23  doing three tweets.

24  Q.  Let me just stop you there.  We'll get it admitted and then

25  we can talk about it.

M291PAL3                    **JA 0841**          Bennet - Cross

1    A.  Okay.  I'm sorry.

2           MR. AXELROD:  Your Honor, I'd move for admission of

3    Defense Exhibit 53.

4           MR. VOGT:  No objection.

5           THE COURT:  Received.

6           (Defendant's Exhibit 53 received in evidence)

7    BY MR. AXELROD:

8    Q.  Okay.  So at 11:12, Ms. Ingber emails you --

9           MR. AXELROD:  It's right at the bottom, Mr. DiMezza,

10   if you can grab that.

11   Q.  And she writes with, "Adding Tyson too.  Thanks, James.

12   Perhaps on Twitter, it could be a human voice that walks

13   through what happened (and the tweets could be 'threaded' so

14   they are all connected.)  For example, something like this:"

15          And then she walks through a couple of thread tweets.

16   Do you see that?

17   A.  Yes.

18          MR. AXELROD:  And then if you can go to the next part

19   of this, Mr. DiMezza.  Yeah.  Thank you.

20   Q.  You respond, "Since it's the editorial voice, I think it

21   might be best coming from our main account.  Adding Liriel."

22   Is that a person, Liriel?

23   A.  Liriel was our social media editor who managed our account;

24   the head social media editor.

25   Q.  Hanna then responds, "That sounds good.  It could be a

1  human voice on the opinion account."  And then you respond,

2  "Yes, I think it can be very conversational.  Liriel's the best

3  judge in our shop, but maybe:"  What did you mean by "but

4  maybe"?

5  A.  "But maybe," meaning I'm suggesting an edit to the language

6  that she had provided.

7  Q.  And so --

8  A.  But indicating that Liriel would be the best authority on

9  what the language should be.

10  Q.  And so let's look at what you proposed.

11       "1.  We published an editorial last night on the

12  shooting of the G.O.P. men's baseball team practice field in

13  Alexandria.

14       "2.  We got an important fact wrong, incorrectly

15  linking political incitement and the 2011 shooting of Rep.

16  Giffords.  No such connection was ever established."

17       Why did you write "We got an important fact wrong"?

18  A.  Because it -- because I wanted to emphasize the importance

19  of -- of this correction and I felt terrible and --

20  Q.  And -- sorry.  I cut you off.

21  A.  I just wanted to emphasize the importance of what the

22  record actually showed.

23  Q.  And:  "3.  We're sorry about this and we appreciate that

24  our readers called us on the mistake.  We've corrected the

25  editorial.  LINK."

M291PAL3                        JA 0843      Bennet - Cross

1          Why did you write "We're sorry about this and we

2     appreciate that our readers called us on the mistake"?

3     A.  Well, I didn't know that at that point, that apologizing

4     was against the company policy in a situation like this, and we

5     were sorry about it, and I wanted it to, you know, to be a

6     human voice, because we are human beings, so I added that.  I

7     think that "appreciate getting called out on the mistake"

8     was -- was Hanna's -- a version of Hanna's language, and I

9     thought that was a really good -- again, to indicate that, you

10    know, we -- our readers are doing us a favor when they tell us

11    we've got something wrong, you know, they're helping us do our

12    jobs and make sure that the record is correct.

13    Q.  Did you make a mistake in publishing "America's Lethal

14    Politics"?

15    A.  Yes.

16    Q.  Did you know it was a mistake when you published it?

17    A.  No.

18          MR. AXELROD:  You can take that down, please.  And

19    could you put up DX 54, just for Mr. Bennet.

20    Q.  And Mr. Bennet, do you know what DX 54 is?

21    A.  This is the actual -- these are the actual tweets that were

22    sent from the account.

23          MR. AXELROD:  Your Honor, I'd move for admission of

24    Defense Exhibit 54.

25          MR. VOGT:  No objection.

1          THE COURT:  Received.

2          (Defendant's Exhibit 54 received in evidence)

3    Q.  And then just briefly -- I know I'm beating up explaining

4    Twitter.  Could you explain what threading the tweets like this

5    means to the jury.

6    A.  It means linking them together so that they're read in

7    sequence.

8    Q.  Okay.  And so these three tweets were put out in sequence?

9    A.  Yeah, yes.  That's my understanding.

10         MR. AXELROD:  If you could take that down and then put

11   up PX 8, which is Plaintiff's Exhibit 8, for Mr. Bennet.

12   Q.  And Mr. Bennet, do you know what Plaintiff's Exhibit 8 is?

13   A.  That's one of these tweets.  Oh, excuse me.  This is the --

14   the main account of -- Twitter account of the *New York Times*

15   tweeting out our tweet about getting an important fact wrong.

16         MR. AXELROD:  Your Honor, I'd move for admission of

17   PX 8.

18         MR. VOGT:  No objection.

19         THE COURT:  Received.

20         (Plaintiff's Exhibit 8 received in evidence)

21   Q.  So if you could just, again, now that the jury has it in

22   front of them -- which they should in a second -- can you just

23   explain what this is.

24   A.  *The New York Times* has different Twitter feeds.  Opinion

25   had one; there's one that was effectively controlled by the

 1   newsroom that had a larger following, and that main Twitter
 2   feed also tweeted out our -- our tweet saying we got an
 3   important fact wrong and that no link was ever established.
 4            MR. AXELROD:  You can take that down, Mr. DiMezza, and
 5   put up DX 5, which is already in evidence.
 6   Q.  And so Mr. Bennet, I'm showing you the now corrected
 7   version of the editorial.
 8            MR. AXELROD:  And we can go to the second page and
 9   look at the correction -- or sorry, the third page.
10   Q.  Did you help write this correction?
11   A.  Yes.
12            MR. AXELROD:  And if you can just take this little
13   part down and go back to the main document.
14   Q.  This is the corrected version of the editorial, isn't it?
15   A.  Yes.
16   Q.  After this was corrected, could a reader going to *The New*
17   *York Times* website access the original version of the
18   editorial?
19   A.  You mean without the correction?
20   Q.  Correct.
21   A.  No.
22   Q.  In addition to the correction, did you make substantive
23   changes in the body of the editorial?
24   A.  Yes, we -- we changed the language in the editorial to
25   reflect the correction.

M291PAL3                         Bennet - Cross

1   Q.  And were you involved in making those changes?

2   A.  I must have been, yes.

3              MR. AXELROD:  If we can go to page 2, paragraph 5, and

4   blow it up.  "Was this attack evidence. . ."

5              I'm sorry.  I grabbed the wrong paragraph.  Sorry,

6   Mr. DiMezza.  The very top paragraph on the page.  I apologize.

7   Q.  All right.  So Mr. Bennet, this paragraph now reads, "Was

8   this attack evidence of how vicious American politics has

9   become?"  "Probably" is still in there.  "In 2011, Jared Lee

10  Loughner opened fire in a supermarket parking lot. . ." And

11  then it goes on and says, "At the time, we and others were

12  sharply critical of the heated political rhetoric on the right.

13  Before the shooting, Sarah Palin's political action committee

14  circulated a map that showed the targeted electoral districts

15  of Ms. Giffords and 19 other Democrats under stylized

16  crosshairs.  But in that case no connection to the shooting was

17  ever established."  Do you see that?

18  A.  Yes.

19  Q.  What was now changed in this editorial?

20  A.  Well, the word "incitement" has been changed to "heated

21  political rhetoric," and the -- the language about a link is

22  gone.

23  Q.  And the last sentence, was that added?

24  A.  Oh, and -- I'm sorry.  And the last sentence was added to

25  make, you know, clear that no connection was established.

M291PAL3                          Bennet - Cross

1   Q.  And I just want to go through this change.

2          The first sentence, "At the time, we and others were

3   sharply critical of the heated political rhetoric on the

4   right."  And so that was at the time of the Jared Lee Loughner

5   shooting?

6   A.  Yes.

7   Q.  Was that an accurate statement?

8   A.  Yes.  Yeah.

9   Q.  The next sentence says, "Before the shooting, Sarah Palin's

10  political action committee circulated a map that showed the

11  targeted electoral districts of Ms. Giffords and 19 other

12  Democrats under stylized crosshairs."  Was that an accurate

13  statement?

14  A.  Yes.

15  Q.  And then the third sentence, which is the added sentence,

16  "But in that case no connection to the shooting was ever

17  established."  And was that an accurate statement?

18  A.  Yes.

19          MR. AXELROD:  And if you could go now to the next

20  paragraph, Mr. DiMezza.

21          That's the second paragraph from the top.  Thank you.

22  Q.  This now says, "Conservatives and right-wing media were

23  quick on Wednesday to demand forceful condemnation of hate

24  speech and crimes by anti-Trump liberals."  Was that an

25  accurate statement?

**JA 0848**          Bennet - Cross

1   A.  Yes.

2   Q.  "They're right.  Liberals should of course be held to the

3   same standard of decency that they ask of the right."

4           And so what was the change that was made to this sixth

5   paragraph?

6   A.  Oh, we dropped the language about making the distinction

7   that in this case there was no -- no evidence of clear

8   incitement that was connected to the victims there, no

9   direct -- whatever that language was, is gone now.

10  Q.  If you could --

11          MR. AXELROD:  Could you take that down, Mr. DiMezza,

12  and put up Defense Exhibit 111, which is not in evidence yet.

13  Q.  And Mr. Bennet, do you know what this is?

14  A.  This is a news report in *The New York Times* on June 15th

15  about the -- about the shooting in Virginia.

16          MR. AXELROD:  Your Honor, I'd move for admission of

17  DX 111.

18          MR. VOGT:  No objection.

19          THE COURT:  Received.

20          (Defendant's Exhibit 111 received in evidence)

21  Q.  So I think you said this was a news report about the

22  shooting on -- in Virginia; is that right?

23  A.  Yeah.

24  Q.  But this was from the news division, not the opinion

25  division?

M291PAL3                    Bennet - Cross

1   A.  Yes.

2   Q.  Do you know when this was published?

3   A.  What time it was published?

4   Q.  Yeah, what time or when?

5   A.  It would have been published sometime overnight between

6   June 14th and June 15th and then in the paper on June 15th.

7   That is published digitally sometime overnight.

8   Q.  Were you aware of this article when you were revising the

9   editorial on the night of June 14th of 2017?

10  A.  I don't believe it had been published yet when I was

11  working on the editorial.

12  Q.  Did you --

13  A.  But in any case, I wasn't aware of it.

14  Q.  Did you review this article the next day when you were

15  working on the correction?

16  A.  Yes, I believe this is the one that we relied on.  Yes.

17          MR. AXELROD:  So Mr. DiMezza, if you could go to

18  page 4 of this document.

19          And blow up the -- yeah, sorry.  The second paragraph.

20  Q.  And it reads, "In 2011, the shooting of Ms. Giffords by a

21  mentally ill assailant came during a convulsive political

22  period, when a bitter debate over health care yielded a wave of

23  threats against lawmakers.  Sarah Palin, the former

24  vice-presidential candidate, drew sharp criticism for having

25  posted a graphic online that showed crosshairs over the

JA 0850

1   districts of several members of Congress, including

2   Ms. Giffords—though no connection to the crime was

3   established."

4           MR. AXELROD:  And Mr. DiMezza, now if you could put up

5   that language next to DX 5, which has the correct language in

6   the editorial.

7           And you can go to the next page, yeah.  Yeah, top

8   paragraph.  Thank you.

9   Q.  And Mr. Bennet, how would you compare the language in the

10  news article versus the corrected language in the editorial on

11  June 15th?

12          MR. VOGT:  Objection.

13  A.  We were --

14          THE COURT:  Sustained as to the form put.

15          MR. AXELROD:  Okay.

16  Q.  How would you compare the language --

17          THE COURT:  I'm not sure what you are asking him to

18  do, and that's why I sustained it on grounds of form.

19          MR. AXELROD:  Okay.

20          THE COURT:  Compare in what sense?

21          MR. AXELROD:  Yeah, I'm really just focused on -- let

22  me ask it a better way.

23  BY MR. AXELROD:

24  Q.  Mr. Bennet, do you see a similarity in the language that

25  was used in the corrected version of the editorial to what was

M291PAL3                      **JA 0851**      Bennet - Cross

1    used in the newest article that was published by *The Times*?

2    A.   It's almost identical.

3    Q.   And was that intentional?

4    A.   Yes.

5    Q.   And could you explain that to the jury.

6    A.   We were relying on the news report of the -- and again,

7    because, back to making sure the record is clear and

8    consistent, there had been no criticism whatsoever of the news

9    report that day.  I trusted the news report of *The New York*

10   *Times* to be accurate.  We were trying to correct the editorial

11   as quickly as possible, so we relied on the characterization in

12   the news pages to write the correction.

13   Q.   So just kind of taking --

14              MR. AXELROD:  You can take that down.  Thank you.

15   Q.   On June 15th, when you made the decision to correct the

16   editorial, how did you feel?

17   A.   I mean, I felt terrible.

18   Q.   And why is that?

19   A.   I, you know -- it's -- it is -- it's just a terrible thing

20   to make a mistake.  I have -- I mean, I -- I've edited, written

21   hundreds of pieces on deadline, probably, you know, thousands

22   of pieces overall, and I will say I have made very few

23   mistakes—at least ones that I know of.  But I made one that

24   night, and it -- and it's terrible, and -- and, you know,

25   furthermore, it was a mistake that, you know -- that, you know,

M291PAL3                         **JA 0852**        Bennet - Cross

1   as I wrote to Ross in one of those emails, that made it look
2   like we were being partisan, and it was extremely important to
3   me that the editorial board reestablish a reputation, or have a
4   reputation, for being able to call balls and strikes without
5   regard to partisanship.  So not only had it been a terrible
6   mistake, it was one that, you know, undermined something I
7   really -- I mean, just -- it was a terrible mistake.  It was --
8   just felt terrible.  I'm -- and still does.
9              MR. AXELROD:  Mr. DiMezza, if you could put up Defense
10  Exhibit 60, just for Mr. Bennet.
11  Q.  And Mr. Bennet, just superficially, what is Defense
12  Exhibit 60?
13  A.  This is the exchange that we -- I saw part of yesterday
14  when I responded to these questions that came in from CNN about
15  the mistake.
16             MR. AXELROD:  Your Honor, I'd move for admission of
17  DX 60.
18             MR. VOGT:  No objection.
19             THE COURT:  Received.
20             (Defendant's Exhibit 60 received in evidence)
21             MR. AXELROD:  And again, Mr. DiMezza, if you could
22  blow up that chunk right where you have the cursor.
23  BY MR. AXELROD:
24  Q.  So Danielle Rhoades Ha writes to you, "James, below are
25  questions from Oliver Darcy, a media reporter at CNN who was

M291PAL3                          Bennet - Cross

1    previously at The Blaze.  Please let me know your thoughts on

2    responding and then we can figure out how best to respond (if

3    at all).  In a meeting but will be free to discuss shortly."

4               And then there's a list of questions, and we'll just

5    go through those quickly.

6               So the first question is:  "Was The Times prompted to

7    make the change after criticism on Twitter.  There has been a

8    lot of talk about the removal of the public editor position and

9    I'm wondering if this was a case where the public's use of

10   social media platforms helped hold The Times accountable."

11              The second is:  "The Times's revised editorial seems

12   to still suggest the Palin map put Giffords 'under stylized

13   crosshairs.'  The map in fact put her district under

14   crosshairs.  Will The Times correct?"

15              The third is:  "What do you make of critics calling on

16   The Times to go further and retract the whole editorial since a

17   core piece of it was found to be incorrect?"

18              The fourth says:  "Will The Times be issuing an

19   apology to Sarah Palin for wrongly linking her to the shooting

20   of Giffords?"

21              And five:  "How did the error make it to print?  It

22   contradicts The Times' own reporting -- even an article that

23   was published in the same edition of the newspaper."

24              Do you see that?

25   A.  Yes.

1    Q.  And so --

2                MR. AXELROD:  Take that down.

3    Q.  And you respond, "Moving facts here but here are my

4    answers -- I have to go into a meeting so please call me out if

5    they're bad/insufficient."

6                And first you write, "Yes, we did in part respond to

7    the criticism on Twitter, and while it's always agonizing to

8    get something wrong, we appreciate it when our readers call us

9    out like this."  What did you mean by that?

10   A.  I'm just responding.  He was asking if we learned about the

11   problem and corrected it because of the criticism on Twitter,

12   and I'm acknowledging that that was part of it but not -- not

13   the whole thing.  And -- and again, just saying that, you know,

14   we value -- as painful as something like that is, we really

15   value it when we hear that feedback from our readers.

16   Q.  Second, you write, "You're right.  Thank you for calling

17   that to our attention and we've fixed it."  Was that in

18   reference to -- I think Mr. Vogt asked you about this

19   yesterday --

20   A.  Yes.

21   Q.  -- to the second correction?

22   A.  Yes, regarding the map itself.

23   Q.  Third, you write, "We made an error of fact in the

24   editorial, and we've corrected it.  But that error doesn't

25   invalidate the argument of the piece."  Do you see that?

M291PAL3                         Bennet - Cross

1   A.  Yeah.

2   Q.  Why did you write "that error doesn't invalidate the

3   argument of the piece"?

4   A.  Because I -- I feel that the overall argument of the piece

5   was still valid.

6   Q.  Explain that.

7   A.  You know, it -- I continue to believe that the three points

8   we were trying to make that day are important points, that this

9   was a horrible event, that people should calm down their

10  rhetoric because it can create the conditions that might lead

11  to events like this, and that the easy availability of guns

12  also can create an environment where this kind of lethal

13  violence or this kind of violence becomes more likely, and I --

14  as, you know, important as this correction was, I don't -- I

15  didn't think it -- it, as I say, invalidated that overall

16  argument.

17  Q.  Fourth, you respond, "I'm not aware that Sarah Palin has

18  asked for an apology, but yes, I, James Bennet, do apologize to

19  her for this mistake."  Why did you write that?

20  A.  Because I -- I didn't know that she had herself reacted to

21  this, but I did know other people were saying -- taking it as

22  having been critical of her, and I wanted to apologize for that

23  to her.

24  Q.  And when you wrote this, did you think that that apology

25  would be published?

M291PAL3                    Bennet - Cross

1   A.  Yes.  I thought it was published.  I didn't find out -- I

2   don't know -- for a day or two later that it hadn't been

3   relayed.

4   Q.  Then you wrote, fifth, "We screwed up.  It's not the first

5   time a mistake has made it into print, and every time it

6   happens we take it very seriously, as we do any mistake on any

7   platform."  And what did you mean by that?

8   A.  I again wanted to acknowledge that we had screwed -- you

9   know, that we'd made a mistake and -- and also just, again, I'm

10  using human language there because we are human beings, you

11  know, we do make mistakes.  There's a reason there's a

12  corrections box in the paper.  There's a reason there's such

13  detailed instructions about how you're supposed to make

14  corrections and styles for that.  It just happens.  It happens,

15  you know, and --

16  Q.  Let me --

17  A.  We don't promise to be perfect, we promise to try our

18  damnedest to be perfect, and when we're not, you know, we try

19  to fix it, and that's -- that's what I think the thought that

20  I'm -- a little bit defensively, I'll admit -- trying to

21  express here.

22  Q.  You write, "It's not the first time a mistake has made it

23  into print, and every time it happens we take it very

24  seriously."  Did you take this mistake very seriously?

25  A.  Yes.

1          MR. AXELROD:  Your Honor, if I may have a moment?

2          THE COURT:  Yes.

3          MR. AXELROD:  I have no further questions.

4          THE COURT:  Redirect.

5     REDIRECT EXAMINATION

6     BY MR. VOGT:

7     Q.  Mr. Bennet, do you recall being asked about Defense

8     Exhibit 16, which I've put up in front of you?

9     A.  Yes.

10    Q.  And this is the email string around 12:00 p.m. on the 14th,

11    where the first entry, it says, "Ok, we should definitely shoot

12    for a piece, not huge."  Do you see that?

13    A.  Well, the first entry is at 11:30.  It's at the bottom

14    of --

15    Q.  At the top, the one that's been highlighted.

16    A.  Oh, I -- I do see it.  Chronologically it's not the first.

17    That's --

18    Q.  Do you see that, though, that it's been highlighted?

19    A.  Yes, yes.

20    Q.  So at that point in time a decision had been made to write

21    a piece about gun control, correct?

22    A.  Partly about gun control.

23    Q.  Because at this point in time you had not sent your email

24    at 12:41 raising the prospect of writing about political

25    incitement, correct?

M291PAL3                    Bennet - Redirect

1   A.  That's correct.

2   Q.  And if we look at the 11:50 a.m. email from Mr. Semple --

3   A.  I see that.

4   Q.  And he says, "It would be interesting to know how many of

5   those Republican athletes are beholden to the NRA and its

6   generally antiregulatory philosophy, and whether something like

7   this might pound a little sense into their heads."  Do you see

8   that?

9   A.  I do.

10  Q.  He's referring there to the Republicans who had just been

11  shot; is that right?

12  A.  I think he is.

13  Q.  And you don't see that as being biased?

14          MR. AXELROD:  Objection.

15          THE COURT:  Sustained.

16  Q.  Now at this point in time at 11:50, did you know the

17  condition of the Republicans who had been shot?

18  A.  I don't remember what time I knew their condition.

19  Q.  Did you know if any of them were dead?

20  A.  I don't remember what I knew at 11:50.

21  Q.  Did you have a debate within the editorial department about

22  that comment by Mr. Semple?

23  A.  I don't remember.

24  Q.  And I think one of the other things that you had

25  mentioned --

M291PAL3                    Bennet - Redirect

1                    MR. VOGT:  If we can go to DX 17.

2     Q.  -- with respect to your 12:41 email.  And Mr. Axelrod asked

3     you some questions about the rhetoric of demonization in here?

4     A.  Yes.

5     Q.  And I think one of the things that you had said in response

6     to that was, when you raised questions about the rhetoric of

7     demonization, you were talking about politicians as well as the

8     media, correct?

9     A.  I don't remember what I said, but -- but I may have said

10    that.

11    Q.  You may have said the media is also included, right?

12    A.  Yeah.

13    Q.  And that would include *The New York Times*.

14    A.  I -- I wasn't thinking of *The New York Times* when I said

15    that.

16    Q.  Were you thinking of Kathy Griffin?

17    A.  I don't -- I -- I -- no, I wasn't thinking of Kathy

18    Griffin.  I mean, I --

19    Q.  And I think the way that you described when you were

20    discussing this email, when you had the -- use the words

21    "whether there's a point to be made about the rhetoric of

22    demonization --"

23    A.  Yes.

24    Q.  -- and whether it incites people to this kind, that you

25    were raising a question there, that's right?

JA 0860

M291PAL3                          Bennet - Redirect

1   A.  Yes.

2   Q.  And if I understood your testimony correctly, you said that

3   Ms. Williamson answered that question in her draft; is that

4   your understanding?

5   A.  Yes.

6   Q.  And in her draft, she did not use the word "incitement,"

7   did she?

8   A.  No, she didn't.

9   Q.  And I think you said, with respect to your testimony about

10  this particular issue, you said "we can't prove rhetoric leads

11  to violence"; is that right?

12  A.  Yes.

13  Q.  And you knew that as of June 14th of 2017, correct?

14  A.  Yes, yes.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   BY MR. VOGT:

2   Q.  And the question you posed here was if there was inciting

3   hate speech on the left that you wanted to address the issue of

4   incitement, correct?

5   A.  Yes.

6   Q.  And just to clarify, you never saw any inciting hate speech

7   on the left prior to the publication of this editorial, right?

8   A.  I didn't see a specific example of it.

9   Q.  Did you see any example of it?

10  A.  No, I don't think I did.

11  Q.  No, because I think you told us you made an assumption,

12  based off the shooter's social media pages, that he was

13  politically motivated, correct?

14  A.  I made an assumption that politics had something to do with

15  his decision to attack those Congressmen.  Again, that's an

16  opinion.

17  Q.  And when you say in here, when you use the term

18  "incitement," I think you said that, with respect to your

19  statement in this e-mail, incite requires an object as a verb,

20  correct?

21  A.  I did say that, but as I said it, I thought I'm actually

22  not sure if that is correct.

23  Q.  Because if we look at the way you used it in this, incite,

24  the object of the verb would be people to this kind of

25  violence, wouldn't it?

1    A.   Yes.

2    Q.   And that's a causal connection, isn't it?

3    A.   In that case it is, yes.

4    Q.   And this was actually the direction you gave to

5    Ms. Williamson in writing her piece, wasn't it?

6    A.   Yes.

7    Q.   And I believe other direction that you would have given

8    Ms. Williamson in writing her piece was the e-mails that we had

9    looked at where you had said -- let's pull up D-136.  I'm sorry

10   that's not it.  Where is the more relevant -- I think it is

11   D-28.

12             THE COURT:  While you are looking for that, just so I

13   am clear on one of the witness's previous answers, you are

14   familiar with grammar, are you not?

15             THE WITNESS:  I am.

16             THE COURT:  And you know the difference between a

17   transitive and an intransitive verb?

18             THE WITNESS:  I think so.

19             THE COURT:  And a transitive verb takes an object,

20   yes?

21             THE WITNESS:  Yes.

22             THE COURT:  So if the dictionary says that "incite" is

23   a transitive verb, it means it takes an object.

24             THE WITNESS:  It takes an object.

25             THE COURT:  All right.

1          THE WITNESS:  Thank you.

2          THE COURT:  Go ahead.

3    BY MR. VOGT:

4    Q.  Mr. Bennet, with respect to this e-mail, you sent this to

5    Elizabeth Williamson and said, we dug a little further, take a

6    look at these two, correct?

7    A.  That's correct.

8    Q.  And we had also looked at, and Mr. Axelrod had asked you

9    about, an e-mail sent around the same time on which

10   Ms. Williamson was copied where you said these two are more

11   relevant to the piece that was being written.  Correct?

12   A.  Yes.  Is that the same -- yeah, yes.

13   Q.  And the two pieces that you have identified as being more

14   relevant were "Bloodshed and Invective in Arizona" and "As We

15   Mourn," correct?

16   A.  Yes, I think I referred to them as relevant precedent.

17   Q.  And if we can pull up Plaintiff's Exhibit 134.

18          And you went through this one with Mr. Axelrod on some

19   of it and he pointed out to you the third paragraph down --

20   A.  Yes.

21   Q.  -- that he is very much a part of a widespread squall of

22   fear.

23          But you guys didn't look at the paragraph above that.

24   Let's look at that one.

25          It says, "Jared Loughner, the man accused of shooting

1   Ms. Giffords, killing a federal judge and five other people,
2   and wounding 13 others, appears to be mentally ill.  His
3   paranoid Internet ravings about government mind control place
4   him well beyond usual ideological categories."
5            Do you see that?
6   A.  I do see that.
7   Q.  Do you recall reading that particular paragraph about
8   Mr. Loughner prior to editing Ms. Williamson's draft?
9   A.  I must -- I think I did, yes.  Again, I don't recall
10  specifically reading all this, but we definitely used this as
11  precedent for the piece that we wrote that day.  So --
12  Q.  So it's highly probable that you read that paragraph?
13  A.  Yes, yes.
14  Q.  And let's look now at the other piece in your e-mail.
15           Can you pull up Plaintiff's Exhibit 135, please.
16           And I think one of the things that you had said with
17  Mr. Axelrod was that you had not instructed anyone to write
18  anything about Governor Palin.  Is that right?
19  A.  That's right.
20  Q.  But we can agree that when you sent "As We Mourn" and
21  "Bloodshed and Invective in Arizona" to Ms. Williamson, you
22  were giving her some instruction on the direction that the
23  piece should go in, correct?
24  A.  That's correct.
25  Q.  And if we turn to the second page of "As We Mourn," the

1    third paragraph on the bottom it says, "The president's words

2    were an important contrast to the ugliness that continues to

3    swirl in some parts of the country."

4    A.  Um-hmm, yes.

5    Q.  "The accusation by Sarah Palin that 'journalists and

6    pundits' had committed a 'blood libel.'"

7            Do you see that?

8    A.  Yes.

9    Q.  Do you recall reading that paragraph?

10   A.  Again, I don't specifically recall reading it.

11   Q.  But we can agree that that raises Sarah Palin's name in the

12   context of the Loughner shooting, is that correct?

13   A.  Yes, it does.

14   Q.  Do you have any idea what she meant by "blood libel"?

15   A.  I do know.

16   Q.  What did she mean by that phrase?

17   A.  That journalists had raised questions about her overheated

18   rhetoric.

19   Q.  In connection with the Loughner --

20   A.  Yes, with that shooting.

21   Q.  And that would have been journalists had done that back in

22   the 2011 time period, correct?

23   A.  That's right.

24   Q.  It's highly probably that you read this paragraph before

25   publishing the editorial, is that correct?

1    A.  It's probable, I think, yeah.

2    Q.  I think what you testified to with respect to the

3    "Bloodshed and Invective" piece, when you were talking to

4    Mr. Axelrod about that, was that that was an example of

5    Republicans who were being blamed when a Democrat was shot, is

6    that right?

7    A.  I don't remember the precise words I used, but I think that

8    was the gist.

9    Q.  That was the gist of it?

10            And so when we get to --

11   A.  As we read it.  Could -- would -- could we look at that

12   exhibit again?

13   Q.  Sure.

14   A.  Because I just remember the word "Republican" was used, and

15   I didn't see the word Democrat there, but I might be -- I might

16   have overlooked it.

17   Q.  Plaintiff's Exhibit 134.

18   A.  No, I don't see what I would have been referring to.

19   Q.  But you do make that reference, correct, in your testimony?

20   A.  Yes.

21            Could we see the next page, please?  Oh, yes, there it

22   is.  Yes.  This was the editorial, yup.

23   Q.  Do you see also, if we look at the second full paragraph on

24   this page, it says, "It is facile and mistaken to attribute

25   this particular madman's act directly to Republicans or Tea

1  Party members"?

2  A.  I do.

3  Q.  Do you recall reading that on June 14 before the editorial

4  was published?

5  A.  Again, it is in the same category.  I probably read it.

6  Q.  And so if we fast-forward from this piece that blamed

7  Republicans for a Democrat being shot to June 14 of 2017, on an

8  occasion when Republicans were shot, what the "America's Lethal

9  Politics" editorial did was blame both Republicans and

10 Democrats in the context of that shooting, wasn't it?

11 A.  I don't think that's accurate.

12 Q.  Well, on that date we can agree that Republicans were shot,

13 correct?

14 A.  Yes.

15 Q.  And in the editorial itself, we can agree that the rhetoric

16 of the Republicans was raised in the editorial, correct?

17 A.  Yes.

18 Q.  Can we also agree that the rhetoric of Democrats was not

19 raised in "Bloodshed and Invective in Arizona"?

20 A.  It doesn't look like it, no.

21 Q.  And if we can go to Plaintiff's Exhibit 174, this is your

22 e-mail exchange with Mr. Douthat, and I want to look at your

23 top entry on the morning of June 17, at 7:56 a.m.  At the end

24 of that, you acknowledge to Mr. Douthat, "I see your point.  It

25 reads like partisan score-keeping."  Is that right?

1    A.  Yes.

2    Q.  If we go back to Defense Exhibit 17 for a second, your

3    12:41 a.m. e-mail, and I believe that when you were discussing

4    this e-mail with Mr. Axelrod in the context of the editorial,

5    you referred to what Ms. Williamson wrote in her draft as being

6    her theory, correct?

7    A.  I -- I'm sorry.  Can you rephrase the question?

8    Q.  Yeah.  Do you recall when you were testifying a moment ago

9    with Mr. Axelrod, I think you referred to Ms. Williamson's

10   draft as being her theory.  Is that right?

11   A.  I don't recall saying that, and I'm not sure what I

12   specifically meant; but it wasn't her theory, and if I said

13   that, that was a mistake.

14   Q.  It was your theory, correct?

15   A.  I think it was our collective theory.

16   Q.  Well, you were the first one that would have raised this

17   theory in your 12:41 a.m. e-mail, correct?

18   A.  I raised the question of whether we should address this.

19   Q.  And I think you also testified --

20   A.  So it is also my theory.

21   Q.  -- that what you meant was that you were interested in

22   looking at the highly charged atmosphere of political rhetoric,

23   is that right?

24   A.  That's right.

25   Q.  And if we go to Ms. Williamson's draft, which is

1    Plaintiff's Exhibit 141, and we go to "Just as in 2011," and

2    Ms. Williamson says, "Just as in 2011, when Jared Lee Loughner

3    opened fire in a supermarket parking lot, grievously wounding

4    Representative Gabby Giffords and killing six people, including

5    a 9-year-old girl, Mr. Hodgkinson's rage was nurtured in a vile

6    political climate."  Do you see that?

7    A.  I do.

8    Q.  And that would be equivalent to a highly charged atmosphere

9    of political rhetoric, wouldn't it?

10   A.  I mean, I think it is in line with that same idea, yeah.

11   Q.  And Ms. Williamson here, you have gone through with

12   Mr. Axelrod, she also, in the prior paragraph, discussed the

13   pattern, the sickeningly familiar pattern that is emerging.

14   A.  Yes.

15   Q.  You see that?

16        And you kept reference to that pattern in the actual

17   editorial that was published after you edited it, correct?

18   A.  I did.

19   Q.  And the pattern consisted of the Hodgkinson shooting and

20   the Loughner shooting, correct?

21   A.  That's right.

22   Q.  And to be more accurate, the Hodgkinson shooting and the

23   Loughner shooting were the evidence that was cited in support

24   of the pattern, correct?

25   A.  Yes, that is correct.

1    Q.  And we can agree that evidence consists of facts, correct?

2    A.  Yes, we can agree to that.

3    Q.  And so with respect to the actual editorial which -- can

4    you pull up Plaintiff's Exhibit 1?  Go to the second page.

5    "Was this attack."

6              We just looked at the language in Ms. Williamson's

7    draft where she had discussed "the vile political climate."  Do

8    you recall that?

9    A.  Yes.

10   Q.  And you deleted that reference, correct?

11   A.  Yes.

12   Q.  And you replaced that reference with the link to "political

13   incitement was clear."  Right?

14   A.  That's right.

15   Q.  And I think you mentioned in your testimony, you had a

16   reference to an opinion, that you had asserted some form of an

17   opinion in this editorial, is that right?

18   A.  Yes.

19   Q.  The opinion was the pattern, though, correct?

20   A.  Well, the opinion was that whether or not the attack -- the

21   attack was evidence of how vicious our politics has become.  So

22   it refers to the whole question of a connection to the

23   political environment.

24   Q.  But with respect to the statement "the link to political

25   incitement was clear," that is a factual statement, correct?

M292Pal4                     Bennet - Redirect

1    A.   Again, it is -- to my mind, it is part of the -- it all

2    flows from the probably this is evidence of how vicious

3    American politics has become.

4    Q.   Could you drop that down and pull up Plaintiff's Exhibit 7.

5    A.   But I think it is fair to say that we are saying that this

6    is -- it is fair to say that we are saying that this is a

7    specific example of what we are talking about.

8    Q.   It's fair to say that because you actually said we got an

9    important fact wrong, didn't you --

10   A.   Right.

11   Q.   -- when you corrected this?

12   A.   Yes.

13   Q.   And I think that you had testified with Mr. Axelrod that

14   your intention, when crafting this particular tweet, was to

15   unmuddy the record, right?

16   A.   That's right.

17   Q.   And make sure that the record was clear with respect to the

18   fact that you got wrong in this piece, is that correct?

19   A.   That's right.

20   Q.   And you would not, after making an error like this,

21   misrepresent what that error was to the public, would you?

22   A.   No.

23   Q.   That would be compounding the error, wouldn't it?

24   A.   That would.

25   Q.   And the way that you represented to the public that the

1   error was made in this was that you got an important fact

2   wrong, correct?

3   A.  Yes.

4   Q.  You did not tell the public:  I used the word "incitement"

5   in an improper way, did you?

6   A.  I don't think I did.

7   Q.  You didn't tell the public that's not what I meant when I

8   used the word "incitement," did you?

9   A.  I did not say that.

10  Q.  Can you pull up D-96.

11          Mr. Bennet, you had talked about this Tom Friedman

12  piece with Mr. Axelrod as being something that motivated your

13  rewriting or informed the way that you had rewritten the

14  editorial on June 14 of 2017, is that right?

15  A.  That's right.

16  Q.  Did you send this piece to Ms. Williamson?

17  A.  No, I didn't.

18  Q.  Did you give Ms. Williamson any information that this piece

19  was what you intended to address in the editorial?

20  A.  I didn't intend to address this piece.

21  Q.  Did you at any point in time mention this piece by

22  Mr. Friedman to Ms. Williamson?

23  A.  No.  No, on that day, no.

24  Q.  And you had mentioned -- you had gone through some of this

25  piece with Mr. Axelrod, but I want to focus on the first

1   statement there.  It says, "And that, ladies and gentlemen, is

2   how Israeli Prime Minister Yitzhak Rabin got assassinated."  Do

3   you see that?

4   A.  I see that.

5   Q.  That's making a reference to political rhetoric leading to

6   assassination, isn't it?

7   A.  Yes.

8   Q.  That's a causal connection, isn't it?

9   A.  Well, again, I think if you read the piece, it is a -- he

10  is connecting it indirectly.

11  Q.  Right.  And I think you mention that with Judge Rakoff,

12  that the fact that -- and I think the language that

13  Mr. Friedman uses in here is that the statements by then

14  candidate Trump could end up inciting just this kind of

15  violence, correct?

16  A.  I'm sorry.  Can you repeat that?

17  Q.  Yeah, I think it is on the second page.  It is on here

18  somewhere.  I think on the third page.  I am missing it now.  I

19  believe that there is somewhere in this piece --

20          THE COURT:  If you can't find it, go on to something

21  else.

22          MR. VOGT:  I will go on, your Honor.

23  Q.  But I think that when you were being questioned about this,

24  you actually answered a question from Judge Rakoff in that you

25  considered what Mr. Friedman was talking about in this piece to

JA 0874

M292Pal4                    Bennet - Redirect

```
1   be, in terms of the incitement, an indirect cause.  Do you

2   remember that terminology?

3   A.  I remember using it as an adverb, indirectly, but I don't

4   remember if I used "cause" or not.

5   Q.  But you did use the word indirect, right?

6   A.  I think so, but I'm not sure.

7   Q.  All right.  Can we go to Plaintiff's Exhibit 1, second

8   page, second paragraph from the top.

9           And what you wrote in the editorial when you revised

10  it was "though there is no sign of incitement as direct as in

11  the Giffords attack."  Do you see that?

12  A.  Yes.

13  Q.  And that was a word that you chose, "direct," correct?

14  A.  Yes.

15  Q.  And did you at any point in time describe Mr. Loughner in

16  these paragraphs of the editorial that you rewrote as deranged?

17  A.  I -- yes.  If you go back up, the pattern that we write

18  about specifically says that it includes a surely deranged

19  person conducting an attack.  So that description applied to

20  both Mr. Hodgkinson and Mr. Loughner.

21  Q.  And I think that when you were testifying with Mr. Axelrod,

22  you had mentioned or talked about when you got Ms. Williamson's

23  draft.  Do you recall that?

24  A.  Yes.

25  Q.  And initially, when you got her draft, it wasn't your
```

M292Pal4                      Bennet - Redirect

1    intention to rewrite it.  Is that correct?

2    A.  Yes, that's correct.

3    Q.  Was it your intention on that day to edit the draft at all?

4    A.  It became my intention to do that; but, no, I didn't start

5    the day intending that or even through the afternoon I wasn't

6    intending that.

7    Q.  Can we pull up D-38.

8            In this -- Mr. Axelrod talks about this e-mail with

9    you.

10   A.  Yes.

11   Q.  And this is Ms. Williamson responding to your 7:22 p.m.

12   e-mail at 7:29?

13   A.  Yes.

14   Q.  And she describes the lede, and it says, "and I can tell

15   from your messages that you were keen to take this on."  Do you

16   see that?

17   A.  Yes.

18   Q.  Did you ever tell her that you weren't keen to take this on

19   after she sent you this e-mail?

20   A.  No, but I also don't know what she is referring to.  I was

21   not keen to take it on.

22   Q.  But she got the impression that you were apparently.

23   A.  That's what --

24   Q.  Is that right?

25   A.  That's what she says here, yes.

M292Pal4                    Bennet - Redirect

1   Q.  And I think at one point today you referred to

2   Ms. Williamson as that day's expert on the question that was

3   addressed in the editorial.  Is that correct?

4   A.  Words to that effect, yes.  She had done the reporting for

5   the editorial that day.

6   Q.  And when you say "the reporting," you are referring to her

7   draft, right?

8   A.  The work she had done in order to produce the draft, yes.

9   There would have been other -- there would have been a lot of

10  other reporting that didn't probably, in the end, make it into

11  the final draft.

12  Q.  And that would be the reporting that you rewrote, would it

13  not?

14  A.  I rewrote the draft.

15  Q.  I think you also at one point today testified that this was

16  your problem, it was your responsibility, referring to the

17  corrections, is that right?

18  A.  I think I said that referring to the mistake.

19  Q.  And then after that, I think that you said that you told

20  Elizabeth Williamson to fix it.  Is that right?

21  A.  No, I didn't say that.

22  Q.  Didn't you give Ms. Williamson the assignment of doing the

23  research at 5:08 on the morning of June 15?

24  A.  Yes.

25  Q.  You didn't do that research yourself?

M292Pal4                         Bennet - Redirect

1   A.   No.

2   Q.   And in terms of the correction, I think you testified that

3   you helped write the correction, is that -- was I correct in

4   that?

5   A.   I think that we collectively -- I didn't actually put my

6   hands on the keyboard, but we collectively arrived at the

7   correction.

8   Q.   And I think it was Defense Exhibit 5.  And this would have

9   been the correction I think that you were talking about with

10  Mr. Axelrod.  And if we go to the second page, that "was this

11  attack evidence of how vicious," that's the corrected

12  paragraph, correct?

13  A.   That's correct.

14  Q.   And what you say here is, "In 2011, Jared Lee Loughner

15  opened fire in a supermarket parking lot, grievously wounding

16  Representative Giffords and killing six people, including a

17  9-year-old girl.  At the time, we and others were sharply

18  critical of the heated political rhetoric on the right."

19  A.   Right.

20  Q.   Now, Michael, can you keep that up and pull up 141.  And

21  pull up the "just as in 2011" paragraph.

22           And do you see, so in the rewrite it says, "At the

23  time, we and others were sharply critical of the heated

24  political rhetoric on the right."  Do you see that?

25  A.   Yes.

M292Pal4                    Bennet - Redirect

1    Q.  In Ms. Williamson's draft she says, "Then, it was the

2    pro-gun right being criticized."

3    A.  I see that.

4    Q.  Those are the same concepts, aren't they?

5    A.  Well, I mean, hers were specifically to pro-gun right.

6    Q.  But she specifically refers to criticism of the right,

7    doesn't she?

8    A.  Yes, she does.  She doesn't refer to our criticism of the

9    right, but she does refer to criticism of the right.

10   Q.  And when she says "then" she is referring back to 2011,

11   correct?

12   A.  Yes.

13   Q.  And that's -- when she says "then," it is the same thing as

14   saying "at the time," isn't it?

15   A.  Yes.

16   Q.  And so the correction, at least in that regard, says

17   essentially the same thing that Ms. Williamson said in her

18   draft, doesn't it?

19   A.  It says a version of it, yes.

20   Q.  And that's -- that part of her draft is what you rewrote

21   and wrote "the link to political incitement was clear."

22   A.  That was where I -- yes, at least that's generally where I

23   put those words.

24   Q.  Can you pull up D-60.  Go to the next page.  And you went

25   through this a moment ago with Mr. Axelrod.  Your e-mail

M292Pa1l4                    Bennet - Redirect

1  exchange with Ms. Rhoades Ha concerning the list of questions

2  from Oliver Darcy, a media reporter at CNN.

3  A.  Yes.

4  Q.  Are you familiar with Mr. Darcy?

5  A.  I don't know him.

6  Q.  What's a media reporter?

7  A.  Someone who covers the press, writes about other

8  publication, writes about journalism.

9  Q.  And they are known at times to be critics of journalists,

10 is that right?

11 A.  Well, again, there is a difference between a reporter and a

12 critic.  A reporter is supposed to cover the media.  A critic

13 is somebody who is more akin to an opinion columnist who is

14 able to express opinions about the media.

15 Q.  And Mr. Darcy is a media reporter to your understanding?

16 A.  That's what it says here.

17 Q.  And then you went through these -- the questions at the

18 bottom and then your answers up at the top with Mr. Axelrod.

19 Do you remember that?

20 A.  Yes.

21 Q.  And with respect to his bottom question, "How did this

22 error make it to print?  It contradicts *The Times*' own

23 reporting, even an article that was published in the same

24 edition of the newspaper."  Do you see that?

25 A.  I do.

M292Pal4                        **JA 0880**            Bennet - Redirect

```
 1    Q.  Then your response to that is "we screwed up."

 2    A.  Yes.

 3    Q.  Now, you did not say in your immediate response, we weren't

 4    aware of any report in the newspaper that day, did you?

 5    A.  No, I didn't say that.

 6    Q.  And again, you thought at the time that what -- the

 7    responses you were giving here were actually going to be

 8    published by Mr. Darcy, correct?  They would be made public?

 9    A.  Well, I didn't know for -- I think I said at the top of the

10    e-mail that she should respond to me if they -- if -- I can't

11    remember the language I used, if she wanted to change them

12    somehow, but barring that, I did think that they would be made

13    public, yes.

14    Q.  And when they are made public, they are part of the record,

15    correct?

16    A.  Yes.

17    Q.  The record that you don't want to be muddy, right?

18    A.  That's right.

19    Q.  And so you would have been as accurate as possible in your

20    responses to Mr. Darcy's questions, wouldn't you?

21    A.  Regardless I would be as accurate as I could be in response

22    to his questions.

23    Q.  Then the top question that Mr. Darcy asks down at the

24    bottom is "was *The Times* prompted to make the change after

25    criticism on Twitter?"
```

1      Do you see that?

2  A.  I do.

3  Q.  And then your response to that was, "Yes, we did in part

4  respond to the criticism on Twitter; and while it's always

5  agonizing to get something wrong, we appreciate it when our

6  readers call us out like this."  Is that right?

7  A.  That's right.

8  Q.  So it was your readers that were calling you out on

9  Twitter, wasn't it?

10 A.  Yes.

11 Q.  Not just conservative media reporters.  But actual readers,

12 right?

13 A.  They are readers.

14 Q.  Were there also nonmedia readers that you saw calling you

15 out on Twitter?

16 A.  I didn't see that.

17 Q.  Did you ever learn that there were nonmedia readers that

18 had called out on Twitter?

19 A.  I didn't learn that specifically, no.

20 Q.  Did you look into that?

21 A.  I didn't.

22 Q.  And I think with respect to his question about an apology

23 to Sarah Palin, you had said "I'm not aware that Sarah Palin

24 has asked for an apology; but, yes, I, James Bennet, do

25 apologize to her for this mistake."  Right?

M292Pal4                    Bennet - Redirect

1   A.  Yes.

2   Q.  And I think you said that regard that you found out a

3   couple of days later that that apology had not been published.

4   Correct?

5   A.  I don't remember.  I think I said I found out a day or two

6   later.  It definitely wasn't that day.  I went home that night

7   thinking it had been.

8   Q.  But it was shortly after this exchange that you found out

9   that the apology had not gone public, correct?

10  A.  That's correct.

11  Q.  And at that point in time, did you reach out to

12  Governor Palin to apologize?

13  A.  I didn't because I learned that our policy was not to do

14  that; and I raised my concerns about that policy, but it

15  remained in place.

16  Q.  And are you still working at *The Times*?

17  A.  No, I'm not.

18  Q.  Since you left *The Times*, have you reached out to

19  Governor Palin to apologize to her?

20  A.  No, I haven't.  May I explain why?

21          THE COURT:  Well, there is no pending question.  We

22  will see if your counsel wants to do some recross.

23          Anything else, counsel?

24          MR. VOGT:  I have one more thing, your Honor, I just

25  wanted to go through.

M292Pal4                        Bennet - Redirect

**JA 0883**

1    Q.  I think at one point in your testimony, when you were

2    talking about -- I think you were talking about you felt

3    terrible about this mistake that you had made?

4    A.  Yes.

5    Q.  And you were talking about making sure that the record was

6    correct and clear.  Do you remember that?

7    A.  I do remember that.

8    Q.  And I think that one of the things you said there was you

9    were concerned about making sure that the editorial board's and

10   *The New York Times*' reputation that it was not partisan was

11   being protected.  Is that right?

12   A.  I don't think I phrased it that way.

13   Q.  Do you recall the way that you phrased it?

14   A.  I don't recall specifically the way I phrased it, but I

15   don't think that's how I phrased it.

16   Q.  Did *The New York Times* have a reputation to your knowledge

17   for not being partisan?

18            MR. AXELROD:  Objection.

19            THE COURT:  Sustained.

20            MR. VOGT:  May I confer, your Honor?

21            THE COURT:  Yes.

22            (Counsel confer)

23            MR. VOGT:  Nothing further, your Honor.

24            THE COURT:  We have time for a couple of minutes of

25   recross.

JA 0884

1              MR. AXELROD:  I'm going to be very brief, cognizant of

2       the time.

3       RECROSS EXAMINATION

4       BY MR. AXELROD:

5       Q.   So Mr. Bennet, just a couple minutes ago Mr. Vogt was

6       asking you about, you know, you left *The Times* now, why haven't

7       you apologized to Ms. Palin.  Why haven't you?

8       A.   Well, because the Governor is suing the *Times* and me for

9       libel; and if I were her, under those conditions, I wouldn't

10      think an apology was being made in good faith, that it would

11      look like an effort to get out of a lawsuit.  And maybe she

12      wouldn't think that, but I would think that in her position,

13      and so that's why I hadn't done it during that period.

14      Q.   On June 15, when you are thinking about correcting the

15      editorial, why didn't you try to explain to people or to the

16      media critics that you saw, that they were taking your words in

17      a way that you hadn't intended?

18      A.   Again, well, partly those sorts of -- when we say things

19      like, oh, we referred imprecisely or we didn't, blah, blah,

20      blah, those corrections always sound sort of weasely to me, and

21      it also sounds like you are blaming the readers for getting it

22      wrong when it's actually your fault; and then, most

23      fundamentally, though, because, as I said, I just wanted to

24      make sure that the record was clear and consistent, and this

25      was the most direct and forthright way to do it.  And again, my

**JA 0885**

1    hope was that this would allay the critics and demonstrate, to

2    use the word -- the term I just used, demonstrate good faith.

3    Q.  Mr. DiMezza, if you could put up Plaintiff's Exhibit 1,

4    which is the editorial.  Go to the sixth paragraph, please.

5    "Conservatives."  There you go.

6            I think Mr. Vogt was asking you questions about who

7    this editorial was calling out, whether it was calling out the

8    left or the right.  Do you recall that string of questions?

9    A.  I do.

10   Q.  And so this paragraph says, "Conservatives and right-wing

11   media were quick on Wednesday to demand forceful condemnation

12   of hate speech and crimes by anti-Trump liberals.  They're

13   right."  Do you see that?

14   A.  I do.

15   Q.  And then if you go to the very last paragraph of this

16   editorial, okay, this one, it looks like this one cuts it off.

17   Can we try going to Defense Exhibit 5 -- Defense Exhibit -- our

18   equivalent.  I think it's 3?  Thanks.  Yeah, that's fine.  If

19   you go to the "President Trump."

20           It reads, "President Trump said just the right thing

21   after the attack on Wednesday:  'we may have our differences,

22   but we do well in times like these to remember that everyone

23   who serves in our nation's capital is here because, above all,

24   they love our country.  We can all agree that we are blessed to

25   be Americans, that our children deserve to grow up in a nation

1   of safety and peace."

2           Are you praising President Trump here, Mr. Bennet?

3   A.  Yes.

4   Q.  Why?

5   A.  Because, I mean, we felt he had said exactly the right --

6   this was just the right sentiment and it was put beautifully

7   and, you know, we wanted to draw attention to it.  I just

8   thought it was the right sentiment to, you know, to hear from

9   the president on a day like that.

10          MR. AXELROD:  I have no further questions, your Honor.

11          THE COURT:  All right.  Anything else?

12          MR. VOGT:  Just one.

13          THE COURT:  Go ahead.

14  REDIRECT EXAMINATION

15  BY MR. VOGT:

16  Q.  Now can you pull up D-136.  The bottom of page 2.

17          That paragraph Mr. Axelrod just read to you about

18  President Trump, do you see the start of it there at the very

19  bottom?  Do you see that?

20  A.  Oh, I'm sorry, yes, I do, I do.

21  Q.  Just so we are clear on this, the black text is text that

22  Ms. Williamson had in her original draft, isn't it?

23  A.  The black text is the quote and, yes, that's correct.

24  Q.  So that was already in there, right?

25  A.  Yeah.

**JA 0887**

M292Pal4                    Bennet - Redirect

1   Q.  But the red part with the line through it is what you cut

2   out, where it says "offering" or "offered a unifying initial

3   response," correct?

4   A.  That's right.

5           MR. VOGT:  That's all I have, your Honor.

6           THE COURT:  Just so we are clear, though, it was you

7   who added "said just the right thing after the attack on

8   Wednesday."

9           THE WITNESS:  Yes.  Those were my words.

10          THE COURT:  Anything else?

11          MR. AXELROD:  No, your Honor.

12          THE COURT:  Thank you very much.  You may step down.

13          (Witness excused)

14          THE COURT:  Thank you very much, ladies and gentlemen

15  of the jury.  We will take our lunch break and we will

16  reconvene at 2:05.

17          (Continued on next page)

18

19

20

21

22

23

24

25