# No. 22-558

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

SARAH PALIN, an individual

*Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY, a New York
corporation, and JAMES BENNET, an individual

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Southern District of New York
(Case No. 1:17-cv-04853-JSR, Hon. Jed S. Rakoff)**

**JOINT APPENDIX**

**VOLUME V OF XI (Pages JA888 to JA1157)**

Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: 813- 834-9191
Fax: 813-443-2193

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY 10017
Tel: 212-907-7300 Fax: 212-754-0330

*Counsel for Plaintiff-Appellant Sarah Palin*

# JOINT APPENDIX

# TABLE OF CONTENTS

## Volume V of XI

Trial Transcript, February 9, 2022....................................................................JA888

Trial Transcript, February 10, 2022..................................................................JA942

Trial Transcript, February 11, 2022..................................................................JA961

1                  (Jury not present)

2                  THE COURT:  Mr. Bennet, you can step down.

3                  Please be seated.

4                  We are going to continue now with the instructions to

5        the jury.  Anyone who would regard that as boring beyond

6        belief, a reasonable point, is free to leave and start their

7        lunch now; but anyone who wants to stay, you have my

8        condolences.

9                  So go ahead, counsel.

10                 MR. BROWN:  Thank you, your Honor.

11                 To pick up where we left off, I had just started to

12       explain that, with respect to instructions no. 9 and 10, we

13       felt there was one important point that had been in the Court's

14       prior draft of the instructions but which was eliminated from

15       the current draft and which we believe should be reinserted.

16                 In our view, it should be expressed in both

17       instruction no. 9 and no. 10; although if the Court is inclined

18       not to repeat the point, we would insert it in instruction 10.

19       And if I may, I will tell you what that one sentence is --

20                 THE COURT:  I'm dying to hear.

21                 MR. BROWN:  -- and then I can point to the places

22       where we think it should be.

23                 The point is this, your Honor.  Nowhere in the current

24       draft of the instructions does the Court inform the juror of

25       what the plaintiff alleges a defamatory meaning conveyed by the

M292Pal4                              Bennet - Redirect

1    challenged statements was, and we believe that the jury must be

2    informed of that.

3              And so, and again, I will pinpoint the spot in no. 9

4    first.  On the second page of the instruction, the first

5    paragraph at the top of the page begins with "specifically,"

6    and then the Court --

7              THE COURT:  So the place it would come in would be in

8    10.  So what is it you want to add to 10?

9              MR. BROWN:  Your Honor, there that would also be at

10   the end of the first paragraph where the Court had just

11   referred to the two statements, and we would there ask the

12   Court to add the sentence, "The plaintiff claims that each of

13   these two challenged statements defamed her by falsely

14   asserting that she personally was responsible for the map and

15   therefore was 'clearly and directly responsible for inciting a

16   mass shooting at a political event in January 2011,'" and I am

17   quoting there paragraph 1 of the first amended complaint.  That

18   is the singular defamatory meaning that plaintiff alleges the

19   two statements, either in combination or individually,

20   communicated about her, and we believe the jury needs to be

21   informed of what she alleges the defamatory meaning is.

22             THE COURT:  All right.  Well, my handwriting is not

23   quick enough to copy all that down, but I will leave it to my

24   law clerk to get that.

25             I agree with you that we should put in something in

**JA 0890**

that sentence as to what her claim is.  The fact that the

complaint we have discussed this once before, the fact that the

complaint gloms together all her assertions of defamation

doesn't mean that she hasn't asserted subsets of that, which is

why I broke it into two challenged statements as opposed to

one.  But I think that maybe something along the lines of

"specifically, plaintiff claims that these challenged

statements defamed her by asserting that she bore" -- "by

asserting that her role, if any, in arranging for the

distribution of the crosshairs map made her responsible for

inciting a virulent atmosphere."  I'm not sure I like those

words, but "that helped lead to Mr. Loughner's shootings."  I'm

going to play with that.  I'm not totally happy with that.

     But I don't think -- if you want to quote the

complaint, I could live with that, as long as we added a

sentence -- I mean, it is, I think, basic law 101 that if you

assert in a complaint a combination of allegations, that

doesn't mean that you can't still prevail if some, but not all,

of the allegations turn out to be correct.  So that's why I

have a little trouble with your formulation.

     MR. BROWN:  Well, your Honor, referring the Court

again to paragraph 1 of the first amended complaint, at docket

70, paragraph 1 sets forth in her own words what the

purportedly false and defamatory meaning conveyed by the

challenged statements was.  And I understand the Court's point

M292Pal4                      Bennet - Redirect

1    about two different statements that the jury can consider in

2    combination or individually, but --

3            THE COURT:  Yeah.  And see, you glom together, as her

4    complaint does, "clear and direct," for example; but, in fact,

5    I think she is perfectly within her rights to pursue a

6    defamation claim for either clear or direct.

7            MR. BROWN:  And your Honor, I am not trying to

8    foreclose that, but what she indicates in her pleadings and

9    throughout the history of this case, that each of those two

10   challenged statements convey the meaning; and, again, I am

11   quoting from paragraph 1, that is, that that she personally was

12   "responsible for inciting a mass shooting at a political event

13   in January 2011."  And I think she is bound by her pleadings as

14   to what defamatory meaning --

15           THE COURT:  No, she -- first of all, if I recall the

16   Federal Rules of Civil Procedure, the Court can give leave as

17   late as just before a case goes to the jury to amend or modify

18   the pleadings.  So I don't think we need to be totally caught

19   up on that.  But I will tell you what I will do, and then I

20   want to hear from plaintiff's counsel.  Maybe I will just say,

21   "Overall, plaintiff claims in her complaint" and then just

22   quote that sentence.  But I don't want to -- if I do that, I

23   don't want to have an argument made by defense counsel in

24   summation that, well, if she can't prove both clear and direct,

25   she doesn't prevail.  That is why I divided it, to avoid that.

**JA 0892**

M292Pal4                              Bennet - Redirect

1    That's why I divide it to two statements, not one.  But I do

2    agree with you that something should be said about what she

3    specifically says is defamatory.

4           Let me hear from plaintiff's counsel if you have any

5    objection to that latest solution.

6           MR. VOGT:  I don't have an objection to a general

7    description of that.

8           THE COURT:  All right.

9           MR. VOGT:  I will just point out, your Honor, we go on

10   in paragraph 1 just to say generally that the article said that

11   she incited Jared Loughner's 2008 mass shooting.

12          THE COURT:  Okay.  So in any event, I will do it,

13   then, the way -- I will say "Overall, plaintiff claims in her

14   complaint that" and quote that sentence, and we will leave it

15   at that.  And that will go at the end of the first paragraph on

16   instruction 10.

17          All right.  What else?

18          MR. BROWN:  Thank you, your Honor.  Turning to -- I

19   had told you that we had two and a half points.  The second

20   point is with respect to instruction no. 13 on actual malice.

21          THE COURT:  Yes.

22          MR. BROWN:  The second page of that instruction, the

23   paragraph that begins "the second aspect of" and we would urge

24   the Court either to return to the prior version of that

25   paragraph from the Court's original instructions or if the

JA 0893

1    Court prefers a shorter version, then in the Court's original

2    instruction of that second aspect to consider the version that

3    we had proposed in our instructions.  And here is the point,

4    your Honor:

5            In the current iteration, this explains to the jurors

6    that, in determining whether Mr. Bennet was aware of an

7    intended meaning that Ms. Palin alleges was conveyed by the

8    statement, the Court has changed the phrasing to say "intending

9    that the statement would defame Mrs. Palin," which we believe

10   confusingly conflates --

11           THE COURT:  I'm sorry.  You need to either --

12           MR. BROWN:  I beg your pardon, your Honor.

13           THE COURT:  Go ahead.

14           MR. BROWN:  By using the phrase "intending that the

15   statement would defame Ms. Palin," that this risks confusing

16   this awareness prong of actual malice with the falsity prong.

17   And here, as we suggested in our original proposed

18   instructions, your Honor, if you prefer to go the short route

19   on that, we had suggested saying that Mr. Bennet -- under your

20   point (i), that Mr. Bennet in fact intended that readers

21   attribute the claimed defamatory meaning to the words added

22   into the editorial.

23           THE COURT:  No, I didn't like that.  But how about

24   this?  "Intended that the statement would subject Ms. Palin

25   to," and then we can go back to the New York Court of Appeals,

M292Pal4                    Bennet - Redirect

1   "intended that the statement would expose Ms. Palin to public

2   hatred, contempt, ridicule, or disgrace."

3        MR. BROWN:  Your Honor, I don't believe that address

4   the issue here.

5        THE COURT:  I'm, then, not understanding what you say

6   is the issue.

7        MR. BROWN:  I apologize.  Let me try and be more

8   precise.

9        THE COURT:  Yes.

10        MR. BROWN:  This second aspect of actual malice

11   focuses on whether the defendant was aware of the meaning that

12   others subsequently attributed to his words and went ahead and

13   published them anyway, either knowing they would be interpreted

14   that way or with reckless disregard for whether they would be

15   interpreted to have that meaning.

16        And so focusing on "intent to defame" does not, in our

17   view, adequately describe this second aspect of actual malice.

18   The case law, which is of course discussed in greater detail in

19   the parties' briefing earlier in the case --

20        THE COURT:  First of all, and maybe you misspoke, but

21   I don't think you are right.  You say, "This second aspect of

22   actual malice focuses on whether the defendant was aware of the

23   meaning that others subsequently attributed to his words."  The

24   jury would not understand that and I don't think the case law

25   states it in that way.  I think it is "the defendant was aware

**JA 0895**

M292Pal4                          Bennet - Redirect

1   of the defamatory meaning that would arise from his statements

2   or could arise from his statements and chose to make them

3   anyway."

4              MR. BROWN:  Yes, your Honor.  In this case I would

5   just say he was aware of the claimed defamatory meaning.  And

6   indeed, in your earlier version of the instructions, dated

7   February 6, you --

8              THE COURT:  Okay.  Now I understand your point, and I

9   will fix it accordingly.

10             MR. BROWN:  Thank you, your Honor.

11             And then the half point, your Honor, is just a matter

12  of preserving a point.  I understand from the Court's comments

13  this morning that you will not be entertaining any argument on

14  the *per se*/*per quod* point.

15             THE COURT:  It would be very entertaining, I'm sure;

16  but, no, I have thought about that issue at great length, and I

17  have made my ruling.

18             MR. BROWN:  Understood, your Honor, and I just want --

19             THE COURT:  I considered, of course, the papers that

20  you had previously submitted on that, so I had your arguments.

21             MR. BROWN:  Indeed.  I just wanted to preserve the

22  point that defendants object to instruction no. 14 --

23             THE COURT:  On that ground.

24             MR. BROWN:  -- on that ground.

25             THE COURT:  Yes very good.

**JA 0896**

1              MR. BROWN:  Thank you, your Honor.

2              THE COURT:  So I will get you by tomorrow  my final

3     instructions of law.  I will hear no further argument on it

4     unless someone finds a typo or something like that.

5              It is my practice to allow counsel on summation to

6     refer to my instructions.  Some judges don't allow that.  I do.

7     I think it is helpful to the jury.  Obviously you need to be

8     careful to add, when you do that, "of course you need to

9     consider the judge's instructions as a whole," so that, since

10    you are only focusing on one aspect, they won't forget the

11    others.  But you are more than welcome to do that.

12             Who is the next witness?

13             MR. BROWN:  Forgive me, your Honor, one more point

14    on --

15             THE COURT:  You want three quarters?

16             MR. BROWN:  No, with respect to the verdict form, your

17    Honor.

18             THE COURT:  Oh, the verdict form.

19             MR. BROWN:  Could we reserve comments on that until we

20    see the final version of the instructions?

21             THE COURT:  Sure.

22             So the next witness is.

23             MR. TURKEL:  Ross Douthat, Judge.

24             THE COURT:  And after that?

25             MR. TURKEL:  After that, Governor Palin, your Honor.

1          THE COURT:  And those are the final witnesses, yes?

2          MR. VOGT:  There is one possible very short witness,

3    Hanna Ingber.  She has always been on the list, too.

4          THE COURT:  So it sounds like we will probably finish

5    the evidence in this case by late tomorrow.

6          MR. TURKEL:  I would think we would be done with the

7    evidence by the end of the morning session tomorrow.

8          THE COURT:  Okay, great.  So after that, whenever it

9    is, I will excuse the jury, I will take any motions anyone

10   wants to make.  We still have to sort out, for example,

11   punitive damages or not, and then we will have closing

12   arguments and my instructions of law on Friday.

13          How long does plaintiff want for your summation.

14          MR. TURKEL:  Six hours, Judge?  Just joking.

15          THE COURT:  Yeah.

16          MR. TURKEL:  What's your custom?  I have become

17   accustom to fitting into whatever the Court's preference is.

18          THE COURT:  My own view is that the jury can really

19   only absorb about two hours at a time, so I would give you two

20   hours and I would give your adversary two hours.  And we would

21   go plaintiff first, defendant second and, believe it or not, in

22   the state, they foolishly do it the other way around.  I have

23   never understood that.  But in my court we always do plaintiff

24   first, defendant second, because the plaintiff has the burden

25   of proof.

1           MR. TURKEL:  I would like to reserve rebuttal time,

2     your Honor.

3           THE COURT:  Well, I don't usually allow rebuttal

4     unless there is something unexpected that comes up in defense

5     counsel's summation that you reasonably could not have

6     addressed in yours; but if you prefer, I will think about

7     giving you, then, maybe an hour and 40 minutes on your direct

8     summation and 20 minutes on rebuttal.  What I don't allow is,

9     in effect, a repeat of the opening summation under the guise of

10    a rebuttal.  But I will think about a 20-minute rebuttal and we

11    will talk about that later.

12          Okay.  And then I think the jury can probably begin

13    their deliberations on Friday.  You know, it may only be a

14    short period.

15          Okay.  Anything else?

16          MR. TURKEL:  Just to be clear, I mean this is probably

17    obvious, but that will put us off for tomorrow afternoon after

18    the close of evidence.

19          THE COURT:  So -- well, but I don't want to put any

20    limits on how long anyone is on the stand tomorrow.  I mean, if

21    it goes until 4:00 tomorrow -- well, 3:30 tomorrow, then we

22    will have to pick up and finish the evidence on Friday morning.

23    But then we would still just have a quick break, I would deal

24    with the motions, and then we would still -- you are going to

25    have your summations on Friday.

1              MR. TURKEL:  That's what I meant.

2              THE COURT:  Yeah, okay.  That's fine.

3              MR. AXELROD:  And, your Honor, I just want to set

4    proper expectations.  Mr. Turkel, I think, is being optimistic.

5    Good for him.  I'm not sure I share his optimism about getting

6    done as early as he does.

7              THE COURT:  Okay.  Well, we will see what happens.

8              MR. VOGT:  Your Honor, just one -- when you are

9    revising the instruction on the actual malice, just the last

10   sentence of that paragraph, two points about the actual malice

11   on the defamatory meaning.

12             THE COURT:  Hold on a minute.

13             Go ahead.

14             MR. VOGT:  Just that last part, I know I inverted the

15   word consciously chose to defame.

16             THE COURT:  Yeah, I put in that word that you

17   suggested.

18             MR. VOGT:  I know, and I know what your Honor is

19   trying to accomplish there.  It seems to me that it almost

20   means intent, intended to defame, which is the first element,

21   not the second one.  So if there is some language your Honor

22   could --

23             THE COURT:  All right.

24             MR. VOGT:  -- maybe deal with there to just make it

25   obvious.

**JA 0900**

M292Pal4                    Bennet - Redirect

```
 1              THE COURT:  Yes, I think that's a fair point.  Let me
 2     work on some language on that.
 3              MR. VOGT:  Thank you.
 4              THE COURT:  Okay.
 5              All right.  Very good.  Now, unfortunately, you will
 6     have to eat fast, but we will see you at 2:05.
 7              MR. AXELROD:  Thank you.
 8              (Luncheon recess)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**JA 0901**

M291PAL1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SARAH PALIN, an individual,

4               Plaintiff,

5          v.                          17 CV 4853 (JSR)

6   THE NEW YORK TIMES COMPANY, *et
    al.*,
7
                Defendants.
8
    ------------------------------x        Trial
9
                                           New York, N.Y.
10
                                           February 9, 2022
11                                         9:23 a.m.

12  Before:

13                      HON. JED S. RAKOFF,

14                                         District Judge

15                          APPEARANCES

16  TURKEL CUVA BARRIOS, P.A.
17       Attorneys for Plaintiff
    BY:  SHANE B. VOGT
18       KENNETH G. TURKEL

19
    BALLARD SPAHR, LLP
20       Attorneys for Defendants
    BY:  DAVID L. AXELROD
21       JACQUELYN N. SCHELL
         THOMAS BYRNE SULLIVAN
22       JAY WARD BROWN

23

24  Also Present:

25  Dana Green, Senior Counsel, The New York Times Company

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1                          AFTERNOON SESSION

2                              2:13 p.m.

3              (In open court; jury present)

4              THE COURT:  Please be seated.

5              Linda, do you want to swear in the witness.

6              (Witness sworn)

7              THE DEPUTY CLERK:  Please be seated.  State your name

8    and spell it slowly for the record.

9              THE WITNESS:  My name is Ross Gregory Douthat.  That

10   is --

11             THE COURT:  I think you're a little too close to the

12   microphone now.

13             THE WITNESS:  Rookie mistake.

14             Ross Gregory Douthat.  R-O-S-S, G-R-E-G-O-R-Y,

15   D-O-U-T-H-A-T.

16             THE COURT:  Counsel.

17    ROSS GREGORY DOUTHAT,

18        called as a witness by the Plaintiff,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MR. TURKEL:

22   Q.  Good afternoon, Mr. Douthat.  My name is Ken Turkel.  I

23   don't know if we've met.  You met my partner Shane Vogt at your

24   deposition.

25             Let's start with where you currently work.  Where is

1  that?

2  A.  I work for *The New York Times*.

3  Q.  And how long have you been at *The Times*?

4  A.  I've been at *The Times* since the spring of 2009, I believe.

5  Q.  What is your role, or I should say title, let's say, at

6  this time?

7  A.  They changed it recently, but I'm an opinion columnist.

8  Q.  They changed it to opinion columnist recently?

9  A.  Well, I -- it's -- it's -- I -- the traditional term was

10  "op-ed columnist," but the term "op-ed" was considered

11  confusing and has been retired.

12  Q.  And has that been your role at *The Times* ever since you got

13  there in 2009?

14  A.  It has, yes.

15  Q.  What else do you do in addition to being an op-ed or

16  opinion columnist?

17  A.  At the newspaper itself or more generally?

18  Q.  Don't you run a podcast of some kind affiliated with *The*

19  *Times*?

20  A.  I was for a couple of years the co-host of a podcast called

21  *The Argument*, which was basically me and a couple of colleagues

22  arguing about, as the title suggests, about the week's news.

23  I'm no longer a full-time host of that podcast.  It's now

24  hosted by a woman named Jane Coaston, so that's no longer part

25  of my regular duties.

1    Q.  And that is the same podcast at which Phoebe Lett works,

2    correct?

3    A.  Yes, that is her -- she certainly did while I was -- while

4    I was part of it, yes.

5    Q.  Let's talk a little bit about your pre-*Times* background.

6    Where did you work before *The Times*?

7    A.  I worked for *The Atlantic*, in Washington, DC.

8    Q.  And how long were you at *The Atlantic*?

9    A.  About seven years.

10   Q.  So would that take us back to college or did you have

11   another media job?

12   A.  It would take us back to college, yes.

13   Q.  You went to Harvard, right?

14   A.  I did, yes.

15   Q.  And graduated in 2003?

16   A.  2002.

17   Q.  2002.  What was your job at *The Atlantic*?

18   A.  I was a senior editor.

19   Q.  And I think at this point the jury's heard about *The*

20   *Atlantic*, but did you edit particular types of pieces or was it

21   just a general editor job?

22   A.  By the end, I was usually editing long pieces, which meant

23   that in a given issue of the magazine, there would be maybe one

24   long 5,000-or-so-word piece that I would have edited.

25   Q.  What was it that prompted you to leave *The Atlantic* for *The*

M291PAL5                         Douthat - Direct

1   *New York Times*?

2   A.  I was offered the job that I have now, and it is a, I think

3   it's fair to say, unusual and very desirable job in American

4   journalism, so I was very happy at *The Atlantic*, but I was also

5   very eager to accept the job at *The Times*.

6   Q.  When you worked at *The Atlantic*, did you work with Jim

7   Bennet at all, James Bennet?

8   A.  I -- I did work with James, yes.

9   Q.  How much crossover was there between your tenures there?

10  A.  I'm -- I don't recall exactly how long he was there.  I

11  would guess that it was about two years while we were both

12  there.  I'm not completely sure.  It was some reasonable span

13  of time.

14  Q.  And for that period of time, whether two years or a little

15  more, little less, what was Mr. Bennet's role at *The Atlantic*?

16  A.  He was editor of the magazine.

17  Q.  Is that the highest position on the content side?

18  A.  At that point, it was, yes.  The masthead sort of altered

19  from time to time, but yes, he was in charge.

20  Q.  Did you and Mr. Bennet maintain a relationship in between

21  the time when you left *The Atlantic* and he got to *The New York*

22  *Times*?

23  A.  I -- I wouldn't say a strong relationship.  We probably

24  exchanged emails from time to time, but that was about it.

25  Q.  Do you follow him professionally?

1   A.  Did I follow him?  I mean, I continued to read *The Atlantic*

2   so I was -- I was aware of the work that he was doing, yes.

3   Q.  And would it be consistent with your memory to say he got

4   there, to *The Times*, in, what, 2016, Mr. Bennet?

5   A.  I would not -- I would not recall the exact year, but it

6   wouldn't be inconsistent with my memory to say that, yes.

7   Q.  I like that.  I got it.

8          Within your role as an op-ed or opinions writer, what

9   is your sort of niche or subspecialty, I should say?

10  A.  My subspecialty is being a conservative columnist for *The*

11  *New York Times*, and then within -- with that sort of political

12  allegiance, I write mostly about national politics, a certain

13  amount about religion, pop culture, and foreign affairs.

14  Q.  You're also a movie critic for *The National Review*, aren't

15  you?

16  A.  I am, yes.

17  Q.  One of the -- as an opinions writer, you pretty much get to

18  choose your topics, don't you?

19  A.  Yes.

20  Q.  I want to take you forward to June of 2017.

21          MR. TURKEL:  And I want to pull up Plaintiff's 171.

22          And if you could, Michael, this is one of those that

23  starts on the second page.  I think the first part of it starts

24  there.

25  Q.  All right.  Do you recognize this document, Mr. Douthat?

1    A.  I do, yes.

2    Q.  And it's an email thread between you and James Bennet on

3    June 14, 2017, right?

4    A.  I believe that's correct, yes.

5    Q.  For context, I want to talk about this first entry.  Could

6    you explain to the jury exactly what Mr. Bennet is emailing you

7    about on that first message.

8    A.  Yes.  He's sending me a complimentary note about a column

9    that I had written, probably -- well, actually, not probably,

10   since I see the date -- just that week, about basically making

11   analogies between Donald Trump and various figures in ancient

12   Roman history.

13   Q.  To the extent it refers to the Julius Caesar "kerruffle,"

14   which I was told -- I always thought it was kerfuffle -- but

15   what is that reference to?

16   A.  I believe it is a reference to the controversy about the

17   play of Julius Caesar that was put on around that time in which

18   Caesar was presented as a somewhat Trump-like figure, and there

19   was some controversy because obviously Caesar is assassinated

20   in the course of the story of Julius Caesar, and I had -- I

21   don't think I -- I don't recall exactly what I said in the

22   column, but I had used that controversy as a kind of hook on

23   which to, you know, show off my knowledge of ancient Rome,

24   basically.

25   Q.  I take it that's what the column was about?

1  A.  That's -- you know, yes, that's what the column was about,

2  yes.

3  Q.  Meaning your knowledge of ancient Rome.

4  A.  Yes.

5  Q.  Okay.  In that time frame, June of 2017, was it uncommon

6  for you to receive these types of emails from Mr. Bennet?

7  A.  I don't know how common they were.  He would certainly send

8  occasional notes when he liked a column that I'd written.  It

9  wouldn't be an unusual event, but it definitely didn't happen

10  every week.

11        MR. TURKEL:  All right.  Mike, if we could page over

12  to the main page.

13        THE COURT:  I do think "kerfuffle" is misspelled.

14        MR. TURKEL:  Was I right, Judge?

15        THE COURT:  I think so.  Clearly that email was not

16  adequately fact-checked.

17        MR. TURKEL:  I'm between a Harvard and a Yale guy.  I

18  went to Tulane, so --

19        THE COURT:  Don't brag.

20        All right.  Go ahead.

21  BY MR. TURKEL:

22  Q.  All right.  So we'll draw your attention, Mr. Douthat, to

23  your response here at 10:35 p.m., and obviously the first line

24  of that is self-explanatory.  You're just thanking Mr. Bennet

25  for the compliment, right?

1   A.  Yes.

2   Q.  And I don't think we need to find out what your column's

3   flippancy about the assassination was, but after that first

4   line, you take it upon yourself to express to Mr. Bennet what

5   you refer to as your bafflement at the editorial, correct?

6   A.  Yes, that's correct.

7   Q.  And just to be clear -- and this has been talked about a

8   bit in the trial, but as an opinions writer, you're under the

9   same perhaps general umbrella as the editorial board but

10  separate, if that makes sense.

11  A.  Yes.  That is -- that is correct.  We are part of the same

12  part of the newspaper but we are separate from each other.

13  Q.  Right.  Does Mr. Bennet, sitting as the editor over the

14  editorial board, does his role also sit over the opinions side?

15  In other words, does he sit over the whole department?

16  A.  That's -- that certainly is my memory of the chain of

17  command, yes.

18  Q.  All right.  And when you are expressing here that you would

19  be remiss if you didn't express your bafflement at the

20  editorial, what editorial were you referring to?

21  A.  The editorial that ran immediately in the aftermath of the

22  congressional baseball shooting that day.

23          MR. TURKEL:  All right.  If we could pull up 1,

24  Exhibit 1, and maybe split screen it so the email is still up

25  there, that would be great.

1  Q.  Do you read the editorial section every day?

2  A.  I -- I do not read every editorial that we run, no.

3  Q.  Was it just coincidence that you read this one?

4  A.  No.  I had -- I believe that I had seen people criticizing

5  it on social media, particularly on Twitter, which made me -- I

6  consume a lot of media through Twitter, which made me more

7  likely to read it.

8  Q.  And after you read it, did you draw any conclusions from it

9  prior to sending this email to Mr. Bennet?

10  A.  You'd have to clarify the question.

11  Q.  Yeah, it was a poorly asked question.

12          After you read the editorial, did it create any

13  impressions in your mind that prompted this email to

14  Mr. Bennet?

15  A.  I would say it prompted the impressions that I tried to

16  convey in the email itself, so -- so yes.

17  Q.  And just to be clear, your motivation in sending this was

18  more corrective and professional, wasn't it?

19  A.  Yes.

20  Q.  As opposed to critical is what I'm saying.

21  A.  Yes.  I -- I felt that I could convey some important

22  information to James about the editorial and the criticism that

23  it was receiving.

24  Q.  And so just to go through this first paragraph, the second

25  sentence there says, "There was not, and continues to be, so

1   far as I could tell, no evidence that Jared Lee Loughner was

2   incited by Sarah Palin or anyone else, given his extreme mental

3   illness and lack of any tangible connection to that crosshair

4   map, the Tea Party or other right-wing cause."  How did you

5   know that?

6   A.  I wouldn't say that I knew it for 100 percent certainty,

7   which is why I have the, you know, cautious "so far as I can

8   tell" line in there, but I had followed that case pretty

9   closely when it actually happened, the original shooting of

10  Congresswoman Giffords, and there had been sort of a brief

11  phase, in my memory, at least, where people had jumped to the

12  conclusion that there was a connection, a political motivation

13  for the shooting, and then my recollection was that subsequent

14  reporting had revealed that to be not the case, that there was

15  no evidence and the evidence in fact pointed towards, as I say

16  here, Jared Lee Loughner's extreme mental illness as the only

17  cause.

18  Q.  And in that sentence why do you use Sarah Palin's name as

19  the subject of incitement or the object of incitement?

20  A.  Because -- I can't quite see it in the split screen, but

21  the editorial makes -- in its original form, made specific

22  reference to Sarah Palin's PAC, I believe.

23  Q.  And the next sentence, you discuss the fact that the

24  shooter, as -- today, as our editorial concedes, seems to have

25  a clear partisan anti-Trump purpose.  Did you glean that from

1    the actual editorial or from any other sources?

2    A.  I assume from other sources, rather than from the editorial

3    itself.  I don't remember the specific sources, but I think at

4    that point in the unfolding of the story, there had been some

5    reporting on the shooter's left-wing political associations and

6    allegiances as being a pretty clear part of his back story.

7    Q.  Do you remember whether that was referenced at all in the

8    editorial?

9    A.  I assume that I -- I don't recall the details.  Since I

10   wrote, "as our editorial concedes," I assumed that it was.

11          MR. TURKEL:  All right.  Mike, if you could, on the

12   second page of the actual editorial, pull up the paragraph

13   where it discusses Hodgkinson.

14          No, that's not the one.  It's a long paragraph.  The

15   one that discusses Hodgkinson.  There it is right down --

16   there.  There it is.  No, that's not it.

17   Q.  I'll try to find it to refresh your memory.  It's not that

18   big of a deal right now.

19          But as you go on in your response here, what is that,

20   the next sentence, where you say, "That doesn't mean that

21   liberals or 'The Resistance' were in any way responsible for

22   this horror, I don't buy those kind of arguments at all," what

23   does that mean?

24   A.  It means that in my view, just because someone commits an

25   act of political violence, that doesn't mean that, you know,

1    people whose rhetoric might have been in that person's mind are

2    therefore responsible for whatever acts that person commits.

3    Q.   And by "The Resistance," what do you mean?

4    A.   I mean specifically people who were vehemently anti--

5    vehemently opposed to Donald Trump and literally described

6    themselves as "The Resistance," sort of invoking images of, you

7    know, in effect, you know, like French, French resistance to

8    Nazi occupation, these kind of things, sort of historically

9    fraught metaphors and analogies that were very popular with

10   some of Trump's opponents at the time.

11   Q.   In the next -- understand.  The next sentence, you say,

12   "But our editorial seems to essentially reverse the fact

13   pattern as I understand it, making it sound like Loughner had

14   the clearer connection to partisan rhetoric, when to the best

15   of my knowledge he had none."  And upon what did you base that

16   conclusion?

17   A.   My reading of the paragraph, the crucial paragraph in the

18   editorial was -- you want me to recall it from memory or can I

19   look?

20   Q.   No.  We're going to bring it up right now.

21   A.   Okay.

22            MR. TURKEL:  Mike, if you could bring up --

23   Mr. Bucher, are you doing it?  Because I'm looking at you, not

24   at the screen.

25   A.   Right.  So my reading of the first paragraph here, it says,

M291PAL5                          **JA 0914**      Douthat - Direct

1   "When Jared Lee Loughner opened fire, the link to political

2   incitement was clear."  And then in the subsequent paragraph it

3   says, "though there's no sign of incitement as direct as in the

4   Giffords attack."  So in my reading of the editorial, that

5   seemed to be implying that there was a clearer link between

6   political rhetoric and the Giffords shooting than there was

7   between in this case left-wing rhetoric and the baseball field

8   shooting, when in fact, again, as I said in the email, as far

9   as I knew, it was the reverse, that the baseball shooter had a

10  clear political motivation and Jared Lee Loughner did not.

11  Q.  Had you covered Governor Palin when she was active in

12  politics?

13  A.  Like most people, I wrote a great deal of things about

14  Governor Palin when she was active in politics, yes.

15  Q.  And when would you say, for you -- when would you say, for

16  you personally, you stopped writing about Governor Palin from a

17  political perspective?

18  A.  I don't think there was a sort of absolute stopping point,

19  but basically between the time that she decided not -- not to

20  run, or to resign -- when she basically left politics, right,

21  and the point at which she endorsed Donald Trump, there was

22  sort of a diminution of how often I wrote about her, and

23  then -- yeah, so I wrote about her a great deal in 2008 and its

24  aftermath, and somewhat less thereafter, diminishing steadily

25  until the Trump endorsement, when I think I probably wrote

1  something about her again.

2  Q.  Given that you cover national politics, in June of 2017,

3  were you writing about her anymore?

4  A.  I -- I'm not -- I'm not going to say with hundred percent

5  certainty that I wasn't writing about her anymore.  If I was

6  writing about her, it was certainly more -- much more

7  occasional than it would have been years before.

8  Q.  Let's go back now to the --

9        MR. TURKEL:  Mr. Bucher, if you could kill those two

10  cutouts.

11  Q.  And the last sentence at the bottom of the first page of

12  the actual email says, I don't -- oh, okay.  "I don't normally

13  raise issues with our editorials (I expect to disagree with

14  them, after all!)."  Why did you say that, that you expect to

15  disagree with them, after all?

16  A.  Because generally my politics are conservative, and

17  generally I would describe the politics of our editorial page

18  as liberal.

19  Q.  And you finish the sentence by saying that, "I felt I

20  should express my confusion in this case," right?

21  A.  Yes.

22  Q.  And what was your -- your goal in doing that?

23  A.  Several things.  To just sort of bring this to James's

24  attention; it was something that was being discussed a lot

25  online; if there, you know -- if -- if he was sort of unaware

1    of some of the facts behind the Giffords case, I was sharing

2    those with him, or sharing that, you know, my best recollection

3    of them, and if there was a correction that needed to be made,

4    you know, the sooner the better.

5    Q.  So you get a response later that same evening at 11:09 p.m.

6    from Mr. Bennet, right?

7    A.  Mm-hmm.

8    Q.  Now separate and apart from your own observations of social

9    media, whatever else you were looking at, were you aware of

10   what was going on inside the office at *The Times* with respect

11   to this piece at that time?

12   A.  No.

13   Q.  Do the opinion writers work in the same location as the

14   editorial board?

15   A.  Some of them are in the same general office space, but I

16   have never been.

17   Q.  You work remotely or different office?

18   A.  Yeah.  At this point I would have been in -- in June 2017,

19   I would have been either in Ridgefield, Connecticut, or in New

20   Haven, Connecticut, not in New York City.

21   Q.  So let's draw your attention then to this response from

22   Mr. Bennet at 11:09 p.m.  Obviously a greeting:  "Thanks, and

23   I'll look into this tomorrow.  But my understanding was that in

24   the Giffords case there was a gun sight superimposed over her

25   district; so far in this case we don't know of any direct

M291PAL5                         Douthat - Direct

1    threat against any of the congressmen on the field."  Now

2    because I know you respond to this, but in a vacuum, I take it

3    you knew what he was talking about when he referenced the gun

4    sight superimposed over her district, right?

5    A.  Yes, I do, or I did.

6    Q.  And were you -- at that point in time, from what you had

7    read, in the editorial and so forth, were you aware of any

8    other reasons they were claiming there was direct incitement

9    other than the map with the gun sight superimposed over her

10   district?

11   A.  Was I aware of anything cited in the editorial or in

12   general?

13   Q.  With respect to the Tucson shootings in general and the

14   initial claim that it was motivated by politics.

15   A.  I didn't get any --

16           MR. SULLIVAN:  Objection, your Honor.

17           MR. TURKEL:  Sorry.  Judge, I didn't hear that.

18           THE COURT:  Hold on a minute.

19           MR. TURKEL:  I can rephrase that, Judge.

20           THE COURT:  Yeah.

21           MR. TURKEL:  That's okay.  That's not that big of a --

22   I'll move on.

23   BY MR. TURKEL:

24   Q.  I think it will be easier to look at your response, so

25   let's pull up your response to this response from Mr. Bennet.

Case 22-558, Document 53, 09/19/2022, 3384723, Page33 of 272

1          MR. TURKEL:  Mr. Bucher, if you could put those sort

2     of side by side, the cutout of Mr. Bennet's response and

3     then -- so the jury can see all of them.

4          All right.  There we go.  Great.

5     Q.  All right.  Do you see the big blocks pulling out your

6     response there, Mr. Douthat?

7     A.  Yes, I do.

8     Q.  All right.  And you start by saying "fwiw."  What does that

9     mean?

10    A.  I think that's a separate email, a subsequent email.  That

11    stands for "for what it's worth," but I think that is a -- the

12    email that I sent after this email.

13    Q.  Oh, okay.  That didn't go with the 7:34 a.m. email.

14    A.  I believe not.  If you pull back.  Sorry.

15         MR. TURKEL:  Mike, if you could pull back.  Yeah, it's

16    7:40.

17    A.  Yeah, I sent that one 10 minutes later.

18    Q.  My bad.  I'm sorry.  We'll just pull out the 7:34 one.

19         All right.  And you responded that the targets were

20    used by Palin, or her group, in a map of seats targeted for

21    pickup in the midterms.  And did you know that just

22    independently from covering politics or specific to this

23    incident?

24    A.  I -- that was my recollection from being aware of that

25    story while it was unfolding and being debated.

JA 0919

M291PAL5                        Douthat - Direct

1   Q.  And if you could, please, explain the next line here.  "You

2   can argue about whether that crosses a line," and you have a

3   parenthetical there.

4   A.  Well, I think that there is a sort of ongoing debate that

5   continues to this day around American politics about what kinds

6   of sort of highly aggressive rhetoric should be considered

7   dangerous or inciting or sort of threatening of violence, and

8   obviously the argument of critics of the Palin PAC was that

9   putting targets on a map is an invitation to violence, and I'm

10  skeptical of that argument, I think, but I'm saying that there

11  is an argument there, a sort of -- again, a sort of ongoing one

12  that continues to this day.

13  Q.  Right.  With respect to the specific map, though, the

14  Loughner shootings, you were aware, were you not, that no link

15  was ever established?

16  A.  Yes, I say that in the -- that's why I say that in the

17  subsequent sentence, or in that same sentence, I guess.

18  Q.  And the next line there, do you actually say, "no link,

19  none at all -- at at all," delete reporter's repeated word.

20  You have two "ats" there.

21  A.  Yeah.

22  Q.  If we go to the next sentence, where it says, "People

23  assumed a link initially -- there was a Paul K. column."  And

24  who does that refer to?

25  A.  That refers to my colleague Paul Krugman.

1    Q.  And when you call him your colleague, does he also work at

2    *The Times*?

3    A.  He has the same job that I do at *The Times*.

4    Q.  You go on to reference that you think Loughner was

5    instigated by a nonanswer she'd given him at a town hall.  By

6    "she," are you referring to Gabby Giffords?

7    A.  Yes.

8    Q.  "-- about one of his theories of grammar, or his obsession

9    with lucid dreaming, or something."  And how did you hear that?

10   A.  Well, as you can see from my "or something," I wasn't a

11   hundred percent sure of it, but I knew it was something along

12   those lines, again, from having followed the story reasonably

13   closely and written about it, I think when it was, again, when

14   it was unfolding and being investigated.

15   Q.  All right.  And you finish this with the same point I think

16   you had made in your first email about one being more explicit

17   political motivation and then the Giffords one and basically

18   you close the discussion out there, right?

19   A.  Yes.

20   Q.  All right.  Now we can go up to the one that we were

21   looking at before.  That's a separate email, the little small

22   one with two links.

23           All right.  Now this was about 10 minutes later,

24   right?

25   A.  Yup.  Yes.

1    Q.  And "fwiw," for what it's worth, "it's not only the right

2    that's reading the editorial this way."  Why did you send these

3    two links to Mr. Bennet?

4    A.  I sent them -- they're links I believe to tweets by

5    Jonathan Chait and Chris Hayes, who are both journalists on,

6    you know -- liberal journalists, it's fair to say, who -- I

7    mean, basically, as you can see from me saying the phrase

8    "reading the editorial," I felt that James, in his response to

9    me, was reading the editorial in a slightly different way than

10   how I interpreted it, and so I was saying -- I was offering him

11   evidence that my reading was the sort of natural one that not

12   only Conservatives inclined to be hostile to *The Times* but also

13   liberals inclined to be sympathetic were -- were coming to,

14   basically.

15            MR. TURKEL:  If you could pull up just for the witness

16   Plaintiff's 172, redacted version.

17   Q.  Now as to 172, Mr. Douthat, do you recognize that as one of

18   the Twitter links you sent?

19   A.  I don't actually remember the details, but I assume that it

20   is the link, yes.

21   Q.  Would that have been the name of the actual account --

22            MR. SULLIVAN:  Objection, your Honor.  I don't believe

23   this is in evidence yet.

24            MR. TURKEL:  I was laying the predicate, Judge.

25            THE COURT:  Are you offering it?

1          MR. TURKEL:  I can offer it now if they're not going

2     to object.

3          THE COURT:  Well, find out.

4          MR. SULLIVAN:  We object to the introduction as well.

5          THE COURT:  Hold on.

6          Sustained.

7          MR. TURKEL:  Judge, I'm assuming the predicate -- I

8     was going to continue the predicate.

9          THE COURT:  I don't know what that means, but if you

10    can lay -- right now, I think you're going to have serious

11    hearsay problems as well, but give it your best shot.

12         MR. TURKEL:  All right.

13         If you would, Mike, if we can pull up 171, where the

14    emails are -- I mean the Twitter links.

15    BY MR. TURKEL:

16    Q.  So if you could look at that.  That's in evidence right

17    now.

18    A.  Yup.

19    Q.  The two names on the Twitter links you were sending to

20    Mr. Bennet, does that help refresh your recollection as to

21    whether the link I just showed you matches up with that one?

22    A.  The -- you showed me a tweet from Jonathan Chait.  I think

23    I would give it a 90 percent to 95 percent probability that

24    that is the tweet that I shared, that I put in that email.

25         MR. TURKEL:  Judge, as to --

1          THE COURT:  You state that as a statistician?

2          THE WITNESS:  No.  I state it as someone for whom this

3   happened five years ago and there are many, many tweets in the

4   universe.

5          THE COURT:  To get serious, the question is:  Do you

6   remember whether this was the tweet or not?

7          THE WITNESS:  I -- I am -- I'm quite sure -- I give it

8   a 90 to 95 percent probability because I'm quite sure that it

9   is, without being a hundred percent sure.

10          THE COURT:  All right.  Go ahead, counsel.

11          MR. TURKEL:  It's to the substance hearsay, I don't

12   want to argue --

13          THE COURT:  Keep putting questions and we'll see where

14   we go.

15   BY MR. TURKEL:

16   Q.  The purpose -- again, I don't want you -- oh, it's not up

17   there right now.

18          The purpose of you sending these tweets to Mr. Bennet

19   was to simply show him the other people in your profession who

20   I assume he knew were reading the editorial the same way you

21   were; is that right?

22   A.  To show him people in our profession who were political

23   liberals and that's not just inclined to sort of a reflexive

24   critique of a *Times* editorial.

25   Q.  So the content of what they're representing is secondary

1    just to the fact that they're agreeing with your reading of the

2    editorial, right?

3    A.  Yes.  The -- they're agreeing to my reading of the

4    editorial while having politics generally aligned with *The New*

5    *York Times* editorial page.

6    Q.  You weren't sending these off to Mr. Bennet to prove, for

7    instance, that Mr. Loughner was or wasn't a right-winger or

8    anything like that.

9    A.  No.  I was sending them to him to prove that other people

10   like me were reading the editorial to suggest that there was a

11   clear link between the Palin PAC map and what Loughner did.

12          MR. TURKEL:  Judge, my that's what my response would

13   be to the hearsay aspect.

14          THE COURT:  Let me see the exhibit.

15          Let me see the exhibit.

16          MR. TURKEL:  Oh, I'm sorry, Judge.  Do you not have a

17   copy up there on your monitor?  172?

18          THE COURT:  All right.  Hold on.  Hold on.

19          So the statements made by Mr. Chait and Mr. Geraghty,

20   if offered for the truth, including the truth of what they

21   perceived, is hearsay.  Now if this is being offered for

22   something relating to Mr. Bennet's state of mind, normally that

23   would not be relevant at this stage of the chronology except

24   that both you and his counsel questioned him about that state

25   of mind at the time of the corrections or leading up to the

M291PAL5                          JA 0925          Douthat - Direct

1    corrections.

2              MR. TURKEL:  Yes, your Honor.

3              THE COURT:  And therefore the door was opened.

4              MR. TURKEL:  I would also argue nonhearsay state of

5    mind as opposed to hearsay state of mind.

6              THE COURT:  So I will admit this exhibit solely for

7    what impact, if any, it had on Mr. Bennet.

8              MR. TURKEL:  That's why it's being offered, Judge.

9              THE COURT:  Well, I'm delighted to hear that.

10             MR. SULLIVAN:  Your Honor, just on that point, if I

11   may be heard briefly on that.

12             THE COURT:  Yes, go ahead.

13             MR. SULLIVAN:  We also believe it's just prejudicial,

14   and Mr. Bennet, if it was being introduced to go to Mr. Bennet,

15   it could have been introduced when Mr. Bennet was on the stand,

16   not a witness who doesn't have the ability to testify to that.

17             THE COURT:  That's true, but I think that has to be

18   balanced against the fact that he testified, not just on

19   questioning from Ms. Palin's counsel but also on questioning

20   from your colleague, about input he received, including from

21   this witness, and so I think the door was plainly opened, and I

22   think the 403 objection, while not without some force, is

23   insufficient.

24             But let me explain this to the jury, because we're

25   talking lawyers talk.  What the heck is that?  There are some

M291PAL5                          Douthat - Direct

1   statements in this exhibit by Mr. Chait and Mr. Geraghty, two

2   other people.  They're not here.  They're not witnesses.  They

3   haven't been questioned.  We don't know what they would say

4   about any of this.  That's called hearsay.  Normally hearsay is

5   not admissible because you need to have the person right here

6   to find out what he or she meant, saw, observed, or whatever.

7   But here it's being offered because this was forwarded to

8   Mr. Bennet before he made the corrections and was part of,

9   plaintiffs contend, the instigation to his making a correction,

10  so for that limited purpose, you can consider it.  So it is

11  received.

12          (Plaintiff's Exhibit 172 received in evidence)

13          MR. TURKEL:  And that was No. 172, Judge.

14          Also, could Mr. Bucher show him, just the witness, so

15  he can look at it, 173, just to make sure it's the other of the

16  two links.

17          And please place it on the judge's monitor also.

18          There were two links on the email, Judge, so -- I just

19  want to make sure you saw that.

20          THE COURT:  Okay.

21          MR. SULLIVAN:  Your Honor, we have the same objection;

22  understanding it's the same ruling.

23          THE COURT:  Same ruling, yeah.  Received.

24          (Defendant's Exhibit 173 received in evidence)

25          MR. TURKEL:  So we'd offer 172 and 173, your Honor.

1                THE COURT:  Yes, they're received.

2                MR. TURKEL:  All right.

3     BY MR. TURKEL:

4     Q.  Going back to your actual email --

5                MR. TURKEL:  Are we publishing to the jury the email?

6     So Mike, if we can try and split screen and put the emails up

7     with the link on one side and then the actual 172 and the 173

8     on the other.

9                All right.  That's great.

10               All right.  So just so it's all out on the screen at

11    the same time, the -- you don't have to cut that out.

12    BY MR. TURKEL:

13    Q.  You sent those two links to Mr. Bennet in a separate email

14    at 7:44 a.m. on June 15th, right?

15    A.  Yes, that's correct.

16    Q.  All right.  And Exhibit 172, on the right is that first

17    link, Jonathan Chait\status, right?

18    A.  Yes.

19               MR. TURKEL:  All right.  And Mr. Bucher, if you could

20    take 172 down and put 173 on the right side.

21               And -- yeah, there it is.

22    Q.  The other tweet that you sent was from Chris Hayes, the one

23    at the bottom of 173 on the right side of the screen?

24    A.  Yes.

25    Q.  And who is Chris Hayes?

1    A.  Chris Hayes is a prime time host for MSNBC.

2    Q.  And who is Jonathan Chait?

3    A.  Jonathan Chait is a writer for *New York Magazine*.

4    Q.  Are you familiar with them professionally?

5    A.  Yes.

6    Q.  Do you know if Mr. Bennet is aware of them professionally?

7    A.  I would assume that he is, yes.

8    Q.  After you sent that email, the last one with the two tweet

9    links, did you have any interaction with Mr. Bennet about the

10   editorial, your comments on it, and so forth?

11   A.  Not that I can recall, no.

12   Q.  Email, phone, anything?

13   A.  Not -- again, not that I -- not to my recollection, no.

14           MR. TURKEL:  Judge, if I can have one moment?

15           THE COURT:  Yes.

16   Q.  Just one question I may have missed.  In your 7:34 email,

17   Mr. Douthat --

18   A.  Yup.

19   Q.  -- we talked about that parenthetical where it says,

20   "Democrats had used effectually a bullseye on a map of Rs who

21   voted against the stimulus and so on down the rabbit hole."

22   A.  Yes.

23   Q.  To what are you referring there?

24   A.  I -- I believe that during the controversy about the Palin

25   PAC map, someone dug up an instance where some Democratic group

M291PAL5                                    Douthat - Cross

1   had similarly put some kind of target over Republicans who they

2   were targeting for some kind of criticism or political attack.

3   And then "and so on down the rabbit hole" implies that if you

4   continued searching, you would find lots of similar examples on

5   both sides of the partisan divide.

6   Q.  Understood.

7            MR. TURKEL:  Okay.  Thank you, Judge.  I have no more

8   questions.

9            THE COURT:  Cross-examination.

10  CROSS EXAMINATION

11  BY MR. SULLIVAN:

12  Q.  Good afternoon.

13  A.  Good afternoon.

14  Q.  In answering some questions from Mr. Turkel, you discussed

15  your view that a person isn't responsible for the acts

16  committed by someone else when they have that other person's

17  political rhetoric in their mind; is that a fair summary of

18  what you said?

19  A.  As a general view, yes.

20  Q.  And is that an opinion or a fact, in your view?

21  A.  That is my opinion, as it's not universally shared.

22  Q.  And is it an opinion about which reasonable minds could

23  differ?

24  A.  Yes, I would say it is.

25  Q.  You also testified about your reading of the editorial, and

M291PAL5                          Douthat - Cross

1    we walked through an email exchange with Mr. Bennet about that;

2    is that correct?

3    A.  Yes.

4    Q.  And is your reading of the editorial your opinion about

5    what the editorial says as well?

6    A.  Yes, it -- it certainly is.

7    Q.  Could reasonable minds differ about that as well?

8    A.  I think reasonable minds can differ about a great deal of

9    things.  I think it is the most natural reading of the

10   editorial is the one that I offered to James.

11   Q.  And it's your opinion that that's the most natural read.

12   A.  It is my opinion that that is the most natural reading,

13   yes.

14   Q.  You also mentioned you had stopped writing about Governor

15   Palin at some point; is that correct?

16   A.  Or at least diminished, yes.

17   Q.  Why had you diminished writing about Governor Palin?

18   A.  Because she was a less central and important figure in

19   American politics by the 2015 to 2017 period relative to five

20   or eight years before.

21              (Continued on next page)

22

23

24

25

1  Q.  Just to back up for a second, you testified that you were

2  either an opinion columnist or used to be an op-ed columnist in

3  *The New York Times*.  Is that correct?

4  A.  Yes.

5  Q.  Could you describe briefly what it means to be a columnist

6  at the *New York Times*?

7  A.  It means that you write about the news of the day from a

8  more sort of opinionated and in a more -- often a more

9  personalized style than on the news pages.  You can report

10  stories, but you are not primarily supposed to be a reporter.

11  You are primarily supposed to bring your own judgment to bear

12  on the headlines and interpret them and argue about them.

13  Q.  And as an opinion columnist, are you a member of *The New*

14  *York Times* editorial board?

15  A.  I am not, no.

16  Q.  As an opinion columnist, do you have any role in the

17  editorials produced by the editorial board?

18  A.  Not at all.

19  Q.  Do you read editorials before they are published by *The New*

20  *York Times*?

21  A.  Never.

22  Q.  Who chooses what you write about as a columnist at *The*

23  *Times*?

24  A.  I choose what I write about, for better or worse.

25  Q.  Has anyone at *The Times* ever told you not to write a column

M292Pal6                    Douthat - Cross

 1  because they disagreed with the view you expressed in it?

 2  A.  No.

 3  Q.  Did Mr. Bennet ever tell you not to write something in a

 4  column?

 5  A.  Not to my recollection.

 6  Q.  You discussed with Mr. Turkel your responding to

 7  Mr. Bennet's e-mail about your column about "The Trumpiest

 8  Roman of Them All" with your comments about the editorial, is

 9  that correct?

10  A.  Yes.

11  Q.  And you reached out to Mr. Bennet to explain your reading

12  of the editorial, is that right?

13  A.  That, and the -- yes, yes, that was why I reached out.

14  Q.  Were you concerned about reaching out to Mr. Bennet to

15  express these concerns about the editorial?

16  A.  Concerned as in anxious about his response?

17  Q.  Yes.

18  A.  No.

19  Q.  Why not?

20  A.  Because I had a good relationship with James and I

21  considered him a good editor; and I assumed that if there were

22  a serious factual issue with an editorial, he would want to be

23  informed of it immediately and certainly would not be upset at

24  the person who told him that there was such an issue.

25  Q.  I believe you testified this was part of an e-mail chain

1    that began with comments about your column "The Trumpiest Roman

2    of Them All"?

3    A.  Yes.

4    Q.  Mr. DiMezza, could you just pull up Plaintiff's Exhibit 75,

5    please, just for the witness and the Court.

6              I am showing you what's been premarked as Plaintiff's

7    Exhibit 75.  Do you recognize this document?

8    A.  I do, yes.

9    Q.  And what is this document?

10   A.  This document is the column that I wrote comparing Donald

11   Trump to various figures from Roman history.

12             MR. SULLIVAN:  Your Honor, we move the admission of

13   Plaintiff's Exhibit 75.

14             MR. TURKEL:  No objection.

15             THE COURT:  I'm sorry?

16             MR. TURKEL:  Judge, we have no objection.

17             THE COURT:  Oh, no objection.  Sorry.  I didn't hear

18   you.

19             Received.

20             (Plaintiff's Exhibit 75 received in evidence)

21   BY MR. SULLIVAN:

22   Q.  Turning to the e-mail chain itself, Mr. DiMezza, can you

23   please pull up Plaintiff's Exhibit 171.  It's been admitted.

24             And this e-mail chain, this is the chain you were

25   discussing with Mr. Turkel, where you discussed the editorial

1   with Mr. Bennet, is that correct?

2   A.  That is correct, yes.

3   Q.  What time did you originally reach out to Mr. Bennet about

4   the editorial?

5   A.  It looks like 10:35 p.m.

6   Q.  Mr. DiMezza, I think it is on the prior page.

7   A.  Yeah, I just saw it.  It's 10:35 p.m., yeah.

8   Q.  Do you see when he wrote back to you?

9   A.  Yes, approximately 30 minutes later.

10  Q.  What did he say when he wrote back to you?

11  A.  He said that he was planning to look into it in the

12  morning; and then that he suggested that in the Giffords case —

13  I am just doing a paraphrase — that in the Giffords case, there

14  was a sort of direct threat towards her involved in political

15  debate, and in this case there wasn't a direct threat that we

16  knew of against any of the Congressmen who were shot.  And then

17  he says that's not to say any of its okay, and he says it's

18  also not to say that the violence in either case was caused by

19  that sort of targeting rhetoric.  But because there was no

20  targeting in –- or no, you know, equivalent of the Palin PAC

21  map in the congressional shooting case, he is saying the

22  incitement seems to be less specific.

23  Q.  What did you understand him to mean by that?

24  A.  I wouldn't say that I 100 percent understood what he was

25  saying, but it seemed to me that he was saying that,

M292Pal6                          **JA 0935**        Douthat - Cross

1   independently of whether the violence was caused by the

2   rhetoric, it mattered that there was some specific rhetoric in

3   the Loughner incident that was, you know, sort of implied

4   violence towards Congresswoman Giffords, whereas there wasn't

5   rhetoric that similarly implied violence prior to the shooting

6   itself towards the Republican Congressmen.

7   Q.  This was a different reading of the editorial than your

8   reading, is that right?

9   A.  This was certainly a different reading of the editorial,

10  yes.

11  Q.  Did you have any reason to doubt Mr. Bennet's good faith in

12  giving you that explanation in his e-mail?

13  A.  No.

14          MR. TURKEL:  Objection, your Honor.

15          THE COURT:  Overruled.

16  A.  No, I did not.

17  Q.  Why was that?

18  A.  Because I had worked with James in two separate jobs, and I

19  had and have a lot of respect for his integrity.

20  Q.  Mr. DiMezza, can you please pull up Plaintiff's Exhibit 113

21  just for the witness and the Court, please.

22          I am showing you what's been premarked as Plaintiff's

23  Exhibit 113.  Do you recognize this document?

24  A.  Yes.  It's the column that I wrote shortly after the

25  congressional baseball shooting.

JA 0936

M292Pal6                         Douthat - Cross

1          MR. SULLIVAN:  Your Honor, we move to admit

2     plaintiff's 113.

3          MR. TURKEL:  No objection, Judge.  Could Mr. DiMezza

4     blow that up a little bit, though?

5          THE COURT:  Yes.

6          MR. SULLIVAN:  Mr. DiMezza, could you blow up the top

7     part and sort of the column, if possible.

8          THE COURT:  Received.  I'm receiving this even though

9     I don't see a single reference to an ancient Roman.  Go ahead,

10    counsel.

11          (Plaintiff's Exhibit 113 received in evidence)

12    BY MR. SULLIVAN:

13    Q.  In writing this column, was it intended as a response of

14    sorts to the "America's Lethal Politics" editorial?

15    A.  I believe that was one thing that I was trying to do in

16    this column, yes.

17    Q.  And why were you responding to the editorial in this

18    column?

19    A.  I felt that the error that we had made in the editorial

20    reflected the power of certain mythologies that grow up around

21    incidents of political violence, and I thought it was important

22    to talk about how those mythologies develop and why in the real

23    world the acts of political violence are often a lot more

24    complicated than you would think from just sort of following

25    partisan politics.

1          So, for instance, the piece starts by referencing the

2     shooting of John F. Kennedy and there is a sort of, you know, I

3     think potent mythology around that assassination, where

4     liberals like to talk about the climate of hatred and

5     anti-J.F.K. sentiment in Dallas at the time, which was

6     obviously very powerful.  But in fact, as far as we can tell,

7     Lee Harvey Oswald did not have right wing politics.  Quite the

8     opposite.  He had Communist politics.  So there is a gap

9     between a certain kind of mythology around the killing of

10    Kennedy, which makes it seem like right-wing hatred did it, and

11    the facts of the case.

12         And I cite other examples, and the overall point being

13    that you shouldn't go into an assassination or act of political

14    violence in America with the assumption that it's going to cash

15    out as a sort of simple, straightforward, you know, partisan

16    motivation, right-wing or left-wing politics taken too far.

17    It's often more complicated and sometimes just plain weirder

18    than that.

19    Q.  And that's you expressing your opinion about these subjects

20    in this piece, is that correct?

21    A.  That is all just my opinion, except Lee Harvey Oswald was a

22    Communist.  I think that's a fact.

23    Q.  Did you run this column past anyone at *The Times* before

24    publishing it?

25    A.  I ran it past my editor, not James, but the editor who

M292Pal6                    Douthat - Cross

1    works on my columns at the time, and my assistant would have

2    fact-checked it, and then it would have been seen by some

3    number of people before publication, but I didn't have contact

4    with them.

5    Q.  Did anyone at *The Times* object to publishing this column

6    that was at least partially a response to the "America's Lethal

7    Politics" editorial?

8    A.  Not to my knowledge, no.

9    Q.  And Mr. Bennet was in charge of the opinion section at that

10   point, is that correct?

11   A.  That is correct, yes.

12   Q.  Did Mr. Bennet do anything to prevent you from publishing

13   this column?

14   A.  He did not, no.

15   Q.  Were you in any way punished or disciplined for writing a

16   column critical of *The New York Times* editorial?

17   A.  I believe I was not.

18          MR. SULLIVAN:  Thank you.  May I confer with my

19   colleagues briefly, your Honor?

20          THE COURT:  Yes.

21          (Counsel confer)

22          MR. SULLIVAN:  No further questions at this time, your

23   Honor.

24          THE COURT:  Any redirect.

25          MR. TURKEL:  Just a few, Judge.

M292Pal6                    Douthat - Redirect

1    REDIRECT EXAMINATION

2    BY MR. TURKEL:

3    Q.  Mr. Douthat, did you follow the evolution of corrections

4    that *The Times* made to the "America's Lethal Politics"

5    piece?

6    A.  Not -- I was aware that we had made corrections, but no,

7    no, I didn't follow them closely.

8    Q.  I am going to show you Plaintiff's No. 7, which is in

9    evidence, and see if you remember seeing this document at any

10   point in time, meaning either this tweet or that content

11   republished anywhere.

12   A.  I would say it is very likely that I saw it.  I won't say

13   that I have a very specific recollection of seeing it at the

14   time, but it is quite likely that I saw it.

15   Q.  Within this discussion of opinions, specifically your

16   opinion regarding the reading of that piece and your

17   conclusions about how it should be read in your eyes, is

18   everything within that opinion or are there certain things

19   within it that are fact?

20   A.  I'm sorry.  You will have to clarify the question.

21   Q.  I will ask a better question without a lengthy start-up

22   like that.

23          For instance, are you aware of at any point in time

24   any facts that have been published or otherwise disclosed that

25   supported the idea that Jared Loughner was motivated by

M292Pal6                    Douthat - Redirect

1  right-wing politics?

2  A.  No.

3  Q.  As to what the conclusions were to him, the large majority

4  was that he was suffering from mental illness, correct?

5             MR. SULLIVAN:  Objection, your Honor.

6             THE COURT:  Sustained.

7  Q.  Were you aware of any politics playing a part in Jared

8  Loughner's life?

9             MR. SULLIVAN:  Objection, your Honor.

10             THE COURT:  Sustained.

11  Q.  Let me try and ask this in a way --

12             THE COURT:  You are not going to be able to.  I don't

13  see any way you can go down this line.

14             MR. TURKEL:  Okay.

15             THE COURT:  Zilch.

16             MR. TURKEL:  Sorry, Judge.  I thought there may be one

17  way, but I'm not going to try it because you just told me there

18  is no way.  That's it, then.  I don't --

19             THE COURT:  Feel free to try it.  I don't want to --

20  you know, it's been a quiet day, and I haven't had a chance to

21  sustain objections --

22             MR. TURKEL:  I'm here for you.

23             THE COURT:  -- except for the once or twice.  This

24  will give me lots of more opportunities.

25             MR. TURKEL:  Let me try this way.

1    BY MR. TURKEL:

2    Q.  In your coverage of the Tucson shootings, at any point in

3    time did you come across any facts that support any politics

4    playing a role in the life of that shooter, Jared Loughner?

5              MR. SULLIVAN:  Objection.

6              THE COURT:  Sustained.

7              MR. TURKEL:  All right.  No worries.

8              THE COURT:  But good try.

9              MR. TURKEL:  I kept it broad.

10             THE COURT:  Anything else.

11             MR. SULLIVAN:  Nothing from us, Judge.

12             THE COURT:  Thank you very much.  You may step down.

13             THE WITNESS:  Thank you, your Honor.

14             (Witness excused)

15             THE COURT:  Please call your next witness.

16             MR. TURKEL:  Judge at this time we would be calling

17   Governor Palin.

18             THE COURT:  Okay.

19    SARAH PALIN,

20        called as a witness by the plaintiff,

21        having been duly sworn, testified as follows:

22             THE COURT:  Go ahead, counsel.

23             MR. TURKEL:  Thank you, your Honor.

24   DIRECT EXAMINATION

25   BY MR. TURKEL:

JA 0942

M2a2Pal1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SARAH PALIN, an individual,

               Plaintiff,

        v.                  17 CV 4853 (JSR)

THE NEW YORK TIMES COMPANY, *et al.*,

               Defendants.

------------------------------x       Trial

                             New York, N.Y.

                             February 10, 2022
                             9:00 a.m.

Before:

                HON. JED S. RAKOFF,

                             District Judge

                     APPEARANCES

TURKEL CUVA BARRIOS, P.A.
     Attorneys for Plaintiff
BY:   SHANE B. VOGT
     KENNETH G. TURKEL

BALLARD SPAHR, LLP
     Attorneys for Defendants
BY:   DAVID L. AXELROD
     JACQUELYN N. SCHELL
     THOMAS BYRNE SULLIVAN
     JAY WARD BROWN

Also Present:

Dana Green, Senior Counsel, The New York Times Company

**JA 0943**

M2a2Pal5                          Ingber - Direct

1          THE COURT:  Anything else.

2          MR. TURKEL:  We have no questions, Judge.

3          THE COURT:  Thanks very much.  You may step down.

4          THE WITNESS:  Thank you.

5          (Witness excused)

6          THE COURT:  I understand you have one final witness.

7          MR. VOGT:  Yes.

8          MR. TURKEL:  Mr. Vogt will be handling that final

9   witness.

10          THE COURT:  Let's get that witness on the stand.

11          MR. VOGT:  Hanna Ingber, your Honor.

12   HANNA INGBER,

13       called as a witness by the plaintiff,

14       having been duly sworn, testified as follows:

15          THE COURT:  Counsel.

16          MR. VOGT:  Thank you, your Honor.

17   DIRECT EXAMINATION

18   BY MR. VOGT:

19   Q.  Can you please state -- do you work for *The New York Times*?

20   A.  Yes, I do.

21   Q.  And what's your official title or position there?

22   A.  I'm the editor of the On Tech newsletter.

23   Q.  And what's the On Tech newsletter?

24   A.  It's a newsletter we publish three days a week about how

25   technology is changing our lives for better or for worse.

M2a2Pal5                          Ingber - Direct

1    Q.   And how long have you been in that position?

2    A.   Since of the pandemic began, so about two years.

3    Q.   And prior to that, what was your position at the *New York*

4    *Times*?

5    A.   I ran a team called the reader center.

6    Q.   And what's the reader center?

7    A.   It was a team that we started in 2017 as a way of building

8    ties between our readers and our journalists, and we also hoped

9    to deepen trust with our readers through transparency.

10   Q.   And when you say deepen trust with readers through

11   transparency, what are you talking about?

12   A.   We wanted our readers to know what we did as journalists.

13   We wanted them to have more insight into how journalists find

14   stories, put together stories, publish stories.  We wanted them

15   to really see the "insides outs" of what we do as journalists

16   so that they would have a better understanding of our work and

17   trust us.

18   Q.   And were you working in the reader center in June of 2017?

19   A.   Yes.  We had just started it.

20   Q.   And did the reader center work with the editorial

21   department at the *New York Times*?

22   A.   Yes.

23   Q.   And what type of interaction did the reader center have

24   with the editorial department?

25   A.   Well, as I mentioned, we had just started the reader center

**JA 0945**          Ingber - Direct

1    a couple of months earlier, and we were in an unusual position

2    in that we worked with both the newsroom side and the opinion

3    side of the *Times*.  And we were a brand new team and, again,

4    had just begun, so we were really trying to figure out what

5    that would look like.  So at that time it was so early we were

6    having meetings and talking about what we could do to help that

7    side of the organization.

8    Q.  And as part of your job during that June of 2017 time

9    period, would that have included monitoring social media that

10   related to *The New York Times*?

11   A.  Yes, the team did that.

12   Q.  And did the reader center also respond to readers who made

13   comments on stories posted on *The New York Times* website?

14   A.  Occasionally.

15   Q.  And did the reader center also respond to readers who

16   e-mailed *The New York Times*?

17   A.  Yes.

18   Q.  And do you recall -- can you bring up 206 which I think has

19   been admitted, Plaintiff's 206.

20        Do you recognize this e-mail that should have popped

21   up on your monitor, Plaintiff's Exhibit 206?

22   A.  Yes.

23   Q.  And at 10:26 a.m. on June 15, you sent this e-mail to

24   Mr. Bennet, correct?

25   A.  Correct.

JA 0946

M2a2Pal5                          Ingber - Direct

1   Q.  And after saying, "Hi, James," you say, "I'd be happy to

2   chat about the Sarah Palin editorial and options for responding

3   to readers if that would be helpful."

4           Do you see that?

5   A.  Yes.

6   Q.  And what were you referring to when you said "the Sarah

7   Palin editorial"?

8   A.  I had not -- I hadn't read the editorial until I was

9   basically made aware of it, and I don't remember if I was made

10  aware of it by a colleague or by seeing some reaction from some

11  of our readers on Twitter.  But after I heard about it or read

12  the reaction, I was contacting James to discuss the editorial.

13  Q.  And by "the editorial," do you mean "America's Lethal

14  Politics"?

15  A.  Yes.

16  Q.  And was there any reason in particular why you referred to

17  it as the Sarah Palin editorial?

18  A.  Because the only reason I, frankly, had read it or was

19  aware of it or was involved in it or the reason I was

20  contacting James was because of a line that referenced Sarah

21  Palin.

22  Q.  And did -- were readers upset at all about the editorial?

23          MS. SCHELL:  Objection, your Honor.

24          THE COURT:  Sustained.

25  BY MR. VOGT:

**JA 0947**

M2a2Pal5                           Ingber - Direct

```
1   Q.  Why did you -- had you spoken at all to Mr. Bennet on the
2   morning of June 15 of 2017, prior to sending this e-mail?
3   A.  I don't remember, but I doubt it.
4   Q.  And do you recall why you were sending Mr. Bennet this
5   e-mail at 2 -- at 10:26 a.m.?
6   A.  Based on the e-mail, it seems that I was aware that some
7   readers were upset about the editorial, had feedback on the
8   editorial, and that I was reaching out to James to offer help.
9   Q.  And when you say readers were upset, do you recall what
10  they were upset about?
11             MS. SCHELL:  Objection.
12             THE COURT:  Sustained.
13             MR. VOGT:  Your Honor, the only other thing I would do
14  at this point is offer two exhibits that I think you made a
15  preliminary ruling on.
16             THE COURT:  All right.
17             MR. VOGT:  Just identify them by number, which is
18  Plaintiff's 179 and 181.
19             MS. SCHELL:  Your Honor, we --
20             MR. VOGT:  I assume your rulings from pretrial still
21  apply.  I just needed to offer them during trial.
22             MS. SCHELL:  We object to both exhibits, your Honor.
23             THE COURT:  Yes, sustained.
24             MR. VOGT:  No further questions, your Honor.
25             THE COURT:  Cross-examination.
```

**JA 0948**

M2a2Pal5                    Ingber - Cross

1    CROSS-EXAMINATION

2    BY MS. SCHELL:

3    Q.  Good afternoon, Ms. Ingber.

4    A.  Hello.

5    Q.  Mr. Vogt asked you about the reader center.  Can you tell

6    the jury again what the reader center was?

7    A.  Yes.  We were a team in the newsroom whose objective was to

8    deepen ties between our readers and our journalists.

9    Q.  And you mentioned that you were trying to create

10   transparency.  Did that involve behind-the-scenes looks at *The*

11   *Times*?

12   A.  Yes.

13   Q.  You also mentioned your interactions with -- or Mr. Vogt

14   asked about your interactions with the opinion section and the

15   news section.  Do you remember this?

16   A.  Um-hmm, yes.

17   Q.  When you were interacting in June of 2017 with the opinion

18   section, to the extent you were, were you involved before or

19   after news pieces were published?  Or excuse me, let me try

20   that again.

21         When you were interacting with the opinion section,

22   were you dealing with pieces that were about to be published or

23   that had already been published?

24   A.  At that point we were focused on pieces that had already

25   been published.

**JA 0949**

M2a2Pal5                                   Ingber - Cross

1   Q.  And you mentioned that you reached out to Mr. Bennet on

2   June 15, the day after the editorial was published.  That's

3   correct?

4   A.  Right.

5   Q.  Mr. DiMezza, would you please pull up Defense Exhibit 52.

6   This has already been admitted into evidence.

7           So I believe Mr. Vogt was showing you your e-mail to

8   Mr. Bennet at 10:26 a.m. on the 15th.

9           About a couple lines down, Mr. DiMezza.

10  A.  Right.

11  Q.  Thank you.

12          Had you had any involvement in the "America's Lethal

13  Politics" editorial on June 14?

14  A.  No.

15  Q.  Were you involved in drafting the editorial at all?

16  A.  No.

17  Q.  Were you involved in revising the editorial on the 15th?

18  A.  No.

19  Q.  Were you involved in drafting the corrections that were

20  published on the 15th?

21  A.  No.

22  Q.  You state to Mr. Bennet in your e-mail, "I don't know what

23  your response is, but given much of the discussion is happening

24  on Twitter, one option could be to do some threaded tweets in

25  your response."

JA 0950

M2a2Pal5                          Ingber - Cross

1      Could you explain what a threaded tweet is?

2    A.   Yes.   The idea was, rather than just sending one tweet to

3    our audience or to the public, to send a few tweets so that he

4    could or the *Times* could more fully explain what was happening;

5    and when you thread tweets, it means that the tweets aren't in

6    isolation, they are connected to each other, like pages in a

7    book.

8    Q.   So is it fair to say that if someone clicked on one of the

9    tweets, they would then see the second and third with it?

10   A.   Right.

11   Q.   Thank you.

12       I jumped ahead of myself a little bit.   Looking at the

13   sentence before, you mention to Mr. Bennet, "I'd be happy to

14   chat about the Sarah Palin editorial and options for responding

15   to readers if that would be helpful."

16       Mr. Vogt asked why you referred to the Sarah Palin

17   editorial; and if I'm remembering your testimony correctly, you

18   said something to the effect of you were only involved because

19   of a single line that referenced her PAC, is that correct?

20   A.   Right.

21   Q.   Had you heard anyone else at *The Times* calling it the Sarah

22   Palin editorial?

23   A.   No.

24   Q.   And then going back to the second paragraph — sorry to jump

25   around on you — you say, "That can keep it conversational,

M2a2Pal5                    Ingber - Cross

1    human, and native to the platform where the criticism is

2    coming."

3          Why did you suggest to Mr. Bennet that the response

4    should be conversational and human?

5    A.  One of the goals of the reader center was to make *The Times*

6    more accessible to our readers, less arrogant, more -- again,

7    more trustworthy, and so we wanted to -- the suggestion was to

8    really explain to readers what was happening and why a mistake

9    happened, if that's what we felt happened.  You know, it wasn't

10   my -- basically just to be able to fully explain to our readers

11   what happened and to not do it in this institutional way, but

12   to do it in a human way.

13   Q.  Fair to say that you wanted the response from *The Times* to

14   be relatable?

15   A.  Relatable, understandable, yes.

16   Q.  And is it fair to say that you wanted to help make sure

17   that the response could be understood by readers?

18   A.  Right.

19   Q.  You mentioned that "the response could be native to the

20   platform where the criticism is coming."  Can you explain what

21   you meant by that?

22   A.  The criticism we were seeing was on Twitter.  So some

23   readers were upset with *The Times* based on this line in the

24   editorial, and those readers were talking about it on Twitter.

25   And it seemed important that if we were going to engage with

**JA 0952**

1   those readers and we were going to explain where we were coming

2   from or we were going to explain what happened or if we had

3   done something wrong, explain what we did wrong, it would make

4   sense to meet them where they were and to go to -- I use the

5   word platform here, but basically go to the website where the

6   readers were talking about this.

7           If they were in Chicago talking about it, it wouldn't

8   make sense to go to New York.  So where we saw the criticism

9   was on Twitter, and so it made sense to have our response and

10  our correction, if need be, be there because we wanted as many

11  readers as possible to know where we stood.

12  Q.  And then Mr. Bennet responds to you at 10:46 a.m. on the

13  14th, and he says, "Hey, Hanna, we're about to publish a

14  correction.  Do you think it would make sense to push that

15  through our -- I'm sorry, push that out through our opinion

16  Twitter feed?"  Is that correct?

17  A.  Right.

18  Q.  What was your understanding of why *The Times* or Mr. Bennet

19  would push a correction out through a Twitter feed?

20  A.  Again, the whole point of a correction is to let readers

21  know that we made a mistake and literally to correct the

22  record.  So his suggestion is in line with what I was

23  suggesting, which is to make sure that that correction takes

24  place and it happens and appears in the place where readers are

25  talking about the error.

JA 0953

M2a2Pal5                    Ingber - Cross

1   Q.  Is it also a way to make sure that more readers see the

2   correction?

3   A.  Certainly.  But again, doing it on Twitter was -- made

4   sense because that's where -- that's where the discussion was

5   happening.

6   Q.  Mr. DiMezza, you can take that down.

7            Would you please put up Defense Exhibit 53.

8            THE COURT:  Before you do that, go back to that

9   exhibit for a second.

10           MS. SCHELL:  Oh, yes.

11           THE COURT:  So you indicated that no one else that you

12  can recall referred to this as the Sarah Palin editorial.  Why

13  did you refer to it as the Sarah Palin editorial?

14           THE WITNESS:  I don't 100 percent remember, but my

15  guess is that I was nervous and that I hadn't read the

16  editorial -- I didn't typically read editorials, and --

17           THE COURT:  Was the readers' comments that you were

18  receiving, without telling us anything specific, but were they

19  focused on the Sarah Palin aspect?

20           THE WITNESS:  So the only feedback that I was paying

21  attention to of that editorial was the ones that was focused

22  on, Sarah Palin.

23           THE COURT:  Okay.

24           MS. SCHELL:  Thank you, your Honor.

25  BY MS. SCHELL:

**JA 0954**

M2a2Pal5                          Ingber - Cross

Q.  Mr. DiMezza, if you would please put up Defense Exhibit 53,

which has been admitted in evidence.  If you could turn --

perfect.  Thank you.

        Mr. DiMezza, could you zoom in on the June 15 e-mail

toward the bottom of page 1 and on to the top of the second

page, please.

        Ms. Ingber, is this your response to Mr. Bennet at

11:12 a.m.?

A.  Yes.

Q.  You say, "Thanks, James.  Perhaps on Twitter, it could be a

human voice that walks through what happened," and you mention

again "and the tweets could be threaded so they are all

connected."

A.  Correct.

Q.  And then you propose three draft tweets.  Is that what the

numbered paragraphs say?

A.  Yes.

Q.  And on the third proposal you state, "We appreciate that

our readers and others pointed out this error.  We have

corrected the editorial."  Is that correct?

A.  Yes.

Q.  Why did you want to include that tweet?

A.  Again, the point of the reader center was to build these

connections or ties or deepen engagement — however, whatever

journalistic jargon you want to use — between our readers and

M2a2Pal5                          Ingber - Cross

1    our journalists.  So one of the things that we had found was

2    that readers of the *Times* really wanted to be heard.  You know,

3    when they had feedback of our coverage, they wanted us to know

4    about it.  They had been reading *The Times* for generations

5    sometimes in their families and they felt a connection to us

6    already; and when they felt that we got something wrong or they

7    felt that we weren't covering a particular story well enough or

8    they felt that we should have more coverage of a particular

9    story, they had strong opinions about it and they really wanted

10   to tell us and they also really wanted to be heard.  They

11   didn't want to be sending off this information into a vacuum

12   and to not get a response.

13          And so one of the goals of the reader center was to

14   make sure that not just that we were listening to the feedback

15   from our readers, because even before the reader center

16   existed, *Times* journalists were all listening to feedback, but

17   with the addition of reader center, we wanted readers to

18   actually know we were listening to it and know that we were

19   having these conversations and know that we were taking the

20   feedback seriously.

21          And so by saying we appreciate that our readers and

22   others pointed out this error, we are basically saying, we

23   heard you, we appreciate that you took the time to correct us,

24   and we want you to tell us again if we -- if you think that we

25   have messed up.

**JA 0956**

M2a2Pal5                        Ingber - Cross

1    Q.  So it's a way of acknowledging the misperception or the

2    error or the feedback?

3    A.  Yes.

4    Q.  And Mr. DiMezza, you can put down that zoom in, but could

5    you please zoom in again on Mr. Bennet's 11:22 response.

6            Ms. Ingber, can you see this response on your screen

7    at 11:22 a.m.?

8    A.  Yes.

9    Q.  And are these Mr. Bennet's -- this is Mr. Bennet's

10   revisions to your proposed tweets, correct?

11   A.  That was my understanding, yes.

12   Q.  And did he keep this language about "we are sorry about

13   this and appreciate that our readers called us on the mistake"?

14   A.  It looks like that, yes.

15   Q.  And then you include a link at the end.  Is that correct?

16   A.  Right.

17   Q.  Would that be a link to the revised editorial?

18   A.  Right.

19   Q.  So that would have further pushed the correction out into

20   the audience.

21   A.  Right.

22           MS. SCHELL:  Your Honor, may I have just a moment to

23   confer?

24           THE COURT:  Yes.

25           (Counsel confer)

JA 0957

M2a2Pal5                         Ingber - Cross

```
1    BY MS. SCHELL:
2    Q.  Ms. Ingber, let me correct something in my last question.
3            On Mr. Bennet's revisions to the three proposed
4    tweets, your original language read, "We appreciate that our
5    readers and other pointed out this error."
6            Mr. Bennet's response reads, "We're sorry about this
7    and we appreciate that our readers called us out on the
8    mistake."  So he kept your language, correct, or the substance
9    of your language.
10   A.  He kept the idea of it, but he tweaked it, correct.
11   Q.  And then did he also add an apology that we're sorry about
12   this?
13   A.  Yes.
14   Q.  And the reader center, just going back to the reader center
15   generally, am I remembering correctly that it was responding to
16   feedback from readers?
17   A.  Yes.
18   Q.  How many people worked for the reader center?
19   A.  It varied, but at that time there was probably five to
20   seven of us.  We had -- we wore a lot of different hats.
21   Q.  And does The Times get a lot of feedback from readers?
22   A.  Yes.  Though that team wasn't only focused on looking at
23   reader feedback.
24   Q.  Right.  I was just referring to that portion of the reader
25   center.
```

M2a2Pal5                          Ingber - Redirect

1              But *The Times* received overall a lot of feedback from

2      readers?

3      A.  Yes.

4              MS. SCHELL:  Nothing further, your Honor.

5              THE COURT:  Redirect?

6              MR. VOGT:  Briefly.

7      REDIRECT EXAMINATION

8      BY MR. VOGT:

9      Q.  Ms. Ingber, I just wanted to clarify something.

10             I think you said, when Judge Rakoff asked you about

11     why you called this the Sarah Palin editorial, I believe you

12     said that you were nervous, is that right?

13     A.  I probably was nervous if James Bennet had contacted me

14     about an editorial.

15     Q.  And I think you also said at the time you reached out to

16     Mr. Bennet at 10:26 you don't believe that you had read the

17     editorial yet, is that correct?

18     A.  I don't think that's what I said, no.

19     Q.  Okay.  So is it possible you had read the editorial at that

20     time?

21     A.  At 10:26, I probably would have read the editorial.  What I

22     was saying was that I had not that morning woken up and had

23     breakfast and drank my coffee and read the editorial, that I

24     only read the editorial once I was aware that there was

25     feedback on it that the reader center should be involved with.

**JA 0959**

M2a2Pal5                          Ingber - Redirect

1  Q.  And do you recall stating that you referred to this as the

2  Sarah Palin editorial because readers who were upset about the

3  editorial were upset about the part that mentioned Sarah Palin?

4          MS. SCHELL:  Objection.

5          THE COURT:  Well, I'm not sure that's exactly what she

6  said, but you can put it as a question.

7  BY MR. VOGT:

8  Q.  So, Ms. Ingber, do you recall stating that the reason that

9  you were involved in this situation was that there were readers

10 who were upset about the editorial, and the part that they were

11 upset about was the part that mentioned Sarah Palin?

12 A.  Yes.

13 Q.  And then with respect to -- you said readers a couple of

14 times during the course of your testimony.  When you say

15 readers, who are you referring to?

16 A.  Yeah, that's a good question.  We use that word in all

17 sorts of ways.  Usually we are just referring to the public.

18 So people on Twitter talking about *Times* journalism.  We hope

19 that everyone is a reader of the *Times*, and -- but we don't

20 only mean subscribers or we don't mean only paying subscribers.

21 We, within the newsroom, when we talk about our readers, we

22 really mean the audience at large, whether or not that's people

23 who are paying for *Times* coverage or people who only read one

24 story by the *Times*, or just in general the public.

25 Q.  And then lastly, you were just asked some questions about

**JA 0960**

M2a2Pal5

1  Defense Exhibit 53 and the language you had proposed for the

2  tweet about the corrections to "America's Lethal Politics" and

3  then some changes Mr. Bennet made, including adding "we're

4  sorry about this."  Do you recall that?

5  A.  I'm sorry.  I got distracted by seeing the writing.  Do you

6  mind repeating the question?

7  Q.  Sure.  I'm sorry.  You were asked some questions about

8  Defense Exhibit 53 and the exchange between you and Mr. Bennet

9  about the draft tweet --

10  A.  Yes.

11  Q.  -- that you all were working on.  Do you recall that?

12  A.  Yes.

13  Q.  And one of the things that Mr. Bennet added is "we're sorry

14  about this."  Do you remember that?

15  A.  Right.

16  Q.  Was adding that language against *Times* policy?

17  A.  To apologize to readers for a mistake?

18  Q.  Yes.

19  A.  No, I'm not aware of any *Times* policy that would say you

20  shouldn't apologize.

21            MR. VOGT:  No further questions.

22            THE COURT:  All right.  Anything else?

23            MS. SCHELL:  No, your Honor.  Thank you.

24            THE COURT:  Thank you very much.  You may step down.

25            (Witness excused)

**JA 0961**

M2a2Pal1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    SARAH PALIN, an individual,

 4                   Plaintiff,

 5              v.                        17 CV 4853 (JSR)

 6    THE NEW YORK TIMES COMPANY, et
      al.,
 7
                   Defendants.
 8
      ------------------------------x        Trial
 9
                                             New York, N.Y.
10
                                             February 10, 2022
11                                           9:00 a.m.

12    Before:

13                        HON. JED S. RAKOFF,

14                                           District Judge

15
                            APPEARANCES
16
      TURKEL CUVA BARRIOS, P.A.
17         Attorneys for Plaintiff
      BY:  SHANE B. VOGT
18         KENNETH G. TURKEL

19
      BALLARD SPAHR, LLP
20         Attorneys for Defendants
      BY:  DAVID L. AXELROD
21         JACQUELYN N. SCHELL
           THOMAS BYRNE SULLIVAN
22         JAY WARD BROWN

23

24    Also Present:

25    Dana Green, Senior Counsel, The New York Times Company
```

**JA 0962**
M2A1PAL6

By the way, I guess I mispronounced it.  It's *Morsette* v. *The Final Call*, at 309 A.D.2d 249, a First Department case from 2003, and the quote that I just gave is at page 255.

So punitive damages will not be submitted to the jury.

Now are there any other motions that anyone wants to make?

MR. VOGT:  None from plaintiffs, your Honor.

MR. BROWN:  Yes, your Honor.  The defendants move for judgment as a matter of law on liability pursuant to Rule 50 on three independent grounds.  Now I recognize that the Court doesn't need argument on the standard it's to apply under Rule 50.  Suffice to say Ms. Palin has now been fully heard on her defamation claim, and setting aside all issues of witness credibility, there is no legally sufficient basis for a reasonable jury to find for her on liability on each of three elements.  And I'll begin with actual malice, your Honor.

New York's anti-SLAPP statute, as this Court has already held applies in this case, and also the First Amendment, require Ms. Palin to prove actual malice as an essential element of her claim.  As the Court's planned jury charge makes clear, there are two aspects of actual malice that Ms. Palin is required to prove, by clear and convincing evidence, and once again, setting aside all issues of witness credibility, there is simply no evidence of either aspect of actual malice and not even circumstantial evidence from which a

**JA 0963**

M2A1PAL6

1   reasonable juror could draw an inference of actual malice.

2           The first aspect is falsity—that is, knowledge of

3   falsity of the statements.  As your Honor has put it in the

4   proposed charge to the jury, Ms. Palin must prove by clear and

5   convincing evidence that at the time of publication, James

6   Bennet either knew it was false to say that there was a direct

7   or a clear link between the crosshairs map and Jared Loughner's

8   decision to shoot people in Arizona in 2011, or, alternatively,

9   that Mr. Bennet knew there was a high likelihood that it would

10  be false to say such a thing, but that he went ahead and did so

11  anyway.  This is what the courts refer to in shorthand as a

12  calculated falsehood.  That's from the *Garrison v. Louisiana*

13  case.

14          Mrs. Palin has not come forward with any evidence to

15  show that at the time of publication, Mr. Bennet in fact

16  harbored subjective knowledge of falsity or that he harbored

17  any doubts about the truth of the words he chose to use.  The

18  affirmative evidence in the record, which includes both

19  Mr. Bennet's testimony and, significantly, the contemporaneous

20  emails before and immediately after publication, including the

21  emails between him and Mr. Douthat that were admitted into

22  evidence and text messages and emails between Mr. Bennet and

23  Ms. Williamson —

24          THE COURT:  Before you get into more detail, just go

25  through and tell me what the three items are.

**JA 0964**

M2A1PAL6

1    MR. BROWN:  Sure.  So that's prong one of actual

2  malice.  And then obviously we also contend that there is no

3  evidence from which a reasonable jury could find that

4  Mr. Bennet, as the Court put it in its charge to the jury,

5  either intended to defame Mrs. Palin by making those

6  accusations or published his words despite having a high degree

7  of awareness that readers—that is, the ordinary reader—would

8  interpret them to have the defamatory meaning she alleges.

9  Those are the two prongs of actual malice.

10    We also don't believe that she's carried her burden of

11  proof on the "of and concerning" element, nor on the falsity

12  element, your Honor.

13    THE COURT:  Okay.  So the reason I interrupted you or

14  asked you to shorten it -- here is my normal practice, which I

15  think I will adopt here.  When there is that kind of motion, an

16  across-the-board type motion, I reserve on it until at least

17  after closing arguments of counsel, because plaintiff's counsel

18  will obviously have to address in his closing argument what he

19  thinks the evidence is for all four elements, and defense

20  counsel, conversely, will be addressing in his argument on

21  closing argument why he thinks there's no evidence of one or

22  more elements.  So rather than have you give me a preview of

23  your summations now, I will simply reserve on that motion until

24  I hear closing arguments of counsel.

25    MR. BROWN:  Yes, your Honor.  Thank you.

**JA 0965**

M2B1PAL1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

SARAH PALIN, an individual,

                    Plaintiff,

          v.                          17 CV 4853 (JSR)

THE NEW YORK TIMES COMPANY, *et al.*,

                    Defendants.

------------------------------x          Trial

                                         New York, N.Y.

                                         February 11, 2022
                                         9:27 a.m.

Before:

                    HON. JED S. RAKOFF,

                                         District Judge

                         APPEARANCES

TURKEL CUVA BARRIOS, P.A.
     Attorneys for Plaintiff
BY:  SHANE B. VOGT
     KENNETH G. TURKEL


BALLARD SPAHR, LLP
     Attorneys for Defendants
BY:  DAVID L. AXELROD
     JACQUELYN N. SCHELL
     THOMAS BYRNE SULLIVAN
     JAY WARD BROWN


Also Present:

Dana Green, Senior Counsel, The New York Times Company

1    (In open court; jury not present)

2    THE COURT:  Good morning.  Please be seated.

3    So my understanding is that plaintiff wants to

4    introduce some exhibits into evidence; is that right?

5    MR. VOGT:  Your Honor, yes.  There were just four --

6    MR. TURKEL:  Mr. Vogt is handling it, Judge.

7    MR. VOGT:  There were four editorials that were

8    hyperlinked in some e-mails that we talked about that I thought

9    had actually made their way in but didn't, which were

10   Plaintiff's 129 through 132.

11   THE COURT:  All right.  Hang on.

12   Any objection to those?

13   MR. AXELROD:  Yeah, your Honor.  The jury never saw

14   those documents.  No witness talked about them.  I don't know

15   why we'd admit them.

16   THE COURT:  Sustained.

17   All right.  Very good.  Let's bring in the jury.

18   (Jury present)

19   THE COURT:  Please be seated.

20   So good morning, ladies and gentlemen, and thank you,

21   as always, for your promptness.

22   We're about to hear closing arguments of counsel.  I

23   want to remind you, as I did before opening statements, that

24   nothing that counsel says is evidence.  The evidence is before

25   you, and it consists of testimony and exhibits, and there were

M2B1PAL1                    Summation - Mr. Turkel

1    a few stipulations.  And that's the only source of evidence.

2              However, before you decide what that evidence proves

3    or fails to prove, it will probably be useful to you to hear

4    what each side believes the evidence shows or doesn't show, so

5    we give each side an opportunity to make their arguments to you

6    as to what they think you should derive from the evidence.

7              Each side is given two hours.  The plaintiff gets an

8    initial statement of an hour and 45 minutes, then the defense

9    gets two hours, and then the plaintiff gets a brief rebuttal of

10   15 minutes because they have the burden of proof.  So we have a

11   full day ahead of us.  We'll take breaks, obviously, at

12   appropriate times.

13             And we'll begin with plaintiff's counsel.

14             MR. TURKEL:  Thank you, and may it please the Court,

15   your Honor, and counsel, members of the jury.

16             I want to start by going back to my partner Shane

17   Vogt's comments last week.  I think it was last week.  The

18   first day and last day always feel very far apart.  But he

19   spoke to you about what we intended to prove in this case, the

20   evidence we'd put on, about the challenges we faced, our

21   acceptance of those burdens.  But there was no illusion about

22   taking on *The New York Times*, that the evidence we'd put on

23   would be clear, and that we understood the challenge behind it.

24             When we look back on that and reflect on the idea that

25   Sarah Palin, former candidate for vice president in 2008, is in

M2B1PAL1                         Summation - Mr. Turkel

1    a position in 2017 where that's the challenge that's put upon

2    her, after a career in the public eye, career which she

3    suffered plenty of jokes, plenty of insults, slings and arrows,

4    of a society all too quick to judge someone they don't know

5    because they disagree with how they think, and the line had to

6    be drawn at some point in 2017 when *The Times* resurrected a

7    horrific false accusation, that had been recognized as false

8    almost uniformly, and that, in its simplest form, accused

9    Governor Palin of inciting a murder of six people, a federal

10   judge, a 9-year-old girl—at a time when she had a 9-year-old

11   girl—injured I believe 16 others.  It became time to draw the

12   line.

13           When we talk about this case and we talk about the

14   background against which this occurs, yes, we talked about

15   politics and political rhetoric and political speech and media

16   and so forth over the last week.  The facts of this case

17   require that because the actual comment upon which we're suing

18   occurred in the context of a political arena.  But the politics

19   don't matter.  Personal feelings or thoughts -- and Judge

20   Rakoff will instruct you on what you can and can't consider

21   when you're in here.  And it may be difficult in a case that

22   was so charged up, with a fact pattern that dealt with so much

23   politics.  But at its core what matters here isn't the politics

24   of it.  It may define why things happen, it may define why

25   certain people were judged certain ways, or even why certain

M2B1PAL1                    Summation - Mr. Turkel

1    comments were made, but the bottom line is that yesterday there

2    was a dialogue between Mr. Axelrod and Governor Palin,

3    bantering back and forth about the First Amendment.  And I

4    think in more than one spot there, Governor Palin interjected:

5    Yes, that's fine, we can disagree, but you can't say false

6    things.  That's where the line gets drawn.  And I'm sure you

7    all remember that because it's fairly recent in the history of

8    the case.

9              And so as sort of the threshold to this discussion,

10   yes, there was politically charged talk and ideas being thrown

11   around this courtroom to explain to you this dispute, but what

12   this dispute is about, in its simplest form, is really power

13   and lack of power.  And I know that may seem not easy to take

14   in when you're dealing with someone who was, in 2008, on the

15   international stage, but the truth of the matter is, in 2017,

16   Sarah Palin is a consultant and a speaker; she's a mother and a

17   grandmother.  She loves her hometown so much that despite the

18   fact that most of her work is in the Lower 48, as they say in

19   Alaska, and over here on the East Coast, an 11-hour flight, she

20   chooses to still live in Wasilla because her family is there.

21             There's no expectation when you come into a courtroom

22   with someone who has lived a public life that you know who they

23   are.  You know who you've learned they are from what you've

24   watched or what you've read.  Hopefully yesterday, when

25   Governor Palin testified, you got a sense of who she is.  Maybe

JA 0970

M2B1PAL1                    Summation - Mr. Turkel

1   the idea that they always talked about her being from Alaska

2   and so forth, you got a sense of this town she lived in, with

3   20,000 people in it, of her working on the PTA and being

4   inspired to enter in public service, of sitting on the city

5   council so she could help her fellow citizens fight for their

6   land rights, of becoming the mayor of her tiny hometown there,

7   of becoming the youngest governor in the state's history.  And

8   whatever preconceptions you may have had about these things, or

9   whether you agree or disagree with how she discharged her

10  public career, doesn't really matter.  At the end of the day,

11  what you should have learned from her yesterday, the way she

12  entered public service to do good, she served as a governor of

13  her state, and she was chosen to run for vice president of our

14  country.  And as she testified, it threw her into kind of a

15  different world.  I think at one point she said her favorite

16  part was meeting the people.  But that's 2008.  In 2017, she's

17  trying to stay busy enough with the consulting work and trying

18  to be a mom and a grandmother, and to be with her sisters and

19  her brother and her family in Wasilla.

20          The reason I bring that up is because when I talk

21  about this case being about power—and Governor Palin testified

22  about this yesterday—she did not have the same platform in 2017

23  as she had in 2008, or even 2011, when the Tucson massacre

24  occurred.

25          At one point in her testimony we discussed whether she

1    had taken any action against any media in 2011.  And she said

2    no.  And I asked her why, and she said:  Because there were

3    people that had died and I wasn't going to capitalize on that.

4    But in 2017, when *The Times*, with every opportunity, if they

5    had just not been so keen on disregarding it and turning a

6    blind eye to it and not reading it and not caring about it, and

7    if it hadn't been so easy for them to put this false accusation

8    back out there, takes a wound that's sealed and reopens it.

9    And for what reason, in 2017?  What was Sarah Palin in *The New*

10   *York Times*'s world in 2017?  She wasn't running for office, she

11   wasn't sitting in office.  She was just someone who had been an

12   elected official almost, what, at that point nine years

13   earlier.

14          And, you know, for whatever reason -- and maybe this

15   is where we start talking a little bit about the political

16   ideologies and all that -- they saw fit to not only

17   re-resurrect this false accusation, and they used the word in

18   one of their editorials, Linda Cohn, this horrific tragedy, but

19   then when confronted with clear, undisputed accusations about

20   the fact that it was false, engage in some meaningless

21   corrections that don't mention her name, never apologize.  They

22   come in here and testify they didn't put her name in the

23   corrections because they thought it would be gracious not to

24   put her name in the same sentence as the tragedy again, when

25   they left it in the article the entire time.  Those types of

M2B1PAL1                          Summation - Mr. Turkel

1    nonsensical explanations are why we're here.  And they're

2    indicative of an arrogance and a sense of power that's

3    uncontrolled and for which Governor Palin's only remedy is to

4    use our system here, our judicial system, and that's why we're

5    here today and that's why you're here today.

6          An entity as large as The New York Times Company

7    controls every aspect of this dialogue—the questions that are

8    asked, the answers that are given, the people to whom the

9    questions are relevant.  They do it over on Eighth Avenue in

10   their offices where the editorial board sits.  We heard the

11   people that all worked there.  Interestingly enough, over the

12   course of the trial, we find out they email a lot but there's

13   not a whole lot of sort of one-on-one talking.  And as they go

14   through this, you know, almost, seemingly, at the click of a

15   button, someone's accused of inciting murder.

16         There is no real version of this story that Mr. Bennet

17   or *The Times* has justified in this courtroom.  We're here to

18   have them held accountable.  As my partner told you at the

19   front end of this case, it's not about money.  And we'll talk

20   about that at the end of my presentation, about the guidance

21   the Court gives you.  It's a civil lawsuit, so ultimately civil

22   lawsuits are about money, but that's not why we're here.

23         I want to start and walk you through some of the

24   documents that we've seen countless times.

25         And if we could, Mr. Bucher, pull up 117.

JA 0973

M2B1PAL1                    Summation - Mr. Turkel

1          Now, and I understand you've all seen documents

2    popping up for the last week.  I'm just going to try and

3    present them in a way where we're not going witness to witness

4    so we can try and synthesize what they mean here.

5          If you recall this, the subject line there, "Re: are

6    we writing on the congressional shooting?" was the sort of

7    subject that Elizabeth Williamson puts in this as she starts

8    this discussion that occurs about the Scalise shooting.  I'm

9    sure at this point the date June 14, 2017, is a date you're

10   familiar with.  We're at around 10:45 in the morning when this

11   thread starts.  We heard about who Bob Semple is, and he's not

12   the boss on the editorial board, that's Mr. Bennet, but he had

13   been there for a very long time, I think Phoebe Lett, when she

14   testified, said she loved him, and he's a sounding board for

15   the various approaches to this article they want to write.  So

16   his initial response is this.  And this is the place where I

17   think the word's going to mean a little bit more as we look in

18   context up to the thread.  He says, "Can't see it yet, but keep

19   looking.  A nutcase who hates Republicans???"  The tone of

20   which is, he can't see it, because a nutcase who hates

21   Republicans and decides to go shoot them is apparently not

22   something they can write on.

23          So if you go up the thread, there's a discussion --

24   because in '17, I believe Trump was in office.  He's speaking

25   at 11:30.  They're waiting to hear what president Trump says.

**JA 0974**

1   And then at 11:50 -- so now we're after this thread starts --

2   Mr. Semple responds, and he says, "We have written a ton

3   (mainly Frank)," and we've learned that's Frank Clines, their

4   sort of resident gun expert, or gun control expert.  "We did a

5   huge series on it a few years ago.  While this is almost

6   certainly a lone nut, it would be interesting to know how many

7   of those Republican athletes are beholden to the NRA and its

8   generally antiregulatory philosophy, and whether something like

9   this might pound a little sense into their heads."

10         Now I want to take a step back at this point and talk

11   about what I opened with, right?  Yes, there's a political

12   statement in there.  And in a vacuum looking at this,

13   Mr. Semple's reaction is whether this could be a lone nut, but

14   we'd like to see how many of those Republican athletes that are

15   playing baseball for the congressional baseball game are

16   beholden to the NRA and whether this might pound sense into

17   their heads, when we're talking about a gunman who came out to

18   shoot US congressmen, seems to be a bit of a crass response.

19         And as we go up this thread, Linda Cohn adds in that

20   the nutcase went to her high school, but then adds in that it

21   was one of the most racist towns in America, "that was ages

22   ago, but it's hard to picture any anti-Trump sentiment there."

23   The point being that if Mr. Hodgkinson had come from her town,

24   she has trouble believing he would hate Republicans.

25         So there's a shooting of US congressmen.  The

JA 0975

1   discussion on the editorial board immediately pivots to which

2   side are we playing, which team.  Ultimately Mr. Semple says,

3   okay, we definitely -- "we should definitely shoot for a piece,

4   not huge, but a piece."

5            So what I'd like to call this at this point is the

6   forming of the narrative they want to write for this story,

7   right?  The story isn't just:  Guy goes out and shoots US

8   congressmen.  That's the news story.  They're going to write a

9   narrative that's built around some other theory, and what we

10  find developing is gun control and the other side is -- please

11  pull up 119.

12           Mr. Bennet joins the conversation, and this is where

13  we get the other half of the narrative.  "As Bob has said,

14  there's most likely a gun control point to be made here.  The

15  other question is whether there's a point to be made about the

16  rhetoric of demonization and whether it incites people to this

17  kind of violence.  Hard for me to imagine that Bernie himself

18  is guilty of anything like that."

19           By way of refreshing your memory on the evidence,

20  James Hodgkinson, the Scalise shooter, was found through social

21  media to be a Bernie Sanders supporter and very anti-Trump.  So

22  we get the comment that it's hard for him to imagine that

23  Bernie himself is guilty of anything like that.  "But if

24  there's evidence of the kind of inciting hate speech on the

25  left that we, or I at least, have tended to associate with the

JA 0976

M2B1PAL1                          Summation - Mr. Turkel

1    right (e.g., in the run-up to the Gabby Giffords shooting) we

2    should deal with that."

3          Now if there's one thing as you go through this

4    process ultimately that I ask you to do is disregard whose side

5    everybody's on here for anything other than placing these

6    comments in context. And the context is this: Mr. Bennet has

7    said he's looking for inciting hate speech on the left, that he

8    has tended to associate with the right, in the run-up to the

9    Gabby Giffords shooting. When that phrase has been used, "the

10   run-up," it generally refers to this map that erroneously, any

11   number of times in this process, has been said to have been

12   released weeks before the shooting, when in truth it was

13   released almost a year before the shooting. And hopefully you

14   all picked that fact up because we tried to hit it a few times

15   during the course of the trial.

16         But the reaction of Mr. Bennet is to say, well, let's

17   see if this person on the left side of politics was incited by

18   some sort of hate speech or this rhetoric of demonization, and

19   he's tended to usually associate that with the right, but let's

20   take a look.

21         So the assignment is given out to Elizabeth Williamson

22   at this point to run down that theory.

23         And at this point what we ultimately see is the

24   narrative for this story is set. This isn't going to be a

25   story about just gun control. It's moving in the direction of

M2B1PAL1                    Summation - Mr. Turkel

1    this rhetoric and inciting and using examples of this.

2              So if we can go to DX 21.  And we're going to run

3    through these pretty quick, but it's just to keep you all on

4    the time line and where it makes sense.

5              "I asked Phoebe to send you four basic gun control

6    pieces."  This is Mr. Semple putting a research assignment

7    there to research this theory.  And Phoebe, as we learned, is

8    Phoebe Lett, who is an administrative assistant who did

9    research and entertained the guests and did some minimal

10   fact-checking and so forth.

11             If we could pull up DX 22.

12             So in conjunction with this, Ms. Lett forwards four

13   links to Ms. Williamson at 1:40 p.m.  And the response is --

14   and the previous email made it clear that Mr. Semple was giving

15   her four basic gun control pieces, right?  Well, the narrative

16   that's being set doesn't really deal with that.  They're

17   looking for this hate speech, this inciting thing.  So

18   Ms. Williamson responds to Phoebe and said, "Is there one that

19   references hate type speech against dems in the run-up to her

20   shooting?  James referenced that thanks."  So we're already

21   fixating on the Gabby Giffords shooting that was six years

22   before this.  That's the example that Mr. Bennet has adhered to

23   in this early part of the process, while the research is

24   happening.

25             So if you could pull up No. 120 -- wait.  Hold on one

**JA 0978**

M2B1PAL1                         Summation - Mr. Turkel

1    second.  Is this DX 21?  Pull up DX 22.

2            That is 22?  All right.  Pull up then Plaintiff's 126.

3    124.  I'm sorry.  124.  Plaintiff's 124.

4            All right.  So after Ms. Williamson sends Phoebe Lett

5    out to get another link, one that references hate type speech

6    against Dems in the run-up to her shooting, at 2:21 Ms. Lett

7    responds, "We never ran an editorial on it.  Frank Rich wrote

8    this piece on it but the board never did.  James was wondering

9    if there had been one."

10           So this piece -- if you would pull up 133, Plaintiff's

11   133 -- is a piece written, 2011, by Frank Rich.  And this was a

12   piece written right in the wake of the Gabby Giffords shooting.

13   So when we look at this piece -- and remember, this is research

14   being done to write the article that we've ultimately sued on

15   here.  And this is supposed to be research that's being done to

16   find out what they're going to write about and if there is a

17   story there that's supported by this idea that political speech

18   is inciting people to commit violence.

19           So in this piece we see -- if you could highlight the

20   bottom paragraph there, Mike.

21           "For the sake of this discussion, let's stipulate that

22   Loughner was a lone nut job who had never listened to Glenn

23   Beck or been a card-carrying member of either the Tea or

24   Communist parties.  Let's also face another tragedy: the only

25   two civic reforms that might have actually stopped him—tighter

1  gun control and an effective mental health safety net—won't

2  materialize even now."

3           If you could pull that back.

4           And then go to the paragraph that starts with -- and

5  you can put the paragraph on top of it in there too -- the one

6  that starts with, "The other inescapable reality" and the one

7  that says, "Did Loughner," those two.

8           And this raises an issue that was touched on by

9  defense counsel in the case, to which we responded, about the

10  blood libel video.  In an interview Governor Palin gave where

11  she said when was it less heated—back in those calm days when

12  political figures literally settled their differences with

13  dueling pistols?  Mr. Rich agreed with her.  "Calls for

14  civility will have no more lasting impact on the tone of

15  American discourse."

16           But if we look down in the next paragraph, we see

17  this.  "Did Loughner see Palin's own most notorious

18  contribution to the rancorous tone—her March 2010 web graphic

19  targeting congressional districts?"  Not her PAC, by the way;

20  her.  This is an op-ed writing for *The New York Times*.  What

21  should grab your attention a little bit more is how he answers

22  his own rhetorical question.  Did Loughner see Palin's own most

23  notorious contribution?  "We have no idea—nor does it matter."

24  And then he goes on to talk about how Giffords did and spoke on

25  it in interviews.

1        And pull that back, Mike, please.

2        And go to the next page.

3        And I think the last page.  Let me take a look.

4        All right.  The takeaway from that is the research

5   that's being given upstream to Ms. Williamson, Mr. Bennet, and

6   the rest of the editorial board is research that acknowledges

7   the fact that they have not a shred of evidence that Jared

8   Loughner ever saw this map or was incentivized.  What should be

9   more troubling is the fact that he said it doesn't matter.

10  Because the theory in that article -- this is evidence that

11  goes back to the jury room with y'all -- is that, well, it

12  doesn't matter if he's mentally disturbed or not, there's all

13  this political discourse going on, and as a result, it's going

14  to affect him whether he's clinically insane or not, so it

15  doesn't matter whether he saw the map.

16       If we move forward and we look at Plaintiff's 125.

17  Mr. Bennet's response to this was, "Good for us.  Can you let

18  Elizabeth know?"

19       Now just to try and keep this as simple and

20  chronological as possible, an idea has been put out.  They want

21  to write an article, starts with gun control.  Mr. Bennet

22  inserts this idea of political speech and hate speech into the

23  discussion, and now they're doing research to see if they can

24  support it.

25       So if you could pull up 128, please.

**JA 0981**

1    I'm sorry.  126, Mike.  My bad.

2    That was -- there you go.

3    All right.  And so this is a continuation of that same

4    thread, but ends with, "Can you send me the pieces you sent

5    Elizabeth," which are the four gun control links that

6    Mr. Semple got in the front end of this.  So at this point in

7    time, after Ms. Lett sends Mr. Bennet the four gun control

8    links, the Frank Rich article we just read, and you're about to

9    see two more of them that were sent, he has seven links to

10   content that is supposed to educate him about what they're

11   writing here.

12   If you could pull up 128, please.

13   Now Ms. Lett finds two more pieces.  If you note, all

14   of these pieces were written in 2011, in January, right after

15   the Tucson shooting.  It's 2017.  That's the most recent place

16   they can go to try and explore this theory.

17   So he forwards these two links to Elizabeth Williamson

18   saying, "We dug a little further.  Take a look at these two."

19   The purpose of the research, the purpose of the digging, is to

20   see if they can find something to support this theory -- hate

21   speech, political rhetoric, inciting violence.  At 3:03 p.m.,

22   at that point in time, Mr. Bennet has no less than seven links

23   to content.  He has those links because he asked for them.  He

24   asked for the research to be done.

25   Let's go to 136, Plaintiff's 136.

1    Now with the vast number of these, Mr. Bennet's

2    response as to whether he read them was:  I don't recall.  The

3    judge is going to instruct you that you rely on your own

4    memories for the evidence and so rely on your own memory, but

5    he doesn't testify that he read any of these except he

6    volunteers on the stand that he saw this email later in the

7    case and definitely read these two based on this email.  Now

8    this email is June 14th at 3:05, so a few minutes after this

9    last exchange, and he forwards them to Bob Semple and says,

10   "FYI these are two more relevant precedent for tonight's piece.

11   Elizabeth has them too."

12       So the two articles linked there from January 2011 are

13   Plaintiff's 134, if we could pull that up.

14       This is an article called "Bloodshed and Invective in

15   Arizona," printed within a day, I believe, of the Gabby

16   Giffords incident, the Tucson shooting.  And what does it say

17   in the second paragraph right there?  "Jared Loughner, the man

18   accused of shooting Ms. Giffords, killing a federal judge and

19   five other people, and wounding 13 others, appears to be

20   mentally ill.  His paranoid internet ravings about government

21   mind control place him well beyond usual ideological

22   categories."

23       Now you see a pattern emerging in these articles.  And

24   I am not asking you -- this isn't an issue of whether you agree

25   with these theories or anything.  It's an issue of looking at

1    the facts and seeing what *The Times* had and what Bennet and the

2    editorial board had in their possession at the time they chose

3    to write that there was a politically charged incitement of

4    Jared Loughner, because that's ultimately where we go here.

5    They resurrect that false accusation when Mr. Bennet himself is

6    forwarding this article that says Jared Loughner's paranoid

7    internet ravings about government mind control place him well

8    beyond usual ideological categories.  Against that background,

9    it's sort of hard to say he was charged up by Republican hate

10   speech.

11          But if we look at the next paragraph, and this almost

12   speaks to exactly why this happened to Governor Palin.  There's

13   the "but."  It's not enough that the guy is so crazy that

14   they're saying he has government mind control theories, and

15   it's not enough that every article puts his mental health, this

16   mental instability element into it.  There's a "but."  And the

17   "but" is, he's very much part of a widespread squall of fear,

18   anger and intolerance that has produced violent threats against

19   scores of politicians.  We don't care if he has no obvious

20   political affiliation or a theory of facts supporting the same.

21   He appears to be mentally ill.  He has paranoid ravings and

22   mind control ideas, but he's still part of this political

23   speech.  And it's that exact kind of thought that ultimately

24   pushes them to write this piece.

25          Look at 135, please.

1      This is the other article Mr. Bennet sends to Bob

2  Semple that was supposed to be more relevant to what they were

3  doing.

4      This is called "As we Mourn," and it largely

5  memorializes discussions President Obama was having in the wake

6  of Tucson.  And if you look at the bottom, you see this

7  paragraph, paragraph 3, I think, "It was important that

8  Mr. Obama transcend the debate about whose partisanship has

9  been excessive and whose words have sown the most division."

10  The last sentence -- the first sentence, last paragraph, is the

11  more critical one here.  "'This horrific event,' he said,

12  'should be a turning point for everyone—not because a simple

13  lack of civility caused this tragedy—it did not—but rather

14  because --'" if you could go to the next page, Mr. Bucher --

15  "'only a more civil and honest public discourse can help us

16  face up to our challenges as a nation.'"

17      The point President Obama was making was, we're not

18  here to stop these things because of a lack of civility, which

19  made perfect sense when the shooter was found to be mentally

20  ill.  All of this is in the possession of *The Times* editorial

21  board at roughly 3:00 on that day.  And those last two pieces,

22  Mr. Bennet himself is telling Mr. Semple these are more

23  relevant to what we're doing here.  So as to the state of mind

24  of Mr. Bennet, at 3:00 on the day that this thing is ultimately

25  published, we know one thing very clearly.  He read an article

1    telling him that Jared Loughner had no political ideology, that

2    Jared Loughner appeared to be mentally ill, internet paranoia,

3    government mind control and things like that.  Interestingly

4    enough, that never showed up in the article, the editorial they

5    ultimately published.

6            Please pull up 141.

7            Now I want y'all to recall the fact that at the

8    beginning of this draft, Elizabeth Williamson was the writer.

9    And then you'll see a series of emails -- and I'm sure y'all

10   saw this during the course of the trial -- where Mr. Bennet

11   somewhat commandeers it.  I think the words Williamson says is

12   he's keen about it.  He does vast changes, sends her an email

13   to her almost apologizing for it.

14           But the article that comes out of Mr. Bennet doesn't

15   look like the one that's started.  And why that matters is, is

16   every witness from the editorial board that testified said the

17   writer is ultimately responsible for the content.  And I don't

18   know if you remember we asked that question over and over, who

19   was supposed to fact-check this, who was supposed to fact-check

20   this.  The writer is ultimately responsible.

21           If we look at this first draft, there are a few things

22   we can see here.  One, if you would go -- if you hit the "That

23   in 10 minutes" and you go down from the next paragraph.  Yeah,

24   there you go.  All right.

25           All right.  "That in 10 minutes a single gunman could

1    wreak such carnage in a bedroom community a short drive from

2    the Capitol is horrifying, but no longer surprising.  Not all

3    the details are known yet, but a sickeningly familiar pattern

4    is emerging—a deranged individual with a gun, perhaps multiple

5    guns, and scores of rounds of ammunition, uses politics as a

6    pretense for a murderous shooting spree."  And then we get this

7    comment, because they're going to politicize it:

8    "Mr. Hodgkinson was a Bernie Sanders supporter and campaign

9    volunteer virulently opposed to president Trump, who among many

10   anti-Trump messages posted 'Time to Destroy Trump & Co.' on

11   social media in March."

12           All right.  Let's take a breath here for a second.  I

13   want to remind you at every point about this.  Doesn't matter

14   if you like Trump or don't like Trump.  What we know right now

15   is that the guy who shot Steve Scalise, based on Elizabeth

16   Williamson's scan of his social media, was found to be a guy

17   who supported Bernie Sanders and who posted at least one social

18   media message indicating "Time to Destroy Trump & Co."  So he's

19   been placed in that bucket now.

20           Now I don't know if y'all recall, but we asked what a

21   "sickeningly familiar pattern" was.  The only example that was

22   given was Loughner.  That's why all the research is going back

23   to 2011.  That's why you didn't see articles in 2015, oh, there

24   was this other shooter then.  Everything goes back to 2011.

25           So what happens in the first draft?  It's a reflection

1  of this research.  "Just as in 2011, when Jared Lee Loughner

2  opened fire in a supermarket parking lot, grievously wounding

3  Representative Gabby Giffords and killing six people, including

4  a 9-year-old-girl, Mr. Hodgkinson's rage was nurtured in a vile

5  political climate.  Then, it was the pro-gun right being

6  criticized: in the weeks before the shooting Sarah Palin's

7  political action committee circulated a map of targeted

8  electoral districts that put Ms. Giffords and 19 other

9  Democrats under stylized crosshairs."  And Ms. Williamson has

10 written this and she doesn't do what ultimately is done.  She

11 doesn't write a link between Jared Loughner and Governor Palin,

12 okay?  She stops short of it, because there's nothing there to

13 support it.

14          Now what's most interesting is this statement that

15 "Mr. Hodgkinson's rage was nurtured in a vile political

16 climate."  If we go to the last paragraph, just highlight that

17 last paragraph.

18          So we've had two statements in the article saying he

19 was incentivized by politics.  But on the wrap-up, what we're

20 going to say is whatever his motives were.  You see the

21 pattern.  What's interesting at the time -- and if you could

22 pull up 140E.

23          Is that 140E?  Okay.  So go to the second page of

24 that, please, Mr. Bucher.

25          This was the draft that Linda Cohn, who testified a

1   little earlier I think in the week, who was an editor who

2   received the editor assignment on this piece, this was her

3   draft.  And when she took her cut at it, I think her words were

4   that she was concerned that it wasn't going where James wanted

5   it to.  She basically reviewed it and asked a few questions.

6   And the questions, as we found from her direct exam, are in

7   bold in the middle of this paragraph.  So "do we know of any

8   elected officials on the left who have incited violence?  Or

9   just unaffiliated people online or comedians.  Most are pro-gun

10  control.  Does this graph --" remember "graph" doesn't mean

11  "graph"; it's like paragraph -- "imply equivalence?"  Right?

12  Equivalence meaning we're keeping political score here.

13          Now one thing that may be interesting is, in 2011,

14  when the link was drawn to Governor Palin in Tucson, she wasn't

15  sitting in office.  She had unsuccessfully run for vice

16  president.  She was working in the private sector.  But I asked

17  Ms. Cohn:  Did you look for any people on the, you know -- did

18  you find any people or do we know of any elected -- did you

19  find any elected officials on the left who have incited

20  violence?  They couldn't find any.  The best example I think

21  she gave was Kathy Griffin, the comedian.

22          Now what's ironic about that, if you go up to Defense

23  68, and you show the date on it, Mr. Bucher -- all right.

24  May 30, 2017.

25          Could you pull up 141, the first draft of the article.

M2B1PAL1                    Summation - Mr. Turkel

1  Actually, pull up -- pull up the actual -- pull up the actual

2  article.  The draft is fine.  Just pull up 141.

3          Split screen it.  I need Kathy Griffin back up there.

4  I don't need her back up there, but I want that side by that

5  side.

6          All right.  And could you put the Griffin side up.

7  There we go.  May 30, 2017.  We know that the Scalise shooting

8  happens 15 days later, on June 14, 2017.

9          Could you, Mike, "That in 10 minutes," right?

10         There we go.  All right.  We have an outwardly

11  left-wing Bernie Sanders supporting a comedian holding a

12  severed head of the president with blood on it, on May 30th,

13  and two weeks later, they're writing about someone who was a

14  Bernie Sanders supporter and campaign volunteer who, among many

15  anti-Trump messages, posted "Time to Destroy Trump & Co." on

16  social media.  You think there's an outside chance this may

17  have been a good place to look for political or rhetorical

18  speech, demonizing speech?  Do you think they're demonizing

19  with a mock severed head of the president with blood coming out

20  of it?  Again, it's not agreeing with the politics of it.  It's

21  about trying to look for facts that you can actually prove,

22  when you write an article like this.  But this was disregarded,

23  and I think Ms. Cohn's words were "a comedian's take" or

24  something wasn't relevant enough or whatever.  But she was

25  certainly aware that this was out there.

**JA 0990**

M2B1PAL1                    Summation - Mr. Turkel

1          We ultimately find out, if we want to talk about

2     rhetorical demonizing political speech, that Ms. Griffin takes

3     an uninvited visit to Wasilla, Alaska, to go knock on Governor

4     Palin's door.  So this was disregarded in the edit that was

5     done by Ms. Cohn.

6               So let's take that down too.

7               Let's go to the actual article.  Could you please put

8     up Plaintiff's 1, Mike.

9               So on June 14th, "America's Lethal Politics" gets

10    published.  And from the testimony, we know that it goes out in

11    the evening.

12              Please go to the two paragraphs on the second page.

13              And highlight them, please.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    MR. TURKEL:  Now, we know when this is written that

2    there are seven links of content that were guided by the

3    research staff, including the two we looked at that Mr. Bennet

4    had sent through to Mr. Semple, saying these are more relevant,

5    neither of which places any link between Jared Loughner and

6    Governor Palin, neither of which ties him to the map, neither

7    of which even indicates what his politics are.  In fact, the

8    one article says he looks to be beyond any ideological

9    affiliation.

10        So the article gets written, and it is resurrected,

11   and this false accusation, specifically:  The link to political

12   incitement was clear.  Before the shooting, Sarah Palin's

13   political action committee circulated a map of targeted

14   electoral districts that put Ms. Giffords and 19 other

15   Democrats under stylized crosshairs.

16        The link to political incitement was clear.  That was

17   written after an entire staff of the editorial board, of which

18   Mr. Bennet was the boss — actually called that by witnesses —

19   had research that expressly indicated to the contrary,

20   research that was actually written by the *Times*, but it went

21   out anyway.

22        And if we can go to the next paragraph, and we see the

23   second sentence there or third sentence, you get the

24   acknowledgment, right, the "but."  The conservatives were quick

25   on Wednesday to demand forceful condemnation of hate speech and

1    crime by the anti-Trump liberals.  They're right.

2              Then we get the second part of this, "Though there's

3    no sign of incitement as direct as in the Giffords attack,

4    liberals should of course hold themselves to the same standard

5    of decency that they ask of the right."

6              No sign of incitement as direct as in the Giffords

7    attack.  And that's being written by a 30-year veteran, from

8    the highest levels of journalism, who has read an article

9    saying that Jared Loughner is mentally unstable, paranoid,

10   worries about government mind control.

11             I want to show you another piece of research they had,

12   because it's hyperlinked in the article.  If you could pull up

13   Plaintiff's Exhibit 142, and go to the second page of that,

14   please.  Up at the top where it says "no connection."  First --

15   yeah, there we go.  Highlight the first sentence, Mr. Bucher,

16   please.

17             This is an article from ABC news.  It is linked in

18   "America's Lethal Politics."  There is a hyperlink in there.

19   That's where you click on the thing that takes you.

20             Throw that in there.

21             "No connection has been made between this graphic and

22   the Arizona shooting."  All right?  "No connection has been

23   made between this graphic and the Arizona shooting."  It's

24   being linked in an article that he calls -- it says there is a

25   direct and clear link between the graphic and the Arizona

**JA 0993**

M2b2Pal2                              Summation - Mr. Turkel

1    shooting.

2          The article goes out, and what happens?  The reader

3    center starts getting reader complaints.  Backlash occurs.

4          And if you would pull up Plaintiff's Exhibit 171, Ross

5    Douthat, who writes for the op-ed and who is professionally --

6    we would call professional friends with Mr. Bennet, responds.

7          If you go to the second page, please, he

8    coincidentally got an e-mail from Mr. Bennet about this

9    Shakespeare kerfuffle, and it was a nice compliment.  It was

10   the same night as the piece goes out, and he responds to that

11   e-mail.  I know you all heard Mr. Douthat testify.  He is a

12   Middle East conservative guy.

13         Let's keep our eye on the ball, which is, what did

14   they have when they published that told them what they were

15   publishing was false?  And Douthat was so set off by it that he

16   writes his professional friend.  Remember, they work for the

17   same company.  You have the op-ed writers on the one side, the

18   editorial on the other.

19         And he says he would be remiss if he didn't express

20   his bafflement at the editorial that we just ran on today's

21   shootings and political violence.  There was no -- and

22   continues to be so far as I can tell, no evidence that Jared

23   Lee Loughner was incited by Sarah Palin or anyone else, given

24   his extreme mental illness and lack of any tangible connection

25   to their crosshairs map, the Tea Party, or other right-wing

M2b2Pal2                    Summation - Mr. Turkel

1    cause.

2              He even says at the bottom:  I don't normally raise

3    issues with our editorials, because he is ideologically

4    different, but he felt he should express his confusion in this

5    case.

6              So if you pull back and look at the total document,

7    and Mr. Bennet responds at 11:00 and says he will look into

8    this tomorrow, but my understanding was that, in the Giffords

9    case, there was a gun sight superimposed over a district.  So

10   far in this case we don't know of any direct threat against any

11   of the Congressmen on the field.  For him to say "but my

12   understanding was in the Giffords case there was a gun sight

13   superimposed over her district" and then continue to say that

14   the incitement in the Scalise case is less specific would have

15   meant one of two things.  He read the articles that he had had

16   his research staff gather and didn't understand them, chose to

17   completely ignore them, or both.  It, it -- there is no other

18   way to explain it.

19             This dialogue goes on.  Mr. Douthat explains

20   essentially the same background on the lack of evidence

21   supporting Loughner's link to any politics, and he decides also

22   to send two more links through to tell Mr. Bennet it's not only

23   the right that's reading the editorial this way.  And he sends

24   over two tweets from Jonathan Chait, who is a liberal

25   columnist, that is Plaintiff's 172; and 173, which is Chris

M2b2Pal2                         Summation - Mr. Turkel

1    Hayes, another liberal journalist.  This was the editorial.

2    You see the original tweet and you see Mr. Hayes chime in here

3    to say, yeah, that's nuts.

4            So Mr. Bucher, if you could pull up 174.  Against this

5    background, Mr. Bennet tells us he is going to feel lousy about

6    it, he will get to the bottom of it this morning.  It is now

7    the 15th.  The two tweets were sent over later than the initial

8    thread.

9            So this ultimately results in two corrections or

10   purported corrections.  Plaintiff's Exhibit 5, if you can pull

11   up and highlight the correction language:  An earlier version

12   of this editorial incorrectly stated that a link existed

13   between political incitement and the 2001 [sic] shooting of

14   Representative Giffords.  In fact, no such link was

15   established.

16           The article said there was a link between Jared

17   Loughner and Sarah Palin's political action committee and the

18   map and it was clear and direct, and this was what feeling

19   lousy about it resulted in.

20           They get more backlash.  Please pull up Plaintiff's

21   Exhibit 6 and highlight the correction there.  "An editorial on

22   Thursday about the shooting of Representative Steve Scalise

23   incorrectly stated that a link existed between political

24   rhetoric" -- now they have changed the word "incitement" to

25   "rhetoric" -- "and the 2011 shooting of Representative Gabby

1  Giffords  In fact, no such link was established.  The editorial

2  also incorrectly described a map distributed by a political

3  action committee" -- a political action committee, not Sarah

4  Palin's political action committee, or not SarahPAC.  We are

5  not going to use the name.  "It depicted electoral districts,

6  not individual democratic lawmakers, beneath stylized

7  crosshairs."

8           I asked Ms. Cohn about that because she was involved

9  to a degree with the corrections.  Her testimony was words to

10  the effect of we thought it would be gracious not to put her

11  name in a line with that horrific tragedy or words to that

12  effect.  You will rely on your recollections.  But it is still

13  in the article.  And what's even stranger is it's still in the

14  article as Sarah Palin's political action committee.  And then

15  they refer in the correction as a political action committee,

16  almost implying to a reader that maybe there are two political

17  action committees.  No real explanation for it other than what

18  Ms. Cohn gave.

19           But what they didn't do, and if you look at -- Mike,

20  please go to the paragraphs on page 2.  All right.  Go there.

21           "Was this attack evidence of how vicious American

22  politics has become?"  We go through the language again as

23  corrected, right?  Why did they even leave the sentence

24  starting at "before the shooting" in the article if no link or

25  connection to the shooting was even established?  Why does the

1    reader even know about it other than to keep Governor Palin's

2    name in play in this article?

3         Before the shooting, Sarah Palin's political action

4    committee circulated a map that showed the targeted electoral

5    districts of Ms. Giffords and 19 other Democrats under stylized

6    crosshairs, but in that case no connection to the shooting was

7    ever established.  So why is it there?  Why is it there if not

8    just to keep her name attached to this theory?  To keep her

9    name in this article about "America's Lethal Politics"?

10        What does this all mean?  When we are done talking to

11   you today and you are charged on the law, you are ultimately

12   going to deliberate and Judge Rakoff is going to tell you what

13   the law is.

14        Mike, if you could shift to the deck.

15        I want to go through some of the elements we are

16   charged with proving and make it clear to you that the full set

17   of jury instructions gets read to you by Judge Rakoff.  These

18   are excerpts and things that may help me explain to you how all

19   the evidence fits in to these different elements.

20        We have sued, as y'all heard, for defamation, for

21   libel, and the first element we have to prove is defamatory

22   meaning.  A statement is defamatory if it tends to expose the

23   plaintiff to public hatred, contempt, ridicule, or disgrace,

24   that is, if it would tend to lead the average person in the

25   community to form an evil or bad opinion of the plaintiff, or

M2b2Pal2                          Summation - Mr. Turkel

1    if it tends to discredit the plaintiff in the conduct of her

2    occupation, profession, trade, or office or if it charges the

3    plaintiff with a serious crime.  In focusing on one or the

4    other of the two challenged statements, you should consider the

5    statement in the context of the editorial as a whole, not just

6    in isolation, and you should not impose an unfair or forced

7    construction on the words used or take any word, phrase, or

8    sentence out of context.

9             Go to the next slide, please.

10            So the challenged statements, the link to political

11   incitement was clear.  And then there at the bottom you see the

12   two bubbles.  There is no sign of incitement as direct as in

13   the Giffords attack, right, made in the context of an article

14   that uses all these other words.  Right?  In an environment of

15   sickening pattern, vicious American politics, and all that.  So

16   you consider these words tying Governor Palin to this in the

17   context of the article in which it is written.

18            If you move to the next slide, please, these are

19   excerpts from Douthat's memo:  So saying that Giffords was a

20   case of incitement and this one isn't reads like we are

21   downplaying that motive while strongly implying that Loughner

22   had right-wing motivations that he simply didn't have.

23            Then Mr. Douthat recognized:  The editorial seems to

24   essentially reverse the fact pattern, making it sound like

25   Loughner had the clearer connection to partisan rhetoric, when

JA 0999

M2b2Pal2                    Summation - Mr. Turkel

1      to the best of his knowledge he had none.

2              That's what I was sort of pointing out to ya'll in

3      this stream of articles that go around with this political

4      rhetoric theory.  The standard just doesn't seem to make much

5      sense.

6              If we go to the next slide, Linda Cohn's words.

7      Horrific shooting.

8              Next slide.  And these are paraphrases, these are --

9      relying on your recollection of the testimony, but I think you

10     remember most of this.  When Mr. Vogt asked Mr. Bennet:  As an

11     editor, would it surprise you that readers would understand the

12     word incitement to read what its dictionary definition is?  And

13     his answer:  It wouldn't surprise me.

14             We spent at one time I think 20 or 30 minutes

15     listening to definitions other than what the dictionary says

16     about the word "incite."  The jury instruction tells you, if

17     you could go back to the slide 1, please, you should not impose

18     an unfair or forced construction on the words used or take any

19     word, phrase, or sentence out of context.  Incite means incite.

20     It's got a dictionary definition.

21             Go back to where we were.  Next slide.

22             This was the part that we looked at that we discussed

23     earlier, and it describes in a little more detail the actual

24     Tucson incident, right?  And the point of all this is, when you

25     consider the words defamatory meaning, that these links that

JA 1000

1    are being made to Governor Palin aren't being made with respect

2    to, you know, maybe a brawl outside of a bar or something

3    that's not as horrific as death.  They are being tied to the

4    single biggest congressional shooting incident that could be

5    found in the last 20 years, which was the Giffords thing, and

6    resurrecting that same accusation years after it's been

7    debunked.

8              Next slide.  The second element that the plaintiff

9    must prove is that the given challenged statement you are

10   considering was of or concerning Ms. Palin.  In other words,

11   Ms. Palin must prove that the ordinary reader of the editorial

12   would reasonably have understood that the challenged

13   statement -- the challenged statement to refer to her

14   personally.

15             Just to wrap up on defamatory meaning, at the end of

16   the day, we show you examples of evidence and all that.  They

17   accused her of inciting murder.  They accused her of inciting

18   murder.  That should be enough.

19             If we look at the next page on this "of or

20   concerning," we are going to take all the places in the

21   evidence where people referred to it as Sarah Palin or Sarah

22   Palin's and not SarahPAC.  And this idea that it's a

23   corporation, the defense was advocating this position, it's a

24   corporation, it's a corporation, but you never see it referred

25   to as SarahPAC.

1    And Mr. Crawford's testimony, Governor Palin's

2    testimony, if it's SarahPAC and Sarah Palin isn't involved and

3    her face isn't on, her signature, the testimony was pretty

4    clear, it didn't have much value.  Okay.  We don't call

5    McDonald's Ray Kroc's Hamburger Store.  We call it McDonald's

6    because it is a corporation.  All right.  SarahPAC, everybody

7    refers to it as Sarah Palin's political action committee.

8        Next slide, please.  The broader goal of the PAC was

9    to promote Ms. Palin and her agenda.  These things came in

10   without challenge.  I think it was pretty clear that SarahPAC

11   was the conduit through which Sarah Palin could promote her

12   name, her political causes and so forth.  Right.

13       Next slide.  And then you run into, you know -- next

14   slide.  I don't want to go through all the Crawford stuff.

15       Hanna Ingber, who was the last witness to testify, she

16   is not in the editorial department.  She is over at the reader

17   center, and she says -- she calls it.  I would be happy to chat

18   about the Sarah Palin editorial.

19       Next slide.  Mr. Douthat, I think he -- I asked him:

20   Why did you say Sarah Palin?  And what he said was:  Because

21   Sarah Palin's name was in the article.

22       Next slide.  SarahPAC with Sarah's signature right

23   there on the front.  Any of the social media, her image.

24       Next slide.  These tweets that they were using to

25   discuss the map when it was posted and this tweet that defense

M2b2Pal2                          Summation - Mr. Turkel

1  claimed was months later, after criticism, when in fact it went

2  out the exact same day the map went out.  Sarah Palin, Sarah

3  Palin.

4          Next slide, please.  Sarah Palin's crosshairs ad.

5  This is the ABC news link.

6          Next slide.  And this is an internal e-mail about

7  adding the content to the draft.  Did James add that line about

8  Giffords and Palin?

9          Next slide, please.  I think readers would want to

10  know who is Sarah if I used SarahPAC.  Ms. Williamson's answer.

11          Next slide, please.  We are on the third element.  The

12  takeaway from the SarahPAC issue "of or concerning" it's pretty

13  clear from all of the evidence that most, if not all, readers

14  of much of the contents surrounding this, including the actual

15  article, read it to believe it was about Sarah Palin.  Indeed,

16  I challenge you to find one reader who said we are really

17  concerned about the editorial you wrote about SarahPAC.  They

18  themselves didn't even use SarahPAC in there.

19          As an aside, when they did the correction, you know, a

20  political action committee, they can't even use it there.

21          Third element, material falsity.  A statement is false

22  if it is not substantially true.  Minor inaccuracies in the

23  statement may be disregarded in determining whether a statement

24  is false.  And you will determine from the evidence presented

25  what the truth was and then compare that with the challenged

**JA 1003**

M2b2Pal2                    Summation - Mr. Turkel

1   statements in the editorial, taking the challenged statements

2   according to the ordinary meaning of the words and considering

3   the context in which those words appear and in the editorial as

4   a whole.  Ordinary meaning of the words.

5           Next slide, please.  There was some discussion in the

6   case, various witnesses, you know, injecting the idea of

7   opinion and so forth into this.  This was a fact.  We know it

8   was a fact because *The New York Times* tweeted out, "We got an

9   important fact wrong, incorrectly linking political incitement

10  and the 2011 shooting of Giffords.  No link was ever

11  established."

12          It is somewhat amazing that through the tweets and

13  corrections and all of it they couldn't find it in their heart

14  or heads to mention Governor Palin's names once, once.  I will

15  leave it to you all.  It's your province to determine whether

16  that was on purpose because they don't like her, her politics.

17  That's what you do.  You find those facts.

18          From when I started a long time ago, one of the

19  reasons I pointed that out is that this isn't an issue of

20  whether you agree with the politics or not.  It's an issue of

21  looking and saying what is their mindset when they do this?  Is

22  the mindset big enough to kind of ignore the fact that James

23  Hodgkinson had a social media post that said destroy all

24  Trumpers and then later in the article say whatever his motives

25  were?  That's for you all to figure out.  That's your province

1   as fact finders.  It's the greatest power that exists in this

2   courtroom.  It's a celebration of it, of our system.

3           Next slide.  An earlier version of this editorial

4   incorrectly stated that a link existed, again, between

5   political incitement.

6           And just go to the next slide.  These are all the

7   instances in which they have acknowledged the falsity of what

8   they printed.  Corrections must be accurate to unmuddy the

9   record and avoid misleading the public.  We heard a lot about

10  how important corrections were, how seriously they took them.

11          Next slide, please.  And this was Ms. Lepping.  She

12  did some fact-checking finally and found the police report.  No

13  evidence that the Loughner shooting was politically incited at

14  all.  I believe so yes.  Unfortunately that fact-check came a

15  little too late.

16          Next slide.  Please move through that.  We discussed

17  that.

18          Next slide.  ABC news.

19          Next slide.  Now we go to actual malice.  The first

20  aspect of actual malice, and that's something we have to prove

21  because Ms. Palin is a public figure, and you must decide is

22  whether, at the time the editorial was published, Mr. Bennet,

23  and therefore The New York Times Company, knew that either or

24  both of the alleged defamatory statements he had drafted were

25  in fact false or that at a minimum he consciously chose to

M2b2Pal2                          Summation - Mr. Turkel

1   recklessly disregard the high probability they were false.

2          Next slide.  This gives you the guidelines for how you

3   fact-find, how you determine what Mr. Bennet's state of mind

4   was.  And we have to prove that by clear and convincing

5   evidence.  So it's not enough to show that did he not know one

6   way or the other whether the challenged statement was true or

7   false, nor is it enough to prove that he was merely negligent.

8   You can read that for yourself without me reading the whole

9   thing.  It gives you the ground rules.  Fairly and sufficiently

10  investigate or to research a particular point does not

11  establish actual malice unless the plaintiff has demonstrated

12  that such inaction was a conscious, deliberate attempt to avoid

13  confirming the statements' probable falsity.  Even

14  irresponsible reporting or a demonstrated failure to follow

15  professional journalistic standards does not on its own

16  establish actual malice unless the plaintiffs has proved that

17  there was a high probability that Mr. Bennet actually doubted

18  the truth of the challenged statement you are considering and

19  nevertheless consciously chose to disregard the high

20  probability that the statement was false.

21         Next slide.  The second part of this is that we have

22  to prove by clear and convincing Mr. Bennet believed the

23  challenged statement was false and he either intended to defame

24  Ms. Palin or acted in reckless disregard of whether it would

25  defame Ms. Palin.  And here again we talk about Mr. Bennet

1   having a high degree of awareness that ordinary readers would

2   understand the challenged statements to convey that Ms. Palin

3   bore clear or direct responsibility for causing Loughner to

4   commit the Arizona shooting.  We have accepted the burden.

5   That was what Mr. Vogt was talking about at the beginning of

6   the case.

7           If you would go to the next slide.  The evidence that

8   James Bennet acted with high probability of reckless disregard

9   of the truth of this permeates through this record.  And it was

10  something I mentioned earlier when we talked about the two

11  pieces that he sent over to Bob Semple at 3:05 on June 14.

12  This was research he asked people to do for him to write this

13  article.  This wasn't, hey, grab me the file on the old

14  shooting thing.  Can you go find something that links someone.

15  There is five, six, seven e-mails exchanging links back and

16  forth ostensibly so he researches what he has chosen to write

17  about, the demonization of rhetoric and the air of vile pol --

18  whatever.  Not just guns.  We are going to add the political

19  thing in.  Go get me more authority for it.  We know he reads

20  these, because he sends them to Semple and says these two are

21  more relevant and precedent for tonight's piece.

22          I showed you those articles.  There is zero chance

23  that you could read those articles, particularly a man as

24  educated and experienced as James Bennet, and come away with it

25  not disregarding it entirely or knowingly publishing a link

M2b2Pal2                      Summation - Mr. Turkel

1    between Sarah Palin and Jared Loughner.  It's impossible.  It's

2    impossible.  The articles say the link isn't there.

3            So how does he get there?  If he didn't know there was

4    a high probability, he was disregarding something that was

5    likely false or did it intentionally, wanted to make it fit

6    that bad.  Because if you go all the way back to the Frank Rich

7    article, he says Loughner was mentally unstable, but it doesn't

8    matter.  Maybe that's what they think, and maybe that's what

9    they want out there, and that's fine.  Put the opinion out

10   there.  Just don't make a factual statement about my client

11   when you do it, and that factual statement is a false

12   accusation that she incentivized murder.  Have your theories.

13   Have your dialogue.  Have your open debate and vigorous

14   discourse in the marketplace of ideas of America, but don't say

15   false things.  It's a simple rule.  When you know they are

16   false, it's even simpler.  And when you have read it or asked

17   for it so you could read it and chosen to disregard it, it's

18   simple.

19           Next slide.  These are the articles.  I have gone

20   through them with you.

21           Next slide.  Those were the two links in that e-mail

22   if I haven't made that clear yet.

23           Next slide.  This gets to this back and forth about

24   what incitement means or doesn't mean or what he understood it

25   to mean.  I think it was Ross Douthat who said he read it the

1    natural way or the way people would naturally read it.

2              And I believe we have this one question and answer:

3    As an editor would it surprise you that readers would

4    understand the word incitement to mean what its dictionary

5    definition is?  Mr. Bennet's answer:  It wouldn't surprise me.

6    There is the dictionary definition.

7              Next slide.  This was the basis for Jim Bennet --

8    James Bennet's forced construction of the word "incite."  A

9    comparison of the assassination of Yitzhak Rabin in Israel, a

10   strong word to get readers' attention, where incitement is used

11   in the Israeli-Palestinian conflict.  Deliberate orders,

12   invocations.  This isn't . . .

13             Go to the next slide.  These are general instructions

14   on witness credibility.  And it gives you a list, sort of a set

15   of guidelines for how the law tells you to evaluate a witness.

16   How did they seem on the witness stand?  Does their testimony

17   match other testimony in the case?  Were they really easy to

18   talk to for one side but not the other?  Did they seem evasive?

19   When somebody said they don't recall, did it seem like they

20   said they don't recall because they really didn't recall?

21   Every witness, both sides of the case, regardless of who they

22   worked for so on and so forth, you evaluate it like that.

23   Those are your rules.

24             And I would tell you that a moment that could raise

25   some serious issues about the witness credibility related to

M2b2Pal2                    Summation - Mr. Turkel

1    this idea of the policy on apologies.  And we will talk about

2    it a little bit later.  But there were, you know, three people

3    I think in this courtroom talking about this forced

4    construction of the word "incitement," and they all work for

5    the *Times*.  Ross Douthat, he works for the *Times*.  He seemed to

6    say:  I read it like I think most people would.  He just works

7    for the other part of the building, so.  Those are the kind of

8    things you look at on witness credibility.

9            Next slide, please.  You are going to get instruction

10   on direct and circumstantial evidence.  I will leave it to

11   Judge Rakoff to read this one.  It's a very natural sort of

12   distinction between these types.  Not everything is someone

13   saying, oh, I knew it was false.  The circumstantial evidence

14   are all the things that surround a situation that can prove it,

15   because rarely are people going to say, yes, we published that

16   article because we hate Sarah Palin.  That's not going to

17   happen.

18           That's why I spent some time trying to go through

19   these sorts of approaches they had over the years.  When you

20   hear these words "the rhetoric of demonization" coming from a

21   media entity that's putting out article after article trying to

22   tell people that there is a rhetoric of demonization, it sort

23   of makes you want to look at the circumstances and look at the

24   common thread through all those pieces.  And there is a common

25   thread through all the pieces as it relates to how they treat

1    people on the right that they don't agree with.

2            Next slide.  When you take the totality of the

3    evidence and apply it to the actual malice standard, the

4    various elements, we are not asking you to rely on evidence

5    that we put in it that they violated a journalistic standard

6    alone or that they failed to investigate and research alone or

7    they were negligent alone.  Every single one of these, these

8    criteria were proven.  The day after the tweet -- after the

9    tweet, I mean after the article goes out -- Mike, do you

10   remember the one, I don't know whether it is true, the number

11   on that one?

12           This is a cutout from an e-mail that was entered into

13   evidence.  We talked about it a fair amount during our case.

14   And this is the day after the article gets published.  This is

15   Mr. Bennet telling his team:  We are taking a lot of criticism

16   for this.  The claim is that this was fully investigated and

17   debunked in the months after the attack and the shooter was

18   found to have acted only because of his personal demons.  Take

19   yourself back, the two articles he forwarded to Semple.  What

20   does that article -- not "As We Mourn," but "Bloodshed" -- I

21   always forget the name of it, the first one, the one I keep

22   talking about with the government control and the paranoia.  If

23   that doesn't tell you that Mr. Loughner acted only because of

24   personal demons, nothing does.

25           Mr. Bennet had it.  Mr. Bennet read it.  Mr. Bennet

M2b2Pal2                         Summation - Mr. Turkel

1   sent it to Mr. Semple.  The day after the article goes out:  I

2   don't know what the truth is here.  That is the editor of the

3   editorial board of the *New York Times* the day after he has

4   accused the former governor of Alaska, a candidate for the vice

5   presidency, of inciting the murder of six people in Arizona in

6   a politically charged suit.  I don't know what the truth is

7   here.  I don't know what the truth is here.

8           Go back to the elements, please, Mike.  No.  The one

9   we were on, the criteria.

10          In a vacuum, any one of these criteria may not be

11  enough to prove actual malice, but he didn't know whether it

12  was true or false.  We know that because he admitted it the day

13  after.

14          Now, you are going to have to judge whether he is just

15  saying that to his team and didn't read the article that he

16  said was more relevant, but there is negligence regarding truth

17  or falsity also because he had an article, indeed, multiple

18  articles that he had asked people to get at from him that he

19  either didn't read or read and disregarded.

20          The failure to investigate and research.  Do you

21  remember when I asked who fact-checked this line, the one about

22  Governor Palin, and nobody could answer?  They fact-check like

23  numbers and they fact-check dates and months, and days, and

24  nobody fact-checked this gigantic accusation in the middle of

25  the article.

1    Six years after the Giffords shooting, if there was

2    one thing that could have fortified in James Bennet's and his

3    team's mind the fact that it wasn't politically charged it was

4    more investigation and research or maybe even just reading what

5    you had in front of you.

6    Conscious effort to avoid the truth and meaning.  See

7    my last statement.  You have it there.  Multiple pieces of

8    research you have gotten.  They either read it and ignored it

9    or consciously chose not to read it.

10   Failure to follow their own journalistic standards.

11   We asked questions about that.  I'm not going to go through

12   them all now.

13   And bias and ill will, and we talk about bias and ill

14   will.  It is, again, why I tried to point out for you all, this

15   isn't a plea to agree with one side or the other, but just look

16   at the thread running through all of their pieces.  I believe

17   at one point in the testimony Mr. Bennet used the word "our

18   opposition" or "our opponents."  Isn't the whole gist of this

19   thing not to be divisive?

20   And so what I am asking you to look at when you look

21   at all the articles they have written is look at the common

22   thread and how on every single one of them they demonize the

23   right wing or just treated them differently.  Hodgkinson posts

24   that he wants to destroy all Trumpers, but when he gets to the

25   end of the article that becomes whatever his motives are.  It's

M2b2Pal2                    Summation - Mr. Turkel

1   a sliding scale that doesn't apply.  Look, it takes some heavy

2   lifting.  I'm not telling you this comes easily or naturally.

3   This is a fact-intensive case.  But look at those articles over

4   the years that they got for research and see that common demon

5   there.

6        And there is your bias.  That's why they don't care.

7   She is just one of them.  Even in 2017.  She is not even

8   serving in office.

9        Next slide, please.  You pull the whole thing up,

10  Mike.  Can you do that or just the cut up.  No.

11       I wanted you all to see this e-mail.  This is what

12  Mr. Bennet sends the next morning at 5:08 a.m.  interestingly

13  enough, this is after he gets Ross Douthat not only just

14  telling him he is wrong, but sending him two tweets from

15  liberal journalists that say he is wrong.  And now all of a

16  sudden, yeah, I don't know what the truth is here.  We may have

17  relied too heavily on our own early editorials.

18       Look at the editorials they relied on.  They are in

19  evidence.  Look at them.  Look at the ones of the two he said

20  he read.  That's how you assess it.  Does it make sense with

21  the other evidence?

22       Next slide, please.  This is what I tried to tell you,

23  hopefully I was decent at it, at the beginning.  When this

24  e-mail went out that took this from a Bob Semple gun control

25  piece to this rhetoric of demonization and whether it incites

M2b2Pal2                           Summation - Mr. Turkel

1    people, the narrative was set.  This story was set.  And they

2    were going to publish this story whether they could support it

3    or not.  And that's what they did.

4          I mean, you want to really go there?  What do they

5    know about Hodgkinson other than one post?  The guy was dead.

6    He got shot on sight.  Did anybody really talk to him about how

7    political he was.  They scanned his social media.  Reverse

8    engineering.  We believe the violence is all caused by the

9    political rhetoric.  Let's find examples.  Unfortunately,

10   because the Gabby Giffords shooting was the only one of any

11   real content before Scalise, my client becomes a casualty of

12   their ignorance of the truth.  Because they can't write it if

13   they don't have examples.  Incite.  Has to incite something.

14   They can't write it without their examples.  That's why they

15   are looking for examples at the beginning.  Go find me an

16   article about a left wing guy who does it.  Let's play the

17   political scoreboard.  The left kills one.  The right kills

18   one.  They are all incentivized because they yell at each other

19   all the time.  I mean, it's absurd.  In so many respects, they

20   perpetuate everything they sit there and condemn.

21         Next slide, please.  This is a summary of my last ten,

22   15 minutes.  I mean, I have made the point.  There was just so

23   many things, so many things that weren't done, consciously,

24   some negligently.  All together, they are actual malice.  They

25   are what creates a claim at this high standard.

M2b2Pal2                    Summation - Mr. Turkel

1    Because if there is one thing in 2017 we know, Sarah

2    Palin has done nothing to deserve this.  You want to take a

3    shot at her?  She's a tough woman.  They have taken shots at

4    her for nine, ten years in her political career.  You heard

5    her.  She doesn't like to complain.  Brought up in a coach and

6    a teacher's family.  What is it?  Suck it up, cupcake?  This

7    isn't her nature.  She has had people hating her who don't know

8    her for years.  But when you resurrect this lie, when you

9    resurrect this falsity, it becomes a different story.

10   I hope you understand the distinction between why she

11   sued in 2017 and why she took no action in 2011, because that

12   is her.

13   Mike, next slide, please.  The First Amendment starts

14   getting thrown around.  I think we all get it.  My client

15   certainly gets it because she talked about it on the witness

16   stand.  The line gets drawn in at falsity.  The law, as

17   Judge Rakoff is going to read you, all of these elements of a

18   libel claim, that's where the line is drawn.  That's why we are

19   here.  That's what a citizen can do.  That's their redress.

20   Next slide, please.  We have gone through these.

21   Hopefully you all remember the testimony, these aspirational

22   guidelines they have that seem to be ignored at many turns.

23   Next.  This was something I mentioned earlier and this

24   is something I want to call the apology issue.  Mr. Bennet was

25   effusive, constantly saying, I felt lousy.  I'm sorry.  I'm

1    sorry.  This stops with me.  I'm responsible.

2              And then what did we get?  "But."  We got "but."

3              Eileen Lepping was really in charge of fact-checking.

4              This is really Elizabeth Williamson's piece.

5              Somebody else should have caught it.

6              The responsibility is with me, but.

7         And at the end of the day, every other witness we

8    asked this question to, and I think Mr. Bennet has acknowledged

9    it, too, the ultimate writer of the story is the fact-checker,

10   and it is agreed that he was the ultimate writer.  He took the

11   piece away from Williamson, added all this incendiary language,

12   and chose not to fact-check it.  And then when it blew up in

13   his face, he blames everybody else.  He blames himself.  I get

14   that.  But if you paid close attention, which isn't the easiest

15   thing to do over a long trial, do you remember those little

16   places where he said that should have been caught by this one

17   or that one?  It doesn't work that way.  The buck has to stop

18   somewhere.

19        Next slide.  Next slide.  I don't -- the point of the

20   employment review is at *The Times* this seems to be behavior

21   that's rewarded.

22        Next.  Mike, take me up to -- stop right there.  This

23   was one aspect of his review where they said ask for

24   forgiveness not permission.  This was under the theory of sort

25   of being more aggressive and controversial with the journalism.

M2b2Pal2                    Summation - Mr. Turkel

1    He is the head guy.  He is responsible for discharging the

2    company, their vision, their policies.

3           Next, Mike.  I have gone through these so many times.

4    When you all are assessing bias, ask that hard question.  How

5    is this not on purpose?  How is it not on purpose?  That they

6    never used her name in the corrections.

7           Mike.

8           MR. AXELROD:  Objection.  This is not in evidence.  It

9    is redacted in evidence and --

10           MR. TURKEL:  Oh, take it down.  Put the redacted up.

11   There.

12           We have gone through these.  You can move forward

13   anyways.  These are the tweets that Douthat sent from the

14   liberal journalists.

15           This, this is something that if you all look through

16   these political rhetoric editorials that were being shot

17   around, it permeates them, right?  With all this going on, with

18   the factual balance that he was seeking taken out because they

19   were dead wrong, that error doesn't undercut or weaken the

20   argument of the piece.

21           Go back to Frank Rich's piece, 133, that I showed you,

22   where he recognizes that Jared Loughner is mentally unstable,

23   had no political ideology, and then said the exact same thing.

24   It doesn't matter.  It doesn't matter if you were actually

25   incited by political rhetoric.  You were.  That's kind of what

M2b2Pal2                          Summation - Mr. Turkel

1   he is saying here.  It's the same exact thing that Rich did.

2            Next slide.

3            Next slide.  Yeah.  We have gone -- I have gone

4   through all this, Michael.  Do me a favor.  Take me up to

5   damages.  There we go.

6            I want to talk to you all about the damages in the

7   case and explain to you what we are actually seeking, because I

8   know we have said, Mr. Vogt said in opening and I'm saying it

9   again now, this case is about Governor Palin drawing a line in

10  her life as to when enough is enough.  She's got thick skin.

11  If you don't all see how she is put together when it comes to

12  be insulted or attacked after all that, you know, she's got

13  thick skin.  This one crossed the line.

14           So we are here primarily to get a judgment against

15  them, and the way that works is we haven't claimed any

16  financial injury or we lost this job or that job.  If you find

17  that we prove our claim of libel, you have to determine the

18  amount of money, called compensatory damages, that any exercise

19  of your good judgment and common sense you decide is fair and

20  just compensation for the injury, if any, to the plaintiff's

21  reputation and the humiliation and mental anguish in her public

22  and private life that you have find was caused by the

23  challenged statement or statements that you determine

24  constitute libel.

25           In fixing that amount, you should consider the

M2b2Pal2                          Summation - Mr. Turkel

1   plaintiff's standing in the community, the extent to which the

2   challenged statements were circulated, the tendency of the

3   challenged statements to injure a person such as Ms. Palin, and

4   all of the other facts and circumstances.  These damages cannot

5   be proved with mathematical accuracy.  Fair compensation may

6   vary from very little to a substantial sum.

7           Next slide, please.  That's why we printed that really

8   long stipulation about the circulation.  This thing

9   circulated -- printed paper, 610,531, 283,829 digital page

10  views -- with the vile false accusations that my client incited

11  someone to murder six people and it has been up, what, four

12  years, seven months, 29 days.  No apology.  No call to her

13  before for a comment maybe, I don't know, nothing.  But we do

14  know this.  It's been circulated in the hundreds of thousands,

15  and you all can look at that.  And I know it seems imprecise,

16  but it's your job as a jury, it's your province to determine

17  what's fair and just under the circumstances in this case.

18          Next, Mike.

19          It is hard for someone like Sarah Palin to talk from a

20  position of complaining and weakness, and if you don't think

21  she was being honest about that, go back to the believability

22  of witnesses instruction and the stuff it says about looking

23  how people appear when they testify.  When she was discussing

24  2011 and the fact that Christina-Taylor Green was 9 at the same

25  time she had a 9-year-old daughter factoring why she took no

M2b2Pal2                    Summation - Mr. Turkel

1    legal action in 2011, you could hear her choked up, maybe,

2    maybe not.  You all rely on your own recollection of it.

3         But if Sarah Palin is one thing, she is a people

4    person.  And if one thing got her here, it was being -- it was

5    having this accusation resurrected and put back into the public

6    eye again.  And there was no reason for it, man.  She wasn't in

7    play here.  She is a private citizen, doing her best.  So all

8    those things, you know, there is no precise way to value these.

9         Mike, go to the next slide.  Hanna Ingber.  If there

10   is a pin-drop moment in this trial, they paraded up witnesses

11   telling us about their policy against apologies.  Do not

12   apologize under any circumstances.  It's a policy.  Until Hanna

13   Ingber took the stand.  Shane asked her, Mr. Vogt asked her:

14   Is there a policy at *The Times* against apologies?  And what did

15   she say?  No, there is no policy against apologies.

16        You know what is different about Hanna and the rest of

17   the witnesses from *The Times*, with the exception of Douthat?

18   She doesn't work in the editorial board.  She works over the

19   reader side.  She is not one of the gang.  Sure takes -- makes

20   you look back at a lot of the evidence you heard about why they

21   didn't apologize to Governor Palin.

22        Next slide.  Next slide that isn't blank.  Is that it?

23   Okay.  Go back to the damages slide.  Sorry.

24        I'm going to leave you all with this.  Mike, could you

25   pull up the verdict form and show it to them, please?  Not that

M2b2Pal2                    Summation - Mr. Turkel

1    verdict form.

2           It's a very simple verdict form, and I'm not showing

3    it to you to explain anything other than you getting a look at

4    it.  And Judge Rakoff is going to talk to you about all that

5    stuff.  But when you go through all these jury instructions,

6    the Judge will instruct you, you alone decide whether they are

7    liable or not.  In the bottom line it says:  "If you find the

8    defendants liable, indicate in the box below how much you award

9    in compensatory or nominal damages."

10          Nominal damages are a nominal amount.  It's a way you

11   could all recognize that we proved our case and haven't proved

12   a sum of damages beyond.  Whatever you want to set it at.  It

13   could be a dollar.  It could be ten.  It could be a hundred.

14   That's ya'll's province.  And whatever that number turns out to

15   be, you put it into the box if you find them liable.

16          I think there is some guidance.  I went through the

17   circulation.  When the judge instructs you on damages, I don't

18   want to go back through the whole instruction again, there is

19   guidance there.  But it's your province.

20          I'm going to finish where I started, which is where

21   Mr. Vogt started a week -- a week ago?  We leave it to ya'll

22   for damages.  I'm not going to put a number on the board.  I'm

23   not going to say this is worth whatever.  You know what

24   happened in this case.  If you find that they are liable for

25   libel, you can discuss amongst yourself what value you want to

1    put on what that did to Governor Palin.

2              And I would say in its simplest form, having one of

3    the largest newspapers in the word call you a murderer,

4    inciting murder again, maybe it's worth something.  But if you

5    don't think it is, then don't -- put a dollar there.

6              But recognize what they did here.  Recognize what they

7    did here.  Recognize that they crossed that line from just a

8    vigorous discourse in political rhetoric and demonization and

9    all these terms they throw around, because all they had to do

10   was care the slightest bit.  All they had to do was dislike her

11   a little less, and we are not sitting here today.

12             It's been my privilege to talk to you all this

13   morning.  Thank you.

14             THE COURT:  Thank you very much.

15             All right, ladies and gentlemen.  We will take a

16   15-minute break at this time.

17             (Jury not present)

18             THE COURT:  Please be seated.

19             I want to be absolutely sure before we send that thumb

20   drive to the jury with all the exhibits that all redactions

21   have been made and both sides have confirmed that.

22             MR. AXELROD:  Yes, your Honor.  I trust Mr. DiMezza

23   with my life, and he conferred last night with the plaintiff's

24   side and I thought it was perfect, but we will work on it.

25             THE COURT:  Okay.  No problem.

**JA 1023**

M2b2Pal2

1    MR. TURKEL:  We will double check, your Honor.

2    THE COURT:  It was harmless there because it was only

3    up for a second or two before the error was caught, but

4    obviously we want to make sure when the jury gets it, they have

5    it in the right form.

6    Okay.  We will see you all in 15 minutes.

7    (Recess)

8    (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court; jury not present)
 2              THE COURT:  Counsel, when we get close to 1:00, you'll
 3    figure out an appropriate spot to break, and then you'll
 4    continue after lunch.
 5              MR. AXELROD:  Your Honor, if I get to like five of 1
 6    and it's a good time, can I pull the plug?
 7              THE COURT:  That's fine.
 8              MR. AXELROD:  Okay.
 9              THE COURT:  Very good.
10              MR. TURKEL:  Judge, can I turn my chair?
11              THE COURT:  Yes.
12              (Jury present)
13              THE COURT:  Please be seated.
14              So ladies and gentlemen, we'll now hear from defense
15    counsel.
16              Because both sides get a total of two hours, but we
17    want to give you your lunch at the normal time, defense counsel
18    will go for an hour and 20 minutes, an hour and 30 minutes now,
19    and then we'll break for lunch, and then he'll continue after
20    lunch.
21              MR. AXELROD:  Thank you, your Honor.
22              And thank you very much, ladies and gentlemen of the
23    jury.  I second what everyone here has said.  To look at you is
24    to look at a jury that's engaged, and we all really appreciate
25    it.  The only thing we can really ask of a jury is one that
```

M2B1PAL3                     Summation - Mr. Axelrod

1   cares about the case as much as we care about the case, and

2   cares as much as James Bennet cares about the case and *The New*

3   *York Times* cares about the case, and I thank you for that.

4           Our system of law in the United States is great.  It's

5   wonderful.  And I would say it's the best in the world.  But I

6   don't really know the other ones, but I would still say it's

7   the best in the world.  But one of the problems is it does

8   place a very high burden on a jury.  And in a case like this --

9   this is the seventh day of trial -- you all have had to leave

10  your lives, you've had to come in here, you've had to pay rapt

11  attention to witnesses, documents flying at you, Dave Axelrod

12  reading way too fast, all those things that we put upon you,

13  and you have to digest it so quickly, and it's hard.  And we

14  really appreciate it.

15          But in our country, there's lots of lawyers' jokes,

16  because sometimes lawyers do things that, in my opinion, make

17  things harder on a jury, and I'm going to show you a couple of

18  examples of how that just happened.

19          So Mr. DiMezza, if we could put up -- before we get

20  there, for one second, when Mr. Turkel was summarizing his

21  argument to you, he put up a clip of Mr. Bennet's testimony.

22          THE COURT:  I'm sorry.  Mr. Turkel, you can sit there

23  as you requested, but you can't then get up --

24          MR. TURKEL:  But I had to --

25          THE COURT:  Well, fix it now, because I don't like the

1    impoliteness of standing up while someone else is speaking.

2          Very good.

3          MR. AXELROD:  Mr. Turkel put up what he said was his

4    summary -- it was a portion of Mr. Bennet's testimony -- about

5    what Mr. Bennet testified he meant by the term "incitement."

6    And what he did was he cut out the rest of James's testimony,

7    Mr. Bennet's testimony, just to show you the bits and pieces

8    that he wanted you to see.  And that's not fair, and that's not

9    fair on you.  So what I want to do first is show you what

10   Mr. Bennet actually testified to when he was talking about

11   where he found his inspiration for how he used that word

12   "incitement" when he was constructing "America's Lethal

13   Politics."

14         Mr. DiMezza?

15         If you could blow that up.

16         So you may recall, Mr. Vogt was examining Mr. Bennet,

17   and he said, "And I believe with respect to that, the term

18   includes, among them, deliberate orders, invocations and

19   summonses for people to carry out violent attacks; is that

20   right?"  And Mr. Bennet said, "It's not quite right.  I gave

21   you a very long list of things.  I said at the time it

22   encompasses a range of communication, including textbooks, that

23   dehumanize the other side in the conflict, posters that

24   encourage, you know, the kind of anger that Linda Cohn was

25   describing earlier.  It's used on both sides in that conflict

1  to basically describe all sorts of communications that teach

2  people to treat each other as enemies, and in some cases even

3  less than human."

4          That's what Mr. Bennet testified to.  But Mr. Turkel

5  is not helping you out when he slices and dices Mr. Bennet's

6  testimony, hoping that you won't remember the rest of it.

7          And I want to show you one other example of this.

8          Mr. DiMezza, if you could put up DX 500.

9          And this is something you never even saw.  This was

10 the stipulation that my colleague Ms. Schell was nice enough to

11 read to you all.  But it had very important data.

12         And if we could go to the page that has the data.

13         All right.  If you could blow up that chart.

14         So Mr. Turkel was making the point that the editorial

15 which they were complaining about was viewed by 283,829 page

16 views.  What he was hoping you would forget, and that I

17 wouldn't be quick enough to bring up, was that only 53 percent

18 of that was before the correction and that 47 percent was after

19 that.  He was hoping you would remember that.

20         And so these are just two examples of why the judge

21 cautioned you, before Mr. Turkel and when I came and started

22 speaking to you, that you got to use your recollection as best

23 you can, and when you get back in that jury room and you all

24 start talking to each other, you got to work together to

25 remember the evidence, because it's really hard, and sometimes

M2B1PAL3                        Summation - Mr. Axelrod

1     lawyers make it even harder on you.

2            You can take that down.  Thank you.

3            So one thing that was somewhat shocking about the

4     summation we just saw was that when Mr. Vogt opened this case

5     to tell you about what their theory was, their theory was that

6     *The New York Times* and Mr. Bennet printed something false in

7     the original version of the editorial, and that was that there

8     was a link to incitement.  But Mr. Turkel spent, at least it

9     seemed to me, a large portion of his summation arguing about a

10    theory.  He was arguing about a theory, an opinion, and that

11    was an opinion that Mr. Bennet had, it was an opinion that Tom

12    Friedman had, it was an opinion that was in the "Bloodshed and

13    Invective," and in this country, thank goodness, you're allowed

14    to have opinions.  Opinions can't be wrong, as much as you

15    disagree with them.  We have disagreements about opinions.

16    That's what's great.  But this is a case about whether facts

17    are wrong, but Mr. Turkel was arguing that the theory was

18    wrong.  And there's a very important distinction there.

19           So it's clear that the two sides in this case have a

20    very, very great difference of a view of what the relevant

21    evidence is.  But it's an incredibly important case, because it

22    is about the freedom of the press, and it's about the First

23    Amendment, as Mr. Turkel told you many times.  The First

24    Amendment provides legal protection to journalists and

25    newspapers, like Mr. Bennet, like *The New York Times*, who make

M2B1PAL3                    Summation - Mr. Axelrod

1    an honest mistake when they write about a person like Sarah

2    Palin.  And at the end of the day, just like I started at the

3    beginning, that's what this case is really about.  It's about

4    an honest mistake.  And you all, you all were picked for this

5    duty because everyone in here—us, them, certainly Judge

6    Rakoff—thought you could apply your common sense and your

7    shared life perspective and look at the evidence fairly.  And

8    when you all go back in that room and look at this evidence

9    fairly, using your common experience, you're going to see that

10   that's all this was was an honest mistake—an honest mistake

11   that was made very quickly in a very short period of time; an

12   honest mistake that, as soon as that mistake was seen, was

13   rectified less than 14 hours later; an honest mistake that

14   caused James Bennet to stay up that night and that, as he

15   testified, has caused him to think about every day since.

16        Mr. Turkel didn't mention the words once "clear and

17   convincing evidence."  We're going to talk about that, because

18   it's a really important issue in this case.  But we're going to

19   be very blunt.  For Governor Palin to prevail in this case --

20   and maybe that's what Mr. Turkel was talking about, without

21   saying it -- she needs to show you, they need to show you, that

22   this wasn't just an honest mistake.  They need to show you by

23   clear and convincing evidence that Mr. Bennet and *The Times*

24   intentionally meant to defame Governor Palin, or were extremely

25   reckless in doing so, that they printed something that they

M2B1PAL3                    Summation - Mr. Axelrod

1    knew was false.  And that's going to take some time, and I want

2    you to bear with me, and I apologize for being long-winded, but

3    I'm going to walk you through the evidence, I'm going to walk

4    you through the circumstantial evidence, the direct evidence,

5    and you're going to see that it overwhelmingly shows that

6    Governor Palin can't come close to meeting this burden.

7             Now June 14th of 2017 was a tragic day.  That we can

8    all agree upon.  A deranged man shot and attempted to kill

9    members of Congress.  And *The New York Times* editorial board

10   saw this as an important issue that needs to be addressed.  I

11   mean, that's what the newspaper is there for and that's what

12   the editorial board is there for, to express their shared

13   values.  And the editorial board wanted to raise the alarm bell

14   about what they saw as a confluence of two very dangerous

15   things.  And this is 2017, so try to take yourself back.

16   That's five years ago.  Try to take yourself back.  That was a

17   heated period.  President Trump had just been elected, and

18   there was political rhetoric flying back and forth.  And there

19   is no doubt, and something you all know from your common life

20   experience, that this is a country awash in guns.  And *The New*

21   *York Times* editorial board and Mr. Bennet saw this as those two

22   issues needed to be addressed because they're dangerous, and

23   they're of public concern, and we need to say something about

24   it.

25             And in making those important points, *The Times* made a

1    natural connection, one that Governor Palin herself made even

2    before the editorial was published—that you had a 2017 shooting

3    by a guy who looked like he was acting from a political motive,

4    and you had a 2011 shooting that occurred in another very

5    contentious period.  And I'm dating myself, but some of you may

6    remember this, some of you may not.  2011, as you heard during

7    this trial, was contentious.  The Obamacare policy had just

8    passed.  The 2010 election was very contentious.  So it was a

9    natural connection for the board to talk about.

10             Mr. DiMezza, you can put up the presentation.

11             So what we've done here is we've tried to construct a

12   time line to show you how quickly this all happened.  Now

13   Mr. Turkel gave you this narrative that essentially there was

14   some type of conspiracy here to either attack Governor Palin,

15   attack the right, advance a narrative, something else.  But

16   what you actually see here is that this was a day, it was a day

17   where something happened, something newsworthy happened, and

18   *The New York Times* editorial board acted quickly to address

19   this.

20             You don't have to stare at this.  We're going to go

21   through this slowly.  It's certainly not a test.

22             But one other really interesting thing that Mr. Turkel

23   said -- I thought this was a great point -- all of the

24   communications in this case happened by email.  And you get to

25   see all of it.  So you get to see the back-and-forth.  You get

M2B1PAL3                    Summation - Mr. Axelrod

1  to see the evidence of what was said, but you also get to know

2  that there was nothing else said.  And so that shows you that

3  there's no conspiracy here to defame Governor Palin.  It shows

4  you what happened here was a very quick reaction and mistakes

5  were made.

6           So let me take you through it.

7           The baseball shooting happens in the morning.  And so

8  this is now 10:46.  And Elizabeth Williamson sends that email,

9  "are we writing on the shooting?"

10          We're going to put this together, and I apologize for

11 being a cliche machine, but I'm going to try to put together

12 the pieces of the puzzle so all of this makes sense.

13          So starting at 10:46, Elizabeth Williamson sends this

14 email to the editors on the board, "are we writing on the

15 congressional shooting?"  Because Ms. Williamson was down in DC

16 and she saw this as something that she thought they should

17 write on.  Bob Semple responds, and then there's that

18 back-and-forth you see.  And 11:59, Bob Semple suggests the gun

19 control angle.

20          And let's talk about Bob Semple here.  Mr. Semple

21 didn't take the stand in this case.  He certainly could have.

22 Plaintiff's counsel could have called him as a witness.

23          MR. TURKEL:  I'm going to object, Judge.

24          THE COURT:  So ladies and gentlemen, you should be

25 aware that either side can subpoena for testimony anyone in the

JA 1033

M2B1PAL3                    Summation - Mr. Axelrod

1  United States, and therefore Mr. Semple would have been

2  available to both sides.

3          MR. AXELROD:  Yeah.  He would have been.  And do you

4  think if Mr. Semple had something that was going to help

5  advance the theory that this was a conspiracy to attack

6  Republicans or conspiracy to attack Governor Palin, they

7  wouldn't have called him to put him on that stand?

8          MR. TURKEL:  It's the same inference.  Objection,

9  Judge.

10         MR. AXELROD:  And --

11         THE COURT:  I think the point is this, ladies and

12 gentlemen:  Witnesses, under federal law, are available to both

13 sides.  If you think that the failure of someone to call a

14 particular witness gives rise to an inference that his

15 testimony would not have supported their position, that's a

16 possible inference, but there are many other inferences

17 available.  And likewise, if you think that the failure of the

18 other side to call him suggests that his testimony would not

19 have been as helpful as the other side thinks.  That's also a

20 possible inference.  But there are many other possibilities.

21 So just while you can draw inferences, just remember that the

22 witnesses are available to both sides.

23         MR. AXELROD:  So Mr. Turkel spoke for about an hour

24 and 45 minutes, and besides me objecting to a document that

25 wasn't in evidence, did you see me interrupt?

1              MR. TURKEL:  Judge, objection.

2              MR. AXELROD:  He's trying to break up the flow of the

3     argument.  Because there are inferences, and Mr. Turkel argued

4     what he thought the evidence showed, and now I'm arguing what

5     I --

6              THE COURT:  Mr. Axelrod.

7              MR. AXELROD:  Yes, your Honor.

8              THE COURT:  That is not a proper argument.

9              MR. AXELROD:  I'll move on, your Honor.

10             THE COURT:  He had a perfect right to raise an

11    objection because the Court needed, as would normally be the

12    case, in hundreds of trials, to instruct the jury on the

13    so-called missing witness issue.  So that was a perfectly

14    proper objection on Mr. Turkel's behalf.  Please go on.

15             MR. AXELROD:  I will.  And of course, Mr. Turkel is

16    going to have a chance to rebut.  He's going to have 15

17    minutes, and he's going to have a chance to say, no,

18    Mr. Axelrod didn't get that right.  And you're going to hear

19    him do that.  But let's move on.

20             So you heard Mr. Turkel talk about Bob Semple a lot,

21    and Bob Semple had that insensitive email.  But what was

22    important about Bob Semple is he had no role in writing this

23    editorial.  He was gone.  As you heard Linda Cohn say, he left

24    in the afternoon to go to an event.  He didn't touch it.  So

25    what does it mean that he said something about NRA, about

1    congressmen being beholden to the NRA?  Nothing.  It's

2    irrelevant.

3         So 12:04, Linda Cohn emails and she compares the

4    Virginia shooting to the Arizona shooting.  Remember this?

5    "I'm thinking back to what a giant story the Gabby Giffords

6    shooting was.  Amazing that shooting congressmen doesn't seem

7    so shocking now."

8         And she told you that that was a natural connection

9    because these were the only congresspeople who had been shot.

10   Her email also said something really scary.  "I'm thinking back

11   to what a giant story Gabby Giffords shooting was.  Amazing

12   that shooting congressmen doesn't seem so shocking now."  She's

13   saying we've become numb to gun violence in this country and

14   violence against politicians, and she's making the point that

15   the editorial board wanted to make, that we need to address

16   this because it's an important issue that we need to discuss.

17        At 12:08, as you saw, Bob Semple gives the green

18   light.  And let's look at his email.  "We should definitely

19   shoot for a piece, not huge, but a piece."  As you saw, this

20   was never supposed to be a huge piece.  This was never supposed

21   to be an editorial that was going to go out of its way to

22   attack Governor Palin.  This was not an editorial that was

23   going to attack Republicans.  This was a day of tragedy, and as

24   you're going to see -- it's 12:00 -- the editorial gets

25   completed seven hours later.  This was a day of tragedy, but it

M2B1PAL3                    Summation - Mr. Axelrod

was also the editorial board engaging in back-and-forth,

quickly writing a piece to address the news of that day.  It

wasn't a long drawn-out process where an established scheme was

set out.

About 40 minutes later, James Bennet raises the idea

of the rhetoric of demonization.  And prior to him editing,

later in the afternoon, and besides him saying there are two

more relevant precedents, which we're going to talk about, this

is the only time he offered any substantive guidance for the

piece.

And let's look at what he says.  Because we heard

Mr. Turkel talking about how Mr. Bennet and the board had it

out for Governor Palin and had it out for the right.  But at

the very end of this email, he's saying, "But if there's

evidence of the kind of inciting hate speech on the left. . .

we should deal with that."  He's saying that we need to deal

with left-wing inciting rhetoric.  He's looking for evidence

that there's inciting left-wing political rhetoric.  He's not

saying we got to go after the right here.  And he's certainly

not bringing up Governor Palin.

And as you all heard, from 12:08 to about 4:40,

Elizabeth Williamson is writing her draft.

And before that even happens, *Breitbart* publishes that

"exclusive" with Sarah Palin.  Here it is.  You can go look at

it.  It's DX 70.

**JA 1037**

M2B1PAL3                    Summation - Mr. Axelrod

1          And in that piece, Governor Palin does two things.

2    One, she herself refers back to the Giffords shooting, because

3    she made that connection too.  Two shootings of congresspeople.

4    But one other thing that's very strange about this is Governor

5    Palin brought up the allegation that she was somehow blamed for

6    the Giffords shooting.  Think about that.  Hopefully nothing

7    really bad has ever really happened in your life, and I'm sure

8    some small bad things have happened, and think about those

9    painful things.  Are those things you want to talk about?

10          MR. TURKEL:  Judge, objection; "Golden Rule."

11          THE COURT:  Yes.

12          MR. TURKEL:  Yes.

13          THE COURT:  What's your objection?

14          MR. TURKEL:  I'm sorry.  My objection is it's a

15    "Golden Rule" violation?

16          THE COURT:  I'm sorry?

17          MR. TURKEL:  Judge --

18          THE COURT:  I don't understand that.

19          Overruled.  And I do think, while your previous

20    objection was well taken, I think you should be careful not to

21    make objections during summation unless you are quite sure that

22    you have the law on your side.

23          MR. AXELROD:  Thank you, your Honor.

24          Governor Palin claims that the 2011 allegations were

25    incredibly painful, and maybe they were.  But why would she

1    bring them up herself at another day of tragedy five and a half

2    years later?  Ask yourself if that makes sense based on your

3    common sense.

4              Go forward.

5              At 4:45, Elizabeth Williamson finishes her draft.  And

6    she says, "I'm no Frank Clines but I did my best.  Frank, if

7    you are about, can you please check my math?"

8              And you know, plaintiff's counsel have made a big deal

9    about the fact that there was no fact-checking of that piece.

10   What did we hear from Eileen Lepping?  Eileen Lepping went

11   through and said she fact-checked every sentence.  But she

12   didn't get that piece.  She didn't get the lines that

13   Mr. Bennet added about "the link to political incitement was

14   clear."  And she said she didn't get it.  She missed it.  But

15   she also said a really important thing.  Mr. Bennet never told

16   her to ignore that piece.  He never said:  Don't check that.

17   Linda Cohn never said:  Don't check that.  Elizabeth Williamson

18   never said:  Don't check that piece, we need to make sure that

19   we get that factually false thing to the readers.  Nobody said

20   that.  It was a mistake.

21             But what's really important in this time frame -- and

22   as you'll recall, Elizabeth Williamson files her piece at 4:45,

23   and Linda Cohn picks it up, because Bob Semple had left for the

24   day.  And Linda Cohn takes a look at it, and she didn't think

25   it fit.  She had some issues with it.  And she goes and -- she

M2B1PAL3                    Summation - Mr. Axelrod

1    goes to Mr. Bennet's office and she says: Can you take a look

2    at it. And plaintiffs, throughout this case, have made out

3    Mr. Bennet to have this grand scheme, that he was going to

4    publish something false to fit the narrative.

5         What did Linda Cohn tell you about why she went to

6    Mr. Bennet's office? She said: It was my decision to go talk

7    to him and pass off the edits. He had never said when Linda --

8    when Elizabeth's piece comes in, I want to take a look at it, I

9    need to read it, I need to revise it. It happened by chance.

10   Now if there was this grand conspiracy happening here among *The*

11   *Times* editorial board members to publish something false about

12   Governor Palin, wouldn't it have been set up so it was going to

13   go straight to James Bennet? Nobody told you that because it

14   didn't happen. It's a myth.

15        And you'll see -- there's evidence -- Eileen Lepping

16   is looking at other stuff. They're trying to make sure things

17   are right. They missed something.

18        James Bennet works on Elizabeth's piece from 5:03 to

19   7:22. And remember why he said he was doing it. He was

20   originally going to send it back to her, but now we're on

21   deadline. We're trying to get this thing done for the next

22   day's paper. Now if Mr. Bennet, at 7:22, were so intent on

23   publishing something false, what would he have done? You know

24   the answer to this. He would have said: I'm sending this

25   right to the people who are going to publish this, we're giving

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2B1PAL3                    Summation - Mr. Axelrod

1    this thing up right now, because I don't want anybody looking

2    at this and making sure there isn't a problem.  Right?  If he

3    had that guilty mind-set, that's what he would have done,

4    right?  But what did he do?  "Hey, Elizabeth, I really reworked

5    this one.  I hope you can see what I was trying to do.  Please

6    take a look.  Thank you for the hard work today and I'm sorry

7    to do such a heavy edit."

8          "Please take a look."  He wanted Elizabeth Williamson

9    to look at his draft and make sure it made sense.  Is that

10   consistent with someone who wanted to publish something false?

11         All right.  Maybe we can forget about that email

12   because Linda Cohn was definitely in on the deal with James

13   Bennet.  Linda Cohn, who's now retired from *The New York Times*,

14   has no skin in the game, she just wants to enjoy her retirement

15   post pandemic.  But maybe she was Mr. Bennet's pawn, under

16   Mr. Turkel's theory.  So let's see what she does.

17         Oh.  Elizabeth, "Hi, I don't know whether James sent

18   you a playback with his changes.  Just in case, here's

19   another."

20         Why did Linda Cohn do that?  She told you.  She wanted

21   to make sure Elizabeth had it.  She wanted to make sure

22   Elizabeth could read it.  She wanted to make sure Elizabeth

23   could see if there were any problems.  Okay.  So maybe Linda

24   Cohn wasn't in on it either.

25         Listen, mistakes happen, and as I said, the very first

M2B1PAL3                    Summation - Mr. Axelrod

1    thing I said to you, a mistake happened here.  But there's no

2    grand conspiracy, because the facts don't support it.  No one's

3    hiding the ball.  It's all over email, as Mr. Turkel told you.

4            So at 9:45, "America's Lethal Politics" gets

5    published, online, and at 10:35, Mr. Douthat expresses his

6    concern about the editorial.  Mr. Douthat, who Mr. Turkel says

7    you should trust, you should trust his email, because he's

8    expressing his concerns.  And so let's be very clear.  This is

9    at 10:35 of June 14th of 2017 -- long before Governor Palin

10   tweets out that she's going to sue, long before she filed the

11   lawsuit.  This is at 10:35 at night, after James Bennet has

12   ended his day.  And in the top in the yellow, you'll see

13   Mr. Douthat expresses his concern about the points that were

14   being made.  And a little bit later I'm going to talk about

15   what Mr. Douthat actually testified to.

16           But what I really want you to focus on is what

17   Mr. Bennet sent back.  This is before a lawsuit.  This is

18   before all of this.  This is the unvarnished, unpolished, James

19   Bennet, sitting on his couch, maybe watching *SportsCenter*.

20   This is his response.  It was June, so he was watching a

21   Yankees game.  "Hey, thanks, and I'll look into this tomorrow.

22   But my understanding was that in the Giffords case there was a

23   gun sight superimposed over her district; so far in this case

24   we don't know of any direct threat against any of the

25   congressmen on the field."  That is exactly what his testimony

was before you.  He was saying the incitement in Arizona was

the crosshairs map, and then Giffords got shot.  But what he

was saying was that in Virginia, there was no incitement before

the shooting.  There was no map that says, go drive to

Virginia, there's Republican congressmen practicing baseball

there.  Now the point that was made in the editorial was that

both shootings came about in a political atmosphere, and

there's no doubt, if you look at the evidence you saw here,

that Mr. Hodgkinson was connected to politics.  As Mr. Bennet

said, why would you drive from Illinois, Belleville,

Illinois -- I don't know where that is in Illinois -- to

Virginia to go attack a baseball game unless politics is your

motive?  But what Mr. Bennet is saying here, unvarnished, maybe

when he's watching the Mets game, is that we don't know if

there's a direct threat against any of the congressmen in

Virginia.  That was the distinction in his mind.  And you can

maybe disagree with that distinction.  That's fine.  But the

distinction was, in Arizona, we had a crosshairs map, where

Gabby Giffords was listed with a crosshairs over her district,

and then she was shot eight months later.  And in Virginia, we

didn't have anything.  But we had somebody get shot.

          And this is really crucial.  So Mr. Turkel spent a

while saying, oh, Mr. Bennet, you know he's lying because the

dictionary definition of "incitement" doesn't support him.

Mr. Bennet said in the moment, "That's not to say that any of

1   it is okay, obviously," and, this is important, "or that the

2   violence in either case was caused by the political rhetoric."

3   Long before plaintiffs ever pushed their theory of this case,

4   that "incitement" meant causation, that by using the word

5   "incitement," James Bennet meant that Governor Palin had caused

6   directly and clearly that violence, Mr. Bennet is saying to

7   Mr. Douthat, "That is not to say that the violence was caused."

8   It's incredibly important because before -- once cases start,

9   you know, things happen.  This was before there was any

10  litigation.

11          So what does he do?  Now if you were part of the

12  conspiracy to publish something false about Republicans or

13  publish something false about Governor Palin, you would sit on

14  that email and you'd do nothing, right?  Because you knew what

15  you had done.  You had advanced a political agenda or

16  something.  But Mr. Bennet, he doesn't sit on it.  Almost

17  immediately he texts Elizabeth Williamson:  "Are you up?  The

18  right is coming after us over the Giffords comparison.  Do we

19  have it right?"  If Mr. Bennet knew what he had published was

20  false, and if he'd intended to publish something false, at

21  11:38 would he have emailed Elizabeth Williamson?  Does that

22  make any sense?  No, of course not.

23          At 5:08, about five and a half hours later --

24  Mr. Bennet said he didn't sleep -- he emails Eileen Lepping and

25  Elizabeth Williamson:  "I'd like to get to the bottom of this

1  as quickly as possible . . . and correct the piece if needed."

2  Use your own common sense and life experience.  Think about

3  times where you've been upset about something.  Maybe think

4  about times where you've made a mistake.  Have you ever felt

5  the urge -- the urge to correct it as quickly as you could,

6  yearning for that morning to come so that you could go and do

7  what you needed to do to fix that mistake you made?  Well,

8  that's what Mr. Bennet was doing here.  If Mr. Bennet had

9  intended to defame Governor Palin and intended to print a

10  falsehood, would he have been up at 5:08 saying, We've got to

11  get down to the bottom of this, maybe we got to correct?  Of

12  course he wouldn't.  He would have been sleeping soundly,

13  knowing that he had advanced the agenda that he wanted to

14  advance.

15         But he doesn't say that.  He says, "We're taking a lot

16  of criticism for saying that the attack on Giffords was in any

17  way connected to the incitement."  Now why does he say, "I

18  don't know what the truth is here"?  He says it because he

19  doesn't know what the truth is here.  And we're going to get to

20  this a little bit later, but Mr. Bennet wasn't trying to say,

21  when he revised the editorial the night before, that Loughner

22  had acted because of the crosshairs map.  He was trying to say

23  the same thing that were in some of the other pieces that we

24  saw that we're going to look at, in the "Bloodshed and

25  Invective," and the Frank Rich piece, and the "wink, wink" to

1    Second Amendment folks.  He was trying to advance the same

2    theory—a theory, an opinion—that we live in a world where

3    violent political rhetoric heats up the temperature and can

4    create an environment where someone who's crazy, someone who

5    has a loose connection to reality, can take from that

6    incitement a call to action.  That's the theory.  He was in no

7    way advancing the theory that Mr. Loughner had been caused to

8    act by the crosshairs map.  And that's why he didn't know.  It

9    wasn't because he was reckless the day before.  It's because it

10   wasn't part of the theory.  And as I said -- sorry.  Going

11   backward.

12          You can disagree with the theory, but that's not

13   defamation.  In this country, we're allowed to have our own

14   opinions, and we argue about those opinions.

15          Now going back to this a second.  If Mr. Bennet had

16   intended to publish something false and he had got this word

17   from Ross Douthat that there were concerns about it, what would

18   he have done?  He would have started circling the wagons,

19   right?  We got to get on the same page, folks.  You would have

20   seen the emails, or you would have seen the calls, you would

21   have seen testimony about calls:  We're getting criticism, we

22   need to show people what we meant and why it was right.  He

23   does the opposite.  He talks about his own failure.  He talks

24   about not knowing what the truth is.  That's not consistent

25   with a conspiracy to defame.  That's consistent with making a

1    mistake and wanting to make it right.

2                By 11:33, the correction is issued, less than 14 hours

3    later.  And it's not a quiet correction.  It's direct.  You saw

4    the exchange in the email with Hanna Ingber.  "We're sorry

5    about this and we appreciate that our readers called us on this

6    mistake."  "We're sorry about this."

7                Now Mr. Turkel thinks that Hanna Ingber's testimony

8    about the apology policy was the great "gotcha" moment.  Who

9    knows what Hanna Ingber was referring to, whether that was the

10   apology policy at the reader center, whether she was right

11   about the apology policy, but certainly, Mr. Bennet and she

12   agreed about that we could say we're sorry in a tweet on

13   June 15th.

14               Later that day, we see that Mr. Bennet wants to

15   apologize to Governor Palin personally, and he finds out that

16   that's what the policy is about.  But guess who wasn't on those

17   emails between Danielle Rhoades Ha and James Bennet?  Hanna

18   Ingber.  So just because maybe some people say things

19   different, doesn't mean that somebody is lying.  And if Hanna

20   Ingber had been in those conversations between James Bennet and

21   Danielle Rhoades Ha and said no, no, no, that wasn't how the

22   conversation went, James Bennet's not right, well, then maybe

23   Mr. Turkel would have something.  But she wasn't.  She wasn't

24   part of that.  She doesn't know.

25               Okay.  But again, with this correction, if the intent

1  was to defame, if the intent was to harm political rivals,

2  would you say "We're sorry we made a mistake?"  You wouldn't.

3  You'd circle the wagons.  You'd get into your own foxhole, as

4  the editorial said.

5          But what's also outstanding about this is that this

6  wasn't a quiet correction.  Mr. Bennet, you heard testimony

7  from Mr. Bennet, from Ms. Ingber, that they wanted this

8  correction to be read by as many people as possible.

9          And if you look at DX 500, which was the stipulation

10 that we read to you -- and you can look at it -- you'll see

11 that the tweets that got the most traction, they're the tweets

12 about the correction, the most comments and the most favorites.

13 When this happened, Mr. Bennet and *The Times* tried to correct

14 it as quickly as possible, and not in a -- as James Bennet

15 said, not in a mealy-mouthed way.  We didn't want to tell our

16 readers, that was your fault, you got it wrong, you didn't

17 understand it.  Mr. Bennet realized, he didn't understand the

18 way that some people would read what he wrote.  And rather than

19 saying, it's your fault for not understanding my highfalutin

20 language, he said, no, we got it wrong.  He said he wanted to

21 take responsibility and he wanted to correct the record.  He

22 didn't want it to be muddled.  That's why he was so direct.

23 And then it was disseminated as broadly as it could.  The

24 opinion Twitter sends it out and then *The Times* Twitter sends

25 it out.  If James Bennet and *The Times* were trying to be quiet

M2B1PAL3                    **JA 1048**    Summation - Mr. Axelrod

1    about this, would they have done that?  No.

2              That afternoon, Governor Palin threatens a lawsuit.

3    Had she been harmed, by that time?  We don't know.  But her

4    first instinct was not to say, correct it, retract it; it was

5    that I'm going to run to court and file a lawsuit.  Who knows

6    if I've been harmed or not; that's what I'm doing.  The very

7    same day.

8              And then she files the lawsuit two weeks later, as she

9    testified.

10             Now there are five very important things that got

11   demonstrated during this trial.  The first is that the

12   congressional shooting in Virginia was an incredibly important

13   event, and the *Times* editorial board saw itself as having a

14   duty to respond to it, a duty to talk about the violent

15   political rhetoric and the easy access to guns.

16             2.  The editorial's reference to Sarah Palin's PAC was

17   incidental but obvious because it called back to the only other

18   violence against a member of Congress in recent history.

19             And let me take up something first.  Mr. Turkel, you

20   may recall, made that funny comment about you don't call

21   McDonald's Ray Kroc's McDonald's.  But if they had said a

22   political action committee had issued something or SarahPAC had

23   issued something, readers would have said, What's SarahPAC,

24   right?  Think of somebody doing a review of Ruth's Chris Steak

25   House, a name I always have trouble saying.  Would they say, I

1    went to a steakhouse?  No.  They'd say, I went to Ruth's Chris

2    Steak House.  Sarah Palin's name was in there as a descriptive

3    measure.  And you heard -- and that wasn't -- that was on

4    purpose.  Elizabeth Williamson described that.  She said I know

5    campaign finance law.  I know that there's an important

6    distinction between the individual and the political action

7    committee.

8            The third point is operating under a deadline, *The*

9    *Times* failed to understand how some would understand "the link

10   to incitement" language.

11           The fourth:  Upon learning about this, *The Times*

12   rushed to quickly correct.

13           And then finally, Governor Palin is extremely well

14   known, and as you saw yesterday, she's shown no credible

15   evidence of harm.

16           So let's talk about these five points.

17           So first, we talked about this a little bit briefly.

18   You saw the evidence.  No one on June 14th woke up with the

19   idea to write an editorial that invoked Governor Palin's name.

20   It wasn't a preconceived plan.  It was responding to the day's

21   news.  And even in an email where Mr. Bennet sets out the idea

22   of rhetoric of demonization, he doesn't say:  Talk about the

23   crosshairs map.  If he'd wanted it in that piece, wouldn't he

24   have said that?  No mention by Mr. Bennet, up until the time he

25   edits the draft.  Actually, I take that back.  Mr. Bennet never

M2B1PAL3                         Summation - Mr. Axelrod

1  says:  Put Sarah Palin's name in this.  You'll see in the draft

2  in a second, Elizabeth Williamson added Sarah Palin's name.

3  Mr. Bennet didn't do that.

4        So how did he get Elizabeth Williamson to do that if

5  it's not in the emails?  Maybe it was mind control?  I mean, it

6  just doesn't make any sense.  I mean, Mr. Turkel was up here

7  fighting the good fight, but you've got to look at reality.

8  All the communications here are by email.  Mr. Bennet never

9  says:  Put Sarah Palin in this piece.  Why didn't he do that?

10  Because he didn't care about it.  He didn't care whether her

11  name was in it or not.  Elizabeth Williamson put her name in

12  there because the crosshairs map was a piece of political

13  rhetoric that preceded the Gabby Giffords shooting.

14        Now Mr. Turkel spent a lot of time talking about how

15  those two more relevant precedents are evidence that Mr. Bennet

16  knew it was false.

17        Go back, ladies and gentlemen, look at DX 29.  When

18  you get back in the jury room, you're going to get a list of

19  every exhibit, and I urge you to go look at DX 29.  "Bloodshed

20  and Invective."  Look at this piece that we pulled out.

21        (Continued on next page)

22

23

24

25

M2b2Pal4                    Summation - Mr. Axelrod

1              MR. AXELROD:  "It is facile and mistaken to attribute

2      this particular madman's act directly to Republican or Tea

3      Party members," not to mention Mr. Bennet said he wasn't trying

4      to do that.  "But it is legitimate to hold Republicans, and

5      particularly their most virulent supporters in the media,

6      responsible for the gale of anger that has produced the vast

7      majority of these threats.  Many on the right have exploited

8      the arguments of division, reaping political power by

9      demonizing immigrants, or welfare recipients, or bureaucrats."

10             It's the exact same argument that Mr. Bennet was

11     making in "America's Lethal Politics."  Don't use Republicans,

12     Democrats.  Don't use violent political rhetoric.  Because it

13     can create a dangerous environment.  That's what is in

14     "Bloodshed and Invective."  That's what's in Thomas Friedman's

15     piece.  That's what is in Frank Rich's piece.

16             Again, you can disagree with that theory, but that's

17     not libel and that's not defamation.

18             Think about how this trial went.  Who brought up

19     "Bloodshed and Invective" to Mr. Bennet and asked him about it?

20     It wasn't them.  It was me.

21             And Mr. Bennet explained to you how, when he read --

22     when he said these two more relevant pieces, he explained why

23     they were relevant, and they were relevant because they were

24     advancing the exact same theory.  They show exactly what was in

25     Mr. Bennet's mind on the night of June 14.

1           So plaintiff's counsel spent a lot of time talking

2    about how this editorial was about Sarah Palin, it was an

3    attempt to get at her, somebody who was nothing in 2017.  I

4    don't remember the exact language, and so I apologize to

5    Mr. Turkel.  I tried to write it down quickly.  But it was

6    something like "if they just hated Governor Palin a little bit

7    less."  But that's a theory, too.  Because this editorial

8    wasn't about Governor Palin.

9           Discussing Arizona in this editorial made perfect

10   sense.  Just look at what Governor Palin did.  And it wasn't

11   James Bennet who introduced this idea.  Linda Cohn, Linda Cohn

12   is off enjoying retirement, and Mr. Turkel said something about

13   the arrogance of talking about Gabby Giffords and Sarah Palin.

14   Did Linda Cohn strike you as arrogant when she was on the

15   stand?  Did she strike you as someone who is off in retirement

16   and isn't going to tell you the truth about what she did and

17   what she knew?  Does that make any sense?  Linda Cohn brought

18   the Gabby Giffords point, not James Bennet, not Elizabeth

19   Williamson.

20          You are going to have both of these exhibits in

21   evidence.  Elizabeth Williamson's draft is DX 32 and

22   Mr. Bennet's redline — I will call it a redline, we lawyers

23   spend way too much time working on redlines — is DX 136.

24          You, the jury, you haven't had a chance to go back and

25   look at the editorial.  I urge you, one of the first things you

1  do when you get back in the jury room is read it.  Read the

2  entire thing.  Because what you are going to find is that

3  Governor Palin's involvement in that editorial is almost a

4  footnote.  The editorial is not about her.  It's about the

5  shooting of the day, it's about that pattern for two

6  paragraphs, it's about gun violence, and then it ends with

7  praising Donald Trump.

8        Oh, right.  Mr. Turkel didn't show you that.  This

9  piece that supposedly was anti-Republican and

10  anti-Governor Palin ends by praising Donald Trump for saying

11  just the right things.

12        But look at Mr. Bennet's redline, because it's not

13  just a redline of those two paragraphs.  Mr. Bennet, he did a

14  heavy edit, just as he said to Elizabeth Williamson.  And it

15  was a heavy edit.  He almost rewrote the whole thing.  He left

16  a couple of words in there.  And that shows you that Mr. Bennet

17  wasn't out to get Governor Palin.  He was out to make a piece

18  better.  He was out to make it better written.  The lede does a

19  much better job of showing the violence of that day, or

20  something like that.  Look at Mr. Bennet's edits.

21        This is from *The New York Times*' home page on June 15.

22  If Mr. Bennet and *The New York Times* were out to get

23  Governor Palin, wouldn't they have put her name in the

24  headline?  Wouldn't they have put her name in the blurb to

25  catch viewers' attention?  Here is what we are doing.  We are

M2b2Pal4                    Summation - Mr. Axelrod

1    getting after her.

2              They didn't do that because it didn't happen.  That

3    wasn't the motive.  Anybody who visited the website would have

4    had no idea that this thing even mentioned Governor Palin.

5              This is the lede, L-E-D-E.  There are a lot of

6    readers, different types of readers in this country.  Some

7    people read every piece fully, and some people grab the first

8    paragraph and see what catches their fancy.  But if Mr. Bennet

9    and the *Times* had a mission to make Governor Palin the

10   scapegoat and that was their goal, wouldn't Mr. Bennet have

11   moved her name up, put it in the first paragraph, catch

12   readers' interest?  It's not in the first paragraph.  It's not

13   in the second paragraph.  It's not in the third paragraph.

14   It's not in the fourth paragraph.  It's buried in the fifth

15   paragraph.  Is that consistent with an intentional plan to

16   print a falsehood?  Come on.  You know the answer to that.

17             This is the print version.  And when you go back to

18   the jury room, you are also going to have the real physical

19   copy, which is getting pretty frayed.  But you can look at it.

20   Even somebody casually going through the editorial page at the

21   second to last page of the A section, a seriously prominent

22   place to go after Governor Palin.  I'm kidding.  Please laugh.

23             It just doesn't make sense.  It's buried.  It's buried

24   in the section, it's buried in the editorial, and it's

25   inconsistent with this idea that there was a grand scheme here.

1    Mr. Bennet took the stand and he fell on his sword,

2    and you all have to decide whether that was credible.  I think

3    there is a lot of evidence in the record for you to find that

4    that is credible.  But there were a lot eyes that were put on

5    this editorial.  Linda Cohn read it after James Bennet finished

6    it.  You saw those exhibits where Nick Fox weighed in with

7    changes, too.  Elizabeth Williamson got it twice.  Jesse Wegman

8    that night says:  I like the piece.  And Elizabeth responds:

9    Yeah.  I started it and James riffed.  Jesse Wegman looked at

10   it.  Eileen Lepping, remember, she sent it to Bob Semple.

11   Eileen Lepping read it, and then two of the best copyright --

12   copyeditors at *The Times* read it.  Remember, you know they read

13   it closely because they found a factual error between what was

14   in the news side and what was in the editorial side.  You can

15   look at that exhibit, too.  Joe Rakowski and Bruce Levine

16   reviewed it.

17        Listen.  Sometimes mistakes get made and here one,

18   two, three, four, five, six, seven, eight, nine people had eyes

19   on this thing and nobody saw the unfortunate way that some

20   people would view those passages.  Prepublication, no one was

21   aware that the editorial would be read to imply causation.  You

22   heard James Bennet.  You heard Elizabeth Williamson.  They

23   meant to convey the same theory: overheated political rhetoric

24   can create that dangerous environment.  That's what they meant.

25   That's how they all read it.  Should they have done a closer

M2b2Pal4                    Summation - Mr. Axelrod

1    read?  Should someone have caught it?  Yeah.  Because if they

2    had, we all wouldn't be here.  You would be back at work.  I

3    would be stuck in some other courtroom.

4         But they didn't, and there is no evidence that Joe

5    Rakowski and Bruce Levine, who we haven't heard -- we didn't

6    call them, they didn't call them, we didn't hear that they were

7    in on the conspiracy because there was no conspiracy.  This was

8    a mess-up.  It was a goof.  And, yeah, it stinks.  But because

9    we value the First Amendment, we tolerate it.  Because nothing

10   was done here intentionally.

11        I just want to take on this idea that this was somehow

12   a political hit piece.  Read the editorial.  Even read the

13   corrected version.  The corrected version makes the point, it

14   sets it out by saying that back in 2011 liberals were mad

15   because the Tea Party and people hating on Obamacare were

16   raising all this political rhetoric and liberals were mad.  And

17   the editorial says liberals got a point.  They had a point in

18   2011.  But now don't be hypocrites.  The same standards apply

19   to you.  Go look at that.  And you can look at it in the

20   original version, which is PX 1, and you can look at it in any

21   of the corrected versions.  It wasn't a political hit piece.

22        Now, this is the SarahPAC map.  You all can decide

23   whether they look like rifle crosshairs.  You have certainly

24   seen evidence that a lot of people did.  Maybe Governor Palin

25   thought they were rifle crosshairs, maybe she didn't.  It was

**JA 1057**

1    hard to tell.

2              But James Bennet was making the point that I tried to

3    express before.  When he said the link to political incitement

4    was clear, he wasn't saying that Loughner acted because of the

5    map.  He was saying that -- I'm going to do this and

6    Mr. DiMezza is going to kill me because I'm probably going to

7    mess up the screen, but here, there, there, that's Arizona.

8    That's where Gabrielle Giffords' congressional district is.

9    And if you look at this map that is in evidence, I think it is

10   DX 61, but you will have all the exhibits, don't trust me on

11   that one, it has Gabrielle Giffords's name listed below.  And

12   the point that Mr. Bennet was making was that there you have

13   her on the map.  You have her district on the map.  And then

14   eight months later there was a shooting.  And he was saying

15   there was a direct link, a link between a piece of an

16   incitement and then a shooting that followed eight months

17   later.  That was the point.  Did he mess it up?  Clearly.

18   Because he admitted it was a mistake.  But was it an

19   intentional mistake?  No, it wasn't.

20             I talked about this before.  Mr. Bennet failed to see

21   how readers would understand the theory.  This is from 11:09,

22   his exchange with Ross Douthat.  And then 30 minutes later, "No

23   worries, Elizabeth.  I feel lousy about this one.  I just moved

24   too fast."  And doesn't it look like he did?  He is sorry.

25             We talked about this a little bit before, but the

1  correction was fast and broad.  Mr. Bennet wasn't sitting on

2  this issue.  5:08 a.m. he is rallying his people.  Skip the

3  morning meeting if necessary.  I need an answer.  I want to

4  correct it, if necessary, as quickly as possible.

5          Let's just walk through this.  These are the threaded

6  tweets.

7          One, "We published an editorial last night on the

8  shooting at the GOP men's baseball team practice field in

9  Alexandria.  We got an important fact wrong, incorrectly

10 linking political incitement and the 2011 shooting of Giffords.

11 No link was ever established."

12         If Mr. Bennet knew that was false, if he intended to

13 defame Governor Palin, why would he fall on his sword?  It

14 doesn't make any sense.

15         And then the next tweet, "We're sorry about this and

16 we appreciate that our readers called us on the mistake.  We've

17 corrected the editorial."  Why would you send out this apology

18 to readers?  Why would you call it a mistake?  The correction

19 you see in that box, "An earlier version of this editorial

20 incorrectly stated that a link existed between political

21 incitement and the 2011 shooting of Representative Gabby

22 Giffords.  In fact, no such link was established."

23         Two points I want to make about this.  Mr. Turkel

24 spent a lot of time talking about how it doesn't say

25 Governor Palin's name in there.  And remember, you heard why.

1   Linda Cohn told you that, as she was sitting there working on

2   the correction, Mr. Bennet said, let's put Sarah Palin's name

3   in the correction; and Linda Cohn said, I don't think that

4   that's how *Times* policy goes, because we don't want to repeat

5   the error.  And what she meant by that is if Sarah Palin's name

6   was in there in saying an earlier version of this editorial

7   incorrectly stated that a link existed between political

8   incitement, it would have been -- it would have repeated the

9   correction.  It would have said, We stated that SarahPAC

10  directly incited the Loughner shooting.  And what that would

11  have meant was that, going forward, that would have been

12  available on the Internet.  Anyone who Googled it would have

13  seen it.  The text in the editorial, in the corrected one, does

14  not repeat that mistake.  Yes, it does talk about SarahPAC and

15  the crosshairs map, but it removed the factual error.  It's a

16  big difference than repeating the error in the correction.

17          But what's even more important about that, that's

18  highly technical, is that James Bennet wasn't the one who was

19  saying take Sarah Palin's name out of the correction.  He was

20  the one who said put it in.  It was Linda Cohn.  Linda Cohn,

21  who is retired, who is waiting for the pandemic to end so she

22  can enjoy her retirement.  Come on, man.  If Linda Cohn was in

23  on this scheme to hurt Governor Palin or if James Bennet had

24  somehow told her that that was his intent, wouldn't she have

25  told that you?  She had no reason to lie.  She told you that

JA 1060

M2b2Pal4                          Summation - Mr. Axelrod

1   was on her.

2          But this, if you really wanted to get inside James

3   Bennet's head on June 15, you are going to do two things.  You

4   are going to look at the exchange with Hanna Ingber about

5   sending the tweet out through the opinion page and look at his,

6   Bennet's, edits to the Twitter feed.  And then you are also

7   going to go look at his exchange with Danielle Rhoades Ha where

8   he talks about his apology to Sarah Palin and he talks about

9   how he made a mistake.  Again, completely inconsistent with

10  someone who is out to push a false narrative.

11         And here is the second one.  And remember, this was in

12  response to a request from a CNN media reporter.  Mr. Bennet

13  wrote these pieces thinking that Danielle Rhoades Ha was going

14  to send this to CNN and CNN was going to publish these things.

15  "I'm not aware that Sarah Palin has asked for an apology, but,

16  yes, I, James Bennet, do apologize to her for this mistake."

17  He thought that was going to get published by CNN.  If on June

18  14 he had it in his heart and his head to hurt Governor Palin,

19  why on June 15, 12 hours later, would he be writing that I

20  apologize to her?  Does it make any sense?  No.

21         And then also this is what he also thought was going

22  to be in CNN.  "We screwed up."  We screwed up.  Why would

23  somebody write "we screwed up" if they had actually intended to

24  harm someone or if they were so sure of their theory that they

25  wanted to push a false narrative?

**JA 1061**

1          Think about your own personal lives.  Think about your

2     friends.  Would anybody want to go to CNN and have CNN report

3     that they screwed something up?  No.  Mr. Bennet is doing that

4     because he felt bad.  He is doing that because he knew he made

5     a mistake.  He is doing that because his friend Ross Douthat,

6     who he trusted, said, hey, buddy, you got it wrong.  And he

7     said, We take it very seriously.

8          And ask yourselves, was there anything that happened

9     on that witness stand when James Bennet was up there for hours

10    that gave you any doubt that Mr. Bennet is a man who takes his

11    job seriously?

12         Now, we are going to talk about Governor Palin's

13    damages claims a little bit later, but here this is important.

14    This is June 1 of 2017, 14 days before the Virginia shooting

15    ever happened.  Governor Palin didn't know it was going to

16    happen.  She didn't know that there was going to be a shooting

17    of Congressmen.  She didn't know that the media was going to

18    connect it to Arizona.  This is on her website.  She put the

19    map up on her website and she is talking about the allegations

20    from 2011.  Fourteen days before the shooting.  Why did she do

21    this?  It doesn't make any sense.  If these were harmful

22    allegation, why would someone publish them on their own website

23    with no reasonable connection?  Oh, I forgot.  There was the

24    testimony that it was because Kathy Griffin had showed up on

25    her door.  Come on.  It doesn't make any sense.

**JA 1062**
M2b2Pal4                    Summation - Mr. Axelrod

1       But look at that and ask yourself what's going on

2  here?  Why would someone publish allegations that they thought

3  really hurt them?  And there is no reason to doubt that.  But

4  why would they publish them for no reasonable reason two weeks

5  before the Virginia shooting?  It just doesn't make much sense.

6       And then we saw this before, on the 14th, before the

7  editorial ever gets published, Governor Palin is making the

8  same connection, Virginia and Arizona.  Now, we are here

9  because Governor Palin says she was harmed and she said her

10  reputation has been harmed and she says that she suffered

11  emotional damages.

12       Governor Palin told you on the stand that she has a

13  well-established reputation and she wouldn't be surprised to

14  hear people describe her as polarizing.  She was the Governor

15  of Alaska.  She was a Republican nominee.  She is a big deal.

16  There aren't many vice presidential nominees walking around.

17       And after she resigned, she was a Fox News

18  commentator.  She has written books; numerous TV shows; giant

19  social media presence, 4.1 million Facebook followers; and

20  after the 2011 shooting, all of that continued.  Remember, she

21  got a new contract for Fox News in 2013.

22       And after the 2017 shooting and after the editorial

23  was published, she was on *The Masked Singer*; two months after,

24  three months after the editorial was published, we saw she was

25  campaigning in Alabama; she was campaigning in Georgia; she has

JA 1063

1   been making speeches; she is on that *Masked Singer*.

2           So that's just to say, listen, *The Times* made a

3   mistake here, but the idea that Governor Palin has been

4   damaged, there just is no support for it.  I will talk about

5   that a little bit more a little bit later.

6           So Mr. Turkel talked about the jury instructions a

7   little bit.  I'm going to do the same in a little bit of a

8   different manner.

9           There are four elements that Governor Palin has the

10  burden of proving to prevail.  And it is her burden because she

11  is the plaintiff, and the judge is going to instruct you the

12  defendants have absolutely no burden.

13          So the four elements that Governor Palin has to prove

14  are the challenged statements were defamatory; "of and

15  concerning," they concerned her; they were false; and then

16  actual malice.  And then damages is a different piece.

17          All of these elements are important.  Some are big,

18  and I'm going to spend a lot more time talking about them.

19  Some are technical, and I will spend less time talking about

20  them.  But it's Governor Palin's burden to prove each and every

21  one of them.  Besides damages; that's a separate issue.  And we

22  submit to you that she can't prove any of them.

23          So let's first talk about defamatory meaning.  Let's

24  talk about what the editorial did.  And again, I urge you to go

25  back and read the first version of the editorial, and try as

M2b2Pal4                    Summation - Mr. Axelrod

1    you might, when you do that, give it two readings.  One, try to

2    view it as a new babe in the woods, without knowing all the

3    knowledge that you have picked up over the last seven days,

4    without my arguments, without their arguments.  Try to think

5    about reading it as a reader would have read it on June 15 in

6    the paper.  And then read it again, bringing in everything.  I

7    know this is going to be really hard, probably not going to

8    work, but try it.  Because what the editorial did and what

9    Governor Palin's lawyers say it did, there is a pretty big

10   canyon between those two positions.

11          When you look at it, you are going to see that the

12   editorial focused on the Virginia shooting and the country's

13   reaction to it.  That's, like, the first four paragraphs.  And

14   you are going to see that was one large focus of Mr. Bennet's

15   edits.  Mr. Bennet wanted to express to the country that we

16   shouldn't become immune to the idea that mass shootings and

17   political violence are okay, and that we should accept it and

18   that it shouldn't be shocking.  He disagreed with Linda Cohn.

19   He thought it was shocking, and he wanted to express that

20   shock.  That's the first part of the editorial.

21          You are going to see then the editorial's focus on

22   those two theories, the two theories of the case.  The first,

23   the overheated political rhetoric, it's two paragraphs,

24   paragraphs five and six.  And then the portions about guns

25   follow.  It's about four paragraphs after that.  That's the

M2b2Pal4                    Summation - Mr. Axelrod

1   breakdown.  And then it ends with the praise of Mr. Trump's

2   speech.  That's how the structure of the editorial looks.

3          But let's talk about some of the substance.

4          The editorial sets out this sickeningly familiar

5   pattern, and in discussing that pattern, the language

6   Mr. Bennet says is Hodgkinson was surely deranged.  And when he

7   took the stand, he said, yeah, that was part of the pattern.  I

8   assume -- and I'm paraphrasing here -- I assume that anyone who

9   picks up a gun and goes and shoots people that they don't know

10  like that, politicians like that, they must be deranged.  So he

11  is telling the readers that political shooters are deranged.

12         And Mr. Turkel has kind of said that.  Go back and

13  look at those documents that were researched that day.  They

14  are going to say that Jared Loughner was deranged and he had no

15  political affiliation.  There is no either/or here.  One could

16  be deranged and still have a political motive.  One could be

17  deranged and inspired by something they see.  I mean, that's --

18  it's a theory.  But it was James Bennet's theory.  So, you

19  know, just saying it, Mr. Turkel repeated over and over again,

20  he was deranged, it was clear, it's not the end of the

21  question.

22         You are going to see the caution of both sides of the

23  political spectrum, and you are going to see that in that fifth

24  paragraph, the second half of the fifth paragraph, referred to

25  Governor Palin's political action committee.  That's what the

M2b2Pal4                        Summation - Mr. Axelrod

1   editorial did.

2            What it did not do is it did not blame any specific

3   politician for causing the Virginia shooting because it

4   couldn't find it.  But it did bring out all those things on

5   Mr. Hodgkinson's website, the anti-Trump stuff.  It also did

6   not blame any specific politician for causing the Arizona

7   shooting.  And it certainly, it certainly did not call

8   Governor Palin a murderer.  Look at the language.  And go and

9   try and use that babe in the woods view before you knew what

10  you know now and apply your common sense and see if reading

11  that makes sense.  I submit to you that it does not.  It is a

12  stretch to read that editorial in good faith and see that it

13  calls Governor Palin herself a murderer and someone who incites

14  the murder of a 9-year-old girl.

15           That's why, you remember, Mr. Turkel put up that slide

16  that had a lot of words going around it.  It kind of looked

17  like a circle.  It's why he pulled all those words from other

18  places, because it didn't say that Governor Palin was a

19  murderer.

20           Look at the editorial as a whole.  Don't just use a

21  microscope.

22           So I have taken excerpts of Judge Rakoff's jury

23  charge.  You should, of course, read his charge.  His charge is

24  the word.  I'm -- as you have seen in this trial, I'm certainly

25  not going to try to tell you something contrary to the judge.

M2b2Pal4                        Summation - Mr. Axelrod

1          I have highlighted portions that I think are important

2     and that I ask you to consider, but take his charge as a whole

3     when considering the evidence.

4          So his charge says, "A statement is defamatory if it

5     tends to expose a plaintiff to public hatred, contempt,

6     ridicule, or disgrace." We are four and a half -- I'm so bad

7     at math. We are four and a half years from publication of the

8     editorial, four and a half years to prepare for trial. If

9     there were witnesses who could testify that they thought less

10    of Governor Palin because of the editorial, they thought it

11    defamed her, they didn't want to work with her, they didn't

12    want to be around her, they wanted to move away from her, they

13    kicked her out of the country club, kicked her out of a book

14    club, if there were any of those witnesses, don't you think

15    they would have testified to you? There were no witnesses who

16    could say that. Plaintiffs didn't put up anyone.

17    Governor Palin herself said I couldn't identify anybody who

18    shied away from me because the facts don't support it. The

19    facts don't support that this was defamatory.

20         The facts show that after this happened Governor Palin

21    was back out on the campaign trail three months later. The

22    facts show that in 2020 she is on *The Masked Singer*. *The*

23    *Masked Singer*. Do they put on inciters of violence? Do they

24    put on *The Masked Singer* people who are accused of inciting the

25    violence against a 9-year-old girl? Come on.

M2b2Pal4                    Summation - Mr. Axelrod

1          You have heard bits and pieces throughout this trial,

2     but you didn't hear from anyone directly, except Ross Douthat,

3     who criticized the editorial.  What was the criticism that you

4     heard, the only evidence that came into this trial?  What was

5     the criticism?  The criticism was of *The New York Times* for

6     messing something up.  You saw no evidence that anyone

7     criticized Governor Palin because of what was written in the

8     editorial.  None.  Zip.  Zilch.  All of the criticism was

9     directed at *The New York Times*.  It shows that plaintiffs

10    cannot show this was defamatory.  Because nobody believed it.

11    Criticism was all directed at *The Times*.

12         You are also going to see that in Judge Rakoff's

13    instruction "a statement that is merely unpleasant, offensive,

14    or embarrassing or that hurts plaintiff's feelings is not

15    necessarily defamatory."  That's what the instruction tells

16    you.

17         This is a point that I will just repeat.  Yeah,

18    Governor Palin testified that she was mortified.  That doesn't

19    mean it's defamatory.  Governor Palin testified that she had

20    trouble, I think, putting her head on a pillow or sleeping.

21    Doesn't mean it's defamatory.  You have got to show that it

22    exposed -- tended to expose the plaintiff to public hatred,

23    contempt, ridicule, or disgrace.  You heard Governor Palin

24    testify that back in 2011 she had some hate mail.  Did you hear

25    about any hate mail in connection with this editorial?  It

M2b2Pal4                    Summation - Mr. Axelrod

1    didn't.  It didn't happen.  Nothing in the evidence -- nothing

2    in the record supports it.  There is no evidence of any lost

3    opportunities or people refusing to associate with

4    Governor Palin.

5           Remember the first thing the judge instructed you,

6    "Ms. Palin has not sought to recover any financial loss, and

7    that's a matter of the binding representations in her lawsuit."

8    If she had lost some big jobs, don't you think she would have

9    come in here and told you about that?  Don't you think she

10   would have pointed the finger at *The Times* saying, I can't get

11   a book contract, I can't get a Fox News contract?  She doesn't

12   do that because it didn't happen.

13          I asked her:  "Governor Palin, after the editorial was

14   published, did anyone you spoke with personally tell you that

15   they believed that you incited Jared Loughner's shooting of

16   Congresswoman Giffords?"

17          "No one close to me who knew me well, no.  I don't

18   think so."

19          Because they didn't believe it.

20          "And you can't identified anyone who shied away from

21   you, can you?"

22          "I can't specifically give you a name."

23          But come on.  Think about this people in your lives.

24   If there was someone who didn't want to be around you because

25   of something you did, you would know about it, right?

1    "Of and concerning," and I will be quick about this

2    one.  This is very simple.  Governor Palin must prove that the

3    ordinary reader of the editorial would reasonably have

4    understood the challenged statements to refer to her

5    personally, and they just don't.  Look at the text.  "Sarah

6    Palin's political action committee."  Sarah Palin is purely

7    descriptive.  If it just said SarahPAC, every reader would say:

8    What the heck is SarahPAC?

9        I guess they could have done a hyperlink, done

10   SarahPAC in the hyperlink to SarahPAC to this map, but that

11   would have been the same thing.

12       It was purely descriptive.  It was describing what the

13   PAC was.  It didn't say Sarah Palin circulated the map.  It

14   didn't say Sarah Palin put it on her Facebook page.

15       And Elizabeth Williamson, she told you there is a big

16   difference between a political action committee and a person.

17   Governor Palin told you herself.  When she is raising money,

18   she is not raising money for herself.  She is raising money for

19   the PAC.  When the PAC is spending money, it's the PAC spending

20   money.  It's not Sarah Palin.

21       There is a reason why it says SarahPAC and not Sarah

22   Palin.  Again, I talked about a technical issue.  This is a bit

23   of a technical issue.  But it's an important one.  And it is

24   Governor Palin's burden to establish that, and she hasn't done

25   it.  You didn't hear any witnesses who came in and testified,

M2b2Pal4                    Summation - Mr. Axelrod

1    yeah, I thought that was Sarah Palin.  Didn't happen.

2            Falsity.  Governor Palin claims that the editorial

3    asserted that the crosshairs map clearly and directly --

4    clearly and directly incited Loughner to act.  And you saw that

5    Mr. Bennet and the *Times* issued a correction saying that there

6    was no link established because he wanted to clear the record.

7    I get it.  *The Times* said no link was established, so it's got

8    to be false, right?  That's a good argument.  But it's

9    Governor Palin's burden to establish it's false.  It's

10   Governor Palin's burden to come in and show you facts

11   supporting that position, and they have to do so by something

12   clear and convincing evidence.

13           Mr. Turkel didn't mention it to you, but I'm going to

14   mention it here.  There are two burdens of proof: beyond a

15   preponderance of the evidence, which is like you proved it by a

16   little amount, 50.1 percent; but clear and convincing evidence

17   has to be highly probable, highly probable, which is a lot more

18   than 50.1 percent.

19           Governor Palin's team had the obligation to prove

20   falsity by clear and convincing evidence.  She had to prove to

21   you all that Loughner did not act because of the crosshairs

22   map.  And there is lots of stuff they could have done.  They

23   could have brought in evidence from the investigation.  They

24   could have brought in agents to testify about what was done.

25   They could have shown you court records.  They could have gone

M2b2Pal4                          Summation - Mr. Axelrod

1   and tried to track down that police report that Eileen Lepping

2   says she believed she saw.  They could have done all that.

3   They could have called the Tucson police.

4           But they didn't do anything.  They did bupkis.  They

5   said just look at *The Times*.  They said they got it wrong.

6   Good enough.  Maybe you will think it is, but I just ask you to

7   look at the record because saying *The Times* said we got it

8   wrong, when you heard Mr. Bennet say we were doing that to

9   clear the record, to make sure the record was clear, it's their

10  burden.  They have got a job to do, and just ask yourself when

11  you have get back in that room, did they do it?

12          And your Honor, this would be a good place to break

13  for lunch.

14          THE COURT:  All right.  Very good.  We will take our

15  lunch break at this time and resume at 1:55.

16          (Jury not present)

17          THE COURT:  Please be seated.

18          Not that anyone is counting, but you have 38 minutes

19  left after we resume.

20          MR. AXELROD:  Do I get any additional time for -- I

21  will take my 38 minutes.

22          THE COURT:  And of course you have 15 minutes.

23          All right.  Anything anyone needs to raise with the

24  Court?  Very good.  We will see you at 1:55.

25          (Luncheon recess)

1       AFTERNOON SESSION

2       2:00 p.m.

3       (In open court; jury present)

4       THE COURT:  Please be seated.

5       Counsel.

6       MR. AXELROD:  Thank you, your Honor.

7       I'm going to take a brief break from going back to the

8       elements and talk about two things very quickly.

9       First, during Mr. Turkel's presentation, he was

10      attacking the theory that political rhetoric doesn't incite

11      people, and saying it's been debunked, blah, blah, blah, and it

12      shouldn't have been used after the Hodgkinson shooting.

13      Remember Defense Exhibit 77.  It is from Governor Palin's

14      website.  It's talking about Rodney Davis, who's the

15      representative, who said, "Today's shooting was because of

16      violent political rhetorical terrorism."  Okay?  Just take a

17      look at that.

18      Second, Mr. Turkel talked again about the definition

19      of "incitement."  Let's talk about what "incitement" means,

20      according to the definition.  It does not say incite to

21      violence.  That is not there.  Some of the words were to

22      arouse, spur on.  Mr. Bennet's definition was entirely

23      consistent with that definition.  But you don't just need to

24      only rely on the dictionary.  Look at the Tom Friedman column.

25      I think it's Defense Exhibit 96.  He uses "incitement" in the

M2B1PAL5                    Summation - Mr. Axelrod

1    exact same way that Mr. Bennet does.

2              I'm sorry.  I had it right here.  It's this one, and

3    you'll have it in your packet when you go back.

4              But don't just trust Mr. Bennet and don't just trust

5    Mr. Friedman.  Trust Governor Palin.  So you'll also have this

6    back there.  This is DX 222, which she put out after the 2011

7    shooting.  And I'll just read this really quickly.  It's

8    paragraph 3 on the second page:  "If you don't like their

9    ideas, you're free to propose better ideas.  But especially

10   within hours of the tragedy unfolding, journalists and pundits

11   should not manufacture a blood libel that serves only to incite

12   the very hatred and violence they purport to condemn."

13   Governor Palin was condemning journalists for inciting

14   violence.  But of course she wasn't saying that journalists

15   were saying:  Go attack Governor Palin.  What she was saying

16   was that when you blame someone, when you demonize someone,

17   when you say someone's at fault, it could lead to violence

18   against them.  Same point.  So when Mr. Turkel says, well, the

19   incitement that Mr. Bennet was using was completely irrational,

20   it's not.  And you have exhibits in the record that you can go

21   refer to that support it.

22             By the way, as Mr. Bennet said when he was taking the

23   stand, "incite" is just not used with incite to violence.  One

24   of the examples was, you could be incited to passion.  It's a

25   much broader term.  And so don't lose track of that.

M2B1PAL5                    Summation - Mr. Axelrod

1           All right.  Now we can go back to the elements.

2           All the elements -- all of the elements are important.

3    And Governor Palin can't carry her burden on any of them.  But

4    when it comes to actual malice, which is highlighted here,

5    Governor Palin hasn't even come close to satisfying her burden.

6    She has no evidence to point to.  There are two important

7    components:

8           First, that James Bennet knew his words were false, or

9    published them notwithstanding that he subjectively doubted

10   they were true.  That's a lot to take in.  You can boil it down

11   to it's a calculated falsehood.  He knew they were false or --

12   it says he stuck his head in the sand because he had a good

13   reason to doubt they were false and did it anyway.

14          And the second is Bennet's intent to defame or his

15   awareness that readers would read it with a defamatory meaning.

16   It all boils down to one really easy point.  They've got to

17   prove that Governor Palin -- Governor Palin's got to prove by

18   clear and convincing evidence knowledge and -- I lost it.

19   Knowledge and intent.

20          We lost it all, your Honor.

21          (Pause)

22          THE COURT:  All right.  We'll take a short pause here.

23          MR. AXELROD:  Thank you, sir.

24          (Pause)

25          THE COURT:  So while we're waiting, ladies and

M2B1PAL5                          Summation - Mr. Axelrod

1   gentlemen, here's something that you can consider.  After

2   summations are over, which will be, once we get going again, in

3   about 45 minutes, I will then give you my instructions of law,

4   and that will take about a half hour.  So the case will be

5   yours to start deliberating probably around, oh, 3:15.  You

6   have the option then, you can either leave at 3:30, as you

7   would normally, and come back Monday at 9:30, or, if you

8   prefer, you can stay later, and we can arrange to have you stay

9   even as late as 6:00, but it can also be something less than

10  that, if you want to start your deliberations in more detail

11  today than the 15 minutes or so that you'll have.  So think

12  about that.  And don't tell me now, but I'll ask you to tell me

13  when you first start your deliberations about 3:15 or so.

14          And here is our savior.

15          Maybe not.

16          (Discussion off the record)

17          THE COURT:  All right.  And I won't even subtract that

18  time from your --

19          MR. AXELROD:  Thank you.

20          THE COURT:  All right.  Go ahead, counsel.

21          MR. AXELROD:  Thank you, your Honor.  Thank you for

22  the time.

23          So this is actual malice.  And Governor Palin can't

24  prevail without proving both of these elements by clear and

25  convincing evidence that Mr. Bennet knew the challenged

M2B1PAL5                    Summation - Mr. Axelrod

1  statements were false or recklessly disregarded the high

2  probability they were false, and that he intended to defame or

3  his awareness that ordinary readers would understand his words.

4  What this means is it can't be a mistake.  You can't rule for

5  Governor Palin if you find that this was a mistake, or that it

6  might have been a mistake, or that it was probably a mistake,

7  or even if it was maybe a mistake.  It means that Governor

8  Palin has to prove by clear and convincing evidence that

9  Mr. Bennet had knowledge and he had the intent or was

10  completely reckless in defaming Governor Palin.  And what that

11  means is willful blindness, that he blinded himself to what he

12  knew was false.

13          Let's talk about clear and convincing evidence really

14  quickly.

15          So the first line talks about the burden.  Defendants

16  have no burden.  It's all on plaintiff.  It's her case.  To

17  establish an element by clear and convincing evidence means to

18  prove that the element is highly probable.  That's what I'm

19  talking about.  And when you look at Judge Rakoff's

20  instructions, you're going to see the distinction between

21  preponderance of the evidence and clear and convincing

22  evidence.  It's a higher standard.  And we'll talk about why

23  that is in a second.

24          What this means, though, is that if you, when you're

25  evaluating actual malice and you say, oh, I guess maybe

M2B1PAL5                    Summation - Mr. Axelrod

1    Governor Palin's team has proved it, it's not good enough.  If

2    you think, oh, I think by just -- like, they tip the scales

3    just enough, it's not good enough.  To find defendants liable,

4    to find for Governor Palin on actual malice, means by clear and

5    convincing evidence, it has to be highly probable.

6            So let's talk about the rationale for actual malice.

7            The First Amendment enshrines the freedom of the

8    press.  And for public figures like Governor Palin, it's not

9    enough for plaintiffs to prove that a newspaper like *The Times*

10   made a mistake; it's not enough for them to prove negligence;

11   it's not enough to prove that they really screwed up; it's not

12   enough for them to prove that they should have done better.

13   That's not good enough.  And the reason why is some of the

14   facts we've seen in this case.  Public figures require less

15   protection.

16           First of all, public figures like Governor Palin, they

17   know what they're getting into.  When you decide to put

18   yourself out there, as Governor Palin did -- and she talked

19   about this a lot -- she understands there's slings and arrows

20   in politics and you got to "suck it up, buttercup."  That's the

21   expectation.  That's the law's expectation.

22           But also, people like Governor Palin have more ability

23   to fight back.  Now Mr. Turkel says that this is just Governor

24   Palin up in Wasilla with a pencil.  She's got 4.1 million

25   Facebook followers.  She's friends with Nancy French, whose

M2B1PAL5                    Summation - Mr. Axelrod

1   husband is David French, who, if you go back and look at that

2   tweet, one of the tweets we saw, it's retweeting David French.

3   Is that a coincidence?  I don't know.  But the idea is that

4   people like Governor Palin, the vice-presidential nominee of

5   this country -- there ain't many of them -- they have the power

6   to fight back.

7           But there's also a second prong, and that's speech

8   requires more protection.  For newspapers like *The New York*

9   *Times*, liability for honest mistakes would lead to an onslaught

10  of liability.  As you saw in the stipulation, *The Times*

11  publishes between 175 and 250 pieces of content a day.  That's

12  a lot of content.  But it's also a lot of opportunity for

13  mistake, for an honest mistake.  And you can do

14  exponentially -- if you do 175 times 7 -- I'm not going to do

15  that now because you'll laugh at me, but -- you'll see that the

16  numbers go up and up, and that's a lot of risk.  So to allow

17  that onslaught of litigation for honest mistakes would have a

18  chilling effect on newspapers like *The Times*.  They might be

19  forced to significantly reduce the content.

20          MR. TURKEL:  Judge --

21          MR. AXELROD:  They might be forced to not wade into

22  thorny issues of public concern.  They might be forced to not

23  take on the powerful in this country.  That's why this needs

24  protection.

25          So this case is more than just about Sarah Palin.  And

M2B1PAL5                         Summation - Mr. Axelrod

1   Mr. Turkel was talking about holding *The Times* to account.  But

2   it's also about *The Times* and why we need media, and the values

3   of the First Amendment.

4        All right.  So let's talk about knowledge about

5   falsity.  This is the first part of actual malice.  To assess

6   this, it's a subjective test.  So you're not looking to

7   understand what was out in the world to understand whether

8   James Bennet had knowledge of falsity.  You're looking at what

9   was in his head on the day of publication.  So you got to put

10  yourself in James Bennet's shoes at the time of publication.

11  It's not an assessment of what he could have done better.  He

12  didn't have to go investigate.  He didn't have to read

13  different things.  It's not an assessment of what was

14  reasonable for him to do; it's an assessment of what was in his

15  head.

16        And so obviously, the first place to start is James

17  Bennet's email to Eileen Lepping and Elizabeth Williamson,

18  where he says, "I don't know what the truth is here."  It's a

19  great starting point.  Well, what if the reality was that

20  really this was an actual intentional defamation, right?

21  Wouldn't Eileen Lepping or Elizabeth Williamson respond to

22  James:  What are you talking about?  We told you.  We told you

23  the truth yesterday?  They didn't respond that.  Elizabeth

24  responds later –- I can't remember the exact language, but:

25  I'll call you soon, we'll work on a correction soonest.  You'll

M2B1PAL5                          Summation - Mr. Axelrod

1    see the exhibits.  This is after the Douthat exchange, and I

2    won't show you that again because I'll probably show you again

3    in a little bit.  But what this was was James Bennet had an

4    honest attempt to get to the bottom of this, and it shows that

5    he didn't know what was going on the day before, and why he

6    didn't know the answer to this question, whether Loughner had

7    seen the crosshairs map, because he told you, it wasn't what he

8    was focused on.  This wasn't about causation.  It was about the

9    environment that can be created.  So it wasn't important to

10   him.  And that's not to say the truth wasn't important to him,

11   but that wasn't the focus of the editorial.

12          Reckless disregard.  Mr. Turkel showed you part of

13   this.  Parse this through.  Look at this.  It's not enough just

14   to prove he was merely negligent.  A failure to sufficiently

15   investigate, to research a point does not establish actual

16   malice.

17          And you saw Mr. Turkel.  He's throwing a bunch of

18   stuff at you and saying, this all adds up, this all adds up.

19   He's trying to do that because there is no evidence that the

20   truth was actually in Mr. Bennet's head that day.  They can't

21   prove that, so he's trying to just grab things from other

22   places and trying to make it add up, but it doesn't add up

23   because you know the evidence.

24          There is no evidence of reckless disregard.  There is

25   no evidence that James Bennet put his head in the sand.

**JA 1082**

1  There's no evidence that Elizabeth Williamson put her head in

2  the sand.  James said research Virginia, research whether

3  there's left -- incitement on the left.  Numerous *Times*

4  staffers were involved in this.  You go back to the eight,

5  eight or nine people who looked at this.  Nobody said to

6  Mr. Bennet, this is wrong, man, we gotta change this.  And

7  there's no conspiracy.  James Bennet and Linda Cohn sent that

8  draft to Elizabeth Williamson to review, and she didn't respond

9  back saying this is wrong.

10          Lepping continued to fact-check until publication.

11  Did she miss that piece?  Yeah.  She admitted she did.  But

12  again, that doesn't put the knowledge inside James's head.

13  There's simply no evidence that Mr. Bennet blinded himself to

14  the truth.  And Mr. Turkel told you to go back and look at the

15  research that was done.  I agree.  Go look at it.

16          This is testimony from Mr. Bennet:

17          "When you said 'incitement as direct as in the

18  Giffords attack,' were you intending to convey to readers that

19  Mr. Loughner had acted because of the crosshairs map?"

20          "No, I was not intending that."

21          "Were you aware of the possibility at that point that

22  readers could interpret those words as a suggestion that

23  Loughner had acted because of the crosshairs map?"

24          "No."

25          "What did you think about this message of speaking

M2B1PAL5                    Summation - Mr. Axelrod

1  about the two congressional shootings and the danger of

2  political rhetoric?"

3          "I thought it made sense, you know, in my view.  As I

4  said earlier, when politicians get shot, I suspect it has

5  something to do with politics, and I think that an atmosphere

6  of highly charged political rhetoric makes such, you know,

7  terrifying events more likely."

8          Then here's really the important one, at the bottom.

9  We asked Mr. Bennet whether he'd done the research, and he said

10 no.  And this is at the bottom:

11         "I didn't think then, and I don't think now, that the

12 map caused Jared Loughner to act.  I didn't think we were

13 saying that, and therefore I wouldn't have -- the question

14 wouldn't have entered my mind, didn't enter my mind to research

15 that question."

16         He wasn't sticking his head in the sand because he

17 knew the answer wouldn't support his draft.  He was sticking --

18 he wasn't sticking his head in the sand.  He was trying to make

19 a completely different point.

20         But the knowledge of falsity is this.  Why correct so

21 fast, if he knew the truth and was publishing something false

22 intentionally?  Why the sleepless night?  Why apologize to

23 readers?  Why tell readers 'we made a mistake'?  Why tweet out

24 the correction?  Why take personal responsibility?  Why think

25 CNN is going to publish your apology to Governor Sarah Palin

1      personally?  If James Bennet knew it was false, none of this

2      makes sense.  It just doesn't.

3              The second element is the intent to defame.  And

4      again, you know, this is a very similar point, but you heard

5      Mr. Bennet's testimony, you saw his email here to Ross Douthat.

6      He did not intend to imply causation.  And if you think -- if

7      Mr. Turkel comes up and argues that at 11:09, 30 minutes after

8      Mr. Douthat had informed James that there might be a problem,

9      that Mr. Bennet wrote this email in preparation for one day

10     sitting in that seat and appearing before a jury like you, ask

11     yourself, does that make any sense?  No, it doesn't.  You know

12     that this email is the in-the-moment response, where James

13     said, "that's not to say any of it is okay. . . whether the

14     violence in either case was caused by the political rhetoric."

15     What Mr. Bennet was referring to is replete in this record:

16     The Tom Friedman article, DX 96, Donald Trump's language

17     against immigrants could incite just this kind of violence;

18     DX 29, which is "Bloodshed and Invective," "the squall of fear,

19     anger, and intolerance."  *The Times* editorial board and those

20     nine sets of eyes just didn't realize how some would read this.

21     And if they had intended that meaning, why wouldn't they have

22     stuck with it?

23              So let's talk about the ABC News article, the real

24     smoking gun Mr. Turkel was talking to you about.  If James

25     Bennet had intended to defame Governor Palin and to suggest to

1    readers that she had incited a mass murder in the killing of a

2    9-year-old girl—serious charges—why would he have allowed a

3    link to be published in that editorial that says there's no

4    connection to support that charge?  It doesn't make any sense.

5    It's completely inconsistent with delivering the message that

6    the crosshairs map caused that shooting.  It just doesn't make

7    any sense.  If James Bennet and the rest of the people on the

8    editorial board had intended to make this false charge, why

9    would they include a link to this editorial -- this article?

10   It's crazy.

11        The whole idea that James Bennet, who testified before

12   you that he takes every mistake seriously -- and you could see,

13   you could see the upset on his face -- the idea that he's the

14   villain in this case makes no sense.  Did he make a mistake?

15   Yeah.  Does he regret it?  Yeah.  Was it unfortunate?  Yes.

16   Was it a serious mistake?  Yes.  But it was a mistake.  And yet

17   that he's a villain and he's acted in bad faith makes no sense.

18   There was no motive to harm Governor Palin.  He did not bring

19   her up.  Elizabeth Williamson did.  Bennet edited the draft by

20   chance.  Linda Cohn told you that.  If Linda Cohn had just

21   decided to edit the piece herself or send it back to Elizabeth,

22   he never would have touched it.  There was no directive that

23   said:  Bring me the draft; I need to insert falsehoods into it.

24   It didn't happen.  Again, Bennet's draft was viewed by

25   everyone.  If you're going to publish something false, you

1   would have taken it to the leadership and said, we've got to

2   get this thing out now.  He's not letting nine people look at

3   it -- nine people who have access to email accounts, nine

4   people who have access to text messages, nine people who could

5   have produced evidence in this case showing what Mr. Bennet

6   intended to do and that it was wrong.  You never saw any of

7   that evidence because it doesn't exist.  Mr. Bennet's draft was

8   viewed by everyone because what he thought he was doing was

9   accurate.  And there is that sleepless nights and personal

10  responsibility.  Is that consistent with being a villain?  I

11  don't think so.

12          And then we saw two days later -- this is an exhibit

13  you're going to see -- Ross Douthat publishes a column

14  criticizing his boss.  Does that happen if James Bennet is the

15  villain in this case, trying to defame Governor Palin?  I

16  assert it does not.

17          James Bennet's credibility is incredibly important.

18  And we saw, we all saw how you looked at him when he was on the

19  stand.  The evidence in this case gives you every reason to

20  trust his story and trust what he says to you.  But you don't

21  need to just rely on that evidence alone.  On one point I agree

22  with Mr. Turkel.  He suggested that you trust Ross Douthat, and

23  I agree.  What did Ross Douthat, the conservative columnist,

24  say?

25          "First, why did you reach out to Bennet?"

1          "To just sort of bring this to James's attention.  It

2     was something that was being discussed a lot online.  If he was

3     sort of unaware of some of the facts behind the Giffords case,

4     I was sharing those with him, or sharing that, you know, my

5     best recollection of them, and if there was a correction that

6     needed to be made, you know, the sooner the better."

7          Ross Douthat reached out to James because he thought

8     he might not know the facts.

9          But this is even more important.  My colleague

10    Mr. Sullivan was -- Mr. Douthat was on the stand, and he asked

11    him:

12         "Did you have any reason to doubt Mr. Bennet's good

13    faith in giving you that explanation in his email?"  And that's

14    the email above.

15         "No, I did not."

16         "Why was that?"

17         "Because I had worked with James in two separate jobs,

18    and I had and have a lot of respect for his integrity."

19         Trust Ross Douthat.

20         *The Times* as the villain in this case also makes no

21    sense.  There's nothing in the record to suggest that there was

22    a motive to harm Sarah Palin.  No directive by the publisher.

23    You have that evaluation of James Bennet, six months after

24    this.  There was nothing in there that said:  Great job on the

25    Palin piece, way to really get her.  It's not there.  There was

1   no directive that you saw, no email.

2              And then if *The Times* itself was out to get Governor

3   Palin, why would the news side have published this piece which

4   was published at 9:15?  You can look at DX 500 for that

5   information.  That contradicted the information in the

6   editorial.  It says no connection to the crime was established.

7   This was the language that Mr. Bennet said he looked at on

8   June 15th and he brought the editorial in line with.  If there

9   was a grand conspiracy by James Bennet and *The Times* to defame

10  Sarah Palin by writing a false editorial, why, that very same

11  night, would they publish a news story with contradictory

12  information?  It doesn't make sense.  The simple answer is,

13  there was no conspiracy.  The simple answer is, we're all here

14  because *The Times* made an honest mistake.

15             So let's talk about damages.  Governor Palin says her

16  reputation has been harmed and she suffered emotional harm.

17  There's really no evidence in this case of those harms.  And

18  there's a good reason for that.  The editorial had a

19  regrettable mistake, but it did not include those types of

20  toxic accusations that would really impact someone.  And then

21  when you add that together with the idea that it was corrected

22  so fast, it just doesn't support the idea that this is one of

23  the cases where someone's really going to suffer.  The

24  correction went out so fast.  And also, remember, the Twitter

25  media entities -- Chris Hayes, Jonathan Chait, Ross Douthat --

1   all those folks who had covered the Giffords shooting back in

2   2011, they weren't criticizing Governor Palin; they were

3   criticizing *The Times*.

4           So let's talk about reputational harm.  There's no

5   proof of any economic damages.  We talked about that.  There's

6   no proof of any missed opportunities.  No witnesses who

7   testified that they would not work with Governor Palin.

8   Governor Palin spent no money trying to "fix" her reputation.

9   Only vague assertions from her that her reputation was harmed.

10  Again, it's been four and a half years, and in all that time

11  they couldn't find one witness to come and testify about these

12  things?  Now had she really suffered reputational harm, don't

13  you think we would have seen that witness?  Why didn't they

14  find that person?  Because no person exists.

15          After the 2011 allegations:  Book deals, Fox News

16  contract, her own TV network, paid speeches.  After the 2017

17  editorial:  Appearance on *The Masked Singer*, pitching financial

18  products, political aspirations, campaigning.

19          Similarly, there's just a lack of evidence of

20  emotional harm.  No medical records, no medical consultations,

21  no spiritual consultations, no recollection of conversations

22  with friends/family, only vague assertions that she was

23  mortified and restless.  And she told you herself, she dealt

24  with it.  She went running.  Running is a great therapy.  But

25  it's not the type of evidence that if you're going to come in

1   here and say that you were harmed, really seriously emotionally

2   harmed, it's not the type of evidence you'd expect to see.

3          So at the end of the day, the elements of a claim of

4   defamation can't be proven by Governor Palin and they can't be

5   proven for damages either.

6          So I'm guessing you're all pretty happy that I'm

7   almost done.  I'm on my last slide, and I'm about to wrap up.

8   And I really appreciate your patience.  I'm asking for a couple

9   minutes more.

10         You heard Judge Rakoff say that Mr. Turkel gets what's

11  called the rebuttal.  He gets to go last.  And there's a reason

12  why everyone wants to get the last word, why we have that in

13  our lexicon, because getting the last word means you get to

14  leave the last impression, and that's especially important in a

15  situation like this.  I wish I got the last word, but I don't.

16         Listen, it's clear you're all paying attention, and I

17  appreciate that.  Throughout this trial, where, you know, we

18  did this dance where one of us would come up here and one of us

19  would go back there, Mr. Vogt said this, Mr. Axelrod said this,

20  Mr. Turkel said this, I'm sure you're sick of that.  I'm sure

21  you're going to hear "Mr. Axelrod" in your brains when you're

22  trying to go to sleep, and I apologize for that.  But I'm going

23  to ask you one more time to do it.  One more time, one more

24  "Mr. Axelrod."  When Mr. Turkel gets up here and he's rebutting

25  the evidence that I've showed you, and he's making arguments,

M2B1PAL5                    Summation - Mr. Axelrod

1    maybe some are good, maybe some are bad, but I have one simple

2    request.  Ask yourself:  What would Dave Axelrod say?  That's

3    my request.  You know this evidence.  You're going to get this

4    evidence when you go back in the room.  I don't get a chance to

5    come back and say, that was wrong.  So I'm going to rely on you

6    to do that.  So if he makes an argument that doesn't seem quite

7    right, look at the record.  If emails seem out of place and the

8    timing doesn't seem right, look at the timing.  If Mr. Turkel

9    keeps pushing this same tired conspiracy theory, think in your

10   head, does that make sense?  That's what I'm asking you.  I

11   appreciate it.  We all really appreciate it.  We appreciate the

12   time and attention you've paid.

13           Governor Palin has brought this case for money.  I

14   know Mr. Turkel is saying they don't care about money, but

15   that's why people generally bring lawsuits.  But it's also

16   about something important as well.  At stake here is the right

17   of free expression and the freedom of the press.  And you've

18   heard a lot of freedom of the press talk from Governor Palin,

19   you heard it from Mr. Turkel earlier, and to really appreciate

20   what it means, you need to think about the First Amendment.

21           Mr. Turkel talked about that exchange of ideas, and

22   that's been important in this country since 1776 and even

23   earlier.  The free exchange of thoughts and arguments with the

24   idea that the good is going to win out over bad, and that in

25   this country we trust our people.  We don't silence people but

1    we trust our people to argue and hopefully they sort it out.

2    And that's why those rights are enshrined in the First

3    Amendment.

4          So what does that all mean for this case here?  Well,

5    it means a lot.  The press is an important institution.  And as

6    you heard Mr. Turkel say, *The New York Times* is an important

7    part of that press.  *The New York Times* is a big paper.  *The*

8    *New York Times* has reporters all over the world.  *The New York*

9    *Times* has reporters all over this country.  Those reporters

10   report on critically important stories about our government,

11   that keep us informed.  And it also has an editorial board that

12   publishes the vision of values, expresses the values that are

13   important to the paper.

14         And on June 14th, after that shooting in Virginia, the

15   editorial board rightly determined that it had an important

16   message to send.  It needed to speak about those two important

17   topics that you've heard so much about.  And at the end of the

18   day*, The Times* worked quickly to publish a piece that it

19   believed spoke to those important ideas.  And you can quibble

20   about gun control policy and you can quibble -- or you can have

21   a good-faith argument like Mr. Douthat talked about, whether

22   political rhetoric leads to violence.  But you can't quibble

23   about the idea that those are important ideas, and they're

24   important ideas for *The New York Times* to express.

25         After publishing*, The Times* and Mr. Bennet realized

1  that a small portion of that piece was being understood,

2  misunderstood, in a way that was never intended.  It was an

3  honest mistake.  You probably heard me say it 35 times.  You

4  get it, I know.  But *The Times* took the immediate and

5  responsible action.  They issued a correction, posted a new

6  version of the story that day, a version of the story that

7  contains no inaccuracy.  The law does not create liability for

8  honest mistakes like this.  The law is based in the idea that

9  having a robust press means that sometimes mistakes get made.

10      At bottom, this case is about whether a newspaper can

11  publish stories and express opinions that are critically

12  important without fear that a powerful person will seize on an

13  honest mistake that was corrected almost immediately and tie up

14  the paper in litigation and potential liability.  Freedom of

15  the press and freedom of speech are fragile things.  Mr. Bennet

16  and *The Times* published an editorial that had important

17  messages, and they made a mistake.

18      But as you've heard, and as you'll see in Judge

19  Rakoff's instruction, the First Amendment is so important that

20  honest mistakes do not create liability.  And we're not trying

21  to hide behind the First Amendment.  But the reality is -- and

22  you heard this from witnesses -- mistakes get made in

23  journalism, and we take them all very seriously.  Mistakes get

24  made everywhere.  It's unfortunately part of life.  But in this

25  area, because of the value of the First Amendment, you cannot

M2B1PAL5                    Summation - Mr. Axelrod

1   hold *The Times* liable for a mistake.

2           And now quickly, that was the big picture, but there's

3   also something very personal here.  You saw that James Bennet

4   is a hard-working, serious journalist who unfortunately made a

5   mistake.  A mistake not brought of malice but, in his words, "I

6   just moved too fast."  More than just delivering for Governor

7   Palin a verdict or not a verdict, this also has an impact on

8   James Bennet, as it does on Elizabeth Williamson, as it does on

9   Lynn do Cohn.  The evidence does not support branding

10  Mr. Bennet with the scarlet "D" for defamation for the rest of

11  his life.  The evidence does not support that.  It does not

12  support tying Elizabeth Williamson and Linda Cohn to it either.

13          And that's it.  The simplest explanation.  I started

14  out by saying, when I got in front of you -- I feel it was like

15  a month ago but I think it was only a week -- that we're here

16  because *The Times* made an honest mistake, that it corrected

17  almost immediately.  In life, the simplest explanation is

18  usually the right one, and that is no different in this case.

19  James Bennet and *The Times* made an honest mistake that they

20  corrected in less than 14 hours.  Governor Palin has utterly

21  failed to demonstrate that it was anything more than that.

22          So when you go back into that room and you look at all

23  the evidence, and you use your common sense and your life

24  experience, as I know you will, I ask you to return the only

25  verdict that is supported by the law and the evidence, and that

1   is a verdict in favor of Mr. Bennet and *The New York Times*.

2          Thank you again for your patience and for your

3   consideration.

4          THE COURT:  Thank you very much.

5          And we'll hear from Mr. Turkel on rebuttal.

6          MR. TURKEL:  May it please the Court, your Honor.

7          I feel like I've spent the better part of the week

8   putting on my mask in here and then taking off my glasses.

9          Well, I'll start with this, and I've got 15 minutes,

10  so I'm not going to be able to pull up every document that

11  addresses and rebuts or defeats the things you were just told,

12  but when you're back there and you're asking yourself what

13  Mr. Axelrod would say, you can just make it up.  I never used

14  the word "conspiracy" once in my closing, not once.  I never

15  contended -- we're not contending there's some sort of

16  conspiracy.  I have zero idea where the word came from.

17  Certainly not going to see it in the jury instructions.

18         And to that point, when my colleague on the defense

19  side tells you that the law does this and the law does that,

20  the law does what Judge Rakoff will tell you in the jury

21  instructions.  It won't be filled with these general, broad

22  propositions of scarlet letters and whatever else he was saying

23  there.  Judge Rakoff will read you the law.  And that law is

24  the distillation, it is what the Constitution requires in a

25  First Amendment case to be read to a jury.  That's what you

M2B1PAL5                         Rebuttal - Mr. Turkel

1   follow.

2           And in that respect, at any point in time during my

3   closing did I talk to you about a fact, or an issue in which

4   there wasn't a piece of paper that directly addressed it in

5   front of you?  In other words, when opposing counsel blames me

6   or accuses me of never talking about clear and convincing

7   evidence, and accepting that standard, did I not read to you

8   directly from that jury instruction, with it on your screen?

9   Because I did, and the words "clear and convincing" are in it.

10          And I don't expect you to remember everything we did

11  then.  But some of these contentions that were being made to

12  sort of shift the focus off their conduct and onto me, I just

13  don't understand.  The case isn't about me.  I'm an attorney

14  representing somebody here.  And in that respect, it's not

15  about Mr. Axelrod either.  It's about his client.  And in all

16  of that indignation and denial, the one thing you did not hear

17  an explanation for, the one thing that wasn't addressed, the

18  one thing that wasn't reconciled, is the fact that on the 14th,

19  two pieces of research that were requested by Jim Bennet were

20  forwarded to Bob Semple with the note from Bennet that:  These

21  are more relevant to our point; with Semple responding I think

22  words to the effect of:  Yes, particularly the Obama one.  And

23  how the representations that were ultimately made in the

24  article by Mr. Bennet could possibly be reconciled with that.

25          And in a particularly animated part of my presentation

1   earlier, I was arguing to you and explaining that this isn't

2   about debating whether Mr. Bennet has some sort of theory about

3   guns that relates to the fact that it's always political even

4   if somebody has been diagnosed or recognized as being mentally

5   unstable.  That's not what it's about.  He can have the theory,

6   but -- he can have the theory.  Where the theory crossed the

7   line in this case is when, to support his theory, he included

8   facts that were false.  And the only way he can contend that he

9   didn't either know they were false or was recklessly

10  disregarding their falsity is to somehow say that articles

11  which he read, he didn't understand, which we didn't hear, or

12  for some reason or another words take on a different meaning to

13  him and that somehow justifies him reading the articles and not

14  understanding the plain language that was in them, particularly

15  those two that went to Semple.

16          And some of these things, I don't know where they came

17  from.  We weren't making any contentions about Semple.  Semple

18  was the older guy there.  If you look at the emails, he is

19  guiding the original concept for this piece.

20          And then you'll see at Exhibit 119 -- and I'm sorry I

21  can't bring anything up on the board, so if you don't have it

22  in your notes -- or maybe I can.  Telepathy, Professor X.

23          119.  There's this pivot point at 12:41.  And this is

24  Mr. Bennet adding to the equation this political speech thing,

25  and this is the path it takes.  And again, some of these

　　　　　　　　　Rebuttal - Mr. Turkel

1　contentions that were being made by counsel for *The Times*, I

2　just don't know where they're coming from.  There's no dispute

3　in this case that Mr. Bennet is the one who added the

4　incitement language to the final draft of this.  If you look at

5　Elizabeth Williamson's first draft -- it's Exhibit 141 -- it

6　isn't in there.  If you look at Linda Cohn's draft, 140E, it

7　isn't in there.  She asks a few questions.  She barely changes

8　it.  It comes back that night, at 7:44, after Mr. Bennet has

9　told Elizabeth Williamson, "I did a major rework here," with

10　all of the language that caused the problem.  It's not a

11　conspiracy.  There's no contention of that.  I don't have any

12　idea where that came from.  What it is is Mr. Bennet being so

13　convinced that that narrative and theory is right, that he

14　tried to reverse-engineer the facts to match it.  He had no

15　other facts.  He takes these facts.  They are false.

16　　　　　　And when the contention is he didn't mean to hurt

17　Sarah Palin or he didn't do it with intent to harm her, the law

18　doesn't zone in on it that way.  It's a little bit different,

19　okay?  There are these concepts of high probability of reckless

20　disregard.  And Judge Rakoff is going to read them to you.

21　We've gone through them.  Because what do you think someone is

22　going to do?  Do you think Mr. Bennet was going to get on the

23　witness stand and say, yeah, I knew it was false, the whole

24　time I knew it was false, and I published it falsely, it would

25　lead to something else that would establish it was false

1    because I wanted to hurt Sarah Palin?  You know, we go back to

2    these things and you see the little clues here, this bias that

3    they have.  It doesn't make people villains or evil

4    necessarily; it's just how they think.  And unfortunately, when

5    your emails say things like, "if there's evidence of the kind

6    of inciting hate speech on the left that we, or I at least,

7    have tended to associate with the right (e.g., in the run-up to

8    the Gabby Giffords shooting) we should deal with that," this

9    fixation, nobody's being critical of it.  People can think how

10   they want to think.  You cross the line once you, to support

11   the way you think, you publish materially false facts,

12   particularly in this case, which accuse my client of inciting

13   somebody to murder six people.  And the concept that the

14   defense argued that that somehow wouldn't be bad enough to

15   impute defamatory meaning is so hard to grapple.  What worse

16   could you say, that someone did actually kill them?  If they

17   didn't incite the killing, then they actually killed them.  Is

18   there anything in between?  Because it doesn't really get much

19   worse.

20          Take a look, if you don't have it in your notes, at

21   Exhibit 142.  This is the ABC News link that was hyperlinked in

22   the defamatory publication.  Again, I didn't call this a

23   smoking gun.  There's nothing smoking gun about it.  It just

24   begs attention when they link an article to the article that

25   includes the falsity about my client and the hyperlinked

1    article literally repeats what they're putting in there about

2    my client.

3          And while we're at it, that ABC News hyperlink that is

4    linked on "America's Lethal Politics" is also pretty good proof

5    that everybody knew this was Sarah Palin and not SarahPAC or

6    anything like that.  The idea that one or two people, or even

7    three, two of whom worked for Mr. Bennet, read it the way he

8    does isn't how it goes.  Some of the jury instructions you're

9    going to see, the jury instructions will tell you that a forced

10   construction doesn't work.  The natural way people are reading

11   it are the language -- it's words like "natural" and

12   "ordinary," I think, right?  Judge Rakoff will read them.  And

13   listen to him, because he will also at the same time say forced

14   constructions don't work.  When the reader center is getting

15   feedback from their readership saying they have a problem with

16   this, and Ross Douthat is sending an email saying this is

17   wrong -- "I read it the way I feel it reads naturally" is what

18   he said on the witness stand -- Mr. Bennet is too smart to play

19   that dumb, that he's the only one who's using that definition

20   of a word.  He just got caught.  And it doesn't mean he had to

21   sit there and convict himself to hurting Sarah Palin.  What it

22   does mean, though, is that you trigger liability for publishing

23   false statements when you turn a blind willful eye to material

24   that you asked for, for the very purpose of not publishing

25   false statements, puts you in here.  This is what we do.

1     And I'm going to pivot to the damages just to address

2     a point that opposing counsel made.

3          The instruction that's given on this, all right,

4     describes damages to the plaintiff's reputation and humiliation

5     and mental anguish in her public and private life that you find

6     was caused by the challenged statement or statements that you

7     determine constitute libel.  Nowhere in this instruction will

8     Judge Rakoff read to you that she was obligated to call friends

9     in or find people who didn't like her anymore to come testify

10    that they didn't like her anymore.  You heard Governor Palin's

11    story.  There's no requirement in that story that she do

12    anything other than explain to you how she -- how this

13    happened, how she felt about it, and then it's in your hands.

14         And I'm going to say the same thing we've said from

15    day one.  If you find liability and proceed down nominal

16    damages, you can come up with whatever number you want.  You

17    could put a dollar, 10, does not matter.  This was not about

18    proving up a gigantic damages case here.  Just wasn't.  We've

19    been saying that since day one.  If it was, maybe we'd have all

20    these people come talk that Mr. Axelrod contends we should

21    have.  So this point about, over and over again, there is this

22    contention about how contrite and sorry Mr. Bennet was, but he

23    had a team of other people.  They participated too.  It was

24    their fault too.

25         Let's put one thing to rest.  It is undisputed that he

1  was the writer of this piece -- undisputed by him, by

2  Ms. Williamson, by Ms. Cohn, by Nick Fox, by anybody who talked

3  about it.  He was the ultimate rewriter, to the extent that

4  they called anyone the writer.

5       And if you want to know why those other employees

6  would go in and perhaps support his version of the story, there

7  was a point in her direct testimony where Ms. Williamson I

8  believe called him the boss, Mr. Douthat called him the boss.

9  He was the head guy there.  And that may explain why Hanna

10 Ingber comes in, who doesn't work in that department, that part

11 of *The Times*, and so didn't get the memo on the whole apologies

12 thing.  Now there was zero motivation for that young woman to

13 come in here and lie about that.  And so is it important?  I

14 mean, use your common sense to determine whether that was

15 important.  But when the other four come in and say there's a

16 policy against apologies and the one person who's not in the

17 editorial and comes in and says there isn't, you glean from

18 that what you will.  That's your province.  That's what your

19 role is here, so --

20       THE COURT:  Counsel, you have two minutes.

21       MR. TURKEL:  Yes, Judge.  I got the clock here.  So --

22       A comment was made about the First Amendment and

23 protecting media from the powerful in conjunction with

24 statements about how they have reporters all over the world who

25 report for *The New York Times*.  It's a business.  And in 2017

M2B1PAL5

1    there's no version of this that makes Governor Palin a more

2    powerful entity and force than *The New York Times*, particularly

3    in this situation.  Particularly in this situation.

4         So to go back where we started, the First Amendment

5    line gets drawn in material falsities.  They have not still,

6    with all the argument and all the calling out of my name,

7    explained to you in any viable way why someone as smart as

8    James Bennet didn't understand the plain research he had

9    ordered to write this piece.  And yes, it's a mistake, but it's

10   not an honest mistake.  It's a reckless mistake, an

11   intentionally, wilfully blind mistake.  And those are the kind

12   of mistakes you find liability for.

13        It's been a privilege to talk to you all today.  It's

14   been a privilege to represent my client in this trial.  And

15   when you go back there on that very simple verdict form, I ask

16   that you check that they're liable.  Discuss it amongst

17   yourselves.  If you find nominal, find nominal.  It's your

18   province.  We put it in your hands from day one.

19        Just one last fact.  The reason why you have before

20   and after the correction numbers on that circulation, from our

21   perspective, the correction was never corrected as to us.  So

22   we don't parse it out.  That's why we gave the whole number of

23   how many issues were circulated, how many digital hits there

24   were.

25        I thank you again for your time.

**JA 1104**

M2B1PAL5

 1          THE COURT:  Thank you very much.

 2          Ladies and gentlemen, I think what we're going to do

 3  now is give you a five-minute break because I need to know

 4  whether you want to stay late or not.  If you don't, I think

 5  we'll just end now, because I don't want to rush through my

 6  instructions, so I would give you my instructions first thing

 7  Monday.  If you do want to stay late, I'll give you my

 8  instructions and then you can deliberate.

 9          So why don't you go back to the jury room, but just

10  for five minutes, and decide what your preference is.

11          (Jury not present)

12          THE COURT:  Please be seated.

13          So I do want to compliment both counsel for I thought

14  excellent summations that fairly put the issues before the

15  jury.

16          Is there anything anyone needs to raise knew?

17          (Continued on next page)

18

19

20

21

22

23

24

25

**JA 1105**

M2b2Pal6

1       MR. BROWN:  Your Honor, you had suggested that we

2   return to Rule 50 at the conclusion of counsel's argument.

3       THE COURT:  Yes.  So what do you think is, of the four

4   elements, the one that you think plaintiff has most clearly, in

5   your view, failed to meet?

6       For example, you made the argument yesterday that she

7   had not met the element to show that this was directed at her

8   personally.  To be frank, I think that's a very weak argument

9   on your part.  Mr. Bennet didn't offer to apologize to the

10   SarahPAC group.  He offered to apologize to Sarah Palin.  And

11   that's because, at least by then, he recognized that a great

12   many people were viewing this as relating to her personally.

13       Your last witness or the last witness referred to it

14   in her e-mail to Mr. Bennet as the Sarah Palin column, and

15   clearly that's the way she read it and, if I recall correctly,

16   indicated that's what the people who -- whose input she was

17   responding to had read it, as well.

18       So if you thought that was your strongest argument,

19   you are going to lose.  But maybe you want to point me to some

20   other element.

21       MR. BROWN:  Your Honor, I actually began yesterday

22   with actual malice, but just to make the record on "of and

23   concerning," even if -- there are two standards for "of and

24   concerning," the common law standard under New York law and the

25   First Amendment standard as described in *New York Times* v.

1  *Sullivan*.  It is not often paid attention to that in that case

2  the U.S. Supreme Court ruled both on actual malice and on "of

3  and concerning."

4          And just very briefly, here the literal words of the

5  publication are Sarah Palin's political action committee and,

6  under the common law, it is well accepted, both in New York and

7  elsewhere, that a statement directed at an entity's conduct is

8  not, without more, directed at the person for whom the entity

9  is named.

10         The *Zepter* case out of the D.C. Circuit, which is

11  cited in our papers, is a good example of that Peter Zepter

12  sued for statements about the conduct of Zepter Bank, and the

13  Court held, the D.C. Circuit held that, under the common law,

14  that that was not sufficiently about him as a matter of law.

15  But even setting aside the --

16         THE COURT:  Well, that -- I'm sorry.  Go ahead.

17         MR. BROWN:  In the second half of *New York Times* v.

18  *Sullivan*, the Supreme Court's opinion, it deals with the fact

19  that when you are talking about a public official, later

20  extended to public figures, and we think Ms. Palin qualifies as

21  both for this purpose, the accusation that is "of and

22  concerning" in the challenged statement must be particularly

23  direct to satisfy the First Amendment standard.  And in that

24  case, don't forget Commissioner Sullivan, the head of the

25  police department, had brought in multiple witnesses who

M2b2Pal6

1    testified that they read the advertisement in question that was

2    alleged to be defamatory, understood it to be about him

3    personally because it was about the governmental department he

4    managed, and the United States Supreme Court said, while that

5    might be enough to satisfy the state common law standard, that

6    does not satisfy the First Amendment.  And we say that the same

7    rule applies here.

8              I will stop there on "of and concerning."

9              THE COURT:  It's interesting.  I haven't had a chance

10   to research the common law precedents from 1579, 1602, or 1733,

11   when most of the common law was formulated.  I think at least

12   the printing press had been invented, so there was some

13   relevance.  But I prefer to rely on, instead of the common law,

14   common sense, and I think it is almost impossible for a

15   reasonable person to read the statements that are being

16   challenged here in the editorial without seeing them as clearly

17   directed at Sarah Palin.

18             Now, whether it also satisfies the point you are

19   making about *The New York Times v. Sullivan*, you are right to

20   focus me on that, which is a few centuries subsequent to the

21   common law, and I will go take a look at that.  But I would

22   still be more interested in your arguments on the other points.

23             But we are going to interrupt right now because the

24   most important thing is to bring the jury back and find out

25   what they have decided.

JA 1108

M2b2Pal6                          Charge

1       Nick, do you want to go see?

2       THE LAW CLERK:  Yes.

3       (Pause)

4       THE LAW CLERK:  One more minute.

5       MR. TURKEL:  They are deliberating over deliberating.

6       THE COURT:  We will know the jury verdict shortly on

7  this pending question.

8       MR. TURKEL:  Special verdict about deliberating.

9       THE DEPUTY CLERK:  Do you want a juror to tell you or

10  do you want me?

11       THE COURT:  No.  Bring them back.

12       (Jury present)

13       THE COURT:  So please be seated.  So has the jury

14  reached a verdict on the pending question?

15       JUROR NO. 1:  Yes, we have, your Honor.

16       THE COURT:  And what's your pleasure?

17       JUROR NO. 1:  We decided that we are willing to stay

18  until around 5 or 6.

19       THE COURT:  All right.  Great.  Then I'm going to ask

20  my law clerk to now give to each of you a copy of my

21  instructions of law, and then we are going to read them

22  together.

23       I think I am going to take advantage of being able to

24  take off my mask.  Although after four hours of hearing

25  counsel, it's very warm in here.

**JA 1109**

1    But in any event, if you would turn to the table of

2    contents, you will see that my instructions are divided into

3    four parts.  First are general instructions.  Those are

4    instructions about how you go about your job of deliberating in

5    general.

6    Then we have a section called liability.  That's the

7    section on whether you determine whether all four elements of

8    this claim have been met.  If any one of them has not been met,

9    then you don't need to go on to the damages section because

10   damages is about money; and if the essential elements have not

11   been met, there is no money to be given.  But if you determine

12   that the essential elements have been met, then you go on and

13   look at damages.

14   And in any event, you would look at the fourth section

15   on concluding instructions, which is about how you fill out

16   your verdict and things like that.

17   So let's start on the first general instruction on

18   page 3.

19   We are now approaching the most important part of this

20   case, your deliberations.  You have heard all the evidence in

21   the case, as well as the final arguments of the lawyers for the

22   parties.  Before you retire to deliberate, it is my duty to

23   instruct you as to the law that will govern your deliberations.

24   These are the final and binding instructions, which entirely

25   replace the preliminary instructions I gave you after opening

1    statements, which you should now discard.

2         Regardless of any opinion that you may have as to what

3    the law may be or ought to be, it is your sworn duty to follow

4    the law as I give it to you.  Also, if any attorney or other

5    person has stated a legal principle different from any that I

6    state to you in my instructions, it is my instructions that you

7    must follow.

8         Because my instructions cover many points, I have

9    provided each of you with a copy of them, not only so that you

10   can follow them as I read them to you now, but also so that you

11   can have them with you for reference throughout your

12   deliberations.  In listening to them now and reviewing them

13   later, you should not single out any particular instruction as

14   alone stating the law, but you should instead consider my

15   instructions as a whole.

16        Your duty is to decide the fact issues in the case and

17   arrive, if you can, at a verdict.  You, the members of the

18   jury, are the sole and exclusive judges of the facts.  You pass

19   upon the weight of the evidence; you determine the credibility

20   of the witnesses; you resolve such conflicts as there may be in

21   the testimony; and you draw whatever reasonable inferences you

22   decide to draw from the facts as you determine them.

23        In determining the facts, you must rely upon your own

24   recollection of the evidence.  To aid your recollection, we

25   will send you at the start of your deliberations a computerized

1    and indexed version of all of the exhibits.  And I should

2    interrupt there to say there is one actual physical exhibit in

3    addition to the ones that -- and that's that copy of the actual

4    *New York Times*.  So we will send that in as well so you can

5    have that with you for your deliberations.

6          If you need to review any particular item of

7    testimony, we can also arrange to provide them to you in a

8    computerized form that you can access.  Please remember that

9    none of what the lawyers have said in their opening statements

10    and their closing arguments and their objections or in their

11    questions is evidence, nor is anything that I may have said

12    evidence.  The evidence before you consists of just three

13    things: the testimony given by witnesses that was received in

14    evidence, the exhibits that were received in evidence, and a

15    few stipulations of the parties as to matters in evidence.

16          Testimony consists of the answers that were given by

17    the witnesses to the questions that were permitted to be asked,

18    either here in court, remotely by video, or in the depositions

19    that were read into evidence.  Please remember that questions,

20    although they may provide the context for answers, are not

21    themselves evidence.  Only answers are evidence, and you should

22    therefore disregard any question as to which I sustained an

23    objection.  Also, you may not consider any answer that I

24    directed you to disregard or that I directed be stricken from

25    the record.  Likewise, you may not consider anything you heard

M2b2Pal6                          Charge

about the contents of any exhibit that was not received in

evidence.  Be careful not to speculate about matters not in

evidence; your focus should be solely on the evidence that was

presented here in court.

It is the duty of the attorney for each side of a case

to object when the other side offers testimony or other

evidence that the attorney believes is not properly admissible.

Counsel also have the right and duty to ask the Court to make

rulings of law and to request conferences out of the hearing of

the jury.  All such questions of law must be decided by me.

You should not show any prejudice against any attorney or party

because the attorney objected to the admissibility of evidence,

asked for a conference out of the hearing of the jury, or asked

me for a ruling on the law.

Finally, I ask you to draw no inference from my

rulings or from the fact that on occasion I asked questions of

certain witnesses.  My rulings were no more than applications

of the law and my questions were only intended for

clarification or to expedite matters.  You should understand

that I have no opinion as to the verdict you should render in

this case.

You are to perform your duty of finding the facts

without bias or prejudice or sympathy or hostility or any

preconception whatsoever as to any party, for all parties are

equal under the law.  You are to perform your final duty in an

1  attitude of complete fairness and impartiality.  You are not to

2  be suede by rhetoric or emotional appeals.  It must be clear to

3  you that if you were to let extraneous considerations interfere

4  with your thinking, there would be a risk that you would not

5  arrive at a true and just verdict.  So do not be guided by

6  anything except clear thinking and calm analysis of the

7  evidence.

8          As you know, this is a civil case.  In order to

9  prevail in a civil case, a party who is making a claim against

10 another party has what we call the "burden of proof," which is

11 the burden of establishing each of the essential elements of

12 the claim.  Here, the plaintiff, Sarah Palin, is making a

13 single claim of libel against two defendants, James Bennet and

14 The New York Times Company, who, the parties agree, are to be

15 considered jointly.  I will describe the four essential

16 elements of that claim shortly, but for now please note that

17 for the first two elements of her libel claim, the plaintiff

18 must establish each element by what is called the

19 "preponderance" of the credible evidence, but that with respect

20 to the final two elements of her libel claim, the plaintiff

21 must establish those elements by "clear and convincing

22 evidence."

23          To establish an element of a claim by the

24 "preponderance" of the credible evidence means to prove that

25 the element is more likely true than not true.  To establish an

**JA 1114**

element by "clear and convincing evidence" means to prove that

the element is highly probable.  In either case, the burden of

proof refers to the quality of the evidence, its persuasiveness

in convincing you of its truth.

             In deciding whether a party meets its burden of proof,

you may consider both direct evidence and circumstantial

evidence.

             Direct evidence is evidence that proves a fact

directly.  For example, where a witness testifies to what he or

she saw, heard, or observed, that is called direct evidence.

             Circumstantial evidence is evidence that tends to

prove a fact by proof of other facts.  To give a simple

example, suppose that when you came into the courthouse today

the sun was shining and it was a nice day, but the courtroom

blinds were drawn and you could not look outside.  Later, as

you were sitting here, someone walked in with a dripping wet

umbrella and, soon after, somebody else walked in with a

dripping wet raincoat.  Now, on our assumed facts, you cannot

look outside of the courtroom and you cannot see whether it is

raining, so you have no direct evidence of that fact.  But on

the combination of the facts about the umbrella and the

raincoat, it would be reasonable for you to infer that it had

begun raining.

             That is all there is to circumstantial evidence.

Using your reason and experience, you infer from established

1    facts the existence or the nonexistence of some other fact.

2    Please note, however, it is not a matter of speculation or

3    guess; it is a matter of logical inference.

4          The law makes no distinction between direct and

5    circumstantial evidence.  Circumstantial evidence is of no less

6    value than direct evidence, and you may consider either or

7    both, and may give them such weight as you conclude is

8    warranted.

9          It must be clear to you by now that counsel for the

10   opposing parties are asking you to draw very different

11   conclusions about various factual issues in the case.  An

12   important part of that decision will involve making judgments

13   about the testimony of the witnesses you have listened to and

14   observed.  In making these judgments, you should carefully

15   scrutinize all of the testimony of each witness, the

16   circumstances under which each witness testified, and any other

17   matter in evidence that may help you to decide the truth and

18   the importance of each witness's testimony.

19         Your decision to believe or to not believe a witness

20   may depend on how the witness impressed you.  How did the

21   witness appear to you?  Was the witness candid, frank, and

22   forthright, or did the witness seem to be evasive or suspect in

23   some way?  How did the way the witness testified on direct

24   examination compare with how the witness testified on

25   cross-examination?  Was the witness consistent, or

1   contradictory?  Did the witness appear to know what he or she

2   was talking about?  Did the witness strike you as someone who

3   was trying to report his or her knowledge accurately?  These

4   are examples of the kinds of common-sense questions you should

5   ask yourselves in deciding whether a witness is or is not

6   truthful.

7            How much you choose to believe a witness may also be

8   influenced by the witness's bias.  Does the witness have a

9   relationship with any of the parties that may affect how he or

10  she testified?  Does the witness have some interest, incentive,

11  loyalty, or motive that might cause him or her to shade the

12  truth?  Does the witness have some bias, prejudice, or

13  hostility that may cause the witness to give you something

14  other than a completely accurate account of the facts he or she

15  testified to?

16           You should also consider whether the witness had an

17  opportunity to observe the facts he or she testified about, and

18  whether the witness's recollection of the facts stands up in

19  light of the other evidence in the case.

20           In other words, what you must try to do in deciding

21  credibility is to size up a person just as you would in any

22  important matter where you are trying to decide if a person is

23  truthful, straightforward, and accurate in his or her

24  recollection.

25           Some of the testimony before you is in the form of a

M2b2Pal6                    Charge

1    videotaped deposition that was received in evidence.  A

2    deposition is simply a procedure where prior to trial the

3    attorneys may question a witness or an adversary party under

4    oath before a court stenographer.  You may consider the

5    testimony of a witness given at a deposition according to the

6    same standards you would use to evaluate the testimony of a

7    witness given live at trial.

8           In addition, one witness testified remotely by

9    videoconference, as a consequence of the courthouse's COVID-19

10   protocols.  You should consider this testimony according to the

11   same standards you use to evaluate the testimony of the

12   witnesses who testified here in the courtroom.

13          In this case, one of the defendants, The New York

14   Times Company, is a corporation.  The mere fact that one of the

15   defendants is a corporation does not mean it is entitled to any

16   lesser consideration by you.  All litigants are equal before

17   the law, and corporations, big or small, are entitled to the

18   same fair consideration as you would give any other individual

19   party.

20          Obviously, a corporation has no capacity to "think" or

21   "act" except through its officers, employees, and other agents,

22   and whether a corporation "knows," "intends," "states" or does

23   something is therefore a function of what the corporate

24   officers, corporate employees, and other corporate agents know,

25   intend, state, and do.

JA 1118

1  In this case, the parties agree that the relevant

2  thoughts, actions, and intentions are those of Mr. Bennet,

3  which are then imputed to The New York Times Company as a

4  matter of law.  As a result, Mr. Bennet's thoughts, actions,

5  and intentions apply equally to both defendants.

6  Applying the general principles that I have just

7  discussed, you must now determine, in accordance with my

8  instructions, whether the plaintiff has established her libel

9  claim against the defendants.  This is called "proving

10  liability."  For the reasons just discussed, if you find

11  Mr. Bennet liable, you must find The New York Times Company

12  liable.  And if you find Mr. Bennet not liable, you must also

13  find The New York Times Company not liable.

14  Ms. Palin's claim is for the wrong known as libel.  A

15  libel is a false statement about a person in writing that tends

16  to expose the person to contempt, ridicule, disgrace, or public

17  hatred.

18  As you know, the plaintiff, Sarah Palin, claims she

19  was libeled by certain statements largely drafted by defendant

20  James Bennet that appeared in a *New York Times* editorial

21  entitled "America's Lethal Politics," that was published

22  following the June 14, 2017, shooting of Congressman Steve

23  Scalise.  The editorial was published online by codefendant

24  The New York Times Company on the evening of June 14, 2017, and

25  appeared in the print newspaper the following day.  The

M2b2Pal6          Charge

portions of the editorial of which the plaintiff complains were

part of two paragraphs that read:

"In 2011, when Jared Lee Loughner opened fire in a

supermarket parking lot, grievously wounding Representative

Gabby Giffords and killing six people, including a 9-year-old

girl, the link to political incitement was clear.  Before the

shooting, Sarah Palin's political action committee circulated a

map of targeted electoral districts that put Ms. Giffords and

19 other Democrats under stylized crosshairs.

"Conservatives and right-wing media were quick on

Wednesday to demand forceful condemnation of hate speech and

crimes by anti-Trump liberals.  They're right.  Though there's

no sign of incitement as direct as in the Giffords attack,

liberals should of course hold themselves to the same standard

of decency that they ask for the right."

Here, the plaintiff argues that she was libeled by

what she takes to be the assertion in the first paragraph that

her political action committee's circulation of the so-called

crosshairs map was clearly linked to political incitement of

the 2011 shooting by Mr. Loughner of Ms. Giffords and others.

Similarly, the plaintiff argues that she was further libeled by

what she takes to be the assertion in the second paragraph that

this link was "direct."  I will refer to these two statements

as the "challenged statements."

To establish her claim of libel, the plaintiff must

**JA 1120**

1   prove to you the following four essential elements with respect

2   to either or both of the challenged statements:

3          First, that the challenged statement you are

4   considering was, in the context of the editorial as a whole,

5   reasonably understood by the ordinary reader to be defamatory,

6   meaning that it intended to injure the plaintiff's reputation

7   by exposing her to ridicule, disgrace, contempt, or public

8   hatred;

9          Second, that the challenged statement you are

10  considering would reasonably be taken by the ordinary reader to

11  refer to the plaintiff personally;

12         Third, that the challenged statement you are

13  considering was materially false, meaning that it was

14  substantially untrue; and

15         Fourth, that the defendants published the challenged

16  statement you are considering with what is called "actual

17  malice," a legal term that I will explain to you shortly.

18         In order to establish her claim, the plaintiff must

19  prove the first two of these elements by a preponderance of the

20  credible evidence, and she must prove the final two elements by

21  clear and convincing evidence.  Also, to find the defendants

22  libel, you must be unanimously agreed that at least one of the

23  two challenged statements meets all four of these required

24  elements.

25         I will now describe each of these four essential

1    elements in more detail.

2         The first question for you to decide is whether the

3    plaintiff has proved that the ordinary reader of whichever of

4    the two challenged statements you are considering would

5    understand that statement, in the context of the editorial as a

6    whole, to be defamatory.  Overall, plaintiff claims that the

7    challenged statements communicated to readers that Ms. Palin

8    was clearly and directly responsible for helping to incite the

9    January 2011 shootings by Mr. Loughner.

10        The plaintiff must prove this element by a

11   preponderance of the evidence.

12        A statement is defamatory if it tends to expose the

13   plaintiff to public hatred, contempt, ridicule or disgrace —

14   that is, if it would tend to lead the average person in the

15   community to form an evil or bad opinion of the plaintiff; or

16   if it tends to discredit the plaintiff in the conduct of her

17   occupation, profession, trade or office; or if it charges the

18   plaintiff with a serious crime.

19        Not every unpleasant or uncomplimentary statement is

20   defamatory.  A statement that is merely unpleasant, offensive

21   or embarrassing, or that hurts the plaintiff's feelings, is not

22   necessarily defamatory.  Because language often has different

23   meanings, the law imposes upon the plaintiff the burden of

24   proving that the statement about which the plaintiff complains

25   would in fact be understood by the ordinary reader as

1  defamatory.

2          In focusing on one or the other of the two challenged

3  statements, you should consider the statement in the context of

4  the editorial as a whole, not just in isolation, and you should

5  not impose an unfair or forced construction on the words used

6  or take any word, phrase, or sentence out of context.

7          If you find that the plaintiff has proved that one or

8  both of the challenged statements in the editorial would tend

9  to expose the plaintiff to hatred, contempt, ridicule, or

10 disgrace in the mind of the ordinary reader of the statements,

11 then you must find that the statement is defamatory and proceed

12 to consider the remaining essential elements.  But if you find

13 that the plaintiff has not proved that either of the statements

14 are defamatory, then you need go no further and must find the

15 defendants not liable.

16         The second element that the plaintiff must prove is

17 that the given challenged statement you are considering was "of

18 and concerning" Ms. Palin.  In other words, Ms. Palin must

19 prove that the ordinary reader of the editorial would

20 reasonably have understood the challenged statement to refer to

21 her personally.

22         The plaintiff must prove this element of her claim by

23 a preponderance of the evidence.

24         The first challenged statement in the editorial

25 states, among other things that "Sarah Palin's political action

M2b2Pal6          Charge

committee circulated a map of targeted electoral districts,"

and the second challenged statement implicitly refers back to

the same map.  The plaintiff contends that this reference would

be commonly understood by the ordinary reader to refer to

Ms. Palin personally.  By contrast, defendants argue that the

editorial referred only to Ms. Palin's political action

committee, SarahPAC, which the ordinary reader would understand

is a distinct entity from Ms. Palin.

     If you find that the plaintiff has proved that one or

both of the challenged statements would be commonly understood

by the ordinary reader to refer to Ms. Palin personally, then

you must consider the remaining elements of her case.  But if

you find that the statements would not be commonly understood

by the ordinary reader to refer to Ms. Palin personally, then

you need proceed no further and must find the defendants not

liable.

     The third element that the plaintiff must prove is

that the challenged statement you are considering was in fact

false.

     Please note that the plaintiff must prove this element

by clear and convincing evidence, that is, the plaintiff must

prove that it is highly probable that the statement was false.

     A statement is false if it is not substantially true.

Minor inaccuracies in the statement may be disregarded in

determining whether a statement is false.

1    You will determine from the evidence what the truth

2    was and then compare that with the challenged statements in the

3    editorial taking the challenged statements according to the

4    ordinary meaning of the words and considering the context in

5    which those words appear in the editorial as a whole.

6    If you find by clear and convincing evidence that one

7    or both of the challenged statements were false, then you must

8    proceed to consider the other elements of the plaintiff's case.

9    But if you find that neither of the challenged statements was

10   false, then you do not need to proceed further and must find

11   the defendants not liable.

12   The fourth element that the plaintiff must prove is

13   called "actual malice," a legal term that concerns the

14   defendants' state of mind, and specifically Mr. Bennet's state

15   of mind, at the time the editorial was published.  There are

16   two aspects of actual malice, both of which the plaintiff must

17   prove by clear and convincing evidence, that is, they must be

18   proved to be highly probable.

19   The first aspect of "actual malice" you must decide is

20   whether, at the time the editorial was published, Mr. Bennet,

21   and therefore The New York Times Company, (i) knew that either

22   or both of the allegedly defamatory statements he had drafted

23   were in fact false; or that, at a minimum (ii), he consciously

24   chose to recklessly disregard the high probability that they

25   were false.

1      In considering Mr. Bennet's state of mind, you should

2  consider all the evidence, including relevant inferences to be

3  drawn therefrom.  But also keep in mind that the plaintiff must

4  prove what was in Mr. Bennet's mind by clear and convincing

5  evidence.  For example, with regard to "reckless disregard," it

6  is not enough just to show that Mr. Bennet did not know, one

7  way or the other, whether the challenged statement you are

8  considering was true or false.  Nor is it enough to prove that

9  he was merely negligent regarding the statement's truth or

10  falsity.  For instance, a failure to sufficiently investigate

11  or to research a particular point does not establish actual

12  malice, unless the plaintiff has demonstrated that such

13  inaction was a conscious, deliberate attempt to avoid

14  confirming the statements' probable falsity.  Even

15  irresponsible reporting or a demonstrated failure to follow

16  professional, journalistic standards does not, on its own,

17  establish actual malice, unless the plaintiff has proved that

18  there was a high probability that Mr. Bennet actually doubted

19  the truth of the challenged statement you are considering and,

20  nevertheless, consciously chose to disregard the high

21  probability that the statement was false.

22      The second aspect of actual malice that you must

23  decide is whether the plaintiff has proved by clear and

24  convincing evidence that, if Mr. Bennet believed that the

25  challenged statement you are considering was false, he also

**JA 1126**

1    either (i) intended the statement to defame Ms. Palin or (ii)

2    acted in reckless disregard of whether the statement would

3    defame Ms. Palin.  As previously noted, "reckless disregard" is

4    only satisfied if the plaintiff has proved that there was a

5    high probability that Mr. Bennet had a high degree of awareness

6    that ordinary readers would understand the challenged

7    statements to convey that Ms. Palin bore direct or clear

8    responsibility for causing Loughner to commit the Arizona

9    shooting and proceeded to publish anyway.

10           If you find that the plaintiff has proved, by clear

11   and convincing evidence, both of the two requirements of actual

12   malice as to the challenged statement you are considering, then

13   you must proceed to the issue of damages.  But if you find that

14   the plaintiff has failed to prove either or both of the

15   requirements of actual malice as to the challenged statement

16   you are considering, you must find the defendants not liable.

17           If you find that the plaintiff has proved all four

18   essential elements of her libel claim as to one or both of the

19   challenged statements, then you must determine the sum of money

20   that must be paid by the defendants to the plaintiff as a

21   result.  These sums of money are called "damages," and the

22   plaintiff bears the burden of proving the amount of her damages

23   by a preponderance of the credible evidence.

24           Ms. Palin does not claim that she suffered any

25   financial injury from the alleged libel, but she claims that

M2b2Pal6                                    Charge

1  she suffered reputational harm and the like.  If you find that

2  she has proved her claim of libel, you must then determine the

3  amount of money (called "compensatory damages") that, in the

4  exercise of your good judgment and common sense, you decide is

5  fair and just compensation for the injury, if any, to

6  plaintiff's reputation and the humiliation and mental anguish

7  in her public and private life that you find was caused by the

8  challenged statement or statements that you determine

9  constituted libel.

10       In fixing that amount, you should consider the

11 plaintiff's standing in the community, the extent to which the

12 challenged statements were circulated, the tendency of the

13 challenged statements to injure a person such as Ms. Palin, and

14 all of the other facts and circumstances in the case.  These

15 damages cannot be proved with mathematical accuracy.  Fair

16 compensation may vary, ranging from very little to a

17 substantial sum.

18       In determining damages, you may not consider any

19 injury to, or feelings of, her family, friends, business

20 associates or relatives.  It is only Ms. Palin's own injury,

21 personal to her reputation, that may be compensated.  Nor may

22 you award damages for any damages the plaintiff may have

23 suffered to her reputation as a result of other statements,

24 articles, or publications made before or after the editorial at

25 issue in this case, whether published by The New York Times

M2b2Pal6                    Charge

1    Company or another source.

2           If you find that the plaintiff has proved all four of

3    the essential elements of her libel claim (that is, has proved

4    liability) but has failed to prove any actual damages

5    whatsoever, you must nevertheless award her the sum of one

6    dollar.  Such an award is called "nominal damages," and it is

7    intended to confirm your judgment that, even if no damages were

8    proved, liability was found.

9           You will shortly retire to the jury room to begin your

10   deliberations.  As soon as you get to the jury room, please

11   select one of your number as the foreperson to preside over

12   your deliberations and to serve as your spokesperson if you

13   need to communicate with the Court.

14          You will be bringing with you into the jury room a

15   copy of my instructions of law and a verdict form on which to

16   record your verdict.

17          Let me just show you the verdict form that will be

18   sent in.  It is a very simple one page, and it asks you to say

19   whether you have found the defendants liable or not liable.

20   You will check the box.  If you find not liable, then that's

21   all you have to check.  If you find liable, then there is a

22   place for putting in the amount of damages.

23          Your foreperson will then sign and date this, fold it

24   up, and place it in this envelope cleverly marked "Jury

25   Verdict," and I will not open that until you are all back here

1   in the courtroom; and then after we have opened it, it will be

2   read to you, and we will ask each of you individually to

3   confirm that that is your verdict.

4           And the reason we go through all of those steps is to

5   be absolutely sure that we have your verdict as you have

6   determined it.

7           So let's go back to the instructions.

8           In addition, we will send into the jury room a

9   computerized and indexed version of all of the exhibits that

10  were admitted into evidence.  If you want any of the testimony,

11  that can also be provided in computerized form.  But please

12  remember that it is not always easy to locate what you might

13  want, so be as specific as you possibly can be in requesting

14  portions of testimony.

15          Any of your requests, in fact any communication with

16  the Court, should be made to me in writing, signed by your

17  foreperson, and given to the marshal, who will be available

18  outside the jury room throughout your deliberations.  After

19  consulting with counsel, I will respond to any question or

20  request you have as promptly as possible, either in writing or

21  by having you return to the courtroom so that I can speak with

22  you in person.

23          You should not, however, tell me or anyone else how

24  the jury stands on any issue until you have reached your

25  verdict and recorded it on your verdict form.

1    Each of you must decide the case for yourself, after

2    consideration, with your fellow jurors, of the evidence in the

3    case and your verdict must be unanimous.  In deliberating, bear

4    in mind that while each juror is entitled to his or her

5    opinion, you should exchange views with your fellow jurors.

6    That is the very purpose of jury deliberation — to discuss and

7    consider the evidence; to listen to the arguments of fellow

8    jurors; to present your individual views; to consult with one

9    another; and to reach a verdict based solely and wholly on the

10   evidence.

11   If, after carefully considering all of the evidence

12   and the arguments of your fellow jurors, you entertain a

13   conscientious view that differs from the others', you are not

14   to yield your view simply because you are outnumbered.  On the

15   other hand, you should not hesitate to change or modify an

16   earlier opinion that, after discussion with your fellow jurors,

17   now appears to be erroneous.

18   In short, your verdict must reflect your individual

19   views and it must also be unanimous.

20   This completes my instructions of law.

21   So all objections to the instructions that were

22   previously made in the charging conference are deemed to have

23   been renewed at this time and are denied.

24   Is there any other reason any counsel needs to come to

25   the Court?

M2b2Pal6                          Charge

1          MR. AXELROD:  No, your Honor.  Thank you.

2          MR. VOGT:  No, your Honor.

3          THE COURT:  Very good.  All right.

4          All right.  So, ladies and gentlemen, we are going to

5     excuse you now to begin your deliberations, and please be sure

6     to let us know if we can be of any help to you in any respect

7          THE DEPUTY CLERK:  But first. . .

8          THE COURT:  First we need to swear in the marshal.  I

9     am so sorry.  There you are, Mr. Marshal.  Come forward.

10         THE MARSHAL:  Yes, sir.

11         (Marshal sworn)

12         THE DEPUTY CLERK:  Jurors, please follow the marshal.

13         (Jury retires to deliberate; time noted, 3:42 p.m.)

14         THE COURT:  Please be seated.

15         Okay.  So I have a sentencing in a different courtroom

16    at 4:00.  Obviously if we get a note from the jury I will

17    interrupt the sentencing and come deal with that.

18         And in the meantime I will take a look at *New York*

19    *Times v. Sullivan* on the point that was just raised by defense

20    counsel since that was not a point I had really focused on.

21         So we will see you all -- here is my rule.  You are

22    welcome to go out in the hallway or whatever.  No one can leave

23    this floor, however, because I don't want to have trouble

24    rounding you up.  And there always has to be available at least

25    one lawyer from each side who can respond to any question we

**JA 1132**

M2b2Pal6                Charge

1    get from the jury.

2              Okay?

3              MR. AXELROD:  Thank you.

4              MR. BROWN:  Your Honor, could I just make sure that I

5    preserve for the record the three arguments under Rule 50 which

6    are the two branches of actual malice, of and concerning, and

7    the element of falsity?

8              THE COURT:  Yes.  Well, I didn't know that we had

9    finished our discussion.  I thought you were going to tell me

10   which was the most important.

11             MR. BROWN:  Actual malice.

12             THE COURT:  Yes, I now infer that.  So we will talk

13   about that when I come back, but with respect to "of and

14   concerning," which I thought and, frankly, still am leaning to

15   thinking is a slam dunk for the plaintiff, I do want to take a

16   look at *New York Times v. Sullivan* just in case it changes my

17   mind.

18             MR. BROWN:  Thank you, your Honor, I just wanted to

19   make sure I preserved it.

20             THE COURT:  Yes, yes.  You look fully preserved.

21             (Recess pending verdict)

22

23

24

25

1    (In open court; jury not present)

2    THE COURT:  Please be seated.

3    So I've completed my other matter, the sentencing, and

4    I wanted then to continue the discussion of the pending motion.

5    And to be frank, I think defense counsel has grossly overstated

6    what *New York Times v. Sullivan* says on the "of and concerning"

7    issue.  The relevant portions of the Supreme Court's majority

8    opinion in that case, which is 376 U.S. 254, occurs at

9    pages 288, 289, and 290, and read as follows:

10    "There was no reference to respondent --" that is to

11    say Mr. Sullivan -- "in the advertisement, either by name or

12    official position."  Let's stop right there, because clearly

13    here, there was a reference to Ms. Palin's name.

14    The court goes on:

15    "A number of the allegedly libelous statements did not

16    even concern the police.  The statements upon which respondent

17    principally relies as referring to him are the two allegations

18    that did concern the police or police functions that

19    'truckloads of police ringed the Alabama State Capitol campus'

20    and that 'Dr. King had been arrested seven times.'  The

21    statements were false in that police had been deployed near the

22    campus but not actually ringed it and that Dr. King had been

23    arrested only four times.  Although the statements may be taken

24    as referring to the police, they did not on their face make

25    even an oblique reference to respondent."  And then they go on

1  and discuss, or the argument is made, well, he was implicated

2  by virtue of his official position as chief of police, and they

3  reject that out of hand.

4          So it does not seem to me, counsel, remotely close to

5  what you represented to the Court.  So I deny the portion of

6  the motion based on the "of and concerning" prong.

7          Now you wanted to be heard on the other portions.

8          MR. BROWN:  Yes, your Honor, and I would only say that

9  I apologize if the Court feels misled.  I was referring to the

10  legal principle that the Court was articulating in that case

11  and did not mean to suggest that the facts were directly

12  aligned here.

13          THE COURT:  Go ahead.

14          MR. BROWN:  With respect to actual malice, your Honor,

15  as the Court has indicated in the charge and as the Court has

16  previously ruled, both New York's anti-SLAPP statute and the

17  First Amendment require Ms. Palin to prove actual malice as an

18  element of her libel claim, and as the Court's jury charge

19  delivered a moment ago makes clear, there are two aspects of

20  that.  And we move for judgment as a matter of law on either or

21  both of those aspects of actual malice.

22          First, to deal with falsity, your Honor.  As the Court

23  put it in the proposed charge to the jury, Ms. Palin must have

24  proved by clear and convincing evidence that at the time of

25  publication, James Bennet either knew it was false to say that

1   there was a direct or clear link between the crosshairs map and

2   Jared Loughner's decision to shoot people in Arizona in 2011,

3   or, alternatively, that he knew there was a high likelihood

4   that it would be false to say such a thing, and that he

5   recklessly went ahead and did so anyway.  As Mr. Axelrod

6   pointed out --

7            THE COURT:  Yes.  I think plaintiff's counsel chiefly

8   is relying on the reckless disregard prong, not actual

9   knowledge, but we'll hear from him in due course.

10            MR. BROWN:  And your Honor, as Mr. Axelrod outlined

11   more precisely in his closing summary of the evidence, but as

12   is also reflected in plaintiff's counsel's summary of the

13   evidence at closing, there simply is no affirmative evidence at

14   all that at the time of publication, Mr. Bennet in fact

15   harbored subjective knowledge of falsity or that he in fact

16   harbored any doubts about the truth of the words he chose to

17   use.  To the contrary, the affirmative evidence, which includes

18   both Mr. Bennet's own testimony about his state of mind and,

19   significantly, the contemporaneous emails before and

20   immediately after publication that were admitted into evidence,

21   including his exchange with Mr. Douthat and the text messages

22   and email exchange with Ms. Williamson and Ms. Lepping, the

23   night after publication and early the following morning, all

24   establish that he then and to this day does not know whether

25   Loughner saw or was motivated by the crosshairs map, and

M2B1PAL7

1  whether the link he proposed was therefore direct or certain in

2  the particular sense claimed by Mrs. Palin here in this

3  lawsuit.  What Mr. Bennet now knows, as a result of efforts

4  related to the correction after publication, is that no one has

5  ever affirmatively established that Loughner in fact did see

6  the map.  And that's an important distinction both temporally,

7  that knowledge came after publication --

8       THE COURT:  Well, I think I'm not fully grasping the

9  significance of that.  I think you're making a valid point in

10  this sense.  The very evidence that plaintiff's counsel in his

11  summation referred to to establish what he took to be

12  Mr. Bennet's bias and prejudgment and all like that show that

13  Mr. Bennet initially believed that there was the link referred

14  to.  So there's the statement in one of the exhibits where he's

15  saying, in one of the emails, something to the effect of -- I

16  wish I had the emails.  The one with the parentheses, about

17  "e.g.," the Loughner thing.  Maybe someone can --

18       MR. TURKEL:  119, Judge.  Plaintiff's 119.

19       THE COURT:  Well, can someone put it on the screen?

20  Are we still able to do that?  If not, we can get it.

21       Yeah, this is from Mr. Bennet to Ms. Williamson and

22  copying Mr. Semple, Ms. Cohn, etc., at Exhibit 119.  And it

23  reads, "Hey Elizabeth -- as Bob had said, there's most likely a

24  gun control point to be made here.  The other question is

25  whether there is a point to be made about the rhetoric of

**JA 1137**

1    demonization and whether it incites people to this kind of

2    violence.  Hard for me to imagine that Bernie himself is guilty

3    of anything like that."  I pause to say presumably because

4    Mr. Sanders's rhetoric is rather boring.  But continuing with

5    the email, "but if there's evidence of the kind of inciting

6    hate speech on the left that we, or at least I, tended to

7    associate with the right (e.g., in the run-up to the Gabby

8    Giffords shooting) we should deal with that."  Now your

9    adversary pointed to that to show prejudgment bias on the part

10   of Mr. Bennet, but I think it supports your point, because it

11   shows that at least at that point in time, which was June 14,

12   2017, at 12:41 p.m., Mr. Bennet clearly believed that the Gabby

13   Giffords/Sarah Palin situation was an example of the rhetoric

14   of demonization that incites people to this kind of violence.

15   So that would be totally inconsistent with knowledge that the

16   assertion to that effect, which is how plaintiffs read the

17   editorial, was known to him as to be untrue.  However, that

18   still leaves what occurred thereafter, which plaintiff's

19   counsel is arguing shows reckless disregard because in effect

20   what they're saying is he didn't want to hear that it might not

21   be true.

22           MR. BROWN:  But your Honor, this is not a situation in

23   which, for example, there is a contemporaneous email in which

24   the key witness made a statement suggesting in its wording that

25   he doubted or disbelieved the truth of the statement.  There's

1  no such contemporaneous email.  In that circumstance, there may

2  well be a credibility question for a jury to have to resolve,

3  to reconcile what was said in an email that suggested that was

4  actual evidence of suggestive doubt as to truth or subjective

5  awareness of defamatory meaning, the second prong.

6       THE COURT:  Well, I'm not quite sure what you're

7  saying there, because the law is clear, at least in the Second

8  Circuit, that if you find that a witness has lied about some

9  essential matter, you can infer that he or she lied because of

10  the opposite, that the opposite was true and they were

11  concealing it, and while that's not sufficient in and of itself

12  to carry your burden, it can with other evidence then be

13  sufficient, if there is other evidence.  So there's always

14  present, when credibility is a big issue, as it clearly is in

15  this case, the possibility of the so-called adverse inference.

16       MR. BROWN:  But my point, your Honor, is that all of

17  the admitted exhibits confirm rather than contradict

18  Mr. Bennet's testimony about his state of mind on the day of

19  publication.  And the mere possibility that jurors might

20  disbelieve him, the courts have repeatedly held, is not enough

21  to create a jury issue on the issue of actual malice.

22       And I think it's important here, your Honor, to bear

23  in mind two things.  As the Court has pointed out in its

24  charge, the two statements at issue, one of which refers to the

25  direct link, or rather the clear link, and one of which is a

M2B1PAL7

1    comparative use of direct in comparison to the Virginia

2    situation, and from Mr. Bennet's perspective, he has both

3    testified that he believed that to be true at the time of

4    publication and indeed he explained the reason that he, in his

5    view, correctly believed a link existed is because he was

6    referring to the fact that Representative Giffords's name

7    appeared on what he considered an example of violent political

8    rhetoric—that is, a map with gun sights on it—and that that

9    person later became a victim of violence.  That, he has

10   testified, is the sense in which he was using the phrase

11   "links," that is, between the political rhetoric and the

12   victim.  As we all know, readers apparently understood that in

13   a different sense than he has testified he intended, and

14   Mrs. Palin has alleged that the editorial communicated to the

15   typical or ordinary reader that she was personally responsible

16   for causing Loughner to commit the crime.

17            THE COURT:  Yes, and while that's not the issue you're

18   now raising, just so we're clear, I don't see that to be a

19   necessarily unreasonable view.  Indeed, as we know, a lot of

20   people held that view after reading it, including people even

21   at *The Times*.  But that, of course, is not the issue you're

22   raising now.

23            MR. BROWN:  Right.

24            THE COURT:  You're raising the issue of what was in

25   his mind.

M2B1PAL7

1          MR. BROWN:  Correct.  And my point is only, he has

2     testified that what was in his mind was the fact of the link,

3     which is demonstrably true that --

4          THE COURT:  Yes, but here's the point -- and again,

5     I'm not expressing my own view; this is just because I must, on

6     this motion, take everything most favorably to the plaintiff.

7     So if a reasonable reader could read these editorial comments

8     as stating that Ms. Palin created a map that was a direct and

9     clear link to rhetoric that helped cause or impacted the

10    shooting of Ms. Giffords and others, and if, assuming arguendo

11    that that's a reasonable reading of the editorial, then when

12    Mr. Bennet takes the stand and says, no, that wasn't my intent

13    at all, why is the jury bound by that?  They may say, come on,

14    you're saying that now, self-serving, but we don't think that's

15    what you really thought.

16         MR. BROWN:  But again, your Honor, first of all, we're

17    sort of mixing up the falsity element and the awareness of

18    defamatory meaning element.

19         THE COURT:  Yeah.  I was trying to show how one could

20    relate to the other, but go ahead.

21         MR. BROWN:  And clearly they are related.  But on that

22    point, your Honor, again, the cases have repeatedly said that

23    the mere hope that the jury might disbelieve the defendant in a

24    defamation case such as this is not enough to get to the jury.

25    Rather, there has to be some actual evidence of subjective

1    doubt.  And here, there is none.  One of the arguments --

2                THE COURT:  Okay.  What cases are you referring to?

3                MR. BROWN:  For example, *Contemporary Mission*, the

4    Second Circuit case, 842 F.2d at 621-22, says, quite literally,

5    it is not enough for the plaintiff to get to the jury for the

6    plaintiff merely to speculate that the jury might believe the

7    witness's uncontradicted testimony.  That's a near verbatim

8    quotation from *Contemporary Mission*.  But --

9                THE COURT:  Wait.  That's a different point, I think.

10   Read me that again.

11               MR. BROWN:  That the jury might disbelieve the

12   defendant's testimony is not a sufficient basis on which to get

13   to the jury on the subject of actual malice.

14               THE COURT:  But presumably that was a case where the

15   case did not go to the jury.  In other words, in this case, he

16   took the stand --

17               MR. BROWN:  Right.

18               THE COURT:  -- and so they could have assessed his

19   demeanor and all sorts of stuff that wouldn't be before the

20   court if the case was dismissed before going to the jury.

21               MR. BROWN:  No, and that was my point a moment ago,

22   your Honor.  This is not a case in which there is some

23   objective evidence that calls into question the defendant's

24   testimony about his subjective state of mind.  There is not a

25   late-night email in which the defendant appears to confess to

M2B1PAL7

1    having told a lie and the jury then needs to reconcile, based

2    on the denials under oath from the stand, whether --

3              THE COURT:  Yes, but I don't know of any case, even in

4    this refined context, that says the only way the jury can infer

5    that a witness lied is if he previously confessed to the

6    opposite of what he's now saying.

7              MR. BROWN:  And I was not --

8              THE COURT:  That would be, to use your favorite

9    authority, contrary to at least 500 years of common law

10   determination.

11             MR. BROWN:  And I did not suggest that was the only

12   way, your Honor.

13             THE COURT:  All right.

14             MR. BROWN:  But the point of the cases is that there

15   needs to be something more than the mere suggestion that the

16   jury might.  And here, your Honor, to focus on the things to

17   which plaintiff's counsel pointed in his summation as evidence

18   of this, we have various articles published at various times,

19   some of which -- hyperlinks for which were provided on the day

20   of publication, prior to publication, opinion pieces.

21             THE COURT:  Anything after publication is irrelevant

22   for this purpose that we're talking about.

23             MR. BROWN:  Correct.  And counsel has said that -- has

24   argued to the jury that a person reading those articles would

25   see that there was no link between the map and the Loughner

M2B1PAL7

1    shooting.  What each of those articles is careful to say,

2    however, is that it has not been established that there was any

3    link.  And so I'll get in a moment to the question of whether

4    Mr. Bennet had any duty to read those articles that were

5    forwarded, but assuming for the moment that he did, assuming

6    for the moment that he did read them, as counsel has argued the

7    jury should infer, the fact is not one of those articles said:

8    It was established that Loughner did not see the map.  Nowhere

9    in the record is there any evidence --

10            THE COURT:  Well, that's true.  Let me put you on

11   pause for a moment.  I want to hear from plaintiff's counsel as

12   to the points so far made.

13            MR. VOGT:  Well, your Honor, there's kind of been an

14   interweaving of the defamatory meaning and falsity issue,

15   but --

16            THE COURT:  We're only on falsity right now.

17            MR. VOGT:  But I want to try to give an overview,

18   because the only reason I brought that up is I think I'm going

19   to talk about both, but -- so you have a situation here where

20   Mr. Bennet, for our position, has a preconceived narrative at

21   the time at 12:41 about wanting to write about the issue of

22   incitement.  At that point in time he directs that research be

23   done.  He doesn't review any of that research.  Initially in

24   his deposition, and through discovery, he claims:  I read none

25   of it.  When confronted with an email that he forwarded to

1 colleagues pieces that he says are more relevant to the piece

2 that they're writing, he changes his testimony at trial, which

3 raises a serious credibility issue, and he actually admitted to

4 changing his testimony on the stand. Those two pieces -- and

5 while I understand there is differing interpretations of what

6 the language in those could mean, I don't think that anyone

7 could say that someone looking at those pieces would not at

8 least have a signal given to them that there's a possibility

9 that the statement that Governor Palin's map not just incited

10 but clearly and directly incited Mr. Loughner's crime was

11 something that needed to be investigated further. That is a

12 key issue in the recklessness sphere, because as your Honor

13 points out in the jury instructions, in situations such as that

14 where people have been signaled that furthering the

15 investigation is necessary and that they deliberately failed to

16 do so, this is particularly strong evidence of actual malice on

17 the issue of falsity. That is combined with the fact --

18          THE COURT: I don't think I say quite that in my

19 charge. But I get your point.

20          MR. VOGT: And then you have, compounding that failure

21 by Mr. Bennet, his failure to click on a hyperlink which has a

22 clear statement in it that there is no connection that has been

23 established between the map and Mr. Loughner's crime. We now

24 have a time frame a little more established than we did at the

25 summary judgment phase where Mr. Bennet, said today in closing,

1    has this article from 5:03 until 7:22 but apparently did not

2    click the one hyperlink that happens to be in these paragraphs.

3         THE COURT:  What about, going back to my first point,

4    Exhibit 119?  That seems, one might argue, unequivocal evidence

5    that, whether mistakenly or not, Mr. Bennet honestly believed,

6    hours before the editorial was published, that there was a

7    direct link between Ms. Palin's map and the Giffords shooting?

8         MR. VOGT:  Twofold.  One, I think --

9         THE COURT:  I'm sorry.  Hold on one second.

10        Oh, okay.  Go ahead.

11        MR. VOGT:  Counsel made a particularly strong argument

12   to the jury today that Mr. Bennet had no idea about whether

13   there was a connection between the Palin map and the Loughner

14   shooting at the time of this particular email, and the reason

15   why they argue that was to refute our theory about a

16   preconceived narrative, but they said he never instructed

17   anyone to write about Ms. Palin because he didn't even know

18   about her involvement, which is consistent with other testimony

19   he had when I had him on the stand, where I believe I went

20   through a laundry list of factors, including the fact that he

21   did not recall ever seeing the map, the map was not even

22   visually in his mind at the time that he wrote --

23        THE COURT:  So that's a good point, but what do you

24   take to be what he's referring then "in the run-up to the Gabby

25   Giffords shooting"?

M2B1PAL7

1  MR. VOGT:  I don't know exactly what he's referring

2  to, but I know the position that the defense took confidently

3  to the jury was that that does not refer to any link between

4  Governor Palin and the Loughner map.

5  THE COURT:  All right.  Hold on just one second.  My

6  law clerk handed up from a case that defense counsel quoted a

7  minute ago.

8  This is very interesting.  So this is from

9  *Contemporary Mission, Inc. v. New York Times Company*, 842 F.2d

10  612 (2d Cir. 1988), at pages 621-22.  And what it says in

11  effect is that the normal rules regarding adverse inferences

12  that might apply where the burden is simply preponderance don't

13  apply where the burden is clear and convincing.  So they say,

14  referring to the Supreme Court case of *Anderson v. Liberty*

15  *Lobby, Inc.*, 477 U.S. 242 (1986), "The court in *Liberty*,"

16  meaning the Supreme Court, "The court in *Liberty Lobby* reasoned

17  that in ruling on a motion for summary judgment, the judge must

18  view the evidence presented through the prism of the

19  substantive evidentiary burden—namely, the clear and convincing

20  standard.  The court," again, meaning the Supreme Court in

21  *Liberty Lobby*, "discounted the argument also made here that the

22  defendant should seldom, if ever, be granted summary judgment

23  where his state of mind is at issue and the jury might

24  disbelieve him or his witnesses as to this issue, stressing

25  that a plaintiff opposing a fully supported motion must offer

1  concrete evidence from which a reasonable juror could return a

2  verdict in his favor.  It is not enough for the plaintiff

3  merely to assert that the jury might, and legally could,

4  disbelieve the defendant's denial of legal malice."

5          So that's very interesting.  What the court is saying

6  is that given the enhanced "clear and convincing evidence"

7  standard, the more everyday rule in preponderance cases that

8  the jury should be free to draw an adverse inference based on

9  their assessment of the credibility of the defendant can't

10  carry you all the way when the burden is that you have to

11  establish that it was highly probable that he had a particular

12  state of mind.

13          Interesting point.  Okay.  Back to you.

14          MR. VOGT:  And I don't think that that's what we're

15  saying here, your Honor.  I think those are situations where

16  the only thing that the plaintiff is saying is a jury could

17  disbelieve his denial of subjective intent.  That's not what

18  we're saying.  As I just pointed out, Mr. Bennet had already

19  testified that he wasn't specifically referencing the Palin map

20  in the Loughner shooting in his 12:41 email that's in

21  Plaintiff's Exhibit 119.

22          In addition to that, as I was going through with the

23  Court, you have the conscious and deliberate decision, from our

24  perspective, at least, that he not do things like click on the

25  hyperlink, that is then compounded by the fact that when he

**JA 1148**

1    gets this draft from Ms. Williamson, his testimony is that it

2    was his understanding that that draft constituted the results

3    of her research.

4              THE COURT:  Yes, but remember, we're talking about his

5    knowledge of falsity, and therefore, what is in something that

6    he doesn't click on doesn't carry you I think where you're

7    going.

8              MR. VOGT:  As to actual knowledge, but it does as to

9    recklessness.

10             THE COURT:  Well, remember, recklessness is an

11   intentional act.  It's not a question of negligence.  It's a

12   question of a conscious decision to blind one's self to what

13   there is a high probability will be there if you look.  And I'm

14   not sure how what you've just referred to meets that standard.

15             MR. VOGT:  Hopefully I'll be able to explain.  But so

16   in the particular paragraph where Ms. Williamson has the

17   results of her research about the issues that Mr. Bennet then

18   tells her to go look up, there is a hyperlink, which

19   Ms. Williamson testified was the support for her statement

20   about the map itself.  That signals to any journalist, and

21   including in the guidelines and standards we put in, that when

22   you have a reference like that, as source attribution, that you

23   always click on those links and verify that they say -- they

24   support the fact that's in there.  Particularly important here,

25   because what Mr. Bennet did was despite the fact that

**JA 1149**

M2B1PAL7

1     Ms. Williamson's draft already embodied, by his own admission,

2     what he was supposedly intending to say was that there was an

3     environment of rhetoric surrounding the map, in addition to

4     failing to click on that link, he also changed the language to

5     say something quite different, meaning that there was direct

6     and clear incitement.  And anyone who was changing the language

7     within the draft, which he acknowledged only said that there

8     was rhetoric surrounding that shooting, would definitely have

9     clicked on the link to see if that was supported as well.

10          THE COURT:  All right.  That's interesting.  We'll

11    come back to you on the other prong in a minute, but let me

12    hear from defense counsel.

13          MR. BROWN:  First of all, your Honor, it's important

14    to keep in mind that Mr. Bennet did not write the words "Sarah

15    Palin" or even "Sarah Palin's political action committee caused

16    Jared Loughner to shoot Gabby Giffords and others."  What he

17    said, based on Ms. Williamson's draft referencing the

18    crosshairs map, is that there was a link, clear and more direct

19    than in the Virginia case, between that map and an act of

20    violence.  And again --

21          THE COURT:  Yes, but of course that's what brings us

22    here.

23          MR. BROWN:  But Mr. Bennet --

24          THE COURT:  But what he is taking, which is a

25    suggestion of a link and saying it's more than a suggestion,

JA 1150

M2B1PAL7

1    it's clear and direct.

2         MR. BROWN:  And in this case, your Honor, he's

3    testified that he was referring to the fact that the victim's

4    name, Representative Gabrielle Giffords's name, appeared on

5    that map along with gun sights and that therefore the map was

6    linked to the victim.  So I just --

7         THE COURT:  He may have said that, but I'm not sure --

8    as I understood defense counsel's theory as stated on

9    summation, he began with an opinion, which defense counsel I

10   think rightly emphasized was an opinion on a fact, that this

11   excessive rhetoric created conditions that could lead to

12   violence even with people who were, or maybe because they were,

13   mentally imbalanced, but then he goes further and  says that

14   the link was clear and direct.  That's a factual assertion.

15   And by the way, although it's interesting that *The Times* did

16   not argue in their initial papers in this case that even that

17   was a question of opinion, which might have been an interesting

18   argument, I assume one of the reasons they didn't make that

19   argument is because Mr. Bennet himself describes it as a fact

20   when he issues the correction.

21         (Continued on next page)

22

23

24

25

1    MR. BROWN:  My point, your Honor, is only that it is

2    important to distinguish between the words Mr. Bennet used and

3    the meaning that plaintiff alleges the word conveys.  But

4    turning to the evidence to which plaintiff's counsel points as

5    purportedly being evidence from which a reasonable jury could

6    draw the inference by clear and convincing evidence actual

7    malice, he refers to the ABC article at the hyperlink.

8         Now, first of all, when Mr. Bennet received the draft,

9    and then the draft was published, the hyperlink was under the

10   word "circulated."  In other words, it was offered by

11   Ms. Williamson as support for the assertion that Sarah Palin's

12   political action committee circulated a map.

13        THE COURT:  And you are saying -- that's a good point.

14   You are saying --

15        MR. BROWN:  It's an uncontested fact.

16        THE COURT:  And no particular reason why he would have

17   to check the hyperlink to have confirmed that fact since it was

18   common knowledge.

19        MR. BROWN:  Exactly.

20        If Ms. Williamson had provided a draft with a

21   hyperlink under the word "incitement" or "direct cause of" or

22   something, plaintiff's counsel might have a stronger argument.

23   I won't even concede that, but there might be a stronger

24   argument.

25        But here, it was obvious and not in need of

1  fact-checking from Mr. Bennet's perspective that Sarah Palin's

2  political action committee circulated a map.  So there was no

3  particular reason on the face of the editorial when he received

4  the draft that that link needed to be double checked.

5       And, your Honor, even if a person clicks on the link,

6  as was obvious from the exhibit displayed, the first thing one

7  sees is a headline, and I don't have it in front of me, so I

8  won't get the quotation quite right, but --

9       THE COURT:  Well, I know what you are about to say,

10  but I also think it is relevant, because if they have an

11  argument at all, it's from his failing to click on the link,

12  not because of what he would have found if he did click on the

13  link.

14       MR. BROWN:  And my point is the failure to click is,

15  on the face of the draft he received, not a breach of

16  journalism ethics or some shocking thing, because it was

17  clearly visually indicated that it was support for the

18  proposition that the map was circulated.

19       THE COURT:  Okay.  Let me hear what plaintiff's

20  counsel says about that.

21       MR. VOGT:  Your Honor, that argument was begun with

22  the argument that if it had been under the word "incite" or

23  "causation," it would be a different story.  But neither of

24  those words were in there.  He was substantially changing the

25  meaning of that text in what she wrote, which has been our

M2b2Pal8

```
1   position if it goes all the way back to the --

2               THE COURT:  No, no, but here is the point.  You may

3   have an argument about that he didn't do sufficient

4   fact-checking and what inferences can be drawn from that when

5   he changed the language to make it so much stronger, but it

6   doesn't follow that you have an argument that his failure to

7   click on the link that she sent him is supportive of a

8   conscious reckless disregard when, as defense counsel points

9   out, the link was in support of "circulate" and therefore even

10  when he added the stronger language, he wouldn't need to go

11  back because everyone knew it was circulated.

12              MR. VOGT:  I think I was trying to make this point,

13  but probably not in a very good way.

14              (Pause)

15              THE COURT:  Go ahead.

16              MR. VOGT:  Just assuming that the hyperlink only

17  relates to the word "circulated" I think is a bit of a jump.

18  It's in that sentence.  That's particularly at issue.  There

19  was no testimony from Ms. Williamson that that was the sole

20  issue that that hyperlink was in there for.  It's a natural

21  place to put it, because there is a reference to the map, but I

22  think any reasonable journalist, when there is a hyperlink in a

23  sentence, is going to click on that.  And I think we heard some

24  of that testimony from Ms. Lett, as well as Eileen Lepping,

25  that every time there is a link in there, the people are going
```

M2b2Pal8

1    to check it to make sure that the facts it leads to are

2    accurate, and not just that, but that it leads to the correct

3    place to support what it says.

4            THE COURT:  Yes, but the point is, and I think you are

5    right, that it may have been negligence on his part not to

6    click on that link, but the point is there was nothing to alert

7    him to that link having anything to do with anything other than

8    circulation.

9            MR. VOGT:  Of the map.  And, see, that's my point,

10   that at this point, your Honor, he had already testified, he

11   testified he did not have an image of the map in his mind.  He

12   did not really recall what the map looked like.  He had not

13   heard any of the tweets that were associated with the map and

14   did not have those in his mind.  So basically he has no idea

15   what that map looks like, what anything surrounding it had to

16   do, and if someone in that situation is going to turn around

17   and say there was a direct and clear link between that map that

18   has no idea what it says or what it looks like, that is

19   certainly a purposeful avoidance of the truth.

20           THE COURT:  All right.  Let me --

21           MR. BROWN:  Your Honor --

22           THE COURT:  No.  I want to call a time out.  You know

23   that is -- even without watching the Super Bowl on Sunday, I

24   assume you know the "time out" sign.

25           I will ask my courtroom deputy to go find out what the

1  jury situation is and then we will continue or not as the case

2  may be.

3      (Pause)

4      THE COURT:  I was worried because I have a tradition

5  in this case of missing the playoffs and things like that from

6  working on the case.  You know, I thought maybe I would be

7  forced to watch the Super Bowl, but now you are giving me such

8  food for thought that I will just be reading case law.

9      Let's see what my courtroom deputy finds out.

10     (Pause)

11     THE DEPUTY CLERK:  They will be conducting

12 deliberations on Monday.  9:30, they said.

13     THE COURT:  Yes, 9:30 is right.  So I will ask my

14 courtroom deputy to make sure that the jury is excused as

15 always, and she will come back and then you guys can leave.

16     And I think this is in terms -- I already ruled that I

17 deny the motion in terms of the "of and concerning" issue.  I

18 think the issue on actual malice is still alive in my mind,

19 particularly after I see the case that I just quoted from that

20 says it has to be evaluated through the special prism of clear

21 and convincing evidence.  So I will look forward to continuing

22 discussion.  If there are -- I was kidding about the Super

23 Bowl.  If there are cases that either side wants me to read

24 over the weekend, just e-mail my law clerk and I will do that

25 because, you know, the ads will be endless, anyway.

**JA 1156**

M2b2Pal8

1    MR. VOGT:  I'm sure Mr. Werle is looking forward to

2    that as well.

3    THE COURT:  Mr. Werle has two young children, so he

4    actually has not slept in the last ten years.

5    Okay.  So why don't we get together at 9:00, then, on

6    Monday, and I hope you all have a very good weekend, and we

7    will see you then.

8    MR. TURKEL:  Judge, one point.

9    THE LAW CLERK:  We have another thing at 9:00.

10   THE COURT:  I'm sorry.  I am told I have another

11   proceeding at 9:00, so 9:30.

12   MR. AXELROD:  Great.  Thank you.

13   MR. TURKEL:  Judge, whether it be formal or informal,

14   are you going to give the jury instruction about looking at

15   things since --

16   THE COURT:  I'm sorry?

17   MR. TURKEL:  Just the cautionary instruction since

18   they are going home for the weekend not to look at anything.

19   THE COURT:  Well, if they haven't left yet, I think

20   that's a good idea.  Why don't we bring them in.

21   MR. TURKEL:  I would be content --

22   THE COURT:  That's good idea.

23   MR. TURKEL:  I just get sensitive these days.

24   THE COURT:  That's an excellent point.

25   MR. AXELROD:  I think one thing the parties can agree

**JA 1157**

M2b2Pal8

1    on is that we don't want to try this again.

2              (Pause)

3              THE DEPUTY CLERK:  All clear.  They are already gone.

4              THE COURT:  I'm sorry.  Can we e-mail them?

5              THE DEPUTY CLERK:  Yes.

6              THE COURT:  Just e-mail them and say to remind them

7    they should not discuss the case with anyone or look at

8    anything regarding the case.

9              THE DEPUTY CLERK:  Okay.

10             MR. TURKEL:  That's fine.

11             THE COURT:  Very good.

12             (Adjourned to Monday, February 14, 2022, at 9:30 a.m.)