# No. 22-558

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

SARAH PALIN, an individual

*Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY, a New York
corporation, and JAMES BENNET, an individual

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Southern District of New York
(Case No. 1:17-cv-04853-JSR, Hon. Jed S. Rakoff)**

**JOINT APPENDIX**

**VOLUME VI OF XI (Pages JA1158 to JA1450)**

Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: 813- 834-9191
Fax: 813-443-2193

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY 10017
Tel: 212-907-7300 Fax: 212-754-0330

*Counsel for Plaintiff-Appellant Sarah Palin*

# JOINT APPENDIX

# TABLE OF CONTENTS

## Volume VI of XI

Trial Transcript, February 14, 2022 ................................................................JA1158

Trial Transcript, February 15, 2022 ...............................................................JA1216

DOC 108 – Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts & Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment ........................................................................JA1236

DOC 117 – Opinion and Order regarding Motions for Summary Judgment entered August 28, 2020 ............................................................................................JA1331

DOC 45 – Opinion and Order granting Defendants' Motion to Dismiss ......JA1367

DOC 96 – Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment..........................................................................................JA1393

DOC 100 – Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment .............................................................................JA1424

JA 1158

M2E1PALF

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SARAH PALIN, an individual,

4               Plaintiff,

5          v.                           17 CV 4853 (JSR)

6   THE NEW YORK TIMES COMPANY, *et
    al.*,
7
                Defendants.
8
    ------------------------------x      Trial
9
                                         New York, N.Y.
10
                                         February 14, 2022
11                                       9:44 a.m.

12  Before:

13                      HON. JED S. RAKOFF,

14                                       District Judge

15
                        APPEARANCES
16
    TURKEL CUVA BARRIOS, P.A.
17       Attorneys for Plaintiff
    BY:  SHANE B. VOGT
18       KENNETH G. TURKEL

19
    BALLARD SPAHR, LLP
20       Attorneys for Defendants
    BY:  DAVID L. AXELROD
21       JACQUELYN N. SCHELL
         THOMAS BYRNE SULLIVAN
22       JAY WARD BROWN

23

24  Also Present:

25  Dana Green, Senior Counsel, The New York Times Company


                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

# JA 1159

M2E1PALF

```
 1                (Trial resumed; jury not present)

 2                THE COURT:  Please be seated.

 3                Linda, how are we doing with the jury?

 4                THE DEPUTY CLERK:  All present.

 5                THE COURT:  So the jury has recommenced their

 6      deliberations.

 7                I understand counsel has a matter to raise, and then I

 8      have some matters to raise as well.  So let me hear first from

 9      any counsel who wishes to be heard.

10                MR. AXELROD:  Yes, your Honor.

11                Over the weekend, we became aware that a nonparty was

12      releasing video transcripts of depositions taken during

13      discovery in this case of two witnesses who took the stand

14      here, Elizabeth Williamson and Linda Cohn, and prior to trial,

15      a couple months earlier -- I can't remember the exact date --

16      that this nonparty had released deposition videos of

17      transcripts of James Bennet's deposition.

18                THE COURT:  Who's the party?

19                MR. AXELROD:  It's this group called Project Veritas.

20                THE COURT:  Although those of us who took Latin in our

21      early schooling, we know that it's pronounced "wer-i-tas," but

22      I'll leave it to the reporter to pick that up.

23                Although to digress even further -- and I shouldn't,

24      because this is a serious matter, but it does remind me of the

25      old Jeopardy joke — "The answer is:  9W [nein, W]."  "The
```

# JA 1160

M2E1PALF

1    question is:  Do you spell your name with a V, Mr. Wagner?"

2           Anyway, go ahead.

3           MR. AXELROD:  So, your Honor, I thank you for sending

4    out the instruction over the weekend to the jury to remind them

5    not to review media reports.  Obviously that's very important.

6    We're concerned that this kind of goes a step further because

7    this isn't media reports that are now out there, this is

8    evidence that was not admitted at trial, and has the deposition

9    clips -- we've provided them to your clerk -- they slice and

10   dice the deposition transcripts in a way that suggests things

11   that aren't necessarily there, and we are, of course, concerned

12   that this could improperly influence the jury.

13          THE COURT:  Well, it would only be a problem if they

14   disobeyed my strict order to them not to look at the media and

15   to turn away if they saw anything in the media.

16          For the record, the instruction that my law clerk sent

17   to the jurors at my request at 9:37 a.m. on Saturday and also

18   was sent to counsel reads as follows:

19          "Dear Jurors:  Thank you for your attention to the

20   trial this week and last.  I'm sure this case is on your mind

21   and that you are eager to continue your deliberations on

22   Monday.  Judge Rakoff asked me to remind you, however, of the

23   instructions he gave you earlier in the case.  It is your duty

24   to remain focused solely on the evidence and arguments

25   presented in the courtroom.  Please avoid any media coverage of

M2E1PALF

1    the trial.  If you see something on TV, please change the

2    channel.  If you see something online, please navigate away.

3    While the case is likely on your mind, your duty is not to

4    speak about the case with anyone other than your fellow jurors

5    and then to do so only while you are assembled together in the

6    deliberation room.  Should a friend or family member bring up

7    the case, please ask them not to speak about the case or any of

8    the issues it raises in your presence.

9         "Thank you, again, for your careful and diligent

10   service throughout this trial.  The Court and the parties are

11   immensely grateful."

12        So it's hard to imagine a more clear instruction than

13   that.  And so what would you like me to do?

14        MR. AXELROD:  Your Honor, as I said, we're glad you

15   sent the instruction.  We just thought, because of the fact

16   that this was more evidence than news reports, we thought we

17   should raise it to the Court, bring it to your attention.  I'm

18   optimistic and remain noncynical that the jury has all of your

19   instructions, but we just want you to be made aware of it in

20   case something happens.

21        THE COURT:  Okay.  So anything else that counsel

22   needed to raise before I want to go back to the Rule 50 motion?

23        And first --

24        MR. TURKEL:  Not from the plaintiff, Judge.

25        THE COURT:  First, let me thank both sides for the

M2E1PALF

1   very helpful citations they sent me over the weekend, which

2   caused me to miss all but the last four minutes of the Super

3   Bowl, but it's clear I didn't miss anything.

4          So I think it comes down to a single issue.  By the

5   way, were I to grant the motion -- and I haven't decided yet,

6   but were I to grant the motion, I would still let the jury

7   continue to reach a verdict so that the Court of Appeals, if

8   they disagree with my determination, would still have the

9   jury's verdict before them and we wouldn't have to retry the

10  case.  But I don't mean to suggest by that that I've made a

11  decision.  I just wanted to flag what would be the result if I

12  did grant the motion.

13         I think it comes down to the prong of actual malice

14  relating to reckless disregard of falsity.  So here is sort of

15  where I think the land lies, and then I want to hear from

16  counsel.

17         Prior to drafting the editorial, Mr. Bennet indicated,

18  in Plaintiff's Exhibit 119 that I referred to on Friday, to

19  "evidence of the kind of inciting hate speech on the left that

20  we, or I, at least, have tended to associate with the right

21  (e.g., in the run-up to the Gabby Giffords shooting)."  So

22  while that may be helpful to plaintiff on a different

23  issue—namely, bias and prejudgment—it indicates on its face

24  that he saw the run-up to the Gabby Giffords shooting as a kind

25  of inciting hate speech.  And yes, that email doesn't refer

1    specifically to the crosshairs map, but then, of course, he

2    gets the draft editorial from Ms. Williamson, which does

3    expressly refer to the crosshairs map.

4          Then his attention is called to, first, the op-ed

5    piece by Frank Rich.  And I continue to be shocked that no one

6    remembers that Frank Rich was a very distinguished drama critic

7    for many years for *The Times* long before he became a columnist.

8    But in any event, I see mixed messages being sent by the Frank

9    Rich column.  On the one hand, in referring to President

10   Obama's Tucson speech, he says, "Of the many truths in

11   President Obama's powerful Tucson speech, none was more

12   indisputable than his statement that no one can know what is in

13   a killer's mind."  But he adds in the next sentence, "So why

14   have we spent so much time debating exactly that," suggesting

15   on the very first two sentences that there are a variety of

16   views out there.  And he adds later in the discussion, "Did

17   Loughner see Palin's own most notorious contribution to the

18   rancorous tone—her March 2010 web graphic targeting

19   congressional districts?  We have no idea, nor does it matter."

20         So then he goes on to quote Congressperson Giffords,

21   "In her MSNBC interview that Wednesday, Giffords said that

22   Palin had put the 'crosshairs of a gun sight over our

23   district,' adding that when people do that, 'They've got to

24   realize there is consequences to that action.'"

25         So without going on -- and it's a long article -- the

**JA 1164**

1    main thing that is brought to the attention of Mr. Bennet in

2    the Frank Rich article is that -- and by the way, it's not

3    clear that he read it, but assuming for the sake of argument

4    that he read it, it expresses the author's opinion but also

5    clearly expresses that there are contrary opinions out there as

6    to the impact of the crosshairs map on the shooting.

7         The same is true for the opinion, for the editorial

8    entitled "Bloodshed and Invective in Arizona," Plaintiff's

9    Trial Exhibit 134.  And I won't go through these in great

10   detail.

11        And finally, the same is true of the "As We Mourn"

12   editorial, Plaintiff's Exhibit 135.

13        None of these undercuts someone holding the view that

14   the crosshairs map directly or indirectly could have impacted

15   Loughner.

16        A stronger argument might be made for plaintiff with

17   respect to the ABC News article.  That is more clearly directed

18   at the issue.  But it is not contested that Mr. Bennet failed

19   to click on the link.  Plaintiff argues that this was proof of

20   conscious disregard, but as was pointed out on Friday, the link

21   is linked to the word "circulated" in the email, which was

22   something that everyone knew.  Mr. Bennet didn't need to look

23   at that.

24        I would also note that after he made his changes in

25   the editorial appear and he received the email from Ross

1    Douthat on the evening of June 14, questioning whether there
2    was a basis for Mr. Bennet's editorial assertions, Bennet
3    explains that his "understanding was that in the Giffords case
4    there was a gun sight superimposed over her district."
5    Plaintiff's Exhibit 171.  And the immediate response tends to
6    corroborate that it was that belief that was motivating him.
7    And I haven't seen anything yet that indicates that at the time
8    he wrote the editorial, he either believed that what he was
9    saying was false—I don't think anyone contends that—or that in
10   what plaintiff latches onto, he was acting with reckless
11   disregard of the truth.  This might be a different call if it
12   were not for the "clear and convincing" standard.

13          This was what I thought was the most interesting point
14   brought to my attention by defense counsel on Friday.  The
15   Supreme Court direction in the case of *Anderson v. Liberty*
16   *Lobby*, 477 U.S. 242, 254, that on a Rule 50 motion, "the judge
17   must view the evidence presented through the prism of the
18   substantive evidentiary burden."  Note that that's a direction.
19   "The judge must view the evidence presented through the prism
20   of the substantive evidentiary burden."  And they go on to
21   indicate what they mean by that—namely, that it's got to be
22   more than it would be if the burden was simply preponderance of
23   the evidence, whereas in the case of clear and convincing
24   evidence, it has to render the determination of reckless
25   disregard highly probable.

**JA 1166**

M2E1PALF

1     And as I think we also discussed on Friday, the Second

2     Circuit has interpreted that to mean that it's not enough for a

3     jury to draw an inference from the defendant's testimony, an

4     inference adverse to him, and conclude that he is not telling

5     the truth and therefore the opposite might be the case, which

6     is a permissible approach in preponderance cases, although even

7     there, it cannot carry the entire burden.  But in cases

8     applying *The New York Times v. Sullivan* "clear and convincing"

9     requirement, it's not remotely enough, nor -- and this is the

10    Second Circuit case, *Contemporary Mission, Inc.* v. *New York*

11    *Times*, 842 F.2d 612, 621 (2d Cir. 1988), "nor are bare

12    assertions of ill will sufficient to establish a triable issue

13    of actual malice."

14    And lastly, the cases brought to my attention by

15    counsel over the weekend put all this in the context of the

16    obligation of a district judge to enforce the constitutional

17    underpinnings of *New York Times v. Sullivan*.  So I think that's

18    where we really have the issue of whether there is a Rule 50

19    motion that should be granted.  I've considered the other

20    points made by defendants' counsel as to why the Rule 50 motion

21    should be granted, and I do not find them persuasive.  Some are

22    stronger than others.  I've already expressed my strenuous

23    disagreement that the editorial wasn't referring to Sarah

24    Palin.  But I've considered the other arguments as well.

25    I think one argument that may or may not be germane

**JA 1167**

1    and I throw out for discussion is this:  There are false

2    statements and there are false statements.  In this case, the

3    false statement was in effect that Ms. Palin had incited the

4    murder of numerous people and the injury of still others that

5    was perpetrated by Mr. Loughner.  That's a very strong

6    assertion.  Now Mr. Bennet says that really wasn't what he had

7    in mind, but certainly taking everything most favorably to the

8    plaintiff, which I must on a Rule 50 motion, the changes that

9    Mr. Bennet made to the Williamson draft, which are set forth in

10   Defense Exhibit 136, was to make, so far as this issue

11   concerned, make much stronger the assertion that Ms. Palin's

12   crosshairs map was clearly and directly linked to the shooting.

13   And the argument that possibly might be relevant here -- and as

14   this indicates, I'm still thinking this through -- is that it's

15   one thing not to check on a statement that turned out to be

16   false but is relatively low-key, so to speak, and certainly the

17   case law is clear that a mere failure to check is not enough to

18   support the reckless disregard in the context of a libel claim;

19   but that where the assertion is that someone incited murder,

20   that that is such a strong statement that even under a reckless

21   disregard standard, it calls for more assiduous checking than

22   would be normally the case.  And I didn't see, in any of the

23   cases that counsel directed me to on either side, any

24   discussion of that.

25            I mean, this is, as so many have already noticed, an

1   unusual case.  On the one hand, it's hard to believe that most

2   people did not see the map circulated by Ms. Palin's PAC as a

3   crosshairs map.  On the other hand, it's hardly surprising, in

4   this Court's view, that she brought this lawsuit when, some

5   years later, she was accused, in effect, of inciting murder.

6          Okay.  Let me interrupt.  We have a note from the

7   jury:

8          "Your Honor, we request the transcript of Ross

9   Douthat's testimony."  And then there is the signature of the

10  foreperson but it is indecipherable.  Though I'm guessing that

11  the person who spoke for the jury on Friday is probably the

12  foreperson, but you never know.

13         So here's what I think makes sense.  I've laid out all

14  the indications of where my own thinking is on the Rule 50

15  motion.  It's probably good to give you guys a pause to put

16  together whatever you want to say rather than off the top of

17  your head.  So first, work with my law clerk and the court

18  reporter to get an electronic version of Mr. Douthat's

19  testimony that we can bring immediately into the jury.

20         THE LAW CLERK:  They want the whole testimony?

21         THE COURT:  Yes, that's what they're asking for, the

22  whole testimony.

23         By the way, I don't bother to redact questions to

24  which objections were sustained because the jury knows they're

25  to disregard that anyway, and that would take endless amount of

**JA 1169**

M2E1PALF

1  time.  And there were no sidebars during his testimony, so we

2  don't have to worry about that.  So this should take only a few

3  minutes.

4          But why don't we reconvene in 20 minutes, at 10:35,

5  and I'll hear argument then on the Rule 50 motion.

6          MR. BROWN:  Your Honor, one question for

7  clarification.

8          THE COURT:  Yes.

9          MR. BROWN:  The third branch of the motion, which we

10  have not yet discussed, is our position that plaintiff has

11  failed to carry her burden of proving by clear and convincing

12  evidence that the alleged defamatory meaning was false.  Did

13  the Court deny that branch of the motion or may we argue that?

14          THE COURT:  Well, you may argue it, since you haven't

15  argued it previously.  And you can also argue that Cincinnati

16  should have won the Super Bowl, but perhaps that won't be an

17  adequate argument.

18          All right.

19          MR. TURKEL:  10:35, your Honor?

20          THE COURT:  10:35.

21          (Recess)

22          (In open court; jury not present)

23          THE COURT:  Please be seated.

24          All right.  So let me hear first from plaintiff's

25  counsel, then from defense counsel.

**JA 1170**

1    MR. VOGT:  Thank you, your Honor.

2    On the issue that your Honor raised at the end of the

3    discussion concerning the significance of the changes that

4    Mr. Bennet made to the draft editorial and making it a much

5    stronger assertion about incitement of murder, and also adding

6    the terms "clear" and "direct" to those allegations -- "direct"

7    in particular is significant and I'll explain in a moment --

8    but in the *Sharon* case, your Honor, which we actually provided

9    to the Court, there's actually a portion of that at 599 F.Supp.

10   538, pinpoint cite 582, where, and I'll quote, "Although a

11   reporter may have sufficient evidence of his charge to

12   foreclose any material issue of constitutional malice towards

13   publication, he may nonetheless make himself liable if he

14   knowingly or recklessly misstates that evidence to make it seem

15   more convincing or condemnatory than it is," and references

16   how, in this particular instance in *Sharon*, they qualitatively

17   transformed the allegation by making it more serious and

18   substantive, and we think that's exactly what happened here.

19   THE COURT:  But that may go to the falsity issue, but

20   I'm not sure why it goes to the actual malice issue.  If there

21   is no evidence that he believed his assertion was false at the

22   time he wrote it, or there's no evidence that he purposely,

23   consciously disregarded a high probability that his assertions

24   were false at the time he wrote them, then plaintiff hasn't

25   satisfied the one aspect of the actual malice standard.  So if

**JA 1171**

M2E1PALF

you take something you know and then grossly exaggerate it,

that's one thing, but that's not the situation the evidence

presents here, because his claim -- and more to the point,

there is no affirmative evidence whatsoever that he knew or

believed the statement was false.  So we're totally concerned

with reckless disregard.  And with respect to reckless

disregard, every indication is that he believed, and continued

to believe, until after the publication, that he had it right;

at least that's the argument that I think you need to address.

          MR. VOGT:  Well, I'll say in that regard -- and I know

these concepts kind of get intermingled sometimes, but his

position, at least as we understand it, is not that, you know,

saying that there was incitement is actually a true statement

or he thought that there was a direct and clear link between

incitement and the Loughner shooting.  That's not what his

claim was.  His claim was that he meant to use the term

"incitement" in a way --

          THE COURT:  Well, that's a good point.  And you're

saying nevertheless, despite that testimony, a reasonable juror

could look at this and say, no, he's saying incitement to

murder.

          MR. VOGT:  Correct.  And the reason --

          THE COURT:  And then you say, if his belief is that

Ms. Palin's crosshairs map contributed to a culture of violence

that then impacted Loughner but instead of saying that, in your

M2E1PALF

1    view, he says she had a direct and clear link with what

2    Mr. Loughner did, then the case you just cited sounds to me

3    more relevant.

4              MR. VOGT:  Yes, your Honor.  And one of the things

5    that we specifically did in that regard was I asked Mr. Bennet

6    during examination whether Ms. Williamson's draft accurately

7    embodied that principle of the "rhetoric of demonization"

8    environment surrounding the time of the Giffords shooting, and

9    he said yes.  And I went through that with him.  And I said,

10   "But then you changed it to 'incitement,'" which he confirmed.

11   And then subsequently I went back and got him to admit that the

12   correction, or the corrected text in the editorial itself, was

13   consistent with what Ms. Williamson had written originally,

14   which demonstrates that there was an intention here to

15   substantially change the terminology in a way that made it more

16   serious, something different, and that's why we went through

17   his, you know, understanding of the use of the term

18   "incitement" with him so much.  But that I think puts it

19   squarely within the *Sharon* logic, which, and that portion I

20   read you, your Honor, was actually in the actual malice

21   analysis in that case.

22             THE COURT:  Okay.  Well, now that you clarified where

23   you were going, I understand the point.

24             So let me hear on that point from defense counsel and

25   then we'll come back to plaintiff's counsel.

**JA 1173**

M2E1PALF

1          MR. BROWN:  Well, a couple of points, your Honor.

2     First, of course, it's very important to maintain in mind the

3     distinction between the words Mr. Bennet actually added to the

4     editorial and what plaintiff alleges the final editorial meant.

5     Essentially we're talking about the words "clear" and "direct,"

6     with respect to the link.  The rest of the language within the

7     crucial passage was Ms. Williamson's.  And plaintiff alleges

8     from that that the editorial communicated to the typical reader

9     that she was personally responsible for inciting Loughner to

10    commit the shooting.  Now there's a fact question that the jury

11    is considering, whether it has that meaning.  That's not at

12    issue here today.  But in fact, the words that Mr. Bennet added

13    were that the clear and more direct link -- and he testified

14    that in his mind at the time, he was referring to the fact that

15    the map which he cited and Ms. Williamson cited as an example

16    of this kind of rhetoric, included both gun sights, and gun

17    sights in relation to the name of one of the ultimate victims.

18    And it was in that sense that Mr. Bennet has testified he was

19    using the words "clear" and "direct."

20          But to turn to the *Sharon* case, and your Honor's

21    earlier point, or question, about whether if a charge is

22    particularly serious, is there some additional duty on the part

23    of the author of that charge.  The difficulty for plaintiff's

24    counsel here, your Honor, is that insofar as the *Sharon* case

25    addresses actual malice, United States Supreme Court

1  subsequently said it was bad law.  And the Supreme Court said

2  that in the *Harte-Hanks* case, which we cited in our list of

3  citations to the Court.  The particular reference is at

4  491 U.S. at 665-66.  That's because the *Sharon* court -- and

5  plaintiff's counsel also in their list of citations included

6  the *Loeb* case.  Both of those, both *Loeb* and *Sharon*, are cases

7  from this court in the early 1980s, and their analysis of

8  whether actual malice was present in those cases turned on what

9  those courts viewed as "an extreme departure from professional

10 standards."  And in *Harte-Hanks*, the court said that's not

11 correct; that is not how one evaluates, or proves, actual

12 malice.  Rather, to prove actual malice, the Supreme Court

13 said, one needs actual evidence of subjective awareness of

14 falsity, as your Honor's other comments suggest.  And so *Sharon*

15 is no particular authority here.

16       But to address the Court's point about the particular

17 damaging statement, or an alleged defamatory meaning that is

18 particularly damaging, we are unaware of any case authority

19 that says that by itself is sufficient to trigger a different

20 level of duty.  Indeed, I think *Harte-Hanks* is properly read to

21 reject that.  Rather, the question here is whether there is any

22 evidence that at the time of publication, Mr. Bennet harbored

23 doubts about whether his choice of words were accurate, and

24 there is not an iota of evidence in the record that Mr. Bennet

25 had any doubts about whether it was correct to say that there

**JA 1175**

M2E1PALF

1    was a direct or clear link between the map and the ultimate

2    shooting.  Again, he doesn't say in any direct words in the

3    editorial that the map caused the shooting but that there was a

4    link, and the link was explained by Ms. Williamson in her draft

5    because the map contained gun sights, related to Gabrielle

6    Giffords, who was a victim, and we respectfully submit, your

7    Honor, that even accumulating those separate things that

8    plaintiff contends each independently would be evidence of

9    actual malice, they simply don't add up to clear and convincing

10   evidence because the fundamental starting point, the essential

11   element of actual malice, some evidence of subjective knowledge

12   of falsity, subjective doubt about the truth, as your Honor

13   noted, in the record, there is not a bit of evidence of that

14   until after publication when Ross Douthat first raises the

15   question.

16         THE COURT:  So I think you make a point that prompts

17   some clarification.  The editorial, after Mr. Bennet's changes,

18   was somewhat ambiguous on precisely what he was asserting in

19   terms of the "link," and that's why in my instructions I point

20   out to the jury that the plaintiff takes it as meaning such and

21   such, not that it necessarily was.  So the paragraph begins,

22   referencing the Scalise shooting, "Was this attack evidence of

23   how vicious American politics has become?  Probably.  In 2011,

24   when Jared Lee Loughner opened fire in a supermarket parking

25   lot, grievously wounding Representative Gabby Giffords and

**JA 1176**

M2E1PALF

killing six people, including a 9-year-old girl, the link to

political incitement was clear.  Before the shooting Sarah

Palin's political action committee circulated a map of targeted

electoral districts that put Ms. Giffords and 19 other

Democrats under stylized crosshairs."

　　　　　Now if the jury reads that, as I think they reasonably

could -- there are other alternatives -- as saying that

Loughner shot these folks because of the crosshairs over

Ms. Giffords' electoral district, then I think it presents a

much more extreme situation than what you've just been arguing

about.  That's not the only possible interpretation.  And

Mr. Bennet gave a different interpretation.  But then he says

in the following paragraph, "Conservatives and right-wing media

were quick on Wednesday to demand forceful condemnation of hate

speech and crimes by anti-Trump liberals.  They're right.

Though there's no sign of incitement as direct as in the

Giffords attack, liberals should of course hold themselves to

the same standard of decency that they ask of the right."

Again, somewhat ambiguous.  But assuming that the jury could

resolve that ambiguity as saying, well, the ordinary reader

would read this as an assertion that the crosshairs map

directly or indirectly caused Mr. Loughner's action, which I

think is a possible reading—not the only one, but a possible

reading—then the question that I was raising is:  Is that

extreme assertion so far removed from anything that Mr. Bennet

M2E1PALF

1    knew that it called for a greater -- it wasn't a question of

2    professional ethics; it's just a question of common sense.  You

3    don't make that kind of assertion without some deeper knowledge

4    than he clearly possessed.

5              MR. BROWN:  And the single-word answer to that

6    question, your Honor, is no.  And that implicates the second

7    prong of the actual malice analysis—that is, awareness of or

8    intention to communicate that particular defamatory meaning.

9    And this record wholly lacks any evidence that Mr. Bennet was

10   aware, prior to publication, or that he intended, prior to

11   publication, that readers interpret the article to have the

12   more extreme meaning you're saying.  And so plaintiff cannot

13   carry her burden of proving actual malice absent some actual

14   evidence that the court in *Harte-Hanks* and other cases said was

15   required here—there must be some actual evidence of subjective

16   awareness both of falsity and of the allegedly false meaning

17   prior to publication.  And of course the Court has said, look,

18   if there is some evidence of that awareness but it isn't clear

19   and convincing evidence of that awareness, then other kinds of

20   evidence can bolster that and push it across the line.  But the

21   court --

22             THE COURT:  You're saying there's zilch here.

23             MR. BROWN:  Exactly, your Honor.

24             THE COURT:  "Zilch" being a legal term of art.

25             MR. BROWN:  Exactly.

1    THE COURT:  All right.  Let me hear from plaintiff's

2  counsel.

3    MR. VOGT:  On that last point, your Honor, I think

4  when you're talking about, you know, one reasonable way to read

5  the editorial, that it would be as the plaintiff has alleged it

6  should be read, which is that adding the words "incitement,"

7  "clear," and "direct" indicated that there was either a direct

8  or indirect, you know, relationship between these two things.

9  That's consistent with the dictionary definition of the term,

10  which is the most natural way to read it, which is what

11  Mr. Douthat testified to.

12    The other thing is, there is evidence in the record to

13  support that Mr. Bennet was aware that readers would interpret

14  it that way.  The very first question I asked him is, "As an

15  editor, would it surprise you that readers would understand the

16  word 'incitement' to mean what its dictionary definition is?"

17  And he said, "It wouldn't surprise me."

18    THE COURT:  Yeah, I remember that, because there was

19  no objection to that clearly improper question -- improper as

20  to form, not as to substance, but --

21    MR. VOGT:  Thank you.

22    And then later on, I asked Mr. Bennet, "As a

23  journalist, are you trained to consider how readers may

24  interpret the words you use when you're writing a piece?"  And

25  he said yes.  "And did you endeavor to do that when you were

M2E1PALF

1    writing the portions of 'America's Lethal Politics' that you

2    wrote?"  And he said, "I endeavored to do that."  That's, you

3    know, direct evidence that in his mind he knew of the

4    possibility, and we believe the strong possibility, that

5    readers were going to interpret the word "incitement"

6    consistent with its dictionary definition, he used it anyway,

7    and in doing so, he also added the words "clear" and "direct."

8    And I mentioned earlier that I was going to get back to a point

9    with your Honor, but one of the statements that's in the

10   "Bloodshed and Invective" pieces, which Mr. Bennet testified

11   that he read -- this was, you know, between the "Bloodshed and

12   Invective" and "As We Mourn," because he was confronted with

13   the email of having said, these two pieces are more relevant to

14   the editorial -- there is a statement on the second page,

15   second full paragraph, first line, "It is facile and mistaken

16   to attribute this particular madman's act directly to

17   Republicans or Tea Party members."  That to me, when you have

18   Mr. Bennet adding the word "direct" along with the word

19   "incitement" into the editorial, I think there's a -- I know

20   your Honor disagrees, but I think that's an argument that there

21   is actual knowledge of falsity when he's adding in the word

22   "direct," because he has a member of the editorial board itself

23   writing a piece that said you can't do that.

24          THE COURT:  All these articles, first of all, have

25   mixed messages; but secondly, if he genuinely believes -- let's

**JA 1180**

M2E1PALF

1     take the more extreme -- that the crosshairs map directly

2     caused the Loughner shooting, let's say he believed that in

3     good faith at the time that he wrote the editorial -- that's

4     not what he's saying but I'm taking the extreme -- then the

5     fact that other people, including people on his own editorial

6     board, disagree with him is neither here nor there.  The

7     question still is: was that a good-faith belief or did it

8     recklessly disregard the high probability that it was wrong.

9     That's a different issue.  That's why his not seeing the ABC

10    article I think is more directly on point, because --

11              MR. VOGT:  I agree with that point, your Honor.

12              THE COURT:  Okay.

13              MR. VOGT:  But certainly, when you have the ABC

14    situation and then in addition, you at least have a statement

15    of that in "Bloodshed and Invective in Arizona," it is a signal

16    to someone who is making a significant change to the

17    terminology of a piece and, in our position, changing the

18    meaning of it significantly, that there should be an

19    investigation done.  That proposition from *Sharon* is still good

20    law.  *Sharon* wasn't overruled by *Harte-Hanks*.

21              THE COURT:  So I have to take what will be literally a

22    10-minute phone call on another matter, and then we will

23    resume.  But you might want to take a look at -- I asked my law

24    clerk to see if there were any cases involving really extreme

25    allegations, such as murder, and there were no federal cases

1  that he could find, but there is a Court of Appeals case that I

2  think you're already familiar with, Court of Appeals of the

3  State of New York, *Prozeralik v. Capital Cities Communications*.

4  Both of you, if I recall, cited this in your earlier papers,

5  but just in case you didn't, it's reported at 605 N.Y.S.2d 218,

6  and that's an allegation of kidnapping and assault, so pretty

7  strong allegation that was found to be false.  So take a look

8  at that case.  And we will resume in 10 minutes.

9          (Recess)

10          (In open court; jury not present; 11:29 a.m.)

11          THE COURT:  Please be seated.

12          I'm sorry that took longer than I thought it would,

13  but I have no other matters till 2:00, so I'm at your service.

14          So I think we were at plaintiff's counsel, or I'm not

15  sure who we were at, but I'll hear from plaintiff's counsel,

16  then from defense counsel.

17          MR. VOGT:  Your Honor, I think where we left off is

18  your Honor had gone through, you know, a reasonable and

19  rational reading of the editorial being consistent with what

20  the plaintiff's position is in this case, and I think it's

21  important to point out in that regard that for purposes of a

22  Rule 50 motion, the editorial has to be read that way.

23          THE COURT:  I agree.

24          MR. VOGT:  And if that's the case, then the evidence

25  here --

**JA 1182**

M2E1PALF

1  THE COURT:  Well, as long as yours is a possible

2  reading, but I agree that it's a possible reading.

3  MR. VOGT:  And so when that happens, then I think you

4  fall right in line with these cases that show that there are

5  sufficient facts in the record from which that same reasonable

6  jury could find malice with convincing clarity, because for the

7  reasons that we've already discussed today, there is ample

8  evidence that Mr. Bennet significantly rewrote the editorial

9  even though he knew that Ms. Williamson's editorial already

10  said what he claims he was trying to say.  The piece --

11  THE COURT:  But a lot of the changes are stylistic,

12  for lack of a better term.  Not the ones you're concerned with,

13  I grant.

14  MR. VOGT:  Correct.

15  THE COURT:  But, I mean, he's the editor in chief of

16  this particular board.  If my law clerks ever handed me a draft

17  opinion that I didn't edit, I would feel I ought to give up my

18  job; I'm not doing my job.

19  MR. VOGT:  Right.

20  THE COURT:  So the fact of the editing per se is I

21  think harmless.  The key thing is the two changes that he made

22  that we're concerned with here.

23  MR. VOGT:  Correct, and significantly changing the

24  meaning and intent of the editorial on those particular points

25  to the way that the -- specifically with respect to the jury

**JA 1183**

M2E1PALF

1 reading that we were just talking about a moment ago.  And then

2 in that regard, it's undisputed that he has no evidence to

3 support that type of statement as a whole, and I think he

4 clearly testified as to that.  And as a matter of fact, one of

5 the things I did with him was went through and asked whether,

6 you know, he had seen the map prior to making his revisions and

7 he said no.  Did he have any image in his mind?  No.  Was he

8 aware of any evidence that there was any link between those?

9 No.  And then I think when you're making such a strong

10 assertion like that, then a duty to investigate that arises

11 because of the seriousness of the charge that you're making,

12 and --

13 　　　　　THE COURT:  Well, I threw that out as a thought that

14 had occurred to me.  I still don't see any case law directly on

15 point on that, and when is it a really serious charge might be

16 a hard thing to define with predictability, but --

17 　　　　　MR. VOGT:  I believe there is case law to that effect,

18 your Honor.  Now it may not be, you know, fact-specific to what

19 we're talking about here, but I do believe there is case law

20 that stands for the general proposition that the seriousness of

21 the charges being leveled against someone can give rise to an

22 increased obligation to investigate the accuracy of --

23 　　　　　THE COURT:  Well --

24 　　　　　MR. VOGT:  -- the underlying statements, and I'll try

25 and get with my office and see if I can pull that --

**JA 1184**

1       THE COURT:  I'm going to make this decision today.  I

2   don't want to let it keep hanging out there.

3       MR. VOGT:  I understand.  I think I briefed it before,

4   so I think it's something that someone in my office can find

5   fairly quickly.

6       THE COURT:  Okay.  Let's go to defense counsel.

7       MR. BROWN:  Certainly, your Honor.

8       First, with reference to the *Prozeralik* case that your

9   Honor cited, I think that actually clearly supports the

10  defendants' position here.  In that case, the article at issue

11  had stated that the plaintiff was the victim of a kidnapping

12  and beating related to organized crime.  That was the allegedly

13  false and defamatory statement.  The plaintiff obtained a jury

14  verdict, and when it got to the New York Court of Appeals, the

15  New York Court of Appeals reversed that verdict in favor of the

16  plaintiff and remanded for retrial, finding that the judge had

17  improperly instructed the jury that the statement was

18  false—that is, the falsity element of the claim.  As relevant

19  here, however, the New York Court of Appeals rejected the

20  request by the defendant Cap Cities ABC to dismiss instead of

21  remanding for new trial, and Capital Cities had argued that the

22  plaintiff had failed to state or carry the burden of getting

23  back to trial, malice.

24      THE COURT:  I looked at it only briefly, but I thought

25  there was a factual issue of where --

1        MR. BROWN:  Exactly, your Honor.

2        THE COURT:  -- not relevant to our present discussion,

3   but the question there was the defendants said the reporter

4   said an FBI agent had told him X, Y, and Z, that the plaintiff

5   was the likely person who committed the kidnapping or something

6   like that, and the FBI agent denied that, so that presented a

7   jury question on whether he knew or had any basis for his

8   assertion that X was the kidnapper.

9        MR. BROWN:  Well, again, as I understand it, the

10  plaintiff was the victim of the kidnapping --

11       THE COURT:  Yes, that's right.

12       MR. BROWN:  -- and the court ruled that the plaintiff

13  had adequately stated the elements of the claim, that he was

14  entitled to a jury trial, a retrial, rather than having the

15  complaint dismissed, because multiple defendant's employees had

16  testified that prior to publication, they raised that they

17  thought they had the wrong name in the article for that.

18       And here, your Honor, even after James Bennet finished

19  what plaintiff has suggested were substantial changes -- we

20  disagree with that, but -- after Mr. Bennet had finished

21  rewriting the article, he did not push the button and publish

22  it.  He sent that draft back to multiple editors on the

23  editorial board, members of the editorial board, and to the

24  fact-checkers, and each one of those people testified, without

25  equivocation, that they did not read the revised editorial to

M2E1PALF

1    have the meaning that plaintiff attributes to it.  So this is

2    not a case where Mr. Bennet solely changed the editorial and

3    then published it.  The entire editorial board and

4    fact-checking staff read it the way he did, not the way

5    plaintiff did.  This is not a case where multiple employees,

6    upon seeing the revised draft, put up their hands and said, we

7    have it wrong, and Mr. Bennet published anyway, which is what

8    the evidence in the *Prozeralik* case suggested the defendants

9    had done.  And for that reason, that case directly supports

10   judgment as a matter of law on actual malice here.

11          Two other quick points, your Honor.  Mr. Vogt has a

12   couple of times brought up Mr. Bennet's testimony where he was

13   asked:  Would it surprise you if readers interpreted a word

14   according to its dictionary definition.  He did not ask

15   Mr. Bennet:  In 2017, on June 14th, on the day of the

16   editorial, would it have surprised you that readers interpreted

17   your words that day to be a direct accusation of causation?  He

18   asked Mr. Bennet, sitting here today, would that surprise him;

19   and after the last five years of history, needless to say,

20   Mr. Bennet is not surprised by that.  But on the day of

21   June 14th, that matters.

22          THE COURT:  I just can't help myself, but the rules of

23   evidence are something very important to this Court, so even

24   though defense counsel did not object to questions so phrased,

25   it is grossly objectionable to phrase a question that way

**JA 1187**

M2E1PALF

1    because it's really a form of counsel testifying.  It's never

2    an issue of any importance whether someone is surprised or not

3    surprised.  What counsel is really saying when it uses that

4    kind of question is, I'm asserting that a lot of people viewed

5    it this way, but he doesn't say that because that would be too

6    obvious a gross dereliction of his role, so he says, would it

7    surprise you that lots of people read it this way or would it

8    surprise you if a lot of people read it this way or something

9    like that; a flagrant violation of the federal rules, but one

10   that apparently defense counsel didn't care about.

11            MR. BROWN:  Precisely because the question wasn't

12   addressed to the day of June 14th, your Honor.  And the

13   uncontradicted evidence as of June 14th, both the testimony of

14   the witnesses and all of the contemporaneous documents, is that

15   Mr. Bennet was indeed greatly surprised at how readers had

16   interpreted the word.  And this goes to the other point.

17   Plaintiff's counsel speaks as if the word "incitement" has only

18   a single definition, but even the dictionary definition that

19   your Honor read to one of the witnesses on the stand during

20   testimony contained multiple variations of what the word means

21   and was not at all --

22            THE COURT:  Actually, that's not quite accurate.  So I

23   go back to *Webster's New Collegiate Dictionary, Second Edition*.

24            MR. BROWN:  Your Honor, could I ask what year that was

25   published.

**JA 1188**

M2E1PALF

```
1          THE COURT:  Oh, it's probably 1776.

2          No, it was 1959.  And it says that incite is "to

3     arouse to action, spur or urge on."  That sounds like two

4     definitions to me, not multiple, but --

5          MR. BROWN:  Well, fair enough, your Honor.  It's

6     unclear, of course, what some 50 years later, little more than

7     50 years later, the dictionary definition would be.  But --

8          THE COURT:  You think the definition of "incitement"

9     has changed between 1959 and the present?

10          MR. BROWN:  I think that's entirely possible.

11          THE COURT:  Well, what's your evidence of that?

12          MR. BROWN:  Your Honor, I don't have a dictionary in

13     hand to offer.  I'd be happy to submit examples of dictionary

14     definitions.

15          THE COURT:  Well, I think we'll leave that for --

16          MR. BROWN:  But even the definition --

17          THE COURT:  I'm sorry my mother is deceased.  She was

18     an English teacher.  She would really want to take you on on

19     this.

20          MR. BROWN:  Your Honor, my deceased mother would have

21     greatly appreciated that because she too was an English

22     teacher.

23          THE COURT:  Well, there you go.  And what happened to

24     the two of us?  We became lawyers.  Oy.

25          MR. BROWN:  Exactly, your Honor.
```

**JA 1189**

M2E1PALF

1    But I note, your Honor, that even in the ancient

2    definition that the Court read, the word "violence" doesn't

3    appear in it.  That is a word that requires a direct object.

4    And as Mr. Bennet testified, one can inspire everything from

5    passion to violence.  And "spur on" does not equate with

6    directly causing, your Honor.  I don't think that would be a

7    reasonable interpretation of the word.

8    THE COURT:  Look, I agree that, as I indicated

9    previously, there are alternative possible readings of

10   Mr. Bennet's language.  But the one that plaintiff is

11   suggesting seems to me to be a reasonable possibility, and

12   therefore, for purposes of this motion, I have to accept his

13   interpretation.

14   Now you will be delighted to know that the *Oxford*

15   *English Dictionary*, on February 14, 2022, at 11:40 a.m. -- of

16   course it's now past that so who knows -- says that "incite"

17   means "to urge or spur on," the first similar definition given

18   previously, but also, "to stir up, animate, instigate,

19   stimulate."  Then it says, under construction, "to do something

20   to or unto some action."  If you have greater interest, it's

21   ultimately derived from the Latin *incitare*, "to set in rapid

22   motion, rouse."  And so far as the *Oxford English Dictionary* is

23   aware, it appeared for the first time in the English language

24   in 1483, when I was just a young boy.

25   Now what else would you like to say?

**JA 1190**

M2E1PALF

1       MR. BROWN:  Your Honor.

2       THE COURT:  Ah.  We have another note:

3       "Your Honor, we request James Bennet's testimony

4   transcripts."

5       So I think we need to take a pause because the jury

6   gets our first priority.  And now I don't remember; was it

7   during Mr. Bennet's testimony that we had one or -- no, it was

8   later that we had the sidebars.  Okay.  So we don't have to

9   worry about the sidebars.

10      Okay.  So just work with the reporter.  I'll come back

11  at 12:00 and we'll continue this discussion.

12      THE LAW CLERK:  I can do it right here.

13      THE COURT:  Oh, never mind.  Please be seated.  My law

14  clerk says he needs only 15 seconds so --

15      MR. BROWN:  Just a couple more points, your Honor,

16  related to plaintiff's counsel's argument.  I thought I

17  understood plaintiff's counsel to say at one point that

18  defendants had no evidence to support the truth of their

19  statements, and if I understood that correctly, it is of course

20  important to emphasize that it is not defendants' burden to

21  prove truth; rather, it is their burden to prove Mr. Bennet's

22  subjective state of mind at the time of publication.  Let me

23  say that differently.  That's an element of plaintiff's claim,

24  but that's the focus of the evidence, and defendants have no

25  burden --

**JA 1191**

M2E1PALF

1    THE COURT:  On the element of actual malice.

2    MR. BROWN:  Yes.  Precisely.  And with respect to your

3    comment, your Honor, it indicated that you had not -- sorry.  I

4    got ahead of myself.

5    With respect to that, plaintiff's counsel made a point

6    of suggesting that Mr. Bennet had testified that he didn't have

7    the map in his mind, was unsure what the map had said.  As I

8    understood Mr. Bennet's testimony, those statements were with

9    reference to the email that he sent at approximately noon that

10   day, inquiring generally about the inciting rhetoric in the

11   run-up to or the rhetoric in the run-up to that shooting in

12   Arizona, but five hours later, when he received Elizabeth

13   Williamson's draft of the editorial, Ms. Williamson's draft

14   very clearly described the content of the map, and Mr. Bennet

15   had that in front of him, and in Mr. Bennet's view, as he

16   testified, the link to the events in Arizona was clear and

17   direct because the map contained gun sights and Gabrielle

18   Giffords's name and district on the map, and that was all --

19   THE COURT:  But there are two -- maybe I missed your

20   point earlier, but it seems to me there are two

21   interpretations, at least, but two interpretations that could

22   be given to the relevant paragraphs of his editorial.  One is

23   that because this crosshairs map put a gun sight, in effect, on

24   Ms. Giffords's district, that a crazy guy like Loughner might

25   say, aha, I'm going to go out and shoot her 'cause that's what

1  I'm being incited to do.  And I had a case in 2018 involving a

2  guy named Sayoc who sent would-be bombs through the mail to

3  various members of Congress because, as he said when he pled

4  guilty, he felt that this is what Trump -- he was a great Trump

5  supporter -- would have done if he had been in his place, or

6  words to that effect.  So that's the kind of direct kind of

7  possibility.  And then there is the indirect possibility that

8  the crosshairs map creates a culture of violence or gives an

9  approval to violence that would otherwise not be part of

10  American political discourse and that this in turn indirectly

11  then encourages crazy guys like Loughner to do what they do.

12  It seems to me both of those are possible readings of the

13  editorial.

14        MR. BROWN:  And as you pointed out, your Honor, it

15  will be the jury's duty to find as fact whether the ordinary

16  reader attributed the claimed meaning that plaintiff asserts to

17  the editorial, but in either event, whichever meaning is the

18  one properly attributable, it remains plaintiff's burden to

19  come forward with clear and convincing evidence that Mr. Bennet

20  both subjectively was aware that his words would communicate

21  that meaning, there has to be actual evidence of subjective

22  awareness that his words were going to communicate or were

23  highly likely to communicate that meaning, and that that

24  meaning would be false.

25        THE COURT:  That's right.  I'm not sure the fact that

**JA 1193**
M2E1PALF

1     the fact-checkers didn't pick up on this is particularly

2     important because as one of them testified, they're more

3     looking at things like dates, you know, things whose accuracy

4     can be instantaneously ascertained.  But on the other hand,

5     once Mr. Bennet became aware of what you would say was the

6     public misinterpretation of his words, then he apologized, or

7     attempted to apologize, and corrected, and in his correction

8     he's correcting the fact, and the fact can only be what the

9     plaintiff's interpretation is.

10            MR. BROWN:  And as Mr. Bennet testified, they wanted

11    to be clear and clear the record and not -- I think he used the

12    phrase not be mealy-mouthed in suggesting and blaming --

13            THE COURT:  Another legal term.

14            MR. BROWN:  -- the readers for misunderstanding, and

15    that would have just led to more argument about what was

16    intended, that they thought that was the best way to do right

17    by correcting the record; they corrected it in the strongest,

18    clearest, most direct way rather than blaming the readers for

19    having misunderstood.

20            THE COURT:  Although of course they left in the

21    reference to the crosshairs map.  But we're getting a little

22    far away from the legal issue.

23            MR. BROWN:  The bottom line, your Honor, is that as

24    all of the cases say, there has to be some actual evidence of

25    subjective awareness of the allegedly defamatory meaning and

**JA 1194**

M2E1PALF

1    some evidence of subjective knowledge that that would be false.

2            THE COURT:  Yes.  And I agree, that's the issue I'm

3    focused on.

4            Now before we go back to plaintiff's counsel, since

5    you were dying to tell me also why, in your view, the plaintiff

6    hasn't shown the falsity element as opposed to knowledge of

7    falsity, go ahead.

8            MR. BROWN:  And in that regard, your Honor, it's again

9    important to remember that the issue of falsity has to align

10   with the defamatory meaning that plaintiff alleges the

11   editorial conveyed, which is, here, that that circulation of

12   the map caused Loughner to commit those crimes.  And simply

13   put, your Honor, Ms. Palin offered no evidence whatsoever at

14   trial as to whether or not Jared Loughner saw or was motivated

15   to commit his horrible crimes by the crosshairs map.  She did

16   not depose Mr. Loughner.  He's available.  He could be deposed.

17   She did not depose him to ask him whether he had seen the map

18   or was aware of it.

19           THE COURT:  Why isn't the subsequent admission by

20   Mr. Bennet proof of falsity?

21           MR. BROWN:  Because what Mr. Bennet admitted in the

22   correction -- I should say *The New York Times* admitted in the

23   correction -- is that the link had not been established, which

24   is different than saying there was no link.  It is Ms. Palin's

25   burden in this case to prove that it is false to say that the

**JA 1195**

1    map caused the link.  And we do not know -- all the correction

2    said is no link had been established.  It does not say there

3    was no link.

4          Same is true of all the articles offered by

5    plaintiff's counsel.  And even if those articles were

6    admissible for proof of -- the other editorials and the ABC

7    articles and so forth, even if they were admissible for proof

8    of the truth of the matter asserted, which they are not, each

9    of them simply states the link hasn't been established.  Not

10   one of them purports to say there is no link, or was no link.

11   Plaintiff could have subpoenaed investigative files, could have

12   deposed the law enforcement officers who searched

13   Mr. Loughner's house at the time of his arrest.  There was

14   literally no evidence offered demonstrating a lack of

15   connection between the map and the shooting, and that was her

16   burden as plaintiff in order to prove -- by clear and

17   convincing evidence is the required evidentiary burden -- that

18   it would be false to say the map inspired this shooting.

19          THE COURT:  Well, you certainly have reduced the value

20   of the correction to triviality.  But let me hear from --

21          MR. BROWN:  If I could, your Honor, just say one last

22   sentence.

23          THE COURT:  Yes.

24          MR. BROWN:  As the US Supreme Court said in *Hepps*,

25   475 U.S. 776, and I'm quoting, "In those instances when the

M2E1PALF

1    fact-finding process will be unable to resolve conclusively

2    whether the speech is true or false, it is in those cases that

3    the burden of proof is dispositive."  And we submit that that's

4    the case here, your Honor.

5              THE COURT:  Okay.  Let me hear from plaintiff's

6    counsel.

7              MR. VOGT:  Your Honor, on the correction issue -- and

8    again, it's not just the correction, it's the first correction,

9    the second correction, and the tweets that went along with it,

10   including Mr. Bennet specifically adding the language that you

11   were discussing a moment ago with opposing counsel into those,

12   along with the testimony of Mr. Bennet as well as others

13   confirming the fact that they make their corrections as

14   accurate as possible because they don't want to mislead the

15   public to the truth as it relates to a correction.  That's when

16   we got into the whole "muddying of the waters" issue with him.

17   In addition to that, Mr. Douthat testified that he reported on

18   and covered the Loughner shooting and the subsequent criminal

19   case --

20             THE COURT:  What you're saying, in effect, is that if

21   an editorial asserts two plus two equals five and then they

22   issue a correction that says, "We want to make clear that there

23   is no evidence that two plus two equals five," that's, in

24   effect, to the average, ordinary reader, an admission that the

25   original statement was untrue.

**JA 1197**

M2E1PALF

1    MR. VOGT:  I guess that's one way of saying it, your

2  Honor.  In this particular instance, though, keeping in mind

3  that what Mr. Bennet actually said in the editorial was that

4  there was a clear and direct link that had been established,

5  and when you say that, you know, there's no proof that a link

6  is established, clearly that's inconsistent with a clear and

7  direct link being there.

8    But it went further with that in Mr. Douthat's

9  testimony, you know, which he summarized in his emails but he

10  also confirmed in the testimony that he reported on and

11  investigated this and confirmed that there was no link.

12    And Phoebe Lett, I believe it was, testified as to the

13  same thing, and I think your Honor even asked her a question in

14  a follow-up to mine, where she'd actually reviewed the police

15  report and the police report had determined there had been no

16  incitement that led to Mr. Loughner's shooting.  So I think

17  that that evidence is more than sufficient to demonstrate --

18    THE COURT:  Do I remember from discovery you had the

19  police report?

20    MR. VOGT:  We didn't have the police report that

21  Ms. Lett reviewed because they only -- her testimony was that

22  she only reviewed those online and they weren't provided to us.

23    THE COURT:  Oh, you didn't have them.

24    MR. VOGT:  We didn't have them, whatever she reviewed.

25    THE COURT:  All right.  I was thinking of best

**JA 1198**
M2E1PALF

1    evidence, but you've answered my question.

2         All right.  Anything else that anyone -- and this is

3    your last shot.  And forgive me.  It's been very helpful to the

4    Court, and I really appreciate the fine arguments made by

5    counsel.  Anything else anyone wants to say on any of the

6    issues we've discussed?

7         MR. VOGT:  Your Honor, the only thing I would say is

8    that we've talked about a lot of issues sort of discretely and

9    little -- in different pockets today on different issues, but

10   the *Reeves* case, which is a Supreme Court case, and then we

11   cited a case, the *Kaytor v. Electric Boat Corp.* case, which is

12   609 F.3d 537, 545 (2d Cir. 2010), just highlights again that in

13   addition to, on this type of motion, all inferences still being

14   drawn in our favor, as long as they're reasonable, even though

15   there may be contrary inferences that might also be reasonably

16   drawn, is the appropriate standard, and that all of this has to

17   be reviewed collectively in our favor.  So, you know, each one

18   of the things that we've been talking about today—the reading

19   of the editorial, the evidence, you know, that supports our

20   version of, you know, certain readings or certain events—all of

21   that has to be reviewed collectively, under the Rule 50

22   standard but also under the actual malice law.  For each one of

23   these components of actual malice and circumstantial

24   evidence—Mr. Bennet's conduct, the emails that went back and

25   forth, the failure to investigate, the seriousness of the

M2E1PALF

1    charges, the material change in the language that's at

2    issue—all of those things together are enough evidence combined

3    for a reasonable jury to conclude that there was actual malice

4    in this case.

5          THE COURT:  By the way, not that it's of any moment,

6    but my law clerk says you do have the police reports in your

7    exhibit binders.

8          MR. VOGT:  We have.  We did a public records request

9    for documents from Arizona.  But we don't have -- I asked

10   Ms. Lett in her deposition -- I may have asked her at trial,

11   but I know I asked her in her deposition -- "Do you still have

12   the police report that you looked at?"  And she said, "No, I

13   just looked at that online."

14         Or Lepping.

15         THE COURT:  Yes, but in establishing falsity, it

16   doesn't matter whether she saw it or not.  If there's a police

17   report that is admissible in evidence that tends to establish

18   falsity, you could have introduced it.  But it's all right.

19   It's not a matter I want to dwell on.

20         Yes.

21         MR. BROWN:  Your Honor, I just urge the Court to

22   review the deposition testimony or the trial testimony to which

23   counsel just referred.  Mr. Douthat, for example, in the

24   testimony to which he was referring, I believe explained that

25   it was his opinion that that was the case and not that he had

1   investigated and established a final judgment, so to speak, on

2   the matter.

3           And with respect to Ms. Lepping or Ms. Lett and

4   testimony about the police report, as the Court has pointed

5   out, that testimony alone cannot constitute clear and

6   convincing evidence of what is contained in documents not in

7   evidence in court.

8           And finally, your Honor, I return to the claim now

9   made a couple of times but is, in our view, dispositive.  What

10  is lacking in this record is even an iota of testimony or

11  documentary evidence that at the time of publication,

12  Mr. Bennet was either subjectively aware that his words were

13  going to likely be interpreted in the way plaintiff has alleged

14  or that such an interpretation would in fact be false.  And

15  because those are two independent grounds for granting judgment

16  as a matter of law, we believe judgment should be entered on

17  both of those grounds as well as the others cited previously.

18          THE COURT:  All right.  So I am very grateful to

19  counsel.  I will think about this for at least another hour or

20  two because it's an important matter, obviously.  And I have a

21  2:00 other matter that will take about a half hour, so we will

22  reconvene at 2:30 unless we will get another note from the

23  jury, which we very well may.

24          I want to repeat from Friday that at all times, with

25  one exception that I'll mention in a moment, there must be

1    present on this floor at least one lawyer from each side who

2    can respond to any and all questions from the jury, as well as

3    the parties have to be present as well.

4         But the exception is from 1 to 2, and I will apprise

5    the jury through my courtroom deputy that I am excusing

6    everyone for lunch from 1 to 2, so everyone can go and have

7    lunch.  So the bottom line is, I will see you at 2:30 unless we

8    get a note from the jury before then, at which time I will give

9    you a ruling on the Rule 50 motion.

10        MR. VOGT:  Your Honor, I did just want to correct, it

11   was Ms. Lepping.  I misspoke, and I was corrected.  I just want

12   to make sure the Court was aware of it so I wasn't misleading

13   your Honor.

14        THE COURT:  Okay.  Thank you.

15        (Recess pending verdict, 12:06 p.m.)

16        (In open court; jury not present; 2:54 p.m.)

17        THE COURT:  Please be seated.

18        So our jury is hard at work.  Before I turn to the

19   main matter, with respect to the argument that was being made

20   by defense counsel that there was no proof of falsity, I don't

21   agree with that.  I think it is a jury question, but I'll

22   mention in that regard two things:

23        First, the first correction, which appeared on the

24   website *The Times NYT Opinion* on June 15th, states, "We got an

25   important fact wrong, incorrectly linking political incitement

1    and the 2011 shooting of Giffords.  No link was ever

2    established."  I think that comes very close to saying that the

3    original statement was untrue.

4         But in addition, I went back and looked at

5    Ms. Lepping's testimony, at page 410, beginning at line 9:

6         "Q.  And did you at any point in time conduct any

7    factual research to determine whether or not a link was

8    established between political incitement and the 2011 shooting

9    of Gabrielle Giffords and the other individuals in Arizona?"

10        "A.  Did I ever, meaning which date?"

11        "Q.  Yes, and I'll clarify.  Do you recall that on

12   June 15th of 2017, you conducted factual research concerning

13   whether or not a link was established between political

14   incitement and the 2011 shooting of Gabrielle Giffords?"

15        "A.  I did, yes."

16        "Q.  And what did that research determine?"

17        "A.  I think the best thing I could find was something

18   in a police report that said it wasn't politically connected."

19        "Q.  And when you say 'it,' you're saying the Loughner

20   shooting was not politically connected; is that correct?"

21        "A.  I think so, to the best of my recollection."

22        Now there were no objections to any of those

23   questions, so all of that evidence was admitted, including the

24   substance of the police report, which otherwise, of course,

25   could have been objected on hearsay grounds, best evidence

**JA 1203**
M2E1PALF

1 grounds, form grounds, and numerous other grounds, but since

2 none of those objections were made, it was received for all

3 purposes. And while I'm still bemused that plaintiff's counsel

4 didn't put in the police report which they had marked as an

5 exhibit, here's the essence of it right in the testimony in

6 evidence. So I think a reasonable jury could, even from just

7 the two items I've mentioned, infer that the editorial was not

8 true, at least the portions of the editorial that are being

9 challenged.

10           Now, though, we come to the more important point, and

11 because I know there are some people in the courtroom who are

12 not lawyers—fortunately—I thought I might make clear just what

13 it is that I've been spending so much time with counsel on

14 beginning last week even before we excused the jury and now

15 continuing through to today, which is a motion under Rule 50 of

16 the Federal Rules of Civil Procedure. Rule 50(a) says:

17           "If a party has been fully heard on an issue during a

18 jury trial and the Court finds that a reasonable jury would not

19 have a legally sufficient evidentiary basis to find for the

20 party on that issue, the Court may resolve the issue against

21 the party and grant a motion for judgment as a matter of law

22 against the party."

23           Then the rule continues:

24           "A motion for judgment as a matter of law may be made

25 at any time before the case is submitted to the jury," and it

1    was in fact so made here.

2              And then just to complete the picture, there's

3    Rule 50(b):

4              "If the court does not grant a motion for judgment as

5    a matter of law made under Rule 50(a), the Court is to consider

6    to have submitted the action to the jury subject to the court's

7    later deciding the legal questions raised by the motion."

8              So I certainly considered the possibility that I

9    should wait until after the jury had rendered its verdict in

10   this case before deciding this motion, but the more I thought

11   about it over the weekend, the more I thought that was unfair

12   to both sides.  We've had very full argument on this, I know

13   where I'm coming out, and I ought to therefore apprise the

14   parties of that.  On the other hand, this is the kind of case

15   that inevitably will go up on appeal, and the Court of Appeals

16   I think would greatly benefit from knowing how the jury

17   decided.  So for example, if I were to dismiss the case as a

18   matter of law for failure to prove an essential element and the

19   jury were to decide to the contrary, then on appeal, the Court

20   of Appeals wouldn't have to send it back for a new trial; they

21   could reinstate the verdict.  And there are other possibilities

22   as well.  So I'm going to give you my decision now, which is

23   essentially, therefore, a 50(a) decision, but I will enter it

24   formally after the jury returns its verdict so it will be in

25   that sense a 50(b) decision.  But I wanted to lay that all out

# JA 1205

1   and also make clear to the people who are not lawyers that the

2   question before the Court now is whether, taking everything

3   most favorably to the plaintiff, the plaintiff has still failed

4   to prove an essential element of the claim and therefore the

5   claim should be dismissed, which is different from what the

6   jury has to decide.  They can decide that issue in part if they

7   wish but they can also decide just that they think one side has

8   the better case or the other.  It's a different kind of

9   standard.  They are not bound to take things most favorably to

10  one side or the other.

11          So with that long-winded explanation, I think that

12  there is one essential element that plaintiff has not carried

13  its burden with respect to, which is the portion of actual

14  malice relating to belief in falsity or reckless disregard for

15  falsity.  And I want to make clear that although I am required

16  to take everything most favorably to the plaintiff and I have

17  endeavored to do so, this is a very high standard.  This is

18  part of what *New York Times v. Sullivan* is all about.  And of

19  course that's a controversial case, as we all know, but that

20  case sets a very high burden for plaintiffs where the plaintiff

21  is a public figure, like Ms. Palin; the theory being that the

22  Constitution favors a very robust debate involving especially

23  people in power and that the whole point of the First Amendment

24  as applied in that context would be undercut if the standard

25  for libel and defamation were not as high as the Supreme Court

1    decreed.  It's a controversial point.  The argument can be made

2    that this opens the door to false accusations being made

3    against public figures, and certainly we all know that that has

4    happened, but the Supreme Court made the balance and set a very

5    high standard.  And I don't think that standard has been

6    realized by plaintiff with respect to at least one aspect of

7    the actual malice requirement.

8         Specifically, I don't think she has adduced sufficient

9    evidence, taken even most favorably to her, that a reasonable

10   juror could conclude that Mr. Bennet either knew that the

11   challenged statements were false or that he thought that there

12   was a high probability they were false and he recklessly

13   disregarded that high probability.

14        As I explained earlier, and really a very important

15   part of what my decision turns on, is the Supreme Court's

16   holding in *Anderson v. Liberty Lobby* that "The judge must view

17   the evidence presented through the prism of the substantive

18   evidentiary burden"—namely, clear and convincing evidence.  And

19   as I also mentioned, this has been adopted, as it must be, of

20   course, as a Supreme Court holding, but further clarified by

21   the Second Circuit in *Contemporary Mission, Inc. v. New York*

22   *Times Company*, 842 F.2d 612, a 1988 decision of the Second

23   Circuit, that places the burden very much on the plaintiff in

24   these situations to come forward with strong, affirmative

25   evidence that before publishing, the author either had actual

**JA 1207**

M2E1PALF

1  knowledge that the challenged statements were false or at least

2  a conscious recognition that they were probably -- some

3  decisions say highly probably -- false and that he purposely,

4  consciously chose to disregard that, and that that has been

5  established by clear and convincing evidence—that is to say, by

6  a high probability.  So it's a very high standard.

7       I also think it's worth repeating here what I

8  instructed the jury, and that is that -- and this embodies both

9  the federal law and the New York law, which is also applicable

10 here, and the two laws are really identical when it comes to

11 this aspect of actual malice.  But I instructed the jury --

12 this was as part of my Instruction No. 13:

13       "The first aspect of 'actual malice' you must decide

14 is whether, at the time the editorial was published,

15 Mr. Bennet, and therefore The New York Times, (i) knew that

16 either or both of the allegedly defamatory statements he had

17 drafted were in fact false; or that, at a minimum, (ii) he

18 consciously chose to 'recklessly disregard' the high

19 probability that they were false."

20       And the instruction continues:

21       "In considering Mr. Bennet's state of mind, you should

22 consider all the evidence, including relevant inferences to be

23 drawn therefrom.  But also keep in mind that the plaintiff must

24 prove what was in Mr. Bennet's mind by clear and convincing

25 evidence.  For example, with respect to 'reckless disregard,'

**JA 1208**

M2E1PALF

1  it is not enough just to show that Mr. Bennet did not know, one

2  way or the other, whether the challenged statement you are

3  considering was true or false.  Nor is it enough to prove that

4  he was merely negligent regarding that statement's truth or

5  falsity.  For instance, a failure to sufficiently investigate

6  or to research a particular point does not establish actual

7  malice, unless the plaintiff has demonstrated that such

8  inaction was a conscious, deliberate attempt to avoid

9  confirming the statement's probable falsity.  Even

10  irresponsible reporting or a demonstrated failure to follow

11  professional, journalistic standards does not, on its own,

12  establish actual malice, unless the plaintiff has proved that

13  there was a high probability that Mr. Bennet actually doubted

14  the truth of the challenged statement you are considering and

15  nevertheless consciously chose to disregard the high

16  probability that the statement was false."

17  So as that illustrates, the standard is very high, and

18  the same standard applies here except that, as mentioned, I

19  have to take everything most favorably to the plaintiff in

20  terms of construing the evidence.

21  So I think it is common ground that the plaintiff here

22  is not relying on actual affirmative proof that Mr. Bennet knew

23  that his statements were false but rather on reckless

24  disregard, and plaintiff has not identified any prepublication

25  email in which Mr. Bennet suggests in any respect the probable

1  falsity of the suggestion that the crosshairs map helped cause

2  Loughner to mount his violent attack.  Indeed, as mentioned

3  this morning, in PX 119, Bennet's prepublication email

4  proposing the framing for the editorial shows his preexisting

5  belief that violent right-wing rhetoric incited Loughner's

6  attempted assassination of Representative Giffords, and

7  although he doesn't mention there the map or Sarah Palin, it

8  shows what his belief was, and it really has not been

9  contradicted that he had any different belief at the time.

10          Plaintiff relies on several pieces of research

11  circulated by the editorial team that plaintiff says made

12  Mr. Bennet aware that it had been determined that Mr. Loughner

13  was not inspired to act by the crosshairs map.  It's by no

14  means clear that Mr. Bennet read these articles, and we know

15  that he specifically denies reading at least one of them, but

16  in any event, as I pointed out again this morning, all these

17  columns—Plaintiff's Exhibits 133, 134, 135—give opinions on

18  both sides of that issue and hardly suggest that there is the

19  kind of much more definitive showing as there is in the police

20  report or in the ABC investigation contradicting his good-faith

21  belief.

22          It is true that the argument could be made that he

23  should have looked at the hyperlinked ABC News article under

24  the word "circulated" that accompanied Ms. Williamson's draft.

25  That is in Plaintiff's Exhibit 142.  But negligence, as

**JA 1210**

1    previously mentioned, would not be enough to sustain

2    plaintiff's burden.  In any event, aside from the fact that

3    it's uncontradicted that Mr. Bennet did not open the link, it's

4    perfectly plausible that he would have no reason to open the

5    link since it was linked to the question of circulation, which

6    was really never in doubt—circulation, that is to say, of the

7    crosshairs map.

8            The allegation that he published with actual malice is

9    also undermined, in the Court's view, by the actions he took

10    after finishing his revisions of Ms. Williamson's draft.  For

11    while it's undisputed that an article's author has primary

12    responsibility for fact-checking and accuracy, Mr. Bennet,

13    after revising the editorial, emailed Ms. Williamson, alerting

14    her that he had completed a "heavy edit" and asking her to

15    "please take a look."  This is Plaintiff's Exhibit 163.

16    Mr. Bennet testified that by asking Ms. Williamson to take a

17    look, he meant for her to fact-check the revision, and of

18    course no revision came back from Ms. Williamson or anyone else

19    regarding the issues that are here the subject of the claim of

20    defamation.

21            It is true, of course, that after the editorial was

22    first published, Ross Douthat, on the evening of June 14th,

23    questioned whether the information was all correct, and

24    Mr. Bennet responded by immediately saying, well, this was his

25    understanding but he would pursue it further, and he pursued it

**JA 1211**

1    further to the corrections that were shortly issued.

2         Now I'm not altogether happy with having to make this

3    decision on behalf of the defendant.  As I indicated earlier, I

4    am troubled by the fact that the erroneous edits made by

5    Mr. Bennet reasonably could be read by many readers as an

6    accusation that Ms. Palin's PAC's distribution of the

7    crosshairs map was clearly and directly linked to the Loughner

8    shooting and concomitant murders, and as I mentioned this

9    morning, I'm hardly surprised, therefore, that Ms. Palin

10   brought this lawsuit, for even though *The Times* corrected,

11   perhaps not perfectly in any event, the accusation in fairly

12   quick time, it means that Ms. Palin was subjected to an

13   ultimately unsupported and very serious allegation that

14   Mr. Bennet chose to revisit seven years or so after the

15   underlying events.  So I don't mean to be misunderstood.  I

16   think this is an example of very unfortunate editorializing on

17   the part of *The Times*.  But having said that, that's not the

18   issue before this Court.  My job is to apply the law.  The law

19   here sets a very high standard for actual malice.  And in this

20   case, the Court finds that that standard has not been met.

21   Accordingly, I will ultimately issue an order pursuant to

22   Rule 50 dismissing the complaint, but I will only do so after

23   the jury has returned its verdict.  And they of course will not

24   know about my decision, and therefore, we will have both the

25   benefit of my decision on the law and their decision on the

**JA 1212**

M2E1PALF

1   facts, if you would, on the different standard that they apply,

2   and therefore the Court of Appeals will have the benefit of

3   both determinations before it when it views the inevitable

4   appeal.

5            So needless to say, the plaintiff is deemed to have

6   objected to my decision, and that is preserved for appeal as

7   well.

8            Anything else that either counsel wanted to raise on

9   this subject?

10           MR. VOGT:  No, your Honor.

11           MR. AXELROD:  No, your Honor.

12           THE COURT:  All right.  So I'm going to go deal with

13   another matter that I have at 3:30 in a different courtroom,

14   but of course we should ask the jury whether they want to stay

15   past 3:30 today.  So let's do that before that.  I'll stay here

16   until we find out the answer to that.

17           THE DEPUTY CLERK:  Okay.

18           (Pause)

19           MR. AXELROD:  Your Honor, while we're waiting, would

20   you want to make the submissions that the parties submitted

21   over the weekend part of the record?

22           THE COURT:  Sure, if you want.  That's fine with me.

23   The case citations, you're talking about?  Sure.  I'll have my

24   law clerk make sure those are docketed.

25           MR. AXELROD:  Thank you.

JA 1213

M2E1PALF

```
1         THE COURT:  And if I have a chance -- I don't

2    guarantee this, but if I have a chance -- I will try to reduce

3    my decision to a written order as well.

4         Okay.  So we have a note from the jury:

5         "We would like to continue deliberating until 5 p.m."

6    So that's fine.  So stick around, and I will see you later.

7         (Recess pending verdict, 3:30 p.m.)

8         (In open court; jury not present; 4:46 p.m.)

9         THE COURT:  So it's about quarter of 5, so the jury,

10   which has been very quiet, is probably still deliberating, and

11   they asked to deliberate till 5.  My question for counsel is

12   whether you want me to bring them in to give them a

13   face-to-face, so to speak, admonition about avoiding anything

14   in the media or whether you think that's overkill and that we

15   should just leave things as is.

16        So let me ask plaintiff's counsel first what your

17   choice is.

18        MR. TURKEL:  We leave things as is.

19        THE COURT:  Okay.  Defense counsel?

20        MR. AXELROD:  Your Honor, I think it would make sense

21   to bring them in.  I think there may be push notifications that

22   get sent out to people's phones and I worry that -- I think we

23   should make sure they're hypervigilant about not seeing

24   anything.

25        THE COURT:  The only thing I worry about a little bit
```

**JA 1214**
M2E1PALF

1    there is too much of this is kind of inviting, you know:  Why

2    does he keep telling us not to look at the media?

3         Here's what I think makes sense.  I will bring them

4    in, I'll wish them a happy Valentine's Day, I'll schmooze with

5    them, and then I'll throw in something in passing.

6         (Jury present)

7         THE COURT:  Please be seated.

8         So ladies and gentlemen, I didn't think I should let

9    the day expire, when you know I love this jury, without wishing

10   you a happy Valentine's Day.  And all my deep appreciation,

11   sincerely, for your hard work.

12        I also wanted to alert you that when you resume your

13   deliberations tomorrow -- and you can take as little or as long

14   a time as you want.  That is totally up to you.  But tomorrow,

15   unlike the last couple of days, we can only go to 3:30 because

16   of other things that I had, so I just wanted to flag that for

17   you in advance.

18        And lastly, of course, I need to remind you something

19   you've heard before, but just to keep it in mind:  If you see

20   anything in the media about this case, just turn away.  Read

21   about the traumatic results for the Cincinnati team, and I

22   think it's not true that Putin has promised not to invade

23   Ukraine if we trade him Hawaii.  But in any event, seriously,

24   though, do not look at anything regarding the case, don't

25   discuss the case with anyone outside, etc.

**JA 1215**

M2E1PALF

```
 1              Okay.  So we'll excuse you for today and we'll see you
 2      at 9:30 tomorrow morning.
 3              (Jury not present)
 4              THE COURT:  So I was tempted, of course, to say Putin
 5      will not invade the Ukraine if we trade him Alaska, but I knew
 6      that would touch on sensitive feelings so. . .
 7              All right.  Very good.  We'll see you all tomorrow.  I
 8      don't think we have anything to discuss at 9, so we'll see you
 9      at 9:30 tomorrow.  Thanks a lot.
10              (Adjourned to February 15, 2022, at 9:30 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# JA 1216

M2F1PALF

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SARAH PALIN, an individual,

4                    Plaintiff,

5            v.                              17 CV 4853 (JSR)

6   THE NEW YORK TIMES COMPANY, et
    al.,
7
                     Defendants.
8
    ------------------------------x        Trial
9
                                           New York, N.Y.
10
                                           February 15, 2022
11                                         10:24 a.m.

12  Before:

13                        HON. JED S. RAKOFF,

14                                         District Judge

15
                             APPEARANCES
16
    TURKEL CUVA BARRIOS, P.A.
17       Attorneys for Plaintiff
    BY:  SHANE B. VOGT
18       KENNETH G. TURKEL

19
    BALLARD SPAHR, LLP
20       Attorneys for Defendants
    BY:  DAVID L. AXELROD
21       JACQUELYN N. SCHELL
         THOMAS BYRNE SULLIVAN
22       JAY WARD BROWN

23

24  Also Present:

25  Dana Green, Senior Counsel, The New York Times Company
```

**JA 1217**

M2F1PALF

1          (Trial resumed; jury not present, 10:24 a.m.)

2          THE COURT:  Please be seated.

3          So we got an interesting note from the jury.  It reads

4     as follows:

5          "Your Honor, per your instructions, we need to show

6     'the plaintiff proved that there was a high probability that

7     Mr. Bennet actually doubted the truth of the challenged

8     statement. . .'

9          "If a juror were able to make this inference from a

10    response by Mr. Bennet from a question put forth by the

11    defense, would the fact the defense posed the question

12    invalidate this inference, and can it contribute to the

13    evidence brought forth by the plaintiff?"

14         So off the top of my head, my instinct is to ask them

15    specifically what question they have in mind, what question and

16    answer, because that would, I think, enable us to give a fuller

17    response.  But if we didn't do that, then I think probably we

18    would say something along the lines of:  The fact that the

19    question was asked by the defense is neither here nor there,

20    but keep in mind that an inference from a statement by

21    Mr. Bennet is not of itself sufficient to carry the clear and

22    convincing burden, or something like that.  But let me hear

23    from counsel what you think.

24         MR. TURKEL:  Judge, to me, I think the answer would

25    be:  Sworn testimony is sworn testimony regardless of the

**JA 1218**

1  method used to elicit it and therefore it's all to be

2  considered the same whether the answers were elicited by

3  plaintiff or defense.

4         THE COURT:  Well, that's a possible answer.

5         Let me hear from defense counsel.

6         MR. AXELROD:  Your Honor, I thought your second

7  approach would be appropriate, and I support something like

8  that.

9         THE COURT:  So they're not really familiar, though

10  this played a role in my decision, with the case law that says

11  as a matter of law, an adverse inference that would normally be

12  sufficient for certain purposes in a preponderance situation is

13  not sufficient in a clear and convincing situation,

14  particularly one involving defamation.  That's why I thought,

15  though, it would be useful to see the question, because then we

16  would know whether they're talking about an adverse inference

17  or direct inference.  Either way, the same point, though, would

18  have to be made.

19         Well --

20         MR. TURKEL:  Judge, if I may, their question is

21  specifically directed at whether they can consider testimony

22  elicited by defense to contribute to plaintiff's evidence.  I

23  would think going past that is answering a question they're not

24  asking.

25         THE COURT:  Well, I think there's something to that.

**JA 1219**

M2F1PALF

1   If they had stopped with, would the fact that the defense -- I
2   mean, there are two things.  They don't tell us what kind of
3   inference they're drawing, whether it's an adverse inference or
4   a direct inference.  But putting that aside, they say, "would
5   the fact the defense posed the question invalidate this
6   inference?"  The answer to that -- and this is your point -- is
7   no, it would not.  But then they go on and say, "and can it
8   contribute to the evidence brought forth by the plaintiff?"
9   And that's why I think we have to tell them that while it can
10  contribute, it is not sufficient.
11              MR. TURKEL:  By itself.
12              THE COURT:  By itself.
13              MR. TURKEL:  I just -- when you instructed them on the
14  law, I believe the instructions went back there with them, did
15  they not, your Honor?
16              THE COURT:  Yes, but I don't think we addressed this
17  question.  This was a question that came up a great deal in my
18  ruling, but I don't think we addressed this question about
19  inferences in a clear and convincing prism, which is what the
20  case law is all about.
21              MR. TURKEL:  When they say "it," I just don't think
22  it's clear that they're asking for guidance on whether they can
23  use an inference as much as they're asking for guidance on
24  whether they can use an answer elicited by defense counsel --
25              THE COURT:  Wal, that's the question.  If it stopped

**JA 1220**

M2F1PALF

1    there, I would agree with you, the answer should be no, because

2    that's the answer, if that's the only question asked.  But they

3    asked a second question.

4              MR. TURKEL:  Which is:  "Can the answer be brought

5    forth --"

6              THE COURT:  "It" might be the inference or the answer,

7    but same point either way, I think, but it's unclear whether

8    "it" is a reference to the word "inference" or the word

9    "answer."  But doesn't really matter.

10             MR. TURKEL:  Just to be clear, they used the word

11   "response," not "answer," but same thing.

12             THE COURT:  I think the word "it" refers back, under

13   basic rules of grammar, to "inference."  That's the last noun.

14   And the basic rule is that a term like that goes back to the

15   last noun.  So the question is:  Can the inference contribute

16   to the evidence brought forth by the plaintiff?  And so that's

17   why defense counsel is suggesting that something more has to be

18   said than simply answering their first question.  Because

19   they've asked two questions.

20             MR. TURKEL:  And just to be clear, if I'm not clear

21   already—and I think I am—I think the word "it" refers to the

22   word "response."

23             THE COURT:  Excuse me?

24             MR. TURKEL:  Can it—in other words,

25   response—contribute to the evidence brought forth by the

**JA 1221**

M2F1PALF

1    plaintiff?  It's clear --

2              THE COURT:  No.  So let's read the sentence again,

3    because I have the deepest respect for your legal abilities but

4    I have some question now about your knowledge of basic grammar.

5    The question reads, the second paragraph:

6              "If a juror were able to make this inference from a

7    response by Mr. Bennet from a question put forth by the

8    defense, would the fact the defense posed the question

9    invalidate this inference, and can it contribute to the

10   evidence brought forth by the plaintiff?"  And you're saying

11   that the word "it" is a reference not to the word "inference,"

12   which appears three words before it, not even to the word

13   "question," which appears seven words before it, but --

14             MR. TURKEL:  I would say to the prior --

15             THE COURT:  But to the word "response," which appears

16   25 words before it.

17             MR. TURKEL:  Or "question."

18             THE COURT:  Oh, it's now "question"?

19             MR. TURKEL:  I think "question" and "response" are

20   equal as far as --

21             THE COURT:  Well, forgive me.  I thought you were -- I

22   suggested earlier that you might mean "inference" and it might

23   be "question," and you said, oh, no, no, it means "response."

24   You're withdrawing that position?

25             MR. TURKEL:  I wouldn't say withdrawing, because I

**JA 1222**

M2F1PALF

1    think it's clear what they're confused about is how that answer

2    is elicited determines how it can be used.  That's the way we

3    read it.

4           THE COURT:  Well, two things are clear.  They asked

5    two questions, joined by the word "and."  The first question

6    is:  "Would the fact the defense posed the question invalidate

7    this inference?"  The answer to that, I agree with you, is no,

8    it would not.  I don't think we need to do anything more to

9    answer that question.

10          Then they ask a second question:  "Can it," which I

11   think the more grammatical reading refers to inference,

12   "contribute to the evidence brought forth by the plaintiff?"

13   And I think the trouble there is that if this were a

14   preponderance case, the answer would simply be yes, but given

15   the case law that they're not familiar with about inferences

16   and statements by the defendant in a defamation case, that they

17   need to be told, perhaps, that it would not be sufficient in

18   itself to carry that burden.  And I'm not sure what your

19   problem with it is.

20          MR. TURKEL:  I don't necessarily have a problem.  I'm

21   just thinking through it as we discuss it.  But if we're going

22   to go into that depth -- and I may want to talk to Mr. Vogt

23   about it -- then we may want to know exactly what the question

24   and answer are to determine whether the inference is perhaps

25   a --

**JA 1223**

M2F1PALF

1     THE COURT:  That was my alternative suggestion was

2  that we ask them:  What question and answer are you referring

3  to?  Would you like to do that?

4     MR. VOGT:  Your Honor, looking at this question, when

5  they ask, "can it contribute," "it" being the inference,

6  "contribute to the evidence brought by the plaintiff," it

7  almost seems inherent to me in that question that they are

8  already saying they're going to add that inference to other

9  evidence that we have put forth, so the answer would just be

10  yes.

11     THE COURT:  Well, I thought your colleague a minute

12  ago said we should find out what the question and answer is,

13  where he is now thinking that might be the best, but you're

14  disagreeing with him?

15     MR. VOGT:  I just haven't spoken on it, your Honor,

16  and I was just noting the question itself has already answered

17  the question the Court has already posed as to whether this is

18  considering the evidence or the inference by itself or in

19  conjunction with other evidence, and when they say "contribute

20  to the evidence brought forth by the plaintiff," seems like

21  they've already done that based on the instructions.

22     THE COURT:  Well, there's something to that.

23     Let me hear again from defense counsel.

24     MR. AXELROD:  Your Honor, the answer to the first

25  question is certainly no, but I do think that they obviously

**JA 1224**

M2F1PALF

1    understand that they can -- that if the answer is no, that it

2    can contribute, but I think you do have to remind them, because

3    this is not a direct fact, this is an inference, and so an

4    inference alone wouldn't allow them to find that the burden has

5    been satisfied.  If they said -- if they put it a different

6    way, maybe I would agree with Mr. Vogt, but I think they leave

7    open that possibility.

8            THE COURT:  All right.  So I have a very short

9    telephone conference beginning right now.  I will go down to my

10   chambers, as soon as that conference is over come back, but

11   just to guide me so we can -- because I don't want to hold the

12   jury up and I want to get them a response as soon as we get

13   back, on the first suggestion, which was that we ask them what

14   question and answer they're referring to, does plaintiff

15   counsel agree with that or disagree?

16           MR. TURKEL:  Judge, how you phrased that, I thought we

17   totally agreed the answer to the first part was no.

18           THE COURT:  I thought you said no ten minutes ago, but

19   now you seem to be changing your mind, but okay.  It doesn't

20   matter.  You're free to change your mind or not, as the case

21   may be.  I just want to know so when I go downstairs, I'll know

22   what the position of the parties is.  So you don't like that

23   approach.

24           MR. TURKEL:  Well, Judge, you rephrased what you said

25   earlier.  Our position on the first half of it --

**JA 1225**

M2F1PALF

| | |
|---|---|
| 1 | THE COURT:  No, no, no, no, no. |
| 2 | MR. TURKEL:  I'm sorry, Judge. |
| 3 | THE COURT:  I want an answer to my question.  There |
| 4 | are two possibilities.  Either we can answer this note, try to |
| 5 | go about what they're getting at, or we can ask them for what |
| 6 | question and answer they have in mind, which might give us a |
| 7 | much more specific meaning of what they're getting at.  You're |
| 8 | free to say yes or no.  I just want to know what your position |
| 9 | is. |
| 10 | MR. TURKEL:  I would say we do not need to know the |
| 11 | question and answer they're referring to, Judge. |
| 12 | THE COURT:  All right.  And defense counsel's position |
| 13 | is? |
| 14 | MR. AXELROD:  While I certainly want to know the |
| 15 | question, I think the better approach is not to know the |
| 16 | question.  I think we can -- |
| 17 | THE COURT:  All right.  So that's what I wanted to |
| 18 | know.  So both sides are agreed that we don't ask them for what |
| 19 | the question and answer is. |
| 20 | Okay.  So the next question is:  With respect to the |
| 21 | first of the two questions they put, are both sides agreed the |
| 22 | answer to that question is a simple no?  Is that -- |
| 23 | MR. VOGT:  Correct. |
| 24 | MR. AXELROD:  That's correct. |
| 25 | THE COURT:  Okay.  All right.  So we're 2/3 there. |

M2F1PALF

1    So with respect to the second question they asked, do

2    I understand that plaintiff's position is simply to say yes and

3    that defense position is to say yes but it's not sufficient to

4    carry the burden in a clear and convincing case?

5            MR. AXELROD:  That would be fine, your Honor.

6            THE COURT:  And your position is?

7            MR. VOGT:  Correct, your Honor.

8            THE COURT:  You want just yes, without the --

9            MR. VOGT:  Yes.  And if your Honor does side with the

10   defense, we think it just needs to be clear that if it's an

11   instruction along those lines, it's not sufficient to carry the

12   day, the "by itself" be included in there.

13           THE COURT:  Doesn't mean it can't be part of the mix.

14           MR. VOGT:  Correct.  So they don't get the impression

15   that no, we can't --

16           THE COURT:  Okay.  That's all I wanted to know.

17           Let me go take care of the other matter I had and I

18   will come back in hopefully about ten minutes.

19           (Recess, 10:51 a.m.)

20           (In open court; jury not present; 11:12 a.m.)

21           THE COURT:  Please be seated.

22           All right.  So you have my proposed response to the

23   jury.  I take it -- but let me make sure -- there's no

24   objection from defense counsel.

25           MR. AXELROD:  Your Honor, there's one typo

**JA 1227**

M2F1PALF

1  clarification and then one clarification.

2              THE COURT:  Okay.

3              MR. AXELROD:  I think at the first sentence, in the

4  second clause of the first sentence, it reads, "you are free to

5  draw any reasonable inference you choose to draw from any

6  answer received," should be "into evidence."

7              THE COURT:  Oh, thank you very much for catching the

8  typo.

9              MR. AXELROD:  And then the substantive, the very small

10  substantive change we'd ask for is, at the very end of the

11  proposal, the last clause, right before you get to the last

12  clause, so the third line from the bottom, "Bennet actually

13  doubted the truth of a challenged statement" before

14  publication, or prior to publication; just giving the temporal

15  element.

16              THE COURT:  Okay.  Now plaintiff's counsel, as I

17  understand it, they would object to the portion about "not

18  sufficient in itself," and that objection is preserved.  I

19  think, though, it's responsive to the thrust of this note.  But

20  is there any other objection from plaintiff's counsel?

21              MR. VOGT:  I just want to make sure that it's not

22  inconsistent, your Honor, with Instructions No. 5 and No. 13

23  that the jury had already been given; No. 5 being that

24  circumstantial evidence is of no less value than direct

25  evidence and that the jury may consider either or both; and

**JA 1228**

M2F1PALF

1    that on No. 13, the jury is instructed to, in considering

2    Mr. Bennet's state of mind, they should consider all the

3    evidence, including relevant inferences.

4              THE COURT:  Yes.  But I don't think there's anything

5    inconsistent here.  The gloss that wasn't given to them was the

6    particular burden that the case law in defamation subsequent to

7    *New York Times v. Sullivan* and comparable New York law places

8    on a plaintiff to establish clear and convincing evidence of

9    actual malice through something other than the mere statements

10   of the defendant, which would otherwise be sufficient in a more

11   average case.  But I did put in the --

12             MR. VOGT:  The qualifier at the end, your Honor.  I

13   appreciate that.

14             THE COURT:  I included the point that plaintiff's

15   counsel made that the "it" in their question could refer to

16   either the response or the inference, so I put both in there

17   for your benefit.  And I know you object to the sufficiency

18   language, but is there anything else that you object to is my

19   point?

20             MR. VOGT:  No, your Honor.

21             THE COURT:  Okay.  Very good.  So I will have my law

22   clerk make those couple changes, the one typo and the other

23   addition of "prior to publication," and we will send that right

24   in to the --

25             MR. VOGT:  I'm sorry.  One thing, your Honor.

**JA 1229**

M2F1PALF

1    THE COURT:  Yes.

2    MR. VOGT:  If we could, at the very last part of this,

3  where it says, "but it can contribute to the other evidence."

4    THE COURT:  Yes.

5    MR. VOGT:  Can that say, "but yes, it can contribute"?

6    THE COURT:  But what?

7    MR. VOGT:  "But yes, it can contribute," because that

8  was their question.

9    THE COURT:  Well --

10    MR. VOGT:  "And can it contribute to the evidence

11  brought forth by a plaintiff?"  But I think we should --

12    THE COURT:  "Can" says exactly what they asked.  Their

13  question was "can it contribute" and the answer is yes, it can

14  contribute, but I don't see what "yes" adds to the words "it

15  can contribute."

16    MR. VOGT:  I think it's just a formal answer to their

17  question.

18    THE COURT:  Well, okay.  Your proposal is duly noted.

19    All right.  So we'll send that right in.  And we'll

20  see you if there's more activity.

21    (Recess pending verdict, 11:21 a.m.)

22    (In open court; jury present, 2:28 p.m.)

23    THE COURT:  Please be seated.

24    Mr. Foreperson, I understand you've reached a verdict.

25  If you would hand the verdict envelope to my deputy.

**JA 1230**

M2F1PALF

1    I'm going to open it in a minute and then we'll take

2  what's called the reading of the verdict.  And I won't comment

3  on your verdict because that's your job, but I want to comment

4  once again on the fact that you really have been a terrific

5  jury.  I'm very impressed with you.  You were so attentive; you

6  paid such careful attention; you were prompt.  It was really a

7  pleasure to have you in this court, and you have my very great

8  thanks.

9    Okay.  We'll open the verdict.

10    I think I'll break down and put on my glasses.

11    All right.  So my deputy will take the reading of the

12  verdict.

13    THE DEPUTY CLERK:  Mr. Foreman, please rise.

14    In *Sarah Palin v. The New York Times and James Bennet*,

15  Docket No. 17 Civ. 4853, as to the plaintiff's libel claim, you

16  the jury find the defendant liable or not liable, you say?

17    THE FOREPERSON:  Not liable.

18    THE COURT:  All right.  So we will poll the jury.

19    THE DEPUTY CLERK:  Juror No. 1, is that your verdict?

20    JUROR:  Yes.

21    THE DEPUTY CLERK:  Juror No. 2, is that your verdict?

22    JUROR:  Yes.

23    THE DEPUTY CLERK:  Juror No. 3, is that your verdict?

24    JUROR:  Yes.

25    THE DEPUTY CLERK:  Juror No. 4, is that your verdict?

**JA 1231**

M2F1PALF

```
1               JUROR:  Yes.

2               THE DEPUTY CLERK:  Juror No. 5, is that your verdict?

3               JUROR:  Yes.

4               THE DEPUTY CLERK:  Juror No. 6, is that your verdict?

5               JUROR:  Yes.

6               THE DEPUTY CLERK:  Juror No. 7 is that your verdict?

7               JUROR:  Yes.

8               THE DEPUTY CLERK:  Juror No. 8, is that your verdict?

9               JUROR:  Yes.

10              THE DEPUTY CLERK:  Juror No. 9, is that your verdict?

11              JUROR:  Yes.

12              THE DEPUTY CLERK:  Jury polled, your Honor.  Verdict
```
13  unanimous.
```
14              THE COURT:  Very good.
```
15              So a couple of other things, ladies and gentlemen.  As
16  you leave the court, it is quite possible that you will be
17  approached by reporters and other members of the media, because
18  this case has been followed in the media.  I'm glad that you
19  were free of all that coverage since you were instructed, and
20  it's clear to me you followed, not to pay any attention to that
21  and to disregard it and turn away from it.  But here's the
22  point.  It's up to you whether or not you want to talk to the
23  folks from the media.  They naturally have a natural interest
24  in talking to you.  My recommendation, though, is that you not
25  talk to them, and that is because the jury system is dependent

**JA 1232**

M2F1PALF

1    on the privacy of your deliberations.  When you were in the

2    jury room and you were giving your views, you were clothed with

3    the knowledge that this was all secret, that you would make a

4    determination on the facts and the law based on a forthright

5    assessment of whatever each of you thought, and it would be

6    very unfair to your fellow jurors to now start talking about it

7    with members of the press.  So it's up to you, but my

8    recommendation is for you not to talk to them.

9         The lawyers may also want to talk to you.  Under

10   Second Circuit law, they can only do that after they first ask

11   permission from me, so if they do that, I'll let you know, but

12   at least at the moment, they won't be talking to you at this

13   time and probably not thereafter.

14        In the unlikely event -- and I think this is very,

15   very unlikely -- that either a lawyer or someone representing a

16   party tries to talk to you without my permission, or some

17   person of the media who you say to, "I don't want to talk to

18   you," persists and really gets pushy, please let me know

19   immediately and I will handle that situation.

20        I wanted to tell you one other thing.  Your job was to

21   decide the facts, which you have now done.  My job is to decide

22   the law, and I have concluded as a matter of law that the

23   defendants are not liable too.  So we've reached the same

24   bottom line.  And you'll probably hear about that if you get

25   into the media.  But it's on different grounds.  You decided

**JA 1233**

M2F1PALF

1 the facts; I decided the law.  As it turns out, they both were

2 in agreement in this case.

3          So now I've laid all that on you, I want to again

4 express my admiration.  The jury system is the heart and soul

5 of the American legal system, and it's because of folks like

6 you.  And you are now excused.

7          And by the way, you don't have to serve in another

8 jury for at least four years.  I know that breaks your heart,

9 but you'll manage somehow.  So the jury is now excused.

10          Please follow my courtroom deputy.

11          (Jury discharged)

12          THE COURT:  Please be seated.

13          So judgment will be entered.  I'll issue a written

14 judgment probably later this afternoon or first thing tomorrow,

15 dismissing the case with prejudice on two independent

16 grounds—the jury's verdict and the determination of law that I

17 made under Rule 50.

18          I would be negligent if I didn't express my thanks to

19 the lawyers for both sides.  Obviously in this and every other

20 case one side wins, another side loses, and it's never much fun

21 for the loser and it's always very nice for the winner.  But

22 the truth of the matter is that the system of justice in this

23 country is dependent on there being very good lawyers on both

24 sides—lawyers who are professional, lawyers who understand the

25 rules, lawyers who work so hard—and it was evident to me that

**JA 1234**

M2F1PALF

1   every lawyer in this case worked extremely hard and extremely

2   diligently and that's, to my mind, what the system of justice

3   is all about.  So I express my thanks to all the lawyers.

4           All right.  Unless anyone has anything else to raise,

5   that concludes this matter.

6           Yes, sir.

7           MR. AXELROD:  Your Honor, we would request your

8   permission to meet and talk to the jury.

9           THE COURT:  Why?

10          MR. AXELROD:  Given that *The Times* is a news-gathering

11  institution, to the extent that jurors want to share their

12  thoughts about the case, of course *The Times*'s philosophy is

13  that more information for the world is a better thing.  So

14  under that guise, I think that would be our request.

15          THE COURT:  Well, I think another aspect of the

16  American jury system is that the very good citizens who, not

17  just in this case but in hundreds of cases, give of their time,

18  give of their abilities to the very difficult job of

19  determining where justice lies should not feel that they are

20  now going to be the subject of inquiries.  I do understand that

21  it's very natural for the lawyers to want to talk to the

22  jurors, but to my mind, it's an imposition on the jurors and on

23  the jury system.  If you had some very specific reason in mind,

24  I might consider it—for example, if they wanted to know why

25  your hair has turned gray, but we can all infer the answer to

**JA 1235**

M2F1PALF

1   that.

2          MR. AXELROD:  Trials and kids, your Honor.  Trials and

3   kids.

4          THE COURT:  I do understand, you know, your natural

5   desire, but I think I'm going to deny the application.

6          MR. AXELROD:  I'll just say one other thing.  I think

7   because of the infrequency of trials like this, I think that

8   that would be another reason that lawyers would want to do so,

9   but I certainly understand your Honor's decision.

10         THE COURT:  Well, it is true that there has been a

11  decrease in both civil and criminal jury trials.  It's a

12  terrible thing, because jury trials are where the system gets

13  put to the test.  But having said that, I think you're just

14  going to have to read books about it instead.  All right?

15         MR. AXELROD:  Yes, sir.

16         THE COURT:  Anything else?

17         Very good.  Thanks very much.

18         THE DEPUTY CLERK:  All rise.

19                              o0o

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SARAH PALIN, an individual,

                Plaintiff,

  – against –

THE NEW YORK TIMES COMPANY,
a New York corporation, and JAMES
BENNET, an individual,

                Defendant.

No. 17 Civ. 4853

Hon. Jed S. Rakoff

ECF Case

**PLAINTIFF'S RESPONSE TO DEFENDANTS' LOCAL RULE 56.1
STATEMENT OF MATERIAL FACTS [DOC. NO. 97]
&
COUNTERSTATEMENT OF MATERIAL FACTS
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone: (813) 443-2199
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY 10017
Telephone: (212) 907-7300
Facsimile: (212) 754-0330
Facsimile: (212) 754-0330

Plaintiff, Sarah Palin ("Gov. Palin"), by counsel and pursuant to Local Rule 56.1(b), files this Response to Defendants' Statement of Material Facts [Doc. No. 97], filed by Defendants, The New York Times Company ("The Times") and James Bennet ("Bennet") (collectively, "Defendants"), and, pursuant to Local Rule 56.1(b), submits her Statement of Additional Material Facts in Opposition to Defendants' Motion for Summary Judgment, and states as follows:

## Preliminary Statement/Objection

Plaintiff objects to Defendants' Statement of Undisputed Materials Facts in its entirety to the extent it seeks to assert facts as "undisputed" that are based on the testimony of James Bennet. The Second Circuit already ruled Mr. Bennet's testimony implicates credibility issues, the drawing and weighing of inferences, and the weighing evidence that are jury functions. *Palin v. The New York Times Company*, 940 F.3d 804, 812 (2d Cir. 2019) (citing *Soto v. Gaudette*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))); *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 521 (1991) (citing *Anderson*, 477 U.S. at 255) ("[t]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue of fact.").

## RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

### The Parties

1. Plaintiff **OBJECTS** to the phrase "public figure" because it is a legal conclusion, not a statement of fact. Subject to and with full reservation of Plaintiff's argument that the actual-malice rule and its "public figure" component should no longer apply for the reasons more fully set forth in Plaintiff's Motion for Partial Summary Judgment [Doc. No. 100], it is undisputed that Plaintiff is the former governor of Alaska and vide-presidential candidate.

Case 22-558, Document 54, 09/19/2022 3284725, Page3 of 395
Case 1:17-cv-04853-JSR   Document 154   Filed 07/10/20   Page 3 of 95

JA 1238

2.      Undisputed that SarahPAC was Sarah Palin's PAC, domiciled in Virginia that ceased operations in 2016, the goal of which was to promote Palin and her agenda and to which Palin was critical.  [Vogt Decl. Ex. 10, Crawford Depo. 57:1-7, 64:19-22]

3.      Undisputed.

4.      Disputed.  Although The Times' Newsroom and Opinion divisions are considered separate, the opinion division relies upon the newsroom division for facts in support of Editorials and both divisions are governed by The Times Ethics Handbook and Guidelines on Integrity, including their standards for fact-checking, accuracy, and corrections. [Vogt Decl. Ex. 12, PL Depo Ex 2; Vogt Decl. Ex. 13, PL Depo Ex 3; Vogt Decl. Ex. 11, PL Depo Ex 1 at p. 3; Vogt Decl. Ex. 6, Cohn Depo 29:5-10; Vogt Decl. Ex. 2, Lepping Depo 77:11-78:15]

5.      Undisputed.

6.      Disputed, except to the extent that Bennet concedes he is ultimately responsible for everything the opinion section publishes.  [Vogt Decl. Ex. 4, Bennet Depo 13:8-24]

**The Crosshairs Map**

7.      Disputed.  The map did not "feature[] crosshairs."  The "Take Back the 20" map was created by SarahPAC's Internet consultant, Upstream, and staffer Andy Davis, with symbols "pulled from Google mapping tools" to depict 20 congressional districts "that went for McCain-Palin, but were represented by Democratic members."  [Vogt Decl. Ex. 10, Crawford Depo 67:1-68:10, 70:1-4]

8.      Disputed.  The map did not place a "crosshairs" symbol over Rep. Giffords' district; it used symbols "pulled from Google mapping tools" to depict 20 congressional districts that "went for McCain-Palin, but were represented by Democratic members."  [Vogt Decl. Ex. 10, Crawford Depo 67:1-68:10, 70:1-4]

9.      Plaintiff **OBJECTS** to this statement because improperly and inaccurately suggests a causal connection and/or attempts to draw an inference between the publication of the map and "violent attacks," contrary to the facts and controlling summary judgment standard. *Palin*, 940 F.3d at 812. Nevertheless, this statement is disputed because it is false. The vandalism on Rep. Giffords' office occurred early (2:40 a.m.) on the morning on ***March 22, 2010—BEFORE*** Sarah Palin posted the map on March 23, 2020. [Vogt Decl. Ex. 176, "*Rep. Giffords' Tucson office vandalized after health care vote*" Arizona Daily Star, Mar. 22, 2010 ("The front door was smashed out at Congresswoman Gabrielle Giffords' congressional office last night."); Vogt Decl. Ex. 172, Def. Depo Ex. 16 (Palin March 23, 2010 10:18 a.m. "Don't Get Demoralized! Get Organized! Take Back the 20!" Tweet); Vogt Decl. Ex. 177, "Vandalism reported at offices of three Democrats [including Giffords]", CNN, Mar. 22, 2010 (discussing vandalism before map posted); Vogt Decl. Ex. 178, "Vandals Attack Dem Offices Nationwide," Talking Points Memo, Mar. 23, 2010 9:00 a.m. (compiling list of vandalism occurring before map was posted)] Moreover, the vandalism referenced in the Washington Post article Defendants cite (Sullivan Decl. Ex. 58—"Is there a right to reload?") were directed at Representatives not identified on the map, *i.e.,* Rep. Carnahan (Missouri); Rep. Louise Slaughter (New York); Democratic Party offices (Wichita, Cincinnati, Rochester); Rep. Bart Stupak (Michigan). [compare Sullivan Decl. Ex. 34 (map) to Sullivan Decl. Ex. 58] Moreover, as explained in the Washington Post article Defendants cite, the "vandalism appears to have been inspired by Alabama blogger, Mike Vanderboegh, who trumpeted the bright idea that opponents of health-care reform should throw bricks at Democratic headquarters across the country." [Doc. No. 99, Sullivan Decl. Ex. 58 at p. 3] Vanderboegh is a "longtime leader and propagandist in the antigovernment 'Patriot' movement specializing in fiery rhetoric urging violent self-defense' against a tyrannical, Constitution-flouting U.S. government determined to impose

the Communist principles of gun control and universal health care." [Vogt Decl. Ex. 179, SPLC Extremist Files, Michael Brian Vanderboegh] On March 19, 2010, Vanderboegh reacted to the imminent passage of health care reform by posting on his blog, "To all modern Sons of Liberty: THIS is your time. Break their windows. Break them NOW." [Vogt Decl. Ex. 180, "To All Modern Sons of Liberty," Sipsey Street Irregulars, Mar. 19, 2010] In January 2011, *Mother Jones* reported that "Giffords Office Was Vandalized by Followers of Former Militia Leader [Vanderboegh]" [Vogt Decl. Ex. 181 (citing Sullivan Decl. Ex. 58)].

10.     Disputed. Publication of the map did not "prompt[] a national debate." The "debate" and "epithets, death threats, and attacks on some members' offices after passage of the Affordable Care Act" occurred before Palin posted the map. [See Paragraph 9, above] Moreover, as explained in the Christian Science Monitor article ("*Stumping for McCain, Sarah Palin dials back the gun rhetoric*") cited by Defendants, Palin spoke at a nationally televised campaign rally for McCain in **Tucson** on March 26, 2010 and said, "We know violence isn't the answer…When we take up our arms, we're talking about our vote…" [See Doc. No. 99, Sullivan Decl. Ex. 47 at p. 2]

11.     Palin **OBJECTS** to and disputes this statement because it mischaracterizes Plaintiff's tweet (Sullivan Decl. Ex. 35), ignores Plaintiffs testimony explaining the tweet, and distorts the facts and evidence to try to suggest Plaintiff intended the symbols on the map to be a "bull's eye." Plaintiff testified that by placing the word "bullseye" *in quotes* she was referring to it "facetiously or, like, that's what they say, that's what they call it. But it wasn't hey, these are bullseyes, somebody go out and get an individual…I always put quotation marks around it to say this what what somebody else says" [Vogt Decl. Ex. 9, Palin Depo 145:20-146:15]. Plaintiff also OBJECTS based on relevance because there is no evidence that Bennet was aware of this tweet.

Moreover, as explained in Paragraphs 8-9, above, this statement is disputed because the symbols on the map were not crosshairs or a "bullseye."

12. Plaintiff **OBJECTS** to and disputes this statement because it mischaracterizes and takes out of context the allegations in Plaintiff's First Amended Complaint ("FAC") [Doc. No. 70]. Paragraph 99 of the FAC uses the phrase "crosshairs" to explain Defendants' statement "that the Palin Map 'put Giffords and 19 other democrats under stylized crosshairs'" is false. [Doc. No. 70 at p. 24] Throughout her FAC, Palin alleges the editorial falsely asserts the map placed crosshairs over individual lawmakers. [See i.e. FAC ¶¶ 9, 118]

13. Undisputed.

14. Plaintiff **OBJECTS** to the relevance of her use of the phrase "Don't retreat, instead reload" because Bennet testified he was not even aware of her referenced Tweet or use of this phrase when he wrote and published the defamatory passages in the subject Editorial and, further, that he did not consider metaphors such as this used in politics to be "incitement." [Vogt Decl. Ex. 6, Bennet Depo 98:19-99:13, 102:11-23] Plaintiff further **OBJECTS** to the extent this statement ignores Plaintiff's testimony explaining that the expression "Don't retreat. Reload" is "an old saying of my dad's…a retired teacher and coach…that's where he would go with motivation…" and was never meant as an allusion to a gun, "Not at all. 'Don't retreat, reload,' means don't back down, don't let them tell you to sit down and shut up just because they have the power of the pen or whatever they—whatever they want to use to make you stop what you're doing if what you're doing is right. Don't let them. Don't retreat." [Vogt Decl. Ex. 9, Palin Depo 144:8-145:19]

### The Loughner Shooting

15.    Undisputed, although this statement omits the reference in the cited allegation to the nine-year-old girl Loughner murdered.

16.    Plaintiff **OBJECTS** to this statement as an incomplete, inaccurate, and an argumentative description of the aftermath of Loughner's shooting.  Undisputed that certain members of the media falsely speculated about the motive for Loughner's shooting immediately after it occurred, among whom The Times' Paul Krugman stood out as one of the first to incorrectly rush to judgment.  [Vogt Decl. Ex. 3, ("Assassination Attempt In Arizona," P. Krugman, NYT Opinion, Jan. 8, 2011 at 3:22 p.m. ("We don't have proof yet that this was political, but the odds are that it was…"); Vogt Decl. Ex. 104, ("Climate of Hate," P. Krugman, NYT, Jan. 9, 2011); Vogt Decl. Ex. 38, PL Depo Ex. 38 (Ross Douthat 6/14/17 email string with Bennet stating, "people assumed a link initially—there was a Paul K[rugman] column that was particularly vivid in blaming Republicans—but the investigation debunked it."); Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*," A. Sullivan, Jun. 16, 2017 (discussing Krugman's "leap" to linking Loughner to Palin map); Vogt Decl. Ex. 102, PL Depo Ex. 181 ("*We Don't Have Proof Yet*" J. Taranto, WSJ, Jan. 10, 2011)]  This speculation occurred in the days immediately after Loughner's shooting, but soon after a consensus was reached that Loughner's shooting was not incited by or connected to Palin's map.  [Vogt Decl. Ex. 32, PL Depo Ex. 30 at pp. 19-21 ("As We Mourn," NYT Editorial, Jan. 12, 2011 (recognizing President Obama's statement during Loughner shooting memorial service that "If, as has been discussed in recent days, their death helps usher in more civility in our public discourse, let us remember it is not because a simple lack of civility caused this tragedy—**it did not**" and noting Palin maintained "journalists and pundits" had committed a "blood libel")); Vogt Decl. Ex. 106, PL Depo Ex. 182 ("*It Did Not*," J. Taranto, WSJ, Jan. 13,

2011 (noting how "New York Times's response to last weekend's murders in Tucson was to instigate a witch hunt against Republican politicians, and how President Obama's statement "It did not" (quoted in "*As We Mourn*") "[w]ith those three truthful words—an improvisation or a late addition, as they were not in the prepared text—[President Obama] rebuked the out-of-control liberal media that have, under the leadership of the New York Times, been engaging in a vicious campaign of lies and smears.")); Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*," in which Andrew Sullivan demanded a correction from The Financial Times for article accusing him of "linking" Loughner shooting to Palin map; ; Vogt Decl. Ex. 107 ("*Massacre, followed by libel*," C. Krauthammer, Washington Post, Feb. 26, 2011 ("Not only is there no evidence that Loughner was impelled to violence by any of those upon whom Paul Krugman, Keith Olbermann, the New York Times, the Tucson Sheriff and other rabid partisan as fixated. There is no evidence that he was responding to *anything*, political or otherwise, outside of his own head."); Vogt Decl. Ex. 107 ("Sarah Palin Is Right About 'Blood Libel'," Rabbi Shmuley Boteach, WSJ. Jan. 14, 2011 ("Sarah Palin has every right to use ['Blood Libel']. The expression may be used whenever an amorphous mass is collectively accused of being murderers or accessories to murder.")] The Times, *The Atlantic* (while Bennet was at its helm), *Wall Street Journal*, and *Washington Post*— all of which Bennet was "regularly reading" for his news in 2011—were among the major news outlets confirming within ***days*** (not weeks or months) of Loughner's shooting that it was not linked to or incited by Gov. Palin or the map. [Vogt Decl. Ex. 4, Bennet Depo. 103:25-104:10; *see* Vogt Decl. Ex. 32, 38, 74, 103, 104, 106, 107, above; *see also* Vogt Decl. Ex. 83, PL Depo. Ex. 147 ("*Was the Shooting of Rep. Giffords Political?*"—The Atlantic/Wire); Vogt Decl. Ex. 84, PL Depo. Ex. 148 ("*Did Sarah Palin's Target Map Play Rile in Giffords Shooting?*"—The Atlantic/Wire); Vogt Decl. Ex. 85, PL Depo. Ex. 149 ("*What We Know About Jared Lee*

*Loughner"*—The Atlantic/Wire); Vogt Decl. Ex. 86, PL Depo. Ex. 150 *"Stop the Blame Game"*—

The Atlantic); Vogt Decl. Ex. 87, PL Depo. Ex. 151 *"The More We Know"*—The Atlantic/Dish);

Vogt Decl. Ex. 88, PL Depo. Ex. 153 (*"Ten Days That Defined 2011"*—The Atlantic/Wire); Vogt

Decl. Ex. 16, PL Depo Ex. 8 (*"Time, the Enemy"*—NYT); Vogt Decl. Ex. 50, PL Depo. Ex. 60

(*"The Tucson Witch Hunt"*—NYT); Vogt Decl. Ex. 51, PL Depo. Ex. 64 (*"Suspect's Odd Behavior*

*Caused Growing Alarm"*—NYT); Vogt Decl. Ex. 52, PL Depo. Ex. 67 (*"Looking Behind the Mug-*

*Shot Grin"*—NYT); Vogt Decl. Ex. 102, PL Depo Ex. 181 (*"We Don't Have Proof Yet"*—WSJ),

182 (*"It Did Not"*—WSJ); Vogt Decl. Ex. 80 ("The bogus claim that a map of crosshairs by Sarah

Palin's PAC incited Rep. Gabby Giffords' shooting").  In fact, on January 15, 2011, The Times

publicly discussed how the media's rush to judgment about the motive for Loughner's actions

should be a teaching moment for how the media's bias and "storytelling habits" led them to falsely

accuse people like Gov. Palin of inciting the shooting when it became known fairly quickly after

the tragedy that Loughner was not motivated by anything Gov. Palin said or did.  [Vogt Decl. Ex.

16, PL Depo Ex. 8 ("Time, the Enemy," ("The Times had a lot of company [in the 'egregious rush

to judgment in the Times coverage of the Arizona shooting'], as news organizations, commentators

and political figures shouldered into an unruly scrum battling over whether the political

environment was to blame.  Meanwhile, opportunities were missed to pick up on evidence—quite

apparent as of early the first day—that Jared Lee Loughner, who is charged with the shootings,

had a mental disorder and might not have been motivated by politics at all."))]

17.    Undisputed there is no evidence Loughner saw the map.  However, this statement

is incomplete in that omits the testimony of The Times' witnesses who investigated the underlying

facts surrounding Loughner's shooting who confirmed no link between Loughner and the map was

established.  [Vogt Decl. Ex. 2, Lepping Depo. 15:6-17 ("[T]here was a [police] report saying that

JA 1245

Case 1:17-cv-04853-JSR   Document 154   Filed 07/10/209   Page 10 of 95
Case 22-558, Document 54, 09/19/2022, 3384725, Page90 of 295

there was no direct connection between political incitement and the Loughner shooting."); Vogt Decl. Ex. 6, Cohn Depo. 68:10-22 ("I know that there was no link established between the [map circulated by Sarah Palin's PAC] and the Giffords shooting.")]

18.     Undisputed, except to the extent multiple news organizations, including The Times, reported in the ***days*** (not "weeks and months") following the shooting that Loughner was mentally unstable and developed animosity toward Gifford ***years*** before Palin's map.  [*See* Paragraph 16, above.]

### The Congressional Baseball Shooting

19.     Undisputed.

20.     Undisputed.

### Drafting the Editorial America's Lethal Politics

21.     Undisputed.

22.     Disputed.  There was no "debate" about the focus of the proposed editorial.  As set forth in the below table, Robert Semple and Williamson discussed the piece and Semple decided to write about the Scalise shooting and "gun control" well before Bennet got involved:

| Time | Description | Supporting Evidence |
|------|-------------|---------------------|
| 10:46 a.m. | E. Williamson emails B. Semple, J. Bennet, and N. Fox with the subject line "are we writing on the congressional shooting?" | Vogt Decl. Ex. 174 (NYTIMES 1034) |
| 10:49 a.m. | E. Williamson emails "possible shooter ID" with link to Washington Post article identifying James Hodgkinson | Vogt Decl. Ex. 96, PL Depo Ex. 164 |
| 10:53 a.m. | E. Williamson emails "POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump" with links to Hodgkinson's Facebook, LinkedIn and Twitter accounts | Vogt Decl. Ex. 97, PL Depo Ex. 165 |

Case 1:17-cv-04853-JSR   Document 154   Filed 07/10/2019   Page 11 of 95
Case 22-558, Document 54, 09/19/2022, 3384725, Page91 of 295

JA 1246

| Time | Description | Supporting Evidence |
|------|-------------|---------------------|
| 11:28 a.m. | R. Semple responds to Williamson's 10:46 a.m. question by saying, ***"Can't see it yet…but keep looking…a nut case who hates republicans???..."*** | Vogt Decl. Ex. 21, PL Depo Ex. 15 (emphasis added) |
| 11:31 a.m. | N. Fox responds that he "talked to Bob about the politicize of horror angle and he didn't quite see it…" | Vogt Decl. Ex. 21, PL Depo. Ex. 15 |
| 11:49 a.m. | R. Semple emails his potential angles for a piece:<br><br>"We have written a ton (mainly Frank [Clines]) on gun control…we did a huge series on it a few years ago…while this is almost certainly a lone nut, ***it would be interesting to know ho many of those Republican athletes are beholden to the NRA and its generally anti-regulatory philosophy, and whether something like this might pound a little sense into their heads…***whether the guy bought the rifle at a gun show or inherited from his grandmother, it's still a gun, of which there enough [sic] for practically every man woman and child in this country…" | Vogt Decl. Ex. 22, PL Depo Ex. 16 (emphasis added) |
| 11:59 a.m. | R. Semple responds to himself by saying, "second (or third) message—***the more I think about the gun control angle, the better I like it***." | Vogt Decl. Ex. 22, PL Depo Ex. 16 (emphasis added) |
| 12:04 p.m. | L. Cohn replies in email string "The nutcase went to my high school in Belleville…I'm thinking back to what A GIANT STORY [g]ABBY Giffords shooting was.  Amazing that shooting congressmen doesn't seem so shocking now." | Vogt Decl. Ex. 23, PL Depo Ex. 17 |
| 12:08 p.m. | R. Semple confirms the Editorial Board will write a piece, "***OK we should definitely shoot for a piece, not huge, but a piece***." | Vogt Decl. Ex. 23, PL Depo Ex. 17 (emphasis added) |

It was not until *forty minutes after* Semple made the decision to write a piece about the Scalise shooting and gun control that Bennet—in response to Williamson's 10:53 a.m. email circulating Hodgkinson's "pro-Bernie, anti-Trump" social media accounts—interjected with his narrative about "the rhetoric of demonization and whether it incites people to this kind of violence" and the "inciting hate speech" he "tended to associate with the right." [Vogt Decl. Ex. 25, PL Depo Ex. 20; Vogt Decl. Ex. 4, Bennet Depo 247:3-249:5, 250:4-23]:

23.    The content of Cohn's referenced email is undisputed.

24.    Undisputed, subject to the additional facts set forth in Paragraph 22, above.

### Research

25.    Disputed to the extent this statement mischaracterizes Williamson's research as "familiarize[ing] herself with the Loughner Shooting in 2011." Rather, at Bennet's request, Williamson specifically researched whether there was a link between incitement and the Loughner shooting and whether there was any evidence of a link between incitement and the Hodgkinson shooting. [Vogt Decl. Ex. 3, Williamson Depo 142:1-143:24, 126:8-131:22; Vogt Decl. Ex. 6, Bennet Depo 245:5-247:2]

26.    Disputed. Semple—consistent with his decision to address gun control in the editorial—asked Lett to send Williamson "four [of his] basic gun control pieces (dealing mainly with the plentitude of weapons and porous controls) that also happen to mention Gabrielle Giffords…" [Doc. 99, Sullivan Decl. Ex. 9; Vogt Decl. Ex. 9, Lett Depo 87:15-21] Plaintiff also **OBJECTS** to this statement to the extent it insinuates Semple tasked Lett to conduct *all* the research for the editorial.    As set forth in Paragraph 25, above, Bennet specifically tasked Williamson with researching whether there was a link between incitement and Loughner's shooting.

11

27.     Undisputed that Lett circulated the "four basic gun control pieces (dealing mainly with the plentitude of weapons and porous controls) that also happen to mention Gabrielle Giffords…" Semple asked her to send to Williamson.  (Sullivan Decl. Ex. 9) (these four pieces included "*Rep. Gabby Giffords Farewell*" (1/27/2012), "*6000 Bullets in Colorado*" (7/24/2012), "*Democrats Find their Voice on Gun Control*" (7/29/2016), and "*Myths About Gun Regulation*" (1/2/2013)—all of which were pieces written by Semple.)  [Doc. 99, Sullivan Decl. Ex. 13 (PL Depo. Ex. 30)]

28.     Undisputed except as to completeness.  Williamson asked Lett for assistance finding a piece on "hate type speech" (Sullivan Decl. Ex. 12), in response to Bennet's 12:41 p.m. email [Vogt Decl. Ex. 25].  As set forth in Paragraph 25, above, Williamson was already conducting the research Bennet asked for concerning incitement and the Loughner shooting, and she testified she did not know or ask what Bennet meant by the term "hate speech." [Vogt Decl. Ex. 3, Williamson Depo 207:18-208:5, 209:18-210:16]

29.     Disputed.  This statement takes the facts out of context and asserts an inaccurate timeline of events. In response to Williamson's 1:40 p.m. email to Lett (see Paragraph 28, above; Sullivan Decl. Ex. 12), Lett then emailed Bennet at 1:46 p.m. asking, "I'm trying to find the piece Elizabeth is referring to here, do you happen to know which one she is talking about?"  [Vogt Decl. Ex. 28, PL Depo Ex. 27]  Bennet responded to Lett (not Williamson) at 2:07 p.m., asking, "No— I was just wondering if there was such a piece; that is, did we ever write anything connecting to the Giffords shooting to some kind of incitement?" [Id.]

30.     Disputed.  This statement takes the facts out of context and asserts an incomplete timeline of events. At 2:20 p.m., Lett replied to Bennet's 2:07 p.m. email (see Paragraph 29, above) by forwarding him a link to a Frank Rich column (not an Editorial):  "*No One Listened to Gabrielle*

12

*Giffords*," Jan. 15, 2011.  [Vogt Decl. Ex. 28, PL Depo Ex. 27; Vogt Decl. Ex. 30, PL Depo Ex. 30 at pp. 11-15 (Frank Rich Column)]  At 2:34 p.m., Bennet responded to Lett by saying "Good for Us.  Can you let Elizabeth [Williamson] know?"  [Vogt Decl. Ex. 28, PL Depo Ex. 27]  Bennet testified that he doesn't recall what he meant by "Good for Us," but the inference to be drawn is that Bennet was free to advance his preconceived narrative because the Editorial Board had not written about the subject.  [Vogt Decl. Ex. 4, Bennet Depo 252:6-24]  At 2:52 p.m., Bennet followed up by asking Lett to send him the four basic gun control pieces Semple asked Lett to send to Williamson.  [Vogt Decl. Ex. 28, PL Depo Ex. 27]  Bennet does not recall whether he read all of the materials Lett sent him.  [Vogt Decl. Ex. 4, Bennet Depo 250:24-251:11]  Bennet asked Lett to "dig a little further" because it "seemed strange" to him that the Editorial Board had not "editorialized at all about the [Loughner] shooting…because it was an important news event and the kind of thing we would typically editorialize on." [*Id.*, Bennet Depo. 253:8-254:10]  Lett found 2 additional Editorials ("Bloodshed and Invective In Arizona" and "As We Mourn").  [*Id.*, Bennet Depo 254:6-10; Vogt Decl. Ex. 29, PL Depo Ex. 29; Vogt Decl. Ex. 30, PL Depo Ex. 30 at pp. 16-21]  However, Bennet claims he did not read those pieces either.  [Vogt Decl. Ex. 24, Bennet Depo 254:11-18]

31.     Disputed.  This statement takes the facts out of context and asserts an inaccurate timeline of events. As set forth in Paragraph 22, above, Semple decided the Board should write a piece on the shooting and gun control 40 minutes ***before*** Bennet interjected his incitement narrative in response to Williamson's email about Hodgkinson's "pro-Bernie, anti-Trump" social media accounts.  [Vogt Decl. Ex. 25, PL Depo Ex. 20]  Bennet testified that he "thought that [the Board] should deal with this issue of incitement if there was evidence of inciting hate speech on the Left." [Vogt Decl. Ex. 4, Bennet Depo 250:4-14]  However, Bennet conceded he and the Board never

13

uncovered any evidence of inciting hate speech on the Left leading up to Hodgkinson's shooting [*Id.*, Bennet Depo 250:15-13 ("We didn't find a specific example of hate speech connected to the people on the -- hate ·speech, I'm sorry, I don't usually use that term of, of -- of rhetoric of demonization connected to the ball players that day.· You know, naming Steve Scalise or something like that.")]

32.     Disputed.  Bennet did not "ask Williamson to be mindful of whether such rhetoric came from both sides of the political spectrum."  Rather, as set forth in Paragraph 31, above, Bennet interjected his incitement narrative in response to Williamson's email about Hodgkinson's "pro-Bernie, anti-Trump" social media accounts; and testified that he "thought that [the Board] should deal with this issue of incitement if there was evidence of inciting hate speech on the Left." Unlike Bennet, Williamson did not associate any speech on the right that she considered to be inciting hate speech to the Gabby Giffords shooting.  [Vogt Decl. Ex. 3, Williamson Depo 208:18-209:3, 209:18-210:6]  Bennet conceded he and the Board never saw any evidence of inciting hate speech on the Left leading up to Hodgkinson's shooting [Vogt Decl. Ex. 4, Bennet Depo 250:15-13 ("We didn't find a specific example of hate speech connected to the people on the -- hate ·speech, I'm sorry, I don't usually use that term of, of -- of rhetoric of demonization connected to the ball players that day.· You know, naming Steve Scalise or something like that.")]

33.     Disputed.  Bennet specifically asked Williamson to research the Loughner shooting and the Scalise shooting.  [Vogt Decl. Ex. 3, Williamson Depo. 142:1-14, 126:8-25]

34.     Disputed. This statement is false.  The research did not "focus" on prior editorials by The Times.  As discussed in Paragraphs 25-33, above, at Bennet's request, Williamson specifically researched whether there was a link between incitement and the Loughner shooting and whether there was a link between incitement and the Hodgkinson shooting.  [Vogt Decl. Ex. 3,

14

Williamson Depo 142:1-143:24, 126:8-131:22; Vogt Decl. Ex. 4, Bennet Depo 245:5-247:2].  As

for "editorials," Semple merely asked Lett to send Williamson "four basic gun control pieces

(dealing mainly with the plentitude of weapons and porous controls) that also happen to mention

Gabrielle Giffords…"  Bennet also told Lett he "was just wondering" whether there were any

editorials "connecting to the Giffords shooting to some kind of incitement?" [Vogt Decl. Ex. 28,

PL Depo Ex. 27]  Also, Benet's cited testimony from the 8/16/17 Hearing (p. 6:5-12) is impeached

by Williamson (Williamson Depo. 142:1-14).

### *First Draft*

35.   Undisputed.

36.   Undisputed Williamson's draft included the quoted passages.  Palin objects to the

characterization of Palin's contentions as incomplete.

37.   Undisputed except that the referenced hyperlink does not appear to direct a reader

who clicked on it to a "package of on-line news reports published by ABC."  Exhibit C of the cited

Brown Declaration appears to contain materials from different URLs.  Undisputed the hyperlink

directed readers to a January 9, 2011 ABC article by John Berman [Vogt Decl. Ex. 32, PL Depo

Ex. 34; Vogt Decl. Ex. 3, Williamson Depo 234:3-235:16], which in its byline states it is a "**4 Min

read**" and in its first multi-sentence paragraph (found on the top of page 2) states:

> No connection has been made between this graphic and the Arizona
> shooting, but it has put the Palin team somewhat on the defensive.
> Rebecca Mansour, a spokesperson for SarahPac, told conservative
> commentator Tammy Bruce, "We never imagined, it never occurred
> to us that anybody would consider it violent." Insisting she was
> speaking for herself, and not on behalf of Palin, Mansour added,
> "We never ever, ever intended it to be gun sights."

38.   Undisputed the Editorial included a hyperlink to the article quoted above (PL Depo.

Ex. 34)

15

39.     Disputed for the reasons stated in Paragraph 37, above.

40.     Undisputed that the January 9, 2011 ABC article by John Berman states in pertinent part:

> No connection has been made between this graphic and the Arizona shooting, but it has put the Palin team somewhat on the defensive. Rebecca Mansour, a spokesperson for SarahPac, told conservative commentator Tammy Bruce, "We never imagined, it never occurred to us that anybody would consider it violent." Insisting she was speaking for herself, and not on behalf of Palin, Mansour added, "We never ever, ever intended it to be gun sights."

41.     Undisputed that Williamson had no "specific" recollection of reading the ABC article "because three years have gone by since I conducted that research." [Vogt Decl. Ex. 3, Williamson Depo 234:3-236:1]  However, disputed as an incomplete statement of Williamson's knowledge at the time she drafted the editorial which, based on the research she conducted concerning the Loughner shooting, was that she knew she could not say there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting.  [*Id.*, Williamson Depo 143:2-24]

42.     Disputed.   Plaintiff **OBJECTS** to this statement concerning Williamson's recollection of the research she conducted because The Times failed and refused to produce Williamson's search and browsing history from June 14, 2017.  [Vogt Decl. Ex. 3, Williamson Depo. 1271:1-131:22]  This statement also is disputed because Williamson testified she recalled the results of the research Bennet asked her to conduct concerning the Loughner shooting, based on which she knew she could not say there was a "clear and direct link" between the map circulated by Sarah Palin's political action committee and the Loughner shooting.  [*Id.*, Williamson Depo 143:2-24]

43.     Disputed.     Plaintiff **OBJECTS** to this statement concerning Williamson's knowledge of the research she conducted because, although she turned over her search and browsing history from June 14, 2017 to counsel for The Times, The Times failed and refused to produce that documentation in response to discovery requests served by Plaintiff.   [*See* Paragraph 42, above.]   Plaintiff also objects because the cited testimony does not support the statement that Williamson "did not know why Loughner targeted Gifford."  This statement also is disputed because Williamson testified she recalled the results of the research Bennet asked her to conduct concerning the Loughner shooting, based on which she knew she could not say there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting.  [Vogt Decl. Ex. 3, Williamson Depo 143:2-24]

44.     Disputed.  Williamson emailed her first draft to Bennet, Semple, Fox, Frank Clines, as well as Cohn, at 4:45 p.m.  [Vogt Decl. Ex. 59, PL Depo Ex. 72 ("shootings is in backfield" reference in Williamson's email indicates draft has been submitted to The Times content management system for editing); Vogt Decl. Ex. 3, Williamson Depo 230:16-231:11]]

45.     Undisputed, but incomplete to the extent Williamson also testified Bennet was responsible for fact-checking the portions of the editorial he re-wrote.  [Vogt Decl. Ex. 3, Williamson Depo 67:14-68:6]

46.     Undisputed.

### *Revisions*

47.     Disputed as to the characterization of Cohn's cited testimony, which states in pertinent part:

> I sort of remember standing in front of his glass door, you know, opening up the door or something, and saying, "You need to look at this."…I recall thinking I wasn't really sure if its what ***he wanted***.  I thought there had been quite the confusion over the day as to where

> this piece was headed, as to be either more of a gun control piece or
> to be more of a piece about the political climate and the sort of lack
> of civility in America's political discourse...***I wasn't sure what
> James intended, wanted in the piece.*** I wasn't sure if the piece
> worked…I wasn't sure it accomplished what James would want it
> to accomplish…there were a couple competing ideas about the
> piece…

[Vogt Decl. Ex. 6, Cohn Depo 57:13-58:22 (emphasis added)]

48.    Undisputed, except to the extent this statement is incomplete in that it does not

identify the "questions" Cohn asked, indicated by the bold text in the draft editorial.  [Sullivan

Decl. Ex. 18 at pp. 1-2]

49.    Disputed.  Cohn testified that when she went to Bennet's office to raise her concerns

about the piece (*see* Paragraph 47, above), Bennet responded by saying something along the lines

of, "yeah, it needs some work, I'll do it."  [Vogt Decl. Ex. 6, Cohn Depo 60:3-7]

50.    Plaintiff objects to the phrase "in relevant part."  Otherwise, undisputed.

51.    Undisputed.

52.    Disputed.   The editorial was not itself "breaking news," and the Hodgkinson

shooting was already being covered by The Times newsroom.  [Doc. 41-34, 8/16/17 Hrg. Transcr.

24:11-23].  Cohn testified that "goal" was to get it in the next day's print paper" but there were

already at least two or three other editorials scheduled to run in the next day paper which could

have been run instead.  [Vogt Decl. Ex. 6, Cohn Depo 61:2-24]

53.    Disputed.  Cohn testified the deadline was sometime between 8:00 and midnight,

and the Editorial Section did not go to press until later.  [Vogt Decl. Ex. 6, Cohn Depo. 130:4-

132:25]

54.    Disputed.  As set forth in paragraphs 52-53, above, the editorial was not itself

"breaking news," the Hodgkinson shooting was already being covered by The Times newsroom,

18

Cohn testified that "goal" was to get it in the next day's print paper" but there were already at least two or three other editorials scheduled to run the next day and the print deadline was between 8:00 p.m. and midnight.

55. Undisputed.

56. Plaintiff **OBJECTS** to and disputes this statement because Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, although Bennet made this conclusory statement, he cites no facts to support his supposed belief, and therefore lacks sufficient foundation to admit.

57. Plaintiff **OBJECTS** to and disputes this statement because Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812 Moreover, this statement is incomplete and omits portions of Bennet's quoted testimony, which reads in full:

> Q. Could you explain what you meant by the term "political incitement" when you wrote this?
>
> A. Yeah. There are a couple of things at work there. One, I had been very much affected by and was thinking about that day a column that a colleague of mine, Tom Friedman, had written during the course of the presidential campaign -- the last presidential campaign. Then candidate Donald Trump had at a rally and in a speech -- I won't get the words exactly correct -- had said something to the effect that, well, maybe the Second Amendment people can do something about Hillary Clinton. And Tom had made a connection that day that I did not make. He had said that -- he wrote a piece saying basically to hold on. I have seen this movie before. This is the kind of direct language that was heard at the runup to the assassination of Rabin. We need to take this kind of stuff very seriously.
>
> And then that morning in June this terrible thing had happened. Right? We had actually seen the Congressman come under fire on this field in Virginia. And I was looking for a very strong word to write about the political climate because I wanted to get our readers' attention. This is a word that we do use sometimes;

we don't use it every day. We use lots of strong expressions like "inflammatory rhetoric," things like that. Those aren't actually quite as powerful expression as it has been largely drained of its power because it is used so often, "incendiary rhetoric," so on and so forth.

Also, I was thinking about -- the way I view that particular word from is in my experience in one of my roles at the time that I was a correspondent in Jerusalem at one point for The Times, and the word "incitement" is used there by the Israelis -- in my time by the Israelis about the Palestinians but also, to some degree, by the Palestinians about the Israelis to talk about a range of communications from, you know, to deliberate orders, invocations, summonses for people to carry out violent attacks to textbooks that are published that align important facts from the other side's national narrative or history, to tell outright lies about that history, to maps that misrepresent the politics of the region. And that's specifically where I was drawing that word from.

[Doc. 41-34, 8/16/17 Hr'g Tr. at 11:13-12:25]

58.　　Undisputed.

59.　　Undisputed, as part of the testimony cited in Paragraph 57, above.

60.　　Plaintiff **OBJECTS** and disputes this statement because Bennet's self-serving testimony about his beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, this statement omits portions of and mischaracterizes the quoted testimony to improperly suggest Bennet used "incitement" to draw readers' attention to the Scalise shooting. Bennet's re-write uses "incitement" in the context of Sarah Palin and the Loughner shooting [Vogt Decl. Ex. 33, PL Depo Ex. 35 (*America's Lethal Politics* (original version))], and Bennet concedes that despite researching the issue of any incitement leading to the Scalise shooting, they "didn't find anything." [Vogt Decl. Ex. 4, Bennet Depo 245:5-247:1]

61.　　Defendants' summarization of Bennet's referenced testimony is undisputed.

62.　　Defendants' summarization of Bennet's referenced testimony is undisputed.

63. Plaintiff **OBJECTS** to the relevance of this statement and article because Bennet did not mention it when testifying about drafting the Editorial. [Doc. 41-34 at 11:13-12:25]

64. Disputed. The cited testimony does not support the statement that "[w]hile Bennet revised the Editorial, Cohn, Eileen Lepping, and Nick Fox focused on fact checking the Editorial." Bennet testified Defendants did not fact check the Editorial until after Bennet completed his re-write ("We--·you know, fact checked the version that was edited, not this [Williamson's draft] version."). [Vogt Decl. Ex. 4, Bennet Depo 262:11-263:17] Cohn testified that after turning over the Editorial to Bennet at around 5:00 p.m. she did not do anything on it again until she got it back from Bennet. [Vogt Decl. Ex. 6, Cohn Depo 18:4-16] Moreover, Bennet was responsible for fact-checking the portions of the Editorial he re-wrote. [Vogt Decl. Ex. 3, Williamson Depo 68:1-6]

65. Disputed. This statement mischaracterizes Cohn's cited testimony and omits the question asked ("Q.·Do you have any recollection of whether or not, on June 14 of 2017, you conducted any research related to political rhetoric or political incitement in connection with the "America's Lethal 24· ·Politics" editorial?"), as well as the beginning of Cohn's answer to that question, which states, "I really can't specifically recall. I mean, I know I got that I wasn't really involved with that piece until very late in the day, so I really can't recall what kind of research I was doing prior to that or in that small amount of time I had it." [Vogt Decl. Ex. 6, Cohn Depo 73:20-74:7]

66. Disputed, and Plaintiff **OBJECTS** because this statement mischaracterizes the evidence. Bennet sent Williamson an email at 7:22 p.m. that said only "I really reworked this one. I hope you can see what I was trying to do. Please take a look. Thank you for the hard work today and I'm sorry to do such a heavy edit." [Vogt Decl. Ex. 100, PL Depo Ex. 172] The statement

"make sure the piece is correct" <u>does not</u> appear anywhere in this email.  [*Id.*; Vogt Decl. Ex. 4, Bennet Depo 266:11-22]

67.   Disputed.  Bennet's self-serving testimony lacks credibility and cannot be accepted as true.  *Palin,* 940 F.3d at 812.  Moreover, this statement is incomplete because it omits that Williamson's draft embodied the results of her research about the Loughner shooting.  [Vogt Decl. Ex. 4, Bennet Depo. 264:3-12]

68.   Disputed.   Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Bennet was responsible for fact-checking the portions of the Editorial he rewrote.  [Vogt Decl. Ex. 3, Williamson Depo 68:1-6]  Also, Bennet already knew Williamson's draft was the embodiment of the research she conducted about the Loughner shooting, including the research Bennet specifically requested concerning any link to incitement [Vogt Decl. Ex. 4, Bennet Depo 262:17-263:17, 264:3-12], which was embodied in the paragraph Bennet rewrote – which Williamson testified she originally wrote to reflect the true results of the research Bennet asked for:

> ·A     I wrote my piece based on what I found, so I did not draw a link in what I wrote.
>
> Q· · ·Why not?
>
> A· · ·I talked about the overheated political climate.
>
> Q· · ·Why didn't you draw a link?
>
> A     Because that's not my job.· I wrote -- I wrote my piece based on the research that I did, and what I wrote reflected that research.
>
> Q· · ·When you say that's not your job, what do you mean?
>
> A· · ·I did my job.· So I did the research, and I wrote the piece based on the research that I found.
>
> Q· · ·Based on the research that you found, did you think that you could say that there was a clear and direct link between the map

circulated by Sarah Palin's political action committee and the Loughner shooting?

A·· ·No.

[Vogt Decl. Ex. 3, Williamson Depo 142:3-143-24 (lines 143:5-24 quoted above)]

69.     Plaintiff **OBJECTS** to and disputes this statement because Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true, *Palin*, 940 F.3d at 812, and Defendants failed and refused to produce Bennet's browsing and search history from June 14, 2017, which would have showed what Bennet clicked on and reviewed. [Vogt Decl. Ex. 4, Bennet Depo. 293:21-294:4]

70.     Disputed.  Bennet knew the results of Williamson's research, which showed no link.  (*See* Paragraph 68, above).  Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.

71.     Disputed for the reasons stated in Paragraph 52-54 and 69, above.  Also, Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812.  Moreover, the contention that Bennet did not have time to click on the hyperlink and review the ABC article is false.  Bennet made his first change to the operative paragraph of Williamson's draft at **6:39 p.m.** and had re-written that paragraph and the following one to include the defamatory statements about the "clear" and "direct" link between Plaintiff's "incitement" and Loughner by **6:58 p.m.** [Vogt Decl. Ex. 210, PL Depo Ex 32(L) at pp. 55-57, 49-52].  As noted in the byline of the ABC Article [Vogt Decl. Ex. 32, PL Depo Ex. 34], it would at most only have taken **4 minutes** to read that entire article.

72.     Undisputed.

**<u>Publication of the Editorial</u>**

73.     Undisputed.

23

JA 1260

Case 1:17-cv-04853-JSR   Document 202   Filed 07/10/20   Page 25 of 95
Case 22-558, Document 54, 09/19/2022, 3384725, Page105 of 295

74.     Undisputed, although an incomplete summary of all Plaintiff's operative allegations.

75.     Undisputed that the published version of the Editorial contains the hyperlink. Disputed that Bennet did not click on the hyperlink and has no memory of having seen the article; for the reasons stated in Paragraph 71, above, and because Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.

76.     Undisputed.

77.     Disputed.  The Times published "news reports" about the Scalise shooting soon after it occurred and throughout the day on June 14, 2017.  [Vogt Decl. Ex. 108, "*What Happened at the Shooting…,*" NYT, June 14, 2017 @ 3:15 p.m.]  Also, this statement cites to Ex. 6 of the FAC, but that Exhibit does not support this statement.

78.     Disputed.  Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Defendants should be precluded from arguing about what Bennet clicked or reviewed because they failed and refused to produce his browsing and search history from June 14, 2017.  [Vogt Decl. Ex. 4, Bennet Depo. 293:21-294:4]  Also, Bennet testified that despite specifically asking for research concerning whether there was any incitement leading to the Scalise shooting, they "didn't find anything"— which means he must have been aware of news stories about the Scalise shooting.  [*Id.*, Bennet Depo 245:5-247:1]

### Criticism of the Editorial and The Times' Response

79.     Undisputed, except as to the use of the word "some."  Bennet stated Defendants were "taking *a lot of criticism* for saying that the attack on Giffords was in any way connected to incitement…"  [Vogt Decl. Ex. 37, PL Depo Ex. 37 (emphasis added)]  Numerous readers and

journalists commented.  [*See* Paragraph 364, below; *see also* Vogt Decl. Ex. 70, PL Depo Ex. 96 (Comments on Editorial)]

80.    Disputed.  Douthat told Bennet in his email the night of June 14, 2017 that "[t]here was not, and continues to be so far as I can tell, no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else…], and made no mention in this email about readers questioning the Editorial.  [Vogt Decl. Ex. 41, PL Depo Ex. 39]  Douthat's first mention of other comments on the Editorial was the following morning, when Douthat sent Bennet links to two tweets from left-leaning journalists.  [Vogt Decl. Ex. 40-42, PL Depo Ex. 38; 38(A); 38(B); Vogt Decl. Ex. 8, Douthat Depo. 95:16-98:11]

81.    Undisputed that the contents of the cited email string between Douthat and Bennet [Sullivan Decl. Ex. 21] speak for themselves.  Also undisputed that Bennet responded to Douthat's statement that there was "no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else" over 30 minutes later by saying he would "look into this tomorrow."  [Sullivan Decl. Ex. 21]

82.    Undisputed.

83.    Plaintiff **OBJECTS** to and disputes this statement because it is false and misleading, and mischaracterizes the testimony of several witnesses.  First, Bennet wrote the defamatory portions of the Editorial—not Williamson or Cohn—specifically including the rewrite of the paragraph Williamson drafted embodying the results of her research showing no direct link between incitement and Loughner's shooting.  The testimony of Williamson Defendants partially quote related to her original draft of the Editorial <u>NOT</u> the final version Bennet re-wrote.  [Vogt Decl. Ex. 3, Williamson Depo 232:2-234:10]  The partially quoted testimony of Cohn had <u>nothing</u> to do with Bennet's drafting of the defamatory language at issue. The quoted portion of Cohn's

25

testimony is taken out of context to make it appear as if she was talking about the use of the word

"incitement" in the final version of the Editorial when, in reality, Cohn's testimony about the word

"incitement" was in reference to the question she added into Williamson's first draft of the

Editorial ("Do we know of any elected officials on the Left who have incited violence?· Or just

unaffiliated people online or comedians, most are pro-gun control…").  [Vogt Decl. Ex. 6, Cohn

Depo 92:4-22].  The entirety of Cohn's testimony about her thoughts at that time is that she did

not believe the map circulated by Sarah Palin's PAC incited Loughner to commit his shooting in

2011 because "incitement," Cohn said, "sounds very direct, that it—that the map led him to commit

the shooting."  [*Id.*, Cohn Depo 96:15-97:7]  Bennet's testimony about his "intent" when he wrote

the defamatory passages at issue lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d

at 812.

84.     Disputed.  Bennet's testimony about his subjective beliefs or intent lacks credibility

and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Bennet did not create an

"inference" for readers that there was a causal link—he stated unequivocally that the map was

"incitement" and was clearly and directly linked to Loughner's shooting [Vogt Decl. Ex. 35, PL

Depo Ex. 35 (Original Editorial)].  Even those within The Times knew this language conveyed a

causal link.  Cohn understood "incitement" to be "very direct" and mean "that it—that the map led

him to commit the shooting" [Vogt Decl. Ex. 6, Cohn Depo 96:15-97:7], and Douthat immediately

understood Bennet's use of "incitement" to draw a causal connection between Palin's map and

Loughner's shooting (see Vogt Decl. Ex. 43, PL Depo Ex. 39)]

85.     Disputed.  Bennet's testimony about his subjective beliefs or intent lacks credibility

and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Bennet used "incitement,"

which he knew was a very "strong word" that meant "deliberate orders, invocations, summonses

for people to carry out violent attacks…[Doc. 41-34, 8/16/17 Hr'g. Trans. 11:13-12:25] and was "a call to violence." [Vogt Decl. Ex. 4, Bennet Depo 114:10-15]

86. Disputed. Bennet's self-serving testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812.

87. Disputed. Bennet's testimony about his subjective beliefs or intent lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812.

88. Disputed. Bennet's testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, Bennet used "incitement," which he considered a very "strong word" that he knew meant "deliberate orders, invocations, summonses for people to carry out violent attacks…" (Doc. 41-34, 8/16/17 Hr'g. Trans. 11:13-12:25) and "a call to violence." (Bennet Depo 114:10-15) The evidence also refutes that Bennet was truly "concerned," because his response on the night of June 14, 2017 when learning from Douthat that the Editorial was false was to respond that he would "look into this tomorrow." (PL Depo Ex. 380 Moreover, Bennet did not create an "inference" for readers that there was a causal link—he stated unequivocally that there is a "clear" and "direct" link between incitement by the map and Loughner's shooting (PL Depo Ex. 35), language which even those within The Times knew meant the map caused Loughner to shoot (*see* Cohn Depo 96:15-97:7; *see also* PL Depo Ex. 39).

89. Disputed. Bennet's self-serving testimony about his subjective beliefs or intent lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, although Bennet made this conclusory statement, he cites no facts to support his supposed belief, and therefore lacks a factual predicate to establish the requisite foundation to admit his testimony. Defendants do not cite a single example of anyone interpreting the defamatory statements

consistent with Bennet.  Moreover, Bennet used "incitement," which he considered a very "strong word" that he knew meant "deliberate orders, invocations, summonses for people to carry out violent attacks" (8/16/17 Hr'g. Trans. 11:13-12:25) and "a call to violence" (Bennet Depo 114:10-15).  Bennet did not create an "inference" for readers that there was a causal link—he stated unequivocally that there is a "clear" and "direct" link between incitement by the map and Loughner's shooting (PL Depo Ex. 35), language which even those within The Times knew meant the map caused Loughner to shoot.  (Cohn understood "incitement" to be "very direct" and mean "that it—that the map led him to commit the shooting" [Vogt Decl. Ex. 6, Cohn Depo 96:15-97:7] and Douthat immediately understood Bennet's use of "incitement" to draw a causal connection between Palin's map and Loughner's shooting [Vogt Decl. Ex. 43, PL Depo Ex. 39)]  Also, Bennet knew the difference between incitement and rhetoric, as demonstrated by the changes made to the correction.  (*See* Paragraph 107 and 109, below).

90.     Disputed.  Bennet's testimony about his subjective "aim in the  Editorial" lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Bennet's true "aim" is apparent from, among other things, the communications and events leading up to and surrounding his rewrite of Williamson's draft—such Bennet's injection of the "incitement" narrative into what was originally intended to be a "gun control" piece (*see* Paragraphs 22-23, above) and insistence on re-writing it to ensure what he "wanted" to accomplish (*see* Paragraph 47, above) even though he already knew there was no evidence of incitement associated with the Scalise shooting (*see* Paragraph 31, above) and that the results of Williamson's research embodied in her draft did not make any link between political incitement and Loughner's shooting (*see* Paragraphs 41 and 67, above).

91.     Disputed.  Bennet's testimony about his subjective "worries" lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, this contention is disproven by the fact that Bennet never called out liberals or democrats for incitement.  [Vogt Decl. Ex. 4, Bennet Depo. 101:10-102:3]

92.     Disputed.  Bennet's testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  In support, *see* Paragraph 91, above.  Moreover, if Bennet was supposedly trying to address "rhetoric," Williamson's Draft already did that.

93.     Disputed.  Bennet's testimony about his subjective beliefs lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  In support, *see* Paragraph 91, above.

94.     Undisputed that Bennet had actual knowledge and testified there was no link between incitement and the Scalise shooting, and therefore no "pattern" of incitement to support his narrative.  [Vogt Decl. Ex. 4, Bennet Depo. 246:14-247:2; Vogt Decl. Ex. 25, PL Depo. Ex. 25, PL Depo. Ex. 20]  In fact, Bennet was not aware of any example of what he considers to be "incitement" on the Left and had never called out the Left for "incitement."  [Vogt Decl. Ex. 4, Bennet Depo 101:10-102:3]

95.     The language of the Editorial speaks for itself and is undisputed, but, as set forth in Paragraph 94, above, the entire premises of Bennet's supposed thesis, like the Palin incitement claim, was debunked.

96.     Disputed.  Williamson wrote referenced passage about crosshairs being placed over lawmakers, not Bennet.  [Vogt Decl. Ex. 31, PL Depo Ex. 33; Vogt Decl. Ex. 3, Williamson Depo 232:24-234:10, 269:11-270:16]

97.     Disputed.  This statement is false.  Williamson's partially quoted testimony was about her **draft**, not the final Editorial.  [Vogt Decl. Ex. 3, Williamson Depo 232:2-234:10; 270:2-

16] As set forth in Paragraph 41 and 67, above, Bennet re-wrote this portion of Williamson's draft even though it embodied the results of her research on the Loughner shooting.

98.     Plaintiff objects to and disputes this statement because it is false and mischaracterizes the referenced testimony. Cohn was not testifying about the use of the word "incitement" in the Editorial—she was testifying about *her* use of "incitement" in the question she posed in Williamson's *original draft* of the Editorial. [Vogt Decl. Ex. 6, Cohn Depo. 91:15-96:25; Sullivan Decl. Ex. 18]

99.     Undisputed. However, the entirety of the text messages should be included. (*See* Paragraph 362, below).

100.    Undisputed.

101.    Undisputed.

102.    Undisputed.

103.    Disputed. Bennet's testimony about his subjective beliefs lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Bennet was covering for himself – and his e-mail asking Williamson and Lepping to research "what the truth is here" raises even more doubts about his credibility because, based on Bennet's "honest mistake" excuse, there was no need to ask for this research, and doing it was inconsistent with Bennet's claim this was an error in syntax.

**The Times Revises the Editorial**

104.    Disputed. As set forth above, the Editorial Board already knew there was no direct connection between Plain's map and Loughner's shooting – they said there is a "direct" and "clear" link. (*See* Paragraphs 42 and 68, above).

105.    Disputed. The referenced passages of the Editorial did not "suggest" a direct connection. (*See* Paragraphs 84-85, above).

106.    Undisputed.

107.    Undisputed.

108.    Disputed.  As described above, and alleged by Plaintiff, the entire premise of the

Bennet's narrative in the Editorial mentioning Palin was mentioned was bogus – there was no

"pattern" and therefore no reason to mention Palin.  (*See* Paragraphs 94-95, above).  Nonetheless,

Bennet insisted on keeping that section and Palin in the "Lethal Politics" Editorial, even though

Board member Jesse Wegman (like Douthat) told Bennet that doing so was nothing more than

political scorekeeping.  [Vogt Decl. Ex. 43, PL Depo. Ex. 39 (Douthat email); Vogt Decl. Ex. 63,

PL Depo. Ex. 81 (Wegman email re. "sneaking the link in.")].

109.    Undisputed.

110.    Undisputed, except to note the print edition corrections does not mention Palin or

the name of the Editorial.

111.    Undisputed, except to note no such tweets were sent out following the second

correction (*see* Paragraph 109, above) to the Editorial.

## Allegations Regarding Actual Malice

112.    Disputed.   Bennet was Editor of "The Atlantic magazine **and The Atlantic's**

**website.**" [Vogt Decl. Ex. 4, Bennet Depo 41:12-25 (emphasis added)]

113.    Disputed to the extent this statement mischaracterizes and incorrectly summarizes

the allegations in paragraphs 42 and 54-59 of the FAC, which speak for themselves.  Moreover,

Bennet conceded at his deposition that while Editor-in-Chief "regularly read" The Atlantic in 2011

and "must have read at least several" of articles about the Loughner Shooting published on The

Atlantic's website [Vogt Decl. Ex. 69, PL Depo. Ex. 122; Vogt Decl. Ex. 4, PL Depo Ex 22;

Bennet Depo 122:6-22].  Bennet testified he "must have read at least several" of these Loughner

articles because he "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like." [Vogt Decl. Ex. 4, Bennet Depo 122:23-123:7] In fact, Bennet described himself as "consuming [The Atlantic's] site." [*Id.*, Bennet Depo 123:7-9]

114.    Disputed.  The Dish was "integrated" into The Atlantic's website –it was "digitally present[ed] as part of the Atlantic.com [and] …its audience would be credited -- as part of The Atlantic's network of sites"—and The Atlantic "took responsibility for the production, meaning, the digital production of the site… mean[ing] maintaining the links, maintaining the archive, and so forth, and at the same time had the ability to sell advertising on the business side against the content that -- and the page views that [The Dish] was producing. [Vogt Decl. Ex. 4, Bennet Depo 49:3-25]

115.    Undisputed.

116.    Undisputed.

117.    Disputed.  (*See* Paragraphs 112-114, above.)

118.    Disputed.  As set forth in Paragraphs 113 and 114, above, and shown through the URL for "An Assassination" [Sullivan Decl. Ex. 42 at p. 1]—the post appeared on *The Atlantic's* website, of which Bennet was the Editor, and for which he was responsible.

119.    Undisputed as to first sentence.  Disputed as to second sentence.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Bennet conceded at his deposition that he "regularly read" The Dish [Vogt Decl. Ex. 4, Bennet Depo. 54:5-9] and The Atlantic website in 2011 and "must have read at least several" of articles about the Loughner Shooting published on The Atlantic's website (*see*

Case 22-558, Document 54, 09/19/2022, 3384725, Page114 of 295
Case 1:17-cv-04853-JSR Document 308 Filed 07/10/20 Page 34 of 95

JA 1269

Paragraph 113, above). Moreover, as set forth in Paragraph 121, below, Bennet recalls Sullivan writing posts about Palin and spoke to Andrew Sullivan about the Loughner shooting.

120. Disputed. As set forth in paragraphs 112-114, above, and shown through the URL for "An Assassination Attempt in Arizona: Live-Blogging,"" [Sullivan Decl. Ex. 55 at p. 1]—Sullivan's live blog appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.

121. Undisputed as to first sentence. Disputed as to second sentence. Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. Moreover, Bennet conceded at his deposition that he "regularly read" The Dish [Vogt Decl. Ex. 4, Bennet Depo. 54:5-9] and The Atlantic website in 2011 and "must have read at least several" of articles about the Loughner Shooting published on The Atlantic's website (*see* Paragraph 113, above), and recalls Sullivan posting about Palin and even spoke to Sullivan about the Loughner shooting (*see* Paragraph 119, above).

122. Disputed. As set forth in paragraphs 112-114, above, and shown through the URL for "Caldwell's Unfairness" [Sullivan Decl. Ex. 43 at p. 1]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.

123. Undisputed.

124. Disputed. Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true. *Palin*, 940 F.3d at 812. In support, *see* Paragraph 119, above.

125. Disputed. As set forth in paragraphs 112-114, above, and shown through the URL for "The More We Know" [Sullivan Decl. Ex. 56 at p. 1]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.

126. Undisputed.

JA 1270

Case 1:17-cv-04853-JSR Document 54 Filed 07/10/20 Page 35 of 95
Case 22-558, Document 54, 09/19/2022, 3384725, Page115 of 295

127.    Disputed.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  In support, *see* Paragraph 119, above.

128.    Undisputed, except that The Wire, like The Dish, was integrated into The Atlantic's Website.  [*See* URLs on Sullivan Decl. Exs. 30, 52, 53, 54.]

129.    Disputed.  As set forth in paragraphs 112-113, and shown through the URL for "Ten Days That Defined 2011" [Sullivan Decl. Ex. 30 at p. 1]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.  Also, during his deposition, Bennet testified "it's possible" he read this piece.  [Vogt Decl. Ex. 4, Bennet Depo 127:13-128:8; Vogt Decl. Ex. 88, PL Depo Ex. 153]

130.    Disputed.  As set forth in paragraphs 112-113, and shown through the URL for "Was Shooting of Rep. Gabrielle Giffords Political" [Sullivan Decl. Ex. 52 at p. 1]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.  Also, this post was among those listed in PL Depo. Ex. 122 Bennet testified he "must have read."  (Bennet Depo. 122:6-22)

131.    Disputed.  As set forth in paragraphs 112-113, and shown through the URL for "Did Sarah Palin's Target Map Play Role in Giffords Shooting" [Sullivan Decl. Ex. 53 at p. 1]— this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.  Also, this post was among those listed in PL Depo. Ex. 122 Bennet testified he "must have read."  (Bennet Depo. 122:6-22)

132.    Disputed.  As set forth in paragraphs 112-113, and shown through the URL for "What We Know About Jared Lee Loughner" [Sullivan Decl. Ex. 54 at p. 1]—this post appeared on *The Atlantic's* website, of which Bennet was the Editor and for which he was responsible.  Also,

this post was among those listed in PL Depo. Ex. 122 Bennet testified he "must have read."
(Bennet Depo. 122:6-22)

133.    Disputed.  Bennet's testimony about what he recalls reading lacks credibility and
cannot be accepted as true.  *Palin v*, 940 F.3d at 812.  Moreover, Bennet conceded at his deposition
that he "regularly read" The Atlantic website in 2011 and "must have read at least several" of
articles about the Loughner Shooting published on The Atlantic's website [Vogt Decl. Ex. 69, PL
Depo Ex 122; Vogt Decl. Ex. 4, Bennet Depo 122:6-22].  Bennet testified he "must have read at
least several" of these Loughner articles, that was because he "was a regular reader of The
Atlantic's website both because [he] was interested in it as a reader and because [he] would try to
keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't
like."  [*Id.*, Bennet Depo 122:23-123:7]  In fact, Bennet described himself as "consuming [The
Atlantic's] site." [*Id.*, Bennet Depo 123:7-9]  The Atlantic wire posts about the Loughner shooting
are listed in PL Depo. Ex. 122 at pp. 1, 5, among numerous other articles and posts debunking the
Palin/Loughner link.

134.    Undisputed except that *National Journal*, like *The Dish*, was integrated into The
Atlantic's Website.  [*See* URL on Sullivan Decl. Ex. 57 at p. 1; *see also* PL Depo. Ex. 122 at p. 5
("Stop the Blame Game" with Atlantic URL).]

135.    Disputed.  As shown through the URL for "Stop The Blame Game" [Sullivan Decl.
Ex. 57 at p. 1; PL Depo. Ex. 122 at p. 5]—this post appeared on *The Atlantic's* website, of which
Bennet was the Editor for which he was responsible.

136.    Disputed.  Bennet's testimony about what he recalls reading lacks credibility and
cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Bennet conceded at his deposition
that he "regularly read" The Atlantic website in 2011 and "must have read at least several" of

articles about the Loughner Shooting published on The Atlantic's website (PL Depo Ex 122; Bennet Depo 122:6-22).  Bennet testified he "must have read at least several" of these Loughner articles because he "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like."  (Bennet Depo 122:23-123:7)  In fact, Bennet described himself as "consuming [The Atlantic's] site."  (Bennet Depo 123:7-9) "Stop the Blame Game" is among the articles on PL Depo. Ex. 122 at p. 5 Bennet testified he must have read.

137.    Undisputed.

138.    Undisputed.

139.    Disputed.    Plaintiff **OBJECTS** to this statement concerning Bennet's, Williamson's, and Cohn's recollection of editing, drafting, and reading prices from The Times because although they turned over their search and browsing history from June 14, 2017 to counsel for The Times, The Times failed and refused to produce that documentation in response to discovery requests served by Plaintiff, and The Times refused to produce documents Plaintiff requested concerning who edited, drafted, and researched the pieces Defendants cite in this statement.  [Bennet Depo. 293:21-294:4; Cohn Depo. 78:21-79:25; Williamson Depo. 127:1-130:13]  Moreover, Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  As set forth in paragraphs 112-136, above, Bennet likely read The Atlantic articles about the Loughner shooting.  Bennet also testified he regularly read The Times.  (Bennet Depo. 104:25-105:18)  Williamson testified she recalled the results of the research Bennet asked her to conduct concerning the Loughner shooting, based on which she knew she could not say there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting (Williamson Depo 143:2-24).

JA 1273

Case 1:17-cv-04853-JSR Document 393 Filed 07/10/20 Page 38 of 95
Case 22-558, Document 54, 09/19/2022, 3384725, Page118 of 295

140.    Plaintiff **OBJECTS** and Defendants should be precluded from arguing about what Bennet recalls or reviewed because they refused to produce his browsing and search history from June 14, 2017.  [Bennet Depo. 104:25-105:18]  Also, Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, Bennet conceded at his deposition that he "regularly read" The Atlantic in 2011 and "must have read at least several" of articles about the Loughner Shooting published on The Atlantic's website because he "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like," and Bennet described himself as "consuming [The Atlantic's] site." (*See* Paragraphs 112-136, above.)  Also, Bennet knew Williamson's draft was the embodiment of the research she conducted about the Loughner shooting, including the research Bennet specifically requested concerning any link to incitement (Bennet Depo 262:17-263:17).

141.    Undisputed, however the referenced allegations speak for themselves.

142.    Disputed.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, with respect to the threat on his brother's office, Bennet testified that he did, in fact, recall a threat on his brother's office: "I remember an arrest was made -- I mean, I remember a threat. I remember this incident. I just didn't remember when it took place."  [Doc. No. 41-34, 8/16/17 Hr'g. Trans. 69:10-18]  This is not surprising because Bennet conceded such threats are a "big deal." [Vogt Decl. Ex. 4, Bennet Depo 145:16-146:14]

143.    Disputed.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, it is highly suspect that Bennet would not recall his brother giving a speech during the filibuster immediately after the Pulse

Case 22-558, Document 54, 09/19/2022, 3384725, Page119 of 295

Nightclub shooting, when his Editorial Board wrote about the filibuster and the Pulse shooting, and gun control was one of Bennet's hot button issues.  [Vogt Decl. Ex. 4, Bennet Depo 163:20-23, 164:4-165:16; Vogt Decl. Ex. 162, PL Depo Ex. 286]

144.    Disputed.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Moreover, when asked, "You are saying you didn't know when you wrote the editorial that Sarah Palin had endorsed your brother's opponent?" Bennet conceded "If I had known that, I didn't remember it. That's all I'm saying. It doesn't surprise me, certainly."  [Doc. No. 41-34, 8/16/17 Hr'g Trans. 71:6-10]

145.    Disputed.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.

146.    Disputed.  Bennet's testimony about what he recalls reading lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.

147.    Undisputed Bennet was "very concerned [about] the epidemic of gun violence." Cohn's referenced testimony about a "big focus" is irrelevant because Bennet himself testified issues involving gun control were "important to [him] personally.  [Vogt Decl. Ex. 4, Bennet Depo 165:5-7]

148.    Undisputed.

149.    Undisputed.

150.    Disputed.  Bennet testified he could not "remember" editing his brothers' speeches on gun control.  [Vogt Decl. Ex. 4, Bennet Depo 62:25-63:6]  Moreover, his testimony about his involvement with his brother's speeches on gun control lacks credibility and cannot be accepted as true.  *Palin*, 940 F.3d at 812.  Bennet also admitted to being directly involved in his brother's political career [*Id.*, Bennet Depo 63:7-16]

151.    Undisputed.

152.    Undisputed.

153.    Disputed for the reasons more fully explained in Paragraphs 251-262, below.

154.    Disputed.  Defendants' statement is incorrect and incomplete, as shown by Palin's full testimony on pages 194-196 of her deposition.  [Vogt Decl. Ex. 9]

155.    Disputed.  Defendants' statement is incorrect and incomplete, as shown by Palin's full testimony on pages 198-201 of her deposition.  [Vogt Decl. Ex. 9]

## PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS

### The Times

156.    *The New York Times* is regarded as the "Paper of  Record," reflecting the considerable weight and influence attributed to the "voice" of *The Times*.  [Vogt Decl. Ex. 166 (NYT Innovation Report) at p. 22; *see also* Vogt Decl. Ex. 182, 183]

157.    *The Times* publishes one of the oldest and most widely circulated print papers in the United States.  [Vogt Decl. Ex. 159 (NYT 2019 Annual Report) at p. 6]

158.    Over the past decade, *The Times* has been transitioning to a subscription-first, mobile-first content provider primarily dependent on digital subscriptions and digital advertising to generate revenue.  [*Id*. at pp. 2, 6-7; Vogt Decl. Ex. 166 at pp. 82-84]

159.    In its 2014 Innovation Report, The Times recognized it had fallen behind in a "critical area" in the digital age: "the art and science of getting our journalism to readers."  [Vogt Decl. Ex. 166, p. 4]

160.    The Times also acknowledged '[t]he realities of a cluttered Internet and distracted mobile world require extra effort to get our journalism to readers." [Id at p.7]

161.    The Times was under attack by news "startups" trying to "disrupt" its industry using new technology to offer cheaper and inferior alternatives, such as Huffington Post, Vox, Business Insider, Buzzfeed, Politico, and Twitter.  [Id. at p. 17]

162.    To compete in this challenging digital landscape, The Times shifted its focus from journalism to "audience development" through strategies such as promotion and distribution through social media and mobile platforms, tagging, search engine optimization, and similar methods of engaging readers.  [Id. at pp. 24, 26]  During that process, The Times integrated its journalism with its "business side."  [Id. at pp. 60-61]

163.    The Times also decided to be more "aggressive" in promoting itself and implementing its competitors' standard practices for maximizing traffic.  [Id. at p. 95]

164.    During its digital-transition, The Times began developing artificial intelligence-based tools that helped them determine what content to publish and promote on social media and summarized what The Times audience was reading so it could target certain topics and connect topics with readers.  [Vogt Decl. Ex. 168]

165.    Among these tools, The Times developed "*Project Feels*," an artificial intelligence model that predicts readers' emotional response to content The Times publishes [Vogt Decl. Ex. 169; Vogt Decl. Ex. 5; Stile Depo 46:22-47:6], and "*ReaderScope*," an AI-driven data insights tool that summarizes what The Times' audience is reading and uses that data to visualize interest in certain topics.  [*Id.* ; Vogt Decl. Ex. 5, Stile Depo 44:20-45:16]

166.    The Times data strategy team also built "Blossom Bot," a digital tool that predicts how articles and posts will perform on social media and suggests which stories should be promoted by drawing from enormous stores of data including information on story content and performance metrics on social media.  [Vogt Decl. Ex. 15, PL Depo Ex. 272; Stile Depo 88:15-17]

167.     The Times also developed an in-house data analytics dashboard, "*Stela*," a tool that pulls in data from multiple sources and presents it in one place (a dashboard or "view"), with simplified visuals and non-jargony categories catered towards journalists to help reporters and editors get feedback on the things they are being asked to do online, such as tweaking headlines and promoting stories on social media.  [Vogt Decl. Ex. 165, PL Depo Ex. 293 at pp. 1-3; Vogt Decl. Ex. 5, Stile Depo 27:20-28:17, 29:22-30:12]

168.     Stela pulls in data from The Times' desktop and mobile websites, as well as all of The Times' mobile apps, as well as third-party data sources like Google analytics and Chartbeat, to provide data on specific articles, such as pageviews, referrals, top comments from social media, information on what social posts are performing the best, and the "conversation" surrounding a story.  [Vogt Decl. Ex. 165, PL Depo Ex. 293 at p. 4; Vogt Decl. Ex. 5, Stile Depo 31:14-43:18]

169.     The Times uses these tools for content strategy—deciding which topics to write about and promote on social media.  [Vogt Decl. Ex. 169]

170.     The Times actively promotes content in several ways, such as on its social media accounts (i.e. Facebook and Twitter), homepage, through news alerts and newsletters, and similar strategies.  [Vogt Decl. Ex. 159 at pp. 46-49]

171.     As The Times was transitioning from a traditional print publication to primarily a digital platform, it also eliminated its Public Editor position—which was responsible for holding The Times accountable for its journalism ethics and standards—and replaced it with a "Reader Center," described as  "faux-accountability" system.  [Vogt Decl. Ex. 153 ("The Public Editor Signs Off"); Vogt Decl. Ex. 154, ("Reader Center Already Proving a Step Backward"); Vogt Decl. Ex. 171, Ingber Depo Ex. D; Vogt Decl. Ex. 155]

## The Editorial Board

172.   The Editorial Board represents the "loud and far-reaching voice" of The Times. [Vogt Decl. Ex. 11; PL Depo. Ex. 1 at p. 4]

173.   In 2017, *The Times'* Editorial Board was comprised of 16 experienced journalists with varying focuses of expertise, led by its editor, James Bennet ("Bennet"). [FAC ¶¶ 33-34]

174.   In June 2017, the Editorial Board members and Opinion staff included, among others, the following individuals who worked on "*America's Lethal Politics*":

     a.     Bennet:  the editorial page editor of The New York Times, in charge of the Opinion department.  [Vogt Decl. Ex. 209 at p.1]

     b.     Robert B. Semple Jr. ("Semple"):  Editorial Board Member who served as an Associate Editor and senior statesman of the Editorial department, who "had worked at The Times for 50·years-ish, if not more [and]… at that point, he was technically an editor of the -- for the page, but he read and shaped the language in a lot of our editorials with Linda [Cohn] and Nick [Fox], I guess, at that point."  Semple since retired from The Times.  [Id. pp. 1-2; Vogt Decl. Ex. 7, Lett Depo 43:5-12, 77:4-13; Vogt Decl. Ex. 6, Cohn Depo 14:19-24];

     c.     Linda Cohn ("Cohn"): Editorial Board Member who served "as an editor at the Editorial page since 1988, beating the arrival of the Internet by years [who] worked with Op-Ed columnists, most recently Paul Krugman and Ross Douthat. She retired in November 2017.  [Vogt Decl. Ex. 209, p. 2; Vogt Decl. Ex. 6, Cohn Depo 12:10-14:9, 11:20-12:2];

     d.     Nick Fox ("Fox"):  Editorial Board Member who served as an Editor at the Editorial page and had worked for The Times since 1995.  [Vogt Decl. Ex. 209, p. 2; Lett Depo 43:5-12];

     e.     Jesse Wegman: Editorial Board Member who joined the board in 2013 and who's expertise included The Supreme Court and Legal Affairs.  [Vogt Decl. Ex. 209, p. 4];

     f.     Elizabeth Williamson ("Williamson"):   Editorial Board Member who joined the board in 2015 and focused on National Politics and Congress [Vogt Decl. Ex. 209,  p. 5]

Before joining The Times, Williamson worked as a reporter for the Wall Street Journal's Washington D.C. special projects team, writing features about national politics and the culture of Washington. [Id.]

     g.    Eileen Lepping ("Lepping"): Researcher for Editorial Board since 2007, who served as the "main" fact-checker in 2017. [Vogt Decl. Ex. 2, Lepping Depo 18:18-20:15; Vogt Decl. Ex. 7, Lett Depo 28:13-19]

     h.    Phoebe Lett ("Lett"): Editorial Board research, administrative, and editorial assistant who performed various administrative tasks and helped fact-check pieces. [Vogt Decl. Ex. 7, Lett Depo 23:17-25:10, 27:4-28:4; Vogt Decl. Ex. 172, Lett Depo Ex. A; Vogt Decl. Ex. 6, Cohn Depo 16:5-7]

175.    Cohn, Lepping, Lett, Bennet, and Fox "were all on the team that took the writing and edited it, fact checked it, had it copy edited, and ready to be published." [Vogt Decl. Ex. 7, Lett Depo 76:19-77:3]

## The Times Professed Journalistic Standards

176.    The Times admittedly holds itself to a higher standard of care with respect to seeking and publishing the truth. [Vogt Decl. Ex. 159, PL Depo Ex. 280 at p. 1 ("Our mission [is] to seek the truth…")]

177.    "The central mission of The New York Times is to help people understand the world by providing them with trustworthy, deeply reported, independent and timely news and information." [Id. at p. 2]

178.    The Times holds itself to "the highest standards of journalistic ethics." [Vogt Decl. Ex. 12, PL Depo Ex. 2 at p. 2]

179.    The Times' adopted standards apply to the newsroom and opinion section alike. [Id., PL Depo Ex. 2 at p. 2 ("These guidelines generally apply to all members of the news and editorial departments whose work directly affects the content of the paper…")]

180.    In June 2017, The Times and Bennet were bound by The Times' Ethical Journalism Handbook of Values and Practices for the News and Editorial Departments [Vogt Decl. Ex. 12, PL Depo Ex. 2] and the Guidelines on Integrity [Vogt Decl. Ex. 13, PL Depo Ex. 3; Vogt Decl. Ex. 4, Bennet Depo 70:24-73:12]

181.    When it comes to facts—verifiable pieces of information—editorials are no different than any other article in *The Times*—the Editorial Board's policy is that if something is represented as a fact, it has to be correct. [Vogt Decl. Ex. 11, PL Depo Ex. 1 at p. 3; Vogt Decl. Ex. 6, Cohn Depo 29:5-10]

182.    The Times' Editorial Department "ensures" facts are correct "[t]he same way the newsroom does, by reporting." [Vogt Decl. Ex. 11, PL Depo Ex. 1 at p. 2]

183.    The Editorial Board relies upon the news pages of *The Times* (and other papers) for facts to support editorials. [Vogt Decl. Ex. 11; Vogt Decl. Ex. 2 Lepping Depo 77:11-78:15]

184.    Editorial Board writers have the first and primary responsibility for fact-checking, although they are "backed up" by the editors who edit their editorials, staff researchers and copy editors. [Vogt Decl. Ex. 1, PL DEPO EX 1 at p. 4; Vogt Decl. Ex. 6, Cohn Depo 29:13-31:19; Vogt Decl. Ex. 2, Lepping Depo 25:3-6; Vogt Decl. Ex. 3, Williamson Depo 68:1-6]

185.    With respect to the Editorial at issue in this case, Bennet was responsible for fact-checking the portions he re-wrote. [Vogt Decl. Ex. 3, Williamson Depo 67:14-68:6]

186.    The relevant policies governing The Times and Bennet from the Ethical Journalism Handbook (PL DEPO EX 2) provide:

> A.    "DUTY TO READERS": "In print and online, we tell our readers the complete, unvarnished truth as best we can learn it. It is our policy to correct our errors, large and small, as soon as we become aware of them. [Vogt Decl. Ex. 12 at p. 5]

JA 1281

Case 22-558, Document 54, 09/19/2022, 3394725, Page126 of 295
Case 1:17-cv-04853-JSR Document 380 Filed 07/10/20 Page 46 of 95

B.    "FAMILY TIES":  A spouse or companion who runs for public office would obviously create the appearance of conflict for a political reporter or an editor involved in election coverage.  A brother or daughter in a high-profile job on Wall Street might produce the appearance of conflict for a business reporter or editor…To avoid such conflicts, staff members may not write about people to whom they are related by blood or marriage or with whom they have close personal relationships, or edit material about such people or make news judgments about them. [*Id*. at p. 24]

187.    The Guidelines On Integrity provide that "it is imperative that The Times and its staff maintain the highest possible standards" and practice daily journalism which must be "beyond reproach" (PL Depo Ex. 3 at p. 1) including the following specific practices::

a.    Fact Checking:  Writers at The Times are their own principal fact checkers and often their only ones…If deadline pressure requires skipping a check, the editors should be alerted with a flag like "desk, please verify," but ideally the writer should double back for the check after filing; usually the desk can accommodate a last-minute repair… [Vogt Decl. Ex. 13 at pp. 2-3]

b.    Corrections:  Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small…any complaint should be relayed to a responsible supervising editor and investigated quickly.  If a correction is warranted, ***fairness demands that it be published <u>immediately</u>.  In case of reasonable doubt or disagreement about the facts, we can acknowledge that a statement was "imprecise" or "incomplete" even if we are not sure it was wrong.***  [Vogt Decl. Ex. 13 at pp. 3-4 (emphasis added)]

188.    Bennet confirmed he and The Times followed the policies embodied in The Times Ethics Handbook and Guidelines on Integrity in June 2017.  [Vogt Decl. Ex. 4, Bennet Depo 70:24-71:9, 73:6-15; 74:24-75:12]

189.    Bennet also confirmed he was not aware of any situation where a correction was made that involved an issue on which there was reasonable doubt or disagreement about the facts

Case 1:17-cv-04853-JSR   Document 54   Filed 07/10/20   Page 47 of 95
Case 22-558, Document 54, 09/19/2022, 3384725, Page127 of 295

JA 1282

or where he acknowledged that a statement was imprecise or incomplete.  [*Id.*, Bennet Depo 75:20-76:10]

190.    The Times' correction policy is further explained in its Manual of Style and Usage [Vogt Decl. Ex. 160], which provides:

> **corrections.** Because its voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small (even misspellings of names), promptly and in a prominent reserved space in the paper.  A correction serves all readers, not just those who were injured or complained, so it must be self-explanatory, tersely recalling the context and the background while repairing the error…If a correction is warranted, it should follow immediately…For the handling of more general lapses (those of fairness, balance and perspective), *see* <u>editor's notes</u>.

191.    Bennet defined an "editor's note" as "usually not a correction of fact—although it can be that as well…corrections are much more our standard way of addressing mistakes that are made in the paper.  And editor's notes tend to be reserved for those occasions, I think, when The Times is addressing a body of work, like the Iraq war coverage."  [Vogt Decl. Ex. 4, Bennet Depo 76:21-77:10]

192.    Following several prominent factual errors by The Times over recent years, The Times recognized the need to slow down and fact-check its work.  [Vogt Decl. Ex. 15, PL Depo Ex. 7 ("Systemic Change Needed After Faulty Times Article," L. Spayd, Dec. 18, 2015); Vogt Decl. Ex. 16, PL Depo Ex. 8 ("*Time, the Enemy*," A. Brisbane, Jan. 15, 2011)]

193.    Bennet likewise held himself to the principle that "a writer must listen carefully, question everybody's assumptions, including his own."  [Vogt Decl. Ex. 112, PL Depo Ex. 191 at p. 2; Vogt Decl. Ex. 4, Bennet Depo 68:2-69:13]

194.    Ultimately, Bennet acknowledged he is responsible for the accuracy of each and every editorial published by *The Times*, particularly the editorials which he authors and edits. [Vogt Decl. Ex. 4, Bennet Depo 13:8-24; Vogt Decl. Ex. 3, Williamson Depo 65:16-68:6]

195.    The Times also publicly pronounced its devotion to "transparency" in its editorial and fact-checking processes ("We should be much more transparent than we were in the past.  We should tell people how we do things.  We should be open about how we make decisions.")  [Vogt Decl. Ex. 157 at p. 2 (quoting Dean Baquet)]

### The Times' Subverts its Principles to Profits

196.    In the digital landscape, The Times operates in a "highly competitive environment where it competes for subscription and advertising revenue with both traditional and other content providers, as well as search engines and social media platforms."  [Vogt Decl. Ex. 159 at p. 11]

197.    In this digital environment, The Times' "ability to compete depends on, among other things, audience engagement, its ability to reach new users, and its visibility on search engines and social media platforms and in mobile app stores."  [*Id*. at p. 11]

198.    As she was being ousted from The Times shortly before the Editorial was published, The Times' Public Editor, Liz Spayd, noted that, "Digital disruption and collapsing business models get all the attention, but the prospect of major media losing its independence, and its influence, ranks equally high among the industry's perils."  [Vogt Decl. Ex. 153 ("The Public Editor Signs Off" at p. 2]

199.    Spayd also recognized The Times' elimination of its Public Editor position showed the paper's move away from "institutional integrity," demonstrated an unwillingness to seriously listen to criticism and doubt the impulses and wisdom of its inner sanctum, and was leading to

"morph[ing] into something more partisan, spraying ammunition at every favorite target and openly delighting in the chaos." [*Id.* at pp. 2-3]

## The Times Systemic Bias

200.    The Times has a Left-leaning media bias. [Vogt Decl. Ex. 185]

201.    The Editorial Board and Opinion pages have a Left media bias. [Vogt Decl. Ex. 186]

202.    One review of the Editorial Board found it to be "consistently left" and "could not find even one example of an editorial piece with a Center or Right perspective." [Id.]

203.    This review concluded:

> [T]he New York Times Editorial Board never writes favorably or sympathetically about the Republican Party, its members and ideas. We found The New York Times Editorial Board engages in some sensationalism around issues, contributing to its Far Left Stance…The New York Times Editorial Board consistently displays a Far Left stance on policies and issues of the day.

[Id.]

204.    In June 2016, when she first took over as The Times' Public Editor, Liz Spayd, wrote about public perception about The Times' bias—which she described as "poison." [Vogt Decl. Ex. 187, ("*Why Readers See The Times as Liberal*")]

205.    After noting that The Times' coverage "is in fact biased," Spayd called out The Times' "home page…[a]nchoring its top right corner is the Opinion section, which promotes the columns and editorials of its mostly liberal writers." [Id. at p. 2]   "'Readers know the difference between opinion and news,' you'll often hear.  I'm not sure all do, especially when the website makes neighbors of the two and social platforms make them nearly impossible to tease apart." [Id.]

206.   Spayd made specific note of "the placement of an editorial calling for gun control on the front page last December, which garnered a record number of comments, was shrill proof of the kind of Times bias they expect." [Id. at p. 3]

207.   Spayd went on to say, "WHAT'S happening at The Times isn't only about The Times.  It's part of the fracturing media environment that reflects a fractured country.  That in turn leads liberals and conservatives toward separate news sources.  A Pew Research Center survey two years ago found that liberals are flocking to The Times, with 65 percent of its readers possessing political values that were left of center." [Id. at p. 3]

208.   Spayd concluded with, "Imagine a country where the greatest, most powerful newsroom in the free world was viewed not as a voice that speaks to all but as one that has taken sides…Or has that already happened?" [Id. at p. 4]

209.   The Times' gun control editorial Spayd mentioned (see Paragraph 206, above), "End the Gun Epidemic in America," was published December 15, 2015.  This Editorial ran on the front page of the newspaper—the first time an editorial has such placement since 1920.  [Vogt Decl. Ex. 188 ("*End the Gun Epidemic in America*"); *see also* Vogt Decl. Ex. 189 ("*Conservatives take shots at New gun control editorial*," T. Kludt, CNN, Dec. 7, 2015, at p. 2 ("The Times generated quite the stir with its Saturday editorial on the "gun epidemic."  It was the first time the newspaper ran an editorial on page one since 1920, when it expressed regret over the nomination of Warren G. Harding")]

210.   The Times and its Editorial Board hold a well-established history of bias concerning Second Amendment rights and gun control, even publishing a book on the subject. [Vogt Decl. Ex. 11, PL Depo Ex. 1 at p. 8; Vogt Decl. Ex. 161, PL Depo Ex. 285 ("*Gun Control:*

*Changing Perspectives*"); Vogt Decl. Ex. 162, PL Depo Ex. 286; Vogt Decl. Ex. 30, PL Depo Ex.

30]

211.    They also have a history of bias against Sarah Palin.  [*See, e.g.,* Vogt Decl. Ex. 17,

PL Depo. Ex. 10; Vogt Decl. Ex. 18, PL Depo. Ex. 11]

212.    Hannah Ingber, who was tapped to lead The Times Reader Center shortly before

the Palin Editorial was published, once attacked Palin for being a mother while running for Vice

President:

> Watching Sarah Palin accept the Republican nomination for vice
> president, all I could think was that I am so grateful my mother did
> not run for president or VP while I was a baby.  This is hardly good
> judgment on Palin's part.
>
> …
>
> But running on a national ticket months after your child was born?
> Let alone a son who has Downs Syndrome and therefore under the
> best of circumstances is going to need every last bit of attention.
> How can one possibly be an involved and nurturing parent while
> campaigning in such a heated race?
>
> You can be a great mother and work.  But you can't be a great
> mother and work 80 hours a week.  There is no way you are a great
> mother if you are not there…

[Vogt Decl. Ex. 170, Ingber Depo Ex. D]

213.    Bennet described Palin as "in over her head," "lacking sufficient preparation," and

"polarizing."  [Vogt Decl. Ex. 4, Bennet Depo 133:3-11, 134:14-17]

214.    Within The Times, Gov. Palin was also seen as a convenient target for attacks

against conservative policies and a subject likely to spark readership interest, as described by

Charles M. Blow in his column "She Who Must Not Be Named" [Vogt Decl. Ex. 19, PL Depo Ex.

12]:

> She was a vice presidential nominee. But she lost. She was the governor of
> Alaska. But she quit. Now she's just a political personality — part

50

cheerleader, part bomb-thrower — being kept afloat in part by the hackles of her enemies and the people who admire her resilience in the face of them. The left's outsize and unrelenting assault on her has made her a folk hero. The logic goes that if she's making people on the left this upset, she must be doing something right.

Yet the left continues to elevate her every utterance so that they can mock and deride her. The problem is that this strategy continues to backfire. The more the left tries to paint her as one of the "Mean Girls," the more the right sees her as "Erin Brockovich." The never-ending attempts to tear her down only build her up. She's like the ominous blob in the horror films: the more you shoot at it, the bigger and stronger it becomes.

Yes, she's about as sharp as a wet balloon, but we already know that. How much more time and energy must be devoted to dissecting that? How is this constructive, or even instructive at this point? What purpose does it serve other than inflaming passions to drive viewership and Web clicks?

As Politico's editor in chief, John F. Harris, and its executive editor, Jim VandeHei, very candidly expressed in August: "More traffic comes from an item on Sarah Palin's 'refudiation' faux pas than from our hundreds of stories on the complexities of health care reform or Wall Street regulation." So left-leaning blogs like The Huffington Post plaster pictures of her and her family all over their sites with entries about her latest gaffe or sideswipe. But she's barely mentioned on popular conservative blogs.

The same leftward skew is also true on television. An analysis of CNN, MSNBC and Fox News from Nov. 3 to Dec. 2, using data from ShadowTV, a monitoring service, found that CNN mentioned the name "Sarah Palin" nearly 800 times… Left-leaning MSNBC mentioned it nearly 1,000 times. But Fox News, which employs her, mentioned it fewer than 600 times… People on the left seem to need her, to bash her, because she is, in three words, the way the left likes to see the right: hollow, dim and mean. But since she's feeding on the negativity, I suggest three other words: get over it.

215.    In an increasingly competitive digital media landscape, attacking Gov. Palin in the context of gun control issues was the type of biased, partisan "spraying [of] ammunition at [a] favorite target and openly delighting in the chaos" [Vogt Decl. Ex. 153 ("The Public Editor Signs Off")] attack Blow recognized scores political points with readers and stirs controversy to drive

viewership and bring an economic benefit to The Times' business. [Vogt Decl. Ex. 19, PL Depo Ex. 12]

216.    On the flip side, Bennet acknowledged he has never called out the Left for employing the same type of "rhetoric," images, and terminology he attacked Gov. Palin for using. [Vogt Decl. Ex. 4, Bennet Depo 101:10-102:3; 102:11-103:10, 106:9-120:8; Vogt Decl. Ex. 129, 130, 131, 133, PL Depo Ex. 216, 216(A), 217, 220]

217.    Bennet's bias runs so deep he does not consider the following graphics posted by the DCCC and DLC to be "incitement" or the same thing as Palin's Map [Vogt Decl. Ex. 4, Benet Depo. 114:16-118:7]:





**The Times Marketed Itself on the Promise to Tell the Truth**

218.    Following the 2016 election of Donald Trump, The Times pledged to rededicate itself to accurate reporting and publishing "the complete, unvarnished truth as best we can learn it." [Vogt Decl. Ex. 118, PL Depo Ex. 201A]

219.    This supposed rededication to accuracy coincided with The Times' new advertising campaign, "The Truth Is Hard," which debuted at the Academy Awards in February 2017.  [Vogt Decl. Ex. 150]

220.    Bennet promoted this "Truth" advertising campaign on his personal Twitter account.  [Vogt Decl. Ex. 158]

221.     Among other things, this advertising campaign included merchandise marketed to children, such as its Truth poster, and on shirts, buttons and mugs.  [Vogt Decl. Ex. 152]

222.     Through its Truth campaign, The Times used its commitment to publishing the "Truth" to convince the public to buy subscriptions: "Support fact-based journalism" by subscribing to The Times, while professing "Truth. It has no alternative… it comes at a cost… [and]… It's hard to find. But easier with 1,000+ journalists looking."  [Vogt Decl. Ex. 151, PL Depo. Ex. 254]

223.     The Times prominently featured its advertisements, such as "The Truth is more important now than ever." on billboards in Manhattan [Vogt Decl. Ex. 14, PL Depo Ex. 6 at p. 2]

224.     The Times' Truth campaign worked; earning 5.12 billion impressions, $16.8 million in media value, won more subscribers for The Times in 24 hours than the paper had gained in the preceding 6 weeks, and launched The Times to record subscription growth in 2017 (passing 2 million digital-only subscribers in the second quarter of 2017, a first for any news organization. [Vogt Decl. Ex. 190 ("*The New York Times 'Truth' Campaign Drives Digital Subscriptions*"); Vogt Decl. Ex. 207 (NYT Quarterly Reports)]

## The Times' Hypocrisy

225.     *In practice*, while drastically increasing profit on the promise of purveying Truth, The Times and its Editorial Board were plagued by factual errors they openly recognized but internally never implemented institutional changes to correct:

   a.    No changes were implemented after The Times acknowledged its major errors in covering the Loughner shooting Vogt Decl. Ex. 16, PL Depo. Ex. 8; Vogt Decl. Ex. 8, Douthat Depo 59:3-23];

   b.    No changes were implemented after Liz Spayd noted the need for "systemic change" to address failure of sufficient skepticism at every level of the reporting and editing

process." [Vogt Decl. Ex. 15, PL Depo Ex. 7; Vogt Decl. Ex. 2, Lepping Depo 31:4-33:11];

c. No changes were implemented by Bennet when, shortly before the subject Editorial was published, Bret Stephens (a controversial columnist hired by Bennet) published a climate change column that was widely criticized for factual inaccuracies, so much so The Times' own reporters and news editors immediately denounced it on Twitter. [Vogt Decl. Ex. 14, PL Depo Ex. 6 *("The NY Times promised to fact check their new climate denier columnist – they lied,*" J. Room, *Think Progress*); Vogt Decl. Ex. 4, Bennet Depo 222:9-223:3; Vogt Decl. Ex. 6, Cohn Depo 30:20-31:9; Vogt Decl. Ex. 2, Lepping Depo 27:19-24]

226. *In practice*, The Times and Bennet have been anything but "transparent" when it comes to Bennet's errors:

a. Williamson was forced to remove post critical of another Editorial Board hire from her personal social media page [Vogt Decl. Ex. 3, Williamson Depo 110:22-115:22; Vogt Decl. Ex. 90, 55, 56, 57 (PL Depo Ex. 158, 69B, 69C, 69D)].

b. At the same time, Bennet issued a company-wide memo instructing all staff to "criticize our work privately." [Vogt Decl. Ex. 58, PL Depo Ex. 70; Vogt Decl. Ex. 3, Williamson Depo 116:18-124:4; Vogt Decl. Ex. 4, Bennet Depo 236:3-237:8]

c. Soon after that, Bennet got "upset" about a transcript of a meeting with staffers being "leaked" because "[h]e didn't realize that [he] was on the record and it was going to be shared…when you talk to journalists and it's off the record, they respect that…in this case they didn't." [Vogt Decl. Ex. 93, PL Depo Ex. 161; Vogt Decl. Ex. 4, Bennet Depo 214:7-215:8]

**The Ultimate Hypocrisy—The Times' True Mission**

227. Although The Times and Bennet outwardly profess their "mission" to tell the Truth and reaped the financial rewards of positioning themselves as such, *in practice*, behind closed doors, the directives were much different: stir controversy to drive readership and revenue—an

JA 1292

Case 1:17-cv-04853-JSR Document 54 Filed 07/10/20 Page 57 of 95
Case 22-558, Document 54, 09/19/2022, 3384725, Page137 of 295

objective confirmed by A.G. Sulzberger when he commended Bennet for "ensuring [his] editorial strategy is advancing our company strategy." [Vogt Decl. Ex. 4, Bennet Depo 220:17-221:10]

228.    Among other things, Sulzberger lauded Bennet for his hiring of Michelle Goldberg, Brett Stephens, and Bari Weiss. [Vogt Decl. Ex. 4, Bennet Depo 221:11-20]

229.    Sulzberger also told Bennet to "move faster, take bigger risks, and play more aggressively outside your lanes." [Vogt Decl. Ex. 4, Bennet Depo 216:10-218:8, 219:10-20] He also told Bennet he wanted "more" of what occurred in 2017, instructing Bennet to "[a]sk for forgiveness, not permission…[because] you enjoy much more autonomy and a much bigger tolerance for risk…[which] should give you the blessing to move faster or to make changes that are more disruptive," and also told him to "play outside you lanes a bit more often". [Id.]

230.    Bennet's implementation of his and The Times' true mission, consistent with Sulzberger's directives, is apparent from numerous controversies during Bennet's tenure at The Times:

a.  Bret Stephens hiring was very controversial and resulted in several factually inaccurate columns that garnered significant attention and had to be corrected. [Vogt Decl. Ex. 4, PL Depo Ex. 6; Vogt Decl. Ex. 4, Bennet Depo 221:5-222:16, 223:4-224:15];

b.  Michelle Goldberg was another controversial Bennet hire who wrote a book review the day she was hired that was plagued with factual errors for which a correction had to be issued. [Vogt Decl. Ex. 128 ("The Opinionator"); Vogt Decl. Ex. 4, Bennet Depo 226 :6-227 :20]

c.  Bari Weiss was another very controversial Bennet hire involved in several controversies and factual errors. [Vogt Decl. Ex. 53, PL Depo Ex. 69; Bennet Depo 227:21-228:8]]

d.  Bennet "hired" Quinn Norton but she never actually started working in the opinion department after public outrage over her "pattern of tweeting activity" Bennet begrudgingly admitted was

JA 1293

Case 22-558, Document 54, 09/19/2022, 3394725, Page138 of 295
Case 1:17-cv-04853-JSR Document 203 Filed 07/10/20 Page 58 of 95

"racist" led to Bennet's employment offer being "rescinded." [Vogt Decl. Ex. 54, 93 (PL Depo Ex. 69A, 161); Vogt Decl. Ex. 4, Bennet Depo 228:10-230:17];

e.  Bennet also stoked controversy by hiring Sarah Jeong, who like Quinn Norton had a pattern of tweeting activity deemed by many to be "racist," although her employment offer was not rescinded because her tweets were directed at white people. [Vogt Decl. Ex. 90, 55, 56, 57 (PL Depo Ex. 158, 69B, 69C, 69D); Vogt Decl. Ex. 4, Bennet Depo 230:18-231:15]

f.  Bennet's tenure was also marked with publishing controversial pieces by the likes of Louise Mensch and Erik Prince [Vogt Decl. Ex. 128; Vogt Decl. Ex. 4, Bennet Depo 232:15-235:5]

## **James Bennet**

231.    Bennet is an extremely intelligent individual with an excellent memory. [Vogt Decl. Ex. 4. Bennet Depo 30:20-31:9; Vogt Decl. Ex. 2, Lepping Depo 27:19-24; Vogt Decl. Ex. 6, Cohn Depo 155:25-157:9; Vogt Decl. Ex. 3, Williamson Depo 103:10-20]

232.    Bennet was born to privilege and raised in a family with a strong Democrat tradition:

a.  Bennet's grandfather was an aid to Connecticut Governor and congressman Chester Bowles and served as an economic adviser in the Roosevelt Administration [Vogt Decl. Ex. 191 at p. 2; Vogt Decl. Ex. 192]

b.  Bennet's father was a Washington insider with an esteemed career in politics, journalism, and the educational field, including: serving as an assistant to Ambassador Bowles in the 1960s; running for Congress in 1970s serving in 1967-1968 as an assistant to Vice President Humphrey; serving as Assistant Secretary of State for Legislative Affairs in 1977-1979; running the U.S. Agency for International Development 1979-1981; serving as Assistant Secretary of State for International Organization Affairs in 1993-1995 for the Clinton administration; serving as President of NPR from 1983-1992; and serving as President of Wesleyan University from 1995-2007 [Id.]

c.  Bennet's brother, Michael F. Bennet, received his J.D. from Yale Law School, after which he clerked for the 4th Circuit Court

of Appeals and  as Counsel to the Deputy Attorney General in the Clinton Administration, and later served in the Clinton White House.  He is currently the senior Democratic Senator for Colorado—a position to which he was appointed in late 2009. He was also  national co-chair of President Obama's re-election campaign. [Vogt Decl. Ex. 195; Vogt Decl. Ex. 113; Vogt Decl. Ex. 194; Vogt Decl. Ex. 195]

233.    From his father, Bennet was instilled with a passion for "civility" in discourse. [Vogt Decl. Ex. 191 at p. 4 (describing Douglas Bennet's banning of "chalking at Wesleyan University because it did not "meet the civility test."); Vogt Decl. Ex. 4,  Bennet Depo 123:12-124:5]

234.    While his father excelled as a Washington elite, Bennet shined at the prestigious St. Albans School in Washington D.C. and at Yale, before interning for Sen. Tom Eagleton.  [Vogt Decl. Ex. 4, Bennet Depo 25:17-27:15, 28:3-7; Vogt Decl. Ex. 196]

235.    Bennet began his career in journalism working as an intern for The News & Observer and The New Republic.  [Vogt Decl. Ex. 4, Bennet Depo 27:19-25, 28:8-29:9]

236.    Early in his career, Bennet spent 15 years working for The Times in several roles, including as its' Detroit bureau chief, White House correspondent and Jerusalem bureau chief. [Vogt Decl. Ex. 4, Bennet Depo 35:13-23, 38:18-39:11]

237.    From 2006 to 2016, Mr. Bennet served as Editor-In-Chief of The Atlantic.  [Vogt Decl. Ex. 4, Bennet Depo 41:12-42:11, 64:9-13]

238.    Mr. Bennet returned to The Times as its Editorial Page Editor in April 2016 [Vogt Decl. Ex. 4, Bennet Depo 64:9-13].

239.    Bennet's family's prominence in the Democratic "establishment" is well-known; even chronicled in 2019 by the Washington Post in "*Can the Bennet Brothers save the*

*Establishment?*" in which Bennet and his brother are described as an "*Anti-Trump Dynasty*."
[Vogt Decl. Ex. 196, PL Depo Ex 159; Vogt Decl. Ex. 4, Bennet Depo 59:10-61:9, 35:24-38:17]

**The Bennet Brothers' Close Connection**

240.    Bennet is extremely close with his brother, and editing speeches for him and traveling with him for the last 2 weeks of his 2010 Senate campaign.  [Vogt Decl. Ex. 4, Bennet Depo 62:3-63:18]

241.    In fact, attacks on his family are a "trigger" for Bennet, known to send him into "fit[s] of rage."  [Vogt Decl. Ex. 191, PL Depo Ex. 159; Vogt Decl. Ex. 4, Bennet Depo 59:10-60:21]  Although Bennet denies the facts reported in the Washington Post story, he concedes he read the story when it came out and never asked for a correction and refused to be interviewed for the piece, while acknowledging his lack of knowledge of human resources complaints lodged against him.  [Id.]  In the past, Bennet has asked other media outlets for corrections where he has read stories about him that were inaccurate.  [Vogt Decl. Ex. 4, Bennet Depo 66:15-24]

242.    Sen. Bennet was running for re-election in 2010 when Gov. Palin's political action committee posted a map of targeted electoral districts (the "Palin Map"), including two districts in Sen. Bennet's home state.  [Vogt Decl. Ex. 4, Bennet Depo 63:13-24; Sullivan Decl. Ex. 34; Sullivan Decl. Ex. 38 (Mar. 23, 2010 post with map)]

243.    The two incumbent Colorado lawmakers whose districts were depicted on the Palin Map, Reps. John Salazar and Betsy Markey, endorsed Sen. Bennet during his 2010 Democratic primary. [Vogt Decl. Ex. 175 (Palin 4571-4577)]

244.    On January 6, 2011—two days before the Loughner Shooting—a man called Sen. Bennet's offices and threatened to "come down there and shoot you all."  Following

additional threats, the man was arrested (two days after the Loughner Shooting). The FBI even placed additional security at Sen. Bennet's home and Denver office. [Vogt Decl. Ex. 77]

245. Bennet knew about the threats made against his brother surrounding the Loughner Shooting, which were also reported by The Atlantic in an article also disclosing the family connection between Bennet and his brother. [Vogt Decl. Ex. 4, Bennet Depo 145:5-146:14; Vogt Decl. Ex. 77]

246. Sen. Bennet, like James, became an outspoken advocate for gun control; even giving a floor speech on gun control on June 15, 2016, joining 30 of his Democratic colleagues for a filibuster about gun laws following the Pulse Nightclub shooting. [Vogt Decl. Ex. 11, PL Depo Ex. 190] Sen. Bennet's floor speech occurred *the same day* James Bennet's Editorial Board published an editorial about the Pulse Nightclub shooting [Vogt Decl. Ex. 164, PL Depo Ex. 286] and was circulating drafts of a book about political rhetoric and Sarah Palin. [Vogt Decl. Ex. 122, PL Depo Ex. 208]

247. Sen. Bennet was even endorsed by Rep. Gabrielle Giffords' PAC, Americans for Responsible Solutions, a gun control political action committee. [Vogt Decl. Ex. 110, PL Depo Ex. 189] .

248. Bennet's editorial department at The Times is no stranger to Giffords PAC. Thwey regularly received emails from Giffords PAC and used its website as a resource for conducting research in support of their gun control positions. [Vogt Decl. Ex. 24; Vogt Decl. Ex. 2, Lepping Depo 86:14-88:4; Vogt Decl. Ex. 61, 62, 63 (PL Depo Ex. 74, 74(A), 74(B))]

249. Gun control was also an important issue for James Bennet "personally." [Vogt Decl. Ex. 4, Bennet Depo 165:5-7], one he even hosted a gun control forum attended by Gabby

Giffords and Mark Kelly (Americans for Responsible Solutions), who spoke about gun control. [Vogt Decl. Ex. 114, PL Depo Ex. 195; Vogt Decl. Ex. 4, Bennet Depo 169:7-171:10]

250.    Simply stated, Bennet is as an extremely-intelligent, highly-educated journalist with an excellent memory who spent his career serving as a reporter and editor-in-chief working in a field that requires him to remember facts and have an exceptional grasp over the English language, and who has a strong personal connection to political rhetoric, civility, gun control, and threats of gun violence against politicians.  (*See* Paragraphs 231-249, above).

### Bennet's History of Trolling

251.    According to The Times, a "troll is a figure who skips across the web, saying whatever it takes to rile up unsuspecting targets, relishing the chaos in his wake and feasting on attention, good or bad."  [Vogt Decl. Ex. 163, "*How the Trolls Stole Washington,*" A. Hess, *New York Times*, Feb. 28, 2017 at p. 1], much in the same way Liz Spayd recognized *The Times* was "morph[ing] into something more partisan, spraying ammunition at every favorite target and openly delighting in the chaos."  [Vogt Decl. Ex. 153, PL Depo Ex. 256 at pp. 2-3]

252.    Bennet began his career interning at *New Republic*, where his mentors included Andrew Sullivan.  [Vogt Decl. Ex. 112, PL DEPO EX 191 at p. 2 (noting A. Sullivan as oner of Bennet's "mentors"); Vogt Decl. Ex. 4, Bennet Depo 28:16-29:16]

253.    Bennet "learned a lot from [Sullivan] over the years," including Sullivan's controversial, polemic, polarizing style, and how people were drawn to that kind of work—even those who disagreed—leading to success in digital media.  [Vogt Decl. Ex. 4, Bennet Depo 29:11-33:15]

254.    Once Bennet took over at *The Atlantic*, he hired Sullivan to help transform The Atlantic from a print to digital first publication – where Bennet reaped the rewards of Sullivan's

controversial, polarizing, polemic style, even being named Editor of the Year in 2009 after the addition of Sullivan increased The Atlantic's traffic by 50% (1 million to 2 million unique visitors). [Vogt Decl. Ex. 4, Bennet Depo 56:20-57:19]

255.   Bennet remembers Sullivan writing posts about Sarah Palin while he was working for The Atlantic ("I recall he was quite critical of her").  [Vogt Decl. Ex. 4, Bennet Depo 53:20-54:16]

256.   Sullivan's most well-known controversy that drove traffic for *The Atlantic* under Bennet's tenure was "Trig-Trutherism," an ongoing campaign against Sarah Palin maintaining she is not actually the mother of her son with Down syndrome, Trig.  [Vogt Decl. Ex. 78, 79, 80; Vogt Decl. Ex. 4, Bennet Depo 55:25-56:19]

257.   While working at *The Atlantic* for Bennet, Sullivan even once said of Palin:  "Do not under-estimate the appeal of a beautiful, big breasted, divinely chosen warrior-mother as a military leader in a global religious war."  [Vogt Decl. Ex. 109, PL Depo Ex. 187 ("*Sarah Palin's Breasts and Andrew Sullivan*")]

258.   Not surprisingly, fellow journalists began to notice "Bennet's propensity toward trolling, which was noticed during his tenure at *The Atlantic*, seemed to be based on the following premise:  We are too divided to convince each other of the truth, so all we can do is entertain each other with outrageous opinions."  [Vogt Decl. Ex. 197 ("*America Is Fracturing—and So Is 'The New York Times'*")]

259.   As The Times was in the midst of its transformation to a digital-first platform, it hired Bennet because of his success using these methods to drive traffic at *The Atlantic*.  [Vogt Decl. Ex.4, Bennet Depo 219:23-221:10]

260.    A number of Bennet's peers, some of whom once worked for him, have noted Bennet's propensity for trolling continued at The Times.  [Vogt Decl. Ex. 198, "*Opinion: Trolling is Not Opinion*," L. Finnegan, Aug. 30, 2017 at p. 2 (Bennet "loves to troll, and position his writers as martyrs for their bad opinions…the controversial pieces the Opinion section runs under the auspices of fomenting some sort of 'conversation' are done so disingenuously.  The Times is not furthering useful conversation with these bad and wrong op-eds, it is spraying its readers in the eyes with tear gas and then asking them why they are screaming…[which] is particularly egregious when you consider that, post-Trump, the Times has widely marketed itself as a crusader for capital-T Truth and an essential component of a healthy democracy."); Vogt Decl. Ex. 199, "*How Bret Stephens and Bari Weiss have taken the NY Times' campus concern trolling to new heights in just 2 ye*ars," P. Holloy, Media Matters; Vogt Decl. Ex. 200, "*Why are Newsweek and The New York Times using troll tactics for clicks?*" A. Nichols, The Outline, Nov. 29, 2017 at p. 3, 5 ("The insidious trend in which influential news organizations promote the most incendiary part of an otherwise milquetoast article on social media has unfortunately become the norm.  It's like clickbait, but more irritating and less profitable.  The New York Times, our most august defender of democracy, uses this strategy in what is either the most cynical or most idiotic of ways...The objective, it seems, is to provoke liberals into momentarily thinking about The New York Times by any means necessary.  Acting out for attention—this is the logic of children.  Every so often, these attempts to troll readers actually drive some traffic")]

261.    In "*The Opinionator*," Jason Linkins (*The Baffler*) outlines in detail Bennet's tenure of "trolling" at The Times.  [Vogt Decl. Ex. 128 at pp. 9-14]

262.    As set forth above under the guise of "expanding voices," Bennet often stirred controversy by hiring writers like Bret Stephens [Vogt Decl. Ex. 14, PL Depo Ex. 6; *see also* Vogt

JA 1300

Case 22-558, Document 54, 09/19/2022, 3394725, Page145 of 295
Case 1:17-cv-04853-JSR   Document 380   Filed 07/10/20   Page 65 of 95

Decl. Ex. 201 ("New York Times Promises Truth and Diversity, Then Hires Climate-Denying Anti-Arab White Guy," Z. Jilani, The Intercept, Apr. 14, 2017)], Bari Weiss [Vogt Decl. Ex. 128 at p. 9-10; see also Vogt Decl. Ex. 199 ("*How Bret Stephens and Bari Weiss have taken the NY Times' campus concern trolling to new heights in just 2 years*")], Michelle Goldberg [Vogt Decl. Ex. 128 at p. 14]; Quinn Norton [Vogt Decl. Ex. 53-54 (PL Depo Ex.69, 69(A))]; see also Vogt Decl. Ex. 202 ("*New York Times writer fired just hours after being hired*" J. Tacopino, *New York Post*, Feb. 14, 2018)] and Sarah Jeong [Vogt Decl. Ex. 53, 55, 56, 57, 90 (PL Depo Ex. 69, 69(B), 69(C), 69(D), 158) ("Sarah Jeong and the N.Y. Times: When Racism is Fit to Print," A. Sullivan, New York Magazine, Aug. 3, 2018; see also Vogt Decl. Ex. 203 ("*Newest Member of NYT Editorial Board Has History of Racist Tweets*," J. Crowe, National Review, Aug. 2, 2018)].

## The Lessons of the Loughner Shooting Coverage

263.    Members of the media, including The Times, rushed to blame Sarah Palin and others for Jared Loughner's January 8, 2011 shooting in Tucson Arizona; first among them The Times' Paul Krugman.  [Vogt Decl. Ex. 103, PL Depo Ex. 181(A) ("Assassination Attempt In Arizona," P. Krugman, NYT Opinion, Jan. 8, 2011 at 3:22 p.m. ("We don't have proof yet that this was political, but the odds are that it was…"; Vogt Decl. Ex. 104 ("Climate of Hate," P. Krugman, NYT, Jan. 9, 2011; Vogt Decl. Ex. 38, PL Depo Ex. 38 (Douthat email string with Bennet stating, "people assumed a link initially—there was a Paul K[rugman] column that was particularly vivid in blaming Republicans—but the investigation debunked it."; Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*," discussing Krugman's "leap" to linking Loughner to Palin map; Vogt Decl. Ex. 102, PL Depo Ex. 181 ("*We Don't Have Proof Yet*" J. Taranto, WSJ, Jan. 10, 2011)]

264.    However, a well-known consensus was reached shortly after Loughner's shooting that it was not connected in any way to the map circulated by Plaintiff's PAC.  [Vogt Decl. Ex. 30, PL Depo Ex. 30 at pp. 19-21 ("As We Mourn," NYT Editorial, Jan. 12, 2011 (recognizing President Obama's statement during Loughner shooting memorial service that "If, as has been discussed in recent days, their death helps usher in more civility in our public discourse, let us remember it is not because a simple lack of civility caused this tragedy—**it did not not**"…; and noting Palin's position that "journalists and pundits" had committed a "blood libel")); Vogt Decl. Ex. 106, PL Depo Ex. 182 ("*It Did Not*," J. Taranto, WSJ, Jan. 13, 2011 (noting how "New York Times's response to last weekend's murders in Tucson was to instigate a witch hunt against Republican politicians, and how "[w]ith those three truthful words—an improvisation or a late addition, as they were not in the prepared text—[President Obama] rebuked the out-of-control liberal media that have, under the leadership of the New York Times, been engaging in a vicious campaign of lies and smears.")); Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*," asking for correction from Financial Times for Caldwell's article accusing Andrew Sullivan of "linking" Loughner shooting to Palin map; Vogt Decl. Ex. 105 ("*Massacre, followed by libel*," C. Krauthhammer, Washington Post, Feb. 26, 2011 ("Not only is there no evidence that Loughner was impelled to violence by any of those upon whom Paul Krugman, Keith Olbermann, the New York Times, the Tucson Sheriff and other rabid partisan as fixated.  There is no evidence that he was responding to *anything*, political or otherwise, outside of his own head."); Vogt Decl. Ex.  107, ("Sarah Palin Is Right About 'Blood Libel'," Rabbi Shmuley Boteach, WSJ. Jan. 14, 2011 ("Sarah Palin has every right to use ['Blood Libel'].  The expression may be used whenever an amorphous mass is collectively accused of being murderers or accessories to murder.")]

265.    The Times, The Atlantic (while Bennet was at its helm), Wall Street Journal, and Washington Post—all of which Bennet was "regularly reading" for his news in 2011—were among the major news outlets confirming *within days* of Loughner's shooting that it was not linked to incitement, Palin or the map in any way.  [Vogt Decl. Ex. 4, Bennet Depo. 103:25-104:10; Vogt Decl. Ex. 74, PL Depo Ex. 123 ("*Caldwell's Unfairness*"—The Atlantic/Dish), Vogt Decl. Ex. 83, ("*Was the Shooting of Rep. Giffords Political?*"—The Atlantic/Wire), Vogt Decl. Ex. 84 ("*Did Sarah Palin's Target Map Play Rile in Giffords Shooting?*"—The Atlantic/Wire), Vogt Decl. Ex. 85 ("*What We Know About Jared Lee Loughner*"—The Atlantic/Wire), Vogt Decl. Ex. 86 "*Stop the Blame Game*"—The Atlantic), Vogt Decl. Ex. 87 ("*The More We Know*"—The Atlantic/Dish), Vogt Decl. Ex. 88 ("*Ten Days That Defined 2011*"—The Atlantic/Wire); Vogt Decl. Ex. 16, PL Depo Ex. 8 ("*Time, the Enemy*"—NYT), Vogt Decl. Ex. 50 ("*The Tucson Witch Hunt*"—NYT), Vogt Decl. Ex. 51("*Suspect's Odd Behavior Caused Growing Alarm*"—NYT), Vogt Decl. Ex. 52 ("*Looking Behind the Mug-Shot Grin*"—NYT); Vogt Decl. Ex. 102 ("*We Don't Have Proof Yet*"—WSJ), Vogt Decl. Ex. 106 ("*It Did Not*"—WSJ); Vogt Decl. Ex. 105 ("*Massacre, followed by Libel*"—WaPo); Vogt Decl. Ex. 80 ("*The Bogus Claim that a map…*")].

266.    In fact, The Times wrote about how the media's rush to judgment in blaming Gov. Palin for Loughner's actions should be a teaching moment—an example of how the media's bias and "storytelling habits" led them to falsely accuse Gov. Palin of inciting the shooting when it became known fairly quickly that Loughner was not motivated by anything Gov. Palin said or did. [Vogt Decl. Ex. 18 ("*Time, the Enemy*") ("The Times had a lot of company [in the "egregious rush to judgment in the Times coverage of the Arizona shooting"], as news organizations, commentators and political figures shouldered into an unruly scrum battling over whether the political environment was to blame.  Meanwhile, opportunities were missed to pick up on

evidence—quite apparent as of early the first day—that Jared Lee Loughner, who is charged with the shootings, had a mental disorder and might not have been motivated by politics at all."))]  In relevant part, The Times' said:

> The Tucson shootings afforded another, quite different illustration of the pressure of time in news coverage — not pressure measured in seconds and minutes, but pressure that news organizations feel to define the context of a story, to set up a frame for it, sometimes before the facts can be fully understood.

> The Times's day-one coverage in some of its Sunday print editions included a strong focus on the political climate in Arizona and the nation. For some readers — and I share this view to an extent — placing the violence in the broader political context was problematic.

> C. Wenk, a reader in Alexandria, Va., criticized "an egregious rush to judgment in the Times coverage of the Arizona shooting, specifically aimed at linking the shooting to various conservative or Republican political rhetoric."

> So why does a story get framed this way? Journalism educators characterize this kind of framing as a storytelling habit — one of relating new facts to an existing storyline — and also as a reflex of news organizations that are built to handle some topics well, and others less well.

> Jerry Ceppos, dean of the journalism school at the University of Nevada, Reno, said journalists' impulse to quickly impose a frame on a story is "genetic."

> "Journalists developed automatic framing protocols generations ago because of the need to report quickly," he said. "Today's hyper-deadlines, requiring journalists to report all day long and all night long, made that genetic disposition even more dominant."

JA 1304

Case 22-558, Document 54, 09/19/2022, 3384725, Page149 of 295
Case 1:17-cv-04853-JSR   Document 384   Filed 07/10/20   Page 69 of 95

Still, I think the intense focus on political conflict — not just by The Times — detracted from what has emerged as the salient story line, that of a mentally ill individual with lawful access to a gun.

Whether covering the basic facts of a breaking story or identifying more complex themes, the takeaway is that time is often the enemy. Sometimes the best weapon against it is to ignore it, and use a moment to consider the alternatives.

267.    Bennet was well-aware of the problem of "framing," specifically in the context of the Loughner shooting coverage, from his time at The Atlantic.  [Vogt Decl. Ex. 138, 139]  On January 12, 2011, the editor of The Atlantic's website, Bob Cohn, forwarded Bennet a potential story by Jim Sleeper, a writer and "lecturer in political science at Yale, [who] teaches a course in Journalism, Liberalism, and Democracy."  [Vogt Decl. Ex. 138 at p.1, 5; Vogt Decl. Ex. 4, Bennet Depo 135:10-136:9]  In this email Bennet received were links to sources Sleeper cited, the first of which is to an article by T.A. Frank in the New Republic, "How the Media Botched the Arizona Shooting."  [Vogt Decl. Ex. 138 at p. 2; Vogt Decl. Ex. 139]

268.    The T.A. Frank article Bennet received on January 14, 2011 [Vogt Decl. Ex. 139] provides in pertinent part:

When disaster strikes, journalists have to write something about it—and write it fast. That means they have to take mental shortcuts, calling up established narratives and laying them out like old wrapping paper for new and more ambiguous facts. (Wife poisons husband. Revenge killing? Money killing? Self-defense killing? We stand at the ready with a lot of templates.) While the resulting gift isn't always pretty, it's generally good enough for deadline work.

But sometimes the shortcuts produce a journalistic stampede at the worst possible time. That's what happened last weekend, when 22-year-old Jared Lee Loughner shot six people to death at an Arizona Safeway and gravely wounded many more, including Democratic Congresswoman Gabrielle Giffords. The dominant storyline in the press—one that persisted in the face of all the facts —was that right-wing hysteria and lunacy had given rise to Loughner's atrocity. Only on Wednesday night, when President Obama delivered a speech that effectively told everyone to cut it out, was the stampede halted (one hopes). But it's still worth reviewing how the nation's leading periodicals descended into such mindlessness.

So why did the press go so far astray this week? How did many fine, otherwise fair-minded journalists allow their judgment to become so clouded? Let's venture briefly—and hopefully not too speculatively, lest I be accused of double standards—into the realm of cognition. Organizational theorists such as Karl E. Weick, a professor of psychology at the University of Michigan Business School, have researched how we react to unexpected events. In his 1995 book *Sensemaking in Organizations*, Weick notes that we humans automatically categorize what we encounter, ushering messy new complexities into tidier established categories ("myths, metaphors, platitudes, fables, epics and paradigms," to be precise). When something bad and inexplicable takes us by surprise, our brains reach for the handiest existing narratives, and accuracy falls by the wayside in favor of simple plausibility. "The stories are templates," writes Weick. "They are products of previous efforts at sensemaking. They explain. And they energize."

Contributing to such tendencies are the habits of newsrooms. In their 1989 book *How Do Journalists Think?*, S. Holly Stocking and Paget H. Gross note that a typical reporter launches into a story with an investigative hypothesis, one that is often bolstered during the reporting process by "confirmation bias." Only with great reluctance—in the face of overwhelming evidence to the contrary—is such a hypothesis normally discarded. Added to that is the weakness that competing hypotheses are tested one at a time, so that alternative explanations for the same data points are almost never considered simultaneously. "For example," write the authors, "if one is testing a theory about the negative impact of feminism on women's lives, one is unlikely also to test theories about its positive impact."

At this point, however, a reader might reasonably ask why, in this case, launching into a discussion of political hysteria was such a bad thing. If the shootings in Arizona can serve as a springboard for discussing a significant, if not necessarily related, societal menace, why not let them do so? After all, much of the right truly has become unhinged.

Well, yes, but let's remember that the deaths caused by Jared Loughner were preventable. There were concrete things that could have been done and that we now should do. Some people think we should place more restrictions on gun ownership. Some think we should provide more security services to members of Congress. Some think we should have improved mental-health resources. Such solutions may be wise or foolish, but the point is that they are directly relevant to the tragedy of last weekend.

By focusing on explanations that are abstract and speculative and only indirectly related, however, we risk losing sight of the crucial and immediate questions at hand. For instance, when Congressman James Clyburn was interviewed by NPR about the shootings, Clyburn followed the lead of all the major news outlets and focused almost entirely on "the discourse around the political arena," suggesting a reexamination of the Fairness Doctrine. In short, Clyburn largely ignored a real problem while pledging to focus on an imagined one. That is the danger here.

In 1911, a fire at the Triangle Shirtwaist Factory in New York killed 146 garment workers, most of them women and immigrants. Fortunately, the outrage that followed it went in a healthy direction, resulting in new federal workplace safety laws. This was a lot more helpful than essays blaming the fire on misguided ideals of femininity. There's a place for speculation and supposition, of course. But not a big place, and not for long. It's well past time for journalists to move on from what we *don't* know about the causes of last weekend's tragedy and grapple seriously with a great deal that we now *do* know—even if, God forbid, it means we'll have to abandon our hypotheses.

**Bennet's Knowledge of No Palin/Loughner Link Before the Scalise Shooting**

269.   Bennet had actual knowledge the "Media Botched the Arizona Shooting" by "reaching for the handiest existing narratives" to conclude a link existed between Plaintiff and Loughner's shooting—the very same "framing" concept The Times warned against in the context of its own false reporting surrounding the Loughner shooting.  [Vogt Decl. Ex. 4, Bennet Depo 137:15-139:3; Vogt Decl. Ex. 139; Vogt Decl. Ex. 16 (PL Depo Ex. 8)]

270.   The same problem was addressed in another article posted on The Atlantic's website three days after the Loughner shooting, while Bennet was at its helm—"*Stop the Blame Game*" [Vogt Decl. Ex. 86, PL Depo. Ex. 150]:

> I'm not a media critic and never will be, but this has not been a shining 48 hours for my profession. Following the shooting that left Rep. Gabrielle Giffords, D-Ariz., gravely wounded and six bystanders murdered at a Tucson shopping center, the media have spent as much time trying to assign political blame for the cause of the shooting as they have trying to unearth facts. As it turns out, the murderer is a mentally unstable individual, with no coherent political ideology.

> And in the aftermath of the Tucson shooting, the media's worst tendencies were on display, from the onset of the crisis when several outlets inaccurately reported that Giffords had died, to the immediate, unwarranted assumption that the killer was associated with the tea party.

It's becoming increasingly clear that overheated political vitriol played virtually no role in Jared Lee Loughner's shooting spree. His political thinking is hardly coherent, and his obsession with Giffords predated the tea party and Sarah Palin's emergence in national politics. One of his few close friends told Mother Jones that he became fixated on the congresswoman when he asked her a question at a 2007 town hall about "the government having no meaning" and felt she didn't answer. His killing spree wasn't motivated by disagreement with her positions on health care or immigration.

The other lesson learned from the coverage of this awful tragedy is that it's better to be right than first -- a challenge in a journalism culture that increasingly rewards speed over substance. In the rush to break news as the crisis unfolded, several major media outlets inaccurately reported that Giffords had died. Others later inaccurately reported that Giffords was speaking after her surgery on the day of the attack. It raises questions about news organizations' standards for what's allowed on air or online.

Those standards have been in decline, and go beyond reporting inaccurate information. Far too often, we give serious leeway for sources to anonymously attack their opponents. It makes for sexier stories but further coarsens the discourse in Washington.

Far too often, we rush to report campaign attacks on candidates without verifying their validity and without even getting a response. Campaigns and national party committees know that news outlets are hungry for sensational material, and they exploit that.

271.    In fact, as an editor who trains journalists, Bennet acknowledged his familiarity with the problem of "framing" and publishing "preconceived narratives" occurring in the aftermath of the Loughner shooting and even "cautioned the journalists that work for [him] about doing what Mr. Frank was referencing in his piece [Vogt Decl. Ex. 139] about framing events in terms of

Case 1:17-cv-04853-JSR   Document 380   Filed 07/10/20   Page 74 of 95
Case 22-558, Document 54, 09/19/2022, 3384725, Page154 of 295

JA 1309

preconceived narratives;" analogizing that problem to Bennet's self-directive to "guard[] ourselves against our own assumptions about any given story."  [Vogt Decl. Ex. 4, Bennet Depo 139:10-19]

272.    Bennet claims he cannot "recall" certain stories published on The Atlantic website denouncing any connection between Gov. Palin and Loughner's shooting, but conceded at his deposition that he "regularly read" The Atlantic in 2011 and "must have read at least several" of the articles about the Loughner Shooting published on The Atlantic's website [Vogt Decl. Ex. 69; Vogt Decl. Ex. 4, Bennet Depo 122:6-22]  Bennet testified he "must have read at least several" of these Loughner articles because he "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like."  [*Id.*, Bennet Depo 122:23 123:7]  In fact, Bennet described himself as "consuming [The Atlantic's] site."  [*Id.*, Bennet Depo 123:7-9]

273.    Bennet also conceded that he regularly read Sullivan's *The Dish* published on The Atlantic's website and even recalled Sullivan writing about Sarah Palin.  [*Id.*, Bennet Depo 54:5-9]

274.    Bennet acknowledged he may have even spoken with Sullivan about the Loughner shooting.  [*Id.*, Bennet Depo 98:6-9]

275.    Sullivan live-blogged about the Loughner shooting on *The Atlantic's* website under the post "*An Assassination Attempt in Arizona: Live-Blogging*"  [Vogt Decl. Ex. 81], and posted several other pieces about the shooting which denounced any "link" between Palin and Loughner's crime.  [Vogt Decl. Ex. 74, 87]

276.    On January 15, 2011, Mr. Bennet's "close friend," Sullivan, posted a column on *The Atlantic's website* titled "*Caldwell's Unfairness*," in which Sullivan demanded a correction

from a journalist for the *Financial Times* who wrote that "Andrew Sullivan, the *New York Times* columnist Paul Krugman, and the Pima County Sheriff Clarence Dupnik **linked** the shootings to Republican ideology or rhetoric, as expressed by former vice presidential candidate Sarah Palin…" [Vogt Decl. Ex. 74]  Sullivan asked for "actual evidence" to support such a charge and then stated that his "first personal judgment of any link between Loughner and the Tea Party is to *debunk* it." Sullivan then concluded with the following passage:

> Did I explore the issue of far right violence after Giffords' father cited the Tea Party?  You bet I did.  How could I not?  Did I ever link the shootings to Republican ideology or rhetoric?  Nope.  Do I think such rhetoric is over the top in a world where crazy people have access to guns?  Yes.  Do I agree with Giffords that Palin's imagery was dangerous?  Yes.  But as for the motive of Loughner, by the time 6:32 p.m. comes along, I have concluded that this was likely a psychotic breakdown, and cited a psychiatrist to that effect, and specifically ended with the case that he is "of no party."  How can I be accused of linking Loughner to the GOP when I specifically cite that he seems to be of "no party"?

> *The Financial Times* needs to run a correction.

277.    In the ensuing days after the Loughner shooting, numerous other articles were published on The Atlantic's website noting the lack of a connection between Palin or the Palin Map and the shooting, including but not limited to:

a.    "*Was shooting of Rep. Gabrielle Giffords Political?*" (January 8, 2011); [Vogt Decl. Ex. 83]

b.    "*Did Sarah Palin's Target Map Play Role in Giffords Shooting?*" (January 10, 2011); [Vogt Decl. Ex. 84]

c.    "*What We Know about Jared Lee Loughner*" (January 10, 2011); [Vogt Decl. Ex. 85]

d.    "*Ten Days That Defined 2011*" (December 29, 2011) [Vogt Decl. Ex. 88].

278.     These articles about the Loughner Shooting were among those Bennet testified he must have read because he was "consuming" The Atlantic's website.  [*See* Paragraph 272-273, above]

279.     If a "direct" and "clear" link had been made between Palin's map and the Loughner shooting, that clearly would have been something Bennet would have known because Bennet testified the Loughner shooting was a "very big story" and political discourse and gun control were two of Bennet's hot button issues.  [Vogt Decl. Ex. 4, Bennet Depo 40:5-22, ]

280.     Bennet tries to distance himself from involvement with *The Wire* published on The Atlantic's website, but conceded at his deposition that he received daily email updates for pieces posted by The Wire on The Atlantic's website, as well as "Daily News Roundup" emails containing relevant news stories posted on The Atlantic's website.  [Vogt Decl. Ex. 4, Bennet Depo 124:10-127:12; Vogt Decl. Ex. 136-137, PL Depo Ex. 226, 228]

281.     The January 10, 2011 article, "*What We Know about Jared Lee Loughner*," (Vogt Decl. Ex. 85) posted on The Atlantic's website notes, "**He Was More Delusional Than Political**… Jared Lee Loughner appeared to be more driven by a delusional mind than a real interest in politics, mental health experts said Sunday."  The article also references and hyperlinks *The New York Times* is to *The Times'* January 9, 2011 article, "*Suspect's Odd Behavior Caused Growing Alarm*" an in-depth report about Loughner's behavior and past.  [Vogt Decl. Ex. 151]

282.     A year-ending 2011 piece, "*Ten Days That Defined 2011*," [Vogt Decl. Ex. 88] that ran on *The Atlantic's website,* recognized that it was wrong to link Gov. Palin to the Loughner Shooting:

> In a meta media sense, the bad thing to come out of this already terrible story was a round of blame hurling, with people rushing to point at Sarah Palin's infamous <u>target map</u> or Loughner's left seeming (but not really) anti-Bush sentiments.  In truth, Loughner is

> clinically insane and this was not really about politics at all. That many, including us, immediately jumped to that conclusion says some pretty sorry things about the state or our political machine.

283. Bennet conceded at his deposition that "it's possible" he read "*Ten Days That Defined 2011.*" [Vogt Decl. Ex. 4, Bennet Depo 127:13-128:8]

284. Within days of the Loughner Shooting, the consensus within *The Times* and *The Atlantic*—the first two of Bennet's primary news sources—was that Gov. Palin and the Palin Map did not incite Loughner's shooting and no direct or clear link between the two was ever established. (*See* Paragraphs 263-283, above). In fact, both news organizations published pieces calling out the media (including themselves) for rushing to blame people like Sarah Palin for Loughner's criminal actions. (*See* Paragraphs 266-271).

### The Events Leading to the Editorial

285. In January of 2016, Gov. Palin endorsed Donald Trump for President, following which The Times' Opinion pages referred to her as a "Rage Whisperer." [Vogt Decl. Ex. 75, 115]

286. In April/May 2016, Bennet re-joined The Times as Editor of the Editorial Department. (*See* Paragraph 238, above).

287. On June 7, 2016, Sarah Palin endorsed Republican candidate Darryl Glenn in Sen. Bennet's senate re-election race in Colorado. [Vogt Decl. Ex. 76]

288. On June 12, 2016, the Pulse Nightclub shooting occurred in Orlando, Florida. [Vogt Decl. Ex. 94]

289. On June 13, 2016, the Editorial Board published the editorial "*What Donald Trump Gets Wrong About Orlando*," which states, "Now the politics. All mass shootings convulse the nation, but this one falls in the middle of one of the nastiest, most divisive presidential campaigns in memory" before railing on Republicans for opposing gun control and causing "America's gun-violence epidemic." [Vogt Decl. Ex. 211]

290.     On June 15, 2016, Times' CEO Mark Thompson emailed Bennet an extract from his book, "Enough Said," which Bennet then forwarded to Times' deputy Op-Ed editor James Dao [Vogt Decl. Ex. 4, Bennet Depo 159:4-162:18; Vogt Decl. Ex. 122-123]  In his forwarding email, Bennet states, "The good news is that it's a book on political rhetoric," [Vogt Decl. Ex. 122] in which the first chapter is devoted to Sarah Palin's "rhetoric"  [Vogt Decl. Ex. 123 at pp. 3-24]

291.     That same day, June 15, 2016 Bennet received a potential op-ed on gun-control from Steven Hill, a Senior Fellow at New America Foundation.  [Vogt Decl. Ex. 95]

292.     Also on that same day, June 15, 2016, Sen. Bennet gave a  Floor Speech on gun control as part of the Democratic filibuster.  [Vogt Decl. Ex. 111]

293.     Also on that same day, June 15, 2016, the Editorial Board published its editorial about the Pulse Nightclub shooting.   [Vogt Decl. Ex. 162]

294.     On July 1, 2016, Gov. Palin spoke at the Western Conservative Summit in Colorado to support then-candidate Donald Trump and Sen. Bennet's re-election opponent, Darryl Glenn. [Vogt Decl. Ex. 204]

295.     In July 2016, Bennet and his Editorial Board were following Gov. Palin in connection with the Republican National Convention, which Bennet and Williamson attended in Cleveland Ohio.  [Vogt Decl. Ex. 124-127; Vogt Decl. Ex.  3,  Williamson Depo. 173:13-174:1]

296.     On August 9, 2016, The Times reported on a statement made by then-candidate Donald Trump made a comment at a North Carolina rally which The Times characterized as "suggest[ing] 'Second Amendment People' could act against Hillary Clinton."   [Vogt Decl. Ex. 116]

297.     That same day, August 9, 2016, Tom Friedman wrote a column published in The Times Opinion section titled, "*Trump's Wink Wink to 'Second Amendment People*.'"  [Vogt Decl.

Ex. 120]  Friedman's column drew a parallel between Trump's comment and the "rabid rhetoric" leading to that assassination of Israeli Prime Minister Yitzhak Rabin.  [Id.]

298.    Bennet testified that Friedman's column was one of his motivations for re-writing and crafting the defamatory portions of the America's Lethal Politics editorial.  [Vogt Decl. Ex. 4, Bennet Depo 184:21-25]   Bennet described Friedman's piece as having made a "powerful impression on me."  [Id., Bennet Depo 182:18-25]

299.    In fact, Bennet and Friedman spoke about the column before it was published, when Friedman told Bennet Trump's statement "reminded him of the kind of rhetoric, inflammatory rhetoric" in Israel leading up to the shooting of Prime Minister Rabin.  [Id., Bennet Depo 183:1-24]

300.    On August 24, 2016, Rep. Giffords' Americans for Responsible Solutions PAC endorsed Sen. Bennet in his senate re-election race. [Vogt Decl. Ex. 110]

301.    Soon after President Trump was elected, on November 13, 2016, The Times published a letter to its readers pledging to "rededicate themselves to The Times "core mission." [Vogt Decl. Ex. 118]  The same day, The Times engaged directly with President Trump on Twitter [Vogt Decl. Ex. 147-148]

302.    On December 17, 2016, Bennet ordered the Book, "*The Persecution of Sarah Palin: How the Media Elite Tried to Bring Down a Rising Star.*"  [Vogt Decl. Ex. 121]

303.    In early 2017, The Times embarked on its "Truth" advertising campaign and capitalized on refocusing its coverage to promote its "subscription strategy."  (*See* Paragraphs 218-224, above).

304.    On February 7, 2017, Brent Staples emailed Bennet about concern and nervousness about anxiety within the Editorial Department, specifically mentioning "a right-wing propaganda

Case 1:17-cv-04853-JSR   Document 54   Filed 07/10/20   Page 80 of 95
Case 22-558, Document 54, 09/19/2022, 3384725, Page160 of 295

JA 1315

tweet [from] Sarah Palin claiming The Times was desperately renting out floors because it was failing." [Vogt Decl. Ex. 20]

305.    On April 5, 2017, Bennet tweet that he was "looking for a great new colleague to stir things up" [Vogt Decl. Ex. 132]

306.    In May 2017, Kathy Griffin posted a photo of herself holding a bloody severed head of President Trump, which drew widespread media attention. [Vogt Decl. Ex. 135, 205]

307.    In early June, 2017, The Times eliminated its Public Editor—a position that essentially served as a watchdog over the paper and held it to account. [Vogt Decl. Ex. 153]

308.    In the days leading up to the June 14, 2017 Scalise shooting, The Times was at the center of public criticism for its sponsorship of a Shakespeare in the Park production of Julias Cesar depicting Trump as Caesar, which other sponsors withdrew from over public outcry that the play was a form of incitement [Vogt Decl. Ex. 206]

### The Defamatory Palin Article

309.    After the Hodgkinson shooting on the morning on June 14, 2017, *Times* Editorial Board member Elizabeth Williamson first raised the question of whether the Editorial Board should comment on the shooting. (*See* Paragraph 22, above).

310.    She quickly researched the shooter, located his social media pages, realized they contained pro-Bernie/anti-Trump messages, and circulated them to Bennet, Semple. (*Id.*)

311.    Initially, Semple was uninterested in writing about a "nut case who hunts republicans."

312.    Eventually, Semple wanted to pursue a "gun control angle." (*Id.*)

313.    In response, Cohn mentioned the Giffords shooting. (*Id.*)

314.    Once Semple decided at 12:08 p.m. that the Board should "shoot for a piece," Bennet had not been involved in the email strings, and the purpose of the piece Semple decided to try to write was twofold:  (1) to focus attention on the shooting; and (2) to restate the longstanding position of *The Times'* Editorial Board in favor of sensible gun control.  (*Id.*)

### Bennet's Predetermined Storyline & Objective

315.    Forty minutes after Semple decided to "shoot for a piece" with a "gun control angle," Bennet—specifically in response to Williamson's email sending the group Hodgkinson's anti-Trump/Pro-Bernie social media pages—injected his preconceived narrative about "inciting hate speech" into the discussion.  (*Id.*)

316.    Bennet, having seen Williamson's earlier emails, knew Hodgkinson was pro-Bernie and anti-Trump; and Bennet was also well-aware of the recent criticism over the Kathy Griffin Trump-beheading situation and The Times' sponsorship of the Shakespeare in the Park production featuring Trump as Cesar.  [Vogt Decl. Ex. 4, Bennet Depo 237:23-240:14]

317.    Semple decided the Board should write a piece on the shooting ***before*** Bennet interjected with his preconceived storyline in response to Williamson's email about Hodgkinson's "pro-Bernie, anti-Trump" social media accounts; an email in which Bennet asked "***whether*** there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence."  (*See* Paragraph 22, above).  Bennet went on to ask "***if*** there's evidence of the kind of inciting hate speech on the left that ***we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting)*** we should deal with that."  (*Id.* (emphasis added)) Bennet testified that he "thought that [the Board] should deal with this issue of incitement if there was evidence of inciting hate speech on the Left."  (*Id.*)  However, Bennet also conceded he and the Board never saw any evidence of inciting hate speech on the Left leading up to Hodgkinson's

shooting [Vogt Decl. Ex. 4, Bennet Depo 250:15-13 ("We didn't find a specific example of hate speech connected to the people on the -- hate ·speech, I'm sorry, I don't usually use that term of, of -- of rhetoric of demonization connected to the ball players that day.· You know, naming Steve Scalise or something like that.")]

318.    From the outset, Bennet was predisposed to use the Loughner Shooting as the sole example of "political incitement" to counterbalance the fact that the Left and The Times were taking criticism for "incitement" in the lead-up to the Scalise shooting.  (*See* Paragraphs 304-308, above).

319.    Based on his prior personal and professional experience and his actual knowledge of *The Atlantic's* publications and other media publications described in Paragraphs 263-284, above, Mr. Bennet already knew that there was no established connection or link between political rhetoric or "incitement" and Loughner's shooting, let alone any "clear" and "direct" link between Gov. Palin or the Palin Map and Loughner's horrific crime.

320.    Before Williamson had ever set pen to paper and conducted her research, Bennet already had made up his mind that "hate-type speech" on the Right caused the Loughner shooting. [Vogt Decl. Ex. 25]

321.    At Bennet's request, Williamson specifically researched whether there was a link between the Palin map and Loughner shooting and whether there was any evidence of a link between incitement and the Hodgkinson shooting.  [Vogt Decl. Ex. 3, Williamson Depo 142:1-143:24, 126:8-131:22; Vogt Decl. Ex. 4, Bennet Depo 245:5-247:2]

322.    It was actually Semple—who decided to write about gun control—that asked  Lett to circulate "four basic gun control pieces (dealing mainly with the plentitude of weapons and porous controls) that also happen to mention Gabrielle Giffords…"  [Sullivan Decl. Ex. 9]  These

four pieces included "*Rep. Gabby Giffords Farewell*" (1/27/2012), "*6000 Bullets in Colorado*" (7/24/2012), "*Democrats Find their Voice on Gun Control*" (7/29/2016), and "*Myths About Gun Regulation*" (1/2/2013)—all of which were pieces written by Semple. [Vogt Decl. Ex. 9; Sullivan Decl. Ex. 13 (PL Depo. Ex. 30)]

323. Eventually, Lett and Williamson also looked to see whether they could find the piece about "hate-type speech" Bennet referenced in his earlier email, although Williamson had no idea what Bennet meant by that term. [*See* Paragraphs 29-30, above; Vogt Decl. Ex. 3m Williamson Depo 207:18-208:5, 209:18-210:16]

324. In response to an email from Williamson at 1:40 p.m. about Bennet's request (Sullivan Decl. Ex. 12), Lett emailed Bennet at 1:46 p.m. asking, "I'm trying to find the piece Elizabeth is referring to here, do you happen to know which one she is talking about?" (*Id.*) Bennet responded to Lett (not Williamson) at 2:07 p.m., asking, "No—I was just wondering if there was such a piece; that is, did we ever write anything connecting to the Giffords shooting to some kind of incitement?" (*Id.*)

325. At 2:20 p.m., Lett replied to Bennet's 2:07 p.m. email by forwarding him a link to a Frank Rich column (not an Editorial): "*No One Listened to Gabrielle Giffords*." (*Id.*)

326. At 2:34 p.m., Bennet responded to Lett by saying "Good for Us. Can you let Elizabeth [Williamson] know?" (*Id.*) Bennet testified that he doesn't recall what he meant by "Good for Us," but the clear inference to be drawn is that Bennet was free to advance his preconceived narrative because the Editorial Board had not written about the subject. [Vogt Decl. Ex. 4, Bennet Depo 252:6-24]

327. At 2:52 p.m., Bennet followed up by asking Lett to send him the four basic gun control pieces Semple asked Lett to send to Williamson, but Bennet claims he does not recall whether he read all of the materials Lett sent him. [*Id.*, Bennet Depo 250:24-251:11]

328. Later, Bennet asked Lett to "dig a little further" because it "seemed strange" to him that the Editorial Board had not "editorialized at all about the [Loughner] shooting…because it was an important news event and the kind of thing we would typically editorialize on." [Bennet Depo. 253:8-254:10]

329. Lett found 2 additional Editorials ("*Bloodshed and Invective In Arizona*" and "*As We Mourn*"), but Bennet apparently did not read those pieces either. [*Id.*, Bennet Depo 254:11-18]

330. Notably, the "***As We Mourn***" editorial discusses President Obama's speech about Loughner's shooting and his recognition that Loughner's shooting cannot be blamed on rhetoric. [Vogt Decl. Ex. 30 at p. 19]

### *The Results of Williamson's Research—Embodied in Her First Draft*

331. As directed by Bennet, Williamson researched the Loughner shooting and knew, based on that research, she could not say there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting. (*See* Paragraph 68, above).

332. Williamson knew that any assertion that there was a clear and direct link between Gov. Palin and Loughner's Shooting would be false, so she made no such assertion. (*Id.*)

333. Bennet conceded that Williams' first draft embodied the research he specifically asked her to conduct concerning any incitement leading to the Loughner shooting [Vogt Decl.

Ex. 4, Bennet Depo 262:17-263:17, 264:3-12, and Williamson testified she wrote her draft consistent with what the research Bennet asked for showed:

> A      I wrote my piece based on what I found, so I did not draw a link in what I wrote.
>
> Q      Why not?
>
> A      I talked about the overheated political climate.
>
> Q      Why didn't you draw a link?
>
> A      Because that's not my job.· I wrote -- I wrote my piece based on the research that I did, and what I wrote reflected that research.
>
> Q      When you say that's not your job, what do you mean?
>
> A      I did my job. So I did the research, and I wrote the piece based on the research that I found.
>
> Q      Based on the research that you found, did you think that you could say that there was a clear and direct link between the map circulated by Sarah Palin's political action committee and the Loughner shooting?
>
> A      No.

[Vogt Decl. Ex. 3, Williamson Depo 142:3-143-24 (lines 143:5-24 quoted above)]

334.    Ms. Williamson did, however, falsely state that the Palin Map "put Giffords and 19 other Democrats under stylized crosshairs" because map depicted crosshairs over targeted electoral districts, not Rep. Giffords and other individual lawmakers.  [Vogt Decl. Ex. , Williamson Depo 232:24-234:10, 269:11-270:16]

A.      **Mr. Bennet's Defamatory Re-Write and Purposeful Avoidance of the Truth**

335.    Williamson submitted her first draft to Bennet, Semple, Fox, Frank Clines, as well as Cohn, at 4:45 p.m.  [Vogt Decl. Ex. 59 ("shootings is in backfield" reference in Williamson's email indicates draft has been submitted to The Times content management system for editing); Vogt Decl. Ex. 3. Williamson Depo 230:16-231:11]

336. After reviewing the draft, at around 5:00 p.m., Cohn took it to Bennet's office and spoke with him about it because she, like everyone else besides Bennet, was not sure what he wanted in the piece:

> I sort of remember standing in front of his glass door, you know, opening up the door or something, and saying, "You need to look at this."…I recall thinking I wasn't really sure if its what **_he wanted_**. I thought there had been quite the confusion over the day as to where this piece was headed, as to be either more of a gun control piece or to be more of a piece about the political climate and the sort of lack of civility in America's political discourse...**_I wasn't sure what James intended, wanted in the piece._** I wasn't sure if the piece worked…I wasn't sure it accomplished what James would want it to accomplish…there were a couple competing ideas about the piece…

[Vogt Decl. Ex. 6, Cohn Depo 57:13-58:22 (emphasis added)]

337. Cohn testified that when she went to Bennet's office to raise her concerns about the piece, Bennet responded by saying something along the lines of, "yeah, it needs some work, I'll do it." [Vogt Decl. Ex. 6, Cohn Depo 60:3-7]

338. At that point, Bennet set out to re-write the editorial consistent with his preconceived narrative expressed in his earlier email [Vogt Decl. Ex. 25; Doc. 41-34, 8/16/17 Hr'g Tran. at 7:23-25, 8:25 (that draft "wasn't exactly accomplishing the objective that we had set out to achieve," so Bennet "effectively re-wrote the piece.")]

339. In doing so, Bennet knowingly re-wrote the paragraph that embodied the results of Williamson's research, which did not draw a clear and direct link between or label as incitement the Palin Map and Loughner's shooting, and replaced her conclusion with his preconceived narrative, including the defamatory statements that Mrs. Palin was responsible for the "incitement" of, and had a "clear" and "direct" "link" to, Loughner's shooting. (*Id.*)

340.    Bennet testified he intentionally used the "very strong" word "incitement" because he "wanted to get our readers' attention" and knew the term was used to mean "deliberate orders, invocations, summonses for people to carry out violent attacks." and understood as meaning "a call to violence."  [Doc. 41-34, 8/16/17 Hr'g Tran. at p. 11:13-12:25; Vogt Decl. Ex. 4, Bennet Depo 114:10-15]

341.    Cohn understood "incitement" to be "very direct" and mean "that it—that the map led him to commit the shooting" [Vogt Decl. Ex. 6, Cohn Depo 96:15-97:7].  Likewise, Douthat immediately understood Bennet's use of "incitement" to draw a causal connection between Palin's map and Loughner's shooting [Vogt Decl. Ex. 41]

342.    In fact, Mr. Bennet found his inspiration for his narrative about Gov. Palin's "incitement" of Loughner  Friedman's, August 9, 2016 column, "*Trump's Wink Wink to 'Second Amendment People*," and its premise that "Donald Trump's language… could end up **inciting**… violence," akin to the "wave of toxic **incitement** against [Yitzhak] Rabin," which included calls for Rabin's death prior to his assassination at a peace rally in 1995. [*See* Paragraph 57, above; Vogt Decl. Ex.  120]

343.    Bennet testified that Friedman's column was one of his motivations for re-writing and crafting the defamatory portions of the America's Lethal Politics editorial.  [Vogt Decl. Ex. 4, Bennet Depo 184:21-25]   Bennet described Friedman's piece as having made a "powerful impression on me."  [*Id.*, Bennet Depo 182:18-25]

344.    In fact, Bennet and Friedman spoke about the column before it was published, when Friedman told Bennet Trump's statement "reminded him of the kind of rhetoric, inflammatory rhetoric" in Israel leading up to the shooting of Prime Minister Rabin.  [*Id.*, Bennet Depo 183:1-24]

345.    Bennet sent his draft of the Editorial to Williamson at around 7:30 PM [Vogt Decl.

Ex. 98]—leaving plenty of time for him to check his facts before publication.

346.    Bennet was responsible for fact-checking the portions of the editorial he re-wrote.

[Vogt Decl. Ex. 3, Williamson Depo 67:14-68:6]

347.    As an experienced editor, Mr. Bennet is an expert in the business of knowing and

understanding the meanings and significance of words. [Doc. No. 41-34, 8/16/17 Hrg Tran. at

13:21-14:5; see Paragraphs 235-239, above]

**B.    The Defamatory Passages**

348.    On June 14, 2017, published the false and defamatory Palin Article, "*America's

Lethal Politics,*" online, and immediately promoted it on their social media accounts.  [Vogt Decl.

Ex. 33-35]

349.    The Editorial was also prominently featured on The Times' homepage.  [Vogt Decl.

Ex.  167]

350.    On June 15, 2017, *The Times* published the Palin Article in *The New York Times*

print edition.  [Vogt Decl. Ex. 36]

351.    The Editorial asserted the existence of "Lethal Politics" evidenced by a "sickening

pattern" of politically "incited" violence against members of Congress, the only example of which

was Gov. Palin's direct and clear incitement of Loughner's  Shooting.  [Vogt Decl. Ex. 33]

352.    Bennet  wrote  and  *The Times*  published  the  following  false  and  defamatory

statements of and concerning Gov. Palin:

> Was this attack evidence of how vicious American politics has
> become?  Probably.  In 2011, when Jared Lee Loughner opened fire
> in a supermarket parking lot, grievously wounding Representative
> Gabby Giffords and killing six people, including a 9-year-old girl,
> the link to political incitement was clear.  Before the shooting, Sarah
> Palin's  political  action  committee  circulated  a  map  of  targeted

JA 1324

Case 1:17-cv-04853-JSR   Document 104   Filed 07/10/20   Page 89 of 95
Case 22-558, Document 54, 09/19/2022, 3384725, Page169 of 295

electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask for of the right.

353.    Bennet conceded the above-two passages of the Editorial are false.  [Vogt Decl. Ex. 4, Bennet Depo 92:18-94:5]

354.    The Editorial also falsely asserted that the map put crosshairs over individual lawmakers.  (*See* Paragraph 334, above).

## The Knowingly False Premise of a "Pattern"

355.    When Bennet rewrote the Editorial, he knew there was no evidence of incitement leading to Hodgkinson's shooting.  [Vogt Decl. Ex. 4, Bennet Depo 245:5-247:2]]

356.    And Bennet claimed he did not know whether any link existed between Palin's map Loughner's shooting.  [Vogt Decl. Ex. 37]

## There was no Need to Mention Palin at all

357.    After completion of the US Edition of the Editorial, Linda Cohn and Fox set out to "trim" the Editorial for the International Edition.  [Vogt Decl. Ex. 71]

358.    During that process, they deleted the defamatory passages of the Editorial and any reference therein to Sarah Palin.  [Id.; Vogt Decl. Ex. 72]

359.    Linda Cohn testified the trimmed International Edition of the Editorial does an effective job of expressing the opinions that the Board tried to express in the original Editorial that appeared on June 14 of 2017.  [Vogt Decl. Ex. 6, Cohn Depo 136:4-13, 137:11-140:8]

Case 22-558, Document 54, 08/19/2022, 3384725, Page170 of 295
Case 1:17-cv-04853-JSR    Document 54    Filed 07/10/20    Page 90 of 95

JA 1325

### *The Times* Concedes the Falsity of the Palin Article—
### But Does Not Meaningfully Retract It or Apologize

360.    The night of June 14, Times columnist Ross Douthat immediately told Bennet the Editorial was false.  (*See* Paragraph 80, above).

361.    Early the next morning, already facing significant criticism, Bennet emailed Williamson and Lepping and asked them to research whether what he said was true, and in that email makes no mention of his current position that he never intended the words "incitement" and "clear" and "direct" link to mean exactly what they said:

> Hey guys -- We're taking a lot of criticism for saying that the attack on Giffords was in any way connected to incitement. The claim is that this was fully investigated and debunked in the months after the attack, and the shooter was found to have acted only because of his personal demons. I don't know what the truth is here but we may have relied too heavily on our early editorials and other early coverage of that attack. If so, I'm very sorry for my own failure on this yesterday. In any case I'd like to get to the bottom of this as quickly as possible this morning and correct the piece if needed. Can you two please put your heads together on this first thing this morning? Please skip the morning meeting if necessary. JB

[Vogt Decl. Ex. 37]

362.    Bennet also texted Williamson early that morning, a text exchange which Williamson emailed to herself at 9:25 a.m., which stated in pertinent part [Vogt Decl. Ex. 101, 164-165]

> No worries. I feel lousy about this one -- I just moved too fast. I'm sorry.
>
> Now what I need from you/ Eileen soonest is a rock-solid version of what we should say -- that an investigation showed NO  link to incitement, or NO DIRECT link or NO CLEAR link. I

363.    By the time of this text exchange at no later than 9:25 a.m., Williamson had not conducted any research on the issue Bennet texted her about [Vogt Decl. Ex. 3, Williamson Depo 269:11-274:1], which shows Bennet already knew no link existed <u>before</u> Williamson conducted any research that morning.

364.    *The Times* was hit by public backlash from its readers and even liberal-leaning media outlets over falsely stating that Gov. Palin incited Loughner to commit murder.  [Vogt Decl. Ex. 99, 100, 73, 140, 141, 142, 143, 144, 145, 146, 70, 39, 40]

365.    As soon as Cohn arrived at work early on the morning of June 15, 2017, everyone already knew Editorial was wrong about the link and she immediately started working on a correction with Bennet and Wegman in her office.  [Vogt Decl. Ex. 6, Cohn 68:14-70:3; 143:14-18; 147:7-148:3, 150:4-152:18]

366.    During this same time period, Hannah Ingber reached out to Bennet about the "Sarah Palin" Editorial.  [Vogt Decl. Ex. 64]

367.    Along with an initial edit, *The Times* added a half-hearted correction (the "First Attempted Correction") [Vogt Decl. Ex. 43]  written in a passive voice about the "link" between "political <u>incitement</u>" and Loughner's heinous crime:

> **Correction: June 15, 2017**
> *An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.*

368.    The First Attempted Correction did not remove the unnecessary reference in the column to Gov. Palin, even though there was no established connection between "political incitement" and Loughner's crime, and as written, also suggests that such a connection may still be established, when Mr. Bennet and *The Times* already knew that no such link existed, while making no mention of Gov. Palin, while the column continued to reference her by name.  (*Id.*)

369.     Given that Mr. Bennet's entire thesis in re-writing the Palin Article was the "sickening pattern" of politically incited violence that emanated from a false link between Gov. Palin and Loughner's 2011 crime, which *The Times* concedes did not exist, the entire Palin Article should have been retracted—not minimally and inadequately corrected.  [Doc. 41-34, 8/16/17 Hr'g Tran. 50:22-51:8]

370.     While working on the correction, Bennet was also working on responding to media inquiries and a Tweet to accompany the correction.  [PL Depo Ex 49]

371.     In drafting the Tweets to accompany the correction, Bennet actually wrote the portion that states, "We got an important wrong…"  [Vogt Decl. Ex. 4, Bennet Depo. 81:3-83:6, 84:14-90:14; Vogt Decl. Ex. 66]

372.     *The Times'* Editorial Page eventually published the Tweet about the correction, admitting Bennet's "<u>fact</u>" error:



373.    As that process was unfolding, Bennet and The Times also were aware of Palin's tweets about the defamatory Editorial.  [Vogt Decl. Ex. 4, Bennet Depo. 284:20-285:14; Vogt Decl. Ex. 100]

374.    The Times eventually published a second online correction  [Vogt Decl. Ex. 44] but only after it was called out by CNN for falsely asserting that the Palin Map placed crosshairs over individual lawmakers and, specifically, Rep. Giffords.  [Vogt Decl. Ex. 145]

375.    Still devoid of any reference to Gov. Palin, this second correction (the "Second Attempted Correction") addressed the mischaracterization of the map of targeted electoral districts as placing "stylized cross hairs" on Gabrielle Giffords and other lawmakers individually and changed the word "incitement" to "rhetoric." [Vogt Decl. Ex. 44]

> **Correction: June 16, 2017**
> *An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.*

376.    Even in the second correction, Bennet refused to recede from his original. preconceived narrative despite the fact that Wegman pointed out that keeping any reference to Palin in the Editorial was still trying to "sneaking the link in."  [Vogt Decl. Ex. 63]

377.    In fact, Bennet confirmed his allegiance to his narrative in a statement provided to CNN,  in which Mr. Bennet said:

> While it is always *agonizing* to get something wrong we appreciate it when our readers call us out like this.  We made an *error of fact* in the editorial and we've corrected it.  *But that error doesn't undercut or weaken the argument of the piece.*

[Vogt Decl. Ex. 145, p. 1 (Emphasis added)]

378.     Bennet maintains he could not apologize to Palin because there is a NYT policy prohibiting apologies, although there is no written policy to this effect.  [Vogt Decl. Ex. 4, Bennet Depo. 282:18-284:3]   Nevertheless, Bennet admitted he never made an attempt to personally apologize to Gov. Palin.  (*Id.*)

379.     This supposed policy against apologies flies in the face of The Times itself demanding apologies from other news organizations when they made false statements about The Times.  [Vogt Decl. Ex. 119]

380.     On June 16, 2017, *The Times'* published at the bottom of its Editorial Page, in fine print, the same inadequate online corrections it ran on the Editorial—completely devoid of any reference or apology to Gov. Palin.   [Vogt Decl. Ex. 49]

381.     Following the Editorial and its corrections, Palin still received death threats because of its publication, just like those following the false accusations in 2011.  [Vogt Decl. Ex. 208 (Devine Tweet); Vogt Decl. Ex. 9, Palin Depo. 175:14-178:2]

Dated:  July 10, 2020.

*/s/ Shane B. Vogt*
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@bajocuva.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 443-2199
Facsimile: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts [Doc. No. 97] and Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment was filed electronically on July 10, 2020. This Notice will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt. Parties and their counsel may access this filing through the Court's system.

/s/ Shane B. Vogt
Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
SARAH PALIN,                              :
                                          :
                                          :   17-cv-4853 (JSR)
        Plaintiff,                        :
                                          :   OPINION AND ORDER
        -v-                               :
                                          :
THE NEW YORK TIMES COMPANY and JAMES      :
BENNET,                                   :
                                          :
        Defendants.                       :
------------------------------------------x

JED S. RAKOFF, U.S.D.J.

        Familiarity with the prior proceedings in this action is

here assumed. As relevant here, on December 30, 2019, plaintiff

Sarah Palin filed an amended complaint against defendants the

New York Times Company (the "Times") and James Bennet, alleging

that they had defamed her in an editorial (the "Editorial")

published on June 14, 2017. Dkt. 70. After the completion of

discovery, both sides filed motions for summary judgment that

are now ripe for decision.

        Both motions relate to the proposition that a public figure

cannot recover for defamation unless the defamatory statement

was made with "actual malice." See New York Times Co. v.

Sullivan, 376 U.S. 254, 280 (1964). Specifically, plaintiff

moves for partial summary judgment on the basis of her assertion

that the requirement is no longer good law or at least does not

apply to this case. Dkt. No. 95; Plaintiff's Memorandum of Law

in Support of Plaintiff's Motion for Partial Summary Judgment
("Pl. Mem."), Dkt No. 100; Plaintiff's Reply Memorandum of Law
in Opposition [sic] to Plaintiff's Motion for Partial Summary
Judgment ("Pl. Reply"), Dkt. No. 112. Defendants oppose.
Defendants' Memorandum of Law in Opposition to Plaintiff's
Motion for Partial Summary Judgment ("Defs' Opp."), Dkt. No. 104

Conversely, defendants, maintaining that the actual malice
standard fully applies here, seek summary judgment on the ground
that no reasonable jury could find, based on the evidence of
record, that the allegedly defamatory statements were published
with actual malice. Dkt. No. 94; Defendants' Memorandum of Law
in Support of their Motion for Summary Judgment ("Defs' Mem."),
Dkt. No. 96; Defendants' Reply Memorandum of Law in Support of
their Motion for Summary Judgment ("Defs' Reply"), Dkt. No. 113.
Plaintiff opposes. Plaintiff's Memorandum of Law in Opposition
to Defendants' Motion for Summary Judgment ("Pl. Opp."), Dkt.
No. 107.

     I.    <u>Factual Background</u>[1]

---

[1] On a motion for summary judgment, the Court construes all
facts in the light most favorable to the non-moving party.
Ordinarily, when faced with cross-motions for summary judgment,
a district court would "evaluate each party's motion on its own
merits, taking care in each instance to draw all reasonable
inferences against the party whose motion is under
consideration." <u>Schwabenbauer v. Bd. of Educ. of Olean</u>, 667 F.2d
305, 314 (2d Cir. 1981). Here, however, plaintiff's motion for
partial summary judgment presents a pure question of law and
does not depend on the evidence in this case. Therefore, the

Plaintiff Sarah Palin is the former governor of Alaska and a former vice-presidential candidate. See Defendants' Statement of Undisputed Material Facts, Dkt. No. 97, ¶ 1; Plaintiff's Response to Defendants' Local Rule 56.1 State of Material Facts & Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment ("Pl. SUMF"), Dkt. No. 108, ¶ 1.[2] Defendant The New York Times Company (the "Times"), a New York corporation, is a global media organization that publishes The New York Times daily newspaper. First Amended Complaint ("FAC"), Dkt. No. 70, ¶ 6. Defendant James Bennet was at all times relevant to this lawsuit the editor overseeing opinion journalism at the Times, including masthead editorials by the Times Editorial Board. Pl. SUMF ¶ 3.

On June 14, 2017, defendant The Times published the Editorial, authored (in the segments here relevant) by defendant Bennet, which identified a "familiar pattern" of politically motivated violence and criticized members of Congress for supporting permissive gun regulations. Pl. SUMF ¶ 348. The Editorial identified two instances of mass shootings "fuel[ed]" by politics: (1) James Hodgkinson's June 14, 2017 armed attack

---

following facts are either undisputed or, where disputed, taken most favorably to plaintiff.

[2]    Where a fact is undisputed, the Court cites to plaintiff's Rule 56.1 statement.

on members of Congress at a baseball field in Virginia, which seriously wounded U.S. Congressperson Steve Scalise; and (2) Jared Lee Loughner's January 8, 2011 armed attack in Arizona, which seriously wounded U.S. Congressperson Gabby Giffords.[3] Declaration of Thomas B. Sullivan ("Sullivan Decl."), Dkt. No. 99, Ex. 40.

Describing Loughner's 2011 attack, the Editorial stated: "[T]he link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs."[4] Id. The Editorial contrasted the Loughner attack with that day's Hodgkinson shooting, where there was "no sign of incitement as direct as in the Giffords attack." Id. The Editorial did, however, include a hyperlink to an ABC News Article titled Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate, published

---

[3]    Although not relevant to the issues here presented, it certainly should not be forgotten that Loughner's shooting also resulted in the death of six people, including U.S. District Judge John Roll.

[4]    The Palin committee's circular is hereinafter referred to as the "Map." Although plaintiff purports to dispute that the marks on the circular were crosshairs, see Pl. SUMF ¶ 7, even the most causal interpretation of the circular definitively rebuts plaintiff's suggestion, and there is no evidence of record to the contrary. And, in any event, even plaintiff does not suggest that the defendants acted with actual malice in describing the marks as crosshairs.

the day after Loughner's 2011 attack, which stated that "[n]o connection has been made between [the Map] and the Arizona shooting." Pl. SUMF ¶¶ 37, 40.

The Editorial was the product of discussions that occurred over the course of June 14, 2017. Soon after the Hodgkinson attack, evidence emerged that Hodgkinson was a supporter of Senator Bernie Sanders and an opponent of President Donald Trump. Id. ¶ 20. In an email thread between Editorial Board members discussing whether and how to cover the shooting, Bennet suggested writing about "the rhetoric of demonization and whether it incites people to this kind of violence." Sullivan Decl. Ex. 11. In particular, Bennet said that "if there's evidence [surrounding the Hodgkinson shooting] of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting) we should deal with that." Id.

Another member of the Board, Elizabeth Williamson, then researched the Hodgkinson and Loughner shootings and wrote the first draft of the Editorial. Pl. SUMF ¶ 35. Her draft referred to the fact that there had been some debate in the media in the wake of the Loughner shooting regarding whether there existed a connection between the shooting and the Map. See Sullivan Decl. Ex. 24. But Williamson's draft did not affirmatively state that such a connection had been established. See id. The draft also

included the hyperlink to the above-mentioned ABC news article.
Id. As relevant here, Williamson's draft read:

> Just as in 2011, when Jared Lee Loughner opened fire
> in a supermarket parking lot, grievously wounding
> Representative Gabby Giffords and killing six people,
> including a nine year-old girl, Mr. Hodgkinson's rage
> was nurtured in a vile political climate. Then, it was
> the pro-gun right being criticized: in the weeks
> before the shooting[,] Sarah Palin's political action
> committee circulated a map of targeted electoral
> districts that put Ms. Giffords and 19 other Democrats
> under stylized crosshairs.

Bennet received the draft around 5:00 p.m. Pl. SUMF ¶ 335.
After reading the draft, Bennet, who was ultimately responsible
for the content of such editorials, decided it needed
substantial revision and began rewriting it himself. Id. ¶ 51.
Around 7:30 p.m., Bennet sent a revised draft back to
Williamson, asking her to "[p]lease take a look." Id. ¶ 66.
Without further relevant changes, the Editorial, as revised by
Bennet, was published around 9:00 p.m. Id. ¶ 73.

Around 10:00 p.m., Ross Douthat, a Times opinion writer,
reached out to Bennet via email to express concern over the
Editorial. Sullivan Decl. Ex. 21. Douthat explained that there
was "no evidence that Jared Lee Loughner was incited by Sarah
Palin or anyone else, given his extreme mental illness and lack
of any tangible connection to that crosshair map." Id. A few
minutes later, Bennet responded that his "understanding [is]
that in the Giffords case there was a gun sight superimposed

over her district; so far in this case we don't know of any direct threat against any of the congressman on the field. That's not to say that any of it is ok, obviously, or that the violence in either case was caused by the poltical [sic] rhetoric. But the incitement in this case seems, so far, to be less specific." Id.

That night, Bennet reached back out to Williamson to see whether she was available to start investigating Douthat's concerns. Pl. SUMF ¶ 99. Early the next morning, Bennet emailed a larger group of people, instructing them to "get to the bottom of this as quickly as possible." Id. ¶ 101.

Less than a day after the Editorial's publication, after having found no evidence of the "link" to which it referred, the Times revised and corrected the Editorial. The Times published the first revised online version at 11:15 a.m. on June 15, 2017. Id. ¶ 106. In it, the Times deleted the phrases "the link to political incitement was clear" and "[t]hough there's no sign of incitement as direct as in the Giffords attack" and added the sentence "But no connection to that crime was ever established." Id. In addition, the Times published a series of corrections, which ultimately clarified that no link between political rhetoric and the 2011 shooting of Representative Gabby Giffords was ever established. Id. ¶ 109.

# JA 1338

Despite these prompt corrections, plaintiff chose to sue the Times, and filed her initial complaint less than two weeks later. Dkt. No. 1. After an evidentiary hearing convened with the consent of both parties,[5] this Court dismissed plaintiff's complaint in its entirety, holding that she had failed to plausibly allege that the Editorial was published with actual malice, as required by the First Amendment. Dkt. No. 45. The Second Circuit reversed, holding, inter alia, that plaintiff's proposed (though not yet filed) amended complaint had sufficiently alleged actual malice. Palin v. New York Times Co., 940 F.3d 804, 813 (2d Cir. 2019). Soon thereafter, on December

---

[5] The hearing was something of an innovation, designed to allow a court to better assess the "plausibility" standard that the Supreme Court requires district courts to apply on a motion to dismiss a complaint, see Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), by providing the court with enough context to make that determination. After all, how can a judge assess whether a claim is "plausible" if it involves conduct that occurred in a setting with which the judge is totally unfamiliar? But even though the hearing was consented to by all parties, the Second Circuit held that such a hearing is not countenanced by the Federal Rules of Civil Procedure. Palin v. New York Times Co., 940 F.3d 804, 807 (2d Cir. 2019). Of course, the judge-made "plausibility" standard is not mentioned in the Federal Rule of Civil Procedure either. And in the roughly analogous setting of class certification, the Second Circuit, having at one time insisted that a district court could not look beyond the complaint in determining whether to certify a class, see Caridad v. Metro-North Commuter, R.R., 191 F.3d 283, 292-93 (2d Cir. 1999), later reversed its position because it recognized that a court may often have to look at matters beyond the complaint to fulfill its gatekeeping role, see In re Initial Public Offerings Securities Litigation, 471 F.3d 24, 41-42 (2d Cir. 2006)

30, 2019, plaintiff filed the amended complaint, naming Bennet as a co-defendant. Dkt. No. 70. After full discovery, the parties filed, briefed, and argued their cross-motions for summary judgment.

## II. General Legal Standards[6]

Under Rule 56(a) of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In reviewing the record, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Although the party opposing summary judgment may not "rely on mere conclusory allegations nor speculation," D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), if "there

---

[6]    Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper," Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

"Under New York law,[7] a plaintiff must establish five elements to recover in libel: 1) a written defamatory statement of fact concerning the plaintiff; 2) publication to a third party; 3) fault (either negligence or actual malice depending on the status of the libeled party); 4) falsity of the defamatory statement; and 5) special damages or per se actionability (defamatory on its face)." Celle v. Filipino Reporter Enterps. Inc., 209 F.3d 163, 173 (2d Cir. 2000). Furthermore, as discussed at length below, under here applicable federal law binding on the states, a public figure claiming defamation or libel must establish that the statements at issue were published with actual malice — that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." Palin, 940 F.3d at 809 (quoting New York Times, 376 U.S. at 280). Further still, a court ruling on a motion for summary

---

[7] This Court and the Second Circuit have already held that New York law (along with certain federal constitutional requirements) governs plaintiff's claim. See Palin v. New York Times Co., 264 F. Supp. 3d 527, 533 n.4, rev'd on other grounds by Palin, 940 F.3d 804.

judgment on actual malice "must be guided by the <u>New York Times</u> 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists — that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 257 (1986).

III. <u>Plaintiff's Motion for Partial Summary Judgment</u>

Plaintiff's motion for partial summary judgment presents a pure question of law: whether plaintiff is required to prove that the allegedly libelous statements at issue in this case were published with "actual malice." Pl. Mem. at 1. There is no dispute that plaintiff is a public figure and must therefore, under seemingly well-settled law, prove that the statements were published with actual malice. See <u>Palin</u>, 940 F.3d at 809-10; <u>see generally</u> <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254 (1964). What plaintiff is really asking, then, is for this Court either to "overrule" <u>New York Times v. Sullivan</u> or else to distinguish that case on the facts and refuse to apply the actual malice rule here. Pl. Mem. at 8, 13. To the extent those are, in fact, different requests, the Court declines them both.

While plaintiff acknowledges that the actual malice rule of <u>New York Times</u> and its progeny is well-established, <u>see</u>, <u>e.g.</u>, <u>id</u>. at 6, she fundamentally misunderstands the doctrine of <u>stare decisis</u> that makes that rule binding on this Court. Plaintiff

alludes to the "factors considered in deciding whether to overrule precedent" and notes in particular that "constitutional questions are less susceptible to stare decisis." Id. at 10 (citing Janus v. American Fed'n of State, County, and Mun. Emps. Council 31, 138 S. Ct. 2444 (2018); Kimble v. Marvel Entm't, LLC, 576 U.S. 446, 456 (2015)). But those factors, and those cases, pertain to horizontal stare decisis, whereby a court determines whether its own prior precedent remain binding on that court. See Dodge v. Cty. of Orange, 282 F. Supp. 2d 41, 79 (S.D.N.Y. 2003). By contrast, what lies before this Court is vertical stare decisis, whereby a higher court ruling binds a lower court. Id. "[V]ertical stare decisis is absolute, as it must be in a hierarchical system with 'one supreme Court.'" Ramos v. Louisiana, 140 S.Ct. 1390, 1416 n.5 (2020) (Kavanaugh, J., concurring in part) (quoting U.S. Const., art. III, § 1). In other words, this Court has "a constitutional obligation" to follow the Supreme Court's precedent "unless and until it is overruled by [the Supreme Court]." Id.

Perhaps recognizing that this Court is not free to disregard controlling precedent even if it were so inclined (which in this case it distinctly is not), plaintiff offers what she calls an alternative argument: that "the actual malice rule arose from distinguishable facts and should not be applied" here. Pl. Mem. at 13. More precisely, plaintiff's argument is

that the actual malice rule, which was first articulated more than half a century ago in the days before the Internet and social media, has run its course and should no longer govern our contemporary media landscape. Binding precedent does not, however, come with an expiration date. To the extent plaintiff believes the actual malice requirement ought to be abolished, she could make that argument to the appropriate court – the Supreme Court. Until then, public figures, like plaintiff, must establish actual malice before collecting damages for defamation. Plaintiff's motion for partial summary is therefore denied.[8]

IV.  Defendants' Motion for Summary Judgment

Given the denial of plaintiff's motion, the remaining question presented by defendants' motion is whether, with the benefit of discovery, plaintiff has adduced sufficient evidence to prove actual malice (taking the evidence most favorably to plaintiff). That is to say, defendants move for summary judgment on the ground that no reasonable jury could find that the statements at issue in this case were published with actual

---

[8]   Defendants also argue that plaintiff cannot challenge the actual malice rule because it has been cemented as law of the case and that, in any event, plaintiff must establish actual malice as a matter of state law. Defs' Opp. at 6. Because the Court rejects plaintiff's motion on stare decisis grounds, the Court does not reach these other arguments.

malice. In this respect, defendants make two arguments. First, they argue that plaintiff cannot prove that Bennett was aware that the statements carried a defamatory meaning — that is, that Bennet did not have actual malice with respect to the statements' <u>meaning</u>. Second, they argue that, even assuming Bennett was aware that the statements carried a defamatory meaning, plaintiff cannot prove that Bennet was aware that the statements were false — that is, that Bennet did not have actual malice with respect to the statement's <u>falsity</u>.[9] The Court addresses each argument in turn.

      A. <u>Actual Malice — Meaning</u>

---

[9]    In response, plaintiff makes the threshold argument that the Second Circuit has already decided the issue of actual malice in this case in its earlier opinion when it explained that, even if this Court had converted the 12(b)(6) motion into a summary judgment motion after the Court's evidentiary hearing, it "would still have to vacate because [this Court's] opinion relied on credibility determinations [regarding Bennet's testimony] not permissible at any stage before trial." 940 F.3d at 812. Plaintiff concludes that under the law-of-the-case doctrine, therefore, defendants' motion must be denied. But the Second Circuit's discussion of how it would have ruled had the motion been converted to summary judgment is pure dicta and does not constitute law of the case. <u>See Schwabenbauer v. Bd. of Educ.</u>, 777 F.2d 837, 841-42 (2d Cir. 1985). Moreover, even if the Second Circuit's dicta were construed as law of the case, additional evidence, which was not before the Second Circuit, has arisen in the course of discovery. Therefore, even if the Second Circuit held that Bennet's testimony alone could not support a grant of summary judgment, it has not — and indeed, could not have — ruled on whether this additional evidence justifies summary judgment.

# JA 1345

Defendants first argue that plaintiff cannot prove that at the time Bennet wrote the allegedly defamatory portion of the Editorial, he knew that, or was reckless with respect to whether, readers would understand his words in the defamatory sense — that is, that the Map had "directly caused Loughner to shoot his victims." Defs' Mem. at 1. More generally, defendants suggest that a person who believes and intends to say one thing is not guilty of actual malice "merely because he or she chooses the wrong language to say or because those who hear the statement reasonably believe it to mean something different." Id. at 15 (quoting Hon. Robert D. Sack, <u>Sack on Defamation: Libel, Slander, and Related Problems</u> § 5:5.1[B] (5th ed, 2017)). In response, plaintiff contests this facet of the actual malice rule and asks the Court not to impose what she calls "an additional actual malice element" to her claim. Pl. Opp. at 9. Accordingly, the Court must first decide whether to adopt defendants' version of the actual malice rule before determining whether the record supports defendants' first ground for granting summary judgment in favor of defendants.

> 1. <u>Whether plaintiff **must** prove actual malice with respect to meaning</u>

The legal question presented here is whether the First Amendment requires that plaintiff prove that Bennet "was aware of, or recklessly blinded himself to, the defamatory import of

his words." <u>See</u> Marc Franklin & Daniel Bussel, <u>The Plaintiff's</u>
<u>Burden in Defamation: Awareness and Falsity</u>, 25 Wm. & Mary L.
Rev. 825, 834 (1984). There is no controlling precedent squarely
on point.[10]

In the early years of the actual malice standard, Justice
Byron White, writing only for himself in a concurring opinion,
suggested that <u>Sullivan</u> should not be "extended to preclude
liability for injury to reputation caused by employing words of
double meaning, one of which is libelous, whenever the publisher
claims in good faith to have intended the innocent meaning."
<u>Greenbelt Co-Op. Pub. Ass'n v. Bresler</u>, 398 U.S. 6, 22 (1970)
(White, J., concurring in the judgment). He explained that the

---

[10]    Defendants cite to <u>Bose Corp v. Consumers Union of U.S.,</u>
<u>Inc.</u>, 466 U.S. 485, 511 n.30 (1984), for the proposition that
the actual malice standard "requires the plaintiff to
demonstrate with clear and convincing evidence that the
defendant realized that his statement was false or that he
subjectively entertained serious doubt as to the truth of his
statement." Seizing on "realized," defendants argue that it
"necessarily follows that the actual malice standard is not met
where a defendant was unaware of the defamatory meaning his or
her words conveyed." Defs' Mem. at 15. But defendants misread
<u>Bose</u>. That case did not involve "the employment of an ambiguous
<u>word</u>; it involved a report of an ambiguous <u>event</u>, specifically
how plaintiff's stereo speakers sounded to listeners present. .
. . As such, <u>Bose</u> simply stands for the unremarkable proposition
that the First Amendment protects an author from liability when
adoption of language chosen was one of a number of possible
rational interpretations of an <u>ambiguous event</u> because this
represents the sort of inaccuracy that is commonplace in the
forum of robust debate to which the <u>New York Times</u> rule
applies." <u>Sprague v. American Bar Ass'n</u>, No. Civ.A 01-382, 2003
WL 22110574 (E.D. Penn July 21, 2003).

actual malice rule was rooted in a recognition of the challenge of ascertaining truth. Id. at 22-23. But he saw "no reason why the members of a skilled calling should not be held to the standard of their craft and assume the risk of being misunderstood — if they are — by the ordinary reader of their publications." Id.

In more recent years, however, lower courts have disavowed Justice White's reasoning and have expressly adopted this awareness requirement. The Ninth Circuit, for example, has held that "constitutional malice does not flow from a finding that an 'intelligent speaker' failed to describe the words he used as the finder of fact did." Newton v. Nat'l Broad. Co., 930 F.2d 662, 681 (9th Cir. 1990) (explaining that defendants should not be liable "for what was not intended to be said" lest we "eviscerate[] the First Amendment protections established by New York Times"); see also Dodds v. American Broad. Co., 145 F.3d 1053, 1064 (9th Cir. 1998) (requiring plaintiff to "show that a jury could reasonably find by clear and convincing evidence that [defendant] intended to convey the defamatory impression").

Ultimately, this issue comes down to the values underlying Sullivan. And, on this point, the Court agrees with the California Supreme Court, which has explained that failure to impose an awareness requirement "would create precisely the chilling effect on speech which the New York Times rule was

designed to avoid." Good Government Group of Seal Beach, Inc. v. Sup. Court, 22 Cal.3d 672, 684 (1978); see also Saenz v. Playboy Enterprises, Inc., 841 F.2d 1309, 1318 (7th Cir. 1988) ("[R]equiring a publisher to guarantee the truth of all the inferences a reader might reasonably draw from a publication would undermine the uninhibited, open discussion of matters of public concern.").

Plaintiff argues that those cases, and the awareness rule, are limited to claims of libel or defamation by implication — that is, cases "where the defamatory meaning of ambiguous and innocuous statement has to be inferred or implied to establish a claim" – and are therefore inapposite. Pl. Opp. at 10. Where, as here, the allegedly libelous statements are "explicit and facially defamatory" and where there is "substantial evidence" showing what the speaker meant and intended to say, plaintiff suggests, the awareness rule should not apply. The Court disagrees. "The purpose of the awareness element is to ensure that liability is not imposed upon a defendant who acted without fault. This must hold true regardless of whether the defendant's statement is directly or indirectly libelous." Masson v. New Yorker Magazine, Inc., 832 F. Supp. 1350, 1361-63 (N.D. Cal. 1993), aff'd on other grounds, 85 F.3d 1394 (9th Cir. 1996).

Plaintiff also invokes the law of the case doctrine. She suggests that the defendants already made the argument for, and

the Second Circuit already rejected, the awareness requirement.
See Pl. Opp. at 6-9. But while plaintiff is correct that the
Times has raised this issue before, see, e.g., Defendant's
Supplemental Memorandum of Law in Further Support of Its Motion
to Dismiss the Complaint, Dkt. No. 42, at 7, neither this Court
(previously) nor the Second Circuit has squarely addressed, much
less resolved, whether plaintiff must establish actual malice
with respect to meaning as well as falsity. For the above-
discussed reasons, the Court now holds that she must.

        2. <u>Whether plaintiff **can** prove actual malice with
          respect to meaning</u>

     Whether plaintiff can make that showing, however, is a
different question. Where a plaintiff's defamation case depends
on a statement that is capable of multiple meanings — one
defamatory, the other innocuous — the plaintiff must prove that
the defendant acted with actual malice not only with respect to
the statement's falsity but also to its meaning. Indeed, as the
Seventh Circuit has explained, "[e]vidence of defamatory meaning
and recklessness regarding potential falsity does not alone
establish the defendant's intent." <u>Saenz</u>, 841 F.2d at 1318.
Instead, the plaintiff must show that the defendant "either
deliberately cast its statements in an equivocal fashion in the
hope of insinuating a false import to the reader or that it knew
and acted with reckless disregard of whether its words would be

interpreted by the average reader as a false statement." <u>See</u>
<u>Solano v. Playgirl, Inc.</u>, 292 F.3d 1078, 1084 (9th Cir. 2002).

Of course, because actual malice "is a matter of the
defendant's subjective mental state, revolves around facts
usually within the defendant's knowledge and control, and rarely
is admitted," <u>Dalbec v. Gentleman's Companion, Inc.</u>, 828 F.2d
921, 927 (2d Cir. 1987), a defendant cannot "automatically
insure a favorable verdict by testifying that he published with
a belief that the statements were true." <u>St. Amant v. Thompson</u>,
390 U.S. 727, 732 (1968). Here, to be sure, Bennet has sworn
multiple times that he "did not intend to imply a direct causal
link between [the Map] and Loughner's horrific acts."
Declaration of James Bennet ("Bennet Decl."), Dkt. No. 98, ¶ 8.
He also avers that "it did not occur to [him] that readers would
understand the phrase 'the link to political incitement was
clear' as suggesting that Loughner himself was directly inspired
or motivated by the [Map] to engage in the shooting, and [he]
did not intend for readers to draw such an inference." <u>Id.</u>
Instead, he claims that he "intended to advance the idea that
overheated political rhetoric can create a climate inducive to
violent acts, and [he] mentioned the [Map] as an example of the
kind of 'political incitement' that contributes to this
atmosphere." <u>Id.</u>

However, as the Second Circuit has already made clear in this very case, the Court cannot automatically credit this testimony at the summary judgment stage. See Palin, 940 F.3d at 812; see also Sprague, 2003 WL 22110574, at *6 ("The defendant author and his editors contend that they did not anticipate that the readers would perceive the [allegedly defamatory] term . . . in its negative capacity. This is testimonial evidence that the jury will be permitted to weigh as it deems warranted.")

Defendants, however, argue that Bennet's allegedly innocent intent is independently corroborated by Bennet's contemporaneous email exchange with Douthat. Specifically, in his email responding to Douthat's concerns, Bennet explained that his "understanding was that in the Giffords case there was a gun sight superimposed over her district; so far in [the Scalise] case we don't know of any direct threat against any of the congressmen on the field. That's not to say any of it is ok, obviously, or that the violence in either case was caused by the poltical [sic] rhetoric. But the incitement in [the Giffords] case seems, so far, to be less specific [than in the Scalise case]." Sullivan Decl. Ex. 21. This email suggests that Bennet did not intend for his words to convey the idea that the Map directly caused Loughner's shooting, which is the heart of what plaintiff says was libelous.

**JA 1352**

But in the end plaintiff meets her burden of adducing evidence that, taken in the light most favorable to plaintiff, could enable a rational jury to conclude that Bennet either knew, or was reckless not to know, that his words would carry the defamatory meaning. Indeed, at least four items of evidence warrant this conclusion.

First, there is the language of the Editorial's statements themselves, such as, e.g., the reference to the Map as being a "direct" form of "incitement" to Loughner's shooting. As defense counsel conceded at oral argument, in determining actual malice, the finder of fact is "entitled to consider the wording of the alleged defamatory statement." Transcript of Oral Argument, July 27, 2020 ("Tr.") at 10:20-11:1; see also id. at 12:9-12 ("I agree that the language of the publication is part of the mix" in determining actual malice). Here, Bennet's contention that, notwithstanding the words he used, he did not mean to suggest a direct link between the Map and the shooting, may be "so inherently improbable that only a reckless man would have" chosen the words he chose to convey the meaning he (allegedly) sought to convey.[11] Dalbec, 828 F.2d at 927; cf. id. ("[T]he

---

[11]    To be sure, it is not the case, as plaintiff suggests, that the clarity of a statement renders irrelevant the speaker's awareness of its meaning. Instead, the clarity of a statement can serve as evidence – here, powerful evidence — for inferring the speaker's awareness of its meaning.

plain language of the . . . statement strongly supports the inference that it was made with knowledge of its falsity.")

Second, Bennet has himself admitted that he was aware that the term "incitement" could mean a call to violence. Indeed, at his deposition, Bennet conceded that the term "incitement" means "different things to different people" and that "some people could interpret [the term] as a call to violence." See Sullivan Decl. Ex. 2 (Bennet Dep.) at 112-14. Bennet's general awareness of the fact that "incitement" could be construed as a call to violence is further evidence in favor of actual malice. See Sprague, 2003 WL 22110574, at *5 (knowledge "that the average reader of the journal would be familiar with both" the defamatory and nondefamatory meanings of the word at issue counts in favor of finding actual malice).

Third, Bennet's decision to substantially revise Williamson's earlier draft, which did not include the allegedly defamatory language and meaning, is, a jury could find, yet more evidence of actual malice. To be sure, Bennet testified that he made these changes because he worried that phrases like "incendiary" or "inflammatory rhetoric" had been "drained of [their] power because [they are] used so often" and that he was searching for "a very strong word to write about the political climate," and so chose "political incitement." Defs' Mem. at 18 (quoting Pl. SUMF ¶¶ 56, 58-59). But, as discussed above, the

credibility of that testimony is for the jury to assess, not for this Court to credit at the summary judgment phase. It is virtually undeniable that Bennet's edits changed the meaning of Williamson's draft, an alteration that a reasonable jury might conclude was intentional. Cf. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 521 (1991) ("[T]he progression from typewritten notes, to manuscript, then to galleys provides further evidence of intentional alteration.").

Fourth, the nature of the corrections issued by the Times in the aftermath of the Editorial stand as further circumstantial evidence that Bennet was aware that the Editorial carried the defamatory meaning. As discussed above, upon receiving Douthat's email expressing concern over the Editorial, Bennet reached out to Williamson and other members of the team and asked them to "get to the bottom of this as quickly as possible." Pl. SUMF ¶ 101. The team then looked into whether there existed a direct link between the Map and the Loughner shooting; and when it concluded that no such link had been established, the Times issued a correction which read, in part: "An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established." Id. ¶¶ 104-107.

**JA 1355**

The fact that Bennet and the Times were so quick to print a correction is, on the one hand, evidence that a jury might find corroborative of a lack of actual malice, as discussed later. But, on the other hand, a reasonable jury could conclude that Bennet's reaction and the Times' correction may also be probative of a prior intent to assert the existence of such a direct link, for why else the need to correct? Indeed, the correction itself concedes that Bennet's initial draft incorrectly stated that there existed such a link. If, as Bennet now contends, it was all simply a misunderstanding, the result of a poor choice of words, it is reasonable to conclude that the ultimate correction would have reflected as much and simply clarified the Editorial's intended meaning.[12]

Ultimately, while much of plaintiff's evidence is circumstantial, as is often the case when actual malice is at issue, and while there is arguably contrary evidence as well,[13]

---

[12]    See Tr. at 38:14-18 (quoting Shane B. Vogt, Esq.) ("[I]f the true facts are as defendants say they are and this was really just a syntax error and Mr. Bennet's explanation for this was, oh, that's not what I meant, that's not what I meant there's no need to do that research. It's pointless to do that research. He shouldn't have been asking for anyone to do that research. He should have just said, oh, that's not what I meant, and affixed an editor's note.").

[13]    For example, defendants point to evidence that Bennet had previously used the term "incitement" in the broader, rhetorical sense of the phrase, in an earlier article for the Times discussing a meeting of a joint Israeli-Palestinian "committee on 'prevention of incitement,'" which focused on "messages in

the Court finds that, taking the evidence in the light most favorable to plaintiff, she has sufficiently pointed to enough triable issues of fact that would enable a jury to find by clear and convincing evidence that Bennet knew, or was reckless not to know, that his words would convey the meaning in the minds of the readers that plaintiff asserts was libelous, to wit, that she bore a direct responsibility for inciting the Loughner shooting.

### B. Actual Malice – Falsity

It is not enough, however, for plaintiff to show that Bennet meant to say what plaintiff claims was libelous; in addition, to establish actual malice, plaintiff must show that defendants published the libelous statement "with knowledge that it was false or with reckless disregard of whether it was false or not." Sullivan, 376 U.S. at 279. "Mere negligence does not suffice." Masson, 501 U.S. at 510. Instead, "[a] finding of malice must be based on clear and convincing evidence that the defendant in fact entertained serious doubts as to the truth of his publication, or, in the alternative, knew of its falsity." Dalbec, 828 F.2d at 927.

---

the schools and news media encouraging violence." Sullivan Decl. Ex. 28. While such prior use of the term in the non-defamatory sense weighs against a finding of actual malice, the weighing of evidence here is for the jury, not the Court.

While mere failure to conduct an investigation before publishing cannot itself establish actual malice, nonetheless, "where there are obvious reasons to doubt the veracity" of the information, that can give rise to an inference of actual malice. Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 688 (1989). Thus, as the Ninth Circuit explained, "where [a] publisher undertakes to investigate the accuracy of a story and learns facts casting doubt on the information contained therein, it may not ignore those doubts, even though it had no duty to conduct the investigation in the first place." Masson v. New York Magazine, Inc., 960 F.2d 896, 901 (9th Cir. 1992). That is why, as the Supreme Court has explained, "the purposeful avoidance of the truth is in a different category" from mere failure to investigate. Harte-Hanks, 491 U.S. at 692.

As the Second Circuit explained in this very case, plaintiff's "overarching theory of actual malice is that Bennet had a 'pre-determined' argument he wanted to make in the editorial," his commitment to which "led him to publish a statement about Palin that he either knew to be false, or at least was reckless as to whether it was false." Palin, 940 F.3d at 813. In support of that theory, the Second Circuit found three allegations in the amended complaint that "paint[ed] a plausible picture of this actual-malice scenario." Id. Now that discovery is over (and the standard is no longer mere

plausibility), it turns out that two of these three allegations find no support in the actual evidence. However, there is enough support for the third allegation to preclude a grant of summary judgment.

The Court begins by reviewing the two refuted allegations before turning to the evidence supporting the third.

### 1. Bennet's Background

The Second Circuit held that "Bennet's background as an editor and political advocate provided sufficient evidence" to infer actual malice. Id. In particular, the court focused on the fact that Bennet was the editor-in-chief of The Atlantic from 2006-2016 and that during that time the magazine published several articles confirming there was no link between the Map and the Loughner shooting. Id. A plausible inference, the court explained, is that "one who had risen to editor-in-chief at The Atlantic knew their content and thus that there was no connection between Palin and the Loughner shooting." Id. at 814.

The undisputed record now shows, however, that Bennet was not responsible for editing any of those articles; instead, they were published by sister publications over which Bennet had no editorial control. Defs' Mem. at 22; see also Deposition of Andrew Sullivan, Dkt. No. 99-41, at 93. Indeed, Andrew Sullivan, who ran one of the blogs on which many of these articles were

published, testified that Bennet had no role whatsoever in the preparation of those posts. Id.

In response, plaintiff points out that the posts "appeared on The Atlantic's website," see, e.g., Pl. SUMF ¶ 118, and that Bennet conceded that he "consumed" the Atlantic's website in 2011 and admitted that he "must have read" some of these articles, see Pl. Opp. at 18. But, as defendants persuasively reply, plaintiff cites to no evidence, beyond the mere fact that the two sites shared a URL, that Bennet had editorial control over those articles, so at most he simply read the posts. Having once read an article many years before the drafting of the Editorial is hardly enough to create an inference of knowledge of the Editorial's falsity.[14]

The Second Circuit further speculated on the basis of the amended complaint's allegations that "Bennet in particular was more likely than the average editor-in-chief to know the truth about the Loughner shooting because he had reason to be personally hostile toward Palin." Palin, 940 F.3d at 814. But the Second Circuit also made clear that these speculations were only "relevant to the credibility of Bennet's testimony that he

---

[14]   For the same reason, plaintiff's evidence that Bennet was sent soon after the Loughner shooting an article refuting the causal link between the shooting and the Map is likewise insufficient to support a finding of actual malice. See Pl. SUMF ¶ 267.

was unaware of facts published on his watch relating to the Loughner shooting." Id. As just discussed, there is no evidence to suggest that those facts were actually published on his watch. And standing alone, as the Second Circuit itself recognized, political opposition "does not constitute actual malice." Id.

### 2. The Retraction

While a defendant's willingness (as here) to quickly acknowledge and correct its error ordinarily weighs against a finding of actual malice, see e.g., Zerangue v. TSP Newspapers, Inc., 814 F.2d 1066, 1071 (5th Cir. 1987), the Second Circuit once again theorized that it was "plausible that the correction was issued after a calculus that standing by the editorial was not worth the cost of the public backlash." Palin, 940 F.3d at 815. But, as defendants point out, plaintiff does not cite to any evidence in the record that corroborates this theory of the retraction/correction so far as defendants' knowledge of falsity is concerned, and the Court's own review of the record discloses no evidence warranting this speculation.

### 3. The Drafting and Publication Process

Ultimately, then, we are left with how Bennet handled the Williamson draft and the attached hyperlink, which the Second Circuit held could show that Bennet "willfully disregarded the truth." Palin, 940 F.3d at 815. Plaintiff argues that,

construing the evidence in the light most favorable to her, a jury could conclude that (1) Bennet instructed Williamson to research whether there was a link between the Map and the shooting; (2) Bennet conceded, and Williamson confirmed, that her draft embodied the results of that research and did not turn up evidence of a causal link between the Map and the shooting; (3) the hyperlinked article attached to Williamson's draft recognized as much; and (4) therefore, Bennet "knew there was no link but rewrote the draft anyway to say a link existed — consistent with the narrative he already decided to portray." Pl. Opp. at 18.

As a threshold matter, defendants insist there is "no evidence to support these assertions." Defs' Reply at 8. Specifically, defendants contend that Bennet did not instruct Williamson to research whether there was a link between the map and the shooting; rather, according to defendants, Bennet only "asked for research to determine if the Times' own Editorial Board had previously written anything connecting the Loughner Shooting to incitement . . . because he wanted to ensure the new editorial was in sync with any prior Board position. Id. at 8-9.

However, taking the evidence in the light most favorable to plaintiff, Williamson acknowledges in her deposition that Bennet specifically asked her to "look for pieces related to the Giffords shooting and whether there was such a connection."

# JA 1362

Sullivan Decl. Ex. 3 (Williamson Dep.) at 142; see also id. ("[Bennet] asked me to research that particular shooting, and I did."). Defendants suggest that plaintiff is taking these statements out of context, weaving "two strands of testimony into a fiction." Defs' Reply at 9. But, again, at the summary judgment phase, the Court finds that Williamson's deposition testimony could allow a juror to conclude that, at some point during the drafting process, Bennet specifically instructed Williamson to research whether there existed a link between the Map and the shooting and learned that there was no material support for such a link.

Beyond this, Williamson's inclusion in her first draft of the hyperlink to the contemporaneous ABC news article that flatly stated there was no such connection would have given Bennet, if he had accessed the article, "obvious reasons to doubt the veracity" of the alleged connection. Harte-Hanks, 491 U.S. at 688. If so, Bennet's failure to investigate could support an inference that he purposefully avoided the truth. Id. at 692. To be sure, Bennet maintains that he never clicked on the hyperlink. See Bennet Dep. at 261. But under all the circumstances, a jury might discredit this testimony. Nonetheless, even if it were true, it could be evidence of reckless disregard. After receiving Williamson's draft, a reasonable jury might conclude, Bennet had obvious reasons to

# JA 1363

doubt whether there existed a link between the Map and the Loughner shooting. At that point, Bennet's failure to further investigate or at least just click on the link to the only article Williamson had presented could support the inference that he was purposefully avoiding the truth.

There are other pieces of evidence from the drafting process that further support such a theory. First, as the editors were discussing whether to cover the Hodgkinson shooting, it was Bennet's idea to focus the editorial on "the rhetoric of demonization and whether it incites people to this kind of violence." Sullivan Decl. Ex. 11. Then, during the research phase, Bennet asked a researcher to determine whether the Board had previously written "anything connecting to the Giffords shooting to some kind of incitement." Pl. SUMF ¶ 324. After the researcher sent Bennet an article (written not by the Board but by a columnist at the Times), Bennet replied "Good for us." Id. ¶ 326. While Bennet has testified that he does not recall what he meant by that response, a reasonable jury could infer from this response that Bennet felt free to advance his narrative because the Editorial Board had not written on the subject.

In addition, researchers sent to Bennet other articles that disclaimed the idea that Loughner had been motivated by violent rhetoric. Notably, Bennet was sent an earlier editorial entitled

"As We Mourn," published in January 2011, which quoted President Barack Obama saying Loughner's shooting cannot be blamed on "a simple lack of civility." Declaration of Shane B. Vogt, Dkt. No. 102, Ex. 30 at 19. Like the hyperlink, Bennet testified that he did not read this article, even after specifically asking for the researcher to dig up articles of this sort. Pl. SUMF ¶¶ 324-330. But, as with the hyperlink, a jury could infer from this a purposeful avoidance of the truth.

Once again, there is considerable evidence that defendants mount to support the notion that Bennet simply drew the innocent inference that a political circular showing crosshairs over a Congressperson's district might well invite an increased climate of violence with respect to her. But, taken in the light most favorable to plaintiff, the evidence shows Bennet came up with an angle for the Editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results the Williamson research that he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth

Accordingly, the Court concludes that there is sufficient evidence to allow a rational finder of fact to find actual malice by clear and convincing evidence. Anderson, 477 U.S. at 254.

C. Conclusion

**JA 1365**

For the above-discussed reasons, plaintiff's motion for partial summary judgment is denied and defendants' motion for summary judgment is also denied.[15] The Clerk of the Court is directed to close docket entries 94 and 95. The trial of this case, pandemic permitting, will commence on February 1, 2020 at 9:30 a.m.

SO ORDERED.

---

[15]    Also before the Court is plaintiff's motion for reconsideration of the Court's decision to dismiss her claim for disgorgement damages. Dkt. No. 111. In that motion, plaintiff asks the Court to reconsider its earlier decision because, she argues, the Supreme Court's decision in Liu v. SEC, 140 S.Ct. 1936 (2020), decided on June 22, 2020, constituted "a change in controlling law" and gave rise to "a need to correct a clear legal error or prevent manifest injustice." Plaintiff's Memorandum of Law in Support Reconsideration And/Or Alteration or Amendment, Dkt. No. 111, at 4.

The Court denies plaintiff's motion as untimely. Under Local Rule 6.3, a motion for reconsideration of a court order must be served within 14 days after entry of the order determining the original motion. While there might be some fuzziness regarding when the fourteen-day clock starts and stops, plaintiff's motion is untimely under even the most generous interpretation of Rule 6.3. The Court's order on the original motion was entered on January 21, 2020. Dkt. No. 83. Plaintiff did not move for reconsideration until July 15, 2020 — more than five months later. Thus, a strict application of Rule 6.3 would warrant denying plaintiff's motion as grossly untimely. Moreover, even if the fourteen-day clock were deemed to have restarted on the date the Supreme Court announced its decision in Liu and if the clock were deemed to have stopped on the date plaintiff sought leave from this Court to file the motion, she would still have missed the deadline. Plaintiff sought leave to file this motion on July 8, 2020 — sixteen days after the Supreme Court decided Liu on June 22, 2020.

Dated:    New York, NY
          August 28, 2020

                                    JED S. RAKOFF, U.S.D.J.

# JA 1367

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------x
SARAH PALIN,                              :
                                          :
                                          :    17-cv-4853 (JSR)
        Plaintiff,                        :
                                          :    OPINION AND ORDER
        -v-                               :
                                          :
THE NEW YORK TIMES COMPANY,

                                     USDC SNY
                                     DOCUMENT
                                     ELECTRONICALLY FILED
                                     DOC #:
        Defendant.                   DATE FILED: 8/29/17
--------------------------------------x

JED S. RAKOFF, U.S.D.J.

Nowhere is political journalism so free, so robust, or perhaps

so rowdy as in the United States. In the exercise of that freedom,

mistakes will be made, some of which will be hurtful to others.

Responsible journals will promptly correct their errors; others will

not. But if political journalism is to achieve its constitutionally

endorsed role of challenging the powerful, legal redress by a public

figure must be limited to those cases where the public figure has a

plausible factual basis for complaining that the mistake was made

maliciously, that is, with knowledge it was false or with reckless

disregard of its falsity. Here, plaintiff's complaint, even when

supplemented by facts developed at an evidentiary hearing convened

by the Court, fails to make that showing. Accordingly, the complaint

must be dismissed.

## Background

In her one-count complaint filed on June 27, 2017, plaintiff

Sarah Palin, an acknowledged public figure, alleged that defendant

The New York Times Company (the "Times") defamed her in an editorial published on June 14, 2017, the defamatory statements in which were not corrected until the next day. On July 14, 2017, the Times moved to dismiss the complaint for failure to state a claim as a matter of law, and the matter was promptly briefed by both sides.

On its face, the complaint plainly suffered from several material deficiencies. For example, it failed to identify any individual at the Times who allegedly acted with actual malice, positing instead a kind of collective knowledge unrecognized by the law in this area. But while the Court might have dismissed the complaint on such grounds, the editorial in question was signed by "The Editorial Board" of the Times, and in such a situation the Court believed it could not carry out its prescribed role of ascertaining whether the numerous allegations in the complaint to the effect that "the Times" knew this, or intended that, could, when taken most favorably to the plaintiff, be attributed to a specific individual or individuals without the Court's knowing a modicum of factual background. Accordingly, the Court ordered a brief evidentiary hearing on August 16, 2017 to ascertain who was (or were) the author(s) of the offending statements and other basic facts that would provide the context for assessing the plausibility or implausibility of the complaint's allegations.[1]

---

[1] By requiring district courts to make plausibility determinations based on the pleadings, see Ashcroft v. Iqbal, 556 U.S. 662 (2009) and Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court has, in effect, made district courts gatekeepers. Evaluating plausibility is "a context-specific task," Iqbal, 556 U.S. at 679,

2

Case 22-558, Document 54, 09/19/2022, 3384725, Page 214 of 295
Case 1:17-cv-04853-JSR   Document 51   Filed 08/29/17   Page 3 of 26

JA 1369

Although, therefore, if the Court were to solely limit its evaluation to the face of the complaint, it would readily grant the motion to dismiss, the Court has instead evaluated the plausibility of the complaint in light of such background facts developed during the evidentiary hearing that, as shown by the parties' post-hearing briefs, were either undisputed (at least for purposes of the instant motion) or, where disputed, are taken most favorably to plaintiff. In brief, the pertinent factual allegations are as follows:

On the morning of June 14, 2017, James Hodgkinson opened fire on members of Congress and current and former congressional aides playing baseball at a field in Virginia. Complaint ("Compl.") ¶ 2, ECF No. 1; Transcript of Aug. 16, 2017 Hearing ("Tr.") at 4:22. That same day, Elizabeth Williamson, an editorial writer at the Times,

---

because a court must have some knowledge of the context in which the underlying events occurred in order to carry out the function with which the Supreme Court has tasked it. Thus, the Court here convened a hearing pursuant to Rule 43(c) of the Federal Rules of Civil Procedure, which provides that "When a motion relies on facts outside the record [as the instant motion does in effect by arguing that the allegations of the complaint are in context implausible], the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions." Although such a hearing was somewhat unusual, neither party at any point objected to the Court's holding the hearing or to the Court's considering (at least for the limited purpose of deciding this motion) such facts there developed that are not in dispute. See Transcript of Aug. 16, 2017 Hearing ("Tr.") at 72:15-25; Pl.'s Memo. of Law on Context, Inferences and Plausibility at 1-2, ECF No. 40 ("Memo. on Plausibility"); Def.'s Supp. Mem. in Further Support of its Mot. to Dismiss the Complaint ("Mem. in Further Support of Mot. to Dismiss") at 1, 4-8, ECF No. 42. As to any disputed fact, however, the Court, as it advised the parties at the hearing, makes no credibility determinations, Tr. at 74:1-3, and takes those facts most favorably to plaintiff.

proposed that the Times editorial board write a piece about the shooting.[2] Tr. at 4:22-24, 5:13, 7:17. Before she began writing, James Bennet – the Times' editorial page editor, id. at 3:24 – asked Ms. Williamson to look at editorials the Times had previously published in the aftermath of a January 7, 2011 attack carried out by Jared Lee Loughner at a political event in Tucson, Arizona. See id. at 6:5-9, 60:17-18; Compl. ¶ 1. In this shooting spree, Loughner shot nineteen people, severely wounding United States Congresswoman Gabrielle Giffords and killing six others, including Chief U.S. District Court Judge John Roll and a nine-year-old girl. Compl. ¶ 1. Mr. Bennet asked a researcher to send Ms. Williamson these editorials, which the researcher did, copying Mr. Bennet. Tr. at 36:14-17, 37:8-13, 61:3-7.[3]

Shortly following Loughner's attack, speculation arose about a connection between the crime and plaintiff Palin. Compl. ¶ 24. This speculation focused on a map (the "SarahPAC Map") circulated by plaintiff's political action committee, SarahPAC, prior to the

---

[2] Ms. Williamson was not available to testify at the time of the hearing on August 16, 2017. See Tr. at 72:1-3. After Mr. Bennet's testimony was completed, the Court advised the parties that it now saw no need to call Ms. Williamson, unless either party wanted to do so. Id. at 73:1-3. The Times immediately declared that it saw no such need. Id. at 72:5-7. The Court then advised plaintiff that if she would like to call Ms. Williamson as a witness, plaintiff should file a letter with the court by no later than August 17, 2017 at 5:00 pm. Id. at 73:4-7. Plaintiff chose not to submit such a letter.

[3] At the request of plaintiff, and with no objection from defendant, these editorials were furnished to plaintiff subsequent to the evidentiary hearing but prior to post-hearing briefing by the parties. See Tr. at 72:8-12; 79:3-80:1.

shooting. Id. ¶¶ 24, 45. The map depicted stylized crosshairs placed over the geographic locations of congressional districts that Republicans were targeting in an upcoming election, including Representative Gabrielle Giffords' district, as well as photos (below the map) of the incumbent Democrats. See Decl. of Jay Ward Brown, Esq. in Support of Def.'s Mot. to Dismiss the Complaint ("Brown Decl.") Ex. D, ECF No. 26-4. In the end, however, articles published in the Times and elsewhere stated that no such connection had been established between the circulation of the SarahPAC Map and the Loughner shooting. See, e.g., Compl. ¶¶ 42-46 (describing such articles).

Ms. Williamson sent a first draft of the editorial to Mr. Bennet around 5:00 pm on June 14. Tr. at 6:16-19; Court's Hearing Exhibit 1. The original draft stated, in relevant part, that "[n]ot all the details [of the Hodgkinson shooting] are known yet, but a sickeningly familiar pattern is emerging: a deranged individual with a gun — perhaps multiple guns — and scores of rounds of ammunition uses politics as a pretense for a murderous shooting spree.... Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured in a vile political climate. Then, it was the pro-gun right being criticized: in the weeks before the shooting Sarah Palin's political action committee **circulated** a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats

under stylized crosshairs." Court's Hearing Ex. 1. The word

"circulated" was highlighted as above in the manner indicating that

it was a hyperlink. <u>See</u> Court's Hearing Ex. 1. Accessing the

hyperlink would take the reader to an ABC News article published the

day after Loughner's attack, which stated, <u>inter alia</u>, that "[n]o

connection has been made between [the SarahPAC Map] and the Arizona

shooting." Brown Decl. Ex. C at 1, ECF No. 26-3.

After receiving Ms. Williamson's draft, Mr. Bennet "effectively

rewr[o]te the piece." Tr. at 8:25; <u>compare</u> Court's Hearing Ex. 1

(original draft) <u>with</u> Compl. Ex. 1 (original published version). Mr.

Bennet's revised version of the editorial was published online on

the evening of June 14, 2017 and in print on June 15, 2017 under the

title "America's Lethal Politics." Compl. ¶¶ 3, 32-33. The two

paragraphs here relevant read as follows:

> Was this attack [by Hodgkinson] evidence of how
> vicious American politics has become? Probably.
> In 2011, when Jared Lee Loughner opened fire in
> a supermarket parking lot, grievously wounding
> Representative Gabby Giffords and killing six
> people, including a 9-year-old girl, the link to
> political incitement was clear. Before the
> shooting, Sarah Palin's political action
> committee **circulated** a map of targeted electoral
> districts that put Ms. Giffords and 19 other
> Democrats under stylized cross hairs.

> Conservatives and right-wing media were quick on
> Wednesday to demand forceful condemnation of
> hate speech and crimes by anti-Trump liberals.
> They're right. Though there's no sign of
> incitement as direct as in the Giffords attack,
> liberals should of course hold themselves to the
> same standard of decency that they ask of the
> right.

Case 22-558, Document 54, 09/19/2022, 3384725, Page218 of 295
Case 1:17-cv-04853-JSR Document 53 Filed 08/29/17 Page 7 of 26

JA 1373

Id. Ex. 1 at 2; id. ¶ 3. The published version of the editorial
retained the hyperlink to the ABC News article. See Def.'s Memo. of
Law in Support of its Mot. to Dismiss the Compl. ("Mot. to Dismiss")
at 3 n.5, ECF No. 25.

However, within a day or so of publication, the Times twice
revised (and corrected) the text of the editorial, Compl. ¶¶ 50-52,
and separately also issued two corrections online beginning on or
about 11:15 am on June 15, id. ¶¶ 52, 55, Tr. at 30:9-17. The
corrections were also in the print editions of the Times on June 16.
Compl. ¶ 63. Specifically, the Times revised the editorial text
online by deleting the phrases "the link to political incitement was
clear" and "[t]hough there's no sign of incitement as direct as in
the Giffords attack," and adding the sentence "But no connection to
that crime was ever established." Id. ¶¶ 51-52. As to the
corrections, published both online and in print, the first
correction read: "An earlier version of this editorial incorrectly
stated that a link existed between political incitement and the 2011
shooting of Representative Gabby Giffords. In fact, no such link was
established." Id. ¶ 52. The second correction read: "An editorial on
Thursday about the shooting of Representative Steve Scalise
incorrectly stated that a link existed between political rhetoric
and the 2011 shooting of Representative Gabby Giffords. In fact, no
such link was established. The editorial also incorrectly described
a map distributed by a political action committee before that

7

Case 22-558, Document 54, 09/19/2022, 3384725, Page219 of 285
Case 1:17-cv-04853-JSR Document 54 Filed 08/29/17 Page 8 of 26

shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized crosshairs." Id. ¶¶ 55, 63.

Despite these corrections, plaintiff, less than three weeks later, filed the instant complaint alleging that the Times defamed her by including within the original version of the editorial the subsequently-corrected errors. Id. ¶ 37. As noted, the Times then promptly moved to dismiss the complaint. The motion was fully briefed by both sides, and the Court heard oral argument, after which it convened the aforementioned evidentiary hearing. The hearing was followed, in turn, by still more briefing. As a result, the motion is now fully ripe for decision.

### Discussion

On a motion to dismiss, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the non-moving party. See Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008). However, conclusory allegations are not entitled to be assumed true. Ashcroft v. Iqbal, 556 U.S. 662, 680-681 (2009). Moreover, to survive a motion to dismiss, a complaint must contain "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

Additionally, in a defamation case, these standards must be applied consistently with the First Amendment protections famously put forward in New York Times v. Sullivan, 376 U.S. 254 (1964) and its progeny. Thus, in "defamation cases, Rule 12(b)(6) not only protects against the costs of meritless litigation, but provides

assurance to those exercising their First Amendment rights that
doing so will not needlessly become prohibitively expensive." Biro
v. Conde Nast, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013); see also
Michel v. NYP Holdings, Inc., 816 F.3d 686, 702 (11th Cir. 2016)
("[A]pplication of the plausibility pleading standard makes
particular sense when examining public figure defamation suits. In
these cases, there is a powerful interest in ensuring that free
speech is not unduly burdened by the necessity of defending against
expensive yet groundless litigation.").

As noted, the complaint here alleges, in a single count, the
tort of defamation. "Defamation is the injury to one's reputation
either by written expression, which is libel, or by oral expression,
which is slander." Idema v. Wager, 120 F. Supp. 2d 361, 365
(S.D.N.Y. 2000) (citing Morrison v. Nat'l Broad. Co., 19 N.Y.2d 453,
458 (1967)). The specific elements of this tort are set forth in
applicable state law, here the law of New York.[4] "Under New York law,
a plaintiff must establish five elements to recover in libel: 1) a
written defamatory statement of fact concerning the plaintiff; 2)
publication to a third party; 3) fault (either negligence or actual
malice depending on the status of the libeled party); 4) falsity of
the defamatory statement; and 5) special damages or per se

---

[4] "'The parties' briefs assume that New York law controls, and such
implied consent . . . is sufficient to establish choice of law.'"
Chau v. Lewis, 771 F.3d 118, 126 (2d Cir. 2014) (quoting Krumme v.
WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000)).

actionability (defamatory on its face)." Celle v. Filipino Reporter Enterps. Inc., 209 F.3d 163, 176 (2d Cir. 2000).

As to the third element, plaintiff, because she is a public figure,[5] must under federal law "surmount a much higher barrier" and establish by clear and convincing evidence that the Times acted with "actual malice," that is, with knowledge that the statements were false or with reckless disregard of their falsity. Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 773, 775 (1986). "Though a state-based cause-of-action, the elements of a libel action are heavily influenced by the minimum standards required by the First Amendment." Celle, 209 F.3d at 176.

In its pending motion, the Times advances three bases for dismissing the Complaint: first, that the challenged statements are not "of and concerning" plaintiff; second, that the challenged statements are not provably false; and third, that plaintiff has not adequately plead actual malice. See Mot. to Dismiss at 1. The Court considers each in turn:

**1. Whether the Statements are "Of and Concerning" Mrs. Palin**

For purposes of the law of defamation, statements alleged to be defamatory are "of and concerning" a plaintiff where "'the allegedly defamatory content refer[s] to the plaintiff' such that those knowing the plaintiff 'understand that [she] was the person meant.'"

---

[5] Plaintiff does not dispute that she is a public figure. See, e.g., Pl.'s Memo. of Law in Opp. to Def.'s Mot. to Dismiss ("Memo. in Opp.") at 14, ECF No. 29; Compl. ¶¶ 14-18 (describing plaintiff as a public figure and former public official).

Gilman v. Spitzer, 538 F. App'x 45, 47 (2d Cir. 2013) (quoting Brady v. Ottaway Newspapers, Inc., 84 A.D.2d 226, 228 (1981) and Geiser v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)). That is, a statement is "of and concerning" a plaintiff if it "could have been understood by a reasonable reader as being, in substance, actually about" the plaintiff. Kirch v. Liberty Media Corp., 449 F.3d 388, 399 (2d Cir. 2006) (emphasis in original).

Here, the editorial in issue stated that "Sarah Palin's political action committee" circulated the SarahPAC Map. Compl. Ex. 1 at 2 (emphasis added). The Times argues that plaintiff's claim of defamation is "directed" at plaintiff's political action committee, SarahPAC, and not plaintiff herself. Mot. to Dismiss at 6-10. "Under the group libel doctrine, a plaintiff's claim is insufficient if the allegedly defamatory statement referenced the plaintiff solely as a member of the group." Church of Scientology Int'l v. Time Warner, Inc., 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992), aff'd sub nom Church of Scientology Int'l v. Behar, 238 F.3d 168 (2d Cir. 2001).

However, the group libel doctrine is inapplicable where, as here, "'the circumstances of the publication reasonably give rise to the conclusion that there a particular reference to the member.'" Id. (quoting Restatement (Second) of Torts § 564A(b)). Three circumstances permit the inference that the challenged statements would be understood by a reasonable reader as being about plaintiff in particular. First, the political action committee is not mentioned by name. Second, plaintiff is referenced by name. Third,

11

the reference describes plaintiff's relationship to the political action committee as possessive ("Sarah Palin's political action committee"). Accordingly, because plaintiff is "distinguished from other members of the group," the Court finds, for purposes of this motion to dismiss, that the allegedly defamatory statements are of and concerning plaintiff. Three Amigos SJL Rest., Inc. v. CBS News Inc., 15 N.Y.S.3d 36, 41 (N.Y. App. Div. 2015), aff'd 28 N.Y.3d 82 (2016).[6]

## 2. Whether the Statements are Provably False

Falsity is a necessary element of a defamation action. Buckley v. Littell, 539 F.2d 882, 889-894 (2d Cir. 1976); Gross v. New York Times Co., 82 N.Y.2d 146, 152-153 (1993). Therefore, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990). Here, however, although the offending paragraphs quoted above contain various assertions of opinion, a reasonable reader could well view them as asserting that there was a "direct" "link" between the SarahPAC Map and the Loughner shooting. Indeed, according to Mr. Bennet's testimony, it was the receipt by the Times of communications from readers complaining about such an assertion

---

[6] Although the Second Circuit stated in 2001 that the "of and concerning" requirement should "ordinarily be decided at the pleading stage," Church of Scientology Int'l v. Behar, 238 F.3d 168, 173 (2d Cir. 2001), it is not clear to this Court that this would have prevented the Times from litigating this issue at trial as a mixed issue of law and fact if the case had survived the motion to dismiss.

that led Bennet to order the corrections thereafter made. See Tr. at 27:9-30:8.

If these readers were reasonably reading the sentences here at issue to suggest that, as a factual matter, distribution of the SarahPAC Map was directly causally linked to Loughner's shooting, then, as even the Times appears to concede, that is a factual statement that can be proved false, and, according to the complaint, has already been so proven, since, among other things, there is no evidence that Loughner ever saw the SarahPAC Map. Compl. ¶ 47. But even if, on the Times' somewhat strained reading, the statements here at issue should be read to suggest no more than that the SarahPAC Map helped foster "political incitement" (albeit seemingly directed at the specified incumbents), which in turn was "direct[ly]" and "clearly" linked to Loughner's shooting, these are still factual assertions that can be demonstrated to be false and, according to the complaint, were made in reckless disregard of their falsity. Id. ¶¶ 25, 47-48.

As to the first assertion, that circulation of the SarahPAC Map helped foster political incitement, this is akin to the kind of factual assertion that juries in effect have to resolve regularly in false advertising cases that assess the effect of a given advertisement on consumers. See Johnson & Johnson * Merck Consumer Pharm. Co. v. Smith Kline Beecham Corp., 960 F.2d 294, 297-298 (2d Cir. 1992); Mylan Pharm., Inc. v. Proctor & Gamble Co., 443 F. Supp. 2d 453, 459-460 (S.D.N.Y. 2006). As to the second assertion, that

13

the political incitement directed at the incumbents was directly

linked to Loughner's shooting, the Times argues that this is really

an assertion about an individual's motivation to act, which, it

claims, can never be proved false. <u>See</u> Mot. to Dismiss at 10-12

("What motivated or influenced Loughner is unknown — even by him.").

But, as the courts have so often noted,  "the state of a man's mind

is as much a fact as the state of his digestion," <u>Siegelman v.</u>

<u>Cunard White Star Ltd.</u>, 221 F.2d 189, 198 (2d Cir. 1955), though

such mental states are often proved or disproved circumstantially.

Indeed, the Times itself stated in its published correction that "An

earlier version of this editorial incorrectly stated that a link

existed between political incitement and the 2011 shooting of

Representative Gabby Giffords. In fact, no such link was

established."  Compl. ¶ 58; <u>see also id.</u> ¶ 58 ("We got an important

fact wrong, incorrectly linking political incitement and the 2011

shooting of Giffords. No link was ever established."). As this very

statement suggests, the link in question can, as a factual matter,

either be "established," i.e., proved, or disproved.

That the offending statements appeared in an editorial, which

by its nature presents an overall opinion or opinions, is relevant,

but hardly dispositive. <u>See</u> <u>Brian v. Richardson</u>, 87 N.Y.2d 46, 52

(1995). Unlike statements in cases relied upon by the Times that

voiced editorial opinions about connections that "appeared to be" or

"could well happen," <u>see</u>, <u>e.g.</u>, <u>Immuno v. Moor-Jankowski</u>, 77 N.Y.2d

235, 255 (1991), the statements here complained of stated

14

unequivocally that there was a "direct" and "clear" link between the SarahPAC Map and the Loughner shooting, albeit a link created by intermediating "political incitement." A reasonable reader could well infer that the Times was in possession of objective evidence that the SarahPAC Map incited Mr. Loughner's shooting, whereas, according to the complaint, the Times had no evidence of either a direct or indirect link.

In short, some or all of the statements here at issue are fact-laden statements that can be proven false, and the complaint adequately alleges evidence sufficient to enable a reasonable juror to find them false if the juror so chose.[7]

### 3. Actual Malice

Public figures who seek damages for defamatory statements must, however, do more than prove that the statements about them were false. They must also prove by "clear and convincing evidence" that the statements were made with "actual malice" — that is, with knowledge that the statements were false or with reckless disregard as to their falsity. Sullivan, 376 U.S. at 279-280; Masson v. New Yorker, 501 U.S. 496, 508 (1991); Biro v. Conde Nast, 807 F.3d 541,

---

[7] Plaintiff also argues that still another false statement in the editorial was the statement that the SarahPAC Map "put Ms. Giffords and 19 other Democrats under stylized cross hairs," when in fact, as the Times' second correction noted, it was the geographic districts of the incumbents that were placed under the cross hairs. However, this misstatement was authored by Ms. Williamson, not Mr. Bennet (who testified that he never saw the SarahPAC Map, Tr. 21:5-9), id. 20:6-16, and plaintiff has presented no material evidence that Ms. Williamson acted with actual malice, and, indeed, plaintiff declined the Court's invitation to have Ms. Williamson testify.

15

544-545 (2d Cir. 2015). Reckless disregard can be established by "evidence of an intent to avoid the truth," <u>Harte-Hanks Comms., Inc. v. Connaughton</u>, 491 U.S. 657, 693 (1989), evidence that the defendant "entertained serious doubts as to the truth of his publication," <u>St. Anant v. Thompson</u>, 390 U.S. 727, 731 (1968), or evidence that the defendant acted with a "high degree of awareness of [a statement's] probable falsity," <u>Garrison v. State of Louisiana</u>, 379 U.S. 64, 74 (1964). <u>See</u> <u>Dongguk Univ. v. Yale Univ.</u>, 734 F.3d 113, 124 (2d Cir. 2013). But even then, a defamation complaint by a public figure must allege sufficient particularized facts to support a claim of actual malice by clear and convincing evidence, or the complaint must be dismissed.

Here, as already mentioned, the complaint fails on its face to adequately allege actual malice, because it fails to identify any individual who possessed the requisite knowledge and intent and, instead, attributes it to the Times in general. This will not suffice. "When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." <u>Dongguk Univ.</u>, 734 F.3d at 123; <u>see</u> <u>Sullivan</u>, 376 U.S. at 287 ("[T]he state of mind required for actual malice would have to be brought home to the persons in the [defendant's] organization having responsibility for the publication of the [statement].").

16

But even assuming, in light of the evidentiary hearing, that the complaint should now be construed as asserting actual malice on the part of Mr. Bennet – the primary, if not sole author of the sentences in question and the Times' editorial page editor – plaintiff still fails to meet the actual malice standard.  That standard is grounded in "a profound national commitment to the principle that debate on public issues be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." Sullivan, 376 U.S. at 270. Sullivan and succeeding cases "have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies." St. Amant, 390 U.S. at 731-732. "[S]peaking out on political issues is a core freedom protected by the First Amendment and probably presents the 'strongest case' for applying 'the New York Times [v. Sullivan] rule.'" Schatz v. Republican State Leadership Comm., 669 F.3d 50, 51 (1st Cir. 2012) (quoting Harte-Hanks, 491 U.S. at 666 n.7, 686-687)).

Coupling this protective overlay with the more technical requirement that a public figure, in order to survive a motion to dismiss a claim of defamation, must allege specific facts that plausibly evidence actual malice in a clear and convincing manner, it is plain that plaintiff has not and cannot meet this standard,

even with the benefit of the facts brought forth by the evidentiary hearing.[8]

To put the matter simply, Bennet — as the undisputed testimony shows — wrote the putatively offending passages of the editorial over a period of a few hours and published it very soon thereafter. Shortly after that, his mistakes in linking the SarahPAC Map to the Loughner shooting were called to his attention, Tr. 27:8-17, and he immediately corrected the errors, not only in the editorial itself but also by publishing corrections both electronically and in print, Tr. 28:19-29:10; Compl. ¶¶ 50-55, 63. Such behavior is much more plausibly consistent with making an unintended mistake and then correcting it than with acting with actual malice.

Plaintiff's response is, first, to posit that the Times in general, and Mr. Bennet in particular, had a motive to defame Mrs. Palin. As to the Times in general, the complaint alleges that "there is existing hostility toward Mrs. Palin" and "her name and attacks upon her inflame passions and thereby drive viewership and Web clicks to media companies." Compl. ¶ 30. As to the alleged "hostility," it goes without saying that the Times editorial board is not a fan of Mrs. Palin. But neither the fact of that opposition, nor the supposition that a sharp attack on a disfavored political figure will increase a publication's readership, has ever been

---

[8] For these purposes only, the Court has taken as true plaintiff's interpretation of the evidence that emerged at the evidentiary hearing, on the supposition that plaintiff could amend her complaint to include such a gloss.

enough to prove actual malice. See, e.g., Harte-Hanks, 491 U.S. at 665 ("[A] newspaper's motive in publishing a story — whether to promote an opponent's candidacy or to increase its circulation — cannot provide a sufficient basis for finding actual malice."). For "it is hardly unusual for publications to print matter that will please their subscribers; many publications set out to portray a particular viewpoint or even to advance a partisan cause. Defamation judgments do not exist to police their objectivity." Reuber v. Food Chem. News, Inc., 925 F.2d 703, 716 (4th Cir. 1991).

Here, moreover, as previously noted, it is not the Times' collective knowledge and intent that is relevant but rather Mr. Bennet's. As to hostility, the best that plaintiff can muster is that Mr. Bennet has a long association with liberal publications and that his brother is the Democratic senator from Colorado who was endorsed by Congresswoman Giffords' political action committee in his 2016 election and whose opponent was endorsed by Mrs. Palin in that same election. Tr. at 34:17-19, 68:20-22, 70:24-71:17; see also Memo. on Plausibility at 5-6 & n.22. If such political opposition counted as evidence of actual malice, the protections imposed by Sullivan and its progeny would swiftly become a nullity.

As for the alleged economic motive, there is not a shred of factual support, either in the complaint or in the evidentiary hearing, for the supposition that considerations of attracting readership ever entered Mr. Bennet's mind when he was drafting this particular editorial. Indeed, if that were his goal, one would have

expected him to mention Mrs. Palin's name more than once in the editorial or use her name in the social media promoting the editorial, neither of which was done. See Compl. Exs. 1, 16.

In her complaint, plaintiff also relies on her allegations that the Times cited "no source" for the challenged statements and failed to conduct an adequate investigation into their veracity, allegations that plaintiff now suggests apply to Mr. Bennet as well. Memo. in Opp. at 16-19; Transcript of July 31, 2017 Hearing at 19:20; Memo. on Plausibility at 8-10. As to the Times in general, this allegation is undercut by the fact that the original draft of the editorial that Ms. Williamson sent Mr. Bennet, as well as the version published, included a hyperlink to an article that described in some detail the SarahPAC Map and its circulation and concluded that there was no proven link between that circulation and the Loughner shooting. Tr. at 20:6-25; Compl. Ex. 1 at 2; Brown Decl. Ex. C (ABC News article). "The hyperlink is the twenty-first century equivalent of the footnote for purposes of attribution in defamation law." See Adelson v. Harris, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013). The inclusion of this article through the hyperlink shows, first, that the Times did do some research before publishing the editorial (despite the very limited time available) and, second, that the allegation of actual malice is even more improbable because the Times included as a hyperlink an article undercutting its own conclusions.

**JA 1587**

Once again, however, it is Mr. Bennet's knowledge and intent that are ultimately at issue so far as actual malice is concerned, and Bennet testified that he himself did not read the hyperlinked article when rewriting the editorial nor do any further investigation of his own (though he was copied on a communication sent by the researcher that he had directed to find and examine prior Times editorials regarding Mrs. Palin and the Loughner shooting). See Tr. at 20:20-21:14, 61:3-7. But it is well-established that supposed research failures do not constitute clear and convincing evidence of actual malice, even of the "reckless" kind. Indeed, in Sullivan itself, the Supreme Court recognized that the editorial advertisement there at issue contained facts contradicted by earlier news stories printed in the New York Times. 376 U.S. at 287. The Court held that the existence of these prior stories did not establish actual malice in part because failure to investigate "supports at most a finding of negligence in failing to discover the misstatements." Id. at 288.

Similarly, failure to comply with journalistic policies – which the complaint here also alleges, although in wholly conclusory fashion, Compl. ¶¶ 69-72 – cannot establish actual malice absent allegations supporting an inference of reckless disregard. See, e.g., Harte-Hanks, 491 U.S. at 665 ("[A] public figure plaintiff must prove more than an extreme departure from professional standards" to demonstrate actual malice).

Alternatively, plaintiff argues that Bennet actually knew, or recklessly disregarded, that his editorial statements were false, because of prior articles in the <u>Times</u> and the <u>Atlantic</u> (where Bennet was editor-in-chief for many years) that he presumably read and that disclaimed any link between the SarahPAC Map and the Loughner shooting. At the evidentiary hearing, Bennet testified that he did not remember reading any of these articles or, if he did read them when they appeared years earlier, he did not have them in mind when he wrote the editorial. Tr. 21:19-22:3, 22:22-26:3, 58:14-67:14. Plaintiff's position is that either Mr. Bennet, contrary to his testimony, read and remembered these sources, in which case he knew the challenged statements were false, or else, consistent with his testimony, he did not read and/or remember these sources, in which case he acted with willful blindness in publishing the editorial. <u>See</u> Memo. on Plausibility at 5-9; Memo. in Opp. at 17-19.

But these kinds of lawyers' arguments do not substitute for the requisite factual showing. The fact is that all these articles appeared years earlier, and there is no reason to suppose that, even if Bennet had read them at the time, he would necessarily remember their conclusions, especially since, as the complaint itself notes, there were also articles that appeared shortly after the Loughner shooting that drew contrary conclusions. Compl. ¶ 24. As the Supreme Court stated in <u>Sullivan</u>, "The mere presence of . . . stories in the files does not, of course, establish that the Times 'knew' the [publication at issue] was false." 376 U.S. at 287.

22

Plaintiff argues, however, that Bennet's failure, at the very time he was preparing the editorial, to read either the hyperlinked article or the past editorials gathered by his researcher are evidence of reckless disregard. As for the hyperlinked article, however, the inclusion of the article along with the editorial cuts against any inference of actual malice. If Bennet purposely failed to read it because he knew it would undercut his thesis, why would he not have removed the hyperlink, which he had full power to do. See Tr. 22:11-15 (no "substantive changes" were made to the editorial following Bennet's work on it, and he "authorized publication of the editorial").

As for the editorials emailed to Ms. Williamson and copied to Mr. Bennet by the Times' researcher, Bennet knew by the time he rewrote the editorial that Ms. Williamson had likely reviewed them, so there was little incentive for him to read them as well. See Tr. 60:1-9. Plaintiff claims that, if Bennet had read them, he would have seen that at least two of them contradicted his erroneous statements. See Memo. on Plausibility at 6. But this is doubly wrong: it does not matter what they contained unless his failure to read them reasonably suggests reckless disregard, which it does not; and, in any event, they do not contradict his thesis nearly as much as plaintiff suggests.

The first article, Bloodshed and Invective in Arizona, states in relevant part:

> Jared Loughner . . . appears to be mentally ill.
> . . . It is facile and mistaken to attribute
> this particular madman's act directly to
> Republicans or Tea Party members. But it is
> legitimate to hold Republicans and particularly
> their most virulent supports in the media
> responsible for the gale of anger that has
> produced the vast majority of these threats,
> setting the nation on edge.

Memo. on Plausibility Ex. 29. The second article, an op-ed by Frank

Rich entitled <u>No One Listened To Gabrielle Giffords</u>, states in

pertinent part:

> Did Loughner see Palin's own most notorious
> contribution to the rancorous tone — her March
> 2010 Web graphic targeting Congressional
> districts? We have no idea — nor does it matter.
> . . . That Loughner was likely insane, with no
> coherent ideological agenda, does not mean that
> a climate of antigovernment hysteria has no
> effect on him or other crazed loners out there.

<u>Id.</u> Ex. 33.

As is evident, both articles contain some language tending to

corroborate parts of the challenged statements. For example, Frank

Rich's piece stated that even if Mr. Loughner was insane, that "does

not mean that a climate of antigovernment hysteria has no effect on

him." <u>Id.</u> And the other editorial indicates that people (not

including the author) had drawn a connection between the SarahPAC

Map and Mr. Loughner's shooting. <u>Id.</u> Ex. 29. So Bennet, even if he

had read these articles (which he claims he did not), would not

automatically have been led to conclude that his editorial was

erroneous.

The Court has considered plaintiff's other alleged evidence of actual malice and finds it too inconsequential to be worth further discussion. The Court has also considered whether the various items of supposed evidence of actual malice discussed above, even if individually insufficient to support an inference of actual malice, are collectively sufficient to support an inference of actual malice. But, as the foregoing discussion demonstrates, each and every item of alleged support for plaintiff's claim of actual malice consists either of gross supposition or of evidence so weak that, even together, these items cannot support the high degree of particularized proof that must be provided before plaintiff can be said to have adequately alleged clear and convincing evidence of actual malice.

We come back to the basics. What we have here is an editorial, written and rewritten rapidly in order to voice an opinion on an immediate event of importance, in which are included a few factual inaccuracies somewhat pertaining to Mrs. Palin that are very rapidly corrected. Negligence this may be; but defamation of a public figure it plainly is not.

For the foregoing reasons, the Court grants defendant's motion to dismiss. Because, moreover, this Court has canvassed in the discussion above all the various additions that plaintiff has even remotely suggested it would include in an amended complaint, the dismissal is "with prejudice," that is, final. Clerk to enter judgment.

SO ORDERED.

Dated:    New York, NY
         August 29, 2017

                                     JED S. RAKOFF, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

                                    :

SARAH PALIN                         :    No. 17 Civ. 4853 (JSR)

                   Plaintiff,     :

                                      :    ECF Case

               -against-       :

                                      :

THE NEW YORK TIMES COMPANY and JAMES  :
BENNET,

                 Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**

Jay Ward Brown
David L. Axelrod
Thomas B. Sullivan
Jacquelyn N. Schell
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................................... ii

PRELIMINARY STATEMENT .....................................................................................1

FACTUAL BACKGROUND ..........................................................................................2

A.   The Crosshairs Map ..........................................................................................2

B.   Drafting Of The Editorial..................................................................................4

     1.   *Research*................................................................................................4

     2.   *Initial Draft* .........................................................................................6

C.   The Editorial .....................................................................................................7

D.   Criticism Of The Editorial And The Times's Response .....................................8

E.   The Times Corrects The Editorial....................................................................11

F.   This Litigation..................................................................................................11

ARGUMENT ...............................................................................................................12

I.   PALIN CANNOT DEMONSTRATE THAT BENNET WAS AWARE
BEFORE PUBLICATION THAT THE EDITORIAL COULD BE READ
TO ALLEGE THAT THE CROSSHAIRS MAP CAUSED THE
LOUGHNER SHOOTING AND THAT PALIN WAS PERSONALLY
RESPONSIBLE FOR IT........................................................................................14

II.   PALIN CANNOT DEMONSTRATE THAT AT THE TIME OF
PUBLICATION BENNET KNEW OR WAS RECKLESS AS TO
WHETHER IT WOULD BE FALSE TO ASSERT A DIRECT CAUSAL
LINK BETWEEN THE CROSSHAIRS MAP AND THE LOUGHNER
SHOOTING .........................................................................................................20

CONCLUSION.............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                       **Page(s)**

*600 W. 115th St. Corp. v. Von Gutfeld*,
   80 N.Y.2d 130, 138 (1992) ................................................................................12

*Anderson v. Liberty Lobby*,
   477 U.S. 242, 249, 257 (1986) ...................................................................13, 14

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
   757 F.2d 523, 528 (2d Cir. 1985) ........................................................................3

*Bose Corp. v. Consumers Union of U.S., Inc.*,
   466 U.S. 485, 511 & n.30, 513 (1984) ...............................................14, 15, 17

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 323 (1986) ..................................................................................13

*Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*,
   768 F.3d 183, 192 (2d Cir. 2014) ....................................................................14

*Contemporary Mission, Inc. v. N.Y. Times Co.*,
   842 F.2d 612, 621 (2d Cir. 1988) ....................................................................15

*Dodds v. Am. Broad. Co.*,
   145 F.3d 1053, 1064 (9th Cir. 1998) ...............................................................16

*Dunlop-McCullen v. Rogers*,
   No. 00 Civ. 3274 (JSR) (JCF), 2002 U.S. Dist. LEXIS 3202, at *16-17, 20
   (S.D.N.Y. Feb. 21, 2002) ...........................................................................12, 13

*Fay v. Oxford Health Plan*,
   287 F.3d 96, 103 (2d Cir. 2002) .......................................................................13

*Garrison v. Louisiana*,
   379 U.S. 64, 75 (1964) ................................................................................13, 20

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323, 340 (1974) ..................................................................................12

*Goenaga v. March of Dimes Birth Defects Found.*,
   51 F.3d 14, 18 (2d Cir. 1995) ...........................................................................13

*Harte-Hanks Commc'ns v. Connaughton*,
   491 U.S. 657, 659, 665-66, 685 (1989) ..................................................... *passim*

*Hodges v. State Journal Publ'g Co.*,
   1980 OK 102, 617 P.2d 191, 196 ......................................................................16

*Journal-Gazette Co. v. Bandido's, Inc.,*
    712 N.E.2d 446, 463 (Ind. 1999) ......................................................16

*Masson v. New Yorker Magazine, Inc.,*
    501 U.S. 496, 510 (1991) .............................................................13

*Masson v. New Yorker Magazine, Inc.,*
    832 F. Supp. 1350, 1361-63 (N.D. Cal. 1993) ........................15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574, 586 (1986) .............................................................13

*Mickens v. Kodiak,*
    640 P.2d 818, 820 (Alaska 1982) ...............................................12

*N.Y. Times v. Sullivan,*
    376 U.S. 254, 272, 280 (1964) ........................................12, 13, 24

*Newton v. Nat'l. Broad. Co.,*
    930 F.2d 662, 681 (9th Cir. 1990) .........................15, 16, 17

*Olivit v. City & Borough of Juneau,*
    171 P.3d 1137, 1143 (Alaska 2007) ...........................................12

*Palin v. N.Y. Times Co.,*
    940 F.3d 804, 813, 814, 815 (2d Cir. 2019) ..................22, 24, 25

*Pearson v. Fairbanks Publ'g Co.,*
    413 P.2d 711, 713-14 (Alaska 1966) ..........................................12

*Phila. Newspapers, Inc. v. Hepps,*
    475 U.S. 767, 772 (1986) .............................................................12

*St. Amant v. Thompson,*
    390 U.S. 727, 730-31 (1968) ......................................................13

*Tilton v. Cowles Publ'g Co.,*
    76 Wash. 2d 707, 725 (1969) .....................................................16

*Woods v. Evansville Press Co.,*
    791 F.2d 480, 487 (7th Cir. 1986) .............................................16

## Other Authorities

Fed. R. Civ. P. 56(a) .......................................................................13

Fed. R. Civ. P 12(b)(6) ...................................................................12

Hon. Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems
  § 5:5.1[B] (5th ed. 2017).............................................................................................15

Case 1:17-cv-04853-JSR   Document 54   Filed 06/19/20   Page 6 of 31
Case 22-558, Document 54, 09/19/2022, 3384725, Page243 of 295

JA 1598

## PRELIMINARY STATEMENT

In this defamation action, Sarah Palin challenges three sentences in an editorial written by James Bennet and published by The New York Times Company ("The Times") in June 2017. Concededly, these sentences, written in haste under deadline, were not worded as precisely as they could have been. As a result, some readers understood them as an allegation that an ad circulated by SarahPAC, a political action committee associated with Palin, had directly caused a horrible act of gun violence by Jared Loughner years earlier, and that Palin herself was responsible for that ad. But even assuming that the drafting and publication of those three sentences constituted negligence, in this case, it is Palin's burden as a public figure to prove, by clear and convincing evidence, that Bennet and The Times told a calculated falsehood about her—*i.e.*, that they published the sentences in question with "actual malice."[1]

Although the Court of Appeals held that Palin had adequately *alleged* actual malice, discovery has demonstrated that she cannot prove it by the requisite clear and convincing evidence and Defendants therefore are entitled to summary judgment. This is so for two independent reasons:

First, at the time he wrote the allegedly defamatory portion of the editorial, Bennet did not intend, and was unaware that readers would understand his words in the defamatory sense alleged by Palin—that she had circulated an ad that directly caused Loughner to shoot his victims. Bennet testified, both at a hearing before this Court and at deposition, that he never intended to assert a direct causal link between the advertisement circulated by SarahPAC and the Loughner Shooting, much less that Palin herself was personally responsible for the ad. Nor did

---

[1] Palin has given notice she intends to move for a ruling that she is not a public figure. Dkt. 95. Defendants will respond fully to that contention in response to her motion, if she files it. Suffice for present purposes to observe that the allegations of her Amended Complaint foreclose it.

Case 22-558, Document 51, 09/12/2022, 3384725, Page244 of 295
Case 1:17-cv-04853-JSR Document 61 Filed 06/19/20 Page 7 of 31

Bennet realize, until after publication, that his words could be construed as making such an assertion. Bennet's unrebutted testimony regarding his subjective state of mind is supported by contemporaneous emails and the testimony of his colleagues. On this basis alone, Palin's claim fails as a matter of law.

Second, even assuming (contrary to the record) that Bennet actually had been aware prior to publication that readers would interpret his words to be an accusation that SarahPAC's ad played a direct causal role in Loughner's deadly shooting spree, there is no evidence in the record, much less clear and convincing evidence, that Bennet either knew that such a statement was false or that he had serious doubts about whether it was true.

## FACTUAL BACKGROUND

### A.      The Crosshairs Map

Palin is the former governor of Alaska, former vice presidential candidate, and influential public figure. SUMF ¶ 1. SarahPAC was a political action committee created under Federal law and domiciled in Virginia that ceased operation in 2016. SUMF ¶ 2. In the course of public debate surrounding congressional consideration of the Affordable Care Act, SarahPAC in 2010 published a map that featured stylized crosshairs positioned over the congressional districts of twenty Democrats who supported the legislation, along with a list of each Representative's name (the "Crosshairs Map"). SUMF ¶ 7. Although Palin denied at deposition that the symbol represented a gun sight, SUMF ¶ 13, she had described it shortly after publication as a "'bull's eye[,]'" SUMF ¶ 11, and, in the same period, "issued her now oft repeated rallying cry" to opponents of so-called "Obamacare": "'Don't retreat. RELOAD[,]'" SUMF ¶ 14. Indeed, she

JA 1400

Case 22-558, Document 54, 08/19/2022, 3384725, Page245 of 295
Case 1:17-cv-04853-JSR   Document 54   Filed 06/19/20   Page 8 of 31

affirmatively pleads in this case that the Map "depicted crosshairs."  SUMF ¶ 12.[2]  One of those

listed on the Crosshairs Map was Rep. Gabrielle Giffords of Arizona.

Shortly after its publication, violent attacks on the offices of several Representatives

identified on the Crosshairs Map, including that of Giffords, led to a substantial national debate

about the potential of such inflammatory rhetoric to incite those "on the fringe of the

movement."[3]  At the time, Giffords said on national television that "'when people do that,

they've got to realize there are consequences to that action.'"  SUMF ¶ 14.

On January 8, 2011, Jared Loughner shot nineteen people at a Giffords political event in

Tucson, killing a federal judge and five other people, and wounding thirteen others, including

Giffords (the "Loughner Shooting").  SUMF ¶ 15.  There soon followed a renewed public

controversy about the inclusion of Giffords on the Crosshairs Map.[4]  The ensuing criminal

investigation did not disclose any evidence that Loughner had seen the Crosshairs Map.  SUMF

¶ 17.  Multiple news organizations, including The Times, reported that he was mentally unstable

---

[2] "A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding."  *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985).

[3] E. Robinson, *Is there a right to 'reload'?*, Wash. Post (Mar. 26 2010) at A23 (noting that many Representatives identified on Map requested additional security due to threats); *see* L. Feldmann, *Stumping for McCain, Sarah Palin dials back the gun rhetoric*, The Christian Science Monitor (Mar. 26, 2010) at 11 (discussing pressure on Palin to tone down her rhetoric).  SUMF ¶ 9.

[4] *See, e.g*., D. Balz, *Cross hairs: Crossroads for Palin?*, Wash. Post (Jan. 11, 2011) at A9 (noting that issue of whether Palin "was partly to blame" became top question on Facebook after shooting); D. Milbank, *A McKinley moment?*, Wash. Post (Jan. 11, 2011) at A21 (opining that heat on Palin for "recklessly playing with violent images" was well deserved).  SUMF ¶ 16.  The controversy surrounding the Crosshairs Map resurfaced again in 2015 after a gunman's attack on an abortion clinic in Colorado.  *See, e.g*., P. Dvorak, *Fiery rhetoric a close relative of violence*, Wash. Post (Dec. 1, 2015) at B1 (citing SarahPAC ad and decrying leaders who "incite and inflame with fiery speeches" even when that "may not be their intent").  Indeed, just one month before publication of the Editorial, the Washington Post again published an opinion piece arguing that the Crosshairs Map had "incite[d]" the Loughner Shooting.  P. Dvorak, *At a D.C. Pizzeria, the Dangers of Fake News Just Got All Too Real*, Wash. Post (Dec. 5, 2016).

and had apparently developed animosity toward Giffords before publication of the Crosshairs Map. SUMF ¶ 18.

### B. Drafting Of The Editorial

On the morning of June 14, 2017, during a baseball practice in Virginia, James Hodgkinson opened fire with an assault rifle on a group of Republican members of Congress and others, seriously wounding several, including Rep. Steve Scalise. SUMF ¶ 19. Hodgkinson was a political supporter of Sen. Bernie Sanders and "'virulently opposed'" Pres. Trump. SUMF ¶ 20. Around 10:45 a.m. that day, Elizabeth Williamson, a writer for The Times's Editorial Board who was based in the District of Columbia, inquired of her New York-based colleagues via email whether the Board intended to write about the shooting involving Rep. Scalise. SUMF ¶ 21. Williamson, Bennet, and their colleagues Robert Semple and Linda Cohn then discussed the idea by email, debating whether the proposed piece should focus on the horror of the shooting itself, the Board's long-held position in favor of sensible gun control regulation, or "concern about the state of political rhetoric in the country." SUMF ¶ 22. During that email exchange, Cohn pointed out one difference she perceived between the response to the 2017 shooting involving Scalise and the shooting involving Giffords a few years earlier, observing that she was "thinking back to what a giant story [G]abby Gifford[s'] shooting was. Amazing that shooting congressmen doesn't seem so shocking now." SUMF ¶ 23.

#### 1. *Research*

Around noon, Semple decided that the Board should write a piece on the shooting, and Williamson began to do so. SUMF ¶ 24. Initially, Williamson researched breaking news relating to the Scalise shooting to "keep [herself] apprised of what authorities knew." SUMF ¶ 25. She also familiarized herself with the Loughner Shooting, which had occurred years earlier. *Id*. Semple, who suggested focusing on gun control measures, asked an Editorial Assistant,

Phoebe Lett, to send several "basic gun control pieces" to Williamson.  SUMF ¶ 26.  Lett

circulated four past editorials relating to gun policy, which incidentally referenced the Loughner

Shooting and other notable shootings that had prompted policy debates.  SUMF ¶ 27.[5]

Bennet, who had suggested in an email that there might be "a point to be made about the

rhetoric of demonization and whether it incites people to this kind of violence," asked

Williamson to be mindful of whether such rhetoric came from both sides of the political

spectrum.  SUMF ¶¶ 31, 32 ("If there's evidence of the kind of inciting hate speech on the left

that we, or I at least, have tended to associate with the right (e.g. in the run-up to the Gabby

Giffords shooting) we should deal with that.").  He testified that he was "specifically asking if

there was some evidence of a piece of incitement … that was directed at the ball players, the

Congressmen who were playing ball that day."  SUMF ¶ 33.

Lett explained that the Editorial Board had not written on that topic, but circulated an

opinion column by Frank Rich, *No One Listened to Gabby Giffords*, published in the aftermath

of the Giffords Shooting.  SUMF ¶ 30.  The column discussed the increase in political violence

in the two years preceding the shooting, speculation about motives behind various attacks, and

criticisms of political rhetoric in response.  Rich acknowledged the difficulty of understanding a

shooter's motives and stated that "we have no idea" whether Loughner saw "Palin's own most

notorious contribution to the rancorous tone – her March 2010 Web graphic targeting

Congressional districts."  Rich concluded in his column that discussion of motivation

---

[5] Much of the research focused on prior editorials by The Times, rather than its news reports or other news organizations' publications because, as Bennet testified, he assumed that the Board "had talked about the political climate and I wanted to harmonize whatever we were saying now with the position the board had taken" previously.  SUMF ¶ 34 (discussing importance of reviewing past Board positions and making changes thoughtfully).

"sidestep[s] the issue" of failure to speak out against violence or take measures to curb it.

### 2.    *Initial Draft*

Williamson submitted her draft of the piece to her New York-based colleagues via The Times's document management system around 4:45 p.m. that day.   SUMF ¶ 44. Williamson understood that Cohn and Bennet would be responsible for finalizing the piece.  SUMF ¶ 45.  As it relates to the language at issue in this case, Williamson's draft contained the following passage:

> Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured in a vile political climate.  Then, it was the pro-gun right being criticized: in the weeks before the shooting[,] Sarah Palin's political action committee circulated[6] a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

SUMF ¶ 36.

Cohn reviewed the draft and "wasn't sure if the piece worked," in part because she found it unclear whether the piece was focused on gun control or "about the political climate and the sort of lack of civility in America's political discourse."  SUMF ¶ 47.  She added questions to the draft and, around 6:00 p.m. that day, handed it off to Bennet for further revision.  SUMF ¶ 49.

Bennet, who was ultimately responsible for the content of such editorials, agreed that the draft needed substantial revision.  SUMF ¶ 51.  As the Editorial related to breaking news and the deadline for publication in the next morning's print edition was less than three hours away, he

---

[6] In her draft, Williamson inserted at the word "circulated" a hyperlink to a package of on-line news reports published by ABC.  SUMF ¶ 37.  The lead report, published in January 2011 shortly after the Arizona shooting, is titled "Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate."  *Id*.  It observed that "[n]o connection has been made between [the Crosshairs Map] and the Arizona shooting."  *Id.*  The hyperlink also appeared in the Editorial as originally published on line.

began revising it himself. SUMF ¶¶ 52, 53. In addition to other changes not relevant here, Bennet revised the above-quoted paragraph from Williamson's draft and added a further paragraph, as follows:

> Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

SUMF ¶ 74. Bennet testified that he used the word "incitement" in a broad sense, to "talk about a range of communications" "that contributed to intensifying and raising the temperature of the political debate," – that is "very, very, strong language that describes the person on the other side of the debate as an enemy." SUMF ¶ 61. And with respect to his use of the words "link" and "direct," Bennet was referring to the fact that Giffords' name and district appeared on the Crosshairs Map, not that a direct causal link existed between the Map and Loughner's actions. SUMF ¶ 93.

Meanwhile, Cohn and another colleague worked on fact-checking the draft, including the specific details of gun laws cited in the draft, because Cohn knew from her experience that such laws were "ornate and detailed and different in all the states." SUMF ¶¶ 64, 65.

### C. The Editorial

That evening, The Times published on its website the Editorial now at issue, with the headline "America's Lethal Politics," which also was included in the print edition of the newspaper for distribution the next morning. SUMF ¶ 73. The content of the Editorial speaks

for itself, but the relevant portions may be summarized as follows:  First, the Editorial described

the Scalise shooting, referenced another mass shooting that took place in San Francisco the same

day, and observed that "[a]n American would once have been horrified and shocked by such

savagery.  An American today would be right to be horrified – and not very surprised."  SUMF ¶

73.

The Editorial then bemoaned "a sickeningly familiar pattern . . . emerging in the

[Virginia] assault," noting that Hodgkinson was a Bernie Sanders supporter "virulently opposed

to President Trump" who had posted harsh messages on social media.  SUMF ¶ 73.  The

passages challenged by Palin, as set forth in the two above-quoted paragraphs, followed.

The Editorial then moved on to its main thesis:  "Was this attack evidence of how readily

available guns and ammunition are in the United States?  Indisputably."  *Id*.  It posited that

Hodgkinson should not have been able to, but easily did, obtain the weaponry used in the attack,

discussed the reaction of gun control opponents to it, forecast an America in which virtually

everyone carries a gun, and noted the policy choices facing President Trump and all Americans

with respect to gun control.  *Id.*

That same evening, The Times published a series of news reports about the shootings,

one of which – posted shortly *after* the Editorial – similarly revisited the Arizona attack that had

injured Giffords.  SUMF ¶ 77.  In describing the controversy surrounding that tragedy, the news

article noted that Palin had "dr[awn] sharp criticism" following publication of the Crosshairs

Map, "though no connection to the crime was established."  *Id*.  Bennet had not read this article

or any draft of it prior to publication of the Editorial.  SUMF ¶ 78.

### D.      Criticism Of The Editorial And The Times's Response

Following publication of the Editorial online, Ross Douthat, an opinion columnist,

brought to Bennet's attention by email around 10:00 p.m. that evening questions about what he

understood the Editorial to be suggesting, explaining that he understood that there was "no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else, given his extreme mental illness and lack of any tangible connection to that crosshair map." SUMF ¶¶ 79-81.

Bennet responded by email a few minutes later:

> Thanks, and I'll look into this tomorrow. But my understanding [is] that in the Giffords case there was a gun sight superimposed over her district; so far in this case we don't know of any direct threat against any of the congressman on the field. That's not to say that any of it is ok, obviously, or that the violence in either case was caused by the political rhetoric. But the incitement in this case seems, so far, to be less specific.

SUMF ¶ 81. Douthat in turn replied by email, explaining his concern about the Editorial as he had understood it:

> The targets were used by Palin, or her group, in a map of seats targeted for pickup in the midterms. You can argue about whether that crosses a line … but the point is that the map had no link, none at all, to Giffords' actual murder. People assumed a link initially … but the investigation debunked it. I think Loughner was instigated by a non-answer she'd given him at a town hall about one of his theories of grammar, or his obsession with lucid dreaming, or something. His act had nothing to do with the political climate, so far as anyone can tell. Whereas the Alexandria shooter seems to have had an explicit political motivation. So saying that Giffords was a case of incitement and this one isn't reads like we're downplaying that motive or implying that Loughner had right-wing motivations that he simply didn't have."

SUMF ¶ 82. And Douthat subsequently pointed out to Bennet Tweets by readers that suggested others were misinterpreting the Editorial as well. SUMF ¶¶ 80.

The testimonial and documentary evidence demonstrates without dispute that no one involved in the preparation of the Editorial had intended to convey the proposition inferred by Douthat and some other readers. Bennet testified that, in using the word "incitement," he was referring to "the danger that we're increasingly treating political opponents like enemies [in] a conflict." SUMF ¶ 83. And the "direct" connection or "link" that Bennet intended to posit was between the particular piece of political rhetoric at issue in the earlier shooting (the Crosshairs

9

Case 1:17-cv-04853-JSR Document 54 09/19/2022 838472f5 Filed 06/19/2019 Page 15 of 31
Case 22-558, Document 54, 09/19/2022, 838472f5, Page252 of 295

Map) and one of the victims (Giffords), not a direct causal link between the Map and Loughner's decision to fire shots. SUMF ¶ 93. Cohn understood the challenged passage to be a discussion of "the kind of heated political rhetoric against which all these sorts of violent activities were happening," not a suggestion "that the map led [Loughner] to commit the shooting." SUMF ¶ 83 ("I certainly didn't mean someone was giving, like, orders or saying go shoot someone or go commit a violent act, but just that the rhetoric was ugly enough that it would boil up and foster people to take things into their own hands."). And Williamson, who had used the phrase "political rhetoric" in her original draft, explained she was referring to "a general overheated back-and-forth political climate." *Id.*

In response to Douthat's late-night email alerting him to the fact that readers were interpreting the Editorial as alleging the existence of a direct causal link between the Crosshairs Map and Loughner's attack, Bennet immediately sent a message to Williamson to see if she was available to begin investigating and, early the next morning, Bennet emailed several people who had worked on the Editorial to request their help. SUMF ¶¶ 99-102. Bennet, who had not intended to suggest such a direct causal link and therefore had not considered while writing the sentences challenged by Palin whether such a link between the Map and Loughner's actions had been established, explained in writing to his colleagues that morning by email that he was *unsure* whether a direct connection between Loughner and the Crosshairs Map had been proven or disproven and he asked that Lepping "get to the bottom of this as quickly as possible." SUMF ¶ 101. Both Lepping and Williamson promptly began looking into this question. *Id.* Ultimately, they determined that multiple news outlets, including The Times, had reported that Loughner was mentally unstable and appeared to have developed animosity toward Giffords prior to SarahPAC's publication of the Map, but that it had never been affirmatively proven or disproven

whether Loughner was familiar with or inspired by the Crosshairs Map.  SUMF ¶ 104.

### E.   The Times Corrects The Editorial

As a result of Lepping's and Lett's research, The Times promptly revised the online

version of the Editorial to remove the words that had caused readers to draw the unintended

inference of an assertion that the Crosshairs Map was a direct cause of the Loughner shooting,

and also to make clear that, on the Map, the crosshair symbol appeared over Giffords' district,

not over her name or image.  SUMF ¶ 105.  The final version reads:

> An editorial on Thursday about the shooting of Representative Steve Scalise
> incorrectly stated that a link existed between political rhetoric and the 2011
> shooting of Representative Gabby Giffords.  In fact, no such link was
> established.  The editorial also incorrectly described a map distributed by a
> political action committee before that shooting.  It depicted electoral districts,
> not individual Democratic lawmakers, beneath stylized cross hairs.

SUMF ¶ 109.  On social media, The Times disseminated a statement saying, "We got an

important fact wrong, incorrectly linking political incitement and the 2011 shooting of Giffords.

No link was ever established.  We're sorry about this and we appreciate that our readers called us

on the mistake."  SUMF ¶ 111.

### F.   This Litigation

Palin filed suit on June 27, 2017.  Dkt. 1.   On August 29, 2017, following argument on

The Times's motion pursuant to Rule 12(b)(6), this Court dismissed this action, ruling that Palin

had not adequately pleaded actual malice.  Dkt. 45 at 1.  On September 25, 2017, Palin moved

for reconsideration, proffering a proposed amended complaint, Dkt. 54-1.  This Court

subsequently denied the motion for reconsideration, Dkt. 61, and Palin appealed.  The Court of

Appeals reversed and remanded for further proceedings.  Palin filed her Amended Complaint on

December 30, 2019.  Dkt. 70.  The parties have since completed all relevant discovery.  Pursuant

to the Court's Civil Case Management Plan, Dkt. 90 at 2, Defendants timely gave notice of their

intent to file this motion for summary judgment, Dkt. 94, and now timely file their motion.

## ARGUMENT

"Freedoms of expression require 'breathing space.'" *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 772 (1986) (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 272 (1964)). Errors, while certainly regrettable, are also "nevertheless inevitable in free debate." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974). Consistent with these principles, the First Amendment requires public-figure defamation plaintiffs, including Palin, to prove, by clear and convincing evidence, that the publisher made the challenged statements with "actual malice." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 659 (1989). The New York and Alaska state constitutions, both of which extend broader protection to speech than that required by the federal constitution, also impose the same burden on Palin as a matter of state law. *See 600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 138 (1992); *Mickens v. Kodiak*, 640 P.2d 818, 820 (Alaska 1982). And, if Alaskan law applies, Palin likewise is required to prove actual malice as a matter of state common law because the statements at issue involve a matter of public interest. *See Olivit v. City & Borough of Juneau*, 171 P.3d 1137, 1143 (Alaska 2007); *Pearson v. Fairbanks Publ'g Co.*, 413 P.2d 711, 713-714 (Alaska 1966).

"Actual malice" is a term of art. It means that a plaintiff must present clear and convincing evidence that the defendant published false information about plaintiff "with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 280. As this Court has recognized, "proving actual malice is a heavy burden." *Dunlop-McCullen v. Rogers*, No. 00 Civ. 3274 (JSR) (JCF), 2002 U.S. Dist. LEXIS 3202, at *20 (S.D.N.Y. Feb. 21, 2002). It is not enough to show that the defendant was negligent in publishing; a plaintiff must "demonstrate that the author in fact entertained serious doubts as to the truth of his publication, or acted with a high degree of awareness of probable falsity."

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (internal marks and citations omitted). The question is *not* whether "a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 730-31 (1968). Indeed, even an "extreme departure from professional standards . . . cannot provide a sufficient basis for finding actual malice." *Harte-Hanks*, 491 U.S. at 665. In other words, a defendant can only be held liable in a public figure-plaintiff defamation case for "calculated falsehood[s]." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964).

Summary judgment must be granted when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002). After the moving party meets its initial burden of demonstrating "the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), "the opposing party must come forward with specific facts showing that there is a genuine issue for trial by a showing sufficient to establish the existence of every element essential to that party's case, and on which that party will bear the burden of proof at trial," *Dunlop-McCullen*, 2002 U.S. Dist. LEXIS 3202, at *16-17 (internal marks and citations omitted). The party opposing summary judgment must demonstrate to the court that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986), and summary judgment should be granted "where the nonmovant's evidence is conclusory, speculative, or not significantly probative," *Dunlop-McCullen*, at *17; *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (party opposing summary

judgment cannot rely only on argument that movant's witnesses are not credible).  There is no

genuine factual dispute "when the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party."  *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic*

*Dist. Comm'n*, 768 F.3d 183, 192 (2d Cir. 2014) (internal quotation marks omitted).

      Whether the record in this case would support a finding of actual malice is a question of

law.  *Harte-Hanks*, 491 U.S. at 685; *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485,

511 (1984).  And, to defeat this motion, Palin is required to come forward now with sufficient

evidence "such that a reasonable jury might find that actual malice had been shown *with*

*convincing clarity*."  *Anderson*, 477 U.S. at 257 (emphasis added).  Despite the completion of

extensive discovery, Palin cannot meet her burden here for at least two separate reasons:  The

undisputed evidence establishes that Bennet lacked awareness at the time of publication that his

words might convey the defamatory meaning Palin alleges, and in any event, he did not know

such a meaning would be false.

**I.**    **PALIN CANNOT DEMONSTRATE THAT BENNET WAS AWARE BEFORE
PUBLICATION THAT THE EDITORIAL COULD BE READ TO ALLEGE
THAT THE CROSSHAIRS MAP CAUSED THE LOUGHNER SHOOTING AND
THAT PALIN WAS PERSONALLY RESPONSIBLE FOR IT.**

      Palin is unable to show – by the required clear and convincing evidence – that, at the time

of publication, Bennet was aware of the defamatory meaning that she alleges the Editorial

conveys – namely, that "Palin was clearly and directly responsible for inciting a mass shooting at

a political event in January 2011" by having circulated the Crosshairs Map.  Am. Compl. ¶ 1.  As

a matter of law, therefore, Palin cannot meet her burden of proving that the statements at issue

were published with actual malice.[7]

More specifically, as noted above, the actual malice standard "requires the plaintiff to demonstrate with clear and convincing evidence that the defendant *realized* that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose*, 466 U.S. at 511 n.30 (emphasis added); *accord Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988). It necessarily follows that the actual malice standard is not met where a defendant was unaware of the defamatory meaning his or her words conveyed. As Judge Sack has aptly put it: "A person who believes and intends to say one thing is not lying, and is therefore not guilty of 'actual malice,' merely because he or she chooses the wrong language to say it or because those who hear the statement reasonably believe it to mean something different." Hon. Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 5:5.1[B] (5th ed. 2017).

"The purpose of the awareness element is to ensure that liability is not imposed upon a defendant who acted without fault. This must hold true regardless of whether the defendant's statement is directly or indirectly libelous." *Masson v. New Yorker Magazine, Inc.*, 832 F. Supp. 1350, 1361-63 (N.D. Cal. 1993), *aff'd on other grounds*, 85 F.3d 1394 (9th Cir. 1996). Courts have warned against exposing defendants to liability "not only for what was not said but also for what was not intended to be said" because such a result would "eviscerate[] the First Amendment protections established by *New York Times*." *Newton v. Nat'l. Broad. Co.*, 930 F.2d 662, 681 (9th Cir. 1990); *see Bose*, 466 U.S. at 513 (observing that writer's "choice of . . .

---

[7] This first prong of this motion, that Bennet lacked awareness of any defamatory meaning and therefore could not have published the challenged sentences with actual malice, was not raised previously precisely because it depends on evidence beyond the four corners of the pleadings, and neither this Court nor the Court of Appeals has had occasion to consider this argument.

language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella," and rejecting rule under which "any individual using a malapropism might be liable, simply because an intelligent speaker would have to know that the term was inaccurate in context, even though he did not realize his folly at the time"); *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1064 (9th Cir. 1998) (reaffirming that defendant "must have actually intended to convey the defamatory impression," and noting that "there is no actual malice where journalists unknowingly mislead the public" (internal quotations marks omitted)); *Woods v. Evansville Press Co.*, 791 F.2d 480, 487 (7th Cir. 1986) ("Simply because a statement reasonably can be read to contain a defamatory inference does not mean . . . . that the publisher of the statement either intended the statement to contain such a defamatory implication or even knew that readers could reasonably interpret the statement to contain the defamatory implication.").

This principle squarely applies even where the court believes it would have been better to use different language or finds the implication from the statement at issue "clear and inescapable." *Newton*, 930 F.2d at 681; *see Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 463 (Ind. 1999) ("use of an inaccurate word as a result of a misconception or poor interpretation is not actual malice"); *Hodges v. State Journal Publ'g Co.,* 1980 OK 102, ¶ 25, 617 P.2d 191, 196 ("where there was no evidence that the publisher intended or was aware of a potentially defamatory meaning of an article, which meaning was admittedly at variance with the known truth, 'malice' as required by *New York Times* . . . could not be inferred"); *Tilton v. Cowles Publ'g Co.*, 76 Wash. 2d 707, 725 (1969) (reversing with instructions to enter judgment for defendant because plaintiff had failed to "prove with convincing clarity that defendant was aware of a high probability that the public would read the article as reporting a criminal charge,

JA 1414

Case 22-558, Document 54, 09/19/2022, 3384752, Page 22 of 31
Case 1:17-cv-04853-JSR Document 494 Filed 06/19/2019 Page 22 of 31

or at least that defendant entertained serious doubts on this matter," when report concerned civil matter).   And the principle also squarely applies even where, as here, the writer is an "intelligent speaker," *Bose*, 466 U.S. at 513, or professional journalist, *Newton*, 930 F.2d at 681.

Here, the undisputed evidence demonstrates that Bennet did not intend to allege that circulation of the Crosshairs Map caused the Loughner Shooting, much less that Palin herself personally was responsible for that Map, and that he was caught entirely by surprise when he learned, after publication, that some readers had drawn such inferences from the language he used to convey his intended meaning.  More specifically:

**Bennet's Intended Meaning:**  Bennet testified that his aim in the Editorial was "to express concern about the state of political rhetoric in the country of political incitement, the danger that we're increasingly treating political opponents like enemies in a conflict."  SUMF ¶ 90.  He worried that "the overall climate of political incitement . . . gives permission, to some degree, for violence against elected officials."  SUMF ¶¶ 91-92 (agreeing that one idea he was attempting to advance "was that overheated political rhetoric can create a climate *conducive* to violent acts") (emphasis added).  Other witnesses involved in editing and drafting the Editorial also testified that this was their aim.  As Williamson put it, she viewed the Editorial as talking about the "general overheated back-and-forth political climate."  SUMF ¶ 83.  Cohn similarly said that she read the Editorial as saying that the "rhetoric was ugly enough that it would boil up and foster people to take things into their own hands."  *Id*.

**Bennet's Reference to the Map:**  Bennet explained that he was not "trying to say that any particular piece of political incitement causes a maniac like Jared Lee Loughner to take up arms and shoot at elected representatives," nor that Palin was responsible for this particular piece of political incitement.  SUMF ¶ 85-88 (noting that readers thought The Times was "accusing

Case 1:17-cv-04853-JSR   Document 54   Filed 06/19/2019   Page 23 of 31
Case 22-558, Document 54, 09/19/2022, 3384732, Page260 of 295

Governor Palin of complicity in this shooting, which . . . I also didn't remotely intend. . . . Really, we didn't mean to communicate that, so I was very concerned to see that that was one of the inferences that people had drawn from what I had written.").  Instead he mentioned the Map circulated by SarahPAC as "an example of the kind of political incitement that contributes to this atmosphere" and one which had mentioned by name a person who ultimately was a victim of the Loughner Shooting.  SUMF ¶ 93.  By contrast, while the Editorial "criticiz[ed] the left for creating an atmosphere of incitement" in advance of the Scalise Shooting, Bennet was not aware of a specific, concrete example of such rhetoric "that connected the victims [of the Scalise Shooting] to that atmosphere."  SUMF ¶ 94.  Therefore, the "link" between inflammatory rhetoric and the Loughner Shooting was more "clear."  As Bennet notes, this was the question asked at the very beginning of the Editorial – was the Scalise Shooting "evidence of how vicious American politics has become?" – which was answered, due to this precise uncertainty, "probably."  SUMF ¶ 95.

**Bennet's Choice of Words:**  When he rewrote Williamson's draft of the Editorial, quickly and on deadline to discuss a breaking news event, Bennet worried that phrases like "incendiary" or "inflammatory rhetoric" had been "drained of [their] power because [they are] used so often."  SUMF ¶ 56.  He was searching for "a very strong word to write about the political climate," a word that that was not used every day, as a way to draw readers' attention to the particular horror of the Scalise shooting and so chose "political incitement"  SUMF ¶ 58-59.

In this regard, Bennet brought to his writing that day "a very specific history and experience with the term" he adopted, "incitement" – language like that in Israel which preceded the assassination of Israeli Prime Minister Yitzhak Rabin.  SUMF ¶¶ 57-58 It was his worry that "some of what I saw there could happen here."  SUMF ¶ 60.  He said that, when he reported

from Jerusalem for The Times, the word "incitement" was used broadly to "talk about a range of communications" "that contributed to intensifying and raising the temperature of the political debate," that is "very, very, strong language that describes the person on the other side of the debate as an enemy."   SUMF ¶ 61.  This ranged from "deliberate orders, invocations, summonses for people to carry out violent attacks" to more subtle contributions to the poisonous atmosphere between the groups, like "maps that misrepresent the politics of the region."  SUMF ¶ 62.  Notably, he had written about such incitement at that time, discussing a meeting of a joint Israeli-Palestinian "committee on 'prevention of incitement,' which [was] focusing on messages in the schools and news media encouraging violence."  SUMF ¶ 63.  While he recognized that "some people" can interpret incitement to mean a "call to violence," put simply "[t]hat was not the way [he was] using it in the editorial."  SUMF ¶ 89.[8]

Bennet's and his colleagues' testimony in this regard is not only unrebutted, but contemporaneous documents produced in discovery directly corroborate Bennet's testimony regarding the more general point that he intended to make and thought, prior to publication, that his words were conveying.  As Bennet explained in an email to his colleague Douthat minutes after Douthat first raised with him a question about the Editorial's meaning that very evening:

> [M]y understanding [is] that in the Giffords case there was a gun sight superimposed over her district; so far in this case we don't know of any direct threat against any of the congressman on the field.  That's not to say that any of it is ok, obviously, or that the violence in either case was caused by the political rhetoric.  But the incitement in this case seems, so far, to be less specific.

---

[8] Bennet is neither alone nor the first to have used "incitement" in this sense.  See, e.g., J. Rudoren, "Israeli Official Points to 'Incitement' by Palestinians," N.Y.Times (Jan. 6. 2014) (available at https://www.nytimes.com/2014/01/07/world/middleeast/israeli-official-points-to-incitements-by-palestinians.html?searchResultPosition=3); H. Cooper, "China Accuses U.S. and Japan of Incitement," N.Y. Times (May 31, 2014) (available at https://www.nytimes.com /2014/06/01/ world/asia/china-accuses-us-and-japan-of-sowing-discord-in-asia-pacific.html ?searchResultPosition=24).

SUMF ¶ 81.  Indeed, during the planning of the Editorial earlier that day, Bennet had asked his team to determine *whether* the Editorial Board had ever written "anything connecting [] the Giffords shooting to some kind of incitement."  SUMF ¶ 29.  Immediately after publication of the Editorial and in light of the misinterpretation of it, Bennet reiterated this query in his written communications with others.  SUMF ¶ 102.[9]

Bennet has admitted that he "did a very poor job . . . of trying to express" his intended thought and "created an inference for readers that there was a causal link between political incitement and the shooting of Gabby Giffords."  SUMF ¶ 84.  But the fact that his writing was unclear does not mean that Bennet intentionally lied in the Editorial.  *See Garrison*, 379 U.S. at 75 (requiring proof of "calculated falsehood" to demonstrate actual malice).  To defeat this motion for summary judgment, Palin must point to clear and convincing evidence from which a reasonable jury could find that Bennet was aware and therefore intended that readers would understand the challenged sentences in the Editorial to be an allegation that the Crosshairs Map directly caused Loughner to shoot his victims and that Palin personally was responsible for that Map.  There is no such clear and convincing evidence and Palin's defamation claim therefore fails as a matter of law.

## II.  PALIN CANNOT DEMONSTRATE THAT AT THE TIME OF PUBLICATION BENNET KNEW OR WAS RECKLESS AS TO WHETHER IT WOULD BE FALSE TO ASSERT A DIRECT CAUSAL LINK BETWEEN THE CROSSHAIRS MAP AND THE LOUGHNER SHOOTING.

Even assuming, *arguendo*, that Bennet was aware and therefore intended that readers would understand the Editorial as an allegation that the Crosshairs Map caused the Loughner

---

[9] Bennet similarly did not intend to suggest that the Crosshairs Map had included "actual photographs of these representatives . . .put under the crosshairs," as opposed to over their districts, SUMF ¶ 96, though some readers apparently read it that way despite the fact that the Editorial specifically referred to it as "a map of targeted electoral districts."  SUMF ¶ 73.

Shooting and that Palin personally was responsible for the Map (which the unrebutted evidence demonstrates he was not), Palin nevertheless is unable to point to clear and convincing evidence that Bennet, when he published the Editorial, knew or was reckless regarding whether it would be false to assert such a direct causal link between the Crosshairs Map and the Loughner Shooting. Specifically, Bennet, the author of the disputed portion of the Editorial, has testified unambiguously that he did not know then, and does not know now, whether or not Loughner was aware of the Crosshairs Map at the time he committed the shooting. *See* SUMF ¶ 86. Palin therefore is unable to prove actual malice for this second, independent reason, and her Amended Complaint should be dismissed on this ground as well.

In her Amended Complaint, the proffered version of which was before the Court of Appeals when it ruled on The Times's 12(b)(6) motion, Palin speculatively pleads numerous categories of "facts" purportedly constituting proof that Bennet "must" have known it was false to suggest such a causal link. However, Palin herself testified that, at the time the Editorial was published, "reasonable people could have interpreted either way" whether there was a "connection between the crosshairs map and Jared Loughner's motivation." SUMF ¶ 154 ("I guess it's tough for me to judge whether the public believed that there was a consensus out there as to motivation of Jared."). This admission by Palin prevents her from establishing that Bennet "must have known" it was false to suggest such a connection between the Map and the Shooting. But even beyond Palin's own concession, there simply is *no* evidence to support many of her conclusory allegations, and those allegations that do have some factual support fall far short of constituting clear and convincing evidence of knowing falsity or reckless disregard for truth.

The first set of allegations that the Court of Appeals held sufficiently plausible, if proven, to support a finding of actual malice involved "the editorial positions Bennet held at The Atlantic

and The New York Times." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 813 (2d Cir. 2019). Specifically, the panel credited Palin's allegations that, as editor in chief of *The Atlantic* magazine, Bennet must have "reviewed, edited and approved the publication of numerous articles [that] confirmed there was no link between Mrs. Palin and Loughner's shooting," focusing in particular on an article titled "Ten Days That Defined 2011." *See id.* at 813-14. While The Times and the Court were required to accept the truth of these allegations in connection with its 12(b)(6) motion, the allegations are, quite simply, wholly unsupported by the evidence.

**Bennet's Alleged Knowledge of the Supposed Consensus:** Bennet consistently and without contradiction has testified that he does not recall reading and was not at the time of publication of the Editorial aware of having read any of the articles cited by Palin that purportedly demonstrate a consensus that the Loughner Shooting was not in any way caused by the Crosshairs Map. *See* SUMF ¶ 140.

**Bennet's Alleged Role in the "*Atlantic* Articles":** Contrary to Palin's allegations, the undisputed evidence establishes that Bennet was *not* in fact the editor responsible for the articles in question, and Palin's contention that Bennet "must" have reviewed them and known their content has no basis in fact. Many of the "articles" cited by Palin were not articles at all, but posts in *The Dish*, a blog controlled and edited by Andrew Sullivan hosted on the same website as *The Atlantic* magazine at the time the Loughner Shooting occurred. SUMF ¶¶ 118, 120, 122, 125. Sullivan and his staff made over 1,400 individual posts to *The Dish* in that month alone. SUMF ¶ 117. Sullivan testified without contradiction that he had complete editorial independence in running *The Dish* and that no one, including Bennet, reviewed or edited his blog posts before publication. SUMF ¶¶ 114-115. Bennet so testified as well. *Id.* Asked what role

Case 22-558, Document 54, 09/19/2022, 3384752, Page265 of 295
Case 1:17-cv-04853-JSR Document 54 Filed 06/19/2019 Page 28 of 31

**JA 1420**

Bennet had played in *The Dish*, Sullivan responded, "[n]one whatsoever."  SUMF ¶ 116.

Similarly, the piece "Ten Days That Defined 2011," on which Palin and therefore the Court of Appeals placed heavy emphasis, was a blog post by *The Atlantic Wire*, not *The Atlantic* magazine.  SUMF ¶ 129.  Palin cited other pieces published in *The Atlantic Wire* as well.  SUMF ¶ 130-132.  The *Atlantic Wire* was a "sister site" run by a separate editor, Gabriel Snyder, that primarily acted as a news aggregation hub.  SUMF ¶ 128.   Another "article" on which Palin premised her allegations was a post on the site of the *National Journal*, and Bennet did not edit the content of that separate publication.  SUMF ¶ 135-136.

**Bennet's Alleged Knowledge of the Times' Articles Cited By Palin:**  Each of the persons involved in the drafting of the Editorial testified that they have no recollection of editing, drafting, or even reading the pieces from *The Times* that Palin contends would have demonstrated to them that it would be false to suggest a causal link between the Crosshairs Map and the Loughner Shooting.  SUMF ¶ 139.  As Cohn testified, she has "edited hundreds of op-ed columns."  SUMF ¶ 139.

**Bennet's Purported Personal Connections:**  Palin also alleged that "Bennet in particular was more likely than the average editor-in-chief to know the truth about the Loughner shooting because he had reason to be personally hostile toward Palin, her political party, and her pro-gun stance," including because Bennet's brother is a Senator from Colorado who was endorsed by House members whose districts had been targeted by the Crosshairs Map, that a man had threatened to attack Sen. Bennet's offices in the days before the Loughner Shooting, that both Bennets had become advocates for gun control, and that Palin had endorsed Sen. Bennet's opponent.  *See Palin*, 940 F.3d at 814.  As this Court previously noted, "[i]f such political opposition counted as evidence of actual malice, the protections imposed by *Sullivan*

and its progeny would swiftly become a nullity." *Palin*, 264 F. Supp. 3d at 538; *see Harte-Hanks*, 491 U.S. at 665 (ruling that newspaper's desire to "promote an opponent's candidacy . . . cannot provide a sufficient basis for finding actual malice").  And in any event, Bennet testified that he does not recall speaking with his brother about the threat to his office.  SUMF ¶ 142. Bennet similarly does not recall that Senator Bennet had given a floor speech about gun violence, SUMF ¶ 143, and was unaware that Palin had endorsed his brother's opponent in 2016, that the Crosshairs Map had included among targeted districts two lawmakers who had endorsed his brother, or that Giffords' PAC had endorsed Senator Bennet.  SUMF ¶¶ 144-145.  Significantly, in response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother regarding any of these topics.  SUMF ¶ 148.

**Bennet's Alleged Feelings Toward Palin and Conservative Politics:**  Finally, there is also no evidence to support the contention that Bennet included a reference to Palin's name out of personal animosity toward her more broadly.  *See* Am. Compl. ¶¶ 45-52.  To the extent Palin contends Bennet was motivated by political, rather than personal disagreements, *see id.*, testimonial and documentary evidence demonstrates without contradiction that Bennet attempted to broaden the range of political views in the Opinion section, in particular by including more conservative voices.  SUMF ¶ 153.  Nor is there any evidence to suggest that Palin's name was included to attract subscribers or drive advertising revenue, particularly given that the single reference to her name occurs in the fifth paragraph of a lengthy Editorial and is not part of the headline, the lede, or any accompanying photo or graphic.  *See* Am. Compl. ¶¶ 6, 11.  Moreover, as noted, even if there were any evidence of personal ill-will, political disagreement, or an economic motive for publication of the Editorial, none of these factors are a sufficient basis for a finding of actual malice.  *Harte-Hanks*, 491 U.S. at 665-66.

Case 22-558, Document 54, 09/19/2022, 3384752, Page267 of 295
Case 1:17-cv-04853-JSR Document 91 Filed 06/19/20 Page 30 of 31

**JA 1422**

**Bennet's Alleged Knowledge of the Contents of the Hyperlinked Articles:** Palin alleges that Bennet either did or should have clicked on the hyperlink embedded under the word "circulated" in Williamson's draft and that, had he done so, he would have been taken to an article that purportedly proved that there was no link between the Crosshairs Map and the Loughner Shooting, and that his failure to have done so is evidence he "willfully disregarded the truth." *See Palin*, 940 F.3d at 815. But Bennet has twice testified that he did not click on the hyperlink that Williamson had included in her initial draft and has no memory of having seen the linked ABC articles on June 14, 2017. SUMF ¶ 69. Bennet had less than three hours to substantially rewrite the Editorial. SUMF ¶ 54. He explained that he did not click the link because he was "on a tight deadline," and viewed his role as editing the Editorial, not reporting it. SUMF ¶ 71. Moreover, as discussed above, Bennet has testified unequivocally that he was not intending to suggest any sort of direct causal link between the Crosshairs Map and the Loughner Shooting and that he did not know whether such a link existed at the time he wrote the Editorial. Simply put, Bennet cannot be said to have willfully avoided the truth about a statement he was not even aware he was making.

Palin therefore is unable to meet her burden of offering clear and convincing evidence that Defendants published a statement suggesting a direct causal link between the Crosshairs Map and the Loughner Shooting either knowing that such a suggestion was false, or with reckless disregard for whether it was false, and defendants are entitled to summary judgment.

## CONCLUSION

For each of the foregoing independent reasons, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss the Amended Complaint.

Dated:  New York, New York               Respectfully submitted,
      June 19, 2020

                                    BALLARD SPAHR LLP

By:  */s/ Jay Ward Brown*
 Jay Ward Brown
 David L. Axelrod
 Thomas B. Sullivan
 Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com
*Counsel for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SARAH PALIN, an individual,

               Plaintiff,

  – against –

THE NEW YORK TIMES COMPANY,
a New York corporation, and JAMES
BENNET, an individual,

               Defendant.

No. 17 Civ. 4853

Hon. Jed S. Rakoff

ECF Case

---

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone: (813) 443-2199
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY 10017
Telephone: (212) 907-7300
Facsimile: (212) 754-0330
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

# **TABLE OF CONTENTS**

Table of Contents .................................................................................................. i

Table of Authorities ............................................................................................. ii

I.      Introduction .............................................................................................. 1

II.     *Stare Decisis* Does Not Mandate Continued Adherence to the Actual
        Malice Rule .............................................................................................. 6

III.    Precedent Establishing the Actual Malice Rule Should be Overruled ........... 8

IV.     The Actual Malice Rule Arose from Distinguishable Facts and Should Not
        Be Applied ............................................................................................... 13

Certificate of Service ........................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*American Civil Liberties Union v. Reno*, 929 F.Supp. 824 (E.D. Pa. 1996), judgment aff'd, 521 U.S. 844 (1997) .................................................................... 2

*Bank of Or. v. Indep. News, Inc.*, 670 P.2d 616 (Or. Ct. App. 1983) ......................... 17

*Blankenship v. Manchin*, 471 F.3d 523 (4th Cir. 2006) ............................................. 17

*Blum v. State*, 255 A.D.2d 878 (N.Y. App. Div. 1998) .............................................. 17

*Bostock v. Clayton County, Georgia*, 2020 WL 3146686 (2020) ......................... 9, 10

*Burnett v. Coronado Oil & Gas Co.*, 285 U.S. 393 (1932) ......................................... 7

*Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883) ............................. 11

*Commonwealth of Virginia v. Rives*, 100 U.S. 313, 25 L.Ed. 667 (1880) ................ 11

*Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967) .................................. 5, 6, 7, 12, 13, 14, 15, 18, 19

*De Jonge v. Oregon*, 299 U.S. 353 (1937) ................................................................ 15

*Dennis v. U.S.*, 341 U.S. 494 (1951) ........................................................................ 13

*Dilworth v. Dudley*, 75 F.3d 307 (7th Cir. 1996) ..................................................... 16

*Drews v. Michelson*, 327 N.W.2d 723 (Wis. Ct. App. 1982) .................................... 17

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) ..................... 7, 9, 20

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ........................ 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 16, 18, 19, 20

*Gilbert v. WNIR 100 FM*, 756 N.E.2d 1263 (Ohio Ct. App. 2001) ........................... 17

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ............... 1

*Henderson v. Van Buren Pub. Sch. Superintendent*, 644 F.2d 885, 6 Med. L. Rptr. 2409 (6th Cir. 1981) ................................................................................ 17

*Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 853 N.E.2d 770 (Ill. App. Ct. 2006) .............................................................................................. 17

*In re Ex Parte Commonwealth of Virginia*, 100 U.S. 339 (1879) ............................. 11

*Jaffree v. Board of Sch. Comm'rs*, 554 F.Supp. 1104 (S.D. Ala. 1983) ...................................... 7

*Jaffree v. Wallace*, 705 F.2d 1526 (11th Cir. 1983) ...................................... 7

*Janus v. American Federation of State, County, and Mun. Employees, Council 31*, 138 S.Ct. 2448 (2018) ...................................... 10

*Kimble v. Marvel Ent., LLC*, 576 U.S. 446 (2015) ...................................... 7

*Kiseau v. Bantz*, 686 N.W.2d 164 (Iowa 2004) ...................................... 17

*Knight first Amendment Institute at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) ...................................... 15

*Lee v. City of Rochester*, 174 Misc. 2d 763 (N.Y. Sup. Ct. 1997) ...................................... 17

*Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6 (1st Cir. 2011) ...................................... 1

*Mahoney v. State*, 236 A.D.2d 37 (N.Y. App. Div. 1997) ...................................... 16

*Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072 (3d Cir. 1985) ...................................... 17

*Mathis v. Cannon*, 573 S.E.2d 376 (Ga. 2002) ...................................... 16

*McKee v. Cosby*, 139 S.Ct. 675 (2019) ...................................... 8, 9, 10, 20

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ...................................... 5, 6, 18, 20

*Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990) ...................................... 17

*NAACP v. Button*, 371 U.S. 415 (1963) ...................................... 8

*New Prime Inc. v. Oliveira*, 586 U.S. ——,139 S.Ct. 532, 202 L.Ed.2d 536 (2019) ...................................... 9

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ...................................... 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 18, 19, 20

*Northern Securities Co. v. U.S.*, 24 S.Ct. 436 (1904) ...................................... 9

*Obsidian Finance Group, LLC v. Cox*, 740 F.3d 1284 (9th Cir. 2014) ...................................... 1, 19

*Orr v. Argus-Press Co.*, 586 F.2d 1108 (6th Cir. 1978) ...................................... 16

*Patterson v. McLean Credit Union*, 491 U.S. 164 (1989) ...................................... 7

*Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82 (Nev. 2002) ...................................... 17

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992) ...................................... 7

*Price v. Time, Inc.*, 416 F.3d 1327 (11th Cir. 2005) ........................................................ 17

*Riddle v. Golden Isle Broad, LLC*, 621 S.E.2d 822 (Ga. Ct. App. 2005) .................................. 17

*Robertson v. Baldwin*, 165 U.S. 275 (1897) ......................................................... 13

*Rodriguez v. Nishiki*, 653 P.2d 1145 (Haw. 1982) .......................................................... 17

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ........................................................... 5

*Sewell v. Trib Publ'ns, Inc.*, 622 S.E.2d 919 (Ga. Ct. App. 2005) ........................................... 17

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ............................................................ 11

*Smith v. Allwright*, 321 U.S. 649 (1944) .......................................................... 7

*Stare Decisis*, 49 Colum. L. Rev. 735 (1949) ......................................................... 7

*State v. Phillips*, 540 P.2d 936 (Utah 1975) ........................................................... 7

*State v. Taylor*, 664 P.2d 439 (Utah 1983) ............................................................ 7

*Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264 (3d Cir. 1980) ........................................... 17

*Swate v. Schiffers*, 957 S.W.2d 70 (Tex. Ct. App. 1998) ................................................... 17

*Terminiello v. Chicago*, 337 U.S. 1 (1949) ......................................................... 15

*Thomas v. Tel. Publ'g Co.*, 929 A.2d 993 (N.H. 2007) ..................................................... 17

*Time, Inc. v. Hill*, 385 U.S. 374 (1967) ............................................................. 6

*Wilson v. Daily Gazette Co.*, 588 S.E.2d 197 (W. Va. 2003) ................................................ 17

*WJLA-TV v. Levin*, 647 S.E.2d 383 (Va. 2002) ........................................................ 17

## OTHER AUTHORITIES

1 Law of Defamation § 1:21 (2d ed.) (Protection of Reputation—Purposes) ............................. 5

2 *Internet Law and Practice* § 24:15 ............................................................ 15

20 Am. Jur. 2d Courts § 125 ......................................................... 7

Aaron Perzanowski, *Relative Access to Corrective Speech: A New Test for Requiring Actual Malice*, 94 Calif. L. Rev. 833 ............................................. 4, 5

# JA 1429

Ann E. O'Connor, *Access to Media All A-Twitter: Revisiting Gertz and the Access to Media Test in the Age of Social Networking*, 63 Fed.Comm. L.J. 507 ............................ 14

California Code of Civil Procedure § 425.16 (California) ........................................ 20

Fla. Stat. § 768.295 (Florida) ............................................................................... 20

Hatherine D. Gotelaere, *Defamation or Discourse?  Rethinking The Public Figure Doctrine on the Internet*, 2 Case W. Reserve J.L. Tech. & Internet 1 (2011) ....................... 4

Jeff Kosseff, *Private or Public? Eliminating the Gertz Defamation Test*, Journal of Law, Technology & Policy [Vol. 2011] ........................................................... 16

Marc A. Franklin, *Suing Media for Liable: A Litigation Study*, 1981 Am. B. Found. Res. J. 795, 801, 829 .......................................................................... 2

Marc A. Franklin, *Winners and Losers and Why: A Study of Defamation Litigation*, 1980 Am. B. Found. Res. J. 455, 471, 489, 498 .................................... 2

Mary-Rose Papandrea, *The Story of New York Times Co. v. Sullivan*, Boston College Law School Legal Studies research Series, May 30, 2012 ........................ 8

Michael L. Rustad, Sanna Kulevska, *Reconceptualizing the Right to Be Forgotten to Enable Transatlantic Data Flow*, 28 Harv. J.L. & Tech. 349 (2015) .............................. 18

Nat Stern, *Unresolved Antithesis of the Limited Public Figure Doctrine*, 33 Hous. L. Rev. 1027 (1996) .............................................................................. 2

Plaintiff, Sarah Palin ("Gov. Palin"), by counsel and pursuant to Federal Rule of Civil Procedure 56, moves for the entry of a partial summary judgment against Defendants, The New York Times Company ("The Times") and James Bennet ("Bennet") (collectively, "Defendants"), holding that Plaintiff is not required to prove the defamatory statements at issue in this case were published with "actual malice."[1]  In support, Gov. Palin states as follows:

## I.    Introduction

Through the lens of the actual malice rule, Sarah Palin's defamation claim against *The Times* and James Bennet is viewed no differently than a claim by someone like Darnella Frazier against an anonymous internet troll.  The rule applies to plaintiffs irrespective of the popularity of their beliefs and shields individual defendants as well as the press.[2]  Unbeknownst to many, an exponentially increasing number of people arguably could be subjected to the rule's "elusive[3]" standard of fault in circumstances beyond contemplation when the rule came into existence.

The actual malice rule was judicially-imposed to solve problems peculiar to a bygone era, long-before the Internet and social media took hold of American society.  Its justifications rest on incorrect and outdated beliefs about assumed risk and access to methods of mass communication which must be used to decide who must suffer the rule's "heavy, often insurmountable[4]"

---

[1] Plaintiff reserves all rights and arguments concerning the actual malice issue, including but not limited to, her right to prove actual malice (if necessary) and oppose Defendants' Motion for Summary Judgment on actual malice by demonstrating a reasonable jury could find the statements at issue in this case were published with actual malice.

[2] *Obsidian Finance Group, LLC v. Cox*, 740 F.3d 1284, 1291 (9th Cir. 2014) ("[T]he First Amendment defamation rules in *Sullivan* and its progeny apply equally to the institutional press and individual speakers") (collecting cases).

[3] *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989).

[4] *Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6, 14 (1st Cir. 2011).

Case 1:17-cv-04853-JSR   Document 136   Filed 06/19/20   Page 8 of 27
Case 22-558, Document 54, 09/19/2022, 3384725, Page276 of 295

burden.[5]  Not surprisingly, the rule's effects have transgressed far afield from its intended purpose; prominent among them self-professed immunity for media companies like *The Times* and the intimidation of plaintiffs with legitimate claims.[6]

It has become clear that the rule is obsolete and unworkable, incapable of consistent application, and holds no footing in the modern speech landscape.  Defamation plaintiffs should not be subjected to its unwarranted burden.  This is not to say the importance of protecting speech from governmental censorship has diminished.  Rather, the foundation of the actual malice rule has eroded as society, technology, and the platforms for free speech evolved.  Gone are the days when a small group of powerful people enjoyed exclusive influence and control over the public debate through unmatched access to a limited means of communication with the American public.  Now, the Internet and social media have given a loud and far-reaching voice to virtually every citizen and empowered them with an equal opportunity to decide what information and ideas flow to and from their fellow citizens and to shape the public debate.

Even as far back as 30 years ago, the Internet's impacts were obvious:  "It is no exaggeration to conclude that the Internet has achieved, and continues to achieve, the most participatory marketplace of mass speech that this country—and indeed the world—has yet seen."  *See American Civil Liberties Union v. Reno*, 929 F.Supp. 824, 881 (E.D. Pa. 1996), *judgment aff'd*, 521 U.S. 844, 851, 853 (1997) ("Anyone with access to the Internet may take

---

[5] "In practice, this requirement poses an insurmountable barrier in all but a relative handful of egregious cases." *See* Nat Stern, *Unresolved Antithesis of the Limited Public Figure Doctrine*, 33 Hous. L. Rev. 1027, 1028 (1996) (*citing* Marc A. Franklin, *Suing Media for Liable: A Litigation Study*, 1981 Am. B. Found. Res. J. 795, 801, 829 (study results demonstrate "trial court decisions overwhelmingly favored defendants"); Marc A. Franklin, *Winners and Losers and Why: A Study of Defamation Litigation*, 1980 Am. B. Found. Res. J. 455, 471, 489, 498 (analyzing a study of defamation decisions and concluding that "the most striking point shown . . . is the plaintiffs' notable lack of success")).

[6] *See* Plaintiff's Statement of Material Facts ("SMF") ¶ 1.

Case 1:17-cv-04853-JSR Document 126 Filed 06/19/20 Page 9 of 27
Case 22-558, Document 54, 08/19/2022, 3384725, Page277 of 295

advantage of a wide variety of communication and retrieval methods…[and]…with a computer connected to the Internet can 'publish' information."). Since then, these impacts have continued to expand.

One need only look to the growing number of movements spawned by ordinary citizens without assistance from the press—Arab Spring, Occupy Wall Street, Black Lives Matter, the Woman's March, March for Our Lives[7]—to see how much free speech has progressed. Most recently, a 17-year-old girl from Minneapolis altered the course of American history by using Facebook to post a video of George Floyd being murdered by police.[8]

The current speech environment is incomparable to what confronted the Supreme Court in the 1960's and 1970's. Then, Martin Luther King Jr. was at the mercy of the press to disseminate his "Letter From Birmingham Jail"—which *The Times* declined to publish.[9] Now, one person with a cell phone has the power to instantly start a worldwide movement without any media assistance. One's ability to be heard by the masses, effectuate change, and criticize the government is no longer dependent upon a centralized group of newspapers, magazines, and broadcasters.

The opportunities, access, and audience available through the Internet were unimaginable when the actual malice rule was created. And when the rule was extended to public figures, no one could have anticipated the extraordinary number of people who use the Internet and social media on a daily basis to inject themselves into and influence the resolution of countless issues and controversies; all of whom arguably may be crossing into "public figure" territory.

---

[7] *See* Plaintiff's SMF ¶ 2.
[8] *See* Plaintiff's SMF ¶ 3.
[9] *See* Plaintiff's SMF ¶ 4.

It is a mistake to instinctively apply the actual malice rule while ignoring the Internet's impacts and the rule's unanticipated potential consequences.[10]   An intellectually honest evaluation of the justifications for the rule in the context of Internet and social media use shows a far greater number of people seemingly fall within the category of speakers that could be deemed to have sacrificed their ability to adequately defend their reputations.[11]  This includes people who engage in speech similar to that of Darnella Frazier[12], Greta Thunberg[13], Parkland students[14], and countless others; presumably unaware doing so could subject them to the same standard Defendants seek to impose on Sarah Palin.

The continued use of the actual malice rule ignores the existing imbalance between the right to protect one's reputation and the need to prevent government suppression of speech.[15] The Internet substantially weakened the free speech side of the rule's required balancing test; while the instantaneous, autonomous access it provides all Americans to free expression[16]

---

[10] "The traditional public figure doctrine, as formulated through Supreme Court jurisprudence, is unable to meet the needs of the Internet.  In an age where virtually anyone can create an online profile and a video can go 'viral' in a matter of hours, it is exceedingly difficult to analyze whether an individual, through his online activity, has voluntarily assumed the public spotlight and accompanying criticism such that he should be subject to the actual malice standard in a defamation suit." *Defamation or Discourse?  Rethinking The Public Figure Doctrine on the Internet*, Hatherine D. Gotelaere, 2 Case W. Reserve J.L. Tech. & Internet 1 (2011).

[11] Actual malice is a "substantial abridgment" of reputational rights and "exacts a correspondingly high price from the victims of defamatory falsehood [as] many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the New York Times test." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342-343 (1974).

[12] *See* FN 8.

[13] *See* Plaintiff's SMF ¶ 5

[14] *See* Plaintiff's SMF ¶ 6

[15] *Gertz*, 418 U.S. at 343 (needs of the press must be balanced against an individual's right to protect their reputation)

[16] "New technologies, most notably the Internet, democratized communication in ways inconceivable to the *Gertz* court…Where traditional media allowed for one-to-many distribution of information, the Internet facilitates many-to-many communication.  On the Internet, for better or worse, each of us can have our say."  Aaron Perzanowski, *Relative Access to Corrective Speech: A New Test for Requiring Actual Malice*, 94 Calif. L. Rev. 833, 834.

(including the dissemination of false information and defamatory speech) tilted the scales even further in favor of protecting human dignity. "The protection of reputation has taken on additional gravity since the development of the Internet. It is now easier to defame another person than at any time in world history, as the Internet makes everyone a potential mass-media publisher." *See* 1 Law of Defamation § 1:21 (2d ed.) (Protection of Reputation—Purposes). This imbalance continues to grow as the number of "private" people potentially exposing themselves to "public figure" status increases and social media permeates the fabric of more people's daily lives.

What this all shows is that the Defendants seek to impose the actual malice standard on Plaintiff in substantially dissimilar circumstances to those present in *New York Times v. Sullivan*, 376 U.S. 254 (1964), *Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967), and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974).[17] The right to protect one's reputation and recover compensation for the permanent harm Internet defamation causes outweighs the outmoded policies from which the actual malice rule arose. Continuing to apply the rule subverts human dignity[18] even though the justifications for doing so have ceased to exist. What's more, as explained in Section IV, the rule poses a substantial risk to free expression because it chills speech and fosters the proliferation of false information.

---

[17] 94 Calif. L. Rev. at 847-848 ("By focusing on the Court's conception of the media during the decade between Sullivan and Gertz, a picture of a doctrine inextricably tied to outdated assumptions emerges.")

[18] "[W]e have regularly acknowledged the 'important social values which underlie the law of defamation,' and recognized that '[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation… 'The right of a man to protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22 (1990) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 86 and 92-93 (1966)).

The historical importance of *Sullivan, Butts*, and *Gertz*, can easily obscure the obligation to question whether they should still apply. But it is wrong to instinctively presume the necessity and appropriateness of the actual malice rule—and potentially subvert the right of basic human dignity—simply because it cured evils that imperiled speech in a bygone era and invoked rousing concepts like our "profound national commitment to the principle of debate on public issues" and the importance of "assur[ing] the unfettered exchange of ideas for the bringing about of political and social changes desired by the people." *Sullivan*, 376 U.S. at 269-70. Indeed, the Supreme Court counseled against such a "blind application" of the rule. *Butts*, 388 U.S. at 148 (citing *Time, Inc. v. Hill*, 385 U.S. 374, 390 (1967)). No one questions the importance of the free speech principles *Sullivan* sought to protect. What must be questioned is a Pavlovian-adherence to the actual malice rule every time the press invokes *Sullivan,* which ignores the Internet's profound impacts on speech, the unfettered access to the marketplace of ideas it provides, and the resulting proliferation of the uninhibited, robust, and wide-open debate *Sullivan* and its progeny sought[19]—but are no longer necessary—to ensure.

Society changed, and with it so must the law. At bare minimum, the actual malice rule should not be applied because the reasons for doing so no longer exist.

## II. *Stare Decisis* Does Not Mandate Continued Adherence to the Actual Malice Rule

The arguments raised herein undoubtedly arouse *stare decisis* reservations. Defendants may try to pigeonhole Plaintiff's arguments as embodying a singular request to ignore binding precedent, but that is not the case.

There is one component of Plaintiff's argument (Section III) that asserts the actual malice rule should be overruled. Plaintiff is not oblivious to the implications of *stare decisis*. Although

---

[19] "The *New York Times-Butts-Gertz* culpability requirements further ensure that debate on public issues remains 'uninhibited, robust, and wide-open." *Milkovich*, 497 U.S. at 20.

there are instances of lower courts refusing to apply binding precedent,[20] the appropriateness of doing so is admittedly suspect[21] (and often depends on the eyes of the beholder or injustice motivating the departure from controlling law).  Notably, Constitutional questions are less susceptible to *stare decisis.*[22]

Independently, Plaintiff contends the actual malice rule is inapplicable because the surrounding context of this case is substantially dissimilar from that presented in *Sullivan*, *Butts*, *Gertz*, and the like.  *Stare decisis* is limited in application to cases involving substantially similar facts.  20 Am. Jur. 2d Courts § 125 ("Under the doctrine of stare decisis, when a court has laid down a principle of law as applying to certain facts, it will adhere to that principle and apply it to

---

[20] *See e.g., Jaffree v. Board of Sch. Comm'rs*, 554 F.Supp. 1104, 1128 (S.D. Ala. 1983); rev'd in part sub nom, *Jaffree v. Wallace*, 705 F.2d 1526 (11th Cir. 1983), cert. denied, 446 U.S. 926 (1984), aff'd 472 U.S. 38 (1985); *State v. Phillips*, 540 P.2d 936, 938 (Utah 1975), *overruled* by *State v. Taylor*, 664 P.2d 439, 448 n.4 (Utah 1983).

[21] *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 764 (1985) (Burger, concurring) (noting "*Gertz*, however, is now the law of the land, and until it is overruled, it must, under the principle of *stare decisis*, be applied by this Court.")

[22] *Kimble v. Marvel Ent., LLC*, 576 U.S. 446 (2015); William O. Douglas, *Stare Decisis*, 49 Colum. L. Rev. 735, 736 (1949) ("A judge looking at a constitutional decision may have compulsions to revere past history and accept what was once written.  But he remembers above all else that it is the Constitution which he swore to support and defend, not the gloss which his predecessors may have put on it."); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 954-55 (1992) (Rehnquist, J., concurring in the judgment in part and dissenting in part) ("Erroneous decisions in such constitutional cases are uniquely durable, because correction through legislative action, save for constitutional amendment, is impossible. It is therefore our duty to reconsider constitutional interpretations that 'depart from a proper understanding' of the Constitution.") (citations omitted); *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989) ("[C]onsiderations of stare decisis have added force in statutory cases because Congress may alter what we have done by amending the statute. In constitutional cases, by contrast, Congress lacks this option, and an incorrect or outdated precedent may be overturned only by our own reconsideration or by constitutional amendment."); *Smith v. Allwright*, 321 U.S. 649, 665 (1944) ("In constitutional questions, where correction depends upon amendment and not upon legislative action this Court throughout its history has freely exercised its power to reexamine the basis of its constitutional decisions."); *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406-07 (1932) (Brandeis, J., dissenting) ("[I]n cases involving the Federal Constitution, where correction through legislative action is practically impossible, this Court has often overruled its earlier decisions.").

all future cases where the facts are substantially the same.").   As explained in Section IV, the factual circumstances justifying application of the actual malice rule are absent today. Plaintiff's challenge to the *application* of the actual malice rule on factual grounds does not rest on the soundness of Supreme Court precedent or implicate *stare decisis* concerns.

## III.    Precedent Establishing the Actual Malice Rule Should be Overruled

The actual malice rule was implemented in response to the government using criminal laws alongside defamation lawsuits by government officials against members of the press to try to stifle the voices of Civil Rights leaders[23] during the Civil Rights movement.[24]   It began as a "policy-driven" means of protecting the "breathing space[25]" necessary for speech critical of the government. *McKee v. Cosby*, 139 S.Ct. 675, 676 (2019) (Thomas, C., concurring).

*Sullivan* and its progeny are understandably celebrated as "great cases," but their popularity is not "the road to salvation for a court of law."   *Gertz* 418 U.S. at 370 (White, J., dissenting).   These decisions seem to embody of the type of well-intended judicial legislation courts are warned to avoid in the face of immediate social ills; less they exceed the defined responsibilities with which courts are charged, ignore the impartial position courts must maintain

---

[23] *See* Mary-Rose Papandrea, *The Story of New York Times Co. v. Sullivan*, Boston College Law School Legal Studies Research Series, May 30, 2012, pp. 2-8.
[24] The 1960's saw, among other things, the 1963 March on Washington,  passage of the Civil Rights Act and "Bloody Sunday" in Selma in 1964, passage of the Voting Rights Act and assassination of Malcolm X in 1965, and the assassination of Martin Luther King Jr. and passage of the Fair Housing Act in 1968.
[25] The genesis for the Supreme Court's "breathing space" concerns was *NAACP v. Button*, 371 U.S. 415, 433 (1963), which involved attempts to oppress minority speech.  At issue was a Virginia statute that infringed the right of the NAACP and its members and lawyers to associate for the purpose of assisting persons who seek legal redress for infringements of their constitutionally guaranteed and other rights.   *Id.* at 428.   The Court struck the statute as unconstitutional because it could "easily become a weapon of oppression, however evenhanded its terms appear…[and]…freeze out of existence all such activity on behalf of the civil rights of Negro citizens."   *Id.* at 435-436.

JA 1438

Case 22-558, Document 54, 09/19/2022, 3394725, Page283 of 295
Case 1:17-cv-04853-JSR   Document 54   Filed 06/19/20   Page 15 of 27

in a democratic society, and lead to rules that cannot be checked and balanced by the other

branches of government.  As Justice Holmes aptly stated:

> Great cases, it is appropriate to remember, like hard cases make
> bad law. For great cases are called great, not by reason of their real
> importance in shaping the law of the future, but because of some
> accident of immediate overwhelming interest which appeals to the
> feelings and distorts the judgment.  These immediate interests
> exercise a kind of hydraulic pressure which makes what previously
> was clear seem doubtful, and before which even well settled
> principles of law will bend." [26]

For this reason, among others,[27] the validity of the actual malice rule often has been

questioned.  *See McKee*, 139 S. Ct. 675; *Gertz*, 418 U.S. at 370 (White, dissenting) ("As I see it,

there are wholly insufficient grounds for scuttling the libel laws of the States in such wholesale

fashion, to say nothing of deprecating the reputation interest of ordinary citizens and rendering

them powerless to protect themselves."); *Dun & Bradstreet*, 472 U.S. at 764 (Burgur, concurring

in judgment) ("I continue to believe, however, that Gertz was ill-conceived and therefore agree

with Justice White that Gertz should be overruled…The great rights guaranteed by the First

Amendment carry with them certain responsibilities as well.").  These questions resonate louder

as the justifications for the actual malice rule continue to disappear, and the Supreme Court

reaffirms the importance of textualism.[28]

---

[26] *Northern Securities Co. v. U.S.*, 24 S. Ct. 436, 468 (1904) (Holmes, dissenting)

[27] Other questions raised include the absence of textual support for the actual malice rule in the
First Amendment and whether it was appropriate to constitutionalize centuries of well-
established defamation law.  *McKee*, 139 S.Ct. at 677 (citing *Dun & Bradstreet*, 418 U.S. at 766
(White, J. concurring in judgment) ("*New York Times* was the 'first major step in what proved to
be a seemingly irreversible process of constitutionalizing the entire law of libel and slander.'")

[28] *See Bostock v. Clayton County, Georgia*, 2020 WL 3146686, *4 ("If judges could add to,
remodel, update, or detract from old statutory terms inspired only by extratextual sources and our
own imaginations, we would risk amending statutes outside the legislative process reserved for
the people's representatives.  And we would deny the people the right to continue relying on the
original meaning of the law they have counted on to settle their rights and obligations. *See New
Prime Inc. v. Oliveira*, 586 U.S. ——, —— – ——, 139 S.Ct. 532, 538–539, 202 L.Ed.2d 536

There is no need to repeat the sound reasoning of those who have already questioned the actual malice rule's viability.  Suffice it to say, Plaintiff adopts those arguments while noting the factors considered in deciding whether to overrule precedent appear to support receding from the actual malice rule.  *See Janus v. American Federation of State, County, and Mun. Employees, Council 31*, 138 S. Ct. 2448 (2018) (factors include the quality of the past decision's reasoning, the workability of the rule it established, its consistency with other related decisions, developments since the decision was handed down, and reliance on the decision).

There are, however, several points that warrant brief discussion.  These include: the important practical distinction between public officials and public figures; the absence of the immunity justification for the actual malice rule in the public figure context; the lack of weight afforded to the chilling effect of the actual malice rule; and the boundaries of courts' authority to legislate.

First, *Sullivan*'s original rule providing that public *officials*[29]—agents of the government who necessarily expose themselves to constitutionally-protected criticism—should face a higher burden when they sue the press for criticizing them[30] seems unnecessary.  The First Amendment already prohibited the government from curtailing free speech, be it through legislative,

---

(2019)").   "By its terms, the First Amendment addresses only 'law[s]' 'ma[d]e' by 'Congress.'"  *McKee*, 139 S. Ct. at 682, n.3.  The actual malice rule seems to run afoul of the Supreme Court's recent recognition that "[o]nly the written word is the law, and all persons are entitled to its benefit."  *Bostock*, 2020 WL 3146686 at *3.

[29] Unlike public figures, public officials occupy a special position in society.  As Justice Brennan remarked in *Sullivan*, "public men, are, as it were, public property."  376 U.S. at 268.  In *Gertz*, Justice Powell noted government officials "must accept certain necessary consequences" including "the risk of closer public scrutiny than might otherwise be the case." 418 U.S. at 344.

[30] *Sullivan*, 376 U.S. at 283 ("We hold today that the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct.")

executive or judicial action;[31] which should include lawsuits brought by agents of the government against the people they serve. The quantum leap from *Sullivan*'s premise to imposing the same rule on private citizens deemed "public figures" is significantly different and unjustifiable on the same grounds, particularly in light of the recognition that false statements are valueless and unprotected by the First Amendment.

Second, the expansion of *Sullivan's* actual malice rule from public officials to public figures lacks the original justification for the rule—immunity—among the latter group. *Sullivan* explicitly recognizes the symbiotic relationship between state actor immunity and the newly-minted "privilege" it created for their citizen-critics: "a privilege for criticism of official conduct appropriately analogous to the protection accorded a public official when he is sued for libel by a private citizen." *Sullivan*, 376 U.S. at 282-283 ("It would give public servants an unjustified preference over the public they serve, if critics of official conduct did not have a fair equivalent of the immunity granted to officials themselves.") Public figures are not agents of the

---

[31] "That the action of state courts and of judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court. That principle was given expression in the earliest cases involving the construction of the terms of the Fourteenth Amendment. Thus, in *Commonwealth of Virginia v. Rives*, 100 U.S. 313, 318, 25 L.Ed. 667 (1880), this Court stated: 'It is doubtless true that a State may act through different agencies,—either by its legislative, its executive, or its judicial authorities; and the prohibitions of the amendment extend to all action of the State denying equal protection of the laws, whether it be action by one of these agencies or by another.' *In Ex parte Commonwealth of Virginia*, 1880, 100 U.S. 339, 347, 25 L.Ed. 676, the Court observed: 'A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way.' In *Civil Rights Cases*, 1883, 109 U.S. 3, 11, 17, 3 S.Ct. 18, 21, 27 L.Ed., this Court pointed out that the [First] Amendment makes void 'state action of every kind' which is inconsistent with the guaranties therein contained, and extends to manifestations of 'state authority in the shape of laws, customs, or judicial or executive proceedings.' Language to like effect is employed no less than eighteen times during the course of that opinion. Similar expressions, giving specific recognition to the fact that judicial action is to be regarded as action on the State for the purposes of the Fourteenth Amendment, are to be found in numerous cases which have been more recently decided." *Shelley v. Kraemer*, 334 U.S. 1, 14–18 (1948).

government and enjoy no such immunity.  Cases such as *Butts* acknowledge *Sullivan*'s immunity justification for actual malice and its absence in the public figure context, but do not explain why the actual malice rule can be extended to public figures despite their lack of immunity.  *See Butts,* 388 U.S. at 154.  This distinction and the doubts it raises concerning the legitimacy of the extending *Sullivan* to public figures is significant.

Third, through the actual malice rule, courts must classify plaintiffs based on standards that effectively punish them for engaging in free speech in order to deprive them of the same well-established right to seek redress for reputational harm that their fellow private citizens enjoy.  The actual malice rule was extended to public figures based on the premise that by exercising their own First Amendment rights (whether by "assum[ing] roles of special prominence in the affairs of society…[or]…thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved…"), certain people[32] should be subjected to a higher burden to plead and prove a claim for defamation. *Gertz*, 418 U.S. at 344-345.  The proposition that private citizens sacrifice the right to protect their reputations as a consequence of successfully engaging in free speech raises obvious chilling-effect concerns.  Perhaps these concerns were less important in the 1960's, when very few people could attain public figure status, but today they should carry significantly greater weight.  Important voices that could be empowered by the Internet to enter the public debate may not because the actual malice rule makes them more susceptible to but less capable of redressing false and defamatory attacks.  This was not, nor could it have been, a concern placed onto the scales in *Butts or Gertz.*

---

[32] *Gertz* suggests the successful exercise of free speech rights by public figures "invite[d] attention and comment" and that these individuals presumptively "enjoy[ed] significantly greater access to the channels of effective communication and hence… a more realistic opportunity to counteract false statements than private individuals normally enjoy."  418 U.S. at 344-345.

JA 1442

Case 1:17-cv-04853-JSR   Document 102   Filed 06/19/20   Page 19 of 27
Case 22-558, Document 54, 09/19/2022, 3384725, Page287 of 295

Finally, the actual malice rule arose outside the confines of the unique and often unenviable role courts serve in American democracy. Courts, unlike legislatures and executives, must exercise restraint when wading into the immediate problems of the day:

> …History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures.
>
> Primary responsibility for adjusting the interests which compete in the situation before us of necessity belongs to the Congress. The nature of the power to be exercised by this Court has been delineated in decisions not charged with the emotional appeal of situations such as that now before us…
>
> Beyond these powers we must not go; we must scrupulously observe the narrow limits of judicial authority even though self-restraint is alone set over us. Above all we must remember that this Court's power of judicial review is not "an exercise of the powers of a super-Legislature."

*Dennis v. U.S.*, 341 U.S. 494, 524-525 (1951) (*citing Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). This is to say, irrespective of *Sullivan*'s and its progeny's results and their celebration as "great cases," those decisions should nevertheless fall if they veered outside the recognized limits of judicial authority.

## IV.   The Actual Malice Rule Arose from Distinguishable Facts and Should Not Be Applied

The rules emanating from *Sullivan, Butts,* and *Gertz* cannot be extracted from the factual circumstances from which they came to exist. "Blind application" of the actual malice rule is improper. *See Butts*, 388 U.S. at 148. Courts must consider the factors which arise in the particular context at issue. *Id.* In other words, media defendants cannot continue to benefit from general pronouncements of law plucked from these decisions and transposed upon circumstances to which they never were intended to apply.

The actual-malice rule was justified on facts that do not exist today.  The rule arose during a time where the methods of mass communication consisted of newspapers, magazines, and broadcasters; naturally limiting the number of people with access to the mass communication necessary to inject themselves into the national debate and defend themselves against defamatory attacks.[33]   That environment gave rise to certain justifications for the actual malice rule and public figure doctrine, such as the belief that very few people could expose themselves to the risk of defamation through voluntary participation in the public debate and enjoyed the corresponding media access that provided an opportunity for rebuttal.  *See Gertz*, 418 U.S. at 344. [34]

But we no longer live in an era where the public depends exclusively on the traditional press as the only "outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities—who wish to exercise their freedom of speech even though they are not members of the press." *Sullivan*, 376 U.S. at 266.  In the decades since *Sullivan, Butts,* and *Gertz*, the Internet drastically altered the communications landscape and created significant "breathing space" for everyone to enter the public debate and freely discuss their supposed grievances and proposed remedies.

---

[33] The Internet and its vehicles for speech "extended communicative power previously vested solely in the hands of a small group of publishers and broadcasters to the public."  94 Cal. L. Rev. at 835.

[34] As one commentator explains, "[t]he Supreme Court's basic assumptions as to media in the time of New York Times and Gertz reflect the nature of media in that time—'a simplistic and antiquated conception'—that hardly compares to how the media world looks today."  Ann E. O'Connor, *Access to Media All A-Twitter: Revisiting Gertz and the Access to Media Test in the Age of Social Networking*, 63 Fed. Comm. L.J. 507, 523.  Further, "[w]hen the Court was deciding *Gertz*, it did so with a singular understanding of the media landscape as it existed in 1974.  At that time, the media were entirely limited to print and broadcast media, often represented by large conglomerate news organizations." *Id.* at 528-29.

As discussed above, the Internet is readily-accessible to virtually everyone and provides equal access to a forum where debate on public issues is "uninhibited, robust, and wide-open…includ[ing] vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270 (citing *Terminiello v. Chicago*, 337 U.S. 1, 4; *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937)). Case in point, every American has direct access to the President of the United States through his Twitter account[35], several of this generation's most significant social movements sprouted on social media[36], and "citizen journalism" and "online social movements" have flourished online and become part of the modern lexicon. [37]

The actual-malice rule arose because access such as this did not exist. It emanated from the notion that very few people would command substantial public interest and have sufficient access to the means of communication necessary to expose through discussion the falsehood and fallacies of defamatory statements. *See Butts*, 388 U.S. at 154-155. Now, a vast majority of the citizens of this country habitually use the Internet, social media, message boards, YouTube, online profiles, online comments, and/or similar virtual forums to publicly exchange information and their opinions, question and hold our government to account, and thrust themselves into the "vortex" of pressing social issues seeking to influence outcomes and affect social change.[38] As many as 87% of Americans get their news on mobile devices or computers[39] and social media outpaces print newspapers as a news source in the United States.[40] Given this undeniable

---

[35] *Knight First Amendment Institute At Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019).
[36] *See* FN 7.
[37] *See* Plaintiff's SMF ¶¶ 7-8.
[38] *See* Plaintiff's SMF ¶ 9; *see also* 2 *Internet Law and Practice* § 24:15 ("Because individuals can now easily thrust themselves into the public debate by setting up their own websites, participating in discussions in chat rooms or posting messages on bulletin boards, it would appear easier to assume limited public figure status.")
[39] *See* Plaintiff's SMF ¶ 10.
[40] *See* Plaintiff's SMF ¶ 11.

proliferation of online speech, the primary reason for the actual malice rule—the need to create

uninhibited, robust, and wide-open debate—no longer justifies its application.

A significantly greater number of people also expose themselves to the risk of injury

from online attacks through social media and the Internet.[41] *Compare Gertz*, 418 U.S. at 345

(assuming that private individuals voluntarily expose themselves to the risk of injury from

defamatory falsehoods is "unjustified"). And there is much greater access to the channels of

effective communication today, which provides more people the opportunity to counteract false

statements; neither of which was the case when the Supreme Court extended the actual malice

rule to public figures.

The inability to consistently determine who qualifies as a public figure is compelling

evidence of why the actual malice rule is outdated. One Circuit went so far as to say, "anyone

who publishes becomes a public figure in the world bounded by the readership of the literature to

which he has contributed." *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996). As noted by

one of many legal scholars to examine this issue, various categories of plaintiffs have been held

to be both public figures and private figures, despite similar facts: government contractors,

criminal defendants, companies that advertise, college professors, entertainers, lawyers, high

school students, business executives, coaches, owners of bars and

restaurants, physicians, and police officers. [42]

---

[41] Plaintiff's SMF ¶ 12.

[42] Jeff Kosseff, *Private or Public? Eliminating the Gertz Defamation Test*, Journal of Law, Technology & Policy [Vol. 2011] (*comparing Mathis v. Cannon*, 573 S.E.2d 376, 382 (Ga. 2002) (stating an owner of municipal solid waste contractor is a public figure because "his more public efforts in helping develop the quasigovernmental project"), *with Mahoney v. State*, 236 A.D.2d 37, 40 (N.Y. App. Div. 1997) (stating a government contractor is not a public figure because "[n]either the receipt of public funds . . . nor involvement in a controversial industry, alone, confers public figure status on an individual"); *comparing Orr v. Argus-Press Co.*, 586 F.2d 1108, 1116 (6th Cir. 1978) (finding a criminal defendant was a public figure because "his

conduct has made him the target of a criminal proceeding about which the public has a need for information and interpretation‖), *with Thomas v. Tel. Publ'g Co.*, 929 A.2d 993, 1018 (N.H. 2007) (finding a criminal defendant accused of bank robbery was not a public figure because his alleged crimes ―[were] not matters of public controversy‖); *comparing Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 274 (3d Cir. 1980) (holding that a company is a public figure because ―through its advertising blitz, [it] invited public attention, comment, and criticism‖), *with Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 853 N.E.2d 770, 777 (Ill. App. Ct. 2006) (―[T]he mere fact that [plaintiff] advertised its merchandise does not, without more, establish it as a limited purpose public figure.‖).; *comparing Blum v. State*, 255 A.D.2d 878, 880 (N.Y. App. Div. 1998) (finding a professor involved in a tenure dispute to be a public figure because he ―thrust‖ himself into the public forefront), *with Sewell v. Trib Publ'ns, Inc.*, 622 S.E.2d 919, 923 (Ga. Ct. App. 2005) (finding a professor to be a private figure in a libel lawsuit regarding classroom comments he made about the Iraq war because he ―in no way thrust himself to the forefront of the controversy in any public forum‖); *comparing Rodriguez v. Nishiki*, 653 P.2d 1145, 1149 (Haw. 1982) (finding plaintiff musicians to be public figures in a lawsuit against a newspaper), *with Riddle v. Golden Isles Broad, LLC*, 621 S.E.2d 822, 826 (Ga. Ct. App. 2005) (finding plaintiff musician was a private figure ―[b]ecause there was no public controversy‖); *comparing Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1083 (3d Cir. 1985) (finding that a lawyer representing a well-known motorcycle gang was a public figure because ―it is clear that the present case involves a public controversy‖), *with Gilbert v. WNIR 100 FM*, 756 N.E.2d 1263, 1272 (Ohio Ct. App. 2001) (finding that a prominent community attorney was not a public figure in a libel suit over news reporting about a murder investigation); *comparing Henderson v. Van Buren Pub. Sch. Superintendent*, 644 F.2d 885, 6 Med. L. Rptr. 2409, 2410 (6th Cir. 1981) (finding that a high school government president was a public figure when he ―intentionally thrust himself into the controversy as between the School Board and the students at the high school . . .‖), *with Wilson v. Daily Gazette Co.*, 588 S.E.2d 197, 209 (W. Va. 2003) (finding that a prominent high school athlete was not a public figure because ―[n]othing in the record remotely suggests that [plaintiff] was a ‗central' figure in any purported public controversy involving sportsmanship that existed prior to the Gazette's publications‖); *compare Blankenship v. Manchin*, 471 F.3d 523, 531 (4th Cir. 2006) (finding that a well-known businessman was a public figure in his defamation suit), *with Bank of Or. v. Indep. News, Inc.*, 670 P.2d 616, 621 (Or. Ct. App. 1983) (finding bank executive was not a public figure); *compare Price v. Time, Inc.*, 416 F.3d 1327, 1346 (11th Cir. 2005) (stating plaintiff, University of Alabama's football coach, was ―undisputedly a public figure‖), *with Moss v. Stockard*, 580 A.2d 1011, 1033 (D.C. 1990) (finding that a college coach was not a public figure); *compare Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 92 (Nev. 2002) (finding that a restaurant owner was a limited public figure for defamation lawsuit over negative restaurant review), *with Lee v. City of Rochester*, 174 Misc. 2d 763, 771 (N.Y. Sup. Ct. 1997) (finding that bar owner plaintiff was not a public figure); *compare Swate v. Schiffers*, 975 S.W.2d 70, 76 (Tex. Ct. App. 1998) (finding because plaintiff doctor ―has certainly been drawn into controversy,‖ he was a public figure), *with WJLA-TV v. Levin*, 564 S.E.2d 383, 391 n.3 (Va. 2002) (indicating that plaintiff doctor was not a private figure); *compare Drews v. Michelson*, 327 N.W.2d 723 (Wis. Ct. App. 1982) (unpublished disposition) (finding plaintiff police officer who had filed a discrimination complaint was a public figure), *with Kiseau v. Bantz*, 686 N.W.2d 164, 178 (Iowa

17

Beyond those problems, one of the bedrock assumptions upon which the actual malice

rule rests is that society can tolerate defamatory statements because they are "inevitable in free

debate."[43]  This necessarily presumes untruths will be the exception.  *See Butts*, 388 U.S. at 152

("We have recognized the inevitability of ***some*** error in the situation presented in free debate."

(emphasis added)).  However, false information is rampant online and spreads farther and faster

than the truth.[44]  This phenomenon harms the public debate *Sullivan* and *Gertz* sought to protect,

and simultaneously shows why defamatory falsehoods cannot sufficiently be overcome by the

"self-help" discussed in *Gertz*.  *See Gertz*, 418 U.S. at 344.  We are worlds away from the days

when a public figure was capable of meaningfully defending herself against defamation by

issuing press statements or holding a press conference to refute false charges.[45]

---

2004) (finding plaintiff police officer was a not a public figure, even though she is a high-ranking officer).

[43] Despite the fact that false statements are valueless and devoid of constitutional protection, *Milkovich,* 497 U.S. at 18, some justify them based on *Sullivan*'s premise that "erroneous statement[s] [are] inevitable in free debate, and… must be protected…"  *Sullivan*, 376 U.S. at 271-272.  However, reliance on this proposition in the public figure context is misplaced because it arose within the narrow confines of overruling "cases which impose liability for erroneous reports of the political conduct of officials [because they] reflect the obsolete doctrine that the governed must not criticize their governors."  *Id.*  Extending this justification to false statements about public *figures* simply ignores the fact that such *figures* do not in any sense "govern" the people criticizing them.

[44] *See* Plaintiff's SMF ¶ 13.

[45] "Unlike the human brain with its imperfections and forgetfulness, the web recollects nearly everything and everyone. Information is perpetually accessible, and data subjects have limited ability to conceal past transgressions. Now we are switching to a system in which the Internet is a treasure trove of immutable memories and data subjects must take extraordinary steps in order to forget. That is an enormous transformation. Social media postings that go viral permanently stigmatize by creating a 'digital Scarlet letter,' which is 'an indelible record of people's past misdeeds .... The Internet is indeed a cruel historian.'"  Michael L. Rustad, Sanna Kulevska, *Reconceptualizing the Right to Be Forgotten to Enable Transatlantic Data Flow*, 28 Harv. J.L. & Tech. 349, 352–53 (2015) (internal citations omitted).

JA 1448

Case 1:17-cv-04853-JSR   Document 54   Filed 06/19/20   Page 25 of 27
Case 22-558, Document 54, 09/19/2022, 3384725, Page293 of 295

It simply is no longer necessary or appropriate to apply the actual-malice rule.  Anyone who posts comments, pictures, videos, memes, tweets, or similar expressions online or on social media about topics such as elections, President Trump, Black Lives Matter, the police, protests, LGTBQ rights, equality, #metoo, local politics, school boards, college campuses, homeowner's associations, COVID-19, or anything else "of concern" to other people arguably can be swallowed by the actual malice rule.  Moreover, once subjected to that standard, it must be satisfied not just in actions against members of the press, but against anyone who posts false and defamatory false statements.  *Obsidian Finance Group*, 740 F.3d at 1291.[46]  The public vs private figure dichotomy is rooted in standards entirely dependent on outdated assumptions about people's access to the media, their ability to thrust themselves into important public controversies, and effectively counter false attack.  The lines between public and private figures and the media and individuals are murky at best, while the primary beneficiaries of the actual malice rule remain members of the press who invoke it to justify publishing false statements they, as journalists, had no business publishing in the first place.  And legitimate concerns exist over the progression of the *Sullivan, Butts,* and *Gertz* to the point where actual malice applies to everyone, the rule chills free speech by forcing people with important voices to remain silent if they want to preserve their dignity and the right to protect their reputations, and public debate suffers greater harm because the rule proliferates more and more false information.

---

[46] *Obsidian* goes on to note that "[w]ith the advent of the Internet and the decline in print and broadcast media … the line between the media and others who wish to comment on political and social issues becomes far more blurred.")  *Id.*

# JA 1449

The States' common law of defamation co-existed with the First Amendment for centuries before *Sullivan* was decided and can strike the required balance[47] between constitutionally protected free speech and the individual's right to protect his or her good name (which lies "at the root of any decent system of ordered liberty"[48]).  Some state legislatures have even enacted anti-SLAPP[49] laws, which provide means to test the merits of defamation lawsuits at early stages.  The necessary equilibrium between human dignity and speech can be struck without the actual malice rule. The need and justifications for the rule no longer exist.  It should not be applied.

Dated:  June 19, 2020.

/s/ Shane B. Vogt
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@bajocuva.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 443-2199
Facsimile: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff*

---

[47] *Milkovich*, 497 U.S. at 13-14; *McKee*, 139 S.Ct. at 678-679.
[48] *Dun & Bradstreet*, 472 U.S. at 757-758 (quoting *Gertz*, 418 U.S. at 348).
[49] *See e.g.,* Fla. Stat. § 768.295; California Code of Civil Procedure § 425.16.

Case 22-558, Document 54, 09/19/2022, 3394725, Page295 of 295
Case 1:17-cv-04853-JSR   Document 280   Filed 06/19/20   Page 27 of 27

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment was filed electronically on June 19, 2020.  This Notice will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt.  Parties and their counsel may access this filing through the Court's system.

                         */s/ Shane B. Vogt*
                         Attorney