# No. 22-558

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

SARAH PALIN, an individual

*Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY, a New York
corporation, and JAMES BENNET, an individual

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Southern District of New York
(Case No. 1:17-cv-04853-JSR, Hon. Jed S. Rakoff)**

**JOINT APPENDIX**

**VOLUME VII OF XI (Pages JA1451 to JA1725)**

Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  813- 834-9191
Fax: 813-443-2193

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY  10017
Tel: 212-907-7300  Fax: 212-754-0330

*Counsel for Plaintiff-Appellant Sarah Palin*

# JOINT APPENDIX

# TABLE OF CONTENTS

## Volume VII of XI

DOC 107 – Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment...................................................................JA1451

DOC 157 - Joint Pretrial Consent Order.........................................................JA1479

DOC 172 – Order entered February 16, 2022 ................................................JA1559

DOC 174 – Order supplementing record entered February 16, 2022 ...........JA1561

February 22, 2022 Letter from Shane B. Vogt to Honorable Jed S. Rakoff at the request of the Court...........................................................................JA1570

Hearing Transcript dated February 24, 2022 – post trial...............................JA1591

DOC 136 – Defendants' Memorandum of Law in Support of Their Motion in Limine to Exclude Evidence Regarding Articles and Posts Published by Atlantic Media, An Article James Bennet was Sent, and Senator Michael Bennet ......................JA1595

DOC 138 – Defendants' Memorandum of Law in Support of Their Motion in Limine to Exclude Evidence of James Bennet's Departure from the Times, Unrelated Controversies During his Tenure as Opinion Editor, and the Elimination of the Public Editor Position ...................................................................JA1610

DOC 147 – Plaintiff's Memorandum of Law in Opposition to Defendants' Motion in Limine to Exclude Evidence Regarding Articles and Posts Published by Atlantic Media, An Article James Bennet was Sent, and Senator Michael Bennet ....JA1623

DOC 145 – Plaintiff's Memorandum of Law in Opposition to Defendant's Motion in Limine to Exclude Evidence of James Bennet's Departure from the Times, Unrelated Controversies During his Tenure as Opinion Editor, and the Elimination of the Public Editor Position .........................................................................JA1625

Plaintiff Trial Exhibit 032 ....................................................................JA1668

Plaintiff Trial Exhibits 057-058 ...........................................................JA1674

Plaintiff Trial Exhibit 50 .....................................................................JA1683

Plaintiff Trial Exhibit 119 (entered) ....................................................JA1694

Plaintiff Trial Exhibit 121 (entered) ....................................................JA1695

Plaintiff Trial Exhibit 124 (entered) ....................................................JA1696

Plaintiff Trial Exhibit 125 (entered) ....................................................JA1697

Plaintiff Trial Exhibit 126 (entered) ....................................................JA1699

Plaintiff Trial Exhibit 127 (entered) ....................................................JA1701

Plaintiff Trial Exhibit 128 (entered) ....................................................JA1702

Plaintiff Trial Exhibit 133 (entered) ....................................................JA1704

Plaintiff Trial Exhibit 134 (entered) ....................................................JA1707

Plaintiff Trial Exhibit 135 (entered) ....................................................JA1712

Plaintiff Trial Exhibit 136 (entered) ....................................................JA1715

Plaintiff Trial Exhibits 171-173 (entered) ...........................................JA1717

Plaintiff Trial Exhibit 174 (entered) ....................................................JA1721

Plaintiff Trial Exhibit 191 (entered) ....................................................JA1723

Plaintiff Trial Exhibit 021 ...................................................................JA1724

# JA 1451

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SARAH PALIN, an individual,

Plaintiff,

– against –

THE NEW YORK TIMES COMPANY,
a New York corporation, and JAMES
BENNET, an individual,

Defendant.

No. 17 Civ. 4853

Hon. Jed S. Rakoff

ECF Case

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone: (813) 443-2199
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY 10017
Telephone: (212) 907-7300
Facsimile: (212) 754-0330
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

# JA 1452

## TABLE OF CONTENTS

Table of Contents ................................................................................................ i

Table of Authorities ........................................................................................... ii

INTRODUCTION ................................................................................................ 1

RESPONSE TO DEFENDANTS' PRELIMINARY STATEMENT ......................................... 2

I.      The Summary Judgment Standard ................................................................ 3

II.     The Issue of Actual Malice on Summary Judgment Has Already Been Decided ....................................................................................................... 5

      A.     Defendants' Motion is Barred by Law of the Case .............................. 5

      B.     Defendants Misrepresent the Record to Try to Skirt the Law of the Case ....................................................................................................... 6

III.    Defendants' First Argument is a Thinly Veiled Request to Make New Law Based on Defamation by Implication Cases from Other Jurisdictions ............................. 9

IV.    THERE IS SUBSTANTIAL EVIDENCE BENNET INTENDED TO CONVEY A DEFAMATORY MEANING ................................................................ 13

V.     There is Ample Evidence Benet Had Knowledge of Falsity ......................... 16

VI.    THERE IS AMPLE EVIDENCE BENNET PURPOSEFULLY AVOIDED THE TRUTH ....................................................................................................... 19

VII.   Recklessness – Circumstantial Evidence & the Badges of Actual Malice .................... 20

Certificate of Service ....................................................................................... 23

# JA 1453

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................................................... 4, 17

*Bell v. Rochester Gas & Elec. Corp.*, 329 Fed. Appx. 304 (2d Cir. 2009) ................................. 5

*Biro v. Conde Nast*, 807 F.3d 541 (2d. Cir. 2015) ....................................................................... 21

*Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485 (1984) ......................................... 12

*Bose Corp. v. Consumers Union of United States, Inc.,* 692 F.2d 189 (1st Cir.1982) .................................................................................................... 14, 16

*Bryant v. Maffucci*, 923 F.2d 979 (2d Cir. 1991) ......................................................................... 5

*Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163 (2d Cir. 2000) ..... 4, 14, 16, 17, 20, 21

*Clements v. Nassau County*, 835 F.2d 1000 (2d Cir. 1987) ......................................................... 5

*Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921 (2d Cir.1987) ............................ 14, 16, 20

*Dodds v. American Broadcasting Co.,* 145 F.3d 1053 (9th Cir. 1998) ....................................... 12

*Dongguk Univ. v. Yale Univ.*, 734 F.3d 113 (2d Cir. 2013) ....................................................... 21

*Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308 (5th Cir. 1995) ......................................... 17, 20

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ................................................................................ 21

*Guitar v. Westinghouse Elec. Corp.*, 396 F.Supp 1042 (S.D.N.Y. 1975) ..................................... 3

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ............. 17, 19, 20, 21

*Herbert v. Lando*, 568 F.2d 974 (2d Cir. 1977), *rev'd*, 441 U.S. 153 (1979) ........................... 3, 4

*Hodges v. State Journal Publ'g Co.,* 1980 OK 102, 617 P.2d 191 (Sup. Ct. Okla. 1980) ................................................................................................................. 12

*Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983) ............................................... 17, 20, 21

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) ...................................................................... 16, 17

*Insurance Group Comm. v. Denver & Rio Grande W. R.R.*, 329 U.S. 607 (1947) ...................... 6

*Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446 (Ind. 1999) ....................................... 11

*Kahl v. Bureau of National Affairs, Inc.,* 856 F.3d 106 (DC Cir. 2017) .................................. 14

*Kendall v. Daily News Publ'g Co.*, 716 F.3d 82 (3d Cir. 2013) ................................. 13

*Kerwick v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625 (1981) ................................................................................................... 20, 21

*Liberty Lobby v. Dow Jones & Company, Inc.*, 838 F.2d 1287 (D.C. Cir. 1988) ..................... 16

*Loeb v. New Times Comm. Corp.*, 497 F.Supp. 85 (S.D.N.Y. 1980) .................................. 3

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ..................................... 4, 14, 18, 21

*Masson v. New Yorker Magazine, Inc.*, 832 F. Supp. 1350 (N.D. Cal 1993) ........................... 12

*Newton v. Nat'l Broad. Co.,* 930 F.2d 662  (9th Cir. 1990) ............................................. 10, 11, 13

*Palin v. The New York Times Company*, 940 F.3d 804 (2d Cir. 2019) ....... 3, 5, 6, 7, 9, 17, 20, 21

*Pinkney v. EMI Music Pub., Inc.*, 296 Fed. Appx. 186 (2d Cir. 2008) ........................................ 5

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ............................................. 5

*Rezzonico v. H & R Block, Inc*., 182 F.3d 144 (2d Cir. 1999) ........................................... 6

*Shoen v. Shoen*, 48 F.3d 412 (9th Cir. 1995) ............................................................. 17

*Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028 (10th Cir. 2013) ................................................................................................... 20, 21

*Sprague v. Am. Bar Ass'n*, 2003 WL 22110574 (E.D. Pa. July 21, 2003) ............................... 14

*St. Amant v. Thompson*, 390 U.S. 727 (1968) ................................................... 17, 21, 22

*St. Surin v. Virgin Islands Daily News, Inc.,* 21 F.3d 1309 (3d Cir.1994) ................................ 14

*Stepanov v. Dow Jones & Co., Inc.*, 987 N.Y.S.2d 37 (2014) .................................... 13

*Tavoulares v. Piro*, 763 F.2d 1472 (D.C. Cir. 1985) .......................................... 20, 21

*Tilton v. Cowles Publ'g Co.*, 76 Wash. 2d 707 (1969) ............................................. 11

*Tobinick v. Novella*, 108 F.Supp.3d 1299 (S.D. Fla. 2015) ............................................. 20

*United States v. Gladden*, 394 F.Supp.3d 465 (S.D.N.Y. 2019) ........................................... 6

*U.S. Commodity Futures Trading Com'n v. Hunter*, 2012 WL 297838 (S.D.N.Y. Jan. 31, 2012) .................................................................................................. 5

# JA 1455

*Vandenburg v. Newsweek, Inc.*, 441 F.2d 378 (5th Cir. 1971) ....................................... 17

*Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024 (5th Cir. 1975) .......................................... 17

*Vasquez v. O'Brien*, 85 A.D.2d 791 (3d Dep't 1981) .................................................... 22

*Ventura v. Kyle*, 63 F.Supp.3d 1001 (D. Minn. 2014), *rev'd on other grounds*, 825
    F.3d 876 (8th Cir. 2016) ..................................................................... 20, 21

*Wojnarowicz v. American Family Ass'n*, 745 F.Supp. 130 (S.D.N.Y. 1990) ......................... 14

*Woods v. Evansville Press Co.,* 791 F.2d 480 (7th Cir. 1986) .................................... 12, 13

*Yiamouyiannis v. Consumers Union of the United States, Inc.*, 619 F.2d 932 (2d
    Cir. 1980) ............................................................................................ 3

*Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066 (5th Cir. 1987) ................................. 20, 21

**Page(s)**

## OTHER AUTHORITIES

Awareness of Meaning In Libel Law: An Interdisciplinary Communication & Law
    Critique, C. Clavert, 16 N. Ill. U. L. Rev. 111, 111-112 (1996) .................................... 9

## INTRODUCTION

Interesting that @FoxNews 'debunked'
@SarahPalinUSA's @GabbyGiffords
crosshairs, despite IT's A FACT that inspired
me to #HuntRepublicans

Sarah Palin put Congress in the Crosshairs
All we are sayin' is #HuntRepublicans

-- James Devine, Twitter, June 17, 2017

After James Bennet ("Bennet") and The New York Times ("The Times") falsely accused Sarah Palin ("Gov. Palin") of inciting Jared Loughner to murder nine people, among them a nine-year-old girl and Federal Judge—and even *after* Defendants ran their woefully-insufficient "corrections" to *America's Lethal Politics*—Gov. Palin faced threats like the above, which came immediately on the heels of a "nut job who hates republicans" having already opened fire on Republican congressmen playing baseball on a field in Virginia.  [CSMF[1] ¶ 381, 22 (Vogt Decl. Ex. 21)]  Perhaps those who have never faced threats like this take them lightly, but even Bennet acknowledged their seriousness and the reality is that Gov. Palin lives in a world where people have actually tried to follow-through on calls to harm her and her family. [CSMF ¶ 381]

Defendants persist in trying to downplay the seriousness of what they said about Gov. Palin, mischaracterizing Bennet's actions as an "honest mistake" in syntax leading only "some readers" to understand their Editorial as asserting Gov. Palin caused Loughner's shooting. As shown below, Defendants' post-hoc "I didn't mean what my words clearly said" defense is belied by the facts. and no one except Bennet (so he claims) read his intentionally selected "strong"

---

[1] Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts & Counterstatement in Opposition to Defendants' Motion for Summary Judgment is cited herein as "CSMF ¶ ___"

words – "incitement" and "clear [and] direct link" – to connote anything other than their unmistakable plain meanings.

Defendants have a "loud and far-reaching" voice. The Times is the "Paper of Record." That enormous power comes with great responsibility and accountability, and Defendants better than anyone know such power must be held to account. Defendants defamed Palin with actual malice. Bennet's self-serving claims to the contrary have already been rejected on appeal and remain legally and factually insufficient to shield Defendants from the necessary accountability for their actions. They must face trial, or everyone else will think they can get away with the same tortious conduct.

## RESPONSE TO DEFENDANTS' PRELIMINARY STATEMENT

Contrary to what Defendants would have this Court believe, since the Court of Appeals ruled that it would be improper to grant summary judgment in this case on actual malice because of credibility issues and required inferences associated with Bennet's subjective intent, discovery has revealed *significantly more* evidence upon which a jury could reasonably conclude Defendants defamed Gov. Palin with actual malice. Discovery unearthed more proof of Bennet's knowledge of falsity and additional evidence showing Defendants published the Editorial with reckless disregard of whether it was false or not.

**First,** Defendants' argument seeking to circumvent the Second Circuit's decision rejecting Bennet's "honest mistake" defense is barred by the law of the case doctrine. Even if that were not the case, Defendants' contention that Gov. Palin must also now prove actual malice as to Bennet's awareness of how readers would understand his words is an incorrect statement of and an attempt to change controlling law. The actual malice rule applies to the truth or falsity of the statements at issue—not to Bennet's understanding of how readers might interpret what he said. This is not

2

a defamation by implication situation.  Defendants' effort to ascribe an alternative "impression" to the plain meaning of the unambiguous words Bennet used is *non sequitur*.  Moreover, even if the Court were inclined to disregard the law of the case and to then also create new law in this jurisdiction by adopting Defendants' request to impose an *additional* actual malice element on Plaintiffs' claim, the facts developed through discovery still are more than sufficient for a jury to reasonably conclude Bennet intended—or, at minimum, was aware of and recklessly disregarded—that the language he used would convey to readers that Gov. Palin's "Lethal Politics" were directly and clearly linked to and incited Loughner's shooting.

**Second**, assuming *arguendo* there is a basis to entertain Defendants' "traditional" actual malice argument given the Second Circuit's ruling that a summary judgment based on Bennet's testimony "would still have to [be] vacat[ed]," there is now significantly *more* evidence of Bennet's actual knowledge of falsity and reckless disregard of the truth.  *Palin v. The New York Times Company*, 940 F.3d 804, 812 (2d Cir. 2019).  Among other things, this additional evidence crystalizes Bennet's knowledge that Palin's map was not clearly and directly linked to and did not incite Loughner's shooting, and it solidifies the existing proof of Bennet's preconceived storyline, purposeful avoidance of the truth, failure to investigate, rejection of journalistic standards, bias and ill-will, and other circumstantial evidence of recklessness.

## I.    The Summary Judgment Standard

Gone are the days where summary judgment is the "rule" in defamation cases.  *Yiamouyiannis v. Consumers Union of the United States, Inc.*, 619 F.2d 932, 940 (2d Cir. 1980) (overruling *Guitar v. Westinghouse Elec. Corp.*, 396 F. Supp. 1042 (S.D.N.Y. 1975)). On summary judgment, the scales are not tipped in favor of a media defendant in a defamation case, even though our profound national commitment to free speech is involved.  *Id.* (citing *Herbert v. Lando*, 568 F.2d 974, 980 (2d Cir. 1977), rev'd, 441 U.S. 153 (1979)); *see also Loeb v. New Times Comm.*

# JA 1459

*Corp.*, 497 F.Supp. 85, 94 (S.D.N.Y. 1980) ("[T]he court is mindful of the Second Circuit's recent pronouncement that it is no longer permissible to take into account the 'chilling effect' a libel suit may have on the exercise of first amendment rights.")  The controlling standard is that "neither grant nor denial of summary judgment is to be preferred" because defamation actions are for summary judgment purposes "to be treated no differently from other actions."  *Id*.

This standard recognizes an important aspect of this and every other defamation case that is often ignored.  Defamation actions are a necessary and important component of the balance between free speech and individual liberty.  "States undeniably have an interest in affording individuals some measure of protection from unwarranted defamatory attacks.  Libel actions serve that end, not only by assuring a forum in which reputations can be publicly vindicated and dignitary injuries compensated, but also by creating incentives for the press to exercise considered judgment before publishing material that compromises personal integrity."  *Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 171 (2d Cir. 2000) (quoting *Herbert v. Lando*, 441 U.S. 153, 203 (1979) (Marshall, J., dissenting)).

As recognized in *Palin*, 940 F.3d at 812, and by the Supreme Court in *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991), in defamation cases all reasonable inferences must still be drawn in favor of the nonmoving party, "including questions of credibility and of the weight to be accorded particular evidence."  Here, as the Second Circuit ruled, summary judgment is inappropriate because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…" and "the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue of fact."  *Id., see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

# JA 1460

"In order to grant a motion for summary judgment, a district court must find that 'there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Bell v. Rochester Gas & Elec. Corp.*, 329 Fed. Appx. 304, 305 (2d Cir. 2009) (quoting Fed.R.Civ.P. 56(c)). "The summary judgment inquiry requires viewing the record in the light most favorable to the nonmoving party and resolving all ambiguities against the moving party." *Pinkney v. EMI Music Pub., Inc.*, 296 Fed. Appx. 186 (2d Cir. 2008). "[A]lthough the court should review the record as a whole, *it must disregard all evidence favorable to the moving party that the jury is not required to believe*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (emphasis added)). Where the evidence at issue is "susceptible of different interpretations or inferences by the trier of fact, summary judgment is inappropriate." *U.S. Commodity Futures Trading Com'n v. Hunter*, 2012 WL 297838, at *2 (S.D.N.Y. Jan. 31, 2012). Specific to this case, Courts are cautioned against awarding summary judgment to a defendant where that defendant's state of mind is at issue. *See Bryant v. Maffucci,* 923 F.2d 979, 985 (2d Cir. 1991). Indeed, "summary judgment is usually unwarranted when state of mind is at issue" and where (as the case is here) "solid circumstantial evidence exists to prove plaintiff's case." *Clements v. Nassau County*, 835 F.2d 1000, 1005 (2d Cir. 1987).

## II. The Issue of Actual Malice on Summary Judgment Has Already Been Decided

As a preliminary matter, Defendants' motion should be rejected because it ignores the Second Circuit's decision that it would be reversible error to grant the relief they request. *Palin*, 940 F.3d at 812. More troubling, Defendants seek this unattainable relief by misstating the record.

### A. Defendants' Motion is Barred by Law of the Case

Defendants' motion never addresses the Second Circuit's ruling that a summary judgment on actual malice based on Bennet's self-serving testimony would have to be vacated. *Id*. Since that ruling, nothing has changed in favor of Defendants that would overcome this insurmountable

5

## JA 1461

obstacle. Defendants still base their request for summary disposition of this case entirely upon Bennet's testimony about what he supposedly "knew," "recalled," and "intended" when he re-wrote the Editorial. *See* Doc. 96, pp. 17-20, 23, 25. The Second Circuit already ruled such evidence does not satisfy Defendants' summary judgment burden.

Under the law of the case doctrine, Defendants' Motion must be denied. This doctrine provides that "a trial court cannot reconsider on remand an issue decided by an appellate court." *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 148-149 (2d Cir. 1999) (citing *Insurance Group Comm. v. Denver & Rio Grande W. R.R.*, 329 U.S. 607, 612 (1947)); *see also United States v. Gladden*, 394 F.Supp.3d 465, 474-475 (S.D.N.Y. 2019) ("The law of the case doctrine has two branches. The first requires a trial court to follow an appellate court's previous ruling on an issue in the same case. This is the so-called 'mandate rule.' The second and more flexible branch is implicated when a court reconsiders its own ruling on an issue in the absence of an intervening ruling by a higher court. It holds that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless cogent and compelling reasons militate otherwise." (citations and quotations omitted)).

Here, because of the unique procedural posture of this case and Defendants' argument in the appellate court that their motion to dismiss was converted to a motion for summary judgment, *Palin*, 940 F.3d at 812, the Second Circuit explicitly ruled on the issue of whether Bennet's self-serving testimony could support summary judgment. The conclusion: it cannot. *Id.* (Even if Defendants' motion had been converted to one for summary judgment, "we would still have to vacate because the district court's opinion relied on credibility determinations not permissible at any stage before trial"). That ruling is binding and cannot be avoided.

### B.    Defendants Misrepresent the Record to Try to Skirt the Law of the Case

In what appears to be a calculated effort to circumvent the implications of law of the case,

# JA 1462

Defendants assert the untenable positions that the Second Circuit only held "Palin had adequately *alleged* actual malice" [Doc. No. 96 at p. 6] and go so far as to claim (buried in a footnote) [Doc. 96 at p. 15, n. 7] that "[t]he first prong of this motion, that Bennet lacked awareness of any defamatory meaning and therefore could not have published the challenged statements with actual malice, was not raised previously…and neither this Court nor the Court of Appeals has had occasion to consider this argument." Both propositions are false.

As set forth above, in addition to holding Palin adequately *alleged* actual malice, the Second Circuit explicitly ruled Bennet's self-serving testimony cannot support summary judgment because it raises "credibility determinations not permissible at any stage before trial." *Palin,* 940 F.3d at 812-815. The Second Circuit specifically noted the impropriety of "crediting" Bennet's testimony about what he "recalled" and rejecting the permissible inferences required to be drawn in favor of Palin from such evidence as articles published by *The Atlantic* under Bennet's stewardship, Bennet's biases and ill-will, and his personal connections to the Loughner shooting— all of which raise credibility issues and required inferences that *still* must be drawn in Gov. Palin's favor. *Id.* at 812, n. 25, 813-815. When addressing the sufficiency of Gov. Palin's complaint, the Second Circuit took the extra step of ruling, "[t]he jury may ultimately agree with the district court's conclusion that Bennet was credible—***but it is the jury that must decide***." Id. at 815 (emphasis added).

Aware of this problem, Defendants seek to side-step it by distorting the record to claim they are raising an argument about Bennet's "awareness of defamatory meaning" that was never raised or considered before. This is simply untrue. The record in this Court shows Defendants' arguments on this very point. One glaring example is Defendant's Supplemental Memorandum of Law in Further Support of Its Motion to Dismiss the Complaint [Doc. No. 42], which not only

asserts the very argument now being raised, but also explicitly contends based on many of the same cases Defendants cite in their present motion that "[Bennet's] testimony reinforces the conclusion that Mrs. Palin can never ultimately meet her burden of demonstrating actual malice—*no such knowledge of "probable falsity" can exist, as a matter of law, if the author did not intend the alleged defamatory meaning and was not aware it would be conveyed by his statement at the time of its publication*." *See* Doc. No. 42 at pp. 9-11 (emphasis added) (compare cases cited in Doc. No. 42 at p. 7 and FN 5 to cases cited in Doc. No. 96 at pp. 15-16).[2] This same argument was the entire focus of Defendants' Reply Memorandum In Further Support of Its Motion to Dismiss the Complaint. *See* Doc. No. 44. In the Answer Brief in the ensuing appeal, Defendant echoed the same position: "The District Court properly rejected these allegations as implausible, especially in light of the 'obvious alternative explanation' for the challenged statements' genesis: that Bennet had made an unintentional mistake…the only plausible inference a reasonable person might draw from these specifically alleged facts is that The Times, or more specifically, Bennet, made 'an unintended mistake.'" *See* Doc. No. 72 at pp. 12, 22.

Removing any doubt as to whether Defendants' "intended meaning" argument was raised and considered before, the Second Circuit's opinion provides:

> "Bennet explained at the hearing that his reference to Palin in the editorial was intended to make a rhetorical point about the present atmosphere of political anger….In the Times' view, the district court correctly determined that Palin's original complaint and the PAC both gave rise to only one plausible conclusion: that Bennet made an unintended mistake by including the erroneous facts about Palin. We disagree…The district court at one point stated Bennet's 'behavior is much more plausibly consistent with making an unintended mistake and then correcting it than with acting with actual malice. Perhaps so, but it is not the district court's province

---

[2] This Supplemental memorandum followed two hearings on the motion to dismiss, at which the same issue involving Bennet's intent/meaning also was addressed. *See i.e.* Vogt Decl. Ex. 173, 7/31/2017 Hr'g Tran. at 11:12-14:10; Doc. 41-34, 8/16/2017 Hr'g Tran. at 13:5-17:10, 19:5-30:8.

> to dismiss a plausible complaint because it is not as plausible as the
> defendant's theory. The test is whether the complaint is plausible,
> not whether it is less plausible than an alternative explanation. The
> jury may ultimately agree with the district court's conclusion that
> Bennet was credible—but it is the jury that must decide."

*Palin*, 940 F.2d at 809, 813, and 815.

The predicate for the "first prong" of Defendants' argument—that it is an argument they had not "raised previously" and neither this Court nor the Court of Appeals "had occasion to consider" it—is flat wrong. Even if Defendants try to overcome this problem by claiming the procedural posture of the case is different now than when the Second Circuit ruled, that would still be an exercise in futility because the Second Circuit plainly acknowledged Defendants' "intended meaning" defense and rejected it, and summary judgment remains a jury issue in this case because Bennet's self-serving testimony (much of which was before the Second Circuit) still cannot be accepted as true.

## III. Defendants' First Argument Is a Thinly Veiled Request to Make New Law Based on Defamation by Implication Cases from Other Jurisdictions

In their effort to avoid the law of the case, Defendants also ask this Court to create new law by imposing an additional actual malice element for Plaintiff's defamation claim. The Supreme Court, this Circuit, and New York courts have never held this additional actual malice element to be a required component of a plaintiff's defamation claim nor a necessary additional actual malice standard a plaintiff must prove. Defendants are asking this Court to adopt what one commentator aptly described as "a new, constitutionally mandated fault element" that has been advanced by "legal scholars, libel defense attorneys, and a number of federal courts to again alter the constitutional landscape of libel law" by "add[ing] further protection—protection beyond the actual malice standard and procedural requirements—to the constitutional shields that now guard defendants in civil libel actions." *See* Awareness of Meaning In Libel Law: An Interdisciplinary

**JA 1465**

Communication & Law Critique, C. Clavert, 16 N. Ill. U. L. Rev. 111, 111-112 (1996).

Defendants' argument based on non-binding case law seeks a monumental change in the law. And, the non-binding cases they cite clearly are distinguishable because they are rooted in defamation by implication—not statements which, like Bennet's, on their face directly and explicitly convey a meaning that is defamatory per se. As this Court noted previously, "What [the Editorial is] asserting is not that people at the time thought this, it's asserting as a fact that there's a direct link between this and the shooting." See 7/31/2017 Hr'g Tran. at 11:12-14 (Vogt Decl. Ex. 173).

According to The Times, in addition demonstrating that a defendant made a statement with actual malice—that is, that he or she either knew was false or acted with reckless disregard of whether it was false or not—a plaintiff must now also prove the defendant was aware of the defamatory meaning his or her words conveyed. *See* Doc. 96, p. 13. Defendants make this argument as if it is established law, yet fail to cite a single *binding* case that supports this proposition. Instead, Defendants cite factually distinguishable cases from state and federal courts in other jurisdictions involving situations where the defamatory meaning of ambiguous and innocuous statements had to be inferred or implied to establish a claim.

For instance, Defendants cite *Newton v. Nat'l Broad. Co.,* 930 F.2d 662, 681 (9th Cir. 1990), which involved statements alleged to give rise to defamatory impressions, not statements (like the ones at issue here) that are defamatory on their face. Specifically, Wayne Newton alleged NBC aired a broadcast that conveyed the false impression that the Mafia and mob sources helped him buy a Las Vegas casino and hotel and that he deceived the gaming authorities about his relationship with the mafia. *Id.* at 667. A jury decided the case in favor of Newton, awarding compensatory and punitive damages. After trial, the district court upheld the liability finding in

10

part because it concluded NBC edited and complied the broadcast in a way that created "defamatory impressions" and those impressions were "clear and inescapable**.**" *Id.* at 679. Consequently, the Court found the jury could reject the testimony of the publishers that they had not intended to leave a false impression. *Id.* at 680. On appeal, the Ninth Circuit reversed, explaining that by determining the impressions were "clear and inescapable," the trial court "substituted its own view as to the supposed impression left by the broadcast for that of the journalists who prepared the broadcast." *Id.* at 682.

While there are a number of distinguishing factors, this case and *Newton* are different in two significant ways. First, the defamatory statements in this case are explicit and facially defamatory. Second, unlike in *Newton*, this case involves substantial evidence showing what Bennet meant and intended to say – not the least of which is the plain meaning of his chosen words. *See infra,* Part IV. In *Newton*, the court *exclusively* relied on the statements themselves to support a finding of intent.

Defendants cite *Dodds v. American Broadcasting Co.,* 145 F.3d 1053, 1063 (9th Cir. 1998), for the proposition that a defendant must have intended to convey a defamatory impression. *See id.* at 1064. But, again, this case is not one dealing with "impressions." Like *Newton*, *Dodds* is also a case where there was <u>no</u> evidence the publishers intended to convey the defamatory impression. *Id.* That cannot be said here. *See infra,* Part IV. More importantly, *Dodds* clarifies that a defendant's intent to convey a defamatory impression is a unique attribute of defamation by implication cases. Indeed, the analysis regarding intent is consumed within the Court's discussion of defamation by implication. Critically, however, there were some statements in *Dodds* that were actionable on their face. And for those statements, the *Dodds* court engaged only in the traditional

actual malice analysis—i.e. did defendants publish the challenged statements with knowledge of their falsity or with reckless disregard for their truth or falsity. *See id.* at 1061-1063.

*Woods v. Evansville Press Co.,* 791 F.2d 480, 487 (7th Cir. 1986) is another defamatory implications case. In *Woods,* a television station owner alleged he was libeled in a newspaper column that implied that he was dishonest, in financial trouble, and a religious fraud. The Court explicitly acknowledged there was no claim the statements were facially false and defamatory. Also, like in *Newton* and *Dodds*, there was <u>no</u> evidence the defendants intended that the statements "be read to contain the defamatory innuendoes the plaintiff attributes to it." *Id.*

*Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485 (1984), cited by Defendants, is also a case where the record was devoid of any evidence of actual malice. The only claimed evidence of actual malice was the inaccuracy of the statement itself. *Id.* at 513.

Other cases Defendants cite likewise involve situations where there is little or no evidence of actual malice. *See Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 463 (Ind. 1999) (no evidence reflecting Pinckley's state of mind or whether she "entertained serious doubts as to the truth of the headline" or had a "high degree of awareness" of the headline's probable falsity); *Tilton v. Cowles Publ'g Co.*, 76 Wash. 2d 707, 725 (1969) (involving limited circumstantial evidence of actual malice); *Hodges v. State Journal Publ'g Co.,* 1980 OK 102, 617 P.2d 191, 195-196 (no evidence to refute publishers claims of good faith, or showing publication conflicted with the information author obtained or that source was unreliable, and no evidence of any personal motive to injure plaintiff or abdicated their traditional roles of fairly reporting the news.)

Defendants' remaining case, *Masson v. New Yorker Magazine, Inc.,* 832 F. Supp. 1350, 1361-63 (N.D. Cal 1993), is far afield from the facts presented here because it involved a plaintiff claiming he was defamed by being misquoted. The portion of the case upon which Defendants

heavily rely concerned a jury instruction that added the defendant's awareness of the defamatory meaning as an element of the claim, which the district court realized was breaking new ground when it resorted to model instructions, *Newton,* and *Woods*, to impose "awareness of defamatory meaning" element on the plaintiff's defamation claim.  In doing so, the court also noted "in the case at hand… the defamation is somewhat ambiguous and indirect." *Id.* at 1363.

Simply stated, Defendants cannot use non-binding defamation by implication cases to superimpose a new, additional actual malice element on Palin's claim.  By nature, defamation by implication cases involve an additional "communicative intent" element because the statements at issue on their face are not defamatory. *Kendall v. Daily News Publ'g Co.*, 716 F.3d 82, 90 (3d Cir. 2013).  Under New York law, defamation by implication "is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Stepanov v. Dow Jones & Co., Inc.*, 987 N.Y.S.2d 37, 43 (2014).  In cases such as this one, the words at issue are facially defamatory and explicitly false.

If awareness and intent to convey defamatory meaning were an element of all defamation claims as Defendants suggest, there would be no need for defamation by implication.  Certainly, one would expect the courts of New York to have made such a pronouncement if that were true.

## IV.  THERE IS SUBSTANTIAL EVIDENCE BENNET INTENDED TO CONVEY A DEFAMATORY MEANING

Even is this Court decides to adopt the new standard Defendants request, one requiring an additional showing of actual malice as to a defendant's awareness of defamatory meaning (in additional actual malice as to falsity), there is more than sufficient evidence upon which a jury could reasonably conclude Bennet was aware of the defamatory meaning apparent on the face of the statements he wrote about Palin.

# JA 1469

The same standards would govern this inquiry. Bennet's self-serving testimony as to his state of mind and his intended meaning should be disregarded, and proof of subjective awareness can be demonstrated by inference from objective facts. *See Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 182–83 (2d Cir. 2000) ("although actual malice is subjective, a court will typically infer actual malice from objective facts"). To require otherwise would allow a defendant to defeat a defamation claim by testifying "I didn't mean it" – which is precisely what Defendants aim to do. Numerous courts have recognized that actual malice "may be inferred from objective facts because a defendant will rarely admit he acted with actual malice."[3]

Defendants' argument and proffered "evidence" concerning Bennet's "intent" is akin to the situation addressed in *Sprague v. Am. Bar Ass'n*, 2003 WL 22110574, at *4 (E.D. Pa. July 21, 2003). There, the court recognized:

> The instant case is no exception. In their motion for summary judgment, defendants deny intending or even anticipating that readers of the Journal would interpret the term "lawyer-cum-fixer" in the defamatory way. Conversely, plaintiff contends that this defense is at odds with common sense since it is the expertise of authors and editors to know the meaning of words. More importantly, plaintiff presents objective circumstantial evidence from which a rational jury could conclude that by publishing the article in question, defendants acted with actual malice. The record presents several pieces of evidence that could support a jury finding that when defendants employed the label "lawyer-cum-fixer" they

---

[3] *Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 147 (S.D.N.Y. 1990); *see also Bose Corp. v. Consumers Union of United States, Inc.,* 692 F.2d 189, 196 (1st Cir.1982) ("whether [defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts."); *Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921, 927 (2d Cir.1987) ("Malice may be proved inferentially because it is a matter of the defendant's subjective mental state, revolves around facts usually within the defendant's knowledge and control, and rarely is admitted."); *Kahl v. Bureau of National Affairs, Inc.,* 856 F.3d 106, 116 (DC Cir. 2017) ("Of course, actual malice rarely is admitted" (quotations and citations omitted)); *Masson v. New Yorker Magazine,* 501 U.S. 496, 521 (1991) (listing items of circumstantial evidence regarding defendant's state of mind at the time of publication which raised genuine issues of material fact as to actual malice for jury consideration); *St. Surin v. Virgin Islands Daily News, Inc.,* 21 F.3d 1309, 1318 (3d Cir.1994) (same).

14

Case 22-558, Document 55, 09/19/2022, 3384727, Page23 of 278

# JA 1470

> either deliberately cast this description in an ambiguous light in the hope of insinuating a false import to the reader, or that defendants knew or recklessly disregarded the possibility that its words would be interpreted by the average reader as false statements of fact.

Keeping in mind the Second Circuit already rejected Bennet's self-serving testimony about what he "intended" to mean, the additional evidence surrounding Bennet's re-write of the Editorial solidifies the reasonable conclusion Bennet knew and intended to say exactly what the plain meaning of the words he used mean such as the following:

- Bennet admitted to knowing that it is reasonable readers understand "incitement" to mean a "call to violence" [CSMF ¶ 88 (Bennet Depo. 114:10-15]

- Although claiming Bennet's true intent was to "express concern about the state of political rhetoric," he rewrote Williamson's draft, even though it already said what Bennet claims he was trying to convey.  There was no reason to make the change except to convey something different. [CSMF ¶ 331-340]

- Bennet clearly understood "rhetoric" and "incitement" have different meanings.  Defendants even changed the word "incitement" to "rhetoric" in the second correction. [CSMF ¶ 340, 367, 375]

- Bennet's own definition of "incitement," a "very strong word," originates from factual situations where violent attacks were carried out, such as the assassination of Rabin, and he used the word in the context of the Scalise shooting under the title "Lethal Politics."  [CSMF ¶ 340, 342-344, 347][4]

- Bennet even concedes Tom Friedman's article about incitement leading to Rabin's assassination was a driving force behind his choice of language. [CSMF ¶ 342-344]

- Bennet titled the Editorial "America's Lethal Politics"— which in conjunction with the word "incitement," a word which Bennet admittedly knew to mean "deliberate orders,

---

[4] Defendants' reliance upon a prior article written by Bennet discussing incitement is completely irrelevant, because Bennet described the basis for his use of the word during his testimony on 8/16/2017 and never mentioned this piece.

15

invocations, summonses to carry out violent attacks," (chief among them the assassination of Rabin) clearly gives rise to a reasonable inference that Bennet intended to convey to readers that Gov. Palin's actions incited Loughner to shoot and kill innocent people.  [CSMF ¶ 340, 351]

- Bennet's editor, who worked with him on the Editorial, knew exactly what "incitement" meant:  "that it – that the map led him to commit the shooting."  [CSMF ¶ 341]

- Defendants do not cite any example someone interpreting Bennet's language in the Editorial to mean anything other than what Palin maintains it says.

- Bennet's colleagues and readers immediately knew Bennet made a causal connection.  [CSMF ¶ 341, 364, 79-81]

## V.    THERE IS AMPLE EVIDENCE BENNET HAD KNOWLEDGE OF FALSITY

Because a defendants' state of mind "does not readily lend itself to a summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, n. 9 (1979), a "court typically will infer actual malice from objective facts."  *Celle*, 209 F.3d at 183 (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189, 196 (1st Cir. 1982).  Indeed, actual malice may be proven inferentially because defendants rarely admit to knowledge or doubts of falsity.  *Id.*  Thus, a defamation plaintiff can use "evidence of negligence, motive and intent such that an accumulation of evidence and appropriate inferences supports the existence of actual malice." *Id.* (citing *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987)).

In evaluating the circumstantial evidence supporting a finding of actual malice, courts must consider the totality of the evidence to determine whether a reasonable jury could find, based on the accumulation of that evidence, knowledge of falsity or reckless disregard for the truth.  Among other things, actual malice can be established "through the defendants' own actions or statements, the dubious nature of his sources, and the inherent probability of the story [among] other circumstantial evidence."  *Celle*, 209 F.3d at 183 (citing *Liberty Lobby v. Dow Jones & Company,*

16

*Inc.*, 838 F.2d 1287, 1293 (D.C. Cir. 1988)).  Thus, for example, although a showing of bias or ill

will *alone* may not be sufficient to demonstrate actual malice, such evidence concerning motive *is*

relevant to the actual malice inquiry and helps establish actual malice.  *Palin*, 940 F.3d at 814-816;

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989); *Celle*, 209 F.3d at

183 ("Evidence of ill will combined with other circumstantial evidence ... may also support a

finding of actual malice.").[5]  Similarly, although evidence of a failure to properly investigate *may*

not be *alone* sufficient to support a finding of actual malice, courts have recognized that it also is

a piece of evidence that, in conjunction with other evidence, can support a finding of actual malice.

*See Palin*, 940 F.3d at 814-15; *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983)

("'[A]ctual malice may be inferred when the investigation was grossly inadequate in the

circumstances'" (quoting *Vandenburg v. Newsweek, Inc.*, 441 F.2d 378, 380 (5th Cir. 1971)); *see*

*also Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024, 1026-27 (5th Cir. 1975) (same).

     A defendant, like Bennet, cannot "automatically insure a favorable verdict by testifying he

published with a belief the statements were true."  *Celle*, 209 F.3d at 190 (quoting *St. Amant v.*

*Thompson*, 390 U.S. 727, 732 (1968)).  Even indirect evidence of actual malice can defeat a

defendant's claim he acted in good faith.  *Id.*  Moreover, on summary judgment, self-serving

testimony must be rejected.  *Palin*, 940 F.3d at 812; *Anderson*, 477 U.S. at 255.  Credibility

determinations are unquestionably at play when self-serving testimony about a person's mental

state are involved.  *See Hutchinson*, 443 U.S. 111, n. 9 (1979); *Palin*, 940 F.3d at 812-814.  On

---

[5] *See also, e.g.*, *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995) ("[I]ll will *is* considered circumstantial evidence of actual malice.") (emphasis added); *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995) ("[E]vidence of ulterior motive can often bolster an inference of actual malice.").

# JA 1473

summary judgment, these credibility issues and all inferences still are drawn in favor of the non-movant. *See Masson*, 501 U.S. at 520; *Palin*, 940 F.3d at 814.

Here, there is a mountain of direct and circumstantial evidence showing Bennet knew there was no clear and direct link between Palin and Loughner and that Palin's map did not incite Loughner's crime:

- Bennet specifically instructed Williamson to research whether there was any established link between incitement and Loughner's shooting. Bennet conceded, and Williamson confirmed, her draft article embodied the results of her research, which was that there was no direct and clear link between Palin's Map and Loughner. [CSMF ¶ 68, 331-333] Thus, Bennet knew there was no link or but rewrote the draft anyway to say a link existed – consistent with the narrative he already decided to portray. [CSMF ¶ 22, 335-339]

- Bennet still claims he could not recall whether he read news reports and Atlantic's articles confirming no link existed, which in and of itself already created credibility and fact issues sufficient to deny summary judgment. However, Bennet's testimony about his knowledge got worse for Defendants when he was deposed. Bennet conceded he "regularly" read The Times and "consumed" The Atlantic's website in 2011, even admitting he "must have read" some of The Atlantic's articles about Loughner and even spoke with Andrew Sullivan about the shooting. [CSMF ¶ 113, 263-284]

- New evidence unearthed in discovery revealed that soon after the Loughner Shooting, Bennet was emailed a potential article and the hyperlinked story "How the media botched the Arizona shooting," which like a Times article written at the same time discussed the false narratives of incitement surrounding the Loughner shooting and explained how "framing " caused journalists to falsely conclude people like Palin incited Loughner's crime. [CSMF ¶ 266-271]

- Bennet claims he did not know whether a link existed but even this self-serving claim admits knowledge of falsity because it concedes Bennet proves he knew it was false to say there was a "direct" and "clear" link. [CSMF ¶ 86, 356]

- There is substantial evidence of Bennet's ill-will, bias, and motive. Beyond what the Second Circuit already recognized as sufficient, discovery showed:

  ► The events leading to the Editorial [CSMF ¶ 285-308], notable among them Bennet's focus on Palin and The Times and the Left being accused of incitement shortly before the Scalise shooting, and Bennet's injection of the incitement narrative after seeing Hodgkinson's social media validate that Bennet was trying to level the playing field.

  ► The Times and Bennet had systemic and personal bias against Palin, and Bennet was "trolling" consistent with Sulzberger's directives. [CSMF ¶ 227-230, 231-262, 200-217]

## VI.   THERE IS AMPLE EVIDENCE BENNET PURPOSEFULLY AVOIDED THE TRUTH

Even if, *arguendo*, the evidence of Bennet's actual knowledge of falsity could be deemed insufficient to preclude summary judgment, there is also more than sufficient evidence upon which a jury could reasonably conclude Defendants purposefully avoided the truth. This case is a textbook example of a publisher blindly adhering to a preconceived narrative in furtherance of which he turned a blind-eye to obvious reasons to doubt the veracity of the defamatory statements at issue. *Harte-Hanks*, 491 U.S. at 692.

Here, the facts developed during discovery show Bennet injected the incitement narrative about Plaintiff and purposefully avoided the truth with intent to voice his narrative regardless of the truth:

- Bennet still advanced the narrative <u>after</u> admitting no link was established. [CSMF ¶ 369, 376-377]

- Bennet injected his narrative <u>after</u> seeing the shooters pro-Bernie social media, on the heels of the Trump/Caesar backlash against The Times, and <u>after</u> the decision was already made to write about gun control, then rewrote the piece because Williamson didn't advance his narrative. [CSMF ¶ 308, 315-320]

- Bennet pursued his narrative based on a "pattern" of incitement he knew did not exist.  [CSMF ¶ 355-356]

- Bennet ignored the results of Williamson's research and rewrote the Editorial to advance his narrative.  [CSMF ¶ 335-340]

- Bennet had reason to pursue his narrative and disregard the truth, including his personal biases, connections, gun control and anti-rhetoric agenda, and "political scorekeeping." [CSMF ¶ 213, 215-217, 231-250, 302-308]

- Bennet avoided the truth, ignoring Williamson's research and failing to read any of the materials or hyperlink. [CSMF ¶ 318-333, 338-339]

## VII.   Recklessness—Circumstantial Evidence & the Badges of Actual Malice

There is also a significant amount of other circumstantial evidence of actual malice in this case.  The circumstantial evidence of actual malice[6] that overcomes self-serving claims of good faith can take many forms.  These recognized badges of actual malice (as well as the inferences to be drawn from them) must be evaluated **cumulatively** or **in the aggregate**.  *Celle*, 209 F.3d at 183.

Here, the additional circumstantial evidence of recklessness includes:

- **Failure to Investigate**.  Bennet ignored the results of Williamson's research and didn't read any research he received.  [CSMF ¶ 318-333, 338-339]  He ignored his own

---

[6] Badges of actual malice include, but are not limited to:  (1) evidence of negligence, motive, and intent (*Celle*, 209 F.3d at 183; *Palin*, 940 F.3d at 814 (political opposition is evidence of actual malice and goes to credibility)); (2) the defendants' own actions or statements (*Id.*); (3) the dubious nature of sources (*Id.*); (4) the inherent improbability of the story (*Tobinick v. Novella*, 108 F.Supp.3d 1299, 1310 (S.D. Fla. 2015); *St. Amant*, 390 U.S. at 732; *Dalbec*, 828 F.2d at 927); (5) bias or ill will (*Palin*, 2019 WL 3558545, at *6-7; *Connaughton*, 491 U.S. at 668; *Celle*, 209 F.3d at 183; *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995); *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 310, n. 10 (5th Cir. 1995)); (6) failure to investigate (*Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983)); (7) refusal to retract and apologize (*Tavoulares v. Piro*, 763 F.2d 1472, 1477 (D.C. Cir. 1985); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987); *Ventura v. Kyle*, 63 F.Supp.3d 1001, 1014 (D. Minn. 2014)); (8) failure to adhere to journalistic policies (*Kerwick v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625, 627 (1981); and (9) grossly inadequate investigation under no time pressure (*Hunt*, 720 F.2d at 645; *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1057-58 (10th Cir. 2013)).

practices and The Times' standards to the contrary.  [CSMF ¶ 176-191, 193-194]   *See Masson, Inc.,* 960 F.2d at 901; *Garrison v. Louisiana,* 379 U.S. 64, 74, (1964); *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968); *Harte–Hanks,* 491 U.S. at 692; *Dongguk Univ.*, 734 F.3d at 124.

- **Bias, Motive, And Ill Will.**   As noted above, there is substantial evidence of Bennet's bias, motive and ill-will. *See Palin*, 940 F.3d at 814-15; *Connaughton*, 491 U.S. at 668; *Celle*, 209 F.3d at 186; *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d. Cir. 2015).

- **Refusal To Retract/Apologize.**   Despite knowing his narrative was false, Bennet still pursued it and left Palin in the Editorial, never meaningfully apologizing.  Defendants conceded the International Edition of the Editorial, making no mention of Palin, adequately conveyed the points they wanted to make. [CSMF ¶ 355-356, 357-359, 360-380]  *See Tavoulareas v. Piro*, 763 F.2d 1472, 1477 (D.C. Cir. 1985); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987); *Ventura v. Kyle*, 63 F. Supp. 3d 1001, 1014 (D. Minn. 2014) (explaining that "most authorities" hold that failure to retract can establish actual malice), *rev'd on other grounds*, 825 F.3d 876 (8th Cir. 2016).

- **Failure To Adhere To Journalistic Policies.**   Bennet admittedly failed to follow The Times' heightened standards, and never fact-checked his re-write; even going so far as to ignore the results of Williamson's research. [CSMF ¶ 176-194, 331-334, 338-339]  *Kerwick v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625, 627 (1981).

- **Grossly Inadequate Investigation Under No Time Pressure.**  An editorial is "not news," and The Times had other editorials on deck to run that day instead of the Editorial.  [CSMF ¶ 52-54]  *Hunt*, 720 F.2d at 645 (*quoting Vandenburg I*, 441 F.2d at 1026-27; *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1057-58 (10th Cir. 2013 (rush to publish despite lack of time pressure is evidence of actual malice).

- **Inherently Improbable Defamatory Statements.**  Bennet disregarded obvious reasons to doubt the veracity of the statements he made, not the least of which was no knowledge of any "pattern," the supposed thesis of his narrative. [CSMF ¶ 263-265, 271, 331-333, 355-356]  *St.*

Case 22-558, Document 55, 09/19/2022, 3384727, Page30 of 278

# JA 1477

> *Amant*, 390 U.S. at 732; *Dalbec*, 828 F.2d at 927 (same; presents a jury question).[7]  Similarly, "courts have upheld findings of actual malice when a defendant failed to investigate a story weakened by inherent improbability[.]"

Cumulatively, the foregoing evidence is more than sufficient for a reasonable jury to find actual malice.  It certainly raises disputed issues of fact sufficient to make actual malice a jury issue.

Defendants' Motion should be denied.

Dated:  July 17, 2020.

*/s/ Shane B. Vogt*
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@bajocuva.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 443-2199
Facsimile: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff*

---

[7] *See also Vasquez v. O'Brien*, 85 A.D.2d 791, 792 (3d Dep't 1981) ("The content of the statements themselves and the context in which they arose may give rise to significant suggestions of possible falsity which should alert the speaker ... [and] inaccurate or untrue use of language, in the intense political climate then prevailing, could certainly be found to be evidence of actual malice on the part of defendant.").

**JA 1478**

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment was filed electronically on July 17, 2020.  This Notice will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt.  Parties and their counsel may access this filing through the Court's system.

                             */s/ Shane B. Vogt*
                             Attorney

# JA 1479

**IN THE UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                                   :

SARAH PALIN,                   :   No. 17 Civ. 4853 (JSR)

              Plaintiff,    :   ECF Case

                                     :

            -against-         :

                                     :

THE NEW YORK TIMES COMPANY and JAMES  :
BENNET,

                                     :

              Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## JOINT PRETRIAL CONSENT ORDER

       Pursuant to Rule 4 of the Court's Individual Rules of Practice, Plaintiff Sarah Palin and

Defendants The New York Times Company ("The Times") and James Bennet respectfully

submit this proposed joint pretrial order for the jury trial scheduled to commence on January 24,

2022.

**I.**    **JOINT OVERVIEW OF THE CASE**

       This is an action to recover damages for libel, also commonly referred to as defamation.

A libel is a false statement, in writing, about the plaintiff, which tends to expose the plaintiff to

public hatred, contempt, ridicule or disgrace.

       Sarah Palin is the former governor of Alaska and a former vice-presidential candidate.

The Times is a media company that that publishes *The New York Times* newspaper, and

Mr. Bennet was the Editor of the Opinion Section of the newspaper during the relevant period.

# JA 1480

On the morning of June 14, 2017, a gunman named James Hodgkinson attacked a group of Republican members of Congress practicing for the annual Congressional Baseball Game at a field in Arlington, Virginia – hitting four people, among them Congressperson Steve Scalise. After the shooting, Defendants published an editorial entitled "America's Lethal Politics" (also referred to as the "Editorial").

The Editorial states, in part:

> "Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old-girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right."

Governor Palin asserts that these passages of the Editorial defamed her. Defendants contend that Governor Palin cannot satisfy her burdens of proof on the elements of her defamation claim.

## II.    GOVERNOR PALIN'S PARTICULARIZED DESCRIPTION OF HER CLAIM[1]

Governor Palin's libel claim is based on the following defamatory passages in "America's Lethal Politics":

> "Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old -girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

---

[1] Defendants have not asserted any claims or counterclaims.

# JA 1481

> Conservatives and right-wing media were quick on Wednesday to
> demand forceful condemnation of hate speech and crimes by anti-
> Trump liberals. They're right. Though there's no sign of
> incitement as direct as in the Giffords attack, liberals should of
> course hold themselves to the same standard of decency that they
> ask of the right."

Defendants published these defamatory passages, which are "of and concerning"
Plaintiff, false, and defamatory, both online and in print. Specifically, Governor Palin maintains
that these passages falsely assert that she "incited" Jared Loughner to "open fire in a supermarket
parking lot, grievously wounding Representative Gabby Giffords and killing six people,
including a 9-year-old-girl," and that Governor Palin's "political incitement" of Loughner's
crimes was clear and directly linked to the "Giffords attack." As a matter of law, the challenged
statements are actionable without proof of special damages because they tend to expose
Governor Palin to hatred, contempt, ridicule, or disgrace and, independently, because they are
reasonably susceptible to a connotation of criminality and/or tend to disparage Governor Palin in
her office, profession, occupation, or trade.

## III. PARTICULARIZED STATEMENT OF THE SPECIFIC FACTS, STIPULATIONS, ADMISSIONS, AND OTHER MATTERS ON WHICH THE PARTIES AGREE

### Factual Stipulations

1.  In 2006, Governor Palin was elected as the first female governor of Alaska.

2.  Governor Palin rose to national prominence when Senator John McCain selected
    her as his running mate in the 2008 presidential election, becoming the first
    woman nominated to be the Republican vice-presidential candidate.

3.  On January 8, 2011, Loughner attacked a "Congress on Your Corner" political
    event hosted by Congressperson Giffords at a supermarket parking lot in Tucson,
    Arizona. Loughner shot 19 people, killing six, including a nine year-old girl and
    Chief Federal Judge John Roll, and severely wounding Congressperson Giffords
    and others.

4.  In May 2016, The Times hired Bennet as Editor of the Opinion Section.

# JA 1482

5. On the morning of June 14, 2017, Republican members of Congress were at a field in Arlington, Virginia, practicing for the annual Congressional Baseball Game, when James Hodgkinson shot and wounded Republican Congressperson Scalise and others, before he was shot and killed by police.

6. In June 2017, the Editorial Board members and Opinion staff at The Times included, among others, the following individuals who worked on "America's Lethal Politics":

- Bennet was the Editor of the Opinion Section of The Times during the relevant period.

- Robert B. Semple Jr. was an Editorial Board Member who served as an associate editor and had worked for The Times for around 50 years when The Times published the Editorial. Semple has since retired from The Times.

- Linda Cohn was an Editorial Board Member who had served as an editor within the Opinion Section since 1988 and retired in November 2017.

- Nick Fox is an Editorial Board Member who serves as an editor within the Opinion Section and has worked for The Times since 1995.

- Jesse Wegman is an Editorial Board Member who joined the board in 2013 and is focused on The Supreme Court and legal affairs.

- Elizabeth Williamson was an Editorial Board Member who joined the board in 2015 and focused on national politics and the United States Congress. Williamson is now employed by The Times for its Features Section.

- Eileen Lepping has been a researcher for the Editorial Board since 2007 and served as the "main" fact-checker in 2017.

- Phoebe Lett was a research, administrative, and editorial assistant for the Editorial Board who performed various administrative tasks and helped with researching and fact checking in 2017. She remains at The Times in a different role.

7.      Soon after this shooting, Hodgkinson was identified as a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump.

8.      On June 14, 2017, Times Editorial Board Member Elizabeth Williamson wrote the first draft of the Editorial.

9.      Bennet revised Williamson's draft.

10.     At approximately 9:45 p.m. on June 14, 2017, The Times published "America's Lethal Politics" on The Times's website

11.     On June 15, 2017, The Times published "America's Lethal Politics" in the print edition of the newspaper.

12.     At approximately 11:15 a.m. on June 15, 2017, The Times published a revised digital version of "America's Lethal Politics" and added the following to the end of the Editorial:

> *Correction: June 15, 2017*
> *An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.*

13.     At approximately 11:15 a.m. on June 15, 2017, The Times's Opinion Section tweeted about this correction.

14.     The Times's main Twitter account re-tweeted the above tweet.

15.     On June 16, 2017, The Times published a print version of the corrections at the bottom of its Editorial Page.

16.     Governor Palin is not seeking to recover and will not claim or assert loss of income, job, or other paid opportunities, including losses of book sales or any decrease in ad revenue from sarahpalin.com or any other websites.

### Documents

1.      The parties waive all objections to the admissibility of documents listed on each party's Rule 26(a)(3) disclosure on the ground that they are duplicates under Federal Rule of Evidence ("FRE") 1002 (originals) and 1003 (admissibility of duplicates), except to the extent that the version of a document produced at trial varies materially from the original.

# JA 1484

IV.  **EACH PARTY'S PARTICULARIZED CONTENTIONS AS TO THE SPECIFIC FACTS THAT ARE DISPUTED**

A.  **Plaintiff's Contentions as to Disputed Facts**

The following are facts Plaintiff asserts which she understands Defendants some of and dispute the legal significance:

### 1.    Publication

Shortly after 7:00 a.m. on June 14, 2017, James Hodgkinson opened fire on Republican members of Congress practicing for the annual Congressional Baseball Game for Charity, severely wounding Representative Scalise, House majority whip, as well as Capitol Police Officer Crystal Griner, congressional aide Zack Barth, and lobbysit Matt Mika.  The Times published "news reports" about the Scalise shooting soon after it occurred and throughout the day on June 14, 2017.

Later that morning, *Times* Editorial Board member Elizabeth Williamson raised the question of whether the Editorial Board should write about the shooting.  After quickly researching the shooter and locating his social media pages, which contained pro-Bernie Sanders and anti-Trump messages, Williamson circulated this information to Bennet and Board members Semple, Fox, and Cohn.

Initially, Semple was uninterested in writing about a "nut case who hunts republicans," but eventually wanted to pursue a "gun control angle."  At one poiont, Cohn mentioned the Giffords shooting.  Semple decided at 12:08 p.m. that the Board should "shoot for a piece" that would:  (1) focus attention on the shooting; and (2)  restate the longstanding position of The Times's Editorial Board in favor of gun control.

Approximately forty minutes after Semple made this decision, Bennet interjected with his narrative about "the rhetoric of demonization and whether it incites people to this

# JA 1485

kind of violence" and the "inciting hate speech" he "tended to associate with the right." Bennet "thought that [the Board] should deal with this issue of incitement if there was evidence of inciting hate speech on the Left." Bennet has conceded that he and the Board never uncovered any evidence of inciting hate speech on the Left leading up to Hodgkinson's shooting.

Williamson was tasked with writing the piece, and Bennet specifically asked her to research whether there was a link between incitement and the Loughner shooting and whether there was any evidence of a link between incitement and the Hodgkinson shooting. Bennet also told Times researcher Phoebe Lett that he was wondering whether there were any editorials "connecting to the Giffords shooting to some kind of incitement?"

As directed by Bennet, Williamson researched Loughner's shooting and knew she could not say there was a link between it and the map circulated by Sarah Palin's political action committee. She also knew any assertion that there was a clear and direct link between Gov. Palin and Loughner's Shooting would be false, so she made no such assertion in her draft. Bennet conceded that Williamson's first draft of the editorial embodied the research he specifically asked her to conduct, and Williamson testified she wrote her draft consistent with what the research Bennet asked for showed.

Williamson's draft included a hyperlink to a January 9, 2011 ABC article by John Berman, which is a "4 Min read" and in its first multi-sentence paragraph states: "No connection has been made between this graphic and the Arizona shooting…" At around 4:45 p.m., Williamson emailed her draft to Bennet, Semple, Fox, Frank Clines, and Cohn.

Bennet then rewrote the piece, significantly changing the passage reflecting the results of Williamson's research and replacing it with the defamatory passages. Defendants

published the false and defamatory passages of "*America's Lethal Politics*" online and in print and promoted the piece on their social media accounts. The Editorial was also prominently featured on The Times's homepage.

### 2. __Of and Concerning__

As stated in the Editorial, the map referenced in the defamatory passages was "circulated" by "Sarah Palin's political action committee." This political action committee, SarahPAC, was formed in 2009 for Governor Palin to promote candidates she supported and build an organization to support her future political plans. She was the eponymous figurehead of her PAC, and its publications and related materials prominently featured images of Governor Palin and her signature.

The defamatory passages of the Editorial are reasonably understood as referring to Governor Palin. Among other things, the Editorial refers to Governor Palin specifically by her full name in the context of the challenged statements. Public reaction to the Editorial after it was published, including reader comments and emails, social media posts, and reports and press inquiries by members of the media, demonstrate the defamatory passages are "of and concerning" Governor Palin.

The Times's witnesses confirmed through testimony that the Editorial references and is about Governor Palin. Hannah Ingber, who worked on with Bennet on the Tweets about the correction, even referred to the Editorial as the "Sarah Palin editorial." In emails on the night of June 14, 2017 and the morning of June 15, 2017, Times columnist Ross Douthat repeatedly recognized Governor Palin as the subject of the defamatory passages in the Editorial, including when he told Bennet that "[t]here was not, and continues to be

8

so far as I can tell, no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else…"

3.    **Falsity**

As Bennet and others have conceded several times, the challenged passages about Gov. Palin in the Editorial are false statements of fact.  Defendants admitted falsity in their correction and Tweets about it:



**JA 1488**

The Times's correction policy is explained in its Manual of Style and Usage, which provides:

> **corrections.** Because its voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small (even misspellings of names), promptly and in a prominent reserved space in the paper. A correction serves all readers, not just those who were injured or complained, so it must be self-explanatory, tersely recalling the context and the background while repairing the error…If a correction is warranted, it should follow immediately…For the handling of more general lapses (those of fairness, balance and perspective), *see* editor's notes.

The use of a correction as opposed to an Editor's Note in this instance proves the challenged statements were false statements of fact, not a legitimate misunderstanding over the meaning of the word "incite."

The night of June 14th, Times columnist Ross Douthat told Bennet the Editorial was false because "[t]here was not, and continues to be so far as I can tell, no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else…" The following morning, Douthat stated to Bennet: "the point is that the map had no link, none at all, to Gifford's actual murder." In Douthat's email string with Bennet, he also told Bennet "people assumed a link initially—there was a Paul K[rugman] column that was particularly vivid in blaming Republicans—but the investigation debunked it."

After the Arizona shooting, law enforcement conducted a thorough investigation, during which they searched Loughner's home and seized a letter from a safe in his basement written by Giffords in 2007 (3 years before the map was created) along with other materials about his planning of the attack.

A well-known consensus was reached shortly after Loughner's shooting that it was not connected in any way to the map. The Times, The Atlantic (while Bennet was at its

# JA 1489

helm), Wall Street Journal, and Washington Post—all of which Bennet was "regularly reading" for his news in 2011—were among the major news outlets confirming within days of Loughner's shooting that it was not linked to incitement, Palin, or the map in any way. In fact, The Times wrote about how the media's rush to judgment in blaming Gov. Palin for Loughner's actions should be a teaching moment—an example of how the media's bias and "storytelling habits" led them to falsely accuse Gov. Palin of inciting the shooting when it became known fairly quickly that Loughner was not motivated by anything Gov. Palin said or did.

President Obama even made a statement during the Loughner shooting memorial service that "If, as has been discussed in recent days, their death helps usher in more civility in our public discourse, let us remember it is not because a simple lack of civility caused this tragedy—it did not."

The Times's witnesses who investigated the underlying facts surrounding Loughner's shooting also confirmed no link between Loughner and the map was established. Lepping testified "[T]here was a [police] report saying that there was no direct connection between political incitement and the Loughner shooting." Cohn testified, "I know that there was no link established between the [map circulated by Sarah Palin's PAC] and the Giffords shooting." She also testified that as soon as she arrived at work early on the morning of June 15, 2017, everyone already knew the challenged passages were false

The second correction admits the Editorial falsely asserted the map placed crosshairs over individual lawmakers:

**JA 1490**

*Correction: June 16, 2017*
*An editorial on Thursday about the shooting of Representative Steve Scalise*
*incorrectly stated that a link existed between political rhetoric and the 2011*
*shooting of Representative Gabby Giffords. In fact, no such link was*
*established. The editorial also incorrectly described a map distributed by a*
*political action committee before that shooting. It depicted electoral districts,*
*not individual Democratic lawmakers, beneath stylized cross hairs.*

4.    **Defamatory**

The defamatory passages in the Editorial are actionable without proof of special

damages because they were published in writing and tend to expose Governor Palin to

hatred, contempt, ridicule, or disgrace.  Independently, the challenged statements also

(although need not) qualify as defamatory "*per se*" because they are reasonably

susceptible to a connotation of criminality and/or tend to disparage Governor Palin in her

office, profession, occupation, or trade.

Bennet used the "very strong" word "incitement" because he "wanted to get our

readers' attention" and knew the term was used to mean "deliberate orders, invocations,

summonses for people to carry out violent attacks," and understood as meaning "a call to

violence."  Bennet found inspiration for his narrative about Gov. Palin's "incitement" of

Loughner in Thomas Friedman's August 9, 2016 column, "*Trump's Wink Wink to 'Second*

*Amendment People*," and its premise that "Donald Trump's language… could end up

*inciting*… violence," akin to the "wave of toxic *incitement* against [Yitzhak] Rabin," which

included calls for Rabin's death prior to his assassination at a peace rally in 1995.

Cohn understood "incitement" to be "very direct" and meaning "that it—that the

map led him to commit the shooting"  As discussed above, Douthat immediately

understood Bennet's use of "incitement" to draw a direct connection between Palin and the

map and Loughner's shooting.  Reaction to the Editorial after it was published, including

reader comments and emails, social media posts, and reports and press inquiries, demonstrate the same.

When Loughner opened fire at the "Congress on Your Corner" event hosted by Congressperson Giffords for her constituents in Tucson, he murdered a nine-year-old girl, federal judge, and five other people, and severely wounded thirteen others, including shooting Representative Giffords in the head. Aseertin that Plaintiff "incited" these crimes subjected Plaintiff to hatred, ridicule, and disgrace. The details of these crimes are laid out in law enforcement investigation files about the attack. Loughner was charged with attempting to kill a Member of Congress (18 U.S.C. 351(c)); attempting to murder a federal employee (18 U.S.C. 1114); use of a firearm in relation to a crime of violence (18 U.S.C. 924(c)(1)(A); murder of a federal employee (18 U.S.C. 1114); causing a death through the use of a firearm (18 U.S.C. 924(j)(1)); causing the death of participants in a federally provided activity (18 U.S.C. 245(b)(1)(B)); and injuring participants in a federally provided activity (18 U.S.C. 245(b)(1)(B). The "incitement" of these crimes violates 18 U.S.C. 373.

## 5. **"Actual Malice"**[2]

Despite claiming his true intent was to "express concern about the state of political rhetoric," Bennet rewrote Williamson's draft even though it already said what Bennet claims he was trying to convey. If what Bennet claims were true, there was no reason to

---

[2] Governor Palin asserts the facts in this section without waiving her arguments and positions against the continued viability and applicability of the actual malice standard under *Times v. Sullivan*, as well as her arguments against the application of that standard under New York's Anti-SLAPP statute—both of which this Court previously rejected [Doc. No 117 and 125]. Plaintiff preserves these arguments for purposes of any subsequent appeal in this case. Also, there are a number of disputed facts outlined in the Court's Order denying summary judgment [Doc. 117] which, to the extent not specifically referenced herein, are incorporated by reference.

**JA 1492**

make any changes.

Bennet admits reasonable readers understand "incitement" to mean a "call to violence." He also knew "rhetoric" and "incitement" have different meanings, and even changed the word "incitement" to "rhetoric" in the second correction. Bennet's own definition of "incitement," a "very strong word," originates from "incitement" leading to violent attacks, such as the assassination of Rabin. Bennet admitted Friedman's article about incitement leading to Rabin's assassination was a driving force behind his choice of language. Bennet also knowingly used the word "incitement" in the context of the Scalise shooting under the title "Lethal Politics."

The title's reference to "Lethal Politics" in conjunction with the word "incitement," which Bennet admittedly knew to mean "deliberate orders, invocations, summonses to carry out violent attacks," clearly demonstrates Bennet intended to convey to readers that Gov. Palin incited Loughner to shoot and murder innocent people. Cohn new exactly what "incitement" meant: "that it – that the map led him to commit the shooting."

Bennet specifically instructed Williamson to research whether there was any established link between incitement and Loughner's shooting. Bennet conceded, and Williamson confirmed, her draft embodied the results of her research. Thus, Bennet knew there was no link to incitement but rewrote the draft anyway to say one existed – consistent with the narrative he already decided to publish.

Bennet's claim that he cannot recall whether he read news reports and posts confirming no link existed lacks credibility. Bennet is a very intelligent person with a good memory and conceded he "regularly" read The Times and "consumed" The Atlantic's website in 2011, even admitting he "must have read" some of The Atlantic's articles about

Loughner and spoke with Andrew Sullivan about the shooting. If a "direct" and "clear" link had been made between Palin's map and the Loughner shooting, Bennet agreed that would have been something he would have known because the Loughner shooting was a "very big story" and political discourse and gun control were two of Bennet's hot button issues

Bennet "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like." Bennet also regularly read Andrew Sullivan's *The Dish*, published on The Atlantic's website[3], and recalled Sullivan writing about Sarah Palin. Sullivan live-blogged about the Loughner shooting on The Atlantic's website and posted several other pieces about the shooting which denounced any "link" between Palin and Loughner's crime

As noted above, soon after the Loughner Shooting, Bennet received a potential article and hyperlinked story ("How the media botched the Arizona shooting") which, like a Times article written at the same time, discussed the false narratives of incitement surrounding the Loughner shooting and explaining how journalists to falsely concluded Palin incited Loughner's crimes.

Bennet also received daily email updates for pieces posted by The Wire on The Atlantic's website, as well as "Daily News Roundup" emails containing relevant news

---

[3] The Dish was "integrated" into The Atlantic's website –it was "digitally present[ed] as part of the Atlantic.com [and] …its audience would be credited -- as part of The Atlantic's network of sites"—and The Atlantic "took responsibility for the production, meaning, the digital production of the site… mean[ing] maintaining the links, maintaining the archive, and so forth, and at the same time had the ability to sell advertising on the business side against the content that -- and the page views that [The Dish] was producing.

# JA 1494

stories posted on The Atlantic's website. The January 10, 2011 article, "*What We Know about Jared Lee Loughner*," posted on The Atlantic's website notes, "He Was More Delusional Than Political… Jared Lee Loughner appeared to be more driven by a delusional mind than a real interest in politics, mental health experts said Sunday." The article also references and hyperlinks The Times's January 9, 2011 article, "*Suspect's Odd Behavior Caused Growing Alarm*" an in-depth report about Loughner's behavior and past. A year-ending piece, "*Ten Days That Defined 2011*," that ran on *The Atlantic's* website recognized that it was wrong to link Gov. Palin to the Loughner Shooting:

> In a meta media sense, the bad thing to come out of this already terrible story was a round of blame hurling, with people rushing to point at Sarah Palin's infamous <u>target map</u> or Loughner's left seeming (but not really) anti-Bush sentiments. In truth, Loughner is clinically insane and this was not really about politics at all. That many, including us, immediately jumped to that conclusion says some pretty sorry things about the state or our political machine.

Bennet conceded at his deposition that "it's possible" he read "*Ten Days That Defined 2011*."

Bennet injected his narrative after seeing the shooter's pro-Sanders social media 40 minutes after the decision was already made to write about gun control. He rewrote the piece because Williamson's version didn't advance his narrative. Bennet pursued his narrative based on a "pattern" of incitement he knew did not exist and ignored the results of Williamson's research so he could advance it. Bennet pursued his narrative and disregard the truth for several reasons, including his personal biases, agenda, and "political scorekeeping." Bennet purposefully avoided the truth, ignoring Williamson's research and failing to read any of the research conducted and ABC article in the hyperlink, so he could advance his narrative.

From the outset, Bennet was predetermined to use the Loughner Shooting as "political incitement" to counterbalance the fact that Hodgkinson was pro-Sanders and anti-Trump, and recent criticism over the Kathy Griffin Trump-beheading situation and The Times's sponsorship of the Shakespeare in the Park production featuring Trump as Cesar.

Bennet already knew that there was no established connection or link between political rhetoric or "incitement" and Loughner's shooting, let alone any "clear" and "direct" link between Gov. Palin or the map and Loughner's horrific crime, but he already had made up his mind that "hate-type speech" needed to be used to counter-balance the Left's rhetoric leading up to Hodgkinson's attack on Republican lawmakers.

At Bennet's request, Williamson specifically researched whether there was a link between the Palin map and Loughner shooting and whether there was any evidence of a link between incitement and the Hodgkinson shooting.  Eventually, Lett and Williamson also looked to see whether they could find the piece about "hate-type speech" Bennet referenced in an earlier email, although Williamson had no idea what Bennet meant by that term.  In response to an email from Williamson about Bennet's request, Lett emailed Bennet asking, "I'm trying to find the piece Elizabeth is referring to here, do you happen to know which one she is talking about?"  Bennet responded to Lett (not Williamson) asking, "No—I was just wondering if there was such a piece; that is, did we ever write anything connecting to the Giffords shooting to some kind of incitement?"  Lett replied to Bennet's email by forwarding him a link to a Frank Rich column "*No One Listened to Gabrielle Giffords*."  Bennet responded to Lett by saying "Good for Us.  Can you let Elizabeth [Williamson] know?"

**JA 1496**

Although Bennet testified that he doesn't recall what he meant by "Good for Us," this statement demonstrates Bennet was glad because he felt he was free to advance his preconceived narrative. Bennet followed up by asking Lett to send him the four basic gun control pieces Semple asked Lett to send to Williamson, but Bennet claims he does not recall whether he read all these materials Lett sent him. Later, Bennet asked Lett to "dig a little further" because it "seemed strange" to him that the Editorial Board had not "editorialized at all about the [Loughner] shooting…because it was an important news event and the kind of thing we would typically editorialize on." Lett found 2 additional Editorials ("*Bloodshed and Invective In Arizona*" and "*As We Mourn*"), but Bennet claims he does not recall reading those pieces either. Notably, the "*As We Mourn*" editorial discusses President Obama's speech about Loughner's shooting and statement that Loughner's shooting cannot be blamed on rhetoric.

Bennet had ample time to click on the hyperlink and review the ABC article, but chose not to. He made his first change to the operative paragraph of Williamson's draft at **6:39 p.m.** and had re-written that paragraph and the following one to include the defamatory statements by **6:58 p.m.** As noted in the byline of the ABC Article, it would at most only have taken 4 minutes to read that entire article.

At around 5:00 p.m., Cohn took Williamson's draft to Bennet's office and spoke with him about it because she (like everyone else besides Bennet) was not sure what he wanted in the piece:

> I sort of remember standing in front of his glass door, you know, opening up the door or something, and saying, "You need to look at this."…I recall thinking I wasn't really sure if its what he wanted. I thought there had been quite the confusion over the day as to where this piece was headed, as to be either more of a gun control piece or to be more of a piece about the political climate and the sort of lack

## JA 1497

of civility in America's political discourse...I wasn't sure what James intended, wanted in the piece. I wasn't sure if the piece worked…I wasn't sure it accomplished what James would want it to accomplish…there were a couple competing ideas about the piece…

Cohn testified that when she went to Bennet's office to raise her concerns about the piece, Bennet responded by saying something along the lines of, "yeah, it needs some work, I'll do it." At that point, Bennet rewrote the editorial consistent with his preconceived narrative expressed in his earlier email (that draft "wasn't exactly accomplishing the objective that we had set out to achieve," so Bennet "effectively re-wrote the piece.").

In doing so, Bennet knowingly re-wrote the paragraph that embodied the results of Williamson's research, replacing it with his preconceived narrative, including the defamatory statements. As an experienced editor, Bennet knew and understood the meanings and significance of the words he used. Bennet sent his rewrite to Williamson at around 7:30 PM—leaving plenty of time for him to check his facts before publication. Bennet was responsible for fact-checking the portions of the editorial he re-wrote.

An editorial is not "hot news," and The Times had other editorials on deck to run instead of the Editorial. Plus, the Hodgkinson shooting was already being covered by The Times newsroom. Cohn testified the "goal" was to get it in the next day's print paper but there were already at least two or three other editorials scheduled to run the next day that could have been run instead. The Editorial could have waited until the following day to make sure it was accurate—if Bennet had actually cared about its accuracy. Regardless, there was plenty of time to read the research Bennet requested and read the source Williamson included in her draft.

# JA 1498

Bennet admittedly failed to follow The Times's heightened journalism standards and never fact-checked his re-write; even going so far as to ignore the results of Williamson's research and all the other materials his colleagues sent for him to review on June 14, 2017.

The Times admittedly holds itself to a higher standard of care with respect to seeking and publishing the truth. The Times holds itself to "the highest standards of journalistic ethics." The Times's journalism standards apply to the newsroom and opinion section alike. ("These guidelines generally apply to all members of the news and editorial departments whose work directly affects the content of the paper…")] In June 2017, The Times and Bennet were bound by The Times's Ethical Journalism Handbook of Values and Practices for the News and Editorial Departments and the Guidelines on Integrity.

When it comes to facts—verifiable pieces of information—editorials are no different than any other article in *The Times*—the Editorial Board's policy is that if something is represented as a fact, it has to be correct. The Times's Editorial Department "ensures" facts are correct "[t]he same way the newsroom does, by reporting." The Editorial Board relies upon the news pages of *The Times* (and other papers) for facts to support editorials.

Editorial Board writers have the first and primary responsibility for fact-checking, although they are "backed up" by the editors who edit their editorials, staff researchers and copy editors. With respect to the Editorial at issue in this case, Bennet was responsible for fact-checking the portions he re-wrote.

The relevant policies governing The Times and Bennet from the Ethical Journalism Handbook provide:

A. "DUTY TO READERS": "In print and online, we tell our readers the complete, unvarnished truth as best we can learn it. It is our policy to correct our errors, large and small, as soon as we become aware of them. ]

B.       "FAMILY TIES": A spouse or companion who runs for public office would obviously create the appearance of conflict for a political reporter or an editor involved in election coverage. A brother or daughter in a high-profile job on Wall Street might produce the appearance of conflict for a business reporter or editor…To avoid such conflicts, staff members may not write about people to whom they are related by blood or marriage or with whom they have close personal relationships, or edit material about such people or make news judgments about them.

The Guidelines On Integrity provide that "it is imperative that The Times and its staff maintain the highest possible standards" and practice daily journalism which must be "beyond reproach" including the following specific practices:

a.     <u>Fact Checking</u>: Writers at The Times are their own principal fact checkers and often their only ones…If deadline pressure requires skipping a check, the editors should be alerted with a flag like "desk, please verify," but ideally the writer should double back for the check after filing; usually the desk can accommodate a last-minute repair…

b.     <u>Corrections</u>: Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small…any complaint should be relayed to a responsible supervising editor and investigated quickly. If a correction is warranted, fairness demands that it be published immediately. In case of reasonable doubt or disagreement about the facts, we can acknowledge that a statement was "imprecise" or "incomplete" even if we are not sure it was wrong.

**JA 1500**

Bennet confirmed he and The Times followed the policies embodied in The Times Ethics Handbook and Guidelines on Integrity in June 2017. Ultimately, Bennet acknowledged he is responsible for the accuracy of every editorial published by *The Times*, particularly the editorials which he authors and edits. Bennet's failure to adhere to journalistic standards was used as the justifications for ending his employment in June 2020, after The Times's increasingly liberal staff revolted over a highly controversial column Bennet approved for publication but later admitted he never reviewed.

Defendants published the challenged statements about Plaintiff knowing they were false or, at minimum, in reckless disregard of their truth, purposefully avoiding information easily demonstrating the falsity of the statements, in part because of bias and ill-will toward Plaintiff and her politics.

The Times's Public Editor, Liz Spayd, acknowledged that The Times's coverage "is in fact biased" and that "the Opinion section [] promotes the columns and editorials of its mostly liberal writers." As one example, a Times's gun control editorial Spayd mentioned ("End the Gun Epidemic in America") was published December 15, 2015 and ran on the front page of the newspaper—the first time an editorial has such placement since 1920.

Defendants are also biased when it comes to the Second Amendment and gun control, publishing numerous pieces and a book about the subjects. Bennet was "very concerned [about] the epidemic of gun violence," and gun control is "important to [him] personally. Bennet's bias runs so deep that he openly admitted never calling out the Left for employing the same type of "rhetoric," images, and terminology he attacked Gov. Palin

for using.  For example, he does not consider a bullseye map "targeting" Republicans posted by Democrats "incitement."

Defendants have a history of bias against Sarah Palin. Bennet described Palin as "in over her head," "lacking sufficient preparation," and "polarizing."  Bennet hied Andrew Sullivan because of his controversial, polarizing, style, which increased The Atlantic's traffic by 50% (1 million to 2 million unique visitors), including through regular, vicious attacks against Sarah Palin—the worst of which was "Trig-Trutherism," an ongoing campaign maintaining Governor Palin is not actually the mother of her son, Trig.  Within The Times, Palin was seen as a convenient target for attacks against conservative policies and a subject likely to spark readership interest, as described by Charles M. Blow in his column "She Who Must Not Be Named."

Bennet's bias also stems from family ties.  His grandfather was an aid to Chester Bowles and served as an economic adviser in the Roosevelt Administration.  His father was a Washington insider with an esteemed career in politics, journalism, and the educational field.  Bennet shined at the prestigious St. Albans School in Washington D.C. and Yale before interning for Sen. Tom Eagleton.  Bennet's brother, Sen. Michael Bennet, served in the Clinton Administration, worked in the Clinton White House, and was national co-chair of President Obama's re-election campaign.  Bennet is close with his brother, and edited speeches for and traveled with him for the last 2 weeks of his 2010 Senate campaign.

Bennet's brother was running for re-election in 2010 when the map of targeted electoral districts, which including two districts in Sen. Bennet's home state, circulated. On January 6, 2011—two days before the Loughner Shooting—a man called Sen. Bennet's offices and threatened to "come down there and shoot you all."  Following additional

threats, the man was arrested (two days after the Loughner Shooting). The FBI placed additional security at Sen. Bennet's home and Denver office. Bennet knew about the threats made against his brother, which were also reported by The Atlantic in an article also disclosing the family connection between Bennet and his brother.

Both Bennets are outspoken advocates for gun control. Bennet hosted a gun control forum attended by Gabby Giffords and Mark Kelly (Americans for Responsible Solutions). Sen. Bennet was endorsed by Rep. Gabrielle Giffords' PAC, Americans for Responsible Solutions, a gun control political action committee. Bennet and the Editorial Department regularly received emails from Giffords PAC and used its website as a resource for conducting research in support of their gun control positions. Sen. Bennet gave a floor speech on gun control on June 15, 2016 as of a filibuster after the Pulse Nightclub shooting. Sen. Bennet's floor speech occurred the same day James Bennet's Editorial Board published an editorial about the Pulse Nightclub shooting and was also circulating drafts of a book about political rhetoric and Sarah Palin.

Bennet's purposeful avoidance of the truth also stemmed from A.G. Sulzberger's directives for Bennet to stir controversy to drive readership and revenue. Among other things, Sulzberger lauded Bennet for his hiring of Michelle Goldberg, Brett Stephens, and Bari Weiss. Sulzberger also told Bennet to "move faster, take bigger risks, and play more aggressively outside your lanes," and that he wanted "more" of what occurred in 2017, instructing Bennet to "[a]sk for forgiveness, not permission…[because] you enjoy much more autonomy and a much bigger tolerance for risk…[which] should give you the blessing to move faster or to make changes that are more disruptive," and also told him to "play

**JA 1503**

outside you lanes a bit more often." Bennet stoked numerous controversies during tenure at The Times:

- Bret Stephens hiring was very controversial and resulted in several factually inaccurate columns that garnered significant attention and had to be corrected.

- Michelle Goldberg was another controversial Bennet hire who wrote a book review the day she was hired that was plagued with factual errors for which a correction had to be issued.

- Bari Weiss was another very controversial Bennet hire involved in several controversies and factual errors.

- Bennet "hired" Quinn Norton but she never actually started working in the opinion department after public outrage over her "pattern of tweeting activity" Bennet begrudgingly admitted was "racist" led to Bennet's employment offer being "rescinded."

- Bennet also stoked controversy by hiring Sarah Jeong, who like Quinn Norton had a pattern of tweeting activity deemed by many to be "racist," although her employment offer was not rescinded because her tweets were directed at white people.

# JA 1504

- Bennet's tenure was also marked with publishing controversial pieces by the likes of Louise Mensch and Erik Prince.

The events leading up to the publication of the Editorial also reflect the growing bias, ill-will, and animosity toward Governor Palin and need for "political score-keeping" that led Defendants to publish the challenged statements despite their known and obvious falsity:

- In January of 2016, Gov. Palin endorsed Donald Trump for President, following which The Times's Opinion pages referred to her as a "Rage                                                                                    Whisperer."

- On June 7, 2016, Sarah Palin endorsed Republican candidate Darryl Glenn in Sen. Bennet's senate re-election race in Colorado.

- On June 13, 2016, after the Pulse Nightclub shooting occurred in Orlando, the Editorial Board published the editorial "*What Donald Trump Gets Wrong About Orlando*," which railed on Republicans for opposing gun control and causing "America's gun-violence epidemic."

- On June 15, 2016, Times's CEO Mark Thompson emailed Bennet an extract from his book, "Enough Said," which Bennet then forwarded to Times's deputy Op-Ed editor James Dao ("The good news is

26

that it's a book on political rhetoric"). The first chapter is devoted to Sarah Palin and rhetoric.

- That same day, Se, Bennet gave his Floor Speech on gun control as part of the Democratic filibuster.

- On August 9, 2016, Friedman wrote his column "*Trump's Wink Wink to 'Second Amendment People.*'"

- On August 24, 2016, Rep. Giffords' Americans for Responsible Solutions PAC endorsed Sen. Bennet in his senate re-election race.

- Soon after Trump was elected, on November 13, 2016, The Times published a letter to its readers pledging to "rededicate themselves to The Times "core mission." The same day, The Times engaged directly with President Trump on Twitter.

- On December 17, 2016, Bennet ordered the Book, "*The Persecution of Sarah Palin: How the Media Elite Tried to Bring Down a Rising Star.*"

- In early 2017, The Times embarked on its "Truth" advertising campaign and capitalized on refocusing its coverage to promote

its                     "subscription                     strategy."

- On February 7, 2017, Brent Staples emailed Bennet about concern and nervousness about anxiety within the Editorial Department, specifically mentioning "a right-wing propaganda tweet [from] Sarah Palin claiming The Times was desperately renting out floors because it was failing."

- In May 2017, Kathy Griffin posted a photo of herself holding a bloody severed head of President Trump, which drew widespread media attention.

- In early June, 2017, The Times eliminated its Public Editor—a position that essentially served as a watchdog and held it to account.  As she was being ousted, Public Editor Liz Spayd noted that The Times's elimination of its Public Editor position showed the paper's move away from "institutional integrity," demonstrated an unwillingness to seriously listen to criticism and doubt the impulses and wisdom of its inner sanctum, and was leading to "morph[ing] into something more partisan, spraying ammunition at every favorite target and openly delighting in the chaos."

- In the days leading up to the June 14, 2017 shooting, The Times was at the center of public criticism for its sponsorship of a Shakespeare in the Park

## JA 1507

production of Julias Cesar depicting Trump as Caesar, asother sponsors withdrew over public outcry that the play was a form of incitement.

Even after Bennet's false narrative was quickly identified by his colleagues and members of the press, he and The Times steadfastly refused to meaningfully correct the Editorial or apologize to Governor Palin. Defendants' half-hearted corrections were due to public backlash and embarrassment, and did not adequately address the libelous statements they published about Governor Palin.

The edits to the Editorial did not remove the entirely unnecessary reference in the piece to Gov. Palin, even though there was no established connection between "political incitement" and Loughner's crime or Hodgkinson's shooting. Even after being revised, the Editorial still suggests that a link exists or might still be established, which led Bennet's own colleagues to question why Palin was still being mentioned at all. Cohn testified that the International Edition of the Editorial, which was trimmed to remove any reference to Governor Palin, adequately conveyed the points the Board wanted to make in the piece. Given that Mr. Bennet's entire thesis in re-writing the Palin Article was supposedly the "sickening pattern" of politically incited violence that did not exist, the entire Editorial (or at least all references to Governor Palin) should have been retracted—not minimally and inadequately corrected.

Even after the second correction, Bennet refused to recede from his preconceived narrative, despite Wegman pointing out that keeping any reference to Palin in the Editorial was still trying to "sneaking the link in." Instead, Bennet reaffirmed his allegiance to his narrative in a statement provided to and published by CNN, in which he said:

> While it is always ***agonizing*** to get something wrong we appreciate
> it when our readers call us out like this. We made an ***error of fact***

in the editorial and we've corrected it.  ***But that error doesn't
undercut or weaken the argument of the piece.***

Bennet later revealed that he would not apologize to Governor Palin because The
Times has a policy prohibiting apologies, although there is nothing in writing to this effect.
Regardless, Bennet agreed that he never personally reached out to Governor Palin to
apologize either.

The Times's June 16, 2017, inadequate corrections published at the bottom of its
Editorial Page, in fine print was equally deficient.  This correction was completely devoid
of any reference or apology to Governor Palin.

## 6.    <u>Damages</u>

The Editorial Board represents the "loud and far-reaching voice" of The Times.
The Times is regarded as the "Paper of  Record," which reflects the considerable weight
and influence attributed to its "voice."  The Times actively promotes content in several
ways, such as on its social media accounts (i.e. Facebook and Twitter), homepage, through
news alerts and newsletters, and similar strategies.

The impact of Defendants' defamatory statements about Governor Palin were made
within the context of The Times's pledge to rededicate itself to accurate reporting and
publishing "the complete, unvarnished truth as best we can learn it."  The editorial was
published in the midst of The Times's advertising campaign, "The Truth Is Hard," which
debuted at the Academy Awards and Bennet promoted on his Twitter account.  The Times
used its commitment to publishing the "Truth" to convince the public about the accuracy
of the facts it published and to buy subscriptions: ("Support fact-based journalism" by
subscribing to The Times because "Truth. It has no alternative… it comes at a cost…
[and]… It's hard to find. But easier with 1,000+ journalists looking.)   The Times

## JA 1509

prominently featured its "The Truth is more important now than ever" ads on billboards in Manhattan and online.

Plaintiff seeks to recover damages for reputational harm, humiliation, embarrassment, and mental anguish. These types of damages do not lend themselves to precise calculation and will be determined by the jury based on what is fair and just. *See* N.Y. Pattern Jury Inst. – Civil § 3.29; *Maleski v. Long Island Railroad Co.*, 499 F.2d 1169 (2d Cir. 1974). Plaintiff also seeks damages for the cost of reputational repair or correcting the defamatory statements in the approximate amount of $421,000, which is supported by the testimony of her expert witness, Craig Kronenberger, and other documents and evidence, such as The Times's advertising rates and internal data related to the publication of the Editorial. Plaintiff also seeks to recover punitive damages, the amount of which have not been determined and falls within the jury's discretion. N.Y. Pattern Jury Instr. – Civil § 3.30. Plaintiff also seeks recovery of her attorneys' fees and recoverable costs.

7. **Plaintiff's Position On Defendants' Disputed Facts About The Map**

The map circulated by Sarah Palin's political action committee was created by an Internet consultant and staffer using symbols "pulled from Google mapping tools" to depict 20 congressional districts "that went for McCain-Palin but were represented by Democratic members."

Defendants' contentions about the "Don't retreat. Reload" tweet are irrelevant because (1) Bennet testified he was not was not even aware of this Tweet; (2) Bennet testified he was not aware of Governor Palin's use of this phrase when he wrote and published the defamatory the Editorial; and (3) Bennet testified he did not consider metaphors such as this used in politics to be "incitement." [Bennet Depo 98:19-99:13,

# JA 1510

102:11-23] Without waiving Plaintiff's objections to this evidence, Plaintiff also disputes Defendants' interpretation of the Tweet. The expression "Don't retreat. Reload" is "an old saying of [Gov. Palin's] dad's…a retired teacher and coach…that's where he would go with motivation…" and was never meant as an allusion to a gun, "Not at all. 'Don't retreat, reload,' means don't back down, don't let them tell you to sit down and shut up just because they have the power of the pen or whatever they—whatever they want to use to make you stop what you're doing if what you're doing is right. Don't let them. Don't retreat."

Defendants' contentions about another Tweet involving a "bullseye" are also irrelevant, and similarly misconstrue the facts. The Tweet does not characterize the map as placing a "bullseye" on lawmakers. Rather, Governor Palin testified she put the word "bullseye" *in quotes* because she used it "facetiously or, like, that's what they say, that's what they call it. But it wasn't hey, these are bullseyes, somebody go out and get an individual…I always put quotation marks around it to say this what somebody else says"

Defendants' contentions concerning attacks supposedly occurring after the map was circulated are also wrong and irrelevant. Rep. Giffords' office was vandalized early (2:40 a.m.) on the morning on March 22, 2010—**before** the map was posted on March 23, 2020. ["*Rep. Giffords' Tucson office vandalized after health care vote*" Arizona Daily Star, Mar. 22, 2010 ("The front door was smashed out at Congresswoman Gabrielle Giffords' congressional office last night."); March 23, 2010 10:18 a.m. "Don't Get Demoralized! Get Organized! Take Back the 20!" Tweet); "Vandalism reported at offices of three Democrats [including Giffords]", CNN, Mar. 22, 2010 (discussing vandalism before map posted); "Vandals Attack Dem Offices Nationwide," Talking Points Memo, Mar. 23, 2010 9:00 a.m. (compiling list of vandalism occurring **before** map was posted)]

## JA 1511

Other vandalism during that time period was directed at Representatives not identified on the map (*i.e.,* Rep. Carnahan (Missouri); Rep. Louise Slaughter (New York); Democratic Party offices (Wichita, Cincinnati, Rochester); Rep. Bart Stupak (Michigan)), and appear to have been inspired by Alabama blogger, Mike Vanderboegh, a "longtime leader and propagandist in the antigovernment 'Patriot' movement specializing in fiery rhetoric" who encouraged his followers to "Break [Democrats'] windows." In January 2011, *Mother Jones* reported that "Giffords Office Was Vandalized by Followers of Former Militia Leader [Vanderboegh]"

The "controversy" Defendants contend surrounded the map after the Loughner shooting was quickly resolved, long-before June 14, 2017. As Ross Douthat explained to Bennet on the night of June 14, 2017, "people assumed a link initially—there was a Paul K[rugman] column that was particularly vivid in blaming Republicans—but the investigation debunked it.". Speculation may have occurred in the days immediately after Loughner's shooting, but a consensus was quickly reached that Loughner's shooting was not incited by Governor Palin or linked to the map. The Times, The Atlantic (while Bennet was at its helm), Wall Street Journal, and Washington Post—all of which Bennet was "regularly reading" for his news in 2011—were among the major news outlets confirming within days of Loughner's shooting that it was not linked to or incited by Gov. Palin or the map.

**B.**     **Defendants' Contentions as to Disputed Facts**

Plaintiff's above contentions as to disputed facts are inaccurate, inflammatory, and contain assertions of fact that are unfounded, irrelevant, and unduly and unfairly prejudicial and

for that reason, are the subject of Defendants' motions *in limine*. The following are facts that Defendants assert and will establish at trial, and that Defendants understand Plaintiff disputes:

1. **The Crosshairs Map**

Palin denied at deposition that the crosshair symbol on the Crosshairs Map represented a gun sight, but she had described it shortly after publication as a "bull's eye," and, in the same period, "issued her now oft repeated rallying cry" to opponents of so-called "Obamacare": "Don't retreat. RELOAD."

At around the time of publication of the map, violent attacks on the offices of several Representatives it identified, including that of Giffords, led to a substantial national debate about the potential of such inflammatory rhetoric to incite those "on the fringe of the movement." At the time, Giffords said on national television "when people do that, they've got to realize there are consequences to that action." After the Arizona Shooting, there soon followed a renewed public controversy about the Crosshairs Map and whether it contributed to Loughner's attack on Giffords.

2. **The Drafting Process Demonstrates no Focus on Gov. Palin**

At around 10:45 a.m. on June 14, 2017, hours after the Virginia Shooting, Elizabeth Williamson, a writer for The Times's Editorial Board who was based in the District of Columbia, inquired of her New York-based colleagues via email whether the Board intended to write about the shooting. Williamson, Semple, Cohn, and to a lesser extent Bennet, discussed by email whether the proposed piece should focus on the horror of the shooting itself, the Board's long-held position in favor of sensible gun control regulation, or "concern about the state of political rhetoric in the country." During that email exchange, Cohn pointed out one difference she perceived between the responses to the Virginia Shooting and the Arizona Shooting a few years earlier, observing that she was "thinking back to what a giant story [G]abby Gifford[s'] shooting

34

was.  Amazing that shooting congressmen doesn't seem so shocking now."

        (a)      Research

Around noon, Semple decided that the Board should write a piece on the shooting, and Williamson began researching and drafting.  Initially, Williamson researched breaking news relating to the Virginia Shooting to "keep [herself] apprised of what authorities knew."  She also familiarized herself with the Arizona Shooting, which had occurred years earlier.  Semple, who suggested focusing on gun control measures, asked an Editorial Assistant, Phoebe Lett, to send several "basic gun control pieces" to Williamson.  Lett circulated four past editorials relating to gun policy, which incidentally referenced the Arizona Shooting and other notable shootings that had prompted policy debates.[4]

Bennet, who had suggested in an email that there might be "a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence," asked Williamson to be mindful of whether such rhetoric came from both sides of the political spectrum.  He also wanted to know whether there was "some evidence of a piece of incitement … that was directed at the ball players, the Congressmen who were playing ball that day."  Bennet did not, prior to publication of the Editorial, ask Williamson or anyone else to research the Arizona Shooting and/or determine whether Loughner had been motivated by politics generally, or the Crosshairs Map specifically.

Plaintiff repeatedly asserts or implies in this filing (as she did in her opposition to Defendants' motion for summary judgment) that, *prior* to publishing the Editorial, Bennet

---

[4] Much of the research focused on prior editorials by The Times, rather than its news reports or other news organizations' publications because, as Bennet testified, he assumed that the Board "had talked about the political climate and I wanted to harmonize whatever we were saying now with the position the board had taken" previously.

instructed Williamson to research "whether there was a link between the Palin map and Loughner shooting . . . ." and to research whether Loughner acted because of political incitement.  This is inaccurate.  Bennet first asked Williamson (and Eileen Lepping) to research whether there was any proof that the map had caused the Arizona shooting the morning *after* publication and after Douthat had shared his concerns with Mr. Bennet about the Editorial.  *See* DX-46.  Accordingly, Plaintiff's argument that actual malice is demonstrated by the fact that Bennet purportedly ignored Williamson's research when he revised her draft of the Editorial on June 14 is baseless.

(b)     Initial Draft

Williamson submitted her draft to her New York-based colleagues via The Times's document management system around 4:45 p.m. the day of the Virginia Shooting.  Williamson sought to deliver a message about the dangers of an abundance of guns and the risk that inflammatory political rhetoric could increase the likelihood that someone would commit a violent act.  As it relates to the language at issue in this case, Williamson's draft contained the following passage:

> Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured in a vile political climate.  Then, it was the pro-gun right being criticized: in the weeks before the shooting[,] Sarah Palin's political action committee circulated[5] a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

Williamson drafted the sentence including the reference to "Sarah Palin's political action committee."

---

[5] In her draft, Williamson inserted at the word "circulated" a hyperlink to a package of on-line news reports published by ABC.  The linked report, published in January 2011 shortly after the Arizona shooting, is titled "Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate."

36

# JA 1515

Cohn reviewed the draft and "wasn't sure if the piece worked," in part because she found it unclear whether the piece was focused on gun control or "about the political climate and the sort of lack of civility in America's political discourse." She added questions to the draft and handed it off to Bennet for his review.

Bennet agreed that the draft needed substantial revision. He thought that the top of that draft "read like the kind of piece that the news side was going to do" and he wanted to "capture the shock and wrongness" of the attack on members of Congress playing baseball. As the Editorial related to breaking news and the deadline for publication in the next morning's print edition was less than three hours away, he began editing it himself. Bennet made substantial changes to sections of the Editorial with which Governor Palin does not take issue, and he also edited the above-quoted paragraph from Williamson's draft and added a further paragraph, as follows:

> Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

Bennet did not intend to convey the idea that the Crosshairs Map directly caused Loughner to commit the Arizona Shooting. Instead, Bennet used the word "incitement" in a broad sense, to "talk about a range of communications" "that contributed to intensifying and raising the temperature of the political debate," – that is "very, very, strong language that

## JA 1516

describes the person on the other side of the debate as an enemy."[6]  And with respect to his use

of the words "link" and "direct," Bennet was referring to the fact that, prior to the Arizona

Shooting, the Crosshairs Map (which Bennet viewed as an example of "incitement" in the sense

he was using the term), had included Giffords' name and superimposed rifle crosshairs over her

congressional district.

     After Bennet completed his editing, Editorial Board members Cohn, Williamson,

Wegman, Fox, and Lepping all reviewed this draft.  Meanwhile, Cohn and another colleague

worked on fact-checking the draft, including the specific details of Virginia gun laws cited in the

draft, because Cohn knew from her experience that such laws were "ornate and detailed and

different in all the states."

     Above, Plaintiff suggests that Cohn knew the Editorial was making a false assertion

because Cohn purportedly testified that incitement means, "that it—that the map led him to

commit the shooting."  Plaintiff baldly misrepresents Cohn's testimony regarding the meaning of

incitement.  The full exchange accurately reflects Cohn's testimony, in which she *rejects* the

interpretation offered by Plaintiff's counsel:

---

[6] Plaintiff repeatedly asserts in this filing (as she did in her opposition to Defendants' motion for summary judgment) that Bennet testified that "the term [incitement] was used to mean 'deliberate orders, invocations, summonses for people to carry out violent attacks,' and understood as meaning 'a call to violence.'"  Plaintiff's assertion is based on a misleading edit of Bennet's testimony to remove the parts she does not like.  Bennet's full relevant testimony, from the Court's hearing on August 16, 2017, is as follows: "I was thinking about -- the way I view that particular word from is in my experience in one of my roles at the time that I was a correspondent in Jerusalem at one point for The Times, and the word 'incitement' is used there by the Israelis -- in my time by the Israelis about the Palestinians but also, to some degree, by the Palestinians about the Israelis to talk about *a range of communications* from, you know, to deliberate orders, invocations, summonses for people to carry out violent attacks to textbooks that are published that align important facts from the other side's national narrative or history, to tell outright lies about that history to maps that misrepresent the politics of the region.  And that's specifically where I was drawing that word from." (emphasis added).

Q:     And when you said "incited violence" in this bolded section that we've been looking at, at this time on June 14 of 2017, at 5:03 p.m., did you believe that the map that Sarah Palin's political action committee had circulated had incited Jared Loughner to commit his shooting in 2011?

A:     I -- no.  I -- not that directly.  I would think of it more as -- the way *you phrased it* sounds very direct, that it -- that the map led him to commit the shooting.  I -- no, I did not see that.  I saw it as, as one example of the kind of heated political rhetoric against which all these sorts of violent activities were happening.  That it was part of a backdrop of how the conversation in this country was becoming heated and often used violent imagery (emphasis added).

### 3.     Defendants' Response to Criticism of the Editorial Demonstrates a Lack of Actual Malice

The Times published the Editorial online at approximately 9:45 p.m.  Shortly thereafter,

Ross Douthat, an opinion columnist, brought to Bennet's attention by email around 10:00 p.m.

that evening questions about what he understood the Editorial to be suggesting.  Douthat

explained that he understood that there was "no evidence that Jared Lee Loughner was incited by

Sarah Palin or anyone else, given his extreme mental illness and lack of any tangible connection

to that crosshair map."  Bennet responded by email a few minutes later:

Thanks, and I'll look into this tomorrow. But my understanding [is] that in the Giffords case there was a gun sight superimposed over her district; so far in this case we don't know of any direct threat against any of the congressman on the field.  That's not to say that any of it is ok, obviously, or that the violence in either case was caused by the political rhetoric.  But the incitement in this case seems, so far, to be less specific.

Douthat in turn replied by email, explaining his concern about the Editorial as he had understood

it:

The targets were used by Palin, or her group, in a map of seats targeted for pickup in the midterms.  You can argue about whether that crosses a line … but the point is that the map had no link, none at all, to Giffords' actual murder.  People assumed a link initially … but the investigation debunked it.  I think Loughner was instigated by a non-answer she'd given him at a town hall about one of his theories of grammar, or his obsession with lucid dreaming, or something.  His act had nothing to do with the political climate, so far as anyone can tell.  Whereas the Alexandria shooter seems to have had an explicit

> political motivation.  So saying that Giffords was a case of incitement and this
> one isn't reads like we're downplaying that motive or implying that Loughner
> had right-wing motivations that he simply didn't have."

The testimonial and documentary evidence demonstrates without dispute that no one

involved in the preparation of the Editorial had intended to convey the proposition inferred by

Douthat and others.

In response to Douthat's late-night email alerting Bennet to the fact that some readers

were interpreting the Editorial as alleging the existence of a direct causal link between the

Crosshairs Map and Loughner's attack, Bennet immediately sent a message to Williamson to see

if she was available to begin investigating and, early the next morning, Bennet emailed several

people who had worked on the Editorial to request their help.  Bennet, who had not intended to

suggest such a direct causal link and therefore had not considered while writing the sentences

challenged by Palin whether such a link between the Map and Loughner's actions had been

established, explained in writing to his colleagues that morning that he was *unsure* whether a

direct connection between Loughner and the Crosshairs Map had been proven or disproven and

asked that they "get to the bottom of this as quickly as possible."

Until Bennet reached out to them on the morning of June 15, 2017, Williamson and Cohn

were unaware that the Editorial was being criticized for asserting that Loughner acted because of

the Crosshairs Map.  Neither had intended for the Editorial to make that assertion and, at the

point Bennet reached out to them on the morning of June 15th, neither knew whether that

assertion was accurate or not.  Both Lepping and Williamson promptly began looking into this

question.  Ultimately, they determined that multiple news outlets, including The Times, had

reported that Loughner was mentally unstable and appeared to have developed animosity toward

Giffords prior to SarahPAC's publication of the Map, but that it had never been affirmatively

proven or disproven whether Loughner was familiar with or inspired by the Crosshairs Map.

4.     **The Times Promptly Corrects the Editorial Less than 14 Hours after Publication**

The Times promptly revised the online version of the Editorial to remove the words that had caused readers to draw the unintended inference of an assertion that the Crosshairs Map was a direct cause of the Arizona Shooting, and later to make clear that, on the Map, the crosshair symbol appeared over Giffords' district, not over her name or image – though her name was listed separately.  Additionally, The Times published a tweet stating: "We got an important fact wrong, incorrectly linking political incitement and the 2011 shooting of Giffords.  No link was ever established.  We're sorry about this and we appreciate that our readers called us on the mistake."

5.     **Given the Absence of Actual Malice, Plaintiff Seeks to Make this Case About Anything But the Editorial**

From the facts surrounding the drafting of the Editorial to the responsive correction and revision there is a paucity of evidence of actual malice.  Recognizing this fatal deficiency, Plaintiff seeks to make this case about anything but the Editorial.  To that end, and as Plaintiff's summary above demonstrates, Plaintiff seeks to introduce irrelevant and unduly prejudicial evidence about the following distractions:

- Kathy Griffin's Photo of a beheaded Donald Trump

- A rendition of Julius Caesar in Central Park

- Sen. Tom Cotton's 2020 Op-Ed regarding the Protests Following George Floyd's Murder

- Andrew Sullivan's 2008 assertions about the parentage of Gov. Palin's son

- The fact that in 2014 James Bennet attended a forum at which Congresswoman Giffords and her husband were interviewed by someone (not by James Bennet)

- The 2016 Pulse Nightclub shooting in Orlando, Florida

41

- Sen. Bennet's Senate floor speech about the Pulse Nightclub shooting

- Louise Mensch's 2017 Op-Ed about Russian hacking

- Threats made against Sen. Michael Bennet that have no connection to this case

- The Times decision to revamp the "Public Editor" position and the question of whether the Reader Center was an adequate replacement

- Sen. Michael Bennet's 2016 Presidential campaign

- A 2016 book written by Times CEO Mark Thompson about the language of politics that includes a chapter that discusses Gov. Palin's use of language

- Bret Stephen's 2017 column about global warming

- James and Sen. Michael Bennet's family lineage

- Erik Prince's 2017 Op-Ed about Afghanistan

- The Times's liberal bias and position on gun control

- Bennet's decisions to hire diverse (and ideologically diverse) writers for the Opinion Section, including Sarah Yeong, Quinn Norton, Bari Weiss, and Bret Stephens

- Whether President Trump was good for The Times's business

**6.  Governor Palin Cannot Prove She was Harmed by Publication of the Editorial**

Less than two weeks after the Virginia Shooting and the publication of the Editorial, Governor Palin sued the Times.  She has not asserted that she suffered any particular financial or economic harm from publication of the Editorial, and she affirmatively has stated in the course of discovery in this action that she is not seeking to recover any such damages.  Governor Palin asserts generally that her reputation was harmed but she concedes that, since publication of the Editorial, she has not hired a public relations firm or any similar service to help repair the purported damage to her reputation.  Substantial evidence will show that any evidence of

reputational harm is far-fetched because by the time of publication of the Editorial, Gov. Palin already was viewed as a controversial figure with a complicated history and reputation, and in the time since the Editorial was published, Gov. Palin has prospered.

Governor Palin also seeks compensation for alleged emotional harm. However, Governor Palin will introduce no evidence whatsoever, other than her own self-serving and uncorroborated testimony, supporting her claim of alleged emotional harm.

## V.   RELIEF SOUGHT BY PLAINTIFF[7]

### A.   Plaintiff's Contentions Regarding Appropriate Relief[8]

Plaintiff seeks to recover damages for reputational harm, humiliation, embarrassment, and mental anguish. These types of damages are presumed, do not lend themselves to precise calculationm and will be determined by the jury based on what is fair and just. *See* N.Y. Pattern Jury Inst. – Civil § 3.29; *Maleski v. Long Island Railroad Co.*, 499 F.2d 1169 (2d Cir. 1974); *Rinaldi v. Winston, Inc.*, 42 N.Y.2d 369, 379 (1977); *Carey v. Piphus*, 435 U.S. 247, 262-263 (1978); *Stem v. Cosby*, 645 F.Supp.2d 258, 289 (S.D.N.Y. 2009); *Metropolitan Opera Ass'n. v. Local 100*, 2005 WL 1712241, at *4 (S.D.N.Y. Jul. 19, 2005).

Plaintiff also seeks damages for the cost of reputational repair or correcting the defamatory statements in the approximate amount of $421,000, which is supported by the testimony of her expert witness, Craig Kronenberger, and other documents and evidence, such as The Times's advertising rates and internal data related to the publication of the Editorial.

---

[7] Defendants have not asserted any claims or counterclaims and thus do not seek relief in this action at this time.
[8] Plaintiff incorporates by reference her Memoranda of Law filed contemporaneously herewith in opposition to Defendants' Motions in Limine.

*Metropolitan Opera*, 2005 WL 1712241, at *4; *Den Norske v. Sun Printing and Pub'g Ass'n.*, 226 N.Y. 1 (1919); *Ahmed v. Kifle*, 2015 WL 11199078, *2 (N.D. Ga. Feb. 6, 2015).

Plaintiff also seeks to recover punitive damages, the amount of which have not been determined and falls within the jury's discretion. N.Y. Pattern Jury Instr. – Civil § 3.30. *Prozeralik v. Cap Cities Commc'ns., Inc.*, 82 N.Y.2d 466, 478 (1993); *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163 (2d Cir. 2000); *Stem v. Cosby*, 645 F.Supp.2d 258 (S.D.N.Y. 2009). Plaintiff also seeks recovery of her attorneys' fees and recoverable costs. *Metropolitan Opera*, 2005 WL 1712241, at *5-7.

Plaintiff's First Amended Complaint also requests the entry of a permanent injunction prohibiting Defendants from publishing the defamatory statements in the future. Such injunctions are legally appropriate and not unconstitutional prior restraints where they are awarded after an adjudication at a trial on the merits that the challenged statements are false and defamatory. *Rombom v. Weberman*, 2002 WL 1461890, at *2 (N.Y. Sup. Ct. Jun. 13, 2002), aff'd, 309 A.D.2d 844 (Oct. 20, 2003); *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir. 1992).

In her First Amended Complaint, Plaintiff also sought to recover unjust enrichment or restitution damages. However, the Court granted judgment on the pleadings against the Plaintiff on these damages [Doc. 83]. Plaintiff raises her request for these damages here solely for purposes of preserving it in the event of any appellate proceedings.

### B. Defendants' Contentions Regarding Limitations on Relief

#### 1. Plaintiff Cannot Assert a Claim for Economic or Special Damages Nor Use Evidence of Lost Opportunities in Support of Claims for Other Damages

During discovery, Defendants sought information regarding Governor Palin's income, arguing that it was relevant to her claim of reputational harm. *See, e.g.*, Def.'s First Set of Reqs.

# JA 1523

to Pl. for the Production of Docs., at Req. No. 14 ("Your federal and state income tax returns, all related schedules and attachments, and W-2, 1099, K-1 or similar forms"), Req. No. 28 ("Documents sufficient to show website traffic, advertising revenue, and donations to the website site sarahpalin.com, for the three months prior to publication of the Editorial, and for the three months following publication of the Editorial.").  Indeed, Defendants ultimately requested that the Court compel Governor Palin to produce this and related information and materials. Governor Palin responded that her financial information was irrelevant because she was not asserting that she suffered economic harm.  Ultimately, in a February 26, 2020 ruling via email, the Court agreed with Governor Palin and denied Defendants' motion to compel evidence related to economic damages, including lost opportunities.

Due to Governor Palin's assertion that she is not claiming any economic damages, and the Court's ruling that she was thus not required to disclose evidence related to economic damages in discovery, Defendants have not obtained any information about Governor Palin's finances, income, or economic opportunities.  For instance, Defendants served the following two requests for admission on Plaintiff: (1) "Admit that you did not lose income as a result of the publication of the Editorial"; and (2) "Admit that you did not lose any job or other paid opportunities as a result of the publication of the Editorial."  Pl.'s Resps. and Objs. to Defs.'s Reqs. for Admiss., at Req. Nos. 23, 24.  In response to each, Governor Palin asserted:

> Plaintiff objects to this Request based on the Court's February 26, 2020
> ruling denying Defendants' request to compel discovery concerning this topic,
> and because it seeks discovery regarding a matter is not relevant to any party's
> claim or defense, nor proportional to the needs of the case, and seeks to invade
> Plaintiff's privacy and the disclosure of private financial information outside the
> scope of permissible discovery.  *Plaintiff does not seek to recover lost income as
> a result of Defendant's defamatory publication.*  Accordingly, the request is
> outside the permissible scope of discovery.  *Wiesenberger v. W.E. Hutton &
> Co.*, 35 F.R.D. 556, 557-58 (S.D.N.Y. 1964); *Delpilar v. Foodfest Depot, LLC*,
> 2015 WL 9460141, *1-2 (S.D.N.Y. Dec. 23, 2015).  This request is a fishing

expedition for private, personal information about Plaintiff that is completely irrelevant to this case.  Moreover, and subject to the foregoing, Plaintiff is not able to admit or deny this Request because she has not determined whether she lost income as a result of the publication because she is not seeking to recover lost income as an element of her damages.

*Id.* at Req. No. 23; *see also id.* at Req. No. 24 (substantively stating same).

Similarly, Defendants served on Governor Palin the following request for admission:

"Admit you suffered no financial or other economic harm of any kind as a result of the

publication of the Editorial."  Pl.'s Am. Resp. and Obj. to Defs.'s Req. for Admis. No. 27.  She

responded:

Plaintiff objects to this Request to the extent the phrase "financial or other economic harm" is undefined, vague and ambiguous, and could be interpreted as calling for a legal conclusion.  To the extent this Request seeks discovery concerning whether Plaintiff has suffered loss of income, job or other paid opportunities, book sales, any decrease in ad revenue from sarahpalin.com or any other websites, or similar "financial" or "economic harm," Plaintiff objects because this Request is an attempt to circumvent the Court's February 26, 2020 ruling denying Defendants' request to compel discovery concerning this topic.  Based on that ruling, Plaintiff is not required to respond if the intent of this Request is to force Plaintiff to determine and disclose whether she lost income, job or other paid opportunities, book sales, any decrease in ad revenue from sarahpalin.com or any other websites, or similar "financial" or "economic harm," as a result of the Editorial.  *See also* Plaintiff's Responses to Requests 23-26.

*For sake of clarity, Plaintiff admits she is not seeking to recover and will not claim or assert loss of income, job or other paid opportunities, book sales, any decrease in ad revenue from sarahpalin.com or any other websites, or similar "financial" or "economic" harm as a result of the publication of the Editorial.*

However, to the extent the phrase "financial or other economic harm" is defined or can be interpreted as including the damages Plaintiff seeks to recover for reputational repair/the cost of correcting or counteracting the injurious effects of the Editorial—which are in the nature of a pecuniary or "financial" loss and supported by the expert opinions of Craig Kronenberger—Plaintiff denies this Request.

*Id.* (emphasis added).

Once again, during Defendants' deposition of Governor Palin, Defendants sought to ask

questions about her claimed damages.  In response, Plaintiff's counsel refused to let her answer

# JA 1525

any such questions.  *See, e.g.*, Tr. of May 20, 2020 Dep. of S. Palin, at 103:8-20.  The following

exchange is one example:

> MR. AXELROD [Defendants' counsel]: Shane, I've asked her how she was
> harmed.  If she claims business opportunities, people[] shied [a]way. . . .

> MR. VOGT [Governor Palin's counsel]: She's not – she's not

> MR. AXELROD: I'm entitled -- these are relevant questions about harm, and
> you're [sic] client has brought them into this deposition, and I'm entitled to get an
> answer.

> MR. VOGT: No.  You asked her questions.  She's not bringing them into the
> deposition.  She's not seeking these damages.

> MR. AXELROD: I asked --

> MR. VOGT: She's not seeking the damages.

*Id.*

Despite refusing to answer discovery requests and deposition questions about economic

damages, Governor Palin, in response to questions about the harm she claims to have suffered,

repeatedly and vaguely referred to lost opportunities.  *See, e.g.*, Tr. of May 21, 2020 Dep. of S.

Palin, at 292:24-25–293:1-12.  The following exchange is one example:

> Q       . . . You say "resources, time and fiscal."  What fiscal resources have you
> spent repairing your reputation or correcting the defamatory statement?

> A       Fiscal resources in terms of not having earned income because of The
> New York Times' success and [sic] unfortunately defaming me.

> Q       So you haven't spent any money out of pocket to this point to repair your
> reputation or correct the defamatory statements?

> A       I travel and speak and work pro bono a lot.  And in these travels and
> speeches and events, when I have tried to correct The New York Times and
> media's defamation, that's, that's an economic impact.

*Id.*

Because Governor Palin and her counsel have stated she is not asserting economic

damages, including lost economic opportunities, which prevented Defendants from obtaining

# JA 1526

evidence related to economic damages and lost opportunities – Plaintiff cannot assert such damages to establish reputational or any other type of injury at trial. *See Bunstine v. Kivimaki*, 2021 N.Y. Misc. LEXIS 4942, *11-12 (N.Y. Sup. Ct., Westchester County, Jul. 12, 2021) (granting defendant's motion to compel discovery information relating to economic damages, or alternatively precluding plaintiff from "offering evidence and/or testimony at trial on the issue of special damages").

### 2. Governor Palin Cannot Obtain Damages for Prospective Reputation Repair Costs

To support her claim for money damages to repair her reputation, Governor Palin seeks to introduce the testimony of Craig Kronenberger. For all the reasons in Defendants' Motion *in Limine*, the Court should conclude that, under the Federal Rules of Evidence and applicable case law, Kronenberger's testimony is unreliable, and his opinion and estimated cost to repair the alleged harm to Gov. Palin's reputation are not admissible. Even if the Court disagrees and allows Kronenberger to offer expert testimony, Kronenberger's opinion and Gov. Palin's claim for reputation repair costs that she has not incurred would only be relevant if the Court also holds that the statements are defamatory *per se*. For the reasons stated in Defendants' Motion *in Limine*, the Court should conclude that the statements are not defamatory *per se*. As the statements are, at most, defamatory *per quod*, Gov. Palin cannot recover any damages unless she first proves special damages, which she will not be able to do, as she has already conceded she is "not seeking to recover and will not claim or assert loss of income, job, or other paid opportunities, including losses of book sales or any decrease in ad revenue from sarahpalin.com or any other websites." *See Agnant v. Shakur*, 30 F. Supp. 2d 420, 426 (S.D.N.Y. 1998) ("To satisfy the special damages requirement, a plaintiff must set forth an itemized account of his losses; round figures, general allegations of a dollar amount or boilerplate allegations of some

impairment to business reputation are insufficient"); *see also Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (requiring proof of defamation *per se* or special damages).

### 3. Palin is Only Entitled to Damages from Publication of "America's Lethal Politics"

In her Amended Complaint, Governor Palin spends significant time describing how she was defamed in *January 2011* immediately following the Arizona Shooting, *see, e.g.*, *Am. Compl.* ¶¶ 73-74, and how she was harmed by that defamation, *id.* ¶ 73. Indeed, during her deposition, Governor Palin was unable to disentangle the harm she claims she suffered from the publication of "America's Lethal Politics" from the harm she claims she suffered from publication of unspecified articles in 2011. *See e.g.*, Tr. of May 21, 2020 Dep. of S. Palin, at 501:20-25 – 502:1-19.

To the extent Governor Palin is entitled to recover at all, that recovery must be limited to the harm she suffered *as a result of* the publication of "America's Lethal Politics" – separate and apart from the harm she claims to have suffered previously because of unspecified 2011 articles that similarly linked the Crosshairs Map to the Arizona Shooting. *See Celle v. Filipino Reporter Enters.*, 209 F.3d 163,184 (2d Cir. 2000) (reversing jury verdict as to one of three statements and remitting damages proportionally). In other words, just as Governor Palin's damages cannot be based on *true* statements within the Editorial, they cannot be based on *separate* statements outside of the Editorial. *See* Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems*, § 10:5.3 (5th Edition 2021) ("Plainly, the causation that a plaintiff must establish is between the false and defamatory statement made with the requisite degree of fault and the injury. If truthful information in a statement causes some or all of the harm, there can be no recovery for that portion of the injury."). There plainly must be a proven nexus between the allegedly defamatory statement and the alleged damages. *Id.* Given Governor Palin's inability

49

to distinguish between the harm allegedly caused by news published about her in 2011 and the harm allegedly caused by the statements in the 2017 Editorial, there is a substantial risk of jury confusion – and this may require clarification or instruction at trial.

### 4. New York State Law Does Not Permit Punitive Damages in Cases Such as This

Plaintiff has provided notice of her intent to seek punitive damages. All apart from Plaintiff's inability to meet her burden at common law of proving that Defendants' sole motivation in publishing the Editorial was to harm her, Defendants respectfully submit that New York State law separately prohibits the imposition of punitive damages in a defamation case such as this one, in which a public figure has sued over a statement to the public on a matter of public concern. It is well established that the New York Constitution affords materially broader protection to speech on matters of public concern than does the First Amendment. *See, e.g., 600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 138 (1992); *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 249 (1991).

There do not appear to be any reported cases in which a New York state court has awarded punitive damages in a case like this one. Indeed, the two state court cases that address the issue suggest that cases involving public figures and "matters of public concern" are different than non-public concern cases with respect to punitive damages. *See Mahoney v. Adirondack Pub. Co.*, 71 N.Y.2d 31, 41 (1987) ("[W]e have no occasion to consider whether plaintiff's proof of common-law malice was sufficient to sustain such an award or whether punitive damages are ever recoverable in libel actions involving matters of public concern."); *Prozeralik v. Cap. Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 478 (1993) (quoting *Mahoney*).

Defendants acknowledge that there are at least two federal cases, applying New York State law, that assume such damages are available, relying on the somewhat ambiguous language

in *Prozeralik* for their conclusion. In *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 172, 176, 190-91 (2d Cir. 2000), the court concluded that public figure plaintiffs had sufficiently proven common-law malice to sustain punitive damages with regard to two of three challenged statements made by newspaper defendants, and in *Stern v. Cosby*, 645 F. Supp. 2d 258, 286 (S.D.N.Y. 2009), the court denied the defendant journalist's motion for summary judgment on the issue of punitive damages in a defamation case brought by a public-figure plaintiff. There is no indication, however, that in either of those cases the defendants raised the State Constitutional question raised by Defendants here. While Defendants recognize this Court may consider itself bound to follow the assumption made by the Court of Appeals in *Celle*, Defendants respectfully ask the Court to address the question so that, at a minimum, Defendants preserve the issue for appeal to the Second Circuit, if necessary. Defendants can provide additional briefing if the Court has questions or is inclined to hear oral argument on this issue.

**5.     The Jury's Determination of Punitive Damages – if Necessary – Should be Bifurcated**

If the Court concludes that New York state law permits an award of punitive damages in this type of defamation action at all, then bifurcation of the question whether Defendants are liable for punitive damages from the question of what amount of punitive damages to award would serve the interests of both judicial economy and fundamental fairness.[9] Plaintiff consents to this proposal.

---

[9] To establish that defendants are liable to her for punitive damages, Governor Palin would have to prove, in addition to the other elements of her claim, that Defendants acted with common law malice – a separate and distinct standard from actual malice. *See Prozeralik v. Cap. Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479 (1993) ("[a]ctual malice, as defined in *New York Times Co. v Sullivan* (376 US 254, *supra*), is insufficient by itself to justify an award of punitive damages"); *Celle*, 209 F.3d at 184 ("Punitive damages may only be assessed under New York law if the plaintiff has established common law malice in addition to the other elements of libel.").

# JA 1530

Determination of the amount of punitive damages in this case would require the jury to consider factual and legal issues that it would not otherwise need to consider – and this prospect carries a high risk of juror confusion and prejudice to Defendants. A separate proceeding to determine the amount of such damages if, and only if, the jury determines Defendants are liable for punitive damages, is therefore both practical and warranted, and this separate trial would only become necessary if the jury were to find in favor of Governor Palin on liability.

Federal Rule of Civil Procedure 42(b) authorizes the Court to "order a separate trial of one or more separate issues . . . [f]or convenience, to avoid prejudice, or to expedite and economize" the proceedings. "[B]ifurcation may be appropriate where, for example, the litigation of the first issue might eliminate the need to litigate the second issue, . . . or where one party will be prejudiced by evidence presented against another party." *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999); *see also Smith v. Lightning Bolt Prods.*, 861 F.2d 363, 373-74 (2d Cir. 1988) (stating "it often would be prejudicial to a defendant to attempt to litigate its financial condition during the trial on the issues of liability and compensatory damages"). Liability and damage issues are commonly bifurcated, and it is particularly appropriate to do so in cases raising First Amendment issues, where potential confusion or prejudice can take on constitutional dimensions. *See, e.g., Guccione v. Hustler Magazine,* 800 F.2d 298, 300 (2d Cir. 1986) (liability and damages bifurcated in libel action).

Here, factually, as relevant to punitive damages, Defendants may be required to put forth evidence of their financial information, and this showing would likely require the testimony of witnesses who would not otherwise testify. The admission of evidence that is not otherwise relevant at trial, coupled with the addition of a distinct legal standard, would create a high risk of jury confusion and of prejudice to Defendants. Further, as noted above, if the jury finds in favor

of Defendants on liability, it will not need to reach the issue of punitive damages at all.

Therefore, bifurcation of the trial, so that a determination of the proper amount of punitive

damages is *only* addressed by the parties and the jury if Governor Palin is able to prove liability

and common law malice, would preserve the time and resources of the Court, the parties, and the

jury.

**6.     New York Law Does not Provide for an Award of Attorney's Fees in Defamation Actions**

In this filing, Plaintiff states that she seeks recovery of her attorneys' fees and

recoverable costs.  However, New York law does not provide for an award of attorney's fees to a

plaintiff in a defamation action.  *Robertson v. Doe*, 05 Civ. 7046(LAP), 2010 U.S. Dist. LEXIS

151305, at *11-14 (S.D.N.Y. May 11, 2010) (stating there is a "general rule in New York against

recovery of attorneys' fees in the context of defamation actions"); *Wallace v. Weiss*, 82 Misc. 2d

1053, 372 N.Y.S.2d 416, 421 (Sup. Ct. 1975) (holding that "attorney's fees for the

commencement of this [libel] action . . . do not constitute an item of damage").

**VI.    WITNESS LIST IN THE LIKELY ORDER OF APPEARANCE**

1.    Sarah Palin
2.    James Bennet
3.    Elizabeth Williamson
4.    Linda Cohn
5.    Ross Douthat
6.    Eileen Lepping
7.    Phoebe Lett
8.    Andrew Sullivan (by deposition)
9.    Tim Crawford (by deposition)
10.   Danielle Rhoades Ha
11.   Hanna Ingber
12.   Justin Stile
13.   Sebastian Tomich (if necessary)
14.   Craig Kronenberger (Expert)
15.   Roland Caputo (if necessary)

## VII. <u>EXHIBIT LISTS WITH PARTICULARIZED OBJECTIONS NOTED IN ACCORDANCE WITH FED. R. CIV. P. 26(a)(3)</u>

### A. Plaintiff's Exhibit List[10]

Below is a list of exhibits that Plaintiff intends to offer in its case in chief, with any objections, referenced by the applicable Federal Rule of Evidence, to such exhibits noted in the column at the right. Defendants reserve all objections under 402 and 403, as well as foundational objections that may depend on the witness through whom the exhibit is offered.

| Pl. Ex. No. | DESCRIPTION | OBJECTIONS |
|---|---|---|
| 1 | *America's Lethal Politics [6/14/2017 Original Version--Online]* | |
| 2 | *NYT Opinion Tweet of America's Lethal Politics [6/14/2017]* | |
| 3 | *NYT (Main Twitter Account) Tweet of America's Lethal Politics [6/14/2017]* | |
| 4 | *America's Lethal Politics [6/14/2017 Original Version--Print]* | |
| 5 | *America's Lethal Politics—First Correction [6/15/2017]* | |
| 6 | *America's Lethal Politics—Second Correction [6/16/2017]* | |
| 7 | *NYTOpinion Tweet—"We got an important fact wrong" [6/15/2017]* | |
| 8 | *NYT (Main Twitter Account) Retweet of NYTOpinion Correction Tweet* | |
| 9 | *NYTOpinion Full Correction Tweet (3 parts) [6/15/2017]* | |
| 10 | *NYT Opinion Section—Print Edition—Correction of America's Lethal Politics [6/16/2017]* | |
| 11 | *America's Lethal Politics—International Edition—print edition [6/16/2017]* | |
| 12 | *NYT Homepage Preservation [6/15/2017]* | |

---

[10] In addition to Defendants' stated specific objections, many of the Plaintiff's exhibits attach cover pages and have added content which is inauthentic and inadmissible. *See, e.g.*, Pl. Ex. 1. Defendants do not object to Plaintiff's exhibits containing such content as a whole, but object to these extraneous additions, which should be removed prior to trial.

# JA 1533

| 13 | *The Struggles of Sarah Palin [10/2/2008]* | 402, 403 (undue prejudice, etc.) |
|----|----|----|
| 14 | *Palin and Her Enemies [7/5/2009]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 15 | *9/3/2008 WSJ Article re. Palin Candidacy* | |
| 16 | Andrew Rosenthal—*Talk to The Times-Reader Questions & Answers* | 402 (relevance), 403 (undue prejudice, etc.) |
| 17 | *Ethical Journalism—A Handbook of Values and Practices for the News & Editorial Departments* | 402 (relevance), 403 (undue prejudice, etc.) |
| 18 | NYT *Guidelines on Integrity* | 402 (relevance), 403 (undue prejudice, etc.) |
| 19 | NYT Campus Weblines—SPJC Code of Ethics | 402 (relevance), 403 (undue prejudice, etc.) |
| 20 | *"Can the Bennet Brothers save the Establishment?"—Washington Post [10/29/2019]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 21 | *"The Well Connected Bennet Family"* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 22 | *Technology Policing Violence—CSPAN [5/6/2014]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 23 | *"New York Times Says Senator's Op-Ed Did Not Meet Standards,"* NYT, June 4, 2020 | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 24 | *Sarah Palin, Rage Whisperer—NYT--Nicole Wallace (Opinion) [1/25/2016]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 25 | *She Who Must Not Be Named—NYT--Charles Blow [12/3/2010]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 26 | *"A Smear?"—Andrew Sullivan [8/31/2008]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 27 | *"Why Does Trigg Matter?"—Andrew Sullivan [6/28/2010]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 28 | *"The Day Trigg Was Born"—Andrew Sullivan [6/31/2011]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 29 | *Ingber Article— "Mom for Vice President"* | 402 (relevance), 403 (undue prejudice, etc.) |
| 30 | *Pima Sheriff Loughner Investigation Files* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 31 | *Loughner Files—*NYTimes.com | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 32 | *Time, the Enemy—NYT--Arthur Brisbane (Public Editor) [1/15/2011]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 33 | *"The Tucson Witch Hunt"—Charles Blow [1/14/2011]* | 402 (relevance), 403 (undue prejudice, etc.) |

# JA 1534

| 34 | *"United in Horror"—Ross Douthat* [1/9/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
|---|---|---|
| 35 | *"The Arizona Shooting, and What Led Up to it"—NYT* [1/9/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 36 | *"Suspect's Odd Behavior Caused Growing Alarm"— NYT* [1/9/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 37 | *"Looking Behind the Mug-Shot Grin"—NYT* [1/15/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 38 | *"Before Attack, Parents of Gunman Tried to Address Son's Strange Behavior"— NYT* [3/27/2013] | 402 (relevance), 403 (undue prejudice, etc.) |
| 39 | *Atlantic—"Jared Loughner" Articles Search* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 40 | *"Caldwell's Unfairness"—Andrew Sullivan* [1/15/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 41 | *"5 Best Monday Columns"—Atlantic* [1/10/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 42 | *"An Assassination—Live Blogging—Andrew Sullivan"* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 43 | *"An Assassination?"—Andrew Sullivan* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 44 | *"Was the Shooting of Rep. Gabrielle Giffords Political?"—The Atlantic* [1/5/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 45 | *"Did Sarah Palin's Target Map Play Role in Giffords Shooting?"—The Atlantic* [1/16/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 46 | *"What We Know About Jared Lee Loughner"—The Atlantic* [1/10/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 47 | *"Stop the Blame Game"—The Atlantic* [1/11/2011 | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 48 | *"The More We Know"—Andrew Sullivan* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 49 | *"Here Comes the Jared Loughner Competency Hearing"—The Atlantic [5/24/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 50 | *"Ten Days That Defined 2011—The Atlantic* [12/29/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |

**JA 1535**

| 51 | *Sen Bennet Statement on Giffords Shooting* [1/8/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
|---|---|---|
| 52 | *WaPo—Sarah Palin's Crosshairs* [1/9/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 53 | USGS Topographic Map Symbols | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 54 | *Sarah Palin's & Democrats' Maps With Crosshairs—FactReal* [1/11/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 55 | DCCC.org *"Recovery" Map page Wayback Machine* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 56 | *5 Best Columns from the Atlantic Wire* [11/28/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 57 | *Something About Tucson the I Haven't Said* Email & Attachment [1/14/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 58 | *How the Media Botched the Arizona Shooting—*T.A. Frank (Hyperlinked in Ex. 230) | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 59 | *Loughner's Descent Into Madness—*Atlantic [1/13/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 60 | *Prosecutors Expect Jared Loughner to Be Found Unfit for Trial—Atlantic* [5/25/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 61 | *"America's Enduring Strength"* | 402 (relevance), 403 (undue prejudice), 801 (hearsay) |
| 62 | *The Opinionator—The Baffler* [12/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 63 | *James Bennet 2017 Performance Review Letter—A.G. Sulzberger* | |
| 64 | *Liberal Use of 'Extremist' Is the Winning Strategy—*James Bennet [11/7/96] | 402 (relevance), 403 (undue prejudice, etc.) |
| 65 | *"The Newsroom Feels Embarrassed"—Vanity Fair HIVE* [2/26/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character), 801 (hearsay) |
| 66 | *NYTComms Tweet re. Bennet Statement on Quinn Norton* [2/14/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 67 | *"Times Stands By Editorial Board Member After Outcry Over Old Tweets"—NYT* [4/2/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |

# JA 1536

| 68 | *"The Outrage Over Sarah Jeong"—Brett Stephens* [8/9/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
|---|---|---|
| 69 | *Elizabeth Williamson Apologizes for Jeong Tweet* [8/1/2018] | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 70 | *"The New York Times Has Abandoned Liberalism for Activism"—Andrew Sullivan* [9/13/2019] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 71 | *O'Keefe Investigates Scope of NYT Anti-Trump Bias Within Editorial Ranks* [10/10/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 72 | *"Staff Anxiety"* Email between Bennet & Stephens [2/7/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 73 | *"Sarah Palin endorses Darryl Glenn in Colorado's U.S. Senate primary"—The Denver Post* [6/7/2016] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 74 | *"Arrest Made in Threat on Sen. Bennet's Office"—The Atlantic* [1/10/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 75 | *"The Trumpiest Roman of Them All"—Ross Douthat* [6/14/2017] | |
| 76 | *"The real tragedy of Orlando"* Op-Ed proposal Bennet forwards to Dao [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 77 | *ARS PAC Endorses Michael Bennet for United States Senate* [8/24/2016] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 78 | *Watch Colorado Se. Michael Bennet's Floor Speech on Guns* [6/16/2016] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 79 | *"Trump Suggests 'Second Amendment People' Could Act Against Hillary Clinton"—NYT* [8/9/2016] | |
| 80 | *For NYT, Trump is a sparring partner with benefits—Columbia Journalism Review* [6/29/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 81 | *"To Our Readers, From the Publisher and Executive Editor"* [11/13/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 82 | *"Trump's Wink to Second Amendment People"—Thomas Friedman* [8/9/2016] | |
| 83 | Bennet Book Order/Reimbursement Request—*"The Persecution of Sarah Palin"* [12/17/2016] | |
| 84 | *Enough Said* Excerpts emailed to Bennet/Baquet by Mark Thompson [6/15/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 85 | Bennet forwards Thompson email re. *Enough Said* to J. Dao [6/16/2016] | 402 (relevance), 403 (undue prejudice, etc.) |

# JA 1537

| 86 | Bennet email string with Williamson re. RNC Lineup [7/14/2016] | |
|----|---|---|
| 87 | NYT Daily Clip Report Email 7/18/2016—GOP Arena Highlights Trump's Blacklist | 402 (relevance), 403 (undue prejudice, etc.) |
| 88 | "New Colleague to Stir Things Up" Tweet—James Bennet [4/5/2017] | |
| 89 | Breitbart—Sarah Palin Condemns Kathy Griffin [5/30/2017] | |
| 90 | NYT/Trump Twitter Exchange [11/13/2016] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 91 | Dean Baquet : 'Trump Is the Best Thing to Happen to The Times Subscription Strategy'—Grabien | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 92 | Reliable Sources—CNN—Transcript 2/26/2017 | 402 (relevance), 403 (undue prejudice, etc.) |
| 93 | 'Truth Is Hard' Advertising Campaign First Ever Oscars Ad—AdAge [2/23/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 94 | NYT Truth Advertisements | 402 (relevance), 403 (undue prejudice, etc.) |
| 95 | The Truth—NYTStore—Truth Merchandise | 402 (relevance), 403 (undue prejudice, etc.) |
| 96 | NYT Truth Advertising Campaign--Poster | 402 (relevance), 403 (undue prejudice, etc.) |
| 97 | NYT Truth Advertising Campaign – Comes at a Cost | 402 (relevance), 403 (undue prejudice, etc.) |
| 98 | NYT Truth Advertising Campaign – It has no Alternative | 402 (relevance), 403 (undue prejudice, etc.) |
| 99 | NYT Truth Advertising Campaign – Tweet/All Facts No Alternatives | 402 (relevance), 403 (undue prejudice, etc.) |
| 100 | The Public Editor Signs Off—NYT [6/2/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 101 | NYT's New reader Center Already Proving a Step Backward in Accountability— FAIR [6/23/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 102 | NYT Opinion—Hillary Clinton for President [9/24/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 103 | NYT Book—Gun Control : Changing Perspectives | 402 (relevance), 403 (undue prejudice, etc.) |
| 104 | The Corrosive Politics That Threaten L.G.T.B. Americans [6/15/2016] | 402 (relevance), 403 (undue prejudice, etc.) |
| 105 | Exclusive—Sarah Palin Condemns 'Sick Audacity' of Kathy Griffin's Trump Beheading Photo—Breitbart [5/30/2017 | |

| 106 | *"End the Gun Epidemic in America,"* NYT Editorial Board, Dec. 4, 2015 | 402 (relevance), 403 (undue prejudice, etc.) |
|---|---|---|
| 107 | *"How the Trolls Stole Washington,"* Amanda Hess, NYT, Feb. 28, 2017 | 402 (relevance), 403 (undue prejudice, etc.) |
| 108 | *"Social Media's Globe-Shaking Power,"* F. Manjoo, Nov. 16, 2016 | 402 (relevance), 403 (undue prejudice, etc.) |
| 109 | *Times Digest* email for 6/15/2017 | |
| 110 | *"The Indigenous American Berserk Strike Again"—Bret Stephens* [6/15/2017] | |
| 111 | *"Rhetoric and Bullets"—Charles Blow* [6/15/2017] | |
| 112 | *"Shooting is Latest Eruption in a Grim Ritual of Rage and Balme"—Alexander Burns* [6/14/2017] | |
| 113 | *"Notes on a Political Shooting"—Ross Douthat* [6/17/2017] | |
| 114 | *Breitbart—Sarah Palin Don't Blame Sanders* [6/14/2017] | |
| 115 | *"Are we writing about the congressional shooting"* Email String between Williamson/Semple/Fox [6/14/2017] | |
| 116 | *"Are we writing on congressional shooting"* Email String between Williamson/Semple/Fox/Cohn/Lepping/Lett [6/14/2017] | |
| 117 | *"Are we writing on the congressional shooting"* Email String between Semple/Cohn/Bennet/Lepping/Lett/Williamson/Fox [6/14/2017] | |
| 118 | *"Are we writing on the congressional shooting"* Email String between Williamson/Fox | |
| 119 | *"POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump"* Email String between Bennet/Williamson/Semple/Fox/Cohn [6/14/2017] | |
| 120 | *"POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump"* Email String between Bennet/Williamson/Semple/Fox/Cohn [6/14/2017] | |
| 121 | *"Gun Control past pieces from Bob"* Email String between Lett/Williamson/Semple/Cohn [6/14/2017] | |
| 122 | *"POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump"* Email String between Bennet/Williamson/Semple/Fox/Cohn [6/14/2017] | |
| 123 | *"Gun Control past pieces from Bob"* Email String between Lett/Williamson [6/14/2017] | |
| 124 | *"Gun Control past pieces from Bob"* Email String between Lett/Williamson [6/14/2017] | |

| 125 | *"Gun Control past pieces from Bob"* Email String between Lett/Bennet [6/14/2017] | |
| 126 | *"Gun Control past pieces from Bob"* Email String between Lett/Bennet [6/14/2017] | |
| 127 | *"Gun Control past pieces from Bob"* Email String between Lett/Bennet [6/14/2017] | |
| 128 | *"Gun Control past pieces from Bob"* Email String between Williamson/Bennet [6/14/2017] | |
| 129 | "*Gabby Giffords's Farewell,*" NYT Opinion, Jan. 26, 2012 | |
| 130 | "*6,000 Bullets*," NYT Opinion, July 23, 2012 | |
| 131 | "*Democrats Find Their Voice on Gun Control*," NYT Editorial Board, July 29, 2016 | |
| 132 | "*Myths About Gun Regulation*," NYT Opinion, Jan. 31, 2013 | |
| 133 | "*No One Listened to Gabrielle Giffords*," NYT Opinion, Jan. 15, 2011 | |
| 134 | "*Bloodshed and Invective in Arizona*," NYT Opinion, Jan. 9, 2011 | |
| 135 | "*As We Mourn*," NYT Opinion, Jan. 12, 2011 | |
| 136 | *"Gun Control past pieces from Bob"* Email String between Semple/Bennet/Williamson/Fox/Cohn [6/14/2017] | |
| 137 | *"possible shooter id"* Email sent from Williamson to Fox [6/14/2017] | |
| 138 | *"POSSIBLE shooter's POSSIBLE social media"* Email sent from Williamson to Bennet/Semple/Fox [6/14/2017] | |
| 139 | *"demons"* Email from Fox to Williamson [6/14/2017] | |
| 140 | *Scoop* History for *America's Lethal Politics* | |
| 140A | *Excerpt* | |
| 140B | *Excerpt* | |
| 140C | *Excerpt* | |
| 140D | *Excerpt* | |
| 140E | *Excerpt* | |
| 140F | *Excerpt* | |
| 140G | *Excerpt* | |
| 140H | *Excerpt* | |
| 140I | *Excerpt* | |
| 140J | *Excerpt* | |
| 140K | *Excerpt* | |
| 140L | *Excerpt* | |
| 140M | *Excerpt* | |
| 141 | *America's Lethal Politics—Williamson Draft* | |

| 142 | *Sarah Palin's 'Crosshairs' Ad Dominates Giffords Debate*—ABC News [1/9/2011] | |
| 143 | *"shootings in backfield, thanks"* Email from Williamson to Bennet/Semple/Fox/Clines [6/14/2017] | |
| 144 | Fox/Cohn Email String re: who's handling Williamson Editing [6/14/2017] | |
| 145 | *"shootings in backfield, thanks"* Email from Fox to Williamson [6/14/2017] | |
| 146 | *"shootings in backfield"* Email string between Williamson/Fox [6/14/2017] | |
| 147 | *"a couple small suggestions"* Email String between Williamson/Fox [6/14/2017] | |
| 148 | *"guns in Virginia"* Email from Lepping to Bennet/Williamson/Fox/Cohn [6/14/2017] | |
| 149 | *Law Center to Prevent Gun Violence* | |
| 150 | *Giffords Law Center to Prevent Gun Violence* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 151 | *"also on shootings"* Email String between Williamson/Lepping [6/14/2017] | |
| 152 | *"Lawmakers Head Warily for Home"*—NYT Opinion Editorial [3/26/2010] | |
| 153 | *"also on shootings"* Email String between Lepping/Cohn [6/14/2017] | |
| 154 | *"15thu1 playback—America's Lethal Politics* [6/14/2017] | |
| 155 | *"fixes on shooting"* Email from Fox to Cohn [6/14/2017] | |
| 156 | *"15thu1 playback"* for America's Lethal Politics—Scoop [6/14/2017] | |
| 157 | *"also on shootings"* Email String between Cohn/Lepping [6/14/2017] | |
| 158 | *"Do we need to put a blurb in Mira's piece?"* Email String between Fox/Cohn [6/14/2017] | |
| 159 | *"shooting hed and blurg"* Email String between Cohn & Fox [6/14/2017] | |
| 160 | *Ross Douthat Tweet—"You are responsible for inciting violence if you actually incite or organize or bless violence..."* [6/14/2017] | |
| 161 | *"a couple small suggestions"* Email from Fox to Bennet [6/14/2017] | |
| 162 | *"Sanders condemnation of violence"* Email from Rabbi Lerner to Bennet [6/14/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 163 | *"hey"* Email from Bennet to Williamson [6/14/2017] | |

# JA 1541

| 164 | *"Inciting Violence May Not Be Protected Speech"—NYT—March 5, 2013* | 402 (relevance), 403 (undue prejudice, etc.) |
|-----|---|---|
| 165 | *NYT Manual of Style & Usage Excerpts* | 402 (relevance), 403 (undue prejudice, etc.) |
| 166 | *"Trump Incites Mob," NYT, Jan. 7, 2021* | |
| 167 | *Opinion Today—*NYTimes.com *[6/15/2017]* | |
| 168 | *"This brings Shooting to 330"* Email String between Fox/Cohn re. TRIM of America's Lethal Politics for International Edition [6/14/2017] | |
| 169 | *"The day on social, 6/15" Social Media Wrapup* Email [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 170 | *NYT 2017 Annual Report* | |
| 171 | *"NYTimes: The Trumpiest Roman of Them All"* Email String between Bennet/Douthat [6/14/2017-6/15/2017] | |
| 172 | *Jonathan Chait Tweet* | |
| 173 | *Chris Hayes Tweet* | |
| 174 | *"NYTimes: The Trumpiest Roman of Them All"* Email String between Bennet/Douthat [6/14/2017-6/15/2017] | |
| 175 | *NYTPolitics Tweet-"Fact Check: Partisans falsely blamed Loretta Lynch, Tim Kaine, Bernia Sanders for Wednesday's Virginia Shooting"* [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 176 | Sarah Palin Tweets re. Editorial to *"@nytopinion"* [6/15/2017] | |
| 177 | Sarah Palin "With this sickening NYT's editorial" Tweet [6/15/2017] | |
| 178 | *"fyi, small fix on shooting editorial"* Email String between Cohn/Rakowski/Levine | |
| 179 | NYT Reader Emails re. *America's Lethal Politics* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 180 | Comments on *America's Lethal Politics* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 181 | LEGIBLE Comments on *America's Lethal Politics* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 182 | *Washington Post—Fact Checker* Email [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 183 | *"Media rips NYT Editorial after Alexandria shooting"—Axios* [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |

| 184 | *"No evidence Sarah Palin's PAC incited shooting of Rep. Gabby Giffords"*— PunditFact [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
|---|---|---|
| 185 | *"Sunday sked 6.18.17"* Email String between Weiss/Seaton/!NYHQ-op-discuss [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 186 | *"Guns"* Email string between Wegman/Williamson [6/14/2017] | |
| 187 | *"And now I see"* Email string between Wegman/Williamson [6/14/2017] | |
| 188 | *Text Exchange w James* Email from Williamson to self [6/16/2017] | |
| 189 | *Williamson/Bennet 6/14/2017 Text Exchange (screen shots)* | |
| 190 | *Williamson/Bennet 6/15/2017 Text Exchange (screen shots)* | |
| 191 | *"Giffords"* Email String between Lepping/Bennet/Williamson [6/15/2017] | |
| 192 | Lepping forwards Lett *"Giffords"* Email String between Lepping/Bennet/Williamson [6/15/2017] | |
| 193 | Bennet forwards Williamson *"NYTimes: The Trumpiest Roman of Them All"* Email String between Bennet/Douthat [6/15/2017] | |
| 194 | *"And now I see"* Email String between Wegman/Cohn [6/15/2017] | |
| 195 | *"let's check count of those injured"* Email String between Williamson/Bennet/Lepping/Wegman [6/15/2017] | |
| 196 | *"let's check count of those injured"* Email String between Williamson/Bennet/Lepping/Wegman [6/15/2017] | |
| 197 | *"looks like we may have another error"* Email String between Bennet/Wegman/Lepping [6/15/2017] | |
| 198 | *"editorial and readers?"* Email string between Ingber/Bennet [6/15/2017] | |
| 199 | *"NYT Editorial correction"* Email String between Rhoades Ha/Rubin/Alahydoian/Ingber [6/15/2017] | |
| 200[11] | *"Question from Yahoo News"* Email String between Rhoades Ha/McGraw/Bennet [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |

---

[11] Plaintiff's exhibits 200 and 227 contain redactions for "Attorney Client Privilege." Defendants object only to those portions of the exhibits.

| 201 | *"Criticize Our Work Privately..."*—Washington Post [2/16/2018] | 402 (relevance), 403 (undue prejudice, etc.) |
|---|---|---|
| 202 | *"new wording"* Email from Cohn to Bennet | |
| 203 | *"earlier version, w Linda's question"* email between Wegman/Cohn/Lepping [6/15/2017] | |
| 204 | *"earlier version, w Linda's question"* email between Wegman/Williamson [6/15/2017] | |
| 205 | *"Moment to chat?"* Email String between Wegman/Erika lamb (Everytown.org) | |
| 206 | *"editorial and readers?"* Email string between Ingber/Bennet [6/15/2017] | |
| 207 | *"editorial and readers?"* Email string between Ingber/Bennet/Evans/Higa [6/15/2017] | |
| 208 | *"editorial and readers?"* Email string between Ingber/Higa [6/15/2017] | |
| 209 | *"NYT Editorial Correction"* Email String between Ingber/Rhoades Ha [6/15/2017] | |
| 210 | *"editorial and readers?"* Email string between Ingber/Bennet/Evans/Higa [6/15/2017] | |
| 211 | *"editorial and readers?"* Email string between Ingber/Higa [6/15/2017] | |
| 212 | *"Media Inquiry"* Email String between Rhoades Ha/Sydney Smith (iMediaEthics) [6/15/2017] | |
| 213 | *"NYT Editorial correction"* Email String between Rhoades Ha/Bevacqua/Jordan Cohen [6/16/2017] | |
| 214 | *"NYT Editorial correction"* Email String between Rhoades Ha/Bevacqua/Jordan Cohen [6/16/2017] | |
| 215 | *"DRAFT—corp comm note"* Email String between Bevacqua/Rhoades Ha [6/16/2017] | |
| 216 | *"New York Times issues correction to editorial after firestorm of controversy"*— CNN [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 217 | *"earlier version, w Linda's question"* email between Wegman/Williamson [6/15/2017] | |
| 218 | *"this line is misleading"* Email String between Williamson/Cohn/Wegman/Bennet [6/15/2017] | |
| 219 | *"earlier version, w Linda's question"* Email String between Cohn/Wegman [6/15/2017] | |
| 220 | *"could you make one change, via BOB"* Email String between Cohn/Fox [6/16/2017] | |
| 221 | *"David Rubenstein observer"* Email String between Bennet/Cohn/Semple [6/16/2017] | |

# JA 1544

| 222 | *"CNN request for comment re: Times Editorial"* Email String between O. Darcy(CNN)/Rhoades Ha [6/15/2017] | |
|---|---|---|
| 223 | *"Fox News Comment Request"* Email String between Bennet/Rhoades Ha [6/15/2017] | |
| 224 | *"And now I see"* Email string between Wegman/Williamson [6/14/2017] | |
| 225 | *"question from Yahoo News"* Email between Stableford & Rhoades Ha [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 226 | *New York Times requests apology from Fox"—Politico* [7/23/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 227 | Email String between Bennet/McGraw/Rhoades Ha re. CNN Inquiry [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) (partially; other parts are admissible); 901 (authenticity) |
| 228 | *Fox News Comment Request* Email String between Rhoades Ha/Bennet [6/15/2017] | |
| 229 | *Question from Business Insider* Email String between Rhoades Ha/Max Tani [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.); 801 (hearsay) |
| 230 | *NYT Editorial* Email String Between Rhoades Ha & Sara Fisher (Axios) [6/15/2017] | |
| 231 | *CNN Request for Comment re. Times Editorial* Email String Between Rhoades Ha/E. Murphy/Oliver Darcy [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 232 | *NYT Editorial Correction* Email String between J. Cohen & Rhoades Ha [6/15/2017] | 402 (relevance), 403 (hearsay) |
| 233 | *WaPo question on Loughner claim* Email String between Bennet and Paul Farhi [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 234 | *CNN Request for Comment re. Times Editorial* Email String Between Rhoades Ha/Bennet/Oliver Darcy [6/15/2017] | |
| 235 | *CNN Request for Comment re. Times Editorial* Email String Between Rhoades Ha/Oliver Darcy [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 236 | *CNN Request for Comment re. Times Editorial* Email String Between Rhoades Ha/Oliver Darcy [6/15/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 237 | *Politifact Media Inquiry re. « America's Lethal Politics »* Email String [6/15/2017] | |
| 238 | *A Note from James Bennet* [2/15/2018] | 402 (relevance), 403 (undue prejudice, etc.) |
| 239 | *The Times Issues Social Media Guidelines for the Newsroom* [10/13/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 240 | *NYT Slammed for Lack of Transparency in Editor's Resignation*—The Hill [5/2/2018] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |

# JA 1545

| 241 | *On Trust and Transparency—A.G. Sulzberger, Our New Publisher, Answers Readers' Questions* [1/22/2018] | 402 (relevance), 403 (undue prejudice, etc.) |
| --- | --- | --- |
| 242 | *How the New York Times Maintains its Credibility—Quill* [12/15/2018] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 243 | *Former NY Times Editor Rips Trump Coverage as Biased—Fox News* [1/2/2019] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 244 | *Williamson Re-Tweet of Correction* | |
| 245 | *"Palin gets Death Threats Too"—The Atlantic* [3/7/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 246 | *"The Threats Against Palin"—Andrew Sullivan* [1/14/2011] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 247 | *James Devine--#HuntRepublicans Tweet* | 402 (relevance), 403 (undue prejudice, etc.) |
| 248 | *[Same w/ Time Stamp]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 249 | *Dozens of Twitter Users Call for Palin's Death—Daily Caller* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 250 | *FBI Complaint Form re. Palin Threats* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 251 | *FBI Complaint Form re. Palin Threats* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 252 | *FBI Complaint Form re. Palin Threats* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 253 | *Death Threats Against Palin Increase—Politico* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 254 | *Rhoades Ha* Email to Kruzel re. timing of Corrections [6/15/2017] | |
| 255 | *Enough Said—"Incitement" is a crime passage* | 402 (relevance), 403 (undue prejudice, etc.) |
| 256 | *New York Times Editor Says Trump Has Put His Reporters' Lives at Risk— Guardian* 11/18/2019] | 402 (relevance), 403 (undue prejudice, etc.) |
| 257 | *Analytics NYT-Roll-Up-Opinion—Main Daily Opinion Dashboard* Email 6/16/2017 to Bennet & to opinionweb@nytimes.com | |
| 258 | *Chartbeat Daily Perspective for* nytimes.com Email [6/16/2017] | |

| 259 | *NYT Spreadsheets re. Digital Subscriptions as of 6/14/2017 and 6/15/2017* | |
| 260 | *NYT Pageviews* | |
| 261 | *NYT Spreadsheets re. Social Media/Users/Referring URL's* | |
| 262 | *NYT Slack Messages re. Editorial & Social* | 402 (relevance), 403 (undue prejudice, etc.) |
| 263 | *NYT Slack Coding for America's Lethal Politics traction* | 402 (relevance), 403 (undue prejudice, etc.) |
| 264 | *That Time Trump Spent Nearly $100,000 on an Ad Criticizing U.S. Foreign Policy in 1987—BuzzFeed.News* [1/10/2015] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 265 | *Fox News Takes Out Full Page New York Times Ad After Dispute With The Paper—HuffPo* [7/27/2017] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 266 | NYT 2017 Rate Card | |
| 267 | NYT 2019 Rate Card | |
| 268 | NYT 2021 Rate Card | |
| 269 | *NYT « Today's Paper » May 21, 2020* | |
| 270 | *NYT Advertising Media Kit* | 901 (authenticity) |
| 271 | *NYT Spreadsheet Print Distribution 6/15/2017* | |
| 272 | *How the NYT's AI-driven data insight tool is informing ad campaigns* [1/10/2019] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 273 | *The New York Times Advertising & Marketing Solutions Group Introduces 'nytDEMO' : A Cross-Functional Team Focused on Bringing Insights and Data Solutions to Brands* [2/15/2018] | 402 (relevance), 403 (undue prejudice, etc.) |
| 274 | *New York Times Thinks Small to reach readers on Apple Watch—Mobile Marketer* | 402 (relevance), 403 (undue prejudice, etc.) |
| 275 | Stela Opinion Daily Report [6/14/2017] | |
| 276 | Daily Opinion Dashboard Email—Google Analytics [6/16/2017] | |
| 277 | Chartbeat Email [Redacted—6/16/2017] | 402 (relevance), 403 (undue prejudice, etc.), 901 (authenticity) |
| 278 | Chartbeat Email [Unredacted—6/16/2017] | |
| 279 | Kronenberger Summary of Editorial Comments | 801 (hearsay) |
| 280 | Kronenberger Cision/SimilarWeb Spreadsheet for Readership & Ad Equivalency | 801 (hearsay) |
| 281 | "*It's True: False News Spreads Faster and Wider,*" S. Lohr, Mar. 8, 2018 | 402 (relevance), 403 (undue prejudice, etc.) |
| 282 | *NYT Insurance Policies* | 402 (relevance), 403 (undue prejudice, etc.) |
| 283 | *NYT Form 10-Q September 26, 2021* | |

| 284 | *NYT 2020 Annual Report – Form 10-K* | |
| 285 | *Systemic Change Needed After Faulty Times Article—NYT—Margaret Sullivan (Liz Spayd, Public Editor) [12/18/15]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 286 | *The NY Times Promised to Fact Check their New Climate Denier Columnist— They Lied [4/29/2017]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 287 | *"Atlantic Assures Fans It Hasn't Sold Its Soul—Media Ad-Age [3/10/2008]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 288 | *"editorials INYT, Fri., June 16"* Email from Cohn to Levine/et.al. [6/14/2017] | |
| 289 | *"Exclusive: Loughner Friend Explains Alleged Gunman's Grudge Against Giffords"—Mother Jones [1/10/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 290 | *"We're Not Going to Let Our Campaign Be Dictated by Fact-Checkers"— James Bennet (Atlantic) [8/28/2012]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 291 | *"Sarah Jeong and the N.Y. Times: When Racism is Fit to Print"—Andrew Sullivan [8/2/2018]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 292 | *Daily Clip Report June 14* Email to James Bennet | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 293 | *"We Don't Have Proof Yet"—WSJ—Taranto [1/10/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 294 | *"Assassination Attempt in Arizona"—Krugman [1/8/2011]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 295 | *"Climate of Hate"—Krugman [1/9/2011]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 296 | *"Massacre, followed by libel"—Charles Krauthammer [2/26/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 297 | *"It Did Not"—WSJ—Taranto [1/13/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 298 | *"Paladino's Rant"—Andrew Sullivan [10/12/2010]* | 402 (relevance), 403 (undue prejudice, etc.) |
| 299 | *"Sarah Palin Is Right About 'Blood Libel'"—WSJ—Rabbi Boteach [1/14/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 300 | *"Palinoia, the Destroyer"—WSJ—Taranto [1/19/2011]* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 301 | *"James Bennet—Big Ideas—The Writer" [3/15/2016]* | 402 (relevance), 403 (undue prejudice, etc.) |

## JA 1548

| 302 | *James Bennet Twitter Following* | 402 (relevance), 403 (undue prejudice, etc.) |
|---|---|---|
| 303 | *« NYT Requests Apology from Fox on ISIS Story"—Politico* [7/23/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 304 | *"House Democrats Unveil 2020 Targets"—CNN* [1/28/2019] 28/2019] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 305 | *"Democrats Go on Offense..." DNCC Cheri Bustos* [1/ | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 306 | *DLC—Heartland Strategy* [12/13/2004]—Bullseye Map | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay), 901 (authenticity) |
| 307 | *First Read* Email Atlantic [8/22/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 308 | *MPA Daily News Roundup 9.5.11—Atlantic* | 402 (relevance), 403 (undue prejudice, etc.) |
| 309 | *Content Title Report—Top Daily—Atlantic* [11/21/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 310 | *Josh's Palin Piece* Email between Bennet/Purdum/Codinha [5/12/2011] | 402 (relevance), 403 (undue prejudice, etc.) |
| 311 | *How 'Fake News' Changed The New York Times—The Wilson Quarterly* [Winter 2018] | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 312 | *Reader Center : Covering Studies That Were Not Peer Reviewed* [6/22/2017] | 402 (relevance), 403 (undue prejudice, etc.) |
| 313 | *The NYT Had Two Embarrassing takes on the Alexandria Shooting—The New Republic* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 314 | *SimilarWeb Monthly Unique Visitors* | 402 (relevance), 403 (undue prejudice, etc.), 801 (hearsay) |
| 315 | *"Why Readers See The Times as Liberal,"* Liz Spayd, July 23, 2016 | 402 (relevance), 403 (undue prejudice, etc.) |
| 316 | Bennet Tweets June 3, 2020 | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 317 | NYT Tweet re. Cotton Op-Ed | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |
| 318 | *"Why We Published the Tom Cotton Op-Ed,"* J. Bennet, June 4, 2020 | 402 (relevance), 403 (undue prejudice, etc.), 404 (character) |

B.    **Defendants' Exhibit List**

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 1 | | Complaint, Palin v. NYT | 401, 402, 403, 105 (if Admitted); 106 (if Admitted) |
| 2 | | Amended Complaint, Palin v. NYT | 401, 402, 403, 105 (if Admitted); 106 (if Admitted) |
| 3 | 6/14/2017 | America's Lethal Politics, Print version | |
| 4 | 6/14/2017 | America's Lethal Politics, Original Digital Version | |
| 5 | 6/15/2017 | America's Lethal Politics, Corrected Digital Version | |
| 6 | 6/16/2017 | America's Lethal Politics, Second Corrected Digital Version | |
| 7 | 6/16/2017 | Print Correction | |
| 8 | 6/15/2017 | NYT Tweet re Correction | |
| 9 | 6/14/2017 | Email: Williamson to Bennet, Semple, & Fox "are we writing one the congressional shooting?" | |
| 10 | 1/9/2011 | ABC News: Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate | |
| 11 | 6/14/2017 | Email: Fox to Williamson "Re: are we writing on the congressional shooting?" | |
| 12 | 6/14/2017 | Email: Williamson to Bennet, Semple, & Fox "possible shooter ID" | |
| 13 | 6/14/2017 | Email: Williamson to Bennet, Semple, & Fox "Possible shooter's Possible social media pages pro-Bernie, anti-Trump" | |
| 14 | 6/14/2017 | Email: Fox to Williamson "Fwd: are we writing on the congressional shooting?" | |
| 15 | 6/14/2017 | Email: Williamson to Fox "are we writing on the congressional shooting?" | |
| 16 | 6/14/2017 | Email: Semple to Cohn "Re: are we writing on the congressional shooting?" | |
| 17 | 6/14/2017 | Email: Bennet to Williamson "Re: POSSIBLE shooter's POSSIBLE social . . ." | |
| 18 | 6/14/2017 | Email: Williamson to Bennet "Re: POSSIBLE shooter's POSSIBLE social . . ." | |

# JA 1550

| Exhibit No | Date | Description | Objections |
|:---:|:---:|---|---|
| 19 | 6/14/2017 | Email: Lett to Williamson "Gun Control past pieces from Bob" | |
| 20 | | Editorials Lett emailed | |
| 21 | 6/14/2017 | Email: Semple to Williamson "Re: POSSIBLE shooter's POSSIBLE social . . ." | |
| 22 | 6/14/2017 | Email: Williamson to Lett "Re: Gun Control past pieces from Bob" | |
| 23 | 6/14/2017 | Email: Lett to Williamson "Re: Gun Control past pieces from Bob" | |
| 24 | | Frank Rich editorial | |
| 25 | 6/14/2017 | Email: Bennet to Lett "Re: Gun Control past pieces from Bob" | |
| 26 | 6/14/2017 | Email: Bennet to Lett "Re: Gun Control past pieces from Bob" | |
| 27 | 6/14/2017 | Email: Lett to Bennet "Fwd: Gun Control past pieces from Bob" | |
| 28 | 6/14/2017 | Email: Bennet to Williamson: "Fwd: Gun Control past pieces from Bob" | |
| 29 | 6/14/2017 | Editorials Bennet emailed. | |
| 30 | 6/14/2017 | Entire Scoop File | |
| 31 | 6/14/2017 | Excerpt from Scoop: Bennet 7:21 p.m. version | |
| 32 | 6/14/2017 | Excerpt from Scoop: Williamson in backfield | |
| 33 | 6/14/2017 | Excerpt from Sccop: Linda Cohn first edit | |
| 34 | 6/14/2017 | Email: Williamson to Bennet et al: "Shootings is in backfield, thanks" | |
| 35 | 6/14/2017 | Email: Lepping to Bennet: "guns in Virginia" | |
| 36 | 6/14/2017 | Email: Williamson to Lepping: "Re: also on shootings" | |
| 37 | 3/26/2010 | Editorial cited in Lepping email above | |
| 38 | 6/14/2017 | Email: Bennet to Williamson "Re: hey" | |
| 39 | 6/14/2017 | Email: Fox to Cohn "fixes on shooting" | |
| 40 | 6/14/2017 | Email: Lepping to Cohn "Fwd: also on shooting" | |
| 41 | 6/14/2017 | Email: Lepping to Semple, including scoop file and "clean version" of America's Lethal Politics | |

# JA 1551

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 42 | 6/14/2017 | Email: Cohn to Williamson, including scoop file and "clean version" of America's Lethal Politics | |
| 43 | 6/14/2017 | Email: Douthat to Bennet: "Re: NYTimes: The Trumpiest Roman of Them All" | |
| 44 | 6/15/2017 | Jonathan Chait Tweet | |
| 45 | 6/15/2017 | Chris Hayes Tweet | |
| 46 | 6/14/2027 | Text: Bennet to Williamson "Are you up? . . . ." | |
| 47 | 6/14/2017 | Email: Williamson to Wegman "And now I see" | |
| 48 | 6/15/2017 | Email: Lepping to Lett: "Fwd: Giffords" | |
| 49 | 6/15/2017 | Email: Lepping to Bennet: "Re: Giffords" | |
| 50 | 6/15/2017 | Email: Wegman to Williamson: "Re: And now i see" | |
| 51 | 6/15/2017 | Text: Williamson to Bennet: "Do you have time to talk by phone this morning?" | |
| 52 | 6/15/2017 | Email: Bennet to Ingber: "Re: editorial and readers" | |
| 53 | 6/15/2017 | Email: Ingber to Higa, Bennet: "Re: editorial and readers?" | |
| 54 | 6/15/2017 | Email: Higa to Ingber, Bennet: "Re: editorial and readers? | |
| 55 | 6/15/2017 | Email: Rhoades Ha to Smith: "Re: Media Inquiry" | |
| 56 | | INTENTIONALLY LEFT BLANK | |
| 57 | | INTENTIONALLY LEFT BLANK | |
| 58 | | INTENTIONALLY LEFT BLANK | |
| 59 | 6/15/2017 | Williamson Retweet of Correction | |
| 60 | 6/15/2017 | Bennet to Rhoades Ha: "CNN Request for Comment" | |
| 61 | | Crosshairs Map | |
| 62 | 3/23/2010 | Palin Facebook: Don't Get Demoralized! | 401, 402,403, 404, 405 |
| 63 | 3/23/2010 | Palin Tweet: Don't Retreat. Reload | 401, 402,403, 404, 405 |
| 64 | 11/4/2010 | Palin Tweet: "Remember months ago "bullseye" icon used 2 target . . . | 401, 402,403, 404, 405 |

# JA 1552

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 65 | 1/9/2011 | CBS News: Palin Criticized Over Giffords . . . | 401, 402, 403, 404, 405, 801, 802 |
| 66 | 1/9/2011 | CBS News: The End of Palin's Don't Retreat . . . | 401, 402, 403, 404, 405, 801, 802 |
| 67 | 1/12/2011 | Politico: Palin Charges Critics with "Blood Libel" . . . . | 401, 402, 403, 404, 405, 801, 802 |
| 68 | 5/30/2017 | Breitbart: Sarah Palin Condemns 'Sick Audacity' of Kathy Griffin's Trump . . . | |
| 69 | 6/1/2017 | Palin Article: Kathy Griffin Blamed Sarah Palin's "Crosshairs Map" | |
| 70 | 6/14/2017 | Breitbart: Exclusive -- Sarah Palin: Hopefully Media Have Learned To Not Play . . . | |
| 71 | 6/14/2017 | Email: Recher to Windeknecht: "Aaron pls post this link next . . ." | 401, 402, 403, 404, 405, 801, 802 |
| 72 | 6/14/2017 | Email: Perry to Recher: "I'm going to publish the SP one you did to FB in about 15 mins . . ." | 401, 402, 403, 404, 405, 801, 802 |
| 73 | 6/14/2017 | Email: Perry to Knorr: "I think it would be great if you want to write it up for the website." | 401, 402, 403, 404, 405, 801, 802 |
| 74 | 6/15/2017 | Palin Article: FLASHBACK: Sanders' Fundraising Email Falsely Accuses Palin of Inciting 2011 Shooting | 401, 402, 403, 404, 405, 801, 802 |
| 75 | 6/15/2017 | Palin Tweet: "With this sickening NYT's editorial, the media is doing exactly what I said yesterday should not be done . . ." | |
| 76 | 6/15/2017 | Palin Tweet: Does Sarah Palin have a libel case? | |
| 77 | 6/14/2017 | Rep. Rodney Davis on Poltically-Motived Violence | 401, 402, 403, 404, 405, 801, 802 |
| 78 | 6/15/2017 | Palin Article: Palin Investigates Legal Options Following New York Times' Fake News | 401, 402, 403, 404, 405, 801, 802 |
| 79 | 10/5/2018 | Palin Tweet: Hey Lisa Murkowski - I can see 2022 from my house... | 401, 402, 403, 404, 405, 801, 802 |
| 80 | 9/23/2020 | Palin Video: Lisa Murkowski - I can 2022 from my House | 401, 402, 403, 404, 405, 801, 802 |
| 81 | 3/11/2020 | Masked Singer Video - Reveal | 401, 402, 403, 404, 405, 801, 802 |
| 82 | 12/12/2016 | 1 Quote from NYT's Editor about Christians Tells You Everything You Need To Know . . . | 401, 402, 403, 404, 405 |

# JA 1553

| Exhibit No | Date | Description | Objections |
|:---:|:---:|:---|:---|
| 83 | 2/14/2017 | NYT Reporter Calls Melania "A Hooker," Instantly Two Things Happen | 401, 402, 403, 404, 405 |
| 84 | 3/2/2017 | NYT Just Slammed Trump For Something They IGNORED Under Obama For 8 Years | 401, 402, 403, 404, 405 |
| 85 | 3/26/2017 | The NY Times Just Dropped a BOMBSHELL Concession About MSNBC And The Liberal Media | 401, 402, 403, 404, 405 |
| 86 | 4/19/2017 | NYT Publishes Articles From Convicted Terrorist...But It Gets WORSE | 401, 402, 403, 404, 405 |
| 87 | 4/22/2017 | NYT Editor Calls Himself THIS For Misleading Tweet | 401, 402, 403, 404, 405 |
| 88 | 4/26/2017 | FINALLY! NYT Reporter Posts Misleading Tweet On Trump . . . | 401, 402, 403, 404, 405 |
| 89 | | Masked Singer Video - Dancing and Rapping | 401, 402, 403, 404, 405, 801, 802 |
| 90 | 7/22/2021 | Zillow: Sarah Palin most desirable celebrity neighbor: poll | |
| 91 | 7/26/2021 | Breitbart: Sarah Palin, Seahwaks Greats Team Up for Alaska Kids | |
| 92 | 4/20/2020 | Palin Responses to Requests for Admission | 401, 402, 403,106 (if Admitted) |
| 93 | | INTENTIONALLY LEFT BLANK | |
| 94 | 5/14/2020 | Palin Am. Response to Request for Admission - RFA 27 | 401, 402, 403, 106 (if Admitted) |
| 95 | 6/14/2017 | Email: Recher to Knorr re "This is great and I think it would be good for tomorrow" | 401, 402, 403, 801, 802 |
| 96 | 8/9/2016 | Thomas Friedman: Trump's Wink Wink to 'Second Amendment People' | |
| 97 | 6/17/2017 | Elizabeth Williamson: Another, Far Different, Washington Billionaire | 401, 402, 403, 404, 405, 801, 802 |
| 98 | 2/28/2020 | Kronenberger Report | |
| 99 | 2/28/2020 | Kronenberger underlying documents | |
| 100 | 2/28/2020 | Kronenberger Comment analysis | |
| 101 | 6/15/2017 | Stela Report | |
| 102 | 6/16/2017 | Daily Opinion Dashboard | |
| 103 | 7/27/2017 | New York Post: Sarah Palin sues NY Times | 401, 402, 403, 404, 405, 801, 802 |

# JA 1554

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 104 | 6/15/2017 | Business Insider: New York Times corrects editorial that drew huge backlash for blaming Sarah Palin | 401, 402, 403, 404, 405, 801, 802 |
| 105 | 8/29/2017 | Forbes: Sarah Palin's Defamation Suit Against the New York Times is Dismissed | 401, 402, 403, 404, 405, 801, 802 |
| 106 | 8/21/2019 | Washington Post: New York Times lawyer on Palin editorial: 'It was an honest mistake' | 401, 402, 403, 404, 405, 801, 802 |
| 107 | | INTENTIONALLY LEFT BLANK | |
| 108 | 2/28/2020 | Cision: America's Lethal Politics | |
| 109 | 1/26/2016 | Washington Post: The GOP Contest | 401, 402, 403, 404, 405, 801, 802 |
| 110 | | About SarahPalin.com | 401, 402, 403, 404, 405 |
| 111 | 6/14/2017 | NYT: Shooting Is Latest Eruption in a Grim Ritual of Rage and Blame | |
| 112 | 9/3/2008 | WSJ: Palin Candidacy Exposes Divisions Among Women | 401, 402, 403, 404, 405, 801, 802 |
| 113 | | INTENTIONALLY LEFT BLANK | |
| 114 | 1/30/2016 | A Chance to Reset the Republican Race | 401, 402, 403, 404, 405, 801, 802 |
| 115 | | INTENTIONALLY LEFT BLANK | |
| 116 | | Palin Facebook Page | 401, 402, 403, 404, 405 |
| 117 | | Palin Twitter Page | 401, 402, 403, 404, 405 |
| 118 | | Sarahpalin.com | 401, 402, 403, 404, 405 |
| 119 | | INTENTIONALLY LEFT BLANK | |
| 120 | | INTENTIONALLY LEFT BLANK | |
| 121 | | Turning Point USA: America Fest 2021 Speakers | 401, 402, 403, 404, 405 |
| 122 | | Turning Point USA: Palin Bio | 401, 402, 403, 404, 405 |
| 123 | 6/14/2017 | Emails b/w Jesse Wegman & Elizabeth Williamson re: guns | |
| 124 | 7/29/2014 | Video - WSJ: Sarah Palin Launches Her Own Subscription Channel | 401, 402, 403, 404, 405, 801, 802 |

# JA 1555

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 125 | | Sarahpalin.com - Online Store | 401, 402, 403, 404, 405 |
| 126 | 6/15/2017 | Online: Front page of NYT | |
| 127 | 6/15/2017 | Online: Front page of NYT (later) | |
| 128 | | Stela: America's Lethal Politics | |
| 129 | | Stela: News Article on Shooting | |
| 130 | | Palin Instagram Account | 401, 402, 403, 404, 405 |
| 131* | 1/31/2011 | The Dish (Andrew Sullivan Blog): Guarding Their Heritage | 401, 402, 403, 404, 405, 801, 802 |
| 132* | 1/8/2011 | The Dish (Andrew Sullivan Blog): An Assassination? | |
| 133* | 1/8/2011 | The Dish (Andrew Sullivan Blog): An Assassination Attempt in Arizona | |
| 134* | 1/17/2011 | The Dish (Andrew Sullivan Blog): The More We Know | |
| 135* | 1/15/2011 | The Dish (Andrew Sullivan Blog): Caldwell's Unfairness | |
| | | | |
| 200 | 1/6/2021 | Palin Fox News re Capital Insurrection | 401, 402, 403, 404 |
| 201 | 2021 | Palin Video: American Prosperity Summit | 401, 402, 403, 404 |
| 202 | 6/10/2021 | Confirmed Speakers: Young Women's Leadership Summit | 401, 402, 403, 404 |
| 203 | 11/18/2009 | Politico: Palin Trashes "Lamestream Media" | 401, 402, 403, 404 |
| 204 | 6/17/2016 | Palin: Obama "is a special kind of stupid" | 401, 402, 403, 404 |
| 205 | | INTENTIONALLY LEFT BLANK | |
| 206 | 6/25/2009 | Miami Herald: Palin popular among Republicans but polarizing according to poll | 401, 402, 403, 404, 405, 801, 802 |
| 207 | 9/4/2008 | Politico: Media swoon over Palin's fiery speech | 401, 402, 403, 404, 405, 801, 802 |
| 208 | 8/20/2020 | Steve Schmidt: "paranoia, pathological lying, profound ignorance, brittleness and insanity" | 401, 402, 403, 404, 405, 801, 802 |
| 209 | 10/5/2011 | Palin Will Not Seek Presidential Nomination | 401, 402, 403, 404, 405, 801, 802 |
| 210 | | Washington Post: Seven Years Ago Palin Gave the Best Speech of Her Life | 401, 402, 403, 404, 405, 801, 802 |

# JA 1556

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 211 | 11/6/2015 | Sarah Palin Evolves on Katie Couric | 401, 402, 403, 404, 405, 801, 802 |
| 212 | 10/21/2008 | RNC Shells Out $150k for Palin Fashion | 401, 402, 403, 404, 405, 801, 802 |
| 213 | 4/26/2010 | CBS News: Did Sarah Palin Resign as Governor Because of Money | 401, 402, 403, 404, 405, 801, 802 |
| 214 | 7/4/2009 | Los Angeles Times: Sarah Palin's Resignation as Alaska Governor sets off speculation | 401, 402, 403, 404, 405, 801, 802 |
| 215 | 1/13/2010 | Steve Schmidt's war against Palin | 401, 402, 403, 404, 405, 801, 802 |
| 216 | | Going Rogue | 401, 402, 403, 404, 405 |
| 217 | | America By Heart | 401, 402, 403, 404, 405 |
| 218 | | Sarah Palin Uncut | 401, 402, 403, 404, 405 |
| 219 | | Good Tidings and Great Joy | 401, 402, 403, 404, 405 |
| 220 | | Sweet Freedom: A Devotional | 401, 402, 403, 404, 405 |
| 221 | | Sarah Palin: You Betcha! | 401, 402, 403, 404, 405 |
| 222 | 1/12/2011 | Palin Statement re Blood Libel | 401, 402, 403, 404, 405 |
| 223 | 1/12/2011 | Reuters: Palin's "Blood Libel" Charge Ignites Firestorm | 401, 402, 403, 404, 405, 801, 802 |
| 224 | 1/12/2011 | Salon: Sarah Palin Re-Inserts Herself in the News Cycle | 401, 402, 403, 404, 405, 801, 802 |
| 225 | 10/7/2010 | 60 Minutes: Steve Schmidt Article | 401, 402, 403, 404, 405, 801, 802 |
| 226 | 10/9/2008 | NBC News: Legislative Report re Palin Firing Public Safety Commissioner | 401, 402, 403, 404, 405, 801, 802 |
| 227 | 10/10/2008 | Legislative Report | 401, 402, 403, 404, 405, 801, 802 |
| 228 | 7/4/2009 | Business Insider: Sarah Palin: Quitter | 401, 402, 403, 404, 405, 801, 802 |
| 229 | 4/19/2017 | Palin Facebook Post - Hilary Clinton | 401, 402, 403, 404, 405 |

Case 1:17-cv-04853-JSR   Document 157-2   Filed 01/22/22   Page 79 of 80
Case 1:17-cv-04853-JSR   Document 157   Filed 01/17/22   Page 79 of 80

JA 1557

| Exhibit No | Date | Description | Objections |
|---|---|---|---|
| 230 | 8/19/2020 | Palin: "I wouldn't prostitute myself . . . ." | 401, 402, 403, 404, 405 |
| 231 | 7/29/2014 | Palin Channel Promo | 401, 402, 403, 404, 405 |

*Defendants may offer if the need arises

## VIII.   ESTIMATED LENGTH OF TRIAL

Five (5) days.

Dated: January 21, 2022

_____
Rakoff, J.

79

# JA 1558

January 17, 2022

Respectfully submitted,

For Plaintiff:

For Defendants:

TURKEL CUVA BARRIOS, P.A.

BALLARD SPAHR LLP

*/s/ Shane B. Vogt*
Kenneth G. Turkel (admitted *pro hac vice*)
Email: kturkel@tcb-law.com
Shane B. Vogt (admitted *pro hac vice*)
Email: svogt@tcb-law.com
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: (813) 834-9191
Fax: (813) 443-2193

By: */s/ David L. Axelrod*
   David L. Axelrod
   Jay Ward Brown
   Thomas B. Sullivan
   Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

Michael M. Munoz
E-mail: mmunoz@golenbock.com
Golenbock Eiseman Assor Bell & Peskoe LLP
711 Third Avenue
New York, NY 10017
Tel: (212) 907-7300
Fax: (212) 754-0330

*Counsel for Defendants*

*Counsel for Plaintiff*

# JA 1559

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────┐
│ SARAH PALIN,                │
│                             │
│         Plaintiff,          │
│                             │
│     -v-                     │
│                             │
│ THE NEW YORK TIMES COMPANY  │
│ and JAMES BENNET,           │
│                             │
│         Defendants.         │
└─────────────────────────────┘
```

17-cv-4853 (JSR)

<u>ORDER</u>

JED S. RAKOFF, U.S.D.J.:

It is the Court's uniform practice after a verdict has been rendered in a jury trial to have the Court's law clerk inquire of the jury as to whether there were any problems understanding the Court's instructions of law, so that improvements can be made in future cases. Late yesterday, in the course of such an inquiry in this case -- in which the jury confirmed that they had fully understood the instructions and had no suggestions regarding jury instructions for future cases -- several jurors volunteered to the law clerk that, prior to the rendering of the jury verdict in this case, they had learned of the fact of this Court's Rule 50 determination on Monday to dismiss the case on legal grounds. These jurors reported that although they had been assiduously adhering to the Court's instruction to avoid media coverage of the trial, they had involuntarily received "push notifications" on their smartphones that contained the bottom-line of the ruling. The jurors repeatedly assured the Court's law

# JA 1560

clerk that these notifications had not affected them in any way or played any role whatever in their deliberations.

The Court also notes that when it proposed to the parties, during oral argument on Monday morning, to render its Rule 50 decision later that day but to permit the jury to continue deliberating so that the Court of Appeals would have the benefit of both the Court's legal determination and the jury's verdict, no party objected to this plan. Nor did any party object when the Court reconvened later that day, outside the presence of the jury, and the Court indicated that it was prepared to issue a Rule 50 decision at that time. Indeed, no party objected to this procedure at any time whatever.

Nevertheless, in an excess of caution, the Court hereby brings the foregoing facts to the parties' attention. If any party feels there is any relief they seek based on the above, counsel should promptly initiate a joint phone conference with the Court to discuss whether any further proceedings are appropriate.

SO ORDERED.

New York, NY
February 16, 2022

JED S. RAKOFF, U.S.D.J.

# JA 1561

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - -
| SARAH PALIN,                              |
|                                           |
|           Plaintiffs,                     |
|                                           |
|      -v-                                  |
|                                           |
| THE NEW YORK TIMES COMPANY                |
| and JAMES BENNET,                         |
|                                           |
|           Defendants.                     |
- - - - - - - - - - - - - - - - - - - - - - -
```

17-cv-4853 (JSR)

<u>ORDER</u>

JED S. RAKOFF, U.S.D.J.:

The Clerk is directed to docket the attached documents, to supplement the record in this case. Exhibit A is an instruction sent by email to members of the jury on Saturday, February 12, 2022 admonishing them again to avoid any media coverage of the trial. Exhibit B is correspondence between the Court and counsel for the parties regarding case law germane to Defendants' Rule 50 motion for judgment as a matter of law.

SO ORDERED.

New York, NY
February 16, 2022

JED S. RAKOFF, U.S.D.J.

JA 1562

EXHIBIT A

# JA 1563

| | |
|---|---|
| **From:** | Nicholas Werle |
| **To:** | Rakoff NYSD Chambers |
| **Bcc:** | ███████████████████████ |
| **Subject:** | A message to the Jury from Judge Rakoff \| Sarah Palin v. N.Y. Times & James Bennet (17-cv-4853) |
| **Date:** | Saturday, February 12, 2022 9:37:21 AM |

Dear Jurors -

Thank you for your attention to the trial this week and last. I am sure the case is on your mind, and that you are eager to continue your deliberations on Monday. Judge Rakoff asked me to remind you, however, of the instructions he gave earlier in the case:

It is your duty to remain focused solely on the evidence and arguments presented in the courtroom. Please avoid any media coverage of the trial. If you see something on TV, please change the channel; if you see something online, please navigate away. While the case is likely on your mind, your duty is not to speak about the case with anyone other than your fellow jurors, and then to do so only while you are assembled together in the deliberation room. Should a friend or family member bring up the case, please ask them not to speak about the case, or any of the issues it raises, in your presence.

Thank you again for your careful and diligent service throughout this trial. The Court, and the parties, are immensely grateful.

Best regards,
Nick Werle


Nicholas Werle
Law Clerk to the Hon. Jed S. Rakoff
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street – Room 1340
New York, NY 10007
Chambers: 212-805-0401

**JA 1564**

EXHIBIT B

**From:** Shane Vogt
**To:** Brown, Jay Ward; Nicholas Werle; Axelrod, David L.; Schell, Jacquelyn N.; Ken Turkel
**Subject:** RE: Palin v. NY Times | 17-cv-4853 (JSR) | Defendants" Citations in Support of Actual Malice Branch of JML
**Date:** Sunday, February 13, 2022 11:51:29 AM

==**CAUTION - EXTERNAL:**==

Mr. Werle:

The following is Plaintiff's list of key citations in opposition to Defendants' Rule 50 Motion argument on actual malice:

1. *Markowitz v. Republic Nat. Bank of New York*, 651 F.2d 825, 828 (2d Cir. 1981) (cited in *Contemporary Mission, Inc.*, 842 F.2d at 621-622).
2. *Loeb v. New Times Comm's Corp.*, 497 F.Supp. 85, 92-94 (S.D.N.Y. 1980).
3. *Celle v. Filipino Reporter Entreprises, Inc.*, 209 F.3d 163, 177-178 and 183-185 (2d Cir. 2000).
4. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).
5. *Sharon v. Time, Inc.*, 599 F.Supp. 538, 580-581 and 585 (S.D.N.Y. 1984).
6. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151-153 (2000).
7. *Lee v. McCue*, 2007 EWL 2231000, at *3 (S.D.N.Y. Jul. 25, 2007).
8. *Young v. Gannett Satellite Info. Network, Inc.*, 734 F.3d 544, 547-550 (7th Cir. 2013).
9. *Cotto v. Pabon*, 2008 WL 4962986, at *7-8 (S.D.N.Y. Nov. 20, 2008).
10. *Sparrow Fund Management, L.P. v. Mimdex Group, Inc.*, 2019 WL 8955307, at *5 (S.D.N.Y. Nov. 7, 2019).
11. *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545-546 (2d Cir. 2010).
12. *Stern v. Cosby*, 645 F.Supp.2d 258, 280 n.14 (S.D.N.Y. 2009).

---

**From:** Brown, Jay Ward <brownjay@ballardspahr.com>
**Sent:** Sunday, February 13, 2022 10:04 AM
**To:** Nicholas Werle <Nicholas_Werle@nysd.uscourts.gov>; Axelrod, David L.
<AxelrodD@ballardspahr.com>; Schell, Jacquelyn N. <SchellJ@ballardspahr.com>; Shane Vogt
<svogt@tcb-law.com>; Ken Turkel <kturkel@tcb-law.com>
**Subject:** RE: Palin v. NY Times | 17-cv-4853 (JSR) | Defendants' Citations in Support of Actual Malice
Branch of JML

Mr. Werle:  Attached as a PDF please find defendants' list of key citations in support of the portion of their motion under Rule 50 relating to actual malice.  If the Court prefers that this be formatted as a formal memorandum with caption and signature block, please just let me know.  Thank you.

Respectfully,

**Jay Ward Brown**

# JA 1566

**He/Him/His**
2021 Pro Bono Honor Roll – Gold
Ballard Spahr LLP
1909 K Street, NW, 12th Floor
Washington, DC 20006-1157
Direct 202.508.1136
brownjay@ballardspahr.com
www.ballardspahr.com

---

**From:** Nicholas Werle <Nicholas_Werle@nysd.uscourts.gov>
**Sent:** Friday, February 11, 2022 6:21 PM
**To:** Axelrod, David L. (Phila) <AxelrodD@ballardspahr.com>; Schell, Jacquelyn N. (New York) <SchellJ@ballardspahr.com>; Brown, Jay Ward (DC) <brownjay@ballardspahr.com>; Shane Vogt <svogt@tcb-law.com>; Ken Turkel <kturkel@tcb-law.com>
**Subject:** RE: Palin v. NY Times | 17-cv-4853 (JSR) | Revised Jury instructions


Counsel –

Please provide the Court a link to the cloud fileshare directory where you have posted the exhibits admitted into evidence.

To clarify Judge Rakoff's statement from the bench: should either party wish to provide case citations concerning the pending Rule 50 motion as to the actual malice element, counsel may provide any relevant citations (including pincites and non-Faulknerian explanatory parentheticals) by Sunday at noon. You can send these to me by email, cc'ing opposing counsel. But please note that the Court is not looking for, and will not accept, briefs or written arguments on the motion.

Have a good weekend.

Thanks,
Nick

Nicholas Werle
Law Clerk to the Hon. Jed S. Rakoff
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1340
New York, NY 10007
Chambers: (212) 805-0401

_Palin v. New York Times Co._, 17-cv-4853 (JSR)

### DEFENDANTS' CITATIONS IN SUPPORT OF THEIR
### MOTION FOR JUDGMENT AS A MATTER OF LAW ON ACTUAL MALICE

**Standard Under Rule 50 Where Heightened Burden of Proof Applies:**

_Reeves v. Sanderson Plumbing Prods._, 530 U.S. 133, 149-150 (2000) (standard for judgment as matter of law at conclusion of evidence "mirrors" summary judgment standard, and "court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party'").

_Contemporary Mission v. N.Y. Times Co._, 842 F.2d 612, 621-22 (2d Cir. 1988) ("where the factual dispute concerns whether a publisher acted with actual malice, 'the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not,'" and "the judge must view the evidence presented through the prism of the substantive evidentiary burden") (quoting _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 254-56 (1986)).

_Bose Corp. v. Consumers Union of U.S., Inc._, 466 U.S. 485, 511 (1984) (in public-figure defamation actions, "[j]udges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice'").

**Plaintiff's Failure To Meet Burden To Prove Actual Malice:**

_N.Y. Civ. Rights Law § 76-a(2)_ (requiring defamation plaintiffs in cases such as this one to prove, by clear and convincing evidence, that defendant made statement at issue "with knowledge of its falsity or with reckless disregard of whether it was false").

*Palin v. New York Times Co.*, 17-cv-4853 (JSR)

### A. Failure to prove knowledge of or reckless disregard of falsity

*Sweeney v. Prisoners' Legal Servs.*, 84 N.Y.2d 786, 793 (1995) ("To satisfy the reckless disregard standard, plaintiff had to establish that defendants in fact 'entertained serious doubts as to the truth of the publication' or that they actually had a 'high degree of awareness of its probable falsity,'" and "defendants' failure to investigate cannot amount to 'purposeful avoidance' unless it evidences an intent to avoid the truth. Absent some direct evidence that defendants in this case were aware that Mays' complaint was probably false, they cannot be found to have harbored an intent to avoid the truth." (internal quotations and citations omitted)).

*Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 665, 681-82, 691-92 (1989) (holding that "public figure plaintiff must prove more than an extreme departure from professional standards[,] and [] a newspaper's motive in publishing a story – whether to promote an opponent's candidacy or to increase its circulation – cannot provide a sufficient basis for finding actual malice"; and affirming verdict for plaintiff where defendant had, before publication, interviewed multiple witnesses who contradicted challenged statement and had recording of interview of key witness to events that defendant did not review).

*Garrison v. Louisiana*, 379 U.S. 64, 75, 78-79 (1964) (actual malice standard requires more than absence of a "reasonable belief" in statement's truth and is "not keyed to ordinary care," because what First Amendment does not protect is not mere falsity, but only "calculated falsehood").

### B. Failure to prove knowledge or reckless disregard of defamatory meaning

*Palin v. N.Y. Times Co.*, 482 F.Supp.3d 208, 217-218 (S.D.N.Y. 2020) (Rakoff, J.) ("[w]here a plaintiff's defamation case depends on a statement that is capable of multiple meanings — one defamatory, the other innocuous — the plaintiff must prove that the defendant acted with actual malice not only with respect to the statement's falsity but also to its meaning").

*Dodds v. ABC*, 145 F.3d 1053, 1064 (9th Cir. 1998) (reaffirming that plaintiff who is required to demonstrate actual malice must prove that defendant "actually intended to convey the defamatory impression" alleged).

JA 1570



100 N. Tampa St.
Suite 1900
Tampa, FL, 33602

Tel: 813.834.9191
Direct: 813.868.6650
svogt@tcb-law.com

February 22, 2022

*Via Email*
Hon. Jed S. Rakoff
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:     ***Palin v. The New York Times Company, et al.***
         Case No. 1:17-cv-04853-JSR

Dear Judge Rakoff:

Pursuant to Mr. Werle's February 17, 2022 email, Plaintiff provides the following information concerning the relief she seeks at the February 23, 2022 hearing, including a brief statement of the basis for each request:

1.     **Approval to File Written Motion to Disqualify**: Plaintiff seeks approval under Individual Rule of Practice 2(b)[1] to file a written motion seeking disqualification under 28 U.S.C. § 455. Based on events that transpired during and immediately after trial, Plaintiff believes disqualification is mandatory under Section 455(a)-(b). Plaintiff's motion will seek disqualification *retroactive* to the scheduling of this case for trial, including vacating all substantive rulings and orders from August 28, 2020 through the present, together with setting aside the jury verdict [Doc. 173] and vacating the judgment [Doc. 171]. *See e.g., U.S. v. Microsoft Corp.*, 253 F.3d 34, 107-117 (D.C. Cir. 2001) (retroactive disqualification and vacating rulings appropriate for Court's communications with media about pending case); *In re. Boston's Children First*, 244 F.3d 164 (1st Cir. 2001); *Ligon v. City of New York*, 736 F.3d 118, 123-127 (2d Cir. 2013), *vacated in part on other grounds*, 743 F.3d 362 (2d Cir. 2014); *In re. IBM Corp.*, 45 F.3d 641 (2d Cir. 1995); *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863-64 (1988) (judgment can be vacated under Rule 60 based on violation of 28 U.S.C. § 455). In the event Plaintiff's disqualification request is denied, her motion will also ask the Court to withhold ruling on any post-trial motions and/or requests for relief until such time as Plaintiff has an opportunity to file and the Second Circuit decides whether to grant a Petition for Writ of Mandamus on the disqualification issue. *See e.g., Ligon*

---

[1] Individual Rule of Practice 2(b) provides that "[n]o party will ever be denied the right to make a motion permitted by law…"

Hon. Jed S. Rakoff
Page 2
February 22, 2022

**JA 1571**

*v. City of New York*, 736 F.3d 118, 123-127 (2d Cir. 2013), *vacated in part on other grounds*, 743 F.3d 362 (2d Cir. 2014); *In re. Boston's Children First*, 244 F.3d at 171 (granting writ of mandamus based on comments to the press about pending case in violation of Section 455); *In re. Aguinada*, 241 F.3d 194, 202 (2d Cir. 2001). Plaintiff requests that her deadline to file this written motion for disqualification be set for Friday, **February 25, 2022**.

Among other things, Plaintiff's motion will be primarily based on events that transpired on February 14-15, 2022, such as:

- the substance and timing of the Court's Rule 50 Motion determination, which was announced while the jury was still deliberating on February 14, 2022;

- the Court's statement that "no party objected" to the announcement of the Rule 50 determination [*see* Doc. 172], even though the Court *sua sponte* stated at the conclusion of the announcement of the ruling that, ***"[s]o needless to say, the plaintiff is deemed to have objected to my decision, and that is preserved for appeal as well.***" [*see* Trial Transcript at 1306:5-7; attached as **Exhibit A**];

- the Court's instruction in response to the jury's February 15, 2022 question regarding sufficient evidence of actual malice [see **Exhibit B**], which contradicts controlling law and Jury Instructions 5 [circumstantial evidence] and 13 [actual malice];[2]

- the failure to immediately disclose to counsel on February 15, 2022, that several jurors "volunteered to the law clerk …that they had learned of the fact of the Court's Rule 50 determination on Monday [Feb. 14th]" [*see* Doc. 172];

- the Court's comments on the morning of February 16, 2022 to at least one member of the media[3] about the jury's exposure to the

---

[2] In discussing this jury question and response, the Court recognized that there is a distinction between an adverse inference and direct inference, but decided to instruct the jury that *any* inference was insufficient to establish actual malice—which is not correct [*see* Trial Transcript at 1312:9-18, attached as **Exhibit C**]. As explained in Paragraph 4 (Motion for Reconsideration of Rule 50 Decision), a reasonable observer with knowledge of all the facts could perceive bias to exist based on this instruction to the jury and the likelihood that it was intended to steer the jury toward reaching the same decision as the Court and disregard direct evidence of actual knowledge of falsity (Bennet's own admission of knowledge of falsity).

[3] *See* "*Palin Jurors Knew Judge Dismissed N.Y. Times Case Before Verdict*," Bob Van Voris, *Bloomberg*, Feb. 16, 2022 at 11:34 a.m. (https://www.bloomberg.com/news/articles/2022-02-

Hon. Jed S. Rakoff
Page 3
February 22, 2022

**JA 1572**

Rule 50 determination, including the statement that "I continue to think it was the right way to handle things;"[4]

- the Court's comments to the media about the jury's exposure to push notifications and their impact on the verdict *before informing counsel* about this development, *before* the jurors could be interviewed by counsel, and *before* post-trial motions are due;[5] and

- the Court's disclosure that some jurors "repeatedly assured the Court's law clerk that these notifications had not affected them in any way or played any role whatever in their deliberations" [Doc. 172], which a reasonable observer with knowledge of the facts could see as intended to defend the Court's decisions during trial and validate the verdict,[6] but also has the potential to taint the other jurors who may not have spoken to the Court on February 15, 2022 while also violating Federal Rule of Evidence 606(b)(1).[7]

2. **Approval to Interview Jurors**:  In light of the revelation that some jurors apparently received push notifications [presumably throughout the trial, not just concerning the Court's Rule 50 determination], Plaintiff seeks approval to conduct one-on-one stenographically recorded interviews of each juror. Under the circumstances, such interviews are appropriate.  *See Fed.R.Evid.* 606; *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994); *U.S. v. Calbas*, 821 F.2d 887, 896-897 (2d Cir. 1987); *U.S. v. Loyd*, 269 F.3d 228, 237-241 (3d Cir. 2001); *U.S. v. Gaggi*, 811 F.2d 47, 51 (2d Cir.), *cert. denied*, 482 U.S. 929 (1987); *U.S. v. Lord*, 565 F.2d 831, 838-839 (2d Cir. 1977). Among other things, Plaintiff's counsel should be permitted to inquire about the following:

---

16/palin-jurors-knew-judge-dismissed-n-y-times-case-before-verdict?sref=Hu4igNEZ) [attached as **Exhibit D**] ["The judge said he spoke to his clerk today after being informed of the issue by Bloomberg, and was told that 'at most three' jurors reported knowing about his ruling before delivering their verdict and all said it didn't affect their deliberations."]

[4] As explained in *U.S. v. Microsoft Corp.*, 253 F.3d at 112-115, public comments made by a presiding judge about the merits of a pending case run afoul of Canon 3A(6), Canon 3A(4), and Canon 2 of the Code of Conduct for United States Judges.  *See also In re. Boston's Children First*, 244 F.3d at 168; *Ligon*, 736 F.3d at 126-127.

[5] One wonders whether counsel would have been informed about the jurors' disclosure at all if the press had not reached out to the Court for comment.

[6] As noted in *In re. Boston's Children First*, 244 F.3d at 170, a judge's public defense of their own orders prior to the resolution of an appeal creates the appearance of partiality.

[7] As explained in *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994), "[e]ven when a juror attests to receiving information outside the record, the juror may not go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations." (*citing* Fed.R.Evid. 606(b)).

Hon. Jed S. Rakoff
Page 4
February 22, 2022

**JA 1573**

A.      All push notifications each juror received related to this case, the trial, the court's rulings, and/or the parties at any time during the trial;

B.      Any disclosure(s) of push notifications jurors received to other members of the jury;

C.      The sources (*i.e.,* news apps or news websites) of all push-notifications each juror received related to this case, the trial, the court's rulings, and/or the parties at any time during trial;[8]

D.      The factual circumstances surrounding the jurors' February 15, 2022 disclosure of their receipt of push notifications to the Court prior to the verdict;

E.      Whether the jurors were exposed to information concerning the Court's Rule 50 Motion decision through means other than push notifications (*i.e.*, from family members who learned about the dismissal; from other news sources; from text or instant messages from family or friends);

F.      Whether the jurors were exposed to any other information concerning this case, the trial, the court's rulings, and/or the parties through means other than push notifications (*i.e.*, family members, other news sources, text or instant messages from family or friends) during the trial.

3.      **Disclosure of Factual Circumstances Surrounding Court's Communications with Media During Trial**: On the afternoon of February 16, 2022, at approximately **12:13 p.m**., Plaintiff's counsel learned through a request for comment on the Bloomberg story posted at approximately **11:34 a.m** [see FN 3] that the Court had already made public comments to the press about jurors' receipt of push notifications concerning the Rule 50 ruling. The full extent of these communications with the press and specifics concerning statements made by the Court are unknown at this time. Plaintiff should be permitted to obtain evidence concerning the Court's interactions with and statements to the press on February 15, 2022.[9] However, Plaintiff cannot obtain this information from the journalist(s)

---

[8] Notably, Plaintiff asked the Court to inquire about this issue during jury selection [*see* Doc. 154, Questions 4-5], but the Court declined to do so.

[9] *U.S. v. Microsoft Corp*., 253 F.3d at 108-109 (discussing state of the "record" and evidentiary nature of disqualification inquiry).

Hon. Jed S. Rakoff
Page 5
February 22, 2022

involved in these interactions with the Court because of New York's Shield Law.[10]

4.  **Approval to File Motion for Reconsideration of Rule 50 Decision**: Plaintiff also seeks approval to file a written motion seeking reconsideration of the Court's February 14, 2022 Rule 50 decision.  Among other things, the Court's Rule 50 decision appears contrary to the evidence and controlling law.  The Court's Rule 50 decision focused on the "adverse inference" aspect of *Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 621-622 (2d Cir. 1988)—specifically, the statement that "it is not enough for the plaintiff merely to assert that the jury might, and legally could, disbelieve the defendant's denial of actual malice." [See Trial Transcript at 1240:5-1241:12].  This limited focus appears to have resulted in the avoidance of direct testimony by Mr. Bennet that admitted actual knowledge of falsity: "…***I didn't think then and don't think now that the map caused Jared Loughner to act***…".  [see Trial Transcript at 720:25-721:9, attached as **Exhibit E**].  Also, the Court concluded the hyperlink to the ABC article in the Editorial was not evidence of actual malice [*see* Trial Transcript at 1303:22-1304:7, attached as **Exhibit F**], but the Second Circuit already rejected this position.  *Palin v. New York Times Co.*, 940 F.3d 804, 813-815 (2d Cir. 2019) ("The district court, siding with the Times, concluded that including the hyperlinked article was further evidence of a simple mistake.  After crediting Bennet's testimony that he did not read the hyperlinked article, the district judge concluded that a mistake was the only plausible explanation.  But the inclusion of the hyperlinked article gives rise to more than one plausible inference, and any inferences to be drawn from the inclusion of the hyperlinked article was for the jury—not the court.")  Plaintiff believes these and several other factual and legal reasons warrant reconsideration of the Rule 50 ruling, and therefore requests that she be permitted to file a written motion for reconsideration on or before Monday, **February 28, 2022**.

5.  **Approval to File Written Post-Trial Motions**: Plaintiff also seeks approval to file a written motion for new trial and to set aside the verdict under Rules 59 and 60, pursuant to Individual Rule of Practice 2(b).  As discussed above, Plaintiff believes the verdict should be set aside based on (among other things) the timing of the Court's Rule 50 Motion decision, the jury's exposure to push notifications during trial, and the erroneous instruction the jury received in response their Question on February 15, 2022 concerning evidence of actual malice.  Plaintiff believes a new trial should be granted based on (among other things) her request for

---

[10] *See* N.Y. Civil Rights Law § 79-h; *Giuffre v. Maxwell*, 221 F.Supp.3d 472, 476-478 (S.D.N.Y. 2016).

Hon. Jed S. Rakoff
Page 6
February 22, 2022

**JA 1575**

disqualification (above), improper arguments of opposing counsel;[11] and the accumulation of the Court's rulings excluding evidence the Second Circuit already deemed relevant.[12] *See Graham v. City of New* York, 128 F.Supp.3d 681, 692-93 (E.D.N.Y. 2015); *Lee v. City of Troy*, 339 F.R.D. 346, 370 (N.D.N.Y. 2021) (Court is bound to consider totality of circumstances in ruling on motion for new trial). Plaintiff requests that her deadline to file this motion be set for **March 15, 2022** (28 days from the verdict and final judgment).

Respectfully submitted,

Shane B. Vogt

Attachments
cc: Counsel of record

---

[11] *See generally, Pappas v. Middle Earth Condo. Assoc.*, 963 F.2d 534 (1992) (improper conduct of counsel). By way of example, during closing argument defense counsel made "golden rule" arguments (i.e., asking the jury to put themselves in the defendants' shoes), conscience of the community arguments, attacks on opposing counsel, improper references to the law (i.e., First Amendment), and other inflammatory statements. [*see e.g.*, Trial Transcript at 1122:19-1123:2, 1124:15-24; 1131:4-9, 1138:2-81150:7-101154:21-1155:7, 1163:23-25, 1172:7-151173:12-1174:3, 1185:17-1188:1, 1188:2-12]. Plaintiff's counsel's initial attempt to prevent these improper arguments was thwarted [see Trial Transcript at 1131:10-22]. The allowance of these improper arguments amounted to plain error and seriously affected the fairness, integrity, and public reputation of the proceedings. *See e.g., Smith v. Crown Lift Trucks*, 2007 WL 1467970, * 6 (S.D.N.Y. May 16, 2007).

[12] *See Palin*, 940 F.3d at 813-815 (discussing relevance of Bennet's relationship with his brother and *Atlantic* articles, evidence of which was excluded by the Court at trial).

JA 1576

# EXHIBIT A

M2E1PALF

# JA 1577

1     facts, if you would, on the different standard that they apply,

2     and therefore the Court of Appeals will have the benefit of

3     both determinations before it when it views the inevitable

4     appeal.

5          So needless to say, the plaintiff is deemed to have

6     objected to my decision, and that is preserved for appeal as

7     well.

8          Anything else that either counsel wanted to raise on

9     this subject?

10          MR. VOGT:  No, your Honor.

11          MR. AXELROD:  No, your Honor.

12          THE COURT:  All right.  So I'm going to go deal with

13     another matter that I have at 3:30 in a different courtroom,

14     but of course we should ask the jury whether they want to stay

15     past 3:30 today.  So let's do that before that.  I'll stay here

16     until we find out the answer to that.

17          THE DEPUTY CLERK:  Okay.

18          (Pause)

19          MR. AXELROD:  Your Honor, while we're waiting, would

20     you want to make the submissions that the parties submitted

21     over the weekend part of the record?

22          THE COURT:  Sure, if you want.  That's fine with me.

23     The case citations, you're talking about?  Sure.  I'll have my

24     law clerk make sure those are docketed.

25          MR. AXELROD:  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA 1578

# EXHIBIT B



Your Honor,    Jury Note 5

Per your instructions we need
to show "the plaintiff proved that
there was a high probability that
mr Bennet actually doubted
the truth of the challenged
Statement ..."

If a juror were able to make
this inference from a response
by mr. Bennet from a question
put forth by the defense,
would the fact the defense
posed the question invalidate
this inference, and can it contribute
to the evidence brought forth by the plaintiff?

2/15/22

10:25 AM

**JA 1580**

                                        Response to Jury Note of
                                          2/15/2022 at 10:21 a.m.

To the jury,

Thank you for your latest note.

In response to your first inquiry, you are free to draw any
reasonable inference you choose to draw from any answer received
in evidence, regardless of which side posed the question to which
the answer was given.

In response to your second inquiry, an answer given by Mr. Bennet
and a reasonable inference drawn therefrom is not sufficient in
itself to carry the plaintiff's burden of showing by clear and
convincing evidence that there was a high probability that Mr.
Bennet actually doubted the truth of a challenged statement prior
to publication, but it can contribute to the other evidence brought
forth by the plaintiff.


                    Judge Rakoff

JA 1581

# EXHIBIT C

M2F1PALF                    **JA 1582**

1  method used to elicit it and therefore it's all to be

2  considered the same whether the answers were elicited by

3  plaintiff or defense.

4          THE COURT:  Well, that's a possible answer.

5          Let me hear from defense counsel.

6          MR. AXELROD:  Your Honor, I thought your second

7  approach would be appropriate, and I support something like

8  that.

9          THE COURT:  So they're not really familiar, though

10  this played a role in my decision, with the case law that says

11  as a matter of law, an adverse inference that would normally be

12  sufficient for certain purposes in a preponderance situation is

13  not sufficient in a clear and convincing situation,

14  particularly one involving defamation.  That's why I thought,

15  though, it would be useful to see the question, because then we

16  would know whether they're talking about an adverse inference

17  or direct inference.  Either way, the same point, though, would

18  have to be made.

19          Well --

20          MR. TURKEL:  Judge, if I may, their question is

21  specifically directed at whether they can consider testimony

22  elicited by defense to contribute to plaintiff's evidence.  I

23  would think going past that is answering a question they're not

24  asking.

25          THE COURT:  Well, I think there's something to that.

# EXHIBIT D



Doggykingdom Custom Dog Harness, No Pull, Warranty, Camouflage Pink / M

**Business**
Legal

# Palin Jurors Knew Judge Dismissed Times Case Before Verdict

- Jurors couldn't avoid push notifications on their smart phones
- Deliberations had continued after judge said he'd toss suit



By Bob Van Voris
February 16, 2022, 8:34 AM EST  Updated on February 16, 2022, 3:27 PM EST

Several jurors tasked with deciding Sarah Palin's defamation case against the New York Times learned from smart-phone push notifications that the judge presiding over the trial had already ruled in the newspaper's favor.



present sufficient evidence to win the case.

But some of the jurors learned of his decision when they went home that night, before completing their deliberations, according to people with knowledge of the matter. After Rakoff was told by Bloomberg that jurors had disclosed the information to his clerk, the judge issued a court filing notifying both sides in the case.

"I'm disappointed that the jurors even got these messages, if they did," Rakoff said in an interview, referring to the news notifications. "I continue to think it was the right way to handle things."

The incident follows on the heels of British socialite Ghislaine Maxwell's efforts to win a new trial based on disclosures in the press by one of the jurors in her criminal sex-trafficking case. And it illustrates the difficulty of keeping jurors insulated from information that could affect their verdicts in a time where news -- from the score of a recorded football game to a judge's decision in a high profile case -- is increasingly hard to avoid.



On Monday, Rakoff cited a lack of evidence proving the Times had knowingly or recklessly published falsehoods about Palin when it ran a 2017 opinion piece linking her to a deadly shooting. The next day, jurors returned a unanimous verdict in favor of the Times.

### Jurors Find Out

Several jurors told one of the judge's clerks on Tuesday that they weren't able to avoid learning about Rakoff's widely reported decision, according to people with knowledge of the matter. When Rakoff was informed of that information by Bloomberg on Wednesday, he said he spoke to his clerk.

The judge said he was told "at most three" jurors reported knowing about his ruling before delivering their verdict, and all said it didn't affect their deliberations.

He later issued a written order informing the parties of the jurors' discussion with his clerk.



"In an excess of caution, the Court hereby brings the foregoing facts to the parties' attention," Rakoff said. "If any party feels there is any relief they seek based on the above, counsel should promptly initiate a joint phone conference with the court to discuss whether any further proceedings are appropriate."

Whether there will be any fallout for Palin or the Times is unclear.

"The standard for overturning a jury's verdict is a demanding one," said Barbara Wall, a partner for the new firm Avvet Fox LLP.

Rakoff told the parties that he allowed the jury to deliver a verdict despite his ruling so that if the case is appealed, the court would have the benefit of both for review.

The jury's knowledge of Rakoff's intent to throw out Palin's case doesn't affect his decision to do so. And Palin may choose to appeal.

Kenneth Turkel, a lawyer for Palin, had no immediate comment, and spokesman for the Times declined to comment.

### No Evidence

In his ruling, Rakoff said Palin failed to show that the Times's former opinion page editor James Bennet "either knew that the challenged statements were false, or that there was a high probability they were false and he recklessly disregarded that possibility." That's the so-called "actual malice" standard set by the U.S. Supreme Court for public figures like Palin in its landmark 1964 decision in New York Times v. Sullivan.

The 2008 Republican vice presidential candidate sued the Times and Bennet over a piece entitled "America's Lethal Politics" published in June 2017. Bennet inserted language into the piece suggesting a map published by Palin's political action committee helped incite a 2011 shooting in Tucson, Arizona, in which six people were killed and 13 wounded, including then-U.S. Representative Gabrielle Giffords. An investigation later determined the shooter, who was mentally ill, had anger at Giffords unrelated to the map.

The Times and Bennet argued they may have made mistakes that they corrected less than a day after publication.

The case is Palin v. New York Times, 17-cv-04853, U.S. District Court, Southern District of New York (Manhattan).

(Updates with interview with judge and his order.)

### From The Web





# EXHIBIT E

M292Pal2                    **JA 1586** Cross

1   rhetoric?

2   A.  I thought it made sense, you know, in my view.  As I said

3   earlier, when politicians get shot, I suspect it has something

4   to do with politics, and I think that an atmosphere of highly

5   charged political rhetoric makes such, you know, terrifying

6   events more likely.

7   Q.  Prior to reading Ms. Williamson's draft, did you know

8   whether she was going to discuss Governor Palin's political

9   action committee?

10  A.  No.

11  Q.  And I think Mr. Vogt asked you this, but you see that

12  "circulated" word?

13  A.  I do.

14  Q.  Did you click on that link?

15  A.  I didn't.

16  Q.  Now, on the night of June 14, as you worked on revising

17  Ms. Williamson's draft, did you know whether or not Jared

18  Loughner had seen the crosshairs map?

19  A.  I didn't, no.

20  Q.  Why not?

21  A.  I hadn't reported that myself and I don't think I read any

22  reporting on that.  So I didn't know.

23  Q.  Did you research it?

24  A.  I didn't research it, no.

25  Q.  Why didn't you research it?

M292Pal2                    JA 1587      Cross

1  A.  I, I -- I didn't -- I was functioning as the editor, not

2  the reporter on the piece, so I wouldn't normally do the

3  reporting in a situation like this, particularly when we were

4  on a tight deadline.  But also I didn't, I didn't think -- I

5  wouldn't have thought it was -- I didn't think then and don't

6  think now that the map caused Jared Loughner to act.  I didn't

7  think we were saying that, and therefore I wouldn't have -- the

8  question wouldn't have entered my mind, didn't enter my mind to

9  research that question.

10 Q.  So when you started editing Ms. Williamson's draft on the

11 night of June 14, what was your goal?

12 A.  My goal was to make it, you know, a clearer argument and

13 specifically more compelling about -- more compelling

14 description of what happened that day, a more vivid description

15 of what happened that day.

16 Q.  When you were revising -- strike that.

17         Did you revise Ms. Williamson's draft because you

18 wanted to blame Ms. Palin or her political action committee for

19 the Arizona shooting?

20 A.  No.

21         MR. VOGT:  Objection.

22 Q.  Did you revise Ms. Williamson's draft because you wanted to

23 make the point that Loughner acted because the crosshairs map?

24 A.  No, no.

25 Q.  So, Mr. DiMezza, if you could put up Defense Exhibit 136

JA 1588

# EXHIBIT F

**JA 1589**

1  falsity of the suggestion that the crosshairs map helped cause

2  Loughner to mount his violent attack.  Indeed, as mentioned

3  this morning, in PX 119, Bennet's prepublication email

4  proposing the framing for the editorial shows his preexisting

5  belief that violent right-wing rhetoric incited Loughner's

6  attempted assassination of Representative Giffords, and

7  although he doesn't mention there the map or Sarah Palin, it

8  shows what his belief was, and it really has not been

9  contradicted that he had any different belief at the time.

10         Plaintiff relies on several pieces of research

11  circulated by the editorial team that plaintiff says made

12  Mr. Bennet aware that it had been determined that Mr. Loughner

13  was not inspired to act by the crosshairs map.  It's by no

14  means clear that Mr. Bennet read these articles, and we know

15  that he specifically denies reading at least one of them, but

16  in any event, as I pointed out again this morning, all these

17  columns—Plaintiff's Exhibits 133, 134, 135—give opinions on

18  both sides of that issue and hardly suggest that there is the

19  kind of much more definitive showing as there is in the police

20  report or in the ABC investigation contradicting his good-faith

21  belief.

22         It is true that the argument could be made that he

23  should have looked at the hyperlinked ABC News article under

24  the word "circulated" that accompanied Ms. Williamson's draft.

25  That is in Plaintiff's Exhibit 142.  But negligence, as

M2E1PALF                    **JA 1590**

1    previously mentioned, would not be enough to sustain

2    plaintiff's burden.  In any event, aside from the fact that

3    it's uncontradicted that Mr. Bennet did not open the link, it's

4    perfectly plausible that he would have no reason to open the

5    link since it was linked to the question of circulation, which

6    was really never in doubt—circulation, that is to say, of the

7    crosshairs map.

8             The allegation that he published with actual malice is

9    also undermined, in the Court's view, by the actions he took

10   after finishing his revisions of Ms. Williamson's draft.  For

11   while it's undisputed that an article's author has primary

12   responsibility for fact-checking and accuracy, Mr. Bennet,

13   after revising the editorial, emailed Ms. Williamson, alerting

14   her that he had completed a "heavy edit" and asking her to

15   "please take a look."  This is Plaintiff's Exhibit 163.

16   Mr. Bennet testified that by asking Ms. Williamson to take a

17   look, he meant for her to fact-check the revision, and of

18   course no revision came back from Ms. Williamson or anyone else

19   regarding the issues that are here the subject of the claim of

20   defamation.

21            It is true, of course, that after the editorial was

22   first published, Ross Douthat, on the evening of June 14th,

23   questioned whether the information was all correct, and

24   Mr. Bennet responded by immediately saying, well, this was his

25   understanding but he would pursue it further, and he pursued it

M2N1PALC                    **JA 1591**

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SARAH PALIN, an individual,

4                   Plaintiff,

5          v.                          17 CV 4853 (JSR)

6   THE NEW YORK TIMES COMPANY, *et*
    *al.*,
7
                    Defendants.
8                                      Remote Conference
    ------------------------------x
9
                                       February 24, 2022
10                                     4:08 p.m.

11  Before:

12                     HON. JED S. RAKOFF,

13                                     District Judge

14                        APPEARANCES

15
    TURKEL CUVA BARRIOS, P.A.
16       Attorneys for Plaintiff
    BY:  SHANE B. VOGT
17       KENNETH G. TURKEL

18
    BALLARD SPAHR, LLP
19       Attorneys for Defendants
    BY:  DAVID L. AXELROD
20       JAY WARD BROWN

21

22  Also Present:

23  Dana Green, Senior Counsel, The New York Times Company

24

25

M2N1PALC **JA 1592**

1          THE COURT:  This is Judge Rakoff.  Would counsel

2     please identify themselves for the record.

3          MR. TURKEL:  Ken Turkel and Shane Vogt for the

4     plaintiff, your Honor.

5          MR. AXELROD:  And for defendants, your Honor, David

6     Axelrod and Jay Brown from Ballard Spahr, and Dana Green from

7     The New York Times.

8          THE COURT:  So this is basically a scheduling

9     conference.  I had asked counsel to let me know by yesterday

10     what motions they wanted to file, if any, and none from the

11     defense, but the plaintiff indicated that they wanted to file

12     five interesting motions:

13          The first was a motion to disqualify me, and to

14     disqualify me retroactively;

15          The second was a motion to allow them to interview the

16     jurors;

17          The third motion—which I'll return to in a minute—was

18     disclosure of factual circumstances surrounding the Court's

19     communications with the media during trial;

20          The fourth was a motion for reconsideration of my

21     Rule 50 decision; and

22          The fifth was motions under Rules 59 and 60 to set

23     aside the verdict or for a new trial.

24          And we will set a schedule for all that in a minute.

25          With respect to the motion that's entitled Disclosure

M2N1PALC                    **JA 1593**

1    of Factual Circumstances Surrounding Court's Communications

2    with Media During Trial, I had zero communications with the

3    media during trial.  None whatsoever.  After the trial, after

4    final judgment had been entered, you may recall that I went off

5    to Columbia to teach, which is why we had told the jury earlier

6    that day that they could only sit to 3:30.  The next morning,

7    when I arrived, which, I have to admit, was somewhat late

8    because I slept in, my courtroom deputy told me that a

9    Bloomberg reporter had called and said it was urgent, so I

10   called that reporter back.  And it turned out it was about

11   information he had received about push notifications that the

12   jurors had told my law clerk about.  I was already beginning to

13   explore that issue with my law clerk, but I decided to give the

14   reporter a very short statement so that if his story appeared

15   before the order that I was already undertaking a draft, there

16   would be no misunderstandings.  So I did give him a short

17   statement, which contained the same information, in more

18   abbreviated form than my order, which appeared -- that was sent

19   to counsel as well -- I think approximately five minutes after

20   his story came out.

21          So that was the entirety of my communications, and all

22   of it was after the trial, after the final judgment had been

23   entered.  But if counsel still wants to file a motion about all

24   that, he is welcome to do so.

25          So let's talk about schedule.

1      I had indicated repeatedly during the colloquy on the

2 Rule 50 motion that I intended to write an opinion setting

3 forth in more detail the reasons why I dismissed the case, and

4 in light of all this fracas, I have expedited that and I intend

5 to file that no later than next Tuesday, March 1st.

6      With respect, therefore, to the motions from the

7 plaintiff, which I think should be an omnibus submission

8 containing all of the motions -- obviously some of them may be

9 mooted if I grant some of the others, but in any event, one

10 single filing, and I would suggest two weeks after my opinion

11 comes down.  That would be March 15th.  Then two weeks after

12 that for any reply by the defendants.  That would be

13 March 29th.  And then reply papers on April 5th.  I don't

14 usually, on post-trial motions, hold oral argument, but if it

15 were necessary to hold oral argument, I would reach out to the

16 parties to schedule that.

17      So how many pages does plaintiff's counsel want, since

18 it will be an omnibus submission?

19      MR. TURKEL:  Judge, we request 50 pages.

20      THE COURT:  50?  Five, zero?

21      MR. TURKEL:  Yes, your Honor.

22      THE COURT:  Yes, that's fine.  And 50 pages then for

23 the defense, and then why don't we say 15 pages for the reply.

24      All right.  So I think that covers everything, and I

25 think that concludes this proceeding.  Thanks very much.

# JA 1595

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

SARAH PALIN

                   Plaintiff,

                 -against-

THE NEW YORK TIMES COMPANY and JAMES
BENNET,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

No. 17 Civ. 4853 (JSR)

ECF Case

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION *IN LIMINE* TO EXCLUDE EVIDENCE REGARDING ARTICLES AND POSTS PUBLISHED BY ATLANTIC MEDIA, AN ARTICLE JAMES BENNET WAS SENT, AND SENATOR MICHAEL BENNET**

David L. Axelrod
Jay Ward Brown
Thomas B. Sullivan
Jacquelyn N. Schell
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
axelrodd@ballardspahr.com
brownjay@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*

## JA 1596

### <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................. ii

I.      Articles Published by "The Atlantic" ............................................................... 1

II.    Article Sent to Mr. Bennet in 2011 .................................................................. 8

III.   Evidence Regarding Mr. Bennet's Brother ...................................................... 8

CONCLUSION ............................................................................................................. 11

# JA 1597

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*In re Agent Orange Prod. Liab. Litig.*,
    611 F. Supp. 1223, 1256 (E.D.N.Y. 1985) ...............................................................6

*Bose Corp. v. Consumers Union*,
    466 U.S. 485, 498 (1984) ...........................................................................................5

*Celle v. Filipino Reporter Enterprises, Inc.*,
    209 F.3d 163, 183 (2d Cir. 2000) .............................................................................10

*Chisholm v. Mem'l Sloan-Kettering*,
    2011 U.S. Dist. LEXIS 53243, at *11 (S.D.N.Y. May 13, 2011) .............................6

*Palin v. N.Y. Times Co.*,
    482 F. Supp. 3d 208, 221, 222 (S.D.N.Y. 2020) ............................................ *passim*

*Palin v. N.Y. Times Co.*,
    940 F.3d 804, 814 (2d Cir. 2019) .........................................................................9, 10

*United States v. Litvak*,
    889 F.3d 56, 69 (2d Cir. 2018) ..................................................................................6

*United States v. Quinto*,
    582 F.2d 224, 233 (2d Cir. 1978) ..............................................................................4

**Other Authorities**

Fed. R. Evid. 401 .............................................................................................................4

Fed. R. Evid. 402 .......................................................................................................4, 10

Fed. R. Evid. 403 .......................................................................................................5, 11

2 Weinstein's Federal Evidence § 403.04 (2020) .........................................................5

ii

# JA 1598

Defendants The New York Times Company ("The Times") and James Bennet ("Mr. Bennet" and together with The Times, "Defendants"), respectfully submit this memorandum of law in support of their motion to exclude from trial exhibits, questions, and argument related to various allegations previously put forward by Plaintiff Sarah Palin ("Gov. Palin" or "Plaintiff") to support her claim of actual malice, which this Court ruled "find no support in the actual evidence." *See Palin v. N.Y. Times Co.*, 482 F. Supp. 3d 208, 221 (S.D.N.Y. 2020). Specifically, Defendants seek to exclude references to (1) articles and blog posts published by publications which were under the same broad corporate umbrella as *The Atlantic* magazine but not actually run by Mr. Bennet, (2) a 2011 article to which Mr. Bennet was sent a hyperlink as part of another article, and (3) Mr. Bennet's brother, a Democratic United States Senator from Colorado.

Gov. Palin, recognizing that evidence of Defendants' actual malice in connection with the publication of "America's Lethal Politics" (the "Editorial") is negligible, has throughout this case attempted to demonstrate actual malice through strained assertions, speculation, and conspiracy theories. The Court, in reviewing Defendants' motion for summary judgment, already had the opportunity to review, and reject, some of these ponderous theories. For that reason, and the reasons below, Gov. Palin should not be permitted to introduce this irrelevant, confusing, and distracting evidence.

## I.      Articles Published by "The Atlantic"

Earlier in this case, Gov. Palin argued that actual malice can be inferred from the content of various articles and blog posts about the Arizona Shooting published, allegedly by "The Atlantic," while Mr. Bennet was editor in chief of *The Atlantic* magazine. *See* Pl.'s Mem. on Context, Inferences and Plausibility at 5 n.23, Dkt. 40; Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. at 18, Dkt. 107. Specifically, Gov. Palin contends that because "The Atlantic"

**JA 1599**

published content in 2011 stating that Loughner was driven by mental illness and casting doubt on whether Loughner was motivated by the Crosshairs Map, Mr. Bennet must have known in 2017 that asserting otherwise was false.

During discovery, Gov. Palin spent significant time exploring Mr. Bennet's knowledge of the content published under the Atlantic umbrella in 2011. *See* Declaration of Thomas B. Sullivan in Support of Defendants' Motions *In Limine* ("Sullivan Decl."), Ex. P at 29:10-33:15; 47:8-52:4; 53:20-54:16; 55:25-57:8; 97:23-98:9; 122:6-124:5; 124:10-128:8. Mr. Bennet carefully explained that he had little involvement with the content published by Andrew Sullivan in the "Daily Dish," or articles published by the "Atlantic Wire," which both were technically under the Atlantic umbrella. *Id.* at 50:2-52:4; 124:18-125:4. Though Gov. Palin's attorneys showed Mr. Bennet a number of "Daily Dish" blog posts, Loughner-related contented published by the Atlantic Wire, and a google search list of Atlantic content related to Loughner, Mr. Bennet testified that he did not remember reading any specific article but conceded he regularly read the Atlantic website in 2011 he therefore "must have read" some of the posts at issue. *Id.* at 122:6-22. This quote was in reference to Plaintiff's Exhibit 39,[1] which is simply a list of search results from the Atlantic website:



---

[1] Sullivan Decl., Ex. U.

# JA 1600

The list does not identify the substance of any given article or blogpost. Mr. Bennet's concession that the "must have read" some of these articles thus does prove that Mr. Bennet read an article that discussed Loughner and the Crosshairs Map, making Gov. Palin's assertion of relevance all the more strained. Andrew Sullivan's deposition testimony did not undermine Mr. Bennet's testimony, nor did any other piece of documentary evidence.

This Court flatly rejected Palin's argument that a jury could find actual malice on the basis of Mr. Bennet's purported admission at his deposition that because he regularly read the Atlantic website in 2011 he therefore "must have read" some of the posts at issue. It concluded that "[h]aving once read an article many years before the drafting of the Editorial is hardly enough to create an inference of knowledge of the Editorial's falsity." *Palin*, 482 F. Supp. 3d at 221-22. Moreover, discovery established that Mr. Bennet had nothing to do with the publication of these articles and blog posts, which were published in blogs that Mr. Bennet did not oversee on a day-to-day basis, rather than in *The Atlantic* magazine. For this reason, this Court determined on summary judgment, "[t]he undisputed record now shows . . . that Bennet was not responsible for editing any of those articles . . . ." *Id.* at 221.

Despite the Court's conclusion, Gov. Palin now seeks to introduce these same blog posts, and similar content also not published in *The Atlantic* magazine, at trial as Plaintiff's Exhibits 39, 40,[2] 41,[3] 42,[4] 43,[5] 44,[6] 45,[7] 46,[8] 47,[9] 48,[10] 50,[11] 56,[12] 59,[13] 60.[14] Similarly, Gov. Palin seeks to

---

[2] Sullivan Decl., Ex. V.

[3] Sullivan Decl., Ex. W.

[4] Sullivan Decl., Ex. X.

[5] Sullivan Decl., Ex. Y.

[6] Sullivan Decl., Ex. Z.

# JA 1601

introduce the deposition testimony about these posts by Andrew Sullivan, who authored many of them, *see* Sullivan Decl., Ex. AI; *id.*, Ex. AJ at 55:1-56:23; 62:22-65:17; 65:25-72:14, as well as deposition testimony by Mr. Bennet about Mr. Sullivan and his lack of knowledge of and control over the posts, *see id.*, Ex. O; *id.*, Ex. P at 29:10-33:15; 47:8-52:4; 53:20-54:16; 55:25-57:8; 97:23-98:9; 122:6-124:5; 124:10-128:8.

As the Court has already concluded that this evidence is irrelevant, Gov. Palin should be precluded from introducing it at trial. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Evidence is irrelevant if it does not possess a tendency "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Quinto*, 582 F.2d 224, 233 (2d Cir. 1978); *see* Fed. R. Evid. 401. Here, this Court has already determined that a jury could not reasonably conclude Defendants had knowledge of falsity in 2017 because Mr. Bennet potentially read articles or blog posts in 2011 that might have discussed Loughner and the Crosshairs Map. Therefore, the articles and blog posts do not make it more or less probable that the Editorial was published with actual malice, the only purpose for which Gov. Palin could introduce it. Because the articles and posts are not relevant, this Court should preclude introduction of this evidence at trial.

---

[7] Sullivan Decl., Ex. AA.

[8] Sullivan Decl., Ex. AB.

[9] Sullivan Decl., Ex. AC.

[10] Sullivan Decl., Ex. AD.

[11] Sullivan Decl., Ex. AE.

[12] Sullivan Decl., Ex. AF.

[13] Sullivan Decl., Ex. AG.

[14] Sullivan Decl., Ex. AH.

# JA 1602

In any event, the negligible, at best, probative value of this evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay and wasting time.  *See* Fed. R. Evid. 403.  There would be substantial dangers of each of these negative impacts on the trial.

Evidence is unfairly prejudicial if it creates "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Advisory Committee Notes, Fed. R. Evid. 403; *see* 2 Weinstein's Federal Evidence § 403.04 (2020) ("Unfairness may be found in any form of evidence that may cause a jury to base its decision on something other than the established propositions in the case.").  The introduction of these articles and blog posts would be unfairly prejudicial to the Defendants in at least two ways.  First, actual malice is measured by the author's knowledge "at the time of publication," *see, e.g.*, *Bose Corp. v. Consumers Union*, 466 U.S. 485, 498 (1984).  At best, the evidence shows that Mr. Bennet may have read some, though it is impossible to know what, of this content six years before he revised the Editorial.  This, however, does not mean that Mr. Bennet recalled information about Loughner and the Crosshairs Map in June 2017.  Accordingly, the introduction of these articles and blog posts will confuse the jury about the appropriate period to consider when making the actual malice assessment.

Second, it is undisputed that Mr. Bennet did not edit or review these articles and blog posts.  However, if Gov. Palin is permitted to use these documents at trial, the jury may find it difficult to understand that these other publications – sharing the name *Atlantic* – were not under Mr. Bennet's direct control, and assume that Mr. Bennet must know their content, again deciding the issue of actual malice on the basis of this irrelevant evidence.  For the same reason, there is a real danger here that this evidence could mislead the jury or confuse the issues.  *See United*

# JA 1603

*States v. Litvak*, 889 F.3d 56, 69 (2d Cir. 2018) (excluding testimony that "had a high probability of confusing the jury by asking it to consider as relevant [a] perception . . . that was entirely wrong").

Allowing Plaintiff to introduce this evidence will also waste significant trial time. *See Chisholm v. Mem'l Sloan-Kettering*, 2011 U.S. Dist. LEXIS 53243, at *11 (S.D.N.Y. May 13, 2011) (excluding testimony as a "waste of time" when its only purpose would be to support a defense precluded by precedent). Gov. Palin's exhibit list contains at least 14 *Atlantic* blog posts. It will require substantial trial time to introduce these multi-page exhibits. Gov. Palin also intends to introduce the deposition testimony of Mr. Sullivan discussing the content he published. This is notwithstanding the fact that, as this Court found at summary judgment, Mr. Sullivan "testified that Bennet had no role whatsoever in the preparation of those posts." *Palin*, 482 F. Supp. 3d at 221. Gov. Palin has also designated deposition testimony by Mr. Bennet discussing Mr. Sullivan and the blog posts at issue, and, one would assume intends to raise these issues with Mr. Bennet in his live testimony at trial.

This problem would be amplified because Defendants would be required to counter the false impression that Mr. Bennet was directly involved in the publications at issue by not only presenting his testimony explaining his role at *The Atlantic,* but also by presenting additional deposition excerpts from Mr. Sullivan, whose testimony Defendants would not otherwise introduce. *See In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1256 (E.D.N.Y. 1985) ("The waste-of-time ground for exclusion is particularly persuasive when detailed rebuttal testimony would be necessary to establish that the proffered evidence lacks probative worth."). Should the Court grant this motion, Defendants do not expect that Mr. Sullivan would be called as a witness by either party.

# JA 1604

For similar reasons, this Court should also exclude evidence of posts written by Mr. Sullivan about Gov. Palin's son Trig. Gov. Palin has included three blog posts written by Mr. Sullivan about Trig on her exhibit list – Exhibits 26,[15] 27,[16] and 28[17] - and designated testimony from Mr. Sullivan and Mr. Bennet on this point for use at trial, *see* Sullivan Decl., Ex. AI; *id.*, Ex. AJ at 39:17-41:6, 44:1-48:5, 52:11-15; *id.*, Ex. O; *id.*, Ex. P. at 53:20-54:16, 55:25-57:8. It is difficult to understand the possible relevance of this evidence, but it appears that Gov. Palin seeks to tie Mr. Bennet to Mr. Sullivan's questioning of the circumstances of Trig's birth and parentage, *see* Sullivan Decl., Ex. AK..

The undisputed record shows that Mr. Bennet had no editorial control or input on any post on Mr. Sullivan's blog. Moreover, regarding the "Trig" blog posts, Mr. Sullivan testified that "at no point did James Bennet direct, oversee, or even comment to [Mr. Sullivan] about this." *See id.*, Ex. AJ at 102:18-104:7. Therefore, the posts, and any testimony about them, should be excluded as irrelevant.

Their introduction would also be unfairly prejudicial. Given the lack of relevance, it appears Gov. Palin seeks to introduce these blog posts to unfairly tie Mr. Bennet to Mr. Sullivan, and create the illusion that Mr. Bennet had something to do with these highly provocative posts, and thus had a history of publishing distasteful content about Gov. Palin. It also appears that Gov. Palin is attempting to use the "Trig" blog posts to provoke an emotional response from jury members who find these posts outrageous or repulsive.

---

[15] Sullivan Decl., Ex. AK.

[16] Sullivan Decl., Ex. AL.

[17] Sullivan Decl., Ex. AM.

# JA 1605

For these reasons, each of these articles and blog posts, all questions related to such content, and any suggestion or argument that Mr. Bennet had knowledge or responsibility for them should be excluded from this trial.

## II. Article Sent to Mr. Bennet in 2011

On summary judgment, Gov. Palin also argued that actual malice could be inferred from Mr. Bennet's receipt soon after the Arizona Shooting of "an article refuting the causal link between the shooting and the Map." *Palin*, 482 F. Supp. 3d at 222 n.14. Gov. Palin now seeks to introduce this article at trial as Plaintiff's Exhibit 58,[18] as well as Exhibit 57,[19] an email sent to Mr. Bennet attaching another article which linked to Exhibit 58. Gov. Palin has also designated Mr. Bennet's deposition testimony on this subject, *see* Sullivan Decl., Ex. O; *id.*, Ex. P at 135:10-139:19. This Court rejected this supposed evidence as well for the "same reason," that even if Mr. Bennet had read the article years before The Times published the Editorial it is "insufficient to support a finding of actual malice." *Palin*, 482 F. Supp. 3d at 221-222 & n.14. Therefore, Defendants request that any reference to this article be excluded from the trial as well, because the article is irrelevant and any possible relevance is outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay and wasting time.

## III. Evidence Regarding Mr. Bennet's Brother

As with the Atlantic theory, throughout this case, Gov. Palin has pushed the theory that Mr. Bennet had motive to defame Gov. Palin because of his relationship with his brother, United States Senator Michael Bennet. Despite finding no evidence to support this strained assertion, Gov. Palin apparently intends to persist with the argument that because Mr. Bennet's brother is a

---

[18] Sullivan Decl., Ex. AN.

[19] Sullivan Decl., Ex. AO.

United States Senator who supports gun control laws and who Gov. Palin opposed, Mr. Bennet had actual malice when he drafted the Editorial. This is confirmed by the fact that Gov. Palin has identified numerous exhibits related to Senator Bennet and Mr. Bennet's family more broadly on her exhibit list – Exhibits 20,[20] 21,[21] 51,[22] 73,[23] 74,[24] and 78[25] – as well as deposition testimony by Mr. Bennet on these subjects, *see* Sullivan Decl., Ex. O; *id.*, Ex. P at 58:7-8, 59:10-61:9, 62:3-63:18, 117:17-22, 120:19-121:8, 144:20-145:15, 162:19-164:3, 172:2-173:20.

 In opposing summary judgment, Gov. Palin argued that because Mr. Bennet's brother is a Democratic United States Senator, Mr. Bennet had reason to be hostile to Gov. Palin and to be aware of facts allegedly published "on his watch" about the Arizona Shooting. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 814 (2d Cir. 2019). Discovery too, exposed this as unsubstantiated. Gov. Palin adduced no evidence showing that Mr. Bennet knew that Gov. Palin had supported Senator Bennet's opposition or that Mr. Bennet had any animus towards Gov. Palin due to this familial relationship. *See* Sullivan Decl., Ex. P at 145:5-15, 163:11-13; *id.*, Ex. AV at 70:24-71:10. Gov. Palin failed to notice Senator Bennet's deposition, implicitly conceding this theory was unfounded.

 In ruling on Defendants' motion for summary judgment, the Court noted that while the Second Circuit had remarked on allegations about Mr. Bennet's personal hostility to Gov. Palin,

---

[20] Sullivan Decl., Ex. AP.

[21] Sullivan Decl., Ex. AQ.

[22] Sullivan Decl., Ex. AR.

[23] Sullivan Decl., Ex. AS.

[24] Sullivan Decl., Ex. AT.

[25] Sullivan Decl., Ex. AU.

it "made clear that these speculations were only 'relevant to the credibility of Bennet's testimony that he was unaware of facts published on his watch [at *The Atlantic*] relating to the [Arizona] shooting.'" *Palin*, 482 F. Supp. 3d at 222 (quoting *Palin*, 940 F.3d at 814). Because "there is no evidence to suggest that those facts were actually published on his watch," as the articles at issue were in fact printed by sister publications not run by Mr. Bennet, *see supra* at 4-6, Mr. Bennet's relationship with his brother is not relevant, *Palin*, 482 F. Supp. 3d at 222.

Defendants expect Plaintiff to argue, citing *Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 183 (2d Cir. 2000), that motive is relevant to prove actual malice. While that may be accurate as a matter of law, in *Celle*, there was actual evidence that the defamation defendant had motive to injure the plaintiff. There is no such evidence here. Plaintiff's assertion that Mr. Bennet had motive to defame Gov. Palin, because Gov. Palin endorsed Senator Bennet's opponent, falls flat. First, there is no evidence that Mr. Bennet even knew that Gov. Palin endorsed Senator Bennet's opponent. Second, this would mean that Mr. Bennet would have motive to defame any high-profile Republican, because it is very likely that almost every national Republican of note weighed in on that swing-state senatorial election.

Plaintiff's assertion that Mr. Bennet had motive to defame Gov. Palin because Senator Bennet was the victim of political violence is even more strained. Gov. Palin includes on her exhibit list an article discussing an arrest in connection with violence at Senator Bennet's office in January 2011. *See* Sullivan Decl., Ex. AT. Though there is no assertion that this violence was in any way connected to the Crosshairs Map, it appears Gov. Palin will assert that Mr. Bennet blamed Gov. Palin for this violence and then retaliated through publication of the Editorial.

Because the Court has already concluded that this evidence is irrelevant, it should be excluded from trial. *See* Fed. R. Evid. 402. Specifically, this Court should preclude Gov. Palin

from introducing testimony about Mr. Bennet's relationship with Senator Bennet, Senator Bennet's political beliefs or positions, and the endorsements received by Senator Bennet and his opponents, and exclude the following exhibits: (1) Plaintiff's Exhibits 20 and 21, articles about Mr. Bennet, Senator Bennet, and their family's political connections, (2) Plaintiff's Exhibits 51 and 78, statement made by Senator Bennet about the Arizona Shooting and guns, (3) Plaintiff's Exhibit 73, an article regarding Gov. Palin's endorsement of Senator Bennet's political opponent, and (4) Plaintiff's Exhibit 74, an article regarding the arrest of a person who had threatened Senator Bennet's office.

As with the articles and blog posts discussed above, even if this evidence has minimal relevance it should still be excluded under Rule 403. The introduction of information about Senator Bennet, endorsements Senator Bennet's opponent received, violence against Senator Bennet's office, and statements by Senator Bennet about the Arizona Shooting and gun policy could confuse the jury and encourage the jury to make a decision based on emotion or politics, or about completely irrelevant facts. Additionally, it would be a time-consuming distraction that would not advance the search for truth.

The Second Circuit provided Gov. Palin the opportunity to produce evidence showing that Mr. Bennet's relationship with his brother was somehow relevant to this case. Gov. Palin could produce nothing. Therefore, this evidence concerning Senator Michael Bennet should also be excluded from trial.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully ask the Court to enter an order, *in limine,* excluding from Plaintiff's case any presentation of evidence or testimony concerning issues which the Court has already found are irrelevant to the issues at stake in this action: (1)

**JA 1609**

articles or blog posts published in sister publications to *The Atlantic*, including those relating

both to Jared Loughner and Trig Palin, (2) the news article to which Mr. Bennet was sent a link

in 2011, and (3) Mr. Bennet's brother, Senator Michael Bennet.

Dated:  New York, New York
         January 10, 2022

Respectfully submitted,

BALLARD SPAHR LLP

By: */s/ David L. Axelrod*
     David L. Axelrod
     Jay Ward Brown
     Thomas B. Sullivan
     Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                         :

SARAH PALIN                     :   No. 17 Civ. 4853 (JSR)

               Plaintiff,     :

                        :   ECF Case

          -against-        :

                        :

THE NEW YORK TIMES COMPANY and JAMES  :
BENNET,

               Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF JAMES BENNET'S DEPARTURE FROM THE TIMES, UNRELATED CONTROVERSIES DURING HIS TENURE AS OPINION EDITOR, AND THE ELIMINATION OF THE PUBLIC EDITOR POSITION**

David L. Axelrod
Jay Ward Brown
Thomas B. Sullivan
Jacquelyn N. Schell
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
axelrodd@ballardspahr.com
brownjay@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................. ii

I.      EVIDENTIARY STANDARDS ................................................................................1

II.     THE EVIDENCE AT ISSUE .....................................................................................2

        A.      The Essay by Senator Cotton and Mr. Bennet's Resignation ...................2

        B.      Other Controversies ..................................................................................7

        C.      Departure of the Public Editor ................................................................10

CONCLUSION.............................................................................................................11

# JA 1612

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Carter v. Hewitt*,
   617 F.2d 961, 972 (3d Cir. 1980)..................................................................2

*Gariepy v. Pearson*,
   120 F. Supp. 597, 598 (D.D.C. 1954)........................................................9

*Kipper v. NYP Holdings Co.*,
   12 N.Y.3d 348, 355 (2009) ........................................................................11

*Nickerson v. G.D. Searle & Co.*,
   900 F.2d 412, 418, 419 (1st Cir. 1990).....................................................6

*St. Amant v. Thompson*,
   390 U.S. 727, 731 (1968) ...........................................................................5

*Tavoulareas v. Piro*,
   93 F.R.D. 35, 35  (D.D.C. 1981)................................................................9

*United States v. Cadet*,
   664 F.3d 27, 32 (2d Cir. 2011)...................................................................6

*United States v. Carneglia*,
   603 F. Supp. 2d 488, 496 (E.D.N.Y. 2009) .............................................1

*United States v. Gordon*,
   987 F.2d 902, 908 (2d Cir. 1993)...............................................................6

*United States v. Quattrone*,
   441 F.3d 153, 186 (2d Cir. 2006)...............................................................2

*Westmoreland v. CBS, Inc.*,
   601 F. Supp. 66, 68, 69 (S.D.N.Y. 1984) .............................................9, 10

**Other Authorities**

Fed. R. Evid. 401 .............................................................................................1

Fed. R. Evid. 402 ...................................................................................1, 5, 8, 11

Fed. R. Evid. 403 ................................................................................... *passim*

Fed. R. Evid. 404 .........................................................................................6, 9

1 J. Weinstein & M. Berger, Weinstein's Evidence § 403(03) (1978)............................2

# JA 1613

Defendants The New York Times Company ("The Times") and James Bennet ("Mr. Bennet" and together with The Times, "Defendants"), respectfully submit this memorandum of law in support of their motion *in limine* asking the Court to exclude from evidence and preclude the Plaintiff from asking witnesses questions about topics intended to turn this trial, which is narrowly focused on two lines of a single Editorial conceived, written, published, and corrected within less than a day, into a baseless and broad indictment of Mr. Bennet's tenure as head of the Opinion section and The Times itself.

To this end, Gov. Palin apparently intends to introduce evidence about editorial and policy decisions that have nothing to do with that Editorial and, in many cases, occurred years after the Editorial's publication, and are intended to confuse and distract the jury, including: (1) the publication of an op-ed column by Senator Tom Cotton that ultimately led to Mr. Bennet's resignation, (2) other "controversies" that occurred during Mr. Bennet's tenure as Opinion Editor such as content and hiring decisions that had no connection to the events of this case, and (3) The Times's decision to eliminate the public editor position. These issues have no relevance to the case before the Court, and the introduction of these topics will only serve to confuse and distract the jury such that Defendants are unduly prejudiced.

## I.    EVIDENTIARY STANDARDS

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. "Irrelevant evidence is not admissible," Fed. R. Evid. 402, and indeed must be excluded "in order to ensure a fair and efficient adjudication," *United States v. Carneglia*, 603 F. Supp. 2d 488, 496 (E.D.N.Y. 2009).

Even relevant evidence may be excluded where "its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury, undue delay, wasting

# JA 1614

time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Among other things, evidence is unfairly prejudicial if it could "inappropriately lead the jury to [rule] on the basis of conduct not at issue in the trial." *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006); *see Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980) (evidence is "unfairly prejudicial if it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'" (quoting 1 J. Weinstein & M. Berger, Weinstein's Evidence § 403(03), at 403-15 to 403-17 (1978)); *see* Fed. R. Evid. 403 advisory comm. notes to 1972 amendment ("Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").

## II.     THE EVIDENCE AT ISSUE

Given the paucity of evidence of Defendants' actual malice, it appears that Gov. Palin intends to focus a large part of her trial presentation on controversies involving Mr. Bennet and The Times that have nothing to do with the publication of "America's Lethal Politics" or Gov. Palin. As described more fully below, these other controversies are irrelevant to this case, and introduction of such evidence will only serve to confused the jury, unfairly prejudice Defendants, and waste significant time.

### A.     The Essay by Senator Cotton and Mr. Bennet's Resignation

On June 3, 2020, almost three years after publication of "America's Lethal Politics," The Times published an essay titled "Send in the Troops" by Republican United States Senator Tom Cotton (the "Cotton Op-Ed"). *See* Declaration of Thomas B. Sullivan in Support of Defendants' Motions *In Limine* ("Sullivan Decl."), Ex. A. The Cotton Op-Ed called for the use of the military as part of "an overwhelming show of force" in response to illegal behavior occurring at protests in American cities reacting to death of George Floyd. *Id.* For a number of reasons,

including the public outcry over George Floyd's murder and President Trump's decision to use force to clear protesters from Lafayette Square, just two days before, the reaction to the Cotton Op-Ed was immediate and intense, including inside The Times itself.  Dozens of Times employees tweeted that "[r]unning [the Cotton Op-Ed] puts Black @NYTimes staff in danger" and "[m]ore than 800 staff members signed a letter protesting its publication."  *See id.*, Ex. B (Palin Exhibit 23).  Critics outside The Times assailed The Times for the decision to run the editorial, running articles and editorials with headlines such as "You Don't Have to Publish Both Sides When One Side Is Fascism."[1]

In response to this intense criticism, the following day, Mr. Bennet explained in The Times' *Opinion Today* newsletter the decision to publish the Cotton Op-Ed.  *See id.*, Ex. C (Palin Exhibit 318).  Mr. Bennet explained that The Times editorial board had published pieces criticizing the "president's used of federal forces in Washington, D.C.," defending the protesters as patriots, and condemning police brutality.  Mr. Bennet defended publishing the Cotton Op-Ed on the grounds that The Times "committed to Times readers to provide a debate on important questions like this [and] [i]t would undermine the integrity and independence of The New York Times if we only published views that editors like me agreed with . . . ."  *Id.*

On June 5, The Times appended an editor's note to the Cotton Op-Ed stating that, following a review, the editors had "concluded that the essay fell short of our standards and should not have been published."  *See id.*, Ex. A.  Mr. Bennet ultimately resigned from The Times on June 7.  *See id.*, Ex. D.   The publication of the note and Mr. Bennet's resignation led

---

[1] *See, e.g.*, Eric Alterman, *You Don't Have to Publish Both Sides When One Side Is Fascism*, The Nation, June 11, 2020, *available at* https://www.thenation.com/article/society/tom-cotton-new-york-times/)

## JA 1616

to another round of criticism, now "about the potential chilling effects the response to the Op-Ed may cause."[2]

Indeed, the Times's own Editorial Page reflected the extent the intensity of the response on all parts of the political spectrum. The headline of a column by Michelle Goldberg referred to the Cotton Op-Ed as "fascist" and read Senator Cotton as "calling for what would almost certainly amount to massive violence against his fellow citizens."[3] By contrast, Bret Stephens said that, "decision by this newspaper to disavow an Op-Ed by Senator Tom Cotton is a gift to the enemies of a free press — free in the sense of one that doesn't quiver and cave in the face of an outrage mob."[4]

The publication of the Cotton Op-Ed and the related fall-out has nothing to do with this trial. Yet, Gov. Palin's exhibit list indicates that she intends to spend significant time on this at trial. Gov. Palin has included on her exhibit list: (1) an article by The Times concerning the reaction to the Cotton Op-Ed (Exhibit 23); (2) a series of tweets by Mr. Bennet on June 3, 2020 concerning the Cotton Op-Ed (Exhibit 316)[5]; (3) a tweet by The Times concerning the Cotton Op-Ed (Exhibit 317);[6] and (4) Mr. Bennet's explanatory article from June 4 (Exhibit 318).[7]

---

[2] Kathleen Kingsbury, *Our Writers' Responses to the Tom Cotton Op-Ed*, N.Y. Times, June 12, 2020, available at https://www.nytimes.com/2020/06/12/opinion/tom-cotton-new-york-times.html.

[3] Michelle Goldberg, *Tom Cotton's Fascist Op-Ed*, N.Y. Times, June 4, 2020, available at https://www.nytimes.com/2020/06/04/opinion/tom-cotton-op-ed-new-york-times.html.

[4] Bret Stephens, *What The Times Got Wrong*, N.Y. Times, June 12, 2020, available at https://www.nytimes.com/2020/06/12/opinion/tom-cotton-op-ed.html.

[5] Sullivan Decl., Ex. E.

[6] Sullivan Decl., Ex. F.

[7] Sullivan Decl., Ex. C.

Defendants anticipate that Gov. Palin will also ask witnesses questions about the Cotton Op-Ed and Mr. Bennet's resignation. While Defendants have no objection to acknowledging the fact that Mr. Bennet no longer works for The Times, the circumstances behind Mr. Bennet's resignation and the controversy surrounding the Cotton Op-Ed should be excluded as they are completely irrelevant.

The publication of the Cotton Op-Ed, the resulting outcry, and Mr. Bennet's decision to resign from The Times are all simply irrelevant to this case, and therefore should be excluded under Rule 402. Confronted with negligible evidence of actual malice, Gov. Palin is attempting to prove actual malice through the accumulation of irrelevant, confusing, and distracting sideshows. As part of this kitchen sink approach, Gov. Palin undoubtedly seeks to argue that the Opinion section had poor editorial controls or was error prone, but, even if that was somehow true, which Defendants do not concede, that would have nothing to do with whether Defendants acted with actual malice in publishing the Editorial three years earlier.

For purposes of actual malice, "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing," but rather whether "defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Potential flaws in The Times' editing process or criticisms of Mr. Bennet's running of the Opinion section in 2020 say nothing whatsoever about what Mr. Bennet or anyone else was thinking at the time the Editorial was published in 2017.

There are fundamental differences between publication of the Cotton Op-Ed and publication of the Editorial that further demonstrate irrelevance. First, the Cotton Op-Ed was written by a United States Senator, not Mr. Bennet or any other member of The Times's staff. Second, the Cotton Op-Ed controversy centered on The Times' decision about what content and

opinion is appropriate to publish, not the clarity of the words used in an editorial. There was no allegation that the Cotton Op-Ed said anything injurious of another person's reputation.[8]

Moreover, the introduction of the Cotton Op-Ed, the reaction to it, and Mr. Bennet's resignation would be unfairly prejudicial in multiple ways and, therefore, even if this evidence was somehow relevant, it should be excluded under Rule 403. Inevitably, just like among The Times's own columnists, the jury will potentially include people with differing and strong political views. Some jurors may think The Times put lives at risk and even embraced fascistic ideas by giving a platform to the views expressed in the Cotton Op-Ed. Others may believe that a police response to illegal activities is entirely appropriate or think that The Times' subsequent failure to defend the essay's publication and cave to public pressure is a threat to free speech. None of this has anything to do with this case.

The very real risk that the jury could rule based on political opinion and emotion about issues that remain raw for some people, instead of the relevant facts, requires this evidence's exclusion. *Cf. Nickerson v. G.D. Searle & Co.*, 900 F.2d 412, 418-19 (1st Cir. 1990) (finding that district court did not abuse its discretion in excluding questions about expert's experience with abortion, noting "the fierce emotional reaction that is engendered in many people when the subject of abortion surfaces in any manner").

The introduction of this evidence would also create the strong possibility that jurors could view Mr. Bennet's role in the decision to run the Cotton Op-Ed and departure from The Times as

---

[8] Because of these differences between the publishing of the Editorial and the Cotton Op-Ed, the evidence would also not be admissible to prove intent or for another permissible purpose under Rule 404(b). *See United States v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011) ("[w]hen 'other act' evidence is offered to show knowledge or intent . . . such evidence must be sufficiently similar to the conduct at issue to permit the jury to draw a reasonable inference of knowledge or intent from the other act" (internal marks omitted)); *see also United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993) (requiring a "close parallel")

a confirmation that he was unfit for the job and connect that to his role in publishing the Editorial three years earlier. But there is no evidence whatsoever that Bennet's departure from The Times had anything to do with the publication of "America's Lethal Politics." Indeed, if forced, The Times would introduce uncontroverted evidence that Mr. Bennet's departure had nothing to do with the Editorial. Nonetheless, the introduction of this evidence would create a mini-trial on this issue, require The Times to call additional witnesses who would not otherwise testify but for the introduction of this issue, and importantly, would only serve to confuse the jury and waste time.

For these reasons, evidence concerning the Cotton Op-Ed, the reaction to it, and Mr. Bennet's resignation should be excluded as irrelevant, improper character evidence, and unfairly prejudicial.

## B. Other Controversies

Not satisfied with only introducing the Cotton Op-Ed controversy to unduly prejudice Defendants, , Gov. Palin's exhibit list also includes documents related to a number of other insignificant "controversies" that arose while Mr. Bennet ran the Opinion section of The Times. Again, Gov. Palin's intent is clear. Lacking evidence of actual malice, she seeks to use whatever she can find, no matter how irrelevant, to make The Times look bad. Specifically, the list includes (1) an overview article about "backfires and explosions" at the Opinion section (Exhibit 65)[9]; (2) various documents related to "controversial" hires by the Opinion Department during Mr. Bennet's tenure, Quinn Norton and Sarah Jeong, (Exhibits 66,[10] 67,[11] 68,[12] 69[13], 291[14]); (3)

---

[9] Sullivan Decl., Ex. G.

[10] Sullivan Decl., Ex. H.

[11] Sullivan Decl., Ex. I.

an article about a factual error made by columnist Bret Stephens in a piece he wrote about climate change (Exhibit 286)[15]  In addition, Gov. Palin has designated portions of Mr. Bennet's deposition testimony, *see* Sullivan Decl., Ex. O on several related topics, including "public controversy" surrounding Mr. Stephens's error, *see id.*, Ex. P at 221:25-226:3; the hiring of Ms. Norton, Ms. Jeong, Michelle Goldberg and Bari Weiss, Quinn Norton, and Sarah Jeong*, id.* at 226:6-232:14; and op-eds published by Louise Mensch and Erik Prince, *id.* at 232:15-234:14. Plaintiff's counsel also asked Times columnist Ross Douthat similar questions during his deposition.  *See* Sullivan Decl., Ex. Q at 120:25-127:12.[16]  Gov. Palin should not be permitted to introduce this evidence in a transparent effort to distract from the issues actually at hand.

Like the Cotton Op-Ed, all of this evidence should be excluded as irrelevant under Rule 402.  That Mr. Bennet hired (or attempted to hire) controversial opinion columnists or was involved in the decision to publish certain pieces that were later criticized, says absolutely nothing about whether the Editorial was true or false, whether its publication damaged Gov. Palin's reputation or even concerned her at all, or whether Bennet wrote the sentences at issue with actual malice.  Unlike the Editorial, none of these other controversies involved Mr. Bennet's writing or Gov. Palin herself in any way.

---

[12] Sullivan Decl., Ex. J.

[13] Sullivan Decl., Ex. K.

[14] Sullivan Decl., Ex. N.

[15] Sullivan Decl., Ex. L.

[16] Gov. Palin has also designated an exhibit involving a metropolitan editor's resignation due to "inappropriate communications" with female employees, *see* Sullivan Decl., Ex. R (Exhibit 240), which has nothing to do with Mr. Bennet or the Opinion section.  This exhibit is addressed in Defendants' objections to Gov. Palin's exhibits.

A judge in this District previously found that even evidence of "other controversies" involving the *same* documentary at issue in the case then at bar was irrelevant at trial. In *Westmoreland v. CBS, Inc.*, 601 F. Supp. 66 (S.D.N.Y. 1984), the plaintiff sought to introduce sections of a report prepared by CBS that suggested that, in addition to the portions of the documentary which were allegedly defamatory, the broadcast had violated internal rules and guidelines in several ways, including by allowing an interview subject to rehearse his interview, allowing the same person to be interviewed twice, and failing to identify him as a paid consultant, *id.* at 68-69. Judge Leval ruled that "[i]f it is the case that various internal rules of CBS were broken in the making of the documentary, that fact has no bearing on whether the documentary was made in reckless or intentional disregard of the truth. The fact of the violation of rules is not relevant to any issue in the lawsuit." *Id.* at 69. Here, the evidence Gov. Palin would admit is even further from the issues at the core of this case, in that none of it has anything to do with the Editorial at issue.

Gov. Palin apparently intend to use this evidence to baselessly argue that Mr. Bennet has a poor character and that Mr. Bennet acted in conformity with this character in publishing the Editorial, it should be excluded under Rule 404. In *Tavoulareas v. Piro*, 93 F.R.D. 35 (D.D.C. 1981), the court denied discovery into, among other things, demand and complaint letters received by the defendant about unrelated allegedly defamatory articles, noting that evidence of unrelated prior bad acts would be inadmissible under Rule 404 to prove the character of the defendant and that the defendant acted in conformity with his character in publishing the article at issue. *Id.; see also Gariepy v. Pearson*, 120 F. Supp. 597, 598 (D.D.C. 1954) ("evidence of defamation committed by the defendant against third persons in no way connected with the suit

# JA 1622

is inadmissible").  None of the events here are in way similar to the conduct at issue here, let alone a close parallel.

And, just like the Cotton Op-Ed, the introduction of these events carries significant risk of unfair prejudice against The Times and Mr. Bennet, wasting time at trial, and misleading the jury about the issues they will actually be tasked to decide, and therefore, even if it was somehow relevant, this evidence should be excluded under Rule 403.  Most significantly, there would be a significant chance that a jury could conclude that other missteps in running the Opinion section somehow demonstrated that Defendants were at fault in publishing the Editorial.  As Judge Leval noted in *Westmoreland*, such evidence could be seen as demonstrating "recklessness of a different sort – not recklessness as to truth.  It might therefore prejudice the jury against the defendants.  Even if some marginal relevance can be found, it is far outweighed by the potential for misunderstanding, confusion and prejudice."  601 F. Supp. at 69.  Many of these controversies also involved issues or figures about which and whom jurors could hold passionate views.  And again, while Gov. Palin will attempt to paint these "controversies" as clear-cut examples of mistakes that demonstrate negligence, the truth is much more nuanced, and The Times will be forced to spend significant trial time calling witnesses and introducing evidence demonstrating the thought, time, and care that Mr. Bennet put into each of these supposed controversies.

For these reasons, all evidence involving these supposed other controversies should also be excluded from the trial of this matter.

## C.    Departure of the Public Editor

Finally, Gov. Palin appears to intend to introduce evidence of The Times' decision in May 2017 to eliminate the position of Public Editor, held at that time by Liz Spayd.  *See* Sullivan

# JA 1623

Decl., Ex. S (Exhibit 100) and Ex. T (Exhibit 101). Gov. Palin seems to seek to introduce this evidence to suggest that, in the absence of the Public Editor, The Times had no incentive to comply with "editorial standards." *See id.*, Ex. T.

This subject should be excluded from the trial for much of the same reasons as those discussed above with respect to other evidence. First, it is completely irrelevant to this case, and therefore should not be admitted pursuant to Rule 402. There is no suggestion anywhere in the record that eliminating the Public Editor position had anything to do with the publication of the Editorial weeks later. Second, as also discussed in the prior sections of this motion, even if this evidence could in some way be relevant, its introduction would be unfairly prejudicial, in violation of Rule 403, because its only purpose is to criticize The Times's following of proper editorial standards when those standards are not at issue here. *See, e.g. Kipper v. NYP Holdings Co.*, 12 N.Y.3d 348, 355 (2009) (noting that paper's "failure to employ fact-checkers" is not evidence of actual malice). The introduction of these subjects would also unnecessarily occupy significant trial time. At about the same time The Times eliminated the Public Editor position, it created a department called the Reader Center. Thus, if the Court permits Palin to engage in this detour, unnecessary time and effort will be spent debating whether the Reader Center was an adequate replacement.

For these reasons, this Court should also exclude from the trial any reference to the elimination of the Public Editor position.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this motion and bar Gov. Palin from introducing evidence or soliciting testimony concerning the following subjects:

# JA 1624

1. The publication of the Cotton Op-Ed, the reaction to it, and Mr. Bennet's departure from The Times;

2. The fact-checking of columns by Bret Stephens,;

3. The hiring of Mr. Stephens, Michelle Goldberg, Bari Weiss, Quinn Norton, and/or Sarah Jeong;

4. Op-eds published by Louise Mensch and/or Erik Prince; and

5. The elimination of the Public Editor position.

Dated: New York, New York
    January 10, 2022

Respectfully submitted,

BALLARD SPAHR LLP

By: _/s/ David L. Axelrod_
    David L. Axelrod
    Jay Ward Brown
    Thomas B. Sullivan
    Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

_Counsel for Defendants_

# JA 1625

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SARAH PALIN, an individual,

               Plaintiff,

  – against –

THE NEW YORK TIMES COMPANY,
a New York corporation, and JAMES
BENNET, an individual,

               Defendant.

No. 17 Civ. 4853

Hon. Jed S. Rakoff

ECF Case

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING
## ARTICLES AND POSTS PUBLISHED BY ATLANTIC MEDIA, AN ARTICLE JAMES
## BENNET WAS SENT, AND SENATOR MICHAEL BENNET

TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 834-9191
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

# JA 1626

## TABLE OF CONTENTS

Table of Contents ................................................................................................... i

Table of Authorities ............................................................................................ iii

Introduction ......................................................................................................... 1

   A.   THE ATLANTIC ARTICLES AND POSTS ARE RELEVANT, MATERIALS, AND ADMISSIBLE ................................................. 2

      (1)   The Evidence is Relevant and Material to Actual Malice ...................... 2

      (2)   The Evidence is Relevant and Material to Common Law Malice ......................................................................................... 5

      (3)   The Evidence is Relevant and Material to Falsity ................................. 5

      (4)   The Evidence is Relevant and Material to Credibility ........................... 6

   B.   THE ATLANTIC ARTICLES AND POSTS RELEVANT, MATERIAL, AND ADMISSIBLE ................................................. 7

      (1)   Actual Malice ......................................................................... 7

      (2)   Common Law Malice ............................................................. 10

      (3)   Falsity .................................................................................... 10

      (4)   Credibility ............................................................................. 10

   C.   THE ARTICLE BENNET WAS SENT IS RELEVANT, MATERIAL, AND ADMISSIBLE ................................................. 10

   D.   EVIDENCE CONCERNING SENATOR BENNET IS RELEVANT, MATERIAL, AND ADMISSIBLE ........................... 11

      (1)   Actual Malice ......................................................................... 11

      (2)   Common Law Malice ............................................................. 12

      (3)   Credibility ............................................................................. 15

   E.   DEFENDANTS' MISPLACED RELIANCE ON THE COURT'S DENIAL OF SUMMARY JUDGMENT ....................................... 15

**JA 1627**

F.    THE   COURT'S   DISCUSSION   ON   THE   SUMMARY
      JUDGMENT  EVIDENCE  THAT  IS  ALSO  AT  ISSUE  IN
      DEFENDANTS' MOTION IN LIMINE .......................................................... 17

Certificate of Service ................................................................................................ 20

# JA 1628

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bose Corp. v. Consumers Union of U.S.*, 692 F.2d 189 (1st Cir. 1982) .................................... 11

*Campbell v. Citizens for an Honest Government, Inc.*, 255 F.3d 560 (8th Cir. 2001) ................................................................................................................................. 15

*Celle v. Filipino Reporter Ent., Inc.*, 209 F.3d 163 (2d Cir. 2000)............. 2, 3, 4, 5, 7, 12, 15, 19

*Church of Scientology v. Behar,* 238 F.3d 168 (2d Cir. 2001) .................................... 12

*Church of Scientology Intern. v. Time Warner, Inc.*, 903 F.Supp. 637 (S.D.N.Y. 1995) ................................................................................................................. 12

*Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921 (2d Cir. 1987) .................................... 2, 4

*Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308 (5th Cir. 1995)................................... 4

*Dunlop-McCullen v. Rogers*, 2002 WL 1205029 (S.D.N.Y. Feb. 21, 2002)................................ 7

*Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969)............................................. 3, 4, 5, 7, 9, 10

*Harris v. City of Seattle*, 152 Fed. Appx. 565 (9th Cir. 2005).................................... 11

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ................... 4, 15, 19

*Herbert v. Lando*, 441 U.S. 153 (1979) ......................................................... 2, 3, 5, 7

*Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983) ................................................... 4

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) ............................................................ 7

*Kerwick v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625, (1981).................................................................................................................... 4

*Kipper v. NYP Holdings Co., Inc.*, 12 N.Y.3d 348 (2009) ........................................... 11

*Liberty Lobby v. Dow Jones & Company, Inc.*, 838 F.2d 1287 (D.C. Cir. 1988) ...................... 4

*Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) ....................... 3, 4, 6, 7, 9, 10, 18, 19

*Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306 (2d Cir. 1991) ......................................... 16

*Prozeralik v. Capital Cities Comm's, Inc.*, 82 N.Y.2d 466, 605 N.Y.S.2d 218, 626 N.E.2d 34 (1993)................................................................................... 1, 5, 10, 12

# JA 1629

*Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977)..................................................................... 5

*Sharon v. Time, Inc.*, 599 F.Supp. 538 (S.D.N.Y. 1984) .................................. 3, 5, 6

*Shoen v. Shoen*, 48 F.3d 412 (9th Cir. 1995) ......................................................... 4

*Sindi v. El-Moslimany*, 896 F.3d 1 (1st Cir. 2018) ...................................... 12

*Smith v. Wade*, 461 U.S. 30 (1983)...................................................................... 10

*Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1057-58 (10th Cir. 2013) ........................................................................................... 4

*St. Amant v. Thompson*, 390 U.S. 727 (1968).................................................... 4

*Switzerland Cheese Ass'n v. E. Horne's Market, Inc.*, 385 U.S. 23, 87 S.Ct. 193, 17 L.Ed.2d 23 (1966) .................................................................................. 16

*Tavoulares v. Piro*, 763 F.2d 1472 (D.C. Cir. 1985) ......................................... 4

*Tobinick v. Novella*, 108 F.Supp.3d 1299 (S.D. Fla. 2015) ................................ 4

*U.S. v. Chichakli*, 2014 WL 5369424 (S.D.N.Y. Oct. 16, 2014).................... 7, 10, 15

*Vandenburg v. Newsweek, Inc.*, 441 F.2d 378 (5th Cir. 1971) ....................... 4

*Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024 (5th Cir. 1975) ...................... 4

*Ventura v. Kyle*, 63 F.Supp.3d 1001 (D. Minn. 2014) ..................................... 4

*Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066 (5th Cir. 1987) .............. 4

**Page(s)**

**OTHER AUTHORITIES**

Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 607.04 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.2009) ........................... 7

New York Pattern Jury Instructions - Civil, 3:30 ..................................... 5

# JA 1631

## INTRODUCTION

As Governor Palin sets out to prove that Defendants' Editorial is false, defamatory, and was published with actual[1] and common law[2] malice, Defendants are trying to prevent her from using significant evidence that the law gives her the right to use.  Plaintiff is entitled to prove several elements of her case through the evidence Defendants seek to exclude.

Mr. Bennet, his memory and knowledge of the consensus reached in 2011 that there was no connection between Plaintiff or the map and Loughner's shooting, his motives for publishing the editorial, and the reasons why Bennet *supposedly* failed to read or recall the research he had in front of him on the day of publication (establishing the falsity of the statements about Governor Palin), will all be central issues at trial.  Necessarily, Bennet's credibility and *supposed* inability to recall well-known facts and articles about a prominent mass shooting implicating two issues he considered important (gun control and rhetoric) must be tested.  Defendants' biases, ill-will, and motives are also critical components of actual and common law malice that Plaintiff must be allowed to present to the jury.

Defendants' Motion [Doc. 135] seeks to exclude two broad categories of evidence: (1) evidence regarding articles and posts published by The Atlantic, as well as an article Bennet received while he was The Atlantic's editor-in-chief; and (2) evidence of Bennet's bias, ill-will, and motives, including evidence related to his brother, Senator Michael Bennet.  All of this evidence is relevant, material, and highly probative, independently and collectively, to several

---

[1] Plaintiff preserves all prior arguments and objections to the actual malice standard, which requires Plaintiff to demonstrate actual knowledge of falsity or reckless disregard for the truth. [Doc. 117, 125]

[2] Plaintiff seeks punitive damages, and therefore must establish common law malice, meaning a deliberate intent to injure or out of hatred, ill will or spite, or willful, wanton, or reckless disregard of another's rights.  *Prozeralik v. Capital Cities Comm's, Inc.*, 82 N.Y.2d 466, 605 N.Y.S.2d 218, 626 N.E.2d 34 (1993).

# JA 1632

issues the jury must decide in this case—**not just actual malice** (the sole focus of Defendants'

Motion), but also common law malice for punitive damages, falsity, and Bennet's credibility.

## A.   THE ATLANTIC ARTICLES AND POSTS ARE RELEVANT, MATERIAL, AND ADMISSIBLE

### (1)   The Evidence is Relevant and Material to Actual Malice

It is well-established that defamation plaintiffs are entitled to use an "accumulation of

[circumstantial] evidence and appropriate inferences" to prove actual malice (whether through

actual knowledge or recklessness). *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927

(2d Cir. 1987)).  Governor Palin has a right to prove her case through a totality of circumstantial

evidence of actual malice.  This right is necessary because of the subjective nature of the actual

malice inquiry and the law's resulting recognition that circumstantial evidence is crucial because

defendants rarely admit actual knowledge of falsity or doubts of truth.  *Celle v. Filipino Reporter*

*Ent., Inc.*, 209 F.3d 163, 183 (2d Cir. 2000); 8/28/2020 Order [Doc. 117] at p. 20.

Defamation plaintiffs are entitled to present any circumstantial evidence tending to show

the defendant was aware that what they published was untrue.  *Dalbec*, 828 F.2d at 927.  As the

Supreme Court recognized in *Herbert v. Lando*, 441 U.S. 153, 160 (1979):

> To be liable, the alleged defamer of public officials or of public
> figures must know or have reason to suspect that his publication is
> false. In other cases proof of some kind of fault, negligence perhaps,
> is essential to recovery. Inevitably, unless liability is to be
> completely foreclosed, the thoughts and editorial processes of the
> alleged defamer would be open to examination. It is also untenable
> to conclude from our cases that, although proof of the necessary
> state of mind could be in the form of objective circumstances from
> which the ultimate fact could be inferred, plaintiffs may not inquire
> directly from the defendants whether they knew or had reason to
> suspect that their damaging publication was in error.

More importantly, the Supreme Court recognized in *Herbert* that, "[a]s a general rule, <u>any</u>

<u>competent evidence</u>, either direct or circumstantial, can be resorted to…"  *Herbert*, 441 U.S. at

164, n. 12.  The range of evidence available to a plaintiff to prove actual malice is not narrow - "quite the opposite" is true.  *Id.* at 168.  Plaintiffs saddled with the burden of proving subjective intent by clear and convincing evidence are entitled to present evidence of "all of the relevant circumstances."  *Celle*, 209 F.3d at 183; *Goldwater*, 414 F.2d at 324.

As for actual knowledge, plaintiffs can present any evidence to "permit the conclusion" that the defendant was aware of falsity.  *Sharon v. Time, Inc.*, 599 F.Supp. 538, 564 (S.D.N.Y. 1984).  Thus, any evidence indicating that Bennet may have read and received articles at The Atlantic at the time of Loughner's shooting (articles that concluded there was no link to incitement or Governor Palin) is precisely the type of "competent evidence" that could "permit the conclusion" Bennet knew the truth; and particularly so given the prominence of that event and Bennet's focus on rhetoric and gun control.  *Palin v. New York Times Co.*, 940 F.3d 804,813-815 (2d Cir. 2019).

Aside from a specific admission of guilt, there may not be more compelling circumstantial evidence of awareness of falsity than proof that the Defendant read, received, and/or was aware of articles confirming the falsity of the challenged statements, including articles published on the website of the media company of which the Defendant was editor-in-chief.  These same articles demonstrate the well-publicized consensus within the journalism community that the challenged statements are false, including publications at which Bennet worked as a journalist, served as editor-in-chief, and admittedly consumed their content.  On this independent basis, The Atlantic articles are highly probative and compelling proof of actual knowledge of falsity.

With respect to recklessness and purposeful avoidance of the truth, there are several categories of circumstantial evidence courts consistently recognize that plaintiffs are entitled to use to prove their case, including:

1.    Evidence of negligence[3]

2.    Evidence of  motive and intent"[4]

3.    A defendants' own actions or statements[5]

4.    The inherent probability of the story[6]

5.    Bias or ill will[7]

6.    Failure to properly investigate[8]

7.    Refusal to meaningfully retract and apologize[9]

8.    Failure to adhere to journalistic policies[10]

9.    Grossly inadequate investigation under no time pressure[11]

The Atlantic articles and evidence associated with Bennet's brother are relevant and material to several of these categories.  By trying to exclude this evidence, Defendants are asking the Court to prevent Plaintiff from proving actual malice through the types of circumstantial evidence the Supreme Court and Second Circuit have explicitly prohibited trial courts from

---

[3] See *Goldwater v. Ginzburg*, 414 F.2d 324, 343 (2d Cir. 1969).

[4] See *Dalbec*, 828 F.2d at 927.

[5] See *Celle*, 209 F.3d at 183 (citing *Liberty Lobby v. Dow Jones & Company, Inc.*, 838 F.2d 1287, 1293 (D.C. Cir. 1988)).

[6] *Id.*; *see also Tobinick v. Novella*, 108 F.Supp.3d 1299, 1310 (S.D. Fla. 2015); *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *Dalbec*, 828 F.2d at 927).

[7] *Palin*, 940 F.3d at 814-816; *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989); *Celle*, 209 F.3d at 183 ("Evidence of ill will combined with other circumstantial evidence ... may also support a finding of actual malice."); *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995) ("[I]ll will *is* considered circumstantial evidence of actual malice.") (emphasis added); *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995) ("[E]vidence of ulterior motive can often bolster an inference of actual malice."). *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 310, n. 10 (5th Cir. 1995).

[8] *Palin*, 940 F.3d at 814-15; see also *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983) ("'[A]ctual malice may be inferred when the investigation was grossly inadequate in the circumstances'" (quoting *Vandenburg v. Newsweek, Inc.*, 441 F.2d 378, 380 (5th Cir. 1971)); *see also Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024, 1026-27 (5th Cir. 1975) (same)

[9] See *Tavoulares v. Piro*, 763 F.2d 1472, 1477 (D.C. Cir. 1985); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987); *Ventura v. Kyle*, 63 F.Supp.3d 1001, 1014 (D. Minn. 2014))

[10] See *Kerwick v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625, 627 (1981)

[11] *Hunt*, 720 F.2d at 645; see also *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1057-58 (10th Cir. 2013)).

excluding.  Granting Defendants' fundamentally unfair request "would require that plaintiff prove the ultimate fact of recklessness without being able to adduce proof of the underlying facts from which a jury could infer recklessness [and] limit successful suits to those cases in which there is direct proof by a party's admission."  *Goldwater*, 414 F.2d at 343.

### (2)     The Evidence is Relevant and Material to Common Law Malice

Plaintiff also seeks to recover punitive damages in this action.[12]  To do so, she is entitled to present evidence to the jury demonstrating by a preponderance of the evidence that Defendants published the editorial with common law malice—meaning they published (1) with deliberate intent to injure Plaintiff, (2) out of hatred, ill will, or spite; or (3) with willful, wanton, or reckless disregard of Plaintiff's rights.  *See Prozeralik v. Capital Cities Communications, Inc*., 82 NY2d 466, 479-480, 605 NYS2d 218, 626 NE2d 34 (1993); New York Pattern Jury Instructions - Civil, 3:30.

To prove her case, Plaintiff certainly is entitled to present evidence to the jury that tends to show that defendants harbored ill-will or spite toward her, and acted wantonly or recklessly.  *Id*. The focus of this evidence is the defendants' mental state and motive.  *Prozeralik*, 82 N.Y.2d at 480.  Common law malice is established by examining all relevant circumstances.  *Celle*, 209 F.3d at 184.  Any competent evidence can be resorted to.  *Id.* (citing *Herbert*, 441 U.S. at 164, n.12)

### (3)     The Evidence is Relevant and Material to Falsity

Plaintiff must also prove the falsity of the challenged statements.  Under controlling law, this element requires Plaintiff to prove the challenged statements are not substantially true.  *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 380 (1977).  On this issue, published news

---

[12] Punitive damages are appropriate in defamation actions involving public figures.  See *Sharon*, 599 F.Supp. at 586-587; *Celle*, 209 F.3d at 184, 190.

reports, including articles published by The Atlantic, are relevant and material.

### (4) The Evidence is Relevant and Material to Credibility

In light of the subjective nature of the actual and common law malice inquiries, Bennet's credibility will be a centerpiece of the trial. As this Court recognized in its August 28, 2020 Order denying summary judgment, there are serious questions surrounding Bennet's *supposed* inability to recall well-known facts about the Loughner shooting and supposed inability to recall whether he read the research and hyperlinked article Williamson included in her draft of the editorial—all of which are critical issues in the determination of whether Bennet acted with malice. *See* Doc. 117 at pp. 22-24, 32-34; *see also Palin v. New York Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019).

It is the exclusive province of the jury to decide whether Bennet's lack of memory of the Atlantic articles, the journalistic consensus that there was no link, and supposed unimportance of his brother's close connections to the Loughner shooting are believable. *Palin*, 940 F.3d at 815. Importantly, a publisher "cannot feign ignorance or profess good faith where there were clear indications present which bring into question the truth or falsity of the defamatory statements." *Sharon*, 599 F.Supp. at 584.

As a matter of law, Plaintiff is entitled to present evidence calling the credibility of Bennet's feigned ignorance of the consensus that there was no link between Plaintiff, the map, and Loughner's shooting into question. Certainly, The Atlantic articles published while he was its editor-in-chief are relevant and probative in that regard.

Credibility can also be attacked by demonstrating bias. "Potential bias of a witness "is always significant in assessing credibility, the trier of fact must be sufficiently informed of the underlying relationships, circumstances, and influences operating on the witness to determine whether a modification of testimony reasonably could be expected as a probable human reaction."

# JA 1637

*See U.S. v. Chichakli*, 2014 WL 5369424, at *17 (S.D.N.Y. Oct. 16, 2014) (citing Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 607.04 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.2009)).  Here, Bennet's brother is clearly relevant.

Credibility determinations are unquestionably at play when self-serving testimony about a person's mental state are involved.  *See Hutchinson v. Proxmire*, 443 U.S. 111, n. 9 (1979); *Palin*, 940 F.3d at 812-814.  The evidence Defendants seek to exclude is directly relevant to and admissible on credibility issues at trial.

## B. THE ATLANTIC ARTICLES AND POSTS ARE RELEVANT, MATERIAL, AND ADMISSIBLE

### (1) Actual Malice

As recognized by the Supreme Court and Second Circuit, the law's imposition of the "heavy"[13] burden to prove actual malice (a subjective standard) by clear and convincing evidence does not allow the exclusion of evidence that tends to show Bennet actually knew of the falsity of what he was saying (i.e., having read or known about the conclusions in The Atlantic articles and received an article discussing the absence of any link).  *Herbert*, 441 U.S. at 164; *Celle*, 209 F.3d at 183; *Goldwater*, 414 F.2d at 324.

Of course Bennet denies remembering the numerous Atlantic articles establishing there was no connection.  The law presumes this will happen.  Which is precisely why Bennet's claim that he cannot recall whether he read or knew about these news reports and posts confirming no link cannot be accepted as true.

That Bennet may not have had "editorial control" over the articles in question goes to the weight of The Atlantic evidence, not its admissibility.  [Doc. 117 at pp. 28-29]  Even the possibility

---

[13] *Dunlop-McCullen v. Rogers*, 2002 WL 1205029, at *7 (S.D.N.Y. Feb. 21, 2002).

## JA 1638

that Bennet **read** or **knew about** these articles gives rise to the inference that he was aware of what they said—namely, the absence of the link.

Additionally, whether Bennet recalled the entire content of these articles several years later is not the only reason why they are relevant. They are also evidence that, given the Atlantic's publication of several articles refuting the existence of the link, Bennet was aware of the common conclusion throughout his publication that there was no link to Plaintiff.

Bennet is a very intelligent person with a good memory and conceded he "regularly consumed[14] The Atlantic's website in 2011; even admitting he "must have read" some of The Atlantic's articles about Loughner and spoke with Andrew Sullivan about the shooting. [Doc. 118 at ¶¶ 231, 265, 272] Bennet also testified that the Loughner shooting was a "very big story" and political discourse and gun control were two of his hot button issues. [*Id*. at ¶ 279]

Bennet also conceded he regularly read Sullivan's *The Dish*, published on The Atlantic's website[15], and recalled Sullivan writing about Sarah Palin. [*Id*. at ¶¶ 273-274] He also received daily email updates for pieces posted by *The Wire* on The Atlantic's website, as well as "Daily News Roundup" emails containing relevant news stories posted on The Atlantic's website. [*Id*. at ¶ 280]

One such story ("*What We Know about Jared Lee Loughner*") posted on The Atlantic's website notes, "He Was More Delusional Than Political… Jared Lee Loughner appeared to be

---

[14] Bennet "was a regular reader of The Atlantic's website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like."

[15] The Dish was "integrated" into The Atlantic's website –it was "digitally present[ed] as part of the Atlantic.com [and] …its audience would be credited -- as part of The Atlantic's network of sites"—and The Atlantic "took responsibility for the production, meaning, the digital production of the site… mean[ing] maintaining the links, maintaining the archive, and so forth, and at the same time had the ability to sell advertising on the business side against the content that -- and the page views that [The Dish] was producing

more driven by a delusional mind than a real interest in politics, mental health experts said Sunday."[16]  [*Id*. at ¶ 281]  The Second Circuit specifically called out the "most notable"[17] of The Atlantic articles ("*Ten Days That Defined 2011*"), which recognized that it was wrong to link Gov. Palin to the Loughner Shooting:

> In a meta media sense, the bad thing to come out of this already terrible story was a round of blame hurling, with people rushing to point at Sarah Palin's infamous <u>target map</u> or Loughner's left seeming (but not really) anti-Bush sentiments.  In truth, Loughner is clinically insane and this was not really about politics at all.  That many, including us, immediately jumped to that conclusion says some pretty sorry things about the state or our political machine.

**Bennet testified that "it's possible" he read *Ten Days That Defined 2011*."**  [Doc. 118 at ¶¶ 282-283]

The believability of Bennet's claim that he doesn't recall reading these articles is for the jury to decide.  The jury must also decide whether Bennet's feigned ignorance of the consensus reached, including in the Atlantic articles, that there was no link is credible.

The Atlantic articles are also relevant and material to the issue of Defendants' negligence, which is a recognized component of the actual malice inquiry.  *Goldwater*, 414 F.2d at 343 ("there is no doubt that evidence of negligence… may be adduced…").  Plaintiff is entitled to demonstrate negligence by showing Bennet's "opportunity to know the journalistic consensus that the connection was lacking."  *Palin*, 940 F.3d at 814.  As stated by the Second Circuit, the Atlantic articles are evidence that "Bennet was recklessly disregarding the truth when he published the editorial ***without reacquainting himself*** with the contrary articles published in The Atlantic six

---

[16] The article also references and hyperlinks *The Times'* January 9, 2011 article, "*Suspect's Odd Behavior Caused Growing Alarm*" an in-depth report about Loughner's behavior and past.
[17] *Palin*, 940 F.3d at 813-814.

## JA 1640

years earlier." *Id.*; *see also Goldwater*, 414 F.2d at 343 ("failure to discover" is relevant and admissible to help show actual malice).

    **(2)    Common Law Malice**

For these same reasons, The Atlantic articles are relevant to common law malice. Punitive damages can be awarded on a showing of reckless disregard for the rights of another (*Prozeralik*, 82 N.Y.2d at 480; *Smith v. Wade*, 461 U.S. 30, 31 (1983)). "Recklessness is, after all, only negligence raised to a higher power." *Goldwater*, 414 F.2d at 343.

    **(3)    Falsity**

The Atlantic articles are also relevant to show falsity, including the consensus reached shortly after Loughner's shooting that it was not connected in any way to the map. [*Id.* at ¶ 284] The Times, The Atlantic (while Bennet was at its helm), Wall Street Journal, and Washington Post—all of which Bennet was "regularly reading" for his news in 2011—were among the major news outlets confirming within days of Loughner's shooting that it was not linked to incitement, Palin, or the map in any way. [*Id.* at ¶¶ 264-265]

    **(4)    Credibility**

Given the importance of Bennet's memory, knowledge, and intent to this case, his credibility is of paramount importance. His supposed lack of knowledge of and inability to recall The Atlantic articles and consensus they reached is clearly relevant and admissible in that regard. *Chichakli*, 2014 WL 5369424, at *17; *Palin*, 940 F.3d at 813-815.

## C.    THE ARTICLE BENNET WAS SENT IS RELEVANT, MATERIAL, <u>AND ADMISSIBLE</u>

The article Bennet received soon after the Loughner Shooting ("How the Media Botched the Arizona Shooting") is relevant and admissible for the same reasons discussed in Section B. Additionally, Bennet's receipt of this article is significant and highly probative because it also

confirms his knowledge of "framing" within the context of the Loughner Shooting. [*See* Doc. 108 at ¶ 267-268]  The same problem was addressed by The Times [Doc. 108 at ¶ 269] and in another Atlantic article [Doc. 108 at ¶ 270]  Critically, Bennet acknowledged his familiarity with this problem and cautioned the journalists that work for him about doing what the article he received warned about: rushing to blame Governor Palin for the Loughner Shooting.  [Doc. 108 at ¶ 271]

## D. EVIDENCE CONCERNING SENATOR BENNET IS RELEVANT, MATERIAL, AND ADMISSIBLE

Defendants next argue that all evidence concerning Senator Bennet should be excluded. However, their argument goes to the weight of this evidence, not its admissibility.  As explained above, Defendants are trying to deny Plaintiff's right to present relevant, material evidence she is legally entitled to use to prove her claim.

### (1) Actual Malice

It is entirely appropriate to admit evidence of common-law, ill-will malice as evidence probative of the existence of actual malice.  As the court in *Kipper v. NYP Holdings Co., Inc.*, 12 N.Y.3d 348, n. 4 (2009), noted, constitutional "actual malice" should not be confused with common-law ill-will malice, although common-law malice may be relevant to the actual malice determination.  Courts permit evidence of ill will, hatred, and bias to be introduced for whatever weight it deserves on the actual malice question, with the caveat that ill will, hatred, or spite standing alone can never establish knowing or reckless disregard for the truth.  *Bose Corp. v. Consumers Union of U.S.*, 692 F.2d 189, 196 (1st Cir. 1982).  Such evidence is relevant and admissible in the determination of whether the defendant possessed a state of mind highly conducive to reckless disregard of falsity, and may also be relied upon to show 'high degree of awareness of probable falsity.'"  *Kipper*, 12 N.Y.3d at 348; *Harris v. City of Seattle*, 152 Fed. Appx. 565 (9th Cir. 2005).

The admissibility of such evidence reflects a common-sense evidentiary notion that someone blinded with hatred or animus toward a person is more likely to fabricate false stories about the person, or ignore the truth, or spread statements couched as if the speaker knows them to be true, when in fact the speaker subjectively knows that they do not know whether they are true. Thus, "[a]lthough motive alone cannot suffice to prove actual malice, it is a *highly relevant* consideration." *Sindi v. El-Moslimany*, 896 F.3d 1, 16 (1st Cir. 2018).

Here, bias is particularly probative concerning Bennet's purposeful avoidance of the truth. [Doc. 117, p. 27]   Case law explicitly recognizes that <u>bias</u> coupled with departure from investigative techniques establishes actual malice. *Church of Scientology v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001); *Church of Scientology Intern. v. Time Warner, Inc.*, 903 F.Supp. 637, 641 (S.D.N.Y. 1995).

**(2)    Common Law Malice**

Even if evidence of bias and ill-will is excluded with respect to the issue of actual malice, it must be admitted to show common law malice. *Prozeralik*, 82 N.Y.2d at 480; *Sharon*, 599 F.Supp. at 586-587; *Celle*, 209 F.3d at 190. Defendants' motion does not even address this issue.

Plaintiff must be allowed to show that Bennet's brother was one potential source of bias. Bennet's brother was running for re-election in 2010 when the map of targeted electoral districts, which including two districts in Sen. Bennet's home state, circulated. [*Id*. at ¶ 242]   On January 6, 2011—two days before the Loughner Shooting—a man called Sen. Bennet's offices and threatened to "come down there and shoot you all." [*Id*. at ¶ 244]   Following additional threats, the man was arrested (two days after the Loughner Shooting). The FBI placed additional security at Sen. Bennet's home and Denver office. Bennet knew about the threats made against his brother,

# JA 1643

which were also reported by The Atlantic in an article also disclosing the family connection between Bennet and his brother.  [*Id*. at ¶ 245]

Both Bennets are also outspoken advocates for gun control.  Bennet hosted a gun control forum attended by Gabby Giffords and Mark Kelly (Americans for Responsible Solutions).  [*Id*. at ¶ 249]  Sen. Bennet was endorsed by Rep. Gabrielle Giffords' PAC, Americans for Responsible Solutions, a gun control political action committee.  [*Id*. at ¶ 247]  Bennet and the Editorial Department regularly received emails from Giffords PAC and used its website as a resource for conducting research in support of their gun control positions.  [*Id*. at ¶ 248]  Sen. Bennet gave a floor speech on gun control on June 15, 2016 as of a filibuster after the Pulse Nightclub shooting.  [*Id*. at ¶ 246]  Sen. Bennet's floor speech occurred the same day James Bennet's Editorial Board published an editorial about the Pulse Nightclub shooting and was also circulating drafts of a book about political rhetoric and Sarah Palin.

The events leading up to the publication of the Editorial, several of which involved Sen. Bennet, also reflect the an area ripe with bias, ill-will, and animosity toward Governor Palin and the need for "political score-keeping" that motivated Bennet to publish the challenged statements:

- In January of 2016, Gov. Palin endorsed Donald Trump for President, following which The Times' Opinion pages referred to her as a "Rage Whisperer."

- On June 7, 2016, Sarah Palin endorsed Republican candidate Darryl Glenn in Sen. Bennet's senate re-election race in Colorado.

- On June 13, 2016, after the Pulse Nightclub shooting occurred in Orlando, the Editorial Board published the editorial "*What Donald Trump Gets Wrong About Orlando*," which railed on Republicans for opposing gun control and causing "America's gun-violence epidemic."

# JA 1644

- On June 15, 2016, Times' CEO Mark Thompson emailed Bennet an extract from his book, "Enough Said," which Bennet then forwarded to Times' deputy Op-Ed editor James Dao ("The good news is that it's a book on political rhetoric"). The first chapter is devoted to Sarah Palin and rhetoric.

- That same day, Sen. Bennet gave his Floor Speech on gun control as part of the Democratic filibuster.

- On August 9, 2016, Friedman wrote his column "*Trump's Wink Wink to 'Second Amendment People*.'"

- On August 24, 2016, Rep. Giffords' Americans for Responsible Solutions PAC endorsed Sen. Bennet in his senate re-election race.

- Soon after Trump was elected, on November 13, 2016, The Times published a letter to its readers pledging to "rededicate themselves to The Times "core mission." The same day, The Times engaged directly with President Trump on Twitter.

- On December 17, 2016, Bennet ordered the Book, "*The Persecution of Sarah Palin: How the Media Elite Tried to Bring Down a Rising Star.*"

- In early 2017, The Times embarked on its "Truth" advertising campaign and capitalized on refocusing its coverage to promote its "subscription strategy."

- On February 7, 2017, Brent Staples emailed Bennet about concern and nervousness about anxiety within the Editorial Department, specifically mentioning "a right-wing propaganda tweet [from] Sarah Palin claiming The Times was desperately renting out floors because it was failing."

- In May 2017, Kathy Griffin posted a photo of herself holding a bloody severed head of President Trump, which drew widespread media attention.

- In early June, 2017, The Times eliminated its Public Editor—a position that essentially served as a watchdog and held it to account. As she was being ousted, Public Editor Liz Spayd noted that The Times' elimination of its Public Editor position showed the paper's move away from "institutional integrity," demonstrated an unwillingness to

seriously listen to criticism and doubt the impulses and wisdom of its inner sanctum, and was leading to "morph[ing] into something more partisan, spraying ammunition at every favorite target and openly delighting in the chaos."

- In the days leading up to the June 14, 2017 shooting, The Times was at the center of public criticism for its sponsorship of a Shakespeare in the Park production of Julias Cesar depicting Trump as Caesar, as other sponsors withdrew over public outcry that the play was a form of incitement.

Evidence concerning Bennet's relationship with his brother is a compelling component of the bigger picture of Bennet's bias and ill-will, all of which Plaintiff is entitled to present.  In fact, courts have specifically recognized that circumstantial evidence of rivalry, ill will, hostility, and bias are admissible to show a defendant's motives.  *Celle*, 209 F.3d at 190.  Evidence of political motivations is also recognized as appropriate to help support a showing of malice.  *Harte-Hanks*, 491 U.S. at 664 (publication motivated by political interests); *Campbell v. Citizens for an Honest Government, Inc.*, 255 F.3d 560 (8th Cir. 2001).

**(3)    Credibility**

Evidence of ill-will toward the plaintiff is also probative of actual malice because it impugns the credibility of the defendant.  Bennet's credibility is subject to attack based on his biases, including those stemming from his relationship with his brother.  *Chichakli*, 2014 WL 5369424, at *17.

**E.    DEFENDANTS' MISPLACED RELIANCE ON THE COURT'S DENIAL OF SUMMARY JUDGMENT**

Defendants make an argument throughout their motion, with respect to each of the categories of evidence they seek to exclude,[18] that the Court's August 28, 2020 Order denying summary judgment [Doc. 117] already excluded this evidence.  Defendants suggest the Court—at

---

[18] *See* Doc. 13 at pp. 3-4 [Atlantic articles], p. 8 [article sent to Bennet], and pp. 9-10 [Sen. Bennet].

the summary judgment stage, while addressing only the issues raised in Defendants' summary judgment motion—conclusively determined the Atlantic articles, article Mr. Bennet received, and evidence related to his brother, have no relevance to the issues being tried.

In the Order at issue, the Court "denied" [Doc. 117 at p. 35] Defendants' Motion for Summary Judgment. That motion took aim at the issue of actual malice (not common law malice or falsity). The Court did not make any explicit rulings in the August 28, 2020 Order under Rule 56(g) (i.e., "stating any material fact … that is not genuinely in dispute and treating the fact as established in the case"[19]). Defendants appear to be seeking to expand the Court's discussion of certain summary judgment evidence in the Order [Doc. 117 at pp. 29-30] to an adjudication of facts and the admissibility of evidence for purposes of trial (even though those issues were never raised, and such broad relief was never requested).

Defendants' effort to expand the scope of the Court's denial of summary judgment contradicts Rule 56(e)(2) [allowing facts to be considered "undisputed for purposes of the motion"[20]], and Supreme Court[21] precedent:

> The Supreme Court has summarized succinctly the effect of denying a summary judgment motion: "the denial of a motion for summary judgment because of unresolved issues of fact does not settle or even tentatively decide anything about the merits of the claim. It is strictly a pretrial order that decides only one thing—that the case should go to trial."

The Court's discussion of certain summary judgment evidence that is the subject of Defendants'

---

[19] Defendants have never explicitly claimed (including in their moving papers [Doc. 136]) that the Court's August 28, 2020 Order is an is an order treating facts as established in the case under Rule 56(g). The August 28, 2020 Order gives no indication the Court made any such determinations on its own initiative.

[20] The commentary to Rule 56(g) expressly cautions against using Rule 56(g) because of Rule 56(e)(2)'s limitation "for purposes of the motion."

[21] *Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1316 (2d Cir. 1991) (quoting *Switzerland Cheese Ass'n v. E. Horne's Market, Inc.*, 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966)).

Motion in Limine in its August 28, 2020 Order should not be conclusive of any facts or the admissibility of evidence for purposes of trial. If the Court disagrees, it would raise several other issues that must be addressed:

1.  The Court was only addressing actual malice and could not have been determining the relevance and admissibility of the evidence at issue for purposes other than actual malice, including common law malice and credibility. Those issues were not at issue in Defendants' summary judgment motion and not properly before the Court when it reached its decision on August 28, 2020.

2.  If the Court's August 28, 2020 Order did adjudicate facts under Rule 56(g), those rulings are interlocutory in nature and have no preclusive impact. *Audi Vision, Inc. v. RCA Mfg. Co.*, 136 F.2d 621, 625 (2d Cir. 1943) As such, if such decisions were made, they can and should be revisited, for the reasons explained in Section F, below.

3.  If the Court's August 28, 2020 Order did adjudicate facts under Rule 56(g), there are numerous other facts that would be established for purposes of trial, each of which should be incorporated into the Pretrial Order and/or clearly identified on the record so Plaintiff can adjust her proofs at trial accordingly.

## F. THE COURT'S DISCUSSION OF THE SUMMARY JUDGMENT EVIDENCE THAT IS ALSO AT ISSUE IN DEFENDANTS' MOTION IN LIMINE

In the August 28, 2020 Order, the Court discounted the significance of articles published on The Atlantic's website while Bennet was Editor-in-Chief that confirmed there was no link between the map and Loughner's shooting [Doc. 117 at pp. 28-29], as well as the article Bennet received soon after the shooting that also refuted the causal link between the shooting and the map [Doc. 117 at p. 29, n. 14]. The Court stated that Defendants "persuasively argued Bennet had no editorial control" over the articles, so at most he simply "read the posts," and concluded "[h]aving once read an article many years before the drafting of the Editorial is hardly enough to create an inference of knowledge of the Editorial's falsity."

17

# JA 1648

The focus on Bennet's "editorial control" seems to contradict the Second Circuit's emphasis on the fact issue arising from Bennet's testimony that he could not recall "reading them." *Palin*, 940 F.3d at 814 ("At the hearing, Bennet stated that he could not recall reading those articles, and even if he had read them, he did not have them in mind when he published the editorial. The district court, in rejecting Palin's theory as implausible, credited this testimony as truthful…").

The Court acknowledged in its Order that Bennet's testimony cannot be credited [Doc. 117 at pp. 21, 24] and assumed Bennet read the articles[22] [*Id*. at p. 29] before reaching the conclusion that reading the articles was "hardly enough to create an inference of knowledge of falsity." This conclusion inherently (and necessarily) credits Bennet's testimony that he could not recall the substance of the Atlantic articles he presumably read; a crediting which the Court and Second Circuit seem to agree cannot be done.

In the August 28, 2020 Order, the Court also concluded that the Second Circuit "made clear" that "these speculations [about Bennet's "personal hostility toward Palin"] were ***only*** 'relevant to the credibility of Bennet's testimony that he was unaware of facts published on his watch relating to the Loughner shooting.'" [Doc. 117 at pp. 29-30 (emphasis added)]. The Second Circuit's discussion of the relevance of Bennet's "personal hostility" does not appear to be this restrictive. The acknowledgement that Bennet's "personal[] bias[] against Palin and pro-gun positions in general" "strengthened" the plausible inference of reckless disregard arising from Bennet's failure to "reacquaint himself with the contrary articles published in The Atlantic six years earlier" does not automatically mean that Bennet's biases are therefore irrelevant to every

---

[22] This assumption is supported by the evidence, which among other things included testimony from Bennet that he regularly read The Atlantic and specifically stated it was "possible" he read "Ten Days That Defined 2011," which the Second Circuit explicitly called out in its decision. *Palin*, 940 F.3d at 813-814.

## JA 1649

other issue in this case, including other circumstantial evidence of recklessness.  *Palin*, 940 F.3d at 814-815.

As discussed throughout this filing, it is well-established that evidence of bias or ill-will bias "combined with other circumstantial evidence ... may also support a finding of actual malice." *Celle*, 209 F.3d at 183.[23]  Evidence of bias and animosity is significant circumstantial evidence of recklessness where it is coupled with a failure to adhere to journalistic standards.  *Harte-Hanks*, 491 U.S. at 664.  Here, Bennet committed serious violations of journalistic ethics.  [Doc. 108 at ¶¶ 178-191] [Doc. 117 at pp. 23-25]  Certainly, Bennet's bias is relevant to and strengthens the inference that Bennet was recklessly disregarding the truth when he engaged in these actions.

Defendants' Motion [Doc. 135] should be denied.

Dated:  January 17, 2022.

/s/ Shane B. Vogt
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@tcb-law.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 834-9191
Facsimile: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff*

---

[23] *See also, e.g.*, *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995) ("[I]ll will *is* considered circumstantial evidence of actual malice.") (emphasis added); *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995) ("[E]vidence of ulterior motive can often bolster an inference of actual malice.").

# JA 1650

## CERTIFICATE OF SERVICE

I hereby certify that Plaintiff's Memorandum of Law in Opposition to Defendants' Motion in Limine to Exclude Evidence Regarding Articles and Posts Published by Atlantic Media, an Article James Bennet Was Sent, and Senator Michael Bennet [Doc. 135] was filed electronically on January 17, 2022. This Notice will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt. Parties and their counsel may access this filing through the Court's system.

*/s/ Shane B. Vogt*
Attorney

# JA 1651

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH PALIN, an individual, | No. 17 Civ. 4853 |
| Plaintiff, | Hon. Jed S. Rakoff |
| – against – | ECF Case |
| THE NEW YORK TIMES COMPANY, a New York corporation, and JAMES BENNET, an individual, | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF JAMES
BENNET'S DEPARTURE FROM THE TIMES, UNRELATED CONTROVERSIES
DURING HIS TENURE AS OPINION EDITOR, AND THE ELIMINATION OF THE
PUBLIC EDITOR POSITION**

TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 834-9191
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

# JA 1652

## <u>TABLE OF CONTENTS</u>

Table of Contents ........................................................................................................ i

Table of Authorities ................................................................................................... ii

Introduction ................................................................................................................ 1

    A.    THE RELEVANCY OF THE EVIDENCE DEFENDANTS ASK TO EXCLUDE ............................................................................................ 1

    B.    JAMES BENNET'S DEPARTURE FROM THE TIMES IS RELEVANT, MATERIAL, AND ADMISSIBLE ................................................ 5

    C.    JAMES BENNET'S CONTROVERSIES ARE HIGHLY RELEVANT, MATERIAL, AND ADMISSIBLE ................................................ 6

    D.    THE ELIMINATION OF THE PUBLIC EDITOR IS RELEVANT, MATERIAL, AND ADMISSIBLE .................................................. 11

Certificate of Service ................................................................................................ 13

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Biro v. Conde Nast*, 807 F.3d 541 (2d Cir. 2015) ............................................... 6, 7, 8

*Celle v. Filipino Reporter Ent., Inc.*, 209 F.3d 163 (2d Cir. 2000) ...................... 2, 3, 4

*Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921 (2d Cir. 1987) ................... 1, 2, 3, 7, 10

*Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308 (5th Cir. 1995) .............................. 3

*Gilmore v. Jones*, 2021 WL 68684 (W.D. Va. Jan. 8, 2021) .................................... 6, 8

*Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969) ............................................ 3, 4

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ................. 3, 6, 7, 8

*Herbert v. Lando*, 441 U.S. 153 (1979) ................................................................. 2, 4

*Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983) ............................................ 3

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) ....................................................... 5

*Kerwick v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625 (1981) ............................................................................................................ 3, 8

*Liberty Lobby v. Dow Jones & Company, Inc.*, 838 F.2d 1287 (D.C. Cir. 1988) ........ 3

*Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) ..................................... 3, 5

*Plough v. Baltimore & O.R. Co.*, 164 F.2d 254 (2d Cir. 1947) ................................ 5, 6

*Prozeralik v. Capital Cities Comm's, Inc.*, 82 N.Y.2d 466, 605 N.Y.S.2d 218, 626 N.E.2d 34 (1993) ................................................................................ 1, 4

*Sharon v. Time, Inc.*, 599 F.Supp. 538 (S.D.N.Y. 1984) ....................................... 2, 4, 6

*Shoen v. Shoen*, 48 F.3d 412 (9th Cir. 1995) ......................................................... 3

*Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028 (10th Cir. 2013) ............................................................................................................ 3

*St. Amant v. Thompson*, 390 U.S. 727 (1968) ........................................................ 3

*Tavoulares v. Piro*, 763 F.2d 1472 (D.C. Cir. 1985) ............................................... 3

*Tavoulares v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) ..................................................................... 6, 8

*Tobinick v. Novella*, 108 F.Supp.3d 1299 (S.D. Fla. 2015) ............................................................ 3

*Tribune Co. v. Purcigliotti*, 93 Civ. 7222, 1996 U.S. Dist. LEXIS 8433 (S.D.N.Y. June 19, 1996) ....................................................................................................................... 5, 6

*U.S. v. Chichakli*, 2014 WL 5369424 (S.D.N.Y. Oct. 16, 2014) .................................................. 5

*Vandenburg v. Newsweek, Inc.*, 441 F.2d 378 (5th Cir. 1971) ...................................................... 3

*Ventura v. Kyle*, 63 F.Supp.3d 1001 (D. Minn. 2014) ................................................................... 3

*Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066 (5th Cir. 1987) ............................................. 3

**Page(s)**

## OTHER AUTHORITIES

Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 607.04 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.2009) ........................................... 5

New York Pattern Jury Instructions - Civil, 3:30 ........................................................................ 4

# JA 1655

## INTRODUCTION

Defendants' Motion In Limine to Exclude Evidence of James Bennet's Departure from The Times, Unrelated Controversies During his Tenure as Opinion Editor, and the Elimination Of The Public Editor Position ("Motion") [Doc. No. 137] should be denied because all the evidence it seeks to exclude is relevant, material, and probative, independently and collectively, to several issues the jury must decide in this case—**not just actual malice** (the sole focus of Defendants' Motion), but also common law malice and Defendants' credibility.

## A.    THE RELEVANCY OF THE EVIDENCE DEFENDANTS ASK TO EXCLUDE

To establish her claim, Governor Palin must prove that the challenged statements in Defendants' editorial are false, defamatory, and were published with actual[1] and common law[2] malice.  Her burden of proof on some elements is "clear and convincing" evidence.

Defendants' motives for publishing the editorial and the reasons why Bennet purposefully avoided the truth will be central issues at trial.  Defendants' biases, ill-will, and motives are critical evidence of actual and common law malice that Plaintiff must be allowed to present to the jury. As explained below, it is a matter of well-established law that Plaintiff is entitled to prove her case through the evidence Defendants seek to exclude.

Defamation plaintiffs are entitled to use an "accumulation of [circumstantial] evidence and appropriate inferences" to prove actual malice (whether through actual knowledge or recklessness).  *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987).  Thus,

---

[1] Plaintiff preserves all prior arguments and objections to the actual malice standard, which requires Plaintiff to demonstrate actual knowledge of falsity or reckless disregard for the truth. [Doc. 117, 125]

[2] Plaintiff seeks punitive damages, and therefore must establish common law malice, meaning a deliberate intent to injure or out of hatred, ill will or spite, or willful, wanton, or reckless disregard of another's rights.  *Prozeralik v. Capital Cities Comm's, Inc.*, 82 N.Y.2d 466, 605 N.Y.S.2d 218, 626 N.E.2d 34 (1993).

# JA 1656

Governor Palin has a right to prove her case through a totality of circumstantial evidence of actual malice. This right is necessary because of the subjective nature of the actual malice inquiry and the law's resulting recognition that circumstantial evidence is crucial because defendants rarely admit actual knowledge of falsity or doubts of truth. *Celle v. Filipino Reporter Ent., Inc.*, 209 F.3d 163, 183 (2d Cir. 2000); 8/28/2020 Order [Doc. 117] at p. 20.

Defamation plaintiffs are entitled to present any circumstantial evidence that tends to show the defendant was aware that what they published was untrue. *Dalbec*, 828 F.2d at 927. As the Supreme Court recognized in *Herbert v. Lando*, 441 U.S. 153, 160 (1979):

> To be liable, the alleged defamer of public officials or of public figures must know or have reason to suspect that his publication is false. In other cases proof of some kind of fault, negligence perhaps, is essential to recovery. Inevitably, unless liability is to be completely foreclosed, the thoughts and editorial processes of the alleged defamer would be open to examination. It is also untenable to conclude from our cases that, although proof of the necessary state of mind could be in the form of objective circumstances from which the ultimate fact could be inferred, plaintiffs may not inquire directly from the defendants whether they knew or had reason to suspect that their damaging publication was in error.

More importantly, the Supreme Court recognized in *Herbert* that, "[a]s a general rule, <u>any competent evidence</u>, either direct or circumstantial, can be resorted to…" *Herbert*, 441 U.S. at 164, n. 12. The range of evidence available to a plaintiff to prove actual malice is not narrow - "quite the opposite" is true. *Id.* at 168. Plaintiffs saddled with the burden of proving subjective intent by clear and convincing evidence are entitled to present evidence of "all of the relevant circumstances." *Celle*, 209 F.3d at 183. This includes any evidence to "permit the conclusion" that the defendant was aware of falsity. *Sharon v. Time, Inc.*, 599 F.Supp. 538, 564 (S.D.N.Y. 1984).

# JA 1657

With respect to recklessness and purposeful avoidance of the truth, there are several categories of circumstantial evidence courts consistently recognize that plaintiffs are entitled to use to prove their case, including:

1.   Evidence of negligence[3]

2.   Evidence of  motive and intent"[4]

3.   A defendants' own actions or statements[5]

4.   The inherent probability of the story[6]

5.   Bias or ill will[7]

6.   Failure to properly investigate[8]

7.   Refusal to meaningfully retract and apologize[9]

8.   Failure to adhere to journalistic policies[10]

9.   Grossly inadequate investigation under no time pressure[11]

---

[3] See *Goldwater v. Ginzburg*, 414 F.2d 324, 343 (2d Cir. 1969).

[4] See *Dalbec*, 828 F.2d at 927.

[5] See *Celle*, 209 F.3d at 183 (citing *Liberty Lobby v. Dow Jones & Company, Inc.*, 838 F.2d 1287, 1293 (D.C. Cir. 1988)).

[6] Id.; see also *Tobinick v. Novella*, 108 F.Supp.3d 1299, 1310 (S.D. Fla. 2015); *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *Dalbec*, 828 F.2d at 927).

[7] See *Palin v. New York Times Co.*, 940 F.3d 804, 814-816 (2d Cir. 2019); *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989); *Celle*, 209 F.3d at 183 ("Evidence of ill will combined with other circumstantial evidence ... may also support a finding of actual malice."); *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995) ("[I]ll will *is* considered circumstantial evidence of actual malice.") (emphasis added); *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995) ("[E]vidence of ulterior motive can often bolster an inference of actual malice.").

[8] *Palin*, 940 F.3d at 814-15; see also *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983) ("'[A]ctual malice may be inferred when the investigation was grossly inadequate in the circumstances'" (quoting *Vandenburg v. Newsweek, Inc.*, 441 F.2d 378, 380 (5th Cir. 1971)).

[9] See *Tavoulares v. Piro*, 763 F.2d 1472, 1477 (D.C. Cir. 1985); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987); *Ventura v. Kyle*, 63 F.Supp.3d 1001, 1014 (D. Minn. 2014)).

[10] See *Kerwick v. Orange Cty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 53 N.Y.2d 625, 627 (1981).

[11] *Hunt*, 720 F.2d at 645; see also *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1057-58 (10th Cir. 2013)).

# JA 1658

Defendants' current Motion [Doc. 137] and an accompanying one [Doc. 135] are fundamentally unfair attempts to prevent Plaintiff from proving actual malice through the types of circumstantial evidence the Supreme Court and Second Circuit have deemed proper and admissible. Excluding this evidence "would require that plaintiff prove the ultimate fact of recklessness without being able to adduce proof of the underlying facts from which a jury could infer recklessness [and] limit successful suits to those cases in which there is direct proof by a party's admission." *Goldwater*, 414 F.2d at 343.

Plaintiff also seeks to recover punitive damages in this action.[12] To do so, she is entitled to present evidence to the jury demonstrating by a preponderance of the evidence that Defendants published the editorial with common law malice—meaning they published (1) with deliberate intent to injure Plaintiff, (2) out of hatred, ill will, or spite, or (3) with willful, wanton, or reckless disregard of Plaintiff's rights. *See Prozeralik*, 82 N.Y.2d at 479-480; New York Pattern Jury Instructions - Civil, 3:30.

To prove her case, Plaintiff certainly is entitled to present evidence to the jury that tends to show that defendants harbored ill-will or spite toward her, and that they acted wantonly or recklessly. *Id*. The focus of this evidence is the defendants' mental state and motive. *Prozeralik*, 82 N.Y.2d at 480. Common law malice is established by examining all relevant circumstances. *Celle*, 209 F.3d at 184. Any competent evidence can be resorted to. *Id*. (citing *Herbert*, 441 U.S. at 164, n.12)

In light of the subjective nature of the actual malice and common law malice inquiries, Defendants' credibility will be a centerpiece of the trial. *See* Doc. 117 at pp. 22-24, 32-34; *see*

---

[12] Punitive damages are appropriate in defamation actions involving public figures. See *Sharon v. Time, Inc.*, 599 F.Supp. 538, 586-587 (S.D.N.Y. 1984); *Celle*, 209 F.3d at 184, 190.

# JA 1659

*also Palin v. New York Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019). Credibility can be attacked by demonstrating bias. "Potential bias of a witness "is always significant in assessing credibility, the trier of fact must be sufficiently informed of the underlying relationships, circumstances, and influences operating on the witness to determine whether a modification of testimony reasonably could be expected as a probable human reaction." *See U.S. v. Chichakli*, 2014 WL 5369424, at *17 (S.D.N.Y. Oct. 16, 2014) (citing Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 607.04 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.2009)).

Credibility determinations are unquestionably at play when self-serving testimony about a person's mental state are involved. *See Hutchinson v. Proxmire*, 443 U.S. 111, n. 9 (1979); *Palin*, 940 F.3d at 812-814. The evidence Defendants seek to exclude is directly relevant to and admissible on credibility issues at trial.

## B. JAMES BENNET'S DEPARTURE FROM THE TIMES IS RELEVANT, MATERIAL, AND ADMISSIBLE

Defendants seek to exclude evidence surrounding Bennet's departure from The Times on the grounds that it is irrelevant to actual malice and prejudicial. This request should be denied for several reasons.

First, Plaintiff is entitled to show Defendants' bias and prejudice to establish elements of her claim and to attack Bennet's credibility. *See e.g., Plough v. Baltimore & O.R. Co.,* 164 F.2d 254, 255 (2d Cir. 1947) ("[f]ederal courts have adopted a liberal attitude toward the admission of evidence, otherwise irrelevant and prejudicial, to show bias on the part of a witness" (internal citations omitted)). While not all the circumstances surrounding Bennet's departure from The Times in June 2020 are known, he may have entered into a severance agreement with The Times. Such an agreement, to the extent it contains terms providing for cooperation with The Times in ongoing litigation, is probative evidence and proper grounds for examination at trial. *Tribune Co.*

# JA 1660

*v. Purcigliotti,* 93 Civ. 7222, 1996 U.S. Dist. LEXIS 8433, at *6 (S.D.N.Y. June 19, 1996); *Plough,* 164 F.2d at 255 (likelihood that an employee might color his testimony in favor of his employer is a proper matter for the consideration of the jury in determining credibility).

The circumstances surrounding Bennet's departure are also relevant to the issue of bias, which in turn is relevant to actual and common law malice. Moreover, the circumstances surrounding Mr. Bennet's departure involve his failure to read an editorial before it was published, resulting in significant backlash amongst the liberal Times' staff—ultimately forcing Bennet's ouster. These circumstances are relevant to the recklessness exhibited throughout Bennet's tenure at The Times (discussed in Section C, below) and highly probative of actual and common law malice.

## C.    JAMES BENNET'S CONTROVERSIES ARE HIGHLY RELEVANT, MATERIAL, AND ADMISSIBLE

Bennet's controversies at The Times combined with his breaches of journalistic practices are precisely the type of evidence the Supreme Court and Second Circuit have identified as being supportive of actual and common law malice. In addition to the categories described on page 3, above, actual malice can be established through evidence of a publisher's previous dealings with the Plaintiff. *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015).[13] Managerial pressure to publish certain types of stories in situations where there is no regard for accuracy is also probative evidence of actual malice. *Tavoulares v. Piro*, 817 F.2d 762, 796-797 (D.C. Cir. 1987). In fact, this is recognized as particularly compelling evidence of actual malice. *Gilmore v. Jones*, 2021 WL 68684, at *8 (W.D. Va. Jan. 8, 2021). Profit motive is also evidence that may in appropriate circumstances contribute to the finding of actual malice. Id. at *7 (citing *Harte-Hanks*, 491 U.S.

---

[13] In *Sharon*, 599 F.Supp. at 565, the Court recognized that "a plaintiff may prove the actual malice of a press defendant by relying on the acts of all the defendant's employees."

## JA 1661

at 667-668).   In *Harte-Hanks*, the Supreme Court noted that, in finding actual malice, the lower court had "attribute[d] considerable weight to the evidence that the [Defendant newspaper publisher] was motivated by its interest in the reelection of the candidate [that] it supported and its economic interest in gaining a competitive advantage over the Cincinnati Enquirer, its bitter rival in the local market."   *Id*.

Despite the well-established rules entitling Plaintiff to present evidence of actual malice in totality (*Dalbec*, 828 F.2d at 927), Defendants are using a divide-and-conquer approach to Plaintiff's evidence of actual malice, trying to isolate discrete pieces and deprive Plaintiff of her right to present this evidence to the jury as a whole.   *Dalbec*, 828 F.2d at 927; *Biro*, 807 F.3d at 545-546.  For purposes of trial, and for evaluating Defendants' Motion, it is important to consider the totality of the evidence Plaintiff is entitled to present.

Defendants have a systemic liberal bias and history of bias against Governor Palin.  [Doc. 108 at ¶¶ 200-208]  Within The Times, Palin was seen as a convenient target for attacks against conservative policies and a subject likely to spark readership interest, as described by Charles M. Blow in his column "She Who Must Not Be Named."[Id. at ¶¶ 211-214]  The Times, Bennet, and the Editorial Board also hold a well-established history of bias on gun control.  [Id. at ¶ 210]

Heading into the publication of the Editorial, The Times was in the midst of transitioning to a digital-first business model, in a highly competitive environment in which Defendants needed to use biased, partisan attacks on people like Plaintiff to keep pace with competition.  [Id. at ¶¶ 215]  This new direction materialized in hiring Bennet and A.G. Sulzberger's directives for Bennet to stir controversy to drive readership and revenue.  [Id. at ¶¶ 227-229]  Among other things, Sulzberger lauded Bennet for hiring of Michelle Goldberg, Brett Stephens, and Bari Weiss (see Motion at p. 8).  Sulzberger also told Bennet to "move faster, take bigger risks, and play more

# JA 1662

aggressively outside your lanes," even instructing Bennet to "[a]sk for forgiveness, not permission…[because] you enjoy much more autonomy and a much bigger tolerance for risk…[which] should give you the blessing to move faster or to make changes that are more disruptive," and to "play outside you lanes a bit more often." [Id.] Sulzberger's directives made specific reference to several of Bennet's numerous controversies during his tenure at The Times (which Defendants ask to exclude) and demonstrate that Bennet and The Times were engaged in precisely what numerous courts have held to be reckless. *Biro*, 807 F.3d at 546; *Tavoulares*, 817 F.2d at 796-797; *Harte-Hanks*, 491 U.S. at 667-668; *Gilmore*, 2021 WL 68684, at *8; *Kerwick*, 53 N.Y.2d at 627. These controversies include the following:

- Bret Stephens hiring was very controversial and resulted in several factually inaccurate columns that garnered significant attention and had to be corrected.

- Michelle Goldberg was another controversial Bennet hire who wrote a book review the day she was hired that was plagued with factual errors for which a correction had to be issued.

- Bari Weiss was another very controversial Bennet hire involved in several controversies and factual errors.

- Bennet "hired" Quinn Norton but she never actually started working in the opinion department after public outrage over her "pattern of tweeting activity" Bennet begrudgingly admitted was "racist" led to Bennet's employment offer being "rescinded."

- Bennet also stoked controversy by hiring Sarah Jeong, who like Quinn Norton had a pattern of tweeting activity deemed by many to be "racist," although her employment offer was not rescinded because her tweets were directed at white people.

- Bennet's tenure was also marked with publishing controversial pieces by the likes of Louise Mensch and Erik Prince.

Those controversies are directly relevant to and probative of malice because they are emblematic of Defendants' bias, motives, and recklessness. Their relevancy and probative value must also be considered in connection with evidence of the events leading up to the publication of the editorial, also demonstrating bias, ill-will and animosity, as well as the need for "political score-keeping" [Id. at ¶ 108]; all of which led Defendants to publish the challenged statements despite their known and obvious falsity [Id. at ¶¶ 285-230]:

- In January of 2016, Gov. Palin endorsed Donald Trump for President, following which The Times' Opinion pages referred to her as a "Rage Whisperer."

-  On June 7, 2016, Sarah Palin endorsed Republican candidate Darryl Glenn in Sen. Bennet's senate re-election race in Colorado.

- On June 13, 2016, after the Pulse Nightclub shooting occurred in Orlando, the Editorial Board published the editorial "*What Donald Trump Gets Wrong About Orlando*," which railed on Republicans for opposing gun control and causing "America's gun-violence epidemic."

- On June 15, 2016, Times' CEO Mark Thompson emailed Bennet an extract from his book, "Enough Said," which Bennet then forwarded to Times' deputy Op-Ed editor James Dao ("The good news is that it's a book on political rhetoric"). The first chapter is devoted to Sarah Palin and rhetoric.

- That same day, Senator Bennet gave his Floor Speech on gun control as part of the Democratic filibuster.

- On August 9, 2016, Thomas Friedman wrote his column "*Trump's Wink Wink to 'Second Amendment People*,'" part of the inspiration for Bennet's use of "incitement."

- On August 24, 2016, Rep. Giffords' Americans for Responsible Solutions PAC endorsed Sen. Bennet in his senate re-election race.

- Soon after Trump was elected, on November 13, 2016, The Times published a letter to its readers pledging to "rededicate themselves to The Times "core mission." The

same day, The Times engaged directly with President Trump on Twitter.

- On December 17, 2016, Bennet ordered the Book, "*The Persecution of Sarah Palin: How the Media Elite Tried to Bring Down a Rising Star.*"

- In early 2017, The Times embarked on its "Truth" advertising campaign and capitalized on refocusing its coverage to promote its "subscription strategy."

- On February 7, 2017, Brent Staples emailed Bennet about concern and nervousness about anxiety within the Editorial Department, specifically mentioning "a right-wing propaganda tweet [from] Sarah Palin claiming The Times was desperately renting out floors because it was failing."

- In May 2017, Kathy Griffin posted a photo of herself holding a bloody severed head of President Trump, which drew widespread media attention.

- In early June, 2017, The Times eliminated its Public Editor—a position that essentially served as a watchdog and held it to account. As she was being ousted, Public Editor Liz Spayd noted that The Times' elimination of its Public Editor position showed the paper's move away from "institutional integrity," demonstrated an unwillingness to seriously listen to criticism and doubt the impulses and wisdom of its inner sanctum, and was leading to "morph[ing] into something more partisan, spraying ammunition at every favorite target and openly delighting in the chaos."

- In the days leading up to Hodgkinson's June 14, 2017 shooting, The Times was at the center of public criticism for its sponsorship of a Shakespeare in the Park production of *Julias Cesar* depicting Trump as Caesar, asother sponsors withdrew over public outcry that the play was a form of incitement.

Collectively, this evidence is precisely the type of "accumulation" of proof courts have consistently concluded plaintiffs have the right to use to establish actual malice and demonstrate common law malice for purposes of punitive damages. *Dalbec*, 828 F.2d at 927; *Celle*, 209 F.3d

**JA 1665**

at 183.  Defendants cannot hamper Governor Palin's ability to prove her case through recognized means of doing so simply because they don't like the picture it paints.

D.   **THE ELIMINATION OF THE PUBLIC EDITOR IS RELEVANT, MATERIAL, AND ADMISSIBLE**

For the same reasons outlined above, evidence of The Times' elimination of the Public Editor position is relevant, material evidence that is highly probative of recklessness.

The Public Editor served as a "watchdog" over The Times, helping ensure journalistic integrity.  Among other things, Public Editor Liz Spayd was critical of the Editorial Department's bias, and her predecessor actually wrote a piece about the mistakes made by Times journalists and others in linking Governor Palin to the Loughner shooting.  [Doc. 108 at ¶ 266 ("*Time, the Enemy*")].  While serving in the Public Editor role, Liz Spayd acknowledged that The Times' coverage "is in fact biased" and that "the Opinion section [] promotes the columns and editorials of its mostly liberal writers."  [Id. at ¶205]  As one example, a Times' gun control editorial Spayd mentioned ("End the Gun Epidemic in America") was published December 15, 2015 and ran on the front page of the newspaper—the first time an editorial has such placement since 1920.  [Id. at ¶¶ 206-209]

In early June, 2017—*shortly before the publication of the Editorial*—The Times eliminated the Public Editor position. [Doc. 108 at ¶ 307]   As she was being ousted, Liz Spayd wrote that The Times' elimination of her position showed the paper's move away from "institutional integrity," demonstrated an unwillingness to seriously listen to criticism and doubt the impulses and wisdom of its inner sanctum, and was leading The Times to "morph into something more partisan, spraying ammunition at every favorite target and openly delighting in the chaos."  [Id. at ¶¶ 199, 215]

# JA 1666

Clearly, the elimination of the Public Editor position in conjunction with all the other evidence Governor Palin is entitled to present (including, without limitation, the evidence described in Section C), is extremely probative of Defendants' bias, motive, intent, and recklessness, each of which are critical components of the actual and common law malice inquiries. Defendants can elicit testimony providing an explanation for why they eliminated the Public Editor position, but this circumstantial evidence is highly relevant and probative and the jury should be able to see and weigh it accordingly.

For all of these reasons, Defendants' Motion [Doc. 137] should be denied.

Dated:  January  17, 2022.

*/s/ Shane B. Vogt*
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@tcb-law.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 834-9191
Facsimile: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff*

# JA 1667

## CERTIFICATE OF SERVICE

I hereby certify that Plaintiff's Memorandum of Law in Opposition to Defendants' Motion in Limine to Exclude Evidence of James Bennet's Departure from The Times, Unrelated Controversies During His Tenure as Opinion Editor, and the Elimination of the Public Editor Position [Doc. 137] was filed electronically on January 17, 2022. This Notice will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt. Parties and their counsel may access this filing through the Court's system.

*/s/ Shane B. Vogt*
Attorney

**JA 1668**



| | |
|---|---|
| Document title: | Time, the Enemy - The New York Times |
| Capture URL: | http://www.nytimes.com/2011/01/16/ opinion/16pubed.html?rref=collection%2Ftimestopic %2FLoughner%2C%20Jared%20Lee&action=click&conte ntCollection=timestopics&region=stream&module=stream _unit&version=latest&contentPlacement=73&pgtype=colle ction |
| Captured site IP: | 151.101.33.164 |
| Page loaded at (UTC): | Tue, 11 Jul 2017 18:35:01 GMT |
| Capture timestamp (UTC): | Tue, 11 Jul 2017 18:35:23 GMT |
| Capture tool: | v5.2.2 |
| Page Vault server IP: | 52.7.109.102 |
| Browser engine: | Chrome/58.0.3029.81 |
| Operating system: | Microsoft Windows NT 6.2.9200.0 (6.2.9200.0) |
| PDF length: | 6 |
| Portal URL: | https://portal.page-vault.com/#/snapshot/658230 |
| User: | bc-gayla |

Exhibit 8
Witness: James Bennet
Date: 5/27/20
Court Reporter: Amanda McCredo

PAGE VAULT PDF REF#: goyMu739bee7NkurCnR3zk

PLAINTIFF TRIAL EXHIBIT 032

PALIN03659

ON THE GROUND

The Trumps Embraced a
Russian Plot

EDITORIAL

Donald Trump Jr. and the
Culture of Dishonesty

DAVID BROOKS

How We Are Ruining
America

DAVID LEONHARDT

Health Reform, Both Real
and Conservative

PAID POST: LINCOLN
These Luxury Goods
Outlasted the Royals Who
Made Them Famous

OP-ED CONT...

Searching
Earhart

We capture videos, websites & social
media for legal use

PAGEVAULT
REQUEST A FREE QUOTE

The Opinion Pages

# Time, the Enemy

**The Public Editor**
By ARTHUR S. BRISBANE   JAN. 15, 2011

      68

[JIM ROBERTS](#), the assistant managing editor who has helped create today's [NYTimes.com](#), likes to call it the 1440/7 news cycle — 1,440 minutes every day, seven days a week, each one of those minutes demanding news for delivery to a networked world.

Unfortunately, during a few of those minutes on Jan. 8, The Times had the story wrong. In that brief window of time, NYTimes.com was reporting that Representative Gabrielle Giffords was dead of gunshot wounds. The error and some other aspects of the coverage of the Tucson shootings illustrate how difficult it is in the current environment to be both timely and authoritative.

The circumstances were these: A major breaking news event, occurring on a Saturday afternoon with a small staff on duty, with print deadlines to worry about and a Web site that needed to be fed as fast and as frequently as possible.

The Times's first online posting came at 1:47 p.m., followed by two quick updates — at 1:53 and 2:16. These stories, pieced together from other news organizations that were on the ground in Tucson, reported the shootings and other basic facts, attributing word of the shooting to the congresswoman's spokesman, C. J. Karamargin. At this point, her condition was described as "unclear."



**The Public Editor**
Liz Spayd, the sixth public editor, is at the intersection of Times readers and Times journalists.

The Public Editor Signs Off   JUN 2

Friday Mailbag: Manchester, Stereotypes and
Social Security Math   MAY 26

The Bombing, the Crime Scene Photos and the
Outcry   MAY 25

Vague Guidelines Lead to a Misstep on Gender
Pronouns   MAY 25

The Real Power of Journalism? Blockbuster
Scoops   MAY 20

See More »

ADVERTISEMENT



SPRING    Shop now    Shop now    Free shipping
+ free returns

At 2:27, though, the story was revised to say Ms. Giffords had been shot and killed, attributing the information to Mr. Karamargin and "news reports." Lower in the story, those news reports were identified as coming from NPR and CNN. As it turned out, the information was incorrect. The Times compounded the error by appearing to attribute it in part to Ms. Giffords's own spokesman, who was not the source of the error.

Here's how the error was made. It was hectic in the newsroom with many news reports flowing in as Kathleen McElroy, the day Web news editor, was trying to decide whether The Times was ready to report Giffords's death. She decided against it and was telling Web producers to hold off reporting it in a news alert when J. David Goodman, who was writing the story, told her he had a few changes he wanted to make.

Ms. McElroy said, "I should have looked at every change," but she thought Mr. Goodman was referring to small stuff. Mr. Goodman told me he then erred by reporting Representative Giffords's death in the lead as though The Times itself were standing behind the information. In any event, Ms.

FROM OUR ADVERTISERS

HSBC

Finding an Ideal Neighborhood
What it's like to live in the most sought-
after NYC neighborhoods.

TNT "WILL"
Was Shakespeare a Playboy?
Commitment issues? Shakespeare had
them, too.

LINCOLN
The Craft of Royal Opulence
Empress Josephine's legacy: porcelain
and cashmere

BRIGHTHOUSE
Rethink Retirement Spending
About to retire? It may be time to change
your strategy.

PLAINTIFF TRIAL EXHIBIT 032

PALIN03660

☰  𝕋  🔍     The Opinion Pages | Time, the Enemy                          Subscribe  f  🐦  ✉  ➤  🔖  68

ON THE GROUND

The Trumps Embraced a Russian Plot

EDITORIAL

Donald Trump Jr. and the Culture of Dishonesty

DAVID BROOKS

How We Are Ruining America

DAVID LEONHARDT

Health Reform, Both Real and Conservative

PAID POST: LINCOLN
These Luxury Goods Outlasted the Royals Who Made Them Famous

OP-ED CONT

Searching Earhart

Times itself were standing behind the information. In any event, Ms. McElroy had said O.K. without seeing that change, so Mr. Goodman pushed the button.

The result was a news story with changes that were not edited. Less than 10 minutes later, a new story appeared with the words "and killed" stricken.

"Nobody should self-publish," said Philip B. Corbett, standards editor for The Times. "Everything should go through an editor. Ideally, it should go through two editors."

I agree with him, but that takes time. In the 1440/7 news cycle, and in the environment of the newsroom on Jan. 8, time seemed unavailable. On this particular day, things were happening quickly and simultaneously, and a mistake was made.



Earl Wilson/The New York Times

The Tucson shootings afforded another, quite different illustration of the pressure of time in news coverage — not pressure measured in seconds and minutes, but pressure that news organizations feel to define the context of a story, to set up a frame for it, sometimes before the facts can be fully understood.

The Times's day-one coverage in some of its Sunday print editions included a strong focus on the political climate in Arizona and the nation. For some readers — and I share this view to an extent — placing the violence in the broader political context was problematic.

C. Wenk, a reader in Alexandria, Va., criticized "an egregious rush to judgment in the Times coverage of the Arizona shooting, specifically aimed at linking the shooting to various conservative or Republican political rhetoric."

**Opinion Today**
Every weekday, get thought-provoking commentary from Op-Ed columnists, The Times editorial board and contributing writers from around the world.

[ Sign Up ]

A second reader, Kevin O'Donnell of Greenbrae, Calif., saw it as a case of The Times jumping too quickly: "I understand the larger point about coarse speech raising the

💬 RECENT COMMENTS

GMoney  February 2, 2011
didn't make the cut, huh? but you fel compelled to print this drivel'That has to be the understatement of the decade. The bodies of the...

texred  February 2, 2011
I also would like to add if he would have used a 99 ford crown vic would we be trying to outlaw cars and also trying to make ford mtr corp...

RobbyS  February 2, 2011
The only thing political about the shooting is that the main object of the attack was an attractive woman who had spurned a whacko kid and...

SEE ALL COMMENTS





Document title: Time, the Enemy - The New York Times
Capture URL: http://www.nytimes.com/2011/01/16/opinion/16pubed.html?rref=collection%2Ftimestopic%2FLoughner%2C%20Jared%20Lee&amp;action=click&amp;con...
Capture timestamp (UTC): Tue, 11 Jul 2017 18:35:23 GMT

PLAINTIFF TRIAL EXHIBIT 032

Page 2 of 5

PALIN03661

 The Opinion Pages | Time, the Enemy

JA 1671

Subscribe

ON THE GROUND
The Trumps Embraced a Russian Plot


EDITORIAL
Donald Trump Jr. and the Culture of Dishonesty


DAVID BROOKS
How We Are Ruining America


DAVID LEONHARDT
Health Reform, Both Real and Conservative


PAID POST: LINCOLN
These Luxury Goods Outlasted the Royals Who Made Them Famous

OP-ED CONT
Searching Earhart


Sign Up

SEE SAMPLE | PRIVACY POLICY | OPT OUT OR CONTACT US ANYTIME

about coarse speech raising the potential for violence. By offering that debate within hours of events, doesn't The Times risk starting at the conclusion end of the argument?"

The Times had a lot of company, as news organizations, commentators and political figures shouldered into an unruly scrum battling over whether the political environment was to blame. Meanwhile, opportunities were missed to pick up on evidence — quite apparent as early as that first day — that Jared Lee Loughner, who is charged with the shootings, had a mental disorder and might not have been motivated by politics at all.

"If I were a reporter on this story, my very first call would have been to a mental health professional willing to consider the nature of Mr. Loughner's illness," Max Etchemendy of East Palo Alto, Calif., wrote. "The 'political' angle has been beaten to death, and 'medical' angle has been ignored completely."

So why does a story get framed this way? Journalism educators characterize this kind of framing as a storytelling habit — one of relating new facts to an existing storyline — and also as a reflex of news organizations that are built to handle some topics well, and others less well.

Jerry Ceppos, dean of the journalism school at the University of Nevada, Reno, said journalists' impulse to quickly impose a frame on a story is "genetic."

"Journalists developed automatic framing protocols generations ago because of the need to report quickly," he said. "Today's hyper-deadlines, requiring journalists to report all day long and all night long, made that genetic disposition even more dominant."

To be fair, there were some good reasons to steer the coverage initially in this direction. As Rick Berke, the national editor, said: "Our coverage early on was broad and touched everything from the possible shooter to the victims to the reaction to, yes, the political climate in Arizona. By our count, there were 49 stories in the paper the first six days after the tragedy, of which only 14 were political in nature. But it would be ridiculous for us to neglect that. After all, a politician was shot in the head while meeting with constituents. That same lawmaker had her office vandalized during an especially rancorous campaign. And after the shooting the sheriff called his state the capital of hatred and bigotry."

Still, I think the intense focus on political conflict — not just by The Times — detracted from what has emerged as the salient story line, that of a mentally ill individual with lawful access to a gun.

Whether covering the basic facts of a breaking story or identifying more complex themes, the takeaway is that time is often the enemy. Sometimes the best weapon against it is to ignore it, and use a moment to consider the alternatives.

———

E-mail: public@nytimes.com

A version of this op-ed appears in print on January 16, 2011, on Page WK10 of the New York edition with the headline: Time, the Enemy. Today's Paper | Subscribe

**The Public Editor**

Liz Spayd, the sixth public editor, is at the intersection of Times readers and Times journalists.

The Public Editor
Step Off...


Friday Mailbag:


The Bombing, the




Ad


Crystal Clear

Brilliant Business Phones

Warning: Do not use your business phone until you read this

Visit Site                Expert

TRENDING

1. Russian Dirt on Clinton? 'I Love It,' Donald Trump Jr. 

2. Read the Emails on Donald Trump Jr.'s Russia 

Document title: Time, the Enemy - The New York Times
Capture URL: http://www.nytimes.com/2011/01/16/opinion/16pubed.html?rref=collection%2Ftimestopic%2FLoughner%2C%20Jared%20Lee&amp;action=click&amp;con...
Capture timestamp (UTC): Tue, 11 Jul 2017 18:35:23 GMT

PLAINTIFF TRIAL EXHIBIT 032

Page 3 of 5

PALIN03662

JA 1672

The Opinion Pages | Time, the Enemy

Subscribe


ON THE GROUND
The Trumps Embraced a Russian Plot


EDITORIAL
Donald Trump Jr. and the Culture of Dishonesty


DAVID BROOKS
How We Are Ruining America


DAVID LEONHARDT
Health Reform, Both Real and Conservative


PAID POST: LINCOLN
These Luxury Goods Outlasted the Royals Who Made Them Famous


OP-ED
Searching for Amelia Earhart

**The Public Editor Signs Off**
The New York Times may no longer have a public editor, but if that role's extinguished, who will watch the watchdog?

**Friday Mailbag: Manchester, Stereotypes and Social Security Math**
Readers wondered about the continued naming of the arena's performer. Other concerns: a photo of food stamp recipients and a take on the U.S. debt.

**The Bombing, the Crime Scene Photos and the Outcry**
The smoke had barely cleared from the Manchester attack before The New York Times ran forensic-evidence images. British officials were angry. So were readers.

2. Read the Emails on Donald Trump Jr.'s Russia Meeting
3. Op-Ed Columnist: How We Are Ruining America
4. Trump Jr. Was Told in Email of Russian Effort to Aid Campaign
5. Twitter Users Blocked by Trump File Lawsuit
6. Editorial: Donald Trump Jr. and the Culture of Dishonesty
7. Feature: This Town Melts Down
8. Trump Rules: The Deep Industry Ties of Trump's Deregulation Teams
9. How Key Trump Associates Have Been Linked to Russia
10. Building Boom in Boston Casts Shadows on History and Public Space

View More Trending Stories »

### More in Opinion

Go to the Opinion Section »


ON THE GROUND
The Trumps Embraced a Russian Plot


EDITORIAL
Donald Trump Jr. and the Culture of Dishonesty


PAID POST: NORTON
How a Router Can Help Keep Your Family Safe


DAVID BROOKS
How We Are Ruining America


DAVID LEONHARDT
Health Reform, Both Real and Conservative


OP-ED CONTRIBUTOR
Searching for Amelia Earhart

### Recommended for You

Go to All Recommendations »


Steve Scalise Undergoes Surgery to Control Infection After Shooting

After Scalise Shooting, a Twist: Lawmakers Want to Loosen Gun Laws

At Bronx-Lebanon, Offering an Injured Doctor a Cast of Solidarity


SPRING    Shop now    Shop now    Free shipping + free returns

### The New York Times

Go to Home Page »

**NEWS**
World
U.S.
Politics
N.Y.
Business
Tech
Science
Health
Sports
Education
Obituaries
Today's Paper
Corrections

**OPINION**
Today's Opinion
Op-Ed Columnists
Editorials
Contributing Writers
Op-Ed Contributors
Opinionator
Letters
Sunday Review
Taking Note
Room for Debate
Public Editor
Video: Opinion

**ARTS**
Today's Arts
Art & Design
Books
Dance
Movies
Music
N.Y.C. Events Guide
Television
Theater
Video: Arts

**LIVING**
Automobiles
Crossword
Food
Education
Fashion & Style
Health
Jobs
Magazine
N.Y.C. Events Guide
Real Estate
T Magazine
Travel
Weddings & Celebrations

**LISTINGS & MORE**
Classifieds
Tools & Services
Times Topics
Public Editor
N.Y.C. Events Guide
Blogs
Multimedia
Photography
Video
NYT Store
Times Journeys
Subscribe
Manage My Account

**SUBSCRIBE**
🏠 Home Delivery
📱 Digital Subscriptions
✎ Crossword

Email Newsletters
Alerts
Gift Subscriptions
Corporate Subscriptions
Education Rate

Mobile Applications
Replica Edition

Document title: Time, the Enemy - The New York Times
Capture URL: http://www.nytimes.com/2011/01/16/opinion/16pubed.html?rref=collection%2Ftimestopic%2FLoughner%2C%20Jared%20Lee&amp;action=click&amp;con...
Capture timestamp (UTC): Tue, 11 Jul 2017 18:35:23 GMT

PLAINTIFF TRIAL EXHIBIT 032

Page 4 of 5

PALIN03663

JA 1673



The Opinion Pages | Time, the Enemy

Subscribe


ON THE GROUND
The Trumps Embraced a Russian Plot


EDITORIAL
Donald Trump Jr. and the Culture of Dishonesty


DAVID BROOKS
How We Are Ruining America


DAVID LEONHARDT
Health Reform, Both Real and Conservative

PAID POST: LINCOLN
These Luxury Goods Outlasted the Royals Who Made Them Famous


OP-ED CONT
Searching Earhart

The New York Times may no longer have a public editor, but if that role's extinguished, who will watch the watchdog?

**Social Security Math**

Readers wondered about the continued naming of the arena's performer. Other concerns: a photo of food stamp recipients and a take on the U.S. debt.

The smoke had barely cleared from the Manchester attack before The New York Times ran forensic-evidence images. British officials were angry. So were readers.

3. Op-Ed Columnist: How We Are Ruining America
4. Trump Jr. Was Told in Email of Russian Effort to Aid Campaign 
5. Twitter Users Blocked by Trump File Lawsuit 
6. Editorial: Donald Trump Jr. and the Culture of Dishonesty 
7. Feature: This Town Melts Down
8. Trump Rules: The Deep Industry Ties of Trump's Deregulation Teams 
9. How Key Trump Associates Have Been Linked to Russia
10. Building Boom in Boston Casts Shadows on History and Public Space

View More Trending Stories »

**More in Opinion**                                    Go to the Opinion Section »


ON THE GROUND
The Trumps Embraced a Russian Plot


EDITORIAL
Donald Trump Jr. and the Culture of Dishonesty


PAID POST: NORTON
How a Router Can Help Keep Your Family Safe


DAVID BROOKS
How We Are Ruining America


DAVID LEONHARDT
Health Reform, Both Real and Conservative


OP-ED CONTRIBUTOR
Searching for Amelia Earhart

**Recommended for You**                                Go to All Recommendations »


Steve Scalise Undergoes Surgery to Control Infection After Shooting


After Scalise Shooting, a Twist: Lawmakers Want to Loosen Gun Laws


At Bronx-Lebanon, Offering an Injured Doctor a Cast of Solidarity

SPRING    Shop now    Shop now    Free shipping + free returns

The New York Times                                     Go to Home Page »

| NEWS | OPINION | ARTS | LIVING | LISTINGS & MORE | SUBSCRIBE |
|---|---|---|---|---|---|
| World | Today's Opinion | Today's Arts | Automobiles | Classifieds | Home Delivery |
| U.S. | Op-Ed Columnists | Art & Design | Crossword | Tools & Services | Digital Subscriptions |
| Politics | Editorials | Books | Food | Times Topics | Crossword |
| N.Y. | Contributing Writers | Dance | Education | Public Editor | |
| Business | Op-Ed Contributors | Movies | Fashion & Style | N.Y.C. Events Guide | Email Newsletters |
| Tech | Opinionator | Music | Health | Blogs | Alerts |
| Science | Letters | N.Y.C. Events Guide | Jobs | Multimedia | Gift Subscriptions |
| Health | Sunday Review | Television | Magazine | Photography | Corporate Subscriptions |
| Sports | Taking Note | Theater | N.Y.C. Events Guide | Video | Education Rate |
| Education | Room for Debate | Video: Arts | Real Estate | NYT Store | |
| Obituaries | Public Editor | | T Magazine | Times Journeys | Mobile Applications |
| Today's Paper | Video: Opinion | | Travel | Subscribe | Replica Edition |
| Corrections | | | Weddings & Celebrations | Manage My Account | |

© 2017 The New York Times Company   Contact Us   Work With Us   Advertise   Your Ad Choices   Privacy   Terms of Service   Terms of Sale          Site Map   Help   Site Feedback   Subscriptions

Document title: Time, the Enemy - The New York Times
Capture URL: http://www.nytimes.com/2011/01/16/opinion/16pubed.html?rref=collection%2Ftimestopic%2FLoughner%2C%20Jared%20Lee&amp;action=click&amp;con...
Capture timestamp (UTC): Tue, 11 Jul 2017 18:35:23 GMT
PLAINTIFF TRIAL EXHIBIT 032
Page 5 of 5

PALIN03664

# JA 1674

## Fw: Something about Tuscon that i haven't seen said

| | |
|---|---|
| **From:** | "Bennet, James" <jbennet@theatlantic.com> |
| **To:** | "Cohn, Bob" <bcohn@theatlantic.com> |
| **Date:** | Fri, 14 Jan 2011 18:01:52 -0500 |
| **Attachments:** | SLEEPER, The Atlantic.docx (17.75 kB) |

Want it?

**From**: jimsleep@aol.com
**To**: Bennet, James
**Cc**: Fallows, James
**Sent**: Fri Jan 14 16:26:09 2011
**Subject**: Something about Tuscon that i haven't seen said
James, Drawing on my experience covering the Long Island Rail Road massacre of 1994 (for the NY Daily News), and allowing for the obvious differences, I say that while it's okay to push back against liberal journalists for rushing to blame conservative rhetoric, it would be much better to reckon with the extra-legal connections, which are real enough in their own right. Do you think this might have a place with you online? Jim Sleeper 646 761 4695

Take a look at www.jimsleeper.com

PLAINTIFF TRIAL EXHIBIT 057

ATLANTIC000832

**JA 1675**

SLEEPER, THE ATLANTIC

Here are the links:

1. Third paragraph, "T.A Frank in The New Republic:"

http://www.tnr.com/article/politics/81485/how-the-media-botched-the-arizona-shooting

2. Third paragraph: Liberal Racism :
http://www.jimsleeper.com/articles/signature-pieces/Liberal%20Racism.pdf

3. Seventh paragraph, Julius Lester: http://www.jimsleeper.com/articles/signature-pieces/Blacks%20and%20Jews%20%28Leonard%20Jeffries,%20LIRR%20massacre,%20Israel%20Massacre,%20early%201990s.pdf
(The Ferguson article is the second and third items on this pdf, not the first0

By Jim Sleeper

I don't know a lot about building construction, but I do know that, even in this wireless age, new wiring is always being woven into "smart buildings" in ways and for reasons most of us never see or think about. That's true, too of a society's subliminal undercurrents -- its fears, hatreds, its not-so-grand narratives: They're forever being channeled, sluiced, and tapped by people who grasp and weave them in ways most others can't even imagine.

Pima county Sheriff Clarence Dupnik wasn't wrong to grasp the truth, apropos the Tuscon massacre, that "the anger, the hatred, the bigotry that goes on in this country is getting to be outrageous." The last four words matter. While no good prosecutor would posit a legal connection between the unwired delusions of Jared Loughner and the routinized delusions of, say, Sharon "Second Amendment remedies" Angle, Tea Party congressional "town hall" demonstrators, or Sarah "Blood Libel" Palin, that doesn't mean such connections aren't festering, beyond the reach of the law.

ATLANTIC000833

True, reporters and pundits often draw the connections impulsively. "When disaster strikes," notes T. A. Frank in The New Republic, they "have to …. take mental shortcuts, calling up established narratives…  for new and more ambiguous facts." In 1997 I noted similarly, in *Liberal Racism*, that reporters, "[p]lunged daily into a torrent of actors and events out of which they must make some sense on a deadline,… use whatever story lines or narratives are already in their heads or easily at hand."

While Frank is reproving liberal journalists for taking too strong a cue from Sheriff Dupnik, I was reproving them for letting established narratives of black victimhood eclipse a connection between the 1993 shooting rampage of a deranged black loner, Colin Ferguson, against 25 white Long island Rail Road passengers, six of whom died, and Ferguson's avid immersion in black demagoguery that had included on-air death threats against white journalists.

There's no similarly obvious connection between Jared Loughner's delusional fear that government is controlling our grammar and, say, some Tea Partiers' delusional demand that government take its hands off their Medicaid. Frankly, I'd be glad to have a government capable of providing both more public health care and better public school instruction in grammar, but those of us who aren't actually prosecuting Loughner and want to track the Tuscon massacre's extralegal undercurrents or wiring beneath the courthouse floor, as it were, don't need to establish a legal or policy connection.

What matters more – and what also prevents us from having better government health care and schools -- is that our public sphere is now crackling with incitements to violent hatred of government. Surely Loughner picked up such signals in his own weird way before ranting against government and shooting public officials.

But how do we explain this connection extra-legally? In 1985, the black poet Julius Lester noted presciently, in words I would quoted with chilling hindsight just after Ferguson struck, that violent rhetoric such as Louis Farrakhan's at that time was "subtly but surely creating an atmosphere in America where hatreds of all kinds

PLAINTIFF TRIAL EXHIBIT 057

ATLANTIC000834

will be easier to express openly, and one day, in some as yet unknown form, those hatreds will ride commuter trains into the suburbs. By then it will be too late for us all."

It wasn't only the Long Island commuter-train massacre that bared the extra-legal truth that psychotics are often tuned in more acutely than the rest of us to a society's subliminal signals and that, as those undercurrents of fear and hatred are surfaced by impresarios of ethno-racial grievance, the deranged may be only the first to act on them. That truth was also bared in the lethal rage of former Brooklyn resident Baruch Goldstein, who massacred 29 Palestinians at prayer on the West Bank only a few months after Ferguson's rampage.

And the violent congressional "town hall" meetings reminded me of some violent white leftist (as well as segregationist) histrionics of the 1960s. Todd Gitlin describes in his book _The Sixties_ some young radicals' premise that, as a Weatherman communiqué put it, "Smashing the pig means smashing the pig inside ourselves, destroying our own honkiness.... We are against everything that's 'good and decent' in honky America...."

Including, as I recall quite vividly, anything having to do with government.

"No alternative theory or action crystallized from the murk of the collective despair," Gitlin wrote. "_They're crazy,_ one heard [of the worst militants], _but you have to admit they've got guts. Anyway, are you so sure they're wrong?"_ By Gitlin's estimate, between September 1969 and May 1970 there were some 250 "bombings and attempts linkable with the white left.... the explosions amplified, as usual, by the mass media."

What matters now isn't that we establish lethal symmetries among leftist terrorists, black or white, and right-wing militias or prove that Loughner was glued to Fox News. What matters is more public recognition that, in all such cases, any politics turning on death portends the death of politics. The angels of that death aren't always as composed (or, as some think, "heroic") as a Kathy Boudin

PLAINTIFF TRIAL EXHIBIT 057

ATLANTIC000835

or a Timothy McVeigh. More likely, they're as fallen and tormented as Charles Manson, Colin Ferguson, or Jared Loughner.

And they're precisely what signal-senders Sarah Palin are provoking. Demagogues like her and their funders, orchestrators, and adepts -- one of whom, William Kristol, once applauded warnings like mine against the smooth-talking fanatics who handed Colin Ferguson his bloody script -- now dodge all blame and soul-searching for themselves.

That some of their journalistic critics have themselves been alarmist or conspiratorial doesn't mitigate the fact that the signal senders are "subtly but surely creating an atmosphere in America where hatreds of all kinds will be easier to express openly." Already, people less disconnected than Jared Loughner are expressing those hatreds. We need to re-work the social wiring running beneath the law and under the courthouse floor.

_____

*Jim Sleeper, a lecturer in political science at Yale, teaches a course on Journalism, Liberalism, and Democracy.*

PLAINTIFF TRIAL EXHIBIT 057

ATLANTIC000836

ADVERTISING

# How the Media Botched the Arizona Shooting

By **T.A. FRANK**

January 14, 2011

Add to Pocket

When disaster strikes, journalists have to write something about it—and write it fast. That means they have to take mental shortcuts, calling up established narratives and laying them out like old wrapping paper for new and more ambiguous facts. (Wife poisons husband. Revenge killing? Money killing? Self-defense killing? We stand at the ready with a lot of templates.) While the resulting gift isn't always pretty, it's generally good enough for deadline work.

But sometimes the shortcuts produce a journalistic stampede at the worst possible time. That's what happened last weekend, when 22-year-old Jared Lee Loughner shot six people to death at an Arizona Safeway and gravely wounded many more, including Democratic Congresswoman Gabrielle Giffords. The dominant storyline in the press—one that persisted in the face of all the facts —was that right-wing hysteria and lunacy had given rise to Loughner's atrocity. Only on Wednesday night, when President Obama delivered a speech that effectively told everyone to cut it out, was the stampede halted (one hopes). But it's still worth reviewing how the nation's leading periodicals descended into such mindlessness.

Let's go back to this Saturday. When news of the incident first broke, bloggers began to speculate that this was a Tea Party-related incident. No evidence of that emerged. Once a little more information trickled out, *The New York Times* and other outlets linked Loughner to a far-right publication called *American Renaissance.* That likewise had no basis in fact. Over the next day or two, as Loughner turned out to give off numerous indications of mental illness but very few of right-wing ideology, the dominant analysis became, "Okay maybe this guy was nuts, but, still, he was at least indirectly a product of a climate of political hysteria."

PLAINTIFF TRIAL EXHIBIT 058

JA 1680

By Monday, *The New York Times'* editorial page had kicked into action. It conceded that, sure, Loughner operated "well beyond usual ideological categories," but, still, it was "legitimate to hold Republicans and particularly their most virulent supporters in the media responsible for the gale of anger that has produced the vast majority of these threats, setting the nation on edge." The *Los Angeles Times* followed suit. It admitted that, sure, Loughner and "his own demons were primarily to blame," but it still condemned the "increasingly incendiary and violent rhetoric that characterizes today's political debate," for which "the right bears the brunt of responsibility." Meanwhile, dozens of opinion writers were busily adding related but equally ethereal musings to the heap. Writing in the *Guardian*, blogger Jessica Valenti blamed a "country that sees masculinity—especially violent masculinity—as the ideal."

There is of course one advantage to all such lines of argument, if argument is the word for it. They are entirely faith-based, which makes them pretty much irrefutable. But faith-based punditry works in more than one direction. Seven years after the massacre at Columbine High School—in which two senior students shot and killed twelve students and a teacher—CBS News invited Brian Rohrbough, who had lost his son Dan, to explain why he thought the shootings had happened. "The public school system has taught in a moral vacuum, expelling God from the school and from the government, replacing him with evolution, where the strong kill the weak, without moral consequences and life has no inherent value," Rohrbough said. "And I assure you the murder of innocent children is always wrong, including by abortion. Abortion has diminished the value of children." Most liberals (myself included) would disagree with Rohrbough's explanation for the shooting, but they'd have trouble explaining why it's any less plausible or substantive than explanations blaming Jared Loughner on rightwing hysteria.

So why did the press go so far astray this week? How did many fine, otherwise fair-minded journalists allow their judgment to become so clouded? Let's venture briefly—and hopefully not too speculatively, lest I be accused of double standards—into the realm of cognition. Organizational theorists such as Karl E. Weick, a professor of psychology at the University of Michigan Business School, have researched how we react to unexpected events. In his 1995 book *Sensemaking in Organizations*, Weick notes that we humans automatically categorize what we encounter, ushering messy new complexities into tidier established categories ("myths, metaphors, platitudes, fables, epics and paradigms," to be precise). When something bad and inexplicable takes us by surprise, our brains reach for the handiest existing narratives, and accuracy falls by the wayside in favor of simple plausibility. "The stories are templates," writes Weick. "They are products of previous efforts at sensemaking. They explain. And they energize."

PLAINTIFF TRIAL EXHIBIT 058



# TNR Newsletters. Must reads. 5 days a week.

Sign Up Now

Contributing to such tendencies are the habits of newsrooms. In their 1989 book *How Do Journalists Think?*, S. Holly Stocking and Paget H. Gross note that a typical reporter launches into a story with an investigative hypothesis, one that is often bolstered during the reporting process by "confirmation bias." Only with great reluctance—in the face of overwhelming evidence to the contrary—is such a hypothesis normally discarded. Added to that is the weakness that competing hypotheses are tested one at a time, so that alternative explanations for the same data points are almost never considered simultaneously. "For example," write the authors, "if one is testing a theory about the negative impact of feminism on women's lives, one is unlikely also to test theories about its positive impact."

At this point, however, a reader might reasonably ask why, in this case, launching into a discussion of political hysteria was such a bad thing. If the shootings in Arizona can serve as a springboard for discussing a significant, if not necessarily related, societal menace, why not let them do so? After all, much of the right truly has become unhinged.

Well, yes, but let's remember that the deaths caused by Jared Loughner were preventable. There were concrete things that could have been done and that we now should do. Some people think we should place more restrictions on gun ownership. Some think we should provide more security services to members of Congress. Some think we should have improved mental-health resources. Such solutions may be wise or foolish, but the point is that they are directly relevant to the tragedy of last weekend.

By focusing on explanations that are abstract and speculative and only indirectly related, however, we risk losing sight of the crucial and immediate questions at hand. For instance, when Congressman James Clyburn was interviewed by NPR about the shootings, Clyburn followed the lead of all the major news outlets and focused almost entirely on "the discourse around the political arena," suggesting a reexamination of the Fairness Doctrine. In short, Clyburn largely ignored a real problem while pledging to focus on an imagined one. That is the danger here.

PLAINTIFF TRIAL EXHIBIT 058

JA-1682

In 1911, a fire at the Triangle Shirtwaist Factory in New York killed 146 garment workers, most of them women and immigrants. Fortunately, the outrage that followed it went in a healthy direction, resulting in new federal workplace safety laws. This was a lot more helpful than essays blaming the fire on misguided ideals of femininity. There's a place for speculation and supposition, of course. But not a big place, and not for long. It's well past time for journalists to move on from what we *don't* know about the causes of last weekend's tragedy and grapple seriously with a great deal that we now *do* know—even if, God forbid, it means we'll have to abandon our hypotheses.

*T.A. Frank is a writer in Los A........................................................ ..n Monthly.*



Su                                      m

Unlimited access for less than $2 a month

Subscribe Now



## TNR Newsletters.
## Must reads. 5 days a week.

Sign Up Now

PLAINTIFF TRIAL EXHIBIT 058

# Ten Days That Defined 2011

Out of the year's 365 days, here are 10 that made 2011 what it was.

RICHARD LAWSON  |  DEC 29, 2011   GLOBAL

[f] Share   [t] Tweet   ...

TEXT SIZE − +



ALL-DAY OFFSITE MEETINGS CALL FOR ALL-DAY BATTERY LIFE.

QUALCOMM ENGINEERS BUILT THE ANSWER.

QUALCOMM

*This article is from the archive of our partner* **The Wire**

*Out of the year's 365 days, here are 10 that made 2011 what it was.*

## A Shooting in Arizona



On the sunny morning of **January 8th**, a mentally ill man named Jared Loughner approached a town hall meeting being held in a Tucson Safeway parking lot by congresswoman Gabrielle Giffords and shot her point-blank in the head. He then opened fire on the crowd, killing six people, including a nine-year-old girl, and wounding fourteen others. As the newsmedia scrambled to get accurate reports from the horrific scene, Giffords was declared dead then alive then dead then alive, depending on who you were following. Giffords was in fact alive, and has made a pretty remarkable recovery in the almost-year since. Loughner is currently incarcerated and undergoing psychiatric treatment, after being diagnosed with schizophrenia and deemed unfit to stand trial in May. In a meta media sense, the bad thing to come out of this already terrible story was a round of blame hurling, with people rushing to point at Sarah Palin's infamous target map or Loughner's left seeming (but not really) anti-Bush sentiments. In truth, Loughner is clinically insane and this was not really about politics at all. That many, including us, immediately jumped to that conclusion says some pretty sorry things about the state of our political machine.

ARTICLE CONTINUES AFTER ADVERTISEMENT



NOW ON THEATLANTIC.COM

**How Americans Are Still Reeling from the Great Recession**

READ NOW

SPONSOR CONTENT
Betterment

## A Revolution Begins

Starting at the very end of 2010, pro-democracy protests in Tunisia led to the ousting of that nation's dictatorial president Zine El Abidine Ben Ali on

PLAINTIFF TRIAL EXHIBIT 050

PALIN04487

JA 1684

### A Revolution Begins

Starting at the very end of 2010, pro-democracy protests in Tunisia led to the ousting of that nation's dictatorial president Zine El Abidine Ben Ali on **January 14th.** The Tunisians' struggle and success created a wave of civic protests, both peaceful and violent, that swept across North Africa and into the Middle East, a phenomenon that came to be known as Arab Spring. Rallies began in Cairo, Egypt on January 25th, beginning the Egyptian Revolution that would see the end of Hosni Mubarak's reign and Tahrir Square's elevation to that of a household place name. Later, NATO deployed bombers to aid Libyan revolutionaries, who captured and killed long-reviled big bad Muammar Qaddafi sometime around October 20th. Now, civil unrest continues in Syria (and in Egypt and in Libya and in Yemen, etc.) and the political fate of the region remains uncertain. (As do its economic prospects.) What made January 14th, and many other days of Arab Spring, so landmark, beyond the obvious, is that much of the protesting was organized using 21st century media, particularly social networks like Facebook and Twitter. It would be grandiose and overreaching to say that either one of them personally felled any dictators, but they certainly proved effective rallying tools.



### Charlie's Wild Ride

On Thursday, **February 24th** actor Charlie Sheen did an interview with radio host Alex Jones in which he lashed out at *Two and a Half Men* creator Chuck Lorre, a bizarre and drug-fueled tirade that led to his firing from the show and began a long and strange trip down the tiger blood-soaked rabbit hole that is Charlie Sheen's mind. We all watched in awe as his brand spanking new Twitter account gained what seemed like 10,000 new followers every second on the day he started it, March 1st. The harrowing celebrity supernova experience seemed like it would never end -- there were goddesses and roasts and videos and more addled rantings -- but, as these things go, the whole thing had basically sputtered out by the fall. Now *Two and a Half Men* is back and going strong (ratings-wise, at least) with Ashton Kutcher as the replacement Sheen (whose character died a terrible off-screen death), while Charlie is on quiet damage control, trying to put a new show together and acting contrite in interviews. Phew!

### Catastrophe in Japan

On **March 11th**, a massive earthquake struck off the coast of Japan, triggering a tsunami that reached heights of 130 feet and traveled ten miles inland. The horror of the disaster was compounded when damaged nuclear reactors began failing and the possibility of a major fallout catastrophe loomed. Luckily the reactors were eventually cooled and repaired, by insanely brave workers who walked into radioactive ground zeros, and radiation leakage, while high, did not reach cataclysm-level. Still, some 15,000 people lost their lives in the tsunami and entire towns were wiped off the map. Reaction was immediate and mostly sympathetic, save for those few who made unfortunate Pearl Harbor references or poorly timed jokes on various social media outlets. On the lighter side of the year in earthquakes, a 5.8 magnitude quake struck in

ADVERTISEMENT



# Want to Retire Comfortably?

If you have a $500,000 portfolio, download the guide by *Forbes* columnist Ken Fisher's firm. It's called, **The Definitive Guide to Retirement Income**.

**Click Here** to Download Your Guide!

FISHER INVESTMENTS®

 Home    Share    Tweet

Next story in **Global** ›

PLAINTIFF TRIAL EXHIBIT 050

lives. The aftermath and the response were... the response was immediate and mostly sympathetic, save for those few, unfortunate Pearl Harbor references or poorly timed jokes on various social media outlets. On the lighter side of the year in earthquakes, a 5.8 magnitude quake struck in Virginia on August 23rd, a surreal but ultimately harmless experience that shook (and shocked) East Coasters who thought such a thing impossible. The National Cathedral and Washington Monument were damaged, but really the Great East Coast Earthquake of 2011 mostly existed so people in the BosWash corridor can now say we've felt an earthquake too.

### A Surprising New Star



Also bizarrely on **March 11th**, fittingly a Friday, *Mystery Science Theater 3000* comedian Michael J. Nelson tweeted a link to a music video calling it "the worst video ever made." That video? "Friday," a tuneless yet auto-tuned music video by a young lady named Rebecca Black, the first guinea pig out of the Ark Music Factory, a company that records songs and makes videos for teen wannabes in exchange for cash. For whatever reason, by the time Friday had become Monday, Black's video was a phenomenon. When Ark pulled the video from YouTube (only to repost for maximum monetizing) on June 16th, the video had been watched nearly 170 million times. (That's almost three views for every living soul in the UK, for some perspective.) Did Rebecca Black's insane rise to infamy teach us anything? Maybe something about the power of YouTube, or Twitter, or how fast-spreading the digital conversation can be. But mostly it taught us the days of the week. If yesterday was Thursday, then today is... Friday!

ARTICLE CONTINUES AFTER ADVERTISEMENT



SPONSOR CONTENT *Fidelity*

PREVIEW

If you live in a smart city, the street lights might be texting you before long.

Listen to "When Cities Get Smart"

THE FUTURE ACCORDING TO NOW

A NEW PODCAST

Listen to Episode 6

### A Modern Fairy Tale



It had been thirty long years since the unwashed masses got to witness a grand British royal wedding, so anticipation for the impending nuptials of Prince William to party supply heiress Kate Middleton had reached a fever pitch by the time the shindig went down on **April 29th**. The ceremony, which was mostly boring pomp and circumstance, just about took over the internet -- an instant star was born as Kate's sister Pippa made her international debut, and Princess Beatrice's

Home | Share | Tweet

Next story in **Global** >

---

PLAINTIFF TRIAL EXHIBIT 050

PALIN04489

on **April 29th**. The ceremony, which was mostly boring ~~and full of~~ pomp and circumstance, just about took over the internet. ~~A~~ major was born as Kate's sister Pippa made her international debut, and Princess Beatrice's hat became the most important hat since Aretha Franklin's inauguration chapeau in 2009. There were kisses and horses and a long white train and all that good royal wedding stuff. While many may find the idea of royalty politically and economically silly, as far as entertainment goes, you can do little better. The problem is now our appetite for grand weddings has been whetted, and we really kinda need Harry to get married like right away. To us, preferably. But if not, Pippa will do.

### Mission Actually Accomplished



On the evening of **May 1st**, a Sunday, an announcement went out saying that President Obama would be making some sort of... announcement later in the night, the subject of which was unclear. People on Twitter, Facebook, and all other manner of social media immediately began speculating about the topic -- a death, a war, a pregnancy? -- but the most popular guess was that nearly ten years after the September 11th terrorist attacks that he orchestrated, Al Qaeda head Osama bin Laden had been killed or captured. The conjecture quickly became fact and essentially the entire nation, or at least those that were near a television or computer, watched and waited for the formal announcement. Finally, hours after the initial speculation began, the president delivered a brief-ish speech confirming bin Laden's death and giving the rough details of the Navy SEAL raid in Pakistan that killed him. "Long form death certificate" jokes abounded on Twitter, a strange cheering death cult formed, we were reminded of our own mortality as we realized that many kids don't even know who Osama bin Laden is, and Obama's (don't say Osama's! That was a common misspeak in those first heady days) approval ratings spiked. The mission was probably the most concrete and tangible success of the often dismaying and misguided War on Terror, and it gave many hope that our bad fortunes were reversing. Of course the news ultimately didn't change much of anything -- terrorism still exists, Afghanistan is still a depressing nightmare -- but at least we got the top guy, right?

### Weiner Slip



On **May 27th**, beloved New York congressman Anthony Weiner accidentally tweeted out a picture of a man's crotch, only to quickly delete the post and blame it on some sort of hacking. But, as happens in this internet age, the truth quickly revealed itself: Weiner had been sending pictures of his, well, self to women and one accidentally got made public. One woman he'd sent the image to gave it to conservative blogger Andrew Breitbart and a standoff began. Weiner denied, denied, denied, insisting he was hacked, but on June 6th he held a press conference during which he admitted that he'd been sexting and resigned from office. Two days later, the photo leaked. An embarrassing (though perhaps temporary) end to a promising political career. Weiner wasn't the only congressman felled by technology this year, as the trawlers at Gawker got ahold of and published, on February 9th, a Craigslist sex ad posted by New York representative Christopher Lee, who resigned amid the scandal. And of course actor turned California governor Arnold Schwarzenegger split from his wife this

ADVERTISEMENT



SIEMENS
Ingenuity for life

When you control your own energy, you control your future.

Learn more ›

 Home    Share   Tweet

Next story in **Global** ›

Document title: Ten Days That Defined 2011 - The Atlantic
Capture URL: https://www.theatlantic.com/international/archive/2011/12/ten-days-defined-2011/333741/
Capture timestamp (UTC): Fri, 11 Aug 2017 20:46:39 GMT

PLAINTIFF TRIAL EXHIBIT 050

PALIN04490

JA 1687

of and published, on February 9th, a Craigslist sex ad posted by New York
representative Christopher Lee, who resigned amid the scandal. And of course
actor turned California governor Arnold Schwarzenegger split from his wife this
spring, only to admit on May 17th that he had secretly fathered a child by another
woman. He was safely out of office by then, but it was insanely bad PR for a guy
who was trying to ingratiate himself to American movie audiences again. Tsk tsk,
gentlemen.

ARTICLE CONTINUES AFTER ADVERTISEMENT



## The Rise of the 99%



On **September 17th**, a thousand or so protesters,
spurred on by the Canadian magazine *Adbusters* and
the hacktivist group Anonymous, took to Wall Street to
protest corporate greed, big business's influence in
Washington, and a lot of other stuff. They quickly
settled in nearby Zuccotti Park and were dubbed, or dubbed themselves, Occupy
Wall Street, which was a domain name registered by *Adbusters* back in June.
Similar Occupy protests began to sprout up all over the world as the core Zuccotti
protest grew, with celebrity endorsers and gallons of blog ink behind it. After one
false start, the Zuccotti Park encampment was eventually broken up by police on
November 15th, after nearly two months of drum beating, car pooping, and other
annoyances that unfortunately distracted from the movement's genuinely
important, if perhaps too big to wrangle, message about human lives lived as
pawns of the always dispassionate and indifferent financial sector. It's hard to say
if anything specific was accomplished by the Occupy protests, but there is
certainly at least an acute awareness now of the left's version of the Tea Party. (A
comparison that, yes, *may* be a little specious, but also kind of fits.)

## Death of Invention



On **October 5th**, Steve Jobs, the co-founder, CEO, and
creative visionary (to use a word often used when
discussing him) of innovative tech giant Apple, died
after a long struggle with pancreatic cancer. Jobs, who
had stepped down from his position in August, was a
hero to many in the tech/online community, and thus tributes were myriad in the
days after his death. There were also some harsher analyses of his legacy, but
mostly people just felt sad -- sad like a rockstar or someone of that status had
died. Jobs made computers, yes, but he also expertly sold a particular lifestyle:
Something at once sleek and functional but also whimsical and playful. The
proud owner of a shiny-cool Apple product -- be it computer, phone, or music
device -- was granted, to some, a kind of instant cachet. They bought the more
expensive products because they smoothly functioned like wondrous external
organs. And to some, they helped define personhood and personality. Because
Jobs himself was so personally tied up in this mystique, some feared Apple stock
would suffer in the wake of his death. But the inherent strength of his products
endured and the company has continued on smoothly. Still, it's hard to imagine



How Men Tighten Skin

LATEST VIDEO

A Home   f Share   🐦 Tweet

Next story in **Global** ›

---

PLAINTIFF TRIAL EXHIBIT 050

JA 1688

Jobs himself was so personally tied up in this mystique that the stock would suffer in the wake of his death. But the inherent strength of his products endured and the company has continued on smoothly. Still, it's hard to imagine any other nerd in a turtleneck engendering as much adoration as Jobs, and perhaps rightfully so -- people used his products to Occupy, to watch "Friday," to text the Red Cross for Japan, to organize protests in North Africa, to read the news of Osama bin Laden's death. Job's death marked a year that, in some ways, his accomplishments helped make possible.

*This article is from the archive of our partner The Wire.*

 Share    Tweet    Comments

**How Men Tighten Skin**

LATEST VIDEO



**How Cable News Fails Viewers**
Jon Lovett wonders if political commentary has become theater criticism.

**From The Web**

Ads by Revcontent


**Front Sight Focus is Actually Making You a Whimp Shooter**
Spec Ops Shooting


**Very Few People Can Answer These 10 U.S History Questions**
Topix


**Mainstream Media Refuses to Report Truth? Fake News is an Epidemic**
Casey Research


**Best Defense Against Attacker is Not Pepper Spray**
Safesound Personal Alarm

# Most Popular



### Have Smartphones Destroyed a Generation?

JEAN M. TWENGE

One day last summer, around noon, I called Athena, a 13-year-old who lives in Houston, Texas. She answered her phone—she's had an iPhone since she was 11—sounding as if she'd just woken up. We chatted about her favorite songs and TV shows, and I asked her what she likes to do with her friends. "We go to the mall," she said. "Do your parents drop you off?," I asked, recalling my own middle-school days, in the 1980s, when I'd enjoy a few parent-free hours shopping with my friends. "No—I go with my family," she

[ CONTINUE READING ]



### How America Lost Its Mind

KURT ANDERSEN

When did America become untethered from reality?

I first noticed our national lurch toward fantasy in 2004, after President George W. Bush's political mastermind, Karl Rove, came up with the remarkable phrase *reality-based community*. People in "the reality-based community," he told a reporter, "believe that solutions emerge from your judicious study of discernible reality ... That's not the way the world really works anymore." A year later, *The Colbert*

[ CONTINUE READING ]

Document title: Ten Days That Defined 2011 - The Atlantic
Capture URL: https://www.theatlantic.com/international/archive/2011/12/ten-days-defined-2011/333741/
Capture timestamp (UTC): Fri, 11 Aug 2017 20:46:39 GMT
PLAINTIFF TRIAL EXHIBIT 050
Page 6 of 11

PALIN04492

JA 1689

...'d really works anymore." A year later, *The Colbert*

CONTINUE READING

---



### Is the World Slouching Toward a Grave Systemic Crisis?

PHILIP ZELIKOW

*On August 5, Philip Zelikow delivered the following keynote address at the annual meeting of the Aspen Strategy Group, a discussion forum for experts and government practitioners. Zelikow, who is currently the White Burkett Miller Professor of History at the University of Virginia, has served at all levels of American government, and for administrations of both parties—including roles at the White House, State Department, and Pentagon. He was also the executive director of the 9/11 Commission. In this speech he reflects on the much-discussed*

CONTINUE READING

---



### Why Does Trump Still Refuse to Criticize Putin?

DAVID A. GRAHAM

President Trump is most comfortable when he's on the verbal offensive. He loves a good war of words, whether his target is a foreign adversary, a foreign ally, a Republican rival, or Rosie O'Donnell. According to a *New York Times tally*, Trump has attacked 351 separate people, places, and things on Twitter alone since July 2015.

The president has demonstrated that tendency this week, with his escalating, improvised threats against North Korea

CONTINUE READING

---



### No Country for Colin Kaepernick

VANN R. NEWKIRK II

A year ago, Colin Kaepernick—as an injured San Francisco 49ers backup quarterback during an exhibition game—began his practice of sitting during the pregame rendition of the national anthem. "I am not going to stand up to show pride in a flag for a country that oppresses black people and people of color," he said of his protest. Through the season, even as he regained the starting gig for 11 games, Kaepernick continued his demonstration.

CONTINUE READING

---



### The Average Guy Who Spent 6,003 Hours Trying to Be a Professional Golfer

STEPHEN PHILLIPS

Dan McLaughlin reckons he's sat down to compose the farewell post to the Dan Plan a hundred times. "I just don't know what to write," he says.

Sitting in his spartan home in Portland, Oregon, McLaughlin is self-effacing and soft-spoken. He recently

Document title: Ten Days That Defined 2011 - The Atlantic
Capture URL: https://www.theatlantic.com/international/archive/2011/12/ten-days-defined-2011/333741/
Capture timestamp (UTC): Fri, 11 Aug 2017 20:46:39 GMT

PLAINTIFF TRIAL EXHIBIT 050

PALIN04493

JA 1690



Dan McLaughlin reckons he's sat down to compose the post to the Dan Plan a hundred times. "I just don't know what to write," he says.

Sitting in his spartan home in Portland, Oregon, McLaughlin is self-effacing and soft-spoken. He recently launched an artisanal soft-drink venture. Discussing the Dan Plan is like reaching back into another life: Seven-plus years ago, aged 30 and unsure even of which hand to grip a

CONTINUE READING



## Trump Is 'Locked and Loaded' in a Nuclear Game of Chicken

KRISHNADEV CALAMUR

President Trump this week has gone from saying the U.S. will respond to North Korean threats with "fire and fury like the world has never seen" to clarifying those words were perhaps not "tough enough," and to spelling out Friday, in case there were doubts, that the U.S. military was "locked and loaded" to counter any threat.



Donald J. Trump ✓        Follow

CONTINUE READING



## How to Deal With North Korea

MARK BOWDEN

点击这里阅读中文版本 | Read this article in Chinese.

Thirty minutes. That's about how long it would take a nuclear-tipped intercontinental ballistic missile (ICBM) launched from North Korea to reach Los Angeles. With the powers in Pyongyang working doggedly toward making this possible—building an ICBM and shrinking a nuke to fit on it —analysts now predict that Kim Jong Un will have the

CONTINUE READING



## Emmanuel Macron: Monsieur Unpopular

YASMEEN SERHAN

Emmanuel Macron has said that he wants to govern like the Roman god Jupiter, staying above the fray of everyday government issues. But less than three months into the French president's time in office, his poll numbers are proving just how mortal he is. U.K.-based pollster YouGov reported a seven-point drop in the young leader's approval rating, which fell from 43 to 36 percent over the month of July. French pollster Ifop observed a similar decline over the same period, noting that: "Apart from Jacques Chirac in July

CONTINUE READING



## A Question for Google's CEO

CONOR FRIEDERSDORF

PLAINTIFF TRIAL EXHIBIT 050

PALIN04494

## JA 1691



### A Question for Google's CEO

CONOR FRIEDERSDORF

When CEO Sundar Pichai addressed a controversial memo about diversity that circulated inside Google, culminating in the termination of its author, James Damore, he began by telling the company's 72,053 employees that "we strongly support the right of Googlers to express themselves, and much of what was in that memo is fair to debate, regardless of whether a vast majority of Googlers disagree with it."

"However," he added, "portions of the memo violate our

CONTINUE READING



### 'Holy Shit, We're in a Cult'

JACLYN SKURIE AND NICOLAS POLLOCK

EnlightenNext was an organization that promised spiritual awakening. Instead, it turned into a complicated, often-sinister community.

WATCH VIDEO



### What Does 'Late Capitalism' Really Mean?

LEAH VARJACQUES, ALICE ROTH, AND ANNIE LOWREY

The intellectual meme for a garbage economy

WATCH VIDEO



### Can Single People Be Happy?

KASIA CIEPLAK-MAYR VON BALDEGG, SAM PRICE-WALDMAN, AND GREYSON KORHONEN

We asked experts.

WATCH VIDEO

MORE POPULAR STORIES

0 Comments       The Atlantic                                    1 Login ▾

♡ Recommend      ⇄ Share                               Sort by Best ▾

Document title: Ten Days That Defined 2011 - The Atlantic
Capture URL: https://www.theatlantic.com/international/archive/2011/12/ten-days-defined-2011/333741/
Capture timestamp (UTC): Fri, 11 Aug 2017 20:46:39 GMT
PLAINTIFF TRIAL EXHIBIT 050
Page 9 of 11
PALIN04495

JA 1692



0 Comments    The Atlantic                                    🔵 Login ▾

♡ Recommend      ⤤ Share                              Sort by Best ▾

Start the discussion…

LOG IN WITH          OR SIGN UP WITH DISQUS ⑦

Name

Be the first to comment.

ALSO ON THE ATLANTIC

**No Country for Colin Kaepernick**
264 comments • 4 hours ago
Bill Smith — Lesson here is this: if you are going to be a controversial figure who wants to lecture to the people paying …

**The Democratic Party's Abortion Dilemma**
203 comments • a day ago
viskarenvista — Shocking stupidity on the part of the Democrats, shows they've learned nothing from their stunning …

**Trump Doubles Down on North Korea**
297 comments • a day ago
bigjericho — Oh, shut the hell up. Every day this guy proves that he's unfit to lead and you know it. Stop making excuses …

**Why Does Trump Still Refuse to Criticize Putin?**
307 comments • 4 hours ago
whynotsomethingsomething — That's the beauty of kompromat…Putin's got something on Trump, he owns Trump…

✉ Subscribe     ⊕ Add Disqus to your site     🔒 Privacy                     **DISQUS**



## Subscribe

Get 10 issues a year and save 65% off the cover price.

Name
Address 1            Address 2
City                 State ▾    Zip
United States        Email

**ORDER NOW**

Fraud Alert regarding The Atlantic

## Newsletters

**The Atlantic**                    **CityLab**

☐ *The Atlantic* Daily            ☐ Today's Top Stories
☐ This Week                        ☐ This Week's Most Popular Stories
☐ This Month
☐ New Photo Galleries             ☑ *I want to receive updates from partners and sponsors.*
☐ Top Videos This Week
☐ Politics & Policy Daily          Email

                                   **SIGN UP**

## Follow

f  Facebook          🐦 Twitter
in LinkedIn          📷 Instagram
t  Tumblr            📌 Pinterest
🔴 RSS               App Store

## About

Masthead             Contact Us
FAQ                  Send a News Tip
Press                Privacy Policy
Jobs                 Advertise
Shop                 Advertising Guidelines
Books                Terms and Conditions
Emporium             Responsible Disclosure

Document title: Ten Days That Defined 2011 - The Atlantic
Capture URL: https://www.theatlantic.com/international/archive/2011/12/ten-days-defined-2011/333741/
Capture timestamp (UTC): Fri, 11 Aug 2017 20:46:39 GMT
PLAINTIFF TRIAL EXHIBIT 050

PALIN04496

JA 1693



Start the discussion...

LOG IN WITH

OR SIGN UP WITH DISQUS ?

Name

Be the first to comment.

ALSO ON THE ATLANTIC

**No Country for Colin Kaepernick**
128 comments • 4 hours ago

Bill Smith — Lesson here is this: if you are going to be a controversial figure who wants to lecture to the people paying ...

**Trump Doubles Down on North Korea**
297 comments • 1 day ago

bigjericho — Oh, shut the hell up. Every day this guy proves that he's unfit to lead and you know it. Stop making excuses ...

**The Democratic Party's Abortion Dilemma**
203 comments • 1 day ago

viskarenvisla — Shocking stupidity on the part of the Democrats, shows they've learned nothing from their stunning ...

**Why Does Trump Still Refuse to Criticize Putin?**
307 comments • 4 hours ago

whynotsomethingsomething — That's the beauty of kompromat...Putin's got something on Trump, he owns Trump. ...

Subscribe      Add Disqus to your site      Privacy

DISQUS



## Subscribe

Get 10 issues a year and save 65% off the cover price.

Name
Address 1 | Address 2
City | State | Zip
United States | Email
**ORDER NOW**

Fraud Alert regarding The Atlantic

## Newsletters

*The Atlantic*

☐ *The Atlantic* Daily
☐ This Week
☐ This Month
☐ New Photo Galleries
☐ Top Videos This Week
☐ Politics & Policy Daily

CityLab

☐ Today's Top Stories
☐ This Week's Most Popular Stories
☑ *I want to receive updates from partners and sponsors.*

Email
**SIGN UP**

## Follow

Facebook          Twitter
LinkedIn          Instagram
Tumblr            Pinterest
RSS               App Store

## About

Masthead          Contact Us
FAQ               Send a News Tip
Press             Privacy Policy
Jobs              Advertise
Shop              Advertising Guidelines
Books             Terms and Conditions
Emporium          Responsible Disclosure
Manage Subscription   Site Map

TheAtlantic.com Copyright (c) 2017 by The Atlantic Monthly Group. All Rights Reserved.

Document title: Ten Days That Defined 2011 - The Atlantic
Capture URL: https://www.theatlantic.com/international/archive/2011/12/ten-days-defined-2011/333741/
Capture timestamp (UTC): Fri, 11 Aug 2017 20:46:39 GMT

PLAINTIFF TRIAL EXHIBIT 050

Page 11 of 11

PALIN04497

# JA 1694

Message

| | |
|---|---|
| **From:** | Bennet, James [jamesb@nytimes.com] |
| **on behalf of** | Bennet, James <jamesb@nytimes.com> [jamesb@nytimes.com] |
| **Sent:** | 6/14/2017 12:41:48 PM |
| **To:** | Williamson, Elizabeth [ Williamson, Elizabeth <elizabeth.williamson@nytimes.com>] |
| **CC:** | Robert Semple [Robert Semple <semple@nytimes.com>]; Nicholas Fox [Nicholas Fox <nickfox@nytimes.com>]; Cohn, Linda [ Cohn, Linda <cohn@nytimes.com>] |
| **Subject:** | Re: POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump |

Hey Elizabeth -- As Bob has said there's most likely a gun control point to be made here. The other question is whether there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence.  Hard for me to imagine that Bernie himself is guilty of anything like that. But if there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting) we should deal with that.

On Wed, Jun 14, 2017 at 10:53 AM, Williamson, Elizabeth <elizabeth.williamson@nytimes.com> wrote:
https://www.facebook.com/jthodgkinson?ref=br_rs

https://www.linkedin.com/in/james-hodgkinson-8101a0a4/

https://twitter.com/jthinspections

Elizabeth Williamson
Editorial Board, National Politics
The New York Times
o. 202 862 0382
c: 202 674 2463
https://twitter.com/NYTLiz

PLAINTIFF TRIAL EXHIBIT 119

# JA 1695

Message

| | |
|---|---|
| **From**: | Lett, Phoebe [phoebe.lett@nytimes.com] |
| on behalf of | Lett, Phoebe <phoebe.lett@nytimes.com> [phoebe.lett@nytimes.com] |
| **Sent**: | 6/14/2017 12:54:33 PM |
| **To**: | elizabeth.williamson [ elizabeth.williamson <elizabeth.williamson@nytimes.com>]; Robert Semple [Robert Semple <semple@nytimes.com>]; Linda Cohn [Linda Cohn <cohn@nytimes.com>] |
| **Subject**: | Gun Control past pieces from Bob |

http://www.nytimes.com/2012/01/27/opinion/rep-gabby-giffordss-farewell.html

http://www.nytimes.com/2012/07/24/opinion/6000-bullets-in-colorado.html
https://www.nytimes.com/2016/07/29/opinion/democrats-find-their-voice-on-gun-control.html
http://www.nytimes.com/2013/02/01/opinion/myths-about-gun-regulation.html

--
**Phoebe Lett**
**Editorial Assistant to the Editorial Board**
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

PLAINTIFF TRIAL EXHIBIT 121

# JA 1696

Message

| | |
|---|---|
| **From:** | Lett, Phoebe [phoebe.lett@nytimes.com] |
| **on behalf of** | Lett, Phoebe <phoebe.lett@nytimes.com> [phoebe.lett@nytimes.com] |
| **Sent:** | 6/14/2017 2:21:22 PM |
| **To:** | Williamson, Elizabeth [ Williamson, Elizabeth <elizabeth.williamson@nytimes.com>] |
| **Subject:** | Re: Gun Control past pieces from Bob |

We never ran an editorial on it, frank rich wrote this piece on it but the board never did. James was just wondering if there had ben one, he says.

On Wed, Jun 14, 2017 at 1:40 PM, Williamson, Elizabeth <elizabeth.williamson@nytimes.com> wrote: phoebe thanks. is there one that references hate type speech against dems in the runup to her shooting? James referenced that thanks E.

Elizabeth Williamson
Editorial Board, National Politics
The New York Times
o. 202 862 0382
c. 202 674 2463
https://twitter.com/NYTLiz

On Wed, Jun 14, 2017 at 12:54 PM, Lett, Phoebe <phoebe.lett@nytimes.com> wrote:
http://www.nytimes.com/2012/01/27/opinion/rep-gabby-giffordss-farewell.html

http://www.nytimes.com/2012/07/24/opinion/6000-bullets-in-colorado.html
https://www.nytimes.com/2016/07/29/opinion/democrats-find-their-voice-on-gun-control.html
http://www.nytimes.com/2013/02/01/opinion/myths-about-gun-regulation.html

--
**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

--
**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

PLAINTIFF TRIAL EXHIBIT 124

# JA 1697

Message

| | |
|---|---|
| **From:** | Bennet, James [jamesb@nytimes.com] |
| **on behalf of** | Bennet, James <jamesb@nytimes.com> [jamesb@nytimes.com] |
| **Sent:** | 6/14/2017 2:34:23 PM |
| **To:** | Lett, Phoebe [ Lett, Phoebe <phoebe.lett@nytimes.com>] |
| **Subject:** | Re: Gun Control past pieces from Bob |

Good for us. Can you let Elizabeth know?

On Wed, Jun 14, 2017 at 2:20 PM, Lett, Phoebe <phoebe.lett@nytimes.com> wrote:
No, but Frank Rich did: http://www.nytimes.com/2011/01/16/opinion/16rich.html

On Wed, Jun 14, 2017 at 2:07 PM, Bennet, James <jamesb@nytimes.com> wrote:
No -- I was just wondering if there was such a piece; that is, did we ever write anything connecting to the Giffords shooting to some kind of incitement?

On Wed, Jun 14, 2017 at 1:46 PM, Lett, Phoebe <phoebe.lett@nytimes.com> wrote:
I'm trying to find the piece Elizabeth is referring to here, do you happen to know which one she is talking about?
---------- Forwarded message ----------
From: **Williamson, Elizabeth** <elizabeth.williamson@nytimes.com>
Date: Wed, Jun 14, 2017 at 1:40 PM
Subject: Re: Gun Control past pieces from Bob
To: "Lett, Phoebe" <phoebe.lett@nytimes.com>


phoebe thanks. is there one that references hate type speech against dems in the runup to her shooting? James referenced that thanks E.


Elizabeth Williamson
Editorial Board, National Politics
The New York Times
o: 202 862 0382
c: 202 674 2463
https://twitter.com/NYTLiz


On Wed, Jun 14, 2017 at 12:54 PM, Lett, Phoebe <phoebe.lett@nytimes.com> wrote:
http://www.nytimes.com/2012/01/27/opinion/rep-gabby-giffordss-farewell.html

http://www.nytimes.com/2012/07/24/opinion/6000-bullets-in-colorado.html
https://www.nytimes.com/2016/07/29/opinion/democrats-find-their-voice-on-gun-control.html
http://www.nytimes.com/2013/02/01/opinion/myths-about-gun-regulation.html


--
**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

NYTIMES0001157

# JA 1698

...

**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

--
**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

PLAINTIFF TRIAL EXHIBIT 125

NYTIMES0001158

Message

# JA 1699

| | |
|---|---|
| **From:** | Bennet, James [jamesb@nytimes.com] |
| **on behalf of** | Bennet, James <jamesb@nytimes.com> [jamesb@nytimes.com] |
| **Sent:** | 6/14/2017 2:52:20 PM |
| **To:** | Lett, Phoebe [ Lett, Phoebe <phoebe.lett@nytimes.com>] |
| **Subject:** | Re: Gun Control past pieces from Bob |

Thanks. Can you send me the pieces you sent Elizabeth?

On Wed, Jun 14, 2017 at 2:34 PM, Lett, Phoebe <phoebe.lett@nytimes.com> wrote:
Yes, already did. Thanks for helping!

On Wed, Jun 14, 2017 at 2:34 PM, Bennet, James <jamesb@nytimes.com> wrote:
Good for us. Can you let Elizabeth know?

On Wed, Jun 14, 2017 at 2:20 PM, Lett, Phoebe <phoebe.lett@nytimes.com> wrote:
No, but Frank Rich did: http://www.nytimes.com/2011/01/16/opinion/16rich.html

On Wed, Jun 14, 2017 at 2:07 PM, Bennet, James <jamesb@nytimes.com> wrote:
No -- I was just wondering if there was such a piece; that is, did we ever write anything connecting to the Giffords shooting to some kind of incitement?

On Wed, Jun 14, 2017 at 1:46 PM, Lett, Phoebe <phoebe.lett@nytimes.com> wrote:
I'm trying to find the piece Elizabeth is referring to here, do you happen to know which one she is talking about?
---------- Forwarded message ----------
From: **Williamson, Elizabeth** <elizabeth.williamson@nytimes.com>
Date: Wed, Jun 14, 2017 at 1:40 PM
Subject: Re: Gun Control past pieces from Bob
To: "Lett, Phoebe" <phoebe.lett@nytimes.com>


phoebe thanks. is there one that references hate type speech against dems in the runup to her shooting? James referenced that thanks E.


Elizabeth Williamson
Editorial Board, National Politics

o. 202 862 0382
c: 202 674 2463
https://twitter.com/NYTLiz


On Wed, Jun 14, 2017 at 12:54 PM, Lett, Phoebe <phoebe.lett@nytimes.com> wrote:
http://www.nytimes.com/2012/01/27/opinion/rep-gabby-giffordss-farewell.html

http://www.nytimes.com/2012/07/24/opinion/6000-bullets-in-colorado.html
https://www.nytimes.com/2016/07/29/opinion/democrats-find-their-voice-on-gun-control.html
http://www.nytimes.com/2013/02/01/opinion/myths-about-gun-regulation.html

--
**Phoebe Lett**

PLAINTIFF TRIAL EXHIBIT 126

# JA 1700

Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

~~

**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

--

**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

--

**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

PLAINTIFF TRIAL EXHIBIT 126

# JA 1701

Message

| | |
|---|---|
| **From:** | Lett, Phoebe [phoebe.lett@nytimes.com] |
| on behalf of | Lett, Phoebe <phoebe.lett@nytimes.com> [phoebe.lett@nytimes.com] |
| **Sent:** | 6/14/2017 2:52:39 PM |
| **To:** | James Bennet [James Bennet <jamesb@nytimes.com>] |
| **Subject:** | Fwd: Gun Control past pieces from Bob |

---------- Forwarded message ----------
From: **Lett, Phoebe** <phoebe.lett@nytimes.com>
Date: Wed, Jun 14, 2017 at 12:54 PM
Subject: Gun Control past pieces from Bob
To: "elizabeth.williamson" <elizabeth.williamson@nytimes.com>, Robert Semple <semple@nytimes.com>, Linda Cohn <cohn@nytimes.com>

http://www.nytimes.com/2012/01/27/opinion/rep-gabby-giffordss-farewell.html

http://www.nytimes.com/2012/07/24/opinion/6000-bullets-in-colorado.html
https://www.nytimes.com/2016/07/29/opinion/democrats-find-their-voice-on-gun-control.html
http://www.nytimes.com/2013/02/01/opinion/myths-about-gun-regulation.html

~~
**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

--
**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

PLAINTIFF TRIAL EXHIBIT 127

NYTIMES0001161

# JA 1702

Message
_____

**From:** Bennet, James [jamesb@nytimes.com]
**on behalf of** Bennet, James <jamesb@nytimes.com> [jamesb@nytimes.com]
**Sent:** 6/14/2017 3:03:46 PM
**To:** Elizabeth Williamson [Elizabeth Williamson <elizabeth.williamson@nytimes.com>]
**Subject:** Fwd: Gun Control past pieces from Bob

_____

We dug a little further. Take a look at these two.
---------- Forwarded message ----------
From: **Lett, Phoebe** <phoebe.lett@nytimes.com>
Date: Wed, Jun 14, 2017 at 3:01 PM
Subject: Re: Gun Control past pieces from Bob
To: James Bennet <jamesb@nytimes.com>


http://www.nytimes.com/2011/01/10/opinion/10mon1.html

http://www.nytimes.com/2011/01/13/opinion/13thu1.html

On Wed, Jun 14, 2017 at 2:52 PM, Lett, Phoebe <phoebe.lett@nytimes.com> wrote:

---------- Forwarded message ----------
From: **Lett, Phoebe** <phoebe.lett@nytimes.com>
Date: Wed, Jun 14, 2017 at 12:54 PM
Subject: Gun Control past pieces from Bob
To: "elizabeth.williamson" <elizabeth.williamson@nytimes.com>, Robert Semple <semple@nytimes.com>,
Linda Cohn <cohn@nytimes.com>


http://www.nytimes.com/2012/01/27/opinion/rep-gabby-giffordss-farewell.html

http://www.nytimes.com/2012/07/24/opinion/6000-bullets-in-colorado.html
https://www.nytimes.com/2016/07/29/opinion/democrats-find-their-voice-on-gun-control.html
http://www.nytimes.com/2013/02/01/opinion/myths-about-gun-regulation.html

--
**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com


--
**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com


--
**Phoebe Lett**

PLAINTIFF TRIAL EXHIBIT 128

**JA 1703**

Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

PLAINTIFF TRIAL EXHIBIT 128

NYTIMES0001165

The New York Times

The Opinion Pages  |  OP-ED COLUMNIST

# No One Listened to Gabrielle Giffords

By FRANK RICH    JAN. 15, 2011

OF the many truths in President Obama's powerful Tucson speech, none was more indisputable than his statement that no one can know what is in a killer's mind. So why have we spent so much time debating exactly that?

The answer is classic American denial. It was easier to endlessly parse Jared Lee Loughner's lunatic library — did he favor "The Communist Manifesto" or Ayn Rand? — than confront the larger and harsher snapshot of our current landscape that emerged after his massacre. A week on, that denial is becoming even more entrenched. As soon as the president left the podium Wednesday night, we started shifting into our familiar spin-dry post-tragedy cycle of the modern era — speedy "closure," followed by a return to business as usual, followed by national amnesia.

If we learn nothing from this tragedy, we are back where we started. And where we started was with two years of accelerating political violence — actual violence, not to be confused with violent language — that struck fear into many, not the least of whom was Gabrielle Giffords.

For the sake of this discussion, let's stipulate that Loughner was a "lone nutjob" who had never listened to Glenn Beck or been a card-carrying member of either the Tea or Communist parties. Let's also face another tragedy: The only two civic reforms that might have actually stopped him — tighter gun control and an effective mental

# JA 1705

health safety net — won't materialize even now.

Gun and ammunition sales spiked last week, especially for the specific varieties given the Loughner imprimatur. No editorial — or bloodbath — will move Congress to enact serious gun control (which Giffords herself never advocated and Obama has rarely pushed since 2008). Enhanced mental health coverage is also a nonstarter when the highest G.O.P. priority is to repeal the federal expansion of health care. In Arizona, cutbacks are already so severe that terminally ill patients are being denied life-saving organ transplants.

The other inescapable reality was articulated by Sarah Palin, believe it or not, in her "blood libel" video. Speaking of acrimonious partisan debate, she asked, "When was it less heated — back in those calm days when political figures literally settled their differences with dueling pistols?" She's right. Calls for civility will have no more lasting impact on the "tone" of American discourse now than they did after the J.F.K. assassination or Oklahoma City. Especially not in an era when technology allows all 300 million Americans a cost-free megaphone for unmediated rants.

Did Loughner see Palin's own most notorious contribution to the rancorous tone — her March 2010 Web graphic targeting Congressional districts? We have no idea — nor does it matter. But Giffords did. Her reaction to it — captured in an interview she did back then with Chuck Todd of MSNBC — was the most recycled, if least understood, video of last week.

The week of that interview began with the House passing the health care bill on Sunday. Within hours, on Monday morning, vandals smashed the front door of Giffords's office in Tucson. The Palin "target" map (and the accompanying Twitter dictum to "RELOAD") went up on Tuesday, just one day after that vandalism — timing that was at best tone-deaf and at worst nastily provocative. Not just Giffords, but at least three other of the 20 members of Congress on the Palin map were also hit with vandalism or death threats.

In her MSNBC interview that Wednesday, Giffords said that Palin had put the "crosshairs of a gun sight over our district," adding that "when people do that, they've got to realize there's consequences to that action." Chuck Todd then asked Giffords if "in fairness, campaign rhetoric and war rhetoric have been

PLAINTIFF TRIAL EXHIBIT 133

## JA 1706

interchangeable for years." She responded that colleagues who had been in the House "20, 30 years" had never seen vitriol this bad. But Todd moved on, and so did the Beltway. What's the big deal about a little broken glass? Few wanted to see what Giffords saw — that the vandalism and death threats were the latest consequences of a tide of ugly insurrectionism that had been rising since the final weeks of the 2008 campaign and that had threatened to turn violent from the start.

Giffords's first brush with that reality had occurred some seven months before her office was vandalized — in the red-hot health care fever of August 2009. She had held another "Congress on Your Corner" meeting, at a Safeway in the town of Douglas. There the crowd's rage and the dropping of a gun by one attendee prompted aides worried about her safety to summon the police. The Tucson Tea Party co-founder, Trent Humphries, told The Arizona Daily Star afterward that this was a lie, that "nobody was threatening Gabby." After Loughner's massacre, Humphries was still faulting her — this time for holding "an event in full view of the public with no security whatsoever."

Others on the right spent last week loudly protesting the politicization of tragedy. What was most revealing was how often they tried to rewrite the history of previous incidents having nothing to do with Loughner. A Palin aide claimed that her target map was only invoking a "surveyor's symbol," not gun sights. A Tucson Tea Party leader announced that the attack on Giffords's office (never solved by the police) was probably caused by skateboarding kids. Mike Pence, a potential G.O.P. "values" candidate for president, told the C-Span audience that those bearing firearms at Congressional town hall meetings and Obama events (including one in Arizona that August of 2009) were no different from anti-Bush demonstrators "waving placards."

For macabre absurdity, it would seem hard to top Newt Gingrich, who wailed about leftists linking Loughner to the right as if he had not famously blamed a psychotic double-murder of 1994, Susan Smith's drowning of her two sons in South Carolina, on "Lyndon Johnson's Great Society." But Representative Trent Franks, Republican of Arizona, did top Newt. On "Meet the Press" last Sunday he implored us to "treat each other as fellow children of God" without acknowledging (or being questioned about) his 2009 diatribe branding Obama as "an enemy of humanity."

PLAINTIFF TRIAL EXHIBIT 133

**JA 1707**

As the president said in Tucson, we lack not just civil discourse, but honest discourse. Much of last week's televised bloviation was dishonest, dedicated to the pious, feel-good sentiment that both sides are equally culpable for the rage of the past two years. To construct this false equivalency, every left-leaning Web site and Democratic politician's record was dutifully culled for incendiary invective. If that's the standard, then both sides are equally at fault — rhetoric can indeed be as violent on the left as on the right.

But that sidesteps the issue. This isn't about angry blog posts or verbal fisticuffs. Since Obama's ascension, we've seen repeated incidents of political violence. Just a short list would include the 2009 killing of three Pittsburgh police officers by a neo-Nazi Obama-hater; last year's murder-suicide kamikaze attack on an I.R.S. office in Austin, Tex.; and the California police shootout with an assailant plotting to attack an obscure liberal foundation obsessively vilified by Beck.

Obama said, correctly, on Wednesday that "a simple lack of civility" didn't cause the Tucson tragedy. It didn't cause these other incidents either. What did inform the earlier violence — including the vandalism at Giffords's office — was an antigovernment radicalism as rabid on the right now as it was on the left in the late 1960s. That Loughner was likely insane, with no coherent ideological agenda, does not mean that a climate of antigovernment hysteria has no effect on him or other crazed loners out there. Nor does Loughner's insanity mitigate the surge in unhinged political zealots acting out over the last two years. That's why so many — on both the finger-pointing left and the hyper-defensive right — automatically assumed he must be another of them.

Have politicians stoked the pre-Loughner violence by advocating that citizens pursue "Second Amendment remedies" or be "armed and dangerous"? We don't know. What's more disturbing is what Republican and conservative leaders have *not* said. Their continuing silence during two years of simmering violence has been chilling.

A few unexpected voices have expressed alarm. After an antigovernment gunman struck at Washington's Holocaust museum in June 2009, Shepard Smith of Fox News noted the rising vitriol in his e-mail traffic and warned on air that more

PLAINTIFF TRIAL EXHIBIT 133

**JA 1708**

"amped up" Americans could be "getting the gun out." The former Bush administration speechwriter David Frum took on the "reckless right" that August, citing the incident at the Giffords Safeway event. But when a Department of Homeland Security report warned of far-right extremism and attacks by "lone wolves" that same summer, Gingrich called it a smear and John Boehner demanded an apology.

Last week a conservative presidential candidate, Tim Pawlenty, timidly said it wouldn't be his "style" to use Palin's target map, but was savaged so viciously by his own camp that he immediately retreated. A senior Republican senator told Politico that he saw the Tucson bloodbath as a "cautionary tale" for his party, yet refused to be named.

What are they and their peers so afraid of? No doubt that someone might reload — the same fears that prompted Gabrielle Giffords to speak up, calmly but firmly, last March. Unless and until they can match her courage and speak out too, it's hard to see what will change.

A version of this op-ed appears in print on January 16, 2011, on Page WK10 of the New York edition with the headline: No One Listened to Gabrielle Giffords.

© 2017 The New York Times Company

**The New York Times**

The Opinion Pages | EDITORIAL

# Bloodshed and Invective in Arizona

JAN. 9, 2011

She read the First Amendment on the House floor — including the guarantee of "the right of the people peaceably to assemble" — and then flew home to Arizona to put those words into practice. But when Gabrielle Giffords tried to meet with her constituents in a Tucson parking lot on Saturday, she came face to face with an environment wholly at odds with that constitutional ideal, and she nearly paid for it with her life.

Jared Loughner, the man accused of shooting Ms. Giffords, killing a federal judge and five other people, and wounding 13 others, appears to be mentally ill. His paranoid Internet ravings about government mind control place him well beyond usual ideological categories.

But he is very much a part of a widespread squall of fear, anger and intolerance that has produced violent threats against scores of politicians and infected the political mainstream with violent imagery. With easy and legal access to semiautomatic weapons like the one used in the parking lot, those already teetering on the edge of sanity can turn a threat into a nightmare.

Last spring, Capitol security officials said threats against members of Congress had tripled over the previous year, almost all from opponents of health care reform. An effigy of Representative Frank Kratovil Jr., a Maryland Democrat, was hung from

a gallows outside his district office. Ms. Gifford's district office door was smashed after the health vote, possibly by a bullet.

The federal judge who was killed, John Roll, had received hundreds of menacing phone calls and death threats, especially after he allowed a case to proceed against a rancher accused of assaulting 16 Mexicans as they tried to cross his land. This rage, stirred by talk-radio hosts, required marshals to give the judge and his family 24-hour protection for a month. Around the nation, threats to federal judges have soared for a decade.

It is facile and mistaken to attribute this particular madman's act directly to Republicans or Tea Party members. But it is legitimate to hold Republicans and particularly their most virulent supporters in the media responsible for the gale of anger that has produced the vast majority of these threats, setting the nation on edge. Many on the right have exploited the arguments of division, reaping political power by demonizing immigrants, or welfare recipients, or bureaucrats. They seem to have persuaded many Americans that the government is not just misguided, but the enemy of the people.

That whirlwind has touched down most forcefully in Arizona, which Pima County Sheriff Clarence Dupnik described after the shooting as the capital of "the anger, the hatred and the bigotry that goes on in this country." Anti-immigrant sentiment in the state, firmly opposed by Ms. Giffords, has reached the point where Latino studies programs that advocate ethnic solidarity have actually been made illegal.

Its gun laws are among the most lenient, allowing even a disturbed man like Mr. Loughner to buy a pistol and carry it concealed without a special permit. That was before the Tucson rampage. Now, having seen first hand the horror of political violence, Arizona should lead the nation in quieting the voices of intolerance, demanding an end to the temptations of bloodshed, and imposing sensible controls on its instruments.

A version of this editorial appears in print on January 10, 2011, on Page A20 of the New York edition with the headline: Bloodshed and Invective in Arizona.

PLAINTIFF TRIAL EXHIBIT 134

© 2017 The New York Times Company

**The New York Times**

The Opinion Pages | EDITORIAL

# As We Mourn

JAN. 12, 2011

It is a president's responsibility to salve a national wound. President Obama did that on Wednesday evening at the memorial service in Tucson for the six people who died in last weekend's terrible shooting. It was one of his most powerful and uplifting speeches.

Mr. Obama called on ideological campaigners to stop vilifying their opponents. The only way to move forward after such a tragedy, he said, is to cast aside "point-scoring and pettiness." He rightly focused primarily on the lives of those who died and the heroism of those who tried to stop the shooter and save the victims. He urged prayers for the 14 wounded, including Representative Gabrielle Giffords, the target of the rampage. Their stories needed to be told, their lives celebrated and mourned.

It was important that Mr. Obama transcend the debate about whose partisanship has been excessive and whose words have sown the most division and dread. This page and many others have identified those voices and called on them to stop demonizing their political opponents. The president's role in Tucson was to comfort and honor, and instill hope.

This horrific event, he said, should be a turning point for everyone — "not because a simple lack of civility caused this tragedy – it did not – but rather because

only a more civil and honest public discourse can help us face up to our challenges as a nation."

He also said that after a senseless tragedy it is natural to try to impose some meaning. Wisely, he did not try. But he was right to warn that any proposals to reduce this kind of bloodshed will remain out of reach if political discourse remains deeply polarized. Two of those essential proposals, we believe, are gun safety laws and improvement to the mental health system, and it was heartening to hear the president bring them up.

Mr. Obama noted that several of Saturday's victims were struck down as they performed public service. Ms. Giffords was engaging in the most fundamental act of a representative: meeting with her constituents to hear their concerns. Gabriel Zimmerman, her murdered aide, had set up the "Congress on Your Corner" event. John Roll, the murdered federal judge who lived nearby, came into the line of fire while thanking Ms. Giffords for helping to ease his court's crowded legal calendar.

Many of the other victims were performing one of citizenship's most basic duties: listening to and questioning one of their political representatives. Christina Taylor Green, the 9-year-old student council president who was killed, was brought there by a neighbor because of her interest in politics.

The president's words were an important contrast to the ugliness that continues to swirl in some parts of the country. The accusation by Sarah Palin that "journalists and pundits" had committed a "blood libel" when they raised questions about overheated rhetoric was especially disturbing, given the grave meaning of that phrase in the history of the Jewish people.

Earlier in the day, the speaker of the House, John Boehner, and the minority leader, Nancy Pelosi, issued their own, very welcome, calls to rise above partisanship. It is in that arena where Wednesday's high-minded pledges will be tested most.

Mr. Obama said that it must be possible for Americans to question each other's ideas without questioning their love of country. We hope all of America's leaders, and all Americans, will take that to heart.

A version of this editorial appears in print on January 13, 2011, on Page A28 of the New York edition with

PLAINTIFF TRIAL EXHIBIT 135

**JA 1714**

the headline: As We Mourn.

---

© 2017 The New York Times Company

# JA 1715

Message

| | |
|---|---|
| **From:** | Semple, Robert [semple@nytimes.com] |
| on behalf of | Semple, Robert <semple@nytimes.com> [semple@nytimes.com] |
| **Sent:** | 6/14/2017 3:16:14 PM |
| **To:** | Bennet, James [ Bennet, James <jamesb@nytimes.com>]; Williamson, Elizabeth [ Williamson, Elizabeth <elizabeth.williamson@nytimes.com>] |
| **CC:** | Fox, Nick [ Fox, Nick <nickfox@nytimes.com>]; Cohn, Linda [ Cohn, Linda <cohn@nytimes.com>] |
| **Subject:** | Re: Gun Control past pieces from Bob |

just right. the obama "as we mourn" in particular.

On Wed, Jun 14, 2017 at 3:05 PM, Bennet, James <jamesb@nytimes.com> wrote:
FYI -- these two are more relevant precedent for tonight's piece. Elizabeth has them, too.

---------- Forwarded message ----------
From: **Lett, Phoebe** <phoebe.lett@nytimes.com>
Date: Wed, Jun 14, 2017 at 3:01 PM
Subject: Re: Gun Control past pieces from Bob
To: James Bennet <jamesb@nytimes.com>


http://www.nytimes.com/2011/01/10/opinion/10mon1.html

http://www.nytimes.com/2011/01/13/opinion/13thu1.html

On Wed, Jun 14, 2017 at 2:52 PM, Lett, Phoebe <phoebe.lett@nytimes.com> wrote:

---------- Forwarded message ----------
From: **Lett, Phoebe** <phoebe.lett@nytimes.com>
Date: Wed, Jun 14, 2017 at 12:54 PM
Subject: Gun Control past pieces from Bob
To: "elizabeth.williamson" <elizabeth.williamson@nytimes.com>, Robert Semple <semple@nytimes.com>, Linda Cohn <cohn@nytimes.com>


http://www.nytimes.com/2012/01/27/opinion/rep-gabby-giffordss-farewell.html

http://www.nytimes.com/2012/07/24/opinion/6000-bullets-in-colorado.html
https://www.nytimes.com/2016/07/29/opinion/democrats-find-their-voice-on-gun-control.html
http://www.nytimes.com/2013/02/01/opinion/myths-about-gun-regulation.html

----
**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

----
**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

PLAINTIFF TRIAL EXHIBIT 136

""

**Phoebe Lett**
Editorial Assistant to the Editorial Board
The New York Times | 620 8th Ave | New York, NY 10018
T: 212-556-4580 | E: phoebe.lett@nytimes.com

PLAINTIFF TRIAL EXHIBIT 136

# JA 1717

Message

| | |
|---|---|
| **From:** | Ross Douthat [douthat@gmail.com] |
| **on behalf of** | Ross Douthat <douthat@gmail.com> [douthat@gmail.com] |
| **Sent:** | 6/15/2017 7:44:53 AM |
| **To:** | James Bennet [James Bennet <jamesb@nytimes.com>] |
| **Subject:** | Re: NYTimes: The Trumpiest Roman of Them All |

And fwiw it's not only the right that's reading the editorial this way ...

https://twitter.com/jonathanchait/status/875316078037127169
https://twitter.com/chrislhayes/status/875188757489647616

On Thu, Jun 15, 2017 at 7:34 AM, Ross Douthat <douthat@gmail.com> wrote:
The targets were used by Palin, or her group, in a map of seats targeted for pickup in the midterms. You can argue about whether that crosses a line (Democrats had used bullseyes on a map of Rs who voted against the stimulus, and so on down the rabbit hole), and God knows Glenn Beck et. al. were being crazy at the time ... but the point is that the map had no link, none at all, to Giffords' actual murder. People assumed a link initially -- there was a Paul K. column that was particularly vivid in blaming Republicans -- but the investigation debunked it. I think Loughner was instigated by a non-answer she'd given him at a town hall about one of his theories of grammar, or his obsession with lucid dreaming, or something. His act had nothing to do with the political climate, so far as anyone can tell. Whereas the Alexandria shooter seems to have had an explicit political motivation. So saying that Giffords was a case of incitement and this one isn't reads like we're downplaying that motive, while strongly implying that Loughner had right-wing motivations that he simply didn't have.

Anyway. Thanks for listening.
R

On Wed, Jun 14, 2017 at 11:09 PM, James Bennet <jamesb@nytimes.com> wrote:
Hey -- Thanks, and I'll look into this tomorrow. But my understanding was that in the Giffords case there was a gun sight superimposed over her district; so far in this case we don't know of any direct threat against any of the congressmen on the field. That's not to say any of it is ok, obviously, or that the violence in either case was caused by the poltical rhetoric. But the incitement in this case seems, so far, to be less specific.

On Wed, Jun 14, 2017 at 10:35 PM Ross Douthat <douthat@gmail.com> wrote:
You're very kind, especially since I felt that the column's flippancy about assassination was somewhat ill-timed for the day we just had.

On that note, I feel I would be remiss if I didn't express my bafflement at the editorial that we just ran on today's shootings and political violence. There was not, and continues to be so far as I can tell, no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else, given his extreme mental illness and lack of any tangible connection to that crosshair map, the Tea Party or other right-wing cause. Whereas the shooter today, as our editorial concedes, seems to have had a clear partisan, anti-Trump purpose. That doesn't mean that liberals or "The Resistance" were in any way responsible for this horror; I don't buy those kind of arguments at all, in either case. But our editorial seems to essentially reverse the fact pattern as I understand it, making it sound like *Loughner* had the clearer connection to partisan rhetoric, when to the best of my knowledge he had none. I don't understand that claim at all, and I don't understand why we're making it.

I don't normally raise issues with our editorials (I expect to disagree with them, after all!), but I felt I should express my confusion in this case.

yrs,

PLAINTIFF TRIAL EXHIBIT 171

NYTIMES0001716

**JA 1718**

R

On Wed, Jun 14, 2017 at 8:31 PM, James Bennet <jamesb@nytimes.com> wrote:
What a great (and chilling) column. Such a smart way to deal with the Julius Caesar kerruffle. Congrats.

NYTimes: The Trumpiest Roman of Them All

https://www.nytimes.com/2017/06/14/opinion/the-trumpiest-roman-of-them-all.html?smprod=nytcore-iphone&smid=nytcore-iphone-share

**JA 1719**



Search Twitter



**Jonathan Chait** ✓
@jonathanchait

I wrote this at the time. Jared Lughner was not a right-winger. At all. NYT editorial is perpetuating a myth.


newrepublic.com/article/81168/...

> 🔵 **Jim Geraghty** ✓ @jimgeraghty · Jun 15, 2017
> Tucson shooter was a paranoid schizophrenic who believed grammar was a conspiracy. NY Times is completely wrong. nyti.ms/2s4yzKH
>
> Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.
>
> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold

11:36 AM · Jun 15, 2017 · TweetDeck

**285** Retweets   **392** Likes

Document title: Jonathan Chait on Twitter: &quot;I wrote this at the time. Jared Lughner was not a right-winger. At all. NYT editorial is perpetuating a myth. https
Capture URL: https://twitter.com/jonathanchait/status/875316078037127169
Capture timestamp (UTC): Fri, 08 May 2020 12:12:33 GMT
PLAINTIFF TRIAL EXHIBIT 172



Document title: Chris Hayes on Twitter: &quot;@DavidAFrench @MattMackowiak Let me chime here to say: yeah, that&#39;s nuts.&quot; / Twitter
Capture URL: https://twitter.com/chrislhayes/status/875188757489647616
Capture timestamp (UTC): Fri, 08 May 2020 12:14:52 GMT    PLAINTIFF TRIAL EXHIBIT 173

# JA 1721

Message

| | |
|---|---|
| **From:** | James Bennet [jamesb@nytimes.com] |
| on behalf of | James Bennet <jamesb@nytimes.com> [jamesb@nytimes.com] |
| **Sent:** | 6/15/2017 7:56:42 AM |
| **To:** | Ross Douthat [Ross Douthat <douthat@gmail.com>] |
| **Subject:** | Re: NYTimes: The Trumpiest Roman of Them All |

OK, thanks. I'll get to the bottom of this this morning. I do feel lousy about it regardless. We were trying to make the point that that we should of course take incitement seriously and instead -- I see your point -- it reads as partisan score-keeping.

On Thu, Jun 15, 2017 at 7:34 AM Ross Douthat <douthat@gmail.com> wrote:
> The targets were used by Palin, or her group, in a map of seats targeted for pickup in the midterms. You can argue about whether that crosses a line (Democrats had used bullseyes on a map of Rs who voted against the stimulus, and so on down the rabbit hole), and God knows Glenn Beck et. al. were being crazy at the time ... but the point is that the map had no link, none at all, to Giffords' actual murder. People assumed a link initially -- there was a Paul K. column that was particularly vivid in blaming Republicans -- but the investigation debunked it. I think Loughner was instigated by a non-answer she'd given him at a town hall about one of his theories of grammar, or his obsession with lucid dreaming, or something. His act had nothing to do with the political climate, so far as anyone can tell. Whereas the Alexandria shooter seems to have had an explicit political motivation. So saying that Giffords was a case of incitement and this one isn't reads like we're downplaying that motive, while strongly implying that Loughner had right-wing motivations that he simply didn't have.
>
> Anyway. Thanks for listening.
> R

> On Wed, Jun 14, 2017 at 11:09 PM, James Bennet <jamesb@nytimes.com> wrote:
> Hey -- Thanks, and I'll look into this tomorrow. But my understanding was that in the Giffords case there was a gun sight superimposed over her district; so far in this case we don't know of any direct threat against any of the congressmen on the field. That's not to say any of it is ok, obviously, or that the violence in either case was caused by the poltical rhetoric. But the incitement in this case seems, so far, to be less specific.

> On Wed, Jun 14, 2017 at 10:35 PM Ross Douthat <douthat@gmail.com> wrote:
> You're very kind, especially since I felt that the column's flippancy about assassination was somewhat ill-timed for the day we just had.
>
> On that note, I feel I would be remiss if I didn't express my bafflement at the editorial that we just ran on today's shootings and political violence. There was not, and continues to be so far as I can tell, no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else, given his extreme mental illness and lack of any tangible connection to that crosshair map, the Tea Party or other right-wing cause. Whereas the shooter today, as our editorial concedes, seems to have had a clear partisan, anti-Trump purpose. That doesn't mean that liberals or "The Resistance" were in any way responsible for this horror; I don't buy those kind of arguments at all, in either case. But our editorial seems to essentially reverse the fact pattern as I understand it, making it sound like *Loughner* had the clearer connection to partisan rhetoric, when to the best of my knowledge he had none. I don't understand that claim at all, and I don't understand why we're making it.
>
> I don't normally raise issues with our editorials (I expect to disagree with them, after all!), but I felt I should express my confusion in this case.
>
> yrs,

PLAINTIFF TRIAL EXHIBIT 174

NYTIMES0001736

# JA 1722

R

On Wed, Jun 14, 2017 at 8:31 PM, James Bennet <jamesb@nytimes.com> wrote:
What a great (and chilling) column. Such a smart way to deal with the Julius Caesar kerruffle. Congrats.

NYTimes: The Trumpiest Roman of Them All

https://www.nytimes.com/2017/06/14/opinion/the-trumpiest-roman-of-them-all.html?smprod=nytcore-iphone&smid=nytcore-iphone-share

PLAINTIFF TRIAL EXHIBIT 174

# JA 1723

Message

| | |
|---|---|
| **From:** | Lepping, Eileen [eileen.lepping@nytimes.com] |
| on behalf of | Lepping, Eileen <eileen.lepping@nytimes.com> [eileen.lepping@nytimes.com] |
| **Sent:** | 6/15/2017 8:19:23 AM |
| **To:** | elizabeth.williamson@nytimes.com [ elizabeth.williamson@nytimes.com <elizabeth.williamson@nytimes.com>] |
| **CC:** | James Bennet [James Bennet <jamesb@nytimes.com>] |
| **Subject:** | Re: Giffords |

Sure. I'll be in the office shortly.

On Thursday, June 15, 2017, <elizabeth.williamson@nytimes.com> wrote:
Shall do. Will start reading now; Eileen let me know when you're ready. E.

Elizabeth Williamson
Editorial Board, National Politics

o: 202 862 0382
c: 202 674 2463
https://twitter.com/NYTLiz

On Jun 15, 2017, at 5:08 AM, James Bennet <jamesb@nytimes.com> wrote:

> Hey guys -- We're taking a lot of criticism for saying that the attack on Giffords was in any way connected to incitement. The claim is that this was fully investigated and debunked in the months after the attack, and the shooter was found to have acted only because of his personal demons. I don't know what the truth is here but we may have relied too heavily on our early editorials and other early coverage of that attack. If so, I'm very sorry for my own failure on this yesterday. In any case I'd like to get to the bottom of this as quickly as possible this morning and correct the piece if needed. Can you two please put your heads together on this first thing this morning? Please skip the morning meeting if necessary. JB

--
Eileen Lepping
The New York Times
Editorial Department
212-556-1398
eileen.lepping@nytimes.com

PLAINTIFF TRIAL EXHIBIT 191

NYTIMES0001803

JA 1724

**Muckety**

Mapping connections of the rich, famous & influential

Enter the name of a person or organization   [Search]

Search Help | Advanced Search

Monday, August 14, 2017

HOME | FAMILIES | FAVES | POLITICS | BIZ | SHOW BIZ | NONPROFITS | THINK TANKS | TOP 1% | MUCKETY THIS | NEW | SEARCH | HELP

## The well-connected Bennet family

By Laurie Bennett
April 14, 2016 at 11:50am

When the New York Times announced last month that James Bennet would become the new editorial page editor, it noted that the departing editor, Andrew M. Rosenthal, was the son of the legendary A.M. Rosenthal, editor of the newspaper.



View large map | View static map | Embed this map | License Muckety technology

The story failed to mention Bennet's powerful connections. His brother, Michael F. Bennet, is a U.S. senator from Colorado and was national co-chair of President Obama's re-election campaign.

His father, Douglas J. Bennet Jr., was president of Wesleyan University and NPR, and served as an assistant secretary of state.

James Bennet, who previously was the Times's Jerusalem bureau chief and White House correspondent, most recently served as president and editor of the Atlantic.

Tweet This!   Share on Facebook

**Click here to sign up for the Muckety Newsletter**

Email this | Digg This! | Share on Facebook

**THIS IS NOT** A TYPICAL DATING SITE
Just send a message and start dating
• NO FAKE PROFILES
• NO CREDIT CARD REQUIRED
• GIRL WILL MAKE FIRST MOVE
JOIN FREE
Victoria Hearts

Google Custom Search   [Search]

**Related stories on Muckety**

Michael Bennet has two years to prove himself to CO voters – January 7, 2009
Kaiser and Rosenthal know the ropes – November 9, 2007
Huntsman named chairman of Atlantic Council – January 17, 2014
The ultra-connected economist – March 14, 2014
Bono to write op-ed columns for New York Times – October 23, 2008
The rapid rise of well-connected offspring – August 15, 2013
Obama administration is a family affair – May 11, 2009
The press secretary's creative family tree – August 18, 2014

**VIZIO**   Beautifully Simple

New 2017 VIZIO SmartCast™ P-Series™ 55" Class Ultra HD HDR XLED Pro™

SHOP NOW

### Map hints

**The relationship map to the left is interactive.**

• **Solid lines** are current relations. Dotted lines are former relations.

• **Expand** items with + signs by double-clicking or by selecting multiple items in the map and pressing the "e" key.

• **Move** an item in the map by clicking and dragging.

• You can also **delete** items, **separate boxes** and **save maps**. Right-click on the map or select Map Tools for these options.

• **Find out more** about an item in the map by right-clicking on the item and choosing *Information about...*

• View map color key.

• This interactive map requires Flash player.

### Recent stories

**Sinclair looks to expand its conservative broadcast network**
August 8, 2017 at 6:08am
After decades of quietly building a nationwide network of TV stations, Sinclair Broadcast Group is now in the spotlight.

**Flynn reveals ties to Cambridge Analytica**
August 4, 2017 at 5:28am
In yet another revised financial disclosure filing, former national security adviser Michael Flynn will reveal ties to the big-data firm central to the Trump campaign, the Associated Press reports.

**The Rockefeller reach**
August 1, 2017 at 9:15am
The Rockefeller name is iradicable, still shaping and reshaping the current geographic, financial, philanthropic landscape.

**How much blame should go to Wells Fargo directors?**
July 30, 2017 at 6:58am
Wells Fargo (WFC), already reeling from revelations that it fraudulently opened accounts in customers' names, has been hit with a new scandal.

**Donald Trump's many potential conflicts**
July 27, 2017 at 9:18am
The list of the Trump administration's potential conflicts of interest lengthens with every revised financial statement filed by a family member or appointee.

More stories →

Become a Fan of Muckety on Facebook

### Search for stories

Search for post/stories here   [Search]

### Muckety archives

Document title: The well-connected Bennet family | Muckety - See the news
Capture URL: http://news.muckety.com/2016/04/14/the-well-connected-bennet-family/48051
Capture timestamp (UTC): Mon, 14 Aug 2017 16:43:51 GMT

Page 1 of 2

PLAINTIFF TRIAL EXHIBIT 021

PALIN02590

JA 1725

View large map | View static map | Embed this map | License

The story failed to mention Bennet's powerful connections. His brother, Michael F. Bennet, is a U.S. senator from Colorado and was national co-chair of President Obama's re-election campaign.

His father, Douglas J. Bennet Jr., was president of Wesleyan University and NPR, and served as an assistant secretary of state.

James Bennet, who previously was the Times's Jerusalem bureau chief and White House correspondent, most recently served as president and editor of the Atlantic.

🐦 Tweet This!    f Share on Facebook

**Click here to sign up for the Muckety Newsletter**

Email this • Digg This! • Share on Facebook



THIS IS NOT A TYPICAL DATING SITE
Just send a message and start dating
• NO FAKE PROFILES
• NO CREDIT CARD REQUIRED
• GIRL WILL MAKE FIRST MOVE
JOIN FREE
Victoria Hearts

| Google Custom Search | Search |

**Related stories on Muckety**

Michael Bennet has two years to prove himself to CO voters - *January 7, 2009*
Kaiser and Rosenthal know the ropes - *November 9, 2007*
Huntsman named chairman of Atlantic Council - *January 17, 2014*
The ultra-connected economist - *March 14, 2014*
Bono to write op-ed columns for New York Times - *October 23, 2008*
The rapid rise of well-connected offspring - *August 15, 2013*
Obama administration is a family affair - *May 11, 2009*
The press secretary's creative family tree - *August 18, 2014*
Liz Cheney gains favor among conservatives - *September 29, 2009*
BP hires politically connected PR firms - *June 8, 2010*

*This post is tagged with:* Atlantic, James Bennet, Michael Bennet, New York Times

*Read related stories:* Families • Newspapers • Politics • Recent Stories

**0 Comments**

There are no comments yet, be the first by filling in the form below.

**Leave a Comment**

**\* Name:**

**\* Mail:**

**Website:**

**\* Your Comments:**

[Submit]

### Recent stories

**Sinclair looks to expand its conservative broadcast network**
*August 8, 2017 at 6:06am*

After decades of quietly building a nationwide network of TV stations, Sinclair Broadcast Group is now in the spotlight.

**Flynn reveals ties to Cambridge Analytica**
*August 4, 2017 at 5:26am*

In yet another revised financial disclosure filing, former national security adviser Michael Flynn will reveal ties to the big-data firm central to the Trump campaign, the Associated Press reports.

**The Rockefeller reach**
*August 1, 2017 at 9:15am*

The Rockefeller name is irradicable, still shaping and reshaping the current geographic, financial, philanthropic landscape.

**How much blame should go to Wells Fargo directors?**
*July 30, 2017 at 6:58am*

Wells Fargo (WFC), already reeling from revelations that it fraudulently opened accounts in customers' names, has been hit with a new scandal.

**Donald Trump's many potential conflicts**
*July 27, 2017 at 9:18am*

The list of the Trump administration's potential conflicts of interest lengthens with every revised financial statement filed by a family member or appointee.

More stories →

Become a fan of Muckety on Facebook

### Search for stories

| Search for post/stories here | Search |

### Muckety archives

August 2017
July 2017
June 2017
May 2017

🐦 Follow Muckety on Twitter

Muckety has no direct connection to most of the people or organizations listed on these pages.
We are unable to forward personal messages or provide personal contact information.
We make every effort at Muckety to ensure that our data is correct and timely. However, relationships are in constant flux and we cannot guarantee accuracy. If you come across incorrect or outdated information, please let us know by email.
© 2017 Muckety LLC

---

Document title: The well-connected Bennet family | Muckety - See the news
Capture URL: http://news.muckety.com/2016/04/14/the-well-connected-bennet-family/48051
Capture timestamp (UTC): Mon, 14 Aug 2017 16:43:51 GMT

PLAINTIFF TRIAL EXHIBIT 021

PALIN02591