# No. 22-558

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

SARAH PALIN, an individual

*Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY, a New York
corporation, and JAMES BENNET, an individual

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Southern District of New York
(Case No. 1:17-cv-04853-JSR, Hon. Jed S. Rakoff)**

**JOINT APPENDIX**

**VOLUME X OF XI (Pages JA2178 to JA2419)**

Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  813- 834-9191
Fax: 813-443-2193

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY  10017
Tel: 212-907-7300  Fax: 212-754-0330

*Counsel for Plaintiff-Appellant Sarah Palin*

# JOINT APPENDIX

# TABLE OF CONTENTS

## Volume X of XI

Brief For Defendant-Appellee (Excerpt) Case No. 17-3801-cv ....................JA2178

DOC 97 - Defendants' Statement of Undisputed Material Facts .................JA2187

DOC 104 – Defendants' Memorandum of Law in Opposition to
Plaintiff's Motion for Partial Summary Judgment .......................................JA2212

DOC 113 – Defendants' Reply Memorandum of Law in Support
Of their Motion for Summary Judgment .......................................................JA2223

DOC 197 – Plaintiff's Notice of Appeal .......................................................JA2238

DOC 198 – Plaintiff's Omnibus Memorandum of Law in Support
of Post-Trial Motions ....................................................................................JA2241

DOC 199 – Initial Notice of Stay of Appeal .................................................JA2416

DOC 200 – Order of U.S. Court of Appeals Order staying petition ............JA2417

# 17-3801-cv

# United States Court of Appeals

*for the*

# Second Circuit

———◆———

SARAH PALIN, an individual,

*Plaintiff-Appellant,*

– v. –

THE NEW YORK TIMES COMPANY,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

DAVID E. MCCRAW
THE NEW YORK TIMES
620 Eighth Avenue, 18th Floor
New York, New York 10018
(212) 556-4031

LEE LEVINE
JAY WARD BROWN
BALLARD SPAHR LLP
1909 K Street, NW, 12th Floor
Washington, DC 20006
(202) 661-2200

– and –

DAVID A. SCHULZ
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
(212) 223-0200

*Attorneys for Defendant-Appellee*

court with those specifically alleged by Palin in her complaints and briefs
establishes, the court credited only those facts set forth in her pleadings and the
materials attached to or referenced in them, including, specifically, those portions
of Bennet's testimony that *Palin* expressly adopted in her supplemental briefs and
proposed FAC.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.
2002).

Second, even if it could fairly be said that the district court ventured outside
the pleadings, it nevertheless complied fully with Rule 12(d).  Palin not only had
notice of, but expressly advocated for the evidentiary hearing and that hearing
afforded her reasonable, proportional and decidedly "one-sided" discovery
concerning the single issue on which the district court based its dismissal.
Accordingly, the district court could properly be deemed to have converted the
motion to one for summary judgment, *Morelli v. Cedel*, 141 F.3d 39, 45-46 (2d
Cir. 1998), and, because the record presents no disputed issues of material fact and
The Times is entitled to prevail as a matter of law, the judgment may be affirmed
on this alternative basis.

In addition, although the district court correctly granted The Times's motion
to dismiss the original complaint "with prejudice" (because amendment would
have been futile), the question is moot because Palin thereafter tendered and the
district court independently considered her proposed FAC, correctly concluding

framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." 282 F.3d at 153 (citation omitted).

Palin's own reliance on Bennet's testimony reflects the reality that the hearing was designed to work in her favor, arming her with additional facts, beyond those set out in her initial Complaint, that she could and did invoke to bolster the plausibility of her claim. If nothing else, therefore, Palin is not entitled to vacatur of the decision below because she cannot show that she was prejudiced by the district court's references to the same factual allegations she advanced in her supplemental briefing and FAC. *See, e.g.*, *Reliance Ins. Co. v. Polyvision Corp.*, 474 F.3d 54, 57 (2d Cir. 2007); *Sira v. Morton*, 380 F.3d 57, 68 (2d Cir. 2004).

## B.     The District Court Did Not Violate Rule 12(d)

A district court must treat a motion pursuant to Rule 12(b)(6) as one for summary judgment under Rule 56 when "matters outside the pleadings are presented to and not excluded by the court." Fed. R. Civ. P. 12(d). When a motion has been converted under Rule 12(d), the district court is obliged to provide the parties "a *reasonable* opportunity to present all the material that is pertinent to the motion." *Id.* (emphasis added). And, however a district court may characterize its ruling, a court of appeals may affirm the judgment either by deeming it to have been entered under Rule 56, or by converting the motion to one for summary

judgment itself.  *See, e.g.*, *Morelli*, 141 F.3d at 46; *Northville Downs v. Granholm*,

622 F.3d 579, 585-86 (6th Cir. 2010).

This Court's Rule 12(d) jurisprudence emphasizes substance over form, and

notwithstanding Palin's assertions to the contrary, affords substantial flexibility in

applying its terms. District courts, for example, are not obligated to provide the

parties notice before converting a motion:

> The essential inquiry is whether the appellant *should
> reasonably have recognized the possibility* that the motion
> might be converted into one for summary judgment or
> was taken by surprise and deprived of a reasonable
> opportunity to meet facts outside the pleadings.

*Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999) (emphasis added).  Thus, a

party opposing a motion may be deemed to have adequate notice of conversion

"[e]ven where only the party moving to dismiss has submitted extrinsic materials

such as depositions or affidavits."  *G. & A. Books v. Winehouse*, 770 F.2d 288, 295

(2d Cir. 1985); *accord Galiotti v. Green*, 475 F. App'x 403, 404 (2d Cir. 2012)

(summary order).

Moreover, conversion does not entitle the party opposing the motion to

whatever discovery it demands; it is entitled only to conduct discovery "pertinent

to the motion."  Fed. R. Civ. P. 12(d).  Accordingly, a party cannot reasonably

complain that it has been deprived of discovery unless it identifies "factual

material [it] wished to ascertain through discovery that could raise a factual issue

material to [its] claims." *MacFall v. City of Rochester*, 495 F. App'x 158, 161 (2d Cir. 2012) (summary order).

As explained *supra,* the district court properly adjudicated The Times's motion pursuant to Rule 12(b)(6). Even if this Court were to conclude otherwise, however, the court complied with Rule 12(d) and its judgment can therefore be affirmed under Rule 56 as well.

Palin does not argue, nor could she, that she lacked effective notice of the possibility of conversion. The order convening the "evidentiary hearing" alerted her to its purpose, *i.e.*, to ascertain information bearing on her actual malice allegations that was "peculiarly within the knowledge of" the Times. *See* A319-20. Insofar as Palin's grievance is that facts that emerged from the hearing are "outside the pleadings" but were then considered by the court, even if that were true (and it is not, as explained *supra*), she cannot complain that she was "taken by surprise" when the court did so. *See G. & A. Books*, 770 F.2d at 295 (in light of parties' submission of factual materials on motion to dismiss, appellant could not "claim to have been unaware that the district court was considering material outside the record" or to have lacked effective notice of possibility of conversion); *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 592 (2d Cir. 1993) (same).

Case 22-558, Document 58, 09/19/2022, 3384739, Page8 of 244
Case 22-3801, Document 73, 03/13/2023, 3297885, Page52 of 69

Nor can Palin reasonably contend that she was deprived of a meaningful opportunity to discover and present evidence *pertinent* to The Times's motion. Although she casts the hearing as "one-sided discovery" that deprived her of a "full and fair" opportunity to litigate her claims, Br. 48-49, that description is incorrect. Notwithstanding that "one-sided discovery" refers to discovery afforded *to* one party and not the other (in this case, Palin was the only party permitted to "throw punches" – *i.e.,* take testimony from an adverse witness and compel the production of documents from its adversary, Br. 49), the hearing was, for all intents and purposes, a deposition of *the* relevant witness on *the* single issue on which the motion was granted. Bennet's cross-examination by Palin's counsel was extensive. The key document, the initial draft of the Editorial, was produced by The Times at Palin's insistence. Palin questioned Bennet both about that document and multiple exhibits she tendered. Following the hearing, she was provided with additional documents that she requested be produced by The Times for use in her supplemental briefing. And the district court afforded Palin's counsel the opportunity to cross-examine Williamson, the author of the initial draft, although they elected not to do so.

The document production and testimony the district court ordered were well within its broad discretion to control discovery. As Palin concedes, "district courts have wide latitude to determine the types and sequencing of discovery." Br. 26;

Case 22-558, Document 58, 09/19/2022, 3384739, Page9 of 244
Case 22-558, Document 73, 09/19/2022, 3384735, Page9 of 69

*see, e.g.*, *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 n.13 (2d Cir. 2017) ("*Chorches*") ("in all matters relating to discovery, the district court has broad discretion to limit discovery in a prudential and proportionate way").  Indeed, Rule 26(b)(1), which codifies the principle of proportionality in discovery, is specifically intended to "'encourage judges to be more aggressive in identifying and discouraging discovery overuse' by emphasizing the need to analyze proportionality before ordering production of relevant information."  *State Farm Mut. Auto. Ins. Co. v. Fayda*, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015) (quoting Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 1983 and 2015 amendments), *aff'd*, 2016 WL 4530890 (S.D.N.Y. Mar. 24, 2016)).  *Accord, United States ex rel. Customs Fraud Investigations, LLC. v.Victaulic Co.*, 839 F.3d 242, 259 (3d Cir. 2016) (quoting Roberts, C.J.).

Viewed in this context, the evidentiary hearing may properly be understood as the district court's reasonable and proportional response to the needs of the case before it.  Within weeks of filing her suit, Palin had begun the process of serving subpoenas on 23 current and former Times employees, as well as voluminous document requests, interrogatories, and requests for admissions on The Times itself.  A214-26.  These discovery requests were entirely disproportionate to what was required to resolve the dispositive issue of whether Palin had plausibly

pleaded (or, viewed through the lens of Rule 56, whether they raised any genuine dispute of material fact regarding her ability to prove) that The Times published the challenged statements with actual malice. The hearing represented the district court's effort "to tailor a discovery process that suit[ed] the case at hand," *Chorches*, 865 F.3d at 88 n.13—one that balanced Palin's need to access information "peculiarly within the knowledge of [The Times]," A329, against The Times's interest in avoiding unnecessarily burdensome and intrusive discovery. The process was fair, and well within the district court's broad discretion, particularly in a case like this one where the discovery that Palin sought itself threatens public discussion about matters of national concern.

Finally, it bears emphasis that Palin never lodged *any* objection to the district court's procedure, either before or after the hearing. To the contrary, she expressly endorsed it. Especially under these circumstances, she cannot now object to The Times's motion being treated as one seeking summary judgment. *MacFall*, 495 F. App'x at 161; *see Reliance Ins. Co.*, 474 F.3d at 57 (district court's failure formally to convert was harmless because plaintiff "responded with its own evidentiary submissions," "did not object to the procedure the district court used," and "the error [did] not disadvantage" plaintiff). This Court may therefore review the district court's ruling as if it had granted summary judgment

or, alternatively, it may itself convert the motion to one for summary judgment and affirm the decision below on that basis.

### C.    Leave To File The Proposed FAC Would Have Been Futile

Palin incorrectly contends that the judgment should be reversed because the district court erred in denying leave to replead. Br. 50-58. First, she misstates the applicable legal standard. Although she correctly notes that this Court reviews the district court's refusal to permit amendment on the ground of futility *de novo*, Br. 50, she erroneously asserts that "[f]utility exists 'only where it is beyond doubt that the plaintiff can prove no set of facts in support of his amended claims,'" Br. 25 (citing *Pangburn v. Culbertson*, 200 F.3d 65, 71 (2d Cir. 1999)). That standard is no longer good law. It "hales from *Conley v. Gibson*, 355 U.S. 41, 45-46 … (1957), which was abrogated by *Twombly*. The standard of *Twombly* and *Iqbal* now controls the pleading requirements of a complaint." *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 150 n.7 (S.D.N.Y. 2012) (citations omitted); *accord Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185-86 (2d Cir. 2012).[19]

_____

[19] Palin also miscites *Cruz v. Gomez*, 202 F.3d 593, 597-98 (2d Cir. 2000), for the proposition that "a court may not deny leave to amend as 'futile' unless [it] can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.'" Br. 45. Even indulging the dubious proposition that this formulation survives *Twombly* (*Cruz* similarly cited *Conley* as authority for it), that standard applies only to requests for leave to amend made by



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                               :

SARAH PALIN                         :   No. 17 Civ. 4853 (JSR)

               Plaintiff,    :   ECF Case
                               :

          -against-       :   **DEFENDANTS' STATEMENT OF**
                               :   **UNDISPUTED MATERIAL FACTS**

THE NEW YORK TIMES COMPANY and JAMES   :
BENNET,                             :
            Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Pursuant to Rule 56.1 of the Local Rules for the United States District Court for the

Southern District of New York, Defendants The New York Times Company ("The Times") and

James Bennet ("Bennet," and, together with The Times, "Defendants") submit the following

Statement of Undisputed Material Facts in support of their Motion for Summary Judgment:

<u>**The Parties**</u>

1.    Sarah Palin is the former governor of Alaska, a former vice presidential candidate,

and an influential public figure.  Am. Compl. ¶¶ 20-23.

2.    SarahPAC was a political action committee created under Federal law and

domiciled in Virginia that ceased operation in 2016.  Sullivan Decl. ¶ 6, Ex. 5 ("Crawford Dep.")

at 25:13-26:5; Brown Decl. in Supp. of Defs.' Mot. to Dismiss Exs. A, B, Dkt. 26.

3.    Bennet was, at all times relevant to this lawsuit, the editor overseeing all opinion

journalism at The Times, including columns written by opinion columnists, letters from readers,

individual contributions, op-eds solicited from outside writers, and masthead editorials written

by The Times Editorial Board.  Sullivan Decl. ¶ 3, Ex. 2 ("Bennet Dep.") at 12:6-19.

4.      The opinion division is separate from the larger newsroom division of The Times. Bennet Dep. at 12:25-13:7.

5.      Editorials are pieces that reflect the work of the Editorial Board of The Times. They do not include an individual author's byline.  Bennet Dep. at 12:14-17.

6.      Bennet oversaw the editorials and opinion pieces that The Times publishes, but did not individually review each piece.  Bennet Dep. at 12:9-19, 13:8-14:10, 42:23-11.

## The Crosshairs Map

7.      In 2010, SarahPAC published a map that featured crosshairs positioned over congressional districts of twenty Democrats who supported the Affordable Care Act, along with a list of each Representative's name (the "Crosshairs Map").  Am. Compl. ¶ 99; Sullivan Decl. ¶ 35, Ex. 34; Sullivan Decl. ¶ 7, Ex. 6 ("Palin Dep.") at 82:16-24, 140:15-22; Crawford Dep. at 67:1-8.

8.      The Crosshairs Map places a crosshairs symbol over Rep. Gabrielle Giffords' district, and listed her name. Sullivan Decl. ¶ 35, Ex. 34.

9.      Shortly after publication of the Crosshairs Map, violent attacks occurred on the offices of several Representatives identified on the Map, including that of Rep. Giffords. Sullivan Decl. ¶ 48, Ex. 47 (Linda Feldmann, *Stumping for McCain, Sarah Palin dials back the gun rhetoric*, The Christian Science Monitor (Mar. 26, 2010) at 3]; Sullivan Decl ¶ 59, Ex. 58 (E. Robinson, *Is there a right to 'reload'?*, Wash. Post (Mar. 26, 2010)).

10.     Publication of the Crosshairs Map prompted a national debate, including discussion of the actual or potential impact of inflammatory rhetoric—specifically including the Crosshairs Map as an example.  Sullivan Decl. ¶ 48, Ex. 47 (discussing "epithets, death threats, and attacks on some members' offices" after passage of the Affordable Care Act).

11.     On November 4, 2010, Palin referred to the symbol on the Crosshairs Map as a "bull's eye" in a tweet.  Sullivan Decl. ¶ 36, Ex. 35 (Nov. 4, 2010 Sarah Palin Tweet).

12.     The Amended Complaint states that the Crosshairs Map "depicted crosshairs." Am. Compl. ¶ 99.

13.     At her deposition, Palin denied that the symbol placed over the districts on the Crosshairs Map represented a gun sight.  Palin Dep. at 23:16-24:2, 140:23-141:3, 143:14-25.

14.     Palin used the expression "Don't retreat. RELOAD" as a rallying cry for opponents of the Affordable Care Act, also known as Obamacare.  Sullivan Decl. ¶ 39, Ex. 38 at 2.

## The Loughner Shooting

15.     On January 8, 2011, Jared Loughner shot nineteen people at a political event in Tucson, killing a federal judge and five other people, and wounding thirteen others, including Rep. Giffords.  Am. Compl. ¶ 1.

16.     This renewed speculation by the public and the media whether Rep. Giffords' inclusion on the Crosshairs Map, and similar political rhetoric contributed, directly or indirectly, to political violence like the Giffords' shooting.  Palin Dep. at 148:2-17, 149:3-22; Sullivan Decl. ¶ 16, Ex. 15 (Frank Rich, *No One Listened to Gabrielle Giffords*, N.Y. Times (Jan. 15, 2011)); Sullivan Decl. ¶ 37, Ex. 36 (Dan Balz, *Cross hairs: Crossroads for Palin?*, Wash. Post (Jan. 11, 2011)) at A.9 (noting that issue of whether Palin "was partly to blame" became the top question on Facebook after shooting); Sullivan Decl. ¶ 38, Ex. 37 (Dana Milbank, *A McKinley moment?*, Wash. Post (Jan. 11, 2011)) at A.21 (opining that heat on Palin for "recklessly playing with violent images" was well deserved).

17.     During the ensuing criminal investigation, law enforcement discovered no

evidence regarding whether Loughner had or had not seen the Crosshairs Map. Sullivan Decl. ¶ 39, Ex. 38 (John Berman, *Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate*, ABC News (Jan. 9, 2011).

18.     In the weeks and months following the shooting, multiple news organizations, including The Times, reported that Loughner was mentally unstable and appeared to have developed animosity toward Rep. Giffords well before publication of the Crosshairs Map. Am. Compl. ¶¶ 59, 61 & Exs. 8-12.

## The Congressional Baseball Shooting

19.     The morning of June 14, 2017, during a baseball practice in Virginia, James Hodgkinson opened fire on several Republican members of Congress and others, seriously wounding Republican Rep. Steve Scalise, among others. Am. Compl. ¶ 4.

20.     Hodgkinson was a political supporter of Senator Bernie Sanders and "'virulently opposed'" President Trump. Am. Compl. ¶ 4.

## Drafting the Editorial America's Lethal Politics

21.     On June 14, 2017, around 10:45 a.m., Elizabeth Williamson, a writer for the Editorial Board based in the District of Columbia, asked whether the Board intended to write about the shooting involving Rep. Scalise. Sullivan Decl. ¶ 4, Ex. 3 ("Williamson Dep.") at 194:14-195:10; Sullivan Decl. ¶ 9, Ex. 8 (NYTIMES0001068-69).

22.     Williamson, Bennet, and their Editorial Board colleagues Robert Semple and Linda Cohn debated whether the proposed piece should focus on the shooting itself, the Board's position in favor of sensible gun control, or "concern about the state of political rhetoric in the country." Sullivan Decl. ¶ 2, Ex. 1 ("Hr'g Tr.") at 5:13-6:1; Williamson Dep. at 199:22-200:2; Sullivan Decl. ¶ 10, Ex. 9 (NYTIMES 0001082); Sullivan Decl. ¶ 5, Ex. 4 ("Cohn Dep.") at

Case 1:17-cv-04853-JSR Document 58 Filed 06/19/2009 Page 5 of 25
Case 22-558, Document 58, 09/19/2022, 3384729, Page16 of 244

JA 2191

40:21-41:13.

23. During that discussion, Cohn pointed out a difference she perceived between the response to the 2017 shooting involving Scalise and the shooting involving Giffords only a few years earlier, writing "I'm thinking back to what a giant story [G]abby Giffords shooting was. Amazing that shooting congressmen doesn't seem so shocking now." Sullivan Decl. ¶ 11, Ex. 10 (NYTIMES0001070-71).

24. Around noon, Semple decided that the Board should write a piece on the shooting, and Williamson began to draft one. Sullivan Decl. Ex. 10; Williamson Dep. at 206:10-18.

### *Research*

25. To start the writing process Williamson researched breaking news reports about the Scalise shooting and familiarized herself with the Loughner Shooting in 2011. Williamson Dep. at 195:21-196:25, 213:7-19; Sullivan Decl. ¶ 12, Ex. 11 (NYTIMES0001078).

26. Semple tasked Times Editorial Assistant, Phoebe Lett, with conducting research for the piece and had her provide this research to Williamson. Sullivan Decl. Ex. 9.

27. Lett circulated four pieces to Williams, Bennet, and others that the Editorial Board had previously published relating to gun policy. Sullivan Decl. ¶ 13, Ex. 12 (NYTIMES0001083); Sullivan Decl. ¶ 14, Ex. 13 (Aug. 17, 2017 email from J. Brown).

28. Williamson asked Lett for assistance finding a prior editorial "that references hate type speech against dems in the runup to [the Giffords] shooting." Sullivan Decl. Ex. 12.

29. Bennet responded by asking if the Editorial Board had ever written "anything connecting [] the Giffords shooting to some kind of incitement." Sullivan Decl. ¶ 30, Ex. 29 (NYTIMES0001157-58).

30.    Lett responded that the Editorial Board had not, but circulated an opinion piece by Frank Rich, *No One Listened to Gabby Giffords*, published in the aftermath of the Giffords Shooting.  Sullivan Decl. ¶ 15, Ex. 14 (NYTIMES0001159-60); Sullivan Decl. Ex. 15.

31.    During the planning of the Editorial, Bennet emailed Williamson:  "there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence."  Sullivan Decl. Ex. 11.

32.    Bennet asked Williamson to be mindful of whether such rhetoric came from both sides of the political spectrum.  Sullivan Decl. Ex. 9 ("[I]f there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g. in the run-up to the Gabby Giffords shooting) we should deal with that."); Sullivan Decl Ex. 11; Sullivan Decl. Ex. 14.

33.    Bennet was "specifically asking if there was some evidence of a piece of incitement … that was directed at the ball players, the Congressmen who were playing ball that day."  Bennet Dep. at 245:22-25, 246:4-13.

34.    Much of the research Editorial Board employees conducted focused on prior editorials by The Times, because Bennet assumed that the Board "had talked about the political climate and I wanted to harmonize whatever we were saying now with the position the board had taken" previously.  Hr'g Tr. at 6:5-12; Sullivan Decl. Ex. 11; Cohn Dep. at 77:17-78:3.

### First Draft

35.    Williamson wrote the first draft of the America's Lethal Politics editorial (the "Editorial").  Williamson Dep. at 232:14-233:3; Sullivan Decl. ¶ 25, Ex. 24 (PALIN00234-35).

36.    As it relates to the language Palin contends is defamatory, Williamson's draft included the following:

JA 2193

Case 1:17-cv-04853-JSR Document 58 Filed 06/19/2019 Page 7 of 25
Case 22-558, Document 58, 09/19/2022, 3384720, Page 18 of 244

> Just as in 2011, when Jared Lee Loughner opened fire in a
> supermarket parking lot, grievously wounding Representative
> Gabby Giffords and killing six people, including a nine year-old
> girl, Mr. Hodgkinson's rage was nurtured in a vile political
> climate.  Then, it was the pro-gun right being criticized: in the
> weeks before the shooting[,] Sarah Palin's political action
> committee circulated a map of targeted electoral districts that put
> Ms. Giffords and 19 other Democrats under stylized crosshairs.

Williamson Dep. at 232:2-233:9; Sullivan Decl. Ex. 24.

37.     The word "circulated" was a hyperlink such that a reader who clicked on it would

be directed to a package of on-line news reports published by ABC.  Williamson Dep. at 234:11-

15; Brown Decl. in Supp. of Defs.' Mot. to Dismiss Ex. C; Sullivan Decl. Ex. 38 (Partial

Version).

38.     The original version of the Editorial published online also included this hyperlink.

Sullivan Decl. ¶ 50, Ex. 49 (Original Web Editorial); Brown Decl. in Supp. of Defs.' Mot. to

Dismiss Ex. C.

39.     The first article in the package of hyperlinked news reports was an article

published shortly after the Arizona shooting, titled "Sarah Palin's 'Crosshairs' Ad Dominates

Gabrielle Giffords Debate."  Brown Decl. in Supp. of Defs.' Mot. to Dismiss Ex. C.

40.     This article included a statement that "[n]o connection has been made between

[the Crosshairs Map] and the Arizona shooting."  Brown Decl. in Supp. of Defs.' Mot. to

Dismiss Ex. C at 2.

41.     At the time she drafted the Editorial, Williamson did not recall reading in the

ABC article that that suggested no evidence of a link between the Crosshairs Map and the

Loughner Shooting.  Williamson Dep. 236:2-24, 237:23-238:5.

42.     Williamson did not recall reading any source that specifically addressed the link

between the Crosshairs Map and the Loughner Shooting.  Williamson Dep. at 237:22-238:5.

Case 22-558, Document 58, 09/19/2022, 3384739, Page19 of 244

43.    Williamson did not know why Loughner targeted Gifford.  Williamson Dep. 237:11-238:5.

44.    Williamson submitted this first draft to her editor, Linda Cohn, around 4:45 p.m. on June 14, 2017.  Williamson Dep. 232:14-233:3; Sullivan Decl. Ex. 16 (Email), 18 at 3-4 (Draft).

45.    Williamson received further drafts but believed that Cohn and Bennet would edit and finalize the Editorial.  Williamson Dep. 248:9-25; Sullivan Decl. ¶ 18, Ex. 17 (NYTIMES0003239).

46.    Williamson did no further work on the Editorial prior to publication.  Williamson Dep. at 248:9-25.

*Revisions*

47.    Cohn reviewed Williamson's draft and "wasn't sure if the piece worked" in part because she found it unclear whether the piece was focused on gun control or "about the political climate and the sort of lack of civility in America's political discourse."  Cohn Dep. at 57:19-58:7, 17:23-18:7, 57:19-58:7, 60:8-12.

48.    Cohn added some questions to the draft and around 5:00 p.m. and went to Bennet's office in person to speak with him about her criticism of the draft.  Cohn Dep. at 18:5-7, 57:5-16; Sullivan Decl. ¶ 19, Ex. 18 (NYTIMES0000288-91).

49.    Cohn then handed the draft off to Bennet for further revision.  Cohn Dep. at 17:23-18:7; 60:8-12.

50.    In relevant part, Williamson's draft included the sentence, "In the aftermath of Wednesday's shooting, the political right and left and both sides of the gun debate dove into their respective foxholes."  Sullivan Decl. Ex. 18 at 2.  Cohn added a question after that line asking,

Case 1:17-cv-04853-JSR   Document 58   Filed 06/19/2009   Page 9 of 25

"do we know of any elected official on the left who have incited violence? [O]r just unaffiliated people online or comedians.  [M]ost are pro-gun control.  [D]oes this graph imply equivalence?"  *Id.*; Cohn Dep. at 92:12-22, 92:23-94:20.

51.     Upon reading Williamson's draft, Bennet, who was ultimately responsible for the content of such editorials agreed with Cohn that the draft needed substantial revisions and began substantially rewriting it himself.  Hr'g Tr. at 7:19-8:7.

52.     As the Editorial related to breaking news, the Editorial Board sought to publish the Editorial in the next day's print edition of the paper.  Bennet Dep. at 22:6-19; Cohn Dep. at 60:13-15, 61:7-13; Williamson Dep. 252:22-253:4.

53.     The deadline to submit the Editorial for publication in the next morning's print edition was roughly 8:00 p.m.  Bennet Dep. at 22:6-19; Cohn Dep. at 61:7-13.

54.     At the time he decided to substantially rewrite the Editorial, Bennet had less than three hours to do so.  Hr'g Tr. at 8:11-16; Cohn Dep. at 60:13-15, 101:22-102:10.

55.     Bennet ultimately "effectively rewrote the piece."  Hr'g Tr. at 8:25.

56.     When he rewrote Williamson's draft, Bennet worried that phrases like "incendiary" or "inflammatory rhetoric" had been "drained of [their] power because [they are] used so often."  Hr'g Tr. at 12:8-12.

57.     Bennet decided to use the word "incitement" because he had "a very specific history and experience with the term."  Hr'g Tr. at 11:13-12:2.

58.     Bennet had served as The Times Jerusalem bureau chief and prior to the assassination of Israeli Prime Minister Yitzhak Rabin inciting language had been used.  Hr'g Tr. at 11:13-12:2; Bennet Dep. at 112:23-113:18, 186:7-8.

59.     Bennet also chose to use "incitement" because it was "a very strong word to write

about the political climate," and it was a word that that was not used every day so it would draw readers' attention to the particular horror of the Scalise shooting. Hr'g Tr. at 12:3-12; Bennet Dep. at. 112:23-113:18.

60.     Bennet worried that "some of what I saw [in Israel] could happen here." Bennet Dep. at 123:22-25.

61.     Bennet said that, when he reported from Jerusalem for The Times, the word "incitement" was used broadly to "talk about a range of communications" "that contributed to intensifying and raising the temperature of the political debate," that is "very, very, strong language that describes the person on the other side of the debate as an enemy." Hr'g Tr. at 12:13-25, 47:20-48:1; Bennet Dep. at 112:23-113:18.

62.     Such incitement ranged from "deliberate orders, invocations, summonses for people to carry out violent attacks" to more subtle contributions to the poisonous atmosphere between the groups, like "maps that misrepresent the politics of the region." Hr'g Tr. at 12:20-24.

63.     Bennet had previously written an article for The Times, discussing a meeting of a joint Israeli-Palestinian "committee on 'prevention of incitement,' which [was] focusing on messages in the schools and news media encouraging violence." Sullivan Decl. ¶ 29, Ex. 28 (NYTIMES0003278-81).

64.     While Bennet revised the Editorial, Cohn, Eileen Lepping, and Nick Fox focused on fact-checking the Editorial. Cohn Dep. at 74:8-75:8.

65.     In particular, they focused on specific details of cited gun laws, which Cohn knew from her experience to be "ornate and detailed and different in all the states," requiring additional fact checking. Cohn Dep. at 74:8-75:8; Sullivan Decl. ¶ 60, Ex. 59 ("Lepping Dep.")

Case 1:17-cv-04853-JSR Document 58-7 Filed 06/19/20 Page 11 of 25

at 86:7-12.

66.    Around 7:22 p.m., Bennet emailed a revised draft to Williamson, asking her to

"'[p]lease take a look" to "make sure that the piece is correct."  Bennet Dep. at 266:13-16;

Sullivan Decl. Ex. 17.

67.    Bennet assumed that Williamson had fact-checked her initial draft before sending

it to him.  Bennet Dep. at 263:21-264:6.

68.    Bennet also believed that Williamson would check the revised draft to make sure

he had not added anything contrary to her research.  Bennet Dep. at 264:23-266:16; Hr'g Tr.

60:1-9.

69.    Bennet did not click on the hyperlink or review the ABC article included at that

link.  Bennet Dep. at 261:15-262:10; Hr'g Tr. at 20:23-21:4.

70.    When The Times published the Editorial Bennet did not know whether there was

or was not a direct causal link between the Crosshairs Map and the Giffords shooting, and had

not read anything suggesting that such a connection did not exist.  Bennet Decl. ¶ 10; Bennet

Dep. at 97:3-11.

71.    Bennet did not click the link because he was "on a tight deadline," and viewed his

role as editing the Editorial, not reporting it.  Hr'g Tr. at 21:11-14.

72.    Bennet and Cohn continued working on the draft and a proposed headline until

shortly after 8:00 p.m.  Cohn Dep. at 104:18-105:5, 117:19-118:3; Sullivan Decl. ¶ 49, Ex. 48

(NYTIMES0000250-253).

### Publication of the Editorial

73.    The Times published the Editorial on its website around 9:00 p.m.  Am. Compl.

¶ 1, Ex. 1; Def. Ex. 2 (Print Editorial).

74.    The Editorial included the following passages, which Palin contends are

defamatory:

> Was this attack evidence of how vicious American politics has
> become?  Probably.  In 2011, when Jared Lee Loughner opened
> fire in a supermarket parking lot, grievously wounding
> Representative Gabby Giffords and killing six people, including a
> 9-year-old girl, the link to political incitement was clear.  Before
> the shooting, Sarah Palin's political action committee circulated a
> map of targeted electoral districts that put Ms. Giffords and 19
> other Democrats under stylized cross hairs.

> Conservatives and right-wing media were quick on Wednesday to
> demand forceful condemnation of hate speech and crimes by anti-
> Trump liberals.  They're right.  Though there's no sign of
> incitement as direct as in the Giffords attack, liberals should of
> course hold themselves to the same standard of decency that they
> ask of the right.

Am. Compl. ¶ 117; Def. Ex. 2.

75.    The hyperlink added by Williamson remained in the published draft.  Sullivan

Decl. Ex. 49.  Bennet did not click on the hyperlink and has no memory of having seen the

article on June 14, 2017.  Hr'g Tr. at 20:23-21:4; Bennet Dep. at 261:15-262:10.

76.    The international print edition of The Times did not include the passage that Palin

contends is defamatory or reference "Sarah Palin's political action committee." Sullivan Decl. ¶

51, Ex. 50 (NYTIMES0002914).

77.    That same evening, The Times published a series of news reports about the

shootings.  Am. Compl. Ex. 6.

78.    Bennet did not read The Times news stories about the Scalise shooting prior to

publication of the Editorial.  Hr'g Tr. at 24:13-25:1.

**Criticism of the Editorial and The Times' Response**

79.    Following publication of the Editorial online, some readers posted comments on

and tweeting reactions to the Editorial challenging the notion that the Crosshairs Map constituted

"political incitement" or that there was any "link" between it and the Arizona shootings. Bennet

Dep. at 85:20-86:22.

80.     Ross Douthat, a Times opinion writer, first told Bennet that readers were

questioning the Editorial in an email he sent at around 10:00 p.m. on June 14th. Sullivan Decl. ¶

22, Ex. 21 (NYTIMES0001716-17); Bennet Dep. at 81:22-24.

81.     Douthat explained that he believed there was "no evidence that Jared Lee

Loughner was incited by Sarah Palin or anyone else, given his extreme mental illness and lack of

any tangible connection to that crosshair map". Sullivan Decl. Ex. 21; Bennet Dep. at 86:12-14.

Bennet responded by email a few minutes later:

> Thanks, and I'll look into this tomorrow. But my understanding
> [is] that in the Giffords case there was a gun sight superimposed
> over her district; so far in this case we don't know of any direct
> threat against any of the congressman on the field. That's not to
> say that any of it is ok, obviously, or that the violence in either case
> was caused by the political rhetoric. But the incitement in this case
> seems, so far, to be less specific.

Sullivan Decl. Ex. 21.

82.     Douthat in turn replied by email, explaining his concern about the editorial as he

had understood it:

> The targets were used by Palin, or her group, in a map of seats
> targeted for pickup in the midterms. You can argue about whether
> that crosses a line … but the point is that the map had no link, none
> at all, to Giffords' actual murder. People assumed a link initially
> … but the investigation debunked it. I think Loughner was
> instigated by a non-answer she'd given him at a town hall about
> one of his theories of grammar, or his obsession with lucid
> dreaming, or something. His act had nothing to do with the
> political climate, so far as anyone can tell. Whereas the
> Alexandria shooter seems to have had an explicit political
> motivation. So saying that Giffords was a case of incitement and
> this one isn't reads like we're downplaying that motive or implying

Case 1:17-cv-04853-JSR Document 58 09/19/2022 i-3384739 Page 25 of 244
Case 1:17-cv-04853-JSR Document 55 Filed 06/19/20 Page 14 of 25
JA 2200

that Loughner had right-wing motivations that he simply didn't
have."

Sullivan Decl. Ex. 21.

83.     The drafters of the Editorial—Cohn, Williamson, and Bennet—did not intend to

suggest a causal link between the Crosshairs Map and the Loughner Shooting.  Hr'g Tr. at 5:24-

6:1 (testifying that "incitement" referred to "the danger that we're increasingly treating political

opponents like enemies a conflict"); Bennet Dep. at 112:23:113:18; Bennet Decl. ¶ 8; Cohn Dep.

at 96:22-97:7, 94:12-20 ("I certainly didn't mean someone was giving, like, orders or saying go

shoot someone or go commit a violent act, but just that the rhetoric was ugly enough that it

would boil up and foster people to take things into their own hands."); Williamson Dep. at

233:16-21 (testifying that "political rhetoric" referred to "a general overheated back-and-forth

political climate"), 234:3-15.

84.     Bennet has admitted that he "did a very poor job . . . of trying to express" his

intended thought and "created an inference for readers that there was a causal link between

political incitement and the shooting of Gabby Giffords."  Bennet Dep. at 93:8-12.

85.     Bennet was not "trying to say that any particular piece of political incitement

causes a maniac like Jared Lee Loughner to take up arms and shoot at elected representatives,"

nor that Palin was responsible for this particular piece of political incitement.  Hr'g Tr. at 15:11-

13; Bennet Decl. ¶ 9.

86.     Bennet did not know then, and does not know now, whether or not Loughner was

aware of the Crosshairs Map at the time he committed the shooting.  Bennet Decl. ¶¶ 10-11; Hr'g

Tr. 33:10-34:12.

87.      Bennet stated that he "didn't remotely intend" to "accus[e] Governor Palin of

complicity in this shooting,"  Hr'g Tr. at 28:6-8.

88.　Moreover, he said that he "was very concerned to see that that was one of the inferences that people had drawn from what I had written."  Hr'g Tr. at 28:15-18.

89.　Though he later recognized that "some people" can interpret incitement to mean a "call to violence," he testified that "[t]hat was not the way [The Times was] using it in the editorial."  Bennet Dep. at 114:10-15.

90.　Bennet's aim in the Editorial was "to express concern about the state of political rhetoric in the country of political incitement, the danger that we're increasingly treating political opponents like enemies in a conflict."  Hr'g Tr. at 5:23-6:1.

91.　Specifically, Bennet worried that "the overall climate of political incitement . . . gives permission, to some degree, for violence against elected officials."  Hr'g Tr. at 15:8-11.

92.　Bennet was attempting to advance the idea "that overheated political rhetoric can create a climate conducive to violent acts."  Hr'g Tr. at 48:4-8; Bennet Decl. ¶ 8.

93.　Bennet mentioned the map circulated by SarahPAC as "an example of the kind of political incitement that contributes to this atmosphere" and one which had mentioned by name a person who ultimately was a victim of the Loughner Shooting.  Hr'g Tr. at 16:5-7; *id.* at 17:21-18:2, 19:16-22, 50:22-51:7; Bennet Decl. ¶ 6.

94.　While the editorial "criticized the left for creating an atmosphere of incitement" in advance of the Scalise Shooting," Bennet was not aware of a specific, concrete example of such rhetoric "that connected the victims [of the Scalise Shoooting"] there to that atmosphere."  Hr'g Tr. at 19:11-20; Bennet Decl. ¶ 7.

95.　The question asked at the very beginning of the paragraph at issue—was the Scalise Shooting "evidence of how vicious American politics has become?"—was answered in the Editorial with "probably."  Hr'g Tr. at 16:8-14.

96.     Bennet did not intend to suggest that the Crosshairs Map had included "actual photographs of these representatives . . .put under the crosshairs," as opposed to over their districts, and the Editorial specifically referred to it as "a map of targeted electoral districts."  see Hr'g Tr. 31:3-8; Sullivan Decl. ¶ 50, Ex. 49 at 3.

97.     Williamson viewed the Editorial as talking about the "general overheated back-and-forth political climate."  Williamson Dep. at 233:16-21.

98.     Cohn read the Editorial as saying that the "rhetoric was ugly enough that it would boil up and foster people to take things into their own hands."  Cohn Dep. at 94:12-20.

99.     Bennet sent a text message to Williamson around 11:00 p.m., asking if she was available to begin investigating Douthat's concerns.  Sullivan Decl. ¶ 23, Ex. 22 (JBENNET0000038-39).

100.     Williamson responded early the following morning that she would look into the issue.  Sullivan Decl. Ex. 22.

101.     On June 15 at 5:08 a.m., Bennet emailed several people who had worked on the Editorial to ask them to "get to the bottom of this as quickly as possible."  Sullivan Decl. ¶ 24, Ex. 23 (NYTIMES0001803).

102.     Bennet also told Williamson that he needed "a rock-solid version of what we should say – that an investigation showed no link to incitement, or no direct link, or no clear link. I don't want to soften it if we don't need to.  If there was no link, we should say so."  Bennet Dep. at 278:25-279:11; Sullivan Decl. ¶ 40, Ex. 39 (NYTIMES0003261); Sullivan Decl. Ex. 22.

103.     Bennet asked this because, "At that point, [he] didn't know" the answer and "wanted our people to go back and start over and figure out precisely what the right way to characterize it was." Bennet Dep. at 279:17-24.

## The Times Revises the Editorial

104. After investigating, the Editorial Board was not able to affirmatively prove or disprove any direct connection between Loughner and the Crosshairs Map. Williamson Dep. at 261:6-9, 277:2-11; Cohn Dep. at 68:14-22.

105. Nonetheless, The Times revised the online version of the Editorial to remove portions understood as suggesting a direct connection and to make clear that, on the Map, the crosshair appeared over Giffords' district, not over her name or image. Am. Compl. ¶¶ 134-40.

106. The Times published the first revised online version at 11:15 a.m. on June 15. Hr'g Tr. at 30:9-17; Sullivan Decl. ¶ 41, Ex. 40 (PALIN02729-32). Specifically, The Times deleted the phrases "the link to political incitement was clear" and "[t]hough there's no sign of incitement as direct as in the Giffords attack" and added the sentence "But no connection to that crime was ever established." Op. & Order at 7, Dkt. 45; Sullivan Decl. ¶ 20, Ex. 19 (NYTIMES0002912); Sullivan Decl. Ex. 40.

107. The Times also published a series of corrections. The first version of the correction, published at the bottom of the online version of the Editorial on June 15, 2017, read:

> An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.

Sullivan Decl. ¶ 28, Ex. 27 (PALIN02733-37).

108. Once The Times revised the Editorial on June 15, 2017, the publicly-accessible version of the Editorial available on The Times website did not contain language connecting the Crosshairs Map to the Loughner shooting. Sullivan Decl. Ex. 40.

109. The final version of the correction, published at the bottom of the online version of the Editorial on June 16, 2017, read:

> An editorial on Thursday about the shooting of Representative
> Steve Scalise incorrectly stated that a link existed between political
> rhetoric and the 2011 shooting of Representative Gabby Giffords.
> In fact, no such link was established.  The editorial also incorrectly
> described a map distributed by a political action committee before
> that shooting.  It depicted electoral districts, not individual
> Democratic lawmakers, beneath stylized cross hairs.

Sullivan Decl. Ex. 27.

110.    On July 16, 2017, the print version of The Times contained the final version of

the correction in the Editorial section of the newspaper.  Sullivan Decl. ¶ 52, Ex. 51

(NYTIMES0002916).

111.    On June 15, 2017, at 11:33 a.m., 11:37 a.m., and 11:40 a.m., The Times published

a series of tweets on the opinion division Twitter account, @NYTOpinion, including the text:

"We got an important fact wrong, incorrectly linking political incitement and the 2011 shooting

of Giffords.  No link was ever established.  We're sorry about this and we appreciate that our

readers called us on the mistake."  Sullivan Decl. ¶ 26, Ex. 25 (PALIN03829-33); Sullivan Decl.

¶ 27, Ex. 26 (PALIN03827-28).

## Allegations Regarding Actual Malice

112.    Prior to his most recent role at The Times, Bennet was the Editor-in-Chief for *The
Atlantic* monthly magazine.  Bennet Dep. at 41:16-18.

113.    Palin contends that as the Atlantic's Editor-in-Chief Bennet must have "reviewed,

edited and approved the publication of numerous articles [that] confirm[ed] there was no link

between Gov. Palin and Loughner's shooting."  Am. Compl. ¶¶ 42, 54-59.

114.    *The Dish* was a blog controlled and edited by Andrew Sullivan that was hosted on

the same website as *The Atlantic* magazine at the time the Loughner Shooting occurred in

January 2011.  Bennet Decl. ¶ 15; Sullivan Decl. ¶ 42, Ex. 41 ("A. Sullivan Dep.") at 85:11-

86:6; 86:22-87:3; 106:21-107:11; Bennet Dep. at 48:2-8; 49:3-50:11; Hr'g Tr. at 64:20-65:1; 67:4-5.

115.    Sullivan had complete editorial independence in running *The Dish*. No one, including Bennet, reviewed or edited his blog posts before publication. Bennet Decl. ¶ 15; A. Sullivan Dep. at 85:11-86:6; 106:21-107:11; Bennet Dep. at 46:6-48:7; Hr'g Tr. at 64:20-65:1; 67:4-5.

116.    Bennet had no role "whatsoever" in *The Dish.* A. Sullivan Dep. at 86:22-87:3.

117.    Sullivan and his staff made over 1,400 individual posts to *The Dish* in January 2011 alone. A. Sullivan Dep. at 90:5-8.

118.    The piece titled "An Assassination," discussed in the Amended Complaint at Paragraph 57, was a blog post from *The Dish*, not a column in *The Atlantic.* A. Sullivan Dep. at 58:18-21, 91:3-93:3; Sullivan Decl. ¶ 43, Ex. 42 (PALIN04351-58); Am. Compl. ¶ 57.

119.    James Bennet had no role in preparing or editing the blog post "An Assassination." A. Sullivan Dep. at 93:4-7. At the time of publication of the Editorial, Bennet had no recollection of reading "An Assassination." Hr'g Tr. at 21:19-22:1.

120.    Sullivan's live blog titled "An Assassination Attempt in Arizona: Live-Blogging," discussed in Paragraph 58 of the Amended Complaint, was published as part of *The Dish*. A. Sullivan Dep. at 56:8-16, 93:8-96:15; Sullivan Decl. ¶ 56, Ex. 55 (PALIN04359-72); Am. Compl. ¶ 58.

121.    James Bennet had no role in preparing or editing the live blog tiled "An Assassination Attempt in Arizona: Live-Blogging." A. Sullivan Dep. at 96:16-22. At the time of publication of the Editorial, Bennet had no recollection of reading of Sullivan's live blog. Hr'g Tr. at 21:19-22:1.

122.    The piece titled "Caldwell's Unfairness," discussed in the Amended Complaint at Paragraphs 66-67, was a blog post from *The Dish*, not a column in *The Atlantic.* A. Sullivan Dep. at 62:22-74:15, 98:8-99:14; Sullivan Decl. ¶ 44, Ex. 43 (PALIN04388-91); Am. Compl. ¶¶ 66-67.

123.    James Bennet had no role in preparing or editing the blog post "Caldwell's Unfairness."  A. Sullivan Dep. at 99:15-25.

124.    At the time of publication of the Editorial, Bennet had no recollection of reading "Caldwell's Unfairness."  Hr'g Tr. at 21:19-22:1, 65:2-4.

125.    The piece titled "The More We Know," discussed in the Amended Complaint at Paragraphs 59 and 63, was a blog post from *The Dish*, not an article in *The Atlantic.* A. Sullivan Dep. at 74:16-75:3, 96:23-98:7; Sullivan Decl. ¶ 57, Ex. 56 (PALIN04498-505); Am. Compl. ¶¶ 59, 63.

126.    James Bennet had no role in preparing or editing the blog post "The More We Know."  A. Sullivan Dep. at 98:4-7.

127.    At the time of publication of the Editorial, Bennet had no recollection of reading "The More We Know."  Hr'g Tr. at 21:19-22:1.

128.    *The Atlantic Wire* was a "sister site" to *The Atlantic* magazine, run by a separate editor, Gabriel Snyder, that primarily acted as a news aggregation hub.  Bennet Decl. ¶¶ 13-14; Bennet Dep. at 124:20-125:4; Sullivan Decl. ¶ 45, Ex. 44 ("Douthat Dep.") at 66:11-21; A. Sullivan Dep. at 101:20-102:9.

129.    The piece titled "Ten Days That Defined 2011," discussed in the Amended Complaint at Paragraphs 59, 68 and 69, was a blog post from *The Atlantic Wire*, not an article in *The Atlantic.*  Bennet Dep. at 127:13-128:4; Sullivan Decl. ¶ 31, Ex. 30 (PALIN04486-97); Am.

Case 1:17-cv-04853-JSR   Document 58   Filed 06/19/20   Page 21 of 25
Case 22-558, Document 58, 09/19/2022, 3384739, Page32 of 244

**JA 2207**

Compl. ¶¶ 59, 68-69.

130.    The piece titled "Was Shooting of Rep. Gabrielle Giffords Political," discussed in the Amended Complaint at Paragraph 59, was a blog post from *The Atlantic Wire*, not an article in *The Atlantic.*  Sullivan Decl. ¶ 53, Ex. 52 (PALIN04514-21); Am. Compl. ¶ 59.

131.    The piece titled "Did Sarah Palin's Target Map Play Role in Giffords Shooting," discussed in the Amended Complaint at Paragraphs 59 and 69 n.2, was a blog post from *The Atlantic Wire*, not an article in *The Atlantic.*  Sullivan Decl. ¶ 54, Ex. 53 (PALIN04392-99); Am. Compl. ¶¶ 59, 69 n.2.

132.    The piece titled "What We Know About Jared Lee Loughner," discussed in the Amended Complaint at Paragraphs 59 and 61, was a blog post from *The Atlantic Wire*, not an article in *The Atlantic.*  Sullivan Decl. ¶ 55, Ex. 54 (PALIN04530-38); Am. Compl. ¶¶ 59, 61.

133.    Bennet did not edit the content of *The Atlantic Wire* and does not recall reading the posts to it cited by Palin in her Amended Complaint at the time of publication or prior to publishing the Editorial.  Bennet Decl. ¶¶ 10, 13-14; Hr'g Tr. at 21:19-22:1.

134.    *National Journal* was another "sister site" to *The Atlantic* magazine, run by a separate editor, Ron Fournier.  Bennet Decl. ¶¶ 13-14.

135.    The piece titled "Stop The Blame Game," discussed in the Amended Complaint at Paragraphs 59, was published by *National Journal*, not *The Atlantic.*  Sullivan Decl. ¶ 58, Ex. 57; Am. Compl. ¶¶ 59.

136.    Bennet did not edit the content of *National Journal* and does not recall reading "Stop The Blame Game" at the time of publication or prior to publishing the Editorial.  Bennet Decl. ¶¶ 10, 13-14; Hr'g Tr. at 21:19-22:1.

137.    Cohn did not edit the piece titled, "She Who Must Not Be Named," discussed in

Case 72-558, Document 58, 09/19/2022, 3384739, Page33 of 244
Case 1:17-cv-04853-JSR   Document 58   Filed 06/19/20   Page 22 of 25

JA 2208

the Amended Complaint at Paragraph 76, and does not recall ever reading it.  Cohn Dep. at 48:7-17; Sullivan Decl. ¶ 47, Ex. 46 (PALIN03562-64); Am. Compl. ¶ 76.

138.   Cohn did not edit the piece titled, "The Tucson Witch Hunt," discussed in the Amended Complaint at Paragraph 126, and does not recall reading it at the time of publication or prior to publishing the Editorial.  Cohn Dep. at 49:16-50:5; Sullivan Decl. ¶ 46, Ex. 45 (PALIN03655-58); Am. Compl. ¶ 126.

139.   Bennet, Williamson, and Cohn each have no recollection of editing, drafting, or even reading the pieces from The Times that Palin contends would have demonstrated to them that it would be false to suggest a causal link between the Crosshairs Map and the Loughner Shooting.  Bennet Decl. ¶ 10; Hr'g Tr. at 22:22-25:6, 59:2-24, 62:15-63:23; Williamson Dep. at 285:10-288:11 (testifying that she did not recall seeing Pl. Ex. 64, 67, 149, 150, or 60 while drafting Editorial); Cohn Dep. at 46:11-50:20 (testifying that she did not recall working on Pl. Ex. 10, 11, 12, 60, 61); id. at 48:14-17; 51:7-18 (testifying that she cannot recall individual columns because of the volume she has edited over years working as an editor).

140.   Bennet does not recall reading and was not at the time of publication of the Editorial aware of having read any of the articles cited by Palin that purportedly demonstrate a consensus that the Loughner Shooting was not in any way caused by the Crosshairs Map.  Bennet Decl. ¶ 10; Hr'g Tr. 21:15-22:1; 26:13-27:1, 59:2-24; 63:20-67:12; Bennet Dep. 122:15-22; 123:23-124:6; 132:3-11; 134:10-15.

141.   Palin also alleged that Bennet had "reason to be personally hostile toward Palin, her political party, and her pro-gun stance," namely that Bennet's brother is a Senator from Colorado who was endorsed by House members whose districts had been targeted by the Crosshairs Map, that a man had threatened to attack Sen. Bennet's offices in the days before the

Loughner Shooting, that both Bennets had become advocates for gun control, and that Palin had endorsed Sen. Bennet's opponent in 2016. Am. Compl. ¶ 50; *Palin*, 940 F.3d at 814.

142.    Bennet does not recall speaking with his brother about the threat to his office, and it was not the sort of topic about which they typically would speak. Bennet Dep. at 145:5-15.

143.    Bennet does not recall that Sen. Bennet had given a floor speech about gun violence. Bennet Dep. at 163:11-13.

144.    Bennet was unaware at the time he wrote the Editorial that Palin had endorsed Michael Bennet's opponent in his 2016 senate race. Hr'g Tr. at 70:24-71:10.

145.    Bennet was unaware at the time he wrote the Editorial that the Crosshairs Map had included among targeted districts those of two lawmakers who had endorsed his brother. Hr'g Tr. at 70:19-23.

146.    Bennet was unaware at the time he wrote the Editorial that Giffords' PAC had endorsed Senator Bennet. Hr'g Tr. at 71:11-17.

147.    Linda Cohn testified that Bennet was "very concerned [about] the epidemic of gun violence," but the issue was not a "big focus" of his. Cohn Dep. at 113:11-21.

148.    In response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother James Bennet regarding threats made against his office in January 2011. Sullivan Decl. ¶ 33, Ex. 32 at No. 7 (Non-Party Michael Bennet's Responses and Objections to a Subpoena from Plaintiff ("Sen. Bennet R&O")).

149.    In response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother, James Bennet, concerning Sen. Bennet's speeches on gun control. Sen. Bennet R&O Nos. 8-9.

150.    Bennet did not write, edit, or comment on any of Sen. Bennet's speeches on gun

control.  Bennet Dep. at 62:25-63:6.

151.    In response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother, James Bennet, concerning Palin's endorsement of Sen. Bennet's political opponent in 2016.  Sen. Bennet R&O No. 10.

152.    In response to a subpoena from Palin, Sen. Bennet stated that a reasonable search had discovered no communications with his brother, James Bennet, concerning gun control or gun legislation.  Sen. Bennet R&O No. 13.

153.    As Editor of The Times's opinion section, Bennet sought to expand the range of voices represented, including by adding more conservative writers or contributors.  Bennet Dep. at 200:4-21; 209:22-210:24.

154.    Palin concedes that, at the time the Editorial was published, "reasonable people could have interpreted either way" whether there was a "connection between the crosshairs map and Jared Loughner's motivation."  Palin Dep. at 195:14-20.; *id.* at 195:24-196:2 ("I guess it's tough for me to judge whether the public believed that there was a consensus out there as to motivation of Jared.").

155.    Palin concedes that, following some initial reporting that connected the Crosshairs Map and Loughner Shooting, "obviously there was not the clarification made even within The New York Times team in those years" that no such connection existed because "otherwise why would The New York Times have said it again" in the Editorial in 2017.  Palin Dep. at 201:2-6.

Dated:  June 19, 2020

Respectfully submitted,

BALLARD SPAHR LLP

By: _/s/ Jay Ward Brown_____
    Jay Ward Brown
    David L. Axelrod
    Thomas B. Sullivan
    Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*

Case 22-558, Document 58, 09/19/2022, 3384739, Page37 of 344
Case 1:17-cv-04853-JSR   Document 92   Filed 07/10/20   Page 1 of 11

**JA 2212**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
          :

SARAH PALIN           :    No. 17 Civ. 4853 (JSR)

           Plaintiff,       :

                       :    ECF Case

           -against-       :

                       :

THE NEW YORK TIMES COMPANY and JAMES  :
BENNET,

           Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Jay Ward Brown
David L. Axelrod
Thomas B. Sullivan
Jacquelyn N. Schell
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.    PALIN HAS WAIVED ANY CHALLENGE TO THE APPLICATION OF
      THE ACTUAL MALICE STANDARD TO HER CLAIMS ............................................... 2

II.   *SULLIVAN* AND ITS PROGENY REQUIRE THIS COURT TO APPLY
      THE ACTUAL MALICE STANDARD HERE .................................................................. 3

III.  THIS CASE FITS SQUARELY WITHIN THE *SULLIVAN* LINE OF
      CASES ................................................................................................................................ 4

IV.   PALIN IS IN ANY EVENT ALSO REQUIRED TO PROVE ACTUAL
      MALICE UNDER STATE LAW ........................................................................................ 6

CONCLUSION ............................................................................................................................... 7

# JA 2214

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*County of Suffolk v. Stone & Webster Engineering Corp.*,
    106 F.3d 1112, 117 (2d Cir. 1997)..........................................................................2

*Dodge v. County of Orange*,
    282 F. Supp. 2d 41, 79-80 (S.D.N.Y. 2003) ..........................................................4

*Fogel v. Chestnutt*,
    668 F.2d 100, 108 (2d Cir. 1981)............................................................................2

*Giordano v. City of N.Y.*,
    274 F.3d 740, 754 (2d Cir. 2001)............................................................................7

*Immuno AG v. Moor-Jankowski*,
    77 N.Y.2d 235, 249 (1991) .....................................................................................6

*Mickens v. Kodiak*,
    640 P.2d 818, 820 (Alaska 1982)............................................................................6

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)........................................................................................ *passim*

*Olivit v. City & Borough of Juneau*,
    171 P.3d 1137, 1143 (Alaska 2007)........................................................................7

*Palin v. N.Y. Times Co.*,
    940 F.3d 804, 817 (2d Cir. 2019)............................................................................3

*Pearson v. Fairbanks Publishing Co.*,
    413 P.2d 711, 713-14 (Alaska 1966) ......................................................................7

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    244 F. Supp. 2d 289, 305 (S.D.N.Y. 2003)............................................................4

*Reno v. ACLU*,
    521 U.S. 844, 870, 885 (1997)................................................................................6

*Stolberg v. Members of Board of Trustees for State Colleges*,
    541 F.2d 890, 894 (2d Cir. 1976)............................................................................7

*United States v. Gardner*,
    837 F. Supp. 2d 346, 351-52 (S.D.N.Y. 2011) ......................................................4

## PRELIMINARY STATEMENT

Sarah Palin bears the burden in this defamation action of proving, by clear and convincing evidence, that each statement she challenges was made with "actual malice"—that is, that it was a calculated falsehood about her. In the nearly three years this case has been pending, including in contesting a motion to dismiss based on her failure to adequately plead actual malice and the subsequent appeal of an order granting dismissal on that basis, Palin has not once argued that any other legal standard should apply to her claims. Now, apparently recognizing at the conclusion of discovery that she is unable to meet her burden, Palin has shifted course and seeks a ruling that some lesser standard should apply. Palin's motion fails for at least four independent reasons:

First, Palin has waived this argument by repeatedly conceding that the actual malice standard applies to her claims.

Second, this Court is bound by *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and its progeny, and the Court is not empowered to disregard such precedent.

Third, even if Palin were correct in asserting that the requirement established in *Sullivan* and its progeny that "public figures" prove actual malice properly is limited to the circumstances of those early cases and need not be extended to encompass ordinary citizens communicating via the Internet, that assertion cannot help Palin here: As a former governor, candidate for vice president of the United States, and potential candidate for president, who continues regularly to seek to influence matters of public concern (and who alleges that the statements at issue concerned her personal conduct through her Political Action Committee in attempting to influence national policy on gun control and the outcome of national Congressional elections), Palin in this case is *the* paradigmatic public figure to whom the holdings in *Sullivan* and its progeny apply.

**JA 2216**

Fourth and finally, even if *Sullivan* were not the law of the land and the First Amendment did not require her to prove actual malice in this case, Palin still would bear *that very same burden* as a matter of state law.

## ARGUMENT

### I.   PALIN HAS WAIVED ANY CHALLENGE TO THE APPLICATION OF THE ACTUAL MALICE STANDARD TO HER CLAIMS

Under the law-of-the case doctrine, "a decision made at a previous stage of litigation, which could have been challenged in the ensuing appeal but was not, becomes the law of the case; the parties are deemed to have waived the right to challenge that decision, for 'it would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost.'" *Cty. of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997) (quoting *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981)). "The principle applies as well to everything decided by necessary implication." *Fogel*, 668 F.2d at 108.

The parties extensively litigated, both before this Court and the Court of Appeals, a dismissal motion premised on the contention that Palin was required as an essential element of her claims to prove actual malice, and that she had failed adequately to plead that element. In response to The Times's motion, Palin conceded that actual malice was an element of her cause of action, *see* Dkt. 29 at 2, and this Court similarly held that actual malice was "an essential element of the claim," Dkt. 35 at 1. As this Court noted at oral argument on the motion to dismiss, it has been "common ground" in this case "that when a public figure is involved, even false statements are protected unless they were done with actual malice." Defs' Counter-Statement of Undisputed Material Facts Re: Pl's Mot. for Partial Sum. J. ("CSUMF") ¶ 20.

Case 22-558, Document 58, 09/19/2022, 3384729, Page42 of 244
Case 1:17-cv-04853-JSR Document 94 Filed 07/10/20 Page 6 of 11

JA 2217

On her appeal from the order dismissing her Complaint, Palin did not *in any way* challenge this Court's conclusion that she was required to plausibly allege actual malice. To the contrary, Palin explicitly embraced this burden and used it to argue that this Court's ruling was incorrect, explaining that "the Supreme Court already struck the balance between public figure defamation-plaintiffs' rights to recover for defamatory statements and defamation-defendants' First Amendment rights by requiring public-figure defamation-plaintiffs to allege and ultimately prove actual malice." CSUMF ¶ 22; *see also id.* ¶ 23 (noting "public-figure defamation-plaintiffs' ultimate burden of *proving* actual malice by clear and convincing evidence to prevail at trial"). In its opinion, the Court of Appeals similarly applied the actual malice standard, observing that "[n]othing in this opinion should . . . be construed to cast doubt on the First Amendment's crucial constitutional protections. Indeed, this protection is precisely why Palin's evidentiary burden at trial—to show by clear and convincing evidence that Bennet acted with actual malice—is high." *Palin v. N.Y. Times Co*., 940 F.3d 804, 817 (2d Cir. 2019).

Palin had every opportunity in connection with the motion to dismiss in this Court and her subsequent appeal to argue that the actual malice standard does not govern her claim—no discovery was necessary to advance such an argument, nor has there been any intervening change in the law. And the Internet existed at the time the parties previously litigated the applicable standard of fault. Palin should not be now be permitted to reverse course and argue for application of a different standard at this late date—she has waived that argument for all purposes at this and all future stages of this litigation.

## II.     *SULLIVAN* AND ITS PROGENY REQUIRE THIS COURT TO APPLY THE ACTUAL MALICE STANDARD HERE

Palin argues (1) that this Court may disregard *Sullivan* and its progeny (though even she admits that "the appropriateness of doing so is admittedly suspect,"); and (2) that those cases

should be overruled, at least to the extent they require public figures, in addition to public officials, to prove actual malice. Dkt. 100 at 6-13.

It is a matter of blackletter law, of course, that a district court is bound by the decisions of the Supreme Court of the United States and the Court of Appeals. *E.g. United States v. Gardner*, 837 F. Supp. 2d 346, 351-52 (S.D.N.Y. 2011). Palin in her brief refers to *stare decisis* and invokes various exceptions to it as purportedly excusing this Court from that constraint. *See* Dkt. 100 at 6-8. The simple flaw in Palin's argument, however, is that she "fail[s] to distinguish . . . between horizontal *stare decisis* (whereby a court binds itself) and vertical *stare decisis* (whereby a higher court's decision binds lower courts)." *Dodge v. Cty. of Orange*, 282 F. Supp. 2d 41, 79-80 (S.D.N.Y. 2003). In other words, the Supreme Court of the United States "can choose whether or not to follow its own precedent," but a federal district court "is obligated to accept the law as it has been interpreted by the Supreme Court and Second Circuit." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 305 (S.D.N.Y. 2003).

And on the point of law raised by Palin's motion, the appellate precedent is clear: Both public figures and public officials must present clear and convincing evidence of actual malice to establish a claim sounding in defamation or analogous areas of law. *See* Dkt. 96 at 12-13 (citing cases). That long line of precedent forecloses Palin's argument. Indeed, Palin has previously acknowledged that *Sullivan* and the Second Circuit decisions interpreting it are binding. CSUMF ¶ 21.

## III.    THIS CASE FITS SQUARELY WITHIN THE *SULLIVAN* LINE OF CASES

Palin argues in the alternative that the "factual circumstances justifying application of the actual malice rule are absent today," and therefore the rule should not be applied to her case.

4

Dkt. 100 at 7-8.  Specifically, she contends that, due to the development of the Internet, "an exponentially increasing number of people . . . could be subjected to the rule's 'elusive' standard of fault in circumstances beyond contemplation when the rule came into existence."  *Id.* at 1. Palin also contends that courts have at times been inconsistent in determining what qualifies a person as a public figure.  *Id.* at 16.  And she argues that, because of the "proliferation of online speech, the primary reason for the actual malice rule—the need to create uninhibited, robust, and wide-open debate—no longer justifies its application."  *Id.*[1]

Even assuming, *arguendo*, that there were any merit to Palin's theory that "times have changed," they have not changed insofar as relevant to the application of *Sullivan* to *this* case. Palin is not a public figure for purposes of her claims here because of the Internet.  If the Warren or Burger Courts were asked to determine whether a person is a public figure if – using Palin's own words – that person is a former governor, CSUMF ¶¶ 14-15, who (1) "rose to national prominence" when she was placed on the Republican presidential ticket as the vice presidential candidate, *id.* ¶ 16; (2) is a "paragon of Conservative politics," *id.* ¶ 17; (3) planned at one point to run for president herself, *id.* ¶ 18; and (4) alleges that the challenged statement defamed her in her capacity as the person responsible for a Political Action Committee's public advocacy to influence both national policy on gun control and the outcomes of numerous Congressional elections, *id.* ¶ 19, they would require no explanation of modern technology.  Their answer

---

[1] Palin's arguments are logically inconsistent in numerous respects.  For example, Palin simultaneously argues that "there is much greater access to the channels of effective communication today, which provides more people the opportunity to counteract false statements," Dkt. 100 at 16, while also arguing that  "[w]e are worlds away from the days when a public figure was capable of meaningfully defending herself against defamation by issuing press statements or holding a press conference to refute false charges," *id.* at 18.  But this Court need not (indeed, should not) reach the merits of Palin's contentions, and the defendants will not here undertake to fully rebut them, for the reasons stated above.

would be "yes."[2]

In short, even if there were a class of defamation cases that, in modern circumstances, fairly could be said to be inapposite to those governed by *Sullivan*, this case, based on Palin's own allegations, is not one of them.

## IV.    PALIN IS IN ANY EVENT ALSO REQUIRED TO PROVE ACTUAL MALICE UNDER STATE LAW

Finally, Palin's motion should be denied because it assumes that the actual malice requirement is grounded only in the First Amendment to the United States Constitution.  As defendants pointed out in their brief in support of their motion for summary judgment, however, regardless of whether Alaska or New York state law governs Palin's defamation claim, both would require a heightened showing of fault by Palin here.  Dkt. 96 at 12.  Specifically, both the Alaska and New York state constitutions have been interpreted to offer broader protection than does the First Amendment.  *Mickens v. Kodiak*, 640 P.2d 818, 820 (Alaska 1982) (holding that free speech clause of Alaska constitution is "at least as protective" as First Amendment); *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 249 (1991) ("whether by the application of 'interpretive' (e.g., text, history) or 'noninterpretive' (e.g., tradition, policy) factors, the protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the Federal Constitution" (internal marks and

---

[2] Moreover, the Supreme Court has made clear that its "cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied" to the Internet.  *Reno v. ACLU*, 521 U.S. 844, 870 (1997).  To the extent Palin argues that the actual malice standard is somehow inhibiting free speech on the Internet, *see* Dkt. 100 at 16, 19, as the Supreme Court previously has observed, "[t]he dramatic expansion of this new marketplace of ideas contradicts the factual basis of this contention.  The record demonstrates that the growth of the Internet has been and continues to be phenomenal," *Reno*, 521 U.S. at 885 (rejecting the government's argument that "the unregulated availability of 'indecent' and 'patently offensive' material on the Internet is driving countless citizens away from the medium").

citations omitted)).  And under Alaska common law, Palin would be required to prove actual malice in this case because the statements at issue involve a matter of public interest—political rhetoric and its connection to violence against politicians.  *Olivit v. City & Borough of Juneau*, 171 P.3d 1137, 1143 (Alaska 2007); *Pearson v. Fairbanks Publ'g Co.*, 413 P.2d 711, 713-714 (Alaska 1966).[3]

No federal court may disregard the articulation of state law by the state's highest court. *See Giordano v. City of N.Y.*, 274 F.3d 740, 754 (2d Cir. 2001) ("the New York Court of Appeals['] . . .  construction of New York State law binds this Court"); *Stolberg v. Members of Bd. of Trs. for State Colls.*, 541 F.2d 890, 894 (2d Cir. 1976) ("It is basic that a state court's construction of its own constitution is definitive and binding upon the federal court."). Therefore, even if this Court were to conclude that it is not bound by *Sullivan* to apply the actual malice standard under the First Amendment, Palin would still be required to make that same showing under applicable state law, and her motion should be denied for this separate and independent reason.

## **CONCLUSION**

For each of the foregoing independent reasons, defendants respectfully request that the Court deny Palin's motion for partial summary judgment.

---

[3] Because Defendants raised the issue of applicable state law in their motion for summary judgment, Dkt. 96 at 12, they assume Palin will respond to that argument in her opposition, and Defendants therefore reserve their further arguments on applicable state law for their reply brief.

Dated:  New York, New York
         July 10, 2020

Respectfully submitted,

BALLARD SPAHR LLP

By: */s/ Jay Ward Brown*
    Jay Ward Brown
    David L. Axelrod
    Thomas B. Sullivan
    Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com
*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

SARAH PALIN,

              Plaintiff,

              -against-

THE NEW YORK TIMES COMPANY and JAMES
BENNET,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

No. 17 Civ. 4853 (JSR)

ECF Case

**DEFENDANTS' REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Jay Ward Brown
David L. Axelrod
Thomas B. Sullivan
Jacquelyn N. Schell
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

I.      THERE IS NO PROCEDURAL BAR TO DEFENDANTS' MOTION............................1

II.     PALIN IS REQUIRED TO DEMONSTRATE THAT BENNET WAS
AWARE PRIOR TO PUBLICATION THAT THE EDITORIAL COULD
BE READ TO ALLEGE A CAUSAL LINK BETWEEN PALIN, THE MAP
AND THE LOUGHNER SHOOTING AND SHE HAS NOT DONE SO ........................5

III.    PALIN CANNOT SHOW THAT BENNET KNEW IT WAS PROBABLY
FALSE TO ASSERT A DIRECT CAUSAL LINK BETWEEN THE MAP
AND THE LOUGHNER SHOOTING..............................................................................8

CONCLUSION...............................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                         **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 244, 248-50, 256-57 (1986) ........................................................................3, 4

*Biro v. Conde Nast*,
    883 F. Supp. 2d 441, 470 (S.D.N.Y. 2012)....................................................................6

*Bose Corp. v. Consumers Union*,
    466 U.S. 485, 512-13 (1984) .....................................................................................4, 5, 6

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 324 (1986)..............................................................................................4

*Cohen v. Equifax Info. Servs., LLC*,
    2019 U.S. Dist. LEXIS 169267, at *6 (S.D.N.Y. Sep. 13, 2019) .............................3

*Contemporary Mission v. N.Y. Times Co.*,
    842 F.2d 612, 621 (2d Cir. 1988).................................................................................5

*Corp. Training Unlimited v. NBC*,
    981 F. Supp. 112, 121 (E.D.N.Y. 1997) ......................................................................6

*Davis v. New York*,
    316 F.3d 93, 100 (2d Cir. 2002)...................................................................................3

*Greene v. Paramount Pictures Corp.*,
    2020 U.S. App. LEXIS 18430, at *5 (2d Cir. Jun. 11, 2020) ...................................7

*Hernandez v. Sessions*,
    731 F. App'x 51, 55 (2d Cir. 2018) .............................................................................2

*Kavanagh v. Zwilling*,
    578 F. App'x 24, 25 (2d Cir. 2014) .............................................................................6

*Markowitz v. Republic Nat'l Bank*,
    651 F.2d 825, 828 (2d Cir. 1981).................................................................................4

*Masson v. New Yorker Magazine, Inc.*,
    832 F. Supp. 1350, 1361-63 (N.D. Cal. 1993).............................................................6

*Palin v. N.Y. Times Co.*, 940 F.3d 804, 807-08, 812-16 (2d Cir. 2019) ............................... *passim*

*Schwabenbauer v. Bd. of Educ.*,
    777 F.2d 837, 841-42 (2d Cir. 1985) ..........................................................................2

*Tilton v. Cowles Publ'g Co.*,
  459 P.2d 8, 18-19 (Wash. 1969) ............................................................................6

*Time, Inc. v. Pape*,
  401 U.S. 279, 285, 290-92 (1971) .........................................................................6

**Other Authorities**

Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems*
  § 5:5.1[B] (5th ed. 2017)........................................................................................6

M. Franklin & D. Bussel, *The Plaintiff's Burden in Defamation: Awareness and
  Falsity*, 25 Wm. & Mary L. Rev. 825, 835-42 (1984).........................................6

The evidence adduced during discovery establishes without contradiction that, when James Bennet wrote the passages of the Editorial at issue, he did not intend to draw, and was unaware that his choice of words would be construed as alleging a causal link between the rhetoric of SarahPAC (or Sarah Palin personally) and Jared Loughner's deadly shooting spree. Moreover, the evidence demonstrates that Bennet did not know one way or the other whether such a causal link existed. Bennet has himself so testified twice, and his testimony is corroborated by both his co-workers' testimony and contemporaneous documents.

In the absence of any actual evidence to support her allegations, Palin argues that:

(i) the Court of Appeals, in reversing this Court's order granting The Times's prior 12(b)(6) motion, held that summary judgment is precluded here and that "law of the case" bars this motion;

(ii) this Court would make "new law" if it held that Bennet's lack of awareness of defamatory meaning prevents Palin from establishing actual malice; and

(iii) she has identified sufficient admissible evidence from which a reasonable jury could find that she clearly and convincingly has proved that Bennet wrote the passages in question despite knowledge of their probable falsity.

In so arguing, Palin relies on long-outdated case law, misstates current law, and mischaracterizes the evidence of record. Because Palin cannot meet her burden under the First Amendment and applicable state law of coming forward now with evidence of actual malice that a reasonable jury could find "clear and convincing," defendants' motion should be granted.[1]

## I.     THERE IS NO PROCEDURAL BAR TO DEFENDANTS' MOTION

Palin argues that this motion for summary judgment is barred by the Court of Appeals' ruling in connection with the prior 12(b)(6) motion as "law of the case." Palin is mistaken. The panel itself, while acknowledging the Constitutional issues present in the case, expressly noted

---

[1] Palin does not contest and thus concedes defendants' argument, Dkt. 96 at 12, that the New York and Alaska constitutions and Alaska common law also require her to prove actual malice.

that its sole concern was with "how district courts evaluate pleadings." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 817 (2d Cir. 2019). It ultimately concluded that this Court "erred in relying on facts outside the pleadings to dismiss the complaint" and that the proposed amended complaint "plausibly states a claim for defamation and may proceed to full discovery." *Id.* at 807-08.

Palin claims that the Court of Appeals held "that a summary judgment on actual malice based on Bennet's self-serving testimony would have to be vacated." Dkt. 107 at 5; *see also id.* at 6 (arguing Court of Appeals "already ruled" that "Bennet's testimony about what he supposedly 'knew,' 'recalled,' and 'intended' when he re-wrote the editorial" "does not satisfy Defendants' summary judgment burden"). She bases this contention on a single sentence in which the panel noted that, "[e]ven if the plaintiff had been given notice and the court had explicitly converted the motion to one for summary judgment, we would still have to vacate because the district court's opinion relied on credibility determinations not permissible at any stage before trial." 940 F.3d at 812.

**First**, contrary to Palin's assertion, the sentence in question is not "law of the case" precluding this motion for summary judgment. Palin ignores that the Court of Appeals expressly held that the prior motion had *not* been converted to one for summary judgment. *Id.* Therefore, its discussion of what would have happened if such a conversion had actually occurred was dicta. The law of the case "doctrine does not apply to dicta." *Hernandez v. Sessions*, 731 F. App'x 51, 55 (2d Cir. 2018); *accord Schwabenbauer v. Bd. of Educ.*, 777 F.2d 837, 841-42 (2d Cir. 1985).

**Second**, even if that dicta could otherwise be viewed as a "holding," it would not have the impact Palin attributes to it. On a motion to dismiss, a court is required to assume the truth of the facts alleged in the complaint, and the Court of Appeals did so here: "[G]iven the facts *alleged*," the panel found it plausible that Bennet made the statements with actual malice, and

2

**JA 2229**

ruled that this Court could not "anchor[]" its "negative view of the plausibility of Palin's allegations" in its finding that Bennet was a credible witness. 940 F.3d at 815-16 (emphasis added). In its hypothetical discussion of the impact of converting the dismissal motion to one for summary judgment, the panel relied on this same, procedurally required assumption – that Palin's factual *allegations* were true –as Palin herself acknowledges. *See* Dkt. 107 at 7.

Following denial of a motion to dismiss, however, the burden shifts. As the Supreme Court put in the seminal defamation case presenting this question, a party in Palin's current position "may not rest upon mere allegation or denials of h[er] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *accord Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). Moreover, in ruling on summary judgment, a "judge must bear in mind the actual quantum and quality of proof necessary to support liability" and "view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S at 254. Importantly, in the context of this public-figure defamation case, that means the question is "whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." *Id*. at 257; *see id.* at 254 (no genuine issue exists if opposing evidence "is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence").

The parties have now conducted extensive discovery and, as discussed in defendants' opening brief, Dkt. 96 at 21-25, and below, there is no admissible evidence from which a jury could conclude that Palin clearly and convincingly established that Bennet deliberately wrote false facts about her. *See Cohen v. Equifax Info. Servs., LLC*, 2019 U.S. Dist. LEXIS 169267, at *6 (S.D.N.Y. Sep. 13, 2019) (Rakoff, J.); *Anderson*, 477 U.S. at 249-50 ("if the evidence is

# JA 2230

merely colorable or is not significantly probative, summary judgment may be granted" (citations omitted)). In urging otherwise, Palin largely relies on cases decided prior to *Anderson*. Dkt. 107 at 3-4. Following *Anderson*, however, even if this Court were to find that Palin can now provide evidentiary support for certain of her allegations, her claim must still fail, because they do not add up to the clear and convincing evidence as required at this stage of the case.

**Third**, the Court of Appeals' observation that credibility determinations are irrelevant at any stage of proceedings before trial is accurate, but beside the point. On summary judgment, a court is *not* called upon to make a credibility determination if a witness' testimony is corroborated and there is no contrary evidence sufficient to overcome the applicable burden of proof. *See Anderson*, 477 U.S. at 248-49 (requiring "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial" (citation omitted)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (party opposing summary judgment must "designate specific facts showing that there is a genuine issue for trial" (citation omitted)). Indeed, the Supreme Court expressly has rejected Palin's argument, Dkt. 107 at 16-17, that summary judgment should be denied where the defendant's "state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue." *Anderson*, 477 U.S. at 256; *accord Markowitz v. Republic Nat'l Bank*, 651 F.2d 825, 828 (2d Cir. 1981) (plaintiff not entitled to jury trial simply because defendant's state of mind is material element). A plaintiff therefore cannot "defeat a defendant's properly supported motion for summary judgment in a . . . libel case" "without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial . . . of legal malice." *Anderson*, 477 U.S. at 256; *see also, e.g., Bose Corp. v. Consumers Union*, 466 U.S. 485, 512 (1984) ("discredited testimony is

4

not [normally] considered a sufficient basis for drawing a contrary conclusion").[2]

For all of these reasons, this motion is not barred on any procedural ground.

## II. PALIN IS REQUIRED TO DEMONSTRATE THAT BENNET WAS AWARE PRIOR TO PUBLICATION THAT THE EDITORIAL COULD BE READ TO ALLEGE A CAUSAL LINK BETWEEN PALIN, THE MAP AND THE LOUGHNER SHOOTING AND SHE HAS NOT DONE SO

Contrary to Palin's contentions, the requirement that a defendant be aware of and intend to communicate a defamatory meaning is part and parcel of the actual malice requirement, and is neither limited to defamation-by-implication cases nor "new law" in this Circuit. (Of course, here, Palin alleges that the challenged statement, which expressly is directed at her PAC, implies that she personally was responsible for the PAC's conduct.) At its core, the actual malice standard is designed to allow public figures to recover damages for defamatory statements only when the defendants make "a *knowing* falsehood or [have] subjective awareness of probable falsity." *Contemporary Mission v. N.Y. Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988) (internal marks and citations omitted). A defendant who misspeaks or fails to understand the import of what he or she has said does not knowingly lie and therefore does not publish with actual malice. *See, e.g.*, *Bose*, 466 U.S. at 512-13 (holding mere use of "malapropism" by someone who "would have to know that the term was inaccurate in context, even though he did not realize his folly at the time," insufficient to establish actual malice, and observing that choice of language

---

[2] Palin contends alternatively that the "awareness" argument specifically is barred because it was previously raised by The Times (although not by Bennet, who was not then a defendant). But neither this Court nor the Second Circuit even purported to address the question of Bennet's lack of awareness of the alleged defamatory meaning of his words. Because neither court addressed this issue, even if Palin were correct that The Times had "raised" the argument in its post-hearing brief on the 12(b)(6) motion, there is no judicial ruling on the issue that this Court is required to follow. Palin asserts that the Court of Appeals addressed the awareness argument by its reference to "an unintended mistake," Dkt. 107 at 8-9, but, as the panel made clear elsewhere in the opinion, it considered the "mistake" to be the inclusion of "erroneous facts about Palin." 940 F.3d at 813; *see id.* at 815 (describing issue as about "a mistake due to a research failure").

"reflecting a misconception . . . does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella"); *Time, Inc. v. Pape*, 401 U.S. 279, 285, 290-92 (1971) (where reporters "admitted an awareness at the time of publication" that they had "significantly altered" the wording of a government document, "but insisted that its real meaning had not been changed," their "arguabl[e] … misconception" and "error of judgment" did not amount to actual malice); Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 5:5.1[B] (5th ed. 2017).

As a matter of logic, it is not surprising that this doctrine often comes into play in cases of defamation by implication, but the principle that a defendant in a public figure defamation case cannot be held liable for unknowingly making a false statement has not been limited to that context. *See Masson v. New Yorker Magazine, Inc.*, 832 F. Supp. 1350, 1361-63 (N.D. Cal. 1993), *aff'd*, 85 F.3d 1394 (9th Cir. 1996); *see also Tilton v. Cowles Publ'g Co.*, 459 P.2d 8, 18-19 (Wash. 1969); Sack § 5:5.1[B]; M. Franklin & D. Bussel, *The Plaintiff's Burden in Defamation: Awareness and Falsity*, 25 Wm. & Mary L. Rev. 825, 835-42 (1984). Nor is this requirement new to this Circuit. In *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 470 (S.D.N.Y. 2012), for example, the court ruled that the meaning ascribed by the plaintiff to certain passages at issue was not actionable because "nothing in the language suggests that Defendants intended or endorsed such far-reaching implications." *See also Kavanagh v. Zwilling*, 578 F. App'x 24, 25 (2d Cir. 2014) (complaint had "fail[ed] to allege that the defendants 'intended or endorsed' the n[eg]ative inference allegedly made in the press release" at issue); *Corp. Training Unlimited v. NBC*, 981 F. Supp. 112, 121 (E.D.N.Y. 1997) (granting summary judgment where there was "no evidence that the NBC employees responsible for the Broadcast were aware of that implication when the Broadcast was aired"). And just last month, the Court of Appeals upheld

summary judgment for the defendants because the plaintiff had failed to "raise a genuine issue of material fact as to whether defendants acted with knowledge or reckless disregard in making defamatory statements 'of and concerning' him" where there was no reason for defendants to think that viewers of the film would perceive a character as depicting the plaintiff. *Greene v. Paramount Pictures Corp.*, 2020 U.S. App. LEXIS 18430, at *5 (2d Cir. Jun. 11, 2020).

Palin is unable to point to any admissible evidence, much less evidence a reasonable jury could find clear and convincing, that Bennet was aware that his choice of words would be interpreted by readers as an allegation that Palin personally, through the Crosshairs Map, caused Loughner to shoot people. Instead, she argues that Bennet's testimony to the contrary should be "disregarded" because it is "self-serving." Dkt. 107 at 14. But Bennet's testimony is directly corroborated by the admissible evidence: Among other things, a contemporaneous email exchange between Bennet and Ross Douthat (in which Douthat first drew Bennet's attention to the alternative meaning of his words) corroborates Bennet's testimony that he did not intend that meaning. RSUMF ¶¶ 80-82; *see also* RSUMF ¶¶ 83-93.

To try to manufacture a factual dispute about Bennet's lack of awareness, Palin mischaracterizes the evidence and relies on irrelevancies. Most significantly, she repeatedly suggests that Bennet and Cohn testified they understood "incitement" as used by Bennet to mean a direct call to violence, but their deposition testimony in fact is the opposite. *See* RSUMF ¶¶ 83, 89. While Palin is correct that Bennet believed Williamson's draft needed revision and that he wanted to use a strong word for the concept he was describing, RSUMF ¶¶ 56-59, neither is relevant to whether he was aware readers would attach a different meaning to his words than he intended. Simply put, there is no evidence in the record from which a jury could find that Palin has clearly and convincingly established that Bennet was aware his words would be read as

accusing Palin of directly causing the Loughner Shooting. Defendants are entitled to summary judgment on this ground alone.

## III. PALIN CANNOT SHOW THAT BENNET KNEW IT WAS PROBABLY FALSE TO ASSERT A DIRECT CAUSAL LINK BETWEEN THE MAP AND THE LOUGHNER SHOOTING

Separately, as defendants established in their opening brief, Palin is unable to show that Bennet knew, at the time of publication, that there was no causal link between SarahPAC's rhetoric and the Loughner Shooting. *See* Dkt. 96 at 20-25. Notably, Palin does not address or attempt to explain her admission at her deposition that there was, at the time, no consensus about whether such a link existed. *See* Dkt. 96 at 21; RSUMF ¶ 154. This alone prevents her from establishing with convincing clarity that Bennet knew his words were probably false.

While a defendant cannot automatically ensure summary judgment through testimony that he lacked knowledge of falsity, a defendant's testimony to that effect also is not automatically disregarded. And defendants do not rely solely on Bennet's testimony – it is supported by the testimony of numerous other witnesses and contemporaneous documentary evidence chronicling the drafting process and defendants' actions immediately in the wake of publication. Palin was required now to put up sufficient evidence to show this Court that, at trial, she could meet her burden of clear and convincing proof of actual malice. She did not.

The supposed "facts" to which Palin points as establishing actual malice are unsupported by admissible evidence – indeed, many are bald misstatements of the record. For example, Palin asserts that Williamson was instructed before producing her first draft of the Editorial to research whether there was a link between the Crosshairs Map and the Loughner Shooting and that, in revising her draft, Bennet disregarded the results of her research. *See* Dkt. 107 at 18, 20. There is no evidence to support these assertions. Rather, the evidence is that, while Williamson was writing, she familiarized herself with the Loughner Shooting, but she testified she does not recall

reading any source discussing whether a link existed between the Map and that crime. *See* RSUMF ¶¶ 25, 42-43. Separately, Bennet asked for research to determine if The Times's *own* Editorial Board had previously written anything connecting the Loughner Shooting to incitement – it had not – because he wanted to ensure the new editorial was in sync with any prior Board position. *Id.* ¶¶ 29, 34. Palin conflates these two strands of testimony into a fiction.

With respect to those allegations on which the Court of Appeals based its decision, Palin does not seriously contest that she has been unable to support them with admissible evidence.[3] Before the Court of Appeals, Palin alleged that Bennet was "responsible for the content of, reviewed, edited and approved the publication of numerous articles" in *The Atlantic* magazine, which the panel found permitted an inference "that one who had risen to editor-in-chief at *The Atlantic* knew their content and thus that there was no connection between Palin and the Loughner shooting." 940 F.3d at 813-14. However, the record now clearly establishes that Bennet was not responsible for editing any of these articles – they were each published by sister publications over which he exercised no editorial supervision. Dkt. 96 at 22-23. Palin now makes the very different argument that Bennet should be deemed to have actual malice because he testified that he regularly read The Times and The Atlantic's website and therefore must have read some articles about the Loughner Shooting, despite his testimony that he does not recall reading any of the articles on which Palin relies. *See* Dkt. 107 at 18. If a general interest in the news of the day is a sufficient basis on which to charge a defendant with knowledge of all facts reported in the media, the actual malice rule would be a nullity.

---

[3] The only new evidence Palin cites is a proposal for an article sent to Bennet immediately after the Loughner Shooting that included a link to another article. Dkt. 107 at 18. Bennet, however, testified that he received many such pitches and his practice was to forward them to another editor for consideration. RSUMF ¶ 267.

The Court of Appeals also found plausible support for actual malice in Palin's allegations that "Bennet had a personal connection to a potential shooting that animated his hostility to pro-gun positions at the time of the Loughner shooting in 2011." 940 F.3d at 814. Palin fails to acknowledge that *not a single document nor a word of testimony* supports her speculation. *See* Dkt. 96 at 23-25. Moreover, the panel found that these allegations were relevant only because they created a "plausible inference" that Bennet would be aware of articles "published on his watch relating to the Loughner shooting." 940 F.3d at 814. As discussed above, however, no such articles were in fact "published on his watch." Palin instead falls back on an argument that Bennet was biased against her for political reasons. As the panel noted in the appeal in this case, however, "political opposition alone does not constitute actual malice." *Id.*[4]

Finally, the Court of Appeals also agreed that The Times's swift correction of the Editorial plausibly supported actual malice if it "was issued after a calculus that standing by the editorial was not worth the cost of the public backlash." 940 F.3d at 815. Palin points to no evidence in the record suggesting that The Times made such a calculation. Instead, the evidence confirms that, after Bennet was first alerted by a colleague to a potential issue approximately an hour after the Editorial was published, he began working that same night to determine if a mistake had been made. RSUMF ¶¶ 73, 80, 99. Palin accordingly has failed to meet her burden.

## CONCLUSION

Defendants respectfully request that the Court grant their motion for summary judgment.

---

[4] Additionally, the undisputed evidence demonstrates that Bennet did not willfully disregard the hyperlink contained in the Editorial—he did not read the linked article because he was writing on deadline. RSUMF ¶¶ 69, 71. Williamson did not recall reading the portion of the linked article regarding the existence of a causal connection between the shooting and the Map. *Id.* ¶ 41. Moreover, even if he had read the linked article, because he did not intend to suggest a causal connection, the article would not have put him on notice that the Editorial contained an "error."

**JA 2237**

Dated:  New York, New York   Respectfully submitted,
    July 17, 2020

           BALLARD SPAHR LLP

           By: _/s/ Jay Ward Brown_
            Jay Ward Brown
            David L. Axelrod
            Thomas B. Sullivan
            Jacquelyn N. Schell
           1675 Broadway, 19th Floor
           New York, NY 10019-5820
           Phone: (212) 223-0200
           Fax: (212) 223-1942
           brownjay@ballardspahr.com
           axelrodd@ballardspahr.com
           sullivant@ballardspahr.com
           schellj@ballardspahr.com
           _Counsel for Defendants_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SARAH PALIN, an individual,

               Plaintiff,

  – against –

THE NEW YORK TIMES COMPANY,
A New York corporation

               Defendants.

---

No. 17 Civ. 4853

Hon. Jed S. Rakoff

ECF Case

## <u>NOTICE OF APPEAL</u>

NOTICE IS HEREBY GIVEN that Sarah Palin, Plaintiff in this case, hereby appeals to the United States Court of Appeals for the Second Circuit from the Final Judgment entered in this action on February 15, 2022 [Doc. 171] ("Final Judgment"), inclusive (without limitation) of: the Court's February 14, 2022 oral [Tr. Trans. at 1295-1306] and March 1, 2022 written [Doc. 196] rulings granting judgment as a matter of law under *Fed. R. Civ. P.* 50; the February 15, 2022 Jury Verdict [Doc. 173]; the December 29, 2020 Memorandum Order [Doc. 125] (applying N.Y. Civil Rights Law § 76-a, as amended on November 10, 2020, to this action); and any and all interlocutory judgments, decrees, decisions, rulings, verdicts, and opinions that merged into and became part of the Final Judgment, that are related to the Final Judgment, and upon which the Final Judgment is based.

**Notice of Pending Motions Under Rule 4(a) *Fed. R. App. P.***

On February 28, 2022, pursuant to Local Civil Rule 6.1 and Rule 2 of the Court's Individual Rules of Practice, Plaintiff filed her Notice of Omnibus Post-Trial Motions [Doc. 195], including (among others) motions for: reconsideration under Local Civil Rule 6.3 and to alter or amend the Final Judgment under Rule 59; for new trial under Rule 59; and for relief under Rule 60.  Pursuant to Rule 4(a), *Fed. R. App. P.*, the time to file this Notice of Appeal runs from the entry of the order disposing of the last remaining of these motions.  However, because Plaintiff's deadline for filing her memorandum of law in support of the Omnibus Post-Trial Motions is not until March 22, 2022 [*see* March 4, 2022 Minute Entry], Plaintiff is filing this Notice of Appeal within thirty days of the Final Judgment to ensure preservation of all her appellate rights.

*/s/ Shane B. Vogt*
Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 834-9191
Fax: (813) 443-2193

and

Case 1:17-cv-04853-JSR Document 197, Filed 03/17/22 Page 3 of 3

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY 10017
Tel:  (212) 907-7300
Fax:  (212) 754-0330

*Counsel for Petitioner/Plaintiff*
*Sarah Palin*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Notice of Appeal was filed electronically on the 17th day of March, 2022.  Notice of this filing will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt.  Parties and their counsel may access this filing through the Court's system.

*/s/ Shane B. Vogt*

Attorney for Plaintiff Sarah Palin

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SARAH PALIN, an individual,

              Plaintiff,

– against –

THE NEW YORK TIMES COMPANY,
a New York corporation, and JAMES
BENNET, an individual,

              Defendant.

No. 17 Civ. 4853

Hon. Jed S. Rakoff

ECF Case


**PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW
IN SUPPORT OF POST-TRIAL MOTIONS**


TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone: (813) 834-9191
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY 10017
Telephone: (212) 907-7300
Facsimile: (212) 754-0330
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

## TABLE OF CONTENTS

Table of Contents .................................................................................................. i

Table of Authorities ............................................................................................. ii

I.     INTRODUCTION ..................................................................................... 1

II.    GOVERNING LAW ................................................................................. 2

    A.    Disqualification ............................................................................. 2

    B.    Vacatur and New Trial ................................................................. 3

III.   THE ERRORS SUPPORTING VACATUR AND NEW TRIAL ............. 5

    A.    The Refusal to Carry Out the Mandate on Summary Judgment ........................... 5

    B.    The Insufficient *Voir Dire* ............................................................ 8

    C.    The Erroneous and Prejudicial Exclusion of Evidence at Trial in Violation of the Mandate ...................................................... 10

    D.    The Erroneous Judgment as a Matter of Law Under Rule 50 ............................. 12

    E.    The Erroneous Instruction Responding to the Jury's Question About Evidence of Actual Malice ................................................ 17

    F.    The Tainted Verdict ................................................................... 20

    G.    The *Ex Parte* Jury Interview ...................................................... 21

    H.    The Court's Extra-Judicial Comment to the Press ....................... 21

    I.    The Rule 50 "Opinion" .............................................................. 23

IV.   DISQUALIFICATION IS REQUIRED ................................................. 35

CONCLUSION .................................................................................................. 38

CERTIFICATE OF SERVICE ........................................................................... 40

**JA 2243**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Cᴀsᴇs

*Aetna Cas. & Sur. Co. v. Home Ins. Co.*, 882 F.Supp. 1355 (S.D.N.Y. 1995)............................ 5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..................................................... 5, 13, 14

*Arilo v. Lively*, 474 F.3d 46 (2d Cir. 2007)..................................................................... 11

*Banister v. Davis*, 140 S. Ct. 1698 (2020) ..................................................................... 4

*Bibbins v. Dalsheim*, 21 F.3d 13 (2d Cir. 1994) ............................................................. 24

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009).................................................. 2

*Davidson v. Riley*, 44 F.3d 1118 (2d Cir. 1995) ............................................................. 1

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ............................................................. 1

*Delima v. Trinidad Corp.*, 302 F.2d 585 (2d Cir. 1962) ................................................... 20

*Giano v. Sullivan*, 709 F.Supp. 1209 (S.D.N.Y. 1989)..................................................... 1

*Girden v. Sandals Intern.*, 262 F.3d 195 (2d Cir. 2001) ................................................... 20

*Gottwald v. Sebert*, 2022 WL 709757 [Case No. 2021-03036] (1st Dept. Mar. 10, 2022) ............................................................................................................. 12

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ............................ 29

*Holzapfel v. Town of Newburgh*, 145 F.3d 516 (2d Cir. 1998)............................................ 20

*In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001) ............................................ 35, 36

*In re Coudert Brothers, LLP*, 809 F.3d 94 (2d Cir. 2015)................................................. 8

*In re IBM Corp.*, 45 F.3d 641 (2d Cir. 1995)................................................................ 35

*Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148 (2d Cir. 2004) ....................................... 20

*Johnstone v. Kelly*, 808 F.2d 214 (2d Cir. 1986) ........................................................... 1

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537 (2d Cir. 2010) .......................................... 14, 15

*Lamborn v. Dittmer*, 726 F.Supp. 510 (S.D.N.Y. 1989)................................................... 3

*Lee v. McCue*, 2007 WL 2230100 (S.D.N.Y. Jul. 25, 2007).............................................. 14

*Ligon v. City of New York*, 736 F.2d 118 (2d Cir. 2013), *vacated in part on other grounds*, 743 F.3d 362 (2d Cir. 2014) ................................................................... 36

**Page(s)**

*Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988)................................. 36, 37

*Liteky v. U.S.*, 510 U.S. 540, 555 (1994) ............................................................................ 2

*Loeb v. New Times Communications Corp.*, 497 F.Supp. 85 (S.D.N.Y. 1980)........................ 34

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991)...................................................... 15

*Microsoft Corp. v. Bristol Tech., Inc.*, 250 F.3d 152 (2d Cir.2001) ............................................ 4

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243 (1940) ........................................................ 3

*Nemaizer v. Baker*, 793 F.2d 58 (2d Cir. 1986)......................................................................... 4

*Owen v. Thermatool Corp.*, 155 F.3d 137 (2d Cir. 1998).......................................................... 20

*Paddington Partners v. Brouchard*, 34 F.3d 1132 (2d Cir. 1994).............................................. 4

*Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) ..... 1, 5, 6, 7, 8, 14, 23, 24, 29, 31, 33

*Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534 (2d Cir.1992) ........................................... 3

*Raedle v. Credit Agricole Indosuez*, 670 F.3d 411 (2d Cir.2012) ............................................... 3

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)........................... 14, 15, 24

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017)........................................................... 11, 20

*Rippo v. Baker*, 137 S.Ct 905 (2017) ......................................................................................... 2

*Santa Maria v. Metro-North Commuter R.R.*, 831 F.3d 265 (2d Cir. 1996) ............................... 3

*Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135 (2d Cir. 2008) ................................................ 4

*Shade v. Hous. Auth. of New Haven*, 251 F.3d 307 (2d Cir. 2001) .......................................... 20

*Sharkey v. J.P. Mogan Chase & Co.*, 251 F.Supp.3d 626 (S.D.N.Y. 2017)................................ 2

*Sharon v. Time, Inc.*, 599 F.Supp. 538 (S.D.N.Y. 1984) ................................................ 14, 15, 26

*Shrader v. CSX Transp., Inc.*, 70 F.3d 255 (2d Cir. 1995) ......................................................... 4

*Soto v. Gaudett*, 862 F.3d 148 (2d Cir. 2017)............................................................................ 5

*Stampf v. Long Island R.R. Co.*, 71 F.3d 192 (2d Cir. 2014)....................................................... 3

*Tumey v. Ohio*, 273 U.S. 510 (1927) ......................................................................................... 1

*Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006)................................ 15

*U.S. v. Adegbite*, 877 F.2d 174 (2d Cir. 1989)........................................................................... 4

*U.S. v. Amico*, 486 F.3d 764 (2d Cir. 2007)................................................................... 2, 3, 36

*U.S. v. Bando*, 244 F.2d 833 (2d Cir. 1957), *cert. denied* 355 U.S. 844 (1957) ...................... 10

*U.S. v. Cooley*, 1 F.3d 985 (10th Cir. 1993) ................................................ 35

*U.S. v. Diaz*, 797 F.2d 99 (2d Cir. 1986) ..................................................... 2

*U.S. v. Ferguson*, 550 F.Supp. 1256 (S.D.N.Y. 1982) ................................... 3

*U.S. v. Kahaner*, 204 F.Supp. 921 (S.D.N.Y. 1962) ................................... 10

*U.S. v. Kozeny*, 667 F.3d 122 (2d Cir. 2011) ..................................... 3, 20

*U.S. v. Lawes*, 292 F.3d 123 (2d Cir. 2002) ..................................... 8, 10

*U.S. v. Lovaglia,* 954 F.2d 811 (2d Cir. 1992) ........................................ 2

*U.S. v. Marin*, 662 F.Supp.2d 155 (D.D.C. 2009) ................................... 3

*U.S. v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ........................ 35, 36, 37

*U.S. v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ............................................ 2

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18 (1994) ....................... 4

*Virgin Atl. Airways v. Nat'l Mediation Bd.*, 956 F.2d 1245 (2d Cir. 1992) ................. 4

*Village of Freeport v. Barrella*, 814 F.3d 594 (2d Cir. 2016) ................... 11

*Withrow v. Larkin*, 421 U.S. 35 (1975) ................................................. 2

*Yimouyannis v. Consumer Union of the U.S., Inc.*, 619 F.2d 932 (2d Cir. 1980) ............ 34

*Young v. Gannett Satellite Info. Network, Inc.*, 734 F.3d 544 (6th Cir. 2013) ............ 29

**Page(s)**

## OTHER AUTHORITIES

28 U.S.C. § 455 ................................................................. 1, 35, 36

28 U.S.C. § 455(a) ................................................................... 2

Canon 3A(6) of the Code of Conduct for United States Judges ..................... 35

Federal Rule of Civil Evidence 401 ................................................ 12

Federal Rule of Civil Evidence 606(b) ............................................. 24

Federal Rule of Civil Procedure 12 ................................................. 5

Federal Rule of Civil Procedure 47(a) ............................................. 10

Federal Rule of Civil Procedure 59 ................................................. 1

Federal Rule of Civil Procedure 59(a) ................................................................ 3

Federal Rule of Civil Procedure 59(a)(1)(A) ..................................................... 3

Federal Rule of Civil Procedure 59(e) ................................................................ 3

Federal Rule of Civil Procedure 60 .................................................................... 1

Federal Rule of Civil Procedure 60(b)(6) ........................................................... 4

N.Y. Civil Rights L. § 76-a(2) ........................................................................... 12

## I.      INTRODUCTION

The totality of the facts and circumstances surrounding this case and its recent trial require vacatur of the Verdict [Doc. 173], Rule 50 Opinion [Doc. 196], and Final Judgment [Doc. 171] and a new trial under Rules 59 and 60, *Fed. R. Civ. P.* These facts and circumstances also demonstrate an appearance of partiality requiring recusal under 28 U.S.C. § 455, which should be granted *before* the Court rules on Plaintiff's post-trial motions. The grounds necessitating the relief Plaintiff seeks include:

(1)     failure to carry out the Second Circuit's decision in *Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) (the "Mandate");

(2)     a legally insufficient *voir dire*;

(3)     the exclusion of crucial evidence of actual malice contrary to the Mandate;

(4)     requiring Plaintiff to prove actual malice as to defamatory meaning;

(5)     requiring Plaintiff to prove actual malice under New York's anti-SLAPP law;

(6)     the erroneous oral and written [Doc. 196] Rule 50 decision;

(7)     the announcement of the Rule 50 decision during jury deliberations;

(8)     the erroneous instruction in response to the jury's February 15, 2022 question; and

(9)     the Court's extra-judicial comments to a journalist about the jury's exposure to push notifications.

Several of these errors independently require a new trial, and collectively they establish Plaintiff was denied her right to a fair trial before a judge who appears impartial.[1]

---

[1] *Davidson v. Riley*, 44 F.3d 1118, 1122 (2d Cir. 1995); *Delaware v. Van Arsdall*, 475 U.S. 673, 681-682 (1986); *Tumey v. Ohio*, 273 U.S. 510, 535 (1927); *see also Giano v. Sullivan*, 709 F.Supp. 1209, 1217 (S.D.N.Y. 1989) (*citing Johnstone v. Kelly*, 808 F.2d 214, 218 (2d Cir. 1986)).

**JA 2248**

## II.    GOVERNING LAW

**A.    Disqualification**

The U .S. Constitution, federal statutory law, and codes of judicial conduct each prescribe recusal standards. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876-77 (2009); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 113-115 (D.C. Cir. 2001). Due process requires recusal "when, objectively speaking, 'the probability of actual bias on the part of the judge… is too high to be constitutionally tolerable.'" *Rippo v. Baker*, 137 S.Ct. 905, 907 (2017) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Under 28 U.S.C. § 455(a), any federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." "The Second Circuit applies this standard by asking whether 'an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal,' or alternatively, whether a 'reasonable person, knowing all the facts,' would question the judge's impartiality.'" *Sharkey v. J.P. Mogan Chase & Co.*, 251 F.Supp.3d 626, 629 (S.D.N.Y. 2017) (citing *U.S. v. Yousef*, 327 F.3d 56, 169 (2d Cir. 2003) (quoting *U.S. v. Lovaglia,* 954 F.2d 811, 815 (2d Cir. 1992))).

The rules governing disqualification are "obviously formulated in general terms and do not offer bright-line guidelines." *Lovaglia*, 954 F.2d at 815. Generally, disqualification is appropriate where a judge expresses a personal bias concerning the outcome of the case at issue. *Id*. (*citing U.S. v. Diaz*, 797 F.2d 99, 100 (2d Cir. 1986). While it is generally accepted that judicial rulings and remarks *almost* never constitute a valid basis for a bias or partiality motion, they will support recusal where they "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. U.S.*, 510 U.S. 540, 555 (1994)

Section 455(a) "deals exclusively with appearances." *U.S. v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007). "Its purpose is the protection of the public's confidence in the impartiality of the

2

judiciary." *Id*. Under the statute, courts consider "the allegations of bias or impartiality" as well as "the judge's rulings on and conduct regarding them," and ask whether the facts would lead the public reasonably to believe that these problems affected the manner in which the judge presided over the case. *Id*. An appearance of partiality sufficient to warrant recusal can arise from the "cumulative effect of the judge's reactions." *Id*. at 776. Moreover, "[a]lthough a legal ruling may not itself serve as the basis for a motion to disqualify, a particular judicial ruling 'can be evidence of an extrajudicial bias or prejudice.'" *U.S. v. Marin*, 662 F.Supp.2d 155, 158 (D.D.C. 2009).

Where the question of recusal is a close call, a court should recuse itself. *Amico*, 486 F.3d at 775; *Lamborn v. Dittmer*, 726 F.Supp. 510, 518 (S.D.N.Y. 1989); *U.S. v. Ferguson*, 550 F.Supp. 1256, 1259-60 (S.D.N.Y. 1982).

## B. Vacatur and New Trial

Pursuant to Rule 59(a) of the *Federal Rules of Civil Procedure*, "[a] court may grant a new trial 'for any reason for which a new trial has heretofore been granted in an action at law in federal court....'" *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir.2012) (quoting *Fed.R.Civ.P.* 59(a)(1)(A)). Grounds for a new trial include substantial errors in the admission or exclusion of evidence, *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 203 (2d Cir.2014), prejudicial misconduct affecting the fairness of the trial, *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir.1992), non-harmless errors in jury instructions, *United States v. Kozeny*, 667 F.3d 122, 130 (2d Cir.2011), and other actions rendering the trial unfair, *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940), *Santa Maria v. Metro-North Commuter R.R.*, 831 F.3d 265, 273 (2d Cir. 1996).

Rule 59(e) "gives a district court the chance to rectify its own mistakes in the period immediately following its decision" based on manifest errors of fact or law or to prevent manifest

injustice. *Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020); *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 153 (2d Cir. 2008). One such situation arises when a court misapprehended factual matters or controlling law. *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). As explained by the Second Circuit, "[t]he standard for granting a [motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Id*. To grant reconsideration based on the need to correct a clear error or prevent a manifest injustice, "the Court must have 'a clear conviction of error on a point of law that is certain to recur.'" *Virgin Atl. Airways v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citations omitted); *U.S. v. Adegbite*, 877 F.2d 174, 178 (2d Cir. 1989).

Rule 60(b)(6) of the *Federal Rules of Civil Procedure* allows a court to relieve a party from a final judgment, order, or proceeding for "any other reason that justifies relief." A motion seeking relief under Rule 60(b) is addressed to the sound discretion of the district court. *Nemaizer v. Baker,* 793 F.2d 58, 61–62 (2d Cir.1986); *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1140 (2d Cir.1994) ("A district court's decision on a Rule 60 motion is reviewed for abuse of discretion."). The moving party bears the burden of demonstrating "equitable entitlement to the extraordinary remedy of vacatur." *Microsoft Corp. v. Bristol Tech., Inc.,* 250 F.3d 152, 154 (2d Cir.2001) (*quoting U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,* 513 U.S. 18, 26 (1994)). In determining whether to grant a motion under Rule 60(b)(6), a court must weigh the interests of the

**JA 2251**

parties against the public interest in finality of judgments, including any precedential or preclusive effect. *Aetna Cas. & Sur. Co. v. Home Ins. Co.,* 882 F.Supp. 1355, 1357 (S.D.N.Y.1995).

### III. THE ERRORS SUPPORTING VACATUR AND NEW TRIAL

Several fundamental, prejudicial errors occurred before and during the February 3-15, 2022 jury trial, ultimately resulting in a contaminated jury verdict, erroneous judgment as a matter of law, and final judgment. These errors independently and collectively necessitate vacatur and a new trial.

### A. The Refusal to Carry Out the Mandate on Summary Judgment

When the Second Circuit vacated this Court's dismissal and refusal to accept Plaintiff's proposed amended complaint [Doc. 45], it also addressed facts supporting actual malice under summary judgment standards,[2] and remanded "for proceedings consistent with this opinion." *Palin*, 940 F.3d at 808, 813. The Mandate identifies several jury issues and contains directives that were not followed throughout this case.

First, Bennet's testimony could not be accepted as true: "The jury may ultimately agree with the district court's conclusion that Bennet was credible—*but it is the jury that must decide.*" *Palin*, 940 F.3d at 812 (emphasis added) and n. 25 (*citing Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Second, inferences from Bennet's background as an editor and political advocate and the Editorial's drafting and editing process had to be drawn in Plaintiff's favor, specifically including articles about the Loughner shooting published on *The Atlantic's* website while Bennet was its Editor-In-Chief and facts associated with Bennet's brother (Sen. Michael Bennet) and his "political

---

[2] The Mandate reached these issues because the Times briefed and argued on appeal that the dismissal should be affirmed on summary judgment grounds under Rule 12(d). *Id.* at 185

opposition" to Plaintiff and her political views.  *Id*. at 814-815.[3]  Third, Bennet's testimony that

he did not read the ABC News article ("*Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle*

*Giffords Debate*") hyperlinked in the Editorial that "stated, contrary to the claim in the published

editorial, that '[n]o connection' was made between the SarahPAC map and Loughner" could not

be accepted as true.  *Id*. at 815 ("… any inference to be drawn from the inclusion of the hyperlinked

article was for the jury - not the court."). Fourth, an honest mistake was not the only reasonable

inference that could be drawn from the facts.  *Id.* at 815.

On August 28, 2020, this Court denied summary judgment [Doc. 117] but ruled actual

malice must be established *both* as to defamatory meaning and falsity.  Requiring proof of actual

malice as to defamatory meaning is indicative of the continued acceptance of Bennet's testimony

that he made a mistake, contrary to the Mandate.[4]  *Palin*, 940 F.3d at 813.

After acknowledging the Mandate [Doc. 117 at p. 21], the Court begrudgingly found

Plaintiff adduced sufficient evidence of actual malice as to *defamatory meaning* based on "at least

four items of evidence" that "taken in the light most favorable to plaintiff, could enable a rational

jury to conclude that Bennet either knew, or was reckless not to know, that his words would carry

---

[3] These facts demonstrated Bennet "in particular was more likely than the average editor-in-chief
to know the truth about the Loughner shooting because he had reason to be personally hostile
toward Palin, her political party, and her pro-gun stance," are "**relevant to the credibility of
Bennet's testimony** that he was unaware of facts published on his watch relating to the Loughner
shooting and that he made a mistake when he connected [Plaintiff] to that shooting," which
"[w]hen properly viewed in the plaintiff's favor, **a reasonable factfinder could conclude** this
amounted to more than a mistake due to a research failure."  *Id*. at 814-815 (emphasis added)

[4] The decision to require proof of actual malice as to defamatory *meaning* was also erroneous
because it was based on non-binding defamation by implication cases, as acknowledged in this
Court's conclusion that "where a plaintiff's defamation case depends on a statement that is capable
of multiple meanings - one defamatory, the other innocuous - the plaintiff must prove that the
defendant acted with actual malice not only with respect to the statement's falsity but also as to its
meaning." [Doc. 117 at pp. 18-19] The Court previously recognized that "what [the Editorial is]
asserting is not that people at the time thought this, it's asserting as a fact that there's a direct link
between this [the map] and the shooting."  [7/31/17 Trans. at 11:12-14]

the defamatory meaning." [*Id*. at 19-26]. As for actual malice as to *falsity*, the Court denied summary judgment but refused to carry out the Mandate by disregarding *The Atlantic's* Loughner shooting articles (*Palin*, 940 F.3d at 813-814) and Bennet's background and brother (*Palin*, 940 F.3d at 814-815). [*Id*. at 27-30]. The Court concluded *The Atlantic* articles were irrelevant based on Bennet's "editorial control[5]" (which ignores whether Bennet *read* them[6]) and evidence concerning Bennet's brother and personal connections to the shooting was irrelevant because its relevancy rested exclusively on whether Bennet had "editorial control" over *The Atlantic* articles [Doc. 117 at pp. 29-30].

The Court relied on evidence associated with the drafting and editing process to deny summary judgment, which "taken in the light most favorable to plaintiff… shows Bennet came up with an angle for the Editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results [of] the Williamson research that he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth." [Doc. 117 at pp. 33-34] The Court specifically acknowledged fact issues arising from the Times' editorials about the Loughner shooting circulated on June 14, 2017 (which "disclaimed the idea that Loughner had

---

[5] Several of *The Atlantic* articles about Loughner's shooting were authored by "sister" publications (blogs) that were "integrated" into and under the "umbrella" of *The Atlantic's* website. [Doc. 108 at ¶¶ 114, 128, 134, 264-265, 269-284] Bennet did not have day-to-day direct editorial control over the blogs' content, but did over *The Atlantic's* website as a whole, which he "consumed" its website as part of his job as Editor. [*Id*.] Bennet "must have read" some of these Loughner shooting articles and was regularly reading the "sister" blogs. [Doc. 108 at ¶¶ 272-273, 278]

[6] These articles are relevant and material because Bennet likely ***read*** (not edited) them. Bennet admittedly "consumed" *The Atlantic's* site in 2011 and "must have read" some of these articles. [Doc. 108 at ¶¶ 272-273] Further, because of his position as Editor-in-Chief, Bennet "was a regular reader of *The Atlantic's* website both because [he] was interested in it as a reader and because [he] would try to keep [his] eye on it for purposes of commenting to our editor about what [he] liked and didn't like." [Doc. 108 at ¶ 272]

been motivated by violent rhetoric") and the hyperlink to the ABC News article[7] (specifically addressed in the Mandate, *Palin*, 940 F.3d at 815). [Doc. 117 at pp. 30-34]

Courts are required to scrupulously carry out mandates and give them full effect. *In re Coudert Brothers, LLP*, 809 F.3d 94, 98 (2d Cir. 2015). This includes "matters expressly decided" and issues "impliedly resolved," and the broader "spirit of the mandate." *Id*. at 99.

## B.    The Insufficient *Voir Dire*

Although district courts have broad discretion in jury selection, a *voir dire* is so insufficient that it calls for reversal where:  (1) it is so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about potential jurors' general outlook, experience, communication skills, intelligence, lifestyle, etc.; or (2) there is a failure to inquire about, or warn against, a systemic or pervasive bias in the community that would have been cured by asking a question posed by a party. *U.S. v. Lawes*, 292 F.3d 123, 129 (2d Cir. 2002).

Here, the jury selection process did not sufficiently explore the venire's potential biases or prejudices. The Court began *voir dire* by telling the venire that whether they had "heard of one side or the other… [or]… will have perhaps views…is an irrelevancy." [Tr. Trans. at 3:19-22] After providing a brief overview of the case, the Court asked the venire whether there was anything about the description that made them feel they could not serve as fair and impartial jurors, and whether they were exposed to media about this case[8] and, if so, whether they thought they would

---

[7] The Court stated "a jury might discredit [Bennet's] testimony that he did not click on the hyperlink…[and]…[n]onetheless, even if it were true, it could be evidence of reckless disregard… [and]… a reasonable jury might conclude, Bennet had obvious reasons to doubt whether there existed a link between the map and the Loughner shooting… [and his] failure to further investigate or at least just click on the link to the only article Williamson had presented could support the inference that he was purposefully avoiding the truth." [Doc. 117 at pp. 32-33]

[8] The Court did not ask the jurors who responded affirmatively what media coverage they were exposed to.

have a problem being fair and impartial. [*Id.* at 4:20-23, 9:6-11] One juror who responded affirmatively revealed significant hostility[9] toward Plaintiff, and the Court tried to convince this person to be impartial before striking them for cause.

After some general background questions [*Id.* at 11:3-13:7], the selection process began [*Id.* at 13:8-18]. When Plaintiff's counsel inquired about asking the parties' potential *voir dire* questions [*Id.* at 15:8-9], the Court responded "I have chosen not to ask those questions." [*Id.* at 15:10-12] When Plaintiff's counsel raised exploring "whether anybody has preconceived biases" [*Id.* at 15:13-16], and the Court indicated that would be addressed in a final question [*Id.* at 15:17-20]. After two rounds of preemptory challenges, the Court asked the venire whether "there [was] any other reason that I haven't covered why any of the nine of you feel that you cannot serve as a fair and impartial juror," and tried to persuade one juror who responded affirmatively to be impartial [*Id.* at 21:7-22:11], which continued after the juror revealed hearing about the case and working for "progressive type not-for-profits" [*Id.* at 22:12-23:14].

Defendants' counsel objected over the "dismissal of jurors who would be fine, are educated jurors who read the paper…" [*Id.* at 23:21-24:2]. Plaintiff's counsel again expressed concern over the lack of questions addressing preconceived notions and biases [*Id.* at 25:19-24], in response to which the Court admonished Plaintiff's counsel: "You have made your record. You have made it twice. I don't want a third time." [*Id.* at 24:25-25:4] A short while later, the Court stated: "Just for the record, so to speak, my philosophy of picking a jury is, of course, to make sure that we get the fairest jury possible, but also that we don't artificially exclude anyone of intelligence, and many of the questions [submitted prior to trial] that were suggested in this case seemed to me inevitably

---

[9] This person stated, "I don't like Sarah Palin. I think she is a cruel person. I don't like her, and I don't think I would be fair to her listening to what she has to say." [Tr. Tran. at 9:19-21]

## JA 2256

to have the effect, I'm sure this was not the intent, but have the effect of dumbing down the jury, and I have seen that repeatedly in the 300 juries I have selected over the years, and I'm not going to let that happen." [*Id*. at 27:1-8].[10]

Plaintiff's proposed *voir dire* questions asked about (among other things) the venire's sources for news and whether they subscribed to any news media [Doc. 154]. These questions were not designed to exclude "educated" jurors but figure out whether jurors subscribed to the Times (and might be biased) or other news websites or apps through which they were or could be exposed to extra-judicial information about the case.

These questions should have been asked in a case involving a major media defendant, polarizing parties and political issues, and extensive press coverage. *See* Rule 47(a), *Fed. R. Civ. P.*[11] Moreover, the jury selection process as a whole was so insufficient it calls for reversal. *Lawes*, 292 F.3d at 129.

## C. The Erroneous and Prejudicial Exclusion of Evidence at Trial in Violation of the Mandate

Defendants moved to exclude [Doc. 136 and 138] substantial evidence of actual malice, including all evidence associated with Bennet's brother, *The Atlantic's* Loughner shooting articles, the "*How the Media Botched the Arizona Shooting*" article sent to Bennet, and evidence associated with the Public Editor. In opposition, Plaintiff explained the relevancy and materiality of this evidence and rebutted Defendants' argument that the summary judgment order [Doc. 117] excluded it. [Doc. 145 and 147]

---

[10] Based on defense counsel's prior objection, this comment must have been directed at Plaintiff's counsel.

[11] As one court noted, "it would be naïve not to recognize…that the publicity surrounding the case…underscores the court's duty to question jurors on *voir dire* with painstaking care to assure…an impartial jury and a fair trial." *U.S. v. Kahaner*, 204 F.Supp. 921, 924 (S.D.N.Y. 1962) (*citing U.S. v. Bando*, 244 F.2d 833, 838 (2d Cir. 1957), *cert. denied*, 355 U.S. 844 (1957)).

The Court initially deferred ruling on Defendants' motions, but excluded this crucial evidence at trial as irrelevant and overly prejudicial [Doc. 196 at p. 53], including *The Atlantic* articles about the Loughner shooting, the Times' article ("*Time, the Enemy*") and article Bennet received at *The Atlantic* discussing how the media erroneously blamed Plaintiff for the Loughner attack,[12] and all evidence related to Bennet's brother. [Tr. Tran. At 501-511]

Clearly erroneous evidentiary rulings such as these warrant a new trial. *See e.g.*, *Village of Freeport v. Barrella*, 814 F.3d 594, 610-611 (2d Cir. 2016) (new trial appropriate where evidentiary rulings are a clear abuse of discretion and clearly prejudicial to the outcome of the trial). An "abuse of discretion" occurs where the district court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions." *Barrella*, 814 F.3d at 610-611. Errors are prejudicial to the outcome of the trial where "the jury's judgment would be swayed in a material fashion by the error." *Restivo v. Hessemann*, 846 F.3d 547, 573 (2d Cir. 2017) (citing *Arilo v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007)).

Here, the Court excluded *The Atlantic* articles based on the conclusion they could not be admitted unless Bennet admitted reading and remembering them when he rewrote the Editorial [Tr. Tran. at 506:22-507:4]:

> THE COURT: To make this relevant, you have to have a foundation for the following: first, that he read it; second, that, at the relevant time of his adding his sentences to the draft editorial, he remembered it and chose to purposely disregard it; and that, in some cases, but not in this one, there would be the further question whether there is any reason to believe he read it at all, but you seem to have evidence on the third point with respect to *The Wire*.

---

[12] The Court excluded *all* evidence related to the Public Editor, who wrote the "*Time, the Enemy*" piece [PL Tr. Ex. 32] published in the Times Opinion Section. [Tr. Tran. at 392:13-394:17]

If this were the standard, a defendant could automatically guarantee exclusion of such evidence simply by claiming not to have read or remembered an article when writing a challenged statement.

Under Rule 401, Plaintiff only needed to demonstrate the evidence had the tendency to make a fact of consequence more or less probable. [*Id*. at 386:13-387:12]  She did this by introducing evidence that Bennet:  regularly read *The Atlantic's* website (including its integrated blogs) and the Times at the time of the Loughner shooting [*Id*. at 616:3-620:16, 621:7-9] and "must have read" some of the articles; considered the Loughner shooting a "big story" [*Id*.at 620:17-19]; read articles about the shooting that concerned Loughner's "mental state" [*Id*. at 620:20-25]; confirmed his particular interest in political rhetoric and gun control and moderated a gun control event at which Gabrielle Giffords spoke [*Id*. at 626:5-25]; and was personally observed by a co-worker (Lepping) recalling articles from several years ago.  [*Id*. at 412:22-413:1]  This laid a more than adequate foundation to admit excluded articles.

## D.    The Erroneous Judgment as a Matter of Law Under Rule 50

Defendants moved for judgment as a matter of law under Rule 50 (the "Rule 50 Motion") based on several elements of Plaintiff's claim (of and concerning, actual malice, and falsity),[13] but the Court eventually zeroed in on the same issue used to dismiss this case in 2017:  actual malice as to falsity.[14]

---

[13] The Court characterized the "of and concerning" issue as a "slam dunk" for Plaintiff [Tr. Tran. at 1226:12-17] and easily dispensed the falsity issue based on the first correction ("We got an important fact wrong, incorrectly linking political incitement and the 2011 shooting of Giffords. No link was ever established.") and Lepping's testimony that she found a police report saying the Loughner shooting was not politically connected [*Id*. at 1296:4-1297:9]

[14] Pursuant to a December 29, 2020 Memorandum Order [Doc. 125], the Court applied the actual malice requirement under New York's amended Anti-SLAPP statute (N.Y. Civil Rights L. § 76-a(2)).  This conclusion was recently called into question.  *Gottwald v. Sebert*, 2022 WL 709757 [Case No. 2021-03036] (1st Dept. Mar. 10, 2022).

At one point during the argument, Defendants' counsel correctly conceded that granting judgment as a matter of law is improper where "the key witness made a statement suggesting in its wording that he doubted or disbelieved the truth of the statement." [Tr. Tran. at 1231-1232] Bennet testified at trial that: "***I didn't think then and don't think now that the map caused Jared Loughner to act***…" [*Id*. at 721:5-6] Independently, this testimony was sufficient evidence of actual knowledge of falsity to require denial of the Rule 50 Motion.[15]

However, the Court's focus centered around "the possibility of the so-called adverse inference"[16] and the clear and convincing burden of proof. [Tr. Tran. at 1232:6-21; 1234:16-1236:20; 1240:5-1241:13] The Court expressed surprise over the requirement to "view the evidence through the prism of the substantive evidentiary burden—namely, the clear and convincing standard" during the Rule 50 argument [Tr. Tran. at 1240:5-1241:13], but cited this standard several times in the summary judgment order [Doc. 117 at pp. 11, 34], and specifically evaluated the evidence through the "prism[17]" of the clear and convincing burden of proof at summary judgment. [Doc. 117 at p. 11 (*citing Anderson*, 477 U.S. at 257)]

---

[15] For purposes of the Rule 50 Motion, the Court "assume[d] as Palin alleges, that Bennet either intended his edits to Williamson's draft to convey that the crosshairs map played a causal role in spurring Loughner to commit the Arizona shooting or at least that Bennet recklessly disregarded the defamatory meaning." [Doc. 196 at pp. 45-46]

[16] This refers to the proposition that a plaintiff cannot rely _exclusively_ on the jury's ability to disbelieve the defendants' testimony as the _only_ evidence of actual malice [Doc. 196 at pp. 44-45] (*i.e.,* "merely asserting that the jury might, and legally could, disbelieve the defendant's denial of a conspiracy or of legal malice").

[17] The Court evaluated the evidence through the "**prism**" of the clear and convincing burden of proof: "Further still, a court ruling on a motion for summary judgment on actual malice 'must be guided by the New York Times 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists - that is, whether evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." [Doc. 117 at p. 11 (citing *Anderson*, 477 U.S. at 257)] It also concluded "there is ***sufficient evidence to allow a rational finder of fact to find actual malice by clear and convincing evidence***. Anderson, 477 U.S. at 254." [*Id*. at p. 34 (emphasis added)]

13

After learning the jury would be continuing deliberations on Monday (February 14) [Tr. Tran. at 1248:22-1249:12], the Court indicated it would consider the Rule 50 arguments over the weekend and invited the parties to email any additional authorities they wanted the Court to consider. [*Id.* at 1249] On Sunday (February 13), the parties emailed their case citations. [Doc. 174][18]

On the morning of February 14, 2022, the Court briefly addressed an issue raised by Defendants (a non-party posting video excerpts of depositions from this case over the weekend) [Tr. Tran. 1253-1256][19] before resuming the Rule 50 argument. After confirming a decision had not been reached, the Court stated "were I to grant the motion, I would still let the jury continue to reach a verdict." [*Id.* at 1256:4-12][20] If a judge were inclined to grant a Rule 50 motion but wanted the jury to reach a verdict, the natural and customary course of action would be to defer ruling until after the verdict, as permitted under Rule 50(b).

After the Court commented on various evidence and "prism of the substantive evidentiary burden" [*Id.* at 1259:13-1260:13], the jury requested Ross Douthat's testimony. [*Id.* at 1262:6-12] When the Rule 50 argument continued, Plaintiff's counsel directed the Court's attention to *Sharon v. Time, Inc.*, 599 F.Supp. 538, 582 (S.D.N.Y. 1984) for the proposition that materially altering

---

[18] The case law Plaintiff provided confirmed that the same standard governs Rule 56 and Rule 50 motions [Doc. 174 (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-153 (2000); *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545-546 (2d Cir. 2010); *Lee v. McCue*, 2007 WL 2230100, *3 (S.D.N.Y. Jul. 25, 2007))] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150 (citing *Anderson*, 477 U.S. at 255); *see also Palin*, 940 F.3d at 812, n. 25.]

[19] The judicial law clerk called Plaintiff's counsel about this issue while they were on their way to the courthouse from the airport on the morning of February 14, 2022.

[20] In the written Rule 50 decision [Doc. 196], the Court asserts it "indicated [it] was leaning toward agreement with Defendants' position on the issue of actual malice as to falsity" [Doc. 196 at n. 20], but no such indication was given (and the Court included no citation in support of this assertion).

# JA 2261

language in a draft can establish actual malice.[21]  [*Id*. at 1264-1266]  Then, the jury requested Bennet's testimony.  [*Id*. at 1284]

Near the end of the Rule 50 argument, Plaintiff's counsel specifically reminded the Court about the standards established in *Reeves*, 530 U.S. at 150-153, and *Kaytor*, 609 F.3d at 545 (required inferences, credibility determinations, and evidence collectively must be viewed in Petitioner's favor).  [*Id*. at 1292:7-1293:4]  The Court recessed for lunch and reconvened nearly three hours later.  [*Id*. at 1295:4-16 ("I will see you at 2:30, unless we get a note from the jury before then, at which time I will give you a ruling on the Rule 50 motion.")]  Upon returning without a verdict, the Court announced the Rule 50 decision, [*Id*. at 1295-1306], noting the decision could be deferred until after the verdict, "but the more I thought about it over the weekend, the more I thought that was unfair to both sides."  [*Id*. at 1298:2-25]

In *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405 (2006), the Supreme Court recognized that "while a district judge is permitted to enter judgment as a matter of law when it concludes that the evidence is legally insufficient, it is not required to do so."  ***"To the contrary, the district courts are, if anything, encouraged to submit the case to the jury, rather than granting such motions.***"  *Id*. (emphasis added)

The Court granted judgment as a matter of law on actual malice as to falsity based on the "prism of the substantive evidentiary burden."  [*Id*. at 1299:11-15, 1300:8-1301:6]  In support, the

---

[21] *Sharon* states "[a]lthough a reporter may have sufficient evidence of his charge to foreclose any material issue of constitutional malice for its publication, he may nonetheless make himself liable if he knowingly or recklessly misstates that evidence to make it seem more convincing or condemnatory than it is." 599 F.Supp. at 582.  Over the weekend, Plaintiff's counsel directed the Court's attention to *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520-522 (1991) [Doc. 174], which the Court cited on summary judgment for the jury issue created by Bennet's substantial revision to Williamson's draft [Doc. 117 at pp. 23-24] and in finding sufficient evidence of actual malice to satisfy the clear and convincing standard.  [*Id*. at pp. 26-27]

Court asserted there was no "prepublication email in which Mr. Bennet suggests in any respect probable falsity" and that "[Bennet's] prepublication email suggesting the framing for the editorial" [*Id*. (PL Tr. Ex. 119)] only "shows his preexisting belief that violent right-wing rhetoric incited Loughner's attempted assassination…" [Tr. Tran. at 1302:21-1303:9] The Court disregarded the research Bennet admittedly read during the drafting process as "giv[ing] opinions on both sides" [*Id*. at 1303:10-21], and explained away the ABC News article hyperlink as only being evidence of "negligence," while crediting Bennet's testimony that he did not open or read it. [*Id*. at 1303:22-1304:7] The Court also credited Bennet's testimony when concluding that his actions after rewriting Williamson's draft "undermined" a finding of actual malice [*Id*. at 1304:8-20], specifically adopting Bennet's claim that by emailing Williamson at 7:21 p.m. to "please take a look" Bennet "meant for her to fact-check the revision." [*Id*.] Finally, the Court characterized Bennet's email exchange with Douthat on the night the Editorial was published as innocuous (Douthat "questioning whether the information [in the Editorial] was all correct" and Bennet responding, "this was his understanding but he would pursue it further.") [*Id*. at 1304:21-25]

Although the Court expressed it was "troubled by the fact that the erroneous edits made by Mr. Bennet could be read by many readers as an accusation that Ms. Palin's PAC's distribution of the crosshairs map was clearly and directly linked to the Loughner shooting and concomitant murders," it ultimately concluded this "an example of very unfortunate editorializing on the part of The Times." [*Id*. at 1305:2-20] The Court completed the announcement of the Rule 50 decision without interruption, specifically mentioning "non-lawyers" [*Id*. at 1299:1-2 and 1297:10-16] and that "I will ultimately issue an order pursuant to Rule 50 dismissing the complaint, but I will only do so after the jury returned its verdict." [*Id*. at 1305:19-23] The Court also commented, "[a]nd [the jurors] of course will not know about my decision…" [*Id*. at 1305:23-24]

**JA 2263**

The Court concluded by acknowledging the "inevitable appeal" and stating: "So, needless to say, the plaintiff is deemed to have objected to my decision, and that is preserved for appeal as well." [*Id*. at 1306:5-7] At that point, *ALL* of Plaintiff's objections to the ruling were preserved. There was no need for her to object. The "cat was out of the bag" with respect to the announcement of the decision[22] which was the subject of immediate news coverage and "push notifications" while the jury was still deliberating. [Doc. 172] News outlets, including the Times, published stories about the dismissal as early as 3:22 p.m., many revealing the decision to dismiss the case in their headlines.[23] [*See* **Exhibit 1**]

**E.     The Erroneous Instruction Responding to the Jury's Question About Evidence of Actual Malice**

On the morning of February 15, 2022, the jury submitted a question dealing directly with the issue of actual malice as to falsity:

---

[22] The Court recessed after the announcement (at 3:30 p.m.) and reconvened at 4:46 p.m. [Tr. Tran. 1307] Upon returning, the Court immediately asked whether it should bring back the jury and give them an additional admonition about avoiding anything in the media, but recognized that giving yet another reminder could be problematic. [*Id*. at 1307:25-1308:5]

[23] It is also reasonable to assume that jurors' family members or friends learned about the decision through news reports and may have mentioned it to the jurors when they returned home (on Valentine's Day).

**JA 2264**



This question quotes the jury instruction on actual malice [Instruction No. 13], including the clear and convincing ["high probability'] burden of proof.  [Doc. 170]

Upon receiving this question, the Court's immediate response was to give an instruction misstating the law and dissuading a finding of actual malice:  "an inference from a statement by Mr. Bennet is not itself sufficient to carry the clear and convincing burden…"  [Tr. Tran. at 1311:18-23]  Defendants' counsel urged the Court to provide this improper instruction, stating "an inference alone wouldn't allow them to find the burden has been satisfied."  [*Id*. at 1318:1-7]

Plaintiff's counsel objected and advised that the proposed language was inconsistent with Jury Instructions No. 5 (circumstantial evidence) and No. 13 (actual malice) [Doc. 170].  [Tr. Tran. at 1321:21-1322:3]  Nevertheless, the Court persisted ("I don't think there's anything inconsistent

18

## JA 2265

here") and explained why the jury should be instructed about the rationale for granting the Rule 50

Motion:

> THE COURT: The gloss that wasn't given to them was the particular burden that the case law in defamation subsequent to New York Times v. Sullivan and comparable New York law places on a plaintiff to establish clear and convincing evidence of actual malice ***through something other than the mere statements of the defendant***, which would otherwise be sufficient in a more average case...."

[*Id*. at 1322:4-11][24]    Consequently, the Court gave the jury the following erroneous instruction:

```
                                        Response to Jury Note of
                                        2/15/2022 at 10:21 a.m.

To the jury,

Thank you for your latest note.

In response to your first inquiry, you are free to draw any
reasonable inference you choose to draw from any answer received
in evidence, regardless of which side posed the question to which
the answer was given.

In response to your second inquiry, an answer given by Mr. Bennet
and a reasonable inference drawn therefrom is not sufficient in
itself to carry the plaintiff's burden of showing by clear and
convincing evidence that there was a high probability that Mr.
Bennet actually doubted the truth of a challenged statement prior
to publication, but it can contribute to the other evidence brought
forth by the plaintiff.


            Judge Rakoff
```

[Tr. Tran. at 1323]  This instruction contradicted the law and instructions the jury already received,

told them to disregard legally sufficient evidence of actual malice, and effectively instructed them

to find in Defendants' favor on actual malice at a critical time during deliberations.  It is far from

harmless, constitutes fundamental error, and requires a new trial.

---

[24] This explanation is focused exclusively on the "negative inference" issue, ignoring that the jury question could have been about a direct inference or conclusion to be drawn from Bennet's testimony, or even an admission of actual knowledge of falsity.

# JA 2266

"An erroneous instruction, unless harmless, requires a new trial." *U.S. v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011). A jury instruction is erroneous if "the instruction misleads the jury as to the proper legal standard, or it does not adequately inform the jury of the law." *Owen v. Thermatool Corp.*, 155 F.3d 137, 139 (2d Cir. 1998). Instructions that effectively instruct the jury to find a certain way or accept certain evidence are erroneous. *Girden v. Sandals Intern.*, 262 F.3d 195, 204-205 (2d Cir. 2001). The timing of an instruction is also important, as instructions given at critical points of trial are likely to affect a verdict. *Id.* at 205 (citing *Delima v. Trinidad Corp.*, 302 F.2d 585, 587 (2d Cir. 1962); *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 525 (2d Cir. 1998)). A new trial is appropriate where an erroneous instruction is given about a "potentially dispositive" issue. *Restivo*, 846 F.3d at 572. Instructions containing errors that are so serious and flagrant that they threaten the integrity of the trial or deprive the jury of legal guidance in making a decision are fundamental error. *Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 162 (2d Cir. 2004) (citing *Shade v. Hous. Auth. of New Haven*, 251 F.3d 307, 313 (2d Cir. 2001)).

## F.    The Tainted Verdict

After their exposure to push notifications about the Rule 50 decision and the improper instruction, the jury soon reached a verdict for Defendants. [Tr. Tran. 1323] After the verdict, the Court discussed the media coverage of the case,[25] recommended jurors not talk to the media,[26] and told them about the Rule 50 Motion decision.[27] None of the jurors volunteered any information

---

[25] "I'm glad that you were free of all that coverage since you were instructed, and its clear to me you followed, not to pay any attention to that and to disregard it and turn away from it." [Tr. Tran. at 1325:15-21]

[26] Deliberations were "clothed with the knowledge that this was all secret" and "it would be very unfair to your fellow jurors to now start talking about it with members of the press." [Trial Tr. at 1326:1-8]

[27] "I have concluded as a matter of law that the defendants are not liable too. So we've reached the same bottom line…You decided the facts; I decided the law. As it turns out, they both were in agreement in this case." [Tr. Tran. at 1326:25-1327:2]

**JA 2267**

about their exposure to media coverage or "push notifications," and they were released. [Tr. Tran. at 1327

At 4:53 p.m. on February 15, 2022, the Court docketed the Final Judgment, [Doc. 171], which states "[i]n view of the jury having returned a verdict of not-liable, and independently, for the reasons stated by the Court previously in granting Defendants' Rule 50 motion, final judgment is hereby entered dismissing the complaint with prejudice."

## G. The *Ex Parte* Jury Interview

On the afternoon of February 15, 2022, the judicial law clerk conducted an exit interview of the jurors.[28] [Doc. 172] During the interview, several jurors apparently volunteered that they were exposed to push notifications about the Rule 50 decision. [*Id.*] This also means they received push notifications **throughout the trial**, which was the subject of intense press coverage, including articles with headlines that disparaged Plaintiff and her trial testimony. [*See* **Exhibit 2**]

## H. The Court's Extra-Judicial Comment to the Press

The exposure to push notifications was not disclosed to counsel for the parties on February 15, 2022 or on the morning of February 16, 2022. On February 16, 2022, at 12:13 p.m., Plaintiff's counsel received an e-mail [**Exhibit 3**] from a *Bloomberg* journalist requesting comment on the article "*Palin Jurors Knew Judge Dismissed N.Y. Times Case Before Verdict*," which was posted online that morning at 11:34 a.m. [**Exhibit 4**] This article quoted the Court, which spoke to the *Bloomberg* reporter and confirmed jurors' exposure to push notifications:

> "I'm disappointed that the jurors even got these messages, if they did," Rakoff said in an interview Wednesday, referring to the news notifications received by jurors. ***I continue to think it was the right way to handle things.***

---

[28] Presumably, this occurred shortly after the jury was excused (at approximately 2:30 p.m.) and well before the Final Judgment was entered (at 4:53 p.m.).

> The judge said he spoke to his clerk today *after being informed of the issue by Bloomberg*, and was told that "at most three" jurors reported knowing about his ruling before delivering their verdict *and said it didn't affect their deliberations*.

The Court did not inform counsel about the jury's exposure to push notifications until <u>12:26 p.m.</u>, when the judicial law clerk emailed counsel a copy of a 2-page order that would be "docketed shortly." [**Exhibit 5**]

At a hearing on February 23, 2022, the Court elaborated on the conversation with the journalist:

> After the trial, after final judgment had been entered, you may recall that I went off to Columbia to teach, which is why we had told the jury earlier that day that they could only sit to 3:30. The next morning, when I arrived, which, I have to admit, was somewhat late because I slept in, my courtroom deputy told me that a Bloomberg reporter had called and said it was urgent, so I called that reporter back. And it turned out it was about information he had received about push notifications that the jurors had told my law clerk about. I was already beginning to explore that issue with my law clerk, but I decided to give the reporter a very short statement so that if his story appeared before the order that I was already undertaking a draft, there would be no misunderstandings. So I did give him a short statement, which contained the same information, in more abbreviated form than my order, which appeared -- that was sent to counsel as well -- I think approximately five minutes after his story came out.

[Tr. Tran. at 3:3-20]

The Court indicates it was "already undertaking a draft [of the order]" and "already beginning to explore that issue with my law clerk" [2/23/22 Tran. at 3:12-15] when calling back the *Bloomberg* journalist, but the article states "[t]he judge said he spoke to his clerk today *after being informed of the issue by Bloomberg* and was told that 'at most three' jurors reported knowing about his ruling before delivering their verdict." (Emphasis added). Also, the Court indicates "my order, which appeared -- that was sent to counsel as well -- I think approximately *five minutes after*

*his story came out*" [2/23/22 Tran. at 3:18-20 (emphasis added)], but the *Bloomberg* story was posted at 11:34 a.m. and the order was not sent to counsel until 12:26 p.m. (52 minutes later).

Regardless, the Court talked to the press about this issue *before* informing counsel, and made statements defending the decision to announce the Rule 50 ruling during deliberations and about the impact of the push notifications. Presumably, jurors have since read this article.

## I.     The Rule 50 "Opinion"

On February 23, the Court indicated it would be expediting a written order on the oral Rule 50 decision. [2/23/22 Tran. at 4:1-5] On March 1, 2022, the Court issued the 68-page "Opinion" (the "Rule 50 Opinion") [Doc. 196] defending the Rule 50 decision.

Beyond "elaborating" on the substance of the ruling, the Rule 50 Opinion seeks to validate the "unusual" timing of the Rule 50 decision based on a waiver (*i.e.,* "neither side objected to it in the slightest") [Doc. 196 at pp. 3-6, 33-38, 64-65]. This waiver position was rejected in the Mandate (*Palin*, 940 F.3d at 812) and contradicts the Court's statement: "So, needless to say, the plaintiff is deemed to have objected to my decision, and that is preserved for appeal as well." [Tr. Tran. at 1306:5-7][29] The Court's unconditional preservation was not limited to "prior" objections or the "legal substance" of the court's ruling. [Doc. 196 at n. 21]

---

[29] The Court suggests Plaintiff had four opportunities to object to the procedure. [Doc. 196, p. 5] Two of these were *after* the decision was announced [Tr. Tran. at 1306-1307]; one was *during* the ruling [*Id.* at 1295-1297] (apparently suggesting Plaintiff's counsel should have predicted the outcome and stopped the ruling); and the other was supposedly when the Court "made the initial proposal" [Doc. 196 at p. 5]—but no "proposal" was made (rather, the Court confirmed it had not made a decision "but were I to grant the motion, I would still let the jury continue to reach a verdict") [Tr. Tran. at 1256:4-12].

The Rule 50 Opinion also seeks to validate the verdict[30] by commending the "model jury" [Doc. 196 at pp. 65-66] and describing jurors as "adamant that [push notifications] had not affected their determination of the verdict in the slightest." [*Id*. at pp. 6-7, 37-38, 64-66] However, there is no way to test this assertion because Rule 606(b), *Fed. R. Evid*., prohibits the disclosure of "the effect of anything on [a] juror's or another juror's vote." *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994). The Court also comments about "promptly notif[ying] the parties" of some jurors' exposure to push notifications" [Doc. 196 at p. 7] but (as noted above) spoke to *Bloomberg* at least 52 minutes before notifying counsel about the jurors' exposure. Ultimately (despite extensive effort to validate the verdict), the Rule 50 Opinion deems the verdict "legally irrelevant" "even if one indulges the implausible hypothesis that the jury would have returned a verdict for Palin absent news alerts.[31]" [Doc. 196 at p. 7]

The substance of the Rule 50 Opinion relies on a skewed, incomplete version of the facts that disregards significant evidence of actual malice, draws inferences against Plaintiff, and adopts Bennet's testimony as true, as well as the incorrect notion that Plaintiff lacked any "concrete evidence" of actual malice and her case rested exclusively on the possibility that the jury might disbelieve Bennet's testimony. [*Id*. at pp. 44-45] The Rule 50 Opinion does precisely what the Second Circuit said in the Mandate (*Palin*, 940 F.3d at 813-815) and the Supreme Court said in *Reeves*, 530 U.S. at 152-153, cannot be done: it "disregarded critical evidence favorable to petitioner…failed to draw all reasonable inferences in favor of petitioner…discredited petitioner's

---

[30] The Court noted the "firm view that a few jurors' pre-verdict awareness of news about the Court's intended Rule 50 decision did not nullify the jury's verdict in any respect." [Doc. 196 at p. 7]

[31] The appearance of partiality arising from this speculative comment is considerable, and it ignores Rule 606(b) and the "objective test" applied to assess the likelihood that extraneous information "would affect a typical juror." *Bibbins*, 21 F.3d at 17. Learning the presiding judge determined a case has no merit is the type of information that would affect a typical juror.

evidence… [and]… impermissibly substituted its judgment concerning the weight of the evidence for the jury's."

The characterization of the "origins" of the Editorial [Doc. 196 at pp. 10-12] is one example of the slanted view of the case embracing Defendants' version of the facts and failing to account for Bennet's preconceived narrative and position as the head of the Opinion Section.  The evidence at trial presented an even stronger case of actual malice than at the summary judgment stage, when the Court concluded: "taken in the light most favorable to plaintiff, the evidence shows Bennet came up with an angle for the Editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results [of] the Williamson research that he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth." [Doc. 117 at p. 34]

The only inferences drawn from the limited facts cited in the Opinion related to the drafting and editing process are in favor of Defendants,[32] which makes it seem as if Bennet was not intimately involved and in control of the content of the Editorial.  However, the same facts (and others) demonstrate that Bennet (the "boss" with "ultimate decision-making authority" over the Editorial [Tr. Tran. at 521:8-18]) plowed ahead with his preconceived narrative about "incitement" (injected forty minutes after Semple already decided the Editorial was going to be about gun control) [PL Tr. Ex. 119] even though there was no evidence or "pattern" to support the defamatory statements.  [Tr. Tran. at 603:1-604:11; 784:10-786:22].[33]  It is likewise reasonable to conclude

---

[32] The Opinion notes Linda Cohn's role in the Editorial [Doc. 196 at p. 18], but Cohn only briefly reviewed Williamson's draft and immediately took it to Bennet and told him "you need to look at this" because she was not sure it was what he wanted.  [Tr. Tran. at 519:23-522:5]  This was not a "conversation" about the content, but a "one sentence" exchange.  [Id.]

[33] At one point, Bennet admitted the argument in the Editorial "fell apart," but quickly tried to backtrack.  [Tr. Tran. at 651:20-652:22]

that no one who worked for Bennet was going to question or change what he wrote in the Editorial—particularly after he decimated the operative passages of Williamson's draft [Doc. 196 at p. 20 (redline of operative passages)] because they did not say what Bennet conveyed to everyone in his 12:41 p.m. email [PL Tr. Ex. 119] he wanted the Editorial to say.[34] In fact, Williamson testified Bennet was "super keen" to take on the Editorial [Tr. Tran. at 157:4-24; PL Tr. Ex. 163; PL Tr. Ex. 186][35] and Bennet's significant edit to Williamson's draft and insertion of language with a different meaning bolsters the conclusion that Bennet was in control.[36]

The Rule 50 Opinion ignores the "strong" language Bennet used to grab reader's attention [Tr. Tran. at 605:11-19][37] and assertion that the "link" to "incitement" was "clear" and "direct," which conveyed there was conclusive proof of the causal connection between the map and Loughner's attack. This is significant given Bennet's admission that Williamson's draft already said what Benet claims he was trying to say [Tr. Tran. at 792:20-793:23; 784:1-786:24], meaning there was no reason to change the draft unless Bennet was purposefully editing it to convey

---

[34] Indeed, as the District Court noted in its summary judgment order, "taken in the light most favorable to plaintiff, the evidence shows Bennet came up with an angle for the Editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results [of] the Williamson research that he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth." [Doc. 117 at p. 34] This explains why no one who reviewed Bennet's rewrite flagged any problems [Doc. 196 at p. 2] and why Lepping did not fact-check the lines Bennet added about incitement [*Id.* at pp. 22-3]

[35] This is another critical area where Bennet's conflicting testimony created a fact issue. Bennet denied Williamson's assertions that he was "keen" and "super keen" to take on the Editorial. [Tr. Tran. at 790:14-25]

[36] The alteration of a draft by adding or changing language to create a different meaning is recognized evidence of actual malice. *Sharon*, 599 F.Supp. at 582; *Young*, 74 F.3d at 547-548.

[37] The Court previously found this was "powerful evidence" of actual malice, strongly supportive of the inference that the statements were made "with knowledge of [their] falsity," and implicated Bennet's credibility, which "is for the jury to assess, not for this Court to credit..." [Doc. 117 at pp. 22-24]

something different.[38]  Williamson drafted the Editorial consistent with the results of her research (refusing to draw any direct or clear connection to incitement) [Tr. Tran. at 142-143, 181-182], and Bennet obliterated it because it did not track his narrative.

The Rule 50 Opinion's description of the research conducted on June 14, 2017 about Bennet's preconceived narrative is also tilted exclusively in favor of Defendants.  It disregards Bennet's glaring admission of actual knowledge of falsity ("I didn't think then and don't think now the map caused Jared Loughner to act" [Tr. Tran. at 721:5-6]), asserting it "must be read" to mean something other than what it plainly says.  [Doc. 196 at p. 55][39]  In another attack of Plaintiff's proof at trial, the Rule 50 Opinion faults her for "offer[ing] no admissible evidence that would undermine Bennet's" claimed "recollection" [Doc. 196 at p. 52] and failing to adduce "affirmative evidence" that Bennet or the Editorial Board were biased,[40] while crediting Bennet's "deni[al] [of] having any recollection of specific articles he read in 2011 or thereafter about the Arizona shooting that discussed Loughner's mental state," and simultaneously citing the exclusion of evidence associated with Bennet's brother and *The Atlantic* articles (in violation of the Mandate) [*Id*. at n. 31-32].  Also, despite acknowledging Bennet's request for prior editorials

---

[38] Bennet received a glowing review from A.G. Sulzberger for 2017 (the year the editorial was published), including that his "instinct for stories, framing, and language is impeccable."  [Tr. Tran. at 673:15-674:4]

[39] The explanation conflates defamatory meaning and falsity, but the Court did not grant judgment as a matter of law on defamatory meaning [Doc. 196 at n. 26] and assumes Bennet intended to convey the crosshairs map caused Loughner's attack.  [*Id*. at p. 45]

[40] Plaintiff introduced substantial evidence of bias, not the least of which was Semple's discussion of the Republican lawmakers shot by Hodgkinson in prepublication emails and the Editorial Board's liberal bias.  [Tr. Tran. at 829:11-18]

"connecting…the Giffords shooting to some kind of incitement," the Rule 50 Opinion ignores Bennet's "good for us" response when learning there were none.[41]

The Rule 50 Opinion also takes a decidedly one-sided view of the two editorials ("*Bloodshed and Invective*" and "*As We Mourn*") and op-ed column ("*No One Listened to Gabrielle Giffords*") circulated during the drafting process, suggesting this research Bennet requested, received, and read before writing the defamatory passages does not matter. [Doc. 196 at pp. 13-16, 49-51[42]] This erroneously disregards several statements within these articles that flatly refute Bennet's preconceived narrative.[43] If one accepts that Bennet read and understood each of these articles, it is impossible to grant judgment as a matter of law on actual malice.[44] The statements and other information in these articles demonstrate Bennet knew his assertion of a **"clear"** and **"direct"** link between the map and incitement was false.

---

[41] At summary judgment, the Court concluded that "a reasonable jury could infer from this ["good for us"] response that Bennet felt free to advance his narrative because the Editorial Board had not written on the subject." [Doc. 117 at p. 33]

[42] The Opinion tries to avoid the implications of Bennet's admission to reading this research by suggesting the articles did not "include any conclusive statement regarding [Loughner's] motivations or political convictions, if any" [Doc. 196 at p. 116] and that "none presents any definitive facts about the Arizona shooting" [*Id.*].

[43] For example*, "Jared Loughner …appears to be mentally ill. His paranoid Internet ravings about government mind control place him well beyond usual ideological categories*" [*Id.* at p. 15]; "*This horrific event, [Pres. Obama] said, should be a turning point for everyone – 'not because a simple lack of civility caused this tragedy—it did not…'*" [*Id.* at p. 16]; "*It is facile and mistaken to attribute this particular madman's act directly to Republicans or Tea Party members*." [*Id.* at p. 48]) Bennet testified it was probable he read each of these statements. [Tr. Tran. at 781:21-782:5; 778:17-779:13; 779:14-781:1] Bennet also confirmed reading the portion of "*As We Mourn*" concerning the "accusation by Sarah Palin that journalists and pundits had committed a 'blood libel'." [*Id.* at 779:14-781:1; Doc. 196 at n.7]

[44] Indeed, at summary judgment, the Court specifically addressed these same articles and described them as "disclaim[ing] the idea that Loughner had been motivated by violent rhetoric," [Doc. 117 at pp. 33-34] and ultimately concluded that "taken in the light most favorable to plaintiff, the evidence shows Bennet came up with the angle for the editorial, ignored the articles brought to his attention that were inconsistent with his angle, disregarded the results [of] the Williamson research he commissioned, and ultimately made the point he set out to make in reckless disregard of the truth." [*Id.*]

At bare minimum, these same materials establish Bennet's reckless disregard of the truth because they indisputably provide information that called Bennet's preconceived narrative into doubt. As the Court found a summary judgment, "where [a] publisher undertakes to investigate the accuracy of a story and learns facts casting doubt on the information contained therein, it may not ignore those doubts, even though it had no duty to investigate in the first place." [Doc. 117 at p. 27][45] The Second Circuit acknowledged the same principle in the Mandate. *Palin*, 940 F.3d at 814 (discussing Bennet's failure to "reacquaint[] himself with the articles published in *The Atlantic*.").[46]

The Rule 50 Opinion also contradicts the Mandate and summary judgment order[47] by discounting the ABC News article hyperlink and "reject[ing] Palin's argument that the presence…of the hyperlink" was circumstantial evidence of actual malice; which also once again erroneously accepts Bennet's testimony that he did not click on the hyperlink or read the ABC News article. [Doc. 196 at pp. 17-18, 49-52] *Palin*, 940 F.3d at 815. The Opinion also argues the ABC News article is not evidence of actual malice "assuming <u>arguendo</u>" Bennet read it [*Id.* at 50, n. 28] based on the proposition (which contradicts the Mandate) that a "reasonable reader in

---

[45] The Court also concluded that: "After receiving Williamson's draft, a reasonable jury might conclude, Bennet had obvious reasons to doubt whether there existed a link between the map and the Loughner shooting… [and his] failure to further investigate or at least just click on the link to the only article Williamson had presented could support the inference that he was purposefully avoiding the truth." [Doc. 196 at p. 33]

[46] Plaintiff cited another case during the Rule 50 argument illustrating this same proposition. *Young v. Gannett Satellite Info. Network, Inc.*, 734 F.3d 544, 548 (6th Cir. 2013) (*citing Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989)). In *Young*, the court found recklessness based on a failure to investigate further where initial research "found no definitive statement" to support an accusation, and the failure to conduct additional research indicates a "deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of the accusation. *Young*, 734 F.3d at 548.

[47] *See* Doc. 117 at pp. 32-33 ("a jury might discredit [Bennet's] testimony" that he did not click on the hyperlink and, "[n]onetheless, even if it were true, it could be evidence of reckless disregard.").

Bennet's position" would not understand the ABC News article to call Bennet's assertion of a causal link between the map and Loughner's attack into doubt."[48]  This ignores the statement "no connection has been made between [the map] and the Arizona shooting" and other information on the second page of the ABC News article which refutes any connection (*i.e.,* "an acquaintance of Loughner's, Caitie Parker… described him on Twitter as "more libertarian & definitely socially liberal").

The Court also gave considerable weight to a one-sided view of some of the events occurring after Williamson completed her draft, continuing to credit Bennet's testimony about what transpired and who was responsible for fact-checking the portions of the Editorial Bennet rewrote [Doc. 196 at pp. 18-23, 58-59], accepting as true Bennet's claim that he functioned solely as an editor, not a reporter [*Id*. at p. 20].  Williamson refuted Bennet's claim, confirming that he was responsible for fact-checking his rewrite.  [Tr. Tran. at 92:9-13]  The Rule 50 Opinion also adopts Defendants' position that "the Times' editing and fact-checking processes [bely] the inference that [Bennet] intentionally or recklessly published false information" [Doc. 196 at pp. 58-59], and gave significant weight to Bennet's claim that he sent his revised version to Williamson to fact-check it.  [*Id*. at 20-23]  However, Williamson flatly contradicted Bennet's testimony, confirming that Bennet's email on the evening of June 14, 2017 did not "specifically ask [her] to fact-check anything in the draft that he changed" [Tr. Tran. at 157:25-158:3] and that once she submitted her draft of the Editorial her work was done [*Id*. at 138:9-12].

---

[48] The Opinion suggests it is "not at all clear" Bennet was even "negligent" by failing to click on the hyperlink because it was on the word "circulated." However, Plaintiff introduced evidence that Bennet was responsible for fact-checking the portion so the Editorial he rewrote [Tr. Tran. at 92:9-13] and fact-checking requires clicking on hyperlinks ("you open every link") and confirming they support the facts.  [*Id*. at 398:5-20; 421:2-422:5]

The Rule 50 Opinion's view of Bennet's post-publication conduct also improperly draws inferences only in favor of Defendants and accepts Bennet's claim that he made an innocent mistake in its analysis of Bennet's email exchanges with Ross Douthat and Bennet's 5:08 a.m. email to Williamson and Lepping [Doc. 196 at pp. 24-27, 60-63]. [49]

The Court clearly believed Bennet's claim that he was "upset and confused" by Douthat's email. [Doc. 196 at p. 26] However, after Douthat informed Bennet the Editorial was false, Bennet's real-time reaction was "Thanks, and I'll look into this tomorrow" [PL Tr. Ex. 171], and he did not immediately call Williamson [Tr. Tran. at 648:2-5] or conduct any fact research online [*Id*. at 648:2-10]. Instead, Bennet looked at comments about the false accusations in the Editorial on social media [*Id*. at 649:10-25; 795:23-796:13; 835:1-838:11], which continues to give rise to the reasonable inference that "Bennet could have published the editorial knowing—or recklessly disregarding—the falsity of the claim, and then decided later that the false allegation was not worth defending… a calculus that standing by the editorial was not worth the cost of public backlash."[50] *Palin*, 940 F.3d at 815. This "calculus" began with Douthat's emails to Bennet, including links to social media posts by well-known *liberal* media pundits who were taking shots at the false accusations in Bennet's Editorial. [Tr. Tran. at 835:1-14; 842:1-7; PL Tr. Ex. 171-173] In fact, the public backlash underlying this calculus was so bad that the head of the Times' Reader Center

---

[49] The Court also noted Bennet's "regret for the mistake," citing an apology in a statement in response to questions from a CNN reporter that "a member of the [Times'] public relations staff did not pass along." Bennet claimed at trial he did not know the apology was not published [Tr. Tran. at 797:2-20], but the full email string produced by the Times in discovery contains substantial portions redacted as attorney-client communications, which contradicts Bennet's self-serving claim. [**Exhibit 6**]

[50] Bennet admitted he did not see anyone interpreting the Editorial consistent with what he claimed to be his intended meaning. [Tr. Tran. at 650:1-4]

reached out to Bennet on her own initiative about the "Sarah Palin editorial."  [*Id.* at 1021:18-1023:12; 1029:17-22; 1034:9-1035:24]

The Rule 50 Opinion also fails to draw inferences in Plaintiff's favor from Bennet's 5:08 a.m. email to Williamson and Lepping [PL Tr. Ex. 191].   It only considers this email as evidence that Bennet was upset over his mistake and as inconsistent with actual malice.  [Doc. 196 at p. 61] However, this ignores that Bennet's early morning email refutes the claim that he made a mistake because it does not claim his use of the term "incitement" was being misconstrued.   Thus, "a reasonable jury could conclude that Bennet's reaction and the Times' correction may also be probative of a prior intent to assert the existence of such a direct link... If, as Bennet now contends, it was all simply a misunderstanding, the result of a poor choice of words, it is reasonable to conclude that the ultimate correction would have reflected as much and simply clarified the Editorial's intended meaning."  [Doc. 117 at p. 25][51]

Bennet's 5:08 a.m. email exchange with Williamson and Lepping also highlights Bennet's "unusual admission" that "I don't know what the truth is here."  [Doc. 196 at p. 62], which the Rule 50 Opinion characterizes as mere "negligence" [Doc. 196 at p. 60].   However, another reasonable inference is that Bennet's 5:08 a.m. email was an attempt to cover for himself and place blame on those around him (notably, Bennet states in the same email "**_we_** may have relied to

---

[51] This inference is further supported by the Times' correction policy, which specifically provides for acknowledging a statement was "imprecise" or "incomplete" in situations involving mistakes in meaning.  However, Defendants admitted making a "factual" error, and Bennet testified his post-publication Tweet about the correction (admitting to an error of fact) was posted "to make sure the record was clear with respect to the fact [he] got wrong" and that he "would not, after making an error like this, misrepresent what that error was to the public" because "that would be compounding the error."  [Tr. Tran. at 786:8-24]  Bennet also admitted he "did not tell the public [that he] used the word 'incitement' in an improper way" and "didn't tell the public that's not what I meant when I used the word "incitement."  [*Id.* at 787:4-9]

heavily on past editorials and early coverage"—when he was the one who wrote the false statements).[52]  The Court made this finding on summary judgment [Doc. 117 at p. 25[53]].

The Rule 50 Opinion also concludes a lack of actual malice is inferred from the fact that Bennet otherwise "likely would have been defensive, avoided issuing a correction to the Editorial, or tried to minimize the correction's confession of error."  [Doc. 196 at p. 63]  This violates the Mandate, which specifically addresses the alternative inferences arising from the correction.[54] *Palin*, 940 F.3d at 815.   Moreover, there was substantial evidence demonstrating the minimalization of the correction's confession of error; including the exclusion of any reference to Plaintiff in the correction while leaving her name in the Editorial—which one Times' Editorial Board member recognized as Bennet "still trying to sneak the link in."  [Doc. 196 at pp. 30-31 (summarizing corrections and edits to body of Editorial); Tr. Tran. at 589:2-591:9; 591:10-592:15; 592:19-593:9; 671:14-672:13][55]

Beyond violating the Mandate, the acceptance of Bennet's credibility throughout the Rule 50 Opinion is particularly troubling given the impeachment evidence at trial.  Bennet changed his testimony about reading the June 14, 2017 research.  He denied reading the research when he testified under oath at the 2017 plausibility hearing and at his deposition, but admitted reading it

---

[52] Bennet also tried shifting blame for his false narrative by claiming it was Williamson's "theory" [Tr. Tran. at 718:25-719:17] and then a "collective" theory [*Id*. at 783:2-24].

[53] "[A] reasonable jury could conclude that Bennet's reaction and the Times' correction may also be probative of a prior intent to assert the existence of such a direct link… If, as Bennet now contends, it was all simply a misunderstanding, the result of a poor choice of words, it is reasonable to conclude that the ultimate correction would have reflected as much and simply clarified the Editorial's intended meaning."

[54] The Rule 50 Opinion ignored Bennet's public affirmation that the error "doesn't undercut or weaken the argument of the piece."  [*Id*. at 670:4-12]

[55] The Rule 50 Opinion discounts this "sneak the link" in email from Jesse Wegman to Williamson as lacking "context" [Doc. 196 at n. 16], which contravenes the obligation to draw all inferences in favor of Plaintiff.

at trial when faced with the email he wrote forwarding "*Bloodshed and Invective*" and "*As We Mourn*" to Semple and describing them as "more relevant precedent" to the Editorial.  [Tr. Tran. at 634:9-635:3; Pl Tr. Ex. 136]  Bennet's credibility also took a significant hit when he tried to claim he did not apologize to Plaintiff because the Times had a policy against apologies [Tr. Tran. at 675:1-676:2], but the Times' written policies contain no such prohibition [PL Tr. Ex. 17-18] and the head of the Reader Center testified there was no such policy.  [Tr. Tran. at 1036:19-20]

The Rule 50 Opinion concludes by asserting the judgment as a matter of law reflects the Court's "duty" to ensure that public figure libel actions do not chill free speech.  [Doc. 196 at p. 66]  This violates controlling precedent: "It is no longer permissible to take into account the 'chilling effect' a libel suit may have on the exercise of first amendment rights.  *Loeb v. New Times Communications Corp.*, 497 F.Supp. 85, 94 (S.D.N.Y. 1980) (*citing Yimouyannis v. Consumer Union of the U.S., Inc.*, 619 F.2d 932, 940 (2d Cir. 1980)).[56]

---

[56] *Loeb* is another case Plaintiff cited to the court during the Rule 50 argument.

## IV.    DISQUALIFICATION IS REQUIRED

An objective, disinterested observer fully informed of the events described herein occurring before, during, and after the trial of this action would entertain doubts about the Court's impartiality.  The Court's refusal to abide by the Mandate and handling of the trial (including the 2017 dismissal of the case, summary judgment rulings, scheduling of the trial,[57] insufficient jury selection process, exclusion of critical evidence recognized in the Mandate, making and timing of the announcement of the Rule 50 decision, improper jury instruction on actual malice during deliberations, and comments to a member of the press about the case) establish an appearance of partiality that requires disqualification.  A reasonable person fully informed of the facts would question the Court's impartiality and predisposition.

Independently, comments to the press about pending cases warrant disqualification because they run afoul of Canon 3A(6) of the Code of Conduct for United States Judges (requiring federal judges to "avoid public comment on the merits of [ ] pending or impending" cases).  Although rare, situations where judges make public comments to the press about a pending case over which they are presiding almost always result in mandatory disqualification under Section 455.  *U.S. v. Microsoft Corp.*, 253 F.3d 34, 112-113 (citing *In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001); *In re IBM Corp.*, 45 F.3d 641 (2d Cir. 1995); *U.S. v. Cooley*, 1 F.3d 985 (10th Cir. 1993)).  As discussed in *Microsoft Corp.*, 253 F.3d at 115, "Judges who covet

---

[57] The trial was originally set during the week of Plaintiff's counsel's daughter's wedding (in Tampa) on January 29, 2022.  The Court also denied a request to continue the trial due to the Omicron variant surge and concerns that COVID exposure would cause Plaintiff's counsel to miss the wedding.  After Plaintiff tested positive for COVID, the Court notified the public and stated: "She is, of course, unvaccinated."  [Tr. Tran. at 2:21-25]  This comment immediately received wide-spread, negative media attention.  Conversely, when a key Times' witness (Eileen Lepping) tested positive for COVID at trial, the Judge made no comment about her vaccination status.  [Tr. Tran. at 2:23-3:7]

publicity, or convey the appearance that they do, lead any reasonable observer to wonder whether their judgments are being influenced by the prospect of favorable coverage in the media."[58]

The Court's comment to the press can also reasonably be construed as an attempt to bolster the Court's rulings. *In re Boston's Children First*, 244 F.3d at 170 (under some circumstances judge's defense of own orders, prior to resolution of appeal, may create appearance of partiality). The 68-page "Opinion" solidifies this perception; as does the timing of the comment to the press *before* counsel was informed about the developments with the jury. Moreover, the Court did not discuss purely procedural matters with the press. *Microsoft*, 253 F.3d at 112. Regardless, as stated in *Microsoft*, "[i]t is no excuse that the judge may have intended to 'educate' the public about the case or to 'rebut misconceptions' purportedly caused by the parties." *Id*. In fact, "[b]ecause there is no scienter requirement in section 455, the test is not how a judge intended his remarks to be understood, but whether, as a result of the interviews or extra-judicial statements, the appearance of impartiality might reasonably be questioned." *Ligon v. City of New York*, 736 F.2d 118, 126-127 (2d Cir. 2013).

There are a variety of remedies for violations of 28 U.S.C § 455 based on the relative harm to the parties, the public, and the judicial process. *U.S. v. Amico*, 486 F.3d 764, 777 (2d Cir. 2007) (citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 862-864 (1988)). These include retroactive disqualification and vacatur of rulings, orders, and judgments. *Liljeberg*, 486 U.S. at 864; *Amico*, 486 F.3d at 777. Recusal and vacating or reversing the Court's rulings and

---

[58] Indeed, this is why "[j]udges are generally loath to discuss pending proceedings with the media." *Ligon*, 736 F.3d at 126 (citing *In re Boston's Children First*, 244 F.3d at 169). "In fact, the very rarity of such public statements, and the ease with which they may be avoided, make it more likely that a reasonable person will interpret such statements as evidence of bias. *In re Boston's Children First*, 244 F.3d at 170.

orders is necessary and appropriate here given the unique circumstances of this case. *Microsoft Corp.*, 253 F.3d at 116-117; *Liljeberg*, 486 U.S. at 862-864.

**CONCLUSION**

Ultimately, despite public perception and speculation about possible larger implications of this case, Plaintiff's primary objective is to obtain a fair trial. The reasons set forth herein require (1) vacatur of the verdict, judgment as a matter of law, and final judgment, as well as the Court's rulings contrary to the Mandate, (2) a new trial, and (3) recusal. It reasonably appears to objective observers that the Court is partial and predisposed, such that a new trial before a new judge is necessary to preserve the appearance of justice.

Dated:  March 22, 2022.

Respectfully submitted,

*/s/ Shane B. Vogt*

Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@tcb-law.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 834-9191
Facsimile: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff*

JA 2286

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that Plaintiff's Omnibus Memorandum of Law in in Support of Post-Trial Motions was filed electronically on March 22, 2022. This Notice will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt. Parties and their counsel may access this filing through the Court's system.

                                */s/ Shane B. Vogt*
                                Attorney

# EXHIBIT 1

*to Plaintiff's Omnibus Post-Trial Motions*

Case 1:17-cv-04853-JSR Document 58-09 Filed 03/22/21 Page 2 of 49

JA 2288

# POLITICO

   

**LEGAL**

## Judge throws out Palin libel case against New York Times

The ruling came as a Manhattan jury was deliberating on Palin's suit, which claimed the Times defamed her by linking her to a 2011 shooting spree that killed six and wounded then-Rep. Gabby Giffords.



Former Alaska Gov. Sarah Palin arrives at a federal court in Manhattan to resume a case against the New York Times on Feb. 3, 2022. | Spencer Platt/Getty Images

By **JOSH GERSTEIN**

02/14/2022 03:22 PM EST

Updated: 02/14/2022 07:35 PM EST

Case 1:17-cv-04853-JSR Document 58-10 filed 01/18/21 Judge dismisses defamation case against New York Times Filed 03/22/21 Page 3 of 49

# POLITICO

   

A judge has ruled that a libel lawsuit former Alaska Gov. Sarah Palin filed against the New York Times over a 2017 editorial should be thrown out because her lawyers failed to produce adequate evidence that the newspaper knew what it wrote about her was false or acted recklessly toward indications it was false.

The ruling from U.S. District Court Judge Jed Rakoff Monday came as a Manhattan jury was deliberating on Palin's suit, which claimed the Times and former editorial page editor James Bennet defamed her by unfairly linking her to a 2011 shooting spree in Arizona that killed six people and gravely wounded then-Rep. Gabby Giffords (D-Ariz.).

Advertisement



Rakoff said he would continue to allow the jury to deliberate to a verdict, arguing that an appeal in the case seems inevitable and that the jury's verdict could be useful to the appeals court. The judge's announcement that he plans to dismiss the case came after a trial that lasted a little more than a week and as the jury was in its second day of deliberations. The jurors left Monday afternoon without reaching a verdict and are expected to return Tuesday morning.

Rakoff said in his ruling that during the trial, Palin's attorneys failed to elicit enough evidence for a reasonable jury to conclude that the 2008 Republican vice presidential nominee had met the "actual malice" standard the Supreme

Case 1:17-cv-04853-JSR   Document 91831   Filed 03/22/21   Page 4 of 49

JA 2290

   

The judge said that standard, aimed at allowing robust public debate on issues of public importance, is open to question. However, he said it was not his role to revisit that rule.

"The Supreme Court made that balance and set a very high standard, and I don't think that standard has been realized by plaintiff with respect to at least one aspect of the actual malice requirement," Rakoff said. "I don't think a reasonable juror could conclude that Mr. Bennet either knew the statements were false or that he thought the statements were false and he recklessly disregarded that high probability."

At the time Palin filed the suit, more than four years ago, her legal team billed it as a vehicle to challenge that "actual malice" standard. The suit was brought as prominent figures on the right, including then-President Donald Trump, were expressing increasing frustration the *Times v. Sullivan* framework. In recent years, Justices Clarence Thomas and Neil Gorsuch have called on their fellow justices to revisit that decision. However, in 2020, the New York Legislature adopted that *Sullivan* standard as the rule under New York state law. Legal experts say that move makes the Palin case an unlikely vehicle for the high court to revisit the half-century-old rule.

Rakoff noted that Palin was not only obligated to show actual malice, but needed to prove it with clear and convincing evidence. "That places the burden very much on the plaintiff in these situations," he said. "In this case, the court finds that that standard has not been met."

The editorial, titled "America's Lethal Politics," was published on the day a gunman opened fire on a congressional GOP baseball practice in Alexandria, Va., badly wounding Rep. Steve Scalise (R-La.) and three other people. The gunman in that attack, who was killed at the scene, was a fan of Sen. Bernie Sanders (I-Vt.).

Case 1:17-cv-04853-JSR Single Doc judge tosses case against New York Times Page 116 of 49

# POLITICO

  

politicians at both ends of the political spectrum to tone down their rhetoric. He said he introduced language into the editorial that suggested a direct link between a targeting map issued by Palin's political action committee and the 2011 Arizona shooting. No such link was ever established, but Bennet said he wasn't trying to imply there was a cause-and-effect relationship, just that there was rhetoric specifically targeting Giffords in advance of that shooting.

Advertisement

The Times issued two corrections to the disputed editorial within hours, but Palin claimed they were inadequate and that the publication damaged her reputation, leading to fewer speaking engagements and requests for political help.

Testimony at the trial exposed sloppy practices at the Times, with Bennet amping up the language in the editorial shortly before deadline, a fact-checker skipping over the language that gave rise to the suit and an editorial writer failing to closely read all of Bennet's changes when they were sent to her.

Case 1:17-cv-04853-JSR Document 219-11 Filed 03/22/21 Page 6 of 49

JA 2292

# POLITICO

   

doubt about the truth of his statements at the time they were published. Rakoff said there was no evidence the editor had any concern about the accuracy of the statements until a colleague emailed him after the editorial was posted online.

As he issued his ruling, Rakoff gave the Times a mild tongue-lashing.

"Ms. Palin was subjected to an ultimately unsupported and very serious allegation that Mr. Bennet chose to revisit 7 years or so after the underlying events," the judge said. "I think this is an example of very unfortunate editorializing on the part of the Times but, having said that, that's not the issue before this court."

Rakoff has repeatedly warned the jurors not to look at press coverage of the case, and he seemed convinced Monday that they would not learn of his ruling.

"They, of course, will not know about my decision," said the judge, an appointee of former President Bill Clinton.

"I certainly considered the possibility that I should wait until after the jury had rendered its verdict in this case, but the more I thought about it over the weekend, the more I thought that was unfair to both sides. We've had very full argument on this; I know where I'm coming out," Rakoff said just before he announced his ruling.

Before the jurors were excused for the day Monday, Times attorney David Axelrod expressed concern to Rakoff that some of the jurors might see "push notifications" about his decision that were sent out by various news outlets.

The judge then said he planned to "schmooze" with the jurors a bit before telling them to avoid press coverage of the case.

"I didn't think I should let the day expire, when you know I love this jury, without wishing you a happy Valentine's Day," he later told the jury. "If you see anything in the media about this case, just turn away."

Case 1:17-cv-04853-JSR Document 131 Filed 03/22/22 Page 7 of 49

JA 2293

   

did so in 2017) after an unusual hearing in which Bennet testified about his decision-making related to the editorial. The 2nd Circuit Court of Appeals later reinstated Palin's suit, calling Rakoff's approach unorthodox and in violation of federal rules covering civil litigation.

*CORRECTION: An earlier version of this report misstated the year of the New York Times Co. v. Sullivan libel ruling. It was 1964.*

**FILED UNDER:** STEVE SCALISE, THE NEW YORK TIMES, SARAH PALIN, LIBEL, (•••)

SPONSORED CONTENT                                                    By



**85% of Americans Don't Know...**

Bon Voyaged



**[Photos] At 48, This Is The Car Heidi Klum ...**

Medicare Granny



**Before you renew Amazon Prime, read...**

Capital One Shopping



**[Photos] At 31, This Is Alexandria...**

Sport Pirate

**[Photos] Gilligan's Island' Star i...**

Wordsa



**[Photos] This Is How Luxurious Jen Psaki Lives**

Car And Yachts



**Early Amazon investor believes this $3 stock...**

The Alpha Cut



**[Photos] Super Bowl Halftime Shows Ranked:...**

Gameday News



**Ranking The Worlds Strongest Militaries**

Auto Overload



**[Gallery] The Largest Athletes Make Humans...**

DailyStuff

Case 1:17-cv-04853-JSR    Document 19821    Filed 03/22/21    Page 3 of 49



   

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do not sell my info

Notice to California Residents

———————

© 2022 POLITICO LLC



Case 1:17-cv-04853-JSR Document 198-2, Filed 03/22/22 Page 104 of 49

🔒 **Page Vault**

| | |
|---|---|
| Document title: | Sarah Palin Defamation Lawsuit Against New York Times Dismissed |
| Capture URL: | https://www.businessinsider.com/sarah-palin-defamation-lawsuit-against-new-york-times-dismissed-2022-2 |
| Page loaded at (UTC): | Thu, 17 Feb 2022 00:09:16 GMT |
| Capture timestamp (UTC): | Thu, 17 Feb 2022 00:10:19 GMT |
| Capture tool: | v7.13.2 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 4 |
| Capture ID: | 0de9951d-bb1b-4379-8f27-3268eb149272 |
| User: | GArnold |

US MARKETS CLOSED
In the news

▲ Dow Jones -0.16%   ▲ Nasdaq -0.11%   ▼ S&P 500 +0.09%   ▼ TSLA 0.29%   ▲ FB -2.02%   ▲ BABA -0.07%

INSIDER   One-month trial for only $1   TRY FOR $1

HOME > NEWS

# Judge dismisses Sarah Palin's defamation lawsuit against The New York Times in the middle of jury deliberations

Jacob Shamsian  Feb 14, 2022, 8:46 PM





The New York Times

$1 a week?
That's something
to think about.

Unlimited news access:
$4.25 $1 a week
Special offer.

SUBSCRIBE NOW

Cancel or pause anytime

Sarah Palin, 2008 Republican vice presidential candidate and former Alaska governor, arrives for the trial in her defamation lawsuit against the New York Times, at the United States Courthouse in the Manhattan borough of New York City, U.S. February 4, 2022. REUTERS/Brendan McDermid TPX IMAGES OF THE DAY

* The judge overseeing Sarah Palin's lawsuit against the New York Times dismissed it in the middle of jury deliberations.

* He ruled that Palin didn't prove the Times acted with "actual malice," the standard for defamation against public figures.

* Palin is expected to appeal the decision and is considering challenging the "actual malice" standard.

Get a daily selection of our top stories based on your reading preferences.

| Email address | SIGN UP |

By clicking 'Sign up' you agree to receive marketing emails from Insider as well as other partner offers and accept our Terms of Service and Privacy Policy.

SPONSORED CONTENT

How digital engineering is keeping the US firmly ahead of evolving threats

Read the story





The New York Times

$1 a week?
That's something
to think about.

Unlimited news access:
$4.25 $1 a week
Special offer.

SUBSCRIBE NOW

Cancel or pause anytime.

The judge overseeing Sarah Palin's defamation lawsuit against the
New York Times dismissed the case on Monday as the jury was still
deliberating its verdict.

US District Judge Jed Rakoff ruled that Palin, after a week of
testimony, didn't produce enough evidence that the New York Times
acted with "actual malice," the legal threshold used for cases of
potential defamation against public figures.

Rakoff said he would allow the jury, which began deliberating on
Friday afternoon, to continue its deliberations so that it may be used
for a future appeal.

The former Republican vice-presidential candidate filed her lawsuit
in 2017 over an editorial published by the Times that June titled
"America's Lethal Politics." The piece followed the shooting of
several Republican members of Congress by a man with a history of
opposing their political positions.

RECOMMENDED VIDEO



INSIDER
Newsletters

10 Things Before the Opening Bell
The market moves fast — don't miss a thing

Articles delivered to your inbox daily

SIGN UP FOR FREE

The Times article, published in its opinion section, drew a link
between the shooting and an earlier one, in 2011, where another
man shot then-Democratic Rep. Gabriel Giffords in Arizona,
wounding her and killing six others. According to the version of the
editorial that was initially published, Palin incited that shooting
because her political action committee posted an image on
Facebook that put Giffords's district under crosshairs.

The Times corrected the article the next day, admitting that there
was no established link between Palin's committee's post and the
Giffords shooting. Palin filed her lawsuit two weeks later.

James Bennet, the head of the Times's opinion operation, inserted
the phrases Palin claims were defamatory while revising another
writer's first draft of "America's Lethal Politics." Bennet resigned
from the Times in June 2020 after running an op-ed by Senator Tom
Cotton calling for the deployment of US military troops to quell
American civilian protests, but remains a co-defendant in the
lawsuit.

Rakoff initially dismissed the lawsuit in August 2017, ruling that the
Times made a "mistake" but that the former Alaska governor had
not proved that the mistake "was made maliciously, that is, with
knowledge it was false or with reckless disregard of its falsity."



INSIDER

How They Got Here:
Battery Packs

LEARN MORE

INSIDER   Just $1 for monthly Insider access   SUBSCRIBE NOW

INSIDER Just $1 for monthly Insider access  SUBSCRIBE NOW

An appeals court later ruled against Rakoff, setting the stage for a
trial. It was scheduled to begin on January 24 of this year but was
delayed after Palin, who opposes using safe coronavirus vaccines,
tested positive for COVID-19.



The trial featured testimony from Bennett, Elizabeth Williamson,
who wrote the first draft of the editorial, and other New York Times
employees. The Times staffers laid bare the editorial process and
how the opinion section — which is separate from the newsroom —
handles corrections.

Palin also testified about her feelings about the editorial. She alleged
that the Times had a record of "lying" about her, but did not specify
any examples, and alleged without evidence that the editorial
damaged her career prospects.

As Rakoff sent the jurors into deliberations, lawyers for the Times
filed a motion to dismiss the case wholesale, claiming Palin had not
proven her case. In granting the motion on Monday, Rakoff noted
that Bennett's language was "very unfortunate editorializing" but
that he did not act with "reckless disregard," considering the steps
he took to evaluate whether a correction was warranted after the
editorial was initially published.



INSIDER Unlock your access today  50% OFF SALE  Limited time only

Palin has suggested that she wants the Supreme Court to revisit the
"actual malice" standard of defamation law. Two conservative
members of the Supreme Court, Clarence Thomas and Neil Gorsuch,
have both said they believe the standard is problematic.

In an interview with Insider Thursday, Palin said she'd consider
raising the argument upon appeal.

"We'll consider it after this case," she said.

⚡ KEEP READING



Premium  STRATEGY
I tried Notion, the productivity tool TikTokers say can
improve your workflow. I loved the design, but it didn't work
for me in the long term.

More   Sarah Palin   New York Times   Breaking   Defamation  ▾

| Document title: | Judge throws out Palin libel case against New York Times \| Daily Mail Online |
| --- | --- |
| Capture URL: | https://www.dailymail.co.uk/news/article-10512439/Judge-throws-Palin-libel-case-against-New-York-Times.html |
| Page loaded at (UTC): | Wed, 16 Feb 2022 23:43:36 GMT |
| Capture timestamp (UTC): | Wed, 16 Feb 2022 23:53:44 GMT |
| Capture tool: | v7.13.2 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 14 |
| Capture ID: | b8a4d458-1701-4524-a4e3-c079f337502b |
| User: | GArnold |

PDF REFERENCE #:          35x48EKnPm7vU7nqucLhHc


Ensure Data Center Uptime
Ensure Server Uptime by Protecting Critical Electrical Components and Systems.

SEL                                                     Open >

# 'Palin judge deliberately tainted verdict': Legal experts slam Clinton-appointed judge for tossing out Sarah Palin's NYTimes libel case while the jury is STILL deliberating on it

- Sarah Palin's libel case against The New York Times will be dismissed after the jury determines a verdict on Monday afternoon
- Multiple attorneys have said US District Court Judge Jed Rakoff made the wrong call in throwing the case out before the jury had returned
- Rakoff made the ruling as the jury deliberated whether the Times defamed her by linking her to a 2011 shooting spree in Arizona
- He said she hasn't proven The New York Times had actual malice against her, stating on Monday: 'I think that there is one essential element that plaintiff has not carried its burden with—the portion of actual malice'
- Palin sued the newspaper for a 2017 editorial for incorrectly linking her to a mass shooting six years earlier that wounded Congresswoman Gabby Giffords
- Palin had said that if she lost at trial, her appeal might challenge New York Times v. Sullivan's decision that established the 'actual malice' for public figures

By ALYSSA GUZMAN and DANIEL BATES and NATASHA ANDERSON FOR DAILYMAIL.COM

PUBLISHED: 15:41 EST, 14 February 2022 | UPDATED: 09:26 EST, 15 February 2022

f Share   Share   🐦   📌   f   💬   ✉   🔗          413 shares          ♥2k View comments



The Best In Israeli Film & TV
Israeli Film Center
Open >

Legal experts have slammed the Clinton appointed New York judge who tossed Sarah Palin's libel lawsuit against The New York Times while jurors are still deliberating the case and say he's effectively hobbled the jury.

'I would have expected the judge to wait for the jury to return its verdict before ruling on the motion for judgment as a matter of law, because there was no urgency to issuing that ruling,' attorney Mitchell Epner, of Rottenberg Lipman Rich PC, told Law & Crime on Monday.

'Nothing would have changed if he had waited for the verdict to have been announced, or for the jury to say that they couldn't reach a verdict.'

While jurors have been warned to avoid reporting of the case until they've concluded their task, experts say it's inevitable that news of its dismissal will reach them, and potentially undermine their efforts to reach an honest, unprejudiced verdict which no longer carries any weight.

US District Court Judge Jed Rakoff made the ruling on Monday afternoon as the jury deliberated whether the Times defamed her by linking her to a 2011 shooting spree in Arizona that injured Congresswoman Gabby Giffords.

Rakoff claimed he'd done so because her lawyers failed to produce evidence the paper had acted maliciously. He used a 1964 precedent which states that journalists who defame people accidentally, and without malice, cannot be convicted, to justify his ruling.

Palin's lawyers did not respond to DailyMail.com's request for comment.

George Freeman, the executive director of the Media Law Resource Center, argued that although Rakoff acted within the law he had also 'potentially sown confusion.'

'He did follow the law, which is what he's supposed to do. And there is no actual malice according to the evidence,' Freeman told the New York Times. 'But generally a judge would hold his views in his pocket.'

He added that any verdict the jury reaches 'has no legal power at this point'.

George Freeman, the executive director of the Media Law Resource Center, argued that although Rakoff acted

'He did follow the law, which is what he's supposed to do. And there is no actual malice according to the evidence,' Freeman told the **New York Times**. 'But generally a judge would hold his views in his pocket.'

He added that any verdict the jury reaches 'has no legal power at this point'.

'This jury verdict was never going to be the ultimate word on this,' echoed University of Utah College of Law professor RonNell Andersen Jones.

However, the media law expert argued the jury's finding 'lays the groundwork for the future trajectory of this case' in preserving the verdict so the case won't have to be retried.'

Epner also claimed the ruling 'introduces another potential appellate issue,' arguing if Palin loses in front of the jury, her attorneys could argue 'the news of the ruling by the judge couldn't help but it seeped its way into the knowledge of the jury'.

Rakoff said he will order the dismissal of Palin's lawsuit, but enter his order after her jury finishes its own deliberations. He added that he expected Palin to appeal, and that the appeals court 'would greatly benefit from knowing how the jury would decide it.'

His unusual order effectively preempted a potential jury verdict to the contrary. Jurors are still deliberating the case. It is unclear if they'll be told about the dismissal, with jurors usually discouraged from reading about the trials they're hearing while empaneled. But if the 12 men and women do end up hearing that the case has already been dismissed before reaching their own verdict, it could influence them into thinking that Palin's case is without merit in a clear case of prejudice against the former VP.



A New York judge has tossed Sarah Palin's libel lawsuit against The New York Times because her lawyers failed to produce evidence of the newspaper had actual malice against her. Pictured: Palin talking to the media after the judge's ruling Monday





JA 2303





Clinton appointee Judge Ned Rakoff, pictured, said he was throwing Palin's case against the Times out while jurors are still deliberating it

The judge's decision to dismiss the case falls under the grounds of a legal technicality known as a 'failure to state a claim for relief'.

That means that even if all the allegations they presented were true, they did not provide sufficient evidence to justify a legal remedy, such as a conviction or fine.

A New York Times spokesperson issued a statement to DailyMail.com saying the organization 'welcomes today's decision'.

'It is a reaffirmation of a fundamental tenet of American law: public figures should not be permitted to use libel suits to punish or intimidate news organizations that make, acknowledge and swiftly correct unintentional errors,' the statement said.

The former governor of Alaska had sued the newspaper and its former editorial page editor James Bennet, arguing that a 2017 editorial incorrectly linked her to a mass shooting six years earlier that wounded Democratic US Congresswoman Gabby Giffords.

She claimed the newspaper had damaged her career as a political commentator and consultant with the editorial about gun control published after US Representative Steve Scalise, a Louisiana Republican, was wounded when a man with a history of anti-GOP activity opened fire on a Congressional baseball team practice in Washington.

In the editorial, The Times wrote that before the 2011 mass shooting in Arizona that severely wounded Giffords and killed six others, Palin's political action committee had contributed to an atmosphere of violence by circulating a map of electoral districts that put Giffords and 19 other Democrats under stylized crosshairs.

The Times acknowledged that the editorial wrongly described both the map, and any link to the shooting, but said the mistake wasn't intentional.





JA 2304





Palin was seen walking into court on Monday ahead of the judge saying he would throw out her case







Palin looked glamorous in bold red earrings and an almost all-black outfit, outfitted with a white shirt and a pink bag on Monday

Court sketch shows a moody looking Palin sitting in court wearing a mask and looking at James Bennett, former editorial page editor of The New York Times, being embraced by his lawyers

It is rare for a major media outlet to defend its editorial



Court sketch shows a moody looking Palin sitting in court wearing a mask and looking at James Bennett, former editorial page editor of The New York Times, being embraced by his lawyers

It is rare for a major media outlet to defend its editorial practices in court, as the Times had to do in this case.

Palin had said that if she lost at trial, her appeal might challenge New York Times v. Sullivan, the 1964 US Supreme Court decision establishing the 'actual malice' standard for public figures to prove defamation.

The judge said she did not prove 'actual malice.'

'I think that there is one essential element that plaintiff has not carried its burden with—the portion of actual malice relating to belief in falsity or reckless disregard in falsity,' he said on Monday.

'My job is to decide the law,' he continued. 'The law sets a very high standard, the court finds that that standard has not been met.'

He argued that the case regarded negligent journalism, not knowingly writing falsehoods to degrade a public figure, according to the Washington Post's **Erik Wemple.**

The lawsuit at the center of the case concerned a June 14, 2017, editorial headlined 'America's Lethal Politics,' that addressed gun control and lamented the rise of incendiary political rhetoric.

It was written the same day as a shooting at a congressional baseball practice in Alexandria, Virginia, where Scalise was wounded.

One of Bennet's colleagues prepared a draft that referred to the January 2011 shooting in a Tucson, Arizona, parking lot where six people were killed and Giffords was wounded.

Bennet inserted language that said 'the link to political incitement was clear' between the Giffords shooting and a map previously circulated by Palin's political action committee that the draft editorial said put Giffords and 19 other Democrats under crosshairs.

Times attorney David Axelrod asked Palin at her trial on February 9 about a map put out by her PAC, SarahPac, in 2010, that put crosshairs on the congressional districts for Democrats she wanted to unseat.

Palin initially called the gun symbols an 'emoji' but admitted that a 'reasonable person' could interpret them as a rifle sight.

Axelrod asked Palin about a tweet she sent in March 2010 urging her supporters: 'Don't retreat, reload'.

He asked: 'Reload is a word that's often used in connection with firearms.'

Palin responded: 'It's a word I have used all my life.'

In her earlier testimony Palin claimed that the tweet she sent in March 2010 telling her supporters 'don't retreat, reload' was not about guns - but intended as a motivational speech.

She said: 'My dad was a coach for years. It was a motivational saying, one of a few.

'It meant don't back down. My parents were marathon runners and they'd use it (the saying) for themselves.

'Don't back down, buck up, refuel, get back out there and try harder. We were all obsessed with sports so things like this were commonplace.'

Axelrod asked if she put this tweet out even though she was already being criticized for the crosshairs map, and she confirmed her PAC did.

## Judge throws out Palin NYT lawsuit - but concedes an appeal is likely

A federal judge will dismiss the defamation lawsuit former Alaska Governor Sarah Palin brought against the New York Times after she and her legal team allegedly failed to prove the newspaper acted with 'actual malice'.

The decision to dismiss the case falls under the grounds of a legal technicality known as a 'failure to state a claim for relief'. That means that even if all the allegations they presented were true, they did not provide sufficient evidence to justify a legal remedy, such as a conviction or fine.

US District Court Judge Jed Rakoff, who made the ruling in his Manhattan courtroom on Monday, argued the case did not meet the 'very high standard' the law sets for malice.

He used his prerogative to toss the case after saying that the burden of proof had not been met in the former VP candidate's case against the Times.

In simple terms, he said Palin's team hadn't been able to prove that the New York Times error was a malicious error, rather than an honest mistake.

The case is currently being decided by jurors, and hasn't been formally dismissed. Even if they return a verdict against the Times, no conviction will stand.

But Rakoff concedes an appeal is likely, and says he wants jurors to complete their deliberations so that judges asked to try the appeal have a wealth of information with which to make their decision.

He cited a 1964 Supreme Court case - New York Times Co. v. Sullivan - which set a precedent to shield journalists from liability over 'honest mistakes' made when covering public officials.

The 1964 case, which involved the same newspaper, established that the so-called actual malice standard means reporters can only be held liable for defamation if they knew the statement or information was false when they published it or if they had a 'reckless disregard' for its falsity.

Rakoff argued Palin and her attorneys did not provide enough evidence to prove that former New York Times editorial page editor James Bennet knew the statement was false or that he deliberately avoided learning the truth.

The judge said 'sloppy, irresponsible or negligent reporting' is not enough to prove actual malice.

'My job is to apply the law. The law here sets a very high standard for actual malice and in this case the court finds that standard has not been met,' Rakoff told the courthouse, according to **Buzzfeed News.**

'The standard is very high and the same standard applies here.'




Daily **Mail**.com



JA 2307



Palin sued The New York Times and James Bennett (pictured in 2017), who was the editorial page editor at the time



Court sketches show Bennett being embraced by his lawyers as Palin looks on in the background

Before the jury came in, Axelrod referred to the Tweet as he told the judge: 'The evidence will show that Miss Palin likes to make provocative statements she knows are going to lead to criticism.

'The one who makes provocative comments like this don't retreat, reload in the face of criticism about using violent gun imagery has a hard time proving she has sustained emotional damage when the criticism comes back'.

Considering the issue, Judge Rakoff said that Axelrod had a right to ask on cross examination: 'What are you talking about?'

### Judge tosses Sarah Palin's libel case: Now what?

US District Court Judge Jed Rakoff tossed Sarah Palin's libel lawsuit against The New York Times on Monday while jurors continue to deliberate the case.

Jury deliberations are set to continue Tuesday. Rakoff has instructed the jury not to view media coverage of the trial - although experts say its inevitable that news of the case's collapse will reach them before they conclude deliberations



violent gun imagery has a hard time proving she has ...

Considering the issue, Judge Rakoff said that Axelrod had a right to ask on cross examination: 'What are you talking about?'

Judge Rakoff continued, suggesting Axelrod's possible line of questioning to Palin: 'You love this kind of language, you love the heat of political turmoil, you relish your opponents making statements so you can say: "Look at what jerks they are?"'

Axelrod said that Palin was a 'public figure' who 'uses hyperbole' and did so as well after 2010.

Under cross examination Palin admitted that she didn't seek help from a doctor for the emotional distress she claims to have suffered as a result of the Times article.

Asked by Axelrod if she got any kind of counseling, Palin replied: 'No, I holistically remedy issues that are caused by stress. Running, hot yoga, and other healthy things'.

Palin maintained that the effect of the article on her wellbeing was 'quite impactful' but she didn't speak to a therapist because she has 'never operated like that.'

She said: 'I have a women's prayer group and we prayed about it.'

Palin testified that the NYTimes article left her feeling 'powerless' and 'devastated.'

Palin's lawyer Kenneth Turkel asked how she felt 'emotionally' after the article came out in 2017 and Palin said she felt 'mortified'.

Wearing a white blazer, black top, black pants and black stiletto, Palin said: 'Well, I was devastated to read again false allegations I had anything to do with murder. Murder of innocent people. I felt powerless. I know I wanted to respond and get the word out against these untruths.'

She spoke with a clear confident voice as she said earlier this month, 'Once again I was up against Goliath - I was David.'

... libel lawsuit against The New York Times on Monday ...

... erations are set to continue Tuesday. Rakoff has instructed the jury not to view media coverage of the trial - although experts say its inevitable that news of the case's collapse will reach them before they conclude deliberations.

Although Rakoff already announced his decision for dismissal, he does not intend to enter his order after her jury finishes its deliberations.

The judge, along with many legal experts, expects Palin to appeal the ruling.

Rakoff argued the appeals court will 'would greatly benefit from knowing how the jury would decide'.

Attorney Mitchell Epner, of Rottenberg Lipman Rich PC, predicts Palin will appeal the decision, said: 'One of the arguments that I would expect her attorneys to make is that the news of the ruling by the judge couldn't help but it seeped its way into the knowledge of the jury.'

Other lawyers - including those who know Rakoff - say his decision carried little risk. They argue Palin could still win a jury verdict that could be restored on appeal, negating the need for a potential retrial.

Palin previously said she would 'consider' asking the Supreme Court overturn New York Times Co. v. Sullivan - the landmark 1964 case that established the legal standards for criticizing public figures - if she were to lose her defamation case.

It remains unclear if she will pursue that course of action.



BRITISH EXPATS IN USA:
DID YOU LEAVE A
PENSION IN THE UK?

- Avoid Losing Up To 50%
- Enjoy A Higher Income
- Take Your Pension Early

FREE GUIDE







**JA 2309**

| | |
|---|---|
| Vic Snyder — AR-2 | Earl Pomeroy — ND-AL |
| Ann Kirkpatrick — AZ-1 | Charlie Wilson — OH-6 |
| Harry E. Mitchell — AZ-5 | John Boccieri — OH-16 |
| Gabrielle Giffords — AZ-8 | Kathy Dahlkemper — PA-3 |
| John Salazar — CO-3 | Christopher Carney — PA-10 |
| Betsy Markey — CO-4 | John M. Spratt Jr. — SC-5 |
| Allen Boyd — FL-2 | Bart Gordon — TN-6 |
| Suzanne M. Kosmas — FL-24 | Tom Perriello — VA-5 |
| Brad Ellsworth — IN-8 | Alan B. Mollohan — WV-1 |
| Baron P. Hill — IN-9 | Nick J. Rahall II — WV-2 |

■ Already retiring at the end of their terms. 17 more to go!

**Let's take back the 20, together!**

**JOIN ME TODAY**

This map by Palin's PAC came out months before the 2011 shooting that killed six and injured Representative Gabby Giffords. It was used in a 2017 NY Times editorial to link Palin to the shooting. Palin sued the publication for defamation over the article

Palin said it was hard to 'figure out what were the stones' she could throw at the Goliath, meaning the Times.

Palin said that the Times was an organization that 'buys ink by the barrel' and she 'had my No.2 pencil on my kitchen table in Alaska.'

Turkel asked how the Times article affected Palin and in particular, her sleep.

She said: 'It's hard to lay your head on a pillow and have a restful night's sleep when you know that lies are being told about you, specifically a lie that's not going to be fixed.

'That caused some stress...it was tough to get a good night's sleep.'

On the stand, Palin revealed that when she heard about the shooting of former Representative Gabby Giffords in 2011, she suffered death threats against her family because her critics thought she was responsible somehow.

Palin said she wanted to correct 'negative comments, a lot of false accusations and lies that I had somehow incited the murders of innocent people.'

She claimed that the 'media was politicizing the deaths of a nine-year-old girl,' referring to Christina-Taylor Green, the youngest victim.

She also got 'disturbing' death threats that 'ramped up' including against her own daughter Kimberly, who was around the same age as Green.



Court drawings from last week show the title of The New York Times' June 14, 2017, editorial headlined 'America's Lethal Politics,' which she is suing over as it wrongfully connected her to murder

## Key moments in Sarah Palin's libel lawsuit against the New York Times

Sarah Palin launched a defamation lawsuit against the New York Times after the newspaper published a 2017 editorial



# Key moments in Sarah Palin's defamation lawsuit against the New York Times

Sarah Palin launched a defamation lawsuit against the New York Times after the newspaper published a 2017 editorial incorrectly linking the former Alaska governor to a 2011 shooting spree in Arizona that injured Congresswoman Gabby Giffords.

Here is a timeline of events in Palin's libel lawsuit, which a Bill Clinton-appointed New York judge has tossed even though jurors are still deliberating the case:

**Jan. 8, 2011** - Gunman Jared Lee Loughner opened fire at an event held in a Tucson, Arizona parking lot by Democratic Rep. Gabrielle Giffords, killing six people and seriously wounding the congresswomen.

**June 14, 2017** - Gunman James Hodgkinson fired shots on Republican US Congress members who were practicing for a charity baseball game in Alexandria, Virginia. Four people are wounded including Steve Scalise, a member of the Republican leadership in the House of Representatives.

That night, the New York Times published an editorial, headlined America's Lethal Politics, citing the Virginia shooting as probable 'evidence of how vicious American politics has become.'

Editorial page editor James Bennet wrote some of the piece, including that 'the link to political incitement was clear' between the 2011 shooting and a map previously published by Palin's political action committee that, according to the piece, put 20 Democrats including Giffords under 'stylized cross hairs.'

**June 15, 2017** - The Times issued a correction to the editorial, saying it 'incorrectly stated that a link existed between political rhetoric' and the Giffords shooting. It also corrected its description of the map, saying it depicted electoral districts, not Giffords and other Democratic lawmakers.

**June 27, 2017** - Palin sued the New York Times for defamation in Manhattan federal court, saying the newspaper acted with 'actual malice' in suggesting she had incited Loughner to commit the 2011 shooting.

**Aug. 29, 2017** - US District Judge Jed Rakoff dismissed the lawsuit, ruling that while the editorial may have contained errors, it was not plausible those errors were made maliciously - which a public figure like Palin must prove to win a defamation lawsuit.

**Aug. 6, 2019** - A federal appeals court revived the case, saying Rakoff erred by basing his decision in part on testimony from Bennet.

**Dec. 30, 2019** - Palin refiled the lawsuit, adding a claim against Bennet.

**June 7, 2020** - Bennet resigned from his position at the Times following controversy over the decision to publish an opinion piece by Republican US Sen. Tom Cotton advocating using the military to quell violence amid protests over racial inequality.

**Aug. 28, 2020** - Rakoff denied a motion to dismiss Palin's lawsuit, allowing it to go to trial.

**Jan. 24, 2022** - The defamation trial is delayed after Palin tests positive for COVID-19.

**Feb. 3, 2022** - Palin's defamation trial began in Manhattan court.

**Feb. 10, 2022** - Palin testified that she felt 'powerless' after the editorial was published and 'mortified' at being linked to the murder of innocent people. She claimed the editorial caused her stress and that 'things changed in terms of being called upon to advise and to help, and to be seen publicly on a high-profile political stage' after it was published.

Bennet testified that he never meant to imply a causal link between Palin or the map and the 2011 shooting. 'If I thought it caused the violence, I would have used the word 'cause,'' Bennet stated.

**Feb. 11, 2022** - Lawyers for Palin and the New York Times delivered closing arguments to jurors, who begin deliberations.

Palin's lawyer Kenneth Turkel told jurors that the Times and Bennet turned a 'blind eye' to the facts as the newspaper smeared Palin's reputation.

Times lawyer David Axelrod said the editorial amounted to an 'honest mistake' and was not meant as a 'political hit piece.' The jury began deliberations.

**Feb. 14, 2022** - Judge Rakoff announced his decision to throw out the case because Palin failed to show that the Times acted with 'actual malice,' the standard necessary to win, even as jurors continued to deliberate.

He used a 1964 precedent which states that journalists who defame people accidentally, and without malice, cannot be convicted, to justify his ruling.

Rakoff said he will enter a formal dismissal order only after the jury reaches a verdict. The judge added he expects Palin to appeal and that the appeals court 'would greatly benefit from knowing how the jury would decide it.'



**16 Silly Things Adults Waste A Fortune On**

Here are 16 silly things you're wasting a fortune on but didn't know. Stop buying these and you'll save a fortune this year! You're probably guilty of most of these!

Click here for the list

Palin said: 'They were wishing the same thing happened to Piper as happened to Christina.'

Reeling off the names of those injured or killed, Palin said that they had been 'impacted by this horrible, horrible tragedy.'

She said: 'I felt for them and I wanted to get the message out...a; the same time I wanted to respect the fact that they were grieving families who deserved comfort and the last thing politics provides is comfort.'

Describing her reaction to first hearing about the Times' editorial in 2017, Palin said that in 2011, she was 'inundated' with comments from people.

She said she was appalled that 'The New York Times had lied again.'



---

She said: 'I felt for them and I wanted to get the message out...at the same time I wanted to respect the fact that people were feeling pain and I just wanted to come out and be compassionate.'

Describing her reaction to first hearing about the Times editorial in 2017, Palin said that in 2011, she was 'inundated' with comments from people.

She said she was appalled that 'The New York Times had lied again.'

Judge Jed Rakoff asked Palin what she meant and she said: 'They lied before. The New York Times took a lot of liberties and wasn't always truthful. That's what I meant by again'.

Palin added she could not point to a specific article which showed the Times had lied about her before.

She said: 'I remember immediately thinking: 'Oh no. First realizing how significant and horrible this incident was and mortified again that there would be linkage.' referring to the idea she had a role in the shooting.



SHARE THIS
ARTICLE

 Share

RELATED ARTICLES

 NYTimes lawyer zeroes in on Sarah Palin's use of...

 Sarah Palin, 58, enjoys a dinner date in Little Italy with...

 'The NYTimes buys ink by the barrel, I had my No.2 pencil on...

Palin said that in 2017 she did not have her Political Action Committee to support her, nor did she have any TV contracts.

Palin described the New York Times as the 'be all and end all, the loud voice in the media' and felt like they were 'scoring political points' by claiming she incited violence.

Asked by Turkel if the Times ever reached out to her before publication, Palin scoffed: 'No.'

Palin said that she read the two corrections the Times published but none mentioned her by name.

This made it feel like they were trying to 'double down' on their allegations.

James Bennet, a former Times editorial page editor, testified on February 9 that changes he made to a draft of the editorial, which the Times later corrected, were not meant to hold Palin or her political action committee responsible for the 2011 shooting.

'Did you intend to cause Ms. Palin any harm through any of your edits to the draft?' the Times' lawyer David Axelrod asked Bennet during the trial's fifth day in Manhattan federal court.

'No, I didn't,' Bennet responded.



Sarah Palin arrived at Manhattan court holding hands with Ron Duguay, her ex NHL player beau, for a second time on February 10













Some of The Most Haunting Images Captured In Time

© Christopher Peterson/SplashNews.com
Palin and Duguay have yet to confirm their romance with her new beau stating that it is a 'young friendship'











Palin and Duguay were seen on February 11 dining out at a swanky Gelso and Grand restaurant in Little Italy

Bennet also said 'no' when asked if he tried to blame Palin or the political action committee. Bennet said he moved quickly to correct the editorial as criticism mounted that its wording suggested they were to blame.

'We don't promise to be perfect, we promise to try our damnedest to be perfect, and when we're not we try to fix it,' Bennet testified.

Bennet maintained that he added the language while under deadline pressure, thinking that the growth of 'highly charged political rhetoric' could prompt such incidents.

Bennet denied adding the language in order to suggest Loughner used the cross hairs map.

'If I thought it caused the violence, I would have used the word 'cause,'' Bennet said.

Bennet said he was 'alarmed' when conservative Times columnist Ross Douthat emailed less than an hour after the editorial ran that it appeared to incorrectly link Palin to the Giffords shooting. Some readers also complained.

'We were really, really harshly criticized for muddying the record,' Bennet said, 'I thought it was urgent to correct the piece as forthrightly as possible, to acknowledge our mistake. This is basic practice. It's the right thing to do,'

The trial is a test of longstanding legal protections for US media against defamation claims by public figures.

To win, Palin must prove that Bennet and the Times acted with 'actual malice,' meaning they knew the editorial was false or had reckless disregard for the truth.

Lawyers for Palin have tried to show that the correction was too slow, and noted several times that it did not mention her.

Palin's lawyer Shane Vogt questioned Bennet about why the correction omitted his role in crafting the editorial.

'It was something that was being discussed a lot online,' he said. 'If there was a correction that needed to be made, the sooner the better.'

Read more:
Erik Wemple on Twitter: "This ruling puts Judge Rakoff pretty much where he was in 2017, when he tossed the Palin case on the motion to dismiss. He argued that this was a case of negligent journalism, not the assertion of knowing falsehood/reckle ...
Judge Tosses Sarah Palin Lawsuit Against New York Times
Judge Plans to Dismiss Sarah Palin's Lawsuit Against The Times - The New York Times
In Surprise Ruling, Judge Signals He'll Throw Out Sarah Palin's Defamation Suit Against the New York Times with the Jury Still Deliberating

Share or comment on this article: Judge throws out Palin libel case against New York Times

       **413** shares

Scandalous. Judge cover for the NYT.
Topical
by Ladybird2929 · 2261

Add comment

 Taboola Feed



Cher's Son Chaz Bono Is So Skinny Now And Looks Like A Model (Photos)
Daily Finance Shines



Las Vegas: Unsold SUVs Now Almost Being Given Away: See Prices
SUV Deals | Search Ads

 Sponsored Links



Tom Selleck's Daughter Is Probably The Prettiest Woman To Ever Exist
Finance Wealth Post



How Amal Clooney Looks Without Makeup Is Tough To Handle
Loan Insurance Wealth

Sponsored Links

   



| Document title: | Judge set to dismiss Sarah Palin's defamation case, siding with New York Times \| Fox News |
| --- | --- |
| Capture URL: | https://www.foxnews.com/media/judge-set-to-dismiss-sarah-palins-defamation-case-siding-with-new-york-times |
| Page loaded at (UTC): | Thu, 17 Feb 2022 00:04:14 GMT |
| Capture timestamp (UTC): | Thu, 17 Feb 2022 00:04:51 GMT |
| Capture tool: | v7.13.2 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 4 |
| Capture ID: | c03d1eae-90aa-416e-af1a-5b2445c1879a |
| User: | GArnold |



credible doesn't sell your data.
So you can find great rates, without losing your privacy.    Find My Rate
I've got your back.

MEDIA · Published 2 days ago

# Judge set to dismiss Sarah Palin's defamation case, siding with New York Times

Decision marks major victory for Gray Lady

By Brian Flood | Fox News



**Palin trial damages NY Times**
Editorial falsely said she sparked shooting

A U.S. judge will dismiss Sarah Palin's defamation lawsuit against New York Times, although the jury is currently deliberating the case.

The ruling from U.S. District Court Judge Jed Rakoff marks a major victory for the Times, after Palin's legal team argued a 2017 editorial defamed her by unfairly linking her to the 2011 mass shooting that killed six people and wounded then-Rep. Gabby Giffords. Rakoff said Palin had failed to show that the Gray Lady had acted out of malice, which is required in libel lawsuits involving politicians and other public figures.

A U.S. Judge will dismiss Sarah Palin's defamation lawsuit against New York Times

Rakoff said he will issue an order dismissing the complaint after the jury returns its verdict. The judge added that the case will inevitably be appealed and the court of appeals would benefit from knowing how the jury would decide it, which is why they will continue to deliberate. The jury will not be made aware of the judge's order until after deliberations.

**THANKS FOR WATCHING**

This quick video has more information
You may like this trending video

Ad by Sponsor    See More

**More From Fox News**

Housing market is the 'strongest' it's ever been: Mortgage Bankers Association...

CNN medical analyst claims 'younger children' are among 'most vulnerable to...

Biden's 'infinite ignorance' in speech makes Russian invasion of Ukraine...

'Special Report' All-Star Panel on bombshell Durham findings, potential...

'Hannity' on Durham findings, Canadian truckers

Man's hunting and fishing privileges revoked after pleading guilty to shooting...

**Fox News First**
MORNING HEADLINES

Get all the stories you need-to-know from the most powerful name in news delivered first thing every morning to your inbox

Arrives  Weekdays

Subscribe

**Featured Story**

verdict. The judge added that the case will inevitably be the subject of appeals would benefit from knowing how the jury would decide it, which is why they will continue to deliberate. The jury will not be made aware of the judge's order until after deliberations.



An attorney for Palin did not immediately respond to a request for comment.

Palin sued the Times for unspecified damages in 2017, accusing it of damaging her career as a political commentator with the editorial about gun control published after U.S. Rep. Steve Scalise, a Louisiana Republican, was wounded when a man with a history of anti-GOP activity opened fire on a Congressional baseball team practice in Washington.

**SARAH PALIN GETS ASSIST FROM EX-NHL STAR RN DUGUAY AFTER PESTERED AT NYC RESTAURANT**

In the editorial, the Times wrote that before the 2011 mass shooting in Arizona that Palin's political action committee had contributed to an atmosphere of violence by circulating a map of electoral districts that put Giffords and 19 other Democrats under stylized crosshairs.

In a correction two days later, The Times said the editorial had "incorrectly stated that a link existed between political rhetoric and the 2011 shooting" and that it had "incorrectly described" the map.

The Times has admitted wrongdoing but denied that it was done intentionally.



U.S. District Judge Jed Rakoff sided with The New York Times. (Photo by DON EMMERT/AFP via Getty Images) (DON EMMERT/AFP via Getty Images)

Last week, Palin took the witness stand and provided a folksy overview of her family life in Alaska and ascent in Republican politics.



Palin, 58, described herself for jurors as a single mother and grandmother who "holds down the fort" for her family in Alaska when not advising candidates about "the good, bad and ugly" of politics. She also recalled the surprise over her emergence as a vice-presidential candidate in 2008, saying, "I don't think they were prepared for me."

Her testimony came after former Times editorial page editor James Bennet characterized the disputed wording involving Palin as a "terrible mistake" on his part. He added: "We are human beings. We do make mistakes."

**CLICK HERE TO GET THE FOX NEWS APP**

A contrite Bennet admitted Wednesday that he botched the edit but intended no harm.

"I've regretted it pretty much every day since," he said, adding, "That's on me. That's my failure."

Palin resigned as Alaska governor in 2009 and has not formally sought office since.

*Fox News' Brie Stimson and the Associated Press contributed to this report.*





This quick video has more information

You may like this trending video

Ad by Sponsor          See More

**More From Fox News**



Housing market is the 'strongest' it's ever been: Mortgage Bankers Association...

CNN medical analyst claims 'younger children' are among 'most vulnerable' to...

Biden's 'infinite ignorance' in speech makes Russian invasion of Ukraine...

'Special Report' All-Star Panel on bombshell Durham findings, potential...

'Hannity' on Durham findings, Canadian truckers

Mark hunting and fishing privileges revoked after pleading guilty to shooting...

**Fox News** *First*
MORNING HEADLINES

Get all the stories you need to know from the most powerful name in news delivered first thing every morning to your inbox

Arrives   Weekdays

Subscribe

**Featured Story**

Hunter Biden's 'disgusting' laptop: Computer repairman reveals what made him call FBI

Get personal with Credibull.

Personal loan rates, that is.

Find My Rate

credible



| | |
|---|---|
| Document title: | Sarah Palin loses defamation case against NYT : NPR |
| Capture URL: | https://www.npr.org/2022/02/15/1080804339/nyt-sarah-palin-loses-lawsuit |
| Page loaded at (UTC): | Thu, 17 Feb 2022 00:01:26 GMT |
| Capture timestamp (UTC): | Thu, 17 Feb 2022 00:01:55 GMT |
| Capture tool: | v7.13.2 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 3 |
| Capture ID: | 72579a62-377e-4674-83e9-6b6758256a2e |
| User: | GArnold |

PDF REFERENCE #:    p2V9wNAHTU9MccmT888SKy



MEDIA

# Sarah Palin loses defamation case against 'The New York Times'

February 15, 2022 · 3:41 PM ET

DAVID FOLKENFLIK



Former Republican vice presidential candidate Sarah Palin speaks with reporters on she leaves federal court on Feb. 14 in New York City.

Michael M. Santiago/Getty Images

Jurors found on Tuesday that *The New York Times* did not defame Sarah Palin, the former Alaska governor and Republican vice presidential candidate, in a June 2017 editorial that wrongly claimed a link between an ad from her political action committee and a mass shooting many months later.

It was a one-two punch for Palin. The unanimous verdict came a day after the presiding judge, U.S. District Judge Jed Rakoff, ruled that he would set aside the jury's verdict — whatever it might be — and dismiss the case. He said Palin had failed to make a sufficient argument that the *Times* had acted with actual malice to let the case be determined by a jury.

That legal standard of "actual malice," set in a 1964 U.S. Supreme Court ruling that also involved the *Times*, requires that the newspaper either knowingly published damning and false information or recklessly disregarded the likelihood that its claims were likely to prove false.

"You decided the facts. I decided the law," Rakoff told jurors on Tuesday. "It turns out they were both in agreement, in this case."

Article continues after sponsor message



The newspaper cheered the verdict, with spokeswoman Danielle Rhoades Ha calling it "a reaffirmation of a fundamental tenet of American law: public figures should not be permitted to use libel suits to punish or intimidate news organizations that make, acknowledge and swiftly correct unintentional errors."

Palin is believed likely to appeal. Rakoff wanted the verdict to be heard by the appellate court as well. And now, the jury's verdict for the *Times* arrays even steeper odds against Palin's success.



MEDIA
Judge to dismiss Sarah Palin's defamation suit against 'New York Times'



Gentle Herd

NPR thanks our sponsors · Become an NPR sponsor



HOURLY NEWS · LISTEN LIVE · PLAYLIST



Gentle Herd

acknowledge and swiftly correct unintentional errors."

verdict to be heard by the appellate court as well. But  now, the jury's verdict for the *Times* arrays even steeper odds against Palin's success.

Rakoff heard the attorneys' arguments and made his announcement Monday outside of jurors hearing so they could continue to deliberate, unaffected by his thinking and so the appeals court could take guidance from the actual verdict. If it were to set aside his ruling, the jury's verdict would still stand.

Palin's attorneys, Kenneth Turkel and Shane Vogt, did not return NPR's requests for comment after the verdict.

## An attempt to send a message about "lamestream media"

Palin's lawsuit took more than a 4 1/2 years to unfold. In the trial's early stages, Rakoff had also concluded that Palin's team had failed to make a sufficient evidentiary case of actual malice against the *Times* and its former editorial page editor, James Bennet. He dismissed the case then, too. But the appellate court overruled Rakoff's decision and ordered him to take a fresh look.

That culminated in the trial that wrapped up Tuesday: an intense confrontation between a conservative populist who had often derided the "lamestream media" and the nation's leading news outlet.

> **MEDIA**
> Sarah Palin testifies she felt powerless to fight 'New York Times' over editorial

Facing a tough and self-imposed deadline, Bennet had sought to rework an editorial the night Rep. Steve Scalise, a conservative from Louisiana, was shot by a leftist. Bennet wanted to make a broad indictment of rampant gun violence and incendiary political speech. An early draft of the editorial invoked SarahPAC's 2010 ad with crosshairs over the congressional districts of Democratic lawmakers targeted for defeat. Bennet added that "the link to political incitement was clear" between the ad and the mass shooting 10 months later in Tucson, Ariz., that killed six people and gravely wounded others, including then-Rep. Gabby Giffords.

Though Giffords was one of the lawmakers targeted by the ad, no proof emerged to support the claim that the shooter had been inspired or influenced by the ad. The editorial also wrongly suggested that the crosshairs had been placed over the lawmakers' images.

The *Times* corrected the errors in less than a day, and the newspaper termed them "an honest mistake." Despite contentions by Palin's attorneys that the paper had caused harm and had acted out of ideological animus, they did not provide any tangible evidence of such claims.

Many media attorneys saw Palin's lawsuit as a sharp challenge to the protections afforded to the press by the Supreme Court's 1964 decision so that journalists could offer tough scrutiny of public figures, even when making mistakes in good faith.

Rakoff denied the request from *Times* attorney David Axelrod to approach jurors to learn more about the decision-making that went into their verdict. Axelrod noted that such trials are rare and that news outlets like the *Times* seek insight as a principle and a practical matter.

> **MEDIA**
> Former 'New York Times' editor testifies on Sarah Palin editorial: 'This is my fault'

"It is true that there has been a great decrease of both civil and criminal jury trials," Rakoff said. "It's a terrible thing, because jury trials are where the system gets put to the test."

Jed S. Rakoff     nyt     sarah palin     new york times



## Sign Up For The Planet Money Newsletter

Just the right amount of economics, sent weekly.

What's your email?     SUBSCRIBE

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

## More Stories From NPR



**MEDIA**
**Another top CNN executive resigns as WarnerMedia CEO cites ethical lapses**

**JA 2321**



| | |
|---|---|
| Document title: | Jury in Sarah Palin-N.Y. Times libel trial learned of judge's plan to throw out suit - POLITICO |
| Capture URL: | https://www.politico.com/news/2022/02/16/jury-in-sarah-palin-v-new-york-times-libel-trial-learned-of-judges-plan-to-throw-suit-out-00009498 |
| Page loaded at (UTC): | Thu, 17 Feb 2022 01:09:39 GMT |
| Capture timestamp (UTC): | Thu, 17 Feb 2022 01:10:06 GMT |
| Capture tool: | v7.13.2 |
| Collection server IP: | 34.230.137.168 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 3 |
| Capture ID: | 0dbe8c5a-aa0a-4823-93ce-95ff0286763f |
| User: | GArnold |

PDF REFERENCE #:     a2jDQSSCNx7wxFHdebsuim



LEGAL

# Jury in Sarah Palin-N.Y. Times libel trial learned of judge's plan to throw out suit

Jurors' having knowledge of the ruling in the middle of deliberations could bolster the ex-governor's case for a new trial or appeal.



Sarah Palin's lead lawyer told reporters outside the courthouse on Tuesday that she was considering the possibility of filing motions with Rakoff or pursuing an appeal. | Seth Wenig/AP Photo

By JOSH GERSTEIN
02/16/2022 02:39 PM EST
Updated: 02/16/2022 07:38 PM EST

Jurors in former Alaska Gov. Sarah Palin's libel trial against The New York Times became aware during deliberations that the judge overseeing the case had ruled that it should be thrown out, the judge said in an order on Wednesday.

U.S. District Court Judge Jed Rakoff said that after the jury returned a unanimous verdict in favor of the Times in the case on Tuesday, one of his law clerks learned that some on the panel had received alerts on their phones on Monday when Rakoff announced, outside the presence of the jury, that he planned to toss out the case because Palin's lawyers had failed to prove their case to the high standard of evidence required in libel suits against public figures.



"These jurors reported that although they had been assiduously adhering to the Court's instruction to avoid media coverage of the trial, they had involuntarily received 'push notifications' on their smartphones that contained the bottom-line of the ruling," the Manhattan-based Rakoff wrote in a two-page order.

While rulings by judges to throw out a case at the close of a civil or criminal jury trial are not uncommon, many legal experts faulted Rakoff for revealing his plan in the middle of the jury's deliberations. Doing so raised the prospect that jurors would learn of his decision and that it might prompt them to side with the Times regardless of their view of the evidence.

However, Rakoff said in his order that the jurors assured him his decision had

While rulings by judges to throw out a case at the close of a civil or criminal jury trial are not uncommon, many legal experts faulted Rakoff for revealing his plan in the middle of the jury's deliberations. Doing so raised the prospect that jurors would learn of his decision and that it might prompt them to side with the Times regardless of their view of the evidence.

However, Rakoff said in his order that the jurors assured him his decision had not influenced them.

"The jurors repeatedly assured the Court's law clerk that these notifications had not affected them in any way or played any role whatever in their deliberations," wrote the judge, who is an appointee of President Bill Clinton and joined the court in 1995.

The judge issued his order Wednesday afternoon after he discussed the issue in an interview with Bloomberg News.

"I'm disappointed that the jurors even got these messages, if they did," Rakoff said, according to Bloomberg. "I continue to think it was the right way to handle things."

The judge told the news service that "at most three" of the nine jurors saw the news alerts about his ruling. It is unusual for federal judges to conduct interviews about cases that are pending or when appeals are expected.



Advertisement

The New York Times
Keep the facts top of mind.

Unlimited news access:
$4.25 $1 a week
Special offer.

**SUBSCRIBE NOW**

Cancel or pause anytime.

Attorneys for Palin declined to comment Wednesday, but her lead lawyer told reporters outside the courthouse on Tuesday that the 2008 Republican vice presidential nominee was considering the possibility of filing motions with Rakoff or pursuing an appeal.

"We obviously have our own view of the evidence and the law and the facts that came out during this trial," Palin attorney Ken Turkel said. "We're going to evaluate all of our options for appeal, all of our options for further motions practice in court at the trial level."

Turkel also made clear Palin's team disagreed with the timing and the substance of Rakoff's ruling and that her side had failed to make out a plausible case that the Times or former editorial page editor James Bennet acted with "actual malice" when publishing a 2017 editorial that tied Palin's political action committee to the deadly shooting rampage in Tucson six years earlier that killed six people and gravely wounded Rep. Gabby Giffords (D-Ariz.)

"Obviously, we felt yesterday's order was disappointing. From our perspective, it was premature," Turkel said. "We're going to evaluate all of our options."

A spokesperson for the Times declined to comment Wednesday on the development.

FILED UNDER: THE NEW YORK TIMES, LIBEL, SARAH PALIN, LEGAL

SPONSORED CONTENT                                                                by Outbrain











**93% Of Men Have No Idea This Prostate Reducing Solution Exists!**
Epc Hu3.polichien.com

**Simple Method To Reduce Neuropathy (Watch)**
Growthmax Direct

**Most American Chrome Users Didn't Know This (Do It Now)**
Spend It

**25 Best Steakhouses in the U.S., Ranked**
Far & Wide

**Why Russia has never accepted Ukrainian independence**
TRUiC answers

About Us | Advertising | Breaking News Alerts | Careers | Credit Card Payments | Digital Edition | FAQ | Feedback | Headlines | Photos | POWERJobs | Press | Print Subscriptions | Write For Us | RSS | Site Map

Terms of Service | Privacy Policy | Do not sell my info | Notice to California Residents

© 2022 POLITICO LLC

| Document title: | Judge to dismiss Sarah Palin case against N.Y. Times regardless of jury verdict | Reuters |
| Capture URL: | https://www.reuters.com/legal/government/jury-resumes-deliberations-sarah-palin-case-against-new-york-times-2022-02-14/ |
| Page loaded at (UTC): | Thu, 17 Feb 2022 00:25:41 GMT |
| Capture timestamp (UTC): | Thu, 17 Feb 2022 00:27:10 GMT |
| Capture tool: | v7.13.2 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 4 |
| Capture ID: | 75fe0610-b3fc-4219-96da-ad52fd4db20f |
| User: | GArnold |



Over **40%** of crypto owners purchased their first digital asset in 2021

READ THE REPORT

○ PAXOS

February 14, 2022
11:48 PM UTC
Last Updated 2 days ago

United States

# Judge to dismiss Sarah Palin case against N.Y. Times regardless of jury verdict

By Jody Godoy and Jonathan Stempel

5 minute read



NEW YORK, Feb 14 (Reuters) - A U.S. judge said on Monday he will throw out Sarah Palin's defamation lawsuit against the New York Times (NYT.N), after concluding that an editorial in the newspaper did not maliciously link the former Alaska governor and 2008 Republican U.S. vice presidential candidate to a mass murder.

In an abrupt twist in a trial seen as a test of longstanding protections for American media, U.S. District Judge Jed Rakoff in Manhattan said Palin's lawsuit must be dismissed because she failed to show the Times acted with "actual malice," the standard in lawsuits involving public figures.

Sponsored by Capital One
**Sponsored Video**
Watch to learn more

The judge ruled on the trial's eighth day while jurors were still deliberating, and did not inform them of his plan. Rakoff said he plans to enter a formal dismissal only after jurors, who began deliberations on Friday, reach their own verdict.

Rakoff said he expected Palin to appeal, and that the appeals court "would greatly benefit from knowing how the jury would decide it."

His action effectively takes the case out of the hands of jurors. "If you see anything in the media about this case, just turn away," Rakoff told them before

Register now for FREE unlimited access to Reuters.com
Register

### Latest in Legal

Legal Industry
**Large law firms set reopening dates as pandemic plans shift**

United States
**U.S. agency refers 80 unruly airplane passengers for potential prosecution**

Intellectual Property
**Apple defeats copyright lawsuit over racially diverse emoji**

Healthcare & Pharmaceuticals
**U.S. officials prepare for pandemic's next phase as Omicron wanes**

For premenopausal women with **heavy periods** due to UF

His action effectively takes the case out of the hands of jurors. "If you see anything in the media about this case, just turn away," Rakoff told them before dismissing them for the day.

Speaking to reporters outside the courthouse, Palin, 58, criticized Rakoff, while declining to discuss the outcome because deliberations were continuing.

"This is a jury trial, and we always thank jurors. We always appreciate the system," she said. "So whatever happened in there kind of usurps the system that I believe we are used to, and respect, and works."

In an email, Times spokeswoman Danielle Rhoades Ha called Rakoff's action "a reaffirmation of a fundamental tenet of American law: Public figures should not be permitted to use libel suits to punish or intimidate news organizations that make, acknowledge and swiftly correct unintentional errors."

CHALLENGING SUPREME COURT PRECEDENT

Palin sued the Times and its former editorial page editor James Bennet over a June 14, 2017, editorial that incorrectly linked her to the January 2011 mass shooting that wounded Democratic U.S. congresswoman Gabby Giffords.

She has said that if she lost at trial, her appeal might challenge New York Times v. Sullivan, the 1964 U.S. Supreme Court decision establishing the "actual malice" standard for public figures to prove defamation.

Gautam Hans, a Vanderbilt University law professor, said Rakoff's order, while unusual, was reasonable and would likely survive any appeal.

"It is very difficult for plaintiffs to prevail in defamation cases," Hans said. "That's one reason you see some antipathy toward the current state of the law, including from some Supreme Court justices."

Two conservative Supreme Court justices, Clarence Thomas and Neil Gorsuch, have suggested revisiting the Sullivan decision.



1/3 Sarah Palin, 2008 Republican vice presidential candidate and former Alaska governor, arrives for her defamation lawsuit against the New York Times, at the United States Courthous...

**Read More**

Headlined "America's Lethal Politics," the editorial addressed gun control and lamented the rise of incendiary political rhetoric.

It was written the same day as a shooting at a congressional baseball practice in Alexandria, Virginia where Republican U.S. congressman Steve Scalise was wounded.

One of Bennet's colleagues prepared a draft that referred to the January 2011 shooting in a Tucson, Arizona, parking lot where six people were killed and



Healthcare & Pharmaceuticals
U.S. officials prepare for pandemic's next phase as Omicron wanes

SUPER-EFFICIENT SOCIETY?
Japan accelerates revitalization of local regions

Read more

Project Ad

Read Next


United States
U.S. agency refers 80 unruly airplane passengers for potential prosecution


United States
Amazon agrees to NYC union election terms, setting stage for two votes in March


Healthcare & Pharmaceuticals
U.S. officials prepare for pandemic's next phase as Omicron wanes


United States
U.S. Senate expected to hold procedural vote on stopgap spending bill on Thursday




PEER.
FAST FILE SHARING FOR DISTRIBUTED TEAMS
✓ REAL-TIME SYNC
✓ DISTRIBUTED FILE LOCKING



It was written the same day as a shooting at a congressional baseball practice
that seriously wounded U.S. Representative Steve Scalise and four other people
wounded.

One of Bennet's colleagues prepared a draft that referred to the January 2011
shooting in a Tucson, Arizona, parking lot where six people were killed and
Giffords was wounded.

Bennet inserted language that said "the link to political incitement was clear"
between the Giffords shooting and a map previously circulated by Palin's
political action committee that the draft editorial said put Giffords and 19 other
Democrats under crosshairs.

The Times corrected the editorial the next morning. Bennet testified that he
made the additions too quickly under deadline pressure, and intended no harm
to Palin.

'NOT ALTOGETHER HAPPY'

Rakoff, an appointee of Democratic former President Bill Clinton, said he was
"not altogether happy" about ordering a dismissal, calling the original editorial
"an example of very unfortunate editorializing on the part of the Times."

But the judge went on: "My job is to apply the law. The law here sets a very high
standard for actual malice, and in this case the court finds that that standard
has not been met."

Actual malice required a showing that the Times knew its editorial was false, or
had reckless disregard for the truth.

Eric David, a media lawyer at Brooks Pierce in Raleigh, North Carolina, said a
jury verdict favoring the Times would be "much more appeal-proof" because
appeals courts are reluctant to second-guess jurors' factual determinations.

Palin was the late Senator John McCain's running mate in the 2008
presidential election.

That campaign made Palin a Republican Party star and hero to many
conservatives who viewed her as an outsider willing to take on liberals and
established institutions including the news media. She served as Alaska's
governor from 2006 to 2009.

On the witness stand, Palin compared herself to the biblical underdog David
against the Times' Goliath, while accusing the newspaper of trying to "score
political points."

But she struggled under cross-examination to provide specific examples about
how the editorial harmed her reputation and cost her opportunities.

Register now for FREE unlimited
access to Reuters.com        Register

Reporting by Jody Godoy and Jonathan Stempel in New York; Additional reporting by Jan Wolfe in
Washington, D.C.; Editing by Will Dunham, Noeleen Walder and Cynthia Osterman

Our Standards: The Thomson Reuters Trust Principles.

Jody Godoy

Jody Godoy reports on banking and securities law. Reach her at
jody.godoy@thomsonreuters.com

More from Reuters



Daily Docket

Sign up to our legal newsletter for a
smart look at the day's headlines
concerning the practice of law.

Sign up



| | |
|---|---|
| Document title: | Sarah Palin judge will dismiss her libel case, finding no malice by New York Times - The Washington Post |
| Capture URL: | https://www.washingtonpost.com/media/2022/02/14/palin-new-york-times-verdict/ |
| Page loaded at (UTC): | Wed, 16 Feb 2022 23:57:31 GMT |
| Capture timestamp (UTC): | Wed, 16 Feb 2022 23:58:04 GMT |
| Capture tool: | v7.13.2 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 8 |
| Capture ID: | eb4fe146-0d55-4dd0-9104-7474be94bcc5 |
| User: | GArnold |


"Outstanding" - PCMag
Avast One



Media

# Sarah Palin judge will dismiss her libel case, finding no malice by New York Times

The rare and closely watched case has raised concerns that historic protections for journalists may be at risk.


Sarah Palin arrives at the U.S. District Court in Manhattan on Monday. (Eduardo Munoz/Reuters)



By Sarah Ellison and Elahe Izadi

February 14, 2022 at 3:31 p.m. EST

NEW YORK — A judge on Monday said he will dismiss Sarah Palin's libel case against the New York Times, saying she had not met the legal standard showing that the newspaper acted with "actual malice" in publishing a 2017 editorial that included an inaccurate claim about her.

Judge Jed S. Rakoff told the lawyers involved in the case that he will formally issue his ruling after a jury that has been deliberating since Friday returns its decision.

Rakoff said that because the decision is likely to be appealed — a path that could upend long-standing legal protections for journalists who write about public figures — he wanted future courts to have both his decision and the jury's to consider.

Rakoff did not spare the Times criticism for its error, a collection of phrases within a larger essay that inaccurately suggested a link of "incitement" between the crosshairs that her political action committee imprinted on a congressional map and a 2011 mass shooting in Tucson.

ADVERTISING

**MOST READ LIFESTYLE** >



1 Perspective
My boyfriend is 26 and his dad
— still handles his finances.
Carolyn Hax readers give
advice.

2 Perspective
Carolyn Hax: Should dad
intervene in daughter's
marriage by 'coaching'

Stay informed with your free trial to The Washington Post.   Get 4 weeks free

   

"This is an example of very unfortunate editorializing on the part of the Times," he said, adding that he was "not at all happy to make this decision" in its favor.

However, he told the parties gathered in a courtroom in the U.S. District Court for the Southern District of New York in Manhattan that "the law sets a very high standard for actual malice, and in this case the court finds that that standard has not been met."

While Palin's attorneys argued that the paper's then-editorial page editor, James Bennet, had acted recklessly in publishing assertions he should have known were false, a Times lawyer described a frantic rewriting session on deadline that resulted in "a mess-up ... a goof" that Bennet regretted immediately and corrected as quickly as possible.

Ultimately, Rakoff concluded that Palin's team did not prove that Bennet knew the statements were false nor even that he suspected they might be false and then recklessly disregarded that possibility.


Judge to dismiss Sarah Palin's libel case against New York Times

Judge Jed S. Rakoff said on Feb. 14 that he would dismiss former Alaska governor Sarah Palin's defamation lawsuit against the New York Times. (Reuters)

The case — the first libel lawsuit against the Times to go to trial in the United States in nearly two decades — has taken a long and winding path that has left press-freedom advocates concerned that it could open journalists to more legal threats from the powerful people they write about.



Two conservative Supreme Court justices, Clarence Thomas and Neil M. Gorsuch, have signaled an openness to reassessing a landmark 1964 ruling that set a high bar for prominent people pursuing libel claims.

But the case has also served unofficially as a chance to interrogate the "hot take" culture of digital journalism, as well as the relative power of Palin, the former Alaska governor and 2008 Republican nominee for vice president, who has seen her stature and visibility shrink in recent years.

*[Sarah Palin, center stage again, in New York Times court battle that could be her true legacy]*

Palin first filed suit in 2017, not long after the Times published its



**Today's Headlines**

The most important news stories of the day, curated by Post editors and delivered every morning.



Sign up

By signing up you agree to our Terms of Use and Privacy Policy

Stay informed with your free trial to The Washington Post.  Get 4 weeks free

Try four weeks free    Sign in

Palin first filed suit in 2017, not long after the Times published its
editorial, under the headline "America's Lethal Politics." Written in the
hours after the June 2017 shooting attack of Republican lawmakers
practicing baseball at an Alexandria, Va., field, the editorial decried
rising levels of toxic political discourse and gun ownership. And it made
a connection between the Alexandria shooting and a 2011 attack at a
Tucson shopping center that left then-Rep. Gabrielle Giffords (D-Ariz.)
gravely wounded and six other people dead.





"The link to political incitement was clear," the editorial stated. "Before
the shooting, Sarah Palin's political action committee circulated a map
of targeted electoral districts that put Ms. Giffords and 19 other
Democrats under stylized crosshairs."

In fact, investigators never found any indication that the mentally
disturbed Tucson shooter was motivated by the Palin PAC's map. The
Times corrected the error the morning after it was published on the
newspaper's website.

Rakoff dismissed Palin's suit not long after she filed it, stating it was
doubtful that Palin could demonstrate that the Times had shown the
"actual malice" that public figures must prove in a libel case.

"Negligence this may be," he wrote, "but defamation of a public figure it
plainly is not."

But the case was sent back to him by an appellate court — a reversal that
put many legal scholars on alert that a favorable climate for journalists
may be changing.



For 50 years, "journalists have generally been able to count on the
courts to have their backs," said Sonja West, a University of Georgia law
professor. But "when you combine this trend with the drop in the
public's trust in the news media and the rise in high-profile defamation
lawsuits like this case, many press-freedom scholars see reasons to be
concerned about where things are headed," West said.

On Monday evening, a spokeswoman for the Times said the newspaper
welcomed Rakoff's ruling.

"It is a reaffirmation of a fundamental tenet of American law: public
figures should not be permitted to use libel suits to punish or intimidate
news organizations that make, acknowledge and swiftly correct
unintentional errors," said Danielle Rhoades Ha.

Speaking to reporters outside the courthouse, Palin said: "This is a jury
trial. We always thank jurors. We always appreciate the system. So

MOST READ



1   Texting through an insurrection

2   Racist slurs, violent
    messages: How Arbery's
    killers talked about
    Black people

3   Ryan Zinke broke ethics
    rules while leading
    Trump's Interior Dept.,
    watchdog finds

4   Investors bought a
    record share of homes
    in 2021. See where.

5   What's today's Wordle
    answer? It depends on
    which site you use.

Oral Rx treatment
options are now
available for
COVID-19

Discover an option from Pfizer

Stay informed with your free trial to The Washington Post.    Get 4 weeks free

Speaking to reporters outside the courthouse [...] jury trial. We always thank jurors. We always appreciate the system. So whatever happened in there kind of usurps the system."



Oral Rx treatment options are now available for COVID-19

Discover an option from Pfizer

Rakoff said he was letting the jury continue its deliberations for the benefit of an appeals court that will inevitably take up the case; if it returns a decision in Palin's favor, he offered as an example, the appeals court wouldn't necessarily have to send the case back for a new trial but rather reinstate the jury's verdict.

Legal experts called Rakoff's ruling a highly unusual outcome in a highly unusual case.

It's more typical for a judge to issue such a ruling either before a jury begins its deliberations or after it has reached a verdict, said David A. Logan, a Roger Williams University law professor and expert in First Amendment protections. "By doing it this way, it is somewhat efficient," he said, since "another jury does not need to be impaneled" if it goes to the appellate court and is reversed.



Since Rakoff "has already been reversed in the case," Logan said, "I expect he doesn't want to preside on a retrial."

Rakoff told the court Monday that while he considered waiting for the jury's verdict before making his decision, "the more I thought about it over the weekend, the more I thought that was unfair to both sides. We've had very full argument on this. I know where I'm coming out and I want to therefore apprise the parties of that."

By dismissing a case in which the plaintiff didn't satisfy the "burden of proof," Rakoff did "what most judges would do," said University of Richmond Law professor Carl Tobias.

If the jury decides in favor of the Times, "this would confirm the judge's view and make the case difficult for plaintiff to win on appeal." But if the jury rules in Palin's favor, "it becomes more complicated."

ST. JOHN

Fine Jersey Knit Shell

Stay informed with your free trial to The Washington Post.    Get 4 weeks free



Oral Rx treatment options are now available for COVID-19

Discover an option from Pfizer

Pfizer

Jonathan Peters, a media law professor at the University of Georgia, argued that the Palin case is part of a growing effort by public figures "to weaponize libel law in order to generate publicity or score political points or exact revenge on critics," pointing to other recent lawsuits. Most have been dismissed, he said, but they "nevertheless advance the narrative, voiced by some lawyers and judges," that lower courts have given journalists too much leeway when it comes to libeling public figures, or that the actual malice standard "encourages bad journalism."

Meanwhile, the jury finished Monday — its first full day of considering the case, after taking it up late Friday afternoon — still without a decision of its own. That raised the question of whether jurors could avoid learning about Rakoff's ruling, which would have the potential to color their own decision-making.

Like all jurors, they had been instructed to avoid news coverage of their trial. Rakoff expressed concern that repeating his order might tip them off that something had transpired, so he told the court he would call in the jurors to "schmooze them" before his warning.



ST. JOHN

Transparent Rib Knit Dress with Inlay

Cashmere Geometric Shadow Intarsia Knit Sweater

When the jurors entered his courtroom, Rakoff told them that "I didn't think I should let the day expire when you know I love this jury without wishing you a happy Valentine's Day." Laughter ensued, and then he delivered some mundane scheduling announcement before reminding them:

"If you see anything in media about this case, just turn away," he said. "Read about the traumatic results for the Cincinnati team instead."

#### CORRECTION

An earlier version of this article misspelled the name of New York Times spokeswoman Danielle Rhoades Ha.

### Read previous stories:

The existential dread of journalists watching the Sarah Palin trial

Sarah Palin's libel case against New York Times opens in Manhattan courtroom, a culture clash with lasting legal potential

James Bennet testifies as Sarah Palin trial raises questions about New York Times editing: 'This is my fault'



□ 4143 Comments        🎁 Gift Article

By Sarah Ellison
Sarah Ellison is a staff writer based in New York for The Washington Post. Previously, she wrote for Vanity Fair, the Wall Street Journal and Newsweek, where she started as a news reporter in Paris. 🐦 Twitter

By Elahe Izadi
Elahe Izadi covers media for The Washington Post. She joined The Post in 2014 as a general assignment reporter, and has covered pop culture, Congress, demographics and breaking news. 🐦 Twitter

**MORE FROM THE POST**

Which U.S. communities sent

Stay informed with your free trial to The Washington Post.    Get 4 weeks free

Try four weeks free

Sign in

# The Washington Post

## Which U.S. communities sent money to support the Canadian trucker protests?

Feb. 14, 2022



## You can now see how many Uber drivers liked (or hated) you

Today at 5:00 a.m. EST



## Carolyn Hax: Should dad intervene in daughter's marriage by 'coaching' her husband?

Perspective   Today at 12:00 a.m. EST



## Racist slurs, violent messages: How Arbery's killers talked about Black people

Today at 5:41 p.m. EST



## Giuliani's unhinged Jan. 6 rant shows how Trump's media scam really works

Opinion   Today at 10:54 a.m. EST





**Today's Headlines**

The most important news stories of the day, curated by Post editors and delivered every morning.

Sign up

**PAID PROMOTED STORIES**

Recommended by Outbrain



**Before you renew Amazon Prime, read this**
Capital One Shopping



**[Pics] Try To Guess Which First Lady Wore A $46,000 Dress**
Past Factory



**[Pics] Awkward Live TV Moments Where The Camera Kept Rolling**
InvestingBuzz



**Plastic Surgeon: "Do This To Fill In Wrinkles At Home" (Here's How)**
Beverly Hills MD



**Almost Nobody Aces This Baby Boomer Quiz. Can You?**
WorldClass



**[Photos] Super Bowl Halftime Shows Ranked: Worst To Best**
DanaBea News

Sign in to join the conversation

Stay informed with your free trial to The Washington Post.   Get 4 weeks free



# EXHIBIT 2

*to Plaintiff's Omnibus Post-Trial Motions*

NOTABLE: Olympics    Amir Locke    COVID-19    Sarah Palin    Ukraine    Xenotransplantation    Special Offer: Save $25!  •  Sign In

# SLATE

LAUNCHING ITSELF INTO THE AIR

News & Politics    Culture    Technology    Business    Human Interest    Podcasts

🔍 Search

FOLLOW US  📷  🐦  f



We want to hear from you.
Listener feedback makes our podcasts the best they can be.
TAKE THE SLATE PODCAST SURVEY

JURISPRUDENCE

# The Moment Sarah Palin's Testimony Fell Apart

At the New York Times trial, the former governor was impressive at first. It didn't last.

BY SETH STEVENSON                    FEB 10, 2022 • 8:31 PM



Sarah Palin testifies as James Bennet watches during the trial at a federal court in New York City on Thursday.
Reuters/Jane Rosenberg


🐦 TWEET
f SHARE
💬 COMMENT

Sarah Palin took the stand this morning—on day six of her libel trial against the New York Times—clad in a black pencil skirt, cream boucle blazer, and megawatt smile. She delivered dollops of down-home charm. She was, at first, a compelling witness.

When she spoke about the deceased victims of the 2011 mass shooting that badly wounded then-Rep. Gabby Giffords, Palin was careful to say their full names and to convey the sadness she felt when she thought of their grieving families. She recalled that the 9-year-old girl who was murdered that day had been around the same age as her daughter Piper. In the courtroom, she displayed some of the gifts that had made her, for a time, a political sensation.

When Palin was asked about the accusations that proliferated in the immediate wake of that 2011 shooting—accusations falsely suggesting that she had helped incite the violence—she said they were "mortifying, because I knew what the truth was." She remembered that she, and her children, had received many death threats around that time.

she displayed some of the gifts that had made her, for a time, a political sensation.

When Palin was asked about the accusations that circulated in the immediate wake of that 2011 shooting—accusations falsely suggesting that she had helped incite the violence—she said they were "mortifying, because I knew what the truth was." She remembered that she, and her children, had received many death threats around that time.

ADVERTISEMENT





Subscribe to the Slatest Newsletter
A daily email update of the stories you need to read right now.

Email address:

☐ Send me updates about Slate special offers.
By signing up, you agree to our Privacy Policy and Terms.

Sign Up

I admit, at this point in her testimony, I was a little impressed. Palin in no way resembled the caricature I had in my head. She was confident, articulate, and—somewhat to my surprise— quite lucid. I'm not saying she was Stephen Hawking, but she at least evinced a sort of horse sense, paired with grinning charisma, that you could imagine might make her an effective mayor or governor. Then, about a half-hour in, the wheels came off.

Palin's own attorney asked her to shift her focus forward from 2011 to 2017, when a New York Times editorial revived that false connection between Palin's rhetoric and the Giffords shooting (thereby provoking this lawsuit). Palin responded by saying the Times had "lied" about it "again." A lawyer for the Times objected, for obvious reasons: No one—including Palin in her filed complaint—has ever alleged that the New York Times got this wrong on any other occasion aside from that one editorial.

Palin's lawyer tried to help her clean it up. Judge Jed S. Rakoff invited her to clarify what she meant. But Palin doubled down, saying, "My view was the Times took a lot of liberties" in the wake of the Giffords shooting and that the paper had "led the charge" against her back then. Confused looks sprouted on everyone's faces. Reporters exchanged glances. Palin grew flustered, recognizing that *something* had curdled but not exactly sure *what* she'd screwed up. And here she reverted to the caricature: that fidgety posture and those looping, meaningless sentences. "I don't have the specific references in front of me," she said, desperately scrambling to recover.

The judge and all the lawyers seemed to agree, in what felt like silent assent, that an immediate sidebar had become necessary. They retreated to a separate room to hash things out in private. When they returned, everybody just moved on, with no mention of the previous flub. But the spell had been broken. Perhaps it was only a matter of time. I now remembered (and felt a little ashamed that I'd let myself forget) why Palin was, in her heyday, such a frequent figure of ridicule.

That first half-hour of testimony was sort of a microcosmic recapitulation of Palin's 2008 debut on the national stage. When she gave her "hockey mom" speech at that year's GOP convention, bringing down the house, it seemed like the vice presidential nominee might be a formidable force in politics for decades to come. Then—and it sure didn't take long—she turned into a

myself forget) why Palin was, in her heyday, such a frequent figure of ridicule.

That first half-hour of testimony was almost like a microcosmic recapitulation of Palin's 2008 debut on the national stage. When she gave her "hockey mom" speech at that year's GOP convention, bringing down the house, it seemed like the vice presidential nominee might be a formidable force in politics for decades to come. Then—and it sure didn't take long—she turned into a bumpkin pumpkin.

Palin did manage to regain her footing on the stand, and to score a few points. She described a gradual diminution of her celebrity over the past decade, and claimed that by 2017, when the Times resuscitated those incitement accusations, she didn't have the same kind of power to fight back as she'd had in 2011. "I didn't have the PAC up and running and being aggressive," she said. "I didn't have any TV contracts. I didn't have that platform." She described the Times as a "Goliath" to her David. "There I was up in Wasilla, Alaska," she said, "going up against those who buy ink by the barrel, and I had my No. 2 pencil on my kitchen table."



ADVERTISEMENT

IN HONOR OF ENTREPRENEURIAL SPIRIT

Learn More

This was a good line. It was clearly one she'd prepped in advance. And it was, of course, a bit of an exaggeration. Palin isn't the superstar she once was (only a handful of paparazzi waited outside the courthouse to photograph her this morning when she arrived with her reported beau, former New York Rangers hockey star Ron Duguay), but she still has more than a million followers on Twitter and more than 4 million on Facebook.

When a lawyer for the Times cross-examined Palin, he first asked whether that initial round of false accusations, back in 2011, had in fact hurt her reputation much. She acknowledged that she continued to make appearances on Fox News, and even signed a new contract with the network in 2013. She was also the featured character in multiple reality television shows.

Then the lawyer brought up *The Masked Singer*. Palin appeared on this prime-time show in 2020, well after the story she's suing over ran in the Times. In the run-up to this trial, her attorneys filed a motion to bar any showing of the video in the courtroom. Now, Palin tried to bar any *mention* of the incident. "Objection," she said, in an earnest way that made it sound like she actually thought she had the ability, as a witness, to object. The courtroom burst into chuckles. Rakoff informed her that this was a power not accorded to her. Forced to talk about the show, Palin said it was "the most fun 90 seconds of my life" and, when asked how much she was compensated, allowed that it had "paid some bills."

Later, the Times' lawyer asked what kind of mental anguish Palin had endured as a result of the publication of the Times editorial. She said she lost a little sleep, but admitted she'd never seen a doctor about it or taken any medication. She never hired a PR firm to restore her allegedly tarnished image. She'd also never consulted a pastor or a therapist. "I've never operated that way," she said. "I holistically remedy issues that are caused by stress. Meaning running, hot yoga, those kinds of things."

Yesterday, I felt like James Bennet—who wrote the allegedly defamatory passages Palin is suing over, and is now co-defendant with the Times—failed to convey his contrition from the witness stand. Today, I felt Palin failed to convey her suffering. I'm sure it is no fun at all to be falsely accused of inciting the murder of, among others, a young girl. It must be

POPULAR IN **NEWS & POLITICS**

The Most Chilling Thing I Heard at the Sarah Palin-NYT Trial Came Before the Verdict

way," she said. "I holistically remedy issues that are caused by stress. Meaning running, not
overmedicating for things."

Yesterday, I felt like James Bennet—who wrote the allegedly defamatory passages Palin is suing over, and is now co-defendant with the Times—failed to convey his contrition from the witness stand. Today, I felt Palin failed to convey her suffering. I'm sure it is no fun at all to be falsely accused of inciting the murder of, among others, a young girl. It must be horrible. But Palin didn't really manage to get that across in her testimony. And by filing this lawsuit in 2017, just a couple of weeks after the Times piece ran, one might argue Palin actually gained more attention (and goodwill from right-wing partisans) than she would have otherwise enjoyed, as her political prospects shriveled and her star continued to dim.

At the end of the day, both sides rested. Tomorrow, we'll hear their closing statements. And then this will all be in the hands of the jury. No pressure on them—it's only, potentially, the future of American journalism that hangs in the balance. 📕

***Read more of Seth Stevenson's coverage of the Times–Sarah Palin trial.***

**Gold medal savings: $25 off**
Olympics coverage you won't find anywhere else. Subscribe for unlimited access and bonus
segments on Hang Up and Listen, and also save $25 for a limited time.

Join Now

🐦 TWEET  f SHARE 💬 COMMENT

First Amendment     Journalism     New York Times     Sarah Palin

POPULAR IN NEWS & POLITICS

The Most Chilling Thing I Heard at the
Sarah Palin-NYT Trial Came Before
the Verdict

Putin Has a New, Brutal Backup Plan in
Ukraine

The Fast-Spreading Anthony Fauci
Conspiracy Theory That the Right
Hopes Will Tip Elections in November

The Sarah Palin-NYT Case Was
Headed Toward a Dramatic Finale.
Then the Judge Dropped a Bomb.

---

**YOU MAY LIKE**



**Nissan's Gorgeous New Lineup Has
Arrived**
AUTO SAVINGS CENTER | SPONSORED



**Acura Has Done It Again. This Year's
Lineup Has Left Us Speechless**
ALL THINGS AUTO | SPONSORED          Learn More

**The App That's Teaching Americans
Spanish In 15 Minutes A Day**
BABBEL | SPONSORED          Sign Up

Taboola Feed

**MORE FROM SLATE**

Sarah Palin's Trial Saw Shades of Her 2008 Vice-
Presidential Run
SLATE STAFF

The Olympics' Latest Doping Scandal
SLATE STAFF

Help! My Mentor at Work Has a Very Creepy Approach to
"Helping" Me.
JENÉE DESMOND-HARRIS

Does My Straight-A Student Need a Tutor?
MATTHEW DICKS, KATIE HOLBROOK, JOHN ERIC VONA

What the Backlash Over Alvin Bragg's "Day One Memo"
Gets Wrong
JOSHUA PERRY

Dear Prudence Uncensored: "Breakup Bitch"
JENÉE DESMOND-HARRIS, LAUREN WILLIAMS



Power Life | Sponsored

**Mature Trainer: This Is What
"Ripped" Old Guys Do...**



Beach Raider | Sponsored

**Famous Actors Who Were
Models First**



All Things Auto | Search Ads | Sponsored

**2022 Cadillac SUV Lineup Is
Turning Heads**
The 2022 Cadillac SUV Lineup Is Turning Heads --
And Finally On Sale. Discover Trending Searche...





Case 1:17-cv-04853-JSR Document 58-09 Filed 03/22/22 Page 64 of 23

Page Vault

| Document title: | Opinion \| Sarah Palin craters in her testimony in New York Times defamation case - The Washington Post |
| --- | --- |
| Capture URL: | https://www.washingtonpost.com/opinions/2022/02/10/sarah-palin-testimony-new-york-times/ |
| Page loaded at (UTC): | Thu, 17 Feb 2022 15:52:30 GMT |
| Capture timestamp (UTC): | Thu, 17 Feb 2022 15:53:25 GMT |
| Capture tool: | v7.13.2 |
| Collection server IP: | 34.230.137.168 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 9 |
| Capture ID: | ffb32324-006b-489f-8ef2-a9c5bece45c0 |
| User: | GArnold |



Opinions | Editorial Board | The Opinions Essay | Global Opinions | Voices Across America | Post Opinión | D.C., Md. & Va. | Cartoons | Podcasts ⌄

# Opinion: Sarah Palin bombs on witness stand in New York Times trial



Sarah Palin, 2008 Republican vice-presidential candidate and former Alaska governor, arrives at the federal courthouse in Manhattan on Feb. 10. (Shannon Stapleton/Reuters)



By Erik Wemple
Media critic

February 10, 2022 at 5:14 p.m. EST

Former Alaska governor Sarah Palin's years as a conservative provocateur, TV personality and outspoken critic of the "lamestream media" have ill-prepared her for any venue in which the federal rules of evidence hold sway. In the Manhattan courtroom of Judge Jed S. Rakoff on Thursday, Palin and her bombast bombed.

Opinions to start the day, in your inbox. Sign up. →

At issue was Palin's 2017 defamation lawsuit against the New York



Stay informed with your free trial to The Washington Post. Get 4 weeks free

At issue was Palin's 2017 defamation lawsuit against the New York Times over an editorial that baselessly asserted a "political incitement" link between a map circulated in March 2010 by her political action committee (SarahPAC) and a 2011 mass shooting in Arizona. The Times corrected the editorial, and Palin sued less than two weeks after the editorial was published.

But under questioning from her attorney, Ken Turkel, Palin managed to suggest that the Times's alleged libels were broader than the editorial, as her lawyers had previously argued. She claimed that there was, in fact, *another* instance when the Times committed the same mistake.

When Turkel asked about her reaction to the Times editorial, Palin said her closest associates knew that she would be "mortified" and would need to "respond again to what the New York Times had lied about again."

*[Erik Wemple: James Bennet attempted to send an apology for Sarah Palin. It didn't go through.]*

Counsel for the Times quickly objected to Palin's claim, seeking to have it stricken from the record.

Rakoff intervened: "What did you mean by 'again'?"

"They lied before," responded Palin.

"About this?" asked Rakoff

"My view was the New York Times took a lot of liberties and wasn't always truthful," answered Palin. "That's what I meant by 'again.'"

The judge decided that he wouldn't strike the testimony but noted that the Times could probe it on cross-examination.

Turkel then resumed his questioning. "Gov. Palin, when you say 'again,' are you talking specifically with respect to the contention that you had somehow incited Jared Loughner to shoot the people in Tucson?"

Casual Comfort Sandals



**MOST READ OPINIONS** >

1 **Opinion**
We need a 'Mazars warning' on everything Trump says

2 **Opinion**
Yes, Kamila Valieva should be skating in Beijing


3 **Opinion**
Underestimating Lisa Murkowski is a half-baked idea in Alaska


4 **Opinion**
Biden is winning the war against covid. Is anyone noticing?


5 **Opinion**
Federal judge cheated New York Times with early announcement of ruling in Palin case








Stay informed with your free trial to The Washington Post. Get 4 weeks free







Casual Comfort Sandals

**Today's Headlines**

The most important news stories of the day, curated by Post editors and delivered every morning.

Enter your email address

Sign up

By signing up you agree to our Terms of Use and Privacy Policy

"Precisely," responded Palin.

The Times again objected, which brought Rakoff back into the mix. He asked Palin to clarify whether she was blaming the Times specifically, "or just other folks" for making this connection before the 2017 editorial.

"I believe it was the New York Times helping to lead the charge that a link was being made between me, Sarah Palin and SarahPAC, and political incitement of actions that would turn into tragedy," Palin said.

*[Erik Wemple: A key to the New York Times's defense against Sarah Palin]*

Pressed for specifics, Palin came up short: "The New York Times would write with that linkage between Sarah Palin and inciting political violence. And I don't have the specific articles, of course, in front of me."

So now Palin was alleging that there could be *multiple* Times stories at issue. A sidebar discussion among the judge and the attorneys ensued. When he returned, Rakoff said that the legal issue had been resolved. Turkel steered away from the topic from that point onward.



Sarah Palin testifies in court battle with New York Times

Former Alaska governor Sarah Palin on Feb. 10 testified against the New York Times regarding an editorial incorrectly linked her to a mass shooting. (Reuters)

No one who has even casually followed the former governor's career would be surprised at these specifics-free blasts against the media. Yet this time, Palin chose the wrong venue for such a critique. Adoring



Stay informed with your free trial to The Washington Post.    Get 4 weeks free

Try four weeks free

Sign in

this time, Palin chose the wrong venue for such a critique. Adoring
audiences at Fox News don't stop and ask for citations, specifics,
supporting evidence. But that's precisely what happens in a courtroom.

Palin's blame-the-media-at-all-costs ethos also arose when she was
asked about the SarahPAC map at issue in the lawsuit. It overlaid
stylized crosshairs over congressional districts in which the PAC hoped
to prevail in the 2010 midterm elections.



SarahPAC map for the 2010 congressional midterms

Citing language in the editorial saying that SarahPAC had "circulated"
that map, Turkel asked Palin if that was the case. "No," responded Palin.
"No. It was put on my website. The media circulated it." But if that
argument holds sway with the jury, just think of the arguments that the
Times's attorneys could make: *The New York Times didn't circulate this
erroneous editorial. It was put on our website. Subscribers circulated
it.*



-55%

-55%

Casual Comfort Sandals

**MOST READ**



1 Texting through an insurrection

2 Kamila Valieva a
stunning fourth in
women's figure skating;
Russian Anna
Shcherbakova wins gold


3 Ukraine and Moscow-
backed separatists
trade accusations of
shelling in potential
eastern flash point;
Moscow expels senior U.S.
diplomat


4 **Opinion**
We need a 'Mazars
warning' on everything
Trump says


5 'Immense fraud' creates
immense task for
Washington as it tries to


Stay informed with your free trial to The Washington Post       Get 4 weeks free

*erroneous editorial. It was put on our website. Subscribers circulated it.*



**Do This To Save Money On Fuel**

Thousands in United States found a device that can lower fuel consumption by 55%

EcoChip                                                      Open >

Still another lowlight came when David Axelrod, an attorney for the Times, was attempting to establish that people like Palin — politicians on a national stage — must expect scrutiny. Axelrod noted that Sen. John McCain's (R-Ariz.) choice of Palin as his running mate in 2008 prompted criticism of her tenure as governor of Alaska. "I didn't have time nor desire to read what was being written about me while I was jumping on that campaign trail," retorted Palin. But seconds later, she seemed familiar with that coverage. In response to Axelrod's reference to attacks on "her record" in Alaska, Palin said, "That was the problem: My record wasn't being reported."

Even Palin's attempt to show some hockey-mom authenticity backfired. At one point, she referenced the witness stand as the "penalty box." Perhaps she'd forgotten that it was *she* who filed this suit.

The false link in the Times editorial is an astounding claim — that Palin's PAC played an inciting role in a shooting that killed six people and wounded 13, including Rep. Gabrielle Giffords (D-Ariz.). There was enough merit in her legal arguments to get the case in front of a jury. But on Thursday, the plaintiff in *Palin v. New York Times* ran up against her biggest obstacle yet — herself.

💬 4931 Comments          🎁 Gift Article

Opinion by Erik Wemple

Erik Wemple, The Washington Post's media critic, focuses on the cable-news industry. Before joining The Post, he ran a short-lived and much publicized local online news operation, and for eight years served as editor of Washington City Paper.  🐦 Twitter

**MORE FROM ERIK WEMPLE ON PALIN V. NEW YORK TIMES**          📖 HAND CURATED



Sarah Palin needed a          Palin trial exposes the allure          'All they had to do is dislike



Poppin Standing Desks
Poppin

Stay informed with your free trial to The Washington Post.    Get 4 weeks free          ✕

Document title: Opinion | Sarah Palin craters in her testimony in New York Times defamation case - The Washington Post
Capture URL: https://www.washingtonpost.com/opinions/2022/02/10/sarah-palin-testimony-new-york-times/
Capture timestamp (UTC): Thu, 17 Feb 2022 15:53:25 GMT          Page 5 of 8

The Washington Post

JA-237

Sections

Search

Try four weeks free

Sign in

Sarah Palin needed a smoking gun. She had boring emails.

Opinion • February 14, 2022

Palin trial exposes the allure of 'both sides' journalism

Opinion • February 8, 2022

'All they had to do is dislike her a little less': Palin lawyer slams NYT in closing argument

Opinion • February 11, 2022

View 3 more stories ⌄

---

**MORE FROM ERIK WEMPLE** ›

### Federal judge cheated New York Times with early announcement of ruling in Palin case

Today at 7:00 a.m. EST



### Sarah Palin needed a smoking gun. She had boring emails.

Feb. 13, 2022



### 'All they had to do is dislike her a little less': Palin lawyer slams NYT in closing argument

Feb. 10, 2022



### 'You need to look at this': A key to the New York Times's defense against Sarah Palin

Feb. 8, 2022







poppin. Poppin Standing Desks
Poppin

**Today's Headlines**

The most important news stories of the day, curated by Post editors and delivered every morning.

Sign up

---

**PAID PROMOTED STORIES**

Recommended by Outbrain ▷



Top Heart Surgeon: This Simple Technique Helps Empty Your Bowels Every...



Psychologists Say These "10 Kids Books" Make All The Difference



[Pics] Awkward Live TV Moments Where The Camera Kept Rolling

Stay informed with your free trial to The Washington Post.    Get 4 weeks free    

---

Document title: Opinion | Sarah Palin craters in her testimony in New York Times defamation case - The Washington Post
Capture URL: https://www.washingtonpost.com/opinions/2022/02/10/sarah-palin-testimony-new-york-times/
Capture timestamp (UTC): Thu, 17 Feb 2022 15:53:25 GMT

The Washington Post

Top Heart Surgeon: This Simple Technique Helps Empty Your Bowels Every Morning
Gundry MD Bio Complete 3 Supplement

Psychologists Say These "10 Kids Books" Make All The Difference
puppydogsandicecream.com

[Pics] Awkward Live TV Moments Where The Camera Kept Rolling
InvestingFuel

Anyone With Type 2 Diabetes Should Watch This!
Awareness Alert

If You're Going To Buy An Air Fryer, Read This
Capital One Shopping

Brain Surgeon: if You Have Tinnitus (Ear Ringing) Do This Immediately! (Watch)
newhealthylife.club

**Sign in to join the conversation**

## Comments

*This conversation is moderated according to The Post's community rules. Please read the rules before joining the discussion. If you're experiencing any technical problems, please contact our customer care team.*

**Comments are now closed.**

All Comments 4.9k                                    Sort by  Newest ⌄

⌃ **Yeh77uel**  4 days ago

Who were the people who thought she had a case??? She has always fallen over herself!!!

👍 11      ↩ Reply      ⤴                                      🚩

⌃ **Canadian WP Subscriber**  4 days ago

It's hard to argue that Sarah Palin has been defamed by the New York Times piece at the center of this litigation. Given the way that she's been followed in the media surrounding the court case she certainly hasn't lost any of her 'fame', so 'de-famed'? No. She even scored a spot on the Masked Singer.

Not exactly the level of fame that she may covet, but certainly consistent with both her level of fame before the NYT piece, and paralleling such other retired Republican luminaries like Sean Spicer (Dancing with the Stars) and Rudy Giuliani (the Masked Singer, and personalized birthday greetings on Cameo).

She's done far more to destroy her credibility every time she speaks than anything any mainstream / 'lamestream' media could do if they dedicated their full resources, and acted with actual malice. 😊

Maybe she should be suing for definition of character.

👍 24      ↩ Reply      ⤴                                      🚩



poppin.  Poppin Standing Desks
         Poppin

Stay informed with your free trial to The Washington Post.    Get 4 weeks free    ✕

herself!!!

👍 11     ↩ Reply     <     🚩

∧ **Canadian WP Subscriber**  4 days ago

It's hard to argue that Sarah Palin has been defamed by the New York Times piece
at the center of this litigation. Given the way that she's been followed in the media
surrounding the court case she certainly hasn't lost any of her 'fame', so 'de-
famed'? No. She even scored a spot on the Masked Singer.

Not exactly the level of fame that she may covet, but certainly consistent with both
her level of fame before the NYT piece, and paralleling such other retired
Republican luminaries like Sean Spicer (Dancing with the Stars) and Rudy Giuliani
(the Masked Singer, and personalized birthday greetings on Cameo).

She's done far more to destroy her credibility every time she speaks than anything
any mainstream / "lamestream' media could do if they dedicated their full
resources, and acted with actual malice. 😬

Maybe she should be suing for definition of character.

👍 24     ↩ Reply     <     🚩

∧ **Mark Alan Parker**  4 days ago

Palin is a buffoon - just another idiotic non-thinking blowhard. Next case, please!

👍 25     ↩ Reply     <     🚩

∧ **wkendhiker1**  4 days ago

Lipstick on a buffoon is. . . . yes, still a buffoon,

👍 16     ↩ Reply     <     🚩

∧ **LoveAndKindness**  4 days ago

That map sure looks like a shooting target to me....

👍 20     ↩ Reply     <     🚩

∧ **Canadian WP Subscriber**  4 days ago

[ View more ]

**Company**
About The Post
Newsroom Policies & Standards
Diversity and Inclusion
Careers
Media & Community Relations
WP Creative Group
Accessibility Statement

**Get The Post**
Become a Subscriber
Gift Subscriptions
Mobile & Apps
Newsletters & Alerts
Washington Post Live
Reprints & Permissions
Post Store
Books & E-Books
Newspaper in Education
Print Archives (Subscribers Only)
e-Replica
Today's Paper

**Contact Us**
Contact the Newsroom
Contact Customer Care
Contact the Opinions team
Advertise
Licensing & Syndication
Request a Correction
Send a News Tip
Report a Vulnerability

**Terms of Use**
Digital Products Terms of Sale
Print Products Terms of Sale
Terms of Service
Privacy Policy
Cookie Settings
Submissions & Discussion Policy
RSS Terms of Service
Ad Choices

Stay informed with your free trial to The Washington Post.     [ Get 4 weeks free ]



POLITICO

   

## MAGAZINE

**ALTITUDE**

# The Cynical Spectacle of Sarah Palin's Lawsuit Against the New York Times

Ousted editor James Bennet is the only actor in the libel suit drama who is on the level.

Case 1:17-cv-04853-JSR Document 53 Filed 03/21/22 Page 176 of 244

**POLITICO**

   



In this courtroom sketch, James Bennet, former New York Times editorial page editor, holds up a copy of paper as he testifies in former Alaska Gov. Sarah Palin's defamation lawsuit in federal court on Wednesday. | Elizabeth Williams/AP Photo

By **JOHN F. HARRIS**
02/10/2022 04:30 AM EST

   

In an age when every arena of politics and media is infused with remorseless combat, James Bennet has a rare distinction: The former *New York Times* editorial page editor has been circled by ideological packs on left and right with equal ferocity.

The cliche that if you are making both sides mad you must be doing something right has never rung more hollow. In fact, diverse attackers have succeeded in extracting chunks of flesh from one of the most conscientious journalists of his generation.

Advertisement

Case 1:17-cv-04853-JSR Document 58 Filed 03/22/22 Page 177 of 23



   

This has left Bennet a forlorn figure at the center of the libel trial brought by Sarah Palin, nearing its conclusion this week in federal court in New York.

It is a drama in which he may be the only actor whose presence is on the level. The other parties are freighted with multiple layers of artifice and hypocrisy.

Palin's motives are not genuinely about seeking redress for a factual error that was quickly corrected. She knows the whole episode has enhanced, not damaged, her reputation with the partisans on whom her political and financial fortunes depend. Her target is less Bennet than the news organization her confederates on the right have seethed over since the Nixon era. Others cheering her case hope to weaken the legal protections benefiting all journalists.

**POLITICO**    



Sarah Palin reacts to a reporter's question as she leaves Federal court on Feb. 4. | John Minchillo/AP Photo

Meanwhile, Bennet is being defended by a news organization that made a panicky decision to force his resignation rather than defend him against an attack from the left, led by many of its own staff members. The trial's discovery process made clear that *Times* publisher A.G. Sulzberger had pressed Bennet to make his page a bolder, faster, more surprising place. Take more risks, he urged Bennet in a job review. Then he tremblingly raced for the exits when some of those risks had uncomfortable results.

Thus, another distinction Bennet wasn't seeking: He's the only one whose words at the trial can be taken at face value, his pain obviously sincere.

Case 1:17-cv-04853-JSR Document 58-3 Filed 03/22/22 Page 19 of 23

# POLITICO

   





Advertisement

"This is my fault, right, I wrote those sentences," Bennet volunteered to Palin's attorney, Shane Vogt, on Tuesday in order to dispel any suggestion that a colleague bore responsibility for statements in the editorial that appeared to tie Palin's political action committee to a deadly shooting in Arizona a decade ago. Somehow he is unaware of contemporary rules of discourse: Every attack should be met with snarling counterattack and blustery distraction.

Instead, he set about correcting the initial language.

Upon hearing that something bad has happened to someone else, the human mind is wired to seek psychological distance — to grasp for reasons that the same bad thing wouldn't have happened to you.

POLITICO
   

*neighborhood at that hour? "So sad, but you know she is a smoker".*

In Bennet's case the rationalizing impulse doesn't work. Most editors who have held responsibility at Bennet's level know well that his travails could easily be their own.

In the days when I was line-editing copy, could I have inserted a technical error while trying to stir life into a flaccid piece? Well, umm, yes. Not just could have done it — actually have done it. This is what happened to Bennet in 2017 after a disturbed man went on a shooting rampage at a baseball field in Alexandria, Va., wounding Republican Rep. Steve Scalise. On a tight deadline, Bennet added lines to an editorial recalling the 2011 shooting of Democratic Rep. Gabby Giffords and suggesting that political material from Palin's PAC — with what looked like rifle cross-hairs over Giffords' district — may have contributed to the violence. In fact, as a correction acknowledged, there is no evidence indicating that Giffords' shooter was motivated by the Palin's group's material.

Lost in the largely feigned outrage was the obvious common sense of the editorial's main argument: Violent imagery and language invoked as metaphor in politics can stimulate disturbed minds in unpredictable ways, so responsible politicians ought to dial it back.

What about the other large cloud of Bennet's four-year tenure as editorial page editor? Would I have jumped on the tracks to stop the *Times* from running a commentary by Sen. Tom Cotton (R-Ark.) calling for deployment of federal troops to halt urban violence in the wake of the George Floyd murder? With benefit of hindsight: I would have passed on the piece. Cotton's argument — made on the floor of the Senate, not just the op-ed page of the *Times* — was more about ideological scab-picking than it was a serious proposal. But no editorial judgment gets made with the benefit of hindsight. I was surprised that running words from a United States senator that were already in wide circulation led to calls for an editor's head. I was stunned that a publisher of the *New York Times* would give those critics the head.



JA 2356

  

competitors on the Clinton White House beat a quarter-century ago. He became editor of the *Atlantic* not long before I helped start POLITICO.

Advertisement

In some moods, I entertain myself by imagining what Bennet could do if he were as cynically transactional as other players at the Palin trial. He might have turned the whole thing into a career springboard.

He could have testified that Palin was right — he now realizes that he was subconsciously influenced by the pervasive atmosphere of sneering condescension at an elite media outlet that sees all conservatives as rubes. He might have turned that epiphany into millions with his own *Fox News* show as a lead-in to Tucker.



**MEDIA**

**Former NYT editor: Concern over false-equivalence critique prompted flaw in Palin editorial**

BY JOSH GERSTEIN

**POLITICO**    

refugee from corporate media and the ways it props up corrupt power arrangements through self-censorship and timid both-sides journalism. There could be decent money in campus lectures and a Substack column in that.

In the real world, Bennet won't do those things because, as his self-critical testimony this week showed, he has still devoted his professional life to truth-telling — with the humility to recognize that no one is in full possession of the truth.

Three years ago, in a lengthy conversation published in POLITICO magazine, Bennet told me his philosophy as editorial page editor: "We give people an honest struggle, an open debate from a lot of different points of view and show that you can do that kind of work respectfully, that you can actually engage across these different ideological divides and your — even now, these days — tribal divides."

That aspiration feels a good bit more distant now than three years ago.

FILED UNDER: JOHN HARRIS, ALTITUDE

SPONSORED CONTENT                                                    By            |



**[Gallery] Tom Brady and Gisele...**

Gameday News



**Dr. Kellyann: "Slimming Down After 6...**

bellabioticsonline.com



**These Figure Skating Dresses Trul...**

Stadium Talk



**Unsold Camper Vans For Pennies On T...**

Camper Van Warehouse...



**Before you renew Amazon Prime, read...**

capitaloneshopping.com



   

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do not sell my info

Notice to California Residents

© 2022 POLITICO LLC

# EXHIBIT 3

*to Plaintiff's Omnibus Post Trial Motions*

JA 2360

**From:** Bob Van Voris (BLOOMBERG/ FEDERAL C) <rvanvoris@bloomberg.net>
**Sent:** Wednesday, February 16, 2022 12:13 PM
**To:** Ken Turkel <kturkel@tcb-law.com>; Shane Vogt <svogt@tcb-law.com>
**Subject:** Palin jurors knew of Rakoff ruling during deliberations

Would love to know your thoughts. Here's my story:

https://www.bloomberg.com/news/articles/2022-02-16/palin-
jurors-knew-judge-dismissed-n-y-times-case-before-verdict?
sref=Hu4igNEZ

------------------------------------------------------------------------------------------

Bob Van Voris
Legal Reporter
Bloomberg News
731 Lexington Avenue
New York, New York 10022
Cell: **REDACTED**
E-MAIL: **REDACTED** @bloomberg.net
Twitter: @BobVanVoris
Attorney admitted in New York

# EXHIBIT 4

*to Plaintiff's Omnibus Post-Trial Motions*



**Palin Jurors Knew Judge Dismissed Times Case Before Verdict**

- Jurors couldn't avoid push notifications on their smart phones
- Deliberations had continued after judge said he'd toss suit





**Jurors Find Out**



**No Evidence**

 

   

Case No. 17 Civ. 4853

# EXHIBIT 5

*to Plaintiff's Omnibus Post-Trial Motions*

**From:** Nicholas Werle <Nicholas_Werle@nysd.uscourts.gov>
**Sent:** Wednesday, February 16, 2022 12:26 PM
**To:** Axelrod, David L. <AxelrodD@ballardspahr.com>; Schell, Jacquelyn N. <SchellJ@ballardspahr.com>; Sullivan, Thomas B. <SullivanT@ballardspahr.com>; Brown, Jay Ward <brownjay@ballardspahr.com>; Shane Vogt <svogt@tcb-law.com>; Ken Turkel <kturkel@tcb-law.com>
**Subject:** Sarah Palin v. N.Y. Times Co. | 17-cv-4853 (JSR) | Order

Counsel —

Please see the attached order from Judge Rakoff, which will be docketed shortly.

Regards,
Nick Werle



**Nicholas Werle**
**Law Clerk to the Hon. Jed S. Rakoff**
United States District Court
Southern District of New York
500 Pearl Street – Room 1340
New York, NY 10007
Chambers: (212) 805-0401

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - -
SARAH PALIN,

          Plaintiff,                    17-cv-4853 (JSR)

     -v-                                 ORDER

THE NEW YORK TIMES COMPANY
and JAMES BENNET,

          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - -
```

JED S. RAKOFF, U.S.D.J.:

It is the Court's uniform practice after a verdict has been rendered in a jury trial to have the Court's law clerk inquire of the jury as to whether there were any problems understanding the Court's instructions of law, so that improvements can be made in future cases. Late yesterday, in the course of such an inquiry in this case -- in which the jury confirmed that they had fully understood the instructions and had no suggestions regarding jury instructions for future cases -- several jurors volunteered to the law clerk that, prior to the rendering of the jury verdict in this case, they had learned of the fact of this Court's Rule 50 determination on Monday to dismiss the case on legal grounds. These jurors reported that although they had been assiduously adhering to the Court's instruction to avoid media coverage of the trial, they had involuntarily received "push notifications" on their smartphones that contained the bottom-line of the ruling. The jurors repeatedly assured the Court's law

**JA 2366**

clerk that these notifications had not affected them in any way or played any role whatever in their deliberations.

The Court also notes that when it proposed to the parties, during oral argument on Monday morning, to render its Rule 50 decision later that day but to permit the jury to continue deliberating so that the Court of Appeals would have the benefit of both the Court's legal determination and the jury's verdict, no party objected to this plan. Nor did any party object when the Court reconvened later that day, outside the presence of the jury, and the Court indicated that it was prepared to issue a Rule 50 decision at that time. Indeed, no party objected to this procedure at any time whatever.

Nevertheless, in an excess of caution, the Court hereby brings the foregoing facts to the parties' attention. If any party feels there is any relief they seek based on the above, counsel should promptly initiate a joint phone conference with the Court to discuss whether any further proceedings are appropriate.

SO ORDERED.

New York, NY
February 16, 2022

_____
JED S. RAKOFF, U.S.D.J.

# EXHIBIT 6

*to Plaintiff's Omnibus Post-Trial Motions*

| Message | |
|---|---|
| **From**: | Rhoades Ha, Danielle [danielle.rhoades-ha@nytimes.com] |
| on behalf of | Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> [danielle.rhoades-ha@nytimes.com] |
| **Sent**: | 6/15/2017 12:59:49 PM |
| **To**: | David McCraw [David McCraw <mccrad@nytimes.com>]; James Bennet [James Bennet <jamesb@nytimes.com>] |
| **Subject**: | Fwd: question from Yahoo News // yesterday's editorial |

# Attorney Client Privilege

---------- Forwarded message ----------
From: **Dylan Stableford** <dylanstableford@gmail.com>
Date: Thu, Jun 15, 2017 at 12:31 PM
Subject: question from Yahoo News // yesterday's editorial
To: Danielle Rhoades Ha <Danielle.Rhoades-ha@nytimes.com>
Cc: Pamela.Sukhnandan@nytimes.com

Hi Danielle

Dylan from Yahoo News here. Hope you're well.

I see the editor's note/correction but wondering if the paper has a comment/response to Sarah Palin's reaction to yesterday's editorial:

https://twitter.com/SarahPalinUSA/status/875379343257632772

https://twitter.com/SarahPalinUSA/status/875379998726782977

Let me know.

Thanks and take care,

Dylan
_____

Dylan Stableford
Yahoo! News

CONFIDENTIAL

**JA 2369**

http://news.yahoo.com
https://twitter.com/stableford
203.727.1367

CONFIDENTIAL
NYTIMES0004211

Message

| | |
|---|---|
| **From**: | David McCraw [mccrad@nytimes.com] |
| on behalf of | David McCraw <mccrad@nytimes.com> [mccrad@nytimes.com] |
| **Sent**: | 6/15/2017 1:31:14 PM |
| **To**: | Danielle Rhoades Ha [Danielle Rhoades Ha <danielle.rhoades-ha@nytimes.com>] |
| **CC**: | Bennet, James [ Bennet, James <jamesb@nytimes.com>] |
| **Subject**: | Re: CNN Request for comment |

# Attorney Client Privilege

On Jun 15, 2017, at 1:25 PM, Danielle Rhoades Ha <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 12:45 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

James,

These look good. Simple and direct. Before I send to Oliver because I'm think he'll ask, will there be a second correction regarding the "district" change?

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

On Thu, Jun 15, 2017 at 12:23 PM, Bennet, James <jamesb@nytimes.com> wrote:
Moving fast here but here are my answers -- I have to go into a meeting so please call me out if they're bad/insufficient:

NYTIMES0004212

-- Yes, we did in part respond to the criticism on Twitter, and while it's always agonizing to get something wrong we appreciate it when our readers call us out like this.

-- You're right; thank you for calling that to our attention; we've fixed it.

-- We made an error of fact in the editorial, and we've corrected it. But that error doesn't invalidate the argument of the piece.

-- I'm not aware that Sarah Palin has asked for an apology, but, yes, I, James Bennet, do apologize to her for this mistake.

-- We screwed up. It's not the first time a mistake has made it into print, and every time it happens we take it very seriously, as we do any mistake on any platform.

On Thu, Jun 15, 2017 at 12:09 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:
James -

Below are questions from Oliver Darcy, a media reporter at CNN who was previously at The Blaze. Please let me know your thoughts on responding and then we can figure out how best to respond (if at all). In a meeting but will be free to discuss shortly.

- Was the Times prompted to make the change after criticism on Twitter. There has been a lot of talk about the removal of the public editor position, and I'm wondering if this was a case where the public's use of social media platforms helped hold the Times accountable.

- The Times revised editorial seems to still suggest the Palin map put Giffords "under stylized cross hairs." The map, in fact, put her district under cross hairs. Will the Times correct?

- What do you make of critics calling on the Times to go further and retract the whole editorial since a core piece of it was found to be incorrect?

- Will the Times be issuing an apology to Sarah Palin for wrongly linking her to the shooting of Giffords?

- How did this error make it to print? It contradicts the Times' own reporting -- even an article that was published in the same edition of the newspaper.

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

CONFIDENTIAL

JA 2372

| | Message |
|---|---|
| **From**: | David McCraw [mccrad@nytimes.com] |
| on behalf of | David McCraw <mccrad@nytimes.com> [mccrad@nytimes.com] |
| **Sent**: | 6/15/2017 3:07:32 PM |
| **To**: | Rhoades Ha, Danielle [ Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com>] |
| **CC**: | Bennet, James [ Bennet, James <jamesb@nytimes.com>] |
| **Subject**: | Re: CNN Request for comment |

# Attorney Client Privilege

On Jun 15, 2017, at 2:58 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 1:31 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

CONFIDENTIAL

NYTIMES0004214

# Attorney Client Privilege

On Jun 15, 2017, at 1:25 PM, Danielle Rhoades Ha <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 12:45 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

James,

These look good. Simple and direct. Before I send to Oliver because I'm think he'll ask, will there be a second correction regarding the "district" change?

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

On Thu, Jun 15, 2017 at 12:23 PM, Bennet, James <jamesb@nytimes.com> wrote:
Moving fast here but here are my answers -- I have to go into a meeting so please call me out if they're bad/insufficient:

-- Yes, we did in part respond to the criticism on Twitter, and while it's always agonizing to get something wrong we appreciate it when our readers call us out like this.

-- You're right; thank you for calling that to our attention; we've fixed it.

-- We made an error of fact in the editorial, and we've corrected it. But that error doesn't invalidate the argument of the piece.

                                                                 NYTIMES0004215

**JA 2374**

-- I'm not aware that Sarah Palin has asked for an apology, but, yes, I, James Bennet, do apologize to her for this mistake.

-- We screwed up. It's not the first time a mistake has made it into print, and every time it happens we take it very seriously, as we do any mistake on any platform.

On Thu, Jun 15, 2017 at 12:09 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:
James -

Below are questions from Oliver Darcy, a media reporter at CNN who was previously at The Blaze. Please let me know your thoughts on responding and then we can figure out how best to respond (if at all). In a meeting but will be free to discuss shortly.

- Was the Times prompted to make the change after criticism on Twitter. There has been a lot of talk about the removal of the public editor position, and I'm wondering if this was a case where the public's use of social media platforms helped hold the Times accountable.

- The Times revised editorial seems to still suggest the Palin map put Giffords "under stylized cross hairs." The map, in fact, put her district under cross hairs. Will the Times correct?

- What do you make of critics calling on the Times to go further and retract the whole editorial since a core piece of it was found to be incorrect?

- Will the Times be issuing an apology to Sarah Palin for wrongly linking her to the shooting of Giffords?

- How did this error make it to print? It contradicts the Times' own reporting -- even an article that was published in the same edition of the newspaper.

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

CONFIDENTIAL

JA 2375

Message

| | |
|---|---|
| **From**: | Rhoades Ha, Danielle [danielle.rhoades-ha@nytimes.com] |
| on behalf of | Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> [danielle.rhoades-ha@nytimes.com] |
| **Sent**: | 6/15/2017 3:52:46 PM |
| **To**: | David McCraw [David McCraw <mccrad@nytimes.com>] |
| **CC**: | Bennet, James [ Bennet, James <jamesb@nytimes.com>] |
| **Subject**: | Re: CNN Request for comment |

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:07 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 2:58 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

CONFIDENTIAL

**JA 2376**

Attorney Client Privilege

On Thu, Jun 15, 2017 at 1:31 PM, David McCraw <mccrad@nytimes.com> wrote:

Attorney Client Privilege

On Jun 15, 2017, at 1:25 PM, Danielle Rhoades Ha <danielle.rhoades-ha@nytimes.com> wrote:

Attorney Client Privilege

On Jun 15, 2017, at 12:45 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

James,

These look good. Simple and direct. Before I send to Oliver because I'm think he'll ask, will there be a second correction regarding the "district" change?

CONFIDENTIAL
NYTIMES0004218

**JA 2377**

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

On Thu, Jun 15, 2017 at 12:23 PM, Bennet, James
<jamesb@nytimes.com> wrote:
Moving fast here but here are my answers -- I have to go into a
meeting so please call me out if they're bad/insufficient:

-- Yes, we did in part respond to the criticism on Twitter, and
while it's always agonizing to get something wrong we appreciate
it when our readers call us out like this.

-- You're right; thank you for calling that to our attention; we've
fixed it.

-- We made an error of fact in the editorial, and we've corrected it.
But that error doesn't invalidate the argument of the piece.

-- I'm not aware that Sarah Palin has asked for an apology, but,
yes, I, James Bennet, do apologize to her for this mistake.

-- We screwed up. It's not the first time a mistake has made it into
print, and every time it happens we take it very seriously, as we do
any mistake on any platform.

On Thu, Jun 15, 2017 at 12:09 PM, Rhoades Ha, Danielle
<danielle.rhoades-ha@nytimes.com> wrote:
James -

Below are questions from Oliver Darcy, a media reporter at CNN
who was previously at The Blaze. Please let me know your
thoughts on responding and then we can figure out how best to
respond (if at all). In a meeting but will be free to discuss shortly.

- Was the Times prompted to make the change after criticism on Twitter. There has been
a lot of talk about the removal of the public editor position, and I'm wondering if this was
a case where the public's use of social media platforms helped hold the Times
accountable.

- The Times revised editorial seems to still suggest the Palin map put Giffords "under
stylized cross hairs." The map, in fact, put her district under cross hairs. Will the Times
correct?

- What do you make of critics calling on the Times to go further and retract the whole
editorial since a core piece of it was found to be incorrect?

CONFIDENTIAL

**JA 2378**

- Will the Times be issuing an apology to Sarah Palin for wrongly linking her to the shooting of Giffords?

- How did this error make it to print? It contradicts the Times' own reporting -- even an article that was published in the same edition of the newspaper.

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

CONFIDENTIAL

Message

| | |
|---|---|
| **From:** | Rhoades Ha, Danielle [danielle.rhoades-ha@nytimes.com] |
| on behalf of | Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> [danielle.rhoades-ha@nytimes.com] |
| **Sent:** | 6/15/2017 3:57:17 PM |
| **To:** | Bennet, James [ Bennet, James <jamesb@nytimes.com>] |
| **CC:** | David McCraw [David McCraw <mccrad@nytimes.com>] |
| **Subject:** | Re: CNN Request for comment |

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:55 PM, Bennet, James <jamesb@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:52 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

NYTIMES0004221

**JA 2380**

On Thu, Jun 15, 2017 at 3:07 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 2:58 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 1:31 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 1:25 PM, Danielle Rhoades Ha <danielle.rhoades-ha@nytimes.com> wrote:

NYTIMES0004222

# JA 2381

# Attorney Client Privilege

On Jun 15, 2017, at 12:45 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

James,

These look good. Simple and direct. Before I send to Oliver because I'm think he'll ask, will there be a second correction regarding the "district" change?

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

On Thu, Jun 15, 2017 at 12:23 PM, Bennet, James <jamesb@nytimes.com> wrote:
Moving fast here but here are my answers -- I have to go into a meeting so please call me out if they're bad/insufficient:

-- Yes, we did in part respond to the criticism on Twitter, and while it's always agonizing to get something wrong we appreciate it when our readers call us out like this.

-- You're right; thank you for calling that to our attention; we've fixed it.

-- We made an error of fact in the editorial, and we've corrected it. But that error doesn't invalidate the argument of the piece.

-- I'm not aware that Sarah Palin has asked for an apology, but, yes, I, James Bennet, do apologize to her for this mistake.

CONFIDENTIAL

NYTIMES0004223

# JA 2382

-- We screwed up. It's not the first time a mistake has made it into print, and every time it happens we take it very seriously, as we do any mistake on any platform.

On Thu, Jun 15, 2017 at 12:09 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:
James -

Below are questions from Oliver Darcy, a media reporter at CNN who was previously at The Blaze. Please let me know your thoughts on responding and then we can figure out how best to respond (if at all). In a meeting but will be free to discuss shortly.

- Was the Times prompted to make the change after criticism on Twitter. There has been a lot of talk about the removal of the public editor position, and I'm wondering if this was a case where the public's use of social media platforms helped hold the Times accountable.

- The Times revised editorial seems to still suggest the Palin map put Giffords "under stylized cross hairs." The map, in fact, put her district under cross hairs. Will the Times correct?

- What do you make of critics calling on the Times to go further and retract the whole editorial since a core piece of it was found to be incorrect?

- Will the Times be issuing an apology to Sarah Palin for wrongly linking her to the shooting of Giffords?

- How did this error make it to print? It contradicts the Times' own reporting -- even an article that was published in the same edition of the newspaper.

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

CONFIDENTIAL

**JA 2383**

| | |
|---|---|
| Message | |
| **From**: | Rhoades Ha, Danielle [danielle.rhoades-ha@nytimes.com] |
| on behalf of | Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> [danielle.rhoades-ha@nytimes.com] |
| **Sent**: | 6/15/2017 3:58:50 PM |
| **To**: | Bennet, James [ Bennet, James <jamesb@nytimes.com>] |
| **Subject**: | Re: CNN Request for comment |

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:55 PM, Bennet, James <jamesb@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:52 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:07 PM, David McCraw <mccrad@nytimes.com> wrote:

NYTIMES0004225

JA 2384

# Attorney Client Privilege

On Jun 15, 2017, at 2:58 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

## Attorney Client Privilege

On Thu, Jun 15, 2017 at 1:31 PM, David McCraw <mccrad@nytimes.com> wrote:

## Attorney Client Privilege

On Jun 15, 2017, at 1:25 PM, Danielle Rhoades Ha <danielle.rhoades-ha@nytimes.com> wrote:

## Attorney Client Privilege

NYTIMES0004226

JA 2385

# Attorney Client Privilege

On Jun 15, 2017, at 12:45 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

James,

These look good. Simple and direct. Before I send to Oliver because I'm think he'll ask, will there be a second correction regarding the "district" change?

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

On Thu, Jun 15, 2017 at 12:23 PM, Bennet, James <jamesb@nytimes.com> wrote:
Moving fast here but here are my answers -- I have to go into a meeting so please call me out if they're bad/insufficient:

-- Yes, we did in part respond to the criticism on Twitter, and while it's always agonizing to get something wrong we appreciate it when our readers call us out like this.

-- You're right; thank you for calling that to our attention; we've fixed it.

-- We made an error of fact in the editorial, and we've corrected it. But that error doesn't invalidate the argument of the piece.

-- I'm not aware that Sarah Palin has asked for an apology, but, yes, I, James Bennet, do apologize to her for this mistake.

-- We screwed up. It's not the first time a mistake has made it into print, and every time it happens we take it very seriously, as we do any mistake on any platform.

CONFIDENTIAL

NYTIMES0004227

On Thu, Jun 15, 2017 at 12:09 PM, Rhoades Ha, Danielle
<danielle.rhoades-ha@nytimes.com> wrote:

James -

Below are questions from Oliver Darcy, a media reporter at CNN who was previously at The Blaze. Please let me know your thoughts on responding and then we can figure out how best to respond (if at all). In a meeting but will be free to discuss shortly.

- Was the Times prompted to make the change after criticism on Twitter. There has been a lot of talk about the removal of the public editor position, and I'm wondering if this was a case where the public's use of social media platforms helped hold the Times accountable.

- The Times revised editorial seems to still suggest the Palin map put Giffords "under stylized cross hairs." The map, in fact, put her district under cross hairs. Will the Times correct?

- What do you make of critics calling on the Times to go further and retract the whole editorial since a core piece of it was found to be incorrect?

- Will the Times be issuing an apology to Sarah Palin for wrongly linking her to the shooting of Giffords?

- How did this error make it to print? It contradicts the Times' own reporting -- even an article that was published in the same edition of the newspaper.

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

CONFIDENTIAL

JA 2387

| Message | |
|---|---|
| **From**: | Rhoades Ha, Danielle [danielle.rhoades-ha@nytimes.com] |
| on behalf of | Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> [danielle.rhoades-ha@nytimes.com] |
| **Sent**: | 6/15/2017 4:05:35 PM |
| **To**: | Bennet, James [ Bennet, James <jamesb@nytimes.com>] |
| **Subject**: | Re: CNN Request for comment |

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:58 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:55 PM, Bennet, James <jamesb@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:52 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

NYTIMES0004229

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:07 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 2:58 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

NYTIMES0004230

**JA 2389**

On Thu, Jun 15, 2017 at 1:31 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 1:25 PM, Danielle Rhoades Ha <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 12:45 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

James,

These look good. Simple and direct. Before I send to Oliver because I'm think he'll ask, will there be a second correction regarding the "district" change?

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

On Thu, Jun 15, 2017 at 12:23 PM, Bennet, James <jamesb@nytimes.com> wrote:
Moving fast here but here are my answers -- I have to go into a meeting so please call me out if they're bad/insufficient:

NYTIMES0004231

# JA 2390

-- Yes, we did in part respond to the criticism on Twitter, and while it's always agonizing to get something wrong we appreciate it when our readers call us out like this.

-- You're right; thank you for calling that to our attention; we've fixed it.

-- We made an error of fact in the editorial, and we've corrected it. But that error doesn't invalidate the argument of the piece.

-- I'm not aware that Sarah Palin has asked for an apology, but, yes, I, James Bennet, do apologize to her for this mistake.

-- We screwed up. It's not the first time a mistake has made it into print, and every time it happens we take it very seriously, as we do any mistake on any platform.

On Thu, Jun 15, 2017 at 12:09 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:
James -

Below are questions from Oliver Darcy, a media reporter at CNN who was previously at The Blaze. Please let me know your thoughts on responding and then we can figure out how best to respond (if at all). In a meeting but will be free to discuss shortly.

- Was the Times prompted to make the change after criticism on Twitter. There has been a lot of talk about the removal of the public editor position, and I'm wondering if this was a case where the public's use of social media platforms helped hold the Times accountable.

- The Times revised editorial seems to still suggest the Palin map put Giffords "under stylized cross hairs." The map, in fact, put her district under cross hairs. Will the Times correct?

- What do you make of critics calling on the Times to go further and retract the whole editorial since a core piece of it was found to be incorrect?

- Will the Times be issuing an apology to Sarah Palin for wrongly linking her to the shooting of Giffords?

- How did this error make it to print? It contradicts the Times' own reporting -- even an article that was published in the same edition of the newspaper.

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

NYTIMES0004232

CONFIDENTIAL

NYTIMES0004233

# EXHIBIT 6

*to Plaintiff's Omnibus Post-Trial Motions*

**JA 2393**

| | |
|---|---|
| Message | |
| **From**: | McCraw, David [mccrad@nytimes.com] |
| on behalf of | McCraw, David <mccrad@nytimes.com> [mccrad@nytimes.com] |
| **Sent**: | 6/15/2017 5:25:42 PM |
| **To**: | Bennet, James [ Bennet, James <jamesb@nytimes.com>] |
| **CC**: | Rhoades Ha, Danielle [ Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com>] |
| **Subject**: | Re: CNN Request for comment |

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 4:34 PM, Bennet, James <jamesb@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 4:30 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

CONFIDENTIAL

NYTIMES0004234

# Attorney Client Privilege

On Jun 15, 2017, at 3:55 PM, Bennet, James <jamesb@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:52 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:07 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 2:58 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

NYTIMES0004235

**JA 2395**

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 1:31 PM, David McCraw <mccrad@nytimes.com>
wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 1:25 PM, Danielle Rhoades Ha <danielle.rhoades-
ha@nytimes.com> wrote:

# Attorney Client Privilege

NYTIMES0004236

JA 2396

# Attorney Client Privilege

On Jun 15, 2017, at 12:45 PM, Rhoades Ha, Danielle
<danielle.rhoades-ha@nytimes.com> wrote:

James,

These look good. Simple and direct. Before I send to Oliver because I'm think he'll ask, will there be a second correction regarding the "district" change?

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

On Thu, Jun 15, 2017 at 12:23 PM, Bennet, James
<jamesb@nytimes.com> wrote:
Moving fast here but here are my answers -- I have to go into a meeting so please call me out if they're bad/insufficient:

-- Yes, we did in part respond to the criticism on Twitter, and while it's always agonizing to get something wrong we appreciate it when our readers call us out like this.

-- You're right; thank you for calling that to our attention; we've fixed it.

-- We made an error of fact in the editorial, and we've corrected it. But that error doesn't invalidate the argument of the piece.

-- I'm not aware that Sarah Palin has asked for an apology, but, yes, I, James Bennet, do apologize to her for this mistake.

-- We screwed up. It's not the first time a mistake has made it into print, and every time it happens we take it very seriously, as we do any mistake on any platform.

CONFIDENTIAL
NYTIMES0004237

**JA 2397**

On Thu, Jun 15, 2017 at 12:09 PM, Rhoades Ha,
Danielle <danielle.rhoades-ha@nytimes.com>
wrote:

James -

Below are questions from Oliver Darcy, a media
reporter at CNN who was previously at The Blaze.
Please let me know your thoughts on responding
and then we can figure out how best to respond (if
at all). In a meeting but will be free to discuss
shortly.

- Was the Times prompted to make the change after criticism on
Twitter. There has been a lot of talk about the removal of the public
editor position, and I'm wondering if this was a case where the
public's use of social media platforms helped hold the Times
accountable.

- The Times revised editorial seems to still suggest the Palin map put
Giffords "under stylized cross hairs." The map, in fact, put her district
under cross hairs. Will the Times correct?

- What do you make of critics calling on the Times to go further and
retract the whole editorial since a core piece of it was found to be
incorrect?

- Will the Times be issuing an apology to Sarah Palin for wrongly
linking her to the shooting of Giffords?

- How did this error make it to print? It contradicts the Times' own
reporting -- even an article that was published in the same edition of
the newspaper.

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

NYTIMES0004238

**JA 2398**

Message

| | |
|---|---|
| **From**: | Bennet, James [jamesb@nytimes.com] |
| on behalf of | Bennet, James <jamesb@nytimes.com> [jamesb@nytimes.com] |
| **Sent**: | 6/15/2017 5:30:10 PM |
| **To**: | McCraw, David [ McCraw, David <mccrad@nytimes.com>] |
| **CC**: | Rhoades Ha, Danielle [ Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com>] |
| **Subject**: | Re: CNN Request for comment |

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 5:25 PM, McCraw, David <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 4:34 PM, Bennet, James <jamesb@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 4:30 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

NYTIMES0004239

**Attorney Client Privilege**

On Jun 15, 2017, at 3:55 PM, Bennet, James <jamesb@nytimes.com> wrote:

**Attorney Client Privilege**

On Thu, Jun 15, 2017 at 3:52 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

**Attorney Client Privilege**

On Thu, Jun 15, 2017 at 3:07 PM, David McCraw <mccrad@nytimes.com> wrote:

**Attorney Client Privilege**

NYTIMES0004240

On Jun 15, 2017, at 2:58 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 1:31 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 1:25 PM, Danielle Rhoades Ha <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

NYTIMES0004241

JA 2401

# Attorney Client Privilege

On Jun 15, 2017, at 12:45 PM, Rhoades Ha, Danielle
<danielle.rhoades-ha@nytimes.com> wrote:

James,

These look good. Simple and direct. Before I send
to Oliver because I'm think he'll ask, will there be a
second correction regarding the "district" change?

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

On Thu, Jun 15, 2017 at 12:23 PM, Bennet, James
<jamesb@nytimes.com> wrote:
Moving fast here but here are my answers -- I have
to go into a meeting so please call me out if they're
bad/insufficient:

-- Yes, we did in part respond to the criticism on
Twitter, and while it's always agonizing to get
something wrong we appreciate it when our readers
call us out like this.

-- You're right; thank you for calling that to our
attention; we've fixed it.

-- We made an error of fact in the editorial, and
we've corrected it. But that error doesn't invalidate
the argument of the piece.

-- I'm not aware that Sarah Palin has asked for an
apology, but, yes, I, James Bennet, do apologize to
her for this mistake.

-- We screwed up. It's not the first time a mistake
has made it into print, and every time it happens we

CONFIDENTIAL
NYTIMES0004242

# JA 2402

take it very seriously, as we do any mistake on any platform.

On Thu, Jun 15, 2017 at 12:09 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:
James -

Below are questions from Oliver Darcy, a media reporter at CNN who was previously at The Blaze. Please let me know your thoughts on responding and then we can figure out how best to respond (if at all). In a meeting but will be free to discuss shortly.

- Was the Times prompted to make the change after criticism on Twitter. There has been a lot of talk about the removal of the public editor position, and I'm wondering if this was a case where the public's use of social media platforms helped hold the Times accountable.

- The Times revised editorial seems to still suggest the Palin map put Giffords "under stylized cross hairs." The map, in fact, put her district under cross hairs. Will the Times correct?

- What do you make of critics calling on the Times to go further and retract the whole editorial since a core piece of it was found to be incorrect?

- Will the Times be issuing an apology to Sarah Palin for wrongly linking her to the shooting of Giffords?

- How did this error make it to print? It contradicts the Times' own reporting -- even an article that was published in the same edition of the newspaper.

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

CONFIDENTIAL

**JA 2403**

| | |
|---|---|
| Message | |
| **From:** | McCraw, David [mccrad@nytimes.com] |
| on behalf of | McCraw, David <mccrad@nytimes.com> [mccrad@nytimes.com] |
| **Sent:** | 6/15/2017 5:40:19 PM |
| **To:** | Bennet, James [ Bennet, James <jamesb@nytimes.com>] |
| **CC:** | Rhoades Ha, Danielle [ Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com>]; Brayton, Diane [ Brayton, Diane <braytd@nytimes.com>] |
| **Subject:** | Re: CNN Request for comment |

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 5:30 PM, Bennet, James <jamesb@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 5:25 PM, McCraw, David <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

CONFIDENTIAL

JA 2404

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 4:34 PM, Bennet, James <jamesb@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 4:30 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 3:55 PM, Bennet, James <jamesb@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:52 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

NYTIMES0004245

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:07 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 2:58 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

NYTIMES0004246

On Thu, Jun 15, 2017 at 1:31 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 1:25 PM, Danielle Rhoades Ha <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 12:45 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

James,

These look good. Simple and direct. Before I send to Oliver because I'm think he'll ask, will there be a second correction regarding the "district" change?

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

On Thu, Jun 15, 2017 at 12:23 PM, Bennet, James <jamesb@nytimes.com> wrote:

NYTIMES0004247

# JA 2407

Moving fast here but here are my answers -- I have to go into a meeting so please call me out if they're bad/insufficient:

-- Yes, we did in part respond to the criticism on Twitter, and while it's always agonizing to get something wrong we appreciate it when our readers call us out like this.

-- You're right; thank you for calling that to our attention; we've fixed it.

-- We made an error of fact in the editorial, and we've corrected it. But that error doesn't invalidate the argument of the piece.

-- I'm not aware that Sarah Palin has asked for an apology, but, yes, I, James Bennet, do apologize to her for this mistake.

-- We screwed up. It's not the first time a mistake has made it into print, and every time it happens we take it very seriously, as we do any mistake on any platform.

On Thu, Jun 15, 2017 at 12:09 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:
James -

Below are questions from Oliver Darcy, a media reporter at CNN who was previously at The Blaze. Please let me know your thoughts on responding and then we can figure out how best to respond (if at all). In a meeting but will be free to discuss shortly.

- Was the Times prompted to make the change after criticism on Twitter. There has been a lot of talk about the removal of the public editor position, and I'm wondering if this was a case where the public's use of social media platforms helped hold the Times accountable.

- The Times revised editorial seems to still suggest the Palin map put Giffords "under stylized cross hairs." The map, in fact, put her district under cross hairs. Will the Times correct?

- What do you make of critics calling on the Times to go further and retract the whole editorial since a core piece of it was found to be incorrect?

- Will the Times be issuing an apology to Sarah Palin for wrongly linking her to the shooting of Giffords?

CONFIDENTIAL
NYTIMES0004248

**JA 2408**

- How did this error make it to print? It contradicts the Times' own reporting -- even an article that was published in the same edition of the newspaper.

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-Ha@nytimes.com
@daniellerha

CONFIDENTIAL

NYTIMES0004249

**JA 2409**

Message
| | |
|---|---|
| **From**: | James Bennet [jamesb@nytimes.com] |
| on behalf of | James Bennet <jamesb@nytimes.com> [jamesb@nytimes.com] |
| **Sent**: | 6/15/2017 5:57:52 PM |
| **To**: | Danielle Rhoades Ha [Danielle Rhoades Ha <danielle.rhoades-ha@nytimes.com>]; McCraw, David [ McCraw, David <mccrad@nytimes.com>] |
| **CC**: | Brayton, Diane [ Brayton, Diane <braytd@nytimes.com>] |
| **Subject**: | Re: CNN Request for comment |

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 5:57 PM Danielle Rhoades Ha <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 5:40 PM, McCraw, David <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 5:30 PM, Bennet, James <jamesb@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 5:25 PM, McCraw, David <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

NYTIMES0004250

**JA 2410**

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 4:34 PM, Bennet, James <jamesb@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 4:30 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 3:55 PM, Bennet, James <jamesb@nytimes.com> wrote:

# Attorney Client Privilege

NYTIMES0004251

**JA 2411**

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:52 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 3:07 PM, David McCraw <mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 2:58 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

NYTIMES0004252

# Attorney Client Privilege

On Thu, Jun 15, 2017 at 1:31 PM, David McCraw
<mccrad@nytimes.com> wrote:

# Attorney Client Privilege

On Jun 15, 2017, at 1:25 PM, Danielle Rhoades Ha
<danielle.rhoades-ha@nytimes.com> wrote:

# Attorney Client Privilege

NYTIMES0004253

# JA 2413

# Attorney Client Privilege

On Jun 15, 2017, at 12:45 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:

> James,
>
> These look good. Simple and direct. Before I send to Oliver because I'm think he'll ask, will there be a second correction regarding the "district" change?
>
> Danielle Rhoades Ha
> VP, Communications
> The New York Times Company
> O: 212-556-8719 M: 917-379-6928
> Danielle.Rhoades-Ha@nytimes.com
> @daniellerha

> On Thu, Jun 15, 2017 at 12:23 PM, Bennet, James <jamesb@nytimes.com> wrote:
> Moving fast here but here are my answers -- I have to go into a meeting so please call me out if they're bad/insufficient:
>
> -- Yes, we did in part respond to the criticism on Twitter, and while it's always agonizing to get something wrong we appreciate it when our readers call us out like this.
>
> -- You're right; thank you for calling that to our attention; we've fixed it.
>
> -- We made an error of fact in the editorial, and we've corrected it. But

NYTIMES0004254

**JA 2414**

that error doesn't invalidate the argument of the piece.

-- I'm not aware that Sarah Palin has asked for an apology, but, yes, I, James Bennet, do apologize to her for this mistake.

-- We screwed up. It's not the first time a mistake has made it into print, and every time it happens we take it very seriously, as we do any mistake on any platform.

On Thu, Jun 15, 2017 at 12:09 PM, Rhoades Ha, Danielle <danielle.rhoades-ha@nytimes.com> wrote:
James -

Below are questions from Oliver Darcy, a media reporter at CNN who was previously at The Blaze. Please let me know your thoughts on responding and then we can figure out how best to respond (if at all). In a meeting but will be free to discuss shortly.

- Was the Times prompted to make the change after criticism on Twitter. There has been a lot of talk about the removal of the public editor position, and I'm wondering if this was a case where the public's use of social media platforms helped hold the Times accountable.

- The Times revised editorial seems to still suggest the Palin map put Giffords "under stylized cross hairs." The map, in fact, put her district under cross hairs. Will the Times correct?

- What do you make of critics calling on the Times to go further and retract the whole editorial since a core piece of it was found to be incorrect?

- Will the Times be issuing an apology to Sarah Palin for wrongly linking her to the shooting of Giffords?

- How did this error make it to print? It contradicts the Times' own reporting -- even an article that was published in the same edition of the newspaper.

NYTIMES0004255

Danielle Rhoades Ha
VP, Communications
The New York Times Company
O: 212-556-8719 M: 917-379-6928
Danielle.Rhoades-
Ha@nytimes.com
@daniellerha

CONFIDENTIAL

NYTIMES0004256

# JA 2416

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Mar 25 2022

**DEBRA ANN LIVINGSTON**
**CHIEF JUDGE**

Date: March 25, 2022
Docket #: 22-558
Short Title: Palin v. The New York Times Company

**CATHERINE O'HAGAN WOLFE**
**CLERK OF COURT**

DC Docket #: 17-cv-4853
DC Court: SDNY (NEW YORK CITY)
DC Judge: Rakoff

## INITIAL NOTICE OF STAY OF APPEAL

A notice of appeal was filed in this case on March 17, 2022. Since at least one motion cited in FRAP 4(a)(4), has been filed in the district court, this appeal is stayed pending resolution of the motion(s).

Appellant is directed to inform this Court in writing of the status of the motion(s) at 30 day intervals beginning 30 days from the date of this notice, and within 14 days after final disposition of the last outstanding motion. Appellant is also directed to provide the Court with a copy of all dispositive orders.

Inquiries regarding this case may be directed to 212-857-8548.

# JA 2417

**Gayla Arnold**

| | |
|---|---|
| **From:** | NYSD_ECF_Pool@nysd.uscourts.gov |
| **Sent:** | Tuesday, March 29, 2022 11:57 AM |
| **To:** | CourtMail@nysd.uscourts.gov |
| **Subject:** | Activity in Case 1:17-cv-04853-JSR Palin v. The New York Times Company USCA Order - Other |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

### Southern District of New York

## Notice of Electronic Filing

The following transaction was entered on 3/29/2022 at 11:56 AM EDT and filed on 3/29/2022

**Case Name:** Palin v. The New York Times Company
**Case Number:** 1:17-cv-04853-JSR
**Filer:**
**WARNING: CASE CLOSED on 02/15/2022**
**Document Number:** 200

**Docket Text:**
**ORDER of USCA (Certified Copy) USCA Case Number 22-629. Petitioner Sarah Palin has filed a petition for a writ of mandamus. Petitioner has also filed a post-trial motion in the district court which may impact this petition. Upon consideration thereof, IT IS HEREBY ORDERED that this petition is held in abeyance pending the district court's resolution of Petitioners post-trial motion. Petitioner is directed to inform this Court in writing of the status of the motion in 30-day intervals, beginning 30 days from the date of this order. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 03/29/2022..(nd)**

**1:17-cv-04853-JSR Notice has been electronically mailed to:**

Jay Ward Brown      brownjay@ballardspahr.com, LitDocket_East@ballardspahr.com

David A. Schulz      schulzd@ballardspahr.com, LitDocket_East@ballardspahr.com, appell@ballardspahr.com

Michael McGee Munoz      mmunoz@golenbock.com, courtnotifications@golenbock.com

Thomas Byrne Sullivan      sullivant@ballardspahr.com, LitDocket_East@ballardspahr.com, appell@ballardspahr.com, baileys@ballardspahr.com, relyear@ballardspahr.com

1

# JA 2418

Jacquelyn Nicole Schell    schellj@ballardspahr.com, LitDocket_East@ballardspahr.com, appell@ballardspahr.com

Kenneth G. Turkel    kturkel@tcb-law.com, garnold@tcb-law.com, lharm@tcb-law.com, lmeriwether@tcb-law.com, service@tcb-law.com

Shane B. Vogt    svogt@tcb-law.com, garnold@tcb-law.com, lmeriwether@tcb-law.com, service@tcb-law.com

David L. Axelrod    axelrodd@ballardspahr.com

**1:17-cv-04853-JSR Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=3/29/2022] [FileNumber=27463574-
0] [25db56b662775fa9f10774231502aaaac049a8b92ea6af99f5d82031e382a8dc46
81959096261905a8da1c192f50676cc3aa03e5052e186c0332eddcaa1db840]]

**JA 2419**

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 29th day of March, two thousand twenty-two.

In Re: Sarah Palin

--------------------------

Sarah Palin,

      Petitioner,

v.

The New York Times Company, James Bennett,

      Respondents.

**ORDER**

Docket No. 22-629

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Mar 29 2022

Petitioner Sarah Palin has filed a petition for a writ of mandamus. Petitioner has also filed a post-trial motion in the district court which may impact this petition. Upon consideration thereof,

IT IS HEREBY ORDERED that this petition is held in abeyance pending the district court's resolution of Petitioner's post-trial motion. Petitioner is directed to inform this Court in writing of the status of the motion in 30-day intervals, beginning 30 days from the date of this order.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit