# No. 22-558

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

SARAH PALIN, an individual

*Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY, a New York
corporation, and JAMES BENNET, an individual

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Southern District of New York
(Case No. 1:17-cv-04853-JSR, Hon. Jed S. Rakoff)**

**JOINT APPENDIX**

**VOLUME XI OF XI (Pages JA2420 to JA2526)**

Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: 813- 834-9191
Fax: 813-443-2193

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY 10017
Tel: 212-907-7300 Fax: 212-754-0330

*Counsel for Plaintiff-Appellant Sarah Palin*

# JOINT APPENDIX

# TABLE OF CONTENTS

## Volume XI of XI

DOC 201 – Defendant's Opposition to Plaintiff's Post-Trial Motions .........JA2420

DOC 202 – Plaintiff's Reply to Defendants' Opposition to Plaintiff's
Post-Trial Motions ...........................................................................................JA2480

DOC 203 – Opinion and Order denying Post-Trial Motions .......................JA2492

DOC 204 – U.S. Court of Appeals for the Second Circuit (Case No. 22-629)
Order denying Petition for Mandamus entered June 16, 2022 ......................JA2522

DOC  205 – Amended Notice of Appeal filed June 16, 2022 .......................JA2523

DOC 207 – U.S. Court of Appeals for the Second Circuit (Case No. 22-629)
Mandate issued on July 20, 2022.................................................................JA2526

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
    :

SARAH PALIN                       No. 17 Civ. 4853 (JSR)
    :
          Plaintiff,    :
    :
    :    ECF Case
        -against-    :
    :
    :
THE NEW YORK TIMES COMPANY and JAMES    :
BENNET,    :
    :
         Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## DEFENDANTS' OPPOSITION TO PLAINTIFF'S POST-TRIAL MOTIONS

David L. Axelrod
Jay Ward Brown
Jacquelyn N. Schell
Thomas B. Sullivan
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
axelrodd@ballardspahr.com
brownjay@ballardspahr.com
schellj@ballardspahr.com
sullivant@ballardspahr.com

*Counsel for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

I. INTRODUCTION ......................................................................................1

II. RELEVANT PROCEDURAL HISTORY ..................................................1

III. LEGAL STANDARD ................................................................................2

IV. PLAINTIFF IS NOT ENTITLED TO A NEW TRIAL .............................3

    A.    Plaintiff's Mandate Argument Is Not Supported By Law Or Logic ......................3

    B.    The Court's Jury Selection Process Ensured A Fair Jury ........................................8

    C.    The Court Properly Excluded Certain Evidence ....................................................11

    D.    The Mid-Deliberation Instruction Was Not Erroneous ........................................16

    E.    Certain Jurors' Exposure To "Push Notifications" Did Not Impact
        Their Deliberations, And The Court Properly Concluded The Jury
        Was Impartial ........................................................................................................19

    F.    The Court's Post-Verdict Statement To The Press Does Not Warrant
        A New Trial ...........................................................................................................24

    G.    The Court's Entry Of Judgment For Defendants Pursuant To Rule 50
        Is Supported By The Law And The Evidence Actually Of Record ........................26

        1.    The Court's ruling was procedurally correct ..............................................26

        2.    The Court correctly ruled that Plaintiff had not adduced clear
            and convincing evidence of actual malice as to falsity .............................29

            a.    The Court's evaluation of evidence did not violate the
                mandate or the summary judgment order ........................................30

            b.    The Court did not make improper credibility
                determinations ..................................................................................31

            c.    Plaintiff has not identified any evidence that would
                suffice to prove actual malice ..........................................................33

            3.    The Court could have granted the Rule 50 motion for failure to
            prove actual malice as to awareness of defamatory meaning ...................37

V.    DISQUALIFICATION IS NOT WARRANTED.................................................38

      A.    Plaintiff Has Failed To Meet Her Burden To Show This Court's
            Impartiality Would Be Doubted..................................................................38

            1.    Plaintiff's disagreement with this Court's decisions is not a
                  basis for recusal..................................................................................39

            2.    The Court's comment to Bloomberg is not a basis for recusal.................45

      B.    The Court's Decisions Taken As A Whole Do Not Give The
            Appearance Of Partiality............................................................................48

VI.   CONCLUSION...................................................................................................49

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Aguinda v. Texaco*,
241 F.3d 194, 201 (2d Cir. 2001)..................................................................39

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 251, 252, 256 (1986)............................................18, 30, 31, 32

*Bagheri v. Bailey*,
713 F. App'x 141, 145 (4th Cir. 2017) .........................................................21

*Banco Nacional de Cuba v. Farr*,
383 F.2d 166, 177 (2d Cir. 1967)...................................................................4

*In re Barry*,
946 F.2d 913, 914 (D.C. Cir. 1991) .............................................................46

*Berger v. New York City Police Dep't*,
No. 13 Civ. 6084 (VSB), 2019 U.S. Dist. LEXIS 219872, at *8-9 (S.D.N.Y.
Dec. 19, 2019).............................................................................................15

*Bibbins v. Dalsheim*,
21 F.3d 13, 14, 16-17 (2d Cir. 1994) (per curiam) ..........................23, 24

*Bose Corp. v. Consumers Union*,
466 U.S. 485, 511 (1984)................................................................................6

*In re Boston's Children First*,
244 F.3d 164, 166, 167, 172 (1st Cir. 2001)...........................41, 46, 47, 48

*Britt v. Garcia*,
457 F.3d 264, 272 (2d Cir. 2006)..................................................................22

*Brown v. City of Syracuse*,
673 F.3d 141, 148 (2d Cir. 2012)...............................................................5, 6

*Burton v. Richmond*,
370 F.3d 723, 728 (8th Cir. 2004) .................................................................6

*Carter v. Rosenberg & Estis, P.C.*,
No. 95 Civ. 10439 (DLC), 1998 U.S. Dist. LEXIS 4010, at *88-89 (S.D.N.Y.
Mar. 30, 1998)............................................................................................40

*Coleman v. Grand*,
523 F, Supp. 3d 244, 257-59 (E.D.N.Y. 2021) .....................................29

*Contemp. Mission, Inc. v. N.Y. Times Co.*,
842 F.2d 612, 621-23 (2d Cir. 1988) ................................................ *passim*

*In re: Coronavirus/COVID-19 Pandemic*,
    No. 1:20-mc-197, ECF 1 (S.D.N.Y. Apr. 20, 2020) ................................................41

*In re Drexel Burnham Lambert Inc.*,
    861 F.2d 1307, 1312 (2d Cir. 1988) ......................................................................38

*Flores v. DOJ*,
    391 F. Supp. 3d 353, 365 (S.D.N.Y. 2019) ...........................................................3

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*,
    136 F.3d 276, 282, 285 (2d Cir. 1998) .................................................................28

*Gottwald v. Sebert*,
    2022 NY Slip Op 01515, ¶ 2, 3 (1st Dep't March 10, 2022) ................................29

*Great Wall Med. P.C. v. Levine*,
    No. 157517/2017, 2022 N.Y. Misc. LEXIS 988, at *2 (Sup. Ct. N.Y. Cnty.
    Mar. 8, 2022) ........................................................................................................29

*Harte-Hanks Commc'ns v. Connaughton*,
    491 U.S. 657, 666 (1989) .....................................................................................36

*Hill v. Novartis Pharms. Corp.*,
    No. 1:06-cv-00939-JSR-SAB, ECF 194 (E.D. Cal. Jun. 26, 2013) .......................28

*Huddleston v. United States*,
    485 U.S. 681, 690 (1988) .....................................................................................15

*In re IBM Corp.*,
    45 F.3d 641, 642-43 (2d Cir. 1995) ................................................................46, 47

*In re IBM Corp.*,
    618 F.2d 923, 927, 929, 930 (2d Cir. 1980) ...........................................39, 47, 49

*Kesner v. Buhl*,
    No. 20 Civ. 3454 (PAE), 2022 U.S. Dist. LEXIS 43094, at *26 (S.D.N.Y.
    Mar. 10, 2022) ......................................................................................................29

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*,
    729 F.3d 99, 104 (2d Cir. 2013) ............................................................................2

*Konik v. Champlain Valley Physicians Hosp. Med. Ctr.*,
    733 F.2d 1007, 1013 n.4 (2d Cir. 1984) .........................................................26, 27

*Lamborn v. Dittmer*,
    726 F. Supp. 510, 517 (S.D.N.Y. 1989) ...............................................................40

*Liberman v. Gelstein*,
    80 N.Y.2d 429, 438 (1992) .............................................................................30, 34

*Ligon v. City of N.Y.*,
 736 F.3d 118, 124, 126, 127 (2d Cir. 2013)...............................................46, 47, 48

*Liteky v. United States*,
 510 U.S. 540, 555, 556 (1994).......................................................................1, 39, 40

*Luce v. United States*,
 469 U.S. 38, 41 (1984)...............................................................................................7

*Massa Constr. v. Meaney*,
 No. 126837/2020, slip op. at 2 (Sup. Ct. Ontario Cnty. May 13, 2021)..................29

*Mattivi v. S. African Marine Corp.*,
 618 F.2d 163, 166 n.2 (2d Cir. 1980).......................................................................26

*McKenzie v. BellSouth Telecomms., Inc.*,
 219 F.3d 508, 513 (6th Cir. 2000) ..............................................................................6

*Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*,
 290 F.3d 98, 106 (2d Cir. 2002).................................................................................2

*Metro. Opera Ass'n v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*,
 332 F. Supp. 2d 667, 671 (S.D.N.Y. 2004)...............................................................46

*Mistretta v. Prokesch*,
 5 F. Supp. 2d 128, 132 (E.D.N.Y. 1998) ..................................................................27

*Muller-Paisner v. TIAA*,
 No. 03 Civ. 6265 (GWG), 2014 U.S. Dist. LEXIS 5229, at *7, *8-9 (S.D.N.Y.
 Jan. 15, 2014)......................................................................................................39, 49

*N.Y. Times Co. v. Sullivan*,
 376 U.S. 254, 280 (1964)..........................................................................................29

*Nemaizer v. Baker*,
 793 F.2d 58, 63 (2d Cir. 1986)....................................................................................2

*New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*,
 352 F.3d 599, 606 (2d Cir. 2003)................................................................................4

*NOVAGOLD Res., Inc. v. J Capital Rsch. USA LLC*,
 No. 20 Civ. 2875 (LDH) (PK), 2022 U.S. Dist. LEXIS 55734, at *25
 (E.D.N.Y. Mar. 28, 2022) .........................................................................................29

*Palin v. N.Y. Times Co.*,
 940 F.3d 804, 807, 808, 812, 813-14, 816-17 (2d Cir. 2019)........................4, 5, 6, 7

*Palin v. N.Y. Times Co.*,
 482 F. Supp. 3d 208, 218 (S.D.N.Y. 2020)................................................................7

*Palin v. N.Y. Times Co.*,
    No. 17 Civ. 4853 (JSR), ECF 196, at 3, 4, 6-7, 30 n.17, 32, 33-36, 37-38, 41,
    42, 43-44,45-64, 64-66 (S.D.N.Y. Mar. 1, 2022) .................................................. *passim*

*Rafter v. Bank of Am.*,
    No. 04 Civ. 3341 (JSR), 2011 U.S. Dist. LEXIS 133041, at *2 (S.D.N.Y.
    Nov. 14, 2011) ...................................................................................................2

*Reeves v. Sanderson Plumbing Prods.*,
    530 U.S. 133, 149 (2000)...................................................................................31

*Richardson v. Marsh*,
    481 U.S. 200, 206 (1987)...................................................................................22

*Rodriguez v. United States*,
    No. 10 Civ. 5259 (KTD), 2010 U.S. Dist. LEXIS 93634, at *4 (S.D.N.Y.
    Sep. 7, 2010) ......................................................................................................41

*Rosales-Lopez v. United States*,
    451 U.S. 182, 189 (1981)......................................................................................8

*Sackler v. ABC*,
    71 Misc. 3d 693, 698 (Sup. Ct. N.Y. Cnty. 2021) .............................................29

*SEC v. Razmilovic*,
    738 F.3d 14, 30 (2d Cir. 2013)...........................................................................40

*Shaoxing Daqin Imp. & Exp. Co. v. Notations, Inc.*,
    No. 19 Civ. 2732 (JSR), 2020 U.S. Dist. LEXIS 11654, at *2-3 (S.D.N.Y.
    Jan. 22, 2020) ......................................................................................................2

*Simo Holdings, Inc. v. H.K. uCloudlink Network Tech. Ltd.*,
    396 F. Supp. 3d 323, 340 (S.D.N.Y. 2019)..........................................................2

*Simone v. Prudential Ins. Co.*,
    164 F. App'x 39, 40 (2d Cir. 2006) ......................................................................3

*Skilling v. United States*,
    561 U.S. 358, 399 n.34 (2010)............................................................................23

*Sompo Japan Ins. Co. v. Norfolk S. Ry.*,
    762 F.3d 165, 175 (2d Cir. 2014)..........................................................................4

*Spiegel v. Schulmann*,
    604 F.3d 72, 83 (2d Cir. 2010)...........................................................................39

*Sprague v. Ticonic Nat'l Bank*,
    307 U.S. 161, 168 (1939)......................................................................................4

*St. Amant v. Thompson*,
    390 U.S. 727, 731, 733 (1968) ...................................................................30, 36

*Steel v. C.I.R.*,
    No. 99 Civ. 5499 (JSR), 1997 U.S. Dist. LEXIS 15862, at *2 (S.D.N.Y.
    Oct. 14, 1997) .................................................................................................39

*Sweeney v. Prisoners' Legal Servs.*,
    84 N.Y.2d 786, 793 (1995) ........................................................................18, 36

*Sweigert v. Goodman*,
    No. 18 Civ. 8653 (VEC) (SDA), 2021 U.S. Dist. LEXIS 77704, at *4-5
    (S.D.N.Y. Apr. 22, 2021) ................................................................................29

*Trott v. Platinum Mgmt. (NY) LLC*,
    400 F. Supp. 3d 2, 4 (S.D.N.Y. 2019) .............................................................2

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140, 153 (2d Cir. 2014) ...................................................................18

*United States v. Abu-Jihaad*,
    630 F.3d 102, 131 (2d Cir. 2010) ...................................................................14

*United States v. Ben Zvi*,
    242 F.3d 89, 95 (2d Cir. 2001) .........................................................................4

*United States v. Boles*,
    914 F.3d 95, 109 (2d Cir. 2019) ...............................................................12, 13

*United States v. Calbas*,
    821 F.2d 887, 894-95 (2d Cir. 1987) .............................................................24

*United States v. Casamento*,
    887 F.2d 1141, 1154 (2d Cir. 1989) ...............................................................22

*United States v. Colon*,
    961 F.2d 41, 44 (2d Cir. 1992) .......................................................................39

*United States v. Dawkins*,
    999 F.3d 767, 789 (2d Cir. 2021) ...................................................................15

*United States v. Fortier*,
    242 F.3d 1224, 1229 (10th Cir. 2001) ............................................................46

*United States v. Gaggi*,
    811 F.2d 47, 51, 53 (2d Cir. 1987) .....................................................21, 22, 23

*United States v. Ganias*,
    755 F.3d 125, 132 (2d Cir. 2014) ...................................................................21

*United States v. Grinnell Corp.*,
  384 U.S. 563, 583 (1966)............................................................1

*United States v. IBM Corp.*,
  475 F. Supp. 1372, 1379 (S.D.N.Y. 1979)..............................41

*United States v. Int'l Bhd. of Teamsters*,
  247 F.3d 370, 391 (2d Cir. 2001)...........................................2

*United States v. Kozeny*,
  643 F. Supp. 2d 415, 417 (S.D.N.Y. 2009)..............................7

*United States v. Kyles*,
  40 F.3d 519, 524 (2d Cir. 1994).............................................8

*United States v. Lawes*,
  292 F.3d 123, 128, 129 (2d Cir. 2002)..........................8, 9, 11

*United States v. Lloyd*,
  269 F.3d 228, 240 (3d Cir. 2001)..........................................22

*United States v. Lovaglia*,
  954 F.2d 811, 815 (2d Cir. 1992).............................................3

*United States v. Microsoft Corp.*,
  253 F.3d 34, 107-08, 112 (D.C. Cir. 2001)..................46, 47, 48

*United States v. Millar*,
  79 F.3d 338, 342 (2d Cir. 1996).............................................8

*United States v. Nektalov*,
  461 F.3d 309, 318 (2d Cir. 2006)..........................................12

*United States v. Perrotti*,
  734 F. App'x 764, 768 (2d Cir. 2018) ....................................14

*United States v. Sierra Pac. Indus., Inc.*,
  862 F.3d 1157, 1175 (9th Cir. 2017) ......................................46

*United States v. Treacy*,
  639 F.3d 32, 39, 46 (2d Cir. 2011)....................................9, 11

*United States v. Vera*,
  362 F. App'x 199, 200 (2d Cir. 2010) ....................................23

*United States v. Wedd*,
  993 F.3d 104, 117-18 (2d Cir. 2021) ...............................39, 44

*Unitherm Food Systems v. Swift-Eckrich, Inc.*,
   546 U.S. 394, 406 (2006) ........................................................................27

*Vill. of Freeport v. Barrella*,
   814 F.3d 594, 610 (2d Cir. 2016) ...................................................14, 16

*Watkins v. Smith*,
   561 F. App'x 46, 47 (2d Cir. 2014) ........................................................40

*Williams v. Cnty. of Westchester*,
   171 F.3d 98, 101, 102 (2d Cir. 1999) ....................................27, 30, 32

*Zuckerbrot v. Lande*,
   No. 655110/2020, 2022 N.Y. Misc. LEXIS 929, at *30-31, *52 (Sup. Ct. N.Y.
   Cnty. Mar. 17, 2022) ...............................................................................29

**Statutes**

28 U.S.C. § 455 ...........................................................3, 38, 39, 45, 46, 48

**Other Authorities**

Code of Conduct for United States Judges, Canon 3A(6) ....................45, 46

Fed. R. Civ. P. 50(a) ...................................................................................31

Fed. R. Evid. 104(b) ...................................................................................15

Fed. R. Evid. 606(b) ...................................................................................23

*Press Briefing by White House COVID-19 Response Team & Public Health
   Officials* (Nov. 22, 2021) ........................................................................42

9 Wright & Miller, *Federal Practice & Procedure* § 2533 (1971) ...............26

9A Wright & Miller, *Federal Practice & Procedure* § 2533 (2d ed. 1995)................27

**JA 2430**

## I.     INTRODUCTION

Trial in this case demonstrated unequivocally that Defendants did not libel Plaintiff.  This was confirmed both by the Jury's verdict and by the Court's decision to grant Defendants' motion for judgment as a matter of law.  Plaintiff nonetheless asks the Court to vacate the judgment and grant her a new trial.  Additionally, Plaintiff demands that the Court recuse itself.

None of Plaintiff's baseless contentions, whether considered individually or collectively, justify a new trial or recusal.  Rather, Plaintiff's lengthy list of alleged errors purportedly committed by the Court in fact reflects well-supported rulings on disputed issues that the Court simply did not resolve in Plaintiff's favor.  As explained more fully below, the Court did not commit error, much less error so "extraordinary" as to justify a new trial.  Moreover, adverse "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)), and that is certainly true here.

## II.     RELEVANT PROCEDURAL HISTORY

On February 15, 2022, the Court entered final judgment dismissing this case.  ECF 171.  Subsequently, Plaintiff filed a notice informing the Court that she sought the following post-trial relief: (1) disqualification, pursuant to 28 U.S.C. § 455, retroactive to August 28, 2020, vacating every ruling since that time; (2) permission to interview jurors concerning their receipt of push notifications about the trial during deliberations; (3) reconsideration of the Court's decision granting Defendants' motion for judgment as a matter of law; and (4) setting aside of the final judgment, pursuant to Rules 59 and 60 of the Federal Rules of Civil Procedure.  ECF 195.  On March 22, 2022, Plaintiff filed her Omnibus Memorandum of Law in Support of Post-Trial Motions ("Pl. Mem."), ECF 198, in which she abandoned her request to interview jurors, *see generally* Pl. Mem. at 38 (omitting this from her requested relief).

**JA 2431**

## III.    LEGAL STANDARD

For motions under Local Rule 6.3 or Rule 59(e), the standard "is strict and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shaoxing Daqin Imp. & Exp. Co. v. Notations, Inc.*, No. 19 Civ. 2732 (JSR), 2020 U.S. Dist. LEXIS 11654, at *2-3 (S.D.N.Y. Jan. 22, 2020). "This standard is intended to 'ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.'" *Trott v. Platinum Mgmt. (NY) LLC*, 400 F. Supp. 3d 2, 4 (S.D.N.Y. 2019). Therefore, such a motion "should be granted only when the [movant] identifies 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013).

A motion for a new trial under Rule 59 "ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Rafter v. Bank of Am.*, No. 04 Civ. 3341 (JSR), 2011 U.S. Dist. LEXIS 133041, at *2 (S.D.N.Y. Nov. 14, 2011) (quoting *Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 106 (2d Cir. 2002)). Jury verdicts "should be disturbed with great infrequency." *Simo Holdings, Inc. v. H.K. uCloudlink Network Tech. Ltd.*, 396 F. Supp. 3d 323, 340 (S.D.N.Y. 2019).

Rule 60(b)(6) is "properly invoked only when there are extraordinary circumstances justifying relief" or "when the judgment may work an extreme and undue hardship." *Nemaizer v. Baker*, 793 F.2d 58, 63 (2d Cir. 1986); *see also United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001) (noting that a "motion for relief from judgment is generally not

**JA 2432**

favored").  The party seeking relief from judgment bears the burden of proof.  *Simone v. Prudential Ins. Co.*, 164 F. App'x 39, 40 (2d Cir. 2006).

Pursuant to 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  This requires the Court to consider whether "an objective, disinterested observer, fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal."  *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992).  "[C]onsideration of a motion for recusal is committed to the sound discretion of the district court, and there is a substantial burden on the moving party to show that the judge is not impartial."  *Flores v. DOJ*, 391 F. Supp. 3d 353, 365 (S.D.N.Y. 2019).

## IV.     PLAINTIFF IS NOT ENTITLED TO A NEW TRIAL

### A.     Plaintiff's Mandate Argument Is Not Supported By Law Or Logic

Plaintiff contends that the Second Circuit's reversal of this Court's dismissal of the case pursuant to Rule 12(b)(6) deprived this Court of discretion in a number of critical areas. Specifically, Plaintiff claims that, because of the mandate: (1) the Court was precluded from entering judgment in Defendants' favor pursuant to Rule 50; (2) the Court could not rely upon Bennet's testimony regardless of the evidence presented at trial; (3) the Court had no discretion to preclude the admission of articles published by Atlantic Media or evidence concerning Bennet's relationship with his brother, U.S. Senator Michael Bennet; (4) the Court could not rely upon Bennet's testimony that he did not read the hyperlinked ABC News article in the Editorial; and (5) the Court was required to find that an "honest mistake" was not the only reasonable inference that could be drawn from the evidence at trial.  Pl. Mem. at 5-6.  Plaintiff's contentions about the effect of the mandate are not supported by precedent or logic.

Under the mandate rule, a district court must comply "on remand with the dictates of the superior court" and cannot relitigate issues expressly or implied decided by the Court of Appeals.

*United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001). However, "a mandate is controlling only 'as to matters within its compass,'" *New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606 (2d Cir. 2003) (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939)), and a district court does "not violate the mandate rule by addressing on remand an issue that was not decided by the [Second Circuit] in the original appeal," *Sompo Japan Ins. Co. v. Norfolk S. Ry.*, 762 F.3d 165, 175 (2d Cir. 2014). "Put simply, the law of the case 'does not extend to issues an appellate court did not address.'" *New Eng. Ins. Co.*, 352 F.3d at 606; *see Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 177 (2d Cir. 1967) ("[o]f course it does not apply to matters left open by the mandate").

Here, the Second Circuit's mandate was limited to vacating the order granting Defendants' motion to dismiss. Indeed, the panel stressed that it was ruling *only* on whether Plaintiff had adequately pleaded her defamation claim:

> We conclude by recognizing that First Amendment protections are essential to provide "breathing space" for freedom of expression. *But, at this stage, our concern is with how district courts evaluate pleadings.* Nothing in this opinion should therefore be construed to cast doubt on the First Amendment's crucial constitutional protections. Indeed, this protection is precisely why Palin's evidentiary burden at trial—to show by clear and convincing evidence that Bennet acted with actual malice— is high. *At the pleading stage*, however, Palin's only obstacle is the plausibility standard of *Twombly* and *Iqbal*. She has cleared that hurdle.

*Palin v. N.Y. Times Co.*, 940 F.3d 804, 816-17 (2d Cir. 2019) (emphasis supplied); *see id.* at 807 ("This case is ultimately about the First Amendment, but the subject matter implicated in this appeal is far less dramatic: rules of procedure and pleading standards."). The panel's determination explicitly was limited to whether the Amended Complaint stated a plausible claim for defamation. Therefore, the case was allowed to "proceed to full discovery," *id.* at 808, but the panel expressly took "no position on the merits of Palin's claim," *id.* at 817. The case was remanded for "further proceedings consistent with this opinion." *Id.*

Plaintiff attempts to turn the Second Circuit's analysis of the *motion to dismiss* into one which "addressed facts supporting actual malice under summary judgment standards" because, she contends, "the Times briefed and argued on appeal that the dismissal should be affirmed on summary judgment grounds under Rule 12(d)." Pl. Mem. at 5 & n.2. This is flatly contradicted by the Second Circuit's opinion itself, which expressly "decline[d] to treat the Rule 12(b)(6) motion here as having been converted to one for summary judgment." *Palin*, 940 F.3d at 812. While Plaintiff points to instances in which the Second Circuit refers to issues to be decided by "the jury," the panel necessarily was saying only that such issues could not be decided at the dismissal stage and prior to discovery, not limiting the district court's role moving forward by prejudging what might occur in the course of discovery and trial.[1]

Because the Second Circuit dealt only with whether the claim as pleaded in the Amended Complaint survived a motion to dismiss (*i.e.*, was plausible), the mandate did not in any way cabin this Court's later Rule 50 decision or any other evidentiary decision. The Second Circuit considered almost this precise issue in *Brown v. City of Syracuse*, 673 F.3d 141 (2d Cir. 2012). On an initial appeal, the panel had reversed the district court's grant of a motion to dismiss. On remand and following discovery, the court granted defendant summary judgment. Plaintiff appealed, arguing that the summary judgment decision was inconsistent with language in the first appellate opinion. The Second Circuit ruled that "[t]here is no inconsistency between our statement of hypothetical circumstances in [the original appeal] about what could be possible based on the allegations in the complaint and the district court's subsequent determination of

---

[1] Plaintiff provides an extended recitation of ways in which she believes the Court's ruling on Defendants' motion for summary judgment did not comply with the mandate. *See* Pl. Mem. at 5-8. That ruling, however, was in her favor. The Court's denial of Defendants' summary judgment motion provides no grounds for vacating the jury verdict or Rule 50 decision.

what [plaintiff] would in fact be able to prove given the evidence," as well as other intervening court decisions.  *Id.* at 148; *accord Burton v. Richmond*, 370 F.3d 723, 728 (8th Cir. 2004) (trial judge was "free to reassess" because earlier appellate opinion "dealt only with the allegations made by plaintiffs in their complaint" and "such facts are not supported by the record developed by discovery and before the District Court at the summary-judgment stage of the proceedings"); *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000) ("our holding on a motion to dismiss does not establish the law of the case for purposes of summary judgment, when the complaint has been supplemented by discovery").

Just as in *Brown*, this Court was in no way precluded from conducting a full and independent analysis of the evidence actually introduced at trial and concluding that, despite the plausibility of the allegations in the Amended Complaint, Plaintiff failed to meet her burden of proof at trial.  *E.g.*, *Bose Corp. v. Consumers Union*, 466 U.S. 485, 511 (1984) ("Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'").

Nor does the Second Circuit's conclusion that certain of Plaintiff's allegations were sufficient to meet the plausibility standard at the motion to dismiss stage somehow require the drawing of specific inferences or the admission of specific evidence at trial.  On appeal, the Second Circuit accepted as true the Amended Complaint's allegations that Bennet was "responsible for the content of, reviewed, edited and approved" numerous articles supposedly in *The Atlantic* and found it was a plausible inference "that one who had risen to editor-in-chief at *The Atlantic* knew their content and thus that there was no connection between Palin and the Loughner shooting."  *Palin*, 940 F.3d at 813-14.  The evidence actually developed in discovery, however, failed to support these factual allegations.  *See infra* Section IV(C).

6

Indeed, even if Plaintiff had been able to support some of the allegations of the Amended Complaint, this Court would still have had discretion to exclude the evidence in question. Evaluating evidence is inherently contextual. The Second Circuit had no opportunity to consider whether the evidence in dispute, even if potentially relevant, should otherwise be excluded under Rule 403. Any *in limine* "ruling is subject to change when the case unfolds, particularly if the actual testimony differs" from what was previously proffered. *See Luce v. United States*, 469 U.S. 38, 41 (1984); *see also United States v. Kozeny*, 643 F. Supp. 2d 415, 417 (S.D.N.Y. 2009) ("courts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context"). In evaluating the parties' *in limine* motions here, this Court made the same point, noting that relevant evidentiary decisions "will be affected by how the proof actually comes out at a trial." 1/24/22 Tr. at 11:6-19.

Finally, the mandate did not preclude this Court from evaluating Bennet's testimony in the context of all the evidence presented at trial or, as Plaintiff suggests, require this Court to assume Bennet's testimony was not credible. *See, e.g.*, Pl. Mem. at 6 ("Requiring proof of actual malice as to defamatory meaning is indicative of the continued acceptance of Bennet's testimony that he made a mistake, contrary to the Mandate."). Instead, the panel simply held, as this Court acknowledged, that a court "cannot automatically credit this testimony." *See Palin v. N.Y. Times Co.*, 482 F. Supp. 3d 208, 218 (S.D.N.Y. 2020). The Court was free to consider Bennet's testimony, along with all of the other evidence presented at trial, to conclude that Plaintiff did not meet her burden of proof and judgment was required as a matter of law in Defendants' favor. And, indeed, a plaintiff must point to "concrete evidence from which a reasonable juror could return a verdict in h[er] favor" and cannot merely "assert that the jury might, and legally could, disbelieve the defendant's denial . . . of legal malice." *Contemp. Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 621-22 (2d Cir. 1988). As the Court concluded, Plaintiff failed to adduce any

evidence that contradicted Bennet's testimony or that was otherwise sufficient to show, clearly and convincingly, that he made the statements at issue with actual malice.  *See Palin v. N.Y. Times Co.*, No. 17 Civ. 4853 (JSR), 2022 U.S. Dist. LEXIS 36035, at *55-77 (S.D.N.Y. Mar. 1, 2022) (ECF 196, at 45-64 [hereinafter, "Op."]).

For these reasons, there is no basis in law or logic on which to grant Plaintiff a new trial based on any purported failure of this Court to follow the Second Circuit's mandate.

**B.      The Court's Jury Selection Process Ensured a Fair Jury**

Plaintiff's arguments about the Court's voir dire are frivolous.  The Court asked a number of targeted voir dire questions to ensure that potential jurors did not harbor biases toward either party such that they would be unable to decide the case fairly based on the evidence.  The process demonstrably worked, as the Court excused multiple panel members who expressed they could not serve impartially.  The Court did not make any error in jury selection, much less a significant error requiring a new trial.

District court judges have broad discretion in how they carry out jury selection.  *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981); *see also United States v. Millar*, 79 F.3d 338, 342 (2d Cir. 1996).  This discretion compensates for the "different goals" of court and counsel during voir dire: "The court wants a fair and impartial jury to be chosen and to move expeditiously to the presentation of evidence.  Counsel want a jury favorable to their cause – fair or not – and voir dire aids them in exercising peremptory challenges and challenges for cause." *United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002) ("The questioning of potential jurors on voir dire is . . .  quintessentially a matter for the discretion of trial courts.").  A district court, correspondingly, has "broad discretion whether to pose a [party's] requested voir dire questions." *United States v. Kyles*, 40 F.3d 519, 524 (2d Cir. 1994).

JA 2438

Plaintiff claims that the Court's "jury selection process did not sufficiently explore the venire's potential biases or prejudices." Pl. Mot. at 8. Yet, in the course of her argument, she acknowledges the Court's numerous attempts to do just that. *Id.* at 8-9 ("After providing an overview of the case, the Court asked the venire whether there was anything about the description that made them feel they could not serve as fair and impartial jurors, and whether they were exposed to media about this case, and, if so, whether they thought they would have a problem being fair and impartial."). Her argument falls far short of the high bar for reversal.

A trial court judge has such broad discretion in conducting voir dire that the Second Circuit noted in 2011, as it had in 2002, that it "appear[s] never to have reversed a conviction for the failure to ask a particular question on the voir dire of perspective jurors." *United States v. Treacy*, 639 F.3d 32, 46 (2d Cir. 2011); *Lawes*, 292 F.3d at 129 (stating same in 2002). Based on Defendants' research, this remains true today. Nonetheless, at least hypothetically,

> voir dire may be so insufficient as to call for a reversal, but the record viewed as a whole must show . . . a failure to inquire about, or warn against, a systematic or pervasive bias, including one that may be short-lived but existent at the time of trial, in the community that would have been cured by asking a question posed by a party.

*Lawes*, 292 F.3d at 129.

Plaintiff's primary complaint about the Court's jury selection process is that the Court did not ask her proposed voir dire questions about "the venire's sources for news . . . through which they were or could be exposed to extra-judicial information about the case." Pl. Mot. at 9. The Court did not ask Plaintiff's (or Defendants') proposed voir dire questions, nor did it ask the jurors for a digest of their news consumption. Instead, it asked simple and pointed venire questions, probing where appropriate, and it gave warnings sufficient to explore and caution against potential biases or prejudices. Voir Dire Tr. 15:8-13. The Court began the voir dire process by giving the venire a broad instruction about their role as potential jurors in the case:

9

> As you will hear in a minute, the parties in this case are well known,
> and some of you undoubtedly will have heard of one side or the other
> or both and will have perhaps views.  That is an irrelevancy.  What is
> central to every jury is the American sense of fair play.  Jurors, of
> course, have all sorts of views, but when they become jurors, they put
> aside any views they may have and calmly, coldly look at the facts and
> determine what the truth is in any given case.  So that is going to be
> your responsibility in this case as it has been the responsibility of
> every jury since our Constitution was created.

*Id.* at 3:19-4:5.  The Court then asked the following questions to ensure no potential juror would

be partial: (1) "is there anything about that general description that makes any of you nine feel

that you cannot serve as a fair and impartial juror" (no hands raised), *id.* at 4:20-22; (2) "do any

of you or any of your family own stock in or have any special relationship to *The New York*

*Times*" (no hands raised), *id.* at 8:10-12; (3) "do any of you . . . have any personal relations with

any [named potential witnesses]" (no hands raised), *id.* at 9:4-5; (4) "have any of you . . . heard

or seen anything about this case in the media" (several hands raised), *id.* at 9:6-7; (5) reacting to

the raised hands, "raise your hand again if you think you would have any problem being a fair

and impartial juror as opposed to being able to put that out of your mind and judging the case on

the facts" (one hand raised, juror dismissed for cause), *id.* at 9:7-10; and (6) "is there any other

reason that I haven't covered why any of the nine of you feel that you cannot serve as a fair and

impartial juror" (no hands raised), *id.* at 21:8-10.

Juror No. 6, the juror who raised their hand in response to question 5, told the Court: "I

don't like Sarah Palin.  I think she is a cruel person.  I don't like her, and I don't think I would be

fair to her listening to what she has to say."  *Id.* at 9:19-21.  The Court excused Juror No. 6 for

cause.  *Id.* at 9:19-10:14.  Shortly thereafter, Juror No. 3 was dismissed on a peremptory

challenge, and a new Juror No. 3 was called.  This juror informed the Court that, because of

knowledge about the case, they would "struggle to be impartial."  *Id.* at 16:22-18:19.  Just as

with Juror No. 6, the Court also excused Juror No. 3 for cause, *id.* at 18:20-19:3, and it

subsequently did the same with Juror No. 1, *id.* at 25:13-24.  In total, the Court dismissed three

potential jurors who informed the Court that they were biased or could not be impartial.[2]

Given the Court's questioning of the venire and the individual responses of panel

members, Plaintiff's assertion that "the jury selection process did not sufficiently explore the

venire's potential biases or prejudices" rings hollow.  The record establishes that the Court asked

more than sufficient questions "about . . .  systematic or pervasive bias."  *Lawes*, 292 F.3d at

129.  As described above, the Court firmly instructed the venire that, "[j]urors, of course, have

all sorts of views, but when they become jurors, they put aside any views they may have and

calmly, coldly look at the facts and determine what the truth is in any given case."  Voir Dire Tr.

3:24-4:2.  This warning was, in and of itself, an effective bias screening tool.  *Treacy*, 639 F.3d

at 39 ("[A] district court may find that warning a jury against an improper bias may be more

effective in some cases than inquiring about that bias." (citing *Lawes*, 292 F.3d at 129)).

The Court's voir dire was in no way deficient.  Rather, the Court asked questions

informed by its experience in conducting jury selection in more than 300 trials and that were

intended to secure "the fairest jury possible."  Voir Dire Tr. 26:24-27:8.  That the Court chose

not to ask Plaintiff's proposed questions is legally irrelevant in light of the fair process it

undertook.

C.      **The Court Properly Excluded Certain Evidence**

Plaintiff asserts that the Court erred in excluding evidence that she claims would support

a finding of actual malice, thus warranting a new trial.  This argument suffers from two

---

[2] The Court also had potential jurors disclose where they lived, their employment, and their
partner's employment.  *Id.* at 11:16-19.  One member of the venire informed the Court that their
partner previously worked at "Fox News Channel" where "I think [Palin] was a contributor."
Voir Dire Tr. 27:10-28:8.  This person told the Court "I feel that I will be fair and
nonjudgmental" and was not struck for cause.  *Id.*

**JA 2441**

problems. First, district courts have "broad discretion" over the admission of evidence. *United States v. Boles*, 914 F.3d 95, 109 (2d Cir. 2019) (quoting *United States v. Nektalov*, 461 F.3d 309, 318 (2d Cir. 2006)). Second, the Court gave Plaintiff ample opportunity to establish a foundation for the admission of this evidence. Plaintiff failed to do so—indeed, with respect to certain pieces of evidence, she did not even bother to try.

Prior to trial, Plaintiff tendered a lengthy list of proposed exhibits, many of which were objectionable on the grounds of relevance, undue prejudice, and hearsay. ECF 148 at 54-70. The inadmissible evidence included: (1) articles published by Atlantic Media while James Bennet was the editor of *The Atlantic*; (2) documents about the Bennet family and James Bennet's relationship with his brother, Senator Michael Bennet; and (3) exhibits related to other "controversies" that occurred at The Times long after June 2017.

Defendants moved in limine to exclude evidence regarding articles and blog posts published by Atlantic Media, an article Bennet was sent in 2011, and exhibits related to Senator Michael Bennet. ECF 136 (the "Atlantic/Sen. Bennet MIL").[3] As detailed in that motion, Defendants sought to exclude articles and blog posts published by Atlantic Media because Plaintiff's proposed exhibits were all published by the *Daily Dish* or the *Atlantic Wire* rather than by *The Atlantic* itself, and there was no evidence demonstrating that Bennet had actually read these pieces. *See id.* at 1-8. Defendants sought to exclude Plaintiff's proposed exhibits related to Senator Michael Bennet because the evidence was entirely irrelevant and unduly prejudicial. *See*

---

[3] Plaintiff identified an email Bennet received in 2011 (PX-57) containing a link to an article titled "How the Media Botched the Arizona Shooting" (PX-58) about the Loughner shooting. Defendants sought to exclude these exhibits. ECF 136 at 8. Though Plaintiff contends the Court erred by excluding these documents, Pl. Mem. at 10, at trial, Plaintiff never sought to admit them. Indeed, Plaintiff in her Memorandum fails to cite to any point in the record at which the Court made a decision excluding these exhibits, and offers no argument regarding the "error."

*id.* at 8-11.  Defendants also filed a motion in limine seeking to exclude evidence relating to other "controversies" that occurred at The Times, including the decision to eliminate the "Public Editor" position, on the same grounds.  ECF 138 (the "Other Controversies MIL") at 10. Plaintiff opposed both motions.  ECF 145, 147.

On January 24, 2022, the Court held a short hearing regarding these and other motions. The Court granted the Other Controversies MIL in its entirety pursuant to Rule 403 of the Federal Rules of Evidence.  1/24/22 Tr. 12:5-15.  The Court deferred ruling on the Atlantic/Sen. Bennet MIL.  *Id.* at 12:16-23.  However, over the ensuing trial days, the Court heard multiple arguments about content published by the *Daily Dish* or the *Atlantic Wire*.  Trial Tr. at 27:24-34:20, 332:19-333:8, 501:18-511:1.  The Court permitted Plaintiff to ask witnesses questions in an attempt to lay a proper evidentiary foundation.  Trial Tr. at 413:2-8 (Lepping), 504:5-11 (Court), and 615:25-621:6 (Bennet), and even offered Plaintiff opportunities to question Bennet outside the presence of the jury.  Trial Tr. at 13:24-14:9, 508:11-17.

After extensive argument, the Court concluded the Atlantic-related exhibits were inadmissible because there was no evidence whatsoever indicating that Bennet had read the articles in question.  Op. at 53 n.32.  The Court also correctly excluded exhibits related to Senator Bennet, finding that these exhibits were irrelevant, due to a lack of foundation, and unduly prejudicial.  *Id.* at 53 n.31.  Plaintiff now claims that both decisions were erroneous but makes no argument as to *why* the Court's decision about the exhibits related to Senator Bennet was incorrect.  Plaintiff also fails to make any argument about "evidence associated with the public editor."  Accordingly, Defendants respond here only to Plaintiff's arguments concerning Atlantic Media.

"A district court has 'broad discretion' over the admission of evidence."  *Boles*, 914 F.3d at 109.  The trial court receives significant deference in making these determinations because of

its "superior position to assess relevancy and to weigh the probative value of evidence against its

potential for unfair prejudice." *United States v. Abu-Jihaad*, 630 F.3d 102, 131 (2d Cir. 2010).

A district court abuses its discretion "only if the ruling was arbitrary and irrational." *United*

*States v. Perrotti*, 734 F. App'x 764, 768 (2d Cir. 2018). A party challenging a district court's

evidentiary rulings is generally entitled to a new trial only if (1) "the district court committed

errors that were a clear abuse of discretion," and (2) those errors "were clearly prejudicial to the

outcome of the trial, where prejudice is measured by assessing the error in light of the record as a

whole." *Vill. of Freeport v. Barrella*, 814 F.3d 594, 610 (2d Cir. 2016).

In excluding exhibits published by Atlantic Media, the Court did not make a decision that

was "arbitrary and irrational," and its decision was not "clearly prejudicial to the outcome of the

trial." In assessing the admissibility of this evidence, the Court focused on the important

distinction between content published by *The Atlantic* when Bennet was its editor versus content

published by other entities under the Atlantic Media corporate umbrella, which Bennet did not

directly oversee. Trial Tr. 325:20-24, 331:22-332:10. This distinction was critical. Whereas the

jury may have had a basis on which to conclude that Bennet read (or even edited) articles

published by *The Atlantic* under his watch, the same could not be said for articles published by

the *Daily Dish* or the *Atlantic Wire*. The evidence clearly showed that Bennet had little

involvement with content published by these two entities even though they fell under the Atlantic

Media umbrella. ECF 136 at 5. When asked by Plaintiff whether he had read any of these

articles, Bennet testified that he had no recollection of reading any. Trial Tr. 620:5-10.

Accordingly, the Court, over the course of multiple arguments on this point, focused on

whether Plaintiff had established an evidentiary foundation for admission of these exhibits. The

only relevant testimony Plaintiff was able to muster at trial was Bennet's recognition that he

considered "the Loughner shooting to be a big story," *id.* 620:17-19, but that he couldn't "recall

# JA 2444

a specific article" published about Loughner in *The Atlantic, Daily Dish, New York Times, Washington Post, Politico, Drudge Report, New Yorker, or The New York Review of Books*, among others, *id.* at 619:2-620:16.  This was consistent with the evidence Plaintiff produced in discovery.

Rule 104(b) of the Federal Rules of Evidence states that, "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."  *See United States v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021) (affirming district court's exclusion of statement on relevancy grounds where a party made only a "meager proffer" that failed to establish necessary foundational facts) (quoting *Huddleston v. United States*, 485 U.S. 681, 690 (1988) ("In determining whether [a party] has introduced sufficient evidence to meet Rule 104(b), . . . [t]he court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence.")); *Berger v. New York City Police Dep't*, No. 13 Civ. 6084 (VSB), 2019 U.S. Dist. LEXIS 219872, at *8-9 (S.D.N.Y. Dec. 19, 2019) (excluding "other employees' complaints" in an employment discrimination action where the link between complaints about other workplace conditions and the complained-of condition had not been established).  Here, the relevance of content published by the *Daily Dish* and *Atlantic Wire* depended on whether Bennet had actually read the content.  Despite multiple opportunities for Plaintiff to develop evidence in discovery and at trial, there was simply no evidence to establish that Bennet had ever read any of the Atlantic-related exhibits that Plaintiff sought to admit. Without such a foundation, the jury would simply be speculating as to whether Bennet had actually seen them.  Plaintiff could not clear this basic evidentiary hurdle.

Turning to the next question, there is no basis on which to conclude, and Plaintiff does not even argue, that the failure to admit these exhibits was "clearly prejudicial to the outcome of

the trial." *Barrella*, 814 F.3d at 610.  As a general matter, the evidence overwhelmingly

demonstrated that Defendants made an honest mistake.  Moreover, the admission of these

exhibits would not have provided to the jury any additional information that it did not already

have.  The jury had already heard from Ross Douthat that "people had jumped to the conclusion

that there was a connection, a political motivation for the [Giffords] shooting" but "subsequent

reporting had revealed that to be not the case . . . ."  Trial Tr. 825:6-17; *see also* PX-171

(Douthat emails Bennet after publication that there was "no evidence that Jared Lee Loughner

was incited by Sarah Palin").  Had the Court admitted the exhibits, the jury also would have

heard testimony from Bennet that he had no recollection of reading these exhibits.  Additionally,

Andrew Sullivan and Bennet would have both testified that Bennet had no knowledge or control

of content published by the *Daily Dish*.  ECF 136 at 4.  Accordingly, there is simply no basis on

which to conclude that Plaintiff was prejudiced and entitled to a new trial.

> ### D.     The Mid-Deliberation Instruction Was Not Erroneous

There is no error in the Court's response to the jury's question on February 15, 2022.

Contrary to Plaintiff's contention, the Court's "immediate response" was not to "give an

instruction misstating the law and dissuading a finding of actual malice."  *See* Pl. Mem. at 18.

Rather, the Court offered an initial suggestion, "off the top of [his] head," and then sought the

parties' input on the appropriate response.  Trial Tr. 1311-23.  Part of the Court's initial

suggestion was to inquire further of the jury about the nature of its concern, *id.* at 1311:14-17,

but the Court decided not to do so, after both Plaintiff and Defendants expressed concerns with

that suggestion, *id.* at 1319:3-19.  The Court also heard argument about the proposed response

for nearly half an hour, from 10:24 to 10:51 a.m.  *Id.* at 1311:1, 1320:19.  After a brief recess, the

Court returned with a written copy of its proposed response and heard further argument from the

parties on that draft.  *Id.* at 1320:22-1323:20.

JA 2446

The jury's note included two questions: whether a juror could draw an inference that Bennet doubted the truth of the challenged statement based on Bennet's response to a question posed by defense counsel, and whether such an inference can contribute to the evidence brought forth by the plaintiff. Pl. Mem. at 18; Trial Tr. at 1314:12-19. After considering arguments from both parties, the Court sent the jury the following instruction:

> In response to your first inquiry, you are free to draw any reasonable inference you choose to draw from any answer received in evidence, regardless of which side posed the question to which the answer was given.
>
> In response to your second inquiry, any answer given by Mr. Bennet and a reasonable inference drawn therefrom is not sufficient in itself to carry the plaintiff's burden of showing by clear and convincing evidence that there was a high probability that Mr. Bennet actually doubted the truth of a challenged statement prior to publication, but it can contribute to the other evidence brought forth by plaintiff.

Pl. Mem. at 19. Plaintiff objects to the second portion of the Court's response, but she does not propose any alternative language that she would view as having been acceptable. *Id.* at 18-19; Trial Tr. at 1320:1-18.

Plaintiff contends that the Court's response is contrary to its earlier instructions regarding circumstantial evidence, Pl. Mem. at 18, presumably referring to the statement that "[t]he law makes no distinction between direct and circumstantial evidence. … you may consider either or both, and may give them such weight as you conclude is warranted." *See id.* at 9 n.24; ECF 170 at 8.[4] While that instruction is true as a general matter, the Supreme Court has made clear that a circumstantial inference, alone, is insufficient to satisfy the clear and convincing standard required for proof of actual malice, and the Court's instruction was consistent with the law of

---

[4] Plaintiff also contends, in conclusory fashion, that the Court's response differs from the earlier instruction regarding actual malice, but she offers no explanation of this contention. *Id.*

17

actual malice. *See* Trial Tr. at 1321:21-1322:17; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff cannot prevail "without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of a conspiracy or of legal malice"); *Contemp. Mission*, 842 F.2d at 621-22 (same, quoting *Anderson*, 477 U.S. at 256); *Sweeney v. Prisoners' Legal Servs.*, 84 N.Y.2d 786, 793 (1995) ("Absent some direct evidence that defendants in this case were aware that Mays' complaint was probably false, they cannot be found to have harbored an intent to avoid the truth."). Plaintiff has not offered contrary authority, during trial or in her post-trial memorandum. Moreover, jury instructions must be read as a whole, and the Court's pre-deliberation instructions, which Plaintiff does not challenge and which the jury had in hand during deliberations, would resolve any arguable ambiguity in the mid-deliberation instruction. *See Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014) ("We will not require a new trial if the instructions, read as a whole, presented the issues to the jury in a fair and evenhanded manner." (internal marks and citation omitted)).

Plaintiff also contends that the instruction was in error because it "effectively instruct[ed] the jury to find a certain way or accept certain evidence," Pl. Mem. at 20, but the instruction only advised on the law and evidentiary burdens it imposes. Indeed, at the parties' suggestion, the Court decided against inquiring further into the jury's question and it therefore could not know what evidence was at issue, much less instruct the jury to make a particular finding regarding it. Plaintiff also argues that new trials are required where an instruction contains "errors that are so serious and flagrant that they threaten the integrity of the trial or deprive the jury of legal guidance," *id.*, but she offers no explanation as to how this instruction, which accurately states the law of actual malice, could possibly rise to that level. These conclusory contentions should be rejected.

### E. Certain Jurors' Exposure To "Push Notifications" Did Not Impact Their Deliberations, And The Court Properly Concluded The Jury Was Impartial

Plaintiff next argues that jurors' exposure to "push notifications" about the Court's intent to decide the case as a matter of law warrants vacatur and a new trial. *See* Pl. Mem. at 20-21. The exposure of certain jurors to a news headline that flashed on their cell phone did not prejudice the jury or render the verdict infirm.

On the afternoon of February 14, 2022, the Court expressed its intent to grant Defendants' motion for judgment as a matter of law. Trial Tr. 1298:22-25, 1299:11-15. Nevertheless, the Court allowed the jury to continue deliberating so "the Court of Appeals will have the benefit of both determinations before it when it views the inevitable appeal." *Id.* at 1306:2-4. Following this announcement, the Court asked the parties whether it should give the jury an "admonition about avoiding anything in the media." *Id.* at 1307:9-15. Plaintiff declined to ask for any such relief. *Id.* at 1307:9-18. Defendants, however, requested an additional warning to "make sure [the jury] is hypervigilant about not seeing anything." *Id.* at 1307:20-24. The Court agreed and gave the jury the following instruction:

> I need to remind you something that you've heard before, but just keep it in mind: If you see anything in the media about this case, just turn away. . . . But in any event, seriously though, do not look at anything regarding the case, don't discuss the case with anyone outside, etc.

*Id.* at 1308:7-25. This was consistent with the Court's instruction not to pay attention to outside media that the Court gave numerous times during the trial. *See, e.g.*, *id.* at 71:11-16 ("The key to being an American juror is to decide the case on the facts that you hear in the courtroom, not on some report or some view that some other person may express in the media."); *id.* at 1254:16-1255:13 (reading message that the Court sent jurors over the weekend, which stated in part: "It is your duty to remain focused solely on the evidence and arguments presented in the courtroom. Please avoid any media coverage of the trial.").

19

On February 15, 2022, the jury returned to court to continue deliberating.  That morning, at approximately 10:24 a.m., the jury asked the Court a question.  *Id.* at 1311:1-3.  After discussing the jury's note with the parties, the Court provided an answer to the jury at approximately 11:21 a.m.  *Id.* at 1323:19-21.  At approximately 2:28 p.m. the jury returned a defense verdict, *id.* Trial Tr. 1323:22, and each juror confirmed their agreement with the verdict, *id.* 1324:13-1325:13.  Following the verdict, the Court stated:

> As you leave the court, it is quite possible that you will be approached by reporters and other members of the media, because this case has been followed in the media.  I'm glad that you were free of all that coverage since you were instructed, and it's clear to me you followed, not to pay attention to that and to disregard it and turn away from it.  But here's the point.  It's up to you whether or not you want to talk to folks from the media. . . .
>
> I wanted to tell you one other thing.  Your job was to decide the facts, which you have now done.  My job is to decide the law, and I have concluded as a matter of law that the defendants are not liable too.  So we've reached the same bottom line.  And you'll probably hear about that if you get into the media.

*Id.* at 1325:14-1326:25.  Prior to being dismissed, no juror stated there had been any kind of irregularity during the deliberation process or that they had been subject to any undue influence.

After the jurors left the courtroom they met briefly with the Court's law clerk.  During this meeting, the purpose of which was to assess the efficacy of the jury instructions, a number of jurors said that, at the end of the day on February 14, 2022, they had involuntarily received "push notifications" – headlines that news apps flash on the face of subscribers' cell phones – that conveyed "the bottom-line of the Court's intended Rule 50 determination."  ECF 172 ("Push Notification Order"); Op. at 6-7, 37-38, 64-66.  These jurors "were adamant that this knowledge had not affected their determination of the verdict in the slightest," and they "insisted to the Court's law clerk that the information played no role whatsoever in their deliberations and did not affect the outcome."  Op. at 7, 65.  The jurors reportedly "did as instructed" and "turned

away from the reports and set the information aside for the remainder of the deliberation." *Id.* at 65. There is no indication whatsoever to the contrary.

Plaintiff nevertheless claims, without any legal support, that these jurors' minimal exposure to a news headline that flashed on their phones warrants a new trial. Pl. Mem. at 20-21. Plaintiff further criticizes the Court both for complimenting the jury as a "model jury," which the Court described as "carefully watching the witnesses, taking copious notes, and in general, showing that they intended to decide the case based solely on the evidence," and for commenting that the jurors who had seen the push notifications "were adamant that this knowledge had not affected their determination of the verdict in the slightest." *Id.* at 24; Op. at 7, 65-66 n.37.[5]

"A new trial will be granted only if the juror's ability to perform her duty impartially has been adversely affected . . . and [a party] has been substantially prejudiced as a result." *United States v. Ganias*, 755 F.3d 125, 132 (2d Cir. 2014) (internal marks and citations omitted); *see also Bagheri v. Bailey*, 713 F. App'x 141, 145 (4th Cir. 2017) ("Most importantly, each of these five jurors [who were exposed to media reports during the trial in a medical malpractice action] assured the district court that any information he or she heard had no effect on his or her ability to be fair and impartial and had not influenced his or her perception of the case."). "It is not an uncommon occurrence for a notorious trial held in Metropolitan New York to engender extensive publicity," and a juror's exposure to such publicity, though it should be avoided to the extent possible, does not automatically render a trial unfair. *United States v. Gaggi*, 811 F.2d 47,

---

[5] Plaintiff also deduces, without any evidence, that the jurors must have "received push notifications **throughout the trial**, which was the subject of intense press coverage, including articles with headlines that disparaged Plaintiff and her trial testimony." Pl. Mem. at 21 n.28. Nothing supports this assertion, as Plaintiff has not provided a single example of a potentially prejudicial push notification that was sent prior to February 14, 2022.

51 (2d Cir. 1987) (addressing how courts should handle exposure to publicity when it comes to light during a trial, while court is still in session).

The jury plainly was not prejudiced by certain members' exposure to news headlines that flashed on their cell phones. "The jurors, both those who reported awareness of the Rule 50 decision and the others, insisted to the Court's law clerk that the information played no role whatsoever in their deliberations and did not affect the outcome." Op. at 65; *see also* Push Notification Order, at 1-2 ("The jurors repeatedly assured the Court's law clerk that these notifications had not affected them in any way or played any role whatever in their deliberations."). And the jury's actions support this: At the time of the push notifications, they had already deliberated for two days, "so it is reasonable to expect that the jurors were well-informed about the evidence set forth at trial and about the different theories of the case" by then. *United States v. Lloyd*, 269 F.3d 228, 240 (3d Cir. 2001). Additionally, the day after the push notifications, the jury deliberated for another five hours before rendering a verdict of "not liable," which they each independently confirmed without hesitation. *See Gaggi*, 811 F.2d 47 at 53 (agreeing with the district court "that the jury's ability to render an impartial verdict is confirmed by the care which it took in its deliberations" and stating that the record "reveals both an impartial and meticulous jury").

The Court repeatedly instructed the jury to ignore media reports and base its verdict only on the evidence received at trial. *See, e.g.*, Trial Tr. at 71:11-16; *id.* at 1254:16-1255:13. It is an "almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *accord Britt v. Garcia*, 457 F.3d 264, 272 (2d Cir. 2006) (same); *United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989) ("In the absence of evidence to the contrary, we will presume the jury followed these admonitions and avoided exposure to news reports about the trial."). Despite some jurors being exposed to the push

notifications, there is no suggestion anywhere in the record that they failed to follow the Court's instructions to ignore media reports and decided the case on anything other than the evidence presented in Court. *See Skilling v. United States*, 561 U.S. 358, 399 n.34 (2010) ("News coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates. And it is a premise of that system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented.").

The Court did not err in concluding the jury's verdict was free from undue prejudice. When jurors are exposed to media coverage the Court properly may "ascertain how much [jurors] know" of publicity related to a high-profile trial and "what effect, if any" it had on a juror's "ability to decide the case fairly." *Gaggi*, 811 F.2d at 51.[6] Here, the Court appropriately discussed with each of the jurors whether certain jurors' exposure to the push notifications played any role in their deliberations, and all "insisted" that it had not. Op. at 65. The Court also considered the "special facts" of this case, including the jurors' attentive conduct throughout the proceedings, *id.* at 65-66 n.37, and the Court's instructions regarding "their duty to disregard anything they heard about the case in the media," *id.*; *Gaggi*, 811 F.2d at 51. The Court properly exercised its broad discretion when it concluded, with full confidence and no reason for doubt, that the jury rendered its decision impartially. *Gaggi*, 811 F.2d at 51 ("Absent a clear abuse of the trial court's discretion, its finding that the jury was impartial should be upheld.").

---

[6] Plaintiff claims that Rule 606(b) of the Federal Rules of Evidence "prohibits the disclosure of 'the effect of anything on [a] juror's or another juror's vote.'" Pl. Mem. at 24 (citing *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994) (per curiam)). Plaintiff ignores that Rule 606(b)(2) explicitly provides that the court may obtain information about "extraneous prejudicial information" brought to the jury's attention. *United States v. Vera*, 362 F. App'x 199, 200 (2d Cir. 2010). The Court acted well within its discretion in the manner and degree of its questioning.

**JA 2453**

Even in far more extreme cases, where a jury actually discussed prejudicial evidence that was not in the record during its deliberations, the Second Circuit has held that the verdict must stand. *See, e.g.*, *Bibbins*, 21 F.3d at 14, 16-17 (upholding jury's verdict where juror shared that she lived in the neighborhood of the drug transaction at issue and there was little foot traffic, thus making "the street identification of the defendant more compelling"); *United States v. Calbas*, 821 F.2d 887, 894-95 (2d Cir. 1987) (holding that, where juror consulted a telephone directory to determine information about the defendant's address(es), and discussed her findings with other jurors, a new trial was not warranted). The circumstances presented here do not warrant a new trial or any manner of further attention. *Cf. Bibbins*, 21 F.3d at 17 (holding that jury's exposure to extra-record evidence did not warrant a new trial).

### F. The Court's Post-Verdict Statement To The Press Does Not Warrant A New Trial

Plaintiff contends that the Court's innocuous comment to Bloomberg on February 16, 2022, after the jury verdict and after the Court granted Defendants' Rule 50 motion, warrants a new trial. However, Plaintiff cites no case law supporting this contention. Instead, Plaintiff's complaint seems to be that the Court made the comment to Bloomberg before informing the parties. Pl. Mem. at 23. Defendants respond to Plaintiff's claim that this is evidence of bias in Section V.A.2 *infra*, but briefly explain here why this affords no basis for a new trial.

There is no evidence the Court had any "communications with the media during trial." 2/24/22 Tr. at 2:25-3:3. Rather, the morning *after* the Court entered judgment, a Bloomberg reporter contacted the Court with an urgent message and the Court responded to that message. *Id.* at 3:6-10. The reporter asked the Court about the "push notifications that the jurors had told [his] law clerk about." *Id.* at 3:10-12. The Court had already begun to explore this issue and the Court gave the reporter "a very short statement so that if his story appeared before the order that

24

[he] was already undertaking a draft, there would be no misunderstandings." *Id.* at 3:14-16.

The Court's statement to Bloomberg does not reveal any improprieties during trial or suggest that Plaintiff received an unfair trial. Rather, the Court's statement was limited to the news that some jurors had received push notifications about the Court's Rule 50 determination:

> "I'm disappointed that the jurors even got these messages, if they did," Rakoff said in an interview, referring to the news notifications. "I continue to think it was the right way to handle things."
>
> * * *
>
> When Rakoff was informed of that information by Bloomberg on Wednesday, he said he spoke to his clerk.
>
> The judge said he was told "at most three" jurors reported knowing about his ruling before delivering their verdict, and all said it didn't affect their deliberations.

Pl. Mem. at Ex. 4 (Bloomberg article, "Palin Jurors Knew Judge Dismissed Times Case Before Verdict"). The Court included substantively the same information in the Push Notification Order, which the Court issued shortly after Bloomberg published the story. 2/24/22 Tr. at 3:16-20 (stating that the Order was published "approximately five minutes" after the Bloomberg story); Pl. Mem. at 21-22 (stating that it was published 52 minutes after the Bloomberg story).

Plaintiff fails to cite any precedent, much less a case that supports her contention that this innocuous post-trial comment warrants a new trial. This is for good reason. Defendants could find no legal authority that supports Plaintiff's argument. Moreover, it would require an extreme scenario, such as public comments calling into question the fairness of the entire trial, to warrant vacatur. The Court's comment to Bloomberg certainly does not rise to that level, and Plaintiff suffered no prejudice from the brief delay between the time the Court spoke to Bloomberg and its issuance of the Push Notification Order.

**G.** **The Court's Entry Of Judgment For Defendants Pursuant To Rule 50 Is Supported By The Law And The Evidence Actually Of Record**

In addition to challenging the jury's verdict, Plaintiff argues that the Court incorrectly granted judgment to Defendants as a matter of law pursuant to Rule 50. She takes issue with the timing of the Court's announcement of its intended ruling, argues that the Court was precluded by the Second Circuit's mandate and the Court's own order on summary judgment from granting judgment as a matter of law to Defendants, and contends that the Court improperly made credibility determinations or ignored evidence that, in Plaintiff's view, requires a different outcome. None of these arguments has merit, and Plaintiff is not entitled to a new trial.

**1.** **The Court's ruling was procedurally correct**

Plaintiff first argues that the Court's announcement of its intended ruling on Defendants' motion pursuant to Rule 50(a) while the jury was still deliberating was procedurally improper. Pl. Mem. at 12-17. However, the timing of the announcement of the ruling was both consistent with guidance from the Second Circuit and in keeping with the Court's past practice.

The Second Circuit has long advised that, even where trial judges are inclined to grant judgment as a matter of law, they generally should wait until the close of evidence, allow the jury to reach a verdict, and *then* rule pursuant to Rule 50(b), rather than dismissing the jury sooner pursuant to Rule 50(a), to avoid the cost and expense of retrying a case if the appellate court were to reverse the ruling. *Mattivi v. S. African Marine Corp.*, 618 F.2d 163, 166 n.2 (2d Cir. 1980) ("it is in the best interests of efficient judicial administration for the trial judge to refrain from considering a motion for a directed verdict in favor of deciding a motion for judgment n.o.v." (citing 9 Wright & Miller, *Federal Practice & Procedure* § 2533, at 585-86 (1971)); *Konik v. Champlain Valley Physicians Hosp. Med. Ctr.*, 733 F.2d 1007, 1013 n.4 (2d Cir. 1984) (it is preferable to "allow the case to be decided—at least in the first instance—by the

26

jury," so that "[i]f this ruling is reversed on appeal, the jury's verdict may simply be

reinstated").[7]

The Court followed the Second Circuit's direction, allowing the jury to deliberate and

ultimately converting Defendants' Rule 50(a) motion to a Rule 50(b) motion after the jury

verdict. As the Court succinctly explained:

> At that point, the Court could have simply entered final judgment in defendants' favor and dismissed the jury. Instead, however, the Court, while announcing its decision [to the parties while the jurors deliberated], explained that it would allow the jury to continue its deliberations, so that, if the Court of Appeals were to disagree with the Court's determination to dismiss the case as a matter of law, the appellate court would not have to send the case back for trial, since it would have the benefit of the jury's verdict. Moreover, as a technical matter, the Court could then issue its Rule 50 judgment, post-verdict, pursuant to Rule 50(b).

Op. at 4.

Plaintiff argues that this is contrary to *Unitherm Food Systems v. Swift-Eckrich, Inc.*, 546

U.S. 394, 406 (2006), suggesting that the Supreme Court there advised trial courts not to grant

judgment as a matter of law at all. *See* Pl. Mem. at 15. Insofar as that case relates to judgment

as a matter of law, however, the Supreme Court offered the same advice as the Second Circuit—

that trial courts generally should allow the case to go to the jury first, so that, "if the appellate

court holds that the trial court was in error in its appraisal of the evidence, it can reverse and

order judgment on the verdict of the jury, without any need for a new trial." *Unitherm*, 546 U.S.

at 406 (quoting 9A Wright & Miller, Federal Practice & Procedure § 2533, at 319 (2d ed. 1995)).

---

[7] *See also, e.g., Williams v. Cnty. of Westchester*, 171 F.3d 98, 102 (2d Cir. 1999) (advising courts to allow jury to reach a verdict even when ruling as a matter of law so that, "if that ruling is reversed on appeal, the case may be efficiently concluded by reinstatement of the jury's verdict, without the need to hold an entire new trial"); *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 132 (E.D.N.Y. 1998) (declining to follow *Konik* where one-day trial did not require "sift[ing] through the record before ruling" but noting that "where that is necessary, the argument that the trial judge should charge the jury and let it deliberate in the meantime is stronger").

Presumably, Plaintiff's real objection is to the Court's decision to advise the parties of its intended ruling while the jury was still deliberating. However, the Court has followed this same procedure previously, including in a case in which the judgment for defendants was affirmed by the Second Circuit. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 282 (2d Cir. 1998) (affirming judgment as matter of law for defendants that was "indicated" during deliberations but not entered until jury returned verdict in plaintiff's favor and stating this followed "prior observations" about how to grant judgment as matter of law). *See also Hill v. Novartis Pharms. Corp.*, No. 1:06-cv-00939-JSR-SAB, ECF 194 (E.D. Cal. Jun. 26, 2013).[8]

Before announcing its intended ruling to the parties, the Court explained that it was going to do so out of fairness to all parties. Trial Tr. 1298:8-14. Plaintiff did not object to the Court proceeding in that way. Trial Tr. 1298-99; *see also* Op. at 34-36. Plaintiff now makes the novel argument that, in recognizing that Plaintiff had sufficiently preserved her substantive objections after asserting them across several days of argument, the Court preserved "*ALL* of Plaintiff's objections," raised or un-raised. Pl. Mem. at 17. The Court correctly rejected this argument, because "there was no prior objection to the procedural aspects of the Court's action that the Court could have recognized as reasserted," Op. at 36 n.21, and Plaintiff has not pointed to any law that would support her contention that this was error.

---

[8] In *Galdieri-Ambrosini*, the Second Circuit said that it had found "several of the procedural aspects of this case troubling," but the advance announcement by the Court of its intention to rule as a matter of law for defendants is not among the enumerated concerns. 136 F.3d at 285.

### 2. The Court correctly ruled that Plaintiff had not adduced clear and convincing evidence of actual malice as to falsity

Plaintiff does not meaningfully dispute the law governing the Court's Rule 50 decision.[9] She does not deny that, in order to prevail, she was required to prove actual malice – that is, "that Bennet and the Times published the Editorial 'with knowledge that it was false or with reckless regard of whether it was false or not'" – and that she was required to do so by clear and convincing evidence. Op. at 41 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)).

Plaintiff does not dispute the Court's observation that she "was not seriously contending that Bennet published the Editorial with actual knowledge that the Challenged Statements were false," and that instead, Plaintiff had sought to establish actual malice only "by virtue of reckless disregard," *id.* at 42, nor does she contradict the Court's summary of the law on that point:

---

[9] Plaintiff questions the application of New York's Anti-SLAPP statute, Pl. Mem. at 1, 12 n.14, and the requirement that she also prove actual malice as to defamatory meaning, *id.* at 1, but the Court's ruling that Plaintiff failed, as a matter of law, to prove actual malice as to falsity did not turn on either of these points. *See* Op. at 32 (summarizing prior ruling that actual malice is required under both the First Amendment and New York law); *id.* at 41 n.26 (denying Defendants' Rule 50 motion as to awareness of defamatory meaning as moot). Plaintiff never actually explains why the Court's decision to apply New York's Anti-SLAPP statute retroactively was erroneous, justifies a new trial, or demonstrates bias. Plaintiff simply contends, in passing, that applying the law retroactively "was recently called into question." *See* Pl. Mem. at 12 n.14 (citing *Gottwald v. Sebert*, 2022 NY Slip Op 01515, ¶ 2 (1st Dep't March 10, 2022)). While the First Department, in *Gottwald*, ruled that the amendment was not retroactive, *see* 2022 NY Slip Op 01515, ¶ 3, the overwhelming majority of courts to consider this question have agreed with this Court's reasoning and ruled that the 2020 amendments apply to pending actions. *See, e.g., Coleman v. Grand*, 523 F, Supp. 3d 244, 257-59 (E.D.N.Y. 2021), *appeal pending,* No. 21-800 (2d Cir.); *Sweigert v. Goodman*, No. 18 Civ. 8653 (VEC) (SDA), 2021 U.S. Dist. LEXIS 77704, at *4-5 (S.D.N.Y. Apr. 22, 2021); *Kesner v. Buhl*, No. 20 Civ. 3454 (PAE), 2022 U.S. Dist. LEXIS 43094, at *26 (S.D.N.Y. Mar. 10, 2022); *NOVAGOLD Res., Inc. v. J Capital Rsch. USA LLC*, No. 20 Civ. 2875 (LDH) (PK), 2022 U.S. Dist. LEXIS 55734, at *25 (E.D.N.Y. Mar. 28, 2022); *Sackler v. ABC*, 71 Misc. 3d 693, 698 (Sup. Ct. N.Y. Cnty. 2021); *Massa Constr. v. Meaney*, No. 126837/2020, slip op. (NYSCEF Doc. 92) at 2 (Sup. Ct. Ontario Cnty. May 13, 2021); *Great Wall Med. P.C. v. Levine*, No. 157517/2017, 2022 N.Y. Misc. LEXIS 988, at *2 (Sup. Ct. N.Y. Cnty. Mar. 8, 2022); *but see Zuckerbrot v. Lande*, No. 655110/2020, 2022 N.Y. Misc. LEXIS 929, at *30-31, *52 (Sup. Ct. N.Y. Cnty. Mar. 17, 2022).

> The cornerstone of the reckless disregard standard for actual malice is that the plaintiff must prove by clear and convincing evidence, that the "defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). And, as the New York Court of Appeals has explained, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action." *Liberman v. Gelstein*, 80 N.Y.2d 429, 438 (1992).

*Id.*; *see generally id.* at 39-43.

Similarly, Plaintiff does not contend that the Court erred in applying the clear and convincing standard in evaluating whether Plaintiff had satisfied her burden of establishing actual malice. Op. 43-44; Pl. Mem. at 13; *Anderson*, 477 U.S. at 252 ("where the First Amendment mandates a 'clear and convincing' standard, the trial judge in disposing of a directed verdict motion should consider whether a reasonable factfinder could conclude, for example, that the plaintiff had shown actual malice with convincing clarity"). Plaintiff argues only that the Court erred in departing from earlier rulings in this case or in its application of the relevant standard to the evidence at trial. Both of Plaintiff's arguments fail.

### a. The Court's evaluation of evidence did not violate the mandate or the summary judgment order

Plaintiff contends that the Court, in evaluating the evidence at trial, was bound by the Second Circuit's mandate and the Court's own summary judgment ruling. *See* Pl. Mem. at 25, 26 n.34, 28 n.44, 29 n.45. As explained above in Section IV.A, however, nothing in the Second Circuit's analysis of the plausibility of the factual allegations in the Amended Complaint precluded this Court from ruling on Defendants' motion for judgment as a matter of law after trial. Similarly, the Court's rulings on evidence presented at summary judgment are not binding on the Court's analysis of the evidence introduced at trial. *See Williams*, 171 F.3d at 102 (rejecting argument that trial court was precluded from ruling for defendants under Rule 50 after

previously denying defendants' motion for summary judgment); *Anderson*, 477 U.S. at 251 ("summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted").

Indeed, it would be illogical here for the Court's summary judgment decision to tie the Court's hands on a motion following trial because much of the evidence that the Court relied on at summary judgment was inconsistent with the trial evidence. Plaintiff argued that Bennet "ignored articles brought to his attention that were inconsistent with his angle," Pl. Mem. at 25, but trial testimony showed that only a handful of articles or editorials were brought to Bennet's attention and "none presents any definitive facts about the Arizona shooting that would have put Bennet on notice (or led him to strongly suspect) that no link had been established," Op. at 46. Similarly, Plaintiff insists that Bennet "disregarded the results [of] the Williamson research that he commissioned," Pl. Mem. at 25 (quoting ECF 117 at 34), but Williamson's undisputed testimony at trial showed that she did not conduct any research into Loughner's motivations until Bennet asked that she do so the morning *after* publication. *See e.g.*, Trial Tr. 253:4-7 (Q: "Did you do any research on June 14 at all into whether Jared Loughner had seen any type of political rhetoric or political incitement?" A: "No, I did not."); *see also id.* at 174:4-12, 283:22-284:2.

### b.    The Court did not make improper credibility determinations

Plaintiff argues that the Court improperly "credited" Bennet's testimony as a general matter. Pl. Mem. at 24. However, the Court correctly applied Rule 50, drawing reasonable inferences in Plaintiff's favor but adopting testimony where Plaintiff had not adduced any concrete evidence to the contrary. *See* Op. at 50-51, 53 n.31, 57. That is precisely what the law requires the Court to do. *E.g.*, *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000) (citing Fed. R. Civ. P. 50(a)). The Rule 50 standard does not require that the Court adopt

inferences that are unreasonable or unsupported by the evidence in the record. *Williams*, 171 F.3d at 101 (judgment is appropriate where "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture"); *Contemp. Mission*, 842 F.2d at 622-23 ("bare assertions" that a reporter "intentionally distorted and manipulated the truth in order to blacken appellants' reputations" were "not sufficient to establish a triable issue of actual malice").

Nor does the standard require that the Court assume jurors will disbelieve uncontested testimony. To the contrary, the clear and convincing standard for actual malice requires that the plaintiff offer "concrete evidence from which a reasonable juror could return a verdict in [her] favor," which requires more than the mere assertion that the jury might disbelieve the defendant. *Contemp. Mission*, 842 F.2d at 621-22; *Anderson*, 477 U.S. at 256 (same).

More specifically, Plaintiff contends that the Court erred when it improperly "credited" Bennet's testimony that (1) he did not open the hyperlink at the word "circulated" or read the ABC article available through that link, Pl. Mem. at 16; (2) his request that Williamson "please take a look" meant for her to fact check his draft, *id.*; or (3) he did not have a specific recollection of any 2011 articles about the Arizona shooting while revising the Editorial in 2017, *id.* at 27. But even now, Plaintiff fails to point to any concrete evidence calling this testimony into question. She offers no evidence to contradict Bennet's testimony that he did not click on the hyperlink. *See* Pl. Mem. at 30 n.48; Op. at 50. As to Bennet's email to Williamson, Plaintiff points to Williamson's testimony that Bennet was also responsible for his edits or that the email did not "specifically ask [her] to fact-check anything," Pl. Mem. at 30 – but this speaks only to Williamson's understanding of the email, not to Bennet's subjective intent in sending it. *See also* Trial Tr. at 577:2-22 (Cohn testified she sent Williamson Bennet's edits so she could "get back to us if there were any [factual or tonal] issues or problems with it"). And despite the

32

Court's offer to Plaintiff to question Bennet outside the presence of the jury about his memory of the 2011 articles she theorized that he might have read, "plaintiff's counsel never elicited any testimony or proffered any other evidence that Bennet had in fact read the articles in question." Op. at 53-54 n.32.[10]

At bottom, the Court's Opinion demonstrates that it did not blindly "credit" Bennet's testimony, but rather, it conducted a thorough review of the record and determined that Plaintiff had not adduced any evidence to call the relevant portions of his testimony into question or that would even suggest that Bennet or The Times was "aware, at the time 'America's Lethal Politics' was published, that the hypothesized link between her crosshairs map and Loughner's attack had been widely rejected." Op. at 57.

> ### c.    Plaintiff has not identified any evidence that would suffice to prove actual malice

Plaintiff also identifies several pieces of purported evidence that she contends should have caused the Court to deny the Rule 50 motion, primarily: an out-of-context quotation from Bennet's testimony, the ABC article hyperlinked in the Editorial, and three editorials or opinion pieces sent to Bennet on June 14, 2017. Pl. Mem. at 13, 28-29. The Court, however, properly considered and rejected this evidence in its Opinion.

**Bennet's Testimony.** Plaintiff contends that the Court "disregards Bennet's glaring admission of actual knowledge of falsity," namely, a statement that "I didn't think then and don't think now that the map caused Jared Loughner to act." Pl. Mem. at 13, 27 (citing Trial Tr. at

---

[10] Plaintiff also argues that the Court should doubt Bennet's credibility because he thought that The Times had a policy against apologizing and Hanna Ingber was not aware of such a policy. Pl. Mem. at 34. As the Court correctly noted, this is not relevant to the issues at hand. Op. at 30 n.17. Nothing in the record suggests that Ingber was involved in Bennet's email exchanges with Rhoades-Ha or any discussions of apologizing personally to Plaintiff, so any difference in their understanding is irrelevant.

721:5-6).  Plaintiff takes this statement out of context.  In full, Bennet testified:

> I was functioning as the editor, not the reporter on the piece, so I wouldn't normally do the reporting in a situation like this, particularly when we were on a tight deadline.  But also I didn't, I didn't think – I wouldn't have thought it was – I didn't think then and don't think now that the map caused Jared Loughner to act.  I didn't think we were saying that, and therefore I wouldn't have – the question wouldn't have entered my mind, didn't enter my mind to research that question.

Trial Tr. at 721:1-9.  Far from ignoring the testimony, the Court expressly rejected Plaintiff's argument, finding that this uncontradicted statement, taken in context, "explain[s] that because Bennet did not intend to convey that the crosshairs map directly caused Loughner to act, he therefore did not consider the need to research the veracity of that assertion."  Op. at 55.

Even if the Court were to credit Plaintiff's unsupported theory that this was a smoking-gun-style admission by Bennet that he did not know whether his statements were true, it would be insufficient to prove actual malice.  As the Court correctly explained, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false.  Only the latter establishes reckless disregard in a defamation action."  Op. at 62 (quoting *Liberman*, 80 N.Y.2d at 438).  Nothing in Bennet's testimony suggests that he "knew or suspected that there existed any official or widely accepted conclusion that no link whatsoever existed between Loughner's attack and the map."  Op. at 55.[11]

---

[11] Plaintiff also points to a passage in the Opinion where the Court assumed that "Bennet either intended his edits to Williamson's draft to covey that the crosshairs map played a causal role in spurring Loughner to commit the Arizona shooting or at least that Bennet recklessly disregarded the defamatory meaning."  Pl. Mem. at 13 n.15 (citing Op. at 45-46).  The statement is plainly an assumption for the sake of argument, not an evidentiary ruling, as the Court expressly declined to rule on the issue of Bennet's awareness of defamatory meaning, explaining that it ruled on awareness of falsity and therefore "did not address" "actual malice concerning defamatory meaning," denying that branch of Defendants' Rule 50 motion as moot.  Op. at 41 n.26.

***Prior Editorials.***  Plaintiff argues the Court improperly "took a one-sided view" of several past editorials that Times employees sent to Bennet on June 14, arguing that the Court "disregards several statements … that flatly refute Bennet's preconceived narrative."  Pl. Mem. at 28.  Here, too, the Court considered this evidence, but simply found that it did not support Plaintiff's argument.  The Court accepted Plaintiff's proffered inference that Bennet had read and understood the pieces, and the Court then considered in detail the contents of each of those pieces.  Op. at 46-49.  As the Court correctly observed, "even on the assumption that Bennet read and understood these three articles in their entirety, none presents any definitive facts about the Arizona shooting that would have put Bennet on notice (or led him to strongly suspect) that no link had been established between the crosshairs map and Loughner's attack."  *Id.* at 46.  The Court correctly determined that these pieces offer opinions and arguments about the correct response or assignment of blame in the wake of shootings, but none "presents any facts that contradict the facts asserted in the Challenged Statements" such that they would establish actual malice.  *Id.* at 49.[12]

***ABC Article.***  Bennet testified that he did not click on the hyperlink Williamson had inserted at the word "circulated" in her draft and did not read the article to which that link led.  Trial Tr. at 609:15-610:4.  Plaintiff has cited no evidence to the contrary, relying instead on the Court's ruling at summary judgment that "a jury might discredit [Bennet's] testimony."  Pl. Mem. at 8 n.7 (quoting ECF 117 at 32-33); *see* Op. at 50 ("Palin has adduced no affirmative evidence to undermine Bennet's testimony on this point.").  Plaintiff's hope that a jury might not

---

[12] Plaintiff argues that the Court should discredit Bennet's testimony because, in 2017, he testified that he did not recall whether he read these prior editorials, and at trial he testified that he did read them.  Pl. Mem. at 33-34.  But as Bennet explained at trial, he could not recall in 2017 whether he had read them, but, after reviewing his email describing them as "more relevant precedent," he was able to determine that he had read them.  Trial Tr. 608:13-24.

believe Bennet is insufficient as a matter of law to meet her burden, *Contemp. Mission*, 842 F.2d at 621-22, and, as the Court noted, even if Bennet's testimony were in dispute, the mere possibility that he read the article is not proof that he read to the tenth paragraph and understood the statement there that – one day after the shooting – no connection between Loughner and the Map had been found to be dispositive proof that no connection was *ever* made. Op. at 50 n.28.

Inconsistently, Plaintiff also argued that Bennet's failure to read the ABC Article constitutes a reckless disregard for the truth. Op. at 50-51 (noting change in Plaintiff's position at argument). The Court correctly ruled that there was no evidence to suggest that Bennet *should* have checked the hyperlink. *Id.* at 51.[13] And even if there were any such evidence, it still would not satisfy Plaintiff's burden of proof, because nothing suggests that Bennet had "the subjective awareness of (probable) falsity that is the *sine qua non* of actual malice." Op. at 51 (citing *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 666 (1989)); *see also Sweeney*, 84 N.Y.2d at 793 ("Failure to investigate . . . , standing alone, is not enough to prove actual malice even if a prudent person would have investigated before publishing the statement" (citing *St. Amant*, 390 U.S. at 731, 733)).

None of the other theories advanced by Plaintiff in her Memorandum demonstrates an error in the Court's ruling. Plaintiff argues, for example, that Bennett's contemporaneous statements to Douthat, Williamson, or Lepping suggest that he was trying to "cover for himself and pass blame on those around him." Pl. Mem. at 31-32. But Plaintiff cites no evidence at trial

---

[13] Plaintiff did not offer any evidence to suggest this was required of an editor revising a draft. The record reflects that both Williamson and Lepping checked the hyperlink and reviewed the ABC article while drafting and fact-checking and neither saw an issue. *See* Op. at 50; Trial Tr. at 144-46, 265-67, 422-24. "Even taking every inference in Palin's favor, Bennet's compliance with these normal pre-publication procedures is consistent with the behavior of a high-ranking editor who is somewhat removed from the reporting details underlying the piece." Op. at 59.

that would support this theory, and Williamson's testimony that he was "crestfallen" on June 15th reinforces his testimony.  *See* Op. at 63 (quoting Trial Tr. at 183:3-9).  Instead, Plaintiff relies on the possibility that the jury might disbelieve Bennet's undisputed testimony, the testimony of Douthat and Williamson, *see* Trial Tr. at 280:12-17; 282:10-15; 849:11-19, and the statements themselves.  Additionally, the decision not to include Plaintiff's name in the correction (made by Cohn, not Bennet, Tr. at 554:11-18) occurred after publication of the Editorial and has no connection to Bennet's individual state of mind on June 14, 2017.  *See* Pl. Mem at 32 (relying on summary judgment order); *Contemp. Mission*, 842 F.2d at 621 (requiring proof that defendant had actual knowledge of falsehood or "subjective awareness of probable falsity" at time of publication).  In short, Plaintiff has not identified any evidence overlooked or improperly evaluated by the Court that would require it to reconsider its Rule 50 decision.

### 3. The Court could have granted the Rule 50 motion for failure to prove actual malice as to awareness of defamatory meaning

Even if the Court were inclined to revisit its Rule 50 ruling—and for all the foregoing reasons it should not—the Court should reaffirm its judgment in favor of Defendants on the alternative ground that, as a matter of law, Plaintiff failed to prove actual malice with respect to awareness of the alleged defamatory meaning.  *See* Op. at 50 (denying this branch of Defendants' motion as moot in light of ruling on actual malice as to falsity).[14]

Plaintiff failed to show that Bennet was aware that his words would convey to the average reader the defamatory meaning that she alleges the Editorial conveys, namely that "Palin was clearly and directly responsible for inciting a mass shooting at a political event in January

---

[14] Plaintiff baldly asserts that the Court's ruling that she must prove "actual malice as to defamatory *meaning* was also erroneous because it was based on non-binding defamation by implication cases," Pl. Mem. at 6 n.4, but she offers no case law to support this argument and does not elaborate further on it.

2011." Am. Compl. ¶ 1. Bennet testified unequivocally that he did not intend to suggest that the

Crosshairs Map directly caused Loughner to act in the Arizona Shooting, Trial Tr. 731:4-22, and

that it came as a surprise to him that some readers interpreted his words in that way, *id.* 730:8-11,

731:15-22, 743:8-16. Plaintiff did not introduce any evidence to the contrary. Thus, judgment

as a matter of law is proper on this ground as well. *See* Trial Tr. 1286:14-1288:3 (Defendants'

oral argument regarding actual malice as to awareness of defamatory meaning); ECF 174, Ex. B

(case citations submitted by counsel for both parties pertaining to Rule 50 arguments on actual

malice, including as to awareness of defamatory meaning).

## V.   DISQUALIFICATION IS NOT WARRANTED

Plaintiff demands this Court recuse itself pursuant to 28 U.S.C. § 455(a). Because she

fails to demonstrate any ground for an objective observer to doubt the Court's impartiality, this

motion must be denied.[15]

### A.   Plaintiff Has Failed To Meet Her Burden To Show This Court's Impartiality Would Be Doubted

"In deciding whether to recuse himself, the trial judge must carefully weigh the policy of

promoting public confidence in the judiciary against the possibility that those questioning his

impartiality might be seeking to avoid the adverse consequences of his presiding over their

case." *In re Drexel Burnham Lambert Inc*., 861 F.2d 1307, 1312 (2d Cir. 1988). Indeed, a

"judge is as much obliged not to recuse himself when it is not called for as he is obliged to when

it is." *Id.* Therefore, "where the standards governing disqualification have not been met,

---

[15] Plaintiff suggests that this Court should rule on the recusal issue before ruling on her other post-trial motions, *see* Pl. Mem. at 1, and has previously suggested the Court should also delay its consideration of those motions pending a mandamus petition if the recusal motion is denied. However, the Second Circuit has ordered that Plaintiff's petition be "held in abeyance pending the district court's resolution of Petitioner's post-trial motion." ECF 200.

disqualification is not optional; rather, it is prohibited." *Aguinda v. Texaco*, 241 F.3d 194, 201

(2d Cir. 2001).

### 1. Plaintiff's disagreement with this Court's decisions is not a basis for recusal

The law is well-settled that adverse rulings do not present appropriate grounds for

recusal. Under Section 455, the "alleged prejudice of the trial judge must be extrajudicial, . . . it

must arise by virtue of some factor which creates partiality arising outside of the events which

occur in the trial itself." *In re IBM Corp.*, 618 F.2d 923, 927 (2d Cir. 1980). For this reason,

> judicial rulings alone almost never constitute a valid basis for a bias
> or partiality motion. In and of themselves (i.e., apart from
> surrounding comments or accompanying opinion), they cannot
> possibly show reliance upon an extrajudicial source; and can only in
> the rarest circumstances evidence the degree of favoritism or
> antagonism required . . . when no extrajudicial source is involved.

*Liteky*, 510 U.S. at 555; *accord Steel v. C.I.R.*, No. 99 Civ. 5499 (JSR), 1997 U.S. Dist. LEXIS

15862, at *2 (S.D.N.Y. Oct. 14, 1997) ("a court's own prior adverse rulings 'do not provide a

reasonable basis for questioning a judge's impartiality'" (quoting *United States v. Colon*, 961

F.2d 41, 44 (2d Cir. 1992))).

Almost all of Plaintiff's various arguments for disqualification – her contentions related

to the supposed "refusal to abide by the Mandate[,] 2017 dismissal of the case, summary

judgment rulings, scheduling of the trial, insufficient jury selection process, exclusion of critical

evidence recognized in the Mandate, making and timing of the announcement of the Rule 50

decision, [and] improper jury instruction on actual malice during deliberations," *see* Pl. Mem. at

35, fall into this category. However, "fundamental disagreements" about "questions of law . . .

are no basis for reassignment." *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010); *see, e.g.,*

*United States v. Wedd*, 993 F.3d 104, 117-18 (2d Cir. 2021) (even flawed evidentiary rulings are

not ground for recusal); *Muller-Paisner v. TIAA*, No. 03 Civ. 6265 (GWG), 2014 U.S. Dist.

LEXIS 5229, at *7 (S.D.N.Y. Jan. 15, 2014) (adverse rulings overturned by reviewing court do not demonstrate bias); *Carter v. Rosenberg & Estis, P.C.*, No. 95 Civ. 10439 (DLC), 1998 U.S. Dist. LEXIS 4010, at *88-89 (S.D.N.Y. Mar. 30, 1998) (comments made during Rule 50 argument were not basis for recusal because they were "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings," namely testimony elicited and documentary evidence supplied at trial). Moreover, and as discussed more fully above, the Court's rulings at trial were correct. If Plaintiff believes this Court made an error in any of those rulings, any such error would be "proper grounds for appeal, not for recusal." *Liteky*, 510 U.S. at 555.

The other events to which Plaintiff points are "case management decisions," which, again, are not a basis for recusal. *Watkins v. Smith*, 561 F. App'x 46, 47 (2d Cir. 2014) (Rakoff, J., on panel); *see Liteky*, 510 U.S. at 556 ("routine trial administration efforts" are inadequate ground for recusal). Among other things, "[s]cheduling is within the realm of judicial case management which is left to the discretion of the trial court and which does not provide a basis for recusal." *Lamborn v. Dittmer*, 726 F. Supp. 510, 517 (S.D.N.Y. 1989). To the extent the Court made any errors in this regard, that would still not demonstrate the sort of bias that justifies disqualification. *See SEC v. Razmilovic*, 738 F.3d 14, 30 (2d Cir. 2013) ("[A]lthough, as the court acknowledged, two administrative errors occurred when the court ruled on two motions before they were fully submitted, we see no objective basis for attributing those errors to bias. Judges are human. Errors are made; some are corrected; some are not, but are harmless. Few are attributable to bias.").

Plaintiff never attempts to explain why the "rarest circumstances" exist here such that these varied rulings could demonstrate "favoritism or antagonism." *Liteky*, 510 U.S. at 555. Instead, she simply gives a litany of these rulings and states that they "establish an appearance of

partiality that requires disqualification." Pl. Mem. at 35. This is clearly insufficient. "An application for the disqualification of a judge must rest on a factual basis and not on the whim of a litigant who asserts vague contentions." *Rodriguez v. United States,* 10 Civ. 5259 (KTD), 2010 U.S. Dist. LEXIS 93634, at *4 (S.D.N.Y. Sep. 7, 2010); *accord United States v. IBM Corp.*, 475 F. Supp. 1372, 1379 (S.D.N.Y. 1979) (proponent of recusal "must allege specific facts and not mere conclusions or generalities").

While none of the grounds she cites stand up to scrutiny, several of Plaintiff's assertions paint an incomplete picture and require additional context. ***First,*** on the issue of the scheduling of the trial, Plaintiff fails to provide the full history. Following remand, this Court originally scheduled the case for trial on August 24, 2020. *See* ECF 90. With the suspension of jury trials due to the COVID-19 pandemic, *see, e.g., In re: Coronavirus/COVID-19 Pandemic*, No. 1:20-mc-197, ECF 1 (S.D.N.Y. Apr. 20, 2020), the trial was adjourned. Even after trials partially resumed, scheduling was extraordinarily difficult, given limited courtroom space and the priority to conduct criminal trials. *See, e.g.,* 1/24/22 Tr. at 6:12-17; 9:14-22. The trial was adjourned four times, to (1) February 1, 2021, *see* July 22, 2020 Docket Entry, (2) June 21, 2021, *see* Dec. 17, 2020 Docket Entry, (3) September 20, 2021, *see* July 28, 2021 Docket Entry, and ultimately (4) January 24, 2022, *see* Aug. 12, 2021 Docket Entry.

In August 2021, the Court had informed the parties that pandemic developments required an additional postponement. The Court proposed December 13, 2021 and January 24, 2022 as potential new dates, in hopes that by scheduling trial far enough out another false start could be avoided. *Palin v. Rakoff*, No. 22-629 (2d Cir.), ECF 13-12, at PA2058. Plaintiff's counsel told the Court the December date would not work because of a personal conflict and because Plaintiff's proposed damages expert would be travelling for part of that period, and that he also had a conflict with the January 24 date because of his daughter's wedding on January 29. *Id.* at

PA2058-60. To accommodate Plaintiff's counsel, the Court first agreed not to hold trial on Friday, January 28, so that Plaintiff could leave New York on Thursday night and fly to Florida for the wedding. Then, after Plaintiff's counsel raised additional COVID-related concerns, the Court also agreed not to sit on Thursday, January 27th. *See* 1/11/22 Tr. at 10:6-8. The Court expressed sympathy with the situation. *See* 1/24/22 Tr. at 4:16-20 ("[O]f course, the marriage of his daughter trumps all other concerns. I am the first to acknowledge that as a[] father of three daughters.").

Then, due to Plaintiff's subsequent positive COVID test on the eve of trial, the Court rescheduled the trial for February 3, 2022, thus avoiding any conflict with the wedding. Given the accommodations that the Court extended to Plaintiff in scheduling, her argument that this demonstrates the Court's bias is difficult to understand.

In this section of her argument, Plaintiff also cites the Court's remark, with reference to her having tested positive for COVID, that "[s]he is, of course, unvaccinated." *See* Pl. Mem. at 35 n.57. Plaintiff apparently contends, though she does not explicitly argue, that this is further evidence of the Court's partiality. But Plaintiff's vaccination status was directly relevant to the issues then at hand, (1) whether the positive result on the at-home test Plaintiff had taken was likely accurate, which the Court was attempting to assess by having Plaintiff take a more precise PCR test, and (2) whether to delay the trial. *See* 1/24/22 Tr. at 8:23-9:5. The fact that Plaintiff was unvaccinated and at risk of a more severe infection than had she been vaccinated was important for scheduling purposes. *See Press Briefing by White House COVID-19 Response Team & Public Health Officials* (Nov. 22, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/11/22/press-briefing-by-white-house-covid-19-response-team-and-public-health-officials-69/.

# JA 2472

The Court worked to ensure that Plaintiff was not in any way prejudiced by her positive test result. Though noting that there was no "constitutional right for a party" in a civil case to be present when a jury was selected, the Court stated that it thought "it's appropriate that a party be present if they wish to be at the selection of a jury" and therefore would only allow the trial to proceed in Plaintiff's absence with her consent. 1/24/22 Tr. at 3:14-19. After Plaintiff expressed her preference to attend in person, the Court adjourned the trial, *id.* at 8:23-9:3, and stated, "[o]bviously, Mrs. Palin's health comes first." *Id.* at 30:17-18.

**Second,** on the Court's voir dire process, as discussed above, *see* Section IV.B, the Court followed its normal procedure in selecting a jury, *see* Tr. at 25:18-22. As the record reflects, both sides submitted proposed questions, and the Court chose not to ask those submitted by either party. The Court's ruling on this issue thus favored neither side. *See* Voir Dire Tr. at 15:8-20. It is therefore difficult to see how an objective observer would view this as demonstrating bias against Plaintiff. Rather, an objective observer would have seen that the Court struck for cause all three jurors who revealed bias toward Plaintiff, Voir Dire Tr. at 9:19-10:14; 16:22-19:4; 21:13-25:21, but did not strike a juror who informed the Court that her husband worked at Fox News where Plaintiff was a frequent contributor*, id.* at 27:10-28:8.

**Third**, Plaintiff is simply wrong about what actually occurred at trial with respect to evidence she contends was excluded. As discussed above, *see* Section IV.C, the Court did not categorically exclude from evidence articles from Atlantic Media publications. Instead, the Court stated that it would allow Plaintiff's counsel "to put some foundational questions to [Bennett] outside the presence of the jury on this" and would reconsider if Plaintiff could establish more than she had at that point. Trial Tr. at 508:11-17. Plaintiff's counsel suggested he could instead "ask him some foundational questions, not specifically referencing these documents," and the Court said it would depend on the questions. *Id.* at 508:18-509:4.

43

Plaintiff's counsel, however, never attempted to follow either path. *See* Op. at 53-54 n.32. Plaintiff can hardly infer bias from her own failure to attempt to introduce the evidence in question. *See Wedd*, 993 F.3d at 118 (finding no bias in evidentiary ruling where record made clear that defendant's counsel had failed to meet requirements for its admission).

Similarly, Plaintiff argues that the Court "excluded *all* evidence related to the Public Editor," Pl. Mem. at 11 n.12. However, the section of the trial transcript she cites for this point says no such thing. Plaintiff's counsel's questions on this point were repeatedly objected to because, among other things, counsel failed to lay proper foundation and asked a "hopelessly vague question." *See* Trial Tr. at 392:13-394:18. Counsel then moved on, despite the Court indicating how a proper question could be asked. *See id.* at 393:19-394:14. Similarly, Plaintiff does not even attempt to point to a place where she attempted to introduce the "*Botched*" article.

**Fourth,** the Rule 50 decision contains no evidence of favoritism toward Defendants or antagonism toward Plaintiff. Indeed, in its oral ruling, the Court explained that it was "not altogether happy with having to make this decision on behalf of the defendant," that it was "hardly surprised . . . that Ms. Palin brought this lawsuit," and that this case featured "an example of very unfortunate editorializing on the part of *The Times*." Tr. at 1305:2-17. As the Court has previously noted, it "did not rule precipitously" on the motion. Op. at 3. Instead, the Court held argument over several days and allowed the parties to submit supplemental citations over the intervening weekend. *See id.* at 33-34 (noting that the Court held oral argument "in at least five sessions outside the presence of the jury over three days"). Nor did the Court rule in Defendants' favor on all issues in deciding the motion, as one might expect if the Court was somehow biased toward them. The Court rejected Defendants' Rule 50 arguments with respect to substantial falsity, *see* Trial Tr. 1295:18-1297:9, and the "of and concerning" element, *see id.* at 1226:12-1228:12, as well as Defendants' separate motion for a ruling that the challenged

44

statements are not defamatory *per se* (which would have required dismissal of the action because of Plaintiff's failure to offer any evidence of special damages), *id.* at 682:11-16.

**Fifth**, the Court's decision to announce the Rule 50 decision prior to the conclusion of jury deliberations favored neither side and gave no appearance of partiality. The Court explained that it stated its ruling before the jury's verdict because conducting itself otherwise "would have been grossly unfair to both sides, who would have been left with the impression that the case was going to be determined by the jury's verdict when it was not." Op. at 4; *see also* Trial Tr. at 1298:12-14 ("We've had very full argument on this, I know where I'm coming out, and I ought to therefore apprise the parties of that."). Moreover, the Court has taken a similar approach in at least two other cases, demonstrating that the timing here was in no way influenced by the parties involved, as noted above. *See supra* Section IV.G.1 & n.8.

### 2. The Court's comment to Bloomberg is not a basis for recusal

Plaintiff also contends that bias is shown by the substance and timing of the Court's comment to Bloomberg on February 16, 2022. Pl. Mem. at 35-36; *see supra* Section IV.F. Plaintiff suggests that these comments violated the Code of Conduct for United States Judges and that such comments "almost always result in mandatory disqualification under Section 455." Pl. Mem. at 35. She is incorrect on both points. No reasonable person would question the Court's impartiality based on the brief response about the Court's procedure for managing Rule 50 decisions and deliberating juries.

Plaintiff's flawed analysis begins with a misapplication of the pertinent canon. Canon 3A(6) states that a "judge should not make public comment on the *merits* of a matter pending or impending in any court" (emphasis added). It goes on to say that the "prohibition on public comment on the merits does not extend . . . to explanations of court procedures." Here, the Court did not make any comment on the *merits* of any pending matter; rather, it provided an

explanation of the procedure it used in issuing the Rule 50 motion.  Canon 3A(6) does not support Plaintiff's argument.

Case law also undermines the argument for recusal.  The Second Circuit has been clear that "not every media comment made by a judge is necessarily grounds for recusal."  *Ligon v. City of N.Y.*, 736 F.3d 118, 126 (2d Cir. 2013).  Instead, as with any other disqualification analysis, "context is always critical" and "the relevant question at all times remains whether, under the circumstances taken as a whole, a judge's impartiality may reasonably be called into question."  *Id.*  Indeed, even a violation of Canon 3A(6) does not necessarily mean "disqualification is appropriate under § 455(a)."  *Metro. Opera Ass'n v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 332 F. Supp. 2d 667, 671 (S.D.N.Y. 2004); *accord United States v. Sierra Pac. Indus., Inc.*, 862 F.3d 1157, 1175 (9th Cir. 2017) ("not every violation of the Code of Conduct creates an appearance of bias requiring recusal under § 455(a)"); *United States v. Fortier*, 242 F.3d 1224, 1229 (10th Cir. 2001) ("courts construing [Canon 3A(6)] have held that a judge's public comment does not create a per se appearance of bias"); *In re Barry*, 946 F.2d 913, 914 (D.C. Cir. 1991) ("any such violation does not necessarily create an appearance of personal bias or partiality such as to require recusal under 28 U.S.C. § 455").

The cases on which Plaintiff relies are inapposite.  Each involves extensive statements to the press and, in all but one, the judges had spoken to the press multiple times, *see Ligon*, 736 F.3d at 127 (interviews with Associated Press, New York Law Journal, and for a "lengthy profile" in the *New Yorker*); *United States v. Microsoft Corp.*, 253 F.3d 34, 107-08 (D.C. Cir. 2001) (interviews with at least four separate publications, as well as speeches at college and antitrust seminar); *In re Boston's Children First*, 244 F.3d 164, 166 (1st Cir. 2001) (letter to editor and interview); *In re IBM Corp.*, 45 F.3d 641, 642-43 (2d Cir. 1995) (interviews in two newspapers).  In the one exception, *United States v. Cooley*, the judge was interviewed at length

on the nationally televised newsmagazine *Nightline*.  1 F.3d 985, 995 (10th Cir. 1993).

Plaintiff's cited cases also involved commentary about the merits of the case and/or the parties, unlike here, where the Court simply provided an extremely limited explanation of its procedure.  For instance, in *Ligon*, a case concerning stop-and-frisk practices, the judge publicly "describe[d] herself as a jurist who is skeptical of law enforcement, in contrast to certain of her colleagues, whom she characterized as inclined to favor the government," 736 F.3d at 127.  Similarly, the *Microsoft* judge "disclosed his views on the factual and legal matters at the heart of the case.  His opinions about the credibility of witnesses, the validity of legal theories, the culpability of the defendant, the choice of remedy, and so forth all dealt with the merits of the action."  253 F.3d at 112.  The judge in the *Boston's Children First* action had distinguished the case presently before her from another case which was "more complex."  244 F.3d at 167.  The judge in the *IBM* case, an antitrust matter, had spoken about defendant "IBM's activities in general and [government counsel] Assistant Attorney General Baxter's role in particular."  45 F.3d at 642.  The *Cooley* jurist, in a case involving protestors blocking access to abortion clinics, had "state[d] his views regarding the ongoing protests, the protesters, and his determination that his injunction was going to be obeyed."  1 F.3d at 995.

Finally, in the Second Circuit cases Plaintiff cites, unlike here, the comments to the media were secondary to other substantial conduct issues.  For example, in *IBM*, the Court of Appeals had previously granted a writ of mandamus in a related case after that judge had publicly criticized the government's decision to stipulate to dismiss the case and conducted a hearing regarding the role of a Justice Department official.  45 F.3d at 643.  Similarly, in *Ligon*, a large part of the Second Circuit's opinion was devoted to the trial court's "conduct while on the bench."  736 F.3d at 124.  Specifically, the court focused on the trial court's comments that "described a certain claim that differed from the one at issue in the case before her, urged a party

to file a new lawsuit to assert the claim, suggested that such a claim could be viable and would likely entitle the plaintiffs to documents they sought, and advised the party to designate it as a related case so that the case would be assigned to her." *Id.* at 125-26.

*Boston's Children First* presents the closest – though still inapposite – fact pattern. That decision created substantial controversy. After the First Circuit published the opinion, three First Circuit judges who were not on the panel said that they were "of the view that, even if the district court's statement to the reporter comprised a comment on the merits, it does not create an appearance of partiality such as to require mandatory recusal under 28 U.S.C. § 455(a)." 244 F.3d at 172. Those judges were "particularly concerned that section 455(a) not be read to create a threshold for recusal so low as to make any out-of-court response to a reporter's question the basis for a motion to recuse." *Id.* The panel itself was careful to note the "continuing need for a case-by-case determination of such issues," *id.*; *see also Microsoft*, 253 F.3d at 114 ("Although this court has condemned public judicial comments on pending cases, we have not gone so far as to hold that every violation of Canon 3A(6) or every impropriety under the Code of Conduct inevitably destroys the appearance of impartiality and thus violates § 455(a).").

Because this Court's limited comment regarding procedure did not violate Canon 3A(6) in the first instance, and even if it could somehow be said that it did, the comment does not create an appearance of bias, this argument therefore provides no basis on which disqualification even arguably could be warranted.

### B. The Court's Decisions Taken As A Whole Do Not Give The Appearance Of Partiality

The fact that Plaintiff points to a list of decisions with which she disagrees does not alter this analysis:

> A trial judge must be free to make rulings on the merits without the
> apprehension that if he makes a disproportionate number in favor of

> one litigant, he may have created the impression of bias. Judicial
> independence cannot be subservient to a statistical study of the calls he
> has made during the contest.

*IBM*, 618 F.2d at 929; *see id.* at 930 ("There is no authority for, and no logic in, assuming that either party to a litigation is entitled to a certain percentage of favorable decisions.").

In crafting her argument for disqualification based on the appearance of partiality, Plaintiff presents a false universe in which she only received unfavorable rulings. This could not be further from the truth, and the reality easily disposes of Plaintiff's argument. *See Muller-Paisner*, 2014 U.S. Dist. LEXIS 5229, at *8-9. Among other things, the Court denied Defendants' motion for summary judgment, *see* ECF 117; ruled against Defendants' request for a special verdict form, citing its usual practices, 1/24/22 Tr. at 17:12-14; found that the challenged statements constituted libel *per se* such that no special damages need be shown, Trial Tr. at 682:11-15; gave Plaintiff's counsel a rebuttal summation despite its usual practice not to do so, Trial Tr. at 1046:4-15, 1048:21-10:49-3; and rejected Defendant's Rule 50 motion on the "of and concerning" and substantial falsity points, *see* Op. at 33-34, 42; Tr. 1226:12-1228:12; 1295:18-1297:9. The Court was also at times perhaps frustrated with defense counsel and expressed that sentiment. *See, e.g.,* Trial Tr. at 509:21-511:6; 1227:3-1228:6.

In short, there is no evidence of bias nor any conduct that created an appearance of partiality, and Plaintiff's disqualification motion should be denied.

## VI.   **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's post-trial motions in their entirety.

Case 1:17-cv-04853-JSR Document 192 Filed 04/12/22 Page 60 of 60

Dated:  New York, New York
        April 12, 2022

Respectfully submitted,

BALLARD SPAHR LLP

By:  */s/ David L. Axelrod*
    David L. Axelrod
    Jay Ward Brown
    Jacquelyn N. Schell
    Thomas B. Sullivan
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
schellj@ballardspahr.com
sullivant@ballardspahr.com

*Counsel for Defendants*

Case 1:17-cv-04853-JSR Document 202 Filed 04/19/22 Page 1 of 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SARAH PALIN, an individual,

                Plaintiff,

 – against –

THE NEW YORK TIMES COMPANY,
a New York corporation, and JAMES
BENNET, an individual,

                Defendant.

No. 17 Civ. 4853

Hon. Jed S. Rakoff

ECF Case

# PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S POST-TRIAL MOTIONS

TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 834-9191
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

JA 2481

## <u>TABLE OF CONTENTS</u>

Table of Contents ................................................................................................................ i

Table of Authorities ............................................................................................................ ii

ARGUMENT ....................................................................................................................... 1

CERTIFICATE OF SERVICE ............................................................................................ 8

JA 2482

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 3

*Arilo v. Lively*, 474 F.3d 46 (2d Cir. 2007) .................................................................................. 4

*Bibbins v. Dalsheim*, 21 F.3d 13 (2d Cir. 1994) .......................................................................... 5

*Galdieri-Ambrosini v. Nat'l Realty Dev. Corp.*, 136 F.3d 276 (2d Cir. 1998) ........................... 5

*In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001) ....................................................... 6

*In re Coudert Brothers, LLP*, 809 F.3d 94 (2d Cir. 2015) .......................................................... 2

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537 (2d Cir. 2010) ...................................................... 3

*Lamborn v. Dittmer*, 726 F.Supp. 510 (S.D.N.Y. 1989) .............................................................. 2

*Lee v. McCue*, 2007 WL 2230100 (S.D.N.Y. Jul. 25, 2007) ....................................................... 3

*Ligon v. City of New York*, 736 F.2d 118 (2d Cir. 2013), *vacated in part on other grounds*, 743 F.3d 362 (2d Cir. 2014) ........................................................................ 1, 7

*Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) ................................................. 2, 3, 4

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) .......................................... 3

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017) .................................................................... 4

*Sharkey v. J.P. Mogan Chase & Co.*, 251 F.Supp.3d 626 (S.D.N.Y. 2017) ........................... 1, 2

*Village of Freeport v. Barrella*, 814 F.3d 594 (2d Cir. 2016) .................................................... 4

*Williams v. Cnty. of Westchester*, 171 F.3d 98 (2d Cir. 1999) .................................................... 3

*U.S. v. Amico*, 486 F.3d 764 (2d Cir. 2007) ............................................................................. 1, 2

*U.S. v. Ferguson*, 550 F.Supp. 1256 (S.D.N.Y. 1982) ................................................................ 2

*U.S. v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .............................................................. 6

*U.S. v. Yousef*, 327 F.3d 56 (2d Cir. 2003) .................................................................................. 1

**Page(s)**

**OTHER AUTHORITIES**

Federal Rule of Civil Evidence 606(b) ........................................................................ 5

Federal Rule of Civil Procedure 12(d) ....................................................................... 3

# JA 2484

## ARGUMENT

The legitimacy of any judgment depends on the fairness of the process through which it is reached, both in perception[1] and reality[2]. As explained in Plaintiff's Omnibus Memorandum of Law [Doc. 198], the process through which the judgment in this case was reached failed in both respects. None of the arguments raised by Defendants in their Opposition [Doc. 201] can salvage it. The pertinent facts[3] and controlling law are largely undisputed, and Plaintiff's arguments convincingly demonstrate this case should be retried before a different judge.[4] Nevertheless, there are a few issues raised in Defendants' Opposition that bear mentioning.

*First*, Defendants seek to distract from the controlling inquiry on disqualification by reframing Plaintiff's argument as a "statistical study" of her "disagreement" with this Court's "adverse rulings" [*see* Doc. 201 at pp. 39, 49]. Defendants' mischaracterization and compartmentalization of the facts improperly attempts to shift the focus from the forest to the trees. Plaintiff explained why an objective, disinterested observer fully informed of the ***totality of the***

---

[1] Judicial disqualification is based on the ***appearance*** of impartiality. *U.S. v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007) (the test under Section 455(a) "deals exclusively with appearances" because "the protection of the public's confidence in the impartiality of the judiciary" is the paramount concern). "The Second Circuit applies this standard by asking whether 'an ***objective, disinterested observer*** fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal,' or alternatively, whether a 'reasonable person, knowing all the facts,' would question the judge's impartiality.'" *Sharkey v. J.P. Morgan Chase & Co*., 251 F.Supp.3d 626, 629 (S.D.N.Y. 2017) (citing *U.S. v. Yousef*, 327 F.3d 56, 169 (2d Cir. 2003) (emphasis added); *see also Ligon v. City of New York*, 736 F.3d 118, 123-127 (2d Cr. 2013), *vacated in part on other grounds*, 743 F.3d 362 (2d Cir. 2014).

[2] Grounds for a new trial include decisions and actions that affect the fairness of the proceeding. *See* Omnibus Memorandum of Law [Doc. 198] at pp. 8, 10-11, 15, 20.

[3] Obviously, the parties have differing views on how the facts should be interpreted and applied, but the pertinent facts upon which the Post-Trial Motions are based are largely uncontroverted.

[4] To be clear, Plaintiff disagrees with all of Defendants' arguments in opposition to her Post-Trial Motions. However, she is not specifically responding to most of them in this Reply because doing so would require her to repeat the positions already set forth in her Omnibus Memorandum [Doc. 198]. Instead, she incorporates all her arguments in Doc. 198 by reference as if fully set forth herein.

# JA 2485

*circumstances* of this case[5] would question the Court's impartiality. *Sharkey*, 251 F.Supp.3d at

629. Defendants' arguments do not legitimately address or refute the appearance of partiality

emanating from the totality of the circumstances.

**Second**, Defendants do not contest the established principle that where the question of

recusal is a close call a court should disqualify itself. *Amico*, 486 F.3d at 775; *Lamborn v. Dittmer*,

726 F.Supp. 510, 518 (S.D.N.Y. 1989); *U.S. v. Ferguson*, 550 F.Supp. 1256, 1259-60 (S.D.N.Y.

1982).

**Third**, the Court did not carry out the letter of the Second Circuit's decision in *Palin v.*

*New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) (the "Mandate"), nor the "spirit of the mandate,"

including issues it "impliedly resolved." *In re Coudert Brothers, LLP*, 809 F.3d 94, 98 (2d Cir.

2015). Moreover, the Court failed to follow the well-established principles of law set forth within

the Mandate (even if they are considered dicta).[6] Defendants argue the Mandate is limited to

---

[5] As set forth in Plaintiff's Omnibus Memorandum of Law [Doc. 198], the totality of circumstances
requiring disqualification include: (1) the Court's original premature adjudication of this case at
the pleadings stage and subsequent failure to carry out the Second Circuit's decision in *Palin v.*
*New York Times Co*., 940 F.3d 804 (2d Cir. 2019) (the "Mandate") [Doc. 198 at pp. 5-8]; (2) the
legally insufficient *voir dire* [Doc. 198 at pp. 8-10]; (3) the exclusion of crucial evidence of actual
malice contrary to the Mandate and controlling law [Doc. 198 at pp. 10-12]; (4) requiring Plaintiff
to prove actual malice as to defamatory meaning [[Doc. 198 at p. 6]; (5) requiring Plaintiff to prove
actual malice under New York's anti-SLAPP law [Doc. 198 at p. 12]; (6) the erroneous oral and
written Rule 50 decision [Doc. 198 at pp. 15-17, 23-34]; (7) the announcement of the Rule 50
decision during jury deliberations [Doc. 198 at pp. 17, 20-21]; (8) the erroneous instruction in
response to the jury's February 15, 2022 question [Doc. 198 at pp. 17-20]; and (9) the Court's
extra-judicial comments to a journalist about the jury's exposure to push notifications [Doc. 198
at pp. 21-23].
[6] Among other things, in its decisions before, during , and after trial, the Court: (1) accepted
Bennet's testimony as true (*Palin*, 940 F.3d at 812 and n. 25); (2) excluded evidence surrounding
Bennet's background (specifically including articles about the Loughner shooting published on
*The Atlantic's* website while Bennet was its Editor-In-Chief, Bennet's brother, and their politics
and opposition to Plaintiff and her views) and the drafting and editing process (*Id*. at 814-815);
(3) accepted as true Bennet's testimony that he did not read the ABC News article hyperlinked in
the Editorial (*Id.* at 815); and (4) concluded that a mistake is the only reasonable inference to be
drawn from the swift correction of the Editorial (*Id*.).

pleadings issues [Doc. 201 at p. 4-7], but the Second Circuit's opinion contains numerous

references to jury issues and issues of fact a jury must decide because the Times briefed and argued

the dismissal should be affirmed on summary judgment grounds under Rule 12(d). *Palin*, 940 F.3d

at 812. Even if the Mandate's prescriptions against the Court's adjudication of the facts of this

case qualify as "dicta," the Court still committed fundamental error by failing to follow the well-

established prohibitions referenced in the Mandate against weighing and construing evidence

against a non-moving party and making credibility determinations solely within the jury's

province. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-153 (2000); *Kaytor v.

Electric Boat Corp.*, 609 F.3d 537, 545-546 (2d Cir. 2010); *Lee v. McCue*, 2007 WL 2230100, *3

(S.D.N.Y. Jul. 25, 2007). "Credibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*,

530 U.S. at 150 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Palin*,

940 F.3d at 812, n. 25.[7]

**Fourth,** the exclusion of crucial evidence of actual malice was not only contrary to the

Mandate but based on the erroneous determinations that evidence concerning Bennet's brother

was irrelevant and prejudicial and that *The Atlantic* articles could not be admitted unless Bennet

admitted reading and remembering them when he rewrote the Editorial. [Doc. 198 at p. 11] The

Mandate specifically addressed the relevancy of evidence concerning Bennet's brother. *Palin*,

---

[7] In response to Plaintiff's argument that the Rule 50 decision contradicted the Court's own
summary judgment rulings [Doc. 198 at pp. 13, 25-34], Defendants claim summary judgment
rulings are not binding at trial because they are usually based on documentary evidence and
different evidence is often admitted at trial [Doc. 201 at pp. 30-31 (citing *Williams v. Cnty. of
Westchester*, 171 F.3d 98, 102 (2d Cir. 1999) and *Anderson*, 477 U.S. at 251). This argument
misses the mark because the Court's Rule 50 decision is based on the exact same documents and
testimony that was presented at summary judgment.

3

# JA 2487

940 F.3d at 814-815; Doc. 198 at pp. 5-6[8].  *The Atlantic* articles should have been admitted because Petitioner introduced evidence that Bennet regularly read *The Atlantic's* website and integrated blogs and the *Times* in 2011 [Tr. Tran. at 616:3-620:16; 621:7-9], admitted that he "must have read" some of the articles about this "big story" [*Id*. at 620:5-19] and articles about Loughner's "mental state" [*Id*. at 620:20-25], admitted he had a particular interest in political rhetoric and gun control, including moderating a gun control event at which Giffords spoke [*Id*. at 626:5-25], and was observed by a co-worker recalling articles from several years ago [*Id*. at 412:22-413:1].  The decision to exclude this highly relevant evidence of actual malice was contrary to well-established law and highly prejudicial to Plaintiff's case, thus constituting fundamental error requiring a new trial.  *See e.g.*, *Village of Freeport v. Barrella*, 814 F.3d 594, 610-611 (2d Cir. 2016) (new trial appropriate where evidentiary rulings are a clear abuse of discretion and clearly prejudicial to the outcome of the trial); *Restivo v. Hessemann*, 846 F.3d 547, 573 (2d Cir. 2017) (citing *Arilo v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007) (errors are prejudicial to the outcome of the trial where "the jury's judgment would be swayed in a material fashion by the error.").

**Fifth**, Defendants' argument that the Rule 50 decision was procedurally correct [Doc. 201 at pp. 26-28] completely ignores the importance of the **timing** of the decision.  None of the cases cited by Defendants [Doc. 201 at pp. 26-27] support the procedure employed in **this** case, where

---

[8] Defendants incorrectly claim Plaintiff makes no argument about why the exclusion of evidence concerning Bennet's brother was improper [Doc. 201 at p. 13].  Plaintiff explains in her Omnibus Memorandum of Law [Doc. 198 at p. 6, n. 3] that evidence concerning Bennet's brother was improperly excluded because such evidence "demonstrated Bennet 'in particular was more likely than the average editor-in-chief to know the truth about the Loughner shooting because he had reason to be personally hostile toward Palin, her political party, and her pro-gun stance,' are 'relevant to the credibility of Bennet's testimony that he was unaware of facts published on his watch relating to the Loughner shooting and that he made a mistake when he connected [Plaintiff] to that shooting,' which '[w]hen properly viewed in the plaintiff's favor, a reasonable factfinder could conclude this amounted to more than a mistake due to a research failure.'"

**JA 2488**

the Court publicly announced its Rule 50 decision in a highly publicized proceeding *before* the jury reached its verdict.  Defendants' reliance on His Honor's use of a supposedly similar procedure over two decades ago in a *non*-high-profile proceeding is entirely misplaced.  [Doc. 201 at p. 28 (citing *Galdieri-Ambrosini v. Nat'l Realty Dev. Corp.*, 136 F.3d 276 (2d Cir. 1998))].  There is no indication in the *Galdieri-Ambrosini* decision that the plaintiff made an argument on appeal about the impropriety of the *timing* of the Court's Rule 50 decision, and the opinion implicitly recognizes that announcing a Rule 50 decision *before* a verdict is improper: "However, the court noted this Court's prior observations that even if the trial judge has such a view at the close of the evidence, the prudent course of action is to submit the case to the jury and to *grant judgment as a matter of law, if necessary, after the verdict has been returned*, so that if the court of appeals eventually determines that judgment should not have been granted as a matter of law, the need for a second trial will be avoided."  136 F.3d at 282 (emphasis added).

**Sixth**, Defendants (like the Court) improperly rely on some jurors' supposed insistence that the push notifications did not impact their decision in support of the contention that the verdict is legitimate [Doc. 201 at p.p. 22-23].  However, this continues to ignore the well-established prohibition of any inquiry into and the disclosure of "the effect of anything on [a] juror's or another juror's vote."  *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994).  It also ignores Rule 606(b) and the "objective test" applied to assess the likelihood that extraneous information "would affect a typical juror."  *Bibbins*, 21 F.3d at 17.  Learning the presiding judge determined a case has no merit is the type of information that would affect a typical juror—and Defendants offer no valid argument to the contrary.

**Seventh**, Defendants overlook the importance of the connection between the jury's exposure to push notifications about the Rule 50 decision on the evening of January 14, 2022 and

the erroneous instruction they were given about sufficient evidence of actual malice the following morning [Doc. 198 at pp. 17-21]. The improper timing of the Rule 50 decision led to the jury's exposure to the push notifications about the dismissal, which was followed by the patently improper instruction about sufficient evidence of actual malice, and naturally led to a defense verdict soon thereafter. Each of these errors was fundamental, and independently and collectively they are sufficient to warrant a new trial. These errors would also reasonably lead a disinterested, objective observer to conclude that the Court influenced the outcome of the case, and therefore warrant disqualification. It is unreasonable (if not naïve) to suggest that a juror would not be influenced by a news alert that the presiding judge is dismissing the case they are deliberating **and** an instruction from the same judge that the defendants' own testimony is not sufficient evidence against him on a crucial element of the plaintiff's claim.

*Eighth,* the circumstances surrounding and substance of the Court's comments to *Bloomberg* give rise to an appearance of partiality requiring disqualification. The Court defended the timing and substance of its Rule 50 decision to *Bloomberg* before informing counsel about the jury's exposure to push notifications. The Court's comments were indeed about the "merits" of the case, not mere "explanations of court procedures" [Doc. 201 at p. 45] or "purely procedural matters." *U.S. v. Microsoft Corp.*, 253 F.3d 34, 112 (D.C. Cir. 2001). Moreover, the Court's intent in making comments to *Bloomberg* is irrelevant because "[i]t is no excuse that the judge may have intended to 'educate' the public about the case or to 'rebut misconceptions' purportedly caused by the parties." *Id.*[9] In fact, "[b]ecause there is no scienter requirement in Section 455, the test is not how a judge intended his remarks to be understood, but whether, as a result of the interviews or

---

[9] Comments to the press that reasonably be construed as defending the Court's rulings create an appearance of partiality. *In re Boston's Children First*, 244 F.3d 164, 170 (1st Cir. 2001).

JA 2490

extra-judicial statements, the appearance of impartiality might reasonably be questioned." *Ligon*,

736 F.3d at 126-127.

Dated:  April 19, 2022.                       /s/ Shane B. Vogt
_____
Kenneth G. Turkel (admitted *pro hac vice*)
Email:  kturkel@tcb-law.com
Shane B. Vogt (admitted *pro hac vice*)
Email:  svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone:  (813) 834-9191
Facsimile: (813) 443-2193

Michael M. Munoz
E-mail:  mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY  10017
Telephone:  (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

     I hereby certify that Plaintiff's Reply to Defendants' Opposition to Plaintiff's Post-Trial Motions was filed electronically on April 19, 2022. This Notice will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt. Parties and their counsel may access this filing through the Court's system.

                              */s/ Shane B. Vogt*

                              Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
SARAH PALIN,

        Plaintiff,

    -v-

THE NEW YORK TIMES COMPANY
and JAMES BENNET,

        Defendants.
```

17-cv-4853 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.:

Now before the Court is plaintiff Sarah Palin's post-trial motion. She first seeks the Court's retroactive disqualification, arguing that various aspects of the Court's management of her libel trial suggest bias against her. In the alternative, she seeks either a new trial or reconsideration of the Court's prior ruling that entered final judgment in favor of defendants The New York Times Company and James Bennet based on their motion under Fed. R. Civ. P. 50 for judgment as a matter of law. Because Palin's instant motion is wholly lacking in merit, the Court denies it in full.

Whatever she may have claimed in her complaint and pre-trial submissions, Palin was unable to deliver at trial admissible evidence that remotely supported her claim that she was intentionally or recklessly defamed by the defendants. As the Court clearly explained at some length in its Rule 50 Opinion dated March 1, 2022, ECF 196

# JA 2493

("Opinion" or "Op."),[1] which is re-adopted here by reference, Palin wholly failed to establish several essential elements of her claim. Among other things, in the end she offered no affirmative evidence that Bennet or others who worked on the Editorial that is the subject of her claim knew or suspected before publication that the Challenged Statements, which linked Palin's Crosshairs Map to the Arizona shootings of Representative Gabby Giffords and others, were false. Indeed, none of the sources or research upon which the Editorial Board relied to draft, revise, and publish the July 14, 2017 Editorial expressly denied Bennet's inference that Palin's Crosshairs Map had played a causal role in the Arizona shooting. And when cautionary information was brought to defendants' attention, the Times promptly retracted the Challenged Statements. No reasonable juror could therefore have found by clear and convincing evidence that Bennet and the Times published the Challenged Statements with actual malice.

Throughout Palin's motion, she renews complaints about trial procedures and evidentiary rulings, including some made after the trial was over. The passage of time has not rendered these complaints any less meritless. But it is also worth noting that during the trial itself, her counsel was afforded numerous opportunities to object to the rulings and procedures of which she now complains, to lay

---

[1] All capitalized terms here used refer to the definitions set forth in the Opinion, unless otherwise specified. Also, all internal quotation marks, alterations, omissions, emphases, and citations have been omitted from all cited sources.

additional foundation for evidence she now claims was wrongly excluded, and even, post-trial, to seek relief that would establish a factual basis for much of her current complaints -- but she totally failed to do so.

## I.   **Relevant Background**

The Court has previously set forth in the Opinion the procedural and factual background of this case, familiarity with which is here assumed. In brief summary, this case was tried for seven days before the Court and a jury, beginning February 3, 2022. After the close of evidence, the defendants moved under Fed. R. Civ. P. 50 for judgment as a matter of law. Oral argument proceeded over several days while the jury deliberated. The Court eventually determined on February 14, 2022, that it would grant defendants' Rule 50 motion because Palin had failed to present any affirmative evidence supporting the essential element of actual malice. However, as the Court had previewed, it declined to simply enter final judgment and dismiss the jury at that time. Rather, in accordance with prior suggestions from the Second Circuit, the Court explained that it would allow the jury to continue its deliberations and would enter the Rule 50 judgment post-verdict, pursuant to Rule 50(b), so that, if the Court of Appeals were to disagree with the Court's decision to enter judgment as a matter of law, it would have the option of reinstating the jury's verdict rather than remanding for retrial. Neither side objected to this procedure, either when the Court previewed this procedure before ruling, at the time it delivered its ruling in open court, or at any time thereafter

JA 2495

before the jury rendered its own verdict and judgment was entered. <u>See</u> Op. 35-36.

Ultimately, the jury returned a verdict for defendants on February 15, 2022, and the Court entered final judgment that afternoon on the basis of the Rule 50 motion and, independently, on the basis of the jury's verdict. ECF 171 (final judgment); ECF 173 (verdict). After the jury was excused, the Court, in accordance with its very longstanding practice, directed its law clerk to speak with the jurors about any suggestions they might have for future improvements. During this discussion, however, several of the jurors volunteered to the law clerk that they had previously become aware of the bottom line of the Court's preliminary statement on February 14 that it would dismiss the case as a matter of law under Rule 50, because, notwithstanding that they had assiduously adhered to the Court's instruction to avoid media coverage of the trial, they had involuntarily received "push notifications" on their smartphones that gave the "bottom line" of the Court's decision. ECF 172. Although the same jurors made a point of affirmatively volunteering to the law clerk that this limited knowledge had not affected their deliberations in the slightest, the Court, upon learning of this conversation, promptly disclosed it, in writing, to the parties and the public, on the morning of February 16, 2022. <u>Id.</u>[2]

---

[2] As the Court had repeatedly informed counsel, the Court was required to leave the courthouse promptly after the close of each trial day to attend to teaching responsibilities at Columbia Law School, and this was true on the day the jury rendered its verdict (February 15, 2022). In the few minutes available between the law clerk's return to chambers after speaking with the jurors and the

**JA 2496**

On February 23, 2022, the Court held a telephonic conference with counsel regarding Palin's indication in a letter dated February 22, 2022, that she would seek the following forms of relief through post-trial motion practice: (1) the Court's disqualification, pursuant to 28 U.S.C. § 455, retroactive to August 28, 2020; (2) authorization to interview members of the jury; (3) disclosure of any communications between the Court and the media during trial; (4) reconsideration of the Rule 50 decision; and (5) a new trial and to set aside the verdict, pursuant to Fed. R. Civ. P. 59 and 60. See ECF 194 at 2. The Court granted Palin leave to move for any of these forms of relief, and set a schedule for briefing the instant motion, noting that it intended to publish an Opinion on or before March 1, 2022, amplifying the findings of fact and conclusions of law upon which its Rule 50 judgment depended. Id. at 4.

While the February 23, 2022 conference was in all other respects a scheduling conference, the Court, in response to item 3 on plaintiff's list of proposed motions, affirmed that the Court had not communicated with any member of the media at any time during the trial. See id. at 2-3. The Court also explained that on the morning of February 16, 2022, after final judgment had already been entered and

---

Court's departure for Columbia, the Court directed its law clerk to prepare the one-sentence final judgment, which was docketed later that afternoon. See ECF 171. The following morning, however, after the Court learned the details of its law clerk's post-verdict discussion with the jurors, it immediately began drafting the order disclosing the relevant facts, and that order was emailed to counsel and docketed as soon as possible.

the Court had begun drafting the order alerting the parties and the public what its law clerk had learned from the jurors, the Court received an "urgent" message from a Bloomberg reporter asking about the push notification issue. See id. at 3. As the Court explained, it returned the call and, recognizing that Bloomberg might publish its article online before the Court could docket its order, the Court, after confirming certain details with its law clerk, gave a short statement to the reporter so that, if the reporter's article was published online before the Court issued its own announcement, there would be no misunderstandings. The statement contained substantially the same information as the order, which was docketed and emailed to counsel less than an hour after the story was published. See ECF 198-4 (Bloomberg article).

On February 28, 2022, Palin filed a Notice of Motion indicating that she would move for all forms of relief previously listed other than disclosure of the Court's media contacts. See ECF 195. However, her actual motion, filed March 22, 2022, also dropped her request for jury interviews (item 2 on her original list). See generally ECF 198 ("Mot.").

Finally, on March 25, 2022, Palin filed a petition for a writ of mandamus in the U.S. Court of Appeals for the Second Circuit, asking for this Court to be prohibited from ruling on the post-trial motions, for a new trial, and for reassignment to a new district judge. See In re: Palin, No. 22-629 (2d Cir. Mar. 25, 2022) Doc. 3 at 10. But the Court of Appeals, stating that it would benefit from this Court's

# JA 2498

rulings on Palin's post-trial motion, stayed consideration of the petition until after the instant decision was rendered. See ECF 200.

## II.  Palin's Post-Trial Motion

The Court now denies Palin's post-trial motion in full, for the reasons set forth below and, where relevant, for reasons explained in the Opinion issued on March 1, 2022 and incorporated here by reference.

### A. Disqualification

Palin first moves for the Court to disqualify itself, retroactive to August 28, 2020. Palin does not allege actual bias. Rather, she contends that "a disinterested observer fully informed of the events ... occurring before, during and after the trial of this action would entertain doubts about the Court's impartiality." Mot. 35.

Under 28 U.S.C. § 455, a federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned," or "[w]here he has a personal bias or prejudice concerning a party." The proponent of a disqualification motion bears the burden of demonstrating the appearance of bias. In re Int'l Bus. Machines Corp., 618 F.2d 923, 931 (2d Cir. 1980) ("In re IBM").

Palin made no pre-trial motion to disqualify this Court, and much of her current motion to disqualify the Court retroactively to months before trial simply reflects her unhappiness with some of the Court's rulings, both at and before trial. But the Second Circuit has repeatedly rejected the suggestion "that adverse rulings by a judge can per se create the appearance of bias under section 455(a)." Id. at 929. See also Liteky v. United States, 510 U.S. 540, 555 (1994)

# JA 2499

("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion.") Rather, "under section 455(a) the bias to be established must be extrajudicial and not based upon in-court rulings." As the Second Circuit has further explained, this rule is an essential bulwark of judicial independence: "A trial judge must be free to make rulings on the merits without the apprehension that if he makes a disproportionate number in favor of one litigant, he may have created the impression of bias. Judicial independence cannot be subservient to a statistical study of the calls he has made during the contest." In re IBM, 618 F.2d at 929.

In support of her extraordinary request for retroactive disqualification, Palin identifies several aspects of the Court's management of the trial process. These include the Court's 2017 decision to grant defendants' motion to dismiss (subsequently reversed on appeal), unspecified aspects of the Court's subsequent summary judgment rulings,[3] the scheduling of the trial, the Court's voir dire

---

[3] Palin's dispute with the Court's prior summary judgment rulings largely centers on the Court's decision that an amendment to New York's anti-SLAPP statute applies to this action. See Mot. 1. Palin notes that "[t]his conclusion was recently called into question" by a First Department case, Gottwald v. Sebert, 2022 WL 709757 (1st Dep't Mar. 10, 2022), but her motion offers no argument for why the Court's conclusion is wrong, let alone how this conclusion (made before the Gottwald decision was entered) demonstrates bias. See Mot. 12 n. 14. Moreover, as defendants point out, Gottwald appears to be an outlier. See Opp. 29 n. 9 ("[T]he overwhelming majority of courts to consider this question have agreed with this Court's reasoning and ruled that the 2020 amendments apply to pending actions." (collecting cases)). Furthermore, a single Appellate Division case would not require the Court to reverse its earlier application of New York law when the New

**JA 2500**

procedures and rulings during jury selection, certain evidentiary rulings during the trial, the timing of the Court's announcement of its Rule 50 decision, an answer to a jury note, and the Court's aforementioned decision to briefly respond to a reporter's request for comment after final judgment had been entered. See Mot. 35. It is indisputable that all but the last of these complaints "rest upon trial rulings or conduct," which, as explained above, cannot provide the basis for recusal under section 455. In re IBM, 618 F.2d at 929; see also Spiegel v. Schulmann, 604 F.3d 72, 83 (2d Cir. 2010); United States v. Wedd, 993 F.3d 104, 117-118 (2d Cir. 2021). Therefore, even though the opposition papers of the defendants well argue why each of these rulings was correct, see ECF 201 ("Opp.") at 41-45, the Court need not here wade through the details of these decisions. If Palin believes the Court erred in making them, she can address that on appeal.

   Palin's only even arguably legally cognizable complaint concerns the Court's decision to provide a brief post-verdict comment to a Bloomberg reporter's "urgent" request. As detailed above, even that last complaint is without legal merit, let alone any evidence of bias. Palin grounds her argument in a partial (and misleading) quote from Canon 3(A)(6) of the Code of Conduct for United States Judges. In full, however, Canon 3(A)(6) states as follows:

---

York Court of Appeals has yet to weigh in. But, in any event, how any of this demonstrates bias is beyond comprehension.

# JA 2501

> A judge should not make public comment on the merits of a matter
> pending or impending in any court. A judge should require similar
> restraint by court personnel subject to the judge's direction and
> control. The prohibition on public comment on the merits does not
> extend to public statements made in the course of the judge's
> official duties, to explanations of court procedures, or to
> scholarly presentations made for purposes of legal education.

The Court's comment to Bloomberg fully complied with Canon 3(A)(6).[4]

The comment did not in any way address "the merits of [the] matter."

It was rather an "explanation[] of court procedures," specifically

made to prevent the reporter, and, by extension the public, from

misunderstanding the procedures permitted by Rule 50. Such comments

are expressly permitted by Canon 3(A)(6).

Even apart from the textual permission provided by Canon 3(A)(6),

the substance of the Court's comment provides no basis for recusal.

None of the recusal cases cited by Palin concerned a statement to the

media remotely akin to the Court's very brief comment on the Rule 50

procedure; each involved either multiple public statements or a lengthy

televised interview, and each involved judicial comments about the

merits of pending cases. See Mot. 35-36; Opp. 46-48.

"Of course, not every media comment made by a judge is necessarily

grounds for recusal." Ligon v. City of N.Y., 736 F.3d 118, 126 (2d

Cir. 2013). Palin's briefing articulates no reason why "under the

---

[4] The Bloomberg article included the following quote: "'I'm
disappointed that the jurors even got these messages, if they did,'
Rakoff said in an interview, referring to the news notifications. 'I
continue to think it [the announcement of the intended Rule 50 decision
while the jury was deliberating] was the right way to handle things.'"
ECF 198-4 at 2.

**JA 2502**

circumstances taken as a whole, [the Court's] impartiality may reasonably be called into question" by an objective, disinterested observer fully informed of the facts, id., either considering just the comment to Bloomberg or Palin's whole list of supposed errors.

Since "the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited." In re Aguinda, 241 F.3d 194, 201 (2d Cir. 2001). It is hard to see how Palin's recusal motion is anything but frivolous, and it is hereby denied.

### B. New Trial

Palin also seeks a new trial, relying on several supposed errors. Palin cites (1) the voir dire conducted during jury selection, which she argues was inadequate because the Court did not ask her counsel's proposed questions; (2) certain evidentiary rulings, including the Court's decisions to exclude certain articles published on the website of The Atlantic, evidence about Bennet's brother who serves in the U.S. Senate, and evidence about the Times's decision to eliminate the Public Editor position; (3) an allegedly inaccurate response to a jury question; and (4) the timing of the Court's announcement of its decision on the Rule 50 motion. In actuality, none of these was erroneous, let alone a basis for granting Palin a new trial.

Before discussing each of the items, it should be noted that three of Palin's four complaints about the trial -- the voir dire, the response to the jury's note, and the effect of the Rule 50 decision on continuing deliberations -- are irrelevant to the Court's decision

11

to grant judgment to defendants as a matter of law, which supersedes the jury's verdict. Put another way, the Court's dispositive Rule 50 ruling ultimately rests on Palin's total failure to adduce affirmative evidence of actual malice, the core element of her libel claim, not any aspect of how the jury was selected, instructed, or managed. Nevertheless, the Court will address all four asserted grounds for Palin's motion under Rules 59 and 60 seeking a new trial.

### 1. Jury Selection

The purpose of conducting voir dire of prospective jurors during jury selection is to ensure that a fair and impartial jury is efficiently empaneled. Predictably, counsel seek through their own suggested questions to assemble a jury that they perceive to be most favorable to their client's cause, whether or not that assemblage is fair. See United States v. Lawes, 292 F.3d 123, 128 (2d Cir. 2002). There is nothing inherently wrong with this, but the "federal courts have successfully resisted ... attempts" to allow counsel to use "voir dire as an opportunity for advocacy" by repeatedly affirming that the "questioning of potential jurors on voir dire is ... quintessentially a matter for the discretion of trial courts." Id. see also, e.g., United States v. Kyles, 40 F.3d 519, 524 (2d Cir. 1994) (The law is clear that "a trial judge has broad discretion whether to pose a defendant's requested voir dire questions.").

As relevant here, a party is only entitled to a new trial because her proposed questions were not asked when she can show that either:

> (i) [the] voir dire [was] so demonstrably brief and lacking in
> substance as to afford counsel too little information even to
> draw any conclusions about a potential juror's general outlook,
> experience, communication skills, intelligence, or life-style;
> (ii) a failure to inquire about, or warn against, a systematic
> or pervasive bias, including one that may be short-lived but
> existent at the time of trial, in the community that would have
> been cured by asking a question posed by a party; or (iii) [the]
> record viewed in its entirety suggest[s] a substantial
> possibility that a jury misunderstood its duty to weigh certain
> evidence fairly that would have been clarified by asking a
> requested voir dire question.

Lawes, 292 F.3d at 129. Under this standard, Palin identifies no

deficiency in the voir dire conducted for this trial.

In its questioning of the panelists, the Court identified the

parties, witnesses, and other relevant people, noting that they were

likely known to many, and repeatedly asked the prospective jurors

whether there was any reason that they could not be fair and impartial

if selected. See, e.g., Tr. 3-9, 21. In response, several prospective

jurors indicated that they could not, and, after further questioning,

the Court dismissed them for cause. The adequacy of this process is

demonstrated by the fact that several prospective jurors identified

themselves as predisposed against Palin and unable to fairly consider

her claim, and they were dully excused by the Court. Palin's motion

identifies no retained juror that she asserts should have been struck

for cause.

Palin's principal complaint is that the Court did not ask where

prospective jurors got their news, a question that was proposed by

counsel for both sides.[5] See Mot. 10. "[B]ut federal trial judges are not required to ask every question that counsel -- even all counsel -- believes is appropriate." Lawes, 292 F.3d at 128. This case illustrates why: as explained on the record, the Court was concerned with preventing questions about prospective jurors' media habits from leading to the exclusion of educated jurors well equipped to interpret the evidence in this case. Palin's counsel has never meaningfully explained why this question was necessary, or even relevant. Indeed, one of the people ultimately empaneled disclosed that their partner had previously worked at "Fox News Channel," where Palin was a paid contributor. See Voir Dire Tr. 27-28. And considering the subject matter and personalities at issue in this case, the Court was equally concerned about not introducing any political charge to the proceedings. Creating a dynamic in which, for example, readers of the Times and viewers of Fox News were repeatedly struck before the other members of the venire would, in the Court's view, have cast an unacceptably partisan pall over the proceedings.

The Court accordingly reaffirms its confidence, both in the jury selection process that it has developed over more than 300 jury trials

---

[5] The motion suggests that questioning about news sources was required to "figure out whether jurors subscribed to the Times (and might be biased) or other news websites or apps through which they were or could be exposed to extra-judicial information about the case." Mot. 10. This is a red herring. If counsel were concerned at the outset about the jury's exposure to digital media, the appropriate response would have been to request further instructions on that issue. None was requested.

and in the fair and impartial jury selected for this trial. The Court also feels obliged to note, as it did repeatedly during trial and in the Rule 50 Opinion, that it was obvious to any observer that the jury actually selected in this case -- highly intelligent, attentive, diligent, and focused -- was a model jury in every respect.

## 2. Evidentiary Rulings

Palin also argues that the Court improperly excluded evidence by granting certain motions in limine filed by the Times. Specifically, Palin disputes the Court's exclusion of (1) certain articles about the Arizona shooting published on a blog hosted on the website of The Atlantic magazine while Bennet served as editor in chief of the magazine, (2) evidence concerning the Times's elimination of the Public Editor position, (3) an article about the media's inaccurate coverage of the Arizona shooting that was emailed to Bennet in 2011, and (4) evidence concerning Bennet's brother, who was elected as a Democrat to serve as U.S. senator from Colorado. Mot. 10-11. She further suggests that these evidentiary rulings somehow violated the Second Circuit's mandate from the motion to dismiss appeal. Neither contention has any merit.

The Court need not rehash the details of each of these four disputes. In accordance with its usual practice, the Court declined to rule on most of defendants' motions in limine before the trial, instead waiting to see how the evidence developed before making its determinations about relevance, foundation, and prejudice. Each of these issues was subject to written briefing and extensive oral

argument. The record of those arguments already reflects why the Court determined that Palin had failed to establish an adequate foundation to justify admission of this evidence, see Fed. R. Evid. 104(b), particularly in light of the significant Rule 403 concerns about some proffered exhibits.

The Court's Rule 50 Opinion further amplified the Court's rulings on the two most significant rulings, concerning the Atlantic blog posts and the evidence regarding Bennet's brother. See Op. 53-54 nn. 31-32. And even after the Court excluded these disputed categories of evidence, the Court expressly noted that the rulings were subject to reconsideration. For example, despite the absence of an adequate foundation in the deposition excerpts proffered as support by plaintiff's counsel during argument, plaintiff's counsel was expressly offered the opportunity to conduct further voir dire of Bennet outside the presence of the jury to lay additional foundation for the introduction of the challenged evidence. See Tr. 508. But plaintiff's counsel chose not to avail themselves of this opportunity, see, e.g., Op. 53-54 n. 32, and her motion provides no reason to excuse that choice.

Palin also suggests (without supporting argument) that these evidentiary decisions were "in violation of the mandate" that the Second Circuit issued after reversing this Court's order granting defendants' motion to dismiss. Mot. 10. This contention is frivolous. The prior appeal in this case concerned only the allegations set forth in Palin's complaint and the procedures employed by the Court in

16

assessing the plausibility of inferences drawn therefrom. See ECF 65. The Second Circuit made no evidentiary rulings (or even suggestions about admissibility), and it expressly disclaimed any view of the merits of Palin's claim. There is no colorable argument that the Second Circuit's prior mandate established any specific requirements for this Court's evidentiary rulings at trial.

For the foregoing reasons, the Court continues to believe the challenged evidentiary rulings were wholly correct. But, in any event, Palin's counsel, having declined the Court's invitation to try to lay the foundation that they had failed to establish during discovery, can hardly complain, let alone argue that these evidentiary rulings justify a new trial.

### 3. Jury Note

Palin disputes the Court's response to a question posed by the jury on the morning of February 15, 2022. The Court and the parties agreed that the jury's note contained two questions about the element of actual malice as to falsity: (i) whether the jury was permitted to draw an inference from Bennet's answer to a question posed by defense counsel and (ii) whether such an inference could contribute to the plaintiff's proof. Palin renews her objection to the Court's response to the second question, which read:

> In response to your second inquiry, an answer given by Mr. Bennet and a reasonable inference drawn therefrom is not sufficient in itself to carry the plaintiff's burden of showing by clear and convincing evidence that there was a high probability that Mr. Bennet actually doubted the truth of a challenged statement prior to publication, but it can contribute to the other evidence brought forth by the plaintiff.

17

Tr. 1323. Specifically, Palin argues that the jury should not have been told that an inference arising from Bennet's testimony was "not sufficient in itself to carry the plaintiff's burden." She concedes that this is a correct statement of the law insofar as it concerns a negative inference drawn from Bennet's testimony. <u>See</u> Op. 44-45; <u>see also</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 256 (1986). However, she now contends that the Court's response "ignore[es] that the jury question could have been about a direct inference or conclusion to be drawn from Bennet's testimony, or even an admission of actual knowledge of falsity." Mot. 19 n. 24.

There is nothing to support these contentions. As previously explained in the Opinion, Bennet offered no testimony from which the jury could properly draw a direct inference of actual malice, so the question must necessarily have concerned a negative inference. Nor did plaintiff's counsel -- either at the time of the jury note or in their instant motion -- identify any piece of Bennet's testimony from which the jury could have drawn a sufficient direct inference to justify a different instruction. In light of this trial record, her legal dispute is thus wholly academic.

Further still, plaintiff's counsel effectively waived this argument at trial. During the approximately half-hour colloquy through which the Court's response was crafted, the Court asked counsel for all parties whether they wanted to ask the jury "What question and answer are you referring to?" Tr. 1317. Plaintiff's counsel's definitive position was "we do not need to know the question and answer

they're referring to." Tr. 1319. Considering that the argument over the response to the jury's second question concerned the proper role of a negative inference from the defendant's testimony, if plaintiff's counsel believed there was a piece of Bennet's testimony from which a sufficient direct inference might be drawn, they should have accepted the Court's offer to inquire what piece of testimony the jury was asking about.

In any event, a new trial is "not require[d] ... if the instructions, read as a whole, presented the issues to the jury in a fair and evenhanded manner." Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 153 (2d Cir. 2014). As Palin concedes, the Court's response should be read together with Instructions No. 5 (circumstantial evidence) and No. 13 (actual malice), see ECF 170, which together clearly and accurately state the relevant legal standard. But Palin's further argument -- that the response was inconsistent with those instructions -- is wrong. As the Court explained during argument, the response addresses a specific wrinkle of defamation case law concerning the interaction between negative inferences about actual malice drawn from the defendant's testimony and the clear and convincing evidence standard that applies to the actual malice element. See Tr. 1322. The combination of the response to the jury's note read with Instructions No. 5 and 13 correctly states the law regarding the evidentiary basis from which the jury could find by clear and convincing evidence that defendants had published with actual malice.

### 4. Effect of the Rule 50 Decision

Finally, Palin argues that a new trial is warranted because, after the jury had rendered its verdict, a few of the jurors volunteered to the Court's law clerk that on February 14, 2022, while still deliberating, these few jurors had seen push notifications on their smartphones conveying the bottom line of the Court's intention to grant the Rule 50 motion, that is, to dismiss the case as a matter of law at the end of the case. Palin now suggests, without citing a scintilla of evidence, that the jurors must have "received push notifications throughout the trial, ... including articles with headlines that disparaged Plaintiff and her trial testimony." Mot. 21. But this gross and wholly unsupported speculation aside, there are at least four very strong, independent reasons why Palin cannot get a new trial because a few jurors saw a headline about the Court's legal ruling pop up on their phones.

First, and most obviously, if the Court's ruling dismissing the case as a matter of law under Rule 50 is correct, this entire controversy is an irrelevant side-show.

Second, even if the Court of Appeals were to reverse the Court's Rule 50 ruling and so had to consider whether to give effect to the jury's verdict, Palin has effectively waived the argument that the verdict is "tainted" by dropping the prong of her motion asking for permission to interview members of the jury. As the Court informed the parties in its order of February 15, 2022, the few jurors who volunteered to the Court's law clerk that they had seen push

notifications of the Court's Rule 50 determination also volunteered, indeed were adamant, that this had not affected their verdict or deliberations in the slightest. See ECF 172. But since this was hearsay, plaintiff could have asked to interview the jurors themselves to get first-hand knowledge, and, indeed, plaintiff's counsel indicated that they intended to seek the Court's permission to interview the jurors so they could do just that. See, e.g., ECF 195 ¶ 2.

Instead, plaintiff's counsel ultimately abandoned this request. While the plain inference is that they accepted as true what the jurors had told the law clerk, they try to justify their waiver by arguing that "Rule 606(b) prohibits the disclosure of the effect of anything on a juror's or another juror's vote." Mot. 24 (quoting Bibbins v. Dalsheim, 21 F.3d 13, 17 (2d Cir 1994)). This totally misstates the law. Rule 606(b) contains an express exception providing that a "juror may testify about whether ... extraneous prejudicial information was improperly brought to the jury's attention." Fed. R. Evid. 606(b)(2)(A). To be sure, Bibbins reaffirms the longstanding rule that "[e]ven when a juror attests to receiving information outside the record, the juror may not go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations." 21 F.3d at 17. But plaintiff's counsel could have sought interviews to determine precisely how many jurors saw push notifications about the Court's Rule 50 decision, whether any jurors were exposed to other media coverage of the trial, and, most important,

"the degree, if any, to which that information was actually discussed or considered" by the jury, <u>United States v. Calbas</u>, 821 F.2d 887, 896-97 (2d Cir. 1987). These facts might have been relevant to the "objective test" for determining if Palin suffered from any of the prejudice she hypothesizes. <u>Bibbins</u>, 21 F.3d at 17. One can only presume that counsel's preference to argue from innuendo rather than evidence reflects the strategic judgment that juror interviews would likely not have strengthened their hand.

Third, as noted in the Opinion, Palin did not preserve her objection to the Court's Rule 50 procedure.[6] Palin failed to object to the Court's stated intention to announce its Rule 50 decision but not to dismiss the jury, not only when the Court announced its decision but also at any of the earlier sessions of argument when the Court proposed this approach.[7] <u>See</u> Op. 35. And, in her motion, Palin cites no authority holding that the Court acted improperly, either by deciding the Rule 50 motion or by announcing that decision once it had

_____

[6] Palin now also contends that she need not have objected to the Court's decision to announce the Rule 50 decision because "[t]his waiver position was rejected in the Mandate" from the prior Second Circuit appeal. Mot. 23. This is totally without basis. Yes, the Second Circuit excused Palin's counsel's failure to object to the Court's unconventional procedure to conduct a brief evidentiary hearing on the motion to dismiss. <u>See</u> ECF 65 at 12 n. 24. But that cannot reasonably be read to excuse counsel from the obligation to preserve any and all other objections during the entire rest of the litigation.

[7] Palin maintains that the Court preserved her procedural objection in a comment made after it announced the Rule 50 decision. <u>See</u> Mot. 23. But she provides no argument for why this is so, and the Opinion already explains why this position is manifestly incorrect. <u>See</u> Op. 36 n. 21.

decided the issue but declining to then dismiss the jury.[8] Nor did
Palin's counsel believe that any further instruction to the jury about
avoiding media coverage after the Rule 50 decision was announced,
though the Court nevertheless gave such an instruction at defendants'
request. See Op. 36-37; Tr. 1307.

Fourth, the available information suggests that the jury did
exactly as it was repeatedly instructed to do when it encountered
coverage of the trial: turn away and focus on the evidence. "It is not
an uncommon occurrence for a notorious trial held in Metropolitan New
York to engender extensive publicity." United States v. Gaggi, 811
F.2d 47, 51 (2d Cir. 1987). Indeed, if the mere encountering during
trial of media information about otherwise unknown events relevant to
the trial were sufficient to taint a jury and require a new trial, our
entire jury system would be cast in great jeopardy in any and every
case that was the subject of significant media coverage.

Nor does Palin explain why there is a qualitative difference
between exposure to media coverage in general and exposure to coverage
that reflects the Court's view about legal issues in the case.[9] Jurors

---

[8] Indeed, the Court had employed a similar Rule 50 procedure at
least once before, and that case was affirmed by the Second Circuit.
See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 282
(2d Cir. 1998).

[9] Indeed, a jury often learns of a judge's view of a case when,
for example, a judge appoints an expert witness and expressly informs
the jury that it is a court-appointed witness, see Fed. R. Evid.
706(d); **Error! Main Document Only.**when the judge dismisses certain
of the plaintiff's claims before the start of (or during) jury
deliberations and tells the jury that the claims have been dismissed,
see, e.g., Gonzalez v. United States, 1989 WL 124069 at *1 (E.D.N.Y.

are not shy about furnishing their own opinions, nor easily cowed by contrary authority. Indeed, it was just such interference from judicial authority that led our Founding Fathers to enshrine the right to a jury in our Constitution. A new trial is thus only appropriate "if the juror's ability to perform her duty impartially has been adversely affected ... and [a party] has been substantially prejudiced as a result." United States v. Ganias, 755 F.3d 125, 132 (2d Cir. 2014), rev'd on other grounds on reh'g en banc, 824 F.3d 199 (2d Cir. 2016). In the Opinion, the Court discussed at length why it concluded that in this case the Court was "left with the definite conviction that the information did not remotely affect the ultimate verdict." Op. 66. The Court now reaffirms that conclusion.

In sum, Palin's arguments have established neither error nor prejudice, so they cannot justify granting a new trial. Accordingly, Palin's motion for a new trial is denied.

### C. Reconsideration of the Rule 50 Decision

Finally, Palin moves for reconsideration of the Court's decision to grant defendants' Rule 50 motion for judgment as a matter of law. Palin's motion discusses various pieces of evidence while making three basic arguments.

---

Oct. 6, 1989); or when, as used to be common and is still permitted, the judge marshals the evidence as part of its charge to the jury, see United States v. Mundy, 539 F.3d 154, 156-159 (2d Cir. 2008). **Error! Main Document Only.**Here, by contrast, the jury was expressly instructed that the Court's "rulings were no more than applications of the law" and that the Court had "no opinion as to the verdict you should render in this case." Tr. 1206.

First, Palin contends that the Court misapplied the Rule 50 standard by disregarding certain evidence, drawing inferences unfavorable to her claim, and "adopt[ing] Bennet's testimony as true." Mot. 24. This is simply untrue. The Opinion already addressed the full evidentiary record, and none of the arguments in Palin's motion undermines the Court's prior conclusions. Palin wrongly contends that the Opinion improperly "credited" Bennet's testimony on issues such as whether he opened the ABC News hyperlink in Williamson's draft, whether he meant his email to Williamson asking her to "please take a look" as a request for her to fact check his draft, and whether it is true that in 2017 he did not recall any reporting about the police investigation of the 2011 Arizona shooting. Mot. 16, 27. But at trial Palin provided no concrete, let alone material, evidence undermining Bennet's testimony on these points, and she identifies no authority supporting the proposition that the Rule 50 standard requires the Court to disbelieve uncontested testimony.

The fundamental shortcoming in her trial presentation remains apparent: nowhere does the motion identify any piece of research actually considered during the drafting process by Bennet or any other member of his team that states a fact about the Arizona shooting that would have falsified the Challenged Statements' inference of a causal link between the Crosshairs Map and Loughner's murderous rampage. Nor does the motion identify any testimony or contemporaneous communication suggesting that any member of the team knew or suspected that the asserted link had been disproven. And since Palin adduced no

affirmative evidence on these points, her claim fails as a matter of law. See Anderson, 477 U.S. at 256; Contemp. Mission, Inc. v. New York Times Co., 842 F.2d 612, 621-622 (2d Cir. 1988); Op. 43-45.

Palin's second and third arguments are premised on fundamental misunderstandings about the relationship between a motion for judgment as a matter of law advanced at the close of the evidence and the conclusions drawn at earlier points in this litigation.

Palin's second argument is that the Court violated the Second Circuit's mandate from her appeal of the order grating defendants' motion to dismiss, because the Court's interpretation of certain evidence at trial differed from the Second Circuit's assessment of various allegations made in the complaint. But this argument is illogical. The prior appeal considered only the complaint and drew all plausible inferences in Palin's favor therefrom. That appeal never considered any evidentiary record in this case, nor assessed Palin's claims in any posture other than as a motion to dismiss. It is fundamental that a "district court d[oes] not violate the mandate rule by addressing on remand an issue that was not decided by [the Second Circuit] in the original appeal." Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 762 F.3d 165, 175 (2d Cir. 2014). And the Second Circuit has squarely rejected the contention that its review of a claim on a motion to dismiss constrains the district court's analysis after the record has been developed in discovery (let alone limited to the evidence adduced at trial). Brown v. City of Syracuse, 673 F.3d 141, 148 (2d Cir. 2012); see also id. ("There is no inconsistency

between our statement of hypothetical circumstances in [the first appeal] about what could be possible based on the allegations in the complaint and the district court's subsequent determination of what [the plaintiff] would in fact be able to prove given the evidence and subsequently clarified state of the law.").

For instance, Palin argues that "the Opinion ... contradicts the Mandate ... by discounting the ABC News article hyperlink and rejecting Palin's argument that the presence of the hyperlink was circumstantial evidence of actual malice." Mot. 29. But what the Opinion actually holds is that the hyperlink to the ABC News article does not establish that Bennet published with actual malice since the uncontradicted testimony at trial was that he never clicked the link or read the article. Op. 49-50.[10] Palin suggests that the Opinion's reasoning was somehow foreclosed by the Second Circuit's holding that the Court erred by crediting Bennet's testimony at the 2017 plausibility hearing rather than drawing the inference most favorable to Palin from the complaint's allegations. ECF 65 at 18. But that was a procedural ruling that turned on pleading standards, not a substantive assessment of the ABC News article or the evidence concerning its use (or lack thereof)

---

[10] The Opinion further notes that even if Bennet had read the ABC News article, "it is not at all clear that it would establish that Bennet knew that there was no connection between the cross hairs map and Loughner's attack," since a "reasonable reader in Bennet's position would not necessarily understand the hedge contained in the tenth paragraph -- that within one day of the attack, no firm connection had yet been made been made between Loughner and the map -- as conclusive evidence that no such connection was later established by investigators." Op. 50 n. 28.

27

by Bennet and the Times. The Opinion therefore could not have violated the mandate rule, regardless of how it interpreted the evidence on that point. The same error infects the other instances in which Palin's motion invokes the mandate rule.

Finally, Palin suggests that the Rule 50 decision was erroneous because the Opinion's conclusions regarding particular pieces of evidence differed in certain respects from conclusions the Court drew on summary judgment. Palin provides no authority for the proposition that the Court is somehow precluded by its prior denial of summary judgment. Indeed, the Second Circuit has squarely rejected this argument, affirming a district court's grant of a Rule 50 motion for defendants where "at an earlier stage of the case the court had denied a motion by defendants for summary judgment. The denial of summary judgment is an interlocutory decision. All interlocutory orders remain subject to modification or adjustment prior to the entry of a final judgment adjudicating the claims to which they pertain." Williams v. Cnty. of Westchester, 171 F.3d 98, 102 (2d Cir. 1999) (citing Fed. R. Civ. P. 54(b)). Furthermore, even leaving aside the interlocutory nature of summary judgment, it is unremarkable that the Court might reach different conclusions, even as to the same piece of evidence, on a Rule 50 motion. The standard remains the same -- the Court must view the record in the light most favorable to the non-movant -- but the object of analysis has changed. On a Rule 50 motion, the Court must assess each document or piece of testimony in the context of the trial record, which differs from the summary judgment record for many

reasons, including evidentiary rulings by the Court, the strategic choices of counsel, and differences between witnesses' trial and deposition testimony.

Since Palin has identified neither legal nor factual errors with the Opinion, her motion for reconsideration of the Court's Rule 50 decision is denied.

**III.  <u>Conclusion</u>**

The meritless accusations of impropriety in Palin's motion cannot substitute for what her trial presentation lacked: proof of actual malice. This requires, under both Supreme Court precedent and New York State statutory law, clear and convincing evidence that Bennet and the <u>Times</u> published "America's Lethal Politics" knowing that it was false or in reckless disregard of its falsity. <u>See</u> <u>New York Times v. Sullivan</u>, 376 U.S. 254, 280 (1964). And, as the Supreme Court has likewise held, this high standard cannot be satisfied simply by a negative inference drawn from discrediting Bennet's denials. <u>See</u> <u>Anderson</u>, 477 U.S. at 256. Here, Palin still cannot identify <u>any</u> affirmative evidence to support the essential element of actual malice. This absence is not a consequence of trial procedures, judicial bias, or adverse evidentiary rulings. It is, in the Court's view, a reflection of the facts of the case. To be sure, as the Court itself recognized even it is initial statement of its Rule 50 decision, the evidence showed that Bennet and the <u>Times's</u> Editorial Board made mistakes as they rushed to meet a print deadline, and that their editorial processes failed to catch those mistakes before publication.

See Tr. 1303-1304. But in a defamation case brought by a public figure like Sarah Palin, a mistake is not enough to win if it was not motivated by actual malice. And the striking thing about the trial here was that Palin, for all her earlier assertions, could not in the end introduce even a speck of such evidence.

Palin's motion is hereby denied in its entirety.

SO ORDERED.

New York, NY
May 31, 2022

JED S. RAKOFF, U.S.D.J.

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 16th day of June, two thousand twenty-two.

Before:     John M. Walker, Jr.,
            Denny Chin,
                  *Circuit Judge,*
            John F. Keenan,
                  *District Judge.*[*]

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jun 16 2022

In Re: Sarah Palin
----------------------------

Sarah Palin,

      Petitioner,

v.

The New York Times Company, James Bennett,

      Respondents.

---

**ORDER**

Docket No. 22-629

Petitioner Sarah Palin petitions for a writ of mandamus.  Upon due consideration, it is hereby ORDERED that the petition is DENIED because mandamus relief is not warranted under the present circumstances.  *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004). However, denial of the petition is without prejudice to the issues presented in the petition being addressed in Petitioner's pending appeal, which will be assigned to a new panel in the ordinary course.

For the Court**:**
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[*] Judge John F. Keenan, of the United States District Court for the Southern District of New York, sitting by designation.

CERTIFIED COPY ISSUED ON 06/16/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SARAH PALIN, an individual,

                    Plaintiff,

  – against –

THE NEW YORK TIMES COMPANY,
A New York corporation

                  Defendants.

No. 17 Civ. 4853

Hon. Jed S. Rakoff

ECF Case

## <u>AMENDED NOTICE OF APPEAL</u>

NOTICE IS HEREBY GIVEN that Sarah Palin, Plaintiff in this case, hereby appeals to the United States Court of Appeals for the Second Circuit from the Final Judgment entered in this action on February 15, 2022 [Doc. 171] ("Final Judgment"), inclusive (without limitation) of: the Court's February 14, 2022 oral [Tr. Trans. at 1295-1306] and March 1, 2022 written [Doc. 196] rulings granting judgment as a matter of law under *Fed. R. Civ. P.* 50; the February 15, 2022 Jury Verdict [Doc. 173]; The August 28, 2020 Opinion and Order (denying summary judgment) [Doc 117]; the December 29, 2020 Memorandum Order [Doc. 125] (applying N.Y. Civil Rights Law § 76-a, as amended on November 10, 2020, to this action); the May 31, 2022 Opinion and Order [Doc. 203] (denying post-trial motions); and any and all interlocutory judgments, decrees, decisions, rulings,

verdicts, and opinions that merged into and became part of the Final Judgment, that

are related to the Final Judgment, and upon which the Final Judgment is based.

/s/ Shane B. Vogt
Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: (813) 834-9191
Fax: (813) 443-2193

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY 10017
Tel: (212) 907-7300
Fax: (212) 754-0330

*Counsel for Petitioner/Plaintiff*
*Sarah Palin*

**JA 2525**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Amended Notice of Appeal was filed electronically on the 16th day of June, 2022.  Notice of this filing will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt.  Parties and their counsel may access this filing through the Court's system.

                 */s/ Shane B. Vogt*
                 Attorney for Plaintiff Sarah Palin

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jul 20 2022

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 16th day of June, two thousand twenty-two.

Before:      John M. Walker, Jr.,
                Denny Chin,
                      *Circuit Judge,*
                John F. Keenan,
                      *District Judge.*[*]

---

In Re: Sarah Palin
---------------------------

Sarah Palin,

          Petitioner,

v.

The New York Times Company, James Bennett,

          Respondents.

---

**ORDER**

Docket No. 22-629

      Petitioner Sarah Palin petitions for a writ of mandamus. Upon due consideration, it is hereby ORDERED that the petition is DENIED because mandamus relief is not warranted under the present circumstances. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004). However, denial of the petition is without prejudice to the issues presented in the petition being addressed in Petitioner's pending appeal, which will be assigned to a new panel in the ordinary course.

For the Court**:**
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[*] Judge John F. Keenan, of the United States District Court for the Southern District of New York, sitting by designation.