# No. 22-558

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

SARAH PALIN, an individual

*Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY, a New York
corporation, and JAMES BENNET, an individual

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Southern District of New York
(Case No. 1:17-cv-04853-JSR, Hon. Jed S. Rakoff)**

**JOINT APPENDIX**

**VOLUME III OF XI (Pages JA416 to JA594)**

Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: 813- 834-9191
Fax: 813-443-2193

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY 10017
Tel: 212-907-7300 Fax: 212-754-0330

*Counsel for Plaintiff-Appellant Sarah Palin*

# JOINT APPENDIX

# TABLE OF CONTENTS

## Volume III of XI

Trial Transcript, February 7, 2022 .................................................................JA416

**JA 0416**

M271PAL1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SARAH PALIN, an individual,

4                    Plaintiff,

5            v.                              17 CV 4853 (JSR)

6   THE NEW YORK TIMES COMPANY, *et
    al.*,
7
                     Defendants.
8
    ------------------------------x        Trial
9
                                            New York, N.Y.
10
                                            February 7, 2022
11                                          9:30 a.m.

12  Before:

13                        HON. JED S. RAKOFF,

14                                          District Judge

15                          APPEARANCES

16  TURKEL CUVA BARRIOS, P.A.
17       Attorneys for Plaintiff
    BY:  SHANE B. VOGT
18       KENNETH G. TURKEL

19
    BALLARD SPAHR, LLP
20       Attorneys for Defendants
    BY:  DAVID L. AXELROD
21       JACQUELYN N. SCHELL
         THOMAS BYRNE SULLIVAN
22       JAY WARD BROWN

23

24  Also Present:

25  Dana Green, Senior Counsel, The New York Times Company

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M271PAL1                           Lett - Direct

```
 1                (Jury present)

 2                THE COURT:  Please be seated.

 3                So ladies and gentlemen, I hope you had a good

 4      weekend.

 5                I was just told by my courtroom deputy that because we

 6      had to start a little late that you suggested that we forgo the

 7      midmorning break and sit right through till lunch.  Now if you

 8      can do it, I can do it.  Okay.  Of course you'll miss your

 9      midmorning coffee and snacks, but that's all right because my

10      law clerks will consume them.

11                So, all right.  Very good.  Let's please call your

12      next witness.

13                MR. TURKEL:  Plaintiff calls Phoebe Lett.

14                THE DEPUTY CLERK:  Please rise.  Remove your mask.

15      Raise your right hand.

16                (Witness sworn)

17                THE DEPUTY CLERK:  Please be seated.  Pull the

18      microphone closer to you.

19                State your name and spell it for the record.

20                THE WITNESS:  Sure.  I am Phoebe Lett.  P-H-O-E-B-E,

21      last name Lett, L-E-T-T.

22                THE COURT:  Counsel.

23                MR. TURKEL:  Yes, your Honor.  May it please the

24      Court.

25
```

1    PHOEBE LETT,

2         called as a witness by the Plaintiff,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. TURKEL:

6    Q.   Ms. Lett, where do you currently work?

7    A.   I work at *The New York Times* opinion section.

8    Q.   And what is your role right now in *The New York Times*

9    opinion section?

10   A.   I am an audio producer.  I make a podcast called *The*

11   *Argument*.

12   Q.   And if you could just explain perhaps to the jury what that

13   podcast is.

14   A.   Yeah.  It's a debate show that basically takes -- tries to

15   find two good-faith sides of an issue, any big question that's

16   in the zeitgeist or in politics, and tries to find two people

17   who can in good faith represent the diff -- opposing sides of

18   the argument basically so that at the end of an episode, you

19   know better your own opinion and also how the other side

20   thinks, and it sort of defangs and demonstrates that

21   disagreement can actually be something that's a good thing, can

22   be enjoyable, even.

23   Q.   How long have you been doing the podcast?

24   A.   I've been working on the podcast since its inception, so

25   that was in 2018.  But my title, I only became audio producer

JA 0419

M271PAL1                    Lett - Direct

1    in 2019.

2    Q.  Before you worked for the podcast, what was your role at

3    *The New York Times*?

4    A.  I was the editorial assistant to the editorial board.

5    Q.  And in that respect, what did you do?

6    A.  So my job as the editorial assistant to the board was

7    basically to make sure all of their guests that come into the

8    board to meet with them had a good time; also logistics was

9    handled; I also served any administrative needs that the board

10   had, so anything from how do I copy and paste this document to

11   finding, you know, transcripts from a trial of some kind, you

12   know; any -- anything that they needed, kind of handled it

13   administratively.

14   Q.  You were also research assistant to the editorial board,

15   weren't you?

16   A.  Right, yes.  Part of the role would be if they requested,

17   say, you know, there's a -- something happening in Washington,

18   can you find the C-SPAN transcript of it, can you go back and

19   look to see X, Y, and Z; I would research that for them, on

20   their request.

21   Q.  Beyond that you were also editorial op-ed editor

22   fact-checker, were you not?

23   A.  I would -- I wasn't officially a fact-checker.  My title

24   was editorial assistant.  I would fact-check if the Ed. board's

25   main fact-checker Eileen was out sick or on vacation.

M271PAL1                    **JA 0420**                    Lett - Direct

1   Q.  Did you not serve as one of two fact-checkers on the

2   editorial board with -- when you say Eileen, you mean Eileen

3   Lepping, right?

4   A.  I do, yes.

5   Q.  And during your tenure were you not the editorial assistant

6   to Eileen Lepping and actually trained by Eileen Lepping to be

7   a fact-checker?

8   A.  Yes, I was trained by Eileen to fill in for her if she was

9   ever on vacation or out sick.

10  Q.  In that respect, as far as your training as a fact-checker,

11  were there any written policies or procedures that you were

12  given for that training?

13  A.  No.  I -- I don't know what you mean.

14  Q.  Well, let me ask you this:  When you say you were a

15  fact-checker, what a fact-checker does is goes through every

16  piece to make sure every sentence, every word is the truth, it

17  reflects the facts, and is a fair and accurate and truthful

18  representation of what happened, right?

19  A.  Are you asking me if I am a -- if I was a fact-checker or

20  if that's what a fact-checker does?

21  Q.  No.  I'm asking you if that's what a fact-checker does.

22  A.  A fact-checker looks at every line of the given article and

23  verifies that it is as truthful as possible.

24  Q.  Correct.  And the training you received in that respect

25  would have been from Eileen Lepping, right?

**JA 0421**

M271PAL1                         Lett - Direct

1   A.  Prior to my work on the board, I was a freelancer in the

2   opinion section for a few months, so there were a lot of

3   assistants and fact-checkers in my life, so she was one of the

4   people who trained me, yes.

5   Q.  During your time on the board were there any other

6   fact-checkers other than you and Eileen Lepping?

7   A.  No.

8   Q.  And what I was asking you before was:  Beyond the training

9   that you got from Eileen Lepping, there were no written

10  guidelines or procedures given to you as a fact-checker, were

11  there?

12  A.  No.  No, sir.

13  Q.  I want to talk a little bit about your education before you

14  got to *The Times*, all right?

15  A.  Okay.

16  Q.  You graduated from Georgetown in 2013, right?

17  A.  I did, yes.

18  Q.  And you double-majored in American government and English,

19  right?

20  A.  That's right, yes.

21  Q.  You did the first two years of your college at Villanova,

22  correct?

23  A.  I did, yes.

24  Q.  And your major there was political science and English,

25  right?

1   A.   That's right.

2   Q.   Your interest in being a political science major was based

3   on the idea that you wanted a career in political speech

4   writing, right?

5   A.   Yes, yes.

6   Q.   And what spawned that, what ignited that interest was the

7   election between John McCain and Barack Obama, right?

8   A.   That and overdoing of *The West Wing*.

9   Q.   Did you say overdoing *The West Wing*?

10  A.   I sort of watched too much *West Wing* in high school, yes.

11  Q.   Specifically when you were -- before you were of voting

12  age, right?

13  A.   Yes.

14  Q.   You were drawn to President Obama as a political leader

15  based on his speech and rhetoric skills, right?

16  A.   I think -- so yeah, I was a teenager.  It was the first

17  time that I really paid attention to an election, and it was

18  the first time that I thought that politics could be an agent

19  of change on either side.  There was an exciting opportunity

20  for the first something, and it was the first time in my life

21  I'd ever seen candidates from either side that were --

22          THE COURT:  Counsel, there's been no objection so I'm

23  reluctant to intervene, but it's hard for me to see the

24  relevance of any of this.

25          MR. TURKEL:  Well, Judge, background.

JA 0423

M271PAL1                        Lett - Direct

```
 1                  THE COURT:  Well, let's move on.

 2                  MR. TURKEL:  Yes, your Honor.

 3      BY MR. TURKEL:

 4      Q.  In your job as a fact-checker, when you fact-checked a

 5      piece, you used sources which were verified and trusted

 6      sources, right?

 7      A.  That's right.

 8      Q.  And that could be the news division at The Times, right?

 9      A.  Yes, sir.

10      Q.  Or any other verified or trusted news outlets; for

11      instance, the Wall Street Journal would be one, right?

12      A.  Yes, sir.

13      Q.  Washington Post would be one?

14      A.  Yes, sir.

15      Q.  LA Times?

16      A.  Yes, sir.

17      Q.  ABC News, would that be one?

18      A.  Yes, sir.

19      Q.  All right.  So let's go back to your department while

20      you -- prepodcast at the time.  You worked at the New York

21      office, right?

22      A.  Yes, sir.

23      Q.  Do you know who Robert Semple is?

24      A.  I do.

25      Q.  You're very fond of Robert Semple, aren't you?
```

**JA 0424**

M271PAL1                          Lett - Direct

1    A.  I love Bob.

2    Q.  Okay.  He's -- for the jury's benefit --

3              THE COURT:  No.  You can't testify, counsel.

4              MR. TURKEL:  I'll phrase it as a question, your Honor.

5    Q.  Has he been at *The Times* a long time?

6    A.  He had been there a long time.

7    Q.  Had he been there a long time at the time you were working

8    with him?

9    A.  Yes, he had.

10   Q.  When did he leave?

11   A.  Oh, that's a good question.  Probably 2018.  I remember the

12   retirement party well, but I could not tell you the year at

13   this point.

14   Q.  All right.  Linda Cohn, do you know her?

15   A.  I do.

16   Q.  And she worked in the New York office also, right?

17   A.  She did, yes.

18   Q.  And what was her job there?

19   A.  She was one of the editors on the editorial pages.

20   Q.  Nick Fox, are you familiar with him?

21   A.  I am.

22   Q.  He also worked in the New York office, right?

23   A.  Yes.

24   Q.  And was he also an editor?

25   A.  He was.

**JA 0425**

M271PAL1                           Lett - Direct

1   Q.  You worked with Mr. Semple every day, right?

2   A.  I did.

3   Q.  And with Ms. Cohn every day?

4   A.  Correct.

5   Q.  Elizabeth Williamson, do you know who she is?

6   A.  I do, yes.

7   Q.  She worked out of the DC office, right?

8   A.  She did.

9   Q.  You worked with her occasionally if she joined in virtually

10  or if you were asked to research a piece for her, correct?

11  A.  Exactly, yeah.

12  Q.  Also, we talked about Eileen Lepping.  Eileen Lepping

13  worked next to you, too, right, in the New York office?

14  A.  Yes.  Do you mean physically?

15  Q.  So on that editorial sort of board team, everybody was

16  working out of New York except Ms. Williamson on that list,

17  right?

18  A.  No.  We had a foreign correspondent who was -- I believe he

19  lived in Paris, and -- yeah, so I think he was the other

20  non-New Yorker.

21  Q.  I meant out of the people I named.

22  A.  Oh.  Yes, everyone else was there.

23          THE COURT:  That wasn't your question, but if that's

24  your revised question, that's fine.

25          MR. TURKEL:  Yeah, I was trying to clarify, your

M271PAL1                        **JA 0426**    Lett - Direct

 1   Honor.

 2           If we could just, for the benefit of the witness, pull

 3   up No. 17.

 4   BY MR. TURKEL:

 5   Q.  And can you see that, Ms. Lett?

 6   A.  I see "Ethical Journalism"; is that right?

 7   Q.  Yes.  Are you familiar with that document?

 8   A.  Yes.

 9   Q.  Was that a document that you were following when you were

10   working in the editorial department in June of 2017?

11   A.  Yes.

12           MR. TURKEL:  Your Honor, at this time we would offer

13   Exhibit 17.

14           THE COURT:  Any objection?

15           MR. SULLIVAN:  No objection, your Honor.

16           THE COURT:  Received.

17           (Plaintiff's Exhibit 17 received in evidence).

18           THE COURT:  I thought it was already in, but --

19           MR. TURKEL:  There's another one just like it, Judge.

20   It's No. 18.  There's "Ethical Journalism" and "Guidelines on

21   Integrity" book.  I don't know how one got in and not the

22   other.  That's why we're offering it.

23           And if you could publish that.  We're on auto-publish,

24   right?

25   BY MR. TURKEL:

**JA 0427**

M271PAL1                              Lett - Direct

1  Q.  And Ms. Lett, now that the jury can see it, it's in

2  evidence, that's the document that was in place when you were

3  working in your capacity as an editorial assistant in June

4  2017, right?

5  A.  Yes.  It looks like the one in 2017.  I'm sure they update

6  it year to year, but yes.

7          MR. TURKEL:  And if you could pull up Plaintiff's 18

8  also.

9          And this is already in, your Honor.

10 Q.  And are you familiar with that document, "The New York

11 Times Guidelines on Integrity"?

12 A.  Yes.

13 Q.  And that's also another internal guideline and policy book

14 that you were following in June of 2017; is that right?

15 A.  Correct.

16 Q.  All right.  I want to direct your attention now to that

17 very month, to June of 2017.  Are you familiar with the

18 June 14, 2017 editorial that was published relating to the

19 Steve Scalise shooting, titled "America's Lethal Politics"?

20 A.  Yes.

21 Q.  And at that time when it was published, you were working in

22 the editorial department, were you not?

23 A.  Correct.

24 Q.  With respect to that publication, that editorial -- and I

25 think the easiest thing to do is to call it by its name or call

1   it the June '17 editorial for your ease.  But you were asked to

2   look up *The New York Times*'s previous positions and what they

3   had written about that topic, from the board's perspective,

4   were you not?

5   A.  Correct.

6   Q.  And to make sure that the writers and editors that were

7   working on that were as informed as they could be.  Your

8   research was not just on the editorial side but the opinion

9   side also, was it not?

10  A.  No.  I was only researching for the editorial.

11  Q.  Did you not, as a matter of practice, also research on the

12  opinion side?

13  A.  My research included two search engines, our website and

14  then also our internal one, and in that some of the opinion

15  pieces that were not written by the board did seep in, they're

16  not very good search engines, so I was exposed to those, but I

17  was looking for specifically the board.

18  Q.  When you researched the specific piece, the "America's

19  Lethal Politics," did you not inadvertently look at the

20  opinion, search the opinion on the department also?

21  A.  I searched our website under the editorial board's banner

22  and also the internal search engine, which we call Times Past.

23          THE COURT:  So I'm unclear.  This research was

24  undertaken after the editorial first appeared or before?

25          THE WITNESS:  Before, your Honor.

JA 0429

M271PAL1                    Lett - Direct

1                    THE COURT:  Before.  And how long before?

2                    THE WITNESS:  Earlier that morning, so after it had

3       been assigned but before it was fully written.

4                    THE COURT:  Okay.  And who asked you to do this

5       research?

6                    THE WITNESS:  Bob Semple, Robert Semple, asked me to

7       pull the past positions that the board had taken.

8                    THE COURT:  The past positions that the board had

9       taken on what?

10                   THE WITNESS:  On the Giffords shooting, the shooting

11      of politicians in general, but -- the Giffords shooting.

12                   THE COURT:  All right.  Go ahead, counsel.

13                   MR. TURKEL:  Judge, if I could, I've got a copy of the

14      witness's deposition for her.  I'd like her to look at it.  I'd

15      like to follow up on the opinion question, and I have a copy

16      for the Court also.

17                   THE COURT:  Well, I'm not clear, and maybe the jury is

18      not clear, on what the difference is between the research on an

19      editorial relating to facts and research relating to opinions.

20      What is the difference, if any?

21                   THE WITNESS:  The difference is basically my role,

22      your Honor.  So I was looking specifically for past positions,

23      what we'd written on the editorial board so that we can either

24      amend it or correct it.  So if we wanted to change something we

25      had said in the past, we, as the board, we would point to when

M271PAL1                    **JA 0430**          Lett - Direct

1     we were either wrong or when we've evolved our position, so

2     that's what they were looking for me to find was, do we have

3     past positions that we need to either reiterate and stick to or

4     are we making a change, are we saying something new this time.

5     That was basically all I was looking for.  So the ask was, what

6     has the editorial board said.  Now the problem is our search

7     engine did pull in a few opinion articles as well, and so I

8     imagine that's what you want to show me.

9               MR. TURKEL:  Judge, again.

10              THE COURT:  I'm going to let you ask all the questions

11    you want, but I'm still not clear.  If I'm not clear, I don't

12    think the jury is.

13              What specifically did you research?  Just answer that.

14    Don't give me the history of the world.  Just answer that.

15              THE WITNESS:  Yes, your Honor.  I researched the

16    editorial board articles that were written about the shooting

17    of congresspeople.

18              THE COURT:  Editorial articles by *The Times* or by a

19    variety of publications or both?

20              THE WITNESS:  By just the editorial board at *The New*

21    *York Times*.

22              THE COURT:  Okay.  Go ahead, counsel.

23    BY MR. TURKEL:

24    Q.  And so what I'm trying to understand is whether it's your

25    testimony that you didn't also look within the whole

1    department, including the opinion side of the department.

2              THE COURT:  Counsel, unless you can clarify, in this

3    context, what you mean by "opinion," I can't allow the

4    question.

5              MR. TURKEL:  I can lay a predicate, your Honor.

6    Q.  Ms. Lett, within the broad umbrella of the editorial

7    department, you have the editorial board, right?

8    A.  Yes.

9    Q.  And the answers you just gave the Court related to

10   researching pieces written by the editorial board, right?

11   A.  Correct.

12   Q.  And that would include the people we've been talking about,

13   like Ms. Williamson, Mr. Fox, etc.

14   A.  Correct.

15   Q.  Also within that broader umbrella is the opinion editorial

16   section, right?

17   A.  We don't call it the editorial section.

18   Q.  You call it the opinion section.

19   A.  Yes.  We'd call it the opinion side.

20   Q.  And that is comprised perhaps of guest writers or other

21   writers that contribute who aren't part of the editorial board,

22   right?

23   A.  Correct.

24   Q.  All I'm trying to find out is, when you did your research,

25   whether you just researched your editorial board or whether you

1    researched opinions too.

2    A.  I was asked to research the editorial board's positions, so

3    I researched those.  In my search, a few of the opinion side,

4    from the columnists, which are not on the board, did come up,

5    and so I forwarded those as well.

6              MR. TURKEL:  All right.  And, Judge --

7              THE COURT:  All right.  So again, as I understand it,

8    *The New York Times* -- let's take the print edition, for

9    example.  So after one wades through all the other parts of

10   Section A, you finally come to two pages, and they include some

11   editorials written on behalf of *The Times* by the editorial

12   board and they also have some op-eds, some opinion editorials,

13   written by other people.

14             THE WITNESS:  That's right, your Honor, yes.

15             THE COURT:  Okay.  And so are you saying that when you

16   did this research, although you were looking for what the

17   editorial board had written on the subject, you did come across

18   some op-ed columns as well?

19             THE WITNESS:  That's correct.  That's correct, your

20   Honor.

21             THE COURT:  Okay.  Go ahead, counsel.

22   BY MR. TURKEL:

23   Q.  And I guess what I was trying to find out, Ms. Lett, was

24   whether you, as part of this research project, intentionally

25   looked at the opinion research.

M271PAL1                    **JA 0433**
                            Lett - Direct

1   A.  My request—the request given to me—was to look for past

2   editorial board positions and so that research was not out

3   there.

4               MR. TURKEL:  And Judge, again, if I can approach with

5   a copy of her deposition.

6               THE COURT:  Sure.

7               MR. TURKEL:  And I have a copy for the Court, your

8   Honor.

9               MR. AXELROD:  What's the page and line, Mr. Turkel?

10              MR. TURKEL:  Let me hand these to them and I'll read

11  them to you when I get back there.

12              THE COURT:  Page and line number?

13              MR. TURKEL:  Yes, your Honor.  For the benefit of

14  Court and counsel, I'm at page 57, lines 10 through 25.  And

15  for the benefit of the witness, also.

16  BY MR. TURKEL:

17  Q.  And Ms. Lett, if you'd just let me know when you get there.

18              THE COURT:  Any objection?

19              MR. SULLIVAN:  No objection, your Honor.

20              THE COURT:  All right.

21  BY MR. TURKEL:

22  Q.  All right.  So Ms. Lett, you recall having your deposition

23  taken on May 4, 2020?

24  A.  I do, yes.

25  Q.  My partner Shane Vogt, who's sitting right there, took your

M271PAL1                        JA 0434
                                Lett - Direct

1    deposition, right?

2    A.   Yes.

3    Q.   And you took an oath just like you took today, right?

4    A.   Yes.

5    Q.   And at that deposition, were you not asked the following

6    questions and gave the following answers --

7              And for context, I'll read the question before.

8              "And in connection with the editorial of June 14th of

9    2017 on the Scalise shooting, did you go back and do research

10   for past articles in the opinion section concerning the

11   Loughner shooting?"

12             Your answer:  "I was asked to look up our previous

13   positions --"

14             THE COURT:  I'm sorry.  You have to say "Answer" so

15   the jury knows when you're moving from the question to the

16   answer.

17             MR. TURKEL:  I did.  I said, "And your answer," your

18   Honor.

19             THE COURT:  I'm sorry.  Forgive me.

20   BY MR. TURKEL:

21   Q.   Your answer was:  "I was asked to look up our previous

22   positions and what we had written about personally as -- from

23   the board's perspective, so I focused my research on what the

24   board wrote."

25             "Q.  Did you conduct any research into any other

1  opinion pieces, though, besides what the board wrote?"

2          Your answer:  "Yes, part of my job was to make sure

3  that our writers and editors were most informed as they could

4  be, and so I looked for what they asked me to within the whole

5  department."

6          Is that correct?

7  A.  That's what it says here, yes.

8          MR. TURKEL:  And if we could pull up Exhibit 116,

9  Plaintiff's 116.

10 Q.  Now, Ms. Lett, before you is Plaintiff's Exhibit 116.  Have

11 you seen that document before?

12 A.  Just one second, please.

13         Thank you.

14         I don't think I saw the broader one.  I saw the one I

15 was included on.

16 Q.  Which is the center section of Exhibit 116, right?

17 A.  Yes, sir.

18 Q.  And do you have any independent recollection of receiving

19 that back in 2017?

20 A.  I'm afraid I don't.  It was a very long time ago newswise.

21 Q.  And having acquainted yourself with the document through

22 these proceedings, what we see you copied on is an email from

23 Robert Semple responding to other emails starting this thread

24 with Ms. Williamson regarding writing a piece on the Scalise

25 shooting, right?

1    A.  Correct, sir.

2    Q.  And why were you copied on this?

3    A.  I was copied on it in order to find those pieces they'd

4    "written a ton (mainly Frank) on gun control."

5    Q.  The group of people included on the email is, for the most

6    part, the editorial board team in New York, is it not?

7    A.  Correct.

8    Q.  The one exception, of course, being Ms. Williamson, right?

9    A.  That's correct.

10   Q.  Who was the writer going to be, if this piece got done?

11   A.  Liz, because she's the writer here.

12   Q.  And for the Court and jury's benefit, you mean Elizabeth

13   Williamson, right?

14   A.  Yes.  Sorry.  Yes, I meant Elizabeth Williamson.

15   Q.  Mr. Semple read and shaped the language for a lot of the

16   editorials, with Linda Cohn and Nick Fox's assistance, did he

17   not?

18   A.  They were the editors, so they edited, yeah.

19   Q.  And with respect to this piece at this time, June '17,

20   Mr. Semple was providing input as to whether they should do a

21   piece and what type, right?

22   A.  Yes.

23   Q.  Was it common for Linda Williamson -- I mean, Elizabeth

24   Williamson or other writers to seek Mr. Semple's input on these

25   things?

1   A.  Yes.  Any writer talked to their editors about what -- what

2   sort of argument or how the piece should go.

3   Q.  Right.  But Mr. Semple was the most senior editor in that

4   department, right?

5   A.  No.  James was the -- James Bennet was the most senior

6   editor in our department.

7   Q.  Bad question.  I meant by age and tenure is what I meant.

8   A.  He was the most tenured editor, yes.

9   Q.  So as we look at the 11:49 a.m. entry in that, there's a

10  reference to something called DEW in the last line of that.  Do

11  you see that?

12  A.  Yes.

13  Q.  And what is DEW?

14  A.  The DEW was a Google spreadsheet in which I usually would

15  take, after -- after the morning meeting, they would decide

16  what three to four pieces would be going on the page that day,

17  and so the DEW was a spreadsheet that everyone on the team

18  could look at to see which pieces were actually running and

19  which ones needed to be filed that day.

20  Q.  Would it be fair to say the DEW just listed the articles of

21  the day with the editor, the writer, as kind of an informative

22  status update for the staff?

23  A.  Yeah, in journalism it's called, like, the budget.  The

24  day's budget is what is going to be on the page, and so that is

25  what is called the DEW, for whatever reason.

M271PAL1                        JA 0438              Lett - Direct

1   Q.  And you don't recall any specific discussions on June 14,

2   2017, in which someone brought up the 2011 shooting of

3   Congresswoman Giffords, a federal judge, and others in Arizona

4   in the context of the Scalise shooting, do you?

5   A.  Can you restate the question.  I apologize.

6   Q.  Sure.  It was too long.  You don't recall any specific

7   discussions on June 24th, '17, in which someone raised the

8   Gabby Giffords shooting in the context of this Steve Scalise

9   piece, do you?

10  A.  I don't have any recollection of the conversation from that

11  day, no.

12          MR. TURKEL:  If we could pull up Plaintiff's 121,

13  please.

14          If we can blow that up a little bit.

15  Q.  Are you familiar with that document, Ms. Lett?

16  A.  This is an email from me.

17          MR. TURKEL:  Okay.  I think that's been admitted on

18  2/3.  Counsel?

19          MR. AXELROD:  I think so.

20          THE COURT:  Well, do you want to offer it?

21          MR. TURKEL:  Yes, your Honor.

22          THE COURT:  Any objection?

23          MR. SULLIVAN:  No objection, your Honor.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 121 received in evidence)

M271PAL1                    **JA 0439**
                            Lett - Direct

1   BY MR. TURKEL:

2   Q.  And what prompted you to send this email?

3   A.  So the subject is "Gun control past pieces" from Bob, which

4   tells me that Bob probably came over to my desk, and in telling

5   me what I should put on the DEW as the articles for the day,

6   probably said Elizabeth will be writing -- Elizabeth Williamson

7   will be writing about the shooting that happened that morning

8   and that I should find what we've said in the past about

9   politicians and gun violence.

10  Q.  Do you actually remember the conversation you had with

11  Mr. Semple?

12  A.  I'm afraid I don't.  It was a tragic day, but we,

13  unfortunately, have had a lot of those.

14  Q.  Do you remember how you got the links to these four pieces?

15  A.  I'm sure I used that search system that I described

16  earlier.

17  Q.  And when you say you're sure, do you actually remember

18  conducting the searches?

19  A.  I'm afraid that this date felt like another day, it didn't

20  really stand out as something that I should commit to memory

21  for several years, and so I don't remember specific

22  conversations from that day, unfortunately.

23  Q.  Did you read the articles at these four links before you

24  sent them to Ms. Williamson and the rest of the team?

25  A.  I -- I'm sure I made sure that they answered the question

M271PAL1                    Lett - Direct

1    at hand.

2              MR. TURKEL:  Could you pull up 122, please,

3    Plaintiff's 122.

4    Q.  Now at the time --

5              MR. TURKEL:  If you could pull 121 up also, and just

6    to show the times, in a split screen.

7    Q.  Are you familiar with 122, which is the email up there

8    right now?

9    A.  Yes, sir.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M272Pal2                          Lett - Direct

1    Q.  You have to answer verbally.  Okay.

2            So if we look there, this is Mr. Semple telling

3    Ms. Williamson that he had asked you to send four basic gun

4    control pieces, right?

5    A.  Correct, sir.

6    Q.  And does that help you remember at all the words or

7    direction he gave you for those names?

8    A.  I'm sorry.  I don't have a memory of the exact

9    conversation.

10   Q.  All right.  If we could pull up -- by the way, it is 12:58

11   when he sends that e-mail.  So you had already sent

12   Ms. Williamson the links four minutes earlier, right?

13   A.  Yes, sir.

14   Q.  If you could pull up Plaintiff's Exhibit 123.

15           All right.  So Ms. Lett, right now you are looking at

16   Plaintiff's Exhibit 123.  Do you recognize that document?

17   A.  Yes, sir.

18   Q.  That is an e-mail that Ms. Williamson sent you about an

19   hour after the last two e-mails we looked at?

20   A.  Correct.

21   Q.  Beyond this communication in Exhibit 123, this e-mail, did

22   you have any conversations with Ms. Williamson about looking

23   for an article that references hate-type speech against Dems in

24   the run-up to her shooting?

25   A.  No.  Because she was in D.C., I can be sure that I only

1    talked to her through e-mail.

2    Q.  And in response to this, did you go look for an article

3    like that?

4    A.  No.  I believe I forwarded this to James and asked what he

5    was -- what Elizabeth was -- what Elizabeth Williamson was

6    referring to.

7    Q.  When you say "James," you mean James Bennet?

8    A.  I do.

9    Q.  Okay.  In this -- if we could pull up Plaintiff's 124.

10        Going back to your last answer, when you communicated

11   it or, I should say, sought Mr. Bennet's guidance, was that by

12   e-mail or phone?

13   A.  I believe it was by e-mail.

14   Q.  So Exhibit 124 in front of you, do you recognize that?

15   A.  Yes.  This is an e-mail I sent to Elizabeth.

16   Q.  And this is your response to Ms. Williamson's request that

17   you find an article that references hate-type speech against

18   Dems in the run-up to the shooting, right?

19   A.  Yes.

20   Q.  And when it says "to her shooting," this is referring to

21   the Gabby Giffords incident in 2011, right?

22   A.  Yes, I think so.

23   Q.  If you look at the line you wrote there, "We never ran an

24   editorial on it.  Frank Rich wrote this piece."  That

25   underscore on this piece is a hyperlink, right?

1   A.  Correct.

2   Q.  And how did you find -- who -- if you could tell the jury

3   who Frank Rich is?

4   A.  Frank Rich was a columnist at *The Times*.

5   Q.  And by "columnist," that means he is on the editorial side

6   or the opinion side?

7   A.  He is on the opinion side.  In the bucket of opinion,

8   columnists over here, editorial boards over here, op-eds are in

9   the middle.

10  Q.  Was he a frequent contributor?

11  A.  He was a columnist.

12  Q.  A frequent columnist?

13  A.  Yes, sir.  That's what columnist means.

14  Q.  Regular columnist.

15  A.  Yes, sir.

16  Q.  How did you find that hyperlink --

17          THE COURT:  Listen.  Maybe this was earlier.  Frank

18  Rich I thought was the drama critic of *The New York Times*.

19          THE WITNESS:  Before my time.

20          THE COURT:  Before your time.  Well, that, of course,

21  called for a great deal of opinionation.

22          Go ahead, counsel.

23  BY MR. TURKEL:

24  Q.  And going back to that link, do you remember what the name

25  of the article was that you hyperlinked in there?

1   A.   I have no recollection.

2   Q.   All right.  Do you remember if you actually found it or did

3   someone guide you to it?

4   A.   That inevitably was one of the pieces that slipped through

5   the search engine, so I knew that it had -- that the piece

6   mentioned Giffords, Gabby Giffords, but nobody guided me to it,

7   no.

8   Q.   When you did your search, your searches, were those the

9   words, the keywords you were using, Gabby Giffords?

10  A.   Yes.  Well, probably her full name.

11  Q.   Did you use the word "incitement" at all?

12  A.   No.

13  Q.   If we could pull Plaintiff's Exhibit 133.

14          You are shaking your head.  Does that mean you are

15  familiar with this?

16  A.   I am shaking my head because her name, which is what I

17  searched for, is in the headline, which is how it came through

18  in the search engine.

19  Q.   I'm not familiar with the search engine that you used, but

20  if you put -- is it good enough that if you put her name in

21  there it's going to capture every article written about her?

22  A.   Unfortunately, no.  It will capture the ones that have been

23  appropriately tagged on the internal side, so not the

24  front-facing side.

25  Q.   Were you familiar with this article when you found it to

**JA 0445**

M272Pal2                              Lett - Direct

1  forward to Mr. Bennet?

2  A.  No.  It was the first time I had read it.

3  Q.  Did you read it?

4  A.  Yes.

5  Q.  And up to this point in the day, if we could go back to the

6  e-mail, which was the 124, we are at 2:21 in the afternoon at

7  this point, right?

8  A.  Yes, yes.

9  Q.  Do you know what deadline they are trying to make?

10  A.  The print page needed to be set, fully edited, and in place

11  by around 5 p.m. at the latest.  I mean, we would push, but you

12  have to sort of have everything ready to go so that it could go

13  to the press, the printing press.  So. . .

14  Q.  Does that mean a hard 5 p.m.?

15  A.  It --

16  Q.  Ish?

17  A.  It might have been.  I wasn't usually part of that process,

18  because I mostly was the administrative assistant.  So it could

19  have been 6.  I don't want to misstate.

20  Q.  All right.  We can agree 5 to 6?

21  A.  The evening, for sure.

22  Q.  So we look at 124.  You are forwarding this hyperlink to

23  the article that we just did put up there.  "No one Listened to

24  Gabrielle Giffords."  And that was what you had you found to

25  sort of fit this description that Ms. Williamson had given you,

M272Pal2          **JA 0446**          Lett - Direct

1   right?

2   A.  Yes, sir.

3   Q.  Did you talk to Ms. Williamson or Mr. Bennet after you

4   forwarded that piece?

5   A.  I don't think so.  I don't recall exactly.

6   Q.  And if you could pull up, just for the witness's sake — it

7   is not in yet — Plaintiff's Exhibit 125.

8          Do you recognize that document?

9   A.  I do, yes.

10  Q.  And is that a continuance of this thread we have been

11  looking at?

12  A.  Yes.

13          MR. TURKEL:  Your Honor, at this time we would offer

14  Plaintiff's Exhibit 125.

15          MR. SULLIVAN:  No objection, your Honor.

16          THE COURT:  Received.

17          (Plaintiff's Exhibit 125 received in evidence)

18  BY MR. TURKEL:

19  Q.  This shows essentially what you talked about earlier where

20  you asked Mr. Bennet for help in finding this?

21  A.  Yes, sir.

22  Q.  And you then are forwarding to Mr. Bennet the full sort of

23  link to the Frank Rich piece, correct?

24  A.  Yes, sir.

25  Q.  All right.  And if we could pull up -- hold on one sec.

M272Pal2                          Lett - Direct

1              The June 14, 2017, at 2:07 p.m., entry there, if we

2    could highlight the text there.  All right.  There we go.

3              All right.  When you asked Mr. Bennet at 1:46 p.m.

4    that you are trying to find the piece Elizabeth is referring to

5    here, he informs you that he was just wondering if there was

6    such a piece, that is, "Did we ever write anything connecting

7    to the Gifford shooting to some kind of incitement," right?

8    A.  Yes, sir.

9    Q.  When you went to look for, and successfully found, the

10   Frank Rich article, did you know what Mr. Bennet meant by

11   incitement.

12   A.  I know what the word "incitement" means.  What do you -- I

13   don't understand your question.

14   Q.  You answered my question.  When he used the word

15   "incitement" in that sentence, you knew what it meant, right?

16   A.  Yes, sir.

17   Q.  You went and found this article that discussed that general

18   sort of political incitement issue in the context of guns,

19   right?

20   A.  Yes, sir.

21   Q.  Was there ever any discussion or confusion about your

22   understanding of that word?

23   A.  No, sir.

24   Q.  Did you let Elizabeth know, I think I've got my sequence

25   out.  You had already told her, right?

JA 0448

M272Pal2                          Lett - Direct

1   A.  Yes, sir.

2   Q.  All right.  If we could get to 126 just for the witness,

3   please.  We need to offer it.

4          So again, this is a continuance of that same

5   discussion, right, and if we pick it up where we left off at

6   1:45, "Can you let Elizabeth know?"  And you say, "Yes,

7   already" --

8          MR. SULLIVAN:  Your Honor, I don't believe this is in

9   evidence yet.

10          MR. TURKEL:  Judge, I will offer it at this time.  I'm

11   sorry.  I should have offered it first.

12          MR. SULLIVAN:  No objection.

13          THE COURT:  Received.

14          (Plaintiff's Exhibit 126 received in evidence)

15   BY MR. TURKEL:

16   Q.  Ultimately, where this ends up is Mr. Bennet asking you to

17   send him the pieces you sent Elizabeth, right?

18   A.  Yes, sir.

19   Q.  Now, just so we can kind of refresh everybody's

20   recollection, that's the four links you sent originally, right?

21   A.  Yes, sir.

22   Q.  And then the Frank Rich piece, right?

23   A.  Yes.

24   Q.  Was there anything else?

25   A.  Not that I recall.

M272Pal2                              Lett - Direct

1   Q.  And if we could pull up 127 again just for the witness.

2            And do you recognize 127?

3   A.  Yes, sir.

4   Q.  Is that another e-mail sort of parallel to this thread?

5   A.  It's the answer to.

6            MR. TURKEL:  Judge, at this time we would offer

7   Plaintiff's Exhibit 127.

8            MR. SULLIVAN:  No objection.

9            THE COURT:  Received.

10           (Plaintiff's Exhibit 127 received in evidence)

11  BY MR. TURKEL:

12  Q.  If we could show that to the jury.

13           This e-mail has you basically following up with

14  Ms. Williamson, sending her all these links, this research

15  that, just so we stay sort of on path, was being used to

16  develop this editorial they were writing about the Scalise

17  shooting, right?

18  A.  Correct.

19  Q.  Again, just so -- as we move down the pathway of time

20  here, the way this is working is almost entirely by e-mail,

21  right?

22  A.  Correct.

23  Q.  You all are in the same office, aren't you?

24  A.  With the exception of Elizabeth Williamson, yes.

25  Q.  So I take it, then, if it's not on an e-mail, you had no

**JA 0450**

M272Pal2                         Lett - Direct

1    discussions with Mr. Bennet about why he wanted you to send

2    Ms. Williamson those pieces, right?

3    A.  No.

4    Q.  All right.  If we could pull up Plaintiff's Exhibit 128,

5    please.

6           All right.  Can you see that one, Ms. Lett?  This one

7    is already in evidence.

8    A.  Yes, I can see it.

9    Q.  So now we are a little bit later in the timeline and you

10   are forwarding two more pieces or sending two more pieces to

11   Mr. Bennet, right?

12   A.  Yes, sir.

13   Q.  And what prompted that?

14   A.  So, again, I don't exactly recall the events of the day,

15   but I'm sure I kept looking.

16   Q.  Did you keep looking at the request of others or just

17   continuing down your same research path?

18   A.  I don't recall exactly.  I -- it would make sense that I

19   continued down the same research path trying to find any pieces

20   that had slipped through.

21   Q.  Do you have any specific recollection of these two pieces

22   or --

23   A.  I do not.

24   Q.  Okay.  Let's take a look.  If we could pull up Plaintiff's

25   Exhibit 134.

**JA 0451**

M272Pal2                          Lett - Direct

1             Does that title ring a bell as to those two links or

2    one of those two links?

3    A.  I'm not sure if that is one of those links.  The title

4    rings a bell.

5    Q.  If we look at the date on it, what's the date on this

6    publication?

7    A.  January 9, 2011.

8    Q.  If we could go back to Exhibit 128, please.

9             If you look right there at the two links, is that

10   January 10, 2011 link that January 9 article?

11   A.  Probably.

12            THE COURT:  Well, let me ask, just to move this

13   along, do counsel want to stipulate that this is one of the

14   links?

15            MR. SULLIVAN:  Yes, your Honor.

16            THE COURT:  All right.

17   BY MR. TURKEL:

18   Q.  I was going to ask you to explain why the date on the link

19   published is different than the date on the article.

20            THE WITNESS:  Do you want me to answer?

21            MR. TURKEL:  Just for information, Judge, it's not

22   that big of a deal.

23            THE COURT:  No, the -- all right.  You can answer.

24   The witness can answer.

25            But I thought I would try to move things on, counsel.

**JA 0452**

M272Pal2                                    Lett - Direct

```
 1              Go ahead.
 2   A.   The date of the website, the web page that you pulled the
 3   previous exhibit from means that the article was put online
 4   before it went to the press.  It had to be in tomorrow's
 5   papers, which makes it the 10th, not the 9th.
 6   Q.   Got it.
 7              All right.  Now if we could pull up Plaintiff's
 8   Exhibit 135.
 9              Does the title of that piece refresh your memory at
10   all as to whether it was one of the other link, I guess.
11   A.   I don't have specific recollections of these pieces.
12              THE COURT:  Again, do counsel stipulate that this is
13   the other link?
14              MR. SULLIVAN:  We do, your Honor.
15              THE COURT:  Very good.
16   BY MR. TURKEL:
17   Q.   So if we could please go back to 128.
18              At this point in time, just to summarize, you had sent
19   the four first links, the Frank Rich link, and then those two
20   links, right?
21   A.   Yes, sir.
22   Q.   And they were all sent to Ms. Williamson and Mr. Bennet?
23   A.   Yes, sir.
24   Q.   There may have been others, too, right?
25   A.   It looks like I only sent it to Elizabeth and -- Elizabeth
```

M272Pal2                    Lett - Direct

1  Williamson and James Bennet.

2  Q.  What was your participation after this, if any?

3  A.  I don't think I had any.  I don't recall the events of the

4  day, but I don't believe I had any participation after that.

5  Q.  You were not responsible for the main fact-checking on the

6  piece, right?

7  A.  No, sir.

8  Q.  Ms. Eileen Lepping was, right?

9  A.  Yes, sir.

10  Q.  As a fact-checker, if there is a hyperlink in a piece, do

11  you check the hyperlink also?

12  A.  What do you mean by check?

13  Q.  Do you fact-check hyperlinks that are included in pieces

14  that you are fact-checking?  In other words, whatever contents

15  is hyperlinked?

16  A.  You would make sure that the appropriate hyperlink goes to

17  the appropriate place.  You don't fact-check the link itself,

18  the article it links to itself.

19  Q.  You would --

20  A.  You would make sure that the link is going to the correct

21  destination.

22  Q.  Right.  If the destination was a factual resource or

23  support for the article, would you fact-check the destination?

24  A.  You would only fact-check the article you are

25  fact-checking.

**JA 0454**

M272Pal2                          Lett - Direct

1   Q.  If we could pull up 192.  Hold on.  Don't show it.  It may

2   just be for the witness.  Yes, just for the witness.

3           Can you see that, Ms. Lett?

4   A.  Yes, I can.

5   Q.  And do you recall receiving that e-mail from Eileen Lepping

6   on June 15?

7   A.  Yes, sir.

8           MR. TURKEL:  Judge, we would offer 192.

9           MR. SULLIVAN:  No objection.

10           THE COURT:  Received.

11           (Plaintiff's Exhibit 192 received in evidence)

12   BY MR. TURKEL:

13   Q.  Did you discuss this e-mail with Ms. Lepping after you got

14   it?

15   A.  I don't have any recollection of the conversation.

16   Q.  Were you aware that her e-mail is forwarding sort of a

17   description down there about criticisms regarding the piece,

18   "America's Lethal Politics."  Right?

19   A.  Yes, sir.

20   Q.  And in that respect, did you have any discussions with

21   anybody about that after you received this e-mail?

22   A.  Not that I recall.  This would be to let me know that we

23   were going to be issuing a correction on the next day's page.

24   Q.  Were you asked to participate on researching or helping

25   with the team as they did the correction?

1  A.  No.

2              MR. TURKEL:  Judge, can I have a moment to confer?

3              THE COURT:  Yes.

4              (Counsel confer)

5              MR. TURKEL:  116, I don't think I offered this.  I

6   think it was already in.  But just to the extent I missed

7   that --

8              THE COURT:  So you are offering it now?

9              MR. TURKEL:  I am offering it now.

10             THE COURT:  Any objection?

11             MR. SULLIVAN:  Your Honor, we would object to the top

12  portion of it.  The witness testified that she wasn't familiar

13  with that portion, to the extent it is not in evidence already,

14  but I believe it is.

15             THE COURT:  Yeah, I think it is in evidence.

16             MR. TURKEL:  It was in evidence with Ms. Williamson, I

17  believe.

18             THE COURT:  So I will receive it in its entirety.

19             (Plaintiff's Exhibit 116 received in evidence)

20             MR. TURKEL:  Your Honor, we have no further questions

21  at this time.

22             THE COURT:  All right.  Cross-examination.

23  CROSS-EXAMINATION

24  BY MR. SULLIVAN:

25  Q.  Good morning, Ms. Lett.

M272Pal2                         **JA 0456**
                                 Lett - Cross

1    A.  Good morning.

2    Q.  Ms. Lett, you talked a little bit about your work history

3    with Mr. Turkel.  Was your position with *The Times* your first

4    position in journalism?

5    A.  No, it was not.

6    Q.  What was your first job in journalism?

7    A.  I was hired as the social media intern for *New Jersey*

8    *Bride*, a regional bridal magazine, just out of college.

9    Q.  And what did you do after working for *New Jersey Bride*?

10   A.  That was when I began to freelance.  So I started

11   freelancing in the opinion section at the *Times* and a few other

12   sort of scrappy journalism jobs, helping an author research a

13   book, I worked briefly at a coalition against sexual assault in

14   New Jersey, and a few odd jobs.

15   Q.  I believe you then testified that you became the editorial

16   assistant to the ed board at that point, is that correct?

17   A.  That's right.  In January of 2015 I did.

18   Q.  You mentioned that one of your duties was helping with

19   guests at the editorial board, is that right?

20   A.  Yes, sir.

21   Q.  What did it mean to help with guests to the editorial

22   board?

23   A.  It meant everything from start to finish, so booking a

24   meeting with the board, the logistics of when, where, and who

25   would be in the room, and then getting them into the building

1  up to the appropriate room, making sure there is coffee and

2  tea, depending upon their particular taste, making sure that

3  they know where the restrooms are, and then seeing them out the

4  door safely.

5  Q.  And why did guests come into the editorial board?

6  A.  We had guests from all different walks of life.  They would

7  come in to talk to the board because they saw the board as

8  writing these prescriptive reportings, so you would have the

9  day's news, but we would also write about things that we would

10  want to improve in the world.  So, you know, whether it was

11  generals, heads of state, nonprofits, activists, we had all

12  different kinds of people come in to talk to the board,

13  generally for an hour, and explain their side of things and why

14  they think the board was getting something wrong oftentimes,

15  but also what they think the board could do if they took up a

16  position on the matter.

17  Q.  And were those guests from any particular side of an

18  argument or was it different than that?

19  A.  They were not necessarily partisan, it was sort of all over

20  the ideological map.

21        THE COURT:  I have a feeling this is of marginal

22  relevance.

23        MR. SULLIVAN:  Yes, your Honor.  That was my last

24  question on this point, so I will move on.

25  BY MR. SULLIVAN:

M272Pal2                          Lett - Cross

1    Q.  I believe you mentioned that you also did sporadic

2    fact-checking, is that correct?

3    A.  I would fact-check for the board when Eileen was on

4    vacation or out sick.

5    Q.  Why did *The Times* fact-check its editorials?

6    A.  *The Times* fact-checks everything in the opinion section.

7    It needs to be just as airtight and factual as any other piece

8    in the paper, any news article.  But what is different is that

9    there is an opinion attached to those facts.  So these were the

10   facts of the day and here is a point of view on it.

11   Q.  Did you play a role in the editorial that was published on

12   June 14, 2017?

13   A.  Yes, I provided some research.

14   Q.  And could you remind the jury of the subject of that

15   research?

16   A.  I was looking for past positions that the board had taken

17   around previous shootings of Congresspeople.

18   Q.  And why is it important to do research into past positions

19   the editorial board has taken?

20   A.  We do that a lot.  If we are ever going to say something

21   where the subject is of grave import or it's a particularly

22   dicey subject, we will look at what we have said in the past so

23   as to verify that we are -- we either were right or if we were

24   incorrect, we want to correct that record and say we are

25   amending our position.  Because the voice of the board is sort

**JA 0459**

M272Pal2                           Lett - Cross

1    of the voice of *The New York Times*.  It is sort of *The New York*
2    *Times* says X.  And so in that way, it was really important that
3    we had an up-to-date record of all of our positions, and so it
4    was a question that came up a lot.
5    Q.  And so you have been asked to research editorial board
6    positions previously?
7    A.  Yes, all the time.
8    Q.  Are editorials different from op-ed columns?
9    A.  They are.
10   Q.  I know Mr. Turkel asked you a number of questions about
11   op-ed columns.  Can you explain how editorials and op-ed
12   columns are different?
13   A.  Yes.  The editorials are written by a group of journalists
14   who have risen to the top of their field in their subject
15   matter.  So you have the expert journalist on New York politics
16   or the expert journalist on science and health.  And each of
17   them comes to the table and talks about what the big stories
18   are.  They have all the connections, they have done all of the
19   journalistic legwork, and they have risen to the top of their
20   field.  Unlike columnists, they have chosen or they are chosen
21   for this ed board, where they no longer have bylines, so their
22   names are no longer attached to the editorial board.  Instead
23   the voice they are writing with is of the institution of *The*
24   *New York Times*.  And so in that way it is very different than a
25   columnist, because a columnist is always attached to their

1    byline.  You go to that columnist to see what their unique POV

2    is.  In the editorials, it is a lot less personal.  It is a lot

3    more about journalists who are at the top of their game who can

4    also make these prescriptive arguments as to the facts.

5    Q.  And Frank Rich is a columnist I believe you testified or

6    was a columnist at *The Times*?

7    A.  He was, yes.

8    Q.  As a columnist was Mr. Rich a member of the editorial

9    board?

10   A.  No.  No columnists are members of the board.

11   Q.  For the "America's Lethal Politics" editorial, I believe

12   you testified that you did research into past editorial

13   positions on the Gabrielle Giffords shooting, is that correct?

14   A.  Yes, sir.

15   Q.  Do you remember how exactly you were asked to conduct that

16   research?

17   A.  I don't remember the events of the day.  I know that Bob

18   Semple usually walked over to my desk after the morning

19   meeting, when they decided what would go on the page this week

20   and what other pieces could have a few days to work on and

21   percolate.

22          Since this was breaking news, I imagine he came to my

23   desk and told me what would be on the DEW, as I mentioned

24   earlier, so everybody would know what was being written about.

25   And in that moment he, I'm sure, asked me to do my regular task

**JA 0461**

M272Pal2                          Lett - Cross

1   of pulling past positions from the board.

2   Q.  Why would Mr. Semple ask you to perform that type of

3   research?

4          MR. TURKEL:  Judge, objection.

5          THE COURT:  Sustained.

6   BY MR. SULLIVAN:

7   Q.  How did you conduct research into past board positions?

8   A.  I would look on our website, and I would also look on an

9   internal archive which is called Times Past.

10  Q.  I believe you mentioned that you used Gabrielle Giffords as

11  search terms for this search, is that correct?

12  A.  I did, yes.

13  Q.  Did you search for Sarah Palin as part of this search?

14  A.  No.

15  Q.  Why wouldn't you have -- why didn't you search for Sarah

16  Palin?

17  A.  I was only asked to look up the most -- what we wrote about

18  in the most recent shooting of a Congressperson.

19  Q.  After you conducted that initial research, were you asked

20  to perform additional research?

21  A.  I don't think so, no.

22  Q.  I believe you testified that you later performed some

23  additional research at Elizabeth Williamson's request, is that

24  correct?

25  A.  In the e-mails that were --

**JA 0462**

M272Pal2                              Lett - Cross

```
 1   Q.  In the -- let's -- Mr. DiMezza, could you please pull up
 2   Defendant's Exhibit 25 just for the witness and the Court.
 3              Ms. Lett, I'm showing you what's been premarked as
 4   Defense Exhibit 25.  This is a version of an e-mail that you
 5   looked at previously.  Do you recognize this document?
 6   A.  I do, yes.
 7              MR. SULLIVAN:  Your Honor, at this time I move for the
 8   admission of Exhibit 25 into evidence.
 9              MR. TURKEL:  No objection, your Honor.
10              THE COURT:  Received.
11              (Defendant's Exhibit 25 received in evidence)
12   BY MR. SULLIVAN:
13   Q.  Ms. Lett, if you will look at the -- I would ask that it be
14   published to the jury.
15              Ms. Lett, if you will look about halfway down the page
16   to an e-mail Ms. Williamson sent to you at 1:40 p.m.  Do you
17   see that?
18   A.  I do, yes.
19   Q.  And Ms. Williamson asked, "Is there one that references
20   hate-type speech in the run-up to her shooting?"  Do you see
21   that?
22   A.  I do, yes.
23   Q.  So was Ms. Williamson asking you to perform an additional
24   search for that type of document?
25   A.  Yes.  She was looking for a particular position.
```

JA 0463

M272Pal2                          Lett - Cross

1   Q.  And how did you conduct that research?

2   A.  Same way, those two search engines.

3   Q.  You testified previously that that research also turned up

4   a column by Mr. Rich, is that correct?

5   A.  That is correct.

6   Q.  Why would Mr. Rich's column come up in a search for past

7   editorial board editorials?

8   A.  Well, in 2011 we didn't have very hygienic internal URL

9   coding.  I guess it's a question for the internal CMS, the

10  internal system.  But it may have just been flagged as opinion,

11  but it came through the search that I did for the editorials,

12  and so, in seeing it, I shared it.

13  Q.  Had op-ed columns come up in prior research you had done

14  looking into past editorial board positions?

15  A.  Yes, it was a shoddy search engine at the time.

16  Q.  Mr. DiMezza, you can take that down.  Thanks.

17          After performing that search for Ms. Williamson, I

18  believe you testified that there had been two additional links

19  you sent around, is that correct?

20  A.  Yes.

21  Q.  And those links followed a request from -- or, sorry, you

22  testified that those links were just you conducted additional

23  research later that day?

24  A.  Yes, sir.

25  Q.  So ultimately you performed at least two, and perhaps

**JA 0464**

M272Pal2                          Lett - Cross

1   three, separate searches to determine past positions the

2   editorial board had taken, is that correct?

3   A.  Yes, sir.

4   Q.  Did Mr. Bennet ask you to search -- to conduct any research

5   into Sarah Palin's role in the Gabby Giffords shooting --

6   A.  No.

7   Q.  -- in connection with the editorial?

8   A.  No, sir.

9   Q.  Did James Bennet ask you to conduct any research about

10  Sarah Palin in connection with the editorial?

11  A.  No.

12  Q.  Did Elizabeth Williamson ask you to conduct any research

13  into Sarah Palin's role in the Arizona shooting?

14  A.  No.

15  Q.  Did Elizabeth Williamson ask you to conduct any research

16  into Sarah Palin at all in connection with the editorial?

17  A.  No.

18  Q.  Did anyone else at the editorial board ask you to conduct

19  research into Sarah Palin's role in the Arizona shooting?

20  A.  No, sir.

21  Q.  Did anyone else at the editorial board ask you to conduct

22  research into Sarah Palin at all in connection with the

23  editorial?

24  A.  No, sir.

25  Q.  Did anyone at the editorial board suggest to you that the

**JA 0465**     Lett - Cross

1  editorial would blame Sarah Palin for the Arizona shooting?

2  A.  No.

3  Q.  Was the research on this editorial in any way different

4  from the research that you described that you regularly did for

5  the editorial board?

6  A.  No.  It was very common.

7  Q.  Was anything different about the drafting of the editorial

8  in your experience?

9  A.  Not from my point of view.

10  Q.  You previously said that your duties at the editorial board

11  included occasional fact-checking, correct?

12  A.  Yes, sir.

13  Q.  Did you fact-check this editorial?

14  A.  I did not.

15  Q.  Did James Bennet instruct you not to fact-check the

16  editorial?

17  A.  No, he did not.

18  Q.  Did Elizabeth Williamson instruct you not to fact-check the

19  editorial?

20  A.  No.

21  Q.  Did anyone at the editorial board instruct you not to

22  fact-check the editorial?

23  A.  No.

24          MR. SULLIVAN:  Your Honor, may I confer briefly with

25  my colleague?

**JA 0466**

M272Pal2                    Lett - Redirect

```
 1              THE COURT:  Yes.

 2              (Counsel confer)

 3              MR. SULLIVAN:  Your Honor, I have no further questions

 4    for Ms. Lett at this time.

 5              THE COURT:  Redirect.

 6              MR. TURKEL:  Yes, your Honor.

 7    REDIRECT EXAMINATION

 8    BY MR. TURKEL:

 9    Q.  Ms. Lett, so it's clear, you don't recall exactly what

10    search terms you used, right?

11    A.  I am sure I looked for Gabby Giffords' name.

12    Q.  Well, you think that's what you looked for, but you are not

13    certain what you actually used that day because you don't

14    remember, right?

15    A.  I looked for Gabby Giffords' name.

16    Q.  Did you look for anything else?

17    A.  No, sir.

18    Q.  All right.  If you could -- do you still have your

19    deposition up there?

20    A.  Yeah, I think so.

21    Q.  Give me one moment, please.

22              If you could go to page 90 and for the Court and

23    counsel's benefit, lines 9 through 14.

24              And again, Ms. Lett, this was at your sworn

25    deposition, right?
```

**JA 0467**

M272Pal2                    Lett - Redirect

```
 1   A.  Yes, sir.

 2   Q.  And do you --

 3            MR. SULLIVAN:  Objection, your Honor.

 4            THE COURT:  Sustained.  Not inconsistent.  Go on.

 5            MR. TURKEL:  All right.

 6   BY MR. TURKEL:

 7   Q.  You had mentioned earlier that the day 6/14/17 was like any

 8   number of other days?

 9   A.  Yes, unfortunately, yeah.

10   Q.  And you had a number of requests coming through for

11   research.

12            Is that yes?  I'm sorry you have to answer audibly.

13   A.  Yes.  Is that a question?

14   Q.  With respect to fact-checking, in the questions counsel

15   asked you about whether you were asked to fact-check, Eileen

16   Lepping, who you reported to, I guess, was fact-checking the

17   editorial, was she not?

18   A.  Eileen was fact-checking the editorial.

19   Q.  And that was her job.  She was a fact-checker, right?

20   A.  Yes, sir.

21   Q.  And with respect to the questions you were asked about

22   whether anybody asked you to search for Sarah Palin or

23   whether -- the litany of questions you were asked, you had no

24   conversations with anybody that day about this piece, did you?

25   A.  I don't recall the conversations I had that day.
```

**JA 0468**

M272Pal2

1  Q.  You spoke to Mr. Semple at the beginning of the day to get

2  the FOUR links, right?

3  A.  Yes.

4  Q.  You don't recall another conversation the whole day, do

5  you?

6  A.  I'm afraid I did not commit that day to memory, no.

7          MR. TURKEL:  All right.  Judge, that's all I have.

8          THE COURT:  Anything else.

9          MR. SULLIVAN:  No recross, your Honor.

10          THE COURT:  Thank you very much.  You may step down.

11          (Witness excused)

12          THE COURT:  Please call your next witness.

13          MR. VOGT:  Your Honor, our next witness is Eileen

14  Lepping, who is the remote witness, so we need to take a break.

15          THE COURT:  So, ladies and gentlemen, the next witness

16  previously tested positive, but is now testing negative.  But

17  in an excess of caution, we are going to take her testimony

18  remotely rather than bring her into the courthouse.  That means

19  setting up some equipment.  So despite your best efforts, we

20  are going to have to give you a mid-morning break, and we will

21  take a 15-minute break at this time.

22          Thank you.

23          (Continued on next page)

24

25

**JA 0469**

1                    (Jury not present)

2                    THE COURT:  Please be seated.

3                    Now, a couple of quick items before we break to set up

4        that equipment.

5                    First, the testimony from Ms. Lett took about an hour.

6        As near as I can tell, it should have taken five minutes.  The

7        point was she was asked to do some research, here's what she

8        found, and that both sides pretty much agree on that.  I don't

9        see why it took as long as it did, and I am obligated under the

10       Federal Rules of Evidence to make sure that we don't waste

11       time.  So I encourage counsel for both sides not to waste time

12       like that in the future.

13                   Second, just so plaintiff's counsel and I are on the

14       same page with respect to the debate that is still going on as

15       to whether the Sullivan testimony comes in, here is what I was

16       referring to in terms of the federal rules.  Rule 401 says --

17       which is entitled "test for relevant evidence," "evidence is

18       relevant if (a) it has any tendency to make a fact more or less

19       probable than it would be without the evidence and (b) the fact

20       is of consequence in determining the action."  And then there

21       is Rule 402, which, in relevant part, reads, "Irrelevant

22       evidence is not admissible."

23                   Now, counsel, who makes the determination whether

24       evidence is admissible or not?

25                   MR. TURKEL:  The Court does, your Honor.

**JA 0470**

M272Pal2

1          THE COURT:  The Court.  And the test, is it not, is

2     whether any reasonable juror could conclude that the proffered

3     evidence has any tendency to make a fact more or less probable

4     than it would be without the evidence, yes?

5          MR. TURKEL:  That's the definition of --

6          THE COURT:  That's the test.  So just to guide you and

7     defense counsel when we go back to discussing the Sullivan

8     matter later, the question I need to know the answer to is:

9     What evidence or proffered evidence would make it more likely

10    than not, more or less probable in the words of the rule, that

11    Mr. Bennet saw any particular article in the Daily Dish if his

12    testimony is that he didn't see?  That's the issue.  Okay?

13         All right.  We will see you in 15 minutes.

14         (Recess)

15         THE DEPUTY CLERK:  May I bring in the jury?

16         THE COURT:  Please.

17         I see on my screen not only the witness, but also the

18    jury.  That should not be.  It should just be the witness.

19         THE LAW CLERK:  You don't want the witness to see the

20    courtroom?

21         THE COURT:  Excuse me.  I just want the witness.

22         (Continued on next page)

23

24

25

**JA 0471**

M272Pal2

1          (Jury present)

2          THE COURT:  Okay, so ladies and gentlemen, you should

3    all be able to see the witness on your screen.  Please be

4    seated and we will swear in the witness.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1    EILEEN LEPPING,

 2         called as a witness by the Plaintiff,

 3         having been duly sworn, testified as follows:

 4   DIRECT EXAMINATION

 5   BY MR. VOGT:

 6   Q.  Good morning.  Where do you work?

 7   A.  I work at *The New York Times*.

 8   Q.  And what is your job?

 9   A.  I'm a research fact-checker there.

10   Q.  And when did you start working for *The New York Times*?

11   A.  I started in 2007.

12   Q.  And what was your position when you first started?

13   A.  I was an assistant for the editorial board.

14   Q.  And what were your job duties and responsibilities as an

15   assistant?

16   A.  Just a lot of daily clerical things, arranging meetings

17   with the board and assisting them with whatever they needed.

18   Q.  And how long did you work as an assistant to the editorial

19   board?

20   A.  I was there for, like I said, for several years, probably

21   until about 2015 is when I became full-time researcher.

22   Q.  And you used the term "researcher."  What were your job

23   duties and responsibilities in that position?

24   A.  That was to fact-check all the daily editorials.

25   Q.  And in terms of fact-checking, can you describe what you

1   would do to fact-check an editorial.

2   A.   Generally I would go line by line through the piece, figure

3   out all the facts, and try and confirm them.

4   Q.   And how would you go about confirming facts?

5   A.   Either I would use sources from the writer or just do

6   research on my own through either Google or other websites.

7   Q.   And would you usually work closely with the writer on the

8   piece in terms of fact-checking?

9   A.   Yes.

10  Q.   And would the writer usually provide you with sources,

11  links, and other material so that you could fact-check the

12  piece?

13  A.   Yes.

14  Q.   And was it your standard practice to go through each

15  editorial line by line to make sure everything was factually

16  correct?

17  A.   Yes.

18  Q.   And did you receive any specialized training in

19  fact-checking?

20  A.   No.  It was mostly learned on the job through other

21  researchers who taught me.

22  Q.   And did you take any courses at any journalism schools with

23  respect to fact-checking?

24  A.   I'd taken some seminars, things like that, through

25  journalism school, and *The Times* has offered some courses as

1    well.

2    Q.  And as part of those seminar and courses, were you taught

3    how to find court cases, legal documents, government websites,

4    things like that?

5    A.  Yes.

6    Q.  And were those sources that you regularly consulted to find

7    information that you would use to fact-check editorials?

8    A.  Yes.

9    Q.  And so you were working at the editorial board in 2011; is

10   that correct?

11   A.  That's right.

12   Q.  And that would mean that you were working for the editorial

13   board at the time of the Loughner shooting in 2011, correct?

14   A.  Yes.

15   Q.  And in your mind that shooting was a significant event,

16   correct?

17   A.  Yes.

18   Q.  And at the time of the shooting and in the period

19   thereafter, you actually followed news reports and articles

20   about the shooting, didn't you?

21   A.  I probably did, yes.

22   Q.  And you also followed *The New York Times*'s coverage of the

23   shooting?

24   A.  Yes.

25   Q.  And I believe you also worked on some editorials that

M271PAL3                    Lepping - Direct

1    related to the shooting; is that right?

2              MS. SCHELL:  Objection.

3    A.  It's possible.

4    Q.  And with respect to any of the information that you recall

5    reading at or around the time of the Loughner shooting, is it

6    correct to say that you do not recall reading any articles that

7    established any link between the map circulated by Sarah

8    Palin's political action committee and the shooting itself?

9    A.  Not that I recall.

10   Q.  And do you recall specifically any pieces that you may have

11   worked on that related to the Loughner shooting?

12   A.  None that I can recall.

13   Q.  Who's the public editor at the *New York Times*?

14             MS. SCHELL:  Objection, relevance.

15             THE COURT:  Sustained.

16             MR. VOGT:  I need to ask some questions about it to

17   demonstrate the relevancy.

18             THE COURT:  Put another question.

19   BY MR. VOGT:

20   Q.  Was there anyone at *The New York Times* whose job it was to

21   point out things that the paper was doing wrong?

22             THE COURT:  The paper was -- I'm sorry -- doing wrong?

23             MR. VOGT:  Yes, your Honor.

24             THE COURT:  I'm not sure what that means, but if the

25   witness understands it, and since there's no objection to this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    hopelessly vague question, I will allow it.

2              MS. SCHELL:  Your Honor, I would object to that

3    hopelessly vague question.

4              THE COURT:  Sustained.  Thank you.

5              MS. SCHELL:  Thank you, your Honor.

6    BY MR. VOGT:

7    Q.  Was there anyone at *The New York Times* that would publish

8    stories within the opinion pages that would deal with subject

9    matters such as the need to do a better job of fact-checking

10   pieces?

11             MS. SCHELL:  Objection, relevance.

12             THE COURT:  Well, before I reach relevance, sustained

13   as to form.

14   Q.  Let me ask you this:  Do you recall at any point in time

15   anyone within *The New York Times* publishing any pieces that

16   dealt with the issue of whether errors were made in reporting

17   in connection with the Loughner shooting?

18             MS. SCHELL:  Objection.  Vague and relevance.

19             THE COURT:  So just so I'm clear what you're trying to

20   get at, you mean other than the various corrections?

21             MR. VOGT:  I'm talking about the 2011 time period,

22   your Honor.

23             THE COURT:  You're talking about the 2011 period.

24             MR. VOGT:  Yes.

25             THE COURT:  And so the question is whether anyone

M271PAL3                    JA 0477    Lepping - Direct

1   published any pieces in that period that dealt with errors that

2   had appeared in the paper?

3            MR. VOGT:  Errors --

4            THE COURT:  So you need to first establish, if you're

5   going to get there at all, what the underlying article is in

6   2011 that you're referring to.

7            MR. VOGT:  Well, the witness should have a copy of it.

8   Can I show it to the witness?

9            THE COURT:  Well, counsel, put a question.  I just

10  indicated to you how you could get this question fixed, despite

11  all your efforts, and that is, if you think there was a need

12  for some correction at the time, which is apparently what your

13  question seems to refer to, you first have to refer the witness

14  to the article that needed, in your view, correcting.

15           MR. VOGT:  If I can cite for the Court, it wasn't a

16  specific article; it was multiple.

17           THE COURT:  Okay.  Then the objection is sustained.

18           MS. SCHELL:  Thank you, your Honor.

19  BY MR. VOGT:

20  Q.  Do you recall the June 14, 2017, shooting involving Steve

21  Scalise?

22  A.  Yes.

23  Q.  And do you recall how you learned about that shooting?

24  A.  I think it was *The New York Times* breaking news.

25  Q.  And on that date were you working in New York?

1    A.  Yes.

2    Q.  And just in terms of your physical location, were you

3    working in the physical proximity of Phoebe Lett?

4    A.  Yes.

5    Q.  And can you just describe what your role was, if any, on

6    any editorials or pieces on June 14th of 2017 that related to

7    the Scalise shooting.

8    A.  I -- I fact-checked the editorial that day on it.

9    Q.  And when you say the editorial, you're referring to

10   "America's Lethal Politics"; is that right?

11   A.  Yes.

12   Q.  And do you recall reviewing Elizabeth Williamson's draft

13   editorial at around 4:44 that day?

14   A.  Yes.

15   Q.  And would it be typical for you, when you got a draft of an

16   editorial, to go into it right away and start fact-checking

17   things?

18   A.  Yes.

19   Q.  And in terms of fact-checking, is the majority of your work

20   doing things like checking names, dates, locations, and quotes?

21   A.  Yes.

22   Q.  And if you could, you should have there with you

23   Plaintiff's Exhibit 141, which I believe has already been

24   admitted into evidence.

25            MS. SCHELL:  Objection.  Based on foundation for this

M271PAL3                           Lepping - Direct

1    witness.

2              MR. VOGT:  It's the draft article I just asked her

3    about, your Honor.

4              THE COURT:  Well, if this is in evidence, can we put

5    it up on the screen.

6              Okay.  So put the question that you want to put to the

7    witness.

8              MR. VOGT:  Okay.  Thank you, your Honor.

9    BY MR. VOGT:

10   Q.  Do you see in -- you should have in front of you

11   Plaintiff's Trial Exhibit 141, and there is a highlighted note

12   at the end of the third paragraph.  It says "need to

13   check/update"?

14   A.  Yes.

15   Q.  Do you know what that is?

16             THE COURT:  I'm sorry.  It's very hard to read.  Can

17   we see who this is to and from, before we get to the portion

18   that's highlighted now.  Could we blow up who it's to and from,

19   please.

20             MR. VOGT:  Your Honor, this is not an email.  It's the

21   printout of the draft article.

22             THE COURT:  All right.  Let me see what it is.

23             That's what I wanted to see.  Thank you.

24             Okay.  So let me ask the witness:  What is this?

25             THE WITNESS:  This looks like a draft of the

JA 0480

M271PAL3                    Lepping - Direct

1   editorial.

2          THE COURT:  Of the editorial that's the subject of

3   this lawsuit; is that right?

4          THE WITNESS:  I believe so, yes.

5          THE COURT:  So did you see this draft prior to the

6   editorial being finalized?

7          THE WITNESS:  I would have, yes.

8          THE COURT:  Okay.  So now we can go to your questions,

9   counsel.

10         MR. VOGT:  Thank you, your Honor.

11  BY MR. VOGT:

12  Q.  And the spot where I indicated where it said, "need to

13  check/update," is that a note intended for you as the

14  fact-checker?

15         MS. SCHELL:  Objection.

16         THE COURT:  Overruled.

17  A.  That just looks like a general note for anyone, because it

18  is breaking news, make sure we have updated facts in there.

19  Q.  And was there any sort of a standard practice at the time

20  of the editorial that we're here about, which is June 14th of

21  2017, where a writer would signal to a fact-checker that there

22  was a particular item in a draft editorial that needed to be

23  fact-checked?

24  A.  Sure.  They could either leave a note in the draft itself

25  or email.

M271PAL3                    **JA 0481**    Lepping - Direct

1   Q.  And do you recall, with respect to "America's Lethal

2   Politics," whether there were any of those types of notes left

3   in any draft of the editorial for you specifically?

4   A.  No, not that I recall.

5   Q.  And in the editorial you'll also -- the draft that we're

6   looking at, Exhibit 141, the middle paragraph there that starts

7   with, "Just as in 2011," the word there "circulated" is a

8   hyperlink; is that right?

9   A.  That's right.

10  Q.  And so as a fact-checker, when you see a hyperlink like

11  that, what would you do?

12  A.  Normally you'd click on there just to make sure it works,

13  and that generally indicates you want the reader to go there to

14  find out more, and -- or that there are specific facts related

15  to that in the piece, in that piece.

16  Q.  When you say there were specific facts that related to that

17  in the piece, what are you referring to?

18  A.  In this specific sentence, for me would be checking the

19  timing, the number of districts, and to make sure that it was

20  the political action committee who distributed it.

21  Q.  And do you recall whether or not you actually clicked on

22  this particular hyperlink at some point in time on June 14th of

23  2017 and --

24  A.  I did.

25  Q.  -- and went to the site?

M271PAL3                        **JA 0482**
                                Lepping - Direct

1    A.  Yes.

2    Q.  And do you remember reviewing an article that that

3    hyperlink led to?

4    A.  Yes.

5    Q.  And do you recall whether you actually read that article?

6    A.  I don't think I read it word for word.  I was just scanning

7    it for the facts that I was looking for at the moment.

8    Q.  And would it be fair to say the facts you were looking for

9    were more the specific details—times, dates, things of that

10   nature?

11   A.  Yes.

12   Q.  And then you should also have with you what we've premarked

13   as Plaintiff's Exhibit 153.

14   A.  Yes.

15          MS. SCHELL:  No objection, your Honor.

16          THE COURT:  Received.

17          MR. VOGT:  And that one's introduced, your Honor?

18          THE COURT:  Yes.

19          MR. VOGT:  Thank you.

20          (Plaintiff's Exhibit 153 received in evidence)

21          MR. VOGT:  If we can pull that up.

22   BY MR. VOGT:

23   Q.  Do you recall this email that's been premarked as

24   Plaintiff's Exhibit 153?

25   A.  Yes.

**JA 0483**

M271PAL3                         Lepping - Direct

1   Q.  And if we go down to the bottom, at 7:34 p.m., there's an

2   email from you, and this is --

3   A.  Yes.

4   Q.  -- to Elizabeth Williamson, correct?

5   A.  Right.

6   Q.  And now do you recall whether at this time, 7:34 p.m., had

7   anyone other than Ms. Williamson worked on the draft of the

8   editorial?

9   A.  By this time, yes.

10  Q.  And who else had worked on the draft editorial?

11  A.  I think a few other editors, so James and Linda, the two of

12  them.

13  Q.  I'm sorry.  You broke up a little bit there.  Who was that?

14  A.  I think it was the other editors at this point, so James

15  and Linda Cohn.

16  Q.  When you say James, just so we're clear, that's James

17  Bennet, correct?

18  A.  James Bennet, yes.

19  Q.  And do you see, the editorial was within a -- I guess

20  there's a better word you probably know, but -- like a document

21  management system within *The Times*?

22  A.  Yes.

23  Q.  And that's known as Scoop, correct?

24  A.  Right.

25  Q.  And were you able to actually see the document as it was

M271PAL3          JA 0484          Lepping - Direct

1   being edited by Mr. Bennet and Ms. Cohn within the Scoop

2   system?

3   A.  Yes, I could read it.

4   Q.  So as they were editing, you would have been also doing

5   fact-checking at the same time?

6   A.  Yes.

7   Q.  And so this particular email we're looking at, Exhibit 153,

8   we started looking at the 7:34 p.m. email from you.  You say,

9   "We wrote about Palin's crosshairs in March of 2010 so perhaps

10  we should say 'in the months before...' or leading up to the

11  2010 election or something."  And then you have a hyperlink

12  there.

13          Now do you know, or do you have any recollection of

14  what would have prompted you to send this email to Elizabeth

15  Williamson at 7:34?

16  A.  This simply refers to the timing, the dates of the

17  crosshairs.  So I was just saying there was an editorial about

18  the actual shooting that was written before.  That's the only

19  point I was making.

20  Q.  I'm sorry.  It was a poorly phrased question.  But prior to

21  this email do you recall having any conversations with

22  Ms. Williamson that would have led you to be sending her this

23  email or were you just in the process of fact-checking the

24  piece?

25  A.  That was the normal process of fact-checking.

1   Q.  Okay.  And so what was it that you were trying to point out

2   to Ms. Williamson in your 7:34 p.m. email?

3   A.  Basically, I was just suggesting a minor fix for the

4   timing.

5   Q.  The piece that's hyperlinked there, do you recall what that

6   piece was?

7   A.  It looks like a previous -- an editorial we had written

8   previously.

9   Q.  And I'm going to try to avoid having to show you that piece

10  to save time, but if we look at the URL for that, part of the

11  URL says 2010/03/27.  Do you see that?

12  A.  Yes.

13  Q.  And that would have been the date that that particular

14  piece was published, correct?

15  A.  Right.

16  Q.  And so that particular piece on March 27th of 2010 would

17  have had something to do with the crosshairs map being out

18  publicly at that time, correct?

19  A.  Right.

20  Q.  And do you recall that the date of the Loughner shooting

21  was in January of 2011?

22  A.  I don't recall specifically, but --

23  Q.  Well, if we assume that the Loughner shooting took place in

24  January of 2011, this article at least that you were providing

25  to Ms. Bennet -- I mean Ms. Williamson -- would have been

1   approximately nine months or so before?

2   A.  Right.

3   Q.  And so is that why you were saying "in the months before"?

4   A.  Yes.

5   Q.  Now wouldn't it be the most accurate way to represent that

6   particular fact to actually state nine months before?

7          MS. SCHELL:  Objection.  Speculation.

8          THE COURT:  Sustained.

9   Q.  And then Ms. Williamson responds to you at 7:38 p.m. and

10  said, "In the months before sounds good."  Do you see that?

11  A.  Yes.

12  Q.  And then at 7:39 you passed that on to Linda Cohn; is that

13  right?

14  A.  Right.

15  Q.  And was that because Ms. Cohn was the one actually making

16  the changes in the document at that time?

17  A.  Either she was or I made the change and wanted her to be

18  aware of it.

19  Q.  And let me show you another document.  It's been premarked

20  as Plaintiff's 154, which I don't think there's an objection

21  to.

22          MS. SCHELL:  No objection to this.

23          THE COURT:  154 is received.

24          (Plaintiff's Exhibit 154 received in evidence)

25  Q.  Ms. Lepping, do you recognize Plaintiff's Exhibit 154?

M271PAL3                    Lepping - Direct

1                   I'm sorry.  Did you hear me?

2    A.  Yes.

3    Q.  Okay.  Do you recognize Plaintiff's Exhibit 154?

4    A.  Yes.

5    Q.  And it appears to be an email from you to Bob Semple,

6    correct?

7    A.  Right.

8    Q.  And the subject line is "15thu1 playback"; is that right?

9    A.  Yes.

10   Q.  What's a playback?

11   A.  That's just a term that's used in the system, just

12   sending -- you're playing it back for someone means you're just

13   sending them a final draft of something.

14   Q.  And so this would have been a draft that you were providing

15   to Mr. Semple of the "America's Lethal Politics" editorial as

16   it existed in Scoop at that time, correct?

17   A.  Right.

18   Q.  And this is at 7:56 p.m.  Do you see that?

19   A.  Yes.

20   Q.  And if you turn to the second page of this document, the

21   top paragraph, and you see there, there's a part of that that

22   says "the link to political incitement was clear.  In the

23   weeks..."?

24   A.  Yes.

25   Q.  And so at this point in time that phrase, "in the weeks,"

1  that we were looking at in your prior emails had not been

2  changed yet; is that right?

3  A.  Looks that way, right.

4  Q.  And do you recall, in the course of fact-checking, the "in

5  the weeks" issue that we've been talking about, do you also

6  recall fact-checking what was immediately prior to that, which

7  is the phrase "the link to political incitement was clear"?

8  A.  I do not.

9  Q.  I'm sorry?  I didn't hear you.  I apologize.

10            THE COURT:  She said no.

11            MR. VOGT:  Thank you.

12 Q.  And then I'm going to show you now Plaintiff's Exhibit 1,

13 which, I'm amazed, but I don't believe has been entered into

14 evidence yet.  It's the online version of the article.

15            THE COURT:  All right.  Any objection?

16            MR. AXELROD:  We'll, of course, stipulate.

17            THE COURT:  All right.  Received.

18            (Plaintiff's Exhibit 1 received in evidence)

19 Q.  And Ms. Lepping, you should also have a copy of Plaintiff's

20 Exhibit 1 there, which is the online version of the "America's

21 Lethal Politics" editorial from June 14th of 2017.  And are you

22 familiar with this document?

23 A.  Yes.

24 Q.  And if we turn to the second page of this, the top

25 paragraph, top two paragraphs.  And that first paragraph there

1   contains the part that we were just looking at in the playback

2   you sent to Mr. Semple that says, "the link to political

3   incitement was clear.  Before the shooting..."  Do you see

4   that?

5   A.  Yes.

6   Q.  Now do you know who made that change there, "Before the

7   shooting"?

8   A.  I don't.

9   Q.  And do you know why that change wasn't consistent with what

10  Ms. Williamson had told you was good, which was, "In the months

11  before"?

12          MS. SCHELL:  Objection.

13          THE COURT:  Sustained.

14  Q.  Now with respect to this first paragraph that we're looking

15  at, do you recall checking the details of that paragraph?

16  A.  The details meaning the names and the years, numbers,

17  things like that, yes.

18  Q.  And did you also double-check when the map itself was

19  produced or distributed?

20  A.  I believe I did, yes.

21  Q.  Did you actually look at the map?

22  A.  I think so, yes.

23  Q.  And did you check to see whether or not that there were

24  crosshairs put over electoral districts or lawmakers

25  themselves?

1           MS. SCHELL:  Objection.  Vague.

2           THE COURT:  Well, it's a little vague.  But you looked

3    at the map, yes?

4           THE WITNESS:  Yes.

5           THE COURT:  And did you see that the stylized

6    crosshairs were over electoral districts, not over photos of

7    the congresspeople, yes?

8           THE WITNESS:  Right.

9           THE COURT:  Okay.  Go ahead, counsel.

10   BY MR. VOGT:

11   Q.  And did you conduct any fact-checking with respect to the

12   second paragraph that's been blown up on your screen?

13   A.  The one that starts with "Conservatives"?

14   Q.  Yes.

15   A.  Okay.  Yes, I would have checked that as well.

16   Q.  And in particular there, the sentence that begins with,

17   "Though there's no sign of incitement as direct as in the

18   Giffords attack, liberals should of course hold themselves to

19   the same standard of decency that they ask of the right," did

20   you fact-check that sentence?

21   A.  No.  I checked the previous one.

22   Q.  And do you recall whether or not at any point in time

23   during the course of fact-checking this particular editorial,

24   whether you learned that it was common knowledge in news

25   stories that people did not know the reason for Hodgkinson's

1    shooting?

2              MS. SCHELL:  Objection.

3              THE COURT:  Sustained.

4              MR. VOGT:  Your Honor, I'm using terminology the

5    witness used previously, in prior testimony.

6              THE COURT:  That may be, but that doesn't make it

7    admissible.  If a witness in a prior testimony uses a vague

8    term, that doesn't mean you get to use it here in trial.  But

9    if you want to, there's a question there that can be asked, but

10   it's not the question you put.

11             MR. VOGT:  I just didn't want to twist her words, but

12   I understand, your Honor.

13   BY MR. VOGT:

14   Q.  Do you recall conducting any research on June 14th of 2017

15   concerning the issue of whether or not the motives for

16   Hodgkinson's shooting had been discovered?

17   A.  I -- I -- it might have been in the news story about it.

18   Q.  And when you say news story, what are you referring to?

19   A.  *The New York Times* news story.

20   Q.  And do you recall the title of that story?

21   A.  I don't.

22   Q.  And with respect to the two paragraphs we've been looking

23   at, the term "incitement" is used in both of those paragraphs.

24   Do you see that?

25   A.  Yes.

M271PAL3                        Lepping - Direct

1    Q.  And when you were fact-checking these pieces, you

2    understood the word "incitement" to mean what motivates a

3    person; is that right?

4    A.  Right.

5    Q.  Now when you were typically fact-checking pieces, if it was

6    unclear to you what a passage or verbiage in a draft editorial

7    meant, what would you typically do?

8    A.  I would ask the writer or the editor.

9    Q.  And do you have any recollection in this particular

10   instance of talking with either Mr. Bennet or any other editors

11   about any passages in "America's Lethal Politics" that you

12   thought were unclear?

13   A.  No, not that I recall.

14   Q.  And to your recollection you never had any discussions with

15   Mr. Bennet about what the two paragraphs we've been going

16   through meant; is that right?

17   A.  Right.

18   Q.  And do you recall what time you finished working on

19   June 14th of 2017?

20   A.  I don't know.  I think it was after 8 p.m.

21   Q.  And was it typical for you to work until after 8:00?

22   A.  Sometimes, yes.

23   Q.  And do you recall what the deadline would have been --

24        THE COURT:  You work past 8:00 even though you're not

25   a lawyer?

1              Go ahead, counsel.

2    Q.  Do you recall, with respect to your typical work hours, was

3    Mr. Bennet usually at the office when you left?

4    A.  Sometimes, yes.

5    Q.  And do you recall what the deadline would have been on

6    June 14 of 2017 to submit the "America's Lethal Politics"

7    editorial so that it could be printed in the next day's paper?

8    A.  I think then it was usually 8 or 8:15.

9    Q.  And did you at any point in time conduct any factual

10   research to determine whether or not a link was established

11   between political incitement and the 2011 shooting of Gabrielle

12   Giffords and the other individuals in Arizona?

13   A.  Did I ever, meaning, which date?

14   Q.  Yes.  And I'll clarify.  Do you recall that on June 15th of

15   2017, you conducted factual research concerning whether or not

16   a link was established between political incitement and the

17   2011 shooting of Gabrielle Giffords?

18   A.  I did, yes.

19   Q.  And what did that research determine?

20   A.  I -- I think the best thing I could find was something in a

21   police report that said it wasn't politically connected.

22   Q.  And when you say "it," you're saying the Loughner shooting

23   was not politically connected; is that correct?

24   A.  I think so.  To the best of my recollection.

25   Q.  And you believe you found that in a police report; is that

M271PAL3                    **JA 0494**
                        Lepping - Direct

1    right?

2    A.   Yes.

3    Q.   And do you recall where you found that police report?

4    A.   Either through an article on *The Times* or a search online.

5    Q.   And if I understand it correctly, you did not maintain a

6    copy of that police report, correct?

7    A.   Right, I didn't.

8    Q.   And that's because you found it online, right?

9    A.   Right.

10   Q.   Do you recall how long it took you on the morning of

11   June 15th of 2017 to find that police report?

12   A.   I spent awhile looking through some things, so I don't know

13   exactly how long.

14   Q.   Do you recall what time you got in to the office on the

15   morning of June 15th of 2017?

16   A.   I don't recall the exact time.

17   Q.   Let me show you what I believe has already been introduced

18   as Plaintiff's Trial Exhibit 191.

19        And do you see down at the bottom there's an email

20   from Mr. Bennet at 5:08 a.m --

21   A.   Yes.

22   Q.   -- just at the top there, on this issue that I've been

23   talking about with you, but do you see you email at 8:19 a.m.

24   and say --

25   A.   Yes.

M271PAL3                    **JA 0495**    Lepping - Direct

1  Q.  -- "Sure, I'll be in the office shortly"?

2  A.  Yes.

3  Q.  So it would have been obviously some point after 8:19 that

4  you were in the office that morning, correct?

5  A.  Right.

6  Q.  And do you recall what time the correction of the editorial

7  "America's Lethal Politics" took place on June 15th of 2017?

8  A.  I don't know the exact time.

9  Q.  Back in 2017 did you work with Mr. Bennet often?

10  A.  Yes.

11  Q.  And based on your experience working with him in that time

12  period, would you say that he has a good memory?

13          MS. SCHELL:  Objection.

14          THE COURT:  Sustained.

15  Q.  Were there occasions when you worked with Mr. Bennet when

16  you personally observed him demonstrating an ability to recall

17  articles that had been written several years ago?

18          MS. SCHELL:  Objection.

19          THE COURT:  I'll allow that.  Answer yes, no, or if

20  you can't answer yes or no, say that.

21  A.  Could you repeat the question, please.

22  Q.  Yes.  Based on your experience working with Mr. Bennet,

23  were there occasions on which you personally observed him

24  demonstrating an ability to recall articles that had been

25  written several years ago?

M271PAL3          **JA 0496**          Lepping - Direct

1    A.  Yes.

2    Q.  And based on your experience working with Mr. Bennet, were

3    there occasions upon which you personally observed him bringing

4    up articles that had been written while he was working at *The*

5    *Atlantic*?

6              MS. SCHELL:  Objection, relevance.

7              THE COURT:  No, I'll allow that.

8    A.  I don't recall anything specific.

9    Q.  Do you recall him ever being able to bring up articles that

10   were written while he was at *The Atlantic*, though?

11             THE COURT:  Sustained.

12   Q.  And the last thing I wanted to do -- you had mentioned

13   earlier in your testimony that there was a news story that you

14   read on June 14th of 2017 concerning the Scalise shooting; is

15   that right?

16   A.  That's right.

17   Q.  And if I could --

18             MS. SCHELL:  Objection, your Honor.

19             THE COURT:  I'm sorry.  There's no pending question.

20             MR. VOGT:  I was going to ask the witness to look at

21   it.  Before I do that, I was just going to see if we could

22   agree to have it introduced, but I can have the witness look at

23   it and see if this is --

24             THE COURT:  All right.  Well, have the witness look at

25   it without showing it to the jury --

**JA 0497**

M271PAL3                    Lepping - Cross

1              MR. VOGT:  Yes.

2              THE COURT:  -- and then we'll see what your question

3    is.

4    BY MR. VOGT:

5    Q.  Ms. Lepping, you should have there a copy of Plaintiff's

6    Trial Exhibit 112.

7    A.  Yes.

8    Q.  And don't say anything about this, but if you look at the

9    title of this, does that refresh your recollection as to

10   whether this is the news article that you read on June 14th of

11   2017?

12   A.  It doesn't.  I don't know if it is.

13   Q.  Okay.

14             MR. VOGT:  May I confer for a moment, your Honor.

15             THE COURT:  Yes.

16             MR. VOGT:  No further questions at this time, your

17   Honor.

18             THE COURT:  Cross-examination.

19             MS. SCHELL:  Thank you.

20   CROSS EXAMINATION

21   BY MS. SCHELL:

22   Q.  Good morning, Ms. Lepping.  Can you hear me all right?

23   A.  I can.

24   Q.  Would you tell the jury again how long you've worked for

25   *The Times*, please.

1          THE COURT:  You need to speak a little louder or

2     closer to the microphone.

3          MS. SCHELL:  Thank you, your Honor.  There's a bit of

4     an echo in here.

5     Q.  Ms. Lepping, could you please tell the jury how long you've

6     worked for *The Times*.

7     A.  I've been there since 2007.

8     Q.  And you began as an editorial assistant; is that correct?

9     A.  That's right.

10    Q.  When you were an editorial assistant, did you work with a

11    particular department or division of *The Times*?

12    A.  It was only the opinion section for the editorial board.

13    Q.  Did you work exclusively on editorial pieces?

14    A.  Not in 2007 but later on, yes.

15    Q.  And once you became a -- remind me again when you became a

16    researcher.

17    A.  I had done some over the years, but officially, 2015.

18    Q.  And beginning in 2015, as a researcher, which department

19    did you work for?

20    A.  The same; for the editorial board.

21    Q.  And in June of 2017 were you still a researcher for the

22    editorial board?

23    A.  Yes.

24    Q.  I believe you already explained for Mr. Vogt what a

25    fact-checker does, but could you briefly summarize, just to

**JA 0499**

M271PAL3                          Lepping - Cross

1   refresh the jury.

2   A.  Basically go through the piece and look up all the facts

3   and make sure they can be proven.

4   Q.  And what kind of facts are you checking when you look at a

5   piece?

6   A.  It depends, but most of the time you're checking names,

7   dates, quotes, things like that.

8   Q.  Did you ever conduct research for a piece that a writer was

9   drafting?

10  A.  Sometimes, if they needed help looking for something.

11  Q.  Would that be if a writer specifically asked you to

12  research a topic?

13  A.  Yes.

14  Q.  When it comes to fact-checking, does the editorial board

15  take fact-checking seriously?

16  A.  Yes.

17  Q.  Would each editorial be fact-checked?

18  A.  Yes.

19  Q.  And would you go through an editorial line by line?

20  A.  Yes.

21  Q.  You mentioned with Mr. Vogt that a writer might flag a

22  specific thing for you to fact-check.  Did that always happen?

23  A.  Occasionally it would.

24  Q.  And if a writer didn't flag anything, how would you know

25  what facts to check?

**JA 0500**
M271PAL3                     Lepping - Cross

1   A.  I would just go into the piece, use a highlighter, circle
2   all the factual statements.
3   Q.  You'd basically look at the draft and see what facts were
4   in it?
5   A.  Yes.
6   Q.  And how did you learn to fact-check?
7   A.  Most of it was just on-the-job training, through
8   experience.
9   Q.  You worked from -- did you work with a fact-checker before
10  you were at the editorial board?
11  A.  Sorry?
12  Q.  Did you work with the previous fact-checker for the
13  editorial board?
14  A.  Yes, yeah.
15  Q.  Turning to the "America's Lethal Politics" editorial on
16  June 14, 2017, you should have in front of you a document
17  marked PX 117, which was already admitted.
18       MS. SCHELL:  Mr. DiMezza, could you please bring that
19  up.
20  Q.  Have you seen this document before, Ms. Lepping?
21  A.  Yes.
22  Q.  Can you tell me what it is.
23  A.  An email from Bob Semple to me and a few others.
24  Q.  Was this the first you learned of the editorial?
25  A.  I think so, yes.

**JA 0501**

M271PAL3                          Lepping - Cross

1   Q.  What was your understanding of why Mr. Semple copied you on

2   this email?

3   A.  That was typical, just to let us know what was being

4   planned for the day.

5   Q.  Was Mr. Semple asking you to do any research for the

6   editorial at this point?

7   A.  No.

8         MS. SCHELL:  And Mr. DiMezza, if you could zoom in at

9   the top just to see the time.

10  Q.  So that's around noon on the 14th; is that correct?

11  A.  Right.

12  Q.  After you got this email did you start watching for a draft

13  of the editorial to begin fact-checking?

14  A.  I usually do, yes.

15  Q.  And did you understand at this point that you would be

16  fact-checking the editorial once it was drafted?

17  A.  Yes.

18  Q.  You should have a document in front of you marked PX 140A.

19  A.  Yes.

20  Q.  Have you seen that document before?

21  A.  Yes.

22  Q.  And can you tell us what it is, please.

23  A.  Looks like a draft of the editorial.

24  Q.  And I will ask to admit this, but as a first step, could

25  you turn to the last page, and see if that cites whose draft it

1  is.

2          THE COURT:  I'm sorry.  You're offering this?

3          MS. SCHELL:  I just was going to ask her one more

4  question to establish whose draft it was, but yes, I would like

5  to.

6          THE COURT:  Let's just find out whether there's an

7  objection.

8          MR. VOGT:  No, there's no objection, your Honor.

9          THE COURT:  Received.

10          (Plaintiff's Exhibit 140A received in evidence)

11          MS. SCHELL:  Thank you.

12  BY MS. SCHELL:

13  Q.  So looking at the fourth page of this exhibit, Ms. Lepping,

14  in the middle of the page --

15  A.  Yeah.

16  Q.  -- where it says Eileen Lepping, does that indicate --

17  A.  Yes.

18  Q.  -- that this document is your draft of the editorial or the

19  draft that you were in?

20  A.  It's usually from the top down, so underneath it would

21  be -- it's hard to tell by --

22  Q.  Let's turn to the first page.  I think it prints a little

23  differently than it's seen on this system.

24          MR. VOGT:  Your Honor, we'll stipulate that it prints

25  the opposite way.

1        MS. SCHELL:  Thank you.

2        MR. VOGT:  I had a hard time figuring that out.

3        THE COURT:  Okay.  Thank you.

4   BY MS. SCHELL:

5   Q.  So Ms. Lepping, we've stipulated that this was your

6   draft --

7   A.  Okay.

8   Q.  -- the one that begins on page 1.  It's just a print versus

9   online system difficulty.

10       Turning to the first page, just to demonstrate how

11  fact-checking works, could you look at the first paragraph,

12  please, and tell the jury what facts in that paragraph you

13  checked.

14  A.  In this draft, I'm checking where it happened, the date,

15  and the titles.

16  Q.  And I'm sorry.  You broke up.  Could you say that one more

17  time.

18  A.  I'm just checking the location, making sure the location is

19  correct, and that it did take place Wednesday morning, and that

20  Rand Paul is in fact a senator and that it's spelled correctly.

21  Q.  And I think just to -- the symbols are a little strange,

22  but at the end of the sentence it says called "basically a

23  killing field."  Would you also check that quote?

24  A.  Yes.

25  Q.  And in the second paragraph that begins, "A gunman with a

1   long rifle fired 50 rounds," what facts did you check in that

2   paragraph?

3   A.  Again, checking all names and titles, which weapon was the

4   right one, the amount of rounds, and the number of victims,

5   things like that.

6   Q.  And then I'll skip down to the fourth paragraph, just to

7   keep us moving.

8           Actually, excuse me, the fifth paragraph, that begins,

9   "Was this attack evidence of how vicious American politics has

10  become?" before we read that, would you have checked line by

11  line in the third and fourth paragraphs as well?

12  A.  Yes, I would have read through them, yes.

13  Q.  I won't make you do that in front of the jury.  I thought

14  that would take a bit longer than we want.

15          But looking at the fifth paragraph that begins, "Was

16  this attack evidence of how vicious American politics has

17  become?" what facts did you check in this paragraph?

18  A.  Again, it's checking the year, the names are correct, the

19  titles, the age of the girl, and again, "In the weeks," and I

20  checked the hyperlink.

21  Q.  You talked a little bit about this before, but in general

22  when you were fact-checking a hyperlink, did you open every

23  link?

24  A.  Yes.

25  Q.  And what would you be looking for when you opened that

**JA 0505**

1   link?

2   A.   Usually the links are attributed to certain sources, so you

3   just need to determine that the link is sending you to what

4   that source is, the facts in the piece, I'd be checking for

5   that.

6   Q.   So in this specific sentence, "In the weeks before the

7   shooting, Sarah Palin's political action committee circulated a

8   map of targeted electoral districts," what did you check in

9   that sentence when you opened the hyperlink?

10  A.   I believe it was making sure that it was the political

11  action committee that circulated the map, the number of

12  districts.

13          MS. SCHELL:   And Mr. DiMezza, if you could pull up

14  Defense Exhibit 10, which has previously been admitted, please.

15  Q.   Ms. Lepping, is this the document that was included, the

16  hyperlink, when you fact-checked the editorial?

17  A.   Yes.

18  Q.   And did it confirm for you that Sarah Palin's PAC had

19  published the crosshairs map?

20          MR. VOGT:   Objection.

21          MS. SCHELL:   I can rephrase.

22          THE COURT:   No.   Well, that's okay, but I'm overruling

23  the objection.

24          MS. SCHELL:   Thank you.

25          THE COURT:   You may answer.

M271PAL3                    **JA 0506**    Lepping - Cross

1  A.  Yes.

2  Q.  And did this hyperlink -- did this document, when you

3  opened this document, was it an appropriate document to include

4  as the hyperlink for this editorial?

5  A.  Yes.

6  Q.  Is part of what you're checking with a hyperlink just to

7  make sure that the link goes to the right document?

8  A.  Yes.

9  Q.  When you looked at this ABC News piece, Defense Exhibit 10,

10  did you have any concerns about the editorial or the sentence

11  that we were talking about?

12  A.  About the map?

13  Q.  I couldn't hear you.  I'm sorry.

14  A.  You're talking about the map?

15  Q.  When you read the -- when you were fact-checking the

16  editorial and you read the --

17        THE COURT:  No, she's asking which sentence are you

18  referring to?

19  BY MS. SCHELL:

20  Q.  I'm referring to the sentence, "In the weeks before the

21  shooting, Sarah Palin's political action committee circulated a

22  map," and the sentence goes on.

23  A.  Yes.

24  Q.  When you read that sentence and checked the hyperlink, did

25  you have any concerns from a fact-checking perspective?

**JA 0507**

M271PAL3                        Lepping - Cross

1   A.  No.

2   Q.  And Mr. Vogt asked you earlier about -- I believe it was

3   Plaintiff's Exhibit 153, but I'm going to show you Plaintiff's

4   Exhibit 157.

5           Have you seen this document before?

6   A.  I don't recall.

7   Q.  Do you know what this document is?

8   A.  Yes, it looks like a reply from Ms. Cohn.

9   Q.  Is it from Ms. Cohn to you?

10  A.  Yes.

11          MS. SCHELL:  Move to admit Plaintiff's Exhibit 157,

12  your Honor.

13          MR. VOGT:  No objection.

14          THE COURT:  Received.

15          (Plaintiff's Exhibit 157 received in evidence)

16  Q.  You mentioned that this was a response from Ms. Cohn.  Is

17  it a response to the email that you had previously discussed

18  with Mr. Vogt about weeks or months?

19  A.  Yes.

20          (Continued on next page)

21

22

23

24

25

```
 1   Q.  And Ms. Cohn responds, "I just left it as is before . . ."

 2           What was the concern that you had flagged to

 3   Ms. Williamson and then Ms. Cohn in this e-mail?

 4   A.  It was simply on the timing.

 5   Q.  Is that the timing of whether the map was circulated weeks

 6   or months before the shooting?

 7   A.  Yes.

 8   Q.  And does the revised language that Ms. Cohn mentioned here

 9   before, does that solve the issue?

10   A.  Yes, that's one way of following it, yes.

11   Q.  Is it safe to say that Ms. Cohn had already addressed the

12   fact-checking issue that you flagged to her?

13   A.  Yes.

14   Q.  Turning back to Plaintiff's Exhibit 140A, the draft that

15   you had of the editorial, moving on to the sixth paragraph on

16   the top of page 2, the paragraph begins "Conservative and

17   right-wing media were quick on Wednesday."

18   A.  Yes.

19   Q.  Mr. Vogt asked you about this briefly, but could you tell

20   me what facts you checked in this paragraph?

21   A.  I think most of the -- mostly I would have checked the

22   first sentence.

23   Q.  And you said, I think, with Mr. Vogt that you hadn't

24   checked or hadn't checked anything in the second sentence, is

25   that correct?
```

1   A.  Right.

2   Q.  Did you mean by that that you hadn't read the second

3   sentence?

4   A.  No, I would have read it.

5   Q.  Were there any facts in that sentence that required

6   checking?

7   A.  I was doing more of a quick check at that point.

8   Q.  Say that again.  I just couldn't hear you.

9   A.  I guess I was doing more of a quick check of names and

10  dates and things like that.

11  Q.  Are there any names or dates in the sentence that begins

12  "though there is no sign yet of incitement," any names or dates

13  that require checking?

14  A.  No.

15  Q.  You can put that -- Mr. DiMezza, if you will leave the

16  document up but remove the highlight.  Looking at the rest of

17  the draft, and I won't make you go through it line by line, but

18  did you, in fact, check the rest of this editorial line by

19  line?

20  A.  Yes.

21  Q.  Were there any statements in this editorial after you

22  fact-checked that you wanted to check and weren't able to

23  confirm?

24  A.  No, not that I recall.

25  Q.  Were there any facts that you found that were wrong but you

**JA 0510**

1    didn't change?

2    A.  No.

3    Q.  Were there any facts in this editorial that Ms. Williamson

4    told you not to check?

5    A.  No.

6    Q.  Were there any facts in this editorial that Mr. Bennet told

7    you not to check?

8    A.  No.

9    Q.  Were there any facts in this editorial that anyone on the

10   editorial board told you not to check?

11   A.  No.

12   Q.  And when you finished your fact-check, did you have any

13   concerns about *The Times* publishing this editorial?

14   A.  No.

15   Q.  Mr. DiMezza, if you will put up Plaintiff's Exhibit --

16   sorry.  Don't put it up just yet.

17          Ms. Lepping, if you could turn to Plaintiff's Exhibit

18   148, please, and tell me what that is.

19          MR. VOGT:  I'm sorry, what was that number?

20          MS. SCHELL:  Plaintiff's Exhibit 148.

21   A.  This is an e-mail I sent to Mr. Bennet.

22   Q.  Thank you.

23          MS. SCHELL:  We would move for admission of

24   Plaintiff's Exhibit 148, your Honor.

25          MR. VOGT:  No objection.  I think it may have already

JA 0511

M272Pal4                          Lepping - Cross

1    been admitted as well.

2              THE COURT:  Received.

3              (Plaintiff's Exhibit 148 received in evidence)

4    BY MS. SCHELL:

5    Q.  Mr. DiMezza, could you zoom in just on the text, please.

6              Ms. Lepping, what was this e-mail?

7    A.  I believe Mr. Bennet had asked me to double check some of

8    the laws in Virginia so this was my -- what I found.

9    Q.  So this is research that Mr. Bennet asked you to do for the

10   editorial?

11   A.  Yes.

12   Q.  And were you able to find the information he was looking

13   for on the night of the 14th about gun regulations in Virginia?

14   A.  I believe so, yes.

15   Q.  Mr. DiMezza, you can put that down and if you will please

16   pull up -- I believe we admitted Defense Exhibit 41 on direct,

17   yes?  A step ahead of me.  Thank you.

18             Ms. Lepping, can you please tell us what this e-mail

19   is?

20   A.  This is the playback from the editorial I sent that I

21   e-mailed to Bob Semple.

22   Q.  Did you typically send playbacks to Mr. Semple?

23   A.  Yes.

24   Q.  Why did you send playbacks to him?

25   A.  He usually liked to read close to final version of

M272Pal4                    Lepping - Cross

1   (unintelligible).

2

3   Q.  Could you say that again?  The connection was a little

4   unclear.

5   A.  He usually liked to receive whatever final version of the

6   pieces we were running.

7   Q.  Did Mr. Semple read playbacks when you sent them to him?

8   A.  Yes.

9   Q.  If he had a concern about an editorial, would he reach out

10  to you?

11  A.  Yes.

12  Q.  Did he reach out to you about this editorial?

13  A.  No.

14  Q.  Did he raise any concerns about this editorial to you?

15  A.  Not to me, no.

16  Q.  The following day, June 15, after the editorial was

17  published, did you learn at some point that *The Times* was

18  considering issuing a correction?

19  A.  Yes.

20  Q.  And Mr. DiMezza, if you could pull up Defense Exhibit 49.

21          I believe this exhibit was already admitted, your

22  Honor.

23          Ms. Lepping, is this e-mail how you learned about the

24  possibility of a correction of the editorial?

25  A.  I -- at this point I didn't know there was going to be a

1   correction, but . . .

2   Q.  If you look at Mr. Bennet's e-mail, at 5:08 a.m., where he

3   says, "We're taking a lot of criticism for saying that the

4   attack on Giffords was in any way connected to incitement.  The

5   claim is that this was fully investigated and debunked in the

6   months after the attack, and the shooter was found to have

7   acted only because of his personal demons.  I don't know what

8   the truth is here, but we may have relied too heavily on our

9   early editorials and other early coverage of that attack.  If

10  so, I'm very sorry for my own failure on this yesterday.  In

11  any case, I would like to get to the bottom of this as quickly

12  as possible this morning and correct the piece if needed.  Can

13  you two please put your heads together on this first thing this

14  morning?  Please skip the morning meeting if necessary."

15          When you received this e-mail from Mr. Bennet, did you

16  know one way or another what Mr. Loughner's motivations were in

17  the Arizona shooting or in the shooting of Congresswoman

18  Giffords?

19  A.  No.

20  Q.  Prior to this e-mail from Mr. Bennet at 5:08 a.m. on June

21  15 of 2017, had anyone asked to you investigate or research

22  what motivated the Arizona shooter?

23  A.  No, not that I can recall.

24  Q.  And prior to this e-mail on June 15, had anyone asked you

25  to investigate whether Mr. Loughner had -- Mr. Loughner, the

JA 0514

1   Arizona shooter, had seen the crosshairs map?

2   A.  No.

3   Q.  After you received this e-mail from Mr. Bennet, did you

4   research the question that he asked there about whether there

5   was any connection between Loughner and political incitement?

6   A.  Yes.

7   Q.  Were you ever able to determine one way or another whether

8   Mr. Loughner had seen the crosshairs map?

9   A.  I wasn't, no.

10  Q.  Were you able -- were you ever able to determine one way or

11  another whether Mr. Loughner, in shooting Congresswoman

12  Giffords and others in Arizona, had been motivated by the

13  crosshairs map?

14  A.  No, I don't know.

15  Q.  And when Mr. Vogt was questioning you, you mentioned a

16  police report.  Did that police report say to your recollection

17  now definitively whether Mr. Loughner had seen the crosshairs

18  map?

19  A.  No, not that I can recall.

20  Q.  Do you remember if it mentioned the crosshairs map at all?

21  A.  I don't know.

22  Q.  Do you remember if it said definitively what Mr. Loughner's

23  motivation had been?

24  A.  I don't specifically remember.

25  Q.  Was it unusual to receive an e-mail like this asking for

**JA 0515**

M272Pal4                          Lepping - Cross

1   research after a piece had been published?

2   A.  Uhm, I received e-mails to look into something after

3   publication, but, yeah, I would say it was rare.

4   Q.  So you would say it was or wasn't rare to look into

5   something after a piece had been published?

6   A.  It happened on occasion.

7   Q.  Was it usual to receive an e-mail from Mr. Bennet at 5:00

8   in the morning?

9   A.  It was not usual.

10  Q.  Did his e-mail at 5 a.m. asking for you to as quickly as

11  possible look into this suggest anything to you?

12  A.  It suggested it was pretty urgent.

13  Q.  And did you move quickly to research this question?

14  A.  Yes.  As soon as I got to work, I got started on it.

15  Q.  After you did your research, were you involved in drafting

16  the correction on June 15?

17  A.  No.

18          MS. SCHELL:  Your Honor, a moment to confer?

19          THE COURT:  Yes.

20          (Counsel confer)

21  BY MS. SCHELL:

22  Q.  One more question for you, Ms. Lepping.  I asked you

23  earlier, when we were talking about fact-checking on June 14,

24  whether anyone asked you not to check any specific facts.  When

25  you were fact-checking on June 14, was there any part of the

1  editorial, factual or otherwise, that anyone asked you not to

2  check?

3  A.  No.

4          MS. SCHELL:  No further questions, your Honor.

5          THE COURT:  Just so that I'm clear and then we will

6  get to redirect, would you look at Exhibit 1, Plaintiff's

7  Exhibit 1, which is the final actual editorial, if I am

8  correct.

9          MS. SCHELL:  I believe it is Plaintiff's Exhibit 1.

10          THE COURT:  Plaintiff's Exhibit 1, yes, in evidence.

11          MS. SCHELL:  Thank you.

12          THE COURT:  So if you turn, Ms. Lepping, to the second

13  page, at the top of the page are the two paragraphs we have

14  been focusing on.  Do you see that?

15          THE WITNESS:  Yes.

16          THE COURT:  And it says, "In 2011, when Jared Lee

17  Loughner opened fire in a supermarket parking lot, grievously

18  wounding Representative Gabby Giffords and killing six people,

19  including a 9-year-old girl, the link to political incitement

20  was clear.  Before the shooting Sarah Palin's political action

21  committee circulated a map of targeted electoral districts that

22  put Ms. Giffords and 19 other Democrats under stylized

23  crosshairs."

24          So am I right that although you fact-checked various

25  items in that paragraph in those two sentences, no one asked

M272Pal4                    Lepping - Cross

1   you to, and you did not yourself, prior to the time when the

2   editorial appeared, fact-check the "link to political

3   incitement was clear."  Do I have that right?

4           THE WITNESS:  Right.  I don't think I did.

5           THE COURT:  And was that because those are not the

6   kind of facts that you fact-check, unlike age and dates and so

7   forth, or was it an oversight or what?

8           THE WITNESS:  It could have been a combination of

9   things, checking things fast on the line and perhaps my reading

10  of it, my interpretation, led me not to have to look into that

11  specifically.

12  Q.  So there are arguably two facts that are being asserted

13  there, first, that the Loughner shooting was politically

14  incited and, second, that that political incitement was linked

15  to the circulation of the map by the Palin political action

16  committee.  Correct?

17          THE WITNESS:  Yes.

18          THE COURT:  So and when you subsequently did some

19  fact-checking, what you found in the police report was that

20  there was no evidence in the police view or in their report

21  that the Loughner shooting was politically incited at all.  Is

22  that correct?

23          THE WITNESS:  I believe so, yes.

24          THE COURT:  So if it wasn't politically incited, then

25  obviously it couldn't have been linked to any action by the

M272Pal4                    Lepping - Cross

 1  Palin committee -- any political action by the Palin committee,
 2  yes?
 3          THE WITNESS:  I guess that would be the case, yes.
 4          THE COURT:  So and then in the next paragraph, the
 5  relevant sentence is, referring to the attack on Representative
 6  Scalise, "Though there's no sign of incitement as direct as in
 7  the Giffords attack," do you see that?
 8          THE WITNESS:  Yes.
 9          THE COURT:  So the assertion there is being -- that is
10  being made is that not only is there a link between the Palin
11  PAC's circulation of the map, but in fact -- and the Loughner
12  shooting, but in fact it's a direct link, yes?
13          THE WITNESS:  Yes, that's what this is saying.
14          THE COURT:  And you did not fact-check that
15  beforehand, yes?
16          THE WITNESS:  Right, I did not.
17          THE COURT:  Why not?
18          THE WITNESS:  As I said before, it was -- you know, I
19  did the best of my ability with the amount of time I had to do
20  a quick check of the piece.
21          THE COURT:  All right.  Redirect.
22          MS. SCHELL:  Your Honor, before I step down, it might
23  be helpful, if I may, to refresh Ms. Lepping's recollection
24  with a few pages of her deposition.
25          THE COURT:  Sure.

JA 0519

M272Pal4                    Lepping - Cross

1           MS. SCHELL:  I have a copy I could hand up to you, and

2   she should have a copy in front of you.

3   BY MS. SCHELL:

4   Q.  I would ask you to turn to page 77, Ms. Lepping.

5           MS. SCHELL:  And in fact, may I approach, your Honor?

6   Q.  Ms. Lepping, I'm not asking you to read this aloud, but if

7   you -- at the beginning of page 77 or about halfway down the

8   page, at line 16, do you want to read your testimony there and

9   through on to page 78 and let me know if that refreshes your

10  recollection with regards to Judge Rakoff's question.

11          THE COURT:  So I'm not sure this is calling for

12  refreshment, but I will put a question based on it.

13          It is harder to check for things like link to

14  political motivation or link to various events than it is to

15  check for things like what's the right date, what's the right

16  number, true?

17          THE WITNESS:  True.

18          THE COURT:  And even when you did, after the editorial

19  had appeared, check for evidence related to whether there was a

20  link, whether there was a political motivation, and so forth,

21  there are only limited materials that you were able to find.

22  Is that true?

23          THE WITNESS:  That's true.

24          THE COURT:  All right.

25          Anything else, counsel.

1              MS. SCHELL:  Nothing further, your Honor.  Thank you.

2              THE COURT:  Redirect.

3              MR. VOGT:  Very briefly, your Honor.

4     REDIRECT EXAMINATION

5     BY MR. VOGT:

6     Q.  Ms. Lepping, you recall just being asked about whether you

7     had fact-checked the sentence, "Though there is no sign of

8     incitement as direct as in the Giffords attack, liberals should

9     of course hold themselves to the same standard of decency that

10    they ask of the right."  Do you recall that?

11    A.  Yes.

12    Q.  And your answer was no?

13    A.  Right.

14    Q.  Do you still have your deposition in front of you?

15    A.  Yes.

16    Q.  Can you go to page 82/line 11.

17              Do you recall at your deposition --

18              THE COURT:  Wait a minute.  What lines do you want to

19    read?

20              MR. VOGT:  11 and basically goes through 10 on the

21    next page, your Honor.

22              THE COURT:  Page 81/line --

23              MR. VOGT:  82.

24              THE COURT:  I'm sorry, 82.

25              MR. VOGT:  82 starting at, I guess, line 10.

1              THE COURT:  Hold on.  Okay.  Through?

2              MR. VOGT:  83/10.

3              THE COURT:  And counsel, just so I can rule, is

4    this -- are these answers in reference to her fact-checking

5    before or after the appearance of the editorial.

6              MR. VOGT:  I believe before, your Honor.

7              THE COURT:  Okay.  Any objection?

8              MS. SCHELL:  No, your Honor.

9              THE COURT:  Go ahead.

10             MR. VOGT:  Thank you, your Honor.

11   BY MR. VOGT:

12   Q.  Ms. Lepping, if we look at page 82, starting at line 10 of

13   your deposition transcript, you see I start -- I'm not going to

14   read the whole thing, but I read that sentence to you and then

15   I asked, starting at line 16:

16             "Do you recall fact-checking that particular

17   sentence?"

18             And then your response is, "Yeah, I mean, I believe

19   that was common knowledge in the news stories that we didn't

20   know the reason why yet, if there was."

21             I said, "Can you explain that to me?  I'm not

22   following."

23             And you said, "I'm sorry.  Basically that we didn't

24   know at the time what might have encouraged the shooting."

25             And then I asked, "When you say the shooting, are you

JA 0522

M272Pal4                        Lepping - Redirect

1   talking about the Loughner shooting?"

2           And you said, "No.  I'm sorry.  No.  The one of the

3   Congressman."

4           And then I asked, "Okay, so that was part of it that

5   you fact-checked, whether or not there had been any

6   determination as to what had motivated Hodgkinson to shoot?"

7           And your answer was "yes."

8           Is that right?

9   A.  That's right.  As I said earlier, I think it was one of the

10  news stories, that it was too soon to know.

11  Q.  It was too soon to know at the time of the publication of

12  the editorial, correct?

13  A.  Right.

14  Q.  And the only other thing I wanted to follow up on, two

15  things, one was you were asked some questions about

16  Mr. Bennet's 5:08 a.m. e-mail about taking criticism.  I think

17  it was -- you may have looked at the defense version, but it's

18  Plaintiff's Exhibit 191, which is already in evidence.

19  A.  Yes.

20  Q.  And you were asked some questions about whether it was

21  usual to get an e-mail like this.  Do you recall that?

22  A.  Yes.

23  Q.  Was it usual for you to have an editor say "I don't know

24  what the truth is here" about an editorial after it had been

25  published?

M272Pal4                          Lepping - Redirect

1   A.  I mean, have I heard that before?  No, I don't think so.

2   Q.  So you have actually never heard an editor say before that

3   they did not know what the truth was about an editorial after

4   it was published.

5   A.  It's, it's, the way it's worded, there may have been, not

6   that I --

7              (Court reporter confers)

8   Q.  You broke up a little bit on the video.  Can you repeat

9   your answer, please?

10  A.  I think I would have received e-mails from an editor. . .

11             MR. VOGT:  I think she is freezing.

12             THE COURT:  She is freezing.  There we go.  You are

13  back.  Repeat your answer one more time.

14  A.  I would have received e-mails from editors asking to look

15  into something that would have been a possible correction, not

16  implying that we got it right or wrong at the time, but that we

17  maybe needed to look further.

18  Q.  But as to those specific words "I don't know what the truth

19  is here," you never heard those before from an editor?

20  A.  I don't think so, no.

21  Q.  And then the last thing I was going to ask you, we --

22             THE COURT:  You mean after the previous question which

23  you said was your last.

24             MR. VOGT:  I thought I said I had two, your Honor.

25  I'm sorry.  And I should have --

**JA 0524**

M272Pal4

```
 1              THE COURT:  Should I give the jury their lunch while
 2     we wait for your last question or can you give me your true
 3     last question now?
 4              MR. VOGT:  This is my last question.
 5              THE COURT:  All right.
 6     BY MR. VOGT:
 7     Q.  Who is the person that is primarily responsible for
 8     ensuring that facts in editorials are accurate?
 9     A.  The writer.
10              MR. VOGT:  Thank you, your Honor.
11              THE COURT:  Thank you very much.  You are excused.
12     You can turn off your equipment.
13              (Witness excused)
14              THE COURT:  Ladies and gentlemen, since it's 1:05, we
15     will give you until 2:05 for your lunch and see you at 2:05.
16              (Continued on next page)
17
18
19
20
21
22
23
24
25
```

**JA 0525**

M272Pal4

```
 1              (Jury not present)

 2              THE COURT:  Please be seated.

 3              Who is our next witness.

 4              MR. VOGT:  Linda Cohn.

 5              THE COURT:  Okay.  How long do you expect to be on

 6    direct.

 7              MR. VOGT:  Mr. Turkel is handling Ms. Cohn.

 8              THE COURT:  Okay.  How long do you expect to be on

 9    direct?

10              MR. TURKEL:  Judge, 30-ish.  Less than an hour.

11    That's sort of my magic number now.

12              THE COURT:  Well, 30-ish is definitely less than an

13    hour, but all right.  And who is doing the cross?

14              MR. AXELROD:  I am, your Honor.  Probably about 45

15    minutes.

16              THE COURT:  Okay.  So we should be able to complete

17    her testimony today.  All right.  Very good.  We will see you

18    at 2:05.

19              (Luncheon recess)

20

21

22

23

24

25
```

**JA 0526**

M272Pal4

```
                A F T E R N O O N    S E S S I O N

1                           2:05 p.m.

2        (Jury not present)

3        THE COURT:  So, my courtroom deputy got an inquiry

4   from a member of the press.  When you folks sent me your

5   revised witness list last week — and thank you for doing that —

6   you -- someone apparently filed it under seal as docket entry

7   162, is that correct?

8        THE DEPUTY CLERK:  Yes, sir.

9        THE COURT:  And the press, which, needless to say,

10  wants to do their fact-checking, would like to see what is in

11  that mysterious document.  Any problem with that being

12  unsealed?

13       MR. VOGT:  No, your Honor.

14       MR. AXELROD:  No.

15       THE COURT:  Very good.  We will unseal it.

16       Okay.  Let's --

17       MR. VOGT:  We had a slight schedule change.  I spoke

18  with Mr. Axelrod.  What we are going to do is go ahead and play

19  Mr. Crawford's deposition now.

20       MR. TURKEL:  That will keep the rhythm going, Judge.

21       MR. VOGT:  It is approximately 55 minutes and I know

22  that will have us finishing a little early today, but hopefully

23  we can refine the other examinations and cut down on them so

24  that we are not running --
```

**JA 0527**

M272Pal4

```
 1              THE COURT:  All right.  Whatever you like is fine with
 2    me, but you really want to do that rather than put Ms. Cohn on?
 3              MR. VOGT:  It would be our preference so we can
 4    streamline, your Honor.
 5              THE COURT:  This is your choice, plaintiffs.  It is
 6    your case, so okay.
 7              MR. VOGT:  Thank you, your Honor.
 8              THE COURT:  Are we all set up to do that?
 9              MR. VOGT:  Yes.
10              THE COURT:  Okay.  So let's bring in the jury.
11              MR. VOGT:  Thank you for accommodating that, your
12    Honor.
13              (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25
```

M272Pal4

1             (Jury present).

2             THE COURT:  So ladies and gentlemen, the next witness

3    is going to be a videotaped deposition.  Let me remind you what

4    a deposition is.  Before a case goes to trial, both sides can

5    take the testimony under oath of virtually anyone connected to

6    the case, and this is done in part so that there are no

7    surprises and everyone knows what everyone is going to say.

8             But sometimes if a witness is not available to testify

9    at trial, then counsel can introduce the deposition testimony;

10   and, before that is done, I make rulings on what portions of it

11   are admissible and what portions are not.  So we are going to

12   hear the videotaped deposition of the next witness, and if at

13   times it seems to skip from one area to another it's only

14   because I ruled out certain intervening things, so that's why

15   it will be a little disjointed in that sense.

16            Your job is the same as with every witness, determine

17   whether the witness is credible, determine whether the witness

18   is material.  It is no different from a witness here on the

19   stand.  It's just that since the witness is not available for

20   testifying, you get to see the witness by videotape.

21            So please call your next witness.

22            MR. VOGT:  The plaintiff calls Tim Crawford, your

23   Honor.

24            THE COURT:  Go ahead and play the video.

25            (Video played)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA 0529**

M272Pal4

1                THE COURT:  Although there was no objection to that.

2           (Video played)

3           (Continued on next page)

1            MR. VOGT:  That concludes it, your Honor.

2            THE COURT:  All right.  Very good.

3            I think we do have time to start the next witness.  So

4   please call your next witness.

5            MR. VOGT:  Linda Cohn, your Honor.

6            THE COURT:  All right.  You should go get her.

7            (Witness sworn)

8            THE COURT:  Counsel.

9            MR. TURKEL:  Thank you, your Honor.  May it please the

10  Court.

11   LINDA COHN,

12       called as a witness by the Plaintiff,

13       having been duly sworn, testified as follows:

14  DIRECT EXAMINATION

15  BY MR. TURKEL:

16  Q.  Ms. Cohn, hi.  My name is Ken Turkel.  I don't think we met

17  at your deposition.  My partner Shane did.

18            You've introduced yourself.  Where do you currently

19  work?

20  A.  I'm retired.

21  Q.  And where did you work before you retired?

22  A.  At the *New York Times*.

23  Q.  When did you start working at the *Times*?

24  A.  1988.

25  Q.  Was it your first job in the media?

M271PAL5                    Cohn - Direct

1   A.   No.  I had worked at the *Stamford Advocate*.

2   Q.   What was your role when you got to *The Times* in 1988?

3   A.   I was a copy editor.

4   Q.   Did that role change over time?

5   A.   Not for 28 years; then it did, yes.

6   Q.   I can't do the math in my head.  What did it change to

7   after 28 years?

8   A.   I became an editor on the editorial board.

9   Q.   What year was that, to save me from the math?

10  A.   2015.

11  Q.   In addition to that, did you spend time in other

12  departments, or divisions, I should say, of the *New York Times*?

13  A.   I did, as a copy editor in the Sunday business section.

14  Q.   And when did you start doing that?

15  A.   Probably about a year after, or two, after I got to *The*

16  *Times*, and it was one day a week, off and on.  It -- there were

17  certain years I didn't work there, and then I went back to it.

18  Q.   And you kept being a regular copy editor in the editorial

19  department?

20  A.   Yes.

21  Q.   Could you tell the jury what a copy editor does.

22  A.   Copy editor is -- the way it's set up at *The Times* and in

23  my job, you were the last person to read the copy before it

24  went to press, and you wrote headlines; you checked -- you

25  edited the copy for logic, internal logic within the piece; for

**JA 0532**

M271PAL5                    Cohn - Direct

1   writing style; for grammar -- grammar was a big part of it --

2   and for *Times* style, meaning it was just -- just certain rules

3   *The Times* had about certain details and how we used language;

4   and you checked the news to see whether the piece was up to

5   date; and you got it ready for the press.

6   Q.  And you retired in 2017, right?

7   A.  Yes.

8   Q.  Do you miss it?

9   A.  No.  I'm enjoying retirement, except for during COVID,

10  retirement was a little dull.

11  Q.  Couple years before the pandemic, probably not the worst

12  timing.

13          Which office did you work out of when you were at *The*

14  *Times*?  Physically, I mean.

15  A.  I'm not sure I understand.  What do you mean which office?

16  Q.  I'm assuming you worked in New York.

17  A.  In New York, yes.

18  Q.  On Eighth Avenue, right?

19  A.  Yeah.  Well, the old building and then the new building.

20  Q.  And in your capacity as an editor, you would have worked as

21  part of what you referred to as the editorial board; is that

22  right?

23  A.  Well, I worked with the editorial board when I was a copy

24  editor because I worked on the editorials and the columns, and

25  the last two years I worked in a different capacity with the

 1   editorial board.

 2   Q.  So over time would you have worked with Bob Semple?

 3   A.  Yes.

 4   Q.  And for how long?

 5   A.  Decades.

 6   Q.  And did you work with Nick Fox?

 7   A.  Yes, I did.

 8   Q.  James Bennet.

 9   A.  Yes.

10   Q.  Elizabeth Williamson.

11   A.  Yes.

12   Q.  Was there any specific assignment for you as an editor or

13   it was "catch as catch can," for lack of a better word?  Did

14   you always work with the same writers, I guess was my point?

15   A.  No.

16   Q.  Was there any structure, organization, who you worked with?

17   A.  No.  I mean, any of the -- I could edit any of the

18   editorial board members, those last two years.  Before that I

19   was editing also columnists.

20   Q.  And if you could explain to the jury the difference between

21   the columnists and the writers you were working with on the

22   editorial board side.

23   A.  Well, the editorial board is a group of journalists, some

24   of whom have been at *The Times* for years, and others who were

25   hired from outside, who were hired for their expertise and for

1   their writing abilities, and we, the board, met as a group,

2   discussed the issues of the day with the editorial page editor,

3   the editor of the opinion section, and the deputy and the

4   associate, and we just, you know, wrestled with the topics of

5   the day and came up with what we wanted to say, and it was --

6   it's a little hard to explain.  See, it's the institutional

7   voice of the paper, but it has nothing to do with the news

8   department.

9          And the difference with columnists is, the columnists

10  are -- well, it grew over -- it changed over time.  There are

11  many more of them.  But for many of those years they were

12  people who wrote twice a week, and it was just personally their

13  opinion.  Editorial writers, we would usually come to some sort

14  of consensus as a group.  Most of the pieces were unsigned, but

15  not always.  Occasionally there was the opportunity to write a

16  more -- a piece from a more personal viewpoint that would be

17  signed by the writer.  So it's just -- just the difference

18  between like a group voice, an institutional voice, that -- as

19  opposed to the columnists, who were just totally their own

20  entities.  They wrote a piece, the copy editor looked at it

21  for -- mainly for style, grammar, you know, basics of -- of

22  logic, but it was their point of view, and then it went to

23  press.  So it was, yeah, the difference.

24  Q.  And correct me if I'm wrong, but any of the internal style

25  guides, policies, and so forth that governed the editorial

1   side, did that also govern the columnists side?

2   A.  Yes.  I would say columnists often had a -- had a little

3   bit of leeway in terms of language they wanted to use, little

4   bit more, yeah.

5   Q.  And when you retired in 2017, who was the head fact-checker

6   on the editorial board side of *The Times*?

7   A.  Well, Eileen Lepping was the main fact-checker.  I don't

8   think we had any sort of title that was like head.

9   Q.  Right.

10  A.  And then the opinion side had their own fact-checkers, and

11  columnists had assistants.

12  Q.  Okay.  Were you working at *The Times* -- well, I know, were

13  you still there in June of 2017, or had you already left?

14  A.  I was there.

15  Q.  And how soon after that did you retire?

16  A.  November 1st.

17  Q.  And at that point in time did you play a role in editing,

18  or in any other capacity, a piece that was titled "America's

19  Lethal Politics"?

20  A.  Yes.

21          MR. TURKEL:  And if we could, Mr. Boucher, bring up

22  116.

23  Q.  What should be up on your screen, Ms. Cohn, is Plaintiff's

24  Exhibit 116.

25  A.  Oh, yes.  Is that okay?  The microphone?

1    Q.  Oh, I can't tell.

2    A.  Oh.

3    Q.  Yeah, just -- I think the judge will tell you if the

4    microphone's not picking you up.

5    A.  Okay.

6    Q.  If you would take a look at that for a moment.

7              Do you recall this specific email with respect to the

8    piece I just mentioned, "America's Lethal Politics"?

9    A.  Yes.

10   Q.  And if we can look at the middle there, you're on the line

11   of recipients for that, correct?

12   A.  Correct.

13   Q.  Was this a common way for a piece to be vetted or discussed

14   amongst the editorial team?

15   A.  Do you mean was it typical to be discussed by email with

16   the group?

17   Q.  Exactly, yes, like an email going out like this with a

18   topic.

19   A.  Yes, that was typical.

20   Q.  And at this sort of initial point when ideas are being sent

21   around like that, what role do you play as an editor?

22   A.  This one was really letting me know what to expect during

23   the day, and I was free to weigh in if I wanted and respond to

24   the email or respond to any of the people involved.

25   Q.  Ultimately what role did you play in the -- I should say

M271PAL5                      Cohn - Direct

1   drafting and ultimate publication of that piece?

2   A.   Late in the day, Bob Semple was -- had to leave the office

3   for some engagement he had, and the piece was either about to

4   land, it just landed, I don't know.  It was very late

5   afternoon, I think.  Maybe early evening.  And he walked by my

6   office and asked if I could pick up that piece to read, to

7   edit.

8   Q.   But the piece was about to land, does that mean it was

9   about to be published?

10  A.   Go live, yes.

11  Q.   Okay.  And what time, approximately, in the day was that?

12  A.   I remember it was -- it was late, like maybe -- I don't

13  know -- 4:30 or -- 4 to 5.

14  Q.   At the time you had this discussion with Mr. Semple, were

15  you generally aware of the underlying incident that was serving

16  as the basis for the piece?

17          MR. AXELROD:  Objection.

18          THE COURT:  Hold on.  If there's an objection, I have

19  to rule.

20          MR. TURKEL:  I may have phrased that poorly.  I can

21  reask it, Judge.

22          THE COURT:  All right.

23  BY MR. TURKEL:

24  Q.   The actual piece had been based on a news event, a

25  shooting.  Were you familiar with that news already?

1  A.  Do you mean -- you mean the Steve Scalise shooting?

2  Q.  Yes.

3  A.  Yes.

4  Q.  All right.  So in other words, when you see Mr. Semple late

5  in the day, you're already generally aware of this news and

6  this piece being drafted, right?

7  A.  Correct.

8          MR. TURKEL:  All right.  If we could pull up 117.

9  Q.  So this is a continuation or evolution of that thread that

10  I showed you on Exhibit 116.  If you look in the middle at the

11  12:04 entry, you wrote, in the email above -- I assume that's

12  about the shooter, Hodgkinson; is that right?

13  A.  Correct.

14  Q.  I mean, that's actually true, he did actually go to your

15  high school?

16  A.  He did.

17  Q.  Yeah.  That's -- other than that sort of message that you

18  send out there, is your next contact with the team this

19  discussion you have with Mr. Semple later in the day?

20  A.  You know, I -- it's hard to recall.  There might have been

21  some little -- some little conversations in person.  I

22  probably -- Nick Fox and I -- he probably stopped by my office,

23  said something.  I -- I don't recall specifically.

24  Q.  What was your understanding of what the piece was going to

25  be about?

**JA 0539**

M271PAL5                          Cohn - Direct

1    A.  It was going to address two themes.  Well, it was going to

2    discuss the event, the shooting, the Steve Scalise shooting,

3    and then it was going to address two themes, which were gun

4    control and the state of our political rhetoric and the

5    coarsening of our rhetoric.

6            MR. TURKEL:  If you could pull up Plaintiff's 119.

7    Q.  So a different email, but the same participants.  Do you

8    recall receiving this email, Exhibit 119, at around 12:41 on

9    June 14?

10   A.  Yes.

11   Q.  All right.  And does this email summarize at least the

12   theme of the -- let me ask this:  Does this email summarize

13   what the theme of the article was going to be, at least as of

14   12:41?

15   A.  Well, it's giving Elizabeth some ideas to look at and

16   then -- so it would evolve after that.

17   Q.  Is it common -- assuming the piece was meant to go out on

18   that day, June 14th, would it be common practice to still be

19   vetting the actual topic at 12:40, that time of day?

20   A.  Yes.

21   Q.  That's business as usual?

22   A.  Yes.

23   Q.  And was this piece a piece that they wanted to publish that

24   day?

25   A.  To -- yes.  I mean, for the next day's print paper.

M271PAL5                          Conn - Direct

1   Q.  Right.

2   A.  Yes.

3   Q.  With the online going out that day, on June 14th?

4   A.  Yes.

5   Q.  All right.  And so from a timing perspective, as an editor,

6   what are you waiting for at this point?  In other words, what

7   are you waiting for your job to kick in?

8   A.  Well, I'm waiting for the piece to be written by Elizabeth

9   Williamson and I'm waiting to see how the page, the print page

10  is going to shape up in terms of length and what other pieces

11  are going to fit on the page, so -- yeah.

12  Q.  When did you actually receive the piece to begin your job

13  as an editor?

14  A.  I think it was after 4:00 and -- between -- between 4 and

15  5.  I think -- yeah.  That's about how I remember it.

16  Q.  And what was your initial reaction when you -- well, let me

17  not assume something here.

18          What's your normal practice when you get a piece?  Do

19  you just read it first?

20  A.  Yes.

21  Q.  And for the jury's benefit and to a degree mine, when

22  you're doing that, that's just reading, you're not editing yet,

23  you're not changing grammar or anything like that, right?

24  A.  No.  If I see something, I will change it at that time,

25  yes.

**JA 0541**

M271PAL5

```
1   Q.  What was your initial reaction when you read the first
2   draft of "America's Lethal Politics"?
3   A.  My first impression was I was really not sure about how we
4   were addressing these two issues in one piece.  I felt a little
5   unsure.  I'd come into it late.  I hadn't been involved.  I
6   know there had probably been discussions during the day that I
7   was probably not part of, because I was assigned the piece late
8   in the day, so I just wasn't sure if it -- if it really worked,
9   and if it addressed both sufficiently.
10  Q.  To clarify, when you say whether it addressed both
11  sufficiently, you mean the gun control angle and the political
12  rhetoric angle; is that right?
13  A.  Correct.
14          THE COURT:  Counsel, we need to find a spot to --
15          MR. TURKEL:  Judge, this is a good point, because I'd
16  be going into the piece now.
17          THE COURT:  Very good.
18          Ladies and gentlemen, we've made good progress.  We'll
19  see you tomorrow at 9:30.  Have a very good evening.
20          (Continued on next page)
21
22
23
24
25
```

**JA 0542**

M271PAL5

```
 1              (Jury not present)

 2              THE COURT:  Ms. Cohn, is the fact that Jimmy Connors

 3    went to your high school a source of pride or simply

 4    indifference?

 5              THE WITNESS:  Well, Bob Semple is a major tennis fan,

 6    so that was why.

 7              THE COURT:  I see.  So it's pride by association.  All

 8    right.  Very good.  We'll see you tomorrow at 9:30.

 9              (Witness not present)

10              THE COURT:  Please be seated.

11              So tomorrow after Ms. Cohn, who's your next witness?

12              MR. VOGT:  James Bennet.

13              THE COURT:  Okay.  I'm guessing that might take us

14    through the day.

15              So we will take a 10-minute break and then we will

16    have our charging conference.

17              (Recess)

18              (Continued on next page)

19

20

21

22

23

24

25
```

1          (Jury not present)

2          MR. AXELROD:  Your Honor, before you start, could I

3     just raise one thing briefly?

4          THE COURT:  Yes.

5          MR. AXELROD:  I came out of the men's room, and

6     unfortunately I went outside and there was a member of the

7     public who had approached Governor Palin in front of the jurors

8     who were waiting for the elevator before they had gone down and

9     was criticizing *The Times*, saying something like, Governor, I

10    hope you win, I hate *The Times*, all kind of right in front of

11    the jury.  I, of course, understand this stuff happens.  I'm

12    not quite sure what to do about it, but I wanted to let you

13    know that I saw that.

14         THE COURT:  So does Ms. Palin's counsel want to -- did

15    you observe this?

16         MR. TURKEL:  No.  Mr. Axelrod told me in court.  I am

17    in the same place he is when these things happen.  And they

18    happen.  It's difficult to figure out how to solve it.  I know

19    your Honor, I'm sure you have experienced these kind of things

20    in your career, and --

21         THE COURT:  I'm not hearing any application.  What

22    would you like me to do?

23         MR. AXELROD:  I want to think about it, your Honor,

24    but I may come back tomorrow morning and ask you if you just

25    want to colloquy the jury or instruct them that people in the

1  public are going to be in the courthouse; they are going to say

2  things; you are, of course, not supposed to listen to anything

3  they say.  The only thing --

4          THE COURT:  I will consider.  Why don't you propose

5  something tomorrow in writing and have it here at 9:00?

6          MR. AXELROD:  I will.  Thank you.

7          MR. TURKEL:  We will confer, Judge, because, honestly,

8  it is impossible to tell what the impact --

9          THE COURT:  I'm not sure I'm going to do anything.

10 What I am going to do, I think, is tell my courtroom deputy,

11 who is not here right now, to make sure the jury has all exited

12 before the parties exit, and then we won't even run the risk of

13 this.  But thank you for bringing it to my attention.

14         So I provided counsel on Sunday afternoon with my

15 proposed draft charge, telling you we would have the charging

16 conference now.

17         With respect to general instructions 1 through 7, I

18 made two very tiny edits.

19         On page 3, on instruction no. 1, where it says, into

20 the first paragraph, "These are the final and binding

21 instructions, which entirely replace the preliminary

22 instructions I gave you after opening statements," and I have

23 now added the language "and which you should now discard."  So

24 I want to make sure that they are out of their way when they

25 turn to their final deliberations.

1            And then on instruction no. 4, in the third sentence,

2    beginning with the words "I will describe," I have now added a

3    couple of words to make it read, "I will describe the five

4    essential elements of that claim shortly, but for now please

5    note that the first three elements -- I'm sorry, "that for the

6    first three elements of her libel claim, the plaintiff must

7    establish each element by what is called the 'preponderance' of

8    the credible evidence, but that with respect to the final two

9    elements of her libel claim, the plaintiff must establish those

10   elements by 'clear and convincing evidence.'"

11           And then we will talk about instruction no. 8 in a

12   minute, but any objections to or additions to instructions 1

13   through 7?

14           Anything from the plaintiff?

15           MR. VOGT:  No, your Honor.

16           THE COURT:  Anything from defense?

17           MR. BROWN:  No, your Honor.

18           THE COURT:  Very good.

19           Now 8 sort of raises this issue that I flagged this

20   morning, which is, as near as I can tell, the two defendants

21   essentially stand and fall together in this case.  It is clear,

22   for example, that if Mr. Bennet is liable then, on ordinary

23   agency principles, *The New York Times* is liable.  If Mr. Bennet

24   is not liable, while theoretically *The Times* could still be

25   liable if there had been other people who acted with actual

1    malice or the like, I haven't heard even the slightest

2    suggestion that anyone else acted with actual malice.  There

3    has been some suggestion that the fact-checking was not as

4    assiduous as it should have been, but the relevance of that, if

5    at all, goes to whether Mr. Bennet should have demanded more or

6    whatever.  But I haven't heard one word or even the hint that

7    the fact-checkers acted with actual malice or anything else of

8    the requisite intent.

9              So it seems to me to follow from that that if

10   Mr. Bennet is found not liable, *The New York Times* must be

11   found not liable.  So I propose to instruct the jury to that

12   effect I will give you the language in a minute, which would

13   greatly simplify the jury's role as well.

14             But let me find out if plaintiff has any objection to

15   that.

16             MR. VOGT:  I don't believe that we do, your Honor.  I

17   would like to see the language, obviously.

18             THE COURT:  All right.  Well, I obviously gave you

19   today, but I will give you no later than tomorrow morning.

20             MR. VOGT:  I would appreciate that.  Thank you.

21             THE COURT:  Assuming we go that route, then on

22   instruction no. 8, I would add another paragraph to what's

23   already there, which would read as follows:  "Put another way,

24   if you find Mr. Bennet legally liable on plaintiff's claim,

25   then you must also find The New York Times Company liable.

M272Pal6                    Charge Conference

1   Conversely, since plaintiff's claim is premised on Mr. Bennet's

2   conduct and intent, if you find Mr. Bennet not liable, you must

3   also find The New York Times Company not liable."

4           Assuming there is no further objection tomorrow

5   morning, any objection to that particular language?

6           MR. VOGT:  No, your Honor.

7           MR. BROWN:  Your Honor, we certainly would accept that

8   language.  I would just note that it is potentially simpler,

9   and therefore less likely to be confusing to the jury, to use

10  the formulation we had in our proposed instructions which, if

11  you simply wanted to add a sentence to the end of no. 8, could

12  be "as a result, whatever decision you reach in this case will

13  apply equally to both defendants."

14          THE COURT:  That's not bad.  Let me think about that

15  overnight.

16          So anyway, any other objection to instruction no. 8?

17          MR. VOGT:  No, your Honor.

18          MR. BROWN:  No, your Honor.

19          THE COURT:  Turning to instruction no. 9, I have made

20  a few edits, none of which are substantive, but just to

21  clarify, "applying the general principles that I have just

22  discussed, you must now determine, in accordance with my

23  instructions, whether the plaintiff has established her libel

24  claim against the defendants," again, assuming.  "This is

25  called 'proving liability.'  For the reasons just discussed, if

1    you find Mr. Bennet liable, you must find The New York Times

2    Company liable; and if you find Mr. Bennet not liable, you must

3    find *The New York Times* not liable."  I might substitute the

4    language that defense counsel suggested, but it's the same

5    idea.

6              Then I would start a new paragraph.  "Ms. Palin's

7    claim is for the wrong known as libel.  A libel is a false

8    statement about a person in writing."  And then the rest of the

9    instruction no. 9 is as it presently appears, except that on

10   page 14, the second page of this, in (2), I would narrate "the

11   challenged statements would reasonably be taken by the ordinary

12   reader to refer to the plaintiff personally."

13             So with those changes, any problems with instruction

14   no. 9?

15             MR. VOGT:  No, your Honor.

16             MR. BROWN:  Your Honor, two points.  I raise this

17   here, although it relates to the substantive instructions to

18   follow, but in point one, where we say "understood by the

19   ordinary reader," and as you have now amended point two to

20   amend the reference to ordinary reader, we would just note that

21   the New York Court of Appeals typically phrases that as the

22   ordinary and average reader.

23             THE COURT:  Yeah, I saw that, and much as I was

24   tempted to call my friends on the New York Court of Appeals and

25   ask them what the heck they thought was the difference between

1   those two words, I refrained from doing so, but it seems to me

2   they are synonymous.

3          MR. BROWN:  Your Honor, I don't disagree with that,

4   but I note that in some places the Court uses "ordinary" and in

5   some places the Court uses "average."

6          THE COURT:  Okay.  I want to use "ordinary"

7   throughout.  So if you pick up where I used "average," just

8   point it out as we go through that, because I missed that.

9          MR. BROWN:  And I do, your Honor, have a redline, if

10  it's useful to the Court, that I am happy to hand up when I am

11  done.

12         THE COURT:  That will be fine.  Just give it to my law

13  clerk.  Thank you for catching that.

14         Okay.

15         MR. BROWN:  I'm sorry, your Honor, I overlooked one

16  other point there, point three, with respect to publication.

17         THE COURT:  Yes.

18         MR. BROWN:  The defendants have stipulated or

19  conceded, both of them, that the editorial at issue was

20  published, and so our question is whether it is necessary even

21  to mention that element of the claim to the jury.  It seems

22  somewhat confusing to instruct them on something, an element of

23  the claim, which is conceded by the defendant.

24         THE COURT:  Well, if it's fine with plaintiff, I have

25  no problem deleting that and changing it to four elements

1    instead of five elements.  It was there because even though it

2    was undisputed, as I indicate in the body of my instructions, I

3    thought defendants might want the full five mentioned.  But if

4    you are fine with eliminating that, then it is entirely in

5    plaintiff's hands.  Do you want to eliminate that and make it

6    four?

7              MR. VOGT:  I believe that we will begrudgingly accept,

8    your Honor.

9              THE COURT:  All right.  So I will have to fix -- every

10   time I say five I have got to say four and so forth.  But

11   that's fine.  We will just eliminate that, and that's very

12   helpful.

13             So turning to instruction no. 10, oh, yes, there it

14   is, down in the fourth paragraph, the average, the ordinary

15   reader.  Who is the famous humorist from up north who --

16             MR. AXELROD:  Garrison Keiller.

17             THE COURT:  Garrison Keiller.  And his hometown?

18             MR. BROWN:  Lake Wobegon.

19             THE COURT:  Lake Wobegon, where all the children are

20   above average, so there you go.

21             But we are going to go with ordinary reader.

22             MR. BROWN:  Your Honor, I was only going to observe

23   that, in the redline I will hand up, and of course I will give

24   to plaintiff's counsel, we were just going to suggest that on

25   that first reference in the instruction, using the Court of

1  Appeals phrasing, New York Court of Appeals phrasing, "the

2  ordinary and average reader," and then using either "ordinary"

3  or "average," as the Court adheres thereafter.  We don't feel

4  strongly about that.

5          THE COURT:  Well, I will take a look at what you have,

6  but I'm inclined to just go with "ordinary."

7          And I don't actually know what an average reader is.

8  I know what an average arithmetic calculation is.  But anyway,

9  I'm still inclined to just go with "ordinary," but I will take

10  a look at what you hand up.

11          MR. BROWN:  Just to address your question, your Honor,

12  I think the cases suggest that what the Court of Appeals and

13  other states' high courts have tried to signal there is they

14  are talking about the typical or ordinary reader and not an

15  unusual or extraordinary reader.

16          THE COURT:  That is certainly not conveyed by the word

17  "average," but I think it is conveyed by the word "ordinary."

18  So I really think you need to write to the Court of Appeals and

19  tell them they got it wrong, and be sure to copy me on your

20  letter.

21          Okay.  The only other change I made on 10 at the

22  bottom of page 15, in the sentence beginning, "If you find that

23  shall" it now reads, "If you find that the plaintiff has proven

24  that one or more of the challenged statements in the editorial

25  would," etc.  I think plaintiffs are entitled -- they don't

1    have to prove that every single one of the challenged

2    statements was defamatory.  They have to show that at least one

3    was.

4              So with that change, any problems with no. 10 from

5    plaintiff?

6              MR. VOGT:  No, your Honor.

7              THE COURT:  From defense?

8              MR. BROWN:  Your Honor, there is an issue presented by

9    the instruction related to the motion *in limine* that we filed

10   regarding defamatory meaning in connection is *per se* or *per*

11   *quod*, I would be inclined --

12             THE COURT:  You are absolutely right to raise that.  I

13   have not decided that, and we will have to -- there are several

14   places in these instructions that will have to be changed if I

15   find that will you are right and it's not defamatory *per se*.

16   But I have written it now on the assumption that it is

17   defamatory *per se*, but we can fix it if you convince me

18   otherwise.

19             MR. BROWN:  And I'm happy to make that argument at

20   whatever juncture --

21             THE COURT:  I think the proper time to make that

22   argument is at the close of the plaintiff's case.

23             MR. BROWN:  Fair enough, your Honor.  I just wanted to

24   flag that.

25             THE COURT:  I'm very glad you did, and I want you to

1    know that I did think about that, but I thought we -- same with

2    punitive damages.  I included here a punitive damage

3    instruction.  Obviously if I then wind up striking punitive

4    damages, that instruction will go, but the proper time to raise

5    that, in my view, is at the close of the plaintiff's case.

6              MR. BROWN:  And I don't mean to belabor the point now,

7    your Honor, but in the event you stick ultimately with the

8    conclusion that it's defamatory *per se*, you will see in the

9    redline that in the third paragraph we have suggested inserting

10   a clause citing the authority for it.  That is another way the

11   courts explain what defamatory *per se* means to the jury.  It's

12   just additional proposed language if you otherwise stick with

13   this instruction.

14             THE COURT:  I will take a look at it.  Thank you.

15             Instruction no. 11, the only change I made here is in

16   the third paragraph.  "The challenged statements in the

17   editorial state, among other things," because we are -- well,

18   we are only concerned in this instruction with one thing.

19   There are other things that are challenged.  There was also one

20   place in the final paragraph where plaintiff was spelled with

21   capital P, even though everywhere else it's a lowercase P, so I

22   changed that.

23             Any objections after those changes to instruction no.

24   11 from plaintiff?

25             MR. VOGT:  Your Honor, we just think that the first

**JA 0554**

M272Pal6                    Charge Conference

1   paragraph should end after the word "personally," period there,

2   and the language "rather than to some other person or entity"

3   should be excluded.  We think that goes --

4           THE COURT:  I'm sorry.  I miss where you are at.

5           MR. VOGT:  In the first paragraph, the last sentence,

6   "Ms. Palin must prove" --

7           THE COURT:  "The ordinary reader," yes.

8           MR. VOGT:  "The ordinary reader would reasonably have

9   understood the challenged statements to refer to her,

10  personally."  We would put a period right there and delete the

11  "rather than to some other person or entity."  I think that

12  goes beyond the standards, the ones referenced in -- by the

13  Second Circuit I think they cited the *Elias* case.

14          THE COURT:  I don't know about that, but I agree with

15  you since we clarify later what the debate is anyway later, so

16  I will adopt that change.

17          Go ahead.  Something else?

18          MR. VOGT:  No that was it.

19          THE COURT:  Anything from defense counsel.

20          MR. BROWN:  Only, your Honor, that we believe that

21  phrase "rather than just some other person or entity" is

22  entirely consistent with the authority, but we understand --

23          THE COURT:  Yeah, but the whole thing is spelled out

24  in two sentences later, so they know exactly what the dispute

25  is.

**JA 0555**

M272Pal6                    Charge Conference

1          Okay.  Instruction no. 12, "publication" is now going

2     to be eliminated, and I will probably put in someplace early on

3     the published statements just so in case the jury is wondering.

4          But so we are up to instruction no. 13.  I made a

5     couple of changes here.  First, in the first sentence, once

6     again, plaintiff is lowercase.

7          Second, the second sentence now reads, "Please note

8     that plaintiff must prove this element by clear and convincing

9     evidence, that is, plaintiff must prove that it is highly

10    probable that the statements were false."  That's just to

11    remind them, since it's been quite some pages since we defined

12    the difference what "clear and convincing" means.

13          And then in the last paragraph, first sentence,  "If

14    you find by clear and convincing evidence that the challenged

15    statements were false," and then I think we can delete "as I

16    have defined that term here," since it's only a few sentences

17    away.  So the sentence will now read, "If you find by clear and

18    convincing evidence that the challenged statements were false,

19    then you must proceed to consider the other elements," etc.

20          Any problems with instruction no. 13 from plaintiff?

21          MR. VOGT:  I don't have any problem, but I was

22    thinking as your Honor was reading it you had made a change

23    earlier about one or more of the challenged statements.

24          THE COURT:  Oh, yes.  Thank you very much.  That

25    should be here.  So that should be in the first sentence.  "The

1   fourth element that the plaintiff must prove is that one or

2   more of the challenged statements were in fact false."  Yes,

3   that's right.

4           Anything from defense counsel?

5           MR. BROWN:  No, your Honor.

6           THE COURT:  Anything else from plaintiff's counsel?

7           MR. VOGT:  No, your Honor.  I was going to say we have

8   no objection.

9           THE COURT:  All right.  The fifth element is pretty

10  much as I gave it to you.  It will now be the fourth element,

11  obviously, in instruction no. 14.

12          So any objections or additions to instruction no. 14

13  from plaintiff's counsel?

14          MR. VOGT:  We have two, your Honor.  The first is,

15  after the Court has the paragraph, the third paragraph "to

16  establish that the defendants acted with reckless," that one,

17  we would like a paragraph added or maybe a sentence at the end

18  of that that just says, "You should consider all the evidence

19  concerning defendants' acts and conduct in publishing the

20  editorial to decide whether they published with actual malice,"

21  the totality of the evidence standard.  It is actually in the

22  *Goldwater v. Ginsberg* case.  The Court noted how the Court

23  properly instructed, as your Honor has here, about certain

24  things aren't enough on their own, but also noted that the

25  Court properly instructed the jurors that they should consider

1    all of the evidence concerning appellant's acts and conduct in

2    publishing with respect to this issue.

3            THE COURT:  So where would you put that, and give me

4    the exact language.

5            MR. VOGT:  I would put it either at the end of the

6    third paragraph or maybe just a paragraph underneath the third

7    paragraph.

8            THE COURT:  Okay.  So maybe it should be at the end of

9    that, maybe something, since we have given all the things that

10   are not --

11           MR. VOGT:  Right.

12           THE COURT:  -- something like, "However, in evaluating

13   this aspect of actual malice, you should consider all evidence

14   and reasonable inferences to be drawn therefrom."  Is that what

15   you had in mind?

16           MR. VOGT:  Yes, your Honor.

17           THE COURT:  All right.  Is there anything else from

18   plaintiff's counsel?

19           MR. VOGT:  Oh, and then the other thing is, the next

20   paragraph, where your Honor has the actual malice standard with

21   respect to defamatory meaning?

22           THE COURT:  Yes.

23           MR. VOGT:  There is phrase in there where the Court

24   has -- it's in the middle of the paragraph "meaning that

25   Ms. Palin bore direct personal responsibility for causing

M272Pal6                    Charge Conference

 1  Loughner to commit the Arizona shooting," I think that that's

 2  problematic for a number of reasons.  It almost seems like

 3  another concerning element.  I think it's possibly inconsistent

 4  with what we have alleged.  But I understand what the Court is

 5  trying to do, so what I would ask the Court do is use what

 6  Mr. Bennet said in his declaration on summary judgment and that

 7  your Honor included in your --

 8        THE COURT:  Well, how about -- just forgive me for

 9  interrupting -- just taking out the words "direct and

10  personal"?

11        MR. VOGT:  That would be fine, your Honor.

12        THE COURT:  All right.  So let me hear now from

13  defense counsel.

14        MR. BROWN:  Thank you, your Honor.  And given the

15  importance of this particular element of the cause of action,

16  you will not be surprised that I have a couple of substantive

17  comments, your Honor.  I will try to be brief and direct.

18        First, we had suggested in our proposed instructions

19  to use at least a portion of the Modern Federal Jury

20  Instruction number 9101, which is offered in the *Modern Federal*

21  *Jury Instructions*, according to the commentary, because this

22  element of the claim is a particularly arcane concept, not

23  generally familiar to jurors, and the *Modern Federal Jury*

24  *Instructions*, with which I know the Court is familiar,

25  therefore spend as couple of paragraphs discussing why this --

1          THE COURT:  Yeah, no, no, no.  I considered that.

2     First of all, I considered it because I am coauthor of the

3     volumes you are referring to, although I didn't work on this

4     particular instruction that's part of the -- or the commentary

5     that's part of that instruction in the book; and, secondly, I

6     have the greatest respect for all of the authors of that book.

7     The late Judge Sand, who is the lead author, was in my view one

8     of the greatest judges ever to serve on this court.

9          But having said all of that, I don't find this so

10    arcane, complicated, or anything else.  And I certainly don't

11    see why the jury needs to know the policy reasons, if you will,

12    that *The New York Times* v. *Sullivan* case laid out.  My sole

13    intent — this has been true from the day I went on the bench —

14    is to make jury instructions so straightforward and balanced

15    and simple that even the ordinary reader can understand them.

16    So I have considered that, but I rejected that.

17          MR. BROWN:  Your Honor, we have suggested in the

18    redline that I will be handing up in shortened version --

19          THE COURT:  I will take a look at it, but I wouldn't

20    hold my breath if I were you.

21          MR. BROWN:  I won't.  And I will just observe that the

22    reason is that the nonlawyers in the jury box don't regularly

23    have dinner table conversation that includes this concept, I

24    assume.  I am making an assumption there.  But jurists and

25    lawyers is less arcane, too, and the giving that description of

1   the reason provides context that enables a layperson to better

2   understand.

3         THE COURT:  Well, I will look at it one more time but

4   I did spend a lot of time on that --

5         MR. BROWN:  Fair enough.

6         THE COURT:  -- when I was drafting this, and of course

7   if the jury — though it seems to me unlikely — puts a question,

8   what the heck do you mean by this, or what's the purpose, which

9   is really the question you would be addressing, we can deal

10  with that then.

11        MR. BROWN:  Your Honor, the second point is a simple

12  one.  It appears to us that it would potentially be more

13  confusing to the jury to deal first with the issue of falsity

14  and then, second, with the issue of awareness of defamatory

15  meaning.  Rather, it seems logically, and therefore as a matter

16  of the best function for the jury, to reverse the order of

17  those two.

18        THE COURT:  That I'm certainly willing to consider.

19  But why do you think that's the logical?  It seems to me if

20  they didn't know the statements were false, you don't have to

21  worry about the second aspect.  That's why I put it in the

22  order I did.

23        MR. BROWN:  This may be something about which

24  reasonable people can disagree, but it did seem to us that sort

25  of the predicate question is whether the responsible person, in

M272Pal6                    Charge Conference

1    this case Mr. Bennet, was even aware that that message was

2    being communicated.  If the jury finds that he was --

3            THE COURT:  All right.  Well, I'm certainly willing to

4    consider reversing the order of those two aspects.  I will

5    think about that overnight.

6            MR. BROWN:  With respect to plaintiff's proposed

7    addition or change on the meaning --

8            THE COURT:  I'm sorry.  You need to speak into the

9    microphone.

10           MR. BROWN:  I beg your pardon.  I put the paper over

11   it, your Honor.  I'm not usually accused of speaking too

12   softly.

13           THE COURT:  And, so, I was so thrilled when your

14   colleague, whose name I of course am missing, but the young

15   lady --

16           MR. BROWN:  Michelle?

17           THE COURT:  -- when she questioned the witness, it was

18   the first time I had heard polite, dulcet tones in a courtroom

19   in the last 50 years.  But anyway, go ahead.

20           MR. BROWN:  With respect to the phrase that plaintiff

21   drew your attention to in the defamatory meaning section that

22   then specifically when the editorial was published that the

23   words used would convey the meaning that Ms. Palin bore direct

24   personal responsibility for causing Loughner to commit the

25   Arizona shooting, it seems to mean there, rather than focusing

1    on Mr. Bennet's description, we should be focusing on what the

2    plaintiff alleged in her complaint or otherwise argued in her

3    papers as to what the allegedly defamatory meaning is, and we

4    certainly thought that the language the Court used accurately

5    reflected that.  But my point is simply I don't think it is

6    appropriate there to go beyond what plaintiff has claimed is

7    the meaning alleged.

8         THE COURT:  So you would put back "direct personal"?

9         MR. BROWN:  I think that is fairly borne out by the

10    pleadings and arguments that plaintiff has made regarding the

11    message communicated by the statements.

12         THE COURT:  All right.  I'm inclined to think -- I

13    agree with still the plaintiff on direct because the -- that is

14    only part of what they are attacking in the challenged

15    statements.  But I think "personal," which is an element that

16    has to be shown, should be restored.  So I will put back

17    "personal" but still keep out "direct."

18         MR. BROWN:  Without meaning to belabor the point, it

19    may be worth simply briefly reviewing plaintiff's counsel's

20    opening statement to see the words used there.

21         THE COURT:  I'm sorry?  Say that again.

22         MR. BROWN:  It may be worth reviewing plaintiff's

23    opening statement to see -- plaintiff's counsel's opening

24    statement to see the words used there.  Again, my bottom

25    line --

1            THE COURT:  All right, I will take a look at his

2      opening statement and if it changes my mind, I will let both

3      sides know.

4            MR. BROWN:  Thank you, your Honor.

5            And then lastly, after the paragraph that begins "to

6      establish that the defendants acted with disregard as to

7      falsity," so going to the end of that paragraph.

8            THE COURT:  Back on the first page?

9            MR. BROWN:  No.  This would be in the draft as you

10     have it in front of you, the second to the last paragraph.

11           THE COURT:  Oh, okay.  Oh, yes.

12           MR. BROWN:  I'm sorry.  This is the last paragraph of

13     the defamatory meaning section.  I beg your pardon.  So just

14     before, in the version you have where you have "the second

15     aspect of 'actual malice'"

16           THE COURT:  Yes.

17           MR. BROWN:  This would be just before that.  This is,

18     as I understand it, where plaintiff has suggested inserting an

19     instruction about considering the totality of the evidence.

20           THE COURT:  Right.

21           MR. BROWN:  And while that seems to us as unnecessary,

22     based on the Court's other instructions, particularly if the

23     Court accepts that suggestion from plaintiff, then I would

24     strongly request that the Court also accept the following two

25     additions that we propose to make there, which is to point out

**JA 0564**

1    to the jury certain things that they are not allowed to

2    consider in this regard.

3              THE COURT:  We already have that.

4              MR. BROWN:  Your Honor, the two sentences that we

5    would add there, if it's all right, I will just quickly read

6    them.

7              THE COURT:  Go ahead.

8              MR. BROWN:  And again, they will be in what I hand up,

9    but we would add, "In making these determinations, you should

10   consider only the state of mind of the particular individual or

11   individuals actually involved in the publication of the

12   challenged statements.  The state of mind of other persons,

13   including other employees of the *Times* not involved in

14   publishing these particular statements, is not relevant."

15             And then I will just read the second one, and then

16   give a brief explanation. "In addition, the state of mind of

17   the individuals actually involved in publication of the

18   challenged statements is to be judged as of the time of

19   publication.  Any information that was acquired or discovered

20   after the statements were published is not relevant."

21             THE COURT:  I think the second one for sure, although

22   we are -- it shouldn't be individuals plural, because we have

23   already, as a result of earlier discussion, limited it to

24   Mr. Bennet.  But I will take a look at the first one.  I'm less

25   clear on that.  The second one I will put somewhere in that

1    paragraph.  We have to -- I will have to go back and look at

2    the order.  But I'm going to keep what I promised the

3    plaintiff, but I will also maybe put in at least the second of

4    the two sentences you read and possibly the first.

5         MR. BROWN:  And one sentence on why the first, your

6    Honor.  There are a number of witnesses obviously who are not

7    relevant to actual malice, but whose state of mind the

8    plaintiff has questioned the witnesses about and presumably

9    will question additional witnesses.  Their state of mind may be

10   relevant to other elements of the claim, but we think it is

11   important to emphasize in the actual malice instruction that

12   effectively it is only Mr. Bennet's state of mind that is

13   relevant.

14        THE COURT:  All right.  I will certainly consider

15   that.

16        Anything further plaintiff's counsel wanted to say on

17   that.

18        MR. VOGT:  The only thing I would note, your Honor, is

19   that in the very first sentence of this instruction no. 14 you

20   actually do say there "at the time the editorial was

21   published," and that in the third paragraph --

22        THE COURT:  Ah, yes.  Thank you very much.  So that

23   part is there are.

24        MR. VOGT:  And then you do actually make reference, I

25   believe, in the third paragraph "just to show Mr. Bennet or the

M272Pal6                           Charge Conference

1  *The New York Times*," so that might be somewhere to address the

2  other issue that defense counsel was raising.

3       THE COURT:  This is all very helpful, and I will --

4  and just so you know, this is your only opportunity to raise

5  any problems with the charge, except for the one that plaintiff

6  asked to think about it a little bit more overnight, but I will

7  give you, no later than tomorrow night, and hopefully sooner,

8  the charge that reflects which of those things you are

9  suggesting I accepted or rejected and then if you want to say

10 anything more on those, you can.  In other words, you get

11 another bite at the apple, but not a bite to add something

12 totally new that you haven't brought up at the charging

13 conference.

14      MR. VOGT:  Your Honor, just before we move on on that

15 point, since you raised it, I just want to reassert our

16 objection to actual malice.  I know the Court has already ruled

17 on it at summary judgment.

18      THE COURT:  Oh, yeah.  You are preserving this for

19 Supreme Court review and if you are -- I'm not convinced on the

20 merits that *New York Times* v. *Sullivan* should be changed in any

21 way, shape, or form, but if my bosses in the Supreme Court

22 decide otherwise, we could have another trial.  That would be

23 great.  Can't wait.

24      MR. BROWN:  Forgive me, your Honor.  On that point, I

25 just want to explain one suggestion you will see in our

1  redline, which is that we believe that to the extent the Court

2  agrees to refer to the general legal principles in the

3  instruction, that it is important to refer to both New York

4  State law and --

5      THE COURT:  I know that's your -- we went through the

6  anti-SLAPP stuff but I'm not going to put that in the

7  instruction.  That's your point for saying that they will never

8  get to the Supreme Court.  Understand.

9      MR. BROWN:  My only point is, your Honor, to the

10 extent counsel objects that the First Amendment provides no

11 basis for this, the Court has already ruled that the anti-SLAPP

12 statute provides a basis for this instruction.

13     THE COURT:  That is absolutely correct.  Okay.

14     Page 22, in light of our discussion, right, a few

15 minutes ago, the first sentence will now read, "If you find

16 that the plaintiff has proven all five elements of her libel

17 claim, then you must determine," because we don't need either

18 or both.

19     Any problems with or additions to instruction no. 15

20 from the plaintiff?

21     MR. VOGT:  I just recall, your Honor, I think you were

22 going to add something previously about liability, and I don't

23 know if you want to make a reference here to that to try and

24 incorporate that concept before it goes into damages.  I'm not

25 sure.

**JA 0568**

M272Pal6                    Charge Conference

```
 1              THE COURT:  Oh, no, no, it will be in the liability
 2     section, which is the previous section.
 3              MR. VOGT:  I just didn't know if you needed to bring
 4     that back up again.
 5              THE COURT:  No, I don't think so.  Well, you are
 6     saying remind them that they really have to just determine one
 7     sum just like they determine --
 8              MR. VOGT:  Right.
 9              THE COURT:  All right.  I will think about that.
10              Any problems with instruction 15 from defense counsel?
11              MR. BROWN:  No, your Honor.
12              THE COURT:  16, again, in the first sentence I have
13     changed that to -- I have eliminate the words "with respect to
14     a particular defendant," but otherwise it is as you have it.
15              Any problems with 16 from plaintiff's counsel?
16              MR. VOGT:  I just think it would be four elements, I
17     believe --
18              THE COURT:  Excuse me?
19              MR. VOGT:  -- because of the publication issue getting
20     taken out.
21              THE COURT:  There are numerous places throughout where
22     I say five elements that is going to have to be changed to four
23     elements, but yes.
24              MR. VOGT:  I understand.
25              THE COURT:  Anything from defense counsel?
```

1          MR. BROWN:  Your Honor, yes, obviously we object and

2     believe that this instruction is not appropriate and instead

3     should be substituted with the destination *per quod* instruction

4     on special harm, but I understand --

5          THE COURT:  That issue is very much alive and fully

6     preserved until the close of plaintiff's case.

7          By the way, while I am thinking about it, is the close

8     of plaintiff's case in this case also the close of all the

9     evidence?  In other words, anyone that defense -- that defense

10    counsel alone is planning to call?

11         MR. AXELROD:  That remains to be seen, but I think

12    that's likely the case.

13         THE COURT:  Okay.  Very good.

14         Instruction no. 17, punitive damages, again, if I rule

15    out punitive damages this instruction will go, but assuming I

16    keep in an instruction on punitive damages, and again I will

17    strike out the language about particular defendant and so

18    forth, but any problems from plaintiff's counsel?

19         MR. VOGT:  No, your Honor.

20         THE COURT:  From defense counsel?

21         MR. BROWN:  Yes, your Honor.

22         First, I think you were referring, when you said threw

23    out punitive damages, to our position in the joint pretrial

24    order in which we argue that New York State law does not permit

25    an award of punitive damages in the context of this type of

case, period.  And we set out the argument for that at pages 50

and 51 of the joint pretrial order.  I understand you are not

inclined to resolve that now.  I just want to --

THE COURT:  No, but now that you remind me the

specific pages, I will take them home and put them under my

pillow.

MR. BROWN:  Thank you, your Honor.

In the redline that we hand up, you will see we made a

number of suggested deletions because some certain of the

language appears to us unnecessary where the only question is

whether plaintiff is entitled to punitives, and that language

seems more appropriate if you get to an instruction about the

amount of punitive damages.

THE COURT:  No, no.  If they say they want to award

punitive damages, number one, if I allow it to go to the jury

at all and if they then say they want to award punitive damages

by checking a box on the verdict sheet, we will then initiate a

further proceeding immediately to -- which I will give them

full instructions on how to calculate punitive damages, what

they can consider and what they can't, we may have additional

testimony from witnesses whose testimony would not otherwise be

admissible on the matters in chief, etc., etc., where this has

happened, which is rare, but not unheard of, in my cases, you

know, it is usually like about two hours of additional

testimony followed by two or three pages of instruction, but

M272Pal6                    Charge Conference

1    that's the time to give them the instructions on amount.

2              (Continued on next page)

M271PAL7    **JA 0572**

1          MR. BROWN:  And I agree with that, your Honor, but

2     defendants respectfully disagree that all the jury need do is

3     decide in their discretion whether to award punitive.  Rather,

4     under New York law, in a defamation case of this type, the

5     jurors must find that plaintiff has demonstrated, proven by a

6     preponderance of the evidence, that common law malice was the

7     sole motive for publication.  And we address that more, in

8     terms of citations --

9          THE COURT:  That's a point that I hadn't thought

10    about.  Thank you.  I must have gotten tired when I got to this

11    last instruction and so --

12         MR. BROWN:  In my redline, I cite the case that is the

13    principal authority for that, although in our --

14         THE COURT:  What is the case?

15         MR. BROWN:  *Morsette v. The Final Call.*  That's an

16    Appellate Division, State Appellate Division case, which deals

17    very specifically with this.  In our proposed instructions we

18    cite a couple different authorities --

19         THE COURT:  Which department?

20         MR. BROWN:  That is out of the Third -- excuse me --

21    out of the First Department.

22         THE COURT:  Okay.  And let me ask plaintiff's

23    counsel -- because I did miss this -- did you put in something

24    on that issue?

25         MR. VOGT:  I know we have proposed instructions.  I

**JA 0573**

1  don't know if we responded to arguments they made.

2           THE COURT:  Since that is a new point that I hadn't

3  considered, if you want to give me something tomorrow morning

4  on that in writing, that would be fine.

5           MR. VOGT:  Thank you, your Honor.  And I haven't seen

6  the proposed language yet either.

7           THE COURT:  Yeah.  Well, he'll show you his redline.

8  In fact, I think you should furnish your full redline, a copy

9  of that, to plaintiff's counsel.

10           MR. BROWN:  Absolutely, your Honor.

11           THE COURT:  Yes.  All right.

12           Then we have my final instructions, 18 and 19, which

13  are verbatim the instructions I've given for 26 years, but

14  don't let me stop you from objecting to them.  Any objection

15  from plaintiff's counsel?

16           MR. VOGT:  No, your Honor.

17           THE COURT:  From defense counsel.

18           MR. BROWN:  No, your Honor.

19           THE COURT:  Very good.  Okay.

20           All right.  Well, this was very helpful, and I will

21  get you something further and look forward to seeing you at

22  9:00 tomorrow.

23           MR. VOGT:  Can I just ask a practical question.

24           THE COURT:  Yes.

25           MR. VOGT:  I know we have to submit, at the end of

# JA 0574

1    trial, the exhibits for the jury.

2              THE COURT:  Oh, thank you for raising that.  Because

3    of the pandemic, here's how this has to be done.  And the two

4    of you need to coordinate.  We need to have a computerized

5    version.  My law clerk will -- it's not a thumb drive but it's

6    that kind of thing, and he will find out tonight exactly what

7    it is.  And then that includes first an index to all the

8    exhibits and then all the exhibits.  And this is so that when

9    they go in the jury room where they have screens just like I

10   have here in court, they can instantaneously find any exhibit

11   they want.  It's actually much better than in the old-fashioned

12   way before computers when, you know, they had to scout around

13   out of hundreds of documents.  But anyway, I'll get you more

14   information on that and tell you tomorrow.

15             MR. VOGT:  Thank you, your Honor.

16             THE COURT:  Yes.

17             THE LAW CLERK:  Paper exhibits are now allowed.

18             THE COURT:  Well, I don't want it.

19             MR. BROWN:  Your Honor, under the heading of no

20   surprises, although I believe this can wait, I just wanted to

21   note that we have some concern that in at least certain of the

22   instructions, the reference to "one or more of the challenged

23   statements" may create an issue, and it probably makes sense,

24   if the Court agrees, to get the revised version from the Court

25   and then, if we believe that creates an issue, just to raise it

**JA 0575**

492

M271PAL7

1   in connection with the specific usage.  But I didn't want to

2   hide the ball from the Court, that we have --

3           THE COURT:  Well, I appreciate that, but I'm not sure

4   what you think the issue would be.

5           MR. BROWN:  I can answer that question.

6           THE COURT:  Yes, okay.

7           MR. BROWN:  The jury, of course, would have to find

8   that plaintiff has proved all four elements as to a particular

9   statement.

10          THE COURT:  Right.

11          MR. BROWN:  It's not enough for the plaintiff to prove

12  an element as to this statement --

13          THE COURT:  Yes, that's right, that's right.

14          MR. BROWN:  And we're just concerned about how that

15  will work when the Court rewords that.

16          THE COURT:  No.  I think that's a standard problem,

17  and I'm glad you raised it.  I've usually solved it by saying

18  somewhere in the instructions, you must be unanimous as to any

19  statement that you find, that you unanimously find meets all

20  four elements.  And I'm not wording it very well, but this

21  comes up all the time.  Because, for example, in a typical

22  securities case, the SEC will allege there were four false

23  statements, and in order to be found liable or, in a criminal

24  case, convict, the jury has to be unanimous.  It's that

25  statement and/or it's that statement, but you can't pick and

**JA 0576**

M271PAL7

1    choose.  You have to find all the elements as to 1, you may

2    find all the elements as to 2, 3, 4, and 5, but you can't say,

3    oh, it's one element as to 1 and second element as to 2 and so

4    forth.  And I have a standard charge somewhere on that.  I'll

5    try to fish it out.

6              MR. BROWN:  And the reason, your Honor, that we --

7    again, we have questions about this.  The proof will be in the

8    pudding, as is often said.  But the reason we have --

9              THE COURT:  Yeah, I wish I'd said that.

10             MR. BROWN:  The reason we have a concern is because at

11   least our understanding of the allegations of the complaint and

12   the arguments of plaintiff's counsel today is that two

13   statements in the editorial combined to communicate a single

14   defamatory meaning, and in my experience in defamation

15   litigation, when the plaintiff alleges that there are multiple

16   defamatory meanings, then the verdict form asks the jury to

17   make separate findings on each element as to each of the --

18             THE COURT:  Well, I'm not going to have a special

19   verdict, if that's what you're asking.

20             MR. BROWN:  No.  I'm just saying that's the

21   circumstance where you have to specifically call out for the

22   jury that there are multiple meanings and --

23             THE COURT:  Well, let's take a look for one second.

24   Hold on.

25             So if you look at page 13 of what I handed to you,

**JA 0577**

M271PAL7

1   everyone, so far as I know, has agreed that the offending

2   statements are totally in these two paragraphs, and the first

3   one makes the statement that the link to political incitement

4   was clear, but that is tied, inextricably tied, to the next

5   sentence:  "Before the shooting, Sarah Palin's political action

6   committee circulated a map of targeted electoral districts that

7   put Ms. Giffords and 19 other Democrats under stylized

8   crosshairs."  So that's just one statement, with a caveat that

9   I'll get to in a minute about whether it was a separate

10  statement about putting them under stylized crosshairs as

11  opposed to saying electoral districts were under stylized

12  crosshairs.  But other than that, that's one statement.

13          And the second statement they're complaining about is,

14  in the next paragraph, that the incitement previously referred

15  to was direct, indeed more direct than anything suggested in

16  the Scalise situation.

17          So putting aside the "stylized crosshairs" aspect of

18  whether it's over electoral districts or not, those are the two

19  statements that I took plaintiff to be presently complaining

20  of.  Let me ask plaintiff's counsel:  Is that right?

21          MR. VOGT:  Yes, your Honor.

22          THE COURT:  Okay.  So then the only question that

23  would remain in defense counsel's thought is whether they could

24  find liability solely on the suggestion that the first

25  paragraph suggested that the map of targeted electoral

**JA 0578**

1   districts put crosshairs over Ms. Giffords and 19 other

2   Democrats as opposed to their electoral districts.  I don't

3   understand plaintiff's counsel to be making that argument.  I

4   think they're making the argument that that is another example

5   of sloppiness but that the real malice was in the statements I

6   just referred to.  Is that right?

7           MR. VOGT:  Yes, your Honor.

8           THE COURT:  All right.  So there you are.

9           MR. BROWN:  Exactly, your Honor.  And throughout the

10  first amended complaint, plaintiff repeatedly alleges that

11  these statements, the ones identified by your Honor,

12  communicated one allegedly defamatory meaning.  It's stated in

13  paragraph 1 of the first amended complaint "that Mrs. Palin was

14  clearly and directly responsible for inciting the mass shooting

15  at a political event in January 2011."  And our concern is that

16  that is what the jury must determine was false or not.

17          THE COURT:  No, no, no.  I think those are two

18  statements.  And they are separated by the two paragraphs.  The

19  first is that she was clearly responsible for inciting and so

20  forth, and the second is that she was directly responsible.

21  Those are two different concepts.

22          MR. BROWN:  Your Honor, to my knowledge, plaintiff has

23  not argued that position.

24          THE COURT:  Well, all right.  If I'm wrong, then we're

25  down to one statement and we don't have to worry about all this

**JA 0579**

M271PAL7

1    stuff.  But let me ask plaintiff's counsel.

2         MR. VOGT:  You're not wrong, your Honor.  I'm not sure

3    where this argument is coming from, but we've always treated

4    them differently.

5         THE COURT:  As two.

6         MR. VOGT:  Two separate statements.

7         THE COURT:  Yes.  I think I'll look at again what they

8    said in their opening statement, but I think that's been my

9    understanding.  Okay.  And maybe we should spell that out for

10   the jury somewhere in the instructions and then there will be

11   no doubt about what the two statements are they have to look

12   at.  So it will come probably after these two -- before the

13   sentence, I will refer to the challenged portions of these

14   paragraphs.  The challenged statement may be a sentence to the

15   effect of, in particular, plaintiff claims that the first

16   paragraph falsely asserted that Sarah Palin's political action

17   committee's map was a clear incitement and that the second

18   paragraph falsely suggested that it was a direct incitement.  I

19   do think those are separate statements.  They were separate

20   statements in the two paragraphs.  So anyway, let me see if I

21   can come up with some language on that.

22        All right.  I just realized I have a 4:45 proceeding

23   on a conference call that I should have gone down to take five

24   minutes ago.  So we'll see you all at 9:00 tomorrow.

25        (Adjourned to February 8, 2022, 9:00 a.m.)

# JA 0580

INDEX OF EXAMINATION

Examination of:                                    Page

 PHOEBE LETT

Direct By Mr. Turkel . . . . . . . . . . . 335

Cross By Mr. Sullivan  . . . . . . . . . . 372

Redirect By Mr. Turkel . . . . . . . . . . 383


 EILEEN LEPPING

Direct By Mr. Vogt . . . . . . . . . . . . 389

Cross By Ms. Schell  . . . . . . . . . . . 414

Redirect By Mr. Vogt . . . . . . . . . . . 437


 LINDA COHN

Direct By Mr. Turkel . . . . . . . . . . . 447


                  PLAINTIFF EXHIBITS

Exhibit No.                             Received

  17    . . . . . . . . . . . . . . . . 343

  121   . . . . . . . . . . . . . . . . 355

  125   . . . . . . . . . . . . . . . . 363

  126   . . . . . . . . . . . . . . . . 365

  127   . . . . . . . . . . . . . . . . 366

  192   . . . . . . . . . . . . . . . . 371

  116   . . . . . . . . . . . . . . . . 372

  153   . . . . . . . . . . . . . . . . 399

**JA 0581**

498

PLAINTIFF EXHIBITS

Exhibit No.                                         Received

154   . . . . . . . . . . . . . . . . . . 403

1   . . . . . . . . . . . . . . . . . . . 405

140A   . . . . . . . . . . . . . . . . . 419

157   . . . . . . . . . . . . . . . . . . 424

148   . . . . . . . . . . . . . . . . . . 428


DEFENDANT EXHIBITS

Exhibit No.                                         Received

25   . . . . . . . . . . . . . . . . . . 379

# JA 0582

M282Pal1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SARAH PALIN, an individual,

 4                    Plaintiff,

 5            v.                            17 CV 4853 (JSR)

 6   THE NEW YORK TIMES COMPANY, et
     al,
 7
                     Defendants.
 8
     ------------------------------x      Trial
 9
                                          New York, N.Y.
10
                                          February 8, 2022
11                                        9:05 a.m.

12   Before:

13                      HON. JED S. RAKOFF,

14                                        District Judge

15
                            APPEARANCES
16
     TURKEL CUVA BARRIOS, P.A.
17        Attorneys for Plaintiff
     BY:  SHANE B. VOGT
18        KENNETH G. TURKEL

19
     BALLARD SPAHR, LLP
20        Attorneys for Defendants
     BY:  DAVID L. AXELROD
21        JACQUELYN N. SCHELL
          THOMAS BYRNE SULLIVAN
22        JAY WARD BROWN

23

24   Also Present:

25   Dana Green, Senior Counsel, The New York Times Company
```

1          (Trial resumed; jury not present)

2          THE COURT:  All right.  So, I see the draft

3     instruction from defense counsel, but remind me again exactly

4     what occurred.

5          MR. AXELROD:  So, in the hallway yesterday, after

6     court, right after the jury had been dismissed, I witnessed

7     someone — I don't know who they were, they were a member of the

8     public — approach the plaintiff herself while the jurors were

9     in the process of entering the elevator, and I heard him say

10    something like, "I hope you win.  I hate *The Times*."

11         THE COURT:  Okay.  So I may give some curative

12    instruction substantively along the lines of what you

13    suggested, but I think it is too long and really out of

14    proportion to that event, so what I will probably say is, "You

15    may overhear people making comments in the hallway or something

16    like that; don't pay any attention to it; I remind you that you

17    have got to decide this case solely and wholly on the evidence

18    that you hear here in court and put everything else out of your

19    mind," or words to that effect.

20         MR. AXELROD:  Thank you.

21         THE COURT:  However, to avoid any such incidents in

22    the future, or at least minimize the chance of it happening, I

23    have arranged that my courtroom deputy will take the jury to

24    the elevators, and only after they are in the elevators will

25    she then come back to the courtroom, and then the parties can

**JA 0584**

M282Pal1

1   leave at that time.  So you will need to stay here just a

2   couple of minutes extra just to avoid that situation.

3           Okay.  Now, there are some other matters you wanted to

4   take up, someone wanted to take up?

5           MR. VOGT:  Yes, your Honor.

6           THE COURT:  I thought the main matter we should

7   discuss today, such a beautiful day, there is a touch of spring

8   in the air, so I think the really hard decision is whether we

9   should suspend court altogether and go to Central Park and hang

10  out or continue with the trial, but my law clerk says that his

11  parents are coming to watch the trial today, so that overcomes

12  the temptation.

13          Anyway, go ahead.

14          MR. VOGT:  So, your Honor, there are just a couple of

15  topics, areas, and some potential exhibits we want to get into

16  so we don't have a sidebar during Mr. Bennet's testimony.

17          THE COURT:  Yeah.

18          MR. VOGT:  So the first area that I wanted to get

19  into, very limited, on a very limited basis of questioning, the

20  fact that Mr. Bennet's brother Michael is a U.S. Senator, ran

21  for president in 2020; and then also bring out Mr. Bennet

22  testified that he campaigned with his brother the last two

23  weeks of his 2010 Senate campaign, which would have been the

24  same time period when the map was out, and ask -- and two

25  people on the map endorsed Mr. Bennet; and just ask him

**JA 0585**

M282Pal1

1  questions about whether that stood out in his head, things of

2  that nature.

3  THE COURT:  Well, I am a little bit skeptical that

4  this has any probative value, but let me hear from defense

5  counsel.

6  MR. AXELROD:  Your Honor, I'm more than skeptical.

7  The fact that Michael Bennet is James Bennet's brother by

8  itself shows nothing, which the law in fact says.  And I assume

9  Mr. Vogt wants to ask the questions so that he can then argue

10  to the jury that Mr. Bennet, of course, must have had some

11  hostility because his brother was a Democratic U.S. Senator,

12  which I don't think is a natural, logical --

13  THE COURT:  Yes.  I think it would be different if his

14  brother had made some comment about the brochure that was

15  distributed by the Sarah Palin PAC or whatever, but there is

16  nothing in the evidence along those lines.

17  MR. AXELROD:  No, there is not.

18  And the idea, of course, if Mr. Bennet went and

19  campaigned, that would have been in October of 2010.

20  Mr. Bennet himself wasn't identified in the crosshairs map; and

21  the idea that two people who are identified in the crosshairs

22  map endorsed Michael Bennet and that somehow James Bennet knew

23  about it and somehow that was his motive, it's so attenuated

24  that I fail to see any relevant value.

25  THE COURT:  I'm inclined to agree on both 402 grounds

M282Pal1

1   and 403 grounds, so that will be precluded.

2        So there was something else counsel wanted to raise.

3        MR. VOGT:  Yes, your Honor, and then there are a few

4   exhibits that we wanted to get into, and this somewhat ties

5   into the Sullivan issue that we were discussing yesterday.

6        THE COURT:  Yes.

7        MR. VOGT:  So we have testimony in the 2011 time

8   period Mr. Bennet was regularly reading *The Atlantic*, *The New*

9   *York Times*, *Washington Post*, *Wall Street Journal*, *Politico*, and

10  *The Drudge Report*; and that he was reading all of those

11  publications to, number one, keep abreast of the news; but

12  then, number two, he also looked at them because he was the

13  editor of *The Atlantic* and was --

14       THE COURT:  So where we left off in this interesting

15  discussion yesterday was what evidence is there that he read

16  *The Daily Dish*?

17       MR. VOGT:  And I didn't openly -- I will say to the

18  Court, I did not ask that particular question at his

19  deposition.  The one thing is I know we mentioned specifically

20  the list that I had shown him of *Atlantic* articles, and your

21  Honor asked yesterday whether any *Daily Dish* pieces were on

22  there, and in fact there is one.

23       THE COURT:  The others are *Atlantic* articles?

24       MR. VOGT:  Some of them are *Atlantic* articles, but

25  some of them are other blog articles as well.

M282Pal1

1          THE COURT:  Tell me what *The Atlantic* articles are.

2          MR. VOGT:  So *The Atlantic* -- well, I want to use

3     three things.  I wanted to use the list and three things.  I

4     don't think these three are *Atlantic* articles.

5          THE COURT:  I see.  *Atlantic* articles I think you

6     would have a stronger position, and that's why I allowed, over

7     objection, your colleague to put the questions yesterday about

8     did Mr. Bennet have a good memory for articles from *The*

9     *Atlantic* or words to that effect.  I can't remember the exact

10    question.  But you were allowed to ask a couple of questions

11    along those lines.

12          But there is a reason the jury could infer that he

13    would read everything or most everything in *The Atlantic*.  I

14    don't see how one can infer that just because he is an avid

15    reader, he read any particular article in some other

16    publication that he has no recollection of.

17          MR. VOGT:  Just to follow up, so when I showed

18    Mr. Bennet this list at his deposition, he said, I must have

19    read at least some of the pieces on that list, and so --

20          THE COURT:  And did you follow up to specify which

21    ones?

22          MR. VOGT:  I did ask him whether he recalled reading

23    one of the ones on the list that I wanted to --

24          THE COURT:  What did he say?

25          MR. VOGT:  He said:  I don't recall reading that

M282Pal1

1    one --

2              THE COURT:  Oh.

3              MR. VOGT:  -- which I think is a credibility issue.

4              THE COURT:  No, no, no.  You know, I don't want to

5    have the debate I had with your --

6              MR. VOGT:  Understand.

7              THE COURT:  -- able colleague, but credibility is, of

8    course, an issue in the case, and therefore evidence related to

9    credibility may be relevant.  But the fact that credibility is

10   an issue doesn't mean that something that you have no

11   foundation to offer, or insufficient foundation to offer, comes

12   in.  It still has to meet the standards of 401 and 402.  That

13   is, forgive me, Evidence 101.

14             MR. VOGT:  I understand, your Honor.  And I wasn't

15   trying to reargue the point.  I was just making sure that we

16   get these out there and that they are identified and that your

17   Honor --

18             THE COURT:  Well, so --

19             MR. VOGT:  And there is one more.

20             THE COURT:  Yes.

21             MR. VOGT:  There is an article, it is from *The Wire*.

22   It is "Ten Days that Define 2011."  Now, this one, Mr. Bennet

23   does have testimony specifically where it is said that it is

24   possible that he read this one.  Possible.

25             THE COURT:  Okay.  What does that article say?

**JA 0589**

M282Pal1

1      MR. VOGT:  This is also the one that is referenced in

2   the Second Circuit opinion that "Loughner is currently

3   incarcerated and undergoing psychiatric treatment . . . .  In a

4   meta media sense, the bad thing to come out of this already

5   terrible story was a round of blame hurling, with people

6   rushing to point at Sarah Palin's infamous target map or

7   Loughner's left seeming (but not really) anti-Bush sentiments.

8   In truth, Loughner is clinically insane and this was not really

9   about politics at all.  That many, including us" --

10      THE COURT:  I'm sorry, this is by whom?

11      MR. VOGT:  This is *The Wire*, which was a partner of

12   the *Atlantic* that published --

13      THE COURT:  I'm saying who wrote the article?

14      MR. VOGT:  Richard Lawson.

15      THE COURT:  And he does give the basis for saying that

16   Mr. Loughner was clinically insane, etc., etc.

17      MR. VOGT:  He doesn't, because it's a "Ten Days that

18   Defined 2011" piece.  It's sort of a summary of what the big

19   stories were.  But regardless of the basis, our point on this

20   one is if it is possible Mr. Bennet read it, this would provide

21   him notice at least that what he was --

22      THE COURT:  To make this relevant, you have to have a

23   foundation for the following: first, that he read it; second,

24   that, at the relevant time of his adding his sentences to the

25   draft editorial, he remembered it and chose to purposely

**JA 0590**

M282Pal1

1    disregard it; and that, in some cases, but not in this one,

2    there would be the further question whether there is any reason

3    to believe he read it at all, but you seem to have evidence on

4    that third point with respect to *The Wire*.

5          So how does it establish the first two points?

6          MR. VOGT:  Well, your Honor, I don't necessarily agree

7    that we need to establish the first two points.  I mean, if he

8    denies that he read it or if that's all he has to do to have

9    evidence excluded, then we would never get anything in.  I mean

10   he has denied --

11         THE COURT:  No; but, last I remember, the party

12   offering evidence has the burden to show that it is relevant.

13   So the burden is on you, not on him, because you are the one

14   who is offering it and you have to show that it's relevant.

15   And the -- the theory that both you and your able colleague

16   seem to be advancing is if there is anything in the world that

17   appeared that's helpful to your case, and Mr. Bennet denies he

18   ever saw it, that that makes it admissible.  That's ridiculous,

19   frankly.  You have to have some basis for showing that he

20   likely read it and that he had a motive to -- and remembered

21   it, and he had a motive to disregard it.

22         Now, in the memory I allowed you, yesterday, to put in

23   some evidence that might support that.  What's the evidence

24   that he disregarded?

25         MR. VOGT:  At this point there is not any.  He just

**JA 0591**

M282Pal1

1    says he doesn't recall reading it.  I don't --

2               THE COURT:  I thought you said this was the one that

3    he said he did read.

4               MR. VOGT:  It was possible that he read.

5               THE COURT:  I see.

6               Did you put to him in his deposition any questions

7    about:  Did you have an understanding of Mr. Loughner's mental

8    state or anything like that?

9               MR. VOGT:  I don't believe that I did that

10   specifically, your Honor.

11              THE COURT:  All right.  Well, I will tell you what.  I

12   am not -- based on the current showing, I'm not going to allow

13   it.  But at a break during his testimony, because I assume it's

14   going to go on for some time, I will allow you to put some

15   foundational questions to him outside the presence of the jury

16   on this; and if you can establish more than you have so far, I

17   will reconsider.

18              MR. VOGT:  Or I could -- the one thing I am thinking,

19   your Honor, is perhaps I could ask him some foundational

20   questions, not specifically referencing these documents, when I

21   have him up first --

22              THE COURT:  Well --

23              MR. VOGT:  -- prior to redirect --

24              THE COURT:  -- that may be -- I mean, I will have to

25   hear the question, obviously --

**JA 0592**

M282Pal1

1          MR. VOGT:  Right.

2          THE COURT:  -- but theoretically that might be another

3     way to handle it.

4          MR. VOGT:  Okay.

5          THE COURT:  Yes.

6          MR. AXELROD:  So, your Honor, the idea that -- I will

7     just raise this in the record now.  The idea that Mr. Bennet

8     read this piece in *The Wire* is almost as tenuous as *The Daily*

9     *Dish* for this reason.  *The Wire*, like *The Daily Dish*, was kind

10    of a separate entity.  Mr. Bennet did not have any day-to-day

11    editing, reviewing, whatever, to do with *The Wire*.  And this is

12    very meta.  Gabriel Snyder, who was the editor of *The Daily*

13    *Wire* or of *The Atlantic Wire* actually published a piece this

14    weekend after seeing argument about this last week, and he

15    writes that *The Wire* was an opinion aggregator, largely

16    summarizing various columns written on news events and issues.

17    He then goes on to say, "I can, as the person who was in charge

18    of reading, reviewing, and editing *The Wire* content, say that

19    it is not certain at all that Bennet was aware of what we

20    published."

21         THE COURT:  So I'm glad you mention that, because you

22    want me to take consideration or the record to reflect an

23    out-of-court hearsay statement made well after the case has

24    gone to trial by someone who has a motive to state what you

25    just stated, counsel.

**JA 0593**

M282Pal1

1          MR. AXELROD:  Not quite.  I raise it only because this

2     seems like this is the proper forum to raise questions of

3     evidence, you know, under the rules of evidence, and suggest

4     that if this were to become an issue in this case, such that

5     the document was potentially posed to Mr. Bennet, I don't know

6     if I wouldn't come back and ask the Court to allow me to call

7     Mr. Snyder as a witness so he could state, not in hearsay

8     manner, but to this Court exactly what he said in this piece.

9          THE COURT:  Even what he says sounds not like -- it

10    sounds like an opinion and he could only be called as a

11    percipient witness.

12         MR. AXELROD:  Actually, he says, "There was no one

13    else — no fact-checkers, no copyeditors, no top editors —

14    reading our posts before they went up."

15         THE COURT:  So what?

16         MR. AXELROD:  So that is to say that Mr. Bennet had

17    nothing to do with the posts on *The Atlantic Wire*.

18         THE COURT:  But that's not the question.  The question

19    is whether he read it --

20         MR. AXELROD:  Correct, which Mr. Bennet --

21         THE COURT:  -- which this gentleman can't possibly

22    opine on.

23         MR. AXELROD:  Without a doubt.  But Mr. Bennet already

24    testified at his deposition that he doesn't remember reading

25    it.

**JA 0594**
M282Pal1

1          THE COURT:  I have already ruled in your favor.

2          MR. AXELROD:  Okay.

3          THE COURT:  And notwithstanding the arguments you are

4    now making, I still rule in your favor.

5          MR. AXELROD:  All right.  Thank you.  I will sit down

6    now.

7          THE COURT:  All right.  How are we doing?

8          THE DEPUTY CLERK:  All jurors are present.

9          THE COURT:  All jurors are present.  Okay.  So let's

10   get the witness back on the stand and we can get going.

11          (Witness present)

12          THE COURT:  Good morning.  Please be seated.  You can

13   take off your mask, and the Court reminds you that you are

14   still under oath.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25