# No. 22-558

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

SARAH PALIN, an individual

*Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY, a New York
corporation, and JAMES BENNET, an individual

*Defendants-Appellees.*

**On Appeal from the United States District Court
for the Southern District of New York
(Case No. 1:17-cv-04853-JSR, Hon. Jed S. Rakoff)**

**JOINT APPENDIX**

**VOLUME IX OF XI (Pages JA1896 to JA2177)**

Kenneth G. Turkel (Co-Lead Counsel)
kturkel@tcb-law.com
Shane B. Vogt (Co-Lead Counsel)
svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: 813- 834-9191
Fax: 813-443-2193

Michael Munoz
mmunoz@golenbock.com
S. Preston Ricardo
pricardo@golenbock.com
GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
711 Third Avenue
New York, NY 10017
Tel: 212-907-7300 Fax: 212-754-0330

*Counsel for Plaintiff-Appellant Sarah Palin*

# JOINT APPENDIX

# TABLE OF CONTENTS

## Volume IX of XI

E-Mail from Nicholas Werle dated February 16, 2022 with Order...............JA1896

E-Mail from Bloomberg Reporter dated February 16, 2022 ........................JA1899

E-Mail from Shane Vogt, Esq. to Judge Rakoff dated August 12, 2021
regarding conflicts.................................................................................JA1900

E-Mail from Shane Vogt, Esq. to Nicholas Werle regarding positive
COVID Test ..........................................................................................JA1903

DOC 119 - Defendants' Notice of Motion dated November 25, 2020..........JA1904

DOC 125 - Memorandum Order by Judge Rakoff dated
December 29, 2020 ................................................................................JA1906

DOC 113 – Defendants' Reply Memorandum of Law in Support of
Their Motion for Summary Judgment ..........................................................JA1919

DOC 154 – Plaintiff's Proposed Voir Dire Requests ...................................JA1934

DOC 170 – The Court's Instructions of Law to the Jury .............................JA1937

DOC 171 – Docketing Entry for Final Judgment.........................................JA1961

DOC 196 – Opinion dated March 1, 2022...................................................JA1963

Hearing Transcript excerpt dated July 31, 2017 ...........................................JA2031

Hearing Transcript dated August 16, 2017....................................................JA2064

Trial Transcript dated February 3, 2022 – Voir Dire....................................JA2145

**JA 1896**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------
| SARAH PALIN,                |
|                             |
|         Plaintiff,          |          17-cv-4853 (JSR)
|                             |
|     -v-                     |          ORDER
|                             |
| THE NEW YORK TIMES COMPANY  |
| and JAMES BENNET,           |
|                             |
|         Defendants.         |
------------------------------
```

JED S. RAKOFF, U.S.D.J.:

It is the Court's uniform practice after a verdict has been rendered in a jury trial to have the Court's law clerk inquire of the jury as to whether there were any problems understanding the Court's instructions of law, so that improvements can be made in future cases. Late yesterday, in the course of such an inquiry in this case -- in which the jury confirmed that they had fully understood the instructions and had no suggestions regarding jury instructions for future cases -- several jurors volunteered to the law clerk that, prior to the rendering of the jury verdict in this case, they had learned of the fact of this Court's Rule 50 determination on Monday to dismiss the case on legal grounds. These jurors reported that although they had been assiduously adhering to the Court's instruction to avoid media coverage of the trial, they had involuntarily received "push notifications" on their smartphones that contained the bottom-line of the ruling. The jurors repeatedly assured the Court's law

clerk that these notifications had not affected them in any way or played any role whatever in their deliberations.

The Court also notes that when it proposed to the parties, during oral argument on Monday morning, to render its Rule 50 decision later that day but to permit the jury to continue deliberating so that the Court of Appeals would have the benefit of both the Court's legal determination and the jury's verdict, no party objected to this plan. Nor did any party object when the Court reconvened later that day, outside the presence of the jury, and the Court indicated that it was prepared to issue a Rule 50 decision at that time. Indeed, no party objected to this procedure at any time whatever.

Nevertheless, in an excess of caution, the Court hereby brings the foregoing facts to the parties' attention. If any party feels there is any relief they seek based on the above, counsel should promptly initiate a joint phone conference with the Court to discuss whether any further proceedings are appropriate.

SO ORDERED.

New York, NY
February 16, 2022

JED S. RAKOFF, U.S.D.J.

**JA 1898**

**From:** Nicholas Werle <Nicholas_Werle@nysd.uscourts.gov>
**Sent:** Wednesday, February 16, 2022 12:26 PM
**To:** Axelrod, David L. <AxelrodD@ballardspahr.com>; Schell, Jacquelyn N.
<SchellJ@ballardspahr.com>; Sullivan, Thomas B. <SullivanT@ballardspahr.com>; Brown, Jay Ward
<brownjay@ballardspahr.com>; Shane Vogt <svogt@tcb-law.com>; Ken Turkel <kturkel@tcb-
law.com>
**Subject:** Sarah Palin v. N.Y. Times Co. | 17-cv-4853 (JSR) | Order

Counsel –

Please see the attached order from Judge Rakoff, which will be docketed shortly.

Regards,
Nick Werle



**Nicholas Werle**
Law Clerk to the Hon. Jed S. Rakoff
United States District Court
Southern District of New York
500 Pearl Street – Room 1340
New York, NY 10007
Chambers: (212) 805-0401

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**JA 1899**

**From:** Bob Van Voris (BLOOMBERG/ FEDERAL C) <rvanvoris@bloomberg.net>
**Sent:** Wednesday, February 16, 2022 12:13 PM
**To:** Ken Turkel <kturkel@tcb-law.com>; Shane Vogt <svogt@tcb-law.com>
**Subject:** Palin jurors knew of Rakoff ruling during deliberations

Would love to know your thoughts. Here's my story:

https://www.bloomberg.com/news/articles/2022-02-16/palin-jurors-knew-judge-dismissed-n-y-times-case-before-verdict?sref=Hu4igNEZ

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Bob Van Voris
Legal Reporter
Bloomberg News
731 Lexington Avenue
New York, New York 10022
Cell: 646-531-0836
E-MAIL: rvanvoris@bloomberg.net
Twitter: @BobVanVoris
Attorney admitted in New York

| From: | Shane Vogt |
|---|---|
| To: | RakoffNYSDChambers@nysd.com |
| Cc: | Nicholas Werle; Schell, Jacquelyn N.; Axelrod, David L. (AxelrodD@ballardspahr.com); Ken Turkel |
| Subject: | Sarah Palin v. The New York Times Company; Case No. 17-cv-04853-JSR; Requested Trial Conflicts Information |
| Date: | Thursday, August 12, 2021 1:45:00 AM |
| Attachments: | Academic Calendar 2021-2022.pdf |
| | 75 - Amended Case Management and Scheduling Order.pdf |

This email is being sent pursuant to Mr. Werle's request during the August 11, 2021 conference call that Plaintiff's counsel provide additional information regarding certain scheduling conflicts with the proposed December 13-17, 2021 and January 24-28, 2022 trial weeks.

1. <u>December 13-17 Conflicts</u>

   A. Personal Conflict—My oldest daughter's birthday is on December 13, 2021. I have made a concerted effort over the past 21 years to never miss one of my 4 daughter's birthdays. This may not seem like a significant issue to some, but it is something my family and I have always made a priority. My wife and I, along with our other three daughters, will be going to St. Petersburg to celebrate my daughter's birthday with her on the evening of December 13.

   B. Personal Conflict—I also have to pick up my daughter (who does not have a driver's license or vehicle) and move her back home from Eckerd College during the proposed trial week. The exact date of the move during that week is not yet known because it depends on her final exam schedule. As indicated on the attached *Academic Calendar 2021-2022*, my daughter is required to vacate her residence hall within 24 hours after her last exam (which will most likely be on December 15 or 16).

   C. Expert Witness—Plaintiff's damages expert, Craig Kronenberger, is leaving for a 2-week family vacation overseas (France and Morocco) on December 17, 2021. He will be departing with his family from Atlanta. As mentioned on the August 11 call, Mr. Kronenberger is a damages expert and we do not plan on calling him until near the end of Plaintiff's case. Although Mr. Kronenberger could possibly be available on December 13, 14, or 15, he would need to fly back to Atlanta on December 16 at the latest to make final preparations for his trip and avoid any potential travel delays that might cause him to miss his departing flight for

his family vacation. [Also, I would be remiss (likely cursed) if I did not relay that Mr. Kronenberger's wife's strongly opposes any effort to try to squeeze in his testimony during the early part of the week of December 13th and to risking any travel to New York during that time because it could possibly impact a trip that she has been eagerly awaiting for quite some time.]

D. Trial Preparation Conflict—Preparation for the trial discussed in Item 2.B., below, will be occurring in December 2021. Given the holidays and related scheduling difficulties near the end of December, a significant amount of this preparation work will be occurring during the first three weeks of December, and it will be extremely difficult (if not impossible) for Mr. Turkel to be involved in the preparation for and trial of this case during the week of December 13-17 (including associated travel days) while also preparing for the case already set for the January trial term in the Middle District of Florida—which could take place as early as the first week of January. The Pretrial Conference in that Middle District of Florida case is scheduled for December 7, 2021 (at which the parties may or may not learn whether any specific dates for the trial in January 2022 will be set).

2. January 24-28 Conflicts

A. Personal Conflict—My second oldest daughter is getting married and her wedding has already been booked and deposits made for January 29, 2022 in St. Petersburg, Florida. The rehearsal and rehearsal dinner, along with other final preparations, are scheduled for Friday, January 28, 2022. There are also a number of other family activities and preparation surrounding the wedding during the week of January 24-28 that I will be involved in. My wife and I are also trying to spend as much time as possible with our daughter before her wedding because she will be moving away to live with her new husband in Missouri shortly thereafter.

B. Trial Conflict—Mr. Turkel is lead trial counsel in a case [Case No. 8:20-cv-1469-T-30JSS] set for a jury trial in the Middle District of Florida on a January 2022 trial term that runs a

**JA 1902**

calendar month.  Another lawyer in our firm is co-counsel in that case, but not lead trial counsel and cannot try that case alone. Also, the client has specifically requested that Mr. Turkel be lead trial counsel.  Pursuant to local practice in the Middle District of Florida, the trial is not set for dates certain during January, and could take place at any time during January 2022 term.  The case is expected to take 8-10 days to try.  A copy of the Amended Case Management and Scheduling Order entered in the case is attached; Paragraph 6 of which sets the case on the January 2022 trial term.

# JA 1903

| | |
|---|---|
| **From:** | Shane Vogt |
| **To:** | Nicholas Werle; Schell, Jacquelyn N.; Axelrod, David L.; Ken Turkel |
| **Subject:** | RE: Sarah Palin v. NY Times | 17-cv-4853 (JSR) | Draft Preliminary Instruction |
| **Date:** | Sunday, January 23, 2022 5:37:00 PM |
| **Importance:** | High |

Mr. Werle:

We just learned of a positive COVID test on our side of the case. This positive test impacts everyone on our team due to close contact over the past several days during trial preparation. I believe this test will prevent us from entering the Courthouse tomorrow.

I am emailing due to the emergent nature of the situation and was not sure of the best way to bring this to the Court's attention.

Please let us know if we should schedule a call to discuss this or how it should be handled.

Thank you.

**From:** Nicholas Werle <Nicholas_Werle@nysd.uscourts.gov>
**Sent:** Sunday, January 23, 2022 4:32 PM
**To:** Schell, Jacquelyn N. <schellj@ballardspahr.com>; Axelrod, David L. <axelrodd@ballardspahr.com>; Shane Vogt <svogt@tcb-law.com>; Ken Turkel <kturkel@tcb-law.com>
**Subject:** Sarah Palin v. NY Times | 17-cv-4853 (JSR) | Draft Preliminary Instruction

Counsel -

Thank you for your proposed drafts of the preliminary instruction for the jury. Attached, please find the Court's planned preliminary instruction, which may be given as soon as after opening statements. The Court will provide you an opportunity tomorrow morning before jury selection to make any objections to this preliminary instruction.

Regards,
Nick Werle

Nicholas Werle
Law Clerk to the Hon. Jed S. Rakoff
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street – Room 1340
New York, NY 10007
Chambers: 212-805-0401

JA 1904

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                  :

SARAH PALIN                        :   No. 17 Civ. 4853 (JSR)

                 Plaintiff,   :   ECF Case

                  :

           -against-        :

                  :

THE NEW YORK TIMES COMPANY and JAMES  :
BENNET,

            Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that, pursuant to the Court's direction on November 23, 2020,

Defendants The New York Times Company and James Bennet will file a motion pursuant to

Fed. R. Civ. Proc. 54(b), requesting that the Court modify its earlier Opinion and Order, Dkt.

117, and rule that, pursuant to the recently amended Anti-SLAPP statute, New York state law

requires that Plaintiff establish actual malice by clear and convincing evidence. Defendants'

moving papers (up to 5 pages) are due on November 30, 2020, Plaintiff's answering papers (up

to 5 pages) are due on December 7, 2020, and Defendants' reply papers (up to 2 pages) are due

on December 9, 2020. The Court will inform the parties if it decides to hear oral argument on

the motion.

**JA 1905**

Dated: New York, New York
       November 25, 2020

Respectfully submitted,

BALLARD SPAHR LLP

By: _/s/ Jay Ward Brown_
    Jay Ward Brown
    David L. Axelrod
    Thomas B. Sullivan
    Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

_Counsel for Defendants_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- x
SARAH PALIN,                        :
                                    :        17-cv-4853 (JSR)
        Plaintiff,                  :
                                    :
        -v-                         :        MEMORANDUM ORDER
                                    :
THE NEW YORK TIMES COMPANY and      :
JAMES BENNET,                       :
                                    :
        Defendants.                 :
----------------------------------- x

JED S. RAKOFF, U.S.D.J.

On June 27, 2017, plaintiff Sarah Palin brought a single defamation claim against The New York Times Company ("The Times") arising from The Times' editorial of June 14, 2017 titled <u>America's Lethal Politics</u> regarding gun control (the "Editorial"). Dkt. No. 1. The now-operative complaint, filed on December 30, 2019, also named James Bennet, the author of the relevant segments of the Editorial. Dkt. No. 70.

Although plaintiff does not dispute that she is a "public figure," in a previously-filed motion for partial summary judgment, she argued that she is not required to prove actual malice, and prove it by clear and convincing evidence, on the ground that the federal constitutional rule imposing that burden in the case of public figures either is no longer good law or does not apply to this case. Dkt. No. 100. Defendants argued, among

other things, that the federal constitutional rule governed the case and that, in any event, New York law independently imposed an actual malice requirement. Dkt. No. 104. In an Opinion and Order dated August 28, 2020 (the "Opinion"), Dkt. No. 117, the Court held that the federal Constitution, under well-settled and binding precedent, imposed the actual malice requirement, id at 12-13 (citing New York Times Co. v. Sullivan, 376 U.S. 254 (1964)), and declined to reach the question whether New York law independently imposed that burden, id. at 13 n.8. The case is now set for trial, pandemic permitting, on June 21, 2021.

Now before the Court is defendants' motion, pursuant to Federal Rule of Civil Procedure 54(b), for an order modifying the Opinion to reflect the fact that on November 10, 2020, New York amended its "anti-strategic litigation against public participation" ("anti-SLAPP") law to expressly require that public figures prove actual malice by clear and convincing evidence. Dkt. No. 120. Plaintiff opposes. Dkt. No. 123. For the reasons set forth below, the motion is granted.

Federal Rule of Civil Procedure 54(b) provides, in relevant part, that an interlocutory order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Of course, past decisions should not be revisited "without good reason." Official Comm. of

the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003). But "an intervening change of controlling law" is just such a reason. Id.

Here, there has been just such an intervening change of law. It is true that New York's anti-SLAPP law has long had an actual malice requirement, providing that:

> [i]n an action involving public petition and participation, damages may only be recovered if the plaintiff, in addition to all other necessary elements, shall have established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue.

See N.Y. Civil Rights Law § 76-a(2). The prior version of the law, however, defined "an action involving public petition and participation" narrowly to include only claims "brought by a public applicant or permittee, and [that are] materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission." See Intl. Shoppes v. At the Airport, 131 A.D.3d 926, 928 (2d Dep't 2015).[1] As a result, the actual malice requirement was effectively limited to cases initiated by persons or business entities that were

---

[1]    Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

involved in controversies over a public application or permit. See Chandok v. Klessig, 632 F.3d 803, 819 (2d Cir. 2011) ("Uniformly, the New York courts have found that the persons properly alleged to be public applicants within the meaning of the anti-SLAPP statute were persons whose proposed actions required government permission.").

On November 10, 2020, New York amended its anti-SLAPP law. See A.B. 5991-A. Among other things, the amendments substantially broadened the reach of the actual malice rule. As amended, the law defines an "action involving public petition and participation" to include a claim based upon:

> (1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or
>
> (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

N.Y. Civil Rights Law § 76-a(1)(a). The law further directs that the term "public interest" is to "be construed broadly, and shall mean any subject other than a purely private matter." Id. § 76-a(1)(d). Also, although less directly relevant here, the amendments create an affirmative cause of action for certain

-4-

defendants to recover attorneys' fees and other damages from plaintiffs in specified circumstances. Id. § 70-a.[2]

Defendants now ask the Court to rule that § 76-a, as amended on November 10, 2020, applies retroactively to this action and thus requires that plaintiff prove actual malice by clear and convincing evidence as a matter of New York law, separate and apart from the requirements of the federal Constitution. Def. Mem. at 4. They contend that "a ruling now on the applicability of state law will inform the drafting of jury instructions at trial, simplify future proceedings including on appeal, and give effect to constitutional avoidance . . . ." Id. at 5.

Plaintiff responds that defendants have not established extraordinary circumstances warranting reconsideration. Plaintiff's Response to Defendants [sic] Memorandum of Law in Support of Motion for Reconsideration ("Pl. Mem."), Dkt. No. 123, at 1. Plaintiff argues that the Court has already decided that the actual malice standard applies to this case, and that the source of the actual malice rule does not matter for the purposes of the upcoming trial. Id. at 1-2. And, plaintiff contends, if she loses at trial and renews her challenge to the federal actual malice

---

[2]     Defendants do not ask the Court to apply § 70-a in this action, nor do they contend that the provision would even apply in federal court. See Defendants' Memorandum of Law in Support of Motion for Reconsideration ("Def. Mem."), Dkt. No. 120, at 4 n.4.

rule on appeal, defendants will have preserved their argument that New York independently imposes the requirement. Id. at 2. Therefore, according to plaintiff, nothing will be simplified by granting reconsideration; indeed, doing so "would amount to an advisory opinion." Id. at 1-2.

The Court sees no reason why it should delay resolution of this plainly relevant issue. If, as defendants contend, § 76-a applies retroactively to this action, that will undoubtedly simplify proceedings on appeal; by contrast, if, as plaintiff insists, the statute does not have retroactive effect, then we are exactly where we began and, to prevail at trial, plaintiff will still have to prove actual malice as a matter of federal constitutional law. Either way, there is nothing to be gained from delay. In light of the intervening change of law, the Court now turns to the merits of defendants' motion.

It is undisputed that § 76-a requires public figures, like plaintiff, to prove actual malice by clear and convincing evidence. It is also undisputed (albeit by virtue of neither party having raised the issue) that a federal court sitting in diversity must apply § 76-a because it is a substantive, rather than a procedural, provision. See Adelson v. Harris, 774 F.3d 803, 809 (2d Cir. 2014) (affirming the district court's application of certain substantive provisions of Nevada's anti-SLAPP law); see also La Liberte v.

Reid, 966 F.3d 79, 86 n.3 (2d Cir. 2020) (distinguishing between the applicability in federal court of substantive and procedural elements of state anti-SLAPP laws). The only question here is whether § 76-a should be given retroactive effect to this action, which was filed before the amendments took effect but has not yet gone to trial.

Under New York law, statutory amendments are generally "presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated." Matter of Gleason (Michael Vee, Ltd.), 96 N.Y.2d 117, 122 (2001). So-called "remedial legislation," however, "should be given retroactive effect in order to effectuate its beneficial purpose." Id. "Remedial statutes are those designed to correct imperfections in prior law, by generally giving relief to the aggrieved party." Nelson v. HSBC Bank USA, 87 A.D.3d 995, 998 (2d Dep't 2011). "Other factors in the retroactivity analysis include whether the Legislature has made a specific pronouncement about retroactive effect or conveyed a sense of urgency; whether the statute was designed to rewrite an unintended judicial interpretation; and whether the enactment itself reaffirms a legislative judgment about what the law in question should be." Gleason, 96 N.Y.2d at 122.

It is clear that § 76-a is a remedial statute that should be given retroactive effect. The Legislature conveyed a sense of urgency by directing that the amendment was to "take effect immediately." See A.B. 5991-A § 4; see, e.g., Gleason, 96 N.Y.2d at 122. Moreover, the legislative history demonstrates that the amendments to § 76-a were intended to correct the narrow scope of New York's prior anti-SLAPP law. As State Senator Brad Hoylman, the Senate sponsor of the amendments, explained: the prior anti-SLAPP law had been "strictly limited to cases initiated by persons or business entities that are embroiled in controversies over a public application or permit, usually in a real estate development situation." Sponsor Mem. of Sen. Hoylman (July 22, 2020), https://www.nysenate.gov/legislation/bills/2019/s52. "By revising the definition of an 'action involving public petition and participation,' this amendment to Section 76-a will better advance the purposes that the Legislature originally identified in enacting New York's anti-SLAPP law" -- namely, "to provide the utmost protection for the free exercise or speech, petition, and association rights, particularly where such rights are exercised in a public forum with respect to issues of public concern." Id. "These factors together persuade [the Court] that the remedial purpose of the amendment should be effectuated through retroactive application." Gleason, 96 N.Y.2d at 123.

# JA 1914

Plaintiff offers three reasons not to give § 76-a retroactive effect, but none is persuasive. First, plaintiff argues that while "the changes made to Section 70-a appear to be 'remedial' in nature, . . . the changes to Section 76-a are not." Pl. Mem. at 2. For example, plaintiff points out that § 70-a states that it applies to "any person who commenced or continued such action," (emphasis added), whereas § 76-a "contains no such temporal expression." Id. at 4. That § 70-a might also be intended to have retroactive effect, however, does not undermine the clear evidence that the Legislature intended § 76-a to have retroactive effect. Nor is it any surprise that the Legislature did not expressly state that § 76-a would apply to any plaintiff who "continued" such an action; after all, any public figure would have already had to prove actual malice under the federal Constitution.[3]

Next, plaintiff argues that Matter of Regina Metro. Co., LLC v New York State Div. of Hous. & Community Renewal, 35 N.Y.3d 332 (2020), a recent New York Court of Appeals decision, creates a presumption against retroactivity, where, as here, the amendment would "impact substantive rights." Pl. Mem. at 3 (quoting Regina,

---

[3] As the preceding analysis makes clear, the famously "intricate relationship between First Amendment and state libel law," Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 176 (2d Cir. 2000), is especially pronounced where, as here, a state opts to conform aspects of its state law to the First Amendment.

**JA 1915**

35 N.Y.3d at 370). For at least two reasons, however, this argument is unpersuasive. The first is that _Regina_ created no such rule. Instead, the _Regina_ court simply restated well-established New York law: that legislation is typically presumed to apply prospectively but that the presumption could be overcome with "a clear expression of . . . legislative purpose." 35 N.Y.3d at 369 (quoting _Gleason_, 96 N.Y.2d at 36). Nothing in _Regina_ suggests that it is overturning the general rule that remedial legislation, like § 76-a, is presumed to have retroactive effect.[4] Second, even assuming arguendo that _Regina_ did articulate such a rule, § 76-a will not have any meaningful impact on plaintiff's "substantive rights." As already discussed, any public figure seeking to recover damages for defamation would already have had to prove actual malice as a matter of federal law separate and apart from the requirements of New York law.[5]

---

[4]    Indeed, _Regina_ itself recognized that certain portions of the Housing Stability and Tenant Protection Act of 2019 were intended by the Legislature to have retroactive effect, although, as discussed below, it ultimately refused to effectuate that legislative intent on due process grounds. _See_ 35 N.Y.3d at 387.

[5]    To be sure, states are free to subject to the actual malice rule plaintiffs who might otherwise fall outside the reach of the First Amendment. _See, e.g._, _Nelson Auto Center, Inc. v. Multimedia Holdings Corporation_, 951 F.3d 952, 957 (8th Cir. 2020) ("Minnesota is free to categorize corporations as public figures that must prove actual malice even if federal law does not."). Because plaintiff is clearly a public figure under well-established

JA 1916

Finally, plaintiff, again relying on Regina, suggests that applying § 76-a retroactively would "raise a bevy of constitutional concerns," including due process concerns. Pl. Mem. at 4-5. Specifically, plaintiff contends that "the retroactive application of Section 76-a would impose a significant element of proof (actual malice by clear and convincing evidence) upon Plaintiff on a claim based on conduct occurring over three years ago." Id. at 5. Plaintiff is correct, of course, that retroactive legislation could, in certain cases, implicate due process concerns. This, however, is not such a case. As Regina itself recognizes, "due process requires a persuasive reason for the potentially harsh impacts of retroactivity." Regina, 35 N.Y.3d at 375. Here, however, plaintiff fails to identify any "harsh impact" of retroactively applying § 76-a to the instant case.

Regina itself helps prove the point. There, the Court of Appeals held that the retroactive application of certain provisions of the Housing Stability and Tenant Protection Act of 2019 would violate the Due Process Clause. 35 N.Y.3d at 388. Relevant to the court's holding was the fact that the retroactive application of the law would effectively penalize landlords for

federal law, the Court need not and does not address whether § 76-a subjects to New York's actual malice rule a broader collection of plaintiffs than does the First Amendment.

–11–

having disposed of tenant records years earlier, even though doing so at the time was perfectly legal. Id. at 379-80. By contrast, and by virtue of the First Amendment, plaintiff was never entitled to recover monetary damages absent a showing of actual malice.

Put differently, here, unlike the plaintiffs in Regina, plaintiff has not demonstrated any reasonable reliance interest. To the extent plaintiff invokes such a reliance interest, her claim would seem to be that, in first bringing this lawsuit in 2017, she relied on the prospect that the Supreme Court would overturn New York Times Co. v. Sullivan and allow her to recover damages without a showing of actual malice. While courts might, in some contexts, credit the "objectively reasonable reliance on binding appellate precedent," cf. Davis v. United States, 564 U.S. 229, 231 (2011), there is no case law or principle of constitutional adjudication that would credit a litigant's wishful reliance on the prospect that binding appellate precedent will one day be overturned. If anything, the retroactive application of § 76-a will protect the reliance interests of defendants, who published the Editorial in a media landscape long-governed by the actual malice rule, against possible changes of constitutional law at the federal level.

For the foregoing reasons, defendants' motion is granted. The Court holds that N.Y. Civil Rights Law § 76-a, as amended on November 10, 2020, applies to this action and requires plaintiff,

-12-

as a matter of state law, to prove by clear and convincing evidence what she had already been tasked with establishing under the federal Constitution: that defendants made the allegedly defamatory statements in the Editorial "with knowledge of [their] falsity or with reckless disregard of whether [they were] false" -- that is, with actual malice. See § 76-a(2).

The Clerk of the Court is directed to close the entry at docket number 119.

SO ORDERED.

Dated:   New York, NY
         December 29, 2020

_____
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                                  :

SARAH PALIN,                       :     No. 17 Civ. 4853 (JSR)

              Plaintiff,     :

                          :     ECF Case

          -against-         :

                          :

THE NEW YORK TIMES COMPANY and JAMES    :
BENNET,

              Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DEFENDANTS' REPLY MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Jay Ward Brown
David L. Axelrod
Thomas B. Sullivan
Jacquelyn N. Schell
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .......................................................................................... ii

I.     THERE IS NO PROCEDURAL BAR TO DEFENDANTS' MOTION ............................ 1

II.    PALIN IS REQUIRED TO DEMONSTRATE THAT BENNET WAS
AWARE PRIOR TO PUBLICATION THAT THE EDITORIAL COULD
BE READ TO ALLEGE A CAUSAL LINK BETWEEN PALIN, THE MAP
AND THE LOUGHNER SHOOTING AND SHE HAS NOT DONE SO ......................... 5

III.   PALIN CANNOT SHOW THAT BENNET KNEW IT WAS PROBABLY
FALSE TO ASSERT A DIRECT CAUSAL LINK BETWEEN THE MAP
AND THE LOUGHNER SHOOTING ...................................................................... 8

CONCLUSION ..................................................................................................... 10

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                                      **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 244, 248-50, 256-57 (1986) ...........................................................................3, 4

*Biro v. Conde Nast*,
    883 F. Supp. 2d 441, 470 (S.D.N.Y. 2012)..............................................................................6

*Bose Corp. v. Consumers Union*,
    466 U.S. 485, 512-13 (1984) ............................................................................................4, 5, 6

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 324 (1986)..........................................................................................................4

*Cohen v. Equifax Info. Servs., LLC*,
    2019 U.S. Dist. LEXIS 169267, at *6 (S.D.N.Y. Sep. 13, 2019)...........................................3

*Contemporary Mission v. N.Y. Times Co.*,
    842 F.2d 612, 621 (2d Cir. 1988)............................................................................................5

*Corp. Training Unlimited v. NBC*,
    981 F. Supp. 112, 121 (E.D.N.Y. 1997) .................................................................................6

*Davis v. New York*,
    316 F.3d 93, 100 (2d Cir. 2002)..............................................................................................3

*Greene v. Paramount Pictures Corp.*,
    2020 U.S. App. LEXIS 18430, at *5 (2d Cir. Jun. 11, 2020) ..................................................7

*Hernandez v. Sessions*,
    731 F. App'x 51, 55 (2d Cir. 2018) .........................................................................................2

*Kavanagh v. Zwilling*,
    578 F. App'x 24, 25 (2d Cir. 2014) .........................................................................................6

*Markowitz v. Republic Nat'l Bank*,
    651 F.2d 825, 828 (2d Cir. 1981)............................................................................................4

*Masson v. New Yorker Magazine, Inc.*,
    832 F. Supp. 1350, 1361-63 (N.D. Cal. 1993)........................................................................6

*Palin v. N.Y. Times Co.*, 940 F.3d 804, 807-08, 812-16 (2d Cir. 2019) ............................... *passim*

*Schwabenbauer v. Bd. of Educ.*,
    777 F.2d 837, 841-42 (2d Cir. 1985) ......................................................................................2

*Tilton v. Cowles Publ'g Co.*,
  459 P.2d 8, 18-19 (Wash. 1969) ...............................................................6

*Time, Inc. v. Pape*,
  401 U.S. 279, 285, 290-92 (1971) ............................................................6

**Other Authorities**

Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems*
  § 5:5.1[B] (5th ed. 2017)..........................................................................6

M. Franklin & D. Bussel, *The Plaintiff's Burden in Defamation: Awareness and
  Falsity*, 25 Wm. & Mary L. Rev. 825, 835-42 (1984) ..............................6

The evidence adduced during discovery establishes without contradiction that, when James Bennet wrote the passages of the Editorial at issue, he did not intend to draw, and was unaware that his choice of words would be construed as alleging a causal link between the rhetoric of SarahPAC (or Sarah Palin personally) and Jared Loughner's deadly shooting spree. Moreover, the evidence demonstrates that Bennet did not know one way or the other whether such a causal link existed. Bennet has himself so testified twice, and his testimony is corroborated by both his co-workers' testimony and contemporaneous documents.

In the absence of any actual evidence to support her allegations, Palin argues that:

(i)     the Court of Appeals, in reversing this Court's order granting The Times's prior 12(b)(6) motion, held that summary judgment is precluded here and that "law of the case" bars this motion;

(ii)    this Court would make "new law" if it held that Bennet's lack of awareness of defamatory meaning prevents Palin from establishing actual malice; and

(iii)   she has identified sufficient admissible evidence from which a reasonable jury could find that she clearly and convincingly has proved that Bennet wrote the passages in question despite knowledge of their probable falsity.

In so arguing, Palin relies on long-outdated case law, misstates current law, and mischaracterizes the evidence of record. Because Palin cannot meet her burden under the First Amendment and applicable state law of coming forward now with evidence of actual malice that a reasonable jury could find "clear and convincing," defendants' motion should be granted.[1]

## I.    THERE IS NO PROCEDURAL BAR TO DEFENDANTS' MOTION

Palin argues that this motion for summary judgment is barred by the Court of Appeals' ruling in connection with the prior 12(b)(6) motion as "law of the case." Palin is mistaken. The panel itself, while acknowledging the Constitutional issues present in the case, expressly noted

---

[1] Palin does not contest and thus concedes defendants' argument, Dkt. 96 at 12, that the New York and Alaska constitutions and Alaska common law also require her to prove actual malice.

that its sole concern was with "how district courts evaluate pleadings." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 817 (2d Cir. 2019). It ultimately concluded that this Court "erred in relying on facts outside the pleadings to dismiss the complaint" and that the proposed amended complaint "plausibly states a claim for defamation and may proceed to full discovery." *Id.* at 807-08.

Palin claims that the Court of Appeals held "that a summary judgment on actual malice based on Bennet's self-serving testimony would have to be vacated." Dkt. 107 at 5; *see also id.* at 6 (arguing Court of Appeals "already ruled" that "Bennet's testimony about what he supposedly 'knew,' 'recalled,' and 'intended' when he re-wrote the editorial" "does not satisfy Defendants' summary judgment burden"). She bases this contention on a single sentence in which the panel noted that, "[e]ven if the plaintiff had been given notice and the court had explicitly converted the motion to one for summary judgment, we would still have to vacate because the district court's opinion relied on credibility determinations not permissible at any stage before trial." 940 F.3d at 812.

**First**, contrary to Palin's assertion, the sentence in question is not "law of the case" precluding this motion for summary judgment. Palin ignores that the Court of Appeals expressly held that the prior motion had *not* been converted to one for summary judgment. *Id.* Therefore, its discussion of what would have happened if such a conversion had actually occurred was dicta. The law of the case "doctrine does not apply to dicta." *Hernandez v. Sessions*, 731 F. App'x 51, 55 (2d Cir. 2018); *accord Schwabenbauer v. Bd. of Educ.*, 777 F.2d 837, 841-42 (2d Cir. 1985).

**Second**, even if that dicta could otherwise be viewed as a "holding," it would not have the impact Palin attributes to it. On a motion to dismiss, a court is required to assume the truth of the facts alleged in the complaint, and the Court of Appeals did so here: "[G]iven the facts *alleged*," the panel found it plausible that Bennet made the statements with actual malice, and

ruled that this Court could not "anchor[]" its "negative view of the plausibility of Palin's allegations" in its finding that Bennet was a credible witness. 940 F.3d at 815-16 (emphasis added). In its hypothetical discussion of the impact of converting the dismissal motion to one for summary judgment, the panel relied on this same, procedurally required assumption – that Palin's factual *allegations* were true –as Palin herself acknowledges. *See* Dkt. 107 at 7.

Following denial of a motion to dismiss, however, the burden shifts. As the Supreme Court put in the seminal defamation case presenting this question, a party in Palin's current position "may not rest upon mere allegation or denials of h[er] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *accord Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). Moreover, in ruling on summary judgment, a "judge must bear in mind the actual quantum and quality of proof necessary to support liability" and "view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S at 254. Importantly, in the context of this public-figure defamation case, that means the question is "whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." *Id*. at 257; *see id.* at 254 (no genuine issue exists if opposing evidence "is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence").

The parties have now conducted extensive discovery and, as discussed in defendants' opening brief, Dkt. 96 at 21-25, and below, there is no admissible evidence from which a jury could conclude that Palin clearly and convincingly established that Bennet deliberately wrote false facts about her. *See Cohen v. Equifax Info. Servs., LLC*, 2019 U.S. Dist. LEXIS 169267, at *6 (S.D.N.Y. Sep. 13, 2019) (Rakoff, J.); *Anderson*, 477 U.S. at 249-50 ("if the evidence is

merely colorable or is not significantly probative, summary judgment may be granted" (citations

omitted)). In urging otherwise, Palin largely relies on cases decided prior to *Anderson*. Dkt. 107

at 3-4. Following *Anderson*, however, even if this Court were to find that Palin can now provide

evidentiary support for certain of her allegations, her claim must still fail, because they do not

add up to the clear and convincing evidence as required at this stage of the case.

**Third**, the Court of Appeals' observation that credibility determinations are irrelevant at

any stage of proceedings before trial is accurate, but beside the point. On summary judgment, a

court is *not* called upon to make a credibility determination if a witness' testimony is

corroborated and there is no contrary evidence sufficient to overcome the applicable burden of

proof. *See Anderson*, 477 U.S. at 248-49 (requiring "sufficient evidence supporting the claimed

factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the

truth at trial" (citation omitted)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (party

opposing summary judgment must "designate specific facts showing that there is a genuine issue

for trial" (citation omitted)). Indeed, the Supreme Court expressly has rejected Palin's argument,

Dkt. 107 at 16-17, that summary judgment should be denied where the defendant's "state of

mind is at issue and the jury might disbelieve him or his witnesses as to this issue." *Anderson*,

477 U.S. at 256; *accord Markowitz v. Republic Nat'l Bank*, 651 F.2d 825, 828 (2d Cir. 1981)

(plaintiff not entitled to jury trial simply because defendant's state of mind is material element).

A plaintiff therefore cannot "defeat a defendant's properly supported motion for summary

judgment in a . . . libel case" "without offering any concrete evidence from which a reasonable

juror could return a verdict in his favor and by merely asserting that the jury might, and legally

could, disbelieve the defendant's denial . . . of legal malice." *Anderson*, 477 U.S. at 256; *see

also, e.g., Bose Corp. v. Consumers Union*, 466 U.S. 485, 512 (1984) ("discredited testimony is

not [normally] considered a sufficient basis for drawing a contrary conclusion").[2]

For all of these reasons, this motion is not barred on any procedural ground.

## II. PALIN IS REQUIRED TO DEMONSTRATE THAT BENNET WAS AWARE PRIOR TO PUBLICATION THAT THE EDITORIAL COULD BE READ TO ALLEGE A CAUSAL LINK BETWEEN PALIN, THE MAP AND THE LOUGHNER SHOOTING AND SHE HAS NOT DONE SO

Contrary to Palin's contentions, the requirement that a defendant be aware of and intend to communicate a defamatory meaning is part and parcel of the actual malice requirement, and is neither limited to defamation-by-implication cases nor "new law" in this Circuit. (Of course, here, Palin alleges that the challenged statement, which expressly is directed at her PAC, implies that she personally was responsible for the PAC's conduct.) At its core, the actual malice standard is designed to allow public figures to recover damages for defamatory statements only when the defendants make "a *knowing* falsehood or [have] subjective awareness of probable falsity." *Contemporary Mission v. N.Y. Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988) (internal marks and citations omitted). A defendant who misspeaks or fails to understand the import of what he or she has said does not knowingly lie and therefore does not publish with actual malice. *See, e.g.*, *Bose*, 466 U.S. at 512-13 (holding mere use of "malapropism" by someone who "would have to know that the term was inaccurate in context, even though he did not realize his folly at the time," insufficient to establish actual malice, and observing that choice of language

---

[2] Palin contends alternatively that the "awareness" argument specifically is barred because it was previously raised by The Times (although not by Bennet, who was not then a defendant). But neither this Court nor the Second Circuit even purported to address the question of Bennet's lack of awareness of the alleged defamatory meaning of his words. Because neither court addressed this issue, even if Palin were correct that The Times had "raised" the argument in its post-hearing brief on the 12(b)(6) motion, there is no judicial ruling on the issue that this Court is required to follow. Palin asserts that the Court of Appeals addressed the awareness argument by its reference to "an unintended mistake," Dkt. 107 at 8-9, but, as the panel made clear elsewhere in the opinion, it considered the "mistake" to be the inclusion of "erroneous facts about Palin." 940 F.3d at 813; *see id.* at 815 (describing issue as about "a mistake due to a research failure").

JA 1928

"reflecting a misconception . . . does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella"); *Time, Inc. v. Pape*, 401 U.S. 279, 285, 290-92 (1971) (where reporters "admitted an awareness at the time of publication" that they had "significantly altered" the wording of a government document, "but insisted that its real meaning had not been changed," their "arguabl[e] … misconception" and "error of judgment" did not amount to actual malice); Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 5:5.1[B] (5th ed. 2017).

As a matter of logic, it is not surprising that this doctrine often comes into play in cases of defamation by implication, but the principle that a defendant in a public figure defamation case cannot be held liable for unknowingly making a false statement has not been limited to that context. *See Masson v. New Yorker Magazine, Inc.*, 832 F. Supp. 1350, 1361-63 (N.D. Cal. 1993), *aff'd*, 85 F.3d 1394 (9th Cir. 1996); *see also Tilton v. Cowles Publ'g Co.*, 459 P.2d 8, 18-19 (Wash. 1969); Sack § 5:5.1[B]; M. Franklin & D. Bussel, *The Plaintiff's Burden in Defamation: Awareness and Falsity*, 25 Wm. & Mary L. Rev. 825, 835-42 (1984). Nor is this requirement new to this Circuit. In *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 470 (S.D.N.Y. 2012), for example, the court ruled that the meaning ascribed by the plaintiff to certain passages at issue was not actionable because "nothing in the language suggests that Defendants intended or endorsed such far-reaching implications." *See also Kavanagh v. Zwilling*, 578 F. App'x 24, 25 (2d Cir. 2014) (complaint had "fail[ed] to allege that the defendants 'intended or endorsed' the n[eg]ative inference allegedly made in the press release" at issue); *Corp. Training Unlimited v. NBC*, 981 F. Supp. 112, 121 (E.D.N.Y. 1997) (granting summary judgment where there was "no evidence that the NBC employees responsible for the Broadcast were aware of that implication when the Broadcast was aired"). And just last month, the Court of Appeals upheld

summary judgment for the defendants because the plaintiff had failed to "raise a genuine issue of material fact as to whether defendants acted with knowledge or reckless disregard in making defamatory statements 'of and concerning' him" where there was no reason for defendants to think that viewers of the film would perceive a character as depicting the plaintiff. *Greene v. Paramount Pictures Corp.*, 2020 U.S. App. LEXIS 18430, at *5 (2d Cir. Jun. 11, 2020).

Palin is unable to point to any admissible evidence, much less evidence a reasonable jury could find clear and convincing, that Bennet was aware that his choice of words would be interpreted by readers as an allegation that Palin personally, through the Crosshairs Map, caused Loughner to shoot people. Instead, she argues that Bennet's testimony to the contrary should be "disregarded" because it is "self-serving." Dkt. 107 at 14. But Bennet's testimony is directly corroborated by the admissible evidence: Among other things, a contemporaneous email exchange between Bennet and Ross Douthat (in which Douthat first drew Bennet's attention to the alternative meaning of his words) corroborates Bennet's testimony that he did not intend that meaning. RSUMF ¶¶ 80-82; *see also* RSUMF ¶¶ 83-93.

To try to manufacture a factual dispute about Bennet's lack of awareness, Palin mischaracterizes the evidence and relies on irrelevancies. Most significantly, she repeatedly suggests that Bennet and Cohn testified they understood "incitement" as used by Bennet to mean a direct call to violence, but their deposition testimony in fact is the opposite. *See* RSUMF ¶¶ 83, 89. While Palin is correct that Bennet believed Williamson's draft needed revision and that he wanted to use a strong word for the concept he was describing, RSUMF ¶¶ 56-59, neither is relevant to whether he was aware readers would attach a different meaning to his words than he intended. Simply put, there is no evidence in the record from which a jury could find that Palin has clearly and convincingly established that Bennet was aware his words would be read as

7

accusing Palin of directly causing the Loughner Shooting. Defendants are entitled to summary judgment on this ground alone.

## III. PALIN CANNOT SHOW THAT BENNET KNEW IT WAS PROBABLY FALSE TO ASSERT A DIRECT CAUSAL LINK BETWEEN THE MAP AND THE LOUGHNER SHOOTING

Separately, as defendants established in their opening brief, Palin is unable to show that Bennet knew, at the time of publication, that there was no causal link between SarahPAC's rhetoric and the Loughner Shooting. *See* Dkt. 96 at 20-25. Notably, Palin does not address or attempt to explain her admission at her deposition that there was, at the time, no consensus about whether such a link existed. *See* Dkt. 96 at 21; RSUMF ¶ 154. This alone prevents her from establishing with convincing clarity that Bennet knew his words were probably false.

While a defendant cannot automatically ensure summary judgment through testimony that he lacked knowledge of falsity, a defendant's testimony to that effect also is not automatically disregarded. And defendants do not rely solely on Bennet's testimony – it is supported by the testimony of numerous other witnesses and contemporaneous documentary evidence chronicling the drafting process and defendants' actions immediately in the wake of publication. Palin was required now to put up sufficient evidence to show this Court that, at trial, she could meet her burden of clear and convincing proof of actual malice. She did not.

The supposed "facts" to which Palin points as establishing actual malice are unsupported by admissible evidence – indeed, many are bald misstatements of the record. For example, Palin asserts that Williamson was instructed before producing her first draft of the Editorial to research whether there was a link between the Crosshairs Map and the Loughner Shooting and that, in revising her draft, Bennet disregarded the results of her research. *See* Dkt. 107 at 18, 20. There is no evidence to support these assertions. Rather, the evidence is that, while Williamson was writing, she familiarized herself with the Loughner Shooting, but she testified she does not recall

reading any source discussing whether a link existed between the Map and that crime.  *See*

RSUMF ¶¶ 25, 42-43.  Separately, Bennet asked for research to determine if The Times's *own*

Editorial Board had previously written anything connecting the Loughner Shooting to incitement

– it had not – because he wanted to ensure the new editorial was in sync with any prior Board

position.  *Id.* ¶¶ 29, 34.  Palin conflates these two strands of testimony into a fiction.

> With respect to those allegations on which the Court of Appeals based its decision, Palin

does not seriously contest that she has been unable to support them with admissible evidence.[3]

Before the Court of Appeals, Palin alleged that Bennet was "responsible for the content of,

reviewed, edited and approved the publication of numerous articles" in *The Atlantic* magazine,

which the panel found permitted an inference "that one who had risen to editor-in-chief at *The*

*Atlantic* knew their content and thus that there was no connection between Palin and the

Loughner shooting."  940 F.3d at 813-14.  However, the record now clearly establishes that

Bennet was not responsible for editing any of these articles – they were each published by sister

publications over which he exercised no editorial supervision.  Dkt. 96 at 22-23.  Palin now

makes the very different argument that Bennet should be deemed to have actual malice because

he testified that he regularly read The Times and The Atlantic's website and therefore must have

read some articles about the Loughner Shooting, despite his testimony that he does not recall

reading any of the articles on which Palin relies.  *See* Dkt. 107 at 18.  If a general interest in the

news of the day is a sufficient basis on which to charge a defendant with knowledge of all facts

reported in the media, the actual malice rule would be a nullity.

---

[3] The only new evidence Palin cites is a proposal for an article sent to Bennet immediately after the Loughner Shooting that included a link to another article.  Dkt. 107 at 18.  Bennet, however, testified that he received many such pitches and his practice was to forward them to another editor for consideration.  RSUMF ¶ 267.

**JA 1932**

The Court of Appeals also found plausible support for actual malice in Palin's allegations that "Bennet had a personal connection to a potential shooting that animated his hostility to pro-gun positions at the time of the Loughner shooting in 2011." 940 F.3d at 814. Palin fails to acknowledge that *not a single document nor a word of testimony* supports her speculation. *See* Dkt. 96 at 23-25. Moreover, the panel found that these allegations were relevant only because they created a "plausible inference" that Bennet would be aware of articles "published on his watch relating to the Loughner shooting." 940 F.3d at 814. As discussed above, however, no such articles were in fact "published on his watch." Palin instead falls back on an argument that Bennet was biased against her for political reasons. As the panel noted in the appeal in this case, however, "political opposition alone does not constitute actual malice." *Id.*[4]

Finally, the Court of Appeals also agreed that The Times's swift correction of the Editorial plausibly supported actual malice if it "was issued after a calculus that standing by the editorial was not worth the cost of the public backlash." 940 F.3d at 815. Palin points to no evidence in the record suggesting that The Times made such a calculation. Instead, the evidence confirms that, after Bennet was first alerted by a colleague to a potential issue approximately an hour after the Editorial was published, he began working that same night to determine if a mistake had been made. RSUMF ¶¶ 73, 80, 99. Palin accordingly has failed to meet her burden.

## CONCLUSION

Defendants respectfully request that the Court grant their motion for summary judgment.

---

[4] Additionally, the undisputed evidence demonstrates that Bennet did not willfully disregard the hyperlink contained in the Editorial—he did not read the linked article because he was writing on deadline. RSUMF ¶¶ 69, 71. Williamson did not recall reading the portion of the linked article regarding the existence of a causal connection between the shooting and the Map. *Id.* ¶ 41. Moreover, even if he had read the linked article, because he did not intend to suggest a causal connection, the article would not have put him on notice that the Editorial contained an "error."

Case 1:17-cv-04853-JSR Document 123-22 Filed 03/17/20 Page 13 of 15

Dated:  New York, New York
   July 17, 2020

Respectfully submitted,

BALLARD SPAHR LLP

By: _/s/ Jay Ward Brown_____
  Jay Ward Brown
  David L. Axelrod
  Thomas B. Sullivan
  Jacquelyn N. Schell
1675 Broadway, 19th Floor
New York, NY 10019-5820
Phone: (212) 223-0200
Fax: (212) 223-1942
brownjay@ballardspahr.com
axelrodd@ballardspahr.com
sullivant@ballardspahr.com
schellj@ballardspahr.com
*Counsel for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SARAH PALIN, an individual, | No. 17 Civ. 4853 |
| Plaintiff, | |
| – against – | Hon. Jed S. Rakoff |
| THE NEW YORK TIMES COMPANY, a New York corporation, | ECF Case |
| Defendant. | |

## PLAINTIFF'S PROPOSED VOIR DIRE REQUESTS[1]

TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone: (813) 443-2199
Facsimile: (813) 443-2193

and

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY 10017
Telephone: (212) 907-7300
Facsimile: (212) 754-0330
Facsimile: (212) 754-0330

*Attorneys for Plaintiff Sarah Palin*

---

[1] These proposed instructions are filed with full reservation of all prior arguments and objections related to the issues of damages and actual malice and all arguments and objections asserted in pending court filings and the Joint Pretrial Order. Plaintiff respectfully requests leave to amend, modify or add to these instructions based on rulings the Court makes on pending motions.

JA 1935

## PROPOSED QUESTIONS

1. Do you have any opinions about Gov. Sarah Palin?

2. Do you have any opinions about the New York Times?

3. Do you have any opinions about the media?

4. Do you subscribe to any news websites or apps?

5. Where do you typically get your news?

6. Have you ever posted any comments about Sarah Palin on social media?

7. Have you, any of your family members, or anyone close to you ever been the victim of gun violence?

8. Do you have any opinions about the Second Amendment or Gun Control?

9. Do you know anything about or did you follow the Jared Loughner shooting incident in 2011 in Arizona?

10. Do you belong to any political organizations or special interest groups? If so, which ones?

11. Have you ever donated money to any political organizations or special interest groups? If so, which ones?

12. Do you have any opinions about civil lawsuits?

13. Have you or has anyone close to you ever been a plaintiff or defendant in a civil lawsuit? If so, what kind of case?

14. Do you have any opinions about damages awards in civil lawsuits?

15. Have you followed any recent high profile court cases closely?

16. Do you have any opinions about defamation (libel or slander)?

/s/ Shane B. Vogt
Kenneth G. Turkel (admitted *pro hac vice*)
Email: kturkel@tcb-law.com
Shane B. Vogt (admitted *pro hac vice*)
Email: svogt@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone: (813) 834-9191
Facsimile: (813) 443-2193

Michael M. Munoz
E-mail: mmunoz@golenbock.com
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
711 Third Avenue
New York, NY 10017
Telephone: (212) 907-7300
Facsimile: (212) 754-0330

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Plaintiff's Proposed Voir Dire Questions was filed electronically on the 20th day of January, 2022. Notice of this filing will be sent by operation of the Court's electronic filing system to counsel of record for all parties as indicated on the electronic filing receipt. Parties and their counsel may access this filing through the Court's system.

I FURTHER CERTIFY that the foregoing Plaintiff's Proposed Voir Dire Questions were served electronically via e-mail on the 19th day of January, 2022, to:

Thomas B. Sullivan
Jacquelyn N. Schell
Ballard Spahr LLP
1675 Broadway, 19th Floor
New York, NY 10019
sullivant@ballardspahr.com
schellj@ballardspahr.com
*Attorneys for The New York Times Company*

David L. Axelrod
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
axelrodd@ballardspahr.com
*Attorneys for The New York Times Company*

/s/ Shane B. Vogt
Attorney

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SARAH PALIN,

      Plaintiff,

      -v-

THE NEW YORK TIMES COMPANY and
JAMES BENNET,

      Defendants.

17-cv-4853 (JSR)

<u>THE COURT'S INSTRUCTIONS OF LAW TO THE JURY</u>

Case 1:17-cv-04853-JSR Document 68 09/30/2022 Filed 02/14/22 Page 45 of 284
**JA 1938**
Case 1:17-cv-04853-JSR Document 68 09/30/2022 Filed 02/14/22 Page 2 of 24

I.      GENERAL INSTRUCTIONS

1. Duty of the Court

2. Duty of the Jury

3. Duty of Impartiality

4. Burden of Proof

5. Direct and Circumstantial Evidence

6. Witness Credibility

7. Depositions and Remote Testimony

8. Corporations and Employer Liability

II.     LIABILITY

9. Defamation in General

10. First Element – Defamatory Meaning

11. Second Element – Of and Concerning the Plaintiff

12. Third Element – Material Falsity

13. Fourth Element – Actual Malice

III.    DAMAGES

14. Compensatory and Nominal Damages

IV.     CONCLUDING INSTRUCTIONS

15. Selection of Foreperson; Right to See Exhibits and Hear Testimony; Communications with the Court

16. Verdict; Need for Unanimity; Duty to Consult

Case 1:17-cv-04853-JSR Document 62 09/30/2022 Filed 02/14/22 Page 6 of 384
Case 1:17-cv-04853-JSR Document 62 09/30/2022 Filed 02/14/22 Page 3 of 24
**JA 1939**

## I.  **GENERAL INSTRUCTIONS**

### INSTRUCTION NO. 1

### Duty of the Court

We are now approaching the most important part of this case, your deliberations. You have heard all the evidence in the case, as well as the final arguments of the lawyers for the parties. Before you retire to deliberate, it is my duty to instruct you as to the law that will govern your deliberations. These are the final and binding instructions, which entirely replace the preliminary instructions I gave you after opening statements, which you should now discard.

Regardless of any opinion that you may have as to what the law may be or ought to be, it is your sworn duty to follow the law as I give it to you. Also, if any attorney or other person has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

Because my instructions cover many points, I have provided each of you with a copy of them not only so that you can follow them as I read them to you now but also so that you can have them with you for reference throughout your deliberations. In listening to them now and reviewing them later, you should not single out any particular instruction as alone stating the law, but you should instead consider my instructions as a whole.

INSTRUCTION NO. 2

Duty of the Jury


Your duty is to decide the fact issues in the case and arrive, if you can, at a verdict. You, the members of the jury, are the sole and exclusive judges of the facts. You pass upon the weight of the evidence; you determine the credibility of the witnesses; you resolve such conflicts as there may be in the testimony; and you draw whatever reasonable inferences you decide to draw from the facts as you determine them.

In determining the facts, you must rely upon your own recollection of the evidence. To aid your recollection, we will send you at the start of your deliberations a computerized and indexed version of all the exhibits. If you need to review particular items of testimony, we can also arrange to provide them to you in a computerized form that you can access.

Please remember that none of what the lawyers have said in their opening statements, in their closing arguments, in their objections, or in their questions, is evidence. Nor is anything I may have said evidence. The evidence before you consists of just three things: the testimony given by witnesses that was received in evidence, the exhibits that were received in evidence, and a few stipulations of the parties as to matters in evidence.

Testimony consists of the answers that were given by the witnesses to the questions that were permitted to be asked, either here in court, remotely by video, or in the depositions that were read into evidence. Please remember that questions, although they may provide the context for answers, are not themselves evidence; only answers are evidence, and you should therefore disregard any question to which I sustained an objection. Also, you may not consider any answer that I directed you to disregard or that I directed be stricken from the record. Likewise, you may not consider anything you heard about the contents of any exhibit that was not received in

- 4 -

evidence. Be careful not to speculate about matters not in evidence; your focus should be solely on the evidence that was presented here in Court.

It is the duty of the attorney for each side of a case to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible. Counsel also have the right and duty to ask the Court to make rulings of law and to request conferences out of the hearing of the jury. All such questions of law must be decided by me. You should not show any prejudice against any attorney or party because the attorney objected to the admissibility of evidence, asked for a conference out of the hearing of the jury, or asked me for a ruling on the law.

Finally, I ask you to draw no inference from my rulings or from the fact that on occasion I asked questions of certain witnesses. My rulings were no more than applications of the law and my questions were only intended for clarification or to expedite matters. You should understand that I have no opinion as to the verdict you should render in this case.

INSTRUCTION NO. 3

Duty of Impartiality

You are to perform your duty of finding the facts without bias or prejudice or sympathy or hostility or any preconception whatsoever as to any party, for all parties are equal under the law. You are to perform your final duty in an attitude of complete fairness and impartiality. You are not to be swayed by rhetoric or emotional appeals. It must be clear to you that if you were to let extraneous considerations interfere with your thinking, there would be a risk that you would not arrive at a true and just verdict. So do not be guided by anything except clear thinking and calm analysis of the evidence.

# INSTRUCTION NO. 4

## Burden of Proof

As you know, this is a civil case. In order to prevail in a civil case, a party who is making a claim against another party has what we call the "burden of proof," which is the burden of establishing each of the essential elements of the claim. Here, the plaintiff, Sarah Palin, is making a single claim of libel against two defendants, James Bennet and The New York Times Company, who, the parties agree, are to be considered jointly. I will describe the four essential elements of that claim shortly, but for now please note that for the first two elements of her libel claim, the plaintiff must establish each element by what is called the "preponderance" of the credible evidence, but that with respect to the final two elements of her libel claim, the plaintiff must establish those elements by "clear and convincing evidence."

To establish an element of a claim by the "preponderance" of the credible evidence means to prove that the element is more likely true than not true. To establish an element by "clear and convincing evidence" means to prove that the element is highly probable. In either case, the burden of proof refers to the quality of the evidence, its persuasiveness in convincing you of its truth.

INSTRUCTION NO. 5

Direct and Circumstantial Evidence

In deciding whether a party meets its burden of proof, you may consider both direct evidence and circumstantial evidence.

Direct evidence is evidence that proves a fact directly. For example, where a witness testifies to what he or she saw, heard, or observed, that is called direct evidence.

Circumstantial evidence is evidence that tends to prove a fact by proof of other facts. To give a simple example, suppose that when you came into the courthouse today the sun was shining and it was a nice day, but the courtroom blinds were drawn and you could not look outside. Later, as you were sitting here, someone walked in with a dripping wet umbrella, and, soon after, somebody else walked in with a dripping wet raincoat. Now, on our assumed facts, you cannot look outside of the courtroom and you cannot see whether it is raining. So you have no direct evidence of that fact. But on the combination of the facts about the umbrella and the raincoat, it would be reasonable for you to infer that it had begun raining.

That is all there is to circumstantial evidence. Using your reason and experience, you infer from established facts the existence or the nonexistence of some other fact. Please note, however, it is not a matter of speculation or guess; it is a matter of logical inference.

The law makes no distinction between direct and circumstantial evidence. Circumstantial evidence is of no less value than direct evidence, and you may consider either or both, and may give them such weight as you conclude is warranted.

- 8 -

Case 1:17-cv-05248-JSR Document 262-2 Filed 02/14/22 Page 8 of 24
Case 1:17-cv-05248-JSR Document 262 Filed 08/30/2022 Page 52 of 284
**JA 1945**

INSTRUCTION NO. 6

Witness Credibility

It must be clear to you by now that counsel for the opposing parties are asking you to draw very different conclusions about various factual issues in the case. An important part of that decision will involve making judgments about the testimony of the witnesses you have listened to and observed. In making these judgments, you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence that may help you to decide the truth and the importance of each witness's testimony.

Your decision to believe or to not believe a witness may depend on how that witness impressed you. How did the witness appear to you? Was the witness candid, frank, and forthright, or did the witness seem to be evasive or suspect in some way? How did the way the witness testified on direct examination compare with how the witness testified on cross-examination? Was the witness consistent, or contradictory? Did the witness appear to know what he or she was talking about? Did the witness strike you as someone who was trying to report his or her knowledge accurately? These are examples of the kinds of common-sense questions you should ask yourselves in deciding whether a witness is or is not truthful.

How much you choose to believe a witness may also be influenced by the witness's bias. Does the witness have a relationship with any of the parties that may affect how he or she testified? Does the witness have some interest, incentive, loyalty, or motive that might cause him or her to shade the truth? Does the witness have some bias, prejudice, or hostility that may cause the witness to give you something other than a completely accurate account of the facts he or she testified to?

You should also consider whether the witness had an opportunity to observe the facts he or she testified about, and whether the witness's recollection of the facts stands up in light of the other evidence in the case.

In other words, what you must try to do in deciding credibility is to size up a person just as you would in any important matter where you are trying to decide if a person is truthful, straightforward, and accurate in his or her recollection.

INSTRUCTION NO. 7

Depositions and Remote Testimony

Some of the testimony before you is in the form of a videotaped deposition that was received in evidence. A deposition is simply a procedure where prior to trial the attorneys may question a witness or an adversary party under oath before a court stenographer. You may consider the testimony of a witness given at a deposition according to the same standards you would use to evaluate the testimony of a witness given live at trial.

In addition, one witness testified remotely by video conference, as a consequence of the courthouse's COVID-19 protocols. You should consider this testimony according to the same standards you use to evaluate the testimony of the witnesses who testified here in the courtroom.

INSTRUCTION NO. 8

Corporations and Employer Liability

In this case, one of the defendants, the New York Times Company, is a corporation. The mere fact that one of the defendants is a corporation does not mean it is entitled to any lesser consideration by you. All litigants are equal before the law, and corporations, big or small, are entitled to the same fair consideration as you would give any other individual party.

Obviously, a corporation has no capacity to "think" or act except through its officers, employees, and other agents, and whether a corporation "knows," "intends," states, or does something is therefore a function of what the corporate officers, corporate employees, and other corporate agents know, intend, state, and do.

In this case, the parties agree that the relevant thoughts, actions and intentions are those of Mr. Bennet, which are then imputed to The New York Times Company as a matter of law. As a result, Mr. Bennet's thoughts, actions, and intentions apply equally to both defendants.

## II.   **LIABILITY**

### INSTRUCTION NO. 9

### Libel in General

Applying the general principles that I have just discussed, you must now determine, in accordance with my instructions, whether the plaintiff has established her libel claim against the defendants. This is called "proving liability." For the reasons just discussed, if you find Mr. Bennet liable, you must find The New York Times Company liable. And if you find Mr. Bennet not-liable, you must also find The New York Times Company not-liable.

Ms. Palin's claim is for the wrong known as libel. A libel is a false statement about a person, in writing, that tends to expose the person to contempt, ridicule, disgrace, or public hatred.

As you know, the plaintiff, Sarah Palin, claims she was libeled by certain statements largely drafted by defendant James Bennet that appeared in a New York Times editorial entitled "America's Lethal Politics," that was published following the June 14, 2017 shooting of Congressman Steve Scalise. The editorial was published online by co-defendant the New York Times Company on the evening of June 14, 2017 and appeared in the print newspaper the following day. The portions of the editorial of which the plaintiff complains were part of two paragraphs that read:

> *In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.*

> *Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask for the right.*

- 13 -

Here, the plaintiff argues that she was libeled by what she takes to be the assertion in the first paragraph that her political action committee's circulation of the so-called cross hairs map was clearly linked to political incitement of the 2011 shooting by Mr. Loughner of Ms. Giffords and others. Similarly, the plaintiff argues that she was further libeled by what she takes to be the assertion in the second paragraph that this link was "direct." I will refer to these two statements as the "challenged statements."

To establish her claim of libel, the plaintiff must prove to you the following four essential elements, with respect to either or both of the challenged statements:

> (1) That the challenged statement you are considering was, in the context of the editorial as a whole, reasonably understood by the ordinary reader to be defamatory, meaning that it tended to injure the plaintiff's reputation by exposing her to ridicule, disgrace, contempt, or public hatred;

> (2) That the challenged statement you are considering would reasonably be taken by the ordinary reader to refer to the plaintiff personally;

> (3) That the challenged statement you are considering was materially false, meaning that it was substantially untrue; and

> (4) That the defendants published the challenged statement you are considering with what is called "actual malice," a legal term that I will explain to you shortly.

In order to establish her claim, the plaintiff must prove the first two of these elements by a preponderance of the credible evidence, and she must prove the final two elements by clear and convincing evidence. Also, to find the defendants liable, you must be unanimously agreed that at least one of the two challenged statements meets all four of these required elements.

I will now describe each of these four essential elements in more detail.

### INSTRUCTION NO. 10

#### First Element – Defamatory Meaning

The first question for you to decide is whether the plaintiff has proved that the ordinary reader of whichever of the two challenged statements you are considering would understand that statement, in the context of the editorial as a whole, to be defamatory. Overall, plaintiff claims that the challenged statements communicated to readers that Ms. Palin was clearly and directly responsible for helping to incite the January 2011 shootings by Mr. Loughner.

The plaintiff must prove this element by a preponderance of the evidence.

A statement is defamatory if it tends to expose the plaintiff to public hatred, contempt, ridicule or disgrace—that is, if it would tend to lead the average person in the community to form an evil or bad opinion of the plaintiff; or if it tends to discredit the plaintiff in the conduct of her occupation, profession, trade or office; or if it charges the plaintiff with a serious crime.

Not every unpleasant or uncomplimentary statement is defamatory. A statement that is merely unpleasant, offensive or embarrassing, or that hurts the plaintiff's feelings, is not necessarily defamatory. Because language often has different meanings, the law imposes upon the plaintiff the burden of proving that the statement about which plaintiff complains would in fact be understood by the ordinary reader as defamatory.

In focusing on one or the other of the two challenged statements, you should consider the statement in the context of the editorial as a whole, not just in isolation, and you should not impose an unfair or forced construction on the words used or take any word, phrase, or sentence out of context.

If you find that the plaintiff has proved that one or both of the challenged statements in the editorial would tend to expose the plaintiff to hatred, contempt, ridicule or disgrace in the mind of

- 15 -

the ordinary reader of the statements, then you must find that the statement is defamatory and proceed to consider the remaining essential elements. But if you find that the plaintiff has not proved that either of the statements are defamatory, then you need go no further and must find the defendants not-liable.

## INSTRUCTION NO. 11

### Second Element – Of and Concerning the Plaintiff

The second element that the plaintiff must prove is that the given challenged statement you are considering was "of and concerning" Ms. Palin. In other words, Ms. Palin must prove that the ordinary reader of the editorial would reasonably have understood the challenged statement to refer to her personally.

The plaintiff must prove this element of her claim by a preponderance of the evidence.

The first challenged statement in the editorial states, among other things, that "Sarah Palin's political action committee circulated a map of targeted electoral districts," and the second challenged statement implicitly refers back to the same map. The plaintiff contends that this reference would be commonly understood by the ordinary reader to refer to Ms. Palin personally. By contrast, defendants argue that the editorial referred only to Ms. Palin's political action committee, SarahPAC, which the ordinary reader would understand is a distinct entity from Ms. Palin.

If you find that the plaintiff has proved that one or both of the challenged statements would be commonly understood by the ordinary reader to refer to Ms. Palin personally, then you must consider the remaining elements of her case. But if you find that the statements would not be commonly understood by the ordinary reader to refer to Ms. Palin personally, then you need proceed no further and must find the defendants not-liable.

INSTRUCTION NO. 12

Third Element – Material Falsity

The third element that the plaintiff must prove is that the challenged statement you are considering was in fact false.

Please note that the plaintiff must prove this element by clear and convincing evidence, that is, the plaintiff must prove that it is highly probable that the statement was false.

A statement is false if it is not substantially true. Minor inaccuracies in the statement may be disregarded in determining whether a statement is false.

You will determine from the evidence presented what the truth was and then compare that with the challenged statements in the editorial, taking the challenged statements according to the ordinary meaning of the words and considering the context in which those words appear and in the editorial as a whole.

If you find by clear and convincing evidence that one or both of the challenged statements were false, then you must proceed to consider the other elements of the plaintiff's case. But if you find that neither of the challenged statements was false, then you do not need to proceed further and must find the defendants not-liable.

INSTRUCTION NO. 13

Fourth Element – Actual Malice

The fourth element that the plaintiff must prove is called "actual malice," a legal term that concerns the defendants' state of mind, and specifically Mr. Bennet's state of mind, at the time the editorial was published. There are two aspects of actual malice, both of which the plaintiff must prove by clear and convincing evidence, that is they must be proved to be highly probable.

The first aspect of "actual malice" you must decide is whether, at the time the editorial was published, Mr. Bennet, and therefore The New York Times Company, (i) knew that either or both of the allegedly defamatory statements he had drafted were in fact false; or that, at a minimum, (ii) he consciously chose to recklessly disregard the high probability that they were false.

In considering Mr. Bennet's state of mind, you should consider all the evidence, including relevant inferences to be drawn therefrom. But also keep in mind that the plaintiff must prove what was in Mr. Bennet's mind by clear and convincing evidence. For example, with regard to "reckless disregard," it is not enough just to show that Mr. Bennet did not know, one way or the other, whether the challenged statement you are considering was true or false. Nor is it enough to prove that he was merely negligent regarding that statement's truth or falsity. For instance, a failure to sufficiently investigate or to research a particular point does not establish actual malice, unless the plaintiff has demonstrated that such inaction was a conscious, deliberate attempt to avoid confirming the statements' probable falsity. Even irresponsible reporting or a demonstrated failure to follow professional, journalistic standards does not, on its own, establish actual malice, unless the plaintiff has proved that there was a high probability that Mr. Bennet actually doubted the truth of the challenged statement you are considering and, nevertheless, consciously chose to disregard the high probability that the statement was false.

- 19 -

The second aspect of "actual malice" that you must decide is whether the plaintiff has proved by clear and convincing evidence that, if Mr. Bennet believed the challenged statement you are considering was false, he also either (i) intended that the statement to defame Ms. Palin, or (ii) acted in reckless disregard of whether the statement would defame Ms. Palin. As previously noted, "reckless disregard" is only satisfied if the plaintiff has proved that there was a high probability that Mr. Bennet had a high degree of awareness that ordinary readers would understand the challenged statements to convey that Ms. Palin bore clear or direct responsibility for causing Loughner to commit the Arizona shooting and proceeded to publish anyway.

If you find that the plaintiff has proved, by clear and convincing evidence, both of the two requirements of actual malice as to the challenged statement you are considering, then you must proceed to the issue of damages. But if you find that the plaintiff has failed to prove either or both of the requirements of actual malice as to the challenged statement you are considering, you must find the defendants not-liable

## III.   **DAMAGES**

### INSTRUCTION NO. 14

Compensatory and Nominal Damages

If you find that the plaintiff has proved all four essential elements of her libel claim as to one or both of the challenged statements, then you must determine the sum of money that must be paid by the defendants to the plaintiff as a result.  These sums of money are called "damages," and the plaintiff bears the burden of proving the amount of her damages by a preponderance of the credible evidence.

Ms. Palin does not claim that she suffered any financial injury from the alleged libel, but she claims that she suffered reputational harm and the like. If you find that she has proved her claim of libel, you must then determine the amount of money (called "compensatory damages") that, in the exercise of your good judgment and common sense, you decide is fair and just compensation for the injury, if any, to the plaintiff's reputation and the humiliation and mental anguish in her public and private life that you find was caused by the challenged statement or statements that you determine constituted libel.

In fixing that amount, you should consider the plaintiff's standing in the community, the extent to which the challenged statements were circulated, the tendency of the challenged statements to injure a person such as Ms. Palin, and all of the other facts and circumstances in the case. These damages cannot be proved with mathematical accuracy. Fair compensation may vary, ranging from very little to a substantial sum.

In determining damages, you may not consider any injury to, or feelings of, her family, friends, business associates or relatives. It is only Ms. Palin's own injury, personal to her reputation, that may be compensated. Nor may you award damages for any damages the plaintiff

may have suffered to her reputation as a result of any other statements, articles, or publications made before or after the editorial at issue in this case, whether published by The New York Times Company or by another source.

If you find that the plaintiff has proved all four of the essential elements of her libel claim (that is, has proved liability) but has failed to prove any actual damages whatsoever, you must nevertheless award her the sum of one dollar. Such an award is called "nominal damages," and it is intended to confirm your judgment that, even if no damages were proved, liability was found.

## IV. CONCLUDING INSTRUCTIONS

### INSTRUCTION NO. 15

#### Selection of Foreperson; Right to See Exhibits and Hear Testimony; Communications with the Court

You will shortly retire to the jury room to begin your deliberations. As soon as you get to the jury room, please select one of your number as the foreperson, to preside over your deliberations and to serve as your spokesperson if you need to communicate with the Court.

You will be bringing with you into the jury room a copy of my instructions of law and a verdict form on which to record your verdict. In addition, we will send into the jury room a computerized and indexed version of all the exhibits that were admitted into evidence. If you want any of the testimony, that can also be provided in computerized form. But please remember that it is not always easy to locate what you might want, so be as specific as you possibly can be in requesting portions of testimony.

Any of your requests, in fact any communication with the Court, should be made to me in writing, signed by your foreperson, and given to the marshal, who will be available outside the jury room throughout your deliberations. After consulting with counsel, I will respond to any question or request you have as promptly as possible, either in writing or by having you return to the courtroom so that I can speak with you in person.

INSTRUCTION NO. 16

Verdict; Need for Unanimity; Duty to Consult

You should not, however, tell me or anyone else how the jury stands on any issue until you have reached your verdict and recorded it on your verdict form.

Each of you must decide the case for yourself, after consideration, with your fellow jurors, of the evidence in the case, and your verdict must be unanimous. In deliberating, bear in mind that while each juror is entitled to his or her opinion, you should exchange views with your fellow jurors. That is the very purpose of jury deliberation — to discuss and consider the evidence; to listen to the arguments of fellow jurors; to present your individual views; to consult with one another; and to reach a verdict based solely and wholly on the evidence.

If, after carefully considering all the evidence and the arguments of your fellow jurors, you entertain a conscientious view that differs from the others', you are not to yield your view simply because you are outnumbered. On the other hand, you should not hesitate to change or modify an earlier opinion that, after discussion with your fellow jurors, now appears to you erroneous.

In short, your verdict must reflect your individual views and it must also be unanimous.

This completes my instructions of law.

- 24 -

**JA 1961**

| | |
|---|---|
| **From:** | NYSD_ECF_Pool@nysd.uscourts.gov |
| **To:** | CourtMail@nysd.uscourts.gov |
| **Subject:** | Activity in Case 1:17-cv-04853-JSR Palin v. The New York Times Company Judgment |
| **Date:** | Tuesday, February 15, 2022 4:54:13 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* There is no charge for viewing opinions.**

## U.S. District Court

### Southern District of New York

## Notice of Electronic Filing

The following transaction was entered on 2/15/2022 at 4:53 PM EST and filed on 2/15/2022
**Case Name:**      Palin v. The New York Times Company
**Case Number:**    1:17-cv-04853-JSR
**Filer:**
**Document Number:** 171

**Docket Text:**
**FINAL JUDGMENT: In view of the jury having returned a verdict of not-liable, and independently, for the reasons stated by the Court previously in granting Defendants' Rule 50 motion, final judgment is hereby entered dismissing the complaint with prejudice. ADJUDGED AND DECREED. (Signed by Judge Jed S. Rakoff on 2/15/2022) (kv)**

**1:17-cv-04853-JSR Notice has been electronically mailed to:**

Jay Ward Brown      brownjay@ballardspahr.com, LitDocket_East@ballardspahr.com

David A. Schulz      schulzd@ballardspahr.com, LitDocket_East@ballardspahr.com, appell@ballardspahr.com

Michael McGee Munoz      mmunoz@golenbock.com, courtnotifications@golenbock.com

Thomas Byrne Sullivan      sullivant@ballardspahr.com, LitDocket_East@ballardspahr.com, appell@ballardspahr.com, baileys@ballardspahr.com, relyear@ballardspahr.com

Jacquelyn Nicole Schell      schellj@ballardspahr.com, LitDocket_East@ballardspahr.com, appell@ballardspahr.com

Kenneth G. Turkel      kturkel@tcb-law.com, garnold@tcb-law.com, lharm@tcb-law.com, lmeriwether@tcb-law.com

Shane B. Vogt      svogt@tcb-law.com, garnold@tcb-law.com, lmeriwether@tcb-law.com

JA 1962

David L. Axelrod    axelrodd@ballardspahr.com

**1:17-cv-04853-JSR Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=2/15/2022] [FileNumber=27250730-0] [001ad0ab4c8c4f51b0f946a87f277a5979c9bf8f4ea47389388a76a1b786838948c08a3b29207c6a141cc634001e90a1807fb3f90076b915ef470781dc19a3ab]]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - -
SARAH PALIN,

          Plaintiff,                        17-cv-4853 (JSR)

     -v-                                     OPINION

THE NEW YORK TIMES COMPANY
and JAMES BENNET,

          Defendants.
- - - - - - - - - - - - - - - - - - - -
```

JED S. RAKOFF, U.S.D.J.:

At trial, plaintiff Sarah Palin wholly failed to prove her case even to the minimum standard required by law. Accordingly, defendants the New York Times Company (the "Times") and James Bennet moved to dismiss the case prior to the start of jury deliberations. After hearing extensive argument, the Court granted the motion shortly after the jury had begun its deliberations. This Opinion sets forth the reasons for that decision, as well as the reasons for how the Court then dealt with the deliberating jury.

By way of background, on June 14, 2017, defendant Times published an editorial, approved and materially revised by co-defendant Bennet, entitled "America's Lethal Politics" (the "Editorial"). The Editorial was prompted by the shooting earlier that day of Republican members of Congress, including Representative Steve Scalise. However, several sentences in the Editorial could be read to suggest that an earlier mass shooting -- an attack that occurred in Tucson, Arizona in 2011, grievously wounding Congresswoman Gabrielle Giffords and killing

several others -- was prompted by a graphic advertisement circulated some months earlier by a political action committee ("SarahPAC") associated with Palin. The graphic (the "crosshairs map") featured a map of the United States with stylized rifle crosshairs superimposed over congressional districts that SarahPAC had targeted for replacing incumbent Democratic members of Congress with Republican candidates in the 2010 midterm elections. Giffords' district was one of 20 featured on the map.

Prior to publication of the Editorial, Bennet, the top editor on the Times' Editorial Board, had added language asserting a "clear" and "direct" link between the 2011 shooting and the "political incitement" generated by the crosshairs map. Although the original author of the Editorial, several other editors, and a fact checker read the draft after Bennet's revision and before publication, none flagged the new language as inaccurate. Nonetheless, journalists and other readers began criticizing the "clear" and "direct" allegation immediately after the Times published the Editorial online. The Times ultimately issued two corrections (the first approximately 14 hours after the editorial was published online) stating that no such link had been established.

Shortly thereafter, Palin commenced this lawsuit, asserting that she had been libeled by Bennet and the Times in violation of New York defamation law.[1] After extensive delays occasioned by an intervening

---

[1] The parties subsequently agreed that Bennet and The New York Times Co. should be considered as a single unit for the purpose of

# JA 1965

appeal and constraints arising from the COVID-19 pandemic, the Court held a seven-day jury trial starting on February 3, 2022. Following the close of evidence, but before the start of jury deliberations, defendants moved under Fed. R. Civ. P. 50(a) for judgment as a matter of law. Rule 50(a) provides, in general, that:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> > (A)  resolve the issue against the party; and
> >
> > (B)  grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a). The rule further provides that such a motion may be "made at any time before the case is submitted to the jury." Id. While Rule 50(a) does not expressly require a court to grant or deny the motion before jury deliberations begin, it clearly contemplates that a court will rule expeditiously.[2]

Because this was a serious and case-dispositive motion, the Court did not rule precipitously. Rather, the Court reserved judgment, first so that it could hear the lawyers' closing arguments and then, even after the jury had begun its deliberations late on Friday afternoon, so that the Court could receive further written and oral submissions

___

assessing liability. See ECF 170 ("Jury Instructions") at 12. Accordingly, hereinafter, the Court uses "the Times" to refer to both defendants collectively, except where it is necessary to refer to Bennet or The New York Times Co. individually.

[2] If the motion is denied, however, it can be renewed after the jury renders its verdict, pursuant to Fed. R. Civ. P. 50(b).

Case 1:17-cv-04853-JSR Document 262 Filed 03/01/22 Page 48 of 68

from counsel. Ultimately, however, by the early afternoon of Monday, February 14, 2022, the Court had reached the firm conclusion that it would have to grant the motion for judgment as a matter of law and so informed the parties.

At that point, the Court could have simply entered final judgment in defendants' favor and dismissed the jury. Instead, however, the Court, while announcing its decision, explained that it would allow the jury to continue its deliberations, so that, if the Court of Appeals were to disagree with the Court's determination to dismiss the case as a matter of law, the appellate court would not have to send the case back for trial, since it would have the benefit of the jury's verdict. Moreover, as a technical matter, the Court could then issue its Rule 50 judgment, post-verdict, pursuant to Rule 50(b). While this approach was a bit unusual, neither side objected to it in the slightest.

Regardless of these procedural niceties, however, the Court never seriously considered hiding from the parties the firm determination it had reached to dismiss the case as a matter of law. This, as the Court noted at the time, would have been grossly unfair to both sides, who would have been left with the impression that the case was going to be determined by the jury's verdict when it was not. Tr. 1298-1299.[3]

Therefore, on the afternoon of February 14, 2022, the Court announced its conclusion that Palin had failed to prove, by the

---

[3] "Tr. ___" citations refer to pages in the trial transcript.

4

necessary clear and convincing evidence, that Bennet and The New York Times Co. had published the allegedly libelous statements with the state of mind known as "actual malice." Specifically, after reviewing all evidence adduced at trial in the light most favorable to Palin and drawing all reasonable inferences in her favor, the Court concluded that no reasonable jury could find by clear and convincing evidence that Bennet or The New York Times Co. knew at the time of publication that the allegedly libelous statements were false or that Bennet thought that the challenged statements were probably false but recklessly proceeded to publish them anyway. The Court further indicated that it would likely issue a written opinion detailing the reasons for these conclusions. Tr. 1307. Hence, this Opinion.

After the Court announced its determination to enter final judgment for the defendants as a matter of law, the Court, as noted, still allowed the jury to continued deliberating for the aforementioned reasons, stating that it would not formally enter the order dismissing the case until after the jury had rendered its verdict. Tr 1305-1306. As also noted, no party objected in the slightest to the Court's plan. Indeed, the parties were given four opportunities to object to the procedure -- when the Court made the initial proposal, Tr. 1256; when the Court indicated it was about to issue its ruling on the motion, Tr. 1295-1297; after that ruling was delivered, Tr. 1306-1307; and when the verdict was returned -- and never did so.

The only issue that was raised -- and then only by counsel for defendants -- was whether it was necessary to further inoculate the

5

jury against the risk that it might learn of the Court's intended ruling through media reports. When the Court asked counsel what they recommended in this regard, plaintiff's counsel was of the view that the Court should do nothing and "leave things as is." Tr. 1307. But the Court was persuaded by defendants' counsel to again admonish the jury that "If you see anything in the media about this case, just turn away." Tr. 1308. Even though defendants' counsel had raised the possibility (presciently, as it turns out) that some jurors might receive "push notifications" of the Court's Rule 50 determination, Tr. 1307, neither side asked for any other relief than the aforementioned instruction, which was then given to the jury, and accordingly the Court had no occasion to consider any further steps. Tr. 1307.

The next afternoon, the jury returned a verdict of "Not Liable." In the Court's view, the verdict further validated the Court's legal conclusion that no reasonable juror could find by clear and convincing evidence that Bennet or the Times had acted with actual malice. However, this verdict was without immediate legal effect because the Final Judgment entered that day in favor of the Times relied independently on the Court's decision to grant the Rule 50 motion and dismiss the case as a matter of law. ECF 171.

After the jury had been excused, the Court's law clerk discovered, during a routine inquiry, that a few jurors had inadvertently received "push notifications" (alerts automatically generated by news apps installed on their smartphones) containing the bottom-line of the Court's intended Rule 50 determination. See ECF 172. Although these

JA 1969

jurors were adamant that this knowledge had not affected their determination of the verdict in the slightest, the Court promptly notified the parties of this information. See id.

As detailed toward the end of this Opinion, the Court is of the firm view that a few jurors' pre-verdict awareness of news about the Court's intended Rule 50 decision did not nullify the jury's verdict in any respect. But the more fundamental point is that any effect the push notifications may have had is legally irrelevant. The Court had already determined to dismiss Palin's libel claim as a matter of law pursuant to defendants' Rule 50 motion, and the Final Judgment reflected that determination. Even if one indulges the implausible hypothesis that the jury would have returned a verdict for Palin absent the news alerts, the operative final judgment would still have been the same: dismissal of Palin's claim as a matter of law.

The Court now elaborates the reasons for that decision.

## I.  Factual Background

As explained further in § III.B, _infra_, the Court on a Rule 50 motion must view all evidence in the record in the light most favorable to the non-moving party, here Palin, and must draw all reasonable inferences to her benefit. The recitation of relevant facts below therefore reflects these presumptions.

### A. The Allegedly Libelous Statements

On June 14, 2017, defendant The New York Times Co. published the Editorial entitled "America's Lethal Politics" in response to the shooting that morning of Representative Steven Scalise and several

other Republican members of Congress who had been holding a practice session in suburban Virginia for a charity baseball game. The Editorial identified the attack as part of a "sickeningly familiar pattern [that was] emerging" of members of Congress being targeted by people committing mass shootings. PX-1 at 1.[4] The Editorial's thesis was that this political violence emerged from the "readily available guns and ammunition" in the United States and from "deranged" people whose "derangement had found its fuel in politics" by virtue of the increasingly violent rhetoric used in American political discourse. Id. The "pattern" identified by the Editorial identified only one prior data point: the January 8, 2011 incident in which Jared Lee Loughner opened fire in a Tucson, AZ supermarket parking lot during a "Congress on Your Corner" event hosted by Representative Gabby Giffords, killing six people (including U.S. District Judge John Roll and a nine-year-old girl) and grievously wounding the Congresswoman.

In comparing the two shootings, the Editorial, in language that was added by defendant Bennet to an earlier draft, stated that there was a "clear" and "direct" "link" between Loughner's shooting and the "political incitement" arising from a graphic distributed in March 2010 by the political action committee ("PAC") associated with plaintiff Sarah Palin, who previously served as the Governor of Alaska

---

[4] PX-__ citations refer to plaintiff's exhibits received into evidence at trial, and DX-__ citations refer to defendants' exhibits received into evidence at trial. Unless otherwise specified, all internal quotation marks, omissions, elisions, alterations, citations, and emphases are omitted from all sources cited herein.

and as the 2008 Republican candidate for Vice President. Specifically, plaintiff alleges that she was libeled by the following two paragraphs:

> In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask for the right.

PX-4. These paragraphs (the "Challenged Statements") were the fifth and sixth paragraphs in the twelve-paragraph Editorial. Id. "America's Lethal Politics" was published online on The New York Times website at approximately 9:45 p.m. on June 14, 2017, PX-1, and appeared as the first of three editorials in the June 15, 2017 print newspaper, PX-4. Neither Palin, nor SarahPAC, nor the map of targeted congressional districts was referenced elsewhere in the Editorial or in the headline. See id.

Palin alleges that these two paragraphs contain two defamatory statements. The first paragraph, Palin argues, asserts that her PAC's circulation of the so-called crosshairs map was "clear" incitement of Loughner's shooting of Representative Giffords and others. See ECF Jury Instructions at 14. The second paragraph, Palin argues, asserts that the circulation of the crosshairs map served as "direct"

9

"incitement" of the "attack," or, in other words, that the map caused Loughner to act. See id.

Palin contends that both of these paragraphs contain unsupported or unsupportable factual errors concerning the purported causative role of Palin's PAC's "crosshairs map." Although the crosshairs map was widely blamed for inciting Loughner's violence against Giffords in the days following that shooting, it was subsequently determined that Loughner suffered from mental illness and no link between Loughner's attack and the crosshairs map was ever established. DX-111 at 3-4. Rather, it was determined that Loughner acted because of his own personal demons and mental illness. Accordingly, Palin alleges, it was defamatory for the Editorial to assert that the crosshairs map was either a "clear" or "direct" incitement to Loughner's shooting.[5]

## B. The Original Drafting of the Editorial

On the morning of June 14, 2017, James Hodgkinson opened fire on a group of Republican congressmen, who were practicing in suburban Virginia for an upcoming charity baseball game, wounding four persons, including Representative Scalise. See Tr. 107; PX-4; DX-12. The idea of writing an editorial on the shooting was first raised in a brief

---

[5] Although not central to Palin's case, it may also be noted that the Challenged Statements describe the map as having "put Ms. Giffords and 19 other Democrats under stylized cross hairs," PX-4, thereby suggesting that the crosshairs appeared over images or words signifying the politicians themselves. However, the map in fact placed the stylized crosshairs over these 20 Democrats' congressional districts on a map of the United States, which was positioned above a list of the politicians' names. See DX-61.

email sent at 10:46 a.m. by Elizabeth Williamson, a member of the Times' Editorial Board based in Washington, who covered national politics. DX-9; Tr. 78-79. The email went to Bennet and two other editors on the Editorial Board, Robert Semple and Nicholas Fox. DX-9. A few minutes later, in an email titled "POSSIBLE shooter's POSSIBLE social media pages pro-Bernie, anti-Trump," Williamson circulated a set of links to Facebook, LinkedIn, and Twitter profiles that her research suggested belonged to the suspected shooter. DX-13. At 11:49 a.m., after then-President Donald J. Trump had delivered a statement on the shooting, Semple responded by email approving Williamson's proposal to begin drafting an editorial on the shooting, suggesting that the piece focus on gun control. DX-14. Then, at 12:04 p.m. another editor, Linda Cohn, replied to Semple's email, noting that Hodgkinson had gone to high school in her hometown and writing that it was "hard to picture any anti-trump sentiment there." DX-16. Cohn also commented that she was "thinking back to what a giant story [G]abby Gifford[s] shooting was. Amazing that shooting congressmen doesn't seem so shocking now." Id. The record reflects that this was the first time a member of the Editorial Board linked the Virginia and Arizona shootings. Semple, who was a long-tenured member of the Editorial Board, reaffirmed his earlier approval, writing "OK we should definitely shoot for a piece, not huge, but a piece." Id.

Bennet's first contribution to the discussion came in a 12:41 p.m. reply to Williamson's email containing Hodgkinson's suspected social media profiles and copying Semple, Fox, and Cohn. DX-17.

Suggesting an additional argument for the Editorial to make, Bennet wrote:

> Hey Elizabeth -- As Bob has said there's most likely a gun control point to be made here. The other question is whether there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence. Hard for me to imagine that Bernie himself is guilty of anything like that. But if there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting) we should deal with that.

Id. Williamson then agreed to begin writing a draft, noting that she had spoken to Semple. DX-18.

As the assigned writer, Williamson had primary responsibility for research, which included both factual reporting and research on opinions previously expressed by the Editorial Board to maintain consistency with those earlier positions. Tr. 88-89. Williamson testified that on June 14, 2017, she "was researching the political rhetoric that was circulating in our discourse in the run-up to the 2011 shooting in Arizona," not "the shooting itself" or "the state of mind of the gunman." Tr. 174.

To assist Williamson in her research, Semple directed the Board's editorial assistant, Phoebe Lett, to search through prior editorials and send Williamson "four basic gun control pieces (dealing mainly with the plenitude of weapons and porous controls) that also happen to mention Gabrielle Giffords." See DX-21; DX-19.[6] Williamson replied

---

[6] At trial, the four editorials hyperlinked in Lett's email were never shown to any witness, their content was never discussed before the jury, and they were never offered into evidence as part of any witness's testimony. The Court accordingly sustained an objection to

to Lett at 1:40 p.m. asking "is there one that references hate type speech against [Democrats] in the runup to [Giffords'] shooting? James referenced that." DX-22. Lett forwarded this request to Bennet, asking if he "happen[ed] to know which one she is talking about." DX-25. Bennet responded: "No -- I was just wondering if there was such a piece; that is, did we ever write anything connecting ... the Giffords shooting to some kind of incitement?" Id. After searching further, Lett responded "No, but Frank Rich did," providing a link to a January 15, 2011 Op-Ed column entitled "No One Listened to Gabrielle Giffords," DX-24. DX-25. Bennet replied 14 minutes later: "Good for us. Can you let Elizabeth know?" DX-25. Lett then relayed Rich's column to Williamson. DX-23. Viewing the evidence in the light most favorable to Palin, the Court presumes that Bennet read and understood this column by Frank Rich before the Editorial was published.

Rich's column, written one week after the Loughner shooting, discussed that attack and other acts of apparent political violence,

---

plaintiff's counsel motion to admit pre-marked exhibits containing these four editorials when they were offered outside the presence of the jury immediately before closing statements were delivered. See Tr. 1060.

When asked if he had read these four editorials, Bennet testified that he did not recall reading any of them. Tr. 705. And Palin neither adduced any evidence from which the Court could infer that Bennet read these four editorials nor argued in summation that Bennet's knowledge at the time of publication was informed by these four editorials.

Therefore, the content of these four editorials is not in the record and, as a matter of law, none of the four is properly considered as a source for Bennet's pre-publication knowledge. This is so, even though the Court must view the evidence most favorably to Palin and draw all reasonable inferences in her favor.

arguing about they arose from a combination of violent political rhetoric, inadequate gun control, and an ineffective mental health safety net. See DX 24. Rich wrote that it was not yet known whether Loughner had seen the crosshairs map and that then-President Obama had "said, correctly ... that 'a simple lack of civility' didn't cause the Tucson tragedy" or the other incidents he had discussed, such as an earlier act of vandalism at Giffords' office. Id. at 1-2. However, Frank argued that these acts of violence were "inform[ed]" by "an antigovernment radicalism as rabid on the right now as it was on the left in the late 1960s." Id. at 2-3. Rich continued:

> That Loughner was likely insane, with no coherent ideological agenda, does not mean that a climate of antigovernment hysteria has no effect on him or other crazed loners out there. Nor does Loughner's insanity mitigate the surge in unhinged political zealots acting out over the last two years. That's why so many on both the finger-pointing left and the hyper-defensive right automatically assumed he must be another of them.

Id. at 3.

At 2:52 p.m., following Bennet's request, Lett forwarded to Bennet the four editorials that she had previously sent to Williamson. DX-26; DX-27. Lett then kept searching through past editorials and found two more relevant articles, which she emailed to Bennet at 3:01 p.m. and Bennet forwarded to Williamson two minutes later with the note "We dug a little further. Take a look at these two." PX-128. A few minutes later, Bennet separately forwarded the two additional editorials published in the days following the Loughner attack to a group including Semple, Williamson, Fox, and Cohn, writing "FYI -- these two are more relevant precedent for tonight's piece." PX-136. Semple

14

replied, "just right. The Obama 'as we mourn' in particular." Id.
Bennet testified that although he does not recall reading these two
editorials, he concluded based on his review of this email traffic
that he "must have read them, because [he] knew something about their
content." Tr. 608. Viewing the evidence in the light most favorable
to Palin, the Court presumes that Bennet read and understood these two
editorials prior to publication.

The first of these two editorials, entitled "Bloodshed and
Invective in Arizona," was published January 9, 2011, the day after
the Arizona shooting. PX-134. It describes the Editorial Board's
position on the relationships among gun control, violent political
rhetoric, and mental illness and how these forces increase the risk
of political violence and assassination attempts:

> Jared Loughner, the man accused of shooting Ms. Giffords, killing
> a federal judge and five other people, and wounding 13 others,
> appears to be mentally ill. His paranoid Internet ravings about
> government mind control place him well beyond usual ideological
> categories.

> But he is very much a part of a widespread squall of fear, anger
> and intolerance that has produced violent threats against scores
> of politicians and infected the political mainstream with violent
> imagery. With easy and legal access to semiautomatic weapons like
> the one used in the parking lot, those already teetering on the
> edge of sanity can turn a threat into a nightmare.

Id. at 1. "Bloodshed and Invective in Arizona" continues:

> It is facile and mistaken to attribute this particular madman's
> act directly to Republicans or Tea Party members. But it is
> legitimate to hold Republicans and particularly their most
> virulent supporters in the media responsible for the gale of
> anger that has produced the vast majority of these threats,
> setting the nation on edge. Many on the right have exploited the
> arguments of division, reaping political power by demonizing
> immigrants, or welfare recipients, or bureaucrats. They seem to

have persuaded many Americans that the government is not just misguided, but the enemy of the people.

Id. at 2.

The second of these editorials, entitled "As We Mourn," was published on January 12, 2011. PX-135. It addressed then-President Barack H. Obama's speech at a memorial service in Tucson for the victims of the Loughner attack:

> This horrific event, he said, should be a turning point for everyone -- "not because a simple lack of civility caused this tragedy -- it did not -- but rather because only a more civil and honest public discourse can help us face up to our challenges as a nation."

Id. at 1-2.[7] "As We Mourn" does not include any conclusive statement regarding the Arizona gunman's motivations or political convictions, if any.

Bennet testified that on June 14, 2017, he relied on the research Lett conducted on his behalf, and that he never conducted his own factual research in connection with the Editorial. Tr. 610.

## C. Bennet's Revisions

At 4:44 p.m., Williamson uploaded her draft of the Editorial to "Backfield," a section of the Times' content management system that

---

[7] "As We Mourn" continues:

The president's words were an important contrast to the ugliness that continues to swirl in some parts of the country. The accusation by Sarah Palin that "journalists and pundits" had committed a "blood libel" when they raised questions about overheated rhetoric was especially disturbing, given the grave meaning of that phrase in the history of the Jewish people.

PX-135.

stores drafts during the editorial process. Tr. 136–137. Williamson also notified Bennet, Semple, Fox, and Frank Clines (a member of the Editorial Board who covered gun policy). PX–143. After that point, Williamson made no further edits to the piece, Tr. 138, and Palin has not accused her of any actual malice.

The portion of Williamson's 4:44 p.m. draft that served as a precursor to the Challenged Statements reads as follows:

> That in 10 minutes a single gunman could wreak such carnage in a bedroom community a short drive from the Capitol is horrifying, but no longer surprising. Not all the details are known yet, but a sickeningly familiar pattern is emerging: a deranged individual with a gun—perhaps multiple guns—and scores of rounds of ammunition uses politics as a pretense for a murderous shooting spree. Mr. Hodgkinson was a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump, who among many anti-Trump messages posted "Time to Destroy Trump & Co." on social media in March.
>
> Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured in a vile political climate. Then, it was the pro-gun right being criticized: in the weeks before the shooting Sarah Palin's political action committee <u>circulated</u> a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

PX–141.

The underlined word "circulated" in the latter paragraph of Williamson's draft was hyperlinked to an ABC News article that is dated January 9, 2011, the day after the Arizona shooting, and is entitled "Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate." DX–10; Tr. 144. The article discusses the debate in the wake of the shooting about whether Palin's distribution of the crosshairs map "may have fueled the gunman's rage," though it notes in the tenth

17

paragraph that "[n]o connection has been made between this graphic and the Arizona shooting." DX-10 at 1-2. Bennet testified that he neither clicked on the "circulated" link in Williamson's draft nor read the ABC News article before the Editorial was published. Tr. 609-610.

After Williamson circulated her draft, Cohn, one of the Editorial Board editors, reviewed the piece. While reading, she made notes on her reactions to the draft, for instance asking whether the referenced to Hodgkinson as "deranged" reflected "signs of mental illness" or was used "just in the sense that anyone who commits [a] mass shooting is deranged." PX140E at 1. Cohn re-saved the draft at 5:03 p.m. Tr. 526; PX-140E at 2. Then, after she had finished her read-through, Cohn went to Bennet's office and told him that she "was just a little confused about ... what we wanted out of this piece, where it was going.... [She] felt he needed to take a look and weigh in." Tr. 520. Bennet recalls that Cohn "did not think it was a great draft." Tr. 636. Bennet agreed to take a look. Tr. 522; 636-637. Cohn testified that it was her decision to take Williamson's draft and pass it off to Bennet, and Bennet testified that he had never told either Williamson or Cohn that he wanted to edit the draft. Tr. 566, 715.

At approximately 5:03 p.m., after speaking with Cohn, Bennet opened and read through Williamson's draft. Tr. 637; DX-30 at 235. He testified that his impression of Williamson's draft was that it "read like a news story, rather than an opinion piece," and Bennet "felt like it wasn't capturing the shock of the attack and kind of the horror of what had happened." Tr. 716. Although his initial intent was to

JA 1981

provide Williamson guidance on rewriting the Editorial, Bennet soon decided to do the revisions himself:

> I initially started drafting a note to Elizabeth at the top of the editorial, trying to provide some instruction on how I thought the piece should be rewritten. And at that point I realized how late in the day it was getting, and I was concerned about getting the piece done in time. So I couldn't tell you exactly what time this was, but I began just editing the piece myself.

Tr. 637. With respect to the time pressure, Bennet testified that the deadline to submit editorials for print publication the following day was approximately 8:00 p.m. Tr. 640.

Bennet testified that in reading Williamson's draft, he interpreted the paragraphs about the Arizona shooting as "the specific example that Elizabeth returned with of incitement or incendiary rhetoric, and I just trusted that it was ... an example of that based on her characterization." Tr. 719. Bennet further testified that he thought the relationship Williamson had posited between the crosshairs map and Loughner's "made sense" because he suspected that "when politicians get shot, ... it has something to do with politics," and "that an atmosphere of highly charged political rhetoric makes such ... terrifying events more likely." Tr. 719-720.

There are words and phrases in the language about which Palin complains that appeared in Williamson's original draft, such as "a sickeningly familiar pattern is emerging" and "Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs." See DX-136 at 2. But Bennet added the key language that Palin argues

19

conveys the allegedly defamatory meaning -- the assertion that Palin's actions "clear[ly]" and "direct[ly]" caused Loughner to commit a mass shooting. Id.

A redline of the Editorial, comparing Bennet's revision to Williamson's first draft, was accepted into evidence, and it succinctly illustrates Bennet's specific contributions to the two paragraphs containing the Challenged Statements:

> ~~Just as in~~ Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a ~~nine~~ 9-year-old girl, ~~Mr. Hodgkinson's rage was nurtured in a vile political climate. Then, it was the pro gun right being criticized: in the weeks before~~ the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized ~~crosshairs.~~
>
> ~~In the aftermath of Wednesday's shooting, the political right and left and both sides in the gun debate dove into their respective foxholes~~ cross hairs.
>
> Conservatives and right-wing media ~~demanded that~~ were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals ~~get.~~ They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

Id.[8] Bennet testified that as he worked on the Editorial, he did not know whether or not Loughner had seen the crosshairs map, nor did he research that question. Tr. 720. As Bennet explained:

> I was functioning as the editor, not the reporter on the piece, so I wouldn't normally do the reporting in a situation like this, particularly when we were on a tight deadline. But also˘... I

---

[8] As in a standard redline, plain text represents material from Williamson's initial draft, underlined text represents additions by Bennet, and ~~strikethroughs~~ represent deletions by Bennet.

didn't think then and don't think now that the map caused Jared
Loughner to act. I didn't think we were saying that, and
therefore ... [it] didn't enter my mind to research that
question.... My goal was to make it, you know, a clearer argument
and ... [a] more compelling description of what happened that
day, a more vivid description of what happened that day.

Tr. 721.

### D. **Further Editing**

Bennet saved his draft in Backfield at 7:21 p.m. DX-30 at 178.

He then emailed Williamson, alerting her that he had finished revising

her draft:

I really reworked this one. I hope you can see what I was trying
to do. Please take a look. Thank you for the hard work today and
I'm sorry to do such a heavy edit.

PX-163. Bennet testified that his request to "[p]lease take a look"

was indicating to Williamson that she should review the piece for fact

checking. Tr. 638. As Bennet explained at trial:

[T]his is why we send playbacks to writers, because they are the
ones who reported the story. They are the ones who are in
possession of the facts. And it is important for them to review
pieces to make sure that edits haven't introduced errors.

Tr. 639. Williamson testified that, after receiving this email, she

"glanced at" the Editorial and replied to Bennet, writing, among other

things, that the draft "Looks great." Tr. 274; DX-38. She suggested

no edits to Bennet's draft. Id.

Cohn re-claimed the pen around 7:23 p.m. and began editing

Bennet's draft of the Editorial. Tr. 571. She continued working on the

piece, making changes for clarity and accuracy until approximately

7:57 p.m. Tr. 571-573; DX-30 at 136. During that time, Fox and Lepping

were reviewing the piece as well, though they had to relay their

changes to Cohn, since only one person was able to edit the Backfield version at a time. Tr. 572; 575-576; PX-155. Cohn testified that she reviewed the Challenged Statements and did not perceive there to be any problem with the language in those paragraphs. Tr. 574-575. Nor did she approach Bennet to discuss those paragraphs. Tr. 575.

Then, at 7:58 p.m., just after storing the latest version of the Editorial reflecting Bennet's revisions, Cohn emailed a "playback," or a static copy of the latest draft, to Williamson for her review.[9] Tr. 576-577. Cohn explained that she sent the playback to Williamson because, although Cohn "assumed that James Bennet had sent one since at that point he was really editing the piece, [she] was playing it safe since [she] had been the original editor on the piece." Tr. 577. The reason Cohn wanted to be sure Williamson received a playback was so Williamson "could make sure that everything in there was correct and that ... the changes seemed fair to her, that ... there was nothing that she wanted to object to either in terms of facts or tone." Id. Cohn did not receive any further edits or comments from Williamson. Tr. 577-578.

Shortly after Bennet filed his draft of the Editorial to Backfield, Eileen Lepping, the Editorial Board's principal fact checker, also began her process of fact checking and editing. Tr. 395.

---

[9] Cohn described the practice of sending a writer a "playback with changes" as "send[ing] a copy to the writer so ... the changes would show up ... so they could go back and look and get back to [the editors] if there were any issues or problems with it." Tr. 577.

Lepping testified that she fact checked the draft Editorial line-by-line. Tr. 416, 421-422. However, she continued editing the piece as Cohn and Bennet also edited and revised it. Tr. 400-401. While fact checking the Editorial, Lepping clicked through the "circulated" hyperlink to the ABC News article, and "scan[ed] it for the facts that [she] was looking for at the moment," meaning specific details such as times, dates, that it was Palin's PAC that had circulated the map, and the number of congressional districts identified. Tr. 399, 422-423. One correction Lepping made around 7:34 p.m. was to edit words indicating the relative timing of the crosshairs map's publication (March 23, 2010, see DX-62; DX-63) and the Arizona shooting (January 8, 2011) from "in the weeks before the shooting" to "in the months before."[10] See PX-153; Tr. 399-403. Lepping testified that she did look at the crosshairs map itself, though she missed the inaccuracy regarding the location of the stylized crosshairs, an error which had already appeared in Williamson's 4:44 p.m. draft. Tr. 406-407. Lepping further testified that she does not recall fact checking the phrase "the link to political incitement was clear" in the first paragraph. Tr. 405. Nor did she fact check the phrase "Though there's no sign of incitement as direct as the as in the Giffords attack" in the second paragraph. Tr. 407. At that point, with the 8:00 print deadline

---

[10] This text was changed yet again, sometime after Lepping completed her edit at approximately 7:56 p.m. that night: the published version reads "Before the shooting." Tr. 404-406. Lepping testified that she did not know who made that further edit. Tr. 406.

nearing, Lepping testified that she "was doing more of a quick check of names and dates and things like that." Tr. 426. However, Lepping said she was able to confirm all of the facts she did check, and no one instructed her not to check any aspect of the piece. Tr. 426-427. At the end of her edit, Lepping sent a playback to Semple, who had a practice of reading the final versions of editorials before they ran and reaching out if he had any concerns; but Semple did not raise any concerns to Lepping about "America's Lethal Politics." Tr. 428-429.

After Cohn and Lepping's review, the copy editors assigned to the editorials page that night -- Bruce Levine and Joe Rakowski -- also edited the piece. Tr. 578. Additional fact checking occurred at this step, with Levine correcting the number of victims hit by Hodgkinson's bullets from five to four, since the fifth victim was determined to have been hit by shrapnel. See PX-178. Levine made this edit by comparing the draft Editorial to the article on the Virginia shooting prepared by the news department for the following day's paper. Tr. 579. Still, no fix was made to the Challenged Statements.

### E. Publication

The Times published "America's Lethal Politics" on its website at approximately 9:45 p.m. on June 14, 2017.[11] Tr. 640-641. The Times' Twitter accounts posted two tweets promoting the Editorial on the

---

[11] The online version of the Editorial received 150,257 page views before the first correction was posted, and 133,572 page views (after it was corrected) for the remainder of the first week after publication. DX-500 ¶ 13; DX-128.

evening of June 14, 2017. PX-3; DX-500 ¶¶ 16-20. "America's Lethal Politics" was the lead article on the editorial page in the June 15, 2017 print edition of The New York Times.[12] PX-4. And the Editorial was featured on the Times' website homepage through June 15, 2017, although it no longer appeared on the homepage as of 3:00 p.m. June 15, 2017. DX-126; DX-127; DX-500 at 1.

### F. Corrections

At 10:35 p.m., less than one hour after the Editorial was published online, Bennet received an email from Ross Douthat, a conservative columnist for the Times' Opinion section who covers national politics, among other topics. Tr. 820. Douthat's email was a response to an email from Bennet complimenting Douthat's latest column. PX-174 at 2. In his email, Douthat criticized the factual basis for the Challenged Statements:

> I feel I would be remiss if I didn't express my bafflement at the editorial that we just ran on today's shootings and political violence. There was not, and continues to be so far as I can tell, no evidence that Jared Lee Loughner was incited by Sarah Palin or anyone else, given his extreme mental illness and lack of any tangible connection to that crosshair map, the Tea Party or other right-wing cause. Whereas the shooter today, as our editorial concedes, seems to have had a clear partisan, anti-Trump purpose. That doesn't mean that liberals or "The Resistance" were in any way responsible for this horror; I don't buy those kind of arguments at all, in either case. But our editorial seems to essentially reverse the fact pattern as I understand it, making it sound like *Loughner* had the clearer connection to partisan rhetoric, when to the best of my knowledge he had none. I don't understand that claim at all, and I don't understand why we're making it.

---

[12] 610,531 copies of the June 15, 2017 print edition of The New York Times, which included the Editorial, were printed. DX-500 ¶ 8.

25

Id. at 1. Bennet responded at 11:09 p.m.:

> Thanks, and I'll look into this tomorrow. But my understanding
> was that in the Giffords case there was a gun sight superimposed
> over her district; so far in this case we don't know of any direct
> threat against any of the congressmen on the field. That's not
> to say any of it is ok, obviously, or that the violence in either
> case was caused by the pol[i]tical rhetoric. But the incitement
> in this case seems, so far, to be less specific.

Id. Bennet testified that when he read Douthat's email he "took away
from [it that Douthat] was reading the editorial to say that Loughner
was incited by Sarah Palin or somebody else, and that is not the
message we intended to send." Tr. 645.

In addition to replying to Douthat by email, Bennet testified
that he "checked Twitter, because this ... obviously rang a big alarm
for me and, yes, I saw other media people at that point tweeting that
we had gotten it wrong," making similar points to Douthat's. Id. at
645-646. Shortly thereafter, Bennet sent a text message to Williamson:
"Are you up? The right is coming after us over the Giffords comparison.
Do we have it right?" DX-46. Williamson, however, had gone to sleep
and did not respond until the morning. Id. Bennet testified that he
spent time reading the criticism of the Editorial that was appearing
online and tried to sleep but was unable to get much rest, because he
was "so upset and confused."[13] Tr. 747-748.

---

[13] Plaintiff's counsel asked Bennet if Douthat's email prompted
Bennet to make any effort to take the Editorial offline while the
Times was investigating its accuracy. Bennet said he made no such
effort because at the time, "The New York Times ... had a rule against
so-called unpublishing stories; that if you published a story, you
couldn't then just pull it down." Tr. 648. Bennet also noted that the
Editorial was irrevocably set to run in the June 15, 2017 print
edition. Tr. 649. Plaintiff's counsel adduced no evidence suggesting

**JA 1989**

At 5:08 a.m. on June 15, 2017 Bennet emailed Williamson and Lepping with the subject line "Giffords:"

> Hey guys -- We're taking a lot of criticism for saying that the attack on Giffords was in any way connected to incitement. The claim is that this was fully investigated and debunked in the months after the attack, and the shooter was found to have acted only because of his personal demons. I don't know what the truth is here but we may have relied too heavily on our early editorials and other early coverage of that attack. If so, I'm very sorry for my own failure on this yesterday. In any case I'd like to get to the bottom of this as quickly as possible this morning and correct the piece if needed. Can you two please put your heads together on this first thing this morning? Please skip the morning meeting if necessary. JB

PX-191. Later that morning, Williamson and Bennet spoke by phone; Williamson described Bennet's demeanor on the call as reflecting that he was "clearly crestfallen that this had happened." Tr. 183; <u>see</u> PX-190. Williamson ("EB") and Bennet ("JB") also exchanged text messages about the apparent error:

> EB: Hey I'm sorry James. I should have read those [para]grafs more closely and asked more questions. That's on me. Will get a [correction] drafted soonest. E.

> JB: No worries. I feel lousy about this one -- I just moved too fast. I'm sorry.

> JB: Now what I need from you/Eileen soonest is a rock-solid version of what we should say -- that an investigation showed NO link to incitement, or NO DIRECT link or NO CLEAR link. I don't want to soften if it we don't need to -- if there was no link we should say so.

> EW: On it. We'll do the right thing

DX-46; PX-188; Tr. 182-183.

---

that Bennet could have taken the Editorial down at that time or that he lacked awareness of this "unpublishing" policy at the time, so there is no inference that can reasonably be drawn from Bennet's decision not to pursue this.

Williamson and Lepping began researching the issue shortly thereafter to determine if a correction was required, skipping the Editorial Board's morning meeting as directed. Tr. 172. Williamson described the Times' corrections policy as "if we were alerted of an error, the policy would be to as swiftly as possible ascertain the correct facts and write the correction and post it."[14] Tr. 206-207. At 7:18 a.m., Williamson emailed her Editorial Board colleague, Jesse Wegman, who had noted criticism of the Editorial on Twitter the night before, asking "What in your view would be the most reliable assessment of the politics link (or not) in the Loughner case? Am thinking court records/assessment of his state of mind." Williamson's focus was correcting the description of the map itself; the bulk of the research and the correction drafting was done in New York. Tr. 173, 185. That morning, Lepping was responsible for researching whether a link had ever been established between the crosshairs map and Loughner's attack. Tr. 410. Lepping testified that she found a police report online

---

[14] The applicable "Corrections" policy from The New York Times' "Guidelines on Integrity" states in full:

> Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small. The paper regrets every error, but it applauds the integrity of a writer who volunteers a correction of his or her own published story. Whatever the origin, though, any complaint should be relayed to a responsible supervising editor and investigated quickly. If a correction is warranted, fairness demands that it be published immediately. In case of reasonable doubt or disagreement about the facts, we can acknowledge that a statement was "imprecise" or "incomplete" even if we are not sure it was wrong.

PX-18; see also Tr. 299-300.

indicating that the shooting "wasn't politically connected."[15] Id. Cohn, working under direction from Bennet and Wegman, drafted the corrections. Tr. 552-553. The first correction, positioned below the online version of the Editorial, was published at approximately 11:15 a.m. on June 15, 2017, Tr. 659, and it read as follows:

> An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.

PX-5 at 3. At the same time, the two paragraphs containing the Challenged Statements was revised to read as follows:

> Was this attack evidence of how vicious American politics has become? Probably. In 2011, Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl. At the time, we and others were sharply critical of the heated political rhetoric on the right. Before the shooting, Sarah Palin's political action committee circulated a map that showed the targeted electoral districts of Ms. Giffords and 19 other Democrats under stylized cross hairs. But in that case no connection to the shooting was ever established.

> Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Liberals should of course be held to the same standard of decency that they ask of the right.

---

[15] Lepping's testimony about the investigative conclusions she read in the police report was offered for, among other things, the truth of the matters asserted in the report. Plaintiff's counsel never offered the police report, which they had pre-marked as an exhibit and included in the pre-trial exhibit list, see ECF 157 at 55. As such, Lepping's testimony regarding what the report concluded about Loughner's mental state was objectionable hearsay to the extent it was offered for its truth. But since no objection was interposed by defendants, the testimony was received in evidence for all purposes.

Id. at 2.[16] The Times' Opinion Section and its main Twitter accounts also tweeted out the correction. PX-7. The evidence showed that Bennet was involved in drafting the Twitter posts, and that he edited the proposed language to add the apology that "[w]e're sorry about [the error]" and thanked readers for "call[ing] us on the mistake." DX-53 at 1; Tr. 1033.[17]

---

[16] The record contains an email from Wegman to Williamson sent at 12:44 p.m. on June 15, 2017 discussing the correction to the text of the Editorial. In it, Wegman writes, "I made the case that talking about Palin and Giffords in the same [para]graf at all risked seeming like we were still trying to sneak the link in, but James pointed out that in order to write the next [para]graph, we had to put it in there to explain." PX-204 at 1. Plaintiff's counsel, however, elicited no testimony providing context for this statement, and plaintiff's counsel did not rely on any inferences from this document during summation or in argument on the Rule 50 motion.

[17] There was considerable debate at trial about whether the Times has a policy against offering apologies in connection with corrections. See, e.g., Tr. 675, 1036. Plaintiff's counsel raised this issue in connection with the assertion that Palin never received an apology from the Times or Bennet. The Court need not, and does not, resolve the factual issues regarding any apology policy at the Times or whether Palin received an apology, neither of which is materially relevant to the matter at hand. However, it is undisputed that on June 15, 2017, Bennet received a request for comment from CNN's senior media reporter regarding the Editorial's inaccuracy, and that Bennet provided draft comments to the vice president of the New York Times Co. for communications for her to relay back to the CNN reporter. See DX-60. The reporter had asked, inter alia, whether the Times would "be issuing an apology to Sarah Palin for wrongly linking her to the shooting of Giffords." Id. at 2. Bennet's response to this question was "I'm not aware that Sarah Palin has asked for an apology, but yes, I, James Bennet, do apologize to her for this mistake." Id. However, Bennet's statement of apology was not ultimately relayed to CNN, and so it was never published. See PX-236.

Later, the _Times_ issued a second correction to replace the first, addressing the remaining error regarding the description of the map. That second correction read:

> An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.

PX-6. This second correction also ran at the bottom of the editorial page in the June 16, 2017 print edition of the newspaper. PX-10.

## II.  **Procedural Background**

### A. **Prior Proceedings**

Palin initiated this lawsuit by filing a one-count complaint on June 27, 2017. ECF 1. Defendants moved to dismiss the complaint on July 14, 2017. ECF 24. The Court subsequently determined that it was a "close question" whether the complaint had pled sufficient allegations of actual malice. ECF 35. Therefore, without objection from the parties, the Court held a brief evidentiary hearing on August 16, 2017, at which the Court ascertained who were the authors of the Editorial and other basic facts that provided context for assessing the plausibility of the inferences upon which the complaint relied to state a libel claim. _See_ ECF 35 at 2. The Court then determined that Palin had not plausibly pled actual malice and dismissed the complaint. _Id._ Palin appealed that order and the Second Circuit reversed, holding

that the plausibility hearing contravened Fed. R. Civ. P. 12(d). <u>See</u> <u>Palin v. New York Times Co.</u>, 940, F.3d 804, 812-813 (2d Cir. 2019).

Following remand, Palin filed the operative, first amended complaint on December 30, 2019. ECF 70. The Court subsequently granted defendants' motion for partial judgment on the pleadings, dismissing Palin's claim for disgorgement of advertising revenues specifically associated with the Editorial. ECF 83. On June 12, 2020, the parties filed cross-motions for summary judgment. ECF 94, 95. The Court denied these motions on August 28, 2020 and set the case for trial February 1, 2021. ECF 117.

Defendants subsequently filed a motion for reconsideration on the basis of an intervening change in substantive law: New York State's November 10, 2020 amendment of its libel statute to expressly require a public figure such as Palin to prove actual malice by clear and convincing evidence. ECF 119. On December 29, 2020, the Court granted defendants' motion for reconsideration and held that the amendment to New York's so-called "Anti-SLAPP Statute,"[18] N.Y. Civil Rights L. § 76-a(2), applies to this action. Consequently, Palin's burden to prove actual malice as to falsity by clear and convincing evidence is not only required by the First Amendment to the United States Constitution but also by New York State statutory law. ECF 125.

---

[18] "Anti-SLAPP" refers to statutes enacted to prevent libel claims from operating as Strategic Lawsuits Against Public Participation ("SLAPP suits") that would otherwise create a risk of litigation tending to wrongly inhibit public discourse.

## B. The Trial and Rule 50 Motion

Unfortunately, the COVID-19 pandemic's cycles of intensification and abatement resulted in several epidemiological "surges" at times set for trial, requiring repeated adjournments to comply with the pandemic protocols of the Southern District of New York. After these delays, trial was set to commence on January 24, 2022. But on the eve of trial, Palin contracted COVID-19 and so was barred by the pandemic protocols from entering the courthouse. See Minute Entries 1/24/2022. Finally, on February 3, 2022, a jury was empaneled, and the trial commenced.

Following the close of evidence on Thursday, February 10, 2022, defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50(a) on four issues, each of which was necessary for Palin to prove the essential elements of their liability on her single claim of libel.[19] See Tr. 1053. These included the two aspects of the "actual malice" element, actual malice as to falsity and actual malice as to defamatory meaning, as well as the "of and concerning" and falsity elements. Tr. 1054-1055. Oral argument proceeded in at least five sessions outside the presence of the jury over three days, and counsel

---

[19] The Court notes that the Times made the Rule 50 motion at the earliest available time. The Times did not call any witnesses of its own or otherwise present an affirmative case after Palin rested. This follows from the Court's individual rules of practice, which provide that each witness may only be called once but can be examined at that time by both sides on any issue.

made written submissions of relevant caselaw citations over the intervening weekend, see ECF 174 at 5-9.

Meanwhile, while the Court continued to reserve judgment on the Rule 50 motion, the jury began deliberations on the afternoon of Friday, February 11, 2022. That evening, following relevant argument and a close review of caselaw cited by counsel, the Court denied the prong of defendants' Rule 50 motion directed at the "of and concerning" element of Palin's libel claim. Tr. 1228.

Argument then turned to the portion of the actual malice element concerning whether Bennet knew or recklessly disregarded the Challenged Statements' falsity prior to publication. Id. The Court was initially skeptical of defendants' position, on the basis that the jury might make adverse determinations as to Bennet's credibility and draw adverse inferences about his pre-publication state of mind therefrom. See, e.g., Tr. 1232. However, defense counsel drew the Court's attention to a Second Circuit libel case, Contemp. Mission, Inc. v. New York Times Co., which holds, in sum, that in light of the clear and convincing evidence standard, a plaintiff must adduce some affirmative, "concrete evidence from which a reasonable juror could return a verdict in h[er] favor" to establish a jury question on actual malice, and that it is "[i]t is not enough for the plaintiff merely to assert that the jury might, and legally could, disbelieve the defendant's denial of legal malice." 842 F.2d 612, 621-622 (2d Cir. 1988); see Tr. 1235-1241. Over the weekend, the Court studied the

relevant caselaw, including the numerous citations provided by counsel.

During argument regarding defendants' pending Rule 50 motion on the morning of Monday, February 14, 2022, the Court indicated that it was leaning toward agreement with defendants' position on the issue of actual malice as to falsity, but that, to make sure, it would hear further argument on the issue. The Court further advised the parties that if the Court determined that defendants' Rule 50 motion was meritorious, it would still let the jury reach a verdict so that the case might not need to be retried if the Court's judgment as a matter of law were reversed on appeal.[20] As previously noted, neither party objected in the slightest to this proposal either at that time, during either of the two following sessions of oral argument, or even later that afternoon when the Court indicated it was about to announce its decision on the actual malice prong of the Rule 50 motion. See Tr. 1256-1295.

Later that afternoon, the Court reconvened outside the presence of the jury. First, the Court denied the prong of defendants' motion concerning the falsity element. Specifically, it held that there was

---

[20] See Tr. 1256 ("So I think it comes down to a single issue. By the way, were I to grant the motion -- and I haven't decided yet, but were I to grant the motion, I would still let the jury continue to reach a verdict so that the Court of Appeals, if they disagree with my determination, would still have the jury's verdict before them and we wouldn't have to retry the case. But I don't mean to suggest by that that I've made a decision. I just wanted to flag what would be the result if I did grant the motion.").

sufficient evidence, including unobjected-to testimony from Lepping about her research for the corrections (see n. 15, supra) from which a reasonable jury could conclude that Palin had carried her burden to establish the Challenged Statements' falsity by clear and convincing evidence. See Tr. 1295-1297. Then, after discussing the requirements of Rule 50, the Court explained its determination that no reasonable jury could find that Palin had carried her burden to prove by clear and convincing evidence that Bennet had known or recklessly disregarded the Challenged Statements' falsity prior to publication. Tr. 1299-1305. The Court further stated that it would permit the jury to continue its deliberations, and it would formally enter its Rule 50 judgment as a matter of law after the jury returned its verdict. Tr. 1298, 1305. There were no objections.[21]

At the end of the day and after announcing its ruling on the Rule 50 motion, the Court reconvened counsel and asked whether either side sought a further instruction about avoiding media coverage of the

---

[21] Plaintiff's counsel has since suggested that the Court recognized an objection to this procedure when it stated, after delivering the substance of its Rule 50 decision, that "needless to say, the plaintiff is deemed to have objected to my decision, and that is preserved for appeal as well." Tr. 1306. But plaintiff's interpretation grossly misconstrues the record. The full context of the quoted remark reflects that it concerned only the legal substance of the Court's Rule 50 decision, which plaintiff's counsel had addressed at length, and that the Court was merely recognizing plaintiff counsel's presumed reassertion of those prior objections to the substance of the Court's Rule 50 decision. Because neither party had ever objected to the Court's proposal not to discharge the jury after delivering its Rule 50 decision, there was no prior objection to the procedural aspect of the Court's action that the Court could have recognized as reasserted.

trial or whether "we should just leave things as is." Tr. 1307. Plaintiff's counsel declined to ask for any instruction, stating "We leave things as is." Id. However, defense counsel requested an instruction, raising the risk posed by "push notifications that get sent out to people's phones." Id. The Court ultimately recalled the jury and again admonished the jurors not to look at anything regarding the trial, not to speak with anyone about the trial, and "if you see anything in the media about this case, just turn away."[22] Tr. 1308.

The following afternoon, the jury delivered a verdict of not-liable, which was confirmed in a poll of each individual juror. See ECF 173; Tr. 1324-1325. The Court then informed the jury about its ruling on the Rule 50 motion and discharged the jury. Tr. 1326-1327. The Court entered final judgment later on February 15, 2022. ECF 171.

After the jury was excused, the Court directed its law clerk to speak with the jury about any problems it might have had with the Court's instructions of law or any suggestions they might have for improvements. This has been the Court's routine practice for over 25 years and more than 300 jury trials, and it has led to material improvements. For example, as suggested by a jury several years ago, the Court now always provides the jury with a "short-form" version of its instructions of law at or near the very start of the trial, as it

---

[22] The jury was instructed to turn away from media coverage repeatedly throughout the trial, including when it was empaneled, Tr. 71; after an incident in which a member of the public cheered Palin and denigrated The Times while jurors were waiting for the elevator, Tr. 500, 512; and by email over a weekend recess, ECF 174.

did in this very case. However, in the course of their post-verdict discussion in the instant case, a few of the jurors volunteered to the law clerk that they had previously become aware of the bottom line of the Court's February 14 ruling, because, notwithstanding that they had assiduously adhered to the Court's instruction to avoid media coverage of the trial, they had received "push notifications" on their smartphones containing a few words to the effect that the Court intended to dismiss the case. ECF 172. Although the same jurors made a point of affirmatively expressing to the law clerk that their limited knowledge had not affected their deliberations in the slightest, the Court, upon learning of this conversation, promptly disclosed it, in writing, to the parties and the public. Id.

## III.  **Legal Framework**

As explained, the Court entered Final Judgment for defendants as a consequence of their Rule 50 motion for judgment as a matter of law. ECF 171. Specifically, the Court granted the Rule 50 motion with respect to Palin's failure to adduce evidence from which any rational jury could find by clear and convincing evidence either that Bennet and the Times published the Editorial knowing that it contained a false statement of fact about Palin or that Bennet and the Times published in reckless disregard of the Editorial's truth or falsity. Therefore, the Court sets forth in this section the legal frameworks governing the substantive and procedural aspects underlying its judgment.

## A. Elements of Liability for Libel of a Public Figure

A claim of libel arises from the publication of a false defamatory statement made in writing or print. To establish liability for such a claim under here-applicable New York law, Palin, who is a "public figure," was required to prove four essential elements concerning any allegedly libelous statement:[23]

(1) It was a statement of fact that the ordinary reader of the publication would understand, when taken in the context in which it appears, to convey a defamatory meaning, Mahoney v. Adirondack Pub. Co., 71 N.Y.2d 31, 38 (1987);

(2) An ordinary reader would reasonably understand the statement to be "of and concerning" the plaintiff personally, rather than referring to another person or entity, Three Amigos SJL Rest., Inc. v. CBS News Inc., 28 N.Y.3d 82, 86 (2016);

(3) The statement was materially false, Rinaldi v. Holt, Rinehart & Winston, Inc., 42 N.Y.2d 369, 380 (1977); and

(4) At the time of publication, the Times (and Bennet, in particular) had the state of mind known as "actual malice," Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 666 (1989).

While a plaintiff may prove the first two elements by a preponderance of the credible evidence, the elements of falsity and actual malice must be proven by clear and convincing evidence. See Rinaldi, 42 N.Y.2d at 379. Also, the parties agreed, based on the record and the scope of respondeat superior liability under New York law, to treat Bennet and The New York Times Co. as a single unit with any finding of liability or non-liability applying equally to both defendants. Tr.

---

[23] Although a fifth element, publication, is also an essential element of a libel claim, defendants here conceded that the challenged statements were published, so this was never in dispute. See Tr. 466.

462-464 (charge conference); Jury Instructions at 12 (corporate liability). As for damages, since the Challenged Statements, as construed by Palin, were defamatory _per se_, damages were presumed, and proof of special damages was not required as an element of liability.[24]

The First Amendment's guarantees of freedom of speech and of the press prohibit imposition of liability for libel of a public figure unless the plaintiff proves that the defendants acted with "actual malice." _Sullivan_, 376 U.S. at 279-280; _see also Harte-Hanks Commc'ns_, 491 U.S. at 666 (confirming that the _Sullivan_ rule applies to public figures).[25] It is undisputed that Palin is a public figure for the purposes of this lawsuit. _See Gertz v. Robert Welch, Inc._, 418 U.S. 323, 345 (1974) (defining public figures as those who "have thrust themselves to the forefront of particular public controversies in

---

[24] During argument concerning the jury charge, the Court denied defendants' motion _in limine_ that sought a ruling that the Challenged Statements were not defamatory _per se_. _See_ ECF 159; Tr. 682. Under New York law, "[a]ny written or printed article is libelous or actionable without alleging special damages if it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." _Rinaldi_, 42 N.Y.2d at 379. The assertion that Palin's actions played a "clear" or "direct" role in causing Loughner to commit a mass shooting undoubtedly falls within this definition of a libelous _per se_ statement. _See_ Tr. 896-897 (describing death threats Palin and her children received after the accusation was first made in 2011).

[25] Palin has consistently maintained that _New York Times v. Sullivan_ either is no longer good law or does not apply to this case, and thus that the First Amendment does not require her to prove that Defendants published with actual malice. The Court has repeatedly rejected these contentions, which are fully preserved for appellate review. _See, e.g._, ECF 117 at 11-13.

order to influence the resolution of the issues involved" and thereby "invite attention and comment"). Therefore, to prevail, Palin must prove by clear and convincing evidence that Bennet and the _Times_ published the Editorial "with knowledge that it was false or with reckless disregard of whether it was false or not." _Sullivan_, 376 U.S. at 280.[26]

New York State's "Anti-SLAPP" statute independently requires a plaintiff in Palin's position to prove actual malice, i.e., to have "established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false." Civil Rights L. § 76-a(2). The Court has already held that the current version of this

---

[26] A central plank of the defense was Bennet's assertion that he did not intend the Editorial to convey that the crosshairs map directly caused Loughner to commit the Arizona shooting. This issue largely turns on Bennet's intent in using the word "incitement." On summary judgment, the Court accepted defendants' argument that Bennet could not have actual malice as to the Editorial's purported falsity unless he was also aware that readers would interpret his words to convey the allegedly false meaning. _See_ ECF 117 at 13-15. Accordingly, the Court held that Palin was required to prove two necessary aspects of actual malice by clear and convincing evidence: actual malice as to falsity and actual malice as to defamatory meaning. _See id._ at 18-19. To prove actual malice as to defamatory meaning, Palin was required to show that Bennet either intended to convey the alleged defamatory meaning or that he was aware that ordinary readers would probably understand his words to convey the allegedly defamatory meaning and he published anyway. _See_ Jury Instructions at 20.

Although defendants' Rule 50 motion contended that Palin had failed to prove by clear and convincing evidence the aspect of actual malice concerning defamatory meaning, the Court did not address this prong of defendants' motion during oral argument. _See_ Tr. 1263. It therefore forms no part of the Court's reasoning as set forth below and is deemed denied as moot.

statute, amended November 10, 2020, applies retroactively to this action. See ECF 125. Therefore, the Court's entry of judgment as a matter of law for Palin's failure to prove actual malice rests independently on both federal law, via the First Amendment, and on New York State statutory law, via Civil Rights L. § 76-a(2).

As explained above, the Court denied Defendants' Rule 50 motion with respect to all elements except actual malice, and then only granted the motion with respect to the aspect of actual malice concerning Bennet's knowledge or reckless disregard of the Challenged Statements' falsity. It was also clear from argument that Palin was not seriously contending that Bennet published the Editorial with actual knowledge that the Challenged Statements were false; rather, Palin argued that she established actual malice by virtue of reckless disregard.

The cornerstone of the reckless disregard standard for actual malice is that the plaintiff must prove by clear and convincing evidence, that the "defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968). And, as the New York Court of Appeals has explained, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action." Liberman v. Gelstein, 80 N.Y.2d 429, 438 (1992). Liability is therefore barred unless Palin adduced clear and convincing evidence supporting the conclusion that, at a minimum, "a false publication was made with a

high degree of awareness of probable falsity." Id. Proof of negligence does not suffice to establish actual malice: "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." Id.

Nor, without clear and convincing proof that the defendant harbored serious doubts about the truth of the allegedly libelous statement, would it be enough to "show[] ... highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." Harte-Hanks Commc'ns, 491 U.S. at 666. The failure to investigate a fact or confirm an assertion before publication does not establish reckless disregard -- "even if a prudent person would have investigated before publishing the statement" -- unless the evidence proves that "defendants' 'inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity' of the published statement." Sweeney v. Prisoners' Legal Servs. of New York, Inc., 84 N.Y.2d 786, 793 (1995) (quoting Harte-Hanks Commc'ns, 491 U.S. at 692).

### B. Legal Standard -- Rule 50

As already noted, the standard for granting a motion under Fed. R. Civ. P. 50 for judgment as a matter of law requires a court to consider all the evidence in the record and draw all reasonable inferences in favor of the non-movant, here Palin. Furthermore, the Court may neither make determinations as to the credibility of

witnesses or other evidence nor weigh conflicting evidence, as any such analysis of the evidence is the jury's exclusive province.

Independently, however, in reviewing the evidentiary record of actual malice, "the judge must view the evidence presented through the prism of the substantive evidentiary burden," i.e., clear and convincing evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Anderson was a libel case, and it addressed the legal issue before this Court: the appropriate standard to apply to a defendant publisher's motion for summary judgment on the actual malice element of a libel claim brought by a public figure, which it described as identical to the standard applied to motions made under Fed. R. Civ. P. 50. Id. at 245-246, 250. The Anderson Court held that to determine whether a jury question exists as to the actual malice element, a judge must account for the clear-and-convincing standard of proof and determine. Id. at 255. Therefore, "there is no genuine issue" of material fact, and so the defendants' motion must be granted, "if the evidence presented [by the plaintiff] is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." Id. at 254.

Anderson also rejected the proposition that a jury question as to actual malice exists where the defendant's "state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue." 477 U.S. at 256. The Court thus held that a plaintiff cannot reach the jury on her libel claim "without offering any concrete evidence from which a reasonable juror could return a verdict in [her]

favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of a conspiracy or of legal malice." Id. A libel plaintiff has a "burden of producing ... evidence that would support a jury verdict." Id. "[D]iscredited testimony" of the libel defendant on its own "does not constitute clear and convincing evidence of actual malice." Bose Corp., 466 U.S. at 512. Therefore, as a matter of law, a libel "plaintiff must present affirmative evidence" supporting the inference that the defendant published with knowledge or reckless disregard of the statement's falsity to reach a jury on the question of actual malice, even though such "evidence is likely to be within the possession of the defendant." Anderson, 477 U.S. at 257. As the Second Circuit has repeatedly explained, this means that a libel plaintiff bears the burden that "[s]ome [affirmative] facts must be asserted to support the claim that the state of mind existed." Contemp. Mission, 842 F.2d at 622.

**IV.  Bennet's State of Mind**

The essential question is whether the record reflects any evidence that could give rise to the conclusion that Bennet knew or consciously disregarded that the Challenged Statements were false at the time the Editorial was published on June 14, 2017. In making this assessment, the Court, construing Palin's claim most favorably to her, assumes, as Palin alleges, that Bennet either intended his edits to Williamson's draft to convey that the crosshairs map played a causal role in spurring Loughner to commit the Arizona shooting or at least that Bennet recklessly disregarded that defamatory meaning. Therefore, the

specific inquiry is whether there is any basis from which a reasonable jury could find by clear and convincing evidence that Bennet knew or strongly suspected, before publication, that no link had been established between the crosshairs map and the Loughner shooting. As explained below, the Court concludes that the record contains no such evidence.

Palin has pointed to two categories of evidence that she argues foreclose judgment as a matter of law on actual malice: the research gathered for the Editorial and Bennet's prior awareness of Loughner's motivations. The Court deals with each in turn and then discusses other evidence in the trial record that is probative of Bennet's pre-publication state of mind.

### A. The Research

Viewed in the light most favorable to Palin, the Court assumes that Bennet read and understood three prior New York Times opinion pieces that Lett found and circulated on June 14, 2017: Frank Rich's "No One Listened to Gabrielle Giffords," DX-24, and the two editorials published in January 2011: "Bloodshed and Invective in Arizona," PX-134, and "As We Mourn," PX-135. But even on the assumption that Bennet read and understood these three articles in their entirety, none presents any definitive facts about the Arizona shooting that would have put Bennet on notice (or led him to strongly suspect) that no link had been established between the crosshairs map and Loughner's attack.

Rich's column, "No One Listened to Gabrielle Giffords" was written one week after the Arizona shooting and presented no actual evidence about Loughner's mental state at the time he committed the Tucson attack. DX-24. Rich opened by endorsing President Obama's statement that "no one can know what is in a killer's mind" but nonetheless argued that while a "simple lack of civility didn't cause the Tucson tragedy," the political violence committed by Loughner and others emerged from a context filled with violent, antigovernment political rhetoric from the radical right. Id. at 2–3. Rich contended, therefore, that the fact "[t]hat Loughner was likely insane, with no coherent ideological agenda, does not mean that a climate of antigovernment hysteria has no effect on him or other crazed loners out there." Id. at 3. Assuming that Bennet knew the contents of this column when he revised the Editorial, the Court concludes that "No One Listened to Gabrielle Giffords" provides no facts about Loughner or argument about the attack that contradict the facts asserted in the Challenged Statements. Therefore, the Frank Rich column provides no basis for finding that Bennet knew or suspected that his revision introduced false statements of fact into the Editorial.

The Times' editorial published the day after the Arizona shooting, entitled "Bloodshed and Invective in Arizona," also provides no facts or argument that contradict the Challenged Statements. This editorial describes Loughner as "appear[ing] to be mentally ill" and notes that "[h]is paranoid Internet ravings about government mind control place him well beyond usual ideological categories." PX-134 at 1. But the

piece nonetheless argues that violent, antigovernment rhetoric creates a context in which people like Loughner are more likely to commit violent acts.[27] At trial, Bennet described this as "the same point" he was trying to make in "America's Lethal Politics." Tr. 712. The core of the argument presented in "Bloodshed and Invective in Arizona" is also consistent with the argument made in "America's Lethal Politics" that violent political rhetoric can make political violence more likely to occur, even if the perpetrators are deranged:

> It is facile and mistaken to attribute this particular madman's act directly to Republicans or Tea Party members. But it is legitimate to hold Republicans and particularly their most virulent supporters in the media responsible for the gale of anger that has produced the vast majority of these threats, setting the nation on edge. Many on the right have exploited the arguments of division, reaping political power by demonizing immigrants, or welfare recipients, or bureaucrats. They seem to have persuaded many Americans that the government is not just misguided, but the enemy of the people.

PX-134 at 2. Bennet described this passage as "[t]o me, ... the same point" as the one he was trying to make in "America's Lethal Politics." Tr. 713. Granted, a tension emerges when one reads both "Bloodshed and Invective in Arizona" and "America's Lethal Politics" in the light most favorable to Palin's claim: the earlier piece says it is "facile and mistaken to attribute this particular madman's act directly to"

---

[27] See PX-134 at 1 ("But [Loughner] is very much a part of a widespread squall of fear, anger and intolerance that has produced violent threats against scores of politicians and infected the political mainstream with violent imagery. With easy and legal access to semiautomatic weapons like the one used in the parking lot, those already teetering on the edge of sanity can turn a threat into a nightmare.")

specific politicians, but the Editorial can be read as doing just that when it asserts that "the link to political incitement was clear," in the context of a discussion of the crosshairs map. But this tension emerges from the arguments made by these two pieces, not contradictions in their presentations of the relevant facts. Of course, "[u]nder the First Amendment there is no such thing as a false idea," so statements of opinion are not actionable in libel. Gertz, 418 U.S. at 340. "Bloodshed and Invective in Arizona" therefore provides no basis for concluding that Bennet knew or suspected that the Challenged Statements contained materially false statements of fact.

The third piece of research Palin emphasizes is the editorial "As We Mourn," which was published four days after the attack and praises then-President Obama's speech at a memorial service for the Tucson victims. PX-135. Palin focuses on its praise of Obama's statement that the Arizona attack should be a turning point "not because a simple lack of civility caused this tragedy -- it did not -- but rather because only a more civil and honest public discourse can help us face up to our challenges as a nation." Id. at 1-2. But neither this line nor any other portion of "As We Mourn" presents any facts that contradict the facts asserted in the Challenged Statements. Accordingly, Bennet's having read "As We Mourn" does not support the conclusion that he knew or recklessly disregarded that it was false to assert that Loughner was "incited" by the crosshairs map.

The Court also rejects Palin's argument that the presence in Williamson's draft (and the final Editorial) of the hyperlink on the

word "circulated" to the ABC News article weighs in favor of finding that Bennet published with actual malice. To be sure, had Bennet read the ABC News article -- which states in the tenth paragraph that "[n]o connection has been made between this graphic and the Arizona shooting," DX-10 at 1-2 -- it would be relevant to establishing that Bennet had reason to doubt that the "link to political incitement was clear" with respect to the Arizona shooting.[28] But Bennet testified that he neither clicked on the "circulated" link in Williamson's draft nor read the ABC News article before the Editorial was published. Tr. 609-610. And Palin has adduced no affirmative evidence to undermine Bennet's testimony on this point. Therefore, even viewing the record in the light most favorable to Palin and drawing all reasonable inferences in her favor, the Court concludes that the contents of the ABC News article did not inform Bennet's pre-publication state of mind.

Indeed, Palin effectively conceded as much by adopting the alternate position during oral argument on the Rule 50 motion that it

---

[28] Even if, assuming _arguendo_, Bennet had read the ABC News article, it is not at all clear that it would establish that Bennet knew that there was no connection between the cross hairs map and Loughner's attack. The ABC News article was written only one day after the shooting, and its thrust is that people were drawing a link between the shooting and the cross hairs map in the immediate aftermath of the attack. _See_ DX-10. A reasonable reader in Bennet's position would not necessarily understand the hedge contained in the tenth paragraph -- that within one day of the attack, no firm connection had yet been made been made between Loughner and the map -- as conclusive evidence that no such connection was later established by investigators. Of course, this point is academic, since the record reflects that Bennet never read the ABC News article before publication.

was highly unreasonable for Bennet not to have clicked the hyperlink when revising. See, e.g., Tr. 1274. But this contention fails to establish actual malice for two reasons. First, as a legal matter, assuming arguendo that Bennet was negligent -- or even grossly negligent -- in not clicking the link, that would do nothing to establish that Bennet had the subjective awareness of (probable) falsity that is the sine qua non of actual malice. See Harte-Hanks Commc'ns, 491 U.S. at 666. And second, as a factual matter, it is not at all clear that Bennet's failure to click on the link was even negligent: the hyperlink was keyed to the word "circulated," thereby implying factual support for the well-known proposition that Palin's PAC had circulated the crosshairs map prior to the Arizona shooting.[29] Palin established no reason why Bennet was negligent not to validate this proposition, which is distinct from the allegedly libelous assertion and was not subject to question at any time. Accordingly, Bennet's failure to click the ABC News link does not support the conclusion that he published with actual malice.

In sum, drawing all reasonable inferences in Palin's favor regarding Bennet's pre-publication reading, none of the research materials in the record supports the conclusion that Bennet had reason

---

[29] The full sentence in Williamson's draft read: "Then, it was the pro-gun right being criticized: in the weeks before the shooting Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs." PX-141.

to know, or even to suspect, that his revisions had introduced false statements of fact to the Challenged Statements.[30]

Accordingly, the Court concludes that none of the evidence related to the Editorial Board's pre-publication research process supports the conclusion that the Times published the Editorial with knowledge or reckless disregard as to the Challenged Statements' falsity.

## B. **Bennet's Recollection**

In addition to research conducted for the Editorial on June 14, 2017, Bennet theoretically could have had prior knowledge regarding the relationship -- or lack thereof -- between the crosshairs map and the Arizona shooting. But the record belies this possibility. Bennet testified that he was not aware of the details of the Loughner case and that he did not recall the controversies surrounding the crosshairs map before the Editorial was written. Palin offered no admissible evidence that would undermine Bennet's testimony on this point. Nor are Bennet's contemporaneous communications inconsistent with his testimony. Accordingly, the Court concludes that Palin has not proved that Bennet had any prior recollection of the Arizona shooting from which a rational jury could infer that he published with actual malice.

Bennet testified that he did not recall seeing the crosshairs map or any press coverage about it when the map was originally released

---

[30] Nor was there any other research that could have informed Bennet's state of mind on June 14, 2017, because he testified that he relied on Lett's research and did no independent research himself. Tr. 610, 621.

in 2010. Tr. 607. Nor does Bennet recall seeing any posts on Twitter that Palin made in connection with the map. Id. Indeed, Bennet testified that at the time he revised the Editorial, he did not have a mental image of the map and "was relying on [Williamson's] description of it in the piece."[31] Id.; see also Tr. 705.

Bennet also denied having any recollection of specific articles he read in 2011 or thereafter about the Arizona shooting that discussed Loughner's mental state at the time of his attack.[32] Tr. 620. Bennet

---

[31] Palin had sought to offer evidence regarding James Bennet's brother, Michael Bennet, who has served during all times relevant to this case as the Democratic Senator representing Colorado. Palin had argued both that James Bennet's relationship to his brother could establish bias and that it would have made James Bennet more likely to have been aware of the cross hairs map at the time it was published. See, e.g., Tr. 501-502; ECF 147. However, the Court ultimately sustained the Times' objections, articulated on the record and in a motion in limine, see ECF 136, and excluded this evidence both on grounds of relevance, since plaintiff's counsel had laid no foundation adequate to support either asserted theory of relevance, and on Rule 403 grounds. Tr. 502-503.

Palin adduced no affirmative evidence that Bennet or others on the Times' Editorial Board were biased, fairly or unfairly, against Palin. Even had Palin been able to elicit such evidence, whether arising from James Bennet's relationship with his brother or from any other source, that would not have established actual malice. See, e.g., Harte-Hanks Commc'ns, 491 U.S. at 666; Buckley v. Littell, 539 F.2d 882, 889 (2d Cir. 1976). ("Repeatedly the Court has said that ill will toward the plaintiff or bad motive, indeed, hatred, spite or desire to injure, are not the kind of 'malice' that the New York Times Co. v. Sullivan test comprehends.").

[32] Palin had sought to offer several articles written by the commentator Andrew Sullivan who published a blog called The Daily Dish that was associated with website of The Atlantic magazine at the time of the Arizona shooting, when Bennet was the editor of The Atlantic. The Daily Dish articles concerned the investigation into Loughner's attack and the allegation made in its immediate aftermath, but ultimately discredited, that the cross hairs map played a role in causing Loughner to commit the mass shooting. Plaintiff's counsel

did, however, have the general recollection of learning from media reports that Bennet "was deranged." Tr. 621. But Bennet testified that he was unaware on June 14, 2017 "whether or not Jared Loughner had seen the crosshairs map," because, he explained "I hadn't reported that myself and I don't think I read any reporting on that. So I didn't know." Tr. 720. Still, he testified that he had "remember[ed] that there had been a debate ... after the shooting ... about exactly this issue, about, you know, inciting rhetoric, but my memory of that was vague." Tr. 702-703. He did not think to look into this issue, Bennet explained, because he "was functioning as the editor, not the reporter on the piece, so [he] wouldn't normally do the reporting in a situation like this, particularly when ... on a tight deadline." Tr. 721.

Bennet continued:

> I didn't think then and don't think now that the map caused Jared Loughner to act. I didn't think we were saying that, and therefore I wouldn't have -- the question wouldn't have entered my mind, didn't enter my mind to research that question.

---

intended to offer these articles to show that Bennet knew that the allegations of a link between Loughner and the map had been discredited. However, plaintiff's counsel was unable to offer an adequate foundation for these articles' admission. The record reflects that Bennet had no editorial responsibility over The Daily Dish, and plaintiff's counsel never elicited any testimony or proffered any other evidence that Bennet had in fact read the articles in question. Accordingly, the Court excluded the articles under Fed. R. Evid. 401 and 402, subject to reconsideration. Tr. 503-511. Specifically, the Court provided plaintiff's counsel the opportunity to conduct voir dire of Bennet outside the presence of the jury to lay additional foundation for the articles' admission. Tr. 508. However, plaintiff's counsel never availed themselves of this opportunity.

Tr. 721. Palin might argue that the first sentence of this comment indicates that Bennet did not believe that what he was writing was true. But the Court concludes that is not a reasonable reading of Bennet's answer and that such a reading would be inconsistent with Bennet's testimony overall. The answer as a whole explains that Bennet's intention was to convey a message that was consistent with his understanding of the Arizona shooting. As Bennet explained a few answers earlier, "when politicians get shot, I suspect it has something to do with politics, and I think that an atmosphere of highly charged political rhetoric makes such, you now, terrifying events more likely." Tr. 720. Accordingly, Bennet's statement that he "didn't think then ... that the map caused Jared Loughner to act" cannot reasonably be read to mean that he thought the map did not contribute at all to the Tucson attack. Rather, the answer must be read to explain that because Bennet did not intend to convey that the crosshairs map directly caused Loughner to act, he therefore did not consider the need to research the veracity of that assertion. In any event, the statement does not suggest that Bennet knew or suspected that there existed any official or widely accepted conclusion that no link whatsoever existed between Loughner's attack and the map. Therefore, it cannot be reasonably inferred from this answer that Bennet published the Editorial with actual malice.

The evidence reflects that Bennet did not introduce the crosshairs map to the draft Editorial, nor did he direct Williamson or anyone else at the Times to refer to Palin in the Editorial. See Tr. 720.

True, Bennet brought up the Giffords shooting in his 12:41 p.m. email, which stated:

> Hey Elizabeth -- As Bob has said there's most likely a gun control point to be made here. The other question is whether there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence. Hard for me to imagine that Bernie himself is guilty of anything like that. But if there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right (e.g., in the run-up to the Gabby Giffords shooting) we should deal with that.

DX-17. Bennet explained that Loughner's shooting of Representative Giffords was "the obvious precedent" for the "violence against politicians" in the Virginia shooting, Tr. 635, and that his "assumption is that when a politician gets shot, that politics probably had something to do with it," Tr. 704; see also Tr. 720. Bennet also reasonably explained the editorial guidance in his 12:41 email as a proposal for Williamson to research, rather than a directive for her to implement:

> I think "whether" is an important word in this sentence. You know, I've got it there twice. I'm -- I'm putting this to my colleagues as -- I'm raising it as a point to be considered as something we might include, you know, the other question is whether there's a point to be made about this. And then I say the point -- in my mind, the point is whether it incites people to this kind of violence. I didn't write that it incites people to this kind of violence. And I think that's a significant difference. My intention was to raise a question, to make an argument that this was this danger but not to assert it as a matter of fact. Because like the easy availability of guns, you know, I don't have -- I can't prove -- I can't prove that this kind of rhetoric actually, you know, does lead to this sort of violence.

Tr. 700-701. Bennet further testified that when he reviewed Williamson's full draft just after 5:00 p.m., he understood the

56

reference to the crosshairs map to be "the specific example that [Williamson] returned with of incitement or incendiary rhetoric, and I just trusted that it was ... an example of that based on her characterization." Tr. 719. While Bennet then inaccurately strengthened Williamson's language in a manner that led to the factual error, none of Bennet's editorial direction from earlier in the day supports the proposition that Bennet knew or suspected that Loughner's actions were wholly unrelated to the crosshairs map.

If anything, the record as a whole reflects that Bennet had a general, albeit inaccurate, recollection (or, perhaps, assumption) that the Arizona shooting was preceded by "inciting" political rhetoric and that he incorrectly understood Williamson's reference to the crosshairs map as confirmation of that connection. If that account does reflect Bennet's thought process, then it undermines, rather than strengthens, any inference that he knew or suspected that his revision introduced falsity to the Editorial.

In sum, Palin adduced no evidence suggesting that Bennet (and therefore the Times) was aware, at the time "America's Lethal Politics" was published, that the hypothesized link between her crosshairs map and Loughner's attack had been widely rejected.

### C. Other Evidence

As discussed above, Palin failed to offer any affirmative evidence supporting the inference that Bennet knew or suspected that his revisions introduced falsity to the Editorial. This alone suffices for the Court to conclude that Palin failed to adduce evidence sufficient

for a reasonable jury to find by clear and convincing evidence that Bennet published with actual malice. A public figure cannot rely solely on the chance that the jury declines to credit the defendant's testimony denying that he had the necessary state of mind. See Anderson, 477 U.S. at 256; Contemp. Mission, 842 F.2d at 621-622; see also § III.B, supra. Nonetheless, the record reflects a wealth of other evidence that is incompatible with the inference that Bennet knew or suspected that his revision introduced falsity to the Editorial, even if that evidence is viewed in the light most favorable to Palin.

First, the context of Bennet's revision in the Times' editing and fact-checking processes belies the inference that he intentionally or recklessly published false information. Far from Palin's allegation that Bennet intentionally defamed her by forcing the Editorial Board to write a piece in accordance with his diktats because he purportedly held a political grudge against her or her positions, the evidence shows that Bennet did not seek out the opportunity to revise Williamson's draft. The uncontroverted testimony is that Cohn brought the draft Editorial to Bennet's attention because she thought that the draft's argument was unclear; Bennet did not direct Cohn, Williamson, or anyone else to involve him in the editing process for "America's Lethal Politics." See Tr. 520, 636. After Bennet completed his revision at 7:21 p.m., DX-30 at 178, he immediately emailed Williamson, asking her to "[p]lease take a look." PX-163. Bennet testified that his request to "[p]lease take a look" was intended to convey to Williamson

that she should review the piece for fact-checking issues. Tr. 638. This request is incompatible with the inference that Bennet published with actual malice.

Since Bennet was acting as the editor, and since he had not conducted any of the reporting himself, sending a "playback" of the Editorial to the primary author, Williamson, was consistent with <u>Times</u> practices, as they were consistently explained at trial. <u>See</u> Tr. 639, 577. Bennet also submitted his draft to the other editors who were responsible for ensuring the quality, clarity, and accuracy of Editorial Board publications. Accordingly, after Bennet completed his revision, the draft was reviewed, edited, and (in some cases) corrected by Williamson (fact checking), Cohn (editing), Lepping (fact checking), Semple (editing), and Levine and Rakowski (copy editing). <u>See</u> <u>supra</u> § I.D. The thoroughness of these checks was obviously limited by the fact that the print deadline was less than an hour after Bennet saved his draft to Backfield. But the record reflects that this time pressure is routine in the daily newspaper business and not at all suggestive of actual malice.

The Court therefore concludes that, even taking every inference in Palin's favor, Bennet's compliance with these normal pre-publication procedures is consistent with the behavior of a high-ranking editor who is somewhat removed from the reporting details underlying the piece and so was relying on the established processes to ensure that his revisions did not introduce errors. Those processes may have failed in this case; but, nonetheless, Bennet's submission

of the Editorial to several layers of pre-publication review is inconsistent with his intentional or reckless publication of false information.

Second, Bennet's post-publication[33] email exchange with <u>New York Times</u> columnist Ross Douthat about the criticism of the Editorial emerging on Twitter is inconsistent with Bennet having already known or suspected that his revisions introduced falsity. After Douthat explained that the Editorial had the facts of the Loughner case wrong, Bennet responded by stating, in part, that his "understanding was that in the Giffords case there was a gun sight superimposed over her district; so far in this case we don't know of any direct threat against any of the congressmen on the field.... That's not to say ... that the violence in [this] case was caused by the pol[i]tical rhetoric."[34] PX-174. Bennet's response does not specifically insist that he was correct to assert that "the link to political incitement was clear," but he does not state or imply that he believes the

---

[33] See <u>Stern v. Cosby</u>, 645 F.Supp.2d 258, 280 n.14 (S.D.N.Y. 2009) (holding that post-publication statements may be considered as evidence of the defendant's pre-publication state of mind) (Chin, J.).

[34] This email's accurate description of the crosshairs map contrasts with the inaccurate description of the map in the published Editorial and, when viewed in the light most favorable to Palin, could support the inference that Bennet knew that the description of the map Williamson had drafted was false. But Palin does not contend that the inaccuracy in the map's description was a defamatory falsehood; Palin instead complains about the asserted link between her PAC's map and Loughner's attack. Accordingly, no reasonable jury could find that this discrepancy establishes that Bennet published with actual malice as to the falsity of the allegedly defamatory aspects of the Challenged Statements.

Editorial to make a false assertion of fact. Bennet writes instead
that the "specific" link between the crosshairs map and Representative
Giffords does not mean that the map "caused" Loughner's violence, a
message he testified he did not "intend[] to send." Tr. 645.

After checking Twitter to read some of the criticism of the
Editorial, Bennet sent a text message to Williamson asking, about "the
Giffords comparison." DX-46. Bennet asked Williamson, "Do we have it
right?" Id. Even viewing this message and the associated testimony in
the light most favorable to Palin, it suggests that at 11:38 p.m. on
June 14, 2017, Bennet did not know whether the "link" asserted in the
Editorial between the Arizona attack and "political incitement" was
accurate. The late-night message, which Bennet said he sent "[b]ecause
[he] was really worried," Tr. 747, is inconsistent with Bennet having
already known or suspected that the asserted link was false.

Bennet's emails and text messages sent the next morning are also
inconsistent with him having already known or suspected that the
Challenged Statements were false. At 5:08 a.m. -- an "unusual[ly]"
early time for Bennet to be emailing, Tr. 282 -- Bennet told Williamson
and Lepping, in part:

> I don't know what the truth is here but we may have relied too
> heavily on our early editorials and other early coverage of that
> attack. If so, I'm very sorry for my own failure on this
> yesterday. In any case I'd like to get to the bottom of this as
> quickly as possible this morning and correct the piece if needed.
> Can you two please put your heads together on this first thing
> this morning? Please skip the morning meeting if necessary.

PX-191. There are several aspects of this message that undermine the
inference that Bennet had already known or suspected falsity.

First, Bennet states "I don't know what the truth is here." This was an unusual admission: Lepping testified that she had never heard these words from an editor before. Tr. 440. While it may have been negligent for the Times to publish an article that could be read as making a serious accusation without checking if the accusation was true, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action."[35] Liberman, 80 N.Y.2d 438.

The second significant aspect about the email is that Bennet instructed Williamson and Lepping to "get to the bottom of [the factual question] as quickly as possible ... and correct the piece if needed." PX-191. Later that morning, in a text message to Williamson, Bennet reiterated that he "need[ed] ... a rock-solid version" of the correction, which he did not "want to soften if ... we don't need to -- if there was no link we should say so." DX-46 at 2. The Court concludes that these directives are irreconcilable with the suggestion that Bennet purposefully or recklessly published false information. Had he known or suspected the information was false before publication,

---

[35] The Court asked during oral argument for the parties to identify any caselaw that concerned whether the standard for reckless disregard is affected where the allegedly libelous statement had levied serious charges, criminal or otherwise, against the plaintiff. Tr. 1260-1262, 1277. There was extensive argument on this point, and the Court was ultimately persuaded that none of the cases identified by plaintiff's counsel stood for any such proposition that would reduce her burden of proof on actual malice. See generally Tr. 1264-1281.

he likely would have been defensive, avoided issuing a correction to the Editorial, or tried to minimize the correction's confession of error.

The third significant aspect of Bennet's email is his expression of regret for the mistake, which he describes as his "own failure." Bennet's apologetic tone was repeated elsewhere on June 15, 2017. Williamson testified that Bennet was "crestfallen" about the error, Tr. 183, and Bennet's text messages later that morning also reflect that he "fe[lt] lousy about" the error and that he was "sorry." DX-46 at 2. When working on the Twitter posts that would disseminate the first correction, Bennet edited the language proposed by another New York Times staff member to add an apology for the error and thank readers for "call[ing] us on the mistake." DX-53 at 1; Tr. 1033. Bennet also drafted a statement in response to questions from a CNN media reporter in which he stated that "I, James Bennet, do apologize to [Sarah Palin] for this mistake." DX-60 at 2. However, a member of the New York Times Co. public relations staff did not pass along this statement to CNN, so it was never published. PX-236. But for the purpose of assessing Bennet's state of mind, it is not relevant whether the apology ultimately reached Palin. What matters is that, as Bennet testified, "I tried [to apologize] that day. I did -- I thought I had apologized to her. I went home that night thinking I had made a personal apology to the Governor." Tr. 675. The Court concludes that even applying the Rule 50 presumptions, Bennet's private and (intended to be) public expressions of apology, all made before the prospect of

litigation had arisen, are inconsistent with his having intentionally or recklessly introduced the factual error to the Editorial.

Accordingly, the Court's review of the remaining evidence in the record that is relevant to Bennet's pre-publication state of mind weighs heavily and uniformly against finding that he knew or recklessly disregarded that his revisions introduced false statements of fact into the Editorial.

## V.    Conclusion

For the reasons set forth above, the Court finds that Palin adduced no affirmative evidence that Bennet knew that the Challenged Statements were false or recklessly disregarded their probable falsity. The Court is therefore bound to conclude that no reasonable jury could find that Bennet, and therefore The New York Times Co., published "America's Lethal Politics" with actual malice. Clear and convincing proof of knowledge or reckless disregard for falsity is an essential element of a public figure's libel claim. It is required both by Sullivan's construction of the First Amendment and, independently, by N.Y. Civil Rights L. § 76-a(2). Palin thus failed, as a matter of both state and federal law, to carry the heavy burden necessary to prove her libel claim. So the Court was obliged to grant Defendants' Rule 50 motion and dismiss the action with prejudice.

Although the Final Judgment ultimately rests on the Court's dismissal of the action under Rule 50, that legal conclusion is reinforced by the jury's verdict that defendants are not-liable. The Court continues to have great confidence in the integrity of the jury's

verdict, notwithstanding that a few jurors became aware, involuntarily, of the bare fact that the Court intended to dismiss the case as a matter of law. In a case attracting a high degree of public attention, it is inevitable that at least some jurors will encounter information outside the Court's control, even if they are completely conscientious. Here, of course, it was the timing of the Court's announcement of its Rule 50 determination that increased the risk that some jurors would encounter some snippets of the Court's legal conclusion, and that is unfortunate.[36] But the jurors who saw the media coverage say they did as instructed: they turned away from the reports and set the information aside for the remainder of the deliberation. The jurors, both those who reported awareness of the Rule 50 decision and the others, insisted to the Court's law clerk that the information played no role whatsoever in their deliberations and did not affect the outcome. While some outsiders, totally unfamiliar with the exceptional jury in this case,[37] have been quick to assume otherwise,

---

[36] The Court is frank to confess that it was not familiar with the term "push notification" when it was raised by counsel for the Times and did not fully appreciate the potential for jurors to be involuntarily informed about the Court's intended ruling through their smartphones. But it must also be remembered that when defense counsel referred to the term "push notifications," Tr. 1307, the Court responded by doing what defendants' counsel requested, i.e., reminding the jurors of their duty to disregard anything they heard about the case in the media. Defendants' counsel sought no further relief (such as a direction to the jurors to turn off any automated alerts for the duration of the trial) and plaintiff's counsel did not seek any such step or indeed any instruction to the jury whatsoever.

[37] As the Court remarked on several occasions during the trial itself, the jury in this case was a model jury, carefully watching the witnesses, taking copious notes, and in general, showing that they

the Court knows of no reason why the highly conscientious citizens who served as jurors in this case would be so firm that they were unaffected by this information unless it were true. The Court is thus left with the definite conviction that the information did not remotely affect the ultimate verdict.

It also bears repeating that the Final Judgment entered for defendants does not legally depend on the verdict. The verdict could only acquire legal significance if the Court's Rule 50 decision were overturned on appeal and the Court of Appeals then decided to give effect to the verdict rather than remand for retrial.

It remains only to add that the Court's decision to enter judgment as a matter of law also reflected its duty to ensure that public figure libel actions with constitutionally inadequate evidence do not erroneously result in the imposition of liability that might chill protected speech. In libel cases that concern public figures and matters of public concern, the court "must make an independent examination of the whole record so as to assure [itself] that the judgment does not constitute a forbidden intrusion on the field of free expression." Sullivan, 376 U.S. at 285. That principle is no less true in cases where the alleged libel was provably false but neither intentionally nor recklessly so. As the Supreme Court later elaborated:

> [J]udges ... must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation

intended to decide the case based solely on the evidence. See, e.g., Tr. 689, 878, & 1324.

> case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

Bose Corp., 466 U.S. at 510-511; see also Harte-Hanks Commc'ns, 491 U.S. at 697 (reading Bose as requiring "trial judge[s]" to "make their own 'independent' assessment of the facts allegedly establishing actual malice") (Scalia, J., concurring). This independent duty to review the whole record is particularly important where the jury is tasked primarily with "distinguishing actual malice from mere negligence," because this is an area in which "jurors have considerable trouble." Tavoulareas v. Piro, 817 F.2d 762, 807 (D.C. Cir. 1987) (R.B. Ginsburg, J., concurring). And, as this case demonstrates, the stakes of the distinction between negligent error and reckless disregard are significant: the preservation of the "area of breathing space" that "[o]ur profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out ... so that protected speech is not discouraged." Harte-Hanks Commc'ns, 491 U.S. at 686.

For all the reasons set forth above, the Court entered final judgment as a matter of law in favor of The New York Times Co. and James Bennet, because no reasonable jury could find that Sarah Palin proved that the defendants published "America's Lethal Politics" with actual malice.

SO ORDERED.

New York, NY
March 1, 2022

JED S. RAKOFF, U.S.D.J.

**JA 2031**

H7VVPALA1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  SARAH PALIN, *an individual*,

4                    Plaintiff,

5           v.                          17 CV 4853 (JSR)

6  THE NEW YORK TIMES COMPANY, *a*
   *New York corporation*,
7
                   Defendant.          ARGUMENT
8  ------------------------------x
9                                      New York, N.Y.
                                       July 31, 2017
10                                     4:17 p.m.

11 Before:

12                 HON. JED S. RAKOFF,

13                                     District Judge

14                       APPEARANCES

15 BAJO CUVA COHEN TURKEL
        Attorneys for Plaintiff
16 BY:  KENNETH G. TURKEL
        SHANE B. VOGT
17      -AND-
   GOLENBOCK EISEMAN ASSOR BELL & PESKOE
18 BY:  S. PRESTON RICARDO

19 LEVINE SULLIVAN KOCH & SCHULZ
        Attorneys for Defendant
20 BY:  DAVID A. SCHULZ
        JAY W. BROWN
21      JEREMY A. KUTNER

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H7VVPALA1

```
 1              (Case called)

 2              THE COURT:  We are here on the motion to dismiss.

 3              Just to frame the background, in an editorial that

 4     appeared in The New York Times on June 14, 2017, the editorial

 5     first identified two instances of mass shootings that were

 6     "fueled by politics"; the second of those was the attack in

 7     Tucson, Arizona by Jared Lee Loughner on January 8, 2011, which

 8     seriously wounded representative Gabby Giffords.  I might add,

 9     though it has nothing to do with this motion or this case, that

10     everyone seems to have forgotten that there were five people

11     killed in that incident, including the chief judge John Roll of

12     the federal court.

13              In any event, the editorial stated:  "The link to

14     political incitement was clear.  Before the shooting, Sarah

15     Palin's political action committee circulated a map of targeted

16     electoral districts that put Ms. Giffords and 19 other

17     democrats under stylized crosshairs."

18              The editorial, also comparing that with the other

19     incident, the much more recent shooting on June 14, 2017

20     allegedly by James Hodgkinson, said the Hodgkinson shooting was

21     one in which there was "no sign of incitement as direct as in

22     the Giffords attack."  However, the editorial also included a

23     hyperlink to an ABC News article that itself stated that "no

24     connection has been made between the crosshairs map and the

25     Arizona shooting."
```

1          Within two days following the publication of the

2     editorial, *The Times* changed the text by deleting the phrase as

3     referring to the link to political incitement was clear and

4     referring to that there was no sign of incitement as direct as

5     in the Giffords attack, and adding the sentence:  "But no

6     connection to that crime was ever established."

7          *The Times* also issued a correction in print and online

8     noting that:  "An earlier version of this editorial incorrectly

9     stated that a link existed between political incitement and the

10    2011 shooting of representative Gabby Giffords.  In fact, no

11    such link was established.

12         "The editorial also incorrectly described a map

13    distributed by a political action committee before that

14    shooting.  It depicted electoral districts, not individual

15    democratic lawmakers, beneath stylized crosshairs."

16         So we're ready to hear first from moving counsel.

17         MR. SCHULZ:  Thank you, Judge.

18         To clarify, maybe before I jump in on the timeline

19    that you just recited, the facts actually are -- although they

20    are not all pleaded in the complaint this way, but the

21    corrections were made within about 13 hours.

22         THE COURT:  Okay.

23         MR. SCHULZ:  The two corrections that were referred to

24    were about 45 minutes apart, so it was done very quickly,

25    although the exact times are not in the complaint.

 1           I'd like to start by stressing the First Amendment

 2      overlay that exists here, because this case raises issues that

 3      are of central concern to the First Amendment, which is

 4      designed to protect robust speech on matters of public debate.

 5           This is a case arising out of an editorial on gun

 6      control issued the same day as that shooting.  It wasn't

 7      sometime earlier, it was that day, which also explains how it

 8      was written and the time it was written under.

 9           THE COURT:  Well, I'm happy to hear your stump speech,

10      but I think it's common ground that when a public figure is

11      involved, even false statements are protected unless they were

12      done with actual malice.  But if they are done with actual

13      malice, then there is no First Amendment protection, true?

14           MR. SCHULZ:  That is correct, Judge.

15           But the point I'm trying to make is that the First

16      Amendment overlay affects all of the theories that we argued as

17      to why and the grounds for dismissal here are in view with

18      constitutional concerns.  Everywhere there's a closed question,

19      the courts have made clear, the Second Circuit has made clear

20      that that First Amendment overlay says that you should be

21      resolving all doubts in favor of protecting the First

22      Amendment.

23           THE COURT:  I hear you.  But, on the other hand, isn't

24      it true on any motion to dismiss that all reasonable inferences

25      favorable to the adverse party, the party against whom the

H7VVPALA1          **JA 2035**

1     motion is directed, must be drawn in that party's favor?

2              MR. SCHULZ:  Certainly, your Honor, on a motion to

3     dismiss.

4              THE COURT:  This is a motion to dismiss.

5              MR. SCHULZ:  I'm agreeing with you.

6              THE COURT:  Okay.

7              MR. SCHULZ:  But let's just start there with actual

8     malice, because that's what the Court brought up.

9              Ms. Palin's theory of her claim, which is clearly

10    articulated on page 14 of her memo, is that she has alleged

11    actual malice because, in her view, *The New York Times*

12    knowingly inserted a deliberate lie into that editorial and did

13    it for two reasons:

14             One, because it thought it could profit off the use of

15    her name because it would drive web traffic and add revenue;

16    and, second, because *The Times* doesn't really like Ms. Palin,

17    and it needed to use her -- in their words -- to mount a

18    counterattack on conservative and right-wing media who are

19    demanding condemnation of hate speech by anti-Trump liberals

20    and wanted to use her for a counter-narrative.  That's their

21    theory of why there is actual malice here.  On its face,

22    neither of those theories is plausible, given the facts that

23    are alleged and what we know.

24             What we know from the Second Circuit in the *Biro* case

25    is that this Court is charged with looking very closely at the

1   allegations of actual malice in particular to determine whether

2   they meet that threshold.  And as Judge Oetken noted in the

3   district court decision in that same case, this all makes sense

4   if you look at the constitutional concerns.  Actual malice is

5   something very hard to prove at trial and intentionally so.  It

6   requires evidence not just of a normal civil case, it requires

7   clear and convincing evidence; therefore, it's entirely

8   appropriate that on a 12(b)(6) motion that the Court must

9   require the plaintiff at a high threshold to make a reasonable

10  inference that there's plausible grounds to believe that actual

11  malice existed here.

12          THE COURT:  I thought the definition of actual malice

13  was not a question of motive -- though motive may be part of

14  the mix that the Court may want to look at -- but under *New*

15  *York Times v. Sullivan*, actual malice is defined as knowledge

16  that the false statement was false or reckless disregard of

17  whether it was false or not.  That's the standard, is it not?

18          MR. SCHULZ:  Yes, it is, Judge.

19          Just to be clear, as the Supreme Court clarified in

20  *Garrison* and *St. Amant* and some other cases, both prongs of

21  actual knowledge and reckless disregard are intended to require

22  elements of knowledge of the defendant.  Reckless disregard

23  doesn't mean they overlooked something; it means they had

24  serious doubts -- they weren't sure it was false, but they had

25  serious doubts and published anyway.  So it's not a gross

1   negligence standard.

2          THE COURT:  I agree.  It's definitely not gross

3   negligence.  Reckless disregard is a well-established concept

4   in the law and it means usually stating something with

5   knowledge that there is a high probability that it is false.

6          MR. SCHULZ:  Correct.

7          So the plaintiffs here are attempting to suggest to

8   the Court that you should find plausible reason to believe that

9   *The Times* published this knowing it or, as they put it, you

10  should find plausible reason to believe that it was an

11  intentional lie aimed at Ms. Palin because they had an economic

12  motive and because they have a political motive.

13         THE COURT:  What I'm trying to get at is let's put

14  motive aside for the moment; I agree that that's not

15  irrelevant, but it's not itself a required aspect.  You could

16  have a case where you have no idea what the motive is, but if

17  you had direct evidence of actual knowledge of falsity, that

18  would be sufficient.

19         So here, we have their own hyperlink showing that

20  there is no evidence of any link.

21         MR. SCHULZ:  No established evidence.

22         THE COURT:  And yet they are saying -- both directly

23  and indirectly -- that there is such a link.

24         MR. SCHULZ:  Let's just take a peek.

25         I agree with you on motive, that the motive shouldn't

1    matter.  I just highlight that because in their memo opposing

2    this motion, that is their main reason for saying you should

3    find actual malice here, because there was a motive to lie.

4    The motive doesn't make sense.  The motive doesn't even make

5    sense in the editorial.  They say they wanted to use her to

6    push back on the conservative line.  The editorial itself

7    adopts the conservative line.  It says the conservatives are

8    right here; we should be upset on both sides by the rhetoric.

9    So their whole thing doesn't make sense on its own, but that's

10    their main theory.

11            But to turn to the question you are asking about, what

12    is the evidence of actual knowledge?  Their arguments are

13    essentially that the fact of a link between the crosshairs map

14    and the shooting had been so debated and had been generally

15    discounted that it's inherently implausible that they didn't

16    know that it was untrue.

17            THE COURT:  When you look at the map, it says SarahPAC

18    www.  Then it says:  "Twenty house democrats from districts we

19    carried in 2008 voted for the healthcare bill.  It's time to

20    take a stand."  Then there's a map that pinpoints each of those

21    districts.

22            MR. SCHULZ:  And identifies each of the

23    representatives by name.

24            THE COURT:  Below, not where the pinpointing occurs.

25            What even remotely plausible basis could anyone have

1    for believing that that was an incitement referred to violence?

2              MR. SCHULZ:  Well, Judge, you have to understand this

3    in the context of all of the facts that happened before.  That

4    map was put out by a PAC, almost immediately after the house

5    voted in favor of ObamaCare.  It was an anti-ObamaCare act and

6    it was essentially saying, These 20 representatives are in

7    districts that Sarah Palin and John McCain carried in the last

8    election.  We need to target them and throw them out because

9    they voted for this horrible law.

10             THE COURT:  Let's just stop there.

11             If it had said exactly what you just said, forget now

12   about the map, just what you just said, would you say that

13   anyone could plausibly or even conceivably view that as an

14   incitement to violence?

15             MR. SCHULZ:  Well, you have to combine that with the

16   fact that --

17             THE COURT:  Can you answer my question?

18             MR. SCHULZ:  Yes, absolutely, Judge.

19             THE COURT:  You think so?

20             So every time anyone says, We don't like the vote that

21   someone just made in Congress or anywhere else, and they are

22   coming up for reelection, let's target them for defeat, that,

23   in your view, could warrant any person, any reasonable person,

24   in saying, Oh, yes, that's an incitement to violence?

25             MR. SCHULZ:  Judge, it has to be understood in

1    context.  It came out after this vote.  There was a lot of

2    other rhetoric.  Sarah Palin was tweeting at the same time, We

3    don't retreat; we reload.

4             THE COURT:  I thought that was in a different context.

5             MR. SCHULZ:  After that map came out, and this, again,

6    is in newspaper articles contemporaneous with this happening,

7    several of the representatives whose names were listed there,

8    were attacked or vandalized.  They had their homes vandalized,

9    they had their offices vandalized, including Gabrielle

10   Giffords, her office was vandalized, which caused her to go on

11   national TV and decry this type, specifically citing the map,

12   saying, Words have consequences.  This is bad.

13            And then, six months later, eight months later, she's

14   shot and this whole issue comes up again.  It wasn't me

15   suggesting it; it was the No. 1 issue on Facebook that was

16   being debated about what role did the map --

17            THE COURT:  Of course we all know that Facebook is the

18   standard of reasonableness.

19            MR. SCHULZ:  But my point is, Judge, to your question,

20   people at the time thought that there was a link here; that

21   this was outrageous conduct and they were making a lot out of

22   it.  It was widely discussed at the time.

23            THE COURT:  I'm still at a loss to see what's

24   outrageous about this.

25            Supposing, instead of the crosshairs, which not only

1    are part of a gun, but they are part of innumerable optical

2    instruments, but instead of crosshairs it had been a

3    bull's-eye, would your argument be the same?

4         MR. SCHULZ:  The question is what would people -- what

5    would be the intended message there?  Was it the message --

6         THE COURT:  So you think every time Target Stores puts

7    out an ad, they are inciting people to violence?

8         MR. SCHULZ:  No, Judge.  It's not a question of what I

9    think; it's how people reacted to this ad.  Remember, this

10   editorial was written, what, six years -- 2010 -- six or seven

11   years after this happened.

12        THE COURT:  What it's asserting is not that people at

13   the time thought this, it's asserting as a fact that there's a

14   direct link between this and the shooting.

15        MR. SCHULZ:  Right, Judge.  You have to understand the

16   concept.  The reason that the correction was made is that the

17   editorial writers, if you read the editorial literally for what

18   it says as to how it's characterized in the complaint, the

19   point that the writers were making is that in the Giffords

20   shooting, not that there was a causal link between the map and

21   the shooting, but there was a rhetorical link --

22        THE COURT:  Whoa, whoa.  Wait a minute.

23        MR. SCHULZ:  Judge --

24        THE COURT:  You think that the words "direct link" is

25   not a reference to causality?

1          MR. SCHULZ:  It was a link between the rhetoric and

2     the shooting, yes.  And what they were trying to convey, Judge,

3     is all the things I was just saying.  When the map came out,

4     there was all of this upset; that in the Giffords shooting,

5     Giffords had been named in the ad, her district had been

6     targeted as someone who should be thrown out of office.  After

7     the ad came out, her campaign office was attacked; she made

8     national speeches about it; and then she was shot.

9          The point they were making is there's no similar

10     connection between this killer or the shooter in Virginia and

11     any of the people there.  I'm sorry.  There was no similar link

12     between Bernie Sanders, who everyone was saying incited this

13     killer, and anybody who was on that ball field.  Bernie Sanders

14     never put out an ad saying, We've got to get rid of

15     Representative Scalise or any of the other people on the ball

16     field.

17          THE COURT:  I'm sure Bernie Sanders' rhetoric was

18     quite cautious and quiet.  That's certainly his reputation.

19          MR. SCHULZ:  That's not my point, Judge.  That is not

20     my point.

21          The point of the editorial was at least in the

22     Giffords case there was a direct link between the controversial

23     ad and the controversial statements and the person who was

24     shot.  In the case of Bernie Sanders, all the controversial

25     statements and his fiery rhetoric against republicans was never

1    directed against any of the individuals who were shot.  That's

2    a fact.  That's a simple point they were trying to get across.

3    When they realized the way they had phrased it, it was being

4    understood that there was a causal link, they immediately

5    corrected it.  That's what's going on here.

6         So to go back to the actual malice argument, the

7    question is did they knowingly lie about causal link.  There is

8    no plausible grounds to believe that from the facts that they

9    allege.

10        You start with the fact that there is this whole

11   history about what happened after the map came out and

12   instances of violence that they would have been aware of; that

13   it was widely discussed at the time of the shooting, that's in

14   the complaint, paragraph 24; and that other people had

15   construed this the same way.  They don't talk about it.  It's

16   Exhibit D to the second Brown declaration.

17        Six months before the shooting in Virginia, there was

18   a shooting in Washington, D.C., another mentally deranged

19   person went into a pizza store and shot up the store because he

20   believed political rumors he'd read online about Hillary

21   Clinton running a sex ring out of there with children.

22        *The Washington Post* at that point ran a column that

23   made much the same argument that *The Times* was making.  On

24   December 6, 2016, it said, and I'm quoting:  "Supporters of

25   former Alaska governor Sarah Palin put out a map with

1    crosshairs targeting the districts of 20 house democrats."

2              *And then it continues:  "On January 8, 2011, the day*

3    *of the shooting, the consequences were chilling.  Words matter.*

4    *That kind of disregard for common sense and responsibility cuts*

5    *into what we have today.  This editorial was part of an ongoing*

6    *political debate about the level of rhetoric, and The Times* was

7    using it in the context of an article written on the day of two

8    mass shootings bemoaning the fact that there was insufficient

9    attention being paid to the need for gun control on both sides

10   of the political aisle.  It was a gun control ad.

11             THE COURT:  Well, even on your reading there is no way

12   to read this, is there, as other than an assertion that the

13   political incitement that the map allegedly generated was a

14   cause of the shooting of representative Giffords for which

15   there was and remains zero evidence, right?

16             MR. SCHULZ:  I don't know that there -- well, let me

17   put it this way:  The editors were speculating and they were

18   repeating speculation that a lot of other people had said that

19   there is a link -- what they were saying is there is a link

20   between these mass shootings that are going on, they talked

21   about a pattern of mass shootings.  The complaints suggest,

22   Well, there were only two.  That's just not true.  The

23   pizzagate is another example.  There was the shooting in an

24   abortion clinic in Colorado Springs a few years earlier.  In

25   2008, when Barack Obama was running, six people were killed --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  All the things you're mentioning might be

2     relevant on a motion for summary judgment; we're talking about

3     a motion to dismiss.

4          MR. SCHULZ:  The question is is there plausible

5     evidence that this was an intentional lie, because that's the

6     theory of this case.

7          THE COURT:  The question for this motion is have, they

8     taking all the facts most favorably to them and all reasonable

9     inferences most favorably to them, alleged enough to infer that

10    the writer of the editorial was acting with actual malice or

11    with reckless disregard.  So it is unclear to me how all the

12    other things you are talking about, which go well beyond the

13    four corners of the complaint, are relevant to this motion.

14         MR. SCHULZ:  Most of these are in the four corners of

15    the complaint, are referenced by things -- even the fact check,

16    which they have cited they add in Exhibit 11, a fact check of

17    the editorial that was done by *The Washington Post*, they say,

18    Oh, look, it proves that it was wrong.  It does say there was

19    no established link; but that same fact check also goes on to

20    say it's unclear whether Loughner knew about the map.

21         So the fact is these are things that were subject to

22    dispute.  The question is is it plausible to believe that the

23    editorial writers intentionally misrepresented the evidence,

24    when you know everything that's there.

25         There was a news article in the same paper that got

H7VVPALA1    **JA 2046**

1    the facts more correct, saying that there was no established

2    link.  There were two op-eds in the same paper opposite the

3    editorial that get the facts right.  There is a link --

4            THE COURT:  So, I agree, that cuts both ways.  But

5    what about the argument that that really is further evidence of

6    reckless disregard because they had ample -- whoever was

7    writing this editorial had ample evidence right before them

8    that there was no link.

9            MR. SCHULZ:  Judge, that would make sense if they had

10    the evidence and they hid it.  If they had the evidence and

11    they didn't make a correction, the reckless disregard is not

12    just overlooking a fact, it has to be some subjective awareness

13    that they got it wrong.  And the fact that all of this evidence

14    is there and they correct it immediately, they don't try to

15    hide anything, it's just implausible to believe that that

16    supports a claim that they must have known that they did it.

17            That takes us back to motive.  Plaintiff recognizes

18    that this is a problem.  Well, it's not implausible to believe

19    that, because they thought they were going to make a lot of

20    money by putting Ms. Palin's name in the middle of a dense

21    editorial about gun control, not in the headline, no picture,

22    no nothing, and that somehow that's going to drive revenue.

23    The theory of their case is just fundamentally implausible.

24    The most they've demonstrated is an honest mistake that some

25    things weren't looked at; but that's not actual malice, that's

1    negligence.

2              THE COURT:  I know you have other arguments you want

3    to cover, but let's interrupt at this point; let me hear on the

4    actual malice issue from your adversary.

5              MR. SCHULZ:  Certainly.

6              MR. VOGT:  May it please the Court, your Honor, I

7    think that you've actually hit the nail on the head here.

8              THE COURT:  Well, let me throw some nails at you.  I

9    don't mean that as a direct link.

10             What possible motive would the writer of this

11   editorial have for accusing, as you would put it, Ms. Palin of

12   generating the conditions that led to this attack, when they

13   even hyperlink to something that says the opposite.

14             Motive, as I just pointed out, is not an essential

15   element, but it's not irrelevant.

16             What possible motive could they have?

17             MR. VOGT:  I think *The Times* itself said in Exhibit 4

18   of the complaint, your Honor, which is an article that talks

19   about she who must not be named, in which Charles Blow

20   references that people on the left seem to need her, to bash

21   her, because she is, in their words, the way the left likes to

22   see the right:  Hollow, dim, and mean.

23             She was a patsy in this instance.  You have a shooting

24   that *The Times* has come out and said that they believe is

25   politically motivated by a leftist who has fear connections to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1    the republican party.  If your argument is going to be that

2    republicans should not go and attack the left now for political

3    rhetoric during that time period, a time period where you have

4    things like beheading photos of the president coming out --

5            THE COURT:  This is not an editorial overall as

6    directed at Ms. Palin, and she wasn't at this time running for

7    any office or anything like that.  This is an editorial

8    directed at the overall increase in highly divisive, charged

9    political language.  The suggestion is that that can, in turn,

10   incite, in the wrong hands, people to take political actions of

11   violence.

12           That's the thrust, is it not?

13           MR. VOGT:  I believe that the thrust is what the title

14   of the article is, which is *America's Lethal Politics*.  There

15   are two examples cited in it, as you noted early on.  One was

16   the shooting that day for which no one could tell whether a

17   political incitement was actually the cause or led to that

18   shooting.  The only other example given was Sarah Palin.  She

19   was the centerpiece of that article.  At least that's a

20   reasonable interpretation.

21           THE COURT:  Well, because, says your adversary, that

22   at the time, rightly or wrongly, rationally or irrationally,

23   there was a lot of debate as to whether this particular release

24   from her PAC had incited.  So that, says your adversary, is a

25   natural reason why they would have used that as another

1    example.

2        MR. VOGT:  The problem is is that that was seven years

3    prior.  You have by this time period no evidence being

4    generated, despite Mr. Loughner's entire criminal proceeding,

5    extensive FBI investigation, files that had been provided to

6    *The New York Times* through public records request, things of

7    that nature, which we allege in the complaint.  You now have a

8    wealth of knowledge and six years of time have passed.  There's

9    still no evidence --

10       THE COURT:  So there's no doubt that in that sense

11   they got it wrong.  But the question we are talking about is as

12   opposed to a mistake, what reason is there to believe that this

13   was done with actual malice?

14       MR. VOGT:  I think that that's where you get into all

15   of the universe of evidence that we've pled in the complaint,

16   your Honor.  When you're talking about the potential for

17   fabrication, the case law says that when you fail to cite a

18   source for a fact, that's evidence; that gives rise to an

19   inference that a fact had been fabricated in a publication.

20   We've alleged no source was cited here.  This is a very

21   important fact about a very prominent person.  When you were

22   going to say something along the lines that there is a link

23   between a political figure and --

24       THE COURT:  Well, remember that the exact words on the

25   link is "the link to political incitement was clear."  I don't

**JA 2050**

1   know of any evidence you have in your complaint that this

2   release from her PAC did not generate political incitement.

3           MR. VOGT:  Political incitement with respect to the

4   shooting in question, your Honor.

5           THE COURT:  I think you're on stronger ground perhaps

6   when they get to "as direct as," the second sentence.  But the

7   first sentence is probably demonstrably true, yes.

8           MR. VOGT:  I wouldn't agree to that.

9           THE COURT:  You don't think there was political

10  incitement and that all sorts of people -- maybe wrongly -- but

11  all sorts of people were saying, Oh, how could you put out this

12  release?

13          MR. VOGT:  I think that I can argue contrary to that

14  simply based on the publications by *The Times* itself, including

15  those in its op-ed sections in which other op-ed writers, other

16  authors that wrote publications said no link had been

17  established.  They said it back in 2011 --

18          THE COURT:  Maybe the question is what is meant by

19  "political incitement."  But just on its face, is not a release

20  that denounces certain democrats for voting for the health bill

21  and saying, It's time to take a stand, a deducement to an

22  incitement to political action?

23          MR. VOGT:  I think the problem there though, Judge, is

24  there's no evidence to support --

25          THE COURT:  Whoa, whoa.

1          What do you think this was intended to do?  Do you

2    think it was her PAC just was enamored with a map of the United

3    States?

4          On its face it was, was it not, an invitation to those

5    who felt similarly to the PAC to take political action.

6    Voting, of course, is what is the political action that it's

7    directed at, but it's at least that, is it not?

8          MR. VOGT:  I would agree with that statement, your

9    Honor.

10          THE COURT:  Okay.  So it is linked to political

11    incitement.  So what I'm getting at is that sentence, the link

12    to political incitement was clear, is probably true.  What is

13    untrue, you're alleging, is what they then go on to say

14    followed from that, which is the link which they describe as,

15    in effect, direct to the Giffords shooting, yes?

16          MR. VOGT:  Correct.

17          I think it's also important to remember the full

18    context of the surrounding material in the article that your

19    Honor was just discussing.  Because when that political

20    incitement term first comes up, you're looking at an article

21    about America's lethal politics that has a highlighted quote

22    about a sickeningly familiar pattern arising that relates to

23    shootings of members of Congress.  So it's reasonable that an

24    average person looking at that article would read the term

25    "political incitement" to actually mean the violence that was

1    at the heart --

2            THE COURT:  There's a difference between -- if this

3    editorial can only fairly be read as saying, Political rhetoric

4    has become overheated and we shouldn't be surprised, therefore,

5    that bad things happen when some deranged people fall prey to

6    that overheated rhetoric, then you would have no case.

7            So your case has to stand on the notion that it's

8    saying more than that; that it's saying that there is a direct

9    causal link between this article and the shooting.

10            MR. VOGT:  Correct.

11            If you look at the admissions afterward, the

12    retractions, the apologies, they actually admit as a matter of

13    fact that no such link was ever established.

14            THE COURT:  Well, so why isn't that really an argument

15    that while on its face the editorial doesn't necessarily carry

16    the implications you claim it does, once they realize that some

17    people were reading it that way, they wanted to make sure that

18    no one was under a misapprehension; so they then made the

19    corrections that they made so that even those people who were

20    misreading it would be disabused of their mistake.

21            MR. VOGT:  I think that that's sort of where the

22    rubber meets the road on the inquiry on the motion to dismiss

23    phase, is we think that it is, on its face, capable of

24    defamatory meaning.  In fact, people who read the article,

25    which we cited in our papers, other publications who looked at

1   these statements that way, came to the conclusion that this was

2   not only about her, but it established a link between her map

3   and these shootings, a direct link.

4           THE COURT:  I say to you a little bit what I said to

5   your adversary:  It doesn't really matter, does it, what other

6   people thought; it's what it is.  Either it is what you say it

7   is or it is what they say it is.  All the commentators in the

8   world standing on the head of a pin doesn't make it more or

9   less what it is.

10          MR. VOGT:  Ultimately the inquiry is whether six

11  people sitting in a box can look at this and determine whether

12  or not an average person would think that it was of and about

13  her and a statement of fact.

14          THE COURT:  By the way, in my courtroom it's usually

15  nine.

16          MR. VOGT:  Apologize, your Honor.

17          But that's really what we're getting to.  At this

18  stage of the proceeding, I appreciate that arguments have been

19  made on the other side.  I hope that we've made compelling

20  arguments as well.  But that gets us right back to where we

21  are, which is at a motion to dismiss.  Those types of issues

22  are best left for the nine people that ultimately will be

23  sitting here one day.

24          THE COURT:  So your adversary says that one of the

25  implicit -- what they think is the implicit weakness of your

1    position is shown by the fact that you'll hypothesize motives

2    that are implausible such as that this was done to generate

3    revenue.  Why isn't that ridiculous on its face?

4              MR. VOGT:  Well, because at this phase, which the case

5    law notes, when you're dealing with actual malice, all we can

6    do is hypothesize for the most part.  We don't have the benefit

7    of depositions and discovery about what their actual thought

8    processes were.

9              THE COURT:  Of course, that's true with respect to

10   every motion to dismiss that's ever been filed in any case in

11   the United States.  So you're in no better or worse shape than

12   anyone else.

13             MR. VOGT:  Right.  So because of that though, this

14   specific area of the case law says that you look at

15   circumstantial evidence and derive inferences from those, all

16   of which have to be construed in our favor, and see whether or

17   not it's at least plausible or conceivable that this can

18   happen.

19             THE COURT:  But as we know from the Supreme Court's

20   decisions in recent decades, the Court can take account of

21   whether something is plausible or not.  Why isn't the revenue

22   argument patently implausible?

23             MR. VOGT:  I don't think that it is because it's *The*

24   *New York Times* themselves who said, You have a member that

25   writes op-ed columns for *The Times*, did in '11, still does now,

1      who said point-blank in an article that people write articles

2      about this woman and take shots at her because they inflame

3      passions and they derive revenue to websites.

4              There is no way it can be implausible.

5              THE COURT:  So wait.  So that governs what standard

6      this Court should apply?  I can't just apply what I thought I

7      was supposed to apply, which is what a reasonable person would

8      find plausible or implausible; I have to apply what some

9      commentator somewhere in the world thought is plausible or

10     implausible?

11             MR. VOGT:  I don't think that you have to apply --

12             THE COURT:  I can even take Congress's note of it.

13             MR. VOGT:  It's an admission of a party opponent.

14             THE COURT:  Excuse me.  I don't see how that can be

15     said.

16             No party opponent can tell a judge -- even through an

17     admission -- what a reasonable person would or would not find

18     plausible.  That's not a question for a party opponent

19     admissions, assuming arguendo this is, which is, I think, a

20     question in itself.  It's a question for the Court.

21             MR. VOGT:  I agree, your Honor.

22             My only point was that that's evidence that the Court

23     can consider.  It seemed like the Court was inferring that

24     there was nothing in the complaint that would establish that

25     that argument was plausible.  I was simply pointing out to say,

1   Well, *The Times* obviously thought it was plausible because they

2   themselves have said, including the editorial department.

3          THE COURT:  Let's go back to your adversary.  We're

4   going to come back to you in a few minutes.

5          But we'll hear anything further that defense counsel

6   wants to say on actual malice.  And then if there are other

7   issues you wanted to raise, I'll hear you on that.

8          MR. SCHULZ:  Thank you, Judge.

9          First, on actual malice, I do think that it's

10  implausible to suggest her motive was to make money.  Even if

11  you accept that Ms. Palin is a lightning rod, people will read

12  about her, they would have put her in the headline, they would

13  have made a photo.  The suggestion that the headline shows that

14  this was about her, this is an editorial about gun control in

15  which the shooting of Gabby Giffords and the potential link of

16  that sort of type of rhetoric that Sarah Palin's PAC put out is

17  kind of a passing thing.

18         THE COURT:  Their argument is that Sarah Palin, for

19  better or worse, is a hot-button person; and that by using her

20  as an example, they generate greater support for their

21  editorial, which then translates indirectly into increased

22  revenue for *The Times*, something like that.  I admit I'm having

23  a little trouble with their argument in that regard, but what

24  about that?

25         MR. SCHULZ:  And the argument might make sense if they

1    made up something just to put Sarah Palin in here.  They were

2    harkening back to a controversy that had been going on for

3    years about the impact of that ad that had been cited as

4    recently as six months earlier by *The Washington Post* in the

5    same context.  The point of this article was not about Sarah

6    Palin, it was about America's politicians' inability to pass

7    common-sense gun reform.  It was an editorial written on a day

8    in which there were two mass shootings in the country.

9              THE COURT:  Excuse me for interrupting.

10             But they not only singled out Sarah Palin, but they

11   single her out much more strongly than the other example.

12             MR. SCHULZ:  Well, they single her out because, as

13   they say, there was a more clear link between the whole episode

14   involving her and Gabby Giffords that didn't exist with Bernie

15   Sanders and Steve Scalise.  That's the only point they were

16   making.

17             Your Honor, you just were asking my adversary about

18   this notion, you said, doesn't the map on its face is an

19   invitation to take action.  And it is.  And one of the points

20   that is of concern here is that that type of rhetoric, that the

21   use of military or weapons symbolism in this way does incite

22   people to action, we know it happened after the map came out,

23   that there was increased security for the people who were named

24   there, there were real consequences and that's what they were

25   talking about.

1          The editorial was bemoaning the fact that that type of

2     rhetoric does invite people who are deranged or mentally

3     unstable to do things; it inflames them, like the person at the

4     pizza shootout, like the man who went to Planned Parenthood,

5     like the person who shot all the city council in Missouri, like

6     the person who killed a democratic party leader in Arkansas.

7     These people have mental illnesses, but they hear the rhetoric

8     and they get inflamed.  That's the point it was making.

9          Just to finish up on actual malice, I want to go back

10    to the signal constitutional concerns and the questions.

11         As I said at the outset, the Second Circuit in *Biro*

12    has stressed the constitutional importance of the actual malice

13    inquiry itself; and that a court is charged to be sure that

14    they meet the pleading standard.  I would submit that they

15    haven't here.

16         But I'd also like to cite your Honor to the opinion of

17    the D.C. Circuit in *Ollman*, which was dealing with a different

18    issue; it was a pre-*Milkovich* case about is there a special

19    protection for opinion.  But the court was really grappling

20    with the same issue of when we know there are significant

21    constitutional First Amendment concerns at stake, how do we

22    deal with that in deciding whether a claim should go forward or

23    not?

24         And then a concurrence in the *en banc*, Judge Bork

25    writes at length about how a court should address whether

1    something that is said is actionable or not actionable in

2    taking account of the First Amendment considerations.  He says

3    there's three things we should be looking at in trying to

4    figure out where the First Amendment line should be drawn or

5    what type of speech should be deemed not actionable.

6          So the first thing is the nature of the speech and the

7    parties involved.  What we have here is an intense political

8    debate about gun control and a leading figure in that debate

9    who's bringing this libel claim here.  It's clearly at the

10   heart of what the First Amendment was intended to protect to

11   allow that type of things, as Judge Bork --

12         THE COURT:  Let's hypothesize for a moment.

13         I don't mean to interrupt your recitation of what

14   another circuit had to say, but supposing the writer of this

15   editorial, before the editorial is published, sees the

16   hyperlink, say the editor adds the hyperlink, as common

17   experience suggests is often done.  The writer reads the

18   hyperlink and sees that there is no direct connection or

19   nothing has been established that suggests anything like a

20   direct connection.

21         In my hypothetical, the writer says, I don't care.

22   I'm going to leave it as is.

23         Would that be evidence of actual malice?

24         MR. SCHULZ:  In your hypothetical, I think if the

25   writer knew that there was something that was materially wrong

1   and decided to publish anyway, that would be evidence of

2   reckless disregard malice.

3           THE COURT:  So reading the complaint most favorably --

4   but still reasonably -- to the adversary, why isn't that at

5   least a plausible possibility that should allow this case to go

6   to discovery?

7           MR. SCHULZ:  Because it's not plausible given all the

8   other facts.  The link was left in there.  If they intended to

9   mislead people and they had read that, why would they leave the

10  link there?  If they had read the rest of the paper and read

11  these other things into it, the only plausible thing that can

12  be concluded from all the facts that have been put before the

13  Court is that an error was made, an honest mistake was made in

14  how it was phrased.

15          Again, I keep coming back, we're accepting for

16  purposes of this argument that the editorial means what they

17  said it meant.  But I don't think that's actually a fair

18  reading.  And when we get into this and talk to the editorial

19  writers about what they actually intended, I don't think that

20  the editorial intended to say there was a direct cause

21  between --

22          THE COURT:  Certainly used the word "direct."

23          MR. SCHULZ:  They say there was a clear link between

24  that type of rhetoric and the attack on Gabby Giffords, because

25  she was in it, her office was vandalized, she spoke about it,

1      there was a whole set of connections between her and the

2      political rhetoric that didn't exist with Steve Scalise and the

3      democratic rhetoric.  That's the point they were making.  It's

4      a simple point.  It wasn't necessarily that Loughner sought and

5      was motivated because of the map.  That's not the point they

6      were trying to make.  But even accepting that, I say it's

7      implausible to believe that they knowingly made that statement,

8      given what's here.

9              So just to return to *Ollman* quickly, so in deciding

10     where you should draw these lines, the first question is we're

11     in the core because of the parties and the nature of the

12     speech.  The second is what is the impact of allowing this case

13     to go forward?  In other words, what's the nature of the proof

14     that they are going to be going after?

15             They say that to go forward with this case and to make

16     their case, they need to know everything that 23 people at *The*

17     *Times* who work there now or used to work there, that they wrote

18     that might show that they had ill will towards --

19             THE COURT:  No, no.  I think that's a separate issue.

20             If their discovery requests are overbroad, then we

21     need to cut them down.  But I don't see what that has to do

22     with the motion to dismiss.

23             I understand totally why there are First Amendment

24     policy concerns here, that's why the Supreme Court decided *New*

25     *York Times v. Sullivan* and subsequent cases.

1              But I think the law -- I'm just a simple barefoot

2      district judge.  The law here seems to me very clear.  The law

3      is we know what actual malice is defined as; it's either

4      knowledge of falsity or reckless disregard.  Assuming the rest

5      meets the requirements, either they've alleged that

6      sufficiently to pass the standards or they haven't.  And all

7      the rest seems to me to be secondary.

8              MR. SCHULZ:  I would agree with you, Judge, that the

9      actual malice test itself is driven by the First Amendment.

10     All I'm suggesting is particularly in light of *Biro* and the

11     Second Circuit's concern that these things be carefully

12     considered at this stage, because the whole point of having

13     these protections is to avoid the chilling impact of the burden

14     of litigation, the threat of major recoveries of the time and

15     the effort.

16             THE COURT:  Sure.  That would be true whether they've

17     asked for 23 depositions or one deposition, the same policy

18     would still apply.

19             MR. SCHULZ:  That's true.

20             But my point is that's why it's important to consider

21     these at this stage and not down the road.

22             THE COURT:  All right.

23             Do you want to turn to your other issues?

24             MR. SCHULZ:  I was going to turn to -- since we are on

25     *Ollman*, *Ollman* itself was about when do you have a claim that's

1    actionable.  Maybe I should turn to this question of whether

2    there is provably false.

3                    (Continued on next page)

**JA 2064**

H8gdpalh
                              Hearing

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SARAH PALIN,

 4                  Plaintiff,                New York, N.Y.

 5            v.                              17 Civ. 4853(JSR)

 6   THE NEW YORK TIMES COMPANY, a
     New York corporation,
 7
                    Defendant.
 8
     ------------------------------x
 9
                                             August 16, 2017
10                                           2:04 p.m.

11   Before:

12                      HON. JED S. RAKOFF,

13                                           District Judge

14                          APPEARANCES

15   BAJO CUVA COHEN TURKEL
          Attorneys for Plaintiff
16   BY:  KENNETH G. TURKEL
          SHANE B. VOGT
17            – and –
     GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
18   BY:  SHAWN PRESTON RICARDO

19   LEVINE SULLIVAN KOCH & SCHULZ, LLP
          Attorneys for Defendant
20   BY:  DAVID A. SCHULZ
          MICHAEL D. SULLIVAN
21        JAY WARD BROWN

22

23

24

25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

**JA 2065**

H8gdpalh
                            Hearing

1          THE CLERK:  This is August 16, 2017.  This is Sarah

2    Palin versus The New York Times, docket number 17 Civil 4853.

3              Will everyone please be seated, and will the parties

4    please identify themselves for the record.

5          MR. TURKEL:  Your Honor, Ken Turkel on behalf of the

6    plaintiff, Sarah Palin.

7          MR. VOGT:  Shane Vogt on behalf of the plaintiff,

8    Sarah Palin.

9          MR. RICARDO:  Shawn Ricardo on behalf of the

10   plaintiff.

11         MR. SCHULZ:  David Schulz on behalf of the defendant.

12   And, Judge, with me this afternoon is Michael Sullivan, who has

13   a pro hac vice motion pending but with the Court's permission

14   will participate today.

15         THE COURT:  Yes.

16         MR. SULLIVAN:  Michael Sullivan, your Honor, on behalf

17   of the defendant.

18         MR. BROWN:  And Jay Brown for the defendant, your

19   Honor.

20         THE COURT:  All right.  Please be seated.

21              So the Court has, pursuant to its Order of

22   August 10th, convened this evidentiary hearing.  So my

23   understanding is that the editorial in question had an original

24   author who is not available today but if it's necessary we'll

25   decide at the end of the hearing whether it is necessary to

**JA 2066**

H8gdpalh                          Bennet - direct

```
 1   call that person, but that most of the language that is the

 2   subject of the complaint was added by a second person who is

 3   available.  So, please call the person.

 4             MR. SULLIVAN:  Your Honor, the defendant calls

 5   Mr. James Bennet.

 6             THE COURT:  All right.

 7             THE CLERK:  Please take the witness stand.

 8    JAMES BENNET,

 9         called as a witness by the defendant,

10         having been duly sworn, testified as follows:

11             THE CLERK:  Please be seated.

12             Please state your name and spell it slowly for the

13   record.

14             THE WITNESS:  My name is James Bennet.  J-a-m-e-s

15   B-e-n-n-e-t.

16             THE COURT:  All right.  Counsel, you have a half hour.

17             MR. SULLIVAN:  Thank you, your Honor.

18   DIRECT EXAMINATION

19   BY MR. SULLIVAN:

20   Q.  Good afternoon, Mr. Bennet.

21             Where are you employed?

22   A.  I work for The New York Times.

23   Q.  What is your position at The Times?

24   A.  I am the editorial page editor.

25   Q.  How long have you held that position?
```

H8gdpalh                    Bennet - direct

1   A.  Since late spring of last year?

2   Q.  Where did you work prior to that?

3   A.  I worked at The Atlantic before that.

4   Q.  And what period of time were you with The Atlantic?

5   A.  I was there for ten years, from 2006 to 2016.

6   Q.  All right.  What was your position there?

7   A.  I was the editor-in-chief and then the editor-in-chief and

8   president.

9   Q.  Where did you work before that, before you joined The

10  Atlantic?

11  A.  I was at the New York Times before that for about 15 years.

12  Q.  All right.  And in what capacity did you serve?  Were you a

13  reporter or were you on the editorial staff?

14  A.  I was a reporter.

15  Q.  Let's now shift our focus, and I'm going to have you direct

16  your attention to the editorial at issue which was published by

17  The New York Times on June 14, 2017, titled "America's Lethal

18  Politics."

19          Now, Mr. Bennet, could you please tell us generally

20  how the editorial came to be written, the genesis for the

21  piece?  What was the genesis for that editorial?

22  A.  Well, after the shooting that morning in northern Virginia,

23  our editorial writer, based in Washington, suggested -- raised

24  the idea that we should --

25          THE COURT:  Just for the record, what is it you are

H8gdpalh                          Bennet - direct

1    looking at?

2              THE WITNESS:  I'm looking at the editorial.

3              THE COURT:  Which is?

4              MR. SULLIVAN:  Exhibit 1, your Honor, in the

5    defendant's binder, but it is also Exhibit 1 to the plaintiff's

6    complaint.

7              THE COURT:  I see.  OK.  Very good.  Go ahead.

8    BY MR. SULLIVAN:

9    Q.  Pardon me.  You were saying that that morning -- the

10   morning of the shooting, I take it --

11   A.  Right.

12   Q.  -- in northern Virginia?

13   A.  She initially raised the idea that we should comment.  And

14   we had a fair amount of back and forth then and over the course

15   of the day among editors and writers about the points that we

16   wanted to make.  And there were three -- in the end three basic

17   points that we arrived at.  One was simply, to the extent of

18   our ability, to focus attention on the horror of that day and

19   the act that these representatives out playing baseball on a

20   summer morning had come under fire; secondly, to restate what's

21   been a longstanding position of The Times' editorial board in

22   favor of sensible gun control of one sort or another, and,

23   third, to express concern about the state of political rhetoric

24   in the country and of political incitement, the danger that

25   we're increasingly treating political opponents like enemies in

**JA 2069**

H8gdpalh                          Bennet - direct

1  a conflict.

2  Q.  All right.  Let me ask you this.  As you sent her off on

3  this task, did you give her any guidance and additional

4  direction?

5  A.  I asked her to look back at the editorials that The Times

6  had published in the immediate wake of the shooting of Gabby

7  Giffords, because my assumption was that we had talked about

8  the political climate and I wanted to harmonize whatever we

9  were saying now with the position the board had taken.  And

10  that is if we were concerned about the role of political

11  incitement, then we should be concerned about it in this case

12  as well.

13  Q.  OK.  Now, did you receive a draft of the editorial later

14  that day?

15  A.  I did.

16  Q.  And approximately what time was it that you received the

17  draft?

18  A.  It was around 5 o'clock, or a little thereafter, that I had

19  the drafts.

20  Q.  Did you, when you received this draft, did you review it?

21  A.  I did, yeah.

22  Q.  OK.  And tell me, what was your reaction to the draft?

23            THE COURT:  So have you included that draft in your

24  exhibits?

25            MR. SULLIVAN:  They were provided to the Court --

1          THE COURT:  No.  Answer my question.

2          MR. SULLIVAN:  It's not in our exhibits, your Honor.

3          THE COURT:  So are you not planning to offer it?

4          MR. SULLIVAN:  I'm not offering it.

5          THE COURT:  Well, I'm offering it.

6          Mark this as Court Exhibit 1, and it was represented

7   to the Court that this was the draft that your colleague

8   prepared.

9          And let me show it to you and see if you can confirm

10  that.

11         (Handing)

12         THE WITNESS:  That is correct, your Honor.

13         THE COURT:  Very good.  Go ahead.

14         MR. SULLIVAN:  Thank you, your Honor.

15  BY MR. SULLIVAN:

16  Q.  So just to see where we are.  The draft that the Judge just

17  handed you is in fact the draft that Ms. Williamson provided?

18  A.  I believe so, yeah.

19  Q.  All right.  Now, you get that draft.  You look it over.

20  And I think I have asked you before, what was your reaction?

21  When you saw this draft and you had examined it, what was your

22  reaction?

23  A.  That it was very much a first draft and that it wasn't

24  exactly accomplishing the objectives that we had set out that

25  morning to achieve.  I was really focused on the top of it

1   initially that read to me much more like a summary of the news

2   and the kind of work that -- the kind of information that most

3   of our readers would already be in possession of by the time

4   they received our editorial, and I was interested in having a

5   top on the piece that again, as I said earlier, more just sort

6   of conjured the sense of the horror of the day and the

7   significance of this act.

8   Q.  All right.  So basically kind of what you had in mind; is

9   that fair to say?

10  A.  Yeah, that's fair to say.

11  Q.  All right.  So did you send the draft back to

12  Ms. Williamson for revision?

13  A.  I didn't.  I remember I started to write a note on the top

14  for purposes of -- you know, with some instructions for the

15  purpose of sending it back, but it was late in the day and our

16  deadlines were looming.

17         THE COURT:  I'm sorry, Mr. Bennet.  Maybe you ought to

18  move that microphone down a little because you are sort of

19  looking at the -- as you are talking, you are looking at the

20  exhibit so it is not picking up.

21         THE WITNESS:  OK.  Is that better?

22         THE COURT:  Yes, that is better.

23  A.  I was concerned about the deadlines approaching.  We just

24  didn't have that much time, and I wound up plunging in and just

25  beginning to effectively rewrite the piece.

1    Q.  OK.  You concluded --

2    A.  On the top.

3    Q.  -- about the time restrictions.  Did it make more sense for

4    you to just roll your sleeves up and do it yourself?

5    A.  Yes.

6    Q.  All right.  Now --

7          THE COURT:  So plaintiff's counsel was on the verge of

8    standing up because of the blatantly leading question.

9          MR. TURKEL:  Yes, your Honor.

10          THE COURT:  I think we ought to refrain from leading

11    from now on.

12          MR. TURKEL:  Judge, may I have one moment?

13          THE COURT:  Yes.

14          MR. TURKEL:  Given the sort of circumstances of this

15    hearing, I don't know how relaxed or not relaxed evidentiary

16    rules are going to be as to documents, things like that.

17          THE COURT:  Well, the Rules of Evidence do not

18    strictly apply to this hearing.  Nevertheless, since the object

19    of both the rules of evidence and this hearing is to arrive at

20    the truth, if you think something is sufficiently in derogation

21    of the truth, then you should raise objection and I'll rule.

22    So leading tends to be in derogation of the truth because it

23    substitutes the words of counsel for the words of the witness,

24    which when it is a friendly witness is not a useful way to

25    proceed.  That's why I sustain your silently made objection.

H8gdpalh                          Bennet - direct

1              MR. TURKEL:  Thank you, Judge.

2              MR. SULLIVAN:  All right.  I will abide by sort of the

3     spirit of that discussion then.  Thank you.

4              THE COURT:  Go ahead, counsel.

5              MR. SULLIVAN:  Thank you, your Honor.

6     BY MR. SULLIVAN:

7     Q.  Mr. Bennet, would you now look again at Exhibit 1 to the

8     complaint, which, your Honor, as I mentioned earlier, is also

9     Exhibit 1 of our exhibits here.

10             THE COURT:  I am going to assume all of these exhibits

11    for both sides will be received on consent unless either side

12    raises an objection at the moment that they are presented.

13             MR. SULLIVAN:  Yes, your Honor.

14             (Defendant's Exhibit 1 received in evidence)

15    BY MR. SULLIVAN:

16    Q.  All right.  Now, looking at Exhibit 1 there, that is the

17    editorial at issue, correct?

18    A.  Yes.

19    Q.  OK.  If you would turn to the second page of the editorial,

20    look, please, at the first paragraph at the very top of the

21    page.  Do you have that?

22    A.  I do.

23    Q.  OK.  Do you see where it states, "Was this attack evidence

24    of how vicious American politics has become?  Probably.  In

25    2011, when Jared Lee Loughner opened fire in a supermarket

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA 2074**

H8gdpalh                          Bennet - direct

1   parking lot, grievously wounding Representative Gabby Giffords
2   and killing six people, including a 9-year-old girl, the link
3   to political incitement was clear.  Before the shooting, Sarah
4   Palin's political action committee circulated a map of targeted
5   electoral districts that put Ms. Giffords and 19 other
6   Democrats under stylized crosshairs."  Do you see that?
7   A.  I do.
8   Q.  OK.  Now, focusing specifically on the language, "the link
9   to political incitement was clear," do you see that passage?
10  A.  I do, yeah.
11  Q.  And are you the author of that passage?
12  A.  I am.
13  Q.  Could you explain what you meant by the term "political
14  incitement" when you wrote this?
15  A.  Yeah.  There are a couple of things at work there.  One, I
16  had been very much affected by and was thinking about that day
17  a column that a colleague of mine, Tom Friedman, had written
18  during the course of the presidential campaign -- the last
19  presidential campaign.  Then candidate Donald Trump had at a
20  rally and in a speech -- I won't get the words exactly
21  correct -- had said something to the effect that, well, maybe
22  the Second Amendment people can do something about Hillary
23  Clinton.  And Tom had made a connection that day that I did not
24  make.  He had said that -- he wrote a piece saying basically to
25  hold on.  I have seen this movie before.  This is the kind of

H8gdpalh                          JA 2075          Bennet - direct

1   language that was heard at the runup to the assassination of

2   Rabin.  We need to take this kind of stuff very seriously.

3          And then that morning in June this terrible thing had

4   happened.  Right?  We had actually seen the Congressman come

5   under fire on this field in Virginia.  And I was looking for a

6   very strong word to write about the political climate because I

7   wanted to get our readers' attention.  This is a word that we

8   do use sometimes; we don't use it every day.  We use lots of

9   strong expressions like "inflammatory rhetoric," things like

10  that.  Those aren't actually quite as powerful expression as it

11  has been largely drained of its power because it is used so

12  often, "incendiary rhetoric," so on and so forth.

13         Also, I was thinking about -- the way I view that

14  particular word from is in my experience in one of my roles at

15  the time that I was a correspondent in Jerusalem at one point

16  for The Times, and the word "incitement" is used there by the

17  Israelis -- in my time by the Israelis about the Palestinians

18  but also, to some degree, by the Palestinians about the

19  Israelis to talk about a range of communications from, you

20  know, to deliberate orders, invocations, summonses for people

21  to carry out violent attacks to textbooks that are published

22  that align important facts from the other side's national

23  narrative or history, to tell outright lies about that history,

24  to maps that misrepresent the politics of the region.  And

25  that's specifically where I was drawing that word from.

1          THE COURT:  Well, maybe I am misunderstanding the

2     question.  What you're linking to political incitement is the

3     shooting by Mr. Loughner in 2011 of Ms. Giffords and others,

4     yes?

5          THE WITNESS:  Your Honor, what I was thinking of with

6     the word the link to political incitement was clear.  What I

7     was thinking of was the link between an example of political

8     incitement and this larger atmosphere.  What I mean is I was

9     very mindful as I was editing this editorial, I was thinking

10    here we are, we're deploring political incitement on the left.

11    We're not actually calling out any concrete example of such

12    incitement, not citing a single politician or political

13    organization.  And we were looking for -- I had asked

14    Elizabeth, I had said -- the shooter in Virginia was a Bernie

15    Sanders supporter.  One of the questions I'd asked was is there

16    an example of really incendiary rhetoric from Bernie Sanders?

17    Is there a connection between -- we didn't see that word and we

18    didn't see a connection between the victims in Virginia and any

19    specific political incitement.  That was the link I was

20    thinking of.

21          THE COURT:  Well, maybe I am asking a more narrow

22    question.  I am asking a question about grammar and sentence

23    structure, which presumably you have some expertise in.  The

24    sentence in its entirety reads:  "In 2011, when Jared Lee

25    Loughner opened fire in a supermarket parking lot, grievously

H8gdpalh                          Bennet - direct

1    wounding Representative Gabby Giffords and killing six people,

2    including a 9-year-old girl, the link to political incitement

3    was clear."  Doesn't that mean as a matter of ordinary English

4    grammar and usage that that sentence is saying that the

5    shooting in 2011 was clearly linked to political incitement?

6            THE WITNESS:  That is not what I intended it to mean.

7    I understand what you're saying, your Honor.  But what I was

8    thinking of was of the link between the victim and the overall

9    climate, that there was actually an example of political

10   incitement that we could point to in that case to create a link

11   between the victim and the incitement.  I wasn't -- what I

12   wasn't trying to say was that there was a causal link

13   between -- a direct causal link between this map and the

14   shooting.

15           THE COURT:  In the next sentence you seem to be saying

16   that the political incitement was the result, in part, of Sarah

17   Palin's political action committee's map, yes?

18           THE WITNESS:  In which sentence, your Honor?

19           THE COURT:  The very next sentence, "Before the

20   shooting, Sarah Palin's political action committee circulated a

21   map of targeted electoral districts that put Ms. Giffords and

22   19 other Democrats under stylized crosshairs."

23           THE WITNESS:  Right, your Honor.  That is the -- is

24   again -- in my mind was the example -- the specific example

25   of -- and the word I used was "political incitement" or

1   "incendiary rhetoric" that connected the climate to the victim.

2                THE COURT:  OK.

3                THE WITNESS:  That is the link.

4                THE COURT:  So if that's the specific example of

5   political incitement that you are referring to, the whole point

6   of this is to link it to various crimes such as the shooting of

7   Ms. Giffords, yes?

8                THE WITNESS:  What I was concerned about is the

9   overall climate of political incitement and whether that gives

10  permission, to some degree, for violence against elected

11  officials.  I wasn't trying to say that any particular piece of

12  political incitement causes a maniac like Jared Lee Loughner to

13  take up arms and shoot at elected representatives.  I don't --

14  I just -- there isn't a part of it -- to my mind, it is a

15  distinction with a very big difference there between -- I

16  simply don't think -- I think that politicians who say things

17  that are incendiary should be criticized for saying things that

18  are incendiary hopefully before something terrible happens,

19  certainly after something terrible happens.  But I don't

20  think -- I think that it's well sort of saying that in saying

21  something terrible, they're causing a violent action to take

22  place.

23                THE COURT:  Well --

24                THE WITNESS:  I didn't mean to suggest the author

25  wasn't responsible -- I'm sorry, your Honor.

H8gdpalh                         Bennet - direct

1          THE COURT:  If I understand what you're saying, you're

2     saying this map circulated by Sarah Palin's political action

3     committee was a direct cause of the kind of political

4     incitement that you think led to various acts of violence?

5          THE WITNESS:  I would not use the word "cause," your

6     Honor.  I would say that it is an example of the kind of

7     political incitement that contributes to this atmosphere.

8          But I was, again -- in my mind what I was doing was

9     drawing a contrast that I had -- that we had not found yet.

10    This goes back to even the introductory question there, "Was

11    this attack evidence of how vicious American politics has

12    become?  Probably."  The reason we said probably is that we

13    didn't yet have an example of incendiary politics that

14    connected to the victims in Virginia.

15         THE COURT:  So in the next paragraph, immediately

16    after the sentences we just talked about, you say,

17    "Conservatives and right-wing media were quick on Wednesday to

18    demand forceful condemnation of hate speech and crimes by

19    anti-Trump liberals.  They're right.  Though there's no sign of

20    incitement as direct as in the Giffords attack, liberals should

21    of course hold themselves to the same standard of decency that

22    they ask of the right."  Do you see that?

23         THE WITNESS:  Yes, I do.

24         THE COURT:  And that was your language, yes?

25         THE WITNESS:  Yes.

H8gdpalh                              Bennet - direct

1              THE COURT:  So what was the -- what did you mean by

2       saying that the Giffords attack was a direct result of

3       incitement?

4              THE WITNESS:  It is the same idea, your Honor.  It is

5       the same -- there was a sign of incitement of the kind of

6       incitement that can contribute to this atmosphere.  Again, it

7       wasn't in my head that that was -- that was tantamount to

8       complicity in attempted murder.  It's simply rhetoric.  It

9       contributes to an angry environment that I did not intend to

10      imply that it was a causal link to this -- to this crime.

11             THE COURT:  Were you of the belief, or did you have

12      any information that suggested that what you are referring to

13      as political incitement was in any way linked to Mr. Loughner's

14      criminal activities?

15             THE WITNESS:  I did not know for certain one way or

16      another.

17             THE COURT:  What made you think that it might be true?

18             THE WITNESS:  Again, I wasn't -- I didn't -- I did not

19      think that Jared Loughner was acting because of -- it didn't

20      enter my reasoning at the time that Jared Loughner was acting

21      because of this map.  I was adducing the map only -- I was

22      adducing the map only as an example or intending to adduce the

23      map, your Honor, I should say, only as an example of the kind

24      of rhetoric that does contribute to this atmosphere of

25      political incitement and simply saying that in this case --

**JA 2081**

H8gdpalh                                Bennet - direct

1   simply attempting to say that in this case there was a link

2   between such a -- such an example of inflammatory rhetoric and

3   the victim.  It was actually intended as a small point, but I

4   recognize that it introduced -- it was certainly read the way

5   you are reading it by many people.

6          THE COURT:  Is that why you then -- who was

7   responsible for issuing the correction?

8          THE WITNESS:  I was.

9          THE COURT:  Go ahead, counsel.

10         MR. SULLIVAN:  Thank you, your Honor.

11  BY MR. SULLIVAN:

12  Q.  We've discussed the use of "incitement" in the two

13  paragraphs.  I want to focus on the second paragraph that

14  mentions incitement, and that is the one immediately below the

15  first one you were directed to.

16         And you'll see there that that paragraph says,

17  "Conservatives and right-wing media were quick on Wednesday to

18  demand forceful condemnation of hate speech and crimes by

19  anti-Trump liberals.  They're right.  Though there's no sign of

20  incitement as direct as in the Giffords attack, liberals should

21  of course hold themselves to the same standard of decency that

22  they ask of the right."

23         Now, you see that reference there to "sign of

24  incitement" in that first clause of the third sentence, do you

25  see that?

H8gdpalh                    **JA 2082**          Bennet - direct

1    A.  Yes.

2    Q.  OK.  Were you using the word "incitement" in the same sense

3    you explained to us earlier about based on your background?

4    A.  Yes.

5    Q.  OK.  And could you explain to us what you meant when you

6    wrote that there's no sign of incitement as direct as in the

7    Giffords attack?  I take it -- were you comparing the two

8    incidents, and what did you draw from that?

9    A.  I was, again, drawing a distinction here between what we --

10   again, my focus was again on the idea of left-wing incitement

11   and what had happened in Virginia that day.  And I was trying

12   to simply say even though we were -- we were criticizing the

13   left -- that what I thought I was dealing with and trying to

14   deal with was that we were criticizing the left for creating an

15   atmosphere of incitement, but we didn't have an example that

16   connected the victims there to that atmosphere.  I was then

17   describing the Giffords shooting that occurred in also an

18   atmosphere of great political anger and saying that there was

19   an example there of a link between the -- a concrete piece of

20   incitement and the victim.  I did not intend -- I just did not

21   intend -- I was not thinking of it as a causal link to the

22   crime.

23   Q.  All right.  Let me ask you this.  When you tasked your

24   people to do some, you know, looking into this, did they come

25   back with any information suggesting that Bernie Sanders had

1   used rhetoric directed to the Congressman who was shot that

2   morning?

3   A.   No.  No.

4   Q.   Any at all?

5   A.   They didn't find anything that day.

6   Q.   All right.  If you would look again, please, at the first

7   paragraph and look now at the last sentence.  Do you see where

8   it says, "Before the shooting, Sarah Palin's political action

9   committee circulated a map of targeted electoral districts that

10  put Ms. Giffords and 19 other democrats under stylized

11  crosshairs"?

12  A.   Yes.

13  Q.   OK.  Did you draft that sentence?

14  A.   No, I didn't.

15  Q.   And where did you get it?

16  A.   I believe I took it from the original draft, yes.

17           THE COURT:  Court Exhibit 1 has that language, yes.

18           MR. SULLIVAN:  OK.  Thank you.

19  BY MR. SULLIVAN:

20  Q.   You see that the word "circulated" is underscored; do you

21  see that?

22  A.   Yes.

23  Q.   All right.  Now, if you were reviewing this on The Times'

24  website and you clicked on that word, a hyperlink would take

25  you to the ABC News website, where there are articles from 2011

1  about the Giffords shooting.  Mr. Bennet, at any point before

2  publication of the editorial, did you click on that hyperlink

3  and review those ABC stories?

4  A.  No.

5  Q.  In preparing this editorial, at any point before

6  publication did you review the so-called crosshairs map that's

7  referred to in this piece?

8  A.  I didn't look at the map, if that's what the question is,

9  no.

10 Q.  Yes.  All right.

11            THE COURT:  Why not?

12            THE WITNESS:  I was not reporting the editorial, your

13 Honor, I was editing it, and so I was working from the draft

14 that was in front of me on a tight deadline.

15            THE COURT:  Back when you were editor of the Atlantic,

16 that included during the period when this shooting of

17 Ms. Giffords occurred, yes?

18            THE WITNESS:  Yes.

19            THE COURT:  And there was some suggestion at that time

20 that the map was somehow involved, and there were considerable

21 press reports that eventually culminated in I think a consensus

22 that there was no direct causal relationship.  At the time, did

23 you read those articles?  Do you have a recollection of reading

24 those articles?

25            THE WITNESS:  I don't have any recollection of it,

1    your Honor.

2              THE COURT:  Do you have a recollection of ever seeing

3    the map before?

4              THE WITNESS:  I don't, which doesn't mean I didn't see

5    it.  I just don't remember it.

6              THE COURT:  Go ahead, counsel.

7              MR. SULLIVAN:  Thank you, your Honor.

8    BY MR. SULLIVAN:

9    Q.  Now, in this process, let's go to the point where you had

10   finished your work on the piece.  It is now later in the day.

11   To your knowledge, were any substantive changes made to the

12   editorial after you completed your work on it?

13   A.  No.

14   Q.  Are you the person who authorized publication of the

15   editorial?

16   A.  Yes.

17   Q.  At the time you authorized publication, did you believe

18   that the statements in the editorial that we discussed

19   regarding political incitement and the crosshairs map were in

20   any sense false?

21   A.  No.  I believed them to be true.

22   Q.  All right.  Now, at my request, have you reviewed the two

23   articles attached to plaintiff's complaint as Exhibits 9 and

24   10, which are about the Giffords shooting and which The Times

25   published back in 2011?

H8gdpalh                          Bennet - direct

1   A.  Yes -- I'm sorry.  Exhibits 9 and 10?

2   Q.  Those were 9 and 10 to plaintiff's original complaint.

3   A.  I'm sorry.

4           THE COURT:  Are they separately marked here?

5           THE WITNESS:  They are.  But I know the ones you are

6   referring to from --

7   Q.  Sorry.  It is the two ones that appeared in The Times --

8           THE COURT:  So, I mean, just so we can maintain some

9   sort of --

10          MR. SULLIVAN:  Order.

11          THE COURT:  -- order or perhaps confusion, you are

12  referring to Defendant's Exhibits 5 and 6?

13          MR. SULLIVAN:  That is correct, Judge.

14          THE COURT:  OK.

15          MR. SULLIVAN:  Thank you.

16  BY MR. SULLIVAN:

17  Q.  All right.

18  A.  OK.

19  Q.  Did you review Defendant's 5 and 6?

20  A.  After you asked me to, yes.

21  Q.  Yes.  Exactly.  At my request, after the onset of suit.

22          Now, did you review either of those articles in

23  connection with your work on the editorial?

24  A.  That day when we were -- no, I did not.

25  Q.  OK.  And do you recall ever having read either of those two

**JA 2087**

1  articles previously?

2  A.  I don't remember.  I don't recall that.

3  Q.  OK.  Now, again, at my request, have you reviewed the three

4  articles attached to the complaint, and I'll give you the

5  corresponding, but they are Exhibits 6, 7 and 8 to plaintiff's

6  complaint which are --

7          THE COURT:  Defendant's Exhibits 2, 3 and 4.

8          MR. SULLIVAN:  Once again, thank you, your Honor.

9  Q.  So, Mr. Bennet, if you want to look in the binder.

10  A.  Yes.

11  Q.  You see Defendant's Exhibits 2, 3 and 4?

12  A.  Yes.

13  Q.  OK.  Now, those are about the Virginia shooting and they

14  were published by The Times on June 14 and 15 after publication

15  of the editorial.  Do you see that?

16  A.  Yeah.

17  Q.  All right.  Did you ever review those, those exhibits?

18  A.  Did I ever review them?  Yeah, I did.

19  Q.  And when did you review them?

20  A.  That was in a Burns story I saw the next day.  That is the

21  day after our editorial appeared in print, the 15th I think,

22  and the other is I saw that day and subsequently.  I'm not sure

23  exactly when.

24  Q.  OK.  But to put a final point on it, I take it you reviewed

25  them after publication of your editorial?

H8gdpalh                    **JA 2088**          Bennet - direct

1   A.   Yes.

2   Q.   All right.  Let me ask you something.  Does The Times

3   editorial board maintain some sort of file about the Giffords

4   shooting or Jared Loughner that you could have consulted in

5   preparing the editorial?

6   A.   Not that I know of.

7           THE COURT:  So when those links were prepared that you

8   could, if you had the electronic version of the editorial, you

9   could press up and access --

10          THE WITNESS:  Yes.

11          THE COURT:  -- who prepared that?

12          THE WITNESS:  I believe that Elizabeth Williamson

13  prepared those links.

14          THE COURT:  And was that before or after -- was that

15  part of what she had sent to you?

16          THE WITNESS:  Yeah.  That language was in her -- I

17  think if you look at her original --

18          THE COURT:  I'm not talking about the language.  I'm

19  talking about the articles that are linked to that language.

20              In other words, if I understand it --

21          THE WITNESS:  Yes.

22          THE COURT:  -- she actually gave you the language,

23  "Before the shooting, Sarah Palin's political action committee

24  circulated a map of targeted electoral districts that put Ms.

25  Giffords and 19 other Democrats under stylized crosshairs."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H8gdpalh                          Bennet - direct

1           But if you had the electronic version of that as the

2     editorial ultimately appeared, you could click on at that point

3     and get all these other articles?

4                THE WITNESS:  Oh, yeah.  Yes.

5                THE COURT:  So my question is when she sent it to you,

6     could you do that?

7                THE WITNESS:  I could have done that, yes.

8                THE COURT:  Did you do that?

9                THE WITNESS:  No, I didn't do that.

10                THE COURT:  OK.  Go ahead, counsel.

11                MR. SULLIVAN:  Thank you, your Honor.

12     BY MR. SULLIVAN:

13     Q.  Now, in preparing the editorial, did you review any

14     articles in any publications that reported there was no

15     evidence that Jared Loughner had ever seen the crosshairs map?

16     A.  When -- I'm sorry.  Can you ask the question again?

17     Q.  Sure.  Sure.  In preparing the editorial, you doing your

18     work that day, did you review any articles in any

19     publications -- now we are going beyond The Times -- that

20     reported that there was no evidence that Jared Loughner had

21     ever seen the crosshairs map?

22     A.  No.

23     Q.  OK.  At the time you wrote the editorial, did you know one

24     way or the other whether Jared Loughner had ever seen the

25     crosshairs map?

1  A.  No, I didn't, no.

2  Q.  All right.  What we are going to do now -- our time grows

3  short --

4         THE COURT:  Yes, I am going to give you a few extra

5  minutes because I interrupted your direct with the questions I

6  had.  So we will subtract that from your half hour.  So you

7  have about seven minutes left.

8         MR. SULLIVAN:  Perfect.  Thank you, your Honor.

9  Q.  Shifting our focus once again, after the editorial was

10  published, did there come a time when you became aware of

11  public postings on social media criticizing the editorial?

12  A.  Yes, late that night, sometime between 11:30, I think, and

13  midnight or so.

14  Q.  All right.  Did you read those comments?

15  A.  I read some, yeah.

16  Q.  OK.  And you read them that very evening?

17  A.  Yes.

18  Q.  All right.  As you read those comments, did they cause you

19  any concern?

20  A.  Yeah, they caused me a tremendous amount of concern, yes.

21  Q.  And what was your concern?

22  A.  Well, there were two -- there were two things that I saw,

23  that I remember seeing, that caused me a huge amount of

24  concern.  One was -- and I can't -- I remember having -- I

25  don't know if I was drawing the inference or if I was actually

1    seeing this, but that it actually had been dispositively shown

2    that there was no connection between political incitement and

3    the shooting of Gabby Giffords.  And if that was the case, we

4    shouldn't have mentioned the shooting in the course of this

5    editorial whatsoever.  So that was hugely concerning to me.

6         And the second was that we were accusing her -- in

7    this editorial, we were accusing Governor Palin of complicity

8    in this shooting, which, again, I also didn't remotely intend.

9    I just don't think that -- again, I didn't know if Jared

10   Loughner had seen the map or not, but I do think -- I did think

11   then and do think now that he was responsible for that

12   shooting.  And politicians should be, I think, criticized when

13   they use incendiary rhetoric, but it doesn't mean when they do

14   that -- I don't believe that it means when they do that that

15   they're trying to get anybody killed.  Really, we didn't mean

16   to communicate that, so I was very concerned to see that that

17   was one of the inferences that people had drawn from what I had

18   written.

19   Q.  All right.  In light of these concerns, what, if anything,

20   did you do to address those concerns?

21   A.  Very early that morning, which is the 15th, I think around

22   5 a.m., I reached out to Elizabeth again, Williamson, in

23   Washington and to one of the researchers on our staff, and I

24   asked them to, with fresh eyes, go back and ascertain what was

25   known and what was not known, what were the facts about the

1   relationship between Loughner's shooting and political

2   incitement.

3   Q.  All right.  When did you do that?

4   A.  Well, I reached out to them I think it was around 5 a.m.

5   Q.  All right.

6   A.  And I asked them -- we had a daily editorial board meeting

7   that morning, and I believe I asked them to skip it and focus

8   their attention wholly on resolving this, because I said, look,

9   if these accusations were correct, we needed to correct the

10  editorial.

11  Q.  OK.  Now, what did you learn about the question you asked

12  to be researched?  What was the -- what did they come back

13  with?

14  A.  I did not get clarity from our team by the time the

15  editorial board meeting ended, which is, I don't know, 10:15 or

16  10:30 that morning, maybe.  But somebody then showed me the

17  story that you brang me to earlier, that Alex Burns story that

18  had dealt with this subject and that had said that it wasn't

19  established clearly one way or the other.  I'm not using the

20  precise words that were used in that story, but those were the

21  precise words that we had then drawn to correct the editorial.

22  Q.  OK.  In the Alex Burns piece to which you refer, that is a

23  news report?

24  A.  Yes, that's right.

25  Q.  All right.  So what did you ultimately decide with respect

**JA 2093**

H8gdpalh                        Bennet - direct

1   to whether a correction was warranted?

2   A.  We had -- we had created -- I had created an ambiguity that

3   people were reading to say something we didn't mean to say.

4   And that's not their fault, that's not our fault; that is a

5   mistake.  Right?  And so my priority was to correct the record

6   and -- and -- and I mean our first priority is to get the facts

7   right.  And so that's what -- that's what I was trying to do.

8   And I relied on the news report to do that.

9   Q.  All right.  When did you publish that correction?

10  A.  I think it was around 11 a.m./11:15, but we published more

11  than one correction.

12  Q.  As to that first one, that was 11:15?

13  A.  Yes.

14  Q.  The following morning?

15  A.  Yes.

16  Q.  11:15 a.m.?

17  A.  Yes.

18  Q.  Now, did you subsequently add to the initial correction?

19  A.  Yes, we did.  We were --

20  Q.  How did you --

21  A.  Well, we were scrambling, I will say, a little bit, and we

22  had dealt with the problem in the paragraph, the first

23  paragraph that caused the concern, but we had neglected to deal

24  with the "there's no sign of incitement as direct" language in

25  the following paragraph, which, as I said earlier, we repeated

1   the same idea and created the same confusion as a result.  So

2   we then went back in and corrected that.

3   Q.  All right.  And did you at some point deal with this

4   business about the so-called crosshairs map?

5   A.  That came even later in the day.  I was not aware that

6   people were reading that to mean that -- that the actual

7   photographs of these representatives had been put under the

8   crosshairs.  That was brought to my attention later that day

9   actually by our communications office that had gotten an

10  inquiry from another news source.  And once I knew that people

11  were reading that to mean, you know, something that was

12  incorrect, we corrected that as well.

13  Q.  So you --

14          THE COURT:  So, just so I'm clear on this -- and I

15  understand the original source of this language was

16  Ms. Williamson and not yourself.  So the act -- you now looked

17  at the actual --

18          THE WITNESS:  Yes.

19          THE COURT:  -- map, yes?

20          THE WITNESS:  Yes, I have.

21          THE COURT:  And what it has is crosshairs directed at

22  particular geographic districts, yes?

23          THE WITNESS:  Yes, that's right.

24          THE COURT:  Why was it in your mind -- well, let me

25  rephrase it.  Is that as it presently, as you now see that it

**JA 2095**

H8gdpalh                          Bennet - direct

```
 1  is, is that an incitement of any kind?

 2              THE WITNESS:  I'm sorry, I don't understand.

 3              THE COURT:  So what I'm trying to get at is did you

 4  think it was an incitement and one of the reasons you left in

 5  your editorial Ms. Williams' language because you thought that

 6  the map showed the actual persons with crosshairs, or did you

 7  think that even if it just showed the districts with crosshairs

 8  it was still an incitement?

 9              THE WITNESS:  I don't remember, your Honor, whether I

10  had a mental image of what the map showed or not.  I was

11  working off of the draft that had originally pointed to the map

12  as an example of incitement, and I did not -- I did not have an

13  image that led me to think one way or another.

14              THE COURT:  So when you corrected that part of the

15  editorial and issued your correction, did you discuss that with

16  Ms. Williamson?

17              THE WITNESS:  I didn't.

18              THE COURT:  Why not?

19              THE WITNESS:  I -- I was doing ten other things that

20  day and I just didn't circle back to her about it.  I don't --

21  I don't remember why not.

22              THE COURT:  All right.

23              THE WITNESS:  I do know -- I mean, I had not discussed

24  that with her.

25              THE COURT:  All right.  Go ahead, counsel.
```

H8gdpalh                    **JA 2096**
                                    Bennet - cross

1          MR. SULLIVAN:  Your Honor, I have no further

2     questions --

3          THE COURT:  OK.

4          MR. SULLIVAN:  -- at this time.

5          THE COURT:  Very good.  Thank you.

6          Let's have cross-examination.

7          MR. TURKEL:  Judge, if it may please the Court?

8     CROSS-EXAMINATION

9     BY MR. TURKEL:

10    Q.  Mr. Bennet, my name is Ken Turkel.  We have never met

11    before.  I represent the plaintiff in this case.  I want to

12    sort of get something clarified or at least crystallized for

13    the Court and for my benefit also, and I'm trying to parse

14    through the various versions or answers you gave to questions

15    about this.  But is it your testimony today under oath that at

16    the time June 14, 2017, that the editorial was written that is

17    at issue, that you had no idea that a consensus of media

18    organizations had agreed that there was no link between the

19    Palin map and Jared Loughner's conduct in the shooting in

20    Tucson in January 2011?

21    A.  What I understand to be true is that the consensus is that

22    there is -- we don't know one way or the other whether Jared

23    Loughner ever saw this map.

24    Q.  All right.  If that's your understanding --

25    A.  Yes.

1  Q.  -- what I'm asking you is on June 14, 2017, before you

2  rewrote this editorial, is that what your understanding was

3  then?

4  A.  I didn't -- I didn't know one way or the other when I was

5  working on this editorial.  I did not know.

6  Q.  You had no idea when you worked on this editorial?

7  A.  Whether he had seen the map or not, I did not know.

8  Q.  And in the same vein, then, you would have had no idea

9  whether the map or any specific representations in the map

10  incited him to his conduct, is that correct?

11  A.  Whether the -- I did not know if the map had incited him to

12  his conduct, yes, that's correct.

13  Q.  All right.  You were at The Times from 1991 to 2006, right?

14  A.  Yes.

15  Q.  White House correspondent and Jerusalem correspondent?

16  A.  Yes.

17  Q.  You were editor-in-chief at the Atlantic from 2006 to

18  April 2016, right?

19  A.  Yes.

20  Q.  Roughly.  I know you started in The Times in April 2016.

21  A.  Yes.  But my original title was editor and editor-in-chief

22  there.

23  Q.  In 2016 -- or in 2011, were you editor-in-chief at the

24  Atlantic?

25  A.  I was either editor or editor-in-chief, yes, but I was the

1   editor in charge.

2   Q.  All right.  Now, I want to sort of go back through some of

3   the things you testified about in a little more detail.

4           First, we can agree that the purpose of this

5   editorial, as discussed between you and your colleagues on the

6   editorial board, was to do three things, and I think I took

7   them down right but correct me if I am wrong.  One was to

8   address the horror of the day of the Scalise shooting, correct?

9   A.  Yes.

10  Q.  Secondly, it was to assert a sensible position on gun

11  control I think were the words you used?

12  A.  I don't think those are the -- it was to restate our, you

13  know, position in favor of gun control, something like that,

14  yes.

15  Q.  That's the problem with lawyers taking down when you

16  testify the words.

17          And lastly, to express your concern about the state of

18  political rhetoric and political incitement, correct?

19  A.  That was the idea, yeah.

20  Q.  All right.  Now, one of the things you testified to, either

21  in response to the Court's questioning or Mr. Sullivan's, was

22  that you had told Ms. Williamson to go back and look at

23  previous Times editorials that had been written in the wake of

24  the Giffords shooting, correct?

25  A.  That's right.

H8gdpalh                     **JA 2099**
                              Bennet - cross

1   Q.  You were aware that The Times had written editorials in the

2   wake of the shooting in Tucson, right?

3   A.  I didn't know for sure that we had but I assumed that we

4   had.

5   Q.  Do you follow any of your colleagues in the media on

6   Twitter?

7   A.  I do.

8   Q.  Do you follows Charles Blow?

9   A.  I do follow Charles, yeah.

10  Q.  Have you followed Alexander Burns?

11  A.  I think so, yeah.

12  Q.  Were you following them in 2011?

13  A.  I don't know.

14  Q.  All right.  Do you know whether Ms. Williamson ever went

15  back and looked at any of the editorials that The Times wrote

16  in the wake of the Tucson shooting in 2011?

17  A.  I do.  I am confident that she did.

18  Q.  Did she do so before she provided you with the first draft

19  of this editorial?

20  A.  Yes.

21  Q.  And when you say you are confident, because I haven't had a

22  chance to talk to her or do any real in-depth examination of

23  your emails or anything, why are you confident?

24         THE COURT:  Counsel, of course you are more than

25  welcome to tell us all about your preparation, or lack of

1  preparation, but I think it is better if you just ask
2  questions.
3          MR. TURKEL:  Understood, Judge.
4          THE COURT:  Thank you.
5  BY MR. TURKEL:
6  Q.  And you used the word "confidence."  That implies some
7  degree of certainty there?
8  A.  I asked her to do it.  I asked one of our researchers to
9  find the editorials and send them to Elizabeth, and so I'm
10 confident that she did as she was asked.
11 Q.  When you say "she," that she is the researcher?
12 A.  I know that the researcher sent editorials, and the "she"
13 I'm referring to is Elizabeth.
14 Q.  So would it be fair to say that you were then confident
15 when you received Ms. Williamson's draft that it reflected
16 whatever that research was that had been sent to you?
17 A.  Yeah.  Yes.
18 Q.  I want to look at that draft.
19         MR. TURKEL:  Now, Judge, I think that was what you
20 admitted the first as Court Exhibit 1, correct?
21         THE COURT:  Yes.
22 Q.  OK.  Do you have that in front of you, Mr. Bennet?
23 A.  I have it here somewhere.
24         Yes, I have it.
25 Q.  All right.  Now, would you agree with me that in just

H8gdpalh                        **JA 2101**          Bennet - cross

```
 1   reading these -- the actual editorial that was published and
 2   the draft written by Ms. Williamson, that they are somewhat
 3   drastically different in their content?
 4              THE COURT:  Sustained.  Ambiguous.
 5              MR. TURKEL:  I will rephrase, Judge.
 6              THE COURT:  Good idea.
 7   BY MR. TURKEL:
 8   Q.  Do you consider the rewrite you did of the first draft to
 9   be an extensive rewrite?
10   A.  Yes, I do.
11   Q.  And when you read these two pieces side-by-side, would you
12   agree with me that the content changed substantially after your
13   rewrite?
14   A.  I'd have to read them again.  The content -- certainly the
15   writing changed.  The content, I'm not sure -- I'm not sure I
16   do agree.
17   Q.  Let's walk through it.  There are a couple of places I want
18   to point out to you.  All right?
19   A.  OK.
20   Q.  First of all, was this the only draft provided by
21   Ms. Williamson or anybody else on the board?
22   A.  Yes.
23   Q.  And you had mentioned something about having written a note
24   on top of one of them or other iterations of this draft that
25   you may have annotated?
```

H8gdpalh                    Bennet - cross

1    A.  There would have been -- there was the edited -- what we

2    had before us is her original draft and the final draft as

3    published.  There is a document that I would have edited that

4    had the annotations and editing changes and so forth in it.

5    Q.  And at the risk of perhaps redundancy, you received this

6    electronically, correct?

7    A.  Yes.

8    Q.  I want you to go down to the fourth full paragraph, right.

9    And the second sentence there provides as follows:  "Not all

10   the details are known yet, but a sickeningly familiar pattern

11   is emerging: a deranged individual with a gun -- perhaps

12   multiple guns -- and scores of rounds of ammunition uses

13   politics as a pretense for a murderous shooting spree."

14         Now, do you recall reviewing that sentence when you --

15   A.  I'm sure I did, yet I don't recall specifically reviewing

16   it.

17   Q.  And you would agree with me in your ultimate editorial that

18   was published, the statement that "a deranged individual uses

19   politics as a pretense" was taken out, right?

20   A.  Again, I've got to look at the other draft.  I don't --

21   Q.  Why don't you -- it would probably be helpful if you had

22   both drafts out side-by-side?

23   A.  I have the other one here now.

24         MR. TURKEL:  Judge, if the Court can indulge me?  I

25   can't remember what we called -- what we had as Exhibit 1 in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  plaintiff's binder but I think it was Defendant's Exhibit 1.

2           THE COURT:  It was Defendant's Exhibit 1, yes.

3           MR. TURKEL:  Thank you, your Honor.

4  BY MR. TURKEL:

5  Q.  So what you are looking at right now, or what you should be

6  looking at, is the draft which, for the record, is the Court's

7  Exhibit 1 and the uncorrected first iteration of the published

8  editorial, which is Defendant's Exhibit 1.

9  A.  Right.  I guess what I see is a different version of that.

10  Some of the same words.

11           Do you want me to read what's in the editorial?

12  Q.  Why don't you direct me to where you are at.  Are you on

13  page 1?

14  A.  Yes.  Exactly there, sir.

15  Q.  All right.  Now, nowhere in that paragraph do you make the

16  point or do you preserve the point made by Ms. Williamson that

17  a deranged shooter was using politics as a pretense, is that

18  correct?

19  A.  Well, it says, "The sniper, James Hodgkinson, who was

20  killed by Capitol Police officers, was surely deranged, and his

21  derangement had found its fuel in politics."

22           So you're saying what's disappeared is the notion that

23  he was pretending that it was fueled in politics?

24  Q.  I'm not saying that.  I'm actually looking at two pieces --

25  A.  I'm sorry.  I didn't mean to put words in your mouth.

H8gdpalh                    Bennet - cross

1  | You're saying that Elizabeth said it.

2  | Q.  Right.  We can agree that that thought, that it was a

3  | pretense, was removed, correct?

4  | A.  That is correct.

5  | Q.  And instead what it was replaced with was a statement which

6  | you wrote, which was, as you just read, "The sniper, James

7  | Hodgkinson, who was killed by Capitol Police officers, was

8  | surely deranged, and his derangement had found its fuel in

9  | politics."

10 |         Now, you wrote that, right?

11 | A.  Yes.

12 | Q.  And you can agree with me, I would hope, that

13 | Mr. Hodgkinson was dead at the scene, in other words, he was

14 | killed the day of the Scalise shooting, right?

15 | A.  Right.

16 | Q.  By Capitol Police?

17 | A.  Right.

18 | Q.  No interviews, right?

19 | A.  Right.

20 | Q.  No criminal prosecution where he testified, right?

21 | Correct?

22 | A.  That's true.

23 | Q.  Nobody asked him, hey, what fueled your conduct, right?

24 | A.  Right.

25 | Q.  Notwithstanding that, and I'm not an expert on grammar

1    either, but the form of this paragraph after you state that

2    "his derangement had found its fuel in politics," you then jump

3    to a very similar sort of paragraph structure, as you do on the

4    next page, where you make the statement -- or, rather, sentence

5    to provide:  "Mr. Hodgkinson was a Bernie Sanders supporter and

6    campaign volunteer virulently opposed to President Trump.  He

7    posted many anti-Trump messages on social media, including one

8    in March that said 'Time to destroy Trump & Co.'"

9            Do you see that?

10   A.   Yes.

11   Q.   Now, there were numerous times during the course of your

12   testimony, and I'm sure I wrote them down, but where I thought

13   what you were saying was there was no real example to use with

14   respect to Hodgkinson, right?

15   A.   There was no example of a connection between the victims

16   that day and a specific example of -- of inflammatory political

17   rhetoric that we found that day.

18   Q.   Right.  But, nonetheless, what you wrote was that politics

19   had fueled his derangement, it found its fuel in politics.

20   Then you used these sentences about Bernie Sanders, right?

21   A.   Yes.

22   Q.   All right.  Now I want you to turn to the next page.  All

23   right?  This is where we had the paragraph concerning my

24   client, Governor Palin.  And you now jump from attributing the

25   Hodgkinson attack to a derangement fueled by politics to the

1    statement that this was probably evidence of how vicious

2    American politics have become.

3              And then in a very similar sentence structure you

4    write about, "In 2011, when Jared Lee Loughner opened fire in a

5    supermarket parking lot, grievously wounding Representative

6    Gabby Giffords and killing six people, including a 9-year-old

7    girl, the link to political incitement was clear," just like in

8    the previous paragraph, you said his derangement was fueled by

9    politics, right?

10   A.   No, I was not trying to draw that exact parallel that you

11   are asserting.

12   Q.   All right.  So we can agree, regardless of what you were

13   trying to do, the structure of that sentence seems somewhat

14   familiar to the previous one, doesn't it?

15   A.   What is the structural similarity?

16   Q.   You use a factual statement about a death and then at the

17   end of it write something like "his derangement was fueled by

18   politics and the link to political incitement was clear."  You

19   don't find those structurally similar?

20   A.   I don't -- I don't --

21             THE COURT:  I'm letting him go on, but I think, for

22   example, most of these sentences have subjects and verbs that

23   seem to follow a common pattern, and I'm not convinced,

24   counsel, to be frank, that you are going to be able to make

25   much out of this particular --

H8gdpalh                    Bennet - cross

```
 1              MR. TURKEL:  I've got one more question.  Your point
 2    is well taken, Judge.
 3    BY MR. TURKEL:
 4    Q.  The last sentence of that paragraph at the top is the
 5    sentence that says, "Before the shooting" -- in other words,
 6    after you make this "link to political incitement was clear,"
 7    it then says, "Before the shooting, Sarah Palin's political
 8    action committee circulated a map" with a hyperlink there,
 9    right?
10    A.  Yes.
11    Q.  All right.  The next paragraph you double down on it, and
12    you say, "Though there's no sign of incitement as direct as in
13    the Giffords attack," right?
14    A.  That says that, yes.
15    Q.  Now, what you'd expressed to the Court was this was
16    supposed to be or intended to be a comment on I believe you
17    said political rhetoric?
18    A.  Yes.
19    Q.  All right.
20    A.  And the political climate.
21    Q.  The political climate.
22              Now, I want you to go back to Court Exhibit 1.
23    A.  Yes.
24    Q.  And if you would look at the fifth full paragraph there.
25    A.  Mm-hmm.
```

H8gdpalh                        Bennet - cross

1    Q.   That's sort of the paragraph we're dealing with in the

2    ultimate editorial that starts, "Just as in 2011, when Jared

3    Lee Loughner opened fire in a supermarket parking lot,

4    grievously wounding Representative Gabby Giffords and killing

5    six people, including a 9-year-old girl, Mr. Hodgkinson's rage

6    was nurtured in a vile political climate," correct?

7    A.   Yes.

8    Q.   All right.   That changed in your version to "the link to

9    political incitement was clear," right?

10    A.   I don't -- I can't say which -- I'm sorry, I just can't say

11    what changed to what.   I would have to --

12    Q.   Well, the sentence is the same except the "vile political

13    climate" --

14    A.   Is it?   I'm --

15    Q.   Right?   In other words, the draft originally discussed a

16    political climate; do you see that?

17    A.   I'm sorry to ask you to do this, but would you mind

18    starting over which two sentences you are referring to so I can

19    keep track?

20    Q.   Sure.   On Court Exhibit 1, which is the draft --

21    A.   Right.

22    Q.   -- the last part of the first sentence of paragraph 5,

23    which starts, "Just as in 2011," do you see that?

24    A.   Yes.

25    Q.   All right.   Ms. Williamson originally wrote,

1    "Mr. Hodgkinson was nurtured in a vile political climate."

2    A.  Yes.

3    Q.  Do you see that?

4            All right.  When you rewrote it, that portion of the

5    sentence turned into "the link to political incitement was

6    clear."  Do you see that?

7    A.  Yes.

8    Q.  All right.  And then there was the sentence in the original

9    draft that says, "Then, it was the pro-gun right being

10   criticized," and it discusses the map, right?

11   A.  Yes.

12   Q.  And you take out when you rewrite any reference to the

13   pro-gun right and just write this sentence that Sarah Palin's

14   political action committee had circulated a map, right?

15   A.  Yes.

16   Q.  All right.  Now, one of the things you said that I think

17   the word counsel had used was the genesis of this was the

18   speech that President Trump had made sometime around the time

19   you guys wrote this article?

20   A.  It wasn't the genesis of this.  I don't think it was --

21   came out of -- when he asked about the genesis, he was asking

22   about how the editorial got started that day and --

23   Q.  I think it was something that the Judge --

24   A.  I was saying I had in my mind that day, when this horrible

25   thing happened, I was thinking about that column that Tom

1  Friedman had written.

2  Q.  You didn't hyperlink to that column, right?

3  A.  No.

4  Q.  You also mentioned, I think, someone asked you, either the

5  Court or Mr. Sullivan, what did you mean -- you just discussed

6  what you were thinking about, and you also mentioned I think a

7  speech President Trump had given.  Did you mention that?

8  A.  That was what Tom's column -- Tom Friedman's column was

9  about was about that speech.

10  Q.  You didn't mention that speech anywhere in here either, did

11  you?

12  A.  No.

13  Q.  You said you were looking for a very strong word, the word

14  "incitement," and you explained to us the reflections on your

15  time reporting in Jerusalem, right?

16  A.  Yes.

17  Q.  I think you used the definition of the word incitement, the

18  meaning includes "direct orders," right?

19  A.  The meaning -- I'm sorry.  Can you restate the question?

20  Q.  When you defined incitement, or at least your understanding

21  of the word incitement, you stated today earlier in your direct

22  testimony that it meant, among other things, direct orders?

23  A.  I don't remember what specific words I used earlier.  If

24  you say that's what I said, then -- but what I thought I was

25  saying was that it encompassed a lot of different forms of

H8gdpalh                    **JA 2111**          Bennet - cross

1  political rhetoric, political speech.

2  Q.  Now, it --

3        THE COURT:  Well, let me make sure I understand.

4        I thought I understood, but correct me if I have this

5  wrong, that one of the ideas you were advancing in this

6  editorial was that overheated political rhetoric can create a

7  climate conducive to violent acts?

8        THE WITNESS:  Yes.

9        THE COURT:  OK.  By the way, that is just a theory on

10  your part, right?

11        THE WITNESS:  Yes.

12        THE COURT:  OK.

13        THE WITNESS:  Your Honor, and a worry, you know, about

14  the time we're living in, and, you know, the guy who walks into

15  the supermarket in Washington -- I mean, excuse me, the pizza

16  place in Washington and opened fire because of something he'd

17  read, the risk that there is a connection between this kind of

18  really angry discourse that we've got and this kind of

19  violence.

20        THE COURT:  That's your theory.  Someone could

21  disagree and say that deranged individuals, there is no

22  connection, they do things for deranged reasons, or whatever.

23  But you were advancing at least a theory?

24        THE WITNESS:  Yes.

25        THE COURT:  OK.

H8gdpalh                              **JA 2112**          Bennet - cross

```
1           THE WITNESS:  Yeah.  And, again, the pattern that we
2     refer to here is -- and this is not to say the theory is
3     correct or anything, but there had been a lot of attacks on
4     elected officials over the course of the last 10 or 15 years.
5     You know, there have been a number of violent incidents.  So
6     that the pattern is -- there is a pattern.  It's not
7     dispositive that there is a link here at all.  It's not
8     dispositive that there is a link to the widespread availability
9     of guns, which is the other theory that we were advancing in
10    this editorial, but I think those were two legitimate grounds
11    for concern.
12          THE COURT:  But in order to make plausible that
13    theory, or make it more plausible, you wanted to have an
14    example beyond the example of what had occurred in the shooting
15    in the softball game, yes?
16          THE WITNESS:  Yes.
17          THE COURT:  And that's why you sent Ms. Williamson out
18    to look at the Loughner thing, among other things, yes?
19          THE WITNESS:  Well, no.  The real reason I asked her
20    to look at that was just to make sure that, umm, I was worried
21    about our being vulnerable to a charge of hypocrisy if in the
22    case of the shooting of Gabby Giffords we had written an
23    editorial criticizing right-wing incitement and positing a link
24    and then here on a day when several republican congressmen were
25    being shot, if we were silent about the danger of political
```

H8gdpalh                          Bennet - cross

1  incitement, that we would look like hypocrites.  So the reason

2  I wanted to --

3           THE COURT:  I'm totally shocked to hear that any

4  member of any media has ever been accused of hypocrisy or being

5  hypocritical, but I'm glad to have my naiveté corrected.

6           Anyway, go ahead.

7           THE WITNESS:  This is what set this in motion, and I'm

8  not myself prepared to laugh about it yet, but I appreciate

9  your Honor's observation.  Your Honor, I get it.

10 BY MR. TURKEL:

11 Q.  To be clear, to the extent you were trying to use two

12 examples, the Scalise example and the Giffords example, you and

13 I can agree that no one ever found a link to Bernie Sanders,

14 his rhetoric, and James Hodgkinson, right?

15 A.  I don't know of any such link.

16 Q.  And you have already testified that no one, as far as you

17 know, had ever found a link between the Palin map and the

18 Tucson shooting?

19          THE COURT:  I want to go back to my other point again.

20 Can you disregard my facetious --

21          THE WITNESS:  No, I --

22          THE COURT:  But if your purpose of having her look at

23 the Loughner editorials was simply to make sure that The Times

24 was being consistent, then that would be no reason why the

25 Loughner incident would have occurred in your editorial.  So

H8gdpalh                    Bennet - cross

1    the reason, whatever the motivation for having her look at

2    Loughner, the reason she put it in, and you put it in more

3    forcefully, was because you thought it was another example of

4    the thesis you were advancing, yes?

5          THE WITNESS:  Yes.

6          THE COURT:  OK.

7          THE WITNESS:  Absolutely.

8          THE COURT:  Very good.  Go ahead, counsel.

9          MR. TURKEL:  Yes, Judge.

10   Q.  If you could turn to Exhibit 2 in the plaintiff's notebook,

11   which is the one right there to your right.

12         MR. TURKEL:  And your Honor should have a copy with

13   tabs on that.

14         THE COURT:  I'm sorry.  Which tab?

15         MR. TURKEL:  Exhibit 2, your Honor, in the plaintiff's

16   notebook.

17         THE COURT:  Yes.  Got it.

18   A.  It is also the editorial?

19   Q.  Yes.  This is the corrected version.  If you'd look three

20   pages in, you will see the first correction, as we like to

21   refer to it, which is June 15, 2017.  Do you see that?

22   A.  I do see it, yeah.

23   Q.  All right.  Now, if you would turn to the second page.

24         Let's just, as a predicate, if you go down to the

25   first page, nothing changed with respect to the James

**JA 2115**

H8gdpalh                      Bennet - cross

1    Hodgkinson paragraph, correct?

2    A.   Which paragraph again?

3    Q.   The last paragraph on page 1.

4    A.   Yeah.  As far as I know, nothing changed in there.

5    Q.   Go to page 2 and the top paragraph.

6    A.   Mm-hmm.

7    Q.   Now, first, you deleted the language stating that "The link

8    to political incitement was clear."

9    A.   Mm-hmm.

10   Q.   Correct?

11   A.   Yes.

12   Q.   And substituted for that, or added there, is, "At the time,

13   we and others were sharply critical of the heated political

14   rhetoric on the right," correct?

15   A.   Yes.

16   Q.   And that is the first time the word "political rhetoric"

17   shows up in any iteration of these drafts, by the way, or these

18   articles, is it not?

19   A.   I don't know.

20   Q.   If you would look further, again we have the circulated

21   hyperlink and the changes made with respect to the "targeted

22   electoral district," as opposed to "targeted individuals,"

23   right?

24   A.   Yes.

25   Q.   And then a sentence is added at the end that says, "But in

JA 2116

H8gdpalh                              Bennet - cross

1    that case no connection to the shooting was ever established."

2    A.   That's right.

3    Q.   And in the next paragraph you removed the language saying,

4    "Though there's no sign of incitement as direct as in the

5    Giffords attack," right?

6    A.   Yes.

7    Q.   All those changes were made by you, were they not?

8    A.   By me and other editors on the -- yes.

9    Q.   All right.  Now, turn to the next page and let's look at

10   how you actually articulated the correction to the reader there

11   at that portion at the end.  Do you see that?

12   A.   Yes.

13   Q.   And in that you wrote, "An earlier version of this

14   editorial incorrectly stated that a link existed between

15   political incitement" -- and you used the word "political

16   incitement", or the words -- "and the 2011 shooting of

17   Representative Gabby Giffords."  Do you see that?

18   A.   Yes.

19   Q.   And, "In fact, no such link was established," correct?

20   A.   Yes.

21              MR. TURKEL:  All right.  Judge, at this time we'd

22   offer what has been previously marked as Plaintiff's Number 2

23   and have it accepted as either Plaintiff's Number 1 and

24   whatever next is in order, however the Court --

25              THE COURT:  Yes.  That is fine.

H8gdpalh                    Bennet - cross

1            (Plaintiff's Exhibit 2 received in evidence)

2    BY MR. TURKEL:

3    Q.   Now, if you turn to Plaintiff's Exhibit Number 3, which is

4    the second correction, and we'll call it that because that

5    little portion I just read changes in this iteration, does it

6    not?

7    A.   Mm-hmm.  Wait.  Say that again.  I'm sorry.

8    Q.   If you go to the third page of Plaintiff's Exhibit 3.

9    A.   Yes.

10   Q.   Where it says, "Correction:  June 16."

11   A.   Yes.

12   Q.   Right?

13   A.   Mm-hmm.

14   Q.   This is another correction that was made, right?

15   A.   I am -- this was -- this is the full correction that

16   reflects all the changes that were made, including the change

17   to the crosshairs.  So it's the -- it's in a sense the same

18   correction on the editorial but it is the complete one

19   reflecting these other changes.

20   Q.   I understand that.

21   A.   OK.

22   Q.   But one marked difference is instead of stating, as you did

23   in the previous correction, that a link -- that the editorial

24   stated that a link existed between political incitement in the

25   2011 shooting of Representative Gabby Giffords, you had now

**JA 2118**

H8gdpalh                    Bennet - cross

1  changed that word to "rhetoric"?

2  A.  I didn't make that change.

3  Q.  The Times changed that word to rhetoric, did they not?

4  A.  Yes, the word was changed.  Yes, The Times changed it.

5  Q.  So that word "incitement" was taken out and "rhetoric" was

6  supplanted, right?

7  A.  Right.

8  Q.  Did you know that change was being made?

9  A.  No.

10 Q.  Did you authorize that change?

11 A.  No.

12 Q.  Who made that change?

13 A.  I don't know.  I mean, it is not unusual for the copy desk

14 to make changes in the language of corrections.  This does

15 happen.

16 Q.  So you're saying it was someone at the copy desk who --

17 A.  Like I said, I don't know who specifically made it.  What

18 I'm saying is the general proposition that it is not unusual

19 for the copy desk to make sure the corrections, the language,

20 the way they are written conforms to Times' style.  That does

21 happen.

22          THE COURT:  Let me ask a different question.

23          If one were to go on The Times' Web page now and look

24 at this editorial, would it see the corrected version?

25          THE WITNESS:  Yes.

 1          THE COURT:  And would that include not only the change

 2    about, you know, removing the link and removing the direct but

 3    also the correction about the map?

 4          THE WITNESS:  Yes.

 5          THE COURT:  OK.  Go ahead.

 6          THE WITNESS:  And it would have the -- I assume since

 7    this is the last version -- I sure hope so -- but I assume it

 8    would have this version of the full corrected at the bottom of

 9    the piece as well.

10          THE COURT:  Go ahead.

11    BY MR. TURKEL:

12    Q.  You would agree with me in the versions of your editorial

13    that use the phrase "linked to political incitement," none of

14    those ever stated "linked to political rhetoric," right?

15    A.  None of them stated link to political rhetoric, yes.

16    Q.  That shows up in that correction in Exhibit 3, correct?

17    A.  The word "rhetoric" shows up in that correction.

18          MR. TURKEL:  All right.  Judge, at this time we'd

19    offer Plaintiff's Exhibit 3 and ask that it be marked next in

20    order.

21          THE COURT:  Yes.  Received.

22          (Plaintiff's Exhibit 3 received in evidence)

23    BY MR. TURKEL:

24    Q.  Go to Plaintiff's Exhibit 4, if you could, Mr. Bennet.

25          This is a tweet from the NYT Opinion Twitter account.

**JA 2120**

H8gdpalh                    Bennet - cross

1  Is that a New York Times editorial board opinion?

2  A.  Yes.  It is The New York Times Department Twitter account,

3  yeah.

4  Q.  Who prepares the content for those tweets, who does that?

5  A.  Our social media team does it.

6  Q.  And do you authorize it before they do it, or do they just

7  do what they want?

8  A.  Not every tweet, no, I don't authorize every tweet.  They

9  don't do just what they want.  We have standards that they

10  follow.

11  Q.  Did you authorize this tweet?

12  A.  I did.

13  Q.  All right.

14  A.  I did.  I remember as we were correcting it, they were

15  tweeting out the correction and the apology.  I didn't -- I

16  didn't read the tweet before it went out but I authorized its

17  publication.

18  Q.  I don't know what that means.  Did you know what they were

19  going to tweet when they tweeted it?

20  A.  Yes.  Yes, I did.

21  Q.  And so what they tweeted was, "We got an important fact

22  wrong incorrectly linking political incitement in the 2011

23  shooting of Giffords.  No link was ever established."

24  A.  Right.

25  Q.  And in this one you used the word "incitement" again,

**JA 2121**

H8gdpalh                         Bennet - cross

1     right?

2     A.   Yes, we did.

3     Q.   And it was an important fact, right?

4     A.   Yeah.

5     Q.   Because notwithstanding the fact that you may have had

6     theories, as you discussed with Judge Rakoff, or opinions, they

7     do, to some degree, have to be predicated on fact, do they not?

8     A.   That's right.

9     Q.   Now, I want you to look at -- and, Judge, at this time we'd

10    offer Plaintiff's Exhibit 4.

11              THE COURT:   Received.

12              (Plaintiff's Exhibit 4 received in evidence)

13    BY MR. TURKEL:

14    Q.   Look at Exhibit 6 now in that same binder, and I want to

15    look at these previous New York Times editorials that we

16    discussed earlier in your testimony.

17    A.   I'm sorry.  My opinion of 6 isn't here.

18    Q.   That would be a problem.  Could we get you a copy of it?

19    A.   At least there is nothing between those two pages.

20    Q.   6 and 7, there is nothing attached?

21    A.   Yes.

22              THE COURT:  You know, that's the kind of trick lawyers

23    play all the time.

24              MR. TURKEL:  In all the stuff we do, that is actually

25    how we try and catch you.  So the old missing exhibit trick.

**JA 2122**

H8gdpalh                          Bennet - cross

1  A.  The Charles column, yes.

2  Q.  Yes.  This is the column January 14, 2011, written by

3  Charles Blow, in the wake of the Tucson shooting, correct?

4  A.  That's right, yes.

5  Q.  And it is titled, "The Tucson Witch Hunt," right?

6  A.  Yes.

7  Q.  Now, I don't want to go through this every time, but you

8  don't recall reading this before you wrote the editorial, based

9  upon what you've told me earlier?

10  A.  No.

11  Q.  Would this be --

12       THE COURT:  Meaning, because it was a poorly worded

13  question, no, to the best -- to the best of your recollection,

14  you did not read it previously, true?

15       THE WITNESS:  I -- I do not recall whether I read this

16  or not.

17       THE COURT:  OK.  But at the time --

18       THE WITNESS:  I'm sorry.

19       THE COURT:  All right.  A follow-up question.

20       At the time you wrote the editorial, there was not any

21  conscious memory of this column that was in your mind at the

22  time, correct?

23       THE WITNESS:  That's correct.

24       THE COURT:  OK.

25  BY MR. TURKEL:

H8gdpalh                        Bennet - cross

1   Q.  And going back to something we discussed earlier, which was

2   your confidence level that your researcher had provided these

3   previous Tucson shooting editorials to Ms. Williamson, you were

4   confident that she read some editorials.  I assume you don't

5   know exactly which ones?

6   A.  I know that she read the editorial -- I know -- I'm sorry.

7   I know that she read the editorial.  I believe that she read

8   the editorials we wrote in the immediate wake of the shooting,

9   yes.

10  Q.  So if you would look at this one --

11          THE COURT:  This is not an editorial, is it?

12          THE WITNESS:  This is a column.

13  Q.  This is a column, I'm sorry.

14  A.  I'm sorry.  This is from 2011.  Yes, this is an editorial.

15  And I didn't ask for any columns.  I'm sorry, I missed the

16  thrust of your question.  I didn't ask for any columns to be

17  sent.  I only asked for masthead editorials, which are the

18  pieces written by the editorial board, to be sent.

19          THE COURT:  The point -- I think there was some

20  confusion.

21          THE WITNESS:  Yes.

22          THE COURT:  You don't know whether she saw this, you

23  don't know whether she searched for this, all you know is that

24  she was directed and probably did search for the editorials?

25          THE WITNESS:  Yes.

H8gdpalh                          Bennet - cross

```
 1              THE COURT:  OK.
 2   BY MR. TURKEL:
 3   Q.  Were you copied or in any way in the chain of communication
 4   between the researcher and Ms. Williamson when articles may
 5   have been sent to her?
 6   A.  When the editorials were sent to her, I believe I was
 7   copied.
 8   Q.  And this particular column, the last paragraph, in
 9   discussing the shooting in Tucson, states as follows:  "The
10   only problem is that there was no evidence then, and even now,
11   that overheated rhetoric from the right had anything to do with
12   the shooting.  (In fact, a couple of people who said they knew
13   him have described him as either apolitical or "quite
14   liberal.")  The picture emerging is of a sad and lonely soul
15   slowly, and publicly, slipping into insanity."  Do you see
16   that?
17   A.  Right.  It's not the last paragraph of the piece.  It the
18   last paragraph --
19   Q.  On that page?
20   A.  Yes.  I'm sorry.  Yes, I've got it.
21   Q.  And, again, you have no recollection of ever reading that
22   before writing --
23   A.  That's right.
24   Q.  -- your June 14, 2017 piece, right?
25              All right.  Go forward, if you could, to -- I want to
```

JA 2125

H8gdpalh                    Bennet - cross

1  look at Exhibit -- Judge, at this time, we'd offer that, which

2  will be Exhibit 6, Plaintiff's 6, into evidence?

3          THE COURT:  Yes.  Received.

4          (Plaintiff's Exhibit 6 received in evidence)

5          THE COURT:  I think, for completeness, we should make

6  note of the very immediately following sentence after the

7  sentence you just read, which reads:  "I have written about

8  violently rhetoric before, and I'm convinced that it's

9  poisonous to our politics, that the preponderance of it comes

10  from the right, and that it has the potential to manifest in

11  massacres like the one in Tucson."

12          Go ahead, counsel.

13          MR. TURKEL:  Yes, Judge.

14  BY MR. TURKEL:

15  Q.  And on June 14, 2017, the date that you published the

16  editorial in issue, on the same date -- if you would turn to

17  Exhibit 7.

18  A.  Yes.

19  Q.  -- the Times published an article titled, "Shooting is

20  Latest Eruption in a Grim Ritual of Rage and Blame."  Do you

21  see that?

22  A.  I do, yeah.

23  Q.  This was written the same day as your editorial, correct?

24  A.  It did.

25  Q.  It was written by Alexander Burns, right?

H8gdpalh                    Bennet - cross

1   A.  Yes.

2   Q.  And if you could, turn to the third page of 5.

3   A.  Yes.  Third page.  I'm sorry.

4   Q.  Yes.  And the bottom paragraph on that page provides, "In

5   2011, the shooting of Ms. Giffords by a mentally ill assailant

6   came during a convulsive political period, when a bitter debate

7   over healthcare yielded a wave of threats against lawmakers.

8   Sarah Palin, the former vice-presidential candidate, drew sharp

9   criticism for having posted a graphic online," and it is

10  blocked out there, "that showed" -- if you pick up on the next

11  page the rest of it -- "cross hairs over the districts of

12  several members of Congress, including Ms. Giffords -- though

13  no connection to the crime was established."

14  A.  Right.

15  Q.  Now, would you agree that one of the policies or procedures

16  inside the editorial board, or any editorial board, when it

17  comes to fact checking for articles is actually to rely on the

18  news pages of The Times itself?

19  A.  We utilized these pages from The Times, yeah.

20  Q.  I take it you didn't read that article prior to writing the

21  editorial at issue in this case?

22  A.  I didn't see it -- as I said earlier, I didn't see it until

23  we were correcting the article the next morning.

24  Q.  When you edited The Atlantic, do you recall covering the

25  Tucson shooting?

1    A.  I didn't cover it myself.

2    Q.  Let me rephrase that.  That's a fair statement.

3         Do you recall The Atlantic covering the Tucson

4    shooting?

5    A.  I'm sure, yes, we did.  We wrote about it.

6    Q.  I want you to look at Exhibit 28.

7         MR. TURKEL:  Judge, I could have forgotten to offer

8    the previous exhibit, I think it was number 7, in evidence.

9         THE COURT:  Received.

10         (Plaintiff's Exhibit 7 received in evidence)

11         MR. TURKEL:  I'm sorry, it was not 7, your Honor.  Let

12    me -- yes, it is.  It is 7.

13         THE COURT:  Yes.

14    Q.  If you would turn to 28, Exhibit 28?

15    A.  28?

16    Q.  Yes.

17    A.  "Caldwell's Unfairness"?

18    Q.  Yes.

19    A.  Yeah.

20    Q.  Now, The Daily Dish, was that written by Andrew Sullivan?

21    A.  Yes, it was.

22    Q.  You hired Mr. Sullivan to The Atlantic, right?

23    A.  We brought The Daily Dish over to The Atlantic.  It was an

24    independent and under editorial control of The Atlantic --

25    excuse me.  Sometimes I felt like it was the editorial control

H8gdpalh                    **JA 2128**          Bennet - cross

1  of The Atlantic.  To the editorial control of The Daily Dish.

2  Q.  Were you familiar with this article he writes called

3  "Caldwell's Unfairness"?

4  A.  I'm not.

5  Q.  You're not familiar with the existence of a dispute between

6  him and Christopher Caldwell in which Caldwell actually accused

7  Mr. Sullivan of linking the Tucson shootings to Republican

8  ideology or rhetoric?

9  A.  I'm sorry.  Can I just take a moment to look at this?

10 Q.  Yes.

11 A.  I'm trying to refamiliarize myself.

12      (Pause)

13      OK.  I don't remember this.

14 Q.  And so to the extent -- at the time -- and this would have

15 been what, January 15, 2011, you were editor-in-chief at The

16 Atlantic, right?

17 A.  I was.

18 Q.  You didn't know that Mr. Sullivan was essentially demanding

19 a retraction from another journalist who accused him of stating

20 that there was a link between the Loughner shootings and

21 Republican rhetoric and ideology?

22 A.  I may well have been aware of this at the time.  I'm just

23 now trying to remember the -- but I don't --

24 Q.  Take a look --

25 A.  Go ahead.  I'm sorry.

JA 2129

1   Q.  Take a look at the last paragraph of this.

2   A.  Yes, the "Did I explore"?

3   Q.  Yes.  In that Mr. Sullivan writes, "Did I explore the issue

4   of far right violence after Giffords' father cited the Tea

5   Party?  You bet I did.  How could I not?  Did I ever 'link the

6   shootings to Republican ideology or rhetoric'?  Nope.  Do I

7   think such rhetoric is over the top in a world where crazy

8   people have access to guns?  Yes.  Do I agree with Giffords

9   that Palin's imagery was dangerous?  Yes.  But as for the

10  motive of Loughner, by the time 6.32 pm comes along, I have

11  concluded that this was likely a psychotic breakdown, and cited

12  a psychiatrist to that effect, and specifically ended with the

13  case that he is 'of no party.' How can I be accused of linking

14  Loughner to the GOP when I specifically cite that he seems to

15  be 'of no party'?

16          "The Financial Times needs to run a correction."

17          And I guess, from what you have told me, it is your

18  testimony you were unaware that Mr. Sullivan was demanding a

19  correction from the Financial Times when they accused him of

20  this very link that is at issue in this case?

21  A.  No, that's not what I said.  I honestly -- I just don't

22  remember whether or not he did this.  I mean, obviously he did

23  do it.  I just don't remember what my knowledge of it was at

24  the time.

25  Q.  As editor-in-chief, would he have had to come to you for

H8gdpalh                    Bennet - cross

 1   authority to make such a claim or demand?

 2   A.  No.

 3   Q.  He could have done that on his own?

 4   A.  He had editorial control of The Daily Dish.  That was our

 5   agreement.

 6   Q.  To the extent that he could demand a retraction from

 7   another publication?

 8   A.  Yes.

 9   Q.  And so where we'll leave this point is you don't recall

10   whether you knew of this at the time?

11   A.  That's right.  I don't recall whether I knew it at the

12   time.

13   Q.  The -- so going through -- just a few more matters that

14   relate to your remembrance or knowledge of the Tucson shooting.

15           THE COURT:  Yes.  Counsel, you have used your 45

16   minutes, and I showed unusual restraint in not asking many

17   questions myself.  But I will give you five more minutes, as I

18   did your adversary, or seven minutes, to be precise.

19           MR. TURKEL:  I'm ready to wrap up, your Honor.

20           THE COURT:  Very good.

21   BY MR. TURKEL:

22   Q.  In the apologies, I do recall you talking to Judge Rakoff

23   about, in general terms, how you don't want to accuse

24   politicians of conduct where it is not actually based.  You

25   gave somewhat detailed testimony on that.

**JA 2131**

H8gdpalh                          Bennet - cross

```
 1              At no time did you actually use my client's name in
 2    any of the retractions or corrections or apologies that you
 3    issued, did you?
 4    A.  In the -- do we use her name in any of the corrections?
 5    Q.  Yes.  Did you apologize?
 6    A.  I didn't.  We did not apologize to her.
 7    Q.  With respect to the actual hyperlink that we discussed
 8    earlier, and just to be clear, you had the present ability to
 9    click on that hyperlink, did you not?
10    A.  Yes.
11              MR. TURKEL:  Judge, may I have just one moment to
12    confer?
13              THE COURT:  Go ahead.
14              (Pause)
15              MR. TURKEL:  Judge, I just have about three more
16    questions --
17              THE COURT:  Go ahead.
18              MR. TURKEL:  -- I feel duty bound to ask.
19    BY MR. TURKEL:
20    Q.  Mr. Bennet, your brother Michael Bennet is a senator in
21    Colorado, right?
22    A.  Yes.
23    Q.  Two days before the Tucson shooting his office was
24    threatened, was it not?
25    A.  I don't remember that, but if you say it's true, I'm sure
```

H8gdpalh                     JA 2132          Bennet - cross

1   it is.

2   Q.  If you could just turn to Exhibit 14.

3          MR. TURKEL:  Judge, I forgot to offer the last exhibit

4   into evidence, but as a housekeeping matter --

5          THE COURT:  Yeah.  That was 28?

6          MR. TURKEL:  Yes.

7          THE COURT:  28 is received.

8          (Plaintiff's Exhibit 28 received in evidence)

9   BY MR. TURKEL:

10  Q.  Exhibit 14 is an article from January 10, 2011, two days

11  after the Giffords shooting, from The Atlantic, which at the

12  time you were the editor-in-chief of, stating, "Arrest Made in

13  Threat on Sen. Bennet's Office."  You do see that?

14  A.  Yes.

15  Q.  Does that refresh your memory?

16  A.  No.  No.  I'm sorry.  I remember an arrest was made -- I

17  mean, I remember a threat.  I remember this incident.  I just

18  didn't remember when it took place.

19  Q.  Well, it took place two days after --

20  A.  Yes, you said that.  I understand.

21  Q.  If you turn to the second page of that same article from

22  The Atlantic.

23  A.  Um-hmm.

24  Q.  There is a disclosure that says, "Senator Bennet's brother

25  James Bennet edits The Atlantic," right?

H8gdpalh                    Bennet - cross

1    A.  Yes.

2    Q.  All right.  And --

3           THE COURT:  What accounts for the fact that neither

4    you nor your brother nor apparently your parents know how to

5    spell "Bennett"?

6           THE WITNESS:  I know.  It dogs us all, actually.  It

7    is one of those simple names that gets misspelled all the time

8    as a result.

9           THE COURT:  Go ahead, counsel.

10   BY MR. TURKEL:

11   Q.  Just to wrap this point up, if you go back -- and we offer

12   14, Judge.

13          THE COURT:  Yes.  Received.

14          (Plaintiff's Exhibit 14 received in evidence)

15   BY MR. TURKEL:

16   Q.  If you go back to number 12, that is the map at issue.  Do

17   you see that?

18   A.  Yes.

19   Q.  John Salazar and Betsy Markey are two lawmakers from

20   Colorado, both of whom endorsed your brother in his 2010

21   election; do you recall that?

22   A.  Yes.  I mean, I recall them endorsing him.  I actually

23   didn't know that they were on the map.

24   Q.  And do you know -- or do you recall that Sarah Palin

25   endorsed your brother's opponent in his 2016 election?

H8gdpalh                    Bennet - cross

1   A.   I -- I did not know that at the time, or at least I didn't

2   remember it.  I didn't know it at the time.  I didn't know it

3   when I was writing the editorial -- rewriting the editorial.

4   But I know as a consequence of this and the exhibits that have

5   been submitted and so forth that that's the case.

6   Q.   I'm not sure I understand that.  You are saying you didn't

7   know when you wrote the editorial that Sarah Palin had endorsed

8   your brother's opponent?

9   A.   If I had known that, I didn't remember it.  That's all I'm

10  saying.  It doesn't surprise me, certainly.

11  Q.   And, lastly, you would admit that Congresswoman Giffords'

12  political action committee, Americans for Responsible

13  Solutions, which is a gun violence prevention PAC, endorsed

14  your brother for his 2016 election, right?

15  A.   I didn't know that.

16  Q.   You weren't aware of that?

17  A.   I was unaware of that.

18          MR. TURKEL:  That's it.

19          Judge, thank you.

20          THE COURT:  OK.  Thank you.

21          Redirect.

22          MR. SULLIVAN:  Your Honor, I have no redirect.

23          THE COURT:  All right.  Very good.

24          Thank you very much.  You may step down.

25          (Witness excused)

**JA 2135**

H8gdpalh

```
1              THE COURT:  All right.  So we have several open items.

2    First, whether there is any need to call Ms. Williamson, who I

3    understand, if we were going to call her, is available next

4    week.

5              So does either side feel the need to call

6    Ms. Williamson?

7              MR. SCHULZ:  Not the defendant, your Honor.

8              MR. TURKEL:  Judge, I think from our perspective, what

9    would probably be more constructive is to actually see what was

10   sent to her, which editorials and that correspondence, before

11   we would even know whether it made sense to convene again to

12   talk to her.

13             THE COURT:  Well, OK.  I will take that under

14   consideration.

15             I mean, I think it's important to recognize why the

16   Court convened this hearing.  I have to determine ultimately

17   whether the pleadings are sufficient, but the pleadings in this

18   case -- the pleadings in every case -- require a court to draw

19   inferences and determine plausibility, as the Supreme Court has

20   put it, and, therefore, it seemed to me that there was a need

21   for this short hearing to provide the context in which I would

22   be able to rationally determine what were reasonable inferences

23   and what were plausible possibilities.  So that's the limited

24   purpose of this hearing, as I made clear in my Order, and both

25   counsel understood that and raised no objection to it.
```

**JA 2136**

H8gdpalh

1      So it's not clear to me that that limited purpose

2   would be advanced materially by having Ms. Williamson testify,

3   but I'll think about it for the next day or so.

4      Why don't I do this rather than put plaintiff's

5   counsel on the spot?  If you still think tomorrow that

6   Ms. Williamson should be called, send me a letter saying why by

7   no later than 5 p.m. tomorrow and I will consider that.  If a

8   letter is sent, defense counsel can send a letter by no later

9   than 5 p.m. the following day in response.  But that, at least

10  at the moment, given the narrow framework of this hearing, I am

11  not sure that it will be particularly useful to the Court.

12  This is, of course, without prejudice to the fact that maybe if

13  the case goes forward, of course she could be deposed --

14  undoubtedly will be deposed and, for that matter, Mr. Bennet

15  can be deposed.  This hearing in no way precludes any of that

16  if the case goes forward.  This was a narrow hearing for a

17  narrow purpose.  But I'll wait to see what plaintiff's counsel

18  wants in that regard, and then I will make a decision depending

19  on the submissions.  If there are no submissions, I will assume

20  no one wants Ms. Williamson.

21      Secondly, independent of that, I would benefit from

22  counsel submitting on both sides a brief submission on what

23  this hearing, if anything, adds to the determinations that I

24  need to make, particularly on the issue of actual malice, which

25  I think looms as a significant issue.  But, again, I want to

**JA 2137**

H8gdpalh

1   stress, I'm not making any determinations and I don't ask you

2   to make any determinations about the credibility of Mr. Bennet

3   or not.  That's not the purpose of this hearing.  The purpose

4   of this hearing is to ascertain what is a plausible and what is

5   not plausible possibility in this so far as a motion to dismiss

6   is concerned.  So I would benefit from any insights either side

7   wants to offer in that regard.

8              If Ms. Williamson is -- if you do want Ms. Williamson,

9   then these submissions should be 24 hours after she testifies,

10  which would be some day next week.  If neither side wants

11  Ms. Williamson, then the submission should be next Monday.

12  And, either way, I am determined to decide this motion by the

13  close of the month, as I indicated previously, so there is a

14  little bit of a time constraint.

15             Submissions should be no more than 10 double-spaced

16  pages, filed and docketed with the court.  And I don't want

17  responses, just 10 pages from each side.

18             I think that's everything that was on my list.

19  Anything that counsel wants to raise?

20             MR. TURKEL:  Judge, I think, with respect to the

21  request that in lieu of calling her it may be sufficient for us

22  just to see the documents that were described by Mr. Bennet --

23             THE COURT:  Let me find out --

24             MR. TURKEL:  Tell me how to follow up.

25             THE COURT:  That is an interesting point.

H8gdpalh     **JA 2138**

1          Any objection in providing that to plaintiff's

2     counsel?

3          MR. SCHULZ:  Yeah, I'm not quite sure which documents.

4          THE COURT:  I think what he means, if I understood it,

5     was there was an email -- there was a researcher who was asked

6     to find these editorials, and then the researcher sent them to

7     Ms. Williamson and to Mr. Bennet, as I understood his

8     testimony.  Is that what we are talking about?

9          MR. TURKEL:  Yeah.  From what I understood, he was

10    kept in the chain there.

11         THE COURT:  Yes.  Exactly.  Yes.

12         MR. TURKEL:  And I don't know if there was one or two.

13    I don't know.  I mean, he just sort of described those

14    communications.  So that would probably give us enough insight

15    to know.

16         Judge, to some degree, I understand the narrow inquiry

17    at hand.  I equally have some difficulty juxtaposing it with

18    12(b), and I don't know if we are going to brief that or not --

19         THE COURT:  Well, I mean, you're free -- both sides

20    are free to argue on, in their papers, that I should take no

21    account of this hearing, if that's your position.  Neither side

22    raised any objection to my holding that hearing, and we had a

23    telephone conference and if you had objection to it, you should

24    have raised it then.  But that doesn't preclude you from

25    saying, Judge, there is nothing here that in the end, as a

H8gdpalh

1    matter of law, you really should take cognizance of, that's

2    your position.  I thought -- I mean, one of the questions that

3    I thought I needed to know the answer to in order to assess

4    this complaint was whether the portions of the editorial that

5    were complained of were the product of a single author, of a

6    collective group of authors.  The complaint, understandably,

7    just referred to The Times, or The Times' editorial board.  And

8    I thought, in fairness to not just the plaintiffs but in order

9    to do my job, I needed to know a little bit more there, and

10   that was established today without debate from either side.  So

11   we now have undisputed fact as to how this editorial came about

12   that neither side disputes.

13        I would like to take cognizance of that for the

14   purpose of ruling on this motion.  I think I probably will take

15   cognizance of it for purposes of ruling on this motion.  But if

16   you think or either side thinks that that violates the law

17   somehow, then put that into your papers when you submit that

18   10-page brief.

19        MR. SCHULZ:  Yes, I shall.

20        MR. TURKEL:  That would be one sensitivity, and I

21   don't like to use the word "violate the law."  We're on the

22   same treaty.  It wasn't a normal kind of hearing during a

23   12(b)(6) but --

24        THE COURT:  The fact that it wasn't ordinary and usual

25   was not the only reason why I convened it.

H8gdpalh

1          MR. TURKEL:  I know.

2          And to be honest, Judge, we really wouldn't have

3   tendered an objection because we were trying to get a better

4   understanding of kind of what the inquiry was.  You described

5   it in the Order and we got a better sense today.  I think the

6   sensitivity would be two-fold.  One, pockets of testimony today

7   were -- well, a bunch of us discussed there were -- you know,

8   if that's part of the inquiry where -- I don't want to get into

9   the weeds because we are at the four-corner stage with

10  references to people or things that weren't remembered.

11  Secondly, the other one would be just making sure that to the

12  extent there are any defects that are curable, we have the

13  right to amend, and being able to sort of assess that against

14  the background of this type of a hearing.  So those are --

15         THE COURT:  Well, I mean, yeah, the question of

16  whether you can amend or not is a separate question which I'll

17  take up.  The law normally permits that, but there are

18  exceptions to that.  That's not before me.  I haven't really

19  thought about that.

20         I should make clear in my order, but I will make clear

21  again, the purpose of this hearing was to give the Court an

22  idea of what inferences reasonably can be drawn and what is a

23  plausible allegation, given this complaint.  I think that I

24  have clear authority to convene this hearing for that purpose

25  and neither side objected.

JA 2141

H8gdpalh

1        But I would go further and say I think it is a darn
2   good idea.  Other judges should do it.  The Supreme Court of
3   the United States, in the cases of <u>Iqbal</u> and <u>Twombly</u>, has put
4   the district courts in the position of, in effect, gatekeepers.
5   A 12(b)(6) motion now requires a court, in a way that it never
6   did prior to those major Supreme Court cases, to make
7   determinations about plausibility.

8        Now, you cannot make a determination about
9   plausibility without knowing something about the context in
10  which the underlying events occurred.  If a court were asked --
11  if the complaint made some claim about cooking, this is one
12  court that would have no way of assessing the plausibility of
13  that complaint because, being an old-fashioned judge, I know
14  nothing about cooking, although I have to say my two brothers
15  are excellent cooks.

16       So the point is I think it's important, in order to
17  carry out that function that the Supreme Court has placed on
18  the district court, to get some knowledge of the context.
19  That's the sole reason I had this hearing, and it's not to make
20  credibility determinations.

21            MR. TURKEL:  Understood.

22            THE COURT:  OK.

23            MR. TURKEL:  So I guess -- and where I began, you'll
24  let us know if you want us to make an application with respect
25  to the documents --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H8gdpalh

1          THE COURT:  So, yeah.  I'm sorry.  Where do we stand

2     on providing those documents?

3          MR. SCHULZ:  Judge, I need to confer with my client.

4     But if the request is to see the specific editorials that were

5     provided to Ms. Williamson, I think we would probably identify

6     those for plaintiff.

7          THE COURT:  OK.  Good.  So you need to do that, if

8     you're going to do it, certainly by early tomorrow morning so

9     they can make their determination by the close of business

10    tomorrow whether they want to apply to have Ms. Williamson

11    testify.

12         MR. TURKEL:  Yes.  I would just go a step farther,

13    Judge.  We would just like the communication forwarding them to

14    her.  I think that is probably as pertinent as the actual

15    editorials, but I don't want to overstep the scope of the

16    hearing.  I just --

17         THE COURT:  No, I think --

18         MR. TURKEL:  I wanted to know how it was communicated.

19         THE COURT:  I think -- I did not allow discovery in

20    connection with this hearing because it was not intended to

21    substitute for the rules of discovery.  I think for making the

22    assessment as to Ms. Williamson, all you really need at most is

23    to know which editorials she, you know, was sent by the

24    researcher.  So I will ask defense counsel, subject to checking

25    with his client, to provide that by early tomorrow morning.

H8gdpalh

```
 1              MR. TURKEL:  OK.

 2              THE COURT:  OK.

 3              MR. TURKEL:  Should we follow up or write a letter as

 4      indicated?

 5              THE COURT:  Yes.

 6              MR. TURKEL:  OK.

 7              THE COURT:  All right.

 8              MR. TURKEL:  Thank you, Judge.

 9              THE COURT:  Anything else?

10              OK.  Very good.  Thanks very much.

11              MR. SULLIVAN:  Thank you, your Honor.

12              THE CLERK:  All rise.

13

14                              -   -   -

15

16

17

18

19

20

21

22

23

24

25
```

# JA 2144

```
 1                    INDEX OF EXAMINATION

 2     Examination of:                          Page

 3     JAMES BENNET

 4     Direct By Mr. Sullivan . . . . . . . . . . . . . 3

 5     Cross By Mr. Turkel  . . . . . . . . . . . . . .33

 6                      PLAINTIFF EXHIBITS

 7     Exhibit No.                            Received

 8      2    . . . . . . . . . . . . . . . . . . . .54

 9      3    . . . . . . . . . . . . . . . . . . . .56

10      4    . . . . . . . . . . . . . . . . . . . .58

11      6    . . . . . . . . . . . . . . . . . . . .62

12      7    . . . . . . . . . . . . . . . . . . . .64

13      28   . . . . . . . . . . . . . . . . . . . .69

14      14   . . . . . . . . . . . . . . . . . . . .70

15                      DEFENDANT EXHIBITS

16     Exhibit No.                            Received

17      1    . . . . . . . . . . . . . . . . . . . .10

18

19

20

21

22

23

24

25
```

**JA 2145**

M232PalVD1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    SARAH PALIN, an individual,

 4                    Plaintiff,

 5             v.                          17 CV 4853 (JSR)

 6    THE NEW YORK TIMES COMPANY, et
      al.,
 7
                    Defendants.
 8
      ------------------------------x      Voir Dire
 9
                                           New York, N.Y.
10
                                           February 3, 2022
11                                         10:35 a.m.

12    Before:

13                         HON. JED S. RAKOFF,

14                                         District Judge

15
                             APPEARANCES
16
      TURKEL CUVA BARRIOS, P.A.
17         Attorneys for Plaintiff
      BY:  SHANE B. VOGT
18         KENNETH G. TURKEL

19
      BALLARD SPAHR, LLP
20         Attorneys for Defendants
      BY:  DAVID L. AXELROD
21         JACQUELYN N. SCHELL
           THOMAS BYRNE SULLIVAN
22         JAY WARD BROWN

23

24    Also Present:

25    Dana Green, Senior Counsel, The New York Times Company
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA 2146**

M232PalVD1

```
 1

 2              THE COURT:  So good morning, ladies and gentlemen.

 3     Before you are seated, we are going to swear you in.

 4              THE DEPUTY CLERK:  Please raise your right hand if you

 5     are a prospective juror.

 6              You, and each of you, do solemnly swear that you will

 7     true answers give to all questions that shall be put to you,

 8     touching upon your qualifications to serve as jurors in this

 9     cause, so help you God?  I do.

10              JURORS:  I do.

11              THE DEPUTY CLERK:  Please be seated.

12              I am going to put the cards of the jurors into the

13     board as they are seated, but I am going to confirm that I have

14     got the right person as I go.

15              MR. TURKEL:  Can we turn around and face the jurors?

16              THE COURT:  Yes.

17              Ladies and gentlemen, I am Judge Rakoff and we are

18     about to pick a jury in a civil case that will last at most two

19     weeks, probably less.  But counsel and I recognize that even a

20     two-week interruption in your lives is a substantial

21     inconvenience.  But those who have served on juries before

22     will, I think, recognize that what I hear at the end of every

23     case is jurors telling me that it was an inspiring experience.

24              And why is that?  It is because, under our

25     Constitution, we give jurors greater responsibility, greater
```

1    power than any other country in the world.  In many countries,

2    civil cases are decided by judges.  In some cases, of course,

3    they are decided by dictators or their functionaries.  But our

4    founding fathers thought that the determination of justice, not

5    just in criminal cases, but in civil cases as well, was too

6    important to be left to anyone but ordinary citizens like

7    yourselves drawn from all walks of life who come together, who

8    reason together, who determine what the truth is and who reach,

9    if they can, a verdict.

10          Now, in a few minutes, I am going to put questions to

11   the first nine because in a civil case we are picking a jury of

12   nine people.  But I would ask that all of you pay close

13   attention to my questions because some of those nine may be

14   excused and you may be called up in their place, and I don't

15   want to have to repeat each and every question.  I will simply

16   ask, you did you hear my questions before and are any of those

17   that you need to respond to.  And if you need to say more than

18   yes or no, come up to the microphone so everyone can hear you.

19          I want to mention one other thing.  As you will hear

20   in a minute, the parties in this case are well known, and some

21   of you undoubtedly will have heard of one side or the other or

22   both and will have perhaps views.  That is an irrelevancy.

23   What is central to every jury is the American sense of fair

24   play.  Jurors, of course, have all sorts of views, but when

25   they become jurors, they put aside any views they may have and

**JA 2148**

M232PalVD1

1  calmly, coldly look at the facts and determine what the truth

2  is in any given case.

3          So that is going to be your responsibility in this

4  case as it has been the responsibility of every jury since our

5  Constitution was created.

6          All right.  So let me first address Jurors No. 1

7  through 9, and maybe you can raise your hand so we are sure we

8  have all 9.  Very good.

9          So let me tell you a little bit about this case.  So

10  the plaintiff is Sarah Palin, the former governor of Alaska and

11  a former vice presidential candidate.  The defendant is the *New*

12  *York Times*.

13          Ms. Palin claims that *The Times* libeled her, made

14  false statements about her, and did so intentionally.  *The New*

15  *York Times* says that is completely untrue and that while they

16  may have made one or two mistakes in an editorial, they quickly

17  corrected it.

18          So that's the clash of positions, and you will have to

19  resolve that by listening to all of the evidence.

20          But let me just ask at this point, is there anything

21  about that general description that makes any of you nine feel

22  that you cannot serve as a fair and impartial juror?  Very

23  good.

24          Now let me tell you the schedule.  We will normally

25  sit from 9:30 to 3:30.  The lawyers will have to be here at 9,

1   but we start with you a little bit later to accommodate your

2   coming in and avoiding rush hour.

3          And I should mention in that respect that you should

4   have no concerns about COVID-19.  We have had, during the

5   pandemic, 106 trials, jury trials, in this courthouse, and we

6   have, of course, been very careful, as we will with you folks,

7   to keep you masked, to keep you socially distanced, and so

8   forth.  And when you get up to the courtroom, you will see how

9   that is all arranged.  Not a single juror in all these now

10  years has come down with COVID-19, and we are very proud of

11  that.  But we want you to be sure that you recognize that we

12  are being very careful about it.

13         So the schedule.  The jury will normally start at

14  9:30, and we will go until 3:30.  There will be a mid-morning

15  break, and then there will be an hour for lunch, roughly

16  between 1 and 2.  Basically it works out to be three

17  one-and-a-half-hour sessions of testimony each day.

18         We will sit every day, every business day.  As I say,

19  worst case, the case might last two weeks.  I'm, frankly,

20  fairly confident, as I think counsel are, as well, that it will

21  be less than that, but we want to give you the worst case

22  situation, just so you know.

23         Is there any problem with that schedule that any of

24  the first nine jurors has?  Very -- yes, ma'am.

25         You have to come to the microphone so everyone can

1    hear you clearly.

2                    JUROR NO. 2:  So, for example, would the trial start

3    tomorrow and then could the trial potentially go into the week

4    of the 14th?

5                    THE COURT:  Well, we are going to start today, we are

6    going to have our first witnesses today, and the expectation is

7    we will be through by the end of next week.  But the one reason

8    I can't guarantee you that is the one thing I can't control and

9    the lawyers can't control is how long a jury takes to

10   deliberate and to reach a verdict.  So I wanted to give you the

11   worst-case scenario that it might go into the following week,

12   but more likely than not it will be over by the end of next

13   week.

14                   JUROR:  Okay.  Thank you.

15                   THE COURT:  Anyone else?  Okay.  So the -- I am going

16   to ask now the lawyers to introduce themselves and to introduce

17   their clients in effect.  And then we will have some more

18   questions.

19                   So let's start with plaintiff's counsel.

20                   MR. TURKEL:  Good morning.  I'm Ken Turkel.  I'm with

21   my partner Shane Vogt seated to my left.  To my right is

22   Governor Sarah Palin.  That comprises the lawyers for our team.

23   You may see a gentleman named Preston Ricardo occasionally.

24                   THE DEPUTY CLERK:  Mr. Tomich, can you please stand up

25   and face the front of the room because that will show you to

**JA 2151**

M232PalVD1

1    the jurors that are in the room.

2              MR. TURKEL:  Got it.  I didn't know that.  There is no

3    mic up here, though, so I don't know if that helps on picking

4    me up, but that was it.  We addressed it.

5              THE COURT:  I don't know.  I'm the judge, which means

6    I'm technologically incompetent.

7              MR. TURKEL:  Here we go.  You just handed a lawyer a

8    microphone.  I didn't ask for it.  But that was it for me.

9              THE COURT:  So does any one of the first nine jurors

10   personally know any of the folks who were just introduced,

11   either the lawyers or Ms. Palin?

12             Does any member of the first nine jurors have any

13   connection with either Ms. Palin or with the law firm that is

14   representing her?  Very good.

15             We will turn to defense counsel.

16             MR. AXELROD:  Thank you, your Honor.

17             Forgive me for turning my back to you.  My name is

18   David Axelrod.  I represent *The New York Times*, along with my

19   colleagues.  Sitting right here is Jacquelyn Schell.  Next to

20   Jacquelyn is Jay Brown.  And right over there is Tom Sullivan.

21             Our clients here -- thank you very much.  Our clients,

22   to my right, Mr. James Bennet.  James, could you just stand up.

23   Thank you.  And then representing *The New York Times* is a

24   lawyer with the times, Dana Green.

25             Thank you very much, your Honor.

**JA 2152**

M232PalVD1

1          THE COURT:  Yes, and I should have mentioned, ladies

2    and gentlemen, my apologies.  There are two defendants -- *The*

3    *New York Times* and Mr. Bennet, who was just introduced.

4          So do any of the first nine jurors personally know any

5    of the people who were just introduced at defense table?

6          Does any member of the first nine or any member of

7    your immediate family -- and let me define immediate family for

8    you -- your parents, your brothers and sisters, and your

9    children.  I'm not interested in cousins, I'm not interested in

10   nephews, and so forth, just the nuclear family so to speak.  Do

11   any of you or any member of your family own stock in or have

12   any special relationship to *The New York Times*?  Very good.

13         Now I'm going to read you a list of people, and most

14   of these will be witnesses.  Some will just be people whose

15   names will appear prominently in the testimony.  And when I am

16   through with the list, I'm going to ask you to raise your hand

17   if you personally know any of these people.

18         Elizabeth Williamson, Linda Cohn, Ross Douthat, Eileen

19   Lepping, Phoebe Lett, Andrew Sullivan, Tim Crawford, Danielle

20   Rhoades Ha, Hanna Ingber, Justin Stile, Sebastian Tomich, Craig

21   Kronenberger, and Roland Caputo.

22         Anyone personally know any of those folks?  Very good.

23         You are also going to hear testimony about a political

24   action committee associated with Ms. Palin called SarahPAC.

25   You are going to hear reference to Congresswoman Gabrielle

1   Giffords and Congressman Steven Scalise.  You are going to hear

2   reference to a lawyer for the *New York Times* named David

3   McCraw.

4          Do any of you in the first nine have any personal

5   relations with any of those folks?  Very good.

6          Now, have any of you, by show of hands, heard or seen

7   anything about this case in the media?  Okay.  Several.  Raise

8   your hand again if you think you would have any problem being a

9   fair and impartial juror as opposed to being able to put that

10  out of your mind and judging the case on the facts.  Anyone

11  think they would have a problem?

12         THE DEPUTY CLERK:  Over on this side, Judge.

13         Can you come up all the way to the microphone.  I'm

14  sorry.

15         JUROR:  Can we speak in private?

16         THE COURT:  All right.  Come up.

17         (Sidebar)

18         THE COURT:  Yes.

19         JUROR:  I don't like Sarah Palin.  I think she is a

20  cruel person.  I don't like her, and I don't think I would be

21  fair to her listening to what she has to say.

22         THE COURT:  Well, the --

23         JUROR:  I know that might not be what you want to

24  hear, but --

25         THE COURT:  If you were here on trial and some juror

1   said, I don't want to be part of this case because I know this

2   guy and I don't like him, wouldn't you be pretty much

3   disappointed?  Because the whole American system is premised on

4   people being able to put that kind of stuff aside and assess

5   the case on its facts.

6          JUROR:  I agree with you, but just how I feel towards

7   her, I don't think I will be fair.

8          THE COURT:  All right.  I will excuse you.

9          JUROR:  I'm just trying to be as honest as I could.

10          THE COURT:  I appreciate it.

11          JUROR:  I don't want her getting -- I don't want the

12   case taking a left turn.

13          THE COURT:  Well, that's fair.  I'm going to excuse

14   you.

15          MR. TURKEL:  That's the purpose of this.  You don't

16   have to apologize.  The point is being honest about it.

17          THE COURT:  All right.

18          (In open court)

19          THE DEPUTY CLERK:  Juror 6 come over here.  Juror 6 is

20   excused.

21          And the juror that is to go and sit in seat no. 6 is

22   Juror No. 10, James Chana.  So go to seat no. 6, please.

23          THE COURT:  You heard all my questions so far?

24          JUROR:  Yes

25          THE COURT:  Any need to respond to?

**JA 2155**

M232PalVD1

```
 1              JUROR:  No.

 2              THE COURT:  Very good.

 3         Does any member of the first nine have any problem

 4   with their eyesight or their hearing, that they would have any

 5   problem hearing or seeing the witnesses who will -- if you have

 6   any problem hearing me now, you would have a problem.  If you

 7   don't have a problem, it will be -- the witnesses will be even

 8   closer to you when you are in the courtroom.

 9         So anyone have a problem with their eyesight or their

10   hearing?  Very good.

11         Anyone have a problem speaking, reading, or

12   understanding English?  Very good.

13         By show of hands, have any of the first nine ever

14   served on a jury before?  And raise your hand again if the jury

15   was not able to reach a verdict.  Okay.  Very good.

16         I want each of you now to tell me what county or

17   borough you live in -- we don't need your address, just the

18   county or borough -- what you do for a living and, if you have

19   a significant other, what that person does for a living.

20              Starting with Juror No. 1.

21              JUROR:  Good morning.  I'm a retired hospital care

22   investigator.

23              THE COURT:  What kind of investigator?

24              JUROR:  Retired hospital care investigator.

25              THE COURT:  Retired.  Okay.
```

**JA 2156**

M232PalVD1

1           JUROR:  And I'm single.

2           THE COURT:  Where do you live?

3           JUROR:  Divorced.  I live in Manhattan, Harlem.

4           THE COURT:  Very good.  You can return.

5           Juror No. 2.

6           JUROR:  I live in Manhattan.  I am a docent at the

7   Metropolitan Museum of Art, and my husband is vice president

8   program director of Fox Weather.

9           THE COURT:  Juror No. 3.

10          JUROR:  I live in Manhattan, I'm single, and I work

11  for a church children's ministry doing admin.

12          THE COURT:  Juror No. 4.

13          JUROR:  I live in the Bronx.  I work for the Bronx VA

14  Medical Center.  And my significant other works for the

15  Division of School Safety.

16          THE COURT:  Okay.  Juror No. 5.

17          JUROR:  Hi.  I live in Westchester.  I work for a

18  pharmaceutical company as a project manager, and my husband is

19  an attorney.

20          THE COURT:  Juror No. 6.

21          JUROR:  I live on the Upper West Side.  I'm a creative

22  director.  I live with my wife who is a neuropsychologist.

23          THE COURT:  Juror No. 7.

24          JUROR:  I live in Manhattan and I am a technical

25  training manager for a large law firm and I am single.

```
1              THE COURT:  Juror No. 8.

2              JUROR:  I live in the Bronx.  I work as a receptionist

3    in a fertility clinic in Manhattan, reproductive medicine.

4              THE COURT:  Juror No. 9.

5              JUROR:  Hi.  I live in Manhattan.  I am an early

6    childhood educator, and my significant other works in digital

7    advertisement.

8              THE COURT:  Okay.  At this point in time, ladies and

9    gentlemen, counsel get to exercise what are called peremptory

10   challenges, which means that each side can strike up to three

11   jurors and excuse them.  And you should not speculate as to why

12   a particular side excuses one person or another.  We do this in

13   rounds.  So in the first round it will be one challenge for the

14   plaintiffs, one challenge for the defense.

15             (Pause)

16             THE DEPUTY CLERK:  Your Honor, Juror No. 1 is excused.

17   Juror No. 1, the seat number one is now Juror No. 11, Cheryl

18   Baybay, B-A-Y-B-A-Y.  Please come and sit in seat number 1.

19             THE COURT:  All right.  Well, congratulations.  You

20   moved all the way from 11 to 1.  So you heard all my questions

21   before?

22             JUROR:  Yes.

23             THE COURT:  Any that you need to respond to?

24             JUROR:  Yes.

25             THE COURT:  Go to the mic.
```

1      JUROR:  I live in the Bronx.  I am an ICU nurse and

2   currently involved in the treatment of COVID-19 patients, and

3   my husband works in RCN Telecom.

4      THE COURT:  I'm having a little trouble hearing you.

5   Speak a little bit louder.

6      JUROR:  I live in the Bronx.  I'm currently an ICU

7   nurse, currently employed by NYP Lawrence Hospital and

8   currently involved in the treatment of COVID-19 patients.  And

9   due to staff shortage, I would like to ask if I could be

10   excused to help my team in the hospital.

11      THE COURT:  Okay.  Come to the sidebar.

12      JUROR:  Sure.

13      (At the sidebar).

14      THE COURT:  Tell me again what your problem is?

15      JUROR:  I am an ICU nurse currently involved in the

16   treatment of COVID-19 patients in ICU and my manager is asking

17   if there is any way I could go back.

18      THE COURT:  Did you ask to be excused?  Because you

19   can get a six-month extension.

20      JUROR:  I did ask the clerk, and they said there is no

21   one to be excused right now.

22      THE COURT:  I see.  All right.  I will excuse you.

23      JUROR:  Yeah.

24      MR. TURKEL:  Judge, I want to get something on the

25   record while we are at sidebar.  Do you want to finish this

**JA 2159**

M232PalVD1

```
1   exercise, then I can approach again?
2              THE COURT:  What do you want to ask?
3              (In open court)
4              THE DEPUTY CLERK:  Juror No. 11 is the excused.
5              Seat no. 1, so go to seat no. 1 now, is Juror No. 12,
6   Michael Stuart, S-T-U-A-R-T.
7              (At the sidebar; jurors not present)
8              MR. TURKEL:  Yes, Judge.  If it please the Court, we
9   submitted questions.
10             THE COURT:  Yeah.  I considered all the questions that
11  you and The Times submitted, and I have chosen not to ask those
12  questions.
13             MR. TURKEL:  I understand.  I just want to make sure
14  that I get on the record, given the one comment we got from one
15  juror, just simply exploring whether anybody has preconceived
16  biases.
17             THE COURT:  I'm going to ask, before the final
18  challenge, whether there is any other reason they anyone feels
19  they can't be a fair and impartial juror, and that I think is
20  more than sufficient.
21             (In open court)
22             THE COURT:  Okay.  So new Juror No. 1, you heard my
23  questions.  Any of those you need to respond to about the
24  general stuff before you tell us about yourself?
25             JUROR:  No.
```

M232PalVD1

```
 1          THE COURT:  Okay.  Come up and just tell us what you
 2   do for a living and so forth.
 3          JUROR:  I am an accountant and I work exclusively with
 4   not-for-profit organizations, the do-gooder type.
 5          THE COURT:  I'm sorry.  Where do you live?
 6          JUROR:  Oh, I'm sorry.  I live in Manhattan.
 7          THE COURT:  Okay.  Very good.  Thank you very much.
 8          All right.  Counsel will exercise their second round
 9   of challenges, one for each side.
10          (Pause)
11          THE DEPUTY CLERK:  Your Honor, Juror No. 3,
12   Ms. Barker, and Juror No. 4, Ms. Thomas, are excused.
13          Seated in seat no. 3 will now be Juror No. 13, Euan
14   Menzies, M-E-N-Z-I-E-S.
15          Seated in seat no. 4 will now be Juror No. 15, Daniel
16   Martinez, M-A-R-T-I-N-E-Z.
17          THE COURT:  So new Juror No. 3, you heard my general
18   questions.  Any of those you need to respond to?
19          JUROR:  Yes, your Honor.
20          THE COURT:  All right.  Come to the sidebar.
21          (At the sidebar)
22          JUROR:  I'm just not sure, based on information I have
23   got from the media, that I can be unbiased.  I had thought this
24   case had been dismissed a while ago.  And when the stories hit
25   the New York Post about Governor Palin testing positive and
```

**JA 2161**

| | |
|---|---|
| 1 | going out to dinner, I went back and refreshed my memory, and |
| 2 | it was pretty clear that the case was dismissed, and it was |
| 3 | back down on appeal.  I think you might have dismissed it, |
| 4 | actually, yourself.  I'm struggling in my head -- |
| 5 | THE COURT:  I'm having a little trouble -- first of |
| 6 | all, I assume, you sound like an educated person -- |
| 7 | JUROR:  Yes, your Honor. |
| 8 | THE COURT:  -- that you don't necessarily take as the |
| 9 | gospel everything you read in the *New York Post* -- |
| 10 | JUROR:  No, it wasn't -- |
| 11 | THE COURT:  -- or any other publication.  So you have |
| 12 | no firsthand knowledge of any of this.  Correct? |
| 13 | JUROR:  No.  I'm just saying I come today with some |
| 14 | skepticism. |
| 15 | THE COURT:  I'm just exploring that.  You know, I'd |
| 16 | get off of that quickly. |
| 17 | JUROR:  No, I understand. |
| 18 | THE COURT:  But in all seriousness, of course, every |
| 19 | single human, 100 percent, come to cases with preconceived |
| 20 | ideas, sometimes it is specific to the parties, sometimes it is |
| 21 | just general about the kind of case, a million views. |
| 22 | But the great thing about America is that the |
| 23 | overwhelming majority of people recognizing that they might |
| 24 | some day be there, too, recognize that they -- it's their |
| 25 | obligation to put aside that and it is not that difficult |

**JA 2162**

M232PalVD1

1   because their job is simply to listen to the evidence and

2   decide what the facts are, not to make value judgments, not to

3   make legal judgments, just to decide what the facts are.  What

4   the law is is something I decide and will tell the jury how to

5   apply it.  So I'm a little surprised that you feel you are so

6   affected by what you may have read about one person or another

7   that you couldn't be fair.

8             JUROR:  So that's fair.  First of all, I would say I'm

9   trying to take this seriously, so I'm not trying to take it

10  lightly.

11            THE COURT:  Of course.

12            JUROR:  You asked us not to step back and give any

13  perspective to our general feelings on the plaintiff or the

14  defendant.  I mean, I would say I have a bias one way or the

15  other there, to start with.  I can get that out of my head.  I

16  think, combined with the second set of information that is sort

17  of boiling around in there, I am just being honest to

18  everybody, saying that I am going to struggle to be impartial.

19  I am playing it safe.

20            THE COURT:  I am going to excuse you though, to tell

21  you the truth, I'm a little disappointed because you sound like

22  a highly intelligent person.  I appreciate your honesty, but if

23  you are ever called for jury service again, I really would urge

24  you to think about the fact that the system would utterly

25  collapse if people didn't take seriously the need to put aside

**JA 2163**

1   their preconceptions and just call the facts for what they are.

2   I am old enough to remember *Dragnet*, the show, "just the facts,

3   ma'am."  But anyway, I will excuse you.

4           JUROR:  Thank you, your Honor.  I'm sorry.

5           (In open court)

6           THE DEPUTY CLERK:  Juror No. 13 is excused.  He was in

7   seat no. 3.

8           Going to seat number 3 now is Juror No. 15 David Max,

9   M-A-X.

10          THE COURT:  Juror No. 3, you heard my general

11  questions.  Any of those you need to respond to?

12          JUROR:  Yes, your Honor.  Would it be possible to --

13          THE COURT:  Yes.

14          (At the sidebar)

15          JUROR:  I'm a litigation attorney.

16          THE COURT:  Oh.  Well, you have my condolences.

17          JUROR:  That is actually not the reason I come before

18  you.  The reason is that I have three small children, and my

19  wife is an emergency medicine physician in the Bronx where we

20  live.  She is undergoing something that, on my worst days as

21  litigation counsel, I can't even imagine, and we are trying to

22  keep her inasmuch as possible distanced from our children, as

23  strange as it sounds --

24          THE COURT:  I understand.

25          JUROR:  -- coming in and out of school.  The

**JA 2164**

M232PalVD1

```
1   circumstances are very, very difficult for us at the moment,
2   and I think being on a jury would not be necessarily
3   consistent -- well, it would be difficult to manage with my
4   family responsibilities and my work responsibilities, which
5   include cases in this court, not before your Honor, but before
6   another judge right now.
7            THE COURT:  Well, the hell with the latter part, but
8   here is what I think.  I don't think, under the law, I can
9   excuse you for what you just mentioned, but I am very
10  sympathetic.  Let's see how it goes.
11           JUROR:  Okay.
12           THE COURT:  Then if both sides are in agreement, after
13  we finish all of the challenges and they agree that you can be
14  excused, I will go along with that and we will pick someone in
15  your place.
16           JUROR:  And may I mention one other matter, sir?
17           THE COURT:  Yes.
18           JUROR:  That is, I am also a sabbath observer.  I'm
19  not sure if it matters, but it would require me Friday --
20           THE COURT:  In fact, if necessary, we could end even
21  earlier on Friday.  That would not be a problem.
22           JUROR:  Understood.
23           THE COURT:  Okay.  Thank you.
24           (In open court)
25           THE COURT:  Juror No. 4, you heard my general
```

# JA 2165

1   questions.  Any of those you need to respond to?  Come tell us

2   about yourself.

3           JUROR:  I live in the Bronx.  I am currently a

4   cylinder exchange technician at Rapid Recovery.  It's a

5   refrigeration abatement.  And my wife works as a first grade

6   teacher.

7           THE COURT:  Okay.  Thank you.  So before we go to the

8   final round of challenges, is there any other reason that I

9   haven't covered why any of the nine of you feel that you cannot

10  serve as a fair and impartial juror?

11          Okay.  Number one, come on up.

12          (At the sidebar)

13          JUROR:  So I don't know if this is relevant, but I am

14  sitting here and I just realized I have a very strong

15  dislike --

16          THE COURT:  Very strong?

17          JUROR:  -- dislike for the Governor.

18          THE COURT:  Well --

19          JUROR:  I don't know if that's relevant.

20          THE COURT:  -- let's discuss it.

21          It is inevitable, when you have people and

22  publications of this high visibility, that there are going to

23  be people who have strong feelings.  I'm sure if this was a

24  case against Donald Trump there would be people expressing

25  strong feelings.  And if it was a case against Joseph Biden,

**JA 2166**

M232PalVD1

1  there would be other people expressing strong feelings.

2           The bottom line, though, is can -- do you feel

3  comfortable, notwithstanding that, you can determine what the

4  facts are based on the evidence?  That is something that you do

5  every day and you do it regardless of preconceptions.  You just

6  look hard at the evidence and make a determination.  That's all

7  you need to do to be a juror.  You are just going to determine

8  the facts, and I will give you the law and all of that, so you

9  don't have to make policy decisions or anything like that.  So

10 are you comfortable that you can do that?

11          JUROR:  I'm not sure.

12          THE COURT:  Why are you not sure?

13          JUROR:  Well, I have heard about the case --

14          THE COURT:  Well --

15          JUROR:  -- and --

16          THE COURT:  -- and so you feel that hearsay evidence

17 from undoubtedly reliable sources will prevent you from just

18 looking calmly at the evidence and saying here is what the

19 facts show?  That's really all you need to do to be a juror.

20 And, you know, if we were to excuse everyone who had strong

21 feelings about a politician or about a public servant or about

22 a known figure or, for that matter, about a famous publication,

23 no one would ever get a jury.  I mean, so the system really

24 can't operate on that.

25          Tell me a little bit more about yourself.  You gave

**JA 2167**

1   it, but what's your education?

2          JUROR:  College educated, you know, just four-year

3   college, accountant for my whole life.  I work for progressive

4   type not-for-profits.

5          THE COURT:  Well, I'm going to ask you to sit down for

6   a moment and think about it a little bit more, think about, on

7   the one hand, your preconceptions, which I appreciate very much

8   you are bringing to my attention, but, on the other hand,

9   whether you feel that you are nonetheless capable of carrying

10  out an important public responsibility.  That's what a jury

11  service is all about.  If you still feel you can't do it, then

12  I will excuse you, so I am telling you that in advance, but I

13  want you to be honest with me.

14         JUROR:  Sure.

15         THE COURT:  All right?  So we will --

16         MR. AXELROD:  Can I raise one thing, not in front of

17  the juror?

18         THE COURT:  You can go back to your seat for now.

19         JUROR:  Sure.

20         (Juror not present)

21         MR. AXELROD:  Your Honor, I am concerned that

22  Ms. Palin has unfortunately had bad publicity over the past

23  couple of days that jurors are seeing, and it is leading to

24  jurors, who would otherwise be fine jurors, having read about

25  the case and leading to the dismissal of jurors who would be

**JA 2168**

M232PalVD1

1  fine, are educated jurors who read the paper, but now they saw

2  her prancing around town after --

3              THE COURT:  What's your application?

4              MR. AXELROD:  My application is I just don't think

5  that juror should be struck for cause.  I think he is a normal

6  juror, but that he has read the recent stuff in the *Post*, and I

7  think it would be incredibly unfair if a high-profile party

8  like Ms. Palin can create negative media attention for herself

9  and thus lead to jurors who follow the news being excluded from

10 her trial.

11             THE COURT:  Well, I'm not persuaded by that.  Thank

12 you.

13             MR. TURKEL:  Judge, I -- just for the sake of the

14 record, I need to renew my request.

15             THE COURT:  I'm sorry.  You have got to talk louder.

16             MR. TURKEL:  I'm sorry.  I'm very sensitive to the

17 jurors hearing.

18             THE COURT:  Don't worry.  They won't hear you.

19             MR. TURKEL:  I know, but I just need to renew.  I

20 respect how you are doing this.  I know that's your procedure.

21 I have to renew for the record that some of the questions, even

22 just the general question about whether people in this venire

23 are capable of given Sarah Palin a fair trial based on their

24 preconceived notions and biases should be asked.

25             THE COURT:  I think I have asked the questions I am

M232PalVD1          **JA 2169**

1    required to ask by law, and I frankly think that questions like

2    that totally misconceive what the jury system is all about.

3            You have made your record.  You have made it twice.  I

4    don't want a third time.

5            MR. TURKEL:  I understand.  I understand.  I hope you

6    understand.

7            As to Juror 1, we are not going to go into the next

8    round before, because I think he needs to be excused for cause.

9    I don't know how we keep him around when we go through --

10           THE COURT:  Yes, that's a fair point.  So I think why

11   don't we call him back and see what he thinks.

12           (In open court)

13           THE DEPUTY CLERK:  Juror No. 1, would you come to the

14   sidebar again.

15           (Juror present at the sidebar).

16           THE COURT:  So sorry that we couldn't give you more

17   time to think about it, but what is your view?

18           JUROR:  I am not sure that I can, but I can give it a

19   try.

20           THE COURT:  All right.

21           JUROR:  I will excuse you.

22           (In open court)

23           THE DEPUTY CLERK:  The juror who was in seat no. 1 is

24   excused.

25           May I please have Erik Leo, L-E-O, into seat no. 1.

```
1            THE COURT:  So you heard my general questions before.

2    Any of those you need to respond to?

3            JUROR:  No.

4            THE COURT:  Come up and tell us about yourself.

5            JUROR:  I'm a software engineer.  I live in New York

6    County with my wife, who works in digital advertising.

7            THE COURT:  Very good.  Thank you.  There was one

8    other juror who -- yes, come to the side bar.

9            I haven't forgotten about you, Juror No. 3.  I was

10   pointing to Juror 9, but you were in the line of fire.

11           (In open court)

12           (Juror No. 9 present at the sidebar)

13           JUROR:  We are very understaffed.  I'm an early

14   childhood educator, and we are extremely understaffed right

15   now.  It would be very difficult --

16           THE COURT:  I appreciate that, and my heart goes out

17   to you, but I cannot under the law excuse you for that reason.

18   There are many people who are in that situation.  One of the

19   other jurors who I haven't excused was in that situation.

20   Let's see how it goes.  It's conceivable we might be able to

21   excuse you, but I don't think so.  And I'm so sorry, but thank

22   you for bringing it to my attention.  Sorry.

23           (Juror not present)

24           THE COURT:  I wanted to say one other thing about the

25   discussion we had outside the presence of the jurors.  Just for
```

1    the record, so to speak, my philosophy of picking a jury is, of

2    course, to make sure that we get the fairest jury possible, but

3    also that we don't artificially exclude anyone of intelligence,

4    and many of the questions that were suggested in this case

5    seemed to me inevitably to have the effect, I'm sure this was

6    not the intent, but have the effect of dumbing down the jury,

7    and I have seen that repeatedly in the 300 juries that I have

8    selected over the years, and I'm not going to let happen.

9              (Juror No. 2 present at the sidebar)

10             JUROR:  I feel that I will be fair and nonjudgmental,

11   but I feel it important for me to point out that, prior to my

12   husband being in Fox Weather, he was at the Fox News Channel,

13   all right, since it started.  This doesn't affect me at all and

14   I have no opinion about anybody's politics, but I feel everyone

15   should know that that's --

16             THE COURT:  What does he do?

17             JUROR:  Now?

18             THE COURT:  Yeah.

19             JUROR:  Now he is in charge of -- they just started a

20   weather app, and he is in charge of programming the weather.

21             THE COURT:  Oh, my gosh.

22             JUROR:  Programming.

23             MR. TURKEL:  He programs the weather?

24             THE COURT:  So he is a source of huge questioning by

25   everyone.  Why didn't he get it right?  Anyway.  Thank you for

M232PalVD1

```
 1    bringing that up --
 2              JUROR:  I just thought --
 3              THE COURT:  -- for bringing that to my attention.
 4              JUROR:  -- because I think she was a contributor, so I
 5    just wanted to --
 6              THE COURT:  That's fine.  You can be seated.
 7              JUROR:  -- spill the beans.
 8              THE COURT:  Okay.  Thank you.
 9              (Juror not present)
10              THE COURT:  I think maybe if you both agree, even
11    though I can't excuse them for cause, I did feel that Juror No.
12    3 had pretty, you know, good claim for our mercy, but I can't
13    excuse him unless both sides agree.
14              MR. TURKEL:  Judge, if I may, I never want a juror who
15    is distracted by those types of personal/professional issues,
16    because you can never tell.  I know what they say when they
17    come here.  You are an authority figure.  But if it meant
18    enough for him or her to come up and say something, that's
19    obviously on their mind, so I would agree.
20              THE COURT:  That's why I am leaving it to you.  I
21    actually -- my experience has been that even though they say
22    they would be distracted, once they get into it, that
23    disappears.  And that's why I didn't think I could excuse them
24    for cause.  But I have some sympathy for his situation.
25              What's your view?
```

**JA 2173**

1          MR. AXELROD:  I certainly have sympathy, but I'm a
2   little bit worried about the kind of removing of the educated
3   people from our jury that you have just raised concern about,
4   because of people self-selecting because of bias and people
5   self-selecting because of work burden.
6          I would like to talk about it with my client before I
7   voice a decision myself.
8          MR. TURKEL:  I would be happy enough, Judge.  I don't
9   care what level of education they have.  I would be happy to
10  know they don't have preconceived biases against my client.
11  That's it.  These people raised it to us.
12         THE COURT:  I think we should decide it before the
13  final round of challenges, so why don't you go talk.
14         MR. TURKEL:  I'm fine letting him go.  It's really up
15  to *The Times*.
16         THE COURT:  You are fine --
17         MR. TURKEL:  -- with those two jurors, based on the
18  reason they stated.
19         MR. AXELROD:  What two?  I thought there was one we
20  were talking about.
21         THE COURT:  We are talking about number 3.
22         MR. TURKEL:  And the woman behind him that just came
23  up.
24         THE COURT:  No, no.
25         MR. AXELROD:  She's not in this discussion.

JA 2174

M232PalVD1

```
 1            THE COURT:  We are talking about the gentleman who
 2    had --
 3            MR. TURKEL:  The one who keeps Shabbos.
 4            THE COURT:  Pardon?
 5            MR. TURKEL:  The one who keeps Shabbat and the one
 6    behind him who also works in healthcare.
 7            MR. AXELROD:  Early childhood --
 8            MR. TURKEL:  Early childcare.
 9            THE COURT:  I think we have talked to everyone who had
10    their hand up, and the only one that is still a question mark
11    and is in your hands, because I don't think I can excuse him,
12    for cause is Juror No. 3.  And right now there is an objection,
13    so I'm not going to excuse him.  But if you want to talk to
14    your client first about it.
15            MR. AXELROD:  It won't take very long.  Thank you.
16            MR. TURKEL:  I will just stay up here, Dave?
17            THE COURT:  Yeah, just stay here.
18            (Pause)
19            MR. AXELROD:  Your Honor, for the reasons you raised
20    about education, I would like -- we would like to have him as a
21    juror.
22            THE COURT:  All right.  So.
23            MR. AXELROD:  Of course Mr. Turkel --
24            THE COURT:  I think we should bring him over and not
25    tell how the vote is, but I will tell him, so that he will
```

**JA 2175**

M232PalVD1

```
 1  know.  Then we have the final round of challenges.

 2              Linda, would you ask Juror 3 to come over.

 3              (In open court)

 4              THE DEPUTY CLERK:  Juror No. 3, please come to the

 5  sidebar.

 6              (Juror present at the sidebar).

 7              THE COURT:  So, as you know, I put it to counsel

 8  because I didn't think I could legally dismiss you for cause,

 9  and counsel has not agreed to excuse you.  So I'm sorry, but

10  fortunately it's a very short trial.  I think you will find it

11  will pass quite rapidly.  But thank you for bringing it to our

12  attention, but we cannot excuse you.  I'm sorry.

13              JUROR:  Yes, your Honor.

14              THE COURT:  Very good.  All right.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25
```

M231PALVD2

```
 1            (In open court)

 2            THE COURT:  All right.  Counsel will exercise their

 3    final round of challenges.

 4            (Pause)

 5            THE COURT:  Counsel, when I was very young, my

 6    grandmother taught me how to play bridge, and I used to take

 7    forever to reach a decision, and she would say to me, "Did you

 8    come here to play or what?"  So take, of course, as long as you

 9    like.  But you've taken a long time.

10            MR. AXELROD:  Well understood, your Honor.

11            THE DEPUTY CLERK:  Your Honor, Juror No. 3, David,

12    Max, M-A-X, is excused.

13            Into seat No. 3 may I please have Juror No. 17, who is

14    Ricardo Faillace, last name F as in Frank, A-I-L-L-A-C-E.

15    Please take seat No. 3.

16            THE COURT:  We won't inquire as to whether we got the

17    pronunciation right or wrong, but you heard my general

18    questions.  Are there any of those you need to respond to?

19            THE JUROR:  No.

20            THE COURT:  Okay.  Come on up.

21            THE JUROR:  The pronunciation is "Fie-la-chee," by the

22    way.  Thank you.

23            I work in finance at a hedge fund; I live in

24    Manhattan; and my girlfriend is a social worker.

25            THE COURT:  Very good.  You can be seated.
```

**JA 2177**

M231PALVD2

1          All right.  So ladies and gentlemen, you are our nine

2     jurors to try this case.  In a few seconds we're going to swear

3     you in, and then you need to follow my courtroom deputy, who

4     will take you to the witness room.  And then in about 10

5     minutes or so, we'll bring you into the courtroom, we'll hear

6     opening statements of counsel, and then we'll excuse you for

7     your lunch break.  So if you would all, the nine of you, please

8     stand, we'll swear you in.

9          THE DEPUTY CLERK:  Please raise your right hand.

10          (A jury of nine was duly impaneled and sworn)

11          THE COURT:  And counsel, you can go up to the

12     courtroom and I'll meet you there in 10 minutes.

13                              o0o

14

15

16

17

18

19

20

21

22

23

24

25