lives and wounded 17 people.

The stark body count of Americans lays bare the truth of a fearsome gun problem that deserves a full-scale debate beyond Mr. Trump's simplistic terrorism warnings. From 2001 to 2013, federal data shows, 406,496 people died by firearms in this country. In the same period, the tally from domestic terrorism was less than 1 percent of that: 3,030 killed — the vast majority on 9/11, according to CNN. Beyond 9/11, the yearly average has been fewer than 33 deaths from terrorism.

Survivors of shootings like the former Representative Gabrielle Giffords, relatives of gunshot victims, and gun safety advocates were given featured appearances in the Democratic convention spotlight. A clear signal on the issue was the speaking slot afforded Michael Bloomberg, the former New York mayor, who is deeply identified with the gun control cause.

During her campaign for the nomination, Mrs. Clinton made numerous appearances with the families of shooting victims. She has called for a raft of needed restrictions, including closing gun-show loopholes in the law requiring that gun buyers submit to background checks, ending the gun industry's outrageous protection from civil damage suits, and denying guns to domestic abusers and risky suspects on the government's no-fly lists. "We have to take on the gun lobby," she tells voters even as Republican politicians pander in fear of the N.R.A.

Mr. Trump, proudly bearing the N.R.A.'s endorsement, dares to invoke fantasies of a ubiquitously armed citizenry ready to draw in self-defense "shootouts" — this in a nation reeling from gun violence.

*Follow The New York Times Opinion section on Facebook and Twitter (@NYTOpinion), and sign up for the Opinion Today newsletter.*

A version of this editorial appears in print on July 29, 2016, on Page A22 of the New York edition with the headline: Democrats Find Their Voice on Guns.

© 2017 The New York Times Company

The New York Times

The Opinion Pages  |  OP-ED COLUMNIST

# No One Listened to Gabrielle Giffords

By FRANK RICH    JAN. 15, 2011

OF the many truths in President Obama's powerful Tucson speech, none was more indisputable than his statement that no one can know what is in a killer's mind. So why have we spent so much time debating exactly that?

The answer is classic American denial. It was easier to endlessly parse Jared Lee Loughner's lunatic library — did he favor "The Communist Manifesto" or Ayn Rand? — than confront the larger and harsher snapshot of our current landscape that emerged after his massacre. A week on, that denial is becoming even more entrenched. As soon as the president left the podium Wednesday night, we started shifting into our familiar spin-dry post-tragedy cycle of the modern era — speedy "closure," followed by a return to business as usual, followed by national amnesia.

If we learn nothing from this tragedy, we are back where we started. And where we started was with two years of accelerating political violence — actual violence, not to be confused with violent language — that struck fear into many, not the least of whom was Gabrielle Giffords.

For the sake of this discussion, let's stipulate that Loughner was a "lone nutjob" who had never listened to Glenn Beck or been a card-carrying member of either the Tea or Communist parties. Let's also face another tragedy: The only two civic reforms that might have actually stopped him — tighter gun control and an effective mental

SApp-149

health safety net — won't materialize even now.

Gun and ammunition sales spiked last week, especially for the specific varieties given the Loughner imprimatur. No editorial — or bloodbath — will move Congress to enact serious gun control (which Giffords herself never advocated and Obama has rarely pushed since 2008). Enhanced mental health coverage is also a nonstarter when the highest G.O.P. priority is to repeal the federal expansion of health care. In Arizona, cutbacks are already so severe that terminally ill patients are being denied life-saving organ transplants.

The other inescapable reality was articulated by Sarah Palin, believe it or not, in her "blood libel" video. Speaking of acrimonious partisan debate, she asked, "When was it less heated — back in those calm days when political figures literally settled their differences with dueling pistols?" She's right. Calls for civility will have no more lasting impact on the "tone" of American discourse now than they did after the J.F.K. assassination or Oklahoma City. Especially not in an era when technology allows all 300 million Americans a cost-free megaphone for unmediated rants.

Did Loughner see Palin's own most notorious contribution to the rancorous tone — her March 2010 Web graphic targeting Congressional districts? We have no idea — nor does it matter. But Giffords did. Her reaction to it — captured in an interview she did back then with Chuck Todd of MSNBC — was the most recycled, if least understood, video of last week.

The week of that interview began with the House passing the health care bill on Sunday. Within hours, on Monday morning, vandals smashed the front door of Giffords's office in Tucson. The Palin "target" map (and the accompanying Twitter dictum to "RELOAD") went up on Tuesday, just one day after that vandalism — timing that was at best tone-deaf and at worst nastily provocative. Not just Giffords, but at least three other of the 20 members of Congress on the Palin map were also hit with vandalism or death threats.

In her MSNBC interview that Wednesday, Giffords said that Palin had put the "crosshairs of a gun sight over our district," adding that "when people do that, they've got to realize there's consequences to that action." Chuck Todd then asked Giffords if "in fairness, campaign rhetoric and war rhetoric have been

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page4 of 140

SApp-150

No One Listened to Gabrielle Giffords - The New York Times Document 70-16    Filed 12/30/19 ... nytimes.com/2011/01/16/opinion/16rich.htm
Case 1:17-cv-04853-JSR    Document 41-33    Filed 08/21/17    Page 4 of 6

interchangeable for years." She responded that colleagues who had been in the House "20, 30 years" had never seen vitriol this bad. But Todd moved on, and so did the Beltway. What's the big deal about a little broken glass? Few wanted to see what Giffords saw — that the vandalism and death threats were the latest consequences of a tide of ugly insurrectionism that had been rising since the final weeks of the 2008 campaign and that had threatened to turn violent from the start.

Giffords's first brush with that reality had occurred some seven months before her office was vandalized — in the red-hot health care fever of August 2009. She had held another "Congress on Your Corner" meeting, at a Safeway in the town of Douglas. There the crowd's rage and the dropping of a gun by one attendee prompted aides worried about her safety to summon the police. The Tucson Tea Party co-founder, Trent Humphries, told The Arizona Daily Star afterward that this was a lie, that "nobody was threatening Gabby." After Loughner's massacre, Humphries was still faulting her — this time for holding "an event in full view of the public with no security whatsoever."

Others on the right spent last week loudly protesting the politicization of tragedy. What was most revealing was how often they tried to rewrite the history of previous incidents having nothing to do with Loughner. A Palin aide claimed that her target map was only invoking a "surveyor's symbol," not gun sights. A Tucson Tea Party leader announced that the attack on Giffords's office (never solved by the police) was probably caused by skateboarding kids. Mike Pence, a potential G.O.P. "values" candidate for president, told the C-Span audience that those bearing firearms at Congressional town hall meetings and Obama events (including one in Arizona that August of 2009) were no different from anti-Bush demonstrators "waving placards."

For macabre absurdity, it would seem hard to top Newt Gingrich, who wailed about leftists linking Loughner to the right as if he had not famously blamed a psychotic double-murder of 1994, Susan Smith's drowning of her two sons in South Carolina, on "Lyndon Johnson's Great Society." But Representative Trent Franks, Republican of Arizona, did top Newt. On "Meet the Press" last Sunday he implored us to "treat each other as fellow children of God" without acknowledging (or being questioned about) his 2009 diatribe branding Obama as "an enemy of humanity."

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page5 of 140

**SApp-151**

No One Listened to Gabrielle Giffords - The New York Times   Case 1:17-cv-04853-JSR   Document 70-16   Filed 12/30/19   Page 20 of 21   www.nytimes.com/2011/01/16/opinion/16rich.htm

Case 1:17-cv-04853-JSR   Document 41-33   Filed 08/21/17   Page 5 of 6

As the president said in Tucson, we lack not just civil discourse, but honest discourse. Much of last week's televised bloviation was dishonest, dedicated to the pious, feel-good sentiment that both sides are equally culpable for the rage of the past two years. To construct this false equivalency, every left-leaning Web site and Democratic politician's record was dutifully culled for incendiary invective. If that's the standard, then both sides are equally at fault — rhetoric can indeed be as violent on the left as on the right.

But that sidesteps the issue. This isn't about angry blog posts or verbal fisticuffs. Since Obama's ascension, we've seen repeated incidents of political violence. Just a short list would include the 2009 killing of three Pittsburgh police officers by a neo-Nazi Obama-hater; last year's murder-suicide kamikaze attack on an I.R.S. office in Austin, Tex.; and the California police shootout with an assailant plotting to attack an obscure liberal foundation obsessively vilified by Beck.

Obama said, correctly, on Wednesday that "a simple lack of civility" didn't cause the Tucson tragedy. It didn't cause these other incidents either. What did inform the earlier violence — including the vandalism at Giffords's office — was an antigovernment radicalism as rabid on the right now as it was on the left in the late 1960s. That Loughner was likely insane, with no coherent ideological agenda, does not mean that a climate of antigovernment hysteria has no effect on him or other crazed loners out there. Nor does Loughner's insanity mitigate the surge in unhinged political zealots acting out over the last two years. That's why so many — on both the finger-pointing left and the hyper-defensive right — automatically assumed he must be another of them.

Have politicians stoked the pre-Loughner violence by advocating that citizens pursue "Second Amendment remedies" or be "armed and dangerous"? We don't know. What's more disturbing is what Republican and conservative leaders have *not* said. Their continuing silence during two years of simmering violence has been chilling.

A few unexpected voices have expressed alarm. After an antigovernment gunman struck at Washington's Holocaust museum in June 2009, Shepard Smith of Fox News noted the rising vitriol in his e-mail traffic and warned on air that more

"amped up" Americans could be "getting the gun out." The former Bush administration speechwriter David Frum took on the "reckless right" that August, citing the incident at the Giffords Safeway event. But when a Department of Homeland Security report warned of far-right extremism and attacks by "lone wolves" that same summer, Gingrich called it a smear and John Boehner demanded an apology.

Last week a conservative presidential candidate, Tim Pawlenty, timidly said it wouldn't be his "style" to use Palin's target map, but was savaged so viciously by his own camp that he immediately retreated. A senior Republican senator told Politico that he saw the Tucson bloodbath as a "cautionary tale" for his party, yet refused to be named.

What are they and their peers so afraid of? No doubt that someone might reload — the same fears that prompted Gabrielle Giffords to speak up, calmly but firmly, last March. Unless and until they can match her courage and speak out too, it's hard to see what will change.

A version of this op-ed appears in print on January 16, 2011, on Page WK10 of the New York edition with the headline: No One Listened to Gabrielle Giffords.

© 2017 The New York Times Company

**SApp-153**

- Byline:
By THE EDITORIAL BOARD
Body:

Just after 7 a.m. on Wednesday, members of Congress met in a quiet section of Alexandria, Va., to practice for this week's bipartisan congressional baseball game when James Hodgkinson appeared from behind the dugout, and began firing through the chain link fence.

Mr. Hodgkinson was armed with a long rifle and "I think he had handguns as well," said Representative Jeff Flake of Arizona, who saw the gunman just as the shooting started. Mr. Hodgkinson fired at least 50 rounds at the group of congressmen, current and former staffers, who dove for cover or tried to crawl to safety. "He was hunting us," said Representative Mike Bishop, Republican of Michigan, who was at home just before the gunman appeared. He seemed to be "double-tapping," the trigger, Mr. Bishop said, firing so rapidly "you couldn't get up and run." Senator Rand Paul of Kentucky, also at the field, told CNN it "was basically a killing field."

Security officers detailed to Representative Steve Scalise of Louisiana, the House majority whip, exchanged fire with Mr. Hodgkinson as Mr. Scalise, wounded, left a trail of blood as he combat-crawled to hide in taller grass. He is in critical condition after surgery on the bullet wound in his hip. The gunman was killed; in all five people were injured, including Capitol Police officers ==need to check/update==

That in 10 minutes a single gunman could wreak such carnage in a bedroom community a short drive from the Capitol is horrifying, but no longer surprising. Not all the details are known yet, but a sickeningly familiar pattern is emerging: a deranged individual with a gun—perhaps multiple guns—and scores of rounds of ammunition uses politics as a pretense for a murderous shooting spree. Mr. Hodgkinson was a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump, who among many anti-Trump messages posted "Time to Destroy Trump & Co." on social media in March.

Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Loughner's rage was nurtured in a vile political climate. Then, it was the pro-gun right being criticized: in the weeks before the shooting Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

In the aftermath of Wednesday's shooting, the political right and left and both sides in the gun debate dove into their respective foxholes. Conservatives and right-wing media demanded that hate speech and crimes by anti-Trump liberals get more attention than they have. Representative Mo Brooks of Alabama, also present on Wednesday, said, "It's not easy to take when you see people around you being shot and you don't have a weapon yourself." Some Democrats noted that most of the legislators attacked have spent their political careers voting against gun control legislation.

==“Violence of any kind is unacceptable in our society and I condemn this action in the strongest possible terms,” Mr. Sanders said in a statement.==

President Trump offered a unifying initial response: "We may have our differences, but we do well in times like these to remember that everyone who serves in our nation's capital is here because, above all, they love our country," he said. "We can all agree that we are blessed to be Americans, that our children deserve to grow up in a nation of safety and peace."

Mr. Trump is right. Guns are so numerous, and so easy to obtain in America that the risks of being injured or killed with one are higher in America than in any other peaceful nation. So when Republican legislators tuning up for a ballgame with their Democratic colleagues are targeted by a crazed gunman, what might be the likelier cause: fringe elements on both ends of our political spectrum, or the 300 million guns in America? The shooting

**SApp-154**

in Alexandria was one of at least three mass shootings in the United States *on Wednesday*. Before Ms. Giffords' shooting, the last time a member of Congress was gunned down was in 1954, when the number of firearms in this country were a tiny fraction of today's.

Mr. Hodgkinson, whatever his putative motives, was able to shoot Americans because it was easy to get a gun, as it will be for the next potential killer, and the next. Whether Republicans, Democrats or independents, whether on a ballfield, in a nightclub, at school or work, it's never been more likely that as Americans, we will someday wind up in the crosshairs.

Info Box:

*Follow The New York Times Opinion section on Facebook and Twitter (@NYTopinion), and sign up for the Opinion Today newsletter.*

Elizabeth Williamson
Backfield
**06/14/2017 04:44 pm**

 NEWS | U.S. International Politics Lifestyle ⋯ | Watch Live Shows 🔍

# Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate

By JOHN BERMAN
Jan. 9, 2011

[f Share with Facebook] [🐦 Share with Twitter]



ABCNEWS.com

**WATCH** | **Rep. Giffords Criticized Palin's Crosshairs**



In the stunned aftermath of the Tucson massacre, Sarah Palin has found herself in the crosshairs of the ensuing political debate with opponents suggesting she may have fueled the gunman's rage and her supporters saying it is "grotesque" to blame her and to politicize the tragedy.



Crosshairs is a political phrase that emerged from Palin's political action committee SarahPac that targeted congressional districts for the Tea Party campaign in the last election, including the district of Rep. Gabrielle Giffords.

Although Palin later denied she meant the graphic over the districts to look like a gun sight, it is part of the hunting lexicon that critics say she prefers.

Comedian Frank Conniff tweeted: "Hey, Sarah Palin, hows that hatey, killy, reloady, crosshairsy thing working out for ya?"

Facebook executive Randi Zuckerberg said many people on the social networking site are asking whether Sarah Palin is to blame.

According to Zuckerberg that is the #1 question on the social network behemoth following the Tucson shooting.

Like so much with Palin, the roots are on Facebook. On her Facebook page last year when she posted the a map of 20 congressional districts targeted by SarahPac, the headline of the map: "It's time to take a stand."

At the time Giffords reacted to the map in an interview on a cable news program.

"When people do that, they've got to realize there are consequences to that action," Giffords said.

Follow John Berman on Facebook:
http://www.facebook.com/johnbermanabc and Twitter:

## Palin's Now in 'Crosshairs' of Giffords Debate
+ Lawmakers on Edge After Shooting
+ Hero Intern: 'Congresswoman Was Alert'

**Auschwitz Memorial condemns congressman's gas chamber video**

**N. Korean missile test leaves clues, doubts about its technology**

**Lawmaker says meditation may help him work better with Trump**

**Trump policy shifts contradict what most Americans want, polls reveal**

**Trump's 2nd foreign trip includes G-20, meeting with Putin**

**The Note: High stakes for Trump's 2nd foreign trip**

**Trump set for crucial diplomatic test in 1st face-to-face with Putin**

**How your state responded to Trump's voter data request**

**How Trump's stance on China has changed amid North Korea threat**

**Trump, Putin to hold meeting at G-20 summit**

**Trump targets North Korea in latest Twitter attack**

No connection has been made between this graphic and the Arizona shooting, but it has put the Palin team somewhat on the defensive. Rebecca Mansour, a spokesperson for SarahPac, told conservative commentator Tammy Bruce, "We never imagined, it never occurred to us that anybody would consider it violent." Insisting she was speaking for herself, and not on behalf of Palin, Mansour added, "We never ever, ever intended it to be gun sights."

However, following the initial controversy over the "crosshairs" last year, Palin issued her now oft repeated rallying cry, "Don't retreat. RELOAD."

Politico's Jonathan Martin was the first to point out that Palin herself, in a tweet last November following the election, referred to the crosshairs as a "bull's eye."

## Sarah Palin in Crosshairs of Tucson Massacre Debate

Anyone who has seen "Sarah Palin's Alaska" on the TLC channel and seen that Palin has a deep connection and love for hunting. She repeated the "reload" phrase on that show. Language surrounding gun-use and hunting is something she uses often, and often with no political overtones.
And the only reaction to the Arizona shooting from Palin came on her Facebook page.

"My sincere condolences are offered to the family of Rep. Gabrielle Giffords and the other victims of today's tragic shooting in Arizona. On behalf of Todd and my family, we all pray for the victims and their families, and for peace and justice," the statement said.

This statement received more than 25,000 comments from Palin supporters on her page. Many criticized any links being made in the media between the Arizona shooting and Palin, particularly since some accounts from Arizona note that accused gunman Jared Loughner was involved at some point with "liberal" politics and his MySpace profile listed The Communist Manifesto as one of his favorite books.

An acquaintance of Loughner's, Caitie Parker, who said she was in school and in a band with him, described him on Twitter as "more libertarian & definitely socially liberal."

Conservative activists are lashing out against what they consider unfair treatment of Palin in this tragedy. On twitter, SarahPac spokesperson Mansour wrote, "Politicizing this is repulsive."

Conservative activist Andrew Breitbart, wrote, "Of those who're now using this tragedy 4 political purposes, what's your proof of this lunatic's motivation? Isn't that majorly relevant?"

And another tweeted, "Left blamed Palin b4 they knew 1st thing about shooter; unable to admit malice, they double down, co-ordinate narrative. Grotesque."

Another statement being retweeted by conservatives is this one, noting that even President Obama has used the language of armed conflict in politics. "The instigator for AZ massacre? Obama: 'If They Bring a Knife to the Fight, We Bring a Gun," and linking to comments that then-Senator Obama made during Democratic primaries.

One thing is clear, Palin, who has been at the center of so much of the political discourse and discussion the last two years, is right back in the center, you might even say the crosshairs, whether she wants to be there or not.

**Trump tweets church choir's 'Make America Great Again' song**

NYC officer shot, killed while sitting in police car

Judge tells 'Pharma Bro' Martin Shkreli to pipe down

Afghan girls robotics team denied US visas to compete

Florida family 'still shocked' by soldier's surprise Legoland homecoming

'Earlymoons' are the latest wedding trend

'Baby rhino sleep whisperer' serenades calf with his guitar

Dozens of rare white deer will be available for public viewing

Wild monkeys charge family at Florida park



≡ SECTIONS    🏠 HOME    🔍 SEARCH        The New York Times        SUBSCRIBE NOW    LOG IN    ⚙

OP-ED CONTRIBUTOR
Why Waiters Drink. And Why It Matters.

EDITORIAL
After the Terror in Barcelona

CHARLES M. BLOW
Failing All Tests of the Presidency

PAUL KRUGMAN
What Will Trump Do to American Workers?

PAID POST: STELLA ARTOIS
When You're Not Just What You Eat — But How You Eat, Too

THE STONE
College F But What Cheering



Goodness to Go — WHOLE FOODS MARKET — FIND A STORE

The Opinion Pages | OP-ED COLUMNIST

# Trump's Wink Wink to 'Second Amendment People'

 **Thomas L. Friedman**   AUG. 9, 2016        f 🐦 ✉ ↗ 🔖 💬 1609



Donald Trump at a campaign event in Wilmington, N.C., on Tuesday. *Sara D. Davis/Getty Images*

And that, ladies and gentlemen, is how Israeli Prime Minister Yitzhak Rabin got assassinated.

His right-wing opponents just kept delegitimizing him as a "traitor" and "a Nazi" for wanting to make peace with the Palestinians and give back part of the Land of Israel. Of course, all is fair in politics, right? And they had God on their side, right? They weren't actually telling anyone to assassinate Rabin. That would be horrible.

But there are always people down the line who don't hear the caveats. They just hear the big message: The man is illegitimate, the man is a threat to the nation, the man is the equivalent of a Nazi war criminal. Well, you know what we do with people like that, don't you? We kill them.

And that's what the Jewish extremist Yigal Amir did to Rabin. Why not? He thought he had permission from a whole segment of Israel's political class.

In September, I wrote a column warning that Donald Trump's language toward immigrants could end up inciting just this kind of violence. I never in my wildest dreams, though, thought he'd actually — in his usual coy, twisted way — suggest that Hillary Clinton was so intent on taking away the Second Amendment right to bear arms that maybe Second Amendment enthusiasts could do something to stop her. Exactly what? Oh, Trump left that hanging.

"Hillary wants to abolish, essentially abolish, the Second Amendment," Trump said at a rally in Wilmington, N.C., on Tuesday. "By the way, and if she gets to pick her judges, nothing you can do, folks. Although the Second Amendment people, maybe there is, I don't know."

**Thomas L. Friedman**
Foreign affairs, globalization and technology.

Charlottesville, ISIS and Us                    AUG 18
Be Strategic, Not Impulsive, on North Korea      AUG 10
Democrats, Start Aiming for the Gut              AUG 9
Climate Shifts Aren't Limited to the Weather     AUG 2
Self-Driving People, Enabled by Airbnb           JUL 26

See More »

💬 RECENT COMMENTS

**eric selby** August 10, 2016
If anyone of us insting these comments were to have said what Donald Trump said regarding Hillary Clinton, we would have immediately been...

**Maurelius** August 10, 2016
This article is spot on about Trump and what he implied in his speech last night; then he goes with the "I don't know" line. Can anything...

**C Hernandez** August 10, 2016
Imagine the naïve, disdain and uncertainty he could create as president? We're on shaky ground with this man.

SEE ALL COMMENTS

Opinion | Editorial
RELATED COVERAGE

Farther Into the Muck With Mr. Trump
AUG 9, 2016

The Opinion Pages | Trump's Wink Wink to 'Second Amendment People'

  

"Hillary wants to abolish, essentially abolish, the Second Amendment,"
Trump said at a rally in Wilmington, N.C., on Tuesday. "By the way, and if
she gets to pick her judges, nothing you can do, folks. Although the Second
Amendment people, maybe there is, I don't know."

ADVERTISEMENT



Of course Trump's handlers, recognizing just how incendiary were his
words, immediately denied that he was suggesting that gun owners do
anything harmful toward Clinton. Oh my God, never. Trump, they insisted,
was just referring to the "power of unification." You know those Second
Amendment people, they just love to get on buses and vote together.

**Sign Up for the Opinion Today
Newsletter**

Every weekday, get thought-provoking
commentary from Op-Ed columnists, the Times
editorial board and contributing writers from
around the world.

[ Sign Up ]

SEE SAMPLE | PRIVACY POLICY | OPT OUT OR CONTACT US ANYTIME

But that is not what he said.
What he said was ambiguous —
slightly menacing, but with just
enough plausible deniability
that, of course, he was not
suggesting an assassination.
Again, it's just like the Rabin
story. When I wrote about this
issue back in the fall it was to
urge readers to see the new
movie "Rabin: The Last Day,"
by the Israeli director Amos Gitai, timed for the 20th anniversary of Rabin's
assassination.



As The Times's Isabel Kershner reported from Israel when the film was
released, it "is unambiguous about the forces it holds responsible" — the
extremist rabbis and militant settlers who branded Rabin a traitor, the
right-wing politicians who rode the "wave of toxic incitement against Mr.
Rabin as they campaigned against the Oslo accords," and the security
services that failed to heed the warnings that the incitement could get out of
hand.

"Mr. Rabin is almost invisible in the first two hours of the film," she
reported. "Benjamin Netanyahu, the opposition leader at the time, is shown
in now-infamous historical footage addressing a feverish right-wing rally
from a balcony in Jerusalem's Zion Square, as protesters below shouted for
the death of Rabin — the 'traitor' — and held up photomontage posters of
him dressed in an SS uniform."

Mr. Netanyahu, now prime minister, insisted he never saw the posters or
heard the curses.

I am sure that is what Trump's supporters will say, too. But Trump knows
what he is doing, and it is so dangerous in today's world. In the last year we
have seen a spate of lone-wolf acts of terrorism in America and Europe by
men and women living on the fringes of society, some with petty criminal
records, often with psychological problems, often described as "loners," and
almost always deeply immersed in fringe jihadist social networks that heat
them up. They hear the signal in the noise. They hear the inspiration and
the permission to do God's work. They are not cooled by unfinished
sentences.



After all, an informal Trump adviser on veteran affairs, Al Baldasaro, a
Republican state representative from New Hampshire, already declared
that Clinton should be "shot for treason" for her handling of the Benghazi
terrorist attack.

    

After all, an informal Trump adviser on veteran affairs, Al Baldasaro, a Republican state representative from New Hampshire, already declared that Clinton should be "shot for treason" for her handling of the Benghazi terrorist attack.

During the Republican convention, with its repeated chants about Clinton of "lock her up," a U.S.-based columnist for Israel's Haaretz newspaper, Chemi Shalev, wrote: "Like the extreme right in Israel, many Republicans conveniently ignore the fact that words can kill. There are enough people with a tendency for violence that cannot distinguish between political stagecraft and practical exhortations to rescue the country by any available means. If anyone has doubts, they could use a short session with Yigal Amir, Yitzhak Rabin's assassin, who was inspired by the rabid rhetoric hurled at the Israeli prime minister in the wake of the Oslo accords."

People are playing with fire here, and there is no bigger flamethrower than Donald Trump. Forget politics; he is a disgusting human being. His children should be ashamed of him. I only pray that he is not simply defeated, but that he loses all 50 states so that the message goes out across the land — unambiguously, loud and clear: The likes of you should never come this way again.

———

I invite you to follow me on *Twitter* (@tomfriedman).

*Follow The New York Times Opinion section on Facebook and Twitter (@NYTopinion), and sign up for the Opinion Today newsletter.*

A version of this op-ed appears in print on August 10, 2016, on Page A19 of the New York edition with the headline: Trump's Ambiguous Wink Wink. Today's Paper | Subscribe



Illinois Residents: Officials Urge You To Carry This At All Times

---

RELATED
COVERAGE

Opinion | Editorial
**Further Into the Muck With Mr. Trump** AUG. 9, 2016



---

## Thomas L. Friedman

Foreign affairs, globalization and technology.

 **Charlottesville, ISIS and Us**
Pluralism is America's strength, both at home and abroad.

 **Be Strategic, Not Impulsive, on North Korea**
Note to President Trump: We should be laughing at its missile tests, not leveling unscripted threats.

**Democrats, Start Aiming for the Gut**
Trump's campaign genius was pushing the right buttons with voters.

---

### More in Opinion

Go to the Opinion Section »


OP-ED CONTRIBUTOR
**Why Waiters Drink. And Why It Matters.**


EDITORIAL
**After the Terror in Barcelona**


PAID POST: NORTON
**How a Router Can Help Keep Your Family Safe**


CHARLES M. BLOW
**Failing All Tests of the Presidency**


PAUL KRUGMAN
**What Will Trump Do to American Workers?**

THE STONE
**College Football Is Here. But What Are We Really Cheering?**

---

**Recommended for You**                    Go to All Recommendations »

---

### TRENDING

 
 




1. Eclipse Briefing: The Solar Eclipse: What to Expect

2. Watch the Solar Eclipse Cross the U.S. Live

3. New York Today: New York Today: How to Watch the Solar Eclipse

4. Game of 'Thrones: 'Game of Thrones' Season 7, Episode 6 Recap: Jon Snow and Daenerys Targaryen Face the Future

5. Your Photos of A Solar Eclipse's Journey Across America

6. How to Watch the Eclipse Online if You're Stuck Indoors (or It's Cloudy)

7. Danish Submarine Inventor Says He Buried Swedish Journalist at Sea

8. Bannon Was Set for a Graceful Exit. Then Came Charlottesville.

9. Op-Ed Contributor: Why Waiters Drink. And Why It Matters.

10. Jerry Lewis, a Jester Both Silly and Stormy, Dies at 91

View More Trending Stories »

---









Charlottesville, ISIS and Us

Pluralism is America's strength, both at home and abroad.

Be Strategic, Not Impulsive, on North Korea

Note to President Trump: We should be laughing at its missile tests, not leveling unscripted threats.

Democrats, Start Aiming for the Gut

Trump's campaign genius was pushing the right buttons with voters.

## More in Opinion

Go to the Opinion Section »

OP-ED CONTRIBUTOR
Why Waiters Drink. And Why It Matters.

EDITORIAL
After the Terror in Barcelona

PAID POST: NORTON
How a Router Can Help Keep Your Family Safe

CHARLES M. BLOW
Failing All Tests of the Presidency

PAUL KRUGMAN
What Will Trump Do to American Workers?

THE STONE
College Football Is Here. But What Are We Really Cheering?

## Recommended for You

Go to All Recommendations »

Two Men From Elite Universities Charged With a Killing 'Dark and Disturbing'

NONFICTION
Don't Panic, Liberal Arts Majors. The Tech World Wants You.

Fat Bias Starts Early and Takes a Serious Toll

Expect

2. Watch the Solar Eclipse Cross the U.S. Live

3. New York Today: New York Today: How to Watch the Solar Eclipse

4. Game of Thrones: 'Game of Thrones' Season 7, Episode 6 Recap: Jon Snow and Daenerys Targaryen Face the Future

5. Your Photos of A Solar Eclipse's Journey Across America

6. How to Watch the Eclipse Online if You're Stuck Indoors (or It's Cloudy)

7. Danish Submarine Inventor Says He Buried Swedish Journalist at Sea

8. Bannon Was Set for a Graceful Exit. Then Came Charlottesville.

9. Op-Ed Contributor: Why Waiters Drink. And Why It Matters.

10. Jerry Lewis, a Jester Both Silly and Stormy, Dies at 91

View More Trending Stories »

BERINGER MAIN & VINE.
THOUSANDS OF PRIZES, FIND OUT MORE AT
MYUNCORK.COM
WINE & WIN
SWEEPSTAKES

© 2017 The New York Times Company | Contact Us | Work With Us | Advertise | Your Ad Choices | Privacy | Terms of Service | Terms of Sale

ADVERTISEMENT

The Opinion Pages | EDITORIAL

# America's Lethal Politics

By THE EDITORIAL BOARD JUNE 14, 2017

260

America's elected representatives enjoying America's pastime on a ball field just across the Potomac from the Capitol: A particularly American form of terror changed that idyll early Wednesday morning into what Senator Rand Paul, who was there, called "basically a killing field."

A gunman with a rifle fired dozens of rounds at members of Congress and current and former aides, who dove for cover. "He was hunting us," said Representative Mike Bishop, Republican of Michigan, who was at home plate when the gunman appeared. In all, four victims were hit, including Representative Steve Scalise of Louisiana, the House majority whip, who was in critical condition Wednesday night after surgery on a bullet wound to his hip.

An American would once have been horrified and shocked by such savagery. An American today would be right to be horrified — and not very surprised. This was one of two mass shootings in the United States on Wednesday. At a San Francisco UPS facility, a gunman killed three people and himself.

F.B.I. agents collecting evidence after the shooting at Eugene Simpson Stadium Park in Alexandria, Va.
Al Drago/The New York Times

Not all the details are known yet about what happened in Virginia, but a sickeningly familiar pattern is emerging in the assault: The sniper, James Hodgkinson, who was killed by Capitol Police officers, was surely deranged, and his derangement had found its fuel in politics. Mr. Hodgkinson was a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump. He posted many anti-Trump messages on social media, including one in March that said "Time to Destroy Trump & Co."

RELATED COVERAGE

Steve Scalise Among 4 Shot at Baseball Field; Suspect Is Dead JUNE 14, 2017

What We Know and Don't Know About the Shooting of the G.O.P. Men's Baseball Team JUNE 14, 2017

RECENT COMMENTS

**Garlic Toast** Just now
How is it not a lethal threat to millions of Americans for the majority in Congress to propose denying healthcare coverage? When Congress...

**elliot** 1 minute ago
The sentimentality behind the arms movement is precisely what the shooter exhibited: rebellion against the government. (What you will have...

**Peter P. Bernard** 1 minute ago
I find myself captured by Rand Paul's observation; it would be poetic if the scene had not been so terrifying to those, like Rand, were...

SEE ALL COMMENTS WRITE A COMMENT

9 ARTICLES REMAINING The Times Sale. 50% off for one year. Offer won't last. SUBSCRIBE NOW Subscriber login



Case 1:17-cv-04853-JSR    Document 70-21    Filed 12/30/19    Page 3 of 4

The Opinion Pages | America's Lethal Politics

ADVERTISEMENT

Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

Was this attack evidence of how readily available guns and ammunition are in the United States? Indisputably. Mr. Hodgkinson, by definition, should not have had a gun, but he was licensed in his home state, Illinois. And in any event it would have been easy for him to acquire a weapon in Virginia, which requires no background checks in private sales, requires no registration for most weapons and has few restrictions on open carry.

**Sign Up for the Opinion Today Newsletter**

Every weekday, get thought-provoking commentary from Op-Ed columnists, the Times editorial board and contributing writers from around the world.

Enter your email address    Sign Up

☑ You agree to receive occasional updates and special offers for The New York Times's products and services.

SEE SAMPLE | PRIVACY POLICY
OPT OUT OR CONTACT US ANYTIME

ADVERTISEMENT

The reaction of some was that the only solution is yet more guns. Representative Mo Brooks of Alabama, who was among those who came under fire on Wednesday, said, "It's not easy to take when you see people around you being shot and you don't have a weapon yourself."

That's an entirely reasonable reflex. All people in that situation, unarmed and under fire, would long to be able to protect themselves and their friends. Yet consider the society Americans would have to live in — the choices they would all have to make — to enable that kind of defense. Every member of Congress, and every other American of whatever age, would have to go to baseball practice, or to school, or to work, or to the post office, or to the health clinic — or to any of the other places mass shootings now take place — with a gun on their hip. And then, when an attack came and they returned fire, they would probably kill or wound not the assailant but another innocent bystander, as studies have repeatedly shown.

That is the society the gun lobby is working toward. Is it the one Americans want?

President Trump said just the right thing after the attack on

ADVERTISEMENT

Document title: America's Lethal Politics - The New York Times
Capture URL: https://www.nytimes.com/2017/06/14/opinion/steve-scalise-congress-shot-alexandria-virginia.html?_r=1
Capture timestamp (UTC): Thu, 15 Jun 2017 14:37:08 GMT



these to remember that everyone who serves in our nation's capital is here because, above all, they love our country. We can all agree that we are blessed to be Americans, that our children deserve to grow up in a nation of safety and peace."

Yet he will not help create that nation if he continues to advocate easy access to lethal weapons.

---

*Follow The New York Times Opinion section on Facebook and Twitter (@NYTopinion), and sign up for the Opinion Today newsletter.*

A version of this editorial appears in print on June 15, 2017, on Page A24 of the New York edition with the headline: America's Lethal Politics. Today's Paper | Subscribe

ADVERTISEMENT

RELATED COVERAGE

Steve Scalise Among 4 Shot at Baseball Field; Suspect Is Dead JUNE 14, 2017

What We Know and Don't Know About the Shooting of the G.O.P. Men's Baseball Team JUNE 14, 2017

## More in Opinion

Go to the Opinion Section »

OP-ED CONTRIBUTOR
Trump's Imminent Cuba Problem

CHARLES M. BLOW
Rhetoric and Bullets

PAID POST: VEUVE CLICQUOT
Do You Know What the "Third Man" in Polo Is?

GAIL COLLINS
Play Ball, and Then Gunfire

BRET STEPHENS
'The Indigenous American Berserk' Strikes Again

OP-ED CONTRIBUTOR
London Fire Shows Why Britons Don't Trust the System

TRENDING

1. The Dutch Have Solutions to Rising Seas. The World Is Watching.
2. The Universal Phenomenon of Men Interrupting Women
3. Mueller Seeks to Talk to Intelligence Officials, Hinting at Inquiry of Trump
4. Trump Mocks Investigators Over 'Phony Collusion' Story
5. Best of Late Night: Late Night Wishes President Trump a Happy Birthday
6. Attack Tests Movement Sanders Founded
7. Editorial: America's Lethal Politics
8. Wells Fargo Is Accused of Making Improper Changes to Mortgages
9. Steve Scalise Among 4 Shot at Baseball Field; Suspect Is Dead
10. London Fire Death Toll Rises to 17; Government Is Criticized

View More Trending Stories »

## Recommended for You

Go to All Recommendations »

Greece Declares Emergency After Earthquake Hits Lesbos

U.S.
The Virginia Shooting: The Scene and Reaction

2 Inmates Kill Georgia Guards and Escape From Prison Bus, Officials Say

ADVERTISEMENT

Document title: America's Lethal Politics - The New York Times
Capture URL: https://www.nytimes.com/2017/06/14/opinion/steve-scalise-congress-shot-alexandria-virginia.html?_r=1
Capture timestamp (UTC): Thu, 15 Jun 2017 14:37:08 GMT

  The New York Times  

    

With 3 Words, Supreme Court Opens a World of Uncertainty for Refugees | Supreme Court Takes Up Travel Ban Case, and Allows Parts to Go Ahead | Senate Health Bill Reels as C.B.O. Predicts 22 Million More Uninsured | Mayors, Sidestepping Trump, Vow to Fill Void on Climate Change | Miami: The Hidden Gems You Can Explore | Justices t Religious Same-Se

U.S.

## *Shooting Is Latest Eruption in a Grim Ritual of Rage and Blame*

By ALEXANDER BURNS   JUNE 14, 2017       





The scene around Eugene Simpson Stadium Park in Alexandria, Va., on Wednesday after a gunman shot four people, including Representative Steve Scalise. Al Drago/The New York Times

RELATED COVERAGE

 Steve Scalise Among 4 Shot at Baseball Field; Suspect Is Dead  JUNE 14, 2017

 Virginia Shooting Suspect Was Distraught Over Trump's Election, Brother Says  JUNE 14, 2017

 CNN Fires Kathy Griffin From New Year's Eve Broadcast Over Trump Photo  MAY 31, 2017

The violence has come regularly for years, in one politically charged spasm after another. A member of Congress shot through the head in Tucson. Assaults on the Holocaust Museum, a Planned Parenthood office and the Family Research Council, a socially conservative group. Gunmen targeting black churchgoers in South Carolina, Indian immigrants in Kansas and police officers in New York and Texas.

The attempted slaughter of Republican lawmakers on a baseball diamond outside Washington was less an aberration than the latest example of a grim trend, widely remarked upon by leaders in both parties, but never slowed or stopped.

And with lawmakers, legislative aides and Capitol police officers hospitalized on Wednesday, a process of mourning and recrimination unfolded as a kind of familiar ritual, with a somber statement from the president and bipartisan denunciations of violence quickly giving way to finger-pointing and blame on social media.

Even high-level gestures of conciliation, including from President Trump and Senator Bernie Sanders, did little to blunt the sense that America's civic culture is consumed with anger and breaking down — though mental illness sometimes makes it impossible to say exactly what leads to violence.

ADVERTISEMENT

 

7
ARTICLES REMAINING

Document title: Shooting Is Latest Eruption in a Grim Ritual of Rage and Blame - The New York Times
Capture URL: https://www.nytimes.com/2017/06/14/us/baseball-shooting-is-latest-eruption-in-a-grim-ritual-of-rage-and-blame.html
Capture timestamp (UTC): Tue, 27 Jun 2017 14:49:57 GMT

Page 1 of 5





To survivors of past attacks, the shooting in Virginia — perpetrated by a 66-year-old former Sanders supporter who expressed rage over Mr. Trump's presidency — came as a sign that the worst might still be ahead.

Former Senator John C. Danforth, Republican of Missouri, said the violence reflected a contagion in America's political culture, in which adversaries were treated as "people to be destroyed." He said Mr. Trump and Democratic leaders, as well as the news media, all deserved blame.

"We are inundated by rage," Mr. Danforth, who is an ordained minister, said in an interview. "It's not just practicing politicians. It's the demand from the base of the two parties, and it is in large part encouraged by the media."

Mr. Danforth, 80, issued a searing rebuke to his own party in 2015, after the suicide of a state officeholder, Thomas Schweich, who had been the target of brutal personal attacks. In a eulogy Mr. Danforth warned, "Words can kill." But he acknowledged ruefully on Wednesday that practitioners of that brand of politics seldom paid a price for it.

"It apparently works," he said. "It wins elections, wins ratings."

Ron Barber, a former aide to Representative Gabrielle Giffords who was wounded in the 2011 shooting that nearly killed her, and then briefly replaced her in Congress, said Wednesday's attack brought back "terrible memories" for him. After his own election in 2012, Mr. Barber recalled, people left messages at his office threatening to punch or kill him.



Research doctors before they research you.

Find a doctor

Zocdoc

"Fast-forward to 2017, and I'm sorry to say, it gets worse," said Mr. Barber, a Democrat. "What happened in 2016 was a presidential campaign that I think really ramped up the anger and vulgarities that we see directed at members of Congress."

That toxicity does not emanate only from politicians, Mr. Barber said. "I am on Facebook and I see things there that I couldn't imagine anyone saying about another person," he said. "We've seen an increase in racism, anti-Semitism, homophobia. It's time for all our leaders, from the president on down, to say, 'Stop.'"

Voters on the left and the right described themselves as shaken and fearful of what might happen next. Among conservatives, the shooting appeared to confirm a belief that liberal opposition to Mr. Trump had taken a sinister turn, veering into outright violence. For liberals, the attack stirred concern about the potential for extremism on the left, and deepened a sense — dating from Barack Obama's presidency — that ordinary partisan conflicts had taken on more menacing overtones.

In Fairhope, Ala., B. J. Middleton, a retired police officer, said the explosive political atmosphere recalled the time of the Rev. Dr. Martin Luther King Jr.'s assassination in 1968. Mr. Middleton, 78, who supports Mr. Trump, said he increasingly feared "violence coming from the left."

"I was there for the riots and what happened to Dr. King, and I'll tell you, it feels like we're building toward something again," Mr. Middleton said.

Kayla Winner-Connor, a graduate student in Los Angeles, said she was ____yed but not surprised by Wednesday's violence.

____ to say that — everything we're hearing seems really extreme and it

Ad

slippers, reinvented



slippers. reinvented.
the world's most comfortable slippers

Visit Site

"I hate to say that — everything we're hearing seems really extreme and it has been polarized for a while, but now it is dangerous," said Ms. Winner-Connor, who said she was not a supporter of Mr. Trump. She added, "His agenda feels so wrong and I feel an emotionally charged response, but this is spawning some extreme reactions."

Hope that the political system would self-correct seemed to compete with cynicism about the idea that things might even be salvageable. Kari Duma, 45, of Tucson, said she was skeptical that the country would hear Wednesday's gunshots as a "wake-up call."

"How many wake-up calls do we need?" she asked. "The thing is, people are not afraid to attack other people because of politics and beliefs."



**California Today**

The news and stories that matter to Californians (and anyone else interested in the state), delivered weekday mornings.

Enter your email address    Sign Up

☑ You agree to receive occasional updates and special offers for The New York Times's products and services.

☐ I'm not a robot    reCAPTCHA

SEE SAMPLE | PRIVACY POLICY |
OPT OUT OR CONTACT US ANYTIME

There is a long history of political bloodshed and assassination in the United States, sometimes carried out by ideological actors and at other times by people who are mentally unstable. Gunmen have killed four presidents and shot at several others, and killed Dr. King, Robert F. Kennedy and the pioneering gay politician Harvey Milk.

Mentally ill people have targeted members of Congress before, too, including Ms. Giffords and Allard K. Lowenstein, a former antiwar activist who was murdered in his office. In 2003, a member of the New York City Council, James Davis, was shot to death on the chamber's floor by a political opponent.

The apparent violent turn in national politics, and the disappearance of traditional rules of civility, also come as mass shootings — usually targeting nonpolitical civilian targets, in schools and public places — are on the rise.

Some question the correlation between violence and political rhetoric, stressing that gunmen who attack political targets are often unstable or angry for unrelated reasons.

George Brauchler, a Colorado district attorney who prosecuted James Holmes, who killed 12 people in an Aurora movie theater in 2012, said he was inclined to view the gunman outside Washington on Wednesday chiefly as "evil."

"I don't know that politics facilitates that or if it's just an excuse for it," said Mr. Brauchler, a Republican who is running for governor. "It's not like, in the absence of a political issue, this guy would have lived a law-abiding life."

Among politicians and voters on Wednesday, there was at least a visceral link between the latest violence and a long-running disintegration of civic norms, which has left candidates and commentators freer than ever to stoke hateful impulses with little fear of consequences.

In 2011, the shooting of Ms. Giffords by a mentally ill assailant came during a convulsive political period, when a bitter debate over health care yielded a wave of threats against lawmakers. Sarah Palin, the former vice-presidential candidate, drew sharp criticism for having posted a graphic online that placed cross hairs over the districts of several members of Congress, including Ms. Giffords — though no connection to the crime was

Ad

slippers. reinvented.
the perfect summer slippers

Visit Site

Casper
ONE OF THE 50 MOST
INNOVATIVE BRANDS OF 2017

☰  𝕋  🔍          U.S.    Shooting Is Latest Eruption in a Grim Ritual of Rage and Blame                Subscribe   🔗 ⓕ ⓣ ✉ ↗ 🔖

 With 3 Words, Supreme Court Opens a World of Uncertainty for Refugees

  Supreme Court Takes Up Travel Ban Case, and Allows Parts to Go Ahead

Senate Health Bill Reels as C.B.O. Predicts 22 Million More Uninsured

   Mayors, Sidestepping Trump, Vow to Fill Void on Climate Change

PAID POST: MIAMI TOURISM
Miami: The Hidden Gems You Can Explore

Justices t Religious Same-Se

showed cross hairs over the districts of several members of Congress, including Ms. Giffords — though no connection to the crime was established.

Mr. Trump has been an unabashed dabbler in provocative rhetoric, goading attendees at his rallies to rough up protesters, and suggesting last summer that "Second Amendment people" could take action if Hillary Clinton were elected. He was unapologetic during the campaign for comments that critics said verged on incitement.

But Mr. Trump has not had a monopoly on caustic language. Activists on the left have accused the president of "treason," a crime that can carry a death sentence, and compared him to Hitler. The comedian Kathy Griffin recently apologized after posting a video in which she brandished a prop version of Mr. Trump's bloody and severed head.

Frank Keating, who was the governor of Oklahoma when antigovernment militants bombed a federal building there in 1995, killing 168 people, said figures of public authority needed to be more sensitive to the impact of their words on "unstable people."

"There are people that are right on the edge, partisans in both parties, that could — would — do terrible things if that trip wire is tripped," said Mr. Keating, a Republican. "The rhetoric needs to come down about 17 notches."

Voters on both sides of the political divide shared that sentiment. In New York City, Bill Ryan, 60, a Democrat who supported Mr. Trump, said the rhetoric of anger was getting "louder and louder."

"It lights a fuse with these freaking fanatics who go out and start shooting people on a baseball field," Mr. Ryan said.

Christine Quinn, the former speaker of the New York City Council, who witnessed the shooting there in 2003, said the guardrails around political behavior had vanished.

"You see presidential candidates, now the president of the United States, joking about violence," said Ms. Quinn, a Democrat. "Clearly, we see evidence here that it's reverberating on all sides, and the reality is that we have a tone now where there is no cap on it."

───────

Reporting was contributed by Luis Ferré-Sadurní, Jennifer Medina, Fernanda Santos and Matthew Teague.

A version of this article appears in print on June 13, 2017, on Page A1 of the New York edition with the headline: Voices, but Little Action to Halt Grim Cycle of Rage and Blame. Order Reprints | Today's Paper | Subscribe

RELATED COVERAGE

 Steve Scalise Among 4 Shot at Baseball Field; Suspect Is Dead   JUNE 14, 2017

 Virginia Shooting Suspect Was Distraught Over Trump's Election, Brother Says   JUNE 14, 2017

 CNN Fires Kathy Griffin From New Year's Eve Broadcast Over Trump Photo   MAY 31, 2017

More in U.S.                                    Go to the U.S. Section ›


7
ARTICLES REMAINING
›



 Brighthouse

TRENDING

  1   Senate Health Bill Reels as C.B.O. Predicts 22 Million More Uninsured

  2   Op-Ed Columnist: The G.O.P. Rejects

ONE OF THE 50 MOST INNOVATIVE BRANDS OF 2017
-FAST COMPANY-
TRY THE MATTRESS ›

Wynn LAS VEGAS
THE LUXURIOUS SIDE OF SUMMER, NOW WITHIN REACH.
WEB-ONLY SAVINGS



Virginia Shooting Suspect Was Distraught Over Trump's Election, Brother Says JUNE 14, 2017

CNN Fires Kathy Griffin From New Year's Eve Broadcast Over Trump Photo MAY 31, 2017

## More in U.S.

Go to the U.S. Section »

With 3 Words, Supreme Court Opens a World of Uncertainty for Refugees

Supreme Court Takes Up Travel Ban Case, and Allows Parts to Go Ahead

PAID POST: BRIGHTHOUSE
Learn Why the Five Years Before Retirement Are So Important

Senate Health Bill Reels as C.B.O. Predicts 22 Million More Uninsured

Mayors, Sidestepping Trump, Vow to Fill Void on Climate Change

Justices to Hear Case on Religious Objections to Same-Sex Marriage

## Recommended for You

Go to All Recommendations »

3 CNN Journalists Resign After Retracted Story on Trump Ally

Work less. You'll get so much more done.

Why You Don't Want to Have a Baby in a Car

### TRENDING

1. Senate Health Bill Reels as C.B.O. Predicts 22 Million More Uninsured
2. Op-Ed Columnist: The G.O.P. Rejects Conservatism
3. Google Fined Record $2.7 Billion in E.U. Antitrust Ruling
4. The Interpreter: Canada's Secret to Resisting the West's Populist Wave
5. 3 CNN Journalists Resign After Retracted Story on Trump Ally
6. President Trump's Lies, the Definitive List
7. The C.B.O. Score: A Few Bright Spots for Republicans. The Rest Can Be Scored as Grim.
8. Best of Late Night: Stephen Colbert Is Not Asking the Russians to Help Him Become President
9. Op-Ed Contributor: Britain's Broken Ladder of Social Mobility
10. Republicans Struggle to Marshal Votes for Health Care Bill

View More Trending Stories »

© 2017 The New York Times Company | Contact Us | Work With Us | Advertise | Your Ad Choices | Privacy | Terms of Service | Terms of Sale    Site Map | Help | Site Feedback | Subscriptions

The New York Times

SUBSCRIBE | LOG IN

Opinion

OP-ED COLUMNIST

## 'The Indigenous American Berserk' Strikes Again

      

JUNE 15, 2017



Bret Stephens

It didn't take long — hours, in fact — after Rep. Gabrielle Giffords was shot, and six others murdered, in Tucson, Ariz., in January 2011, for liberals to begin pinning political blame for the atrocity.

"Giffords' blood is on Sarah Palin's hands," wrote Daily News columnist Michael Daly, noting that the former Alaska governor had put Giffords's district in a metaphorical cross hairs as a vulnerable Democratic seat.

In Slate, Jacob Weisberg issued a broader indictment, never mind that Jared Loughner was a paranoid schizophrenic of no fixed ideological orientation.

"The Tea Party movement," he wrote, made it "appreciably more likely that a disturbed person like Loughner would react, would be able to react, and would not be prevented from reacting, in the crazy way he did."



ADVERTISEMENT: STELLA ARTOIS

Host One to Remember
Celebrate summer with Stella Artois

Learn More

It will be interesting to read what these and other Tea Party-blamers will have to say after Representative Steve Scalise, the G.O.P. whip in Congress, and three others were shot Wednesday morning (another was hit by shrapnel) by a man whose political leanings were considerably more clear than Loughner's.



President Trump after making a statement Wednesday about the shooting in Alexandria, Va.
DOUG MILLS / THE NEW YORK TIMES

"Trump is a Traitor. Trump Has Destroyed Our Democracy. It's Time to Destroy Trump & Co." So wrote alleged shooter James T. Hodgkinson in one social media post in March. He posted a portrait of Bernie Sanders for his Facebook cover photo and was a fan of Rachel Maddow. He belonged to a Facebook group called

President Trump after making a statement Wednesday about the shooting in Alexandria, Va.
DOUG MILLS / THE NEW YORK TIMES

"Trump is a Traitor. Trump Has Destroyed Our Democracy. It's Time to Destroy Trump & Co." So wrote alleged shooter James T. Hodgkinson in one social media post in March. He posted a portrait of Bernie Sanders for his Facebook cover photo and was a fan of Rachel Maddow. He belonged to a Facebook group called "Terminate the Republican Party."

Hodgkinson had an arrest record for mostly minor infractions, but showed no sign of mental illness. He was married and sociable. A friend described him as "a nice guy" who was simply "fed up" with the political situation. Who isn't?

Since turnabout is fair play, it's tempting to subject the left to the same tendentious excoriation to which it subjected the right six years ago. Kathy Griffin and a bloodied, decapitated Trump. Trump as Shakespeare's murdered Caesar in Central Park. Kirsten Gillebrand's f-bombs. "The Resistance" — all markers of the same culture of self-righteous loathing that supposedly incubates political violence.

"So much of left-wing thought is a kind of playing with fire by people who don't even know that fire is hot," wrote George Orwell, in a line Weisberg puts to use against the right. Thus then. Thus now.

Or not.

It was foul of the left to accuse the Tea Party of inciting Loughner's rampage — Bernie Sanders among them — all the more so since evidence for the claim was so strained. That's a lesson that ought to be learned for good now, when there can be no gainsaying Hodgkinson's politics. If Bernie isn't to blame for the shooting now, Palin wasn't to blame then. Belated apologies — or, at least, private regrets — might yet be in order.

**Sign Up for the Opinion Today Newsletter**

Every weekday, get thought-provoking commentary from Op-Ed columnists, The Times editorial board and contributing writers from around the world.

SIGN UP

As for the right, they might want to avoid their own politicized analysis of Wednesday's violence, not least because it will come back to haunt them the next time an anti-abortion fanatic shoots his way into a Planned Parenthood clinic or an anti-Muslim bigot stabs people on a train. There are causes that explicitly advocate violence — Islamist extremism, Marxist revolution, white supremacy — and inspire their followers to kill. The Tea Party wasn't one of them during the Obama years. The Resistance isn't one of them today. An outlier here or there doesn't disprove the point.

The reality of much of what passes for political violence in America today is the product of what Philip Roth once called "the indigenous American berserk." Hodgkinson seems a representative type: a relatively normal man, with a seemingly normal life, a bit of a loser, a few axes to grind. Then: Boom. Another awful postal moment, stirred by frustration or loneliness or impulse, loosely yoked to a political cause.

ADVERTISEMENT



Ad

Crystal Clear

Brilliant Business Phones

Warning: Do not use your business phone until you read this

Visit Site                    Expert

Surely we could do more to set a different tone in the country: Paul Ryan made a good start with a unifying speech, as did Nancy Pelosi, Bernie Sanders and Donald Trump. Maybe we also could do more to leaven our politics with intellectual modesty, and a less apocalyptic vision of what might happen if we don't get our way right now. The Trumpian right had this disease in the run-up to the election. His opponents — I don't exclude myself here — have it now. If Wednesday's

Surely we could do more to set a different tone in the country: Paul Ryan made a good start with a unifying speech, as did Nancy Pelosi, Bernie Sanders and Donald Trump. Maybe we also could do more to leaven our politics with intellectual modesty, and a less apocalyptic vision of what might happen if we don't get our way right now. The Trumpian right had this disease in the run-up to the election. His opponents — I don't exclude myself here — have it now. If Wednesday's outrage helps the country tone it down a notch, the damage will not have been in vain.

But the fact that events are frightening, bloody and tragic doesn't necessarily make them especially meaningful. Americans are outraged; our politics are angry. It was ever thus. In a nation of 320 million someone fired a gun, shot people and got shot. It shouldn't be like that. It is. As for gun control, we'll learn more about Hodgkinson in the days ahead. But it would take something close to repeal of the Second Amendment to keep someone with his general profile from owning a rifle.

In 2011 the left wanted to blame millions of Americans for the acts of one crazed man. The indictment served nobody. In 2017 the right may seek to do the same. Bad idea. Instead of blaming Sanders and the left, follow the lead of Gabby Giffords: "My heart is with my former colleagues, their families & staff, and the US Capitol Police — public servants and heroes today and every day."

What else, really, is there to say?

***Correction:*** *June 15, 2017*
*An earlier version of this column misspelled the name of a United States senator. She is Kirsten Gillibrand, not Kristen.*

————

*I invite you to follow me on Twitter (@BretStephensNYT) and Facebook.*

*Follow The New York Times Opinion section on Facebook and Twitter (@NYTopinion), and sign up for the Opinion Today newsletter.*

471  COMMENTS »  

**More In Opinion »**

GAIL COLLINS
## Play Ball, and Then Gunfire
The shooting at the congressional baseball practice was awful, but every week we hear bloodier stories.



THOMAS B. EDSALL
## Where Democrats Can Find New Voters
The political loyalty of the 65 million workers in the service sector is up for grabs.



CHARLES M. BLOW
## Rhetoric and Bullets
Our talk should never promote violence, but it needn't be timid.





Breathable Sandal
46% OFF  $15.35
Newchic



∧ Back to top

| Home | Opinion |
|------|---------|
| World | Science |
| U.S. | Health |



Bad idea. Instead of blaming Sanders and the left, follow the lead of Gabby Giffords: "My heart is with my former colleagues, their families & staff, and the US Capitol Police — public servants and heroes today and every day."

What else, really, is there to say?

*Correction:* June 15, 2017
*An earlier version of this column misspelled the name of a United States senator. She is Kirsten Gillibrand, not Kristen.*

———————

*I invite you to follow me on Twitter (@BretStephensNYT) and Facebook.*

*Follow The New York Times Opinion section on Facebook and Twitter (@NYTopinion), and sign up for the Opinion Today newsletter.*

471 COMMENTS »

**More in Opinion »**

GAIL COLLINS
**Play Ball, and Then Gunfire**
The shooting at the congressional baseball practice was awful, but every week we hear bloodier stories.

THOMAS B. EDSALL
**Where Democrats Can Find New Voters**
The political loyalty of the 65 million workers in the service sector is up for grabs.

CHARLES M. BLOW
**Rhetoric and Bullets**
Our talk should never promote violence, but it needn't be timid.

Breathable Sandal
46% OFF   $15.35
Newchic

∧ Back to top

| | |
|---|---|
| Home | Opinion |
| World | Science |
| U.S. | Health |
| Politics | Arts |
| The Upshot | Photos |
| New York | Style |
| Business Day | Video |
| Technology | Most Emailed |
| Sports | |

More Sections

Settings

Ⓣ Download the NYTimes app

Help   Subscribe   Feedback   Terms of Service   Privacy
© 2017 The New York Times Company

Case 1:17-cv-04853-JSR   Document 70-24   Filed 12/30/19   Page 2 of 6



## Rhetoric and Bullets

**Charles M. Blow**  JUNE 15, 2017

A police officer guarding the Capitol after a shooting in nearby Alexandria, Va., on Wednesday.
Aaron P. Bernstein/Reuters

**Charles M. Blow**
Politics, public opinion and social justice.

Trump Is Girding for a Fight   JUN 19
The Resistance: Impeachment Anxiety   JUN 12
James Comey Cometh   JUN 7
Trump's Incredible Shrinking America   JUN 5
The Complexities of James Comey   JUN 1

See More »

**RECENT COMMENTS**

Harlod Dichmor   June 16, 2017
Mr. Blow, you and others have been extremely vociferous, calling for "Resistance" at all levels - remember who said "If they bring a knife to...

Raul Campos   June 16, 2017
Mr. Blow, it doesn't surprise me that you mistakenly believe that political hate speech is not contributory to acts of political violence....

Scott Rose   June 16, 2017
Australia summoned the political will to enact sensible gun control legislation and hasn't had a mass shooting in decades.Scalise in the ...

SEE ALL COMMENTS

In 2011, after Representative Gabby Giffords of Arizona was gravely injured and six others were killed by a shooter in Tucson, I was moved to commit an entire column to condemning the left for linking the shooting so closely to political rhetoric.

Yes, Republican personalities and officials in the wake of Barack Obama's election had spoken openly about "Second Amendment remedies" and being "armed and dangerous" and "revolution," but it was not possible to connect the dots between that irresponsible talk and the Tucson shooter.

Now, here I am again, only this time extending the same condemnation to the right for doing the same after four people, including House Majority Whip Steve Scalise, were shot at an Alexandria, Va., baseball field where Republican members of Congress were practicing in advance of a charity game.

The shooter, identified as James T. Hodgkinson, appears to have had strong liberal, anti-Trump, anti-Republican views — among other things, he was a

0
ARTICLES REMAINING     The Times Sale. 50% off for one year. Ends Sunday.     SUBSCRIBE NOW   Subscriber login



ARTICLE CONTINUES AFTER ADVERTISEMENT



THE MET

Through Oct 29

The Roof Garden Commission
Adrian Villar Rojas

THE THEATER OF DISAPPEARANCE

The very real possibility that the shooting was politically motivated was clearly on the minds of many, including Representative Rodney Davis, Republican of Illinois, who was at the baseball field during the shooting: "This could be the first political rhetorical terrorist attack, and that has to stop."

Let me be clear: I don't have a problem with viewing these incidents through a political lens. Not to do so is naïve and ridiculously self-blinding in a way that avoids reality.

As Katy Waldman wrote for Slate last June:

"Things that happen for political reasons, and have political consequences, demand that we scrutinize them through a political lens. Crying 'politicization' is itself politicization — a way to advance whatever slate of politics favors the status quo. Often people invoke policy goals in order to *get things done;* what's at stake is whether these tragedies should be regarded as irreducible lightning strikes or problems with potential solutions."

What I abhor is ideological exploitation that reduces these acts to a political sport and uses them as weapons to silence political opponents and their "rhetoric," rather than viewing them as American tragedies that we can work together to prevent through honest appraisal and courageous action. Every shooting in this country is a tragedy, and they happen with disturbing frequency here.

As The Washington Post reported, Wednesday's shooting was the 154th mass shooting so far this year in America. That's 154 mass shootings in just 165 days. Violence, particularly gun violence, is the American fact, the

FROM OUR ADVERTISERS



VEUVE CLICQUOT
How to Dress For a Polo Match
Discover style tips from the Veuve Clicquot Polo Classic.

CON EDISON
Power to the People
5 smart technologies that will change NYC forever.

ENHANCE
Disrupting Distracted Driving
Could our smartphones make us safer drivers?

PERU
Lima, Peru: the Top Culinary City?
Indulge in a fusion of flavors you never expected.



IZZE
BUY NOW

0
ARTICLES REMAINING

The Times Sale. 50% off for one year. Ends Sunday.

SUBSCRIBE NOW   Subscriber login



This country has a violent culture, is full of guns, and our federal lawmakers — mostly Republicans, it must be said, because there isn't any real equivalency — are loath to even moderately regulate gun access.

Pretending that America's gun violence is a function of collective political rhetoric rather than the nexus of personal mental defect and easy access to weapons is a way of dodging, well, the bullet.

So, here I must take a stand in defense of rhetoric. While rhetoric should never promote violence, it needn't be timid.

I was impressed by the official responses from Washington. Even Trump's response was sober and direct, not marred by his typical lack of tact, not like the way he tried to exploit the Pulse Nightclub shooting last year. House Speaker Paul Ryan delivered a stately speech from the House floor, and Minority Leader Nancy Pelosi echoed his sentiments in a noble act of bipartisanship.

At the top, the responses were pitch perfect, but the political debate isn't confined to the top. It trickles down into the cesspool of social media, which has grown exponentially since Giffords was shot. At that time, Facebook had only about a third of its current number of users, Twitter had about a fifth of its current users, Instagram was just three months old, and Snapchat didn't exist.

On social media, where anonymity provides cover for vitriol, violent threats are a regular feature.

When Gabby Giffords wrote on Twitter, "My heart is with my former colleagues, their families & staff, and the US Capitol Police — public servants and heroes today and every day," she was met with a sickening number of hateful responses, including one that said, "To bad it was not her." (Yes, it should have been "too," but grammar isn't a major concern in a statement that grotesque.)

It is true that political rhetoric can set a tone that greases the skids for a small number of people who are prone to violence to act on those impulses. We have just gone through a political cycle where that was on full display.

But some rhetoric is necessary and real. I believe Donald Trump and the Republican-led Congress are attempting to do very serious harm to the country and its most vulnerable citizens, and I will never stop saying so in the strongest terms I can summon. For many people, this isn't an abstract policy debate between partisans. For them, these debates — about repealing the Affordable Care Act, for example — are about life and death. But that has nothing to do with the promotion of physical violence; it has everything to do with protecting this country from administrative and legislative violence.

We have to object stridently to proposals that will hurt people, and not be chilled by a deranged man with a gun. Violence is abhorrent and self-










≡  The New York Times  🔍    The Opinion Pages | Rhetoric and Bullets    Subscribe







OP-ED CONTRIBUTOR
Amazon Bites Off Even More Monopoly Power

EDITORIAL
The Health Care of Millions Depends on a Few Senators

FRANK BRUNI
After Georgia Election, Democrats Are Demoralized, Again

ROSS DOUTHAT
In Search of the American Center

PAID POST: BRANDH
Where to Start Your Own Business

THOMAS L.
Where Di
Go?

787

You can, as I do, have sympathy for the victims of yesterday's shooting and condemn the shooter, while at the same time raging, nonviolently of course, against an agenda that places other Americans in very real danger.

———

I invite you to join me on Facebook and follow me on Twitter (@CharlesMBlow), or email me at cblow@nytimes.com.

Follow The New York Times Opinion section on Facebook and Twitter (@NYTopinion), and sign up for the Opinion Today newsletter.

**Charles M. Blow**
Politics, public opinion and social justice.


Trump Is Girding for a Fight
Trump and team are attempting to defame and delegitimize the Russia investigation.


The Resistance: Impeachment Anxiety
It's important to face the very real possibility that Trump's removal may not come.


James Comey Cometh
Comey's statement makes Trump sound more like a mob boss than like the president of a democracy.

**More in Opinion**    Go to the Opinion Section »


OP-ED CONTRIBUTOR
Amazon Bites Off Even More Monopoly Power


EDITORIAL
The Health Care of Millions Depends on a Few Senators


PAID POST: VEUVE CLICQUOT
What You Missed at the 2017 Veuve Clicquot Polo Classic


FRANK BRUNI
After Georgia Election, Democrats Are Demoralized, Again


ROSS DOUTHAT
In Search of the American Center


THOMAS L. FRIEDMAN
Where Did 'We the People' Go?

TRENDING

1.  Democrats Seethe After Georgia Loss: 'Our Brand Is Worse Than Trump'

2.  Uber Founder Travis Kalanick Resigns as C.E.O.

3.  Psychologists Open a Window on Brutal C.I.A. Interrogations

4.  Saudi Arabia Rewrites Succession as King Replaces Heir With Son, 31

5.  Op-Ed Columnist: Where Did 'We the People' Go?

6.  Video of Police Killing of Philando Castile Is Publicly Released

7.  Op-Ed Contributor: What the Watergate Committee Taught Me

8.  Too Hot to Fly? Climate Change May Take a Toll on Air Travel

9.  Op-Ed Columnist: After Georgia Election, Democrats Are Demoralized, Again

10. Feature: 'The Boys From Baga'

View More Trending Stories »

**Recommended for You**    Go to All Recommendations »

The Symptoms of Dying

THE ETHICIST
Should I Help an Unjustly Fired Co-Worker?

WHAT YOU GET
$1.5 Million Homes in Massachusetts, Tennessee and Illinois

We capture videos, websites & social media for legal use    PAGEVAULT

The New York Times    Go to Home Page »

| NEWS | OPINION | ARTS | LIVING | LISTINGS & MORE | SUBSCRIBE |
|------|---------|------|--------|-----------------|-----------|
| World | Today's Opinion | Today's Arts | Automobiles | Classifieds | 🏠 Home Delivery |





a Fight
Trump and team are attempting to defame and delegitimize the Russia investigation.

Impeachment Anxiety
It's important to face the very real possibility that Trump's removal may not come.

Comey...
Comey's statement makes Trump sound more like a mob boss than like the president of a democracy.

2. ... C.E.O.
3. Psychologists Open a Window on Brutal C.I.A. Interrogations
4. Saudi Arabia Rewrites Succession as King Replaces Heir With Son, 31
5. Op-Ed Columnist: Where Did 'We the People' Go?
6. Video of Police Killing of Philando Castile Is Publicly Released
7. Op-Ed Contributor: What the Watergate Committee Taught Me
8. Too Hot to Fly? Climate Change May Take a Toll on Air Travel
9. Op-Ed Columnist: After Georgia Election, Democrats Are Demoralized, Again
10. Feature: The Boys From Baga

View More Trending Stories »

## More in Opinion

Go to the Opinion Section »

OP-ED CONTRIBUTOR
Amazon Bites Off Even More Monopoly Power

EDITORIAL
The Health Care of Millions Depends on a Few Senators

PAID POST: VEUVE CLICQUOT
What You Missed at the 2017 Veuve Clicquot Polo Classic

FRANK BRUNI
After Georgia Election, Democrats Are Demoralized, Again

ROSS DOUTHAT
In Search of the American Center

THOMAS L. FRIEDMAN
Where Did 'We the People' Go?

## Recommended for You

Go to All Recommendations »

The Symptoms of Dying

THE ETHICIST
Should I Help an Unjustly Fired Co-Worker?

WHAT YOU GET
$1.5 Million Homes in Massachusetts, Tennessee and Illinois

We capture videos, websites & social media for legal use
PAGEVAULT

© 2017 The New York Times Company | Contact Us | Work With Us | Advertise | Your Ad Choices | Privacy | Terms of Service | Terms of Sale | Site Map | Help | Site Feedback | Subscriptions

Veuve Clicquot

Veuve Clicquot Polo Classic
Experience the 2017 event

WATCH NOW



The Opinion Pages | OP-ED COLUMNIST

# The Tucson Witch Hunt

**Charles M. Blow**   JAN. 14, 2011                                   350

*Tragedy in Tucson. Six Dead. Democratic congresswoman shot in the head at rally.*

Immediately after the news broke, the air became thick with conjecture, speculation and innuendo. There was a giddy, almost punch-drunk excitement on the left. The prophecy had been fulfilled: "words have consequences." And now, the right's rhetorical chickens had finally come home to roost.

The dots were too close and the temptation to connect them too strong. The target was a Democratic congresswoman. There was the map of her district in the cross hairs. There were her own prescient worries about overheated rhetoric.

Within hours of the shooting, there was a full-fledged witch hunt to link the shooter to the right.

"I saw Goody Proctor with the devil! Oh, I mean Jared Lee Loughner! Yes him. With the devil!"

The only problem is that there was no evidence then, and even now, that overheated rhetoric from the right had anything to do with the shooting. (In fact, a couple of people who said they knew him have described him as either apolitical or "quite liberal.") The picture emerging is of a sad and lonely soul slowly, and publicly, slipping into insanity.

RELATED COVERAGE

Missing Link   JAN. 14, 2011



Charles M. Blow
Politics, public opinion and social justice.

Trump Is Girding for a Fight   JUN 16
Rhetoric and Bullets   JUN 15
The Resistance: Impeachment Anxiety   JUN 12
James Comey Cometh   JUN 7
Trump's Incredible Shrinking America   JUN 5

See More »

RECENT COMMENTS

Gary Peschell   January 15, 2011
Loughner shot Gabrielle Giffords because, it appears, she represented "government". She was not a "random target". Hatred of government...

David R   January 15, 2011
While your our rational arguments are eloquently made, I feel you (as well as most of the rest of the country) actually miss the point. When...

ch2253   January 15, 2011
This was a brave column. Let's hope that the columnist's employer and fellow columnists don't take offense. Readers who watch Fox cable news...

SEE ALL COMMENTS



6
ARTICLES REMAINING



Charles M. Blow
Damon Winter/The New York Times

[I have written about violent rhetoric](#) before, and I'm convinced that it's poisonous to our politics, that the preponderance of it comes from the right, and that it has the potential to manifest in massacres like the one in Tucson.

But I also know that potential, possibility and even plausibility are not proof.

The American people know it, too. According to [a USA Today/Gallup poll released Wednesday](#), 42 percent of those asked said that political rhetoric was not a factor at all in the shooting, 22 percent said that it was a minor factor and 20 percent said that it was a major factor. Furthermore, most agreed that focusing on conservative rhetoric as a link in the shooting was "not a legitimate point but mostly an attempt to use the tragedy to make conservatives look bad." And nearly an equal number of people said that Republicans, the Tea Party and Democrats had all "gone too far in using inflammatory language" to criticize their opponents.

**Opinion Today**

Every weekday, get thought-provoking commentary from Op-Ed columnists, The Times editorial board and contributing writers from around the world.

Enter your email address    | Sign Up |

☑ You agree to receive occasional updates and special offers for The New York Times's products and services.

[ ] I'm not a robot

SEE SAMPLE | PRIVACY POLICY |
OPT OUT OR CONTACT US ANYTIME

Great. So the left overreacts and overreaches and it only accomplishes two things: fostering sympathy for its opponents and nurturing a false equivalence within the body politic. Well done, Democrats.

Now we've settled into the by-any-means-necessary argument: anything that gets us to focus on the rhetoric and tamp it down is a good thing. But a wrong in the service of righteousness is no less wrong, no less corrosive, no less a menace to the very righteousness it's meant to support.

ARTICLE CONTINUES AFTER ADVERTISEMENT







☰  𝕿  🔍        The Opinion Pages | The Tucson Witch Hunt        Subscribe

| EDITORIAL | DAVID BROOKS | DAVID LEONHARDT | THE CONVERSATION | PAID POST: PERU | OP-ED CON |
| The Travel Ban at the Supreme Court | The G.O.P. Rejects Conservatism | A Vote of Conscience and Courage | What Do We Have a Government for? | The World's Top Food Destination Isn't What You Think | The Sena Bipartisa |

# THEATER OF DISAPPEARANCE

You can't claim the higher ground in a pit of quicksand.

Concocting connections to advance an argument actually weakens it. The argument for tonal moderation has been done a tremendous disservice by those who sought to score political points in the absence of proof.

———

I invite you to join me on Facebook and follow me on Twitter, or e-mail me at chblow@nytimes.com.

A version of this op-ed appears in print on January 15, 2011, on Page A23 of the New York edition with the headline: The Tucson Witch Hunt. Today's Paper | Subscribe

**RELATED COVERAGE**    Missing Link  JAN. 14, 2011

---

## Charles M. Blow
Politics, public opinion and social justice.

**Trump Is Girding for a Fight**
Trump and team are attempting to defame and delegitimize the Russia investigation.

**Rhetoric and Bullets**
Our talk should never promote violence, but it needn't be timid.

**The Resistance: Impeachment Anxiety**
It's important to face the very real possibility that Trump's removal may not come.

## More in Opinion                    Go to the Opinion Section »

**EDITORIAL**
The Travel Ban at the Supreme Court

**DAVID BROOKS**
The G.O.P. Rejects Conservatism

**PAID POST: MEXICO TOURISM**
Planning a Trip to Mexico? Consider These Locations.

**DAVID LEONHARDT**
A Vote of Conscience and Courage

**THE CONVERSATION**
What Do We Have a Government for?

**OP-ED CONTRIBUTOR**
The Senate's Secretly Bipartisan Health Bill

## Recommended for You                Go to All Recommendations »

6
ARTICLES REMAINING

### TRENDING

1. Senate Health Bill Reels as C.B.O. Predicts 22 Million More Uninsured
2. Op-Ed Columnist: The G.O.P. Rejects Conservatism
3. Google Fined Record $2.7 Billion in E.U. Antitrust Ruling
4. The Interpreter: Canada's Secret to Resisting the West's Populist Wave
5. 3 CNN Journalists Resign After Retracted Story on Trump Ally
6. President Trump's Lies, the Definitive List
7. The C.B.C. Score: A Few Bright Spots for Republicans. The Rest Can Be Scored as Grim.
8. Best of Late Night: Stephen Colbert Is Not Asking the Russians to Help Him Become President
9. Op-Ed Contributor: Britain's Broken Ladder of Social Mobility
10. Republicans Struggle to Marshal Votes for Health Care Bill

View More Trending Stories »

Document title: The Tucson Witch Hunt - The New York Times
Capture URL: http://www.nytimes.com/2011/01/15/opinion/15blow.html
Capture timestamp (UTC): Tue, 27 Jun 2017 14:50:55 GMT



Document title: The Tucson Witch Hunt - The New York Times
Capture URL: http://www.nytimes.com/2011/01/15/opinion/15blow.html
Capture timestamp (UTC): Tue, 27 Jun 2017 14:50:55 GMT

Page 4 of 4

≡ SECTIONS    ⌂ HOME    🔍 SEARCH    The New York Times    SUBSCRIBE NOW    LOG IN    ⚙

1. Trump Acknowledges He Is Under Investigation in Russia Inquiry  2. Michelle Carter Is Guilty of Manslaughter in Texting Suicide Case  3. ECONOMIC TRENDS The Amazon-Walmart Showdown That Explains the Modern...  4. Amazon to Buy Whole Foods in $13.4 Billion Deal  5. PAID POST SOTHEBY'S REALTY 5 Architectural Homes That Exemplify Modernism  Sotheby's  Minn Acqu Phila



Welcome to Atlantic Canada — Canada — New Brunswick

PUBLIC EDITOR

# A Rare Libel Suit Against The Times

**Liz Spayd**
THE PUBLIC EDITOR    MAY 10, 2017

🔘 ⓕ ⓣ ✉ ↗ 🔖 58

Murray Energy Corporation, one of the largest coal mining companies in the country, has just taken a step that most companies never dare try: It sued The New York Times for libel.

In a legal claim announced last Friday, Murray Energy asserts that a recent Times editorial falsely accused the company's founder, Robert Murray, of lying about the cause of a deadly mine collapse and wrongly asserted that his company violated federal regulations in excess of industry norms.

To the untrained eye, this might look like routine legal jousting. But hardly anyone jousts with The Times when it comes to formally asserting libel. When they do, they almost never win. I'm told by the legal department here that the last time the newspaper lost a libel suit in the United States was at least the early 1960s. (It has lost two in Russia, one in 2015.)

In the case of Murray Energy, The Times said in a statement: "We haven't been served with the complaint, but we're confident that our editorial was accurate and we intend to defend the case vigorously."

It's perhaps not surprising that it is Robert Murray trying to buck the odds against The Times. He has emerged as one of the more outspoken coal company executives amid tensions over environmental regulations. In one 2007 Times article, he was referred to as having a "bombastic" style and a man who pushes against well established wisdom, including the concept of climate change.





### The Public Editor

Liz Spayd, the sixth public editor, is at the intersection of Times readers and Times journalists.

The Public Editor Signs Off    JUN 2

Friday Mailbag: Manchester, Stereotypes and Social Security Math    MAY 26

The Bombing, the Crime Scene Photos and the Outcry    MAY 25

Vague Guidelines Lead to a Misstep on Gender Pronouns    MAY 25

The Real Power of Journalism? Blockbuster Scoops    MAY 20

See More »

💬 RECENT COMMENTS

**Lee Harrison** May 18, 2017
Well, if you thought Murray's effort to relitigate the facts of his Crandall Canyon mine disaster in a publicity stunt and the court of...

**surgres** May 18, 2017
"It's a bit more disconcerting if it suggests that those with a legitimate claim feel too intimidated to even try."Of course the NY Times...

**areader** May 16, 2017
Sometimes there's a button "false" under the comment near a "recommend" button. What does this "false" mean? That anybody who doesn't like...

SEE ALL COMMENTS    WRITE A COMMENT

📣 FROM OUR ADVERTISERS

BRANDIM
They're Living the Hong Kong Dream
Why these entrepreneurs chose the world's freest economy.

MIAMI TOURISM
Miami on the Flip-Side
Follow along as three culture-seekers experience Miami

PRODIGY NETWORK
Investing in Commercial Real Estate
See why the commercial real estate market is so attractive.

BRIGHTHOUSE
How to Spend in Retirement
Learn how to easily go from retirement

3 ARTICLES REMAINING ›

Document title: A Rare Libel Suit Against The Times - The New York Times
Capture URL: https://www.nytimes.com/2017/05/10/public-editor/murray-energy-libel-suit.html?rref=collection%2Ftimestopic%2FThe%20New%20York%20Times%20Co…
Capture timestamp (UTC): Fri, 16 Jun 2017 21:00:15 GMT



Robert Murray, the founder of Murray Energy Corporation. *Kevin Moloney for The New York Times*

I asked Murray Energy officials why they had chosen to sue, since it's more typical that the aggrieved party would pursue other means of rectifying any perceived misstatements — like seeking a correction. (Opinion editors say they're unaware of such a request.)

In an email, the company referred me to a statement, of which the most illuminating part was this: "The New York Times, of course, supported Hillary Clinton, who famously declared her agenda to 'put a lot of coal miners and coal companies out of business.' Murray Energy instituted this suit, in part, in attempt to ensure that such an agenda is not furthered by The New York Times's false and defamatory statements."

It's hard to tell whether Robert Murray has the stamina, or even the desire, to engage a sustained battle with The Times. My bet is that by grabbing a few headlines, he's gotten most of what he came for. But it's curious how few columnists or individuals actually do sue the paper for allegedly libelous claims. That's a good thing if this is a measure of how rarely people feel defamed by The Times. It's a bit more disconcerting if it suggests that those with a legitimate claim feel too intimidated to even try.

Follow the public editor on Twitter @spaydl and reach her by email at public@nytimes.com.

**The Public Editor**

Liz Spayd, the sixth public editor, is at the intersection of Times readers and Times journalists.

**The Public Editor Signs Off**
The New York Times may no longer have a public editor, but if that role's extinguished, who will watch the watchdog?

**Friday Mailbag: Manchester, Stereotypes and Social Security Math**
Readers wondered about the continued naming of the arena's performer. Other concerns: a photo of food stamp recipients and a take on the U.S. debt.

**The Bombing, the Crime Scene Photos and the Outcry**
The smoke had barely cleared from the Manchester attack before The New York Times ran forensic-evidence images. British officials were angry. So were readers.

**Recommended for You**

Their Own Targeted, Republicans Want Looser Gun Laws, Not Stricter Ones

**Solemn Trump Calls for Unity After Congressman's...**
The president, more familiar with the role of political agitator than comforter of a nation, struck a tone of gravity, appearing...

CHARLES M. BLOW
Rhetoric and Bullets

**TRENDING**

1. Trump Acknowledges He Is Under Investigation in Russia Inquiry
2. Michelle Carter Is Guilty of Manslaughter in Texting Suicide Case
3. Economic Trends: The Amazon-Walmart Showdown That Explains the Modern Economy
4. Amazon to Buy Whole Foods in $13.4 Billion Deal
5. Minnesota Officer Acquitted in Killing of Philando Castile
6. How the Russia Investigation Entangled a Manafort Protégé
7. Trump Reverses Pieces of Obama-era Engagement With Cuba
8. Helmut Kohl, Chancellor Who Reunited Germany, Dies at 87
9. Op-Ed Columnist: Why Fathers Leave Their Children
10. Opinion: Why Are So Many Young Voters Falling for Old Socialists?

View More Trending Stories »

The New York Times    Go to Home Page »

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page39 of 140

SApp-185

≡   𝕿   🔍          PUBLIC EDITOR   A Rare Libel Suit Against The Times                                Subscribe   🇫 🇹 ✉ ↗   🔖 58

1.  Trump Acknowledges He Is Under Investigation in Russia Inquiry

2.  Michelle Carter Is Guilty of Manslaughter in Texting Suicide Case

3.  ECONOMIC TRENDS The Amazon-Walmart Showdown That Explains the Modern...

4.  Amazon to Buy Whole Foods in $13.4 Billion Deal

   NEXT POST · SOTHEBY'S REALTY
   5 Architectural Homes That Exemplify Modernism   Sotheby's

5.  Minn Acqu Phila

It's hard to tell whether Robert Murray has the stamina, or even the desire, to engage a sustained battle with The Times. My bet is that by grabbing a few headlines, he's gotten most of what he came for. But it's curious how few companies or individuals actually do sue the paper for allegedly libelous claims. That's a good thing if this is a measure of how rarely people feel defamed by The Times. It's a bit more disconcerting if it suggests that those with a legitimate claim feel too intimidated to even try.

———

Follow the public editor on Twitter @spaydl and reach her by email at public@nytimes.com.

### The Public Editor

Liz Spayd, the sixth public editor, is at the intersection of Times readers and Times journalists.

**The Public Editor Signs Off**
The New York Times may no longer have a public editor, but if that role's extinguished, who will watch the watchdog?


**Friday Mailbag: Manchester, Stereotypes and Social Security Math**
Readers wondered about the continued naming of the arena's performer. Other concerns: a photo of food stamp recipients and a take on the U.S. debt.


**The Bombing, the Crime Scene Photos and the Outcry**
The smoke had barely cleared from the Manchester attack before The New York Times ran forensic-evidence images. British officials were angry. So were readers.

### Recommended for You                                    Go to All Recommendations »

**Their Own Targeted, Republicans Want Looser Gun Laws, Not Stricter Ones**

**Solemn Trump Calls for Unity After Congressman's...**
The president, more familiar with the role of political agitator than comforter of a nation, struck a tone of gravity, appearing...

CHARLES M. BLOW
**Rhetoric and Bullets**

TRENDING

1. Trump Acknowledges He Is Under Investigation in Russia Inquiry

2. Michelle Carter Is Guilty of Manslaughter in Texting Suicide Case

3. Economic Trends: The Amazon-Walmart Showdown That Explains the Modern Economy

4. Amazon to Buy Whole Foods in $13.4 Billion Deal

5. Minnesota Officer Acquitted in Killing of Philando Castile

6. How the Russia Investigation Entangled a Manafort Protégé

7. Trump Reverses Pieces of Obama-era Engagement With Cuba

8. Helmut Kohl, Chancellor Who Reunited Germany Dies at 87

9. Op-Ed Columnist: Why Fathers Leave Their Children

10. Opinion: Why Are So Many Young Voters Falling for Old Socialists?

View More Trending Stories »


I Know . . .
"Our employees rely on WebFOCUS for mission-critical analytics."
Joe Beydoun  Director of Supply Chain and Business Intelligence Strategy | Lipari Foods
Get the Full Story »
I Know ›   Information Builders

### The New York Times                                    Go to Home Page »

**NEWS**
World
U.S.
Politics
N.Y.
Business
Tech
Science
Health
Sports
Education
Obituaries
Today's Paper
Corrections

**OPINION**
Today's Opinion
Op-Ed Columnists
Editorials
Contributing Writers
Op-Ed Contributors
Opinionator
Letters
Sunday Review
Taking Note
Room for Debate
Public Editor
Video: Opinion

**ARTS**
Today's Arts
Art & Design
Books
Dance
Movies
Music
N.Y.C. Events Guide
Television
Theater
Video: Arts

**LIVING**
Automobiles
Crossword
Food
Education
Fashion & Style
Health
Jobs
Magazine
N.Y.C. Events Guide
Real Estate
T Magazine
Travel
Weddings & Celebrations

**LISTINGS & MORE**
Classifieds
Tools & Services
Times Topics
Public Editor
N.Y.C. Events Guide
Blogs
Multimedia
Photography
Video
NYT Store
Times Journeys
Subscribe
Manage My Account

**SUBSCRIBE**
🏠 Home Delivery
💻 Digital Subscriptions
✓ Crossword

Email Newsletters
Alerts
Gift Subscriptions
Corporate Subscriptions
Education Rate

Mobile Applications
Replica Edition

© 2017 The New York Times Company · Contact Us · Work With Us · Advertise · Your Ad Choices · Privacy · Terms of Service · Terms of Sale     Site Map · Help · Site Feedback · Subscriptions

Document title: A Rare Libel Suit Against The Times - The New York Times
Capture URL: https://www.nytimes.com/2017/05/10/public-editor/murray-energy-libel-suit.html?rref=collection%2Ftimestopic%2FThe%20New%20York%20Times%20Co...
Capture timestamp (UTC): Fri, 16 Jun 2017 21:00:15 GMT                                    Page 3 of 3

Case 1:17-cv-04853-JSR   Document 70-27   Filed 12/30/19   Page 2 of 58



The New York Times

# Ethical Journalism

A Handbook of Values and Practices for
the News and Editorial Departments

**September 2004**

# Ethical
# Journalism

A Handbook of Values and
Practices for the News
and Editorial Departments

The New York Times

"*Reporters, editors, photographers and all members of the news staff of The New York Times share a common and essential interest in protecting the integrity of the newspaper. As the news, editorial and business leadership of the newspaper declared jointly in 1998: 'Our greatest strength is the authority and reputation of The Times. We must do nothing that would undermine or dilute it and everything possible to enhance it.'*"

Guidelines on Our Integrity, May 1999

SApp-189

| | | |
|---|---|---|
| **1.** | **Introduction and Purpose** | **3** |
| | The Scope of These Guidelines | 3 |
| | Other Standards of Behavior | 5 |
| **2.** | **Our Duty to Our Readers** | **7** |
| **3.** | **Pursuing the News** | **8** |
| | Personal Relations with Sources | 8 |
| | Obeying the Law in Pursuit of the News | 9 |
| | Accepting Hospitality From Sources | 10 |
| | Dealing with the Competition | 11 |
| **4.** | **Protecting the Paper's Neutrality** | **12** |
| | Providing Financial or Other Advice | 13 |
| | Speaking Engagements | 14 |
| | Competitions and Contests | 16 |
| | The Use of Borrowed Equipment | 17 |
| | Collaboration and Testimonials | 18 |
| **5.** | **Participation in Public Life** | **19** |
| | Voting, Campaigns and Public Issues | 19 |
| | Community Service | 21 |
| **6.** | **Advertisers, Marketing, Promotion** | **23** |
| **7.** | **Obligations to The Times** | **24** |
| | Speaking for The Times | 24 |
| **8.** | **Books, Movies, Reprints and Copyright** | **25** |
| **9.** | **Journalistic Work Outside The Times** | **28** |

Table of Contents

ETHICAL JOURNALISM

Table of Contents

**10.   Appearing on Broadcast Media**                    **31**

**11.   Sorting Out Family Ties**                        **33**

Disclosure of Possible Conflicts                33

**12.   Investments and Financial Ties**                 **35**

Affirming Good-Faith Compliance                 36
Business-Financial, Technology and Media News   37
Transitional Arrangements                       38
Annual Filing by Ranking Editors                39

**13.   Rules for Specialized Departments**              **40**

Sports                                          40
Culture, Styles, Dining                         40
Art, Pictures, Technology                       42
Automobiles                                     42
Travel                                          43

**14.   Dealing with Outside Contributors**              **44**

**Appendix A.**                                          **45**

Sample letter declining a gift                  45

**Appendix B.**                                          **46**

Sample letter declining an unsolicited award    46

**Appendix C.**                                          **47**

Letter of understanding with the
Newspaper Guild of New York                     47

**Index**                                                **49**

SApp-191

# 1

## Introduction and Purpose

**1.** The goal of The New York Times is to cover the news as impartially as possible — "without fear or favor," in the words of Adolph Ochs, our patriarch — and to treat readers, news sources, advertisers and others fairly and openly, and to be seen to be doing so. The reputation of The Times rests upon such perceptions, and so do the professional reputations of its staff members. Thus The Times and members of its news department and editorial page staff share an interest in avoiding conflicts of interest or an appearance of a conflict.

**2.** For more than a century, men and women of The Times have jealously guarded the paper's integrity. Whatever else we contribute, our first duty is to make sure the integrity of The Times is not blemished during our stewardship.

**3.** Conflicts of interest, real or apparent, may come up in many areas. They may involve the relationships of staff members with readers, news sources, advocacy groups, advertisers, or competitors; with one another, or with the newspaper or its parent company. And at a time when two-career families are the norm, the civic and professional activities of spouses, family and companions can create conflicts or the appearance of conflicts.

**4.** In keeping with its solemn responsibilities under the First Amendment, The Times strives to maintain the highest standards of journalistic ethics. It is confident that its staff members share that goal. The Times also recognizes that staff members should be free to do creative, civic and personal work and to earn extra income in ways separate from their work at The Times. Before engaging in such outside activities, though, staff members should exercise mature professional judgment and consider the stake we all have in The Times's irreplaceable good name.

### The Scope of These Guidelines

**5.** These guidelines generally apply to all members of the news and editorial departments whose work directly affects the content of the paper, including those on leaves of absence.

SApp-192

**1**

Introduction and Purpose

They include reporters, editors, editorial writers, photographers, picture editors, art directors, artists, designers, graphics editors and researchers. This group of professional journalists is what this text means by "staff" or "staff members."

6. News clerks, administrative assistants, secretaries and other support staff are generally not bound by these strictures, with two important exceptions: First, no newsroom or editorial page employee may exploit for personal gain any nonpublic information acquired at work, or use his or her association with The Times to gain favor or advantage. And second, no one may do anything that damages The Times's reputation for strict neutrality in reporting on politics and government; in particular, no one may wear campaign buttons or display any other form of political partisanship while on the job.

7. Our contracts with freelance contributors require them to avoid conflicts of interest, real or apparent. In keeping with that, they must honor these guidelines in their Times assignments, as set forth in Section 14.

8. The Times believes beyond question that its staff shares the values these guidelines are intended to protect. In the past The Times has resolved differences of view over applying these values amiably through discussion, almost without exception. The paper has every reason to believe that pattern will continue.  Nevertheless, The Times views any deliberate violation of these guidelines as a serious offense that may lead to disciplinary action, potentially including dismissal, subject to the terms of any applicable collective bargaining agreement.

9. Our fundamental purpose is to protect the impartiality and neutrality of The Times and the integrity of its report. In many instances, merely applying that purpose with common sense will point to the ethical course. Sometimes the answer is self-evident. Simply asking oneself whether a course of action might damage the paper's reputation is often enough to gauge whether the action is appropriate.

**4**　　　　　　　　　E T H I C A L   J O U R N A L I S M

**10.** Every staff member is expected to read this document carefully and to think about how it might apply to his or her duties. A lack of familiarity with its provisions cannot excuse a violation; to the contrary, it makes the violation worse. The provisions presented here can offer only broad principles and some examples. Our world changes constantly, sometimes dramatically. No written document could anticipate every possibility. Thus we expect staff members to consult their supervisors and the standards editor or the deputy editorial page editor if they have any doubts about any particular situation or opportunity covered by this document. In most cases an exchange of e-mails should suffice.

**11.** Thus this handbook is not an exhaustive compilation of all situations that may give rise to an actual or perceived conflict of interest. It does not exclude situations or issues giving rise to such conflicts simply because they are not explicitly covered within this document, nor does the document or any of its particular provisions create an implied or express contract of employment with any individual to whom the guidelines apply. The Times reserves the right to modify and expand the guidelines from time to time, as appropriate. (See the letter of understanding with the Newspaper Guild of New York, included as Appendix C below.)

**12.** The authority to interpret and apply these guidelines is vested in department heads and ranking editors, most notably in the standards editor and the deputy editorial page editor. They may delegate that duty to their ranking assistants, but they remain responsible for decisions made in their name.

### Other Standards of Behavior

**13.** In addition to this handbook, we observe the Newsroom Integrity Statement, promulgated in 1999, which deals with such rudimentary professional practices as the importance of checking facts, the exactness of quotations, the integrity of photographs and our distaste for anonymous sourcing; and

**1**

Introduction and Purpose

**1**

Introduction and Purpose

the Policy on Confidential Sources, issued in 2004. These documents are available from the office of the associate managing editor for news administration or on the Newsroom home page under Policies.

14. As employees of the Times Company, we observe the Rules of the Road, which are the axiomatic standards of behavior governing our dealing with colleagues and going about our work. The Rules are available from the office of the associate managing editor for news administration. Together with a statement of supporting principles, the Rules are on the Internet at http://insite.nytco.com/OUR_COMPANY/our_company.html. We also observe the company's policies against harassment and on computers and electronic communications, which appear on the Internet at http://insite.nytco.com/OUR_COMPANY/POLICIES/policies.html.

SApp-195

**2**

## Our Duty to Our Readers

**15.** The Times treats its readers as fairly and openly as possible. In print and online, we tell our readers the complete, unvarnished truth as best we can learn it. It is our policy to correct our errors, large and small, as soon as we become aware of them.

**16.** We treat our readers no less fairly in private than in public. Anyone who deals with readers is expected to honor that principle, knowing that ultimately the readers are our employers. Civility applies whether an exchange takes place in person, by telephone, by letter or online. Simple courtesy suggests that we not alienate our readers by ignoring their letters and e-mails that warrant reply.

**17.** The Times gathers information for the benefit of its readers. Staff members may not use their Times position to make inquiries for any other purpose. As noted in paragraph 6, they may not seek any advantage for themselves or others by acting on or disclosing information acquired in their work but not yet available to readers.

**18.** Staff members who plagiarize or who knowingly or recklessly provide false information for publication betray our fundamental pact with our readers. We will not tolerate such behavior.

**3**

## Pursuing the News

**19.** The Times treats news sources just as fairly and openly as it treats readers. We do not inquire pointlessly into someone's personal life. Staff members may not threaten to damage uncooperative sources. They may not promise favorable coverage in return for cooperation. They may not pay for interviews or unpublished documents.

**20.** Staff members should disclose their identity to people they cover (whether face to face or otherwise), though they need not always announce their status as journalists when seeking information normally available to the public. Staff members may not pose as police officers, lawyers, business people or anyone else when they are working as journalists. (As happens on rare occasions, when seeking to enter countries that bar journalists, correspondents may take cover from vagueness and identify themselves as traveling on business or as tourists.)

**21.** Theater, music and art critics and other writers who review goods or services offered to the public may conceal their Times connection but may not normally assert a false identity or affiliation. As an exception, restaurant critics may make reservations in false names to protect their identity. Restaurant critics and travel writers must conceal their Times affiliation to eliminate the possibility of special treatment.

### Personal Relations with Sources

**22.** Relationships with sources require the utmost in sound judgment and self discipline to prevent the fact or appearance of partiality. Cultivating sources is an essential skill, often practiced most effectively in informal settings outside of normal business hours. Yet staff members, especially those assigned to beats, must be sensitive that personal relationships with news sources can erode into favoritism, in fact or appearance. And conversely staff members must be aware that sources are eager to win our good will for reasons of their own.

**3**

Pursuing the News

**23.** Even though this topic defies hard and fast rules, it is essential that we preserve a professional detachment, free of any whiff of bias. Staff members may see sources informally over a meal or drinks, but they must keep in mind the difference between legitimate business and personal friendship. A City Hall reporter who enjoys a weekly round of golf with a City Council member, for example, risks creating an appearance of coziness, even if they sometimes discuss business on the course. So does a reporter who joins a regular card game or is a familiar face in a corporation's box seats or who spends weekends in the company of people he or she covers. Scrupulous practice requires that periodically we step back and take a hard look at whether we have drifted too close to sources we deal with regularly. The acid test of freedom from favoritism is the ability to maintain good working relationships with all parties to a dispute.

**24.** Clearly, romantic involvement with a news source would foster an appearance of partiality. Therefore staff members who develop close relationships with people who might figure in coverage they provide, edit, package or supervise must disclose those relationships to the standards editor, the associate managing editor for news administration or the deputy editorial page editor. In some cases, no further action may be needed. But in other instances staff members may have to recuse themselves from certain coverage. And in still other cases, assignments may have to be modified or beats changed. In a few instances, a staff member may have to move to a different department — from business and financial news, say, to the culture desk — to avoid the appearance of conflict.

### Obeying the Law in Pursuit of the News

**25.** Staff members must obey the law in the pursuit of news. They may not break into buildings, homes, apartments or offices. They may not purloin data, documents or other property, including such electronic property as databases and e-mail or voice mail messages. They may not tap telephones, invade computer files or otherwise eavesdrop electronically on news sources. In short, they may not commit illegal acts of any sort.

**3**

Pursuing the News

**26.** Staff members may not use the identification cards or special license plates issued by police or other official agencies except in doing their jobs. Staff members who have applied for or hold "NYP" or other special plates should disclose that fact to the associate managing editor for news administration or the deputy editorial page editor. Staff members whose duties do not require special plates must return them.

**27.** Staff members may not record conversations without the prior consent of all parties to the conversations. Even where the law allows recording with only one party aware of it, the practice is a deception. Masthead editors may make rare exceptions to this prohibition in places where recordings made secretly are legal.

### Accepting Hospitality from Sources

**28.** The Times pays the expenses when its representatives entertain news sources (including government officials) or travel to cover them. In some business situations and in some cultures, it may be unavoidable to accept a meal or a drink paid for by a news source. For example, a Times reporter need not decline every invitation to interview an executive over lunch in the corporation's private dining room, where it is all but impossible to pick up the check. Whenever practical, however, the reporter should suggest dining where The Times can pay. A simple buffet of muffins and coffee at a news conference, for example, is harmless, but a staff member should not attend a breakfast or lunch held periodically for the press by a "newsmaker" unless The Times pays for the staff member's meals.

**29.** Staff members may not accept free or discounted transportation and lodging except where special circumstances give us little or no choice. Among them are certain military or scientific expeditions and other trips for which alternative arrangements would be impractical — for example, a flight aboard a corporate jet during which an executive is interviewed. Staff members should consult their supervisors and the

**10**

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page53 of 140

standards editor or the deputy editorial page editor when special circumstances arise.

30. Staff members who review artistic performances or cover athletic or other events where admission is charged (for example, the New York Auto Show) may accept the press passes or tickets customarily made available. No other staff members, not even editors in the culture and sports departments, may accept free tickets. Even when paying the box office price, no staff member may use his or her Times position to request choice or hard-to-get seats unless the performance has a clear bearing on his or her job.

**Dealing with the Competition**

31. Staff members compete zealously but deal with competitors openly and honestly. We do not invent obstacles to hamstring their efforts. When we use facts reported by another publication, we attribute them.

32. Staff members may not join teams covering news events for other organizations, and they may not accept payment from competitors for news tips. They may not be listed on the masthead of any non-Times publication, except for publications serving organizations of the sort described in paragraph 70. Common examples include a church or synagogue newsletter, an alumni magazine or a club bulletin.

# 4

## Protecting the Paper's Neutrality

33. Staff members may not accept gifts, tickets, discounts, reimbursements or other inducements from any individuals or organizations covered by The Times or likely to be covered by The Times. (Exceptions may be made for trinkets of nominal value, say, $25 or less, such as a mug or a cap with a company logo.) Gifts should be returned with a polite explanation. A sample letter for use in such situations appears below as Appendix A.

34. Staff members may not accept employment or compensation of any sort from individuals or organizations who figure or are likely to figure in coverage they provide, edit, package or supervise.

35. Staff members may not accept anything that could be construed as a payment for favorable coverage or as an inducement to alter or forgo unfavorable coverage. They may share in reprint fees that other journalistic media pay The Times, according to the terms of our contract with the Newspaper Guild. They may also share in fees paid by non-journalistic parties for permission to reprint Times material in advertisements or promotions, though their share of those fees may not exceed $200 an article.

36. Staff members may accept any gifts or discounts available to the general public. Normally they are also free to take advantage of conventional corporate discounts that the Times Company has offered to share with all employees (for example, corporate car rental rates). And staff members may accept free admission at museums or other benefits extended to all Times employees by virtue of the Times Company Foundation's support of various cultural institutions.

37. Staff members must be mindful, however, that large discounts — even those negotiated by the Times Company — may create the appearance of partiality, especially by those who have a hand in the coverage of the company or industry offering the discount. If General Motors, for instance, offers substantial trade discounts to all Times Company employees, the Detroit

correspondent should not accept without discussing the possible appearance of favoritism with the responsible editors. If any such discounts do raise doubts, staff members should bring them to the attention of their department heads and the standards editor or the deputy editorial page editor before accepting.

38. Unless the special terms are offered by The New York Times Company or a Times subsidiary or affiliate, staff members may not buy stock in initial public offerings through "friends and family shares" where any plausible possibility exists of a real or apparent conflict of interest. Staff members may not accept allocations from brokerage firms.

### Providing Financial or Other Advice

39. It is an inherent conflict for a Times staff member to perform public relations work, paid or unpaid. Staff members may not advise individuals or organizations how to deal successfully with the news media (though they may of course explain the paper's normal workings and steer outsiders to the appropriate Times person). They may not, for example, advise candidates for public office, write or edit annual reports or contribute to the programs of sports teams. They should not take part in public relations workshops that charge admission or imply privileged access to Times people, or participate in surveys asking their opinion of an organization's press relations or public image. They are free, however, to offer reasonable help to institutions such as their child's school, a small museum, a community charity or their house of worship. (See paragraph 70 for a fuller discussion of permissible participation.)

40. Staff members may not serve as ghost writers or co-authors for individuals who figure or are likely to figure in coverage they provide, edit, package or supervise. They may not undertake such assignments for organizations that espouse a cause.

**4**

Protecting the Paper's Neutrality

**SApp-202**

**4**

*Protecting the Paper's Neutrality*

**41.** Staff members may not engage in financial counseling (except in the articles they write). They may not manage money for others, proffer investment advice, or operate or help operate an investment company of any sort, with or without pay. They may not do anything that would require registration as an investment adviser. They may, however, help family members with ordinary financial planning and serve as executors or administrators of estates of relatives and friends and as court-appointed conservators and guardians.

## Speaking Engagements

**42.** The Times freely acknowledges that outside appearances can enhance the reputation of its bylines and serve the paper's interests. Nevertheless, no staff member may appear before an outside group if the appearance could reasonably create an actual or apparent conflict of interest or undermine public trust in the paper's impartiality. No staff member who takes part in a broadcast, Webcast, public forum or panel discussion may write or edit news articles about that event.

**43.** Staff members should be especially sensitive to the appearance of partiality when they address groups that might figure in coverage they provide, edit, package or supervise, especially if the setting might suggest a close relationship to the sponsoring group. Before accepting such an invitation, a staff member must consult with the standards editor or the deputy editorial page editor. Generally, a reporter recently returned from the Middle East might comfortably address a suburban synagogue or mosque but should not appear before a group that lobbies for Israel or the Arab states. A reporter who writes about the environment could appropriately speak to a garden club but not to conservation groups known for their efforts to influence public policy.

**44.** Staff members may not accept invitations to speak before a single company (for example, the Citigroup executive retreat)

**14**        E T H I C A L   J O U R N A L I S M

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page57 of 140

or an industry assembly (for example, organized baseball's winter meeting) unless The Times decides the appearance is useful and will not damage the newspaper's reputation for impartiality. In that case, The Times will pay expenses; no speaker's fee should be accepted. Staff members invited to make such appearances should consult their supervisors and the standards editor or the deputy editorial page editor.

45.   Staff members should not accept invitations to speak where their function is to attract customers to an event primarily intended as profit-making.

46.   Staff members may accept speaking fees, honorariums, expense reimbursement and free transportation only from educational or other nonprofit groups for which lobbying and political activity are not a major focus. If a speaking fee exceeds $5,000, the staff member must consult the standards editor, the associate managing editor for news administration or the deputy editorial page editor before accepting.

47.   Staff members who accept fees, honorariums or expenses for speaking engagements must file with the associate managing editor for news administration or the deputy editorial page editor by January 31 of each year an accounting of the previous year's appearances. If their fees total less than $5,000, no annual accounting is required. Fees earned under Times auspices for promotional or other approved purposes need not be included.

48.   Staff members who write books and want to promote them must give their supervisor a schedule of proposed appearances. They may accept routine expenses and fees in promotional appearances, but they must make every effort to ensure that their appearances conform to the spirit of these guidelines and do not interfere with their responsibilities to the paper. If they have doubts about an appearance, they must consult their supervisor and the standards editor or the deputy editorial page editor.

**4**

Protecting the Paper's Neutrality

**4**

*Protecting the Paper's Neutrality*

49. Speeches and other outside endeavors by staff members, paid or unpaid, should not imply that they carry the endorsement of The Times (unless they do). To the contrary, the staff member should gracefully remind the audience that the views expressed are his or her own. Outside commitments should not interfere with the speaker's responsibilities at The Times. Thus no staff member should agree to an extensive speaking schedule without approval from a supervisor.

### Competitions and Contests

50. Staff members may not enter competitions sponsored by individuals or groups who have a direct interest in the tenor of Times coverage. They may not act as judges for these competitions or accept their awards. Common examples are contests sponsored by commercial, political or professional associations to judge coverage of their affairs. The standards editor or the deputy editorial page editor may make exceptions for competitions underwritten by corporate sponsors if broad in scope and independently judged, such as the University of Missouri awards for consumer journalism, long sponsored by J.C. Penney.

51. Staff members may compete in competitions sponsored by groups whose members are all journalists or whose members demonstrably have no direct interest in the tenor of coverage of the field being judged. Times staff members may act as judges for such competitions and accept their awards. For example, a staff member may enter a university-sponsored competition for coverage of economic or foreign affairs but not accept an advocacy group's prize for outstanding environmental coverage.

52. This prohibition on taking part in sponsored competitions applies to film festivals or awards in which critics are asked to vote and to such competitions as the Tony Awards, the Heisman Trophy, most valuable player and rookie of the year honors

and admission to sports halls of fame. Cooperation of this sort puts the paper's independence into question.

**4** | Protecting the Paper's Neutrality

53.   A current list of some competitions that The Times has approved is posted on the Newsroom home page under Policies. Staff members who would like to enter others should consult their supervisors and the standards editor or the deputy editorial page editor. A critical factor in approving a competition, whatever its sponsorship, is a record of arm's-length decisions, including a willingness to honor critical reporting.

54.   Staff members who win unsought awards from groups that do not meet the criteria established here should decline politely. A sample reply appears below as Appendix B.

55.   Normally staff members are free to accept honorary degrees, medals and other awards from colleges, universities and other educational institutions. Those who cover higher education or supervise that coverage should be sensitive to any appearance of coziness or favoritism. Those in doubt should consult the standards editor or the deputy editorial page editor.

**The Use of Borrowed Equipment**

56.   Staff members who borrow equipment, vehicles or other goods for evaluation or review must return the borrowed items as soon as possible. Similarly, items borrowed to be photographed, such as fashion apparel or home furnishings, should be returned promptly.

57.   Staff members may keep for their own collections — but may not sell or copy — books, recordings, tapes, compact discs and computer programs sent to them for review. Such submissions are considered press releases. Recorded or digital media, such as tapes or disks, must be destroyed or returned to the provider if not retained by the journalist; they may not be copied, given away or left where they could be carried off for illicit copying or reuse.

**4**      **Collaboration and Testimonials**

58.  Staff members may not collaborate in ventures involving individuals or organizations that figure or are likely to figure in coverage they provide, edit, package or supervise. Among other things, this prohibition applies to collaborating in writing books, pamphlets, reports, scripts, scores or any other material and in making photographs or creating artwork of any sort.

59.  Except in reviews or columns published in The Times or on its Web site or appropriately voiced in authorized public appearances, staff members may not offer endorsements, testimonials or promotional blurbs for books, films, television programs or any other programs, products or ventures. Masthead editors may authorize rare exceptions (for instance, when a staff member has become expert in a field unrelated to his or her Times duties). This restriction does not apply when permission is given to reprint Times material.

**5** | Participation in Public Life

60. Staff members of The Times are family members and responsible citizens as well as journalists. The Times respects their educating their children, exercising their religion, voting in elections and taking active part in community affairs. Nothing in this policy is meant to infringe upon those rights. But even in the best of causes, Times staff members have a duty to avoid the appearance of a conflict. They should never invoke The Times's name in private activities.

61. As noted in paragraph 6, certain of these requirements apply to all newsroom and editorial page employees, journalists and support staff alike. No newsroom or editorial employee may do anything that damages The Times's reputation for strict neutrality in reporting on politics and government. In particular, no one may wear campaign buttons or display any other sign of political partisanship while on the job. Otherwise, "staff members" in this section refers only to the professional journalists defined in paragraph 5.

**Voting, Campaigns and Public Issues**

62. Journalists have no place on the playing fields of politics. Staff members are entitled to vote, but they must do nothing that might raise questions about their professional neutrality or that of The Times. In particular, they may not campaign for, demonstrate for, or endorse candidates, ballot causes or efforts to enact legislation. They may not wear campaign buttons or themselves display any other insignia of partisan politics. They should recognize that a bumper sticker on the family car or a campaign sign on the lawn may be misread as theirs, no matter who in their household actually placed the sticker or the sign.

63. Staff members may not themselves give money to, or raise money for, any political candidate or election cause. Given the ease of Internet access to public records of campaign contributors, any political giving by a Times staff member would carry a great risk of feeding a false impression that the paper is taking sides.

**5**

Participation in Public Life

**64.** No staff member may seek public office anywhere. Seeking or serving in public office plainly violates the professional detachment expected of a journalist. It poses a risk of having the staff member's political views imputed to The Times, and it can sow a suspicion of favoritism in The Times's political coverage when one of its staff is an active participant.

**65.** Staff members may not march or rally in support of public causes or movements, sign ads taking a position on public issues, or lend their name to campaigns, benefit dinners or similar events if doing so might reasonably raise doubts about their ability or The Times's ability to function as neutral observers in covering the news. Staff members must keep in mind that neighbors and other observers commonly see them as representatives of The Times.

**66.** Staff members may appear from time to time on radio and television programs devoted to public affairs, but they should avoid expressing views that go beyond what they would be allowed to say in the paper. Op-Ed columnists and editorial writers enjoy more leeway than others in speaking publicly because their business is expressing opinions. The Times nevertheless expects them to consider carefully the forums in which they appear and to protect the standards and impartiality of the newspaper as a whole.

**67.** Staff members must be sensitive that perfectly proper political activity by their spouses, family or companions may nevertheless create conflicts of interest or the appearance of conflict. When such a possibility arises, the staff member should advise his or her department head and the standards editor or the deputy editorial page editor. Depending on circumstances, the staff member may have to recuse himself or herself from certain coverage or even move to a job unrelated to the activities in question.

**20**                    E T H I C A L   J O U R N A L I S M

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page63 of 140

**5**

*Participation in Public Life*

**68.** A staff member with any doubts about a proposed political activity should consult the standards editor or the deputy editorial page editor. These restrictions protect the heart of our mission as journalists. Though The Times will consider matters case by case, it will be exceedingly cautious before permitting an exception.

## Community Service

**69.** Staff members may not serve on government boards or commissions, paid or unpaid. They may not join boards of trustees, advisory committees or similar groups except those serving journalistic organizations or otherwise promoting journalism education. Those in doubt about such activities should consult their supervisors and the standards editor or the deputy editorial page editor. Depending on circumstances, exceptions may be made to permit staff members to serve their alma mater (or their children's alma mater) as a trustee or visitor at schools that seldom if ever generate news of interest to The Times.

**70.** The Times has no wish to impede good community citizenship. Normally the restriction on joining trustee boards or advisory committees will not apply to organizations that are highly unlikely to generate news of interest to The Times and that do not generally seek to shape public policy. These typically include houses of worship, community charities, local libraries, fine arts groups, hobby groups, youth athletic leagues, country clubs and alumni groups. Within reason staff members may help such groups with relatively modest fundraising. They should not play a leading role or ever lead a donor to expect a favor in return. They should never solicit anyone with whom they or The Times has professional dealings. Those in any doubt about what is permissible should consult the standards editor or the deputy editorial page editor.

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page64 of 140

**5**

Participation in Public Life

71.   Staff members may not solicit funds for political, social, religious, educational, philanthropic or other causes that reach beyond the sorts of groups described in paragraph 70. Doing so could create an expectation of a favor in return. Staff members should think carefully about their own contributions to various causes, bearing in mind the need for neutrality on divisive issues. Those in doubt about contributions should consult their supervisors and the standards editor or the deputy editorial page editor.

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page65 of 140

**6**

72. The Times treats advertisers as fairly and openly as it treats readers and news sources. The relationship between The Times and advertisers rests on the understanding, long observed in all departments, that news and advertising are strictly separate — that those who deal with either one have distinct obligations and interests and neither group will try to influence the other.

73. Members of the news department should maintain their disinterest and objectivity by avoiding discussions of advertising needs, goals and problems except where those needs or problems are directly related to the business of the news department. In many instances, for example, the news and advertising departments may properly confer on the layout and configuration of the paper or the timing of special sections.

74. When authorized by the executive editor, members of the news staff may take part in interdepartmental committees on problems that affect several departments, including news. As far as possible they should leave advertising issues to colleagues from the business side.

75. From time to time, when authorized by the executive editor or the editorial page editor, staff members may take part in events organized by The Times for marketing or promotion. But they should stick to their expertise and refrain from saying anything that sounds like a sales pitch.

76. No one in the news department below the masthead level (except when authorized by the executive editor) may exchange information with the advertising department or with advertisers about the timing or content of advertising, the timing or content of articles or the assignment of staff or freelance writers, editors, artists, designers or photographers.

Advertisers, Marketing, Promotion

**7**

## Obligations to The Times

77. The Times's good name does not belong to any of us. No one has a right to expropriate it for private purposes.

78. Staff members may not use Times identification cards for purposes not connected with Times employment. Cards may not be used to obtain special treatment or advantage from governmental, commercial or other organizations (except when the card is required for a benefit available to all Times Company employees by virtue of its foundation's charitable relationships, such as free admission to the Metropolitan Museum).

79. Staff members may not use Times stationery, business cards, forms or other materials for any purpose except the business of the newspaper.

### Speaking for The Times

80. Staff members must not disclose confidential information about the operations, policies or plans of The Times or its corporate affiliates.

81. Department heads and masthead executives may authorize other staff members to comment publicly on policies or plans within the staff members' areas of responsibility and expertise. If staff members are approached by other media or other outsiders to discuss Times content or policy, they should refer the questioners to a masthead executive or the corporate communications department.

82. Staff members are free to discuss their own activities in public, provided their comments do not create an impression that they lack journalistic impartiality or speak for The Times.

83. None of these restrictions should be interpreted as barring a staff member from responding openly and honestly to any reasonable inquiry from a reader about that staff member's work. If a reader asks for a correction, that request should be passed promptly to a supervisor. If the request threatens legal action or appears to be from a lawyer, the complaint should be promptly referred to the legal department through a department head.

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page67 of 140

**8 | Books, Movies, Reprints and Copyright**

84. Any staff member intending to write or assemble a nonfiction book based on material that derives from his or her assignment or beat must notify The Times in advance, so The Times can decide whether to make a competitive bid to publish the work. In this regard, staff members cannot accept or entertain any sort of preemptory bid from an outside publisher before allowing The Times to consider the project. Staff members are required to inform The Times of any such project or proposal, in writing, by sending a letter or e-mail to their department head, as well as to the standards editor or the deputy editorial page editor. The notification should include any information about the anticipated time frame of the project, including (if applicable) the time frame that an outside publisher has set for bidding on the project.

85. Within a reasonable period, taking into account the time frame for the project, The Times will inform the staff member in writing whether it wants to compete for the project. If it does, The Times will provide the staff member with a competitive bid. In the end, the staff member and his or her agent have no obligation to accept The Times's offer. This process is intended to assure The Times a seat at the table in any negotiations, including auctions, involving books based on materials derived from a Times assignment or beat.

86. These guidelines do not apply to book proposals or projects that involve the reproduction of articles, columns, photographs, artwork or other material created by staff members and published in The Times or on nytimes.com. The Times owns such material outright, and no such material may be reproduced elsewhere without the prior written permission of The Times, nor may it be rewritten, updated or otherwise altered and then republished without The Times's prior written permission. Staff members are often approached by agents, producers, studios or others seeking rights to Times material. Such inquiries must be forwarded immediately to the standards editor or to the deputy editorial page editor and to the legal department. If a staff member represented by the

**SApp-214**

**8**

Books, Movies, Reprints and Copyright

Newspaper Guild has questions about rights to payment for reprints of articles that the staff member has written, he or she should refer to The Times's collective bargaining agreement with the Guild. In general, this agreement calls for a 50/50 split of the fees involved.

87. In contemplating book projects — or other outside endeavors — staff members must never give an impression they might benefit financially from the outcome of news events. Staff members may not negotiate with any outside person or entity for any rights to an article or story idea before the article has run in The Times. Staff members involved in covering a running story may not negotiate over books, articles, films, programs or media projects of any sort based on that coverage until that news has played out, unless they have written permission in advance from the standards editor or the deputy editorial page editor.

88. No staff member may serve as a ghost writer or co-author for individuals who figure or are likely to figure in coverage they provide, edit, package or supervise.

89. No staff member will be given a leave of absence, paid or unpaid, to write a book without the explicit permission of the executive editor or the editorial page editor. Ideally, a staff member who feels he or she will need to leave to complete a book project should inform The Times of the intention to seek a leave at the same time he or she first makes the book project available for consideration by The Times. A decision to grant or deny a request for a book leave — like requests for most other leaves of absence — will be based on many factors, including previous book leaves or accommodations the newspaper has granted to the staff member; the impact the leave will have on departmental staffing needs, and the degree to which The Times believes the book project will accrue to the newspaper's interests. If a staff member represented by the Newspaper Guild has a question about a leave of absence, he or she should refer to The Times's collective bargaining agreement with the Guild.

**8**

Books, Movies, Reprints and Copyright

90.  At no time may a staff member turn over notes, interviews, documents or other working materials to any third party, including agents, producers, studios or outside production agencies, or share those materials with them unless legally compelled to do so. Staff members are advised that in such circumstances, The Times's legal department will provide assistance. (Those represented by the Guild should refer to their collective bargaining agreement for the parameters of that assistance.) As a matter of policy, The Times will not give commercial producers or publishers access to working materials any more than it would turn them over to government prosecutors for use in court.

91.  This paragraph applies only to television and film: Staff members offered "consulting" agreements by agents, producers, studios or others must consult the standards editor or the deputy editorial page editor before accepting. No staff member may serve as a consultant to a film or program that he or she knows in advance is tendentious or clearly distorts the underlying facts. In no case should a consulting role be described in a way that invokes The Times or implies its endorsement or participation.

# 9

## Journalistic Work Outside The Times

92. Staff members are generally entitled to accept freelance assignments that do not directly compete with The Times's own offerings. Normally, work for competitors will not be permitted. When allowed in rare instances, permission will be limited to cases in which The Times is not interested in assigning the staff member a similar piece or project.

93. The Times competes in a far larger arena today than in the past. The printed paper remains our flagship, as does The International Herald Tribune internationally, but we reach an audience of millions through The New York Times on the Web. We are learning to translate our journalism into outstanding television. We publish numerous books, both original and drawn from past articles; we offer archival photos of museum quality. We deliver The New York Times in its complete form via the Web. Our bedrock mission is to serve a high-quality audience that values Times journalism, relying on any appropriate medium.

94. Competitors include any newspaper, magazine or other media of publication, regardless of form, with an editorial focus on either New York City or general-interest news and information. If the competitive status of a publication, Web site or TV production is unclear, a staff member should consult with the standards editor or the deputy editorial page editor.

95. Staff members are encouraged (but not required) to offer their freelance work to The Times or, in the case of a Web site, to The New York Times on the Web before trying to sell it elsewhere. The Times offers a number of outlets for work for which a staff member is paid extra, including the Times Magazine, the Week in Review, the Book Review and special sections. (As paragraph 84 requires of book proposals, any freelance material that derives from a Times assignment or beat must first be offered to The Times before a staff member offers it elsewhere.)

**9**

*Journalistic Work Outside The Times*

96. Staff members must ensure that their freelance work does not interfere with their responsibilities to The Times and that it is consistent with these policies and guidelines. If any doubt exists, they must consult their supervisors and the standards editor or the deputy editorial page editor before accepting outside assignments.

97. Before accepting a freelance assignment, a staff member should make sure that the tone and content of the publication, Web site or program are in keeping with the standards of The Times. In general, a staff member should write nothing elsewhere that could not fit comfortably under his or her byline in The Times or that implies The Times's sponsorship or endorsement. An outside publication, program or Web site may identify staff members by their Times positions but only in a routine way.

98. Because their primary identification is with The Times, staff members who accept freelance assignments should adhere to these guidelines in carrying out those assignments. For example, a staff member on freelance assignment may not accept compensation, expenses, discounts, gifts or other inducements from a news source. Similarly, staff members who establish their own sites on the World Wide Web must insure that their online conduct conforms to these guidelines.

99. Frequency matters. Freelance work might create a conflict of interest if it is pursued with such regularity that it interferes with Times assignments or compromises the integrity or independence of The Times. Freelancing might also create a conflict if it identifies a staff member as closely with another publication or Web site as with The Times. A business reporter who wrote a column in every issue of a trade magazine might soon become more identified with that magazine than with The Times. A critic writing regularly for an arts magazine might foster the impression that The Times was not his or her prime responsibility. The use of a pseudonym does not alter the obligation to comply with this provision.

**9**

Journalistic Work Outside The Times

**100.** A regular contribution to an outside enterprise is permissible if it does not interfere with or flow from Times responsibilities or involve intellectual matter owed to The Times and its readers. Examples of acceptable affiliations might be a foreign desk copy editor who writes a monthly column on stamp-collecting or a mapmaker working as a freelance illustrator. Staff members considering such continuing ventures should confer with their supervisors and with the standards editor or the deputy editorial page editor.

**10**

**Appearing on Broadcast Media**

**101.** Staff members may participate in radio, television or Internet interviews or discussions, paid or unpaid, that deal with articles they have written or subjects that figure in the coverage they provide, edit, package or supervise. Such occasional appearances must not imply that they carry the sponsorship or endorsement of The Times (unless they do). Staff members should be careful about the use of their names and that of the newspaper in materials promoting the appearances. As a courtesy, they should let their department head know about their plans to appear.

**102.** In deciding whether to make a radio, television or Internet appearance, a staff member should consider its probable tone and content to make sure they are consistent with Times standards. Staff members should avoid strident, theatrical forums that emphasize punditry and reckless opinion-mongering. Instead, we should offer thoughtful and retrospective analysis. Generally a staff member should not say anything on radio, television or the Internet that could not appear under his or her byline in The Times.

**103.** New York Times Television draws on the paper's staff in producing programs for broadcast on its partly owned channel, DiscoveryTimes, and on networks and channels owned by outside parties, such as Public Television and the Discovery Channel. Staff members may not appear on broadcasts that compete directly with The Times's own offerings on television or the Internet. They may not accept assignments from the Times's TV clients or potential clients without its approval. As the paper moves further into these new fields, its direct competitors and clients or potential clients will undoubtedly grow in number. A staff member who has any doubt about the status of a particular program should consult the standards editor or the deputy editorial page editor.

**104.** Appearances might create a conflict of interest if they come so regularly that they interfere with Times assignments or compromise the integrity or independence of The Times.

**10**

Appearing on Broadcast Media

They might also create a conflict if they identify a staff member as closely with a radio or television program or a Web site as with The Times. A Washington reporter who appeared weekly on a television program might soon become more known for that program than for work done for The Times. Occasional appearances on the same program would not run that risk.

**105.** Staff members who want to promote their books through broadcast appearances must conform to the requirements set out in paragraph 48.

**32**

# 11

# Sorting Out Family Ties

**106.** In a day when most families balance two careers, the legitimate activities of companions, spouses and other relatives can sometimes create journalistic conflicts of interest or the appearance of conflicts. They can crop up in civic or political life, professional pursuits and financial activity. A spouse or companion who runs for public office would obviously create the appearance of conflict for a political reporter or an editor involved in election coverage. A brother or a daughter in a high-profile job on Wall Street might produce the appearance of conflict for a business reporter or editor.

**107.** To avoid such conflicts, staff members may not write about people to whom they are related by blood or marriage or with whom they have close personal relationships, or edit material about such people or make news judgments about them. For similar reasons, staff members should not recruit or directly supervise family members or close friends. Some exceptions are permissible — in a foreign bureau, for instance, where a married couple form a team, or in the case of an article by a food writer profiling her brother the Yankee star, where the kinship is of genuine news interest.

## Disclosure of Possible Conflicts

**108.** Staff members must be sensitive to these possibilities. Any staff member who sees a potential for conflict or a threat to the paper's reputation in the activities of spouse, friends or relatives must discuss the situation with his or her supervising editor and the standards editor or the deputy editorial page editor.

**109.** In some cases, disclosure is enough. But if The Times considers the problem serious, the staff member may have to withdraw from certain coverage. Sometimes an assignment may have to be modified or a beat changed. In a few instances, a staff member may have to move to a different department — from business and financial news, say, to the culture desk — to avoid the appearance of conflict.

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page76 of 140

**11**

Sorting Out Family Ties

110. Although this policy necessarily imposes restraints, The Times has no wish to intrude upon the private lives of its staff members and their families. Nothing in this document seeks to prohibit a companion, spouse or other relative of a Times staff member from taking part in any political, financial, commercial, religious or civic activity. The Times understands that friends and relatives of its staff have every right to pursue full and active lives, personally and professionally. If restrictions are necessary, they fall on the Times employee. But any attempt to disguise a staff member's participation in prohibited activity by using a relative's name or any other alias (or by acting anonymously) violates this guideline.

111. In all cases The Times depends on staff members to disclose potential problems in a timely fashion so that we can work together to prevent embarrassment for staff members and The Times.

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page77 of 140

**12**

**Investments and Financial Ties**

112. Every member of the Times staff must be constantly vigilant against any appearance that he or she is abusing nonpublic information for financial gain. That imperative applies to all departments.

113. Though staff members must necessarily accept certain limits on their freedom to invest, this policy leaves a broad range of investments open to them. Any staff member, regardless of assignment, is free to own diversified mutual funds, money market funds and other diversified investments that the reporter or editor cannot control. Any member also may own treasury bills, investment-grade municipal bonds, debt securities other than speculative bonds, and securities issued by the New York Times Company. And staff members are of course free to own stocks entirely unrelated to their Times assignment.

114. No staff member may own stock or have any other financial interest in a company, enterprise or industry that figures or is likely to figure in coverage that he or she provides, edits, packages or supervises regularly. A book editor, for example, may not invest in a publishing house, a health writer in a pharmaceutical company or a Pentagon reporter in a mutual fund specializing in defense stocks. For this purpose an industry is defined broadly; for example, a reporter responsible for any segment of media coverage may not own any media stock. "Stock" should be read to include futures, options, rights, and speculative debt, as well as "sector" mutual funds (those focused on one industry).

115. Staff members may not buy or sell securities or make other investments in anticipation of forthcoming articles that originate with The Times. In general, staff members must refrain from acting on such information before noon Eastern time the day of print publication. This restriction does not apply to spot news that first appears on wire services or that originates elsewhere. That information is public.

**12**    **Affirming Good-Faith Compliance**

Investments and Family Ties

**116.** Staff members in any department will be asked when hired to affirm that they have no investments that would violate paragraph 114 with respect to the assignment they are being given. If a new staff member is unable to make this affirmation, the staff member may choose to sell the conflicting holding. (See paragraph 128.) If not, he or she must be given a different assignment where no such conflict exists.

**117.** Staff members should be acutely sensitive that the investments and business interests of their spouse, family and companions may create real or apparent conflicts of interest by raising questions of favoritism. Staff members will be asked when hired to affirm that to the best of their knowledge no spouse, family member or companion has financial holdings that might reasonably raise doubts about the impartiality of the staff member's reporting or editing in his or her proposed assignment. Depending on circumstances, the new staff member may have to recuse himself or herself from certain coverage or accept an alternative assignment unrelated to the holdings in question.

**118.** The associate managing editor for news administration or the deputy editorial page editor may from time to time ask staff members in any department to affirm that they have no investments in violation of paragraph 114. Such a request might be expected, for example, when a staff member is about to begin a new assignment or work on a particularly sensitive article.

**119.** Similarly, staff members may be asked on occasion to affirm that to the best of their knowledge no spouse, family member or companion has financial holdings that might reasonably raise doubts about the impartiality of the staff member's reporting or editing. If and when such conditions come up, the staff member must alert his or her department head and the standards editor. Depending on circumstances,

the staff member may have to recuse himself or herself from certain coverage or even to move to a job unrelated to the holdings.

**12**

Investments and Financial Ties

120. If a reporter who owns stock in a company outside his or her regular beat is assigned to write an article about that company or its industry, the reporter must discuss the investment with the assigning editor before beginning the work. Similarly, editors assigned to major articles or a series about companies or industries in which they have investments must advise their supervisors of potential conflicts before beginning the editing. In many instances it will be perfectly permissible for the work to proceed, but the reporter or editor who works on such an article or series may not buy or sell stock in the company or industry until two weeks after publication.

## Business-Financial, Technology and Media News

121. Staff members in business-financial news regularly work with sensitive information that affects financial prices. Because of that sensitivity, they are subject to additional and stricter requirements. Staff members in technology news and media news are subject to the same rules as those in business-financial news, for the same reason.

122. Members of these three departments may not play the market. That is, they may not conduct in-and-out trading (buying and selling the same security within three months). They may not buy or sell options or futures or sell securities short. Any of these actions could create the appearance that a staff member was speculating by exploiting information not available to the public.

123. In special circumstances — a family financial crisis, for example — the associate managing editor for news administration may waive the three-month holding period.

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page80 of 140

**12**

Investments and Family Ties

**124.** Supervising editors in business-financial, technology or media news should be especially cautious in investing because they may reasonably expect to become involved in the coverage of virtually any company at any time. Their counterparts in other departments should be equally sensitive to possible conflicts in supervising coverage of companies in their domain.

**125.** Because of the sensitivity of their assignments, some business-financial staff members may not own stock in any company (other than the New York Times Company). These include the Market Place writer, other market columnists, the regular writer of the daily stock market column, reporters regularly assigned to mergers and acquisitions, the daily markets editor, the Sunday investing editor, the Sunday Business editor, the business and financial editor and his or her deputies.

**126.** Masthead editors and other editors who play a principal part in deciding the display of business and financial news, including its display on Page 1, may not own stock in any company (other than the New York Times Company).

**127.** The editorial page editor, the deputy editorial page editor and the Op-Ed editor may not own stock in any company (other than the New York Times Company). Nor may editorial writers and Op-Ed columnists regularly assigned to write about business, finance or economics.

**Transitional Arrangements**

**128.** A staff member who owns stock and moves into an assignment where such holdings are not permitted must sell the stock. Those who are newly barred from owning stock of any sort (for example, on being promoted to deputy business and financial editor) may dispose of their shares in phases, following a reasonable plan worked out with the associate managing editor for news administration. But the phase-out does not apply to reporters or editors who own shares in specific industries they are newly assigned to cover. For instance, it is manifestly

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page81 of 140

untenable for a new Automobiles editor to own stock in an auto company, so divestiture must be prompt.

129. Whenever this document requires the sale of stock holdings, a staff member can satisfy the requirement by putting the shares into a blind trust (or into an equivalent financial arrangement that meets the same goal: preventing an individual from knowing at any given time the specific holdings in the account and blocking the individual from controlling the timing of transactions in such holdings). If The Times assigns a staff member to a new job where mandatory divestiture would impose an undue hardship, The Times will reimburse the staff member for the reasonable costs of setting up a blind trust.

### Annual Filing by Ranking Editors

130. To avoid an appearance of conflict, certain editors must annually affirm to the chief financial officer of The Times Company that they have no financial holdings in violation of paragraphs 125-127 or any other provision of these guidelines. They include the executive editor, the managing editor, deputy and assistant managing editors, associate managing editors, the business and financial editor, his or her deputies and the Sunday Business editor. They also include the editorial page editor, the deputy editorial page editor and the Op-Ed editor.

**12**

Investments and Financial Ties

**13**

**Rules for Specialized Departments**

## Sports

**131.** To avoid an appearance of bias, no member of the sports department may gamble on any sports event, except for occasional recreational wagering on horse racing (or dog racing or jai alai). This exception does not apply to staff members who cover such racing or regularly edit that coverage.

**132.** Except as provided in paragraph 30, members of the sports department may not accept tickets, travel expenses, meals, gifts or any other benefit from teams or promoters.

**133.** Sports reporters assigned to cover games may not serve as scorers. Members of the sports department may not take part in voting for the Heisman Trophy, most valuable player and rookie of the year awards, entry into the Baseball Hall of Fame or similar honors.

## Culture, Styles, Dining

**134.** The Times has exceptional influence in such fields as theater, music, art, dance, publishing, fashion and the restaurant industry. We are constantly scrutinized for the slightest whiff of favoritism. Therefore staff members working in those areas have a special duty to guard against conflicts of interest or the appearance of conflict.

**135.** Reporters, reviewers, critics and their editors in the Book Review, the Times Magazine and the cultural news, media news and styles departments, beyond abiding by the other provisions of this document, may not help others develop, market or promote artistic, literary or other creative endeavors.

**136.** They may not suggest agents, publishers, producers or galleries to aspiring authors, playwrights, composers or artists. They may not suggest chefs to restaurant owners or designers to clothing manufacturers. They may not recommend authors, playwrights, composers or other artists to agents, publishers, producers or galleries.

ETHICAL JOURNALISM

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page83 of 140

**137.** They may not offer suggestions or ideas to people who figure or are likely to figure in coverage they provide, edit, package or supervise. They may not invest in productions that figure or are likely to figure in their coverage. (Food writers and editors may not invest in restaurants.) They may not comment, even informally, on works in progress before those works are reviewed.

**138.** They may not serve on advisory boards, awards juries, study committees or other panels organized by the people they cover or whose coverage they supervise. They may not accept awards from such people. And they may not request extra copies of books, tapes or other materials that are routinely submitted for review.

**139.** An arts writer or editor who owns art of exhibition quality (and thus has a financial stake in the reputation of the artist) may inspire questions about the impartiality of his or her critical judgments or editing decisions. Thus members of the culture staff who collect valuable objects in the visual arts (paintings, photographs, sculpture, crafts and the like) must annually submit a list of their acquisitions and sales to the associate managing editor for news administration.

**140.** The Times recognizes that members of its talented staff write books, operas and plays; create sculpture, and give recitals. It further recognizes that such projects require commercial arrangements to come to fruition. A writer requires a publisher, a playwright a production company.

**141.** Nevertheless those commercial ties can be a breeding ground for favoritism, actual or perceived. Staff members who enter into such arrangements must disclose them to their supervisors, who may require them to withdraw from coverage of the parties involved. Staff members who have a publisher or a movie contract, for example, must be exceedingly sensitive to any appearance of bias in covering other publishers or studios. Those with any doubts about a proposed arrangement should consult the standards editor or the deputy editorial page editor.

**13**

Rules for Specialized Departments

**13**

**142.** Certain positions, such as those of the Book Review editor and the culture editor, have such potential for conflicts that those editors may not enter into any commercial arrangements with publishers, studios, or other arts producers without the executive editor's written approval.

### Art, Pictures, Technology

**143.** Beyond honoring all the other provisions of this document, Times photographers, picture editors, art directors, lab personnel and technology editors and reporters may not accept gifts of equipment, programs or materials from manufacturers or vendors. They may not endorse equipment, programs or materials, or offer advice on product design. This guideline is not meant to restrict The Times from working with vendors to improve its systems or equipment.

**144.** With the approval of the picture editor, the design director, the technology editor or the Circuits editor, staff members may test equipment or materials on loan from manufacturers or vendors, provided such tests are properly monitored. The equipment or materials should be returned promptly after testing unless purchased by The Times.

### Automobiles

**145.** It is our policy that no one may test drive or review a vehicle for The Times unless the paper is paying the vehicle's owner the normal market rental or its equivalent. Rare exceptions may occur when an equivalent rent is largely hypothetical, as with military vehicles, vintage autos or race cars.

**146.** Reviewers should carry out their testing expeditiously and return the vehicle promptly. A reasonable amount of personal use is permissible provided that the use contributes to the review.

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page85 of 140

**Travel**                                                                    **13**

147. No writer or editor for the Travel section, whether on assignment or not, may accept free or discounted services of any sort from any element of the travel industry. This includes hotels, resorts, restaurants, tour operators, airlines, railways, cruise lines, rental car companies and tourist attractions. (See also paragraph 33, which applies to all staff members.) This prohibition applies to the free trips commonly awarded in raffles at travel industry events. It does not apply, however, to routinely accumulated frequent-flyer points.

148. Travel editors who deal with non-staff contributors have a special obligation to guard against conflicts of interest or the appearance of conflict. They must bear in mind that it is our policy not to give Travel assignments to freelance writers who have previously accepted free services. Depending on circumstances, the Travel editor may make rare exceptions, for example, for a writer who ceased the practice years ago or who has reimbursed his or her host for services previously accepted. It is also our policy not to give Travel assignments to anyone who represents travel suppliers or who works for a government tourist office or as a publicist of any sort. The Travel editor may make rare exceptions, for example, for a writer widely recognized as an expert in a particular culture.

149. Writers on assignment for Travel must conceal their Times affiliation. The validity of their work depends on their experiencing the same conditions as an ordinary tourist or consumer. If the Times affiliation becomes known, the writer must discuss with an editor whether the reporting to that point can be salvaged. On rare occasions, the affiliation may be disclosed, for example, when a special permit is required to enter a closed area.

150. No Travel writer may write about any travel service or product offered by a family member or close friend. (See paragraph 107.)

151. These rules also apply to writers and editors for Weekend, Escapes, Sophisticated Traveler and the like.

Rules for Specialized Departments

# 14

**Dealing with Outside Contributors**

152. Times readers apply exacting standards to the entire paper. They do not distinguish between staff written articles and those written by outsiders. Thus as far as possible, freelance contributors to The Times, while not its employees, will be held to the same standards as staff members when they are on Times assignments, including those for the Times Magazine. If they violate these guidelines, they will be denied further assignments.

153. Before being given an assignment, freelance contributors must sign a contract with The Times. These contracts oblige them to take care to avoid conflicts of interests or the appearance of conflict. Specifically, in connection with work for The Times, freelancers will not accept free transportation, free lodging, gifts, junkets, commissions or assignments from current or potential news sources. In addition, they will publish no similar article in a competing publication (see paragraph 94) within 14 days unless The Times approves.

154. The contracts' concise provisions cannot cover every circumstance that might arise. Assigning editors should ensure that contributors are aware of this document and to the greatest extent possible, in fact honor its provisions while on assignment for The Times. Any disagreement over whether a specific provision applies to outside contributors should be resolved before the assignment proceeds.

155. Assigning editors in business and financial news who deal with non-staff contributors have a special duty to guard against conflicts of interest or the appearance of conflict. To the extent possible, assigning editors should ensure that outside contributors meet the strict standards outlined in Section 12 above for the business and financial news staff.

Case 22-558, Document 84-3, 12/07/2022, 3432481, Page87 of 140

SApp-233

**Sample letter declining a gift**

Dear XXXXXXXXX,

Your recent gift came as a pleasant surprise. I appreciate your thinking of me.

But the gift puts me in an awkward position. The New York Times bars its reporters and editors from accepting anything of value from the people or groups they cover. The paper does not want to risk the perception that it will cover a subject more thoroughly or skew its coverage of controversial subjects because interested parties have expressed appreciation for its efforts.

So I must return your gift with thanks. I hope you understand our position, and I thank you for your thoughtfulness.

Sincerely,

Appendix A

SApp-234

# Appendix B

**Sample letter declining an unsolicited award**

Dear XXXXXXXXX,

Your recent letter informing me that I'd been selected to receive an award from XXXXXXXX came as a pleasant surprise. I appreciate the sentiment behind the award.

But your decision puts me in an awkward position. The New York Times bars its reporters and editors from accepting awards conferred by groups that have an interest in the subjects covered by the award recipients. The paper does not want to risk the perception that it will cover a subject more thoroughly or skew its coverage of controversial subjects because interested parties have applauded its efforts.

So I must decline your award with thanks. I hope you and your colleagues understand our position.

Thank you again for your kind words.

Sincerely,

## Letter of understanding with the Newspaper Guild of New York

**The New York Times**
229 WEST 43rd STREET
NEW YORK, N.Y. 10036

JAY I. SABIN, ESQ.
Vice President
Labor Relations

Tel: 212 556-7093
Fax: 212 556-5904
E-mail: jis@nytimes.com

July 28, 2004

Mr. Barry F. Lipton
President
Newspaper Guild of New York
1501 Broadway, Suite 708
New York, New York 10036

Re:   Ethical Journalism

Dear Barry:

This will confirm our understanding reached during recent negotiations concerning the newsroom conflict of interest policy entitled "Ethical Journalism."

We have agreed that Guild-related activities and Guild-sponsored member benefits and discounts shall be excluded from the limitations on employee conduct contained in Paragraphs 33 (Guild benefits/discounts); 34 (Guild employment/compensation); 39 (Guild public relations); 42 (appearances at Guild meetings); 62 (Guild campaign buttons); 69 (Guild trustees); and wherever else they may be referenced in the policy. In addition, with respect to the monetary caps referenced in Paragraphs 35, 46 and 47, The Times agrees to discuss with the Guild, from time to time, whether such figures should be revised.

We have also agreed to discuss with the Guild any growth in the number of New York Times' competitors, clients or potential clients insofar as such growth relates to the application of Paragraph 103. In addition, we have agreed to discuss appropriate fee schedules for Guild covered employees who appear on television, radio or other media at the request of The Times.

Very truly yours,

Jay Sabin

Agreed To and Accepted By:

Barry Lipton, President
Newspaper Guild of New York

JIs:ljm:\b1-ethicalguidesidelttr2

E T H I C A L   J O U R N A L I S M          **47**

SApp-236

ETHICAL JOURNALISM

**References are provided as paragraph numbers**

## Index

activities
  political. see political activities
  private. see private activities
  prohibited, 25
  recreational, news sources and, 23
admission, to museums, 36
advertisers, relationship with, 72
advertising department, and news department
  interactions, 73, 76
advice, providing, 39, 41
advisory committees, serving on
  when allowed, 70
  when prohibited, 69
affiliation
  concealing
    by critics and reviewers, 21
    by travel writers, 149
  normally disclosed, 20
  with outside publishers, acceptable examples of, 100
anonymity
  of critics and reviewers, 21
  of news sources, 13
  of staff member, in conflict situations, 110
  of travel writers, 21, 149
art critics
  anonymity of, 21
  rules governing behavior of, 143, 144
art directors, rules governing behavior of, 143, 144
artistic performances, free tickets for, guidelines
  for accepting, 30
assigning editors, freelance contributors and, 154, 155
athletic events, free tickets for, guidelines for
  accepting, 30, 132
attribution, 31
authors, staff as, 48, 105
  co-authorship and, 40, 88
  promotional tours and, 48
automobile review, 145-146
awards
  from educational institutions, 55
  unsolicited, 54
  sample letter declining, Appendix B
  voting for, 52, 133
ballot causes, endorsing, 62
Baseball Hall of Fame, 133
behavior
  special rules governing
    art, pictures, technology departments, 143-144
    automobile testing, 145-146
    culture, styles, dining departments, 134-142
    sports department, 131-133
    travel department, 147-151
  standards of
    covered by guidelines, 512
  Newsroom Integrity Statement (1999), 13

Rules of the Road, 14
benefit dinners, lending name to, 65
benefits
  financial, from news coverage, 87
  New York Times Foundation and, 36, 78
bias. see impartiality
blind trust, mandatory divestiture and, 129
boards of trustees, serving on
  when allowed, 70
  when prohibited, 69
Book Review, 95
Book Review editor, 142
Book Review staff, rules governing behavior of, 134-142
books
  blurbs, 59
  for review, 57
  staff-authored
    competitive bidding guidelines, 84-85
    financial benefit and, 87
    leave of absence and, 89
    promotion of, 48, 105
    Times publication of, 93
borrowed equipment
  keeping, 57
  return of, 56, 144
  vehicles, 145, 146
brokerage firms, 38
business and financial news
  editor of
    annual good-faith affirmation by, 130
    investment restrictions on, 121-127
  freelance contributors and, 155
  investment restrictions on staff members in, 121, 127
business cards, use of, 79
business stationery, use of, 79
campaign buttons, 6, 61, 62
campaigning, political, 6
campaigns, lending name to, 65
car reviewers, 145-146
charitable events, lending name to, 65
Circuits editor, 144
civility, treating readers with, 16
co-authorship, 40, 88
collaboration, when prohibited, 58
colleges. see educational institutions
comments, public, by staff members, 81, 82
commercial ventures, by staff members, 140, 141
commissions, serving on, 69
communication
  electronic. see electronic communications
  with readers, 16
community groups, serving with, 70

Index

community service, participation in, 69-71

compact discs, for review, 57

companions. see also family members
    investment and business activities of, 117, 119
    political activity of, 67

compensation, prohibited, 34
    speaker's fee, 44

competitions, entering
    approved list of, 53
    when allowed, 51
    when prohibited, 50

competitive bidding, on staff-authored
    non-fiction books, 84-85

competitors
    arena and scope of, 93, 94
    broadcast media, 103
    treatment of, 31
    working with, 31

computer programs, for review, 57

computers
    illegal activities relating to, 25
    policies concerning, 14

confidential information, 80

conflict
    appearance of, avoiding, 23
    family members' activities and
        disclosing, 108-111
    examples and exceptions, 106, 107
    freelance contributors and, 148, 155
    possible areas of, 3
    regular broadcast media appearances as, 104
    travel writers and editors and, 148

consent, to record conversations, obtaining, 27

conservators, serving as, 41

consultation, internal
    on appearing on broadcast media, 103
    on appropriateness of freelance assignment, 94, 100
    for clarification of policy provisions, 10
    to clarify movie and television consulting roles, 91
    on potential conflict with family members'
        activities, 111

"consulting" agreements, movie and television, 91

content. see tone and content

contests, entering. see competitions, entering contracts
    with freelance contributors, 7, 153, 154

contributors, freelance. see freelance contributors

conversations, recording, 27

copyright items, 86

corporate discounts, 36-37

corrections, 15

reader's request for, 83

court-appointed conservators, serving as, 41

courtesy
    informing departmental heads about plans, 101
    to readers, 16

coverage
    ensuring neutrality of, 33-38

advice and, 39-41
    borrowed equipment and, 56, 57, 144
    collaboration and testimonials and, 58, 59
    competitions and contests and, 50-55
    speaking engagements and, 42-49
    Times ownership of, 86
    withdrawal from, 67, 109

critics. see reviewers
    participation in contests, 52
    rules governing behavior of, 134-142

culture editor, 142

culture editors and writers, rules governing
    behavior of, 134-142

de minimis gifts, 33

debt securities, 113

demonstration, political, 62

department heads
    consultation with, 10
    responsibility of, 12

design director, 144

detachment, professional. see impartiality

Dining editors and writers, rules governing
    behavior of, 134-142

disciplinary action, scope of, 8

disclosure
    of family members' activities, 108-111
    of fees accepted, 47
    financial, good-faith compliance with, 116, 120
    inappropriate, 6, 17
    of staff member's identity, 20

discounts
    acceptable, 36
    caution in accepting certain, 37
    travel writers and editors and, 147

Discovery Channel, 103

divestiture, of financial holdings, acceptable
    arrangements for, 128, 129

documents, transfer to third party, 90

donations
    to community groups, 71
    political, 63

editorial page editors
    annual good-faith affirmation by, 130
    investment restrictions on, 127

editorial writers
    investment restrictions on, 127
    participation on radio and television programs, 66

editors
    ad-hoc assignments posing conflicts, 120
    of business and financial news
        annual good-faith affirmation by, 130
        stock ownership limitations on, 121-127

    in cultural and arts departments, rules governing
        behavior of, 134-142

educational institutions
    accepting awards from, 55
    serving as trustee of, 69

elections, voting in, 62

electronic communication
   for consultation, 10
   illegal activities relating to, 25
   policies on, 14
   from readers, 16

e-mail. see electronic communications

employment, prohibited, 34, 39

endorsement
   implied, avoiding, 97
   personal versus corporate, 49, 59
   political, 62

equipment, borrowed
   keeping, 57
   return of, 56, 144
   vehicles, 145, 146

errors, correction of, 15
   reader's request for, 83

Escapes editors and writers, rules governing
   behavior of, 147-151

estate administrators, serving as, 41

ethics guidelines
   interpretation and application of, 12
   modification and expansion of, 11
   and other standards of behavior, 13, 14
   private activities and, 60, 110
   purpose of, 14
   scope of, 5-12
   staff members and, 10

evaluation items
   keeping, 56
   return of, 56, 144
   vehicles, 145, 146

executive editor, authorization by, 74-76, 89, 142

executors, serving as, 41

expenses, for speaking engagement
   disclosing, 47
   when acceptable, 46
   when prohibited, 44

expropriation, of Times name, 77

fact checking, 13

false identity
   foreign travel and, 20
   generally prohibited, 20
   restaurant critics and, 21

false information, 18

family members
   activities of
   investment and business, 117, 119
   political, 67
   potential for conflict, 106, 107
   Times's respect for, 110
   providing financial advice to, 41
   travel services or products offered by, 150

fashion editors and writers, rules governing
   behavior of, 134-142

favoritism
   freedom from. see impartiality
   perceptions of, 37, 134, 141

film festivals, 52

financial advice, providing, 41

financial disclosure, good-faith compliance with, 116-120

financial news. see business and financial news

food critics. see restaurant critics

foreign travel, protecting identity during, 20

free admission, to museums, 36

free tickets, accepting, guidelines for, 30

freelance assignments, by staff members
   for competitors, 93
   competitors versus non competitors, 92-94
   frequency, 99
   interference with normal workload, 96, 100
   offering first to Times, 95
   regular contribution, 100
   tone and content, 97
   Web presence, 98

freelance contributors
   conflict of interest and, 148, 155
   contract with, 7, 153, 154
   disagreements with, 154
   standards applied to, 152
   travel editors and, 148

frequency
   of broadcast media appearances, 104
   of freelance assignments, 99

friend, travel services or products offered by, 150

"friends and family shares," 38

fundraising
   for community groups, 70
   for political causes, 63, 71

gambling, 131

ghost writing, 40, 88

gifts, acceptance of
   when allowed, 36
   when prohibited, 33
   sample letter declining, Appendix A

good-faith compliance, with financial disclosure
   on hiring, 116
   of investments and business activities of family
     members, 117
   on ongoing basis, 117, 118

government boards, serving on, 69

guardians, serving as, 41

harassment, policies against, 14

Heisman Trophy, 52, 133

help to organizations, prohibited and acceptable, 39

hiring, investment disclosure at, 116

honorariums
   disclosing, 47
   when acceptable, 46
   when prohibited, 44

honorary degrees, acceptance of, 55

identification cards, Times, 26, 78

identity
   concealing by travel writers, 21, 149
   disclosing by staff member, 20

Index

illegal acts, examples of, 25

impartiality, 82. see also neutrality
   commercial ties and, 141
   news sources and, 22
   test of, 23

impersonation, 20

in-and-out trading, 122

information
   confidential, 80
   disclosing inappropriately, 6
   false, 18
   gathering of, 17
   nonpublic
      acting on, time constraints for, 115
      exploiting for personal gain, 6
      financial gain from, 112

initial public offerings, of stock, 38

inquiries, from readers, responding to, 16

interdepartmental committees, 74

Internet interviews
   participation in, 101
   tone and content of, 102

interviews
   Internet, 101
   transfer to third party, 90

investment companies, 41

investments
   disclosure on hiring, 116
   divesting
      arrangements for, 128-129
   insider information and
      acting on, time constraints for, 115
      financial gain from, 112
   limits imposed on, 114, 115, 120, 122
   permissible holdings, 113
   providing advice on, 41

judging competitions
   when allowed, 51
   when prohibited, 50, 52

lab personnel, rules governing behavior of, 143, 144

law, observing, 25-27

leaves of absence, 5, 89

legal action
   reader-initiated, 83
   to relinquish working materials, 90

legislation, endorsing, 62

letters, from readers, 16

letters (sample)
   declining gifts, Appendix A
   declining unsolicited awards, Appendix B

license plates, special, 26

lobbying groups, speaking to, 43

lodging
   accepting, guidelines for, 29
   travel writers and editors and, 147

marching, for public causes, 65

market columnists and writers, stock ownership
   limitations on, 125

Market Place writer, stock ownership limitations on, 125

marketing, Times-sponsored, 75

masthead, competitive, listing on, prohibitions and
   exceptions, 32

masthead editors, 59
   annual good-faith affirmation by, 130
   stock ownership limitations on, 126

meals
   accepting, guidelines for, 28
   news sources and, 23

medals, acceptance of, 55

money management, 41

money market funds, 113

most valuable player awards, 133

movies
   "consulting" agreements and, 91
   film festivals, staff participation at, 52

municipal bonds, 113

museums, free admission to, 36

music critics, anonymity of, 21

mutual funds, 113
   "sector", 114

name
   lending to public causes, 65
   Times, expropriating, 77

neutrality, protecting and maintaining, 6, 9, 33-38
   borrowed equipment, 56, 57, 144
   collaboration and testimonials, 58, 59
   competitions and contests, 50-55
   financial and other advice, 39-41
   speaking engagements, 42-49

New York Times Company, owning securities of,
   113, 125, 127

New York Times Foundation, and benefits, 36, 78

New York Times Television, 93, 103

news department, and advertising department
   interaction, 73, 76

news events, financial benefit from, 87

news sources
   anonymous, 13
   cultivating, 22
   hospitality from, accepting, 28-30
   legal obligations toward, 25-27
   personal relations with, 22-24
   professional detachment from, 23
   protecting personal details of, 19
   romantic involvement with, 24
   treating fairly, 18

Newspaper Guild
   leaves of absence and, 89
   relinquishment of working papers and, 90
   reprint fees and, 35, 86

newsroom employees, strictures governing all, 6, 61

Newsroom Integrity Statement (1999), 13

nonpublic information
   acting on, time constraints for, 115
   exploiting for personal gain, 6
   financial gain from, 112

**52**　　　　　　　　E T H I C A L　J O U R N A L I S M

notes, transfer to third party, 90
Ochs, Adolph, 1
online presence
    by staff, 98
    by Times, 86, 93-95
Op-Ed columnists
    investment restrictions on, 127
    participation in radio and television, 66
Op-Ed editors
    annual good-faith affirmation by, 130
    investment restrictions on, 127
opinion-mongering, avoiding, 102
outside contributors, see freelance contributors
outside publisher
    acceptable affiliations with, examples of, 100
    staff-authored non-fiction books and, 84
ownership, of published material, 86
partiality, see impartiality
partisanship, political, 6, 61, 62
photographers, rules on behavior of, 143, 144
photographs
    integrity of, 13
    from Times, 93
picture editor, 144
plagiarism, 18
political activities, 62
    participation in, 62-68
    case by case review, 68
political partisanship, 6, 61, 62
press passes, 30
press releases, submissions considered as, 57
private activities
    ethical guidelines and, 60
    family members and, 110
    public discussion of, 82
professional detachment, see impartiality
profit-making events, speaking at, 44
promotional appearances
    of self-authored works, 48, 105
    Times-sponsored, 47, 75
pseudonym, use of, 99
public affairs programs, appearance on, 66
public comments, by staff members, 81
public life, participation in, 60, 61
    community service, 69-71
political activities, 62-68
public office, seeking or serving, 64
public relations works, 39
Public Television, 103
punditry, avoiding, 102
quotations, exactness of, 13
radio programs
    participation in, 66, 101
    tone and content of, 102

rallying, for public causes, 65
ranking editors
    annual good-faith affirmation by, 130
    consultation with, 10
    responsibility of, 12
readers
    communication with, 16
    duty to, 15-18
    legal action threatened by, 83
    responding to reasonable inquiries from, 16, 83
reassignment of duties, situations demanding
    conflicting investments, 116
    family conflict, 109
    investment and business activities of family
        members, 117
    political activities of family members, 67
    romantic involvement, 24
recording conversations, 27
recreational activities, news sources and, 23
recruitment, of family members, 107
recusal, situations demanding
    investments and business activities of
        family members, 117, 119
    political activities of family members, 67
    romantic involvement, 24
reimbursement, for establishing blind trust, 129
reprint fees, 35
    split formula for, 86
    upper limit on certain, 35
resolution, of differences, 8
responsibility
    of department heads and ranking editors, 12
    of staff member, freelance work interfering with,
        96, 100
restaurant critics
    anonymity of, 21
    rules governing behavior of, 134-142
review items
    keeping, 57
    return or destruction of, 56, 57, 144
    vehicles, 145, 146
reviewers
    anonymity of, 21
    free tickets for, guidelines for accepting, 30
    rules governing behavior of, 134-142
romantic involvements, with news source, 24
rookie of the year award, 133
Rules of the Road, 14
schools, see educational institutions
"sector" mutual funds, 114
signatory, to public statements, 65
solicitation of funds, see fundraising
Sophisticated Traveler editors and writers, rules
    governing behavior of, 147-151
sources, of news, see news sources
speaker's fee
    disclosing, 47
    upper limit on, 46

Index

Index

when acceptable, 46
when prohibited, 44
speaking engagements
approval for, 49
compensation for. see speaker's fee
prohibited settings, 44, 45
to promote books, 48
protecting neutrality and, 42-49
special license plates, 26
sponsorship
of competitions, 50
implied, avoiding, 97
sports department, rules governing, 131-133
sports events, free tickets for, guidelines for
accepting, 30, 132
spouse. see also family members
investment and business activities of, 117, 119
political activity of, 67
staff members. see also specific editors and writers
by department
application of policy by, 10
as authors. see authors, staff as
in business-financial, technology, media news,
stock ownership restrictions, 121-127
creative talents of, commercial ties and, 140, 141
defined, 5
free tickets for, guidelines for accepting, 30
freelance assignments by, 95-100
identity disclosure by, 20
on interdepartmental committees, 74
legal obligations of, 25-27
normally not included as (clerks, secretaries,
assistants), 6
public comments by, 81
in sports department, rules governing, 131-133
at Times-sponsored marketing and
promotional events, 75
standards of behavior
covered by code, 5-12
Newsroom Integrity Statement (1999), 13
Policy on Confidential Sources (2004), 13
Rules of the Road, 14
stock
buying in initial public offerings, 38
buying or selling, time constraints on, 115, 120, 122
owning, 113-114
selling to avoid conflict, 116
arrangements for, 128-129
styles editors and writers, rules governing
behavior of, 134-142
Sunday business editor
annual good-faith affirmation by, 130
investment restrictions on, 125
supervision, of family members, 107
tapes, for review, 57
technology and media news, investment restrictions
on staff members in, 121-127
technology editor, 144
telephone taps, 25
television programs

appearance on, 66, 101
"consulting" agreements and, 91
Times entry into. see New York Times Television
tone and content of, 102
test drive, 145, 146
testimonial, personal versus corporate, 59
tickets, free, guidelines for accepting, 30, 132
Times
bidding competitively on staff-authored
non-fiction books, 84, 85
content and policy of, commenting on, 80, 81
first refusal for freelance work, 95
identification cards issued by, 26, 78
marketing and promotional events sponsored
by, 47, 75
relinquishing working materials, policy on, 90
staff obligations to, 77-83
Times Magazine, 95
staff of, rules governing behavior of, 134-142
tone and content
of freelance assignments, 97
of radio, television programs and Internet
interviews, 102
Tony Awards, 52
transportation, accepting, guidelines for, 29, 44
travel, overseas, protecting identity during, 20
travel editors, rules governing behavior of, 147-151
travel writers
anonymity of, 21, 149
rules governing behavior of, 147-151
treasury bills, 113
trustees, 69, 70
University of Missouri awards for consumer
journalism, 51
unsolicited awards, 54
sample letter declining, Appendix B
values, resolving differences over, 8
vehicle review, 145, 146
views, personal, 49
violations
action taken against, 8
ignorance of policy provisions and, 10
voice-mail messages. see electronic communication
voting
for awards, 52, 133
in political elections, 62
Web site. see also Internet interviews
staff-owned, 98
Times, 86, 93-95
Week in Review, 95
Weekend editors and writers, rules governing
behavior of, 147-151
working materials, transfer to third party, 90
workload, interference with
broadcast media appearances, 104
freelance assignments, 96, 100



## Standards and Ethics

core purpose    professional guideline documents    Guild-represented Employees

**LEADERSHIP**
EXECUTIVES
BOARD OF DIRECTORS

**CULTURE**
OUR HISTORY
STANDARDS AND
ETHICS
DIVERSITY
PULITZER PRIZES

**SOCIAL
RESPONSIBILITY**
ENVIRONMENTAL
STEWARDSHIP
EDUCATIONAL
INITIATIVES
SCHOLARSHIP PROGRAM
THE NEEDIEST CASES
FUND

**EARLY STAGE
INVESTMENTS**

The core purpose of The New York Times is to enhance society by creating, collecting and distributing high-quality news and information. Producing content of the highest quality and integrity is the basis for our reputation and the means by which we fulfill the public trust and our customers' expectations.

**Fairness**
The goal of The New York Times is to cover the news as impartially as possible — "without fear or favor," in the words of Adolph Ochs, our patriarch — and to treat readers, news sources, advertisers and others fairly and openly, and to be seen to be doing so. The reputation of The Times rests upon such perceptions, and so do the professional reputations of its staff members. Thus The Times and members of its news department and editorial page staff share an interest in avoiding conflicts of interest or an appearance of a conflict.

**Integrity**
For more than a century, men and women of The Times have jealously guarded the paper's integrity. Whatever else we contribute, our first duty is to make sure the integrity of The Times is not blemished during our stewardship.   At a time of growing and even justified public suspicion about the impartiality, accuracy and integrity of some journalists and some journalism, it is imperative that The Times and its staff maintain the highest possible standards to insure that we do nothing that might erode readers' faith and confidence in our news columns.  This means that the journalism we practice daily must be beyond reproach.

Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small. The paper regrets every error, but it applauds the integrity of a writer who volunteers a correction of his or her own published story. We observe the Newsroom Integrity Statement, promulgated in 1999, which deals with such rudimentary professional practices as the importance of checking facts, the exactness of quotations, the integrity of photographs and our distaste for anonymous sourcing.

**Truth**
As journalists we treat our readers, viewers, listeners and online users as fairly and openly as possible. Whatever the medium, we tell our audiences the complete, unvarnished truth as best we can learn it. We correct our errors explicitly as soon as we become aware of them. We do not wait for someone to request a correction. We publish corrections in a prominent and consistent location or broadcast time slot. Staff members who plagiarize or who knowingly or recklessly provide false information for publication betray our fundamental pact with our readers. We do not tolerate such behavior.

## Professional Guideline Documents

**Guidelines on Integrity** 🔗   **In a climate of increased scrutiny throughout the news business, these further guidelines are offered to resolve questions that sometimes arise about specific practice.**

**Ethical Journalism Guidebook** 🔗   **A Handbook of Values and Practices for the News and Editorial Departments**

**Editorial Standards for NYTLive** 🔗

**Standards of Advertising Acceptability** 🔗   **The success of advertising depends upon its credibility. No matter how technically brilliant or compelling an advertisement may be, unless readers believe it, it fails in its purpose.**

**Assuring our Credibility** 🔗   **Siegal Committe Report** 🔗🔗 **Preserving Our Readers'
Trust**        **Bill Keller responds to the Credibility Committee's report with a variety of measures**
**(2005)**

## Guild-represented employees

The Journalism Ethics Policy posted on this site applies to all journalists at The New York Times Company and to certain other executives, as defined in Paragraph [?], and to certain contributors

WHO WE ARE    WHAT WE DO    PRESS    CAREERS    INVESTORS    CONNECT

**LEADERSHIP**
EXECUTIVES
BOARD OF DIRECTORS

**CULTURE**
OUR HISTORY
STANDARDS AND
ETHICS
DIVERSITY
PULITZER PRIZES

**SOCIAL
RESPONSIBILITY**
ENVIRONMENTAL
STEWARDSHIP
EDUCATIONAL
INITIATIVES
SCHOLARSHIP PROGRAM
THE NEEDIEST CASES
FUND

**EARLY STAGE
INVESTMENTS**

favor, in the words of Adolph Ochs, our patriarch — and to treat readers, news sources, advertisers and others fairly and openly, and to be seen to be doing so. The reputation of The Times rests upon such perceptions, and so the professional reputations of its staff members. Thus The Times and members of its news department and editorial page staff share an interest in avoiding conflicts of interest or an appearance of a conflict.

**Integrity**

For more than a century, men and women of The Times have jealously guarded the paper's integrity. Whatever else we contribute, our first duty is to make sure the integrity of The Times is not blemished during our stewardship.  At a time of growing and even justified public suspicion about the impartiality, accuracy and integrity of some journalists and some journalism, it is imperative that The Times and its staff maintain the highest possible standards to insure that we do nothing that might erode readers' faith and confidence in our news columns. This means that the journalism we practice daily must be beyond reproach.

Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small. The paper regrets every error, but it applauds the integrity of a writer who volunteers a correction of his or her own published story. We observe the Newsroom Integrity Statement, promulgated in 1999, which deals with such rudimentary professional practices as the importance of checking facts, the exactness of quotations, the integrity of photographs and our distaste for anonymous sourcing.

**Truth**

As journalists we treat our readers, viewers, listeners and online users as fairly and openly as possible. Whatever the medium, we tell our audiences the complete, unvarnished truth as best we can learn it. We correct our errors explicitly as soon as we become aware of them. We do not wait for someone to request a correction. We publish corrections in a prominent and consistent location or broadcast time slot. Staff members who plagiarize or who knowingly or recklessly provide false information for publication betray our fundamental pact with our readers. We do not tolerate such behavior.

## Professional Guideline Documents

**Guidelines on Integrity** ✅   In a climate of increased scrutiny throughout the news business, these further guidelines are offered to resolve questions that sometimes arise about specific practice.

**Ethical Journalism Guidebook** ✅   A Handbook of Values and Practices for the News and Editorial Departments

**Editorial Standards for NYTLive** ✅

**Standards of Advertising Acceptability** ✅   The success of advertising depends upon its credibility. No matter how technically brilliant or compelling an advertisement may be, unless readers believe in it, it fails in its purpose.

**Assuring our Credibility** ✅   **Siegal Committe Report** ✅✅   **Preserving Our Readers' Trust**   Bill Keller responds to the Credibility Committee's report with a variety of measures (2005)

## Guild-represented employees

The Journalism Ethics Policy posted on this site applies to all journalists at The New York Times Company, and to certain other executives, as defined in Paragraph 88, and to nonstaff contributors in connection with their Times Company work. The policy is a minimum standard: individual units of the company may adopt separate policies, in which case the more stringent provision covering any given practice will apply.

For Guild-represented employees, enforcement of this policy is subjec to applicable collective bargaining agreements and local law.

At The New York Times newspaper, the Ethical Journalism handbook dated January 2004, which was the model for the company-wide policy, governs journalists' conduct. The two documents are highly similar, except for the more detailed company-wide provisions that concern blogging and online behavior.

© 2017 THE NEW YORK TIMES COMPANY   TERMS OF USE | CONTACT US

**CHAPTER 4**
**Clear Thinking,**
**Clear Writing**

INTRO | 1 | 2 | 3

4.1: Writing the Lead

4.2: Backing Up the Lead

4.3: Writing Features

4.4: Digging Up the Facts

4.5: Best Reporting

4.6: Interviewing Techniques

4.7: Writing Sports Articles

4.8: Writing Opinion Pieces

4.9: Journalism Ethics

4.10: Balancing Freedom and Responsibility

4.11: The Society of Professional Journalists' Code of Ethics

CHAPTERS | 5 | 6 | 7 | LINKS

CAMPUS WEBLINES

## 4.11: The Society of Professional Journalists' Code of Ethics

**Preamble**

Members of the Society of Professional Journalists believe that public enlightenment is the forerunner of justice and the foundation of democracy. The duty of the journalist is to further those ends by seeking truth and providing a fair and comprehensive account of events and issues. Conscientious journalists from all media and specialties strive to serve the public with thoroughness and honesty. Professional integrity is the cornerstone of a journalist's credibility. Members of the Society share a dedication to ethical behavior and adopt this code to declare the Society's principles and standards of practice.

**Seek Truth and Report It**

Journalists should be honest, fair and courageous in gathering, reporting and interpreting information.

Journalists should:

· Test the accuracy of information from all sources and exercise care to avoid inadvertent error. Deliberate distortion is never permissible.

· Diligently seek out subjects of news articles to give them the opportunity to respond to allegations of wrongdoing.

· Identify sources whenever feasible. The public is entitled to as much information as possible on sources' reliability.

· Always question sources' motives before promising anonymity. Clarify conditions attached to any promise made in exchange for information. Keep promises.

· Make certain that headlines, news teases and promotional material, photos, video, audio, graphics, sound bites and quotations do not misrepresent. They should not oversimplify or highlight incidents out of context.

· Never distort the content of news photos or video. Image enhancement for technical clarity is always permissible. Label montages and photo illustrations.

· Avoid misleading re-enactments or staged news events. If re-enactment is necessary to tell a article, label it.

· Avoid undercover or other surreptitious methods of gathering information except when traditional open methods will not yield information vital to the public. Use of such methods should be explained as part of the article.

· Never plagiarize.

· Tell the article of the diversity and magnitude of the human experience boldly, even when it is unpopular to do so.

· Examine their own cultural values and avoid imposing those values on others.

· Avoid stereotyping by race, gender, age, religion, ethnicity, geography, sexual orientation, disability, physical appearance or social status.

· Support the open exchange of views, even views they find repugnant.

· Give voice to the voiceless; official and unofficial sources of information can be equally valid.

· Distinguish between advocacy and news reporting. Analysis and commentary should be labeled and not misrepresent fact or context.

· Distinguish news from advertising and shun hybrids that blur the lines between the two.

· Recognize a special obligation to ensure that the public's business is conducted in the open and that government records are open to inspection.

**Minimize Harm**

Ethical journalists treat sources, subjects and colleagues as human beings deserving of respect.

Journalists should:

· Show compassion for those who may be affected adversely by news coverage. Use special sensitivity when dealing with children

Document title: Campus Weblines: The Society of Professional Journalists&#39; Code of Ethics
Capture URL: http://www.nytimes.com/learning/general/weblines/4111.html
Capture timestamp (UTC): Tue, 27 Jun 2017 15:07:35 GMT

Page 1 of 2

information can be equally valid.

· Distinguish between advocacy and news reporting. Analysis and commentary should be labeled and not misrepresent fact or context.

· Distinguish news from advertising and shun hybrids that blur the lines between the two.

· Recognize a special obligation to ensure that the public's business is conducted in the open and that government records are open to inspection.

**Minimize Harm**

Ethical journalists treat sources, subjects and colleagues as human beings deserving of respect.

Journalists should:

· Show compassion for those who may be affected adversely by news coverage. Use special sensitivity when dealing with children and inexperienced sources or subjects.

· Be sensitive when seeking or using interviews or photographs of those affected by tragedy or grief.

· Recognize that gathering and reporting information may cause harm or discomfort. Pursuit of the news is not a license for arrogance.

· Recognize that private people have a greater right to control information about themselves than do public officials and others who seek power, influence or attention. Only an overriding public need can justify intrusion into anyone's privacy.

· Show good taste. Avoid pandering to lurid curiosity.

· Be cautious about identifying juvenile suspects or victims of sex crimes.

· Be judicious about naming criminal suspects before the formal filing of charges.

· Balance a criminal suspect's fair trial rights with the public's right to be informed.

**Act Independently**

Journalists should be free of obligation to any interest other than the public's right to know.

Journalists should:

· Avoid conflicts of interest, real or perceived.

· Remain free of associations and activities that may compromise integrity or damage credibility.

· Refuse gifts, favors, fees, free travel and special treatment, and shun secondary employment, political involvement, public office and service in community organizations if they compromise journalistic integrity.

· Disclose unavoidable conflicts.

· Be vigilant and courageous about holding those with power accountable.

· Deny favored treatment to advertisers and special interests and resist their pressure to influence news coverage.

· Be wary of sources offering information for favors or money; avoid bidding for news.

**Be Accountable**

Journalists are accountable to their readers, listeners, viewers and each other.

Journalists should:

· Clarify and explain news coverage and invite dialogue with the public over journalistic conduct.

· Encourage the public to voice grievances against the news media.

· Admit mistakes and correct them promptly.

· Expose unethical practices of journalists and the news media.

· Abide by the same high standards to which they hold others.

NEXT PAGE

Copyright 2001 The New York Times Company | Feedback

M242Pal1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SARAH PALIN, an individual,

 4                  Plaintiff,

 5          v.                              17 CV 4853 (JSR)

 6   THE NEW YORK TIMES COMPANY, et
     al.,
 7
                    Defendants.
 8
     ------------------------------x        Trial
 9
                                            New York, N.Y.
10
                                            February 4, 2022
11                                          9:25 a.m.

12   Before:

13                    HON. JED S. RAKOFF,

14                                          District Judge

15
                        APPEARANCES
16
     TURKEL CUVA BARRIOS, P.A.
17        Attorneys for Plaintiff
     BY:  SHANE B. VOGT
18        KENNETH G. TURKEL

19
     BALLARD SPAHR, LLP
20        Attorneys for Defendants
     BY:  DAVID L. AXELROD
21        JACQUELYN N. SCHELL
          THOMAS BYRNE SULLIVAN
22        JAY WARD BROWN

23

24   Also Present:

25   Dana Green, Senior Counsel, The New York Times Company
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M242Pal1

1

2          (Trial resumed; jury not present)

3          THE COURT:  So thank you for your promptness, and we

4    will get started with the jury in a couple of minutes.

5          I did have one question.  I am working on the rulings

6    on Mr. Crawford's deposition, which I want to get to by lunch

7    today or so in case you wind up making use of that deposition

8    today.

9          What fact issue is he being called to testify about?

10         MR. VOGT:  The "of and concerning" issue.  I am in

11   referring to the plaintiff, your Honor.

12         THE COURT:  And maybe I haven't gotten far enough in

13   the deposition.  What does he say on that?

14         MR. VOGT:  He's got testimony concerning how

15   Governor Palin was out in the front of the PAC, she was the

16   PAC, she was the face of the PAC, all of the PAC materials had

17   her images and signatures on them, things of that nature.

18         THE COURT:  Okay.  Because there seemed to be a lot in

19   there on other subjects.

20         I am told that one juror has not yet arrived.  So we

21   have a few minutes.

22         For example, you have offered testimony, and I am

23   looking at page 65 of the deposition, line 7.

24   "Q  Have you ever heard of the expression 'there is no such

25   thing as bad publicity'?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

M242Pal1

1    "A   I have.

2    "Q   Do you think that's true for a political candidate?

3    "A   Absolutely not true.

4    "Q   Why so?

5    "A   It is absolutely not true.  The reason is because if you

6    get bad publicity, especially in this day and age, it goes,

7    it's out there, and you can never catch it.  You can never fix

8    it."

9            Now, that, first of all, is opinion evidence which can

10   only be offered by an expert, and I don't recall any expert

11   report having been filed which would have been required if you

12   were offering any witness as an expert.

13           Second, it has nothing to do with the issue you just

14   mentioned, "of and concerning."

15           On the other hand, defense counsel made no objection

16   to this portion of the deposition.  So I am in a total state of

17   mystification.

18           Let me start with plaintiff's counsel.  Why are you

19   offering that when it has nothing to do with "of and

20   concerning"?

21           MR. VOGT:  Snoop I believe, your Honor, that we were

22   just including that for sort of background information.

23           THE COURT:  Background at page 70?  This is almost at

24   the end of your deposition.  How can it be background?

25           MR. VOGT:  This wasn't my deposition.  Mr. Axelrod

M242Pal1

1  took the deposition, and some of these issues --

2          THE COURT:  No, but in the very kind marked-up

3  deposition which you gave me, and I appreciate it very much,

4  it's exactly what I wanted, things marked in yellow were being

5  offered by plaintiff; things being marked in red were being

6  offered by defense as counter to what was offered by plaintiff;

7  things marked in blue were being defendants' affirmative;

8  things marked in orange were being marked as plaintiff's

9  counter to defendants' affirmative; things marked in green were

10  things that both of you agreed on; and things marked in purple

11  were indicated to be defendants' affirmative plaintiff counter.

12  I'm not quite sure what the difference between purple and

13  orange is, but maybe I am just becoming color blind.

14          This, the portion I just read is in yellow, namely, it

15  is being offered by you.

16          MR. VOGT:  Yes, your Honor.

17          THE COURT:  Why?  It is irrelevant to the issue you

18  just told me about.  It is irrelevant.  It is also opinion

19  evidence.  And I'm concerned in this case, from even some of

20  the questions that were put yesterday, that the most basic

21  fundamentals of the federal rules 701 and 702 are not being

22  complied with.  A lay witness can only offer factual

23  observations with very, very, very limited exceptions.  If you

24  are offering someone who is an expert, then of course, under

25  the Federal Rules of Civil Procedure, you have to identify them

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-251

M242Pal1

1  in advance and file a full report.  None of that was done with

2  respect to Mr. Crawford.

3          On the other hand, apparently defense counsel is of

4  the view that anything goes, since no objection was made.

5          MR. AXELROD:  Your Honor, we certainly don't feel that

6  way.

7          THE COURT:  Well, I am bound by what you gave me, so

8  I'm going to allow this in, even though I think it is

9  irrelevant, misleading, and potentially prejudicial, because it

10  was up to you to decide whether you wanted it in or not, and

11  you said no objection.

12          MR. AXELROD:  Your Honor, I can't say why we didn't

13  object to it beforehand, but of course, as you know --

14          THE COURT:  Well, there are two possibilities --

15  knowing and intentional waiver of any objection you had or

16  incompetence.  Which should I assume?

17          MR. AXELROD:  Well, I don't want you to assume either

18  because I don't think either is appropriate, but sometimes with

19  wisdom, wisdom comes later, but better than not at all.  And

20  this is a case where wisdom is coming later --

21          THE COURT:  I wish I had said that.

22          MR. AXELROD:  I think you may have said it in a prior

23  trial, so I will give you credit.

24          But, listen, we made a mistake.  Clearly this is

25  objectionable, and I would ask you to exclude it.

SApp-252

M242Pal1

1        THE COURT:  Well, I'm not going to exclude it because

2  there was no objection.

3        All right.  But the reason I gave these grumpy remarks

4  is because I am concerned when we have questioning with live --

5  this is a deposition -- that rules of evidence are strictly

6  adhered to.  I shouldn't have to be the one to remind counsel

7  of that.

8        So, okay.  Let's see what our courtroom deputy has to

9  say about the missing.

10        THE DEPUTY CLERK:  I am still missing a juror.  I

11  tried calling her cell phone and it went right to voice mail,

12  which I am hoping means that she is on the subway, but she is

13  all the way up in Inwood.

14        Do you want me to go to the security line?

15        THE COURT:  Yes, why don't you do that.

16        THE LAW CLERK:  The train in Inwood has delays.

17        THE DEPUTY CLERK:  Nick says the train from Inwood has

18  delays, but I will go downstairs.

19        THE COURT:  I will ask my courtroom deputy to explain

20  to the other jurors who have been so prompt that the train was

21  delayed and we have to wait.  My general practice is if a juror

22  is delayed as much as an hour -- I'm sure that won't be true

23  today -- I excuse that juror and we continue with a jury of one

24  less person.  But hopefully we won't have to reach that issue.

25  It is only -- at the moment she is only five minutes late.

M242Pal1

1              Is there anything else anyone wanted to raise?

2              THE DEPUTY CLERK:  All jurors present.

3              THE COURT:  Wow.  So the power of positive thinking.

4              THE DEPUTY CLERK:  Yes.  May I bring in the jury?

5              THE COURT:  Yes, and let's get the witness on the

6      stand, please.  Does someone want to get the witness?

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SApp-254

681

M291PAL1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SARAH PALIN, an individual,

4                  Plaintiff,

5         v.                              17 CV 4853 (JSR)

6   THE NEW YORK TIMES COMPANY, *et
    al.*,

7
                   Defendants.
8
    ------------------------------x       Trial
9
                                          New York, N.Y.
10
                                          February 9, 2022
11                                        9:23 a.m.

12  Before:

13                   HON. JED S. RAKOFF,

14                                        District Judge

15                        APPEARANCES

16  TURKEL CUVA BARRIOS, P.A.
         Attorneys for Plaintiff
17  BY:  SHANE B. VOGT
         KENNETH G. TURKEL
18

19
    BALLARD SPAHR, LLP
20       Attorneys for Defendants
    BY:  DAVID L. AXELROD
21       JACQUELYN N. SCHELL
         THOMAS BYRNE SULLIVAN
22       JAY WARD BROWN

23

24  Also Present:

25  Dana Green, Senior Counsel, The New York Times Company

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

SApp-255

M292Pal6                         Palin - Direct

1   Q.  Governor Palin, you have introduced yourself.  Where do you

2   currently live?

3   A.  Wasilla, Alaska, still.

4   Q.  And could you tell the jury where Wasilla, Alaska is?

5   A.  It's in south central Alaska, about 50 miles north of

6   Anchorage.

7   Q.  How big is Wasilla, Alaska?

8   A.  Our borough is about 100,000 people.  Within the city

9   limits of Wasilla, less than 20,000.

10  Q.  And how long have you lived there?

11  A.  Since I was in second grade, so forever.

12  Q.  The -- without -- let's talk a little bit about your

13  family, meaning your family, your kids.  Do you have any kids?

14  A.  I have five kids.

15  Q.  Do you have any grandkids?

16  A.  Eight grandkids.

17  Q.  What are your kids' ages?

18  A.  Oh, golly.  Our oldest -- my oldest is 32, then 31, then

19  27, then 20, and 13.

20  Q.  And could you give us a breakdown boy, girl, boy, girl?

21  A.  The boys are the bookends, three girls in the middle.

22  Q.  And where do your kids live right now?

23  A.  A couple of them are in Alaska still.  Of course the little

24  one, he is with me.  And the oldest one is out of the military.

25  He is in Alaska now.  And the three girls, one is in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-256

857

M292Pal6                        Palin - Direct

1    Scottsdale, two are in Texas.

2    Q.  What do you --

3            THE COURT:  Wait a minute.  You have five children,

4    but only eight grandchildren?  This sounds like diminishing

5    returns to me.

6            THE WITNESS:  It's plenty.

7            THE COURT:  Go ahead.

8    BY MR. TURKEL:

9    Q.  Just for background, who are the grandchildren?  Which of

10   your kids has the grandchildren?

11   A.  Track has children, the oldest son.  Bristol, she has

12   grandkids; she is the first-born daughter.  And then the middle

13   daughter Willow, she has twin baby girls, she and her husband,

14   and they are pregnant with another baby.

15   Q.  There we go.

16   A.  Yup.

17   Q.  What do you do as best you can describe it?  What do you do

18   in your day-to-day life now?

19   A.  Holding down the fort in Wasilla, in Alaska.  It's not

20   super easy conditions living up there, but I'm used to it and I

21   don't complain about it.  But single mom now, and my youngest

22   child, he has special needs, so my life revolves around him —

23   his name is Trig — and his schooling and his therapies.  But

24   also trying to help other candidates and traveling around the

25   country, still being involved in certain issues and certain

SApp-257

M292Pal6                    Palin - Direct

1   campaigns at appropriate times.

2   Q.  By the nature of when you say helping other candidates,

3   would that be just general consulting work or stumping?  What

4   would you call it?

5   A.  Stumping more than consulting and just giving them advice,

6   good, bad, or ugly, what they are in for, if they are newbies

7   especially.

8   Q.  Now, when you do that work, does it always take you out of

9   Alaska?

10  A.  Always, yes.  None of -- none of my work is in Alaska.  I

11  haven't had a paycheck from Alaska since I was governor.  So

12  that tells you that I travel a lot for work.

13  Q.  Why do you stay in Alaska?

14  A.  Family.  It's home.  And my dad is there.  I help take care

15  of my dad.  He is elderly.  Family.

16  Q.  Do you have sisters?

17  A.  Yes.  Two sisters and a brother.

18  Q.  Are they all in Alaska?

19  A.  They are all in Alaska.  We are all best buddies.

20  Q.  Let's talk a bit -- a little bit about your career, what

21  got you into politics.

22          You grew up in Wasilla, right?

23  A.  Yeah.  My first five years of life were spent in Skagway,

24  Alaska, a gold rush town that my dad arrived at to teach school

25  and coach, and then Wasilla.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

859

M292Pal6                    Palin - Direct

1   Q.  Not to talk about it too much, but my guess would be most

2   people in here haven't been to Wasilla.  What's it like?

3   A.  Well, they are missing out.  Wasilla, it's a small town,

4   and people -- about 30 percent of the workforce commutes into

5   Anchorage, that hour into Anchorage.  So we would consider it

6   more of a suburban area, though it's 50 miles away from the big

7   city, and it is just a wonderful place to raise kids and be

8   involved in community.

9   Q.  When did you first get involved in public service?

10  A.  When my first two kids were tiny, I ran for city council,

11  recognizing that our town was growing and we wanted to help

12  shape where that growth would be and help residents protect

13  their private property rights and just give a voice for those

14  who wanted some say in local governments.

15  Q.  And why particularly were there private property rights

16  issues at the time?

17  A.  Because our town was growing and the city council was

18  desiring to -- I was just observing at the time as a resident,

19  trying to annex in areas outside the city limits.  Sometimes

20  these people didn't want to be annexed in, and I wanted to be a

21  voice for both sides, so that there would be some reasonable

22  debate instead of -- a lot of local politics there is kind of a

23  lot of bickering sometimes.  I wanted to see that changed.

24  Q.  So what were your -- your first -- you were saying city

25  was -- city council was your first job?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M292Pal6                          Palin - Direct

1   A.  Well --

2   Q.  In public service, I mean.

3   A.  Yeah, PTA and PTO before that, and then city council.

4   Q.  The natural progression.  Did you have to run for city

5   council or was that an appointed position?

6   A.  You had to campaign, and I ran and was elected to serve two

7   terms.

8   Q.  And how long are the terms?

9   A.  Three-year terms.  But into my second term, I knew that in

10  order to really make change, you kind of had to be the top dog

11  there, so I ran for mayor.  We have a strong mayor form of

12  government.  It was the actual city manager.  So in that second

13  term, I ran for mayor and was elected, then reelected, serving

14  six years as mayor.

15  Q.  Were you running against established career politicians in

16  Alaska?

17  A.  Always.  It seems like, yes.  Always.  Mostly those in my

18  party even.  But, yes, it was always a -- always established

19  politicians.

20  Q.  So I know you are not great on dates, but do you recall

21  when you became mayor in Wasilla?

22  A.  It would have been -- let's see, I always relate it to how

23  old my kids were at the time, or which babies were born at the

24  time.  So '94 to '90-whatever I was mayor, and then, yeah,

25  until like '90 -- 2002.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-260

M292Pal6                    Palin - Direct

1   Q.  From '90-something to 2002?

2   A.  I just admitted I'm not good at dates, so, yeah.

3   Q.  Do you remember when you stopped being mayor?

4   A.  Yeah.  That would have been in '02.

5   Q.  And what was your next position?

6   A.  I ran for lieutenant governor and I lost and learned; and

7   then I was appointed oil and gas commissioner in Alaska,

8   chairman of the Alaska Oil and Gas Conservation Commission.

9   Q.  And for the benefit of the jury, are the gas or oil

10  industry positions important in that area?

11  A.  So important.  85 percent of our state budget is funded by

12  oil development, so it's very important that we develop

13  responsibly and that there aren't any conflicts of interest and

14  there is no corruption in the system.  So I was delighted and

15  honored to get to be oil and gas commissioner, the chairman, to

16  make sure that things were done right.  And also we were

17  contributing a good supply into the domestic supply of energy

18  in the U.S.  At our peak, we were -- at the peak, we were about

19  18 percent of the U.S. domestic supply of energy.

20  Q.  You say "we," you mean Alaska, right?

21  A.  We in Alaska.

22  Q.  How long were you oil and gas minister for?

23  A.  That would have been 2000 and -- it would have been two

24  years, because then I ran for governor after that.

25  Q.  Tell us a little bit about that.  What made you run for

SApp-261

M292Pal6                    Palin - Direct

1   governor?

2   A.   Seeing corruption in the oil industry and politicians and

3   their relationship, so that was the impetus.  And I had a

4   campaign slogan, it was Take a Stand, because I wanted people,

5   especially our lawmakers, to finally take a stand and clean up

6   the corruption and the crony capitalism and develop

7   responsibly.  Otherwise people were going to really focus on

8   shutting down an industry up there in Alaska that was so

9   important but also could be run very responsibly.

10  Q.   Did you win?

11  A.   I did win.

12  Q.   You were the youngest governor -- what was it the youngest

13  governor in the history of Alaska?

14  A.   Um-hmm, and first woman.

15  Q.   First woman.  Right.

16  A.   Um-hmm.

17  Q.   And that term started what year?

18  A.   I was elected in 2006.

19  Q.   Right.

20       How long did you serve for?

21  A.   Until 2009.

22  Q.   Did something happen in between 2006 and 2009 --

23  A.   Yes, it did.

24  Q.   -- that had you leave the governor's office for a little

25  bit?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M292Pal6

1  A.  For a little bit, yes.  I was tapped to run for vice

2  president of the United States along with Senator McCain, who

3  was running for president.

4  Q.  How was that when you first learned that you were being

5  pursued for that role?

6  A.  I didn't know I was being pursued until they made the phone

7  call and asked if I wanted to meet with Senator McCain like the

8  next day.  I flew down to Arizona, and right then they asked me

9  if I would run, and I was very, very honored and excited.

10  Q.  Did your life change when you became a candidate for the

11  vice presidency?

12  A.  Yes.

13  Q.  Tell the jury how.

14  A.  Well, I was thrust into a different kind of spotlight.  I

15  was very, very used to local government, which I consider the

16  most responsive and responsible level of government, into a

17  campaign that, well, candidly they didn't kind of understand a

18  whole lot of the connectivity with the people in local

19  government that would -- I would be able to provide.  They had

20  big picture, national politics on their mind all the time,

21  appropriately, and thrust into a campaign where it wasn't -- I

22  don't think they were prepared for me necessarily, because I

23  was new to the national stage.  But it was -- it was an amazing

24  experience to get to travel around the country and meet so many

25  amazing people and to see the beauty of America and offer

SApp-263

M292Pal6

1   myself up in the name of public service at that level.

2              MR. TURKEL:  Judge, I am probably about to pivot.

3              THE COURT:  Okay.  That's fine.

4              MR. TURKEL:  We are done with most of the background.

5              THE COURT:  Ladies and gentlemen, we will end for

6   today.  We will start promptly at 9:30 tomorrow.  Have a very

7   good evening.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-264

M292Pal6

1          (Jury not present)

2          THE COURT:  Ms. Palin, you can step down.

3          Okay, we will see you tomorrow at 9:00.  I don't think

4     we have much to take up, but I will at least get you the latest

5     and final version of the charge.

6          Yes.

7          MR. AXELROD:  Your Honor, to make things go as

8     smoothly as possible tomorrow, I think I will probably raise

9     some exhibits that the plaintiffs have objected to.

10         THE COURT:  All right.  We can do that at 9:00.

11         MR. AXELROD:  Thank you.

12         THE COURT:  Very good.  Thanks a lot.

13         (Adjourned to Thursday, February 10, 2022, at 9:00

14    a.m.)

15

16

17

18

19

20

21

22

23

24

25

868

M2a2Pal1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SARAH PALIN, an individual,

4                   Plaintiff,

5           v.                          17 CV 4853 (JSR)

6   THE NEW YORK TIMES COMPANY, *et
    al.*,
7
                    Defendants.
8
    ------------------------------x      Trial
9
                                         New York, N.Y.
10
                                         February 10, 2022
11                                       9:00 a.m.

12  Before:

13                  HON. JED S. RAKOFF,

14                                       District Judge

15                      APPEARANCES

16  TURKEL CUVA BARRIOS, P.A.
17        Attorneys for Plaintiff
    BY:   SHANE B. VOGT
18        KENNETH G. TURKEL

19
    BALLARD SPAHR, LLP
20        Attorneys for Defendants
    BY:   DAVID L. AXELROD
21        JACQUELYN N. SCHELL
          THOMAS BYRNE SULLIVAN
22        JAY WARD BROWN

23

24  Also Present:

25  Dana Green, Senior Counsel, The New York Times Company

              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

SApp-266

M2a2Pal1

```
 1              (Trial resumed; jury not present)
 2              THE COURT:  So we caught a few little non-substantive
 3      typos in the last draft of the charge.  We will get you the
 4      truly final version later today.
 5              So there were some evidentiary issues that defense
 6      counsel wanted to raise.
 7              MR. AXELROD:  Yes, your Honor.  There are a couple of
 8      exhibits that I think I want to show you before
 9      cross-examination, and I have kind of grouped them.
10              So the first is 62.  Mr. DiMezza, if you could put
11      that up, Defense Exhibit 62.
12              THE COURT:  Are you planning to cross-examine
13      Ms. Palin?  You are a brave man.
14              MR. AXELROD:  If Mr. Turkel sits down right now, I
15      might not, but we will see what happens.
16              MR. TURKEL:  Did you just call me Mr. Turkel?  Two
17      weeks into trial I usually get the name pronounced right.
18              THE COURT:  Counsel.
19              MR. AXELROD:  So the first one is Defense Exhibit 62,
20      which is Governor Palin's Facebook post where she posts the
21      crosshairs map to her Facebook page.
22              THE COURT:  And what is the objection?
23              MR. TURKEL:  Judge, we object on relevance grounds
24      pretty much across the 400 series, including 403.
25              THE COURT:  So what's the relevance?
```

SApp-267

870

M2a2Pal1

1      MR. AXELROD:  I mean, this is the whole reason why we

2  are here.  So this is about the publication of the map, and the

3  door has certainly been opened to this type of evidence.  I

4  mean, one of the key issues in this case is Governor Palin's

5  relationship to the PAC.

6      THE COURT:  Okay.  It does appear to me relevant to

7  that issue.  Ms. Palin identifies the same persons, same

8  Congresspeople, and then she says, "We will aim for these races

9  and any others.  This is just the first salvo in a fight to

10  elect people across the nation who will bring common sense to

11  Washington.  Please go to sarahpac.com and join me in the

12  fight."  So that certainly seems to be in the ballpark of

13  relevancy.

14      MR. TURKEL:  May I be heard, your Honor?

15      THE COURT:  Sure.  Of course.

16      MR. TURKEL:  First of all, this was from March 23,

17  2010.

18      Secondly, Mr. Bennet testified he --

19      THE COURT:  Yes, but the point is that you are

20  asserting one version of the relationship between her and

21  SarahPAC and they are asserting a different one, and they have

22  a right to inquire of Ms. Palin about that and the degree of

23  her involvement or noninvolvement.  And we also heard

24  third-party testimony about that.  So this, seems to me, fair

25  game.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2a2Pal1

1          MR. TURKEL:  Judge, if it's being offered on the issue
2     of her relationship. . .
3          (Pause)
4          MR. TURKEL:  And it's being offered for that purpose,
5     *i.e.*, the pronouns in paragraph, let's say, 2, "We're going to
6     reclaim the power of the people" or "we'll aim for these
7     races."  That's how at least I took your analysis of the
8     relevance.  It is -- to leave the rest of the language in
9     there, which is completely unrelated identification of
10    political opponents and so on and so forth --
11         THE COURT:  Oh, no, no.  It's the very people on the
12    map, right?
13         MR. TURKEL:  Judge, yes, but --
14         THE COURT:  I don't actually understand why you are
15    opposing this.  I would think this is, from your standpoint,
16    strong evidence of the personal relationship between Ms. Palin
17    and SarahPAC, which leads to your argument that she was
18    defamed, even though *The Times* editorial spoke of SarahPAC, not
19    of her personally.  But of course you have -- you can, you
20    know, make your own strategic decisions.  Far be it from me to
21    suggest that if I were in your shoes I would welcome this
22    document.  But you do what you want.
23         MR. TURKEL:  Judge, I understand.  I guess part of the
24    hangup would be Mr. Bennet not having ever read the map himself
25    when he edited the article, too.  But, Judge, look, I

SApp-269

M2a2Pal1

1   understand if they are going to offer it for that purpose, the

2   Court is going to let it in.  It just seems that some of the

3   language in this really doesn't relate to that.

4            THE COURT:  I'm going to let it in.

5            Okay.  What's next?

6            MR. AXELROD:  The next one is 63, your Honor, which is

7   a tweet from Ms. Palin, "Don't retreat, reload," which we saw

8   yesterday.

9            MR. TURKEL:  Again, Judge, relevancy.

10           THE COURT:  So what's the relevance?

11           MR. AXELROD:  The relevance is this is part of the

12  story.  So Sarah Palin releases the map in March of 2010.  They

13  are criticized for using what many people consider violent

14  political rhetoric.  Sarah Palin is criticized.  Governor Palin

15  releases this tweet "don't retreat, reload," which confirms the

16  many people criticizing the PAC, but this is in fact the very

17  nature of what the map was designed to do is to use gun imagery

18  and gun lexicon.  So it confirms that.

19           THE COURT:  But is there any indication that

20  Mr. Bennet saw this --

21           MR. AXELROD:  Your Honor --

22           THE COURT:  -- or knew about it.

23           MR. AXELROD:  -- we have already introduced exhibits

24  in this case which referred to the "don't retreat, reload"

25  language, so I don't -- I think the door has been opened.

M2a2Pal1

1              THE COURT:  Well, that's a different question.  But

2    let's take one question at a time.  I --

3              MR. AXELROD:  I --

4              THE COURT:  I don't recall any evidence that

5    Mr. Bennet saw this.

6              MR. AXELROD:  I think that's right.

7              THE COURT:  Okay.

8              Or knew about it at the time.

9              MR. AXELROD:  I think that's right.

10             THE COURT:  Okay.

11             So the argument then, I think, is whether your

12   adversary has opened the door to this through something she

13   introduced or otherwise.

14             MR. AXELROD:  There are two things.  One is, yes, our

15   adversary has opened the door.  All of the research that was

16   circulated on June 14, one of the editorials that was

17   circulated relates to this, as does the ABC news article from

18   January 9, from the day Gabby Giffords was shot.

19             But, moreover, I think this also goes to Ms. Palin's

20   state of mind.  I think the evidence is going to show today

21   that Ms. Palin likes to make what some people would call

22   provocative statements, statements that she knows are going to

23   lead to criticism in the ether.  So I think the one who makes

24   provocative statements like "don't retreat, reload" in the face

25   of criticism about using violent gun imagery has a hard time

M2a2Pal1

1   then arguing that she sustained emotional damage when the

2   criticism comes back on her.

3           THE COURT:  Okay.  What do you say to that?

4           MR. TURKEL:  I will try and take them in the order he

5   made the arguments, Judge.

6           THE COURT:  Okay.  *Seriatim*, as you would say.

7           MR. TURKEL:  I will adopt that if that's how it is

8   said, Judge.

9           From a basic relevance standpoint, Judge, we are here

10  on a claim that she was libeled because they published an

11  article saying there was a link to political incitement of

12  Jared Loughner that relates to the shooting of Gabby Giffords.

13  There is nothing in evidence nor will there ever be anything in

14  evidence that says that Jared Loughner saw this or --

15          THE COURT:  No.  Let's assume that's given, and we

16  have already established that Mr. Bennet did not see it.  But

17  what is your claim as to damages --

18          MR. TURKEL:  The ruling --

19          THE COURT:  -- as long as it's not a financial claim,

20  it's a reputational harm?

21          MR. TURKEL:  Right.

22          In your instruction, as written, right, the damages

23  are specifically what's excluded.  "Nor may you award damages

24  for any damages the plaintiff may have suffered to her

25  reputation as a result of any other statements, articles, or

M2a2Pal1

1  publications made before or after the editorial at issue in the

2  case."

3        THE COURT:  Well, thank you.  I appreciate your

4  reading my charge.  I have some familiarity with it already.

5        The question is, are you going to contend, which is

6  referred to later in the charge, that Ms. Palin personally

7  suffered hurt, pain, remorse -- not remorse, pain and

8  suffering, mental pain and suffering from seeing this editorial

9  or hearing about it?

10        MR. TURKEL:  Of course we are, Judge.

11        THE COURT:  Okay.  So of course I think that's a fair

12  answer.

13        So then, it is fair cross-examination to say:  What

14  are you talking about?  You love this kind of language.  You

15  love the heat of the political turmoil.  You have relished your

16  opponents making statements about you so you could say look at

17  what jerks they are.  That's what he wants to argue.

18        MR. TURKEL:  Judge, I think where this would probably

19  fall into the relevancy that Mr. Axelrod is arguing is if we

20  were seeking damages and we could seek damages for 2011, but we

21  can't.  We can't.  And this is temporally at the time that

22  occurred when she was relevant in the political arena.  In

23  2017, this wasn't what she tweeted this for.

24        THE COURT:  That's a fair point.  Let me go --

25        MR. TURKEL:  If you want to give us damages in 2011,

SApp-273

M2a2Pal1

1  then we can seek that.

2        THE COURT:  I heard you the first time.

3        So the point that he is saying is that whatever may

4  have been Ms. Palin's state of mind in 2011, when she was in

5  the tumult of a campaign, it's something totally different when

6  this appears in 2017, when she is no longer in that state of

7  mind.  What about that?

8        MR. AXELROD:  I'm a little confused.  I think that the

9  evidence will show --

10        THE COURT:  Only a little?  Well, we are making

11  progress.

12        MR. AXELROD:  All right.  I'm very confused.  I just

13  wanted to downplay it.

14        I think the evidence is going to show — and I think it

15  is common knowledge, but maybe not to the jury — that, you

16  know, Governor Palin, as she is going to, I think, testify

17  about, plays in the public field, makes comments, makes

18  rhetorical comments, uses hyperbole and expects the

19  back-and-forth.  And I don't think that was limited to 2010

20  when this tweet was done.  I think that there are inflammatory

21  statements that she made a couple of weeks ago.  So I don't

22  know why we cabin her mental state to --

23        THE COURT:  All right.  Well, I think that's fair

24  cross-examination.  I will allow it.

25        MR. AXELROD:  All right, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-274

M2a2Pal1

1        Then the next one is 64, same argument.

2        MR. TURKEL:  If I can, just so I make the 403 position

3  on the record, and I'm not trying to change your mind or

4  anything, but from a 403 perspective the concern I have is

5  this, Judge --

6        THE COURT:  That's a different point, which you

7  haven't raised before, 403.

8        MR. TURKEL:  I think I told you at the front end of

9  this we raised almost the 400 series, including 403.

10       THE COURT:  All right.  You objected specifically to

11  this on the grounds of relevance.  That's what you said.  The

12  record will reflect that.  But if you are now challenging it,

13  as well, on 403 grounds, I don't think so.  I mean, I assume

14  Ms. Palin is going to say something about that the language of

15  warfare is used in politics all the time, probably from the

16  days of Thomas Jefferson and Alexander Hamilton, although in

17  Hamilton's case it led to further problems.

18       So I don't think there is a 403 issue.  But thank you

19  for raising it.

20       Go ahead.

21       MR. AXELROD:  The next exhibit in this series is 64,

22  same argument.

23       THE COURT:  So I will receive that, although I think

24  there will come a point where this will raise a 403 problem if

25  it's excessive or too cumulative.

SApp-275

M2a2Pal1

1        MR. AXELROD:  This is it.

2        MR. TURKEL:  May I be heard?  Could we get the bottom

3  redacted out, which is a sort of --

4        MR. AXELROD:  That's fine.

5        THE COURT:  They agree.

6        MR. TURKEL:  As to your 403, the cumulative comment

7  you just made, I know you have dispensed with that argument.  I

8  just want you to understand where I am coming from and what I

9  am worried about is turning, realtime, this courtroom into some

10  sort of forum for political fighting by sort of stacking this

11  up and trying to sort of reignite politics long gone for

12  Governor Palin.  We are talking about 2017, and I'm worried

13  that the cumulative effect of this is going to sort of be so

14  prejudicial that the jury's making political decisions and it's

15  difficult, Judge.

16        THE COURT:  I hear what you are saying, but I think

17  it, frankly, is not a speculation that even needs to be

18  entertained.

19        You have seen this jury, I have seen this jury.  I

20  have never seen a more attentive, fair-minded jury.  They were

21  instructed numerous times of course about the need to put

22  everything aside except the facts of this case, and they will

23  be told that again in my instructions.  But if ever a jury was

24  attuned to that, it's this jury.  This is a very impressive

25  jury, and I don't think your fears are remotely warranted.

SApp-276

M2a2Pal1

```
1    Okay.
2            MR. AXELROD:  Your Honor, the next Exhibit is 74,
3    which is one I raised prior to openings.  It is an article
4    posted to Governor Palin's website on June 15 of 2017.  I think
5    the relevance is pretty apparent, but I can go into it if you
6    would like.
7            THE COURT:  Yes.  So what's the relevance?
8            MR. AXELROD:  Well, the relevance is, your Honor, I
9    believe that plaintiff's counsel had made the assertion or
10   suggestion to the jury that *The Times* was still harming
11   Governor Palin when it did not remove her name completely from
12   the editorial after the correction, suggesting that just
13   attaching her to the Jared Loughner shooting in any way was
14   somehow prejudicial.  But here Ms. Palin is posting the very
15   same type of substance to her website, and I think that
16   undercuts that argument.
17           THE COURT:  Well, let me see.
18           MR. AXELROD:  And as --
19           THE COURT:  I'm sorry.  I don't understand your
20   argument.  You have correctly noted, and I think they are going
21   to argue on summation, that *The Times*' correction was less than
22   sincere because they continued to leave in the reference to
23   Ms. Palin's political action committee map even while
24   disclaiming any link, and that was, therefore, they would say,
25   crocodile tears in terms of the correction, it wasn't sincere,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-277

M2a2Pal1

1   and the jury should disregard it.  That undoubtedly will be

2   their argument.  I don't see how this responds to that.

3         MR. AXELROD:  Your Honor, if you look at the last two

4   sentences above the kind of diagram at the bottom where it

5   reads, "Numerous media outlets blamed Palin for the shooting

6   because a map distributed by her PAC had identified Giffords'

7   district as a target pick-up for Republicans."

8         Then it goes on, "Nevertheless, there was never any

9   evidence found that the shooter was motivated by the governor."

10   That is pretty similar language to what ended up in the

11   corrected editorial.

12         So I think the crocodile tears are --

13         THE COURT:  So your argument is, if you are defamed by

14   someone, in my hypothetical, and you say, I saw today that they

15   made the following accusation and it is totally untrue, that

16   somehow you have relinquished your right to claim damages for

17   the defamation?

18         MR. AXELROD:  No.  Your Honor, this is not a response.

19   As you will see, this doesn't mention *The New York Times*

20   editorial anywhere.  This is not a response to the editorial.

21         THE COURT:  No, but it's the same point.  She is

22   saying they are out there making up this stuff and it's not

23   fair, it is no link.

24         MR. AXELROD:  Which is -- your Honor, if you look at

25   the editorial after it was corrected, it says there is no link,

SApp-278

M2a2Pal1

1  but it says that she was criticized, that the PAC was

2  criticized for the map.  It's the exact same point.

3          THE COURT:  All right.  I will think about that one

4  for a minute.  I'm sorry.  Go ahead.

5          MR. TURKEL:  Just a few points, because I want to make

6  sure that both I understand and communicate with the Court

7  regarding some of the boundaries we are setting here.

8          Judge, first of all, getting into it, the point, you

9  know, about them not including her in any of the apologies came

10  from direct witness testimony by Linda Cohn who expressed --

11          THE COURT:  So what?  We are talking about arguments

12  you are making.  Are you not making that argument?

13          MR. TURKEL:  No.

14          THE COURT:  Are you not making that argument?  Answer

15  me yes or no.

16          MR. TURKEL:  Yes.

17          THE COURT:  Of course you are.

18          MR. TURKEL:  We are.

19          THE COURT:  So what are you talking about?

20          MR. TURKEL:  I just thought the context was a little

21  different in this incident.  She said they were being gracious

22  by keeping her name out of there.  Judge, this is the day after

23  the article.

24          THE COURT:  What does that have to do with the

25  argument that defense counsel is making?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2a2Pal1

1          MR. TURKEL:  I still don't necessarily understand the
2    relevance of it.  In truth, Judge, it's not that big of a deal
3    if we are going to be using partial hearsay things like this to
4    talk about responses at that time.  I mean, I just kind of want
5    to --
6          THE COURT:  This is not hearsay in that it's being --
7    it is a statement of Ms. Palin and something prepared by her,
8    being offered on cross-examination of her as to her state of
9    mind, so it is not a hearsay problem at all.
10          I think it is a little closer than the other two, but
11    I will allow it.
12          MR. AXELROD:  Thank you.
13          MR. VOGT:  Can I say one thing, Judge, because there
14    is a second page on that exhibit.  It has --
15          THE COURT:  All that irrelevant stuff should be --
16          MR. VOGT:  I just want to make sure that's cut off,
17    because there is a pretty provocative headline on that back
18    page.
19          MR. AXELROD:  Which one?
20          MR. VOGT:  What about "Gabby Giffords' Blood is on
21    Sarah Palin's Hands"?
22          MR. AXELROD:  I think that that's part of -- Mr. Vogt,
23    you produced this to us.  You can see it by the Palin Bates
24    stamp at the bottom.  I don't quite --
25          MR. VOGT:  It was responsive --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-280

883

M2a2Pal1

1          THE COURT:  That doesn't matter.

2          MR. VOGT:  -- to discovery.

3          THE COURT:  I can't see it because it has to be blown

4    up.

5          MR. AXELROD:  It is right under the picture of

6    Governor Palin.  I think this was included as part of the

7    article on the website.

8          THE COURT:  Well, I think that's a 403.

9          MR. AXELROD:  That's fine.

10         THE COURT:  Take it out.

11         MR. AXELROD:  Okay.

12         Your Honor, moving on, this is 79, which is a tweet

13   from Governor Palin in 2018 after the shooting saying, "Hey,

14   Lisa Murkowski, I can see 2022 from my house."

15         THE COURT:  So what's the relevance of that?

16         MR. AXELROD:  One who claims that their reputation has

17   been damaged and they are essentially humiliated by my client's

18   defamatory statements, this suggests that she is going to run

19   for Senate in Alaska in 2022, which certainly undermines a

20   claim that they have been diminished because of a defamatory

21   statement.

22         THE COURT:  You can ask her about that, but I don't

23   think this shows that.  It is, I think, without more context,

24   it is ambiguous.  My recollection is Ms. Palin can see Russia

25   from her house.  So in any event, this will not be allowed.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-281

M2a2Pal1

1        MR. AXELROD:  Your Honor, I don't quite understand the

2    ambiguity.  I don't know what the reference to 2022 is except

3    for the fact that Lisa Murkowski was up for reelection and that

4    Ms. Palin would be suggesting that she would challenge her.

5        THE COURT:  If I -- if we didn't have other tweet that

6    is preceded it or followed it, there is no way the jury could

7    put any specific meaning on this without speculation.

8        MR. AXELROD:  I will give it context during

9    cross-examination.

10        THE COURT:  Well, if you do that, I will reconsider at

11    that point.

12        MR. AXELROD:  Thank you.

13        And then to that end, there is a video from 2020 that

14    Ms. Palin made, again, making the same reference to Lisa

15    Murkowski.  This is all in the context of Supreme Court

16    nominations.  And the video talks about if Lisa Murkowski

17    doesn't go ahead and vote for Amy Coney Barrett to be a Supreme

18    Court Justice, Sarah Palin can, then again, see 2022 from her

19    house.

20        THE COURT:  Isn't that more about Ms. Murkowski?

21        MR. AXELROD:  What's that?

22        THE COURT:  I'm not understanding why you think that

23    is not about Ms. Murkowski as opposed to Ms. Palin, right?

24    Your assertion is that Ms. Palin is going to run again?

25        MR. AXELROD:  That certainly seems to be the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SApp-282**

M2a2Pal1

1    suggestion, yeah.  She doesn't name any other candidate who is

2    going to run against her.

3            THE COURT:  Well, I will listen to your foundational

4    questions when you get there, but I'm skeptical that this will

5    come in.

6            MR. AXELROD:  Okay.

7            Your Honor, 92 is responses to requests for

8    admissions, which I actually don't understand why they have

9    been objected to.  I intend to, if you go to the seventh page,

10   I intend to use these responses to RFAs number 19 and 20 and I

11   would actually ask the Court to strike the language after

12   "admitted."

13           THE COURT:  So 19 is, "Admit that, before filing suit

14   against *The New York Times* regarding the editorial, you did not

15   seek a correction."

16           Response is "admitted."

17           Why isn't that admissible?

18           MR. TURKEL:  Judge, I think the context given with the

19   initial is the fact that they had published two corrections at

20   that time already.  There was no purpose on seeking further

21   correction.  And the correction --

22           THE COURT:  So what?  You knew when you filled this

23   out that if you said "admitted" it was binding upon you.

24   That's admissions 101.

25           Now, the rest of it, frankly, which should not have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2a2Pal1

1    been even included in a formal admissions, was "Given *The New*
2    *York Times* published two woefully insufficient supposed
3    corrections," that may or may not be, but it's not part of what
4    should normally be a response to a formal request for
5    admissions.  It should be either admit, deny, or we don't know.
6              MR. TURKEL:  Don't know.
7              THE COURT:  So similarly --
8              MR. TURKEL:  Judge, would my client be precluded from
9    explaining the circumstances, in other words, like on redirect
10   being able to say they had already tried to correct and at that
11   point --
12             THE COURT:  No, of course she could.
13             MR. TURKEL:  As long as we could do that, we are fine.
14   It's the same place ultimately evidentiarily.
15             THE COURT:  Well, anything that's opened on cross you
16   get a chance to respond to on redirect.
17             So the second one, same story.
18             MR. AXELROD:  So, your Honor, I move to strike
19   everything after "admitted."
20             THE COURT:  For purposes of your cross or indeed for
21   any purpose you want to admit it into evidence, the answer is
22   yes.  But that doesn't preclude them, if it's raised during her
23   cross, from then asking her about it.
24             MR. VOGT:  That's fine, Judge.
25             MR. AXELROD:  Defense Exhibit 24 is in 2015,

M2a2Pal1

1    Governor Palin launched her own channel, subscription channel.

2    It's a very short promotional video for a subscription

3    television channel.

4              (Video played)

5              MR. TURKEL:  I would object to that screenshot.

6              THE COURT:  Well, let me find out what's the relevance

7    to this.

8              MR. AXELROD:  So the relevance, your Honor, is

9    plaintiffs claim that in 2011 Ms. Palin was first defamed by

10   being connected to the Loughner shooting.  The fact that she

11   launched a commercial enterprise of her own channel after that

12   defamation, which she claims is the same defamation that took

13   place in 2017, undercuts the argument that there is any

14   reputational harm here.

15             THE COURT:  Why?

16             MR. AXELROD:  How could one launch a subscription

17   channel, invest in a commercial enterprise like that, if they

18   thought that their reputation had been so harmed by something

19   that no one would watch it?

20             THE COURT:  Well, I think this will turn on her

21   direct.  If she is going to be testifying I was so hugely

22   harmed that I didn't dare raise my head in public ever again,

23   then of course this would be relevant.  If, instead, she said I

24   was hurt, I was harmed, I was mortified, I was incensed, but

25   being the kind of person I am, I collected myself and went

SApp-285

M2a2Pal1

1    forward, then I'm not so sure this comes in.  So I think it

2    will turn on what she says on direct.

3            MR. AXELROD:  Okay.

4            MR. TURKEL:  Judge, one, I guess, caveat or perhaps a

5    foreshadowing for the Court, mental anguish is also a component

6    of the damages, and I can tell the Court we don't intend to

7    have the life of Sarah Palin up there *vis-à-vis* these

8    reputational issues.  I think it takes --

9            THE COURT:  As I said, we will hear what you have to

10   say in her testimony.  But keep in mind it is fair game for

11   your adversary to point out that people who enter into public

12   life know they are going to be subjected to attacks.  And that,

13   by the way, does go back to George Washington.  So in fact, if

14   you know your history, he was very hurt by the attacks made on

15   him, but he soldiered on.

16           So I think it will turn on your direct, but I think

17   some of this is fair game.

18           MR. TURKEL:  That's -- I wanted to address at the risk

19   of maybe overstaying my welcome in this dialogue, Judge, but

20   the law on using these specific instances in a defamation case,

21   and that's what these are, they are specific instances of

22   different conduct that they want to use to try and attack a

23   claim that reputation was harmed by a defamatory statement,

24   they still have to have some connection to the actual

25   reputation, trait at issue, which really in this case would be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-286

M2a2Pal1

1   the accusation that she incited violence.  I think the case law

2   is pretty clear that it is not a fair game situation under 608

3   even in a defamation case.

4           THE COURT:  No, no.  I'm not totally understanding

5   your argument.  If they are arguing that someone who enters

6   public life knows that they are going to be attacked, that's

7   not a total defense to defamation.  That doesn't mean that

8   someone can go out and, with actual malice, lie about you, but

9   it is relevant to damages.  I am reduced to quoting one of my

10  heros, Harry Truman.  If you can't stand the heat, stay out of

11  the kitchen.  So I think that is relevant to damages, though it

12  is not a defense to defamation.

13          THE DEPUTY CLERK:  Jury's present, whenever you are

14  ready.

15          MR. TURKEL:  I think the defense to defamation aspect

16  of the Court's statement is taken care of by virtue of the

17  actual malice and everything else, making the entry bar so

18  high.  This is much more a question of reputation evidence and

19  how it is proved.  And in this case not proving it by a

20  reputation witness who says I know people who know her etc. or

21  an opinion witness, they are using a specific instance, look,

22  how could her reputation be bad?  She has this TV show.  That

23  specific instance, Judge, at least as I read the law, has to

24  relate to the character trait which has been defamed.  And in

25  this case it has been stated that she incites violence.  These

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300