SApp-287

M2a2Pal1

1    things have nothing to do with this type of character.

2            THE COURT:  I think you are misreading 608.  It is

3    really designed to get at something else, not at damages.

4            But in that video, there was something you wanted to

5    take out at the end?

6            MR. TURKEL:  I just think there are two screenshots in

7    it that aren't the most flattering in the world.  It doesn't

8    matter, Judge.  They got the video in whatever native form they

9    got it.

10           THE COURT:  I mean, I'm not a witness.  I thought she

11   looked pretty darned good in that.

12           MR. TURKEL:  Yeah, I was making a tongue in cheek

13   comment, Judge.

14           THE COURT:  Yeah, okay.

15           MR. AXELROD:  One more, your Honor.  I am moving on,

16   finally, to DX 222, which came up yesterday.  This is a

17   statement Governor Palin made after the 2011 Gifford shooting.

18   This is the blood libel statement that Mr. Vogt referred to in

19   the Obama editorial "Together We Mourn" or something like that.

20   But specifically I want to focus you on the third paragraph of

21   page 2, where I will explain the relevance.

22           If you can blow that up, Mr. DiMezza.

23           You are going to see a familiar word in here.  These

24   are Ms. Palin's words.

25           THE COURT:  So what's the relevance to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2a2Pal1

1    cross-examination?

2         MR. AXELROD:  Well, the relevance, as I understand the

3    plaintiff's argument, is that "incite" can only mean direct

4    incitement.  Here, Governor Palin accuses the media of inciting

5    violence against her by claiming that she somehow was related

6    to the Gifford shooting.  Now, I believe she will say, no, the

7    media never said, Go attack Sarah Palin.  What she is saying is

8    that the media is interjecting, to use your word, indirect

9    incitement.  So the notion that Mr. Bennet is the only person

10   in the world who could use the word "incitement" that way is

11   certainly undercut by this statement.

12        THE COURT:  Well, let me hear from plaintiff's

13   counsel.

14        MR. TURKEL:  I will comment to the extent I understand

15   this, but their argument is Governor Palin or her agents who

16   handle these various sites and platforms, under -- I think what

17   they are saying is that she understands the word.  I'm not

18   really sure I understand what they mean, Judge.  I think the

19   question about "incite" being a direct or a general word

20   relates to the plain meaning of the word, as you focused on a

21   few times in this case.  If they are saying that this blurb

22   needs to be published to show that Governor Palin --

23        THE COURT:  Well, let me ask -- forgive me for

24   interrupting.  Let me ask defense counsel, are you going to be

25   arguing on summation that Mr. Bennet used the word "incite" in

M2a2Pal1

1   an unusual or at least what was in his mind was a nondictionary

2   use of the word "incite"?

3            MR. AXELROD:  No.

4            THE COURT:  No.

5            So then what's the relevance?

6            MR. AXELROD:  What I am going to argue is that

7   Mr. Bennet used the word "incitement" in the sense that,

8   through rhetoric, one could create an environment where

9   indirectly someone takes action, the exact same way that

10  Governor Palin is using the word "incitement" in this

11  statement.  And --

12           THE COURT:  I think that's -- it's admissible,

13  depending on her answers.  You have to lay a foundation, of

14  course.

15           MR. AXELROD:  Fair enough.

16           THE COURT:  All right.  The jury is here.  If we have

17  other matters to take up, we will take them up at the next

18  break.

19           Let's bring in the jury and let's get the witness back

20  on the stand.

21               (Continued on next page)

22

23

24

25

SApp-290

M2a2Pal1                    Palin - Direct

1          (Jury present)

2          THE COURT:  Ms. Palin, please come up to the witness

3     stand, please.

4      SARAH PALIN, resumed.

5          THE COURT:  Okay, counsel.

6     DIRECT EXAMINATION

7     BY MR. TURKEL:

8     Q.  Good morning, Governor Palin.

9     A.  Good morning.

10    Q.  We were wrapping up yesterday your background and one thing

11    I left out I think was whether you went to college.

12    A.  I did.  I was graduated from University of Idaho with a

13    degree in journalism, a minor in political science.

14    Q.  And what was your first job coming out of college?

15    A.  I was a sports reporter, after having interned at the local

16    NBC affiliate in Anchorage.

17    Q.  All right.  And that kind of brings us up to speed.

18          Where we had left off, I believe, with respect to your

19    political career yesterday, was the end of your term as

20    governor, which was in 2009, correct?

21    A.  Correct.

22    Q.  What did you do after that?  What did life become after you

23    were governor?

24    A.  I returned from the governor's mansion in Juneau to Wasilla

25    and just ushered my youngest kids through more education and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2a2Pal1                    Palin - Direct

1    helped out the older kids with their children and ran a

2    website, started speaking around the country with a speakers

3    bureau and did a lot of rallies, did a lot of help with

4    campaigns, did a lot of television appearances for commentating

5    and just giving analysis usually about current events.

6    Q.   What is SarahPAC?

7    A.   SarahPAC is -- was a political action committee really

8    committed to being around the country, finding, vetting good

9    candidates to run for usually it was national office.

10   Q.   And do you recall when it was formed?

11   A.   I don't remember the exact date, no.

12   Q.   What was your involvement in SarahPAC?

13   A.   Well, SarahPAC was Sarah, Sarah Palin.  It was the tool,

14   the forum to have my voice heard; had great people working with

15   and for SarahPAC, and we were able to get our message out via

16   SarahPAC to help candidates, to help issues.  Usually

17   everything surrounded kind of our foundational desire to see a

18   smaller, smarter government.

19   Q.   Have you, since 2009, since you left the governor's office,

20   have you run for office again?

21   A.   No.

22   Q.   Going forward from SarahPAC, how long has that been your

23   existence, this consulting, speaking, national platform type

24   work?

25   A.   Well, I could say it continues to today, but there aren't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-292

M2a2Pal1                          Palin - Direct

1   nearly as many requests for that kind of assistance anymore.
2   But it really ramped up, you know, from 2009 on and really
3   slowed down.
4   Q.   In 2011, do you recall how you first heard of the shooting
5   in Tucson?
6   A.   I don't recall specifically, but I do recall that it was of
7   huge concern to me personally and those involved in SarahPAC.
8   We knew that we would be responding to that event, that
9   tragedy.
10  Q.   How did you find out that blame was being allocated to you
11  for that shooting.
12  A.   Comments started pouring in, negative comments obviously, a
13  lot of false accusations, and there were lies about me somehow
14  having involvement inciting the murders of innocent people.   I
15  knew I had to respond.
16  Q.   And how did you choose to respond?
17  A.   I wrote -- I wrote responses and, you know, through social
18  media there are opportunities to get your message out, tried to
19  get the message out.   And it was -- I knew it was a very
20  sensitive subject because I wasn't going to politicize, like
21  the media was politicizing at the time, the deaths of a
22  9-year-old girl.
23  Q.   Your --
24  A.   Yup --
25  Q.   -- daughter was that age --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-293

M2a2Pal1                          Palin - Direct

1    A.   Yup.

2    Q.   -- at that time?

3    A.   My daughter Piper is five months older that

4    Christina-Taylor Green, and I just felt for the family more

5    than I can express; Christina and also the federal judge, John

6    Roll, and Ms. Morris and Ms. Schneck and Mr. Stoddard and

7    Mr. Zimmerman, all of their families, all of them so impacted,

8    this horrible, horrible tragedy.  I felt for them, and I wanted

9    to get the message out that there needed to be fairness and

10   facts reported about the tragedy.  But at the same time, I

11   wanted to respect the most important thing and that was

12   grieving families who deserved -- well, they deserved comfort,

13   and the last thing politics provides is comfort to anyone.

14   Q.   You didn't file a lawsuit in 2011, did you?

15   A.   No.

16   Q.   Why not?

17   A.   I will reiterate.  I wasn't going to politicize, capitalize

18   on the deaths of innocent people.  That was the last thing that

19   I would have done was interject myself via the judiciary and

20   politics in trying to help people who were adversely impacted

21   by that.

22   Q.   How did you feel personally, emotionally as a result of the

23   accusations in 2011?

24   A.   It was mortifying because I knew what the truth was.

25   Q.   Did it change your life at all as it related to your

M2a2Pal1                      Palin – Direct

1   day-to-day at the time?

2   A.  Absolutely.  The death threats really ramped up, disturbing

3   death threats against my children mostly, and there seemed to

4   be a campaign out there that was targeted towards my daughter

5   Piper.  It seemed like it was an orchestrated campaign, those

6   wishing the same thing happened to Piper as happened to

7   Christina.  And, yeah, people were -- I feared for my family's

8   safety and my supporters' safety because of those threats.

9            And what changed in the day-to-day life professionally

10  was when a bell is rung, you can't unring the bell; and when

11  the press was reporting that I incited the murder of innocent

12  people, professionally I had to kind of shift gears and work a

13  little bit harder to ask for accountability in the media so

14  they wouldn't lie.

15  Q.  I want to make sure the jury understands that when you

16  referred to the threats ramping up and things like that, is it

17  part of your existence over the years to have various threats,

18  nasty things said about you in the public forum?

19  A.  Every day, but it comes with the territory, as everybody

20  knows, when you involve yourself in national politics.

21  Q.  And around the time in 2011 of the Tucson shootings, it got

22  worse.  Is that what you are saying?

23  A.  It got worse.

24  Q.  Do you operate all your own social media platforms?

25  A.  No.

SApp-295

M2a2Pal1                    Palin - Direct

1   Q.  Over the years, who has operated your social media

2   platforms?

3   A.  Members of SarahPAC, volunteers who try to get deletions

4   when it comes to horrendous comments.  I have volunteers around

5   the country who have access to delete bad, bad comments and

6   threats, and a couple of friends.  There are various people who

7   help with the writing and do everything technical when it comes

8   to the social media forums and formats.

9   Q.  In the wake of 2011, before 2017, we have a six-year

10  period.  I'm not going to talk about every single day of every

11  single year, but what are we doing in that time frame?  What

12  are you doing in that time frame?

13  A.  As I said, I was traveling the country.  And this was, of

14  course, aside from being a mom.  Traveling the country, helping

15  with campaigns, a lot of television appearances.  I had a

16  contract with Fox News and was called upon often to comment

17  upon current events on politics, and writing books, and running

18  that website, having involvement in the website, anyway, and

19  helping candidates.

20  Q.  Moving forward in 2017, what is your life in 2017 sometime

21  around the early summer before "America's Lethal Politics" is

22  published?

23  A.  My life was busy and I was involved in those activities

24  that I just mentioned.

25  Q.  And when you say "those activities," you are referring to

M2a2Pal1                         Palin - Direct

1  what, the speaking, consulting, etc.?

2  A.  Yes.

3  Q.  How did you first find out about "America's Lethal

4  Politics," the editorial published by the *Times*?

5  A.  I don't remember specifically, but, again, like it happened

6  back in 2011, I was inundated with comments and concerns voiced

7  to me by those who worked with me and close to me and knew that

8  I would be mortified and needing to respond again to what *The*

9  *New York Times* had lied about again.

10        MR. AXELROD:  Objection.  Move to strike.

11        THE COURT:  Ground?

12        MR. AXELROD:  "Again"?

13        THE COURT:  Ah.

14        What did you mean by "again"?

15        THE WITNESS:  They have lied before.

16        THE COURT:  About this?

17        THE WITNESS:  My view was *The New York Times* took a

18  lot of liberties and wasn't always truthful.  That's what I

19  meant by "again."

20        THE COURT:  I'm not going to strike anything.  You may

21  inquire on cross if you wish.

22        MR. AXELROD:  Thank you.

23        MR. TURKEL:  And I will try and clarify also, Judge.

24  BY MR. TURKEL:

25  Q.  Governor Palin, when you say "again," are you talking

SApp-297

M2a2Pal1                    Palin - Direct

1    specifically with respect to the contention that you had

2    somehow incited Jared Loughner to shoot the people in Tucson?

3    A.  Precisely.

4    Q.  You were --

5              MR. AXELROD:  Objection, your Honor.

6              THE COURT:  Well, I am putting aside the fact that

7    leading questions are not permissible on direct of a nonhostile

8    witness, as you know, counsel.

9              Had the *New York Times* made the suggestion before the

10   2017 editorial or just other folks?

11             THE WITNESS:  I believe it was the *New York Times*

12   helping to lead the charge that a link was being made between

13   me, Sarah Palin, and SarahPAC, and political incitement,

14   actions that would turn into tragedy.

15             THE COURT:  And you say that was true back before this

16   editorial?

17             THE WITNESS:  Before the 2017 editorial?

18             THE COURT:  Yes.

19             THE WITNESS:  Yes.

20             THE COURT:  What are you specifically referring to?

21             THE WITNESS:  When *The New York Times* would write with

22   that linkage between Sarah Palin and inciting political

23   violence.  And I don't have the specific articles, of course,

24   in front of me, unless they are in exhibits.

25             MR. AXELROD:  Your Honor, can I see you at sidebar,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

901

M2a2Pal1                    Palin – Direct

1   please.

2           THE COURT:  Excuse me?

3           MR. AXELROD:  Could we talk at sidebar, please?

4           THE COURT:  Yes.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M2a2Pal1                          Palin – Direct

1                  (At the sidebar)

2              THE COURT:  Has there been any evidence in this case

3       of *The New York Times* making this insinuation before 2017?

4              MR. TURKEL:  Yes, Judge.  Actually Ross Douthat talked

5       about it yesterday.  We are trying to talk about the exact

6       article he referenced.  But they certainly published in 2011

7       along with the rest of the world.

8              THE COURT:  I don't have a specific recollection of

9       that, but if it's in evidence, then that's fine.

10             MR. AXELROD:  There is no article in evidence, and the

11      fact is that this is incredibly prejudicial because she didn't

12      sue in 2011, and now they are going to argue that somehow the

13      damages that she incurred from 2011 is conflated with 2017.  I

14      noted this in our pretrial --

15             THE COURT:  All right.  Let me see the article.

16             MR. AXELROD:  There is no article.

17             THE COURT:  That's what --

18             MR. TURKEL:  I --

19             MR. AXELROD:  There is a reference to something.

20      There is no article.

21             MR. TURKEL:  Mr. Vogt is looking for it now, and

22      Douthat testified without objection about it.

23             But I want to be very clear.  I don't want to seek

24      damages for 2011.  I know we can't do that, Judge.  This is why

25      I brought up the idea that they want to bring around these

SApp-300

M2a2Pal1                    Palin - Direct

1    temporal things surrounding 2011.  It is just context for the

2    fact that in 2017 the contentions at whole were like opening a

3    sealed wound.  We are not going to lay blame at the *New York*

4    *Times* for 2011.  Everybody wrote about it in 2011.

5            THE COURT:  It's a much more narrow question.  The

6    question is, is there any basis for her saying that *The New*

7    *York Times* made this accusation before 2017?  I don't want to

8    hear about damages.  I don't want to hear about theories.  I

9    don't want to hear about anything else.  What is the basis for

10   her saying that?

11           MR. TURKEL:  Your Honor, you have asked her.  She

12   doesn't remember a specific article.  We are going to look and

13   see if we can refresh her memory on it.  If not, it is fair

14   game for cross, I guess.

15           THE COURT:  It certainly is fair game for cross.  I

16   may then instruct the jury — we will see how it goes — that

17   there is no such article.  So I think for now we will move on,

18   but I am skeptical that there is such an article.  I certainly

19   don't remember.

20           MR. AXELROD:  The difficulty for me, and I really

21   appreciate this, when I took Ms. Palin's deposition, she did

22   this in my deposition and just would conflated 2017 and 2011

23   intertwined, and I couldn't get an answer out of her about

24   2017.  She would just talk about 2011.  And I asked her

25   repeatedly, What article are you referencing? and she said, I

SApp-301

M2a2Pal1                    Palin – Direct

1   don't know.  My lawyers will get back to you.  And it makes it

2   really confusing.

3            THE COURT:  So this should have been handled in

4   preparing her for her testimony here.

5            MR. AXELROD:  Yes, and I included it in our joint

6   pretrial order.

7            MR. TURKEL:  When he said I included it, I don't know

8   what it refers to, but with respect to a specific article,

9   whatever, we are looking.  I do know that Mr. Douthat

10  referenced this without objection yesterday, certainly not

11  this --

12           THE COURT:  I'm sorry.  I don't recall what the

13  testimony was regarding any article or any statement by *The New*

14  *York Times*.  It is uncontested that there were other people

15  making accusations at the time that this was inciting violence

16  and all of that, both sides have explored that, but not *The New*

17  *York Times*.

18           So let me ask you this --

19           MR. TURKEL:  Sure.

20           THE COURT:  -- is it correct that I should instruct

21  the jury now that there is no article by *The New York Times*

22  making this accusation prior to 2017?

23           MR. TURKEL:  Judge, we would want the opportunity,

24  because when I sidebarred with Mr. Vogt --

25           THE COURT:  Well, he has had ten minutes.

SApp-302

M2a2Pal1                    Palin - Direct

 1            MR. TURKEL:  He may have it in there.

 2            THE COURT:  Go find out and come back.

 3            MR. TURKEL:  One minute, your Honor.

 4            (Pause)

 5            MR. TURKEL:  We are printing a copy.  For some reason

 6    we didn't have a spare one.  On 1/9/2011, Charles Krugman, and

 7    this is what Mr. Douthat spoke about yesterday, you Honor,

 8    wrote an article called "Climate of Hate."

 9            THE LAW CLERK:  Paul Krugman?

10            MR. TURKEL:  Yeah, yeah.

11            MR. AXELROD:  I have never seen this.

12            MR. TURKEL:  It's on the list.

13            MR. AXELROD:  Yeah, and I objected to it.

14            THE COURT:  Pardon?

15            MR. AXELROD:  I objected to it.

16            THE COURT:  Well, that doesn't matter.  If in fact

17    there is such an article, then I can't instruct the jury that

18    there is no such article.  But I have to see what the article

19    says.

20            THE LAW CLERK:  What number is it?  181.

21            MR. TURKEL:  No, no, no.

22            MR. AXELROD:  I don't know.

23            THE LAW CLERK:  We have copies of all of them.

24            THE COURT:  Will someone get it or do I sit here like

25    a potted plant?

SApp-303

M2a2Pal1                         Palin - Direct

1                MR. TURKEL:  It's 295.

2                THE LAW CLERK:  Plaintiff's 295?

3                MR. TURKEL:  Yes.

4                (Pause)

5                THE COURT:  I don't see --

6                THE LAW CLERK:  I think it might continue.

7                THE COURT:  Excuse me.

8           I don't see any reference to Ms. Palin in this.  This

9      is an article, January 19, 2011, in the *New York Times* by a

10     columnist Paul Krugman, and it certainly makes the suggestion

11     that "right-wing extremism was on the rise with a growing

12     potential for violence," and he says that this includes, I will

13     read this next paragraph as I think it is relevant

14     "conservatives denounced that report.  But there has, in fact,

15     been a rising tide of threats and vandalism aimed at elected

16     officials, including both John Roll, who was killed Saturday,

17     and Representative Gabrielle Giffords.  One of these days,

18     someone was bound to take it to the next level.  And now

19     someone has."

20          But what I don't see here, this is clearly an

21     accusation that rising -- that the rhetoric has led to a,

22     quote, climate of hate, that therefore created the climate in

23     which the assassinations of Judge Roll and others and the

24     shooting of Ms. Giffords occurred.  I don't see a specific

25     reference there to the Sarah Palin map, but I do think that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2a2Pal1                        Palin - Direct

1    this is generally addressed to the supporters as they say, he

2    says here, "And you could see, just by watching the crowds at

3    McCain-Palin rallies, that it was ready to happen again."

4              So I think this is enough.  You, of course, can do

5    cross-examination.  Now, I'm sorry --

6              MR. AXELROD:  Your Honor.

7              THE COURT:  Excuse me.

8              MR. AXELROD:  I'm sorry.  I apologize.

9              THE COURT:  We have kept the jury much too long.

10             MR. AXELROD:  I know.

11             THE COURT:  I'm not going to issue an instruction now.

12   We will see what you do with it on cross.

13             MR. AXELROD:  Can I make one point --

14             THE COURT:  Yes.

15             MR. AXELROD:  -- very briefly?

16             Your Honor, I believe, I don't have the realtime in

17   front of me, but Ms. Palin testified that *The New York Times*

18   lied about her.  I believe that's what it says.  And this does

19   not talk about her being blamed for the Gabby Giffords

20   shootings.

21             THE COURT:  I'm not going to go any further at this

22   point in time.  Witnesses on their testimony frequently make

23   errors, and that's why we have cross-examination.  But I don't

24   think this calls for an instruction of the Court given this

25   article.

SApp-305

M2a2Pal1                        Palin - Direct

1          MR. TURKEL:  Judge, please read this.

2          THE COURT:  You have won, but you would still like to

3     argue further.

4          MR. TURKEL:  I think it is beneficial to everybody in

5     here, and I wouldn't have done it if I didn't.  I think when

6     Shane referred me to 295, that's because that's what Douthat

7     was talking about, this actually specifically references the

8     crosshairs.  That was my concern.

9          THE COURT:  Oh another article.  Okay.  So this is *New*

10    *York Times*, January 8, 2011, right after the shooting in

11    Arizona.

12         MR. TURKEL:  And the day before.

13         THE COURT:  Oh, yes.  There it is.

14         MR. AXELROD:  And look at the first line.

15         THE COURT:  I'm sorry.  It says -- the first line

16    is -- and this is apparently -- it is marked the opinion pages,

17    but it is not signed by anyone, so maybe it is an editorial.

18         MR. TURKEL:  I think it was Krugman again.

19         THE COURT:  But in any event it says, "We don't have

20    proof yet that this was political, but the odds are that it

21    was.  She's been the target" -- this is referring to

22    Ms. Giffords -- "she's been the target of violence before."

23         And then it goes on in the same paragraph to say,

24    "And, yes, she was on Sarah Palin's infamous crosshairs list.

25    I am glad you pointed me to this article because, I agree with

SApp-306

909

M2a2Pal1                         Palin - Direct

1   you, it makes my ruling even easier.  No instruction will be

2   given, but you can cross-examine.

3            MR. AXELROD:  Thank you.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SApp-307

M2A1PAL2                          Palin - Direct

1          (In open court)

2          THE COURT:  So ladies and gentlemen, every once in a

3   while, a legal issue comes up that I have to deal with out of

4   the presence of the jury, and that's when we have called

5   sidebars, but we actually, because of the pandemic, go down the

6   hall to another room; and I hear stuff that is not necessarily

7   stuff that you should hear because it may not be evidence.  And

8   we try to keep these to a minimum.  I'm sorry that this one

9   took so long.  I know you enjoyed sitting here twiddling your

10  thumbs.  And we will try very hard not to have further

11  sidebars, but that's what that was all about.  I had to resolve

12  a legal issue, which I've now resolved.

13          Go ahead, counsel.

14  BY MR. TURKEL:

15  Q.  Governor Palin, I want to focus on 2017 right now and how

16  you felt when you heard that "America's Lethal Politics" had

17  come out.

18          MR. TURKEL:  If we could pull up Exhibit 1,

19  Plaintiff's 1.

20          All right.  There we go.

21  Q.  Governor Palin, I take it you've seen this editorial

22  before?

23  A.  Yes.

24  Q.  Do you remember where you were when you first found out

25  this editorial had been published?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                          Palin - Direct

1    A.  No.

2    Q.  Do you remember who told you it had been published?

3    A.  I don't remember.

4    Q.  What do you remember when you found out about it?

5    A.  I remember feeling immediately, oh, no.  First, realizing

6    how significant and horrible the incident was and then

7    mortified, again, that there would be a linkage in there

8    written by whomever was on the editorial board that I knew I'd

9    have to take issue with.

10   Q.  Were you running for office at the time?

11   A.  No.

12   Q.  Were you in politics at the time?

13   A.  No.

14           MR. TURKEL:  I want to pull up -- and if we could,

15   Mike, go to the second page, please.

16           And cut off the first two paragraphs.

17   Q.  By 2017, when Exhibit 1 was published, had you done your

18   best to put 2011 to rest?

19           MR. AXELROD:  Objection.

20   A.  Yes, sir.

21           THE COURT:  It's a little vague, but I'll allow it.

22           MR. AXELROD:  It was actually the leading nature, your

23   Honor.

24           THE COURT:  Well, that's true too.  But life is short,

25   so I'll allow it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                    Palin - Direct

1           MR. AXELROD:  Thank you.
2   BY MR. TURKEL:
3   Q.  Were you in the media as much in 2017, meaning actively
4   doing media interviews, as you were in 2011?
5   A.  No.
6   Q.  Was your profile as high?
7   A.  Not at all.
8   Q.  At one point in time after you left the governor position,
9   were you considering running for president?
10  A.  Yes.
11  Q.  By 2017, was that a consideration?
12  A.  No.  I think --
13  Q.  I'm not trying to get you to commit that you were running
14  for president in 2017.
15  A.  No.
16  Q.  What did you do in response to this publication when you
17  found out about it?
18  A.  Discussed the errors in this editorial with those whom I
19  trusted to advise as to what to do next, because it was -- as I
20  say, it was another, oh, no, not again, what are we going to do
21  to correct those errors, those untruths in the editorial when
22  it links me to inciting the murders of innocent people.
23  Q.  Did you feel like you had as much power in 2017 as you did
24  in 2011 to address these things?
25  A.  No.  In that context, I was powerless.  I -- no.  I didn't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-310

913

M2A1PAL2                    Palin - Direct

1   have the political action committee up and running and

2   aggressive; I didn't have a -- any television contracts; I

3   wasn't a regular on television.  No, I didn't have that

4   platform.

5              MR. TURKEL:  If you could, just for the witness,

6   pull -- not in evidence yet -- pull up 114, Plaintiff's 114.

7   Q.  Governor Palin, without discussing the contents of that

8   exhibit, do you recognize it?

9   A.  I do.

10  Q.  And do you recall providing that statement that ultimately

11  resulted in that article being published?

12  A.  I do.

13             MR. TURKEL:  Judge, we'd offer Plaintiff's 114.

14             MR. AXELROD:  No objection.

15             THE COURT:  Received.

16             (Plaintiff's Exhibit 114 received in evidence)

17             MR. TURKEL:  And if you could publish.

18  BY MR. TURKEL:

19  Q.  Governor, in looking at 114, do you see the date?

20             MR. TURKEL:  Mr. Bucher, you'd have to highlight it.

21  A.  Yes.

22  Q.  All right.  That's June 14, 2017.  Do you recall how soon

23  after you gained knowledge of the editorial being published

24  that you provided the statement that's reflected in this

25  article?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                    Palin - Direct

1    A.  My response would have been as soon as possible.  It both

2    happened on the same day; *New York Times* published and I

3    responded the same day.

4            MR. TURKEL:  And if we could, Mr. Bucher, I don't know

5    if that line -- the bottom of the last line, you need to go to

6    the next page.  Yeah, or scroll up.

7            There we go.  And if you could highlight that top

8    paragraph.

9            And Mr. Bucher, if you could highlight "For those

10   seeking" down.

11   BY MR. TURKEL:

12   Q.  Why did you respond with these comments about Bernie

13   Sanders?

14   A.  I was defending Bernie Sanders because there would be, I

15   anticipated, some who would want to blame Bernie Sanders or

16   link him to this shooting, because it had already been reported

17   that the shooter was a Bernie Sanders supporter and I did not

18   want to see -- more untruths printed.  I wanted Bernie Sanders

19   to not be blamed, that there would not be another knee-jerk

20   reaction trying to score political points by capitalizing on

21   horrific violence.

22           MR. TURKEL:  And if we could pull back now to the

23   whole article.

24           Blow it up so we can actually read it.  Can you cut

25   out the text so it can be read.  It's too small.

SApp-312

915

M2A1PAL2                         Palin - Direct

1          I want to pull up Plaintiff's 176, again, for the

2    witness.  I don't think these are in yet.

3    BY MR. TURKEL:

4    Q.  And Governor Palin, do you recognize that tweet?

5    A.  I do.

6    Q.  And is that from your verified Twitter account?

7    A.  Yes.

8          MR. TURKEL:  Judge, at this time we'd offer 176.

9          MR. AXELROD:  Your Honor, I would object to the --

10         THE COURT:  Sustained.

11         MR. TURKEL:  Judge, would he accept redacted, cut out

12   the portion after the top?

13         MR. AXELROD:  No objection to that plan.

14         THE COURT:  Okay.

15         MR. TURKEL:  Let's do this.  Take that one down.  Show

16   the witness 177.

17         Judge, I'd like to offer that—but not publish it—as

18   redacted.

19         THE COURT:  Yes.

20         MR. TURKEL:  Okay.

21         (Plaintiff's Exhibit 176 (as redacted) received in

22   evidence)

23         MR. TURKEL:  Received, your Honor, as redacted?  All

24   right.

25   BY MR. TURKEL:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-313

M2A1PAL2                        Palin - Direct

1    Q.  I'm showing you now, Governor Palin, Exhibit 177.  Do you

2    recognize that?

3    A.  Yes.

4    Q.  And is that from the same Twitter account we just

5    discussed?

6    A.  Yes.

7            MR. TURKEL:  Judge, we'd offer 177.

8            MR. AXELROD:  And again, your Honor, I would object to

9    the portion that is not Ms. Palin's statement.  Ms. Palin's

10   statement can come in.

11           MR. TURKEL:  Judge --

12           THE COURT:  The portion that is not her statement.

13           MR. AXELROD:  Yeah, I object to the --

14           THE COURT:  Yeah.  Okay.  So we can redact that.  So

15   cut that out and then the rest will be received.

16           (Plaintiff's Exhibit 177 (as redacted) received in

17   evidence)

18           MR. TURKEL:  All right.  We'd offer 177, your Honor,

19   as redacted.

20           THE COURT:  Received.

21           MR. TURKEL:  I reserve the right to be heard.  I don't

22   want to --

23           THE COURT:  Okay.

24           MR. TURKEL:  Okay.  Okay.  And if you could go ahead

25   and publish that.

SApp-314

M2A1PAL2                    Palin - Direct

1              Mike, can you put it up in a way that the date is

2    obvious.  Redacted.

3              There we go.  Perfect.  I'm sorry for taking so long

4    there.

5    BY MR. TURKEL:

6    Q.  So this was on June 15, 2017, Governor, at 6:30 a.m.  Do

7    you do all your tweets by yourself?

8    A.  At that time, I did most of them, yes; nowadays, no.

9    Q.  Do you remember this particular tweet?

10   A.  I do.

11   Q.  And was this after you had read the editorial?

12   A.  Yes.

13   Q.  We can't talk about anything other than the language you've

14   used here, but when you say the media is doing exactly what you

15   said should not be done, what were you referring to?

16   A.  I was referring to the statement that I had made the day

17   before, asking, pleading with the media to not -- and that

18   usual knee-jerk reaction, looking for someone to blame and not

19   letting the tragedy go to waste.  Granted, no lives were lost

20   in that horrific shooting, but I was doing -- reprimanding in

21   that statement and warning, and the next day I saw that it went

22   unheeded.

23   Q.  And what do you mean when you say that, the next day?

24   A.  Because *The New York Times*, the be-all, end-all, the loud

25   voice in media, had already taken that knee-jerk reaction, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                    Palin - Direct

1   I felt was already trying to score political points—that's my
2   opinion—politicizing horrific violence.
3   Q.  Did you have a chance to read the corrections that were
4   done by *The New York Times*?
5   A.  Yes.
6           MR. TURKEL:  Let me find the exhibit numbers and pull
7   them up.  I believe they're 6 and 7.
8           All right.  If you can pull up No. 5, please.
9   Q.  All right.  So Governor Palin, we'll show you Plaintiff's
10  Exhibit No. 5 here, which is in evidence.
11          MR. TURKEL:  And please scroll to the second page
12  where the correction is.
13  Q.  Now on June 15th, the day after the editorial was
14  originally published, were you able to read this correction
15  that was published?
16  A.  Yes.  Someone brought it to my attention.  I read it.
17  Q.  Did it do anything in your mind to cure the contentions
18  made about you in the first original edition?
19  A.  There was no mention of me in this, what they called the
20  correction.
21          MR. TURKEL:  If you go up to the text, Mike, the two
22  paragraphs.
23  Q.  And when you read the first corrected edition, did you go
24  back and read these paragraphs again?
25  A.  Absolutely.  Before I wanted to comment on their -- what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                         Palin - Direct

1   they had called the correction, I wanted to make sure I had

2   read it right.

3   Q.  Before the original article was published on June 14th, did

4   anybody from *The Times* call you for a comment?

5   A.  No.

6   Q.  At any point in time before any of the three editions were

7   put out there, published, did you get a call from *The Times*?

8   A.  No.

9            MR. TURKEL:  If you could pull up No. 6, please.  And

10  Mr. Bucher, please pull up the corrected language on No. 6.

11  Q.  Governor Palin, this is the June 16th correction.  Did you

12  have any opportunity to read this when it was published?

13  A.  Yes.

14  Q.  Did it make you feel any better about the accusations that

15  had been made in the original edition of this?

16  A.  No.

17  Q.  Do you see your name anywhere in that correction?

18  A.  No.

19           MR. TURKEL:  If you could, Mr. Bucher, pull the two

20  paragraphs up from the actual text.

21  Q.  And when you read the June 16th corrected editorial, did

22  you read those two paragraphs, the ones that have been cut out

23  there by Mr. Bucher?

24  A.  Yes.

25  Q.  Did you see anything change with respect to the contentions

SApp-317

M2A1PAL2                    Palin - Direct

1   that were made in that paragraph?

2   A.  Nothing changed.  They doubled down.

3   Q.  The language here that your political action committee

4   circulated a map, did it ever circulate a map?

5   A.  No.  It was put on my website.  The media circulated it.

6   Q.  Did you get any calls from *The Times* with respect to the

7   second correction?

8   A.  No.

9   Q.  To the best of your knowledge, Governor Palin, did *The*

10  *Times* ever do a correction in which they mentioned you by name?

11  A.  No.

12  Q.  At any point in time, prior to when you filed the lawsuit

13  or after you filed the lawsuit, did anybody from *The Times*

14  apologize to you?

15  A.  No.

16  Q.  I want to talk to you, if possible, about how you dealt

17  with this after the corrections and all the articles I just

18  showed you.  How did you feel emotionally at that time?

19  A.  Well, it was devastating to read again an accusation, a

20  false accusation that I had anything to do with murder,

21  murdering innocent people, and I felt powerless.  I -- I knew

22  that, you know, if I -- if I wanted to raise my head and try to

23  get the word out that there were untruths printed once again, I

24  knew I was up against Goliath and I felt collectively the

25  people were David, that I was David, and it was tough to, one,

M2A1PAL2                    Palin - Direct

1    to try to figure out what were the stones that David could use

2    to halt these actions of this Goliath, but also tough to really

3    feel that enthusiasm to get back out there and work for

4    integrity in media—specifically this medium.

5    Q.   In addition to the statement that you released that was

6    published in the article we looked at, did you do anything else

7    publicly on this?

8    A.   I commented on it.  I don't know how public the comments

9    were.

10   Q.   Ultimately you filed a lawsuit, did you not?

11   A.   I did.

12          MR. TURKEL:  Judge, I think I want a moment to confer,

13   but I think I'm done for right now.

14          THE COURT:  Okay.

15   Q.   Governor, did you receive any calls from friends or people

16   you knew who had read the article?

17   A.   Yes.

18   Q.   And in that respect what were people calling you to tell

19   you?

20   A.   It ran the gamut.

21          MR. AXELROD:  Objection.

22          THE COURT:  Hold on.

23          Well, I assume, counsel, you're asking this not for

24   the truth of what was said but for its impact on her.

25          MR. TURKEL:  Yes, Judge.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                          Palin - Direct

1              THE COURT:  Ah.  Overruled.

2    BY MR. TURKEL:

3    Q.  You can go ahead and answer.

4    A.  It ran the gamut, the comments.  Received bits of advice,

5    questions as to how or why I would want to get back out there

6    and take on an issue of -- that we're talking about and --

7    well, it was a time of frustration, because those who are close

8    to me know me best.  They were frustrated and trying to give me

9    a little bit of advice on what -- they, again, who knew me

10   best -- what I should do.

11   Q.  Did you feel any physical impacts on a day-to-day basis,

12   sleep, anything like that?

13   A.  Yes.

14   Q.  Could you explain those to the jury.

15   A.  Well, it -- it's hard to lay your head on the pillow and

16   have restful nights when you know that lies are told about you,

17   a specific lie that was not going to be fixed.  That causes

18   some stress anyone would feel.  So yes, tough to get a good

19   night's sleep.

20   Q.  Do you like complaining?

21   A.  No.  That's why I'm kind of stammering through this.

22   Q.  Over the course of your life, the way you are, do you like

23   whining about things?

24   A.  I don't.  I have a motto that's all over sweatshirts that

25   we give out that say "Suck it up, Cupcake," because I don't

SApp-320

M2A1PAL2                    Palin - Cross

1    like to complain and I don't necessarily want to hear others

2    complain.

3    Q.  Was it hard for you when this was published to deal with

4    how you felt about it?

5    A.  It was, because there I was up in Wasilla, Alaska, with

6    that frustration of knowing that, you know, you're up against

7    those who buy ink by the barrel, and I had my No. 2 pencil on

8    my kitchen in Alaska, and I knew it was going to be tough to

9    deal with and I would probably have to deal with it on my own.

10           MR. TURKEL:  Judge, I have no further questions.

11           THE COURT:  Cross-examination.

12           MR. AXELROD:  Thank you, your Honor.

13   CROSS EXAMINATION

14   BY MR. AXELROD:

15   Q.  Good morning, Governor Palin.

16   A.  Good morning.

17   Q.  Do you have enough water up there?

18   A.  Yes.

19   Q.  Okay.  I think you made a comment earlier that when -- I'm

20   trying to find it, so bear with me for a second.  But when you

21   enter public life, you kind of expect -- I can't find it.  I

22   can't find it exactly, but tell me if I got it wrong.  You kind

23   of expect to take some shots when you enter into public life.

24   A.  Some shots, yes.

25   Q.  And when you entered into public life -- I guess you were

SApp-321

M2A1PAL2                    Palin - Cross

1   governor in 2006; is that correct?

2   A.  That's when I was elected, 2006.

3   Q.  And then just trying to get the time line right.  Would it

4   be in September of 2008 you were nominated to be vice president

5   on the Republican ticket?

6   A.  August 2008.

7   Q.  August 2008.  You would agree that at about that time kind

8   of the public focus on you really ramped up?

9   A.  Absolutely.

10  Q.  Right.  And fair to say that a lot of people really liked

11  you, right?

12  A.  I don't know if a lot of people did, but some.

13  Q.  Well, I think tens of millions of people voted for you and

14  John McCain, right?

15  A.  They did.

16  Q.  Right.  And fair to say you gave a very well-received

17  speech at the Republican Convention I think in September of

18  2008?

19  A.  Yes.

20  Q.  I think it was praised by a lot of people in the media; is

21  that right?

22  A.  Yes.

23  Q.  But fair to say that when you go into that level, that very

24  top of the pyramid, you get a lot of people taking shots at you

25  too, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                    Palin - Cross

1    A.  You become a target and people take shots.

2    Q.  Right.  And you expect all that, right?

3    A.  I expect a level playing field when you're in that

4    territory, anticipating some shots.

5    Q.  Right.  But, I mean, you know it's going to come because

6    whether we like it or not, fair to say we live in a country

7    that, it's about 50/50—50 percent on one side, 50 percent on

8    the other side—right?

9    A.  Yes.

10   Q.  And so you know if you're going to be the tippy, tippy top,

11   you're going to take some shots from the other guys, right?

12   A.  Yes.

13   Q.  All right.  And fair to say that in the run-up to that 2008

14   election, you took some shots, right?

15            MR. TURKEL:  Objection, vague.

16   A.  That is vague.  Like what?

17   Q.  There was a lot of criticism, I guess, of people who

18   thought you were unprepared; is that right?

19   A.  That what?

20   Q.  You were unprepared?

21            MR. TURKEL:  Objection, relevance, your Honor.

22   A.  You said in the run-up to the 2008 --

23            THE COURT:  Whoa, whoa.  Hold on.  There's an

24   objection.

25            I think plaintiff's counsel can't have it both ways.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-323

M2A1PAL2                        Palin - Cross

1    You objected to the general question as vague, and now he's

2    trying to put some specifics on it.  Overruled.

3    Q.  So, Governor, fair to say that there were some people in

4    the media who said you were unprepared to be one heartbeat away

5    from the presidency; is that right?

6    A.  I'm sure that was said.

7    Q.  Right.  And when you reach that tippy, tippy top, fair to

8    say a lot of attention came to, you know, kind of some of the

9    things you had done in Alaska; is that right?

10   A.  I didn't have time nor desire to read what was being

11   written about me while I was jumping on that campaign trail.

12   Q.  But clearly you knew that -- I mean, I think you knew that

13   there was a lot of attention being paid to you and your record,

14   correct?

15   A.  No.  That was the problem.  My record wasn't being

16   reported.

17   Q.  Yesterday you talked about -- I think your testimony was

18   something like one of the reasons you wanted to run for

19   governor was to help clean up corruption; is that right?

20   A.  Absolutely.

21   Q.  After you got that nomination, weren't there allegations

22   about malfeasance by you as governor?

23              MR. TURKEL:  Objection.

24              THE COURT:  Sustained, on 403.

25              MR. AXELROD:  Your Honor, I think the door has been

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-324

M2A1PAL2                    Palin - Cross

1    opened.

2           THE COURT:  I understand that's your argument.

3    Q.  So I don't think Mr. Turkel asked you this yesterday, but

4    after the election was over and President Obama and now

5    President Biden won, you went back to Alaska; is that right?

6    A.  Yes.

7    Q.  And your term was to go through November of 2010, through

8    December of 2010?

9    A.  I -- I believe that would have been the month it would have

10   ended, yes.

11          MR. TURKEL:  Judge, if I can anticipating something,

12   I'd probably like a sidebar on this.

13          THE COURT:  Well, I don't think we need yet a sidebar.

14   Do you want to ask defense counsel privately what the next

15   question he's going to put, then we'll see if we need a

16   sidebar.

17          (Counsel conferring)

18   BY MR. AXELROD:

19   Q.  Governor Palin, isn't it true that you didn't serve out

20   your full term, correct?

21   A.  Correct.

22   Q.  You resigned in -- I hope I have the dates right, but

23   correct me if I got it wrong.  You resigned in early July of

24   2009?

25   A.  Correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                         Palin - Cross

1   Q.   About 18 months before the end of your term?

2   A.   Heading into the legislative lame duck session.  I don't

3   know how many months that -- that was exactly.

4   Q.   Well, July --

5   A.   It was about a year and a half, yes.

6   Q.   So about 18 months.  And fair to say that you took a lot of

7   criticism for resigning early?

8   A.   That's subjective also.

9   Q.   I'm not asking you whether it was accurate, but I'm just

10  saying, isn't it fair that people criticized you for not going

11  through --

12  A.   Some.

13  Q.   And fair to say at that time you were getting lots of hate

14  mail?

15  A.   What do you mean by lots?

16  Q.   Did you get any hate mail back in the --

17  A.   Yes.

18  Q.   -- 2009-2010 period?

19  A.   Yes.

20  Q.   And that was that way -- you received hate mail ever since

21  you ran -- since you were the VP nominee?

22  A.   I think ever since I was a city council member, yes.

23  Q.   And personally, you have felt animus from the political

24  left in this country since the 2008 election.

25  A.   Some.

SApp-326

M2A1PAL2                    Palin - Cross

1   Q.  And you wouldn't be surprised to hear people describe you

2   as polarizing; isn't that right?

3   A.  I've heard that.

4          MR. AXELROD:  And Mr. Turkel, actually, I'm going to

5   ask that question.  I am going to ask that question that you

6   asked me about.

7          MR. TURKEL:  Judge, I'd like to approach.

8          THE COURT:  No.  Ask the question and let's see.

9   Q.  Governor Palin, you resigned 18 months early because of

10  inundations with complaints about lawsuits and ethical

11  violations?

12         THE COURT:  Okay.  Now I see the -- sustained.  The

13  jury will disregard the last question.

14         And just for guidance of counsel, this is a 403 issue,

15  and that's the basis for my ruling.

16         MR. AXELROD:  Thank you, your Honor.

17  Q.  And so I'm kind of now focusing on the period after you

18  resigned from the governorship, Governor Palin.  So I think you

19  testified that after the resignation in 2009, you started

20  giving paid speeches?

21  A.  Yes.

22  Q.  And you became a member of a speakers bureau?

23  A.  Yes.

24  Q.  Could you just explain to the jury what a speakers bureau

25  is.

M2A1PAL2                    Palin - Cross

1    A.  It's a business that hustles gigs for their clients, and I
2    would have been a client of Washington Speakers Bureau.  They
3    found events that I would attend and be paid to be a keynote
4    speaker.
5    Q.  And you've been giving paid speeches from 2009 all the way
6    up through 2019?
7    A.  Yes.  A trajectory -- or you don't want to know about the
8    number of speeches.
9    Q.  Well, I just want to know:  You gave speeches, paid
10   speeches in 2011; is that right?
11   A.  Yes.
12   Q.  And in 2012?
13   A.  Yes, through 2019, sure.
14   Q.  And you're still giving paid speeches today, right?
15   A.  Haven't in quite awhile.
16   Q.  Are you a member -- you're currently associated with a
17   speakers bureau called All American Speakers?
18   A.  I don't have a contract with them.
19   Q.  But they advertise that you're available for speeches,
20   right?
21   A.  Yeah, I think I am on their website, and I've asked them
22   why I am because it's been a long time since I've done anything
23   for them.
24   Q.  But you've been giving public speeches at conventions, kind
25   of -- I guess in the past year, right?

M2A1PAL2                    Palin - Cross

1   A.  Conventions?

2   Q.  Yeah.  I guess like meetings?

3   A.  Yes.

4   Q.  Something called AmericaFest in December that you gave a

5   speech at?

6   A.  Yes.

7   Q.  And I think in June of 2021, you appeared at a Young

8   Women's Leadership Summit in Dallas, Texas?

9   A.  Yes, and that was the same organization, the umbrella -- I

10  think it was Turning Point USA -- both those speeches that

11  you're talking about.

12  Q.  And after you resigned, I think you testified you've

13  written a number of books?

14  A.  Four.

15  Q.  Four or five?

16  A.  Four.

17  Q.  Okay.  What about *Going Rogue*?

18  A.  Yup.

19  Q.  That was in 2009?

20  A.  Yes.

21  Q.  I think the second one was *America by Heart*, and that was

22  in 2010?

23  A.  Yes.

24  Q.  *Sarah Palin Uncut* in 2011?

25  A.  Didn't write it, didn't read it.

SApp-329

M2A1PAL2                         Palin - Cross

1              MR. AXELROD:  Mr. DiMezza, could you put up DX 218 for
2    the witness only.
3    Q.  Governor Palin, I'm showing you what looks to be a cover of
4    a book called *Sarah Palin Uncut*.  Do you recognize this?
5    A.  No.  Had I written that, I sure wouldn't have chosen that
6    as a cover shot.
7    Q.  You didn't write this book?
8    A.  No.  And I don't think I've seen it.
9    Q.  Okay.  You wrote *Good Tidings and Great Joy* in 2013?
10   A.  Yes.
11   Q.  You wrote *Sweet Freedom: A Devotional*, in 2015?
12   A.  Yes.
13   Q.  And so I think one of the other things you said you've been
14   doing is that you've been a Fox News commentator; is that
15   right?
16   A.  Yes.  Had been, yes.
17   Q.  Yeah.  Well, you still have been on Fox News --
18   A.  Yes.
19   Q.  -- even after not being a paid commentator, right?
20   A.  Yes.  I'm sorry.  I was assuming you meant as a paid
21   commentator because you were talking about the paid speeches.
22   Yes.
23   Q.  So let's just, if we can, try to explain that to the jury.
24   From 2011 to 2015, you were a paid commentator for Fox News; is
25   that right?

SApp-330

M2A1PAL2                    Palin - Cross

1   A.  On and off before they let me go.  There were a couple of

2   different times that I had contracts, so there were gaps.

3   Q.  Didn't your -- I think you signed your first contract with

4   Fox News in January of 2010; is that right?

5   A.  I don't know.  I can't recall the date that --

6   Q.  Approximately 2010; does that sound right?

7   A.  Approximately, yeah, I think it was 2010.

8   Q.  And then it ran through -- you were a paid Fox News

9   commentator through June of 2015?

10  A.  With a gap in there between contracts.

11  Q.  Yeah.  So your first contract went through 2013; is that

12  right?

13  A.  I believe so.

14  Q.  And then you got a new contract in 2013 that went through

15  2015?

16  A.  I don't know the dates, but yeah, I continued to work, or

17  at least my name was associated, with Fox News, yes.

18  Q.  So maybe -- I'm going to try to help refresh your

19  recollection.

20          MR. AXELROD:  Mr. DiMezza, if you could put up, I

21  guess it's deposition --

22          THE COURT:  I'm not sure I see the relevance.  The

23  witness has confirmed that she worked for Fox News through a

24  large portion of that period, correct?  Correct?

25          THE WITNESS:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-331

934

M2A1PAL2                    Palin - Cross

1          MR. AXELROD:  Through 2015?  I just wasn't clear.

2          THE COURT:  Yes.

3   BY MR. AXELROD:

4   Q.   Okay.  And just to put this time in perspective, Jared

5   Loughner shot Congresswoman Giffords in January of 2011,

6   correct?

7   A.   Correct.

8   Q.   Okay.  And you signed a new contract with Fox News in 2013;

9   that's right?

10  A.   Again, I can't recall the -- the month or the time, but

11  approximately.

12  Q.   Approximately 2013?

13  A.   Approximately.

14  Q.   Okay.  And so then even after your contract with Fox

15  expired, is it fair to say you continued to be on Fox?

16  A.   Not nearly as often, but I was asked to visit, yes.

17  Q.   And you've been on Fox, you know, in the last year or so,

18  too, right?

19  A.   Yes.

20  Q.   And you were on Fox News last week?

21  A.   Yes.  Or a couple weeks ago, yes.

22  Q.   You were on Fox News in January of 2021?

23  A.   Yes.

24  Q.   You were on Fox News kind of talking about the election in

25  2020?

M2A1PAL2                    Palin - Cross

1    A.  Yes.

2    Q.  You've been on a show called -- with Brit, Brit Hume, a

3    bunch of times; is that right?

4    A.  Not a bunch of times; in fact, rarely.

5    Q.  And then I think one thing we didn't cover, or Mr. Turkel

6    didn't cover, in addition to the Fox News aspect, is it fair to

7    say you've also done some reality TV programming?

8    A.  I did *Sarah Palin's Alaska*, eight episodes for Mark

9    Burnett.  I guess you would call it a reality-type show.  It

10   was a travelogue about Alaska.

11   Q.  That was from 2010 to 2011?

12   A.  Yes, that was one.

13   Q.  And then I think you were on a show called *Amazing America*

14   *with Sarah Palin* from 2014 to 2015?

15   A.  Yeah, the Outdoor Channel had me host that show.

16   Q.  I think you were on a show called *Dancing with the Stars*

17   *Juniors* in 2018; is that right?

18   A.  No.  I'm not a junior and I don't dance.  I wasn't on that

19   show.

20   Q.  You weren't on that show?

21   A.  No.

22   Q.  You weren't.  Were you on a show called *Teen Mom OG*?

23   A.  I'm not a teen mom and no.

24   Q.  You didn't make an appearance?

25   A.  Oh, an appearance, like in the background with my daughter,

M2A1PAL2                    Palin - Cross

1    who was on the show?  Yes.  I -- yes.

2    Q.  And then in 2020 you were on a show?

3    A.  So let me correct about *Dancing with the Stars Junior*.  My

4    grandson was on that show, one episode, and I'm sure I was in

5    the background on that also, so if you're talking about just an

6    appearance, yes.

7    Q.  And then in 2020, you were on a show called *The Masked*

8    *Singer*; is that right?

9    A.  Objection.  Yes, yes.  That was dumb.

10   Q.  Governor Palin, what's the objection?  I'm curious.

11   A.  I just thought it was funny.

12   Q.  I mean, you liked being on *The Masked Singer*, right?

13   A.  It was the most fun 90 seconds of my life.

14   Q.  And you got paid good money for that, right?

15   A.  It paid some bills.

16   Q.  Yeah, but it was good money, right?

17   A.  That's relative to whatever.  I'll say it's good money.

18   Q.  Yeah.  And then I think you were also -- just to round this

19   out, you also launched a subscription channel in 2014, the

20   Sarah Palin TV channel?

21   A.  Oh, that was a short-lived something that didn't really

22   work.

23   Q.  But you launched it, right?

24   A.  It was launched.

25   Q.  And one other thing I think you're doing now too.  Is it

**SApp-334**

M2A1PAL2                          Palin - Cross

1  fair to say you're being paid to be a spokesman for a financial

2  company?

3  A.   No.

4  Q.   Do you know what American Prosperity Summit is?

5  A.   Yes.

6  Q.   That's not a financial company?

7  A.   It is.

8  Q.   Okay.  And aren't you being paid as a spokesman for that?

9  A.   No.

10        MR. AXELROD:  If we could just put up DX 201 just for

11  the witness.

12  Q.   You didn't do a video promoting a product for American

13  Prosperity Summit?

14  A.   I did.  I did a video.

15  Q.   Okay.  Sorry.  So it's my definition of spokesperson.  So

16  you did a video promoting that product?

17  A.   Yes.  But you said are you being paid, in the present.  No,

18  I did a video and --

19  Q.   And you were paid to promote -- you were paid to promote

20  that product?

21  A.   Yes, in that video, yes.

22  Q.   Okay.  Essentially you were a pitchwoman for the financial

23  product?

24  A.   I was a picked woman?

25  Q.   Pitch, pitch.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                    Palin - Cross

1    A.  Pitch.

2    Q.  You were pitching it.

3    A.  Yes.  Evidently.

4    Q.  And was that in 2020?

5    A.  2019 or 2020.

6    Q.  And I think Mr. Turkel asked you -- or touched on your

7    social media presence.  Do you recall that testimony?

8    A.  Yes.

9    Q.  You have an active Facebook page?

10   A.  I have people who run a Facebook page for me, my name,

11   Sarah Palin, yes.

12   Q.  And you have about 4.1 million followers on that Facebook

13   page?

14   A.  I don't believe those numbers, but -- they say it's those

15   numbers.  But I think that's the number that they have pegged

16   us at for years.

17   Q.  And you've got a Twitter account I think you talked about?

18   A.  Yes.

19   Q.  And you've got about 1.3 million followers on Twitter?

20   A.  I don't know.  I don't tweet.  They took that away from me.

21          MR. AXELROD:  So Mr. DiMezza, if we could put up

22   DX 117 for the witness.

23          And if you could just blow up the top.

24   Q.  Governor Palin, that is your Twitter account?

25   A.  It is, and I have someone run that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                     Palin – Cross

1  Q.  And you see it says 1.3 million followers?

2  A.  Yes.

3          MR. AXELROD:  And your Honor, I'd move for admission

4  of DX 117.

5          MR. TURKEL:  No objection, Judge.

6          THE COURT:  Received.

7          (Defendant's Exhibit 117 received in evidence)

8          MR. AXELROD:  And you can take that down.  Thank you,

9  Mr. DiMezza.

10  BY MR. AXELROD:

11  Q.  In addition to those social media accounts, you also have a

12  website, sarahpalin.com?

13  A.  Yes.

14  Q.  And how would you describe your website?

15  A.  It's a compilation of news stories of the day, and I have

16  two employees who run that.

17  Q.  One of those employees is Jason Recher?

18  A.  Yes.

19  Q.  And the other is Kris Perry?

20  A.  Yes.

21  Q.  And they're both close friends of yours?

22  A.  Yes.

23  Q.  So I want to talk about SarahPAC.  So I think your

24  testimony was –– tell me if I got it wrong; I was writing notes

25  really quickly.  Do you know when SarahPAC was formed?

SApp-337

M2A1PAL2                    Palin – Cross

1   A.  A year or so after I ran for vice president.

2   Q.  And do you understand that it's a separate legal entity

3   than the person Sarah Palin?

4   A.  Do I understand?

5   Q.  Yes.

6   A.  Yes.

7   Q.  And it's got a professional staff that -- it had a

8   professional staff that ran it?

9   A.  Yes.

10  Q.  And you weren't paid by SarahPAC, correct?

11  A.  No.

12  Q.  And the purpose, as I understand it—but tell me if I got it

13  wrong—was to support candidates who shared your values?

14  A.  It was to have my name, my face, my voice across the

15  country, and a purpose in that was to find candidates to run

16  for office.

17  Q.  And I guess one of the roles of SarahPAC was raising money

18  to support those candidates; is that right?

19  A.  There were a couple people who ran SarahPAC who were tasked

20  with fundraising, yes.

21  Q.  Right.  Because the idea was that SarahPAC would raise

22  money and then it would contribute it to people who the PAC

23  supported, right?

24  A.  The purpose financially was to operate the PAC, pay the

25  staff, and a function, a purpose of fundraising was to help

SApp-338

M2A1PAL2                    Palin - Cross

1  others.

2  Q.   Right.  And the PAC would send out solicitation letters to

3  potential donors, right?

4  A.   Yes.

5  Q.   And it would have events?

6  A.   Rarely.

7  Q.   So in 2010, in March of 2010, SarahPAC was operational;

8  you'd agree with that?

9  A.   Yes.

10  Q.   And this is about two years -- this is two years after the

11  2008 election?

12  A.   Yes.

13  Q.   And just putting this in context, at this time there's

14  significant debate in this country, kind of, about Obamacare;

15  is that right?

16  A.   Yes.

17  Q.   And opposing Obamacare was an issue that you cared about.

18  A.   Yes.

19  Q.   And it's an issue that SarahPAC was focused on; is that

20  right?

21  A.   It was one of our issues that we wanted people to start

22  debating, yes.

23  Q.   And the PAC was supporting candidates that were opposed to

24  Obamacare; is that right?

25  A.   Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-339

M2A1PAL2                     Palin - Cross

1          MR. TURKEL:  Judge, objection, relevance and scope.

2          THE COURT:  Well, I assume this is a foundation to a

3    follow-up question.  If not, I would sustain the objection, but

4    let's hear where it's going.

5          MR. AXELROD:  We're going down that road, your Honor.

6          THE COURT:  Yes.

7    BY MR. AXELROD:

8    Q.  And so the crosshairs map which I'm referring to --

9          MR. AXELROD:  And could you put that up, Mr. DiMezza,

10   DX 61.  It's in evidence.

11   Q.  The crosshairs map was specifically targeting I guess

12   Democrats who had voted in support of Obamacare but were in

13   districts that had voted for McCain-Palin; is that right?

14   A.  Yes, the purpose of the map was to show people who was up

15   for re-election and what seats were up.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

SApp-340

943

M2A1PAL2                          Palin – Cross

1    M2a2Pal3                          Palin – Cross

2    Q.  And specifically identifying those candidates, those people

3    to oppose that I just described for that reason, correct?

4    A.  Those were districts that carried the McCain-Palin ticket

5    but were represented by a Democrat.

6    Q.  And you would agree with me that the little marks over each

7    of those districts looked like rifle crosshairs, right?

8    A.  The little emoji -- a lot of people said, yes, that that

9    looked like targets or a sight, yes.

10   Q.  And you would agree with me that they look like rifle

11   crosshairs, right?

12   A.  A reasonable person could and would.

13   Q.  I guess I'm a little bit confused.  Do you agree they look

14   like crosshairs or do you disagree they don't look like

15   crosshairs?

16   A.  They do.  I mean, they can't -- yes.

17   Q.  So when --

18   A.  They also look like other things that you could perceive

19   those as, like, you know, the surveyor marking and all those

20   other things that we heard.  But yes.

21   Q.  So when people in 2010 started criticizing this map because

22   they thought that these looked like crosshairs, I believe it's

23   your testimony that that was a reasonable interpretation.

24   A.  Yes.

25   Q.  Now, this map was not put out by you, correct?

SApp-341

944

M2A1PAL2                    Palin - Cross

1   A.  It's Sarah, SarahPAC.

2   Q.  It was published by SarahPAC, correct?

3   A.  Right, but SarahPAC is Sarah.  It's me.  It's my name, my

4   voice, my face.

5   Q.  Who paid to have this map produced?  Was it you or was it

6   SarahPAC?

7   A.  It was the fundraising that I had my name on and

8   participated in paid for ads that we would put on our website.

9   Q.  I'm asking a different question.  What entity?  Was it

10  Sarah Palin or was it SarahPAC that paid to have this map

11  produced?

12  A.  Okay.  I'm thinking of one and the same then.  It was

13  SarahPAC though, yeah.

14  Q.  Just to be clear, a political action committee is a

15  creature of federal finance law, right?

16  A.  Right.

17  Q.  And so the point of this map was to raise money to help

18  defeat those targeted candidates, right?

19  A.  It was to get people to be able to see which districts

20  Republicans could probably pick up, yes.

21  Q.  And it's difficult to raise money and -- to raise money for

22  political candidates, right?

23  A.  It depends.

24  Q.  I mean, there are a lot of groups out there and there are a

25  lot of candidates trying to raise money.  Isn't that fair to

SApp-342

945

M2A1PAL2                    Palin - Cross

1  say?

2  A.  Yes.

3  Q.  And to break through and to really be effective, you've got

4  to get something that people are talking about, right?

5  A.  That's why we were successful, because there was some

6  uniqueness in SarahPAC.

7  Q.  And people started talking about this map, right?

8  A.  When?

9  Q.  When it was published in 2010.

10  A.  There wasn't a whole lot of talk about it.  I didn't hear a

11  whole lot of discussion about it in 2010.  It was months later.

12  Q.  You didn't hear criticism in 2010?

13  A.  I'm sure I heard some criticism.

14  Q.  You didn't hear criticism from Gabby Giffords herself about

15  this map?

16  A.  I heard that she -- yes, that she had taken issue with it.

17  Q.  But you endorsed this map, correct?

18  A.  It has my name on it, so yes.

19  Q.  But you didn't have any concern --

20          THE COURT:  I'm sorry, counsel.  Sometime in the next

21  five minutes we want to give the jury their mid-morning break.

22          MR. AXELROD:  I'm almost through this segment.  I

23  appreciate it, your Honor.

24          THE COURT:  Go ahead.

25  BY MR. AXELROD:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                      Palin - Cross

1   Q.  You didn't have any concern with the content that was on

2   this flyer, did you?

3   A.  No.

4   Q.  But after SarahPAC issued this map, you know that it was

5   criticized because people thought that these were crosshairs,

6   right?

7   A.  They were comparing it to the Democrat leadership committee

8   that had the same quote/unquote crosshairs on their map.  There

9   was a lot of comparisons being made.

10  Q.  Isn't it fair to say that you knew that people were

11  criticizing this map because people thought that those were

12  crosshairs?

13  A.  Well, there was a lot of, again, comparison to the

14  criticism or praise given to the Democrat leadership committee

15  that had the same thing.

16  Q.  Yeah, I understand the comparison you want to make,

17  Governor, but I'm just asking a really simple question.  You

18  knew that there was criticism about this map because some

19  people saw these as crosshairs, right?

20  A.  Yes.  But I'm explaining to you what some of the criticism

21  was also, was the comparison to the other map, maps.

22  Q.  And you disagreed with this criticism, correct?

23  A.  I took issue with the interpretation that anybody would

24  have that it was any kind of call for violence, because that

25  was some of the criticism also.

SApp-344

M2A1PAL2                    Palin – Cross

1    Q.  And, Mr. DiMezza, if we could put up DX 63 just for

2    Governor Palin.

3            And Governor Palin, do you recognize Defense Exhibit

4    63?

5    A.  Yes.

6            MR. AXELROD:  Your Honor, I would move for admission

7    of Defense Exhibit 63.

8            MR. TURKEL:  Judge, just subject to our prior

9    position, no objection past what's previously stated.

10           THE COURT:  Your prior objections are preserved, and

11   it will be received.

12           (Defendant's Exhibit 63 received in evidence)

13           MR. AXELROD:  And may I publish?

14           THE COURT:  Yes.

15           MR. AXELROD:  Thank you.

16   BY MR. AXELROD:

17   Q.  And at about the same time as the criticism of the map, you

18   published this tweet, correct?

19   A.  I'm trying to think of the date as it applies to the

20   timeline of the map, but, yes, I tweeted that back then, March

21   23.

22   Q.  Yeah, you tweeted out "don't retreat, instead reload" and

23   you capitalized "reload."  Do you see that?

24   A.  Yes.

25   Q.  And fair to say "reload" is a word that's often used in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-345

948

M2A1PAL2                    Palin - Cross

1   connection with firearms, correct?

2   A.  Yes, a word I've been using all my life.

3   Q.  When you tweeted this out, you knew that people were

4   already criticizing the map for its potential to incite

5   violence, correct?

6   A.  There wasn't a lot of criticism early on on that map.  It

7   wasn't until months later.  But I knew that some of the

8   criticism had to do with that I guess we stole it from the

9   Democrat map, what you are calling crosshairs, yeah.

10  Q.  But you knew when you use the term --

11          MR. TURKEL:  Your Honor, I think I'm going to object

12  as beyond the scope of why it was originally said it was

13  offered and accepted.

14          MR. AXELROD:  I don't think so.

15          THE COURT:  I don't think that's true, but I have a

16  vague recollection that Mr. Axelrod told me he was almost

17  through with this section.

18          MR. AXELROD:  I've got one more question.  I got two

19  more questions.

20          THE COURT:  Go ahead.

21          MR. AXELROD:  If you could just take that down,

22  Mr. DiMezza.

23          THE COURT:  Did you say two more questions

24  (indicating)?

25          MR. AXELROD:  Can you put up Defense Exhibit 64 just

SApp-346

949

M2A1PAL2                    Palin - Cross

1    for Ms. Palin?  Your Honor, I'm going to be really quick.

2            And Governor Palin, do you recognize Defense Exhibit

3    64?

4    A.  Yes.

5            MR. AXELROD:  Your Honor, I move for admission of

6    Defense Exhibit 64.

7            MR. TURKEL:  Again, subject to previous --

8            THE COURT:  Yes all previous objections are preserved.

9            Received.

10           (Defendant's Exhibit 64 received in evidence)

11           MR. AXELROD:  May I publish?

12           THE COURT:  Yes.

13   BY MR. AXELROD:

14   Q.  And so, Governor Palin, you put out this tweet that says,

15   "Remember months ago bull's-eye icon used to target the 20

16   Obamacare-lovin' incumbent seats?  We won 18 out of 20, 90

17   percent success rate 'tain't bad."  Do you see that?

18   A.  Yes.  The one with bull's-eye in quotation marks?  Yes.

19           MR. AXELROD:  Your Honor, I'm finished for now.

20           THE COURT:  All right.  So, ladies and gentlemen, we

21   will give you your mid-morning break, and we will resume in 15

22   minutes.

23           (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                    Palin - Cross

1              (Jury not present)

2              THE COURT:  Please be seated.

3              Ms. Palin, is it true you don't dance?

4              THE WITNESS:  I don't dance and I don't sing.  That's

5     why --

6              THE COURT:  You are missing one of the great joys in

7     life.  I would encourage you to reconsider.  There is, seated

8     in the courtroom, a beautiful lady who is my wife who is an

9     expert in ballroom dancing.  So after this is all over, I

10    encourage you to take lessons.

11             THE WITNESS:  I need help.

12             THE COURT:  Very good.  We will see you all in 15

13    minutes.

14             (Recess)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

M2A1PAL2                    Palin - Cross

1          (Jury present)

2          THE COURT:  Okay, counsel.

3          MR. AXELROD:  Thank you, your Honor.

4    BY MR. AXELROD:

5    Q.  So, Governor Palin, I want to take you to January 8 of

6    2011.  That was the day that Jared Loughner did his shooting.

7    Do you recall that day?

8    A.  Yes.

9    Q.  And you would agree with me that like almost immediately

10   after that shooting some in the media connected the crosshairs

11   map to the Loughner shooting, is that right?

12   A.  Yes.

13   Q.  And I think it was your testimony, but please tell me if I

14   got it wrong, that at some point you issued some type of

15   statement in response to those allegations?

16   A.  Yes.

17   Q.  And was that like three or four days after the shooting?

18   A.  Yes.

19   Q.  And, Mr. DiMezza, if you could put up DX 222 just for the

20   witness, please.

21          Governor Palin, do you recognize what's been marked as

22   Defense Exhibit 222?

23   A.  Yes.

24   Q.  And what is it?

25   A.  It is the statement that I gave — *Politico* picked it up, as

SApp-349

M2A1PAL2                        Palin - Cross

1   did other outlets — speaking to the violence that we saw four

2   days prior, three days prior, four days prior in Arizona.

3           MR. AXELROD:  Your Honor, I would move for admission

4   of DX 222.

5           MR. TURKEL:  Objection, Judge.

6           MR. VOGT:  Subject to prior.

7           MR. TURKEL:  I think, Judge, at this point I don't

8   need to repeat reserving rights on priors.

9           THE COURT:  Oh, yes.  Okay.  But you have no new

10  objections.

11          MR. TURKEL:  Exactly.

12          THE COURT:  Okay.  Your previous objections are

13  preserved and the exhibit is received.

14          MR. AXELROD:  Thank you.

15          (Defendant's Exhibit 222 received in evidence)

16  BY MR. AXELROD:

17  Q.  Mr. DiMezza, if you could publish that for the jury.

18          And just so we can put this in perspective,

19  Governor Palin, if we could blow up the very first paragraph,

20  yeah.  Thank you.

21          Before I even start, did you write this statement?

22  A.  Yes, I had a couple of people who were close to me helping

23  me.

24  Q.  Who was that?

25  A.  It would have been I believe Rebecca Mansour.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-350

953

M2A1PAL2                    Palin – Cross

1    Q.  Who is that?

2    A.  She was a writer and researcher who worked for us, with us

3    at SarahPAC.

4    Q.  Anyone else help you?

5    A.  I don't remember.  I'm sure that others chimed in.  It was

6    that important that . . .

7    Q.  Did you hire any type of public relations firm or anything

8    like that?

9    A.  I didn't, no.

10   Q.  So just to put this in perspective, this is the first

11   paragraph.  "Like millions of Americans, I learned of the

12   tragic events in Arizona on Saturday, and my heart broke for

13   the innocent victims.  No words can fill the hole left by the

14   death of an innocent, but we do mourn for the victims' families

15   as we express our sympathy."

16           And so that is a reference to the shooting in Tucson?

17   A.  To those murdered in Tucson, yes.

18   Q.  Thank you.

19           And now could you, Mr. DiMezza, go to the second page

20   and blow up that paragraph.  Thank you.

21           So, Governor, this paragraph says, "Vigorous and

22   spirited public debates during elections are among our most

23   cherished traditions.  And after the election, we shake hands

24   and get back to work, and often both sides find common ground

25   back in D.C. and elsewhere.  If you don't like a person's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

954

M2A1PAL2                    Palin - Cross

1   vision for the country, you're free to debate that vision."
2            Do you agree with that principle?
3   A.  Yes.
4   Q.  "If you don't like their ideas, you're free to propose
5   better ideas."
6            And you agree that?
7   A.  Yes.
8   Q.  It's the beauty of the First Amendment?
9   A.  Yes.
10           MR. TURKEL:  Objection.
11  Q.  "But especially within hours of tragedy unfoldings,
12  journalists and pundits should not manufacture a blood libel."
13           What does that sentence mean?
14  A.  They should not falsely accuse anyone of, well, literally
15  with the term drawing blood, of killing.
16  Q.  And just to make sure I and the jury understand, when you
17  are talking about being falsely accused, this is -- you are
18  saying that after the Tucson shooting and the murders there,
19  that some in the media were alleging a connection between the
20  crosshairs map and that shooting?  Is that -- am I getting that
21  right?
22  A.  That's what I recall.
23  Q.  And that's what you were referring to here.
24  A.  Yes, making sure that journalists and pundits would not
25  manufacture anything.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-352

M2A1PAL2                    Palin - Cross

1   Q.  And to finish out that sentence you say, "but especially

2   within hours of a tragedy unfolding, journalists and pundits

3   should not manufacture a blood libel that serves only to incite

4   the very hatred and violence they purport to condemn.  That is

5   reprehensible."

6           What did you mean by your use of the word "incite"

7   there?

8   A.  The journalists and pundits should not use their power,

9   their authority, to incite, meaning to stir up and call to

10  action, the hatred and the violence that they like to write

11  about that they condemn.

12  Q.  And just in your words, how were journalists calling to

13  action violence?

14  A.  I was saying they shouldn't.

15  Q.  Yeah, but I think you are saying -- I think this -- correct

16  me if I got it wrong, but this is your response to what

17  journalists have already done, correct?

18  A.  It was in response to the tragedy and a warning, again,

19  that reprimand, to anyone with the power of the pen to not make

20  anything up.

21  Q.  Okay.  But I want to be really careful here about the

22  timing.  So this is four days -- we can agree that you put this

23  statement up four days after the Loughner shooting, right?

24  A.  Tell me the exact date again.  Show me.

25  Q.  I think that the Loughner shooting was January 8 of 2011,

**SApp-353**

M2A1PAL2                          Palin - Cross

1   and this statement was from January 12.  We can go back and

2   look at the first page if you would like.

3   A.   No.  That's why I asked you, because the first page wasn't

4   up.  But go ahead.

5   Q.   So you would agree this statement was put out four days

6   after the shooting?

7   A.   Yes.  We already established that.

8   Q.   And in this sentence, you are saying, "but especially

9   within hours of the tragedy unfolding," so now you are

10  referring back to January 8, within hours of that tragedy,

11  right?

12  A.   Right.

13  Q.   "Journalists and pundits should not manufacture a blood

14  libel."

15            So am I right that you are saying that journalists did

16  manufacture a blood libel within hours of that tragedy.

17  A.   You need to read it literally.  I'm saying they should not.

18  Q.   Okay.

19  A.   It's that warning, that reprimand, because I was familiar

20  with what the power of the pen can do.

21  Q.   So let me just make sure I understand, because I'm a little

22  confused.  Did journalists manufacture a blood libel or did

23  they not within hours of that tragedy?

24  A.   As I stated here, I was asking them not to.

25  Q.   Okay.  But that wasn't quite my question.  Had they already

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                        Palin – Cross

1  done it or hadn't they done it in reference to what you are

2  writing here?

3  A.  My opinion is -- well, it's not my opinion.  I wrote it

4  out, again, to warn them not to do so.

5  Q.  But had they already done it or not?

6  A.  I -- well, yeah.  I wouldn't have --

7  Q.  Right.

8  A.  -- given such a strong warning.

9  Q.  Right.

10        You are responding because, in your opinion, you

11  thought that journalists and pundits had already accused the

12  crosshairs map of inciting Jared Loughner.

13  A.  Wrong.

14  Q.  Okay.  Explain it to me then.

15  A.  Well, you are reading a lot more into the details, and even

16  the way you are posing the question -- well, it's leading for

17  one.  But why don't you reask the question, please.

18  Q.  I won't even ask it that way.  I will just say can you

19  explain to me what you are saying by this blood libel language,

20  because I'm having a little --

21  A.  I'm saying -- I'm sorry.  I'm saying, journalists and

22  pundits, don't manufacture a blood libel.  It's right there.

23  Q.  And the blood libel that you are talking about was the

24  connection between the crosshairs map and the shooting?

25  A.  Not even necessarily the map.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-355

M2A1PAL2                    Palin - Cross

1   Q.  Then I'm a little bit confused.  What are you referring to

2   here?

3   A.  I'm referring to the power of the pen and wherever a

4   journalist would receive that power, having it been seeing a

5   map or hearing a statement or anything else, just report the

6   facts.  Don't manufacture anything.

7   Q.  So this is not in response to allegations that there was a

8   connection between the crosshairs map and the Loughner

9   shooting?

10  A.  It is, but it's not exclusively in response to that.

11  That's why it's written the way it's written.

12  Q.  And when you say -- use the word "incite," how would

13  journalists and pundits incite hatred and violence?

14          MR. TURKEL:  Judge, objection.

15          THE COURT:  Overruled.

16  A.  It's, again, the power of the pen, the power in words, the

17  power held by those, and I'm speaking of those who have that

18  huge platform, that very loud voice, that they have the ability

19  to write something, whatever they want to write, that could

20  result in inciting hatred and violence.

21  Q.  Maybe I got this wrong.  Had any journalist said, People,

22  you should go out and hunt down Sarah Palin because of the

23  crosshairs map?

24  A.  Remember, also, this is the journalists and pundits.

25  Q.  Well, I will broaden the question.  Are you aware of any

SApp-356

959

M2A1PAL2                    Palin - Cross

1    journalist or pundit that said, Go out and hunt Sarah Palin

2    because of the crosshairs map?

3    A.  Because of the crosshairs map?  I have seen and heard

4    people, if we define them as pundits, because I think that they

5    have a voice, with targets on my face saying, Hunt Sarah Palin,

6    hunt, so yes.

7    Q.  Who?

8    A.  I don't have it in front of me, but I have years of that

9    kind of graphic or statement, the death threats.

10   Q.  But here you were worried that journalists and pundits,

11   because they were making this false connection between the

12   crosshairs map and the Loughner shooting, that they could stir

13   up hatred against you, is that right?

14   A.  Because it was false, as you say, that was a possibility.

15   Q.  Especially if someone insane is out there and they see that

16   criticism of you, correct?

17   A.  Not necessarily.

18   Q.  But possibly, right?

19   A.  Not necessarily.

20   Q.  And your use of the term "blood libel" in this response

21   created more criticism, right?

22   A.  Correct.

23   Q.  And -- I really don't want to get into it.  I will pass.

24        After the 2011 Loughner shooting, you didn't hire any

25   PR firms or anything like that to help repair your reputation?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SApp-357**

M2A1PAL2                              Palin - Cross

1   A.  I have never hired a PR firm or a PR -- the PAC may have

2   had someone help put together ads or get out statements.  I

3   don't know.

4   Q.  But you didn't do that?

5   A.  No.  I never had before.  No.  That's not my practice.

6   Q.  Okay.  So now let's go forward into 2017, and I take it

7   from your testimony with Mr. Turkel that the 2011 allegations

8   were pretty painful to you.

9   A.  Correct.

10  Q.  And fair to say you wanted to leave those allegations

11  behind.

12  A.  Correct.

13  Q.  Now, Mr. DiMezza, if you could put up Defense Exhibit 68,

14  please, and this is in evidence.

15          This is something that's been shown during this trial

16  on Breitbart.  This is a picture of Kathy Griffin holding up

17  that bloody Trump mask.  Do you see that?

18  A.  I see that.

19  Q.  And do you see underneath it it says "Former Alaska

20  Governor Sarah Palin Condemned Comedian Kathy Griffin."  Do you

21  see that?

22  A.  I see that.

23  Q.  And below that it says, "No one should be shocked at the

24  sick audacity of sick characters.  Kathy is a hurting

25  individual.  She needs help."  What did you mean by that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                    Palin - Cross

1   A.  Kathy Griffin is one who showed up on my doorstep in

2   Wasilla uninvited.  We had a little bit of history there in

3   terms of she needing help, because you don't just do that.

4   Q.  Do you remember being interviewed by Breitbart for this

5   article?

6   A.  No, but I must have been.  It was an exclusive.

7   Q.  Right.  So if we can go to the second page, Mr. DiMezza.

8   Thank you very much.

9          Just go back up to the top again.  I'm sorry.  I just

10  want to capture the date of this.  They have dates under the

11  picture.

12         So, Governor, this is May 30 of 2017.  Do you see

13  that?

14  A.  Yes.

15  Q.  So about two weeks before the Virginia shooting?

16  A.  Yes.

17  Q.  Okay.  Now if we can go to the second page.  And if you

18  grab those, the paragraphs that start "after the shooting."

19  Yeah.  Thank you.

20         And so this article which you were interviewed for

21  says, "After the attempted assassination of Arizona Democratic

22  Rep Gabrielle Giffords in 2011 in a shooting that left six

23  dead, the Left launched a full-out assault on Palin, trying to

24  blame her for inspiring the severely mentally ill shooter's

25  actions.  A political action committee supporting Palin had

**SApp-359**

M2A1PAL2                         Palin - Cross

1   released a Facebook graphic displaying crosshairs on

2   congressional districts where Tea Party candidates could

3   compete in the 2010 mid term elections."

4            Do you see that?

5   A.  Yes.

6   Q.  And so this is six years after the Loughner shooting,

7   right?

8   A.  Yes.

9   Q.  How did you feel about Breitbart bringing up these

10  allegations?

11  A.  Well, I didn't write it, and I understood why Breitbart

12  would have that in there after I did read it.  It had to be

13  relevant, the interview had to be relevant to what was

14  currently unfolding.

15  Q.  Did you ever send anything to Breitbart asking them to

16  remove this?

17  A.  I don't believe so.

18  Q.  Can you take that one down, Mr. DiMezza, and if you could

19  put up Defense Exhibit 69 just for the witness.

20           And Governor Palin, do you recognize -- don't do that

21  yet.

22           Do you recognize Defense Exhibit 69?

23  A.  The headline and the bottom of it I do.  I haven't read the

24  copy.

25  Q.  You see the top, this is a post from sarahpalin.com?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-360

M2A1PAL2                    Palin - Cross

1   A.  Right.

2          MR. AXELROD:  Your Honor, I move for the admission of

3   DX 69.

4          MR. TURKEL:  Your Honor, I am reserving again, subject

5   to all priors objections.

6          THE COURT:  Yes.  Subject to that, it is received.

7          (Defendant's Exhibit 69 received in evidence)

8          MR. TURKEL:  Sorry Judge sorry you said received?

9          THE COURT:  Yes.

10  BY MR. AXELROD:

11  Q.  So Governor Palin -- are you publishing, Mr. DiMezza?

12  Thank you.

13         You see the top it says Sarah Palin there.  That's how

14  we know it is your website?

15  A.  Yes.

16  Q.  And I want to capture the date here.  You see it says June

17  1, 2017?

18  A.  Yes.

19  Q.  So this is one day after the Breitbart interview but about

20  13 days before the Virginia shooting.

21  A.  Okay.

22  Q.  Do I have that right?

23  A.  I believe so.

24  Q.  Okay.  Great.

25         If you can take that part down, Mr. DiMezza, and if

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL2                    Palin – Cross

1    you could blow up the text.

2         And so this is your website publishing this piece and

3    it says, "Kathy Griffin's grotesque portrait of herself holding

4    a bloodied mask of President Trump is still making headlines

5    almost two days later, and Breitbart just pointed out another

6    major hypocrisy behind the whole scenario — Griffin blamed

7    Governor Sarah Palin's crosshairs map on the shooting of Rep

8    Gabrielle Giffords in 2011.  Check it out."  And then it says,

9    "This is ironic when one considers January 8, 2011 — the date

10   on which Representative Gabby Giffords was shot by the mentally

11   ill Jared Loughner.  That shooting occurred after former Alaska

12   Governor Sarah Palin had asked conservative voters to target

13   certain congressional districts in the 2010 mid-term elections

14   so as to vote representatives who voted for Obamacare out of

15   office."  Then it goes on to say, "Palin's political action

16   committee, SarahPAC, had released a graphic showing crosshairs

17   on 20 swing districts then held by Democrats in Congress that

18   could flip to Republicans.  Due to Palin's successful

19   endorsement of candidates in those swing districts, 19 of those

20   targeted races were won by Republicans."

21   A.  It says "19 of those 20 targeted races were won by

22   Republicans."  Yes.

23   Q.  Thank you.

24        So essentially isn't it fair to say that your website

25   was, six years after the fact, publishing something about the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-362

M2A1PAL2                    Palin - Cross

1   allegations that the crosshairs map was connected to the

2   shooting of Gabby Giffords?

3   A.  It published one, yes, that reference.

4   Q.  And this is 13 days before the Virginia shooting.

5   A.  Okay.

6   Q.  Right?

7   A.  It looks like it is, yes.

8   Q.  And 13 days before the publication of *The New York Times*

9   editorial?

10  A.  Yes.

11  Q.  So now speed up to June 14 of 2017, and that was the day

12  that Congressman Steve Scalise was shot, right?

13  A.  Yes.

14  Q.  And that was a horrifying event, correct?

15  A.  Correct.

16  Q.  And because it involved another Congressperson, it was --

17  did it remind you of the Giffords shooting six years earlier?

18  A.  It reminded me.  It didn't get the same coverage, but it

19  reminded me, yes.

20  Q.  And on that day, you sat down for another exclusive

21  interview with Breitbart, is that right?

22  A.  I don't remember.

23  Q.  Well, I think Mr. Turkel showed you a Breitbart --

24  something, article, during your direct examination.  Do you

25  recall that?

**SApp-363**

M2A1PAL2                    Palin - Cross

1    A.   Yes.  I don't want to screw up dates here, so if there is

2    something printed in Breitbart that I sat down in an interview

3    for, then it's legit.

4    Q.   But do you remember -- I'm trying to put it back in my

5    head -- Mr. Turkel asking you those questions about that piece,

6    where you said some things about Bernie Sanders and how Bernie

7    Sanders --

8    A.   Yes.

9    Q.   -- shouldn't be blamed?

10   A.   Yes.

11   Q.   And that was an interview you did with Breitbart, right?

12   A.   Yeah.  I didn't sit down with them, but yes.

13   Q.   I'm sorry.  I mean "sit down" in the kind of rhetorical

14   sense.

15   A.   Um-hmm.

16   Q.   But you did an interview with Breitbart, correct?

17   A.   To defend Bernie Sanders, yes.

18   Q.   And that was the day of the shooting, correct?

19   A.   I think it was the day of the shooting to, again, warn

20   everybody not to falsely accuse anybody.

21   Q.   And so in than interview, you brought up the Giffords

22   shooting, correct?

23   A.   Yes.  I don't know if I responded to a reporter's question,

24   but I did reference the significance, the relevancy of the

25   Giffords shooting.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-364

967

M2A1PAL2                        Palin - Cross

1  Q.  Right.  Because both shootings involved Congresspeople,

2  there was a natural connection, is that right?

3  A.  Yeah, different degrees, different scale there, but yes.

4  Q.  What does that mean?  Different scale there?

5  A.  The Giffords shooting resulted in the death of six people.

6  Q.  Right.

7  A.  The shooting and harm of 19.  Thankfully there were no

8  lives lost, except for the bad guy, in the Steve Scalise

9  shooting.  That's a different scale, it's different degrees.

10 Q.  And Mr. DiMezza, if you could put up DX 70, which is that

11 exhibit.

12         And Governor, do you recognize this as the exhibit

13 that Mr. Turkel showed you?

14 A.  Yes, sir.

15         MR. AXELROD:  Your Honor, I don't think we have

16 admitted this, but I would admit it now.

17         MR. TURKEL:  No objection.  I think it's in as

18 Plaintiff's 114 also.

19         THE COURT:  I do, too; but, anyway, received.

20         (Defendant's Exhibit 70 received in evidence)

21         MR. AXELROD:  Thank you.  Thank you, Mr. Turkel.

22 Q.  Now, this article, if you go down to the second page, it

23 says "Palin" at the very top, "Palin, in an exclusive

24 statement, called for the media industry to be more careful

25 than they were back when Giffords was shot — especially asking

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-365

968

M2A1PAL2                    Palin – Cross

1   for media integrity."  Do you see that?

2   A.  It says "specifically asking for media integrity."

3   Q.  Right.

4           And you don't refer to *The New York Times* in your

5   quotes, right?

6   A.  I didn't want to pick a fight with *The New York Times*.

7   Q.  Right.  Do you know whether you did this interview with

8   Breitbart before the editorial was published?

9   A.  I don't remember.

10  Q.  Well, I think we have established during this trial that

11  the editorial was published at 9:45 p.m. on the night of June

12  14.

13  A.  And this interview again was?

14  Q.  It was June 14.

15  A.  Okay.

16  Q.  Does that help you at all?

17  A.  No.

18          (Continued on next page)

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL4                    Palin - Cross

1    BY MR. AXELROD:

2    Q.  So maybe I can help you a little bit more.

3            MR. AXELROD:  Mr. DiMezza, if you could put up DX 71

4    just for the witness.

5    Q.  And do you see what we've marked as DX 71?

6    A.  Yes.

7    Q.  And this is an email from Jason Recher to Kris Perry and

8    some other people?

9    A.  Yes.

10   Q.  And Jason Recher and Kris Perry worked for you?

11   A.  Yes.

12           MR. AXELROD:  Your Honor, I'd move for admission of

13   DX 71.

14           MR. TURKEL:  No objection, Judge.

15           THE COURT:  Received.

16           (Defendant's Exhibit 71 received in evidence)

17   Q.  And so just to put this in perspective, who is Jason --

18   jrecher@northstarstrategies.com?

19   A.  Jason Recher is a consultant who has worked with me since

20   the vice-presidential campaign.

21   Q.  So you would agree that on Wednesday, June 14th, at 2:29,

22   he's asking some other people to post this link next?  Do you

23   see the link is to the *Breitbart* article we just looked at?

24   A.  Yes, and I don't know if that 2:29 was Alaska time or East

25   Coast time, but yes.

M2A1PAL4                    Palin - Cross

1   Q.  I'm ashamed I don't know this, but what time zone is Alaska
2   in?
3   A.  Well, we're four hours behind.
4   Q.  Four hours behind.  So even if this was 2:29 Alaska time,
5   it would be 6:29 Eastern time?
6   A.  Oh, yeah.  If it were 2:29 Alaska time, four hours later,
7   6.
8   Q.  Yeah.  And so even if it's 6:29, you know the editorial
9   wasn't published till 9:45 on June 14th, correct?
10  A.  Correct.
11  Q.  So you would agree that the *Breitbart* piece was published
12  before the editorial was published.
13  A.  Yup, and that's what I was getting at with help me out on
14  the timing, yes.
15  Q.  And you had no objection to your team publishing that
16  *Breitbart* piece, did you?
17  A.  I must not have.  I don't know if they ran it by me to ask
18  if they should.  They're quite independent in discerning in
19  what should go on that website, but I didn't have a problem
20  with it when it was up.
21          MR. AXELROD:  Now if you could take that down and put
22  up Defense Exhibit 74.
23  Q.  And Governor Palin, what's Defense Exhibit 74?
24  A.  It's a post on Sarah Palin website.  And you want me to
25  read the headline?

SApp-368

M2A1PAL4                        Palin - Cross

1          MR. TURKEL:  Could we have them blow that up.  I don't

2     know if your -- my font is very small.

3     A.   And it was a writer posting about a flashback to Bernie

4     Sanders fundraised off the false accusations back in 2011.

5          MR. AXELROD:  I'm going to actually take that down.

6     Thank you.

7     Q.   I think one of the things you said during your direct

8     examination was that you were -- when you interviewed with

9     *Breitbart*, you didn't want people to use this tragedy to score

10    political points?

11    A.   Correct.

12    Q.   What did you mean by that?

13    A.   Capitalizing on strategy -- I mean on a tragedy to gain

14    anything for their own political means, and often this includes

15    anybody playing the game of politics of personal destruction,

16    so it's not just politics, it's individuals also.

17    Q.   And would you agree that you didn't want -- you were kind

18    of warning people, don't say that this happened because of

19    political rhetoric?

20    A.   Correct.

21    Q.   Because you don't agree that political rhetoric causes

22    people to do violence like that; is that right?

23    A.   I -- I don't, but --

24         MR. AXELROD:  Okay.  Mr. DiMezza, if we could put up

25    DX 77 for the witness.

M2A1PAL4                    Palin - Cross

1   Q.  Governor Palin, if you look at this exhibit, you see that

2   there's a headline at the top and the url that says

3   "sarahpalin.com/rep-rodney-davis-political-motivated-violence-

4   got-to-stop"; do you see that?

5   A.  I see that headline.

6   Q.  And you would agree that this is a post on sarahpalin.com.

7   A.  I don't know.  It's not on the same -- it doesn't have any

8   of the same graphics or anything, but I see a yellow byline and

9   I see copy.  I don't know where it was.

10  Q.  Mary Kate Knorr was someone who worked on sarahpalin.com;

11  is that correct?

12  A.  She did submit articles, yes.

13          MR. AXELROD:  Your Honor, I'd move for admission of

14  DX 77.

15          MR. TURKEL:  No objection, Judge.

16          THE COURT:  Received.

17          (Defendant's Exhibit 77 received in evidence)

18  Q.  And so the date of this article on sarahpalin.com is

19  June 14th of 2017.  Do you see that, Governor?

20  A.  I see that on this, yes.

21  Q.  And it's talking about "Rep. Rodney Davis, an Illinois

22  Republican who was on the softball field during the violence."

23  Do you see that?

24  A.  I see that.

25  Q.  And you see that Mr. Davis, the rep. from Illinois, blamed

SApp-370

M2A1PAL4                    Palin - Cross

1    "political rhetorical terrorism" for the increasing amount of

2    violence?  Do you see that?

3    A.   I see that.

4    Q.   "And Davis noted that there were children on the field

5    during the time of the shooting.

6            "Check it out:

7            "'This political rhetoric and political discourse that

8    has led to hate has led to gunfire.  I never thought I'd go to

9    baseball practice for charity and have to dodge bullets.'"

10           Do you see that?

11   A.   I see that.

12   Q.   "He went on:  'This has got to stop and it has got to stop

13   today.'

14           "The reporter asked Davis if the language of American

15   politics. . . was responsible for it.  He says, 'I'm not going

16   to assess who takes responsibility, but we all are responsible

17   for the discourse that happens in American government.  We have

18   the right to be free in this country.  We have the right to

19   elect our leaders.  And we have the right to vote against them

20   if we disagree with their policies.'

21           "Davis continued:

22           "'In the media, in the 24-hour news cycle, these are

23   things that have to stop.  This is a result, I believe, of

24   political rhetorical terrorism.  That has to stop.'"

25           And you would agree that Mr. Davis, at least, was

974

M2A1PAL4                    Palin - Cross

1   blaming the shooting on "political rhetorical terrorism."

2   A.  It sounds like it, yes.

3   Q.  And this was posted to your website.

4   A.  Or he was, yes, 'cause he says that this is a result of, I

5   believe, political rhetorical -- so it was his opinion, yes.

6   Q.  And this was posted to your website on June 14th of 2017?

7   A.  Again, I don't know where it was posted, but it's -- if it

8   was cut and pasted from the website by y'all, then yes.

9   Q.  And you see that url is sarahpalin.com, and that's your

10  website, correct?

11  A.  I see that, but, again, I haven't seen a format like this

12  that's not -- it doesn't use the graphics or anything of Sarah

13  Palin web page, any of the pages.  But I assume you're correct

14  that it is.

15  Q.  Thanks.

16          MR. AXELROD:  You can take that down, Mr. DiMezza.

17  And if you could put up DX 4, which is the original version of

18  "America's Lethal Politics."  And just leave it just like that

19  for now.

20  Q.  And Governor, I think you testified that you heard about or

21  read "America's Lethal Politics" on the day it was published;

22  is that correct?

23  A.  I believe so, yes.  Yes.

24  Q.  And you would agree that your name is not mentioned in the

25  headline?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-372

M2A1PAL4                    Palin - Cross

1    A.  There are only three words in the headline.  My name isn't

2    in there.

3    Q.  And would you agree -- and we can blow this up if you need

4    us to.  But you would agree that Sarah Palin's political action

5    committee is not mentioned until the fifth paragraph?

6    A.  I only see the first page of your exhibit.

7           MR. AXELROD:  Let's blow that up, Mr. DiMezza.  And we

8    can go back to the front and show the governor and she can look

9    through and tell us when she gets to the fifth paragraph.

10   A.  Either that or just highlight the fifth paragraph.

11          MR. AXELROD:  That's one, two, three, four, and then

12   we go to the fifth paragraph, and yeah, you can grab that.

13   Thank you.

14   Q.  And you see "Sarah Palin's political action committee" is

15   in that fifth paragraph?

16   A.  Oh, yeah, on the top of that page, yes.  I see my name.

17   Q.  And if a reader saw the headline, they would have no clue

18   that Sarah Palin would even be mentioned in this editorial,

19   correct?

20          MR. TURKEL:  Judge, object.

21          THE COURT:  Sustained.

22   Q.  Now fair to say very quickly after reviewing this --

23          MR. AXELROD:  And leave it up, and you can take off

24   the text box --

25   Q.  -- very quickly after reviewing, reading this editorial,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL4                    Palin - Cross

1  your first reaction, I think we saw on direct, or one of your

2  first reactions, because you explained it to me, was to talk

3  about filing a lawsuit, right?

4  A.  Right.  I knew something had to be done.

5          MR. AXELROD:  And Mr. DiMezza, I'm sorry, I don't have

6  a note, but do you recall what the redacted tweets Mr. Turkel

7  showed?

8          I'll get back to it.  It's fine.

9  Q.  Before you issued that tweet that talked about the lawsuit,

10  you didn't reach out to *The Times* to issue a correction, did

11  you?

12  A.  Before the tweet where I mentioned in one sentence talking

13  to attorneys, I never direct -- before that I never directly

14  asked *The New York Times* to retract, no.

15  Q.  And you never asked them to issue a correction; is that

16  right?

17  A.  Oh, no, that was -- I think to anybody who had read my --

18  what I was writing, it was just inherent in that that they

19  needed to retract and correct.

20  Q.  So let me make sure I understand that.  Your tweet -- and I

21  really wish --

22          MR. AXELROD:  Is it Plaintiff's Exhibit 72, that's

23  been redacted?

24          MR. VOGT:  It's 176 or 177.

25          MR. AXELROD:  Thank you very much.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL4                         Palin - Cross

1          Can you do it in a redacted way so that content

2    doesn't come in that was objectionable.

3          Thank you very much, Mr. DiMezza.

4          Thank you.

5    BY MR. AXELROD:

6    Q.   Governor, was this the tweet you were referring to?

7    A.   About exploring options --

8    Q.   Yeah.

9    A.   -- with attorneys?  Yes.

10   Q.   Was this also the tweet you were referring to that you said

11   should have been read as a request for a correction and a

12   retraction?

13   A.   Ask that again.

14   Q.   Well, I don't want to confuse you.  So -- or I don't want

15   to confuse myself.

16          I think you testified before that -- correct me if I

17   get it wrong -- that your tweet should have been read as a

18   correction or a request for a correction or retraction; is that

19   right?

20   A.   Yeah.  Not just my -- that one specific tweet, but the

21   things that I was saying.

22   Q.   Well, what else were you saying besides the tweet that were

23   going to *The New York Times*?

24          MR. TURKEL:  Judge, I object and just ask, if she's

25   refreshing off this, that she be able to see the full version.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-375

M2A1PAL4                          Palin - Cross

1    A.  I tagged *The New York Times* in this tweet.  Is it an

2    exhibit?  Is it submitted?  I can quote it.

3    Q.  Yeah, you can read it, for sure.

4    A.  Yeah.  "Common sense suggestion by a journalist, am talking

5    to attorneys this [morning] -- this AM, and exploring options.

6    By the way, wonder. . ." And then it was continued.

7    Q.  And so it's your testimony that this was a request by *The*

8    *Times* to issue a correction?

9    A.  Well, I don't know what -- it says, "By the way,

10   wonder . . ." meaning there's more to it, in a series of

11   tweets.

12          MR. AXELROD:  Can we go to the next one, Mr. DiMezza.

13   Do you have that?

14   A.  But no, it doesn't say explicitly in that, in those two

15   sentences what I thought *The New York Times* should do.

16   Q.  You didn't reach out to *The New York Times* for a

17   correction, right?

18   A.  No.  They just accused me of inciting murder.  I didn't

19   think I was going to get a friendly response.

20   Q.  And you didn't request a retraction, either?

21   A.  Not in those two sentences, no.

22   Q.  I'm really focusing on ever.

23   A.  Okay.  But you were talking specifically about a tweet,

24   but -- ever.

25   Q.  Yeah, ever, ever.  Did you ever request a correction either

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL4                    Palin – Cross

1    before you filed a lawsuit or after?

2              MR. TURKEL:  Judge, asked and answered.

3              THE COURT:  Overruled.

4    A.  I personally didn't.  I don't know if people did that on my

5    behalf, but no, I didn't.

6    Q.  And did you ever request a retraction either before you

7    filed a lawsuit or after you filed the lawsuit?

8    A.  I don't know if my attorneys did.  I did not personally

9    reach out to an unfriendly recipient of what I would be

10   requesting of them.  It was common sense that -- they knew that

11   they were -- they printed an untruth.

12   Q.  Are you thinking about something specific when you're

13   suggesting that maybe someone else had reached out for a

14   retraction?

15   A.  I'm wondering.

16   Q.  Okay.  But you don't have any evidence or you're not

17   thinking of anything specific to suggest that that happened.

18   A.  That's why I said I'm wondering if anybody did.  I -- I

19   don't know.  I did not.

20   Q.  And fair to say you never sought an apology from the *Times*

21   either?

22   A.  To me?

23   Q.  Yeah, to you.

24   A.  No.

25   Q.  Did you ever seek an apology from *The Times* for anyone?

SApp-377

M2A1PAL4                    Palin - Cross

1   A.  I thought you said did you see an apology.

2   Q.  I'm sorry.  Seek, seek.

3   A.  No.

4            MR. AXELROD:  Mr. DiMezza, if you could pull up

5   Defense Exhibit 5, which is the corrected version.  And go to

6   the second page, please.  Grab the first two paragraphs.

7   Q.  And so you see, Governor Palin, this is the corrected

8   version of the editorial, and you can tell that by looking at

9   the last sentence of the first paragraph, "But in that case no

10  connection to the shooting was ever established."  Do you see

11  that?

12  A.  The one that still has my name in it, Sarah -- yes, I see

13  that.

14  Q.  Okay.  The first sentence says, "Was this attack evidence

15  of how vicious American politics has become?"  You see that's a

16  question?

17  A.  Yes.

18  Q.  And then the next sentence is, "In 2011, Jared Lee

19  Loughner --"

20           THE COURT:  No, I think you missed --

21           MR. AXELROD:  Sorry.  "Probably."

22           THE COURT:  Yeah.

23           MR. AXELROD:  Yeah.

24  Q.  Then the next sentence says, "In 2011, Jared Lee Loughner

25  opened fire in a supermarket parking lot, grievously wounding

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL4                    Palin - Cross

1    Representative Gabby Giffords and killing six people, including
2    a 9-year-old girl."  Do you see that?
3    A.   Yes.
4    Q.   And that sentence is accurate, correct?
5    A.   Yes.
6    Q.   And then the next sentence is, "At the time, we and others
7    were sharply critical of the heated political rhetoric on the
8    right."  And that sentence was accurate, right?
9    A.   It's accurate the way you read it, yes.
10   Q.   Then the next sentence says, "Before the shooting, Sarah
11   Palin's political action committee circulated a map that showed
12   the targeted electoral districts of Ms. Giffords and 19 other
13   Democrats under stylized crosshairs."  Do you see that?
14   A.   That's accurate the way you read it.
15   Q.   And then the last sentence is, "But in that case no
16   connection to the shooting was ever established."  And that
17   sentence is accurate too, right?
18   A.   It's accurate the way you read it, yes.  I don't know if
19   you're asking if the content, if the meaning is accurate or --
20   Q.   Oh, I'm so sorry.  I was asking you whether the content was
21   accurate.  I'm not asking you about my reading abilities.
22   A.   Oh, then start over.
23            THE COURT:  I think it was ambiguous, so we need to go
24   back.
25            MR. AXELROD:  Yeah.  I'm so sorry.

M2A1PAL4                    Palin - Cross

1    Q.  I'm asking you about the content being accurate.  So let's

2    start again.

3    A.  Yes.

4    Q.  "In 2011, Jared Lee Loughner opened fire in a supermarket

5    parking lot, grievously wounding Representative Gabby Giffords

6    and killing six people, including a 9-year-old girl."  Is that

7    content accurate?

8    A.  Yes.

9    Q.  "At the time, we and others were sharply critical of the

10   heated political rhetoric on the right."  Is that content

11   accurate?

12   A.  Yes.

13   Q.  Then the next sentence says, "Before the shooting, Sarah

14   Palin's political action committee circulated a map that showed

15   the targeted electoral districts of Ms. Giffords and 19 other

16   Democrats under stylized crosshairs."  And you would agree that

17   that statement is factually accurate, correct?

18   A.  Out of context.  It wasn't -- it was months before the

19   shooting, and I didn't circulate it.  It was on a website.

20   Again, the media circulated it.  And yeah, it was almost a year

21   before that that map was on a website -- my website.

22   Q.  Okay.  And then the last sentence, "But in that case no

23   connection to the shooting was ever established."  And you

24   would agree that that's accurate.

25   A.  Yes.

M2A1PAL4                    Palin - Cross

1              MR. AXELROD:  You can take that down, please.

2    Q.  So Governor Palin, what I want to do is ask you about some

3    of the closest people in your life who you speak to, which I

4    think Mr. Turkel asked you about on direct.  So I think you

5    included in this tight group your father; is that right?

6    A.  Yes.

7    Q.  Your children?

8    A.  Yes.

9    Q.  Your sister Molly McCann?

10   A.  Yes.

11   Q.  Your sister Heather Bruce?

12   A.  Yes.

13   Q.  Your brother Chuck Heath, Jr.?

14   A.  Yes.

15   Q.  And then that's the family, and then I think your close

16   group of friends -- let me see if I got this right.  Kris

17   Perry?

18   A.  Yes.

19   Q.  Juanita Fuller?

20   A.  Yes.

21   Q.  Deb Remus?

22   A.  Yes.

23   Q.  Deana Monk?

24   A.  Yes.

25   Q.  Linda Menard?

SApp-381

984

M2A1PAL4                    Palin - Cross

1    A.  Yes.

2    Q.  Pam Weaver?

3    A.  Yes.

4    Q.  And then you also have some cousins that you're close to?

5    A.  Yes.

6    Q.  Now after *The New York Times* published the editorial, no

7    one in your close circle contacted you and said, can you

8    believe that *The New York Times* made this allegation in the

9    editorial, did they?

10   A.  I don't know if anybody had that exact quote.

11   Q.  But even in substance, no one contacted you and said, can

12   you believe *The New York Times* made that allegation in the

13   editorial?

14   A.  I don't recall specifically talking to anyone on that

15   specific list about -- I'm sure I talked to them 'cause they're

16   my best friends, they're my closest people, but I don't recall

17   specifically.

18   Q.  And isn't it fair to say that besides your attorneys, which

19   I do not want to get into, you only emailed with one person

20   about the editorial "America's Lethal Politics"?

21   A.  In what time frame?

22   Q.  In any time frame.

23   A.  Yeah, yeah, I probably emailed maybe Jason, or somebody.  I

24   don't remember who.

25   Q.  Actually, isn't it fair to say that the only person you

SApp-382

M2A1PAL4                    Palin - Cross

1    emailed besides your lawyers, which I don't want to talk about,

2    is a woman named Nancy French?

3    A.   Maybe it was Nancy, yeah.  That's what I'm saying.  I don't

4    recall who, but I'm sure I --

5    Q.   So you only emailed with one person, Nancy French.

6    A.   Pardon?

7    Q.   You only emailed with one person, and that would be Nancy

8    French.

9    A.   I probably reached out to Nancy.

10   Q.   And Nancy French is a writer?

11   A.   Correct.

12   Q.   Do you have any type of -- well, I should ask it this way.

13   What's your relationship with Nancy French?

14   A.   She wrote for and with Bristol Palin.  My daughter Bristol

15   had a very active Facebook page, website, social media, and

16   Nancy contributed to Bristol's content that was published.

17   Q.   Did Nancy French help you out with any of your books?

18   A.   Yes.

19   Q.   Which books did she help you out with?

20   A.   She contributed to the devotional, the Christian

21   devotional.

22   Q.   And Nancy French is married to a man named David French; is

23   that right?

24   A.   Correct.

25   Q.   And David French is a prominent writer?

M2A1PAL4                    Palin - Cross

1    A.  He is a writer, yes.

2    Q.  And isn't it true that the night of June 15th Nancy French

3    emailed you and said that David French was going to unload on

4    *The New York Times* in *The National Review*?

5    A.  If you have that in front of you, I don't, but --

6    Q.  Well, do you recall that?

7    A.  I don't recall specifically, no.

8    Q.  Okay.  I'll come back to that.

9            But you don't remember talking to your father about

10   the editorial, do you?

11   A.  I'm sure we did.  It was pretty impacting.  But I don't

12   recall specifically a time or place.

13   Q.  When *The New York Times* published the editorial on

14   June 14th of 2017, did you talk to your parents about the

15   editorial?

16   A.  I don't know.  I -- I don't recall.  I -- I don't like

17   to -- I didn't like to burden my parents with things that were

18   in the press that were ugly.  They --

19   Q.  And you don't remember talking to your sister Molly McCann

20   about the editorial either, do you?

21   A.  As I sit here today, in the "penalty box," I don't recall

22   specifically.

23   Q.  Isn't it true, Governor Palin, that when the editorial was

24   published in 2017, the day of that shooting, you don't recall

25   talking to your sister Molly McCann about it?

**SApp-384**

M2A1PAL4                    Palin - Cross

1   A.  As I sit here today, I -- I don't.  That was a very busy,

2   tumultuous, dramatic, sad time.

3   Q.  And you don't remember talking to your sister Heather Bruce

4   about the editorial either, do you?

5   A.  Same answer.  I can't recall specifically who all I talked

6   to, but --

7   Q.  And you don't remember talking to your brother Chuck Heath,

8   Jr. about the editorial?

9   A.  No.

10  Q.  And you didn't talk to your kids about the editorial?

11  A.  Oh, I'm sure my kids heard about it and talked about it, I

12  would think.

13  Q.  So it's your testimony you did talk to your kids about it?

14  A.  I'm saying I'm sure that they knew that it was out there

15  and -- at some point.  I don't know if it was right then, I

16  don't know if it was months later, what kind of -- I don't

17  know.  But I'm sure an issue like that was discussed.

18          MR. AXELROD:  And your Honor --

19  A.  Well -- it probably wasn't that day, 'cause I don't know if

20  they were around that day.

21          MR. AXELROD:  May I approach, your Honor.

22          THE COURT:  Yes.

23          MR. AXELROD:  And your Honor, the line is 57:8-9.

24  A.  So page?

25  Q.  57:8-9.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL4                    Palin – Cross

1   A.  Okay.

2           THE COURT:  So you want to read that?

3           MR. AXELROD:  I do.

4           THE COURT:  Any objection?

5           MR. TURKEL:  I'm just reading it right now.

6           THE COURT:  I'm sorry?

7           MR. TURKEL:  I'm -- 57:8?

8           THE COURT:  Just two lines, 8 through 9.

9           MR. TURKEL:  Judge, to be honest, I don't remember the

10  predicate pending --

11          THE COURT:  I think the predicate has been laid.  You

12  may read it.

13          MR. AXELROD:  Thank you, your Honor.

14  BY MR. AXELROD:

15  Q.  Governor Palin, do you recall sitting for a deposition on

16  May 20th of 2020?

17  A.  In my kitchen table alone in Wasilla, yes, I do.

18  Q.  Obviously in the heart of the pandemic.

19          And do you remember that -- do you recall that that

20  deposition was being transcribed?

21  A.  Yes.  So -- so there's mistakes right off the bat, but --

22  Q.  What types of mistakes?

23  A.  Very first word I'm reading is Chuck Keith, Jr.  He's not

24  Chuck Keith.  It's H-E-A-T-H.  But I'm not going to go through

25  and proofread.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-386

M2A1PAL4                          Palin - Cross

1   Q.  Directing you to lines 57 -- page 57, lines 8 through 9,

2   the question was:  "Did you talk to any of your kids about it?"

3   And the answer was:  "I don't think I did."

4   A.  Yeah, I don't think I did that day.  I don't know if I did.

5   I don't -- if I did.  And was the question asked in that

6   deposition -- did it have any kind of time frame?

7   Q.  Governor Palin, we're going to move on.  You can set that

8   aside.

9            MR. VOGT:  Your Honor, I think it's fair for the

10  question to be read, page 56 --

11           THE COURT:  So starting at page 56, line 24:

12           "Q.  Now, when the editorial in 2017 was published the

13  day of the congressional shooting, did you talk to Molly McCann

14  about it?"

15           "A.  I don't remember."

16           "Q.  Did you talk to Heather Bruce about it?"

17           "A.  I don't remember."

18           "Q.  Did you talk to Chuck Heath, Jr. about it?"

19           "A.  I don't remember."

20           "Q.  Did you talk to any of your kids about it?"

21           "A.  I don't think I did."

22           MR. AXELROD:  Thank you.

23           THE COURT:  So the context was, the time frame was

24  when the editorial was published.

25  BY MR. AXELROD:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL4                    Palin – Cross

1   Q.  And Governor Palin, you don't remember talking to any other
2   family members, in addition to the ones I've asked you about
3   here, about the editorial.
4   A.  Okay.  I want to understand your question then.  You're
5   asking the question, when the editorial was published, on that
6   day, did I speak to these people.
7   Q.  I'm asking you, after the editorial was published, did you
8   talk to any other family members besides the ones I've asked
9   you about?
10  A.  I would think so, at some point.
11          MR. AXELROD:  And your Honor, if we could go to
12  page 57, 16 through 19.
13          THE COURT:  I'm sorry.
14          MR. TURKEL:  Objection.
15          THE COURT:  Sustained.
16  BY MR. AXELROD:
17  Q.  Governor Palin, did you talk to any other family members,
18  besides the ones I've already asked you about, about the
19  editorial after it was published?
20  A.  At some point, I'm sure I did.
21          MR. AXELROD:  And your Honor, I would ask to read
22  lines 16 through 19.
23          MR. TURKEL:  Same objection, your Honor.
24          THE COURT:  So the difficulty is here, the time frame
25  set on page 56, beginning line 24, may or may not have been

M2A1PAL4                    Palin – Cross

1    what a reasonable person could have understood the time frame

2    to be for page 57, lines 16 through 19, and therefore, I

3    sustain the objection.

4           MR. AXELROD:  Thank you.  I'll move on.

5    BY MR. AXELROD:

6    Q.  So let's talk about your friends, Governor Palin.

7           After the editorial was published, you don't remember

8    speaking to Kris Perry about it, do you?

9    A.  At some point, I'm sure I did.

10          MR. AXELROD:  And your Honor, I go to page 59:12-14.

11   A.  And remember, the question in your deposition was specific

12   to that day.

13          MR. AXELROD:  59:12-14, please.

14          THE COURT:  Well, let me just to move this along.

15          Is it fair to say that you don't remember with any

16   specificity any particular conversation you had about this with

17   any of the people he's just mentioned?

18          THE WITNESS:  On that day, no, I don't remember.

19          THE COURT:  Or even subsequently, with specificity.

20   In other words, you may remember that you might have talked to

21   them but you don't remember what specifically you said or

22   exactly who you said it to; is that fair?

23          THE WITNESS:  That is accurate.

24          THE COURT:  Okay.  All right.  Let's move on.

25          MR. AXELROD:  Thank you, your Honor.

SApp-389

M2A1PAL4                    Palin - Cross

1   BY MR. AXELROD:

2   Q.  Governor Palin, after the editorial, after the editorial

3   was published, did anyone you spoke with personally tell you

4   that they believed that you incited Jared Loughner's shooting

5   of Congresswoman Giffords?

6   A.  No one close to me who knew me well, no.  I don't think so.

7   Q.  And I just want to make sure I understand this.  In this

8   case you're not seeking to recover any lost income, correct?

9   A.  I lost income, but -- I don't know.  It --

10              THE COURT:  Well, I'll help you out here, because this

11  is partly a legal matter.  The jury should know that in her

12  lawsuit, Ms. Palin has not sought to recover any financial

13  loss, and that's a matter of the binding representations in her

14  lawsuit.

15  BY MR. AXELROD:

16  Q.  And Governor, you can't identify any specific opportunities

17  that were taken away from you because of the publication of the

18  editorial; isn't that right?

19              MR. TURKEL:  Objection, your Honor.  Relevance, given

20  the instruction.

21              THE COURT:  Sustained.

22  Q.  Governor, you can't identify anyone who has shied away from

23  you as a result of the publication of the editorial, can you?

24  A.  Oh, I can't name names that -- of my friends or those who

25  know me who shy away, no.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL4                    Palin - Cross

1   Q.   And I think with Mr. Turkel you talked a lot about working

2   with candidates; is that right?

3   A.   Yes.

4   Q.   And you can't identify any specific candidates who have

5   shied away from you as a result of the publication of the

6   editorial?

7   A.   I don't know who or how many have shied away, but after the

8   editorial, things changed in terms of being called upon to

9   advise and to help and to be seen with publicly on a -- a

10  high-profile political stage.

11  Q.   But you can't identify anyone specifically who has shied

12  away from you, can you?

13  A.   I'm saying I -- nobody -- I can't specifically give you a

14  name of someone who told me that they didn't want me to help

15  them, not the specific language.

16  Q.   And you can't identify anyone who thought less of you

17  because of the editorial.

18          MR. TURKEL:  Objection, your Honor.

19          THE COURT:  Overruled.

20  A.   Based on all of the comments that I received in the

21  aftermath of the false accusation, a lot of people did think

22  less, sir, and those comments flooding in via different means,

23  including social media, were evidence of a reputation having

24  been changed.

25  Q.   But you can't identify a name of anyone --

SApp-391

994

M2A1PAL4                     Palin - Cross

1    A.  Well, not as I sit here.

2    Q.  And I think I asked you this after 2011, but after 2017,

3    it's your testimony, correct, that your reputation has been

4    damaged?

5    A.  Yes.

6    Q.  And you haven't spent any money hiring any type of

7    consultant, PR person, anyone to help repair your reputation?

8            MR. TURKEL:  Judge, objection.  I would like to

9    approach if -- if it's not obvious where I'm coming from.

10           THE COURT:  All right.  On that representation, we

11   will have a sidebar.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

SApp-392

M2A1PAL4                          Palin - Cross

1           (At the sidebar)

2           MR. TURKEL:  Judge, we had an expert witness, Craig

3     Kronenberger, whose reports and testimony were excluded under

4     *Daubert*.  Part of what he was retained to do was estimate the

5     cost of repairing reputational -- on the internet and so forth.

6     That is what he does.  And generally speaking, incorporated in

7     his damages report and theory is the cost of doing that.

8           THE COURT:  All right.  So you think if she gave a

9     full and complete answer to that question, she might delve into

10    that which we excluded.

11          MR. AXELROD:  My question isn't about the extent of

12    the damages.  My question was:  If she thought her reputation

13    was damaged -- one, if they thought their reputation was

14    damaged and had the means to, they would go hire someone.

15    That's the point I'm making.  It has nothing to do with what

16    her damages are in this case.  That's beside the point.

17          MR. TURKEL:  Judge, if I may, we hired him.  That's

18    what he does, you know, after these cases, he estimates what it

19    is and --

20          THE COURT:  But at least in terms of what I excluded,

21    it wasn't that.  He was excluded as an expert on the measure of

22    damages, or, as I found, not much of an expert.

23          MR. TURKEL:  I'd love to have a coffee with you and

24    him about the science of --

25          THE COURT:  Anyway --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL4                    Palin - Cross

1          MR. TURKEL:  The point is, she hired him and --

2          THE COURT:  I think I will allow this single question,

3    that:  You didn't hire anyone to help repair your reputation?

4    And I'll instruct her to answer that, if she can, yes or no,

5    and then we'll just move on.

6          MR. TURKEL:  Yes.  You understand my concern, though.

7          THE COURT:  Yes.  Thank you for --

8          MR. TURKEL:  I didn't do this just to --

9          THE COURT:  No.  Thank you for raising it.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SApp-394

997

M2A1PAL4                         Palin – Cross

1              (In open court)

2              THE COURT:  Ms. Palin, for legal reasons you don't

3    need to worry about, let me rephrase the question; and just

4    answer it yes or no, if you can.  After the editorial was

5    printed and after you perceived that you had had a loss of

6    reputation, did you hire anyone to help repair that loss?

7              THE WITNESS:  No, your Honor.

8              THE COURT:  Very good.  Okay.

9              MR. AXELROD:  Thank you, your Honor.

10   BY MR. AXELROD:

11   Q.  I think, Ms. Palin, on direct, you testified about the fact

12   that the editorial caused you a lack of the ability to sleep?

13   A.  That it was hard to lay your head peacefully on the pillow

14   at night, yes.

15   Q.  Did you go see a doctor about that?

16   A.  No.

17   Q.  Did you take any medication?

18   A.  No.

19   Q.  Did you go talk to like any type of counselor or anything

20   about that?

21   A.  No.  I holistically remedy issues that are caused by

22   stress, meaning running and hot yoga and other healthy things.

23   Q.  And so the stress and the anguish, did you talk to anyone

24   about the stress and the anguish that you've testified you were

25   feeling because of the editorial?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-395

M2A1PAL4                          Palin - Cross

1    A.  I'm sure I did.  It was quite impacting.

2    Q.  Did you talk to any type of health professional I guess is

3    my question.

4    A.  No.

5    Q.  And did you go talk to a priest, a pastor, or religious

6    person, any person like that, about the things you were

7    feeling?

8    A.  I have a women's prayer group that we pray about it, but

9    no, I -- I've never operated that way, really.

10   Q.  And this is something we touched on earlier.  I think we

11   talked about the First Amendment before.  Do you recall that

12   testimony?

13   A.  Yes.

14   Q.  And you believe that Americans should have the right to

15   voice their opinions, correct?

16   A.  Absolutely.

17   Q.  Even if it's an unpopular opinion.

18   A.  Absolutely.

19   Q.  And that means that we as a country have to accept some

20   ugly speech, unfortunately, right?

21   A.  Yes.

22   Q.  Because the First Amendment protects that ugly speech as

23   well, right?

24   A.  It does.

25   Q.  And I think that -- I think I got at this before with you,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-396

999

M2A1PAL4                    Palin - Cross

1    but the First Amendment has allowed you to voice your opinion,
2    even if it's an unpopular opinion as well; is that right?
3    A.  As long as it's truthful.
4    Q.  And you know when you voice some of these unpopular
5    opinions that you're going to be criticized, correct?
6    A.  Yes.
7    Q.  Because the First Amendment allows people who disagree with
8    you to tell you you got it wrong, right?
9    A.  Correct.
10   Q.  And that's the beauty of the First Amendment, right?
11   A.  Right.
12   Q.  Because we believe that rather than silencing speech, we
13   should have competing ideas, and hopefully it will lead to the
14   best result, right?
15   A.  As long as everyone's speaking truthfully.
16   Q.  Yes.  We trust that with more speech, the right idea will
17   eventually win out?
18   A.  Ideally.
19   Q.  And so in this case, *The New York Times* published
20   "America's Lethal Politics" on June 14th, correct?
21   A.  Correct.
22   Q.  And then as you've seen in this case, after that
23   publication, Ross Douthat, who is a conservative columnist for
24   *The Times*, reached out to Mr. Bennet and he said:  You got it
25   wrong; right?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

SApp-397

M2A1PAL4                    Palin - Cross

1    A.  Correct.

2    Q.  And we saw some of those tweets that Mr. Douthat forwarded,

3    we saw him forward those links from Chris Hayes and Jonathan

4    Chait, right?

5    A.  Correct.

6    Q.  And we saw that even *The Times*' own columnist Ross Douthat

7    wrote a piece criticizing the editorial; isn't that right?

8    A.  We saw that, yes.

9    Q.  And because of the criticism that Mr. Bennet and *The Times*

10   saw online on Twitter, on June 14th and June 15th, they

11   corrected the editorial; isn't that right?

12   A.  They claimed it was because of online criticism on Twitter.

13   Q.  Right.  So they published the piece and then people

14   criticized *The Times*, and *The Times* corrected it, right?

15   A.  Right.  They said they read it on Twitter and -- and they

16   didn't fully correct it, but -- they amended a part of their

17   statement, yeah, or editorial.

18   Q.  Governor Palin, isn't it true that you recently talked

19   about running for office again?

20   A.  Oh, I've always answered kind of the same -- I'm not going

21   to say pandering way, but I've always said the door is always

22   open.

23   Q.  I think you were on a program maybe a couple weeks ago

24   where you were asked whether you were interested in running and

25   you said something like that, the door is always open, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL4                    Palin - Cross

1   A.  Correct.

2   Q.  And then I think you posted that, that video to your

3   website?

4   A.  I don't know if they posted it or not.

5   Q.  And there's also been times where you've talked about

6   challenging a senator in Alaska and running for senate in

7   Alaska; isn't that right?

8   A.  I don't know if I've talked about me challenging her

9   specifically, but supporting a worthy candidate, perhaps, who

10  would challenge her.

11  Q.  So it's your testimony that you've never suggested that

12  you're going to run for senate in Alaska?

13  A.  Well, that's subjective, the whole suggesting, the term

14  that you're using, I suggested.  In fact, I've been blatant

15  about being willing to support someone to challenge her.

16  Q.  Yeah.  I think my question is a little bit different,

17  though.  Isn't it true that you've suggested -- take that

18  however you want to, but you've suggested that you'd like to

19  run for senate in Alaska?

20  A.  Not necessarily for that seat, but I've suggested that I

21  would -- I would be honored to be back in public service.

22  Q.  When did you do that?

23  A.  I've done that for years.

24  Q.  Yeah.  And so Governor Palin, I just want to make sure I

25  understand this, that since the editorial was published in

SApp-399

M2A1PAL4                    Palin – Redirect

1    2017, isn't it fair to say that you've been on Fox News?

2    A.   Yes.

3    Q.   And you were on *The Masked Singer* in 2020?

4    A.   Yes.

5    Q.   And you did that video for that financial product?

6    A.   I did.

7    Q.   And you're doing public appearances for Talking Points --

8    or Turning Point, something like that?

9    A.   Turning Point USA; I did two appearances for them.

10             MR. AXELROD:  Your Honor, may I confer with counsel.

11             THE COURT:  Yes.

12             MR. AXELROD:  I have no more questions, your Honor.

13             THE COURT:  Okay.  Redirect.

14   REDIRECT EXAMINATION

15   BY MR. TURKEL:

16   Q.   Governor Palin, for the most part I want to just go through

17   a few of these documents and point out a couple things.

18             MR. TURKEL:  So first off, if we could pull up No. --

19   Defense 68.

20   Q.   And Governor Palin, do you see that in front of you?  It's

21   the Kathy Griffin article.

22   A.   Yes.

23   Q.   All right.  One thing you started saying that I don't know

24   you got a chance to fully explain was something about her

25   showing up at your doorstep in Wasilla?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-400

M2A1PAL4                    Palin – Redirect

1   A.   Yes.

2   Q.   And could you explain to the jury what happened there.

3   A.   She flew to Alaska and showed up on the doorstep, and one

4   of the -- I guess left a note.  One of the kids got the note

5   from her.  And I didn't know how to reach out to her contact to

6   tell her to never do that again.

7   Q.   I take it from that answer she had not been invited?

8   A.   She had not been invited.

9   Q.   Did she provide any notice that she was coming to your

10  doorstep?

11  A.   No.

12          MR. TURKEL:  Mr. Bucher, if you could highlight the

13  date on this piece.

14  Q.   So this article of her holding the bloody fake head of

15  then-president Trump was on May 30, 2017.  Is that when you

16  recall seeing this?

17  A.   That article, yes.

18  Q.   And do you recall off the top of your head when the

19  editorial came out?

20  A.   It came out couple weeks later.

21          MR. TURKEL:  And if we could go to the second page of

22  this defense exhibit and, please, Mr. Bucher, blow it up a

23  little bit for us.

24  Q.   As to the term that Mr. Axelrod kept repeating, "blood

25  libel," do you have any idea that it had any meaning that was

M2A1PAL4                    Palin - Redirect

1    A.  I see that.

2    Q.  All right.  And do you recall, without me pulling it up,

3    what the date was of the previous Kathy Griffin piece?

4    A.  End of May 2017.

5    Q.  All right.  As far as you know, was this written in

6    conjunction with that?

7    A.  Yes.

8            MR. TURKEL:  Okay.  And could you go to the second

9    page, please, Mr. Bucher.  Or is that it?

10           All right.  Yeah, blow that up right there.

11   Q.  All right.  So you see here, the bottom line, you were

12   asked about the language on this on cross.  You were asked

13   about the language concerning putting a reference to Jared

14   Loughner in this article, right?  Do you remember that question

15   on cross by Mr. Axelrod?

16   A.  Yes.

17   Q.  Have you seen in any of *The New York Times* versions of the

18   editorial, the first version, before they did the corrected,

19   did they point out the fact that the map and the shooting were

20   found to be entirely unrelated?

21   A.  No.

22   Q.  Right.  They issue corrected versions after the fact, did

23   they not?

24   A.  They define them as corrected versions, yes.

25           MR. TURKEL:  Go back to the first page.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-403

M2A1PAL4                        Palin - Redirect

1           And if you could blow up that point in the middle, the

2    first block.  Right there.  Yeah.

3    Q.  And do you know that precise language, that Jared Loughner

4    was mentally ill, whether that was brought out in the first

5    *Times* editorial?

6    A.  I don't believe it was.

7           MR. TURKEL:  All right.  Let's move to 77.  Actually,

8    no, 62.

9           THE COURT:  And then, counsel, we need to break for

10   lunch after this.

11          MR. TURKEL:  I was going to try to kind of hustle

12   through and finish before, Judge.  But if we don't want to, I

13   have like two or three left.

14          THE COURT:  It's up to you, but I don't want to keep

15   the jury from their lunch break till, worst case, five minutes

16   after 1.  If you think you could finish by then --

17          MR. TURKEL:  I think it will probably -- let me finish

18   on this, then I can organize thoughts.  It will be quicker

19   after lunch on balance, I think.

20          THE COURT:  Very good.  That's fine.

21   BY MR. TURKEL:

22   Q.  Let's just look at 62.

23          MR. TURKEL:  And if you could -- this is a two-page

24   exhibit, actually, so Mr. Bucher, if you could put the other

25   part of it there.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-404

M2A1PAL4                    Palin – Redirect

1              MR. AXELROD:  Mr. Turkel, I don't think this is in
2    evidence, but I don't have any objection.
3              MR. TURKEL:  Oh, this is Defense 62.  I thought they
4    offered it, your Honor.  I'm sorry.
5              THE COURT:  You're offering it now?
6              MR. TURKEL:  Yes, I will.
7              THE COURT:  Received.
8              (Defendant's Exhibit 62 received in evidence)
9              MR. TURKEL:  There you go.
10   BY MR. TURKEL:
11   Q.  All right.  Now if we could look at the date, Governor
12   Palin, do you recognize what this is?
13   A.  I assume it's -- there isn't any graphic or heading or
14   anything, but I assume it's a SarahPAC notice, or post.
15   Q.  Right.  And --
16   A.  That it went on our website, yeah.
17   Q.  Right.  And the map is the second part of this.
18   A.  Okay, yes, then that's --
19   Q.  Do you see the date it was initially posted?
20   A.  Yes.
21             MR. TURKEL:  All right.  Now if we could pull up
22   Defense 63, which I do think is in evidence.
23             MR. AXELROD:  It is.
24   Q.  Now, Governor Palin, just to be clear, was that the first
25   time the map was posted on your website, March 23, 2010?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-405

M2A1PAL4

1   A.  I believe I was told that, yeah.  I didn't see it when it

2   was first posted, but I believe that's accurate.

3   Q.  All right.  Now here's the tweet that you were asked about

4   on cross that was referred to as I believe occurring later.  Do

5   you see what date it is?

6   A.  I see that date.

7   Q.  And what date is that?

8   A.  March 23, 2010.

9   Q.  Is that the same date the map got put up for the first

10  time?

11  A.  I didn't look at that date that you had just showed me in

12  the exhibit, but --

13  Q.  It was the one we just looked at, Defense 62.

14  A.  Yes, March 23, 2010.

15          MR. TURKEL:  All right.  Judge, that's it for now, and

16  then we should not have much when we come back.

17          THE COURT:  Very good.

18          Ladies and gentlemen, we'll take our lunch break and

19  resume at 2:00.

20          (Continued on next page)

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-406

M2A1PAL4

1          (Jury not present)

2          THE COURT:  You can step down.

3          All right.  Please be seated.

4          Now I wasn't clear from yesterday.  Is there another

5     witness after Ms. Palin?

6          MR. TURKEL:  A short one, I believe.

7          MR. VOGT:  Very brief.

8          THE COURT:  Okay.  And so that person will be ready to

9     go.  All right.  So we're right on schedule.

10          As soon as that witness is completed, I assume the

11     parties will rest.  We'll then excuse the jury and have

12     argument on any motions that anyone wants to make, and then we

13     can have summations and charge tomorrow.

14          So we'll see you at 2.

15          Yes.

16          MR. AXELROD:  Your Honor, in addition to the witness,

17     there is one brief stipulation that the parties have worked

18     out.

19          THE COURT:  Yes, that's fine.

20          MR. AXELROD:  Thank you.

21          THE COURT:  All right.  We'll see you at 2:00.

22          (Luncheon recess)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-407

1010

M2a2Pal5                    Palin – Redirect

1              A F T E R N O O N     S E S S I O N

2                         2:05 p.m.

3           (Jury not present)

4           THE COURT:  All right.  Please be seated.  Let's get

5      the witness back on the stand, and we will bring in the jury.

6           (Jury present).

7           THE COURT:  Please be seated.

8           Counsel.

9           MR. TURKEL:  Yes, your Honor.  If I may inquire?  I

10     just have a few more.

11          THE COURT:  Yes.

12     BY MR. TURKEL:

13     Q.  If we could pull up Defense 63, please.

14          Governor Palin, do you see Defense 63 in front of you?

15     A.  I do.

16     Q.  I just wanted to ask you this, where does that phrase come

17     "don't retreat, instead reload"?

18     A.  It was a bumper sticker on my dad's truck forever, but it

19     came from my dad as a coach.  He was a coach for years, and it

20     was a motivational saying that he had, one of a few, and it

21     meant don't back down, specifically as it applied to -- my

22     parents were marathon runners, and they would use this for

23     themselves and for their athletes on different teams, don't

24     back down.  Buck up and fuel up, refuel and get back out there

25     and try harder.

SApp-408

M2a2Pal5                    Palin - Redirect

1   Q.  And when you say your dad used this, is this going back to

2   when you were growing up?

3   A.  Yes.  We were all pretty -- best with sports, so things

4   like this were commonplace.

5   Q.  Were sports important in your family?

6   A.  Extremely important.

7   Q.  What did you play?

8   A.  All the sports that were offered.  Basketball was my

9   favorite.

10  Q.  Let's pull up 64.  And if you could -- just the top line

11  there "remember months."

12          The word "bull's-eye" is in quotes.  Do you see that?

13  A.  Yes.

14  Q.  Why did you put the word "bull's-eye" in quotes?

15  A.  It just signified that others called it, referred to it as

16  a bull's-eye icon, and I did that because there was argument

17  whether everyone interpreted it as a bull's-eye or not.

18  Q.  Let's go to Plaintiff's Exhibit 176 redacted.  And can we

19  have the one that has both entries of the tweet?  Not the stuff

20  that was redacted underneath, but the 2 of 2.  It may have come

21  in as a defense exhibit, too.  Hold on one moment.

22          Mr. Bucher, could you get the original of that and

23  clip out the two tweets without the redacted information?

24          All right.  Let's move on.

25          Pull up Plaintiff's 177, please.  There we go.  All

SApp-409

M2a2Pal5                    Palin - Redirect

1    right.  If you could highlight that a little, bring that up.

2    No, we are good.

3            Governor Palin, looking at 177 there -- and Judge, I

4    don't know if I offered this.  I know that I authenticated it.

5    I thought I offered it.  But if not, I am offering it now.

6            MR. AXELROD:  No objection, your Honor.

7            THE COURT:  Received.

8            (Plaintiff's Exhibit 177 received in evidence)

9    BY MR. TURKEL:

10   Q.  This tweet that you sent out, first I would like you to

11   look at the date.  Do you see the date there?

12   A.  I do.

13   Q.  And what is the date?

14   A.  June 15, 2017.

15   Q.  And where does that date stand in relation to "America's

16   Lethal Politics"?

17   A.  That was after the *New York Times* had already published,

18   circulated their erroneous editorial.

19   Q.  And did anybody from the *Times* reach out to you in response

20   to that tweet?

21   A.  No.

22   Q.  Do we have 176?

23            Mr. Bucher, do we have 176?

24            MR. VOGT:  He didn't edit it correctly.

25            MR. TURKEL:  Can you take the original one and cull it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2a2Pal5                    Palin – Recross

1   out?  No?

2               All right, Judge, I have nothing further.

3               THE COURT:  Oh, all right.

4               MR. AXELROD:  Your Honor, I have just a couple.

5               THE COURT:  Go ahead.

6               MR. AXELROD:  Thank you.

7   RECROSS EXAMINATION

8   BY MR. AXELROD:

9   Q.  Governor Palin, when I was examining on cross before, we

10  were talking about whether you had ever said you were thinking

11  about running for Senate in Alaska in 2022.  Do you recall

12  that?

13  A.  I recall that.

14  Q.  Isn't it true that on August 2 of 2021, you talked about

15  potentially running for Senate in 2022?

16  A.  I don't know what I talked about on that day.

17  Q.  You were at a conference for the Harvest International

18  Ministry.  Do you recall that?

19  A.  I do.

20  Q.  And at that conference, you talked about potentially

21  running for Senate in 2022?

22  A.  If I was asked if I wanted to run for office, specifically

23  that Senate seat, I'm sure I responded and said the door is

24  always open.

25  Q.  Governor Palin, how long after the editorial was -- I'm so

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

M2a2Pal5                    Palin - Recross

1  sorry.  I stepped all over that.

2          How long after the editorial was published did you

3  file your lawsuit?

4  A.  A couple weeks.

5  Q.  Yeah.  Just a couple weeks, right?

6  A.  Yes.

7  Q.  Now, turning back to something you said to -- when

8  Mr. Turkel was talking to you, I think you said this, but

9  please correct me if I got it wrong, I think you said something

10 like in 2017 you weren't in politics.  Do you recall that?

11 A.  Correct.

12 Q.  What does that mean?

13 A.  I wasn't in any political office.

14 Q.  Were you involved in working with candidates or anything

15 like that in 2017?

16 A.  Yeah, and I commented publicly on politics, like thousands,

17 if not millions, of other people do, yes.

18 Q.  And what about after the editorial?  Were you -- in '17, so

19 after June 14 of 2017, were you active in politics?

20 A.  I continued to speak about politics in the media, yes.  So

21 I wasn't in elected office, though, so I wasn't officially in

22 politics.  I commented on them.

23 Q.  Did you get out -- in 2017, really focusing on that period

24 after the editorial, did you get out and hit the trail with any

25 candidates?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-412

1015

M2a2Pal5                      Palin - Recross

1  A.  2017?  Yes, I did, yes.

2  Q.  Do you remember any candidates that you got out and hit the

3  trail for?

4  A.  A couple of Georgia Senate candidates, and those were the

5  two that I am recalling right now.

6  Q.  Mr. DiMezza, if you could put up DX 139, which I haven't

7  given your Honor yet, so just for the witness.

8          So, Ms. Palin, do you see that this is a tweet from

9  you on September 14 of 2017 said, "Hitting the trail, stay

10 tuned for details"?

11 A.  I see that.

12         THE COURT:  I'm sorry.  Is this in evidence or not in

13 evidence?

14         MR. AXELROD:  I'm sorry, I apologize, your Honor.

15 Could I -- your Honor, we would move to admit DX 139.

16         MR. TURKEL:  No objection, Judge.

17         THE COURT:  Received.

18         (Defendant's Exhibit 139 received in evidence)

19         THE COURT:  Now you can read from it.

20         MR. AXELROD:  Thank you very much.

21 BY MR. AXELROD:

22 Q.  So Governor Palin, this is from September 14 of 2017.  This

23 is your tweet.  Well, it was.  Oh, thank you.  It's back.

24         "Hitting the trail.  Stay tuned for details."  And

25 then it looks like there is a Facebook link.  Do you see that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-413

M2a2Pal5                    Palin - Recross

1    A.  I see that.

2    Q.  If you could, yeah, just, Mr. DiMezza, if you could bring

3    up DX 140 just for the witness.

4              And Governor Palin, do you recognize Defense Exhibit

5    140?

6    A.  I don't recognize that document, but I recognize what the

7    issue was, yeah.

8    Q.  And you recognize the URL, the website address,

9    sarahpalin.com?

10   A.  Yes.

11   Q.  And you recognize that woman's name, Mary Kate Knorr, who

12   worked on your website?

13             MR. VOGT:  Judge, I don't think this has been

14   introduced.

15             MR. AXELROD:  I'm just authenticating.

16             THE COURT:  Are you offering?

17             MR. AXELROD:  I am going to offer it right now, yeah.

18             THE COURT:  Well, let's find out if there is an

19   objection.

20             MR. VOGT:  I don't believe it is on their exhibit

21   list.

22             MR. AXELROD:  Oh.  It's a new exhibit.

23             THE COURT:  Pardon?

24             MR. AXELROD:  It's a new exhibit.

25             THE COURT:  I know that.  Is there any objection?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-414

M2a2Pal5                          Palin - Recross

1              MR. VOGT:  Yes.  It wasn't disclosed.

2              THE COURT:  Excuse me?

3              MR. VOGT:  It wasn't disclosed on their pretrial --

4              THE COURT:  They don't have to disclose cross-examine

5     materials.

6              MR. VOGT:  It also wasn't produced in discovery.

7              THE COURT:  Excuse me?

8              MR. VOGT:  I don't believe it was produced in

9     discovery.

10             THE COURT:  So what?

11             MR. VOGT:  I --

12             THE COURT:  It will be received.  I'm sorry.

13    Overruled.  Received.

14             MR. AXELROD:  Thank you.

15             (Defendant's Exhibit 140 received in evidence)

16             MR. AXELROD:  And may I publish?

17             THE COURT:  Yes.

18    BY MR. AXELROD:

19    Q.  Governor Palin, this is a post on your website?

20    A.  It looks like it is, yes.

21    Q.  And the date is September 14 of 2017?

22    A.  Correct.

23    Q.  And it reads, "Governor Palin will travel to Alabama to

24    join a bus tour supporting Judge Roy Moore?

25    A.  That's the title.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2a2Pal5

1     Q.  Who was Judge Roy Moore?

2             THE COURT:  No, no.  That is, I think, a 403 problem.

3             MR. AXELROD:  Judge Roy Moore was running for Senate

4     in Alabama.

5             MR. TURKEL:  Objection.

6     A.  Correct.

7             THE COURT:  I'll allow that.

8             MR. AXELROD:  Understood, your Honor.

9             If we can go to the second page, and I am very wary of

10    what your Honor is saying.  If you could pull up the top.  And

11    grab the rest of that.  I'm sorry, grab the whole thing there,

12    yeah, yeah.

13    Q.  And it says, "'Palin plans to barnstorm Alabama this week

14    prior to the special election to double down on her strongly

15    stated support of Judge Moore,' a source familiar with the

16    former Alaska governor and 2009 GOP vice presidential nominee's

17    planning told Breitbart News.  'Governor Palin is a

18    conservative rock star, and her presence in Alabama is sure to

19    seal the deal for Judge Roy Moore,' said a second source

20    familiar with Palin's plans."

21            This is September 2017, correct?

22    A.  I believe so, yeah.

23    Q.  About three months after publication of the editorial?

24    A.  Correct.

25            MR. AXELROD:  I have no further questions, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2a2Pal5

1          THE COURT:  And then I understand there is a
2    stipulation that one side or the other wanted to introduce.
3          MS. SCHELL:  Yes, your Honor.  The parties have agreed
4    to a stipulation.
5          THE COURT:  Just let me remind the ladies and
6    gentlemen of the jury that there are three types of evidence —
7    testimony, exhibits, and then stipulations.  Stipulations are
8    where the parties agree on some fact, and then you can take
9    that as an undisputed fact.
10          Go ahead.
11          MS. SCHELL:  Your Honor, I have a copy, if I may
12    approach, and I am prepared to read it into the record if you
13    would like.
14          THE COURT:  Yes, absolutely.  Go ahead, counsel.  I
15    can't imagine it will take you more than two hours to read this
16    stipulation.
17          MS. SCHELL:  Hopefully I can keep it a little shorter
18    than that.
19          Would you rather I go there?
20          THE COURT:  Yes.
21          MR. VOGT:  I thought you were talking to Mr. Turkel.
22          MS. SCHELL:  The parties stipulate to the following
23    facts:
24          Defense Exhibit 126, which the parties agree should be
25    admitted, and your Honor we would move for admission.

M2a2Pal5

1        THE COURT:  Received.

2        (Defendant's Exhibit 126 received in evidence)

3        MS. SCHELL:  Thank you.

4        Defense Exhibit 126 is the home page for the *New York*

5    *Times* website as it appeared at approximately 11 a.m. on June

6    15, 2017, the morning after the editorial was published online.

7        Defense Exhibit 127, which the parties agree should be

8    admitted, and your Honor we would ask to admit.

9        THE COURT:  Received.

10       (Defendant's Exhibit 127 received in evidence)

11       MS. SCHELL:  This is the home page for the *New York*

12   *Times* website as it appeared at approximately 3:00 p.m. on June

13   15, 2017.

14       *The Times* typically publishes somewhere between 175

15   and 250 pieces of content per day.

16       *The Times* uses a program called Stela to, among other

17   things, track the approximate number of "page views" of a given

18   article or editorial, meaning the number of times Internet

19   browsers on desktop computer, tablets, or cell phones accessed

20   that article or editorial.

21       In 2017, the number of page views serves as a proxy

22   for the number of people who saw a given article or editorial,

23   but it would not include people who read the editorial or

24   article in the newspaper and if, for instance, one person

25   viewed an editorial on both their laptop and their phone or

SApp-418

M2a2Pal5

1    reloaded that article, that one person would count as multiple

2    page views.

3           Defense Exhibit 128, which the parties agree should be

4    admitted, and your Honor we would ask to admit.

5           THE COURT:  Received.

6           (Defendant's Exhibit 128 received in evidence)

7           MS. SCHELL:  This Defense Exhibit 128 is the Stela

8    report for the editorial "America's Lethal Politics" the week

9    that it was published.

10           According to Defense Exhibit 128, there were 283,829

11   page views of the editorial "America's Lethal Politics" in the

12   week it was published, with roughly 40 percent of the views on

13   phones, 17 percent of the views on tablets, and 43 percent of

14   the views on desktop computers.

15           The *New York Times* printed 610,531 copies of the June

16   15, 2017 edition of the newspaper, which included the

17   editorial.

18           The web address, or URL, for the editorial is and I

19   will read this out, https://www -- your Honor, would you like

20   me to read this or --

21           THE COURT:  Yeah.  Go ahead.  We are having such fun.

22   It's not too long, www.nytimes.com/2017/06/14/opinion/

23   steve-scalise-congress-shot-alexandria-virginia.html.

24           This URL has not changed since publication, and anyone

25   clicking on this URL or a link to this URL will be directed to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-419

M2a2Pal5

 1   the latest version of the editorial.

 2          When the editorial was revised on June 15, it remained

 3   the same URL.  So anyone who accessed this URL after the

 4   revision would see the revised version and the most recent

 5   correction.

 6          After the editorial was revised, the original version

 7   was no longer available on *The New York Times*' website.

 8          Of the 283,829 page views of the editorial -- and

 9   then -- let's see -- roughly 150,000 were before the correction

10   at approximately 11 a.m. -- and Mr. DiMezza you may need to

11   scroll down for this -- oh, no, I'm sorry.  You were fine.

12          Of the page views of the editorial, roughly 150,000

13   were before the correction at approximately 11 a.m. on June 15,

14   and roughly 133,500 were after the correction.

15          And then the stipulations your Honor, includes a chart

16   showing the exact breakdown.

17          Before the correction, there were 150,257 page views,

18   comprising 53 percent of the page views.  After the correction,

19   there were 133,572 page views, which is 47 percent of the first

20   week.

21          Stela also tracks certain social media posts by the

22   *Times* linking to a given article or editorial.  Defense Exhibit

23   128 shows that the *Times*' main Facebook account did not post

24   about the editorial.

25          And if you will scroll up -- down a bit, Mr. DiMezza.

SApp-420

M2a2Pal5

1    The bottom of page 2.  Thank you.

2          Defense Exhibit 128 also shows tweets published by the

3    *Times* in connection with the "America's Lethal Politics"

4    editorial.

5          The chart at the top of page 3 lists those tweets,

6    along with the associated number of favorites and retweets for

7    them.

8          A "favorite" is when a Twitter user indicates that

9    they like or want to save a given tweet.

10          A "retweet" is when a Twitter user shares the original

11    tweet with that user's own network.

12          Defense Exhibit 128 shows that at 9:58 p.m. on June

13    14, 2017, the *New York Times* opinion section's Twitter account,

14    @nytopinion, tweeted a link to the original editorial, with the

15    text, "Was this attack evidence of how readily available guns

16    and ammunition are in the United States?  Indisputably."  This

17    tweet was retweeted 76 times and favorited 121 times.

18          Defense Exhibit 128 shows that at 10:46 on June 14,

19    2017, *The New York Times* main Twitter account @nytimes tweeted

20    a link to the editorial with the text, "Opinion: "America's

21    Lethal Politics."  That tweet was retweeted 105 times and

22    favorited 196 times.

23          Defense Exhibit 128 shows that at 11:40 a.m. on June

24    15, 2017, *The New York Times* opinion section's Twitter account,

25    @nytopinion, tweeted a link to the revised editorial and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-421

M2a2Pal5

1    correction stating, "We're sorry about this, and we appreciate

2    that our readers called us on the mistake.  We've corrected the

3    editorial."  That tweet was retweeted 409 to times and

4    favorited 398 times.

5         Defense Exhibit 128 shows that at 2:40 p.m. on June

6    15, 2017, *The New York Times*' main Twitter account, @nytimes,

7    tweeted about and provided a link to the revised editorial and

8    correction, with the text "a statement from @nytopinion on this

9    editorial."  That tweet was retweeted 50 times and favorited

10   115 times.

11        Mr. DiMezza, you can take that exhibit down.

12        Defense Exhibit 129, which the parties agree should be

13   admitted, and, your Honor, we would ask to admit.

14        THE COURT:  Received.

15        (Defendant's Exhibit 129 received in evidence)

16        MS. SCHELL:  This is the Stela report for a news

17   article, "Congressman Steve Scalise Gravely Wounded in

18   Alexandria Baseball Field Ambush," published by *The Times* on

19   the morning of June 14, 2017.  This report shows 2,676,397 page

20   views for the news article.

21        And you can take that down, Mr. DiMezza.

22        Defense Exhibit 111, which has already been admitted,

23   is another news piece, written by Alexander Burns and titled,

24   "Shooting is Latest Eruption in a Grim Ritual of Rage and

25   Blame," published on June 14, 2017, at 9:14 p.m.

SApp-422

M2a2Pal5

1          THE COURT:  Do you want to mark this entire

2     stipulation as an exhibit; and, if so, what number should we

3     give it?

4          MR. AXELROD:  Why don't we just call it Defense

5     Exhibit 500.

6          THE COURT:  Defense Exhibit 100, okay.

7          MR. AXELROD:  I said 500.

8          THE COURT:  Oh, 500.

9          MR. AXELROD:  Yeah, keep it deep.

10          THE COURT:  All right.

11          MR. AXELROD:  Thank you.

12          THE COURT:  Received.

13          MS. SCHELL:  Thank you, your Honor.

14          (Defendant's Exhibit 500 received in evidence)

15          THE COURT:  Does plaintiff rest?

16          MR. TURKEL:  Judge, plaintiff rests.  The only thing,

17     I would ask to check certain redacted documents that were

18     redacted on the fly to make sure that --

19          THE COURT:  That will be done before they are

20     furnished to the jury actually.

21          Does defense counsel rest?

22          MR. AXELROD:  Your Honor, defense counsel rests with

23     the provision that I just want to make sure -- talk to my team

24     and make sure that everything has been admitted that should

25     have been.  I think it has, but I just want to double check.

SApp-423

M2a2Pal5

1          THE COURT:  Okay.  Well, that can be done outside the

2     presence of the jury, yes?

3          MR. AXELROD:  Of course.

4          THE COURT:  All right.

5          So ladies and gentlemen, that's the end of the

6     evidence in this case.  Tomorrow -- we are going to excuse you

7     a full half hour early, but don't take it as a precedent.

8          Tomorrow we will have the final arguments of counsel

9     and, if we have time, my instructions of law, and then the case

10    will be yours to deliberate, probably starting either very late

11    tomorrow or first thing Monday morning.

12         So I remind you once again, even now, you should not

13    talk about the case, but have a very good evening and we will

14    see you at 9:30 tomorrow.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

SApp-424

1045

M2a2Pal5

1          (Jury not present)

2          THE COURT:  Please be seated.  Okay.  So before we

3    hear motions, a couple of housekeeping items.  Counsel, after

4    they have worked out the redactions and the inclusions and so

5    forth with respect to the exhibits, need to prepare, by no

6    later than the end of lunch tomorrow, a thumb drive in a form

7    that my law clerk will tell you about after we end today.

8          THE LAW CLERK:  I have.

9          THE COURT:  Oh, you already have.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M2A1PAL6

1          THE COURT:  Which will include an exhibit list and all

2     the exhibits.  And that's so that I can give it to the jury as

3     soon as my instructions are completed.

4          Second, in terms of summations, I went back and looked

5     at my individual rules, which of course govern all cases, not

6     just this one, and in Rule No. 11, entitled Summations in Civil

7     Cases, it states, "In all civil trials, plaintiff's counsel

8     will sum up first, followed by defendant's counsel.  Where

9     there is only one defense summation, plaintiff's counsel will

10    normally not be permitted a rebuttal summation except in

11    unusual circumstances."

12         Nevertheless, because of the high burden—in

13    particular, the clear and convincing evidence burden that

14    applies to two of the more important elements—I will give

15    plaintiff's counsel a brief rebuttal.  I think, thinking about

16    it overnight, it should be limited to 15 minutes, not the 20

17    minutes I originally indicated, because I think the reason for

18    my rule not normally permitting it is because it's something

19    that defense counsel doesn't get a chance to respond to and

20    therefore it should only be focused on the most key points that

21    plaintiff's counsel wants to stress by way of rebuttal.  So

22    plaintiff's counsel will have an hour and 45 minutes for

23    beginning summation, and that means, since we'll start promptly

24    at 9:30, it will go till we take our break, which we'll take at

25    11:15 tomorrow; then defense counsel will give the first hour

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2A1PAL6

1   and a half of his summation, which will take us to the lunch

2   break at 1, because we'll start at 11:30; and we'll take our

3   lunch break; then defense counsel will have the last half hour

4   of his summation; followed immediately by the 15-minute

5   rebuttal, which will take us to 2:45.  Now if all that works as

6   planned, we'll have time to give the jury my instructions as

7   well before our 3:30 break.  But if, for whatever reason,

8   there's slippage or a juror is late or whatever, then we'll do

9   the instructions first thing Monday morning.  So we'll just

10  leave that uncertain till we see how it all plays out.  But

11  certainly the summations will all be done tomorrow.

12          I will enforce those time limits strictly, as I did

13  with opening statements, so just keep that in mind.  I will

14  give you a warning two minutes before each segment is about to

15  reach its limit.

16          So I think that's everything about summations.  So

17  before I turn to other matters, any question about any of that?

18          MR. TURKEL:  Judge, I had asked earlier about using

19  jury instructions during summation.

20          THE COURT:  Yes.

21          MR. TURKEL:  And your Honor approved it subject to

22  making it clear --

23          THE COURT:  Yes, absolutely.  And you should have

24  gotten the absolute final -- Nick, did you send it out?

25          THE LAW CLERK:  No, I didn't.

M2A1PAL6

1    THE COURT:  Okay.  We found one or two typos which we

2    corrected, so you will get this afternoon the absolute final

3    that you can then read from or quote or whatever on your

4    summation.

5        MR. TURKEL:  And can we use them on the video monitor?

6        THE COURT:  Yes, you can put them on the video

7    monitor.  It's unfortunate judges are not allowed to copyright

8    their work, so you're free to use it.

9        MR. TURKEL:  I'm sitting on the board of the Supreme

10   Court jury instruction committee for defamation cases right

11   now.

12       THE COURT:  Oh, good.  Well --

13       MR. TURKEL:  We copyright it before we go home.  One

14   of them -- actually someone on the committee said we don't need

15   these; nobody tries defamation cases.

16       I was going to say, the verdict form we can put on the

17   monitor?

18       THE COURT:  Yes.  So let's talk about the verdict

19   form.  That was the next thing on my list.  But first, was

20   there something?

21       MR. AXELROD:  Very quickly, your Honor.  Usually I

22   find myself probably asking for an exception from your rules,

23   here I'm asking you to apply the rules, but I don't think I'm

24   going to convince you not to give plaintiff a brief rebuttal,

25   so --

M2A1PAL6

1          THE COURT:  Yes, I think, as I say, they have a very

2    substantial burden in this case.  I think it's fair to give

3    them a short rebuttal, but strictly limited to 15 minutes.

4          MR. AXELROD:  And then the other question, your

5    Honor -- I know this is optimistic, but if we do reach a point

6    tomorrow where the jury is charged, would you apply the strict

7    3:30 go home rule or would you let them deliberate if they so

8    desire?

9          THE COURT:  If, number one, they want to sit later

10   and, number two, our Marshals can arrange all the security

11   that's necessary, then they could sit later.  We also have to

12   run it through our district executive's office because the

13   reason we stop at 3:30 is partly for COVID reasons so when

14   they're on the subway, they're not surrounded by, you know,

15   rush hour crowding.  But having said all that, I have no, in

16   principle, objection to that.  If we don't reach my

17   instructions, of course, they'll go home and we'll start on

18   Monday.

19         MR. AXELROD:  Okay.  Thank you.

20         MR. TURKEL:  Judge, in line with that, we have to make

21   travel plans.  It hadn't occurred to me we wouldn't get a

22   verdict tomorrow, so we should have this discussion.  I'm

23   trying to think.  If you charge them tomorrow, we have this

24   protocol, they can't deliberate past 3:30; is that my takeaway

25   from that?

SApp-429

M2A1PAL6

1          THE COURT:  No, no, no.  The default position is they

2     can't deliberate past 3:30, but if they would like to sit later

3     and the Marshals say okay and the district executive office

4     says okay, then I would do it, but if you had travel plans,

5     then we won't do it.

6          MR. TURKEL:  No.  We can adjust our travel plans.  In

7     other words, if we end up having to be back here Monday, we

8     will be back here Monday.

9          THE COURT:  Yes.  Oh, I think the likelihood is strong

10    that (a) they may not even ask to deliberate longer, or (b)

11    even if they do, I would be surprised if we get a verdict

12    tomorrow.  No one knows, so I think you should be planning to

13    definitely be here Monday morning, yeah.

14         MR. TURKEL:  That's the bigger question.

15         THE COURT:  Monday morning.  And they were told when

16    we swore them in it was a two-week trial, so we're still well

17    within that framework, because we started on a Thursday and so

18    two weeks would be next Wednesday, this coming Wednesday.

19         MR. TURKEL:  Understood.  Just the closure of the end

20    of the week just had me thinking we'd be done completely, so --

21         THE COURT:  Yes.  So my recollection from when I was a

22    trial lawyer, about 90 years ago, was that after you've

23    finished your summation and the jury has begun its

24    deliberations, you don't travel, you head for the nearest bar,

25    but that was just my practice.  Okay.

M2A1PAL6

1          MR. TURKEL:  I'd like to see my wife.  It's been a

2     while.

3          THE COURT:  Now we'll hear motions at this time.

4          Oh, I'm sorry.  Anything on the verdict form?

5          MR. VOGT:  My only request would be -- and I assume

6     it's no, but -- it seems like your Honor has decided to keep

7     punitive damages off the verdict form.

8          THE COURT:  I'm sorry.  Oh.  Well, no, no, no.  We're

9     going to talk about punitive damages right now.  I meant other

10    than that.  Okay.  So --

11         MR. BROWN:  The defense has nothing on the form, your

12    Honor.

13         THE COURT:  Okay.  So let's talk about punitive

14    damages.

15         So the defense makes two arguments why punitive

16    damages should not be permitted.  The first is the argument

17    that punitive damages in a libel case are not available where

18    the alleged libel was against a public figure, sort of an

19    extension of *New York Times v. Sullivan*.  I don't agree with

20    that.  I think that's a possible reading of some state cases,

21    and of course we have to look to the New York State

22    Constitution as well as the federal Constitution.  But I think

23    that argument has substantially been rejected by the Second

24    Circuit in *Celle v. Filipino Reporter Enterprises, Inc.*, 209

25    F.3d 163, 190-191 (2d Cir. 2000), and in *DiBella v. Hopkins*,

M2A1PAL6

1  403 F.2d 102, 122 (2d Cir. 2005).  While there is case law that

2  might be read otherwise, I think the better reading of those

3  cases is that punitive damages is permitted even in the case of

4  a public figure.  However, *The Times* makes a second argument,

5  which is that under New York law and particularly -- well,

6  there are several cases.  The punitive damages in a case like

7  this can be permitted "only if a reasonable jury could find

8  that the speaker was solely motivated by a desire to injure

9  plaintiff and that there must be some evidence that the animus

10  was the one and only cause for the publication."  That's a

11  quote from the *Morsette* case out of the First Department, but

12  it's the highest state law on this issue and therefore binding

13  on this Court unless I were to conclude that the Court of

14  Appeals of New York would come to a different conclusion, which

15  I do not believe.

16       So I don't see how any reasonable juror could conclude

17  that the alleged libelous statements in this case were

18  motivated solely by a desire to injure plaintiff and that that

19  animus was the one and only cause for the publication.

20       Furthermore, the evidence, frankly, that Mr. Bennet

21  harbored ill will towards Ms. Palin is quite modest indeed, and

22  if I had to reach the issue, I might conclude it was not

23  enough, even on a lesser standard, to take the punitive damages

24  issue to the jury, but I don't have to reach that because I

25  adopt the positions that I just quoted from the *Morsette* case.

SApp-432

M242Pal1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    SARAH PALIN, an individual,

4                    Plaintiff,

5            v.                          17 CV 4853 (JSR)

6    THE NEW YORK TIMES COMPANY, *et
     al.*,

7
                     Defendants.
8    ------------------------------x       Trial

9
                                           New York, N.Y.
10
                                           February 4, 2022
11                                         9:25 a.m.

12   Before:

13                   HON. JED S. RAKOFF,

14                                         District Judge

15                          APPEARANCES

16   TURKEL CUVA BARRIOS, P.A.
17        Attorneys for Plaintiff
     BY:  SHANE B. VOGT
18        KENNETH G. TURKEL

19
     BALLARD SPAHR, LLP
20        Attorneys for Defendants
     BY:  DAVID L. AXELROD
21        JACQUELYN N. SCHELL
          THOMAS BYRNE SULLIVAN
22        JAY WARD BROWN

23

24   Also Present:

25   Dana Green, Senior Counsel, The New York Times Company

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

SApp-433

M2A1PAL6

1          THE COURT:  All right.  Anything else we need take up

2    today?

3          MR. AXELROD:  I don't think so.  Thank you.

4          THE COURT:  Very good.  We'll see you tomorrow.  There

5    may not be any reason we need to get together at 9 tomorrow.

6    Why don't we say 9:15 in an excess of caution in case something

7    does come up, but otherwise, I'm sure you'll need every moment

8    you can get to prepare your closing arguments.

9          MR. TURKEL:  One question:  Are we going to leave the

10   podium back here or is it going to be centered up here?

11         THE COURT:  No, it's going to be right there.  And it

12   prevents -- when I was a young prosecutor, I won a case against

13   a lawyer who went right up to the bar and addressed each juror

14   face on.

15         MR. TURKEL:  I like him already.

16         THE COURT:  And one of the jurors told me afterwards:

17   Did you know that he spit in my face?

18         MR. TURKEL:  I don't like him anymore.

19         THE COURT:  Anyway, it will be from that place back in

20   the box there.

21         Okay.  Very good.  See you tomorrow.

22         THE DEPUTY CLERK:  All rise.

23         (Adjourned to February 11, 2022, at 9:15 a.m.)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SApp-434

1057

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                          Page

 3     SARAH PALIN

 4    Direct By Mr. Turkel . . . . . . . . . . . . 893

 5    Cross By Mr. Axelrod . . . . . . . . . . . . 923

 6    Redirect By Mr. Turkel . . . . . . . . . . .1002

 7    Recross By Mr. Axelrod . . . . . . . . . . .1013

 8

 9     HANNA INGBER

10    Direct By Mr. Vogt . . . . . . . . . . . . .1019

11    Cross By Ms. Schell  . . . . . . . . . . . .1024

12    Redirect By Mr. Vogt . . . . . . . . . . . .1034

13

14                    PLAINTIFF EXHIBITS

15    Exhibit No.                            Received

16     114   . . . . . . . . . . . . . . . . . 913

17     176 (as redacted)   . . . . . . . . . . . 915

18     177 (as redacted)   . . . . . . . . . . . 916

19     177  . . . . . . . . . . . . . . . . . .1012

20

21                    DEFENDANT EXHIBITS

22    Exhibit No.                            Received

23     117   . . . . . . . . . . . . . . . . . 939

24     63    . . . . . . . . . . . . . . . . . 947

25     64    . . . . . . . . . . . . . . . . . 949
```

SApp-435

1058

```
 1                        DEFENDANT EXHIBITS

 2     Exhibit No.                              Received

 3     222  . . . . . . . . . . . . . . . . . 952

 4     69   . . . . . . . . . . . . . . . . . 963

 5     70   . . . . . . . . . . . . . . . . . 967

 6     71   . . . . . . . . . . . . . . . . . 969

 7     77   . . . . . . . . . . . . . . . . . 972

 8     62   . . . . . . . . . . . . . . . . .1007

 9     139  . . . . . . . . . . . . . . . . .1015

10     140  . . . . . . . . . . . . . . . . .1017

11     126  . . . . . . . . . . . . . . . . .1038

12     127  . . . . . . . . . . . . . . . . .1038

13     128  . . . . . . . . . . . . . . . . .1039

14     129  . . . . . . . . . . . . . . . . .1042

15     500  . . . . . . . . . . . . . . . . .1043

16

17

18

19

20

21

22

23

24

25
```



The Opinion Pages | EDITORIAL

# America's Lethal Politics

BY THE EDITORIAL BOARD  JUNE 14, 2017

America's elected representatives enjoying America's pastime on a ball field just across the Potomac from the Capitol: A particularly American form of terror changed that idyll early Wednesday morning into what Senator Rand Paul, who was there, called, "basically a killing field."

A gunman with a rifle fired dozens of rounds at members of Congress and current and former aides, who dove for cover. "He was hunting us," said Representative Mike Bishop, Republican of Michigan, who was at home plate when the gunman appeared. In all, four victims were hit, including Representative Steve Scalise of Louisiana, the House majority whip, who was in critical condition Wednesday night after surgery on a bullet wound to his hip.

An American would once have been horrified and shocked by such savagery. An American today would be right to be horrified — and not very surprised. This was one of two mass shootings in the United States on Wednesday. At a San Francisco UPS facility, a gunman killed three people and himself.

F.B.I. agents collecting evidence after the shooting at Eugene Simpson Stadium Park in Alexandria, Va.

Not all the details are known yet about what happened in Virginia, but a sickeningly familiar pattern is emerging in the assault: The sniper, James Hodgkinson, who was killed by Capitol Police officers, was surely deranged, and his derangement had found its fuel in politics. Mr. Hodgkinson was a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump. He posted many anti-Trump messages on social media, including one in March that said "Time to Destroy Trump & Co."

RELATED COVERAGE

Steve Scalise Among 4 Shot at Baseball Field; Suspect Is Dead

What We Know and Don't Know About the Shooting of the G.O.P. Men's Baseball Team

RECENT COMMENTS

Garlic Toast

eliot

Peter F. Bernard

Document title: America's Lethal Politics -The New York Times
Capture URL: https://www.nytimes.com/2017/06/14/opinion/steve-scalise-congress-shot-alexandria-virginia.html?_r=1
Capture timestamp (UTC): Thu, 15 Jun 2017 14:37:08 GMT

PLAINTIFF TRIAL EXHIBIT 001



Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

Was this attack evidence of how readily available guns and ammunition are in the United States? Indisputably. Mr. Hodgkinson, by definition, should not have had a gun, but he was licensed in his home state, Illinois. And in any event it would have been easy for him to acquire a weapon in Virginia, which requires no background checks in private sales, requires no registration for most weapons and has few restrictions on open carry.

### Sign Up for the Opinion Today Newsletter

Every weekday, get thought-provoking commentary from Op-Ed columnists, the Times editorial board and contributing writers from around the world.

[Enter your email address.] [Sign Up]

☐ You agree to receive occasional updates and special offers for The New York Times's products and services.

☐ [I'm not a robot]

See Sample | Privacy Policy | Opt out or contact us anytime

The reaction of some was that the only solution is yet more guns. Representative Mo Brooks of Alabama, who was among those who came under fire on Wednesday, said, "It's not easy to take when you see people around you being shot and you don't have a weapon yourself."

That's an entirely reasonable reflex. All people in that situation, unarmed and under fire, would long to be able to protect themselves and their friends. Yet consider the society Americans would have to live in — the choices they would all have to make — to enable that kind of defense. Every member of Congress, and every other American of whatever age, would have to go to baseball practice, or to school, or to work, or to the post office, or to the health clinic — or to any of the other places mass shootings now take place — with a gun on their hip. And then, when an attack came and they returned fire, they would probably kill or wound not the assailant but another innocent bystander, as studies have repeatedly shown.

That is the society the gun lobby is working toward. Is it the one Americans want?

President Trump said just the right thing after the attack on



Document title: America's Lethal Politics -The New York Times
Capture URL: https://www.nytimes.com/2017/06/14/opinion/steve-scalise-congress-shot-alexandria-virginia.html?_r=1
Capture timestamp (UTC): Thu, 15 Jun 2017 14:37:08 GMT

PLAINTIFF TRIAL EXHIBIT 001



Document title: America's Lethal Politics -The New York Times
Capture URL: https://www.nytimes.com/2017/06/14/opinion/steve-scalise-congress-shot-alexandria-virginia.html?_r=1
Capture timestamp (UTC): Thu, 15 Jun 2017 14:37:08 GMT

PLAINTIFF TRIAL EXHIBIT 001

Page 4 of 4

PALIN02742

K Nxxx,2017-06-15,A,024,Bs-BW,E1

A24 THURSDAY, JUNE 15, 2017

# Opinion

The New York Times

EDITORIALS

## America's Lethal Politics

America's elected representatives enjoying America's pastime on a ball field just across the Potomac from the Capitol: A particularly American form of terror changed that idyll early Wednesday morning into what Senator Rand Paul, who was there, called "basically a killing field."

A gunman with a rifle fired dozens of rounds at members of Congress and current and former aides, who dove for cover. "He was hunting us," said Representative Mike Bishop, Republican of Michigan, who was at home plate when the gunman appeared. In all, four victims were hit, including Representative Steve Scalise of Louisiana, the House majority whip, who was in critical condition Wednesday night after surgery on a bullet wound to his hip.

**A sickening pattern emerges in the assault on members of Congress at a ball field.**

An American would once have been horrified and shocked by such savagery. An American today would be right to be horrified — and not very surprised. This was one of two mass shootings in the United States on Wednesday. At a San Francisco UPS facility, a gunman killed three people and himself.

Not all the details are known yet about what happened in Virginia, but a sickeningly familiar pattern is emerging in the assault: The sniper, James Hodgkinson, who was killed by Capitol Police officers, was surely deranged, and his derangement had found its fuel in politics. Mr. Hodgkinson was a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump. He posted many anti-Trump messages on social media, including one in March that said "Time to Destroy Trump & Co."

Was this attack evidence of how vicious American politics has become? Probably. In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear. Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Though there's no sign of incitement as direct as in the Giffords attack, liberals should of course hold themselves to the same standard of decency that they ask of the right.

Was this attack evidence of how readily available guns and ammunition are in the United States? Indisputably. Mr. Hodgkinson, by definition, should not have had a gun, but he was licensed in his home state, Illinois. And in any event it would have been easy for him to acquire a weapon in Virginia, which requires no background checks in private sales, requires no registration for most weapons and has few restrictions on open carry.

The reaction of some was that the only solution is yet more guns. Representative Mo Brooks of Alabama, who was among those who came under fire on Wednesday, said, "It's not easy to take when you see people around you being shot and you don't have a weapon yourself."

That's an entirely reasonable reflex. All people in that situation, unarmed and under fire, would long to be able to protect themselves and their friends. Yet consider the society Americans would have to live in — the choices they would all have to make — to enable that kind of defense. Every member of Congress, and every other American of whatever age, would have to go to baseball practice, or to school, or to work, or to the post office, or to the health clinic — or to any of the other places mass shootings now take place — with a gun on their hip. And then, when an attack came and they returned fire, they would probably kill or wound not the assailant but another innocent bystander, as studies have repeatedly shown.

That is the society the gun lobby is working toward. Is it the one Americans want?

President Trump said just the right thing after the attack on Wednesday: "We may have our differences, but we do well in times like these to remember that everyone who serves in our nation's capital is here because, above all, they love our country. We can all agree that we are blessed to be Americans, that our children deserve to grow up in a nation of safety and peace."

Yet he will not help create that nation if he continues to advocate easy access to lethal weapons.

## Daughters Will Suffer From Medicaid Cuts

Nearly one in five adult children at some point provide care for at least one elderly parent, according to a new study by the Center for Retirement Research at Boston College. The burden is particularly demanding for daughters, who spend as much time on such care as spouses of older adults, and as much time as sons, in-laws, grandchildren and other relatives combined.

House Republicans' proposal to slash federal spending on Medicaid by some 25 percent over 10 years, shifting costs to states that could not afford them, would be devastating, because nursing homes, home care and community-based programs for the elderly account for almost two-thirds of Medicaid spending. One of the few ways that adult children can get help with caregiving duties is Medicaid's support for seniors, which many middle-class people qualify for after spending most of their income and assets on long-term care. Cutting Medicaid could make it more difficult to qualify, so more adult children would have to care for their parents.

The stresses, which are already significant, would become extreme. The researchers at Boston College found that these caregivers spend an average of 77 hours per month with their parents, the equivalent of about two weeks of full-time work. That time is money. Calculations based on the American Time Use Survey indicate that caregivers effectively forfeited $522 billion in 2013 due to such duties; that is more than double the total cost of formal care, at $211 billion. Women caregivers were more likely than men to retire because of these demands, and those who kept working reduced their workweeks by three to 10 hours on average. Beyond this sacrifice, caregivers spend 35 percent of their own budget on parental care, surveys indicate.

Caregiving also takes a toll on physical and mental health. Women who care for parents report more pain, and significantly higher out-of-pocket costs for their own health care. Both women and men say they are more depressed and had poorer health because of parental care.

Even if Medicaid spending were not cut, demand for long-term care would rise as baby boomers age, leading to increased reliance on adult children and formal caregiving arrangements. That unfolding dynamic is not a concern for the distant future. The youngest baby boomers are now 52, the oldest are 71. More than half of 85-years-olds need help with one or more basic self-care tasks, including getting out of bed, walking across a room, going to the bathroom, bathing, dressing, eating, taking medicine, using a phone, shopping and cooking.

In the face of deep Medicaid cuts, a system of caregiving that is already clearly strained would implode.

If health, prosperity and dignity were driving policymaking, lawmakers would be looking for ways to increase Medicaid coverage, not destroy it.

## How ISIS Grew in the Philippines

While President Rodrigo Duterte of the Philippines was bragging about his brutal war on drugs, the Islamic State was consolidating its sway over Islamist rebel groups on the island of Mindanao. The extent to which ISIS has succeeded is now alarmingly evident, as a pitched battle between Philippine troops and Islamist militants for control of the largely Muslim city of Marawi enters its fourth week.

With the presence of foreign fighters, including Malaysians and Indonesians, who are working alongside militant leaders with strong ties to ISIS, Mr. Duterte has a serious problem on his hands that threatens the security of the entire region.

The news on Wednesday that, in addition to American military advisers and intelligence assistance, United States troops are now on the ground in Marawi raises the stakes. Mr. Duterte, who has threatened to eject American forces from his country, said Sunday that he was unaware of the presence of military assistance in Marawi. In fact, the Pentagon has no permanent presence in the Philippines, but for years has kept 50 to 100 Special Forces troops in the south of the country on rotational exercises. Despite Mr. Duterte's hostility to America, his army has close ties to the Pentagon, values its help against the extremists and has resisted Mr. Duterte's efforts to expel the Americans.

Mr. Duterte's braggadocio is partly to blame for the escalation of the conflict. Last year, he rejected a cease-fire offer from the Maute group, which is leading the fight in Marawi. He said in December that when the group pledged to "go down upon Marawi to burn the place," he responded, "Go ahead, do it." The battle raging now began when Maute militants, who have joined forces with the Abu Sayyaf Islamist group, strongly resisted an attempt on May 23 by Philippine security forces to capture Isnilon Hapilon, Abu Sayyaf's leader. Mr. Hapilon is on the F.B.I.'s list of most-wanted terrorists.

The Philippine military is pummeling Marawi with daily bombing runs, presumably with targeting assistance from Americans. More than 300 people have been killed and some 2,000 civilians are believed to be trapped.

President Trump has supported Mr. Duterte, including his use of extrajudicial killings to fight the drug trade, and he has intensified the fight against ISIS in Syria and Iraq. But strongman tactics — like Mr. Duterte's recent threat to declare martial law over the entire country — and a widening military show of brute force aided by the United States will not address the fundamental problems that have fueled militant movements on Mindanao since the 1970s: grinding poverty; lawless zones, where criminal gangs reign; and overcrowded prisons, which are a boon to Islamist recruiters.

The most urgent need now is to ratchet down the fight in Marawi and press Mr. Duterte to restart negotiations with militant groups.

LETTERS

## The Attack on G.O.P. Lawmakers

TO THE EDITOR:

On Wednesday morning there was a shooting at a baseball field filled with Republican members of Congress practicing for a charity game. Only the diligence of their police protectors prevented a mass killing. The gunman has been identified as a political extremist who was ardently anti-Trump and opposed to Republican tax policies.

Has it really come to this? Has the extreme animus and disrespect between Republicans and Democrats finally morphed into potentially life-taking violent outbursts? Does this event portend a sad and dangerous devolving of societal norms where some fringe, marginalized people feel they have a license, even a duty, to kill those whose views they strongly disagree with?

These are legitimate questions. In this very new presidency, if there has ever been an opportunity and a need for real presidential leadership and wisdom, it is now. President Trump, please refrain from the temptation to politicize this event and help us to heal the abyss that divides us as a nation.

KEN DEROW, SWARTHMORE, PA.

TO THE EDITOR:

Ever since Representative Gabrielle Giffords was shot during an exercise in outdoor democracy in Tucson in 2011, I've wondered how Democrats can safely campaign on contentious issues in red-state America. Evidently neither party is immune from the harms that come from rampant gun proliferation.

I wish Representative Steve Scalise and the others who were shot a full recovery. And I hope Mr. Scalise takes back to his fellow G.O.P. members, and to President Trump, just how much it hurts to get shot.

If this isn't enough of a crime to persuade Congress to tighten up on gun laws, what kind of a crime would be? We've already seen the horrors of Aurora, Newtown, Columbine and Virginia Tech. President Trump went from advocating a ban on assault rifles to being a National Rifle Association parrot, and now talks as if he really believes that the trouble with America is too few guns, not too many.

RON CHARACH, TORONTO

TO THE EDITOR:

I am as disturbed as anyone by the rash and often reckless leadership of President Trump, and what he means to our delicate democracy. But maybe now, in the wake of this apparently politically motivated shooting, the ceaseless drumbeat by Trump critics over the supposed coming fascism in America, along with celebrations of tyrannicide (fake severed heads held up by comedians; theater companies acting out bloody executions), can be toned down a bit.

And this applies especially to the American media, which were rightly appalled when Mr. Trump called them the "enemy of the people," but have, for months now, presented him in exactly that same way. Is it any wonder folks are bursting at the seams out there?

Now is the perfect moment for a reboot. My hope is that Mr. Trump will finally lay off his Twitter feed and start acting presidential. But even if he does not, we must all bear in mind that the best way to oppose politicians and policies with which we may vehemently disagree is through the constitutional and electoral freedoms that remain very much alive and well, even in Mr. Trump's America.

STUART GOTTLIEB, NEW YORK

*The writer, a former senior adviser in the Senate, teaches public policy at Columbia.*

## The Questions Jeff Sessions Didn't Answer

TO THE EDITOR:

Re "Sessions Denies Collusion, Deploring 'Detestable Lie'" (front page, June 14):

During Tuesday's hearing, Attorney General Jeff Sessions claimed that he was confused by "a rambling question" posed by Senator Al Franken during his confirmation hearing that caused him not to mention meetings with the Russian ambassador, Sergey Kislyak. Mr. Sessions repeatedly said he could not remember details of meetings that occurred just a few months ago.

Mr. Sessions leads the Justice Department. Presumably he has to read legal briefs, which in their own right are confusing. If he becomes muddled by questions from senators, how are we to feel confident in his ability to oversee an entire department?

C. K. BERNS
JACKSON HEIGHTS, QUEENS

TO THE EDITOR:

Your June 14 editorial "Jeff Sessions Clams Up in Congress" most compellingly asks, "Why, since he agreed with the committee that Russian interference in the election represents a profoundly serious attack on American democracy, has Mr. Sessions never received or read any detailed briefing on that operation?"

This disturbing pattern of inaction points to either gross incompetence or a bewildering lack of curiosity, as exemplified several times in his testimony:

Mr. Sessions says he discussed getting rid of James Comey after the election but before the inauguration. If Mr. Comey was doing such damage to the F.B.I., why did Mr. Sessions wait six months to recommend his removal?

Mr. Sessions claims to have never discussed Russian hacking with the Russians, even when he met them in his office.

Mr. Sessions apparently never asked Mr. Comey what President Trump said when he cleared the room to be alone with Mr. Comey.

Mr. Sessions couldn't cite a specific Justice Department policy preventing him from reporting conversations with the president. How could he not have been prepped to answer this most fundamental question?

Mr. Sessions testified that he "in effect" recused himself from the Russia investigation his second day in office, but didn't actually do so for another three weeks. Why not?

Mr. Sessions apparently seizes up as well as clamming up.

RICK RUTH, SEATTLE

TO THE EDITOR:

The thing I cannot understand is why so many officials, like ducks in a row, are sacrificing themselves for President Trump, even people like H. R. McMaster, Dan Coats and Adm. Michael Rogers, who have had long careers and credibility, readily damaging themselves, looking as if they're lying or hiding evidence for a president who has no loyalty except to himself and who would throw them under a bus without thinking. There is no reward here.

And what is the worst that would happen to them if they stood up for what's right? Mr. Trump would fire them. And then they would be heroes.

It is a sad spectacle of misjudgment. Jim Mattis and Rod Rosenstein seem to be the only ones trying to hang on to their honor. We will see how far that goes.

REVA COOPER, BROOKLYN

## No Strategy on Afghanistan

TO THE EDITOR:

Re "Trump Gives Mattis Authority to Send More Troops to Afghanistan" (news article, June 14):

I agree with Senator John McCain that "we still haven't got a strategy for Afghanistan." To this Vietnam veteran, this seems like déjà vu all over again.

Gen. William Westmoreland repeatedly asked President Lyndon B. Johnson for more troops to end a similar "stalemate" in Vietnam.

Increasing troop strength without a meaningful strategy leads to endless conflict and more loss of life on every side. President Barack Obama was right to keep civilian control of military plans.

BRUCE W. RIDER, GRAPEVINE, TEX.

## Mixed-Marriage Pioneers

TO THE EDITOR:

Re "50 Years Later, 'We Are Not Unusual Anymore'" (news article, June 12), about the Watsons, an interracial couple who married in 1956:

Thank you both, Leon and Rosina Watson, for pioneering the way for millions of us who have come after you, who have chosen to be married to the partners we love as passionately as anyone else, in the many racial-and-sexual-orientation combinations in today's society.

My husband, Scott, and I are grateful to you for having taken the risk and chance of love, which is stronger than any law.

RICHARD REITHAUER, YONKERS

ONLINE: **MORE LETTERS**

*The group United Against Nuclear Iran writes that Iran is no "beacon of democracy."*
**nytimes.com/opinion**

PLAINTIFF TRIAL EXHIBIT 004



PLAINTIFF TRIAL EXHIBIT 005

SApp-442



PLAINTIFF TRIAL EXHIBIT 005



PLAINTIFF TRIAL EXHIBIT 005



Document title: America's Lethal Politics -The New York Times
Capture URL: https://www.nytimes.com/2017/06/14/opinion/steve-scalise-congress-shot-alexandria-virginia.html?_r=0
Capture timestamp (UTC): Thu, 15 Jun 2017 16:39:54 GMT

Page 4 of 4

PALIN02732

PLAINTIFF TRIAL EXHIBIT 005





Was this attack evidence of how vicious American politics has become? Probably. In 2011, Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl. At the time, we and others were sharply critical of the heated political rhetoric on the right. Before the shooting, Sarah Palin's political action committee circulated a map that showed the targeted electoral districts of Ms. Giffords and 19 other Democrats under stylized cross hairs. But in that case no connection to the shooting was ever established.

Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. Liberals should of course be held to the same standard of decency that they ask of the right.

Was this attack evidence of how readily available guns and ammunition are in the United States? Indisputably. Mr. Hodgkinson, by definition, should not have had a gun, but he was licensed in his home state, Illinois. And in any event it would have been easy for him to acquire a weapon in Virginia, which requires no background checks in private sales, requires no registration for most weapons and has few restrictions on open carry.



### Sign Up for the Opinion Today Newsletter

Every weekday, get thought-provoking commentary from Op-Ed columnists, the Times editorial board and contributing writers from around the world.



The reaction of some was that the only solution is yet more guns. Representative Mo Brooks of Alabama, who was among those who came under fire on Wednesday, said, "It's not easy to take when you see people around you being shot and you don't have a weapon yourself."

That's an entirely reasonable reflex. All people in that situation, unarmed and under fire, would long to be able to protect themselves and their friends. Yet consider the society Americans would have to live in — the choices they would all have to make — to enable that kind of defense. Every member of Congress, and every other American of whatever age, would have to go to baseball practice, or to school, or to work, or to the post office, or to the health clinic — or to any of the other places mass shootings now take place — with a gun on their hip. And then, when an attack came and they returned fire, they would probably kill or wound not the assailant but another innocent bystander, as studies have repeatedly shown.





Crystal Clear

That is the society the gun lobby is working toward. Is it the one Americans want?

President Trump said just the right thing after the attack on Wednesday: "We may have our differences, but we do well in times like these to remember that everyone who serves in our nation's capital is here because,

Document title: America's Lethal Politics - The New York Times
Capture URL: https://www.nytimes.com/2017/06/14/opinion/steve-scalise-congress-shot-alexandria-virginia.html?_r=1
Capture timestamp (UTC): Fri, 16 Jun 2017 13:09:13 GMT

PLAINTIFF TRIAL EXHIBIT 006

PALIN02735





Document title: America's Lethal Politics -The New York Times
Capture URL: https://www.nytimes.com/2017/06/14/opinion/steve-scalise-congress-shot-alexandria-virginia.html?_r=1
Capture timestamp (UTC): Fri, 16 Jun 2017 13:09:13 GMT

PLAINTIFF TRIAL EXHIBIT 006

Page 4 of 4

PALIN02737

SApp-449



Document title: NYT Opinion on Twitter: &quot;We got an important fact wrong, incorrectly linking political incitement and the 2011 shooting of Giffords. No link was ever…
Capture URL: https://twitter.com/nytopinion/status/875376637797441537
Capture timestamp (UTC): Fri, 16 Jun 2017 17:16:21 GMT     PLAINTIFF TRIAL EXHIBIT 007     Page 1 of 1

PALIN03828

SApp-450



The New York Times 🔵 @nytimes · Jun 15

A statement from @nytopinion on this editorial: nyti.ms/2sx8Fke

**NYT Opinion** 🔵 @nytopinion

Replying to @nytopinion

We got an important fact wrong, incorrectly linking political incitement and the 2011 shooting of Giffords. No link was ever established.

💬 88    🔁 61    ♡ 136    ◁

PLAINTIFF TRIAL EXHIBIT 008

K Yxxx,2017-06-16,A,026,Bs-BW,E1

# Opinion

The New York Times

EDITORIALS

## Mr. Trump, It's Your War Now

President Trump was typically self-absorbed in his tweet on Wednesday celebrating the 242nd birthday of the United States Army. "Proud to be your commander-in-chief," he proclaimed to the soldiers.

Yet, when it comes to the actual life-and-death responsibilities of the commander in chief — overseeing America's vast war machine and sending men and women into conflict — Mr. Trump seems more like the delegator in chief. The latest evidence was his decision this week to give Defense Secretary Jim Mattis the authority to determine troop levels in Afghanistan, which could lead to an increase of as many as 5,000 troops, if proposals favored by Mr. Mattis and his generals go forward.

**The president's reluctance to accept responsibility for setting policy on the war in Afghanistan leaves everyone in the dark.**

Mr. Mattis has acknowledged to Congress that the United States-led coalition is "not winning" in Afghanistan. It is not at all clear that adding 5,000 more troops — a roughly 50 percent increase over the current troop level of 8,800 — can make a difference, especially when the administration has yet to confront the basic problem of ensuring public safety and the larger political and economic issues that must be part of a comprehensive strategy to resolve the conflict.

What such a decision would do is reverse the drawdown President Barack Obama put in place and set a new policy of expanding involvement in a war that has already dragged on for 16 years, cost thousands of American and Afghan lives and consumed billions of dollars.

Military commanders chafed under Mr. Obama's tight controls on troop deployments and war making, which some of them saw as micromanagement. Even so, commanders in chief cannot subcontract their most sacred duties; what the United States faces at this moment is not some routine tactical maneuver or choice. It is what to do about America's longest war. That is, at bottom, Mr. Trump's responsibility, and at the moment the nation has no idea what he thinks or where he is headed.

Mr. Trump, who has no prior government experience, leaves the impression that he is cowed by the weighty responsibility of sending more Americans into battle, and is looking to put that onus on Mr. Mattis so he has somebody to blame if things go wrong, as he did when he fingered the generals for a botched raid in Yemen in January, in which one member of the Navy SEALs was killed.

That the president may be distancing himself from a complex challenge is only one concern. Another is the absence of an informed, wide-ranging public debate. Discussions about possible troop increases have largely been theoretical and limited to experts, prompting Senator John McCain, the Republican chairman of the Senate Armed Services Committee, to complain fiercely at a hearing on Tuesday that the Pentagon has yet to present a plan to regain the battlefield momentum that could provide a framework for decision making.

There is an urgent need for just such a plan and such a discussion, not least because everything in Afghanistan seems to be going backward. Mr. Mattis says that he may send some additional troops even before the new war plan is completed, perhaps next month, because the Taliban is once again "surging." (The Islamic State, a relative newcomer to the conflict, has been flexing its muscles in Afghanistan this year.)

Apart from the fact that the need for additional troops has not been cogently debated, much less established as necessary, such a move now would be premature: None of the big questions have been answered. How will 5,000 more troops turn the tide, when the United States was unable to bring stability to Afghanistan when it had more than 100,000 troops there in 2011? What is the core American national security interest — defeating Al Qaeda, ISIS, the Taliban? Stabilizing the Afghan state? All of the above? None?

American civilian and military leaders have long agreed that the goal must be a political settlement with the Taliban. Yet five months into Mr. Trump's tenure, the well-resourced Pentagon, which is on track to receive a large budget increase this year, is calling the shots — not the State Department, which Mr. Trump's budget would decimate.

There also is no sign of a comprehensive strategy coordinated by the National Security Council to integrate all efforts — not just the battle against the Taliban and the Islamic State, but also broader issues of improving governance in Kabul, battling corruption, fostering reconciliation with the Taliban and engaging Pakistan and other regional partners.

MAKE
AMERICA
GREAT AGAIN

One major hindrance to sound policy making is the fact that there are few experts in place to do the work; many senior national security positions remain unfilled. However capable and respected Mr. Mattis may be, the Pentagon and American military forces cannot alone bring stability, or whatever counts as "winning," to Afghanistan. To achieve any worthwhile outcome, the president must be committed and involved, as must his entire national security team. So far the Pentagon is running the show, largely by default.

## Taking the President's Self-Dealing to Court

Lawsuits filed this week by the attorneys general of Maryland and the District of Columbia and by nearly 200 Democratic members of Congress may be the best chance to hold President Trump accountable for unconstitutional self-dealing, since the Republican-controlled Congress won't.

Drafters of the Constitution were so determined to reduce potential corruption that they prohibited officials from accepting "any present, emolument, office, or title, of any kind whatever" from foreign governments without approval from Congress, and barred presidents from receiving payments from federal or state governments other than a salary.

But President Trump seems determined not to let the Constitution stop him from doing what he wants. He has refused to divest his hotels, real estate properties, golf courses and other businesses, many of which earn money and receive other benefits from foreign governments and federal and state agencies.

Mr. Trump's businesses have already become vehicles for foreign and American officials to curry favor with him. Many foreign diplomats and their governments are holding events and booking rooms at the Trump International Hotel at the Old Post Office building in Washington. China and other countries have granted dozens of trademarks to the president and his family, allowing Trump companies to expand their licensing business into new markets. The General Services Administration, a federal agency that reports to the president and manages government buildings, did Mr. Trump a huge favor by deciding in March that he could keep his ownership of the Washington hotel, even though the lease clearly states that no elected official can benefit from it.

The Trump Organization may be receiving foreign and domestic emoluments that the public is not even aware of. Ideally, Congress would hold hearings and demand that the president turn over his tax returns and other financial documents. It would also review and take votes on which foreign emoluments Mr. Trump could accept. Such a process would be laborious and time-consuming, but it is what the Constitution requires if the president is unwilling to divest.

Regrettably, that is not likely to happen as long as both houses of Congress are controlled by Republicans, who have shown little eagerness for holding him accountable. That is where the latest lawsuits, along with a similar case filed earlier by the legal watchdog group Citizens for Responsibility and Ethics in Washington, come in. Courts could dismiss these cases on the grounds that the plaintiffs do not have the legal standing to sue the president. But some legal experts believe that the case brought by the attorneys general might be allowed to proceed, because states are legally considered "coequal sovereign" with the president and because they claim actual harm from unfair competition by Trump properties.

We have a glimpse of how Mr. Trump intends to fight. In a filing in the watchdog group's lawsuit, the Department of Justice said Trump businesses could accept benefits from foreign governments and federal and state agencies because these are ordinary commercial transactions, not emoluments, a rather arcane term that the department defined as "profit arising from an office or employ." In other words, an emolument would be a payment for a job.

**Two recent lawsuits may be the best chance to call Mr. Trump's bluff on unconstitutional business practices.**

But other legal scholars say that dictionaries, the papers of the founders and other historical sources suggest that when the Constitution was written the term encompassed profits from commercial transactions. Taking the Justice Department's argument to its logical conclusion would mean that the president could not accept a salary from a foreign government without consulting Congress, but he wouldn't have to seek permission to rake in millions of dollars in profit from a foreign country through a business he directly owns. Why would the nation's founders leave a gaping loophole in the Constitution that could easily be exploited by corrupt officials?

Mr. Trump's callous disregard for ethical norms is exactly the attitude that the founders sought to protect the country against, through the emoluments clauses they put into the Constitution.

**CORRECTION**

An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.

LETTERS

## Reflections on the Alexandria Shooting

TO THE EDITOR:

Re "G.O.P. Lawmaker Shot Outside Capital" (front page, June 15):

As I reflect on the shooting that occurred in Alexandria, Va., on Wednesday, I look through my lens as a longtime family law attorney. I've witnessed hundreds of unhealthy marriages that ended in divorce and wondered: How did things get this bad?

I ask the same question of our democracy: How did things get this bad? We all felt the pain of each bullet in Alexandria regardless of our political affiliation. It's time to hit the reset button and re-evaluate, as a nation, how we got to this boiling point. And, more important, where do we go from here?

As members of the American family, we are all bound together through community, compassion and care for one another. Let us find peace and work together to solve our common problems.

[illegible], MINNEAPOLIS

TO THE EDITOR:

Re "Shooting Tests Movement on the Left" (news article, June 15):

Your article suggesting that the horrific shooting of a member of Congress by a Bernie Sanders supporter may be a test for Mr. Sanders's political movement is unfashionable and irresponsible. Mr. Sanders has always advocated peaceful and compassionate political actions.

If you are searching for some person or group to blame for this tragedy, look to the gun lobby. Moreover, and I say this with incredible sadness, we may also have to look at the intransigence of the Republican Party in allowing President Trump to continue his legal and constitutional transgressions unchecked, and to steer our country toward policies that blatantly harm most Americans and denigrate the values of a democratic nation.

Of course, none of this justifies this act of violence. A far more reasonable approach for venting frustration is to continue voicing opinions in opposition to the intolerable political culture that has taken over Washington.

Even as we express concern for the wounded, let us continue celebrating those who speak out for justice, rationality and equality — like Bernie Sanders.

MARY FERNAL, POULTNEY, VT.

TO THE EDITOR:

The shooting of members of the Republican congressional baseball team is clearly a tragic and senseless event. The fact that it was perpetrated by a disgruntled supporter of Bernie Sanders speaks volumes about how the vicious political discourse in this country has now stirred up so much hatred that it drove the assailant to this despicable crime. According to news reports, the assailant specifically asked whether the players on the field were Republicans or Democrats before he started shooting.

I am a moderate Republican who voted for Hillary Clinton in 2016 but has become appalled by how vitriolic and partisan the news coverage has become as it relates to the current administration and the Republican Party. It is incumbent on the media to consider their own potential role in this crime. Will they consider that they are complicit in stirring up the hate that led to this insane act? Or will they merely conclude that it was a random act by a crazed individual?

JIM RUTHERFURD, NEW YORK

TO THE EDITOR:

It is right and good that President Trump swiftly condemned the shooting on Wednesday of a member of Congress and others on the baseball field. Where was his voice, however, when similar hate crimes against immigrants and their defenders occurred? Hate speech by the alt-right, including Alex Jones and others with a broad audience, incites hateful acts daily that go uncondemned by our president and Republican representatives.

Bernie Sanders spoke loud and clear against violence committed by one of his purported supporters. It would be right and just if that were the response by politicians of any stripe to any act of violence against innocents of every persuasion. A hate crime is a hateful crime no matter who may commit it.

PEGGY STEVENS
EAST CHARLESTON, VT.

TO THE EDITOR:

Re "Their Own Targeted, G.O.P. Lawmakers Want Looser Gun Laws, Not Stricter Ones" (news article, June 15):

Given that gun laws around the country are already loose, one can only imagine the carnage that could have been wrought in a crowded venue if a number of people had been armed. Handguns are notoriously hard to use with great accuracy, even by those trained to do so. The thought that some good might come of a large number of armed people, panicky and only loosely trained, all blasting away in one area is the real madness here.

JAMES QUINN, LILBURN, GA.

## The Primary Care Doctor and the Specialist

TO THE EDITOR:

Re "The Specialists' Stranglehold," by Jamie Koufman (Sunday Review, June 4):

The proposed model of primary care "gatekeepers" overseeing the health of their patients and approving medical specialists has been tried unsuccessfully in the past.

Although Dr. Koufman reports that lives are lost each year with unnecessary medical procedures, charging primary care physicians with the daunting responsibility of greater oversight and accountability for their patients with limited assistance from specialists will undoubtedly lead to more deaths.

Much specialty care in the United States is driven by two additional factors: patients who have a sense of entitlement that they or family members should have the highest quality care from the most experienced physicians; and primary care providers' fear of medical malpractice and the need to "cover themselves" by referring patients to specialists.

STEPHEN COVEY, ROSLYN, N.Y.

*The writer is a cardiologist affiliated with Winthrop University Hospital.*

TO THE EDITOR:

Contrary to Jamie Koufman, specialists are not corrupting our health care system. Many specialists are no more expensive and earn no more than primary care physicians, and contribute much to the care and management of complex and often chronic diseases for the same fees as primary care doctors.

We do have a problem with the physician work force. The competition for entry into the very well paying fields of radiology, ophthalmology, anesthesiology and dermatology is intense, while a humble field like mine, rheumatology, is underserved and growing more so every day.

Ultimately, medicine is facing the same growing economic disparity between the wealthy and everyone else as the country is. When physicians are able to choose primary care or specialization without concern for future economic well-being, we will all be better off.

CALVIN R. BROWN JR., CHICAGO

*The writer is a rheumatologist at the Northwestern University Feinberg School of Medicine.*

## Pier Project on the Hudson

TO THE EDITOR:

Re "Question in Battle Over Hudson Pier Park: Which Billionaire Will Blink First?" (news article, June 5):

The fight over the fate of the Pier 55 project, better known as "Diller Island," is not a battle of billionaires; it is a struggle between two groups with diametrically opposed views for the future of Hudson River Park.

Wealthy donors throughout the country are trying to shape the future of our public parks, and citizens are resisting. In this case, citizens are concerned about protecting marine life and the integrity of the public process from an ill-conceived plan concocted in secret that was struck down in federal court.

Elected officials and public agencies pushing this amusement park for the rich and famous just want the money and see public involvement and environmental review as a nuisance. They've changed their design at the last minute to try to win court approval. They are just starting another protracted legal fight that is again destined to fail.

TOM FOX, NEW YORK

*The writer was founding president of the Hudson River Park Conservancy from [illegible].*

ONLINE: **MORE LETTERS**

*The Central Bureau of Investigation in India, on freedom of the press.*
nytimes.com/opinion

PLAINTIFF TRIAL EXHIBIT 010

**SApp-452**

| Message | |
|---|---|
| **From:** | Semple, Robert [semple@nytimes.com] |
| **on behalf of** | Semple, Robert <semple@nytimes.com> [semple@nytimes.com] |
| **Sent:** | 6/14/2017 12:08:57 PM |
| **To:** | Linda Cohn [Linda Cohn <cohn@nytimes.com>] |
| **CC:** | Eileen Lepping [Eileen Lepping <eileen.lepping@nytimes.com>]; Phoebe Lett [Phoebe Lett <phoebe.lett@nytimes.com>]; Williamson, Elizabeth [ Williamson, Elizabeth <elizabeth.williamson@nytimes.com>]; James Bennet [James Bennet <jamesb@nytimes.com>]; Nicholas Fox [Nicholas Fox <nickfox@nytimes.com>] |
| **Subject:** | Re: are we writing on the congressional shooting? |

OK we should definitely shoot for a piece, not huge, but a piece. PS LInda: id Jimmy Connors go to your school? I think I already asked you that.

On Wed, Jun 14, 2017 at 12:04 PM, Linda Cohn <cohn@nytimes.com> wrote:
The nutcase went to my high school in Belleville  -- once labeled the most racist town in America by 60 Minutes. That was ages ago of course, but hard to picture any anti-trump sentiment there.
I'm on train and don't know what trump said, but I'm thinking back to what a giant story gabby Gifford shooting was. Amazing that shooting congressmen doesn't seem so shocking now.

On Wed, Jun 14, 2017 at 11:50 AM Semple, Robert <semple@nytimes.com> wrote:
Ok--meanwhile, a broad thought...we have written a ton (mainly Frank) on gun control...we did a huge series on it a few years ago...while this is almost certainly a lone nut, it would be interesting to know how many of those Republican athletes are beholden to the NRA and its generally anti-regulatory  philosophy, and whether something like this might pound a little sense into their heads...whether the guy bought the rifle  at a gun show or inherited from his grandmother, it's still a gun, of which there enough for practically every man woman and child in this country..
 I pout the thing on the DEW for now, as an alternate # 3....

On Wed, Jun 14, 2017 at 11:33 AM, Williamson, Elizabeth <elizabeth.williamson@nytimes.com> wrote:
Okay, let's see what Trump says--he is speaking at 1130. I am writing the Observer about civility in Washington (Rubenstein) so maybe a reference in that piece....

Elizabeth Williamson
Editorial Board, National Politics
o: 202 862 0382
c: 202 674 2463
https://twitter.com/NYTLiz

On Wed, Jun 14, 2017 at 11:28 AM, Semple, Robert <semple@nytimes.com> wrote:
Can't see it yet... but keep looking...a nut case who hates Republicans???....

On Wed, Jun 14, 2017 at 10:46 AM, Williamson, Elizabeth <elizabeth.williamson@nytimes.com> wrote:

Elizabeth Williamson
Editorial Board, National Politics
o: 202 862 0382
c: 202 674 2463

NYTIMES0001070

SApp-453

https://twitter.com/NYTLiz

---

Sent from Gmail Mobile

PLAINTIFF TRIAL EXHIBIT 117

NYTIMES0001071

SApp-454

- Byline:
By THE EDITORIAL BOARD
Body:

Just after 7 a.m. on Wednesday, members of Congress met in a quiet section of Alexandria, Va., to practice for this week's bipartisan congressional baseball game when James Hodgkinson appeared from behind the dugout, and began firing through the chain link fence.

Mr. Hodgkinson was armed with a long rifle and "I think he had handguns as well," said Representative Jeff Flake of Arizona, who saw the gunman just as the shooting started. Mr. Hodgkinson fired at least 50 rounds at the group of congressmen, current and former staffers, who dove for cover or tried to crawl to safety. "He was hunting us," said Representative Mike Bishop, Republican of Michigan, who was at home plate when the gunman appeared. He seemed to be "double-tapping," the trigger, Mr. Bishop said, firing so rapidly "you couldn't get up and run." Senator Rand Paul of Kentucky, also at the field, told CNN it "was basically a killing field."

Security officers detailed to Representative Steve Scalise of Louisiana, the House majority whip, exchanged fire with Mr. Hodgkinson as Mr. Scalise, wounded, left a trail of blood as he combat-crawled to hide in taller grass. He is in critical condition after surgery on the bullet wound in his hip. The gunman was killed; in all five people were injured, including Capitol Police officers ==need to check/update==

That in 10 minutes a single gunman could wreak such carnage in a bedroom community a short drive from the Capitol is horrifying, but no longer surprising. Not all the details are known yet, but a sickeningly familiar pattern is emerging: a deranged individual with a gun—perhaps multiple guns—and scores of rounds of ammunition uses politics as a pretense for a murderous shooting spree. Mr. Hodgkinson was a Bernie Sanders supporter and campaign volunteer virulently opposed to President Trump, who among many anti-Trump messages posted "Time to Destroy Trump & Co." on social media in March.

Just as in 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a nine year-old girl, Mr. Hodgkinson's rage was nurtured in a vile political climate. Then, it was the pro-gun right being criticized: in the weeks before the shooting Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs.

In the aftermath of Wednesday's shooting, the political right and left and both sides in the gun debate dove into their respective foxholes. Conservatives and right-wing media demanded that hate speech and crimes by anti-Trump liberals get more attention than they have. Representative Mo Brooks of Alabama, also present on Wednesday, said, "It's not easy to take when you see people around you being shot and you don't have a weapon yourself." Some Democrats noted that most of the legislators attacked have spent their political careers voting against gun control legislation.

=="Violence of any kind is unacceptable in our society and I condemn this action in the strongest possible terms," Mr. Sanders said in a statement.==

President Trump offered a unifying initial response: "We may have our differences, but we do well in times like these to remember that everyone who serves in our nation's capital is here because, above all, they love our country," he said. "We can all agree that we are blessed to be Americans, that our children deserve to grow up in a nation of safety and peace."

Mr. Trump is right. Guns are so numerous, and so easy to obtain in America that the risks of being injured or killed with one are higher in America than in any other peaceful nation. So when Republican legislators tuning up for a ballgame with their Democratic colleagues are targeted by a crazed gunman, what might be the likelier cause: fringe elements on both ends of our political spectrum, or the 300 million guns in America? The shooting

PLAINTIFF TRIAL EXHIBIT 141

PALIN00234

SApp-455

in Alexandria was one of at least three mass shootings in the United States *on Wednesday*. Before Ms. Giffords' shooting, the last time a member of Congress was gunned down was in 1954, when the number of firearms in this country were a tiny fraction of today's.

Mr. Hodgkinson, whatever his putative motives, was able to shoot Americans because it was easy to get a gun, as it will be for the next potential killer, and the next. Whether Republicans, Democrats or independents, whether on a ballfield, in a nightclub, at school or work, it's never been more likely that as Americans, we will someday wind up in the crosshairs.

Info Box:

*Follow The New York Times Opinion section on* Facebook *and* Twitter (@NYTopinion), *and sign up for the* Opinion Today *newsletter.*

Elizabeth Williamson
Backfield
**06/14/2017 04:44 pm**

PLAINTIFF TRIAL EXHIBIT 141



U.S.    International    Politics    Litestyle    ...    Watch    Live    Shows



# Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate

By JOHN BERMAN
Jan. 9, 2011

Share with Facebook    Share with Twitter

**Palin's Now in 'Crosshairs' of Giffords Debate**

+ Lawmakers on Edge After Shooting
+ Hero Intern: 'Congresswoman Was Alert'

Auschwitz Memorial condemns congressman's gas chamber video

N. Korean missile test leaves clues, doubts about its technology

Lawmaker says meditation may help him work better with Trump



ABCNEWS.com

**WATCH** | Rep. Giffords Criticized Palin's Crosshairs





In the stunned aftermath of the Tucson massacre, Sarah Palin has found herself in the crosshairs of the ensuing political debate with opponents suggesting she may have fueled the gunman's rage and her supporters saying it is "grotesque" to blame her and to politicize the tragedy.

Crosshairs is a political phrase that emerged from Palin's political action committee SarahPac that targeted congressional districts for the Tea Party campaign in the last election, including the district of Rep. Gabrielle Giffords.

Although Palin later denied she meant the graphic over the districts to look like a gun sight, it is part of the hunting lexicon that critics say she prefers.

Comedian Frank Conniff tweeted: "Hey, Sarah Palin, hows that hatey, killy, reloady, crosshairsy thing working out for ya?"

Facebook executive Randi Zuckerberg said many people on the social networking site are asking whether Sarah Palin is to blame.

According to Zuckerberg that is the #1 question on the social network behemoth following the Tucson shooting.

Like so much with Palin, the roots are on Facebook. On her Facebook page last year when she posted the a map of 20 congressional districts targeted by SarahPac, the headline of the map: "It's time to take a stand."

At the time Giffords reacted to the map in an interview on a cable news program.

"When people do that, they've got to realize there are consequences to that action," Giffords said.

Follow John Berman on Facebook:
http://www.facebook.com/johnbermanabc and Twitter:

Trump policy shifts contradict what most Americans want, polls reveal

Trump's 2nd foreign trip includes G-20, meeting with Putin

The Note: High stakes for Trump's 2nd foreign trip

Trump set for crucial diplomatic test in 1st face-to-face with Putin

How your state responded to Trump's voter data request

How Trump's stance on China has changed amid North Korea threat

Trump, Putin to hold meeting at G-20 summit

Trump targets North Korea in latest Twitter attack

PLAINTIFF TRIAL EXHIBIT 142

PALIN00001

@Berns...

No connection has been made between this graphic and the Arizona shooting, but it has put the Palin team somewhat on the defensive. Rebecca Mansour, a spokesperson for SarahPac, told conservative commentator Tammy Bruce, "We never imagined, it never occurred to us that anybody would consider it violent." Insisting she was speaking for herself, and not on behalf of Palin, Mansour added, "We never ever, ever intended it to be gun sights."

However, following the initial controversy over the "crosshairs" last year, Palin issued her now oft repeated rallying cry, "Don't retreat. RELOAD."

Politico's Jonathan Martin was the first to point out that Palin herself, in a tweet last November following the election, referred to the crosshairs as a "bull's eye."

## Sarah Palin in Crosshairs of Tucson Massacre Debate

Anyone who has seen "Sarah Palin's Alaska" on the TLC channel and seen that Palin has a deep connection and love for hunting. She repeated the "reload" phrase on that show. Language surrounding gun-use and hunting is something she uses often, and often with no political overtones.
And the only reaction to the Arizona shooting from Palin came on her Facebook page.

"My sincere condolences are offered to the family of Rep. Gabrielle Giffords and the other victims of today's tragic shooting in Arizona. On behalf of Todd and my family, we all pray for the victims and their families, and for peace and justice," the statement said.

This statement received more than 25,000 comments from Palin supporters on her page. Many criticized any links being made in the media between the Arizona shooting and Palin, particularly since some accounts from Arizona note that accused gunman Jared Loughner was involved at some point with "liberal" politics and his MySpace profile listed The Communist Manifesto as one of his favorite books.

An acquaintance of Loughner's, Caitie Parker, who said she was in school and in a band with him, described him on Twitter as "more libertarian & definitely socially liberal."

Conservative activists are lashing out against what they consider unfair treatment of Palin in this tragedy. On twitter, SarahPac spokesperson Mansour wrote, "Politicizing this is repulsive."

Conservative activist Andrew Breitbart, wrote, "Of those who're now using this tragedy 4 political purposes, what's your proof of this lunatic's motivation? Isn't that majorly relevant?"

And another tweeted, "Left blamed Palin b4 they knew 1st thing about shooter; unable to admit malice, they double down, co-ordinate narrative. Grotesque."

Another statement being retweeted by conservatives is this one, noting that even President Obama has used the language of armed conflict in politics. "The instigator for AZ massacre? Obama: 'If They Bring a Knife to the Fight, We Bring a Gun," and linking to comments that then-Senator Obama made during Democratic primaries.

One thing is clear, Palin, who has been at the center of so much of the political discourse and discussion the last two years, is right back in the center, you might even say the crosshairs, whether she wants to be there or not.

Trump tweets church choir's 'Make America Great Again' song

NYC officer shot, killed while sitting in police car

Judge tells 'Pharma Bro' Martin Shkreli to pipe down

Afghan girls robotics team denied US visas to compete

Florida family 'still shocked' by soldier's surprise Legoland homecoming

'Earlymoons' are the latest wedding trend

'Baby rhino sleep whisperer' serenades calf with his guitar

Dozens of rare white deer will be available for public viewing

Wild monkeys charge family at Florida park

PLAINTIFF TRIAL EXHIBIT 142

PALIN00002

**SApp-458**

PLAINTIFF TRIAL EXHIBIT 142

PALIN00003

