# 22-558

### In the
# United States Court of Appeals
### For the Second Circuit



SARAH PALIN, an individual,

*Plaintiff-Appellant,*

— v. —

THE NEW YORK TIMES COMPANY and JAMES BENNET, an individual,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)

## BRIEF FOR DEFENDANTS-APPELLEES

DAVID L. AXELROD
JAY WARD BROWN
JACQUELYN N. SCHELL
THOMAS B. SULLIVAN
BALLARD SPAHR LLP
*Attorneys for Defendants-Appellees*
1675 Broadway, 19th Floor
New York, New York 10019
(202) 508-1136
axelrodd@ballardspahr.com
brownjay@ballardspahr.com
schellj@ballardspahr.com
sullivant@ballardspahr.com

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee The New York Times Company hereby discloses that it is a publicly traded company, has no parent company, and no publicly held corporation owns ten percent or more of its stock.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................iv

PRELIMINARY STATEMENT .......................................................1

COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW.................1

COUNTER-STATEMENT OF THE CASE ........................................2

A.    The Map.....................................................................................2

B.    The Editorial .............................................................................3

        1.    Drafting and revision .................................................4

        2.    Publication ...................................................................7

        3.    Post-publication comments and Bennet's response .............8

C.    Procedural History ..................................................................11

        1.    Pre-Trial Proceedings ................................................11

        2.    Voir Dire.....................................................................12

        3.    Evidentiary Rulings at Trial .....................................13

        4.    Rule 50 Motion...........................................................14

        5.    Jury Deliberations and Jury Verdict.........................14

        6.    Post-Trial Proceedings ..............................................16

SUMMARY OF ARGUMENT .........................................................17

ARGUMENT ....................................................................................18

I.    THE DISTRICT COURT CORRECTLY HELD THAT PALIN
    HAD THE BURDEN OF PROVING ACTUAL MALICE.........................18

        A.    Palin Waived Any Challenge to the Application of the
            Actual Malice Fault Standard under the First Amendment,
            But In Any Event That Standard Clearly Applies Here......................19

B.    The District Court Correctly Required Proof of Actual Malice Under New York Law ...............................................................21

II.   THE DISTRICT COURT CORRECTLY GRANTED JUDGMENT UNDER RULE 50, BOTH BECAUSE PALIN FAILED TO PROVE ACTUAL MALICE AND FOR ADDITIONAL REASONS ............................................................25

A.    The Evidence Admitted at Trial Fails to Establish Actual Malice .....................................................................................25

B.    The Judgment Pursuant to Rule 50 Should Also be Affirmed on Either Of Two Alternative Grounds..............................36

C.    The District Court Did Not Abuse its Discretion in Excluding Other Purported Evidence of Actual Malice ....................39

    1.    Articles from Sister Publications of *The Atlantic* ....................41

    2.    Evidence Related to Bennet's Brother......................................46

III.   THE JURY'S VERDICT SHOULD BE AFFIRMED..................................49

A.    The Voir Dire Process Complied with Precedent and Ensured an Impartial Jury ...................................................49

B.    The Mid-Deliberation Instruction Was Not Erroneous.......................51

C.    Palin Has Not Identified Any Other Error Requiring Reversal ..............................................................................54

IV.   DISQUALIFICATION IS NOT WARRANTED .........................................55

CONCLUSION .....................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Loksen*,
239 F.3d 256 (2d Cir. 2001) ................................................................38

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) ...........................................................25, 26, 27

*In re Barry*,
946 F.2d 913 (D.C. Cir. 1991) ..........................................................58

*Bose Corp. v. Consumers Union*,
466 U.S. 485 (1984) ..........................................................................27

*In re Boston's Children First*,
244 F.3d 164 (1st Cir. 2001) .............................................................58

*Brown v. City of Syracuse*,
673 F.3d 141 (2d Cir. 2012) .............................................................36

*Celle v. Filipino Reporter Enters.*,
209 F.3d 163 (2d Cir. 2000) .............................................................38

*Clemente v. Impastato*,
274 A.D.2d 771 (3rd Dep't 2000) .....................................................39

*Cnty. of Suffolk v. Stone & Webster Eng'g*,
106 F.3d 1112 (2d Cir. 1997) ...........................................................19

*Coleman v. Grand*,
523 F. Supp. 3d 244 (E.D.N.Y. 2021) ..............................................23

*Contemporary Mission v. N.Y. Times. Co.*,
842 F.2d 612 (2d Cir. 1988) .....................................................*passim*

*DiBella v. Hopkins*,
403 F.3d 102 (2d Cir. 2005) .............................................................22

*Dodds v. ABC*,
145 F.3d 1053 (9th Cir. 1998) ..........................................................37

*Dyer v. MacDougall*,
201 F.2d 265 (2d Cir. 1952) ........................................................26, 27

*El Meson Espanol v. NYM Corp.*,
521 F.2d 737 (2d Cir. 1975) ..................................................38

*Faulkner v. Nat'l Geographic Enters.*,
409 F.3d 26 (2d Cir. 2005) ....................................................55

*Fogel v. Chestnutt*,
668 F.2d 100 (2d Cir. 1981) ...................................................19

*Garrison v. Louisiana*,
379 U.S. 64 (1964) ..................................................................1

*Geraci v. Probst*,
15 N.Y.3d 336 (2010) ...........................................................39

*Gleason v. Michael Vee, Ltd.*,
96 N.Y.2d 117 (2001) .............................................................23

*Gottwald v. Sebert*,
2022 N.Y. Slip. Op. 68019(U) (1st Dep't June 28, 2022)......................22

*Gottwald v. Sebert*,
203 A.D.3d 488 (1st Dep't 2022) ..............................................22

*Gounden v. Campagna*,
487 F. App'x 624 (2d Cir. 2012) ...............................................46

*Great Wall Med. v. Levine*,
2022 N.Y. Misc. LEXIS 988 (Sup. Ct. N.Y. Cnty. Mar. 8, 2022) ...................23

*Huddleston v. U.S.*,
485 U.S. 681 (1988)..............................................................41

*In re IBM Corp.*,
45 F.3d 641 (2d Cir. 1995) ...................................................55, 57

*In re IBM Corp.*,
618 F.2d 923 (2d Cir. 1980) ..................................................56

*Jackson v. City of N.Y.*,
606 F. App'x 618 (2d Cir. 2015) ........................................................49

*Kesner v. Buhl*,
590 F. Supp. 3d 680 (S.D.N.Y. 2022) ..............................................23

*Liberman v. Gelstein*,
80 N.Y.2d 429 (1992) ................................................................30, 38

*Ligon v. City of N.Y.*,
736 F.3d 118 (2d Cir. 2013) .....................................................57, 58

*Liteky v. U.S.*,
510 U.S. 540 (1994)..........................................................................56

*Lore v. City of Syracuse*,
670 F.3d 127 (2d Cir. 2012) .............................................................53

*Massa Constr. v. Meaney*,
No. 126837/2020, slip op. (Sup. Ct. Ontario Cnty. May 13, 2021) ..................23

*Masson v. New Yorker Magazine*,
832 F. Supp. 1350 (N.D. Cal. 1993)..................................................37

*McKinney v. City of Middletown*,
49 F.4th 730 (2d Cir. 2022) ..............................................................20

*N.Y. State Citizen's Coal. for Children v. Poole*,
922 F.3d 69 (2d Cir. 2019) ...............................................................20

*Nelson v. HSBC Bank USA*,
87 A.D.3d 995 (2nd Dep't 2011).......................................................23

*New Eng. Ins. v. Healthcare Underwriters Mut. Ins.*,
352 F.3d 599 (2d Cir. 2003) .......................................................42, 43

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)...........................................................20, 21, 25

*Niagara Mohawk Power v. Hudson River-Black River Regulating Dist.*,
673 F.3d 84 (2d Cir. 2012) ...............................................................54

*Nolan v. State*,
   158 A.D.3d 186 (1st Dep't 2018) ......................................................39

*NOVAGOLD Res. v. J Capital Rsch. USA*,
   2022 U.S. Dist. LEXIS 55734 (E.D.N.Y. Mar. 28, 2022)................................23

*Oakley v. Dolan*,
   833 F. App'x 896 (2d Cir. 2020) ................................................38, 39

*Olson v. Major League Baseball*,
   29 F.4th 59 (2d Cir. 2022) ......................................................20, 36

*Palin v. N.Y. Times*,
   940 F.3d 804 (2d Cir. 2019) ................................................*passim*

*Perry v. Ethan Allen, Inc.*,
   115 F.3d 143 (2d Cir. 1997) ............................................................40

*Reeves v. Sanderson Plumbing Prods.*,
   530 U.S. 133 (2000)..........................................................................25

*Regina Metro. Co. v. N.Y. State Div. of Hous. & Cmty. Renewal*,
   35 N.Y.3d 332 (2020) ......................................................................24

*Reus v. ETC Hous.*,
   203 A.D.3d 1281 (3rd Dep't 2022) .................................................22

*Rinaldi v. Holt, Rinehart & Winston*,
   42 N.Y.2d 369 (1977) ................................................................38, 39

*Rosales-Lopez v. U.S.*,
   451 U.S. 182 (1981)....................................................................49, 50

*Runner v. N.Y. Stock Exch.*,
   568 F.3d 383 (2d Cir. 2009) ............................................................25

*Sackler v. ABC*,
   71 Misc. 3d 693 (Sup. Ct. N.Y. Cnty. 2021) ...................................23

*Saenz v. Playboy Enters.*,
   841 F.2d 1309 (7th Cir. 1988) ........................................................37

*Sharon v. Time, Inc.*,
   599 F. Supp. 538 (S.D.N.Y. 1984) ....................................................29

*Sioson v. Knights of Columbus*,
   303 F.3d 458 (2d Cir. 2002) ............................................................56

*Sweeney v. Prisoners' Legal Servs.*,
   84 N.Y.2d 786 (1995) ..........................................................33, 34, 52

*Sweigert v. Goodman*,
   2021 U.S. Dist. LEXIS 77704 (S.D.N.Y. Apr. 22, 2021) ................23

*Sydney v. MacFadden Newspaper Publishing*,
   242 N.Y. 208 (1926) ........................................................................38

*Tolbert v. Queens College*,
   242 F.3d 58 (2d Cir. 2001) ..............................................................49

*U.S. v. Abarca*,
   22 F.4th 58 (2d Cir. 2021) ...............................................................40

*U.S. v. Barton*,
   647 F.2d 224 (2d Cir. 1981) ............................................................50

*U.S. v. Bright*,
   2022 U.S. App. LEXIS 386 (2d Cir. Jan. 6, 2022).........................50

*U.S. v. Contorinis*,
   692 F.3d 136 (2d Cir. 2012) ............................................................46

*U.S. v. Cooley*,
   1 F.3d 985 (10th Cir. 1993) .............................................................58

*U.S. v. Dawkins*,
   999 F.3d 767 (2d Cir. 2021) ............................................................41

*U.S. v. Djibo*,
   850 F. App'x 52 (2d Cir. 2021) .......................................................44

*U.S. v. Fortier*,
   242 F.3d 1224 (10th Cir. 2001) ................................................57, 58

*U.S. v. Khalupsky*,
   5 F.4th 279 (2d Cir. 2021) ...............................................................51

*U.S. v. Kyles*,
   40 F.3d 519 (2d Cir. 1994) ...............................................................50

*U.S. v. Lawes*,
   292 F.3d 123 (2d Cir. 2002) .............................................................50

*U.S. v. Lovaglia*,
   954 F.2d 811 (2d Cir. 1992) .............................................................55

*U.S. v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ...........................................................58

*U.S. v. Montsalvatge*,
   850 F.3d 483 (2d Cir. 2017) .............................................................40

*U.S. v. Sierra Pac. Indus.*,
   862 F.3d 1157 (9th Cir. 2017) ..........................................................58

*U.S. v. Treacy*,
   639 F.3d 32 (2d Cir. 2011) ...............................................................50

*U.S. v. Wedd*,
   993 F.3d 104 (2d Cir. 2021) .............................................................55

*Vill. of Freeport v. Barrella*,
   814 F.3d 594 (2d Cir. 2016) .............................................................40

*Walker v. City of N.Y.*,
   638 F. App'x 29 (2d Cir. 2016) ........................................................27

*Williams v. Cnty. of Westchester*,
   171 F.3d 98 (2d Cir. 1999) ..........................................................26, 36

*Young v. Gannett Satellite Information Network*,
   734 F.3d 544 (6th Cir. 2013) ............................................................29

**Statutes**

28 U.S.C. § 455(a) ...............................................................................55

N.Y. Civ. Rights Law § 70-a ..........................................................22, 24

N.Y. Civ. Rights Law § 76-a ..........................................................21, 23, 24

**Other Authorities**

Assembly Bill 5991-A § 4 (N.Y. 2020) ..................................................23

Code of Conduct for United States Judges, Canon 3A6...................57, 58

Fed R. Civ. P. 50 ..........................................................................*passim*

Fed R. Civ. P.  54(b) ...........................................................................11

Fed. R. Evid. 104(b)............................................................................41

Fed. R. Evid.  402 ..........................................................................14, 48

Fed. R. Evid.  403 .....................................................................2, 14, 46, 47

Sponsor Mem. of Sen. Hoylman (July 22, 2020),
    https://www.nysenate.gov/legislation/bills/2019/s52/amendment/a .................24

U.S. Const. amend. I ......................................................................*passim*

x

## **PRELIMINARY STATEMENT**

After five years of litigation and a ten-day trial, the jury and the district court each independently determined that Sarah Palin had failed to prove her claim for defamation against The New York Times Company and its former Opinion Editor, James Bennet.  As the district court held, "Palin, for all of her earlier assertions, could not in the end introduce even a speck" of evidence of actual malice, SA164 – *i.e.*, evidence that the challenged statements amounted to a deliberate lie or were disseminated despite a "high degree of awareness" of their "probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 67, 74-75 (1964).

On appeal, Palin raises a litany of claimed errors, first arguing that neither the First Amendment nor New York law requires her to establish actual malice. She also asserts that the district court committed multiple trial errors, from its voir dire to its decision granting Defendants judgment as a matter of law, and its rejection of her post-trial motion for recusal.  None of Palin's arguments have merit, and this Court should affirm the judgment below.

## **COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1.     Whether the district court correctly held that the First Amendment and/or New York law required Palin to prove actual malice as to falsity and that Palin had failed to do so?

2.    Whether in the alternative the district court's judgment should be affirmed because Palin failed to prove either (a) actual malice as to defamatory meaning, or (b) special damages?

3.    Whether the district court correctly ruled that certain evidence Palin sought to introduce was irrelevant and/or properly excluded under Rule 403?

4.    Whether the district court acted within its discretion in voir dire and responding to a mid-deliberation jury question?

5.     Whether the district court properly determined that Palin failed to identify any basis requiring its disqualification?

## <u>COUNTER-STATEMENT OF THE CASE</u>

This case concerns an editorial titled "America's Lethal Politics" (the "Editorial").  JA1483.  Palin contends that the Editorial defamed her personally by asserting that a map circulated by a political action committee in 2010 had caused an attack on Rep. Gabby Giffords and others in 2011.  SApp1; JA1480-1481.

### A.    The Map

Palin is the former governor of Alaska, former vice presidential candidate, and influential public and political figure.  JA1481; JA169:2-15.  In 2010, her affiliated political action committee published a map featuring stylized crosshairs over the districts of certain Democratic members of Congress, along with each representative's name (the "Map").  SApp459; JA489:14-490:8; JA2188-89.  The

2

Map immediately drew criticism that this type of inflammatory political rhetoric could incite violence. JA2188-89. This criticism recommenced a few months later, when Jared Loughner shot nineteen people at a constituent event hosted by Giffords (whose name and district had been included on the Map), killing a federal judge and five other people (the "Arizona Shooting"). *Id.*

### B.    The Editorial

On the morning of June 14, 2017, James Hodgkinson opened fire on Republican members of Congress during a baseball practice in Virginia, seriously wounding Rep. Steve Scalise (the "Virginia Shooting"). JA1482. Hodgkinson was a political supporter of Bernie Sanders and "virulently opposed" to Donald Trump. JA1483.

Elizabeth Williamson was a member of The Times's Editorial Board based in Washington, D.C.[1] Upon hearing about the Virginia Shooting, she asked her New York-based colleagues whether the Board was writing on the shooting. SApp452; JA179:3-20. Williamson, Bennet, and their colleagues Robert Semple and Linda Cohn then discussed the idea by email, debating whether the proposed piece should focus on the shooting itself, the Board's long-held position in favor of

---

[1] The Editorial Board, then led by Bennet, is composed of opinion journalists who write for The Times. The Board's editorials, published without bylines, take positions on the news of the day. JA164:16-19; JA280:10-281:10; JA285:2-14.

gun regulation, or concern about the state of political rhetoric. JA184:6-190:20. At 12:04 p.m., Cohn compared that day's events to the Arizona Shooting, noting "what a giant story" that "shooting was. Amazing that shooting congressmen doesn't seem so shocking now." SApp452; JA187:20-188:7. At 12:08 p.m., Semple asked Williamson to draft an editorial on the Virginia Shooting. JA305:3-15. At 12:41 p.m., Bennet suggested there might be a "point to be made about the rhetoric of demonization . . . and whether it incites people to this kind of violence." JA189:2-190:20.

### 1. Drafting and revision

As part of her drafting process, Williamson researched the two shootings. However, she did not conduct any research that day into whether Loughner had seen the Map or "any type of political rhetoric or political incitement." JA333:22-334:7. This was because she was not researching the shooting itself, but, rather, "the political climate in the run-up to" the Arizona Shooting. JA333:25-334:3; JA229:11-17.

Semple asked Phoebe Lett, an assistant to the Board, to send several "basic gun control pieces" to Williamson to help her "maintain consistency" with past stances the Board had taken on gun control. JA316:9-318:14. Subsequently, Williamson asked Lett for past editorials "referenc[ing] hate-type speech against Dems in the run-up of [the Arizona S]hooting," to which Bennet had referred.

JA319:8-18.  Bennet explained that he was "wondering if there was such a piece; that is, did we ever write anything connecting . . . the Giffords shooting to some kind of incitement?"  JA1699.  Lett responded,  "No, but Frank Rich did," providing a link to a piece by the former opinion columnist for The Times, titled "No One Listened to Gabrielle Giffords," which was published on January 15, 2011  *Id.*; *see* JA1704-08.

Lett also sent Bennet two editorials, which he then forwarded to Williamson. JA1701-02; JA205:8-22; JA207:18-21.  In "Bloodshed and Invective in Arizona," published on January 9, 2011, JA1709-11, the Board stated that "Loughner … appears to be mentally ill," but noted that "he is very much a part of a widespread squall of fear, anger and intolerance that has produced violent threats against scores of politicians and infected the political mainstream with violent imagery." JA1709.  In "As We Mourn," published on January 12, 2011, JA1712-14, the Board called on those "whose partisanship has been excessive and whose words have sown the most division and dread . . . to stop demonizing their political opponents," JA1712.

Williamson submitted her draft to Cohn around 4:45 p.m., which, after describing the Virginia Shooting, contained the following passage:

> Just as in 2011, when Jared Lee Loughner opened fire in
> a supermarket parking lot, grievously wounding
> Representative Gabby Giffords and killing six people . . .
> Mr. Hodgkinson's rage was nurtured in a vile political

5

> climate. Then, it was the pro-gun right being criticized:
> in the weeks before the shooting Sarah Palin's political
> action committee <u>circulated</u> a map of targeted electoral
> districts that put Ms. Giffords and 19 other Democrats
> under stylized crosshairs.

JA-1979. The word "circulated" was hyperlinked to a January 9, 2011 ABC News

article published the day after the Arizona Shooting, which included an image of

the Map. JA225:10-JA226:16; JA1979-80. Williamson testified she included this

link so that readers could see the Map for themselves. JA346:9-12. This ABC

article, in its tenth paragraph, stated that "no connection" had yet been found

between the Map and the previous day's shooting. SA64 n.28.

Cohn reviewed the draft and took it to Bennet, explaining that she "was just

a little confused about what we . . . wanted out of this piece, where it was going"

and felt he should "weigh in." JA603:23-JA605:7; JA649:24-650:5. Bennet had

not intended to revise the draft himself and had not asked to see it, but with the

print deadline of approximately 8 p.m. for the next day's paper quickly

approaching, Bennet gave the piece a "thorough edit," that was intended to sharpen

the piece, not change its meaning. JA724:14-20; JA800:9-23; JA801:3-14;

JA808:8-13. Bennet did not click on the "<u>circulated</u>" hyperlink and did not read

the linked ABC article. JA693:15-694:4. Bennet completed his revisions around

7:20 p.m. and emailed Williamson, asking her to "[p]lease take a look." JA1846;

6

JA824:18-24; *see* JA660:20-662:1.  Williamson skimmed the draft and did not have any concerns.  JA355:14-25.

Several other Editorial Board members also reviewed the piece after Bennet had revised it and before publication, including Eileen Lepping, a fact-checker who reviewed the Editorial for "names, dates, locations, and quotes," JA473:2-13; JA478:5-21; Cohn, who reviewed it again, JA654:25-659:16; Nick Fox, another editor, JA601:20-25, 656:20-25; and two copy editors, JA662:4-663:13 – none of whom expressed concerns to Bennet.  Lepping also sent Bennet's draft to Semple, who did not respond with any concerns about it.  JA487:3-19, JA512:5-15.

### 2.  *Publication*

The Times published the Editorial online at 9:45 p.m. on June 14, and in print the following day.  JA1483; SApp436-439.  In first describing the Virginia Shooting, the Editorial bemoaned "a sickeningly familiar pattern," noting that Hodgkinson was "virulently" anti-Republican in his public comments.  SApp56.  Then came the two passages Palin alleged were defamatory:

> Was this attack evidence of how vicious American politics has become?  Probably.  In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, the link to political incitement was clear.  Before the shooting, Sarah Palin's political action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

7

> Conservatives and right-wing media were quick on
> Wednesday to demand forceful condemnation of hate
> speech and crimes by anti-Trump liberals. They're right.
> Though there's no sign of incitement as direct as in the
> Giffords attack, liberals should of course hold themselves
> to the same standard of decency that they ask of the right.

The Editorial then went on to ask, "Was this attack evidence of how readily available guns and ammunition are in the United States? Indisputably." *Id*. It posited that Hodgkinson should not have been able to, but easily did, obtain the weapons used, and then outlined the gun policy choices facing Americans. *Id.*

### 3. Post-publication comments and Bennet's response

Less than an hour after the Editorial appeared online, at 10:35 p.m., Ross Douthat, an opinion columnist for The Times, expressed concern in an email to Bennet, explaining:

> [t]here was not, and continues to be so far as I can tell, no
> evidence that Jared Lee Loughner was incited by Sarah
> Palin or anyone else, given his extreme mental illness
> and lack of any tangible connection to that crosshair map,
> the Tea Party or other right-wing cause. Whereas the
> shooter today, as our editorial concedes, seems to have
> had a clear partisan, anti-Trump purpose.

JA1721; JA906:8-13. Bennet responded at 11:09 p.m.:

> [M]y understanding was that in the Giffords case there
> was a gun sight superimposed over her district; so far in
> this case we don't know of any direct threat against any
> of the congressmen on the field. That's not to say any of
> it is ok, obviously, or that the violence in either case was
> caused by the political rhetoric. But the incitement in
> this case seems, so far, to be less specific.

8

JA1721.

The exchange with Douthat left Bennet "really concerned" and he "looked on Twitter and [saw] that…other people were making this criticism" and "realized that the editorial was being read in a way we did not intend."  JA831:1-7.  Bennet texted Williamson at 11:38 p.m. alerting her to the criticism and asking if "we have it right."  JA360:8-23; JA1848; JA1849.  Bennet was unable to sleep, JA832:20-JA833:3, and at 5:08 a.m., emailed Williamson and Lepping, explaining the situation and stating, "I don't know what the truth is here but we may have relied too heavily on our early editorials and other early coverage of that attack…. In any case I'd like to get to the bottom of this as quickly as possible this morning and correct the piece if needed."  JA1723.  He also texted Williamson, saying, "what I need from you/Eileen soonest is a rock-solid version of what we should say – that an investigation showed NO link to incitement, or no direct link or no clear link."  JA248:21-JA249:2.

Williamson and Lepping immediately began researching Bennet's question.  JA253:18-255:1; JA515:10-14.  Both testified that the morning of June 15 was the first time they had researched Loughner's "state of mind."  JA255:2-12; JA513:20-JA514:2.  At the time she had written her draft the previous day, Williamson did not know whether Loughner had seen the Map and did not know whether or not it had caused him to act.  JA262:20-JA263:2; JA344:20-25; JA342:16-19.

9

Bennet also had not researched whether Loughner had seen the Map. He testified that he did not think the Editorial suggested the Map caused Loughner to act, so the question of whether that was true "wouldn't have entered [his] mind, didn't enter [his] mind." JA805:16-806:24; JA1982.

However, given that some readers had read the Editorial as suggesting that the Map caused the Arizona Shooting, The Times and Bennet promptly revised the Editorial and issued a correction, the final version of which read:

> An editorial on Thursday about the shooting of Representative Steve Scalise incorrectly stated that a link existed between political rhetoric and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established. The editorial also incorrectly described a map distributed by a political action committee before that shooting. It depicted electoral districts, not individual Democratic lawmakers, beneath stylized cross hairs.

SApp441-448; JA255:2-JA256:11; JA835:1-18. The corrected Editorial appeared online at 11:15 a.m., less than fourteen hours after The Times first published the Editorial. JA288:3-14; JA839:16-25; JA743:23-24. The Times also tweeted the correction, stating: "We got an important fact wrong, incorrectly linking political incitement and the 2011 shooting of Giffords. No link was ever established. . . . We're sorry about this and we appreciate that our readers called us on the mistake. We've corrected the editorial." SApp449; JA842:10-843:12; JA1992.

## C.    Procedural History

### 1. *Pre-Trial Proceedings*

Less than two weeks later, Palin filed suit.  JA15.  The district court granted

The Times's motion to dismiss for failure adequately to plead actual malice.  JA23.

Palin appealed, and this Court reversed, holding that Palin had plausibly alleged

actual malice.  *Palin v. N.Y. Times*, 940 F.3d 804 (2d Cir. 2019) ("*Palin I*").

Following remand, Palin filed her First Amended Complaint, naming both

The Times and Bennet as Defendants.  SApp1-246.  After discovery, the parties

cross-moved for summary judgment raising multiple issues, including whether

Palin was required to prove actual malice and, if so, whether Defendants were

entitled to summary judgment on this issue.  JA1393; JA1424.  The district court,

although holding Palin was required by the First Amendment to prove actual

malice, held that Defendants were not entitled to summary judgment.  SA103-104.

The Times and Bennet thereafter moved under Rule 54(b) for an order modifying

the district court's summary judgment ruling to reflect that, in addition to the First

Amendment, a recently-enacted amendment to New York's Anti-SLAPP statute

separately required Palin to prove actual malice, and the district court granted that

motion.  SA122-134.

11

## 2. *Voir Dire*

After several Covid-19-related postponements, trial began on February 3, 2022.  JA85-JA120; JA-2145-JA2177.  At the beginning of voir dire, the district court summarized the case and asked potential jurors whether there was "anything about that general description that makes any of you nine feel that you cannot serve as a fair and impartial juror?"  JA2148:9-23.  He introduced counsel, the parties, and a list of anticipated witnesses, and confirmed that none of the prospective jurors had connections to any of them.  JA2150:15-2153:5.  Throughout voir dire, he repeatedly asked potential jurors if there was any reason they could not be fair and impartial.  *E.g.*, JA2153:7-11; JA2165:8-11.  The court considered additional voir dire questions proposed by the parties in advance of trial but chose not to ask those questions.  JA2159:8-12.

During voir dire, three potential jurors expressed concerns about their ability to serve impartially.  Two said they had pre-existing negative opinions of Palin and one expressed significant familiarity with the case.  JA2153:19-21; JA2165:13-17; JA2160:17-JA2161:4.  The court reminded these jurors of their duty of impartiality but ultimately dismissed all three for cause.  JA2153:25-JA2154:8; JA2165:20-JA2167:14; JA2169:7-24; JA2160:20-2163:3.  None of the nine jurors selected to serve voiced any concerns about their ability to be impartial, during voir dire or at any point during the trial.

12

### 3. *Evidentiary Rulings at Trial*

At trial, Defendants, through motions in *limine* and timely objections, sought to preclude Palin from introducing various pieces of evidence. First, Palin attempted to introduce several articles published by the Atlantic Media company in other of its publications during the period Bennet had served as editor-in-chief of one publication, *The Atlantic* magazine. The district court excluded this evidence on relevance grounds because Bennet did not have direct editorial control over these other publications and there was no evidence that Bennet had actually read these articles. *See* JA408:19-JA409:19; JA586:17-587:4; JA589:22-JA590:21.[2]

Second, Palin sought to introduce into evidence "the fact that Mr. Bennet's brother Michael is a U.S. Senator, [and] ran for president in 2020; and then also bring out [that] Mr. Bennet testified that he campaigned with his brother the last two weeks of his 2010 Senate campaign, which would have been the same time period when the map was out, and ask – and two people on the [Crosshairs] map endorsed [Senator] Bennet; and just ask [Mr. Bennet] questions about whether that stood out in his head, things of that nature." JA584:18-JA585:2. The court

---

[2] In the earlier version of her Complaint, Palin had inaccurately alleged that these articles were published in *The Atlantic* magazine and that Bennet "was responsible for the content of, reviewed, edited and approved the publication of" these articles, allegations a panel of this Court accepted as true in determining that Palin had plausibly pleaded actual malice. *See Palin I*, 940 F.3d at 813. Palin now concedes Bennet's lack of control over these publications. *See* Palin Br. at 7 n.5.

excluded this evidence under Rules 402 and 403, as irrelevant and unduly prejudicial. JA855:25-586:1.

### 4. *Rule 50 Motion*

On February 11, following summations, Defendants moved pursuant to Rule 50 for judgment as a matter of law, based on Palin's failure to prove that the statements were "of and concerning" her, that the statements were false, that Defendants acted with actual malice, or that she suffered any actual damages, as required because the statements were not defamatory *per se*. JA-962:8-10, 964:1-12. While the jury deliberated, the district court heard argument on the motion in several sessions. JA1105:1-JA1107:25; JA1132:4-1156:4; JA1161:25-1168:5; JA1169:6-1201:13. On February 14, the court informed the parties that it had reached a decision and would publicly announce its ruling but allow the jury to continue deliberating so the Court of Appeals would have the benefit of the court's decision and the jury's verdict. JA1204:22-25. Neither party objected and the court then informed the parties that it would be granting judgment for Defendants because Palin had failed as a matter of law to prove actual malice. JA1205:12-1212:7.

### 5. *Jury Deliberations and Jury Verdict*

Following the announcement of its Rule 50 decision, the district court proposed instructing the jury again to avoid media coverage. JA1213:11-15.

14

Palin's counsel opposed that proposal, but Defendants' counsel asked for the instruction, noting that jurors might receive push notifications about the decision. JA1213:16-24. The court then reminded the jury to avoid any media coverage. JA1214:7-25.

The jury returned the next day, and deliberated for roughly an hour before sending the court a note with a two-part question. JA1215:1-2; JA1217:1-13. The jury asked whether a juror could draw an inference that Bennet doubted the truth of the challenged statements based on Bennet's response to a question posed by defense counsel, and whether such an inference can "contribute to the evidence brought forth by the plaintiff." JA1217:3-13. After discussing the appropriate response with counsel, JA1217:2-JA1229:20, the court sent the jury the following instruction:

> In response to your first inquiry, you are free to draw any reasonable inference you choose to draw from any answer received in evidence, regardless of which side posed the question to which the answer was given.
>
> In response to your second inquiry, an answer given by Mr. Bennet and a reasonable inference drawn therefrom is not sufficient in itself to carry the plaintiff's burden of showing by clear and convincing evidence that there was a high probability that Mr. Bennet actually doubted the truth of a challenged statement prior to publication, but it can contribute to the other evidence brought forth by plaintiff.

SA151. The jury deliberated for three more hours and then delivered a verdict of "not liable." JA1230:13-17; SA1.

15

### 6. *Post-Trial Proceedings*

After the district court excused the jury, in keeping with its usual practice, the law clerk asked jurors if they had any suggestions to improve the court's instructions of law.  JA1559.  During this private meeting, a few jurors volunteered that they had learned "of the bottom line of the Court's February 14 ruling," notwithstanding efforts to avoid media coverage, because "they had received 'push notifications' . . .  containing a few words to the effect that the Court intended to dismiss the case."  JA2000.  The court informed the parties about this the following day, noting that "[t]he jurors repeatedly assured the Court's law clerk that these notifications had not affected them in any way or played any role whatever in their deliberations."  JA1559-1560.

Palin filed her notice of appeal on March 17.[3]  On March 22, Palin filed a post-trial motion seeking vacatur of the final judgment, recusal, and a new trial.  JA2241-JA2285.  On March 25, this Court stayed the appeal pending resolution of Palin's post-trial motion, which the district court denied on May 31.  SA135-164.  This Court then lifted the stay on Palin's appeal.

---

[3] Palin also filed a Petition for Writ of Mandamus, which this Court initially stayed and later denied.

## SUMMARY OF ARGUMENT

Palin first challenges the requirement that she prove actual malice, but she waived this argument by failing to raise it during her first appeal. Regardless, binding precedent requires this Court to apply the actual malice standard, and Palin was separately required to prove actual malice under New York law.

Palin next argues that the district court erred by granting judgment as a matter of law to Defendants. As that court correctly found, however, Palin failed to present any evidence of actual malice, much less clear and convincing evidence.

Palin also contends that the district court erred in excluding articles supposedly published by *The Atlantic* while Bennet served as editor-in-chief and information about Bennet's brother. The court, however, correctly determined that the articles were irrelevant because there was no evidence that Bennet had read them. Nevertheless, the court never issued a final ruling on their admissibility because it offered Palin an opportunity to lay additional foundation, which she failed to do. As to Bennet's brother, the court properly determined that this evidence was both irrelevant and unduly prejudicial. Palin contends that the excluded evidence was relevant but fails to challenge the court's finding of undue prejudice, making her appeal on this issue academic. Finally, Palin does not even attempt to explain how exclusion of this evidence impacted the case's outcome.

17

Palin contends that the district court's voir dire was deficient because it failed to ask specific questions she proposed.  The law, however, permits a court broad discretion to carry out voir dire, and the process employed here was more than sufficient to ensure a fair trial.  Palin also contends that the court erred in responding to a mid-deliberation jury question, but the court's answer was entirely appropriate, particularly in the context of the broader jury instructions.

Finally, there was no reason for the district court to recuse itself.  But because Palin argues only that the court should have disqualified itself before ruling on the post-trial motions and this Court is reviewing the district court's Rule 50 decision *de novo*, this Court need not even reach this issue because it has no practical effect.

## **ARGUMENT**

## I.  **THE DISTRICT COURT CORRECTLY HELD THAT PALIN HAD THE BURDEN OF PROVING ACTUAL MALICE**

For the first three years of this case, including on her first appeal to this Court, Palin conceded she bore the burden of proving actual malice as an element of her claim under the First Amendment.  On summary judgment, for the first time, she argued that she should not.  She now contends that the First Amendment standard has been rendered obsolete by the internet and that New York's expanded Anti-SLAPP law should not be applied retroactively.  The district court correctly rejected these arguments below.

18

A. **Palin Waived Any Challenge to the Application of the Actual Malice Fault Standard under the First Amendment, But In Any Event That Standard Clearly Applies Here**

Under the law-of-the case doctrine,

> a decision made at a previous stage of litigation, which could have been challenged in the ensuing appeal but was not, becomes the law of the case; the parties are deemed to have waived the right to challenge that decision, for "it would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost."

*Cnty. of Suffolk v. Stone & Webster Eng'g*, 106 F.3d 1112, 1117 (2d Cir. 1997) (quoting *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981)). "The principle applies as well to everything decided by necessary implication." *Fogel*, 668 F.2d at 108.

From July 2017 until December 2019, the parties extensively litigated, before both the district court and this Court, a dismissal motion premised on the contention that Palin was required to prove actual malice under the First Amendment. JA1-14; *see* Palin Br. at 4-5. Palin failed to ever argue that the actual malice standard of fault did not govern her claim. As this Court noted, it was "undisputed" that Palin was a public figure and that the actual malice standard applied. *Palin I*, 940 F.3d at 809-10. Palin should not now be permitted to reverse

19

course and argue for application of a different fault standard at this late date—she has waived that argument for all purposes.[4]

Even if Palin had not waived her argument, this Court is bound by *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and its progeny. *See McKinney v. City of Middletown*, 49 F.4th 730 (2d Cir. 2022). To the extent Palin is suggesting that the Supreme Court might reverse this settled precedent, "this Court is not tasked with—and is, in fact, prohibited from—such guesswork." *N.Y. State Citizen's Coal. for Children v. Poole*, 922 F.3d 69, 79 (2d Cir. 2019).

Palin also argues that the actual malice rule should not be applied in circumstances "substantially dissimilar" from those that existed at the time *Sullivan* was decided. Palin Br. at 33. Notably, however, Palin does not dispute that she is a public figure, nor does she argue that a specific aspect of this case requires application of a different fault standard. Instead, she focuses on the broader climate of speech, contending generally that "[t]he protection of reputation has taken on additional gravity since the development of the Internet" because "there are virtually no limits on everyone's equal opportunity to participate" in public discussion. *See* Palin Br. at 31-35. Even assuming, *arguendo*, that there

---

[4] The district court did not reach the waiver argument, instead rejecting Palin's argument on *stare decisis* grounds. SA98 n.8. This Court may affirm on any basis in the record. *Olson v. Major League Baseball*, 29 F.4th 59, 73 (2d Cir. 2022).

were any merit to Palin's theory that "times have changed," they have not changed as relevant to the application of *Sullivan* to *this* case. As a former governor, candidate for vice president, and potential candidate for president who regularly seeks to influence politics and matters of public concern, Palin is *the* paradigmatic public figure to whom the holdings in *Sullivan* and its progeny apply. *See Palin I*, 940 F.3d at 809-10.

## B. The District Court Correctly Required Proof of Actual Malice Under New York Law

Palin also challenges the district court's ruling that, regardless of the First Amendment, she was required to prove actual malice as an element of her claim under New York's amended Anti-SLAPP law, N.Y. Civil Rights Law § 76-a. *See* Palin Br. at 34-35. As amended in 2020, the Anti-SLAPP law imposes an actual malice fault standard in any action concerning the "exercise of the constitutional right of free speech in connection with an issue of public interest." *See* N.Y. Civil Rights Law § 76-a. Palin does not dispute that the Editorial at issue here fits into this category.

Rather, relying on an intermediate state appellate decision, she objects only to the retroactive application of the statute to this action, in which she had filed her Complaint before the relevant amendment to the statute became effective. *See*

21

Palin Br. at 34-35 (citing *Gottwald v. Sebert*, 203 A.D.3d 488 (1st Dep't 2022)).[5]

Palin, however, fails to mention that that the Appellate Division subsequently

granted leave to appeal its decision to the New York Court of Appeals, *see*

*Gottwald v. Sebert*, 2022 N.Y. Slip. Op. 68019(U) (1st Dep't June 28, 2022).  The

Court of Appeals has not yet ruled on this issue, and the Appellate Division's

decision is not binding on this Court.  *See DiBella v. Hopkins*, 403 F.3d 102, 111-

12 (2d Cir. 2005).  Although intermediate courts may be "helpful indicators of how

the state's highest court would rule," this Court can depart from them if

"convinced by other persuasive data that the highest court of the state would decide

otherwise."  *Id.*

The First Department's decision in *Gottwald* is at odds with decisions from

other New York courts.  The Third Department has affirmed a trial court decision

involving retroactive application of the Anti-SLAPP amendments, though it did not

directly address the issue.  *See Reus v. ETC Hous.*, 203 A.D.3d 1281, 1287 (3rd

Dep't 2022) (affirming order dismissing case and awarding fees under N.Y. Civ.

Rights Law § 70-a).  And, while the Second and Fourth Departments do not appear

to have ruled yet on this question, prior to *Gottwald*, the overwhelming majority of

other courts to consider this question agreed with the district court's reasoning in

---

[5] All the other cases Palin cites were also decided by the same court following the
*Gottwald* decision.

this case and ruled that the 2020 amendments apply retroactively to pending

actions.  *See, e.g., Coleman v. Grand*, 523 F. Supp. 3d 244, 257-59 (E.D.N.Y.

2021), *appeal pending*, No. 21-800 (2d Cir. argued May 13, 2022); *Kesner v. Buhl*,

590 F. Supp. 3d 680, 693 (S.D.N.Y. 2022).[6]

Further, the district court's reasoning is sound.  "[R]emedial legislation

should be given retroactive effect in order to effectuate its beneficial

purpose."  *Gleason v. Michael Vee, Ltd.*, 96 N.Y.2d 117, 122 (2001).  "Remedial

statutes are those designed to correct imperfections in prior law, by generally

giving relief to the aggrieved party."  *Nelson v. HSBC Bank USA*, 87 A.D.3d 995,

998 (2nd Dep't 2011) (cleaned up); *Gleason*, 96 N.Y.2d at 122 (retroactively

applying CPLR amendment that was intended to clarify prior judicial

interpretations and that was to take "effect immediately, [which] evince[s] a sense

of urgency" on part of Legislature (cleaned up)).

The revisions to Section 76-a, along with the rest of the amendments, were

intended to "take effect immediately."  A.B. 5991-A § 4 (N.Y. 2020); *see also*

---

[6] *See also Sweigert v. Goodman*, 2021 U.S. Dist. LEXIS 77704, at *4-5 (S.D.N.Y. Apr. 22, 2021), *appeal dismissed*, No. 22-682 (2nd Cir. May 24, 2022); *NOVAGOLD Res. v. J Capital Rsch. USA*, 2022 U.S. Dist. LEXIS 55734, at *25 (E.D.N.Y. Mar. 28, 2022); *Sackler v. ABC*, 71 Misc. 3d 693, 698 (Sup. Ct. N.Y. Cnty. 2021); *Massa Constr. v. Meaney*, No. 126837/2020, slip op. at 2 (Sup. Ct. Ontario Cnty. May 13, 2021) (NYSCEF Doc. 92); *Great Wall Med. v. Levine*, 2022 N.Y. Misc. LEXIS 988, at *2 (Sup. Ct. N.Y. Cnty. Mar. 8, 2022).

23

N.Y. Civ. Rights Law § 70-a (statute applies to action "commenced *or continued*" in violation of its terms (emphasis added)).  The legislation was designed to "better advance the purposes that the Legislature originally identified in enacting New York's Anti-SLAPP law," as the prior Anti-SLAPP law "as drafted, and as narrowly interpreted by the courts . . . failed to accomplish that objective." Sponsor Mem. of Sen. Hoylman (July 22, 2020), https://www.nysenate.gov/legislation/bills/2019/s52/amendment/a.

Palin does not dispute the plain language of the amendments, offering only the conclusory assertion that they "are not 'remedial.'"  Palin Br. at 35.  She contends that the amendments "impact 'substantive burdens and rights,'" but does not explain which rights she contends were impacted or how.  *See id.* (citing *Regina Metro. Co. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332 (2020)).

The case on which Palin relies is inapposite.  In *Regina*, the Court of Appeals was concerned with retroactive effects that "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  35 N.Y.3d at 365 (cleaned up).  Here, Palin's cause of action was substantively unaltered by the change to Section 76-a and no new duties were imposed upon her, as the First

24

Amendment already required proof of actual malice at the time she filed her

Complaint.

## II. THE DISTRICT COURT CORRECTLY GRANTED JUDGMENT UNDER RULE 50, BOTH BECAUSE PALIN FAILED TO PROVE ACTUAL MALICE AND FOR ADDITIONAL REASONS

### A. The Evidence Admitted at Trial Fails to Establish Actual Malice

Palin argues that, in granting judgment as a matter of law, the district court

ignored evidence or improperly made credibility determinations that, in her view,

require a different outcome. She also contends that, as a procedural matter, the

Rule 50 decision was precluded by the *Palin I* mandate. The district court

correctly ruled that Palin had not adduced evidence of actual malice sufficient for a

reasonable jury to find in her favor and that Palin's mandate argument was

"illogical." SA160.

A district court's grant of judgment as a matter of law is subject to *de novo*

review. *Runner v. N.Y. Stock Exch.*, 568 F.3d 383, 386 (2d Cir. 2009). In making

a determination under Rule 50, a "court must draw all reasonable inferences in

favor of the nonmoving party, and it may not make credibility determinations or

weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150

(2000). In a public figure defamation action, a court "must be guided by the *New

York Times* 'clear and convincing' evidentiary standard in determining whether a

genuine issue of actual malice exists -- that is, whether the evidence presented is

such that a reasonable jury might find that actual malice had been shown with convincing clarity." *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986). "It is not enough for the plaintiff merely to assert that the jury might, and legally could, disbelieve the defendant's denial of legal malice. Some facts must be asserted to support the claim that the state of mind existed." *Contemporary Mission v. N.Y. Times. Co.*, 842 F.2d 612, 621-22 (2d Cir. 1988) (cleaned up).

Contrary to Palin's suggestion, a court considering a Rule 50 motion need not adopt inferences that are unreasonable or unsupported by the record. *See Williams v. Cnty. of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999) (judgment is appropriate where "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture"); *see also Contemp. Mission*, 842 F.2d at 622-23 ("bare assertions" that reporter "intentionally distorted and manipulated the truth in order to blacken appellants' reputations" were "not sufficient to establish a triable issue of actual malice").

Nor can a plaintiff defeat a Rule 50 motion merely by arguing that jurors could disbelieve uncontested testimony. *See Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952) (L. Hand, J.) (while "in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that a verdict

would nevertheless have to be directed against him"); *accord Walker v. City of N.Y.*, 638 F. App'x 29, 31 (2d Cir. 2016) ("it is hornbook law that a plaintiff does not carry his burden of proving a fact merely by having witnesses deny that fact and asking the jury to decline to believe the denials"). To the contrary, in order for a claim to survive in the context of the clear and convincing evidentiary standard, a plaintiff must offer "concrete evidence from which a reasonable juror could return a verdict in [her] favor," which requires more than the mere assertion that the jury might disbelieve the defendant. *Contemp. Mission*, 842 F.2d at 621-22; *Anderson*, 477 U.S. at 256 (same). In other words, a defamation plaintiff must put forth actual evidence of a defendant's subjective doubt as to the truth of a publication—and here, Palin failed to do so.

Palin contends that the court erred when it improperly "credited" Bennet's testimony that he did not have a specific recollection of any 2011 articles about the Arizona shooting while revising the Editorial in 2017. Palin Br. at 43. But she points to no admissible evidence to the contrary. And even if the jury disbelieved Bennet's testimony on this point, that would serve only as a basis for disregarding it, not for reaching the conclusion that Bennet in fact knew what he had published was false. *See Bose Corp. v. Consumers Union*, 466 U.S. 485, 512 (1984).

Similarly, Palin argues the court erred in failing to draw the inference she desired—that Bennet had a preconceived narrative he pushed on colleagues

27

because he was their boss. *See* Palin Br. at 40-42. There is simply no evidence to support this theory. The undisputed evidence demonstrated that Cohn, not Bennet, first brought up the Arizona Shooting. *See* SA25-26. And Palin fails to point to any evidence to support her contention that it would have been reasonable to conclude that "no one who worked for Bennet was going to question or change what he wrote in the Editorial." *See* Palin Br. at 41. The truth is that Bennet only edited Williamson's draft because Cohn passed it off to him. He never told Williamson or Cohn that he wanted to edit the draft, SA32, and after he edited the draft, multiple editors made additional changes to the piece, *see* SA35-37.

Nor could the jury have found actual malice based on the research or drafting process. While Palin suggests that research was "conducted on June 14, 2017 about Bennet's preconceived narrative," *see* Palin Br. at 43, the undisputed evidence was that no research was performed that day, by Williamson or anyone else, into whether Loughner had actually seen the Map or whether the Map in any way "caused" the shooting. Instead, Williamson researched only the political climate before the shooting, and she and others reviewed the Board's past editorials to ensure consistency. JA317:9-16; *See* JA333:22-334:7; JA719:4-23. Bennet could not have disregarded research that was never conducted. Palin also contends that Bennet must have intended to convey a different meaning than Williamson or he would not have revised her draft, *see* Palin Br. at 42, but that

28

ignores the facts in evidence and the way editing actually works. Bennet testified that his goal in editing Williamson's draft was to make "a clearer argument" and include "a more vivid description of what happened that day," JA806:10-15.[7]

More broadly, Palin does not explain how any of this supposed evidence—Bennet's desire to write on this topic, his leadership of the Opinion Section, and the language used in the Editorial itself—demonstrates clearly and convincingly that the challenged statements were made with knowledge of their falsity.

Palin also identifies several other pieces of evidence that she contends should have caused the court to deny the motion. Palin Br. at 14, 44-46. However, none of this purported evidence supports a finding that Bennet was aware, at the time the Editorial was published, that a direct causal link between the Map and the Arizona Shooting—the message that Palin alleges the statements at issue convey—was likely nonexistent:

**Bennet's Testimony.** Palin contends that the district court "disregards Bennet's glaring admission of actual knowledge of falsity," namely, his testimony

---

[7] Neither case Palin cites involves simply "the alteration of a draft." Palin Br. at 42 n.43. In *Young v. Gannett Satellite Information Network*, 734 F.3d 544, 548 (6th Cir. 2013), the editor added an allegedly defamatory statement to an article after reviewing an arbitrator's report that contained specific, factual statements that indicated what she was saying was false. In *Sharon v. Time, Inc.*, 599 F. Supp. 538, 583-85 (S.D.N.Y. 1984), the defendant had, among other things, falsely attributed a purported fact to a quasi-judicial body.

that "I didn't think then and don't think now that the map caused Jared Loughner to act."  Palin Br. at 14, 43 (citing JA806:5-6).  But Palin wrenches this statement from context.[8]  In full, Bennet testified:

> I was functioning as the editor, not the reporter on the piece, so I wouldn't normally do the reporting in a situation like this, particularly when we were on a tight deadline.  But also I didn't, I didn't think – I wouldn't have thought it was – I didn't think then and don't think now that the map caused Jared Loughner to act.  I didn't think we were saying that, and therefore I wouldn't have – *the question wouldn't have entered my mind, didn't enter my mind* to research that question.

JA806:1-9 (emphasis added).  Bennet's uncontroverted testimony thus makes clear that whether the Map actually caused Loughner to act *did not enter his mind* as he worked on the Editorial.  Far from ignoring this testimony, the district court appropriately rejected Palin's argument, finding that her reading of Bennet's testimony was "inconsistent with Bennet's testimony overall."  *See* SA69.

Even if this Court were to credit Palin's unreasonable and unsupported theory that the district court should have construed this one cherry-picked sentence as Bennet stating that he did not know whether his statements were true, it would be insufficient to prove actual malice.  Not knowing whether something is true does not equate with being highly aware that it is probably false, which is the

---

[8] While Palin now argues this sentence is a "glaring admission," Palin Br. at 43, it went entirely unmentioned in her counsel's closing argument and rebuttal.

relevant standard for actual malice. *Liberman v. Gelstein*, 80 N.Y.2d 429, 438 (1992) ("[T]here is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action."). Nothing in Bennet's testimony suggests that he "knew or suspected that there existed any official or widely accepted conclusion that no link whatsoever existed between Loughner's attack and the map," and Palin failed to set forth any evidence at trial that would tend to support that conclusion. *See* SA69.

**Prior Editorials and Column.** Palin argues the district court improperly took a "one-sided view" of three past opinion pieces that *Times* employees sent to Bennet on June 14, a column by Frank Rich and two editorials ("Bloodshed and Invective in Arizona" and "As We Mourn"), *see supra* at 5. Palin argues that the court "disregards several statements … that flatly refute Bennet's preconceived narrative." Palin Br. at 44. But the district court considered this evidence and rightly found it inapposite. The court accepted Palin's proffered inference in her favor that Bennet had read and understood the pieces, and the court then considered in detail their contents. SA60. As it correctly observed, "even on the assumption that Bennet read and understood these three articles in their entirety, none presents any definitive facts about the Arizona shooting that would have put

Bennet on notice (or led him to strongly suspect) that no link had been established between the crosshairs map and Loughner's attack." SA60; *see also* SA63.

Indeed, while Palin argues that these pieces contain statements that "flatly refute Bennet's preconceived narrative," Palin Br. at 44 & n.50, the pieces written in the days following the Arizona Shooting in fact do no such thing. While Palin quotes "Bloodshed and Invective in Arizona" as saying Loughner "appears to be mentally ill" and "beyond usual ideological categories," the piece then notes that Loughner "is very much a part of a widespread squall of fear, anger and intolerance that has produced violent threats against scores of politicians and infected the political mainstream with violent imagery." *See* JA1709. Similarly, while the piece does state that it was "facile and mistaken to attribute" Loughner's act "directly to Republicans or Tea Party members," Palin Br. at 44 n.50, the very next sentence states that "it is legitimate to hold Republicans and particularly their most virulent supporters in the media responsible for the gale of anger that has produced the vast majority of these threats, setting the nation on edge," JA1710. While Palin cites a reference in "As We Mourn" to a statement by President Obama that a "simple lack of civility" did not cause the tragedy, and an accusation by Palin that journalists had "committed a blood libel," Palin Br. at 44 n.50, that piece also references "the ugliness that continues to swirl in some parts of the

country" and notes only that journalists had "raised questions about overheated rhetoric," JA1713, not the conclusions of any of those inquiries.

   ***Hyperlinked Article.*** Palin has cited no evidence demonstrating that Bennet, contrary to his testimony, clicked on the hyperlinked ABC article, relying instead on the court's ruling at summary judgment that "a jury might discredit" the testimony. Palin Br. at 46 n.54 (quoting JA1362-1363); *but see* JA2012 ("Palin has adduced no affirmative evidence to undermine Bennet's testimony on this point."). Palin's baseless conjecture that a jury might fortuitously disbelieve Bennet is insufficient as a matter of law to meet her burden. *Contemp. Mission*, 842 F.2d at 621-22. Moreover, as the district court noted, the mere possibility that he read the ABC article, published one day after the Arizona Shooting, is not proof that he read the tenth paragraph and understood the statement that no connection between Loughner and the Map had been found at that early time to be dispositive proof that no connection was *ever* established. SA64 n.28.

   Additionally, inconsistently with her position on appeal, Palin argued at trial that Bennet's *failure to read* the ABC article demonstrated a reckless disregard for the truth. SA64-65. The district court correctly ruled that there was no evidence to suggest that Bennet *should* have checked the hyperlink. SA65. And even if there were any such evidence, a failure to investigate does not amount to actual malice unless there is "evidence that defendants' inaction was a product of a deliberate

33

decision not to acquire knowledge of facts that might confirm the probable falsity of the published statement." *Sweeney v. Prisoners' Legal Servs.*, 84 N.Y.2d 786, 793 (1995) (cleaned up). There is no evidence here that Bennet had any suspicion that his statements were false and that he avoided clicking on the hyperlink so that he could avoid confirming that suspicion.

None of the other theories advanced by Palin demonstrate a jury issue as to whether Bennet had actual malice, nor do any demonstrate an error in the district court's ruling. Palin argues, for example, that Bennet's contemporaneous statements to Williamson and Lepping suggest that he was trying to "cover for himself and place blame on those around him." Palin Br. at 50 (citing JA2024). But Palin cites no evidence at trial that would support this theory, and Williamson's testimony that Bennet was "crestfallen" on June 15 reinforces his testimony. *See* JA2025 (quoting JA264:3-9). Instead, Palin relies on the possibility that, for no apparent reason, the jury might choose to disbelieve Bennet's undisputed testimony, the consistent testimony of the witnesses who interacted with him most closely, and Bennet's contemporaneous statements themselves, which Palin stretches far beyond their plain meaning. *See, e.g.*, JA361:12-17 (Williamson testifying that the morning after publication she talked with Bennet about "how to get to what the facts were and address the criticism that was coming from readers and make a correction, if necessary"), JA363:10-15

(Williamson testifying as to her interpretation of Bennet's 5:08 a.m. email, including that "it meant we really had to scramble the jets and find out what the error was, nail it down, and, as quickly as possible, correct it"), JA935:11-19 (Q: Did you have any reason to doubt Mr. Bennet's good faith giving you that explanation in his e-mail? Douthat: No.). Multiple witnesses testified to the effect that Bennet made an honest mistake in the editing process and did everything he could to swiftly correct it, and Palin failed to set forth evidence that would have allowed a reasonable jury to conclude otherwise.

Additionally, the decision not to include Palin's name in the correction (made by Cohn, not Bennet, JA638:11-18) occurred after publication of the Editorial and has no connection to Bennet's own subjective state of mind on June 14. *See* Palin Br. at 49 (relying on summary judgment order); *Contemp. Mission*, 842 F.2d at 621 (requiring proof that defendant had actual knowledge of falsehood or "subjective awareness of probable falsity" at time of publication).

In short, the district court aptly summarized the bottom line: Palin failed to identify "any piece of research actually considered during the drafting process by Bennet or any other member of his team that states a fact about the Arizona shooting that would have falsified the Challenged Statements' inference of a causal link between the . . . Map and Loughner's murderous rampage." SA159. Nor did she "identify any testimony or contemporaneous communication suggesting that

any member of the team knew or suspected that the asserted link had been disproven." *Id.*[9]

## B.  The Judgment Pursuant to Rule 50 Should Also be Affirmed on Either Of Two Alternative Grounds

Even if this Court were to disagree with the foregoing, it can and should affirm judgment for Defendants under Rule 50 on either of two additional grounds presented to the district court. *See Olson*, 29 F.4th at 73.

***First***, Palin failed to present any evidence that Bennet acted with actual malice as to defamatory meaning, *i.e.*, that he "either intended to convey the alleged defamatory meaning or that he was aware that ordinary readers would probably understand his words to convey the allegedly defamatory meaning and he published anyway." SA0055 n.26 (district court declined to rule on this branch of Rule 50 motion in light of ruling on actual malice as to falsity).

---

[9] Palin also contends that the district court, in evaluating the evidence at trial, was bound by the *Palin I* mandate and the district court's own summary judgment ruling. *See, e.g.*, Palin Br. at 40, 41 n.41, 44-45 n.51, 45 n.52, 46. This is incorrect. This Court's analysis of what Palin had plausibly *alleged* does not preclude the district court from ruling on Defendants' motion for judgment as a matter of law after trial. *Brown v. City of Syracuse*, 673 F.3d 141, 148 (2d Cir. 2012) ("The is no inconsistency between our statement of hypothetical circumstances [in an earlier appeal] about what could be possible based on the allegations in the complaint and the district court's subsequent determination of what Brown would in fact be able to prove . . . ."). Similarly, the district court's rulings at summary judgment are not binding on its analysis of the evidence actually introduced at trial. *E.g. Williams*, 171 F.3d at 102.

As the district court explained, "Bennet could not have actual malice as to the Editorial's purported falsity unless he was also aware that readers would interpret his words to convey the allegedly false meaning." *Id.*; SA0100-04; *see Masson v. New Yorker Magazine*, 832 F. Supp. 1350, 1361-63 (N.D. Cal. 1993) ("The purpose of the awareness element is to ensure that liability is not imposed upon a defendant who acted without fault."), *aff'd on other grounds*, 85 F.3d 1394 (9th Cir. 1996)); *Dodds v. ABC*, 145 F.3d 1053, 1064 (9th Cir. 1998) (reaffirming that defendant "must have actually intended to convey the defamatory impression"); *Saenz v. Playboy Enters.*, 841 F.2d 1309, 1318 (7th Cir. 1988) ("[R]equiring a publisher to guarantee the truth of all the inferences a reader might reasonably draw from a publication would undermine the uninhibited, open discussion of matters of public concern.").

Bennet repeatedly testified that he did not intend the allegedly defamatory meaning that Palin ascribes to the Editorial, that he did not mean to suggest any causal link between the Map and the Arizona Shooting, and that he did not realize, at the time of drafting, that readers might understand his words in that way. *E.g.*, JA729:11-14; JA786:24-788:04; JA815:19-817:06. He only learned of this possible interpretation *after* publication, when Douthat emailed him and he then read comments online. JA831:1-7; JA1721. Palin did not introduce any evidence that calls this testimony into doubt, much less that would constitute clear and

convincing evidence to the contrary. *See Contemp. Mission*, 842 F.2d at 621-22. Palin failed to carry her burden on this second prong of actual malice as well.

**Second,** New York law required that Palin prove, as an element of her claim, either "special damages or per se actionability." *Palin I*, 940 F.3d at 809; *see also El Meson Espanol v. NYM Corp.*, 521 F.2d 737, 740 & n.1 (2d Cir. 1975); *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 176 (2d Cir. 2000); *Oakley v. Dolan*, 833 F. App'x 896, 900-01 (2d Cir. 2020) (citing *Palin I*).

"The issue of whether a statement is actionable per se is for the court." *Albert v. Loksen*, 239 F.3d 256, 271 (2d Cir. 2001). The district court ruled that the statements at issue were defamatory *per se*, because "[t]he assertion that Palin's actions played a 'clear' or 'direct' role in causing Loughner to commit a mass shooting" would "tend[] to expose the plaintiff to public contempt, ridicule, aversion, or disgrace." SA0054 n.24 (citing *Rinaldi v. Holt, Rinehart & Winston*, 42 N.Y.2d 369, 379 (1977)). The district court erred in so ruling. "Only four types of statements are per se actionable under New York law: those that impute unchastity to a woman, assert that a plaintiff has a loathsome disease, tend to injure him in his profession, or charge a plaintiff with a serious crime." *Oakley*, 833 F. App'x at 900 (cleaned up) (citing *Liberman*, 80 N.Y.2d 429).[10] The challenged

---

[10] While *Rinaldi*, which concerned statements suggesting a judge was incompetent and corrupt, and some other New York cases quote language from the 1926 decision in *Sydney v. MacFadden Newspaper Publishing*, 242 N.Y. 208 (1926),

statements do not charge Palin with a serious crime, impugn her in her profession, or fall within any other of the traditional *per se* categories.

Thus, Palin was required as an element of her cause of action to prove special damages – "actual losses that were specifically and causally related to the alleged tortious act." *Oakley*, 833 F. App'x at 900-01 (cleaned up) (affirming dismissal because statements were not defamatory *per se* and plaintiff did not allege special damages). Palin did not even attempt to present evidence of specific financial harm, as her counsel acknowledged in closing arguments. JA1018:15-16 ("we haven't claimed any financial injury or we lost this job or that job"); *see also* JA1018:6-1019:6, JA1021:2-1022:5.

This Court should affirm the Rule 50 judgment in Defendants' favor on either or both of these alternative grounds.

### C. The District Court Did Not Abuse its Discretion in Excluding Other Purported Evidence of Actual Malice

Palin also contends that the Court erred in excluding two categories of proposed evidence – information related to "*The Atlantic* articles" and "Bennet's

---

suggesting a written statement is actionable without proof of special damages if it subjects the person to "disgrace" or "induces an evil opinion of him," 42 N.Y.2d at 379, those cases do not resolve the question of what specific types of statements rise to that level. But most New York courts in addressing this question look to the four traditional *per se* categories. *See Geraci v. Probst*, 15 N.Y.3d 336, 344-45 (2010); *Nolan v. State*, 158 A.D.3d 186, 195 (1st Dep't 2018); *Clemente v. Impastato*, 274 A.D.2d 771, 773 (3rd Dep't 2000).

brother and Bennet's background." Palin Br. at 37-39.  In fact, Palin never obtained a final ruling on some of the documents she claims the court wrongfully excluded.  And the rulings the district court actually issued were correct.  Moreover, Palin has not even attempted to show how these supposed errors impacted the outcome of this case.

A "trial court has broad discretion over the admission of evidence" and "[i]ts evaluation of relevance is entitled to substantial deference." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997).  The district court receives this deference because of its "superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice." *U.S. v. Abarca*, 22 F.4th 58, 66 (2d Cir. 2021).  A district court abuses its discretion "only if the ruling was arbitrary and irrational." *U.S. v. Montsalvatge*, 850 F.3d 483, 493 (2d Cir. 2017) (cleaned up).

A party challenging a district court's evidentiary rulings is generally entitled to a new trial only if (1) "the district court committed errors that were a clear abuse of discretion" and (2) those errors "were clearly prejudicial to the outcome of the trial, where prejudice is measured by assessing the error in light of the record as a whole." *Vill. of Freeport v. Barrella*, 814 F.3d 594, 610 (2d Cir. 2016).  Palin cannot make either showing.

### 1.    *Articles from Sister Publications of The Atlantic*

First, Palin complains about exclusion of what she inaccurately refers to as the "*Atlantic* articles" or the "*Atlantic* website articles."  Palin Br. at 38-39.  As discussed above, these "articles" did not, in fact, appear in *The Atlantic* magazine (of which Bennet was the editor), but, rather, in various sister publications owned by the same publishing company, Atlantic Media.  *See supra* at 13, 17.

The district court correctly determined that Palin had failed to demonstrate that the "*Atlantic* articles" were relevant.  "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."  Fed. R. Evid. 104(b); *see U.S. v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021) (affirming district court's exclusion of statement where a party failed to establish necessary foundational facts).  "In determining whether [a party] has introduced sufficient evidence to meet Rule 104(b), . . . [t]he court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence." *Huddleston v. U.S.*, 485 U.S. 681, 690 (1988).

Here, Palin sought to admit these articles in an attempt to show that Bennet knew, at the time he wrote the Editorial, that the Arizona Shooting had no connection to the Map.  *See* JA406:1-18.  Thus, the relevance of the articles depended on whether Bennet had actually read those articles.

In substantial pretrial briefing and oral argument at trial, Defendants demonstrated that Bennet had no responsibility for editing these "articles," which were actually blog posts from publications edited by others. JA405:1-17. More importantly, Palin offered no evidence that Bennet had ever read them. Whereas the jury may have had a basis on which to conclude that Bennet read (or even edited) articles published by *The Atlantic* magazine itself during his time as editor of that publication, the same cannot be said for articles published by these sister publications, for which Bennet was not the editor. Moreover, Bennet testified that he had no recollection of reading any of the articles. *See* JA408:19-JA409:19; JA586:17-587:4; JA589:22-JA590:21. As Palin concedes, "Bennet did not have day-to-day editorial control" over these other publications. *See* Palin Br. at 7 n.5.

In assessing admissibility, the district court focused on this important distinction. JA330:22-JA415:2; JA407:20-24. Despite multiple opportunities for Palin to develop evidence in discovery and at trial, there simply was no evidence to suggest that Bennet had ever read any of the exhibits that Palin sought to admit. Without such a foundation, the jury would simply be speculating as to whether Bennet had actually seen them.

Palin appears to argue that the *Palin I* mandate required the court to admit this evidence. Palin Br. at 5-6, 10. However, "a mandate is controlling only as to matters within its compass." *New Eng. Ins. v. Healthcare Underwriters Mut. Ins.*,

352 F.3d 599, 606 (2d Cir. 2003) (cleaned up). Here, the *Palin I* mandate was limited to vacating the order granting Defendants' motion to dismiss and, the panel stressed that it was ruling *only* on whether Palin had adequately pleaded her defamation claim. 940 F.3d at 816-17. The evidence developed in discovery failed to support Palin's allegations that Bennet was "responsible for the content" of the supposed "Atlantic articles."

Second, the district court did not arbitrarily or categorically exclude this evidence. Rather, the Court heard multiple arguments about admissibility. *See, e.g.*, JA404:19-JA415:2; JA586:14-JA594:4. It expressed concern that these articles were irrelevant without some evidence Bennet had actually read and remembered them. *See, e.g.*, JA587:13-16 ("I don't see how one can infer that just because he is an avid reader, he read any particular article in some other publication that he has no recollection of."); JA588:9-12 (stating that it is "Evidence 101" that "something that you have no foundation to offer, or insufficient foundation to offer" is not admissible). Additionally, the court offered Palin the opportunity to lay a predicate for admission by posing "foundational questions to [Bennet] outside the presence of the jury." JA591:11-17; *see also*

43

JA591:18-JA592:5. Palin failed to follow up on the court's invitation and did not press the issue. *See* SA68 n.32.[11]

Because the district court made no final ruling on the articles' admissibility, there is no decision for this Court to review. *E.g. U.S. v. Djibo*, 850 F. App'x 52, 57 (2d Cir. 2021) (holding that district court had not issued reviewable final ruling in similar circumstances—*i.e.*, where district court "expressed skepticism about whether [messages defendant sought to admit] were admissible," but invited item-by-item consideration and, although defendant proposed admitting two messages and court permitted them, "[t]he court made no final ruling with respect to any of the other messages, which [appellant] did not seek to admit at trial" and there was therefore "no decision on the admissibility of those messages for [the Court of Appeals] to review, let alone reverse"). The same holds true here.

To the extent this Court concludes the district court did make a final decision, Palin has failed to demonstrate that such a ruling was an abuse of discretion. First, though Palin points to a collection of testimony received at trial which she contends "laid a more than adequate foundation to admit [the] excluded

---

[11] Palin contends that the district court ruled that this evidence could only be relevant if Bennet "admit[ted] reading and remembering an article." *See* Palin. Br. at 10-11; *see also id.* at 39. That misstates what the district court actually said, which was that Palin was required to show "some basis for showing that he likely read it . . . and remembered it, and he had a motive to disregard it." JA590:19-21.

44

articles," *see* Palin Br. at 38, almost all of this testimony was in fact solicited only

***after*** the district court's initial ruling that a sufficient foundation had not been laid.

The court issued its ruling, subject to reappraisal, before Bennet took the stand.

*See* JA591 (ruling); JA682 (Bennet begins testimony).  The cites for the "adequate

foundation" are, with one exception, to Bennet's testimony.  *See* Palin Br. at 38

(citing JA700-05; JA710).[12]  If Palin believed she had laid a sufficient foundation

by obtaining this testimony from Bennet, she should have followed the court's

guidance and sought reconsideration at that point.

   In addition, Palin makes no argument that the failure to admit these exhibits

was clearly prejudicial to the outcome of the trial.  Such argument would be

fruitless.  Palin asked Bennet if he could "recall any articles or stories written" in

various publications "about the Loughner shooting," and he testified that he did not

recall any specific article.  JA704:5-16.  He conceded that some of the articles he

read must have discussed that Loughner was "deranged," though he again did not

recall a specific article.  JA704:20-705:3.  There is no reason to believe Palin

would have received a different response if her counsel had asked Bennet instead

---

[12] The only earlier citation is to testimony by Lepping that she had "personally observed [Bennet] demonstrating an ability to recall articles that had been written several years ago."  JA495:22-496:1.  Notably, Lepping then stated that she did not recall anything specific as to whether any of articles were ones "that had been written while he was working at *The Atlantic.*"  JA496:2-8.

about specific articles from the sister publications instead of these more general questions. Indeed, Palin did ask Bennet about some specific articles during his deposition and he denied remembering reading them. JA1638-1639.

### 2. *Evidence Related to Bennet's Brother*

Palin also sought to introduce evidence related to Bennet's brother. As an initial matter, Palin fails to address one of the two grounds for exclusion of this evidence, arguing only that it was relevant. Palin Br. at 38. However, the court also excluded this evidence under Rule 403. JA584:18-586:1; SA67 n.31. Her failure to address this alternative ground for exclusion moots this challenge: Even if this Court were to reverse as to relevance, the unappealed ruling under Rule 403 would stand. *Cf. Gounden v. Campagna*, 487 F. App'x 624, 626 (2d Cir. 2012).[13]

Palin's sole relevance argument also fails on the merits. She contends that this Court's prior decision "established the relevance of Bennet's brother and

---

[13] The district court's ruling under Rule 403 was correct. The "deferential standard" of review on appeal "is of particular importance with regard to evidentiary rulings under Rule 403 because a district court is obviously in the best position to do the balancing mandated by Rule 403." *U.S. v. Contorinis*, 692 F.3d 136, 144 (2d Cir. 2012) (cleaned up). Evidence about Bennet's brother, including his political party and which candidates he and Palin endorsed in various elections—when there was no evidence that Bennet knew or thought about these facts at the time of drafting—would have been irrelevant to the issues in the case, encouraged the jury to make a decision based on emotion or politics, and been a time-consuming distraction. Therefore, the district court correctly determined that any "probative value" was "substantially outweighed by a danger of" "unfair

46

Bennet's background" and that the district court could not deviate from the mandate. *See* Palin Br. at 38. The *Palin I* Court did no such thing. As discussed above, the mandate related only to whether Palin's complaint was adequate to survive dismissal. The Court could not and did not rule on the admissibility of evidence at a later trial following discovery. *See supra* at 17, 42-44.

Moreover, the discussion in *Palin I* of these allegations relied on a faulty premise. The *Palin I* Court stated that, to the extent allegations about Bennet's brother supported a case for actual malice at the pleading stage, this was because the information was "relevant to the credibility of Bennet's testimony that he was unaware of facts published on his watch relating to the Loughner shooting," with the supposed "facts published on his watch" being the blog posts Palin claimed were published in *The Atlantic*, i.e. the "*Atlantic* articles" discussed above. *Palin I*, 940 F.3d 814; *see id.* at 814-15 (noting that "Palin's allegations that Bennet had reason to be personally biased against Palin and pro-gun positions in general" "strengthened" "the plausible inference that Bennet was recklessly disregarding the truth when he published the editorial without reacquainting himself with the contrary articles published in *The Atlantic* six years earlier"). But these blog posts were not "published on [Bennet's] watch" or in *The Atlantic* at all. And in any

---

prejudice, confusing the issues, misleading the jury, undue delay, [and/or] wasting time." Fed. R. Evid. 403.

event, because Palin did not avail herself of the opportunity to ask Bennet whether he was aware of the so-called "*Atlantic* articles," the jury was never asked to weigh the credibility of that testimony, removing the theoretical relevance of the evidence about his brother.

The district court properly excluded this evidence on relevance and 403 grounds. Palin sought to introduce, among other things, that Senator Bennet ran for president in 2016 and that Bennet campaigned with his brother in 2010, when two Representatives identified on the Map endorsed Senator Bennet. JA584:18-585:2. However, the Map did not reference Senator Bennet, who was never a member of the House of Representatives, and there was no evidence that the brothers had ever discussed it. *See* JA585:13-24.

Palin's clear purpose in introducing this evidence was to paint Bennet, through his relationship with his brother, as a partisan Democrat. But the *Palin I* Court was clear that "political opposition alone does not constitute actual malice," 940 F.3d at 814. The district court correctly excluded this evidence as irrelevant under Rule 402.

Moreover, even if Palin could somehow establish error in excluding this evidence, she has again not even attempted to show that this exclusion was prejudicial to the outcome of the trial. It was not. The district court permitted Palin to ask questions about Bennet's interest in the issue of gun control and his

48

involvement in moderating an event sponsored by *The Atlantic* on that issue at which Rep. Giffords and her husband spoke. *See* JA710:11-22. Therefore, to the extent Bennet's supposed bias against pro-gun positions was in any way separately relevant, Palin was allowed to develop that theme.

## III. THE JURY'S VERDICT SHOULD BE AFFIRMED

If this Court agrees that, for any or all of the foregoing reasons, the district court's judgment pursuant to Rule 50 should be affirmed, it can stop there. But if this Court finds fault with the Rule 50 ruling, it should nevertheless affirm the jury's verdict in favor of Defendants. *See Jackson v. City of N.Y.*, 606 F. App'x 618, 619-20 (2d Cir. 2015); *Tolbert v. Queens College*, 242 F.3d 58, 77-78 (2d Cir. 2001). None of Palin's challenges to the jury's verdict have merit.

### A. The Voir Dire Process Complied with Precedent and Ensured an Impartial Jury

Palin challenges the voir dire, claiming that the district court "never meaningfully explored potential biases." Palin Br. at 9. While the court did not ask the specific questions Palin requested, it asked a number of targeted voir dire questions to ensure that potential jurors did not harbor biases toward either party or would be unable to decide the case fairly based on the evidence. The court did not make any error in jury selection, much less a significant error requiring a new trial.

Trial courts are "accorded ample discretion in determining how best to conduct the voir dire," *Rosales-Lopez v. U.S.*, 451 U.S. 182, 189 (1981); *id.* at 188

(emphasizing that voir dire enables the court to fulfill its responsibility of empaneling an impartial jury), and "an appellate court will not interfere with the manner in which it has been conducted absent a clear abuse of discretion," *U.S. v. Barton*, 647 F.2d 224, 230 (2d Cir. 1981). This broad discretion extends to "whether to pose a [party's] requested voir dire questions." *U.S. v. Kyles*, 40 F.3d 519, 524 (2d Cir. 1994). A district judge has such broad discretion that this Court noted earlier this year that it had "never reversed a conviction for the failure to ask a particular question of prospective jurors." *U.S. v. Bright*, 2022 U.S. App. LEXIS 386, at *2 (2d Cir. Jan. 6, 2022).

In the argument section of her brief, Palin does not assert that the district court failed in voir dire to inquire about potential bias. Nor could she. The record establishes that the court asked more than sufficient questions about "systematic or pervasive bias." *U.S. v. Lawes*, 292 F.3d 123, 129 (2d Cir. 2002) (suggesting that voir dire may be so insufficient as to require reversal if record as whole shows failure to inquire about bias). The court firmly instructed the venire that, "[j]urors, of course, have all sorts of views, but when they become jurors, they put aside any views they may have and calmly, coldly look at the facts and determine what the truth is in any given case." JA2147:24-2148:2. This warning was, in and of itself, an effective bias screening tool. *U.S. v. Treacy*, 639 F.3d 32, 47 (2d Cir. 2011).

50

Palin's primary complaint about the jury selection process – though she never meaningfully explains why it is significant in light of the thorough voir dire that in fact took place – is that the district court did not ask her proposed questions about "the venire's sources for news . . . through which they were or could be exposed to extra-judicial information about the case." Palin Br. at 9 nn.13, 14; *id.* at 37. There is no rule or precedent that requires the court to ask a party's proposed voir dire questions. The district court elected not to ask questions proposed by *either* party and JA2159:10-12. Instead, it asked simple and pointed questions, probing where appropriate, and it gave warnings sufficient to explore and caution against potential biases or prejudices. JA2159:8-20. Ultimately, three jurors were excused as part of this process. JA2153:19-2154:14; JA2160:22-2163:3; JA2169:13-24. The district court's voir dire was in no way deficient.

## B. The Mid-Deliberation Instruction Was Not Erroneous

There also was no error in the district court's response to the jury's mid-deliberation note. That response is reviewed for abuse of discretion. *U.S. v. Khalupsky*, 5 F.4th 279, 294-95 (2d Cir. 2021), *cert. denied*, 2022 U.S. LEXIS 388 (Jan. 10, 2022).

In response to a mid-deliberation question from the jury, and after consultation with the parties, the court instructed the jury, in relevant part, that:

> an answer given by Mr. Bennet and a reasonable
> inference drawn therefrom is not sufficient in itself to

51

> carry the plaintiff's burden of showing by clear and
> convincing evidence that there was a high probability
> that Mr. Bennet actually doubted the truth of a
> challenged statement prior to publication, but it can
> contribute to the other evidence brought forth by
> plaintiff.

SA151; *see supra* at 15. Despite insisting that this instruction was "fundamental

error," Palin does not meaningfully explain her disagreement with the answer, cite

to any case law contradicting this instruction, or propose any alternative language.

*See* Palin Br. at 52-53. In the fact section, she states that it contradicted the district

court's earlier instructions on circumstantial evidence and actual malice, but she

never explains how this is so, *see id.* at 20-21, and at trial her counsel stated only

that he "want[ed] to make sure that it's not inconsistent" with the earlier

instructions, without elaborating, *see* JA1227:21-1228:3.

The instruction was entirely appropriate. The jury's question concerned an

inference (*i.e.*, circumstantial evidence), not a direct admission of knowledge of

falsity or recklessness. With respect to actual malice, the Supreme Court has made

clear that circumstantial inference, without more, is insufficient to satisfy the clear

and convincing standard of proof, and the district court's instruction reflected this.

*See* JA1227:21-1228:17; *Contemp. Mission*, 842 F.2d at 621-22 ("It is not enough

for the plaintiff merely to assert that the jury might, and legally could, disbelieve

the defendant's denial of legal malice." (cleaned up)); *Sweeney*, 84 N.Y.2d at 793

("Absent some direct evidence that defendants in this case were aware that Mays'

complaint was probably false, they cannot be found to have harbored an intent to avoid the truth.").  Thus, the instruction that "an answer given by Mr. Bennet and a reasonable inference drawn" was insufficient by itself but that it "can contribute to the other evidence brought forth by plaintiff" was a correct statement of the law. Palin has not offered authority to the contrary.

Additionally, Palin contends that the instruction "told jurors to disregard legally sufficient evidence of actual malice, and effectively told them to find in Defendants' favor." Palin Br. at 52.  The mid-deliberation instruction did nothing of the sort.  In fact, the instruction only advised on the law and evidentiary burdens it imposes.  In any event, jury instructions must be read as a whole, and the district court's pre-deliberation instructions, which Palin does not challenge and which jury had in hand throughout deliberations, *see* JA1944; JA1955-1956, clearly and carefully instructed the jury on how to evaluate evidence.  *See Lore v. City of Syracuse*, 670 F.3d 127, 156 (2d Cir. 2012) ("If the instructions, read as a whole, presented the issues to the jury in a fair and evenhanded manner, they do not warrant reversal.").

Palin omits that, after receiving the jury's note, the district court gave the parties multiple opportunities to ask the jurors about the inference at issue, and Palin rejected that offer, "effectively waiv[ing] this argument." SA152; *see* JA1225:10-11.  The district court did not know what evidence was at issue, much

53

less instruct the jury to make a particular finding regarding it. Palin's efforts now to speculate as to what the jurors might have been considering—whether they might have been asking about a direct inference or a conclusion from direct evidence, *see* Palin Br. at 21 & n.25—are nothing more than second-guessing.

### C.     Palin Has Not Identified Any Other Error Requiring Reversal

In her brief, Palin complains about several other rulings at trial, but she has not identified any error that would require reversal of the jury's verdict. As explained above in connection with the Rule 50 judgment, *supra* at 29-35, the district court did not err in excluding any evidence that would require reversal. Palin also argued below that the district court's announcement of the intended Rule 50 decision tainted the jury verdict and on appeal she lists the district court's "announcing its [Rule 50] decision during jury deliberations" in her statement of issues, *see* Palin Br. at 2, and discusses in her statement of facts the possibility that certain jurors learned about the Rule 50 decision during deliberations, *see, e.g.*, *id.* at 23-25. Palin, however, does not actually argue that the announcement of the Rule 50 decision was in error or in any way impacted the deliberations. Therefore, she has waived any challenge to the impact of the Rule 50 decision on the jury verdict. *See Niagara Mohawk Power v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012).

## IV.   DISQUALIFICATION IS NOT WARRANTED

Finally, Palin argues that the district court erred in failing to disqualify itself "before ruling on Appellant's post-trial motions."  *See* Palin Br. at 2; *id.* at 28, 53-57.  As an initial matter, to the extent this Court affirms judgment for Defendants on any of the above grounds, it need not reach this issue.  *See Faulkner v. Nat'l Geographic Enters.*, 409 F.3d 26, 42 & n.10 (2d Cir. 2005).  Regardless, however, Palin presents no ground for this Court to disqualify the district court judge.

A district court's decision not to recuse itself is reviewed for abuse of discretion.  *U.S. v. Wedd*, 993 F.3d 104, 114 (2d Cir. 2021).  Under 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  This requires the Court to consider whether "an objective, disinterested observer, fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal."  *U.S. v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992).  "[I]t is a rare case when a district judge's denial of a motion to recuse is disturbed by an appellate court . . . ."  *In re IBM Corp.*, 45 F.3d 641, 642 (2d Cir. 1995).

Palin fails to demonstrate any ground for an objective observer to doubt the district court's impartiality here, let alone that the court abused its discretion in denying her motion.  Palin lays out the law involving recusal and then a list of complaints, including

the history of this case, the decisions discussed above,
refusal to follow the Mandate, circumstances surrounding
the exit interview of the jurors and district court's
comments to the press *before* informing counsel, [the
making of] statements defending the decision to
announce the Rule 50 ruling during deliberations and the
impact of push notifications[,]

*see* Palin Br. at 55—but she does not actually attempt to explain how any of these

factors, individually or collectively, required recusal, with the possible exception

of the district court's comments concerning its public announcement of the Rule 50

decision. As with many of the other issues discussed above, Palin's failure to

actually argue these points should be deemed a waiver. *See Sioson v. Knights of

Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) (per curiam).

Even considering the merits, the district court did not abuse its discretion in

denying the motion here. Palin cites a number of adverse rulings and case

management decisions, but the law is well-settled that neither present appropriate

grounds for recusal. *Liteky v. U.S.*, 510 U.S. 540, 555-56 (1994) ("judicial rulings

alone almost never constitute a valid basis for a bias or partiality motion"). Under

Section 455, the "alleged prejudice of the trial judge must be extrajudicial, . . . it

must arise by virtue of some factor which creates partiality arising outside of the

events which occur in the trial itself." *In re IBM Corp.*, 618 F.2d 923, 927 (2d Cir.

1980).

The only argument for recusal that Palin develops in any detail are her contentions involving the substance and timing of the Court's comment to the press about possible juror knowledge of its Rule 50 decision. *See* Palin Br. at 55-56. Palin argues that these comments violated the Code of Conduct for United States Judges and that such comments "almost always result in mandatory disqualification under Section 455." *Id.* at 55. Palin is incorrect on both points.

Canon 3A(6) states that a "judge should not make public comment on the *merits* of a matter pending or impending in any court" (emphasis added). It goes on to say that the "prohibition on public comment on the merits does not extend . . . to explanations of court procedures." Here, the district court did not make any comment on the *merits* of any pending matter; rather, it provided an explanation of the procedure it used in issuing the Rule 50 motion.

Moreover, this Court has been clear that "not every media comment made by a judge is necessarily grounds for recusal." *Ligon v. City of N.Y.*, 736 F.3d 118, 126 (2d Cir. 2013). Instead, as with any other disqualification analysis, "context is always critical" and "the relevant question at all times remains whether, under the circumstances taken as a whole, a judge's impartiality may reasonably be called into question." *Id.* Indeed, even a violation of Canon 3A(6) does not necessarily mean disqualification is appropriate. *See U.S. v. Fortier*, 242 F.3d 1224, 1229 (10th Cir. 2001) ("courts construing [Canon 3A(6)] have held that a judge's public

comment does not create a per se appearance of bias"); *see also U.S. v. Sierra Pac. Indus.*, 862 F.3d 1157, 1175 (9th Cir. 2017); *In re Barry*, 946 F.2d 913, 914 (D.C. Cir. 1991).

The cases on which Palin relies are inapposite. Each involves extensive statements to the press about the merits of the cases and/or the parties. *See Ligon*, 736 F.3d at 127; *U.S. v. Microsoft Corp.*, 253 F.3d 34, 107-08, 112 (D.C. Cir. 2001); *In re Boston's Children First*, 244 F.3d 164, 166-67 (1st Cir. 2001); *In re IBM Corp.*, 45 F.3d at 642-43; *U.S. v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993). Here, the district court simply provided an extremely limited explanation of one procedural point.

Because the district court's limited comment regarding procedure did not violate Canon 3A(6) in the first instance, and even if it could somehow be said that it did, the comment does not create an appearance of bias, this argument provides no basis on which disqualification even arguably could be warranted.

58

## **CONCLUSION**

The Times and Bennet respectfully request that the judgment be affirmed.

Dated:  December 8, 2022

BALLARD SPAHR LLP

By:  _s/ Jay Ward Brown_
David L. Axelrod
Jay Ward Brown
Jacquelyn N. Schell
Thomas B. Sullivan
1675 Broadway, 19th Floor
New York, NY 10019
Telephone: (202) 508-1136
axelrodd@ballardspahr.com
brownjay@ballardspahr.com
schellj@ballardspahr.com
sullivant@ballardspahr.com

_Attorneys for Defendants-Appellees_

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS
AND TYPE STYLE REQUIREMENTS**

1.  This brief complies with the type-volume limitation of
    Fed.R.App.P.32(a)(7)(B) because:

    This brief contains 13,997 words, excluding the parts of the brief exempted by
    Fed.R.App.32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5)
    and the type style requirements of Fed.R.App.P32(a)(6) because:

    This brief has been prepared in Proportionally-Space typeface using
    Microsoft Word, in Times New Roman, Font Size 14.

Dated: December 8, 2022