58 F.4th 623
United States Court of Appeals, Second Circuit.

UNITED STATES of America, Appellee,

v.

Christian NIEVES, also known as Sealed

Defendant 1, Defendant-appellant,

Elias Polanco, also known as

Sealed Defendant 2, Defendant.[*]

Docket No. 21-1901-cr
|
August Term, 2022
|
Argued: October 28, 2022
|
Decided: January 26, 2023

**Synopsis**
**Background:** Defendant was convicted in the United States District Court for the Southern District of New York, Jed S. Rakoff, J., of witness retaliation, and he appealed.

**Holdings:** The Court of Appeals, Lynch, Senior Circuit Judge, held that:

[1] defendant preserved for appellate review issue of whether voir dire was adequate;

[2] district court abused its discretion by declining to question potential jurors about their gang-related bias;

[3] manner in which district court conducted voir dire did not sufficiently account for risk of gang-related bias; and

[4] fact that victim was himself gang member did not excuse district court from inquiring into potential jurors' gang-related bias.

Vacated and remanded.

**Procedural Posture(s):** Appellate Review; Jury Selection Challenge or Motion.

**West Headnotes (19)**

**[1]    Jury** ⟜ Summoning and impaneling;  voir dire

Part of guarantee of defendant's right to impartial jury is adequate voir dire to identify unqualified jurors. U.S. Const. Amend. 6.

**[2]    Criminal Law** ⟜ Selection and impaneling

Court of Appeals will not reverse criminal conviction on basis of inadequate voir dire unless district court's ample discretion has been abused. Fed. R. Crim. P. 24.

**[3]    Criminal Law** ⟜ Discretion of Lower Court

District court abuses its discretion when its decision incorporates error of law, rests on clearly erroneous factual finding, or cannot be located within range of permissible decisions.

**[4]    Criminal Law** ⟜ Selection and impaneling

Deferential abuse of discretion standard for reviewing district court's conduct of voir dire applies to both general manner in which voir dire has been conducted, and specific questions that district court elects to ask, or not to ask.

**[5]    Jury** ⟜ Discretion of court

Trial court's discretion in conducting voir dire must be exercised consistent with essential demands of fairness.

**[6]    Jury** ⟜ Bias and Prejudice
**Jury** ⟜ Bias and prejudice

Defense deserves full and fair opportunity to expose bias or prejudice on part of veniremen, and where court finds that such bias or prejudice exists, juror is subject to dismissal for cause.

**[7]** **Jury** 👉 Bias and Prejudice

Finding of potential juror's "actual bias" arises upon either juror's own admission or judge's evaluation of juror's demeanor and credibility following voir dire questioning as to bias.

**[8]** **Jury** 👉 Bias and Prejudice

Finding of potential juror's "implied bias" arises from disclosed fact that establishes kind of relationship between juror and parties or issues in case that mandates juror's excusal for cause.

**[9]** **Jury** 👉 Bias and Prejudice

Finding of "inferable bias" arises from responses from potential juror that permit inference that juror in question would not be able to decide matter objectively.

**[10]** **Jury** 👉 Examination of Juror

There must be sufficient factfinding at voir dire to allow for facts probative of bias to reveal themselves; otherwise, fundamental unfairness arises if voir dire is not adequate to identify unqualified jurors.

**[11]** **Jury** 👉 Examination of Juror

Request from counsel – even all counsel – that particular subject be explored during voir dire does not obligate district court to do so.

**[12]** **Criminal Law** 👉 Summoning and impaneling jury

Defendant in witness retaliation prosecution preserved for appellate review issue of whether voir dire was adequate to permit him to explore potential jurors' gang-related bias, even though defendant did not specifically document presence of gang-related bias in community; parties agreed that venire should be questioned about their feelings on gangs, defense counsel requested gang-related questions, and objected to their omission on grounds that "gangs and the Trinitarios" would be key concepts at trial, and that district court's approach compromised defense counsel's ability to make for-cause challenges. Fed. R. Crim. P. 24, 51.

**[13]** **Criminal Law** 👉 Impaneling jury in general

**Criminal Law** 👉 Remand for Determination or Reconsideration of Particular Matters

**Jury** 👉 Personal opinions and conscientious scruples

District court abused its discretion in witness retaliation prosecution against gang member by declining to question potential jurors about their gang-related bias, thus warranting vacatur of defendant's conviction and remand for new trial; government's theory of case was that defendant had targeted witness specifically because of gang's zero-tolerance policy towards gang members who cooperated with law enforcement, voir dire took place at time when city was beginning to emerge from frenetically-publicized reported spike in violent crime that local and federal law enforcement had broadly attributed to gang violence, and both defense and government requested questions specifically concerning gangs in their proposed voir dire submissions. U.S. Const. Amend. 6; Fed. R. Crim. P. 24.

**[14]** **Jury** 👉 Personal opinions and conscientious scruples

Manner in which district court conducted voir dire in witness retaliation prosecution against gang members did not sufficiently account for risk of gang-related bias; government's central theory of case was that defendant's assault on witness was motivated by gang rules, and its evidence in support of that theory consisted of gang-member testimony and gang-related expert testimony, but court did not ask about gang-related bias, but instead asked only generic questions about jurors' county or borough of residence, occupation, and whether or not they had significant other and if so, significant other's occupation. Fed. R. Crim. P. 24.

**[15]**   **Jury** 🔑 Examination of Juror

     **Jury** 🔑 Discretion of court

At voir dire, district court must permit at least some questioning – with nearly limitless discretion as to what that questioning may look like – with respect to any material issue that may arise, actually or potentially, in trial. Fed. R. Crim. P. 24.

**[16]**   **Jury** 🔑 Formation and expression of opinion

     **Jury** 🔑 Personal opinions and conscientious scruples

District court must provide some opportunity for prospective jurors to be meaningfully screened for biases relevant to particular defendant or charges against that defendant. Fed. R. Crim. P. 24.

**[17]**   **Criminal Law** 🔑 Impaneling jury in general

District court's decision not to ask certain questions probative of bias will not be grounds for reversal so long as voir dire otherwise covers subjects that may arise in case to ensure that jurors will be impartial. Fed. R. Crim. P. 24.

**[18]**   **Jury** 🔑 Personal opinions and conscientious scruples

Fact that victim in gang members' alleged witness retaliation scheme was himself gang member did not excuse district court from inquiring into potential jurors' gang-related bias, despite government's contention that any biased juror's perception of victim's credibility would suffer as much as that juror's perception of defendant; gang membership might affect perceptions of credibility, or it might predispose jury to believe that gang member charged with violent crime was dangerous person who deserved to be locked up notwithstanding doubts about whether government has actually proved each element of charged crime beyond reasonable doubt, and there was no reason to believe that those biases would cancel each other out.

**[19]**   **Jury** 🔑 Examination of Juror

It is within judge's discretion to decide whether or not to ask questions at voir dire that elicit jurors' general attitudes about political or social questions, permitting counsel to speculate about jurors' reactions to evidence in case when allocating their peremptory challenges, but where attitude in question is bias or predisposition for or against one side or the other, and particularly where key evidence targets subject of that bias or predisposition, it is judge's responsibility to make some inquiry. Fed. R. Crim. P. 24.

**\*626** Appeal from the United States District Court for the Southern District of New York (Rakoff, *J.*)

**Attorneys and Law Firms**

Jun Xiang, Assistant United States Attorney (Allison Nichols, Karl Metzner, Assistant United States Attorneys, on the brief), for Damian Williams, United States Attorney for the Southern District of New York, New York, NY, for Appellee.

Edward S. Zas, Federal Defenders of New York, Inc., Appeals Bureau, New York, NY, for Defendant-Appellant.

Before: Lynch, Lee, and Robinson, Circuit Judges.

**Opinion**

Gerard E. Lynch, Circuit Judge:

**\*\*1** "[W]e have never reversed a conviction for the failure to ask a particular question of prospective jurors." *United States v. Bright*, No. 20-3792, 2022 WL 53621, at \*1 (2d Cir. Jan. 6, 2022) (summary order). That is no great surprise: district judges are afforded broad discretion in conducting voir dire. That discretion, however, is not boundless.

Christian Nieves ("Nieves") challenges his conviction, by jury trial, on one count of witness retaliation. The essence of his appeal is that the district court's (Jed S. Rakoff, *J.*) abbreviated voir dire left him, and the district court, unable

to meaningfully screen prospective jurors for bias against gang members, rendering Nieves's trial fundamentally unfair. While we disagree with Nieves's more ambitious arguments on appeal that various individual district court decisions in connection with voir dire were, on their own, per se reversible – including his contention that the district court was required specifically to ask prospective jurors about gang-related bias – we agree that under these circumstances, the district court abused its discretion by failing to take any of several possible steps that could have effectively screened prospective jurors for such bias, or to take other steps to counter any bias that may in fact have existed among the venire. We therefore VACATE Nieves's conviction and REMAND to the district court for a new trial.

## BACKGROUND

### I. The Government's Case against Nieves

#### A. The Theory of the Case

In May 2019, Nieves – who also goes by the name Eric Rosario and the moniker "White Boy" – was indicted on four counts: witness retaliation in violation of **\*627** 18 U.S.C. § 1513(b)(1) (Count One); conspiring with codefendant Elias Polanco to commit witness retaliation in violation of 18 U.S.C. § 1513(f) (Count Two); witness tampering in violation of 18 U.S.C. § 1512(b)(3) (Count Three); and, again with Polanco, conspiring to commit witness tampering in violation of 18 U.S.C. § 1512(k) (Count Four).

Those charges stemmed from a February 2019 clash between Nieves and Miguel Carela. Both men were members of the Trinitarios, a "violent gang" of Dominican-American origin. App'x 126. The government's theory was that Carela's decision to testify for the government in a separate 2018 criminal trial ran afoul of the group's strict "code of silence," which includes a pledge not to cooperate with law enforcement. App'x 630. Carela, again taking the stand in this case, testified that after his 2018 testimony and subsequent release from prison, he confided in two Trinitario peers that he "didn't want to be part of that [Trinitarios] life anymore." App'x 255.

According to the government, Carela's perceived disloyalty made him a marked man. On February 5, 2019, after encountering Carela on a Bronx sidewalk, Nieves pursued and physically confronted Carela, slashing Carela's face with

a razor blade and running off with his wallet and sneakers. Although the parties disputed some of these details at trial, including whether there was actually a slashing or whether this was merely a fistfight, the basic fact that the two men fought was not in dispute.

**\*\*2** Rather, the trial centered on *why* they fought. While Nieves characterized the incident as an unremarkable "Bronx street fight," App'x 1004, the government construed Nieves's motivations as both retaliatory and proactive – i.e., as witness retaliation (for Carela's past cooperation) and witness tampering (to discourage future cooperation). In support of that theory, the government elicited testimony from Carela that Nieves told him in the midst of the fight that "[t]his is happening to you for being a snitch." App'x 265-66. According to Carela, he received phone calls the next day from codefendant Polanco warning Carela to "take my name out of your mouth" and threatening to "come over to where you are"; at one point, Nieves joined the call and told Carela that "[i]t was a good thing that that had happened to [Carela], for being a snitch." App'x 284, 288-90.

#### B. The Evidence at Trial

Trial began on April 14, 2021. The government's case-in-chief centered largely on the above testimony from Carela, along with general insight into the Trinitarios from expert witness Detective Paul Jeselson. Jeselson walked the jury through the Trinitarios' written constitution, which lays out the group's "code of silence" and provides that "traitor[s]" who flout that rule will be "severely punished." App'x 630-32. Jeselson also discussed his general experience investigating "hits ... put out" by the Trinitarios, as well as "other violence," including "kidnappings, robberies, [and] shootings" by members of the group. App'x 626. This dovetailed with Carela's testimony concerning his direct participation in Trinitario missions that involved shootings, assaults, murder, and other crimes. Those themes resurfaced at closing, where the government contended that Carela, himself a "violent gang member," App'x 982, had been targeted by the defendants because he was a "snitch" – as "corroborated" by Jeselson's testimony regarding the "nature and organization and rules of the Trinitarios gang." App'x 986-90.

For his part, Nieves's defense consisted of brief testimony from two witnesses: a probation officer who spoke about Carela's **\*628** post-incarceration association with Trinitarios members and continued cooperation with law enforcement,

and a detective who had investigated Nieves's assault and could not recall Carela reporting any other assailants or subsequent threats. In closing, Nieves's counsel argued that Carela had lied about Nieves calling him a "rat and a snitch," and in so doing had "transformed a Bronx street fight into a federal case." App'x 1004-05.

### *C. Verdict and Sentence*

Only two counts reached the jury. Prior to trial, the government abandoned Count Two (conspiracy to commit witness retaliation). After the government rested, the district court entered a judgment of acquittal on Count Three (witness tampering). Ultimately, the jury found Nieves guilty on Count One (witness retaliation), but acquitted both Nieves and Polanco on Count Four (conspiracy to commit witness tampering).

In July 2021, Nieves was sentenced to 36 months' imprisonment to be followed by three years' supervised release.

### **II. Jury Selection**

The jury selection process at the heart of this appeal took place in the opening moments of trial proceedings.

### *A. The Parties' Proposed Voir Dire Questions*

Prior to trial, both sides proposed gang-related voir dire questions. The government suggested asking whether prospective jurors or their families had ever "been involved ... with a case involving a gang or other racketeering activity," and whether the fact that this case "involves racketeering activity, specifically, a gang" would affect their judgment. App'x 33. The defendants recommended asking, among other similar inquiries, whether jurors had any "particular interest" in "[s]treet gangs" or "street violence," or any "personal experiences or feelings arising from any acts of violence ... that would affect your impartiality in a case involving alleged gang violence." App'x 50, 52. The defendants also requested that the district court query whether any prospective jurors "ha[d] any negative feelings, stereotypes, or opinions about Latino Americans," and whether they believed that "Latino American immigrants are more likely to commit crimes than immigrants of [other] backgrounds," along with related questions about immigration. App'x 51.

**\*\*3** The parties also suggested that the district court question jurors about a suite of other topics, including jurors' feelings about law enforcement, their educational and employment backgrounds, what they like to read and watch, their families, and their hobbies. More generally, the defendants urged the district court to individually question each prospective juror in a manner that "explores specific concerns related to the circumstances of this case, and potential biases." App'x 43. A perfunctory individualized voir dire, they insisted, would be "insufficient to ensure the defendants an impartial jury and a fair trial." *Id.*

The district court instead opted for a far swifter approach than either side had advocated.

### *B. Voir Dire*

At the outset, the basic format of voir dire was nothing out of the ordinary. The court seated 12 initial prospective jurors to be questioned as a group and directed the balance of the pool to "listen carefully to my questions, because some of those people may be excused and then you may be called up in their place and I don't want to have to repeat all of my questions." App'x 59-60. As prospective jurors were dismissed, **\*629** the court confirmed that their replacements had heard its initial questions and asked whether those questions raised "[a]ny other issues you need to respond to." *E.g.*, App'x 68.

The court then presented a high-level overview of the charges, without referencing gangs:

> The two defendants are named Christian Nieves and Elias Polanco. They have been charged with conspiring to threaten a government witness, named Miguel [Carela]. And also, Mr. Nieves has been charged with assaulting Mr. [Carela] in retaliation for Mr. [Carela's] testimony at a prior trial.

App'x 60. It next explained several foundational trial concepts, including the role of a criminal jury, the presumption of innocence, and the reasonable doubt standard, and asked whether any of the first 12 prospective jurors had

doubts about their ability to apply those basic principles. None answered. The court continued: "Every once in a while there is a case – not usually this kind of case – involving some other kinds of crimes that people have such strong feeling[s] about that they don't think they could be fair." App'x 60-61. Having explained "a little bit about what this case is about," the court then asked whether any jurors had any doubts about their ability to be fair. App'x 61. Again, none answered.

Finally, the court asked whether prospective jurors or their loved ones had any connection to the defendants, lawyers, or witnesses who would feature in the trial, any connection to various law enforcement agencies, any eyesight or language impediments, any prior criminal charges, or any past experience as a party to a civil lawsuit or as a juror in a criminal trial. When prospective jurors raised their hands to answer in the affirmative, the court briefly followed up with additional queries. That was the extent of the court's generalized questioning.

The court's three- or four-question individualized voir dire was similarly brisk. It solicited each prospective juror's (1) "county or borough" of residence; (2) occupation; (3) "whether or not you have a significant other"; and (4) if so, the significant other's occupation. App'x 69. At a few points, the court asked follow-up questions concerning specific law firms where jurors or their significant others worked, the nature of a prospective juror's company, and a college student's major. That was the extent of the court's individualized questioning.

It was at this point – after the court announced to the venire that counsel would now begin peremptory challenges – that defense counsel first objected. At a sidebar, Polanco's counsel urged the district court to "do some further inquiry of these jurors" in line with the parties' proposed questions, arguing that the questioning thus far was not "enough ... to make any cause challenges." App'x 72. The court rebuffed the request: "after careful study," it had "rejected" the suggested questions as either "inappropriate or otherwise not useful." App'x 73. It assured counsel that the "objection is preserved for appeal." *Id.*

 **\*\*4** When Nieves's counsel specifically broached the topic of "gangs and the Trinitarios" as a voir dire subject, the court responded that it had "thought about that question, but I'm sorry, I'm not giving that question." App'x 73. Nieves's counsel insisted that the questioning thus far was not "sufficient to allow us to meaningfully exercise any

peremptory challenges." *Id.* The court responded that it had a "long standing practice of not asking what might be called attitudinal questions," explaining that "I think that is an invasion of privacy and I also think it is counterproductive and leads to colloquies."*Id.* That ended the discussion.

 **\*630** The parties then proceeded to exercise their peremptory challenges based on the information that had surfaced to that point. Throughout that process, the court also dismissed several more prospective jurors for a range of reasons, including language difficulties, personal ties to law enforcement or to incarcerated relatives, familiarity with a witness, recent service as a government witness, and recent criminal charges. Upon seating new prospective jurors at this stage, the district court asked if they had any responses to its general questions and its four individualized questions. In short order, a panel of twelve jurors had been finalized.

There was one last snag. One prospective alternate juror requested to be excused "[d]ue to the nature of the charges." App'x 88. At a sidebar, he explained: "I just feel uncomfortable. My own biases. ... I don't know if they might be gang members or .... I don't feel comfortable being involved in such a case." *Id.* The court granted his request to be excused, but did not inquire if any other prospective jurors had similar concerns. It would later explain that "part of my concern was that jurors not feel any sense, during this trial, of intimidation or potential fear or anything like that. It's another reason why I didn't put the question that defense counsel had asked for about gangs." App'x 217.

After excusing the juror who had expressed concerns about gangs, the court separately dismissed three other prospective alternates based, respectively, on religious concerns, professional ties to the U.S. Attorney's Office, and personal ties to incarcerated relatives. Shortly thereafter, twelve jurors and three alternates were empaneled.

*C. Nieves's Mistrial Motion*

After the jury was sworn but prior to opening statements, Nieves moved for a mistrial, arguing that voir dire had been inadequate for several reasons, including: (1) that prospective jurors had been masked, as required under the court's COVID-19 protocols at the time, rendering counsel unable to assess their demeanor; (2) that counsel had not had an opportunity to object to the court dismissing jurors for cause because "things were moving extremely quickly"; and

(3) that thanks to the district court's scant questioning, defense counsel had heard many jurors say "maybe five or ten words" at most. App'x 117-18.

The district court quickly disposed of all three arguments. First, as to masks, it remarked that a challenge based on a juror's (hypothetically maskless) appearance "would have been overruled by increasingly clear precedent as to how not only irrelevant it is, but how it is just a cover for discrimination." App'x 116-17. Next, as to counsel's purported lack of opportunity to object to the court's dismissals for cause, it explained to counsel: "[Y]ou were right there... [a]nd you sat there silently." App'x 117.

Finally, as to the brevity of its questioning, the district court said: "Show me where in the constitution or the laws of the United States that says you're entitled to 30 words as opposed to 10." App'x 118. It continued: "[T]his Court's view is that it needs to question the jurors sufficiently to make sure that any who need to be excused for cause are excused," and that all its questions "are directed towards that." App'x 120. By contrast, its questions were intentionally *not* directed towards "go[ing] beyond that and provid[ing] more than very basic details about the persons who are being questioned." *Id.*

 **\*\*5** The court volunteered several justifications for that approach. Questions asking for an "indication of the jurors' attitudes" are not only an "invasion of privacy," it **\*631** explained, but they also pose a "source of potential confusion" and "most important[ly]" invite follow-up questions that "inevitably get the Court into a description of the case in some way or another, which would be totally improper." App'x 120. Thus, the court explained, "I never give those questions." *Id.* Defense counsel clarified that he was not advocating "attitudinal questions," but rather "even a few questions that would elicit something about the jurors' background," such as "their education" or the "number of children they have." App'x 121. The court again brushed the notion aside, explaining that these sorts of questions – "Do you read the New York Times? What is your favorite newspaper?" – are not only a "clear invasion of privacy" but also "an exercise of stereotyping of people." *Id.*

With respect to the specific gang-related questions that counsel had requested, the district court further opined:

> [Y]ou can't describe gangs in the abstract. There are gangs and gangs.

> In order to ascertain whether a juror had a meaningfully improper view or is biased because the case involved gangs, which is the Court's job when it is looking to excuse someone for cause, the Court would ... inevitably have to get into the description of the facts of the particular case. You could make it a little abstract but it would still be that and that would be totally improper. For all those reasons, but especially the latter, I think those are not an appropriate role for the Court.

App'x 120-21.

Defense counsel made one last-ditch appeal for questions that would provide some "basis for exercising ... peremptory challenges." App'x 122. The court replied: "Duly noted; denied." *Id.* Trial then began.

## DISCUSSION

 **[1]**  The Supreme Court has recognized that the voir dire process "plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (plurality opinion). That is because an inadequate voir dire compromises the trial court's "responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence." *Id.* Therefore, notwithstanding the Constitution's literal silence on the matter, it is uncontroversial that "part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

Still, "[d]espite its importance, the adequacy of *voir dire* is not easily subject to appellate review." *Rosales-Lopez*, 451 U.S. at 188, 101 S.Ct. 1629. That is because the trial court, "not unlike ... jurors later on in the trial," is best positioned to "reach conclusions as to impartiality and credibility by relying on [its] own evaluations of demeanor evidence and of responses to questions." *Id.* To that end, district judges have long been "accorded ample discretion in determining how best to conduct ... *voir dire*" pursuant to Rule 24 of the Federal

Rules of Criminal Procedure. *United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007), quoting *Rosales-Lopez*, 451 U.S. at 189, 101 S.Ct. 1629.

Rule 24, in turn, sets forth broad, discretionary parameters. It permits the district court to examine prospective jurors directly or to allow counsel to do so. Fed. R. Crim. P. 24(a)(1). Where the district court itself examines the prospective jurors, it requires that counsel be permitted either to "ask," or "submit" for the court to ask, **\*632** "further questions that the court considers proper." Fed. R. Crim. P. 24(a)(2).

### I. Standard of Review

**[2]** **[3]** **[4]** "Accordingly, we will not reverse unless we determine" that the district court's ample discretion "has been abused." *United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002). A district court abuses its discretion when its decision incorporates an "error of law," rests on a "clearly erroneous factual finding," or "cannot be located within the range of permissible decisions." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001). [1] In this context, that deferential standard applies to both the general "manner in which [voir dire] has been conducted," *United States v. Salameh*, 152 F.3d 88, 121 (2d Cir. 1998), and the specific questions a district court elects to ask, or not to ask. *See United States v. Kyles*, 40 F.3d 519, 524 (2d Cir. 1994); *see also United States v. Tsarnaev*, ––– U.S. ––––, 142 S. Ct. 1024, 1034, 212 L.Ed.2d 140 (2022) ("A trial court's broad discretion in this area includes deciding what questions to ask prospective jurors.").

### II. The Court's Duty to Screen for Bias

**\*\*6** **[5]** **[6]** But that discretion is not boundless. "The standard set by the [Supreme] Court, which remains the standard today, is that the trial court's discretion must be exercised consistent with 'the essential demands of fairness.'" *United States v. Barnes*, 604 F.2d 121, 137-38 (2d Cir. 1979) (footnote omitted), quoting *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054 (1931); *see also United States v. Bright*, No. 20-3792, 2022 WL 53621, at \*1 (2d Cir. Jan. 6, 2022) (summary order) (reiterating this standard). Even in that forgiving, deferential light, "the defense deserves 'a full and fair opportunity to expose bias or prejudice on the part of veniremen.'" *United States v. Colombo*, 869 F.2d 149, 151 (2d Cir. 1989), quoting *Barnes*, 604 F.2d at 139. Where the court finds that such bias or prejudice exists, a juror is subject to dismissal for cause. *United States v. Torres*, 128 F.3d 38, 43, 46-47 (2d Cir. 1997)

(noting that dismissal is mandatory in some circumstances and discretionary in others).

For-cause challenges are generally based on one of three species of bias: (1) actual bias, or "bias in fact"; (2) implied bias, or bias that is "presumed as a matter of law" where a typical person in the juror's position would be biased, irrespective of whether actual bias exists; and (3) inferable bias, which arises "when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." *United States v. Greer*, 285 F.3d 158, 171-72 (2d Cir. 2002) (internal quotation marks omitted).

**[7]** **[8]** **[9]** Crucially, all three forms of bias must be "grounded in facts developed at voir dire." *Torres*, 128 F.3d at 47. A finding of actual bias arises "upon either the juror's own admission or the judge's evaluation of the juror's demeanor and credibility following voir dire questioning as to bias." *Id.* A finding of implied bias arises from a "disclosed fact" that "establish[es] the kind of relationship between the juror and the parties or issues in the case that mandates the juror's excusal for cause." **\*633** *Id.* Finally, a finding of inferable bias arises from "responses from the juror that permit an inference that the juror in question would not be able to decide the matter objectively." *Id.*

**[10]** To that end, even as voir dire challenges have historically not fared well in this Court, we have often reiterated the basic principle that "[t]here must be sufficient information elicited on *voir dire* to permit a defendant to intelligently exercise" both for-cause and peremptory challenges. *Colombo*, 869 F.2d at 151, quoting *Barnes*, 604 F.2d at 142. In other words, there must be sufficient factfinding at voir dire to allow for facts probative of any of these forms of bias to reveal themselves. Otherwise, "[f]undamental unfairness arises if voir dire is not 'adequate ... to identify unqualified jurors.'" *United States v. Whitten*, 610 F.3d 168, 185 (2d Cir. 2010) (second alteration in original), quoting *Morgan*, 504 U.S. at 729, 112 S.Ct. 2222.

In *United States v. Lawes*, we sketched out three basic archetypes of voir dire that falls short in this regard:

> (i) a voir dire so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style;

(ii) a failure to inquire about, or warn against, a systematic or pervasive bias, including one that may be short-lived but existent at the time of trial, in the community that would have been cured by asking a question posed by a party; or

 **\*\*7** (iii) a record viewed in its entirety suggesting a substantial possibility that a jury misunderstood its duty to weigh certain evidence fairly that would have been clarified by asking a requested voir dire question.

292 F.3d at 129 (internal citations omitted). Conspicuously, however, we have never overturned a conviction based on a finding that a particular voir dire actually fell within any of the *Lawes* categories.

### III. Analysis

At the heart of this appeal is Nieves's contention that his is the rare case that does just that. He argues that the government's case against him – which revolved around his Trinitarios affiliation – implicated the second *Lawes* category: a "systematic or pervasive bias ... in the community" against people associated with gangs. *Id.*

We agree. We hold that (1) prejudice against people associated with gangs represented a pervasive bias relevant to a key dynamic likely to arise at trial, and (2) the district court neglected to "inquire about, or warn against," that bias. *Id.* We address each point in turn.

#### A. Systemic or Pervasive Bias

In this case, voir dire took place on April 14, 2021, in Manhattan. At that time, New York City was only beginning to emerge from a frenetically-publicized reported spike in violent crime that local[2] and federal[3] law enforcement had broadly attributed **\*634** to gang violence, including in large part to violence committed by members of traditionally Latin-American gangs like MS-13[4] and the Trinitarios.[5] To be clear, the issue here is not whether the district court should have inquired into this news coverage during voir dire. Rather, we cite this coverage to illustrate the broader risk of prejudice against gang members (and especially members of Latin-American gangs) among prospective jurors who may have been affected by a reported surge in violence broadly attributed to the precise kinds of organizations – and, notably, the precise gang – at the center of the government's case against Nieves. *See Staehr v. Hartford Fin. Servs. Grp., Inc.,*

547 F.3d 406, 425 (2d Cir. 2008) (recognizing that courts may take judicial notice of the fact that news articles and their contents exist, without respect to the truth of those contents).

 **\*\*8** Of course, we have never required district judges to sua sponte curate an exhaustive catalog of every bias that a prospective juror could conceivably track into court. And our holding today does not suggest otherwise. That is because – even setting aside the government's concession at oral argument that it would be reasonable to expect a court to be aware of this context without the parties specifically presenting it – it is undisputed that the district court was in fact well aware of the risk of gang-related bias in this case.

For one thing, it was told of the risk. As a preliminary matter, the district court had long been on notice that the government's theory of the case was that Nieves **\*635** and Polanco had targeted Carela specifically because of the Trinitarios' " 'zero-tolerance' policy towards members of their gang who cooperate with law enforcement." Gov't Opp'n Br. 1, SDNY Dkt. No. 50. It bears reiterating that Nieves was not charged with simple assault, and that it was undisputed that the run-in with Carela in fact occurred. Instead, Nieves was charged specifically with witness retaliation and intimidation, both of which hinge on *why* the fight (and surrounding events) occurred. As the district court knew well, the government's answer to that question was simple: gang affiliation. *See id.* at 1-4.

 **[11]** Accordingly, prior to trial, both the defense and the government requested questions specifically concerning gangs in their proposed voir dire submissions. Two of the eleven questions in the portion of the government's proposed voir dire entitled "Ability to Render a Fair and Impartial Verdict" asked, respectively, about any past involvement with "case[s] involving a gang" and whether the fact that this case involved "a gang" would "affect your ability to be fair and impartial in this case." App'x 32-33. Twice as many of the defendants' proposed voir dire questions explicitly referenced gangs, including whether prospective jurors had "any personal experiences or feelings arising from any acts of violence that might impact the way you think and feel about this case, or that would affect your impartiality in a case involving alleged gang violence." App'x 52. While a request from counsel – "even all counsel" – that a particular subject be explored during voir dire does not obligate the district court to do so, *Lawes,* 292 F.3d at 128, a court can hardly be considered ignorant of a risk that both sides have presented as worthy of its attention.

Moreover, the district court was reminded of that risk by defense counsel's repeated objections prior to trial. And its on-the-record responses are telling. At the outset, it explained that the decision not to ask about gangs was neither an oversight nor an unconsidered rejection: "I thought about that question, but I'm sorry, I'm not giving that question." App'x 73.

Its subsequent elaborations make clear that it was perfectly aware how fraught the topic of gangs could be for prospective jurors. It recognized, for example, that jurors might feel "intimidation or potential fear" based on the fact that the case involved gangs and gang members. App'x 217. And it not only noted the possibility that a juror could harbor "a meaningfully improper view" or indeed "bias[ ] because the case involved gangs," but it acknowledged that it "is the Court's job when it is looking to excuse someone for cause" during voir dire to "ascertain" whether that is in fact the case for any particular juror. App'x 120-21. The court's rationale for how it approached that job was *not* to discount the risk of bias against gang members, but rather to insist that "you can't describe gangs in the abstract" and that it would be "totally improper" to "get into the description of the facts of the particular case." *Id.*

 **\*\*9** Importantly, then, no one – not the district court, not the government, and certainly not Nieves – has disputed that the prospect of bias against gang members was sufficiently "pervasive" in the community at the time of trial to implicate the second *Lawes* category. *See* 292 F.3d at 129. The government itself proposed questions to ward off that risk, and on appeal does not retreat from its stance below that such questions would have been prudent. At best, it now argues that Nieves "did not make a record below" of that risk, and therefore that the district court's approach should be reviewed for plain error. Appellee's Br. 21.

 **\*636** **[12]** But, to start, that argument overstates Nieves's obligations under Rule 51 of the Federal Rules of Criminal Procedure; the defendants preserved the issue for appellate review by requesting gang-related questions and objecting to their omission on the grounds that "gangs and the Trinitarios" would be key concepts at trial, and that the district court's approach compromised defense counsel's ability to make for-cause challenges. App'x 72-73; *see Holguin-Hernandez v. United States*, —— U.S. ——, 140 S. Ct. 762, 764, 206 L.Ed.2d 95 (2020) ("[A] party may preserve a claim of error by informing the court ... of [1] the action the party wishes

the court to take, or [2] the party's objection to the court's action and the grounds for that objection.") (second alteration in original) (quoting Fed. R. Crim. P. 51(b)); *see also United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002) ("We presume that the objection of a co-defendant is an objection for all defendants, and it is sufficient to preserve the issue for appeal.").

And more fundamentally, although it is true that Nieves did not specifically document below the presence of gang-related bias in the community, there was simply no need to. The parties already agreed that the venire should be questioned about their feelings on gangs. The district court, in turn, quickly made clear that it understood the risks posed by possible juror reactions to gangs – and that its decision not to mention gangs during voir dire was attributable neither to ignorance of those risks in general, nor to a factual finding that the risks did not exist in this case, but rather to other justifications that we discuss and reject below.

The absence of dissent as to the prospect of bias against gang members is entirely unsurprising. In our view, it would have been obvious to anyone living in the New York City area at the time that there was a serious risk that jurors tasked with impassively assessing the credibility of the anticipated testimony from Carela and Detective Jeselson concerning the Trinitarios, and impartially applying that testimony to defendants associated with that organization, would have some difficulty maintaining an open mind while doing so. It would have been obvious that prospective jurors might be predisposed to condemn Nieves by association because the specific thing he was associated with had long (and particularly in the months preceding trial) been the persistent target of an onslaught of local and national media reports reciting the violent practices of groups like the Trinitarios – much of it stimulated by pronouncements from members of the very executive branch conducting Nieves's prosecution.

In short, as other Circuits have acknowledged in a variety of contexts, it would have been obvious here that there was a significant "possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict." *United States v. Irvin*, 87 F.3d 860, 865-66 (7th Cir. 1996) (adding that "[g]uilt by association is a genuine concern whenever gang evidence is admitted," and concluding that the district court had erred by admitting certain gang-affiliation evidence); *see United States v. Easter*, 66 F.3d 1018, 1021 (9th Cir. 1995) (affirming a conviction

where the district court "took several steps to minimize possible prejudice" including "prob[ing] potential jurors, during voir dire, on the issue of bias due to gang affiliation" and "dismiss[ing] three potential jurors who indicated that such evidence might influence their deliberations"); *United States v. Smith*, 919 F.3d 825, 831, 834-35 (4th Cir. 2019) (affirming the denial of a mistrial where the district court made "appropriate inquiries into juror bias" after **\*637** members of the jury had expressed mid-trial anxiety in response to evidence of a gang's "violent nature").

**\*\*10 [13]** Accordingly, we hold that under the circumstances presented in this case, Nieves's alleged gang association was a "material issue" likely – indeed, certain – to arise at trial as the cornerstone of the government's theory of motive, and that there was a significant risk that potential "strong feelings" concerning gangs would "skew deliberations in fact." *Barnes*, 604 F.2d at 137-39 (internal quotation marks omitted). Therefore, because the risk of juror prejudice arising from bias against gang members was both significant and apparent to the district court, it was outside of the court's discretion to altogether decline to protect against that risk.

### B. The District Court's Failure to Adequately Screen for Bias

**[14]** Having established that much, we must next decide whether the manner in which the district court conducted voir dire sufficiently accounted for that risk. We hold that it did not.

**[15]** We start with what a district court is required to do. A district court must "permit at least *some* questioning" – with nearly limitless discretion as to what that questioning may look like – "with respect to any material issue that may arise, actually or potentially, in the trial." *Barnes*, 604 F.2d at 137 (emphasis added).

Our decisions illustrate the range of options available to the district court. In these decisions, as is often the case in voir dire appeals, the defendants have targeted specific choices made by the district court during voir dire, arguing that those choices failed to protect against a specific risk of bias. In affirming, we have typically relied upon the fact that each district court accounted for that risk in some *other* permissible way.

For example, in *United States v. Treacy*, which also concerned Judge Rakoff's voir dire practices, we held that his "categorical" policy never to use written questionnaires during voir dire was "well within his bailiwick as a trial judge so long as he conducts adequate voir dire by some other means." 639 F.3d 32, 47 (2d Cir. 2011). We concluded that the judge had sufficiently accounted for concerns about jurors' "potential prejudice against people associated with Wall Street" by asking (1) whether jurors "could be fair and impartial in a securities or stock fraud case involving a former [executive]"; (2) whether they or their loved ones "had ever received any stock options"; (3) whether they or their loved ones "owned stock in or were associated with" the defendant executive's company; and (4) whether any prospective jurors "had been exposed to any pretrial publicity about the case." *Id.* at 36-37. Thus, we concluded, even after eschewing a written questionnaire containing inquiries that "pertained specifically to the jurors' experiences with and views of the financial sector," the district court had permissibly found another way to screen for the relevant bias. *Id.* at 36.

In *United States v. Rahman*, we affirmed a variety of terrorism-related convictions against primarily Muslim and Arab defendants accused, among other things, of conspiring to bomb New York City landmarks. 189 F.3d 88, 104 (2d Cir. 1999). On appeal, we rejected the defendants' argument that the district court's voir dire had not accounted for a range of potential biases among the venire; we noted that the district court had asked not just whether each defendant's religion or ethnicity would compromise jurors' impartiality, but also "more subtle, detailed questions" about jurors' "personal experiences" **\*638** such as "whether they or their loved ones regularly use the Holland and Lincoln Tunnels and the George Washington Bridge." *Id.* at 121.

Three of our recent summary orders have conformed to that same template. In *United States v. Miller*, we acknowledged that it might have been "helpful" to a defendant on trial for visa fraud for the district court to have inquired during voir dire about jurors' occupations, relationships to law enforcement personnel, and "views on immigration or visa fraud generally." 752 F. App'x 51, 52-54 (2d Cir. 2018) (summary order). Nonetheless, we held that the decision not to ask those questions was permissible because the district court had instead screened for relevant biases in other ways, including by: (1) explaining to the venire that the defendant was "charged with fraudulently obtaining a non-immigrant visa that he then used to enter the United States from Jamaica"; (2) posing several questions on that

subject, including questions about jurors' "experience with the visa process [and] relationships with law enforcement and immigration authorities"; and (3) asking whether the nature of the case, which the court had explained in some detail, "would affect [jurors'] ability to impartially assess the evidence." *Id.* at 53-54.

 **\*\*11**  Similarly, in *United States v. Diaz*, we rejected an appeal centered on the district court's decision not to ask a "proffered voir dire question concerning implicit racial bias," emphasizing that the district court "*did* question the potential jurors on the issue of racial prejudice" in other ways, including by warning prospective jurors that "it would be improper for any of you to consider any personal feelings you may have about a defendant's race, religion, national origin, sex, or age" and then immediately asking whether any of the venire would "have any difficulty putting aside any feelings, positive or negative, about the defendant ... based on these considerations." 854 F. App'x 386, 388-89 (2d Cir. 2021) (summary order) (emphasis in original) (internal quotation marks omitted).

Most recently, in *United States v. Bright*, we rejected a defendant's argument that the district court had impermissibly declined to inquire about jurors' "possible prejudices against people who pursue nonconventional sexual practices and fetishes, including age-based role play."No. 20-3792, 2022 WL 53621, at \*1 (2d Cir. Jan. 6, 2022) (summary order). Again, we underscored that "even assuming arguendo that the district court was required to question jurors about the potential biases that [the defendant] identifies, the record reflects that the court did, in fact, do so" in other ways, including by "describ[ing] the non-conventional sexual practice that [defendant] was concerned about – 'age-based role play' – nearly verbatim from his definition of the term," and inquiring whether "evidence involving age play" would prevent jurors from being fair and impartial. *Id.*

 **[16]**   **[17]**   Together, these cases animate the unremarkable but critical proposition that the district court must provide *some* opportunity for prospective jurors to be meaningfully screened for biases relevant to a particular defendant or the charges against that defendant. Or, as the *Rahman* panel put it, a district court's decision not to ask certain questions probative of bias "will not be grounds for reversal" so long as voir dire otherwise " 'covers the subjects' that may arise in the case to ensure that jurors will be impartial." 189 F.3d at 121 (alterations omitted), quoting *Aldridge,* 283 U.S. at 311, 51 S.Ct. 470.

Deciding precisely *how* to do so remains within the district court's expansive voir dire discretion. It could, of course, inquire directly about relevant biases. *See, e.g.,*  **\*639** *Bright,* 2022 WL 53621, at \*1. But we have never reversed for failure to take that specific path, and again refrain from doing so today.

 **[18]**   There are many other tacks a district court might justifiably deem more prudent under the particular circumstances of a case. For example, it could opt instead to ask the kind of "subtle[r]" questions that we endorsed in *Rahman*, sussing out relevant bias without explicitly invoking it. *See, e.g.,* 189 F.3d at 121. It could ask generalized questions about jurors' ability to serve impartially, provided that it also presents sufficient context about the case for jurors' answers to that general question to actually convey information pertinent to the relevant potential biases in that case. *See, e.g., Miller,* 752 F. App'x at 52-54. It could warn jurors of their general duty of impartiality, again assuming it also provides sufficient context for a juror to be able to self-identify the relevant biases before jury selection is complete. *See, e.g., Diaz,* 854 F. App'x at 388-89; *see also Treacy,* 639 F.3d at 47 ("[A] district court may find that warning a jury against an improper bias may be more effective in some cases than inquiring about that bias."). And, although we decline Nieves's invitation to so declare in this case, [6] even if the district court does none of these things, it may even be the case that it can accomplish this end – or at least render harmless [7] the failure to do  **\*640**  so – by asking sufficiently detailed questioning to allow defendants to indirectly "ferret out more subtle biases" through *peremptory* challenges based on circumstantial indicators of bias. *Torres,* 128 F.3d at 43 n.4.

 **\*\*12**  Here, the district court's deliberate decision to jettison any of those options exceeded the bounds of its discretion. It did not ask – overtly or otherwise – about gang-related bias, notwithstanding that the government's central theory of the case was that the assault was motivated by gang rules, and its evidence in support of that theory consisted of gang-member testimony and gang-related expert testimony. The court in fact deliberately declined to mention that the case concerned gangs at all, or at least to caution the jurors that any feelings they might have about gangs or gang members must be set aside in service of their duty to decide, based on the evidence presented, whether the government established all elements of the charged crimes beyond a reasonable doubt. Even after a prospective juror volunteered his own discomfort and "biases" stemming from the mere possibility that the

case could involve gangs (and was thereafter dismissed), the district court neglected to allow for the possibility that others' impartiality could be compromised by the fact that all the central players in the case belonged to allegedly violent gangs, and for that matter, that the defendants were accused of retaliation and intimidation specifically related to court proceedings. *Cf. Smith*, 919 F.3d at 834 (rejecting defendants' challenge to "how [the district court] addressed the jurors' fears of gang retaliation," highlighting that "[a]fter learning of Juror No. 5's fears, the district judge here questioned each juror individually ... and, where necessary, followed up"). Given those choices, there was no way for the district court's generic questions and vague warnings to actually root out, or otherwise guard against, the specific bias against gang members potentially at play in this case.

Nor, as a last resort, did the district court attempt to counterbalance any of this by asking additional biographical or attitudinal questions that might have circumstantially unearthed inferable bias among potential jurors, permitting either the court to dismiss them for cause, or Nieves to exercise his peremptory challenges to the same effect. For example, the district court might have asked not simply what borough or county each juror was from, but what specific areas in each borough or county jurors hailed from, which could have permitted the defendants to use their peremptory challenges to dismiss jurors who lived in places known to be Trinitario strongholds. Or, in lieu of the open-ended questioning on media consumption that it considered invasive, the district court might have asked whether prospective jurors had read news stories concerning the **\*641** reported crime surge in New York City. A question like that would have permitted follow-up that might have surfaced gang concerns, in turn occasioning the court to caution jurors that they must set aside preconceived notions about gangs when assessing the evidence in this case, and to dismiss those jurors unable to heed that warning; at the very least, it would have permitted defense counsel to peremptorily weed out jurors they deemed most problematic. We, again, do not hold that the district court was required to ask these specific questions, nor that its failure to do so was error on its own, nor even that asking these questions would have been sufficiently curative in this case. We offer these examples merely to illustrate some of the tools available to district courts in these situations. Here, the district court availed itself of none of those tools.

That was no accident. The district court reiterated multiple times that it would be "improper" not just to ask gang-related questions, but also to offer the venire any description of the case other than an abstract definition of the statutory charges. It dismissed the notion that it was obligated to solicit any information beyond what was necessary to ensure that "any [jurors] who need to be excused for cause are excused." App'x 120. And while Nieves argues that this statement disregarded the court's accompanying obligation to also facilitate informed peremptory challenges, *see Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991), the more problematic fault was the court's exceedingly narrow take on its obligation to probe for information relevant to for-cause challenges. Even as the court acknowledged its for-cause factfinding role, it insisted that its hands were tied: "In order to ascertain whether a juror had a meaningfully improper view or is biased because the case involved gangs, *which is the Court's job when it is looking to excuse someone for cause*, the Court would ... inevitably have to get into the description of the facts of the particular case ... and that would be totally improper." App'x 120-21 (emphasis added).

As a proposition of law, if not of the district court's own preference, that statement is simply inaccurate. *See Zervos*, 252 F.3d at 169 (a district court abuses its discretion when its decision relies upon an "error of law"); *see also*Fed. R. Crim. P. 24(a)(2)(B) ("If the court examines the jurors, it must permit the attorneys for the parties to submit further questions that the court may ask if it considers them proper."). District courts routinely give such descriptions without appellate rebuke, and this Court has relied upon that practice in rejecting defendants' arguments concerning the adequacy of voir dire. *See, e.g.*, *Miller*, 752 F. App'x at 53. We cannot endorse the district court's apparent belief that it would be "totally improper" to describe the essence of a case to the jury. App'x 120. That view is inconsistent not only with our frequent approval of just that sort of description, but also with our requirement in *Lawes* that the district court's voir dire "inquire about, or warn against," any widespread and relevant bias. 292 F.3d at 129. In most cases, any meaningful inquiry or warning will be impossible without some identification of the facts likely to evoke that bias. [8]

**\*\*13** Judge Rakoff's past voir dire choices reflect as much. Despite Nieves's attempts to attribute Judge Rakoff's suggestion that a question or description concerning gangs would have been improper to a larger pattern **\*642** of purportedly "inflexible" voir dire practices, Appellant's Br. at 27, Judge Rakoff himself, as discussed above, has asked precisely the kinds of questions he declined to ask here, and

this Court has approved his doing so. In *Treacy*, Judge Rakoff did not simply advise potential jurors that the case to be tried generally involved allegations of fraud; to the contrary, he specifically asked jurors "whether they could be fair and impartial in a securities or stock fraud case involving a former chief operating officer and president of [a public company]." 639 F.3d at 36. That question was in no way improper, and is indistinguishable from asking whether venire members could be fair and impartial in a case involving an alleged gang member.

The district court's other rationales were no more persuasive. For instance, it later explained that, in its view, invoking gangs before trial could contribute to jurors feeling "intimidation or potential fear" during trial.[9] App'x 217. At no point, however, did it explain how that dynamic would be assuaged by stifling any mention of gangs until, as it turned out, the second sentence of the government's opening statement – early enough to color jurors' perception of everything they would hear afterwards, but too late to filter any fear-driven bias from their ranks.

Nor did the court offer any justification for its decision to affirmatively represent to the venire that this was *not* the kind of case that would typically provoke prejudice or bias. "Every once in a while," it intimated, "there is a case – *not usually this kind of case* – involving some other kinds of crimes that people have such strong feeling[s] about that they don't think they could be fair." App'x 60-61 (emphasis added). As we have already discussed, that also was simply incorrect. Shortly after the district court made those remarks, one juror spontaneously voiced concerns about serving in a case potentially involving gangs. That can only have vindicated the district court's own belief that, as it expressed later, fear or bias surrounding gang members could be a factor in the case. But avoiding mention of gangs until the subject inevitably and expectedly headlined the government's opening, and much of its key evidence, was never going to somehow suppress the kinds of emotional reactions that could have been detected by appropriate voir dire questions, and thereafter mitigated either through cautionary instructions or disqualification of jurors unable to fairly assess the evidence.

**\*\*14** **[19]** Relatedly, the district court's reluctance to ask either "attitudinal" questions or other questions that it considered invasive cannot justify its refusal to inquire about attitudes *towards gang members*. It **\*643** is within a judge's discretion to decide whether or not to ask questions that elicit jurors' general attitudes about political or social questions,

permitting counsel to speculate about jurors' reactions to the evidence in a case when allocating their peremptory challenges. But where the "attitude" in question is a bias or predisposition for or against one side or the other, and particularly where key evidence targets the subject of that bias or predisposition, it is the judge's responsibility to make some inquiry. Prospective jurors have no right to keep those attitudes private. Here, the jury would be tasked, among other things, with assessing the credibility of Carela's and Detective Jeselson's insights into the rules and practices of the Trinitarios, and the effect those rules and practices may have had on Nieves's (disputed) motivation for his (largely undisputed) conduct in this case. Any predisposition, based on extra-judicial information or prejudice, to believe or disbelieve that sort of testimony was therefore entirely relevant to jurors' ability to do their job.

In short, in our view, a capable and experienced district judge faced with an admittedly tricky task made the wrong call for the wrong reasons. As Judge Pooler wrote in dissent in *Lawes*, "[i]f any set of facts presents an abuse of discretion in the administration of voir dire, it is this case." 292 F.3d at 132 (Pooler, *J.*, dissenting). That perspective did not prevail under the circumstances presented in *Lawes*. It does under those presented here. Although we do not doubt the sincerity of the district court's belief that it was charting the most appropriate course, it is difficult for us, sitting in review, to imagine what less it could have done to guard against potential bias against gang members, even as the court itself acknowledged that the issue warranted close attention. Like Judge Pooler, we "do not advocate that the trial judge was required to ask any particular questions"; rather, the error was the district court's resolve not to "ask *any* question" that might uncover potential predispositions against gang members, or to provide sufficient context to allow its broader questions and warnings to encompass concerns about such bias, therefore leaving that potential prejudice "completely unexplored." *Id.* (emphasis in original).

Because the district court's failure on voir dire to explore, or to take other steps specifically to counter, such potential prejudice unfairly deprived Nieves of the opportunity to unearth a pervasive bias relevant to an issue pivotal to the government's case against him, we hold that the district court abused its discretion.

## CONCLUSION

For the reasons set forth above, we therefore **VACATE** the district court's judgment and **REMAND** for a new trial.

**All Citations**

58 F.4th 623, 2023 WL 405354

## Footnotes

\* The Clerk of Court is directed to modify the caption to conform to the above.

1 Consequently, we have frequently pointed out that the term "abuse" of discretion is an unfortunate misnomer. Despite its harsh connotations, it is substantively "a nonpejorative term of art" that "implies no misconduct on the part of the district court." *United States v. Bove,* 888 F.3d 606, 607 n.1 (2d Cir. 2018).

2 *See, e.g.*, Ali Watkins, *Violent Year in New York and Across U.S. as Pandemic Fuels Crime Spike*, N.Y. TIMES (Dec. 29, 2020), https://www.nytimes.com/2020/12/29/nyregion/nyc-2020-crime-covid.html ("Police officials in New York have pointed to gang disputes as a key driver of the violence over the summer ....").

3 *See, e.g.*, *Acting United States Attorney Seth D. DuCharme Announces Expansion of Strategies For Rapid Federal Response to Spikes in Gun-Related Violence in the Eastern District of New York*, U.S. ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF NEW YORK (Oct. 14, 2020), https://www.justice.gov/usao-edny/pr/acting-united-states-attorney-seth-d-ducharme-announces-expansion-strategies-rapid (announcing a cross-departmental initiative in response to the spike in gun violence, attributing the "local epidemic of shootings in our city" in significant part to "violent gang members" turning portions of the city into "battle zones" (internal quotation marks omitted)).

4 *See, e.g.*, *MS-13's Highest-Ranking Leaders Charged with Terrorism Offenses in the United States*, U.S. ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF NEW YORK (Jan. 14, 2021), https://www.justice.gov/usao-edny/pr/ms-13-s-highest-ranking-leaders-charged-terrorism-offenses-united-states ("MS-13 is responsible for a wave of death and violence that has terrorized communities, leaving neighborhoods on Long Island and throughout the Eastern District of New York awash in bloodshed." (internal quotation marks omitted)); Liz Robbins and Michael D. Shear, *Trump, Visiting Epicenter of MS-13 Killings, Demands Tougher Immigration Laws*, N.Y. TIMES (May 23, 2018), https://www.nytimes.com/2018/05/23/us/politics/trump-immigration-gangs.html ("Mr. Trump again described gang members as 'animals ....' ").

5 *See, e.g.*, Edgar Sandoval, *Crime Wave Hits Bodegas, Threatening a Lifeline in thePandemic*, N.Y. TIMES (Dec. 10, 2020), https://www.nytimes.com/2020/12/10/nyregion/nyc-crime-bodegas.html (discussing a "steep rise" in New York City violence that "shows no signs of slowing down," and highlighting a Bronx bodega murder committed by Trinitarios members as typical of that surge); Clayton Guse and Rocco Parascandola, *Teen Gang Member Busted for Threatening Brooklyn Subway Riders with Machete*, N.Y. DAILY NEWS (Mar. 25, 2021), https://www.nydailynews.com/new-york/nyc-crime/ny-nyc-machete-subway-teen-arrest-20210325-cba6hxk4jvh57lhz6ewdhv66e4-story.html ("[The suspect] is a member of the Trinitarios gang, police said."); Jorge Fitz-Gibbon, *FBI Offers $5K Reward for Arrest of Trinitarios Gang Member*, N.Y. POST (Oct. 15, 2020), https://nypost.com/2020/10/15/fbi-offers-5k-reward-for-arrest-of-trinitarios-gang-member/ ("Eric Rosario, 28, a reputed member of the Trinitarios street gang known as 'White Boy,' is sought for slashing a man in the face at Grand Concourse and 196th Street on Feb. 3, 2019 ...."); Robert Gearty, *The Gang Just as Vicious as MS-13 but without the Notoriety: Savage Trinitarios Return to the Spotlight after Years in the Shadows*, FOX NEWS (July 28, 2018), https://www.foxnews.com/us/the-gang-just-as-vicious-as-ms-13-but-without-

United States v. Nieves, 58 F.4th 623 (2023)

2023 WL 405354

the-notoriety-savage-trinitarios-return-to-the-spotlight-after-years-in-the-shadows (equating the "[s]avage" Trinitarios' "brutality" with that of MS-13).

6    Nieves argues that this case triggers not just the second *Lawes* category, but also the first: "a voir dire so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style." *Lawes*, 292 F.3d at 129. We disagree. Although we hold that the district court's brief, three- or four-question individualized voir dire did nothing to affirmatively *cure* its larger failure to adequately screen for bias against gang members, we do not conclude that the limited scope of questioning concerning prospective jurors' backgrounds in itself constituted reversible error. Judicial efficiency is an important value in busy district courts, and district judges are best positioned to balance that value against the benefits of extensive voir dire. While many – perhaps most – judges would perhaps strike a different balance, and some might lean heavily in the direction of extensive voir dire, we can discern no quantitative standard governing precisely how many questions are required to give the parties a sense of jurors' possible biases.

7    The government does not argue that the failure to inquire on voir dire about venire members' attitudes towards gang members, if error, was harmless. But even assuming arguendo that the district court's voir dire errors could be rendered harmless by other steps taken outside of voir dire – a hypothetical question that we do not decide today, *cf. Tankleff v. Senkowski*, 135 F.3d 235, 248 (2d Cir. 1998) ("[A] *Batson*/*Powers* claim is a structural error that is not subject to harmless error review.") – it did not take any such steps here. It did not, for example, give any limiting instruction with respect to Jeselson's expert gang testimony, nor did its pre-deliberation jury instructions deal with gang-related members in any way (or even refer to gangs specifically). *Cf. Tsarnaev*, 142 S. Ct. at 1035 (holding that the district court's voir dire was sufficient, highlighting jury instructions "the court gave during voir dire and repeated during the trial").

Separately, without expressly invoking the concept of harmless error, the government argues that even if jurors biased against gang members were selected, both sides would have been equally affected. That is because, it contends, any biased juror's perception of the credibility of victim-witness Carela, himself a Trinitario, would suffer as much as that juror's perception of Nieves. That argument is both speculative and ill-conceived. Gang membership might affect perceptions of credibility, or it might predispose a jury to believe that a gang member charged with a violent crime is a dangerous person who deserves to be locked up notwithstanding doubts about whether the government has actually proved each element of the charged crime beyond a reasonable doubt. There is no reason to believe that those biases would cancel each other out, or that jurors biased against a defendant should be seated so long as they are equally biased against a victim or a witness. In any event, the government's reliance on *Rosales-Lopez*, 451 U.S. at 192-93, 101 S.Ct. 1629, to support this otherwise speculative argument is misplaced. In that case, the Supreme Court held that there was no "reasonable possibility that racial or ethnic prejudice" would have influenced the jury's treatment of a defendant of Mexican descent charged with "aiding members of his own ethnic group to gain illegal entry into the United States." *Id.* But the Court's justification for that conclusion was *not* that all of the people involved shared the same potentially bias-inducing characteristic. Rather, it emphasized that the district court had not only asked a question about "aliens" in general, which "jurors would have understood ... to at least include Mexican aliens," but had also dismissed two jurors for cause based on their answers to that question. *Id.* at 193, 101 S.Ct. 1629. There is no analog to that question in this case.

8    While we are of course mindful not to over-parse a district court's spontaneous, on-the-record remarks, we highlight this one because it is emblematic of the court's larger error in this case.

9    The government suggested at oral argument that although the district court's overview of the charges did not expressly mention gangs, any prospective juror who already harbored strong feelings regarding gang members would have understood the court's description of the defendants' "conspiring to threaten," and Nieves's "assault in retaliation" against, a government witness as a description of gang behavior, or at least

as behavior just as likely to incite those same strong feelings. But that theory cuts against the government's briefed argument – that the district court reasonably felt that broaching the topic of gangs in *any* form "might do more harm than good." Appellee's Br. 36. The government cannot have it both ways. Either the district court ducked the subject or it did not. In any event, we are not at all convinced that the district court's recitation of the statutory charges against the defendants somehow signaled to biased jurors that this was a gang case, or some other kind of case that would similarly test their impartiality. That certainly was not the district court's intent: for better or worse, the district court insisted that any allusion whatsoever to gangs risked spooking the venire. App'x 217.

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.