# 22-558

# United States Court of Appeals for the Second Circuit

---

SARAH PALIN,

*Plaintiff - Appellant,*

v.

THE NEW YORK TIMES COMPANY, A NEW YORK CORPORATION, AND JAMES BENNET,

*Defendants - Appellees.*

---

On Appeal from the United States District Court
For the Southern District of New York. No. 1:17-cv-04853-JSR

## BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 52 MEDIA ORGANIZATIONS IN SUPPORT OF APPELLEES SEEKING AFFIRMANCE

Bruce D. Brown
Katie Townsend
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300

Theodore J. Boutrous, Jr.
*Counsel of Record*
Jillian N. London
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
TBoutrous@gibsondunn.com

Connor Sullivan
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (213) 351-4000

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1(a), amici state as follows:

**The Reporters Committee for Freedom of the Press** is an unincorporated association of reporters and editors with no parent corporation and no stock.

**Advance Publications, Inc.** certifies that it has no parent corporation and no publicly held corporation owns any of its stock.

**The Associated Press** is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law. It is not publicly traded.

**Axios Media Inc.** is a privately owned company, and no publicly held company owns 10% or more of its stock.

**Boston Globe Media Partners, LLC**, is a privately held company. No publicly held corporation owns 10% or more of its stock.

**BuzzFeed Inc.** is a privately owned company, and National Broadcasting Company (NBC) owns 10% or more of its stock.

**Cable News Network, Inc.** ("CNN") is ultimately a wholly-owned subsidiary of Warner Bros. Discovery, Inc., a publicly traded corporation. Warner Bros. Discovery, Inc. has no parent company and, to the best of CNN's

knowledge, no publicly held company owns ten percent or more of Warner Bros. Discovery, Inc.'s stock.

**Californians Aware** is a nonprofit organization with no parent corporation and no stock.

**The Center for Investigative Reporting (d/b/a Reveal)** is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

**The Center for Public Integrity** is a nonprofit organization with no parent corporation and no stock.

**Courthouse News Service** is a privately held corporation with no parent corporation and no publicly held corporation holds more than 10 percent of its stock.

**Daily News, LP** is an indirect subsidiary of Tribune Publishing Company, which is publicly held. Alden Global Capital LLC and affiliates together own over 10% of Tribune Publishing Company's common stock. Nant Capital LLC, Dr. Patrick Soon-Shiong and California Capital Equity, LLC together own over 10% of Tribune Publishing Company's stock.

**Dow Jones & Company, Inc.** ("Dow Jones") is an indirect subsidiary of News Corporation, a publicly held company. Ruby Newco, LLC, an indirect subsidiary of News Corporation and a non-publicly held company, is the direct

parent of Dow Jones.  News Preferred Holdings, Inc., a subsidiary of News

Corporation, is the direct parent of Ruby Newco, LLC.  No publicly traded

corporation currently owns ten percent or more of the stock of Dow Jones.

**The E.W. Scripps Company** is a publicly traded company with no parent

company.  No individual stockholder owns more than 10% of its stock.

**First Amendment Coalition** is a nonprofit organization with no parent

company.  It issues no stock and does not own any of the party's or amicus'

stock.

**Forbes Media LLC** is a privately owned company and no publicly held

corporation owns 10% or more of its stock.

**Fundamedios, Inc.** is a non-profit corporation organized under the laws

of Massachusetts, with no parent corporation and no stock.

**Gannett Co., Inc.** is a publicly traded company and has no affiliates or

subsidiaries that are publicly owned.  BlackRock, Inc. and the Vanguard Group,

Inc. each own ten percent or more of the stock of Gannett Co., Inc.

**The Inter American Press Association** is a not-for-profit organization

with no corporate owners.

**Los Angeles Times Communications LLC** is wholly owned by

NantMedia Holdings, LLC.

**The McClatchy Company, LLC** is privately owned by certain funds affiliated with Chatham Asset Management, LLC and does not have publicly traded stocks.

**The Media Institute** is a 501(c)(3) non-stock corporation with no parent corporation.

**The Media Law Resource Center** has no parent corporation and issues no stock.

The Foundation for National Progress, dba **Mother Jones**, is a nonprofit, public benefit corporation.  It has no publicly-held shares.

**National Newspaper Association** is a non-stock nonprofit Florida corporation.  It has no parent corporation and no subsidiaries.

**National Press Photographers Association** is a 501(c)(6) nonprofit organization with no parent company.  It issues no stock and does not own any of the party's or amicus' stock.

Comcast Corporation and its consolidated subsidiaries own 100% of the common equity interests of NBCUniversal Media, LLC., including **NBCUniversal News Group**.

**The New Jersey Press Association** ("NJPA") is a not for profit corporation of the State of New Jersey.  There is no parent corporation of NJPA and no publicly held corporation that owns 10% or more of NJPA's stock.

iv

**The New York News Publishers Association** has no parent company and issues no stock.

**New York Public Radio** is a privately supported, not-for-profit organization that has no parent company and issues no stock.

**The News Leaders Association** has no parent corporation and does not issue any stock.

**News/Media Alliance** is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

**Newsday LLC** is a Delaware limited liability company whose members are Tillandsia Media Holdings LLC and Newsday Holdings LLC. Newsday Holdings LLC is an indirect subsidiary of Cablevision Systems Corporation. Cablevision Systems Corporation is (a) directly owned by Altice USA, Inc., a Delaware corporation which is publicly traded on the New York Stock Exchange and (b) indirectly owned by Altice N.V., a Netherlands public company.

**Nexstar Media Inc.** is a media corporation that owns and operates commercial broadcast television stations. It has no corporate parent company and no publicly held corporation has a ten percent or greater ownership interest in its stock.

**Online News Association** is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**Penguin Random House LLC** is a limited liability company whose ultimate parent corporation is Bertelsmann SE & Co. KGaA, a privately-held company.

No publicly held corporations own any stock in the **Philadelphia Inquirer**, PBC, or its parent company, the non-profit Lenfest Institute for Journalism, LLC.

**POLITICO LLC**'s parent corporation is Capitol News Company. No publicly held corporation owns 10% or more of POLITICO LLC's stock.

**Pulitzer Center on Crisis Reporting** is a non-profit organization with no parent corporation and no stock.

**Radio Television Digital News Association** is a nonprofit organization that has no parent company and issues no stock.

**Reuters News & Media Inc.** is a Delaware corporation whose parent is Thomson Reuters U.S. LLC, a Delaware limited liability company. Reuters News & Media Inc. and Thomson Reuters U.S. LLC are indirect and wholly owned subsidiaries of Thomson Reuters Corporation, a publicly-held corporation, which is traded on the New York Stock Exchange and Toronto Stock Exchange. There are no intermediate parent corporations or subsidiaries of Reuters News & Media Inc. or Thomson Reuters U.S. LLC that are publicly

held, and there are no publicly-held companies that own 10% or more of Reuters News & Media Inc. or Thomson Reuters U.S. LLC shares.

**Slate** is part of The Slate Group, a wholly owned subsidiary of Graham Holding Company.

**The Society of Environmental Journalists** is a 501(c)(3) non-profit educational organization.  It has no parent corporation and issues no stock.

**Society of Professional Journalists** is a non-stock corporation with no parent company.

**Student Press Law Center** is a 501(c)(3) not-for-profit corporation that has no parent and issues no stock.

**Time USA, LLC** is a privately held limited liability company.  No publicly held corporation owns 10% or more of its stock.

**Tribune Publishing Company** is a publicly held corporation.  Alden Global Capital and affiliates own over 10% of Tribune Publishing Company's common stock.  Nant Capital LLC, Dr. Patrick Soon-Shiong and California Capital Equity, LLC together own over 10% of Tribune Publishing Company's stock.

**The Tully Center for Free Speech** is a subsidiary of Syracuse University.

**VICE Media** is a wholly-owned subsidiary of Vice Holding Inc., which is a wholly-owned subsidiary of Vice Group Holding Inc.  The Walt Disney

Company is the only publicly held corporation that owns 10% or more of Vice Group Holding Inc.'s stock.

**Vox Media, LLC** has no parent corporation. NBCUniversal Media, LLC, a publicly held corporation, owns at least 10% of Vox's stock.

**The Washington Post** (formally, WP Company LLC d/b/a The Washington Post) is a wholly-owned subsidiary of Nash Holdings LLC, a holding company owned by Jeffrey P. Bezos. Nash Holdings LLC is a privately held company with no securities in the hands of the public.

**WNET** is a not-for-profit organization, supported by private and public funds, that has no parent company and issues no stock.

Dated: December 15, 2022

*/s/ Theodore J. Boutrous, Jr.*

Theodore J. Boutrous, Jr.

# TABLE OF CONTENTS

Page

INTEREST OF AMICI CURIAE ..................................................................1

SUMMARY OF ARGUMENT ....................................................................3

ARGUMENT ..............................................................................................6

I.   The Protections Of The Actual Malice Standard Remain Vital Today ..........6

     A.   The *Sullivan* Decision ..........................................................8

     B.   The Actual Malice Standard Protects Democratic Values. .................10

II.  The Actual Malice Standard Applies to a Statement's Defamatory
     Meaning as Well as Its Falsity .....................................................17

     A.   This Court Should Join The Many Other Courts Holding That
          The Actual Malice Standard Applies To Defamatory Meaning. ........17

     B.   Holding That The Actual Malice Standard Applies To
          Defamatory Meaning Is Consistent with *Sullivan* And
          Necessary to Protect Important First Amendment Interests. .............20

III. The Amendments to New York's Anti-SLAPP Law Apply
     Retroactively. ..........................................................................21

     A.   The History of New York's Anti-SLAPP Law Establishes Why
          Its Amendments Should Have Retroactive Effect. ...........................22

     B.   New York's Amended Anti-SLAPP Law Applies Retroactively. .......22

CONCLUSION .........................................................................................28

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abbas v. Foreign Pol'y Grp., LLC*,
   783 F.3d 1328 (D.C. Cir. 2015) (Kavanaugh, J.) .............................................15

*Arpaio v. Zucker*,
   414 F. Supp. 3d 84 (D.D.C. 2019)......................................................................12

*Balintulo v. Daimler AG*,
   727 F.3d 174 (2d Cir. 2013) ..................................................................................4

*Blankenship v. Fox News Network, LLC*,
   No. 2:19-cv-00236 (S.D. W. Va. Mar. 29, 2019)................................................12

*Brothers v. Florence*,
   95 N.Y.2d 290 (2000) .........................................................................................23

*Buckley v. Littell*,
   539 F.2d 882 (2d Cir. 1976) ...............................................................................11

*CFCU Cmty. Credit Union v. Hayward*,
   552 F.3d 253 (2d Cir. 2009) ...............................................................................25

*Cheng v. Neumann*,
   51 F.4th 438 (1st Cir. 2022)................................................................................12

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010).......................................................................................3, 14

*Compuware Corp. v. Moody's Invs. Servs., Inc.*,
   499 F.3d 520 (6th Cir. 2007) ..............................................................................18

*Curtis Pub. Co. v. Butts*,
   388 U.S. 130 (1967)............................................................................................10

*Depp, II v. Heard*,
   No. CL-2019-0002911, 2022 WL 2342058 (Va. Cir. Ct. June 24,
   2022) ...................................................................................................................12

*Dodds v. Am. Broad. Co.*,
  145 F.3d 1053 (9th Cir. 1998) ............................................................18

*Edwards v. Nat'l Audubon Soc., Inc.*,
  556 F.2d 113 (2d Cir. 1977) ...............................................................14

*Fairfax v. CBS Corp.*,
  2 F.4th 286 (4th Cir. 2021) .................................................................12

*Finebaum v. Coulter*,
  854 So. 2d 1120 (Ala. 2003) ...............................................................19

*Garrison v. Louisiana*,
  379 U.S. 64 (1964) ..............................................................................16

*In re Gleason (Michael Vee, Ltd.)*,
  96 N.Y.2d 117 (2001) .........................................................................23

*In re Gordon v. Marrone*,
  155 Misc. 2d 726 (Sup. Ct. Westchester Cty. 1992), *aff'd*, 202
  A.D.2d 104 (2d Dep't 1994) ...............................................................22

*Gottwald v. Sebert*,
  203 A.D.3d 488 (1st Dept. 2022) ...................................................26, 27

*Herbert v. Lando*,
  441 U.S. 153 (1979) .............................................................................21

*Herring Networks, Inc. v. Maddow*,
  3:10-cv-01713 (S.D. Cal. Sept. 9, 2019) ............................................12

*Hodges v. State Journal Publ'g Co.*,
  617 P.2d 191 (Okla. 1980) ..................................................................19

*Howard v. Antilla*,
  294 F.3d 244 (1st Cir. 2002) ...............................................................18

*Hustler Mag., Inc. v. Falwell*,
  485 U.S. 46 (1988) .........................................................................11, 14

*La Liberte v. Reid*,
  966 F.3d 79 (2d Cir. 2020) ..................................................................22

xi

*Majewski v. Broadalbin-Perth Cent. Sch. Dist.*,
    91 N.Y.2d 577 (1998) ........................................................................24

*Masson v. New Yorker Magazine, Inc.*,
    832 F. Supp. 1350 (N.D. Cal. 1993), *aff'd on other grounds*, 85
    F.3d 1394 (9th Cir. 1996) ............................................................18, 20

*Nat'l Review, Inc. v. Mann*,
    140 S. Ct. 344 (2019)......................................................................15

*Nelson v. HSBC Bank USA*,
    87 A.D.3d 995 (2d Dep't 2011)..................................................23, 24

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)...................................................................*passim*

*Newton v. Nat'l Broad. Co.*,
    930 F.2d 662 (9th Cir. 1990) ......................................................18, 20

*Nunes v. NBCUniversal Media, LLC*,
    No. 22-cv-01633 (S.D.N.Y. Feb. 28, 2022) .....................................12

*In re OnBank & Tr. Co.*,
    90 N.Y.2d 725 (1997)....................................................................25

*Palin v. N.Y. Times Co.*,
    510 F. Supp. 3d 21 (S.D.N.Y. 2020) ...........................................21, 23

*Peck v. Tribune Co.*,
    214 U.S. 185 (1909) (Holmes, J.) .....................................................8

*Radwan v. Manuel*,
    2022 WL 17332339 (2d Cir. Nov. 30, 2022) ...................................20

*Regina Metro. Co., LLC v. N.Y. State Div. of Hous. & Cmty. Renewal*,
    35 N.Y.3d 332 (2020) ....................................................................27

*Saenz v. Playboy Enters., Inc.*,
    841 F.2d 1309 (7th Cir. 1988) ........................................................18

*St. Amant v. Thompson*,
    390 U.S. 727 (1968).......................................................................10

*Stepanov v. Dow Jones & Co.*,
   120 A.D.3d 28 (1st Dep't 2014) .........................................................20

*Marshall Cty. Coal Co. v. John Oliver*,
   No. 17-c-124 (W. Va. Cir. Ct. Marshall Cty. June 22, 2017) ...........12

*Tilton v. Cap. Cities/ABC, Inc.*,
   905 F. Supp. 1514 (N.D. Okla. 1995), *aff'd*, 95 F.3d 32 (10th Cir.
   1996) ....................................................................................................19

*Tilton v. Cowles Publ'g Co.*,
   459 P.2d 8 (Wash. 1969) ....................................................................19

*Trump v. Cable News Network, Inc.*,
   No. 22-CV-61842, 2022 WL 4785360 (S.D. Fla. Oct. 3, 2022) .......12

*Woods v. Evansville Press Co.*,
   791 F.2d 487 (7th Cir. 1986) ..............................................................17

## Statutes

N.Y. Civ. Rights L. § 70-a ...............................................................22, 24

N.Y. Civ. Rights L. § 76-a .....................................................................22

## Other Authorities

Anthony Lewis, *The Sullivan Decision*,
   1 Tenn. J. L. & Pol. 135, 138 (2004) ..................................................11

1 R. Sack, Defamation § 2:1 (5th ed. May 2022 Update) .............8, 15, 16

1 R. Smolla, Law of Defamation § 1:8 (2d ed. Nov. 2022 Update)..........8

New York Times v. Sullivan: The Case for Preserving an Essential Precedent
   (Mar. 2022) .....................................................................................12, 13

## Constitutional Provisions

U.S. Const. amend. I .........................................................................*passim*

# INTEREST OF AMICI CURIAE[1]

Amici curiae the Reporters Committee for the Freedom of the Press (the "Reporters Committee"), Advance Publications, Inc., The Associated Press, Axios Media Inc., Boston Globe Media Partners, LLC, BuzzFeed, Cable News Network, Inc., Californians Aware, The Center for Investigative Reporting (d/b/a Reveal), The Center for Public Integrity, Courthouse News Service, Daily News, LP, Dow Jones & Company, Inc., The E.W. Scripps Company, First Amendment Coalition, Forbes Media LLC, Fundamedios Inc., Gannett Co., Inc., Inter American Press Association, Los Angeles Times Communications LLC, The McClatchy Company, LLC, The Media Institute, Media Law Resource Center, Mother Jones, National Newspaper Association, National Press Photographers Association, NBCUniversal News Group (NBC News, CNBC, MSNBC), New Jersey Press Association, New York News Publishers Association, New York Public Radio, The News Leaders Association, News/Media Alliance, Newsday LLC, Nexstar Media Inc., Online News Association, Penguin Random House LLC, The Philadelphia Inquirer, POLITICO LLC, Pro Publica, Inc., Pulitzer Center on Crisis Reporting, Radio Television Digital News Association, Reuters News & Media Inc., Slate, Society

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E) and Local Rule 29.1(b), amici declare that no party's counsel authored any part of this brief, and no person other than amici or their counsel contributed money intended to fund the brief's preparation or submission.

of Environmental Journalists, Society of Professional Journalists, Student Press Law Center, TIME USA, LLC, Tribune Publishing Company, Tully Center for Free Speech, Vice Media Group, Vox Media, LLC, The Washington Post, and WNET have filed an accompanying motion seeking the Court's leave to file this amicus brief.

Amici are members and representatives of the news media and organizations that defend the First Amendment and newsgathering rights of the news media on behalf of the public. Lead amicus the Reporters Committee is an unincorporated nonprofit association founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists so they can report information of public concern to the public. A supplemental statement of interest of all amici is attached as Appendix A to the accompanying motion for leave to file this amicus brief.

This appeal presents multiple issues of significant importance to journalists, news media organizations, and the public. Most importantly, Appellant Sarah Palin asks this Court to depart from or limit the scope of bedrock First Amendment doctrines that protect journalists and news media organizations from defamation

2

liability in connection with their newsgathering activities as well as other citizens engaged in speech and debate about public figures in our society. Amici have a strong interest in ensuring that those doctrines remain vital and are applied appropriately to provide the press with adequate protection and to ensure the public continues to benefit from the work of journalists, receiving the information necessary to sustain self-government in a democracy. As the Supreme Court has observed, "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people. The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) (cleaned up).

Appellant also asks this Court to narrow the applicability of New York's revised state law regarding strategic lawsuits against public participation (New York's "anti-SLAPP" law). Amici have a strong interest in ensuring that New York's anti-SLAPP law is interpreted correctly to protect journalists and news organizations from liability in cases like this one.

## SUMMARY OF ARGUMENT

Contrary to the decisions of the Supreme Court of the United States and this Court's own precedent, Appellant asks this Court to outright reject the "actual malice" standard established by the Supreme Court in *New York Times Co. v.*

3

*Sullivan*, 376 U.S. 254 (1964)—which is the bedrock rule of our public discourse and one of the most important protections available to journalists, news media organizations, and citizens engaged in public discussion and debate.  There is no real question that, as a procedural matter, this Court cannot and will not do so. *See, e.g.*, *Balintulo v. Daimler AG*, 727 F.3d 174, 190 (2d Cir. 2013) ("Lower courts are bound by [Supreme Court precedent] and they are without authority to reinterpret the Court's binding precedent in light of irrelevant factual distinctions").  Nonetheless, Appellant's argument is wrong on the merits.  The Supreme Court articulated the actual malice standard decades ago to strike a balance between an individual's interest in her reputation and the vital free speech interests enshrined in the First Amendment, and the Court has repeatedly reaffirmed and expanded it since then.  Even as the nation and the tools we use to communicate have changed dramatically, the actual malice standard continues to strike that appropriate balance and remains ever more vital—not less.  This Court should reject Appellant's invitation and reaffirm the role the actual malice standard plays in protecting freedom of speech and of the press.

Appellant also, in a footnote, asks this Court to reverse the district court's careful and correct ruling—echoing the ruling of many other courts—that where the actual malice standard applies, the plaintiff must show *both* that the defendant intentionally or recklessly published a statement that communicated a particular

defamatory meaning, *and also* that the defendant knew, or was reckless as to whether, that particular defamatory meaning was false.  Because made only cursorily in a footnote, Appellant's argument is waived.  It is also wrong.  Requiring a plaintiff to meet the actual malice standard as to defamatory meaning as well as to falsity is an inevitable consequence of the Supreme Court's decision in *Sullivan*, and equally essential to protect freedom of speech and of the press.  Exposing journalists and news media organizations and others engaged in public discourse about public figures to the prospect of defamation liability where they accidentally express a defamatory meaning they never intended to convey would chill even more speech and risk even more "self-censorship," *Sullivan*, 376 U.S. at 279, than doing so where they make a mere mistake of fact.

Finally, Appellant seeks to avoid the district court's correct conclusion that New York's anti-SLAPP law  applies here.  But the historical context, text, and legislative history of the law's recent amendments make clear that the amended law governs Appellant's claims.  This Court should hold the same.

Appellant emphasizes in her brief that this case was "high-profile."  But the legal questions her appeal raises could not be more ordinary.  The First Amendment's protections apply equally no matter the level of media attention or what "polarizing" issues a case may involve.  Journalists and news media organizations depend on those protections to do their work of delivering important

information to the American people so they can make the decisions necessary to govern themselves. Appellant articulates no reason why those protections should be different here, where Appellant is a high-profile public figure with a national platform to deliver her own messages and information to the public—because there is none. This Court should affirm the district court.

## ARGUMENT

## I. The Protections Of The Actual Malice Standard Remain Vital Today.

In the Supreme Court's seminal *New York Times v. Sullivan* decision, the Court struck a carefully drawn balance between the public interests secured through the traditional elements of the torts of libel and slander, and the need to protect journalists and news organizations from the chilling effect of libel and slander litigation. 376 U.S. 254 (1964). The result—the actual malice standard—ensures that journalists and other speakers discussing the actions of public officials and public figures are protected from the potential crush of massive, unpredictable civil damage awards when their speech includes mere errors, while guaranteeing that injured plaintiffs can still recover for intentional or reckless misstatements of fact. The *Sullivan* Court recognized that "erroneous statement is inevitable in free debate." *Id.* at 271–72. But to ensure "breathing space" in our public discourse, the Court held that mistaken statements made without knowledge that the

6

statements were false—or reckless disregard of whether they could be false—must be tolerated in the name of free expression. *Id.*

The actual malice standard is a product of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270. From the outset, the actual malice standard was designed to shield from tort liability speech that was offensive, provocative, and simply wrong, so long as it was not intentionally untruthful. It thus enabled speakers of all kinds to publish their comments without fear of devastating defamation liability for mistakes.

Appellant urges this Court to depart from half a century of decisions of the Supreme Court, this Court, other courts of appeals, and state courts throughout the nation and hold that the actual malice standard does not apply to this case. Going even further, she suggests the actual malice standard should no longer apply to *any* case because the internet and social media purportedly have made it obsolete.

Appellant is wrong as a matter of law, logic, and reality. There is no question the actual malice standard governs here. Nor is there any sound justification for reconsidering the premises of the rule itself. The vast expansion in the availability of communications tools and the sheer amount of information exchanged by journalists and non-journalists alike in today's highly interconnected

world does not makes the actual malice standard any less vital than it was when *Sullivan* was decided.

### A. The *Sullivan* Decision

Before *Sullivan*, the common law permitted a plaintiff to establish defamation liability under the torts of libel and slander by showing the defendant made a "defamatory false statement of fact of and concerning the plaintiff that cause[d] the plaintiff a loss of reputation."  1 R. Smolla, Law of Defamation § 1:8 (2d ed. Nov. 2022 Update); 1 R. Sack, Defamation § 2:1 (5th ed. May 2022 Update).  Libel was a strict liability tort, *id.* § 1:7; "[w]henever a man publishe[d], he publishe[d] at his peril," *Peck v. Tribune Co.*, 214 U.S. 185, 189 (1909) (Holmes, J.).  Once defamation plaintiffs alleged statements to be false, defendants were forced to prove those statements true in all their particulars.  1 Sack § 2:1.1; *Sullivan*, 376 U.S. at 267.

These common-law rules conflicted with the First Amendment's protections for freedom of speech.  The Supreme Court resolved that conflict in *Sullivan*.  In *Sullivan*, The New York Times published an advertisement regarding the treatment of civil rights protestors by the police in Montgomery, Alabama.  376 U.S. at 256-58.  The police commissioner, L. B. Sullivan, sued the newspaper, arguing that the advertisement included inaccurate details such as what song protestors had sung during a protest and how many times Dr. Martin Luther King, Jr. had been arrested

by local police.  *Id.* at 258–59.  A jury found for the commissioner and awarded $500,000 in damages, which verdict was upheld by the Alabama Supreme Court.

The Supreme Court unanimously reversed, recognizing that the common law of defamation as it stood imposed costs on speech that unreasonably deterred speakers and abridged the right to speak:  "A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to . . . 'self-censorship[,]'" because "the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred."  *Sullivan*, 376 U.S. at 279.  Rather, "would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so."  *Id.*  Imposing such censorship affirmatively through statute would violate the Constitution—and the Court held that "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel."  *Id.* at 277.  Indeed, the Court observed that the prospect of a "succession" of libel judgments would "impose[]" a "pall of fear and timidity . . . upon those who would give voice to public criticism," creating an "atmosphere in which First Amendment freedoms cannot survive."  *Id.* at 278.

To accommodate these constitutional concerns, the Court adopted the actual malice standard. Where the actual malice standard applies, a plaintiff can recover damages only if she proves that a challenged statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 279–80. The Court later extended the actual malice standard to defamation actions brought by public figures. *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 155 (1967).

It is not correct, as Appellant suggests, that the actual malice standard renders journalists "virtually impervious to liability for defamation." Appellant Br. 34. Nor does this standard simply apply the generic inquiry of common-law tort liability. Instead, the *Sullivan* standard permits defamation plaintiffs to recover where the defendant knew something published was false, *Sullivan*, 376 U.S. at 279–80, or "acted with reckless disregard of whether it was false or not," *id.* at 280—that is, "in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Where speakers satisfy that standard, they are properly liable for the damage their publications caused.

## B. The Actual Malice Standard Protects Democratic Values.

The actual malice standard remains as vital today as it was in 1964. Today, defamation litigation is brought by politicians and public figures of every kind, against journalists and media outlets across the spectrum of public and political

10

opinion, arising from speech on every conceivable topic.  Reporters continue to

need the actual malice standard to protect free and open public debate; without it,

the press would be hamstrung in its ability to provide important newsworthy

information to the American people.  *See, e.g.*, *Hustler Mag., Inc. v. Falwell*, 485

U.S. 46, 50–51 (1988) ("At the heart of the First Amendment is the recognition of

the fundamental importance of the free flow of ideas and opinions on matters of

public interest and concern.  The freedom to speak one's mind is not only an aspect

of individual liberty—and thus a good unto itself—but also is essential to the

common quest for truth and the vitality of society as a whole." (cleaned up)).  As

this Court has explained, "[o]ur Constitution thus contemplates a bias toward

unfettered speech at the expense, perhaps, of compensation for harm to

reputation . . . ."  *Buckley v. Littell*, 539 F.2d 882, 889 (2d Cir. 1976).

　　　The actual malice standard arose in the historical context of the civil rights

movement, provoked by the attempts of powerful individuals to throttle reporting

on the movement and reactions to it.  Sullivan's suit against The Times was only

one of many attempts to use defamation law to stifle journalism that some

individuals disfavored.  As Supreme Court reporter Anthony Lewis wrote of the

*Sullivan* case, "[t]he purpose of that libel action, and of others that were brought

soon after, was to frighten the national press out of covering the civil rights

movement in the South."  Anthony Lewis, *The Sullivan Decision*, 1 Tenn. J. L. &

Pol. 135, 138 (2004). The Court in *Sullivan* recognized that the threat of crippling libel judgments—and the burden of defending against a wave of litigation—was enough to stifle speech in a way the First Amendment does not permit. *Sullivan*, 376 U.S. at 278.

The same perils exist today. Prominent individuals and organizations routinely sue journalists and media organizations for reporting they perceive as critical or unfavorable. *See, e.g.*, *Trump v. Cable News Network, Inc.*, No. 22-CV-61842, 2022 WL 4785360 (S.D. Fla. Oct. 3, 2022); *Depp, II v. Heard*, No. CL-2019-0002911, 2022 WL 2342058 (Va. Cir. Ct. June 24, 2022); *Nunes v. NBCUniversal Media, LLC*, No. 22-cv-01633 (S.D.N.Y. Feb. 28, 2022); *Blankenship v. Fox News Network, LLC*, No. 2:19-cv-00236 (S.D. W. Va. Mar. 29, 2019); *Herring Networks, Inc. v. Maddow*, 3:10-cv-01713 (S.D. Cal. Sept. 9, 2019); *Marshall Cty. Coal Co. v. John Oliver*, No. 17-c-124 (W. Va. Cir. Ct. Marshall Cty. June 22, 2017); *Cheng v. Neumann*, 51 F.4th 438, 445-46 (1st Cir. 2022); *Fairfax v. CBS Corp.*, 2 F.4th 286, 290–91 (4th Cir. 2021); *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 87 (D.D.C. 2019). Indeed, according to new research conducted by the Media Law Resource Center, recent years have seen on average an overall *increase* in the number of defamation actions filed in state and federal court. *See* Michael Norwick, *Chapter 3: The Empirical Reality of Contemporary Libel Litigation*, New York Times v. Sullivan: The Case for Preserving an

Essential Precedent at 115–19 (Mar. 2022), *available at* https://live-medialaw.pantheonsite.io/wp-content/uploads/2022/03/nytsullivanwhitepaper-1.pdf.  The potential costs of litigation make each such action a material risk to any news media organization or journalist.  The communications revolution has not changed that fact.

The actual malice standard has become one of the bedrock guarantees undergirding journalists' daily work and the work of defending journalism in court. Journalists and news media organizations rely on the actual malice standard in assessing reporting before publication.  And journalists and news media organizations also rely on the actual malice standard to defend their publications in court against defamation claims.  Few principles have proven more essential or more fundamental to the practice and role of journalism in American society.  *See, e.g.*, Richard Tofel and Jeremy Kutner, *Chapter 2: A Response to Justice Gorsuch*, New York Times v. Sullivan: The Case for Preserving an Essential Precedent at 90-93 ("Sullivan remains the bedrock of American free speech and free press law because it announced a rule that upholds the kind of society the First Amendment sought to protect, one in which citizens remain free to scrutinize their elected leaders as well as those who otherwise enter the arena and attempt to influence public life.").  As the Supreme Court explained in *Sullivan*, the ability of the press to inform, participate in, and provide a forum for "public discussion" is "a

13

fundamental principle of the American form of government." 376 U.S. at 276. In other words, the vital constitutional safeguards for the work of journalists and news media organizations are not mere parochial entitlements to protect a particular profession: they are fundamental structural bulwarks that make it possible for the public to learn about public issues and make informed, important decisions in society. This Court has put it well: "It is elementary that a democracy cannot long survive unless the people are provided the information needed to form judgments on issues that affect their ability to intelligently govern themselves." *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 115 (2d Cir. 1977).

Indeed, in the decades since *Sullivan* was decided, its result and the actual malice standard itself have been repeatedly endorsed by Justices of the Supreme Court from across the ideological spectrum. For example, in *Hustler Magazine, Inc. v. Falwell*, Chief Justice Rehnquist wrote—in an opinion joined by Justices Scalia, O'Connor, Brennan, Marshall, Blackmun, and Stevens—that extending the actual malice standard to apply to speech-related torts beyond defamation was "not merely a blind application of the *New York Times* standard" but "reflects our considered judgment that such a standard is necessary to give adequate 'breathing space' to the freedoms protected by the First Amendment." *Hustler*, 485 U.S. at 56-57. *See also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 337 (2010) (Kennedy, J., joined by Roberts, C.J., and Scalia, Alito, and Thomas, JJ.)

("The following are just a few examples of restrictions that have been attempted at different stages of the speech process—all laws found to be invalid: . . . seeking to exact a cost after speech occurs, *New York Times Co. v. Sullivan*, 376 U.S. at 267 . . ."); *Nat'l Review, Inc. v. Mann*, 140 S. Ct. 344, 346 (2019) ("The constitutional guarantee of freedom of expression serves many purposes, but its most important role is protection of robust and uninhibited debate on important political and social issues." (citing *Sullivan*)) (Alito, J., dissenting from denial of petition for certiorari); *see also Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1339 (D.C. Cir. 2015) (rejecting "novel defamation theory" that would "necessarily ensnare a substantial amount of speech that is essential to the marketplace of ideas and would dramatically chill the freedom of speech") (Kavanaugh, J.). As Judge Sack put it in his definitive treatise on defamation law, "Over the past more than half a century, the *Sullivan* test has been woven into the fabric of the law of libel and slander throughout the country. Imagine if each of those . . . incidents of the reliance on *Sullivan* became obsolete. It is a trellis on which the laws of the states have grown the vines of their defamation jurisprudence for more than five decades." 1 Sack, Defamation § 1:2.9. In short, the actual malice standard is deeply, inextricably embedded in the fabric of First Amendment jurisprudence, and it has helped shape the law governing free expression in manifold ways since it was first articulated in *Sullivan* itself.

15

Appellant, and some other skeptics of the actual malice standard, have suggested that given wide access to global distribution via social media platforms, there is no longer any reason to accord heightened protection to mistaken speech. But the ruling in *Sullivan* was not grounded in any way on the nature of publishing technologies at the time. Changes in those technologies do not make the rule somehow obsolete. If *Sullivan* was rightly decided at the time—and it was, as decades of subsequent court decisions and long experience applying the actual malice standard to the daily practice of journalism have shown—then *Sullivan* remains rightly decided today no matter what changes have taken place in the tools we use to communicate. *See* 1 Sack, Defamation § 1:2.9 ("[T]he conditions that gave rise to *Sullivan*—social and political upheaval and polarization, often regional in nature—are not so different in kind from those prevailing in the country today. Without nationwide constitutional protection, it is reasonable to fear that free expression, such as it is now, would face a serious risk . . . .").

Appellant implies that the facts are different now because there's more "false information" than ever before. Appellant Br. 35. But whether that's true or not, to the extent Appellant is concerned with the proliferation of *disinformation*—meaning false information that is *deliberately spread*—the actual malice standard *already* permits recourse against a speaker who deliberately publishes something they know is false. *See Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) ("[T]he

knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection").

While the forms and forums of public debate have changed over the years, one thing remains unchanged: "[t]he general proposition that freedom of expression upon public questions is secured by the First Amendment." *Sullivan*, 376 U.S. at 269. Since its recognition through the present day, the actual malice standard has secured that freedom of expression for millions of Americans, and it continues to be essential in creating a "debate on public issues [which] should be uninhibited, robust, and wide-open." *Id.* at 270. This Court should not reject that tradition here.

## II. The Actual Malice Standard Applies to a Statement's Defamatory Meaning as Well as Its Falsity.

Though this Court has not yet addressed this question, it should join the courts that have and hold that the actual malice standard applies to defamatory meaning.

### A. This Court Should Join The Many Other Courts Holding That The Actual Malice Standard Applies To Defamatory Meaning.

Numerous courts have repeatedly affirmed that plaintiffs subject to the actual malice standard must show that the defendant acted with actual malice as to both defamatory meaning and falsity. For example, in *Woods v. Evansville Press Co.*, 791 F.2d 487-88 (7th Cir. 1986), the Seventh Circuit explained:

> [R]equiring a publisher to guarantee the truth of all the inferences a reader might reasonably draw from a publication would undermine the uninhibited, open discussion of matters of public concern.  A publisher reporting on matters of general or public interest cannot be charged with the intolerable burden of guessing what inferences a jury might draw from an article and ruling out all possible false and defamatory innuendoes that could be drawn from the article.

*Id.* at 487–88.  *See also Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988) (same).

The Ninth Circuit has reached the same conclusion.  *See, e.g.*, *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 681 (9th Cir. 1990); *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1064 (9th Cir. 1998) (holding the plaintiff must "establish that [the defendant] intended to convey the defamatory implication—and he must do so with convincing clarity"); *see also Masson v. New Yorker Magazine, Inc.*, 832 F. Supp. 1350, 1363 (N.D. Cal. 1993) (holding that "awareness of defamatory meaning is properly an element of a defamation claim").

The First, Sixth, and Tenth Circuits have all agreed.  *See Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 528–29 (6th Cir. 2007) (holding plaintiff must "show[] with clear and convincing evidence that the defendant . . . intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material" (citation omitted)); *Howard v. Antilla*, 294 F.3d 244, 246 (1st Cir. 2002) ("[The plaintiff] must show with clear and convincing evidence that the defendant . . . intended or knew of the implications that the

plaintiff is attempting to draw" (citation omitted)); *Tilton v. Cap. Cities/ABC, Inc.*, 905 F. Supp. 1514, 1523 (N.D. Okla. 1995) (holding the plaintiff must demonstrate defendants' "intent or awareness . . . that they implicitly" made the allegedly defamatory accusation), *aff'd*, 95 F.3d 32, 33 (10th Cir. 1996) ("adopt[ing] the analysis of the district court").

So have the highest courts in Alabama, Oklahoma, and Washington. *See Finebaum v. Coulter*, 854 So. 2d 1120, 1124–25 (Ala. 2003) (requiring that the "plaintiff establish that the statement is susceptible of a defamatory meaning which the defendants knew to be false or which the defendants published with reckless disregard for its potential falsity" *and* "that the defendants intended to imply or were reckless toward the implications"); *Hodges v. State Journal Publ'g Co.*, 617 P.2d 191, 196 (Okla. 1980) ("[I]t is improper to conclude, without other evidence to support that conclusion, that the appellees intended the defamatory meaning, knew that it was not supported by the facts contained in the story, and thus had 'serious doubts' about the truth of the headline."); *Tilton v. Cowles Publ'g Co.*, 459 P.2d 8, 18 (Wash. 1969) ("[I]n order to find actual malice . . . , plaintiffs must prove with convincing clarity that defendant was aware of a high probability that the public would read the article as reporting a criminal charge, or at least that defendant entertained serious doubts on this matter.").

This Court should reach the same conclusion here.

**B.** **Holding That The Actual Malice Standard Applies To Defamatory Meaning Is Consistent with *Sullivan* And Necessary to Protect Important First Amendment Interests.**

Appellant suggests, in passing in a footnote, that the district court's decision that the actual malice standard applies to defamatory meaning was "erroneous."[2] Appellant Br. 6 n.4. As a threshold matter, that argument is waived because it was made only cursorily in a footnote. *Radwan v. Manuel*, 2022 WL 17332339, at *16 n.13 (2d Cir. Nov. 30, 2022).

Appellant is also wrong. The actual malice standard rests on a simple premise: "Realistically, some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times* . . . and similar cases to limit liability to instances where some degree of culpability is present in order to

---

[2] Appellant also suggests in the same footnote that the actual malice standard should only apply to defamatory meaning in "defamation by implication" cases. Appellant Br. 6 n.4. That argument, too, is both waived and wrong. Of course the elements a defamation plaintiff must prove may vary, irrespective of whether the actual malice standard applies to her claims, depending on whether she pleads direct defamation or defamation by implication. *See, e.g.*, *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 37 (1st Dep't 2014). But regardless, the content of the actual malice standard is the same: either it applies to defamatory meaning as well as to falsity or it does not. And for the reasons explained, it does. To hold otherwise would "eviscerate[] the First Amendment protections established by *New York Times*" and "permit liability to be imposed . . . for what was not intended to be said." *Newton*, 930 F.2d at 681. *See also Masson*, 832 F. Supp. at 1363 ("The purpose of the awareness element is to ensure that liability is not imposed upon a defendant who acted without fault. This must hold true regardless of whether the defendant's statement is directly or indirectly libelous" (citation omitted)).

eliminate the risk of undue self-censorship of truthful material." *Herbert v. Lando*, 441 U.S. 153, 171–72 (1979). The chilling effect of those burdens can hardly be overstated. Journalists and news media organizations already accept significant potential costs for undertaking the demanding and socially indispensable project of observing and commenting on public figures and public issues. Appellant asks for a rule that would intolerably heighten the risks of such work. This Court should reject Appellant's attempt to impose those serious costs.

## III.    The Amendments to New York's Anti-SLAPP Law Apply Retroactively.

The district court correctly ruled that the federal Constitution precludes Appellant's claims. Independently, New York state law also leads to the same result. After Appellant initiated this action, New York amended its state anti-SLAPP law to impose the actual malice standard as a matter of state statutory law. In a carefully reasoned opinion, the district court held that New York's amended anti-SLAPP law had "retroactive" effect and applied here. *See Palin v. N.Y. Times Co.*, 510 F. Supp. 3d 21, 26–29 (S.D.N.Y. 2020).[3] This Court should affirm that holding.

---

[3] A federal court sitting in diversity must apply the substantive provisions of New York's amended anti-SLAPP statute that require plaintiffs to meet the actual malice standard in actions involving public participation. *See La Liberte v. Reid*, 966 F.3d 79, 86 n.3 (2d Cir. 2020).

21

A.     **The History of New York's Anti-SLAPP Law Establishes Why Its Amendments Should Have Retroactive Effect.**

When New York enacted one of the nation's first anti-SLAPP laws in 1992, it applied narrowly only to actions related to a public application or permit. 1992 N.Y. Sess. Laws ch. 767. This meant that journalists and news media organizations in New York generally remained exposed to the significant threat of SLAPPs arising from their reporting. As one New York state court put it, "[s]hort of a gun to the head, a greater threat to First Amendment expression" than a SLAPP "can scarcely be imagined." *In re Gordon v. Marrone*, 155 Misc. 2d 726, 736 (Sup. Ct. Westchester Cty. 1992), *aff'd*, 202 A.D.2d 104 (2d Dep't 1994).

In 2020, New York amended its anti-SLAPP law, significantly expanding its scope. *See, e.g.*, N.Y. Civ. Rights L. §§ 70-a, 76-a. The amended law applies to any "action involving public petition and participation," including "any . . . lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest." *Id.* at § 76-a(1)(a). In any such action, the amended law requires plaintiffs to meet the actual malice standard. *Id.* at § 76-a(2). These amendments expanded crucial protections to journalists and news media organizations that had previously been unavailable to them.

B.     **New York's Amended Anti-SLAPP Law Applies Retroactively.**

The district court was correct that New York's amended anti-SLAPP law applies retroactively and governs Appellant's claims here.

22

New York courts have explained that "remedial legislation" should receive "retroactive" effect and apply to suits pending when it was enacted "in order to effectuate its beneficial purpose." *In re Gleason (Michael Vee, Ltd.)*, 96 N.Y.2d 117, 122-23 (2001). A remedial law "correct[s] imperfections in prior law . . . giving relief to the aggrieved party." *Nelson v. HSBC Bank USA*, 87 A.D.3d 995, 998 (2d Dep't 2011) (citation and internal quotation marks omitted). Courts also consider whether the Legislature "conveyed a sense of urgency; whether the statute was designed to rewrite an unintended judicial interpretation; and whether the enactment itself reaffirms a legislative judgment about what the law in question should be." *In re Gleason*, 96 N.Y.2d at 122.

Applying these principles, the district court held that the amended anti-SLAPP law had retroactive effect, *Palin v. N.Y. Times Co.*, 510 F. Supp. 3d at 26-29, as did many other decisions, *see* Brief for Defendants, No. 17-cv-04853, Dkt. 201 at 29 n.9.

The district court was correct. To begin with, the bill says so expressly. The enacted legislation directed that it would "take effect immediately"—"convey[ing] a sense of urgency," *Gleason*, 96 N.Y.2d at 122. *See Brothers v. Florence*, 95 N.Y.2d 290, 299 (2000) (finding immediate effective date supports retroactive application); *Nelson*, 87 A.D.3d at 997-98 (same). The amended law also provides that "damages" in an action involving public participation "may only *be recovered*

if the plaintiff" proves actual malice.  N.Y. Civ. Rights L. § 76-a(2) (emphasis added).  That is, for any action involving public participation that had not yet reached judgment, any damages awarded in the future had to satisfy the amendments—expressly providing for "retroactive" effect.  And the amended law also requires courts to award attorneys' fees to defendants who successfully defeat any SLAPPs that a plaintiff "commenced *or continued*."  N.Y. Civ. Rights L. § 70-a.  That is, the law expressly says that any actions "continued" after the anti-SLAPP amendments were enacted are covered by the amended law.  The New York Court of Appeals has held that a law must be given retroactive effect where "the language" of the law "expressly or by necessary implication requires it." *Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 91 N.Y.2d 577, 584 (1998).  The plain language of the anti-SLAPP amendments require retroactive effect here.

The drafting history of the amendments confirms that the amended law applies to pending actions.  The anti-SLAPP amendments, when introduced, expressly provided for only *prospective* application:  "This act shall take effect immediately and shall apply to actions commenced on or after such date."  *See* A5991, § 3 (2019–20) (as introduced).  The Legislature revised the amendments to delete the terms limiting the amendments to prospective effect:  when enacted, the bill provided only that it "shall take effect immediately."  A5991, § 4 (2019–20) (as enacted).  *See CFCU Cmty. Credit Union v. Hayward*, 552 F.3d 253, 264 (2d

Cir. 2009) (finding legislators' decision to exclude anti-retroactivity language "suggests an intent to apply the law" retroactively).

Other legislative history leads to the same conclusion. *See In re OnBank & Tr. Co.*, 90 N.Y.2d 725, 730-31 (1997) (relying in part on sponsor memorandum and bill jacket to find statute retroactive). The Committee Report in the New York State Assembly regarding the proposed legislation made clear its purpose: while New York's anti-SLAPP statute was "originally enacted . . . to provide 'the utmost protection for the free exercise of speech . . . ,' [it had] failed to accomplish that objective." Committee Report, 2019 N.Y. A.B. 5991(NS) (rev. June 16, 2020), *available at* www.bit.ly/3hcd9Yq. The proposed amendments would "better advance the purposes that the Legislature originally identified in enacting New York's anti-SLAPP law." *Id.* A sponsor of the legislation, State Senator Brad Hoylman, underscored the same rationales for the legislation in his sponsorship memo. S52A – Sponsor's Mem. (rev. July 22, 2020), *available at* https://www.nysenate.gov/legislation/bills/2021/s9239. The New York State Bar Association Committee on Media Law, in a letter in the bill jacket, recognized at the time that the terms of the enacted statute meant it would apply to pending action, writing: "This is welcome news to those New Yorkers who are *already fighting* SLAPP lawsuits. They can finally even the odds." L.2020, ch. 250, Bill Jacket at 34 (Letter of New York State Bar Ass'n Committee on Media Law)

(emphasis added).  Notably, the only letter in the bill jacket *criticizing* the proposed legislation came from the Rent Stabilization Association, specifically *because* the bill as drafted did *not* provide for only prospective application; the Rent Stabilization Association asked the governor to return the bill to the legislature to "restore" the bill to its original terms so that "it is clear and unambiguous that it shall only apply to cases commenced on and after the date of enactment."  L.2020, ch. 250, Bill Jacket at 41–42 (Letter of Rent Stabilization Ass'n).  But the bill was enacted into law with the provision calling for "immediate" effect.

 As Appellant notes, a New York intermediate appellate court has disagreed with the growing consensus and held that the amendments do not apply retroactively.  *Gottwald v. Sebert*, 203 A.D.3d 488 (1st Dept. 2022).  Appellant omits the fact that court also granted the defendant leave to appeal its decision to the New York Court of Appeals.  *See Gottwald v. Sebert*, No. 2021-03036, Dkt. 33 (N.Y. App. Div. 1st Dep't Jun. 28, 2022).  Needless to say, when the outlier court itself authorized the defendant to seek further review, it is incorrect for Appellant to say that the many decisions reaching the opposite conclusion were "clearly erroneous."  Appellant Br. 35.  Regardless, *Gottwald* was wrongly decided.  The court ignored the text of the law, the drafting history and other indications of the legislature's intent, and two of the three factors New York law requires to analyze

retroactivity. *Gottwald*'s conclusion relied almost exclusively on a parenthetical in a decision from the New York Court of Appeals which characterized a United States Supreme Court decision. 165 N.Y.S.3d at 39 (quoting *Regina Metro. Co., LLC v. N.Y. State Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332, 366 (2020)). But the *Regina* decision considered whether to allow retroactive effect based on whether doing so would impose "potentially harsh impacts." 35 N.Y.3d at 375. *Gottwald* did not even consider whether there was such a risk from holding that the anti-SLAPP law applies retroactively. And it is clear that here, retroactivity would have *no* substantive effect on Appellant, much less a "harsh" impact: the amended anti-SLAPP law simply requires her to satisfy the actual malice standard, which she must meet anyway under federal constitutional law. There is no reason to follow *Gottwald*'s aberrant lead.

Assemblywoman Helene E. Weinstein, one of the sponsors of the amended legislation, explained that a "rising tide" of litigation poses a serious risk to the freedom of speech, L.2020, ch. 250, Bill Jacket at 4-5 (Weinstein Sponsor Memorandum). That risk is especially acute for journalists and news media organizations. Holding that the amended provisions of the anti-SLAPP law apply retroactively is essential to protect against that threat. This Court should affirm the district court's decision that they do.

27

## CONCLUSION

For the reasons stated herein, amici respectfully urge this Court to affirm the district court's order.

Dated:  December 15, 2022        Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*
THEODORE J. BOUTROUS, JR.
JILLIAN N. LONDON
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
TBoutrous@gibsondunn.com

CONNOR S. SULLIVAN
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone: (213) 351-2459
CSullivan@gibsondunn.com

BRUCE D. BROWN
KATIE TOWNSEND
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
bruce.brown@rcfp.org
ktownsend@rcfp.org

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5), Federal Rule of Appellate Procedure 32(a)(7)(B)(i) Local Rule 29.1(c), and Local Rule (a)32.1(a)(4)(A) because this brief contains 6,581 words, as determined by the word-count function of Microsoft Word.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  December 15, 2022          Respectfully submitted,


                                                      */s/ Theodore J. Boutrous, Jr.*
                                                      Theodore J. Boutrous, Jr.
                                                      *Counsel for Amici Curiae*