22-558-cv
*Palin v. New York Times Co.*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM 2023

ARGUED: NOVEMBER 6, 2023
DECIDED: AUGUST 28, 2024

No. 22-558

SARAH PALIN,
*Plaintiff–Appellant,*

*v.*

THE NEW YORK TIMES COMPANY and JAMES BENNET,
*Defendants–Appellees.*[*]

————

Appeal from the United States District Court
for the Southern District of New York.

————

Before: WALKER, RAGGI, AND SULLIVAN, *Circuit Judges.*

————

Plaintiff Sarah Palin appeals the dismissal of her defamation complaint against defendant *The New York Times* ("the Times") and its former Opinion Editor, defendant James Bennet, for the second time.

---

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

We first reinstated the case in August 2019 following an initial dismissal by the district court (Rakoff, *J.*) under Federal Rule of Civil Procedure 12(b)(6). Palin's claim was subsequently tried before a jury but, while the jury was deliberating, the district court dismissed the case again—this time under Federal Rule of Civil Procedure 50. We conclude that the district court's Rule 50 ruling improperly intruded on the province of the jury by making credibility determinations, weighing evidence, and ignoring facts or inferences that a reasonable juror could plausibly have found to support Palin's case.

Despite the district court's Rule 50 dismissal, the jury was allowed to reach a verdict, and it found the Times and Bennet "not liable." Unfortunately, several major issues at trial—specifically, the erroneous exclusion of evidence, an inaccurate jury instruction, a legally erroneous response to a mid-deliberation jury question, and jurors learning during deliberations of the district court's Rule 50 dismissal ruling—impugn the reliability of that verdict.

The jury is sacrosanct in our legal system, and we have a duty to protect its constitutional role, both by ensuring that the jury's role is not usurped by judges and by making certain that juries are provided with relevant proffered evidence and properly instructed on the law. We therefore VACATE and REMAND for proceedings, including a new trial, consistent with this opinion.

————

SHANE B. VOGT, Turkel Cuva Barrios, P.A., Tampa, FL (Kenneth G. Turkel, Turkel Cuva Barrios, P.A., Tampa, FL; Michael Munoz, S. Preston Ricardo, Golenbock Eiseman Assor Bell & Peskoe LLP,

New York, NY, *on the brief*) *for Plaintiff–Appellant Sarah Palin*.

JAY WARD BROWN, Ballard Spahr LLP, New York, NY (David L. Axelrod, Jacquelyn N. Schell, Thomas B. Sullivan, *on the brief*), *for Defendants– Appellees The New York Times Company and James Bennet*.

Theodore J. Boutrous, Jr., Jillian N. London, Gibson, Dunn & Crutcher LLP, Los Angeles, CA; Bruce D. Brown, Katie Townsend, Reporters Committee for Freedom of the Press, Washington, DC; Connor Sullivan, Gibson, Dunn & Crutcher LLP, New York, NY, *for amici curiae The Reporters Committee for Freedom of the Press and 52 Media Organizations*.

———

JOHN M. WALKER, JR., *Circuit Judge*:

Plaintiff Sarah Palin appeals the dismissal of her defamation complaint against defendant *The New York Times* ("the Times") and its former Opinion Editor, defendant James Bennet, for the second time. We first reinstated the case in August 2019 following an initial dismissal by the district court (Rakoff, *J.*) under Federal Rule of Civil Procedure 12(b)(6). Palin's claim was subsequently tried before a jury but, while the jury was deliberating, the district court dismissed the case again—this time under Federal Rule of Civil Procedure 50. We conclude that the district court's Rule 50 ruling improperly intruded on the province of the jury by making credibility determinations,

weighing evidence, and ignoring facts or inferences that a reasonable juror could plausibly have found to support Palin's case.

Despite the district court's Rule 50 dismissal, the jury was allowed to reach a verdict, and it found the Times and Bennet "not liable." Unfortunately, several major issues at trial—specifically, the erroneous exclusion of evidence, an inaccurate jury instruction, a legally erroneous response to a mid-deliberation jury question, and jurors learning during deliberations of the district court's Rule 50 dismissal ruling—impugn the reliability of that verdict.

The jury is sacrosanct in our legal system, and we have a duty to protect its constitutional role, both by ensuring that the jury's role is not usurped by judges and by making certain that juries are provided with relevant proffered evidence and properly instructed on the law. We therefore VACATE and REMAND for proceedings, including a new trial, consistent with this opinion.

## I. BACKGROUND

Unless otherwise indicated, the following background information was presented to the jury in the form of exhibits and testimony at trial. Because Palin was the non-movant, we view the evidence in the light most favorable to her. *See Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2004). No statement in this opinion should be understood as resolving issues of fact.

On June 14, 2017, the Times' Editorial Board published the editorial challenged in this case, entitled "*America's Lethal Politics*" ("the editorial"), which compared two political shootings. Suppl.

App'x 440 (PX-4).[1]  In the first attack, on January 8, 2011, Jared Loughner killed six people and injured thirteen others, including Democratic Congresswoman Gabrielle Giffords, during a constituent event held by Giffords in Arizona ("the Loughner shooting").[2]  In the second, which took place in 2017 in Virginia on the day the editorial was published, James Hodgkinson seriously injured four people, including Republican Congressman Stephen Scalise, at a practice for a congressional baseball game ("the Hodgkinson shooting").

In comparing these two tragedies, the editorial made statements about the Loughner shooting that are the subject of this defamation action.  It stated that there was a "clear" and "direct" "link" between the Loughner shooting and the "political incitement" that arose from a digital graphic published in March 2010 by former Alaska governor and vice-presidential candidate Sarah Palin's political action committee ("the challenged statements"[3]).  *Id.*  The

---

[1] "PX" refers to plaintiff's exhibits received into evidence at trial; "DX" refers to defendants' exhibits received into evidence at trial; "App'x" refers to the Joint Appendix; "Sp. App'x" refers to the Special Appendix; and "Suppl. App'x" refers to defendants' Supplemental Appendix.

[2] Among those killed was Judge John M. Roll, who attended the event in his capacity as Chief Judge of the United States District Court for the District of Arizona.

[3] In full, the paragraphs of the editorial containing the challenged statements read:

"Was [the Hodgkinson shooting] evidence of how vicious American politics has become?  Probably.  In 2011, when Jared Lee Loughner opened fire in a supermarket parking lot, grievously wounding Representative Gabby Giffords and killing six people, including a 9-year-old girl, *the link to political incitement was clear*.  Before the shooting, Sarah Palin's political

graphic was a map that superimposed crosshairs over twenty congressional districts represented by Democrats—including Giffords' district. *Id.* at 459 (DX-61). In fact, a relationship between the crosshairs map and the Loughner shooting was never established; rather, at the time of the editorial, the attack was widely viewed as a tragic result of Loughner's serious mental illness.

## A. The Editorial

The idea of publishing an editorial about the Hodgkinson shooting was first raised by Elizabeth Williamson, a writer for the Times, on the morning of June 14, 2017 in an email to James Bennet and other members of the Times' Editorial Board. A follow-up email from Williamson indicated that Hodgkinson might have had "POSSIBLE . . . pro-Bernie, anti-Trump" views. App'x 1694 (PX-119). Editorial Board members weighed in on Williamson's idea. Bennet asked "whether there's a point to be made about the rhetoric of demonization and whether it incites people to this kind of violence," adding that "if there's evidence of the kind of inciting hate speech on the left that we, or I at least, have tended to associate with the right

---

action committee circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized cross hairs.

Conservatives and right-wing media were quick on Wednesday to demand forceful condemnation of hate speech and crimes by anti-Trump liberals. They're right. *Though there's no sign of incitement as direct as in the Giffords attack*, liberals should of course hold themselves to the same standard of decency that they ask of the right." Suppl. App'x 440 (PX-4) (emphasis added).

(e.g., in the run-up to the Gabby Giffords shooting) we should deal with that." *Id.*

Williamson conducted research for the editorial with the aid of the Board's editorial assistant, Phoebe Lett. Prompted by Bennet's suggestions, she asked Lett whether there was a prior Times editorial "that references hate type speech against [Democrats] in the runup to [the Loughner] shooting," since "James [had] referenced that." *Id.* at 1699 (PX-126). Lett forwarded the email to Bennet, who clarified that he was asking if the Times had "ever writ[ten] anything connecting . . . the [Loughner] shooting to some kind of incitement." *Id.* He asked Lett to "send [him] the pieces [she] sent [Williamson]," and he forwarded to Williamson other pieces that he received from Lett. *Id.*; *see id.* at 1702 (PX-128). Specifically, Lett sent Bennet the following three Times articles, the first of which was sent to Williamson by Lett at Bennet's suggestion and the latter two of which Bennet forwarded to Williamson himself:

- "*No One Listened to Gabrielle Giffords*" by Frank Rich (Jan. 15, 2011), which stated that "[w]e have no idea" whether Loughner saw the crosshairs map and referred to Loughner as being "likely insane, with no coherent ideological agenda," while also noting that that "does not mean that a climate of antigovernment hysteria ha[d] no effect on [Loughner]." *Id.* at 1705–07 (PX-133).

- "*Bloodshed and Invective in Arizona*" by the Times' Editorial Board (Jan. 9, 2011), which noted that Loughner "appears to be mentally ill," indicated that Loughner does not fall into "usual ideological categories," and stated that "[i]t is facile and mistaken to attribute [the

Loughner shooting] directly to Republicans or Tea Party members." *Id.* at 1709–11 (PX-134).

- "*As We Mourn*" by the Times' Editorial Board (Jan. 12, 2011), which quoted then-President Barack Obama's statement that "a simple lack of civility . . . did not" cause the Loughner shooting and mentioned that Palin accused journalists of "committ[ing] a 'blood libel'[4] when they raised questions about overheated rhetoric" in connection with the Loughner shooting. *Id.* at 1712–13 (PX-135).

Williamson drafted the editorial and uploaded it to "Backfield," part of the Times' content management system, in the late afternoon of June 14. Williamson's draft ("the initial draft") did not contain the challenged statements. It stated only that Loughner's "rage was nurtured in a vile political climate" and that the "pro-gun

---

[4] The term "blood libel" is typically "used to describe false and beyond-the-pale charges throughout history that Jews committed unspeakable crimes." Frank James, *Sarah Palin's 'Blood Libel' Charge Stirs New Controversy*, NAT'L PUB. RADIO (Jan. 12, 2011, 12:53 PM), https://www.npr.org/sections/itsallpolitics/2011/01/12/132861457/sarah-palins-blood-libel-use-stirs-new-controversy [https://perma.cc/83PD-33HE]. These fabricated allegations were "used to justify atrocities against Jews over centuries." *Id.* Palin used the term in a video addressing assertions that her "political rhetoric contributed to an atmosphere that made the [Loughner] shooting more likely." *Id.* In the video, Palin stated: "If you don't like a person's vision for the country, you're free to debate that vision. If you don't like their ideas, you're free to propose better ideas. But, especially within hours of a tragedy unfolding, journalists and pundits should not manufacture a *blood libel* that serves only to incite the very hatred and violence they purport to condemn. That is reprehensible." *Id.* (emphasis added).

right [was] criticized" at the time of the Loughner shooting.  It also noted that, before the shooting, Palin's political action committee had "circulated a map of targeted electoral districts that put Ms. Giffords and 19 other Democrats under stylized crosshairs."[5]  Suppl. App'x 454 (PX-141).  The word "circulated" in the initial draft was hyperlinked to a January 9, 2011 *ABC News* article entitled "*Sarah Palin's 'Crosshairs' Ad Dominates Gabrielle Giffords Debate*" ("the ABC Article"), which stated that "[n]o connection ha[d] been made between [the crosshairs map] and the [Loughner] shooting." *Id.* at 457 (PX-142); *see id.* at 454–55 (PX-141).

Linda Cohn, an Editorial Board member, was the first person to edit the initial draft.  After making her edits, Cohn asked Bennet to look at the piece, and Bennet added his own revisions to the draft.  Bennet's changes were substantial: Williamson testified that Bennet "rewrote [her] editorial" and, after receiving a complimentary email from a colleague about the piece, Williamson responded that it "was mostly a [Bennet] production" and that Bennet had been "super keen to take it on."  App'x 238; *id.* at 1847 (PX-186); *see also* Sp. App'x 34 (quoting DX-136 (redline reflecting Bennet's changes)).  Bennet's edits added the challenged statements.

After saving his revisions in Backfield, Bennet emailed Williamson, noting that he "really reworked this one" and apologizing for "do[ing] such a heavy edit."  App'x 1846 (PX-163).

---

[5] The initial draft and the published editorial both incorrectly implied that the crosshairs symbols were placed on photos of Giffords and other Democratic representatives, rather than on their congressional districts.  *See* Suppl. App'x 454 (PX-141); *id.* at 440 (PX-4).

Bennet also asked Williamson to "[p]lease take a look."  *Id.*  Williamson responded seven minutes later that the revised piece "[l]ook[ed] great."  *Id.*  Several other Times employees under Bennet also reviewed the revised draft prior to its publication and made minor edits, but none raised concerns regarding the challenged statements.  *See, e.g.*, *id.* at 478–84, 655–57.  The editorial was published online on the Times' website at approximately 9:45 pm on June 14, 2017 and appeared in the Times' print edition the next morning.

Less than an hour after the editorial was published online, Ross Douthat, a Times columnist, emailed Bennet to express serious concerns.  He wrote:

> I feel I would be remiss if I didn't express my bafflement at the editorial that we just ran on today's shootings and political violence.  There was . . . no evidence that . . . Loughner was incited by Sarah Palin or anyone else, given his extreme mental illness and lack of any tangible connection to th[e] crosshair[s] map . . . . [O]ur editorial seems to essentially reverse the fact pattern as I understand it, making it sound like *Loughner* had the clearer connection to partisan rhetoric, when to the best of my knowledge he had none.

*Id*. at 1721 (PX-174).  Bennet responded around a half-hour later that he would "look into this tomorrow" but that his "understanding was that in the [Loughner shooting] there was a gun sight superimposed over [Giffords'] district; so far in [the Hodgkinson shooting] we don't know of any direct threat against any of the congressmen on the field.  That's not to say any of it is ok, obviously, or that the violence in either

case was caused by the political rhetoric. But the incitement in this case seems, so far, to be less specific." *Id.*

> Douthat replied the next morning:

> [T]he point is that the map had no link, none at all [*sic*] all, to Giffords' [attempted] murder. People assumed a link initially – there was a Paul K[rugman] column that was particularly vivid in blaming Republicans – but the investigation debunked it. I think Loughner was instigated by a non-answer she'd given him at a town hall about one of his theories of grammar, or his obsession with lucid dreaming, or something. His act had nothing to do with the political climate, so far as anyone can tell. Whereas the Alexandria shooter seems to have had an explicit political motivation. So saying that Giffords was a case of incitement and this one isn't reads like we're downplaying that motive, while strongly implying that Loughner had right-wing motivations that he simply didn't have.

*Id.*

Douthat was not the only one who criticized the editorial. After a swift public backlash, the Times revised the challenged statements and issued two corrections. The first correction was published on June 15, along with revisions to the challenged statements. The correction read: "An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established." *Id.* at 1483; *see also* Suppl. App'x 443 (PX-5). The second

correction, released the next day, clarified that the map had overlaid crosshairs on Democratic congressional districts, not photos of the representatives themselves. *See* Suppl. App'x 447 (PX-6).

### B. The Complaint, Initial Dismissal, and First Appeal

In June 2017, Palin filed a defamation complaint against the Times in federal court. The Times moved in the district court to dismiss for failure to state a claim. After the motion was fully briefed, the district judge made the unusual decision to hold an evidentiary hearing—with Bennet as the sole witness—to assess whether Palin had sufficiently pled "actual malice" (*i.e.*, that Bennet published the challenged statements either knowing they were false or with reckless disregard as to their falsity). Under *New York Times Co. v. Sullivan*, 376 U.S. 254, 283 (1964) and its progeny, actual malice is a required element of a defamation claim when the plaintiff is a public figure. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665–66 (1989) (explaining that *Sullivan*'s actual malice requirement applies not just to public officials but also to public figures generally). Relying on Bennet's testimony from the hearing, the district court held that Palin had not sufficiently pled actual malice and dismissed the case with prejudice in August 2017, subsequently denying Palin's motion for reconsideration and leave to replead.

In 2019, we vacated the dismissal, holding that Palin had plausibly stated a defamation claim. *See Palin v. New York Times Co.*, 940 F.3d 804, 817 (2d Cir. 2019) ("*Palin I*"). We identified two errors by the district court. First, it improperly relied on matters outside the pleadings (specifically, Bennet's testimony at the evidentiary hearing) to decide the Times' motion to dismiss without converting that motion into one for summary judgment. *Id.* at 811. Second, it

impermissibly credited Bennet's testimony and weighed that evidence in holding that Palin had not adequately alleged actual malice. *Id.* at 814–15.

### C. Pre-Trial Motion Rulings

Following remand, Palin filed the operative, first amended complaint, which added Bennet as a defendant. After discovery, the parties filed cross-motions for summary judgment. Palin's motion for partial summary judgment asserted that she was not required to prove actual malice. The district court denied the motion, concluding that *Sullivan* controlled.

The defendants' motion for summary judgment contended that: (1) Palin was also required to prove a second form of malice, which we refer to as "defamatory malice" (*i.e.*, that Bennet intended or recklessly disregarded that ordinary readers would understand his words to have the defamatory meaning alleged by Palin) and (2) no reasonable jury could find either defamatory malice or actual malice. The district court agreed that Palin was required to prove defamatory malice, an issue of first impression in this circuit. It concluded, however, that there was sufficient evidence to allow a rational juror to find both defamatory malice and actual malice. Thus, the district court denied the defendants' motion, but it added defamatory malice into the jury instructions as a required element to find the defendants liable.

Before the trial began, the defendants filed a motion for reconsideration requesting that the district court modify its order denying the defendants' summary judgment motion to reflect New York's November 2020 amendment of N.Y. Civil Rights L. § 76-a(2)

("the Anti-SLAPP Statute"), which required public-figure defamation plaintiffs to prove actual malice. *See Gottwald v. Sebert*, 197 N.Y.S.3d 694, 704 (2023). The district court granted the motion, holding that the amendment applied retroactively such that "Palin's burden to prove actual malice . . . by clear and convincing evidence is not only required by the First Amendment to the United States Constitution but also by New York State statutory law." Sp. App'x 46.

Finally, the defendants moved for a ruling that the challenged statements were not defamatory *per se*. *See Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 176 (2d Cir. 2000) (noting that under New York law, a defamation plaintiff must either establish special damages or that the challenged statements were defamatory *per se*). The district court orally denied the motion without prejudice, stating that it would "revisit [the issue] at the charging conference." App'x 58. It later concluded that the challenged statements were "undoubtedly" defamatory *per se* under New York law. Sp. App'x 54 n.24.

### D. Jury Trial and Judgment as a Matter of Law

#### 1. The Evidentiary Rulings

Before the trial in February 2022, the defendants submitted motions *in limine* to exclude certain evidence.[6] As relevant to this

---

[6] The defendants sought to exclude evidence related to: (1) articles published by entities under the same corporate umbrella as *The Atlantic* magazine, where Bennet was editor-in-chief at the time of the Loughner shooting, that discussed either the shooting or Palin and her family; (2) an article published in *The New Republic* entitled "*How the Media Botched the Arizona Shooting*," which Bennet received in 2011 as part of a list of three links to sources for a potential story; (3) Bennet's brother, a Democratic United States Senator; (4) the Times' June 2020 publication of an opinion piece by Senator Thomas Cotton, unrelated to the Loughner shooting

appeal, after trial began, the district court orally granted two of these requests, both of which it had earlier denied. First, it ruled that evidence relating to Bennet's brother, Michael Bennet (including that Bennet's brother was a Democratic U.S. Senator, that Bennet had campaigned for his brother in 2010 during "the same time period when the [crosshairs] map was out," and that two of the congressmembers whose districts were targeted on the crosshairs map had endorsed Senator Bennet), was inadmissible because it was irrelevant under Federal Rule of Evidence 402 and unfairly prejudicial under Rule 403. App'x 584–86.

Second, the district court ruled that certain articles about the Loughner shooting published by *The Daily Dish* and *The Wire* (the "Excluded Articles")—entities under the same corporate umbrella as *The Atlantic* magazine, for which Bennet served as editor-in-chief at the time of the Loughner shooting—would be excluded as irrelevant under Rule 402, subject to reconsideration if Palin could establish additional foundation for the articles' admission. This decision was never revisited, and the district court later reaffirmed its ruling.

---

or the crosshairs map, which preceded Bennet's resignation from the Times; (5) other controversies during Bennet's tenure as the Times' Opinion Editor unrelated to the editorial at issue in this case; and (6) the Times' decision to eliminate its public editor position. The district court granted defendants' motion to exclude "evidence relating to Mr. Bennet's departure from [the Times] and other controversies during his time at [the Times] with respect to his departure." App'x 59. It also excluded a subset of articles "about Ms. Palin's son, Trig." App'x 62. All other exclusion requests were initially denied, although the district court indicated that the requests could be re-raised at trial. As noted *infra* in Section II(B)(2), on this appeal, Palin challenges only the exclusion of certain of these articles and the exclusion of evidence regarding Bennet's brother.

## 2.  The Rule 50 Judgment

On February 10, 2022, following the close of evidence but before jury deliberations began, the defendants moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law.  The district court construed the motion to assert that Palin had not offered legally sufficient evidence to prove: (1) actual malice; (2) defamatory malice; (3) that the challenged statements were "of and concerning" her; and (4) that the challenged statements were materially false.  *See* Sp. App'x 47.  The district court initially reserved judgment in order to hear closing arguments and receive further submissions.

On February 14, however, in the midst of jury deliberations, the district court ruled in favor of the defendants after concluding that no reasonable jury could find actual malice by clear and convincing evidence.  The district court's ruling denied the parts of the defendants' Rule 50 motion directed at the "of and concerning" and material falsity elements of Palin's claim and did not substantively address whether Palin had failed to prove defamatory malice.  The district court informed the parties of its ruling outside of the presence of the jury.

The district judge stated that he would dismiss the complaint only after the jury returned its verdict, reassuring counsel that the jury would not learn about his decision in favor of the defendants and thus would be capable of reaching an independent verdict.  Before excusing the jurors that evening, the district court reminded them to "turn away" from anything they saw "in the media about this case." App'x 1214.

16

### 3. The Mid-Deliberation Jury Instruction

After the jury had deliberated for about an hour the next morning, it submitted the following note to the district judge:

> Your Honor, Per your instructions we need to show "the plaintiff proved that there was a high probability that Mr. Bennet actually doubted the truth of the challenged statement . . ." If a juror were able to make this inference from a response by Mr. Bennet from a question put forth by the defense, would the fact the defense posed the question invalidate this inference, and can it contribute to the evidence brought forth by the plaintiff?

App'x 1579.

After discussing the note with counsel, and over an objection by Palin's attorney, the district judge replied:

> In response to your first inquiry, you are free to draw any reasonable inference you choose to draw from any answer received in evidence, regardless of which side posed the question to which the answer was given.

> In response to your second inquiry, an answer given by Mr. Bennet and a reasonable inference drawn therefrom is not sufficient in itself to carry the plaintiff's burden of showing by clear and convincing evidence that there was a high probability that Mr. Bennet actually doubted the truth of a challenged statement prior to publication, but it can contribute to the other evidence brought forth by the plaintiff.

App'x 1580.  After the jury received this response, it deliberated for about three more hours and then returned a unanimous verdict of "not liable."  *See* App'x 1229–31.

### 4.  Jurors' Receipt of Push Notifications

Later that evening, the district judge's law clerk interviewed jurors to see if they had any problems understanding the court's legal instructions during trial.  Such interviews are the district judge's "uniform practice," "so that improvements can be made in future cases."  App'x 1559.  In these interviews, "several" jurors reported that, prior to rendering the verdict, they had learned that the court had made a Rule 50 determination in favor of the defendants via "involuntarily received 'push notifications' on their smartphones."[7] *Id*.  The law clerk reported this information to the district judge.

The record does not establish how many jurors received such notifications or at what time before the jury returned its verdict the notifications were received**.**  It is also unknown from which news outlets jurors received push notifications and precisely what the notifications said.

Palin subsequently filed post-trial motions—seeking a retroactive disqualification of the district court judge as of August 28, 2020 and the setting aside of all judgments he had made since that

---

[7] "Push notifications are the alerts that apps send to your phone . . . even when the apps aren't open."  Abigail Abesamis Demarest, *What are push notifications? How the pop-up alerts sent by apps, devices, and browsers work*, BUS. INSIDER (Apr. 23, 2021, 3:24 P.M.), https://www.businessinsider.com/guides/tech/what-are-push-notifications [https://perma.cc/FW78-KJGV].  Thus, a push notification from a news application can appear at the top of an individual's smartphone or on the lock screen of their phone even if they do not open that application.

date, reconsideration of the Rule 50 judgment, and a new trial—which the district court denied.

## II.  DISCUSSION

The central issue in this appeal is whether the evidence at trial was sufficient for Palin to prove that the defendants published the challenged statements with actual malice, as required for public-figure defamation plaintiffs.  *See Sullivan*, 376 U.S. at 279–80 (introducing the actual malice rule for public officials); *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 665–66 (stating that the actual malice rule applies to public figures generally).  Proving actual malice requires showing that an allegedly defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not."  *Sullivan*, 376 U.S. at 280.  "[T]he concept of 'reckless disregard'" includes when a defendant acts "with a high degree of awareness of [the published statement's] probable falsity" or "entertain[s] serious doubts as to [its] truth."  *Harte–Hanks Commc'ns, Inc.*, 491 U.S. at 667 (internal quotation marks and citations omitted).

Palin does not dispute her public-figure status but claims that the actual malice standard is either no longer good law or does not apply to this case.  Both arguments are barred by the "law of the case" doctrine because they were "ripe for review at the time of [Palin's] initial appeal but . . . nonetheless foregone."  *United States v. Frias*, 521 F.3d 229, 234 (2d Cir. 2008) (internal quotation marks omitted).  Our mandate following the first appeal determined that Palin must show actual malice, *see Palin I*, 940 F.3d at 809, a decision which we decline to revisit, *see United States v. Aquart*, 92 F.4th 77, 87 (2d Cir. 2024) (stating that an appeals court departs from the law of the case doctrine "sparingly and only when presented with cogent and compelling

reasons" (internal quotation marks omitted)).  Moreover, we do not view this case as distinguishable from *Sullivan* and its progeny and are thus bound by the doctrine of stare decisis to reject Palin's argument.

"When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013).  In this case, the parties stipulated that it is Bennet's state of mind that is relevant to determining whether there was actual malice in publishing the editorial.

The plaintiff must prove actual malice by clear and convincing evidence.  *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987).  This means that "[i]t is not enough for the plaintiff merely to assert 'that the jury might, and legally could, disbelieve the defendant's denial of legal malice.'"  *Contemp. Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 621–22 (2d Cir. 1988) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (alterations omitted)).  Rather, a plaintiff must offer some degree of "concrete evidence from which a reasonable juror could return a verdict in h[er] favor" on the question of actual malice.  *Id.* at 621 (internal quotation marks omitted).  We have held, however, that such malice may be proven by inferential and circumstantial evidence "because it is a matter of the defendant's subjective mental state, revolves around facts usually within the defendant's knowledge and control, and rarely is admitted" by the defendant.  *Dalbec*, 828 F.2d at 927.

On appeal, Palin attacks both the Rule 50 decision and the jury verdict.  She attacks the former on the basis that the district court erroneously disregarded or discredited her evidence of actual malice and improperly substituted its own judgment for that of the jury.  She requests vacatur of the jury's verdict on the grounds that multiple prejudicial errors during trial affected that verdict.  Finally, she seeks the disqualification of the district judge.

For the reasons that follow, we agree with Palin that both the judgment for defendants as a matter of law and the jury verdict must be vacated.  We do not find it necessary to remand the case to a different district judge.

### A. The Rule 50 Judgment

We review a district court's ruling on "a Rule 50 motion . . . *de novo*, construing all facts in favor of the nonmoving party."  *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009).  Judgment as a matter of law should be granted only when "a party has been fully heard on an issue" and there is no legally sufficient evidentiary basis for a "reasonable jury" to "find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  The court considering a Rule 50 motion "may not make credibility determinations or weigh the evidence."  *Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 597 (2d Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

The district court based its judgment for defendants solely on its conclusion that, as a matter of law, the trial evidence was insufficient to permit a jury to find that the defendants acted with

actual malice.[8]  We disagree with that conclusion.  After reviewing the record and making all reasonable inferences in Palin's favor as the nonmoving party, we conclude that there exists sufficient evidence, detailed below, for a reasonable jury to find actual malice by clear and convincing evidence.

## 1.  Bennet's Testimony

During cross-examination by the defense, defendant Bennet, who was called as a witness by the plaintiff, stated what could be plausibly viewed as an admission: "I didn't think then and don't think now that the [crosshairs] map caused Jared Loughner to act."[9]  App'x 806.  But the district court dismissed out of hand the possibility that Bennet's statement could be viewed as an admission supporting a finding of actual malice.  The district court concluded that such an interpretation was "not a reasonable reading of Bennet's answer and . . . would be inconsistent with [his] testimony overall."

---

[8] This judgment "rest[ed] independently on both federal law, via the First Amendment, and on New York State statutory law, via Civil Rights L. § 76-a(2)." Sp. App'x 56.  But because the First Amendment and New York's amended Anti-SLAPP Statute share the same substantive requirement (that a public-figure defamation plaintiff must prove actual malice by clear and convincing evidence), we need not decide—and do not decide—whether the Anti-SLAPP Statute's amendment applies retroactively.

[9] Bennet was responding to the question of why he did not research "whether or not Jared Loughner had seen the crosshairs map."  App'x 805.  His full response reads: "I was functioning as the editor, not the reporter on the piece, so I wouldn't normally do the reporting in a situation like this, particularly when we were on a tight deadline.  But also . . . I didn't think then and don't think now that the map caused Jared Loughner to act.  I didn't think we were saying that, and therefore I wouldn't have—the question wouldn't have entered my mind, didn't enter my mind to research that question."  *Id.* at 806.

Sp. App'x 69. Crediting Bennet's explanation that he did not intend to convey in the editorial that the crosshairs map directly caused Loughner to act, the district court interpreted Bennet's "admission" to be merely a statement that the question of whether the crosshairs map spurred Loughner's attack never entered his mind. *Id.*

But in deciding a Rule 50 motion, a district court may not credit the movant's self-serving explanations or adopt possible exculpatory interpretations on his behalf when interpretations to the contrary exist. Furthermore, the district court was plainly incorrect to conclude that Bennet's testimony cannot "reasonabl[y]" be understood to "indicate[] that Bennet did not believe that what he was writing was true." *Id*. Bennet's statement—that he "didn't think," when revising the editorial, that "the [crosshairs] map caused Jared Loughner to act"—can permissibly be read to suggest that Bennet entertained serious doubts as to his assertion that the map and shooting had a "clear" and "direct" "link." App'x 806; *see Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 n.7 (1990) (explaining that the statement, "I think Jones lied," may establish malice if "the speaker really did not think Jones had lied but said it anyway"). The jury may ultimately accept the district court's understanding of Bennet's words—but, as we previously cautioned, "it is the jury that must decide." *Palin I*, 940 F.3d at 815.

## 2. The ABC Article Hyperlink

The ABC Article hyperlinked in Williamson's initial draft—which remained in the article following Bennet's edits—unequivocally states that "[n]o connection has been made between [the crosshairs map] and the [Loughner] shooting." Suppl. App'x. 457 (PX-142). Had Bennet read this article, its contents would at a

minimum allow a rational juror to plausibly infer that Bennet recklessly disregarded the truth when he published the challenged statements.

The district court erroneously ignored this potential inference, in part because it credited Bennet's denial that he had ever clicked the hyperlink and read the article. But a district court may not make credibility determinations when considering a Rule 50 motion and, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Legg v. Ulster Cnty.*, 979 F.3d 101, 114 (2d Cir. 2020) (alteration omitted) (quoting *Reeves*, 530 U.S. at 150–51). Here, the jury was not required to believe Bennet's testimony, which could be viewed as self-serving. The district court's acceptance of that testimony in the jury's stead improperly infringed on the jury's exclusive role.

The district court also erred in concluding that Palin "adduced no affirmative evidence" from which a jury could presume that Bennet read the ABC Article. Sp. App'x 64. Under our caselaw, inferential and circumstantial evidence can satisfy the "affirmative evidence" requirement set forth in *Anderson*. *See Dalbec*, 828 F.2d at 927 (inferential evidence may be used to prove actual malice); *Anderson*, 447 U.S. at 257 ("We repeat, however, that the plaintiff, to survive the defendant's motion [for summary judgment], need only present evidence from which a jury might return a verdict in his favor."). Here, Williamson testified that, although editorial writers were "the first line of fact-checking" for the pieces they drafted, when "someone rewrote a draft" that someone else prepared, the person who did the rewrite had "primary responsibility for fact-checking the

portion that they rewrote." App'x 177–78. A jury could reasonably conclude that Bennet would therefore have been responsible for fact-checking the sentence containing the hyperlink to the ABC Article because, although his revisions to that sentence were minor, his revisions to the preceding sentence—where he added that "the link to political incitement was clear"—substantially changed the nature of the sentence that contained the hyperlink. *See* Sp. App'x 34 (quoting DX-136). A jury could also reasonably believe that such fact-checking obligations would include clicking on and reading through articles hyperlinked in the edited portions of an editorial draft to ensure the accuracy of any changes. And, thus, it could infer that it was more likely than not that Bennet read the ABC Article as part of his editing duties.

### 3. Prior Times Opinion Pieces

Bennet admitted at trial that, while conducting his editorial research, he "must have read" the three prior Times opinion pieces on the Loughner shooting that Lett sent to him and that he sent or had Lett send to Williamson (namely, "*No One Listened to Gabrielle Giffords*," "*Bloodshed and Invective in Arizona*," and "*As We Mourn*"). App'x 694, 719; *see id.* at 692–94, 718–19. These articles were received into evidence, but the district court concluded that they "provide[d] no basis for finding that Bennet knew or suspected that his revision introduced false statements of fact into the [e]ditorial" because the articles do not "contradict the facts asserted in the [c]hallenged [s]tatements." Sp. App'x 61; *see id.* at 60–62. We disagree. The articles can also be plausibly read as casting significant doubt on any link between the Loughner shooting and the crosshairs map.

For example, in "*As We Mourn*," President Obama's denial that political incivility caused the shooting, coupled with Palin's implied condemnation of any assertion that Loughner took inspiration from her, could suggest to a reasonable juror that the crosshairs map was unrelated to the attack. App'x 1712–13 (PX-135). Although "*No One Listened to Gabrielle Giffords*" stated that the fact that Loughner had "no coherent ideological agenda[] does not mean that a climate of antigovernment hysteria ha[d] no effect on him," its disclosure that "[w]e have no idea" whether Loughner saw the crosshairs map can reasonably be viewed as undermining Bennet's assertion that there was a was a "clear" and "direct" "link" between the shooting and the map. *Compare id.* at 1705–07 (PX-133)*, with* Suppl. App'x 440 (PX-4).

Finally, "*Bloodshed and Invective in Arizona*" not only reiterates that Loughner does not fall into "usual ideological categories" but can be seen as directly contradicting the challenged statements by its pronouncement that "[i]t is facile and mistaken to attribute [the Loughner shooting] directly to Republicans or Tea Party members." App'x 1710 (PX-134). The district court admitted this "tension" but discounted it by chalking the difference up to "statements of opinion" and "arguments made by the[] pieces" rather than "contradictions in their presentations of the relevant facts." Sp. App'x 62–63. But as the Supreme Court has noted, "expressions of 'opinion' may often imply an assertion of objective fact." *Milkovich*, 497 U.S. at 18. And a reasonable juror could easily interpret "*Bloodshed and Invective in Arizona*" as indicating that blaming Palin (or any other Republican) for the Loughner shooting was "mistaken" as a matter of fact and not simply as a matter of opinion.

In sum, both how to interpret and what weight to assign to these articles must be left to the jury. *See Legg*, 979 F.3d at 114. Judgment for defendants as a matter of law was unwarranted because a reasonable jury could believe (although it would not be required to do so) that Bennet acted with "reckless disregard of the truth" by publishing the challenged statements after reading the articles. *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).

### 4. Possible Prior Knowledge

The district court acknowledged that "Bennet theoretically could have had prior knowledge regarding the relationship—or lack thereof—between the crosshairs map and the [Loughner] shooting" outside of any research he conducted for the editorial. Sp. App'x 66. Its conclusion, however, that "the record belies this possibility," relied substantially on Bennet's self-serving testimony indicating that "he was not aware of the details of the Loughner case and that he did not recall the controversies surrounding the crosshairs map before the [e]ditorial was written." Sp. App'x 66; *see id.* at 66–68. Such crediting of Bennet's testimony in resolving a Rule 50 motion was error. *See Harris*, 252 F.3d at 597.

Moreover, the district court's determination that "Palin offered no admissible evidence that would undermine Bennet's testimony" on this issue, Sp. App'x 66, ignored plausible inferences tending to support the conclusion that Bennet would have known when he revised the editorial that there was no link between the crosshairs map and the Loughner shooting. For example, the Rule 50 decision gave no weight to the fact that Bennet was a well-read journalist and a long-time senior editor, whose job required him to be generally aware of current events. At the time of the Loughner shooting in

January 2011, which Bennet acknowledged was "a big story" with "blaring headlines," Bennet was the editor-in-chief of *The Atlantic*. App'x 704. Bennet acknowledged that "keep[ing] up" with "the competition" by reading their articles was "really important in [his] job" at *The Atlantic* and that he "regularly read[]" "or at least browsed" a "long list of publications." App'x 703. A rational juror could infer from these facts that Bennet read one or more articles around the time of the Loughner shooting that discredited any link between the shooting and the crosshairs map.

The district court opinion similarly failed to consider evidence of Bennet's recall abilities. Bennet's co-worker testified that she "observed him demonstrating an ability to recall articles that had been written several years ago," which could indicate to a rational juror that Bennet had a strong memory for articles that he had read. App'x 495–96. Bennet also testified to recalling at least some details about the Loughner shooting coverage: he said he had read articles at the time that determined that Loughner "was deranged" and "that there had been a debate . . . after that shooting about . . . exactly this issue, about, you know, inciting rhetoric." App'x 705, 787–88. A reasonable juror could find that remembering these details but not any that contradicted the challenged statements is more indicative of deliberately selective recall than of true memory loss.

From the foregoing evidence, it can be plausibly inferred that Bennet both consumed and remembered media coverage discrediting any link between the Loughner shooting and the crosshairs map. There is no way for us to assess what weight, if any, a jury might ascribe to this circumstantial evidence. But it was error for the district

court to both credit Bennet's testimony on this issue and to ignore contrary evidence in resolving the Rule 50 motion.

Finally, as discussed later in Section II(B)(2), *infra*, the district court also erred in excluding—both from its Rule 50 analysis and at trial—additional circumstantial evidence of Bennet's potential prior knowledge. Namely, it improperly rejected: (1) the Excluded Articles, which Palin offered to show that Bennet "knew that the allegations of a link between Loughner and the [crosshairs] map had been discredited," Sp. App'x 67 n.32, and (2) evidence regarding Bennet's relationship with his brother, a Democratic U.S. Senator ("Senator Bennet"), which Palin argued "could establish bias" and "would have made . . . Bennet more likely to have been aware of the [crosshairs] map" and any controversy surrounding it, *see id.* at 67 n.31.

### 5. "Incompatible" Evidence

In addition to improperly discounting Palin's evidence, the district court also impermissibly viewed Bennet's evidence in the light most favorable to him. For example, it deemed "incompatible" with the conclusion that Bennet acted with actual malice (1) Bennet's compliance with the Times' standard editing process, (2) his attempted apology to Palin,[10] and (3) his post-publication exchanges with Ross Douthat and other colleagues. Sp. App'x 72; *see id.* at 72–78. In so doing, the district court failed to draw all reasonable

---

[10] Bennet drafted the following response to a reporter's question: "I'm not aware that Sarah Palin has asked for an apology, but, yes, I, James Bennet, do apologize to her for this mistake." Sp. App'x 44 n.17 (quoting DX-60). This apology was never passed along to the reporter by the Times' public relations team, however, so Palin never received it. *Id.* at 77.

inferences in Palin's favor and avoid drawing inferences in the defendants' favor. *See Runner*, 568 F.3d at 386 (all facts should be construed in favor of the nonmoving party); *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984) ("The court should not substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury.").

Of course, the evidence cited by the district court could be construed in Bennet's favor and a jury would be free to do so. But the same evidence could also be reasonably interpreted in a way that does not support Bennet's case. A rational jury could disbelieve that the Times' editing process could do much to restrain "the boss" of the editorial team, who had "ultimate decision-making authority" over the editorial. App'x 605 (testimony of Linda Cohn). It could also find that Bennet's attempted apology, given in response to a reporter's question, was made for public relations purposes or to decrease the likelihood Palin would sue rather than out of remorse for an inadvertent error. Nor do Bennet's emails to Douthat foreclose the possibility that Bennet acted with actual malice. They could even support an inference of actual malice, because Bennet's choice to wait until the next morning to address Douthat's serious concerns over the editorial could be viewed as an attempt to wait out the controversy. *See* App'x 1721 (PX-174).[11] Viewed in the light most favorable to Palin, none of this evidence (nor any other evidence cited by the

---

[11] The evidence shows that the only step Bennet took on the night of June 14 to follow up on Douthat's email was texting Williamson at 11:38 p.m. to state "the right is coming after us over the Giffords comparison. Do we have it right?" App'x 1849. Receiving no response, Bennet did nothing further until the next morning.

district court) is so "incompatible" with actual malice as to permit a ruling of non-liability as a matter of law.

In sum, taking the evidence as a whole, we conclude that there is a "legally sufficient evidentiary basis" for a reasonable jury to find for the non-movant plaintiff on the question of actual malice, which means that the question must be left to a jury. Fed. R. Civ. P. 50(a)(1); *Harris*, 252 F.3d at 597. We therefore vacate the Rule 50 judgment "to avoid judicial usurpation of the jury function." *Mariani*, 725 F.2d at 865. Of course, we take no position on the ultimate merits of Palin's claim. Our analysis makes all reasonable inferences in Palin's favor, as we must in addressing the Rule 50 decision, but that does not mean that jurors will necessarily draw the same inferences.

### 6. Defamation *Per Se*

The defendants also argue that even if we find sufficient evidence of actual malice as a matter of law, we should nonetheless rule for them because Palin was required, but failed, to prove special damages—*i.e.*, "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation," *Celle*, 209 F.3d at 179 (internal quotation marks omitted). But here we agree with the district court's conclusion that Palin was not, in fact, obliged to prove special damages because the challenged statements were defamatory *per se*, meaning that they tended "to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of [her] in the minds of right-thinking persons, and to deprive [her] of their friendly intercourse in society." Sp. App'x 54 n.24 (quoting *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 379 (1977)); *see Rinaldi*, 42 N.Y.2d at 379 (concluding that defamatory *per se* statements in any "written or

printed article" are actionable without alleging special damages (internal quotation marks omitted)).[12]

### B. The Jury Trial

Having determined that the defendants were not entitled to judgment as a matter of law by the district court, we must now assess the validity of the jury's verdict. Palin argues that four errors prejudiced the trial's outcome: (1) an insufficient voir dire process; (2) the improper exclusion of evidence; (3) the requirement that the jury must find defamatory malice to hold the defendants liable; and (4) the mid-deliberation jury instruction on actual malice. Jurors' receipt of push notifications during their deliberations alerting them to the district court's Rule 50 decision in the Times' favor may also have prejudiced the trial verdict. Although Palin likely forfeited this issue by failing to sufficiently argue it on appeal, we nonetheless exercise our discretion to review it because it involves a purely legal (and easily resolved) question on an important subject, and because a new trial is required in any event.

The district court's voir dire proceeding, evidentiary rulings, and decision not to order a new trial on account of the push notifications are reviewed for an abuse of discretion. *See United States v. Tsarnaev*, 595 U.S. 302, 313 (2022) (voir dire); *United States v. Pepin*, 514 F.3d 193, 202 (2d Cir. 2008) (evidentiary rulings); *Manley v.*

---

[12] The defendants further argue that we should rule for them as a matter of law because Palin failed to prove defamatory malice (*i.e.*, that Bennet intended or recklessly disregarded that ordinary readers would understand the challenged statements to have the defamatory meaning alleged by Palin). As discussed in Section II(B)(3) of this opinion, however, Palin does not need to prove defamatory malice as an element of her defamation claim.

*AmBase Corp.*, 337 F.3d 237, 251 (2d Cir. 2003) (decision whether to order new trial after jurors exposed to extrinsic information). "Either an error of law or a clear error of fact may constitute an abuse of discretion." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 224 (2d Cir. 1999) (internal quotation marks omitted). Because Palin objected at or before trial to the inclusion of a defamatory malice requirement and to the content of the mid-deliberation actual malice instruction, we review these jury charges *de novo*. *See Ashley v. City of New York*, 992 F.3d 128, 142 (2d Cir. 2021); *see also Dupree v. Younger*, 598 U.S. 729, 736 (2023) (holding that "purely legal issue resolved at summary judgment" need not be raised at trial to preserve issue for appeal).

After applying these standards to each of the five claims of error, we conclude that four of them—the evidentiary rulings, the defamatory malice requirement, the mid-deliberation actual malice instruction, and some jurors' receipt of push notifications regarding the district court's Rule 50 decision—necessitate a new trial. We address each of the five trial issues in turn.

### 1. Voir Dire Proceeding

Palin claims that the district court's voir dire proceeding was legally insufficient. Specifically, she faults the district judge for declining to ask her proposed questions about the news sources to which the potential jurors subscribed. Palin asserts that these questions were intended to reveal possible bias (*e.g.*, by identifying who subscribed to the Times and determining what "extra-judicial information" about the case potential jurors may have encountered). Appellant's Br. at 37.

District courts have "broad discretion" in "deciding what questions to ask prospective jurors." *Tsarnaev*, 595 U.S. at 313. A court's failure to ask certain voir dire questions must render a trial "fundamentally unfair" for reversal to be appropriate. *See Mu'Min v. Virginia*, 500 U.S. 415, 426 (1991). As a result, reversal on these grounds is extremely rare. *See United States v. Bright*, No. 20–3792, 2022 WL 53621, at *1 (2d Cir. Jan. 6, 2022) (summary order) (noting that the Second Circuit had "never reversed a conviction for the failure to ask a particular question of prospective jurors"); *but see United States v. Nieves*, 58 F.4th 623, 636–37 (2d Cir. 2023) (holding that district court abused its discretion by not asking prospective jurors about gang-related bias). We have identified three limited circumstances under which "a voir dire may be so insufficient as to call for a reversal." *United States v. Lawes*, 292 F.3d 123, 129 (2d Cir. 2002). Viewed as a whole, the record must show either:

> (i) a voir dire so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style; (ii) a failure to inquire about, or warn against, a systematic or pervasive bias, including one that may be short-lived but existent at the time of trial, in the community that would have been cured by asking a question posed by a party; or (iii) a record viewed in its entirety suggesting a substantial possibility that a jury misunderstood its duty to weigh certain evidence fairly that would have been clarified by asking a requested voir dire question.

*Id.* (citations omitted). Only the first and second of these possibilities are presented here.

First, while the voir dire proceeding in this case was atypically limited, it was not "so demonstrably brief" that it prevented counsel from "draw[ing] *any* conclusions about a potential juror[]." *Id.* (emphasis added). The district court questioned prospective jurors about what they and their partners did for a living and what county or borough they lived in. Although minimal to the point of being borderline insufficient, these questions provided at least *some* context for counsel to draw upon. While the additional voir dire questions that Palin proposed "might have been helpful to [her] in deciding how to exercise [her] peremptory challenges, we conclude that [their] absence did not render [the] trial 'fundamentally unfair.'" *United States v. Miller*, 752 F. App'x 51, 53 (2d Cir. 2018) (summary order) (quoting *Mu'Min*, 500 U.S. at 426).

Second, the district court did not entirely "fail[] to inquire about" prospective jurors' potential biases. *Lawes*, 292 F.3d at 129. A trial court can meet its baseline obligation to uncover bias by "ask[ing] generalized questions about jurors' ability to serve impartially" after "present[ing] sufficient context about the case for jurors' answers . . . to actually convey [pertinent] information." *Nieves*, 58 F.4th at 639. The district court did so here by providing the jury pool with a short description of the case—highlighting that it involved Palin and the Times—and then inquiring whether anything about its description made individuals feel as if they could not "serve as . . . fair and impartial juror[s]." App'x 2148; *see also id.* at 2152 (specifying Bennet as an additional defendant). When several potential jurors responded that they likely could not evaluate the case fairly due to

their personal feelings about Palin, the district court excused these persons.  The district court also ensured that neither the potential jurors nor their immediate family members had personal relationships with the parties, attorneys, witnesses, or other relevant figures in the case.

Although it would have been prudent to make a more fulsome inquiry into jurors' potential biases given the highly public nature of the case, the district court was not required to "question[] prospective jurors . . . about the specific contents of any news reports they may have seen." *United States v. Rahman*, 189 F.3d 88, 121 (2d Cir. 1999) (per curiam).  It needed only to confirm that potential jurors had not formed an opinion about the case in advance that would prevent them from being impartial.  *See id.*  The district judge met that minimum requirement by asking whether any of the prospective jurors had "heard or seen anything about this case in the media" and confirming that those who had been so exposed would not have a problem "put[ting] that out of [their] mind[s]" and "being . . . fair and impartial juror[s]."  App'x 2153.  When a potential juror voiced doubts that he could be impartial given what he had read about the case in the news, the district court excused him.

In sum, even if the district court's voir dire proceeding might be deemed deficient under a more demanding standard of review, Palin does not clear the high bar for reversal we apply to voir dire challenges.  Thus, a new trial is not warranted on this ground.

## 2.  Evidentiary Rulings

Palin next argues that reversal is required because the district court erroneously excluded certain evidence she sought to offer at

36

trial, contravening what she characterizes as our "[m]andate" in *Palin I*. Appellant's Br. at 10, 38. This evidence falls into two general categories, detailed in Section I(D)(1), *supra*: (1) the Excluded Articles, published by *The Daily Dish* and *The Wire*,[13] and (2) certain evidence related to Bennet's brother, Senator Michael Bennet. We disagree with Palin that admitting this evidence was required by our prior opinion but agree that excluding the evidence was an abuse of discretion. These exclusions affected Palin's substantial rights, warranting a new trial.

### a. *Palin I*'s Mandate Does Not Control This Issue

Palin misunderstands *Palin I*'s mandate. "[A] mandate is controlling only 'as to matters within its compass.'" *New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606 (2d Cir. 2003) (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939)). In making its evidentiary rulings, the district court was not bound by our discussion of evidence in *Palin I*, which addressed a different legal question.

Our mandate in *Palin I* was limited to reversing the Rule 12(b)(6) dismissal of Palin's complaint. *See Palin I*, 940 F.3d at 817. In order to explain how Palin's complaint alleged a plausible defamation claim, *Palin I* offered examples of evidence that, if admissible, might be favorable to Palin at trial. No such admissibility rulings were in question at that stage of the case, however, and none were made.

---

[13] The exact titles of the Excluded Articles are not identified in the record except for an article published by *The Wire* entitled "*Ten Days That Defined 2011*."

### b. The Excluded Articles

At trial, Palin attempted to introduce into evidence articles published by *The Wire* and *The Daily Dish* that disputed the existence of any link between the crosshairs map and the Loughner shooting, as well as a list of dozens of articles on *The Atlantic*'s website that referenced Jared Loughner. When the district court excluded the articles from the evidence presented to the jury, it stated that it would reconsider its ruling if Palin established additional foundation for the articles' admission. The defendants argue that because no such reconsideration occurred, there is "no [final] decision for this [c]ourt to review." Appellees' Br. at 44. But the district court's offer to reconsider did not affect the exclusion ruling. It did nothing more than reflect the district court's power to reconsider before final judgment. *See* Fed. R. Civ. P. 54(b). After the district court entered the final judgment, its evidentiary decisions (along with all other interlocutory rulings) merged into that judgment and became subject to appellate review. *See Marquez v. Silver*, 96 F.4th 579, 581 (2d Cir. 2024).

The sole case cited by the defendants in support of their argument—*United States v. Djibo*, 850 F. App'x 52 (2d Cir. 2021) (summary order)—is both non-precedential and significantly distinguishable. Unlike in this case, in which the district judge clearly stated that he had "ruled in [the defendants'] favor," App'x 594, the *Djibo* district court "reserved decision," 850 F. App'x at 57.

Having concluded that the articles' exclusion is reviewable, we turn now to the ruling itself. Under Rule 402, relevant evidence, which is evidence that has "any tendency" to make a material fact "more or less probable than it would be without the evidence,"

Fed. R. Evid. 401, is presumptively admissible.  *See* Fed. R. Evid. 402; *see also Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 587 (1993) (stating that Rule 402's "basic standard of relevance . . . is a liberal one").  Sometimes the relevancy of evidence depends upon the existence of a particular preliminary fact.  This is referred to as "conditional relevancy."  *See* Fed. R. Evid. 104(b) advisory committee's note to 1972 proposed rule (internal quotation marks omitted).  In such cases, "proof must be introduced sufficient to support a finding that the [conditional] fact . . . exist[s]."  Fed. R. Evid. 104(b).

But it is not the province of judges to ultimately weigh this proof, lest "the functioning of the jury as a trier of fact . . . be greatly restricted and in some cases virtually destroyed."  Fed. R. Evid. 104(b) advisory committee's note to 1972 proposed rule; *see also Huddleston v. United States*, 485 U.S. 681, 690 (1988) ("In determining whether [a party] has introduced sufficient evidence to meet Rule 104(b), the trial court neither weighs credibility nor makes a finding that the [party] has proved the conditional fact . . . .").  Instead, judges are assigned only a limited gatekeeping function: they must "examine[] all the evidence in the case and decide[] whether *the jury* could reasonably find the conditional fact . . . by a preponderance of the evidence."  *Huddleston*, 485 U.S. at 690 (emphasis added).  When conducting this examination, "the trial court must consider all evidence presented to the jury" because "[i]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it."  *Id.* at 690–91 (internal quotation marks omitted).

Here, the Excluded Articles' relevance was conditioned on whether Bennet read and remembered them, which was a separate jury question.  If Bennet was aware, when he drafted the challenged

39

statements, that these articles disputed a connection between the Loughner shooting and the crosshairs map, it would make it more probable that he drafted those statements while knowing they were false or while recklessly disregarding their falsity. After carefully reviewing the record, we hold that the district court abused its discretion in concluding that a reasonable juror could not find by a preponderance of the evidence that Bennet read and remembered the Excluded Articles.

First, the district court's factual finding that Palin never provided "any . . . evidence that Bennet had . . . read the [Excluded Articles]," Sp. App'x 67–68 n.32, was clearly erroneous. Bennet's own deposition testimony indicated that he regularly engaged with the articles' publishers, *The Daily Dish* and *The Wire*, around the time of the Loughner shooting. Although he lacked editorial control over *The Daily Dish*, its articles were nonetheless published on *The Atlantic*'s website while Bennet served as *The Atlantic*'s editor-in-chief.[14] *See*

---

[14] The district court was initially misled on this point by defendants' counsel, who insisted that "[t]he *Daily Dish* was a separate website," such that Bennet's statement in his deposition that he "consum[ed]" *The Atlantic*'s website would not support a conclusion that Bennet encountered any *Daily Dish* articles. App'x 409–11; Dist. Ct. Dkt. 109-4 at 123. But Palin's counsel later clarified that *The Atlantic*'s website did host at least one *Daily Dish* article regarding Jared Loughner. *See* App'x 586. In fact, Palin's list of Loughner-related articles hosted on *The Atlantic*'s website—a list she sought to introduce as evidence, App'x 586–87—indicated that the website hosted at least nine *Daily Dish* articles referencing Loughner. *See* Dist. Ct. Dkt. 109-69; App'x 1726–44. Nonetheless, the district court concluded that Palin had not given sufficient reason to think that Bennet had read any of the *Daily Dish* articles that she sought to introduce.

Dist. Ct. Dkt. 109-4 (Deposition of James Bennet ("Bennet Dep.")) at 48–49, 53; *see also id.* at 42 ("[T]he editor who oversaw [*The Atlantic*'s] website . . . reported to [Bennet]."); *id.* at 49 (*The Atlantic* "took responsibility for the . . . digital production of the site" on which *The Daily Dish*'s articles were published). Bennet not only "regular[ly] read[]" that website, both out of personal interest and for professional purposes, *id.* at 123, but specifically indicated that he was a "huge admirer" of *The Daily Dish* editor's "writing and thinking," *id.* at 47. In fact, Bennet was partially responsible for *The Daily Dish*'s migration onto *The Atlantic*'s site. *See id.* at 47–48. *The Wire*, which primarily served to aggregate news articles published by other sites, was a "sister site" of *The Atlantic*. *Id.* at 124–25. Bennet was familiar with *The Wire*'s site and was subscribed to its email list, at least as of November 28, 2011.[15] *See id.* at 125; Dist. Ct. Dkt. 109-139 (Bennet Dep. Ex. 226). The specific article from *The Wire* that Palin was prevented from introducing at trial, titled "*Ten Days That Defined 2011*," was published a month later, on December 29, 2011, and Bennet testified at his deposition that "[i]t's possible" that he read that article. Bennet Dep. at 128. Viewed cumulatively, there was sufficient evidence from which a reasonable juror could infer that Bennet read the Excluded Articles.

A reasonable juror could also infer that Bennet remembered those articles. As discussed in Section II(a)(4), *supra*, there was evidence to the effect that Bennet generally had a good memory for articles that he had read. And news about the Loughner shooting

---

[15] The date Bennet initially subscribed to the email list is not clear from the record, nor is it apparent whether he ever unsubscribed.

might have been particularly memorable for Bennet, given: (1) his personal belief that the shooting "was a big story," *id.* at 97, and (2) his possible interest in the subject of gun control which, Palin claims, is evidenced by the fact that Bennet was involved in a forum on the topic hosted by *The Atlantic* in 2014. As mentioned earlier, Bennet testified that he recalled at least some details about the media coverage following the Loughner shooting. *See* Section II(a)(4), *supra*. A rational juror could conclude that Bennet also recalled the debunking of any connection between the shooting and the crosshairs map but was economical about the truth out of self-interest. *See Dalbec*, 828 F.2d at 927 (noting that actual malice "rarely is admitted").

Second, the district court committed an error of law when it accepted Bennet's testimony denying awareness of the Excluded Articles.[16] Determining whether Bennet's denials were credible and weighing Bennet's evidence against Palin's was the jury's responsibility. *See Huddleston*, 485 U.S. at 690. It was not for the court to believe Bennet's denial, much less rely upon it. The district court was tasked with answering only a limited threshold question: whether Palin introduced "evidence sufficient to support a finding that" Bennet read and recalled the articles. *Id.* (quoting

---

[16] *See, e.g.*, App'x 116–17 (finding Palin's admissibility arguments "thin" given Bennet's testimony that he had "no recollection of reading" the articles); *id.* at 405 ("[A]ssuming [Bennet] testifies that he never saw [the articles], let me hear . . . why the jury could nevertheless . . . infer that he did see them."); *id.* at 407 ("What would be the argument . . . that it was more likely than not that he did read [the articles], despite his denial?"); *id.* at 470 ("What evidence . . . would make it more likely than not . . . that . . . Bennet saw any particular article in *The Daily Dish* if his testimony is that he didn't see [it]?").

Fed. R. Evid. 104(b)).  As we have just indicated, the answer to that narrow question is yes—and the district court erred in holding otherwise.

The district court's abuse of discretion alone is not enough to warrant a new trial, however: it must also have "affect[ed] a party's substantial rights." *Schering Corp.*, 189 F.3d at 224.  "This occurs when, for example, a district court excludes a party's primary evidence in support of a material fact, and failure to prove that fact defeats the party's claim." *Id.*

Because actual malice "is a matter of the defendant's subjective mental state," proving it often requires inferential or circumstantial evidence. *Dalbec*, 828 F.2d at 927.  The content of the Excluded Articles is such that—were a jury to find that Bennet both read and remembered the articles (as a reasonable jury *could*, but would not be required, to find)—a strong inference of actual malice could be drawn.  "*Ten Days That Defined 2011*" bemoaned "people rushing to point at . . . Palin's infamous [crosshairs] map" after the Loughner shooting, concluding that "[i]n truth, Loughner is clinically insane and this was not really about politics at all."  Dist. Ct. Dkt. 109-91 (Bennet Dep. Ex. 153).  Although it is unclear from the record exactly which articles from *The Daily Dish* were excluded at trial, the district court indicated in its Rule 50 judgment that those articles can similarly be read as "ultimately discredit[ing] that the [crosshairs] map played a role in [the Loughner shooting]."  Sp. App'x 67 n.32.

The district court's exclusion of these articles was error, and it affected Palin's substantial rights by substantially limiting the relevant inferences that she and the jury could draw in support of a key element of her claim, warranting a new trial.

### c. The Excluded Evidence Regarding Senator Michael Bennet

Turning to the second category of prohibited evidence, evidence regarding Bennet's brother, Michael, we first address the defendants' mootness argument. The defendants argue that, while Palin challenged the district court's Rule 402-based exclusion of this evidence, her appeal failed to contest the district court's rejection of the evidence under Rule 403. The defendants assert that this moots the issue because, even if we reverse the Rule 402 ruling, the unchallenged Rule 403 ruling would stand.

It is true that arguments not raised on appeal are generally deemed forfeited (often mischaracterized as waiver[17]). But because this "rule is prudential, not jurisdictional, . . . we have discretion to consider [forfeited] arguments." *Dean v. Blumenthal*, 577 F.3d 60, 67 n.6 (2d Cir. 2009) (per curiam) (internal quotation marks omitted). One of the rule's key aims is to promote judicial economy. *See Thomas v. Arn*, 474 U.S. 140, 147–48 (1985). While it is typically inefficient to address arguments not made by the parties, in this case we are concerned that *not* doing so may be more wasteful: because a new trial is already required, correcting the district court's errors now, even though forfeited, will best conserve judicial resources. *See United States v. Greenfield*, 831 F.3d 106, 124 n.18 (2d Cir. 2016) (considering

---

[17] "The term 'waiver' is best reserved for a litigant's intentional relinquishment of a known right. Where a litigant's action or inaction is deemed to incur the consequence of loss of a right, or . . . a defense, the term 'forfeiture' is more appropriate." *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999); s*ee also Puckett v. United States*, 556 U.S. 129, 138 (2009) (noting that waiver occurs where a party "intentionally relinquishe[s] or abandon[s]" an argument).

forfeited argument "in the interest of judicial economy"); *United States v. Brennan*, 650 F.3d 65, 131 n.67 (2d Cir. 2011) (remanding "arguably forfeited" issue back to the district court since "remand . . . [was] required in any event"). We therefore excuse Palin's forfeiture and turn to the merits of the district court's ruling.

First, the district court abused its discretion by excluding all evidence regarding Bennet's brother as irrelevant under Rule 402. In 2010, the same year that the crosshairs map was released, Bennet's brother was running for re-election as a Democratic U.S. Senator. The map targeted the districts of two House Democrats who endorsed Senator Bennet; Palin—a Republican and known pro-gun advocate—endorsed Senator Bennet's opponent. Bennet was involved in his brother's 2010 re-election bid, editing speeches and traveling with his brother for the last two weeks of the campaign. Two days prior to the Loughner shooting, a man threatened to shoot up Senator Bennet's offices, an incident of which James Bennet could have been aware. *See* Dist. Ct. Dkt. 41-34 at 70 (transcript of James Bennet testimony at pre-discovery hearing in this case acknowledging recollection of threat); *but see* Bennet Dep. at 144–45 (stating he did not recall threat).

This evidence was relevant. A reasonable juror could infer that the aforementioned evidence gave Bennet a reason to personally dislike Palin and that it was therefore more likely that he intentionally or recklessly, rather than inadvertently, connected her to the Loughner shooting. Furthermore, to a reasonable juror, the threat to Senator Bennet just prior to the Loughner shooting might have heightened James Bennet's sensitivity to stories about political shootings, making more likely the possibility that he learned of the crosshairs map controversy. Were the jury to draw such an inference,

it would likely bear upon the credibility of Bennet's assertions that he was unaware of the controversy when drafting the challenged statements.

Second, the district court abused its discretion by rejecting this evidence under Rule 403, which allows the exclusion of relevant evidence only "if its probative value is *substantially* outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." Fed. R. Evid. 403 (emphasis added). The district court made no mention of prejudice on the record and instead simply announced that it agreed that the proposed evidence was barred "on both 402 grounds and 403 grounds." App'x 585–86. Nor did the district court's Rule 50 order identify any prejudice. *See* Sp. App'x 67 n.31. Given that, for the reasons already stated, the district court improperly discounted the evidence's probative value, because it articulated no countervailing prejudice, we conclude that the district court's exclusion of the evidence on Rule 403 grounds was an abuse of discretion. *See United States v. Dwyer*, 539 F.2d 924, 928 (2d Cir. 1976) ("Since the probative value of the evidence proffered was so great, it should not have been excluded in the absence of a significant showing of unfair prejudice."). Excluding this evidence without a showing of unfair prejudice affected Palin's substantial rights and was an abuse of discretion further warranting a new trial. *See Schering Corp.*, 189 F.3d at 224.

To be clear, we do not hold that any and all evidence regarding Senator Bennet should have been allowed at trial. It is James Bennet who is a party to this case, not his brother. But the evidence Palin intended to introduce, *see* App'x 584–85**,** should have been admitted

because it bears on James Bennet's own potential bias against Palin and his possible awareness of the falsity of the challenged statements.

### 3. Defamatory Malice Requirement

In ruling on the parties' motions for summary judgment, the district court agreed with the defendants' argument that Palin was required to prove "defamatory malice"—*i.e.*, that Bennet intended or recklessly disregarded that ordinary readers would understand his words to have the defamatory meaning alleged by Palin. The district court concluded, however, that a reasonable jury could find that Bennet had defamatory malice in drafting the challenged statements. Therefore, it denied defendants' summary judgment motion on the issue but instructed the jury that it must find defamatory malice in order to hold the defendants liable. Palin asserts that proving defamatory malice is not required in public-figure defamation cases, while the defendants contend that showing defamatory malice *is* required—and that we should grant them judgment as a matter of law because Palin failed to make such a showing (an argument that the district court denied as moot and did not substantively address in its Rule 50 judgment).

Neither this circuit nor the Supreme Court has directly ruled on whether a public-figure defamation plaintiff must prove defamatory malice, although at least one Supreme Court Justice has indicated that no such requirement exists. *See Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 22 (1970) (White, *J.*, concurring) (arguing that *Sullivan*'s actual malice standard should not be "extended to preclude liability for injury to reputation caused by employing words of double meaning, one of which is libelous, whenever the publisher claims in

good faith to have intended the innocent meaning"). We therefore address this question as a matter of first impression.

Although some of our sister circuits have recognized that proof of an author's understanding as to a statement's defamatory meaning can be an element of the cause of action, they have done so in so-called "defamation-by-implication cases"—*i.e.*, cases where "the alleged defamatory statement has two possible meanings, one that is defamatory and one that is not." *Kendall v. Daily News Publ'g Co.*, 716 F.3d 82, 89 (3d Cir. 2013); *see, e.g., Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002); *Kendall*, 716 F.3d at 90; *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092–93 (4th Cir. 1993); *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 528–29 (6th Cir. 2007); *Saenz v. Playboy Enters.*, 841 F.2d 1309, 1318 (7th Cir. 1988); *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 681 (9th Cir. 1990); *Klayman v. City Pages*, 650 F. App'x 744, 749 (11th Cir. 2016); *White v. Fraternal Ord. of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990). Those courts have held that it is only in defamation by implication cases that plaintiffs "must show something beyond knowledge of, or recklessness in regard to, the *falsity* of the statement's defamatory meaning," because it is only in such cases that a defendant can claim not to have intended the defamatory meaning. *Kendall*, 716 F.3d at 90; *see, e.g., Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1063–64 (9th Cir. 1998) (requiring plaintiff to prove actual malice as to defamatory meaning where broadcaster implied, but did not state explicitly, that plaintiff used crystal ball to make judicial decisions).

We need not decide whether to join these courts in holding that a plaintiff must prove actual malice as to defamatory meaning because this is not a defamation-by-implication case. The challenged statements here are unambiguous and facially defamatory because

they claimed there was a "direct" and "clear" "link" between the crosshairs map and the Loughner shooting. Thus, this is an "ordinary" defamation case in which the intent to defame can be established by showing "that the defendants knew their statement was false," not a case in which the challenged statement was susceptible to both "defamatory and nondefamatory meanings." *Kendall*, 716 F.3d at 90. The district court therefore erred by instructing the jury that Palin was required to prove actual malice as to defendants' understanding of the editorial's defamatory meaning.

Such an "erroneous instruction requires a new trial unless the error is harmless." *LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*, 173 F.3d 454, 460 (2d Cir. 1999) (internal quotation marks omitted). Errors that create a false impression "regarding the standard of liability" are not harmless. *Id.* at 463 (internal quotation marks omitted). Because the jury could have based its verdict solely on finding a lack of defamatory malice—an erroneous standard of liability—the jury instruction on defamatory malice necessitates a new trial.

### 4. Mid-Deliberation Actual Malice Instruction

Palin also challenges the district court's response to the jury's mid-deliberation question of whether an "inference [made] from a response by Mr. Bennet from a question put forth by the defense" could "contribute to the evidence brought forth by the plaintiff" to conclude that "there was a high probability that Mr. Bennet actually doubted the truth of the challenged statement[s]." App'x 1579 (internal quotation marks omitted). She contends that the response given to the jury—that "an answer given by Mr. Bennet and a reasonable inference drawn therefrom is not sufficient in itself to carry the plaintiff's burden of showing" actual malice, "but it can

49

contribute to the other evidence brought forth by the plaintiff"—misstated the law. App'x 1580. We agree with Palin.

In formulating its response, the district court appears to have assumed that the jurors were asking whether their disbelieving a statement by Bennet (presumably a denial of knowledge) could be taken as affirmative proof of the opposite. If that had been the case, the aforementioned response would have been more accurate: because actual malice must be found by clear and convincing evidence, a negative inference based on a jury's disbelief of a witness's statement by itself is ordinarily insufficient proof. *See Anderson*, 477 U.S. at 256–57; *Contemp. Mission*, 842 F.2d at 621–22. The district court failed, however, to consider the entirely plausible possibility that the jury was instead wondering whether a *positive* inference drawn from Bennet's testimony on cross-examination—that is, a direct inference made from something that Bennet affirmatively stated and which the jury believed—could be used to find actual malice.

The district court justified its overly narrow view by asserting that "Bennet offered no testimony from which the jury could properly draw a direct inference of actual malice." Sp. App'x 152. But that was incorrect. As we explained in Section II(A)(1), a reasonable juror could directly infer actual malice from Bennet's statement, given in response to a question asked by the defense, that "I didn't think then and don't think now that the [crosshairs] map caused Jared Loughner to act." App'x 806. A juror could also have drawn an inference of actual malice based on Bennet's concession that he "must have read" the three prior Times opinion pieces on the Loughner shooting that Lett sent to him, which could have placed him on notice that the crosshairs map had not incited the Loughner shooting. App'x 694; *see*

*supra* Section II(A)(3).  Although Bennet's concession to having read the Times opinion pieces was elicited from a question posed by the plaintiff, rather than by the defense, and thus outside the scope of the jury's question, the district court's reply to the jury's question implied that no inference from *any* of Bennet's responses—regardless of which party's questions he was responding to—would be sufficient to find actual malice.  The district court's instruction may have caused the jury to treat a positive inference drawn from Bennet's testimony as inadequate when, without the instruction, the jury might otherwise have found it determinative.

This error—made at a "critical portion" of the trial when the jury was deliberating—was not harmless.  *Girden v. Sandals Int'l*, 262 F.3d 195, 205 (2d Cir. 2001) (internal quotation marks omitted).  While the district court and the defendants contend that any error was cured by earlier instructions given to the jury, that cannot be the case where, as here, the mid-deliberation instruction contradicts the pre-deliberation instructions on a material point.  *Compare* App'x 1944 ("The law makes no distinction between direct and circumstantial evidence."), *with id.* at 1580 (indicating that inferential evidence from Bennet's testimony cannot, by itself, prove actual malice).  And the fact that the jury had a mid-deliberation question at all indicates that it required further clarification beyond what the pre-deliberation jury instructions provided.  In any event, the mid-deliberation mis-instruction created a substantial risk of confusion on a "potentially dispositive issue." *Restivo v. Hessemann*, 846 F.3d 547, 572 (2d Cir. 2017) (internal quotation marks omitted); *see Hathaway v. Coughlin*, 99 F.3d 550, 554 (2d Cir. 1996) (holding that the district court committed reversible error where its erroneous jury instruction went "to the very heart of the plaintiff's claim, and effectively preclude[d]

51

a finding of liability where one may be warranted"). Thus, a new trial is required.

### 5. Jurors' Receipt of Push Notifications

The last trial issue we address is the jurors' exposure during deliberations to push notifications announcing that the district court found for the defendants in deciding the Rule 50 motion.

"Justice demands that jurors 'decide the case solely on the evidence' before them, without any outside influence." *Manley*, 337 F.3d at 251 (quoting *United States v. Olano*, 507 U.S. 725, 738 (1993)). We have shown particular concern over the potential prejudice of external messages that "attempt to tell the juror how she should decide the case," *id.* at 252, and have stated that reversal may be required where a judge expresses his opinion on an ultimate issue of fact before the jury, *see Manganiello v. City of New York*, 612 F.3d 149, 169 (2d Cir. 2010).

"Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror." *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994) (per curiam) (internal quotation marks omitted). This test focuses on two factors: "(1) the nature of the information or contact at issue, and (2) its probable effect on a hypothetical average jury." *Manley*, 337 F.3d at 252 (internal quotation marks omitted).

The defendants contend that Palin forfeited this issue by failing to argue on appeal that the notifications likely impacted the jury's verdict—an argument that Palin previously made to the district court in her post-trial motion. "It is a settled appellate rule that

issues . . . unaccompanied by some effort at developed argumentation, are deemed" forfeited. *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) (internal quotation marks and citation omitted). This is true even if an appellant argued the same issues more fully before the district court that she left undeveloped on appeal. *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005).

Palin implicitly references the push notifications issue in her opening brief's statement of the issues and argument summary sections. *See* Appellant's Br. at 2 (asking "[w]hether the District Court erred by . . . announcing its [Rule 50] decision during jury deliberations"); *id.* at 28 ("[T]he District Court erroneously . . . announced [the Rule 50] decision during jury deliberations."). But, outside of a brief footnote in her statement of the case, Palin never attempts any "effort at developed argumentation" regarding why jurors' receipt of the notifications necessitates a new trial. *Tolbert*, 242 F.3d at 75. Because the issue is adverted to in only "a perfunctory manner," *id.*, it is likely forfeited. *See, e.g., id.* ("A contention is not sufficiently presented for appeal if it is conclusorily asserted only in a footnote."); *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012) (concluding that a brief's two "cursory" references to an issue—one in the list of issues presented for review and the other in a footnote in the statement of facts—did not sufficiently present the issue for appellate review); *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) (noting that a "[r]eference to a claim in a footnote, without its having been identified in the manner required by [R]ule 28 as . . . part of the argument, . . . [is] insufficient to present the claim for review on direct appeal" (citing Fed. R. App. P. 28)).

53

We have discretion, however, "to decide the merits of a forfeited claim or defense where the issue is purely legal and there is no need for additional fact-finding . . . ." *Patterson v. Balsamico*, 440 F.3d 104, 112 (2d Cir. 2006). Because a new trial is required in any event, we choose to exercise that discretion here to address the push notifications issue, which involves no disputed questions of fact and can be resolved by a straightforward application of the objective test outlined in *Bibbins*. *See Brennan*, 650 F.3d at 131 n.67 (remanding "arguably forfeited" issue since "remand . . . [was] required in any event"); *Restrepo*, 986 F.2d at 1463 (remanding issue that was otherwise forfeited in direct appeal because the issue was, in any event, also subject to collateral attack).

Turning to the merits, we note at the outset that the district court did not proximately cause the push notifications. Indeed, they came as an unfortunate surprise to the district judge. But we do find error in the district court's conclusion that the jury's verdict was not prejudiced because the jurors assured his law clerk that the push notifications "had not . . . played any role whatever in their deliberations." Sp. App'x 84–85. It is well-settled that "an analysis of prejudice cannot be based on the subjective reports of the actual jurors." *Manley*, 337 F.3d at 252. And, after applying the required objective test, we have no difficulty concluding that an average jury's verdict would be affected if several jurors knew that the judge had already ruled for one of the parties on the very claims the jurors were charged with deciding. Given a judge's special position of influence with a jury, we think a jury's verdict reached with the knowledge of the judge's already-announced disposition of the case will rarely be untainted, no matter what the jurors say upon subsequent inquiry. We therefore conclude that a new trial is warranted on this basis.

## C. Disqualification

Finally, Palin asserts that the district judge erred in not disqualifying himself pursuant to 28 U.S.C. § 455(a) before ruling on her post-trial motion. Section 455(a) states that any federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." As evidence of the district judge's partiality, Palin cites the judge's trial rulings that she has challenged on appeal (including his initial dismissal of the complaint, erroneous evidentiary rulings, and determination that Palin was required to prove actual and defamatory malice) and the judge's comments to a reporter about the jurors' receipt of push notifications. A district judge's non-recusal decision is reviewed for an abuse of discretion. *United States v. Brinkworth*, 68 F.3d 633, 637 (2d Cir. 1995).

"[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). While they may do so where a trial judge displays such a "deep-seated and unequivocal antagonism that [it] would render fair judgment impossible," Palin provides no such evidence. *Id.* at 556. Moreover, while Canon 3A(6) of the Code of Conduct for United States Judges states that a "judge should not make public comment on the merits of a [pending] matter," Palin fails to explain how the district court's statement to a reporter confirming that jurors had received push notifications constitutes a statement "on the merits" of the case.

The "[m]ere conclusions [and] opinions" that Palin offers as to why she believes the district judge is, or appears to be, biased do not "constitute legally sufficient grounds for recusal." *Hodgson v. Liquor Salesmen's Union Loc. No. 2*, 444 F.2d 1344, 1348 (2d Cir. 1971). On

remand, we are confident that the district judge will adhere to the principle of complete impartiality, and its appearance, in fulfilling his future judicial responsibilities in this case.

## CONCLUSION

For the forgoing reasons, we VACATE both the district court's Rule 50 judgment and the jury's verdict and REMAND the case to the district court for further proceedings, including a new trial, consistent with this opinion.